EXHIBIT
3

*11/26/2019 Execution Version*

MEMBERSHIP INTEREST PURCHASE AGREEMENT

(Membership Interests in Multiple Solar Projects, the "***Project Company***")

dated as of November _27_, 2019

by and among

SRI Energy, LLC

("***Seller***"),

and

Clean Energy Nexus, LLC

("***Buyer***").

# TABLE OF CONTENTS

Page

1. DEFINED TERMS; RULES OF CONSTRUCTION ................................................................ 1

   1.1. DEFINED TERMS. ................................................................................................................ 1

   1.2. CERTAIN INTERPRETIVE MATTERS. ............................................................................ 7

2. PURCHASE AND SALE ........................................................................................................ 9

   2.1. PURCHASE AND SALE. ..................................................................................................... 9

   2.2. CONSIDERATION. ............................................................................................................... 9

   2.3. WITHHOLDING TAX. ......................................................................................................... 9

3. THE CLOSING; CLOSING CONDITIONS ......................................................................... 9

   3.1 CLOSING AND CLOSING DATE. ..................................................................................... 9

   3.2 DOCUMENTS AND ITEMS TO BE DELIVERED TO BUYER BY SELLER. ................ 9

   3.4 CONDITIONS PRECEDENT TO OBLIGATION OF BUYER. ....................................... 11

   3.5 CONDITIONS PRECEDENT TO OBLIGATION OF SELLER. ...................................... 12

4. REPRESENTATIONS AND WARRANTIES OF SELLER ............................................... 13

   4.1 ORGANIZATION OF THE PROJECT COMPANY. ........................................................ 13

   4.2 ORGANIZATION AND QUALIFICATION OF SELLER. .............................................. 13

   4.3 CAPITALIZATION OF THE PROJECT COMPANY; NO SUBSIDIARIES. ................. 13

   4.4 AUTHORITY OF SELLER. ................................................................................................ 14

   4.5 ISSUANCE OF THE MEMBERSHIP INTERESTS; SELLER'S TITLE TO THE MEMBERSHIP INTERESTS. ....................................... 14

   4.6 NO VIOLATION OR CONFLICT; CONSENTS. ............................................................. 14

   4.7 REQUIRED APPROVALS; COMPLIANCE WITH LAW. .............................................. 15

   4.8 EXISTING CONTRACTS. .................................................................................................. 15

   4.9 LITIGATION. ...................................................................................................................... 16

   4.10 TITLE TO ASSETS AND TANGIBLE PERSONAL PROPERTY. ................................ 16

   4.11 PROJECT SITE. ................................................................................................................ 16

   4.12 UNDISCLOSED LIABILITIES; INVOICES. ................................................................. 17

   4.13 ACCOUNTS PAYABLE. .................................................................................................. 17

   4.14 BANK ACCOUNTS. ......................................................................................................... 17

   4.15 BOOKS AND RECORDS AND FINANCIAL CONTROLS. ......................................... 18

   4.16 INSURANCE. .................................................................................................................... 18

   4.17 EMPLOYEE. ..................................................................................................................... 18

   4.18 EMPLOYEE BENEFIT MATTERS. ................................................................................ 18

| | 4.19 | TAX MATTERS. | 18 |
| | 4.20 | ENVIRONMENTAL MATTERS. | 19 |
| | 4.21 | BROKERS. | 21 |
| | 4.22 | CERTAIN BUSINESS PRACTICES. | 21 |
| | 4.23 | GUARANTEES. | 21 |
| | 4.24 | NO POWERS OF ATTORNEY. | 21 |
| | 4.25 | DISCLOSURE. | 21 |
| **5.** | | **REPRESENTATIONS AND WARRANTIES OF BUYER** | **22** |
| | 5.1. | ORGANIZATION AND QUALIFICATION. | 22 |
| | 5.2. | AUTHORITY OF BUYER. | 22 |
| | 5.3. | NO VIOLATION OR CONFLICT; CONSENTS. | 22 |
| | 5.4. | SOLVENCY. . | 23 |
| | 5.5. | INVESTMENT INTENT. | 23 |
| **6.** | | **COVENANTS OF THE PARTIES** | **23** |
| | 6.1. | FURTHER ASSURANCES. | 23 |
| | 6.2. | EXCLUSIVITY; NON-SOLICITATION; PRE-CLOSING BUSINESS. | 24 |
| **7.** | | **TAX MATTERS** | **27** |
| | 7.1. | TAX MATTERS. | 27 |
| **8.** | | **INDEMNIFICATION** | **28** |
| | 8.1. | SURVIVAL OF REPRESENTATIONS AND WARRANTIES. | 28 |
| | 8.2. | TERMS OF INDEMNIFICATION. | 29 |
| | 8.3. | PROCEDURES. | 29 |
| | 8.4. | ADDITIONAL INDEMNIFICATION PROVISIONS. | 30 |
| **9.** | | **Termination** | **31** |
| | 9.1. | TERMINATION. | 31 |
| **10.** | | **GENERAL PROVISIONS** | **32** |
| | 10.1. | PARTIES IN INTEREST. | 32 |
| | 10.2. | ASSIGNMENT. | 32 |
| | 10.3. | NOTICES. | 32 |
| | 10.4. | SEVERABILITY. | 33 |
| | 10.5. | AMENDMENT. | 34 |
| | 10.6. | WAIVER. | 34 |

ii

10.7.    Expenses................................................................................................................34

10.8.    Governing Law; Choice of Forum; Waiver of Jury Trial.................................34

10.9.    Confidentiality. ...................................................................................................34

10.10.    Counterparts.......................................................................................................34

10.11.    Entire Agreement..............................................................................................35

10.12.    Updates to Schedules .......................................................................................35

10.13.    Press Releases ....................................................................................................35

SCHEDULES:

Schedule 1.1(a)         Permitted Liens
Schedule 4.6            Third Party Rights To Cancel, Modify, Etc.
Schedule 4.7            Permits and Approvals
Schedule 4.8            Contracts
Schedule 4.12(a)        Liabilities
Schedule 4.12(b)        Invoices
Schedule 4.13           Accounts Payable
Schedule 4.20           Environmental Assessments

EXHIBITS:

Exhibit A               Description of Project

Exhibit B               Form of Membership Interest Assignment and Assumption
                        Agreement

Exhibit C               Form of General Release

**MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT**

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "*Agreement*"), is made and entered into as of November 27, 2019 (the "*Effective Date*"), by and between  SRI Energy, LLC    a Michigan Limited Liability Company ("*Seller*"), and Clean Energy Nexus, LLC, a Delaware limited liability company ("*Buyer*"). Each of Seller and Buyer are hereinafter referred to individually as a "*Party*" and together as the "*Parties*."

<u>RECITALS</u>

WHEREAS, Buyer, together with its Affiliates, is a solar independent power producer engaged in the ownership of sustainable infrastructure projects;

WHEREAS, Seller is the owner of all of the issued and outstanding membership interests (the "*Membership Interests*") in the solar project companies listed on Exhibit A (the "*Project Company*");

WHEREAS, the Project Company owns or, by the time of the Closing as defined herein, will own, all of the assets of the respective roof-mounted solar photovoltaic electrical generation project further described in the Joint Development Agreement ("JDA") between the Parties effective the 20th day of February 2019; and

WHEREAS, Seller may desire to sell, and Buyer may desire to buy, all of the Membership Interest in a specific Project Company from time to time.

NOW, THEREFORE, in consideration of the respective representations, warranties, agreements, and conditions hereinafter set forth, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereto hereby agree as follows:

<u>AGREEMENT</u>

## 1.  DEFINED TERMS; RULES OF CONSTRUCTION

1.1. <u>Defined Terms</u>.

As used in this Agreement, the following terms have the meanings set forth below:

"*Affiliate*" means, with respect to a Person, any other Person or entity directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"*Agreement*" has the meaning set forth in the introduction to this Agreement.

"*Alternative On-Bill Credit*" or "*AOBC*" means a bill credit for generation from an Alternative On-bill Credit Generating Unit.

"*Breach*", in respect to any given agreement or law, means the continuation of a breach thereof by a Person beyond the expiration of the applicable cure periods thereunder, or if no cure

period is specified therein, beyond a period of thirty (30) days after notice to such Person of such breach, as applicable.

"***Business***" means the operation of the Project, as a roof-mounted solar photovoltaic electrical generation facility.

"***Business Day***" means any day which is not a Saturday, Sunday or legal holiday in the United States.

"***Buyer***" has the meaning set forth in the introduction to this Agreement.

"***Buyer Party***" means individually, and "***Buyer Parties***" means collectively, each of Buyer, the Project Company (after the Closing), and each of their respective Affiliates, stockholders, members, directors, managers, officers, and employees.

"***Closing***" has the meaning set forth in Section 3.1.

"***Closing Date***" has the meaning set forth in Section 3.1.

"***Closing Deadline***" means December 31, 2019.

"***Code***" means the Internal Revenue Code of 1986, and rules and regulations promulgated pursuant thereto, each as amended and in effect from time to time.

"**Commercial Operation**" means the Project has met the definition of Substantial Completion and has been put into service to provide electricity to the contracted customer(s).

"***Consent***" means any consent, approval, ratification, waiver, novation, award or other authorization necessary to be obtained through the Closing Date in order to carry out the transactions set forth in this Agreement from any Person which is not a Governmental Authority.

"***Contract***", as to any given Person, means any written agreement, contract, instrument, obligation, commitment, covenant, understanding, promise, promissory note, bond, indenture, insurance policy, deed, lease, license, franchise, purchase order, sales order or other obligation, undertaking or arrangement (whether written or oral) that is legally binding upon such Person as of the Closing Date.

"***Control***" and all derivations thereof means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Damages***" means such damages as shall be payable under law or at equity, except to the extent excluded or limited by this Agreement.

"***Data Room***" means the virtual data room set up in regard to the Project Company accessible via Smart Sheets. The parties agree that (i) as to information in the Data Room prior to the Effective Date, to the extent that later information provided by Seller in the Data Room differs from information provided earlier, any representation, warranty or covenant made under this

Agreement shall be considered to be made based upon the later provided information and not the prior provided information, and (ii) with respect to projections and other forward-looking information, Seller represents, warrants and covenants only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

"***Effective Date***" has the meaning set forth in the introduction to this Agreement.

"***Environmental Assessments***" means any reports identified in <u>Schedule 4.20</u>.

"***Environmental Law***" means all applicable laws, statutes, enactments, orders, regulations, rules and ordinances of any Governmental Authority relating to pollution or protection of human health, safety, the environment, natural resources or laws relating to releases or threatened releases of Hazardous Materials into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater, land, surface and subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, transport or handling of Hazardous Materials, including, without limitation (as applicable), the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C, §9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C, App. §1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), the Clean Water Act (33 U.S.C. §1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.) and the Occupational Safety and Health Act, 29 U.S.C. §653 et seq.), and the regulations promulgated pursuant thereto, as amended from time to time.

"***Environmental Permits***" means all Permits required of the Project under currently applicable Environmental Law.

"***Environmental Property***" means any assets, personal property or real property currently or previously owned, leased, operated or used by the Project Company, including the Project Site.

"***EPA***" means the United States Environmental Protection Agency.

"***Existing Contracts***" has the meaning set forth in <u>Section 4.8(a)</u>.

"***FERC***" has the meaning set forth in <u>Section 4.26</u>.

"***GAAP***" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"***Governmental Authority***", as to a Person, means any domestic or foreign national, state or local government, any political subdivision thereof, or any department, agency, authority, bureau or court of any of the foregoing, to the extent such entity has jurisdiction over such Person.

"***Hazardous Materials***" means any chemicals, materials or substances which are defined or regulated as dangerous, toxic, explosive, corrosive, flammable, infectious, radioactive,

carcinogenic, mutagenic or otherwise hazardous or as a pollutant or contaminant under any Environmental Law, including but not limited to radon, urea-formaldehyde, polychlorinated biphenyls, asbestos or asbestos-containing materials, petroleum and petroleum products as defined or regulated thereunder.

"***Indemnified Party***" has the meaning set forth in Section 7.3(a).

"***Indemnifying Party***" has the meaning set forth in Section 7.3(a).

"***IRS***" means the United States Internal Revenue Service.

"***Investment Tax Credit***" means investment tax credits under Section 25(d) or 48(a) of the Code or any successor to such section, or the U.S. Treasury grant in lieu of tax credits under Section 1603 of the American Recovery and Reinvestment Act of 2009.

"***Knowledge of Seller***" means the actual knowledge after due inquiry of Albert Lichoulas.

"***Law***" means any applicable federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, Orders, decrees, codes, directives, injunctions, permits, concessions, grants, franchises, licenses and governmental restrictions, whether now or hereafter in effect.

"***Liability***", as to a Person, means any liability, indebtedness, adverse claim or other obligation of such Person, whether direct or indirect, whether absolute or contingent, whether accrued, vested or otherwise and whether or not reflected or required to be reflected in the financial statements of a Person.

"***Lien***", as to a Person, means any encumbrance against the property of such Person, whether in the nature of a charge, claim, mortgage, lease, sublease, occupancy agreement or similar Contract, tenancy, right-of-way, easement, collateral assignment, restrictive covenant, encroachment, burden, condition, Order, community unity property interest, equitable interest, security interest, lien (statutory or otherwise), pledge, hypothecation, option, right of first refusal or other restriction, limitation, exception or encumbrance of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"***Made Available***" shall mean, (i) as of the Effective Date, the respective documents and materials that that were posted to the Data Room or otherwise disclosed to Seller in writing at least three (3) Business Day prior to the Effective Date, and (ii) as of the Closing Date, the respective documents and materials that that were posted to the Data Room or otherwise disclosed to the Seller in writing at least three (3) Business Day prior to the Closing Date. Any information Made Available to Buyer shall be deemed to have been delivered to Buyer.

"***Material Adverse Effect***" means any event, occurrence, fact or circumstance which (a) has had or is reasonably expected to have a material adverse effect on the business, assets, operations, prospects or financial condition of the Project Company or Project, or (b) is reasonably expected to have a material adverse effect on the ability of Seller or the Project Company to pay or perform its obligations under and in accordance with the Transaction Documents or the Existing Contracts, including the validity or enforceability of any Transaction Document or Existing

Contract or the rights and remedies of the applicable parties thereunder; *provided*, however, that Material Adverse Effect shall not include any event, occurrence, fact or circumstance resulting from the acts or omissions of any Buyer Party or from the economy, industry or financial markets generally applicable to the industries or the markets in which the Project Company participates, including, without limitation, the solar power development industry, or which has been disclosed in writing to Buyer.

"***Mechanical Completion***" means the ordinary and customary milestone for mechanically completing construction of the Project as set forth in the main engineering, procurement and construction contract for the Project; including the completion of work such that a certificate of completion may be submitted to the applicable utility on behalf of the Project. For avoidance of doubt, this excludes work to be performed by the applicable utility for interconnection and related interconnection work by the Project's contractors.

"***Membership Interests***" has the meaning set forth in the recitals to this Agreement.

"***Order***" means any applicable order, injunction (whether temporary, preliminary or permanent), ruling, decree (including any consent decree), writ, subpoena, verdict, charge, assessment, consent or other decision entered, issued, made or rendered by any court or other Governmental Authority or by any arbitrator.

"***Organizational Documents***" means, with respect to a particular Person, (a) if such Person is a corporation, its certificate or articles of incorporation, organization or formation and its by-laws; (b) if such Person is a limited liability company, its certificate or articles of formation or organization and limited liability company or operating agreement; (c) any other charter or similar document adopted or filed in connection with the creation, formation or organization of such Person; and (d) any amendment to any of the foregoing.

"***Party***" or "***Parties***" has the meaning set forth in the introduction to this Agreement.

"***Permit***" means any authorization, approval, consent, license, ruling, permit, tariff, certification, exemption, order, recognition, grant, confirmation, clearance, filing, valid waiver, exemption, variance, franchise, or similar order in respect to the Project Company of or from any Governmental Authority having jurisdiction over the matter in question.

"***Permitted Indebtedness***" means (a) current accounts payable, accrued expenses and other expenses which are not past due arising out of transactions (other than borrowing) in the ordinary course of business on ordinary and customary trade terms, (b) indebtedness in connection with the endorsement and deposit of checks in the ordinary course of business for collection, (c) indebtedness incurred pursuant to any Existing Contracts which are not past due; and (e) indebtedness approved by Buyer, in writing, in Buyer's sole discretion.

"***Permitted Liens***" means (a) those restrictions on transfer imposed by applicable Laws, (b) surety or appeal bonds or other deposits of like nature used in the ordinary course of business, (c) any Liens created or approved by Buyer, (d) capitalized leases disclosed hereunder, (e) Liens created by or pursuant to any Existing Contract or Permit, (f) any Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings and for which adequate reserves or other provision with respect thereto have been made acceptable to Buyer in its

reasonable discretion, (g) unfiled mechanic's or other statutory Lien arising or incurred in the ordinary course of business, and (h) any Liens set forth on Schedule 1.1(a).

"**_Person_**" means any individual, firm, company, general partnership, limited partnership, limited liability partnership, joint venture, association, corporation, limited liability company, trust, business trust, estate, Governmental Authority or other entity.

"**_Photovotaic Rooftop Lease_**" means that certain Rooftop Lease dated as of  August 2019, between Property Owner and the Project Company.

"**_PILOT Agreement_**" means a payment in lieu of tax agreement executed between the Governmental Authority and Project Company, in form reasonably acceptable to Buyer.

"**_Proceeding_**", as to a Person, means any action, claim, complaint, charge, arbitration, audit, hearing, investigation, inquiry, suit, litigation or other proceeding to which Person is a Party (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator having jurisdiction over such matter.

"**_Project Company_**" has the meaning set forth in the recitals to this Agreement.

"**_Project_**" has the meaning set forth in the recitals to this Agreement.

"**_Project Site_**" means the location of the solar project owned by each specific Project Company.

"**_Property_**" has the meaning provided in the Rooftop Lease.

"**_Property Owner_**" means Supermercado Venus Gardens Inc.

"**_Purchase Price_**" has the meaning set forth in Section 2.2(a).

"**_Seller_**" has the meaning set forth in the introduction to this Agreement.

"**_Seller Party_**" means individually, and "**_Seller Parties_**" means collectively, each of Seller, its Affiliates (other than the Project Company after the Closing) and their respective stockholders, members, directors, managers, officers, and employees.

"**_Substantial Completion_**" means the ordinary and customary milestone for substantially completing construction of the Project as set forth in the main engineering, procurement and construction contract for the Project. For avoidance of doubt, this includes Project has received permission to operate by the applicable utility, it is placed in service, and performance testing has been completed.

"**_Tax_**" or "**_Taxes_**", as to a Person, means all federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock,

franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever imposed upon such Person by any Governmental Authority, and payments in lieu of taxes pursuant to a payment in lieu of taxes agreement, including any interest, penalty, or addition thereto, whether disputed or not, and any obligations with respect to such amounts taxable to such Person, whether (i) arising as a result of such Person being a member of an affiliated, consolidated, combined or unitary group for any period applicable thereto, or (ii) assumed by such Person under any Contract with any other Person, or (iii) taxes of a predecessor legally chargeable to such Person.

"*Tax Return*" means any report, return, statement, document, form, declaration or other information or filing (including any amendments) required to be supplied to any taxing authority or jurisdiction (foreign or domestic) of any Governmental Authority with respect to Taxes.

"*Title Commitment*" means a commitment to issue a title insurance policy to insure the Project Company's leasehold interest in the Project Site, which commitment shall be issued by a nationally recognized title insurance company licensed to do business in Puerto Rico and shall be offered at commercially reasonable market rates for issuance of a final leasehold title insurance policy.

"*Transaction Documents*" means this Agreement and all exhibits and schedules, and certificates being delivered pursuant to this Agreement.

"*Transfer Taxes*" has the meaning set forth in Section 6.2(a).

"*Treasury Regulations*" means the federal income tax regulations promulgated under the Code, including temporary regulations, as such regulations may be amended from time to time. All references herein to specific sections of the Treasury Regulations shall be deemed also to refer to any corresponding provisions of succeeding Treasury Regulations, and any references to temporary regulations shall be deemed also to refer to any corresponding provisions of final Treasury Regulations.

1.2. Certain Interpretive Matters.

(a)     General Rules of Construction. In this Agreement, unless the context otherwise requires:

(i)     words of the masculine or neuter gender shall include the masculine and/or feminine gender;

(ii)     reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(iii)     reference to any agreement (including this Agreement) or other Contract or any document means such agreement, Contract or document as amended or modified and in effect from time to time through the Closing Date in accordance with the

- 7 -

terms thereof and, if applicable, the terms hereof;

(iv) any accounting term used and not otherwise defined in this Agreement or any other Transaction Document has the meaning assigned to such term in accordance with GAAP;

(v) all amounts in this Agreement and the other Transaction Documents are stated and shall be paid in United States dollars unless specifically otherwise provided;

(vi) "including" (and with correlative meaning "include") means "including without limitation";

(vii) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including;"

(viii) "hereto," "herein," "hereof," "hereinafter" and similar expressions refer to this Agreement in its entirety, and not to any particular Article, Section, paragraph or other part of this Agreement;

(ix) reference to any "Article" or "Section" number means the corresponding Article(s) or Section(s) number of this Agreement;

(x) the descriptive headings of Articles, Sections, paragraphs and other parts of this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement or any of the terms or provisions hereof;

(xi) reference to any Law or Order, means (A) such Law or Order as amended, modified, codified, supplemented or reenacted, in whole or in part, and in effect from time to time; and (B) any comparable successor Laws or Orders; and

(xii) any Contract, certificate or other document defined or referred to in this Agreement or in any other Transaction Document means such Contract, certificate or other document as from time to time amended, modified or supplemented through the Closing Date, including (in the case of Contracts or instruments) any amendments, modifications, or supplements thereto made by waivers, consents, attachments or other instruments or documents.

(b) Acknowledgment Regarding Negotiation and Preparation of Agreement. The Parties acknowledge and agree that (i) this Agreement is the result of negotiations between the Parties and shall not be deemed or construed as having been drafted by any one Party, (ii) each of the Parties has been represented by its own legal counsel in connection with the negotiations and preparation of this Agreement, each of the Parties has been independently advised as to tax consequences of the contemplated transactions, and each of the Parties and its counsel and advisors have reviewed and negotiated the terms and provisions of this Agreement (including any exhibits and schedules attached hereto) and have contributed to its preparation, (iii) the rule of construction to the effect that any ambiguities are resolved against the drafting Party shall not be employed in

the interpretation of this Agreement, and (iv) the terms and provisions of this Agreement shall be construed fairly as to all Parties and not in favor of or against any Party, regardless of which Party was generally responsible for the preparation of this Agreement.

## 2.   PURCHASE AND SALE

2.1. Purchase and Sale.

Upon and subject to the terms and provisions of this Agreement, at a Closing, Buyer shall purchase and accept delivery of the Membership Interests of the Project Company from Seller, and Seller shall sell, assign, transfer and deliver the Membership Interests to Buyer, free and clear of all Liens, excepting any Permitted Liens.

2.2. Consideration.

The aggregate consideration to be paid by Buyer to Seller for Buyer's acquisition of the Membership Interests of a specific Project Company identified on Exhibit A (the "***Purchase Price***") shall also be specifically identified on Exhibit A.  The payments towards the Purchase Price shall be made in accordance with the milestone Acquisition Fees as detailed in Section 3.1(b) of the JDA.

2.3. Withholding Tax.

Buyer will be entitled to deduct and withhold any and all amounts from the Consideration equal to any withholding Tax owed to any Governmental Authority as a result of the transactions contemplated by and otherwise payable under the terms of this Agreement to the extent, such amounts as are required under applicable Law, to be deducted and shall remit any amount so withheld to with respect to the making of such payment under the Laws of any Governmental Authority.  For avoidance of doubt, any amount deducted and withheld pursuant to this section and duly paid to the appropriate Governmental Authority, will be treated as having been paid to Seller.

## 3.   THE CLOSING; CLOSING CONDITIONS

3.1 Closing and Closing Date.

The purchase and sale of the Membership Interests with respect to the Project Company shall be made at a closing (the "***Closing***") which shall take place on such mutually agreeable date as soon as practicable and both Parties shall use commercially reasonable efforts to achieve no later than five Business Days after the conditions to the Closing of the Project set forth in Sections 3.4 and 3.5 have been satisfied (the date upon which the Closing occurs is the "***Closing Date***"); *provided*, that the Closing shall not occur until all the deliverables set forth in Sections 3.2 and 3.3 have been received (or waived) by the applicable receiving Party.

3.2 Documents and Items to be Delivered to Buyer by Seller.

At the Closing, Seller shall deliver or have Made Available to Buyer:

      (a)    An Assignment and Assumption Agreement of the Membership Interests of the Project Company in form and substance substantially similar to <u>Exhibit B</u>, duly executed by Seller;

      (b)    A certificate(s) in form and substance reasonably acceptable to Buyer, dated as of the Closing Date, executed by a duly authorized officer of Seller and certifying: (i) that attached thereto is a true, correct and complete copy of the Organizational Documents of Seller and the Project Company as in effect on the Closing Date; (ii) that all corporate actions authorizing the execution and delivery of this Agreement and each of the other Transaction Documents to which Seller is a party have been taken and such authorization has not been modified, rescinded or amended and is in full force and effect as of the Closing Date; (iii) as to the incumbency of the officers of Seller and their signatures; and (iv) that the representations and warranties set forth in <u>Article 4</u> of this Agreement are true and correct in all material respects as of the Closing Date (except for any representations and warranties that are made as of a specific date);

      (c)    Certificates of good standing of the Project Company from the appropriate e government agency not dated not earlier than thirty (30) days prior to the Closing Date;

      (d)    Letters of resignation executed by each of the managers, directors and officers of the Project Company, effective as of the Effective Date;

      (e)    A copy of each Existing Contract, which shall be in form and substance satisfactory to Buyer in its sole discretion;

      (f)    Evidence satisfactory to Buyer that all Liens (other than Permitted Liens) have been released in full;

      (g)    Evidence that all Consents that are required for Seller to consummate the Closing, if any, have been obtained in form and substance satisfactory to Buyer in its sole discretion;

      (h)    Estoppel agreements required by Buyer, if any, in the form attached as Exhibit C;

      (i)    The Uniform Commercial Code search reports, in form and substance reasonably satisfactory to Buyer, for all offices in which Uniform Commercial Code financing statements would be filed with respect to the (i) Membership Interest, and (ii) the Project assets, and judgment and tax liens searches in appropriate jurisdictions for Seller and the Project Company, in each case dated not earlier than twenty (20) Business Days prior to the Closing;

      (j)    A general release of the Project Company from all known or unknown claims that Seller may have against the Project Company relating to acts or omissions of the Project

Company occurring prior to the Closing and waiving any right to make any claim or seek any recourse against the Project Company, form attached as Exhibit C;

(k)     The Seller shall have complied with and performed in all respects all of their respective covenants and agreements required to be performed at or prior to the Closing Date pursuant to this Agreement.

(l)     Any and all books and records of the Project Company that have not been delivered to Buyer by Seller prior to the Effective Date; and

(m)     Such other certificates and documents as Buyer may reasonably request.

3.3     <u>Documents and Items to be Delivered to Seller by Buyer.</u>

At the Closing, Buyer will deliver to Seller:

(a)     The portion of the Purchase Price required above, to be paid by Buyer to Seller by wire transfer in immediately available funds to an account designated by Seller;

(b)     An assumption of the Membership Interests of the Project Company, in form and substance substantially similar to <u>Exhibit B</u>, duly executed by Buyer;

(c)     A certificate(s) in form and substance reasonably acceptable to Seller, dated as of the Closing Date, executed by a duly authorized officer of Buyer, and attested to by a Manager of the Buyer, and certifying: (i) that attached thereto is a true, correct and complete copy of the articles of organization of Buyer; (ii) that all corporate actions authorizing the execution and delivery of this Agreement and each of the other Transaction Documents to which Buyer is a party have been taken and such authorization has not been modified, rescinded or amended and is in full force and effect as of the Closing Date; (iii) as to the incumbency of the officers of Buyer and their signatures; and (iv) that the representations and warranties set forth in <u>Article 5</u> of this Agreement are true and correct in all material respects as of the Closing Date (except for any representations and warranties that are made as of a specific date); and

(d)     Such other certificates and documents as Seller may reasonably request.

3.4 <u>Conditions Precedent to Obligation of Buyer.</u>

The obligation of Buyer to consummate the Closing with respect to the Project Company is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and which shall be deemed to have been fulfilled or waived in the event that the Closing shall occur) with respect to the Project:

(a)     Buyer shall have completed confirmatory due diligence on the Project and Project Site, the results of which shall have been deemed satisfactory to Buyer in its sole discretion.

(b)     The Project Company shall have entered into  PILOT Agreements.

(c)     The Project Company shall have entered into an interconnection service

agreement that remains in full force and effect.

(d)     The parties have entered into an amended and restated Rooftop Lease on terms and conditions reasonably acceptable to Buyer and Seller;

(e)     Buyer shall have received a Title Commitment for the Project Site effective as of the Closing Date and a completed ALTA survey (the "*Survey*"), each satisfactory to Buyer in its reasonable discretion.

(f)     Buyer shall have received a Phase I report with respect to the Project Site and such report shall be reasonably satisfactory to Buyer in its reasonable discretion.

(g)     The representations and warranties of Seller contained in this Agreement shall be true and correct in all respects as of the Closing Date (except for any representations and warranties that are made as of a specific date).

(h)     All necessary permits and approvals to construct and operate the Project have been obtained by Project Company (and any appeal period has expired), except administrative building permits normally pulled by a contractor prior to construction.

(i)     Seller shall have performed and complied in all material respects with its obligations and covenants required by this Agreement to be performed and complied with through the Closing Date by Seller.

(j)     Seller shall have caused the Project Company to payoff all of its outstanding debts and obligations, with the exception of Permitted Indebtedness, prior to the Closing Date.

(k)     Seller shall have taken all necessary actions to have all the Liens on the Project Company and its assets removed, with the exception of Permitted Liens, satisfied and removed prior to the Closing Date.

(l)     No Material Adverse Effect shall have occurred.

(m)     No Claim shall be pending or threatened that: (i) seeks to prohibit, restrain or obtain damages or other relief in connection with the consummation of the transactions contemplated by this Agreement; (ii) could reasonably be expected to have a Material Adverse Effect; or (iii) could reasonably be expected to materially impair the ability of Buyer to operate the Business following the Closing Date

(n)     Seller shall have delivered or Made Available to Buyer the deliverables described in Section 3.2.

3.5 Conditions Precedent to Obligation of Seller.

The obligation of Seller to consummate the transactions contemplated in this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following

conditions (any or all of which may be waived by Seller):

(a)      Seller shall have received a counterpart signature page to this Agreement;

(b)      The representations and warranties of Buyer contained in this Agreement shall be true and correct as of the Closing Date;

(c)      Buyer shall have performed and complied in all material respects with its obligations and covenants required by this Agreement to be performed and complied with through the Closing Date by Buyer;

(d)      The parties have entered into an amended and restated Rooftop Lease on terms and conditions reasonably acceptable to Buyer and Seller; and

(e)      Buyer shall have delivered to Seller the deliverables described in Section 3.3.

## 4.  REPRESENTATIONS AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement, Seller represents and warrants to Buyer that the following are true and correct as of the Effective Date and as of Closing Date:

4.1      Organization of the Project Company.

Each Project Company is a limited liability company duly formed, validly existing and in good standing under the laws of the relevant Governmental Authority. The Membership Interests of the Project Company are not evidenced by certificates.

4.2      Organization and Qualification of Seller.

Seller is a Michigan limited liability company located at 24371 Catherine Industrial Drive, Suite 231, Novi MI 48375.

4.3      Capitalization of the Project Company; No Subsidiaries.

As of the Effective Date, Seller owns all of the outstanding equity interest of the Project Company, the Membership Interests constitute 100% of such outstanding equity interests in such Project Company, and the Membership Interests are duly authorized, validly issued, fully paid and non-assessable without restriction on the rights of transfer thereof. Except for the Membership Interests, the Project Company has no other securities of any class issued, reserved for issuance or outstanding. There are no existing options, warrants, calls, exchange rights, conversion rights, or other commitments, Contracts of any character made or granted by or binding upon the Project Company relating to the issuance of membership interests of the Project Company or to the issuance of any securities or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire from the Project Company, any membership interests or other securities or obligations of the Project Company convertible into membership interests of the

Project Company. None of the securities and other ownership interests in the Project Company were issued in violation of applicable Law. The Project Company has no direct or indirect Subsidiaries or ownership interests in other entities.

4.4     Authority of Seller.

Seller has all requisite personal authority to execute and deliver this Agreement and each of the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and each of the other Transaction Documents to which Seller is a party, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby requires no additional authorization and no other proceedings on the part of Seller are necessary to authorize this Agreement and each of the other Transaction Documents to which Seller is a party, the performance of such obligations or the consummation of such transactions.

4.5     Issuance of the Membership Interests; Seller's Title to the Membership Interests.

Seller has good title to and is the lawful, legal, record and beneficial owner of the Membership Interests free and clear of all Liens other than Permitted Liens, and shall deliver to Buyer, at the Closing and upon payment of the Purchase Price, good title to the Membership Interests with respect to the applicable Project Company, free and clear of all Liens other than Permitted Liens.

4.6     No Violation or Conflict; Consents.

(a)     Neither the execution and delivery by Seller of this Agreement or any of the other Transaction Documents to which Seller is a party, nor the performance by Seller of its obligations hereunder and under the Transaction Documents to which Seller is a Party, nor the consummation of the transactions contemplated hereby and thereby, directly or indirectly (with or without notice or lapse of time, or both):

(i)     violates, contravenes, conflicts with or Breaches any term or provision of the Organizational Documents of either Project Company;

(ii)     violates, contravenes, conflicts with, Breaches, constitutes (with or without due notice or lapse of time or both) a default under, requires any notice under (except any notices that have already been given), or except as set forth in Schedule 4.6, give any Person the right to cancel, modify or terminate, or accelerate the maturity or performance of, any instrument or obligation or other Contract, Consent, or Permit to which the Project Company is a party or by which any Project Company assets are bound;

(iii)     violates, contravenes or conflicts with any of the terms, conditions or requirements of, or requires any notice to (except any notices that have already been given) or filing with any Governmental Authority or other Person under, any Permit, Law or Order applicable to Seller or the Project Company or any of their respective assets; or

(iv)     requires any notice to (except any notices that have already been given) or filing with, or the obtaining of any Permit from, any Governmental Authority.

(b)     At the Closing, Seller and the Project Company have obtained all Consents that are required by Seller, the Project Company, or under any Existing Contract for the consummation of the Closing, and such Consents obtained by Seller and the Project Company are set forth on Schedule 4.6.

4.7     Required Approvals; Compliance with Law.

(a)     Required Approvals. All Permits necessary for the ownership and operation of the Project in accordance with the Project Company's Existing Contracts and current course of business have been obtained by or for the benefit of the Project Company, are properly in the name of the Project Company, are in full force and effect, and are listed in Schedule 4.7. The Project Company has not orally or in writing entered into any amendment, supplement, extension or restatement of any such Permits relating to its Project.

(b)     No Violations. The Project Company is in material compliance with, and is not and has not been in material Breach of, (i) any Law or Order applicable to the Project Company or by which any of its property or assets is bound, or (ii) any Permit or other Consent to which the Project Company is a party or by which any of its property or assets is bound.

(c)     No Notice. Neither Seller nor Project Company has received any written notice or other communication (whether written or oral) asserting, and no Proceeding is pending, or, to the Knowledge of Seller, threatened, from or before any Governmental Authority or other Person regarding (i) any actual, alleged, possible or potential violation of, or failure to comply with, any Law, Order or Existing Contract by the Project Company in respect to the Property, the Project, or otherwise; or (ii) any actual, alleged, possible or potential Liability for any remedial action of any nature affecting the Property, the Project, or the Project Company.

4.8     Existing Contracts.

(a)     General. Set forth on Schedule 4.8 is a true and complete list of all Contracts to which the Project Company is a party (including consents and estoppel agreements but excluding Permits) relating to the Project and the Project Site (collectively, the "***Existing Contracts***").

(b)     Delivery of Existing Contracts and Permits. Seller has provided to Buyer a true and complete copy of each Existing Contract and each Permit to which the Project Company is a party or by which any of its property or assets is bound, none of which has been terminated or modified in any way since provided except as disclosed to Buyer in writing or otherwise provided in this Agreement.

(c)     Binding Enforceability and Effect. As of the Closing Date, each Existing Contract that was originally in the name of Seller or its Affiliates has been assigned to the applicable Project Company. As of the Closing Date, each Existing Contract is a valid, binding and enforceable obligation of the Project Company and, to the Knowledge of Seller, the other

parties thereto, in accordance with its terms, except in each case, as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equitable principles and is in full force and effect (except for those Existing Contracts that Buyer and Seller desire to terminate).

(d) <u>No Violation, Change, Breach or Default</u>. Neither Seller, its Affiliates, nor the Project Company is in material Breach under any Existing Contract and there does not exist any event that, with the lapse of time or the giving of notice or both, would constitute such a material Breach. To the Knowledge of Seller, no other party to an Existing Contract is in material Breach under any Existing Contract, and, to the Knowledge of Seller, there does not exist any event that, with the lapse of time or the giving of notice or both, would constitute such a material Breach by another Party. No party to any Existing Contract has (i) indicated in writing to the Project Company, Seller or any of its Affiliates its intention to amend or terminate an Existing Contract, or (ii) made any claims against, or sought indemnification from, the Project Company, Seller or any of its Affiliates as to any matter arising under or with respect to an Existing Contract, and neither Seller, the Project Company, nor any of their respective directors, managers, members or officers, has been advised that any such claims may be asserted or initiated. Execution of this Agreement and consummation of the Closing will not, either immediately or with the passage of time, constitute or result in an event of default under any Existing Contract.

4.9 <u>Litigation</u>.

There has been no Proceeding against the Seller and/or the Project Company since its formation and there is no Proceeding pending or, to the Knowledge of Seller, threatened, against Seller and/or the Project Company, with respect to the Project Company, the Project or Project Site, or that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or the operation of the Project Company in the normal course of business.

4.10 <u>Title to Assets and Tangible Personal Property</u>.

Except for Permitted Liens, the Project Company is in possession of and has good and marketable title to, and is the sole and exclusive owner of, all right, title and interest in all the assets and tangible personal property used by the Project Company in the operation of the Business as of the Closing Date, except that the Project Company does not have any interests in any third party property except in the Property pursuant to the Rooftop Lease. All assets and tangible personal property owned by the Project Company are free and clear of all Liens (other than Permitted Liens).

4.11 <u>Project Site</u>.

(a) The Project Company has, pursuant to the Rooftop Lease, a valid and enforceable leasehold interest in the Project Site and valid and enforceable easements, rights of way or similar property rights relating to its Project (collectively, the "***Real Property Rights***"), in each case, subject to no mortgage, deed of trust, Lien, easement, pledge, charge, security interest or other encumbrance or adverse claim of any nature, except the Permitted Liens and excepting

the requirements, exceptions, exclusions, endorsements, terms and conditions of the Title Commitment. The Real Property Rights are sufficient in all material respects for the Project Company to operate the Project as a rooftop mounted photovoltaic system for the generation of electricity.

(b)     To the Knowledge of Seller, there are no soil, structural, subsurface or other natural or artificial conditions upon or about, or other facts or conditions affecting the Project Site that could reasonably be expected to (i) adversely affect the Project Company's ability to construct or operate the Project on the Project Site or (ii) otherwise have a Material Adverse Effect.

(c)     To the Knowledge of Seller, there are not any pending or planned changes to the Laws applicable to, or restrictions promulgated or enforced by Governmental Authorities with jurisdiction over, the Project Site, where such pending or planned changes could reasonably be expected to (i) adversely affect the Project Company's ability to operate the relevant Project on such real property or (ii) otherwise have a Material Adverse Effect.

(d)     Neither Project Company has assigned, transferred, subleased, licensed, or otherwise granted any Person the right to use or occupy the Project Site or any portion thereof, or assigned, mortgaged, deeded in trust, encumbered, or otherwise conveyed any interest in the Project Site.

4.12    Undisclosed Liabilities; Invoices.

(a)     The Project Company does not have any undisclosed material liabilities, asserted or unasserted, liquidated or unliquidated, accrued, absolute, contingent or otherwise, other than liabilities arising under any Existing Contracts or Permits, or in connection with Taxes not yet due and payable. Neither Seller, the Project Company, nor any other Affiliate of Seller has received any claim from any Person that the Project Company is liable to it for any reason except with respect to Existing Contracts or Permits in the ordinary course of Business.

(b)     Except as set forth on Schedule 4.12(b), all invoices or other demands for payment received prior to the Closing Date by the Project Company or by Seller or its Affiliates with respect to any Existing Contracts have been paid in full, and the Project Company does not have any outstanding obligations to make any payment as of the Closing Date.

4.13    Accounts Payable.

Except as set forth on Schedule 4.13, as of the Closing Date, there are no outstanding or long-term notes or accounts payable of the Project Company.

4.14    Bank Accounts.

Project Companyies have no bank accounts, investment accounts, safe deposit boxes and

similar accounts.

4.15    Books and Records and Financial Controls.

True, correct and complete copies of the books of account, ownership record books, minute books, bank accounts, and other corporate records, if any, of the Project Company have been made available to Buyer and such books and records have been maintained in accordance with good business practices. At the Closing, all of those books and records will be in the possession of the Project Company.

4.16    Insurance.

All insurance policies required to be obtained or maintained by the Project Company under the Project Company's Contracts or under applicable Laws have been obtained and are being maintained by the Project Company and are in full force and effect.

4.17    Employee.

The Project Company does not currently have, nor at any time has had, any employees.  As such, the Project Company is not a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization.

4.18    Employee Benefit Matters.

The Project Company does not maintain, sponsor or contribute to, nor has any obligation to contribute to, nor has any Liability with respect to, any plan, program, policy or Contract which is an employment, severance pay, termination pay, change in control or deferred compensation agreement, or an executive compensation, incentive bonus or other bonus, employee pension, profit-sharing, savings, retirement, stock option, stock purchase, stock appreciation rights, phantom stack, fringe benefit, life, health, medical, disability or accident insurance plan, or other employee benefit plan, program, policy or Contract, including any "employee benefit plan" as defined in Section 3(3) of ERISA.

4.19    Tax Matters.

(a)    The Project Company was formed as a  Delaware limited liability company on March 15, 2018.  Seller and the Project Company have duly and timely (including extended due dates) filed all Tax Returns required to be filed with respect to the ownership of the assets of the Project Company and the operation of the Business, together with payment of any and all required estimated taxes in connection therewith. The Project Company has paid all Taxes due (whether or not shown on any Tax Return) in respect of, in the case of Seller, the ownership of the Project Company, and, in the case of Seller and the Project Company, the assets of the Project Company and the operation of the Business, through and including the Closing Date, including, without limitation, any applicable ad valorem tangible property and intangible personal property Taxes. There has never been, and there is not currently pending, any material dispute or claim concerning any Tax liability with respect to the income, business, operations, or property of the

Project Company claimed or raised in writing by any taxing authority and, to the Knowledge of Seller, there is no basis for such a dispute or claim. No claim has been made by a taxing authority in a jurisdiction where the Project Company does not file Tax Returns that it is or may be subject to Tax in that jurisdiction.

(b)   All Tax Returns that have been filed prior to the Closing Date by Seller: (i) correctly and completely reflect the income, business, assets, operations and activities of such Target Entities; (ii) are correct and complete; (iii) correctly and accurately categorize Project Company's U.S. Federal Income Tax filing classification as, including but not limited to, a partnership, C-Corporation, S-Corporation, Controlled Foreign Corporation or other classification and (iv) have been prepared in accordance with all applicable Laws, in each case, in all material respects.

(c)   All Taxes which the Project Company (or, with respect thereto, Seller) was required by Law to withhold, deposit or collect in connection with any amount paid or owing to any employee, independent contractor, creditor, partner or other third party have been duly withheld, deposited and collected and, to the extent required, have been paid to the relevant taxing authority.

(d)   The Project Company (or, with respect thereto, Seller) has not waived any statute of limitations in respect of the assessment and collection of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency relating to the ownership of the assets of the Project Company or the operation of its business. The Project Company is not a party to any Tax allocation or sharing agreement.

(e)   Throughout its existence, the Project Company has been treated as a disregarded entity for United States federal, state, and local income tax purposes under Treasury Regulations § 301-7701-3(b)(I)(ii) since its formation. No elections have been filed with the IRS to treat the Project Company as an association taxable as a corporation.

(f)   There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets or properties of the Project Company or upon the equity interests in the Project Company.

(g)   Seller is not a foreign person as described in Section 1.1445-2(b)(2) of the treasury regulations promulgated under the Code for purposes of the Code.

4.20   Environmental Matters.

(a)   Except as may be provided in Schedule 4.20 (Environmental Assessments) and any Phase I report referenced therein, to the Knowledge of Seller, all Environmental Property, all current and previous conditions on and uses of the Environmental Property (including without limitation transportation and disposal of Hazardous Materials by or for either Project Company) comply and have at all times complied with, in all material respects, and do not cause and have not caused material liability to the Project Company under any Environmental Law. The Project Company is not in material violation of or has violated any Environmental Law.

(b)     Except as may be set forth in <u>Schedule 4.20</u> (Environmental Assessments), each Project Company has obtained or has applied for its respective Environmental Permits, and with respect to the Environmental Permits held by the Project Company, the Project Company is in material compliance with all such Environmental Permits, and no material deficiencies have been asserted by any Governmental Authority with respect thereto.

(c)     To the Knowledge of Seller, except as may be set forth in <u>Schedule 4.20</u> (Environmental Assessments), there has been no spill, discharge, leak, leaching, emission, migration, injection, disposal, escape, dumping, or release of any kind on, beneath, above, or into the Environmental Property or into the environment surrounding the Environmental Property of any Hazardous Materials, which has resulted in contamination in excess of applicable federal, state or local limits or could require any material remediation costs under any Environmental Law.

(d)     To the Knowledge of Seller, except as may be set forth in the Environmental Assessments, there are and have been no (i) Hazardous Materials stored, disposed of generated, manufactured, refined, transported, produced or treated at, upon or from the Environmental Property, or (ii) asbestos fibers or materials or polychlorinated biphenyls or underground storage tanks on or beneath the Environmental Property.

(e)     To the Knowledge of Seller, no expenditures will be required in order for the Project Company to comply with any Environmental Laws in effect at the time of the Closing in connection with the operation or continued operation of the Business on the Environmental Property.

(f)     There never has been pending against the Project Company or, to the Knowledge of Seller, any other Person to the extent that such other Person from time to time has owned, leased, occupied or conducted operations on the Environmental Property, any material civil, criminal or administrative action, suit, summons, citation, complaint, claim, notice, demand, request, judgment, order, lien, proceeding, hearing, study, inquiry or investigation based on or related to an Environmental Permit or an Environmental Law. Seller has never received written notice of any threatened material civil, criminal or administrative action, suit, summons, citation, complaint, claim, notice, demand, request, judgment, order, lien, proceeding, hearing, study, inquiry or investigation based on or related to an Environmental Permit or an Environmental Law against the Project Company.

(g)     The Project Company has not transported or arranged for the transportation of any Hazardous Materials to any location which is: (i) listed on, or proposed for listing on, the EPA's National Priorities List published at 40 CFR Part 300 or on any similar state list; or (ii) the subject of any regulatory action which may lead to claims against the Project Company for damages to natural resources, personal injury, clean-up costs or clean-up work.

(h)     The Project Company has not ever received any written notice of, nor, to the Knowledge of Seller, has any other Person to the extent that such other Person from time to time has owned, leased, occupied or conducted operations on the Environmental Property, ever received any written notice of, or have any actual knowledge of, any events, conditions, circumstances, or activities on or about the Project Site through the Closing Date that could reasonably be expected to: (i) interfere with, prevent, or increase the costs of compliance or

continued compliance with any Environmental Permits or any renewal or transfer thereof or any Environmental Law; (ii) make more stringent any restriction, limitation, requirement or condition under any Environmental Law or any Environmental Permit in connection with the operations on the Environmental Property; or (iii) give rise to any Liability, loss or expense, or form the basis of any civil, criminal or administrative action, suit, summons, citation, complaint, claim, notice, demand, request, judgment, order, lien, proceeding, hearing, study, inquiry or investigation involving the Environmental Property or the Project Company, based on or related to an Environmental Permit or an Environmental Law or to the presence, manufacture, generation, refining, processing, distribution, use, sale, treatment, recycling, receipt, storage, disposal, transport, handling, emission, discharge, release or threatened release of any Hazardous Materials.

4.21    Brokers.

No investment banker, broker, agent, finder, advisor, firm or other Person is entitled to receive any brokerage, finder's or other payment, fee or commission from Seller or the Project Company in connection with this Agreement or any Existing Contract or the transactions contemplated herein or therein.

4.22    Certain Business Practices.

Neither Seller, the Project Company nor, to the Knowledge of Seller, any of the directors, managers officers, employees, consultants or agents of Seller or the Project Company has: (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful payments relating to political activity, (b) made any unlawful payment to any foreign or domestic government official or employee or to any foreign or domestic political party or campaign or violated any provision of the Foreign Corrupt Practices Act of 1977, (c) consummated any transaction, made any payment, entered into any Contract or taken any other action in violation of Section 112813(b) of the Social Security Act, (d) made any other unlawful payment or other arrangement which could cause the Project Company or its Affiliates to be disqualified or debarred from serving as a contractor, directly or indirectly, for any Governmental Authority, or (e) engaged in any off-book transactions on behalf of the Project Company.

4.23    Guarantees.

The Project Company is not a guarantor, indemnitor, surety or accommodation party or otherwise liable for any indebtedness of any other Person.

4.24    No Powers of Attorney.

There are no outstanding powers of attorney executed on behalf of the Project Company.

4.25    Disclosure.

No representation or warranty by Seller in this Agreement or any other Transaction Document, or any Exhibit or Schedule and no certificate of Seller or Project Company furnished to Buyer, contains any untrue statement of a material fact or any omission of a material fact

necessary to make the respective statements contained herein and therein, in the light of the circumstances under which the statements were made, not misleading. There is no fact (other than matters of a general economic, industry or political nature which do not affect the Project Company or the Project uniquely) to the Knowledge of Seller that has not been disclosed by Seller to Buyer that might reasonably be expected to have or result in a Material Adverse Effect.

## 5. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Effective Date and as of the Closing Date as follows:

5.1. <u>Organization and Qualification</u>.

Buyer is a duly organized and validly existing limited liability company in good standing under the laws of the State of Delaware with all power and authority to own or lease all of its properties and assets and to conduct its business as presently conducted.

5.2. <u>Authority of Buyer</u>.

Buyer has all requisite power and authority to execute and deliver this Agreement and each of the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and each of the other Transaction Documents to which it is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement and each of the Transaction Documents to which Buyer is a party, the performance of such obligations or the consummation of such transactions.

5.3. <u>No Violation or Conflict; Consents</u>.

(a) Neither the execution and delivery by Buyer of this Agreement or any of the other Transaction Documents to which it is a party, nor the performance by Buyer of its obligations hereunder and thereunder, nor the consummation of the transactions contemplated hereby and thereby will, directly or indirectly (with or without notice or lapse of time or both), (i) violate, contravene, conflict with or Breach any term or provision of the Organizational Documents of Buyer, (ii) result in a violation or Breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or require any consent (other than as identified in <u>Schedule 4.6</u>) under, any Contract or other instrument or obligation to which Buyer is a party or by which it or any of its respective properties or assets are bound, (iii) violate any Laws applicable to Buyer or any of its Affiliates or any of their respective properties or assets, or (iv) except with respect to the performance by Buyer of its obligations contained herein and in the Transaction Documents, require any filing with, or the obtaining of any Permit from any Governmental Authority.

(b)    The Buyer has obtained all Consents that are required by Buyer for consummation of the Closing.

5.4. <u>Solvency</u>. Buyer is not insolvent or unable to pay its debts when they come due. No petition or notice has been presented, no order has been made and no resolution has been passed for the bankruptcy, liquidation, winding-up or dissolution of Buyer. No receiver, trustee, custodian or similar fiduciary has been appointed over the whole or any part of Buyer's assets or the income of Buyer. Buyer has no plan or intention of, and has not received any notice that any other Person has any plan or intention of, filing, making or obtaining any such petition, notice, order or resolution or of seeking the appointment of a receiver, trustee, custodian or similar fiduciary.

5.5. <u>Investment Intent</u>.

5.5.1.   Buyer hereby acknowledges that the Membership Interests have not been registered under the Securities Act of 1933, or registered or qualified for sale under any state securities laws, and cannot be resold without registration thereunder or exemption therefrom, to the extent such laws are applicable.

5.5.2.   Buyer is acquiring the Membership Interests for its own account and investment purposes and is not acquiring the Membership Interests with a view to, or for sale in connection with, any distribution thereof within the meaning of any federal or state securities laws. Buyer is an "accredited investor" within the meaning of Rule 501(a) of Regulation D as promulgated by the Securities and Exchange Commission under the Securities Act of 1933, and has sufficient business and financial knowledge and experience to protect its own interests and to evaluate the merits and risks in connection with the purchase of the Membership Interests.

5.5.3.   Buyer understands and acknowledges that no public market now exists for the Membership Interests, and that neither Seller, the Project Company nor any Affiliate has provided assurances that a public market will ever exist for the Membership Interests.

## 6.   COVENANTS OF THE PARTIES

6.1. <u>Further Assurances</u>.

Buyer and Seller shall use commercially reasonable efforts to do and perform or cause to be done and performed all further acts and things and shall execute and deliver all further agreements, certificates, instruments and documents as each may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement or any of the Transaction Documents and the consummation of the transactions contemplated hereby.

6.2. <u>Exclusivity; Non-Solicitation; Pre-Closing Business</u>.

(a)     Seller shall use commercially reasonable best efforts to achieve the conditions precedent to Closing.

(b)     Seller shall not sell or otherwise transfer any of the Membership Interests in the Project Company, or sell or otherwise transfer, or permit the Project Company or Affiliate to sell or otherwise transfer, the Existing Contracts to any Person (other than to the Project Company or to Buyer) prior to the Closing Deadline.

(c)     Seller shall not, and shall cause its Affiliates not to, directly or indirectly, initiate, solicit, negotiate or provide nonpublic or confidential information to facilitate, any proposal or offer with respect to any acquisition of the Membership Interests of the Project Company or the assets of the Project Company (other than by Buyer) prior to the Closing Deadline.

(d)     Seller shall cause the Project Company to conduct the business of the Project Company in the ordinary course consistent with past practice. Without limiting the generality of the foregoing, except as otherwise provided in this Agreement, during the period before the Closing Deadline Seller shall cause the Project Company to:

use its commercially reasonable efforts to preserve the technical, environmental, legal, contractual and economic integrity of the Project, including (A) preserving intact the business organization of the Project Company and (B) maintaining good business relationships with their respective suppliers, customers, licensors, licensees, trade partners, sales representatives, employees and all other Persons having business dealings with the Project Company and the Project;

maintain the properties and assets owned or leased by the Project, including but not limited to, the Project Site;

maintain all existing Permits;

maintain the books and records and accounts of the Project Company and the Project in the manner in which such books and records and accounts are currently maintained; and

preserve the existing Contracts of the Project Company and the Project and satisfy all obligations thereunder.

(e)     With respect to the Project Company and the Project and without limiting the generality of the foregoing, during the period before the Closing Deadline, Seller shall not, and shall cause the Project Company not to, except as otherwise approved in writing by Buyer or as otherwise provided in this Agreement, and Seller shall notify Buyer promptly upon the occurrence of any of the following:

(a) sell, lease, transfer or otherwise dispose of or agree to dispose of, or acquire or agree to acquire, any real property or other assets, or any interest in real property or other assets;

- 24 -

change any accounting methods, principles or practices for Tax or accounting purposes used by the Project Company;

enter into, cancel, modify, terminate, assign or amend (other than at the expiration of its stated term) any Contract of the Project Company;

incur any indebtedness to third parties or a Party without Buyer's approval;

issue, sell, dispose of, transfer or purchase any Membership Interests of the Project Company, any securities convertible, exchangeable or exercisable into Membership Interests of the Project Company, or warrants, options, calls, rights of first offer, rights of first refusal, tag along rights, drag along rights, preemptive rights or other commitments or rights of any character entitling any Person to acquire Membership Interests of the Project Company;

declare or pay any dividends or any distributions in respect of any Membership Interests of the Project Company or make payments of any kind (whether in property, assets or cash and in any form) to Seller or any of its Affiliates except pursuant to the terms of any Existing Contract or with respect to reimbursements to Seller's Affiliates for expenses such Affiliates have paid on behalf of the Project or Project Company;

take any action or make any commitment with respect to or in contemplation of, or adopt resolutions providing for, any complete or partial liquidation, dissolution, recapitalization, reorganization or other winding up of its business or operations;

enter into any employment agreements or hire any employee;

grant any Lien (other than Permitted Liens);

change or amend any limited liability company agreement or other organizational document of the Project Company;

merge or consolidate with or acquire all or substantially all of the business or assets of, any other Person, or enter into any joint venture, partnership or other similar arrangement;

(A) reclassify, split or combine any of the Membership Interests of the Project Company, or (B) make or propose to make any other change in the capitalization of the Project Company;

make any material, or change any existing, Tax elections;

(A) take or agree to commit to take any action that would (1) make any representation or warranty of Seller contained in this Agreement untrue or inaccurate in any material respect at, or as of any time prior to, the Closing Date or (2) impair or prevent Seller, or the Project Company from performing or consummating the transactions

contemplated under this Agreement, or (B) omit or agree or commit to omit to take any action necessary to prevent (1) any representation or warranty of Seller contained in this Agreement from being untrue or inaccurate in any material respect at, or as of any time prior to, the Closing Date, or (2) Seller from failing to perform or consummate the transactions upon the terms and conditions set forth in this Agreement; or

agree or commit to do any of the foregoing.

Between the Effective Date and the Closing Date, Seller will reasonably promptly notify Buyer in writing if it becomes aware of: (i) the occurrence or non-occurrence of any fact or event that could reasonably be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate; (ii) any failure of Seller to comply with or satisfy any covenant or condition to be complied with or satisfied by such party or parties hereunder; (iii) any notice or other communication from any Person alleging that the consent or approval of such Person is or may be required in connection with the transactions contemplated under this Agreement or that such transactions otherwise may violate the rights of or confer remedies upon such Person; (iv) any notice or other communication from any Governmental Authority in connection with the transactions contemplated under this Agreement; and (v) any Proceedings commenced relating to Seller, the Project Company, Buyer or any of the Project that, if pending on the date of this Agreement, would have been required to have been disclosed to Buyer pursuant to this Agreement. Notwithstanding the foregoing, such notices shall not be deemed to cure, or to relieve Seller from any Liability or obligation with respect to, any Breach of or failure to satisfy any representation, warranty, covenant, condition or agreement hereunder; provided that, notice by Seller of any such matter that was not within the Knowledge of Seller or received by Seller as of the Effective Date shall in no event be deemed a Breach under this Agreement.

6.3. <u>Release</u>

<u>Immediately prior to the Closing Date, Seller shall execute a general release of the Project Company from all known or unknown claims that Seller may have against the Project Company relating to acts or omissions of the Project Company occurring prior to the Closing and waiving any right to make any claim or seek any recourse against the Project Company.  The Seller general release shall be attached in the form shown as Exhibit C.</u>

6.4. Cooperation.

From and after the Closing Date, at the request of Buyer or Seller, the other Party will execute and deliver or cause to be executed and delivered to Buyer or Seller, at the expense of requesting Party, such instruments and other documents and take any further action as Buyer or the Seller may reasonably request or is necessary, proper or advisable in order to implement the transactions contemplated by this Agreement.

# 7.   TAX MATTERS

7.1. <u>Tax Matters</u>.

(a)      <u>Transfer and Similar Taxes</u>. All transfer, documentary, stamp, registration or other similar Taxes or fees (including any penalties and interest) incurred in connection with the sale, assignment, transfer and delivery of the Membership Interests from Seller to Buyer on the Closing Date as contemplated by this Agreement (the "***Transfer Taxes***") shall be borne by Seller and shall be paid when due. Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by any applicable Law or Order, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation with respect to the Transfer Taxes.  The party required by Law to file a Tax Return with respect to such Transfer Taxes shall do so within the time period prescribed by Law at their own expense, and remit the required Transfer Taxes due.  The non-filing party shall promptly reimburse the filing party for any Transfer Taxes borne by the non-filing party under this Section.

(b)      <u>Tax Returns and Payments</u>. Seller shall be responsible for, and shall file, all Tax Returns with respect to Seller and the Project Company for all Tax periods or portions thereof ending on or before the Closing Date, and shall be responsible for, and shall pay, all Taxes with respect to Seller and the Project Company for such Tax periods or portions thereof, including, for the avoidance of doubt, both with respect to 2018 and with respect to the portion of 2019 beginning January 1, 2019 and ending on the Closing Date, and including any such Taxes (and related Damages) attributable to an audit, challenge or other dispute regarding such Tax periods or portions thereof. To the extent that any such Tax Returns are to be filed by, or any such Taxes are to be paid by, the Project Company in respect to the foregoing periods, Seller shall prepare all such Tax Returns in a manner consistent with past practice, if any, and applicable law, shall provide drafts of such Tax Returns to Buyer for its review and comment at least 30 days prior to the filing date of each such Tax Return, and shall provide Buyer with proof of payment of all such Taxes. Buyer shall be responsible for, and shall file, all Tax Returns with respect to Buyer and the Project Company for all Tax periods or portions thereof from and after the Closing Date, and shall be responsible for, and shall pay, all Taxes with respect to Buyer and the Project Company for such Tax periods or portions thereof, including, for the avoidance of doubt, both with respect to the portion of 2019 beginning on the Closing Date and ending December 31, 2019, and for all tax periods thereafter, and including any such Taxes (and related Damages) attributable to an audit, challenge or other dispute regarding such Tax periods or portions thereof. To the extent that any such Tax Returns are to be filed by, or any such Taxes are to be paid by, the Project Company in respect to the portion of 2019 beginning on the Closing Date, Buyer shall prepare all such Tax Returns in a manner consistent with past practice, if any, and applicable law, shall provide drafts of such Tax Returns to Seller for its review and comment at least 30 days prior to the filing date of each such Tax Return, and shall provide Seller with proof of payment of all such Taxes.

(c)      Notwithstanding <u>anything in this Agreement,</u> Buyer has the right to represent the interests of the Seller before the relevant Governmental Authority with respect to any inquiry, assessment, Action or other similar event relating to any Tax Period prior to the Closing Date (a "<u>Tax Matter</u>") and has the right to control the defense, compromise or other resolution of

any such Tax Matter, including responding to inquiries, filing Tax Returns and contesting, defending against and resolving any assessment for additional Taxes or notice of Tax deficiency or other adjustment of Taxes of, or relating to, such Tax Matter; provided, however, that Seller shall have the right to participate at its own expense in any Tax Matter and provided, further, that Buyer shall not settle or compromise any such Tax Matter in a manner that could give rise to an indemnifiable Loss without the written consent of Seller (which consent shall not be unreasonably withheld, conditioned or delayed). Seller's right to participate is limited to the Tax Matters arising prior to the Closing Date on the respective Tax Return.

Buyer shall have the right to participate at its own expense in any Tax Matter related to the a Straddle Period and provided, further, that Seller shall not settle or compromise any such Tax Matter in a manner that could give rise to an indemnifiable loss without the written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed).

(d)     <u>Access and Assistance</u>. Each of Seller, Buyer, and their respective Affiliates will provide the other Parties with such assistance as may reasonably be requested by any of them (subject to any material expense associated with such request being paid by the requesting Party) in connection with the preparation of any Tax Return, any Tax audit or other examination by any Governmental Authority, any judicial or administrative proceedings relating to liability for Taxes, or any other claim arising under this Agreement, in each case, of or relating to the Project Company or the Project, and each will retain and provide the others with any records or information that may be relevant to any such Tax Return, audit or examination, proceeding or claim. Such assistance shall include providing copies of any relevant Tax Returns and supporting work schedules, in each case, of or relating to the Project Company or the Project, which assistance shall be provided without charge except for reimbursement of reasonable out-of-pocket expenses. Buyer will or will cause the Project Company to retain, and Seller will retain, until all appropriate statutes of limitation (including any extensions) expire, copies of all Tax Returns of or relating to the Project Company or the Project, supporting work schedules and other records or information which may be relevant to such Tax Returns, and will not destroy or otherwise dispose of such materials without first providing the other Party with a reasonable opportunity to review and copy such materials.

## 8.   INDEMNIFICATION

8.1. <u>Survival of Representations and Warranties</u>.

Except with respect to claims arising from fraud, gross negligence, and willful misconduct, all covenants, agreements, representations and warranties of the Parties contained in this Agreement, together with the associated rights of indemnification contained herein, shall survive the Closing and remain in full force and effect until twenty-four (24) months after the Closing Date; provided that: (i) Claims arising from fraud, gross negligence, and willful misconduct shall survive the Closing and remain in full force and effect until forty-eight (48) months after the Closing Date; and (ii) the following representations and warranties will survive for a period of thirty (30) days following the expiration of the applicable statute of limitations of the applicable claim giving rise to the Indemnification claim: the representations and warranties of Sellers set forth in Sections **Error! Reference source not found.** (Organization of the Company), <u>4.3</u>

(Capitalization of the Company; No Subsidiaries), 6 (No Violation or Conflicts; Consents), 4.19 (Taxes), and 4.21 (Brokers).  Any claim in respect to which a Proceeding shall have been properly filed and commenced prior to the end of the applicable survival period set forth in this Section 8.1, shall continue in effect with respect to such claim until such claim shall have been finally resolved in a court of law or otherwise settled.

8.2. Terms of Indemnification.

Subject to the terms and provisions of this Article 8:

(a)     Seller shall shall, jointly and severally, shall indemnify and hold harmless all Buyer Parties from and against any and all Damages incurred or suffered by any Buyer Party based upon, related to, arising out of, or otherwise in respect of Damages resulting from:

(i)      any Breach of Seller's representations or warranties contained in Article 4 of this Agreement;

(ii)     all Damages actually incurred (including amounts required by Law to be paid) by a Buyer Party, that result from any claim against the Project Company, or any environmental defect or liability of any kind connected to the Project Site, or any title defect, lien or liability of any kind connected to the Project Site if said claim, defect, lien or liability for damages arose or was created prior to the Closing Date, and whether known of by the Seller, or not;

(iii)    any Indebtedness, other than Permitted Indebtedness, and selling expenses not fully paid on or before the Closing Date; and

(iv)     (A)   any Taxes of the Project Company attributable to attributable to the Business prior to the Closing Date; (B) all Taxes of the Project Company arising in connection with the transactions contemplated by this Agreement; (C)  any Taxes attributable to any breach of or inaccuracy in any representation or warranty made in Section 4.19;   (D) any Taxes attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in **Error! Reference source not found.**; and (E) any Taxes attributable the Seller; and (F) and any and all Taxes of any Person imposed on the Project Company as a transferee or successor, by Contract or pursuant to any Law, which Taxes relate to an event or transaction occurring on or before the Closing Date.

(b)     Buyer shall indemnify Seller Parties against, and shall protect, defend and hold harmless Seller Parties from, all Damages actually incurred (including amounts required by Law to be paid) by a Seller Party to the extent such Damages result from any Breach of any of the Buyer's representations or warranties contained in Article 5 of this Agreement.

8.3. Procedures.

(a)     Third Party Actions. Promptly after the commencement of any action or proceeding against any Buyer Party or Seller Party by a third party which could give rise to a claim

for indemnification under this Article 8, the Buyer Party or Seller Party seeking indemnification (the "**Indemnified Party**") shall give notice to the Party from whom indemnification is sought (the "**Indemnifying Party**") if it wishes to assert a claim for indemnification under this Article 8. The Indemnifying Party shall then be entitled to participate in such action or proceeding and, to the extent that it shall wish, to assume the defense thereof with counsel reasonably satisfactory to such Indemnified Party (but prior to assuming such defense the Indemnifying Party shall have acknowledged in writing its indemnification obligation hereunder). After notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of a claim, the Indemnifying Party shall not be liable to such Indemnified Party for any fees of other counsel or any other expenses, in each case subsequently incurred by such Indemnified Party in connection with the defense thereof, other than reasonable costs of investigation or fees incurred by the Indemnified Party at the request of the Indemnifying Party. If an Indemnifying Party assumes the defense of such an action (a) no compromise or settlement thereof may be effected by the Indemnifying Party without the Indemnified Party's consent (which shall not be unreasonably withheld). If notice is given to an Indemnifying Party of the commencement of any action and it does not, within fifteen (15) days after the Indemnifying Party's notice is given, give notice to the Indemnified Party of its election to assume the defense thereof, the Indemnifying Party may assume the defense of such claim, the Indemnifying Party shall cooperate in and have the right to participate in the defense of any such matter, and the Indemnifying Party shall have no liability with respect to any compromise or settlement thereof effected by the Indemnified Party without its consent (which shall not be unreasonably withheld). Notwithstanding the foregoing, if an Indemnified Party determines in good faith that there is a reasonable probability that any action may materially and adversely affect it or its Affiliates other than as a result of monetary damages, such Indemnified Party may, by notice to the Indemnifying Party, assume the exclusive right to defend, compromise or settle such action, but the Indemnifying Party shall have no liability with respect to judgment entered in any action so defended, or a compromise or settlement thereof entered into, without its consent (which shall not be unreasonably withheld).

(b)     Mitigation. Any Indemnified Party that becomes aware of Damages for which it may seek indemnification under this Article 8 shall use commercially reasonable efforts to mitigate such Damages to the extent reasonably practicable and shall consider any mitigating actions reasonably requested by the Indemnifying Party. Neither Party's failure to mitigate shall limit an Indemnified Party's right under this Article 8 to file any claim for Damages or take any other action.

8.4. Additional Indemnification Provisions.

(a)     Project Company as Party for Indemnification Obligations. Notwithstanding anything to the contrary herein, upon the Closing, it is understood that the Project Company shall be treated as a Buyer Party and Seller shall have no rights of recourse, whether for contribution, by virtue of subrogation or otherwise, against the Project Company for any payments Seller makes, or is obligated to make, under this Article 8 or any other section of this Agreement.

(b)     Sole Remedy. The remedies provided for in this Article 8 shall be the sole and exclusive remedies of the Parties and their Affiliates and respective shareholders, partners, members, trustees, officers, directors, managers, employees, agents, representatives, successors and assigns for any Breach; *provided, however*, that the foregoing shall not limit the availability

to any Party of injunctive and other equitable relief, with respect to any Breach, including a claim for specific performance without the requirement to post bond.

(c)    <u>Insurance Proceeds, Tax Refunds and Other Payments</u>. The amount of any and all Damages for which indemnification is provided pursuant to this <u>Article 8</u> will be net of any amounts of any insurance proceeds, indemnification payments, contribution payments or reimbursements actually paid to the Indemnified Party with respect to such Damages or any of the circumstances giving rise thereto. In connection therewith, if, at any time following payment by the Indemnifying Party of any amounts of Damages due under this Agreement, the Indemnified Party receives any insurance proceeds, indemnification payments, contribution payments or reimbursements relating to the circumstances giving rise to such Damages, the Indemnified Party will promptly remit to the Indemnifying Party such proceeds, payments or reimbursements in an amount not to exceed the amount of the corresponding indemnification payment made by the Indemnifying Party.

(d)    <u>Waiver of Damages</u>. Notwithstanding anything to the contrary contained in this Agreement, Seller and Buyer agree that (i) the recovery by any Indemnified Party of any damages suffered or incurred by such Indemnified Party as a result of any breach by another Party of any of its obligations under this Agreement shall be limited to the actual damages suffered or incurred by an Indemnified Party as a result of the breach by the breaching Party of its obligations hereunder, and (ii) in no event shall the breaching Party be liable to an Indemnified Party for any indirect, consequential, special, exemplary or punitive damages (including any damages or diminution in value in any property on account of lost profits or opportunities suffered or incurred by an Indemnified Party as a result of the breach by the breaching Party of any of its obligations hereunder).

## 9.  Termination

9.1. <u>Termination.</u>

(a)    Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date as follows:

(b)    By either Seller or Buyer at any time after the Closing Deadline if the Closing has not occurred, *provided that* a Party may not terminate this Agreement if such Party is in Breach under the Agreement;

By Seller if conditions precedent to Closing under both Projects have been met but Buyer has not closed within thirty (30) days of receiving notice from Seller that the conditions precedent have been met;

By Seller if there has been a material breach by Buyer of any representation, warranty, covenant or agreement contained in this Agreement, which is not cured within thirty (30) days after notice of such breach is received;

By Buyer if there has been a material breach by Seller of any representation, warranty, covenant or agreement contained in this Agreement, which is not cured within thirty (30) days after notice of such breach is received; or

By the mutual written consent of the Parties.

(b)     Notice of Termination. Any Party desiring to terminate this Agreement pursuant to this Section 9.1 shall give written notice of such termination to the other Party to this Agreement.

(c)     Effect of Termination. If this Agreement shall be terminated pursuant to Section 9.1(a)(i) or 9.1(a)(iv), all further obligations of the Parties under this Agreement (other than the provisions which by their terms are intended to survive the expiration or termination of this Agreement) shall be terminated without further liability or obligation on the part of Buyer or Seller; provided, however, that nothing herein shall relieve any Party of any obligations which have accrued to the date of such termination or from liability for fraud, gross negligence, or willful misconduct. Upon termination of this Agreement with respect to the Project prior to its Closing, Seller shall reimburse Buyer for the Interconnection Payment made by Buyer with respect to such Project.

## 10. GENERAL PROVISIONS

10.1.     Parties in Interest.

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, and except as to the Buyer Parties and Seller Parties as Indemnified Parties under the terms and conditions of Section 8 of this Agreement, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, title, privilege, benefit, interest, remedy or claim of any nature whatsoever under or by reason of this Agreement, or any term or provision hereof.

10.2.     Assignment.

This Agreement and the rights, title, privileges, benefits, interests, remedies and obligations hereunder may not be assigned by any Party; provided, however, that Buyer may (a) assign any or all of its rights, title, privileges, benefits, interests and remedies hereunder to any one or more of its Affiliates; or (b) designate any one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

10.3.     Notices.

All notices, requests, claims, demands, waivers, instructions, documents and other communications to be given pursuant to this Agreement shall be in writing, signed by the person giving such notice or demand and shall be delivered personally, emailed, or sent by nationally recognized overnight courier to a party at the address set forth below for such party or to such other address as the party to whom notice is to be given may have furnished to the other parties

hereto in writing in accordance herewith. Any such notice or communication shall be deemed to have been delivered and received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of email, on the date sent (or on the first Business Day following the date sent if the date sent is not a Business Day) if confirmation of successful transmission is received, and (iii) in the case of a nationally recognized overnight courier, on the first Business Day after the date when sent for overnight delivery:

      (b)    <u>If to Seller, to:</u>

        SRI Energy, LLC
        24371 Catherine Industrial Drive, Suite 231
        Novi MI 48375

        With a Copy to:

        James E. Roach
        The Murray Law Group, P.C.
        31780 Telegraph Rd., Suite 200
        Bingham Farms, MI  48025
        Tel:  248.540.7082
        E-mail:  jroach@murraylawpc.com

      (c)    <u>If to Buyer, to:</u>

        Clean Energy Nexus LLC:
        2700 Post Oak Blvd.,
        Suite 2100
        Houston, TX 77056
        Attn: Joaquin Altenberg

        With a copy to:

        Culhane Meadows, PLLC
        Scott Gerhardt
        5611 Briscoe Bend Lane
        Fulshear TX 77441

10.4.    <u>Severability</u>.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law, Order or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect, *provided that*, upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions

contemplated hereby are fulfilled to the fullest extent possible.

10.5.    Amendment.

This Agreement may not be amended or modified except by a written instrument, specifically referring to this Agreement and signed by each of the Parties.

10.6.    Waiver.

Neither the failure nor any delay of any Party to this Agreement to assert or exercise any right, power, privilege or remedy under this Agreement, or to enforce any term or provision hereof, shall constitute a waiver of such right, power, privilege or remedy, and no single or partial exercise of any such right, power, privilege or remedy shall preclude any other or further exercise of such right, power, privilege or remedy or the exercise of any other right, power, privilege or remedy. The rights, powers, privileges and remedies of the Parties to this Agreement are cumulative and not alternative. Any waiver of any right, power, privilege or remedy hereunder or under any of the Transaction Documents shall be valid and binding only if set forth in a written instrument specifically referring to this Agreement and signed by the Party or Parties giving such waiver, and shall be effective only in the specific instance and for the specific purpose for which it is given.

10.7.    Expenses.

Buyer and Seller shall bear their respective fees, costs and expenses incurred in connection with this Agreement (including the preparation, negotiation and performance hereof) and the transactions contemplated hereby (including fees and disbursements of attorneys, accountants, agents, representatives and financial and other advisors), regardless of whether the transactions set forth herein and in the other Transaction Documents are consummated. Except as may be otherwise expressly set forth in this Agreement, Seller shall bear the aforementioned fees, costs and expenses of the Project Company incurred on and prior to the Closing Date.

10.8.    Governing Law; Choice of Forum; Waiver of Jury Trial.

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas applicable to contracts performed in that state. THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN TEXAS WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

10.9.    Confidentiality.

This Agreement is confidential , provided that, neither Party shall be obligated to not disclose the nature of the proposed business relationship between the Parties or the existence of this Agreement.

10.10.    Counterparts.

This Agreement may be executed in any number of counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original, and all of which, taken together, shall be deemed to constitute one and the same instrument. Electronic delivery of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

10.11.    Entire Agreement.

This Agreement (including the schedules and exhibits hereto, which are incorporated into this Agreement by this reference and made a part hereof) constitutes the entire agreement among the Parties with respect to the subject matter hereof and thereof, and supersedes all prior or contemporaneous agreements and understandings, whether written or oral, among the Parties, or any of them, with respect to the subject matter hereof and thereof.

10.12.    Updates to Schedules

From time to time after the date of this Agreement, but prior to the Closing Date, Seller shall have the right to provide supplements, revisions or updates (collectively, "*Schedule Updates*") to the Schedules to this Agreement. All references to the Schedules shall be deemed to be a reference to such Schedules as supplemented or amended by any Schedule Updates. Any such changes shall be provided in writing to Buyer and subject to Buyer's approval. Upon the request of Buyer prior to the Closing Date, Seller shall provide to Buyer any information it reasonably requests in respect of any matter or item being supplemented on the Schedules. Such Schedule Updates shall operate as additional disclosures by Seller, but shall not be considered to have modified any of the Conditions Precedent of Section 3.4 or Deliverables of Section 3.3.

10.13.    Press Releases

No Party shall issue any press release or make any other public announcement relating to the Project or the transaction contemplated hereby or disclose the existence or content of this Agreement without the prior written consent of the other Party hereto (such consent not to be unreasonably withheld), except if required by applicable Law, in which event such Party shall, to the extent practicable, first consult with the other Party as to the terms of such disclosure.

[Remainder of page intentionally left blank. Signature pages to follow.]

IN WITNESS WHEREOF, each Party hereto has caused this Membership Interest Purchase Agreement to be signed on its behalf as of the date first written above.

SRI ENERGY, LLC

By: *Prasad Gullapalli*

Name: Prasad Gullapalli

Title: President

CLEAN ENERGY NEXUS, LLC

By: _____

Name: Joaquin Altenberg

Title: CEO

Signature Page to Membership Interest Purchase Agreement

**Schedule 1.1(a)**

**Permitted Liens**

None found in the data room.

**Schedule 4.6**

**Third Party Rights To Cancel, Modify, Etc.**

Supermercado Venus Gardens Inc. has certain rights to cancel the Rooftop Lease when the Project Company violates the terms of said lease.

**Schedule 4.7**

**Permits and Approvals**

1.      None – there is an exemption in Puerto Rico for Rooftop solar installations under 1MW. No permits/approvals are needed.

**Schedule 4.8**

**Contracts**

Photovoltaic Rooftop Lease Agreement entered into with Supermercado Venus Gardens Inc.

Power Purchase Agreement entered into with Supermercado Venus Gardens Inc.

**Schedule 4.12(a)**

**Liabilities**

None are listed in the Data Room.

**Schedule 4.12(b)**

**Unpaid Invoices**

None listed in the data room.

**Schedule 4.13**

**Accounts Payable**

None listed in the data room.

**Schedule 4.20**

**Environmental Assessments**

None are applicable as this is a rooftop installation.

**Exhibit A**

**PROJECT COMPANIES**

| | | Project Name | Project Co. | Estimated Project Capacity/Size | Estimated Purchase Price | Acquisition Fee ($w/dc) |
|---|---|---|---|---|---|---|
| **1** | | Selectos Venus Gardens | CEN PR SOLAR II LLC | 0.355 | $792,109 | $0.132/w |

**Exhibit B**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment"), is made and entered into as of November 27, 2019, by and between  SRI Energy, LLC, a Michigan limited liability company ("Assignor"), and CLEAN ENERGY NEXUS, LLC, a Delaware limited liability company ("*Assignee*"). This Assignment is being delivered pursuant to the terms of that certain Membership Interest Purchase Agreement, dated November 27, 2019, between Assignor and Assignee (the "*Purchase Agreement*").

WHEREAS, Assignor desires to assign, transfer and deliver to Assignee all of the Membership Interests in CEN PR SOLAR II LLC, a Delaware limited liability company (the "*Company*") and Assignee desires to acquire and accept such Membership Interests from Assignor;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. Definitions. Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

2. Assignment of Interests.

(a)      Assignor hereby irrevocably transfers, conveys, assigns and delivers to the Assignee all of Assignor's right, title, benefits and interest in and to the Membership Interests in the Company and is hereby deemed to have withdrawn and resigned as a member of the Company. Assignor agrees that the name of the Company may or may not be changed following assignment.

(b)      Assignee hereby accepts the assignment and transfer of the Membership Interests in the Company and is hereby deemed to have been admitted as the sole member to the Company.

3. Governing Law and Consent to Jurisdiction. This Assignment shall be governed by and interpreted in accordance with the laws of the State of Texas applicable to contracts performed in that state. THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN TEXAS WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO A DISPUTE AND FOR ANY COUNTERCLAIM WITH RESPECT THERETO.

4. Further Assurances. Assignor agrees to execute, acknowledge and deliver, as appropriate and commercially reasonable, any and all such other and additional instruments, notices, and other documents and to perform such other acts as may be reasonably necessary more fully to assure the Assignee, its successors and assigns, all of the rights and interests hereby assigned, conveyed and

transferred or intended to be so assigned, conveyed and transferred.

5. <u>Counterparts and Headings</u>. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same agreement. Electronic delivery of an executed counterpart of a signature page to this Assignment shall be effective as delivery of an original executed counterpart of this Assignment. The headings used in this Assignment have been inserted for convenience of reference only and do not define, limit, interpret or constitute a part of this Assignment.

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment to be executed and delivered on its behalf as of the date first written above.

SRI ENERGY, LLC

By: *Prasad Gullapalli*

Name: Prasad Gullapalli

Title:President

CLEAN ENERGY NEXUS, LLC

By:

Name: Joaquin Altenberg

Title: CEO

**EXHIBIT C**

**FORM OF**

**GENERAL RELEASE**

This General Release (this "***Release***"), dated as of November 27, 2019, is made by SRI Energy, LLC ("***Seller***"), in favor of <u>CEN PR SOLAR II LLC,</u> a <u>Delaware</u> limited liability company (the "***Project Company***"). Capitalized terms used but not defined herein shall have the meaning given to such terms in the Purchase Agreement (as defined below).

A.      Seller owns 100% percent of the Membership Interests of the Seller Companies, which in turn owns 100% of the membership interests of the Project Company.

B.      Seller has entered into that certain Membership Interest Purchase Agreement (the "***Purchase Agreement***") with Clean Energy Nexus, LLC, a Delaware limited liability company ("***Buyer***"), pursuant to which Seller agrees to sell, and Buyer agrees to purchase, one hundred percent (100%) of the issued and outstanding Membership Interests of the Project Company (the "***Transaction***").

C.      Seller desires to release the Project Company from all known and unknown claims as set forth in this Release and as more particularly described below.

In reliance on the foregoing facts, and in consideration of the mutual release set forth herein, the parties hereto hereby agree as follows:

1.      <u>Release</u>.

(a)      As used herein, "***Claims***" means any claims, demands, accounts, rights, sums of money, charges, contracts, agreements, promises, covenants, causes of action, including, but not limited to, negligence and all other tort actions, suits, controversies, judgments, damages, debts, obligations, equities, statutory claims or liabilities, trespasses, losses, expenses and liabilities, of whatever kind or nature whether in law or in equity, including, without limitation, all matters related to the Project Company's obligations under any contract of any nature and kind whatsoever between the any of the Releasing Parties and the Project Company.

(b)      Except with respect to (a) Claims of Seller in respect of the Transaction documents, including without limitation, (i) the Purchase Agreement (including without limitation those of the Seller Parties as an Indemnified Parties thereunder), (ii) the Assignment and Assumption Agreement, and (iii) the Joint Development Agreement dated February 20, 2019, between Seller and Buyer or (b) Claims arising after the date hereof regarding matters governed by any other contract between Buyer and any of the Releasing Parties which is expressly stated pursuant to the Purchase Agreement to survive the Closing (collectively, the excepted matters under clauses (a) and (b) hereof referred to herein as the "***Excluded Claims***"), Seller hereby fully, irrevocably, and unconditionally releases, acquits, satisfies and forever discharges the Project Company as well as the Project Company's successors, and assigns (collectively, the "***Released Parties***"), from and against any and all Claims (collectively, the "***Released Claims***", which for the avoidance of doubt do not include the Excluded

Claims) that Seller may have against the Released Parties prior to the date hereof and Seller forever waives any right to make any claim or seek any recourse against the Released Parties related thereto.

(c)     This is a full and final release, applying to all known or unknown, foreseen or unforeseen, anticipated or unanticipated, suspected or unsuspected, asserted or unasserted, liquidated or unliquidated, existing or contingent, direct or derivative Released Claims that existed, may have existed or may hereafter arise in any manner or degree from facts and circumstances whether known, or in addition to or different from those now believed to be true, occurring prior to the date of this Release.  Seller understands that it may have Released Claims which have not been manifested or presently known or have not been identified as of the date of this Release, but nevertheless intends to and does deliberately release all of its possible future Released Claims that occurred through the date of this Release.

(d)     The release set forth in Section 1(b) above expressly covers all claims or possible claims by Seller whether the same are known, unknown, suspected or unsuspected, or hereafter discovered or ascertained but which exist as of the date hereof.  Seller acknowledges that it is knowingly and voluntarily releasing unknown claims and waiving all rights they have or may have under any other statute or common law principle of similar effect.

(e)     Seller represents and agrees that (i) it has not assigned, transferred, pledged or otherwise alienated any of its rights under or with respect to any Released Claim, and (ii) it will forever refrain and forebear from instituting, commencing or prosecuting any litigation, action or other proceeding of any kind whatsoever, by way of action, claim, defense, set-off, cross-complaint, counterclaim or third party action, against the Released Parties based on, or arising out of or in connection with any Released Claim.

2.      Governing Law. THIS RELEASE, AND ANY INSTRUMENT OR AGREEMENT REQUIRED HEREUNDER (TO THE EXTENT NOT OTHERWISE EXPRESSLY PROVIDED FOR THEREIN), SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO CONFLICTS OF LAWS PROVISIONS THEREOF.

3.      Entire Agreement; Amendments.  This Release constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, of the parties hereto with respect to the subject matter hereof.  This Release may be amended, modified or waived only by a written instrument executed by the parties hereto. Notwithstanding anything to the contrary, this Release shall not diminish or limit in any way the Claims that Seller may have under the Transaction Documents, including without limitation the Purchase Agreement, the Assignment and Assumption Agreement, and the related transaction documentation.

4.      Severability.  If any provision of this Release is held invalid, illegal or unenforceable in any jurisdiction, the remainder of this Release, or application of that provision to any Persons or circumstances, or in any jurisdiction, other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

5.      Benefit of Agreement.  This Release shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

6.      <u>Titles and Captions</u>.  All section or paragraph titles or captions in this Release are for convenience only, shall not be deemed part of this Release, and in no way define, limit, extend or describe the scope or intent of any provision hereof.

7.      <u>Counterparts</u>.  This Release may be executed in one or more counterparts, each of which shall constitute an original but all of which, taken together, shall constitute but one agreement. Facsimile or PDF signatures shall be deemed original.

This General Release has been duly executed as of the date first written above.

SRI Energy, LLC

By: _____

Name: Prasad Gullapalli

Title: President