# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS E.BURNETT, SR et.al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| - against - | ) | Case no.: 03 MD 1570 (RCC) |
| | ) | |
| AL BARAKA INVESTMENT AND | ) | |
| DEVELOPMENT CORPORATION, et.al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## YESLAM BINLADIN'S
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT
## PURSUANT TO RULES 12 (b)(1), 12 (b)(2) and 12 (b)(6)

## EXHIBIT 3

# Entscheidungen
# des Schweizerischen Bundesgerichts

(einschliesslich Entscheidungen des Eidgenössischen Versicherungsgerichts)
veröffentlicht im Jahre 2000

AMTLICHE SAMMLUNG

126. Band

III. Teil

Zivilrecht und Schuldbetreibungs- und Konkursrecht

# Arrêts du Tribunal Fédéral Suisse

(y compris les arrêts du Tribunal Fédéral des Assurances)
publiés en 2000

RECUEIL OFFICIEL

126ᵉ volume

IIIᵉ partie

Droit civil et Poursuite pour dettes et faillite

# Decisioni del Tribunale federale svizzero

(ivi comprese le decisioni del Tribunale federale delle Assicurazioni)
pubblicate nel 2000

RACCOLTA UFFICIALE

Volume 126

Parte III

Diritto civile e Esecuzioni e fallimenti

EDIPRESSE IMPRIMERIES REUNIES LAUSANNE S.A.

*A.* — C., ressortissant suisse, et dame E., musulmane de nationalité libanaise, se sont mariés le 29 janvier 1993 à Beyrouth (Liban). A cette occasion, C. s'est converti à la religion musulmane. Deux enfants sont issus de cette union: Gilles, né le 1er avril 1994, et Rami, né le 30 mai 1995.

Par mémoire du 13 octobre 1998, l'épouse, alors domiciliée à Beyrouth, a introduit une action en divorce devant le Tribunal civil du district de Delémont, soit au for d'origine de son mari, domicilié quant à lui en Jordanie. Elle a sollicité notamment l'attribution de l'autorité parentale sur les deux enfants, affirmant avoir la ferme intention de s'installer en Suisse avec ceux.

Dans sa réponse du 9 décembre 1998, le défendeur a conclu principalement au rejet de la demande, faisant valoir à titre préjudiciel l'exception de chose jugée, subsidiairement de litispendance, et en tout état de cause, l'incompétence du tribunal saisi. Il a produit à cet effet un acte rendu les 29/31 octobre 1998 par le Tribunal charî'ique sunnite de Beyrouth, selon lequel la décision de dissolution du mariage des époux C. était entrée en force de chose jugée le 17 septembre 1998. Reconventionnellement, il a conclu au divorce et à l'attribution de l'autorité parentale sur les enfants.

*B.* — Le 18 août 1999, le Tribunal civil du district de Delémont, statuant à titre préjudiciel, a rejeté les exceptions soulevées par le défendeur et admis sa compétence pour connaître de la procédure de divorce introduite par la demanderesse, pour le principal motif que la décision libanaise viole gravement l'ordre public suisse et ne saurait être reconnue par les autorités suisses, conformément aux art. 27 et 65 de la loi fédérale du 18 décembre 1987 sur le droit international privé (LDIP; RS 291).

Statuant le 15 décembre 1999 sur appel du défendeur, la Cour civile du Tribunal cantonal du canton du Jura a confirmé ce jugement.

*C.* — Le Tribunal fédéral a rejeté, dans la mesure où il était recevable, le recours en réforme interjeté par C. contre cet arrêt, qui a dès lors été confirmé.

*Extrait des considérants:*

1. — c) L'arrêt du Tribunal cantonal jurassien constitue une décision prise séparément du fond par la juridiction suprême du canton au sujet de la compétence territoriale. En tant que telle, elle peut faire l'objet d'un recours en réforme pour violation des prescriptions de droit fédéral sur la compétence, en particulier internationale (art. 49

al. 1 OJ; arrêts du Tribunal fédéral M. SA c. P. du 16 octobre 1997 et M.-G. c. M. du 9 février 1996; cf. ATF 124 III 382 consid. 2a; 123 III 414 consid. 2 et la jurisprudence citée).

Dans la présente affaire, la compétence des tribunaux jurassiens doit être examinée au regard de l'art. 60 LDIP. Selon cette disposition, les tribunaux d'origine sont compétents pour connaître d'une action en divorce ou en séparation de corps lorsque les époux ne sont pas domiciliés en Suisse et que l'un d'eux est suisse, si l'action ne peut être intentée au domicile de l'un des époux ou si l'on ne peut raisonnablement exiger qu'elle le soit. Les deux premières conditions posées par cette disposition étant à l'évidence réalisées, il convient de statuer sur la question de l'impossibilité d'ouvrir action au domicile de l'un des époux, qui découlerait ici de l'existence d'une décision entrée en force de chose jugée prononçant en constatant la répudiation de l'épouse par le mari. L'examen des conditions d'application de l'art. 60 LDIP et, par conséquent, de la violation des règles fédérales sur la compétence internationale comprend donc nécessairement celui de la force de chose jugée de cette décision. Savoir si une action ayant le même objet est déjà pendante entre les mêmes parties à l'étranger est également une question qui concerne la compétence (cf. ATF 118 II 188 consid. 3b y 192). Selon l'art. 9 al. 1 LDIP, les conséquences juridiques d'une telle litispendance consistent en premier lieu dans la suspension de la cause; le tribunal suisse ne se dessaisit donc pas de l'affaire (Paul Volken, in IPRG Kommentar, n. 26 ad art. 9 LDIP). Il ne lie qu'ultérieurement, pour autant qu'une décision étrangère puissent être reconnue en Suisse lui soit présentée (art. 9 al. 3 LDIP). Le dessaisissement du tribunal suisse ne résulte pas de la litispendance à l'étranger, qui n'existe plus à ce moment-là, mais de l'autorité de la chose jugée de la décision présentée (Stephen V. Berti, in Commentaire bâlois, n. 25 ad art. 9 LDIP). Il s'ensuit que l'exception de litispendance se recoupe en l'espèce avec celle de force de chose jugée. Le présent recours en réforme est dès lors recevable sous ces différents aspects.

2. — En l'absence de convention entre le Liban et la Suisse en la matière, les conditions de la reconnaissance de l'acte de dissolution du mariage émanant du Tribunal de Beyrouth sont régies par la loi fédérale sur le droit international privé, du 18 décembre 1987 (art. 1er LDIP).

a) Selon l'art. 65 LDIP, les décisions étrangères de divorce ou de séparation de corps sont reconnues en Suisse, notamment, lorsqu'elles ont été rendues dans l'État du domicile ou de la résidence habi-

tuelle, ou dans l'Etat national de l'un des époux. La notion de "décision étrangère de divorce" s'entend dans un sens large (ATF 122 III 344). Il suffit que le divorce ait été prononcé à la suite de n'importe quelle procédure qui, dans l'Etat du jugement, présente un caractère officiel. Cette procédure peut être aussi bien judiciaire qu'administrative ou religieuse. Il faut cependant qu'une procédure se soit déroulée ou qu'un organe officiel ait prêté son concours (Message mentaire de la loi fédérale du 18 décembre 1987, n. 3 ad art. 65 p. 173). L'art. 65 LDIP doit être lu en relation avec les règles générales prévues aux art. 25 ss LDIP. Ces dispositions prévoient en substance qu'une décision étrangère est reconnue en Suisse pour autant que les autorités judiciaires de l'Etat dont émane la décision étaient compétentes, que la décision n'est plus susceptible de recours ordinaire et qu'elle n'est pas manifestement incompatible avec l'ordre public suisse matériel ou procédural.

b) En tant que clause d'exception, la réserve de l'ordre public s'interprète de manière restrictive, spécialement en matière de "reconnaissance et d'exécution de jugements étrangers, où sa portée est plus étroite que pour l'application directe du droit étranger. Il y a violation de l'ordre public selon l'art. 27 al. 1 LDIP lorsque la reconnaissance et l'exécution d'une décision étrangère heurte de manière intolérable les conceptions suisses de la justice. Une décision étrangère peut être incompatible avec l'ordre juridique suisse non seulement à cause de son contenu matériel, mais aussi en raison de la procédure dont elle est issue (art. 27 al. 2 LDIP). A cet égard, l'ordre public suisse exige le respect des règles fondamentales de la procédure déduites de la Constitution, tels notamment le droit à un procès équitable et celui d'être entendu (ATF 126 III 101 consid. 3b p. 107/108; 122 III 344 consid. 4a p. 348/349 et les références).

3.— Le recourant soutient que l'acte émanant du Tribunal de Beyrouth constitue un jugement de divorce prononcé par défaut et non une répudiation. Il serait dès lors susceptible d'être reconnu en Suisse, ou qui exclurait une nouvelle procédure de divorce. Il prétend en outre que, même s'il s'agissait d'une répudiation, l'ordre public suisse ne s'opposerait pas à sa reconnaissance.

a) Le Liban connaît différents modes de dissolution du mariage. En ce qui concerne les musulmans sunnites, le Code de la famille du 25 octobre 1917, modifié par la loi du 16 juillet 1962, prévoit notamment la répudiation par le mari ("talaq") et le divorce judiciaire ("tafreeq").

La répudiation peut être le fait du mari ou de son mandataire dûment attitré à cet effet s'il ne peut être présent (répudiation unilatérale). En revanche, la femme ne peut répudier son époux qu'avec l'accord de celui-ci et, en règle générale, moyennant le versement d'une compensation (répudiation convenue ou par rachat). La répudiation est soumise à des conditions de forme et de validité. Ainsi, le mari doit être capable, ne pas être en état d'ivresse, ni sous l'empire de la violence (art. 102, 104 et 105 du Code de 1917). Elle peut être à terme (art. 107) ou conditionnelle (art. 106), révocable ou irrévocable (art. 108, 111 à 118). Pour les musulmans sunnites, l'utilisation d'une formule déterminée n'est pas nécessaire: il suffit que le mari déclare de manière non équivoque vouloir mettre fin au mariage, la présence de témoins n'est pas non plus exigée (art. 109). Le mari qui répudie doit en aviser le juge (art. 116), puis l'état civil. Aucune procédure de conciliation n'est toutefois prévue. De plus, ni la communication au tribunal, ni l'inscription dans les registres de l'état civil ne sont constitutives (cf. BERGMANN/FERID, Internationales Ehe- und Kindschaftsrecht, VI, Liban, p. 22-25; Le droit musulman de la famille et des successions à l'épreuve des ordres juridiques occidentaux, Sami Aldeeb et Andrea Bonomi [éd.], Zürich 1999, p. 149-158).

Le Code de la famille de 1917 a par ailleurs accordé à la femme le droit de divorcer, judiciairement pour divers motifs, tels que l'impuissance ou une maladie grave du mari, son éloignement, respectivement son absence, ainsi qu'en cas de défaut d'entretien (art. 119 à 129). L'art. 130 du code permet en outre à chacun des époux — soit également au mari — de demander le divorce lorsque la vie commune est devenue insupportable. Cette dernière disposition a été complétée par les art. 337 à 346 de la loi du 16 juillet 1962 sur l'organisation des juridictions char'is, sunnites et ja'farites, qui prévoient une procédure de conciliation. Selon l'art. 338 de la loi de 1962, le juge peut en effet essayer de réconcilier les époux en leur impartissant à cette fin un délai d'au moins un mois. Si la réconciliation n'intervient pas, le juge nomme deux conciliateurs pour qu'ils examinent l'affaire, réunissent les époux en conseil de famille et fassent de leur mieux pour les réconcilier (art. 339). S'ils n'y parviennent pas, ils dressent au juge un rapport détaillé dans lequel ils exposent leur point de vue ainsi que leurs propositions quant au divorce, à la lumière des preuves recueillies sur la culpabilité de l'un ou l'autre époux (art. 342). Le divorce prononcé par le juge produit l'effet d'une répudiation irrévocable (art. 433) (cf. BERGMANN/FERID, op. cit.,

p, 25-26). A la différence de la répudiation, le divorce judiciaire exige une cause et le jugement est constitutif (Le droit musulman de la famille et des successions, op. cit., p. 152).

b) Selon la traduction de l'acte rendu par le Tribunal de Beyrouth les 29/31 octobre 1998, la répudiation a été prononcée par une déclaration unilatérale du mandataire du mari. Le juge a simplement décidé d'enregistrer cette déclaration dans les registres du tribunal la décision libanaise litigieuse revêt ainsi les caractéristiques d'une répudiation unilatérale de la femme par le mari, et ce nonobstant le terme de divorce utilisé dans la traduction. L'Institut suisse de droit comparé, à Lausanne, arrive du reste à la même conclusion dans son avis du 27 avril 1999, précisant que la dissolution du mariage a eu lieu par voie de répudiation définitive, sur décision du mari, et que le document établi par le tribunal n'a qu'un caractère constitutoire.

4. — Il y a dès lors lieu d'examiner si, comme le prétend le recourant, une "répudiation par déclaration unilatérale du mari est une décision susceptible d'être reconnue au sens des art. 25 ss et 65 LDIP.

a) Sous l'empire de la LRDC, le Tribunal fédéral refuse de reconnaître une répudiation islamique (unilatérale du mari; selon l'ar... 7g al. 3 LRDC, un divorce ne pouvait être reconnu que s'il avait été "prononcé" par un tribunal, ce qui supposait que l'autorité compétente y ait apporté un "concours décisif" (ATF 88 I 48 consid. 2 p. 50 ss). Depuis l'entrée en vigueur de la LDIP, il n'est plus possible de s'en tenir à cette jurisprudence restrictive sur la notion de "décision susceptible d'être reconnue", déjà critiquée à l'époque. La réserve de l'ordre public de l'art. 27 LDIP permet toutefois de s'opposer à la reconnaissance d'une dissolution de mariage qui serait absolument incompatible avec les conceptions juridiques suisses (ATF 122 III 344 consid. 3a et b p. 346 ss et les références citées).

b) La répudiation est une prérogative maritale mettant fin au mariage du seul fait de son exercice par son titulaire. L'enveloppe procédurale exigée par les diverses législations positives d'inspiration islamique reste une formalité de nature probatoire, fût-elle impérative et parfois assortie de sanctions pénales. Il en va ainsi en droit libanais, qui prévoit que le mari qui a répudié sa femme est tenu d'en informer le juge (art. 110 du Code de la famille de 1917); il doit également dans un délai d'un mois notifier sa décision aux services de l'état civil (art. 27 de la loi du 7 décembre 1951). Le défaut d'accomplissement de ces formalités n'expose les parties qu'au paiement d'une faible amende et ne saurait rejaillir sur la validité de la

répudiation. En homologuant celle-ci, le juge se contente de recevoir la volonté du mari. La répudiation pose ainsi le problème de l'inégalité des époux devant le divorce (cf. ROULA EL-HUSSEINI, Le droit international privé français et la répudiation islamique, in Revue critique de droit international privé, 1999/3, p. 427 ss et les références citées).

Selon la jurisprudence et la doctrine, une telle répudiation viole manifestement l'ordre public matériel suisse (art. 27 al. 1 LDIP, ATF 103 Ib 69 consid. 3a p. 72 s, 88 I 48 ss; cf. aussi ATF 122 III 344 consid. 3b p. 348; DUTOIT, op. cit., loc. cit.) et ne peut en principe être reconnue, sauf lorsque la répudiation est intervenue à l'étranger entre des ressortissants du pays concerné et que la validité du divorce ne se pose qu'à titre préalable, par exemple à propos d'une question successorale (Message du Conseil fédéral, op. cit., loc. cit.; ANTON K. SCHNYDER, Das neue IPR-Gesetz, 2e éd., Zurich 1990, p. 64; FRANK VISCHER, Droit international privé, in Traité de droit privé suisse, t. I/4, p. 102). Il faut cependant considérer les choses in concreto, et non pas rejeter l'institution la répudiation de façon générale et abstraite (SIMON OTHENIN-GIRARD, La réserve d'ordre public en droit international privé suisse, Persones-Famille-Successions, n 809 let. b p. 500 et n. 811 let... d p. 502, PIERRE LALIVE, in Annuaire suisse de droit international, XXVIII, 1972, p. 390).

c) En l'espèce, la reconnaissance de la décision litigieuse ne se pose pas à titre préalable pour juger d'une prétention connexe, mais est invoquée par le recourant pour s'opposer à la demande en divorce introduite par l'intimée devant le tribunal jurassien; au demeurant, seule l'épouse est ressortissante libanaise, les enfants ayant — comme le mari — la nationalité suisse. Selon l'arrêt entrepris, l'intimée s'est installée à Meyrin au printemps 1999 avec ses deux fils, pour qu'ils y effectuent leur scolarité, et le canton de Genève a donné un préavis positif concernant une prochaine autorisation de séjour. Le lien de l'intimée avec la Suisse ("Binnenbeziehung"; cf. IVO SCHWANDER, Internationales Privatrecht, Allgemeiner Teil, 1985, n. 25-27 p. 186, OTHENIN-GIRARD, op. cit., n. 816 p. 503 et p. 299 ss) est certes récent et encore peu étroit, comme le relève la cour cantonale. Il en demeure pas moins que l'intimée vit depuis maintenant plus d'un an en Suisse avec ses enfants, qui sont ressortissants de ce pays. C'est dès lors avec raison que les juges cantonaux ont tenu la reconnaissance de la décision incriminée pour contraire à l'ordre public suisse, conformément à l'avis de l'Institut suisse de droit comparé. Contrairement à ce que soutient le recou-

rant, il importe peu que l'épouse ait été convoquée et n'ait pas comparu, dans la mesure où, comme il a été dit ci-dessus, la procédure relative à la répudiation consiste en de simples formalités à caractère probatoire. Le recourant ne saurait en outre reprocher à l'intimée. d'abuser de son droit, du moment que l'ordre public est en jeu (cf. ATF 114 II I consid. 4 in fine p. 6). La cour cantonale n'a donc pas violé le droit fédéral en refusant de reconnaître la décision libanaise des 29/31 octobre 1998.

5.— Le recourant invoque en outre l'art. 9 al. I LDIP. Selon cette disposition, lorsqu'une action ayant le même objet est déjà pendante entre les mêmes parties à l'étranger, le tribunal suisse suspend la cause s'il est à prévoir que la juridiction étrangère rendra, dans un délai convenable, une décision pouvant être reconnue en Suisse. Dès lors qu'elle a considéré à juste titre que cette dernière condition n'était pas réalisée, l'autorité cantonale n'a pas non plus violé le droit fédéral en écartant l'exception de litispendance soulevée par le recourant.

### 59. Auszug aus dem Urteil der I. Zivilabteilung vom 22. Juni 2000 i.S. A. gegen Bank X. (Berufung)

*Gerichtsstand am Erfüllungsort gemäss Art. 113 IPRG.*
Ein Gerichtsstand am Erfüllungsort gemäss Art. 113 IPRG steht auch bei bestrittener Gültigkeit des in Frage stehenden Vertrages zur Verfügung (E. 3).

*For du lieu d'exécution selon l'art. 113 LDIP.*
Le for du lieu d'exécution, au sens de l'art. 113 LDIP, est également à disposition pour les litiges relatifs à la validité du contrat en cause (consid. 3).

*Foro del luogo dell'adempimento ai sensi dell'art. 113 LDIP.*
L'azione può essere introdotta presso il foro del luogo dell'adempimento, ai sensi dell'art. 113 LDIP, anche qualora la validità del contratto in questione sia controversa (consid. 3).

Am 11. April 1990 unterzeichnete A. (Beklagter) einen öffentlich beurkundeten Solidarbürgschaftsvertrag, in welchem er sich gegenüber der Bank X. (Klägerin) verpflichtete, für Forderungen der Klägerin gegenüber der Z. Holding, Curaçao, Netherland Antilles, bis zum Höchstbetrag von sFr. 25 Millionen solidarisch zu haften. Die Solidarbürgschaft steht unbestrittenermassen im Zusammen-

hang mit einem Rückz
mit der Z. Holding ab
19. März/11. April 1990

Der Bürgschaftsvertra
dass auf die Solidarbürg
ist und allfällige Streitig
Wohnsitz des Bürgen du
teilt werden sollen.

Mit Klage vom 1. Juli
gestützt auf den Bürgs
Bezirksgericht Zürich e
vom 28. Januar 1999 bea
es sei die Klage mangel:

Das Bezirksgericht Zü
te Obergericht des Kanto
Unzuständigkeit mit Be
28. Januar 2000 ab.

Der Beklagte hat geg
Kantons Zürich vom 28.
gelegt. Darin beantragt
Beschluss sei aufzuheber
digkeit nicht einzutreten;
scheidung an die Vorins
trägt Abweisung der Ber
des Bezirksgerichts Züri

Das Bundesgericht wei

*Au*

3.— Nach den Darleg
bleiben, ob die Parteien
einbart haben, da die z
Gerichtsstand des Erfüllu
fehlender Gerichtsstandsv

*a)* Der Beklagte erhebt
chen Einwand, über die G
Gerichte am ordentlichen
mutmasslichen Erfüllungs
seine Rüge auf die in der
die Zuständigkeit des Geri
sei, wenn die Leistung an

3.2

# Entscheidungen
## des Schweizerischen Bundesgerichts
(einschliesslich Entscheidungen des Eidgenössischen Versicherungsgerichts)
veröffentlicht im Jahre 1996

### AMTLICHE SAMMLUNG
122. Band

### III. Teil
Zivilrecht und Schuldbetreibungs- und Konkursrecht

# Arrêts du Tribunal Fédéral Suisse
(y compris les arrêts du Tribunal Fédéral des Assurances)
publiés en 1996

### RECUEIL OFFICIEL
122ᵉ volume

### IIIᵉ partie
Droit civil et Poursuite pour dettes et faillite

# Decisioni del Tribunale federale svizzero
(ivi comprese le decisioni del Tribunale federale delle Assicurazioni)
pubblicate nel 1996

### RACCOLTA UFFICIALE
· Volume 122

### Parte III
Diritto civile e Esecuzioni e fallimenti

IRL IMPRIMERIES RÉUNIES LAUSANNE S.A.

# V. INTERNATIONALES PRIVATRECHT
## DROIT INTERNATIONAL PRIVÉ
## DIRITTO INTERNAZIONALE PRIVATO

**53.** Extrait de l'arrêt de la 1re Cour civile du 23 août 1996 dans la cause K. contre dames P. et F. (recours en réforme).

*Droit international privé; compétence ratione loci; courtage.*
*Interprétation de la notion de «matière contractuelle», au sens de l'art. 5 ch. 1 de la Convention de Lugano (consid. 3a). Application de cette notion en cas du contrat de courtage (consid. 3b). Prorogation tacite de compétence selon l'art. 18 de la Convention de Lugano (consid. 4).*

*Internationales Privatrecht; Zuständigkeit ratione loci; Vermittlung.*
*Auslegung des Begriffs «Vertrag oder Ansprüche aus Vertrag» im Sinn von Art. 5 Ziff. 1 LugÜ (E. 3a). Anwendung dieses Begriffs auf einen Mäklervertrag (E. 3b). Stillschweigende Anerkennung der Zuständigkeit gemäss Art. 18 LugÜ (E. 4).*

*Diritto internazionale privato; competenza ratione loci; mediazione.*
*Interpretazione della nozione di «materia contrattuale» figurante all'art. 5 n. 1 della Convenzione di Lugano (consid. 3a). Applicazione di codesta nozione al contratto di mediazione (consid. 3b). Proroga tacita di competenza giusta l'art. 18 della Convenzione di Lugano (consid. 4).*

Le 23 décembre 1992, P. et F., domiciliées à Genève, y ont assigné K., domicilié à Londres, en paiement de 106'000 fr., plus intérêts, à titre de commission de courtage en rapport avec la vente par le défendeur d'un grand appartement dont il était propriétaire à Genève.

Par jugement du 15 septembre 1995, le Tribunal de première instance du canton de Genève a condamné K. à payer la somme de 96'000 fr., intérêts en sus, à dame F. Il a, en revanche, rejeté la demande de dame F. au motif qu'il n'existait aucun contrat de courtage entre le défendeur et elle.

Statuant sur appel de K., la Cour de justice du canton de Genève, par arrêt du 24 novembre 1995, a confirmé ledit jugement. Elle s'est déclarée compétente ratione loci pour connaître de la présente affaire, en vertu de l'art. 5 ch. 1 de la Convention de Lugano, appliqué le droit suisse conformément à l'art. 117 LDIP (RS 291).

Le défendeur interjette un recours en réforme au Tribunal fédéral. Il conclut à l'annulation de l'arrêt déféré et au déboutement de l'art. 5 ch. 1 de la Convention de Lugano en n'examinant pas de manière suffisante si la cause en litige relevait ou non de la «matière contractuelle». A son avis, un tel examen eût permis d'exclure l'applicabilité de cette disposition et, partant, la compétence des autorités judiciaires suisses, en vertu de l'art. 2 al. 1 de ladite convention, étant donné qu'il est domicilié en Grande-Bretagne.

Le Tribunal fédéral a rejeté le recours, dans la mesure où il était recevable, et confirmé l'arrêt attaqué.

*Extrait des considérants:*

3 — a) La Convention concernant la compétence judiciaire et l'exécution des décisions en matière civile et commerciale conclue à Lugano le 16 septembre 1988 (Convention de Lugano; RS 0.275.11) s'applique aux actions judiciaires intentées postérieurement à son entrée en vigueur dans l'état concerné (art. 54 al. 1; ATF 119 II 391 1er janvier 1992 et en Grande-Bretagne le 1er mai de ladite année. Les demanderesses ont introduit leur action en paiement le 23 décembre 1992. Par conséquent, cette action est régie par la Convention de Lugano.

En principe, les personnes domiciliées sur le territoire d'un État contractant sont attraites, quelle que soit leur nationalité, devant les juridictions de cet État (art. 2 al. 1 de la Convention de Lugano). Cependant, en matière contractuelle, le défendeur domicilié sur le territoire d'un État contractant peut être attrait devant le tribunal du lieu où l'obligation qui sert de base à la demande a été ou doit être exécutée (art. 5 ch. 1 de la Convention de Lugano). La notion de «matière contractuelle» est une notion autonome qui ne doit pas être interprétée par renvoi au droit interne de l'un ou l'autre des États concernés. Elle inclut les contestations sur l'existence ou sur la validité d'un contrat, faute de quoi il suffirait au défendeur d'alléguer que le contrat n'existe pas ou n'est pas valable pour déjouer la règle instituant cette compétence spéciale. L'obligation à retenir n'est ni l'une quelconque des obligations nées du contrat, ni l'obligation

300

Internationales Privatrecht · N° 53

caractéristique, mais l'obligation qui sert de base à l'action en justice. Lorsque les parties n'ont pas désigné le lieu d'exécution de l'obligation litigieuse, le lieu où l'obligation a été ou doit être exécutée, au sens de l'art. 5 ch. 1 de la Convention de Lugano, est déterminé conformément à la loi qui régit l'obligation litigieuse selon sa par cette loi qui fonde la compétence spéciale, le plus souvent, ce détails: Hélène GAUDEMET-TALLON, Les Conventions de Bruxelles et de Lugano — Compétence internationale, reconnaissance et exécution des jugements en Europe, Paris 1993, p. 101 ss; BÉATRICE IVANOVNA BRANDT, Direkte Zuständigkeit der Schweiz im internationalen Schuldrecht, Europäisches Zivilprozessrecht, 5° éd., p. 94 ss).

*b)* Dans le cas particulier, la question centrale a trait à l'existence ou l'inexistence d'un contrat de courtage ayant lié K. à P. Malgré qu'en ait le défendeur, la question relève de la matière contractuelle réservée par l'art. 5 ch. 1 de la Convention de Lugano, attendu que cette notion, autonome, embrasse aussi le problème de l'existence d'un contrat. L'obligation litigieuse est en l'occurrence le paiement de la commission réclamée par la courtière. Pour la localiser, il faut se référer au droit suisse. En effet, cette obligation dérive d'un contrat de courtage, lequel tombe sous le coup de l'art. 417 LDIP recht, Obligationenrecht I, n. 21 ad art. 412 CO). Cette disposition, dans lequel le courtier a sa résidence habituelle ou, s'il agit à titre professionnel, son établissement. Or, la demanderesse P. est domiciliée et travaille à Genève. En droit suisse, à défaut de stipulation contraire, lorsqu'il s'agit d'une somme d'argent, le paiement s'opère dans le lieu où le créancier est domicilié à l'époque du paiement (art. 74 al. 2 ch. 1 CO). Ainsi, en l'espèce, l'obligation relevant du paiement de la commission litigieuse, base à la demande, c'est-à-dire le le défendeur, bien qu'il fît domicilié en Grande-Bretagne au moment de l'ouverture de la présente action, pouvait donc être actif en Suisse, conformément aux dispositions de l'art. 5 ch. 1 de la Convention de Lugano. Partant, la Cour de justice s'est déclarée à cations avancées dans l'acte de recours pour tenter d'établir le contraire tombent dès lors à faux. Au demeurant, le défendeur n'est

pas logique avec lui-même puisqu'il s'ingénie à démontrer l'incompétence territoriale des autorités judiciaires suisses tout en invitant le Tribunal fédéral à débouter P. de ses conclusions, autrement dit à statuer sur le fond.

4.— En tout état de cause, et comme le relèvent avec raison les rgation tacite de compétence conduirait ici au même résultat que chui auquel est parvenue la Cour de justice, à supposer que celle-ci n'eût pas appliqué correctement l'art. 5 ch. 1 de ladite Convention. A cet égard et contrairement aux affirmations de l'intéressé, il ressort du dossier cantonal que le défendeur n'a jamais contesté la compétence territoriale des autorités judiciaires genevoises. De fait, en première instance, il s'est simplement rapporté à justice sur ce point et, en instance d'appel, il n'a même plus repris cette pseudoréserve, mais s'est contenté de conclure au rejet de l'action en se référant, en droit, aux art. 1 ss et 412 ss CO. C'est à un motif supplémentaire de rejet de son recours en réforme.

# VI. VERFAHREN

# PROCÉDURE

# PROCEDURA

**54. Estratto della sentenza 21 febbraio 1996 della II Corte civile** nella causa X. contro U. (ricorso per riforma)

*Ammissibilità di un ricorso per riforma in materia di diritto di riposo.*
L'autore di una risposta, pubblicata in virtù del giudizio di primo grado, ha un interesse degno di protezione a impugnare la sentenza dell'ultima autorità cantonale a lui sfavorevole.

*Zulässigkeit einer Berufung im Verfahren der Gegendarstellung.*
Der Verfasser einer Gegendarstellung, die gestützt auf das erstinstanzliche richterliche Entscheid veröffentlicht wurde, hat ein schützenswertes Interesse daran, den zu seinen Ungunsten ausgefallenen Entscheid der letzten kantonalen Instanz anzufechten.

301

Verfahren · N° 54

*3.3*

# JOURNAL DES TRIBUNAUX

## II. POURSUITE POUR DETTES

*Rédacteur:* **P.-R. GILLIÉRON**
juge émérite au Tribunal cantonal
professeur à l'Université de Lausanne

142ᵉ année — 1994

RENENS
Imprimerie Ruckstuhl S.A.
1994

— 148 —

*b)* En l'espèce, point n'est besoin de faire appel au projet pour déterminer — après avoir constaté qui est le tireur et qui est le tiré

— la nature juridique du titre de créance en question. Il résulte sans équivoque de l'effet de change litigieux que la société B. & M. AG l'a tiré sur elle-même en qualité de tireur au sens de l'art. 993 al. 2 CO; et l'on ne peut non plus évoquer en doute que la lettre de change tirée contient tous les éléments exigés par l'art. 993 CO. En qualité de tireur, la société B. & M. AG est nominalement obligée selon le droit de change conformément à l'art. 999 al. 1er CO.

C'est cela — et rien de plus — que le préposé aux poursuites avait à apprécier sur la base du titre de créance à l'il produit. Le préposé aux poursuites n'avait pas besoin d'examiner si par la suite quelque chose a changé dans la situation de droit matériel pour n'importe quelle raison (par exemple à cause de l'omission du protêt, faute d'acceptation ou faute de paiement). Par conséquent — comme déjà expliqué dans l'arrêt du 20 octobre 1992 — pour la décision dans la présente espèce, ce qui s'est produit dans l'entourage de la société X. GmbH ne peut être pertinent.

RÉSUMÉ D'ARRÊT

**Séquestre. Formalités destinées à parfaire le séquestre. Poursuite en validation de séquestre. Annulation de l'opposition par la mainlevée définitive. Jugement rendu dans un pays étranger avec lequel il n'existe pas de convention sur l'exécution réciproque des jugements. Jugement anglais. Recours de droit public. — Art. 19, 80, 81 a. 3, 278 LP; 4 CSt., 44, 46, 68 al. 1er, 75 ss, 84 al. 1er let. a et c, 97 ss OJ; 5 al. 1er let. a et b PA; 25 ss LDIP.**

Trad. E.S

ment d'un effet de change ou d'un chèque. La force probante du projet concerne uniquement les énonciations qu'il comporte (art. 1036 CO). S'agissant du nom de la personne ou la raison de commerce pour et contre laquelle il est dressé, ces énonciations indiquent qui a requis que le projet soit dressé et contre qui; il ne s'agit nullement d'une interprétation juridique de l'effet par l'office public ou le fonctionnaire habilité à le dresser.

— 149 —

1. Le TF examine d'office et librement la recevabilité du recours de droit public (ATF 117 I a 252; ATF 117 I a 301; ATF 117 I a 337, c. 1; ATF 117 I a 343, c. 2; ATF 117 I a 394, c. 1 a et les arrêts cités). Il vérifie donc la voie de droit ouverte dans chaque cas particulier, quel que soit l'intitulé de l'acte de recours (ATF 115 I b 459, c. 1 rés. JdT 1991 I 482; ATF 115 IV 133, c. 1 a non rés. au JdT 1990 IV (59 s.).

*d)* Le recours de droit public n'est recevable que si la prétendue violation ne peut pas être soumise par une action ou par une autre voie de droit quelconque au TF ou à une autre autorité fédérale (art. 84 al. 2 OJ). Ce principe de subsidiarité est absolu et ne tolère aucune exception (*Kälin, Das Verfahren der staatsrechtlichen Beschwerde,* Berne 1984, p. 265).

En l'absence de convention entre la Grande-Bretagne et la Suisse sur la reconnaissance et l'exécution des jugements, la jurisprudence a confirmé que les décisions relatives à la reconnaissance et à l'exécution des jugements étrangers, notamment dans le cadre d'une poursuite pour dettes (art. 81 al. 3 LP; SJ 1992 p. 180 let. a et les réf.), ne tranchent pas une contestation civile au sens de l'art. 68 al. 1er OJ, de sorte qu'elles ne peuvent être soumises au TF par la voie du recours en réforme (ATF 116 II 377, JdT 1990 I 616, c. 2; SJ 1991 pp. 237/238, c. 1) ou en nullité (ATF 116 II 378, JdT 1990 618, c. 3). Le recours du droit des poursuites (art. 19 LP et 75 ss OJ) est également exclu (ATF 116 II 628, c. 3b rés. JdT 1992 II 183 s.). Aussi, le TF a-t-il admis la recevabilité du recours de droit public fondé sur l'art. 84 al. 1er let. a ou let. c OJ, selon qu'est invoquée la violation des art. 25 ss LDIP ou celle d'un traité international (ATF 116 II 378, JdT 1990 I 618, c. 3 b; SJ 1991 pp. 237/238, c. I).

En revanche, il n'a pas examiné dans ces arrêts la question de la recevabilité du recours de droit administratif au sens des art. 97 ss OJ contre une décision rendue en dernière instance cantonale (art. 98 let. g OJ) sur la reconnaissance et l'exécution d'un jugement étranger en application des art. 25 ss LDIP ou d'une convention internationale, voie préconisée par certains auteurs (*Poudret/Wurzburger,* Unité ou dualité des recours au Tribunal fédéral contre

— 150 —

les décisions rendues en matière de reconnaissance des jugements étrangers?, in JdT 1991 I pp. 290 ss; *Poudret/Würzburger/Haldy*, Procédure civile vaudoise, Lausanne 1991, n. 2 ad art. 507 c. CPC; *Poudret*, Commentaire de la loi fédérale d'organisation judiciaire, vol. V, Supplément ad art. 1-82 OJ, Berne 1992, p. 236). Dans un arrêt, le TF avait déjà relevé que la modification de la loi fédérale d'organisation judiciaire (OJ), à l'entrée en vigueur de la loi sur la procédure administrative (PA), avait en principe ouvert la voie du recours de droit administratif en cas de violation de normes de droit public contenues dans un traité international (ATF 99 Ia 82/83). Un arrêt récent précise cependant que, dans les cas susceptibles d'un recours en réforme, la violation de ces dispositions peut être invoquée à l'appui d'un tel recours (ATF 117 Ia 83; JdT 1993 II 77, c. 1).

Dans un arrêt du 17 octobre 1991, la Seconde Cour civile a examiné la question de la recevabilité du recours de droit administratif contre une décision d'exequatur rendue en application de la Convention franco-suisse du 15 juin 1869. Il l'a laissée indécise, estimant que cette voie ne présentait pas de différences notables par rapport à celle du recours de droit public pour violation d'un traité international (arrêt L. c. dame B., SJ 1992 pp. 179 ss et JdT 1993 II 79 ss, spéc. c. 1b, non publié in ATF 117 Ib n° 42). Comme le recourant se plaint en l'espèce de la violation des art. 25 ss LDIP, il y a lieu d'y revenir.

b) Le TF connaît des recours de droit administratif contre des décisions au sens de l'art. 5 PA (art. 97 al. 1er OJ), notamment lorsqu'elles émanent d'une autorité cantonale statuant en dernière instance (art. 98 let. g OJ). Sont considérées comme des décisions les mesures prises par les autorités dans des espèces, lorsqu'elles sont fondées sur le droit public fédéral et qu'elles ont en particulier pour objet de créer, de modifier ou d'annuler des droits ou obligations, ou d'en constater l'existence, l'inexistence ou l'étendue (art. 5 al. 1er let. a et b PA). En l'espèce, l'arrêt attaqué est une décision qui a pour objet de créer le droit à l'exécution forcée d'un jugement anglais en Suisse. L'exequatur est un effet nouveau, constitutif, qui attribue à la décision étrangère un effet nouveau, à savoir la force exécutoire dans un Etat étranger (*Stojan*, Die Anerkennung und Vollstreckung ausländischer Zivilurteile in Handelssachen, thèse Zürich 1986, p. 177 et les réf.). Reste à déterminer si elle est fondée sur le «droit public fédéral» au sens de l'art. 5 PA.

— 151 —

L'arrêt attaqué a été prononcé en application des art. 25 ss LDIP, c'est-à-dire selon des règles d'exécution forcée qui relèvent du droit public (*Poudret*, op. cit., vol. II, p. 53). Mais la notion de «droit public fédéral» au sens de l'art. 5 PA n'englobe pas l'ensemble du droit public édicté par la Confédération: la doctrine dominante estime qu'elle se limite au droit administratif fédéral (*Brunschwiler*, Staatsrecht und Verwaltungsrecht sind nicht dasselbe, in Mélanges André Grisel, Neuchâtel 1983, pp. 713 ss; *Grisel*, Traité de droit administratif, vol. II, Neuchâtel 1984, p. 855; *Häfelin/Müller*, Grundriss des Allgemeinen Verwaltungsrechts, Zurich 1990, p. 319 n° 1501; *Haller*, in Commentaire de la Constitution fédérale, n. 22 et 66 ad art. 114 bis Cst.; *Hangartner*, Grundzüge des schweizerischen Staatsrechts, vol. II, Zurich 1990, p. 109; *Moor*, Droit administratif, vol. II, Berne 1991, p. 142; *Saladin*, Das Verwaltungsverfahrensrecht des Bundes, Bâle-Stuttgart 1979, p. 77 n° 1C.52). Cette interprétation paraît conforme à l'art. 114 bis al. 1er Cst., qui dispose que la Cour administrative fédérale connaît des «contestations administratives» en matière fédérale (*Brunschwiler*, op. cit., pp. 713/714; *Haller*, op. cit., n. 22 et 66 ad art. 114 bis Cst.; *Schmidli*, BGE 102 Ib 264: Verwaltungsgerichtsschwerde gegen die Veranlagung zu kantonalen Steuern?, in Mélanges André Grisel précités, p. 701; contra: *Patry*, Le critère de distinction, ibid., pp. 706/707). Par conséquent, l'arrêt attaqué ne serait susceptible d'un recours de droit administratif que s'il tranchait, en application du droit fédéral, une contestation administrative. Mais tel n'est pas ce cas.

La décision, objet de la contestation administrative, émane d'une autorité administrative ou statuant ès qualités. Le fondement d'une loi de procédure administrative est alors d'assurer la protection des intérêts des administrés, dans la mesure où l'administration est compétente pour définir unilatéralement, par voie de décision, un régime juridique (*Moor*, op. cit., vol. II, p. 142). L'administration intervient donc au débat comme juge et partie (*Moor*, op. cit., vol. I, p. 5). Or, le juge de l'exequatur, même dans une procédure de mainlevée, n'est pas une autorité administrative, ni partie à un contentieux administratif; il est chargé de trancher un litige entre deux parties privées. Sa décision n'est pas rendue dans une contestation administrative au sens du seul fait qu'elle n'a pas pour but de régler les rapports juridiques entre deux particuliers agissant sur un pied d'égalité, «mais de décider si l'Etat mettra à disposition du requé-

— 152 —

rant la puissance publique pour assurer l'exécution du jugement»
(Poudret/Würzburger, op. cit., p. 295). D'une part, le critère tiré
du caractère unilatéral de la décision n'est pas propre à l'administration, mais peut s'appliquer également au juge (Guldener, Schweizerisches Zivilprozessrecht, 3e éd., Zurich, 1979, p. 30). D'autre
part, s'il est vrai que la procédure d'exécution forcée règle «l'intervention de l'Etat dans les rapports entre créanciers et débiteurs, en
vue d'assurer une réalisation des créances conforme au droit et de
maintenir ainsi l'ordre dans les relations sociales» (Favre, Droit
des poursuites, 3e éd. Fribourg 1974, p. 11 in fine), il n'en demeure
pas moins que, s'agissant de l'activité du juge de l'exequatur, elle
aménage le cadre dans lequel il se prononce sur des intérêts particuliers, à savoir la reconnaissance, à l'endroit du débiteur, d'une
prétention (Guldener, op. cit., pp. 38/39). Cette activité n'a donc pas
la même finalité que celle de l'administration (Moor, op. cit., vol. I,
pp. 4/5). La position du requérant à l'exequatur est celle d'un justiciable qui requiert la collaboration de l'Etat et non celle d'un administré qui se trouve dans un rapport de subordination à l'égard de
ce dernier. Aussi, selon la doctrine dominante, la notion de «droit
public fédéral» au sens de l'art. 5 PA n'englobe-t-elle pas le droit
de l'exécution forcée (Grisel, op. cit., p. 855; Häfelin/Müller, op.
cit., p. 319 n° 1501; Hutterer, op. cit., p. 109; Moor, op. cit., vol. II,
p. 142; Saladin, op. cit., p. 77 n° 10.52).

Par conséquent, la décision dont l'objet est la reconnaissance et
l'exécution d'un jugement étranger, qu'elle soit prise en vertu des
art. 25 ss LDIP ou d'une convention internationale, ne saurait
engendrer une contestation administrative. L'arrêt attaqué n'est
donc pas une décision fondée sur le «droit public fédéral» au sens
de l'art. 5 PA; la voie du recours de droit administratif n'est dès lors
pas ouverte.

Au demeurant, la Seconde Cour civile avait déjà relevé dans
l'arrêt précité du 17 octobre 1991 que la portée pratique de la question de la recevabilité du recours de droit administratif ne devait pas
être surestimée (SJ 1992 pp. 182/183, JdT 1993 II 84; cf. Kaufmann,
Einleitung, in Mélanges André Grisel précités, p. 693). En effet,
selon la jurisprudence, un recours de droit public, irrecevable
comme tel, peut être traité comme recours de droit administratif
(ATF 115 I b 507, JdT 1991 I 515; ATF 115 IV 133/134; ATF 112
I b 243, c. 1a rés. JdT 1988 I 221; ATF 104 I b 121, c. 1; ATF 102
I b 266, c. 1a). En outre, dans les recours fondés sur la violation

— 153 —

d'un traité international, la nature de la voie de droit ouverte n'a
guère d'incidence, le pouvoir d'examen du TF étant le même dans
le recours de droit public et celui du droit administratif (Kaufmann,
ibid.). Cette dernière voie n'est d'ailleurs pas toujours la plus avantageuse: le recours fondé sur l'art. 84 al. 1er let. c OJ n'est pas soumis à l'exigence de l'épuisement préalable des instances cantonales
(art. 86 al. 3 OJ) et les nova sont admis, mêtre si les parties les ont
épuisées (ATF 115 I b 198, c. 4a rés. JdT 1991 II 155; ATF 101 I a
524, c. 1 b in fine rés. JdT 1977 II 89). Il est vrai, en revanche, que,
dans le recours de droit public, le TF ne peut examiner que les violations du traité dénoncées par le recourant (ATF 108 I b 87, JdT
1982 I 368, c. 2a; ATF 101 I a 523/524, JdT 1977 II 88; ATF 98
I a 54, c. 2 non rés. au JdT 1973 II 27 s.; ATF 98 I a 551, c. 1c non
rés. au JdT 1973 I 155 s., II 12), ce qui n'est pas le cas dans le
recours de droit administratif. Il faut enfin relever que l'opinion soutenue par Poudret/Würzburger (op. cit., p. 298) présente, en matière
de mainlevée définitive, l'inconvénient pratique de contraindre le
recourant à interjeter simultanément les deux recours lorsqu'il
invoque à la fois la violation d'une convention internationale, ou
des art. 25 ss LDIP, respectivement celle de l'art. 81 al. 1er LP (SJ
1992 pp. 182/183, JdT 1993 II 85).

c) Lorsque l'application du droit fédéral — en l'occurrence celle
des art. 25 ss LDIP — lui est soumise par la voie du recours de
droit public pour violation de l'art. 4 Cst. (art. 84 al. 1er let. a OJ),
le TF ne l'examine que sous l'angle restreint de l'arbitraire(ATF 116
II 628, c. 3b rés. JdT 1992 II 183 s.; L'arrêt déféré ne sera donc
annulé que s'il est manifestement insoutenable, méconnaît gravement une vraie norme ou un principe juridique clair et indiscuté, ou
encore heurte de manière choquante le sentiment de la justice et de
l'équité (ATF 117 I a 15/16; ATF 117 I a 20 let. c; ATF 117 I a 32,
c. 7a; ATF 117 I a 106 let. b; ATF 117 I a 122, c. 1b; ATF 117 I a 139
let. c). Il ne suffit pas que sa motivation soit insoutenable; encore
faut-il que la décision apparaisse arbitraire dans son résultat
(ATF 117 I a 139 let. c; ATF 116 I a 327 let. a; ATF 116 I a 34 let. c;
ATF 115 I a 125).

3. b) Selon l'art. 25 let. b LDIP, une décision étrangère est
reconnue en Suisse si elle n'est plus susceptible de recours ordinaire
ou si elle est définitive. L'exequatur d'un jugement étranger suppose
qu'il soit non seulement revêtu de la force de chose jugée, mais éga-

— 154 —

lement de la force exécutoire, selon le droit de l'Etat dans lequel il a été rendu (ATF 82 I 246, JdT 1957 I 378; *Panchaud/Caprez*, La reconnaissance et l'exécution des jugements étrangers en Suisse, 2e éd., Zurich 1980, § 116 no 3). La jurisprudence a toujours distingué ces deux notions, en soulignant qu'un jugement étranger pouvait acquérir la force exécutoire avant celle de la chose jugée (ATF 82 I 246, JdT 1957 I 378; ATF 79 I 241, arrêts cités; cf. art. 397 et 404 ZPO bern, et 341 al. 1er CPC frib). Il n'est pas prétendu en l'espèce que le caractère exécutoire serait intervenu après la force de chose jugée. Il faut donc que la décision étrangère ne puisse plus faire l'objet d'un recours ordinaire selon le droit de l'Etat dans lequel elle a été rendue (arrêt Baytur S.A. c. Arab Finagrain Agri-Business Trading Ltd du 19 mai 1989, c. 3c). Selon l'opinion dominante en Suisse, la voie de recours ordinaire est celle qui comporte, dans la mesure des conclusions prises, l'effet suspensif (ATF 102 Ia 76 ss, JdT 1977 II 119 ss; *Stojan*, op. cit., p. 79 et les réf).

Il n'est pas contesté que le recourant pouvait faire appel — plus précisément demander l'autorisation d'appeler (Order 59 rule 4 [I]) — du jugement anglais devant la Court of Appeal jusqu'au 2 janvier 1991. L'appel n'a pas d'effet suspensif de par la loi, mais il peut être accordé par le juge (Order 59 rule 13 [II]). Sous cet angle, il ne constituerait pas une voie de recours ordinaire au sens de l'art. 81 let. b LDIP. Mais il ne s'ensuit pas que la décision anglaise était définitive lors du dépôt de la requête. D'une part, l'octroi possible de l'effet suspensif doit être pris en considération par le juge de l'exequatur; ce n'est donc qu'après l'expiration du délai de recours que le jugement étranger passe en force et peut être déclaré exécutoire (*Stojan*, op. cit., pp. 81 ss). D'autre part, le juge doit tenir compte du délai pour demander l'autorisation d'appeler, la décision ne pouvant être déclarée exécutoire qu'à l'échéance de ce délai (*Stojan*, op. cit., p. 82 n. 23, précisément pour le droit anglais).

L'arrêt attaqué n'est toutefois pas arbitraire dans son résultat. La requête du 21 décembre 1990 était certes prématurée, mais il était constant lors de la décision d'exequatur que le recourant n'avait pas fait appel du jugement anglais. L'admission du moyen tiré d'une violation de l'art. 25 let. b LDIP aurait finalement pour résultat de contraindre les intimés à déposer une nouvelle requête qui porterait sur une condition dont la réalisation n'est pas contestée par le

— 155 —

recourant et qui était acquise lors du dépôt de la requête du 26 avril 1991, avant le jugement de mainlevée définitive rendu en première instance le 29.

c. Il est vrai qu'aux termes de l'art. 29 al. 1er let. b LDIP, la requête en reconnaissance ou en exécution doit être accompagnée d'une attestation constatant que la décision n'est plus susceptible de recours ordinaire ou qu'elle est définitive. Selon la jurisprudence, l'attestation a pour seul but de fournir, par un moyen de preuve formel, la certitude que la décision a acquis force de chose jugée; son absence n'entraîne toutefois pas le refus de l'exequatur, s'il ressort des autres pièces du dossier que la décision est passée en force (ATF 102 Ia 79, JdT 1977 II 123, let. e; ad art. 6 al. 1er de la Convention entre la Suisse et la Belgique; ATF 51 I 218/219, JdT 1928 I 90; ATF 39 I 624, c. 1: ad art. 16 al. 1er ch. 3 de la Convention entre la Suisse et la France). Bien qu'il ait été posé pour le droit conventionnel, on peut admettre — du moins sans tomber dans l'arbitraire — que ce principe vaut également pour l'art. 29 al. 1er let. b LDIP (en ce sens, *Walder*, Einführung in das internationale Zivilprozessrecht der Schweiz, Zurich 1989, p. 103 n. 80).

À l'appui de leur requête du 21 décembre 1990, les intimés n'ont pas produit d'attestation sur le caractère définitif du jugement anglais, puisqu'il ne l'était pas en réalité, ainsi qu'ils l'ont eux-mêmes concédé par la suite. Ce n'est qu'avec la requête «complémentaire» du 26 avril 1991 qu'a été produit un certificat de non-appel établi le 11 avril 1991 par le Civil Appeals Office. Mais le fait que le recourant n'a pas fait appel de ce jugement n'est pas contesté. Or, la preuve littérale n'est pas le seul moyen admissible pour établir la réalisation des conditions de la reconnaissance ou de l'exécution d'un jugement étranger (cf. *Stojan*, op. cit., p. 192). Bien plus, l'aveu rend la preuve inutile (cf. *Deschenaux*, Le Titre préliminaire du Code civil, in TDPS II/1, Fribourg 1969, p. 225 ch. 4 et les réf). Ce serait enfin faire preuve du formalisme excessif que de contraindre les intimés à déposer une nouvelle requête aux seules fins d'attester un fait acquis.

5. Le recourant soutient que le jugement anglais ne saurait être reconnu en vertu de l'art. 27 al. 2 let. b LDIP. La procédure se serait déroulée «en son absence forcée», du fait de l'interdiction de sortie d'Egypte dont il faisait l'objet, alors même que sa déposition

état déterminant; il invoque dès lors une violation de son droit d'être entendu. Le recourant prétend en outre que le jugement aurait été rendu alors que le tribunal ne disposait pas encore des commissions rogatoires qui avaient été ordonnées, ni de l'expertise sur l'authenticité des signatures figurant sur les actes de transferts de fonds en sa faveur.

Selon l'art. 27 al. 2 let. b LDIP, la reconnaissance et l'exécution d'une décision étrangère doit être refusée si une partie établit qu'elle a été rendue en violation de principes fondamentaux ressortissant à la conception suisse du droit de procédure, notamment que ladite partie n'a pas eu la possibilité de faire valoir ses moyens. Le législateur a ainsi consacré un motif de refus distinct de la violation de l'ordre public sur le fond au sens de l'art. 27 al. 1er LDIP (ATF 116 II 629, let. a rés. JdT 1992 II 185), consacrant la jurisprudence selon laquelle un jugement étranger peut être incompatible avec l'ordre public, non seulement à cause de son contenu, mais également en raison de la procédure dont il est issu (ATF 116 II 629, let. a rés. JdT 1992 II 185; ATF III I a 14, c. 2 rés. JdT 1987 I 63; ATF 107 I a 199, JdT 1982 I 183, c. 3; ATF 105 I b 47, JdT 1981 II 24, let. b; ATF 103 I a 201, JdT 1979 II 101, let. b; ATF 102 I a 313, JdT 1978 II 11 c. 5 e; les arrêts cités). A cet égard, l'ordre public suisse exige le respect des règles fondamentales de la procédure déduites de l'art. 4 Cst., telles notamment le droit d'un procès équitable et celui d'être entendu (ATF 116 II 629, let. a rés. JdT 1992 II 185, et les réf.). Mais en tant que clause d'exception, la réserve de l'ordre public doit être interprétée restrictivement (ATF 116 II 630, let. a rés. JdT 1982 II 185; ATF 103 I b 74, c. 3 d; ATF 84 I 123, JdT 1959 I 217, c. 2); il en va tout spécialement en matière de reconnaissance et d'exécution des jugements étrangers, où la portée est plus étroite que pour l'application directe du droit étranger (effet atténué de l'ordre public: ATF 116 II 630, let. a rés. JdT 1982 II 185; ATF 103 I a 204, JdT 1979 II 104, c. 4 a; ATF 103 I b 74, c. 3 d et la jurisprudence citée dans ces arrêts).

a) Il résulte des pièces du dossier que, dans le cadre de la procédure pénale dont le recourant a fait l'objet en Égypte, le procureur général a ordonné le blocage de ses avoirs et prononcé son interdiction de sortie du pays. Les démarches visant à obtenir la levée de cette dernière mesure sont restées vaines. Aussi, le recourant a-t-il requis le juge de reporter la date de l'audience à Londres, fixée au 26 novembre 1990, pour lui permettre de se présenter au procès. Le

juge a pris en considération la requête; il a estimé cependant que le renvoi du procès ne devait pas léser les intérêts des intimés, qui pouvaient être exposés à un dommage dans l'hypothèse où le recourant serait acquitté en Égypte et pourrait ainsi recouvrer la libre disposition de ses actifs. Le renvoi ne serait donc accordé que si des garanties leur étaient offertes. L'accord sur ce point n'est toutefois pas venu à chef, les conseils du recourant faisant état de l'impossibilité de disposer des fonds placés sous séquestre. Eu égard, comme l'atteste un avis de droit de l'avocat égyptien du recourant, le blocage des fonds aurait pu être levé par l'autorité qui l'a ordonné. Or, il résulte clairement d'un procès-verbal du 21 novembre 1990 qu'aucune demande dans ce sens n'a été faite par le recourant, sans qu'il soit en mesure d'en expliquer la raison.

Devant «l'impossibilité de se présenter devant ses juges et de préparer sa défense valablement», le recourant a demandé à son conseil anglais de se retirer de la procédure et de ne plus le représenter. Mais, comme on l'a vu, le renvoi de l'audience était subordonné à la fourniture de sûretés; il incombait dès lors au recourant de faire les démarches nécessaires auprès du procureur général pour obtenir la levée du séquestre, ce qu'il n'a pas fait. On ne voit d'ailleurs pas en quoi le fait de ne pouvoir se présenter devant le juge anglais l'aurait empêché de préparer sa défense valablement.

En effet, le recourant a été assisté par des avocats au cours de la procédure anglaise jusqu'au moment où il a décidé, de son propre chef, de mettre un terme à leur mandat. Il a donc eu la possibilité de faire valoir ses moyens devant le tribunal (cf. ATF 107 I a 201, JdT 1982 I 186), qui en a d'ailleurs tenu compte. Il ne démontre en outre nullement que, par sa seule présence, ses intérêts auraient été mieux défendus. Si le droit d'être entendu garantit au justiciable de pouvoir s'expliquer avant qu'une décision ne soit prise à son détriment (ATF 117 I a 268, c. 4 b; ATF 116 I a 99, let. b; 115 I a 96, let. b rés. JdT 1991 I 517; ATF 115 I a 302, JdT 1991 IV 114, c. 5 a; ATF 114 I a 99, let. a rés. JdT 1990 I 523), il n'implique pas celui de s'exprimer oralement (ATF 117 I I 116/137; ATF 115 I I 133 let. c; ATF 108 I a 191, let. a rés. JdT 1984 I 190 et les arrêts cités). On ne saurait dès lors tenir cette exigence pour un principe fondamental de l'ordre juridique suisse, dont la méconnaissance devrait conduire au refus de l'exequatur. C'est en vain que le recourant rapporte l'opinion du juge anglais, selon laquelle il «serait»

— 158 —

contraire aux principes les plus élémentaires de la justice de tenir le procès en l'absence du défendeur». Outre le fait que cette affirmation doit être appréciée dans son contexte, ce même magistrat s'est dit convaincu, après avoir «examiné les faits plus en détail», que le recourant «n'aurait eu aucune chance de réussir sa défense, que ce fût avec une déposition orale ou sans elle».

*b)* Le recourant reproche au juge anglais d'avoir statué avant même que les commissions rogatoires ne soient revenues. Mais il ne dit rien sur l'identité des personnes qui devraient être entendues, leur rôle dans l'affaire et les raisons pour lesquelles ces témoignages auraient été pertinents, voire décisifs, pour l'issue du litige. Insuffisamment substantié (art. 90 al. 1er let. b OJ), le recours est dès lors irrecevable sur ce point (ATF 117 Ia 12, let. b; ATF 116 Ia 408, c. 4a; ATF 115 Ia 100, JdT 1991 IV 27, c. 5a; ATF 115 Ia 185, c. 3 non res. au JdT 1991 I 27 s. et les arrêts cités). Au demeurant, il apparaît que le juge a estimé que les éléments dont il disposait étaient suffisants pour rendre sa décision, point que le recourant ne critique pas non plus.

Dans le même ordre d'idées, le recourant fait encore valoir que le juge anglais a statué sans disposer de l'expertise relative à l'authenticité des signatures sur les actes de transferts de fond. Mais ce grief, qui n'est guère mieux motivé que le précédent, n'est pas fondé. Le jugement retient en effet qu'une première expertise n'a pu établir que les signatures du défunt et de l'un de ses fils étaient authentiques, étant «toutes deux relativement faciles à imiter». Dans ces conditions, le juge pouvait estimer, par une appréciation anticipée des preuves, qu'une nouvelle expertise n'aurait pas été plus concluante et que les preuves déjà recueillies pouvaient dès lors suffire, ce qui ne constitue pas en soi une violation du droit d'être entendu (cf. ATF 117 Ia 269, c. 4b in fine; ATF 115 Ia 101 n° 18, JdT 1991 IV 27 s., et les arrêts cités).

6. Au terme de son arrêt, la Cour de justice a approuvé la décision du premier juge d'avoir admis que «le jugement anglais était exécutoire à Genève». En réalité l'exequatur prononcé en application du droit fédéral, que ce soit en vertu d'une convention internationale (ATF 94 III 90 ss, JdT 1969 II 104 ss, c. 5) ou des art. 25 ss LDIP (*Gilliéron*, Poursuite pour dettes, faillite et concordat, 2e éd., Lausanne 1988, pp. 143/144), sortit ses effets dans toute la Suisse.

Seconde Cour civile. — *Abdel Moniem M. c. Cour de justice du canton de Genève*, 24 avril 1992; ATF 118 Ia 118.

RÉSU

**Annulation de l'oppos**
**Demande de relief.**

Le recourant fait val
mier juge, il a, en sa
nécessaire pour qu'il
relief. Cela est exact;
300 fr. n'est pas rapp
ce versement a été eff
est accordé, la partie
dépôt des frais de la
le temps d'effectuer ce
faire du paiement des
de recevabilité du reli
suivi doit être consid
relief, en application
applicable à la LP.

Il faut relever d'o
demande de renvoi d'
qu'il n'a pas statué s
négativement, en ren

Certes, il a été jug
mainlevée, justifiait
d'audience émanant
l'intéressé pouvait fa
pièces, le cas échéan
JdT 1976 II 90; *Pan*
§ 161 n. 20). Le renv
cas où le débiteur n'
ou établir une procé
n. 22).

Or, la loi n'impos
audience, fût-elle de
tances le justifient.

En l'espèce, le pou
quels il ressort qu'
annoncé qu'il devai

3.4

# Entscheidungen
# des Schweizerischen Bundesgerichts
(einschliesslich Entscheidungen des Eidgenössischen Versicherungsgerichts)
aus dem Jahre 1992

AMTLICHE SAMMLUNG

118. Band

II. Teil
Zivilrecht

# Arrêts du Tribunal Fédéral Suisse
(y compris les arrêts du Tribunal Fédéral des Assurances)
rendus en 1992

RECUEIL OFFICIEL

118ᵉ volume

IIᵉ partie
Droit civil

# Decisioni del Tribunale federale svizzero
(ivi comprese le decisioni del Tribunale federale delle Assicurazioni)
pronunciate nel 1992

RACCOLTA UFFICIALE

Volume 118

Parte II
Diritto civile

IRL IMPRIMERIES REUNIES LAUSANNE S.A.

wor. Wenn der Beschwerdeführer daher in diesem Zusammenhang namentlich behauptet, es fehle an einer durchsetzbaren gerichtlichen Regelung sowie an einer Verständigung unter den Parteien über das Restschuldrecht, ist er nicht zu hören; auch im Verfahren über die Nichtigkeitsbeschwerde ist das Bundesgericht an den von der Vorinstanz festgestellten Sachverhalt gebunden (Art. 55 Abs. 1 lit. c und Art. 63 Abs. 2 OG in Verbindung mit Art. 74 OG).

39. Extrait et l'arrêt de la 1re Cour civile du 18 février 1992 dans la cause société A. contre S. (recours en réforme)

*Droit international privé; action en validation de séquestre; compétence ratione loci, élection de for et litispendance (art. 4, 5 et 9 LDIP).*
1. Le for suisse du séquestre n'est pas exclusif. Conditions auxquelles il peut être fait abstraction d'une clause d'élection de for (consid. 3a).
2. La suspension de la cause étant la règle sous le régime de la loi nouvelle, elle doit être ordonnée chaque fois que l'on ne peut raisonnablement exclure que la procédure pendante entre les mêmes parties à l'étranger débouche, dans un délai convenable, sur une décision susceptible d'être reconnue en Suisse (consid. 3b).

*Internationales Privatrecht; Arrestprosequierungsklage; örtliche Zuständigkeit, Gerichtsstandsvereinbarung und Rechtshängigkeit (Art. 4, 5 und 9 IPRG).*
1. Der schweizerische Gerichtsstand des Arrestortes ist nicht ausschliesslich. Voraussetzungen, unter denen eine Gerichtsstandsvereinbarung unbeachtlich ist (E. 3a).
2. Da die Aussetzung des Verfahrens nach neuem Recht die Regel bildet, muss sie immer dann angeordnet werden, wenn vernünftigerweise nicht ausgeschlossen werden kann, dass der im Ausland zwischen den gleichen Parteien hängige Prozess innerhalb angemessener Frist zu einem in der Schweiz anerkennbaren Urteil führen wird (E. 3b).

*Diritto internazionale privato; azione di convalida del sequestro; competenza per territorio, proroga di foro e litispendenza (art. 4, 5 e 9 LDIP).*
1. Il foro svizzero del sequestro non è esclusivo. Condizioni alle quali è possibile fare astrazione da una clausola di proroga del foro (consid. 3a).
2. Visto che nella nuova legge la sospensione della causa costituisce la regola, essa deve essere ordinata allorquanno non sia possibile escludere che la procedura pendente fra le stesse parti all'estero si concluda, in un lasso di tempo ragionevole, con un giudizio suscettibile di essere riconosciuto in Svizzera (consid. 3b).

A. — La société A., dont le siège est à Manama (Etat de Bahrein), fait valoir une créance de 7 627 256 rials séoudiens à l'encontre de S., domiciliée à Riyad (Arabie Saoudite). Le 21 juin 1987, elle a ouvert action en paiement de cette somme devant un tribunal séoudien, mais a retiré par la suite sa demande, «tous droits réservés».

Le 27 avril 1988, ladite société a obtenu le séquestre, à Genève, de biens appartenant à son prétendu débiteur. Le 29 juin 1989, elle a introduit, à Genève également, une action en validation de ce séquestre. Le défendeur a soulevé d'entrée de cause l'exception de litispendance, en raison de l'action ouverte précédemment à Riyad, ainsi que l'exception d'incompétence ratione loci, en égard à une clause de prorogation de for incluse dans le contrat liant les parties. Par jugement sur incident du 15 janvier 1991, le Tribunal de première instance du canton de Genève a rejeté les deux exceptions.

La Cour de justice du canton de Genève, statuant sur appel du défendeur, a confirmé ce jugement par arrêt du 24 mai 1991.

B. — Agissant par la voie du recours en réforme, le défendeur invite le Tribunal fédéral à annuler l'arrêt cantonal et à déclarer la demande irrecevable pour incompétence à raison du lieu des tribunaux genevois. A titre subsidiaire, il requiert la suspension de la cause pendante devant ces tribunaux jusqu'à la présentation d'un jugement définitif des tribunaux séoudiens sur le même objet. Plus subsidiairement encore, il sollicite le renvoi de l'affaire à la Cour de justice afin qu'elle complète le dossier et statue à nouveau.

La demanderesse conclut à l'irrecevabilité du recours ou, sinon, à son rejet et à la confirmation de l'arrêt attaqué.

Le Tribunal fédéral admet partiellement le recours, annule ledit arrêt et renvoie la cause à la cour cantonale pour nouvelle décision dans le sens des considérants.

*Extrait des considérants:*

2. — La loi fédérale sur le droit international privé, qui est entrée en vigueur le 1er janvier 1989, régit notamment la compétence des autorités judiciaires suisses en matière internationale (art. 1er al. 1 let. a LDIP). La compétence du juge — suisse ou étranger — ressortit donc exclusivement à la nouvelle loi (ATF 116 II 624 et les références). Il en va, en particulier, ainsi pour la validation de séquestre (art. 4 LDIP), l'élection de for (art. 5 LDIP) et la litispendance (art. 9 LDIP). Ces questions, que soulève la cause en litige,

devront être examinées à la lumière de la loi nouvelle, dès lors que l'action en validation de séquestre a été introduite après l'entrée en vigueur de cette loi.

3. — a)Selon l'art. 4 LDIP, lorsque la présente loi ne prévoit aucun autre for en Suisse, l'action en validation de séquestre peut être introduite au for suisse du séquestre. La jurisprudence a précisé que, abstraction faite du séquestre infructueux, chaque séquestre, quelle que soit la valeur des biens séquestrés, fonde un tel for pour toute la prétention objet de l'action en validation du séquestre, si le séquestre a été autorisé pour la même prétention (ATF 117 II 90 ss).

Le for suisse du séquestre n'est cependant pas exclusif (WALDER, Einführung in das Internationale Zivilprozessrecht der Schweiz, p. 165, n. 16 ad § 5; VOGEL, Grundriss des Zivilprozessrechts, 2e éd., p. 83, n. 64a ad chap. 4). Une élection de for, au sens de l'art. 5 LDIP, est donc admissible en cette matière à la condition toutefois, comme par le passé (ATF 114 II 188 in fine, 106 III 94 consid. 2a, 66 III 57), que le jugement rendu au for élu puisse être reconnu en Suisse (WALDER, ibid.). C'est à celui qui introduit l'action en validation de séquestre en Suisse qu'il appartient d'établir la compétence ratione loci du juge suisse si le défendeur soulève une exception à ce sujet. En effet, sauf stipulation contraire, l'élection de for est exclusive (art. 5 al. 1 in fine LDIP). Partant, il incombe au demandeur de prouver, soit que les parties ont écarté la présomption légale d'exclusivité du for élu (BRAUNSBERG / BRANDT, Direkte Zuständigkeit der Schweiz in internationalen Schuldrecht, thèse Saint-Gall 1991, p. 408, note de pied 1153), soit que l'élection de for exclusive ne peut pas être prise en considération, étant donné son caractère abusif (art. 5 al. 2 LDIP) ou parce que le jugement rendu au for élu ne pourrait pas être reconnu en Suisse. Le tribunal saisi appliquera la lex fori pour décider s'il convient de faire abstraction de la clause d'élection de for (HAAS, Die prorogatio fori, thèse Berne 1943, p. 58).

b) Une action en reconnaissance de cette introduite à l'étranger avant l'exécution du séquestre peut aussi le valider, pour autant qu'elle se rapporte à la créance pour laquelle le séquestre a été exécuté (ATF 114 II 188, 106 III 94, 93 III 77 consid. 2a). Que se passe-t-il, au point de vue procédural, si le demandeur, se fondant sur une clause d'élection de for, a ouvert une telle action à l'étranger contre e prétendu débiteur avant d'introduire l'action en validation de séquestre au for suisse du séquestre et que le défendeur soulève l'exception de litispendance à l'encontre de cette dernière action?

Dans un arrêt du 7 juin 1988, publié aux ATF 114 II 183 ss, le Tribunal fédéral a indiqué que, lorsque l'on ignore si la procédure étrangère aboutira à un jugement au fond exécutoire et Suisse, le juge suisse doit mettre en balance le risque de jugements contradictoires, d'une part, celui d'une atteinte au droit à la protection juridique, d'autre part. Appliquant ce principe à la validation de séquestre, domaine dans lequel la prompte sauvegarde de prétentions compromises est d'une importance primordiale, il a posé que le juge suisse ne peut refuser la protection des tribunaux — autrement dit, admettre l'exception de litispendance — que si l'on peut s'attendre avec une certitude suffisante à ce qu'un jugement exécutoire soit rendu à l'étranger. En effet, si le juge suisse admet l'exception de litispendance et que le procès pendant à l'étranger n'aboutisse pas à un jugement qui puisse être reconnu et exécuté en Suisse, le séquestre tombe, et avec lui une prétention à la protection du droit fédéral, bien que le créancier séquestrant ait fait tout ce qu'il pouvait faire (p. 187).

Le législateur fédéral n'a pas codifié tel quel ce principe jurisprudentiel, mais a opté pour une solution en partie différente — a suspension de la cause — préconisée par la doctrine (cf. parmi d'autres, HABSCHEID, Schweizerisches Zivilprozess- und Gerichtsorganisationsrecht, 1re éd., p. 179, n. 486; B. SCHNEIDER, L'exception de litispendance en droit international privé, in: Mélanges offerts à la Société suisse des Juristes, Genève 1976, p. 314) et à laquelle l'arrêt précité fait du reste allusion (p. 187, 2e §). Ainsi, aux termes de l'art. 9 al. 1 LDIP, lorsqu'une action ayant le même objet est déjà pendante entre les mêmes parties à l'étranger, le tribunal suisse suspend la cause s'il est à prévoir que la juridiction étrangère rendra, dans un délai convenable, une décision pouvant être reconnue en Suisse. En vertu de l'art. 9 al. 3 LDIP, le tribunal suisse se dessaisit dès qu'une telle décision lui est présentée. La suspension de la cause étant la règle sous le régime de la loi nouvelle, elle doit être ordonnée chaque fois que l'on ne peut raisonnablement exclure que la procédure pendante entre les mêmes parties à l'étranger débouche, dans un délai convenable, sur une décision susceptible d'être reconnue en Suisse. En pareille hypothèse, la mise en balance du risque de jugements contradictoires et du risque d'une atteinte au droit à la protection juridique, qu'imposait jusqu'ici la jurisprudence fédérale, ne se justifie plus du moment que le séquestre ne tombera pas avant qu'une décision étrangère pouvant être reconnue en Suisse ait été présentée au tribunal suisse ou que celui-ci ait rendu un jugement dans la cause suspendue. S'il n'y a, en revanche, aucune chance pour que la juri-

diction étrangère rende, dans un délai convenable, une décision pouvant être reconnue en Suisse, le tribunal suisse renoncera à suspendre la cause et rejettera immédiatement l'exception d'incompétence, comme il l'eût fait sous l'empire de l'ancienne jurisprudence.

Le demandeur à l'action en validation de séquestre, qui s'oppose à ce que le tribunal suisse qu'il a saisi suspende la cause jusqu'à droit connu sur l'action en reconnaissance de dette déjà pendante à l'étranger, doit établir que la juridiction étrangère ne sera pas en mesure de rendre, dans un délai convenable, une décision pouvant être reconnue en Suisse. Il est normal que cette preuve lui incombe, car c'est lui qui, après avoir ouvert action à l'étranger, vient porter l'affaire devant la juridiction suisse qu'il estime être la seule à pouvoir rendre une décision exécutoire en Suisse. A cela s'ajoute le fait que l'impossibilité de reconnaître une décision étrangère en Suisse doit être établie par celui qui l'allègue, en tout cas lorsqu'elle découle de l'un des motifs prévus à l'art. 27 al. 2 LDIP, au nombre desquels figure la violation de l'ordre public procédural (ATF 116 II 630 consid. 4 et les références).

c) En l'occurrence, la Cour de justice a rejeté les exceptions d'incompétence ratione loci et de litispendance au motif qu'«il n'y a aucune certitude qu'un procès instruit à Riyad puisse aboutir à un jugement exécutoire en Suisse», de sorte que le risque pour la demanderesse de perdre le bénéfice de son séquestre est réel. Cette argumentation est contraire au droit fédéral, dans la mesure où elle se fonde essentiellement sur l'arrêt publié aux ATF 114 II 183 ss et fait totalement abstraction de l'art. 9 al. 1 LDIP. Les juges précédents ont cru, à tort, pouvoir se dispenser d'examiner si les tribunaux d'Arabie Saoudite sont en mesure de rendre, dans un délai convenable, une décision pouvant être reconnue en Suisse. Ils ont, en outre, fait supporter indûment au défendeur l'absence de preuve à ce sujet.

Cela étant, l'arrêt attaqué doit être annulé et la cause renvoyée à la Cour de justice pour qu'elle complète au besoin le dossier et statue à nouveau (art. 64 al. 1 OJ). Il lui appartiendra de constater, en premier lieu, si l'action en reconnaissance de dette ouverte le 21 juin 1987 à Riyad y est toujours pendante, ce qui l'amènera nécessairement à s'interroger sur la signification du «extrait» de cette action alléguée par la demanderesse, en particulier sur le point de savoir si, selon le droit séoudien, cet acte de procédure unilatéral a mis fin à l'instance — et, dans l'affirmative, s'il doit être assimilé à une décision revêtue de l'autorité de la chose jugée, qui s'opposerait en principe à ce que la même prétention soit portée devant un autre tribunal — ou s'il n'a fait que la suspendre comme le soutient le défen-

deur. La demanderesse, qui affirme avoir fait cesser la litispendance étrangère par ce retrait, devra en établir l'existence et les effets, la preuve par la négative, du contenu du droit de procédure séoudien y relatif pouvant d'ailleurs lui être imposée (art. 16 al. 1, dernière phrase, LDIP). Si elle parvient à le faire et qu'il faille admettre que le retrait de l'action n'empêche pas l'introduction d'une nouvelle demande pour la même prétention, les juges précédents devront encore décider si la présomption d'exclusivité de l'élection de for a été renversée ou non par la demanderesse; dans l'affirmative, ils rejetteront l'exception d'incompétence ratione loci et entreront en matière sur l'action en validation de séquestre; dans la négative, ils l'admettront, à moins que la demanderesse ne parvienne à établir le caractère prétendument abusif de l'élection de for (art. 5 al. 2 LDIP) ou à démontrer qu'une décision rendue au for étranger aurait de toute manière pas pu être reconnue en Suisse. S'il apparaît que l'action ouverte à Riyad est toujours pendante, ou du moins si le contraire n'est pas établi, la Cour de justice devra encore rechercher si la demanderesse a réussi, à démontrer que, 'on peut exclure, avec une vraisemblance confinant à la certitude, que la juridiction séoudienne puisse rendre, dans un délai convenable, une décision susceptible d'être reconnue en Suisse. S'il subsiste un doute légitime à ce propos, la cause devra être suspendue en application de l'art. 9 al. 1 LDIP. Dans le cas contraire, les exceptions soulevées par le défendeur seront définitivement rejetées.

**40. Extrait de l'arrêt de la 1re Cour civile du 28 avril 1992 dans la cause G.S.A. contre V. S.p.A. et Tribunal arbitral (recours de droit public)**

*Arbitrage international; art. 190 al. 2 let. b LDIP.*
Appelé à connaître d'une contestation relative à l'exécution ou l'inexécution d'un contrat, un tribunal arbitral est compétent pour examiner la validité de cette entente au regard de l'art. 85 du Traité du 25 mars 1957 instituant la Communauté économique européenne (Traité de Rome), même si les juridictions arbitrales n'ont pas qualité d'autorités d'un Etat membre de la Communauté.

*Internationale Schiedsgerichtsbarkeit; Art. 190 Abs. 2 lit. b IPRG.*
Ein Schiedsgericht, das über eine Streitsache betreffend Erfüllung oder Nichterfüllung eines Vertrages zu entscheiden hat, ist zur Prüfung zuständig, ob diese Vereinbarung unter dem Gesichtspunkt von Art. 85 des Vertrages...

13   AS 118 II — 1992

3.5

# Entscheidungen
# des Schweizerischen Bundesgerichts

(einschliesslich Entscheidungen des Eidgenössischen Versicherungsgerichts)

aus dem Jahre 1990

## AMTLICHE SAMMLUNG

116. Band

## II. Teil:
## Zivilrecht

# Arrêts du Tribunal Fédéral Suisse

(y compris les arrêts du Tribunal Fédéral des Assurances)

rendus en 1990

## RECUEIL OFFICIEL

116ᵉ volume

## IIᵉ partie:
## Droit civil

IRL IMPRIMERIES RÉUNIES LAUSANNE S.A.

* 110

. LDIP). La compétence
donc exclusivement à la
ions, entraide judiciaire,
ents étrangers, in: Le
ausanne 1988, p. 238 ss;
ternational privé suisse,
ali della nuova legge, in:
i Svizzera, Milan 1990,
élection de for, laquelle
'art. 5 LDIP (VOLKEN,
ions de for selon la loi
n: Festschrift für Max
AEHELIN, in: Das neue
Privatrecht in der
08). Ladite loi était-elle
l faut en analyser les

autorités judiciaires ou
requêtes avant l'entrée
me si leur compétence
ion citée, qui reprend,
a question à trancher,
tre autres objectifs, à
rité du droit (Message
F 1983 I 454/455); elle
its, la survie de la loi
étence d'une autorité
que la nouvelle loi
np d'application dans
nal contenues dans le
nternational privé, in:
ze, 1988, p. 295). Par
ous l'empire de la loi
oit être examinée à la
t cantonal ou du droit
as le cas particulier.
é aux cantons, n'en
s arguments avancés
n retenue par elle —
de la validité de la
nvaincants: l'art. 196

LDIP, auquel la Cour de justice se réfère, ne règle pas la question du droit transitoire en matière de compétence (ATF 116 II 211 consid. 2b); quant à l'art. 197 al. 2 LDIP, ses conditions d'application ne sont manifestement pas réalisées en l'espèce, puisque le jugement de première instance a été rendu après l'entrée en vigueur de ladite loi et que, de surcroît, la cour cantonale estime que la compétence des autorités judiciaires suisses devrait être admise même s'il fallait faire abstraction, en l'espèce, de l'art. 5 LDIP.

Il reste à rechercher si la compétence des autorités judiciaires saisies sous l'empire de l'ancien droit était alors fondée sur des règles de droit fédéral ou de droit cantonal. Selon une jurisprudence constante, les clauses de prorogation de for sont régies par le droit cantonal, même si elles dérogent à une règle dispositive du droit fédéral sur le for (ATF 102 II 393/394 consid. 7 et les arrêts cités). Cette jurisprudence vaut également pour les procédures présentant un caractère d'extranéité (ATF 87 III 27 ss, 76 II 249/250 consid. 1), en l'absence d'un traité international (ATF 76 II 250 consid. 2).

*c)* Au terme de cet examen, il apparaît qu'au moment de l'introduction de l'action, la compétence des autorités saisies était régie exclusivement par le droit cantonal de procédure. Le recours de droit public est, en conséquence, recevable, dès lors que la Cour de justice a appliqué à tort le droit fédéral pour résoudre le problème litigieux.

111. **Extrait de l'arrêt de la I<sup>re</sup> Cour civile du 19 décembre 1990** dans la cause société R. contre P. et Cour de justice du canton de Genève (recours de droit public)

*Reconnaissance et exécution en Suisse d'un jugement civil américain rendu par défaut.*
1. Exception à la nature cassatoire du recours de droit public (consid. 2).
2. Pouvoir d'examen du Tribunal fédéral (consid. 3).
3. Notion et contenu de l'ordre public formel, au sens de l'art. 27 al. 2 let. b LDIP. Ordre public atténué de la reconnaissance (consid. 4a). La violation de l'ordre public procédural n'est pas examinée d'office par le juge de la reconnaissance (consid. 4b).
4. L'absence de notification officielle du jugement par défaut américain ne viole pas l'ordre public suisse (consid. 4c). Qu'en est-il de l'absence de motifs sur le fond? (consid. 4d).

40     AS 116 II — 1990

Case 1:03-md-01570-GBD-SN   Document 13-5   Filed 02/27/04   Page 23 of 27

*Anerkennung und Vollstreckung eines zivilen amerikanischen Abwesenheitsurteils in der Schweiz.*

1. Ausnahme von der kassatorischen Natur der staatsrechtlichen Beschwerde (E. 2).
2. Prüfungsbefugnis des Bundesgerichts (E. 3).
3. Begriff und Inhalt des formellen Ordre public im Sinne von Art. 27 Abs. 2 lit. b IPRG. Genügender Ordre public bei der Anerkennung (E. 4a). Die Verletzung des prozessualen Ordre public wird von Anerkennungsrichter nicht von Amtes wegen überprüft (E. 4b).
4. Die fehlende amtliche Zustellung des amerikanischen Abwesenheitsurteils verstösst nicht gegen den schweizerischen Ordre public. Tut dies die fehlende Urteilsbegründung? (E. 4d).

*Riconoscimento ed esecuzione in Svizzera di una sentenza civile americana pronunciata nei confronti di un convenuto contumace.*

1. Eccezione alla natura cassatoria del ricorso di diritto pubblico (consid. 2).
2. Potere d'esame del Tribunale federale (consid. 3).
3. Nozione e contenuto dell'ordine pubblico formale, ai sensi dell'art. 27 cpv. 2 lett. b LDIP. Ordine pubblico attenuato in sede di riconoscimento (consid. 4a). La violazione dell'ordine pubblico procedurale non va esaminata d'ufficio da parte del giudice adito per il riconoscimento (consid. 4b).
4. L'assenza di notificazione ufficiale della sentenza contumaciale americana non viola l'ordine pubblico svizzero (consid. 4c). Sussiste tale violazione in caso di assenza di una motivazione sul merito? (consid. 4d).

A. — Le 23 mai 1988, la société R. (ci-après: R.), domiciliée au Grand Caïman (Antilles britanniques), a assigné P., entre autres personnes, devant un tribunal américain (United States District Court for the Southern District of New York; ci-après: le Tribunal), aux fins d'obtenir le remboursement de fonds dont elle lui avait confié la gestion.

Initialement, P. était représenté par des avocats américains, qui ont répudié leur mandat en cours de procédure. Par ordonnance du 18 novembre 1988, le Tribunal lui a alors imparti un délai de 30 jours pour comparaître en personne ou désigner un avocat pourrait être prononcé contre lui, P., à qui ladite ordonnance a été communiquée, n'a pas obtempéré.

Le 3 février 1989, le Tribunal a rendu un jugement par défaut condamnant P. à payer à R. la somme de 60'910'330,67 US$. Ce jugement, dépourvu de motifs sur le fond, n'a pas été notifié à P. et est entré en force selon le droit américain.

B. — En février 1990, R. a fait séquestrer les biens de P. sis à Genève, puis a introduit une poursuite en validation de séquestre à laquelle le débiteur a fait opposition.

Statuant le 3 mai 1990, le Tribunal de première instance du canton de Genève a rejeté la requête de mainlevée déposée par R. Par arrêt du 14 août 1990, la Cour de justice du canton de Genève a confirmé le jugement de première instance. Elle a estimé, à l'instar de l'autorité inférieure, que la décision étrangère était incompatible avec l'ordre public suisse.

C. — R. forme un recours de droit public pour violation de l'art. 4 Cst. Elle invite le Tribunal fédéral à annuler l'arrêt attaqué, à reconnaître et déclarer exécutoire le jugement américain, et à prononcer la mainlevée définitive de l'opposition. À titre subsidiaire, la recourante conclut au renvoi de la cause à la cour cantonale pour nouvelle décision.

L'intimé propose le rejet du recours et demande, subsidiairement, à pouvoir prouver les faits allégués dans sa réponse.

La Cour de justice a renoncé à se déterminer sur le recours.

Par ordonnance du 7 novembre 1990, le président de la 1re Cour civile a rejeté la requête d'effet suspensif présentée par la recourante.

*Extrait des considérants:*

1. — (Recevabilité du recours de droit public: voir ATF 116 II 376).

2. — Saisi d'un recours de droit public dirigé contre une décision relative à l'exécution d'un jugement condamnatoire rendu par un tribunal étranger le Tribunal fédéral peut être requis non seulement d'annuler la décision attaquée, mais aussi d'accorder ou de refuser lui-même la mainlevée, lorsque la situation est claire (ATF 102 Ia 409 consid. 1c et les arrêts cités, 101 Ia 160 consid. 4). La conclusion de la recourante tendant au prononcé de la mainlevée es. donc recevable en principe. Force est toutefois de constater, en l'espèce, que la Cour de justice n'a pas du tout examiné le bien-fondé de la demande de mainlevée au regard du droit des poursuites. En outre, la lecture de l'arrêt cantonal ne permet pas de savoir si l'intimé a soulevé ou non des objections à l'encontre de cette demande. Partant, si le présent recours devait être admis, le Tribunal fédéral ne serait pas en mesure d'accorder lui-même la mainlevée et il devrait se borner à annuler l'arrêt entrepris.

3. — a) Aux termes de l'art. 25 LDIP, une décision étrangère est reconnue en Suisse si la compétence des autorités judiciaires ou administratives de l'Etat dans lequel la décision a été rendue était donnée (let. a), si la décision n'est plus susceptible de recours ordinaire ou si elle est définitive (let. b), et s'il n'y a pas de motif de refus au sens de l'art. 27 (let. c). Les deux premières conditions ne sont pas litigieuses. Les parties disputent, en revanche, de la question de savoir si la décision étrangère a été rendue en violation de principes fondamentaux ressortissant à la conception suisse du droit de procédure.

b) Lorsque l'application du droit fédéral — en l'occurrence la violation de l'art. 4 Cst. (art. 84 al. 1 let. a OJ), le Tribunal fédéral ne l'examine que sous l'angle de l'arbitraire. Que l'on ait affaire ci à une décision relative à l'octroi de la mainlevée n'y change rien: le Tribunal fédéral ne revoit pas librement ce genre de décisions, lesquelles ne peuvent être l'objet ni d'un recours en réforme (ATF 93 II 437 consid. 2) ni, contrairement à ce que suggère la lettre du Tribunal fédéral (BlSchK 40/1976, p. 149 ss, n. 49). L'arrêt attaqué ne sera donc annulé que s'il viole gravement une norme ou un principe juridique clair et indiscuté, ou s'il contredit d'une manière choquante le sentiment de la justice et de l'équité (ATF 116 II 29 consid. 5 et les références).

Sans doute le pouvoir d'examen du Tribunal fédéral est-il plus limité, lorsque la décision en cause a été rendue en application des dispositions de la LDIP sur la reconnaissance et l'exécution des jugements étrangers, que lorsqu'elle a été prise sur la base d'un traité bilatéral ou multilatéral réglant la question (art. 8c al. 1 let. c OJ). Ce n'est là toutefois, qu'une conséquence du système de recours institué par la loi. Le Tribunal fédéral ne peut que s'en accommoder, même si elle l'empêche d'assurer pleinement l'application uniforme du droit fédéral en ce domaine. Partant, cet état de choses ne justifie pas une extension de son pouvoir d'examen en la matière ni une interprétation plus large de la notion d'arbitraire («un autre avis: HAUSER, Zur Vollstreckbarerklärung ausländischer Leistungsurteile in der Schweiz, in Festschrift für Max Keller, p. 608).

4. — La Cour de justice a refusé de reconnaître la décision étrangère, en s'appuyant sur l'art. 27 al. 2 let. b LDIP. L'intimée avait soutenu, devant elle, que l'incompatibilité du jugement amé-

ricain avec l'ordre public suisse en matière de procédure, réservé par cette disposition, tenait au fait que ledit jugement, rendu par défaut, ne lui avait pas été notifié et ne comportait pas de motifs sur le fond. La cour cantonale n'a retenu que cette seconde objection. Dans sa réponse au recours, l'intimée n'en maintient pas moins la première. On ne saurait le lui reprocher. En effet, comme il n'a pas d'intérêt à former un recours de droit public contre une décision qui lui est favorable, il doit pouvoir soutenir présentement que la Cour de justice a écarté de manière arbitraire la première objection, pour le cas où le Tribunal fédéral serait amené à casser ladite décision, en admettant le bien-fondé du grief de la recourante dirigé contre la seconde objection (ATF 101 Ia 531 consid. 5, 89 I 523 consid. 4; voir aussi l'ATF 86 I 225).

a) La reconnaissance d'une décision étrangère doit être refusée, entre autres motifs, si une partie établit que cette décision a été rendue en violation de principes fondamentaux ressortissant à la conception suisse du droit de procédure, notamment que ladite partie n'a pas eu la possibilité de faire valoir ses moyens (art. 27 al. 2 let. b LDIP). Outre la violation de l'ordre public matériel (art. 27 al. 1 LDIP), le législateur a donc érigé en motif de refus celle de l'ordre public formel, consacrant ainsi la jurisprudence établie par l'arrêt ATF 85 I 47 (consid. 4a) et confirmée ultérieurement (ATF 111 Ia 14 consid. 2a et les arrêts cités), selon laquelle la réserve de l'ordre public ne vise pas seulement le contenu de la décision en cause, mais aussi la procédure qui a été suivie à l'étranger (sur cette question, voir également le Message du Conseil fédéral du 10 novembre 1982 concernant la loi fédérale sur le droit international privé, FF 1983 I 316 ss).

L'ordre public suisse exige le respect des règles fondamentales de la procédure civile, garanti par l'art. 4 Cst. (ATF 111 Ia 14 consid. 2a et les arrêts cités). Ce sont, notamment, la citation régulière, un déroulement équitable de la procédure, le droit d'être entendu et l'absence d'une procédure identique déjà pendante en Suisse ou d'un jugement en force ayant déjà été rendu dans la même affaire (art. 27 al. 2 LDIP; FF 1983 I 318; sur ce point, cf., dans la doctrine récente, HAUSER, op. cit., p. 596/597; WALDER, Einführung in das Internationale Zivilprozessrecht der Schweiz, p. 142 ss, n. 103; DUTOIT, La reconnaissance et l'exécution des décisions étrangères en Suisse, in: Rapports suisses présentés au XIIe Congrès international de droit comparé, Sydney/Melbourne 1986, p. 55 ss; STOJAN, Die Anerkennung und Vollstreckung aus-

ländischer Zivilurteile in Handelssachen, thèse Zurich 1986, p. 155 ss; plus généralement, cf. GULDENER, Das internationale und interkantonale Zivilprozessrecht der Schweiz, p. 102; BAUR, Einige Bemerkungen zum Verfahrensrechtlichen ordre public, in Festschrift für Max Guldener, p. 2 ss).

La réserve de l'ordre public, interprétée de manière restrictive, doit être interprétée de manière restrictive. Il en va tout spécialement ainsi en matière de reconnaissance et d'exécution de jugements étrangers où l'on a affaire à des rapports juridiques qui ont force de chose jugée ou qui sont définitivement acquis à l'étranger. En refusant de les reconnaître en Suisse, on créerait des rapports de 'ordre public suisse ne créerait définitivement acquis à l'étranger. La réserve s
 suisse du droit et des mœurs est sérieuse. Autrement dit, la reconnaissance constitue la règle, dont il ne faut pas s'écarter sans de bonnes raisons. Dans ce domaine, la doctrine emploie, à juste titre, les termes d'ordre public atténué de la reconnaissance» ou d'«effet atténué de l'ordre public» (ATF 109 Ib 235 consid. 2a et les arrêts cités, FF 1983 I 318; DUTOIT, op. cit., p. 55; NIEDERMANN, Die ordre public-Klauseln in den Vollstreckungsverträgen des Bundes und den kantonalen Zivilprozessgesetzen, thèse Zurich 1976, p. 177 ss et les références).

b) Contrairement à la pratique antérieure (ATF 105 Ib 47), sous l'empire de la LDIP le juge de la reconnaissance n'examine plus d'office la violation de l'ordre public procédural; il ne le fait que si une partie invoque ce moyen (art. 27 al. 2 LDIP; FF 1983 I 318/319; WALDER, op. cit., n. 1/2; ie même, Grundfragen der Anerkennung und Vollstreckung ausländischer Urteile unter besonderer Berücksichtigung schweizerischer Sicht, in: Zeitschrift für Zivilprozess (ZZP) 103/1990, p. 341 ss). La partie qui s'oppose à la reconnaissance et à l'exécution doit donc alléguer et établir que taux respectés par l'ordre juridique suisse.

c) La Cour de justice a refusé à bon droit de considérer l'absence de notification officielle du jugement par défaut à l'intimé comme une violation de l'ordre public suisse.

L'intéressé ne prétend pas que le jugement du 3 février 1989 ne serait pas entré en force selon le droit américain, faute d'une telle notification. Au reste, semblable objection tomberait manifestement à faux, attendu que, selon la règle 77 (d) de la procédure civile des Etats-Unis (Federal Rules of Civil Procedure for the United

States District Courts), le jugement ne doit être notifié qu'à la partie non défaillante. Il appartenait donc à l'intimé, qui l'avait pas décliné la compétence des autorités judiciaires américaines ni contesté l'applicabilité des règles de procédure de ce pays, de prendre toutes les mesures nécessaires à la sauvegarde de ses droits (ATF 101 Ia 8 consid. 2). Au lieu de cela, il a renoncé à se défendre. Il savait, pourtant, qu'une telle attitude entraînerait un jugement par défaut, puisque l'ordonnance du 18 novembre 1988, qu'il avait reçue, le précisait expressément. Partant, la cour cantonale n'est nullement tombée dans l'arbitraire en tenant pour compatible avec l'ordre public suisse le fait que ce jugement n'avait pas été notifié au défaillant, conformément au droit de procédure américain. Son point de vue est d'autant plus défendable que le droit de procédure suisse admet, lui aussi, dans certains cas, que les notifications soient faites par publication (GULDENER, Schweizerisches Zivilprozessrecht, 3e éd., p. 253 ss). Il en va notamment ainsi lorsque l'adresse du destinataire est inconnue (art. 11 et 70 al. 3 PCT) ou encore lorsqu'une partie domiciliée à l'étranger n'a pas élu en Suisse un domicile où les notifications auraient pu lui être adressées (art. 29 al. 4 OJ). On relèvera, dans cet ordre d'idées, que le Tribunal, dans son ordonnance du 18 novembre 1988, avait formellement invité l'intimé à désigner un avocat habilité à le représenter et à recevoir les communications officielles (cf. ATF 97 I 261 in fine). Au demeurant, la Cour de justice n'a fait qu'appliquer la jurisprudence du Tribunal fédéral en la matière (arrêt non publié du 19 décembre 1979, en la cause Würmbrunr c. Geddes, consid. 4). Force est, dès lors, de constater qu'elle n'a pas violé l'art. 4 Cst. en refusant de considérer le défaut de notification du jugement étranger comme un motif de refus au sens de l'art. 27 al. 2 let. b LDIP.

d) Le jugement américain ne comporte pas de motifs sur le fond. Pour la cour cantonale, ce défaut de motivation serait contraire à l'ordre public suisse.

Selon la jurisprudence relative à la Convention germano-suisse du 2 novembre 1929 concernant la reconnaissance et l'exécution de décisions judiciaires et de sentences arbitrales (RS 0.276.191.361), l'exécution d'un jugement par défaut rendu en Allemagne et qui, conformément au code de procédure civile de ce pays, ne contient ni exposé des faits, ni motifs, n'est pas contraire à l'ordre public suisse (ATF 103 Ia 199 ss et les arrêts cités; DUTOIT/KNOEPFLER/LALIVE/MERCIER, Répertoire de droit

international privé suisse, vol. 2, p. 197, n. 118; Le Tribunal fédéral avait exprimé le même avis en 1936 déjà à propos de l'elle est aussi l'opinion émise en doctrine relativement à la Convention franco-suisse du 15 juin 1869 sur la compétence judiciaire et l'exécution des jugements en matière civile (RS 0.276.193.491, avec Dutoit/Knoepfler/Lalive/Mercier, op. cit., p. 105, n. 4-5) et à celle qui a été conclue le 16 décembre 1960 avec l'Autriche (RS 0.276.191.632, Dutoit/Knoepfler/Lalive/Mercier, op. cit., p. 288, n. 12).

Cette jurisprudence doit être maintenue en tout cas pour les jugements par défaut et à la condition que la partie défaillante ait été invitée sans succès à prendre les mesures nécessaires à la sauvegarde de ses droits procéduraux (cf. art. 29 al. 1 let. c LDIP). Il est connu que celui qui se désintéresse du procès dans lequel il est impliqué en supporte les conséquences et doit souffrir, le cas échéant, qu'un jugement par défaut soit rendu sur la base des seules allégations de la partie non défaillante. Sans doute le droit fédéral prescrit-il au juge suisse d'examiner d'office, nonobstant le défaut du défendeur, si les faits allégués par le demandeur permettent d'admettre le bien-fondé de ses conclusions au regard du droit applicable (Guldener, dernier op. cit., p. 270, note de pied 27, let. b). Toutefois, cette exigence, dont on peut aussi déduire l'obligation de motiver le jugement sur le fond, n'est qu'une émanation du principe rendu par l'adage jura novit curia, lequel ne fait, à l'évidence, pas partie intégrante de l'ordre public suisse. Le droit interne exclut d'ailleurs l'application de l'ordre public suisse à certaines procédures (cf., par exemple, l'ATF 110 Ia 4 consid. 2a). On ajoutera que l'obligation qui est faite au juge de motiver ses décisions, telle qu'elle découle du droit d'être entendu garanti par l'art. 4 Cst., vise à permettre au justiciable de saisir la portée du jugement qui lui donne tort, afin qu'il puisse l'attaquer à bon escient (ATF 114 Ia 242 consid. 2). Or, l'intimé a été informé officiellement que son inaction conduirait au prononcé d'un jugement par défaut. Il ne pouvait donc ignorer que, s'il persistait à se tenir à l'écart de la procédure en cours, le Tribunal statuerait sur le vu des allégations de fait et des arguments de droit de la partie adverse, sur lesquels il fonderait son jugement. C'est dire que l'intéressé n'avait pas besoin de connaître les motifs de ce jugement pour en saisir la portée. Admissible en l'espèce même sous l'angle de l'art. 4 Cst., l'absence de motivation du jugement par défaut rendu

aux Etats-Unis ne saurait donc constituer une violation de l'ordre public suisse.

Se référant à l'arrêt ATF 103 Ia 205, la Cour de justice expose, par ailleurs, que la renonciation à l'exigence de motivation suppose que la partie défaillante ait eu la possibilité de faire opposition au jugement par défaut et de rétablir ainsi sans autre formalité la procédure dans sa situation initiale. Or, poursuit-elle, la recourante ne s'est pas prononcée sur cette possibilité. Ce faisant, elle renverse sous raison le fardeau de la preuve, tel qu'il découle de l'art. 27 al. 2 LDIP. Il n'incombait, en effet, pas à la recourante d'établir l'existence d'un moyen de droit susceptible de provoquer la mise à néant du jugement par défaut, mais bien plutôt à l'intimé de rapporter la preuve du contraire puisque c'est lui qui se prévalait du défaut de motivation pour s'opposer à la reconnaissance et à l'exécution dudit jugement. Les conséquences de l'absence de preuve sur ce point doivent dès lors être supportées par l'intimé. Celui-ci ne prétend du reste pas avoir invoqué l'absence d'une voie de droit comme motif de refus, et la Cour de justice admet que le jugement américain pouvait être l'objet d'un appel. L'intimé rétorque qu'il lui était matériellement impossible d'attaquer un jugement qui ne lui avait pas été notifié. Il doit cependant se laisser opposer le fait qu'il a renoncé à participer au procès, sur le conseil de ses avocats, après avoir été formellement averti qu'un tel comportement l'exposerait à un jugement par défaut. De surcroît, comme les connaissances de ses mandataires quant à la portée et aux modalités d'un jugement par défaut doivent lui être imputées, il est censé avoir su que le droit de procédure américain ne prévoit pas la notification de tels jugements à la partie défaillante. Pour cette raison, une violation de l'ordre public peut être exclue d'emblée en l'espèce. Point n'est, dès lors, besoin de décider si l'ordre public suisse ne tolère un jugement par défaut non motivé qu'à la condition qu'il puisse être mis à néant sans autre formalité — c'est-à-dire par une opposition non soumise à l'exigence de motivation — ou s'il tient pour suffisante, à cet égard, la possibilité de former un recours contre ce type de jugements. Il est vrai que, dans l'arrêt précité, le Tribunal fédéral, examinant la situation sous l'angle des art. 4 Cst. et 6 CEDH, paraît avoir mis l'accent sur la possibilité de rétablir la procédure dans son état initial par une simple opposition non motivée. Cela ne signifie pas pour autant que l'absence d'un tel moyen de droit implique toujours une violation de l'ordre public suisse. Il n'en va en tout cas pas ainsi dans

634  Internationales Privatrecht - N° 112

l'hypothèse où la partie défaillante savait qu'un procès était pendant, avait la possibilité d'y participer, mais y a renoncé en connaissance de cause après avoir été menacée d'un jugement par défaut. Toute autre solution reviendrait à privilégier la partie qui s'est désintéressée de la conduite de son procès et, par voie de conséquence, à pénaliser celle qui a satisfait aux exigences du droit de procédure. Dans le cas particulier, le fait que l'intimé avait la possibilité de former un recours contre le jugement par défaut apparaît, dès lors, suffisant.

5. — L'arrêt attaqué viole donc manifestement l'art. 27 al. 2 let. b LDIP en tant qu'il fait de la motivation du jugement par défaut américain un principe fondamental ressortissant à la conception suisse du droit de procédure, au sens de cette disposition. Il est ainsi arbitraire et, partant, doit être annulé.

112. Auszug aus dem Urteil der I. Zivilabteilung vom 14. November 1990 i. S. E. AG gegen K. Ltd. und IHK-Schiedsgericht Zürich (staatsrechtliche Beschwerde)

*Art. 85 lit. c OG und 190 Abs. 2 lit. e IPRG. Internationale Schiedsgerichtsbarkeit. Ordre public.*

Auf Beschwerden wegen Verletzung des Ordre public tritt das Bundesgericht nur insoweit ein, als in der Beschwerdeschrift konkret geltend gemacht wird, gegen welchen fundamentalen Rechtsgrundsatz das angefochtene Schiedsurteil im Ergebnis verstösst. Selbst klare Rechtsverletzungen und offensichtlich falsche Tatsachenfeststellungen genügen für sich allein nicht, um einen Schiedsspruch wegen Verletzung des Ordre public aufzuheben (E. 4).

*Art. 85 let. c OJ et 190 al. 2 let. e LDIP. Arbitrage international. Ordre public.*

Le Tribunal fédéral n'entre en matière sur des recours pour violation de l'ordre public que si le mémoire de recours expose concrètement à quel principe de droit fondamental la sentence attaquée contrevient. Même des violations de droit évidentes et des constatations de fait manifestement fausses ne permettent pas à elles seules d'annuler une sentence arbitrale pour cause d'incompatibilité avec l'ordre public (consid. 4).

*Art. 85 lett. c OG e 190 cpv. 2 lett. e LDIP. Arbitrato internazionale. Ordine pubblico.*

Il Tribunale federale entra nel merito di ricorsi per violazione dell'ordine pubblico solo se l'atto ricorsuale espone concretamente quale e il principio di diritto fondamentale violato dal lodo impugnato. Neppure chiare violazioni del diritto e accertamenti fattuali manifestamente errati per-