**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In Re TERRORIST ATTACKS on SEPTEMBER 11, 2001 | ) ) ) ) | 03 MDL 1570 (RCC) |
| KATHLEEN ASHTON et al.,<br>              Plaintiffs,<br><br>        v.<br><br>AL QAEDA ISLAMIC ARMY et al.,<br>              Defendants. | ) ) ) ) ) ) ) ) ) | 02 CV 6977 (RCC) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF**
**DEFENDANT THE NATIONAL COMMERCIAL BANK**

Dated: March 19, 2004
        Washington, D.C.

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB-4112)
Ugo Colella (admitted *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:     202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*

## Table of Contents

I.    NCB is Immune from Suit Under the Foreign Sovereign Immunities Act ................................. 2

     A.    NCB is an Instrumentality of the Saudi Government ..................................... 2

         1.    The PIF is an Integral Part of the Government
of the Kingdom of Saudi Arabia ................................................................... 3

         2.    Alternatively, the PIF is a Political Subdivision
of the Kingdom of Saudi Arabia ................................................................... 9

     B.    None of the FSIA's Exceptions to Immunity Applies ................................... 10

         1.    Plaintiffs' Claims Against NCB are Governed by the
State-Sponsor of Terrorism Exception (28 U.S.C. § 1605(a)(7)) ................... 12

         2.    The Commercial Activity Exception (28 U.S.C. § 1605(a)(2))
Does Not Eliminate NCB's Immunity ........................................................ 12

         3.    The Non-Commercial Tort Exception (28 U.S.C. § 1605(a)(5))
Does Not Eliminate NCB's Immunity ........................................................ 15

             a.    No Tortious Act or Omission ........................................................ 15

             b.    Insufficient Causal Link .............................................................. 16

             c.    The Entire Tort Was Not Committed Within the
United States ............................................................................... 17

II.    Plaintiffs' Claims Against NCB are Not Justiciable ................................................... 19

III.    This Court Lacks Personal Jurisdiction Over NCB .................................................... 21

     A.    There is No Personal Jurisdiction Over NCB on a Nationwide
Service of Process Theory .......................................................................... 22

     B.    There is No Personal Jurisdiction Over NCB Under New York Law ........................ 22

     C.    NCB Lacks the Constitutionally Required Minimum Contacts
with the United States ............................................................................... 23

IV.    Plaintiffs Fail to State a Claim Against NCB ............................................................ 24

Conclusion ........................................................................................................................ 25

## Table of Authorities

### Cases

*Antares Aircraft v. Federal Republic of Nigeria,*
    999 F.2d 33 (2d Cir. 1993) ..................................................................................................13

*Beacon Enterprises v. Menzies,*
    715 F.2d 757 (2d Cir. 1983) ...............................................................................................23

*Burnett v. Al Baraka,*
    274 F.Supp.2d 86 (D.D.C. 2003) ................................................................................passim

*Burnett v. Al Baraka,*
    292 F.Supp.2d 9 (D.D.C. 2003) ..................................................................................passim

*Cabiri v. Republic of Ghana,*
    165 F.3d 193 (2d Cir. 1999) ..........................................................................................12, 18

*Cicippio-Puleo v. Islamic Republic of Iran,*
    353 F.3d 1024 (D.C. Cir. 2004) ..........................................................................................17

*Compagnie Noga v. The Russian Federation,*
    --- F.3d ---, 2004 WL 504604 (2d Cir. Mar. 16, 2004) ........................................ 4, 6, 7, 8, 9, 10

*Dole Food Co. v. Patrickson,*
    123 S. Ct. 1655 (2003) ....................................................................................................3, 8

*Filetech v. France Telecom,*
    304 F.3d 180 (2d Cir. 2002) ...............................................................................................11

*Filus v. LOT Pol. Airlines,*
    819 F.Supp. 232 (E.D.N.Y. 1993) .......................................................................................9

*Goquiolay v. Philippines Nat'l Bank,*
    No. 90 Civ. 893, 1990 WL 144118 (S.D.N.Y. 1990) ........................................................18

*Grove Press, Inc. v. Angleton,*
    649 F.2d 121 (2d Cir. 1981) ...............................................................................................23

*Hirsh v. State of Israel,*
    962 F.Supp. 377 (S.D.N.Y.),
    *aff'd,* 133 F.3d 907 (2d Cir. 1997) (unpublished) ..........................................................18

*Humanitarian Law Project v. Dep't of Justice,*
    352 F.3d 382 (9th Cir. 2003) ..............................................................................................15

*Hyatt Corp. v. Stanton,*
    945 F. Supp. 675 (S.D.N.Y. 1996) .......................................................................................4

*In re Franklin Nat'l Bank Securities Litig.*,
    478 F. Supp. 210 (E.D.N.Y. 1979) ...................................................................................6

*In re Ski Train Fire in Kaprun, Austria on November 11, 2000*,
    No. 01-MDL-1428, 2003 WL 22909153 (S.D.N.Y. Dec. 9, 2003) ....................................21, 24

*Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*,
    160 F.Supp.2d 722 (S.D.N.Y. 2001) ...............................................................................22

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) ...........................................................................................22

*Kahn Lucas Lancaster v. Lark Int'l*,
    956 F.Supp. 1131 (S.D.N.Y. 1997) .................................................................................23

*Kato v. Ishihara*,
    --- F.3d ---, 2004 WL 301002 (2d Cir. Feb. 18, 2004) ................................................6, 7

*Karaha Bodas v. Perusahaan*,
    313 F.3d 70 (2d Cir. 2002) ..............................................................................................6

*Laborers Local 17 Health and Beneifit Fund v. Philip Morris, Inc.*,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998) ..............................................................................23

*Letelier v. Republic of Chile*,
    488 F.Supp. 665 (D.D.C. 1980) ......................................................................................17

*Liberian E. Timber v. Republic of Liberia*,
    650 F.Supp. 73 (S.D.N.Y. 1986) ......................................................................................6

*Liu v. Republic of China*,
    892 F.2d 1419 (9th Cir. 1989) ........................................................................................17

*Magness v. Russian Federation*,
    247 F.3d 609 (5th Cir. 2001) ...........................................................................................9

*Mantello v. Hall*,
    947 F.Supp. 92 (S.D.N.Y. 1996) ....................................................................................23

*Meteoro Amusement Corp. v. Six Flags, Inc.*,
    267 F. Supp. 2d 263 (S.D.N.Y. 2003)..............................................................................22

*Mizuna v. Crossland Federal Sav. Bank*,
    90 F.3d 650 (2d Cir. 1996) .............................................................................................16

*Montanez Miranda v. Banco Progreso*,
    973 F.Supp. 89 (D.P.R. 1997)...........................................................................................6

*O'Connell Machinery Co. v. M.V. "Americana",*
    734 F.2d 115 (2d Cir. 1984) ................................................................9, 10

*Republic of Argentina v. Weltover,*
    504 U.S. 607 (1992) ..............................................................................13

*Robinson v. Government of Malaysia,*
    269 F.3d 133 (2d Cir. 1999) ................................................10, 15, 16, 17

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003) ........................................................ 4, 6, 8

*S & Davis Int'l v. Yemen,*
    218 F.3d 1292 (11ᵗʰ Cir. 2000) ..............................................................9

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993) ..............................................................................10

*Smith v. Afghanistan,*
    262 F.Supp.2d 217 (S.D.N.Y. 2003) ....................................................12

*Smith v. Socialist People's Libyan Arab Jamahiriya,*
    101 F.3d 239 (2d Cir. 1997) ..................................................................12

*Sutherland v. Islamic Republic of Iran,*
    151 F.Supp.2d 27 (D.D.C. 2001) ..........................................................17

*Transaero v. La Fuerza Aerea Boliviana,*
    30 F.3d 148 (D.C. Cir. 1994) ........................................................ 4, 6, 7, 8

*Transatlantic v. Shiffahrtskontor GMBH v. Shanghai Foreign Trade Corp.,*
    204 F.3d 384 (2d Cir. 2000) ..................................................................16

*Turbana Corp. v. M/V Summer Meadows,*
    2003 U.S. Dist. LEXIS 21583, (S.D.N.Y. Dec. 2, 2003) ..........................22

*Verlinden B.V. v. Central Bank of Nigeria,*
    461 U.S. 480 (1983) ..............................................................................16

*Virtual Countries, Inc. v. Republic of South Africa,*
    300 F.3d 230 (2d Cir. 2002) ................................................ 2, 10, 11, 13, 14

*Wiwa v. Royal Dutch Petroleum Co.,*
    226 F.3d 88 (2d Cir. 2000) ..................................................................22

*Wolf v. Federal Republic of Germany,*
    95 F.3d 536 (7ᵗʰ Cir. 1996) ....................................................................7

*Zappia Middle East Construction Co. v. Emirate of Abu Dhabi,*
215 F.3d 247 (2d Cir. 2000) ....................................................................................... 10

## Federal Statutes

7 U.S.C.

§ 2009cc-1 ............................................................................................................... 7

15 U.S.C.

§ 631 ........................................................................................................................ 7

§ 689a ...................................................................................................................... 7

§ 1023(a) .................................................................................................................. 7

18 U.S.C.

§ 2331 ...................................................................................................................... 22

§ 2333 ...................................................................................................................... 24

§ 2337(2) .................................................................................................................. 25

28 U.S.C.

§ 1350 ...................................................................................................................... 24

§ 1407 ...................................................................................................................... 21

§ 1603(b) .................................................................................................................. 2

§ 1603(b)(1) ............................................................................................................ 2, 3

§ 1603(b)(2) ............................................................................................................. 3

§ 1603(b)(3) ............................................................................................................. 2

§ 1605(a)(2) .................................................................................................. 11, 12, 13, 16

§ 1605(a)(5) .............................................................................................. 11, 15, 16, 17, 18

§ 1605(a)(7) ................................................................................................... 11, 12

§ 1606 ...................................................................................................................... 16

49 U.S.C. § 101(a) ................................................................................................................ 7

**State Statutes**

N.Y. CPLR

§ 301 ........................................................................................................................ 22, 23

§ 302 ............................................................................................................................. 22

§ 302(a)(1) .................................................................................................................... 23

§ 302(a)(2) .................................................................................................................... 23

**Federal Rules of Civil Procedure**

Rule 4(k) ....................................................................................................................... 21

Rule 12(b)(1) ................................................................................................................. 10

**Congressional Record**

H.R. Rep. No. 94-1487, 94th Cong., 2d Sess.,
 *reprinted in* 1976 U.S.C.C.A.N. 6604 ............................................................... 3, 9, 18

**Treatises**

Joseph W. Dellapena, Suing Foreign Governments and Their Corporations,
 § 2.3 (2d ed. 2003) .................................................................................................. 9

**Miscellaneous**

Black's Law Dictionary 1159 (6th ed. 1990) ................................................................. 9

Restatement (Second) of Torts § 876(a) ..................................................................... 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re TERRORIST ATTACKS on SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC) |
| KATHLEEN ASHTON et al., Plaintiffs, v. AL QAEDA ISLAMIC ARMY et al., Defendants. | 02 CV 6977 (RCC) |

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT THE NATIONAL COMMERCIAL BANK

Plaintiffs' allegations against The National Commercial Bank ("NCB") are essentially identical to those made in *Burnett v. Al Baraka*, 03 CV 9849 ("*Burnett*").[1]  As in *Burnett*, Plaintiffs here allege that NCB provided material support and resources to Osama bin Laden and al Qaeda and therefore is responsible for the September 11 attacks.  *See* 4AC, ¶¶ 5, 23.[2]  The grounds requiring dismissal of the *Burnett* complaint apply equally here.[3]

<u>First</u>, NCB is an instrumentality of the Kingdom of Saudi Arabia, and the Foreign Sovereign Immunities Act ("FSIA") bars the claims against NCB because none of the FSIA's exceptions

---

1.     Accordingly, NCB respectfully requests that the Court address this motion and NCB's motion to dismiss *Burnett* at the same time.  Aff. of Mitchell R. Berger ("Berger Aff."), ¶ 3 (attached hereto).

2.     "4AC" means the Fourth Am. Consolidated Master Compl., which Plaintiffs sought permission to file on March 10, 2004.  The 4AC consolidates and incorporates *York* (03-5493), which has been voluntarily dismissed.  *See* Not. of Voluntary Dismissal (Mar. 16, 2004).  Otherwise, the allegations of the 4AC are identical to the Third Amended Complaint.

3.     *See* Mem. of Law in Support of Mot. to Dismiss of Defendant The National Commercial Bank, Oct. 14, 2003, Dkt. #359 ("*Burnett* Op. Mem."); Reply Mem. of The National Commercial Bank in Support of its Mot. to Dismiss, dated March 4, 2004 ("*Burnett* Reply Mem.").  NCB adopts the argument by Prince Sultan that Judge Robertson's rulings in *Burnett* are entitled to substantial deference in these MDL-consolidated actions.  *See* Mem. in Support of HRH Prince Sultan Bin Abdulaziz Al-Saud's Mot. to Dismiss Certain Consolidated Compls. (Mar. 19, 2004), at 10-13.

applies.  <u>Second</u>, Plaintiffs' claims against NCB raise non-justiciable political questions, and violate the act-of-state and international comity doctrines, because they require the Court to second-guess policy judgments of the Executive Branch and to adjudicate whether the Saudi Government adequately regulated Saudi religious practices and financial institutions.  <u>Third</u>, Plaintiffs cannot establish personal jurisdiction over NCB, which does not have the required minimum contacts with either New York or the United States as a whole.  <u>Fourth</u>, Plaintiffs fail to state a claim against NCB because they do not allege the necessary link between NCB's alleged actions and the September 11 attacks.

## I.      NCB is Immune from Suit Under the Foreign Sovereign Immunities Act.

The FSIA provides the "sole basis" for exercising subject matter jurisdiction over foreign states, their political subdivisions, and their agencies or instrumentalities.  *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236 (2d Cir. 2002).  Because NCB is an instrumentality of the Saudi Government, and because none of the FSIA's exceptions to immunity applies, the Court lacks subject matter jurisdiction over Plaintiffs' claims against NCB.  *Id.*[4]

### A.      NCB is an Instrumentality of the Saudi Government.

NCB meets all three statutory criteria for "instrumentality" status under the FSIA.  *See* 28 U.S.C. § 1603(b).  NCB is a "separate legal person" from the Saudi Government and maintains its principal place of business in Saudi Arabia, and not within any State of the United States.  *Id.*, §§ 1603(b)(1), (b)(3); *Burnett* Op. Mem., at 34-35.  NCB likewise satisfies the majority-ownership requirement of the Act.  To be an instrumentality under the FSIA, "a majority of [the entity's] shares or other ownership interest [must be] owned by" either the foreign state itself "or [a] political

---

[4]. NCB also adopts: *Burnett* Op. Mem., at 33-54; *Burnett* Reply Mem., at 2-5; the Affidavit of Abdallah Bin Hamad Al-Wohaibi ("Al-Wohaibi Aff.") (*Burnett* Op. Mem., Exh. 4); the Declaration of Jorge Juco ("Juco Decl.") (*Burnett* Op. Mem., Exh. 5); the Supplemental Affidavit of Abdallah Bin Hamad Al-Wohaibi ("Supp. Al-Wohaibi Aff.") (*Burnett* Reply Mem., Exh. 6); and the Declaration of Nizar Bin Obaid Madani ("Madani Decl.") (*Burnett* Reply Mem., Exh. 7).  *See* Berger Aff., ¶¶ 7-10 & exhs. 4-7.

subdivision thereof." 28 U.S.C. § 1603(b)(2). Before Plaintiffs filed suit against NCB,[5] the Saudi Ministry of Finance owned through one of its administrative units, The Public Investment Fund ("PIF"), a majority of NCB's common stock shares. *Burnett* Op. Mem., at 34-35. The question thus is whether the PIF—which holds the majority of NCB's shares—is either the Saudi state itself or a "political subdivision thereof." Plaintiffs already have supplied the answer—yes—because they allege that, before this suit commenced, the "Saudi Government bought a majority of [NCB's] ownership." 4AC, ¶ 573.[6] The indisputable facts confirm this conclusion.

1.    **The PIF is an Integral Part of the Government of the Kingdom of Saudi Arabia.**

As in *Burnett*, Plaintiffs may argue that the Saudi Government only indirectly owns NCB on the theory that the PIF is itself a separate instrumentality of the Saudi Government. However, as in *Burnett*, any such notion cannot be sustained. To advance that incorrect theory, Plaintiffs would have to show that the PIF is a "separate legal person" from the Saudi state. 28 U.S.C. § 1603(b)(1). This they cannot do: The PIF indisputably is an administrative department of the Ministry of Finance that "has no separate legal status from the Ministry itself." Al-Wohaibi Aff., ¶¶ 2, 4 (emphasis added); *accord* Supp. Al-Wohaibi Aff., ¶¶ 3, 4, 6; *Burnett* Op. Mem., at 34-35.[7] Equally, the Ministry of Finance is not a separate legal person from the Saudi Government. Supp. Al-Wohaibi Aff., ¶ 11. These facts alone establish that the PIF is an indivisible part of the Saudi Government,

---

5.    On September 4, 2002, Plaintiffs filed their original complaint against NCB. *See* Dkt. # 1. The U.S. Supreme Court has held that "instrumentality status [is] . . . determined at the time suit is filed." *Dole Food Co. v. Patrickson*, 123 S.Ct. 1655, 1662, 1663 (2003) (emphasis added); *Burnett* Op. Mem., at 34-35; *Burnett* Reply Mem., at 3 n.5.

6.    In two other MDL-consolidated actions, plaintiffs make the same allegation. *See Fed. Ins.*, 03-6978, FAC, ¶ 287 ("Since 1999, the Kingdom of Saudi Arabia has owned a controlling interest in [NCB], and operated the bank as an agency, instrumentality and organ of the Kingdom."); *Salvo*, 03-5071, Cmpl., ¶ 369.

7.    Although the PIF's characteristics are determined by Saudi law, its FSIA status is controlled by U.S. law. *See* H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., 1976 U.S.C.C.A.N. 6604, 6614.

3

and that NCB therefore is owned directly by the Saudi Government, rendering NCB a Saudi Government "instrumentality" under the FSIA.

The D.C. Circuit's "core functions" test, now adopted by the Second Circuit, further supports this conclusion.[8] In *Transaero v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994), the D.C. Circuit held that the determination of whether an entity is sufficiently part of the foreign state to be deemed the foreign state itself depends upon its "core functions"—*i.e.*, "whether the defendant is the type of entity that is an integral part of a foreign state's political structure, [or rather] an entity whose structure and function is predominantly commercial." *Id.* at 151; *accord Compagnie Noga v. The Russian Federation*, --- F.3d ---, 2004 WL 504604, at *9 (2d Cir. Mar. 16, 2004) (applying *Transaero* "core functions" test); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (same). If the former, then the entity is considered the foreign state itself; if the latter, then the entity is deemed an agency or instrumentality of the foreign state. *See Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *9; *Roeder*, 333 F.3d at 234; *Transaero*, 30 F.3d at 151-52.

The uncontested facts demonstrate that the PIF is "an integral part" of Saudi Arabia's "government and political structure" because the PIF's structure and function are indisputably governmental. Supp. Al-Wohaibi Aff., ¶¶ 6, 12; *see id.* ¶¶ 1-5, 7-11; Al-Wohaibi Aff., ¶¶ 2-12;. The PIF was established, and its charter was authorized, by Royal Decree. Al-Wohaibi Aff., ¶ 3. In addition, the PIF's Board of Directors is comprised entirely of Saudi Government officials, its

---

8.    One judge of this Court has adopted a "legal characteristics" test for determining agency/instrumentality status under the FSIA. *See Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 684 (S.D.N.Y. 1996). However, the Court need not decide which formulation best comports with the FSIA because the PIF is not a separate legal person under either test. Under the legal characteristics test, an entity is a "separate legal person" from the foreign state if the entity "can sue and be sued in its own name, contract in its own name, or hold property in its own name." *Id.* at 681, 682. The PIF meets none of these requirements. Al-Wohaibi Aff., ¶¶ 2, 4, 8-12; Supp. Al-Wohaibi Aff., ¶¶ 3, 4, 6, 11. In any event, *Hyatt Corp.* is inconsistent with the Second Circuit's recent *Compagnie Noga* decision.

employees are members of the Government's civil service, and its costs of operations are all funded by the Ministry of Finance. *Id.*, ¶¶ 4, 8, 10-12.

Equally, the PIF performs "only governmental functions" in furtherance of the Ministry's duty to implement and support Saudi Government policies to protect and develop the Saudi national economy. Al-Wohaibi Aff., ¶ 5; Supp. Al-Wohaibi Aff., ¶¶ 4, 7. The PIF accomplishes this objective by funding investments on behalf of the Saudi Government pursuant to the instructions and authorizations of the Kingdom's Council of Ministers. Al-Wohaibi Aff., ¶ 5; Supp. Al-Wohaibi Aff., ¶ 8. The PIF's investment funds are provided by the Saudi Government, which earmarks Government funds for investment purposes. Al-Wohaibi Aff., ¶ 7. In Resolution No. 508, the Saudi Council of Ministers declared that it is "imperative that economic and social development be complementary to each other and this requires that serious consideration be given to the equitable distribution of income." *Burnett* Op. Mem., Exh. 4, exh. C (CMR No. 508, Preamble). Thus, "the [Saudi] Government" has found it "desirable" to "provide investment opportunities in joint stock companies to a large segment of its citizens who have limited income or limited saving capability, as these opportunities will familiarize those citizens with saving and strengthen their relations with national productive institutions besides improving their income." *Id.* The PIF's function is to (1) "determine th[e] participation and . . . percentage" of the Saudi Government's investment in joint stock companies (like NCB), and to (2) "assume responsibility of the management of these shares, representing the government in all matters related to these shares . . . ." *Id.*, ¶¶ 1, 3; *see also* Al-Wohaibi Aff., ¶¶ 5, 6.

Moreover, the PIF provides financing with terms and for projects that commercial lenders do not. Supp. Al-Wohaibi Aff., ¶ 9. PIF loans generally have a longer maturity than loans made by commercial lenders because the projects that the PIF supports are for the long-term benefit of the Kingdom's national economy. *Id.*, ¶ 10. For example, the PIF provided an interest-free loan to finance a non-profit governmental construction project to house pilgrims who visit the holy city of

5

Mecca. *Id*, ¶ 9. The PIF also provided likely-unprofitable equity funding for a railroad construction project needed to develop Saudi Arabia's extensive phosphate rock deposits, which are "important" to the Saudi national economy. *Id*. Finally, the PIF extends financing for petrochemical and petroleum projects at a fixed rate, compared to the variable, risk-based rates of commercial lenders. *Id*., ¶ 10. This fixed rate charged by the PIF for loans to such projects is set by the PIF's Board of Directors, which is comprised entirely of Government officials. *Id*.

These undisputed facts establish that the PIF is "so closely bound up with the structure of the state[, that] . . . it must . . . be considered as the 'foreign state' itself." *Transaero*, 30 F.3d at 153 (Bolivian Air Force); *see also Roeder*, 333 F.3d at 234 (Iran's Ministry of Foreign Affairs); *Karaha Bodas v. Perusahaan*, 313 F.3d 70, 75 (2d Cir. 2002) (Indonesian Ministry of Finance). The PIF's critical role in protecting and developing the Saudi national economy is a "necessary concomitant of sovereignty." *Transaero*, 30 F.3d at 153; *see Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *7 (holding that a "quintessential 'governmental' function" involves "<u>financing</u> the purchase of massive quantities of basic necessities and <u>infrastructure improvements</u> to provide for the Russian people...." (emphasis added)); *Kato v. Ishihara*, --- F.3d ---, 2004 WL 301002, at *5 (2d Cir. Feb. 18, 2004) ("The promotion abroad of the commerce of domestic firms is a basic—even quintessential—governmental function."); *Montanez Miranda v. Banco Progreso*, 973 F.Supp. 89, 94 (D.P.R. 1997) (governmental entity engaged in "quintessential governmental acts" in managing assets of different companies to protect the national economy); *Liberian E. Timber v. Republic of Liberia*, 650 F.Supp. 73, 75 (S.D.N.Y. 1986) (bolstering economy, creating jobs, and providing funds for the needs of the people "entailed an exercise of powers peculiar to a sovereign" and constituted a "governmental function").[9]

---

9.      The same holds true for numerous U.S. Government entities, a comparison the Second Circuit recently found probative. *Kato*, --- F.3d ---, 2004 WL 301002, at *5; *see In re Franklin Nat'l Bank Securities Litig.*, 478 F. Supp. 210, 216, 219-221 (E.D.N.Y. 1979) (banking agencies had sovereign immunity under the Federal Tort Claims Act for the governmental function of protecting

Thus, the PIF is not stripped of its governmental role just because it discharges its governmental functions through financial activities like loans and share management.  *See Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *7 ("financing...infrastructure improvements" is a "quintessential 'governmental' function"); *Kato*, --- F.3d ---, 2004 WL 301002, at *5 ("promotion of commerce"—a sovereign governmental function—does not equate with "engag[ing] in commerce"—a non-governmental function).  As the Seventh Circuit has observed:  "Money changes hands when people receive tax refunds from the government, too, but no one thinks that this makes the administration of the Internal Revenue Service akin to a private commercial enterprise."  *Wolf v. Federal Republic of Germany*, 95 F.3d 536, 544 (7th Cir. 1996).  Moreover, in addressing this same issue in *Transaero*, the D.C. Circuit held that "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself."  30 F.3d at 152.  In holding that the Bolivian Air Force was part of "the 'foreign state' itself," the court reasoned:

> Any government of reasonable complexity must act through men organized into offices and <u>departments</u>.  If a separate name and some power to conduct its own affairs suffices to make a <u>foreign department</u> an "agency" rather than a part of the state itself, the structure of section 1608 [*i.e.*, the service provisions of the FSIA] will list too far to one side.

---

the national economy); *see also* Small Business Act, 15 U.S.C. § 631 ("It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as possible, the interests of small-business concerns in order to preserve competitive enterprise...."); Department of Transportation, Organization, 49 U.S.C. § 101(a) ("The national objectives of general welfare, economic growth and stability, and the security of the United States require the development of the transportation policies and programs...."); Rural Business Investment Program, 7 U.S.C. § 2009cc-1 ("The purpose of the Rural Investment Program established under this subchapter are--1) to promote economic development and the creation of wealth and job opportunities in rural areas...."); New Markets Venture Capital Program, 15 U.S.C. § 689a ("The purposes of the New Markets Venture Capital Program established under this part are—(1) to promote economic development and the creation of wealth and job opportunities in low-income geographic areas and among individuals living in such areas...."); National Policy on Employment and Productivity, 15 U.S.C. § 1023(a) (noting that one of the purposes of the President's Council of Economic Advisor's is "to formulate and recommend national economic policy to promote full employment, production and purchasing power under free competitive enterprise").

*Id.* at 153 (emphasis added); *accord Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *9; *Roeder*, 333 F.3d at 234.  Thus, under *Transaero*, *Compagnie Noga*, and *Roeder*, so long as the "structure and function" of a "foreign department" make it an "integral part" of the "political structure" of the state, that department is part of the foreign state even if it engages in commercial activity to carry out its governmental functions.  The PIF meets that test, meaning NCB is directly owned by the Saudi Government, and NCB is an "instrumentality" under the FSIA.

The Supreme Court's *Patrickson* decision provides no barrier to holding that NCB is a Saudi Government instrumentality.  There, the Court held that FSIA instrumentality status would not be extended to a <u>subsidiary</u> corporation that a foreign state owned indirectly, through its ownership of the <u>parent</u> company's stock.  123 S. Ct. at 1660.  There is no comparable parent/subsidiary stock ownership structure here.  The PIF is not a corporate or commercial entity that issues shares or that is "owned" by the Saudi Government or the Ministry of Finance, but is instead part of the Government itself.  *See Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *9 ("[A]nalogizing the relationship between the Russian Federation and the Government to the relationship between a corporate parent and a subsidiary belies the reality of the political relationship between the Russian Federation and the Government...."); Supp. Al-Wohaibi Aff., ¶ 11; *Burnett* Op. Mem., at 35.[10]

_____

10.      Regardless, *Patrickson* recognized that the FSIA extends instrumentality status to an entity in which a foreign state has an ownership interest "other than ownership in stock."  *Patrickson*, 123 S.Ct. at 1661.  According to the Court, "[t]he statute had to be written for the contingency of ownership forms in other countries, or even in this country, <u>that depart from conventional corporate structures</u>.  The statutory phrase 'other ownership interest' is best understood to accomplish this objective."  *Id.* (emphasis added).  Council of Ministers Resolution No. 508 gives the Saudi government the power to "sell all or part of" NCB's stock.  CMR No. 508, at 2, 3; Al-Wohaibi Aff., ¶¶ 5, 6; Supp. Al-Wohaibi Aff., ¶ 8.  Thus, even if the Saudi Government were deemed not to "own" NCB's stock directly, the Government's power to control the disposition of that stock—held by the PIF for the Ministry of Finance to further the Kingdom's social and economic policy objectives—reflects an "ownership interest" that "depart[s] from conventional corporate structures."

**2.    Alternatively, the PIF is a Political Subdivision of the Kingdom of Saudi Arabia.**

Even if the PIF were not deemed to be the Saudi state itself, NCB retains its instrumentality status so long as the PIF is a political subdivision of the Saudi Government.  The text of the FSIA does not define "political subdivision," but its legislative history does:   "The term 'political subdivision' includes all governmental units beneath the central government, including local governments."  H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., 1976 U.S.C.C.A.N. 6004, 6613; *see Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *9 (recognizing this definition of "political subdivision").[11]  The PIF qualifies as a "governmental unit beneath the central government" because it is an administrative unit of the Ministry of Finance, with no legal status separate from the Ministry, and whose structure and function are solely governmental.  *See* Part I.A.1, *supra*.  The Second Circuit, and other Circuits, have recognized that a ministry of a foreign government is a political subdivision of that state.  *See Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *9 & nn.11-12; *see also Magness*, 247 F.3d at 613 n.7 (Russian Ministry of Culture); *S& Davis Int'l v. Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000) (Ministry of Supply and Trade of the Republic of Yemen); *Filus v. LOT Pol. Airlines*, 819 F.Supp. 232, 236-37 (E.D.N.Y. 1993) (Ministry of Civil Aviation of the USSR).

Controlling Second Circuit precedent would mandate the conclusion that the PIF is a political subdivision of Saudi Arabia, if it were not deemed the Saudi state itself.  The PIF is no different than the governmental entity held to be a political subdivision in *O'Connell Machinery Co. v. M.V. "Americana"*, 734 F.2d 115 (2d Cir. 1984).  There, the Second Circuit held that the defendant,

---

11.      *See also Magness v. Russian Federation*, 247 F.3d 609, 613 n.7 (5th Cir. 2001); *see generally* JOSEPH W. DELLAPENA, SUING FOREIGN GOVERNMENTS AND THEIR CORPORATIONS § 2.3, at 56 (2d ed. 2003) ("So long as an entity functions essentially in a political or governmental capacity while subordinated to a foreign state proper, the entity is a political subdivision of a foreign state."); BLACK'S LAW DICT. 1159 (6th ed. 1990) (defining "political subdivision" as "[a] division of the state made by proper authorities thereof, acting within their constitutional powers, for [the] purpose of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public.").

Italian Line, was an agency or instrumentality of the Republic of Italy. *Id.* at 116. FINMARE, an Italian governmental entity, owned a majority of Italian Line's shares. *Id.* FINMARE, in turn, was "under the direct control of the Instituto per la Ricostruzione Industriale ["IRI"], a public financial entity which coordinates the management of the commercial enterprises of the Italian Government." *Id.* The Second Circuit affirmed the district court's conclusion "that the Italian Line qualifies as an agency or instrumentality of the Republic of Italy" because FINMARE "fit[s] comfortably" within the definition of a political subdivision. *Id.*; *see Compagnie Noga*, --- F.3d ---, 2004 WL 504604, at *9 (re-affirming *O'Connell*).

The government ownership structure in *O'Connell*—IRI/FINMARE/Italian Lines—is akin to the ownership structure here—Ministry/PIF/NCB—and confirms that NCB, like Italian Lines, is a foreign government instrumentality. *See also Zappia Middle East Construction Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 249, 250 (2d Cir. 2000) (Abu Dhabi Commercial Bank ("ADCB") was an agency or instrumentality of the government of Abu Dhabi, where the Abu Dhabi Investment Authority, "an investment institution wholly owned by Abu Dhabi," owned a majority of ADCB's shares). Equally, the PIF, like FINMARE, is under the "direct control" of a "public financial entity," the Ministry of Finance. Thus, the PIF likewise "fits comfortably" within the definition of a political subdivision.

### B.   None of the FSIA's Exceptions to Immunity Applies.

As an instrumentality of the Saudi Government, NCB is presumptively immune from suit unless one of the FSIA's "limited" exceptions applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). On a Rule 12(b)(1) motion to dismiss under the FSIA, the court looks to the "substance of the allegations" to determine whether one of the FSIA's exceptions applies. *Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 1999). Because NCB has made a *prima facie* case that it is a Saudi Government instrumentality, "[P]laintiff[s have] the burden of going forward <u>with evidence</u> showing that, under exceptions to the FSIA, immunity should not be granted." *Virtual Countries*, 300 F.3d at

241 (emphasis added).  Conclusory allegations do not satisfy Plaintiffs' burden.  *Filetech v. France Telecom*, 304 F.3d 180, 182 (2d Cir. 2002).  Only if Plaintiffs meet their burden of "going forward with evidence" does the ultimate burden of persuasion on FSIA immunity fall to NCB.  *Virtual Countries*, 300 F.3d at 241.

Plaintiffs' allegations against NCB here fall into the same three categories found in the *Burnett* complaint (*see Burnett* Op. Mem., at 35-36):

(1)  <u>Alleged Financial Funnel to Bin Laden and Al Qaeda</u>:  NCB allegedly "was used by Osama bin Laden and al Qaeda as a financial arm, operating as a financial conduit for Osama bin Laden's operations" and for payment of "protection" money by unnamed "Saudi businessmen."  4AC, ¶¶ 295, 461, 564, 573.  NCB purportedly engaged in this conduct until 1999, when the Saudi Government purportedly "closed" this alleged "channel."  *Id.*, ¶ 564.

(2)  <u>Alleged Involvement in the BCCI Affair</u>:  NCB allegedly was "implicated between 1986 and 1990 in the fraudulent schemes and practices of the Bank of Credit and Commerce International" ("BCCI"), and NCB allegedly played an unspecified "role" in "hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism."  4AC, ¶ 564.

(3)  <u>Charitable Giving—Funding the Funders of Terrorism</u>:  At some unspecified time before 1999, NCB allegedly made donations to various Islamic charities pursuant to the religious and government mandate of *zakat*.  4AC, ¶¶ 296, 569-71.  NCB also purportedly had a "budget" of the Saudi Joint Relief Committee, an entity that Plaintiffs allege is comprised of several charities and was "connected to" Osama bin Laden and "two of his top operatives."  *Id.*, ¶¶ 484, 561.  These charitable organizations in turn allegedly funded bin Laden and al Qaeda.  *Id.*, ¶¶ 310-32, 461.[12]

All of these alleged actions occurred in Saudi Arabia.  *See Burnett* Op. Mem., at 36.  Plaintiffs suggest that the commercial activity (28 U.S.C. § 1605(a)(2)), non-commercial tort (28 U.S.C. § 1605(a)(5)), or the state-sponsor of terrorism (28 U.S.C. § 1605(a)(7)) exceptions apply to NCB's alleged conduct.  *See* 4AC, ¶ 2.  As in *Burnett*, none of these exceptions applies.  *See Burnett* Op. Mem., at 35-54; *Burnett* Reply Mem., at 4-5.

---

12.  The alleged actions of NCB's former CEO (4AC, ¶¶ 460, 461, 564-67, 571-72, 577) cannot be imputed to NCB.  *See Burnett* Op. Mem., at 36 n.30; *Burnett* Reply Mem., at 5 n.10; *Burnett v. Al Baraka*, 274 F.Supp.2d 86, 109 n.18 (D.D.C. 2003) ("*Burnett I*").

1.     **Plaintiffs' Claims Against NCB are Governed by the State-Sponsor of Terrorism Exception (28 U.S.C. § 1605(a)(7)).**

In determining which FSIA exception might apply to a foreign sovereign's alleged acts, courts independently determine the gravamen of a plaintiff's claims. *Burnett* Op. Mem., at 36; *Cabiri v. Republic of Ghana*, 165 F.3d 193, 200 (2d Cir. 1999) (courts must look to the gravamen of the complaint). As in *Burnett*, the "substance" of Plaintiffs' claims against NCB here is that it allegedly provided material support and resources to Osama bin Laden and al Qaeda, conduct that fits squarely within the FSIA's state-sponsor of terrorism exception. *See* 4AC, ¶¶ 5, 23; 28 U.S.C. § 1605(a)(7); *Burnett v. Al Baraka*, 292 F.Supp.2d 9, 20 n.5 (D.D.C. 2003) ("*Burnett II*"); *Burnett* Op. Mem., at 16-17, 36-37; *Burnett* Reply Mem., at 4. Judge Baer of this Court has held that providing material support and resources to those who perpetrated the September 11 attacks is an activity that falls within § 1605(a)(7). *See Smith v. Afghanistan*, 262 F.Supp.2d 217, 226-28 (S.D.N.Y. 2003) (discussing the liability of Iraq); *see also Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 244 (2d Cir. 1997) (§ 1605(a)(7) applies to "acts of international terrorism"). Plaintiffs here make the same argument, contending that § 1605(a)(7) waives the immunity of Iran, Iraq, Sudan, and their instrumentalities for allegedly supporting bin Laden and al Qaeda. *Compare* 4AC, ¶¶ 13-22 & Count Six (Iran, Iraq, Sudan, and their instrumentalities) *with* 4AC, ¶¶ 5, 570 (NCB). However, § 1605(a)(7) cannot waive NCB's immunity because Saudi Arabia has not been designated by the Secretary of State as a sponsor of terrorism. *Burnett* Op. Mem., at 16-17, 36-37; *compare* 4AC, Count Six (Iraq, Iran, and Sudan designated state-sponsors of terrorism).

2.     **The Commercial Activity Exception (28 U.S.C. § 1605(a)(2)) Does Not Eliminate NCB's Immunity.**

As in *Burnett*, Plaintiffs theorize that NCB assisted terrorists in two ways: (i) by making donations to charities that, in turn, allegedly funded terrorists; and (ii) by acting as a "financial conduit" between NCB customers and al Qaeda. *Compare supra* at 11 *with Burnett* Op. Mem., at 37-42. Plaintiffs' first theory as a matter of law does not involve commercial activity because "[t]he act

of contributing to a foundation is not within our ordinary understanding of 'trade and traffic or commerce,' nor, apparently, was it within the contemplation of the Congress that enacted the FSIA in 1976[.]" *Burnett II*, 292 F.Supp.2d at 18. Plaintiffs' second theory cannot satisfy the Second Circuit's "legally significant acts" test for §1605(a)(2). Under that test, activities that are "entirely unrelated to the liability" of a foreign sovereign are irrelevant to determining whether §1605(a)(2) applies. *See Antares Aircraft v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993). Plaintiffs' "financial conduit" theory seeks to hold NCB liable for banking transactions of its customers. Judge Robertson, however, already has rejected that theory of liability, holding: "Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service." *Burnett I*, 274 F.Supp.2d at 109. Because NCB cannot be held liable as a "financial conduit" for its customers, the alleged banking acts of its customers cannot be "legally significant acts" of NCB under §1605(a)(2).[13]

Regardless, even if Plaintiffs' allegations could be construed to allege a claim "based upon" commercial activity within the meaning of § 1605(a)(2), that exception still would not apply because those activities did not have the statutorily required "direct effect in the United States." 28 U.S.C. § 1605(a)(2); *Burnett* Op. Mem., at 42-49. To meet (a)(2)'s "direct effect" requirement, Plaintiffs must demonstrate that the September 11 attacks were the "immediate consequence" of NCB's alleged activities. *See Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992); *Virtual Countries*, 300 F.3d at 236; *Burnett* Op. Mem., at 42, 43. Foreseeability alone is insufficient to establish the required § 1605(a)(2) "direct effect" because "[d]efining 'direct effect' to permit jurisdiction when a foreign state's actions <u>precipitate reactions by third parties, which reactions then have an impact on a</u>

---

[13].    Plaintiffs' BCCI allegations are likewise "entirely unrelated to [NCB's] liability" because they are not in any way connected to Osama bin Laden, al Qaeda, or the September 11 attacks. *See Burnett* Op. Mem., at 39-40.

plaintiff, would foster uncertainty in both foreign states and private counter-parties." *Virtual Countries*, 300 F.3d at 238 & n.6 (emphasis added); *Burnett* Op. Mem., at 43, 44.

Far from demonstrating that the September 11 attacks were an "immediate consequence" of NCB's activities, Plaintiffs' theory here, as in *Burnett*, alleges multiple, separate layers of cause-and-effect involving actors located around the world. *See Burnett* Op. Mem., at 42-49. Plaintiffs do not allege that any of NCB's funds, or the funds of those who purportedly used NCB as a financial conduit, ever reached the September 11 hijackers when they were in the United States. *Id.* at 43. Instead, Plaintiffs purport to describe a "world-wide terror conspiracy" (4AC, ¶¶ 24, 59) orchestrated by "numerous [other] individuals and organizations" (*id.*, ¶ 30) that allegedly provided material support and resources to the September 11 hijackers. *Id.* Plaintiffs allege that the September 11 plot was:

(1)     coordinated and supported in Afghanistan (*id.*, ¶¶ 228-31), Dubai (*id.*, ¶¶ 171, 232), Prague (*id.*, ¶¶ 172, 174, 175), Italy (*id.*, ¶ 175), Pakistan (*id.*, ¶ 610), and the UAE (*id.*) by numerous individuals;

(2)     "finalized" in Hamburg, Germany by a group of co-conspirators who had joined forces with the express goal of carrying out the "Holy War" by means of international terror to "kill as many 'infidels' in the United States as possible" (*id.*, ¶¶ 175, 225-28); and

(3)     supported by Al Qaeda cells in Spain (*id.*, ¶¶ 239, 242) and Germany (*id.*, ¶¶ 239-40, 364).

The Hamburg cell itself was comprised of several individuals—three of whom were among the hijackers who committed the September 11 attacks. *Id.*, ¶ 226. The remainder of the alleged co-conspirators—dubbed "al Qaeda operatives" (*id.*, ¶ 180)—purportedly provided financial, material, and logistical support to the hijackers. *Id.*, ¶¶ 238-39, 241-43. Thus, this case involves many more intervening elements than were present in *Virtual Countries, Inc.*, 300 F.3d 230, where the Second Circuit rejected a claim of "direct effect" because there were (only) <u>two</u> intervening elements. *Id.* at 237 (holding that the press release did not have a "direct effect" in the United States because it fell

14

"at the end of a long chain of causation and [was] mediated by numerous actions by third parties");
*see Burnett* Op. Mem., at 48-49.

> **3.** **The Non-Commercial Tort Exception (28 U.S.C. § 1605(a)(5)) Does Not Eliminate NCB's Immunity.**

The FSIA's non-commercial tort exception does not apply here for the same reasons explained in NCB's motion to dismiss in *Burnett*. *See Burnett* Opp. Mem., at 50-54. NCB did not commit a "tortious act or omission"; Plaintiffs' injuries were not "caused by" NCB's alleged tortious acts or omissions; the "entire tort" was not committed within the United States; and, NCB's agents or employees were not acting within the scope of their agency or employment when they engaged in the acts alleged by Plaintiffs. *Id.*; *Burnett* Reply Mem., at 4-5; *see Burnett II*, 292 F.Supp.2d at 19-20.

> **a.** **No Tortious Act or Omission**

None of NCB's alleged actions falls within the (a)(5) requirement of a "tortious act or omission." *Burnett* Op. Mem., at 50-51. Plaintiffs have alleged that NCB either acted as a <u>funnel</u> through which its customers provided their own funds to terrorists, or made <u>donations</u> to Islamic charities (in fulfillment of a religious duty and Saudi Government requirement of *zakat*), which the charities in turn used to fund terrorists. *See supra* at 11; *Burnett* Op. Mem., at 35-36, 66-67. Judge Robertson already has held that an identical financial "funnel" theory in *Burnett* does not state a tort claim against a bank, *Burnett I*, 274 F.Supp.2d at 109, and that holding should apply here. Nor is charitable giving itself a tortious act. *Id.*; *see also Humanitarian Law Project v. Dep't of Justice*, 352 F.3d 382, 402 (9th Cir. 2003) ("Charitable contributions made to organizations are not 'inherently dangerous'"). Plaintiffs allege no <u>facts</u> suggesting that any of NCB's alleged charitable donations were diverted to Osama bin Laden or al Qaeda, that they funded the September 11 attacks in any way, or that NCB knew that this purportedly occurred. Plaintiffs' conclusory allegations (4AC, ¶ 570) thus do not provide the necessary detail to call NCB's alleged acts "tortious." *Robinson*, 269 F.3d at 146 ("generic allegations" of tortious conduct insufficient).

### b.      Insufficient Causal Link

Judge Robertson has held that exception (a)(5) does not cover claims seeking to hold foreign instrumentalities liable for alleged acts of funding charities that in turn allegedly funded terrorists. He held that a claim for <u>funding-the-funders of terrorism</u> was too attenuated a causal chain to satisfy the "caused by" element of § 1605(a)(5).  *Burnett II*, 292 F.Supp.2d at 19-20.  The purported causal link between NCB's alleged actions in this case and Plaintiffs' injuries invokes an identical funding-the-funder of terrorists theory, which should likewise be rejected.  *Burnett* Op. Mem., at 45-49.

Judge Robertson correctly interpreted "caused by" in exception (a)(5) to exclude funding-the-funders claims.  <u>First</u>, Judge Robertson correctly held that the definition of "caused by" in § 1605(a)(5) is governed by federal law, not by state-law standards of tort causation.  *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) (federal law governs jurisdictional determination); *Mizuna v. Crossland Federal Sav. Bank*, 90 F.3d 650, 656 (2d Cir. 1996) (same).  Nothing in the FSIA suggests that "caused by" in § 1605(a)(5) means "proximate cause" or some other non-FSIA-based causation standard.  *See, e.g.*, *Transatlantic Shiffahrtskontor GMBH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000) (under exception (a)(2), holding that the FSIA, not state common law, determines "how near or how distant the 'but for' cause must be if it is to meet the statutory test").  Indeed, the FSIA's separate treatment of immunity/jurisdiction issues (§ 1605) and liability/merits issues (§ 1606) would be meaningless if every jurisdictional requirement of § 1605(a)(5) mirrored tort liability standards.  *Robinson* certainly does not merge those issues because the Second Circuit there addressed only the distinct state-law governed question of whether the acts alleged were "tortious." *Robinson*, 269 F.3d at 142-46.  The *Robinson* court expressly recognized that "[a] district court does not, of course, decide a case on the merits in order to decide if it has jurisdiction."  *Id.* at 141.[14]

---

14.      *Accord Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032, 1033 (D.C. Cir. 2004); *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 47 (D.D.C. 2001).

Second, even if a merits-based proximate cause standard applied under (a)(5), Plaintiffs nevertheless cannot meet that standard. Common law principles of proximate cause require a showing that NCB's alleged actions were a "cause in fact" of the September 11 attacks—*i.e.*, that the September 11 attacks would not have occurred in the absence of NCB's alleged wrongdoing. *Burnett* Op. Mem., at 71-72 & n.58, 73; *Burnett* Reply Mem., at 9-10. Plaintiffs cannot make any such fanciful allegation. Thus, Plaintiffs' conclusory allegation that "defendants"—as an undifferentiated group—purportedly "caused" the September 11 attacks (4AC, ¶ 187) is precisely the sort of empty and "generic" allegation that cannot confer (a)(5) jurisdiction. *See Robinson*, 269 F.3d at 146 (for purposes of (a)(5), "generic allegations . . . absent an assertion or evidence of a factual predicate for such jurisdiction, would invite plaintiffs to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct . . . .").

### c. The Entire Tort Was Not Committed Within the United States

Exception (a)(5) also requires that the "entire tort" occur within the United States—*i.e.*, that both the tortious act or omission <u>of the sovereign defendant</u> and the plaintiff's injury occur within the United States. *See* 28 U.S.C. § 1605(a)(5) (injuries must be "<u>caused by</u> the tortious act or omission <u>of that foreign state</u> or of any official or employee <u>of that foreign state</u> while acting within the scope of his office or employment" (emphasis added)); *Burnett* Op. Mem., at 51-52.[15] The FSIA is "in effect, a Federal long-arm statute over foreign states" and its immunity provisions "prescribe the <u>necessary contacts</u> which must exist before our courts can exercise personal jurisdiction." H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., 1976 U.S.C.C.A.N. 6604, 6612 (emphasis added). Yet,

---

15.     As Judge Robertson recognized, the Ninth Circuit's decision in *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) and the DDC's decision in *Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.D.C. 1980) are distinguishable because those cases "involved causal links significantly shorter and more direct than those alleged here." *Burnett II*, 292 F.Supp.2d at 21. In both of those cases, agents or employees of the foreign state committed tortious acts within the United States. *See Liu*, 892 F.2d at 1430; *Letelier*, 488 F.Supp. at 673.

Plaintiffs can establish no relevant contact between NCB and the United States during the time that Plaintiffs contend NCB engaged in wrongdoing. *See* Part III, *infra*.[16]

The "entire tort" rule derives from the FSIA's legislative history, which states that "the tortious act or omission must occur within the jurisdiction of the United States."  H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.C.C.A.N. 6604, 6619.  The Second Circuit and this Court uniformly have rejected the suggestion that § 1605(a)(5) can be satisfied where only the plaintiff's injury occurs within the United States.  *Cabiri*, 165 F.3d at 200 n.3; *accord Hirsh v. State of Israel*, 962 F. Supp. 377, 383-84 (S.D.N.Y.), *aff'd*, 133 F.3d 907 (2d Cir. 1997) (unpublished); *Goquiolay v. Philippines Nat'l Bank*, No. 90 Civ. 893, 1990 WL 144118, at *3 (S.D.N.Y. 1990); *see Burnett* Op. Mem., at 51-52.

Nor can the "entire tort" consist of the hijacking and destruction of commercial airliners that occurred within the United States on September 11.  Plaintiffs contend that NCB allegedly provided material support and resources to Osama bin Laden and al Qaeda by acting as a financial "conduit" for its customers and by making charitable donations outside the United States.  *See supra* at 11.  Thus, NCB's alleged "entire tort" could not possibly consist only of the hijackers' actions in the United States on September 11, and that alleged "entire tort" therefore could not have occurred in the United States.[17]

Because none of the FSIA's exceptions applies, and because the FSIA is the "sole basis" for jurisdiction over a foreign sovereign, Plaintiffs' claims against NCB must be dismissed for lack of subject matter jurisdiction.  *See also Burnett* Op. Mem., at 54.

---

16.   Tort theories of vicarious liability cannot supply the foreign state's "substantial contact."  By definition, aiding and abetting and conspiracy render a defendant liable for the "tortious conduct of another."  RESTATEMENT (SECOND) OF TORTS § 876(a) (emphasis added).

17.   In addition, (a)(5)'s "scope of … employment" requirement incorporates the doctrine of *respondeat superior*, *see Burnett* Op. Mem., at 52 n.43, and Plaintiffs do not allege any facts suggesting that the supposed acts of NCB's agents or employees were within the scope of their employment.

## II.      Plaintiffs' Claims Against NCB are Not Justiciable.

As in *Burnett*, Plaintiffs' claims against NCB are not justiciable under the political question,

act of state, and international comity doctrines.[18]  The Saudi Assistant Minister of Foreign Affairs

has explained:

> The Saudi Government is committed to cooperation with the United States in the
> common fight to win the war on terrorism.  Lawsuits in United States courts (a
> branch of the United States Government) against Saudi Government officials and
> entities such as the National Commercial Bank, which are based upon allegations
> that these instrumentalities knowingly funded, or otherwise supported, the
> perpetration of the September 11, 2001 terrorist attacks, are not only false, but
> counterproductive, and make government-to-government cooperation more
> difficult.  This concern is deeply felt in all circles of the Saudi Government, and
> applies regardless of whether those instrumentalities are individuals serving as
> officials of the Government, or entities such as the Saudi High Commission for
> Bosnia and Herzegovina, and NCB.

Madani Decl., ¶ 4.  Any finding that, or effort to adjudicate whether, an instrumentality of the Saudi

Government is a sponsor of terrorism would raise all the "political question" and related

justiciability concerns addressed by the Assistant Foreign Minister, and previously explained in

Ambassador Freeman's *Burnett* declarations.  *See Burnett* Op. Mem., at 3-32 & Exhs. 1, 2.

Plaintiffs' claims unavoidably present a political question that is committed to the Executive

Branch for resolution—*i.e.*, whether the Kingdom of Saudi Arabia, through its instrumentalities,

materially sponsored the September 11 attacks.  *See Burnett* Opening Mem., at 3-29, 31-32; *Burnett*

Reply Mem., at 5.  Congress has expressly assigned that assessment to the Secretary of State, who

has declined to designate Saudi Arabia a state-sponsor of terrorism either generally or in connection

with the September 11 attacks.  *Id.*  Equally, Plaintiffs' claims inevitably insert this Court into the

Executive Branch's prosecution of the global war on terrorism, seeking a declaration that Saudi

---

18.      NCB also adopts *Burnett* Op. Mem., at 3-32; *Burnett* Reply Mem., at 5-6; the Declaration and
Supplementary Declaration of Ambassador Charles ("Chas.") W. Freeman (*Burnett* Op. Mem., Exhs.
1-2); the Letter from William J. Burns to the Hon. Jim Kolbe (*Burnett* Op. Mem., Exh. 3); and, the
Declaration of Nizar Bin Obaid Madani, the Saudi Assistant Minister of Foreign Affairs of the
Kingdom of Saudi Arabia (*Burnett* Reply Mem., Exh. 7).  *See* Berger Aff., ¶¶ 4-6, 10 & exhs. 1-3, 7.

Arabia is not an ally in that war, but instead an enemy. *Burnett* Opening Mem., at 3-29, 31-32; *Burnett*

Reply Mem., at 5-6. As explained by the Saudi Assistant Foreign Minister:

> The United States has not designated Saudi Arabia (or any of its agencies or instrumentalities) as sponsors of the September 11 attacks or any other terrorist act. The Executive Branch of the United States Government has stated both publicly and repeatedly that it considers Saudi Arabia to be an ally in the global war against terrorism, and has praised the Kingdom's efforts in the war on terror.
>
> * * * * * * * * * *
>
> The Saudi Government believes that the continuation of these lawsuits, seeking over one trillion dollars in damages from Saudi Government instrumentalities, sends a confusing and mixed message about the relationship between the Governments of Saudi Arabia and the United States, especially when compared to the history of the United States-Saudi cooperation in the common fight against terrorism. Saudi Arabia is committed to this fight but finds that lawsuits such as these, which are based upon false allegations against Saudi Government officials and entities, are a continuing disruption of the government-to-government cooperative work necessary to accomplish the shared objectives of our countries.

Madani Decl., ¶¶ 6, 7.

Finally, as in *Burnett*, adjudicating Plaintiffs' claims against NCB necessarily, but

impermissibly, require this Court to evaluate Saudi Government oversight of a charitable-giving

obligation (called *zakat*), and Saudi central bank regulation of the Saudi financial system. *Burnett* Op.

Mem., at 20-26, 29-31; *Burnett* Reply Mem., at 6.[19] As recognized by Saudi Arabia's Assistant

Foreign Minister:

> The Plaintiffs' allegations fundamentally attack—and ask a branch of the U.S. Government (the courts) to examine and adjudicate—the legitimacy and sufficiency of Saudi Government oversight and regulation of charitable, religious and financial institutions that are alleged to have funded terrorist organizations. It is a matter of grave concern to the Saudi Government that the Plaintiffs are asking the U.S. courts to pass judgment on Saudi Government actions and policies.

---

19. *See* 4AC, ¶ 23 (alleging that "banks . . . operate legitimate businesses but also maintain a dual role as an al Qaeda co-conspirator"); ¶ 292 ("[T]he government of Saudi Arabia is the only representative model Islamic government, the greatest center of Islam as al Qaeda moves to expel the Jews and Christians from Arab lands through mass murder."); ¶ 296 ("The IIRO received funds which were passed on to terrorists in part from Zakat payments from individuals and companies in the Kingdom of Saudi Arabia.").

Madani Decl., ¶ 7.  The political question, act of state, and international comity doctrines were designed to prevent this type of judicial entanglement in the internal affairs of a foreign sovereign state.  *Burnett* Op. Mem., at 20-26, 29-31; *Burnett* Reply Mem., at 5-6.

## III.   This Court Lacks Personal Jurisdiction Over NCB.

Plaintiffs do not meet their burden of alleging a *prima facie* case of personal jurisdiction over NCB.[20]  To establish a *prima facie* case, Plaintiffs must rely on one of two theories:  (1) a nationwide contacts theory pursuant to federal statutes that provide for nationwide service of process; or (2) jurisdiction pursuant to New York law under either a "general" jurisdiction or "specific" (long-arm) jurisdiction theory.  *See generally* FED. R. CIV. P. 4(k).[21]  Plaintiffs also must demonstrate that NCB has the constitutionally required "minimum contacts" with the United States, regardless of whether NCB is an instrumentality of the Saudi Government, or instead is incorrectly deemed a non-sovereign entity.  *Burnett* Op. Mem., at 54-55, 59-64; *Burnett* Reply Mem., at 6.  Personal jurisdiction is determined as of September 4, 2002, the date on which Plaintiffs filed their original complaint against NCB.  *See* Dkt. #1; *Burnett* Op. Mem., at 56.

As in *Burnett*, Plaintiffs' sole allegation relating to personal jurisdiction is contained within a single sentence:  "NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise."  4AC, ¶ 563.  This allegation is

---

20.    NCB also adopts *Burnett* Op. Mem., at 55-57, 59-64; *Burnett* Reply Mem., at 6-8; and, the Declaration of Jorge Juco (*Burnett* Op. Mem., Exh. 5).  *See* Berger Aff., ¶ 8 & exh. 5.

21.    Unlike *Burnett*, which requires application of the District of Columbia's personal jurisdiction statutes (*Burnett* Op. Mem., at 57-58), Plaintiffs' complaint was originally filed in this Court.  As such, New York's law of personal jurisdiction applies here.  *Compare In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, No. 01-MDL-1428, 2003 WL 22909153, at *2 (S.D.N.Y. Dec. 9, 2003) (in a § 1407 transfer, whether a defendant is subject to jurisdiction under a State's long-arm statute is governed by the law of the transferor court).

factually inaccurate (*Burnett* Op. Mem., at 56-57, and Exh. 5, ¶5) and, in any event, insufficient as a matter of law to confer personal jurisdiction over NCB.  *Id.* at 60-61 & n.49.[22]

### A.   There is No Personal Jurisdiction Over NCB on a Nationwide Service of Process Theory.

Plaintiffs have alleged a claim under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.* (4AC, Count Four), which provides for nationwide service of process.  However, Plaintiffs fail to state an ATA claim as a matter of law.  *See* Part IV, *infra*; *Burnett* Op. Mem., at 57, 72-75, 76; *Burnett* Reply Mem., at 9-10 & n.14.  Without a viable claim under a statute that provides for nationwide service of process, Plaintiffs' only basis for asserting personal jurisdiction over NCB is New York law.  *See* N.Y. CPLR §§ 301, 302 *et seq.*  But New York law is of no assistance to Plaintiffs.

### B.   There is No Personal Jurisdiction Over NCB Under New York Law.

New York law provides no basis for exercising personal jurisdiction over NCB, under a theory of either general or specific jurisdiction.  *See* N.Y. CPLR §§ 301, 302 *et seq*; *Turbana Corp. v. M/V Summer Meadows*, 2003 U.S. Dist. LEXIS 21583, *4-5 (S.D.N.Y. Dec. 2, 2003).   General jurisdiction exists only where the defendant is "doing business" in New York such that the defendant's contacts with the state are "continuous, permanent, and substantial."  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000); *see Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 731 (S.D.N.Y. 2001) (explaining that the "doing business" standard is "stringent").   Absent general jurisdiction, a court may exercise specific (or long-arm) jurisdiction where the cause of action "arises out of" or has a "substantial relationship" to the

---

22.    The presence of a subsidiary or branch office in the forum, without more, is not sufficient to confer personal jurisdiction.  *See Burnett* Op. Mem., at 61 n.49; *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) ("Where, as here, the claim is that the foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the state"); *Meteoro Amusement Corp. v. Six Flags, Inc.*, 267 F. Supp. 2d 263, 269-270 (S.D.N.Y. 2003) ("Mere presence of a subsidiary in the forum does not render its parent amenable to suit").

defendant's contacts with New York and the defendant commits one of the predicate jurisdictional acts in New York. *See Beacon Enterprises v. Menzies,* 715 F.2d 757, 764 (2d Cir. 1983); *Mantello v. Hall,* 947 F.Supp. 92, 100 (S.D.N.Y. 1996) (requiring that the connection between the jurisdictional contact and the claim to be "direct"); *Kahn Lucas Lancaster v. Lark Int'l,* 956 F.Supp. 1131, 1134 (S.D.N.Y. 1997) (requiring a "substantial nexus").

Thus, personal jurisdiction could exist over NCB under New York law only if: (1) it is "doing business" in New York under N.Y. CPLR § 301; (2) it "transacts any business" or "contracts to supply goods or services" in New York, and Plaintiffs' claims arise from those specific transactions (N.Y. CPLR § 302(a)(1)); or, (3) it "commits a tortious act" within New York, and Plaintiffs' claims and injuries arise from that specific tortious act (N.Y. CPLR § 302(a)(2)). None of these statutory requirements is met here. NCB is not "doing business" within New York as required by CPLR § 301. *See Burnett* Op. Mem., at 59-64 & Exh. 5, ¶¶ 2-15 (Juco Decl.). Nor can Plaintiffs establish specific jurisdiction under New York law because NCB is not alleged to have transacted business, supplied services, or committed a tortious act in New York that has a "substantial relationship" to Plaintiffs' claims. *See Beacon Enterprises, Inc.,* 715 F.2d at 764; *see also Burnett* Op. Mem., at 57-58 (same, under District of Columbia law); *Burnett* Reply Mem., at 6-8.[23]

### C.   NCB Lacks the Constitutionally Required Minimum Contacts with the United States.

Even if Plaintiffs had stated a viable ATA claim against NCB, this Court still would not have personal jurisdiction over NCB because NCB does not have the constitutionally required "minimum

---

23.   Plaintiffs cannot meet their burden of establishing a *prima facie* case of personal jurisdiction with the conclusory allegation that NCB allegedly participated in a "global" conspiracy. 4AC, ¶¶ 24, 59, 570-71; *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir. 1981). Equally, Plaintiffs must demonstrate, *inter alia,* that a defendant's co-conspirator committed a tortious act in New York. *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 26 F. Supp. 2d 593, 602-03 (S.D.N.Y. 1998). Plaintiffs have not alleged any facts suggesting that NCB conspired with the September 11 hijackers who crashed commercial airliners into the World Trade Center. *See, e.g., Burnett* Op. Mem., at 58-59 n.46.

contacts" with the United States.  The 4AC does not, and could not, allege that NCB was "doing business" in the United States.  *See Burnett* Op. Mem., at 59-64 & Exh. 5, ¶¶ 2-15 (Juco Decl.); *Burnett* Reply Mem., at 6-8; *supra* at 22-23.[24]  Nor does, or could, the 4AC allege that NCB had "purposeful contacts" with, or "purposely directed" or "expressly aimed" its alleged conduct at, the United States.  *See Burnett II*, 292 F. Supp. 2d at 22-23; *Burnett* Reply Mem., at 6-8.

## IV.    Plaintiffs Fail to State a Claim Against NCB.

Plaintiffs allege seven causes of action against NCB:  wrongful death based on intentional murder (4AC, Count One); survival damages based on intentional murder (*id.*, Count Two); assault and battery (*id.*, Count Three); violation of the ATA, 18 U.S.C. § 2333 *et seq.* (*id.*, Count Four); violation of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 (4AC, Count Five); punitive damages (4AC, Count Seven); and, property damage (*id.*, Count Eight).  As in *Burnett*, Plaintiffs seek to hold NCB vicariously liable for the actions of the September 11 hijackers under theories of aiding and abetting and conspiracy.  *Id.*, ¶¶ 5, 23.  As a matter of law, Plaintiffs do not state a claim against NCB.[25]

Plaintiffs' claim for aiding and abetting fails because they do not allege that NCB knowingly and substantially assisted the September 11 attacks.  *See Burnett* Op. Mem., at 68-69; *Burnett* Reply Mem., at 10.  Nor have Plaintiffs alleged the requisite unlawful agreement necessary to state a conspiracy claim.  *See Burnett* Op. Mem., at 69-70; *Burnett* Reply Mem., at 10.  Finally, all of Plaintiffs' causes of action require a showing of proximate cause, an essential element of which is cause-in-fact. *See Burnett* Op. Mem., at 71-72 & n.58; *Burnett* Reply Mem., at 9.  Plaintiffs' multi-step theory of

---

24.    Where, as here, a defendant maintains a "passive" (information-only website), personal jurisdiction will not exist.  *In re Ski Train*, 2003 Dist. LEXIS 22139, *15-*18 ("Passive websites do not confer personal jurisdiction."); *Burnett* Op. Mem., at 61-62.

25.    NCB also adopts *Burnett* Op. Mem., at 65-77 and *Burnett* Reply Mem., at 9-10.

causation (*see supra* at 14-15) inevitably defeats the notion that the September 11 attacks would not have occurred in the absence of NCB's alleged conduct.  *Id.*[26]

### Conclusion

For the foregoing reasons, this Court should grant NCB's motion to dismiss and dismiss with prejudice all of Plaintiffs' claims against NCB.

Dated: March 19, 2004                                     Respectfully submitted,
      Washington, D.C.

           /s/ Ronald S. Liebman
           Ronald S. Liebman (admitted *pro hac vice*)
           Mitchell R. Berger (MB-4112)
           Ugo Colella (admitted *pro hac vice*)
           PATTON BOGGS LLP
           2550 M Street, N.W.
           Washington, D.C. 20037
           Phone: 202-457-6000
           Fax:     202-457-6315

           *Attorneys for Defendant*
           *The National Commercial Bank*

---

26.     As an instrumentality of the Saudi Government, NCB is immune from ATA liability.  *See* 18 U.S.C. § 2337(2); *Burnett* Op. Mem., at 76; *Burnett* Reply Mem., at 10 n.14.  If this Court concludes that NCB is not an instrumentality of the Saudi Government, then Plaintiffs' TVPA claim fails because that statute requires state action.  *Burnett* Op. Mem., at 76; *Burnett* Reply Mem., at 10 n.14. Plaintiffs likewise fail to state a claim for punitive damages, which is a form of relief, and not an independent cause of action.  *Id.*