UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
In re Terrorist Attacks on September 11, 2001 )   MDL   No. 1570
                                        )
                                        )
THOMAS BURNETT, *et al.,*               )
                                        )
         Plaintiffs,                    )
                                        )
     v.                                 )   Civil Action  No. 03-9849 (SDNY)
                                        )
AL BARAKA INVESTMENT AND                )   Judge Casey
DEVELOPMENT CORPORATION, *et al.,*      )
                                        )
Defendants                              )
_____  )

**MOHAMMAD ABDULLAH ALJOMAIH'S REPLY TO PLAINTIFFS'
OPPOSITION TO HIS MOTION TO DISMISS**

Roger E. Warin                              John A. Nocera
(D.C. Bar No. 090241)                       (JN-3399)
Christopher T. Lutz                         Anthony L. Cotroneo
(D.C. Bar No. 204008)                       (AC-0361)


Steptoe & Johnson L.L.P.                    Rosner Nocera & Ragone LLP
1330 Connecticut Avenue NW                  40 Wall Street  --  24th Floor
Washington D.C. 20036                       New York, New York 10005-2301

202-429-3000                                212-635-2244

Dated: March 19, 2004

**Background**

This Reply supports a Motion to Dismiss filed by Mohammad Abdullah Aljomaih ("Mr. Aljomaih") in Burnett v. Al Baraka Inv. and Devel. Corp. ("Burnett") ("Motion") (Docket 354). Burnett was before Judge James Robertson but was sent by the MDL panel to this Court. The Motion and the Opposition ("Opp.") (Docket 416) to which this Reply responds were filed before the transfer.  We are unaware of any efforts to serve Mr. Aljomaih in other 9/11 suits. But, as the Motion shows, he has insufficient contacts with this country for there to be personal jurisdiction over him in any of the consolidated cases.

**Argument**

The Opposition offers no valid reason to keep Mr. Aljomaih in this case. Plaintiffs have not alleged or shown that he has any real contacts with the United States; their attempts to serve him were not authorized or effective; and he is not mentioned anywhere in the Third Amended Complaint ("3AC").  As to Mr. Aljomaih, the plaintiffs have nothing. And, having nothing, they resort to false, reckless allegations, baselessly calling him a supporter of terrorism and murder.

The Opposition's main message is that the constitutional requirements for personal jurisdiction do not apply here. Plaintiffs claim that merely saying "He supports Al Qaeda" will keep anyone in this case. But, if bare allegations of complicity with terrorism were enough, then the doctrine of personal jurisdiction would evaporate, because there are such general claims for every defendant. As  D.C. Circuit courts (see Motion at 1) and this Court[1] have held, such general, "conclusory allegations" do not establish jurisdiction and, if an alleged conspiracy is the

---

[1] Galerie Gmurzynska v. Ingrid Hutton 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003).

basis for jurisdiction (as here), pleading requirements are more exacting, demanding specific allegations tying a defendant to each element of the conspiracy.[2]

## I. NEITHER MR. ALJOMAIH'S WEALTH NOR PLAINTIFFS' FALSE, CONCLUSORY CLAIMS ESTABLISH PERSONAL JURISDICTION

Mr. Aljomaih seeks dismissal on three grounds, but the jurisdictional question is pre-eminent. Nearly 90 years old, Mr. Aljomaih has no personal connection to the United States.[3] Aside from visits for medical treatment, he has not been in this country in 40 years. He owns no property, has no bank accounts, and transacts no business here. Motion at 4-5, 10. The Opposition does not show otherwise. When other defendants have moved for dismissal, plaintiffs have pointed to specific U.S. connections, but here they offer nothing.

Unable to show or allege that Mr. Aljomaih has minimum contacts[4] with the United States, plaintiffs say he is "a very wealthy man with many business interests." Opp. at 11. They add that some of the companies he began are the Saudi partners of U.S. companies. Id. at 11-12. But mostly they argue that the mere claim that Mr. Aljomaih supports terrorism means he has "purposefully directed" his activities at this country so as to support jurisdiction. Id. at 6-10.[5] The first two points are true but irrelevant or insufficient. The third rests on a falsehood, and repeats an argument rejected months ago by Judge Robertson for another defendant.

### B. Mr. Aljomaih's Business Interests and Success Do Not Establish Personal Jurisdiction

---

[2] Motion. at 11-12; Heinfling v. Colapinto 946 F. Supp. 260, 265 (S.D.N.Y. 1996).

[3] The Opposition says (at 6) that the Motion is premised only on Mr. Aljomaih's lack of contact with the District of Columbia. That is untrue. See Motion at 4-5, 10.

[4] See Motion at 7-9; Metropolitan Life Ins. Co. v. Robertson-Ceco Corp. 84 F.3d 560, 567 (2d Cir. 1996); Eskofot v. E.I. Du Pont De Nemours & Co. 872 F.Supp. 81, 87 (S.D.N.Y. 1995).

[5] Plaintiffs also say that even if they cannot make the required prima facie showing of jurisdiction over Mr. Aljomaih, they should still be allowed to take discovery. Opp. at 12.

The only point the Opposition actually supports is that Mr. Aljomaih is a wealthy man who made money in partnership with U.S. companies. Opp. at 11-12 and Exhibits A - C. That is nothing new: The Motion (at 1, 4) describes Mr. Aljomaih's businesses and their success. But, while Mr. Aljomaih's resources may make him an enticing target, wealth does not establish jurisdiction. In any event, any contacts of Aljomaih companies with the United States do not establish jurisdiction in this case over Mr. Aljomaih himself.

### 1. Jurisdiction Over Individuals and Corporations Are Separate Questions

Any positions Mr. Aljomaih might still hold in his family's companies[6] do not establish minimum contacts for him with the United States. District of Columbia and other courts have adopted the "fiduciary shield" doctrine,[7] under which "Personal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum . . . ." Wiggins v. Equifax Inc. 853 F. Supp. 500, 503 (D.D.C. 1994). Even if plaintiffs alleged contacts between Aljomaih companies and this country, that would not establish the requisite contacts for Mr. Aljomaih himself.

### 2. Plaintiffs Do Not Allege That Their Claims Arose Out of Corporate Contacts, As Required by Specific Jurisdiction

---

[6] The materials attached to the Opposition show only that Mr. Aljomaih founded a company that bears his name. They otherwise support none of the Opposition's claims (at 11-12) about business activities or ownership.

[7] New York state courts do not accept the fiduciary shield doctrine as does the District of Columbia. Houbigant Inc. v. Development Specialists Inc. 229 F.Supp 2d 208, 224 (S.D.N.Y. 2002). However, in multi-district proceedings, when an issue is governed by state law, the transferee court uses the law applicable in the transferor court -- here, the law of the District of Columbia. Wright, Miller & Cooper, Federal Practice and Procedure § 3866, p. 610, n.11. In addition, New York discards the fiduciary shield when an individual uses a corporation as his agent in taking actions in the U.S. related to the lawsuit. See e.g., Houbigant supra; In re Sumitomo Copper Litigation 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000). Plaintiffs allege no such situation here.

Plaintiffs cannot argue there is general jurisdiction over Mr. Aljomaih. See Motion at 8. At best, they must rely on the doctrine of specific jurisdiction, and, there, the use of corporate contacts stumbles again. Specific jurisdiction requires (1) minimum contacts with the United States <u>and</u> (2) that plaintiffs' allegations "arise out of or relate to" those contacts. Motion at 8-9. If plaintiffs could impute any U.S. contacts of Aljomaih companies to Mr. Aljomaih, they would *still* have to show that their terrorism allegations involve company business, and they make no such claims.

### D. Reckless, Conclusory Claims of Links With Terrorism Do Not Establish Personal Jurisdiction

#### 1. The Claim that Mr. Aljomaih is "Supporter of Al Qaeda" is Irresponsible, Unsupported, and False

Unable to identify or allege any connection between Mr. Aljomaih and the United States, plaintiffs argue that, from overseas, he "purposefully directed" activities to cause harm in this country. Opp. at 6-10. For others, plaintiffs have said "purposeful direction" could include donations to organizations that allegedly support terrorism, but they identify no such donations by Mr. Aljomaih. In fact, they do not describe a single action he has supposedly taken to support terrorism. This contrasts sharply with the narratives for some defendants in the 3AC -- tales of meetings, travels, or donations. For Mr. Aljomaih, there is nothing.

A complaint's allegations must make a prima facie showing of jurisdiction, but cannot be "conclusory." They cannot just say there is jurisdiction, but must allege facts that, if true, would support that claim. Here, plaintiffs' claims about Mr. Aljomaih (which appear only in the Opposition) are all conclusion and no specifics. Offering no details, Plaintiffs say only that Mr. Aljomaih "supports Al Qaeda." That is no better than saying "He purposefully directs his activities at the U.S." -- just the kind of conclusory allegation that will not establish jurisdiction.

- 4 -

### 2. Claims Based On the "Golden Chain" Are Groundless

The Opposition says Mr. Aljomaih is listed on "the Golden Chain," a supposed roster or "honor roll" of Al Qaeda donors. Opp. at 9, 25, 33. There no allegation in the 3AC connecting Mr. Aljomaih to a "Golden Chain" or any other document, but the Opposition (at 33) surprisingly says otherwise. It claims that

> Plaintiffs make allegations specific to Al Jomaih and other Defendants alleging his active monetary sponsorship as a member of the "Golden Chain," the "honor roll" for al Qaeda sponsors. TAC ¶¶ 261-267. (emphasis added)

That is false. Paragraphs 261-267 of the 3AC actually describe the "SAAR Foundation," a Virginia corporation supposedly connected with "the al-Rahji family." Perhaps plaintiffs thought no one would bother to check. If they are so wrong about their own complaint, there is no reason to credit anything else plaintiffs say about Mr. Aljomaih.

There is also nothing in the Opposition to support the Golden Chain charges. The document is not attached, and there is no evidence concerning it. It is true that during a June 24, 2003 hearing in Burnett, plaintiffs' counsel, pointing to a projected image, simply said "This is the golden chain" and said it listed "contributors." 6/24/03 Tr. at 79. (Exhibit B). But there was no other explanation or support then, and there still is not. An enlarged version of the document that counsel called the Golden Chain is attached to Exhibit A, which translates its pertinent parts. It is a poor copy of a one page, unsigned, undated document handwritten in Arabic. There is no indication of who wrote it, and the words "Golden Chain" do not appear. Donors and donations are not mentioned, nor is the document called an "honor roll" or any similar term. After brief introductory passages, there are several names. Ex. A ¶¶4-7. On the eighth line, there is the following entry: "Aljumiah (Jeddah) Batarji." Jeddah is a city in Saudi Arabia on the Red Sea coast. This appears to be the only reference to a city in the document. Id. at ¶¶ 6,8.

If this is "the Golden Chain," it confirms none of plaintiffs' claims about Mr. Aljomaih. It shows no "purposeful direction" by anyone. The name "Aljomaih" appears, but, even if the document's purpose and provenance were clearer, that would not implicate this defendant. Without a first or middle name, there is no reason to think that entry refers to Mr. Aljomaih, especially given the reference to Jeddah. Mr. Aljomaih lives in Riyadh. He has never lived in Jeddah. See Motion, Attch. B at ¶3; Ex. A, ¶ 9. This document may list an Aljomaih from Jeddah, but that is not the person plaintiffs have sued.[8]

### D. Plaintiffs Ignore the Court's Earlier Discussion of Personal Jurisdiction

In November, Judge Robertson granted motions to dismiss from Prince Turki and Prince Sultan. (Docket 392). (Exhibit C), and, in doing so, discussed personal jurisdiction. The Opposition was filed well after that opinion, but plaintiffs never mention it. Their silence is not surprising, because applying the opinion's reasoning here would result in dismissal. As to personal jurisdiction, plaintiffs pointed to Prince Sultan's alleged charitable contributions (offering far more than they have for Mr. Aljomaih), but Judge Robertson dismissed him nonetheless. Ex. C. at 23-27. He rejected plaintiffs' "desultory" efforts to show that the Prince had minimum contacts with the U.S. (Id. at 24-25), mostly because they could not connect such contacts to their claims. Likewise here: Plaintiffs cannot possibly explain how their speculations about Mr. Aljomaih's business interests could have any relationship to a worldwide terror conspiracy.

Judge Robertson also rejected plaintiffs' "purposeful availment" argument, which was based there, as here, on Calder v. Jones 465 U.S. 783 (1984) and Burger King Corp. v.

---

[8] Suppose the document contained one further entry: "Mubarak -- Paris." In that case, could plaintiffs claim personal jurisdiction over the President of Egypt on the theory that he had "purposefully directed" terrorist activities at the United States? The answer is no, as it should be for Mr. Aljomaih.

Rudzewicz 471 U.S. 462 (1985). He concluded that plaintiffs' allegations about donations did not indicate they were "expressly aimed" or "purposefully directed" at harm in the United States. Mem. at 26-27. He also rejected the idea that anyone whose actions supposedly caused injury in the United States should foresee being sued here -- another argument plaintiffs make now. Opp. at 10. Instead, the Judge said, foreseeability of suit alone is not enough:[9] The foreseeability that matters arises out of an "act by which the defendant purposefully avails itself of the privilege of conducting activities in the forum State . . . ." Ex. C. at 27, quoting Burger King 471 U.S. at 474-75. For Prince Sultan, "nothing like that sort of purposeful availment" was alleged. Id.

The same result is even more appropriate for Mr. Aljomaih. Plaintiffs have shown and alleged far less for him than for Prince Sultan. There are no specifics, whether by allegation or proof. There is no showing or claim that he expressly aimed or purposefully directed terrorist activities at this country, or that he in any way meets the "purposeful availment" standard.[10]

## II.   PLAINTIFFS' EFFORT TO SERVE MR. ALJOMAIH WAS DEFECTIVE

The Opposition defends the attempted service of Mr. Aljomaih in four erroneous ways. First, plaintiffs say publication service on Mr. Aljomaih was authorized. Opp. at 1-2. That is not so, as the Motion to Dismiss (at 13-14) shows. The only Order authorizing notice by publication concerned "certain" "listed" defendants, and Mr. Aljomaih was not among them. Motion at 13-14. The Opposition says (at 1-2) that plaintiffs sought more time to serve defendants in the Gulf state region and then, it says, they "asked for permission to serve by publication" defendants

---

[9] See also, Huang v. Sentinel Government Securities 657 F.Supp. 485, 489 (S.D.N.Y. 1987) ("When a court bases personal jurisdiction on effects in a state caused by acts done elsewhere, it must proceed 'with caution particularly in an international context'." (emphasis added and citations omitted)); Galerie Gmurzynska supra 257 F. Supp. 2d. at 627.

[10] Judge Robertson denied plaintiffs' request for discovery from Prince Sultan because there was no indication how it could have shown that he had any greater contact with this country. Ex. C. at 25. The same is true here.

listed on an exhibit." Id. at 2. However, seeking more time for service generally, and seeking authority under Rule 4(f)(3) to serve in a foreign country are different. As to the latter, plaintiffs never sought, and thus never received, authority to serve Mr. Aljomaih by publication.

Second, plaintiffs say that Mr. Aljomaih might have English speaking associates who could have read the International Herald Tribune notice. Opp. at 5. That ignores the requirement that published notice must be "reasonably calculated" to reach its target. Such notice should have been designed to reach Mr. Aljomaih, not a bi-lingual colleague.[11]

Third, plaintiffs seem to say that the Arabic version of Mr. Aljomaih's name in Al Quds may have been merely misspelled. Opp. at 4-5. However, as Exhibit A explains (at ¶ 11), the entry that plaintiffs point to (Opp. at 5-6, n. 2) would not be recognized as his name by an Arabic speaker. More important, if Mr. Aljomaih's name *had* been in Al Quds, he could not have read it, because that publication is banned in Saudi Arabia. Motion at 16-17. Remarkably, plaintiffs argue that Al Quds might have leaked into Saudi Arabia "much like banned publications, of various sorts, made their way to the former Soviet Union." Opp. at 4. Do plaintiffs seriously contend that a publication is "reasonably calculated" to reach residents of a place where it is banned? If a plaintiff told a court "We plan to serve Mr. Jones by publishing a notice in a newspaper that cannot legally circulate in the country where he lives," the proposal would be rejected instantaneously. The Al Quds[12] notice here should be treated the same way.

---

[11] Suppose plaintiffs said "We plan to serve a defendant who lives in Cairo by publishing a notice in French in Le Monde, which is available in that city. He may only speak Arabic, but he might know someone who speaks French." Surely such notice would not be approved. Presumably, plaintiffs had a reason for running an Arabic language announcement -- to reach those who read only Arabic.

[12] Plaintiffs say that Judge Robertson "agreed" that notice in Al Quds was "appropriate." Opp. at 4. In fact, the Judge simply accepted plaintiffs' representation that Al Quds "widely circulated" throughout the Gulf State region. They did not tell the Judge that it was banned in the nation that is the home of many defendants.

Finally, plaintiffs claim that Mr. Aljomaih now knows about this case, and so it does not matter whether they served him correctly. Opp. at 2-3. But, if that were true, service would be an issue in only rare instances, such as motions to vacate default judgments. In fact, service-related motions are often filed at the start of cases.[13] That could not happen unless the moving party knew about the case. Mr. Aljomaih does not waive the protections of Rule 4 and Mullane by coming to court and showing they have been violated.

## III.    THERE ARE *NO* ALLEGATIONS IN THE COMPLAINT CONCERNING MR. ALJOMAIH

Most of the Opposition (at 12-36) explains plaintiffs' legal theories. This is an odd response to the Motion to Dismiss, which devoted just a few pages to allegation-related points, pointing out that there are no allegations at all satisfying Rule 8 for Mr. Aljomaih. Motion at 17-18. In large part, the last two thirds of the Opposition has nothing to do with the Motion to Dismiss. That section seems to have been lifted with little change from other filings: It attributes arguments to the Motion that it did not make, and then spends many pages rebutting those phantom contentions. For example: At the start of a long discussion of the Alien Tort Claims Act, the Opposition says that Mr. Aljomaih claims "he cannot be held accountable for alleged violations of the 'law of nations,'" and that he argues "Plaintiffs fail to allege a violation of international law." Opp at 24-25. That is false. The Motion to Dismiss says nothing about the "law of nations" or "international law."[14] Other defendants may have made such arguments, but recycled responses to their claims are irrelevant to a decision on this motion to dismiss.

---

[13] In fact, Rule 12(h) requires that arguments about improper service be raised early -- in a party's first responsive pleading.

[14] If there ever were allegations specific to Mr. Aljomaih and if there were jurisdiction -- which we deny -- such questions might arise, but they cannot and need not be addressed now.

Plaintiffs argue that the Complaint's use of the phrases like "all defendants" means they have satisfied Rule 8 as to Mr. Aljomaih. See Opp. at 1, 14. They claim *everything* in the Complaint applies to him. However, given the complex conspiracies recounted in the 3AC, that cannot be right. There is no "plain" and "simple" notice as required by Rule 8(a) of how Mr. Aljomaih fits into plaintiffs' picture of world terror.[15]

The Opposition also says that, because Mr. Aljomaih did not first file a motion for a more definite statement[16] plaintiffs "are forced to guess" at his arguments about their allegations, which they say are "quite truncated and appear to be underdeveloped." Opp. at 13. Plaintiffs cannot be serious. The problem with the 3AC for Mr. Aljomaih is obvious, whether the explanation is long or "truncated": There are *no* allegations that relate to him, and non-existent allegations are necessarily insufficient. No "guessing" is needed to understand that.

## Conclusion

Mohammad Abdullah Aljomaih's Motion to Dismiss should be granted.

\S_____
John A. Nocera
Anthony L. Cotroneo
Rosner Nocera & Ragone LLP
40 Wall Street  --  24th Floor
New York, New York 10005-2301
212-635-2244

---

[15] Judge Robertson so ruled last July. See Memorandum Opinion (July 25, 2003) (Burnett Docket 224) at 45-46, 48-49. (Exhibit D)

[16] Rule 12 (h) requires lack of personal jurisdiction or defective service to be raised in the first response to a complaint. In addition, here, the lack of jurisdiction is so clear that the complaint can be dismissed on that basis even before "clarifying" the absent allegations. Finally, Plaintiffs misrepresent what the Motion says: After noting that Rule 12(e) might not apply where there are no claims, it says that if the Court does not order dismissal, "we ask under Rule 12(e) that it order the plaintiffs to provide a more definite statement of their claims." Motion at 20.