early 1990s. His passport photograph was recovered during a search in 1997 of Kenyan residents suspected of belonging to a local al Qaida cell. During this time period, Saif was in direct contact via telephone from Baku with the Kenyan terrorist cell led by Wadih el Hage, who was responsible for relaying messages between Saif ul Islam in the Caucuses and the military committee of al Qaida in Afghanistan, which included Muhammed Atef and Osama bin Laden.

104.    Within Chechnya, BIF provided material support to al Qaida fighters supporting the Chechen mujihadeen in the form of anti-mine boots, an x-ray machine, military uniforms and cash, in direct contravention of governing United Nations resolutions.

105.    Within the United States, BIF's operations within the United States were headquartered in Illinois and run by senior al Qaida lieutenants Enaam Arnaout and Mohammed Laoy Bayazid, both founding members of the al Qaida movement. In the New York area, BIF was represented by Saffet Abid Catovich, a prominent leader of radical islamic elements in Bosnia-Herzegovina.

106.    BIF engaged in extensive efforts to cover the nature of its operations within the United States from the public, going so far as to draft separate mission statements for internal and external purposes. While the external drafts portray BIF as a pure relief agency, the internal documents make clear that BIF's primary mission was the support of jihad and al Qaida mujihadeen.

107.    Enaam Arnaout spoke with Munib Zahiragic while he was in the custody of Bosnian officials. During the conversation, Zahiragic advised Arnaout that the Bosnian officials had recovered various documents relating to al Qaida activities in Bosnia. Upon learning of the nature of the materials recovered in the raid, Arnaout

ordered Zahiragic to conceal from authorities the involvement of other BIF representatives in the sponsorship of al Qaida activities, including Arnaout's own involvement.

108.    BIF's U.S. arm used the U.S. financial system extensively to launder money for al Qaida and support its terrorist operations throughout the world.  Between June 2000 and September 2001, members of the al Qaida movement transferred in excess of $1,000,000 via wire from an account at Union Bank at Switzerland to BIF's checking account in the United States.  Those funds were co-mingled in BIF's checking account with donations the BIF Enterprise received from other sources and dispersed in large part to BIF offices overseas.

109.    BIF substantially understated the amount of funds it received from the Swiss bank account it its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source.

110.    Between January 4, 2000 and April 11, 2000, BIF sent 19 wire transfers from its checking account with Citibank to the bank accounts of Jordan Relief Association, MADLEE in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Lavia, to support al Qaida mujihadeen fighters in Chechnya.

111.    As the forgoing demonstrates, BIF has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

112.    The September 11th Attack was a direct, intended and foreseeable product of BIF's participation in al Qaida's jihadist campaign.

## THE MUSLIM WORLD LEAGUE

113.    Founded in 1962 by the Kingdom of Saudi Arabia, the Muslim World League (MWL) is among the world's largest Islamic charitable organizations, with offices in more than thirty (30) countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization, World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and Rabita Trust, among others.

114.    MWL is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs MWL operations, appoints and terminates MWL personnel, provides the MWL with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the MWL's operations. In many countries, MWL conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

115.    Senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and orgnas of the Kingdom of Saudi Arabia. During court proceedings in *Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, Docket DES-6-99, an immigration proceeding initiated against an employee of the International Islamic Relief Organization based on his sponsorship of terrorist organizations, Arafat El Asahi, the director of the International Islamic Relief Organization in Canada and a full time employee of the Muslim World League, testified as follows:

> Let me tell you one thing, the Muslim World League,
> which is the mother of IIRO, is a fully government funded
> organization. In other words, I work for the government of

> Saudi Arabia. I am an employee of that government.
> Second, the IIRO is the relief branch of that organization
> which means that we are controlled in all of our activities
> and plans by the government of Saudi Arabia. Keep that in
> mind, please ... I am paid by my organization which is
> funded by the [Saudi] government ... the [IIRO] office, like
> any other office in the world, here or in the Muslim World
> League, has to abide by the policy of the government of
> Saudi Arabia. If anybody deviates from that, he would be
> fired; he would not work at all with IIRO or with the
> Muslim World League.

116.    The MWL has long operated as a fully integrated component of al Qaida's

financial and logistical infrastructure, and provided material support and resources to

al Qaida and affiliated FTOs.

117.    The MWL's close affiliation with Osama bin Laden and other high

ranking al Qaida officials dates to the 1980's. During the war against the Soviet

occupation of Afghanistan, Abdullah Azzam, bin Laden's spiritual mentor and partner in

Makhtab al Kidhmat, headed the office of the MWL in Peshawar, Pakistan, which served

as the rear base for mujihadeen operations. That office was thereafter led by Wa'el

Julaidan, who also served as Director General and a member of the Board of Trustees of

Rabita Trust, a financial arm of the MWL. Wa'el Julaidan is a founding member of

al Qaida. On September 6, 2002, the United States Department of Treasury designated

Julaidan as a Specially Designated Global Terrorist pursuant to Executive Order 13224.

The Treasury Department statement regarding the designation provided as follows:

> Wa'el Hamza Julaidan, a Saudi citizen, is an associate of
> Osama bin Laden. Julaidan fought with bin Laden in
> Afghanistan in the 1980s. Julaidan is also associated with
> several individuals and entities linked to al Qaida,
> including bin Laden's lieutenants, Ayman al Zawahri, Abu
> Zubaida, and Mohammed Atef; and the organizations:
> Maktab al Khidmat, the Rabita Trust, and al-Gamma al
> Islamiya. These individuals and entities have been
> previously designated under President Bush's Executive
> Order and by the United Nations.

Bin Laden himself acknowledged close ties to Julaidan
during a 1999 interview with al-Jazeera TV.  When
referring to the assassination of al Qaida co-founder
Abdullah Azzam, bin Laden stated that "we were all in one
boat, as is known to you, including our brother, Wa'el
Julaidan."  Julaidan has established contacts with several
known Islamic extremists, including bin Laden's principal
lieutenant, Ayman al-Zawahri.  Another bin Laden
lieutenant, Abu Zubaida, claimed that he had accompanied
Julaidan from Pakistan to Kandahar, Afghanistan during
the summer of 2000.  Zubaida said that Julaidan met with
bin Laden and senior bin Laden lieutenant Mohammed Atef
soon after arriving in Kandahar.

In February 2000, Julaidan was appointed to the Board of
Trustees of the Rabita Trust and served as its director
general.  The Rabita Trust is an NGO designated under
President Bush's Executive Order as an organization that
provided logistical and financial support to al-Qa'ida.

### BASIS FOR DESIGNATION

The United States has credible information that Wa'el
Hamza Julaidan is an associate of Osama bin Laden and
several of bin Laden's top lieutenants.  Julaidan has
directed organizations that have provided financial and
logistical support to al-Qa'ida.  Accordingly, the United
States is designating Julaidan under Executive Order 13224
as a person who supports terror.

118.    From the earliest stages of al Qaida's development, the MWL has served

as a front to conceal the terrorist organization's existence and true purpose, as confirmed

by documents seized throughout the world in conjunction with investigations into al

Qaida's global support infrastructure.

119.    An internal al Qaida document seized during the March 2002 search of

BIF's Sarajevo offices, written on the joint letterhead of the MWL and International

Islamic Relief Organization, suggests using the name of the "League" as "an umbrella

which you can stay under."

120.    In another letter seized in Bosnia, the MWL suggests the use of "League offices" for launching al Qaida attacks.

121.    A separate document recovered during the same raid includes a list of orders from Osama bin Laden regarding the management of Islamic charities. At point 10 of his list, Bin Laden urges the creation of a committee to receive and distribute donations to al Qaida, and suggests the participation of the Saudi Red Crescent, Rabita Trust [MWL] and the Relief Agency.

122.    As al Qaida developed and expanded its operations into new geographical regions over the years, the MWL extended its infrastructural support accordingly. While working for the MWL in Kenya, Ihab Ali relayed messages between Osama bin Laden and Wadi El-Hage in connection with the coordination of the bombings of the U.S. embassies in Kenya and Tanzania. El Hage, who was convicted for his role in the embassy bombings, was himself at one time an employee of the MWL.

123.    The MWL also provided direct financial assistance to al Qaida members involved in the attempted assassination of Egyptian President Hasni Mubarak in 1995.

124.    The MWL further sponsored al Qaida through its participation in the Saudi Joint Relief Committee (SJRC), a body established by the Kingdom of Saudi Arabia to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya. The other purported charities compromising the SJRC include the International Islamic Relief Organization, Saudi Red Crescent Society, World Assembly of Muslim Youth, al Haramain Foundation, Islamic Endowments and Makk Establishment, among others.

125. The United Nations' mission in Kosovo declared that the SJRC in Pristina, Kosovo served as a cover for several al Qaida operatives, including Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of SJRC.

126. Between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus. Throughout this time, the Committee was under the supervision and control of Saudi Interior Minister Prince Naif bin Abdul Aziz.

127. As further detailed herein, the MWL has also provided substantial material support and resources to al Qaida through its subsidiary bodies, including the International Islamic Relief Organization, World Assembly of Muslim Youth, Rabita Trust, Benevolence International Foundation and International Islamic Relief Organization.

128. As the forgoing demonstrates, MWL has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

129. The September 11th Attack was a direct, intended and foreseeable product of MWL's participation in al Qaida's jihadist campaign.

## INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO)

130. The International Islamic Relief Organization (IIRO) is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL provides "humanitarian assistance" through the arms of IIRO.

131. Like the MWL, the IIRO is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs IIRO operations, appoints and terminates IIRO personnel, provides the IIRO with virtually all of its funding,

determines how funds will be distributed throughout the world, and otherwise stringently controls the IIRO's operations. In many countries, IIRO conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

132.    As set forth previously, senior officials of the IIRO have expressly acknowledged that the IIRO and the other subsidiary bodies of the MWL are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

133.    The IIRO has long operated as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

134.    According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which al Qaida planned, approved and coordinated the September 11th Attack, and at which some or all of the September 11 hijackers received indoctrination and training.

135.    Outside of Afghanistan, the IIRO has used its branch offices throughout the world to facilitate al Qaida's activities. According to the December 2, 2003 report of the United Nations Security Council Committee Concerning al Qaida and the Taliban, the Philippine branch of the IIRO served as the coordinating center for Islamic extremists in the Far East throughout the 1990's, and channeled funds to the Abu Sayyaf group, a terrorist organization operating under the al Qaida umbrella.

136.    The IIRO office in the Philippines was established and run by Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden. According to the U.S. government, Khalifa and the Philippine office of the IIRO participated in the planning of al Qaida's plots to kill the Pope during a planned January, 1995 visit to the Philippines

and to simultaneously attack multiple U.S. airliners while in flight. The plot to target U.S. airliners developed by the Philippine office of the IIRO served as the inspiration and foundation for the September 11th Attack.

137.    American law enforcement officials detained Khalifa on December 16, 1994, as he was returning to the Philippines from San Francisco, California. Traveling with Khalifa at the time of his detention was Mohamed Loay Bayazid, an al Qaida founding member and top official. Investigators discovered documents in Khalifa's possession referring to the plot to kill the Pope and church bombings carried out by al Qaida the prior year.

138.    In 1993, officials linked members of the Zagreb office of the IIRO to an Islamic extremist group headed by Muhammad Sa'd Darwish Al-Shazy, which was planning to conduct anti-Jewish bombings in Croatia. In addition to representatives of IIRO, Al-Shazy's organization included the heads of the Zagreb offices of the Saudi High Commission and the Kuwaiti Joint Relief Committee, representatives of the Human Relief International and members of the Qatar Charitable Society.

139.    Through its offices in Kenya, the IIRO provided direct financial and logistical support to al Qaida terrorists involved in the 1998 bombings of the United States Embassies in Dar Es Salam, Tanzania and Nairobi, Kenya. As a result of an investigation into the involvement of the IIRO in the bombings, Kenyan officials deregistered the IIRO's Nairobi office.

140.    According to the Indian government, IIRO officials were behind the 1999 al Qaida plot to attack the U.S. consulates in Madras and Calcutta, in response to the American military retaliation for the African embassy bombings.

141.    The operational cell designated to carry out the planned attacks on the U.S. consulates was led by Sayed Abu Nesir, a Bangladeshi national who was directed to launch the attacks by Shaykh Ahmed al-Gamdin, Director of IIRO operations in Asia.

142.    During subsequent interrogation, Abu Nesir declared that 40 to 50% of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir.  Among other duties, Abu Nesir visited the training camps on behalf of IIRO to assess their funding needs.  At the direction of al-Gamdin, Nesir himself attended one of the al Qaida camps to receive training, where he met Osama bin Laden.

143.    IIRO's Bosnia office has been directly involved in al Qaida operations as well.  One of the heads of that office, Abdel Aziz Zaher, was expelled from his residence in Belgrade in early 1993 after officials linked him to terrorist activity in the region. Zaher was also affiliated with the MWL and Sanabil Relief Agency.  Zaher's top lieutenant at IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaida and al Qaida affiliated Islamic militants in the Balkans with weapons and ammunition.

144.    In October 2001, Pakistani officials identified and expelled some two dozen al Qaida members who had been working for the IIRO in Pakistan.

145.    Mahmoud Jaballah, head of IIRO's Canadian office, was arrested and jailed by Canadian officials based on his links to al Qaida and al Jihad.

146.    In 1991, the IIRO established a US branch in Virginia, under the name International Relief Organization, Inc. (IRO).  The IRO operated from offices at 360 South Washington Street, Washington, DC, where it shared office space with the MWL. The Washington, DC offices of the IIRO and MWL were part of a complicated web of

for-profit and ostensible charitable organizations within the United States, commonly known as the SAAR Network, the majority of which maintained offices at 555 Gross Street, Herndon, VA. The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and Washington based charities and for-profit enterprises within the SAAR Network. Through that investigation, the details of which are further discussed herein, federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaida and Hamas.

147.   The IIRO further sponsored al Qaida through its participation in the Saudi Joint Relief Committee. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

148.   As the forgoing demonstrates, IIRO has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

149.   The September 11th Attack was a direct, intended and foreseeable product of IIRO's participation in al Qaida's jihadist campaign.

### WORLD ASSEMBLY OF MUSLIM YOUTH

150.   World Assembly of Muslim Youth (WAMY) is a subsidiary body of the MWL, with more than 60 offices throughout the world.

151.    Like the MWL, WAMY is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs WAMY operations, appoints and terminates WAMY personnel, provides WAMY with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls WAMY's operations. In many countries, WAMY conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

152.    As set forth previously, senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

153.    WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

154.    Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Khasmiri terrorists. In November 2001, Pakistani intelligence officials, operating in conjunction with the Federal Bureau of Investigation, raided WAMY's Peshawar, Pakistan offices, based on its suspected ties to al Qaida militants. The close relationship between that WAMY office and al Qaida was vividly confirmed shortly after the search, when an employee of the office hand-delivered a recorded message from Osama bin Laden to the local media.

155.    According to Indian officials, Nazir Qureshi, an Assistant Secretary General of WAMY, has supplied money and other assets to Khasmiri terrorist groups associated with al Qaida.

156.    Mohammed Ayyub Thukar, President of the World Khasmir Freedom Movement and a principal financier of the al Qaida affiliated Hizbul Mujihadeen, served as a WAMY official during exile in Saudi Arabia.

157.    WAMY has provided military training to prospective jihadists, and members of the organization have fought under Gulbadin Hekmatyar's Hizb e Islami in Afghanistan.  On February 19, 2003, the United States government designated Hekmatyar pursuant to Executive Order 13224, based on his affiliation with al Qaida.

158.    Philippine authorities are currently investigating links between WAMY's offices in the Far East and al Qaida operations in the region.

159.    WAMY also has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world.  When he was arrested in 1992, Ahmed Ajaj, who was subsequently convicted for his role in the 1993 World Trade Center bombing, had in his possession an al Qaida Manual entitled "*Military Lessons In The Jihad Against The Tyrants*" which detailed how to establish and maintain clandestine operational sales.  The manual was distributed to Ajaj by WAMY.  The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

160.    In 1992, Abdullah Bin Laden, Osama bin Laden's brother, established a WAMY office within the United States, in Falls Church, Virginia.  At least through 1998, Abdullah Bin Laden served as the president of WAMY's U.S. operations.  WAMY's U.S. office was part of the SAAR Network of businesses and charities created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida.  WAMY's U.S. operations were raided by federal authorities in conjunction

with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated FTOs.

161.   WAMY also has provided financial support to the U.S. based Council on American Islamic Relations (CAIR), a civil rights organization which received its initial seed money from the Holy Land Foundation for Relief and Development.  On December 4, 2001, the Treasury Department listed Holy Land Foundation for Relief and Development as a specially designed terrorist pursuant to Executive Order 13224.

162.   WAMY has also supported al Qaida affiliated extremists through its participation in the Islamic Coordination Council, an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan.  Other members of the ICC included HRO, Saudi Red Crescent and Qatar Charitable Society.  Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujhadeen elements which joined Osama Bin Laden's al Qaida.

163.   WAMY further sponsored al Qaida through its participation in the SJRC. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives.  Furthermore, between 1998 and 2000, the Kigdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

164.   WAMY is closely affiliated with defendant BIF.  In fact, WAMY and BIF shared a common address in Peshawar, Pakistan, and frequently shared common officers and directors.  As outlined in further detail herein, BIF long has provided material support and resources to al Qaida.

165.    As the forgoing demonstrates, WAMY has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

166.    The September 11th Attack was a direct, intended and foreseeable product of WAMY's participation in al Qaida's jihadist campaign.

## AL HARAMAIN ISLAMIC FOUNDATION

167.    Defendant al Haramain Islamic Foundation (al Haramain) is a Saudi Arabia-based ostensible charity, with branch offices in approximately 49 countries.

168.    Al Haramain is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs al Haramain operations, appoints and terminates al Haramain personnel, provides al Haramain with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls al Haramain's operations. In many countries, al Haramain conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

169.    Al Haramain officials have acknowledged that their operations are under the control and direction of the Kingdom of Saudi Arabia. According to al Haramain's general director, Sheik Aqeel al-Aqeel, "we work under the supervision of Saudi government." Al-Aqeel has also acknowledged that more than 95% of al Haramain's funding comes directly from the Kingdom of Saudi Arabia. In an August 25, 2002 report posted on al Haramain's website, the Chairman of the Africa Committee of al Haramain, al-Sheikh Muhmad al Tujri, declared that al Haramain's activities in Kenya were under the "direct supervision" of the Saudi embassy in that country. A separate report on al

Haramain's website that month indicated that the Saudi Interior Minister had directed the organization to provide assistance to Afghani refugees.

170. Al Haramain has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

171. International investigations have confirmed al Haramain's direct complicity in al Qaida's operations and attacks throughout the world. On March 11, 2002, the United States designated the Bosnia and Herzegovina branches of al Haramain, based on their extensive and pervasive involvement in the funding of al Qaida's activities in those two countries. In describing the close links between the two al Haramain offices and terrorist activity, the United Nations Security Counsel Committee Concerning al Qaida and the Taliban succinctly stated as follows:

> The Somalia and Bosnia branches had been directly implicated in al Qaida funding activities. Al Haramain Somalia had funneled money to al-Ittihad al-Islami, a designated terrorist group, by disguising the funds as contributions for an orphanage project and for Islamic School and Mosque construction. The Bosnia office was linked to al-Jemaah al-Islamiyah, al-Masriyah and to Osama Bin Laden.

172. On January 22, 2004, the United States designated the al Haramain branches in Indonesia, Kenya, Tanzania and Pakistan as well. The Indonesian Office of al Haramain had diverted funds to al Qaida affiliated terrorists for weapons procurement, and directly funded the deadly October 12, 2002 Bali nightclub bombing. According to Omar al-Faruq, a senior al Qaida official apprehended in Southeast Asia, al Haramain served as a primary source of al Qaida funding throughout Southeast Asia.

173.   In the press release issued in conjunction with the designation of the

Kenyan and Tanzanian offices of al Qaida, the Treasury Department described al

Haramain's extensive involvement in terrorist activity within Africa as follows:

- As early as 1997, U.S. and other friendly authorities were informed that the Kenyan branch of AHF was involved in plotting terrorist attacks against Americans. As a result, a number of individuals connected to AHF in Kenya were arrested and later deported by Kenyan authorities.
- In August 1997, an AHF employee indicated that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate of the Embassy. A wealthy AHF official outside East Africa agreed to provide the necessary funds. Information available to the U.S. shows that AHF was used as a cover for another organization whose priorities include dislike for the U.S. government's alleged anti-Muslim stance and purposed [sic] U.S. support for Christian movements fighting Islamic countries.
- Also in 1997, AHF senior activities in Nairobi decided to alter their (then) previous plans to bomb the U.S. Embassy in Nairobi and instead sought to attempt the assassination of U.S. citizens. During this time period, an AHF official indicated he had obtained five hand grenades and seven "bazookas" from a source in Somalia. According to the information available to the U.S., these weapons were to be used in a possible assassination attempt against a U.S. official.
- Information available to the U.S. shows that a former Tanzania AHF director was believed to be associated with UBL [Usama Bin Laden] and was responsible for making preparations for the advance party that planned the August 7, 1998 bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.
- Shortly before the dual-Embassy bombing attacks in Kenya and Tanzania, a former AHF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHF official were arrested in Europe. At that time, they admitted maintaining close ties with EIJ and Gamma Islamiyah.
- Wadih-El-Hage, a leader of the East African al Qaida cell and personal secretary to UBL [Osama Bin Laden], visited the Kenya offices of AHF before the 1998 dual Embassy attacks. Searches conducted by authorities revealed that El-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, then overseeing authority for AHF's offices in Kenya and Tanzania.
- In early 2003, individuals affiliated with AHF in Tanzania discussed the status of plans for an attack against several hotels in Zanzibar. The scheduled

attacks did not take place due to increased security by local authorities, but planning for the attacks remained active.

- Information made available to the U.S. shows that AHF offices in Kenya and Tanzania provided support, or act for or on behalf of al Qaida and AIM.

174.    The Pakistan office of al Haramain provided funding and logistical support for the acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank weapons to al Qaida and al Qaida affiliated militants. In addition, the Pakistan office was closely associated with Makhtab al-Khidmat, the organization co-founded by Osama Bin Laden to support the Jihad against the Soviets in Afghanistan. In 2000, the Director of Makhtab al-Khidmat instructed that funds be deposited into al Haramain accounts in Pakistan, and from there transferred to other accounts.

175.    Al Haramain has also sponsored al Qaida activity within Europe, through the al Nur Mosque. According to German officials, the al Nur Mosque served as a meeting place, recruitment center and base of operations for al Qaida within Germany. At the direction of the Kingdom of Saudi Arabia, al Haramain contributed in excess of $1 million dollars to the Mosque, funding the purchase of the land for the Mosque as well as its construction.

176.    Al Haramain also sponsored al Qaida operations in Chechnya and Kosovo through its participation in the Saudi Joint Relief Committee. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kigdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

177.    On February 19, 2004, in conjunction with its ongoing investigation of Al Haramain's extensive involvement in al Qaida's global operations, federal officials executed a search warrant against property purchased on behalf of Al Haramain in the United States, located in Ashland, Oregon. The search was conducted pursuant to a

criminal investigation into violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act.

178.   As the forgoing demonstrates, al Haramain has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

179.   The September 11th Attack was a direct, intended and foreseeable product of al Haramain's participation in al Qaida's jihadist campaign.

### SAUDI HIGH COMMISSION

180.   The Saudi High Commission is a Saudi Arabia-based charity, established by Prince Slaman bin Abdul Aziz al Saud.

181.   The Saudi High Commission is an agency, instrumentality and organ of the Kingdom of Saudi Arabia.  The Kingdom controls and directs Saudi High Commission operations, appoints and terminates Saudi High Commission personnel, provides the Saudi High Commission with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the Saudi High Commission's operation.  In many countries, the Saudi High Commission conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

182.   The Saudi High Commission has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

183.   According to Bosnian officials, al Qaida mujihadeen fighters began entering Bosnia-Herzegovina in 1992, frequently disguised as relief workers for the Saudi High Commission.

184.    For the next ten years, the Saudi High Commission funneled millions of dollars to al Qaida operations in Bosnia. To this date, investigators have been unable to account for approximately $41 million donated to the charity.

185.    In September 2000, Prince Salman received a letter from a Bosnian association called the "Mothers of Srebrenica and Podrinje" advising Prince Salman that funds donated to the Saudi High Commission were being improperly diverted.

186.    In October 2001, officials of the U.S. government raided the Sarajevo offices of the Saudi High Commission. During the raid, investigators found computer hard drives with photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole. Investigators also discovered files on pesticides and crop dusters, information about how to make fake state department badges, and photographs and maps of Washington, marking prominent government buildings.

187.    Following the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities, stating:

> Members of the SFOR (stabilization forces) have on
> premises on the Saudi high commission relief for Bosnia
> and Herzegovina confiscated some documentation for
> which it can be claimed with certainty that it does not
> belong in the scope of work of a humanitarian organization
> . . .

188.    As the forgoing demonstrates, the Saudi High Commission has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

189.    The September 11th Attack was a direct, intended and foreseeable product of Saudi High Commission's participation in al Qaida's jihadist campaign.

## SAUDI RED CRESCENT SOCIETY

190.    The Saudi Red Crescent Society (Saudi Red Crescent) is a Saudi Arabia-based ostensible charity, which conducts operations throughout the world.

191.    The Saudi Red Crescent is an agency, instrumentality and organ of the Kingdom of Saudi Arabia.  The Kingdom controls and directs Saudi Red Crescent operations, appoints and terminates Saudi Red Crescent personnel, provides the Saudi Red Crescent with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the Saudi Red Crescent's operation.  In many countries, the Saudi Red Crescent conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

192.    The Saudi Red Crescent has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

193.    Throughout the 1980's the Saudi Red Crescent provided extensive financial and logistical support to the mujihadeen in Afghanistan.  During this time, the Saudi Red Crescent was populated and run by Islamic militants who would become the future founders of al Qaida.  Indeed, Wa'el Julaidan served as an officer of the Saudi Red Crescent for many years, and continued to fill that role following the establishment of al Qaida.  Ayman-Zawahiri, al Qaida's second in command, joined the Saudi Red Crescent in 1985.  In 1995, he presented himself as a representative of the Saudi Red Crescent and raised $500,000 in the San Francisco area.

194.    Following the withdrawal of Soviet troops from Afghanistan, the Saudi Red Crescent redirected its efforts towards the fulfillment of the objectives of the newly established al Qaida movement.

195.    The Saudi Red Crescent's integral role in the growth and development of the nascent al Qaida movement has been confirmed by documents seized in Bosnia and Herzegovina, during the searches of the BIF's offices.  As set forth previously, during those searches, investigators recovered a list of orders from Osama Bin Laden regarding the management of Islamic charities.  On point 10 of his list, Bin Laden urges the creation of a committee to receive and distribute donations to al Qaida, and suggests the participation of the Saudi Red Crescent, Rabita Trust and the Relief Agency.

196.    During that same search, investigators found a letter on Saudi Red Crescent stationary to Abu Rida, another founding member of al Qaida, requesting that "weapons be inventoried."  At the bottom of the letter is a note from Osama Bin Laden to Wa'el Julaidan stating that al Qaida has an extreme need for weapons.

197.    Saudi Red Crescent employees have repeatedly been implicated in al Qaida attacks and plots.  In 1996, two Sudanese members of the Saudi Red Crescent, Muhammed Ali Syad and Bashir Babar Quadim, were arrested in connection with the 1995 Egyptian Embassy bombing in Pakistan.

198.    In 2001, two administrators for the Saudi Red Crescent in Bosnia, Boumediene Lakhdar and Nechle Mohammed, were arrested for plotting terrorist attacks against the U.S. and British Embassies in Sarajevo.

199.    In October of 2001, Pakistan deported several dozen representatives of the Saudi Red Crescent, after confirming their affiliation with al Qaida.

200.    The Saudi Red Crescent further sponsored al Qaida through its participation in the SJRC. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kigdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

201.    As the forgoing demonstrates, Saudi Red Crescent has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

202.    The September 11th Attack was a direct, intended and foreseeable product of Saudi Red Crescent's participation in al Qaida's jihadist campaign.

## SAUDI JOINT RELIEF COMMITTEE FOR KOSOVO AND CHECHNYA

203.    As set forth previously, the Saudi Joint Relief Committee (SJRC) is a body established by the Kingdom of Saudi Arabia to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya. The purported charities comprising the SJRC include the IIRO, Saudi Red Crest Society, WAMY, al Haramain Foundation, and Islamic Endowments and Makk Establishment, among others.

204.    Between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million dollars to al-Qaida members and loyalists affiliated with SJRC bureaus. Throughout this time, the committee was under the supervision and control of Saudi Interior Minister Prince Naif Bin Abdul Aziz.

205.    The United Nation's mission in Kosovo has declared that the SJRC office in Pristina, Kosovo, served as a cover for several al-Qaida operatives, including Adel

Muhammad Sadi Bin Kazam and Wa'el Hamza Julaidan, both of whom served as Directors of SJRC.

206.   As the forgoing demonstrates, SJRC has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

207.   The September 11th Attack was a direct, intended and foreseeable product of SJRC's participation in al Qaida's jihadist campaign.

## RABITA TRUST

208.   Defendant Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. Rabita Trust is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs Rabita Trust operations, appoints and terminates Rabita Trust personnel, provides Rabita Trust with virtual all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls Rabita Trust operations. In many countries, Rabita Trust conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

209.   As set forth previously, senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

210.   Rabita Trust has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

211.   Rabita Trust's direct participation in al Qaida's operations dates to the establishment of Bin Laden's terrorist movement, as confirmed by the internal al Qaida

document recovered from BIF's computer files in which Osama bin Laden suggests Rabita Trust's involvement in a committee to collect and distribute funds to al Qaida.

212.    Rabita Trust's material sponsorship of al Qaida has been facilitated by the direct participation of senior al Qaida officials in the management and operation of Rabita Trust. In fact, Rabita Trust was, for several years prior to September 11, 2001, headed by al Qaida founding member Wa'el Hanza Julaidan.

213.    In addition, Rabita Trust has shared common officers and directors with several other charities operating within al-Qaida's infrastructure, including the MWL and SAAR Network of charities and businesses. Abdullah Omar Naseef served as a Chairman of Rabita Trust and as Secretary General of the MWL. Naseef is also an Officer of Makkahl-Mukarramah, Inc., a Virginia based charity operating within the SAAR network. The Vice Chairman of the Board of Trustees of Rabita Trust, Abdullah al-Obaid, also served as an Officer of the MWL and Sanabell al-Kheer organizations within the SAAR network. Al-Obaid also serves as a Senior Executive of al-Watania Poultry in Saudi Arabia, one of the many businesses owned by Suleiman Abdel Aziz al-Rajhi, the founder of the SAAR Network, member of the Board of Directors of IIRO, CEO of al Rajhi Banking and Investment and a defendant herein.

214.    Given its pervasive and ongoing involvement in al-Qaida's operations, and the direct participation of senior al Qaida officials in its management, the United States government designated Rabita Trust as a Specially Designated Global Terrorist on October 12, 2001 pursuant to Executive Order 13224.

215.    As the forgoing demonstrates, Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

216.    The September 11th Attack was a direct, intended and foreseeable product of Rabita Trust's participation in al Qaida's jihadist campaign.

## GLOBAL RELIEF FOUNDATION

217.    Defendant Global Relief Foundation is an ostensible charity organized under the law of Illinois in 1992.

218.    On October 18, 2002, the United States government designated Global Relief Foundation under the authority of Executive Order 13224.  Prior to that designation and the consequent blocking of its assets, Global Relief Foundation had long-acted as a fully integrated component of al-Qaida's logistical and financial support infrastructure, and provided material support and resources to al-Qaida and affiliated FTOs.

219.    In the press release issued in conjunction with the designation of Global Relief Foundation, the Treasury Department described Global Relief Foundation extensive and long-term involvement in furthering the objectives of the al-Qaida movement as follows:

> TREASURY DEPARTMENT FACT SHEET ON THE
> GLOBAL RELIEF FOUNDATION
>
> The Global Relief Foundation (GRF), also known as
> Fondation Secores Mondial (FSM), and its officers and
> directors have connections to, and have provided support
> for and assistance to, Usama Bin Laden (UBL), al Qaida,
> and other known terrorist groups.  These includes groups
> previously designated by the United States under President
> Bush's September 2001 Executive Order 13224 regarding
> terrorism and included on the United Nation's 1267
> Sanctions Committee's consolidated list of individuals and
> entities whose assets are required to be frozen pursuant to
> UN Security Council Resolutions (UNSCRs) 1267 and
> 1390.

Links to UBL and al-Qaida:

Rabih Hadad, a senior GRF official who co-founded GRF
and served as its President throughout the 1990s and in the
year 2000, worked for Makhtab al-Khidamat (MAK) in
Pakistan in the early 1990s. MAK was co-founded by
Sheik Abdullah Azzam and UBL in the 1980s and served
as the precursor organization to al Qaida. MAK was
designated by President Bush in E.O. 13224 and was
subsequently included on the UN 1267 Sanctions
Committee's consolidated list. The organization has helped
funnel fighters and money to the Afghan resistance in
Peshuwar, Pakistan, and establish recruitment centers
worldwide to fight the soviets. Azzam, who served as a
mentor to UBL, was killed in 1989. He is also regarded as
a historical leader of HAMAS, which was designated under
E.O. 13224. At a recent immigration hearing, Haddad
conceded that he met Azzam in Pakistan and characterized
him as a "hero."

In addition, GRF has provided financial and other
assistance to, and received funding from, individuals
associated with al Qaida. Mohammad Galeb Kalaje
Zouaydi, a suspected financier of al Qaida's worldwide
terrorist efforts, was arrested in Europe in April 2002. GRF
has admitted receiving funds from Zouaydi.

GRF and FSM personnel had multiple contacts with Wadih
El-Hage, UBL's personnel secretary when UBL was in
Sudan. El-Hage was convicted in a U.S. District Court in
May 2001, for his role in the UBL-directed 1998 bombings
of the U.S. embassies in Kenya and Tanzania. At the time
that El-Hage was playing an active role in an al-Qaida
terrorist cell in Kenya, he was in contact with GRF. For
example, documents recovered from a search in Kenya
indicated that El-Hage was in contact with GRF after he
returned from visiting al Qaida leadership in Afghanistan in
February 1997. GRF has acknowledged that El-Hage and
Nabil Sayadi, FSM's director in Belgium, were in contact
during this period.

Links to Taliban and Other Entities and Background:

A GRF employee also dealt with officials of the Taliban,
which at the time was an entity subject to U.S. Sanctions
pursuant to United States E.O. 13129 (prohibiting trade and

most transactions with the Taliban because it provided a safe haven and base of operations for UBL and al-Qaida) and subject to international sanctions pursuant to UNSCs 1267 and 1333. In November 2001, during the air strikes in Afghanistan, a GRF medical relief coordinator traveled to Kabul, against the advice of the U.S. Department of State, and engaged in dealings and negotiations with Taliban officials until the collapse of the Taliban regime.

A set of photographs and negatives discovered in 1997 in a trash dumpster outside of GRF's office in Illinois depict large shipping boxes displayed under a GRF banner. The boxes were full of sophisticated communications equipment, including approximately 200 handheld radio transceivers, long-range radio antennas, and portable power packs, with an estimated total value of $120,000. Other photographs depict fighters armed with automatic rifles, a sandbagged bunker with a radio antenna mounted outside, and mutilated corpses with the name "KPI" (Kashmir Press International) printed alongside. Yet another photograph displays two dead men with the caption "Hizbul Mujahideen," a known terrorist organization operating in the Kashmir region. On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government."

GRF has stocked and promoted audiotapes and books authored by Sheik Abdullah Azzam, discussed above, which glorify armed jihad, including "The international conspiracy against Jihad" and "The Jihad in its present stage." Despite Azzam's terrorist background, GRF has enthusiastically promoted Azzam's materials to the public: "His [Azzam's] theology is a sea, his words are jewels, and his thoughts are a light for those who are holding the smoldering embers. He lived the Jihad experiences of the 20[th] century in Afghanistan… and Palestine, and produced a new theory for saving the [Islamic] nation from disgrace, shame, weakness, and submission to others."

GRF has published several Arabic newsletters and pamphlets that advocate armed action through jihad against groups perceived to be un-Islamic. For example, one 1995 GRF pamphlet reads, "God equated martyrdom through JIHAD was supplying funds for the JIHAD effort. All contributions should be mailed to: GRF." Another GRF newsletter requested donations "for God's cause – they [the Zakat funds] are disbursed for equipping the raiders, for the

purchase of ammunition and food, and for their [the
Mujahideen's] transportation so that they can raise God the
Almighty's word... it is likely that the most important of
disbursement of Zakat in our times is on the jihad for God's
cause..."

GRF received $8,521.00 from The Holy Land Foundation
for Relief and Development (HLF) in 2000. HLF, a Dallas,
Texas base Islamic charitable organization, was designated
under E.O. 13224 on December 4, 2001, and under the
European Union's regulation (EC) No. 2580/2001 on June
17, 2002, for its ties to terrorism. HLF's designation was
upheld in a recent decision by a U.S. District Court.

220. As the forgoing demonstrates, Global Relief Foundation has, for a period
of many years and in diverse regions throughout the world, provided critical financial and
logistical support to al Qaida in relation to that terrorist organization's global jihad.

221. The September 11th Attack was a direct, intended and foreseeable product
of Global Relief's participation in al Qaida's jihadist campaign.

### THE SAAR NETWORK

222. Beginning in the 1980s, several prominent and wealthy sponsors of al
Qaida's global jihad began establishing a network of interrelated ostensible charities,
think tanks and for-profit businesses within the United States, commonly referred to as
the "SAAR Network," to generate and surreptitiously transfer funds to terrorist
organizations, including al-Qaida.

223. Many of the organizations within the SAAR Network were established
and funded by, or closely affiliated with, defendant Suleiman Abdul Aziz al Rajhi,
including SAAR Foundation, SAAR International, Safa Group, Mar-Jac Poultry, Mar-Jac
Holdings, Inc., Safa Trust, Inc. and Aradi, Inc.

224. By September 11, 2001, more than one hundred ostensible charities and
for-profit businesses functioned under the umbrella of the SAAR Network, including the

U.S. branches of the MWL, IIRO and WAMY. Other organizations operating within the
SAAR Network included defendants African Muslim Agency, Grove Corporate, Inc.,
Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investment,
Inc., Mena Corporation, Reston Investments, Inc., Sterling Charitable Gift Fund, Sterling
Management Group, Inc., Success Foundation and York Foundation.

225.    Many of the organizations operating within the SAAR Network are related
by common management and parent/subsidiary relationships. The vast majority of the
entities within the Network maintained no physical presence at their purported principal
place of business.

226.    The entities operating within the SAAR Network have long acted as fully
integrated components of al Qaida's logistical and financial support infrastructure, and
provided material support and resources to al Qaida and affiliated FTOs.

227.    On March 20 and 21, 2002, federal authorities raided the offices of the
SAAR Network entities, the vast majority of which were located at a single address in
Herndon, Virginia, as well as the residences of several prominent SAAR Network
officials, pursuant to a search warrant issued by the United States District Court for the
Eastern District of Virginia.

228.    The ongoing investigation of the SAAR network entities, which prompted
the March 2002 searches, has revealed that SAAR entities' funds have been transferred to
Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under
Executive Order 13224 based on their material support and sponsorship of al-Qaida. The
funds were transferred through Bank al-Takwa and Akida Bank Private Ltd., two
Bahamas based banks controlled by Nada and Nasreddin. Both of those banks have been
designated by the U.S. government pursuant to Executive Order 13224, based on their

involvement in financing radical groups throughout the world, including Hamas and al Qaida, both before and after the September 11th attack.

229.    The ongoing investigation of the SAAR Network has also revealed that SAAR entities, including the U.S. branch of the IIRO and Sana-bell, Inc., engaged in financial transactions with Bait Ul-mal, Inc., (BMI, Inc.) an Islamic investing firm established by defendant Soliman Biheiri in New Jersey in 1996. According to federal authorities, BMI and its affiliates have transferred funds to terrorists and terrorist organizations, including al Qaida, Yasin al-Qadi, Musa Abu Marzook, Mohammad Salah and Hamas.

230.    During the course of the federal investigation into BMI's financing of terrorism, a BMI accountant contacted an FBI agent and stated that "funds the accountant was transferring overseas on behalf of the company may have been used to finance the Embassy bombings in Africa."

231.    As the forgoing demonstrates, the SAAR Network has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

232.    The September 11th Attack was a direct, intended and foreseeable product of the SAAR Network's participation in al Qaida's jihadist campaign.

### BLESSED RELIEF (MUWAFAQ) FOUNDATION

233.    The Blessed Relief Foundation, also known as the Muwafaq Foundation, is an ostensible charity established by defendant Yasin al-Qadi.

234.    Blessed Relief has long acted as a fully integrated component of al-Qaida's financial and logistical infrastructure, and provided material support and resources to al-Qaida and affiliated FTOs. According to the U.S. government, the

Blessed Relief Foundation is a front organization through which wealthy Saudis send millions of dollars to al Qaida.

235.    On October 12, 2001, the United States government designated Yasin al-Qadi and the Blessed Relief Foundation under Executive Order 13224, based on their longstanding and integral role in advancing the al-Qaida movement.

236.    As the forgoing demonstrates, Blessed Relief Foundation has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

237.    The September 11th Attack was a direct, intended and foreseeable product of Blessed Relief Foundation's participation in al Qaida's jihadist campaign.

## TAIBAH INTERNATIONAL AID ASSOCIATION

238.    Taibah International Aid Association (Taibah) is a charitable organization headquartered in Falls Church, Virginia. Taibah was co-founded by Abdullah A. Bin Laden in 1991.

239.    Taibah International has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al-Qaida and affiliated FTOs.

240.    Taibah International has been particularly active in furthering al Qaida's efforts to establish a base of operations in Bosnia. Mustafa al-Kadar, one of five al-Qaida members arrested in 2001 for plotting to attack the United States Embassy in Bosnia, gained entry into Bosnia and Bosnian citizenship rights based on his employment with Taibah International.

241.    Based on substantial evidence of pervasive involvement in al Qaida's activities within Bosnia, police raided the offices of Taibah International on December

13, 2001. The raid and subsequent investigation of Taibah International's financial records confirmed that Taibah International diverted donated funds to al Qaida and al Qaida affiliated militants in Bosnia.

242. The investigation further revealed that Taibah International facilitated the entry of al Qaida members into Bosnia by falsely claiming that those terrorists would be serving as employees for the organization in the region.

243. Within Bosnia, Taibah International worked closely with the Global Relief Foundation and Saudi High Commission, from which it received the vast majority of its funding.

244. Taibah International has been directly implicated in al Qaida operations outside of Bosnia as well, including the 1998 United States Embassy bombings in Kenya and Tanzania.

245. Samir Sala and Abdulrahman Alamoudi, two officers of Taibah International's United States branch, are intimately affiliated with several organizations within the SAAR network. According to Alamoudi's resume, he served as Executive Assistant to the President of SAAR Foundation between 1985 and 1990. Alamoudi also served as President of the Hajj Foundation and Secretary of Success Foundation.

246. On August 16, 2003, officials of Britain's National Terrorist Financial Investigations Unit detained Alamoudi when he attempted to travel from London, England to Damascus, Syria. A search of al-Amoudi's belongings conducted by United Kingdom customs officers discovered approximately $340,000 in sequentially numbered $100 dollar bills, two U.S. passports and one Yemeni passport.

247. Federal officials arrested Alamoudi when he returned to the United States on September 28, 2003. In an eighteen count indictment filed shortly thereafter, federal

authorities charged Alamoudi with engaging in prohibited financial transactions with the Libyan government, misuse of a passport, procuring naturalization by fraudulent means, and failure to report foreign bank accounts. According to federal officials, Alamoudi used his control of Taibah International, Success Foundation and the Happy Hearts Trust to funnel money to al Qaida through various al Qaida funds, including the designated terrorist organizations Global Relief Foundation and The Foundation for Human Rights and Humanitarian Relief, which supported al Qaida operatives associated with the millennium bombing plot.

248. On December 15, 2001, FBI officials interviewed Ali Hamid el-Tayeb, and employee of Taibah International's Saraejvo, Bosnia office. El-Tayeb advised FBI officials that Mohamed el-Nagmy was, at that time, an employee of the Bosnian offices of both Taibah International and Global Relief Foundation.

249. On December 14, 2001, Bosnian Federation Police searched the offices of Global Relief Foundation. The search confirmed Global Relief Foundation's sponsorship of al Qaida's activities in Bosnia and elsewhere. Accordingly, Bosnian officials shut down Global Relief Foundation's operations in the country.

250. On February 21, 2002, FBI officials interviewed Mustafa Ait-Idar, another employee of Taibah's Bosnian offices, who confirmed that Taibah International assumed representation of Global Relief Foundation's interests after the Bosnian government closed Global Relief Foundation's offices in Bosnia.

251. As the forgoing demonstrates, Taibah International has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

252.    The September 11th Attack was a direct, intended and foreseeable product of Taibah International's participation in al Qaida's jihadist campaign.

## AL QAIDA'S PARTNERS IN THE INTERNAIONAL BANKING SYSTEM

253.    During testimony before Congress, U.S. Treasury Department General Counsel David Aufhauser estimated that al Qaida had an annual budget of approximately $35 million in the years leading up to September 11, 2001.

254.    Like any global criminal enterprise, al Qaida's survival required that it develop safe and efficient mechanisms to launder and distribute the funds required to sustain its global operations to individuals and entities operating within its infrastructure throughout the world.

255.    The scope of al Qaida's global operations, the number of entities operating within its infrastructure, and the extent of its funding required that al Qaida resort to the international banking system to facilitate the distribution and laundering of its funds.  At the same time, al Qaida needed to avoid triggering any of the regulatory devices developed by the international banking system to identify money laundering and illicit financial transactions.

256.    Al Qaida gained access to the international banking system, and concealed the illicit nature of the transactions it conducted through that system, by establishing its own financial institutions in under-regulated jurisdictions, and by establishing relationships with banks operating within the Islamic banking system that shared al Qaida's perverse worldview and were willing collaborators in its global jihad.

257.    Like the charity defendants, the financial institutions established by al Qaida and its partner banks within the Islamic banking system operated as fully integrated components of the al Qaida's financial and logistical infrastructure.  These

banks knowingly maintained accounts for individuals and organizations operating within al Qaida's infrastructure, and facilitated transfers between those entities. Many of these banks also directly funded al Qaida's global operations. Once deposited with or laundered through one of the banks operating within its infrastructure, al Qaida could move funds throughout the world by exploiting correspondent banking relationships.

258.   Absent the material support and sponsorship of the banks operating within its infrastructure, as further detailed herein, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global scale.

## THE AL TAQWA FINANCIAL NETWORK

259.   Bank Al Taqwa was established in 1988 by defendants Youssef Mustafa Nada and Ahmed Idris Nasreddin. Bank Al Taqwa is a close affiliate of Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. Youssef Nada also controlled Al-Taqwa Trade, Property and Industry Company, Ltd., B.A. Taqwa for Commerce and Real Estate Company, Ltd., and Nada International Anstalt.

260.   In addition to his interest in Bank Al Taqwa, Ahmed Idris Nasreddin controlled the Mega-Malaysian Swiss, Gulf and African Chamber, Gulf Centre SRL, Nascoservice SRL, Nasco Business Residence Centre SAS, Nasreddin Company Nasco SAS, Nasreddin Foundation, Nascotex and Nasreddin International Group, Ltd. Holding.

261.   Defendants Nada and Nasreddin also maintained controlling interests in the Akida Bank.

262.    The corporations and organizations controlled by Nada and Nasreddin are deeply intertwined, and have long provided financial services and other forms of material support to al Qaida.

263.    Nada and Nasreddin serve on the Boards of each other's banks and companies and, in many cases, operate those organizations from the same locations using the same employees. Nada and Nasreddin, and the companies they controlled, were closely tied in with several Islamic charities and business ventures, which have been linked to al Qaida financing, including the Milan Islamic Center, a major al Qaida recruiting center in Europe.

264.    On November 7, 2001, the United States government designated Youssef Nada, Bank Al Taqwa, its affiliated businesses and key executives, under Executive Order 13224. Thereafter, on April 19, 2002, the United States Government designated Ahmed Idris Nasreddin pursuant to Executive Order 13224.

265.    On August 29, 2002, the United States Government designated an additional fourteen companies associated with Nada and Nasreddin pursuant to Executive Order 13224.

266.    In the press statement issued in conjunction with the August 29, 2002 designations, the Treasury Department stated as follows:

> Based on information available to Italy and the United States, Youssef Nada ("Nada") and Ahmed Idris Nasreddin ("Nasreddin"), through commercial holdings, operated an extensive financial network providing support for terrorist related activities. In the case of Nada and Nasreddin, this involves an extensive conglomeration of businesses from which they derive their income or through which they conduct transactions. Based on evidence of their support of terrorism, Nada and Nasreddin were previously designated by the international community as financiers of terror. Nada was designated by the United States on November 7, 2001, and by the United Nations on November 9, 2001.

Nasreddin was designated by the G7 on April 19, 2002, and by the United Nations on April 24, 2002.

Nasreddin's corporate holdings and financial network provide direct support for Nada and Bank Al Taqwa, which was also previously designated by the United State on November 7, 2001, and the United Nations on November 9, 2001. This designation of 14 additional entities owned or controlled by either Nada or Nasreddin will further restrict their assets and their network by precluding these companies from being used to provide funding or support for terrorism.

Nasreddin and Nada, who have worked closely together for many years, are both Directors of Bank Al Taqwa and the Akida Bank. Nada holds a controlling interest in Bank Al Taqwa and Nasreddin holds a controlling interest in Akida Bank. Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense. They are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason, the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government.

Bank Al Taqwa, for which Nasreddin is a Director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al Qaida organization. Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. In 1997, it was reported that the $60 million collected annually for Hamaas was moved to Bank Al Taqwa accounts. As of October, 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his al Qaida organization received financial assistance from Youssef M. Nada.

Nada and Nasreddin own or control a number of business entities through direct ownership, control, or in cooperation with each other. Fourteen of these entities are being designated in furtherance of the prior designation of these two individuals to disrupt their use of assets under their ownership or control that could be used to finance terrorist activities.

267.    Many of al Qaida's most significant individual sponsors and supporters have held positions with one or more of the corporations and organizations controlled by Nada and Nasreddin.  Youssef Al-Qardawi, a member of the Muslim Brotherhood, and Abdel Fattah Abu Ghadda, a member of the Syrian Muslim Brotherhood, both serve on Al Taqwa's Shariah Board.  Albert Friedrich Armand Huber (a/k/a Ahmed Huber), and Ali Ghalib Himmat, both Executive Order 13224 designees, both served as officers of the bank.  In addition, Suleiman Abdul Aziz Al Rajhi worked for the Akida Bank in the Bahamas.  Al Rajhi is the CEO of Al Rajhi Banking and Investment, a member of the Board of Directors of IIRO, and the founder of the SAAR Network of charities and businesses.

268.    As the forgoing demonstrates, the al Taqwa financial network has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

269.    The September 11th Attack was a direct, intended and foreseeable product of the al Taqwa financial network's participation in al Qaida's jihadist campaign.

## AL BARAKAAT GROUP

270.    The Al Barakaat Group is a financial conglomerate, headquartered in Dubai, that operates in 40 countries, including the United States.  The founder of the organization, Shaykh Ahmed Nur Jimale, has close links with Osama bin Laden and has used the organizations within the Al Barakaat Group to facilitate the financing of al Qaida and other terrorist organizations.

271.    The Al Barakaat Group includes business ventures in telecommunications, construction and currency exchange.  According to former Treasury Secretary, John

O'Neill, the Al Barakaat Companies are "a principal source of funding, intelligence and money transfers for bin Laden."

272.    On November 7, 2001, the United States Government designated Al Barakaat Exchange LLC and the following affiliated organizations pursuant to Executive Order 13224, based on their material support and sponsorship of al Qaida:  Aaron Money Wire Service, Inc., Al Baraka Exchange LLC, Al-Barakaat, Al-Barakaat Bank, Al-Barakat Bank of Somalia, Al-Barakat Finance Group, Al-Barakat Financial Holding Company, Al-Barakat Global Telecommunications, Al-Barakat Group of Companies Somalia Limited, Al-Barakat International (a/k/a Baraco Co.), Al-Barakat Investments, Al-Barakat Wiring Service, Baraka Trading Company, Barakaat Boston, Barakaat Construction Company, Barakaat Enterprise, Barakaat Group of Companies, Barakaat International, Barakaat International Foundation, Barakaat International, Inc., Barakaat North America, Inc., Barakaat Red Seat Telecommunications, Barakaat Telecommunications Co. Somalia, Barakat Bank and Remittances, Barakat Computer Consulting (BCC), Barakat Consulting Group (BCG), Barakat Global Telephone Company, Barakat International Companies (BICO), Barakat Post Express (BPE), Barakat Refreshment Company, Barakat Wire Transfer Company, Barakat Telecommunications, Ltd. (BTelco), Barako Trading Company, LLC, Global Services International, Parka Trading Company, Red Sea Barakat Company, Ltd, Somalia International Relief Organization, Somalia Internet Company and Somalia Network AB.

273.    As the forgoing demonstrates, the Al Barakaat Group has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

274.    The September 11th Attack was a direct, intended and foreseeable product of the Al Barakaat Group's participation in al Qaida's jihadist campaign.

## AL RAJHI BANKING AND INVESTMENT GROUP

275.    Al Rajhi Banking and Investment Corporation (Al Rajhi Bank) is a Saudi Arabia based bank with 400 branch offices within the Kingdom, and 17 subsidiaries across the world.

276.    Al Rajhi Bank is a family owned enterprise, in which defendant Suleiman Abdel Aziz Al Rajhi holds the largest personal investment. Suleiman Abdel Aziz Al Rajhi serves as the Chairman and Managing Director of Al Rajhi Bank.

277.    Suleiman Abdel Aziz Al Rajhi also serves on the Board of Directors of the IIRO, and as a member of the Ibn Baz Foundation, which is chaired by Prince Salman. Al Rajhi is also the founder and principal fiancier of many of the ostensible charities and for-profit enterprises comprising the SAAR Network.

278.    Al-Rajhi Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF and Al Haramain, among others.

279.    In cooperation with the charities operating within al Qaida's infrastructure, Al Rajhi Bank advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi Bank facilitates al Qaida's fundraising efforts.

280.     The accounts maintained by Al Rajhi on behalf of the charities operating within al Qaida's infrastructure, and in particular accounts it maintained for al Haramain and IIRO, have been used to transfer funds to al Qaida cells throughout the world.

281.     Al Rajhi Bank has long known that the accounts it maintained for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida. In fact, Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of those charities, including the MWL and IIRO. Through his involvement in the affairs of those charities, Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaida's operations, and consequently that the accounts maintained by Al Rajhi Bank on behalf of those organizations were being used to channel funds to al Qaida.

282.     Despite this knowledge, Al Rajhi Bank has continued to maintain those accounts. In doing so, Al Rajhi knowingly provided financial services and other forms of material support to al Qaida.

283.     As the forgoing demonstrates, Al Rajhi Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

284.     The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida's jihadist campaign.

## NATIONAL COMMERCIAL BANK

285.     The National Commercial Bank was established in 1950 by Salim bin Mahfouz, father of defendant Khalid bin Mahfouz.

286.     With his father's death in 1996, Khalid bin Mahfouz became Presdient and CEO of National Commercial Bank. Khalid bin Mahfouz served as President and CEO

of National Commercial Bank until 1999, when the Kingdom of Saudi Arabia bought out bin Mahfouz's controlling interest in the bank.

287.    Since 1999, the Kingdom of Saudi Arabia has owned a controlling interest in National Commercial Bank, and operated the bank as an agency, instrumentality and organ of the Kingdom.

288.    Throughout the 1980s and early 1990s, the National Commercial Bank was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International (BCCI), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO.  A federal investigation into BCCI's operations revealed extensive involvement in corrupt practices, including money laundering, hiding assets, the obstruction of a Senate investigation and the sponsorship of international terrorism.

289.    A 1992 U.S. Senate Investigative Report regarding BCCI's fraudulent activities directly implicated National Commercial Bank in BCCI's corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization.

290.    Consistent with the findings of the Senate Investigative Report, National Commercial Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others.  Under the supervision of Suleiman Abdul Aziz al-Rajhi, National Commercial Bank also managed the budget of SJRC.

291.   In cooperation with the charities operating within al Qaida's infrastructure, National Commercial Bank advertises the existence and numercial designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida supporters to deposit funds directly into those accounts. Through this mechanism, National Commercial Bank facilities al Qaida's fundraising efforts.

292.   The accounts maintained by National Commercial Bank on behalf of the charities operating within al Qaida's infrastructure, and in particular accounts it maintains for IIRO, SJRC and Blessed Relief Foundation, have been used to transfer funds to al Qaida cells throughout the World. During the 1990s, National Commercial Bank channeled in excess of $74 million to al Qaida through IIRO, and also transferred significant funding to al Qaida through Blessed Relief Foundation accounts it maintained.

293.   National Commercial Bank has long known that the accounts it maintains for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida. In fact, Khalid bin Mahfouz directly participates in the management, funding and operation of several of those charities, including the Blessed Relief Foundation and BIF. Through his involvement in the affairs of those charities, bin Mahfouz has known, for a period of many years, of their sponsorship of al Qaida's operations, and consequently that the accounts maintained by National Commercial Bank on behalf of those organizations were being used to channel funds to al Qaida.

294.   Despite this knowledge, National Commercial Bank has continued to maintain those accounts. In doing so, National Commercial Bank has knowingly provided financial services and other forms of material support to al Qaida.

295.    Through accounts with the National Commercial Bank, wealthy relatives of defendant Abdulrahman Alamoudi, residing within Saudi Arabia, have transferred large sums of money to Alamoudi to support terrorist operations.

296.    As the forgoing demonstrates, National Commercial Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

297.    The September 11th Attack was a direct, intended and foreseeable product of National Commercial Bank's participation in al Qaida's jihadist campaign.

## AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION

298.    Al Baraka Investment and Development Compant (Al Baraka) is a wholly owned subsidiary of Dallah al Baraka Group, LLC.  Al Baraka is headed by defendant Saleh Kamel.

299.    Al Baraka has knowingly maintained accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF and Al Haramain, among others.

300.    In cooperation with the charities operating within al Qaida's infrastructure, Al Baraka advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts.  Through this mechanism, Al Baraka facilitates al Qaida's fundraising efforts.

301.    The accounts maintained by Al Baraka on behalf of the charities operating within al Qaida's infrastructure, and in particular accounts it maintained for al Haramain, have been used to transfer funds to al Qaida cells throughout the world.  Accounts

maintained by Al Baraka on behalf of al Haramain have served as a principal vehicle for funding al Qaida's operations in Bosnia, according to Bosnian officials.

302. Al Baraka has long known that the accounts it maintained for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida.

303. Despite this knowledge, Al Baraka has continued to maintain those accounts. In doing so, Al Baraka knowingly provided financial services and other forms of material support to al Qaida.

304. In addition, Al Baraka has provided substantial support to al Qaida through its subsidiaries and affiliates, including Al Shamal Islamic Bank, Tadamon Islamic Bank and al Aqsa Bank, as further described herein.

305. As the forgoing demonstrates, Al Baraka has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

306. The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida's jihadist campaign.

## DAR-AL-MAAL AL ISLAMI

307. Beginning in the early 1980's, Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical brand of Islam at the heart of the al Qaida ideology, through a complex banking system that had at its center two entities: Dar-Al-Maal Al Islami ("DMI"), chaired until recently by Prince Mohammed Al Faisal Al Saud; and Dallah Al-Baraka. Endowed with enormous funding, these institutions served the Saudi government's goals in two ways: they helped to boost the Kingdom's

financial preeminence in the Arab World, and they gave extensive support for radial

Islamic causes.

308.   DMI, or the House of Islamic money, was created on July 29, 1981 and is

headquartered in Switzerland.  Its main subsidiaries are the Islamic Investment Company

of the Gulf, the Faisal Islamic Bank of Bahrain, and Faisal Finance.  Until October 1983,

the President of DMI was defendant Ibrahim Kamel.

309.   Kamel was replaced as President of DMI on October 17, 1983 by Prince

Mohammad Al Faisal Al Saud, who ran the Bank until the year 2000.

310.   Like other Islamic banking institutions, DMI abides by *sharia* or Islamic

law, which prohibits the earning or payment of interest.  DMI operates by participating in

investments, sharing profits on projects, and earning fees for services performed.  One of

the obligations imposed on Islamic banking systems under *sharia* is the duty to contribute

and manage Zakat funds.  Consistent with this obligation, Islamic banking institutions set

aside a percentage of funds associated with each transaction as Zakat.  As a practical

matter, these funds disappear from the bank's books and can be used to fund radical

Islamic organizations.

311.   DMI has actively sponsored and supported the al Qaida movement

through several of its subsidiaries, including but not limited to, the Islamic Investment

Company of the Gulf, the Faisal Islamic Bank of Bahrain, Faisal Finance, Tadamon

Islamic Bank, and Al Shamal Islamic Bank, as described herein.

312.   Mohammad Al Faisal Al Saud chairs Islamic Investment Company of the

Gulf, as well as Faisal Islamic Bank of Sudan.  Osama bin Laden's brother, Haydr

Mohammad bin Laden, served as a Director of the Islamic Investment Company of the

Gulf.

## FAISAL ISLAMIC BANK – SUDAN

313.   Faisal Islamic Bank of the Sudan is a subsidiary of the Islamic Investment Company of the Gulf. Faisal Islamic Bank of the Sudan is one of the founders of Al Shamal Islamic Bank, which was largely capitalized by Osama bin Laden.

314.   Faisal Islamic Bank of Sudan has long provided financial services and other forms of material support to al Qaida.

315.   During the 2001 trial of the al Qaida conspirators who conducted the 1998 African Embassy bombings in Kenya and Tanzania, Jamal Ahmed Al-Fadl, al Qaida's financial chief in Khartoum, Sudan, testified that al Qaida maintained accounts with the Faisal Islamic Bank of the Sudan.

316.   At all times material hereto, Faisal Islamic Bank of Sudan knew that al Qaida cells maintained accounts with the bank, and that those accounts were being used to launder and distribute funds for al Qaida operations and terrorist attacks.

317.   Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Faisal Islamic Bank continued to maintain those accounts. In doing so, Faisal Islamic Bank knowingly provided financial services and other forms of material support to al Qaida.

318.   As the forgoing demonstrates, Faisal Islamic Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

319.   The September 11th Attack was a direct, intended and foreseeable product of Faisal Islamic Bank's participation in al Qaida's jihadist campaign.

## AL SHAMAL ISLAMIC BANK

320. Al Shamal Islamic Bank (Al Shamal Bank) was established in the Republic of Sudan in or around 1983.

321. When Osama bin Laden relocated al Qaida's leadership structure to the Sudan in 1991, he invested heavily in businesses and infrastructure projects in the Sudan, in order to strengthen al Qaida's collaborative relationship with the ruling National Islamic Front regime. Bin Laden's extensive investment in the Sudan during this period is described in a 2002 Congressional Research Service Report as follows:

> In 1991, bin Laden relocated to Sudan with the approval of Sudan National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, [bin Laden] built a network of businesses including an Islamic bank (Al Shamal), an import/export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help Sudan build roads and airport facilities. The business in Sudan... enabled him to offer safe haven and employment in Sudan to al Qaida members, promoting their involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-US terrorism.

322. According to the State Department, bin Laden invested approximately $50 million in Al Shamal Bank. Other shareholders of Al Shamal Bank include defendant Saleh Abdullah Kamel, Omar Abdullah Kamel, al Baraka Investment and Development, Faisal Islamic Bank and the Sudanese Government.

323. According to published reports, Osama bin Laden remains the principal shareholder in Al Shamal Bank.

324. Al Shamal Bank has long provided financial services and other forms of material support to al Qaida.

325.    Al Shamal Bank has maintained accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF and al Haramain, among others.

326.    The accounts maintained by Al Shamal Bank, on behalf of the charities operating within al Qaida's infrastructure, have been used to transfer funds to al Qaida cells throughout the world.

327.    Al Shamal Bank also maintained accounts on behalf of, and invested capital in, many of the commercial enterprises established by Osama bin Laden in the Sudan to fund al Qaida's global operations, including:  Wadi al-Aqiq Company, Ltd.; Ladin International Company; Taba Investment Company, Ltd.; al-Hijrah for Construction and Development; and the Themar al Mubaraka Company.

328.    According to Al Shamal Bank's general manager, Mohammad S. Mohammad, Al Shamal also maintained three personal accounts for Osama bin Laden between 1992 and 1997.  Bin Laden wired al Qaida member Essam al Ridi $230,000 from one of those accounts to purchase a used jet in Arizona.  According to al Ridi, bin Laden wanted the plane to ship Stinger anti-aircraft missiles from Pakistan to Sudan.

329.    According to Jamal Ahmed Mohamed al Fadl, an al Qaida operative convicted in the 1998 bombings of the U.S. embassies in Kenya and Tanzania, al Qaida used accounts at Al Shamal Bank to finance terrorist operations, including the embassy attacks.  Al Fadl further testified that al Qaida operatives maintained accounts at the bank openly, and regularly received disbursements from accounts at the bank to fund their activities.

330.    Al Shamal Bank has long known that the accounts it maintained for Osama bin Laden, members of al Qaida, and many businesses and ostensible charities,