were being used to solicit and transfer funds to terrorist organizations, including al Qaida. Despite this knowledge, Al Shamal Bank has continued to maintain those accounts. In doing so, Al Shamal Bank knowingly provided financial services and other forms of material support to al Qaida.

331.    The transfer of funds to al Qaida through accounts maintained by the Al Shamal Bank has been facilititated by the direct involvement of several senior al Qaida officials in the bank's management and operation. Defendant Adel Abdul Jalil Batterjee serves as the Chairman of Al Shamal Islamic Bank. As discussed previously, Batterjee is a senior official of al Qaida, and has served as a chairman of BIF and WAMY. Batterjee's longstanding involvement in al Qaida's global operations is detailed at length in the U.S. government's Santiago proffer in the criminal prosecution of Enaam Arnaout.

332.    As the forgoing demonstrates, Al Shamal Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

333.    The September 11th Attack was a direct, intended and foreseeable product of Al Shamal Bank's participation in al Qaida's jihadist campaign.

## TADAMON ISLAMIC BANK

334.    Tadamon Islamic Bank is a Sudanese based banking institution, established in or around 1983.

335.    The shareholders of Tadamon Islamic Bank include al Baraka Investment and Development Corporation, Saleh Abdullah Kamel, National Company for Development and Trade, Dubai Islamic Bank and Faisal Islamic Bank of Sudan.

336.    Tadamon Islamic Bank has long provided financial services and other forms of material support to al Qaida.

337.   According to Jamal Ahmed Mohamed al Fadl, an al Qaida operative convicted in connection with the 1998 bombings of the U.S. embassies in Kenya and Tanzania, Tadamon Islamic Bank openly managed accounts of al Qaida operatives, including Abdouh al Mukhlafi, who served as Osama bin Laden's bodyguard while al Qaida's leadership structure was in the Sudan.

338.   Tadamon Islamic Bank is also a shareholder of Al Shamal Bank, another institution that has provided material support and sponsorship to al Qaida.

339.   At all times material hereto, Tadamon Islamic Bank was aware that al Qaida cells maintained accounts with the bank, and that those accounts were being used to launder and distribute funds for al Qaida operations and terrorist attacks.

340.   Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Tadamon Islamic bank continued to maintain those accounts.  In doing so, Tadamon Islamic Bank knowingly provided financial services and other forms of material support to al Qaida.

341.   As the forgoing demonstrates, Tadamon Islamic Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

342.   The September 11th Attack was a direct, intended and foreseeable product of Tadamon Islamic Bank's participation in al Qaida's jihadist campaign.

## DUBAI ISLAMIC BANK

343.   Dubai Islamic Bank is a financial institution headquartered in the United Arab Emirates, which holds significant equitable interests in Tadamon Islamic Bank, Al Shamal Bank and entities associated with al Baraka Bank.

344. Dubai Islamic Bank has long provided financial services and other forms of material support to al Qaida, including the transfer of financial resources to al Qaida operatives who participated in the planning and execution of the September 11th Attack and African Embassy bombings.

345. Investigations into the financing of the September 11th Attack have confirmed that Mustafa Ahmed al Hisawi, a senior al Qaida financial official, transferred funds from an account at the Dubai Islamic Bank to September 11th hijackers Marwan al Sheehi and Mohamed Atta.

346. Dubai Islamic Bank has long known that accounts it maintained were being used to to launder and distribute funds for al Qaida operations and terrorist attacks.

347. Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Dubai Islamic bank continued to maintain those accounts. In doing so, Dubai Islamic Bank knowingly provided financial services and other forms of material support to al Qaida.

348. Dubai Islamic bank has further sponsored al Qaida through its interest in Al Shamal Bank, Al Tadamon Bank and various al Baraka entities.

349. As the forgoing demonstrates, Dubai Islamic Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

350. The September 11th Attack was a direct, intended and foreseeable product of Dubai Islamic Bank's participation in al Qaida's jihadist campaign.

## ISLAMIC DEVELOPMENT BANK

351.    Islamic Development Bank formally began operations in 1975 under the rules of the organization of the Islamic Conference System, in accordance with the principles of Islamic *sharia*.

352.    Of the 54 national shareholders, Saudi Arabia is by far the largest, contributing 27.33% of the subscribed capital.

353.    Islamic Development Bank has allocated significant grants to several Islamic Centers in the United States, including the Al-Noor School in Brooklyn, New York, an institution which advocates Islamic extremism and jihad.

354.    In July of 1999, the Islamic Development Bank gave a grant of $250,000 for the Washington based Counsel on American Islamic Relations (CAIR) for refurbishment of its offices.  Since September 11, 2001, three CAIR officials have been indicted by the Federal Government on terrorist charges.  CAIR received a substantial portion of its initial seed money from the Holy Land Foundation for Relief and Development, an organization designated under Executive Order 13224 on December 4, 2001.  CAIR has also received assistance from WAMY.

355.    Through its funding of ostensible charities operating within al Qaida's infrastructure, Islamic Development Bank has long provided material support and resources to al Qaida.

356.    The September 11th Attack was a direct, intended and foreseeable product of Islamic Development Bank's participation in al Qaida's jihadist campaign.

## ARAB BANK, PLC

357.    Arab Bank, PLC is a financial institution headquartered in Egypt, with branch offices throughout the world, including offices in New York.

358.   Arab Bank has long provided financial services and other forms of material support to terrorist organizations, including al Qaida.

359.   Spanish investigators have confirmed that al Qaida transferred money to the Spanish logistical cell that funded the September 11th Attack through Arab Bank. Arab Bank accounts have also been used to distribute funds to al Qaida cells in other parts of the world.

360.   Arab Bank also maintains accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others.  The Kingdom of Saudi Arabia uses these accounts to fund al Qaida operations, and as the principal vehicle for supporting Palestinian suicide attacks.

361.   More recently, Israeli officials seized funds associated with several accounts maintained by Arab Bank on behalf of known Hamas fronts.  These accounts were identified to Israeli officials by Arab Bank employees, confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity.

362.   Arab Bank has long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations, including al Qaida.  Despite this knowledge, Arab Bank has continued to maintain those accounts.  In doing so, Arab Bank knowingly provided financial services and other forms of material support to al Qaida.

363.   As the forgoing demonstrates, Arab Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

364.    The September 11th Attack was a direct, intended and foreseeable product of Arab Bank's participation in al Qaida's jihadist campaign.

## SAUDI AMERICAN BANK

365.    Saudi American Bank is a financial institution headquarted in Riyadh, Saudi Arabia. Saudi American Bank was established by royal decree in 1980, and operates as an agency and instrumentality of the Kingdom of Saudi Arabia.

366.    Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including al Qaida.

367.    Saudi American Bank financed many of the projects undertaken by Osama bin Laden and al Qaida in the Sudan during the years that the al Qaida leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport. The Saudi Binladin Group and Mohamed Binladin Organization provided technical assistance on these projects.

368.    Through its participation in the projects undertaken by Osama bin Laden in Sudan, Saudi American Bank knowingly provided material support and resources to al Qaida.

369.    Saudi American Bank has maintained accounts for many of the ostensible charities that operate within al Qaida's infrastructure, including MWL, WAMY, IIRO and al Haramain, among others.

370.    In cooperation with the charities operating within al Qaida's infrastructure, Saudi American Bank advertises the existence and numerical designation of the accounts it maintains for those charities throughout the Muslim world, and provides a mechansim to allow al Qaida supporters to deposit funds directly into those accounts. Through this mechanism, Saudi American Bank facilities al Qaida's fundraising efforts.

371.    The accounts maintained by Saudi American Bank on behalf of the charities operating within the al Qaida's infrastructure, and in particular, accounts it maintained for IIRO, WAMY and al Haramain, have been used to transfer funds to al Qaida cells throughout the World.

372.    Saudi American Bank has long known that accounts it maintained for many ostensible charities were being used to solicit and transfer funds to terrorist organizations, including al Qaida. Despite this knowledge, Saudi American Bank has continued to maintain those accounts. In doing so, Saudi American Bank knowingly provided financial services and other forms of material support to al Qaida.

373.    Saudi American Bank also serves as the Saudi Arabia correspondent for many other banks within al Qaida's infrastructure, including Al Shamal Bank.

374.    As the forgoing demonstrates, Arab Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

375.    The September 11th Attack was a direct, intended and foreseeable product of Arab Bank's participation in al Qaida's jihadist campaign.

## AL QAIDA'S SPONSORS AND PARTNERS IN THE BUSINESS COMMUNITY

376.    Al Qaida has established numerous for-profit businesses throughout the world, to augment the funding it receives from its State sponsors, wealthy donors and the charities and banks operating within its infrastructure.

377.    Like al Qaida's charity and banking partners, these businesses operate as fully integrated components of al Qaida's financial and logistical infrastructure.

378.    While in Sudan, Osama bin Laden established numerous businesses to provide income for al Qaida's operations. These business ventures included: Wadi al

Aqiq Company, Ltd, a holding firm; Ladin International Company, an import/export concern; Taba Investment Company, Ltd., a currency trading firm; al-Hijrah for Construction and Development, a construction enterprise which performed several significant infrastructure projects on behalf of the ruling National Islamic Front; and the Themar al Mubaraka Company, an agricultural concern.

379.   Among the projects bin Laden's al-Hijrah Construction firm performed for the Sudanese Government were the construction of the Tahaddi Road linking Khartoum with Port Sudan, and the construction of a modern international airport near Port Sudan.

380.   Osama bin Laden's al-Hijrah Construction firm received significant support in relation to the projects it performed in Sudan from the Saudi Binladin Group, a Saudi Arabia conglomerate established by bin Laden's father, Mohamed bin Laden, and owned to this date by members of the bin Laden family, including Osama bin Laden.

381.   Saudi Binladin Group is run by Osama bin Laden's brother, Bakr bin Laden, and the board of directors includes Saleh Gazaz, Mohammed Baharuth, Abdullah bin Said, Mohammed Nur Rahimi, Tarek bin Laden, and Omar bin Laden.

382.   During the holy war against the Soviet occupation of Afghanistan, the Saudi Binladin Group materially assisted Osama bin Laden in his efforts to provide material suport to the mujihadeen fighters.

383.   After the Soviet Union withdrew from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for the Saudi Binladin Group. Between 1989 and 1991, while working for the Saudi Binladin Group, Osama bin Laden began establishing the infrastructure for his al Qaida network.

384.   When Osama bin Laden moved the al Qaida infrastructure to the Sudan in 1991, he continued to maintain a close relationship with the Saudi Binladin Group and the members of his family who controlled the conglomerate.

385.   Through its participation in the projects undertaken by Osama bin Laden in Sudan and support of the businesses Osama bin Laden established in that country, Saudi Binladin Group knowingly provided material support and resources to al Qaida.

386.   Al Qaida has established business enterprises to support its operations throughout Europe as well.

387.   Beginning in 1996, several members and sponsors of al Qaida developed a money laundering scheme involving Saudi and Spanish companies, in order to finance al Qaida operational cells in Europe, the Middle East and Asia.

388.   The entities operating within this network included defendants Mushayt for Trading Establishment, Proyectos Y Promociones Iso, Afamiasl Cobis, Abrash Company, Promociones Y Construcciones Tetuan Pricote S.A., Contratas Gioma, Eurocovia Obrassa, Mohammed Ali Sayeed Mushayt, Proyectos Y Promociones Paradise SL, Proyectos Edispan. The masterminds of this network of companies were Ghasoub al Abrash Ghalyoun and Muhammad Galab Kalaje Zouaydi, al Qaida's European financial chief.

389.   Zouaydi arrived in Madrid in 1998 from Jeddah, Saudi Arabia, where he had operated a trading and investment company called Mushayt For Trading Establishment. Upon arrival in Spain, he established or helped to establish several other companies, including a small housing and construction business.

390.   Money was filtered into the Spanish companies by wire transfer from Saudi Arabia, contributions from unidentified investors and cash deposits. According to

Spanish prosecutors, Mushayt for Trading Establishment sent nearly $700,000 to Spain between 1996 and 2001.

391.    The Spanish network of businesses provided income streams for al Qaida cells in Europe and the Middle East, including the German al Qaida cell which planned and carried out the September 11th Attack.

392.    Spanish investigators have confirmed that the Spanish network sent funds to Mahmoud Darkazanly and Abdul Fattah Zammar, two Syrian born businessmen who had close ties with the German al Qaida cell.  According to German officials, Darkazanly belonged to "the most intimate circle of Mohammad Atta."

393.    Transfers between the Spanish network, German al Qaida cell, Darkazanly and Zammar were laundered through the Al Rajhi Bank.

394.    The Spanish network also facilititated the preliminary filming of potential targets for the September 11th Attack, including the World Trade Center.  Ghasoub al Abrash Ghalyoun, Zouaydi's business partner, traveled to the United Stat4es in 1997 to film potential targets.

395.    In addition to providing funding for al Qaida's European cells, Mushayt for Trading Establishment sheltered and supported other Muslim radicals including Nabil Nanakli Kosaibati.  Kosaibati was convicted for terrorist activities within Yemen.  During his trial, he acknowledged that he was recruited and trained to use arms and explosives by the Saudi Intelligence Agency, and that Saudi Intelligence "sent him to Yemen in 1996 as an active Saudi Intelligence agent."  Kosaibati's testimony thus confirms the Kingdom of Saudi Arabia's direct participation in terrorist activity.

396.    As the foregoing demonstrates, the businesses established by al Qaida, and those with which it has partnered, have, for a period of many years and in diverse regions

throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

397.   The September 11th Attack was a direct, intended and foreseeable product of the participation of al Qaida's businesses and business partners in the terrorsit organization's jihadist campaign.

## KINGDOM OF SAUDI ARABIA, SAUDI ROYAL FAMILY AND SAUDI ELITES

398.   More than any other factor, al Qaida's phenomenal growth and development into a sophisticated global terrorist network were made possible by the massive financial, logisitcal and other support it received from the Kingdom of Saudi Arabia, members of the Saudi Royal Family, and prominent members of Saudi society.

399.   As further described herein, the Kingdom of Saudi Arabia has established, funded, managed, maintained, directed and controlled many of the ostensible charities and banks that operate within al Qaida's support infrastructure.  These agencies and instrumentalities of the Kingdom of Saudi Arabia have served as the primary vehicle for raising, laundering and distributing funds on behalf of al Qaida, since the organization's inception.  The vast majority of these funds have been provided by the Kingdom of Saudi Arbia and members of the Saudi Royal Family.  In addition, purported charities, operating as arms of the Kingdom, have provided arms, false travel documentation, physical assets and logistical support to al Qaida.  In many cases, the Kingdom of Saudi Arabia has appointed senior members of the al Qaida movement to high ranking positions within the charities it controlled, thereby providing a cover for their terrorist activity and facilitating the provision of material support and resources to al Qaida.  Al Qaida has planned and coordinated terrorist attacks from branch offices of the charities, including branches which operated from within Saudi embassies throughout the world.

400.   The Kingdom of Saudi Arabia and members of the Saudi Royal Family have known, for a period of many years, of the pervasive involvement of the Kingdom's charities and banks in funding and sustaining al Qaida's support infrastructure. In 1994, a French delegation led by French Interior Minister Charles Pasqua visited Saudi officials, including Saudi Minister of Interior Prince Naif, to discuss the French government's deep concerns regarding the pervasive involvment of the Saudi charities in the sponsorship and funding of terrorist organizations. In 1999 and again in 2000, U.S. officials visited Saudi Arabia to raise the same concerns.

401.   Despite these pleas from the international community, the Kingdom of Saudi Arabia continued to funnel enormous amounts of money and other resources to the charities supporting al Qaida's operations.

402.   As Osama bin Laden had publicly announced that his organization's principal objective was to wage war with the United States, and al Qaida had in fact conducted several attacks against U.S. interests over the years, it is clear that the Kingdom of Saudi Arabia and members fo the Royal Family knew and intended that the funding and support funneled to al Qaida through the charities and banks would be used to attack U.S. interests.

403.   The Kingdom of Saudi Arabia also used its relationship with the Taliban regime in Afghanistan as a tool for sustaining al Qaida between 1991 and 1996.

404.   During this time period, the Taliban regime openly harbored Osama bin Laden and the al Qaida leadership structure, and allowed al Qaida to maintain training camps throughout Afghanistan.

405.   The relationship between the Taliban and al Qaida was truly symbiotic. In exchange for the support it received from the Taliban, al Qaida helped to train and fought

alongside Taliban fighters in the conflict against the Northern Alliance, and the two organizations shared resources with one another.

406.    As a result of its support for al Qaida, the international community imposed sanctions on the Taliban. Despite that fact, the Kingdom of Saudi Arabia extended formal diplomatic relations to the Taliban, and provided funding and logistical support to sustain the regime.

407.    The Kingdom of Saudi Arabia knew and intended that the financial and logistical support it provided to the Taliban would materially benefit al Qaida, by virtue of the close relationship and near identity between the two organizations.

408.    Through its funding, management and operation of the charities and banks, and support of the Taliban regime, the Kingdom of Saudi Arabia has provided the very infrastructure that enabled al Qaida to grow from a small group of extremists into a highly sophisticated global terrorist network. The infrastructure, funding and other forms of material support provided by the Kingdom of Saudi Arabia, as described herein, have fueled al Qaida's growth and development, and sustained the organization since its inception.

409.    Absent the infrastructure, funding and other forms of material support provided by the Kingdom of Saudi Arabia, al Qaida would have remained a regional extremist organization, without the capacity to conduct large scale acts of terrorism on a global scale, such as the September 11th Attack.

410.    In addition to the support funneled to al Qaida through its state controlled banks and charities, ongoing investigations throughout the world have increasingly revealed that officials of the Saudi government have provided direct financial and logistical support to al Qaida cells in Europe and the United States, including al Qaida

members who participated directly in the planning, coordination and execution of the September 11th Attack.

411.    According to senior officials within the United States government, the Joint Congressional Inquiry into the September 11th attack revealed that a Saudi intelligence official named Omar al Bayoumi provided direct assistance to Kalid al-Midhar and Nawaf Al Hazmi, two of the September 11th hijackers.

412.    When al-Midhar and Al Hazmi arrived in Los Angeles, Al-Bayoumi, a Saudi citizen and prominent member of San Diego's Muslim community, traveled to Los Angeles to meet them. Immediately before doing so, Al-Bayoumi visited the Saudi consulate in Los Angeles. At the consulate, Al Bayoumi met with Fahad Al-Thumairy, a Saudi diplomat who was stripped of his diplomatic visa and later barred from the United States, based on suspected ties to terrorism.

413.    Following their meeting, Al-Bayoumi facilitated the future hijackers' settlement in the San Diego community, and paid two months rent for an apartment on their behalf.

414.    According to various sources, Al-Bayoumi is an intelligence agent of the Kingdom of Saudi Arabia. There is substantial credible evidence to support this conclusion. In or around 1994, Al-Bayoumi was hired by Dallah Avco, a division of the Dallah al-Baraka business group, to work on an aviation project commissioned by the Saudi government.

415.    Al-Bayoumi remained in the employment of Dallah Avco for the next seven years. For five of those seven years, the Saudi government reimbursed Dallah Avco for Al-Bayoumi's salary and Al-Bayoumi was considered a Saudi civil servant.

416.   Mysteriously, although the project for which Al-Bayoumi was allegedly hired was based in Saudi Arabia, Al-Bayoumi moved to the United States in August of 1994 and began taking English classes at San Diego State University's College of Extended Studies.

417.   Dallah Avco records indicate that, as of 1999, Dallah Avco sought to terminate Al-Bayoumi's annual employment contracts.  To that end, a Dallah Avco official wrote to the Saudi aviation authority saying "the company is not willing to renew the period for another year and we wish this to be known."

418.   In response, the aviation authority sent an urgent letter advising Dallah Avco that the Saudi government wanted Al-Bayoumi's contract renewed "as quickly as possible."

419.   Witnesses have reported that Al-Bayoumi had access to "seemingly endless" funds while in the United States.  In fact, despite the modest salary he was paid as a Dallah Avco employee, Al-Bayoumi was able to front $400,000 for the purchase of a mosque.

420.   The Joint Inquiry's investigation also revealed that Al-Bayoumi received monthly checks in January 1999 from Princess Haifa, wife of Prince Bandar, through an intermediary named Osama Basnan.  Some of the money Al-Bayoumi received from Princess Haifa ended up in the hands of the two September 11th hijackers.

421.   Ongoing investigations by German authorities into the Hamburg al Qaida cell that coordinated and planned the September 11th Attack have revealed that members of the Hamburg cell received direct support from Saudi officials as well.  In the course of their investigation of the German cell that planned and carried out the September 11th Attack, German officials uncovered evidence that members of the cell were in close and

regular contact with Muhammad Jaber Fakihi, the head of the Islamic Affairs Department of the Saudi Embassy in Berlin. The German authorities' efforts to investigate connections between Fakihi and Mounir Mutasedek, a senior member of the Hamburg cell, have been frustrated by the Saudi government, which has refused to cooperate in the investigation.

422.    Fakihi was instrumental in obtaining funding for the Al-Nur Mosque, which served as a meeting place, recruitment center and base of operations for al Qaida within Germany. In his official capacity as a minister of the Saudi government, Fakihi solicited and obtained funding for the Mosque from Saleh bin Abdulaziz Al-Ashaikh, the Saudi Minister of Islamic Affairs and chairman of al Haramain.

423.    As the foregoing demonstrates, the Kingdom of Saudi Arabia has, for many years and in diverse regions throughout the world, played a central and critical role in funding, facilitating and supporting al Qaida's global operations.

424.    Absent the material support and resources provided to al Qaida by the Kingdom of Saudi Arabia, al Qaida would have remained a regional extremist organization, incapable of conducting large scale acts of international terrorism.

425.    The September 11th Attack was a direct, intended and foreseeable product of the Kingdom of Saudi Arabia's participation in al Qaida's jihadist campaign.

426.    Several members of Saudi Arabia's Royal Family have played particularly integral roles in the sponsorship of al Qaida's operations, acting in both their official and personal capacities.

427.    Prince Sultan bin Abdulaziz al Saud (Prince Sultan) is the Second Deputy Prime Minister and Minister of Defense and Aviation of the Kingdom of Saudi Arabia. In addition, Prince Sultan is the Chairman of the Supreme Council for Islamic affairs,

established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia.

428.   Prince Sultan has long provided material support and resources to al Qaida.

429.   In his capacity as Chairman of the Supreme Council, Prince Sultan has known, for a period of many years, that Saudi-based charities were providing material support and resources to al Qaida.  Rather than intervening to stem the flow of money and support from the charities to al Qaida, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of al Qaida by those charities.

430.   In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of al Qaida's global operations, including the IIRO, MWL, WAMY and al Haramain Foundation.  In 1995, Dr. Ahmad Muhammad Ali, the then Secretary General of the MWL, publicly confirmed that much of the IIRO's funding was provided by Prince Sultan.  In 1998, Prince Sultan donated 5 million Saudi Riyals to a joint charity drive of the IIRO and Sanabel al-Kheer.  During a television fundraising campaign for the MWL, Prince Sultan donted 1 million Saudi Riyals.  In 2002, he dontated more than $250,000 to a joint fundraising drive of the IIRO, WAMY and al Haramain.

431.   At all times material hereto, Prince Sultan knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

432.   Through his official and personal acts, as described herein, Prince Sultan has provided critical financial and logistical support to al Qaida for a period of many years.

433.   Prince Naif bin Abdulaziz al Saud (Prince Naif) is the Saudi Minister of Interior.

434.   Prince Naif has long provided material support and resources to al Qaida.

435.   In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia, including the operations of the SJRC, MWL, IIRO, Saudi Red Crescent, WAMY and al Haramain Foundation.

436.   Between 1998 and 2000, while the SJRC was under the supervision and control of Prince Naif, the Kingdom of Saudi Arabia diverted $74 million to al Qaida members and loyalists through the SJRC.

437.   Prince Naif also heads the Saudi Committee for Relief to Afghans, a government body that oversees and coordinates the operations of several Saudi charities in Afghanistan, including al Haramain.  In this position, Prince Naif has channeled substantial financial and logistical support to sustain al Qaida's presence and operations in Afghanistan.

438.   As Minsiter of Interior, Prince Naif also is responsible for counter-terrorism coordination and implementation within the Kingdom.  Rather than using that authority to disrupt al Qaida's global operations, Prince Naif has used the position to protect al Qaida's support infrastructure.

439.   This conduct is not surprising given Prince Naif's documented history of sponsoring terrorist activity throughout the world.  For many years, he has served as the

head of the Saudi Committee for Support of the Al Quds Intifada, through which the Kingdom of Saudi Arabia has distributed literally millions of dollars to support and sponsor terrorist attacks in Israel and the Palestinian Territories.

440.    In addition, Prince Naif has denied al Qaida's responsibility for the September 11th Attack publicly.  Interviewed in November 2002, Prince Naif stated:

> We put big question marks and asked who committed the events of September 11[th] and who benefited from them . . . I think they [the Zionists] are behind these events . . . I cannot still believe that 19 youths, including 15 Saudis, carried out the September 11 attacks with the support of bin Laden and his al-Qa'ida organization.  It's impossible.  I will not believe that these people have the power to do so horrendous an attack.

441.    In a 2003 letter to Prince Bandar bin Abdul Aziz al Saud, Senator Charles Schumer asked that Prince Naif be replaced as Interior Minister, citing Prince Naif's "well-documented history of supporting terrorist financing and ignoring the evidence when it comes to investigating terrorist attacks on Americans."

442.    Prince Naif has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others.

443.    At all times material hereto, Prince Naif knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

444.    Through his official and personal acts, as described herein, Prince Naif has provided critical financial and logistical support to al Qaida for a period of many years.

445.   Prince Turki al-Faisal bin Abdulaziz al-Saud (Prince Turki) headed Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, and now serves as the Saudi ambassador to the United Kingdom.

446.   Prince Turki has long provided material support and resources to al Qaida.

447.   While under the direction of Prince Turki, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time, al Qaida and the Taliban maintained a symbiotic and mutually supportive relationship.

448.   Prince Turki knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would materially benefit al Qaida, by virtue of the close relationship and near identity between the two organizations.

449.   In his capacity as head of the Istakhbarat, Saudi intelligence officials under his supervision directly participated in the operations of terrorist organizations, including al Qaida. As set forth previously, Nabil Kosaibati, a member of the Spanish al Qaida cell, was recruited and trained to use arms and explosives by the Saudi intelligence service, while it was under the control of Prince Turki. Kosaibati was convicted for terrorist activities in Yemen, and confessed that Saudi intelligence "sent him to Yemen in 1996 as an active Saudi intelligence agent." Similarly, Omar Al-Bayoumi provided material support and assistance to two of the September 11th hijackers in his capacity as a representative of the Saudi intelligence service, while that agency was being directed by Prince Turki.

450.   In his capacity as the head of the Saudi intelligence service, Prince Turki also arranged a meeting between senior Iraqi intelligence officials and Osama bin Laden, and thereby helped to foster a collaborative relationship between Iraqi intelligence and al Qaida.

451.    Prince Turki has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others. In addition, Prince Turki has coordinated the sponsorship of al Qaida by several wealthy members of Saudi society.

452.    At all times material hereto, Prince Turki knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

453.    Through his official and personal acts, as described herein, Prince Turki has provided critical financial and logistical support to al Qaida for a period of many years.

454.    Prince Salman bin Abdul Aziz al Saud (Prince Salman) is the Mayor of Riyadh. Prince Salman founded the Saudi High Commission in 1992. By early 2001, the Saudi High Commission had raised 1.68 billion Riyals through a variety of fundraising mechanisms.

455.    Prince Salman has long provided material support and resources to al Qaida.

456.    When he founded the Saudi High Commission, Prince Salman fully intended that the organization would serve as a vehicle for funding and supporting Islamic militants in Bosnia, including elements of the al Qaida movement.

457.    During the ensuing years, Prince Salman knew that the Saudi High Commission was, in fact, supporting al Qaida's efforts in Bosnia. In September 2000, Prince Salman received a letter from a Bosnian association called the "Mothers of

Srebrenica and Podrinje" advising Prince Salman that funds donated to the Saudi High Commission were being improperly diverted.

458.    In October 2001, officials of the U.S. government raided the Sarajevo offices of the Saudi High Commission. During the raid, investigators found computer hard drives with photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole. Investigators also discovered files on pesticides and crop dusters, information about how to make fake State Department badges, and photographs and maps of Washington, marking prominent government buildings.

459.    Following the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities, stating:

> Members of the SFOR (stabilization forces) have on
> premises on the Saudi high commission relief for Bosnia
> and Herzegovina confiscated some documentation for
> which it can be claimed with certainty that it does not
> belong in the scope of work of a humanitarian organization
> . . .

460.    To this date, investigators have been unable to account for approximately $41 million donated to the charity.

461.    Prince Salman has donated substantial funds to several other charities that operate within al Qaida's infrastructure, including the IIRO, WAMY and al Haramain Foundation. In 1999, Prince Salman donated approximately $400,000 during a joint fundraising event of the IIRO, WAMY and al Haramain Foundation. In 1998, Prince Salman donated 1 million Saudi Riyals during a joint fundraising drive of the IIRO and Sanabel al-Kheer.

462.    In addition, Prince Salman has been instrumental in raising funds for charities within al Qaida's infrastructure from third parties. During a 1994 conference sponsored by the IIRO and Sanabel al-Kheer, Prince Salman publicly stated that he had personally raised more than 6 million Saudi Riyals for Sanabel and IIRO from wealthy Saudi citizens.

463.    At all times material hereto, Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

464.    Through his official and personal acts, as described herein, Prince Salman has provided critical financial and logistical support to al Qaida for a period of many years.

465.    Prince Abdullah al Faisal (Prince Abdullah) is a former official of the Saudi Ministry of Interior, and has served as the de facto ruler of Saudi Arabia since King Fahd's stroke in 1999. In addition to his role within the Saudi government, Prince Abdullah maintains significant business interests, including a controlling stake in al Faisal Group Holding Co., and its predecessor-in-interest, al Faisaliah Group. Al Faisal Group is the representative agent in Saudi Arabia of several international companies.

466.    In his capacity as de-facto head of the Kingdom of Saudi Arabaia, Prince Abdullah has consistently appointed al Qaida supporters and collaborators to head the charities controlled by the Kingdom. Prince Abdullah has done so in order to ensure that the charities would continue to serve as vehicles for sponsoring and sustaining terrorist organizations, including al Qaida.

467.   Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others.

468.   At all times material hereto, Prince Abdullah knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

469.   According to FBI records, September 11th hijacker Hani Saleh Hanjour maintained a registered address in Taif, Saudi Arabia, under the name of al Faisaliah. That address corresponds with the branch office of al Faisaliah Group in Taif.  This evidence thus establishes a direct link between Prince Abdullah's business concerns and one of the September 11th hijackers.

470.   There is substantial evidence that Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish al Qaida cell.  Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing al Qaida's activities in Europe, served for many years as Prince Abdulah's accountant.  During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdulah and Zouaydi maintained a business partnership.

471.   Through his official and personal acts, as described herein, Prince Abdullah has provided critical financial and logistical support to al Qaida for a period of many years.

472.   Prince Mohamed al Faisal al Saud (Prince Mohamed) has long provided material support and resources to al Qaida.

473.   Prince Mohamed served, for many years, as the CEO of Dar al Maal al Islami. Dar al Maal al Islami is the ultimate parent of Faisal Islamic Bank of the Sudan, one of the principal shareholders of the Al Shamal Bank. Prince Mohamed chairs both the Al Shamal Bank and Faisal Islamic Bank of the Sudan.

474.   In his capacity as chairman of Dar al Maal al Islami, Faisal Islamic Bank of the Sudan and Al Shamal Bank, Prince Mohamed has facilitated the material sponsorship of al Qaida by those entities, as further detailed herein.

475.   Prince Mohamed has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations as well, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC and al Haramain, among others.

476.   At all times material hereto, Prince Mohamed knew and intended that the contributions he made to IIRO, WAMY, MWL, Sanabel al-Kheer and al Haramain Foundation would be used to fund al Qaida's global operations and acts of international terrorism.

477.   Through his official and personal acts, as described herein, Prince Mohamed has provided critical financial and logistical support to al Qaida for a period of many years.

478   Prince Bandar bin Sultan bin Abdul Aziz al Saud (Prince Bandar) is the Ambassador of the Kingdom of Saudi Arabia to the United States.

479.   In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds to charities operating within al Qaida's infrastructure, including the IIRO.

480.   Prince Bandar has also contributed millions of dollars of his personal wealth to charities operating within al Qaida's infrastructure, including the IIRO.

481.   Federal authorities are currently investigating transactions involving Saudi embassy bank accounts with Riggs National Corporation, including personal accounts belonging to Prince Bandar and his wife, Princess Haifa. The investigation focuses on transactions totaling tens of millions of dollars in cash, that were not properly reported, and the possible funneling of those funds to terrorist organizations.

482.   Through his official and personal acts, as described herein, Prince Bandar has provided critical financial and logistical support to al Qaida for a period of many years.

483.   Al Qaida also has benefited immensely from the support and sponsorship of prominent members of Saudi society, who are closely affiliated with the Saudi Royal Family. As described herein, these individuals have used the tremendous wealth and authority conferred upon by them by virtue of their privileged status within Saudi society to fuel al Qaida's growth and development, and to support al Qaida's global jihad. While publicly portraying themselves as legitimate business leaders and generous benefactors of worthy charitable causes, these individuals are, in a very real sense, members of the al Qaida movement.

484.   Dr. Sulaiman bin Ali al-Ali (a/k/a Sulaiman Kabbara), is a wealthy Saudi businessman, a member of the IIRO Executive Committee, and a member of the Shura Council of the Kingdom of Saudi Arabia. Al-Ali invested approximately $10 million in

the U.S. based operations of the IIRO, which operated within the SAAR Network of companies established to support al Qaida's global operations. Al-Ali also served as a member of Sana-Bell, Inc. investment firm, and was responsible for executing and managing Sana-Bell's investments. In 1992, he gave over $2.1 million in Sana-Bell charitable assets to investment projects controlled by BMI, Inc., the New Jersey based investment firm established by Soliman Bihieri. As stated previously, Bihieri was indicted by federal prosecutors based on his material support and sponsorship of terrorist organizations, including al Qaida. During the period of time al-Ali controlled the investments of Sana-Bell, millions of dollars of donations disappeared without explanation. Through IIRO and Sana-Bell, al-Ali also invested heavily in Global Chemical Corporation. According to the Federal Bureau of Investigation, IIRO dispersed in excess of $1,000,000 to Global Chemical Corporation between 1993 and 1997. Based on IIROs's 1995 IRS form 990, al Ali's total investment in Global Chemical would appear to exceed $2 million. Global Chemical was intimately associated with Taibah International. On January 9, 1997, Global Chemical's Chicago headquarters were raided by FBI agents as part of an investigation into its involvement in money laundering, fraud, and possible ties to terrorist activities. Al-Ali was also affiliated with the Kuwait based Lajnet al-Dawa, a relief organization designated by the United States government under Executive Order 13224 based on its intimate affiliation with al Qaida. Al-Ali has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

485.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Sulaiman bin al-Ali has long provided material support and resources to al Qaida.

486.    Ibrahim Muhammad Afandi co-founded Sana-Bell, Inc.'s Washington, DC branch, along with defendant Saleh Kamel.  In addition to his affiliation with Sana-Bell, Inc., Afandi is a board member of the IIRO, the chairman of al-Afandi Establishment, the CEO of al-Afandi Germany, CEO of Sky Muzen Holding Co., BV, CEO of Saudi Industrial Services Company, Founder of the Great Saudi Development & Investment Co., founder of the Arabian Company for Development and Investment Limited, Chairman of the National Committee of Saudi Contractors, former general manager and shareholder of al-Amoudi Group, owner of Gang Ranch, Skylight Corporation and BSA Investments, and a partner in African Company of the Sudan, along with Al Rajhi Bank and Dallah al-Baraka.   Afandi is identified as one of al Qaida's principal financiers on the Golden Chain.  In his role as a member of the IIRO, he has actively participated in that ostensible charity's sponsorship of al Qaida's operations.  Afandi has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

487.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Ibrahim Muhammad Afandi has long provided material support and resources to al Qaida.

488.    Defendant Yassin al-Qadi is a Saudi national, who has long provided material support and resources to al Qaida.  Al-Qadi founded the Blessed Relief (Muwafaq) Foundation in Delaware in 1992, and ran the organization from 1992 through

1997. Blessed Relief was registered in the Channel Islands, and run from Jeddah, Saudi Arabia. The charity was endowed, in large part, by Khalid bin Mahfouz, head of the National Commercial Bank of Saudi Arabia. As set forth previously, the United States government designated al-Qadi and the Blessed Relief Foundation under Executive Order 13224 on October 12, 2001, based on their pervasive involvement in sponsoring al Qaida's operations. Al-Qadi is also the Vice President of the Saudi Arabian Company M.M. Badkook Co. for Catering and Trading, owned by Talal Mohammed Badkook, with whom al-Qadi co-founded the Blessed Relief Foundation. Al-Qadi is also the director of Global Diamond Resources, a company in which several members of Osama bin Laden's family have invested and served as officers. Al-Qadi is also a member of the Board of Directors of New Diamond Holdings. Along with Musa Abu Marzook, a prominent Hamas figure, al-Qadi financed the BMI, Inc. investment firm, incorporated in New Jersey by Soliman Bihieri. As set forth previously, a BMI accountant advised FBI officials that the funds he transferred overseas on behalf of BMI were used to finance the embassy bombings in Africa. Al-Qadi has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

489.   Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Yassin al-Qadi has long provided material support and resources to al Qaida.

490.   Defendant Dr. Jamal Barzinji is a Saudi national who has long provided material support and resources to al Qaida. Barzinji has served as a board member of the International Institute of Islamic Thought and WAMY. Barzinji was an officer of Safa Trust, Mar-Jac Poultry and SAAR Foundation, three entities within the SAAR Network.

In his capacity as President of Safa Trust, Barzinji held authority over eighteen (18) bank accounts for Safa entities. Barzinji is also a business associate of Yousef Nada and a trustee and officer of the Imana Mutual Funds Trust. Barzinji was also a board member of the American Muslim Council, headed by Abdurahman Alamoudi. According to federal authorities, Barzinji "committed and conspired to: transit money internationally for the purpose of promoting offenses against foreign nations involving murder or the destruction of property by means of explosive, fire, kidnapping or extortion...; provide material support or resources to foreign terrorist organizations...; and provide material support or conceal or disguise the source of ownership of material support intended for use in preparation for or in carrying out a terrorist act." Barzinji has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

491.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Barzinji has long provided material support and resources to al Qaida.

492.    Defendant Samir Salah was a founder of the Safa Trust, and an officer of several other companies within the SAAR Network. In addition, Salah helped establish Bank al Taqwa in the mid 1980s. Salah was also deeply involved with the operations of Taibah International. Salah has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

493.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Samir Salah has long provided material support and resources to al Qaida.

494.    Defendant Suleiman Abdel Aziz al Rajhi is a Saudi national who has long provided material support and resources to al Qaida. Al Rajhi is Chairman and Managing Director of al Rajhi Banking and Investment Corporation, and the primary financier of the SAAR Foundation and many of the organizations which operated within the SAAR Network of charities and businesses. Al Rajhi also serves on the board of directors of the IIRO. Al Rajhi is identified on the Golden Chain as one of al Qaida's principal financiers. Al Rajhi has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

495.    Al Rajhi has close ties to the Saudi Royal Family and government, as evidenced by the fact that several members of the Saudi Royal Family are employed by, or serve as officers of, businesses owned or controlled by al Rajhi. For example, Prince Mohammad bin Nayef bin Abdel Aziz al Saud, the Assistant Deputy Minister of the Interior of Saudi Arabia, serves as the Chairman of Al Rajhi Commercial Foreign Exchange. Abdallah bin Yahya al Muallimi, the Secretary General of the Jeddah Province, serves as board member in the same company. Prince Faisal Ibn Muhamad Ibn Saud is the Chairman of al Rajhi Yamama Cement Company. Prince Turki Ibn Muhamad Ibn Abdul Aziz Ibn Turki is a board member of al Rajhi Yamama Cement Company.

496.   Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Suleiman Abdel Aziz al Rajhi has long provided material support and resources to al Qaida.

497.   Khalid bin Mahfouz is a wealthy Saudi national, and one of al Qaida's principal individual financiers.  For many years, bin Mahfouz owned a controlling interest in National Commercial Bank, and served as President and CEO of that institution.  While under his control, National Commercial Bank provided extensive financial services and other forms of material support to al Qaida, as described herein. Bin Mahfouz also endowed the Blessed Relief Foundation, founded by Yassin al-Qadi. Khalid bin Mahfouz's son, Abdulrahman bin Mahfouz, served as Director of the Blessed Relief Foundation.  When he endowed the Blessed Relief Foundation, Khalid bin Mahfouz specifically knew that it was established to serve as a vehicle for funding and otehrwise supporting terrorist organizations, including al Qaida.  As stated previously, the U.S. government designated the Blessed Relief Foundation under Executive Order 13224, based on its extensive involvement in al Qaida's global operations.  Khalid bin Mahfouz is also intimately associated with the International Development Foundation, another charity operating within al Qaida's support infrastructure.  Khalid bin Mahfouz is identified on the Golden Chain as one of al Qaida's principal financiers, and has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

498.   Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Khalid bin Mahfouz has long provided material support and resources to al Qaida.

499.    Sheikh Adel Abdul Batterjee is a wealthy Saudi businessman, a senior al Qaida official and one of that terrorist organization's principal individual financiers. Batterjee's longstanding involvement in al Qaida's global operations is detailed at length in the U.S. government's Santiago proffer in the Enaam Arnaout prosecution. Batterjee is the current Chairman of Al Shamal Bank, and one of its largest shareholders. Under Batterjee's direction, Al Shamal Bank has provided extensive financial services and other forms of material support to al Qaida, as further discussed herein. Batterjee has also served as a senior official of BIF and Secretary General of WAMY. Through those positions, Batterjee directly supported al Qaida's global operations. Batterjee has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

500.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Sheikh Adel Abdul Batterjee has long provided material support and resources to al Qaida.

501.    Saleh Abdullah Kamel is a wealthy Saudi businessman and one of al Qaida's principal individual financiers. Kamel is a shareholder in Al Shamal Bank and Tadamon Islamic Bank, and Chairman of al Baraka Financial Institution. As further discussed herein, all three of those institutions are deeply involved in providing financial services and other forms of material support to al Qaida. Saleh Kamel also co-founded the U.S. branch of Sana-Bell, Inc., an enterprise established to provide revenues to sustain the U.S. operations of the IIRO. In founding Sana-Bell, Inc., Saleh Kamel knew and intended that it would be used as a vehicle for funding terrorist organizations, including al Qaida, through IIRO and the SAAR Network. Kamel is identified on the

Golden Chain as one of al Qaida's principal financiers, and has made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks.

502.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Saleh Kamel has long provided material support and resources to al Qaida.

503.    Youssef Jameel is a wealthy Saudi businessman and CEO of Abdul Lateef Jameel Group. Jameel is identified on the Golden Chain as one of al Qaida's principal financiers, and has made substantial contributions to many of the charities operating within al Qaida's infrastructure, including a one time contribution of 8 million Sauid Riyals to support the Saudi Red Crescent. Jameel contributed to the charities operating within al Qaida's infrastructure with full knowledge that the contributed funds would be used to support al Qaida's operations and terrorist attacks.

504.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Saleh Kamel has long provided material support and resources to al Qaida.

505.    Bakr bin Laden is Osama bin Laden's brother, and the head of Saudi Binladin Group. Under Bakr bin Laden's control, Saudi Binladin Group has provided substantial material support and assistance to al Qaida, as further detailed herein. Bakr bin Laden is identified on the Golden Chain as one of al Qaida's principal financiers, and has made substantial contributions to many of the charities operating within al Qaida's infrastructure. Bakr bin Laden was one of the largest single donors to a 1992 fundraiser for the IIRO, which raised 19 million Saudi Riyals for Bonsian "relief" efforts. Bakr bin

Laden contributed to the charities operating within al Qaida's infrastructure with full knowledge that the contributed funds would be used to support al Qaida's operations and terrorist attacks.

506.    Through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Bakr bin Laden has long provided material support and resources to al Qaida.

507.    Abdullah bin Laden is Osama bin Laden's nephew, and the founder of the U.S. branch of WAMY. Abdullah bin Laden served as President of WAMY's U.S. operations for many years. As further discussed herein, the U.S. branch of WAMY operated within the SAAR Network as a vehicle for funding and otherwise sponsoring al Qaida's global operations.

508.    Through his involvement with WAMY and other charities and individuals operating within al Qaida's infrastructure, Abdullah bin Laden has long provided material support and resources to al Qaida.

## SUDAN

509.    The Republic of Sudan (Sudan) has long provided material support and resources to al Qaida, including para-military training, indoctrination, money, travel documentation, safe passage and refuge.

510.    Defendant Sudan openly harbored defendant Osama bin Laden and many top al Qaida lieutenants between 1991 and 1996. During that time, as further described above, the Sudanese government permitted Osama bin Laden to establish al Qaida training camps, set up front companies to move assets and generate new revenues, and to use the cloak of Sudan's state sovereignty to shield al Qaida's operations.

511.    In 1996, the Sudanese government permitted Osama bin Laden to move to Afghanistan, where he was welcomed as an honored guest of the ruling Taliban government, rather than surrendering him to international authorities for prosecution.

512.    Defendant Sudan continues to harbor members of the al Qaida terrorist network, as well as members of affiliated FTOs, and has recently permitted al Qaida and other associated terrorist organizations to re-establish training camps within Sudan, and to otherwise use Sudan as a base to organize their operations and support compatriots elsewhere.

513.    In addition to its extensive direct support of al Qaida, defendant Sudan has long provided material support and resources to defendants Egyptian Islamic Jihad and Hezbollah.

514.    By virtue of its merger with Egytpian Islamic Jihad, and affiliation with Hezbollah, al Qaida has materially benefited from Sudan's sponsorship of those FTOs.

515.    As the forgoing demonstrates, the Sudan has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

516.    The September 11th Attack was a direct, intended and foreseeable product of the Sudan's participation in al Qaida's jihadist campaign.

**SYRIAN ARAB REPUBLIC**

517.    Defendant Syrian Arab Republic (Syria) has long provided material support and resources to al Qaida.

518.    According to the U.S. government, Syria has provided safe haven, financial and logistical assistance, training facilities and political support for Hezbollah. In addition, Syria has for many years facilitated weapons shipments from Iran to

Hezbollah. As set forth above, Hezbollah is, in effect, an agency and instrumentality of the Syrian government.

519.    By virtue of its affiliation with Hezbollah, al Qaida has materially benefited from Syria's sponsorship of that FTO.

520.    Between 1992 and 2003, defendant Syria continually purchased crude oil from defendant Iraq, in violation of United Nations Security Council resolutions and sanctions programs designed to inhibit Iraq's ability to use funds derived from the sale of Iraq's natural resources to promote international terrorism and pursue the development of weapons of mass destruction. Through its state controlled bank, Syria assisted Iraq in laundering revenues realized by Iraq through the illegal oil sales, and through other illicit activities.

521.    Syria's violations of the United Nations Security Council resolutions and sanctions programs, as described above, enabled Iraq to maintain and expand its terrorist sponsorship programs, including its provision of material support and resources to al Qaida and affiliated FTOs, persons, organizations, commercial entities and other parties.

522.    Defendant Syria knew, or should have known, that al Qaida and affiliated FTOs, persons, organizations, commercial entities and other parties would materially benefit from Syria's illegal crude oil purchases from Iraq, and from the assistance Syria provided to Iraq in laundering revenues from the illegal oil sales and other illicit activities.

523.    As the forgoing demonstrates, Syria has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

524. The September 11th Attack was a direct, intended and foreseeable product of Syria's participation in al Qaida's jihadist campaign.

## THE ISLAMIC REPUBLIC OF IRAN

525. Defendant Islamic Republic of Iran (Iran) has long provided material support and resources to al Qaida.

526. According to United States intelligence reports, the relationship between Iran and al Qaida dates to the early 1990's, when al Qaida officials met with Iranian intelligence officials to establish an anti-American partnership.

527. According to the testimony of a former member of the Iranian Ministry of Information and Security, Iran provided direct support to al Qaida in relation to the 1996 bombing attack on the U.S. military base in Dahran, Saudi Arabia. The joint participation by Iran and al Qaida in that operation strengthened their relationship, and prompted increased Iranian support for al Qaida's operations.

528. Later that same year, a delegation from al Qaida led by Saif al Adel came to Iran to discuss the establishment of an al Qaida base in the region between Iran and Afghanistan. As a result of those meetings, Iran and al Qaida agreed to establish a joint base for training of al Qaida and Hezbollah militants.

529. In or around this same time, Saif al Adel moved to Iran, and began coordinating al Qaida operations from the sanctity of Iran's borders.

530. Shortly before September 11, 2001, members of al Qaida leadership, including Saad bin Laden, met with Iranian officials to secure a safe place of retreat for the future al Qaida leadership following the September 11th Attack. The U.S. government has confirmed that Saad bin Laden and several other senior al Qaida officials

retreated to Iran from Afghanistan in the wake of the Septmeber 11th Attack, and are being harbored by Iran to this day.

531.    Iran permits those al Qaida officials to use the cloak of Iran's state sovereignty to shield al Qaida's operations, including the recruitment of new members, training of terrorist cells, and coordination, planning and funding of terrorist attacks throughout the world.

532.    In addition to its extensive direct support of al Qaida, defendant Iran has long provided material support and resources to Egyptian Islamic Jihad, Salafist Group for Call and Combat and Hezbollah.  As set forth above, Hezbollah is, in effect, an agency and instrumentality of the Iranian government.

533.    By virtue of its merger with Egytpian Islamic Jihad, and affiliation with Salafist Group for Call and Combat and Hezbollah, al Qaida has materially benefited from Iran's sponsorship of those FTOs.  Indeed, according to the testimony of Ali Mohamed, a U.S. green beret who pleaded guilty to conspiring with defendant Osama bin Laden to bomb U.S. embassies in Africa, Iran used Hezbollah to supply explosives and explosives training to al Qaida operatives.

534.    As the forgoing demonstrates, Iran has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

535.    The September 11th Attack was a direct, intended and foreseeable product of Iran's participation in al Qaida's jihadist campaign.

## REPUBLIC OF IRAQ

536.     The Republic of Iraq has long provided material support and resources to al Qaida.

537.     According to the U.S. government, defendant Iraq has harbored senior members of the al Qaida terrorist network. Iraq permitted those al Qaida operatives to use the cloak of Iraq's state sovereignty to shield al Qaida's operations, including the recruitment of new members, training of terrorist cells, and coordination, planning and funding of terrorist attacks throughout the world.

538.     At all times material hereto, defendant Iraq operated terrorist training camps within its borders, at which defendant Iraq provided training to members of various terrorist organizations, including members of the al Qaida terrorist network. One such camp was equipped with a commercial airliner fuselage, used by defendant Iraq to train terrorist operatives, including al Qaida members, in hijacking techniques and procedures.

539.     As the forgoing demonstrates, Iraq has, for a period of many years, provided critical financial and logistical support to al Quida in relation to that terrorist organization's global jihad.

540.     The September 11th Attack was a direct, intended and foreseeable product of Iraq's participation in al Qaida's jihadist campaign.

## PLAINTIFFS' INJURIES

541.     At the time of the September 11th Attack, plaintiff Federal provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit A hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of

Exhibit A.[1]  In accordance with the terms of the applicable policies of insurance, plaintiff Federal has made payments to the insureds identified in Exhibit A in an aggregate amount in excess of $1,305,520,292.20, as set forth in greater detail in Column D of Exhibit A, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Federal is subrogated to its insureds' rights of recovery against any responsible third parties.

542.   At the time of the September 11th Attack, plaintiff Pacific Indemnity provided property insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit B hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit B.[2]  In accordance with the terms of the applicable policies of insurance, plaintiff Pacific Indemnity has made aggregate payments to the insureds identified in Exhibit B in an amount in excess of $9,542,008.43, as set forth in greater detail in Column D of Exhibit B, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments, plaintiff Pacific Indemnity is subrogated to its insureds' rights of recovery against any responsible third parties.

543.   At the time of the September 11th Attack, plaintiff Chubb Custom provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit C hereto, relative to the property and/or business interests located at the corresponding addresses identified in Column B of Exhibit C.[3]  In accordance with the terms of the applicable policies of

---

[1]   Exhibit A is expressly incorporated herein by reference.
[2]   Exhibit B is expressly incorporated herein by reference.
[3]   Exhibit C is expressly incorporated herein by reference.

insurance, plaintiff Chubb Custom has made payments to the insureds identified in Exhibit C in an aggregate amount in excess of $612,585, as set forth in greater detail in Column D of Exhibit C, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Chubb Custom is subrogated to its insureds' rights of recovery against any responsible third parties.

544.    At the time of the September 11th Attack, plaintiff Chubb Indemnity provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit D hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit D.[4] In accordance with the terms of the applicable policies of insurance, plaintiff Chubb Indemnity has made payments to the insureds identified in Exhibit D in an aggregate amount in excess of $3,771,622.01, as set forth in greater detail in Column D of Exhibit D, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Chubb Indemnity is subrogated to its insureds' rights of recovery against any responsible third parties.

545.    At the time of the September 11th Attack, plaintiff CICC provided insurance coverage to the corporations, affiliations, companies, partnerships, persons, trusts and other parties identified in Column A of Exhibit E hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit E.[5] In accordance with the terms of the applicable policies of insurance, plaintiff CICC has made payments to the insureds identified in Exhibit E in an aggregate amount

---

[4]    Exhibit D is expressly incorporated herein by reference.
[5]    Exhibit E is expressly incorporated herein by reference.

in excess of $44,547,557.24, as set forth in greater detail in Column D of Exhibit E, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff CICC is subrogated to its insureds' rights of recovery against any responsible third parties.

546.    At the time of the September 11th Attack, plaintiff CICNJ provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit F hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit F.[6] In accordance with the terms of the applicable policies of insurance, plaintiff CICNJ has made payments to the insureds identified in Exhibit F in an aggregate amount in excess of $410,681.69, as set forth in greater detail in Column D of Exhibit F, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff CICNJ is subrogated to its insureds' rights of recovery against any responsible third parties.

547.    At the time of the September 11th Attack, plaintiff Great Northern provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit G hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit G.[7] In accordance with the terms of the applicable policies of insurance, plaintiff Great Northern has made payments to the insureds identified in Exhibit G in an aggregate amount in excess of $598,504,108.30, as set forth in greater

---

[6]     Exhibit F is expressly incorporated herein by reference.
[7]     Exhibit G is expressly incorporated herein by reference.

detail in Column D of Exhibit G, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Great Northern is subrogated to its insureds' rights of recovery against any responsible third parties.

548. At the time of the September 11th Attack, plaintiff Vigilant provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit H hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit H.[8] In accordance with the terms of the applicable policies of insurance, plaintiff Vigilant has made payments to the insureds identified in Exhibit H in an aggregate amount in excess of $41,545,872.30, as set forth in greater detail in Column D of Exhibit H, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Vigilant is subrogated to its insureds' rights of recovery against any responsible third parties.

549. At the time of the September 11th Attack, plaintiff Zurich provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit I hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit I.[9] In accordance with the terms of the applicable policies of insurance, plaintiff Zurich has made payments to the insureds identified in Exhibit I in an aggregate amount in excess of $783,686,766.26, as set forth in greater detail in Column D of Exhibit I, and expects that it will make additional payments in the future, in compensation for damages

[8]    Exhibit H is expressly incorporated herein by reference.
[9]    Exhibit I is expressly incorporated herein by reference.

resulting from the September 11th Attack.  By virtue of its payments to its insureds,
plaintiff Zurich is subrogated to its insureds' rights of recovery against any responsible
third parties.

550.    At the time of the September 11th Attack, plaintiff American Guarantee
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit J hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit J.[10]  In accordance with the terms of the applicable policies of
insurance, plaintiff American Guarantee has made payments to the insureds identified in
Exhibit J in an aggregate amount in excess of $44,407,749.17 as set forth in greater detail
in Column D of Exhibit J, and expects that it will make additional payments in the future,
in compensation for damages resulting from the September 11th Attack.  By virtue of its
payments to its insureds, plaintiff American Guarantee is subrogated to its insureds'
rights of recovery against any responsible third parties.

551.    At the time of the September 11th Attack, plaintiff American Zurich
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit K hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit K.[11]  In accordance with the terms of the applicable policies of
insurance, plaintiff American Zurich has made payments to the insureds identified in
Exhibit K in an aggregate amount in excess of $2,356,183.61 as set forth in greater detail
in Column D of Exhibit K, and expects that it will make additional payments in the
future, in compensation for damages resulting from the September 11th Attack.  By virtue

---

[10]     Exhibit J is expressly incorporated herein by reference.
[11]     Exhibit K is expressly incorporated herein by reference.

of its payments to its insureds, plaintiff American Zurich is subrogated to its insureds'
rights of recovery against any responsible third parties.

552.   At the time of the September 11th Attack, plaintiff Assurance of America
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit L hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit L.[12]  In accordance with the terms of the applicable policies of
insurance, plaintiff Assurance of America has made payments to the insureds identified
in Exhibit L in an aggregate amount in excess of $2,417,600.19 as set forth in greater
detail in Column D of Exhibit L, and expects that it will make additional payments in the
future, in compensation for damages resulting from the September 11th Attack.  By virtue
of its payments to its insureds, plaintiff Assurance of America is subrogated to its
insureds' rights of recovery against any responsible third parties.

553.   At the time of the September 11th Attack, plaintiff Colonial American
provided insurance coverage to the corporations, companies, partnerships, affiliations,
persons, trusts and other parties identified in Column A of Exhibit M hereto, relative to
property and/or business interests located at the corresponding addresses identified in
Column B of Exhibit M.[13]  In accordance with the terms of the applicable policies of
insurance, plaintiff Colonial American has made payments to the insureds identified in
Exhibit M in an aggregate amount in excess of $21,400, as set forth in greater detail in
Column D of Exhibit M, and expects that it will make additional payments in the future,
in compensation for damages resulting from the September 11th Attack.  By virtue of its

---

[12]    Exhibit L is expressly incorporated herein by reference.
[13]    Exhibit M is expressly incorporated herein by reference.

payments to its insureds, plaintiff Colonial American is subrogated to its insureds' rights of recovery against any responsible third parties.

554.    At the time of the September 11th Attack, plaintiff Fidelity provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit N hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit N.[14]  In accordance with the terms of the applicable policies of insurance, plaintiff Fidelity has made payments to the insureds identified in Exhibit N in an aggregate amount in excess of $1,636,903.02 as set forth in greater detail in Column D of Exhibit N, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Fidelity is subrogated to its insureds' rights of recovery against any responsible third parties.

555.    At the time of the September 11th Attack, plaintiff Maryland provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit O hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit O.[15]  In accordance with the terms of the applicable policies of insurance, plaintiff Maryland has made payments to the insureds identified in Exhibit O in an aggregate amount in excess of $448,063.19, as set forth in greater detail in Column D of Exhibit O, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its

---

[14]    Exhibit N is expressly incorporated herein by reference.
[15]    Exhibit O is expressly incorporated herein by reference.

payments to its insureds, plaintiff Maryland is subrogated to its insureds' rights of recovery against any responsible third parties.

556.   At the time of the September 11th Attack, plaintiff Northern provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit P hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit P.[16] In accordance with the terms of the applicable policies of insurance, plaintiff Northern has made payments to the insureds identified in Exhibit P in an aggregate amount in excess of $1,288,908.39 as set forth in greater detail in Column D of Exhibit P, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its payments to its insureds, plaintiff Northern is subrogated to its insureds' rights of recovery against any responsible third parties.

557.   At the time of the September 11th Attack, plaintiff Steadfast provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit Q hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit Q.[17] In accordance with the terms of the applicable policies of insurance, plaintiff Steadfast has made payments to the insureds identified in Exhibit Q in an aggregate amount in excess of $392,783.63, as set forth in greater detail in Column D of Exhibit Q, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack.  By virtue of its

---

[16]   Exhibit P is expressly incorporated herein by reference.
[17]   Exhibit Q is expressly incorporated herein by reference.

payments to its insureds, plaintiff Steadfast is subrogated to its insureds' rights of recovery against any responsible third parties.

558.   At the time of the September 11th Attack, plaintiff Valiant provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit R hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit R.[18]  In accordance with the terms of the applicable policies of insurance, plaintiff Valiant anticipates that it may make payments to the insureds identified in Exhibit R in an aggregate amount in excess of $3,500, as set forth in greater detail in Column D of Exhibit R, and expects that it will make additional payments in the future in compensation for damages resulting from the September 11th Attack.  By virtue of any such payments to its insureds, plaintiff Valiant will become subrogated to its insureds' rights of recovery against any responsible third parties.

559.   At the time of the September 11th Attack, plaintiff One Beacon, through policies of insurance issued by One Beacon or by its predecessors in interest, General Accident, Commercial Union and CGU, provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit S hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit S.[19]  In accordance with the terms of the applicable policies of insurance, plaintiff One Beacon has made payments to the insureds identified in Exhibit S in an aggregate amount in excess of $185,805,247.79, as set forth in greater detail in Column D of Exhibit S, and expects that it will make additional payments in the future, in compensation for damages resulting from the

---

[18]   Exhibit R is expressly incorporated herein by reference.
[19]   Exhibit S is expressly incorporated herein by reference.

September 11th Attack. By virtue of its payments to its insureds, plaintiff One Beacon is subrogated to its insureds' rights of recovery against any responsible third parties.

560. At the time of the September 11th Attack, plaintiff Crum & Forster provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit T hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit T.[20] In accordance with the terms of the applicable policies of insurance, plaintiff Crum & Forster has made payments to the insureds identified in Exhibit T in an aggregate amount in excess of $44,300.08, as set forth in greater detail in Column D of Exhibit T, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its payments to its insureds, plaintiff Crum & Forster is subrogated to its insureds' rights of recovery against any responsible third parties.

561. At the time of the September 11th Attack, plaintiff North River provided insurance coverage to the corporations, companies, partnerships, affiliations, persons, trusts and other parties identified in Column A of Exhibit U hereto, relative to property and/or business interests located at the corresponding addresses identified in Column B of Exhibit U.[21] In accordance with the terms of the applicable policies of insurance, plaintiff North River has made payments to the insureds identified in Exhibit U in an aggregate amount in excess of $3,405,966.77, as set forth in greater detail in Column D of Exhibit U, and expects that it will make additional payments in the future, in compensation for damages resulting from the September 11th Attack. By virtue of its

---

[20]  Exhibit T is expressly incorporated herein by reference.
[21]  Exhibit U is expressly incorporated herein by reference.