EXHIBIT B

1

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | . | Case No. CR03-48-N |
| | . | |
|     Plaintiff, | . | |
| | . | Boise, Idaho |
|     vs. | . | March 11, 2003 |
| | . | 10:15 a.m. |
| SAMI OMAR AL-HUSSAYEN, | . | |
| | . | (Testimony of Michael Gneckow) |
|     Defendant. | . | |
| | . | |

. . . . . . . . . . . . . .

VOLUME I OF II
DETENTION HEARING
BEFORE THE HONORABLE MIKEL H. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:          MR. KIM R. LINDQUIST
                            MR. TERRY DERDEN
                            MS. STEPHANIE PELL
                            United States Attorney's Office
                            877 West Main Street, Suite 201
                            Boise, Idaho  83702

For the Defendant:          MR. DAVID Z. NEVIN
                            MR. SCOTT McKAY
                            Nevin, Herzfeld, Benjamin & McKay
                            P.O. Box 2772
                            Boise, Idaho  83701


COURT RECORDER:             TRANSCRIPTION BY:

Verlene Nelson             CANYON TRANSCRIPTION
U.S. District Court        P.O. Box 387
                           Caldwell, Idaho  83606


Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

2

Exhibit B.txt

I N D E X

| GOVERNMENT WITNESS: | PAGE | LINE |
|---|---|---|
| GNECKOW, Michael James | | |
| Direct Examination by Mr. Lindquist | 3 | 11 |
| Cross-Examination by Mr. Nevin | 134 | 14 |

E X H I B I T S

| GOVERNMENT EXHIBITS: | PAGE | LINE |
|---|---|---|
| GX 3 - List of Web Sites | | |
| Admitted | 37 | 6 |
| GX 4 - Synopsis of Events | | |
| Admitted | 122 | 18 |
| GX 5 through 15 - Photographs | | |
| Admitted | 50 | 7 |
| GX 14 - Photograph | | |
| Withdrawn | 52 | 7 |
| GX 16 through 94 - Photographs and Graphic Images | | |
| Admitted | 65 | 15 |
| DEFENDANT'S EXHIBITS: | | |
| DX A, B, C - Articles of "Seattle PI" | | |
| Admitted | -- | -- |
| DX E - Letter of Muslim Student Association | | |
| Admitted | 185 | 15 |

3

Exhibit B.txt
```
 1                    (Proceedings in progress.)

 2              MR. LINDQUIST:  And with that, Your Honor, we would

 3    have Michael Gneckow testify.

 4              COURT:  Come forward and be sworn.

 5              (MICHAEL JAMES GNECKOW is sworn.)

 6              CLERK: State your full name and spell your last name.

 7              WITNESS:  Full name is Michael James Gneckow.  The

 8    last name is spelled G-n-e-c-k-o-w.

 9              COURT:  You may proceed.

10              MR. LINDQUIST:  Thank you.

11                         DIRECT EXAMINATION

12    QUESTIONS BY MR. LINDQUIST:

13    Q.  You are a special agent with the FBI; is that correct?

14    A.  That is correct, sir.

15    Q.  And have been for how many years?

16    A.  For almost seven years, sir.

17    Q.  And your present duty station is where?

18    A.  The Coeur d'Alene, Idaho Resident Agency.

19    Q.  Can you give us an idea of just generally and briefly what

20    your present responsibilities are there?

21    A.  As special agent in the Coeur d'Alene RA, I'm also assigned

22    to the Inland Northwest Joint Terrorism Task Force.  My

23    responsibility is to investigate crimes that deal with both

24    domestic and international terrorism as well as other felony

25    crimes under Title 18.
```

                                                                      4

```
 1    Q.  We'll chat here in a moment about the international

 2    terrorism aspect of your responsibilities but first, prior to
```

Exhibit B.txt

3    becoming an FBI agent, were you a police officer?

4    A.   No, sir, but I was in federal law enforcement for

5    approximately ten years.

6    Q.   How so?

7    A.   I was a special agent with the Naval Criminal Investigative

8    Service and was assigned to various offices around the world.

9    Q.   Can you give us an idea of what you did in that capacity?

10   A.   As a special agent with the Naval Criminal Investigative

11   Service, it was my responsibility to investigate felony crimes

12   as they relate to Department of Navy personnel.

13   Q.   Did that also have to do with international terrorism at

14   times?

15   A.   Yes, sir, it did.  A large portion of what the Naval

16   Criminal Investigative Service does is deal with force

17   protection issues overseas, investigation of counter-

18   intelligence and international terrorism matters.

19   Q.   With that background, let's talk a bit about international

20   terrorism.  Of course the charges in this case relate to visa

21   fraud and false statements; is that correct?

22   A.   That is correct.

23   Q.   But your understanding is those charges are made within the

24   context of international terrorism; is that right?

25           MR. NEVIN:  I object to misleading.

5

1           COURT:  I'll overrule the objection at this point for

2    foundation purposes.

3           WITNESS:  The question again, please?

Page 4

Exhibit B.txt

4    BY MR. LINDQUIST:

5    Q.   Those charges are made within the context of international

6    terrorism; is that correct?

7    A.   That is correct, sir.

8    Q.   Can you give us an idea just the concept of international

9    terrorism?  What does it mean from your perspective given what

10   you've told us about your duties?

11   A.   Well, international terrorism and terrorism in general is

12   generally used as a political tool used by organizations or

13   individuals in order to pursue or foster their own political

14   agenda.

15   Q.   Is this -- I'm sorry.

16   A.   I'm sorry.  Using terror as a political weapon.

17   Q.   And does that terror necessarily include violence?

18   A.   Yes, sir.  Well, not necessarily includes violence but most

19   times it does.

20   Q.   Are you familiar with the term "stateless nation" with

21   regard to terrorism?

22   A.   Yes, sir, I am.

23   Q.   What does that mean?

24         MR. NEVIN:  Judge, I'll object to the relevance of

25   this.

                                                              6

1          COURT:  Response?

2          MR. LINDQUIST:  The relevance is the -- as I've stated

3    and as Agent Gneckow has testified is that these charges were

4    made within the context of international terrorism.  We're

5    laying the foundation for that and it is particularly pertinent

Exhibit B.txt

6   for this Court's determination of whether or not the defendant

7   should be released pending trial.

8          COURT:   I'll overrule the objection.

9          WITNESS:   A stateless nation is a term that is

10  frequently used with international terrorism organizations.

11  The reason for that is because, most frequently, terrorist

12  organizations are not bound within the context of a regular

13  country or nation as we know it.   Rather international

14  terrorist organizations is generally made up from individuals

15  from various nations, from various countries and nationalities.

16  Therefore, the term "stateless nation" is in reference to a

17  group or rather organization that makes up the terrorist

18  organization itself.

19  BY MR. LINDQUIST:

20  Q.   Does international terrorism as you've described it have a

21  philosophical basis?

22  A.   Yes, it does.

23  Q.   Generally speaking, what is that philosophical basis as it

24  exists currently?

25  A.   Well, philosophically, I suppose the international

                                                              7

1   terrorism attempts to pursue through its own means pushing its

2   political or philosophical agenda where frequently you have a

3   clash of cultures and philosophies will frequently clash as

4   well and many times terrorism or terrorist acts are in

5   furtherance of a certain philosophy.

6   Q.   And in this particular case, does that have anything to do

Exhibit B.txt

7  with the religion of Islam?

8  A.   Yes, it does.

9  Q.   How so?

10 A.   When we talk about the religion of Islam in the context of

11 international terrorism, it's important to note that we're not

12 talking about anything other than a very strict minority; a

13 minority of extremists that use the religion of Islam as a

14 rationale for their terrorist activities.

15 Q.   And does that radical Islam have any particular perception

16 of the west, particularly the United States?

17 A.   Yes, it does.

18 Q.   What is that?

19 A.   Radical Islam, that espoused by the extremist factions of

20 Islam, view the United States and the west in general as a

21 threat to their own culture.   Any presence of the west,

22 particularly in the form of military troops, military presence

23 is perceived as being against the extremist tenets of Islam.

24 Q.   As a nation, albeit without geographical boundaries,

25 stateless if you will, is there nonetheless a need for members

8

1  or a reality of having members of that issue (inaudible)?

2  A.   Yes, absolutely.

3  Q.   And is there also an aspect -- a financial aspect to it?

4  A.   Yes, most definitely.

5  Q.   How so?

6  A.   As with any organization, any country, any nation, it has

7  to have finances.   It has to have infrastructure in order to

8  operate.

Exhibit B.txt

9    Q.   Okay.  Are there organizational needs?

10   A.   Yes.

11   Q.   How so?

12   A.   Well, it's necessary for there to be at least a hierarchy.

13   There needs to be members.  There needs to be infrastructure.

14   There needs to be leadership.  So just like with a regular

15   country itself, there has to have -- there has to be a certain

16   hierarchy, communications, logistics.  Just a regular

17   infrastructure of any sort of organization.

18   Q.   Does recruitment of constituents or members play a role in

19   that phenomenon?

20   A.   Most importantly.  As a stateless nation with no actual

21   borders, with no actual civilian population to recruit from,

22   recruitment -- the recruitment tool or the recruitment methods

23   used are extremely important because this organization has to

24   draw new members from a variety of different nationalities,

25   from a variety of different areas.  So recruitment is most

9

1    definitely an important aspect of that.

2    Q.   Is education and indoctrination an aspect of that

3    recruitment?

4    A.   Yes.

5    Q.   How so?

6    A.   It's important in the recruitment phase for an organization

7    for that organization or that stateless nation to educate

8    prospective recruits.  Generally young -- young men, young

9    persons to educate them as to the ideals of the movement and

Exhibit B.txt

10   then once they're educated, then to further indoctrinate those

11   prospective recruits.

12   Q.   Is organization of those recruits also a factor?

13   A.   Yes, it is.

14   Q.   Motivation of them?

15   A.   Yes, most definitely.

16   Q.   And as far as any particular activities, instruction and

17   direction, is that also part of that phenomenon that you're

18   addressing?

19   A.   Yes.

20   Q.   Generally speaking, do computers play a role in what you've

21   just been talking about?

22   A.   Computers play an amazingly important role.  In today's --

23   in today's day and age with technology the way that it is,

24   communication is just so vastly important.  The world --

25   computers and the internet specifically have allowed the world

10

1   to essentially be shrunken down to much smaller than it ever

2   was and the internet allows everyone, including terrorist

3   organizations, to be able to communicate to the widest audience

4   possible.

5   Q.   So generally speaking, it is therefore a mechanism of

6   recruitment and indoctrination; is that correct?

7   A.   Yes, it is.

8   Q.   And motivation and direction as far as activities

9   associated with that indoctrination?

10   A.   Yes, sir.

11   Q.   Talking about that infrastructure associated with

Exhibit B.txt

12    international terrorism, does that relate to the infrastructure
13    of the United States in any way?
14    A.   It does.   I believe that the infrastructure of the United
15    States provides a great forum for organizations to come to our
16    country, to take advantage of our rules, our civil liberties
17    and to be able to recruit completely unimpeded.   Many of the
18    countries that members of terrorist organizations belong to are
19    often times oppressive and being able to get out and exercise
20    sessions where lectures can be shared, sometimes very violent
21    lectures would not be tolerated in many other countries.   Our
22    country does allow that to take place.
23    Q.   That international terrorist infrastructure then utilizes
24    the U.S. infrastructure; is that right?
25    A.   Yes, it does.

                                                                      11

1    Q.   Is there a money aspect of that?
2    A.   Most definitely.
3    Q.   How so?
4    A.   The United States is a very affluent country and most
5    citizens in the United States want to provide donations.   They
6    want to support worthy causes.   It's a terrific forum for
7    organizations to come to the United States, solicit donations
8    that are ostensibly portrayed as being for good causes when in
9    many cases, that's not the case.
10    Q.   Well, let's talk about that.   Do these particular entities
11    have a generic name?
12    A.   Probably the most common form that these entities take is

Exhibit B.txt

13  in the form of charitable organizations.

14  Q.  By -- what do you mean by a charitable organization within

15  the context of what you're testifying to?

16  A.  Well, charitable organizations are nonprofit organizations

17  that purport to solicit funds, solicit donations and then in

18  turn provide some sort of service to the community at large, to

19  the world at large, whether that be in the form of feeding the

20  hungry, sheltering the homeless or providing any sort of

21  support, whether that be religious, cultural and so forth.

22  Q.  From the standpoint of international terrorism, however,

23  are those charitable organizations based upon your experience

24  sometimes used otherwise?

25  A.  Yes.

                                                              12

1  Q.  How?

2  A.  What we have discovered through lengthy investigations is

3  that in many cases, these charitable organizations do provide a

4  service worldwide.  They do clothe and feed and shelter but

5  we've also found that portions of the money that the donors

6  intend for the purposes that I've just stated are actually

7  siphoned off to more diabolical sort of ends.

8  Q.  That relates to international terrorism directly; is that

9  correct?

10  A.  That is correct.

11  Q.  And you will be testifying to us today about several of

12  those organizations within the context of this case; is that

13  right?

14  A.  Yes, sir.

Exhibit B.txt

15  Q.   Universities.   Do universities factor into the utilization

16  by international terrorism of the U.S. infrastructure?

17  A.   That is correct.

18  Q.   Based upon your experience generally speaking, how is that

19  so?

20  A.   Universities are -- there's a couple of ways that

21  universities are actually utilized.   One is that in my

22  discussions with fellow agents from the INS, the Immigration

23  and Naturalization Service, I've learned that perhaps the most

24  easy way to gain access and protracted stays in the United

25  States is through the receipt of student visas -- F-1 student

13

1  visas.

2         Universities are also a wonderful environment, based

3  on the academics that are shared there, for foreign nationals,

4  including those tied to terrorism, to come and learn from some

5  of our best instructors, some of our best professors some

6  highly technological sort of fields and many of those

7  potentially can be used against us.

8  Q.   You've already mentioned computer technology generally with

9  regard to international terrorism.   Does that also factor

10  specifically into international terrorism's utilization of the

11  American infrastructure?

12  A.   Most definitely.

13  Q.   How is that?

14  A.   And this goes back to our discussion a few moments ago

15  about the computers and the use of the internet by

Exhibit B.txt

16  organizations including terrorist organizations.  The computer

17  is not only a vehicle for massive communication but it's also

18  potentially a weapon.  And terrorist organizations recognize

19  that and are -- it's an important facet of their education to

20  be able to learn computer expertise, to maintain web sites, to

21  be able to maintain this infrastructure of communication world

22  wide.

23  Q.  And this particular case, as you will testify to, addresses

24  some of those issues specifically, universities, charitable

25  organizations and computer technology within the context of

14

1  terrorism; is that right?

2  A.  Yes, sir.

3  Q.  Let's talk about a particular aspect of international

4  terrorism.  Are you familiar with the term Al Quaida?

5  A.  Yes, sir, I am.

6  Q.  What does Al Quaida refer to?

7  A.  Al Quaida is a well known international terrorist

8  organization who's -- they're -- the person they look to for

9  leadership is embodied in the form of Usama Bin Laden.  It was

10  something that was created more or less in 1988 as a result

11  of -- in the aftermath let's say of the Russian invasion of

12  Afghanistan.

13  Q.  And so Usama Bin Laden played a particular role in its

14  creation; is that correct?

15  A.  Yes, he did.  He and others.

16  Q.  And others; is that right?

17  A.  That is correct.

Exhibit B.txt

18    Q.   In addition to some that you will be testifying about in

19    this particular case, in particular two radical Saudi sheikhs;

20    is that correct?

21    A.   That's correct, sir.

22    Q.   And their names are?

23    A.   Their names are Salman Al-Ouda and Safar Al-Hawali.

24    Q.   Can you give us an idea of in recent history some violent

25    events associated with Al Quaida, conducted by Al Quaida if you

15

1    will?

2    A.   Yes, sir.

3         MR. NEVIN:   I object to the relevance.   We're not

4    going to hear that Sami has had contact with Mr. Usama Bin

5    Laden or that he supports his beliefs or any of it.   It's

6    surely to sensationalize the situation.   It's not relevant to

7    this detention hearing.

8         COURT:   Response?

9         MR. LINDQUIST:   Counsel errs.   There will be testimony

10    that the defendant has direct contact with individuals directly

11    associated with Mr. Bin Laden and does espouse and support Mr.

12    Bin Laden's beliefs and activities.   There will be evidence of

13    that.

14         COURT:   All right.   I'll overrule the objection at

15    this time.   (Inaudible) I'm assuming all this information now is

16    general background information in the broadest context.   It

17    will be up to the Government through the presentation of their

18    evidence today to show a connection between the broad

Exhibit B.txt

19  principles or things going on and tie into whether or not this

20  defendant either is a danger to the community or constitutes a

21  risk of flight.  There will have to be that tie made, that

22  evidence presented.

23          MR. LINDQUIST:  Very well.

24          COURT:  With that caveat, I'll overrule the objection.

25          MR. LINDQUIST:  Thank you.

16

1  BY MR. LINDQUIST:

2  Q.  Let's just mention briefly some of the incidents associated

3  with Al Quaida.

4  A.  The most recent incidence -- and please keep in mind there

5  are many incidents.  In August of 1998, Al Quaida was

6  responsible and claimed responsibility for the bombings of the

7  U.S. embassies in Kenya and Tanzania. In October of 2000, the

8  USS Cole was attacked by a small boat laden with explosives.

9  Again, Al Quaida took responsibility for that attack and of

10  course most recently as most people remember, there were the

11  attacks of September 11, 2001 on the World Trade Center and the

12  Pentagon.

13  Q.  What is Jihad in relation to what you're testifying to now?

14  A.  Well, the Jihad that I am going to refer to and it takes

15  many forms is armed Jihad and that is violence against those

16  who are enemies of Islam.

17  Q.  And does that relate to Al Quaida?

18  A.  Yes, it does.

19  Q.  How just briefly?

20  A.  Al Quaida promotes, supports -- supports in the form of

Page 15

Exhibit B.txt

21   training, logistical support, et cetera, armed Jihad against
22   those who it perceives as being enemies of Islam.
23   Q.   Agent Gneckow, you've talked about the infrastructure of
24   international terrorism, Mr. Bin Laden as a leadership
25   component of that.   With regard to the search warrant affidavit

                                                                    17

1    I mentioned earlier, you heard me mention that, correct?
2    A.   Yes, I did.
3    Q.   Are you familiar with that search warrant affidavit?
4    A.   Yes, I am.
5    Q.   How are you familiar with it?
6    A.   I was principally responsible for preparing the affidavit
7    although I was not the affiant on it.
8    Q.   And for logistical reasons, you were not the affiant
9    presented directly to the Court but you in effect were the --
10   one of the sources or the authors of that, correct?
11             MR. NEVIN:   Objection.   Misleading.
12             COURT:   I'll overrule the objection for foundation.
13             WITNESS:   That is correct.
14   BY MR. LINDQUIST:
15   Q.   And in that search warrant affidavit, specifically at
16   paragraph 9, you reference statements attributable to Usama Bin
17   Laden as it relates to this Jihad -- the instigation of
18   violence, the international terrorism as it relates to the
19   United States and utilization of its infrastructure; is that
20   correct?
21   A.   That is correct.

                              Page 16

Exhibit B.txt

22  Q.  And as an aspect of that, there's a component in there that

23  is -- that relates to (inaudible); is that right?

24  A.  Yes.

25  Q.  Explain that very briefly as background for this particular

18

 1  statement associated with him.

 2  A.  Martyrdom is something that's extremely important.  Suicide

 3  operations, for example, are not something that he's done

 4  lately.  There are conditions that must be met prior to

 5  conducting such an operation and if those conditions are met,

 6  then the individual who conducts the suicide operation can

 7  achieve martyrdom.  Martyrdom is essentially a better life -- a

 8  better life after death.

 9  Q.  The quotation attributable to Mr. Bin Laden in paragraph 9

10  of the search warrant affidavit is referred to as his

11  declaration of war; is that correct?

12  A.  That is correct.

13  Q.  And it was found on a web site; is that right?

14          MR. NEVIN:  Object to it as leading.

15          COURT:  I'll overrule the objection for foundation.

16          WITNESS:  Yes.  The affidavit states that it was found

17  on a web site.

18  BY MR. LINDQUIST:

19  Q.  And the quotation attributable to him is recited in full in

20  that paragraph that the Court has; is that right?

21  A.  I'm sorry.  The question again?

22  Q.  That quote that's attributable to him is stated in full in

23  that particular paragraph; is that correct?

Exhibit B.txt

24   A.   Actually, I think this is just a portion.

25   Q.   Or a segment of it; is that right?

19

1    A.   A segment, yes.

2    Q.   But it is a full quote of a segment of that declaration of

3    war; is that right?

4    A.   That's correct.

5    Q.   Just synopsize for us, if you will, what it is that Bin

6    Laden is proclaiming here in this declaration of war by means

7    of this web site without taking the time to read it because the

8    Court has the text.  Just synopsize it for purposes of your

9    testimony.

10   A.   Well, essentially, the text is -- is urging on operations

11   by the youths because it states that our youths believe in

12   paradise after death.  This is a component of martyrdom.  He

13   says in here -- it says in here that they will receive a

14   reward.  They will go to heaven, forgiveness for all of

15   their -- all their sins for lack of a better term.

16   Q.   So this is that motivation associated with terrorism?

17            MR. NEVIN:  Object to it as leading.

18            COURT:  Yes.  I'll sustain the objection.  So the

19   record it clear, while I understand that the web sites will be

20   an issue in this hearing, this one is not connected with this

21   defendant; is that correct?

22            MR. LINDQUIST:  Not directly, that is correct.

23            COURT:  All right.

24   BY MR. LINDQUIST:

Exhibit B.txt
25    Q.    Paragraph 10 refers to another web site publication, does

20

1     it not?

2     A.    Yes, it does.

3     Q.    And in that particular publication that's quoted there, one

4     term -- a particular term is used by Bin Laden in relation to

5     terrorism; is that right?

6     A.    That is correct.

7     Q.    What's that term?

8     A.    The term there is instigate and I think that's a very

9     important term used on this --

10    Q.    Why is that important in this context?

11    A.    When we talk about terrorism in a general sense, it's not

12    just one or two individuals out there but rather it is -- it is

13    a large infrastructure; the stateless nation we referred to

14    before.   And an important component of that is the instigation

15    to commit acts.   The instigation to just act by itself which is

16    a component along with the recruitment, the indoctrination, the

17    education and as you proceed down this path, you eventually get

18    to the point where you're instigated to take action.

19    Q.    Paragraph 11 refers to a quote from a "Time" magazine

20    interview with Bin Laden; is that correct?

21    A.    That is correct.

22    Q.    Is also refers to instigation, does it not?

23    A.    Yes, it does.

24    Q.    Just read that bolded portion of that that refers to

25    instigation as it's found down in the affidavit.

Exhibit B.txt

21

1   A.   Well, the bolded portion reads, "If instigation for Jihad
2   against the Jews and the Americans is considered to be a crime,
3   then let history be a witness that I am a criminal.   Our job is
4   to instigate and by the grace of God, we did that and certain
5   people responded to this instigation."
6   Q.   Paragraph 12 references what?
7   A.   Paragraph 12 is the claim of responsibility by Usama Bin
8   Laden following the September 11 attacks.
9   Q.   Okay.   And does it bear some relationship to his
10  declaration of war and its reference to motivating youths to
11  perform these acts?
12  A.   Yes, it does.   That seems to be a constant thing in this is
13  the motivation of the youths, those that are being targeted for
14  recruitment.
15  Q.   There is a particular term in that first paragraph that is
16  significant, is it not, with regards to these activities --
17  these violent activities?
18  A.   And you're referring to the term "operations"?
19  Q.   Yes.   Why is that significant?
20  A.   Consistently through much of the literature that we read,
21  much of the investigative efforts that we take, the term
22  "operations" is a consistent -- is a consistent term when we're
23  dealing with violent Jihad.
24  Q.   Is there a connection between -- you've already referenced
25  that there is a connection between Bin Laden and the two

Exhibit B.txt

22

1  radical sheikhs that you've mentioned, Al-Ouda and Al-Hawali;
2  is that correct?
3  A.   That's correct.
4  Q.   Generally speaking, what is that association or what is
5  that connection?
6  A.   Sheikh Al-Hawali and Sheikh Al-Ouda, they were termed in
7  the early 1990's as two of the awakening sheikhs.  They took a
8  very radical stance against the Saudi government, a radical
9  stance against western interests inside Arabia and against the
10  west and the United States in general.  Many of the tenets that
11  they have espoused are the same tenets espoused by Usama Bin
12  Laden and in fact, Usama Bin Laden in many of his publications
13  or interviews makes clear reference to Al-Hawali and Al-Ouda as
14  spiritual leaders of the movement.
15  Q.   As a matter of fact, in Bin Laden's declaration of war,
16  does he not reference both of these two men?
17  A.   Yes, he does.
18  Q.   In what context?
19  A.   At the time of the declaration of war which occurred in
20  August of 1996, both Al-Hawali and Al-Ouda were imprisoned in
21  Saudi Arabia by the Saudi government for the radical preachings
22  against the Saudi government.  Usama Bin Laden frequently took
23  it upon himself to make references to the two sheikhs, Al-Ouda
24  and Al-Hawali demanding their release, making statements about
25  how wrongfully they were imprisoned, things of that nature.

23

Exhibit B.txt

1  Q.   Is there public source information that indicates that Bin

2  Laden's turning towards violence more prolifically had

3  something to do with Al-Ouda and Al-Hawali?

4  A.   Yes.   There are some academics out there who believe that

5  as a result of the imprisonment of Al-Ouda and Al-Hawali, Usama

6  Bin Laden took a more violent turn.

7  Q.   Historically, have these two radical sheikhs, Al-Hawali and

8  Al-Ouda been outspoken in their proclamations of Jihad,

9  terrorism and violence against the west, particularly the

10  United States?

11  A.   Yes.   In fact, one of the sheikhs even made Jihad -- his

12  violent Jihad statements prior to the Gulf War, circa 1990.

13  Q.   And that was directed directly towards the United States;

14  is that correct?

15  A.   The United States and the west.

16  Q.   And the west.   Do these radical sheikhs talk about

17  martyrdom and suicide operations in conjunction with the

18  message that they proclaim?

19  A.   Frequently.   Many of their statements are very similar in

20  nature to the ones we referred to from Usama Bin Laden.

21  Q.   Do these two sheikhs also utilize web sites in conjunction

22  with their publications and proclamations?

23  A.   Most definitely.

24  Q.   Generally speaking, how so?

25  A.   Both of the sheikhs and others as well utilize the

24

Exhibit B.txt

1   internet, utilize various web sites to preach their form of
2   radical Islam to the widest audience possible.
3   Q.   Now, you mentioned a moment ago that Bin Laden made some
4   statements regarding the release of these two individuals from
5   imprisonment; is that correct?
6   A.   That is correct.
7   Q.   Would you explain that, their imprisonment and how that
8   relates to that statement?
9   A.   There were -- immediately prior and I think this is the
10  answer to your question.   Immediately prior to the embassy
11  bombings in 1998, there were some -- there were three letters
12  that were --
13  Q.   We'll go to that here in just a moment.
14  A.   Okay.
15  Q.   What I'm -- what I'm referring to is the arrest and release
16  of -- these two sheikhs were ultimately arrested; is that
17  correct?
18  A.   Oh, that is correct, yes.
19  Q.   By what authority, what country?
20  A.   They were arrested in 1994 by the Saudi Arabian government.
21  Q.   There are some particular dates associated with that event?
22  A.   Yes, there are.
23  Q.   Tell us about those dates and the significance of them.
24  A.   On September 11, 1994, Sheikh Al-Ouda and possibly Sheikh
25  Al-Hawali -- but definitely Sheikh Al-Ouda was called before

                                                              25


1   the Saudi ministry of the interior and was ordered to no longer
2   preach his -- or to no longer continue preaching against the
                          Page 23

Exhibit B.txt

3      Saudi ruling government.  Al-Ouda refused -- refused to sign a

4      declaration that was provided to him by the ministry and was

5      subsequently arrested as was Al-Hawali.

6      Q.   Approximately how long were the two imprisoned; do you

7      know?

8      A.   I believe they were released in 1999.

9      Q.   You were going to mention something about the embassy

10     bombings that related to these two men; is that correct?

11     A.   That is correct.

12     Q.   What about that?  Tell us about that.

13     A.   Immediately prior to the embassy bombings in 1998, there

14     were three letters that were faxed to three different media

15     outlets in Europe claiming responsibility for the bombings.  In

16     two of the letters, there were specific conditions that were

17     laid out as to how the violence would stop.  One of the

18     conditions -- and it was -- essentially the same condition in

19     each of these two letters called for the release of Sheikh

20     Al-Hawali, Sheikh Al-Ouda and the (inaudible) sheikh imprisoned

21     in the United States for the 1993 World Trade Center bombings.

22     Q.   Was there a similar demand made in conjunction with another

23     bombing in Saudi Arabia?

24     A.   Yes.

25     Q.   Tell us about that bombing briefly and the circumstances

26

1      associated with it.

2      A.   In 1995, there was a bombing of a National Guard armory --

3      or a National Guard facility in Saudi Arabia.  There was a fax

Page 24

Exhibit B.txt

4    to CNN claiming responsibility for that particular attack and

5    in that attack, it claimed that this act was in retaliation for

6    the imprisonment of Al-Hawali and Al-Ouda.

7    Q.   Another event that I would like you to address regarding a

8    house or a facility associated with Al Quaida, a search of that

9    and things found that related to the Sheikh Al-Ouda.

10   A.   Post 9/11 during a search of a former Bin Laden house in

11   Afghanistan, there were tapes of Sheikh Al-Ouda that were found

12   in the house.

13   Q.   And the tapes dealt with what generally speaking?

14   A.   They were generally motivational speeches, talking about

15   Jihad, talking about -- basically motivational sort of

16   speeches.  Lectures.

17   Q.   All right.  And finally in that regard, you mention that

18   these two sheikhs utilized web sites; is that correct?

19   A.   That is correct.

20   Q.   Are you familiar with a particular interview of Sheikh

21   Al-Ouda by a New York Times correspondent where web sites were

22   specifically discussed?

23   A.   Yes, I am aware of that.

24   Q.   And prior to discussing a web site, give us an idea of the

25   tenor of that interview and what it was that Al-Ouda was

                                                              27

1    expressing with regard to suicide attacks.

2    A.   Essentially what Al-Ouda was saying during this interview

3    with the New York Times was that suicide operations are

4    acceptable under certain conditions.  The conditions were

5    things to the effect of -- that you're at war, that the attack

Exhibit B.txt

6   takes place against the enemy, that innocents are not targeted,

7   things like that.  There were a series of conditions that had

8   to be met before a suicide operation was acceptable.

9   Q.   Was there a discussion of the justification of suicide

10  operations philosophically?

11  A.   Yes.

12  Q.   Generally speaking, what was the philosophical

13  justification?

14  A.   Well, the justification to Al-Ouda was suicide operations

15  are fine because this is war.

16  Q.   In particular, internet web site was referenced by Sheikh

17  Al-Ouda in that interview; is that correct?

18  A.   That is correct.

19  Q.   And that web site is what?

20  A.   That web site is Islam Today.

21  Q.   And does that particular web site bear on your

22  investigation of the defendant in this particular case,

23  generally speaking?

24  A.   Yes, it does.

25  Q.   And how so generally speaking does it bear on the

28

1   defendant?

2   A.   Our investigation has looked into numerous web sites that

3   the defendant has been involved in, one of which is Islam

4   Today.

5   Q.   Let's talk about the defendant from a prospective of your

6   investigation and this information is also contained in the

Page 26

Exhibit B.txt

7    affidavit as you know.   The defendant began his studies here in

8    the United States, at least as far as your investigation is

9    concerned, where?

10   A.   He actually began working on his master's degree at Ball

11   State University in Muncie, Indiana on or about August, 1994.

12   Q.   And from there, his studies took him where?

13   A.   He received his master's degree at Ball State.   Returned to

14   Saudi Arabia and a couple years later came back to the United

15   States as a J-1 -- on a J-1 visa which he's got a student visa,

16   an F-1 student visa.   A J-1 visa is an exchange visitor as I

17   understand it from my INS counterparts.   And at that time, he

18   was at Southern Methodist University and was providing -- was

19   acting as a visiting professor I believe, something to that

20   effect.

21   Q.   And that's spelled out in paragraph 16 of that affidavit;

22   is that correct?

23   A.   That is correct.

24   Q.   Ultimately, the defendant ended up at the University of

25   Idaho, correct?

                                                                    29

1    A.   That is correct.

2    Q.   How did that come about?

3    A.   The defendant made application to the University of Idaho

4    for acceptance into the Ph.D. program for computer science.

5    Q.   And ultimately began studying there; is that right?

6    A.   That's correct.   In the spring semester of '99 if I

7    remember right.

8    Q.   And information that corresponds to that is found in

Exhibit B.txt

9   paragraph 17; is that right?

10  A.   That is correct.

11  Q.   Let's talk about the University of Idaho computer program.

12  Have you looked into that as part of your investigation at

13  least to a certain extent?

14  A.   Yes, sir, I have.

15  Q.   First of all, what was the focus of the defendant's

16  doctoral dissertation?

17  A.   The focus is on computer security, intrusion defense

18  methodology, things of that nature.

19  Q.   Generally speaking, what did -- what does the University of

20  Idaho program have to offer as far as advanced computer

21  studies?

22  A.   The University of Idaho was designated by the National

23  Security Agency in 1998 or 1999 as a center for excellence with

24  regard to their computer science program.  They have at least

25  one extremely competent person on their faculty who is renowned

30

1   throughout government circles as being a forefront of computer

2   security, instrusion detection techniques and so on.  And as a

3   result of the University of Idaho's designation as a center for

4   excellence, they were able to apply for and receive grants from

5   the federal government to be part of the federal government's

6   cybercorps program.

7   Q.   And what's the significance of that as far as projects or

8   activities involved in at the University of Idaho?

9   A.   As both a center for excellence and as having cybercorps

Exhibit B.txt

10    program at the university, it enabled the university to work on

11    sensitive sometimes classified projects on behalf of the

12    federal government.

13    Q.   Did your investigation reveal that there were limitations

14    necessarily associated with that?

15    A.   Yes.   The program at the University of Idaho as I

16    understand it has both the CSDS program which is the center

17    for -- I probably don't have the exact name.   But it works

18    alongside with the cybercorps program in essentially teaching

19    students both sets of programs the same methodology with regard

20    to computer security, instrusion detection, et cetera.   The

21    cybercorps portion of the program is a scholarship program that

22    only U.S. citizens can access.   But essentially, they're taught

23    the same thing with the exception of some very sensitive

24    programs.

25    Q.   So as a foreign student, the defendant would not have been

                                                                        31

1    able to participate in the cybercorps programs; is that

2    correct?

3    A.   That's not quite correct.   He could not participate in the

4    cybercorps program as far as being a scholarship student and he

5    would not necessarily be able to participate on sensitive

6    programs.   However, other programs with lesser sensitivities

7    could potentially have been accessed by the defendant.

8    Q.   And otherwise was the full breadth and depth of the

9    University of Idaho program available to him?

10    A.   More or less with the exception of the sensitive programs.

11    Q.   And as far as access to those American students that did

Exhibit B.txt

12    participate in those programs -- those sensitive programs,

13    there was nothing to prevent his association with them; is that

14    correct?

15    A.   No.   And in fact my understanding is that they all worked

16    alongside one another anyway.

17    Q.   Did your investigation allow you to become somewhat

18    familiar with the University of Idaho computer network?

19    A.   Yes, it did.

20    Q.   How does that relate to the computer program that Mr.

21    Al-Hussayen participated in?

22    A.   I'm not quite sure I understand.

23    Q.   Does the computer network have something to do with his

24    studies there?

25    A.   Yes.

                                                                    32

1     Q.   How?

2     A.   Although my understanding is that much of his project work

3     was not necessarily tied to the network as a computer science

4     Ph.D. candidate, the network was something I'm sure that he

5     would have access on a routine basis.

6     Q.   Tell us about that network just generally.   An advanced

7     network?

8     A.   Very advanced.

9     Q.   What else can you tell us about it just generally to give

10    us some idea?

11    A.   The University of Idaho network is a very fast, very

12    sophisticated, very powerful network.   It is -- for lack of a

                            Page 30

Exhibit B.txt

13    better term, it's a back bone of much of the activity that
14    occurs in that area.
15    Q.   And as far as its activity with other networks, what did
16    your investigation reveal?
17    A.   It's directly connected to many of the other very large
18    universities in the northwest.
19    Q.   We'll come back and revisit that area in a moment but in
20    the meantime, let me ask you some questions about another
21    aspect of the affidavit and we're referring specifically to
22    paragraph 29 as a reference for those that have a copy and the
23    defendant's outside activities, if you will, with regard to web
24    site work.   Are you with me?
25    A.   Yes, I am.

                                                                 33

 1    Q.   Can you just give us an idea generally speaking did your
 2    investigation show that the defendant -- whether or not the
 3    defendant was involved in activities outside of his studies at
 4    the University of Idaho that had to do with web sites?
 5    A.   Yes.
 6    Q.   Generally speaking, what did you find?
 7    A.   What we found and we continue to find are extensive ties,
 8    extensive links either through as a technical advisor, as the
 9    maintainer, as the creator of numerous web sites.
10    Q.   And web sites associated with any particular entities or
11    individuals?
12    A.   Yes.
13    Q.   For example?
14    A.   We have discovered web sites -- multiple web sites that are

Exhibit B.txt

15    tied to a charitable organization located in the Detroit,
16    Michigan area.
17    Q.   What is that organization?  What's the name of it?
18    A.   That organization is the Islamic Assembly of North America.
19    Q.   And its acronym is IANA customarily; is that correct?
20    A.   That is correct.
21    Q.   And generally speaking, what did your investigation reveal
22    as far as his web site activities in relation to that charity?
23    A.   Various web sites that we've looked at have the defendant's
24    stamp on them, whether it's in -- whether it was a web site he
25    created, whether it's a web site that he appears on the

34

1     technical advisory committee for, whether -- whether he is a
2     technical advisor.   Numerous web sites to that fashion.
3     Q.   Have you been able to identify all of the web sites that
4     bear his stamp if you will in your opinion?
5     A.   I seriously doubt we've identified all of them.
6     Q.   But you have identified some; is that correct?
7     A.   Yes.
8     Q.   And we'll get to those more in just a moment.   But first of
9     all, let's talk about the Islamic Assembly of North America.
10    Can you tell us a little bit about that and this roughly
11    corresponds to paragraph 30 of the affidavit?
12    A.   Yes.   My understanding is that the Islamic Assembly of
13    North America or IANA was incorporated in 1993 in Colorado.   It
14    is a nonprofit organization and it -- its purported existence,
15    its purported function is that of the spread of Islam or Da'wa.

Page 32

Exhibit B.txt

16   They use -- they make extensive use of web sites to communicate

17   their messages around the globe.  They solicit donations.  They

18   receive quite a bit of money and another aspect of their

19   function is they generally have an annual conference in which

20   guest speakers are invited, members of other charitable

21   organizations attend and it's generally considered to be a big

22   deal.

23   Q.   Based upon your investigation, can you give us an idea

24   roughly when the investigation shows that the defendant began

25   having these ties with the Islamic Assembly of North America?

35

1    A.   We have ties based on web site activity that begins right

2    about 1998.  Circa '98 I believe.  And we have other ties to

3    him in other areas, financial, in other ways as well.

4    Q.   At some point in time, did you discover a formal

5    demonstration of his tie to the IANA?

6    A.   As a matter of fact, I did.  We were able to access Idaho

7    Department of State records and discovered that Mr. Al-Hussayen

8    is the registered agent for the IANA in Idaho.

9    Q.   And what was the date associated with that initial

10   registration that you found?

11   A.   That was May 11, 2001.

12   Q.   And has your investigation shown activities attributable to

13   the defendant that seem to be consistent with that agency?

14   A.   Yes.

15   Q.   You've mentioned the web sites that bear the defendant's

16   stamp, if you will, and associated with the IANA.

17             MR. LINDQUIST:  Your Honor, I would like the witness

Exhibit B.txt

18    to reference Exhibit 3.  Counsel has a copy.  Your Honor, you

19    should have a copy there and I believe the agent also has a

20    copy of that.

21             COURT:  Any objections to referencing this exhibit for

22    illustrative purposes?

23             MR. NEVIN:  Not to referencing it, no, sir.

24             COURT:  All right.  You may proceed with Exhibit 3.

25    BY MR. LINDQUIST:

36

 1    Q.   Take a look at that Exhibit 3.  Tell us what that is.

 2    A.   Exhibit 3 is a list of various web sites that we have

 3    identified to date that are linked in one fashion or another to

 4    the defendant.

 5    Q.   And it consists of three columns; is that correct?

 6    A.   That is correct.

 7    Q.   The first column is the internet web site name, correct?

 8    A.   Yes.

 9    Q.   What's the second column?

10    A.   The second column is the actual date that the web site was

11    created or registered.

12    Q.   Okay.  And the third column?

13    A.   The third column is just a quick reference to who the web

14    site is registered to and what sort of ties they have to Mr.

15    Al-Hussayen.

16    Q.   So it's a shorthand for those ties; is that correct?

17    A.   That is correct.

18    Q.   And a more -- a fuller statement of that is contained in an

Exhibit B.txt

19 affidavit paragraph 33 further referenced by the Court; is that

20 correct?  Double check.

21 A.   Yes.

22 Q.   All right.  Let's talk about some of the things you found

23 in conjunction with some of these web sites.

24          MR. LINDQUIST:   First of all, Your Honor, I would

25 offer for purposes of this hearing that Exhibit 3.

                                                          37

1          COURT:  All right.  It will be admitted for

2 illustrative purposes of the witness's testimony.   It's

3 referred to also in paragraph 33 (inaudible) as near as I can

4 tell (inaudible).

5          MR. LINDQUIST:   Thank you.

6              (Government Exhibit No. 3 admitted.)

7 BY MR. LINDQUIST:

8 Q.   Agent Gneckow, take a look at web site no. 9 that's listed

9 there.  Do you see that?

10 A.   Yes, I do.

11 Q.   What is that web site?

12 A.   That web site is Al-Asr.ws.

13 Q.   And Al-Asr, what's the significance of that from the

14 standpoint of the defendant's involvement with these web sites?

15 A.   The significance of that particular web site is that the

16 defendant, Mr. Al-Hussayen, is the sole registrant of that web

17 site.

18 Q.   All right.  And Al-Asr, does that refer to a particular

19 entity?

20 A.   Yeah.   There is a Saudi Arabian company named Dar Al-Asr

Page 35

Exhibit B.txt

21   and the Al-Asr web sites -- it's my understanding that the

22   Al-Asr web sites are the official web sites for that company.

23   Q.   And your investigation showed that the defendant was

24   directly linked to those web sites at Dar Al-Asr -- within the

25   context of those web sites; is that correct?

38

1          MR. NEVIN:  I'm going to object to the question, Your

2    Honor, as being leading and I don't understand what he means

3    either with respect to (inaudible).

4          COURT:  Why don't you rephrase the question.

5          MR. LINDQUIST:  Maybe a clarification but the rules of

6    evidence don't apply.

7          COURT:  That's correct.  I have to be able to

8    understand the question that's being posed and understand the

9    answer so --

10         MR. LINDQUIST:  Okay.  So you did not understand the

11   question, Your Honor?

12         COURT:  No.

13   BY MR. LINDQUIST:

14   Q.   Agent Gneckow, does Dar Al-Asr have something to do with

15   the defendant's involvement with these web sites?

16   A.   Yes.

17   Q.   What is that?

18   A.   When you -- when you access Dar Al-Asr records even over

19   the internet, Mr. Al-Hussayen's address and frequently his

20   name, telephone number, e-mail address are all associated with

21   web sites that belong to Dar Al-Asr.

Exhibit B.txt

22   Q.   What address do you see most commonly as far as the
23   defendant is concerned?
24   A.   The address that we generally see is 311 West Sweet Avenue,
25   Apartment 6, Moscow, Idaho, 83843.

39

1    Q.   With regard to that web site, Al-Asr.ws, do you know when
2    that web site was created?
3    A.   Yes.   That was web site was created on September 11, 2000.
4    Q.   By whom specifically?
5    A.   It was created by Mr. Al-Hussayen.
6    Q.   Okay.   And sometime after September 11 of 2000 but before
7    September 11 of 2001, did a particular publication occur or
8    appear on that web site that related to September 11, 2001?
9    A.   That's correct.
10   Q.   Can you -- and that publication at least in part is
11   portrayed in paragraph 20 -- excuse me.   In paragraph 34 of the
12   affidavit; is that correct?
13   A.   That is correct.
14   Q.   Would you read that for us, please?
15   A.   The entire paragraph or --
16   Q.   Just read the quoted portion beginning with the second
17   part.
18   A.   The second part is the rule --
19   Q.   Let me interrupt you just to make sure we're clear.   This
20   is what appeared on the web site created by the defendant; is
21   that correct?
22   A.   That's correct.
23   Q.   And this was -- approximately when did it appear in

Exhibit B.txt

24   relation to September 11, 2001?

25   A.   It occurred either May or June of 2001.   So approximately

                                                                    40

1   four or five months prior to the September 11 attacks.

2   Q.   All right.   Go ahead and read that.

3             MR. NEVIN:   Judge, may I inquire in aid of objection?

4             COURT:   Yes.

5             MR. NEVIN:   When you use the term "create," you don't

6   mean that Mr. Al-Hussayen wrote this language that you're about

7   to read, do you?

8             WITNESS:   Do I answer that?

9             MR. NEVIN:   It was addressed to you.

10            COURT:   Yes.

11            WITNESS:   No, I did not say that he wrote it.

12            MR. NEVIN:   When you use the term "create" referring

13   to the web site itself?

14            WITNESS:   That's correct.

15            MR. NEVIN:   And it's your testimony that he created

16   this web site?

17            WITNESS:   He is listed as the sole registrant for the

18   web site.

19            MR. NEVIN:   Is that the same as creation of the web

20   site?

21            WITNESS:   It can mean the same.

22            MR. NEVIN:   But it doesn't necessarily?

23            MR. LINDQUIST:   Your Honor, I believe this is

24   cross-examination and not aid of --

Exhibit B.txt

25          COURT:  I'll allow counsel to (inaudible).

41

1           MR. NEVIN:  And you don't know whether that's the case

2    in this situation.

3           WITNESS:  I don't believe I know that at this point,

4    no.

5           MR. NEVIN:  But in any event, this wasn't written by

6    Mr. Al-Hussayen?

7           WITNESS:  No.  As a matter of fact, this article was

8    written by another radical Saudi sheikh by the name of Homed

9    Ali (phonetic).

10          MR. NEVIN:  What do you mean by another?

11          MR. LINDQUIST:  Your Honor, now we're into

12   cross-examination.  We're beyond what he needs in the scope of

13   direct.

14          COURT:  I'll allow this last question and then --

15          MR. NEVIN:  What do you mean by another?

16          WITNESS:  In addition to Salman Al-Ouda and Safar

17   Al-Hawali.

18          MR. NEVIN:  That's all I have.

19          COURT:  All right.

20   BY MR. LINDQUIST:

21   Q.  Read that to us, will you?

22   A.  "The second part is the rule that the (inaudible) which

23   means holy warrior must kill himself if he knows that this will

24   lead to killing a great number of the enemies.  And that he

25   will not be able to kill them without killing himself first or

Exhibit B.txt

42

```
 1    demolishing a center vital to the enemy or its military force
 2    and so on.   This is not possible except by involving the human
 3    element in the operation.   In this new era, this can be
 4    accomplished with the modern means of bombing or bringing down
 5    an airplane on an important location that will cause the enemy
 6    great losses."
 7    Q.   Let's talk about the chronology associated with this
 8    publication, the creation of the web site and other events.
 9    You've already testified to Bin Laden's declaration of war; is
10    that correct?
11    A.   That's correct.
12    Q.   And that occurred approximately when?
13    A.   I believe that was August 25, 1996.
14    Q.   And you've testified to the web site registration by the
15    defendant of Al-Asr.ws in which this appears; is that right?
16    A.   That is correct.
17    Q.   And the publication itself in May or June of 2001; is that
18    correct?
19    A.   That is correct.
20    Q.   In conjunction with the events of September 11, did your
21    investigation reveal anything about the defendant's activities
22    in the Moscow area in relation to a bank?
23    A.   Yes, it did.
24    Q.   Tell us about that.
25    A.   More specific question?
```

Exhibit B.txt

43

1    Q.   In specific regard to the date September 11 of 2001, did

2    your investigation identify some activities of the defendant

3    with regard to a banking institution?

4    A.   Yes.

5    Q.   Tell us about that.

6    A.   It's my understanding based on our investigation that the

7    defendant last set foot inside the main branch of the U.S. Bank

8    in Moscow, Idaho on September 4, 2001.

9    Q.   What's the significance of September 4 from the standpoint

10   of September 11 given your experience and this investigation

11   specifically?

12   A.   Activity involving various individuals that are currently

13   under investigation seem to almost halt as of September 4,

14   September 5 time frame.

15   Q.   What happened on September 11 as far as he was concerned

16   and the bank?

17   A.   On September 11, 2002, a year after the terrorist attacks,

18   the defendant was first seen since -- over a year later

19   entering the bank and making a cash deposit.

20   Q.   So you have the November -- the September 11, 2001 events

21   and then a year later, he next appears in the bank following

22   the September 4, 2001 appearance; is that correct?

23   A.   Right.   On the anniversary.

24   Q.   And then you also mention the Bin Laden declaration of

25   acceptance of responsibility for those events.

44

Exhibit B.txt

    1          COURT:  Before we leave that area, is it your
    2    testimony that the defendant was seen at the main bank on
    3    September 4, 2001?
    4          WITNESS:  Yes.
    5          COURT:  You may proceed.
    6    BY MR. LINDQUIST:
    7    Q.   In conjunction with the arrest of the defendant and as part
    8    of this search warrant affidavit, search warrants were
    9    executed; is that correct?
   10    A.   That is correct.
   11    Q.   And just generally speaking, tell us how those search
   12    warrants were obtained.
   13    A.   The search warrants were obtained by applying for the
   14    search warrants preparing an affidavit and presenting those in
   15    front of a U.S. magistrate.  The search warrants were obtained
   16    and then were subsequently executed.
   17    Q.   And executed on what day?
   18    A.   They were executed on February 26, 2003.
   19    Q.   Where were the search warrants executed?
   20    A.   There were four separate locations.  One was the
   21    defendant's home at 311 West Sweet, Apartment 6, Moscow, Idaho.
   22    A second search warrant was executed for the defendant's
   23    vehicle, a 1992 Pontiac Bonneville.  A third one was served at
   24    an apartment on D Street, 504 and one-half D Street which is on
   25    the corner of Van Buren and D in Moscow, Idaho and the fourth

                                                                    45

Exhibit B.txt

1   and final warrant was served at the engineering isotope lab on

2   the University of Idaho campus where the defendant's work

3   station was located.

4   Q.   When you say work station, did that include a computer?

5   A.   Yes, it did.

6   Q.   Was a search done of the contents of that computer?

7   A.   A cursory examination only.

8   Q.   Okay.  And can you tell us just briefly how that search of

9   the computer was conducted, how it was done?

10   A.   The computer was transported to our Pocatello information

11   technology center where some intelligence analysts in

12   conjunction with our computer analysis response team conducted

13   a cursory examination of various files on that computer.

14   Q.   Okay.  Can you give us an idea generally speaking how much

15   material was identified on that computer?  First of all, the

16   size of the hard drive.

17   A.   The hard drive was an 80 gigabyte hard drive which to put

18   in comparison, that computer at that location at the University

19   of Idaho would normally have been only a 3 or 4 gigabyte hard

20   drive.

21   Q.   What did you find as far as the amount of material

22   contained on that large hard drive?

23   A.   In the cursory examination which probably was only 29,000

24   files resulted in the identification of numerous photographs --

25   photo images.

46

1   Q.   Can you give us an idea, recognizing that it has been a

2   cursory review, of the number of photographic images that were

Exhibit B.txt

3    recovered from the hard drive or that are on that hard drive?

4    A.   Thousands.   Thousands of photographs.

5    Q.   Were some retrieved for purposes of this case, for purposes

6    of this hearing?

7    A.   Yes, some were retrieved.

8    Q.   Take a look, if you will, at Exhibits 5 through 15 that you

9    have there in front of you.   Do you see those?

10   A.   Yes, I do.

11   Q.   Are those photographs taken from the hard drive that you've

12   just referenced?

13   A.   Yes.

14   Q.   The defendant's hard drive there in the isotope lab; is

15   that correct?

16   A.   That is correct.

17   Q.   And these are just a few of thousands of other pictures

18   that are on that hard drive; is that right?

19   A.   Yes.

20   Q.   Can you give us an idea generally speaking of what

21   collectively these -- this group of photographs depict?

22   A.   Exhibit 5 through --

23   Q.   5 through 15.   Go ahead and just pull those out.

24   A.   Exhibits 5 through 14 are all photographic or artistic

25   renditions of the attacks on the World Trade Center or

47

1    photographs of the World Trade Center in New York.

2    Q.   And 15?

3    A.   The 15th is an aerial view of the Pentagon building in

Page 44

                    Exhibit B.txt
4    Washington D.C.

5            MR. LINDQUIST:  Your Honor, I offer these for purposes

6    of this hearing.

7            COURT:  Any objection to Exhibits 5 through 15?

8            MR. NEVIN:  Can I have a moment, Your Honor?

9            COURT:  All right.

10           MR. NEVIN:  May I inquire in aid of an objection, Your

11   Honor?

12           COURT:  All right.  It will be solely for foundation,

13   how they were obtained, et cetera.

14           MR. NEVIN:  Yes.

15           COURT:  All right.

16           MR. NEVIN:  Yes.

17                              EXAMINATION

18   QUESTIONS BY MR. NEVIN:

19   Q.   Did you personally seize the computer?

20   A.   No, sir, I did not.

21   Q.   Have you been told where it was seized from?

22   A.   Yes.

23   Q.   And it was seized from an office area?

24   A.   Yes, sir.  It was seized from the engineering isotope lab.

25   Q.   And this is an office area that's utilized by -- only by


                                                            48


1    Mr. Al-Hussayen?  Is that your testimony?

2    A.   No.  It's my understanding that he shares that office with

3    another person.

4    Q.   And do you know the history of this computer?  Do you know

5    who it's been used by, how it arrived at that location, who put

Exhibit B.txt

6   those images on the computer, matters of that sort?

7   A.  No, sir.  Those items are still under investigation.

8   Q.  Isn't there a way that you can look at a computer and tell

9   who's accessed the particular files on the computer and when

10  they were last accessed?

11          MR. LINDQUIST:  Your Honor, this is really

12  cross-examination.

13          WITNESS:  Sir, I'm not a technical expert.

14          COURT:  I'll allow counsel to finish.

15          WITNESS:  Sir, I'm not a technical expert in that

16  manner.

17  BY MR. NEVIN:

18  Q.  Go ahead.  Sorry.

19  A.  The answer is I'm not a technical expert when it comes to

20  computer analysis.

21  Q.  You know that to be the case though.  You can determine

22  when files have been accessed.

23  A.  Sir, I refer those questions to the technical guys.

24  Q.  You can't tell us as you sit here on the witness stand that

25  Mr. Al-Hussayen has ever looked at these images, can you?

                                                              49

1   A.  Sir, that computer was seized from his work station area

2   and I do know that he accessed that computer.

3   Q.  That's not my question.

4           MR. LINDQUIST:  Now we're in cross-examination, Your

5   Honor.

6           MR. NEVIN:  I think this is foundational to whether

                              Page 46

Exhibit B.txt

7    these come into evidence.

8              MR. LINDQUIST:  No, it isn't.  This is

9    cross-examination.

10             COURT:  I'll allow him to finish up this short line of

11   inquiry and then you can state an objection to the evidentiary

12   introduction if you have one.

13   BY MR. NEVIN:

14   Q.  Then my question was you can't testify as you sit on the

15   witness stand today that Mr. Al-Hussayen ever looked at these

16   images, can you?

17             MR. LINDQUIST:  And I'll object to the relevancy of

18   that.

19             COURT:  Do you have an objection to the (inaudible)?

20             MR. NEVIN:  Yeah, I object that they've not been

21   adequately tied to Mr. Hussayen to be admitted into evidence.

22             COURT:  I'll overrule the objection.  Counsel, I plan

23   on going till noon today if that works with everyone before we

24   take that break.  Is that agreeable?

25             MR. NEVIN:  Yes, sir.  Would we start up again at

50

1    1:00 -- 1:30?

2              COURT:  At 1:00.

3              MR. NEVIN:  At 1:00.

4              COURT:  Yes.  All right.  You may proceed.  Exhibits 5

5    through 15 will be admitted.

6              MR. LINDQUIST:  Thank you.

7                (Government's Exhibit Nos. 5 through 15 admitted.)

8                      CONTINUED DIRECT EXAMINATION

Page 47

Exhibit B.txt

9    QUESTIONS BY MR. LINDQUIST:

10   Q.   Very quickly and briefly, what does Exhibit 5 depict?

11   A.   Bear with me for one second.

12   Q.   Do you have them there?

13   A.   I'm sure I have it here somewhere.  Here we go.  Exhibit 5

14   is what appears to be a photograph of the World Trade Center

15   after it had collapsed.

16   Q.   Exhibit 6?

17   A.   Exhibit 6 is what appears to be a computer generated image

18   of the World Trade Center depicting where the first and second

19   impacts of the aircraft hit the towers.

20   Q.   Exhibit 7?

21   A.   Exhibit 7 is a photograph of the World Trade Center sky

22   line prior to the attack -- well, at some time prior to the

23   attack.

24   Q.   Exhibit 8?

25   A.   Exhibit 8 appears to be a dual image of the second aircraft

51

1    before -- immediately before and right after it crashed into

2    the towers.

3    Q.   Exhibit 9?

4    A.   Exhibit 9 are two photographs.  A larger photograph of the

5    World Trade Center undamaged and then an inserted photograph of

6    the trade centers on fire.

7    Q.   Exhibit 10?

8    A.   Exhibit 10 again appears to be a computer generated image

9    of the World Trade Centers showing in stages how the aircraft

Exhibit B.txt

10   impacted into the towers.

11   Q.   Exhibit 11?

12   A.   Exhibit 11 is a photograph -- what appears to be a

13   photograph of the World Trade Centers after they had collapsed

14   and rescue personnel were on the scene.

15   Q.   12?

16   A.   Exhibit 12 is a photograph of the World Trade Centers taken

17   from below.  It shows that both towers are on fire.

18   Q.   13?

19   A.   13 is another image of the trade centers from a distance

20   with the Empire State Building in front of it that show the

21   towers on fire.

22   Q.   14?

23   A.   14 appears to me to be the same --

24   Q.   As a previous one, doesn't it?

25   A.   As a previous one.

52

1   Q.   No. 8?

2   A.   Yes.  That's the same as Exhibit 8.

3              MR. LINDQUIST:  Given that, Your Honor, I would move

4   to withdraw No. 14 because it's already depicted in -- by

5   Exhibit 8.

6              COURT:  All right.  It will be withdrawn.

7                  (Government Exhibit No. 14 withdrawn.)

8   BY MR. LINDQUIST:

9   Q.   And then 15?

10   A.   And 15 is an aerial photograph of the Pentagon building.

11   Q.   Is your testimony that these are the only photographs
                         Page 49

Exhibit B.txt

12    depicting the World Trade Center in conjunction with the events

13    of 9/11 on that computer?

14    A.   By no means whatsoever.

15    Q.   Why do you say that?

16    A.   The cursory examination of the photographic images on that

17    computer revealed thousands and thousands of photographs.   I

18    can't even begin to guess how many were of the World Trade

19    Center.

20    Q.   Let's continue talking about the defendant's web site

21    activities.   Specifically, did your investigation show any

22    connection between the defendant and the sheikhs that you've

23    mentioned, Al-Ouda and Al-Hawali?

24    A.   Yes.

25    Q.   Tell us what those connections are.

53

1    A.   Well, the investigation has revealed numerous connections

2    between the defendant and Sheikh Al-Ouda and Sheikh Al-Hawali.

3    Q.   Let's just talk web sites for right now.

4    A.   As far as web sites are concerned, the defendant has been

5    involved in the maintenance, technical advisement for web --

6    multiple web sites for both Sheikh Al-Ouda and Sheikh

7    Al-Hawali.

8    Q.   Take a look at Exhibit No. 3 which is that list of web

9    sites associated with the defendant.   Do you have that?

10    A.   Yes, I do.

11    Q.   Can you point out the number of the web site that is

12    directly attributable to one of those sheikhs or those two

Exhibit B.txt

13   sheikhs?

14   A.   Islam Today for example is --

15   Q.   Number --

16   A.   Is no. 8.

17   Q.   Okay.

18   A.   Islam Today is Sheikh Al-Ouda's web site.  He publishes a

19   lot of his lectures, articles on that web site and I believe

20   even on the web page itself, there is reference to the fact

21   that that is Sheikh Al-Ouda's web site.

22   Q.   And that's the web site that he referenced in the interview

23   with the New York Times reporter, correct?

24   A.   That's correct.

25   Q.   What other web sites do we see here associated with either

54

1   of those two gentlemen?

2   A.   Well, clearly web sites nos. 10 and 11 are associated with

3   Sheikh Al-Hawali.  Those web sites are Al-Hawali.org and

4   Al-Hawali.com.

5   Q.   Okay.  Now, did your investigation identify some particular

6   publications associated with those web sites or other web sites

7   linked to the defendant and the IANA publications of these two

8   radical sheikhs?

9   A.   Yes.

10   Q.   Let me call your attention to one in particular.  And this

11   is cross referenced if you will with affidavit paragraph 36.

12   Are you with me?

13   A.   All right.

14   Q.   That affidavit paragraph 36 references some publications

Exhibit B.txt

15    that appeared on one of these web sites; is that correct?

16    A.   Yes, it does.

17    Q.   Okay.  Which web site is that?

18    A.   That is web site Al-Asr.ws.

19    Q.   And give us an idea what that publication or publications

20    consisted of.

21    A.   That publication -- Al-Asr.ws is an internet magazine or

22    one of the functions is I suppose as an internet magazine and

23    on the date depicted there in the affidavit of May 15, 2001,

24    there were at least three articles that specifically spoke to

25    the issue of suicide operations.

                                                                    55

1    Q.   Who were the authors of those articles?

2    A.   The authors were Sheikh Homed Ali (phonetic).

3    Q.   And where have we heard him before -- of him?

4    A.   He is the sheikh that wrote the article that had the

5    verbiage in it about bringing down an airplane.

6    Q.   Okay.

7    A.   There was also an article entitled "Suicide Operations"

8    which was written by Sheikh Salman Al-Ouda and --

9    Q.   And in essence, the content of that with regard to suicide

10    operations, what?

11    A.   In that particular article, Sheikh Al-Ouda stated that

12    death is better than a humiliating life and it gave

13    justifications and conditions on suicide operations.

14    Q.   Go to paragraph 37.  Does that reflect another publication

15    associated with Sheikh Al-Ouda?

Exhibit B.txt

16    A.   Yes, it does.

17    Q.   And what -- what web site are we talking about here?

18    A.   That web site is Islam Way.com.

19    Q.   And that is associated with the Islamic Assembly of North

20    America; is that correct?

21    A.   Yes, sir.

22    Q.   And what was the orientation of that publication?

23    A.   I'm not sure I understand.

24    Q.   What did the publication say?  What was its --

25    A.   It again was a publication or an article that justified

56

1     suicide bombings.

2     Q.   Paragraph 38 talks about an event associated with a

3     Canadian web site at the time; is that correct?

4     A.   That's my understanding.

5     Q.   Tell us about that.  What happened here?

6     A.   As is stated in the affidavit, on August 16, 2001, three

7     full weeks prior to the September 11 attacks, there was a

8     posting on the Islam Way.com web site that was titled "An

9     Invitation to Jihad" and in that particular posting, there was

10    an invitation as I said in the title for -- or a recruitment

11    pitch essentially to come and fight with the Mujahideen.  Come

12    and train and then eventually fight with --

13    Q.   Did that result in a complaint by a particular entity?

14    A.   Yes, it did.

15    Q.   Tell us about that.

16    A.   There was a Jewish entity in Canada that became aware of

17    that particular posting, brought that to the attention of the

Page 53

Exhibit B.txt

18    Royal Canadian Mounted Police who initiated an investigation.

19    Q.  Did that also result in some press, some articles in the

20    newspaper?

21    A.  Yes, it did.

22    Q.  Does that paragraph in the affidavit reflect at least a

23    snippet of one of those articles and the perception of what was

24    appearing on that web site?

25    A.  Yes, it does.

57

1     Q.  Would you read that snippet for us if you would on the

2     bottom of page 13?  And that appeared in what newspaper?  Do

3     you recall?

4     A.  I don't recall.

5     Q.  Okay.

6     A.  Sorry.

7     Q.  But a Canadian newspaper; is that correct?

8     A.  That is correct.

9     Q.  All right.  Read that sentence to us, would you?

10    A.  It states, "Terrorist organizations have been making

11    increasing use of the internet to further their violent

12    agendas.  They use computers to communicate, spread propaganda,

13    fund raise and organize operations.  Canada may be becoming a

14    base for such cyber terrorism because of the technological

15    advancement."

16    Q.  Did that newspaper article have anything to do with your

17    investigation of the defendant meaning was it generated as a

18    result of your investigation of the defendant or was it

Exhibit B.txt

19  completely independent?

20  A.   No.  It was completely independent.

21  Q.   This is just something that you came across as part of your

22  investigation; is that right?

23  A.   That's correct.

24  Q.   Let's talk about another publication associated with the

25  defendant's web sites.  Take a look at paragraph 39.  Are you

58

1   with me?

2   A.   Yes, I am.

3   Q.   That is another publication on what web site?

4   A.   That is again on Islam Way.com.

5   Q.   And what is the gist of that particular publication?

6   A.   This again appears to be a posting on Islam Way.com where

7   the writer of the posting advised -- excuse me, that he was

8   leaving Afghanistan in an on-duty status and further stated

9   that Jihad is the only means to eradicate all evil on a

10  personal and general level.  And that the only answer is to

11  ignite and trigger an all out war, a worldwide Jihad, and that

12  we will do our best to ignite this war.  May Allah protect us.

13  Q.   Affidavit paragraph 40 references yet another publication

14  associated with these web sites; is that correct?

15  A.   That is correct.

16  Q.   And this -- the web site in this particular case is what?

17  A.   This web site is Islam Today.net.

18  Q.   Now again, remind us.  That web site is tied to what

19  particular individual?

20  A.   It's my understanding that that belongs to Sheikh Al-Ouda.

Exhibit B.txt

21  Q.   And this publication though is not by Sheikh Al-Ouda,

22  correct?

23  A.   No, it's not.

24  Q.   Is it by whom?

25  A.   It is by Sheikh Safar Al-Hawali.


59


1   Q.   And the date of that publication?

2   A.   September 4, 2002.

3   Q.   Title of the article that was published?

4   A.   The title of the article is "Appeal to Help Our Palestinian

5   Brothers."

6   Q.   Can you give us an idea of the content of that publication,

7   its philosophical orientation, what it was saying?

8   A.   It was essentially calling for support of Jihad in the

9   Palestinian situation.   There is verbiage in the publication

10  that states developing the methods and means of Jihad such as

11  targeting settlements, surprise attacks on military bases,

12  manufacturing and improving weapons and similar careful and

13  wise choices in deep penetration and martyrdom operations,

14  et cetera, et cetera.

15  Q.   These then were publications, indications of direct contact

16  between the defendant and these two radical sheikhs by means of

17  those publications on the web sites; is that right?

18          MR. NEVIN:   I'll object to that as a leading question.

19          COURT:   I'll sustain the objection.

20  BY MR. LINDQUIST:

21  Q.   There were other connections -- your investigation revealed

Exhibit B.txt

22    other connections, did they not, or revealed other things as

23    far as connections between the defendant and these two sheikhs;

24    is that right?

25    A.   That's correct.

60

1     Q.   Did the investigation participate in what is referred to

2     statutorily as the Foreign Intelligence Surveillance Act?

3     A.   Yes, it did.

4     Q.   Just generally speaking, what is that?

5     A.   The Foreign Intelligence Surveillance Act is a mechanism by

6     which the United States Government after going through a long

7     process of applying for -- to have this act operational by

8     which we can have a court-ordered surveillance or court-ordered

9     wire tap with regard to circumstances dealing with national

10    security matters.

11    Q.   All right.  How is that different from what in the federal

12    system we commonly refer to as a Title 3 wire tap or court-

13    ordered authorization?  How is it different?

14    A.   It's different in the sense that we go before an entirely

15    different court.  For example, instead of going before a

16    criminal magistrate to obtain a search warrant, you actually go

17    before the Foreign Intelligence Surveillance Court.

18    Q.   What I'm really getting to is on the Title 3, we're talking

19    about a typical criminal investigation within the federal

20    system; is that correct?

21    A.   That's correct.

22    Q.   As the Foreign Intelligence Surveillance Act deals with

23    national security and investigations that are directly prompted

Exhibit B.txt

24   by national security; is that correct?

25   A.   That's correct.

61

1    Q.   And as a result of those court authorized interceptions, a

2    criminal investigation can gain access to learn what has been

3    intercepted and learned as a result of those investigations; is

4    that right?

5    A.   That's correct.

6    Q.   What type of interceptions were involved -- or did you

7    receive information from?  Are we talking phone calls, computer

8    e-mails?  Is that what we're talking about?

9    A.   Primarily.

10   Q.   Okay.  So that's what we're talking about as far as these

11   interceptions are concerned; is that right?

12   A.   That's correct.

13   Q.   Did some of those court authorized interceptions reveal

14   activities by the defendant?

15   A.   Yes, they did.

16   Q.   And in what capacity?  Telephone and e-mail?

17   A.   That's correct.

18   Q.   All right.  Did those interceptions reveal anything as far

19   as the relationship between the defendant and Sheikh Al-Ouda?

20   A.   Yes.

21   Q.   What did they reveal generally speaking?

22   A.   They revealed -- they revealed one thing, that the

23   defendant has an extreme amount of respect for Sheikh Al-Ouda.

24   He has operated in the capacity of assisting with setting up

Exhibit B.txt

```
25     web sites that Sheikh Al-Ouda can use as a vehicle to preach
```

62

```
 1     his message to -- as I've stated before, to the widest audience
 2     possible.
 3     Q.   Did they reveal the direct contact between the defendant
 4     and that sheikh?
 5     A.   Yes, they do.
 6     Q.   And those associated with the sheikh?
 7     A.   Yes, they do.
 8     Q.   Did those interceptions also reveal anything similar with
 9     regard to Sheikh Al-Hawali?
10     A.   Yes, very similar.
11     Q.   What?
12     A.   Again, the interceptions show a very close link between the
13     defendant and Sheikh Al-Hawali, the setting up of web sites,
14     the providing of vehicles for extended communication,
15     telephonic contact with intermediaries of Sheikh Al-Hawali.
16     Q.   And all within the context of web site work; is that
17     correct?
18     A.   I believe so.
19     Q.   In the course of those interceptions, do you remember any
20     characterization by Sheikh Al-Ouda or those associated with him
21     of the defendant as far as the defendant's role in this web
22     site work?
23     A.   Yes.  I seem to recall there being one intercepted
24     communication in which --
25               MR. NEVIN:  I'll object to that without further
```

Exhibit B.txt

63

 1   foundation as to who made the statement and time, place,
 2   matters of that sort.
 3           COURT:  You may proceed a little bit with foundation.
 4   BY MR. LINDQUIST:
 5   Q.  Tell us approximately when this interception took place and
 6   the defendant was involved; is that correct?
 7   A.  The defendant was involved.  The party on the other end was
 8   Sheikh Al-Ouda and he deferred to the defendant as being the
 9   manager or -- I don't recall the exact verbiage but essentially
10   the manager of the web site and he deferred decisions with
11   regard to the web site to him.
12   Q.  And would follow his, meaning the defendant's direction; is
13   that correct?
14   A.  Yes.
15   Q.  You mentioned that the search warrants were executed in
16   conjunction with the arrest of the defendant.  Did those search
17   warrants show anything or result in any evidence that
18   corroborated the tie between the defendant and Sheikh Al-Ouda
19   and Sheikh Al-Hawali?
20   A.  Yes, they did.
21   Q.  Tell us about that.
22   A.  During one of the executed search warrants, an address,
23   phone book was discovered and in that phone book in Arabic were
24   written the telephone numbers for both Sheikh Al-Ouda and
25   Sheikh Al-Hawali.

Exhibit B.txt

1   Q.   Was that finding consistent with your investigation

2   otherwise that you testified to?

3   A.   Yes.

4   Q.   You've already testified to photographs that were found on

5   the defendant's computer, seized at the isotope lab.   There

6   were other photos that were seized from that in your cursory

7   review; is that correct?

8   A.   Yes.

9   Q.   Take a look at Exhibits 16 through 94.   Do you have those

10   up there?

11   A.   I do.

12   Q.   And all of those exhibits depict photographs; is that

13   correct?

14   A.   I am pretty sure they are all photographs.   No, I take that

15   back.   I know that there are some that are graphic images of

16   maps for example but not many.

17   Q.   But they were all taken from the computer that you

18   testified to; is that right?

19   A.   That's correct.

20   Q.   Categorically, what do all of these photographs have in

21   common from the standpoint of what you've been testifying to

22   today?  What's their significance?  What's their pertinence

23   here?  Why are we showing them to the judge?

24   A.   I think their significance is clear.

25   Q.   What is it?

Exhibit B.txt

1    A.   Almost without exception, these photographs show Jihad --
2    what we could consider to be Jihadist sort of things.   Many
3    photographs of Usama Bin Laden.   Many photographs of Chechnyan
4    Mujahideen.   Photographs of dead disemboweled bodies.
5    Photographs of what appear to be captured Russian soldiers.
6    Q.   International terrorism related event; is that correct?
7    A.   Exactly.
8           MR. LINDQUIST:   I offer these exhibits into evidence,
9    please, for purposes of this hearing.
10          COURT:   Any objection?
11          MR. NEVIN:   The same objection I expressed with
12   respect to the other photographs.
13          COURT:   All right.   That's been noted and overruled.
14   We'll admit Exhibits 16 through 94.
15             (Government Exhibit Nos. 16 through 94 admitted.)
16          COURT:   You may proceed.
17          MR. LINDQUIST:   Thank you.
18   BY MR. LINDQUIST:
19   Q.   Let's just go through some of these.   There are quite a
20   number but there again, in that regard, this is just a small
21   percentage of what your cursory review found; is that right?
22   A.   Just the tip of the iceberg in my opinion.
23   Q.   Take a look at Exhibit 17.   Who's that?
24   A.   That appears to be a photograph of Sudaman Abu Gathe
25   (phonetic) who is known as -- he is an Al Quaida or was an Al

66

Page 62

Exhibit B.txt

1  Quaida spokesman.

2  Q.   Okay.   Exhibit 18?

3  A.   That's a photograph of a Taliban soldier with an RPG -- a

4  rocket propelled grenade.

5  Q.   Exhibit 20?

6  A.   That's a photograph of Usama Bin Laden superimposed on some

7  Arabic text that we have not translated yet.

8  Q.   Exhibit 21?

9  A.   Photograph of Usama Bin Laden.

10  Q.   And 23?

11  A.   Usama Bin Laden.

12  Q.   24?

13  A.   Usama Bin Laden.

14  Q.   25?

15  A.   Usama Bin Laden.

16  Q.   26?

17  A.   That appears to be a photograph of Hisballah (phonetic)

18  rebels with rocket propelled grenades on the shoulders and a

19  firearm of some sort.

20  Q.   29?

21  A.   That is a photograph of the American flag being burned.

22  Q.   What's the significance of 30?

23  A.   30 --

24  Q.   Specifically.

25  A.   Specifically?  Well, it is a photograph almost in the form

67

1  of a poster it appears that shows Usama Bin Laden facing off

2  with President George Bush and there is a target superimposed

Exhibit B.txt

3   on the president's head with the center of his head directly in

4   the center of the cross hairs of the target.

5   Q.   And it has a reference to a web site; is that correct?

6   A.   Yes, it does.

7   Q.   No. 31.

8   A.   Usama Bin Laden and others.

9   Q.   Who's depicted in 33 to your knowledge?

10  A.   You know, I'm not certain.   That's a photograph of an

11  individual that we have yet to identify.

12  Q.   34, what does that show?

13  A.   That is a photograph of Washington, D.C.

14  Q.   The capital building, correct?

15  A.   Yes, it is.

16  Q.   35, what's the significance of that specifically?

17  A.   35 is a poster and the shape of the blob in the middle of

18  the poster appears to be Chechnya.   Inside the blob are

19  soldiers who appear to be Mujahideen and the poster itself

20  makes reference to a very radical web site, Cocaus.com

21  (phonetic) which is linked to many of the IANA, Islamic

22  Assembly of North America, sites and the defendant received

23  e-mail from Cocaus.

24  Q.   36?

25  A.   Taliban soldiers with RPG's.

                                                                68

1   Q.   39?

2   A.   Although I'm not positive, this appears to be a photograph

3   of the inside of the Moscow music hall where the chemical

Exhibit B.txt

```
4    agents were introduced to essentially put an end to the

5    takeover of that -- that theater by Mujahideen rebels.

6    Q.   You're going to reference that here in a moment in another

7    capacity, correct?

8    A.   Yes, sir.

9    Q.   41?

10   A.   That is a photograph of Sheikh Al-Ouda.

11   Q.   42?

12   A.   That is Eden Catab (phonetic), a Chechnyan rebel leader.

13   Q.   You mentioned some Russian soldiers.  Exhibit 44.

14   A.   This is a photograph of what appears to be a Russian

15   soldier, Petrov Demetri Alexandrovich, almost as if he has --

16   he's got his name superimposed in front of him.  Although we

17   don't know what it is, we suspect he may have been taken

18   prisoner.

19   Q.   Similarly 45; is that correct?

20   A.   Yes.

21   Q.   And I'm skipping over some that depict violent deaths; is

22   that right?

23   A.   That is --

24   Q.   Corpses and so forth?

25   A.   That is correct.
```

69

```
1    Q.   Exhibit 49?

2    A.   Exhibit 49 is a map that appears to be pulled from MS NBC.

3    Q.   A map of what?

4    A.   The map is of the State of California and there are four

5    specific locations that are designated on the map, each of
```

Exhibit B.txt

```
 6   which appears to be a bridge:  The Golden Gate Bridge in San

 7   Francisco, the Bay Bridge in San Francisco, the Coronado Bridge

 8   between San Diego and Coronado and the Vincent-Thomas Bridge

 9   that spans the main channel of L.A. harbor.

10   Q.   50?

11   A.   Is a photograph of the Golden Gate Bridge.

12   Q.   52?

13   A.   52 is a photograph of detainees being flown in U.S.

14   military aircraft to Guantanamo Bay.

15   Q.   54?

16   A.   Our initial analysis of this photograph indicates that this

17   is a suicide note with a superimposed arrow pointing to the

18   detonation switch.

19   Q.   58?

20   A.   Usama Bin Laden.

21   Q.   59?

22   A.   This appears to be soldiers including what appears to be a

23   wounded soldier in the Cashmere region.

24   Q.   What's 60?  Who's depicted in 60?

25   A.   That's Sheikh Al-Ouda.
```

70

```
 1   Q.   61, what's the significance of that building?

 2   A.   That's the FBI headquarters building in Washington, D.C.

 3   Q.   62, who's that?

 4   A.   Sheikh Al-Ouda.

 5   Q.   63, more fighters; is that correct?

 6   A.   Actually Taliban fighters.
```

Exhibit B.txt

```
 7   Q.   Taliban fighters?  64, what's that?

 8   A.   That is a United Airlines passenger jet.

 9   Q.   On the ground or flying?

10   A.   Flying.

11   Q.   65?

12   A.   Is a U.S. Navy aircraft carrier.

13   Q.   66, who's that?

14   A.   That's Sheikh Al-Ouda.

15   Q.   67, what's the significance of that building?

16   A.   That's a photograph of a building in Israel where a Jewish

17   wedding was being held and it was bombed.

18   Q.   72, who is that?

19   A.   I'm not sure.  Sorry.

20   Q.   Okay.  What do we see there?  We see --

21   A.   We see what appears to be a scholarly looking elderly man

22   with -- in a vehicle with an automatic weapon at his side.

23   Q.   Going back to Exhibit 64, the United Airlines plane flying,

24   is this the only -- is this the only one of this nature that

25   was found in your cursory review of airplanes?
```

71

```
 1   A.   I don't think so.  I'm not sure.

 2   Q.   Fair enough.  73, what does that depict?

 3   A.   That is the Knesset Building, the Israeli parliament

 4   building.

 5   Q.   75, do you know what that depicts?

 6   A.   That appears to be a nuclear reactor in North Korea.

 7   Q.   The individuals in 76, what's the significance of that

 8   photo; do you know?
```

Exhibit B.txt

```
 9  A.   Those folks -- those three individuals in that one

10  photograph are the victims of the Gibla Baptist Hospital

11  murders.

12  Q.   And does that relate to No. 77 that follows?

13  A.   It does.

14  Q.   What does that show?

15  A.   That's a photograph of the Gibla Baptist Hospital in the

16  Yemen -- Gibla, Yemen.

17  Q.   Does that have something to do with international

18  terrorism?

19  A.   It does.  On December 30, 2002, a terrorist gunman -- at

20  least one entered the hospital and murdered some of the -- at

21  least one doctor and some medical personnel inside the

22  hospital, wounded several others.

23  Q.   And 78, what does that show?

24  A.   That is a photograph of the British ship HMS South Hampton

25  as it's traveling through the Suez Canal.
```

72

```
 1  Q.   79, who is that?

 2  A.   That is Zacharias Musowi (phonetic).

 3  Q.   Who's he?

 4  A.   He is currently at trial for terrorist charges related to

 5  September 11.

 6  Q.   No. 80, who is that?

 7  A.   That is Richard Reed --

 8  Q.   Who is he?

 9  A.   He is the infamous shoe bomber that tried to ignite his
```

Exhibit B.txt

10    shoes in the transatlantic flight.

11    Q.   No. 83, who is that; do you know?

12    A.   That is Daniel Pearl, the assassinated or murdered

13    journalist.

14    Q.   And he was murdered where?

15    A.   Pakistan I think.

16    Q.   Pakistan? 84, what does that depict?

17    A.   That is a photograph of President George Bush superimposed

18    on other photographs that show U.S. military troops and Usama

19    Bin Laden.   The title of this file is "War, Al Quaida."

20    Q.   No. 90?

21    A.   That's Sheikh Al-Ouda.

22    Q.   No. 93?  I think No. 93 and 94 are two versions of the same

23    picture, are they not?

24    A.   Yes, they are.

25    Q.   What do they depict?

                                                              73

1    A.   Well, the title of this file is "Air Marshals" and the

2    photograph shows what appears to be a training exercise where a

3    masked attacker is behind another individual and what appears

4    to be slitting his throat.

5    Q.   The review of that computer is ongoing; is that correct?

6    A.   Yes.

7    Q.   And these particular photographs became available to you

8    only as recently as when?

9    A.   Late last night.

10    Q.   We've been talking about the defendant's web site --

11    outside web site activities and how that relates to terrorism;

Exhibit B.txt

12    is that correct?

13    A.   That's correct.

14    Q.   Now I want to ask you some questions about his outside

15    business activities in the same connection.   We're looking at

16    page 14 for cross reference purposes of the affidavit.

17    Specifically as far as my first question, it's affidavit

18    paragraph 41.   Generally speaking, what did your investigation

19    find as far as the outside business activities of the

20    defendant?

21    A.   The financial aspects of the investigation have revealed

22    extensive amounts of money passing in and out of the

23    defendant's accounts.   We've identified at least six different

24    bank accounts in the United States and significant moneys

25    passing through them.


                                                                    74


1    Q.   Prior to the execution of the search warrants that you've

2    mentioned, how many bank accounts have you identified

3    associated with the defendant?

4    A.   I want to say there were six -- are you talking about other

5    than his own accounts?

6    Q.   No, I'm just talking about accounts known to you prior to

7    his arrest and the execution of the search warrants.

8    A.   His accounts, six.

9    Q.   As a result of the execution of the search warrants, have

10    you become aware of potentially any other bank accounts

11    associated with --

12    A.   It appears that we've identified other accounts, yes.

Exhibit B.txt

13   Q.   And the investigation is ongoing with regard to them; is
14   that correct?
15   A.   That's correct.
16   Q.   Paragraph 42.  These business relationships, these
17   financial relationships that your investigation revealed were
18   connected with what entity primarily?
19   A.   They were primarily connected with the Islamic Assembly of
20   North America.
21   Q.   And were there connections -- financial connections,
22   business connections with other individuals and other entities
23   besides the Islamic Assembly of North America?
24   A.   Yes.
25   Q.   Did that include Sheikh Al-Ouda or that you would

                                                                  75

 1   characterize as business?
 2   A.   Yes.
 3   Q.   Sheikh Al-Hawali?
 4   A.   To the extent that they deal with the web sites, yes.
 5   Q.   Fair enough.  As far as the IANA, the Islamic Assembly of
 6   North America, what -- describe for us, if you would, the
 7   business relationship that your investigation found as far as
 8   the defendant was concerned.
 9   A.   We've cited tens of thousands if not hundreds of thousands
10   of dollars that have passed from the defendant to the Islamic
11   Assembly of North America in the form of checks, wire transfers
12   and other means.
13   Q.   Have colleagues of yours done assessments of the financial
14   information that you have obtained?

Exhibit B.txt

15    A.    Yes.

16    Q.    Does that assessment include the funds going into the

17    defendant's accounts and what funds were going out of the

18    accounts?

19    A.    Yes.

20    Q.    Can you give us an idea generally speaking of the nature of

21    the funds generally speaking going into his personal accounts,

22    going in?

23    A.    The defendant routinely receives large sums of money that

24    come from overseas sources.   Generally from Saudi Arabia.   They

25    pass into his account and subsequently pass out of his

76

1    account --

2    Q.    Before going to where they go out of the account, let's

3    just talk about the funds coming in.   Did you identify any

4    funds coming into his accounts that you could attribute

5    directly to his studies and living?

6    A.    Yes.

7    Q.    Tell us about that.

8    A.    As a foreign student from Saudi Arabia in the United

9    States, Mr. Al-Hussayen is essentially on a scholarship of

10    sorts from the Saudi government.   He receives a monthly stipend

11    that ranges in amounts but it's generally about $2,700 a month

12    more or less.

13    Q.    Were you able in your analysis -- your financial analysis

14    to segregate the study/living related expenses coming into the

15    account and where they went and the nonstudy/living related

Exhibit B.txt

16   expenses or the moneys that came into his account and where
17   they went?
18   A.   Yes.
19   Q.   Were they clearly segregated?
20   A.   It appears that there was a definite split.
21   Q.   Did that financial analysis show that the defendant was
22   functioning as a financial conduit of large sums of money?
23   A.   Yes.
24   Q.   Can you give us an idea of some of the sources of that
25   nonstudy/nonliving expense money that the financial records

77

1    show went into his accounts?
2    A.   Well, for example, we identified two wire transfers in 1998
3    that came from a family member of Mr. Al-Hussayen.
4    Q.   Who's that?
5    A.   That would be Saleh Al-Hussayen.
6    Q.   And as far as the investigation is concerned, what do you
7    deem that relationship to be, that individual to the defendant?
8    A.   It appears that Saleh Al-Hussayen is the defendant's uncle.
9    Those two wire transfers totaled approximately $100,000.
10   Q.   And approximately when did those transfers occur?
11   A.   They occurred in 1998 and I can be more specific if I refer
12   to the affidavit.  In September 10 and September 25 of 1998 and
13   were broken into two wire transfers each approximately $50,000.
14   Q.   Did your financial analysis maintain or insure the
15   integrity of those funds being maintained as they passed
16   through the defendant's bank account and out?
17   A.   Yes.

Page 73

Exhibit B.txt

18    Q.   Where did they go?  Where did they go out and into?

19    A.   Almost to the penny, that hundred thousand dollars went to

20    IANA.

21    Q.   Was there a period of time that the defendant held those

22    funds in his bank account before they went out to the IANA?

23    A.   Yes.

24    Q.   Approximately how long was that?

25    A.   It was approximately six to nine months that that money sat

78

1    in the defendant's account.

2    Q.   By the way, has your investigation revealed whether or not

3    these accounts generated interest?

4    A.   Yes.

5    Q.   What has your investigation shown?

6    A.   They do not generate interest.

7    Q.   And have you come to understand why that is?

8    A.   Yes.   Upon request of many of the foreign students, they

9    will not accept interest payments into their accounts.

10    Q.   As a religious matter; is that correct?

11    A.   That is correct.

12    Q.   So the hundred thousand sat there for that period of time

13    not collecting interest; is that right?

14    A.   That's correct.

15    Q.   And then went where?

16    A.   It went piecemeal to IANA over a period of time.

17    Q.   Did the financial analysis of that flow of the hundred

18    thousand dollars from the uncle through the defendant's bank

Page 74

Exhibit B.txt

19  accounts to the IANA correlate with any other receipt of a

20  large sum of money by the IANA?

21  A.   Yes.

22  Q.   And this is I believe also depicted or referenced in

23  affidavit paragraph 45; is that correct?  No, excuse me.  I'm

24  wrong.  Not 45.  42.

25  A.   No, I don't think it's there.

                                                              79

1   Q.   Okay.  You know what I'm referring to?

2   A.   I know what you're referring to.

3   Q.   I'll find the paragraph here in a moment.

4   A.   There was a -- paragraph 48.

5   Q.   48, thank you.

6   A.   In May of 1998, there was a $300,000 wire transfer to IANA

7   from a Swiss bank account.  It was only when that $300,000 was

8   exhausted by IANA that payments of the defendant's $100,000

9   began to be disbursed to IANA.

10  Q.   Showing the correlation of activity of operations; is that

11  correct?

12  A.   Yes.  As the payments were made, in many cases on the same

13  day that say $14,000 wire transfer was sent to IANA, payments

14  were made to officers from that IANA bank account essentially

15  in the form of salary.

16  Q.   Has your investigation revealed how these moneys -- these

17  moneys that are sent from the defendant's bank accounts to the

18  IANA are characterized by the IANA?

19  A.   Yes.  The investigation has revealed that the IANA books

20  refer to them as loans.

                              Page 75

Exhibit B.txt

21    Q.    Loans?

22    A.    Right.

23    Q.    Is there anything in the investigation that would suggest

24    to you that these are legitimate loans?

25    A.    No.

                                                                    80

1     Q.    Your investigation suggests that --

2               MR. NEVIN:   Object.   This is leading.

3               COURT:   All right.   I'll sustain the objection.

4               MR. LINDQUIST:   I didn't even get it out, Your Honor.

5               COURT:   You appear to be heading in a leading

6     direction.

7               MR. LINDQUIST:   Well, I'm going to surprise you

8     because it wasn't headed that way.

9     BY MR. LINDQUIST:

10    Q.    And what did your investigation suggest as far as the

11    nature of the funds that were being funneled through his

12    account?

13    A.    They appear to be payments that were -- that the defendant

14    was receiving from overseas or sometimes in the form of local

15    solicitation that was being sent to the IANA for use by the

16    IANA exclusively.

17    Q.    And concealed in loan designation?

18    A.    That's what it appears at this stage.

19    Q.    An affidavit paragraph 43, the uncle is mentioned a bit

20    more; is that correct?

21    A.    That is correct.

Exhibit B.txt

22   Q.   Did your investigation show additional contact between this

23   uncle -- and when I say additional, additional to the hundred

24   thousand dollars funds that flowed through the defendant's

25   account, additional contact with the United States by that

81

1   uncle?

2   A.   I'm not sure I understand the question.

3   Q.   Did your investigation reveal that the uncle was here at

4   any particular time in the United States?

5   A.   Yes, it did.

6   Q.   What did your investigation reveal as far as when he was

7   here?

8   A.   It appeared that the uncle arrived in the United States on

9   or about August 20 of 2001.  He was met in New York or

10   Washington, D.C., I'm not exactly sure but he was met on the

11   east coast by some members of a Moslim (inaudible) in New York.

12   He was given a tour of the area, given a tour of downtown New

13   York -- of downtown Manhattan including the vicinity of the

14   World Trade Centers.  He subsequently traveled to the Midwest

15   to Chicago, to Detroit, even into Canada and it appears that he

16   met with numerous officials of both the IANA and other

17   charitable organizations.

18   Q.   Was there anything in your investigation that indicated

19   that the defendant joined him at some point in time on this

20   trip?

21   A.   There are indications that they did join and that is based

22   on our review of financial analysis of the defendant's accounts

23   which show money disbursed in Ann Arbor, Michigan area from his

Page 77

Exhibit B.txt

24    account at the same time that the uncle was in Ann Arbor.

25    Q.   Where did the trip take the uncle and by the way, was the

82

1     uncle alone according to the information that you received as

2     far as this trip was concerned?

3     A.   No, the uncle was accompanied by his spouse, Fadine

4     Peterson (phonetic).

5     Q.   And where did the trip take them after the Detroit area?

6     A.   I may have the sequence incorrect but they did travel to

7     Chicago and to Canada, returned to Michigan and then traveled

8     back to Virginia.

9     Q.   And approximately when was it that they arrived back in

10    Virginia?

11    A.   I believe it was on or about September 6, 2001.

12    Q.   And do you know where they initially stayed when they

13    returned to the Virginia area and what part of the Virginia

14    area was that?

15    A.   It was the Herndon, Virginia area more or less.

16    Q.   Do you recall where they went initially there in the

17    Herndon, Virginia area?

18    A.   They stayed at one hotel for a couple of nights.  I can't

19    recall the hotel but then after one or two nights, changed the

20    hotel to the Marriott Residence Inn in Herndon.

21    Q.   And you recall what day that was that they went into the

22    Marriott Residence in Herndon?

23    A.   I'm not positive.

24    Q.   Approximately how long prior to September 11?

Exhibit B.txt

25   A.   Just two or three days prior.

83

1   Q.   What's the significance of the Marriott Residence in

2   Herndon as far as this investigation is concerned?

3   A.   That particular hotel is significant because our

4   investigation nationwide has revealed that at least three of

5   the hijackers of Flight 77 stayed at that hotel on September

6   10.

7   Q.   And the three hijackers have been linked to which of the

8   flights of the September 11 events?

9        MR. NEVIN:   Object to it as asked and answered.

10        COURT:   I'll allow him to answer (inaudible) response.

11        WITNESS:   The Flight 77 was the flight that eventually

12   crashed into the Pentagon.

13   BY MR. LINDQUIST:

14   Q.   After September 11, did an FBI investigation involve the

15   uncle and his wife?

16        COURT:   This might be a good time to stop before you

17   go into another area.   We'll go ahead and recess for one hour

18   and reconvene at 1:00.   The court's in recess.

19        CLERK: All rise.

20           (A recess was taken.)

21        CLERK:   All rise.   The Court is back in session.

22        COURT:   Good afternoon.   You may be seated.   You may

23   proceed where you left off.   The witness will return to the

24   stand.   I'll remind you you are still under oath.

25        MR. NEVIN:   Judge, could I interrupt just to -- for a

Exhibit B.txt

84

```
 1   moment?  I anticipate the need to present evidence to the Court
 2   by a teleconference.
 3            COURT:  I was advised of that by the clerk.  I will
 4   break a little before 2:00 and (inaudible) set up --
 5            MR. NEVIN:  That will be fine.
 6            COURT:  (Inaudible.)
 7            MR. NEVIN:  Thank you.
 8            COURT:  You may proceed.
 9   BY MR. LINDQUIST:
10   Q.  Agent Gneckow, before the lunch break, you provided
11   testimony about the computer images and if you recall, I
12   skipped over several as far as asking for your specific
13   comments and over the lunch break, you advised me that there
14   were several that you felt would be particularly pertinent as
15   far as their relevance; is that correct?
16   A.  That's correct.
17   Q.  If you'd take Exhibits 86, 87 and 91.  Do you find those?
18   86, 87 and 91.
19   A.  I've got them.
20   Q.  What does the image on 86 portray and its significance?
21   A.  What's interesting about the image on Exhibit 86 is that
22   the file name is "Dirty Bomb."  The photograph depicts or the
23   image depicts two or three individuals that are wearing
24   hazardous material protective gear including gas masks and the
25   like.
```

Exhibit B.txt

1    Q.   Turn to 87.   What's the significance of that image?

2    A.   That image is what appears to be a map of Kenya and there

3    is emblazoned with a red star or --

4    Q.   Asterisk-type --

5    A.   Asterisk type mark where the city of Mumbasa, Kenya is

6    located.   That corresponds to the location of the city of

7    Mumbasa.   Again, what's interesting to me about this particular

8    file is that the file name is "Recruits" for one thing and that

9    that is the location of a terrorist attack.

10   Q.   On the U.S. embassy there?

11   A.   Yes, sir.

12   Q.   And 91?

13   A.   91 appears to be an image of Amed Braheen (phonetic) who

14   was arrested by the Spanish (inaudible) due to his connections

15   to the September 11 terrorist attacks.   The Spanish

16   investigation in conjunction with ours indicates that there are

17   strong ties between Braheen and Sheikh Al-Ouda.

18   Q.   Also during the noon hour, I believe you received some

19   information concerning the source of these images as far as the

20   computers; is that correct?

21   A.   That's correct.

22   Q.   And we need to correct your testimony as far as where these

23   images came from; is that right?

24   A.   That is correct.

25   Q.   Where did these images, Exhibits 5 through 94, come from as

Exhibit B.txt

```
 1    far as the computers related to the search warrants that you've
 2    previously referenced?
 3    A.   Well, originally it was my understanding that they came
 4    solely from the computer at the engineering isotope lab.
 5    However, I was told that that is not correct.  In fact, some of
 6    the images come from the defendant's personal computer taken
 7    from his home.  And may I also clarify something?  The images
 8    themselves were taken -- were taken from a mirror image of
 9    those hard drives so as not to taint the actual real hard
10    drives.
11    Q.   All right.  A couple of other matters of clarification of
12    your previous testimony.  You talked about Islamic Assembly of
13    North America and its offices in the Detroit area; is that
14    correct?
15    A.   That is correct.
16    Q.   More specifically, where are the offices of the Islamic
17    Assembly of North America?
18    A.   Well, specifically, the offices are located I believe in
19    Ypsilanti, Michigan which is a suburb of Ann Arbor.
20    Q.   You also provided testimony about the web site event in
21    Canada associated with Islam Way.com and the complaint by the
22    Jewish entity regarding the recruitment publication there.  Do
23    you recall that?
24    A.   Yes, I do.
25    Q.   Can you tell us what the investigation revealed as far as
```

87

Exhibit B.txt

1   what happened to the web site Islam Way.com as it existed in
2   Canada after that complaint and the investigation by the RCMP?
3   A.   It's my understanding based on information received from
4   the RCMP that when that newspaper article was published, within
5   a day or two, the web site itself Islam Way.com relocated from
6   Canada to Ann Arbor, Michigan.
7   Q.   In your testimony, you refer to certain financial
8   transactions between the defendant and the Islamic Assembly of
9   North America, transactions that were characterized as loans.
10  Do you remember that?
11  A.   That's correct.
12  Q.   Over the noon hour, you referenced to me specifically a
13  check that you recall being identified as part of the financial
14  investigation that had to do with the IANA and a loan; is that
15  right?
16  A.   That is correct.
17  Q.   Tell us about that.
18  A.   The financial investigation showed that there was a check
19  from an IANA bank account back to the defendant and there was a
20  notation in the memo line that indicated -- and I'm not exactly
21  sure of the verbiage but it indicated that it may have been a
22  repayment of a loan.   The significance of that was when the
23  endorsement on the back of the check was reviewed, it was
24  indeed signed by the defendant.   However, it was signed back
25  over to an IANA official.

88

1   Q.   When we broke, you were recounting the trip of the
2   defendant's uncle and his wife to the United States around the

Exhibit B.txt

3   time of September 11, 2001; is that correct?

4   A.   That is correct.

5   Q.   I want to clarify one aspect of your testimony with regard

6   to the Marriott Residence in Herndon.   What did the

7   investigation reveal as far as where the uncle and his wife

8   were staying on the day prior -- or the evening prior to

9   September 11, that is September 10?

10  A.   Well, on the evening of September 10, the uncle and his

11  wife were staying at the Marriott Residence Inn.   On that same

12  evening, our investigation has revealed that three of the

13  hijackers also stayed in the same hotel.

14  Q.   Do you have any idea of how many hotels there are in the

15  Herndon, Virginia area?

16  A.   I couldn't give you a specific number.   I would venture

17  there are several.

18  Q.   Following September 11, did the FBI make contact with the

19  uncle and his wife?

20  A.   Yes.

21  Q.   Approximately how long after September 11?

22  A.   My understanding is that he and his wife were interviewed

23  on or about September 17.

24  Q.   And where did that interview take place?  Do you know?

25  A.   The interview took place at the hotel.

89

1   Q.   And can you tell us what happened at that interview?

2   A.   My understanding after speaking with the agent who

3   conducted the interview was that during the course of the

Page 84

Exhibit B.txt

4    interview, the uncle exhibited signs of physical distress and

5    actually fainted to the ground during the course of the

6    interview.  He was subsequently brought to a local hospital and

7    examined by a physician there.

8    Q.   And did the investigation reveal whether or not anything

9    wrong was found with the uncle?

10   A.   No.  In fact, the agent who conducted the interview spoke

11   directly with the attending physician who told the agent that

12   he could find nothing wrong with the patient and the opinion of

13   the agent, she felt the attack was fained.

14   Q.   The agent felt the attack was fained?

15   A.   Meaning the seizure.

16   Q.   Okay.  That was the agent though that was of that

17   perception?

18   A.   Yes.

19   Q.   All right.  As a result of that seizure -- that fained

20   seizure according to the perception of the agent, what was the

21   result of the interview of the uncle?

22   A.   It was effectively terminated.

23   Q.   And was his wife interviewed?

24   A.   Yes.  While the uncle was being attended at the hospital,

25   the interview continued with the spouse, Fadine Peterson

90

1    (phonetic).

2    Q.   And generally speaking, the content of that interview did

3    include the trip that you have been referencing?

4    A.   Yes, it did.

5    Q.   To the United States?

Page 85

Exhibit B.txt

6    A.   Yes, it did.

7    Q.   Subsequent to that interview of the uncle and his wife by

8    the FBI agents, was there yet another interview by the FBI

9    later?

10   A.   Yes.

11   Q.   How much later?

12   A.   Within the next day or so.

13   Q.   By the same agents or different agents?

14   A.   Different agents.   He was -- the uncle was recontacted

15   based on the circumstances of the incomplete interview.

16   However, no additional information was obtained from the uncle.

17   Q.   And following that interview, where did the uncle and the

18   wife go?

19   A.   They returned to -- my understanding is they returned to

20   Saudi Arabia on or about September 19 I would say.

21   Q.   Had any procedural mechanism been imposed by the Bureau to

22   try and prevent their leaving?

23   A.   There was telephonic contact between the agent who

24   conducted the first interview based on that agent's opinion

25   that the uncle should not be allowed to leave until additional

91

1    follow-up could occur specifically with regard to questions

2    dealing with the events of September 11.   However, her

3    recommendation for whatever reason did not -- was not complied

4    with.

5    Q.   So they left without further contact; is that correct?

6    A.   That is correct.

Page 86

Exhibit B.txt

7   Q.   Let's reference affidavit paragraph 44 in relation to the

8   business relationship between the defendant and the Islamic

9   Assembly of North America.  Based upon your investigation, your

10  personal involvement in this investigation, your knowledge of

11  it, how would you characterize its business relationship with

12  the Islamic Assembly of North America, his role if you will?

13  A.   Well, it was a very close role.  Based on the information

14  we have obtained through our financial investigation, through

15  intercepted communications, it's clear that the defendant had

16  if not a central -- if not a leading role, then certainly a

17  central role in the operation of that organization.

18  Q.   In what capacities?

19  A.   The capacities were multi-faceted.  For example, his

20  technical expertise was extremely valuable to IANA in the

21  registration of web sites, the technical advisement to those

22  running web sites.  He was involved in much of the decision

23  making process with regard to money flow, obtaining donations

24  for the charity.

25  Q.   Personnel decisions?

                                                              92

1   A.   Yes.

2   Q.   He played a key role in that as well?

3   A.   Yes, he did.

4   Q.   Would it be fair to say that for all intents and purposes,

5   he was a senior officer of that organization?

6   A.   I would say if not on paper, he was a de facto senior

7   executive.

8   Q.   Did that relationship -- that business relationship with

Exhibit B.txt

9   the Islamic Assembly of North America include one with its at

10   least paper leader at the time?

11   A.   Yes.

12   Q.   And who was that leader at the time, the head of the

13   Islamic Assembly of North America?

14   A.   The then president was an individual by the name of

15   Mohammed Al-Hamari.

16   Q.   What did your investigation reveal as far as the nature of

17   the relationship between the defendant and Mr. Al-Hamari?

18   A.   The relationship was extremely close.   Hundreds of

19   telephone calls between the two, e-mail contact, financial

20   dealings, face to face contact.   What you might typically see

21   in a corporation with the executive officers.

22   Q.   Is Mr. Al-Hamari presently the subject of a government

23   investigation?

24   A.   Yes, he's currently under investigation.

25   Q.   As an aspect of the defendant's business relationship with

93

1   the IANA, did that include disbursement of funds to

2   individuals?

3   A.   Yes, it did.

4   Q.   And we're talking about affidavit paragraph 44 for

5   reference, are we not?

6   A.   Yes, sir.

7   Q.   Can you give us an idea of some of the locations where

8   money was sent as influenced or done by the defendant?

9   A.   Not including wire transfers or money sent within the

Exhibit B.txt

10    United States, there were numerous wire transfers sent around

11    the world to Cairo, Egypt; Montreal, Canada; Riyadh, Saudi

12    Arabia; Aman, Jordan and Islamabad, Pakistan.

13    Q.   Did your investigation reveal any transfer or transfers

14    associated with an Amal Saltan?

15    A.   Yes, sir, they did.

16    Q.   Who's Amal Saltan?

17    A.   Amal Saltan is currently actively involved in the Al-Manar

18    internet magazine.  He writes for the magazine, has some

19    controlling interest in the magazine although the Al-Manar

20    magazine which is internet site no. 3 on our web site chart on

21    Exhibit 3 is also affiliated with the subject.  He is the

22    administrative contact for that magazine.  But historically,

23    Amal Saltan is of interest to us for this investigation because

24    the defendant has sent him approximately $15,200 over the past

25    two or three years in the form of wire transfers.  Amal Saltan

94

1    is a former member of the Egyptian Islamic Jihad, the EIJ which

2    is designated by the United States Government as a foreign

3    terrorist organization.

4    Q.   What's the significance of the designation as a foreign

5    terrorist organization?  What does that mean?

6    A.   If for example an individual in the United States were to

7    send money to or have significant contact financially or

8    otherwise with an organization that is a foreign terrorist

9    organization or with members of an FTO, that person would be in

10   violation of U.S. law.

11   Q.   And that designation is coming pursuant to a particular law

Exhibit B.txt

12    or procedure?

13    A.   There is a process that is done at the highest levels of

14    government where various organizations and individuals or

15    information pertaining to those individuals or organizations

16    are reviewed and a determination is made through executive

17    order that these individuals and/or organizations would be

18    designated as foreign terrorist organizations.  I'd like to add

19    that currently, Amal Saltan, it appears that he is espousing

20    the fact that he is no longer a member of the EIJ although that

21    is something that is still currently under investigation.

22    Q.   Referring back to Mr. Al-Hamari, the defendant's business

23    relationship -- relationship with him involved a particular

24    bank account that the investigation revealed.

25    A.   Yes, it did.

95

1    Q.   Tell us about that bank account.

2    A.   There is a bank account under the name of the defendant

3    that is in Ann Arbor, Michigan yet the address on the bank

4    account is that of Mohammed Al-Hamari in Ann Arbor, Michigan.

5    In fact, the sole -- the only signatures on that account on the

6    checks are from Mr. Al-Hamari.  However, it is the defendant

7    Mr. Al-Hussayen who is listed as the sole signatory on the

8    account.

9    Q.   Paragraph 49 of the affidavit refers to the travel

10   activities of the defendant as revealed by his financial

11   records primarily; is that correct?

12   A.   That is correct.

Page 90

Exhibit B.txt

13    Q.   Can you give us an idea of the number of -- before I ask

14    you that question, as revealed by the financial records showing

15    either his own travel or travel of others that he helped fund;

16    is that correct?

17    A.   That is correct.

18    Q.   Can you give us an idea of the number of states involved

19    domestically as far as his travel is concerned?

20    A.   As far as an exact number, I'm not certain.  However, there

21    is extensive travel on the west coast, southern United States,

22    the Midwest, the east coast, extensive travel.  In addition,

23    there is travel funded for other individuals including travel

24    as remote as Brazil.

25    Q.   Did your investigation show that that travel was consistent

96

1    with the defendant as a very active officer of the Islamic

2    Assembly of North America?

3    A.   It seemed to go hand in hand with that particularly in the

4    context of raising donations for the charity.

5    Q.   Affidavit paragraph 50 refers to phone toll information

6    gleaned by the investigation, correct?

7    A.   Yes.

8    Q.   What are phone tolls just briefly?

9    A.   Phone tolls are a record kept of telephone calls that are

10    made that are generally charged to a particular telephone

11    number.  Long distance calls, cellular telephone calls, things

12    of that nature.

13    Q.   Can you give us an idea of the breadth of the telephone

14    activity revealed by these phone tolls investigation?

Exhibit B.txt

15    A.   The extent of phone activity is tremendous.   Just with

16    contact with Mohammed Al-Hamari and the IANA for example, there

17    are hundreds of telephone calls.   And in addition to that, much

18    of the telephone activity is not trackable by us at this point

19    because for the past few years, the defendant has been using

20    prepaid calling cards in order to make his long distance calls.

21    Q.   How do prepaid calling cards prevent the generation of the

22    information that the investigation would otherwise seek?

23    A.   It's not impossible but it is extremely difficult to track

24    the phone activity on prepaid calling cards.

25    Q.   Affidavit paragraph 45 talks about another purported

97

1    charitable organization with whom the defendant had contacts;

2    is that correct?

3    A.   That is correct.

4    Q.   What is that organization?

5    A.   That organization is called Help the Needy.

6    Q.   Tell us about Help the Needy.   What has that historically

7    consisted of?

8    A.   Well, Help the Needy is an Iraqi relief organization that

9    is located in Syracuse, New York.   The Help the Needy or HTN as

10   it's referred to was a spin off organization out of the IANA.

11   In fact its leader, its president, Rafael Defere (phonetic), is

12   the self proclaimed vice president of IANA.

13   Q.   Are you aware as part of your participation in this case as

14   to whether or not Help the Needy has been investigated by the

15   federal authorities of the United States?

Exhibit B.txt

16    A.   Yes, it has been.

17    Q.   Do you have knowledge of what those -- that investigation

18    consists of?

19    A.   Yes.   The investigation primarily focused on tax violations

20    and violations of the U.S. embargo on Iraq.

21    Q.   Can you tell us the state of that prosecution presently?

22    A.   Yes.   Rafael Defere and several other officials of Help the

23    Needy have been indicted by a federal grand jury in New York.

24    Their offices have been searched.   Rafael Defere is currently

25    in custody after being arrested on February 26 with a couple

98

1    other officers of Help the Needy.

2    Q.   Did that -- did those events have anything to do with the

3    arrest and search warrant events of this case?

4    A.   Yes, they did.

5    Q.   What?

6    A.   Because of the close association between our defendant, Mr.

7    Al-Hussayen, and Rafael Defere and the close associations

8    between the IANA and Help the Needy, when the Syracuse FBI

9    chose to conduct those searches and affect their arrest in

10    Syracuse, our arrests and our -- our arrest rather and our

11    search warrants here were coordinated in such a fashion that

12    they were conducted at the same time.

13    Q.   Has the investigation revealed a tripart type relationship

14    among the defendant, Mr. Defere and Mr. Al-Hamari?

15    A.   Definitely.

16    Q.   What is the nature of that relationship according to the

17    criminal investigation that you've done?

Exhibit B.txt

18    A.   We have obtained information through a variety of different
19    means that the defendant, Mr. Al-Hussayen, Rafael Defere, the
20    president of Help the Needy, and Mohammed Al-Hamari, the then
21    president of the IANA, have had extensive conversations, have
22    met face to face on numerous occasions and have generally
23    discussed the future of IANA, have discussed setting up boards
24    of trustees, typical executive officer type of meetings.
25    Q.   You mentioned that Mr. Defere was arrested and detained; is

99

1    that correct?
2    A.   That is correct.
3    Q.   Now, these two other individuals were subject of -- at
4    least one other individual was subject of an arrest warrant in
5    that coordinated case, correct?
6    A.   That is correct.
7    Q.   That person's name is what?
8    A.   It's Iman (phonetic) Jarwan.
9    Q.   And do you know if that individual has been detained?
10    A.   It is my understanding that he is detained.
11    Q.   In addition to the charges that you've mentioned otherwise
12    as to Mr. Defere, are there any other charges relating to Mr.
13    Jarwan in conjunction with this detention hearing?
14    A.   I believe so although I'm unaware of the exact specifics.
15    Q.   Do you know -- can I jog your memory?  Does that involve
16    visa fraud charges?
17    A.   As a matter of fact, it does.  Thank you.
18    Q.   Affidavit -- excuse me.  One more series of questions as

Exhibit B.txt

19  far as Help the Needy is concerned.   Did your investigation
20  show any direct financial transactions between defendant and
21  Help the Needy?
22  A.   Yes.
23  Q.   In what form did those transactions occur; how were they
24  reflected?
25  A.   It's my understanding that those were in the form of

100

1  personal checks to Help the Needy.
2  Q.   Do you recall a particular check or checks that had
3  notations that are pertinent to what we're dealing with here?
4  A.   Yes.
5  Q.   Tell us about that.
6  A.   On at least one, maybe more of the checks, there were
7  notations and I believe they were in Arabic on the memo line
8  that stated that the money sent to Help the Needy was for Iraq.
9  Q.   Affidavit paragraph 46 references yet another charity; is
10  that correct?
11  A.   That is correct.
12  Q.   And the name of that charity?
13  A.   The name of that charity is Benevolence International
14  Foundation.
15  Q.   What did the investigation reveal as far as the connection
16  between Benevolence International Foundation and this case?
17  A.   Primarily the financial aspects of the investigation showed
18  that Benevolence International Foundation has sent money to the
19  IANA and in general terms, that money has been sent to
20  assistant sponsoring conferences and the like.

Exhibit B.txt

21    Q.   Has Benevolence International been subject of an

22    investigation?

23    A.   Yes, it has.

24    Q.   Do you have knowledge of what the status of that

25    investigation is presently?

101

1    A.   Yes.  It's my understanding that the leader of Benevolence

2    International, a gentleman by the name of Arno (phonetic) has

3    pled guilty to numerous charges and he is currently awaiting

4    sentencing.

5    Q.   Let me ask you this:  To your knowledge, what was his role

6    or relationship with BIF or Benevolence International

7    foundation?

8    A.   When he was in a leadership role of Benevolence

9    International and he was specifically involved in providing

10   material support to the Mujahideen in Chechnya.

11   Q.   So those federal charges related to the operation by him of

12   Benevolence International as a racketeering enterprise in

13   providing material support to Bin Laden and Al Quaida?

14   A.   Yes.

15   Q.   Now, you indicated that he pled guilty.  Do you recall what

16   he pled guilty to?  Let me see if I can refresh your

17   recollection.

18   A.   Thank you.

19   Q.   Did he plead guilty to illegally averting charitable

20   contributions to Mujahideen in Bosnia and Chechnya?

21   A.   Yes, he did.

Exhibit B.txt

22   Q.   But otherwise denied supporting Al Quaida and Bin Laden; is

23   that correct?

24   A.   That is correct.

25   Q.   However, do you know what the position of the U.S.


102


1    attorney's office in Chicago is as far as the proof that they

2    intend to introduce at his sentencing regarding the connection

3    with Al Quaida and Bin Laden?

4    A.   Yes.   Their position is that they will be introducing

5    information at sentencing that will clearly show that link.

6    Q.   You mentioned with regard to -- I'm not sure I recall in

7    regard to what but as far as the executive order that

8    designates -- oh, it was with regard to the Egyptian Islamic

9    Jihad, the executive order whereby an entity or organization

10   can be designated a terrorist organization; is that correct?

11   A.   That is correct.

12   Q.   Do you know if -- is there a similar designation as far as

13   an organization that doesn't designate as a terrorist

14   organization but a terrorist support?

15   A.   Yes.   As a matter of fact, executive order 13224 gives the

16   United States Treasury the authority to designate organizations

17   and individuals as supporting terrorism.

18   Q.   And was Benevolence International so designated by that

19   executive order?

20   A.   It was and as a result, their assets were frozen.

21   Q.   Frozen by what entity?

22   A.   Frozen by the United States Treasury.

23   Q.   There is an acronym of OFAC.

Exhibit B.txt

24    A.   Yes, it is.

25    Q.   What does OFAC stand for?

103

1     A.   That is the Office of Foreign Asset Control.

2     Q.   Is that the entity that's responsible for making that --

3     for doing that freezing of assets?

4     A.   Yes, sir, it is.

5     Q.   There is yet another charity to which the defendant and the

6     IANA have been connected by the investigation; is that right?

7     A.   That's correct.

8     Q.   And what is that charity?

9     A.   That would be the Global Relief Foundation.

10    Q.   And where is the Global Relief Foundation based?

11    A.   Like Benevolence International, it is also based in the

12    Chicago area.

13    Q.   What did your investigation reveal as far as the

14    connections among Global Relief Foundation, the Islamic

15    Assembly of North America and the defendant?

16    A.   Are you asking about financial?

17    Q.   Financial, yes.

18    A.   Well, we -- our financial aspects of the investigation have

19    revealed that there have been checks -- personal checks written

20    by the defendant to Global Relief and on the memo line of those

21    checks, there is I believe again in Arabic a notation that the

22    money is to go to Chechnya.

23    Q.   Is that consistent with your knowledge of such transactions

24    as they might be associated with the investigation of

Page 98

Exhibit B.txt
25    international terrorism in general?

104

1    A.   Yes.

2    Q.   How so?

3    A.   Investigations around the country that come across

4    information such as this, personal checks with notations on the

5    memo line, seem to indicate that the people that are sending

6    the money have a specific purpose for that check.  In this

7    case, it's our belief that those checks were written

8    specifically to go to the Mujahideen in Chechnya.

9    Q.   Did your investigation reveal a connection between Global

10    Relief Foundation and the Islamic Assembly of North America?

11    A.   Yes, there is a connection.

12    Q.   And generally speaking, what was -- what is that or has

13    been that connection?

14    A.   Well, the connection between Global Relief and the Islamic

15    Assembly is like I had mentioned earlier where the IANA

16    sponsors these annual conferences and invites charitable

17    organizations from around the country to participate.  Global

18    Relief is one of those organizations and it's my understanding

19    that Global Relief may also have sent money to the IANA to help

20    pay -- offset the costs of these conferences.

21    Q.   Does the name Al-Multayce mean anything to you?

22    A.   Yes, it does.

23    Q.   What's Al-Multayce?

24    A.   Well, Al-Multayce is a meeting place.

25    Q.   Where?

Exhibit B.txt

105

1    A.   The specific reference to Al-Multayce as far as our

2    investigation is concerned, it corresponds to one of the search

3    locations that we executed our search warrants for on February

4    26.   That is the apartment that I mentioned earlier that's

5    located at 504 and a half D Street in Moscow, Idaho.

6    Al-Multayce is a relatively small apartment, sparsely

7    furnished -- or not furnished at all actually and inside that

8    apartment is a place where many individuals would go and meet

9    on a regular basis, primarily on Saturday evenings, to discuss

10   information in private that was not necessarily to be discussed

11   at the Islamic center in Moscow.

12   Q.   Did that include the defendant, that group?

13   A.   Yes, it did.

14   Q.   Does Al-Multayce have anything to do with Al-Marreti?

15   A.   Yes, it does.

16   Q.   What's Al-Marreti?

17   A.   Al-Marreti is a web site.   It's also a bank account

18   controlled by Mohammed Al-Hamari.

19   Q.   Mohammed Al-Hamari again the historical leader --

20   A.   The then president of IANA.   Colocated at the Al-Multayce

21   apartment on D Street was a computer that was attached to a

22   credit card machine and from that computer, on-line sales for

23   IANA were conducted and payments were received.

24   Q.   And what was the connection with Al-Hamari as far as the

25   control and maintenance of that account?

Exhibit B.txt

106

1   A.   Although still under investigation, there is a bank account
2   in the Detroit area under the name of Al-Marreti which is the
3   same name as the web site that shows Mohammed Al-Hamari, the
4   then president of IANA, as probably the sole signatory but at
5   least one of the signatories on that account.
6   Q.   Let's shift gears a little bit, Agent Gneckow.   You've
7   indicated that the investigation included a court authorized
8   interception of certain communications by the defendant and
9   including his wife; is that correct?
10  A.   That is correct.
11  Q.   In preparation for this hearing and the investigation
12  otherwise, did you identify certain interceptions that might be
13  of value as far as the court's determination in this particular
14  case?
15  A.   Yes, I did.
16  Q.   Let's talk about a few of those, shall we?   How do they
17  reflect the number of interceptions that have been realized to
18  your knowledge?
19  A.   There are -- there are so many interceptions.   These are
20  just a tiny sample of what we have.
21  Q.   Do you recall any interceptions in which the FBI is
22  mentioned?
23  A.   Yes, I recall at least two.
24  Q.   Okay.   Let me refer you to one I believe September 12 of
25  2002.   Do you know which one I'm talking about?

107

Exhibit B.txt

```
 1    A.   I do.
 2    Q.   And the defendant was one of the -- this was a telephone
 3    intercept; is that correct?
 4    A.   Yes, it was.
 5    Q.   The defendant was one of the participants talking; is that
 6    right?
 7    A.   That is correct.
 8    Q.   And what was discussed between the defendant and the party
 9    that he was talking to as far as the FBI?  What was the nature
10    of this discussion?
11    A.   Well, generally it was a business discussion that dealt
12    with establishing as a venue for business something in the
13    State of Texas.  It was the defendant's response that he didn't
14    feel that was a good idea because there's one company in
15    particular that is having difficulty with the FBI in that
16    state.
17    Q.   You're referring to another call of November 25 of 2002.
18    The defendant was a participant in this telephone call that was
19    intercepted; is that right?
20    A.   Yes.
21    Q.   And they were talking about his studies at the University
22    of Idaho; is that correct?
23    A.   That is correct.
24    Q.   Tell us what the --
25              COURT:   The date of that again?
```

108

```
                        Exhibit B.txt
1              WITNESS:   November 25, 2002.

2    BY MR. LINDQUIST:

3    Q.   They discussed extensions; is that correct?

4    A.   That is correct.

5    Q.   Tell us about that.

6    A.   Well, in this particular telephone call, it dealt with the

7    defendant's attempts to get additional -- an additional

8    extension or stipend from the Saudi government to allow him to

9    stay longer to complete his studies.   In the course of the

10   conversation, the defendant made the statement that he was not

11   prepared to have the FBI knock on his door.

12   Q.   I'll refer you to a telephone call intercepted on October

13   24, 2002.   The defendant's wife was talking with a friend; is

14   that correct?

15   A.   That is correct.

16   Q.   I believe they discussed something that you referenced

17   earlier with regard to the exhibits, the images from the

18   computers; is that right?

19   A.   That's correct.

20   Q.   What was the nature of this discussion?

21   A.   This discussion centered around the Mujahideen takeover of

22   the Moscow music hall in Moscow, Russia.   The content of the

23   conversation was that it was the participants in the

24   conversation's opinion that it was good to go from a defensive

25   posture to an offensive posture with regard to (inaudible)
```

109

```
1    activity.

2    Q.   Did the interception reveal any -- any expression by the
```

Exhibit B.txt

3    defendant's wife as far as her attitude toward America?

4    A.   Yes.   In that telephone call, she said that she hates

5    America.

6    Q.   Let me refer you to an intercepted call of November 19 of

7    2002 involving discussion between the defendant and someone

8    else and discussing the arrest of a person in Palestine.   Do

9    you know what I'm referring to?

10   A.   Yes.

11   Q.   What was the gist of that conversation as far as what was

12   happening in Palestine?

13   A.   Essentially the conversation dealing with this particular

14   arrest was something -- one of the individuals wanted to have

15   posted or published on one of the web sites associated with the

16   defendant, Mr. Al-Hussayen.   However, it was Mr. Al-Hussayen

17   who told the caller -- or the callee that he did not want to

18   have any information published until they got additional

19   details relative to the arrest.

20   Q.   Let me refer you to an intercepted call of October 29, 2002

21   between the defendant and another person where they were

22   talking about conferences.

23          MR. NEVIN:   What was the date again?

24          MR. LINDQUIST:   I'm sorry.   October 29 of 2002.

25   BY MR. LINDQUIST:

                                                           110

1    Q.   With regard to conferences.   Do you know which one I'm

2    talking about?

3    A.   Yes.

Exhibit B.txt

4   Q.   And earlier in your testimony, you referred to one of the

5   publications, the web site publications, the term "operations";

6   is that correct?

7   A.   That's correct.

8   Q.   Is that term used here?

9   A.   Yes, it was.

10   Q.   Tell us about that.

11   A.   In this particular phone call, the discussion of operations

12   in the sense of suicide operations was discussed and the fact

13   that this is a topic that always causes debate at the

14   conferences.   The significance of this particular call we

15   believe is as a result of the Saudi mufti condemning suicide

16   operations after --

17   Q.   The Saudi --

18   A.   M-U-F-T-I.

19   Q.   What's that?

20   A.   That is a religious political leader of the Saudi

21   Arabian -- of Saudi. Following the attacks of -- the terrorist

22   attacks of September 11, he issued a Fatwa condemning the

23   suicide operations.

24   Q.   Fatwa, what's that?

25   A.   A Fatwa is a religious ruling typically issued by a sheikh

111

1   or someone in very high standing with the Islamic society.

2   Q.   Please refer to a call of November 28 of 2002 involving the

3   defendant that also used this term I believe a second

4   operation; is that correct?

5   A.   That is correct.

Exhibit B.txt

6   Q.   Please tell us about that call.

7   A.   In this particular conversation, Sami -- excuse me, Mr.

8   Al-Hussayen and a friend of his discussed suicide operations in

9   Palestine.  They discussed the fact that there were many deaths

10  and Mr. Al-Hussayen thank his friend for that information and

11  said it was very powerful.

12  Q.   I'd like to refer you to a call of December 4, 2002.  That

13  was intercepted but did not necessarily involve the defendant;

14  is that correct?

15  A.   Right.  This was an e-mail communication that was sent to a

16  group address so there were numerous recipients on this

17  particular communication although the defendant was one of the

18  people in the group address.

19  Q.   And what was the nature of the item that was intercepted?

20  A.   The item that was intercepted appears to be a communique

21  from the Al Quaida political office extolling the virtues and

22  successes of a Jihadist and suicide operations targeting the

23  west.

24  Q.   This specifically references, does it not, the bombings in

25  Kenya?

112

1   A.   Yes, it does.  I believe it also references the attack on

2   the USS Cole if I'm not mistaken.

3   Q.   It references those two bombings -- the bombings of the two

4   embassies; is that right?

5   A.   That's correct.

6   Q.   The World Trade Center?

Page 106

Exhibit B.txt

 7   A.   Yes.

 8   Q.   The Pentagon; is that correct?

 9   A.   Yes.

10   Q.   And the Pennsylvania -- or the plane that crashed in

11   Pennsylvania as part of the 9/11 events; is that correct?

12   A.   Yes, there was references to that as well.

13   Q.   And I mean this is -- it's fairly extensive but

14   essentially, what this proclaimed -- what does it teach you or

15   instructing as far as these particular events of the past are

16   related to the future?

17   A.   It's clearly in my opinion a motivational document.  This

18   is the good stuff that we've done and let's continue doing it.

19   Q.   Are you familiar as a result of your experience in this

20   investigation with what is referred to as the Al Quaida

21   political office?

22   A.   I am somewhat familiar with it but not very -- in a

23   detailed fashion.

24   Q.   Are you experienced enough with it to say that this would

25   be part of that infrastructure that you were talking about at

113

 1   the beginning of your testimony associated with international

 2   terrorism?

 3   A.   Certainly.  As part of any organization, something like a

 4   periodic newsletter or motivational document would be part and

 5   parcel of that.

 6   Q.   I'd like to refer you to a telephone call of January 19 of

 7   2003 that was intercepted.  That addressed involved Mr.

 8   Al-Hussayen and another individual  as they talk about two of

Exhibit B.txt

 9  Mr. -- of Sheikh Al-Ouda's lectures; is that right?

10  A.   That is correct.

11  Q.   Tell us what was said between the two gentlemen in this

12  interception.

13  A.   During this particular telephone call, Mr. Al-Hussayen

14  discussed with the other individual the fact that there were

15  two Sheikh Al-Ouda lectures, one of which had not been endorsed

16  or supported by the Saudi government.  During the course of the

17  conversation, Mr. Al-Hussayen stated that he felt that both

18  articles could be published and if they fell under any

19  scrutiny, they meaning the operators of the web site, they

20  would simply say that they are a service provider only and it

21  won't happen again.

22  Q.   Refer to a call of January 21 of 2003, just two days later

23  involving the defendant and another Al-Ouda lecture; is that

24  right?

25  A.   I'm sorry.  I think that is a Al-Hawali lecture.

114

 1  Q.   Is that Al-Hawali?  Okay.  Excuse me.  What lecture are we

 2  referring to?

 3  A.   What date are we talking about?

 4  Q.   January 21 of 2003.

 5  A.   Right.  I'm very sure that is a Al-Hawali lecture.

 6  Q.   Sorry.  Okay.  And what was the title -- first of all, how

 7  does it relate to this telephone call that was intercepted?

 8  A.   The telephone call itself was a discussion in which the

 9  defendant, Mr. Al-Hussayen, was talking about this article that

Exhibit B.txt

10   was going to come out, the article -- the title of the article

11   being the anti Fatwah and the new tarters (phonetic).

12   Q.   What is anti Fatwah?  What does that mean?

13   A.   Anti Fatwah is a violent movement to oust in this

14   particular case the Jews.

15   Q.   And did the investigation ultimately identify that article

16   which was intercepted in this telephone conversation?

17   A.   Yes, we did identify it.

18   Q.   And can you tell us about the content of that article, what

19   it contained?  What did it say?  First of all, where did you

20   find it?  Was it on the web site somewhere?

21   A.   It was on the web site and in fact it was found on Sheikh

22   Al-Ouda's web site, Islam Today.

23   Q.   And that's on our chart, correct?

24   A.   That is on our chart, yes.

25   Q.   All right.  What was the content of this publication?  What

                                                                    115

1   did it say?

2   A.   Well, the content of the publication spoke of the anti

3   Fatwah and how important it was for the true believes to

4   support it in any deed possible, whether by paying money, by

5   writing articles, by actually supporting it through violence.

6   But that the anti Fatwah was something that was forbidden to

7   stop and the anti Fatwah itself encompassed several different

8   fronts many of which -- or all of which are listed in this

9   particular article.  Among them are suicide operations, attacks

10   on settlements, firing mortars, blowing up tanks, developing

11   explosives, killing in hand to hand combat, attacks on bases,

Exhibit B.txt

12    strong intelligence pursuing important Jewish personalities,

13    bribing the enemies.   There were also references in the article

14    to the United States calling the United States itself the new

15    tarters (phonetic).

16          There's verbiage in here that states the only thing

17    that will make America retract from war -- and I believe this

18    is a reference to the possible war with Iraq.   The only thing

19    that will make America retract from war or any murderous

20    project it has in the region is for Israel to be struck and hit

21    causing it more and pain and suffering in such a fashion that

22    there will be no solution but to stop the American aggression.

23    Q.   Okay.   Let me refer you to an e-mail that was intercepted

24    on April 15 of 2002.   Do you know which one I'm referring to?

25    A.   Yes, I do.


                                                                    116


1     Q.   And it referred to Jihad, did it not?

2     A.   Yes, it did.

3     Q.   And weapons?

4     A.   Yes, it did.

5     Q.   In what way?

6     A.   This particular message was forwarded to Mr. Al-Hussayen

7     from another student at the University of Idaho essentially

8     soliciting donations and funding for Hamasse which is a foreign

9     terrorist organization.   The message in short lays out the cost

10    for bullets, assault rifles, explosives, et cetera and calls

11    for support for the Muslim brothers that are fighting in

12    Palestine.

Exhibit B.txt

13    Q.   Another e-mail that was associated with Mr. Al-Hussayen was

14    intercepted on April 16 of 2002; is that correct?

15    A.   That is correct.

16    Q.   This one dealing -- this one being an article in favor of

17    suicide bombings; is that correct?

18    A.   That is correct.

19    Q.   And in sum, what did this article proclaim as far as

20    suicide bombings were concerned?

21    A.   I have to apologize.  I do not have that article with me.

22    Q.   But you can tell us that it was an article extolling the

23    propriety of suicide bombings; is that right?

24    A.   Yes, it was.

25    Q.   An intercepted e-mail of November 12, 2002 regarding the

117

 1    reservation of a web site.  Are you familiar with that?

 2    A.   Yes, I am.

 3    Q.   What was the nature of that e-mail?

 4    A.   This e-mail communication dealt with a specific request to

 5    have the defendant, Mr. Al-Hussayen, set up a web site for an

 6    article by one of the sheikhs.  We believe it is Sheikh

 7    Al-Ouda.  The speech was going to deal with the Iraqi situation

 8    vis-a-vis the United States and in fact a name for that web

 9    site was recommended to Mr. Al-Hussayen.

10    Q.   Were you able to locate that talk for which the web site

11    was reserved, the Iraq talk?

12    A.   Yes.

13    Q.   And can you give us an idea of what the content or the

14    orientation of that talk was for purposes of this hearing?

Exhibit B.txt

15    What did it say?

16    A.   Well, the lecture or the article itself was actually

17    unsigned so it is difficult for us to --

18    Q.   We don't know who the author is.

19    A.   We don't know who the author is.  We believe it was Sheikh

20    Al-Ouda based on the e-mail communication that occurred prior

21    to that.  Before I talk about the article, I think it's

22    important to note that the web site name that was requested of

23    Mr. Al-Hussayen is the web site name that he registered for

24    this particular article although it was linked to a second web

25    site.  The web site in particular that the article exist -- or

118

1    was located on was Sawtna, S-a-w-t-n-a I believe, and it was

2    linked to another web site called Nation Voice all registered

3    by Mr. Al-Hussayen.

4              The speech itself was very similar to much of the

5    verbiage we have seen so far and that is it dealt with

6    showing -- or arguing that the United States was completely

7    wrong in an inference to go against Iraq and that those -- any

8    efforts in that regard would be dealt with.

9    Q.   Is there any reference in the talk to charity associations

10    and organizations?

11    A.   I believe there were.  However, I don't have that

12    information in front of me.

13              MR. LINDQUIST:  Your Honor, we're a little bit before

14    the hour you indicated that you wanted to break.

15              COURT:  It's about five till.  We'll go ahead and

Exhibit B.txt

16  recess.  We'll take a presentation of evidence out of order at

17  this time.  We'll take a recess.

18          CLERK:  All rise.

19              (A recess was taken.  The testimony of Ab Dul

20              Rakman Al-Hussayen was taken.  Direct

21              Examination of Michael Gneckow was continued.)

22          COURT:  We'll go ahead and then continue with the

23  Government's evidence.

24          MR. NEVIN:  Your Honor, thank you for accommodating

25  that out of order (inaudible).


119


 1          COURT:  You're quite welcome.  You may proceed.

 2          MR. LINDQUIST:  Thank you.

 3  BY MR. LINDQUIST:

 4  Q.  Agent Gneckow, we were talking about some specific

 5  interceptions that the investigation revealed.  I'd like to

 6  refer you to the one of January 17 of 2003 that involved a

 7  martyrdom poem.  Do you know what I'm talking about?

 8  A.  Yes, sir, I do.

 9  Q.  That was an e-mail interception; is that correct?

10  A.  That is correct.

11  Q.  And tell us about that, how that was intercepted on the

12  defendant's e-mail.

13  A.  This was an e-mail communication that came from Islam Today

14  I believe.  The communication, it was --

15  Q.  Islam Today so that we remember is the web site associated

16  with Sheikh Al-Ouda?

17  A.  Yes, Sheikh Salman Al-Ouda, that's correct.  This was a

Exhibit B.txt

18   short poem, the title of which was "A Martyr under 20" and if
19   you like, I can --
20   Q.   Do you have the gist of that poem there?
21   A.   Actually I do.
22   Q.   Go ahead.
23   A.   The poem goes as follows:
24            MR. NEVIN:   Judge, let me object to this without
25   additional testimony about the context.  It can't be told from

120

1    the testimony thusfar whether this was something that Mr.
2    Al-Hussayen received under circumstances, whether (inaudible).
3    I think that foundation (inaudible).
4            MR. LINDQUIST:   That's cross-examination.   The link to
5    the defendant has been established as far as the interception
6    of his e-mail.   It's dealing with martyrdom and the other
7    testimony that the agent has provided.   It's very relevant.
8            COURT:   I'll overrule the objection.
9    BY MR. NEVIN:
10   Q.   Go ahead.
11   A.   The poem as translated states, "I kiss your young heart.   I
12   kiss the toes upon your feet that are going to their death.   I
13   kiss a beautiful head and beautiful eyes.   I kiss your heart
14   where religion and your strong faith live.   I kiss your heart
15   which was certain that life that has fettered me and the poor
16   pretentious others was nothing but a passing trip.   I kiss your
17   picture and your name and your wound, your wound that
18   embarrasses shallow people like me.   God is generous and you

Exhibit B.txt

19   are the martyr."

20   Q.   I'd like to you reference another interception I believe.

21   A telephone call the day before the defendant's arrest.   He was

22   arrested on what day?

23   A.   Mr. Al-Hussayen was arrested on February 26, 2003.

24   Q.   So this would be on the 25th; is that correct?

25   A.   That is correct.


                                                                      121


1   Q.   And this call was between the defendant and whom?

2   A.   Between the defendant and one of his brothers.

3   Q.   Do you know which brother that was?

4   A.   Yes.   It was Khalid (phonetic).

5   Q.   One of the brothers mentioned by Abdul Rakman, the brother

6   that just testified; is that correct?

7   A.   That's correct.   I believe he is the brother residing in

8   Calgary.

9   Q.   And can you tell us what this call was about?

10   A.   There was a number of items discussed during the

11   conversation.   Towards the end of the conversation, the brother

12   asks Mr. Al-Hussayen where he would recommend that he send

13   money.   Mr. Al-Hussayen tells his brother to send money to Help

14   the Needy since according to Mr. Al-Hussayen it was above

15   suspicion unlike some other organizations that are under

16   monitoring.   The brother asked if the money was going to Iraq.

17   Mr. Al-Hussayen said yes and that it was a good choice.

18   Q.   I'll also refer you to telephone call that was intercepted

19   on November 16 of 2002 involving the defendant and another

20   individual.   Do you recall that?

Exhibit B.txt

21  A.   Yes, I do.

22  Q.   And what was the gist of that conversation within the

23  context of your testimony here today?

24  A.   In that conversation, Mr. Al-Hussayen stated that they,

25  meaning the United States, have to live in terror in order to


122


1   rationalize their actions.

2   Q.   If you would, do you have exhibit -- do you have Exhibit 4

3   there in front of you?

4   A.   Yes, I do.

5   Q.   And that exhibit is a synopsis, if you will, of the events

6   associated with the false statement and visa fraud charges of

7   the indictment; is that correct?

8   A.   Yes, sir, that is.

9   Q.   And they correspond to essentially affidavit paragraphs 15

10  and 19 through 28; is that right?

11  A.   That's correct.

12          MR. LINDQUIST:  Your Honor, I offer that for the

13  benefit of the Court in simply assessing that aspect of the

14  affidavit.

15          COURT:  Any objections to the summary?

16          MR. NEVIN:  No, sir.

17          COURT:  All right.

18          (Government's Exhibit No. 4 admitted.)

19  BY MR. LINDQUIST:

20  Q.   Agent Gneckow, you mentioned previously in your testimony

21  that your investigation revealed much of the defendant's

Exhibit B.txt

22  doctoral dissertation pursuit at the University of Idaho; is

23  that correct?

24  A.  That's correct.

25  Q.  Did that investigation reveal that he was struggling in

123

1  that doctoral pursuit?

2  A.  It certainly indicated that, yes.

3  Q.  In what way?

4  A.  It appears that Mr. Al-Hussayen, the defendant, has

5  required at least three extensions of his stay in the United

6  States.  Interviews of University of Idaho personnel seem to

7  indicate that he is about a year and a half behind schedule on

8  his studies and in fact some official or an official at the

9  university expressed frustration in his lack of progress in

10  pursuit of his doctoral (inaudible).

11  Q.  And who was that official?

12  A.  That official would be Dr. Debra Frinke.

13  Q.  We'll go to that here in just a moment but before we go

14  there, may I infer from your testimony that the defendant is

15  now functioning under the fourth extension to your knowledge?

16  A.  The details of the extension are unclear to me.  The

17  extension was not something that was extended to Mr.

18  Al-Hussayen in the form of additional stipend payments from the

19  Saudi government.

20  Q.  What has your investigation revealed as far as the status

21  of the stipend payments?

22  A.  It's my understanding that the stipend payments from the

23  Saudi government have ceased and in fact Mr. Al-Hussayen is

Exhibit B.txt

24    supporting his continued stay in the United States out of his

25    own pocket or with assistance from others other than the Saudi

124

1    government.

2    Q.   And do you know whether or not a deadline has been

3    established or did the investigation reveal that as far as that

4    extension -- fundless extension if you will and when the

5    doctoral must be had?

6    A.   It appears on the limited information that I have in my

7    possession that sometime in May appears to be the end of the

8    extension.

9    Q.   Does that correspond to essentially the semester that we're

10    in as far as the University of Idaho is concerned?

11    A.   Essentially, yes.

12    Q.   You mentioned Dr. Frinke  what has been her relationship

13    with the defendant?

14    A.   For a time, Dr. Frinke was the defendant's advisor for his

15    doctoral dissertation.

16    Q.   Is she now?

17    A.   She no longer is now.

18    Q.   Why not?

19    A.   There were a series of events that ultimately led to the

20    defendant switching advisors.  Dr. Frinke stated that although

21    Mr. Al-Hussayen -- although she considered Mr. Al-Hussayen to

22    be very bright, she was puzzled and frustrated by his lack of

23    progress in pursuing the degree.

24    Q.   Did she say anything about him being preoccupied or

Exhibit B.txt
25    otherwise distracted?


                                                                    125


1    A.   In fact, she did.  She said it appeared that he was
2    preoccupied.  She said something was going on.  She couldn't
3    put her finger on it but she felt that something needed to be
4    done, a change of some sort was in order, some action needed to
5    be taken.  That was preceded by Mr. Al-Hussayen switching
6    advisors on his own.
7    Q.   Did she say anything that had to do with her coming close
8    to taking some action -- negative action toward him because of
9    his lack of progress?
10   A.   She indicated that because of his lack of progressing,
11   because something she couldn't immediately identify, something
12   that dealt with his preoccupation perhaps with other items, she
13   was being forced quickly into the position of perhaps having to
14   take some action which ultimately could have been her
15   reassigning him to another advisor herself but certainly she
16   was facing a crossroads.
17   Q.   Your understanding is from interviews of her that the
18   defendant took steps to change advisors in light of that?
19   A.   Yes.
20   Q.   Who is the defendant's advisor now to your knowledge?
21   A.   That would be a Mr. Dickinson at the University of Idaho.
22   Q.   Has he also been interviewed as part of this investigation?
23   A.   Yes, he has.
24   Q.   And can you tell us how he characterized Mr. Al-Hussayen as
25   far as how the defendant compares with his other students?

Exhibit B.txt

126

1    A.   Well, I believe that based on the interview, Mr. Dickinson
2    is fond of Mr. Al-Hussayen.  He feels he's bright but in
3    comparing him with past students he's had as advisees, he said
4    Mr. Al-Hussayen would not be in the star or spectacular
5    category of previous students.
6    Q.   In your testimony, you've indicated that the defendant had
7    his office in the isotope lab there at the University of Idaho,
8    correct?
9    A.   That is correct.
10   Q.   Did your investigation indicate that that has always been
11   the case or not?
12   A.   No.  As a matter of fact, he has not always had his lab at
13   the -- or his work station at the isotope lab.  In fact, our
14   investigation revealed that no one knew that he had moved his
15   lab or his work station to that lab.  No one in authority, that
16   is neither Dr. Frinke, Dr. Dickinson nor people responsible for
17   oversight of the lab itself.
18   Q.   And it was there at the isotope lab where he had his work
19   station that the computer with the large hard drive was
20   identified; is that correct?
21   A.   That's correct.
22   Q.   Did you have occasion to talk to Dr. Frinke about the
23   computer security situation there at the University of Idaho,
24   the network?
25   A.   I did.

Exhibit B.txt

127

1    Q.   Generally speaking, how did she characterize the
2    vulnerability of that network to you?
3    A.   She said that unfortunately because of the academic setting
4    of the university and simple funding issues that the University
5    of Idaho's network was very vulnerable to cyber probing, cyber
6    attack.
7    Q.   Did you discuss with her as part of the interview her
8    position with regard to the program that the advanced students
9    have available to them and how that relates to computer
10   security versus hacking?
11   A.   Yes, we did have an opportunity to discuss that with her.
12   Q.   And essentially, what was her position with regard to that
13   program -- the significance of that program and the concepts of
14   security and hacking?
15   A.   Well, Dr. Frinke as I mentioned earlier in my testimony is
16   considered preeminent within circles of the government with
17   regard to computer security, intrusion defense, things of that
18   nature.   Because of her knowledge in that area, she takes her
19   job very seriously when it comes to instructing new students
20   that are part of these programs.   She told me that she makes it
21   a point upon her initial contact with new students to make sure
22   that they understand to not use the knowledge that they're
23   learning in the program to go out and conduct hacking because
24   certainly someone who knows how to defend a computer system
25   will also know the weaknesses and how to exploit it.

128

Exhibit B.txt

1          She says she takes great pains in even using the FBI
2     as an example to say that if you go out -- addressing the
3     students, if you go out and do any hacking, the FBI will
4     investigate.
5     Q.   You might have said this and I didn't catch it.  If I
6     didn't, I apologize.  Did she characterize these advanced
7     students as sophisticated hackers on the right side of the law?
8     Does that ring a bell?
9     A.   Actually, no.  In our discussions during the interview
10    process, those were -- those were things that we threw back and
11    forth in discussion.  But clearly, it was apparent during the
12    course of the interview that there has to be an ethical line
13    that students with that kind of knowledge have to walk and not
14    cross.  And I believe that she takes a very serious look at
15    that and impresses that upon her students.
16    Q.   I have a newspaper article here with an article attributed
17    to the Associated Press that indicates a quote of Dr. Frinke
18    it says, quote, "The technology that protects the system is the
19    same technology that can bring a system down," closed quote.
20    Assuming she made that statement, is that consistent with what
21    she told you in her interview?
22    A.   I think it's very consistent.  Dr. Frinke even stated that
23    with a cursory look at a student in the CSDS program at the
24    University of Idaho, you might think of that person -- you
25    might believe that person is a hacker because the tools that

129

Exhibit B.txt

1   they use in order to learn their profession to do their

2   research are the same tools that a hacker would use.

3   Q.   I also have an article that came off of a web site that is

4   attributed to I believe the Lewiston Tribune also quoting Dr.

5   Frinke.  It says, "The average computer owner, Frinke said, can

6   help guard against everything from identity theft to terrorism

7   by routinely adapting or using more complicated passwords.

8   Those who have constant on-line service should also invest in

9   the latest firewall components to help insure against entry."

10  Is that comment, assuming she made it, consistent with her

11  interview by the FBI?

12  A.   Absolutely.  I think she is very aware of the potential

13  vulnerabilities of computer systems and that is consistent with

14  what we learned from our interview with her.

15  Q.   Did your investigation include chatting with security

16  officials at the University of Idaho with regard to that

17  network?

18  A.   Yes, it did.

19  Q.   Anyone in particular?

20  A.   Yes.  The IT security director, for lack of a better term,

21  Tony Opheim (phonetic) was interviewed.  I myself did not

22  conduct that interview but I am privy to the information

23  obtained.

24  Q.   And did that interview include -- did it address entries

25  into the network that Dr. Frinke perhaps is referring to here

130

1   in this article and the security danger associated with that?

2   A.   Yes.

Exhibit B.txt

3   Q.   Generally speaking, what is your understanding of what this
4   fellow said as far as entries into the network and the
5   difficulties that that can cause?
6   A.   I think Mr. Opheim is very comfortable with the level of
7   security he has for the network based on the limited budget
8   that he has.   However, he is also very concerned about the
9   vulnerabilities of the network and in the discussions that our
10  investigators have had with him, one of his biggest concerns is
11  of probing or intrusion from within versus from without.   For
12  example, if someone were to have access to the network and in
13  such a fashion, they essentially bypass some of the stronger
14  security layers, get inside the layers of the onion if you will
15  and are able to probe the system, probe the network which as
16  you recall from my earlier testimony is a very advanced, very
17  fast, very sophisticated network.
18  Q.   And connected with other networks; is that right?
19  A.   Yes, it is.
20  Q.   Did your investigation include analysis by computer experts
21  with regard to the large hard drive computer in the isotope
22  lab?
23  A.   Yes.
24  Q.   Did that analysis render a result or an opinion as to the
25  nature of that computer with that large hard drive from the

131

1   standpoint of being a server?
2   A.   Yes, it did.
3   Q.   What's your understanding of that analysis?

Page 124

Exhibit B.txt

4    A.   My understanding from the analysis or the security scan

5    that was run on that particular computer is that it is or was a

6    file server.   The concern by the information technology

7    security personnel at the University of Idaho is independent

8    file service created on a network essentially create a back

9    door for entry into the network.

10   Q.   An open portal; is that correct?

11   A.   Yes.

12   Q.   With the security officer, did you discuss whether or not

13   this type of phenomenon, a server in fact resulting in an open

14   portal in a left-handed way, how that relates to the security

15   policy of the University of Idaho?

16   A.   Yes.   He said that -- I'm sorry.

17   Q.   Go ahead.   What was said?

18   A.   Periodic scans are always made of the computer systems at

19   the university looking for violations of university policy.   An

20   independent file server is a violation of policy and it would

21   be immediately shut down and the persons responsible for either

22   the creation or use of that file server would then be

23   answerable to the dean of the university and perhaps have their

24   network privileges removed.

25   Q.   Did the technical analysis indicate that the defendant's

                                                                   132

1    computer as a server had in effect had that effect of opening

2    that portal?

3    A.   Yes.   An independent scan of that particular server was run

4    and there were indications that IP addresses from outside the

5    network had perhaps probed the network.   What he was not able

Exhibit B.txt

6    to tell us was the extent, whether it was just a probing issue,

7    whether it was a false positive, whether someone actually

8    entered the network and was inside downloading or probing for

9    security weaknesses within.  The scan could not tell us any of

10   that but what it did tell us was that there were at least two

11   IP addresses, possibly three, that appear to have paned or

12   probed at a minimum the system.

13   Q.   Did one of those IP addresses correspond to a web site that

14   we've discussed here today?

15   A.   Yes, it did.

16   Q.   And what is that web site?

17   A.   That web site is Islam Way.com.

18   Q.   And that is associated with the Islamic Assembly of North

19   America; is that correct?

20   A.   Yes, it is.

21   Q.   Shifting gears slightly, did your post-arrest interviews

22   reveal anything as far as people opining about the defendant's

23   radical orientation changing after September 11?

24   A.   Yes.

25   Q.   What did those interviews reveal?

133

1    A.   There was at least one interview that I'm aware of where a

2    fellow student, an associate, stated that prior to September

3    11 --

4              MR. NEVIN:   I'll object to it without further

5    foundation with respect to who made the statement.

6              COURT:   Response?

Page 126

Exhibit B.txt

```
 7          MR. LINDQUIST:  That's fine.
 8   BY MR. LINDQUIST:
 9   Q.   Who made the statement?
10   A.   During the interview, a fellow student, Sala Al-Korida
11   (phonetic), statements were made that prior to September 11,
12   the group to which Mr. Al-Hussayen belongs was very radical but
13   that they toned down their rhetoric for lack of a better word
14   after September 11.
15   Q.   To your knowledge, Agent Gneckow, does the United States
16   have an extradition treaty with Saudi Arabia?
17   A.   To my knowledge, there is no extradition treaty.
18   Q.   And to your knowledge at the present time, independently of
19   this prosecution and this detention hearing mechanism, does the
20   Immigration and Naturalization Service or what was formally
21   before Homeland Security the Immigration and Naturalization
22   Service have a detainer lodged against the defendant at the
23   present time for those independent administrative proceedings?
24   A.   It is my understanding that there is a detainer.
25   Q.   And is your understanding that those charges are similar to
```

134

```
 1   the charges in this indictment and also reflect the orientation
 2   of this investigation?
 3   A.   Yes, sir.
 4          MR. LINDQUIST:  Your Honor, thank you.  Those are the
 5   questions that I have of Agent Gneckow.
 6          COURT:   (Inaudible.)
 7          MR. NEVIN:  Is this a time we can take a brief recess,
 8   Your Honor?
```

Exhibit B.txt

 9          COURT:  All right.  We'll be in recess for 15 minutes
10    until 3:30.
11          CLERK: All rise.
12               (A recess was taken.)
13          COURT:  You may be seated.  You may proceed.
14                     CROSS-EXAMINATION
15    QUESTIONS BY MR. NEVIN:
16    Q.  Let's start with the last point you testified about first,
17    this business of talking to Deb Frinke. Did I understand you to
18    say that Dr. Frinke was not aware that Sami was occupying a new
19    work station at the isotope lab?
20    A.  That's correct.
21    Q.  And he had moved to that location fairly recently, isn't
22    that true?
23    A.  I'm not positive of the date he moved.
24    Q.  You haven't checked that out in the course of your
25    investigation?

                                                             135

 1    A.  Those sorts of things are under investigation right now.
 2    Unfortunately, nobody knew when he moved into the isotope lab.
 3    Q.  No one knew?
 4    A.  No one at the university that we've interviewed to this
 5    date.
 6    Q.  Yeah.  But it's not true that no one knew, is it?
 7    A.  Oh, I'm sure you're correct.  There are some people that
 8    know when he moved over there.  But as far as our investigation
 9    is concerned, we have yet to interview someone who knows when

Exhibit B.txt

10    he moved there.

11    Q.   Yeah, your investigation is incomplete in that respect but

12    we're talking about an office that is a physical location at

13    the university, right?  I mean it's visible to the naked eye,

14    correct?

15    A.   That is correct, sir.

16    Q.   Anybody who wanted to go there could see that Sami was

17    occupying that space, right?

18    A.   That's not correct, sir.  That office space is locked much

19    of the time.

20    Q.   The time -- this is the computer, is it not, that all of

21    these pictures that you found was located on, right?

22    A.   No, sir.  Some of the photographs came from that computer.

23    Some came from Mr. Al-Hussayen's home computer.

24    Q.   Right.  And the bulk of them came from the computer at the

25    isotope lab; isn't that true?

136

1    A.   Sir, I'm not sure what the percentage is.

2    Q.   Did you determine when those pictures had been placed on

3    the hard drive of that computer?

4    A.   As you recall from my previous testimony, sir, it was just

5    a cursory review.  Complete analysis of the computer has yet to

6    be conducted.

7    Q.   Well, isn't it true that those pictures -- that many of

8    those pictures were probably placed on that computer before

9    Sami ever started using it?

10   A.   Sir, as I stated, I --

11   Q.   You don't know.

Page 129

Exhibit B.txt

12    A.    That part of the investigation, that analysis has yet to be

13    conducted.

14    Q.    Isn't it true that Sami has only started using the computer

15    in that location for something like the last six months or so?

16    A.    As I mentioned earlier, sir, we're still looking into the

17    exact date that he moved in there.

18    Q.    Well, yes, sir, but you testified -- your testimony

19    indicated that these photographs -- I mean you came here and

20    testified that these photographs are connected to Sami

21    Al-Hussayen and you indicate that -- the implication is that

22    he's downloaded them and preserved them for the purposes of

23    having them on his computer because they -- they're consistent

24    with his beliefs.  I mean that was the tenor of your testimony,

25    wasn't it?


137

1    A.    Sir, I never stated that he downloaded any of those images.

2    Q.    Well, why were you -- why was it raised then?

3    A.    Because in the normal course of an investigation that deals

4    with computer activity, typical analysis of computers includes

5    retrieving documentary evidence, photographic images, things of

6    the like.

7    Q.    So you had time to print them out and attach the file name

8    to them but you didn't have time to determine when they were

9    downloaded?

10    A.    Sir, the computer at the isotope lab as an example is an 80

11    gigabyte computer.  To put things in perspective, that is

12    thousands, perhaps millions of documents.  The search was

Exhibit B.txt

13  conducted just on the 26th and this was just a cursory review

14  of what was on the computer.

15  Q.  Sir, if you had time to print these images, you had time to

16  tell us when they were downloaded, didn't you?

17  A.  No, sir.

18  Q.  Okay.

19  A.  No, sir.

20  Q.  Okay.  Now, you know, don't you that when I log onto the

21  New York Times.com, for example, that happens to be my home

22  page that the images that are on New York Times.com are

23  downloaded to my computer and they stay there on my computer

24  until I go and I delete them.  Don't you know that to be true?

25  A.  Sir, I don't have an internet computer at home so I don't

138

1  necessarily know that.

2  Q.  You're conducting this investigation and you don't know

3  that?

4  A.  Sir, I rely on my --

5          MR. LINDQUIST:  This is just argumentative.

6          COURT:  I'll sustain the objection.

7          MR. NEVIN:  Well, Your Honor, the witness --

8          COURT:  Proceed by questions, Counsel.

9  BY MR. NEVIN:

10  Q.  Well, sir, you then aren't aware of how pictures end up on

11  a computer?  Is that your testimony?

12  A.  My testimony, sir, is that I rely on the technical experts

13  to tell me that.

14  Q.  And so the answer would be you don't know how they get

Page 131

Exhibit B.txt

15   there, you personally?

16   A.   I'm sorry.  Was that a question?

17   Q.   Yes.

18   A.   I personally rely on the technical experts to provide me

19   information relative to the computer analysis aspects of our

20   investigation.

21   Q.   So if I told you that when a person logs onto a news

22   organization's web site and the photographs are downloaded onto

23   a person's computer, if I told you that they stay there until

24   you go and delete them, you wouldn't be able to disagree to

25   that?

139

1    A.   I would have to refer to the experts.

2    Q.   Did you say that was an 80 gigabyte hard drive?

3    A.   That is my understanding.

4    Q.   That will hold a lot of photographs, won't it?

5    A.   That's what I've been told, yes.

6    Q.   And photographs will keep flowing onto it until it fills

7    up, right?

8    A.   I would have to defer to the experts on that, sir.

9    Q.   And it is the filling up of a computer with photographs

10   that would typically cause its performance to slow down and it

11   would alert a person to the fact that it was filling up that

12   something needed to be done about that; isn't that true?

13   A.   Again, sir, I would have to defer to the experts on that.

14   Q.   You testified that this is unusually large, this 80

15   gigabyte hard drive.  That a 3 or 4 gigabyte hard drive would

Exhibit B.txt

16   be more a typical kind of (inaudible).

17   A.   That's what I've been told.

18   Q.   Isn't it true that a 3 to 4 gigabyte hard drive won't even

19   run the operating systems that are used at the University of

20   Idaho?

21   A.   Again, sir, I'd have to defer to the experts on that.

22   Q.   Did I understand you to say that Dr. Frinke told you that

23   she, Dr. Frinke, made it clear to all of her students that if

24   they did any hacking, the FBI would in some way be made aware

25   of it and would investigate it?

140

1   A.   Yes.   Dr. Frinke made statements to us that indicated that

2   she was cognizant of the potential security concerns and made

3   every effort to allow her students to understand that security

4   on these systems is paramount as far as her teachings are

5   concerned.

6   Q.   So anybody who was using the computer -- anybody who would

7   have been in her program would be -- would have some awareness,

8   some capacity to be aware of the level of sophistication that

9   the FBI has in gathering up these kinds of communications?

10   A.   I don't know that that's necessarily what she said to me,

11   sir.   I believe that she said that she used the FBI as an

12   example of an entity that would potentially investigate in the

13   event there was hacking.

14   Q.   She didn't tell you that Sami had ever been involved in

15   hacking, did she?

16   A.   She did not.

17   Q.   And she didn't tell you that the system at the University

Page 133

Exhibit B.txt

18  of Idaho was ever compromised in any way, did she?

19  A.   She did not say that it had ever been compromised but she

20  did express grave concerns about its vulnerable status.

21  Q.   She told you that Mr. Al-Hussayen had changed advisors on

22  his own?

23  A.   That is what she said, yes.

24  Q.   Did she tell you that she had had an illness, I believe

25  breast cancer, that prohibited her from being at the university

141

1  for something on the order of a year?

2  A.   We were aware of that, yes.

3  Q.   You were aware of that before you testified here?  You were

4  aware of that earlier today when you testified?

5  A.   Was I aware of the fact that Dr. Frinke had suffered from

6  an illness?

7  Q.   Yes.

8  A.   Yes.

9  Q.   Isn't that the reason that Sami Al-Hussayen changed

10  advisors because she was really no longer accessible to him?

11  A.   I have not had the opportunity to ask Mr. Al-Hussayen why

12  he changed advisors.

13  Q.   You had the opportunity to ask Dr. Frinke that, didn't you?

14  Didn't she tell you that?

15  A.   Dr. Frinke said that he changed advisors on her own --

16  excuse me, on his own rather than putting her in the position

17  of having to take action herself but that the break-up was

18  amicable.

Exhibit B.txt

19   Q.   Do you think it's unusual for a person to get extensions on

20   the completion of their doctoral work?

21   A.   I don't know, sir.  I don't know if it's unusual or not.

22   Q.   Well, your testimony implied that it was unusual.

23   A.   I certainly think that three extensions sounds unusual.

24   Q.   Okay.  Have you made inquiry about that to see whether

25   doctoral students typically get extensions, whether that's

142

1   unusual or not?

2   A.   Not specifically, sir.

3   Q.   You referred to a statement that you had overheard or that

4   someone in your investigation had overheard that Sami

5   Al-Hussayen had been involved in and a statement was made to

6   the effect that in the United States, they have to live in

7   terror in order to rationalize their actions?  Do you remember

8   that?

9   A.   Yes, I do remember that.

10   Q.   What was the date of that?

11   A.   I would have to refer to my notes.

12   Q.   Feel free to do that.

13            WITNESS:  Your Honor, may I?

14            COURT:   Yes.

15   BY MR. NEVIN:

16   Q.   Are you ready to --

17   A.   Yes, sir, I am.

18   Q.   Go ahead.

19   A.   The date as reflected in my notes is November 16, 2002.

20   Q.   And was that an e-mail?

Exhibit B.txt

21    A.   I don't recall specifically whether it was e-mail or

22    telephonic intercept.

23    Q.   Mr. Gneckow, what did it refer to?  Can you give it some

24    context?

25    A.   I unfortunately don't have the document in front of me.



143



1    Q.   Aren't you aware that a lot of people around this country

2    feel that one of the justifications for going to war in Iraq

3    which many people disagree with is a degree in a sense of

4    people being terrified and therefore to urge us on to go to war

5    in Iraq?

6    A.   I'm sorry, sir.  I didn't understand your question.

7    Q.   Well, have you been following the debate about whether we

8    should go to war in Iraq over the last few months?

9    A.   Yes, sir, I have.

10    Q.   Aren't you aware that there are a lot of people who believe

11    that argument for going to war in Iraq is based on trying to

12    make people in the United States feel that they live in terror

13    or that they should be fearful and that therefore it's

14    necessary to go to war in Iraq to eradicate terrorism?

15    A.   That may be the argument that some people are placing, yes.

16    Q.   Is that what Mr. Al-Hussayen was referring to in the

17    conversation?

18    A.   Sir, as I mentioned before --

19    Q.   You don't know.

20    A.    -- I don't have content here in front of me.

21    Q.   Now, you also testified that on the day before he was

Exhibit B.txt

22  arrested, Sami spoke to his brother Halid?

23  A.  Khalid.  That's spelled K-h-a-l-i-d.

24  Q.  And you think it's pronounced Khalid?

25  A.  That's how I pronounce it, sir.


144


1   Q.  And is it correct that the brother -- that Khalid asked

2   Sami, "Where should I send money?"  And Sami said to Help the

3   Needy?

4   A.  Yes.

5   Q.  Because that was above suspicion?

6   A.  That's exactly right, sir.

7   Q.  And that he understood the money was going to Iraq?

8   A.  Sami's brother actually asked him if the money was going to

9   Iraq and Sami said that yes, it was.

10  Q.  Don't you know that there have been embargos in place

11  against Iraq for a number of years?

12  A.  Yes, sir, I am aware that there is an embargo.

13  Q.  And aren't you aware that that's created tremendous

14  hardship among common people in Iraq?

15  A.  Sir, that may be so but the embargo is law.

16  Q.  And the embargo has caused there to be medical hardship,

17  nutritional hardship, matters of that sort?  You're aware of

18  that, aren't you?

19  A.  Sir, I've not done any research into the conditions in

20  Iraq.

21  Q.  Isn't it reasonable for people to want to try to provide

22  some relief to people under those circumstances?  Isn't that in

23  fact kind of a noble purpose?

Exhibit B.txt

24   A.   Sir, you recall from my previous testimony, I said the

25   United States is an area in which because of its affluent

145

1   nature and because the American people are so giving that this

2   is an area where donations to charities of worthy causes are

3   something that are common place for us and that's why it's a

4   place that terrorist organizations like to operate out of.

5   Q.   On January 17 of 2003, you stated that there was a

6   martyrdom poem and you read from the poem.

7   A.   I did.

8   Q.   And you indicated that the e-mail was from Islam Today.

9   Who at Islam Today was it from?

10   A.   It's interesting you bring that up because I spoke with Mr.

11   Lindquist and we were going to correct the fact that it came

12   from Islam Way versus Islam Today.

13   Q.   There's a difference, isn't there?

14   A.   Yes, there is a difference.

15   Q.   All right.  And with respect to Islam Way, where did

16   that -- who did that e-mail come from?

17   A.   My recollection of the document is that it came from Islam

18   Way itself; not from a specific individual.

19   Q.   So it was a publication of Islam Way.com?

20   A.   I don't know that to be certain.  The Islam Way.com e-mail

21   address is what sent that to Mr. Al-Hussayen.  I don't know

22   necessarily that it was a publication so much as perhaps it was

23   just an e-mail that included that.

24   Q.   Was it sent to anyone besides Mr. Al-Hussayen?

Exhibit B.txt
25   A.   I'm not certain.


146


1   Q.   Isn't it correct that Islam Way has mailing lists of

2   thousands of people to whom communications are sent?

3   A.   Sir, I don't know that for a fact.

4   Q.   Maybe as many as 90,000?

5   A.   Sir, I don't know that.

6   Q.   Are you -- did you look to see what Sami's GPA was at the

7   University of Idaho?

8   A.   Yes, sir, I looked at it on a number of occasions.

9   Q.   It's a 3.88, isn't it?

10   A.   My recollection that the last one is a 3.88, yes.

11   Q.   Isn't it true that he went all the way through his doctoral

12   program at the University of Idaho and got one B, all the rest

13   A's in his courses?

14   A.   My recollection of his studies indicate that yes, he did

15   get good grades.

16   Q.   And yet your testimony (inaudible) that he was struggling?

17   A.   As you recall, my testimony stated that in the interview

18   with Dr. Frinke, she believed that he was struggling based on

19   his lack of progress in the pursuit of his doctoral

20   dissertation which is not necessarily the same thing as

21   attending class and receiving grades.

22   Q.   Did you mention that on April the 15th, Sami had received a

23   message from another student soliciting money for Hamasse?

24   A.   I'll have to double check the date.  If you'll bear with me

25   for a moment.

Exhibit B.txt

147

1  Q.   Sure.

2  A.   Your question again, please?

3  Q.   April 15 of 2002, a message to Sami requesting soliciting

4  money for Hamasse?

5  A.   On April 15, 2002, Mr. Al-Hussayen did receive an e-mail

6  message from another student at the University of Idaho.  The

7  content of that message was essentially a solicitation of funds

8  for Hamasse.  In that particular e-mail, there was information

9  that suggested the cost of bullets per bullet of automatic

10  weapons, explosives, et cetera.

11  Q.   And you didn't tell us what Mr. Al-Hussayen's response was.

12  A.   I did not tell you what his response is, you're correct.

13  Q.   What was it?

14  A.   Sir, I don't have his response in front of me.

15  Q.   So if I sent you an e-mail describing donations to Hamasse

16  in an unsolicited e-mail, would that make you guilty of

17  something?

18  A.   Sir, I didn't say that someone who receives an e-mail like

19  that is necessarily guilty.  However, individuals who routinely

20  receive e-mail messages that talk about Jihad, that talk about

21  terrorist activity, that is something of concern to me.

22       MR. NEVIN:  Your Honor, I have three exhibits that I

23  would ask to be marked.

24       COURT:  All right.  The bailiff will hand them to be

25  marked.  Marked as Defendant's Exhibits A, B and C.  Copies are

Exhibit B.txt

1   provided to (inaudible).

2           MR. NEVIN:   Yeah.

3           MR. LINDQUIST:   They have?

4           MR. NEVIN:   Yeah.

5           WITNESS:   Thank you.

6   BY MR. NEVIN:

7   Q.   I'll ask if you have Defendant's Exhibits A, B and C in

8   front of you?

9   A.   Yes, sir.

10  Q.   And do you recognize those, sir?

11  A.   I recognize Exhibit A as a photocopy of what appears to be

12  an article from the Seattle Post (inaudible).   Exhibit B is

13  what appears to be another article also from the Seattle PI and

14  Exhibit C is again what appears to be another article from the

15  Seattle PI.

16  Q.   And the date of those articles?

17  A.   The date of the article for Exhibit A is -- appears to be

18  August 2, 2002.

19          MR. LINDQUIST:   Your Honor, I'm going to object.   May

20  I ask a question in aid of that objection?

21          COURT:   All right.

22          MR. LINDQUIST:   Agent Gneckow, have you seen any of

23  these three exhibits before looking at them right now?

24          WITNESS:   No.

25          MR. LINDQUIST:   Foundation hasn't been laid to allow

Exhibit B.txt

 1    this witness to be addressing these exhibits.

 2         COURT:   Response.

 3         MR. NEVIN:   Well, Your Honor, I'll state by way of

 4    proffer that these are articles which appeared in the Seattle

 5    Post Intelligence August the 2nd, 2002, some six months

 6    before -- more than six months before Sami was arrested and

 7    they refer to Sami and there will be additional testimony about

 8    these matters.  And they indicate that members of the Muslim

 9    community in the Palouse were made crystal clear aware that the

10    FBI was conducting an investigation of allegations of money

11    being funded to improper -- funneled to improper organizations;

12    that this information became available, as I say, six months

13    before Sami's arrest and I think it's important because as we

14    know, Sami made no attempt to flee the country despite the fact

15    that these articles were published.

16         COURT:  Well, as I stated at the outset, the formal

17    rules of evidence do not apply in a detention hearing.  We're

18    just going to proceed by proffer or otherwise.  To the extent

19    the objection is based more upon the rules of evidence than the

20    matter that should be considered by the Court, I'll overrule

21    the objection to the extent that the witness may have knowledge

22    of what's contained in the articles or whatever the

23    (inaudible).

24    BY MR. NEVIN:

25    Q.   And you've never seen these before?

150

Exhibit B.txt
1   A.   No, I don't believe I have.

2   Q.   Are you aware of this -- these articles being written?

3   A.   I seem to recall that there was information that part of

4   our investigation had been leaked to the media.  However, I try

5   to make it a habit not to concern myself with the actual

6   written stories that come out.

7   Q.   You're saying it was not a concern to you that your -- some

8   of the aspects of your investigation may have been leaked to

9   the media?

10  A.   No, that's not what I said.  I said the content of the

11  stories themselves are of little concern to me.  The fact that

12  it was leaked to the media was of concern to me.

13  Q.   And the reason that it would be of concern to you is

14  because it might reveal to the people that you were

15  investigating the fact that you were investigating them and

16  then in response to that, they might try to flee or take other

17  actions?

18  A.   Yeah.  Among the other actions they would take could

19  potentially be the destruction of valuable evidence as well.

20  Q.   Right. And possibly trying to flee the jurisdiction to

21  avoid being around when you arrested them.  That's a

22  possibility as well.

23  A.   It is a remote possibility, yes.

24  Q.   Well, do you have information that Mr. Al-Hussayen has

25  destroyed evidence?

151

1   A.   It would be very difficult to determine if say hard

2   documentary evidence in the form of paper had been destroyed
Page 143

Exhibit B.txt

3    and things were shredded or burned or put away other places.

4    It would be difficult to know that.

5    Q.   Sure.  But as difficult as it would be, you do sometimes

6    find that kind of thing out and you don't have any evidence of

7    that having occurred in this situation?

8    A.   Sir, Moscow, Idaho is about two hours south of our office.

9    The logistics of being able to keep an eye on the physical

10   comings and goings of people down there are quite difficult.

11   If someone were to leave the house and destroy evidence, it's

12   very possible we would never know.

13   Q.   And again, you don't have evidence that there's been any

14   destruction of evidence?

15   A.   The investigation --

16        MR. LINDQUIST:  That's been asked and answered, Your

17   Honor.

18        MR. NEVIN:  No, actually it hasn't been answered, Your

19   Honor.

20        MR. LINDQUIST:  It has been answered by this witness.

21        COURT:  Well, just a moment.  Let the Court rule on

22   the matter.  Can you respond to that question directly yes or

23   no?

24        WITNESS:  The investigation has yet to determine

25   whether evidence has been destroyed.  However, as we stated

152

1    throughout my testimony, the investigation is ongoing.

2    BY MR. NEVIN:

3    Q.   And you have acquired mountains of evidence, would that be

Page 144

Exhibit B.txt
4    fair to say?  Is that true?

5    A.   A lot of evidence, yes.

6    Q.   You testified about a check that Sami wrote to the Global

7    Relief Foundation, did you not?

8    A.   Actually I believe I said it was a check or checks written

9    to Global Relief, yes.

10   Q.   And those would have written on Sami Al-Hussayen's bank

11   account?

12   A.   I believe that is the case, yes.

13   Q.   Which bank account uses his name, right?

14   A.   I'm sorry.   Your question?

15   Q.   The bank account uses his name.

16   A.   Which bank account uses his name?  Is that what you're

17   asking?

18   Q.   No.   The bank account that -- from which the checks to the

19   Global Relief Fund were written were written on a bank account

20   that has Sami Al-Hussayen's name attached to it, right?

21   A.   That is correct, yes.

22   Q.   And the checks have his name as well printed right on them,

23   don't they?

24   A.   Yes, I believe so.

25   Q.   Not any effort to hide the fact that that -- that that

153

1    check was being written to that organization, right?

2    A.   Well, not necessarily unless you take into the account the

3    fact that the memo line is written in Arabic versus in English.

4    Q.   Yes.   And do you have anybody in your organization who

5    speaks Arabic, sir?

Page 145

Exhibit B.txt

6    A.   As a matter of fact, we do have a number of language
7    specialists who speak Arabic but there are none assigned to the
8    Coeur d'Alene office nor to the Boise office and that's where
9    the lion's share of the evidence regarding the financial
10   aspects of the investigation are conducted.
11   Q.   The testimony that you provided about the Al-Multayce, the
12   apartment at 504 and a half D Street, do you remember that?
13   A.   Yes.
14   Q.   You indicated that there were private discussions which
15   were undertaken which were not to be discussed in public.
16   A.   I don't believe that's what I said, sir.
17   Q.   What did you say about that?
18         MR. LINDQUIST:   About what, Your Honor?   There was a
19   large number of questions directed toward that.
20         COURT:   They're referring to the apartment and what
21   occurred there.
22   BY MR. NEVIN:
23   Q.   Was their testimony not that it was a place to hold private
24   discussions?
25   A.   I believe that my testimony did shadow -- or did share

                                                                 154

1    information such as that and that's based primarily on
2    investigative experience.   Generally around the country, these
3    sorts of investigations clearly indicate that there are
4    separate secluded meeting places by which many groups that are
5    currently under investigation can meet privately to discuss
6    private things.   These meetings typically took place on
                        Page 146

Exhibit B.txt

7  Saturday evenings in Moscow on the other side of town from the

8  Islamic center.  Not everyone from the Islamic center was

9  invited to these meetings.  Therefore, it appears that these

10  meetings were for more private discussions.

11  Q.  Sir, that was a social club, wasn't it?

12  A.  Sir, I've never been asked to attend.  I would not know.

13  Q.  Well, aren't there foosball tables -- isn't there a

14  foosball table there?

15  A.  Sir, I've never been inside the Al-Multayce apartment.

16  Q.  Well, but the FBI has been inside there.  Didn't they serve

17  a search warrant there?

18  A.  That is correct.

19  Q.  Well, you've not been told that there was a foosball table

20  and a pingpong table there?

21  A.  Sir, no one told me that there is a foosball table inside

22  the apartment and until someone tells me such, I won't know.

23  Q.  In any event, you don't have -- in all of your

24  interceptions and all the rest, you don't have any indication

25  that any kind of secret conversations took place at that

155

1  location, do you?

2       MR. LINDQUIST:  Your Honor, could we approach a side

3  bar, please?

4       COURT:  All right.

5            (A side bar discussion was had.)

6  BY MR. NEVIN:

7  Q.  Mr. Gneckow, you also described payments -- some checks

8  that had been written by Sami to -- that had been intended to

Exhibit B.txt

9    go to Chechnya.   And that those -- those were checks which were

10   directed to the Global Relief Foundation; is that correct?

11   A.   That is correct.

12   Q.   And again, those checks were written on Sami's own bank

13   account, checks that had his name printed on them, correct?

14   A.   I'm not sure without the checks in front of me but I would

15   imagine that is the case.

16   Q.   Do other people write checks to the Global Relief

17   Foundation?

18   A.   Yes.   It's my understanding that the Global Relief

19   Foundation receives many checks.

20   Q.   Thousands of checks from people all over; isn't that true?

21   A.   I don't know what the number is, sir.

22   Q.   Did you indicate that the Global Relief Foundation has been

23   declared to be a terrorist organization?

24   A.   Sir, I believe my testimony stated that pursuant to

25   executive order 13224, it has been designated by the U.S.

156

1    treasury department as a terrorist support organization under

2    the guidelines of OFAC, the Office of Foreign Asset Control.

3    Q.   Is the same true of Help the Needy?

4    A.   No, sir.   I do not believe that Help the Needy has been

5    designated under OFAC.

6    Q.   Is it true that Help the Needy has been indicted as an

7    organization?

8    A.   I'm not absolutely positive that the organization itself

9    has been indicted.

Page 148

Exhibit B.txt

10  Q.  The organization IANA, Islamic Assembly of North America,

11  has not been designated as a terrorist organization, has it?

12  A.  Not at this time, it hasn't.

13  Q.  And not at any time in the past, has it?

14  A.  No, sir.

15  Q.  Not at any time when Sami Al-Hussayen was dealing with it,

16  right?

17  A.  Well, at this time, we have a bunch of evidence as a result

18  of search warrants at IANA that are in the process of being

19  reviewed.  At the conclusion of that review, we'll see what

20  happens.

21  Q.  Yes.  And my question was that at no time during the time

22  that Sami Al-Hussayen was dealing with IANA was it ever

23  declared to be a terrorist organization?

24  A.  And his dealings with them continue to date; is that

25  correct?

157

1  Q.  Today?  They continue today?

2  A.  To date I said.

3  Q.  Is that your testimony, that he continues to deal with them

4  today?

5  A.  Sir, obviously he can't be dealing with them today.

6  Q.  Right.  So let me ask the question again.  Isn't it true

7  that at no time when Sami Al-Hussayen has ever dealt with IANA

8  has it been declared to be a terrorist organization?

9  A.  Not by OFAC, no, sir.

10  Q.  By someone else?

11  A.  Currently investigations clearly point to the fact that

Exhibit B.txt

12   they're considered to be a support for terrorism.
13   Q.   So in other words, you're thinking about declaring them to
14   be a terrorist organization?
15   A.   Sir, that's not my call.
16   Q.   And isn't it true that at all times that Sami has dealt
17   with IANA that it has been a 501(c)(3) corporation?
18   A.   I'm not certain whether the entire time it has been but I
19   believe that is true.
20   Q.   The government has never acted to take away its tax exempt
21   status?
22   A.   Not yet.
23   Q.   It hasn't happened in the past.  Not at any time when Sami
24   was dealing with them was it -- was that status taken away?
25   A.   No, sir, not yet.


                                                                    158


1    Q.   Isn't it true that their assets were frozen at a time after
2    September the 11th but then the freeze was lifted shortly
3    afterwards?
4    A.   Yes, sir.  I'm vaguely aware of that incident, yes.
5    Q.   IANA has not been indicted, has it?
6    A.   No, sir.
7    Q.   Has any person who is presently a principal of IANA been
8    indicted?
9    A.   I'm not exactly certain of the answer of that, sir.  I know
10   that we have individuals who may still be in active status with
11   IANA that are currently under arrest or under indictment.  The
12   current status of those individuals I'm not certain of right

Exhibit B.txt

13   now.

14   Q.   You've referred to IANA from time to time as a charity and

15   IANA has a legitimate purpose even in your view; isn't that

16   true?

17   A.   It's a purported charitable organization, yes.

18   Q.   Well, it conducts seminars and conventions and operates

19   summer programs up in Canada.  You're aware of that, aren't

20   you?

21   A.   I'm not aware of summer programs in Canada, no, sir.

22   Q.   You're aware that undertaking those activities costs money,

23   aren't you?

24   A.   Of course.

25   Q.   You're also aware that they maintain an 800 number called

159

1    Fatwah. Do you know what that is?

2    A.   Yes, sir, I'm aware of the hot line.

3    Q.   And that's a number that people can call to get questions

4    answered about Islamic law and Islamic religious issues?

5    A.   I have never spoken to anyone who has called that line,

6    sir.

7    Q.   You've not made an effort to determine whether that's a

8    legitimate operation or enterprise?

9    A.   Sir, based on the number and various activities including

10   the volume of web sites, the Fatwah line is one of the areas

11   that we have not paid very close attention to other than

12   financial flows back and forth between individuals involved in

13   that.

14   Q.   Well, you know that it costs money to run the Fatwah line,
                              Page 151

Exhibit B.txt

15    don't you?

16    A.  I don't know that, sir.

17    Q.  Then you know as well that IANA runs something called the

18    radio net.

19    A.  Yes, I'm aware that they run a web site called radio net.

20    Q.  And you're aware that there was an effort at one time to

21    start a radio station at IANA, aren't you?

22    A.  I'm not necessarily aware of that, no.

23    Q.  Do you know that it costs money to operate the IANA radio

24    net?

25    A.  I would imagine it probably does cost money, sir.


                                                                    160


1    Q.  Now, you mentioned a quarterly magazine that IANA

2    publishes, Al-Manar Al-Jaheed.  You're familiar with that,

3    aren't you?

4    A.  Yes, I am.

5    Q.  And in fact you testified about money being sent to Amal

6    Saltan, did you not?

7    A.  I did.

8    Q.  Isn't it true that Amal Saltan has been responsible for

9    publication of Al-Manar Al-Jaheed?

10    A.  My understanding is that Amal Saltan is actively involved

11    in that effort, yes.

12    Q.  Yeah.  And you said that Sami had sent Mr. Saltan some

13    $15,200 over a period of time, correct?

14    A.  That does not include money sent directly from IANA to

15    Saltan.

Exhibit B.txt

16  Q.  I was just asking you about money that Sami sent.  That was

17  your testimony, wasn't it?

18  A.  It is although Sami being an officer -- de facto officer at

19  least of the IANA, moneys flowing from the IANA to Amal Saltan

20  I believe are pertinent.

21  Q.  How often were moneys received from -- how often did Sami

22  send money to Amal Saltan?

23  A.  I'm not specifically sure of the number of times but the

24  amount is $15,200.

25  Q.  Is it correct that it costs money to publish the magazine

161

1  Al-Manar Al-Jaheed?

2  A.  Sir, I haven't looked at the books.

3  Q.  You haven't.  You haven't looked at IANA's books?

4  A.  They've been seized as part of a search warrant and I have

5  not reviewed that as yet.

6  Q.  Isn't it true that the magazine Al-Manar Al-Jaheed is

7  received by American universities?

8  A.  Sir, I don't know that.

9  Q.  Isn't it true that IANA publishes books?

10  A.  I do believe that they publish books, yes.

11  Q.  And you can get on Amazon.com right now and find four or

12  five titles that IANA has published, can't you?

13  A.  Sir, do you recall from my testimony I don't have an

14  internet computer.

15  Q.  Are you aware that IANA provides scholarships to students?

16  A.  I'm not aware of that, sir.

17  Q.  Are you aware that IANA has a library program for prison

Exhibit B.txt

18   inmates?

19   A.   Yes, I'm aware of that.

20   Q.   Are you aware that the government reimburses IANA for their

21   expenses associated with that project?

22   A.   Sir, if I may, during my testimony previously, I said that

23   these various charitable organizations around the country do

24   charitable work but portions of the work are not necessarily

25   sent to good causes and in fact in many cases, portions of the

162

1   money are siphoned off for diabolical causes.  So to say to me

2   that IANA is involved in charitable work simply restates what I

3   testified to previously.

4          MR. NEVIN:   Your Honor, I ask that the answer be

5   stricken as nonresponsive.

6          COURT:   It is nonresponsive.   Please just try your

7   best to answer the questions asked by counsel.

8          WITNESS:   Yes, Your Honor.

9   BY MR. NEVIN:

10   Q.   The question was are you aware that they have a public

11   library project?

12   A.   I'm not aware of that, sir.

13   Q.   Well, have you analyzed what IANA has done with the money

14   that you say it received from Sami Al-Hussayen?

15   A.   We have done some analysis in that, yes.

16   Q.   Is it your testimony that it was used for operation of

17   IANA?

18   A.   I believe it is used for operation of IANA, yes.

Exhibit B.txt

19  Q.  And for these legitimate purposes, among others, that I

20  have just articulated?

21  A.  What the money has done after it's paid out as salary out

22  to the employees, I'm not aware of that.

23  Q.  Do you know how many people give money to IANA?

24  A.  No, sir, I don't.

25  Q.  Do you know what organizations give money to IANA?

163

1   A.  I know some.

2   Q.  Is it your intent -- is it your belief that all of the

3   organizations and all of the people who provide money to IANA

4   has committed crimes?

5   A.  Sir, my previous testimony, I said that many people send

6   money -- the reason many of these organizations exist in the

7   United States is because people donate money to these

8   organizations believing that the end result is going to be the

9   charitable -- the charitable services that the organization

10  purports.  So certainly people will send money to charitable

11  organization including IANA not knowing where the money's going

12  but assuming it goes to the charitable cause that they're told.

13  Q.  How long has your investigation of IANA been ongoing?

14  A.  That's kind of difficult to say.  The investigation of the

15  defendant Mr. Al-Hussayen was initiated shortly after the event

16  of September 11, 2001.  As part of the investigation of Mr.

17  Al-Hussayen, IANA was identified and subsequently was

18  investigated.

19  Q.  So you don't know when the investigation of IANA began?

20  A.  Sir, if I could reference some of the case files, I could

Exhibit B.txt

21    tell you exactly the date but I don't have the case files in

22    front of me.

23    Q.   Are they available to you readily today?

24    A.   No, sir.

25    Q.   Despite all of the investigation that you've done, however,


                                                                    164


 1    you still are not -- you still have not caused IANA to be

 2    indicted, correct?

 3    A.   Sir, IANA is not under indictment at this time.

 4    Q.   So to a person from the outside looking in at IANA, during

 5    all of the periods of time that we've been talking about, '98,

 6    '99, the year 2000, the year 2001, the year 2002, IANA looks

 7    for all intents and purposes like a legitimate organization

 8    from the outside, doesn't it?

 9    A.   Oh, not necessarily, sir.

10         MR. LINDQUIST:  I'll object to the form of the

11    question from the perspective of whom?  From the perspective of

12    a law enforcement officer investigating international terrorism

13    or what?

14         COURT:  The witness was starting to answer the

15    question in any event.  I'll let the -- are you standing on

16    your objection?

17         MR. LINDQUIST:  Yes.

18         COURT:  I will sustain the objection and the question

19    can be rephrased.

20         MR. NEVIN:  All right.

21    BY MR. NEVIN:

Exhibit B.txt

22    Q.   From the point of view of a person -- not from the point of

23    view of a law enforcement person.  Let's start from the point

24    of a view of an ordinary person.  IANA has all the appearances

25    of a legitimate organization, does it not?


                                                                    165


 1    A.   Sir, that's a difficult question for me to answer.  I've

 2    been in federal law enforcement for 17 years.  To ask me to

 3    tell you what a reasonable nonlaw enforcement person would

 4    think is -- that's a difficult question for me to answer.

 5    Q.   You offered testimony about Sami's Uncle Saleh.  Do you

 6    recall that testimony?

 7    A.   Yes, I do.

 8    Q.   What is Saleh's background?  Have you determined that?

 9    A.   I believe that he is currently a minister in the Saudi

10    government and his post is Mecca at this time.

11    Q.   Right.  The Islamic holy city?

12    A.   Yes.

13    Q.   And you don't advocate or contend that he advocates

14    terrorism, do you?

15    A.   Sir, not having had the opportunity to interview him, I

16    can't really answer that question.

17    Q.   You're not aware of him ever having written or spoken in

18    favor of terrorism, are you?

19    A.   I have no information at my disposal to analyze regarding

20    that.

21    Q.   And so you simply don't have any evidence to suggest that,

22    do you, and nor does the FBI?

23              MR. LINDQUIST:  To suggest what, Your Honor?
                          Page 157

Exhibit B.txt

24          MR. NEVIN:   That he's involved in terrorism.

25          WITNESS:   Sir, based on the events that resulted in

166

1    his interview and subsequent interview, I don't necessarily

2    have information that suggests that he isn't something --

3    someone that we need to talk to about terrorism.

4    BY MR. NEVIN:

5    Q.   Was it your testimony that he was seen together with the

6    terrorists who were at that hotel?

7    A.   No, sir, that was not my testimony.

8    Q.   He wasn't seen with them at all, was he?

9    A.   Sir, I have no information based on the investigation that

10   he was observed in the company of the hijackers.

11   Q.   You don't have any evidence that he knows the hijackers, do

12   you?

13   A.   Sir, I have no evidence to suggest that he doesn't know the

14   hijackers.

15   Q.   And Mr. Gneckow, if he were truly aware of what the

16   hijackers were about to do and supported it or had been

17   involved in it in some way, the last place he would be with

18   them is at the hotel with them the day before the hijacking

19   occurs.   Doesn't that make sense to you?

20   A.   Sir, you're asking me to speculate into the mind of a

21   person I've never met.

22   Q.   Well, the last place that anybody with advanced knowledge

23   of September 11 would be would be there at that hotel with the

24   hijackers unless they were one of the hijackers.   I mean

Exhibit B.txt
25    doesn't that make sense to you?


167


1        MR. LINDQUIST:  Your Honor, that's a nice argument but
2    we should leave that for closing argument.  I'd be happy to
3    address it.
4        COURT:  All right.  I'll sustain the objection.
5    BY MR. NEVIN:
6    Q.  Well, isn't it more likely in your view, sir, that it's
7    just a coincidence?
8        MR. LINDQUIST:  And again that's just argument.  If
9    counsel wants to make that argument in closing, I'd be happy to
10   respond.
11       COURT:  All right.  I'll sustain the objection.
12   BY MR. NEVIN:
13   Q.  So how old is Saleh?
14   A.  I'm not exactly sure but I believe his date of birth was in
15   1931.
16   Q.  So he's a man in his 70's.
17   A.  If that date of birth is correct, yes.
18   Q.  And was it your testimony that a number of people were
19   questioning him?
20   A.  I believe my testimony was that he was interviewed once on
21   September 17 by a couple of FBI agents and then perhaps a day
22   later.  I'm not sure of the date.
23   Q.  Was it hostile questioning?
24   A.  My understanding, sir, is that when questions were asked
25   relative to the event of September 11, that precipitated a

Exhibit B.txt

168

1    seizure.

2    Q.   So you have a 70-year-old Saudi man who's within days of

3    September 11 is being interviewed by FBI agents and your

4    testimony is that an attack that he had was fained?

5    A.   Sir, the testimony that I provided was based on the

6    information received from the interviewing agent who was

7    perhaps in the best position to make an assessment after also

8    speaking with the attending physician at the hospital.

9    Q.   Mr. Gneckow, isn't it true that all of the money that you

10   claim that Sami forwarded to IANA was forwarded from his own

11   personal bank accounts?

12   A.   Sir, based on the volumes of the accounts involved in this,

13   I wouldn't be comfortable in saying that all of the money has

14   come from his personal accounts.

15   Q.   Well, the vast majority of it?

16   A.   Again, sir, there's continued investigation that needs to

17   be conducted.  For example, a search warrant conducted at Mr.

18   Al-Hussayen's house discovered the existence of a bank account

19   that belongs to another individual who has since left the

20   United States that Mr. Al-Hussayen apparently is using as well.

21   Q.   Well, sir, you don't know of any money that Sami

22   Al-Hussayen sent to IANA that did not come out of his personal

23   bank accounts, do you?

24   A.   That's not necessarily true.

25   Q.   What money do you know of that Sami sent to IANA that did

Exhibit B.txt

169

1    not come out of his personal bank accounts?

2    A.   Sir, during the solicitation of donations for these

3    charitable organizations, in particular for IANA, and based on

4    the review of Mr. Al-Hussayen's bank account and the bank

5    accounts of other associates in Moscow, Idaho, there are a lot

6    of cash transactions that occur.   And it's difficult for me to

7    say where those cash transactions come from.   They could come

8    from Mr. Al-Hussayen's account.   It could come from others'

9    accounts.

10                  MR. NEVIN:   Well, Your Honor, I ask that be stricken

11   as nonresponsive to the question I asked.

12                  MR. LINDQUIST:   It was very responsive.

13                  COURT:   Well, I will not strike the testimony.   He was

14   responding to whether he has information that the money came

15   all out of the personal checking accounts.   He responded that

16   apparently there was some cash transactions (inaudible) respond

17   to that.

18   BY MR. NEVIN:

19   Q.   Your testimony is that there was cash transactions between

20   IANA and Mr. Al-Hussayen?

21   A.   No, sir.   My testimony is that based on the fact that there

22   are these cash transactions that exist out there, the

23   difficulty in tracking that makes it very hard for us to

24   determine whether moneys came from other places other than Mr.

25   Al-Hussayen's account that he personally delivered to IANA.

170

Exhibit B.txt

1   Those are things that require further investigation.
2   Q.   Right.   But at this point, you just don't know of any such
3   transfers, do you?
4   A.   Yes, sir.   But I also don't know that they don't exist.
5   Q.   The bank accounts list -- the bank accounts in Moscow and
6   in Pullman list Sami's correct home address, don't they?
7   A.   I believe the ones in Moscow and Pullman do list his
8   address in Moscow.
9   Q.   And those accounts, according to your testimony, were used
10  to send money to IANA.   Isn't that correct?
11  A.   That is correct.
12  Q.   And the way the banking system works is that checks are
13  photocopied or microfilmed and retained and anybody who wrote a
14  check to IANA on their own bank account would not be able to
15  conceal the fact that they had done so.   Isn't that true?
16  A.   That is assuming of course that the information on the
17  accounts is correct.   For example, my earlier testimony
18  indicated that there is a bank account under Mr. Al-Hussayen's
19  name in Michigan that is solely used by Mohammed Al-Hamari, the
20  president of IANA.
21  Q.   And what was it used for?
22  A.   Sir, I don't know.   But all of the checks written off of
23  that account bear Mr. Al-Hamari's signature.
24  Q.   Well, I understand and with respect to that account, you
25  know that all of those -- all of the money in that account was

171

Exhibit B.txt
1   used for day to day expenditures of Mr. Al-Hamari, don't you?

2   A.   Sir, I don't know that for a fact.

3   Q.   You indicated that Mr. Al-Hussayen was a registered agent

4   for IANA in the State of Idaho.

5   A.   That is correct.

6   Q.   And he registered under his own name, right?

7   A.   Yes.

8   Q.   He didn't go in and offer an alias or a phony name or

9   anything, right?

10  A.   Not to my knowledge.

11  Q.   That's not a particularly effective way to hide your

12  connection with an organization, is it, to list your own name

13  as the registered agent?

14  A.   Yes.   But there are other ways in which he hid his

15  association with IANA.

16  Q.   Well, certainly if a person thought he were making

17  contributions to a terrorist organization, he wouldn't list

18  himself as the registered agent with the organization.   That

19  wouldn't be very smart, would it?

20  A.   Again, sir, I have not had the opportunity to interview Mr.

21  Al-Hussayen and ask him questions such as that.

22          COURT:  All right.  We're going to take a short

23  recess.  I have to address a case that I have set for trial in

24  Pocatello.  I've got to confer with counsel on that.  So we'll

25  recess for about 10 or 15 minutes.

                                                                    172

1          CLERK: All rise.

2                  (A recess was taken. The testimony of John
                          Page 163

Exhibit B.txt

     3                    Dickinson was taken and the proceedings were

     4                    recessed at 5:39 p.m.)

     5

     6

     7

     8

     9

    10

    11

    12

    13

    14

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

                                                                    173


                    I, court-approved transcriber, certify that the

         foregoing is a correct transcript from the official electronic

         sound recording of the proceedings in the above-entitled matter.

Exhibit B.txt


Signature of Approved Transcriber        Date


  Tamara A. Weber

Typed or Printed Name