**EXHIBIT G**

REQUESTED BY: KANE, DAVID C

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE   1 |
| | 3. CASE NUMBER DC02PU02DC0005 |

| 4. TITLE: THE SAFA GROUP - HERNDON, VIRGINIA |
|---|
| 5. CASE STATUS:   INTERIM RPT |

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 071403 | 112101 | 1 | 040 | 090 |

| 11. RELATED CASE NUMBERS:   DC02PU02DC0009   B002PU02B00049 |
|---|
| 12. COLLATERAL REQ: |
| 13. TYPE OF REPORT:<br>  INVESTIGATIVE FINDINGS / MEMO OF INTERVIEW |
| TOPIC: INTERVIEW OF SOLIMAN BIHEIRI |

14. SYNOPSIS:
The RAIC-DC and the Internal Revenue Service-Alexandria, Virginia are investigating the suspected terrorism-related money laundering activities, IEEPA violations and tax code violations of the SAFA GROUP. The SAFA GROUP is a name given to a group of individuals and organizations located predominantly in the area of Northern Virginia. The individuals operating the SAFA GROUP are mainly of Middle Eastern descent. They began establishing the Virginia-based organizations in the early 1980s. These organizations include for-profit businesses, charitable organizations and educational organizations. The SAFA GROUP has funded front organizations believed to be conduits for terrorist organizations. In addition, the investigation has uncovered indirect ties to Al-Qaeda.

On June 15, 2003, SOLIMAN BIHEIRI arrived at Dulles International Airport in Sterling, Virginia. He was subsequently voluntarily interviewed and then arrested pursuant to a federal material witness arrest warrant.

| 15. DISTRIBUTION:<br>RACDC SACBA | 16. SIGNATURE:<br>  KANE           DAVID    C   SPECIAL AGENT |
|---|---|
| | 17. APPROVED:<br>  ROMANOFF       BRAD     S   OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: DC<br>  DC-VIRGINIAS - RAC | 19. TELEPHONE: 410 579 5131 |
| | | 20. TYPIST: KANE |

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE  2 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

Details of Investigation:

On June 15, 2003, at approximately 1345 hrs, SOLIMAN BIHEIRI arrived into Washington Dulles International Airport on Swissair flight LX 34 from Zurich, Switzerland. BIHEIRI'S travel originated in Cairo, Egypt on June 14, 2003.

Upon arrival into the Immigration and Customs area at Dulles, BIHEIRI was met by ICE Senior Special Agents Kane and Moldowan. The agents identified themselves and told BIHEIRI that they would like to speak with him after he cleared Customs. BIHEIRI told the agents that he would have no problem to speak with the agents. He asked if they wished to speak with him regarding "something specific" or if they randomly desired to speak with him. Agent Kane told him that they wished to speak with him regarding "something specific".

Upon clearing Customs, BIHEIRI and the agents proceeded to a conference room in the Customs facility at the airport, where Agents Kane and Balberchak (IRS) proceeded to interview BIHEIRI. The interview began at approximately 1415 hrs.

The agents related that they were investigating a group of individuals and organizations in the area of Northern Virginia that were suspected, among other things, of providing financing to Islamic terrorist organizations, worldwide. The agents related that they knew that BIHEIRI was the former President of BAIT UL MAL, INC. (BMI) and that they were interested in speaking to BIHEIRI about the disposition of money that moved through the company.

BIHEIRI acknowledged that he was one of the founders and the President of BMI. He related that he and HUSSEIN IBRAHIM formed the company in New Jersey in 1985. He related that it was a financial company that then branched into different industries, including real estate and leasing. BIHEIRI told the agents that they must be interested in speaking with him regarding the relationship that BMI had with PTECH, a corporation located in Boston, Massachusetts that is the subject of a current Federal investigation by ICE and the FBI in Boston.

BIHEIRI went on to tell the agents that he became involved with PTECH through OSAMA ZIADE. He related that ZIADE, a Boston-based computer programmer, approached him in late 1992. He told the agents that ZIADE was trying to form a computer software company and needed an initial capital investment. BIHEIRI agreed to assist ZIADE in acquiring the capital as best he could, he related. BIHEIRI related that ZIADE was in need of approximately $3 to $3.5 million

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE   3 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| REPORT OF INVESTIGATION CONTINUATION | |
| | 3. REPORT NUMBER: 090 |

dollars to start his company, PTECH. A few weeks later, BIHEIRI received a phone call from a person by the name of Sheikh YASSIN AL-QADI from Saudi Arabia, he said. He related that he had never met or spoken to AL-QADI before this. He related that AL-QADI must have learned of BMI through one of the many advertisements that he made in various Islamic newspapers and magazines around the world.

He related that AL-QADI was looking to invest $3 to $4 million dollars in his company, as that he heard that it was a well run Islamic investment company. BIHEIRI related that he told AL-QADI of this prospective investment in PTECH and AL-QADI became very interested and invested approximately $3 to $5 million into PTECH, through BMI, shortly thereafter. The money went into a Kadi International account at Bank of New York, then was transferred to Ptech. The signatories on the KADI INTERNATIONAL account were GAMAL AHMED and HUSSEIN IBRAHIM. BIHEIRI related that QADI invested only this amount through BMI, although QADI ended up investing approximately $10 million overall. BIHEIRI explained that BMI only had a role in arranging for the initial start-up capital for PTECH from QADI, and thereafter, QADI invested the rest of his money into PTECH directly through ZIADE.

BIHEIRI related that BMI received a commission for this investment by QADI via stock shares in PTECH, which became worthless when PTECH went bankrupt a few years ago. BIHEIRI related that he knew that QADI invested approximately $10 million total into PTECH through his close personal friend, HUSSEIN IBRAHIM. He related that he (BIHEIRI) and IBRAHIM served on the board of directors of PTECH when it was created. He related that IBRAHIM remained on the board until PTECH went bankrupt. He told the agents that IBRAHIM and ZIADE were the founders of PTECH, both conceptually and officially. He stated that IBRAHIM was a computer programmer with a Phd from Columbia University in New York.

He stated that IBRAHIM, like both himself and GAMAL AHMED, was Egyptian born and had subsequently obtained U.S. citizenship. He related that IBRAHIM was currently living in Egypt. He stated that IBRAHIM was recently in the United States attending the graduation of his daughter at the Massachusetts Institute of Technology (MIT). Ibrahim also had a son that graduated from MIT.

BIHEIRI told the agents that he has met QADI on two occasions, once at a meeting for PTECH at One Harmon Plaza, Seacaucus, New Jersey, at the office of BMI and another time in Saudi Arabia. He related that he believes that QADI is a very kind person and does not believe the allegations of QADI being a supporter of terrorism. He related that QADI was extremely intelligent and that he had studied in Chicago and at Harvard University. He related that QADI obtained a Phd in physics at Harvard.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 4 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

He stated that QADI is Saudi Arabian and comes from a very well known family in Saudi Arabia. He related that QADI'S wife is from the JAMJOOM family. He related that the QADI'S father-in-law is the former finance minister of Saudi Arabia. He related that FNU JAMJOOM held that position for many years. He also related that the JAMJOOM family was a wealthy and educated merchant family whose name was as well-known in Saudi Arabia as the names "MAHFOUZ" and "AL-RAHJI". BIHEIRI related that AL-QADI'S mother was a former Dean of the King Abdul Aziz University in Jeddah, Saudi Arabia. He related that QADI was also very close friend of KHALID BIN MAHFOUZ, who owns a majority interest in the NATIONAL COMMERCIAL BANK in Saudi Arabia. He told the agents that QADI used to work for the NATIONAL COMMERCIAL BANK and currently has a close working relationship with the bank and MAHFOUZ.

When initially asked if he knew of any QADI controlled companies in the United States, BIHEIRI said he did not. The agents then asked him if he knew of a QADI company located in New Jersey. He said he believed that QADI did have one, but did not know its name. The agents then asked if he ever heard of KADI INTERNATIONAL. BIHEIRI then stated that KADI INTERNATIONAL was the company and it was located in New Jersey. Biheiri said that HUSSEIN IBRAHIM and GAMAL AHMED were signatories on the KADI INTERNATIONAL account and that GAMAL AHMED'S and QADI'S names were on the corporate paperwork, but BIHEIRI'S name was not on the paperwork or account.

BIHEIRI related that when he first met QADI, QADI was interested in starting various investment projects in the United States, including a leasing company, a software company and a real estate company. BIHEIRI related that he/BMI managed money for various QADI investments, including real estate investments. He stated that approximately $5 million moved through the bank account that BMI controlled for KADI INTERNATIONAL for investment in Ptech. When asked how the money moved into and out of the KADI INTERNATIONAL bank accounts, BIHEIRI related that QADI had control over those accounts and that he (BIHEIRI) did not know the answer to that.

BIHEIRI related that he believed that PTECH had been formed in the last six months of 1993. He stated that he originally met OSAMA ZIADE in 1992. He arranged for the financing of PTECH by AL-QADI via BMI. He related that ZIADE was constantly in need of large amounts of money, and that he (BIHEIRI) only arranged for the first tranch of $3 to $5 million dollars to be invested by AL-QADI. He related that AL-QADI then dealt directly with PTECH and ZIADE from that point onward.

BIHEIRI described ZIADE as a "computer genius". He related that both ZIADE and IBRAHIM founded the company. BIHEIRI related that QADI agreed to pay BMI/BIHEIRI a 3 to 5% commission for setting up the original deal between him and PTECH. BIHEIRI stated that he was compensated in PTECH stocks, which

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | 1. PAGE  5<br>2. CASE NUMBER DC02PU02DC0005<br>3. REPORT NUMBER: 090 |
|---|---|

subsequently became worthless. Biheiri said he reported the PTECH stock compensation as income on BMI Finance & Investment's income tax returns. He stated that this was documented and that the FBI must have the documents. BIHEIRI stated that he served on the board of directors of PTECH for approximately three years. He stated that approximately $5 million in additional funds passed through KADI INTERNATIONAL bank accounts and on to PTECH. He related that he was not sure if the U.S. KADI INTERNATIONAL bank accounts were controlled by GAMAL AHMED or KADI himself, but GAMAL AHMED's and HUSSEIN IBRAHIM's names were on the account as signatories.

BIHEIRI related that he left the board of PTECH due to a financial disagreement he had with OSAMA ZIADE. BIHEIRI related that he wanted PTECH to go public so it could obtain further and easier financing. He related that ZIADE did not want the company to go public and preferred to continue to raise private capital investments, such as the money invested by QADI.

BIHEIRI related that he and GAMAL AHMED had received grand jury subpoenas in 1999 to testify in a Federal court in Chicago relative to an investigation being conducted by the FBI. He related that his subpoena had been cancelled but that AHMED had testified. He related that the investigation that the FBI was conducting at the time was of AL-QADI. BIHEIRI stated that he knew that AL-QADI was suspected of funding the HAMAS terrorist group. He related that QADI was suspected of providing money to an individual connected to HAMAS by the name of MOHAMED SALAH, who lived in Chicago.

BIHEIRI stated that he never served as a director of KADI INTERNATIONAL. He stated that only GAMAL AHMED served as a director. BIHEIRI told the agents that he knew TAREQ SUWEIDAN (a.k.a. SWEIDAN, SUWAIDEN, SWAIDAN) only in passing. He told the agents that he had met SUWEIDAN at an Islamic conference, and had subsequently seen him at two or three others. He related that they were all ISNA (ISLAMIC SOCIETY OF NORTH AMERICA) and MAYA (MUSLIM ARAB YOUTH ASSOCIATION) conferences. He stated that he did not know or meet with SUWEIDAN on a personal or business level.

When asked if he knew FBI agent GAMAL ABDEL HAFEZ, BIHEIRI became visibly nervous. He took his time in responding to the question. He then related that he did know HAFEZ. He related that he once met HAFEZ at an AMERICAN MUSLIM COUNCIL conference in either 1999 or 2000. He related that HAFEZ was at the conference with the deputy director of the FBI, who was giving a lecture at the conference. He told the agents that he was introduced to HAFEZ and shook his hand, but that was the first and last contact that he ever had with HAFEZ. He stated that the entire Muslim community was very proud of HAFEZ, because he was the first Muslim FBI agent. He related that HAFEZ was Egyptian born and then became a naturalized U.S. citizen. He related that HAFEZ was formerly a translator.

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE  REPORT OF INVESTIGATION CONTINUATION | 1. PAGE: 6 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

BIHEIRI related that ABBAS AHMED, the former project manager for BMI REAL ESTATE, from 1989 until dissolution, was a close friend of HAFEZ and that they had grown up together in Egypt. He stated that they moved to the U.S. from Egypt at about the same time. ABBAS AHMED also attended the conference and that's how BIHEIRI met HAFEZ, according to BIHEIRI.

BIHEIRI related that he knew ABDURAHMAN ALAMOUDI. He related that ALAMOUDI was the former head of the AMERICAN MUSLIM COUNCIL (AMC). He related that ALAMOUDI resigned his position after criticism from the other AMC directors and members regarding his support of Islamic extremist movements and jihad movements in Bosnia and Chechnya, among others. BIHEIRI related that he himself served as a board member of the AMC and that he believes that he still is a board member. He related that the AMC invested a total of approximately $10,000 to $15,000 in BMI over the years. He stated that BMI returned the initial investment with a minimal profit.

BIHEIRI related that QADI invested a total of approximately $3 million into BMI LEASING PARTNERSHIP, INC. and approximately $1 to $2 million into BMI REAL ESTATE DEVELOPMENT, INC. BIHEIRI stated that he has never associated with any known terrorists or Islamic extremist groups and/or individuals.

He stated that he had heard of MOHAMED SALAH, but had never met him nor had any business relationship with him. He related that no one at BMI had a relationship with him either. He stated that no money had been sent to SALAH from BMI (and associated companies) and that BMI (and associated companies) had never invested/managed money for SALAH. He also stated that BMI had never managed any money for the HAMAS terrorist organization or any of its members.

BIHEIRI told the agents that the MUSLIM ARAB YOUTH ASSOCIATION (MAYA) had invested in BMI and also purchased a building through the company. He related that MAYA was basically one and the same organization as the NORTH AMERICAN ISLAMIC TRUST (NAIT) and the ISLAMIC SOCIETY OF NORTH AMERICA (ISNA). He related that the building that MAYA purchased from BMI was located in Indiana, near where MAYA's main office is currently located. He stated that BMI REAL ESTATE DEVELOPMENT (BMI REDI) built the building. BIHEIRI related that he was a member of MAYA.

BIHEIRI stated to the agents that he never handled cash at BMI. He related that he would only deal in payments in the form of check or wire transfer. He related that the same went for all of the other employees/directors at BMI, including his brothers. BIHEIRI stated that he had never conducted a cash transaction of $10,000 or more and has never had a Cash Transaction Report (CTR) filed for him on his behalf.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE  REPORT OF INVESTIGATION CONTINUATION | 1. PAGE 7 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

He related that he has four brothers by the names of MOHAMED, SAMI, AHMED and SALAH. He related that MOHAMED is a cardiologist in Florida, AHMED is a triple boarded physician in Michigan, SAMI is a physician in Egypt, and SALAH is currently living in Florida.

BIHEIRI stated that SALAH joined BMI in 1991 as an accountant working under GAMAL AHMED. He related that SALAH left the company in 1995 and went back to Egypt, where he worked with SAMI, who was living there as well. BIHEIRI said that SALAH came back to Florida between 1999 to 2001. He stated that SALAH never conducted transactions for or on behalf of BMI.

BIHEIRI stated that his brother SAMI incorporated a company by the name of GLOBAL TRADE INTERNATIONAL in New Jersey in 1987. He related that this company was an exporter of textiles to Egypt. He related that this company did business with BMI in the late 1980s, but did not have any success. He related he (SOLIMAN) and SAMI also incorporated SMI TRADE, INC., but the business was short-lived and no money passed through the accounts set up in its name.

BIHEIRI related that HUSSEIN IBRAHIM currently has a software company in Egypt that sells, among other things, PTECH software. He stated that IBRAHIM used to work for the U.S. Defense Department. He related that GAMAL AHMED is still working as an accountant in New Jersey.

Agent Kane then asked BIHEIRI how BMI was conceptualized and formed. BIHEIRI related that he went to high school and college in Switzerland. He said that he earned graduate degrees in economics from the Swiss Universities of Fribourg and Zurich. He related that he met MAHMOUD ABU SAUD and GAMAL ATTIA while in Switzerland. According to BIHEIRI, GAMAL ATTIA is a cousin of BIHEIRI's mother. He related that ATTIA and SAUD are the fathers of the modern Islamic banking system. He related that ATTIA's uncle was the first person to develop the concept of Islamic banking (IE: no interest banking).

BIHEIRI related that ATTIA was the conceptual creator of the ISLAMIC DEVELOPMENT BANK (IDB), which was the first Islamic bank and was incorporated in Jeddah in 1979. It also has an office in Copenhagen, Denmark. He related that the International Islamic Bank (IIB) was conceptualized in 1981 by GAMAL ATTIA at its office in Luxembourg, but its headquarters and operational office was in Denmark. IIB was the first Islamic bank headquartered in Europe. BIHEIRI related that the structure of Islamic banking was conceptualized by ATTIA and ABU SAUD at a dinner in Switzerland in 1978. BIHEIRI stated that ATTIA was a senior member of the MUSLIM BROTHERHOOD (MB) and was Egyptian. He related that ATTIA wrote the by-laws for the KUWAITI FINANCE HOUSE and the Bank of Dubai, in 1982 and 1979, respectively. He related that ATTIA was still alive, and he believes that he is living in Cairo. He told the agents

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE  8 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| REPORT OF INVESTIGATION CONTINUATION | 3. REPORT NUMBER: 090 |

that ATTIA'S father, AZER, was a well-respected Islamic scholar in the Middle East. He related that ATTIA was recently a professor of Egyptian law at a university in Qatar. He related that ATTIA'S son, MOHIELDIN ATTIA, is currently living in the United States and working for AHMAD TOTONJI, HISHAM AL-TALIB and JAMAL BARZINJI at 555 Grove Street, Herndon, Virginia.

BIHEIRI related that the IDB was originally capitalized by the MINISTRY OF ISLAMIC AFFAIRS of KUWAIT (25%), SULAIMAN ABDUL AZIZ AL-RAJHI (5%), FAISAL BANK and AL BARAKAT, as well as a group of other wealthy Middle Eastern merchants. Subsequently, he related, AL-RAJHI purchased a controlling interest in the bank along with FAISAL BANK and AL BARAKAT, who currently control it, to the best of his knowledge.

According to BIHEIRI, he (BIHEIRI) was invited to meet with ABU SAUD and ATTIA in Luxembourg in 1981. At this meeting both SAUD and ATTIA advised him to go to the United States and establish an Islamic financial corporation to take advantage of both the Islamic money in the United States and the freedom of operation of the U.S. financial market, BIHEIRI said. BIHEIRI related that SAUD was also a senior member and board member of the MUSLIM BROTHERHOOD. SAUD became famous for writing the first book on Islamic economics. BIHEIRI related that the three of them all believed that opening a financial company in the United States would afford them more freedom of operation than in any of the Middle Eastern countries, due to the fact that most of the Middle Eastern countries were controlled by either monarchies or dictatorships.

He gave as example of the lack of freedom of Saudi Arabian institutions, the fact that FAISAL FINANCE, SALEH KAMEL and AL-RAJHI BANK could not take any specific "new" actions without the approval of King Fahd. He related that by establishing an American financial company on U.S. soil, they would have the freedom to do as they pleased regarding business activity, he would just have to "follow SEC guidelines". When Agent Kane asked BIHEIRI if SAUD and ATTIA had him (BIHEIRI) open up BMI as a MUSLIM BROTHERHOOD financial institution, BIHEIRI stated that they did not. He related that SAUD and ATTIA only wanted to help BIHEIRI in his financial endeavors and thought that establishing BMI in the United States would be a good idea.

BIHEIRI related that ABU SAUD invested $500,000 of his own money into BMI LEASING in the mid-1980s. He related that this money was returned to his widow at SAUD'S death in the mid-1990s.

BIHEIRI told the agents that YOUSSEF NADA, GHALEB HIMMAT and AHMED NASREDDIN had no involvement with the establishment or operation of BMI. He related that he had met NADA on three occasions. He related that he knew him because they both lived in Switzerland at the same time. He related that they first met at an Islamic conference in Switzerland. Shortly thereafter, SAUD invited

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 9 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

him to meet with NADA, HIMMAT and NASREDDIN at NADA'S home in Campione d'Italia. BIHEIRI told the agents that the purpose of the meeting was simply to meet NADA, not for any specific business propositions. BIHEIRI said that he met HIMMAT whenever he met NADA, because they were always together. BIHEIRI related that NADA was a very successful Egyptian businessman. He related that NADA'S home in Campione cost 12 million Swiss francs when he originally purchased it in the late 1970s. He related that he saw NADA again at a second conference and after that he only spoke with him on the phone three or four times after that. He related that he has no ongoing relationship with NADA. BIHEIRI related that he did not have any involvement with BANK AL-TAQWA, NADA'S bank in the Bahamas, and that NADA never invited him into the bank. He also stated that he never had any accounts at AL-TAQWA and never transferred any money to NADA, HIMMAT, NASREDDIN or any of their businesses or banks.

BIHEIRI related that when he originally interacted with NADA and his associates, he did not know that NADA and HIMMAT were prominent members of the MUSLIM BROTHERHOOD. He stated that he regrets having had any association with him and his partners. BIHEIRI related that NADA advertised AL-TAQWA as an "Islamic bank", but that in reality, it was nothing but an offshore bank. He said that he did not know of any information indicating that AL-TAQWA was utilized by, or supported HAMAS, the PALESTINIAN ISLAMIC JIHAD, AL-QAEDA or any other terrorist organizations.

BIHEIRI related that he knew KHALDOUN DIA-EDDINE, a former employee of AL-TAQWA. He related that DIA-EDDINE was married to HIMMAT'S daughter. BIHEIRI related that DIA-EDDINE had an engineering degree from a Swiss university and that he left AL-TAQWA to work for Zurich Insurance, a Swiss insurance agency, where he still works today.

BIHEIRI related that he only knew SAMIR SALAH from the DAR AL-HIJRAH MOSQUE, where they both used to pray. He related that SALAH was the former president of the mosque. He related that SALAH used to work for the SAAR FOUNDATION. He related that he also met IBRAHIM HASSABALLA at the DAR AL-HIJRAH. He related that HASSABALLA used to work at 555 Grove Street with TOTONJI, SALAH, AL-TALIB and BARZINJI. He stated that he did not have a personal or business relationship with either HASSABALLA or SALAH. He related that neither of two individuals had invested money in BMI or moved money through BMI.

BIHEIRI told the agents that he originally came to the United States in 1985, shortly after obtaining his economics degree in Switzerland. He related that he first lived with his brother SAMI in New York. He related that he first began working for CAMBRIDGE COMPUTER, a Boston-based software corporation owned by NASSER ISMAIL, who also served as its president. BIHEIRI related that CAMBRIDGE COMPUTER was established in Boston with approximately $2.5

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 10 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

million in start-up capital provided by an Egyptian investor by the name of FATHI TOLBA. He related that TOLBA resided in Saudi Arabia at the time. TOLBA's son, FATHI, served as the negotiator for TOLBA and ISMAIL, according to BIHEIRI. BIHEIRI stated that he/BMI helped to raise the capital for CAMBRIDGE COMPUTER.

BIHEIRI related that he incorporated BMI, INC. in 1985 with his close personal friend, HUSSEIN IBRAHIM. He related that IBRAHIM was studying computer science at Columbia University in New York at the time. The start-up capital provided to start BMI was provided by SOLIMAN BIHEIRI, IBRAHIM and MOHAMMED BEHAIRY (his brother in Florida), according to BIHEIRI. BIHEIRI told the agents that he himself provided $50,000, IBRAHIM provided $5,000 to $10,000 and his brother MOHAMMED provided approximately $50,000 to $70,000.

BIHEIRI related that in 1987, BMI arranged for the purchase of $24 million worth of land in the northeastern United States by FATHI TOLBA and another Saudi partner. The land was purchased from former New Jersey Governor Kean according to BIHEIRI. BMI earned a three percent commission for arranging the transfer of money to the Kean family from TOLBA, according to BIHEIRI. He related that BMI earned a total of $1.5 million, which was paid in staggered increments. TOLBA had established several different companies, all named for his children, to handle 6-7 different projects in the U.S., according to BIHEIRI.

BIHEIRI related that he concentrated on attracting the investment money of major banks, including the AL-BARAKAT GROUP, the KUWAITI FINANCE HOUSE and the Qatar Bank. He related that the AL-BARAKAT BANK invested $500,000 into BMI in late 1992 or early 1993. He stated that this investment was placed with BMI LEASING. AL-BARAKAT subsequently began to invest $2 to $3 million a month with BMI. BIHEIRI related that BMI did not have to provide AL-BARAKAT with updates or operating plans for the monthly payments of $2 to $3 million, the BARAKAT BANK would automatically provide the money, no questions asked.

BIHEIRI stated that BMI also signed an investment contract with the QATAR BANK, but no money was invested in the company, due to the first World Trade Center (WTC) attack in 1993. He told the agents that the KUWAITI FINANCE HOUSE invested a total of $1.8 million with BMI in early 1993, but after the WTC attack, all the banks withdrew their investments with BMI.

BIHEIRI told the agents that he met SULAIMAN AL-ALI in 1985 at a dinner in New Jersey at the home of SHEIKH MOHAMMED AL-HANOOTI attended by SULAIMAN AL-ALI, HUSSEIN IBRAHIM and BIHEIRI. He related that AL-HANOOTI had invited them so that they could meet one another. BIHEIRI had previously met HUSSEIN IBRAHIM at a convention in Switzerland. BIHEIRI related that AL-HANOOTI was the former president of the DAR AL-HIJRA MOSQUE in Falls Church, Virginia. He

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 11 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| REPORT OF INVESTIGATION CONTINUATION | |
| | 3. REPORT NUMBER: 090 |

related that AL-HANOOTI was an Egyptian national. AL-ALI was working for the Saudi Arabian government, BIHEIRI said. He related that AL-ALI was attending a two-month training somewhere in the United States at the time.

BIHEIRI told the agents that the next time he saw AL-ALI was in approximately 1989 at a MAYA conference that he believes took place in either Texas or Kansas. At this time, AL-ALI told BIHEIRI that he was in the process of moving back to the United States to open an office of the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO) for the MUSLIM WORLD LEAGUE (MWL), which are both Saudi charities, according to BIHEIRI. BIHEIRI told the agents that the IIRO is a subsidiary of the MWL, worldwide. He stated that the two organizations are almost entirely financed by the Saudi Arabian government.

Shortly after the conference, AL-ALI came to a meeting with BIHEIRI, GAMAL AHMED and HUSSEIN IBRAHIM in New Jersey, according to BIHEIRI. BIHEIRI related that AL-ALI told them at the meeting that he was to receive $10 million dollars from an organization by the name of SANABEL AL-KHEER in Saudi Arabia. He stated that SANABEL was a subsidiary of the MWL. AL-ALI wanted to see if BMI could invest the money for SANABEL, according to BIHEIRI. BIHEIRI and IBRAHIM told AL-ALI that they could do that for him and the money began to arrive from SANABEL, shortly thereafter, BIHEIRI related. The income generated by SANABEL's investment was to be used to cover the expenses of the IIRO office in the United States. BIHEIRI noted that THE SANA-BELL, INC. in the U.S. and SABABEL AL KHEER in Saudi Arabia were really one and the same organization.

BIHEIRI told the agents that that $3 million dollars came into the various BMI entities from SANA-BELL. He related that $1 million came into BMI LEASING bank accounts through SANABEL (Saudi Arabia), $1 million came into BMI REAL ESTATE DEVELOPMENT through SANABEL (Saudi Arabia) and another $1 million came into another account directly from IIRO for the purchase of land in the United States. BIHEIRI told the agents that IBRAHIM dealt with AL-ALI more than he did. He related that he (BIHEIRI) would contact either AL-ALI or his Syrian colleague, KHALED NOURI, at the IIRO in Virginia, when he needed to speak about the SANA-BELL/IIRO investments. He related that GAMAL AHMED was the person who handled most of the account transfers from/for the IIRO/SANA-BELL. He related that AHMED was the individual at BMI that dealt with AL-ALI and NOURI most frequently.

BIHEIRI told the agents that AL-ALI ran into trouble because he began pulling money out of the SANA-BELL investments to pay his personal bills. AL-ALI was also having trouble meeting the expenses of the IRO office in the United States, so he asked BIHEIRI for money from SANABEL's investment in BMI to cover IRO's expenses. He stated that AL-ALI had approximately twenty-seven people working for him and therefore had many bills to pay.

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | 1. PAGE  12 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

BIHEIRI related that in August 1998, he was contacted by a representative of Sanabel (Saudi Arabia) regarding a pending law suit against himself and AL-ALI by SANABEL. The representative informed him that AL-ALI was not authorized to act on behalf of SANABEL. BIHEIRI was surprised by this news because he thought that AL-ALI was representing SANABEL (Saudi Arabia) and did not find out until then (1998) that M. YAQUB MIRZA was the representative for SANABEL. When he tried to contact AL-ALI, he found out that AL-ALI was in Saudi Arabia, according to BIHEIRI. He told the agents that he obtained AL-ALI'S telephone number in Saudi Arabia and contacted him there. He told the agents that AL-ALI told him that he (AL-ALI) was coming back to the U.S. shortly and they would resolve everything upon his return.

BIHEIRI told the agents that at the time, he, AL-ALI, BMI LEASING and BMI REAL ESTATE were possibly going to be sued by SANA-BELL in Maryland for the misuse of their investment funds. Upon the return of AL-ALI to the United States in August 1998, a meeting was arranged at the offices of MAR-JAC INVESTMENTS located at 555 Grove Street, Herndon, Virginia, BIHEIRI related. Present at this meeting were YAQUB MIRZA, the representative of SANA-BELL in the United States, Dr. SAATI, the director of the MWL in New York City, ABDALLAH AL-OBAID, the director of the MWL in Saudi Arabia, HASAN BAHAFZALLAH, the director of SANA-BELL AL-KHEER in Saudi Arabia, BIHEIRI and AL-ALI. Note: BIHEIRI related that Bahafzallah is now deceased

At first, BIHEIRI related, the other individuals did not want AL-ALI present for the meeting, but he insisted that AL-ALI attend, and AL-ALI ultimately attended the meeting. At the meeting, AL-ALI told everyone present that he alone was responsible for any mismanagement of SANA-BELL investment funds, not BIHEIRI, according to BIHEIRI. BIHEIRI told the agents that BAHAFZALLAH was very angry with AL-ALI and shouted at him, accusing him of stealing money. BIHEIRI related that AL-ALI became very belligerent at that point and began shouting back at BAHAFZALLAH, and demanded an apology from him. According to BIHEIRI, at that point, AL-OBAID stood up and related that the meeting had not gone the way he would have liked and said that he would like to terminate the meeting. BIHEIRI related that AL-ALI then stormed out of the office and the meeting ended. OBAID then told BIHEIRI they would deal with AL-ALI later.

About 10 days later, BIHEIRI, BMI and AL-ALI were officially sued by SANA-BELL. BIHEIRI related that at the time of the law suit, AL-ALI had already left the country and was teaching at a university in the United Arab Emirates. The suit ended with a judgment in favor of SANABEL for approximately $2 million. The judgment was never paid by AL-ALI, BIHEIRI, or BMI. BIHEIRI said SANABEL cannot collect because BMI and BIHEIRI are bankrupt.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE  REPORT OF INVESTIGATION CONTINUATION | 1. PAGE 13 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

BIHEIRI found it very strange that SANABEL stated that they had no idea what was occurring with their investments at BMI, because for two and a half to three years leading up to the law suit, he (BIHEIRI) had been sending a bi-annual investment report on SANABEL'S investment to YAQUB MIRZA at 555 Grove Street, Herndon, Virginia (at AL-ALI's request) at the same time that he was sending a copy to AL-ALI/IIRO at 360 South Washington Street, Falls Church, Virginia. BIHEIRI said he thought MIRZA was a consultant to MUSLIM WORLD LEAGUE (MWL) and/or SANABEL. BIHEIRI thought AL-ALI was in charge of SANABEL's/IIRO's investments. BIHEIRI told the agents that he believed that it was impossible for MIRZA and SANA-BELL not to know of the detailed status of SANA-BELL'S investment with BMI. BIHEIRI said that prior to the lawsuit, MIRZA never called to ask about SANABEL's investments or about transfers of money between BMI and SANABEL. BIHEIRI stated, "Where was he (MIRZA) during all these years?" He also told the agents that he found it very strange that AL-ALI opened up the office of the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO) in the United States as the "INTERNATIONAL RELIEF ORGANIZATION" (IRO). BIHEIRI told the agents that AL-ALI'S IRO was one and the same organization as the IIRO in Saudi Arabia. He related that he suspected that the IIRO'S U.S. office had been deliberately named the IRO, so that one could not make the connection between the two organizations.

BIHEIRI told the agents that the only odd transaction that he could remember surrounding SANA-BELL'S investments with BMI was on one occasion when AL-ALI requested a $10,000 or $15,000 payment made out to a personal account of his in Saudi Arabia, rather than the IRO. BIHEIRI related that GAMAL AHMED told AL-ALI that BMI could not legally transfer SANA-BELL'S money to a personal account of AL-ALI. AL-ALI then provided AHMED with a signed letter from SANA-BELL, authorizing the transfer, according to BIHEIRI.

BIHEIRI related that besides this payment, the only other payments that he made from BMI to AL-ALI were in the name of the IRO. He related that he found it ridiculous that MIRZA and SANA-BELL would accuse him of investor fraud. He related that when SANA-BELL opened its investment accounts with BMI, he received official documentation authorizing the investment from SANA-BELL AL-KHEER in Saudi Arabia, indicating that AL-ALI was their representative in the U.S. and that he was authorized to conduct transactions for SANA-BELL. BIHEIRI related that in light of this authorization, he should not be found criminally liable for transfers requested by the representatives of the IRO and SANA-BELL in the U.S.

BIHEIRI related that AL-ALI was in California a short time after the SANA-BELL meeting and that he believed that AL-ALI was then ordered to return to Saudi Arabia, where he was put in prison for one year for the SANA-BELL affair.

BIHEIRI related that AL-ALI was a bad manager and businessman. He related

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 14 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

that AL-ALI would come to him with business proposals that he (BIHEIRI) found ridiculous. BIHEIRI told the agents that one example of such a ridiculous investment was when AL-ALI approached him in the mid-1990s regarding a prospective $1 million investment into a newly designed chemical that was alleged to decrease the drag-coefficient of petroleum during pipeline transportation.

The product was allegedly designed by a Jordanian who had a PhD in chemistry (whose name he cannot recall). BIHEIRI related that AL-ALI came to him pushing BIHEIRI/BMI to endorse an investment into the product. The $1 million prospective investment was on behalf of someone else (not AL-ALI'S money), according to BIHEIRI. BIHEIRI told the agents that AL-ALI told BIHEIRI that he believed that it was a good investment and asked BIHEIRI if he agreed. BIHEIRI told him that he should not invest $1 million just like that, but that he should get a chemist to analyze the product to first determine if it truly was what it was purported to be, he said. He then told the agents that AL-ALI made the investment anyway, against his advice. BIHEIRI related that BMI did not endorse or invest in the product.

BIHEIRI related that the $1 million investment was sent to GLOBAL CHEMICAL, a chemical company operated by a Libyan national in Chicago. BIHEIRI told the agents that $1 million was invested by one person and smaller amounts from various other entities/individuals. After the money had been invested, the Jordanian ran off with the investment funds, and was not seen or heard from again, BIHEIRI said. BIHEIRI told the agents that if they were looking for a fraud or terrorist financing case, they should look into this affair. He related that to him, the whole affair seemed to be a set up. He related that the Jordanian was a close personal friend of TAREQ SUWAIDAN. SUWAIDAN solicited most of the investment funds for the product, BIHEIRI said.

BIHEIRI related that SUWAIDAN and AL-ALI also set up GLOBAL CHEMICAL together. He related that SUWAIDAN and AL-ALI were close friends. He told the agents that SUWAIDAN and AL-ALI hired the Libyan national to manage GLOBAL CHEMICAL.

Three months after AL-ALI approached him about investing in this chemical product, AL-ALI phoned him from Saudi Arabia and told him that he had just spoken with YASSIN AL-QADI, and QADI was very interested in investing in the product, BIHEIRI said. BIHEIRI told the agents that he believes AL-ALI wanted him to endorse the prospective investment and for BMI to become involved in investing in the product at this point, but BIHEIRI told him that he had already given him his professional opinion and had not changed his mind. BIHEIRI told AL-ALI not to call him again about this issue. He related that he did not know if AL-QADI invested in the product or GLOBAL CHEMICAL. BIHEIRI said that he had never heard of ARCHCON, the QURANIC LITERACY INSTITUTE (QLI), WOODBRIDGE PROPERTIES, or ABRAR/ABRAR INVESTMENTS. BIHEIRI

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE  REPORT OF INVESTIGATION CONTINUATION | 1. PAGE  15 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

told the agents that he was never contacted by AL-QADI regarding the investment.

As another example of bad investing by AL-ALI, BIHEIRI cited an attempted purchase of a building in Northern Virginia by AL-ALI/IRO whereby AL-ALI put $50,000 down to hold a building while he obtained the full financing. AL-ALI for whatever reason, BIHEIRI related, ended up losing all $50,000 of the money and not obtaining the property. BIHEIRI told the agents that he spoke to AL-ALI numerous times while this attempted purchase was occurring, and he (BIHEIRI) sometimes had the feeling that the loss of the money might have been deliberate on AL-ALI'S part.

BIHEIRI told the agents that he was familiar with SARA, INC. He told them that SARA was a company in the United Arab Emirates (UAE) owned by SALEH AL-MUBARK (also spelled MUBAREK and/or MUBARAK). BIHEIRI related that MUBARK is a very well-respected person in the Middle East and was a relative of the former Mufti of the UAE. BIHEIRI told the agents that MUBARK/SARA invested approximately $150,000 in homes that were being built by BMI in the area of Maryland. BIHEIRI related that AL-QADI had nothing to do with SARA, INC. BIHEIRI told the agents that MUBARK became aware of BMI through advertisements in Islamic newspapers and wanted to invest money with BMI. BIHEIRI related that MUBARK was finishing a Phd in the United States at the time of his investment and that he left to live in England shortly after the investment. MUBARK's investment was returned to him.

BIHEIRI related that SAMEL INTERNATIONAL, INC. was a QADI company. He believed that SAMEL invested money into BMI in 1993.

BIHEIRI told the agents that he knew AHMED EL-KADI. He stated that he had only met him on two or three occasions, but never socially or for business. He related that he had heard that EL-KADI was tied to the MUSLIM BROTHERHOOD. He related that EL-KADI was one of the founders of MAYA, NAIT and ISNA. He related that EL-KADI created and operated MANA (phonetic), which is an Islamic non-profit organization. He related that SUHAIB BARZINJI, the son of JAMAL, is/was active in this organization.

BIHEIRI related that he knew OSAMA KANDIL. He stated that KANDIL and his family were actually on his flight into Dulles from Zurich and the flight from Cairo into Zurich the day before. BIHEIRI said that IBRAHIM and KANDIL were close friends, and were both active in the MUSLIM STUDENTS ASSOCATION (MSA). BIHEIRI said that he was not a close personal friend of KANDIL, and that he did not speak with him during their trip. He also told the agents that he did not believe that KANDIL was a member of the MUSLIM BROTHERHOOD. He told the agents that KANDIL had invested approximately $25,000 into BMI and that KANDIL had made a slight profit and received his money back.

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 16 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

BIHEIRI told the agents that MAHMOUD ABU SAUD was a personal financial advisor to King Idris Sanusi of Morocco and King Faisal of Saudi Arabia. He related that SAUD had died in the mid-1990s. He related that ABU SAUD'S account of $500,000 was returned to his wife at that point. He told the agents that SALEH KAMEL was married to the niece of ABU SAUD. BIHEIRI added that KAMEL is the majority owner of the AL-BARAKAT BANKING GROUP.

BIHEIRI related that he knew AHMAD TOTONJI, JAMAL BARZINJI and HISHAM AL-TALIB. He related that he had heard numerous people at the DAR AL-HIJRA say that all three of them worked for the Central Intelligence Agency or the FBI due to their extensive contacts in Iraq and the ongoing U.S. geo-political interest in Iraq. When asked, he could not remember anyone specifically who said that they worked for the CIA. He related that these three individuals formed the INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT (IIIT) which is the pre-eminent and most respected Islamic think tank in the world. He related that he first met TOTONJI, BARZINJI and AL-TALIB through a meeting arranged by ABU SAUD in 1985.

BIHEIRI related that he had met TAHA JABER AL-ALWANI before, but did not know him well. He knew him to be a sharia advisor.

BIHEIRI told the agents that he knew SHEIKH YOUSUF QARADAWI very well. He said that QARADAWI was an Egyptian born cleric and one of the most respected clerics in the Middle East. He related that QARADAWI is a senior MUSLIM BROTHERHOOD member. BIHEIRI related that he first met QARADAWI in Qatar many years ago. He related that QARADAWI was the chairman of the Qatar Bank Sharia Board. BIHEIRI told the agents that QARADAWI is virulently anti-American. He related that QARADAWI does not approve of American culture or its foreign policy. BIHEIRI told the agents that QARADAWI once stayed at his (BIHEIRI'S) house in New Jersey, with his family. BIHEIRI told the agents that QARADAWI was expelled from Egypt and travels under a Qatari passport only.

BIHEIRI told the agents that he had met SAMI AL-ARIAN on two or three occasions at Islamic conferences in the United States. BIHEIRI also met AL-ARIAN at IIIT. He first met AL-ARIAN at a joint MAYA/ISNA conference in the late 1980s. He told the agents that he was amazed at a presentation on Islam that AL-ARIAN gave at the conference. He related that he was impressed with AL-ARIAN'S knowledge of Islam, especially because he was a computer programmer by education.

The last time that he met AL-ARIAN was five years ago at a seminar at the IIIT at Grove Street in Herndon, Virginia, where AL-ARIAN gave a lecture. He told the agents that he had never interacted with AL-ARIAN on a personal level (IE: visiting one another) or business level. He stated that AL-ARIAN never

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 17 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

invested money in BMI and he never managed any money for, or on behalf, of AL-ARIAN. He said that he never met RAMADAN ABDALLAH SHALLAH and he did not know until recently that AL-ARIAN and SHALLAH were senior members of the PALESTINIAN ISLAMIC JIHAD (PIJ). BIHEIRI said that he met AL-ARIAN'S brother-in-law, MAZEN EL-NAJJAR, at an Islamic conference. He said that EL-NAJJAR was selling books at the conference.

BIHEIRI told the agents that he knew BASSAM ESTWANI very well. ESTWANI is educated as an attorney, according to BIHEIRI. He stated that ESTWANI invested $100,000 in BMI REDI in the 1990s and lost $45,000 went it went bankrupt. He related that ESTWANI is the director of the DAR AL-HIJRA MOSQUE, as well as one of its founders. BIHEIRI told the agents that ESTWANI lives on the same court as BARZINJI, AL-TALIB and AL-ALWANI, but he hates them because they allegedly tricked him into paying much more than he should have for his house (the SAFA GROUP MENA ESTATES built and sold the houses located on Safa Court, where ESTWANI lives). He also related that ESTWANI resents TOTONJI, AL-TALIB and BARZINJI because they think that he is an idiot.

BIHEIRI related that he has met MOUSA ABU MARZOUK on two or three occasions, all at Islamic conferences. He related that he first met him at an Islamic conference in Kansas City in the early 1980s. BIHEIRI related that MARZOUK gave a speech on the Israeli-Palestinian issue at the conference. He told the agents that he also met with MARZOUK at a 1984 Islamic convention in New Jersey. BIHEIRI related that he did not know that MARZOUK was a political leader of the HAMAS terrorist organization until MARZOUK was arrested in 1995. He stated that he never met with MARZOUK at either his or MARZOUK'S house. He told the agents that he did not have a social or business relationship with MARZOUK. He told the agents that he never handled any money for, or on behalf, of MARZOUK and that he never handled any money for any of MARZOUK'S relatives.

BIHEIRI told the agents that he had met AHMED YOUSSEF at the DAR AL-HIJRA, but that he did not know him personally or through business. He related that YOUSSEF is the director of the UNITED ASSOCIATION FOR STUDIES AND RESEARCH (UASR).

BIHEIRI related to the agents that he sublet his BMI office at 5205 Leesburg Pike to ISLAM ONLINE at a certain point in the late 1990's when BMI could no longer afford to pay the rent. He related that only one person, a Libyan national whose name he could not recall, worked in the ISLAM ONLINE office. He stated that no other entities operated in the office space.

BIHEIRI related that three BIN LADEN family members invested money in BMI, NUR, IMAN and ABDULLAH BIN LADEN. He related that ABDULLAH was the nephew of OSAMA BIN LADEN and resided in Northern Virginia until recently. ABDULLAH was

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 18 |
|---|---|
| | 2. CASE NUMBER DC02PU02DC0005 |
| REPORT OF INVESTIGATION CONTINUATION | |
| | 3. REPORT NUMBER: 090 |

the head of the information technology department for BIN LADEN CONSTRUCTION, BIHEIRI said. BIHEIRI told the agents that ABDULLAH BIN LADEN invested approximately $250,000 in BMI REAL ESTATE LIMITED PARTNERSHIP and the same amount in BMI CONSTRUCTION LIMITED PARTNERSHIP. He said that BIN LADEN made approximately $70,000 in both projects and withdrew all of his money (approximately $640,000). BIHEIRI stated that GAMAL AHMED would know all the details of these transactions.

He related that ABDULLAH also made investments into BMI on behalf of NUR and IMAN BIN LADEN. He told the agents that he could not recall the amount of the latter two investments. BIHEIRI related that NUR was the sister of OSAMA BIN LADEN and IMAN was his mother, or vice-versa (he could not recall exactly). Some of the BIN LADEN investment in BMI was invested in the Oxon Hill development in Prince Georges County, Maryland. BIHEIRI related that the BIN LADEN money invested in the Oxon Hill development was lost when the project collapsed.

BIHEIRI told the agents that ABDULLAH BIN LADEN was also the incorporator and head of the WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY) in Northern Virginia. He added that AHMAD TOTONJI was the first secretary of WAMY in Saudi Arabia and was also a founder of the organization.

BIHEIRI told the agents that he had heard of MERCY INTERNATIONAL because he knew Dr. MENSHAWI, who worked there. He related that MERCY never invested any money with BMI and that BMI never transferred any money for, or on behalf of, MERCY.

BIHEIRI indicated that he was not certain what The CULTURAL SOCIETY was and surmised that it must be MSA.

BIHEIRI told the agents that he had heard of a famous Islamic conference in Lugano, Switzerland in 1979, concerning the contemporary problems of the Muslim ummah. He believes this conference took place at NADA'S home and that many high-ranking individuals in the Islamic world took part in this conference. He related that this conference provided a "blue print" for much of the worldwide Islamic movement(s) in the 1980s.

BIHEIRI told the agents that no one at BMI or any of the BMI organizations had overseas bank accounts at any time. When asked by Agent Kane if he or BMI had any Swiss bank accounts, he said that he/BMI do not and never did.

BIHEIRI stated that he never destroyed any documents associated with BMI, nor did he destroy any documents over the course of the last year and a half. He also stated that he no longer has any documents relating to BMI.

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 19 |
| --- | --- |
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER DC02PU02DC0005 |
| | 3. REPORT NUMBER: 090 |

BIHEIRI related that FAWAZ MUSHTAHA invested $20,000 in BMI in the past and received that, plus a small profit, in return. He related that MUSHTAHA is Palestinian "national" who leads prayers at the DAR AL-HIJRA on certain occasions.

BIHEIRI said he did not know SOLIMAN ALI ELAY or SULAIMA KABRARA (or KABBARA) AL-ALI. They are not names used by SULEIMAN AL-ALI, according to BIHEIRI. BIHEIRI also said he did not know BACHIR KABBARA. BIHEIRI noted that ELAY is a Jewish name, so it would not make sense for AL-ALI to be using that spelling of his last name.

BIHEIRI said that the biggest investors in BMI were (in order of financial significance) YASSIN QADI, SANABEL AL KHEER, KUWAIT FINANCE HOUSE, and the BIN LADENS (ABDULLAH, NUR, and EMAN).

BIHEIRI told the agents that he is currently working for the Lichtenstein Landesbank in Zurich, Switzerland and that his job is to obtain high-net worth Middle Eastern clients. He said that he is currently residing in Egypt and gave the telephone number 20 10 577 0281 as a contact number for him. BIHEIRI told the agents that the purpose of his trip was to persuade his family in Virginia to move back to the Middle East with him so that he could financially support the family, as that his brother MOHAMMED, who had been supporting them during SOLIMAN'S unemployment, refused to do so any longer.

BIHEIRI told Agents Kane and Balberchak at the end of the interview not to contact the Egyptian authorities if they wanted information on him from overseas. He told the agents that if they wanted information about him, they should just ask him directly.

The interview terminated at approximately 1850 hrs. and BIHEIRI was then arrested pursuant to a Federal material witness warrant issued out of the Federal Court for the Eastern District of Virginia at approximately 1900 hrs. BIHEIRI was arrested and read his rights by ICE Agents Ciak and Moldowan.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.