UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001          Civil Action No.
                                                                                          03 MDL 1570 (RCC)

----------------------------------------------------------------x

THOMAS BURNETT, SR., et al.                              No. 03 CV 9849 (RCC)

                          Plaintiffs

                       - against –

AL BARAKA INVESTMENT & DEVELOPMENT CORP.,  et al.,

                       Defendants.
----------------------------------------------------------------x

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT WAEL JELAIDAN

May 14, 2004

## TABLE OF CONTENTS

*Page*

I.    INTRODUCTION.................................................................................................1

II.   ARGUMENT ......................................................................................................3

    A.    THE D.C. COURT HAD *IN PERSONAM* JURISDICTION OVER JELAIDAN, AS
        DOES THIS COURT.......................................................................................3

    B.    ALTERNATIVELY, PERSONAL JURISDICTION OVER JELAIDAN ARISES
        FROM PLAINTIFFS' ALLEGATIONS OF CONSPIRACY...........................................12

III.  CONCLUSION ................................................................................................17

# TABLE OF AUTHORITIES

*Page*

## CASES

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985). ..................................................... 5, 6

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003) ......................................................................................................................... 11

*Burnett v. Al Baraka Investment and Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) ...... 3, 12, 16

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961). .............. 4

*Calder v. Jones*, 465 U.S. 783 (1984) ....................................................................... 7, 8

*Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934 (7th Cir. 2000) ........................................................................... 5

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000) ........................................................ 10

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) ........................ 3

*DSMC, Inc. v. Convera Corp. and NGT Library*, 273 F.Supp.2d 14 (D.D.C. 2002) .................. 12

*Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415 (D.C. Cir. 1992) ............... 12

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) .......................................... 11

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ................................. 5

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................ 16, 17

*In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987) ................ 3

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ................... 4

*In re Sumitomo Copper Litigation*, 120 F.Supp.2d 328 (S.D.N.Y. 2000) .................... 12, 13

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................ 5

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001) ................. 4

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593 ............ 13

*Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 10 F.Supp.2d 334 (S.D.N.Y. 1998) ............................................................................................ 12, 13

*Marine Midland Bank NA v. Miller*, 664 F.2d 899 (2d Cir. 1981) ............................... 11

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ........................................ 11

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) ......................... 5

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) ...... 8, 9, 10

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) ........................................ 8, 10

*Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521 (D.C. Cir. 2001) .................................................................................................................... 11

*Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) ........................... 11

*Whitaker v. American Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) ......................................... 4

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) ........................................... 7, 8

## STATUTES

Racketeer Influenced and Corrupt Organizations Act (RICO); 18 U.S.C. §§ 1961-65 ................. 3

## OTHER AUTHORITIES

5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, (2d ed. 1990) .................................................................................................................. 11

## RULES

Fed. R. Civ. P.  4 ........................................................................................................................ 4

Fed. R. Civ. P. 12 ..................................................................................................................... 3, 4

## LEGISLATIVE HISTORY

Committee Notes to the 1993 Amendments to the Federal Rules of Civil Procedure, H.R. Doc. No. 103-74  (1993) ................................................................................ 5

# I.    INTRODUCTION

In this action, plaintiffs -- family members of those killed in the September 11th terrorist attacks along with survivors who were injured that day -- seek to hold accountable those who supported, financed and sponsored the terrorist network that perpetrated those attacks.   As alleged in the Plaintiffs' 400-page Third Amended Complaint (sometimes referred to as the "3AC" or the "Complaint"), there is a vast (and growing) body of evidence that a network of banks, corporations, wealthy individuals, and so-called "charities" aided, abetted, funded, provided material support to, or otherwise conspired with, al Qaeda and Osama bin Laden. Without this support, the al Qaeda terrorists could not have planned and carried out their attacks.

Defendant Wael Jelaidan ("Jelaidan" or "Defendant")[1] has been a supporter of al Qaeda and its cause literally from its inception:  along with Osama bin Laden, Jelaidan was one of the founders of al Qaeda.  *See* Third Amended Complaint ("3AC" or "Complaint") ¶¶ 255, 270-71. Later, Jelaidan's support of bin Laden and Al Qaeda took a different form.  Jelaidan has served as head of the Muslim World League office in Peshawar, Pakistan, alongside al Qaeda member Wadih el-Hage who was convicted for his role in the 1998 United States Embassy bombings in Africa.  3AC at ¶ 236, 255, 256.  According to the account of al Qaeda member and Osama bin Laden associate Mohammed Bayazid, the MWL opened the office in Pakistan specifically for the use of the founders of al Qaeda.  3AC at ¶ 239.  Jelaidan also serves as Secretary General of the Rabita Trust, another branch of the MWL.  3AC at ¶ 236, 255.  Although perhaps originally founded as a charitable organization, Rabita is in reality an Al Qaeda front.  3AC ¶¶ 268, 270. The U.S. Treasury Department has described Jelaidan as "the head of various non-governmental

---

[1]  In the Complaint, Jelaidan's name appears as "Jalaidan" or "Julaidan."  All of these spellings are transliterations from the Arabic and refer to the same person, who is also identified as Defendant # 96.  *See* 3AC at p. 194.  In his (*footnote continued on next page*)

organizations providing financial and logistical support to the al-Qa'ida network," has designated Jelaidan a Specially Designated Global Terrorist ("SDGT") and has frozen his assets.  3AC at ¶ 236, 255.   As alleged in the Complaint, Jelaidan has "repeatedly aided and abetted terrorists." 3AC at ¶ 236.

At his last public press conference, al Qaeda ideological leader Shaykh Abdallah Azzam spoke of the key role Wael Jelaidan was playing with Osama bin Laden in the growing al Qaeda movement:

> [bin Laden] came himself, with his wealth, in the way of Allah, and he is paying for [*mujahideen*] tickets and looking after their families, paying for their rent and their transport, and their sustenance inside Afghanistan.  He is in the frontline, where the fighting is… One hundred Arabs have given their lives for Allah. What have they come for? Someone like Usama Bin Ladin, like Wael Jalaidan, and others from leading families in Saudi Arabia… [who] have come in search of paradise. They believe that there is a God and that there is a paradise, and that life is cheap.[2]

Not only did Jelaidan play a key role both in the founding of Al Qaeda and its subsequent development, but also he remained close to bin Laden and his commanders throughout. According to the U.S. Treasury Department, Jelaidan met with senior al Qaeda terrorist leaders Ayman al-Zawahiri, Abu Zubaida and even senior bin Ladin lieutenant Mohammed Atef and bin Laden himself as late as Summer of 2000, long after Osama bin Laden's Declaration's of War, the 1998 United States Embassy bombings, the Los Angeles Millenium terror plot, and the bombing of the USS Cole, and just one year prior to the September 11th attacks.[3]

In his motion to dismiss the Complaint against him, Jelaidan does not contest that

---

motion to dismiss, this defendant spells his name "Jelaidan."  Accordingly, plaintiffs adopt the defendant's preferred spelling in this memorandum of law.

[2]  Videotape of the last press conference of Shaykh Abdallah Azzam.

[3]  *See* "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," September 6, 2002.

plaintiffs state claims against him under the Anti-Terrorist Act, the Alien Tort Claims Act, and various common law doctrines, including wrongful death, aiding and abetting and conspiracy, for his role in the September 11 attacks.  He contends only that this Court lacks jurisdiction over him and that plaintiffs' RICO and negligence claims should be dismissed.  Jelaidan claims he lacks sufficient "minimum contacts" with the United States to be held accountable in a U.S. court for the material support he provided to Osama bin Laden and al Qaeda.  He is incorrect. Jelaidan has sufficient jurisdictional contacts with the United States because he aided and abetted and provided support to terrorist acts that were deliberately targeted at the United States and its residents.[4]

## II.   ARGUMENT

### A.   The D.C. Court Had *In Personam* Jurisdiction Over Jelaidan, as Does This Court[5]

Defendant's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction should be denied because Jelaidan purposefully directed his tortious activities at the United

---

[4]  Jelaidan also argues that the "law of the case" bars plaintiffs negligence claims and their claims for violation of the Racketeer-Influenced and Corrupt Organizations ("RICO") Act.  Plaintiffs recognize that in *Burnett v. Al Baraka Investment and Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) ("Burnett I"), the D.C. district court dismissed plaintiffs' RICO claims and their negligence claims against a different charity defendant.  Plaintiffs do not believe that the rulings of the D.C. court in this case prior to transfer to this district are binding on this Court.  *See Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996); *see also* Plaintiffs' Memorandum Of Law In Opposition To Motion To Dismiss Of Defendant The National Commercial Bank at pp. 23-24.  Accordingly, plaintiffs incorporate by reference the Negligence arguments set forth in their oppositions to the motions of Al Rajhi Bank (Docket #97) and Al Haramain (Docket #106).  In the event this Court finds no duty exists as to plaintiffs on the allegations at this time, plaintiffs reserve the right to re-plead this claim against Rabita should additional information become available in discovery.  Similarly, with respect to their RICO claims, plaintiffs incorporate by reference the arguments concerning RICO set forth in their oppositions to the motions of Al Rajhi Bank (Docket #97) and Al Haramain (Docket #106).

[5]  This action was commenced in the United States District Court for the District of Columbia and transferred here. As the Second Circuit has recognized, following a transfer under § 1407, "the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer."  *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 163 (2d Cir. 1987).

States.  No more is required to satisfy the requirements of due process.[6]

On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant. *See Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The plaintiffs' burden, however, is minimal; plaintiffs need only make a *prima facie* showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion.  *Id.* at 208; *see also In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction").  Moreover, "[w]here the issue [of personal jurisdiction] is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor."  *Whitaker*, 261 F.3d at 208.

The standard for determining whether a defendant has sufficient contacts with the forum is not a rigid one, nor can it be applied without reference to the nature of the underlying claims against the defendant.  As the Supreme Court has explained, "'[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."  *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)   It is for this reason that the Supreme Court has rejected a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an approach whereby each case could be evaluated in light of its own unique facts and circumstances, in order to

---

[6]  Jelaidan does not challenge service of process and concedes that the only jurisdictional issue is whether Jelaidan has the constitutionally required minimum contacts for this Court to exercise personal jurisdiction over it.  Jelaidan Br. at 4.  Moreover, the relevant minimum contacts are plainly with the United States.  Jurisdiction in this Court is predicated on F.R.C.P. 4(k)(2).  In that circumstance, "minimum contacts" are measured with the United States as a whole.  *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001); *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 & n.10 (7th Cir. (*footnote continued on next page*)

ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

More recently, the Supreme Court has stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985).   The D.C. Circuit, too, has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").

If ever a case called for recognition of the policy considerations that determine what process is due, it is this one.  The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the cold-blooded manner in which U.S. residents were attacked for no reason other than that they were here, on United States soil.  The policies of "fair play" and "substantial justice" cannot be applied without recognition of the deliberate murderous attacks on the United States that gave rise to plaintiffs' claims.  When a defendant purposefully directs his activities so as to cause this kind of harm in the United States, he should not be heard to say that he has had no contact with the this country.  *See* Plaintiffs' Memorandum of Law in Support of Their Prima Facie Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction, filed herewith May 14, 2004, which rebuts the self-serving Affidavit of Wael Jeladain.

---

2000); *see also* Committee Notes to the 1993 Amendments to the Federal Rules of Civil Procedure, H.R. Doc. No. 103-74, at 168 (1993).

Jelaidan is subject to the jurisdiction of the D.C. court, and thus this Court, because he purposefully directed his tortious conduct at the United States. He participated in the founding of al Qaeda and then went on to operate various charities as fronts or support groups for al Qaeda and bin Laden.  This conduct was directed at the United States because, as alleged in the Complaint, al Qaeda specifically targeted the United States and its innocent civilian residents, proclaiming that "America is a state at war with us" and noting that "killing of women and the old and children of the war states . . . is permissible . . . ." 3AC at p. 207. In 1998, bin Laden issued a "fatwa" in which he proclaimed: "We . . . call on every Muslim . . . to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it." 3AC ¶ 213. Thus, al Qaeda made no secret of the fact that its intended target was the United States and American citizens and residents.  Nor were these words an empty threat.  Bin Laden had carried out a serious of attacks against the United States: the 1993 WTC bombing, 1995 Khobar Towers bombing, and the 1998 the bombings of the U.S. embassies in East Africa. *See* 3AC at pp. 212-13.  Thus, when Jelaidan conspired with al Qaeda and bin Laden, he knew that the purpose of his efforts was to assist in attacks against the United States.  In so doing, it sufficiently aimed its conduct at the United States to support the exercise of jurisdiction here.

In *Burger King*, the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472 (citations omitted).  Physical presence is *not* a requirement.  *Id.* at 475. [7]

In the context of an intentional tort claim, the Supreme Court has held that intentional

---

[7]  Similarly, Jelaidan's argument that plaintiffs cannot impute the contacts of Rabita Trust or Muslim World League to him in order to satisfy the requirements of due process is entirely irrelevant because Jelaidan's own conduct, directed at the United States, suffices to subject him to jurisdiction.

conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum.  *Calder v. Jones*, 465 U.S. 783, 789 (1984) .  In *Calder*, the defendants had no contacts with California other than occasional trips and phone calls.  Nonetheless, the Court held that the assertion of jurisdiction in California comported with due process.  Since California was the focal point of the story and the harm suffered, jurisdiction over the defendants was proper in California "based on the 'effects' of their Florida conduct in California."  *Id.* at 789.

The *Calder* court went on to distinguish the intentional tort of which defendants were accused from allegations of "untargeted negligence."  465 U.S. at 789.  Recognizing that the mere foreseeability of an effect in the forum state is insufficient to satisfy the demands of due process, the Court held that jurisdiction was warranted because the defendants' intentional, and allegedly tortious, actions were "expressly aimed at California."  *Id.*  Because they knew that plaintiff would suffer injury in the state in which she lived and worked, the Court held that defendants should "reasonably anticipate being haled into court there to answer for the truth of the statements made in their article."  *Id.* at 790.  *See also World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980) ("defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there").  Thus, the *Calder* Court concluded:  "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."  465 U.S. at 790.

*Calder* provides the relevant analysis here.  Like the defendants in *Calder*, Jelaidan is alleged to have intentionally committed tortious acts.   Just as the *Calder* defendants knew that the plaintiff in that case would suffer her injury in California, so too in this case, it was not mere

fortuity that plaintiffs' injury was suffered in the United States.  Rather, the United States was the avowed target of Osama bin Laden and al Qaeda when Jelaidan aided, abetted, conspired with or materially supported them.   The plaintiff in *Calder* was targeted because she was a Hollywood celebrity – her residence and the site of her injuries was not merely incidental.  Here, too, plaintiffs and their deceased loved ones were targeted because they were Americans – as in *Calder*, their residence and the site of their injuries were not merely incidental.

Three recent cases involving terrorism against Americans further demonstrate that due process is not violated when those who deliberately target Americans are made to answer in American courts of law.  In *Rein v. Socialist People's Libyan Arab Jamahiriya*, the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction.  995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998).  Even though the attack in *Rein* did not take place in the United States, the court found that the targeting of an American-flagged carrier provided a sufficient nexus for the assertion of jurisdiction.

More recently, in *Pugh v. Socialist People's Libyan Arab Jamahiriya*, the court analyzed the minimum contacts of foreign officials who were sued in their personal capacity.  290 F.Supp.2d 54 (D.D.C. 2003).  *Pugh* arose out of the terrorist downing of a French commercial aircraft en route from Brazzaville, Congo to Paris, with an intermediate stop in Chad.  The passengers, all of whom were killed, were from 17 different countries; seven passengers were Americans, and the action was brought by their survivors.  The individual defendants were accused of conspiring in their individual capacity, and not merely as members of the Libyan government, to sabotage the plane.  Applying the *World-Wide Volkswagen* test that requires the

8

court to look at whether the defendant "should reasonably anticipate being haled into court" in

the United States, the court in *Pugh* held that:

> Taking the factual allegations of the complaint as true for present purposes, the individual defendants in the instant action conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight. As the plane they chose to destroy was on an international flight and expected to stop in several nations before reaching its final destination, the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die. Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d at 59.  In language especially relevant to this case, the *Pugh* court continued:

> The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. Congress has not been indifferent to providing judicial sanctions for terrorist acts committed abroad. Beginning at least five years before the UTA Flight 772 bombing, a succession of federal statutes had evinced an intent to assure the criminal prosecution of foreign individuals who committed terrorist acts overseas against U.S. persons or property. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

*Id.*  Accordingly, the court held that:

> in light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any "traditional notions of fair play and substantial justice."

*Id.* at 60.

Thus, in *Pugh*, the defendants were found to have purposefully directed their conduct at the United States sufficiently to subject themselves to jurisdiction in an American court even though the plane they attacked was a French carrier and the flight was not scheduled to, nor did it take off or land in the United States. Here, by contrast, the entire September 11 attack was focused specifically on the United States. Moreover, the perpetrators of the attacks had announced their intention to attack the United States at the time Defendant provided material support to their terrorist projects. Just as the assertion of jurisdiction in a United States court over the defendants in *Pugh* was found to be consistent with the due process clause of the constitution, so, too, the assertion of jurisdiction over Defendant in an American court is also proper. *See also Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns). In all three cases, *Rein*, *Pugh*, and *Daliberti*, the attacks on Americans took place abroad. In none of the three cases were the defendants alleged to have taken any steps in the United States in furtherance of the plots. In all three cases, however, the court found that defendants had sufficiently targeted Americans, and that defendants had sufficient notice that United States law and United States courts would subject them to liability so that the assertion of personal jurisdiction was constitutional. Here, the attacks in question took place on American soil and were thus more specifically focused on the United States than were the attacks in *Rein*, *Pugh*, and *Daliberti*.

Although the D.C. district court found that a co-defendant, Prince Sultan, did not sufficiently direct his conduct towards the United States to meet the "minimum contacts" test,

*see Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003), that ruling does not assist Jelaidan in any way. The D.C. court recognized that allegations supporting the inference that a defendant "expressly aimed" or "purposefully directed" his conduct at the United States might provide sufficient contacts, but found that the allegations against Prince Sultan did not meet that test. *See* 292 F.Supp.2d at 22-23. The Court found that the allegations against Prince Sultan were somewhat different from those asserted against Jelaidan. The Court focused on the fact that Sultan was alleged to have supported charities that financed and supported al Qaeda; Jelaidan is alleged to have founded al Qaeda and to have directed the very charities that provided material support to Osama bin Laden and al Qaeda. *See supra* pp. 1-2. Thus, even if Sultan's material support of various charities that contributed to al Qaeda did not amount to "purposefully direct[ing]" his conduct at the United States (a conclusion Plaintiffs dispute), Jelaidan's much greater role in founding and then aiding and abetting al Qaeda in raising money to fund its terrorist acts constitutes "purposefully directed" activity at the United States. Having helped al Qaeda to commit the atrocities of September 11, 2001 in this way, Jelaidan has made himself answerable for those atrocities in a United States court.[8]

---

[8] Even if plaintiffs have not sufficiently demonstrated the existence of jurisdiction at this juncture, they should be permitted to take jurisdictional discovery. A plaintiff faced with a motion to dismiss for lack of personal jurisdiction "is entitled to reasonable discovery." *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues"); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) ("generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue")*; Marine Midland Bank NA v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (court may decide challenge to personal jurisdiction "on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion"); *Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) (where plaintiff had not made a *prima facie* showing of jurisdiction, but had made "a sufficient start toward establishing personal jurisdiction" court ordered jurisdictional discovery). Moreover, "[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery. 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990).

Jurisdictional discovery is particularly appropriate here because plaintiffs allege that Jelaidan conspired with other defendants -- including defendants, like MWL and even the hijackers themselves, who committed acts within the United States in furtherance of the conspiracy. *See* 3AC at pp. 208-211; ¶¶ 11, 150-153, 236-255; *see* (*footnote continued on next page*)

**B.      Alternatively, Personal Jurisdiction Over Jelaidan Arises From Plaintiffs'
Allegations of Conspiracy.**

If, however, in the unlikely event the Court does not find that personal jurisdiction over
Jelaidan is fair, just and appropriate, then the court should turn to the theory of conspiracy-based
jurisdiction.  Defendant asserts that the D.C. Circuit "has never recognized conspiracy-based
jurisdiction where the Defendant has contested the existence of the conspiracy." Jelaidan Br. at
8.  Whether or not the Defendant contests the existence of the conspiracy is irrelevant under the
D.C. Circuit's logic.  The only issue is whether the plaintiffs have alleged a prima facie case of
conspiracy.  *See e.g. Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425
(D.C. Cir. 1992) ("We do not at this stage attempt to address the limits on the use of conspiracy
theory to establish personal jurisdiction (internal citations omitted).  Whatever those limits, it is
an abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically
alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-
causing act of the conspiracy within the forum's boundaries."); *See also e.g. DSMC, Inc. v.
Convera Corp. and NGT Library*, 273 F.Supp.2d 14, 20 (D.D.C. 2002) (noting that a plaintiff
"need make only a prima facie showing to prevail on a motion to dismiss for want of
jurisdiction" and acknowledging the utility of the theory of conspiracy-based jurisdiction,

---

*also Burnett I*, 274 F.Supp.2d at 105 (upholding conspiracy allegations against defendant Al Haramain Islamic
Foundation, Inc.).  Where there is a sufficient showing of a conspiracy, personal jurisdiction may be exercised based
on the acts of co-conspirators in the forum.  *See, e.g., In re Sumitomo Copper Litigation*, 120 F.Supp.2d 328, 338
(S.D.N.Y. 2000) (personal jurisdiction could be exercised over either or both of the non-resident defendants "if one
of their alleged co-conspirators committed a tort in New York."); *Levisohn, Lerner, Berger & Langsam v. Medical
Taping Systems, Inc.*, 10 F.Supp.2d 334, 342 (S.D.N.Y. 1998) ("'tortious acts of a co-conspirator within New York
may be attributed to an out-of-state defendant in order to obtain personal jurisdiction over the defendant, on the
theory that the co-conspirator is carrying out activities in New York in furtherance of the conspiracy.'"). And where
a plaintiff has specifically alleged (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an
injury-causing act of the conspiracy within the forum's boundaries, courts permit jurisdictional discovery.  *See
Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1992) (district court abused
discretion in denying jurisdictional discovery where plaintiff specifically alleged existence of conspiracy and
participation of defendant).

requiring simply that the plaintiff sufficiently allege the "existence of a conspiracy, and the connection of that conspiracy with the District of Columbia.").

Defendant further misstates the law by claiming that "it is questionable whether conspiracy-based jurisdiction exists at all." Jelaidan Br. at 8.  Many other courts, including this Court, have adopted a conspiracy-based theory of jurisdiction.  *See e.g. Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593, 601 ("both state and federal courts in New York have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators.").  This Court, in *In re Sumitomo Copper Litigation*, held that personal jurisdiction could be exercised over either or both of the non-resident defendants "if one of their alleged co-conspirators committed a tort in New York."   120 F.Supp.2d 328, 338 (S.D.N.Y. 2000); *see also Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 10 F.Supp.2d 334, 342 (S.D.N.Y. 1998) ("'tortious acts of a co-conspirator within New York may be attributed to an out-of-state defendant in order to obtain personal jurisdiction over the defendant, on the theory that the co-conspirator is carrying out activities in New York in furtherance of the conspiracy.'").

In order to establish jurisdiction under the conspiracy theory a plaintiff simply must: (1) make a prima facie factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant/s was/were members of the conspiracy, and (3) show that the defendant's co-conspirator committed a tortious act in the forum. See *Id*.  Allegations of conspiracy regarding Jelaidan in the TAC include:

> The charitable, financial, religious, and political networks that front terror – the Defendant banks, charities, financial, and business institutions – are responsible for the death and injuries of September 11, 2001.  These Defendants, who aided, abetted, sponsored, conspired to sponsor, financed or otherwise provided material

support to Osama bin Laden, al Qaeda, and international terrorism may be held accountable. 3AC at p. 202-203.

All nineteen (19) hijackers were members of Osama bin Laden's al Qaeda terrorist group. Fifteen (15) of the nineteen suicide hijackers were Saudi Arabian nationals. All received sponsorship, training, support and funding through Osama bin Laden and his al Qaeda terrorist network. All Plaintiffs herein were killed and injured as a direct and proximate cause of the acts of these criminals, the acts of their al Qaeda co-conspirators and sponsors, and the acts of Defendants herein to sponsor these reasonably foreseeable acts. 3AC at ¶ 11.

Shortly after September 11, the United States Treasury Department designated a number of charities as terrorist entities and froze their assets. These included the Rabita Trust, al-Haramain, al-Rashid Trust, Wafa Humanitarian Organization, and others. Furthermore, the Treasury Department froze the assets of the Benevolence International Foundation and the Global Relief Foundation. Many of these charities are Saudi funded. Then, in a series of raids over two days in March 2002, federal and local officials stormed the offices of several locations in Virginia and Georgia. These locations housed numerous charities that funnel money to and from al Qaeda. Certain of these entities are under criminal investigation or indictment. 3AC at ¶ 150.

Al-Haramain took part in a committee of charitable organizations that formed the Saudi Joint Relief Committee (or "SJRC"). Along with al-Haramain, the SJRC is comprised of the IIRO, WAMY, the Saudi Red Crescent, and the Muslim World League, among others. The SJRC has been connected to Osama bin Laden and two of his top operatives, Wa'el Hamza Jalaidan and Adel Muhammad Sadiq bin Kazem. The United States Treasury Department has branded Jalaidan a Specially Designated Global Terrorist Entity [SDGT], stating that Jalaidan is "an associate of Usama bin Laden and a support of al-Qa'ida terror." 3AC at ¶ 172.

Several employees of the Muslim World League, IIRO's parent organization, have explicitly worked with al Qaeda. Osama bin Laden's associates from Afghanistan infiltrated and propagated Muslim World League Offices around the world. The Rabita Trust, another branch of the Muslim World League, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury. Wa'el Jalaidan, as Secretary General of the Rabita Trust and Muslim World League Office in Peshawar, Pakistan has repeatedly aided and abetted terrorists. Jalaidan has been branded a SDGT by the United States Treasury Department and his assets have been frozen. The Treasury Department described Jalaidan as follows at his designation as a terrorist entity:

> Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network. 3AC at ¶ 236.

14

The Muslim World League has numerous connections with al Qaeda operatives. Mohammed Bayazid, an al Qaeda operative who fought alongside Osama bin Laden and the other mujahideen in Afghanistan (and has been implicated in a plot to get nuclear materials for al Qaeda), described how Defendant Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda:

> Brother Jamal Khalifa (Abu-l-Bara) was the one who started the educational project, both in the interior of Afghanistan and abroad. Thanks to Dr. Abdullah Azzam's efforts he succeeded in getting the approval of the Muslim World League to open an office for the League in Peshawar as an umbrella under which the brothers could work and move in Pakistan freely. 3AC at ¶ 254.

Wa'el Jalaidan, whom the United States Treasury Department named as "one of the founders of al Qaeda," headed the Muslim World League in Peshawar, Pakistan and also served as the Secretary-General of the Rabita Trust. Jalaidan has been branded a Specially Designated Global Terrorist Entity (or "SDGT") by the United States Treasury Department and his assets have been frozen. The Treasury Department also characterized Jalaidan as having "directed organizations that have provided financial and logistical support to al-Qa'ida." Wa'el Jalaidan operated Muslim World League offices around the world. These offices served in the early days of al Qaeda to attract and train holy warriors for the war in Afghanistan. 3AC at ¶ 255.

Wael Jeladain remains the Secretary-General of the Rabita Trust in Pakistan, *see* Declaration of Wael Hamzaii Jelaidan an individual Defendant, attached to his Motion to Dismiss.)

> Osama bin Laden, his co-conspirators, aiders and abettors, and material sponsors have engaged in a global conspiracy aimed at the United States and other Western targets. Al Qaeda has also acted as a kind of umbrella organization providing support for other terrorist groups. 3AC at ¶ 493.

> As set forth above, Defendants, jointly, severally and proximately caused the deaths and injuries described herein through and by reason of acts of international terrorism, the aiding and abetting international terrorism, conspiring to commit further acts of international terror, engaging in criminal enterprise to promote international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism. 3AC at ¶ 649.

> As set forth above, Defendants aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to Osama bin Laden, al Qaeda, and international terrorism. This material support

15

and/or aiding and abetting of acts of international terrorism allowed al Qaeda to carry out the terrorist attacks on the United States on September 11, 2001.  3AC at ¶ 650.

According to an authoritative biography of bin Laden and the original members of al Qaeda, the head of Rabita Trust, Wa'el Jalaidan, fought alongside Osama bin Laden and championed his cause.  Detailing how al Qaeda's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s, this account is noted for its accuracy and clarity.  The biography, written by a fellow compatriot of bin Laden, noted:

> One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad.  This man was Osama bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan.  Another Saudi joined together with them; his name was Wa'el Jalaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan.

> These three:  Osama bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Jalaidan (a.k.a. Abu Al-Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan.  3AC at ¶ 271.  *See also* 3AC pp. 204, 208, 211, ¶¶ 153, 244, 249, 251-54.

Accordingly, Jelaidan was branded a Specially Designated Global Terrorist Entity by the United States Treasury Department and his assets have been frozen.  Plaintiffs have alleged a sufficient *prima facie* showing of personal jurisdiction over Jelaidan, sufficiently alleged his participation in the al Qaeda conspiracy, Defendant's motion to dismiss for lack of personal jurisdiction must fail.  In *Burnet I*, in rejecting a similar claim by Al Haramain Islamic Foundation (or "AHIF"), the Court held that "the 3AC also provides AHIF with sufficient notice of the conspiracy claims against it."  *Burnett v. Al Baraka*, 274 F.Supp.2d at 105.  Citing *Halberstam*, the court noted:

> A conspirator may be liable for an injury even if he or she did not plan or know about the particular overt act that caused the injury, "so long as the purpose of the act was to advance the overall object of the conspiracy," (citing *Halberstam* at 487).  Again, plaintiffs' allegations about Al Haramain's financing of al Qaeda's terrorist activities support an inference that there was an agreement concerning

16

> the commission of terrorist acts (with Al Haramain as financier and al Qaeda as perpetrator), and that the September 11 attacks were acts done in furtherance of the scheme.

*Id*.  The allegations and additional evidence presented above are more than enough to satisfy the plaintiffs' burden and defeat Defendant's motion to dismiss for lack of personal jurisdiction. Finally, Plaintiffs incorporate herein the arguments contained in their Memorandum of Law in Opposition to Motion to Dismiss of Defendant Rabita Trust, filed herewith, May 14, 2004.

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Jelaidan's Motion to Dismiss for lack of personal jurisdiction.

New York, New York                    Respectfully submitted,
Dated:  May 14, 2004


/S/
_____
Ronald L. Motley, Esq. (SC-4123)
Jodi Westbrook Flowers, Esq. (SC-66300)
Donald A. Migliori, Esq. (RI-4936; MA-567562; MN-0245951)
Michael E. Elsner, Esq. (NY & VA-ME8337)
William H. Narwold, Esq. (NY-WN1713)
Ingrid L. Moll, Esq. (CT-21866 & NY-IM3949)
Robert T. Haefele, Esq. (NJ-58293; PA-57937)
Elizabeth Smith, Esq.
Justin B. Kaplan, Esq. (TN-022145)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Jayne Conroy, Esq. (NY-JC8611)
Paul J. Hanly, Jr., Esq. (NY-PH5486)
Andrea Bierstein, Esq. (NY-AB4618)
HANLY CONROY BIERSTEIN
    & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq. (IN - 4941-49)
Amy Ficklin DeBrota, Esq. (IN - 17294-49)
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone:  (317) 848-7939

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Chip Robertson, Esq.
Mary Winter, Esq.
BARTIMUS, FRICKLETON, ROBERTSON
    & OBETZ
200 Madison Avenue, Suite 1000
Jefferson City, MO 65101
Telephone:  (573) 230-4665

Jack Cordray, Esq. (SC-1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761


Attorneys for Plaintiffs

18