UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001          MDL No. 1570


-------------------------------------------------------------------x

THOMAS BURNETT, SR., *et al*.                          Civil Action No. 03 CV 9849 (RCC)

Plaintiffs

- against –

AL BARAKA INVESTMENT & DEVELOPMENT CORP., *et al.*,

Defendants.

-------------------------------------------------------------------x




**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT RABITA TRUST**




May 14, 2004

i

TABLE OF CONTENTS

*Page*

I.     INTRODUCTION.................................................................................................1

II.    APPLICABLE LEGAL STANDARDS ..........................................................3

       A.     F.R.C.P. 12(B) STANDARDS ....................................................................3

       B.     F.R.C.P. 8 PLEADING STANDARDS ........................................................4

III.   ARGUMENT ........................................................................................................6

       A.     THE D.C. COURT HAD *IN PERSONAM* JURISDICTION OVER RABITA, AS
              DOES THIS COURT ....................................................................................6

       B.     THE COMPLAINT SHOULD NOT BE DISMISSED FOR LACK OF PERSONAL
              JURISDICTION ........................................................................................12

       C.     PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY ............14

       D.     ALTERNATIVELY, PERSONAL JURISDICTION OVER RABITA TRUST
              ARISES FROM PLAINTIFFS' ALLEGATIONS OF CONSPIRACY................16

IV.    THE THIRD AMENDED COMPLAINT PROVIDES RABITA
       SUFFICIENT NOTICE OF THE CLAIMS AGAINST IT. ........................................21

V.     CONCLUSION ..................................................................................................24

# TABLE OF AUTHORITIES

*Page*

## CASES

*Atuahene v. City of Hartford*, 10 Fed.Appx. 33 (2d Cir. 2001) .................................................... 22

*Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000 (7th Cir. 2002) ............................................................. 1

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985). .......................................................... 7

*Burnett v. Al Baraka Investment & Development Corp.*, 274 F.Supp.2d 86 (D.D.C., 2003) ................................................................................................ passim

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C., 2003) .................................................................................................. 11

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961) ................................................................................................... 6

*Calder v. Jones*, 465 U.S. 783 (1984) ................................................................. 8, 9

*Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934 (7th Cir. 2000) ................................................................. 7

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................ 3, 4, 5

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000) .......................................................... 11

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) ....................................... 2

*DSMC, Inc. v. Convera Corp. and NGT Library*, 273 F.Supp.2d 14 (D.D.C. 2002) .................. 16

*Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415 (D.C. Cir. 1992) ................ 16

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) ............................................. 14

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ................................... 7

*Gauvin v. Trembatore*, 682 F.Supp. 1067 (N.D. Cal. 1988) ........................................... 22

*Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184  (2d Cir. 1998) ................................ 3

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................. 21, 23

*In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987) ......................... 6

*In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171 (D.C. Circuit 1987) ............................................................................................... 3

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ....................... 4

*In re Ski Train Fire In Kaprun, Austria on Nov. 11, 2000*, 257 F.Supp.2d 717 (S.D.N.Y. 2003) ............................................................................................ 15

*In re Southeast Banking Corp.*, 69 F.3d 1539 (11th Cir. 1995) ..................................... 5

*In re Sumitomo Copper Litigation*, 120 F.Supp.2d 328 (S.D.N.Y. 2000) ............................ 17

iii

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .......................................... 6

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001) ................................ 6

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593 .............. 17

*Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 10 F.Supp.2d 334 (S.D.N.Y. 1998) ........................................................................................ 17

*Marine Midland Bank NA v. Miller*, 664 F.2d 899 (2d Cir. 1981) .............................................. 14

*Menowitz v. Brown*, 991 F.2d 36  (2d Cir. 1993) ........................................................... 3

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ........................................................... 14

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) ........................................... 7

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C., 2003) ........................................................................................ 9, 10, 11

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) .......................................... 9, 11

*Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521 (D.C. Cir. 2001) ........................................................................................ 14

*Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) ........................... 14

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ................................................................ 3, 4, 21

*Whitaker v. American Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) ........................................ 4

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ........................................... 8, 9

*Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555 (2d Cir. 1985) ................................ 3

*York v. Assoc. of the Bar of the City of New York*, 286 F.3d 122 (2d Cir. 2002) ...................... 3

## STATUTES

28 U.S.C. § 1407 ........................................................................................ 3, 6

Anti-Terrorism Act; 18 U.S.C. §§ 2331-38 ................................................................ 13

Racketeer Influenced and Corrupt Organizations Act (RICO); 18 U.S.C. §§ 1961-65 .................. 2

## OTHER AUTHORITIES

5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE,  (2d ed. 1990) ........................................................................................ 15

## RULES

Fed. R. Civ. P.  4 ........................................................................................ 6

Fed. R. Civ. P.  8 ........................................................................................ 4, 5

Fed. R. Civ. P. 11 ........................................................................................ 5

Fed. R. Civ. P. 12.................................................................................................... 3, 4, 6

Fed. R. Civ. P. 26 – 37 ................................................................................................. 5

Fed. R. Civ. P. 56........................................................................................................ 5

## LEGISLATIVE HISTORY

Committee Notes to the 1993 Amendments to the Federal Rules of Civil Procedure,
    H.R. Doc. No. 103-74 (1993) ................................................................................. 7

# I.   INTRODUCTION

The Plaintiffs in this action are victims and survivors of the September 11th (or "9/11") terrorist attacks.  They seek to hold accountable those who financed and sponsored the terrorist network that perpetrated those attacks.  As alleged in the Plaintiffs' 400-page Third Amended Complaint (the "3AC" or the "Complaint"), there is a significant body of evidence that a network of banks, corporations, individuals, and charitable organizations aided, abetted, funded, provided material support to, or otherwise conspired with, al Qaeda and Osama bin Laden.  Without this support, the al Qaeda terrorists could not have planned and carried out the 9/11 attacks.  The role of charities in sponsoring al Qaeda has been critical:

> Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all. Organizations that pervert the name of charity are an affront to us all, and we will find them, expose them, and shut them down.  (3AC 159).

As the 7th Circuit put it:  "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence."  *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002).  If you take away those resources, you cut off the life-blood of terrorist violence.   As the *Boim* court recognized:  "The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts."  *Id.* That is what plaintiffs in this lawsuit seek to accomplish.  The Third Amended Complaint (or "3AC") is clear in alleging:

> Defendants knew or reasonably should have known they were providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent people.  Defendants clearly knew or should have known they were providing material support, aiding and abetting and enabling the terrorists that brutalized America and the world on September 11, 2001.

1

3AC, Introduction, at p. 217.  Al Qaeda's financial and support network is "notably and deliberately decentralized, compartmentalized, flexible and diverse in its methods and targets." 3AC, Introduction at p. 203.  It is characterized by "layers and redundancies," and it "raises money from a variety of sources and moves money in a variety of ways."  *Id.* at 204.  This labyrinth of illicit relationships enabled Osama bin Laden.  The Plaintiffs bring this action to hold accountable al Qaeda's financial partners in terror.  The Defendant-movant Rabita Trust (or "Rabita") is one such partner and participant.  *See* 3AC ¶ 150-153; 268-275.

Rabita responds to these allegations, including the charge that it has been designated a terrorist entity by the United States government, with contempt – "So what?" it asks.  *See* Memorandum of Points and Authorities in Support of Defendant Rabita Trust's Motion to Dismiss the Third Amended Complaint (or "Rabita Motion") at 18.  In its motion, Rabita seeks to escape being held accountable for its significant role in financing and supporting al Qaeda by claiming: (1) the Court lacks personal jurisdiction over it because it lacks the necessary jurisdictional contacts; and (2) the Complaint fails to provide Rabita notice of the claims against it.[1]  Neither of these arguments is meritorious.  Rabita has sufficient jurisdictional contacts with the United States because it deliberately targeted the United States and its residents as the target of terrorist activities.  Moreover, the lengthy and detailed Third Amended Complaint contains a

---

[1]  Rabita also argues that the "law of the case" bars plaintiffs negligence claims and their claims for violation of the Racketeer-Influenced and Corrupt Organizations ("RICO") Act.  Plaintiffs recognize that in *Burnett v. Al Baraka Investment and Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) ("Burnett I"), the D.C. district court dismissed plaintiffs' RICO claims and their negligence claims against a different charity defendant.  Plaintiffs do not believe that the rulings of the D.C. court in this case prior to transfer to this district are binding on this Court.  *See Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996); *see also* Plaintiffs' Memorandum Of Law In Opposition To Motion To Dismiss Of Defendant The National Commercial Bank at pp. 23-24.  Accordingly, plaintiffs incorporate by reference the Negligence arguments set forth in their oppositions to the motions of Al Rajhi Bank (Docket #97) and Al Haramain (Docket #106).  In the event this Court finds no duty exists as to plaintiffs on the allegations at this time, plaintiffs reserve the right re-plead this claim against Rabita should additional information become available in discovery.  Similarly, with respect to their RICO claims, plaintiffs incorporate by reference the arguments concerning RICO set forth in their oppositions to the motions of Al Rajhi Bank (Docket #97) and Al Haramain (Docket #106).

wealth of allegations sufficient to apprise Rabita of the nature of the claims against it.  3AC at pp. 199-220; ¶¶ 150-338; ¶¶ 641-717.

## II.   APPLICABLE LEGAL STANDARDS

### A.    F.R.C.P. 12(b)  Standards

Defendant Rabita brings its motion to dismiss under F.R.C.P. 12(b)(2) (personal jurisdiction) and 12(b)(6) (failure to state a claim).

With respect to motions under Rule 12(b)(6), the Second Circuit has instructed that "the district court should deny the motion to dismiss unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir. 1998);[2] *accord Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Accordingly, the court must "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *York v. Assoc. of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002).  Moreover, the Court is to grant plaintiffs the benefit of all inferences that can be derived from the facts alleged. *See, e.g., Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 562 (2d Cir. 1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader").

On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant. *See Whitaker v.*

---

[2]  Although this case originally was filed in the United States District Court for the District of Columbia, both the Second Circuit and the D.C. Circuit have held that, following transfer under 28 U.S.C. § 1407 to a district court in another circuit, the transferee court must apply, and is bound by, decisions of the Court of Appeals for the transferee circuit with respect to issues of federal law. *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993) (noting that "if a federal court simply accepts the interpretation of another circuit without independently addressing the merits, it is not doing its job," and further noting that "[i]t would be unwieldy, if not impossible, for a court to apply differing rules of federal law to various related cases consolidated before it."); *accord In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1174-76 (D.C. Circuit 1987).

*American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The plaintiffs' burden, however, is minimal; plaintiffs need only make a *prima facie* showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion. *Id.* at 208; *see also In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction"). Moreover, "[w]here the issue [of personal jurisdiction] is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Whitaker*, 261 F.3d at 208.

### B.    F.R.C.P. 8 Pleading Standards

The pleading standard at issue is well established. F.R.C.P. 8(a) provides that the complaint must contain:

> (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.

In *Conley*, 355 U.S. at 47, the Supreme Court held that Rule 8 does "not require a claimant to set out in detail the facts upon which he bases his claim." Rather, the Court held, "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* More recently, in *Swierkiewicz,* 534 U.S. at 512-13, the Supreme Court re-iterated that a complaint need simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." The Court carefully differentiated what a plaintiff must prove from what must be pleaded, noting that Rule 8 "establishes a pleading standard without regard to whether a claim will succeed on the merits." *Swierkiewicz,* 534 U.S. at 515. This standard has been specifically adopted as applicable to this case. *See Burnett I*, 274 F.Supp.2d at 103, 107, 110.

In addition, Rule 8 should be read in light of the obligations of counsel under F.R.C.P. 11(b), the provisions for discovery set out in F.R.C.P. 26 – 37, and the procedure for obtaining summary judgment which may eventually be employed in this case under F.R.C.P. 56.   Under Rule 11(b), counsel's signature is a representation that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Moreover, this belief must be formed "after an inquiry reasonable under the circumstances." *Id.* Rules 26 through 37 permit parties to gather evidence in support of their claims after the filing of the Complaint, while Rule 56 permits claims to be disposed of summarily where warranted. Read together, these rules envision broad notice pleading limited primarily by counsel's obligations to make reasonable inquiry and eschew frivolous allegations, with specific factual evidence to be obtained and evaluated later. *See In re Southeast Banking Corp.*, 69 F.3d 1539, 1552 n.5 (11th Cir. 1995) ("Rule 8(a)(2) must be read in the context of Rule 11's prohibition on pleadings formed without reasonable inquiry under the circumstances."); *see also Conley*, 355 U.S. at 47-48 ("simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues").   What many of the defendants herein seek to impose is a summary judgment standard rather than one applicable to a motion to dismiss.   Moreover, many defendants, including Rabita Trust, challenge the Courts' jurisdiction over them.

## III.   ARGUMENT

### A.   The D.C. Court Had *In Personam* Jurisdiction Over Rabita, as Does This Court[3]

Defendant's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction should be denied because there is a sufficient nexus between Rabita and the United States to meet and satisfy applicable due process requirements.[4]

The standard for determining whether a defendant has sufficient contacts with the forum is not a rigid one, nor can it be applied without reference to the nature of the underlying claims against the defendant. As the Supreme Court has explained, "'[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961). It is for this reason that the Supreme Court has rejected a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an approach whereby each case could be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

More recently, the Supreme Court has stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of

---

[3]   As the Second Circuit had recognized, following a transfer under § 1407, "the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 163 (2d Cir. 1987).

[4]   Rabita does not challenge service of process and concedes that the only jurisdictional issue is "whether Rabita has the constitutionally required minimum contacts for this Court to exercise personal jurisdiction over it." Rabita Motion at 4. Moreover, the relevant minimum contacts are plainly with the United States as opposed to a particular forum. Jurisdiction in this Court is predicated on F.R.C.P. 4(k)(2). In that circumstance, "minimum contacts" are measured with the United States as a whole. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001); *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230

minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985).   The D.C. Circuit, too, has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").

The recognition of the policy considerations is important in this matter.   The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the cold-blooded manner in which U.S. residents were attacked for no reason other than that they were here, on United States soil. *See* Plaintiffs' Memorandum of Law in Support of Their *Prima Facie* Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction.   The policies of "fair play" and "substantial justice" cannot be applied without recognition of the deliberate murderous attacks on the United States that gave rise to plaintiffs' claims.

In *Burger King*, the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472 (citations omitted).   Physical presence is *not* a requirement. *Id.* at 475.

In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum. *Calder v. Jones*,

---

F.3d 934, 946 & n.10 (7th Cir. 2000); *see also* Committee Notes to the 1993 Amendments to the Federal Rules of Civil Procedure, H.R. Doc. No. 103-74, at 168 (1993).

465 U.S. 783, 789 (1984).  In *Calder*, the defendants had no contacts with California other than occasional trips and phone calls.  Nonetheless, the Court held that the assertion of jurisdiction in California comported with due process.  Since California was the focal point of the story and the harm suffered, jurisdiction over the defendants was proper in California "based on the 'effects' of their Florida conduct in California."  *Id.* at 789.

The *Calder* court went on to distinguish the intentional tort of which defendants were accused from allegations of "untargeted negligence."  465 U.S. at 789.  Recognizing that the mere foreseeability of an effect in the forum state is insufficient to satisfy the demands of due process, the Court held that jurisdiction was warranted because the defendants' intentional, and allegedly tortious, actions were "expressly aimed at California."  *Id.*  Because they knew that plaintiff would suffer injury in the state in which she lived and worked, the Court held that defendants should "reasonably anticipate being haled into court there to answer for the truth of the statements made in their article."  *Id.* at 790.  *See also World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980) ("defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there").  Thus, the *Calder* Court concluded:  "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."  465 U.S. at 790.

*Calder* provides the relevant analysis here.  Like the defendants in *Calder*, Rabita  is alleged to have intentionally committed tortious acts.   Just as the *Calder* defendants knew that the plaintiff in that case would suffer her injury in California, so too in this case, it was not mere fortuity that plaintiffs' injuries were suffered in the United States.  Rather, the United States was the avowed target of Osama bin Laden and al Qaeda throughout the time period when Defendant

provided them with material support.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendants Challenges to Personal Jurisdiction.  The plaintiff in *Calder* was targeted because she was a Hollywood celebrity – her residence and the site of her injuries was not merely incidental. Here, too, plaintiffs and their loved ones were targeted because they were Americans – as in *Calder*, their residence and the site of their injuries were not merely incidental.

Three recent cases involving terrorism against Americans further demonstrate that due process is not violated when those who deliberately target Americans are made to answer in American courts of law.  In *Rein v. Socialist People's Libyan Arab Jamahiriya*, the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction.  995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998).  Even though the attack in *Rein* did not take place in the United States, the court found that the targeting of an American-flagged carrier provided a sufficient nexus for the assertion of jurisdiction.

More recently, in *Pugh v. Socialist People's Libyan Arab Jamahiriya*, the court analyzed the minimum contacts of foreign officials who were sued in their personal capacity.  290 F.Supp.2d 54 (D.D.C., 2003).  *Pugh* arose out of the terrorist downing of a French commercial aircraft en route from Brazzaville, Congo to Paris, with an intermediate stop in Chad.  The passengers, all of whom were killed, were from 17 different countries; seven passengers were Americans, and the action was brought by their survivors.  The individual defendants were accused of conspiring in their individual capacity, and not merely as members of the Libyan government, to sabotage the plane.  Applying the *World-Wide Volkswagen* test that requires the court to look at whether the defendant "should reasonably anticipate being haled into court" in

the United States, the court in *Pugh* held that:

> [I]t was also altogether foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d at 59.  The *Pugh* court continued:

> The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

*Id.*  Accordingly, the court held that:

> "in light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any 'traditional notions of fair play and substantial justice.'"  *Id.* at 60.

Thus, in *Pugh*, the defendants were found to have purposefully directed their conduct at the United States sufficiently to subject themselves to jurisdiction in an American court even though the plane they attacked was a French carrier and the flight was not scheduled to, nor did it take off or land in the United States.  Here, by contrast, the entire September 11th attacks were focused specifically and directly at the United States.

Moreover, the perpetrators of the attacks had announced their intention to attack the United States at the time Defendant provided material support to their terrorist projects.  Just as the assertion of jurisdiction in a United States court over the defendants in *Pugh* was found to be consistent with the due process clause of the constitution, so, too, the assertion of jurisdiction

over Defendant in an American court is also proper.  *See also Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns). In all three cases, *Rein*, *Pugh*, and *Daliberti*, the attacks on Americans took place abroad.  In none of the three cases were the defendants alleged to have taken any steps in the United States in furtherance of the plots.  In all three cases, however, the courts found that defendants had sufficiently targeted Americans, and that defendants had sufficient notice that United States law and United States courts would subject them to liability and therefore the assertion of personal jurisdiction was constitutional.  Here, the attacks in question took place on American soil and were thus even more specifically focused on the United States itself than were the attacks in *Rein*, *Pugh*, and *Daliberti*.  The same logic applies.

Although the D.C. district court found that a co-defendant, Prince Sultan, did not sufficiently direct his conduct toward the United States to meet the "minimum contacts" test, *see Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C., 2003), that ruling does not assist Rabita in any way.  The D.C. court recognized that allegations supporting the inference that a defendant "expressly aimed" or "purposefully directed" his conduct at the United States might provide sufficient contacts, but found that the allegations against Prince Sultan did not meet that test.  *See* 292 F.Supp.2d at 22-23.  While Plaintiffs disagree with this conclusion, the Court reasoned that the allegations against Prince Sultan were one step further removed than those against Rabita.  Sultan was alleged (among other things) to have contributed to charities, that like Rabita, financed and supported al Qaeda;  Rabita is alleged to *be* one of the charities that financed and supported al Qaeda.

**B.      The Complaint Should Not Be Dismissed for Lack of Personal Jurisdiction**

Although perhaps originally founded as a charitable organization, Rabita is in reality an Al Qaeda front.  3AC ¶¶ 268, 270.  Its Secretary General, Wael Jelaidan, is known to be an al Qaeda member and has repeatedly aided and abetted terrorists.  3AC at ¶ 236, 270.  The U.S. Treasury Department has described Jelaidan as "the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."  3AC at ¶ 236.  In October, 2001, Rabita was designated by President Bush as a "Specially Designated Global Terrorist Entity" ("SDGTE") and its assets were frozen by the Treasury Department.  3AC at ¶ 274.  Jelaidan was designated a "Specially Designated Global Terrorist (or "SDGT)."  3AC at ¶ 236.

Rabita is a "sister organization" of the International Islamic Relief Organization (or "IIRO"); both are subsidiaries of the Muslim World League (or "MWL").[5]  3AC at ¶ 272.  Rabita's Secretary General and co-defendant, Jelaidan, ran MWL offices around the world.  3AC at ¶ 255.  MWL has numerous connections to al Qaeda operatives; indeed, Osama bin Laden's brother-in-law, Mohammed Jamal Khalifah, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda.  3AC at ¶ 254.  According to a former senior Al-Qaeda official and U.S. government informant Jamal Al-Fadl, Osama bin Laden stated to his men that the Muslim World League was one of three main Islamic charitable fronts for Al-Qaeda.  *See* Plaintiffs' Memorandum of Law in Support of Their Prime Facie Showing of Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction, filed May 14, 2004, and incorporated herein by reference.

IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the

Lincoln Tunnel and the Brooklyn Bridge, the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, the 1995 Phillipines terror plots, and the 1998 Embassy bombings in East Africa. 3AC ¶ 234.  In addition, through two of its officers, Rabita has also been connected to the "SAAR" network of charities, which is a convoluted, overlapping arrangement of non-profit and for-profit organizations that serve or have served as front-groups for al Qaeda and extremist Islamic terrorist organizations.  3AC at ¶¶ 262, 273.

Rabita, MWL, IIRO, and the SAAR entities are part of a network of charities around the world that have been usurped by Islamist extremists as a means to raise funds and travel the world easily and efficiently.  3AC at ¶ 151.  The charity defendants in this action, including Rabita, were used as terrorists fronts, to mask money transfers and provide cover for terrorist operatives.  3AC at ¶ 153.  The Complaint alleges numerous causes of action against Rabita including claims under the Anti-Terrorism Act, 18 U.S.C. 2331 et seq.  3AC ¶¶ 641-717.

The direct support from Rabita to Osama bin Laden and al Qaeda sufficiently demonstrates that Rabita "expressly aimed" its conduct at the United States because bin Laden himself had specifically announced that the United States was in fact the target.  As alleged in the Complaint, al Qaeda specifically targeted the United States and its innocent civilian residents, proclaiming that "America is a state at war with us" and noting that "killing of women and the old and children of the war states . . . is permissible . . . ." 3AC at p. 207. In 1998, bin Laden issued a "fatwa" in which he proclaimed: "We . . . call on every Muslim . . . to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it." 3AC ¶ 213. In a multitude of arenas, al Qaeda made no secret of the fact that its intended

---

[5] The Muslim World League's Motion to Dismiss has been denied in this matter.  *Burnett v. Al Baraka Investment*

target was the United States and American citizens and residents.  Nor were these words an empty threat.  Bin Laden had carried out a serious of attacks against the United States here and abroad:  the 1993 WTC bombing, the 1995 Khobar Towers bombing, and the 1998 the bombings of the U.S. embassies in East Africa and the bombing of The Cole.  *See* 3AC at pp. 212-14. Thus, when Rabita provided direct support to al Qaeda and bin Laden, it knew that the purpose of this support was to assist in attacks against the United States.  In so doing, it sufficiently aimed its conduct at the United States to support the exercise of jurisdiction here.

**C.      Plaintiffs Are Entitled to Jurisdictional Discovery**

Even where the court determined the plaintiffs have not sufficiently demonstrated the existence of jurisdiction at this juncture, they should be permitted to take jurisdictional discovery.  A plaintiff faced with a motion to dismiss for lack of personal jurisdiction "is entitled to reasonable discovery."  *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001);  *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues"); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) ("generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue")*; Marine Midland Bank NA v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (court may decide challenge to personal jurisdiction "on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion"); *Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) (where plaintiff had not made a *prima facie* showing of jurisdiction, but had made "a sufficient start toward establishing personal jurisdiction" court ordered jurisdictional discovery).

*and Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003)

Moreover, "[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery. 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990).

First, at a minimum, plaintiffs should be permitted to take discovery in order to further demonstrate that Rabita is a subsidiary/alter ego of the Muslim World League, which maintains an office in the United States and which has already been found to be subject to jurisdiction in this action. *See Burnett I,* 274 F.Supp.2d at 96-97. As another judge in this Court has recently explained, "[w]here plaintiffs can establish that one corporation is the alter ego of another, courts may 'pierce the corporate veil' jurisdictionally and attribute 'contacts' accordingly." *In re Ski Train Fire In Kaprun, Austria on Nov. 11, 2000,* 257 F.Supp.2d 717, 730 (S.D.N.Y. 2003). Here, there is sufficient basis to suggest that Rabita is an alter ego of MWL such that plaintiffs should be permitted to take discovery on this question.

As alleged in the Complaint (and Rabita does not deny), Wael Jelaidan served both as Secretary General of the Rabita and of the Muslim World League office in Pakistan. 3AC at ¶ 236. Abdullah al-Obaid, President of MWL's United States branch and former Secretary General of the organization also served as Secretary General of Rabita. 3AC at ¶ 252. Furthermore, Rabita acknowledges that it was started in part by MWL and received the majority of its funding from MWL, and is a subsidiary of MWL. See Rabita Motion at p. 12. Muslim World League's English website lists the phone number for the Muslim World League as +966 2 5601319 and the Telex as 540009 Rabita SJ.[6] The Saudi Arabian Information Resource website lists the address of the Muslim World League as Muslim World League (Rabita), P.O. Box 537,

Makkah, Saudi Arabia.[7]   The two organizations could be separate legal entities, but they also could be one and the same.   At the very least, the allegations presented are sufficient to merit further jurisdictional discovery on the issue.   If discovery confirms that MWL and Rabita are one and the same, the forum contacts of the Muslim World League would be imputed to Rabita and the jurisdictional requirements of minimum contacts satisfied.   At a minimum, Plaintiffs' claims against Rabita should not be dismissed until plaintiffs have had an opportunity to take discovery on this point.

### D.   Alternatively, Personal Jurisdiction Over Rabita Trust Arises From Plaintiffs' Allegations of Conspiracy.

Personal jurisdiction over Rabita is appropriate, in the alternative, under the court should turn to the theory of conspiracy-based jurisdiction.   Defendant asserts that the D.C. Circuit "has never recognized conspiracy-based jurisdiction where the Defendant has contested the existence of the conspiracy." Rabita Motion at 8.   Whether or not the defendant contests the existence of the conspiracy is irrelevant under the D.C. Circuit's logic.   The only issue is whether the plaintiffs have alleged a prima facie case of conspiracy.   *See e.g. Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1992) ("We do not at this stage attempt to address the limits on the use of conspiracy theory to establish personal jurisdiction. (internal citations omitted).   Whatever those limits, it is an abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-causing act of the conspiracy within the forum's boundaries."); See also e.g. *DSMC, Inc. v. Convera Corp. and NGT Library*, 273 F.Supp.2d 14, 20 (D.D.C. 2002) (noting that a plaintiff "need make only a prima facie showing to prevail on a

---

[6]   *See*  http://www.muslimworldleague.org/mwlwbsite_eng/index.htm.

motion to dismiss for want of jurisdiction" and acknowledging the utility of the theory of conspiracy-based jurisdiction, requiring simply that the plaintiff sufficiently allege the "existence of a conspiracy, and the connection of that conspiracy with the District of Columbia.").

Defendant further misstates the law by claiming that "it is questionable whether conspiracy-based jurisdiction exists at all." Rabita Motion at 8.  Many courts have applied a conspiracy theory of jurisdiction.  *See e.g. Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593, 601 ("both state and federal courts in New York have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators.").  This Court, in *In re Sumitomo Copper Litigation*, held that personal jurisdiction could be exercised over either or both of the non-resident defendants "if one of their alleged co-conspirators committed a tort in New York."  120 F.Supp.2d 328, 338 (S.D.N.Y. 2000); *see also Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 10 F.Supp.2d 334, 342 (S.D.N.Y. 1998) ("'tortious acts of a co-conspirator within New York may be attributed to an out-of-state defendant in order to obtain personal jurisdiction over the defendant, on the theory that the co-conspirator is carrying out activities in New York in furtherance of the conspiracy.'").

In order to establish jurisdiction under the conspiracy theory a plaintiff simply must: (1) make a prima facie factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant/s was/were members of the conspiracy, and (3) show that the defendant's co-conspirator committed a tortious act in the forum. *See Id*.  Allegations of conspiracy regarding Rabita Trust in the TAC include:

"The charitable, financial religious, and political networks that front terror – the

---

[7]  *See* http://www.saudinf.com/main/x0041.htm.

17

Defendant banks, charities, financial, and business institutions – are responsible for the death and injuries of September 11, 2001.  These Defendants, who aided, abetted, sponsored, conspired to sponsor, financed or otherwise provided material support to Osama bin Laden, al Qaeda, and international terrorism may be held accountable." 3AC at p. 202-203.

These charities operated in the United States, Europe, Asia, Africa, and the Middle East in furtherance of international terrorism.  Charities became an essential part of the support system of al Qaeda and Osama bin Laden, providing the financial resources that enabled them to wage war.  3AC at p. 208

All nineteen (19) hijackers were members of Osama bin Laden's al Qaeda terrorist group.  Fifteen (15) of the nineteen suicide hijackers were Saudi Arabian nationals.  All received sponsorship, training, support and funding through Osama bin Laden and his al Qaeda terrorist network.  All Plaintiffs herein were killed and injured as a direct and proximate cause of the acts of these criminals, the acts of their al Qaeda co-conspirators and sponsors, and the acts of Defendants herein to sponsor these reasonably foreseeable acts. 3AC at ¶ 11.

The charity Defendants in this action are used as terrorist fronts, to mask money transfers and provide cover for terrorist operatives.  3AC at ¶ 153.

Shortly after September 11, the United States Treasury Department designated a number of charities as terrorist entities and froze their assets.  These included the Rabita Trust, al-Haramain, al-Rashid Trust, Wafa Humanitarian Organization, and others.   Furthermore, the Treasury Department froze the assets of the Benevolence International Foundation and the Global Relief Foundation.  Many of these charities are Saudi funded.  Then, in a series of raids over two days in March 2002, federal and local officials stormed the offices of several locations in Virginia and Georgia.  These locations housed numerous charities that funnel money to and from al Qaeda.  Certain of these entities are under criminal investigation or indictment. 3AC at ¶ 150.

The Rabita Trust, another branch of the Muslim World League, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury.  Wa'el Jalaidan, as Secretary General of the Rabita Trust and Muslim World League Office in Peshawar, Pakistan has repeatedly aided and abetted terrorists.  3AC at ¶ 236.

Osama bin Laden, his co-conspirators, aiders and abettors, and material sponsors have engaged in a global conspiracy aimed at the United States and other Western targets.  Al Qaeda has also acted as a kind of umbrella organization providing support for other terrorist groups. 3AC at ¶ 493.

As set forth above, Defendants, jointly, severally and proximately caused the deaths and injuries described herein through and by reason of acts of international

terrorism, the aiding and abetting international terrorism, conspiring to commit further acts of international terror, engaging in criminal enterprise to promote international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism. 3AC at ¶ 649.

As set forth above, Defendants aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to Osama bin Laden, al Qaeda, and international terrorism. This material support and/or aiding and abetting of acts of international terrorism allowed al Qaeda to carry out the terrorist attacks on the United States on September 11, 2001. 3AC at ¶ 650.

Rabita Trust is a charitable organization which was created to organize the repatriation and rehabilitation of stranded Pakistanis (Biharis) from Bangladesh. Founded in 1988, the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, the Muslim World League (Rabita al-Alam-e-Islami). Rabita Trust received the majority of its funding from the Muslim World League, a world-wide Islamic organization heavily funded by the Saudis, but which has also been involved with terrorism. 3AC at ¶ 268.

Rabita Trust was initially granted 250 million Riyals from the Pakistani government as well as 50 million Riyals from the Muslim World League to help relocate some 250,000 displaced Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed to relocate a few hundred Biharis. 3AC at ¶ 269.

Rabita Trust is an al Qaeda front, and the Head of Rabita Trust is a known al Qaeda member. A Treasury Department press release issued when Rabita Trust's assets were frozen indicated that:

> Rabita Trust is headed by Wa'el Hamza Jalaidan, one of the founders of al-Qaida with bin Laden. He is the logistics chief of bin Laden's organization and fought on bin Laden's side in Afghanistan. 3AC at ¶ 270.

According to an authoritative biography of bin Laden and the original members of al Qaeda, the head of Rabita Trust, Wa'el Jalaidan, fought alongside Osama bin Laden and championed his cause. Detailing how al Qaeda's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s, this account is noted for its accuracy and clarity. The biography, written by a fellow compatriot of bin Laden, noted:

> One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice

> everything for the Afghani jihad.  This man was Osama bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan.  Another Saudi joined together with them; his name was Wa'el Jalaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan.
>
> These three:  Osama bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Jalaidan (a.k.a. Abu Al-Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan.  3AC at ¶ 271.

Rabita Trust is the sister organization of the International Islamic Relief Organization as they are both subsidiaries of the Muslim World League.  3AC at ¶ 272.

Rabita Trust, a subsidiary of the Muslim World League, is connected to the SAAR Network, through two officers, Dr. Abdullah Omar Naseef and Abdullah al-Obaid.  The SAAR Network was the focus of March 2002 raids led by United States authorities for the network's ties to al Qaeda.  3AC at ¶ 273.

On October 12, 2001, President George W. Bush's Executive Order designated Defendant Rabita Trust as a Specially Designated Global Terrorist Entity and the Treasury Department froze its assets.  Defendant Abdullah Omar Naseef founded the Defendant Rabita Trust in July 1988 and is currently its chairman.  3AC at ¶ 274.

Abdullah Omar Naseef (or "Naseef") also served as Secretary-General of the Muslim World League during the time he created Defendant Rabita Trust and has attempted to spread Muslim World League offices around the world.  Part of his global efforts are found in his involvement in a SAAR Network charity.  Naseef is an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization.  A second shared executive is the Vice-Chairman of the Board of Trustees of Rabita Trust, Abdullah al-Obaid, who is also an officer at two of the SAAR Network businesses that were raided, the Muslim World League and Sanabel al-Kheer. Defendant Abdullah Omar al-Obaid is unique in that, not only is he an officer at the Muslim World League and the SAAR Network, but he is also the Deputy General Manager at one of the al-Rajhi's largest businesses, al-Watania Poultry in Saudi Arabia.  Al-Watania Poultry has branches worldwide and in the United States.  3AC at ¶ 275.  *See also* pp. 204, 211, ¶ 172.

The Plaintiffs undoubtedly have made out a *prima facie* showing of personal jurisdiction generally, as well as one under conspiracy, alleging specific facts that the Defendant was a member of that conspiracy,  In *Burnett I*, in rejecting a very similar claim by Al Haramain

Islamic Foundation, the court held that "the 3AC also provides AHIF with sufficient notice of the conspiracy claims against it."  274 F.Supp.2d at 105.  Citing *Halberstam*, the court noted:

> A conspirator may be liable for an injury even if he or she did not plan or know about the particular overt act that caused the injury, "so long as the purpose of the act was to advance the overall object of the conspiracy," (citing *Halberstam* at 487).  Again, plaintiffs' allegations about Al Haramain's financing of al Qaeda's terrorist activities support an inference that there was an agreement concerning the commission of terrorist acts (with Al Haramain as financier and al Qaeda as perpetrator), and that the September 11 attacks were acts done in furtherance of the scheme.

*Id*.  The allegations and additional evidence presented above are more than enough to satisfy the plaintiffs' burden and defeat Defendant's motion to dismiss for lack of personal jurisdiction.

## IV.  THE THIRD AMENDED COMPLAINT PROVIDES RABITA SUFFICIENT NOTICE OF THE CLAIMS AGAINST IT.

Rabita Trust's argument for the dismissal of the remaining counts is that the Complaint fails to provide Rabita sufficient notice of the claims against it.  Rabita Motion at 18.  Rabita is simply wrong, as the foregoing allegations demonstrate.

The 3AC satisfies the pleading requirements of Rule 8, which require only a short, plain statement sufficient to provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz,* 534 U.S. at 512-13.  The Complaint alleges that "[t]he charity Defendants in this action are used as terrorist fronts, to mask money transfers and provide cover for terrorist operatives." 3AC ¶ 153.  The Complaint provides additional detail, alleging that all defendants, including Rabita, provided material support or resources and aided and abetted al Qaeda terrorists and that they did so knowingly and intentionally, resulting in the causal chain of violence and that Rabita is itself an al Qaeda front.  See 3AC ¶¶ 136, 153, 268-275; 645-652, 654, 661-664.  In addition, the Introduction to the Complaint specifically alleges:

> These charities operated in the United States, Europe, Asia, Africa, and the Middle East in furtherance of international terrorism.  Charities became an

> essential part of the support system of al Qaeda and Osama bin Laden, providing
> the financial resources that enabled them to wage war.

3AC, Introduction, at p. 209.   The Complaint further asserts:

> Defendants knew or reasonably should have known they were providing material
> support to terrorists and terrorist organizations who committed the September 11,
> 2001 savagery that murdered thousands of innocent people.   Defendants clearly
> knew or should have known they were providing material support, aiding and
> abetting and enabling the terrorists that brutalized America and the world on
> September 11, 2001.

3AC, Introduction, at p. 217.   The Complaint alleges that both Rabita and its Secretary General,

Wael Jelaidan, have been designated by the United States as Specially Designated Global

Terrorist Entities related to al Qaeda and, as such, have had their assets frozen.   See Rabita

Motion at 18; see also 3AC at ¶ 236, 274.   These allegations plainly put Rabita on notice about

the nature of plaintiffs' claims against it; any claim to the contrary should be rejected as

disingenuous.

In support of its contention that the Complaint is insufficient, Rabita relies on an

unreported summary order designated by the Second Circuit as one which "may not be cited as

precedential authority to this or any other court."   *See* Rabita Motion at 6, *citing Atuahene v. City*

*of Hartford*, 10 Fed.Appx. 33, 34 (2d Cir. 2001).   But even if *Atuahene* were valid precedent, it

would still not support Rabita here.   In *Atuahene*, the Second Circuit found inadequate a

complaint that failed to differentiate among the defendants and distinguish their conduct.   Here,

by contrast, the Third Amended Complaint contains specific allegations about Rabita and its

role, *see, e.g.* 3AC at ¶¶ 268-275, in addition to the general allegations applicable to the charity

defendants and to all defendants.   Similarly, in the other case relied on by Rabita, a district court

in California found that plaintiff there had lumped all of the defendants into a single, broad

allegation.   *Gauvin v. Trembatore*, 682 F.Supp. 1067, 1071 (N.D. Cal. 1988).     Nothing in

*Atuahene* or in *Gauvin* precludes a plaintiff from using allegations common to all defendants, as

plaintiffs have done here, so long as the particular role of each defendant also is specified. Plaintiffs clearly have done that here.

Based on the bare-bones and self-serving Affidavit of Wael Jelaidan, Rabita further argues that plaintiffs have not alleged that Rabita has taken any action to aid, abet, or conspire with anyone in carrying out the September 11th attacks. That is simply not so. Read together, plaintiffs' allegations that Osama bin Laden and al Qaeda carried out the September 11 attacks, *see* 3AC at ¶ 6; that Rabita is an al Qaeda front, *see* 3AC at ¶ 270; that charities that acted as al Qaeda fronts provided financial and logistical support to al Qaeda and bin Laden; *see* 3AC at ¶¶ 153, and that Rabita's Secretary General, Jelaidan, is "the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network," *see* 3AC at ¶ 236, give rise to the inference that Rabita aided and abetted bin Laden and al Qaeda in carrying out the September 11 attacks. *See, e.g., Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) (where defendant knew that murderer was engaged in some type of personal property crime and provided assistance to his criminal career, she was properly held liable for aiding and abetting murder committed during the course of burglarly, even though she was not present at burglarly and had no specific knowledge of it, because violence and killing were foreseeable risks of the murderer's criminal activity); *see also Burnett I,* 274 F.Supp.2d at 104 (at the pleading stage of this case, it is sufficient plaintiffs allege that al Qaeda committed a wrongful act that caused injury to the plaintiffs and that defendant knowingly financed al Qaeda "in the furtherance of international terrorism.").[8] Rabita has been provided with fair notice of the accusation against it,

---

[8] Defendant attempts to distinguish Rabita Trust's situation from that of Al-Haramain by noting that the court "emphasized the temporal connection between the alleged funding and the carrying out of the September 11, 2001 attacks," and claims that the Complaint "does not allege that Rabita Trust ever financed al Qaeda prior to September 11, 2001." The Court noted that the Complaint alleges support given in the year 2001, but gives no indication that the support must have been given during 2001 to satisfy the liberal pleading requirements. Also, the court found

and this Court should reject Rabita's motion to dismiss.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Rabita's

Motion to Dismiss for lack of personal jurisdiction and failure to state a claim upon which relief

can be granted.

New York, New York                    Respectfully submitted,
Dated:  May 14, 2004


                                             /S/
                          _____
                          Ronald L. Motley, Esq. (SC-4123)
                          Jodi Westbrook Flowers, Esq. (SC-66300)
                          Donald A. Migliori, Esq. (RI-4936; MA-567562;
                               MN-0245951)
                          Michael E. Elsner, Esq. (NY & VA-ME8337)
                          William H. Narwold, Esq. (NY-WN1713)
                          Ingrid L. Moll, Esq. (CT-21866 & NY-IM3949)
                          Robert T. Haefele, Esq. (NJ-58293; PA-57937)
                          Elizabeth Smith, Esq.
                          Justin B. Kaplan, Esq. (TN-022145)
                          MOTLEY RICE LLC
                          28 Bridgeside Boulevard
                          P.O. Box 1792
                          Mount Pleasant, South Carolina 29465
                          Telephone:  (843) 216-9000


                          Jayne Conroy, Esq. (NY-JC8611)
                          Paul J. Hanly, Jr., Esq. (NY-PH5486)
                          Andrea Bierstein, Esq. (NY-AB4618)
                          HANLY CONROY BIERSTEIN
                               & SHERIDAN, LLP
                          415 Madison Avenue
                          New York, NY 10017-1111
                          Telephone:  (212) 401-7600

---

that the allegations against Al-Haramain were *more* than sufficient, indicating that less would still be enough. *Burnet I*, 274 F.Supp.2d at 105.

William N. Riley, Esq. (IN - 4941-49)
Amy Ficklin DeBrota, Esq. (IN - 17294-49)
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone:  (317) 848-7939

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Chip Robertson, Esq.
Mary Winter, Esq.
BARTIMUS, FRICKLETON, ROBERTSON
    & OBETZ
200 Madison Avenue, Suite 1000
Jefferson City, MO 65101
Telephone:  (573) 230-4665

Jack Cordray, Esq. (SC-1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761


Attorneys for Plaintiffs