UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001            03 MDL 1570 (RCC)

-------------------------------------------------------------------x

THIS DOCUMENT RELATES TO:

**THOMAS E. BURNETT, SR., ET AL. VS. AL BARAKA
INVESTMENT AND DEVELOPMENT CORP., ET AL.
03 CV 9849 (RCC); 03 CV 5738 (RCC)**

**KATHLEEN ASHTON, ET AL. VS. AL QAEDA ISLAMIC
ARMY, ET AL.
02 CV 6977 (RCC)**

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR *PRIMA FACIE* SHOWING OF PERSONAL JURISDICTION AND IN OPPOSITION TO DEFENDANTS' CHALLENGES TO PERSONAL JURISDICTION

May 14, 2004

## TABLE OF CONTENTS

*Page*

I.      INTRODUCTION................................................................................................1

II.     THE COMPLAINT SHOULD NOT BE DISMISSED FOR LACK OF
        PERSONAL JURISDICTION OVER DEFENDANTS .................................2

        A.      ARGUMENT ...................................................................................................2

                1.      The Court Has Personal Jurisdiction Over Defendants in that
                        the Claims at Issue Directly Arise from and are Related to the
                        Conduct Alleged Which was Purposefully Directed at the
                        United States so that the Defendants Should Reasonably
                        Anticipate Being Haled into U.S. Court.............................................2

                2.      The Pleadings in the Third Amended Complaint are Sufficient
                        to Make out a *Prima Facie* Showing of Personal Jurisdiction
                        Over Defendants.................................................................................7

                3.      The Plaintiffs are Allowed to Submit Extrinsic Evidence on the
                        Issue of Personal Jurisdiction ...........................................................9

        B.      THE FACTUAL RECORD DEMONSTRATES THAT THE DEFENDANTS
                DIRECTED THEIR CONDUCT AT THE UNITED STATES ...........................................9

                1.      Al Qaeda Openly and Publicly Announced its Terrorist
                        Agenda and Targeted the United States .................................................9

                2.      Evidence Shows that the Defendants Herein Knowingly
                        Provided Material Support, Aided and Abetted and/or
                        Conspired with al Qaeda .......................................................21

III.    CONCLUSION .........................................................................................24

# TABLE OF AUTHORITIES

*Page*

**CASES**

*Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S.Ct. 1026 (1987)................................................................................................3

*Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985)..............................................2, 3

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961) ......................................................................................................................................2

*Calder v. Jones*, 465 U.S. 783 (1984)......................................................................................4

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000)...................................................................7

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) .....................................................7

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998)..............................4

*Helecopteros Nacionales de Colombia, SA v. Hall*, 466 U.S. 408, 414 nn 8, 9 (1984).................2

*Howard v. Klynveld Peat Marwick*, 977 F.Supp. 654 (S.D.N.Y. 1997)...................................9

*International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) ...........................................2

*Kulko v. Superior Court*, 436 U.S. 84, 94-95 (1978)...............................................................3

*Laborers Local 17 Health and Benefit Fund v. Philip Morris*, 26 F.Supp.2d 593 (S.D.N.Y. 1998) .............................................................................................................9

*Marine Midland Bank NA v. Miller*, 664 F.2d 899 (2d Cir. 1981) ..........................................7

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)......................................................7

*Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988).............................4

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) .........5, 6, 7

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) .......................................................5, 7

*Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521 (D.C. Cir. 2001)...........7

*Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) ........................7

*United States v. Omar Ahmad Ali Abdel Rahman et al.* S3 93 Cr. 181(MBM).........................11

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980)..........................................3, 5

**OTHER AUTHORITIES**

5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure,  (2d ed. 1990) ..........7

Gabriel Weimann, www.terror.net *How Modern Terrorism Uses the Internet*, Special Report of the United States Institute of Peace, Report No. 116, p. 3 (March 2004) ................20

Senate Report No. 107-351/House Report No. 107-792.  107th Congress, 2nd Session; December 2002 .........................................................................................................14

Testimony of Jimmy Gurulé, Under Secretary for Enforcement, U.S. Department of the
    Treasury, before the U.S. Senate Judiciary Committee (PO-3635).  November 20, 2002 ........21

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P.  8 ...............................................................................................................................21

Fed. R. Civ. P.  9 ...............................................................................................................................21

Fed. R. Civ. P. 12 .............................................................................................................................24

Fed. R. Civ. P. 15 ...............................................................................................................................7

Fed. R. Civ. P. 56 .............................................................................................................................24

## I.      INTRODUCTION

Plaintiffs' Memorandum of Law in Support of Their *Prima Facie* Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction is submitted to address the numerous motions to dismiss filed under Fed. R. Civ. P. 12(b)(2) contending that the federal courts of the United States lack *in personam* jurisdiction over them because Defendants lack sufficient contact with the United States.[1]   Plaintiffs' response to such assertions is the same:  the "minimum contacts" test to satisfy the requirements of due process is satisfied because the intentional and tortious conduct of each of these Defendants was expressly aimed, directed, targeted, and intended to harm the United States of America and its residents, including the plaintiffs in these actions.   In particular, Defendants aimed their conduct at the United States when they provided material support to Osama bin Laden and al Qaeda (or to organizations that funneled money to al Qaeda), with knowledge that these organizations were engaged in terrorist activities targeted primarily and specifically at the United States and its citizens and residents.

The deliberate targeting of the United States satisfies the minimum contacts test, even if the defendant never entered the United States. The principle is a simple one:  no one is entitled deliberately to plot or launch attacks on the United States and evade U.S. justice merely because the attacks could be planned, supported or financed from afar.   Clearly, Osama bin Laden could be made to answer for his crimes in a U.S. court.  Like bin Laden, the Defendants that have moved to dismiss for lack of jurisdiction directed their conduct at the United States and like bin

---

[1]   Numerous Defendants have asserted a lack of personal jurisdiction over them in this matter; including but not limited to:  Prince Sultan; Prince Turki; Abdul Rahman bin Mahfouz; International Islamic Relief Organization; Saudi Bin Laden Group; Saleh Kamel / Al Baraka Investment and Development Corp.; Wael Jelaidan; Rabita Trust; Shahir Abdulraoof Batterjee; Dr. Abdullah Omar Naseef; Abdullah Muhsen Al Turki; Sheikh Saleh Al-Hussayen; Sheikh Salman Al-Oawdah; Sheikh Hamad Al-Husaini; Safar Al-Hawali; Abdul Rahman Al Swailem; Mohammed Ali Sayed Mushayt; Abdullah Bin Saleh Al-Obaid; Saudi Red Crescent; Adel Abduljalil Batterjee; Aqeel Al-Aqeel; Al Haramain Islamic Foundation; Mohamad Jamal Khalifa; Saleh O. Badahdah; Abdul Al-Moslah; Sulaiman Al-Ali; and Abdullah M. Al-Mahdi.  In the interests of reducing the total amount of briefing (and the number of times that the Court will be asked to read the same argument), Plaintiffs incorporate by reference the evidence and arguments set forth here into their opposition to each of the motions that contain a personal jurisdiction challenge.

Laden, they can and should be held responsible in the courts of this country.  As demonstrated below, the assertion of jurisdiction over all Defendants in this case is both warranted and consistent with due process because, as alleged in the Complaint, in the *prima facie* showing herein, and under the relevant case law, the conduct at issue was expressly targeted and intended to harm the United States of America, its residents, and the Plaintiffs herein.

**II.    THE COMPLAINT SHOULD NOT BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER DEFENDANTS**

    **A.    Argument**

        **1.    The Court Has Personal Jurisdiction Over Defendants in that the Claims at Issue Directly Arise from and  are Related to the Conduct Alleged Which was Purposefully Directed at the United States so that the Defendants Should Reasonably Anticipate Being Haled  into U.S. Court.**

The standard for determining whether due process is satisfied for purposes of personal jurisdiction remains one of establishing "minimum contacts consistent with traditional notions of fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  This analysis should be conducted with reference to the underlying claims against the Defendants.  *See, Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961).

In the personal jurisdiction context, there are two recognized ways of analyzing and satisfying the due process requirement of minimum contacts, described by the courts as "general" or "specific" minimum contacts.  *Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985); *Helecopteros Nacionales de Colombia, SA v. Hall*, 466 U.S. 408, 414 nn 8, 9 (1984).  "General jurisdiction" refers to a form of personal jurisdiction whereby a defendant may be sued in a particular location on any claim regardless of any connection between that claim and the location of the suit.  Many of the Defendants herein may be subject to the jurisdiction of this Court under a "general" minimum contact analysis because of the extent of their business presence or general

minimum contacts with the United States separate and apart from sponsorship of al Qaeda. However, that analysis is not the focus of this pleading, which will deal instead with the "specific" jurisdiction question.

The Supreme Court has continued to distinguish conduct or activity that is "purposefully" related to a forum and activity that is not. *Kulko v. Superior Court*, 436 U.S. 84, 94-95 (1978). A relevant factor in the specific jurisdiction context is whether the Defendants should "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980) ("defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there"); *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S.Ct. 1026 (1987). Reasonableness is also a factor in establishing jurisdiction. *Asahi Metal Indus., Inc. v. Superior Court*, 480 U.S. 102 (1987).

In *Burger King v. Rudzewicz*, the Supreme Court again stressed the important of "purposeful activity" as determining the propriety of specific jurisdiction to adjudicate, stressing that a key factor was whether the litigation "arose out of or was related to" the defendants' activity connecting him to the forum. *Burger King* at 472-76. This finding, that the claims arise out of or are related to the conduct at issue, is the benchmark of the specific jurisdiction analysis. *Id.* The *Burger King* Court balanced the Defendants' interest in avoiding suit in a remote forum against the plaintiffs' interest in suing in a convenient forum and the state's interest in furthering its fundamental social policies. *Id.*, at 476-78. When these factors are weighed in the present case, particularly in light of the direct relation between the act complained of and the conduct at issue, and the policy implications herein, the scales of justice tip squarely in the direction of the Plaintiffs.

Other circuits have recognized that policy considerations may play a part in determining what process is due in a similar situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").  If ever a case called for recognition of the policy considerations that determine what process is due, in terms of traditional notions of fair play and substantial justice, it is this case.   The crimes at issue, from which the claims arise, were purposefully directed at the United States.  The reasonableness of subjecting defendants alleged to have aided and abetted al Qaeda to jurisdiction in the United States is as fair as it is foreseeable.   The allegations must be assessed in light of the cold-blooded manner in which United States residents were attacked for no reason other than that they were here, on United States soil.  Concepts of "fair play," "substantial justice," "foreseeability," "reasonableness" or "purposeful" activity are difficult to apply without recognition of the deliberate murderous attacks on the United States that give rise to plaintiffs' claims.

In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum, (here, the examle the financing or support of al Qaeda).  *Calder v. Jones*, 465 U.S. 783, 789 (1984).  The Court looked to the focal point both of the acts at issue and of the harm suffered.  *Id.* at 789.  There can be no legitimate question that the focal point of 9/11 was the United States.  Defendants herein are alleged to have intentionally committed tortious acts intended to cause injury in the United States.  *See* Section II. A. 1., *supra*.  The United States was the avowed target of Osama bin Laden and al Qaeda during the time period when the Defendants are alleged to have provided

material support, aided and abetted, and/or conspired with al Qaeda. *Id., see* Section II. B., *infra*. Plaintiffs and their murdered loved ones were specifically targeted because they were Americans – this was anything but incidental, it was the focal point of the tort claim that arises as a result.

Three recent cases involving international terrorism against Americans clearly hold that due process is not violated when those who deliberately target Americans are made to answer in American courts of law.  In *Rein* the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction in the New York Courts. *Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998). Even though the attack in *Rein* did not take place in the United States, the court held that the targeting of an American-flagged carrier provided a sufficient nexus under the FSIA for the assertion of jurisdiction.

In *Pugh* the court analyzed personal jurisdiction over foreign officials who were sued in their personal capacity.  *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F.Supp.2d 54 (D.D.C. 2003).  *Pugh* arose out of the terrorist downing of a French commercial aircraft.  The defendants were accused of conspiring to sabotage the aircraft.  Applying the *World-Wide Volkswagen* test that requires the court to look at whether the defendant "should reasonably anticipate being haled into court" in the United States, the court in *Pugh* held that:

> Taking the factual allegations of the complaint as true for present purposes, the individual defendants in the instant action conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight. . . .  Given the number of passengers on [the airplane], and the international nature of the flight, it was also altogether foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d 59.  In language relevant to this case, the *Pugh* court continued:

> The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. Congress has not been indifferent to providing judicial sanctions for terrorist acts committed abroad. Beginning at least five years before [1989], a succession of federal statutes had evinced an intent to assure the criminal prosecution of foreign individuals who committed terrorist acts overseas against U.S. persons or property. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. *It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil in personam jurisdiction over those same individuals for the same acts.*

*Id.,* emphasis added.   Accordingly, the court held that:

> In light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any 'traditional notions of fair play and substantial justice.'

*Id.* at 60-61.

Thus, in *Pugh*, the defendants were found to have purposefully directed conduct at the United States sufficiently to subject themselves to jurisdiction in an American court even though the plane they attacked was a French carrier and the flight was not scheduled to take off or land in the United States.   Here, by contrast, the September 11, 2001, attacks were targeted and focused specifically at the United States.   Moreover, the perpetrators of the 9/11 attacks repeatedly, publicly announced their intention to attack the United States.   *See* Section II. B., *infra.*   Just as the assertion of jurisdiction in a United States court over the defendants in *Pugh* was found to be consistent with the due process clause of the constitution, so, too, the assertion of jurisdiction over Defendants, herein, in an American court is also proper.   *See also Daliberti v.*

*Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns under the FSIA).

In all three cases, *Rein*, *Pugh*, and *Daliberti*, the attacks on Americans took place abroad. In all three cases, the court found that Defendants had sufficiently targeted Americans giving rise to the claims at issue, and that Defendants had sufficient notice that United States law and United States courts would subject them to liability so that the assertion of personal jurisdiction was constitutional. Their rationale is all the more compelling herein. In this case, the attacks took place on American soil and were specifically focused on the United States. Under this fact scenario, as pled in the TAC and described in further detail below, due process is not violated by the exercise of personal jurisdiction over Defendants herein.[2] To the contrary, it would constitute a violation of the Plaintiffs' right to redress a wrong if the Defendants are allowed to escape accountability in this matter through proclamations that the Court lacks personal jurisdiction over them.

2. **The Pleadings in the Third Amended Complaint are Sufficient to Make out a *Prima Facie* Showing of Personal Jurisdiction Over Defendants**

The allegations of the Third Amended Complaint (or "TAC") adequately assert a *prima facie* showing of personal jurisdiction over all Defendants.[3] All Defendants herein are alleged to

---

[2]  Should the court decide otherwise, the Plaintiffs herein move 1) for leave to amend the complaint or 2) for leave to take jurisdictional discovery. Fed. R. Civ. P. 15; *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990)*; Marine Midland Bank NA v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994). 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1351, at 253-59 (2d ed. 1990).

[3]  The Complaints referred to include the Third Amended Complaint ("TAC") in the *Burnett* D.C. action, 03 CV 9849, the First Amended Complaint in the *Burnett* SDNY action, 03 CV 5738, and the Fourth Amended Complaint

be the aiders, abettors, co-conspirators, and material supports of al Qaeda. They are alleged to

have targeted the United States. For example:

> Osama bin Laden, his co-conspirators, aiders and abettors, and material sponsors have
> engaged in a global conspiracy <u>aimed at the United States and other Western targets</u>. Al
> Qaeda has also acted as a kind of umbrella organization providing support for other
> terrorist groups. (TAC ¶ 493, emphasis added.)

Other allegations from the TAC that go directly to the *prima facie* case for personal

jurisdiction over Defendants are set forth in Exhibit 1 to the attached Declaration of Jodi

Westbrook Flowers (or "Dec."). The facts as alleged in the TAC comprise over 180 pages of

allegations, including 35 paragraphs of common allegations against all Defendants. Allegations

made against all Defendants include:

> Those providing financial resources and weapons, *inter alia*, to known terrorists who
> openly pronounced their intention to continue to murder innocent people, <u>specifically
> American citizens</u>, were on notice of the violence such sponsorship would cause. The
> sponsorship of international terrorism was reasonably anticipated to cause additional
> senseless murders of innocent people such as those that occurred on September 11,
> 2001. (Dec., Ex. 1, *citing* TAC pgs. 216-217, emphasis added.)

> The Defendants conspired with, encouraged, furthered and agreed to provide material
> support, funding, sponsorship, aiding and abetting and/or other material resources to al
> Qaeda, Osama bin Laden, and the ends of international terrorism in furtherance of this
> conspiracy. (Dec., Ex. 1, *citing* TAC ¶679)

> The Defendants aided and abetted in concerted efforts, transactions, acts and activities
> designed to cause the attacks of September 11, 2001, <u>on the United States</u>, its citizens,
> foreign citizens, its liberties and freedoms. (Dec., Ex. 1, *citing* TAC ¶686, emphasis
> added.)

There is considerable detail contained in the TAC, that goes directly to a sufficient *prima*

*facie* showing of personal jurisdiction over the Defendants under the relevant case law and

standards.

---

in the *Ashton* action, 02 CV 6977. Plaintiffs note that the allegations in these complaints are substantially similar or
identical.

3.      **The Plaintiffs are Allowed to Submit Extrinsic Evidence on the Issue of Personal Jurisdiction**

Where a Defendant brings a motion to dismiss for lack of personal jurisdiction prior to discovery, the Plaintiff is only required to make out a *prima facie* case of jurisdiction through pleadings and affidavits. *Laborers Local 17 Health and Benefit Fund v. Philip Morris*, 26 F.Supp.2d 593 (S.D.N.Y. 1998); *Howard v. Klynveld Peat Marwick*, 977 F.Supp. 654 (S.D.N.Y. 1997). Moreover, such pleadings and affidavits are to be construed in a light most favorable to Plaintiffs. *Id.* In considering a motion to dismiss for lack of personal jurisdiction, the Court may consider extrinsic evidence submitted by the parties to determine whether there is factual support for Plaintiffs' *prima facie* case of jurisdiction. *Id.* While Plaintiffs maintain that there is more than sufficient showing of a *prima facie* case to establish personal jurisdiction in the Third Amended Complaint, they submit this pleading and proof in further support of a *prima facie* showing of personal jurisdiction over Defendants.

B.      **The Factual Record Demonstrates That the Defendants Directed Their Conduct at the United States**

The evidence demonstrates that throughout the 1990's, al Qaeda's target was first and foremost the United States of America. The evidence also shows that Osama bin Laden made no secret of who the intended target of his terrorist attacks would be, so that Defendants who knowingly provided material support to bin Laden's terrorist program knew that they were targeting the United States.

1.      **Al Qaeda Openly and Publicly Announced its Terrorist Agenda and Targeted the United States**

The goals and ideology of al Qaeda and its various affiliates, co-conspirators, aiders and abettors and material supporters, can be ultimately traced back to the writings and lectures of Osama bin Laden's first spiritual mentor, Shaykh Abdallah Yusuf Azzam (or "Azzam"). Dec., Ex. 3, Report of Evan Kohlmann. Born in 1941, Azzam had become firmly disillusioned with

the Arab struggle against Israel by the late 1960s. Angry and alienated, he left Jordan to eventually teach at the King Abdelaziz University in Jeddah, Saudi Arabia. While there, Azzam became preoccupied with the idea of jihad, or 'Islamic holy struggle.' *Id.*

Azzam became convinced that the Islamic world was under siege by its enemies; at any moment, they would spring forth and devour the last remnants of the Muslim community. The struggle to propagate Islam was no longer an evolutionary campaign; either Islam would triumph by the sword over its unjust and disbelieving enemies, or it would be swept into the dustbin of history. Azzam declared his new personal philosophy to be "jihad and the rifle alone:  no negotiations, no conferences, and no dialogues." *The Striving Sheik:  Abdullah Azzam*, www.islam.org.au, 1996.

Azzam's fervor regarding this perversion of jihad only grew as he witnessed the warfare waged in Afghanistan. Ultimately, Azzam sought not only to evict the Russian armies from Afghanistan, but moreover, to subsequently remove all "infidel" regimes and to reestablish the rule of a greater Islamic empire. He planned to use the jihad in Afghanistan to recruit and train terrorists from across the Middle East and South Asia. Azzam openly advertised the bloody design of this Islamic revolution which became al Qaeda. *The Striving Sheik:  Abdullah Azzam*, www.islam.org.au, 1996.

Azzam's militancy was a magnet for other would-be revolutionaries – including a young and wealthy student of his, from a powerful and well-connected Saudi family, who abandoned a business career for a life as a financier and organizer of the growing Arab *mujahideen* forces fighting in Afghanistan:  Osama bin Muhammad bin Laden (or "bin Laden"). What bin Laden lacked in actual religious knowledge he made up for with a fiery ideological zeal, deep, generous pockets, and the ability to mobilize recruits, financial and logistical supporters.

At his last public press conference, Azzam spoke of the key role bin Laden was playing in the growing radical movement:

> He came himself, with his wealth, in the way of Allah, and he is paying for [mujahideen] tickets and looking after their families, paying for their rent and their transport, and their sustenance inside Afghanistan.  He is in the frontline, where the fighting is . . .  One hundred Arabs have given their lives for Allah.  What have they come for?  Someone like Osama bin Ladin, like Wael Jalaidan, and others from leading families in Saudi Arabia . . . [who] have come in search of paradise.  They believe that there is a God and that there is a paradise, and that life is cheap.[4]

The al Qaeda attacks on America began as early as 1993 when the World Trade Center in New York was bombed.  Within months, many Americans were shocked to learn about a subsequent adjunct terror conspiracy.  Investigators had discovered a jihad cell operating in the New York/New Jersey metropolitan area headed by supporters of the jihad in Afghanistan and the radical imprisoned cleric Shaykh Omar Abdel Rahman who has referred to Americans as the "sons of apes and pigs."  *The CIA and the Sheik*, *The Village Voice*, 3/30/93.  At the time, members of the terror cell were seeking to bankroll terrorist training camps setup inside the United States.  The recruits consisted primarily of Muslim-American volunteers (including relatives and accomplices of the future 1993 World Trade Center bombers).  See Dec., Ex. 3.  In a wiretapped conversation with an FBI informant, Siddig Ibrahim explained:

> "Our goal is that these people get extensive and very, very, very good training, so that we can get started at anyplace where Jihad is needed . . .  And after they receive their training, they go to Bosnia, I mean, they depart . . . And whoever survives, I mean, could come and . . . [instruct] somewhere else . . . any other place.[5]

The training of al Qaeda terrorists, which required material support, was part of a global terror enterprise aimed at the United States.  *See* Dec., Ex. 3.

The terrorist plots conceived by al Qaeda aimed at bringing down a number of United

---

[4]  Videotape of the last press conference of Shaykh Abdallah Azzam, circa 1989.
[5]  FBI Transcript of conversation between Emad Salem and Siddig Ibrahim, Ali. *United States v. Omar Ahmad Ali Abdel Rahman et al.* S3 93 Cr. 181(MBM).  Government Exhibit 641-1T. *Pages 19-21.*

States landmarks simultaneously, including the United Nations building, 26 Federal Plaza, the Holland and Lincoln Tunnels, and even a planned assassination of visiting Egyptian President Hosni Mubarak.   The conspirators of this 1994 plot had done their homework:   they had conducted personal surveillance operations on their would-be targets, carefully noting the positions of police officers, security guards, and other such obstacles.  *Id.*  They could not have done so without resources.

The plan to destroy the Holland and Lincoln Tunnels was particularly intricate. Painstaking details were gone over at great length, including reviewing schedules for lane closures and tunnel cleanup and the positions of covert surveillance cameras in the tunnels. Conspirators discussed with FBI informant Emad Salem the idea of placing large explosives in automobiles, which would then "pretend" to break down in the middle of the Tunnels, near the halfway point between New York and New Jersey.  In FBI wiretaps, Siddig Ali, later convicted for his role in the abortive plots, described the plan:  The driver would proceed to start a small fire in the vehicle, lock the keys inside the car, and quickly depart in a passing getaway car. Siddig Ali and his cohorts casually joked how they would cause the entire of downtown New York to "flood" in a disastrous fashion.   "You will be swimming," he stated to Emad Salem.[6] That the destruction of the United States was the goal of al Qaeda was clear:

> It is going to be a hole . . . I should cut off their artery completely . . . Billions of dollars.  Even one Tunnel, its daily revenue is approximately $400,000. . . the economy will come to a standstill . . . all of the trucks which carry supplies of the daily life, such as vegetables, milk, and so and so on . . . People will not be able to go to the World Trade Center and New York, not to Wall Street . . . there will be no transportation . . . the World Trade Center, compared to this will [be] like a dwarf . . . the water will be going everywhere.  Everything will be broken into smithereens, everything.[7]

---

[6]  Dec., Ex. 3; Interview of Siddig Ali, May 29-30, 1993, Government Exhibit 323T.
[7]  *Id.*

Ressam later testified, "we were speaking about America as an enemy of Islam."[8]   In particular, he recalled a *fatwah* distributed widely "issued by Sheikh Omar Abdel Rahman with his picture on it. . . .  It says fight Americans and hit their interest everywhere."[9]  Clearly, the stated and well recognized al Qaeda target was the United States, with this ideology spreading far beyond the borders of Afghanistan:

> [The Jews and Christians] are the ones that are fighting every Muslim resurrection in the whole world, they act to spread prostitution, usury, and other kinds of corruption all over the land.  Oh, Muslims everywhere!  Cut the transportation of their countries, tear it apart, destroy their economy, burn their companies, eliminate their interests, sink their ships, shoot down their planes, kill them on the sea, air, or land.  Kill them when you find them, take them and encircle them, paralyze their every post.  Kill those infidels . . . Allah will torment by your hands those who wish to kill you; Allah will put shame upon them, he will blow wind in the chests of the believers and show the anger of their hearts.[10]

Al Qaeda member Abu Adel Aziz told the FBI about his directives from Osama bin Laden and indicated that al Qaeda was seeking to use regional *jihads* such as those in Bosnia and Kashmir as "a base for operations... against al Qaeda's true enemy, the United States."[11]  Osama bin Laden's interest in Bosnia was largely as a staging area from which to strike at America.[12] Consequently, bin Laden confidant and Defendant Enaam Arnaout (of Defendant Benevolence International Foundation) personally arranged for elite instructors from the *Al-Sadda* terrorist training camp in Afghanistan to be immediately imported into central Bosnia.[13]  At least two of the nineteen September 11 suicide hijackers – Nawaf  al-Hazmi and Khalid al-Mihdar – fought

---

[8]  Direct Examination of Ahmed Ressam.  United States v. Mokhtar Haouari.  United States District Court Southern District of New York.  Case:  00R15.  June 27-July 6, 2001.

[9]  *Id.*

[10]  Dec., Ex. 3, *quoting* Shaykh Omar Abdel Rahman, 1998.

[11]  "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Ilinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 24-25.*

[12]  "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Ilinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 24-25.*

[13]  Government's Response to Defendant's Position Paper as to Sentencing Factors."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois Eastern Division, Case #: 02 CR 892. *Page 38.*

in Bosnia in 1995.[14]

While the international *jihad* of al Qaeda and its various affiliate organizations grew in strength economically, strategically, logistically and ideologically, the target remained the United States. This was no secret prior to 9/11. The United States of America – its citizens, government officials and military personnel, public and private infrastructure, and strategic and symbolic interests – have been the stated target of al Qaeda since its founding. *See* Dec., Ex. 3. Bin Laden and al Qaeda never lost sight of its main enemy – the United States, and its hatred of the United States was only fostered in terror camps and prisons. Osama Bin Laden's strategy was to inscribe as many Islamist insurgencies as possible under al Qaeda's banner and to redirect their course to attack the United States. Al Qaeda needed financial, logistical, material supporters to further its aims. Al Qaeda's war against the United States and its capacity to strike American targets grew exponentially. According to Osama Bin Laden, political justification and religious legitimization for attacks against American citizens, symbols, and interests exist in many places of the Muslim world:

> Many fatwas . . . allowed the fighting of Americans and Israelis in Palestine and allowing their killings and destroying their economies and properties.[15]

In another interview, published in January 1999 in *Newsweek*, Bin Laden stated:

> Muslim scholars have issued a *fatwa* [religious edict] against any American who pays taxes to his Government. He is our target, because he is helping the American war machine against the Muslim nation.[16]

Similarly, in the book Knights Under the Prophet's Banner, Ayman Al-Zawahiri, al Qaeda's deputy commander, restated the strategy of destroying America to encourage his

---

[14]   "Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001." House Permanent Select Committee on Intelligence/Senate Select Committee on Intelligence. Senate Report No. 107-351/House Report No. 107-792. 107th Congress, 2nd Session; December 2002. *Page 131.*
[15]   Tayseer Alouni Interview with Bin Laden, *Al-Jazeera*, October 21, 2001, Source: http://www. justresponse.net/Bin_Laden2.html.
[16]   Jamal Ismail Interview with Bin Laden, *Newsweek*, January 11, 1999.

followers to engage in even more attacks against the United States:

> Tracking down the Americans and the Jews is not impossible.  Killing them with a single bullet, a stab, or a device made up of a popular mix of explosives or hitting them with an iron rod is not impossible.  Burning down their property with Molotov Cocktails is not difficult.  With the available means, small groups could prove to be a frightening horror for the Americans and the Jews.[17]

Throughout al Qaeda's existence, its prominent Islamic "scholars" have authored books, published articles, and issued *fatwas* calling for the destruction of America.  Their significance for recruitment within al Qaeda's ranks should not be underestimated nor could the stated intent be ignored by the Defendants herein.  All Defendants in this case are alleged to have aided and abetted, conspired with, or provided material support to al Qaeda, with actual or constructive knowledge of al Qaeda's goals.

Al Qaeda's decisive and explicit intent to attack American citizens, institutions, and symbols is evidenced by the long list of launched and failed terrorist attacks against the United States and its interests.  Military strikes against United States targets occurred with a determined consistency throughout the 1990's.[18]

Throughout al Qaeda's existence, their goals have been clearly stated and widely publicized. Numerous public statements, interviews, and publications by leading al Qaeda figures and key operatives, carried widely in the Arabic and world media, openly threatened – and warned – that America was the target of al Qaeda:

---

[17]   Ayman Al-Zawahiri, Knights Under the Prophet's Banner, (London), *Al-Sharq Al-Awsat*, December 5, 2001, FBIS Translated Text.

[18]   Al Qaeda Attacks on the United States before September 11, 2001, include:  In 1992 there was the bombing of US soldiers' hotel in Aden, Yemen; 1993 was the killing of US soldiers in Somalia; 1993 was the World Trade Center car bombing in New York; 1994 was the *Bojinka* plot against US airlines in the Philippines (thwarted); 1995 planned assassination of US President Bill Clinton in the Philippines (thwarted); 1995 planned attack against the UN Headquarters, the Lincoln and Holland tunnels, and the George Washington Bridge in New York (thwarted); 1995 was the Riyadh truck bombing; 1996 was the Khobar Towers blast; 1998 were the East Africa embassy bombings; 1998 was the attempt against the US Embassy in Tirana, Albania (thwarted); 1999 was the Millennium plot against both the LAX International Airport in the United States and US and Israeli tourists attractions in Amman, Jordan (both thwarted); 1999 was the USS 'The Sullivans' attack in Yemen (failed); and in 2000 was the attack on the USS Cole in Yemen, *see* http://www.msnb.msn.com/id/4798571.

In late 1993, Bin Laden announced to a group of al Qaeda members that "the American army now they came to the Horn of Africa, and we have to stop the head of the snake… the snake is America, and we have to stop them.  We have to cut the head and stop them."[19]

In October 1996, the Committee for the Defense of Legitimate Rights, a Saudi Islamist dissident movement affiliated with Usama Bin Laden, released a translation on the Internet of a new "declaration of war" Bin Laden had authored.  The document was signed by Bin Laden and was posted from Afghanistan.[20]  Excerpts from the 1996 declaration:

> It is now clear that those who claim that the blood of the American solders (the enemy occupying the land of the Muslims) should be protected are merely repeating what is imposed on them by the regime; fearing the aggression and interested in saving themselves.  It is a duty now on every tribe in the Arab Peninsula to fight, Jihad, in the cause of Allah and to cleanse the land from those occupiers.  Allah knows that there blood is permitted (to be spilled) and their wealth is a booty; their wealth is a booty to those who kill them… Our youths knew that the humiliation suffered by the Muslims as a result of the occupation of their sanctities can not be kicked and removed except by explosions and Jihad.[21]

> Death is better than life in humiliation! . . . take part in fighting against the enemy -your enemy and their enemy- the Americans and the Israelis.[22]

Again in 1997, al Qaeda's target was made clear:

> We declared jihad against the US government, because the US government is unjust, criminal and tyrannical. It has committed acts that are extremely unjust, hideous and criminal, whether directly or through its support of the Israeli occupation of the Prophet's Night Travel Land (Palestine). And we believe the US is directly responsible for those who were killed in Palestine, Lebanon and Iraq . . . For this and other acts of aggression and injustice, we have declared jihad against the US, because in our religion

---

[19]  Dec., Ex. 3; *United States v. Usama bin Laden, et al.,* S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  *Page 280-285.*

[20]  Dec., Ex. 3; Committee for the Defense of Legitimate Rights (CDLR) <100043.1420@CompuServe. COM>. "MSANEWS: THE LADENESE EPISTLE: DECLARATION OF WAR (I)."  <u>MSANews</u>. <u>http://msanews.mynet.net</u>.  October 12, 1996.

[21]  Dec., Ex. 3; Committee for the Defense of Legitimate Rights (CDLR) <100043.1420@CompuServe. COM>. "MSANEWS: THE LADENESE EPISTLE: DECLARATION OF WAR (I)."  <u>MSANews</u>. <u>http://msanews.mynet.net</u>.  October 12, 1996.

[22]  Dec., Ex. 3; Committee for the Defense of Legitimate Rights (CDLR) <100043.1420@CompuServe. COM>. "MSANEWS: THE LADENESE EPISTLE: DECLARATION OF WAR (I)."  <u>MSANews</u>. <u>http://msanews.mynet.net</u>.  October 12, 1996.

it is our duty to make jihad so that God's word is the one exalted to the heights and so that we drive the Americans away from all Muslim countries.[23]

But I say if the American government is serious about avoiding the explosions inside the U.S., then let it stop provoking the feelings of 1,250 million Muslims. Those hundreds of thousands who have been killed or displaced in Iraq, Palestine, Lebanon, do have brothers and relatives. They would make of Ramzi Yousef [1993 WTC bombing mastermind] a symbol and a teacher. The U.S. will drive them to transfer the battle into the United States.[24]

On February 11, 1998, Shaykh Omar Bakri Mohammed, Abu Hamza al-Masri, and Dr. Mohammed al-Massari were the principle authors of a "declaration of war" against the U.S. and British governments was issued.[25]   In February 1988, another fatwa by British al Qaeda supporters:

[A] message for the US and the British Governments or any other government of non-Muslim countries . . . to stay away from Iraq, Palestine, Pakistan, Arabia etc. or face a full scale war of Jihad which will be the responsibly and the duty of every Muslim around the world to participate in.  We the undersigned call upon the Muslims around the world including the Muslims in the USA and in Britain to confront by all means whether verbally, financially, politically or militarily the US and British aggression.[26]

Osama bin Laden in May of 1988:

Our battle with the Americans is larger than our battle with the Russians. The Americans made a very stupid mistake that no one has made before. They attacked the Muslim symbol, the Kibla [Saudi Arabia], of 200 million people. The reaction was very encouraging by the Muslim scholars and the youth. We predict a black day for America and the end of the United States as United States, and it will be separate states, and will retreat from our land and collect the bodies of its sons back to America, Allah willing.[27]

Once again, I have to stress the necessity of focusing on the Americans and the Jews for they represent the spearhead with which the members of our religion have been slaughtered. Any effort directed against America and the Jews yields positive and direct

---

[23]  Interview with Osama Bin Laden, CNN, March 1997.

[24]  Interview with Osama Bin Laden, CNN, March 1997.

[25]  Dec., Ex. 3; Peterson, Harith Abd Rahman.  "(URGENT) Al-Muhajiroun: MUSLIMS IN BRITAIN DECLARE WAR AGAINST THE US AND BRITISH GOVERNMENTS & a response from the WIN Amir."  Usenet posting on soc.religion.islam.  February 11, 1998.

[26]  Dec., Ex. 3; Peterson, Harith Abd Rahman.  "(URGENT) Al-Muhajiroun: MUSLIMS IN BRITAIN DECLARE WAR AGAINST THE US AND BRITISH GOVERNMENTS & a response from the WIN Amir."  Usenet posting on soc.religion.islam.  February 11, 1998.

[27]  Dec., Ex. 3; Interview with Osama Bin Laden, ABC News, May 28, 1998.

results, Allah willing. It is far better for anyone to kill a single American soldier than to squander his efforts on other activities.[28]

In November 1998, Muslim radical leaders convened the first annual Islamic Revival conference in London, U.K.  At the close of the day, the leaders issued a joint declaration, later published on the Internet:

> The Islamic Movements agree that the US government and their alliance are the greatest enemy for Islam and Muslims today.  They require us to put all of our recourses together in order to counter the aggression whether it be cooperation militarily, politically or economically.  The Islamic Movements endorse the struggle of Sheikh Osama Bin Laden against the US, their alliance and all non-Muslim forces in Muslim countries. [29]

Three months later in February of 1999, a second conference in the U.K. was attended by more than 500 Muslims and international media representatives; the conference was videotaped and distributed in mosques and Islamic bookstores.[30]  Omar Bakri openly called for a jihad against the United States:  "America declared war against Islam, and the West declared war against Islam, and we declare war against them!"  Omar Bakri was followed by Mohammed Jameel who pleaded with the audience, "There is training available.  It is time that we prepare and retaliate against these people."[31]

In June of 1999, Bin Laden told Al-Jazeera:

> We think the United States is very much weaker than Russia. Based on the reports from our brothers who participated in *jihad* in Somalia, we learned that they saw weakness, frailty, and cowardice of US troops. Only 80 US troops were killed. Nonetheless, they fled in the heart of darkness, frustrated, after they had caused great commotion about the new world order.[32]

In 1999, Shaykh Abdelaziz Bin Baz, Grand Mufti (head religious authority) of Saudi

---

[28] Dec., Ex. 3; Interview with Osama Bin Laden, ABC News, May 28, 1998.

[29] Dec., Ex. 3; November 1998 – The First Islamic Revival Conference in the U.K.

[30]  Dec., Ex. 3; "Islamic radicals exhort British Moslems to 'Jihad.'"  <u>Agence France-Presse (AFP)</u>.  February 28, 1999.

[31]  Dec., Ex. 3; "Islamic radicals exhort British Moslems to 'Jihad.'"  <u>Agence France-Presse (AFP)</u>.  February 28, 1999.

[32] Dec., Ex. 3; Interview with Osama Bin Laden, Al-Jazeera, June 10, 1999.

Arabia, released a new book on Muslim-Christian relations that was quickly translated from his native Arabic into English and published around the world.  The book, known as *The Ideological Attack*, is still to this day widely available for sale online and in Islamic bookstores across the U.S., Europe, and the Middle East.  In *The Ideological Attack*, Bin Baz affirmed:

> Yes, the Muslims in general . . . are all subject to a great ideological attack from the various nations of kufr [infidels] from both the east and the west.  The severest and most serious of these attacks are: the attack of the Christian crusaders; the Zionist attack; [and] the communist and atheistic attack."[33]

Bin Baz continued:

> [t]he attack of the christian crusaders is today at its most intense… The Muslim whose mind has not been corrupted cannot bear to see the infidels wielding authority… [t]herefore such a Muslim strives his utmost to expel and distance them—even if he has to sacrifice his own life, or his most cherished possession for this cause.[34]

On July 15, 1999, Shaykh Omar Bakri Mohammed issued an open letter over the Internet to Usama Bin Laden titled "O' Osama, Let Us Hear the Good News."  Omar Bakri congratulated Bin Laden on his "decision to confront the American alliance" as "a victory since the US and its alliance.[35]

> A message Osama Bin Laden sent in June 2001, just a few months before 9/11: "to all mujahideens... it's time to penetrate America and Israel and hit them where it hurts the most."[36]

Unfortunately, the post-9/11 statements by bin Laden and al Qaeda are just as virulent in their anti-Americanism.  As an example:

> We have not reached parity with them. We have the right to kill four million Americans – and millions of them children – and to exile twice as many and wound and cripple hundred of thousands. Furthermore, it is our right to fight them with chemical and

---

[33] Dec., Ex. 3; Bin Baaz, Shaykh Abdul-Azeez.  The Ideological Attack.  Message of Islam Publications; Hounslow, UK, 1999.  Pages 42-43.

[34] Dec., Ex. 3; Bin Baaz, Shaykh Abdul-Azeez.  The Ideological Attack.  Message of Islam Publications; Hounslow, UK, 1999.  Pages 42-43.

[35] Dec., Ex. 3; Muhammad, Shaykh Omar Bakri.  "An Open Call to Sheikh Osama Bin Laden."  July 15, 1999. http://www.almuhajiroun.com.

[36] CNN link:  http://www.cnn.com/2001/WORLD/europe/06/21/video.binladen/index.html.

biological weapons, so as to afflict them with the fatal maladies that have afflicted the Muslims because of the [American's] chemical and biological weapons.[37]

Al Qaeda and its sponsors have been ideologically inspired by the multitude of books, statements, magazines, publications, and other propaganda openly calling for America's destruction. Before (and after) the September 11 operations, thousands of global *jihad* websites have assisted al Qaeda in publicizing its message. Dec., Ex. 3. Featuring up-to-date news from various lands of *jihad,* claims for attacks, communiqués and statements from various al Qaeda leaders and operatives, analytical pieces on global *jihad* strategies and tactics, and even gruesome terrorist manuals and handbooks, these websites serve to extol al Qaeda's campaign of destruction and to recruit additional members and financiers for al Qaeda's war against America. Throughout its existence, al Qaeda compiled and disseminated a number of military manuals and terrorist how-to handbooks.

In addition, websites and chat rooms are an important medium through which violence is spread, and sponsors are solicited. "Today, almost all active terrorist organizations maintain websites, and many maintain more than one website and use several different languages."[38]

The Internet is in many ways an ideal arena for activity by terrorist organizations. Most notably it offers: easy access; little or no regulation, censorship, or other forms of governmental control; potentially huge audiences spread throughout the world; anonymity of communication; fast flow of information; inexpensive development and maintenance of web presence; a multimedia environment (the ability to combine text, graphics, audio, video and to allow users to download films, songs, books, posters, and so forth); and the ability to shape coverage in the traditional mass media, which increasingly use the internet as a source for stories.[39]

According to the United States Department of the Treasury: "The Internet is emerging as a cheap and powerful delivery system, capable of great disruptive power over long distances. It

---

[37] Al Qaeda spokesman Sulaiman Abu Ghaith, *In the Shadow of the Lances: Episode Three*, June 2002.
[38] Gabriel Weimann, www.terror.net *How Modern Terrorism Uses the Internet*, Special Report of the United States Institute of Peace, Report No. 116, p. 3 (March 2004), located at http://www.usip.org.
[39] *Id.*

offers minimal risk to any individual or group wishing to illustrate the strength of its argument with direct confrontation against companies or governments."[40]  "Al Qaeda has always depended heavily on donations, and its global fundraising network is built upon a foundation of charities, nongovernmental organizations, and other financial institutions that use websites and Internet-based chat rooms and forums."[41]  Frequently, the websites offer specific bank account numbers of the site to which donations may be wired.

2. **Evidence Shows that the Defendants Herein Knowingly Provided Material Support, Aided and Abetted and/or Conspired with al Qaeda**

As noted above, Plaintiffs adequately allege in their pleadings that Defendant provided material support, aided and abetted, and/or conspired with al Qaeda.  No additional specificity is required of Plaintiffs at this stage of the case.  *Cf.*, Fed. R. Civ. P. 8; Fed. R. Civ. P. 9.  However, additional evidence against individual Defendants has been gathered since the filing of the TAC in 2002, even prior to formal discovery.  This additional evidence further supports Plaintiffs' claims.  By way of illustration, the "Golden Chain" is a list of wealthy financial sponsors and supporters of al Qaeda discovered by Plaintiffs since the filing of the Complaint.  According to the United States government, the "Golden Chain" document is a list of people referred to within al Qaeda as the Golden Chain, all wealthy donors to their extremist cause.[42]  This list of financial

---

[40]  Testimony of Jimmy Gurulé, Under Secretary for Enforcement, U.S. Department of the Treasury, before the U.S. Senate Judiciary Committee (PO-3635).  November 20, 2002; *see also*, {http://usinfo.state.gov/ topical/pol/terror/02112001.htm}.

[41]  *Id.* at 7.

[42]  Dec., Ex. 3; The Golden Chain was seized by the Bosnian police during searches in the offices of the charity front Benevolence International Foundation in Sarajevo, Bosnia and Herzegovina on March 2002 and presented as evidence by the United States government in the criminal prosecution of al Qaeda.  The Golden Chain list was presented by the United States government as an exhibit in the Department of Justice's Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements in the case of *USA v. Arnaout* (U.S.D.C., Northern District of Illinois, Eastern Division) filed on January 29, 2003.  The list was also included in the Indictment of Defendant Enaam Arnaout on October 9, 2002.  It was not available to Plaintiffs until 2003.  The Golden Chain was part of a computer file labeled "Tareekh Osama," or "Osama History," containing scanned images of several documents, including the formation minutes of al Qaeda.  The computer files seized in Bosnia were delivered to the United States Embassy soon after the raids.

sponsors includes bankers and businessmen, as well as former ministers of Saudi Arabia.  The Golden Chain listing of financial donors and the corresponding al Qaeda recipients includes individuals named as Defendants in this case.  These include Defendants Yousef Jameel, Saleh Kamel, "al-Rajhi," Ibrahim Afandi, and the bin Laden brothers.  Major recipients of the financial support are identified in the document as Defendants Osama bin Laden, Wael Jelaidan and Adel Abdul Jalil Batterjee, the founders of al Qaeda.  Dec., Ex. 4.

Similarly, a memorandum on charity Defendants' International Islamic Relief Organization and Muslim World League letterhead details a meeting between Abu Abdullah (a/k/a Osama bin Laden), Dr. Abdullah Naseef, Sheik Abdel Majeed Zindani, and Dhiaul Haq (Muslim World Leage/IIRO officials) in which it is stated that  "the attacks will be launched from them (these offices) . . . "[43]  The memo also states that:  "You must pursue finding an umbrella which you can stay under . . . and I prefer the name of the League (*e.g.*, Muslim World League) because Dr. Naseef is one of the brothers . . ."  Dec., Ex. 5.

In a January 2002 letter to Swiss authorities, a senior United States Treasury official describes the international financial network that includes Bank Al-Taqwa (Arabic for "Fear of God") and its lengthy history of "financing and facilitating the activities of terrorists," including providing millions of dollars in funding for Al Qaeda.  Dec., Ex. 6.  The Treasury letter also involves Saudi businessman Yassin Al Kadi, describing how Al Kadi, Bank Al-Taqwa and its founder, Youssef M. Nada, used concealed  bank accounts, complex land deals and other hard-to-trace methods to steer large sums of money to terrorists.  *Id.*  The letter states that money "pours in" to branch offices of the Al-Taqwa network for bin Laden. It alleges that, as late as September 2001, Youssef Nada and Ali bin Mussalim, provided "indirect investment services for

---

[43]  Dec., Ex. 4, found as Exhibit 9a to "Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements" in *U.S. vs. Enaam M. Arnaout*, Case No. 02-CR-892.

Al Qaeda, investing funds for bin Laden, making cash deliveries on request to the Al Qaeda organization" and "providing a clandestine line of credit for a close associate of bin Laden." *Id.* The letter also states that another Al-Taqwa board member, Ahmed Idris Nasreddin, has supported the Islamic Center in Milan that the United States government believes may be al Qaeda's "most important base in Europe." *Id.* (All of the above-mentioned individuals and organizations are Defendants herein).

In a Nov. 29, 2001, letter to the Swiss written by then Treasury General Counsel David Aufhauser, Yassin al Kadi is described as having "a long history of financing and facilitating the activities of terrorists and terrorist-related organizations, often acting through seemingly legitimate charitable enterprises and businesses." Kadi was the founder of Muwafaq ("Blessed Relief") Foundation, an Islamic charity that "employed or served as cover" for a number of Islamic extremists connected with bin Laden. Dec., Ex. 7.

Another recently discovered document from the German Intelligence Service states:

> The Saudi Arabian authorities investigated Khalid bin Mahfooz in 1997 -- within the dossier there was information about links to charities/fronts for terrorist groups. One route was the transfer of large sums from the National Commercial Bank to Islamic 'charities'. These included Muwafag el Kheiriya and Islamic Relief. There are institutional links between Muwafag and Usama bin Laden's network. Dec., Ex. 8.

In addition to the National Commercial Bank, the document also implicates Defendants Khalid bin Mahfouz, Yassin al Qadi and the Muwaffaq charity. *Id.*

The Congressional testimony of Matt Epstein and Evan Kohlmann further details additional information as against certain of the Defendants in this case and their role in the financing and support of al Qaeda. Dec., Ex. 9. This testimony identifies additional evidence against Defendants Muslim World League, Benevolence International Foundation, The Saudi Red Crescent, Wael Jelaidan, Rabita Trust, the IIRO, Tarik bin Laden, Sana-Bell, Inc., Taibah International Aid Association, Success Foundation, Mohamed Omeish, Adel Batterjee, World

Assembly of Muslim Youth, Enaam Arnout, Qatar Charitable Society, and Abdul Aziz Abdulrahman al-Thani.  *Id.*

There are volumes of self-serving affidavits being filed in this matter.[44]  While the amount of evidence that Plaintiffs could put in this record to further support their claims against Defendants involvement in al Qaeda is extensive, it would essentially require Plaintiffs to pre-prove their case.  This is not a criminal indictment.  It is a civil suit.  A *prima facie* showing is all that is required at this stage of the litigation, and it has been met, both herein and in the individual oppositions to the various motions to dismiss.  Requiring further showings from Plaintiffs is more properly the subject of a motion for summary judgment, not a motion to dismiss for lack of personal jurisdiction.  *Cf.,* Fed. R. Civ. P. 12, 56.

## III.   CONCLUSION

America has been the main enemy and the principal target for al Qaeda since the founding of the organization.  The Defendants in the case are alleged to have knowingly supported, aided and abetted or conspired with al Qaeda.  In its decade and a half existence, al Qaeda has not only put a down payment on its destructive objectives – but has also successfully created and maintained the world's largest and most lethal terrorist killing machine.  Directed against the United States, it has killed thousands of Americans, wreaked billions' worth of economic damage, and terrorized the lives of millions of innocent civilians.

The financial and material resources provided by the Defendant and utilized by al Qaeda

---

[44]  The affidavits are all of the same ilk, claiming no business interests, ownership of property, or residence in the United States, as well as containing summary claims that the individual or organization never supported al Qaeda, bin Laden or international terrorism.  *See e.g.*, affidavits attached to Motions to Dismiss of  International Islamic Relief Organization; Wael Jelaidan; Rabita Trust; Shahir Abdulraoof Batterjee; Dr. Abdullah Omar Naseef; Abdullah Muhsen Al Turki; Sheikh Saleh Al-Hussayen; Sheikh Salman Al-Oawdah; Sheikh Hamad Al-Husaini; Safar Al-Hawali; Abdul Rahman Al Swailem; Mohammed Ali Sayed Mushayt; Abdullah Bin Saleh Al-Obaid; Saudi Red Crescent; Adel Abduljalil Batterjee; Aqeel Al-Aqeel; Prince Sultan; Prince Turki; Mohamad Jamal Khalifa; Saleh O. Badahdah; Abdul Al-Moslah; Sulaiman Al-Ali; and Abdullah M. Al-Mahdi.  The facts show otherwise, and in the rare case where they do not, Plaintiffs have filed appropriate dismissals.  *See e.g.*, Nimir Petroleum, Delta Oil, Mohammed Hussein al-Amoudi.  The *Burnett* Plaintiffs, in the course of their ongoing investigation, have dismissed twenty-two Defendants.

sustain its infrastructure of terrorist training camps, terrorist recruitment networks, terrorist propoganda, internet sites, publications, mailings, munitions and sleeper cells. Given al Qaeda's explicit objective and demonstrated intent to kill American citizens and to target American interests around the world, any individual, group of individuals, government association, non-profit organization, or business entity that materially supported al Qaeda, provided the means to wage its war on the United States. Those who sponsored and supported al Qaeda, as alleged in the TAC and herein, cannot now feign ignorance of al Qaeda's openly stated goals, or an unfamiliarity with the United States court system, in an effort to defeat personal jurisdiction over them. To reach such a conclusion is offensive to "traditional notions of fair play and substantial justice."

There can be no serious contention that the United States Courts lack personal jurisdiction over the Defendants herein under the claims and facts presented.


New York, New York                        Respectfully submitted,
Dated:  May 14, 2004


                                          /S/

                              _____
                              Ronald L. Motley, Esq. (SC-4123)
                              Jodi Westbrook Flowers, Esq. (SC-66300)
                              Donald A. Migliori, Esq. (RI-4936; MA-567562;
                                 MN-0245951)
                              Michael E. Elsner, Esq. (NY & VA-ME8337)
                              William H. Narwold, Esq. (NY-WN1713)
                              Ingrid L. Moll, Esq. (CT-21866 & NY-IM3949)
                              Robert T. Haefele, Esq. (NJ-58293; PA-57937)
                              Elizabeth Smith, Esq.
                              Justin B. Kaplan, Esq. (TN-022145)
                              MOTLEY RICE LLC
                              28 Bridgeside Boulevard
                              P.O. Box 1792
                              Mount Pleasant, South Carolina 29465
                              Telephone:  (843) 216-9000

James P. Kreindler, Esq.
Marc S. Moller, Esq.
Justin T. Green, Esq.
Andrew J. Maloney, III, Esq.
Vince Parrett, Esq.
KREINDLER & KREINDLER
100 Park Avenue
New York, NY 10017
Telephone:  (212) 687-8181

Jayne Conroy, Esq. (NY-JC8611)
Paul J. Hanly, Jr., Esq. (NY-PH5486)
Andrea Bierstein, Esq. (NY-AB4618)
HANLY CONROY BIERSTEIN
    & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq. (IN - 4941-49)
Amy Ficklin DeBrota, Esq. (IN - 17294-49)
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone:  (317) 848-7939

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Chip Robertson, Esq.
Mary Winter, Esq.
BARTIMUS, FRICKLETON, ROBERTSON
    & OBETZ
200 Madison Avenue, Suite 1000
Jefferson City, MO 65101
Telephone:  (573) 230-4665

Jack Cordray, Esq. (SC-1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761


Attorneys for Plaintiffs