UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

| | |
|---|---|
| Kathleen Ashton, *et al.*<br>      - against –<br>Al Qaida Islamic Army, *et al.* | 03 CV 6977 (RCC) |
| Ernesto Barrera, *et al.*<br>      - against –<br>Al Qaeda Islamic Army, *et al.* | 03 CV 7036 (RCC) |
| Thomas Burnett, Sr., *et al.*<br>      - against –<br>Al Baraka Investment & Development Corp., *et al.*, | 03 CV 5738 (RCC) |
| Gladys H. Salvo, *et al.*<br>      - against –<br>Al Qaeda Islamic Army, *et al.* | 03 CV 5071 (RCC) |
| Walter Tremsky, *et al.*<br>      - against –<br>Osama bin Laden, *et al.* | 03 CV 7300(RCC) |

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF DEFENDANT TURKI AL-FAISAL BIN ABDULAZIZ AL-SAUD TO DISMISS AND TO QUASH SERVICE

May 14, 2004

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

    I.    THIS COURT HAS JURISDICTION OVER THE CLAIMS AGAINST TURKI IN HIS OFFICIAL CAPACITY ............................................................................. 2

        A.    The "Tortious Act" Exception Is Not Limited to Traffic Accidents and Applies Here ................................................................................... 4

        B.    The "Discretionary Function" Clause Does Not Immunize Turki From the Claims Alleged in These Lawsuits ........................................................ 9

        C.    The September 11 Attacks Took Place in the United States .................... 12

        D.    Section 1605(a)(7) Does Not Preclude Application of the "Tortious Act" Exception ....................................................................................... 15

    II.    TURKI IS NOT ENTITLED TO DIPLOMATIC IMMUNITY ............................................. 17

    III.    TURKI'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION SHOULD BE DENIED ....................................................................................... 20

CONCLUSION ............................................................................................................ 22

TABLE OF AUTHORITIES

*Page*

## Cases

*Aidi v. Yaron*, 672 F.Supp. 516 (D.D.C. 1987)............................................................................ 20

*Aramony v. United Way of America*, 254 F.3d 403 (2d Cir. 2001) ................................................ 5

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) .............................. 14

*Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517 (D.C. Cir. 1984)....... 13, 14

*Astarte Shipping Co. v. Allied Steel & Export Service*, 767 F.2d 86 (5th Cir.1985) ..................... 5

*Bergman v. De Sieyes*, 170 F.2d 360 (2d Cir. 1948) .................................................................... 19

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ............................................... 8

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ........................................................................ 20

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. Nov.
 14, 2003) ................................................................................................................................ 5, 12

*Calder v. Jones*, 465 U.S. 783 (1984).......................................................................................... 21

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000)....................................................................... 21

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) ................................. 5, 6

*Devilla v. Schriver*, 245 F.3d 192 (2d Cir. 2001) ........................................................................... 5

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) ......................................................... 21

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998)............................................. 16

*Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983) ............................................................. 7, 8, 9

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987).......................................... 5

*In re Long Distance Telecom. Litig.*, 612 F.Supp. 892 (E.D.Mich.1985), *rev'd in part on
 other grounds*, 831 F.2d 627 (6th Cir.1987)............................................................................... 6

*In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671 (D.C.Cir.1981)...................................... 6

*In re Sept. 11 Litig.*, 280 F.Supp.2d 279 (S.D.N.Y. 2003) ............................................................ 9

*Lamarca v. United States*, 31 F.Supp.2d 110 (E.D.N.Y. 1998)..................................................... 9

*Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980)................................... 10, 11, 13, 16

*Letelier v. Republic of Chile*, 502 F.Supp. 259 (D.D.C. 1980)............................................. 11, 13

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) ......................................... 10, 11, 14, 16

*Marine Midland Bank NA v. Miller*, 664 F.2d 899 (2d Cir. 1981) .............................................. 21

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993).......................................................................... 5

*Olsen v. Government of Mexico*, 729 F.2d 641 (9th Cir. 1984).................................................... 14

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)......................................................... 21

*Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C. Cir. 1984) ........................................ 14

*Price v. Socialist People's Libyan Arab Jamahiriaya,* 294 F.3d 82 (D.C. Cir. 2002) ................ 16

*Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F.Supp.2d 54 (D.D.C. 2003) ............ 21

*Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F.Supp. 325 (E.D.N.Y. 1998),
  (2d Cir. 1998) .................................................................................................................... 21

*Rezzonico v. H&R Block, Inc.,* 182 F.3d 144 (2d Cir. 1999) ........................................................ 5

*Robinson v. Government of Malaysia,* 269 F.3d 133 (2d Cir. 2001) ........................................ 5, 6

*Second Amendment Found. v. U.S. Conference of Mayors,* 274 F.3d 521 (D.C. Cir. 2001)........ 21

*Smith v. Islamic Emirate of Afghanistan,* 262 F.Supp.2d 217 (S.D.N.Y. May 7, 2003) ............... 8

*Stanford v. Kuwait Airways Corp.,* 89 F.3d 117 (2d Cir. 1996) ................................................... 9

*Strategem Devel. Corp. v. Heron Int'l N.V.,* 153 F.R.D. 535 (S.D.N.Y. 1994) .......................... 21

*Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230 (2d Cir. 2003) ........................ 3

## Statutes

22 U.S.C. § 254d .................................................................................................................... 18, 20

28 U.S.C. § 1330 ......................................................................................................................... 2, 3

28 U.S.C. § 1602 .......................................................................................................................... 14

28 U.S.C. § 1604 ............................................................................................................................ 3

28 U.S.C. § 1605(a) .............................................................................................................. passim

## Rules

F.R.C.P. 54(b) ................................................................................................................................ 5

## International Treaties and Conventions

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 1972 WL 122692 (U.S.
  Treaty), T.I.A.S. No. 7502 ........................................................................................... 18, 19, 20

## Legislative History

H.R. Rep. No. 94-1487 ................................................................................................................... 6

House Report No. 103-702 (August 16, 1994) ............................................................................ 17

## Other Authorities

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure,  (2d ed. 1990) ............ 22

## INTRODUCTION

In these consolidated actions,[1] defendant Turki al-Faisal bin Abdulaziz al-Saud ("Turki") is alleged to have assisted Osama bin Laden in building and maintaining his terrorist infrastructure in order to deflect the inevitable fruits of that terrorist activity to countries other than Saudi Arabia, in particular the United States.   Turki asks this Court to dismiss the allegations against him on the ground that any assistance to al Qaeda (which, of course, he denies) was provided in his capacity as an official in the government of Saudi Arabia and thus, he contends, he cannot be held answerable in a U.S. court.   Turki also claims that he has insufficient contact with the United States to be held accountable in his personal capacity.   But Turki's actions fall outside the permissible scope of any official discretion.   Moreover, Turki's deliberate intent to deflect al Qaeda's terrorist activities away from targets in Saudi Arabia coupled with al Qaeda's public announcements of its intentions to attack the United States provide sufficient contact with the United States and with New York to subject Turki to jurisdiction in this Court.

Turki has been identified in a sworn statement as "the facilitator of . . . money transfers in support of the Taliban, al Qaeda, and international terrorism." 4AC ¶¶ 259, 263; AC ¶ 346[2]  In addition, the complaints allege that in 1998, Turki reached an agreement with Osama bin Laden and his followers pursuant to which bin Laden agreed not to use his terrorist infrastructure to subvert the royal family's control of Saudi Arabia and Turki agreed that the Saudis would make

---

1   Turki has filed his motion to dismiss in six actions:  *Ashton v. Al Qaida Islamic Army*, 02-CV-6977; *Barrera v. Al Qaeda Islamic Army*, 03-CV-7036; *Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-5738 ("*Burnet*t SDNY"); *Salvo v. Al Qaeda Islamic Army*, 03-CV-5071; *Tremsky v. Osama bin Laden*, 02-CV-7300; and *York v. Al Baraka Investment & Development Corp.*, 03 CV 5493.   The *York* action was voluntarily dismissed without prejudice on March 16, 2004; the dismissal was so-ordered by this Court on March 22, 2004.  Plaintiffs in the other five actions respond to Turki's motion in this memorandum of law.

2   Citations in the form "4AC ¶ __" are references to the Fourth Amended Complaint in the Ashton action.  Citations in the form "AC ¶ __" are references to the Amended Complaint in the Burnett S.D.N.Y. action (03 CV 5738).

.no demands for the extradition of terrorist individuals, such as Osama bin Laden, and/or for the closure of terrorist facilities and camps.  4AC ¶ 261; AC ¶ 348.  The Complaint further alleges that under Prince Turki's direction, the Saudi intelligence service, of which he was director from 1977 through August, 2001, "served as facilitator of Osama bin Laden's network of charities, foundations, and other funding sources."  4AC ¶ 263; AC ¶ 350.  Thus, Turki is alleged to have provided material support to Osama bin Laden directly and, further, is alleged to have done so with knowledge of bin Laden's terrorist activities and indeed with the specific purpose of deflecting those activities to other countries and away from Saudi Arabia.   In short, Turki gave assistance to Osama bin Laden to carry out terrorist attacks on other countries, including the United States, so that bin Laden would not attack Saudi Arabia.  Official discretion does not extend to this kind of heinous intentional tort and neither the Foreign Sovereign Immunities Act nor diplomatic immunity shield Turki from answering the allegations against him in this Court.

Moreover, in deliberately deflecting al Qaeda's terrorist activities away from Saudi Arabia and towards bin Laden's announced primary target, the United States, Turki purposefully directed his activities at residents of the United States.  No more is required to subject him to personal jurisdiction here.  Accordingly, as demonstrated below, Turki's motion to dismiss for lack of jurisdiction should be denied in its entirety.

### ARGUMENT

## I.   THIS COURT HAS JURISDICTION OVER THE CLAIMS AGAINST TURKI IN HIS OFFICIAL CAPACITY

The Foreign Sovereign Immunities Act ("FSIA") confers subject matter and personal jurisdiction on the district courts for claims against foreign states and their agencies or instrumentalities unless the sovereign (or agency or instrumentality) has immunity for that claim. 28 U.S.C. § 1330.  Turki contends that, to the extent that he is alleged to have acted in his

official capacity, the FSIA provides him with immunity and thus, he argues, the claims in these lawsuits fall outside the jurisdiction provided by § 1330.   While it is true that the FSIA does, generally speaking, provide immunity from suit for foreign officials acting in their official capacity, *see* 28 U.S.C. § 1604, the cloak of immunity provided by the FSIA is not absolute. Congress has carved out seven exceptions to immunity, specifically providing that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" that falls within one of the seven enumerated categories.  28 U.S.C. § 1605(a).   Although plaintiffs have "the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted . . . *the ultimate burden of persuasion remains with the alleged foreign sovereign*" to show that the claimed exception does not apply and that immunity should be granted. *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2003) (emphasis added).

In these cases, the claims against Turki fall within one of the FSIA exceptions, the so-called "tortious act" exception, which lifts immunity for any case:

> in which money damages are sought against a foreign state for personal injury or death or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . .

28 U.S.C. § 1605(a)(5).  Because plaintiffs' claims arise from deaths and injuries that occurred in the September 11 terrorist attacks, they are seeking money damages for personal injury and/or death in the United States based on tortious conduct.  Their claims fall squarely within this exception.

Turki makes four arguments why the "tortious act" exception should not be applied, but as demonstrated below, none is correct.

**A.   The "Tortious Act" Exception Is Not Limited to Traffic Accidents and Applies Here**

Turki claims that the allegations in this case fall outside of Congress's "primary purpose" in enacting the "tortious act" exception, which Turki claims was "to treat foreign sovereigns like other employers with respect to respondeat superior liability for injuries caused by their employees acting within the scope of their employment." *See* Turki Br. at 13. But, to the extent that sovereign immunity is at issue, this lawsuit seeks to accomplish precisely that purpose – to impose liability for injuries that Turki inflicted while acting within the scope of his employment. That the tort in this case was horrific, rather than routine, should not insulate Turki from liability. Quite the contrary.  Suggesting that the "tortious act" exception is limited to traffic accidents, Turki seeks to turn the "tortious act" exception into a "trivial torts" exception.  But surely it makes no sense to say that Congress intended to subject foreign sovereigns to liability for routine acts of negligence, but not for horrendous, intentional torts.

Nor does case law support Turki's effort to narrow the "tortious act" exception.  In *Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980), a former Chilean diplomat was assassinated in Washington, D.C. at the direction of the Chilean government.  The court held that the assassination fell within the "tortious act" exception and that, accordingly, Chile could not claim sovereign immunity in the wrongful death suit that ensued.  Indeed, the *Letelier* court specifically rejected the narrow construction of the "tortious act" exception urged here by Turki, holding that although the problem of automobile accidents may have brought the issue to Congress's attention, "the applicability of the Act was not so limited, for the committees made it quite clear that the Act 'is cast in general terms as applying to all tort actions for money damages' . . . ." 488 F.Supp. at 672.  *See also Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) (Taiwan not immune from suit in case arising from assassination in California).

4

Turki also claims that the "tortious act" exception does not extend to what he characterizes as plaintiffs' "novel and attenuated" theory of causation. *See* Turki Br. at 14. But the Second Circuit has plainly held that the scope of the "tortious act" exception is the same as the scope of the substantive tort law under which the action is brought. *See Robinson v. Government of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001).[3]  Indeed, the House Report on the

---

[3]  Turki relies on the contrary ruling of the D.C. district court in *Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9, 19-20 (D.D.C. Nov. 14, 2003), but *Burnett* is not controlling here.  To the extent that the D.C. court applied a narrow standard of causation to the FSIA than is applicable to the underlying tort, that decision conflicts with the Second Circuit law as set forth in *Robinson*, 269 F.2d at 143.

Even in *Burnett* itself, the decision of the D.C. district court is not a final decision and need not be adhered to.  Rule 54(b) of the Federal Rules of Civil Procedure expressly provides that an order dismissing fewer than all of the defendants from an action "*is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties.*"* F.R.C.P. 54(b) (emphasis added).  *See also Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) ("rulings of the district court are subject to revision by that court 'at any time before the entry of final judgment'").  The only exception to this rule is where the court issuing the order "direct[s] entry of a final judgment as to one or more but fewer than all of the . . . parties . . . ." F.R.C.P. 54(b).  The D.C. court neither issued such a directive with respect to the claims against Prince Turki nor made the findings required to support one.  No final judgment was entered.  Accordingly, the order of the D.C. court was not final and it is, accordingly, subject to revision at any time in this Court.  Moreover, even the so-called "law of the case" doctrine does not require this Court to adhere to the D.C. court's ruling.  As applicable to non-final rulings, the "law of the case" doctrine is wholly discretionary; it "does not constitute a limitation on the court's power." *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001); *accord Aramony v. United Way of America*, 254 F.3d 403, 410 (2d Cir. 2001).

Significantly, the Second Circuit has held that, following a transfer under 28 U.S.C. § 1407, "[t]he transferee district court has the power *and the obligation* to modify or rescind any orders in effect in the transferred case which it concludes are incorrect.' *In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987) (emphasis added); *see also Astarte Shipping Co. v. Allied Steel & Export Service*, 767 F.2d 86 (5th Cir.1985) (same); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996) (re-considering ruling of district court in Texas after transfer).  Such reconsideration is especially necessary where the transferee court is located in a different circuit than the transferor court.  For the Second Circuit also has held that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit." *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993).  That this Court is empowered to revisit the ruling in *Burnett* ensures that consistent results can be reached and applied in all of the actions consolidated into this multidistrict proceeding.  *See Menowitz*, 991 F.2d at 41 (application by the transferee court of the law of its own circuit serves the goals of administrative efficiency by permitting court to apply the same law to all of the various related cases).

Judge Sweet of this court applied these principles in *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996), a case with nearly identical circumstances.  In *Degulis*, six actions were consolidated in the Southern District of New York.  One of those actions, the "*Weiss* action" had been commenced in the Southern District of Texas.  Prior to the transfer of the *Weiss* action to New York, the defendants in that action moved to dismiss; the district court in Texas denied the motion.  After the transfer was accomplished, defendants in four of the other cases moved to dismiss.  One of the *Weiss* defendants then sought reconsideration, pursuant to F.R.C.P. 54(b), of the Texas court's denial of its motion to dismiss.  928 F.Supp. at 1306.  The court agreed to re-consider the ruling of the Texas court.  Judge Sweet held:

Regardless of the merits of the Texas Court's decision, here compelling reasons exist for reconsideration.  The peculiar circumstances of the transfer and the posture of the related actions in this case argue strongly for it.  Reconsideration following transfer by the JPML can ensure consistent pretrial rulings.  *See In re Long Distance Telecom. Litig.*, 612 F.Supp. 892, 902-03

5

legislation shows that the purpose of the "tortious act" exception was to permit a plaintiff "to maintain an action against [a] foreign state *to the extent otherwise provided by law*." H.R. Rep. No. 94-1487, at 21, 1976 U.S.C.C.A.N. at 6620 (emphasis added).  For that reason, the Second Circuit in *Robinson* held that a plaintiff is required to meet the same standard to fall within the "tortious act" exception as would be required to prevail on the merits.  The FSIA does not purport to change the substantive law of torts, but only to lift immunity under certain circumstances for those acts that are considered "tortious" under governing law. Thus, the complaints fall within the scope of the "tortious act" exception to the extent that plaintiffs have stated a claim against Turki for the torts in question.  If Turki can be held liable under the law for these torts, then his acts fall within the "tortious act" exception.

In these cases, plaintiffs have adequately pleaded the causal connection between Turki and the murderous attacks that took place on September 11, 2001 such that Turki can be held legally responsible for the deaths and injuries that occurred.  Plaintiffs allege that Turki proximately caused the deaths and injuries of September 11 because he knowingly aided and abetted al Qaeda in carrying them out by facilitating funding for al Qaeda and by making an explicit arrangement with bin Laden whereby Saudi Arabia would give bin Laden a free hand to operate its terrorist training camps so long as bin Laden directed the resulting terrorist activities outside Saudi Arabia.

---

(E.D.Mich.1985), *rev'd in part on other grounds*, 831 F.2d 627 (6th Cir.1987).   Moreover, transfer of an action by the JPML can constitute, as here, the type of 'significant' and 'fundamental' change warranting reconsideration of the order by the transferee court.  *Id*. at 903. Here, the Court has before it motions to dismiss in four of the other related actions, which involve in large part the same facts and legal issues.   To achieve consistent rulings on the motions to dismiss currently pending before the Court in all of the Blech Securities matters, it is appropriate, regardless of the merits of the Texas Court's order, to readdress the TBC Defendants' motion to dismiss in *Weiss*.  *See In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 678 (D.C.Cir.1981) ("Proper coordination of complex litigation may be frustrated if other courts do not follow the lead of the transferee court.").

*Degulis*, 928 F.Supp. at 1309.  Similarly, this Court can reconsider the D.C. Circuit's ruling that Turki is entitled to sovereign immunity in order to harmonize the result in *Burnett* and the cases that are the subject of this motion.

The doctrine of aiding and abetting does not require that plaintiffs plead a direct link between Turki's conduct and the specific attacks of September 11.  In *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983), the court explained the three requisites for holding a defendant liable for aiding and abetting:  "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."  In applying these elements to the facts before it, the *Halberstam* court held that the defendant Hamilton could be liable for aiding and abetting her co-defendant Welch in the murder of the plaintiff's husband during the course of a burglary.  Hamilton was not present at the burglary and claimed not to have known that Welch was a burglar at all.  Finding that Hamilton had assisted Welch for years in disposing of large quantities of jewelry and precious metals, the Court held:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries.  Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night--whether as a fence, burglar, or armed robber made no difference--because *violence and killing is a foreseeable risk in any of these enterprises.*

*Halberstam*, 705 F.2d at 489 (emphasis added).  Thus, the Court reasoned, Hamilton was liable not only for the burglaries – whether she knew about them or not – but also for the murder that Welch committed during the course of one of them.  *Id.*[4]

---

[4]  It is important to emphasize that in *Halberstam*, the court found that Hamilton "knew" that Welch was involved in personal property crimes – and thus could be held liable for the murder that Welch committed during one of his burglaries – without any direct evidence of that knowledge. 705 F.2d at 486-87.  As noted above, Hamilton denied knowing that Welch was engaged in criminal activities.  But the court was able to infer that Hamilton must have known because she carefully logged all of Welch's sales of jewelry and precious metals but had no records of any purchases, because of the extravagant lifestyle that she enjoyed as a result of Welch's crimes, and because of Welch's mysterious evening absences over the course of their relationship.  The court applied common sense to determine that a person in Hamilton's position must have known that Welch was committing crimes and the D.C. Circuit upheld liability based on that inferred knowledge.  705 F.2d at 486-87.

In *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998), the court applied the same standard used in *Halberstam*, holding:  "[A] plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises . . . Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient . . . ."  999 F. Supp. at 18.  More recently, and more pertinent to the facts of this case, in *Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217, 232 (S.D.N.Y. 2003), the court granted a default judgment to plaintiffs against Iraq for injuries arising out of the September 11 attacks after plaintiffs provided "a sufficient basis for a reasonable jury to draw inferences which could lead to the conclusion that Iraq provided material support to al Qaeda and that it did so with knowledge and intent to further al Qaeda's criminal acts."  *See also Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1023 (7th Cir. 2002) (plaintiffs need show only that defendants knew of the terrorist organization's illegal activities, that they desired to help those activities, and they engaged in some act of helping the illegal activities).

Under *Boim*, *Halberstam*, *Flatow*, and *Smith* plaintiffs need not allege nor prove that Turki participated in the planning or carrying out of the September 11 attacks or even that the assistance he provided was used specifically to assist in those attacks. *See Boim*, 291 F.3d 1000; *Halberstam*, 705 F.2d 472; *Smith*, 262 F.Supp.2d 217; *Flatow*, 999 F.Supp. 1.  Substituting the situation of this case into the framework of *Halberstam*, and using that court's own language, it is not necessary that Turki knew specifically that al Qaeda was going to commit the atrocities of September 11.  Rather, it is enough that, when he provided assistance to al Qaeda, he knew that

al Qaeda was involved in terrorist activity, because the attacks of September 11 were a foreseeable risk of that terrorist activity.  *See Halberstam*, 705 F.2d at 489.[5]

Here, there is no doubt that Turki knew that bin Laden and al Qaeda were plotting terrorist acts.  Turki admits as much when he contends that he went to Afghanistan in order to persuade the Taliban to turn bin Laden over to Saudi Arabia.  Moreover, plaintiffs allege that the specific purpose of Turki's assistance to al Qaeda was to deflect those terrorist acts away from Saudi Arabia.  Nor could there have been any doubt about where al Qaeda would strike instead: bin Laden repeatedly declared "war" on the United States an announced that the United States was his intended target. *See, e.g.,* 4AC ¶ 120; AC at p. 318; *see also* Declaration of Andrea Bierstein in Opposition to Motion to Dismiss of Sultan bin Abdulaziz al-Saud & exhibits thereto. The September 11 attacks, thus, were the plainly foreseeable result of any assistance that Turki provided to al Qaeda and Turki can thus be held liable for his role in them.[6]

Because Turki's role in the September 11 attacks is encompassed within traditional tort doctrines of "aiding and abetting" and causation, it is also encompassed in the "tortious act" exception to the FSIA.

**B.    The "Discretionary Function" Clause Does Not Immunize Turki From the Claims Alleged in These Lawsuits**

Turki also contends that his acts fall within the "discretionary function" exclusion of § 1605(a)(5) (A).  But courts have refused to recognize a foreign official's "discretion" to violate international law or commit crimes against humanity.  *Liu v. Republic of China*, 892 F.2d 1419

---

[5]  That terrorist attacks, including those of September 11, *are* a foreseeable risk of terrorist activity is nearly a tautology that requires little elaboration, especially in light of the D.C. Circuit's ruling in *Halberstam* that "violence and killing is a foreseeable risk" of criminal enterprises involving property crimes.  *Halberstam*, 705 F.2d at 489.

[6]  The result is the same under general tort principles of causation. *See, e.g., Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1996); *In re Sept. 11 Litig.*, 280 F.Supp.2d 279, 309 (S.D.N.Y. 2003); *Lamarca v. United States*, 31 F.Supp.2d 110, 127 (E.D.N.Y. 1998). *See also* Plaintiffs' Memorandum of Law in Opposition to Prince Mohammed al-Faisal al-Saud's Motion to Dismiss.

(9th Cir. 1989) ); *Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980).  This Court should do the same.

The *Letelier* case grew out of the assassination of former Chilean ambassador and foreign minister Orlando Letelier.  The assassination took place in Washington, D.C. by means of a car bomb that was constructed, planted and detonated by a group of individuals in the United States. The *Letelier* plaintiffs alleged that the individuals had acted "in concert and purportedly at the direction and with the aid of" the Republic of Chile and its intelligence organ the Centro Nacional de Inteligencia.  488 F.Supp. at 665.  The court held that Chile was not immune from suit because plaintiffs' claims fit within the "tortious act" exception. In determining that the "discretionary function" clause did not provide Chile with immunity, the court in *Letelier* explained:

> Whatever policy options may exist for a foreign country, it has no "discretion" to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law. Accordingly there would be no "discretion" within the meaning of section 1605(a)(5)(A) to order or to aid in an assassination and were it to be demonstrated that a foreign state has undertaken any such act in this country, that foreign state could not be accorded sovereign immunity under subsection (A) for any tort claims resulting from its conduct.

488 F.Supp. at 673 (citations omitted).

Similarly, in *Liu*, the director of the Taiwanese Defense Intelligence Bureau was accused of arranging the murder of a Taiwanese expatriate living in the United States. The Ninth Circuit found that it had jurisdiction over the Republic of China under the "tortious act" exception to the FSIA and further found that the murder did not fall within the "discretionary exception" clause, because the Taiwanese official had no discretion to carry out an assassination in the United States. *Liu*, 892 F.2d at 1431.

Just as a foreign sovereign has no discretion to plan and direct the assassination of an individual, so too a foreign sovereign and its agents or instrumentalities have no discretion to perpetrate conduct designed to result in terrorist attacks killing thousands of people.  If, as alleged in the Complaint, that is what this defendant did, the FSIA does not cloak him with immunity.

Turki claims that *Letelier* and *Liu* are distinguishable because the assassins in those cases were, according to him, "agents of the foreign government," while the September 11 hijackers were not agents of the Saudi government or of Turki.  *See* Turki Br. at 15-16.  But this argument is entirely conclusory.   In *Liu*, plaintiffs' decedent was assassinated in California by two men, Wu and Tung, who were recruited in the United States by a third man, Chen Chi-Li, who was acting on instructions from Admiral Wong, the Director of the Taiwanese Defense Intelligence Bureau.  Admiral Wong was acting contrary to Taiwanese law in instigating this assassination. Wu and Tang, members of the Chinese Bamboo Union Gang of criminals, were no more connected to the Taiwanese government than the September 11 hijackers were to the Saudi government.  They were "agents" of the government only in the sense that the Ninth Circuit held that Wong and the government of Taiwan could be held legally responsible for the assassination and that the "tortious act" exception lifted any immunity they otherwise would have had. Similarly, as described in a later decision in the *Letelier* litigation, Orlando Letelier was murdered by members of an anti-Castro group of Cuban exiles, recruited in New Jersey by an American, Robert Townley, a civilian contract employee of the Chilean intelligence service.  *See Letelier v. Republic of Chile*, 502 F.Supp. 259 (D.D.C. 1980).  Once again, the actual murderers were several steps removed from the sovereign entity whose immunity was abrogated by the "tortious act" exception.   And in both cases, the court refused to apply the "discretionary

11

function" clause to immunize the instigators of these murders, removed though they were from the actual commission of the crimes.

### C.   The September 11 Attacks Took Place in the United States

Turki also claims that the "tortious act" exception is inapplicable because not all of the planning and funding for the September 11 attacks took place in the United States.   In its November, 2003 decision, the D.C. district court held that plaintiffs here are seeking redress for deaths and injuries that "occurred in the United States" within the meaning of § 1605(a)(5). *Burnett,* 292 F.Supp.2d at 19 n.4.  Although previous decisions in this case are not binding in this Court, *see infra* Point I.A, this particular decision of the D.C. district court was plainly correct and should be followed.   There is no doubt that the September 11 attacks took place in their entirety with the United States.  The terrorists boarded the aircraft at U.S. airports.  The airplanes were hijacked in U.S. airspace.  The planes were turned into bombs and deliberately crashed into buildings in the United States or, in the case of the Flight 93, accidentally crashed in Pennsylvania.   The FSIA defines "United States" as including "all territory and waters, continental and insular, subject to the jurisdiction of the United States."  28 U.S.C. § 1603(c). There can be no question that the September 11 attacks took place here.

Turki, however, focuses not on the September 11 attacks themselves, but on his alleged role part in them. Thus, he alleges that none of *his* acts in support of al Qaeda and terrorism occurred in the United States.  In doing so, Turki loses sight of the nature of the allegations against it.  He is alleged to have aided and abetted or conspired with the terrorists who carried out the attacks.  Because the underlying tort for which plaintiffs seek to hold Turki responsible occurred in the United States, there is no geographical barrier to the use of § 1605(a)(5) to obtain jurisdiction in this case.

Turkic claims, however, that the "entire tort," including the acts of all the co-conspirators or aiders and abettors must occur in the United States for the "tortious act" exception to apply. But the only two cases with facts remotely similar to this case -- *Letelier* and *Liu* -- demonstrate otherwise. In *Letelier*, the murder itself took place in Washington, D.C., but the plot to assassinate Orlando Letelier was begun in Chile, where Robert Townley was recruited to go to the United States and carry out the murder. *See Letelier II,* 502 F.Supp. 259. Similarly, in *Liu*, all of the recruitment and training were conducted in Taiwan. The assassins then traveled to California and carried out the murder there. In both cases, the court applied the "tortious act" exception to lift the immunity of the sovereign alleged to be responsible.

*Letelier* and *Liu* are on all fours with this case. In those cases, as here, the acts of violence resulting in the plaintiffs' injury were carried out in the United States. In *Letelier* and in *Liu*, as in this case, the direct perpetrators, private individuals, acted in this country. In *Letelier* and in *Liu*, as here, a foreign sovereign or its instrumentality was alleged to be vicariously responsible, even though the foreign sovereign or instrumentality had not performed any act in the United States to further the assassination. This case is virtually identical to *Letelier* and *Liu* with respect to this issue. Just as the defendants there were found to lack immunity under the "tortious act" exception, here, too, the tort took place sufficiently within the United States to bring this case within that exception and strip NCB of any immunity it might have for its role in this tort.

NCB claims that *Letelier* was superseded in *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984), but that is not so. *Reclamantes* simply does not address the issue before this Court. In the *Reclamantes* case, the tort that plaintiffs alleged was unrelated to the acts that took place in the United States. The government of Mexico had entered

into a settlement with the United States releasing plaintiffs' claims against the U.S. and undertaking to compensate plaintiffs instead.  But that was not the act that gave rise to plaintiffs' claim, which was that Mexico had subsequently reneged on its promise to compensate the plaintiffs.  735 F.2d at 1524-25.  This act plainly occurred in Mexico. The *Reclamantes* court had no occasion to consider the applicability of the "tortious act" exception where the wrongful act that caused the injury plainly took place in the United States, but ancillary acts assisting it took place elsewhere.   Nor could *Reclamantes*, decided in 1984, have superseded the Ninth Circuit's decision in *Liu*, which was decided in 1989.

Moreover, if Turki's theory were correct and jurisdiction existed only where every single act in furtherance of the tort took place here, foreign governments could engage in assassinations and other crimes in the United States with impunity, simply by ensuring that at least one act in furtherance of the crime took place elsewhere.  That is surely not what Congress intended when it enacted the FSIA to "serve the interests of justice and . . . protect the rights of both foreign states and litigants in United States courts."   28 U.S.C. § 1602; *see Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984). [7]

---

[7]   The actual language of the "tortious act" exception also supports plaintiffs' position.  As noted above, the statute abrogates sovereign immunity for claims "in which money damages are sought against a foreign state for *personal injury or death or damage to or loss of property, occurring in the United States*."  28 U.S.C. § 1605(a)(5).  The plain meaning of these words is that only the "injury or death," not the "tortious act or omission" that caused it, need occur in the United States.  Nonetheless, courts have been reluctant to construe the statute so broadly, most likely because of the amorphous nature of many injuries that cannot be said to "occur" in any particular locus.  *See, e.g.*, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) (economic loss from sinking of ship off Argentine coast felt in United States where contractual payments were due);  *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984) (emotional distress resulting from hostage-taking in Iran felt in United States).  In this case, however, there is nothing remotely amorphous about plaintiffs' injuries or where they occurred. Because plaintiffs are injuries are, sadly, so concrete, there can be no dispute about where they occurred and thus, there is no reason to read the FSIA to mean anything other than what it says.   Moreover, and tragically, all too many of the claims in this case arise not from "personal injury" but rather from "*death . . . occurring in the United States*" 28 U.S.C. § 1605(a)(5).   The place of death is too concrete and fixed to introduce any uncertainty into this phrase. There can be no question that the deaths in this case plainly took place in the United States and defendant cites no case that holds, or even suggests, that under those circumstances, any more is required.

**D.    Section 1605(a)(7) Does Not Preclude Application of the "Tortious Act" Exception**

Finally, Turki claims that plaintiffs must obtain jurisdiction over him, if at all, under the "state-sponsored terrorism" exception to the FSIA, 28 U.S.C. § 1605(a)(7) (which all parties agree is inapplicable to the claims against this defendant). *See* Turki Br. at 12-13.    This argument is nonsense.  Nothing in the language or history of § 1605(a)(7) precludes the Court from hearing a claim against a foreign sovereign for an act of terrorism under any of the other exceptions to the FSIA set forth in other paragraphs of § 1605, so long as the requirements of that other exception are met.  Indeed, in those instances where Congress intended to preclude overlapping interpretations of the various exceptions, it specifically said so.  Thus, the "tortious act" exception can only be used in cases "not otherwise encompassed in paragraph (2)"; similarly, the "state-sponsored terrorism" terrorism exception only applies to cases "not otherwise covered by paragraph (2).  28 U.S.C. §§ 1605(a)(5), (a)(7).  If Congress had intended to limit the applicability of § 1605(a)(5) to cases that did not involve terrorism, it would have said so.

Nor does plaintiffs' reliance on the "tortious act" exception represent some kind of "end-run" around the limitations of § 1605(a)(7) or the policies that underlie them.  Each of the exceptions to sovereign immunity in § 1605 provides a separate and independent basis of jurisdiction over a foreign sovereign.  Use of the "tortious act" exception here in no way undermines the policies of the "state sponsored terrorism" exception because the two exceptions address entirely different circumstances. Section 1605(a)(5) provides jurisdiction over all non-commercial torts, including acts of terrorism, that take place in the United States, while § 1605(a)(7) provides jurisdiction for acts that take place abroad, but is limited to acts of terrorism committed by designated state sponsors of terrorism.

This was the precise holding of the court in *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998).  In that case, the court considered the extraterritorial application of § 1605(a)(7) to determine whether the then-recently enacted state-sponsored terrorism exception extended to acts of terrorism that occurred outside the United States.  Citing *Letelier*, 488 F.Supp. 665 and *Liu,* 892 F.2d 1419, the court reasoned:  "As 28 U.S.C. § 1605(a)(5) already provides jurisdiction over state-sponsored terrorist acts in the United States, the state-sponsored terrorism exception would be redundant if it were held to apply only within the United States." *Flatow*, 999 F.Supp. at 15 (emphasis added; citations omitted).  *See also Price v. Socialist People's Libyan Arab Jamahiriaya*, 294 F.3d 82, 88 (D.C. Cir. 2002) ("Under the original FSIA, therefore, terrorism, torture, and hostage-taking *committed abroad* were immunized forms of state activity."). (Emphasis added.)

Because the terrorism exception in § 1605(a)(7) sweeps so much more broadly than does the "tortious act" exception, encompassing conduct that takes place entirely outside the United States, it is understandable that Congress limited the circumstances in which this exception applies to suits involving terrorist acts and designated state sponsors of terrorism.  But there is no reason similarly to limit the liability of a foreign sovereign when the bomb explodes in the United States, rather than overseas, and nothing in the FSIA suggests that any such limitation was intended. Moreover, the considerations of foreign relations and diplomatic policy that may be implicated when Americans are injured in terrorist conflicts abroad have much less place, if any, in the context of terrorist attacks at home.  The structure of the FSIA recognizes this distinction by lifting the immunity of a foreign sovereign more freely when Americans are injured at home than when they are injured abroad.  *Compare* 28 U.S.C. § 1605(a)(5), 28 U.S.C. § 1605(a)(7).  Indeed, it is notable that, in striking the balance of lifting immunity for acts that

take place entirely outside the United States, but only for states that have been designated as sponsors of terrorism, Congress did not at the same time limit the existing "tortious act" exception, even though it clearly understood that that exception would apply to acts of terrorism committed in the U.S.  *See* House Report No. 103-702 (August 16, 1994) at *4.

Indeed, plaintiffs cannot help but note that Turki's interpretation of the FSIA leads to a fundamental absurdity whereby a foreign sovereign may be sued if one of its employees accidentally runs down a pedestrian in the District of Columbia with his car, but has immunity if that employee blows up the pedestrian in a deliberate act of violence instead.  The FSIA does not countenance such absurdities.  Rather, it presents a coherent scheme in which injuries negligently or deliberately inflicted in the United States are actionable under § 1605(a)(5), while injuries inflicted abroad are actionable only in the more limited circumstances set forth in § 1605(a)(7).[8]

## II.   TURKI IS NOT ENTITLED TO DIPLOMATIC IMMUNITY

Turki's claim that diplomatic immunity requires dismissal of this action against him is frivolous.  Turki concedes that he is a diplomat accredited to the United Kingdom, not the United States.  He contends, however, that he is entitled to the same diplomatic immunity in the United States as he is accorded in the United Kingdom, or, put another way, the same immunity that the United States accords to the Saudi Arabian Ambassador to the United States.  But U.S. law and the controlling international convention provide otherwise.

---

[8] This is especially true because "terrorism" is not a defined or self-defining term.  It is the name we give to certain murders or assaults because of the motivation and the methods used to carry them out.  But the attacks of September 11, 2001 were murders and assaults before they were "terrorism," and as such they are torts that fall within the "tortious act" exception to the FSIA.  Turki's suggestion that when murders become terrorist acts, they cease to be torts would mean that his immunity, and the conditions under which it is abrogated, would depend on the uncertainty of how a particular event is characterized (and by whom) rather than on the certainty of the deaths or injuries at issue.

The scope of diplomatic immunity in the United States is defined in 22 U.S.C. § 254d, which provides in relevant part that "[a]ny action . . .brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under section 254b or 254c of this title, or under any other laws extending diplomatic privileges and immunities, shall be dismissed."   Turki invokes no source of diplomatic immunity other than the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 1972 WL 122692 (U.S. Treaty), T.I.A.S. No. 7502. ("Vienna Convention").   Thus, this suit may be dismissed under § 254d only if Turki is "entitled to immunity with respect to [this] action" under the Vienna Convention.   That convention, however, clearly precludes immunity here.

Article 31 of the Vienna Convention sets forth the immunity to which a diplomat is entitled in the state to which he is accredited.   Article 40 sets forth the immunity to which a diplomat is entitled in a third state.   The contrast between them is most clearly shown in side-by-side comparison:

Section 31:

 "A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction . . . ."

Section 40:

 "If a diplomatic agent passes through or is in the territory of a third State, which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return."

Section 31 thus provides a diplomat with a blanket immunity from the civil jurisdiction "of the receiving state."   Section 40, by contrast, provides a limited immunity from the jurisdiction of a third state (that is, neither the sending state nor the receiving state).   That limited immunity applies *only* when the diplomat "passes through or is in the territory of a third State . . .

while proceeding to take up or to return to his post, or when returning to his own country."
Moreover, rather than according immunity from all civil and criminal jurisdiction, Section 40
confers immunity only "as may be required to ensure his transit or return."

None of the conditions set forth in the Vienna Convention for diplomatic immunity in a
third State is satisfied in this case. Turki is not passing through or in the territory of the United
States while proceeding to take up or return to his post in Great Britain or returning to Saudi
Arabia. And nothing in this Court's exercise of jurisdiction over him will in any way interfere
with his "transit or return."

Turki asks this Court to read into the Vienna Convention an immunity that is not there.
But, more significantly, Turki asks this Court to extend to him an outdated immunity that was,
apparently, *rejected* by the Vienna Convention. In *Bergman v. De Sieyes*, 170 F.2d 360 (2d Cir.
1948), the Second Circuit looked to an earlier international convention on diplomatic immunity,
established at the Sixth International Conference of American States at Havana in 1928. While
recognizing good reasons to limit the scope of diplomatic immunity, that conference nevertheless
had decided to "make[] no distinction between diplomats in transitu and those in situ." *See
Bergman*, 170 F.2d at 362.

The Vienna Convention was adopted in 1961, 33 years after the 1928 conference and 13
years after the *Bergman* decision.[9] Unlike the 1928 conference, the Vienna Convention
explicitly chose to differentiate diplomats *in situ* (that is, in the country to which they are
accredited) from those in transit in a third country and to accord different immunities in the two
different situations. Prince Turki's argument that this distinction should be ignored and that
diplomats should be accorded the same immunity in every state as they are in the state to which

---

[9]   The Vienna Convention was ratified by the President of the United States on November 8, 1972, seven years after
ratification was advised by the Senate. It entered into force with respect to the U.S. on December 13, 1972. *See* 23
U.S.T. 3227, 1972 WL 122692 (U.S. Treaty), T.I.A.S. No. 7502.

they are accredited flies in the face of both the language of the Vienna Convention and the history of international agreements concerning diplomatic immunity.

None of the cases that Turki cites in support of his argument was decided under the Vienna Convention; indeed, none was decided after 1948 and one is sufficiently outdated to involve the Ambassador to France from the Republic of Texas (which, in 1839 when the case was decided, was not an ironic reference to the home of the President of the United States).[10] Turki also attempts to argue that extending immunity to him is good policy.  But § 254d and the Vienna Convention foreclose that argument.  Under controlling authority, Turki has no immunity from suit in the United States except in accordance with the provisions of Section 40 of the Vienna Convention, which are entirely inapplicable here.

## III. TURKI'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION SHOULD BE DENIED

Recognizing that the FSIA confers no immunity for actions in his personal capacity, Turki argues that he cannot be subjected to the jurisdiction of this Court in connection with his personal donations to al Qaeda front charities because, he contends, he lacks sufficient contact with the forum to meet the constitutional requirements for the assertion of jurisdiction. Turki is wrong.

A defendant is subject to jurisdiction in the United States if he "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted).  Physical presence is *not* a requirement.  *Id.* at 475.  Where a defendant's intentional,

---

[10]   The section of Turki's brief addressing diplomatic immunity includes a citation to *Aidi v. Yaron*, 672 F.Supp. 516 (D.D.C. 1987), see Turki Br. at 21, but *Aidi* involved a diplomat accredited to the United States and resident in Washington, D.C.  Turki does not cite it as support for his claim that he should be accorded diplomatic immunity, but only in support of his contention that if diplomatic immunity is applicable, service may be quashed.

and allegedly tortious, actions were expressly aimed at the forum, the "due process" requirement of minimum contacts is satisfied.  *See Calder v. Jones*, 465 U.S. 783, 789 (1984).[11]

Three recent cases involving terrorism against Americans apply this test and hold that due process is not violated when those who deliberately target Americans are made to answer in American courts of law.  *Pugh v. Socialist People's Libyan Arab Jamahiriya*,  290 F.Supp.2d 54 (D.D.C. 2003); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998);  *Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns).

Here, as noted above, Turki clearly knew that bin Laden and al Qaeda were plotting terrorist acts.  *See supra* pp. 1-2, 9.  In this way, Turki directed his conduct at the United States when he provided assistance to bin Laden and al Qaeda.  No more is required to subject him to jurisdiction in the United States.  *See also* Plaintiffs' NCB Brief at Point III-B; Jurisdiction Brief.[12]

---

[11]   Rather than repeat the arguments set forth at length in Plaintiffs' Memorandum of Law in opposition to the motion to dismiss filed by the National Commercial Bank ("Plaintiffs' NCB Brief"), which was previously submitted in this action, and in Plaintiffs' Memorandum of Law In Support of Their Prima Facie Showing of Personal Jurisdiction and In Opposition to Defendants' Challenges to Personal Jurisdiction ("Jurisdiction Brief") being filed in connection with various motions to dismiss in the consolidated actions, plaintiffs hereby incorporate by reference the arguments set forth therein and respectfully refer the Court to those briefs.

[12]   In any event, plaintiffs should be permitted to take jurisdictional discovery concerning  . . . that give rise to plaintiffs' claims in this action. A plaintiff faced with a motion to dismiss for lack of personal jurisdiction "is entitled to reasonable discovery."  *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues"); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) ("generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue"); Marine Midland Bank NA v. Miller, 664 F.2d 899, 904 (2d Cir. 1981) (court may decide challenge to personal jurisdiction "on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion"); *Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) (where plaintiff had not made prima facie showing of jurisdiction, but had made "a sufficient start toward establishing personal jurisdiction" court order jurisdictional discovery). Moreover, "[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of

21

## CONCLUSION

For the foregoing reason, this Court should deny Turki's consolidated motion to dismiss

and to quash service in its entirety.

Dated: New York, NY                    Respectfully submitted,
       May 14, 2004

                             /s/_____

                             Ronald L. Motley, Esq. (RM-2730)
                             Jodi Westbrook Flowers, Esq.
                             Donald A. Migliori, Esq.
                             Michael Elsner, Esq. (ME-8337)
                             MOTLEY RICE LLC
                             28 Bridgeside Boulevard
                             P.O. Box 1792
                             Mount Pleasant, South Carolina 29465
                             Telephone:  (843) 216-9000

                             James P. Kreindler, Esq.
                             Justin T. Green, Esq.
                             Andrew Maloney, Esq.
                             Vincent Parrett, Esq.
                             KREINDLER & KREINDLER LLP
                             100 Park Avenue
                             New York, New York  10017-5590
                             Telephone:  (212) 687-8181

                             Paul J. Hanly, Jr., Esq. (PH-5486)
                             Jayne Conroy, Esq. (JC-8611)
                             Andrea Bierstein, Esq. (AB-4618)
                             HANLY CONROY BIERSTEIN & SHERIDAN, LLP
                             415 Madison Avenue
                             New York, NY 10017-1111
                             Telephone:  (212) 401-7600

                             Harry Huge, Esq. (D.C. Bar #55640)
                             HARRY HUGE LAW FIRM, LLP
                             Market Square North
                             1401 Ninth Street, N.W., Suite 450
                             Washington, D.C. 20004
                             Telephone:  (202) 824-6046

---

personal jurisdiction to enable a party to conduct discovery.  5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1351, at 253-59 (2d ed. 1990).

Allan Gerson, Esq. (DC Bar #327494)
Attorney At Law
4221 Lenore Lane
Washington, DC 20008
Telephone:  (202) 966-8557

Ken Nolan, Esq.
Frank Granito, III, Esq.
SPEISER KRAUSE NOLAN & GRANITO
140 East 45th Street, 34th Floor
New York, NY  10017
Telephone:  (212) 661-0011

Michel Baumeister, Esq.
Thea Capone, Esq.
BAUMEISTER & SAMUELS, P.C.
One Exchange Place, 15th Floor
New York, NY  10006-3008
Telephone:  (212) 363-1200

Thomas E. Mellon, Jr., Esq.
MELLON WEBSTER & SHELLEY
87 North Broad Street
Doylestown, PA  18901
Telephone:  (215) 348-7700

Richard D. Hailey, Esq.
RAMEY & HAILEY
3815 River Crossing Parkway, Suite 340
Indianapolis, IN  46240
Telephone:  (317) 848-3249

J.D. Lee
LEE, LEE, & LEE
422 S. Gay Street
Knoxville, TN  37902
Telephone:  (865) 544-0101

Attorneys for Plaintiffs in the Personal Injury and Death
Cases