# EXHIBIT 11

# TERRORISM FINANCING
## Roots and trends of Saudi terrorism financing

Report prepared for
the President of the Security Council
United Nations

Dec. 19, 2002
New-York, USA

Jean-Charles Brisard
JCB Consulting

**About the author**

Jean-Charles Brisard is an international Expert on Terrorism Financing. He authored the first extensive intelligence report on "Usama bin Laden financial networks" published in 2001 by the French National Assembly and testified in several judicial procedures regarding terrorism financing in Europe. Since July 2002, he is leading the investigation team for the 911 Families United to Bankrupt Terrorism.

Damien Martinez, Terrorism analyst for JCB Consulting, contributed to the report.

For further information or contact :

JCB Consulting
42, avenue Montaigne
75008 Paris – France
Tel : (33) 1 53 67 52 90
Fax : (33) 1 53 67 52 94
jcb@jcbconsulting.com

## EXECUTIVE SUMMARY

The war against terrorism financing has addressed the most obvious fronts of criminal organizations in the past year, by shutting down and freezing the assets of individuals and entities acting as the main recipients or ultimate donors of terrorist organizations.

The international community, apart from political considerations, is fighting the al-Qaida financial networks mostly with tools and behaviors, sometimes biases, inherited from traditional terrorism organizations' structures and practices.

In the case of al-Qaida, surviving myths such as the absence of money in terrorist organizations, the belief that money could extensively be transferred using informal or offshore procedures, or the unwillingness to face the Saudi ideological and financial source of fundamentalism, turns the war against terrorism financing into an equivocal fight that may elude or undermine its long term objectives.

The al-Qaida organization defies the common understandings of traditional terrorism by being able to hide terror behind a visible, mostly legitimate, business cover, using and abusing tools and methods that constitute the basis of Islamic banking, religious donations and modern economic globalization to move and raise money, recruit and train operatives, buy arms and entertain local operational cells able to carry out terrorist attacks around the world.

At the root of that situation is an unresolved dilemma that turned to a confusion between religion and finance in the Kingdom of Saudi Arabia. By mixing religious beliefs, tools and interpretations with financial purposes, without proper regulations and controls, Saudi Arabia opened an avenue for terrorism financing through the traditional Zakat, a legal almsgiving conceived as a way for purification by the Prophet that turned into a financial tool for terrorists.

Abusing this pillar of Islam and benefiting from the Saudi regulatory vacuum, al-Qaida was able to receive between $300 million and $500 million over the last ten years from wealthy businessmen and bankers representing about 20% of the Saudi GNP, through a web of charities and companies acting as fronts, with the notable use of Islamic banking institutions. Most of this financial backbone is still at large and able to support fundamentalist organizations.

If addressing this issue may appear as a difficult task, it remains an essential way to stop the flow of money raised in the hands of terrorists.

Along with this financial challenge, success may be driven by recognizing cultural changes in terrorism nature and organization, politically assessing and weighting allies involved in that war, and finally, face legal challenges regarding the Saudi negligent policy to prevent terrorism financing.

# CONTENTS

Introduction – Some myths about terrorism financing

1.  The roots of Saudi terror financing : Mixing religion and finance
    1.1.  Zakat : from religion to fundamentalism
    1.2.  Zakat tax assessment
    1.3.  Failure to control religious money

2.  Ways & means to export terror : Banks, businesses & charities
    2.1.  The Islamic banking network, a deviated instrument of terror
    2.2.  Penetration of the business sector
    2.3.  Charities as fronts

3.  Challenges ahead
    3.1.  Cultural challenge : Recognize terrorism changes
    3.2.  Political challenge : Choose your allies
    3.3.  Financial challenge : Disrupt terrorism financing sources
    3.4.  Legal challenge : Toward Saudi responsibility

Conclusion

"You go to Friday prayers. You could stand there and say,
"Please Help". And people will give you checks, money, et cetera".
*Prince Bandar, Ambassador to the US, PBS Frontline, September 2001*


"If beneficiaries had used assistance for evil acts,
that is not our responsibility at all".
*Prince Salman, Governor of the Riyadh Province, November 2002*

## INTRODUCTION

### *Some myths about terrorism financing*

For thirty years, Western countries mostly dealt with simple-structured terrorist organizations, mainly disorganized local entities (Europe, Middle-East and Asia) or State-sponsored entities (Hezbollah and others).

Al-Qaida has reshuffled our entire knowledge and assessment of terrorist organizations by creating a complex confederation of militant bases and aggregating financial support networks.

To support its criminal objectives, this organization has been able to build a complex web of political, religious, business and financial instruments or supports.

Still, several surviving myths of this period may undermine, or might have already undermined the war against terrorism in the aftermath of the Sept 11th attacks on the United States.

**The first myth is that terrorism doesn't need money to terrorize.** This idea is largely based upon the real assumption that simple devices don't need a lot of money. This trend has proven to be correct when dealing with simple-structured organizations, Palestinian type in the 70s and Algerian type in the 80s.

The idea also proved correct regarding al-Qaida operational level, where local national cells, mostly dormant cells, happened to live in much modest conditions.

But to apply that idea to the entire al-Qaida network is not only irrelevant but simply turns to an end the war against terrorism financing.

While the operational cost of the USS Cole bombing in 2000 is estimated between $5,000 and $10,000, and the cost of the Djerba suicide attack in 2002 is estimated to $20,000, other actions around the world have turned to be much expensive. The Bali bombing is estimated at $74,000, the Limburg attack to $127,000, not to mention the Sept 11th attacks, which cost is largely above $500,000.

| Terrorist attack | Date | Operational cost (est.) |
|---|---|---|
| African Embassy bombings | 1998 | > $30,000 |
| USS Cole bombing | 2000 | $5,000 - $10,000 |
| Sept 11, 2001 | 2001 | > $500,000 |
| Djerba Mosque bombing | 2002 | $20,000 |
| Limburg bombing | 2002 | $127,000 |
| Bali bombing | 2002 | $74,000 |

Al-Qaida clearly distinguishes in various documents, including its training manual, the organizational funds and the "operational funds".

For al-Qaida, operational funds have two main objectives, the first is to invest in projects that offer financial return to entertain local cells, the second is to carry out terrorist operations.

---

**Al-Qaida operational cells fund raising methods**

- Subscription/membership fees
- Investment projects
- Front companies
- False contracts
- Robbing state banks/bank employee
- Forging checks
- Credit card fraud
- Counterfeiting/forging currency
- Kidnapping
- Extortion
- Arms smuggling
- Drug trafficking
- Various trafficking (cars…)

---

Apart from the operational level, one must not confuse the requirements of al-Qaida in terms of daily logistics and the super-structure level, which is the real innovation introduced by Usama bin Laden.

Al-Qaida is not only a combatant organization, it's also and most of all a confederation of militant organizations around the world. The first purpose of money for al-Qaida at this level is to entertainment the broad network of organizations, to fund them to stabilize and leverage their support and to develop their reach. Over the years, al-Qaida supported financially several entities, from Libya to the Philippines, from Indonesia to Somalia. Figures here range in millions of dollars.

The second purpose of money at the super-structure level has been to pay for protection and asylum. Since 1991, al-Qaida and Usama Bin Laden had to resettle in various countries after the opposition movement was banned from Saudi Arabia. It was the case in Sudan and Afghanistan for years.

| Al-Qaida financial needs |
|---|
| Infrastructure<br>Communication, Networks, Training facilities, Protection<br>(90%) |
| |
| Operational<br>Day to day money, terrorist attacks planning & execution<br>(< 10%) |

**Another myth impeding the war against terrorism financing is that al-Qaida uses offshore facilities to cover its operations**, thus substantially reducing the reach of law enforcement tools and procedures.

That idea (which is by the way contrary to the assumption that terrorists don't need money) proceeds from the behavior that terrorists are using offshore centers to hide money.

With the exception of a few banking institutions based and operated from offshore centers such as the Bahamas and Switzerland, namely al Taqwa Bank and Dar Al Maal Al Islami (DMI) no such examples can be found around the world.

The nature of the al-Qaida network is all but a structure that uses covers to finance its operations. One of the main characteristics of this network has been its ability to act and behave behind a traditional economic and financial network.

Furthermore, financial investigations determined that terrorists didn't need offshore centers simply because they had the ability and the tools to deviate money from their recipient in order to finance their operations in their own countries.

In that respect, the Zakat religious tax system imposed on each transactions to finance charitable Muslim needs, raises in its practical consequences, the same nature of questions as does any offshore business by allowing to deviate under no control large sums of money to suspicious entities.

Zakat is the most important source of financial support for the al-Qaida network, essentially because it is the most usual and unregulated way to raise donations in Saudi Arabia.

In several cases, money originating from Islamic banks and charities in the Gulf was moved and laundered through Western and specifically US correspondents, whether banks or charities, before reaching their recipients.

In that respect, most of the financial revenue of al-Qaida is raised through legal means.

**The third myth is to focus on the Hawala alternative remittance system as the main tool for moving terror money**.

Al-Qaida operational cells rely on Hawala (meaning "in trust"), a paperless financial dealing system operated on the basis of trust among money brokers.

Hawala is an informal system to transfer money. It is based on a short term, discountable, negotiable, promissory note (or bill of exchange). While not limited to Muslims, it has come to be identified with "Islamic Banking".

The system is mostly in use in Pakistan, India, the Gulf countries and Southern Asia.

In Hawala activities, brokers advance funds to depositors on a nod or a handshake, leaving no paper or electronic trails. Those involved often operate from a back of a store or, in remote areas, may not even have an "office" from which to conduct transactions. Brokers are known to use telephones to communicate. Furthermore, Hawala's generations of existence throughout South Asia and the Middle East make it difficult for foreign authorities to eradicate the arcane system.

Hawala have existed in the United States since the 1980s. The number of outlets in the country is unknown, but six or seven Hawalas are operating in the Washington-Baltimore area alone. Most clients are immigrants who use the system — which often transfers money faster than regular banks — for the legitimate purpose of sending money to relatives and friends abroad.

Some users, however, exploit the system to launder money obtained or intended for illegal activity. Drug dealers have relied on Hawala to send profits of drug sales from the United States, often to arms dealers abroad.

The Hawala system is basically an "end user" tool for terrorists on the ground, used to transfer money for operational purposes. It has never been a primary tool or instrument for moving money.

For example, Indian authorities have found Kashmiri militants making extensive use of the Hawala system to finance terrorist operations there. The Hawala is also used in isolated localities, such as the tribal areas of Pakistan and Afghanistan.

Its importance in "end-users dealings" could be reduced by facilitating cheap, fast remittances across international boundaries, and to do away with dual and parallel exchange markets, which are always an incentive to keep transactions underground.



**Terrorism Money Trail**

Zakat donations (Individuals, companies, banks)
▼
Bank transfers
▼
Charities and relief organizations
▼
Local charity & relief offices
▼
Hawala transfers
▼
Terrorist organization
▲
Local fraudulent schemes & criminal activities

**The Fourth myth is that the Saudis never financed or intended to finance al-Qaida because it would have been contrary to their own interest.**

For years, since the installment of Arab Mujahideen forces in Afghanistan in 1980, wealthy Saudi businessmen, bankers and institutions have forged the financial backbone of al-Qaida, by transferring or facilitating the transfer of such funds to charities or fronts of the terrorist organization, some of whom have already been designated as supports of terrorism by the US authorities.

A remarkable event in that regard is that the Saudi government was among the first to recognize and support the Taliban regime in Afghanistan. The Taliban were officially recognized by Saudi Arabia on May 16, 1997. Since mi-1996, it was well-known and publicized that the Taliban regime was giving refuge to several terrorist organizations, including Usama bin Laden, who settled in Afghanistan in May 1996.

The US State Department on Patterns of Global Terrorism for 1996 stressed that "The Taliban militia, which took over the capital city, Kabul, in September, has permitted Islamic extremists to continue to train in territories under its control even though they claimed to have closed the camps…Saudi-born extremist Usama Bin Ladin relocated to Afghanistan from Sudan in mid-1996 in an area controlled by the Taliban and remained there through the end of the year, establishing a new base of operations. In August, and again in November, Bin Ladin announced his intention to stage terrorist and guerrilla attacks against US personnel in Saudi Arabia in order to force the United States to leave the region".

Furthermore, beginning in 1999, international actions were taken against the Taliban regime by the UN Security Council (UNSC Resolution 1267 of 1999 and UNSC Resolution 1333 of 2000). Saudi Arabia issued a circular to freeze the assets of the Taliban in 1999, but continued to entertain close relations with their representatives.

While the symbiotic nature of the Taliban – al-Qaida relationship was known for years, is only on September 25, 2001 that Saudi Arabia officially broke diplomatic relations with the Taliban regime.

Saudi Arabia has proven in the past it could play a risky game not to undermine its own security. In an unpublished interview in 1996, Usama bin Laden stated that an emissary from the Saudi royal family had offered his family 2 billion Saudi riyals (about $535 million) if he abandoned his "holy war" and that he rejected the offer.

Resulting from confessions of Omar al Faruq, former al-Qaida representative in Southern Asia, to the US authorities in 2002, we learned that the Saudi support to fundamentalists was not only proven but organized.

A lieutenant of Usama bin Laden was said to be a representative of a committee of Gulf-state sheiks who are al-Qaida financiers and who have committed ample funds, weapons, ammunition and computers to support this war.

This testimony is consistent with al-Qaida doctrine and policy stated in several documents requiring its members to practice extortion against governments

through assassination and kidnapping. In one of its training manual, al-Qaida refers to the "carrying out [of] threats (extortion) against other regimes if they do not give willingly". In this case "one or two assassinations should be carried out so that the regime would realize that we are serious about our threats". The same applies to international companies such as "pharmaceutical companies, airline companies, insurance companies and petroleum companies, big industrial companies and meat companies, fruit companies".

---

**Main individual Saudi sponsors of al-Qaida**

**Khalid bin Mahfouz, banker**
**Saleh Abdullah Kamel, banker**
**Abdullah Suleiman al Rajhi, banker**
**Adel Abdul Jalil Batterjee, businessman**
**Mohammed Hussein al Amoudi, businessman**
**Wa'el Hamza Julaidan, businessman**
**Yasin al Qadi, businessman**

---

Within a 10-year period, the financial support at the disposal of Al-Qaida or its sisters organizations, received through direct donations or Zakat funds to charities or through various fraudulent schemes ranges between $300 million and $500 million for an annual income of around $50 million.

According to various intelligence estimates, less than 10% of that amount went to operational planning, while 90% were used for the network infrastructure, mainly facilities and organization.

In Saudi Arabia, the entire legal framework, from State regulations, to charities control, through religious interpretation, all contribute to corrupt a system that may be honest and legitimate at its beginning.

1

**THE ROOTS OF SAUDI TERROR FINANCING :**
**MIXING RELIGION AND FINANCE**

At the very beginning of al-Qaida financing is an institutional confusion between religion and finance that plays both as a common and traditional religious justification and still poses real and unanswered questions regarding the use or abuse of legitimate money by such organizations.

The fundamental question refers to the way eminent religious tools created to cope with poverty and charity among Muslims were diverted and abused to serve terror aims around the world. The related issue is how to manage and control religious tools and principles, and forbid any abuse, while for instance several prominent scholars interpret the rule of God as permitting such abuses.

**1.1. Zakat, from religion to fundamentalism**

The main financial vehicle to fund Islam was set up under the Islamic rule of Zakat, a legal almsgiving required as one of the five pillars of Islam on current assets and other items of income. Zakat has been described as the "cornerstone of the financial structure in an Islamic State".

According to the Koran, Zakat is a way of purification. Possessions are purified by setting aside a proportion for those in need, and, like the pruning of plants, this cutting back balances and encourages new growth. This principle is an obligation for every Muslim.

---

**Zakat in the Koran**

(Koran - Al-Baqarah (2), verse 267)
"O you who believe! Spend of the good things which you have (legally) earned, and of that which We have produced from the earth for you, and do not aim at that which is bad to spend from it, (though) you would not accept it save if you close your eyes and tolerate therein. And know that Allah is Rich (Free of all wants), and Worthy of all praise."

(Koran, Surah Taubah (9), verse 60)
"Zakat is only for the poor, and the needy and those who collect them, and for to attract the hearts of those who have been inclined (towards Islam); and to free the captives and those in debt, and for the cause of Allah, and for the wayfarers; a duty imposed by Allah. And Allah is Knower, Wise."

(Koran, Surah Taubah (9), verse 34)
"O ye who believe! there are indeed many among the priests and anchorites, who in Falsehood devour the substance of men and hinder (them) from the way of Allah. And there are those who bury gold and silver and spend it not in the way of Allah. Announce unto them a most grievous penalty."

---

According to the Koran, only the poor and needy deserve Zakat.

Basically, Zakat takes three forms, depending on its recipients, Feesabeelillah (in the way of Allah), Lil-Fuqara (for the poor), and Lil-Masakeen (for the needy).

Only the first form of Zakat has raised questions and various interpretations among Muslim scholars, mostly those influenced by Wahabbism doctrine of Islam.

Feesabeelillah is used to describe money spent in fighting for the cause of Allah (Jihad).

Jihad refers to striving for excellence on one of several levels. The first involves individual efforts, spiritual and intellectual, to become a better Muslim. The second addresses efforts to improve society. The third and last level, or "holy war," involves self-defense or fighting against oppression.

The personal Jihad states that the most excellent jihad is that of the soul. This jihad, called the Jihadun-Nafs, is the intimate struggle to purify the soul of satanic influence — both subtle and overt. It is the struggle to cleanse one's spirit of sin. This is the most important level of jihad.

The verbal Jihad is based of Prophet words that "The most excellent jihad is the speaking of truth in the face of a tyrant." He encouraged raising one's voice in the name of Allah on behalf of justice.

Finally, physical Jihad is combat waged in defense of Muslims against oppression and transgression by the enemies of Allah, Islam and Muslims. We are commanded by Allah to lead peaceful lives and not transgress against anyone, but also to defend ourselves against oppression by "fighting against those who fight against us." This "jihad with the hand" is the aspect of jihad that has been so profoundly misunderstood in today's world.

According to Al Azhar's Islamic Research Academy, the concept of Jihad refers to the "defense of the nation against occupation and the plunder of its resources". But it does not cover the killing of innocent people, the elderly, women, and children, which is forbidden by Islam. The teachings of Islam also forbid the destruction of buildings and establishments not connected with a specific battle. The statement drew a distinction between violence perpetrated by oppressors who have no respect for what is sacred and violence as a legitimate defense launched by the weak to win their rights.

There is a clear distinction between the Koran's concept of a defensive Jihad and the usurped form of offensive Jihad developed by several scholars, including Omar Abu Omar (aka Abu Kutada), al-Qaida principal in the UK, who influenced a trend to support those "fighting in the Cause of Allah" (the Mujahideen), thus justifying Zakat for un-legitimate violence against peaceful nations.

In January 2002, for example a conference of Islam's Ulema religious scholars in Beirut, Lebanon, clearly stated in its final statement that :

*"Hezbollah in Lebanon, Hamas, Islamic Jihad and all resistance forces vividly express the will of the nation. They constitute the first line in the defence of peoples and states and their rights, causes and sanctities. Through their jihad and mujahidin, they represent the honour, pride and dignity of Muslims everywhere and reflect the human ambitions of all oppressed peoples in the world. If the masters and protectors of the Zionist entity in the US administration are targeting the resistance because it poses a real threat to this entity, we view this resistance as the noblest and most sacred phenomenon in our contemporary history."*

Over the time, this legal religious duty has been usurped and abused by terrorists and their supports.

The al-Qaida network extensively utilized the weakness of legal rules to rely on funds diverted from the Zakat and other direct donations through Islamic banks and since 1998, Usama bin Laden made regular calls for Muslims to donate through the Zakat system to his organization.

In December 1998, during an interview with ABC News, Usama bin Laden stated that :

*"Muslims and Muslim merchants, in particular, should give their zakat and their money in support of this state [Taliban regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God".*

Usama bin Laden addressed the same issue in a seized video tape filmed during a wedding party in January 2001 :

*"Deserve credit those traders and businessmen who give Zakat so that they can help arm that ill-equipped Lashkar".*

In September 2001, in a interview with Pakistani newspaper Ummat, he declared that:

*"Al-Qaida was set up to wage a jihad against infidelity, particularly to counter the onslaught of the infidel countries against the Islamic states. Jihad is the sixth undeclared pillar of Islam. [The first five being the basic holy words of Islam ("There is no god but God and Muhammad is the messenger of God"), prayers, fasting (in Ramadan), pilgrimage to Mecca and giving alms (zakat).]".*

Other Al-Qaida leaders made similar references, for example Mahfouz Walad Al-Walid, aka Abu Hafs, during an interview with al-Jazeera on November 30, 2001 :

*"We think that the cause in which there is a possibility for all Muslims to participate in supporting by means of money, men, or any kind of help, is the cause of Afghanistan".*

### 1.2. Zakat tax assessment

The Koran only gives general principles and guidelines regarding the collection of Zakat, and most of the tax regulations are recent. Zakat is levied pursuant to Royal Decree No. 17-2-28-2077 of 1380 A.H. (1960) on Saudi nationals, both corporate (wholly Saudi-owned companies) and individuals, and on the Saudi share of profits of companies owned jointly with foreigners. Citizens and

companies of the Gulf Cooperation Countries (GCC) who are resident in Saudi Arabia and do business in Saudi Arabia are treated as Saudis.

Zakat is calculated on capital and earnings from and on all proceeds, profits and gains from business, industry or personal work, and on property or monetary acquisitions of whatever type or description. These include commercial and financial transactions and dividends, livestock, and crops.

Specifically, Zakat is collected on the following items :

- Gold, calculated on Pure Gold and jewellery at the market value.

- Silver, silver jewellery, House hold items …, payable on silver in pure form or in the form of jewellery utensils, decorative items and all household items including crockery, cutlery made of silver at the prevailing market rates.

- Land property, payable on the properties held with an intention to sell at a future date for a profit or as an investment.

- Business stock, valued at cost price (Purchase Price Plus Transport, Insurance etc). It includes all amounts due to suppliers and loans on stock on the date of calculation.

- Partnership firms, paid whether by the firm or by the individual partners.

- Cash and Bank Balances, payable on all cash balances and bank balances in form of balance in savings account, current account or fixed deposits including monthly income certificate or term deposits.

- Loans.

- Company shares and mutual fund, calculated at quoted value on the date of Zakat calculation.

- Agricultural products : Zakat is payable on all agricultural products including fruits, commercially grown flowers, vegetables and all types of grains at the time of harvest itself.

- Animals including poultry and fish farming.

The following items are deductible from Zakat taxation : Net fixed assets and properties under construction; long-term investments in other companies and Saudi government bonds; long-term investments held outside Saudi Arabia if their earnings are reported with the Saudi operations; deferred charges; spare parts not held for resale (manufacturing); dividends distributed during the year (not to exceed the retained earnings at the beginning of the year) and adjusted deficit

Based on recent figures, Zakat funds are estimated annually around $10 billion in Saudi Arabia alone.

### 1.3. Failure to control religious money

Monitoring of charitable donations through Zakat happened to be baseless, while most of Gulf countries lack effective legal systems that impose strict rules of transparency, accounting and auditing requirements, thus turning a legal religious duty into an illegal money-laundering instrument.

The Zakat funds are controlled by the Department of Zakat and Income taxes (Directorate General of Zakat & Income Tax (DZIT) of the Saudi Ministry of Finance and National Economy. Authority of the Department is based on the Royal Decree No. 3321, dated 21/01/1370HD and the Ministerial Resolution No. 393, dated 06/08/1370H, which include instructions for organizing, auditing, and collecting "Zakat" from all Saudis obligated to pay it.

The Department duties include examining, assessing and taking necessary action to ensure payment of Zakat.

Zakat payment is individual or may be organized at each business level by a special committee that determines the recipients and channel donations to these entities.



John B. Taylor, Undersecretary of Treasury for International affairs, stated in April 2002, that to prevent terrorists from "abusing" these institutions was a main goal in the war against terrorism financing.

The Saudi kingdom in its report to the Security Council pursuant to paragraph 6 of SC resolution 1373 (2001) concerning counter-terrorism stated that "It is a basic principle of the Islamic Shariah that whatever leads to the forbidden is itself forbidden". That principle will remain baseless as far as there is no legal instrument to enforce it.

Moreover, legal measures taken by the kingdom, especially the 1976 Fund-raising for Charitable Purposes Regulation, didn't prevent misuses of Zakat funds, as acknowledged by the governor of the Saudi Arabian Monetary Agency who recognized that "some of them take their dollars and they transfer them to accounts in Europe and use it for God knows what".

In 1999, the Kingdom approved amendments to existing money laundering laws intended to bring them into compliance with international regulations, but these amendments have not been implemented.

In November 2002, Prince Salman bin Abdul Aziz said the country was not responsible if "some change the work of charity into work of evil". He stated that he had personally taken part in the activities of those organizations, "and I know the assistance goes to doing good. But if there are those who change some work of charity into evil activities, then it is not the kingdom's responsibility, nor it people, which helps its Arab and Muslim brothers around the world." The prince, King Fahd's brother, added that if beneficiaries had used assistance "for evil acts, that is not our responsibility at all".

Also in November 2002, Adel Al Jubeir, spokesman for the Saudi Kingdom acknowledged that situation by saying that "People have now taken advantage of our charity, of our generosity, of our naivety, if you want to call it that, of our innocence", and calling for a global audit of every charity in the Kingdom.

He also acknowledged the lack of real financial control. "A number of our charities, especially those operating outside Saudi Arabia did not have sufficient financial control mechanisms to ensure that the funds that were raised and that were spent actually went to where they were supposed to go" citing "a massive fraud in the name of religion".

The Kingdom of Saudi Arabia repeatedly tried to establish legal rules to govern Zakat and charities donations.

In 1994, the Saudi Kingdom issued a royal decree banning the collection of money in the Kingdom for charitable causes without official permission. King Fahd set up a Supreme Council of Islamic Affairs (al-Majlis al-A'la lil-Shu'un al-Islamiyya), headed by his brother Prince Sultan to centralize, supervise and review aid requests from Islamic groups. This council was established to control the charity financing and look into ways of distributing donations to eligible Muslim groups.

Coordination efforts have also been carried out by the Kingdom to deal with specific goals and several bodies were created over time to centralize donations for specific countries and regions.

| Agency | Creation Date |
|---|---|
| Saudi Committee for Support of Palestinians al-Quds Intifada | 1967 |
| General Donation Committee for Afghanistan | 1980 |
| High Committee for Bosnia Herzegovina | 1992 |
| Joint Relief Committee for Kosovo and Chechnya | 1998 |

Efforts to coordinate the money recipients have been largely undermined by the composition and management of these bodies. For example, the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC) included the International Islamic Relief Organization (IIRO), the Saudi Red Crescent Society, the Muslim World League, the World Assembly of Muslim Youth (WAMY), Al-Haramain Est, Islamic Endowments and Makka Est, some of which have already been designated as terrorist supports.

Between 1998 and 200, more than $74 million were diverted to local bureaus of the SJRC that happened to be controlled or to harbor terrorists, while the Committee was supposed to be supervised by the Minister of Interior, Prince Naif bin Abdul Aziz.

In June 1998, the CIA and Albanian authorities raided several houses and offices of members of an associate of the SJRC in Tirana. In July 1998, its Director Muhamed Hasan Mahmud, Egyptian national, was arrested on charges of making false documents and arms possession. He was connected to a 1992 terrorist attack against the Egyptian Parliament. Several of its members and directors were later arrested in connection with the US Embassy bombing in Kenya and Tanzania of August 1998.

Similarly, the United Nations Mission in Kosovo (UNMIK) raided a house rented by the SJRC in Pristina in April 2000, stating the organization was acting as a cover for several Usama bin Laden operatives, including SJRC former directors Adel Muhammad Sadi Bin Kazem and Wael Hamza Julaidan (Secretary General of the Rabita Trust in Pakistan and co-founder of Al-Qaida), designated as terrorist by the United States government in 2002.

Furthermore, in documents obtained from the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance, offices of the Saudi High Commission in Bosnia Herzegovina, the coordination body for charities in the country, clearly appear as a front for radical and terrorism-related activities, noting that documentation was found in 2001 "for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other)".

Through these various unsuccessful attempts to regulate or control the recipients of Zakat or donations, one must question the real ability and willingness of the Kingdom to exercise any control over the use of religious money in and outside the country.

The result of that weak policy toward donations made for so-called charitable purposes and the unwillingness of the Saudi government to consider its responsibility in that regard is a major setback in the war against terrorism financing.

According to the latest figures available, since September 11, 2001, Saudi Arabia has frozen 33 bank accounts belonging to 3 individuals for a total of $5,574,196, or less than 5% of the total amount of terrorist-related funds frozen around the world.

Saudi Arabia has repeatedly claimed to have taken steps to counter terrorism financing since September 11, 2001, as if the Kingdom discovered at that date that several of its prominent citizens were funding a terrorist organization. The Saudi cooperation in the war against terrorism financing is largely insufficient, if not inconsistent.

We don't believe in the "innocence" of the Kingdom in that respect. Saudi Arabia has been mostly negligent, and to some extent, irresponsible in letting

suspected organization to receive funds and continue their operations while being fully aware of their links to terrorists.

For example, according to documents seized by the Israeli authorities in the Palestinian territories, the Saudi Arabian Committee for Support of the Intifada al Quds was fully informed by the Palestinian officials that it was sending funds to Hamas, a terrorist organization.

In a letter written in year 2000, to the Chairman of the Saudi committee, a representative of Palestine stated that "The Saudi committee responsible for transferring the contributions to beneficiaries is sending large sums to radical committees and associations including the Islamic Association which belongs to Hamas, the Al-Atzlach Association [most likely the Al-Salah Association, a known agency of the Hamas in Gaza], and brothers belonging to the Jihad in all areas", adding that "This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody".

Similar warnings were raised in Bosnia in year 2000 by a Bosnian association called "Mothers of Srebrenica and Podrinje". In a letter to Prince Salman, it was clearly claimed that the High Committee for Bosnia Herzegovina didn't meet its goal in terms of financial help, namely accusing the director of the Sarajevo office of diverting $100 million collected after Srebrenica's fall in July 1995, for Srebrenica inhabitants.

2

## WAYS & MEANS TO EXPORT TERROR

### 2.1. The Islamic banking network, a deviated instrument of terror

Beginning in the late 1970s, Saudi Arabia and other Gulf countries settled a banking system aimed at promoting and propagation (Dawa) of Islam around the world.

In 1974 the OIC summit in Lahore voted to create the inter-governmental Islamic Development Bank (IDB). Based in Jeddah, it became the cornerstone of a new banking system inspired by religious principles. In 1975 the Dubai Islamic Bank - the first modern, non-governmental Islamic bank - was opened. In 1979 Pakistan became the first country to embark on a full Islamization of its banking sector.

The creation of the Bank of Credit and Commerce International (BCCI) in 1972, and its downfall in 1991, temporarily slowed the trend of Islamic banking. The bank main fraud scheme was to allocate large loans without real guarantee, in return for investments in the bank's capital, a practice known as "loan back". This way, the main loan beneficiaries were the shareholders themselves.

Saudi Islamic support was channeled through a complex banking system that had at its center two entities created in the early 1980s: Dar-Al-Maal Al Islami (DMI), founded in 1981 and chaired by Mohammed Al-Faisal, and Dallah-Al-Baraka, founded in 1982.

Endowed with enormous funding ($1 billion in the case of DMI), these institutions were rooted in both the Saudi kingdom's desire to spread its financial pre-eminence in the Arab world, and in its support for the radical Islamic cause. Add to that the desire, already perceptible during the inception of the BCCI, to create an international financial network capable of sustaining the economic vitality of the Arab countries in the eyes of large Western banks.

DMI, or "The House of Islamic Money", is located in Switzerland. It was created on July 29, 1981. Until October 1983, its president was Ibrahim Kamel. He was replaced on October 17, 1983, by Prince Mohammad Al Faisal Al Saud,. DMI is one of the central structures in Saudi Arabia's financing of international Islam. Its main subsidiaries are the Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, and Faisal Finance. These high-level establishments enjoy enormous power in the countries where they are settled, principally in the Gulf and Sudan.

Functioning on an Islamic method, DMI adheres to the Zakat system. After the transaction is made, the funds earmarked as Zakat disappear and are off the books. Later, under no financial regulation, the money may be used to fund radical Islamic groups.

Islamic banking institutions operate by participating in investments, sharing profits on projects, and earning fees for services performed.

One of the duties of Islamic banking institutions is to contribute and manage Zakat funds.

Relying on Islamic banking, Usama bin Laden himself, in partnership with several Saudi and Gulf Islamic banks, founded a banking institution in Sudan, Al Shamal Islamic Bank, that provided funding for terrorist operations, as confessed by several Al-Qaida members in 2001 during the US African Embassy Bombing trial.

Several banks helped transferring funds to al-Qaida through the Zakat system, by direct donations or by knowingly providing means to raise or transfer funds to the terrorist organization. Some of them even controlled the Zakat funds beneficiaries, including charities that have provided financial and logistical support to al-Qaida.

Islamic banking facilities, instruments and tools have provided an essential support to the al-Qaida organization and operations.

The banking system, whether knowingly or not, have acted as instrument of terror, to raise, facilitate and transfer money to terrorist organizations.

Governed by Islamic Law (Sharia'a) that regulates commerce and finance in the Fiqh Al Mua'malat, (transactions amongst people), modern Islamic banks are overseen by a Shari'a Supervisory Board of Islamic Banks and Institutions ("The Shari'a Committee").

At the state level, the Saudi Arabian Monetary Authority (SAMA), established in 1952, is the controlling body for the banking sector. For that purpose, it can ask a bank for any information it deems necessary and has the power to inspect accounts and records.

Since Sept. 11, 2001, SAMA has addressed circulars to Saudi banks to investigate the extent to which they may have assets belonging to the individuals and entities that appear in the lists of those suspected of having links to terrorism, and it has asked banks to scrutinize accounts and audit all financial operations that affect them.

Furthermore, SAMA instructed commercial banks to establish a Self-Supervisory Committee to closely monitor and fight terrorism funding and to coordinate all efforts to freeze the assets of the identified individuals and entities. The Committee is composed of senior officers from banks responsible for Risk Control, Audit, Money-Laundering Units, Legal and Operations, and operates in the presence of SAMA officials.

The Saudi Government has also taken steps to combat money laundering. This includes the establishment of anti-money-laundering units, with trained and dedicated specialist staff. These units work with SAMA and law enforcement agencies.

Another institutional initiative is the creation of a specialized Financial Intelligence Unit (FIU) in the Security and Drug Control Department of the Ministry of Interior. This unit is specially tasked with handling money-laundering cases.

Most of these bureaucratic measures, while creating the impression that the Saudi government is taking appropriate actions to counter terrorist funding, have proved ineffective in countering networks that can easily evade the controls.

Indeed targeting money laundering turned to be ineffective, as the practice refers to the cleaning of illegal gains from drug trafficking and other criminal activities. In contrast, the funding of terrorism involves using legitimate income to finance illegal activity, the reverse process.

Similar doubts can also be raised as to the extent of the SAMA willingness to control effectively these institutions, especially when illegal practices involve the use of Zakat funds.

For example, it was only in 1999, after several months of fierce international pressure, that SAMA directed an audit on the National Commercial Bank (NCB), chaired at the time by Usama bin Laden's brother in law, and one of his major financial support in the Kingdom. After the audit revealed several millions of dollars were diverted to terrorist organizations, its Chairman was finally replaced, but remains, along with his family, a major shareholder of the bank with a controlling vote at its board of directors.

Furthermore, several financial investigations established that the NCB was still facilitating banking transactions for terrorists after that date. The same applies to other major banks of the kingdom including Al-Rajhi Bank, Al-Baraka Bank and the Saudi American Bank (SAMBA).

## 2.2. Penetration of legitimate business sector

The confusion observed at the State level in Saudi Arabia between religious aims and financial instruments has created over the years a window of opportunities for fundamentalist organizations to consolidate and expand their reach.

The same way fundamentalists were able to penetrate charities; Al-Qaida is probably the most achieved example of terrorist organization acting under the umbrella of business entities.

The organization succeeded in building a large array of banking and corporate covers for its illegal activities in several countries.

The ability of the terrorist network to penetrate the business sector has been a major factor for moving and receiving money through legal instruments.

Operational cells of al-Qaida have been able established umbrella organizations, registered under local laws. Most of them are involved in the construction, the real estate and public building sectors. In addition, many trade companies based in Saudi Arabia provided financial support to create and run the local companies.

The legal statute of the Establishment in Saudi Arabia offers soft regulations, if any, in terms of accounting rules and legal publications.

Two examples of the abuse of legitimate businesses illustrate the ability of the terrorist organization :

The first is given by the network formed between 1983 and 1996 in Sudan, that crystallized for several years the overall spectrum of facilities and tools at bin Laden's disposal to carry out its fundamentalist goals, through banks, companies and charities. This network included the protection provided by the State itself, a permanent factor in the al-Qaida's history that explains its ability to remain an offensive organization.

When Usama bin Laden relocated to Sudan in 1991, he used its close relations with the then controlling power of Islamic leader Hasan al-Turabi, to set up several business ventures, to the extent of building symbiotic relationships with Sudanese leaders of the National Islamic Front (NIF).

In concert with NIF members, Usama bin Laden invested in several large companies and banks, and undertook civil infrastructure development projects.

The network of businesses controlled by Usama bin Laden included :

- Al Shamal Islamic Bank, funded and controlled by wealthy Saudi businessmen and bankers including Saleh Abdullah Kamel, Mohammed al-Faisal or Adel Abdul Jalil Batterjee.
- An import-export firm.
- Several agricultural companies.
- A construction company settled in connection with his family Saudi conglomerate (Saudi Binladin Group) to build roads and airport facilities in Sudan.


Theses businesses enabled Usama bin Laden to offer safe haven and employment to Al-Qaida members, to provide bank accounts to several operatives, and to finance terrorist operations and facilities, mainly training camps and arms buying.

Most notably, this network was able to carry out legal financial transactions with Western banks and financial institutions, with the guaranty of his prominent Saudi associates.

Beginning in 1999, several business associates of al-Qaida developed a money laundering scheme involving Saudi and Spanish companies, to finance several al-Qaida operational cells or supports in Europe, Middle-East and Asia, including preparatory operations for the Sept. 11th attacks on the United States.

Through several front companies described as covers for Al-Qaida operations established in Madrid, Spain, Al-Qaida sponsors were able to funnel more than $1 million  from companies and individuals based in Saudi Arabia to Germany and other Al-Qaida European cells between 1995 and 2001.

To date, this scheme represents the most direct uncovered link to the Sept. 11th attacks, regarding the operation's financing.

These companies, mainly involved in construction and real estate, were convicted in arms trafficking, credit card fraud and false documents (Credit cards fraud and car smuggling). Along with illegal activities, these entities provided financial assistance to al-Qaida. They made false financial statements and did laundered more than $2.5 million in 5 years. That amount hasn't been recovered yet by the investigators.

Several companies were used as umbrella organizations to facilitate al-Qaida operations in Europe through false contracts signed by a Saudi company controlled by Muhammad Galeb Kalaje Zouaydi, European chief financier for al-Qaida, who created several corresponding companies in Spain with several al-Qaida militants.

To date, the Saudi company, Mushayt for Trading Establishment, is still in activity and managed by several members of the Muslim Brotherhood.

The economic network maintained regular incomes for the cells in Europe or in Middle East (Germany, Italy, Yemen, Syria, and Saudi Arabia). In addition these firms employed Ex-Fighters of Islam in Chechnya or Bosnia and radical Muslims.

The network also maintained close relations with Al-Qaida members and leaders in Europe, including hijacker Mohammed Atta, Said Bahaji and Ramzi Binalshibh, all related to Osama Bin Laden.

Money was funnelled to the Hamburg cell through the Saudi Al Rajhi bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar who provided the cell of hijackers with financial and logistical support. The network of companies also facilitated in 1997 the preliminary filming of the World Trade Center that were delivered to Usama bin Laden courier in Europe.

Ghasoub Al Abrash Ghalyoun (aka Abu Musab), a Spanish cell member and business partner of Muhammad Zouaydi traveled to the United States in August 1997 to film future targets of Al-Qaida, including the World Trade Center.

In addition, Mushayt for Trading Establishment in Jeddah sheltered and supported economically other international muslim radicals, including Nabil Nanakli Kosaibati Nabil, right-hand man of the al-Qaida Spanish cell leader, convicted for terrorist activities in Yemen on behalf of Saudi intelligence services.

As Muhammad Zouaydi and most of the al-Qaida Spanish members, Kosaibati is a Spanish national of Syrian origin. He acknowledged during his trial in 1997 that he was recruited and trained to use arms and explosives by the Saudi intelligence. During his trial confession he said that the Saudi intelligence "sent him to Yemen in 1996 as an active Saudi intelligence agent".

He also acknowledged he received $150,000 from the Saudi intelligence to kill the Yemeni Foreign minister. Documents also revealed that Kosaibati received $14,000 from Muhammad Zouaydi in 1996 and 1997 while living in Sanaa, Yemen on a monthly basis at the request of a lieutenant of Usama bin Laden.

Moreover, Muhammad Zouaydi sustained Islamic charities known as al-Qaida logistical basis. For example, he sent $227.000 to Nabil Sayadi in Belgium from his company Mushayt for Trading Establishment and through the Saudi National Commercial Bank. Nabil Sayadi is leading the Fondation Secours Mondial (Global Relief Foundation) in Belgium, designated on the UN terror list since October 22, 2002.

The Spanish network has also been able to entertain business relations at the highest level of the Saudi Kingdom.

In 1999, in his capacity of advisor-minister to King Fahd of Saudi Arabia, Abdullah al Turki entered in negotiations to become business partner of Muhammad Zouaydi, al-Qaida financier for Europe, for a construction project in Madrid, Spain, worth $ 2.3 million. Both agreed to participate as business partners and a contract was written on October 1, 1999 by Muhammad Zouaydi acting as representative of the Spanish company Proyectos y Promociones ISO, stating that both parties will finance 50% of the project and split the incomes 70/30 between Abdullah al Turki and Muhammad Zouaydi. As a guaranty for the operation, Muhammad Zouaydi sent a check of $ 1.1 million on September 15, 1999 with Abdullah al Turki as beneficiary. Several documents established that both men had business relations on a regular basis until at least year 2000.

Abdullah al Turki is currently Secretary General of the Muslim World League.

In the Al Qaida European economic networks, Muhammad Zouaydi (Aka Abu Talha) represents an illustration of the legal financial support. Indeed, Zouaydi is Syrian born and Spaniard national. He's graduated in management, and passed years in Saudi Arabia as an accountant for the Royal Family. He's also the brother-in-law of Mohamed Baiahah (Aka Abu Khaled), known a personal courier of Osama Bin Laden in Europe. Finally, he founded a trading company in Saudi Arabia, where he used Waqf donations and false contracts to finance the activities of al-Qaida cells in Europe.

The Spanish scheme illustrates the high level of simplicity of terrorism financing using donations through a web of legally established companies transferring money through the Islamic Banking System, namely al-Rajhi Bank, National Commercial Bank, Faisal Islamic Bank and Saudi American Bank.
.



### 2.3. Charities as fronts

241 Saudi charity organizations are currently operating in Saudi Arabia and abroad.

These organizations receive annually between $3 billion to $4 billion, of which between 10% and 20% is sent abroad.

Resulting from confused usage of religious tools, several charities centered their efforts, not only on assisting needy around the world, but also in supporting and participating to the political goals of the few that viewed Islam as a way to combat Western influence.

Another factor that explains and facilitated this evolution is based on the fact that the most important Islamic charities around the world have been founded or are controlled by radical religious or political leaders.

<div style="border:1px solid black">

**Main Saudi charities involved in al-Qaida financing**

**Al-Haramain Islamic Foundation**
**Benevolence International Foundation (Al-Bir Society)**
**International Islamic Relief Organization (IIRO)**
**Muslim World League (MWL)**
**Rabita Trust**
**World Assembly of Muslim Youth (WAMY)**

</div>

To take a few examples, the Muslim World League was created by Said Ramadan, son of the founder of the Egyptian Muslim Brotherhood. His current spokesperson, Abdullah al Turki, is a former Minister of Religious Affairs of Saudi Arabia who was a fellow of Sheikh Abdullah Azzam, Osama Bin Laden spiritual mentor involved in the fight in Afghanistan against the Soviets in the 1980s who created the Bait ul Ansar (Mujahideen Services Bureau) in Peshawar, financed by Usama bin Laden and embryo of the al-Qaida terrorist organization.

Abdullah al Turki organized in January 2002 a conference of scholars hosted by the Islamic Jurisprudence Academy of the Muslim World League. The scholars said the anti-Muslim media campaign following the Sept. 11 attacks against the United States was "orchestrated by Zionist organizations". They stated that terrorism is not equal to Jihad, and defined a right to struggle for holy war "against occupiers … and those who renege on their commitments or prevent Muslims from peacefully preaching". "Jihad is meant for upholding right, ending injustice, ensuring peace and security and establishing mercy. Terrorism and violence committed by the aggressor who usurp the land, desecrate holy sanctuaries and loot wealth cannot be compared to the practice the right of legitimate defense as used by the oppressed seeking to gain their legitimate rights to self-determination."

The International Islamic Relief Organization (IIRO), another charitable association that receives money from the Zakat, was founded by Usama bin Laden brother-in-law.

Former al-Qaida representative in Southern Asia Omar al Faruq confessions to the US authorities show that "Al Haramain was the funding mechanism of all operations in Indonesia. Money was laundered through the foundation by donors from the Middle East". He also stated that the charity office was working under the control of a representative of Usama bin Laden.

The lack of a transparent financial practice of Saudi charities was notably established during controls of humanitarian organizations conducted by the Bosnian government.

While inspecting Al Haramain Islamic Foundation, Benevolence International Foundation, Human Appeal International, International Islamic Relief Organization Igasa, High Saudi Committee for Help to BiH, and Citizens Association the Financial police authorities concluded that it found six main irregularities in business deals of humanitarian organization. It was reported that "The main lack was an existence of proper and legal documentation about

their financial activities. Their accounting was not equal to the actual situation determined by inventories. Foreign citizens were hired without working permits, which are issued by state institutions. They mostly had cash without bank accounts and proper documentation. A significant amount of money was transferred through personal bank accounts of their employees, and there was no documentation about the way of spending of that money".

It is essentially the lack of internal regulation, along with the Kingdom inability and unwillingness to control the Islamic charities, that enabled several of them to harbor, employ or support fundamentalists abroad, using or abusing their statute.

3

# CHALLENGES AHEAD IN THE WAR
# AGAINST TERRORISM FINANCING

## 3.1. Cultural challenge : Recognize changes in terrorism nature and organization

Combating al-Qaida terrorism financing has imposed and still imposes to States and International Organizations a dramatic shift in their behavior of the terrorism's organizational and structural trends.

Al-Qaida has proven to be a more sophisticated network, though more decentralized, combining largely autonomous cells and structures. In that regard, the terrorist organization is more a confederation of individuals and entities, than an organized body of procedures and hierarchies.

Aside from bureaucratic obstacles, political or analytical blindness, the principal factor that explains the contrasted response to the fundamentalist phenomenon since September 11, 2001, is cultural. This was in evidence during a hearing before Congress in 2002, when a US official stated that "it would be a mistake to dismiss the possibility of state-sponsorship whether Iranian or Iraqi" concerning the attacks of September 11. As if the myth of state terrorism, of which Al-Qaida is precisely the counterexample, continued to enjoy favor in government circles. Operationally we know it is on its way out, yet it continues to hold sway as a political argument—as if nothing had changed since the  Cold War, as if bin Laden had never breached the narrow frontiers of the states, as if we were incapable of taking into account the considerable mutation of terrorism in the past twenty years.

After the military offensive on Afghanistan, the decentralized nature of al-Qaida proved to be a major advantage for the structure to reorganize.

Combating al-Qaida financing turns to a multinational war that has nothing to compare with other actions against terrorist organizations in the past.

Culturally, law enforcement agencies and officials face a dramatic change as they were used to deal with organized structures or State-sponsored organization. Al-Qaida defies the common understandings of traditional terrorism.

## 3.2. Political challenge : Choose your allies

The reality is that al-Qaida is progressively reconstituting, multiplying the selective acts intended to rebuild its operational bases and that in parallel it gathers its militants in several countries such as Pakistan, Yemen, Indonesia or Sudan. Benefiting from the weakness of legal authorities, and sometimes from its benevolence or porosity to the fundamentalist ideas.

This situation is particularly marked in countries which experienced a cultural Islamism, especially Pakistan which knows a Algerian-type situation, where the

border becomes fuzzy between the official organizations and the terrorist organizations.

The reluctance of Pakistan to act against several Islamic Schools (Madrassa) or to ban Islamic fundamentalist organizations, illustrates its benevolent behavior toward radical Islam.

From confusion to collusion, those countries turn to be more sanctuaries for al-Qaida than real law-enforcers of an international coalition against it.

How can a war against terrorism succeed while the United States have excluded or preserved countries such as Saudi Arabia or Pakistan, which tolerated the emergence of fundamentalism, sometimes instrumentalized their goal, and today become their sanctuaries.

Preventing to address this issue and cutting that Gordian knot in the fight against terrorism, it is to fear that the situation will continue, with a larval terrorism which won't loose its religious bases, nor its logistical and financial supports.

### 3.3. Financial challenge : To disrupt terrorism is to disrupt its sources

Al-Qaida financial sources mostly involve legal businesses and transfer procedures. Countering theses sources essentially implicates willingness to confront them.

One single example may explain the risks of a counter-terrorism policy contained by political, diplomatic or economic arguments.

On December 4, 2001, within the framework of the fight against the financial networks of terrorism, the United States announced the freezing of assets of several charitable in the United States and of two Palestinian financial companies believed to be support structures for the Hamas terrorist movement. One among these, the banking institution al Aqsa International Bank, was described as the "financial branch of Hamas" by the American authorities. Since 1998, however, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—al Asqa's partner in the United States—to warn its directors of the nature of the bank's activities. According to the Israelis, monies destined for Hamas originated from the U.S.-based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen as part of the same measures taken in December 2001.

Yet, the financial sources and shareholders of the bank were not designated. The bank was established with $20 million in capital by several prominent financial groups or institutions, notably the Jordan Islamic Bank and the Saudi Dallah al Baraka. The Jordan Islamic Bank is the property of the Dallah al Baraka Group, led by Saleh Abdallah Kamel, shareholder of the same bank Usama bin Laden funded in Sudan via local trustees and companies.

Jordan Islamic Bank, a Dallah al-Baraka subsidiary, owns 14 percent of Al-Aqsa, according to al-Aqsa's acting general manager, Mohammed Sarsour, In a

statement, Saleh Abdullah Kamel acknowledged that Dallah al-Baraka owns another 12 percent directly.

Since now, no financial measure has been taken against the assets of this Saudi shareholder, reducing the reach of the war against terrorism financing, as far as the financial sources usually use complex and multiple channels of investment.

Focusing on the end-users entities and individuals is important, but the main objective of the war against those networks is to disrupt the entire chain of financing, including their sources.

### 3.4. Legal challenge : State responsibility toward international peace and security

Sooner or later, the international community will have to face and assess cases of states who negligently failed to prevent terrorist acts.

It is a basic international law principle that prohibits wrongful acts of the state. It is the case when a conduct (whether action or omission) is attributable to a state, such as the unlawful use of force against another state or damage to the territory of another state. This principle has been set in the Chorzow Factory case by the Permanent Court of International Justice (PCIJ) in 1928.

Several principles are founding state responsibility and imputability in international law.

Imputability results from acts committed by the state government, official authorities and entities. It was extended over the time to the acts committed outside the scope of an authority if the state provided means and facilities to accomplish the act, acts of the state even if authority exceeded its competence, and acts of private individuals if acting on behalf or with the consent of the state.

The internationally wrongful act qualification results from a violation of the international law, even if the act is lawful internally.

At least three principles or international legal standards may usefully support the responsibility of Saudi Arabia, especially treaties and international law principles preventing the support and financing of terrorism, specifically UN Security Council Resolution 1373 of September 28, 2001 and UN Security Council Resolution 1269 of October 19, 1999, calling upon all states to "prevent and suppress in their territories through all lawful means the preparation and financing of any acts of terrorism".

These resolutions were adopted under Chapter VII of the United Nations Charter, and are therefore binding on all UN member states.

The 1999 International Convention for the Suppression of the Financing of Terrorism, signed by Saudi Arabia and entered into force on April 10, 2002, is consistent as a basis for Saudi responsibility, even if not yet ratified by this state, as it was adopted pursuant to UN Resolutions adopted under Chapter VII.

The convention considers not only the direct and indirect support but also the incitement and attempt to finance terrorist organizations as a wrongful act of international law, and the negligence in taking adequate measures against terrorism financing.

Furthermore, Saudi Arabia is also a party to the Convention of the Organization of the Islamic Conference on Combating International Terrorism adopted on July 1, 1999, which contains requirements to prevent and combat terrorist crimes, specifically in Article 3 (A) 1, stating that States shall see to "barring their territories from being used as an arena for planning, organizing, executing terrorist crimes or initiating or participating in these crimes in any form; including preventing the infiltration of terrorist elements or their gaining refuge or residence therein individually or collectively, or receiving hosting, training, arming, financing or extending any facilities to them".

This legal issue is fundamental in dealing with a state that doesn't fully apply and effectively implement international or common prevention statutes and principles regarding terrorism.

## CONCLUSION

The war against terrorism financing relies on international cooperation and thus, on common accepted rules, objectives and motives. It also relies on a common consideration of the nature of the threat.

The international community partly failed to address the issue of al-Qaida financing because the Saudi administrative and governmental apparatus is still largely depend upon the religious base of the regime.

Although it may be sincere in expressing its willingness to cooperate in the war against terrorism, the Kingdom faces severe internal resistance from its religious branch to act decisively against funding networks, and lacks the most primary tools to counter abuses.

The few tools lately established by the Kingdom mostly address the issue of money laundering but failed to effectively counter the influence and supports of al-Qaida in the Kingdom.

New tools and new methods would be required to fight these sources of terror financing in the Kingdom, mostly to ensure transparency and effective sanctions.

Without clear and severe regulations, several instruments used by the Saudi financial system turn to be perfect tools for terrorists.

The Kingdom must also face its history and errors in acknowledging it has supported or at least facilitated by negligence the funding of the al-Qaida terrorist network, along with funding those who were giving them refuge.

To that extent, the Kingdom faces growing responsibility if it remains unable to restore, implement or control legitimate religious principles and legal financial and banking regulations.

It will also continue to face legitimate questions and give relevance to comments such as "the possibility that a foreign government provided support" to the September 11th attacks, as recently expressed by US Senator Bob Graham, Chairman of the Senate Select Intelligence Committee.

**MEASURES TO ENFORCE
CONTROL AND REGULATION OF ZAKAT FUNDS,
CHARITIES AND TERRORISM FINANCING**

❖ Effective sanctions mechanism against individuals and entities financially supporting terrorism, including shutting down of businesses,

❖ Establishment of a non-religious control over recipients of Zakat,

❖ Increase Zakat allocated for specific humanitarian & relief projects (through an annual list of designated projects) to limit general Zakat money to organizations,

❖ Harmonization of the Saudi accounting practices and regulations with the International Financial Reporting Standards and International Accounting Standards,

❖ Ban on Zakat to designated or suspected entities (UN, OFAC/SDN…),

❖ Ban on cash donations for Zakat money,

❖ Ban on Zakat money abroad from non-residents,

❖ Ban on donations made for companies,

❖ Establishment of accounting regulations for charity and relief organizations,

❖ Annual publication of donors of Zakat funds received by charity and relief organizations.

❖ Adaptation of the Establishment statute to avoid use of companies for charitable purposes.

❖ Ratification of the 1999 International Convention for the Suppression of the Financing of Terrorism