# EXHIBIT 13

Former director and senior director for counterterrorism, National Security Council

# DANIEL BENJAMIN
# STEVEN SIMON

# THE AGE OF SACRED TERROR

Long before September 11, 2001, Steven Simon and Daniel Benjamin warned publicly of a massive terrorist strike against America. They were not voices from the fringe; they had been the directors of the White House's counterterrorism program. Their warnings were ignored. Now they have written the definitive book on radical Islam's war against America, from its deep origins to our long struggle ahead.

FOR HENRIKE

—

FOR VIRGINIA

Copyright © 2002 by Daniel Benjamin and Steven Simon

All rights reserved under International and Pan-American Copyright Conventions. Published in the United States by Random House, Inc., New York, and simultaneously in Canada by Random House of Canada Limited, Toronto.

RANDOM HOUSE and colophon are registered trademarks of Random House, Inc.

Grateful acknowledgment is made to Mark Russell for permission to reprint lyrics from his original song "Wag the Dog," as performed on *Crossfire*, Sept. 7, 1998. Words and music copyright © 1998 by Mark Russell. Reprinted by permission of Mark Russell.

ISBN 0-375-50859-7

Random House website address: www.atrandom.com

Printed in the United States of America on acid-free paper

2 4 6 8 9 7 5 3

First Edition

*Book design by Casey Hampton*

States was getting, the reception to the delegation's inquiries into financial matters alternated between cool and uncomprehending. The Saudis were particularly recalcitrant. The first conversation the team had with Saudi officials was to let them know what Rick Newcomb's OFAC could do—how it could designate noncooperative entities as being themselves supporters of terrorism. Another meeting made clear that while the message might be getting through, Saudi cooperation was not going to be readily forthcoming. Saudi Interior Ministry officials and bank regulators met Newcomb's team for what the Americans were told was an unprecedented joint gathering—the two Saudi groups never worked together. When the Americans inquired about the Maktab al-Khidmat, they were routinely told that no one had ever heard of it. Everyone the U.S. team met with greeted them with assurances of assistance in the war against terror. But when the conversation got going, the Arab officials would quickly point out that Hamas was a perfectly legitimate organization and nothing would be done to affect its finances. Similarly, they argued, no one should expect that Muslims would stop contributing to those fighting in, for example, Chechnya. The argument that donations for the mujahidin in Chechnya were also funding the terrorists in Afghanistan did not register. The team's initial sense that cutting off al-Qaeda's finances was going to be a challenge was amply confirmed: Saudi Arabia and the UAE had virtually no financial regulatory system and there was no oversight of charities. Even what they thought would have been the clearest of all issues was murky. "In Saudi, the most interesting discussion was a historical one," Wechsler recalls. "It was about the amount of money [Usama bin Laden] got from his parents. They said there was a 'legal' break with the family, but this wasn't Anglo-Saxon law and there were no documents." In other words, the size of bin Laden's inheritance was unknown, and subsequent infusions of family money could not be ruled out. When the discussion turned to other Saudis who might be involved in financing al-Qaeda, says Wechsler, "the more you talked about anyone who had a lot of money, the more freaked out

In July 1999, the United States also ratcheted up the pressure on the Taliban. On July 4—the same day he met with Nawaz Sharif—Clinton issued an executive order placing unilateral economic sanctions on the Kandahar regime, freezing its assets, and prohibiting commercial exchange with the Taliban or any entity in the area it controlled. U.S. trade with Afghanistan was almost nonexistent, so the impact was largely symbolic. (The United States imported insignificant amounts of dried fruit and rugs, and the Afghans were trying to buy a cellular-phone system from an American company.) The sanctions did put another obstacle between the Taliban and Afghanistan's gold reserves, which were worth more than $220 million and remained on deposit with the Federal Reserve, no claim by any of the rival Afghan groups having been recognized as valid. When that did not move the Taliban to be more cooperative, the administration issued further sanctions against Ariana, Afghanistan's national airline, for transporting terrorists, their matériel, and their funds. Ariana kept money in a Citibank branch in India, so those accounts were frozen. The impact was magnified when the administration convinced airports around the world that allowing Ariana to land would have serious consequences for them, including possibly designation as a terrorist entity. That inflicted pain on the Taliban because Ariana was its only connection to the Gulf, where Afghan finances were centered and Afghan narcotics—one of the mullahs' few sources of revenue—were shipped. In October, the United States scored a harder blow when the UN Security Council unanimously adopted sanctions identical to those America had in place. The ease with which Resolution 1267 passed astonished the U.S. diplomats who worked on it. The Security Council had been stuck in gridlock for many months, especially on sanctions issues, and such broad agreement from the Russians, the Chinese, and the rest of the Council was a rare, happy surprise. Humanitarian assistance and food were exempted, as they had been under the American sanctions. The Taliban and its supporters quickly signaled

reports were received, snap meetings were held in the Situation Room, and on plenty of occasions White House officials drove to Langley to discuss issues ranging from terrorist finances to intelligence about weapons of mass destruction. The intelligence world, however, has fences within fences and rooms within rooms that only the most senior White House policy makers may enter; the secrecy is usually for good reasons pertaining to operational security and the protection of sources. Of the areas that outsiders are barred from entering, none is better sealed than the Directorate of Operations' handling of its human assets and the spending of its money. The White House told George Tenet on several occasions that covert operations against al-Qaeda should not be limited because of resources. The CIA would never get everything in the world it wanted—no agency does—but for stopping bin Laden, there would be no stinting. Jack Lew, who was the director of the Office of Management and Budget in the late 1990s, remembers that "the numbers [for covert action] were always small compared to technology and U.S. employee costs", and the message to the Agency was clear: "Money was not the constraint." Whether the message was understood—whether, in fact, the CIA was distributing sufficient cash to enough people—was not something NSC directors or senior directors could ascertain. There is a saying bureaucrats use when the White House becomes too intrusive or inquisitive: "Don't get in our knickers." This was a classic "don't get in our knickers" situation. Whether the Directorate of Operations was making full use of the resources on offer is impossible to say. Some close to the issue today are skeptical.

By mid-1999, the understanding in the White House of al-Qaeda was deepening. Something that had not been clear at first was that the movement's strategy embraced not only terror but also territorial conquest. Beyond Afghanistan itself—where, it was becoming evident, bin Laden's organization was backing the Taliban with cash and loaned detachments of fighters—the group also supported insurrections in Central Asia and the Caucasus. Fighters from the Islamic Movement of

Uzbekistan, who had trained in al-Qaeda camps in Afghanistan, skirmished in Uzbekistan with troops belonging to the government of President Islam Karimov. On a single day in February, the conflict turned more ominous when the IMU set off six car bombs, including one that just missed Karimov himself. That summer, Islamists, including some from the bin Laden orbit, mounted a surprise rebellion in the Russian region of Dagestan and called for the creation there of an Islamic republic. When the Russians had trouble quelling the uprising, the fighting spread to Chechnya, igniting another round of military action in that republic's long-running tragedy. Regional experts were taken aback by the events, because they believed that the Chechens themselves were not eager to renew hostilities with Russia, but the cycle of attack and reprisal drew both sides in. The Russians responded with a massive bombing campaign and, eventually, more ground forces. American revulsion at another wave of Russian brutality in the region caused a chill in relations between the two countries. The episode provided a lesson in how the Islamist forces could wreak havoc not only in their immediate surroundings but also in relations between former Cold War antagonists who were trying to arrive at a better modus vivendi.

At the same time, several elements of Washington's strategy to stop al-Qaeda were in place and showing progress. Intelligence operations outside of Afghanistan continued to roll up terrorist cells on several continents. The $1.1 billion worldwide upgrade of security at embassies was well under way. Efforts to cut off bin Laden's finances were also progressing. Having mapped important nodes in the financial network, Rick Newcomb, Will Wechsler, and others on their interagency team flew to the Persian Gulf in June to meet with Finance Ministry, intelligence, and law-enforcement officials in Saudi Arabia and the UAE. The purpose of the trip was to put the two governments on notice that assistance was needed and that U.S. pressure to deal effectively with those who fund terrorism would grow. Despite all the intelligence cooperation the United