# EXHIBIT A

# United States District Court
### For the District of Columbia

Federal Insurance Company, et al.

**v.**

Al-Qaida, et al.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 03-CV-6978(RCC)
(Southern District of New York)

**TO:** Ms. Kathy Hays, Custodian of Records
Riggs National Bank, N.A.
800 17th Street, NW, 7th Floor
Washington, D.C.  20006

YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

X    YOU ARE COMMANDED   to produce and permit inspectio n and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A attached.

| PLACE | DATE AND TIME |
|---|---|
| Cozen O'Connor | April 30, 2004 |
| 1667 K Street, N.W. | 5:00 p.m. |
| Suite 500 | |
| Washington, D.C.  20006 | |

YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designæe one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* attorney for plantiff | 3/29/2004 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Matthew H. Ash, Esquire
1667 K Street, NW, Suite 500, Washington, D.C. 20006   (202) 912-4830

## PROOF OF SERVICE

| SERVED | DATE | PLACE | |
|--------|------|-------|--|
| SERVED ON (PRINT NAME) | | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | | TITLE: |

## DECLARATION OF SERVER

I declare under penalty of perjury under the United States of America that the foregoing information contained in the Proof of Service is true and correct

Executed on

DATE                                        SIGNATURE OF SERVER

_____

ADDRESS OF SERVER

_____

---

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The *court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.*

(2)(A) A *person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.*

(b) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the *party or attorney designated in the subpoena written objection to inspection or copying of any or all the designated materials or of the premises. If objection is made, the party servicing the subpoena may, upon notice to the person commanded to produce, more at any time for any order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.*

(3)(A) On timely motion, the court by which subpoena was issued shall quash or modify the subpoena if it
    (i) fails to allow reasonable time for compliance;
    (ii) requires a person who is not a party or an officer of a party to travel to place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the *provisions of clause (c)(3)(iii) of this rule, such a person may in order to attend trial be commanded to travel from*

any such place within the state in which the trial is held, or
    (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
    (iv) subjects a person to undue burden.
(B) If a subpoena

    i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
    (ii) requires disclosure of any unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance to production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT "A"
## To Subpoena Duces Tecum Served On
## Riggs National Bank

*As used herein, the term "Prince Bandar Bin Sultan" shall mean Prince Bandar Bin Sultan Bin Abdulaziz Al-Saud, Ambassador of the Kingdom of Saudi Arabia to the United States, and/or his agents, employees, attorneys and/or persons purporting to act on his behalf, and/or any Trust or other fund established for the benefit of Prince Bandar Bin Sultan Bin Abdulaziz Al-Saud.*

*As used herein, the term "you" shall mean Riggs National Bank, its representatives, agents, employees and affiliates.*

*As used herein, the term "Document" shall mean the original or any non-identical copy of any written, printed, typed, photographed or other graphic or electronically recorded matter of any kind or nature prepared or received by, or in the possession, custody or control of the answering party, its agents, servants, employees or other representatives.*

*Unless otherwise specified, the documents specified below are required for the time period commencing January 1, 1991 and continuing through the present.*

*Copies of documents may be served before April 30, 2004 on:*

<div align="center">

Matthew G. Ash, Esquire
Cozen O'Connor
1667 K Street, N.W.
Suite 500
Washington, D.C. 20006
(202) 912-4830

</div>

*Said Custodian of Records for Riggs National Bank is required to produce the following documents and other items, as specified below, which are in the possession, custody or control of Riggs National Bank and/or any of its predecessors in interest, or which were at one time under the possession, custody or control of Riggs National Bank's predecessors in interest but have since been turned over to Riggs National Bank:*

(1)    Any and all documents pertaining to Riggs National Bank accounts held either exclusively and/or jointly by Prince Bandar Bin Sultan, including but not limited to, monthly account statements, annual account statements, deposits, withdrawals, deposit slips, check stubs, cleared or cancelled checks, disbursement checks, receipts, account notices;

(2)    Any and all documents, including but not limited to, wire transfer memos, debit slips, credit slips, confirmations, correspondence, or the like, showing the source(s) and/or destination(s) of any funds deposited into or withdrawn from a Riggs National Bank account held either exclusively and/or jointly by Prince Bandar Bin Sultan, from January 1, 1991 through the present;

(3)     All documents, including but not limited to, correspondence, letters, memoranda, notes, and e-mails, that refer to, relate to or reflect any and all communications (oral and/or written) occurring after January 1, 1991, between or among you and Prince Bandar Bin Sultan.

(4)     Any and all documents indicating those persons and/or entities that: (i) have direct beneficial ownership and/or interest in a Riggs National Bank account held either exclusively and/or jointly by Prince Bandar Bin Sultan; (ii) have signatory authority for a Riggs National Bank account held either exclusively and/or jointly by Prince Bandar Bin Sultan.

(5)     All other documents in your possession, custody or control that refer to or relate to Prince Bandar Bin Sultan.

PHILA1\2019680\1 117430.000

2

# United States District Court
### For the District of Columbia

Federal Insurance Company, et al.
                    **v.**
Al-Qaida, et al.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 03-CV-6978(RCC)
(Southern District of New York)

**TO:**  Ms. Kathy Hays, Custodian of Records
         Riggs National Bank, N.A.
         800 17th Street, NW, 7th Floor
         Washington, D.C.  20006

   YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

[X]    YOU ARE COMMANDED   to produce and permit inspectio n and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

   See Exhibit A attached.

| PLACE | DATE AND TIME |
|---|---|
| Cozen O'Connor<br>1667 K Street, N.W.<br>Suite 500<br>Washington, D.C.  20006 | April 30, 2004<br>5:00 p.m. |

   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE(INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) _(signature)_ atty for plaintiff | DATE 3/29/2004 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Matthew G. Ash, Esquire
1667 K Street, NW, Suite 500, Washington, D.C. 20006  (202) 912-4830

## PROOF OF SERVICE

| SERVED | DATE | PLACE | |
|---|---|---|---|
| SERVED ON (PRINT NAME) | | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | | TITLE: |

## DECLARATION OF SERVER

I declare under penalty of perjury under the United States of America that the foregoing information contained in the Proof of Service is true and correct

Executed on

| DATE | SIGNATURE OF SERVER |
|---|---|
| | |
| | ADDRESS OF SERVER |

---

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and coping of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(b) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all the designated materials or of the premises. If objection is made, the party servicing the subpoena may, upon notice to the person commanded to produce, more at any time for any order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which subpoena was issued shall quash or modify the subpoena if it
    (i) fails to allow reasonable time for compliance;
    (ii) requires a person who is not a party or an officer of a party to travel to place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(iii) of this rule, such a person may in order to attend trial be commanded to travel from

any such place within the state in which the trial is held,or
    (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
    (iv) subjects a person to undue burden.
(B) If a subpoena

    i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
    (ii) requires disclosure of any unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena    or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance to production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**EXHIBIT "A"**
**To Subpoena Duces Tecum Served On**
**Riggs National Bank**

*As used herein, the term "Saudi Embassy" shall mean the Saudi Arabian Embassy to the United States, and/or its agents, employees, attorneys and/or persons purporting to act on its behalf, and/or any Trust or other fund established for the benefit of the Saudi Arabian Embassy to the United States.*

*As used herein, the term "you" shall mean Riggs National Bank, its representatives, agents, employees and affiliates.*

*As used herein, the term "Document" shall mean the original or any non-identical copy of any written, printed, typed, photographed or other graphic or electronically recorded matter of any kind or nature prepared or received by, or in the possession, custody or control of the answering party, its agents, servants, employees or other representatives.*

*Unless otherwise specified, the documents specified below are required for the time period commencing January 1, 1991 and continuing through the present.*

*Copies of documents may be served before April 30, 2004 on:*

Matthew G. Ash, Esquire
Cozen O'Connor
1667 K Street, N.W.
Suite 500
Washington, D.C. 20006
(202) 912-4830

*Said Custodian of Records for Riggs National Bank is required to produce the following documents and other items, as specified below, which are in the possession, custody or control of Riggs National Bank and/or any of its predecessors in interest, or which were at one time under the possession, custody or control of Riggs National Bank's predecessors in interest but have since been turned over to Riggs National Bank:*

(1)     Any and all documents pertaining to Riggs National Bank accounts held either exclusively and/or jointly by the Saudi Embassy, and which are subject to the investigation conducted by the U.S. Treasury Department's Office of the Comptroller of the Currency, as discussed in the attached newspaper article from the Wall Street Journal.

(2)     Any and all documents pertaining to Riggs National Bank accounts held either exclusively and/or jointly by the Saudi Embassy, including but not limited to, monthly account statements, annual account statements, deposits, withdrawals, deposit slips, check stubs, cleared or cancelled checks, disbursement checks, receipts, account notices.

(3)     Any and all documents, including but not limited to, wire transfer memos, debit slips, credit slips, confirmations, correspondence, or the like, showing the source(s) and/or destination(s) of any funds deposited into or withdrawn from a Riggs National Bank account held either exclusively and/or jointly by the Saudi Embassy, from January 1, 1991 through the present.

(4)     All documents, including but not limited to, correspondence, letters, memoranda, notes, and e-mails, that refer to, relate to or reflect any and all communications (oral and/or written) occurring after January 1, 1991, between or among you and the Saudi Embassy.

(5)     Any and all documents indicating those persons and/or entities that: (i) have direct beneficial ownership and/or interest in a Riggs National Bank account held either exclusively and/or jointly by the Saudi Embassy; (ii) have signatory authority for a Riggs National Bank account held either exclusively and/or jointly by the Saudi Embassy.

(6)     All other documents in your possession, custody or control that refer to or relate to the Saudi Embassy.

PHILA1\2039140\1 117430.000

2

## Probe of Saudi Embassy Widens

U.S. Regulators Scrutinize
Many Bank Transactions
Not Properly Recorded

By **GLENN R. SIMPSON**
**Staff Reporter of THE WALL STREET JOURNAL**
January 14, 2004

WASHINGTON -- U.S. federal banking regulators looking into the Saudi Arabian Embassy's bank accounts are examining numerous transactions, totaling tens of millions of dollars in cash, that weren't properly reported, according to documents and interviews with lawyers and regulators.

While the U.S. investigation into the Saudi accounts was previously known, the discoveries at Riggs National Corp. show it is far broader than previously disclosed. When the inquiry began in 2002, it focused on only a few thousand dollars thought to be indirectly related to the Sept. 11, 2001, terrorist attacks. Now investigators are trying to account for millions of dollars in hard-to-trace cash.

Riggs repeatedly failed in 2001 and 2002 to file suspicious-activity reports related to cash transactions in the low tens of millions of dollars in Saudi accounts, said people familiar with the matter. While the basics of the large cash transactions were reported, the Treasury Department's Office of the Comptroller of the Currency accused the bank of failing to analyze the transactions for suspicious characteristics, as money-laundering rules require. In July, after the transactions were discovered, Treasury imposed unusually stringent controls and changes on the Washington bank holding company, according to investigators.

It is unusual for the U.S. to scrutinize the finances of a close ally such as Saudi Arabia. But since Sept. 11, the Justice and Treasury departments have been trying to track the origins and destinations of money brought by the Saudis to the U.S. to fund schools, mosques, charities and Islamic groups, some of which are considered extremist by the U.S.

Saudi representatives acknowledged past problems with weak controls on cash, but insisted there was no wrongdoing. They declined to comment further.

Some of the Saudi accounts are in the names of the country's diplomats, including the nation's ambassador to the U.S., Prince Bandar bin Sultan. The Saudis have waived their right of sovereign immunity and given investigators access to the accounts. The embassy also has pledged to overhaul its finances and to give U.S. law enforcement regular access to information about the charities and Islamic causes that receive funding.

"We've talked to them about it, and they have committed to us to be more careful about what they're doing," a senior U.S. official said.

Riggs officials, while conceding that the bank may face fines or other measures, said they have upgraded technology, changed procedures, and hired a new expert to fight money laundering.

"From the moment we learned of the OCC's findings, we have taken them very seriously, and we have been commended by government banking regulators for our responsiveness and cooperation," Riggs said.

The Treasury's Financial Crimes Enforcement Network continues to review the Riggs matter for possible violations of money-laundering law, said lawyers and officials. A parallel investigation by the Federal Bureau of Investigation is seeking to trace the flow of money to Islamic groups from Saudi Arabia.

Saudi officials said much of the money under examination is used for travel and medical treatment for Saudi citizens. But they have promised to curtail spending on Islamic causes.

Before Sept. 11, U.S. officials often turned a blind eye to the preference of many wealthy Saudis for carrying cash. Saudi diplomats often obtain large quantities of cash before a trip, then redeposit most of it in the bank upon their return, generating heavy turnover in accounts.

The inquiry began after investigators in 2002 found indications that funds from the Riggs account of Princess Haifa al Faisal, wife of Prince Bandar, ended up with two Sept. 11 hijackers. The Saudis insist the money was intended for charity, and investigators have no reason to suspect that Princess Haifa intended to aid the Sept. 11 plot.

While Riggs disclosed the Treasury sanctions in a public statement last summer, it didn't mention the Saudis. The comptroller ordered Riggs to "implement systems and controls to identify potentially suspicious transactions." Suspicious-activity rules require banks to analyze large cash transactions and determine, for instance, whether individuals involved are known to the bank. Riggs also was ordered to create a written program to review large cash purchases of money orders and cashier's checks.

Money-laundering experts said the order's language suggests that there were big problems at Riggs. "It looks to me like they had a total breakdown in the antimoney-laundering systems -- if they had any," said Robert Serino, former director of enforcement for the comptroller's office.

Riggs, founded in 1842, is Washington's biggest local bank. It handles the bulk of the city's diplomatic accounts, a niche market that revolves around relationships and discretion. In previous examinations, regulators had determined that the bank complied with money-laundering rules.

Riggs says it has upgraded technology and improved procedures. To lead the changes, Riggs hired David Caruso, a money-laundering expert formerly with KPMG LLP. Riggs said it has outsourced its internal auditing, hired a team of former U.S. Secret Service agents who specialize in money laundering, and hired other experts to set up a new monitoring system for suspicious activity.

"Riggs senior management, without caviling, went about remaking Riggs compliance systems with vigor, and now they have good compliance systems in place in this area," said Riggs consultant Eugene Ludwig, a former comptroller.

**Write to** Glenn R. Simpson at glenn.simpson@wsj.com <mailto:glenn.simpson@wsj.com>

# United States District Court

### For the District of Columbia

Federal Insurance Company, et al.

<div align="center"><b>v.</b></div>

Al-Qaida, et al.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 03-CV-6978(RCC)
(Southern District of New York)

**TO:**  Ms. Kathy Hays, Custodian of Records
Riggs National Bank, N.A.
800 17th Street, NW, 7th Floor
Washington, D.C.  20006

YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

[X]   YOU ARE COMMANDED   to produce and permit inspectio n and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

   See Exhibit A attached.

| PLACE | DATE AND TIME |
|---|---|
| Cozen O'Connor<br>1667 K Street, N.W.<br>Suite 500<br>Washington, D.C.  20006 | April 30, 2004<br>5:00 p.m. |

YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE(INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]*  attorney for plaintiff | 3/29/2004 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Matthew G. Ash, Esquire
1667 K Street, NW, Suite 500, Washington, D.C. 20006  (202) 912-4830

## PROOF OF SERVICE

| SERVED | DATE | PLACE |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE: |

## DECLARATION OF SERVER

I declare under penalty of perjury under the United States of America that the foregoing information contained in the Proof of Service is true and correct

Executed on

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and coping of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(b) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all the designated materials or of the premises. If objection is made, the party servicing the subpoena may, upon notice to the person commanded to produce, more at any time for any order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held,or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of any unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance to production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT "A"
### To Subpoena Duces Tecum Served On
### Riggs National Bank

*As used herein, the term "Princess Haifa" shall mean Princess Haifa Al-Faisal, wife of Prince Bandar Bin Sultan Bin Abdulaziz Al-Saud, Ambassador of the Kingdom of Saudi Arabia to the United States, and/or her agents, employees, attorneys and/or persons purporting to act on her behalf, and/or any Trust or other fund established for the benefit of Princess Haifa Al-Faisal.*

*As used herein, the term "you" shall mean Riggs National Bank, its representatives, agents, employees and affiliates.*

*As used herein, the term "Document" shall mean the original or any non-identical copy of any written, printed, typed, photographed or other graphic or electronically recorded matter of any kind or nature prepared or received by, or in the possession, custody or control of the answering party, its agents, servants, employees or other representatives.*

*Unless otherwise specified, the documents specified below are required for the time period commencing January 1, 1991 and continuing through the present.*

*Copies of documents may be served before April 30, 2004 on:*

<div align="center">

Matthew G. Ash, Esquire
Cozen O'Connor
1667 K Street, N.W.
Suite 500
Washington, D.C. 20006
(202) 912-4830

</div>

*Said Custodian of Records for Riggs National Bank is required to produce the following documents and other items, as specified below, which are in the possession, custody or control of Riggs National Bank and/or any of its predecessors in interest, or which were at one time under the possession, custody or control of Riggs National Bank's predecessors in interest but have since been turned over to Riggs National Bank:*

(1)     Any and all documents pertaining to Riggs National Bank accounts held either exclusively and/or jointly by Princess Haifa, including but not limited to, monthly account statements, annual account statements, deposits, withdrawals, deposit slips, check stubs, cleared or cancelled checks, disbursement checks, receipts, account notices;

(2)     Any and all documents, including but not limited to, wire transfer memos, debit slips, credit slips, confirmations, correspondence, or the like, showing the source(s) and/or destination(s) of any funds deposited into or withdrawn from a Riggs National Bank account held either exclusively and/or jointly by Princess Haifa, from January 1, 1991 through the present;

(3)     All documents, including but not limited to, correspondence, letters, memoranda, notes, and e-mails, that refer to, relate to or reflect any and all communications (oral and/or written) occurring after January 1, 1991, between or among you and Princess Haifa.

(4)     Any and all documents indicating those persons and/or entities that: (i) have direct beneficial ownership and/or interest in a Riggs National Bank account held either exclusively and/or jointly by Princess Haifa; (ii) have signatory authority for a Riggs National Bank account held either exclusively and/or jointly by Princess Haifa.

(5)     All other documents in your possession, custody or control that refer to or relate to Princess Haifa.

PHILA1\2028339\1 117430.000

2

# United States District Court

## For the District of Columbia

Federal Insurance Company, et al.

v.

Al-Qaida, et al.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 03-CV-6978(RCC)

(Southern District of New York)

TO:  Ms. Kathy Hays, Custodian of Records
Riggs National Bank, N.A.
800 17th Street, NW, 7th Floor
Washington, D.C.  20006

YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

[X]   YOU ARE COMMANDED   to produce and permit inspectio n and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A attached.

| PLACE | DATE AND TIME |
|---|---|
| Cozen O'Connor<br>1667 K Street, N.W.<br>Suite 500<br>Washington, D.C.  20006 | May 7, 2004<br>5:00 p.m. |

YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE(INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* G. Ash, Atty for Plaintiff | 4/9/04 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Matthew G. Ash, Esquire
1667 K Street, NW, Suite 500, Washington, D.C. 20006   (202) 912-4830

## PROOF OF SERVICE

| SERVED | DATE | PLACE | |
|---|---|---|---|
| SERVED ON (PRINT NAME) | | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | | TITLE: |

## DECLARATION OF SERVER

I declare under penalty of perjury under the United States of America that the foregoing information contained in the Proof of Service is true and correct

Executed on

DATE                                    SIGNATURE OF SERVER

                                        ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and coping of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(b) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all the designated materials or of the premises. If objection is made, the party servicing the subpoena may, upon notice to the person commanded to produce, more at any time for any order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which subpoena was issued shall quash or modify the subpoena if it

    (i) fails to allow reasonable time for compliance;

    (ii) requires a person who is not a party or an officer of a party to travel to place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(iii) of this rule, such a person may in order to attend trial be commanded to travel from

any such place within the state in which the trial is held, or

    (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

    (iv) subjects a person to undue burden.

(B) If a subpoena

    i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

    (ii) requires disclosure of any unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance to production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**EXHIBIT "A"**
**To Subpoena Duces Tecum Served On**
**Riggs National Bank**

*As used herein, the term "Ahmed Kattan" shall mean Ahmed A. Kattan, executive assistant to Prince Bandar Bin Sultan Bin Abdulaziz Al-Saud, Ambassador of the Kingdom of Saudi Arabia to the United States, and/or his agents, employees, attorneys and/or persons purporting to act on his behalf, and/or any Trust or other fund established for the benefit of Ahmed A. Kattan.*

*As used herein, the term "General Al-Noah" shall mean General Abdual Rahman Al-Noah, chief military aide to Prince Bandar Bin Sultan Bin Abdulaziz Al-Saud, Ambassador of the Kingdom of Saudi Arabia to the United States, and/or his agents, employees, attorneys and/or persons purporting to act on his behalf, and/or any Trust or other fund established for the benefit of General Al-Noah.*

*As used herein, the term "you" shall mean Riggs National Bank, its representatives, agents, employees and affiliates.*

*As used herein, the term "Document" shall mean the original or any non-identical copy of any written, printed, typed, photographed or other graphic or electronically recorded matter of any kind or nature prepared or received by, or in the possession, custody or control of the answering party, its agents, servants, employees or other representatives.*

*Unless otherwise specified, the documents specified below are required for the time period commencing January 1, 1991 and continuing through the present.*

*Copies of documents may be served before May 7, 2004 on:*

Matthew G. Ash, Esquire
Cozen O'Connor
1667 K Street, N.W.
Suite 500
Washington, D.C. 20006
(202) 912-4830

*Said Custodian of Records for Riggs National Bank is required to produce the following documents and other items, as specified below, which are in the possession, custody or control of Riggs National Bank and/or any of its predecessors in interest, or which were at one time under the possession, custody or control of Riggs National Bank's predecessors in interest but have since been turned over to Riggs National Bank:*

(1)     Any and all documents pertaining to the Riggs National Bank accounts, financial transactions and individuals which are referenced in the April 7, 2004 Newsweek article titled, *Tangled Ties, Law Enforcement Officials Follow The Money Trail Among Suspected Terrorists Straight To The Doors Of The Saudi Embassy* (hereinafter "Newsweek Article"), which is attached hereto.

(2)     Any and all documents pertaining to Riggs National Bank accounts held either
        exclusively and/or jointly by Ahmed Kattan, including but not limited to, monthly
        account statements, annual account statements, deposits, withdrawals, deposit slips,
        check stubs, cleared or cancelled checks, disbursement checks, receipts and account
        notices.

(3)     Any and all documents, including but not limited to, wire transfer memos, debit slips,
        credit slips, confirmations, correspondence, or the like, showing the source(s) and/or
        destination(s) of any funds deposited into or withdrawn from a Riggs National Bank
        account held either exclusively and/or jointly by Ahmed Kattan, from January 1, 1991
        through the present.

(4)     All documents, including but not limited to, correspondence, letters, memoranda, notes,
        and e-mails, that refer to, relate to or reflect any and all communications (oral and/or
        written) occurring after January 1, 1991, between or among you and Ahmed Kattan.

(5)     Any and all documents indicating those persons and/or entities that: (i) have direct
        beneficial ownership and/or interest in a Riggs National Bank account held either
        exclusively and/or jointly by Ahmed Kattan; (ii) have signatory authority for a Riggs
        National Bank account held either exclusively and/or jointly by Ahmed Kattan.

(6)     All other documents in your possession, custody or control that refer to or relate to
        Ahmed Kattan.

(7)     Any and all documents pertaining to Riggs National Bank accounts held either
        exclusively and/or jointly by General Al-Noah, including but not limited to, monthly
        account statements, annual account statements, deposits, withdrawals, deposit slips,
        check stubs, cleared or cancelled checks, disbursement checks, receipts and account
        notices.

(8)     Any and all documents, including but not limited to, wire transfer memos, debit slips,
        credit slips, confirmations, correspondence, or the like, showing the source(s) and/or
        destination(s) of any funds deposited into or withdrawn from a Riggs National Bank
        account held either exclusively and/or jointly by General Al-Noah, from January 1, 1991
        through the present.

(9)     All documents, including but not limited to, correspondence, letters, memoranda, notes,
        and e-mails, that refer to, relate to or reflect any and all communications (oral and/or
        written) occurring after January 1, 1991, between or among you and General Al-Noah.

(10)    Any and all documents indicating those persons and/or entities that: (i) have direct
        beneficial ownership and/or interest in a Riggs National Bank account held either
        exclusively and/or jointly by General Al-Noah; (ii) have signatory authority for a Riggs
        National Bank account held either exclusively and/or jointly by General Al-Noah.

2

(11)    All other documents in your possession, custody or control that refer to or relate to
General Al-Noah.

(12)    Any and all documents pertaining to any investigation, audit or review of financial
transactions involving, or accounts associated with, Ahmed Kattan and/or General Al-
Noah.

PHILA1\2046885\1 117430.000

# Newsweek  National News



Chris Usher / Apix for NEWSWEEK

## Column / Terror Watch
# Michael Isikoff and Mark Hosenball

✉ • E-mail the authors    🛈 • Biographies    🗐 • More by the authors

# Tangled Ties

### Law-enforcement officials follow the money trail among suspected terrorists straight to the doors of the Saudi Embassy

Newsweek

April 7 - Within weeks of the September 11 terror attacks, security officers at the Fleet National Bank in Boston had identified "suspicious" wire transfers from the Saudi Embassy in Washington that eventually led to the discovery of an active Al Qaeda "sleeper cell" that may have been planning follow-up attacks inside the United States, according to documents obtained by NEWSWEEK.



**N** CURRENT ISSUE

Newsweek
THE DIRTY LITTLE SECRET OF THE TAX CUT
Why It's Smarter Than You Think
By Allan Sloan

Subscribe Now

U.S. law-enforcement officials familiar with the matter say there is no evidence that officials at the Saudi Embassy were knowingly financing Al Qaeda activity inside the country. But documents show that while trying to trace a tangled money trail beginning with the Saudi Embassy, investigators soon drew startling connections between a group of Saudi nationals receiving financial support from the embassy and a 34-year-old microbiologist and MIT graduate who officials have since concluded was a U.S. operative for 9/11 mastermind Khalid Shaikh Mohammed.

advertisement

*For more information, including risks, charges, and expenses, obtain a prospectus at www.vanguard.com. Read it carefully before investing.*

- Why Condoleezza Rice Agreed to Testify
- The Spinmeisters' Advice to John Kerry
- Did the War in Iraq Make America Safer?
- Still the Man: Prince Parties Like it's 2004

The microbiologist, Aafia Siddiqui, a mother of three young children, has since fled the country—most likely to her native Pakistan-and is

---

now wanted for questioning by the FBI. But "suspicious-activity reports" (SARS) filed by Fleet Bank with the U.S. Treasury Department, suggest that Siddiqui and her estranged husband, Dr. Mohammed Amjad Khan, an anesthesiologist, may have been active terror plotters inside the country until as late as the summer of 2002.

The reports show that Fleet Bank investigators discovered that one account used by the Boston-area couple showed repeated debit-card purchases from stores that "specialize in high-tech military equipment and apparel," including Black Hawk Industries in Chesapeake, Va., and Brigade Quartermasters in Georgia. (**Black Hawk's Web site**, advertises grips, mounts and parts for AK-47s and other military-assault rifles as well as highly specialized combat clothing, including vests designed for bomb disposal.)

Fleet accounts associated with the couple also showed "major purchases" from U.S. airlines and hotels in Pittsburgh and North Carolina as well as an $8,000 international wire transfer on Dec. 21, 2001, to Habib Bank Ltd., a big Pakistani financial institution that has long been scrutinized by U.S. intelligence officials monitoring terrorist money flows.

NEWSWEEK first reported, in a June 23, 2003, cover story, that the FBI had identified Siddiqui and Khan as suspected Al Qaeda agents. Internal FBI documents showed that, after his capture in March 2003, Khalid Shaikh Mohammed told U.S. interrogators that Siddiqui was supposed to support "other AQ operatives as they entered the United States." Agents also found evidence that she had rented a post-office box to help another Baltimore-based Al Qaeda contact who had been assigned by Khalid Shaikh Mohammed to blow up underground gasoline-storage tanks. Bureau documents also stated that Khan, Siddiqui's husband, had purchased body armor, night-vision goggles and a variety of military manuals that were supposed to be sent to Pakistan.

**NATIONAL NEWS**

- The Doctors' Orders
- A New Window on the War Room

**CAMPAIGN 2004**



- The Doctors' Orders
- Party Of One
- Wolffe: Iraq Could Swing Campaign 2004
- GENEXT: Berkeley's Youth More Likely to Vote
- Wolffe: Kerry's Smart Strategy on 9/11 Panel

**TERROR WATCH**   Current Column | Archives

- **Clarke's Private Terror Pipeline**
  The former counterterrorism chief tapped a private researcher to develop intelligence on Al Qaeda. The disclosure sheds new light on White House frustrations with the FBI

- **Was 9/11 Preventable?**
  Could the terror attacks have been prevented? Clarke's testimony to the 9/11 commission raises the prospect that the answer might have been yes

The newly obtained SARS documents filed by Fleet shed additional light on the federal government's effort to track Siddiqui and Khan's activities—and raise questions about possible links to other Saudis in the United States. As early as

October 2001, long before Khalid Shaik Mohammed's capture, FBI and Treasury Department investigators were alerted to the couple's possible terror links in a series of SARS filed by Fleet. At the time, Fleet's Financial Intelligence Unit was trying to trace $70,000 in wire transfers on the same day, July 10, 2001, to two Saudis in the United States. One, for $50,000 from the Saudi Armed Forces Account at the Riggs Bank in Washington, D.C., went to a Saudi student at Clark University in Worcester, Mass. Two others, totaling $20,000 from the same Saudi military account, went to a Saudi national named Abdullah Al Reshood in Boston.

NEWSWEEK has been unable to locate either Saudi. But a spokesman for the Saudi Embassy in Washington said both wire transfers were consistent with the Saudi government's longstanding practice of providing educational and medical assistance to fellow countrymen living in the United States. The spokesman said the embassy has no reason to believe either Saudi has any connection to terrorist activity.

But Fleet security officers were concerned about the transactions from the start. Immediately after receiving the $20,000 wire from the Saudi Embassy in Washington, Al Reshood wrote a $20,000 check to another Saudi, Hatem Al Dhahri, who five days later wired $17,193 back to an account controlled by Al Reshood at the Al Rahji Bank in Saudi Arabia. "There appears to be no commercial reason nor reasonable explanation for the series of transactions," wrote one Fleet security officer in an Oct. 24, 2001, SARS report. Both Saudis lived at the same address, a high-rise apartment building in Boston's Mission Hill neighborhood that was frequented by Arab nationals. If the purpose of the expenditures was to provide medical expenses for either Al Reshood or Al Dhahri and their families in the United States, as the Saudis claimed, the security officials wanted to know why the money was being wired back to Saudi Arabia. Al Dhahri also listed as his address the same apartment number, 2008, as another Fleet Bank customer—Aafia Siddiqui.

It is still not clear what connection, if any, Al Dhahri had with Siddiqui or whether they shared the apartment at the same time. (The Fleet Bank records suggest that Al Dhahri and Siddiqui's accounts were both active and current in the fall of 2001 and do not indicate a change of address had been filed.) A Saudi Embassy spokesman said that the payments to Al Dhahri were to pay for liver treatments for one of his children in the United States. A Saudi Embassy spokesman said that Al Dhahri has been interrogated by the FBI and has denied any knowledge of the microbiologist.

But the common address prompted Fleet auditors to zero in on Siddiqui, resulting in more "links" that "shocked" the security officers,

according to a source familiar with the matter. In addition to the expenditures for high-tech military equipment—items that seemed unusual for a microbiologist—the security officers found that Siddiqui was making regular debit-card payments to one Islamic charity, Benevolence International, that was under active investigation by federal agents for raising funds for terrorist causes. (The charity has since been shut down and its founder jailed.) In addition, Siddiqui was found to be active with the Al-Kifah Refugee Center, another Islamic charity that was ostensibly raising funds for Bosnian orphans but which also was under scrutiny by federal investigators.

A spokeswoman for Fleet, which last week was purchased by Bank of America, declined to comment on the bank's role, noting that it is a violation of federal law to even refer to the existence of a SARS. But investigators noted that Fleet Bank SARS stand in stark contrast to the lack of similar reports from Riggs Bank, where the Saudi Embassy kept its accounts and the wire transfers began. Riggs Bank's failure to alert investigators to a large number of unusual cash transactions by the Saudi Embassy and other foreign bank customers has led to a wide-ranging investigation by Treasury Department regulators that is likely to result in substantial civil fines imposed on the bank in the next few weeks, according to sources familiar with the matter. "Anytime, you have suspicious money movements, and it's not reported as needed, it hurts our overall efforts," a senior U.S. counterterrorism official said about Riggs' failure to file the SARS. Riggs recently terminated the Saudi Embassy as a client and, according to a story in today's Wall Street Journal, may be planning to drop its diplomatic business entirely.)

Riggs officials say they've initiated a program to more vigorously monitor financial accounts. And the bank late last year filed more than two-dozen reports involving Saudi Embassy transactions, including large overseas wire transfers and cash deposits made by Saudi Ambassador Prince Bandar bin Sultan; his executive assistant, Ahmed A. Kattan; his chief military aide, Gen. Abdual Rahman Al-Noah, and other embassy officials.

Most of these transactions have no apparent links to terrorism and may simply reflect the Saudis' longstanding habit of mixing government and personal accounts. In one case, Kattan, who carries the rank of ambassador, deposited $6 million in embassy funds into his personal account at Riggs, wired $5.5 million to the agents of a school in Egypt and the remaining $500,000 to his own account in Saudi Arabia. Al-Noah, the military officer, made a total of $1.6 million in cash deposits—most in cash, one of them for $210,000—and then wired the money to pay for the purchase of furniture for a new palace in Saudi Arabia. Bandar himself wired $17 million last year to his

construction manager for a new palace in Saudi Arabia. Just last December, one of Bandar's personal aides deposited $3 million in international drafts, converted them to dollars, and then wired substantial sums back overseas—including about $200,000 to a luxury-car dealer in Great Britain. (A Saudi spokesman said that Bandar has substantial business interests overseas, so it is not surprising that he would conduct such transactions.)

But other transactions raised eyebrows at the FBI. The Riggs accounts showed a number of checks to flight schools and flight-school students in the United States as well as 50 separate $1,000 American Express travelers checks issued by Bandar to Saudi employees between July 9, 2001 and Aug. 28, 2001—including seven that were deposited that summer at the MGM Grand Hotel in Las Vegas. Riggs also reported $19,200 in payments from the Saudi Embassy to Gulshair al-Shukrijumah, a Florida-based imam who once served as an interpreter for the "blind Sheik" Omar Abdul Rahman, who was convicted in 1996 of a plot to blow up New York City landmarks. Gulshair al-Shukrijumah's son, Adnan al-Shukrijumah, also known as "Jaffar the Pilot," is a suspected Al Qaeda operative who is the subject of a worldwide FBI manhunt. (In response to U.S. demands to impose tighter controls, the Saudis have since terminated the payments to Gulshair al-Shukrijumah, along with a number of other clerics who were being supported by the embassy.)

A Saudi Embassy spokesman stressed that the Saudis have been actively cooperating with U.S. officials on all aspects of the war on terrorism and that the embassy has recently been assured by top FBI officials that the bureau "has no concerns" about any of the embassy accounts. But senior law-enforcement officials told NEWSWEEK that Saudi Embassy accounts—including the wire transfers related to Siddiqui—remain under active investigation. Told that the Saudis have been assured the FBI "has no concerns," a law-enforcement official made additional checks and reported back to NEWSWEEK: "That is not the case."

© 2004 Newsweek, Inc.

| **Newsweek** TOP STORIES | **🖄 TOP MSNBC STORIES** |
|---|---|
| • Hirsh: Has Bush Botched the War on Terror? | • U.S. halts Fallujah offensive |
| • South Africa: Grading a Decade of Democracy | • 9/11 debate shifts to memo |
| • Mark Starr: Why Hockey's Pucked | • Poll shows Bush, Kerry still even |
| • Fineman: Rating Condi's 9/11 Testimony | • Sadr denies kidnapping Japanese |
| | • Spain reminded of historic tension |