# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) ) ) ) **Civil Action No. 03MDL1570 (RCC)**<br>Relates to:  C.A. Nos. 1:02-6977 (RCC)<br>1:02-7300 (RCC-FM)<br>1:03-5071 (RCC)<br>1:03-5493 (RCC)<br>1:03-5738 (RCC)<br>1:03-7036 (RCC) |

## REPLY IN SUPPORT OF MOTION TO DISMISS AND TO QUASH SERVICE OF PROCESS OF HIS ROYAL HIGHNESS PRINCE TURKI AL-FAISAL BIN ABDULAZIZ AL-SAUD

KELLOGG, HUBER, HANSEN,
  TODD & EVANS, P.L.L.C.
Mark C. Hansen (MH0359)
Michael K. Kellogg (MK4579)
David C. Frederick (DF4906)
Michael J. Guzman (MG9623)
J.C. Rozendaal (JR1430)

Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900

May 28, 2004

I.     The FSIA Requires Dismissal of the Claims Against Prince Turki

    **A. Plaintiffs Have Failed To Present Any Evidence To Rebut FSIA Immunity.**

At all times relevant to the complaint, Prince Turki was the head of Saudi Intelligence. In his declaration, Prince Turki explained that all his interactions with Osama bin Laden and Al-Qaeda were in that official capacity. Decl. ¶ 5. Plaintiffs make no effort to counter that evidence. Indeed, plaintiffs acknowledge that Prince Turki headed Saudi Intelligence from September 1977 until August 30, 2001 (Ashton Compl. ¶ 256), and all of the allegations in the complaint pertaining to Prince Turki expressly relate to actions taken in that official capacity. Id. ¶¶ 257-263, 288. Judge Robertson properly concluded in Burnett that the absence of any contrary showing by the plaintiffs "compels the conclusion that the allegations against Prince Turki only relate to actions he took in his official capacity." Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9, 15 (D.D.C. 2003).

Accordingly, Prince Turki is immune from suit under the FSIA unless one of its narrow exceptions applies. Plaintiffs suggest that the "non-commerical tort" exception applies because Prince Turki aided and abetted the 9/11 attacks by providing material support to Osama bin Laden and Al-Qaeda in exchange for guarantees that they would not target Saudi Arabia. But on this issue, too, Prince Turki has submitted competent evidence. He has emphatically denied that he "in any way encouraged, funded, or provided any form of material or other assistance — direct or indirect — to enable Osama bin Laden and his Al-Qaeda network of terrorists to perpetrate [the September 11] attacks." Decl. ¶ 4. To the contrary, he actively worked on joint intelligence efforts with the United States "to combat terrorism in general and Osama bin Laden in particular." Id. ¶ 10. And, in all his interactions with Osama bin Laden, Al-Qaeda, and the Taliban, he was carrying out "Saudi Arabia's foreign and national security policies." Id. ¶ 5.

Plaintiffs concede (at 3) that they have "the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002). Yet they offer no such evidence. The FSIA demands evidence. Mere allegations, as reflected in the complaint, are worth nothing on the issue of FSIA immunity. See Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998) ("it was error for the district court to accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction"); Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) (under FSIA, court cannot simply "assum[e] the truth of the facts alleged by the plaintiff and disputed by the defendant").

Prince Turki's declaration put plaintiffs to their burden to proffer *evidence* showing that an FSIA exception applies. Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001). Their failure to do so is dispositive. Virtual Countries, 300 F.3d at 241 (affirming dismissal of complaint against foreign sovereign where "[d]espite an opportunity to come forward with evidence to meet its burden of production in order to prevail on the jurisdiction issue, [plaintiff] failed to provide sufficient evidence for its contentions"); Filetech S.A. v. France Telecom S.A., 304 F.3d 180, 182 (2d Cir. 2002) (affirming FSIA dismissal where plaintiff "produced little if any evidence to meet its burden," and noting that plaintiffs' obligation "is not altered by the claimed interconnection of the merits and jurisdiction"); El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (same). Accordingly, in the absence of any evidence presented by plaintiffs to rebut Prince Turki's declaration, the case against him must be dismissed.[1]

---

[1] Prince Turki made his motion to dismiss, with accompanying Declaration, in Burnett in May of 2003, thus putting plaintiffs on notice of their obligation to present evidence on the FSIA

2

### B. Plaintiffs' FSIA Argument Is Also Legally Flawed.

In lieu of evidence, plaintiffs offer a series of legal arguments as to why the non-commercial torts exception applies in this case. But each of those arguments depends on the Court accepting the allegations in plaintiffs' complaint as true. Under the FSIA, the Court cannot do that. Hence, plaintiffs' purely legal arguments are irrelevant. In any event, their legal arguments are wrong, which provides additional grounds for dismissal of this complaint.

### 1. Plaintiffs' claims implicate the terrorism exception, which cannot apply here.

Plaintiffs allege that Prince Turki and other Saudi officials provided "material support or resources" for the terrorists who committed the September 11 attacks. The FSIA explicitly conditions such suits on official designation of the state in question as a "state sponsor of terrorism." 28 U.S.C. § 1605(a)(7)(A). The State Department has not so designated the Kingdom of Saudi Arabia. Thus, plaintiffs cannot sue the Kingdom or its officers under § 1605(a)(7). Neither can they evade the need for State Department designation by invoking § 1605(a)(5).

Plaintiffs dismiss this point – which was accepted by Judge Robertson in a carefully considered decision, *see* 292 F. Supp. 2d at 20 – as an "absurdity" (Opp. 17) or "nonsense" (id. 15). But it is plaintiffs who make nonsense of a very real limitation on judicial power imposed by Congress. To read the non-commercial torts exception as plaintiffs do — to include acts in support of terrorism committed abroad by ministers acting in their official capacity — obviates the need for the State Department to determine whether the minister's foreign state sponsors terrorism. Congress made a specific legislative choice to confer that important role on the State De-

---

issue. Since then, plaintiffs have filed three separate responses to Prince Turki, and have failed to present evidence in any of them. In oral argument before Judge Robertson, plaintiffs repeatedly admitted that they had no such evidence to present. See, e.g., Hrg. Tr., Burnett, Docket No. 02-1616 (D.D.C. Oct 17, 2003), id. at 63 ("we haven't put in any facts on this"); id. at 64 ("there is no evidence on that point"); id. at 65-66 ("we don't have a lot of information").

3

partment. To allow plaintiffs to sue Saudi Arabia's top government officials under an aiding/abetting theory, simply by citing § 1605(a)(5) instead of § 1605(a)(7), would render § 1605(a)(7) meaningless and launch the very kinds of suits that Congress sought to prevent against foreign states that have not been designated sponsors of terrorism. Plaintiffs' counsel have repeatedly acknowledged – in criticizing the complaints in Federal Insurance and O'Neil – that they cannot sue the Kingdom of Saudi Arabia directly for complicity in 9/11. It follows inexorably that they also cannot sue agencies and instrumentalities of the Kingdom on the same theory, because "a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly." Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101-02 (9th Cir. 1990).

### 2. The non-commercial torts exception does not apply to discretionary functions.

Even if plaintiffs' claims were of a type that Congress intended to include within the non-commercial torts exception, that exception does not apply to "the exercise or performance or the failure to exercise or perform a discretionary function," 28 U.S.C. § 1605(a)(5)(A). The tort that Prince Turki is alleged to have committed involved carrying out Saudi policies in dealing with the Taliban, Al-Qaeda, and Osama bin Laden. But, "[t]he activities of the DGI are an integral part of Saudi Arabia's foreign and national security policies" (Decl. ¶ 5) – the types of classic discretionary functions that are immune from challenge. As Judge Robertson explained, it is "nearly self-evident" that Prince Turki's alleged actions are "squarely covered" by the "discretionary function" exception. Burnett, 292 F. Supp. 2d at 20. Plaintiffs do not dispute this.

Instead, plaintiffs allege that Letelier v. Republic of Chile, 488 F. Supp. 665 (D.D.C. 1980), supports some sort of "horrible act" exception to the discretionary function doctrine. But their reliance on Letelier is misplaced for at least three reasons. Opp. 11. First, there is no such

4

"horrible act" exception in § 1605(a)(5). The discretionary function exception applies whether or not "the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). As the same Judge who decided Letelier subsequently explained, FSIA immunity for acts "belonging to the discretion of the executive" of a foreign country "is absolute in this regard, no matter how heinous the alleged illegalities." Herbage v. Meese, 747 F. Supp. 60, 67 (D.D.C. 1990), aff'd, 946 F.2d 1546 (D.C. Cir. 1991) (Table).

Second, in Letelier the plaintiffs offered unrebutted proof that agents of the Chilean government directly ordered an assassination in the United States. See 488 F. Supp. at 671. Here, all the unrebutted proof goes against plaintiffs. Prince Turki denies in a sworn statement that he had any involvement in the 9/11 attacks or supported bin Laden and Al-Qaeda in any way. Plaintiffs offer no factual rebuttal to establish an exception to FSIA immunity, a failure that disposes of this case.

Finally, even if this Court were to accept plaintiffs' allegations as true – an error of law, to be sure – the allegations here are a far cry from the proof in Letelier that Chilean intelligence agents had directly committed a murder in the United States. While the court held that Chile had no discretion "to perpetrate conduct designed to result in" an assassination in the United States, 488 F. Supp. at 673, plaintiffs make no allegation that Prince Turki engaged in any conduct "designed to result in" the September 11 attacks (such as sending his own operatives to conduct those attacks). Rather, plaintiffs allege only that Prince Turki acted to deflect Al-Qadea terrorism away from Saudi Arabia, with the "foreseeable result" that bin Laden would attack the United States. Br. at 9. Such allegations are far too vague and indirect to take Prince Turki's conduct of Saudi intelligence operations outside the discretionary function exception. Plaintiffs cannot meet their burden of showing that Prince Turki's conceded actions as outlined in his Dec-

laration (or even as stated in plaintiffs' Complaint) did not "involv[e] an element of judgment or choice" based on "considerations of public policy" and therefore did not involve discretionary functions for which immunity has long been the rule. Berkovitz v. United States, 486 U.S. 531, 537 (1988); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984).[2]

### 3. Plaintiffs do not allege that Prince Turki committed a tort within the U.S.

All the allegations against Prince Turki concern actions he took in Saudi Arabia and Afghanistan. The non-commercial torts exception does not extend to alleged torts committed abroad by a foreign sovereign. See Asociacion de Reclamantes v. United Mexican States, 735 F.2d 1517, 1525 (D.C. Cir. 1984); Persinger v. Islamic Republic of Iran, 729 F.2d 835, 841 (D.C. Cir. 1984) ("If Congress had meant to remove sovereign immunity for governments acting on their own territory, with all of the potential for international discord and for foreign government retaliation that that involves, it is hardly likely that Congress would have ignored those topics and discussed instead automobile accidents in this country."). In Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989), the Supreme Court rejected a claim where the wrongful conduct occurred outside the United States even though the effects and injury were felt within the United States. See id. at 441-42. The Court there contrasted the different language of the

---

[2] Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989), is also inapposite. That case involved respondeat superior liability for a murder carried out by the Republic of China's ("ROC") intelligence service of a Taiwanese expatriot living in the United States. See id. at 1431. The court rejected a discretionary function defense based on a finding by the ROC courts that the agent in question violated ROC law. Here, Prince Turki's undisputed Declaration establishes that he was acting at all times to carry out the policies of his country, and there is no suggestion that he violated Saudi law in any respect. See also Risk v. Halvorsen, 936 F.2d 393, 396 (9th Cir. 1991) (holding that act is immune discretionary function if official complies with foreign state's law even if that act violates U.S. law). There is also no allegation that agents of Prince Turki (or the Saudi government) carried out the September 11 attacks; hence, no respondeat superior liability for those attacks applies here.

6

non-commercial torts exception, which contains no "direct effects" language, with the commercial activity exception of § 1605(a)(2), which provides for a foreign state's liability "for its commercial activities 'outside the territory of the United States' having a 'direct effect' inside the United States." Id. at 440-41.

Although the September 11 attackers themselves committed their entire tort within the United States, nothing in the Complaint alleges that Prince Turki had dealings of any kind with those persons or had a respondeat superior relationship with any of the hijackers. No court has ever construed the non-commercial torts exception to encompass the kinds of causally attenuated acts committed abroad with unintended consequences in the United States that plaintiffs here have asserted – but not evidenced in any respect – against Prince Turki.

Plaintiffs' reliance on Letelier and Liu to evade that clear limitation is misplaced. Each involved assassinations allegedly committed by agents of the foreign sovereign on U.S. soil. Neither case discussed the "entire tort" rule, but the result in both cases can be read as a straightforward application of the principle that an agent's act can be imputed to the principal. See Restatement (Second) of Agency § 212 (1958). Moreover, unlike those cases, the hijackers were in no sense "agents" of Prince Turki or his government. Although Prince Turki's actions overseas allegedly aided and abetted (in an extremely attenuated manner) torts committed in the United States, the non-commercial torts exception has never been extended, and by its terms cannot be extended, to cover such conduct.

## II. This Court Lacks Personal Jurisdiction Over Prince Turki

Even if he were not immune under the FSIA, Prince Turki has established that he lacks the requisite contacts with New York and the United States to support this Court's exercise of personal jurisdiction over him. See Def.'s Opening Br. 21-25; Decl. ¶ 20. Plaintiffs concede (at

21) that Prince Turki has no contacts with New York by arguing that the relevant contacts in this action are only with the United States. Even so, Prince Turki "own[s] no property, conduct[s] no business, and hold[s] no bank accounts in the United States." Decl. ¶ 20. His only non-official contacts with the United States are an occasional trip "over the years for medical reasons or on holiday." Id. Such contacts fail to satisfy a national contacts test. See Def.'s Opening Br. 21.

Without disputing the inadequacy of these contacts,[3] plaintiffs attempt to bootstrap jurisdiction by unparticularized allegations that Prince Turki aided and abetted persons who themselves, again in an unpleaded manner, aided and abetted a tortious act in the United States. Under a specific jurisdiction analysis, which looks to the nature of the tort, a plaintiff must establish that the defendant had a "substantial connection" with the forum state, as demonstrated by "an action of the defendant purposefully directed toward the forum State." Asahi Indus. Co. v. Superior Court of California, 480 U.S. 102, 112 (1987) (plurality op.) (emphasis added). Even if it were true that Prince Turki somehow facilitated payments to the Taliban or Al-Qaeda, it would not follow that Prince Turki "purposefully directed" any of his actions toward the United States. Id. Plaintiffs allege that Prince Turki "deflected" Al-Qaeda away from Saudi Arabia, which is not the same as purposely directing Al-Qaeda "towards the United States." Under plaintiffs' theory, every person in the world who "made easier" Al-Qaeda's September 11 attack meets the requisites of specific jurisdiction. The law of personal jurisdiction does not sweep so broadly.

---

[3] With respect to this issue, Prince Turki stands in the same position as Prince Sultan, as to whom Judge Robertson held that jurisdictional discovery was unwarranted. Burnett, 292 F. Supp. 2d at 15-16. Only if the plaintiff "demonstrates that it can supplement its jurisdictional allegations through discovery" is jurisdictional discovery "justified." GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1351 (D.C. Cir. 2000)). Without some factual showing even to warrant limited jurisdictional discovery, discovery would "frustrate the significance and benefit of entitlement to immunity from suit." Burnett, 292 F. Supp. 2d at 16 (quoting El-Fadl, 75 F.3d at 671). Plaintiffs have made no such showing here, so jurisdictional discovery is unwarranted.

**III.     Diplomatic Immunity Requires Dismissal**

As Saudi Ambassador to the United Kingdom, Prince Turki enjoys long-established diplomatic immunity, not only in the U.K., but in third countries as well. No case supports haling a diplomat stationed abroad to answer civil litigation in the United States. In contending otherwise, plaintiffs misconstrue the Vienna Convention. Article 40 provides that, when a diplomat "passes through or is <u>in the territory</u> of a third State," that third state "shall accord [the diplomat] <u>inviolability and such other immunities</u> as may be required to ensure his transit or return" from or to the receiving state. T.I.A.S. No. 7502, at 20 (emphases added). If a third state cannot exercise jurisdiction over an ambassador when he is "in the territory of [the] third State," then it certainly cannot hale him 3,000 miles into court while he is still in his receiving state performing his ambassadorial duties. That logic is inescapable: once he was "in the territory" of the third state to answer process, that third state would immediately have to accord him "inviolability and such other immunities as may be required to ensure his . . . return" to his post in the receiving state. <u>Id.</u> Had Prince Turki traveled to the United States and been personally served with the Complaint, therefore, Article 40 would have ensured his immunity from such service so that he could return to the United Kingdom to resume his ambassadorial duties. Instead, Prince Turki accepted service, while expressly reserving his right to move to quash that service on grounds of diplomatic immunity. The end result is the same – no process may properly be served on him.

Article 40 follows the rule of <u>Bergman v. DeSieyes</u>, 170 F.2d 360, 362-63 (2d Cir. 1948), which held that diplomatic immunity attached to a diplomat credentialed in a third country during transit through the United States. As Judge Learned Hand's opinion for the court explained, the policy rationales are exactly the same: avoiding the "indignity to the sovereign . . . from subjecting him to suit" and "the interference with his duties" that defending a suit entails. <u>See id.</u> at

9

362. Plaintiffs suggest (at 19) that, because Bergman was decided prior to ratification of the Vienna Convention and its codification in the United States, it has no power to inform this Court's analysis. But Bergman based its rationale on a report submitted to the Secretary of State by the United States delegates to the Sixth International Conference of American States that met in Havana in 1928 (Havana Convention),[4] which considered "the whole question of diplomatic immunity" and issued articles for the recognition of diplomatic immunity that "make[] no distinction between diplomats in transitu and those in situ." Bergman, 170 F.2d at 362. As Judge Hand explained, the Havana Convention "professes to incorporate 'the principles generally accepted by all nations'" and thus "constitutes weighty authority." Id.

The Vienna Convention specifically "embodied fundamentally the same principles as those stated in the Havana Convention." I Yearbook of the International Law Commission: Summary Records of the Tenth Session 84 (28 April-4 July 1958). Indeed, a comparison of the relevant provisions of the Havana and Vienna Conventions makes clear that diplomats under both regimes receive immunity in a third-party state, consistent with the rule laid down by the Bergman court.[5] Against that drafting history, plaintiffs offer no authority to support their assertion that a diplomat accredited in another country is not entitled to assert diplomatic immunity in a suit filed against him in the United States. Accordingly, this Court should accord diplomatic immunity to Prince Turki.

---

[4] Convention Regarding Diplomatic Officers, signed at Havana on 20 February 1928. See League of Nations, Treaty Series, vol. CLV, 1934-1935, No. 3581.

[5] Article 23 of the Havana Convention is quite similar to Article 40 of the Vienna Convention quoted above, in providing: "Persons belonging to the mission shall also enjoy the same immunities and prerogatives in the States which they cross to arrive at their post or to return to their own country, or in a State where they may casually be during the exercise of their functions and to whose Government they have made known their position." Id. at 271.

        Respectfully submitted,

        KELLOGG, HUBER, HANSEN,
         TODD & EVANS, P.L.L.C.

        By: /s/_____
        Mark C. Hansen (MH0359)
        Michael K. Kellogg (MK4579)
        David C. Frederick (DF4906)
        Michael J. Guzman (MG9623)
        J.C. Rozendaal (JR1430)

        Sumner Square
        1615 M Street, N.W., Suite 400
        Washington, D.C. 20036-3209
        (202) 326-7900

May 28, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 28th day of May 2004, I caused copies of the <u>Reply In Support of Motion to Dismiss and to Quash Service of Process of His Royal Highness Prince Turki Al-Faisal Bin Abdulaziz Al-Saud</u> to be served electronically pursuant to the Court's ECF system and by United States first-class mail on any parties not participating with the Court's ECF system as thereafter advised by the Court.

/s/
Kelly J. Thompson