IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

_____
                                    )
                                    )
In re Terrorist Attacks on September 11, 2001   )   03-MDL-1570
                                    )   ECF Case
_____)

*Relates to:*
<u>Ashton v. Al Qaeda Islamic Army</u>, 02-CV-6977 (RCC)
<u>Burnett v. Al Baraka Investment & Development Corp.</u>, 03-CV-5738 (RCC)
<u>Federal Insurance Co. v. Al Qaida</u>, 03-CV-6978 (RCC)
<u>Barrera v. Al Qaeda Islamic Army</u>, 03-CV-7036 (RCC)
<u>Salvo v. Al Qaeda Islamic Army</u>, 03-CV-5071 (RCC)
<u>Burnett v. Al Baraka Investment & Development Corp.</u>, 03-CV-9849 (RCC)


**REPLY IN SUPPORT OF
HIS ROYAL HIGHNESS PRINCE SULTAN BIN ABDULAZIZ AL-SAUD'S
MOTION TO DISMISS CERTAIN CONSOLIDATED COMPLAINTS**

William H. Jeffress, Jr. (admitted *pro hac vice*)
D.C. Bar No. 041152

Christopher R. Cooper (admitted *pro hac vice*)
D.C. Bar No. 453387

Jamie S. Kilberg (admitted *pro hac vice*)
D.C. Bar No. 480207

Sara E. Kropf (admitted *pro hac vice*)
D.C. Bar No. 481501

BAKER BOTTS, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
 Phone:   (202) 639-7700
 Fax:     (202) 639-7890

**Attorneys for HRH Prince Sultan bin Abdulaziz Al-Saud**

I. **Plaintiffs Have Not Established A Factual Basis Either For A Claim Against Prince Sultan Under the FSIA, Or For Personal Jurisdiction**

The Plaintiffs devote several pages of their Opposition to Prince Sultan's Motion to Dismiss ("Opp."), along with numerous exhibits, to demonstrating that the world knew years before September 11, 2001 that Al Qaeda was targeting America for terrorism. What plaintiffs fail to mention is an even more relevant fact established by their own exhibits: Osama bin Laden also targeted the Saudi regime, of which Prince Sultan is one of the most prominent officials,[1] and publicly recognized the regime's efforts to stop his activities and bring him to justice. A staff report of the National Commission on Terrorist Attacks Upon the United States describes the true relationship between the Saudi government and bin Laden prior to September 11:

> The ruling monarchy also knew Bin Ladin was an enemy. Bin Ladin had not set foot in Saudi Arabia since 1991, when he escaped from . . . house arrest and made his way to Sudan. Bin Ladin had fiercely denounced the rulers of Saudi Arabia publicly in his August 1996 fatwa. . . .

Exhibit 1 to Declaration of Sara E. Kropf ("Kropf Decl.") at 8.[2] Bin Laden himself confirmed the enmity of the Saudi regime toward him in his 1997 interview by Peter Arnett, attached to plaintiffs' Opposition as exhibit 4 (at page 6):

---

[1] Bin Laden's 1996 "fatwa" states that "[t]he [Saudi] regime is fully responsible for what had been incurred by . . . the nation." Pl. Ex. 3 at 16. The fatwa singles out Prince Sultan – who as Minister of Defense authorized and oversaw the presence of American troops in the Kingdom – as among the "traitors who implement the policy of the enemy in order to bleed the financial and the human resources of the [nation]." Id. at 7. "To whose benefit," bin Laden asks, "does Prince Sultan and Prince Nayeff push the country into a civil war that will destroy everything?" Id. Bin Laden's 1998 fatwa likewise targets "Americans *and their allies*" with retaliation for the U.S. "occupation" in Saudi Arabia. Pl. Ex. 5, at 3.

[2] The same report also includes the following:
"In the spring of 1998 the Saudi government successfully disrupted a major Bin Ladin-organized effort to launch attacks on U.S. forces in the Kingdom using a variety of man-portable missiles. Scores of individuals were arrested."
\* \* \*
"[At the request of the U.S.], Crown Prince Abdullah agreed to make an all-out secret effort [using Prince Turki Al-Faisal as an emissary] to persuade the Taliban to expel Bin Ladin for eventual delivery to the United States or another country."
\* \* \*
"[Although these efforts ultimately proved unsuccessful], [US] officials thanked the [Crown] Prince for his efforts, and wondered what else could be done." Ex. 1 to Kropf Decl. at 8-9.

1

> Q: Mr. Bin Ladin, your family is a rich powerful family in Saudi Arabia. Have they, or the Saudi Arabian government asked you to stop your activities?
>
> A. They have done that a lot. They have pressured us a lot . . . They (my family) conveyed the Saudi government's message that if I did not go back, they'll freeze all my assets, deprive me of my citizenship, my passport, and my Saudi I.D. and distort my picture in the Saudi and foreign media.

The plaintiffs also devote many pages to an effort to establish that Prince Sultan was placed on notice prior to 2001 that funds of Islamic charities were being diverted to Al Qaeda and/or other terrorist organizations, and that he failed in his supposed official function of "preventing the diversion of Saudi charitable donations to terrorists." Opp. at 6; see also Opp. at 2, 23. In fact, Prince Sultan never had any such function.[3] The Supreme Council which he chaired has no role in monitoring the activities of charities; its function is limited to making recommendations to Saudi Arabia's Council of Ministers on requests for government funding received from Islamic organizations operating abroad. See Declaration of Abdulaziz H. Al-Fahad, Exhibit 2 to Kropf Decl.[4] Moreover, the plaintiffs' contention that a Minister of Defense of a foreign government may be sued in courts of the United States for an alleged failure adequately to carry out his responsibilities in his own country is absurd. Do the plaintiffs suggest that Secretary of Defense Rumsfeld may be sued in courts of the Middle East – or

---

[3] The plaintiffs offer as support for their false assertion what they style as a "Report prepared for the President of the Security Council United Nations." The author of that "report," Jean-Claude Brisard, is on plaintiffs' payroll as an investigator in this case. The United Nations did not commission this report and has issued public statements disavowing Brisard's "deceitful" and "mislead[ing]" statements to the contrary. See "French Investigator Tricked UN on Terror Report," Arab News, March 1, 2004, attached as Exhibit 3 to Kropf Decl.

[4] The Saudi government's minimal oversight of charitable giving prior to September 11th attacks was recently noted by the bi-partisan commission investigating the attacks: "Until 9/11, few Saudis would have considered government oversight of charitable donations necessary; many would have perceived it as interference in the performance of their faith. At the same time, the governments ability to finance most state expenditures with energy revenue has not created the need for a modern income tax system. As a result, there were strong religious, cultural, and administrative barriers to monitoring charitable spending." Staff Statement No. 5 at 8, Exhibit 1 to Kropf Decl..

2

America, for that matter – for failure to prevent mistreatment of prisoners at Abu Ghraib or Guantanamo Bay?

Plaintiffs repeatedly blur the distinction between the charities that Prince Sultan is on record as having supported and various other charities that plaintiffs allege are linked to terrorism. It is important to note that the only charities involved in this case to which it has been established that Prince Sultan contributed, either officially, are the International Islamic Relief Organization ("IIRO") and the World Assembly of Muslim Youth ("WAMY"), both of which are large, well-established charities that operate worldwide. Although the various complaints make unsupported allegations that he also contributed to the Muslim World League ("MWL") and Al-Haramain, Prince Sultan has countered those allegations with sworn affidavits attesting that no such donations were made and, indeed, the plaintiffs opposition fails to identify any specific donations to any of these charities other than the IIRO.[5] Accordingly, the plaintiffs' repeated references to the activities of Al-Haramain, the MWL (including those contained in the former French Minister of Interior's affidavit), and numerous other "Islamic charities" or "front charities" are irrelevant to their claims against Prince Sultan.

Finally, plaintiffs attempt to bolster their allegations against the charities by branding them with such official sounding designations as "suspected terrorist organizations" and "sponsors of terrorism." See Opp. at 8, 9. In fact, however, none of the charities mentioned in connection with Prince Sultan has been found by the United States to be an organization that sponsors or provides financial support to terrorists.[6]

---

[5] Those affidavits filed in support of the motion to dismiss in the Burnett action in D.C., are incorporated by reference into Prince Sultan's motion in these actions.

[6] Under Executive Order 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001), the Secretary of Treasury in consultation with the Secretary of State and the Attorney General must determine persons or entities that "assist in, sponsor, or provide financial, material, or technological support for" acts of terrorism by designated persons or groups including Al Qaeda. Despite all of the information marshaled by the plaintiffs in an effort to convince this Court not only that IIRO and WAMY are such organizations, but also that Prince Sultan knew that to be the case prior to September 11,

3

When all of plaintiffs' evidentiary submissions are considered, they are left with a theory not that Prince Sultan supported Al Qaeda or Osama bin Laden, but only that he caused contributions to be made to well-established international Islamic charities in the face of warnings that funds of those charities had been diverted from time to time to support terrorists. As shown in our Motion and further discussed below, that is far from sufficient to establish either an exception to the FSIA, or to establish personal jurisdiction over Prince Sultan.

## II.  The Non-Commercial Tort Exception to the FSIA Does Not Apply

The only basis plaintiffs have asserted for the exercise of subject matter jurisdiction over Prince Sultan on claims premised on his official acts is the FSIA's non-commercial tort exception.[7] That exception does not apply, however, because (1) Prince Sultan was exercising a discretionary function, (2) this claim is properly brought only under section 1605(a)(7),[8] and (3) the plaintiffs have not alleged adequate causation under Section 1605(a)(5).

### A.  Prince Sultan Was Exercising A Discretionary Function

The plaintiffs do not contest that the official conduct upon which they base their claims against Prince Sultan – the recommendation of government grants to several long-standing and respected Islamic charities – was undertaken within his discretion as a high-ranking government official. Thus, as Judge Robertson found, under the express language of section 1605(a)(5), the non-commercial tort exception does not permit a claim against Prince Sultan. Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9, 21 (D.D.C. 2003). This is true even if Prince

---

2001, the fact is that the Executive Branch *has made no such finding*. On January 23, 2004, in a joint press conference, the United States and Saudi Arabia did designate four branches of Al Haramain as supporters of terrorism (Indonesia, Kenya, Tanzania and Pakistan). See "Prepared Remarks of Treasury Secretary John Snow to Announce Joint U.S. and Saudi Action Against Four Branches of Al-Haramain in the Financial War on Terror," Exhibit 4 to Kropf Decl. Prince Sultan is not, however, alleged to have provided any funds to these four branches. The Saudi-based parent charity was not so designated.

[7] Although the Burnett plaintiffs invoked the "commercial activities" exception in the DC litigation, Judge Robertson squarely rejected its application, and the plaintiffs do not raise it in their opposition brief.

4

Sultan intended the grants to benefit Al Qaeda (which he did not) because "[t]he focus of the [discretionary function] inquiry is not on the agent's subjective intent in exercising the discretion conferred . . . , but on the nature of the actions and whether they are susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 325 (1991).

Neither Letelier v. Republic of Chile, 488 F. Supp 665 (D.D.C. 1980), nor Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989) – the only two cases offered by the plaintiffs – alters that self-evident conclusion. Both are factually inapplicable for two reasons. First, as Judge Robertson observed in Burnett, both cases "involved causal links significantly shorter and more direct than those alleged here[.]" 292 F. Supp. 2d at 21. In Letelier, Chile was accused of ordering the assassination of a dissident leader living in the U.S. In Liu, the Republic of China was held vicariously liable for a political assassination ordered by one of its officials. No one has suggested that Prince Sultan ordered or had advance knowledge of the September 11 attacks.

Second, the foreign sovereigns *did not invoke the discretionary function exception* in either case because the government agents clearly acted outside the scope of their official authority. In fact, the Chilean government in Letelier expelled the agent who participated in the assassination and expressly denied that it authorized his actions. See Memorandum of Law, annexed to Diplomatic Note No. 180 (filed Sept. 4, 1979) (arguing that "no Chilean official was in any way authorized to commit the alleged acts[.]") (attached as Ex. 5 to Kropf Decl.). And in Liu, the Chinese government tried and convicted the official who ordered the assassination, leading the Court to hold the discretionary function proviso inapplicable because the official "violate[d] . . . internal [Chinese] law." Liu, 892 F.2d at 1431. These cases thus should not be read as creating an exception to discretionary function immunity, but rather as cases in which

---

[8] This argument was fully presented in our opening brief and is further addressed in the reply brief filed by Prince Turki al-Faisal.

foreign governments disavowed their agents' conduct as outside the scope of their official discretion altogether. In contrast, the relevant charities here operate lawfully in Saudi Arabia, and Prince Sultan's official support of them is in full accord with his government's foreign and religious policies. The plaintiffs simply cannot and do not allege that Prince Sultan violated Saudi law or that he lacked either the authority or the discretion to act as he did.[9] The discretionary function provision clearly applies.

### B.     Plaintiffs Have Failed to Allege Adequate Causation Under the FSIA

Plaintiffs' theory of causation as to Prince Sultan for aiding and abetting proceeds in three steps: (1) Osama bin Laden publicly targeted the United States with terrorism; (2) Prince Sultan knew that funds of the charities to which he authorized government grants were from time to time diverted to Al Qaeda (although not necessarily the funds authorized by Prince Sultan); and (3) it was therefore foreseeable to Prince Sultan that grants authorized by him would be used to fund terrorist attacks, including the attacks of September 11, 2001.[10] As Judge Robertson has previously held, these allegations fail to satisfy the FSIA's requirement that for the non-commercial tort exception to apply, the injury must be "*caused by* the tortious act or omission of" the foreign government official. 28 U.S.C. § 1605(a)(5) (emphasis added).[11]

Plaintiffs cannot satisfy the non-commercial tort exception's "caused by" requirement by alleging that it was "foreseeable" to Prince Sultan that his alleged official acts would result in the

---

[9] The Plaintiffs' invocation of the Second Circuit's Alien Tort Claims jurisprudence is beside the point. Opp. at 19. Cases like Kadic and Filartiga do not address the discretionary function issue present here.

[10] Plaintiffs' reliance on a foreseeability standard is explicit. See, e.g., Opp. at 17 (alleging that Prince Sultan's knowledge made it "*entirely foreseeable*" that his donations would be used to fund terrorist attacks); id. ("it is enough that . . . he knew that al Qaeda was involved in terrorist activity, because the attacks of September 11 were a *foreseeable* risk of that terrorist activity") (emphasis added).

[11] Judge Robertson's conclusion is fully consistent with Robinson v. Government of Malaysia, 269 F.3d 133 (2d Cir. 2001). The narrow question presented in Robinson was whether the Malaysian government's alleged failure to maintain its property in a "reasonably safe condition" is cognizable as a "tortious act or omission" under New York common law, thus satisfying the non-commercial tort exception. Id. at 145-46. The court concluded that it was not.

6

September 11th attacks. Foreseeability is not even sufficient to confer *personal* jurisdiction over Prince Sultan, much less subject-matter jurisdiction under an FSIA exception. That is, while Congress intended the FSIA exceptions to also confer personal jurisdiction, the Second Circuit has held that the burden for establishing subject-matter jurisdiction under the FSIA is *higher* than for establishing personal jurisdiction. Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2d Cir. 1991) (holding that standard for application of FSIA exception "requires a closer nexus than the 'minimum contacts' necessary for personal jurisdiction"). Because the United States Supreme Court has repeatedly held that personal jurisdiction cannot be exercised over a defendant under a foreseeability standard, Burger King v. Rudzewicz, 471 U.S. 462, 474 (1985) (holding that "foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction") (internal citations omitted), and the FSIA demands a higher standard, foreseeability cannot be a sufficient causation standard to satisfy the FSIA.

The plaintiffs rely on an aiding and abetting theory under Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which requires that the plaintiffs allege facts showing that a defendant "knowingly and substantially assist[ed] the principal violation." Id. at 477. See also Pittman v. Grayson, 149 F.3d 111 (2d Cir. 1998).[12] As the plaintiffs argue in another brief to this Court, under Halberstam, they must allege facts showing that Prince Sultan "knew that he was supporting al Qaeda," "that he desired to assist the illegal activities of al Qaeda," and "that he took some action to assist these illegal activities."[13] In other words, they must show that Prince Sultan knowingly aided a terrorist organization, that he intended to assist illegal acts of that

---

[12] Under New York law, aiding and abetting liability also requires that Prince Sultan have had *actual* knowledge of the primary violation, not merely constructive knowledge. Kolbeck v. Lit America, Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996).

[13] Plaintiffs' Opposition to Prince Mohammed Al Faisal Al Saud's Motion to Dismiss at 13.

7

organization, and that it was foreseeable that this organization would commit terrorist acts. The plaintiffs have made no such allegations here. Rather, they allege only that Prince Sultan made donations to charities – which are not alleged to be terrorist organizations – and that it was foreseeable these funds would be diverted to Al Qaeda. Under the plaintiffs' own formulation of Halberstam, this is not sufficient.

Other federal cases that have addressed terrorism claims have similarly required a close causal link between the defendant and the terrorist attack. See, e.g., Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1012 (7th Cir. 2002) (imposing liability "on those who knowingly and intentionally supply the funds to the persons who commit the violent acts"); Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (requiring plaintiffs to "link th[e defendant's] support to the Ungar murders specifically"). The claim that Prince Sultan supplied funds to international Islamic charities which he allegedly knew to have previously diverted funds to terrorists falls far short of that standard. Judge Robertson was certainly correct in concluding the plaintiffs' theory "stretch[es] the causation requirement of the noncommercial tort exception . . . to terra incognita." Burnett, 292 F. Supp. 2d at 20.

### III. Plaintiffs Have Not Established Facts Supporting the Exercise of Personal Jurisdiction

Plaintiffs do not claim that Prince Sultan has "minimum contacts" with the United States sufficient to support personal jurisdiction as to him. They rest their entire argument on the "purposefully directed activities" test of Calder v. Jones, 465 U.S. 783 (1984), and Burger King v. Rudzewicz, 471 U.S. 462 (1985). The facts, however, fall far short of satisfying this test as it has been described by the Supreme Court and the Second Circuit. Judge Robertson's rejection of plaintiffs' argument was clearly correct.

In its most recent description of the Calder principle, the Second Circuit has said that "a court may exercise personal jurisdiction over defendant consistent with due process when defendant is a *primary participant* in international wrongdoing – albeit extraterritorially – *expressly directed at the forum*." In re Magnetic Audiotape Antitrust Litigation, 334 F.3d 204, 208 (2d Cir. 2003) (emphasis added). In that case, the court reversed the district court's dismissal of a price-fixing complaint against a German parent company, on the ground that evidence offered by plaintiffs was sufficient at least to warrant discovery on the "purposefully directed" theory. The evidence consisted of minutes of a meeting attended by the parent company in Korea at which fixing of prices in the United States was discussed.

If the plaintiffs in this case were to adduce evidence that Prince Sultan met with Al-Qaeda leaders to plan attacks on Americans, even though the meeting occurred abroad, the "primary participant" and "expressly directed" requirements described in In re Magnetic Audiotape Antitrust Litigation might be satisfied. But the plaintiffs' theory – that Prince Sultan "contributed money to organizations that he knew were diverting funds to Al-Qaeda [and] also knew that the primary targets of Al-Qaeda's terrorist agenda were the United States and Americans," Opp. at 23 – does not come close to satisfying the Calder test. Courts have emphasized it is not enough to show that effects in the forum state from acts committed abroad were foreseeable. See, e.g., Bancroft & Masters Inc. v. Augusta Nat. Inc., 223 F. 3d 1082, 1087 (9th Cir. 2000). What is required is that the defendant's conduct was "intentionally targeted at and focused on" the forum state, ESAB Group, Inc. v. Centricut Inc., 126 F. 3d 617, 625 (4th Cir. 1997), and that the defendant was "personally involved in the specific conduct that gave rise to the plaintiff's claim." Time, Inc. v. Simpson, No. 02 Civ. 4917 (MBM), 2003 WL 23018890,

9

at *5. (S.D.N.Y. Dec. 22, 2003). As Judge Robertson has held, nothing of the sort is alleged here, much less supported by evidence.

The three district court decisions relied upon by plaintiffs, Opp. at 23,[14] do not support their argument as to Prince Sultan. The courts in Rein and Daliberti held that the defendants were subject to suit in this country under the FSIA's terrorism exception, 28 U.S.C. § 1605(a)(7), and the discussion in the opinions relates to whether that exception can constitutionally be applied to governments and government officials. Section 1605(a)(7) is not, of course, applicable here because Saudi Arabia has not been designated a state sponsor of terrorism. The court in Pugh also relied on Section 1605(a)(7) to provide personal jurisdiction over defendants, but went on to say that jurisdiction also existed over the officials in their individual capacities where their deliberate conduct in sabotaging and destroying a French airplane flying from Brazzaville to Paris resulted in the deaths of three Americans.[15] All three cases are quite different from the plaintiffs' contention regarding Prince Sultan, in that the defendants were alleged to have personally and directly participated in the terrorist acts at issue. The notion that one who provides charitable contributions (or loans, or services) to an organization whose primary activity is humanitarian relief may be held liable for terrorist acts on the ground that the organization's funds were wrongfully diverted to terrorists would expand the "purposefully directed" doctrine beyond recognition, and far beyond the holdings of the Supreme Court and the Second Circuit.

---

[14] Pugh v. Socialist People's Libyan Arab Jamahirya, 290 F.Supp. 2d. 54 (D.D.C. 2003); Rein v. Socialist People's Libyan Arab Jamahirya, 995 F.Supp. 325 (E.D.N.Y. 1998); Daliberti v. Iraq, 97 F.Supp. 2d 38 (D.D.C. 2000).

[15] The Pugh opinion, which is currently on appeal (No. 03-7172, D.C. Circuit), relies on a finding that it was "foreseeable" that Americans would be traveling on the sabotaged flight. That reasoning is flatly inconsistent with the caselaw cited above.

Dated: May 28, 2004                              Respectfully submitted,

                                                 S/ _____
                                                 William H. Jeffress, Jr. (admitted *pro hac vice*)
                                                 D.C. Bar No. 041152

                                                 Christopher R. Cooper (admitted *pro hac vice*)
                                                 D.C. Bar No. 453387

                                                 Jamie S. Kilberg (admitted *pro hac vice*)
                                                 D.C. Bar No. 480207

                                                 Sara E. Kropf (admitted *pro hac vice*)
                                                 D.C. Bar No. 481501

                                                 BAKER BOTTS, LLP
                                                 1299 Pennsylvania Avenue, N.W.
                                                 Washington, D.C. 20004-2400
                                                  Phone:   (202) 639-7700
                                                  Fax:     (202) 639-7890