# EXHIBIT 1



**Diplomacy**

*Staff Statement No. 5*

Members of the Commission, with your help, your staff has developed initial findings to present to the public on the diplomatic efforts to deal with the danger posed by Islamic extremist terrorism before the September 11 attacks on the United States. We will specifically focus on the efforts to counter the danger posed by the al Qaeda organization and its allies. These findings may help frame some of the issues for this hearing and inform the development of your judgments and recommendations.

This report reflects the results of our work so far. We remain ready to revise our understanding of these topics as our work continues. This staff statement represents the collective effort of a number of members of our staff. Scott Allan, Michael Hurley, Warren Bass, Dan Byman, Thomas Dowling, and Len Hawley did much of the investigative work reflected in this statement.

We are grateful to the Department of State for its excellent cooperation in providing the Commission with needed documents and in helping to arrange needed interviews both in the United States and in nine foreign countries. We are also grateful to the foreign governments who have extended their cooperation in making many of their officials available to us as well. The Executive Office of the President and the Central Intelligence Agency have made a wealth of material available to us that sheds light on the conduct of American diplomacy in this period.

**Counterterrorism in U.S. Foreign Policy**

Terrorism is a strategy. As a way to achieve their political goals, some organizations or individuals deliberately try to kill innocent people, non-combatants. The United States has long regarded such acts as criminal. For more than a generation, international terrorism has also been regarded as a threat to the nation's security. In the 1970s and 1980s terrorists frequently attacked American targets, often as an outgrowth of international conflicts like the Arab-Israeli dispute. The groups involved were frequently linked to states. After the destruction of Pan American flight 103 by Libyan agents in 1988 the wave of international terrorism that targeted Americans seemed to subside.

The 1993 attempt to blow up the World Trade Center called attention to a new kind of terrorist danger. A National Intelligence Estimate issued in July 1995 concluded that the most likely threat would come from emerging, "transient" terrorist groupings that were more fluid and multinational than the older organizations and state-sponsored surrogates.

This "new terrorist phenomenon" was made up, according to the NIE, of loose affiliations of Islamist extremists violently angry at the United States. Lacking strong organization, they could still get weapons, money, and support from an assortment of governments, factions, and individual benefactors. Growing international support networks were enhancing their ability to operate in any region of the world.

Since the terrorists were understood as loosely affiliated sets of individuals, the basic approach for dealing with them was that of law enforcement. But President Clinton emphasized his concern about the problem as a national security issue in a Presidential Decision Directive, PDD-39, in June 1995 that stated the U.S. policy on counterterrorism. This directive superseded a directive signed by President Reagan in 1986. President Clinton's directive declared that the United States saw "terrorism as a potential threat to national security as well as a criminal act and will apply all appropriate means to combat it. In doing so, the U.S. shall pursue vigorously efforts to deter and preempt, apprehend and prosecute, or assist other governments to prosecute, individuals who perpetrate or plan to perpetrate such attacks."

The role of diplomacy was to gain the cooperation of other governments in bringing terrorists to justice. PDD-39 stated: "When terrorists wanted for violation of U.S. law are at large overseas, their return for prosecution shall be a matter of the highest priority and shall be a continuing central issue in bilateral relations with any state that harbors or assists them." If extradition procedures were unavailable or put aside, the United States could seek the local country's assistance in a rendition, secretly putting the fugitive in a plane back to America or some third country for trial.

**Counterterrorism and Foreign Policy in Practice:  Four Examples from 1995-1996**

*Ramzi Yousef, 1995*

 The U.S. government believed that the World Trade Center attack of 1993 had been carried out by a "cell" led by Abdul Basit Mahmoud Abdul Karim, better known by his alias, Ramzi Yousef. Yousef had escaped and was a fugitive. By early 1995 he was also wanted for his participation in a plot to plant bombs on a dozen American airliners in the Far East. Yousef had fled to Pakistan. The United States learned where he was and, working effectively with Pakistani officials, carried out a rendition that sent him back to America for trial.

*Khalid Sheikh Mohammed, 1996*

In 1995 the United States also learned that Khalid Sheikh Mohammed, "KSM," was living in Doha, Qatar and was reportedly employed by a government agency there. The United States obtained other specific details that could locate KSM, who was then sought as a suspect in the Ramzi Yousef airlines plot. Working with the U.S. ambassador in Doha, the FBI and CIA worked on how to capture KSM. But they were reluctant to seek help from the Qatari government, fearing that KSM might be tipped off.

The U.S. government instead considered the option of capturing KSM without Qatari help. The available options were rejected as unwieldy and too risky. Therefore, after first waiting for a sealed indictment against KSM to be handed down by a New York grand jury, the U.S. government asked the Emir of Qatar for help in January 1996. Qatari authorities first reported that KSM was under surveillance. They then asked for development of an alternative plan that would conceal their aid to Americans. They then reported that KSM had disappeared.

KSM would later become a principal planner of the 9/11 attacks and was captured in 2003. We do not know whether KSM was tipped off in 1996. According to some unconfirmed information, KSM may have left Qatar in 1995 for an extended period after being warned by his nephew, Ramzi Yousef, that U.S. authorities were looking for him. According to this same information, he may have returned to Qatar later that year, but then became concerned again following the December 1995 capture of Wali Khan, another conspirator in the airliner bombing plot, and left Qatar for good in early 1996. The government of Qatar has not yet provided an account of this episode or its government's past relationship to KSM.

*Usama Bin Ladin, 1996*

The U.S. government was also interested in another individual with disturbing ties to terrorists, a Saudi named Usama Bin Ladin. Bin Ladin was then based in Sudan. Under the influence of the radical Islamist Hassan al Turabi, Sudan had become a safe haven for violent Islamist extremists. By 1995, the U.S. government had connected Bin Ladin to terrorists as an important terrorist financier.

Since 1979 the Secretary of State has had the authority to name State Sponsors of Terrorism, subjecting such countries to significant economic sanctions. Sudan was so designated in 1993. In February 1996, for security reasons, U.S. diplomats left Khartoum. International pressure further increased as the regime failed to hand over three individuals involved in a 1995 attempt to assassinate Egyptian president Hosni Mubarak. The United Nations Security Council imposed sanctions on the regime.

Diplomacy had an effect. In exchanges beginning in February 1996, Sudanese officials began approaching U.S. officials, asking what they could do to ease the pressure. During the winter and spring of 1996, Sudan's defense minister visited Washington and had a series of meetings with representatives of the U.S. government. To test Sudan's willingness to cooperate on terrorism the United States presented eight demands to their Sudanese contact. The one that concerned Bin Ladin was a request for intelligence information about Bin Ladin's contacts in Sudan.

These contacts with Sudan, which went on for years, have become a source of controversy. Former Sudanese officials claim that Sudan offered to expel Bin Ladin to the United States. Clinton administration officials deny ever receiving such an offer. We have not found any reliable evidence to support the Sudanese claim.

3

Sudan did offer to expel Bin Ladin to Saudi Arabia and asked the Saudis to pardon him. U.S. officials became aware of these secret discussions, certainly by March 1996. The evidence suggests that the Saudi government wanted Bin Ladin expelled from Sudan, but would not agree to pardon him. The Saudis did not want Bin Ladin back in their country at all.

U.S. officials also wanted Bin Ladin expelled from Sudan. They knew the Sudanese were considering it. The U.S. government did not ask Sudan to render him into U.S. custody.

According to Samuel Berger, who was then the deputy national security adviser, the interagency Counterterrorism and Security Group (CSG) chaired by Richard Clarke had a hypothetical discussion about bringing Bin Ladin to the United States. In that discussion a Justice Department representative reportedly said there was no basis for bringing him to the United States since there was no way to hold him here, absent an indictment. Berger adds that in 1996 he was not aware of any intelligence that said Bin Ladin was responsible for any act against an American citizen. No rendition plan targeting Bin Ladin, who was still perceived as a terrorist financier, was requested by or presented to senior policymakers during 1996.

Yet both Berger and Clarke also said the lack of an indictment made no difference. Instead they said the idea was not worth pursuing because there was no chance that Sudan would ever turn Bin Ladin over to a hostile country. If Sudan had been serious, Clarke said, the United States would have worked something out.

However, the U.S. government did approach other countries hostile to Sudan and Bin Ladin about whether they would take Bin Ladin. One was apparently interested. No handover took place.

Under pressure to leave, Bin Ladin worked with the Sudanese government to procure safe passage and possibly funding for his departure. In May 1996, Bin Ladin and his associates leased an Ariana Airlines jet and traveled to Afghanistan, stopping to refuel in the United Arab Emirates. Approximately two days after his departure, the Sudanese informed the U.S. government that Bin Ladin had left. It is unclear whether any U.S. officials considered whether or how to intercept Bin Ladin.

*Khobar Towers, 1996*

In June 1996 an enormous truck bomb was detonated in the Khobar Towers residential complex for Air Force personnel in Dhahran, Saudi Arabia. Nineteen Americans were killed and 372 were wounded. The operation was carried out principally if not exclusively by Saudi Hizbollah, an organization that had received support from the government of Iran. It is still unclear whether Usama Bin Ladin or his associates played any supporting role in this attack. This case and concern about terrorism from Hizbollah shadowed American counterterrorism policy for the next five years.

The Khobar bombing began as a law enforcement case. The director of the FBI, Louis Freeh, personally led a massive effort to gather evidence of responsibility. That investigation culminated in a June 2001 indictment of 13 members of Saudi Hizbollah and one unidentified member of Lebanese Hizbollah. Although the public indictment details some contacts of these groups with the Iranian government, no Iranian was named or charged in this indictment. In his interview with the Commission, Director Freeh described the responsibility of the Iranian government in very strong terms. He apparently provided a similar depiction to the White House in 1999.

The Khobar bombing also was an intelligence case. That aspect of the case developed significant information implicating key agencies and senior officials of the Iranian government. DCI Tenet also characterized this case to us in strong terms. He could not recall when he arrived at this judgment or how he communicated it.

The Khobar case highlights a central policy problem in counterterrorism: the relationship between evidence and action. Secretary of State Madeleine Albright emphasized to us, for example, that even if some individual Iranian officials were involved, this was not the same as proving that the Iranian government as a whole should be held responsible for the bombing. National Security Adviser Berger held a similar view. He stressed the need for a definitive intelligence judgment. The evidence might be challenged by foreign governments. The evidence might form a basis for going to war. Therefore, he explained, the DCI and the Director of the FBI must make a definitive judgment based on the professional opinions of their experts.

In this and other episodes before 9/11 we found that the CIA and the FBI tended to be careful in discussing the attribution for terrorist acts. In the Khobar case and others, the circle of individuals working with the evidence was tightly compartmented in order to prevent leaks that might limit the President's options or his time for decision. Whatever analysts might say privately, their written work was conservatively phrased and caveated. Evidence was catalogued in neutral detail. In the Khobar case, as in some others, the time lag between terrorist act and any definitive attribution grew to months, then years, as the evidence was compiled.

**The Afghanistan Problem**

From 1980 to 1991 the United States supplied billions of dollars worth of secret assistance to rebel groups in Afghanistan fighting against Soviet occupation and the Soviet-installed successor government. This assistance was funneled through Pakistan. The Pakistani Army's intelligence service, the ISID, helped train the rebels and distribute the arms.

The war against the Soviets became a 'jihad' for many Muslims. It was a clear fight against a foreign, atheist regime. Saudi Arabia contributed billions of dollars of its own,

consulting with the Americans and Pakistanis. Arab volunteers flocked to Afghanistan. One, who became a fundraiser and celebrity for the cause, was Usama Bin Ladin.

These foreigners, who received little if any U.S. assistance, had a slight impact on the war. However, some established links to both Pakistan and Afghan leaders that would prove useful in the future. Most volunteers stayed only brief periods before returning home, where their governments often viewed them with intense suspicion and little support. Angry at their treatment, these alienated fighters began to turn their grievances toward other targets.

In 1989 the Soviet Union withdrew its last forces, leaving behind an unpopular Marxist government. Soviet departure removed the main impetus for foreign volunteers, many of whom began to search for a new focus. Some joined already returned compatriots in a series of increasingly violent, domestic extremist groups. Others were attracted to a transnational struggle against perceived enemies of Islam. In 1988 Bin Ladin and a small circle of other leaders created al Qaeda with the aim of its creating and coordinating such a global struggle, the elite "foundation" for this "Islamic Army." The U.S. government knew nothing about it.

By the time of the Soviet withdrawal, Pakistan was home to an enormous—and generally unwelcome—Afghan refugee population. The badly strained Pakistani education system had little ability or interest in extending secular education to the refugees or to many Pakistanis, where the government increasingly viewed privately funded religious schools as a cost-free alternative. Over time, these schools produced large numbers of half-educated young men with no marketable skills but deeply held fundamentalist views. These young men, a ready source of manpower for both continued fighting in Afghanistan and the Kashmir insurgency, provided the continuing core of what, by 1994, became the Taliban movement. Imposing a ruthless version of Islamic law, the Taliban seemed to be a potential force for order. The Pakistani government gave them significant assistance. In September 1996, the Taliban captured Kabul and controlled most of the country. They declared the creation of the "Islamic Emirate of Afghanistan."

After suffering some disruption from his relocation to Afghanistan, Usama Bin Ladin and his colleagues rebuilt. In August 1996 he issued a public declaration of jihad against American troops in Saudi Arabia. In February 1998 this was expanded into a public call for any Muslim to kill any American, military or civilian, anywhere in the world.

By early 1997 intelligence and law enforcement officials in the U.S. government had finally received reliable information disclosing the existence of al Qaeda as a worldwide terrorist organization. That information elaborated a command-and-control structure headed by Bin Ladin and various lieutenants, described a network of training camps to process recruits, discussed efforts to acquire weapons of mass destruction, and placed al Qaeda at the center among other groups affiliated with them in its "Islamic Army."

This information also dramatically modified the picture of inchoate "new terrorism" presented in the 1995 National Intelligence Estimate. But the new picture was not widely

known.  It took still more time before officials outside the circle of terrorism specialists, or in foreign governments, fully comprehended that the enemy was much larger than an individual criminal, more than just one man, "UBL," and "his associates."

For example, in 1996 Congress passed a law that authorized the Secretary of State to designate foreign terrorist organizations that threaten the national security of the United States—a designation that triggers economic, immigration, and criminal consequences. Al Qaeda was not designated by the Secretary of State until the fall of 1999.

While Afghanistan became a sanctuary for al Qaeda, the State Department's interest in Afghanistan remained limited.  Initially after the Taliban's rise, some State diplomats were, as one official said to us, willing to "give the Taliban a chance" because it might be able to bring stability to Afghanistan.  A secondary consideration was that stability would allow an oil pipeline to be built through the country, a project to be managed by the Union Oil Company of California, or UNOCAL.

During 1997 working-level State officials asked for permission to visit and investigate militant camps in Afghanistan.  The Taliban stalled, then refused.  In November 1997 Secretary Albright described Taliban human rights violations and treatment of women as "despicable."  A Taliban delegation visited Washington in December.  U.S. officials pressed them on the treatment of women, negotiating an end to the civil war, and narcotics trafficking.  Bin Ladin was barely mentioned.

UN Ambassador Bill Richardson led a delegation to South Asia—and Afghanistan—in April 1998.  No U.S. official of this rank had been to Kabul in decades.  Ambassador Richardson used the opening to support UN negotiations on the civil war.  In light of Bin Ladin's new public fatwa against Americans in February, Ambassador Richardson asked the Taliban to turn Bin Ladin over to the United States.  They answered that they did not control Bin Ladin and that, in any case, he was not a threat to the United States.

The Taliban won few friends.  Only three countries recognized it as the government of Afghanistan:  Pakistan, Saudi Arabia, and the United Arab Emirates.

**The Saudi Effort and its Aftermath**

In May 1998 the Clinton administration issued a new presidential directive on terrorism, PDD-62.  It described ten policy programs.  Program number one was "Apprehension, Extradition, Rendition, and Prosecution."  The lead agency was the Justice Department, supported by the Department of State.

As this directive was issued a plan was being developed to capture and bring Bin Ladin to justice.  This plan would use Afghan agents of the CIA.  Top policymakers, including the CIA leadership, did not think the plan would work.  They welcomed a diplomatic alternative.

Saudi Arabia was a problematic ally in combating Islamic extremism. One of the world's most religiously conservative societies, the Kingdom's identity is closely bound to its religious links, especially as the guardian of Islam's two holiest sites. The obligation to donate to charity is a basic pillar of faith for all Muslims. Traditionally, throughout the Muslim world, there is no formal oversight mechanism for donations. Individuals select and aid the recipients directly. As Saudi wealth increased, the amounts that individuals, and the state, could and did contribute grew dramatically. Substantial sums went to finance Islamic charities of every kind.

Until 9/11, few Saudis would have considered government oversight of charitable donations necessary; many would have perceived it as interference in the performance of their faith. At the same time, the government's ability to finance most state expenditures with energy revenues has not created the need for a modern income tax system. As a result, there were strong religious, cultural, and administrative barriers to monitoring charitable spending.

Attitudes toward the United States were mixed. The United States was aligned with Israel in a conflict where Saudis ardently sympathized with the Palestinian cause. Yet for more than half a century the Saudi monarchy has had close relations with the United States, finding common cause in the commercial exploitation of its oil wealth and the anti-Communism of the cold war. In 1990 the Kingdom had chosen to host U.S. armed forces in the first war against Iraq. In 1998 it was still the base for ongoing military operations against Iraq.

The ruling monarchy also knew Bin Ladin was an enemy. Bin Ladin had not set foot in Saudi Arabia since 1991, when he escaped a form of house arrest and made his way to Sudan. Bin Ladin had fiercely denounced the rulers of Saudi Arabia publicly in his August 1996 fatwa. But the Saudis were content to leave him in Afghanistan, so long as they were assured he was not making any trouble for them there.

Events soon drew Saudi attention back to Bin Ladin. In the spring of 1998 the Saudi government successfully disrupted a major Bin Ladin-organized effort to launch attacks on U.S. forces in the Kingdom using a variety of man-portable missiles. Scores of individuals were arrested. The Saudi government did not publicize what had happened, but U.S. officials learned of it. Seizing this opportunity, DCI Tenet urged the Saudis to help deal with Bin Ladin. President Clinton, in May, designated Tenet as his representative to work with the Saudis on terrorism. Director Tenet visited Riyadh a few days later, then returned to Saudi Arabia in early June.

Crown Prince Abdullah agreed to make an all-out secret effort to persuade the Taliban to expel Bin Ladin for eventual delivery to the United States or another country. Riyadh's emissary would be the Saudi intelligence chief, Prince Turki bin Faisal. Director Tenet said it was imperative now to get an indictment against Bin Ladin. A sealed indictment against Bin Ladin was issued by a New York grand jury a few days later, the product of a lengthy investigation. Director Tenet also recommended that no action be taken on other

8

U.S. options, such as a covert action plan. Vice President Gore thanked the Saudis for their efforts.

Prince Turki followed up in meetings during the summer with Mullah Omar and other Taliban leaders. Employing a mixture of possible bribes and threats, he received a commitment that Bin Ladin would be handed over. After the Embassy bombings in August, Vice President Gore called Riyadh again to underscore the urgency of bringing the Saudi ultimatum to a final conclusion.

In September 1998 Prince Turki, joined by Pakistan's intelligence chief, had a climactic meeting with Mullah Omar in Kandahar. Omar reneged on his promise to expel Bin Ladin. When Turki angrily confronted him, Omar lost his temper and denounced the Saudi government. The Saudis and Pakistanis walked out. The Saudi government then cut off any further official assistance to the Taliban regime, recalled its diplomats from Kandahar, and expelled Taliban representatives from the Kingdom. The Saudis suspended relations without a final break.

The Pakistanis did not suspend relations with the Taliban. Both governments judged that Iran was already on the verge of going to war against the Taliban. The Saudis and Pakistanis feared that a further break might encourage Iran to attack. They also wanted to leave open room for rebuilding ties if more moderate voices among the Taliban gained control.

Crown Prince Abdullah visited Washington later in September. In meetings with the President and Vice President he briefed them on these developments. The United States had information that corroborated his account. Officials thanked the Prince for his efforts, wondering what else could be done.

The United States acted too. In every available channel U.S. officials, led by State's aggressive counterterrorism coordinator, Michael Sheehan, warned the Taliban of dire consequences if Bin Ladin was not expelled. Moreover, if there was any further attack, he and others warned, the Taliban would be held directly accountable, including the possibility of a military assault by the United States.

These diplomatic efforts may have made an impact. The U.S. government received substantial intelligence of internal arguments over whether Bin Ladin could stay in Afghanistan. The reported doubts extended from the Taliban, to their Pakistani supporters, and even to Bin Ladin himself. For a time, Bin Ladin was reportedly considering relocating and may have authorized discussion of this possibility with representatives of other governments. We will report further on this topic at a later date. In any event, Bin Ladin stayed in Afghanistan.

This period may have been the high-water mark for diplomatic pressure on the Taliban. The outside pressure continued. But the Taliban appeared to adjust and learn to live with it, employing a familiar mix of stalling tactics again and again. Urged on by the United

9

States, the Saudis continued a more limited mix of the same tactics they had already employed. Prince Turki returned to Kandahar in June 1999, to no effect.

From 1999 through early 2001, the United States also pressed the United Arab Emirates, one of the Taliban's only travel and financial outlets to the outside world, to break off its ties and enforce sanctions, especially those relating to flights to and from Afghanistan. Unfortunately, these efforts to persuade the UAE achieved little before 9/11. As time passed, the United States also obtained information that the Taliban was trying to extort cash from Saudi Arabia and the UAE with various threats and that these blackmail efforts may have paid off.

After months of heated internal debate about whether the step would burn remaining bridges to the Taliban, President Clinton issued an executive order in July 1999 effectively declaring that the regime was a state sponsor of terrorism. UN economic and travel sanctions were added in October 1999 in UN Security Council Resolution 1267.

None of this had any visible effect on Mullah Omar, an illiterate leader who was unconcerned about commerce with the outside world. Omar had no diplomatic contact with the West, since he refused to meet with non-Muslims. The United States also learned that at the end of 1999 the Taliban Council of Ministers had unanimously reaffirmed that they would stick by Bin Ladin. Relations between Bin Ladin and the Taliban leadership were sometimes tense, but the foundation was solid. Omar executed some subordinates who clashed with his pro-Bin Ladin line.

By the end of 2000 the United States, working with Russia, won UN support for still broader sanctions in UN Security Council Resolution 1333, including an embargo on arms sales to the Taliban. Again these had no visible effect. This may have been because the sanctions did not stop the flow of Pakistani military assistance to the Taliban. In April 2001 State Department officials in the Bush administration concluded that the Pakistani government was just not concerned about complying with sanctions against the Taliban.

Reflecting on the lack of progress with the Taliban, Secretary Albright told us that "we had to do something." "In the end," she said, "it didn't work. But we did in fact try to use all the tools we had."

Other diplomatic efforts with the Saudi government centered on letting U.S. agents interrogate prisoners in Saudi custody in cases like Khobar. Several officials have complained to us that the United States could not get direct access to an important al Qaeda financial official, Madani al Tayyib, who had been detained by the Saudi government in 1997. American officials raised the issue. The Saudis provided some information. In September 1998 Vice President Gore thanked the Saudis for their responsiveness on this matter, though he renewed the request for direct U.S. access. The United States never obtained this access.

The United States also pressed Saudi Arabia and the UAE for more cooperation in controlling money flows to terrorists or organizations linked to them. After months of arguments in Washington over the proper role of the FBI, an initial U.S. delegation on terrorist finance visited these countries to start working with their counterparts in July 1999. U.S. officials reported to the White House that they thought the new initiatives to work together had begun successfully. Another delegation followed up with Saudi Arabia and other Gulf states in January 2000. In Saudi Arabia the team concentrated on tracing Bin Ladin's assets and access to his family's money, exchanges that led to further, fruitful work. Progress on other topics was limited, however. The issue was not a consistent U.S. priority. Moreover, the Saudis were reluctant or unable to provide much help. Available intelligence was also so non-specific that it was difficult to confront the Saudis with evidence or cues to action.

The Bush administration did not develop any diplomatic initiatives on al Qaeda with the Saudi government before the 9/11 attack. Vice President Cheney apparently called Crown Prince Abdullah on July 4, 2001, only to seek Saudi help in preventing threatened attacks on American facilities in the Kingdom.

**Pressuring Pakistan**

Although Pakistan exists because of its Islamic identity, political Islam played a relatively minor role in its national politics until the 1970s. Following a 1977 coup, however, military leaders turned to Islamist groups for support. Fundamentalist groups became more prominent. South Asia has given birth to some of the most influential schools of Islamic fundamentalist thought, whose views shaped Taliban thinking. In addition, since the 1970s the influence of the Wahhabi school of Islam has grown as a result of Saudi-funded institutions and contact with Wahhabi ideas in Afghanistan.

For its entire existence Pakistani politics has also been preoccupied with its conflict with India. Three wars had been fought by 1971; another could easily happen—especially over the disputed territory of Kashmir. The Pakistani army is the country's strongest and most respected institution. The army sees hostile or unstable neighbors in every direction. It has adjusted by spinning webs of secret relationships. Secret Pakistani aid for the Taliban seemed for a time to make sense to the army as part of an effort to gain what some officers called "strategic depth" in a possible conflict with India. Their tolerance of Bin Ladin made sense to them too, at least for a time, in part because Bin Ladin's terrorist training camps were also training fighters for Pakistani-sponsored operations in Kashmir. The U.S. government believed Pakistani intelligence officers had direct links to Bin Ladin, perhaps concealed from the civilian leaders.

U.S. relations with Pakistan have been troubled since the Soviet withdrawal from Afghanistan. Cold war cooperation turned to arguments about military coups, nuclear proliferation, and the growing power of Islamic extremism in Pakistani life. Friendship during the Afghan jihad was replaced by concerns about corruption and regional stability.

11

Secretary Albright hoped to promote a more robust approach to South Asia when she took office. But the administration had a full agenda of concerns including a possible nuclear weapons program, illicit sales of missile technology, terrorism, an arms race and danger of war with India, and a succession of weak democratic governments. The American ambassador to Islamabad in most of the immediate pre-9/11 period, William Milam, told us that U.S. policy "had too many moving parts" and could never determine what items had the highest priority.

A principal envoy to South Asia for the administration, Deputy Secretary of State Strobe Talbott, explained the emphasis on nuclear weapons both because of the danger of nuclear war and because nuclear proliferation might increase the risk that terrorists could access such technology. In May 1998 both Pakistan and India had tested nuclear weapons. These tests marked a setback to nonproliferation policy and reinforced U.S. sanctions on both countries. But the tests also spurred more engagement in order to reduce the threat of war.

Bin Ladin and terrorist activity in Afghanistan were not significant issues in high-level contacts with Pakistan until after the Embassy bombings of August 1998. After the U.S. missile strikes on Afghanistan, Bin Ladin's network and their relationship with the Pakistani-supported Taliban did become a major issue in high-level diplomacy.

After the strikes President Clinton called Pakistani president Nawaz Sharif and he was sympathetic to America's losses. But the Pakistani side thought the strikes were overkill, the wrong way to handle the problem.

The United States asked the Saudis to put pressure on Pakistan to help. A senior State Department official concluded that Crown Prince Abdullah put "a tremendous amount of heat" on Sharif during his October 1998 visit to Pakistan.

Sharif was invited to Washington and met with President Clinton on December 2, 1998. Tension with India and nuclear weapons topped the agenda, but the leaders also discussed Bin Ladin. Pakistani officials defended Mullah Omar, and thought the Taliban would not object to a joint effort by others to get Bin Ladin.

In mid-December President Clinton called Sharif, worried both about immediate threats and the longer-term problem of Bin Ladin. The Pakistani leadership promised to raise the issue directly with the Taliban, in Afghanistan. But the United States received word in early 1999 that the Pakistani army remained reluctant to confront the Taliban, in part because of concerns about the effect on Pakistani politics.

In early 1999 the State Department counterterrorism office proposed a comprehensive diplomatic strategy for all the states involved in the Afghanistan problem, including Pakistan. It specified both carrots and sticks, including the threat of certifying Pakistan as not cooperating on terrorism. A version of this diplomatic strategy was eventually adopted by the State Department. Its author, Ambassador Sheehan, told us that it had been watered down to the point that nothing was then done with it.

By the summer of 1999 the counterterrorism agenda had to compete with cross-border fighting in Kashmir that threatened to explode into war. Nevertheless, President Clinton contacted Sharif in June, urging him strongly to get the Taliban to expel Bin Ladin. Clinton suggested Pakistan use its control over oil supplies to the Taliban and its access to imports through Karachi. The Pakistani leadership offered instead that Pakistani intelligence services might try to capture Bin Ladin themselves.

President Clinton met with Prime Minister Sharif in Washington on July 4. The prime subject was resolution of the crisis in Kashmir. The President also complained to the Prime Minister about Pakistan's failure to take effective action with respect to the Taliban and Bin Ladin. Later the United States agreed to assist in training a Pakistani special forces team for the Bin Ladin operation. Particularly since the Pakistani intelligence service was so deeply involved with the Taliban and possibly Bin Ladin, U.S. counterterrorism officials had doubts about every aspect of this new joint plan. Yet while few thought it would do much good, fewer thought it would do any actual harm. Officials were implementing it when Prime Minister Sharif was deposed by General Pervez Musharraf in October 1999. General Musharraf was scornful about the unit and the idea.

At first the Clinton administration hoped that Musharraf's takeover might create an opening for action on Bin Ladin. National Security Adviser Berger wondered about a trade of getting Bin Ladin in exchange for softer treatment of a relatively benign military regime. But the idea was never developed into a policy proposal. Meanwhile the President and his advisers were anxious about a series of new terrorist threats associated with the Millennium and were getting information linking these threats to al Qaeda associates in Pakistan, particularly Abu Zubaydah. President Clinton sent a message asking for immediate help on Abu Zubaydah and another push on Bin Ladin, renewing the idea of using Pakistani forces to get him. Musharraf told Ambassador Milam that he would do what he could. But he preferred a diplomatic solution on Bin Ladin. Though he thought terrorist should be brought to justice, he did not find the military ideas appealing.

Administration officials debated whether to keep working with the Musharraf government or confront the General with a blunter choice, to either adopt a new policy or "Washington will draw the appropriate conclusions." One such threat would be to cancel a possible presidential visit in March. U.S. envoys were given instructions that were firm, but not as confrontational as some U.S. officials had advocated. Musharraf was preoccupied with his domestic agenda but replied that he would do what he could, perhaps meeting with the Taliban himself.

Despite serious security threats, President Clinton made a one-day stopover in Islamabad on March 25, 2000, the first presidential visit since 1969. The main subjects were India-Pakistan tensions and proliferation, but President Clinton did raise the Bin Ladin problem. The Pakistani position was that their government had to support the Taliban and that the only way forward was to engage them and try to moderate their behavior.

13

They asked for evidence that Bin Ladin had really ordered the Embassy bombings a year and a half earlier. In a follow-up meeting the next day with Under Secretary of State Thomas Pickering, President Musharraf argued that Pakistan had only limited influence over the Taliban.

Musharraf did meet with Mullah Omar and did urge him to get rid of Bin Ladin. In early June the Pakistani interior minister even joined with Pickering to deliver a joint message to Taliban officials. But the Taliban seemed immune to such pleas, especially from Pakistani civilians like the interior minister. Pakistan did not threaten to cut off its help to the Taliban regime. By September the United States was again criticizing the Pakistani government for supporting a Taliban military offensive to complete the conquest of Afghanistan.

**Considering New Policies Toward Afghanistan and Pakistan**

The civil war in Afghanistan posed the Taliban on one side, drawn from Afghanistan's largest ethnic community, the Pashtuns, against the Northern Alliance. Pashtuns opposing the Taliban, like the Karzai clan, were not organized into a political and military force. The main foe of the Taliban was the Northern Alliance led by Ahmed Shah Massoud, a hero of the Afghan jihad and a leader of ethnic Tajiks. The Taliban were backed by Pakistan. The Northern Alliance received some support from Iran, Russia, and India.

During 1999 the U.S. government began thinking harder about whether or how to replace the Taliban regime. Thinking in Washington divided along two main paths. The first path, led by the South Asia bureau at the State Department, headed by Assistant Secretary of State Karl Inderfurth, and his counterpart on the NSC staff, was for a major diplomatic effort to end the civil war and install a national unity government.

The second path, proposed by counterterrorism officials in the NSC staff and the CIA, was for the United States to take sides in the Afghan civil war and begin funneling secret military aid to the Taliban's foe, the Northern Alliance. These officials argued that the diplomatic approach had little chance of success and would not do anything, at least in the short term, to stop al Qaeda. Critics of this idea replied that the Northern Alliance was tainted by associations with narcotics traffickers, that its military capabilities were modest, and that an American association with this group would link the United States to an unpopular faction that Afghans blamed for much of the misrule and war earlier in the 1990s.

The debate continued inconclusively throughout the last year and a half of the Clinton administration. The CIA established limited ties to the Northern Alliance for intelligence purposes. Lethal aid was not provided.

The Afghan and Pakistani dilemmas were handed over to the Bush administration as it took office in 2001. The NSC counterterrorism staff, still led by Clarke, pushed urgently for a quick decision in favor of providing secret military assistance to the Northern

Alliance to stave off its defeat. The initial proposed amounts were quite small, with the hope of keeping the Northern Alliance in the field, tying down Taliban and al Qaeda fighters.

National Security Adviser Condoleezza Rice discussed the issue with DCI Tenet. In early March 2001, Clarke presented the issue of aid to the Northern Alliance to Rice for action. Deputy National Security Adviser Stephen Hadley suggested dealing with this as part of the overall review they were conducting of their strategy against al Qaeda. In the meantime, lawyers could work on developing the appropriate authorities. Rice agreed, noting that the review would need to be done very soon but that the issue had to be connected to an examination of policy toward Afghanistan. Rice, Hadley, and the NSC staff member for Afghanistan, Zalmay Khalilzad, told us that they opposed aid to the Northern Alliance alone, contending that the program needed to include Pashtun opponents of the regime and be conducted on a larger scale. Clarke supported a larger program, but he warned that delay risked the Alliance's defeat.

The issue was then made part of the reviews of U.S. policy toward Afghanistan and Pakistan. The government developed formal policy papers that were discussed by subcabinet officials, the "Deputies," on April 30, June 27 and 29, July 16, and September 10. During this same time period the administration was developing a formal strategy on al Qaeda, to be codified in a National Security Presidential Directive (NSPD). The al Qaeda elements of this directive had been completed by Deputies in July. On September 4, the principals apparently approved the submission of this directive to the President.

The Afghanistan options debated in 2001 ranged from seeking a deal with the Taliban to overthrowing the regime. By the end of the Deputies meeting on September 10, the officials had formally agreed upon a three-phase strategy. It called first for dispatching an envoy to give the Taliban an opportunity to expel Bin Ladin and his organization from Afghanistan, even as the U.S. government tried to build greater capacity to pressure them. If this failed, pressure would be applied on the Taliban both through diplomacy and by encouraging anti-Taliban Afghans to attack al Qaeda bases, part of a planned covert action program including significant additional funding and more support for Pashtun opponents of the regime.

If the Taliban's policy failed to change after these two phases, the Deputies agreed that the United States would seek to overthrow the Taliban regime through more direct action. The Deputies also agreed to revise the draft NSPD on al Qaeda and add the new strategy on Afghanistan to the directive. According to Hadley, the timeframe for this strategy was about three years. Deputy Secretary of State Richard Armitage said that the Department initially continued the previous administration's policy on Afghanistan but that, after seven or eight months, State was moving clearly in the direction of a policy aimed at overthrowing the Taliban. If the United States was going to arm the Northern Alliance, he said, it was doing it to initiate regime change and should give Massoud and others the strength to achieve total victory.

15

On Pakistan the policy review concluded that the United States should attempt to improve relations with Pakistan. Assistant Secretary of State Christina Rocca called this moving from "half engagement" to "limited engagement." The United States should be willing to lift, or seek congressional support in lifting, some of the existing sanctions toward Pakistan. The administration recognized how difficult this would be.

On June 19 and 20 Pakistani foreign minister Sattar visited Washington to meet officials from the new administration. National Security Adviser Rice told him that Afghanistan was the big problem and could leave the relationship dead in the water. Sattar, Rice recalled to us, seemed to have heard it all before. But she told him that, at some point, Pakistan will be judged by the company it keeps.

A week later, Clarke followed up, urging that the United States think about what it would do after the next attack, and then take that position with Pakistan now, before the attack. Deputy National Security Adviser Hadley suggested that Clarke prepare an option for the Deputies to consider. Yet, when President Bush sent a letter on the terrorism danger to President Musharraf on August 4, the tone was similar to past requests.

Deputy Secretary Armitage acknowledged to us that, before 9/11, the new strategy toward Pakistan had not yet been implemented. After 9/11 Pakistan was confronted with a direct choice: You are either with us or against us. Musharraf made his choice.

**Conclusion**

--   From the spring of 1997 to September 2001 the U.S. government tried to persuade the Taliban to expel Bin Ladin to a country where he could face justice and stop being a sanctuary for his organization. The efforts employed inducements, warnings, and sanctions. All these efforts failed.

--   The U.S. government also pressed two successive Pakistani governments to demand that the Taliban cease providing a sanctuary for Bin Ladin and his organization and, failing that, to cut off their support for the Taliban. Before 9/11 the United States could not find a mix of incentives or pressure that would persuade Pakistan to reconsider its fundamental relationship with the Taliban.

--   From 1999 through early 2001, the United States pressed the UAE, one of the Taliban's only travel and financial outlets to the outside world, to break off ties and enforce sanctions, especially related to air travel to Afghanistan. These efforts achieved little before 9/11.

--   The government of Saudi Arabia worked closely with top U.S. officials in major initiatives to solve the Bin Ladin problem with diplomacy. On the other hand, before 9/11 the Saudi and U.S. governments did not achieve full sharing of important intelligence information or develop an adequate joint effort to track and disrupt the finances of the al Qaeda organization.