# EXHIBIT 5

CA 78-1477

FILED

SEP 4 1979

JAMES F. DAVEY, Clerk

N° 180

        The Embassy of Chile presents its compliments to the Department of State and, upon instructions from its Government, has the honor to refer to Note No.72 of the Embassy of the United States of America in Santiago, dated November 17, 1978, and to the responding note of the Chilean Ministry for Foreign Relations, dated January 16, 1979, relating to the case of <u>Letelier, et al</u>. <u>v</u>. <u>Central Nacional de Informaciones, et al</u>. (Civil Action 78-1477) in the United States District Court for the District of Columbia.

2.-         More than six months has elapsed since the Chilean Ministry presented its note concerning this matter. In the intervening time, the Government of Chile has not been informed of the position of the United States or of the District Court with respect to the points raised in that note, and, in particular, it has not been advised if the case in question has been dismissed for lack of jurisdiction.

3.-         Since its above mentioned note of January 16, 1979, the Chilean Ministry for Foreign Relations has studied further the legal considerations, both international and municipal, which are relevant to the jurisdictional issue. The results of this study are incorporated in a "Memorandum of Law" which is annexed to this note. The Memorandum makes two essential points:

(a) The District Court like courts in other countries has the authority to determine its own jurisdiction; without jurisdiction the court lacks power to maintain the civil action. Under the relevant statute (the United States Foreign Sovereign Immunities Act) as well as under international law upon which the statute is based, it is clear that the court lacks jurisdiction in this case.

//.-

2.-

(b)   The exercise of jurisdiction would involve inquiry
into alleged acts attributed by the amended com-
plaint to the Republic of Chile and portrayed in that
complaint as political decisions.  Adjudication of the
validity of such allegations formulated in a complaint
against a foreign State, is outside the jurisdiction
which a local court may exercise with respect to a for-
eign State, both under international public law and under
the  "Act of State Doctrine"  applied by the United States
courts.


4.-             The Embassy of Chile understands
that it is the policy of the Department of State, in
cases involving the Foreign Sovereign Immunities Act,
that a diplomatic note presented by a foreign government
concerning the assertion of jurisdiction under this stat-
ute is transmitted by the Department of State to the ap-
propriate court.  In accordance with this policy, the
Embassy begs leave to request that a copy of this note and
the annexed Memorandum of Law be transmitted to the United
States District Court for the District of Columbia,  so
that the Court may be further aware of the position taken
by the Republic of Chile in this matter.


            The Embassy has been instructed to
emphasize that an exercise of jurisdiction in this case
would be contrary to legal authority and would be without
precedent in international law or practice.  Although
there is a shared concern to bring all the guilty parties
to justice in accordance with the law,  this objective
cannot justify an unwarranted assertion of one nation's
judicial processes against another sovereign nation.


            The Embassy request that it be advised
by the Department of State of the decision by the District

///...

3.-

Court on these questions of jurisdiction, so that, if the position of the Republic of Chile is not accepted, the Government of Chile may consider alternative means of resolving the jurisdictional dispute that would then exist between two sovereign States. In the Chilean note of January 16, 1979, the Chilean Ministry for Foreign Relations suggested the possibility of international adjudication, and the Chilean Embassy would welcome an indication from the Department of State as to whether the United States is prepared to submit to international adjudication any jurisdictional dispute which may arise as a result of a United States judicial decision in this matter.

The Embassy of Chile avails itself of this opportunity to renew to the Department of State the assurances of its highest and most distinguished consideration.



Washington, D.C.,  AUG 1 4 1979

CA 78-1477

FILED

SEP 4 1979

JAMES E. DAVEY, Clerk

ANNEX

MEMORANDUM OF LAW

The Republic of Chile and one of its government departments, the Central Nacional de Informaciones, have been named as defendants in a civil legal proceeding that has been brought before the United States District Court for the District of Columbia in a case entitled <u>Letelier, et al. v. Central Nacional de Informaciones, et al.</u> (Civil Action 78-1477).

This memorandum presents legal authorities in support of the position that the Republic of Chile and its government departments cannot be subjected to the jurisdiction of a United States court in this case. First, the District Court in this case lacks jurisdiction over a sovereign nation with respect to the type of claims which have been asserted. Second, an exercise of jurisdiction by the District Court in this particular case would implicitly call into question the position taken and representations made by the Republic of Chile with respect to the crime that has been committed, and would involve judicial inquiry into alleged acts, policies and motivations of the Chilean Government, in violation of the Act of State Doctrine as applied by United States courts.

In demonstrating that the District Court cannot properly exercise jurisdiction, the following facts are relevant to the analysis:

1.-  On September 21, 1976, Orlando Letelier and Ronni Moffitt were slain by a bomb while in an automobile in the District of Columbia.

2.-  In the aftermath of this crime, the Republic of Chile has conducted its own investigation and has assisted United States authorities in their investigations. In the latter regard, the Republic of Chile has taken the

2.-

extraordinary step of allowing United States prosecu-
tors to come to Chile and to interrogate, in Chile, of-
ficers and employees of the Chilean Government.  The
Republic of Chile also expelled from Chile Michael
Vernon Townley, an action which ensured his entering
into the custody of United States authorities and his
becoming the principal witness in the criminal prosecu-
tions which are occurring in the United States.

3.-   The Republic of Chile has taken the position and
      has represented both to the United States Government
as well as publicly that it was not responsible for these
crimes.  The highest officials of the Chilean Government
have stated publicly that no Chilean official was in any
way authorized to commit the alleged acts that are the
basis of the civil action that has been brought in the
District of Columbia, or to engage others to commit these
acts.

4.-   On August 1, 1978, a criminal indictment against
      several individuals was brought in the District of
Columbia concerning the same events.  On August 23, 1978,
an amended complaint was filed in the pending civil action.

5.-   With respect to the individual defendants in the civ-
      il action, the amended complaint essentially pre-
sents a claim for wrongful death, the plaintiffs being
survivors of the deceased victims.  Any recovery that would
be available to survivors appears to be governed by the
District of Columbia Code.

6.-   The amended complaint in the civil action attempts
      to implicate the Republic of Chile itself in the
crime for which certain individuals have been indicted, by
attempting to portray the crime as involving a political
decision by a sovereign nation.  For example, the amended

3.-

complaint alleges not only that a sovereign nation was
responsible for two murders, but that these alleged ac-
tions were part of a <u>conspiracy</u> for the "purpose of de-
priving" of their rights "persons opposed to the lawless
and inhumane actions of the government of the Republic
of Chile" (Amended Complaint, paragraph 7); that a
sovereign nation allegedly committed these crimes "will-
fully, maliciously, deliberately and intentionally"
(Amended Complaint, paragraph 9); that a sovereign
nation allegedly "violated the norms of the law of
nations, including but not limited to acts of torture,
unlawful confinement and assassination" and allegedly
"assassinated and caused the assassination" of the slain
victims (Amended Complaint, paragraph 13); and that a
sovereign nation allegedly made "a violent attack" upon
an internationally protected person (Amended Complaint,
paragraph 15).

7.-    On November 17, 1978, the Embassy of the United
       States of America in Santiago, Chile, delivered a
Diplomatic Note to the Ministry of Foreign Affairs of the
Republic of Chile, to which were attached certain judicial
documents purporting to serve legal process on the Republic
of Chile in the civil action pending in the District of
Columbia.  On January 16, 1979, the Ministry of Foreign
Affairs delivered a Diplomatic Note in response to the
Embassy's communication.  The Ministry's Note rejected the
purported service and returned the original judicial docu-
ments to the Embassy of the United States of America.  In
so doing, the Ministry of Foreign Affairs took the position
that the District Court from which the documents originated
lacked jurisdiction in a matter of this nature, and stated
also that "the Republic of Chile cannot in this matter
permit itself to be subjected to the inquiries of a na-
tional court of another state, or to permit such a court
implicitly to question the statements made by the Chilean

4.-

Government concerning this crime."  It was requested
that the Note be transmitted to the District Court  "so
that the Court may be aware of the position taken by
the Republic of Chile in this matter."

8.-    On September 20, 1978, one month after the filing
of the amended complaint in the civil action, the
Embassy of the United States of America in Santiago,
Chile, presented to the Ministry of Foreign Affairs a
request for extradition under the Treaty on Extradition
between the United States and Chile of 1902.  The request
and supporting documents sought the extradition to the
United States of three Chilean nationals who were indicted
in the related criminal case and who are defendants in
the pending civil action:  former Colonel Juan Manuel Con-
treras Sepúlveda, former Major Pedro Espinoza Bravo, and
former Army Lieutenant Armando Fernandez Larios.  On the
following day, September 21, 1978, the Ministry transmitted
the request and supporting documents to the Supreme Court
of Chile, and it so advised the Embassy of the United
States, noting that the Supreme Court of Chile, like the
United States Supreme Court, was separate from and independ-
ent of the executive branch of the government, and that
the extradition request was under Chilean law to be decided
in the first instance by the President of the Supreme Court
of Chile in accordance with the relevant Treaty.

9.-    On May 13, 1979, the President of the Supreme Court
of Chile announced his decision that, under the re-
levant Treaty, the request for extradition had to be denied.
The decision noted that under Article 1 of the 1902 Treaty
on Extradition, it was required that the evidence in sup-
port of the extradition request be assessed  "according to
the laws of the place"  where the persons charged are found;
that under Chilean law testimony obtained in exchange for
a bargained plea cannot be the basis for a conviction; that
under Article 5 of the Treaty, neither Chile nor the United

/.

5.-

States are "bound to deliver up its own citizens or subjects"; that the United States Supreme Court has previously ruled that the United States President lacks the authority to extradite U.S. citizens under a similar treaty provision, <u>Valentine v. U.S. ex rel. Neidecker</u>, 299 U.S. 5, October Term, 1936; and that in view of the military status of the three individuals concerned, a certified copy of this decision would be transmitted to the Second Military Court in Santiago for appropriate proceedings "to investigate what responsibility may be charged to Fernandez, Espinoza, and Contreras in the homicides of Orlando Letelier and Ronni Moffitt". The attorney representing the United States Government in the extradition proceedings in Chile has appealed this decision to the Supreme Court. This appeal is now pending.

10.- The Republic of Chile has not yet been informed whether the District Court in the civil action has made a decision as to its own jurisdiction, in light of the Ministry of Foreign Affairs note of January 16, 1979.

In view of this background, the following legal points must be considered.

## THE DISTRICT COURT LACKS JURISDICTION

1.- **The Court Must Determine Its Jurisdiction in Cases Involving A Foreign Sovereign**

It is an elementary legal principle that a court may not exercise judicial authority unless it has jurisdiction. Under United States law, federal courts must establish that they have "subject matter jurisdiction." A United States

/.

6.-

district court may at any time, and at its own initiative,
determine whether it has subject matter jurisdiction.
<u>Louisville & Nashville Railroad v. Mottley</u>, 211 U.S. 149,
October Term, 1908.  Thus, in <u>Mellos v. Brownell</u>, 250 F.2d
35, United States Court of Appeals, District of Columbia
Circuit, decided November 27, 1957, the Court of Appeals
concluded that jurisdiction "may be raised at any time,
by the parties or by the court <u>sua sponte</u>," and it dismiss-
ed the suit because the United States was entitled to im-
munity -- it had not "consented" to be sued.

In cases involving foreign sovereigns, subject mat-
ter jurisdiction is determined under section 1330(a) of
the Foreign Sovereign Immunities Act, United States Code,
Title 28, Section 1330(a) which states:

> The district court shall have original jurisdiction...
> of any nonjury civil action against a foreign state...
> as to any claim for relief in personam with respect to
> which the foreign state is <u>not</u> entitled to <u>immunity</u>...
> under Sections 1605-1607 of this title... /Underscoring
> added./

The legislative material accompanying this statute indi-
cates that an action is to be dismissed for lack of juris-
diction where "the foreign state is entitled to sovereign
immunity." House of Representatives Report No. 94-1487,
September 9, 1976, page 13.

Therefore, the District Court must determine that
the Republic of Chile is <u>not</u> <u>entitled</u> to sovereign im-
munity in order to determine that it has jurisdiction.
This determination in each case is necessary because, as
suggested in the legislative material, "a disparate treat-
ment of cases involving foreign governments may have adverse
foreign relations consequences." House of Representatives
Report No. 94-1487, September 9, 1976, page 13.

7.-

The Foreign Sovereign Immunities Act makes a
distinction between establishing jurisdiction (where
it must be determined whether a foreign state is
"entitled" to immunity) and attempts by a foreign
state to claim sovereign immunity as a separate defense.
Even though a foreign state may have to meet certain
burdens in support of a separate defense, the under-
lying jurisdiction of the court must be established
through an inquiry into the entitlement of the foreign
state concerned to immunity under sections 1605-1607 of
the statute.

  2.-    There is No Jurisdiction Under
          Sections 1330(a) and 1605(a)(5)
          of the Foreign Sovereign Immunities
          Act

Since the existence of jurisdiction depends upon a
determination that the Republic of Chile is "not entitled
to immunity... under sections 1605-1607" of the Foreign
Sovereign Immunities Act, one must examine the latter pro-
visions relating to immunity. With respect to the Lete-
lier civil action, the only relevant provision relating
to the non-entitlement to immunity is Section 1605(a)(5)
of the Foreign Sovereign Immunities Act. Indeed, the Amend-
ed Complaint (paragraph 4) refers only to Section 1605(a)(5)
as a basis for concluding that the Republic of Chile and
CNI are not entitled to immunity.

Section 1605(a)(5) relates to claims based upon
private "torts". As stated in the legislative material,
"Section 1605(a)(5) is directed primarily at the problem of
traffic accidents but is cast in general terms as applying
to all tort actions for money damages..." The legislative
material states also:

/.-

8.-

> The purpose of section 1605(a)(5) is to permit
> the victim of a traffic accident or other non-
> commercial tort to maintain an action against
> a foreign state to the extent otherwise provided
> by law.

House of Representatives Report No. 94-1487, September
9, 1976, page 21.

Recent decisions by United States courts inter-
preting this provision demonstrate that Section 1605(a)(5)
relates to <u>private</u> torts, particularly traffic accidents,
and clearly does not cover scurrilous allegations of po-
litical assassinations and similar assertions designed to
implicate a foreign sovereign in a crime. In particular,
these U.S. decisions emphasize that the Foreign Sovereign
Immunities Act denies immunity only with respect to com-
mercial and private acts, and not with respect to acts
which are alleged to be of a governmental or political origin
or nature.

Thus, in <u>Carey v. National Oil Corp.</u>, 453 F. Supp.
1097, United States District Court, S.D. New York, June 15,
1978, it was stated:

> The structure of the Foreign Sovereign Immunities
> Act leaves no question that non-commercial activities
> of a foreign state will be treated with the same de-
> ference to which they were entitled before 1976. (page
> 1102)

A similar principle was announced in <u>Yessenin-Volpin
v. Novosti Press Agency</u>, 443, F. Supp. 849, United States
District Court, S.D. New York, January 23, 1978. In that
case, a Soviet dissident brought a suit claiming that two
Soviet news agencies, TASS and Novosti, had engaged in po-
litical attacks against his reputation which constituted
libel. After noting that the particular claim of libel was

expressly exempted under one provision of the Foreign
Sovereign Immunities Act, the Court then considered a
second immunity provision -- Section 1605(a)(2) -- and
whether the plaintiff's claim was of a commercial/private
character or of a governmental/political character. The
Court concluded that although it was opposed to the poli-
tical tone of the TASS and Novosti articles, it never-
theless had to conclude that the publication of Soviet
political commentary constituted "an activity whose es-
sential nature is public or governmental." (at page 857)
The claims pending against the Republic of Chile are much
more extreme in two respects. First, the Republic of Chile,
unlike TASS and Novosti, has repeatedly reaffirmed that it
did not engage in the acts that are alleged in the Complaint.
Second, Plaintiffs' efforts to implicate the Republic of
Chile in the civil action have led the plaintiffs to allege
that a political assassination has occurred -- clearly an
allegation whose essential nature is not private or com-
mercial.

In <u>Gittler v. German Information Service</u>, 408 N.Y.S.
2d 600, Supreme Court, Special Term, New York County, Part
I, June 20, 1978, the Court concluded that the engagement
of a public relations consultant "in connection with foster-
ing cultural relations in promoting understanding between
Germany and the United States" was not of a private or com-
mercial nature under the Foreign Sovereign Immunities Act.

Cases decided prior to the enactment of the Foreign
Sovereign Immunities Act are also relevant. As stated in
the legislative material, the Foreign Sovereign Immunities
Act in the area of jurisdictional immunities simply "cod-
ified" the preexisting law in the United States as fol-
lowed by the courts and the executive branch. House of Re-
presentatives Report No. 94-1487, September 9, 1976, page 7.

Thus, in <u>Heaney v. Government of Spain</u>, 445, F.2d
501, United States Court of Appeals, Second Circuit,
July 2, 1971, the Court concluded that a foreign state's
engaging of a private individual to create political pro-
paganda against a third country clearly fell within the
category of strictly political or public acts for which a
foreign state is entitled to immunity. (page 503)  The Court
then considered the argument of the appellants that po-
litical conduct which was improper should not give rise to
immunity.  The Court rejected that argument:

> We are likewise unable to accept appellant's
> alternative contention that even if the acts in
> question may be characterized as political, they
> are political acts of a sort which are incompatible
> with the appropriate exercise of diplomatic functions
> by a foreign sovereign in this country and therefore
> unprotected by whatever immunity Spain might other-
> wise enjoy...
> But even assuming that there were some basis (for
> contending that Spain's actions were improper or
> unlawful), we are not persuaded that the suggested
> conclusion would follow... Rather, to condition a
> foreign sovereign's immunity on the outcome of a pre-
> liminary judicial evaluation of the propriety of its
> political conduct, with the attendant risks of embarass-
> ment at the highest diplomatic levels, would frustrate
> the very purpose of the doctrine itself.  (page 504)

The present civil action presents an even more extreme
political situation because the Government of Chile's
involvement in the events giving rise to the action has
been categorically denied.

In summary, the allegations appearing in the amended
complaint cannot be fitted into a  "commercial or private"
framework.  It is only be alleging conduct of a political
character that the amended complaint can attempt to im-
plicate the Republic of Chile.

/.

3.-    Jurisdiction Must Also be Denied Under
       International Law, Upon Which the
       Foreign Sovereign Immunities Act Is
       Based

The Foreign Sovereign Immunities Act provisions on
jurisdictional immunities are based on international law.
This is made clear in the legislative material. House of
Representatives Report No. 94-1487 states that the Foreign
Sovereign Immunities Act codifies the restrictive principle
of sovereign immunity "as presently recognized in interna-
tional law" (page 7); that "the United States has found
that sovereign immunity is a question of international law"
(page 9); that "sovereign immunity is a doctrine of
international law" (page 8); and that the Foreign Sover-
eign Immunities Act provides "a statutory regime which
incorporates standards recognized under international law"
(page 14).

International law, in particular court decisions in
other countries, reaffirms the distinction between commer-
cial/private and governmental/political claims that is
embodied in the Foreign Sovereign Immunities Act. The fol-
lowing list of decisions from several nations shows that
alleged conduct not of a purely private character cannot be
the basis for asserting jurisdiction over a foreign sover-
eign:

Immunity of United Kingdom from Jurisdiction Case,
24 International Law Reports 207 (Federal Republic of
Germany: Ct. of App. Schleswig, March 26, 1957). In that
case, an individual accompanying the British forces in
Germany following World War II was sent to the Soviet Zone
in Germany to bring back certain arms and military plans.
He was arrested by Soviet forces, sustained injuries, and
subsequently brough suit against the United Kingdom in a

/.

12.-

West German court.  The court concluded that even though
one might attempt to portray the plaintiff's claim as
being  "of a private character,"  the claim in fact alleged
"performance of sovereign functions by the British Army"
and thus the United Kingdom was immune from suit.

    The Ditta Pomante v. Federal Republic of Germany,
40 International Law Report 64 (Italy: Civil Ct. L'Aquila,
December 7, 1960).  This was an action for wrongful con-
version and alleged breach of a contract committed by the
German Military Command in Italy during World War II.  The
plaintiff, who had provided timber to the Nazi forces,
claimed he had not been paid.  The court stated that the
distinction between private and political claims must be
respected:

> "The efforts of counsel for the plaintiff to endow
> with contractual and private law characteristics
> something which ...  seems to be and is no more and
> no less that a requisitioning of works and services
> for the benefit of the occupying forces, must there-
> fore fail ..."

The Italian court concluded that since the claim was
based on alleged exercise of sovereign and political power,
the foreign state was immune from suit. .

    Societe Anonyme Eau, Gaz, Electricite et Applications
v. Office D'Aide Mutuelle, 23 International Law Reports 205
(Belgium: Ct. of App. Brussels, January 25, 1956).  The
plaintiff suffered damages in a traffic accident involving
a British military truck transporting troops.  The court
concluded that claims relating to the transport of troops
on the order of a foreign government did not involve pri-
vate wrongs, and that the foreign state was entitled to
immunity.

    Henon V. Egyptian Government and British Admiralty,

/.

13.-

/1947/ Annual Digest 78 (Egypt: Civil Tribunal Mixed
Courts, April, 1947). Plaintiff's villa was requisition-
ed by the British Forces in Egypt during World War II.
Extensive damage was done to the villa and plaintiff
brought suit after the war.  The court dismissed the
suit on grounds of immunity.

    The Hanna I, 15 International Law Reports 146
(Norway:  Supreme Court, August 18, 1948).  A maritime
lien was asserted against a ship, alleging that the ship
had negligently caused damages after it had been requi-
sitioned by the German Occupation authorities in Norway
during World War II.  The court recognized immunity even
though the ship had subsequently been returned to private
activities.

    U Kyaw Din v. The British Government, /1956/ 23
International Law Reports 209 (Burma: High Court of Ran-
goon, July 14, 1948).  Immunity accorded in a tort action
relating to the destruction of property by the British
forces when evacuating Rangoon in 1942.

    The countries of Latin America have consistently
taken an even stronger position with respect to the immu-
nities of foreign states than have the countries of North
America and Western Europe.  Virtually all countries of
Latin America are parties to the Inter-American Convention
on Private International Law of 1928  (Bustamante Code).
Under Articles 333-335 of this international treaty, foreign
states are entitled to immunity except in cases involving
a claim with respect to real property, a waiver of im-
munity, or a counter-claim.

    It should be noted that the Republic of Chile is a
party to this treaty and, indeed, has incorporated its

/.

14.-

provisions into Chilean domestic law. <u>Codigo de Derecho
Internacional Privado</u>, art. 333-335. Under this codifi-
cation, the Republic of Chile extends a broad immunity
to all foreign states in accordance with the immunity
principles of the Inter-American Convention on Private
International Law. A refinement to this approach is
contained in a recent enactment in Chile which states:

> Any foreign state and its organizations, institutions
> and enterprises will be able to ask for immunity from
> jurisdiction and from execution in Chile, according
> to the circumstances of the case, on the same terms
> and with equal breadth and identical exceptions as
> are recognized in its own legislation in favor of
> the State of Chile or its organizations, institutions
> and enterprises.

Decree Law No. 2.349 of October 13, 1978, art. 90.

These principles, which clearly extend immunity
for claims alleging political or governmental conduct,
have been applied in Latin American judicial decisions.
Thus, the Supreme Court of Uruguay recognized immunity
of a foreign state in a case involving the construction
of a government railway. <u>Sociedad Europea de Estudios y
Empresas, S.A. v. Government of the Peoples Federal Re-
public of Yugoslavia</u>, Judgment of the Supreme Court of
Justice, Uruguay, <u>Anuario Uruguayo de Derecho Internacio-
nal</u>, 247 (1962).

The United States a few years ago benefitted from
these rules of immunity in a case involving the discharge
of a Brazilian national by the United States Information
Service in Brazil. <u>United States Information Service v.
Torres Brandao</u>, Judgment of May 4, 1967, Tribunal Superior
do Trabalho, Brazil, reported in A. Dias da Silva, <u>Direito
Processual Internacional</u>, 193 (1971).

15.-

All of these authorities demonstrate that unless
a claim is clearly of a <u>private</u> nature, a foreign state
is entitled to immunity.  Certainly, the more extreme
claims in the pending civil suit -- claims of political
assassination, of conspiracy, of malicious and deliberate
assault with intent to murder a political opponent -- do
not involve the clearly private claims to which a sover-
eign nation may be subjected under international law and
which are contemplated in the Foreign Sovereign Immuni-
ties Act.

In summary, the joining of the Republic of Chile
is based upon various alleged acts which are portrayed
in the complaint as political conduct of a foreign sover-
eign.  Wholly apart from the absence of any basis for this
imputation, it must be pointed out that it cannot be con-
cluded that the Republic of Chile  "is not entitled to
immunity under Section 1605-1607"  of the Foreign Sover-
eign Immunities Acts, because the amended complaint with
respect to the Republic of Chile is not based upon alle-
gations of commercial or private acts.  Consequently,
jurisdiction does not exist under United States Code,
Title 28, Section 1330(a) and the civil action against the
Republic of Chile must be dismissed.

### THE DISTRICT COURT MAY NOT EXERCISE JURISDICTION BECAUSE OF THE ACT OF THE STATE DOCTRINE

The Act of State Doctrine is a longstanding prin-
ciple of American law under which United States courts de-
cline to adjudicate cases relating to the acts, conduct
and policies of foreign governments.  The United States
Supreme Court in the case of <u>Banco Nacional de Cuba v.
Sabbatino</u>, 376 U.S. 398, October Term, 1963, stated that
the Act of State Doctrine has  "constitutional underpinnings"

/.

16.-

(at page 423).

In the earlier case of <u>Oetjen v. Central Leather Co.</u>, 246 U.S. 297, October Term, 1917, the Supreme Court stated:

> The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest consideration of international comity and expediency. To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations." (at pages 303-304).

These principles received additional explanation in the recent case of <u>Hunt v. Mobil Oil Corp.</u>, 550 F. 2d 68, United States Court of Appeals, Second Circuit, decided January 12, 1977. In that decision, the Court of Appeals concluded that the Act of State Doctrine precluded United States courts from making inquiry into the "motivation" and "policies" of the Libyan Government. The Court Stated:

> The American judiciary is being asked to make inquiry into the subtle and delicate issue of the policy of a foreign sovereign, ... precluded by the act of state doctrine as well as the realities of the fact-finding competence of the court in an issue of far-reaching national concern. (at page 77)

The Court of Appeals noted that the United States Department of State had condemned the Libyan actions which were involved in the case, and concluded that this was an additional reason for the Court not to exercise jurisdiction. Then the Court stated:

/.

17.-

> Even if the Department of State had not spoken, the
> inquiry required by the third claim in this private
> litigation is hardly within the fact-finding compe-
> tence of the judicial branch...
> This necessarily would require a wholesale examination
> of Libyan policy—how did it treat other companies,
> what provoked its displeasure, how far could conces-
> sions by Hunt appease President al-Qadhafi... To
> dismiss this examination as an issue of fact and not
> of law and therefore beyond the ambit of the act of
> state doctrine is, in our view, neither conceptually
> nor pragmatically sound.  (at page 78)

The same considerations apply to the pending civ-
il action.  The Republic of Chile has repeatedly re-
presented, both diplomatically and publicly, that it
was not responsible for the crimes which have occurred,
and that no Chilean official was in any way authorized
to commit those acts or to engage others to do so.

If the District Court were to exercise juris-
diction in the pending civil action, it would be implicit-
ly questioning the foregoing representations--represen-
tations which have been made in Chile by the highest of-
ficials of the Chilean Government.

In addition, judicial inquiry into these represen-
tations as well as into the amended complaint would re-
quire the District Court to "find facts" relating to
events which occurred in Chile.  The amended complaint
in effect alleges that the Republic of Chile directed a
United States citizen (Townley)  and several Cuban
nationals to commit a crime -- and that this alleged
direction of a crime was committed by Chilean officers
within Chile.  Thus, the district Court would not only be
making inquiry into the representations made in Chile,
but also into claims cocerning alleged events in Chile.

Finally, as in the case of Hunt v. Mobil Oil Corp.,

18.-

the amended complaint makes allegations concerning the motivation and policies of a sovereign nation. It alleged that a sovereign nation commited crimes and did so "willingly, maliciously, deliberately and intentionally." It alleges a "conspiracy" by a sovereign nation, that crimes were allegedly committed as part of alleged policies to deny fundamental rights, "to silence those opposed to its policies," and to commit other wrongful acts.

There can be no more extreme example than this case, where a United States court is being asked to inquire into the motivations and policies of another sovereign state. When these considerations are added to the other reasons for applying the Act of State Doctrine discussed above, it becomes clear that the Doctrine precludes an exercise of jurisdiction in this situation.

## CONCLUSIONS

I.   The District Court lacks jurisdiction under United States Code, Title 28, Section 1330(a).

II.  Even if jurisdiction were found to exist --which would be an improper result-- nevertheless such jurisdiction could not be exercised because the claims would require judicial review of the acts, representations, policies and motivation of a foreign sovereign -- judicial endeavors prohibited by the Act of State Doctrine.