UNITED STATES DISTRICT COURT
SOUTHERN DISTRIC OF NEW YORK

|  |  |  |
|---|---|---|
| In re TERRORIST ATTACKS on SEPTEMBER 11, 2001 | ) ) ) ) | 03 MDL 1570 (RCC) |
| KATHLEEN ASHTON et al | ) ) ) |  |
| Plaintiffs, v. | ) ) ) | 02 CV 6977 (RCC) |
| AL QAEDA ISLAMIC ARMY et al | ) ) ) |  |
| Defendants | ) ) ) |  |

**MEMORANDUM OF DEFENDANTS SALEH ABDULLAH KAMEL
AND AL BARAKA INVESTMENT & DEVELOPMENT CORPORATION
IN OPPOSITION TO ASHTON PLAINTIFFS' MOTION TO AMEND
THE FOURTH AMENDED COMPLAINT**

Martin McMahon & Associates
1150 Connecticut Avenue, NW
Suite 900
Washington, D.C. 20036
(202) 862-4361

*Attorneys for Defendants
Saleh Abdullah Kamel and
Al Baraka Investment & Development Corp.*

# TABLE OF CONTENTS

The Fourth Amended Complaint Alleges Facts About Saleh Kamel
And Al Baraka Investment & Development Corp. That Fail To State
a Claim To Support Liability or Proximate Cause And The Proposed
Amendments Would Merely Restate These Same Kind of Facts In Support
Of the Same Inadequate Legal Theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    1.       The Plaintiffs' Legal Theory of Liability and Proximate Cause
    Embraces the 'Six Degrees of Separation" Concept of Remote
    Connectivity Which is Legally Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    2.  The Proposed New Allegations Merely Restate The Same
    Kind of Facts to Support The Same Inadequate Legal Theory of Liability
    And Proximate Cause Found in the Fourth Amended Complaint . . . . . . . . .    8

CONCLUSION:  The Motion to Amend The Fourth Amended Complaint
Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

# TABLE OF AUTHORITIES

Page Number

**Federal Cases:**

| | |
|---|---|
| American Express Shareholder Litigation, 39 F.3d 395 (2nd Cir. 1994) | 1 |
| Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002) | 8, 12 |
| Browning v. Clinton, 292 F.3d 235 (D.C. Cir. 2002) | 5 |
| Casey v. Corson & Grumman Company, 221 F.2d 51 (D.C. Cir. 1955) | 6 |
| City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415 (3rd Cir. 2002) | 5 |
| First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2nd Cir. 1994) | 6 |
| Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) | 4 |
| Leonelli v. Pennwalt Corp., 887 F.2d 1195 (2nd Cir. 1991) | 1 |
| In re Pennie & Edmonds LLP, 323 F.3d 86 (2nd Cir. 2003) | 11 |
| W.E. Media Inc. v. General Electric Co., 218 F.Supp.2d 463 (S.D.N.Y. 2002), *aff'd*, 2004 U.S. App. Lexis 7379 (2nd Cir. 2004) | 2 |

**Federal Rules of Civil Procedure:**

| | |
|---|---|
| F.R.Civ.Pr 11 | 11 |

**State Cases:**

| | |
|---|---|
| Lindsay v. Lockwood, 625 N.Y.S.2d 393, 163 Misc.2d 228 (Sup.Ct 1994) | 5 |
| Weissich v. County of Marin, 274 Cal.Rptr. 342, 224 Cal.App.3d 1069 (1991) | 6 |

**English Cases:**

| | |
|---|---|
| Jameel v. Times Newspapers Limited, 2003 EWHC 2609 (Queens Bench, November 7, 2003) | 10 |

**Other Authorities:**

| | |
|---|---|
| Moore's Federal Practice 3d §15.15[3] | 1 |

Restatement (Second) Torts §433 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . .   6

**Books:**

George Crile, *Charlie Wilson's War* (2003) . . . . . . . . . . . . . . ... . . . . . . . . .   11-12

Duncan J. Watts, *Six Degrees:  The Science of a Connected Age* (2003) . .   2

*May It Please The Court:*

The Defendants Saleh A. Kamel and Al Baraka Investment & Development Corp. oppose the Plaintiffs' Motion to Amend the Fourth Amended Complaint to add allegations respecting either Saleh Kamel or Al Baraka Investment & Development Corp. on the ground that it would be futile and that the new allegations are just as inadequate as the factual allegations of the Fourth Amended Complaint.

*Moore's Federal Practice 3d* §15.15[3] observes:

Courts will not grant leave to amend, however, when the proposed amendment is legally insufficient and it would be futile to grant leave to amend. An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.

Similarly, the Second Circuit affirmed the denial of motion for leave to amend in *In re American Express Co. Shareholder Litigation,* 39 F.3d 395, 402 (2nd Cir. 1994) because new allegations would not be sufficient to allege proximate cause:

Moreover, leave to amend may be denied if the amendment would be futile. *Foman v. Davis,* 371 U.S. at 182, *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1198 (2nd Cir. 1991). Appellants have not indicated how they could satisfy RICO's proximate cause requirement, and it is hardly self-evident that they could transform the facts pleaded into a sufficient allegation of proximate injury to American Express.

The Plaintiffs propose to amend their Complaint to add new factual allegations about Saleh Kamel and Al Baraka Investment & Development Corp., but none of these allegations would state a claim of providing material support for terrorism. None of the allegations charge or show a conspiracy to provide material support for terrorism, and none of the allegations would support or show a claim of aiding and abetting terrorism. The proposed allegations are, in part, a continuation of the inadequate legal theory that a

1

person who became a minority shareholder in a bank a decade or more before the terrorist activity complained in the Complaint, provides material support to terrorists, because terrorist or others who have some connection, even indirect, have banking relationships with the bank.  Some of the new allegations, like the allegations in the Fourth Amended Complaint relating to Omar Al-Bayoumi, are based on the employment of persons who have an indirect connection to the Defendants.  Other new allegations are legally inadequate for the reasons explained herein.

**The Fourth Amended Complaint Alleges Facts About Saleh Kamel
And Al Baraka Investment & Development Corp. That Fail To
State a Claim To Support Liability or Proximate Cause And The Proposed
<u>Amendments Would Merely Restate These Same Kind of Facts</u>**

**1.  The Plaintiffs' Legal Theory of Liability and Proximate Cause
Embraces the 'Six Degrees of Separation" Concept of Remote Connectivity
<u>Which is Legally Inadequate</u>**

The allegations of the Fourth Amended Complaint relating to Saleh Kamel and Al Baraka Investment & Development Corp. are a classic example of the application of the Six Degrees of Separation problem, which posits that anyone in the known world could be connected to anyone else through a chain consisting of no more than five intermediaries.  *See* D.J. Watts, *Six Degrees:  The Science of a Connected Age*  (2003). This Court has ruled that the Six Degrees of Separation concept, built as it is upon a string of connections that does not directly connect the first and last parties, is legally inadequate to support liability and causation.  *WE Media Inc. v. General Electric Co.,* 218 F.Supp.2d 463, 475 (S.D.N.Y. 2002)(rejecting plaintiff's causation theory based on connections between General Electric and other entities partially owned by General Electric), *aff'd,* 2004 U.S. App. Lexis 7379 (2nd Cir. 2004).

2

A review of the allegations of the Fourth Amended Complaint shows (1) there are no allegations that Saleh Kamel or Al Baraka Investment & Development Corp. were involved in the planning or implementation of the conspiracy, which, following on the heels of Osama bin Laden's February 1998 "fatwah," that it is duty of Muslims to kill Americans wherever they can be found, *Fourth Amended Complaint* ¶120-21, allegedly began in Hamburg, Germany in 1999, *Fourth Amended Complaint* ¶226-228, to murder the Plaintiffs on September 11, 2001; (2) there are no allegations that Saleh Kamel or Al Baraka Investment & Development Corp. later made an agreement with anyone in furtherance of this conspiracy; and (3) there are no allegations that Saleh Kamel or Al Baraka Investment & Development Corp. knowingly provided substantial assistance to the murderers who hijacked the planes. Indeed, there are no allegations in the Fourth Amended Complaint that Saleh Kamel or Al Baraka Investment & Development Corp. agreed with anyone at any time to cause harm to anyone including the Plaintiffs.

Unable to allege that Saleh Kamel or Al Baraka Investment & Development Corp. are directly responsible for the murders of the Plaintiffs or that they conspired to harm anyone, the Plaintiffs have devised a legal theory, with its foundation in the concept of Six Degrees of Separation that you can connect anyone to anything (such as the murders of the Plaintiffs) through a limited number of intermediaries, that such connections are sufficient to support a claim of aiding and abetting terrorism and proximately causing the deaths and injuries of the Plaintiffs. In the case of Saleh Kamel and Al Baraka Investment & Development Corp. the factual allegations are two-fold: (1) in 1984, Saleh Kamel and Al Baraka Investment & Development Corp. became minority shareholders in al Shamal Islamic Bank based in Khartoum, Sudan and that in the same time period they

invested in other Islamic banks in Arab and Middle Eastern countries; and (2) that prior to 1998, a man named Omar al Bayoumi was employed by Dallah Avco, an aviation subsidiary of Al Baraka's parent company, Dallah Al Baraka Group, LLC, as an assistant to the director of finance for Dallah Avco.  According to the allegations of the Fourth Amended Complaint, Saleh Kamel and Al Baraka Investment & Development Corp. become "connected" to terror because: (1) in 1991, when Osama bin Laden was forced out of Saudi Arabia and moved to Sudan, he allegedly invested $50 million in al Shamal Islamic Bank and he established construction and trading companies in Sudan that had accounts in al Shamal Islamic Bank from which it made deposits and withdrawals, of which some were in support of terror training; and (2) in early 2001, Omar al Bayoumi allegedly paid rent on an apartment in San Diego where two of the September 11 hijackers resided briefly; and (3) a Saudi charity, Al Haramain, transferred money from its account at Al Baraka Turkish Finance House, a Turkish bank partially owned by Al Baraka Investment & Development, to Al Haramain's account at Deposit Bank in Sarajevo, Bosnia, and these Al Haramain funds were later allegedly used to support terror in Bosnia.

The legal flaw in applying the Six Degrees of Separation concept of connectivity is that it totally fails to support a legal claim of aiding and abetting international terrorism and it falls well short of meeting the requirements that a defendant's conduct represent the proximate cause of the Plaintiffs' injuries.  In the leading case of *Halberstam v. Welch*, 705 F.2d at 478, 484 (D.C.Cir. 1983)., the D.C. Circuit recognized six factors to guide the Court in determining whether a defendant has provided "substantial assistance" in support of another's wrongful act to support a claim

of aiding and abetting: (1) the nature of the act encouraged; (2) the amount of the assistance given by the defendant; (3) the defendant's presence or absence at the time of the tort, (4) his relation to the other tortfeasor; (5) his state of mind; and (6) duration of the assistance provided.   The Court of Appeals further stated that where the vicarious act is longer in time and physically farther away from the act of the direct tortfeasor, the case is not appropriate for an aiding and abetting claim.  *Id.* at 482 and 485.  Accord, *Lindsay v. Lockwood,* 625 N.Y.S.2d 393, 397, 163 Misc.2d 228 (Sup. Ct. 1994) (driving plaintiff to a party where plaintiff was injured and presence at party is not assistance --- "causal relationship is too distant.").   There are no allegations in the Fourth Amended Complaint respecting Saleh Kamel or Al Baraka Investment & Development Corp. that meet this legal test for knowingly provided "substantial assistance" to a wrongdoer --- a critical element of aiding and abetting --- and none of the proposed new allegations meet this test either.

Similarly, proximate cause requires that a plaintiff plead "a direct relationship between the injury asserted and the injurious conduct alleged."  *Browning v. Clinton,* 292 F.3d 235, 249 (D.C. Cir. 2002); *City of Philadelphia v. Beretta U.S.A.Corp.,* 277 F.3d 415, 423 (3rd Cir. 2002).  Pleading a sequence of circumstances or connections linking the first party to the last party fails to plead proximate cause and leads to dismissal of the complaint.  *City of Philadelphia v. Beretta U.S.A.Corp.,* 277 F.3d 415, 423 (3rd Cir. 2002).[1]  Remoteness in time and place between the Defendant's conduct and the

---

[1]  In its opinion, the Third Circuit rejected a "long and tortuous" sequence of connections relied on by Plaintiff to support its claim of proximate cause: "In its analysis, the district court examined the route a gun takes from the manufacturer to Philadelphia streets, finding it 'long and tortuous.'  First the defendant manufacturers sell guns to licensees; second, the licensees sell the guns to dealers; third, the dealer sells it to a lawful purchaser acting as a straw buyer; fourth, the straw buyer transfers the weapon to a criminal or a youth; fifth the transferee uses the gun to commit a crime, or the youth injures himself or a companion; and finally, demand on the City's or the organizational plaintiffs' resources is increased."  *Id.*

Plaintiffs' injuries demonstrates the absence of proximate cause. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2nd Cir. 1994)(5 year period of time between defendant's actions and plaintiffs injury suggests external factors were a substantial cause); *Weissich v. County of Marin*, 274 Cal.Rptr. 342, 351-52, 224 Cal.App.3d 1069, 1083-84 (1991)(*dicta:* eleven year lapse of time between the alleged negligent misrepresentation and the murder may be the case where the absence of proximate cause can be determined as a matter of law); *Casey v. Corson and Gruman Company*, 221 F.2d 51, 52 (D.C. Cir. 1955)(actor's conduct "too remote . . .in time, place and circumstances to be a proximate cause of plaintiff's injuries."); *Restatement (Second) Torts*, §433(c) and *comment f* (1965)(long length of time renders actor's conduct too attenuated to be the cause of plaintiffs' injuries).

### 2. The Proposed New Allegations Merely Restate The Same Kind of Facts to Support The Same Inadequate Legal Theory of Liability And Proximate Cause Found in the Fourth Amended Complaint

The proposed allegations that Plaintiffs now want to add to a Fifth Amended Complaint all fall into the same quicksand of indirect and remote connectivity based on the concept of Six Degrees of Separation. All of the proposed allegations are remote in time and place from the injuries of the Plaintiffs. These allegations are:

> *Defendant Saleh Abudullah Kamel was a founder and an original trustee of defendant Sana-Bell, Inc., a SAAR network entity and the investment branch of defendant IIRO, a charity front tied to al Qaeda.*

This allegation is just another remote allegation dating back to 1989. The Complaint alleges that Sana-Bell, Inc. was incorporated in the District of Columbia in 1989, and from 1992-1998 it invested $3.7 million with Soliman S. Biheiri and

6

companies he controlled.  *Fourth Amended Complaint* ¶¶323, 326.  Biheiri, according to the Complaint, operated another investment fund called BMI, which focused on real estate and real estate development, *Fourth Amended Complaint* ¶328.   There is nothing in the proposed allegation, which even hints that Saleh Kamel knowingly provided material support for terrorism or that indicates any action on the part of Saleh Kamel that is the proximate cause of Plaintiffs' murder.  This is another example where the Complaint, embracing the Six Degrees of Separation concept of connectivity, tries to link one person to another person who is linked to another person who "may be" (*Fourth Amended Complaint* ¶329) linked to an act of terrorism other than the September 11 murders.

> *Defendant Al Baraka, a wholly owned subsidiary of defendant Dallah Al Baraka, invested between $2 and $3 million per month with, BMI, a Muslim Brotherhood investment fund established in the United States and run by defendant Soliman Biheiri. By design, defendant BMI had no responsibility to report back to AlBaraka regarding the purported investment of these funds.  BMI used Al Baraka's investments to fund terrorist acts.*

As just noted, the Complaint alleges that BMI "acted as an investment bank focused on real estate and real estate development along the North East seaboard." *Fourth Amended Complaint* ¶328.  The Complaint also alleges that some of BMI's funds were used to support terrorism.  According to the proposed allegation,  "BMI had no responsibility to report back to [Al Baraka] regarding the purported investment of these funds, which were used by BMI to fund terrorist acts."  This proposed allegation would confirm that Al Baraka Investment & Development Corp. did not know that BMI was being used for terrorist purposes as alleged, and therefore Al Baraka Investment & Development Corp. could not be knowingly aiding and abetting terrorism as a matter of

law.  *Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002)(providing of funding alone insufficient to state a claim; requirement of knowing participation in terrorist funding).

> *Defendant Saleh Abdullah Kamel also partnered with defendant Youssef Nada and defendant Prince Mohammed al Faisal al Saud in founding defendant Faisal Islamic Bank-Sudan.*

This proposed allegation is likewise a dated allegation going back to a time in history even earlier than 1984 as Paragraph 65 of the Fourth Amended Complaint alleges that Faisal Islamic Bank-Sudan was one of the initial investors in the Al Shamal Islamic Bank in 1984.  This dated historical fact does nothing to show support for terrorism or a causal link to the murder of the Plaintiffs on September 11, 2001 for the reasons stated in Defendants' Motion to Dismiss.  This is just another classic example that shows the Plaintiffs' legal theory is built on the Six Degrees of Separation concept of connectivity.

> *Defendant Saleh Abdullah Kamel and Al Baraka invested substantial sums of money in Bank Al Taqwa.*
>
> *As of October, 2000, Bank Al Taqwa was providing a line of credit to one of Bin Laden's close associates.*

Like the allegations relating to al Shamal Bank, Plaintiffs propose to allege that Saleh Kamel and Al Baraka Investment & Development Corp. are shareholders in a bank that allegedly provided a line of credit to an associate of Osama bin Laden.  This is a continuation of the inadequate legal claim that a minority shareholder in a bank that allegedly provides material support to terrorists who have banking relationships with the bank merely because he is a shareholder.  This fails to state a claim for which relief can be granted.

8

> *Defendant Dallah Al Baraka employed defendant Abdul Sattar Abu Ghuddah as head of its sharia board. Ghuddah is a preference shareholder in defendant Bank Al Taqwa, which has been listed as Specially Designated Global Terrorist Entity by the United States Treasury.*
>
> *As late as September 2001, defendant Youssef Nada, the head of Bank Al Taqwa and Kamel's business partner in Faisal Islamic Bank-Sudan, was providing Bin Laden with financial assistance.*

There are no allegations in the Complaint about Mr. Abu Ghuddah or that he has done anything, and there is nothing to suggest he in involved with or sponsors terrorism. This allegation is a sad attempt to connect causally Al Baraka Investment & Development Corp. to terrorism because a person has a connection to a connection to an entity allegedly supporting terrorism. The Plaintiffs' allegations amount to nothing more than an application of the remote and distant connectivity concept of Six Degrees of Separation. Similarly, the allegation that Youseff Nada is the head of Bank Al Taqwa, is nothing more than another transparent application of the Six Degrees of Separation concept, attempting to associate Saleh Kamel with the allegations respecting Mr. Nada because, as noted above, Kamel and Nada are connected because, prior to 1984, both were involved in investing in Faisal Islamic Bank Sudan.

> *Defendant Saleh Abdullah Kamel was included on the "Golden Chain" – a list of wealthy donors who gave money to Osama bin Laden and other leaders of al Qaeda at a time when they were publicly advocating a war against "infidels" – primarily the United States and its citizens.*

The "Golden Chain" is another dated, historical document that has been recently described by an English court which took testimony on the document as falling "well short of establishing the existence of sufficient grounds for an enquiry or investigation:"

> In my judgment the [Golden Chain] list falls well short of establishing the existence of sufficient grounds for an enquiry or investigation. In brief my reasons are these: the list is in manuscript; its author is unknown, as is the

> source of the author's information; there is nothing in the list to suggest that the individuals named have made donations, rather than that they are potential donors; the list has been dated by Mr. Brisard, the lead investigator in the *Burnett* case, to 1988 at which time [Osama bin Laden] was engaged in resisting the Soviet incursions into Afghanistan with the approval of western governments; there is nothing to link the list to Al-Qaeda; any money which was donated was apparently to be applied to fund fighters in Chechriya and Bosnia and not the atrocities which took place many years later in New York. It is true that the Golden Chain list was attached to an Evidentiary Proffer filed in US criminal proceedings against Mr. Aranout in support of the admissibility of co-conspirator statements. But the Evidentiary Proffer was ruled inadmissible. In any event Mr. Aranout was not convicted of any offence implicating him in terrorist activities on the part of Al-Qaeda or [Osama bin Laden] in the US; he pleaded guilty to defrauding donors by using their donations without their knowledge to fund activities for which they were aware.

*Jameel v. Times Newspapers Limited*, 2003 EWHC 2609 (Q.B. November 7, 2003)(Gray, J.)(copy attached).

The significance of this ruling cannot be understated. Mr. Jameel was a defendant named in the *Burnett* litigation brought by the families of the victims of the September 11 attacks. The London Times printed a story that Mr. Jameel was a defendant in the litigation and there was suspicion linking him to terrorism. The Defendant, Times Newspapers, moved for summary judgment on its defense of justification in a libel action brought by Mr. Jameel, relying on the Golden Chain document for its justification. The court noted that the defense of justification would require the Times to show, where the publication essentially reports that there is an allegation of suspicious conduct by the plaintiff and that there is sufficient reason to enquire or investigate the conduct, that the Times was *subjectively reasonable* in relying on hearsay such as the Golden Chain document for its defense. In holding that "the [Golden Chain] list falls well short of establishing the existence of sufficient grounds for an enquiry or investigation" *id.,* the Court held that it was <u>not</u> *subjectively reasonable* to rely on the Golden Chain document,

10

a document dating to "1988 at which time [Osama bin Laden] was engaged in resisting the Soviet incursions into Afghanistan with the approval of western governments." *Id.* If the Golden Chain document falls far short of meeting the subjectively reasonable test, it cannot satisfy counsel's requirements of F.R.Civ.Pr 11.

According to their brief, Plaintiffs' counsel wants to amend the Fourth Amended Complaint to allege that the "Golden Chain" is "a list of wealthy donors to Osama bin Laden's cause at a time when Bin Laden was publicly advocating wars against 'infidels' – primarily the United States, its citizens and interests." Rule 11 requires an attorney signing a Complaint to certify that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ***- (3) the allegations and other factual contentions have evidentiary support . . ." F.R.Civ.Pr. 11. Sanctions may be imposed "if the lawyer's claim to have evidentiary support is not objectively reasonable." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2nd Cir. 2003). In view of the *Jameel* ruling, since the Golden Chain list fails to provide a subjectively reasonable basis for enquiry, it cannot provide an objectively reasonable basis for alleging that Saleh Kamel was a donor to Osama bin Laden's cause as required by Rule 11. Nor, as the English court found, given that the document dates to 1988 when both bin Laden and the United States were raising funds in a war against Soviet aggression in Afghanistan[2] and one year before al Qaeda was organized, *Fourth Amended Complaint*

---

[2] It is well known and well documented that the greatest provider of resources to the muhajideen fighters in Afghanistan during this time period was the United States of America through the covert support of both Congress and the Central Intelligence Agency that ultimately reached 750 million dollars per year. G. Crile, *Charlie Wilson's War* (2003). As Crile writes, the United States and Saudi Arabia were equal partners in raising money for the support of the mujahideen in Afghanistan. Saudi Arabia matched the United States dollar for dollar, with the United States urging Saudi Arabia to support "your Muslim brothers . . . using the money for food, for the families, for clothing, for weapons, for repairing the mosques." C. Crile, *Charlie Wilson's War* 165, 238, 276, 340 (2003). In the epilogue of his book, Crile acknowledges that the terror attacks of September 11, 2001 are "unforeseen and unintended consequences"

11

¶33-34, does the document provide an objectively reasonable basis for claiming that bin Laden was publicly advocating wars against --- primarily the United States, its citizen and interests." Bin Laden's "fatwah" directed at the interests of the United States and its interest was not uttered until ten years later in February 1998. *Fourth Amended Complaint* ¶121.

This is further demonstration that the Plaintiffs' legal theory incorporates the remote connectivity concept of Six Degrees of Separation, yet fails to meet the legal requirements for pleading aiding and abetting or proximate cause.

*Defendant Saleh Abdullah Kamel also personally contributed large sums of money to defendant IIRO and advocated that all zakat collected worldwide be sent to that organization.*

Finally, the Plaintiffs want to add an allegation that Saleh Kamel personally donated large sums of money to the International Islamic Relief Organization (IIRO) and advocated that all zakat collected worldwide be sent to that organization. This allegation would fail to state a claim for which relief can be granted, because it is legally inadequate to show aiding and abetting terrorism or causation of plaintiffs' injuries. There is no allegation of when these donations to IIRO were made or when Saleh Kamel allegedly advocated that all *zakat* be sent to the IIRO. The Complaint explains that IIRO is an Islamic charity that was founded in 1978, *Fourth Amended Complaint* ¶270, a "direct arm of the Saudi Royal family," *Fourth Amended Complaint* ¶267, and by some time during

---

of American support for the Afghan resistance during the 1980s. "Afghanistan was the largest and most successful covert operation ever mounted by the CIA. But the scope and nature of this campaign has still not registered in the consciousness of most Americans. Nor is it understood that such secret undertakings inevitably have unforeseen and unintended consequences, which in this case remained largely ignored. None of the sponsors of the campaign, least of all Charlie Wilson, has ever felt responsible for the path the CIA-sponsored jihad has taken; perhaps that's because their intentions were so pure and because the specific objectives they sought were initially so overwhelmingly successful." C. Crile, *Charlie Wilson's War* 508-09 (2003).

12

the 1990s, the IIRO allegedly began providing financial support to al Qaeda and other groups in support of terrorism. *Fourth Amended Complaint* ¶310. To allege that a person sponsors terrorism because he allegedly makes donations to a humanitarian organization is, without more, legally inadequate. *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1011-12 (7th Cir. 2002)(allegation that defendant gave money to a terror group, by itself, legally inadequate). There must be some allegation showing that the donations were not remote in time from the injuries suffered by the Plaintiffs, *Boim*, *id.* at 1007, and that the party provided the funding with the knowledge and intent to further terrorist acts. *Id.* at 1015. This allegation is just another example that the Plaintiffs' legal theory is built on the remote connectivity concept of Six Degrees of Separation.

## CONCLUSION

The Plaintiffs' Motion to Amend the Fourth Amended Complaint should be denied on the grounds that it would be futile, because the proposed allegations would merely restate the same kind of facts and inadequate legal theory of liability and proximate cause found in the Fourth Amended Complaint.

Dated: June 4, 2004.

    Respectfully submitted,
    Martin McMahon & Associates
    1150 Connecticut Avenue, NW
    Suite 900
    Washington, D.C. 20036
    (202) 862-4361

    *Attorneys for Defendants*
    *Saleh Abdullah Kamel and*
    *Al Baraka Investment & Development Corp*