# Exhibit 1

## More Definite Statement as to Sulaiman Al-Ali

Plaintiffs incorporate by reference the entirety of the Third Amended Complaint, (*Burnett* original docket #29, filed November 22, 2002) including all of the allegations and claims contained therein. Plaintiffs additionally allege, upon information and belief, as to Sulaiman Al-Ali, *Burnett* Defendant #14:

1.  On July 22, 1991, Sulaiman bin Ali Al-Ali (or "Al-Ali"), wealthy businessman, member of the International Islamic Relief Organization's (IIRO) Executive Committee, and a member of the Shura (Consultative) council of the Kingdom of Saudi Arabia, established the U.S. branch of Defendant IIRO) at 360 S. Washington St. in Falls Church, Virginia. Sulaiman bin Al-Ali is alleged to have aided, abetted, materially supported and conspired with Defendants IIRO, Muslim World League, Sana-Bell, Inc., and Taibah International Aid Association in furtherance of the goals of international terrorism and al Qaeda.

2.  According to the deposition of Dr. Al-Ali's former U.S. business partner, Soliman Beheiri, Al-Ali came to the United States in the Summer of 1991 to establish IIRO. Beheiri stated that Al-Ali came to the United States from Saudi Arabia with $10 million dollars to invest through IIRO and Defendant Sana-Bell, with the goal of generating a sufficient return on investment to support IIRO's mission in the United States. Beheiri further testified how, in November 1991, Sulaiman Al-Ali introduced Biheiri to Dr. Abdulrahim Saati, a university professor of economics in Jeddah. Al-Ali introduced Saati as a "welcoming from Saudi Arabia from the office of the International Islamic Relief Organization to visit his office here to find out how he's progressing in establishing the organization here, and also assisting them in buying the building they have bought in Falls Church."

3.	Defendant Sana-Bell, Inc. (the U.S. branch of Sanabel Al-Kheer) was organized as a District of Columbia non-profit company on July 28, 1989.  In a civil lawsuit filed with the USDC for the District of Maryland, Sana-Bell described itself as an American non-profit corporation deserving of tax-exempt status and headquartered in Jeddah, Saudi Arabia.  Defendant Dr. Abdullah al-Obaid and Defendant Hassan Bahafzallah, listed as officers of Sana-Bell on their Articles of Incorporation filed in Washington D.C., have both served for many years as senior IIRO/MWL Executives in Saudi Arabia.

4.	Al-Ali was himself later named as a member of Sana-Bell's Investment Committee and claimed to be the sole corporate executive responsible for executing and managing Sana-Bell investments.  In April of 1998, the President of the "SanaBel Committee," [sic] writing on the letterhead of the Office of the Secretary General of the Muslim World League wrote to Defendant Yaqub Mirza to confirm that Al-Ali "rejoin[ed]" the Sana-Bell Al Kheir Committee and that Al-Ali would be "responsible for Sanabel in U.S.A."  In July 1998, Defendant Dr. Abdullah Al-Obaid, Secretary General of the Muslim World League and Chairman of IIRO, wrote to Committee" of Sanabell S.A. of IIRO, and that he assisted in the review of its investments. Al-Obaid noted that part of the proceeds of these investments were used to establish Sana-Bell, Inc in the U.S.  According to the deposition of Soliman Biheiri, "money transferred from Sana-Bell account to [Sulaiman Al-Ali's] office here was big, and I have a record of that.  That can come close to over $1 million."

5.	IIRO's form 1023 discloses that Sulaiman Al-Ali had strong relationships with other Islamic relief organizations, specifically, the Kuwaiti based Lajnat al-Dawa. On January 9, 2003, the Office of Foreign Assets Control of the United States Department of Treasury listed the Kuwaiti Lajnat al-Dawa as a specially designated global terrorist (SDGT), and blocked all of

its assets pursuant to the International Emergency Economic Powers Act. Lajant al-Dawa was a critical component of the al-Qaeda network, delivering both financial and operational support. Indeed, during a videotaped interview from the late 1980's, al-Qaeda founder Abdullah Azzam mentioned two relief organizations that supported the Arab Mujahideen in Afghanistan. One of those organizations was the Kuwaiti Lajnat al-Dawa. Recently captured 9/11 mastermind Khalid Sheikh Mohammad and his brother Ziad headed the Lajnat al-Dawa offices in Peshawar, Pakistan.

6. A search of the Person Locator (P-SRCH) database on Lexis-Nexis indicates that Sulaiman A. Al-Ali's former name is Sulaiman Kabbara. He has two brothers residing in the Northern Virginia area: Bachir and Amal Kabbara. On September 30, 1993, on behalf of himself, Amal, and Sulaiman, Bachir Kabbara incorporated "3 Brothers Of Virginia Paging Inc." using the same business address as IIRO: 360 S. Washington St. in Falls Church, Virginia. On November 1, 1993, Bachir Kabbara also incorporated "NAMA, Inc." using the 360 S. Washington St. address. Al-Ali's brother Bachir Kabbara had formerly served as the Imam of the radical Islamic Center of Tucson**,** Arizona from 1990 to 1992. One of Bachir Kabbara's predecessors as leader of the Tucson center was none other than MWL official and senior Bin Laden advisor Wael Jalaidan. Between 1985 and 1993 (including times at which Kabbara was in charge), the Islamic Center of Tucson served as the de-facto headquarters of Al-Qaeda in the United States. The mosque was integral in disseminating *Al-Jihad*, the Arabic-language publication of the Peshawar, Pakistan-based "Mujahideen Services Office." As a result, the Islamic Center spawned the Al-Kifah Refugee Center, the Arab-Afghan jihad fundraising outlet tied to the 1993 World Trade Center bombing. While he lived in Arizona, Wadih el-Hage, Osama Bin Laden's former personal secretary, was a regular attendee at the Tucson mosque at

this time.  Phoenix Memo author FBI Agent Kenneth Williams believes that "El-Hage established an Osama Bin Ladin support network in Arizona while he was living there and that this network is still in place."  At meetings at Kabbara's mosque, El-Hage has admitted in sworn federal grand jury testimony to overhearing conversations between other worshippers that particular dissident Muslim leaders "should be killed" as "infidels."

7. According to the IRS 990 forms between 1992 and 1998, using supposedly charitable funds in IIRO and Sana-Bell accounts, Sulaiman Al-Ali made the following disbursements to other Muslim organizations suspected of connections to terrorism:

- $4,212,318 destined for IIRO operations in Bosnia and Somalia – 1992 & 1996.  Paradoxically, rather than being distributed directly to the relief zones, this money was apparently re-routed back through the IIRO central offices in Jeddah, Saudi Arabia.

- $36,322 to the Horn of Africa Relief Agency (HARA) – 1992.  HARA was used as a front to provide support to various Al-Qaeda affiliates, including the Eritrean Islamic Jihad Movement (EIJM).  At the time IIRO made their $36,322 donation, HARA donor forms distributed in the U.S., titled "Eritrean Islamic Jihad Movement," advertised: "This pledge will support an orphan or the training of a Mujahid ["holy warrior"] or his family while he is in Jihad."  Three payment options were listed: a $3,000 suggested yearly donation to help train a "Mujahid," $700 to "take care of a Mujahid's family," and $420 to support an orphan.

- $23,780 to the Holy Land Foundation (HLF) – 1996 & 1997.  On December 4, 2001, the Office of Foreign Asset Control (OFAC) of the United States Department of Treasury designated the Holy Land Foundation (HLF) as a specially designated terrorist (SDT), as a specially designated global terrorist (SDGT), and blocked all of its assets pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. (IEEPA), and Executive Orders 13224 and 12947.  According to Judge Gladys Kessler, who upheld the OFAC ruling against HLF, "the administrative record contains ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas."

- $10,000 to the Islamic African Relief Agency (IARA) – 1992. IARA is a Sudanese based Islamic charity group, headquartered in Khartoum with U.S. branch offices in Columbia, Missouri; Baltimore, Maryland; Norman, Oklahoma; Orlando, Florida; and elsewhere. In December 1999, two federal grants totaling $4.2 million dollars from the U.S. Agency for International Development (USAID) to IARA were cut off when the U.S. State Department determined that they were not in America's "national security interests." Orlando, Florida resident Ziyad Khaleel was detained by Jordanian authorities on December 29, 1999, on charges of being a "procurement agent" for Osama Bin Laden. Khaleel, who was one of only eight U.S. regional IARA fundraising directors and the former IARA website administrator, is also responsible for the maintenance of a variety of radical Islamic Internet sites, including the official Hamas homepage (http://www.palestine-info.net).

- $17,500 to Taibah International Aid Association – 1995 & 1996. Taibah, with offices located in IIRO's building at 360 S. Washington, claimed to the IRS that it was "a missionary in the United States to promote the Muslim faith" and to aid needy Muslims around the world. However, Taibah International has been under investigation in Bosnia since shortly after September 11, 2001, when the Interior Ministry claimed to have averted a terror attack involving a computer consultant and suspected Al-Qaeda member working for Taibah. The Bosnian report further found evidence of "fictitious declarations of affiliation and employment" and of visas for entry into Bosnia for suspected militants. It concluded that "large cash sums were withdrawn by [Taibah] management... which were never accounted for," indicating "a wide scope for possible illegal spending." On May 6, 2004 the U.S. Treasury Department designated Taibah under Executive Order 13224. The U.S. is asking the United Nations' 1267 Sanctions Committee to add this entity to its consolidated list of terrorists tied to al-Qaeda, Osama bin Laden and the Taliban. Information shows this entity has significant ties to Global Relief Foundation (GRF), which initially operated in Bosnia under the auspices of Taibah. A former employee of Taibah International was a member of Ayadi Chafiq Bin Muhammad's network, who was designated by the Treasury department on October 12, 2001.

8.      Al-Ali's IRO has been linked with Mercy International who US prosecutors claimed provided support for the 1998 US African embassy bombers.

9.      In addition to charitable donations, Sulaiman Al-Ali also made several major financial investments in the United States on behalf of IIRO and Sana-Bell, Inc. In December

1992, Dr. Al-Ali transferred over $2.1 million in Sana-Bell charitable assets to investment projects controlled by BMI, Inc. (a.k.a. Bait ul-Mal), a company founded in Secaucus, New Jersey by Soliman Beheiri.  According to a sworn statement filed by FBI Special Agent Robert Wright, BMI "had receive financing from [Yassin Kadi] and United States designated HAMAS terrorist [Musa abu Marzook]."  In October 2001, the U.S. Treasury Department froze the assets of Yassin Kadi and listed him as a Specially Designated Global Terrorist, citing his financial support for al-Qaeda through a "relief" organization called Muwafaq, or Blessed Relief.  Agent Wright had initially investigated BMI as part of an ongoing Hamas fundraising investigation in the United States.  According to an Affidavit filed by Wright, Yassin Kadi put up $820,000 for a real estate deal structured to funnel proceeds to Hamas operative Mohammed Salah.  Moreover, "a note specifying that $820,000 was due and payable on December 31, 1993, [provided] that, 'All payments are to be made to Kadi International Corp., c/o BMI, Inc., One Harmon Plaza, Secaucus, New Jersey.'"

10. The $2.1 million invested by Sana-Bell in BMI ultimately became the subject of a civil lawsuit after the money disappeared entirely (it remains unaccounted for to this day).  During the suit, Soliman Beheiri purportedly confessed that he had mishandled Sana-Bell's investments and was willing to "go to jail" to put this all behind him.  Beheiri eventually defaulted in the suit and fled the country when faced with producing a financial accounting.  According to Agent Robert Wright's sworn statement, an accountant at BMI later called another FBI agent to discuss his concerns that "funds the accountant was transferring overseas on behalf of [BMI] may have been used to finance the embassy bombings in Africa."

11. Through IIRO and Sana-Bell, Dr. Sulaiman Al-Ali also invested vast sums into other parallel fraudulent investment schemes tied to suspected terrorist financing.  One of these

was known as the Global Chemical Corporation (a.k.a. Amana Industrial and Trading), a defunct Illinois for-profit entity in Chicago, Illinois.  According to FBI Special Agent Valerie Donahue, since November 1993, IIRO disbursed approximately $1,225,975 to Global Chemical and Amana.  IIRO 990 records from 1995 quoted Al-Ali's total investment in Amana/Global Chemical at closer to $2,189,434.  According to one Global Chemical administrator, Al-Ali was able to marshal these funds because "he's originally from Saudi Arabia, and he knew a lot of businessmen overseas in the Gulf area, and he… was the potential person to generate that money from different businessmen.  And we looked… up to him to really generate that funding for this big project… and he stepped up to the plate and he said, yeah, I know a lot of people that I can generate that money."

12. In a ten-count federal grand jury indictment returned in October 1996, Global Chemical President Mohammed Mabrook was charged with fraudulently obtaining at least $1,000,000 from various investors.  As part of this scheme, Mabrook allegedly "created fictitious documents purporting to reflect customer orders for hundreds of thousands of dollars' worth of Global Chemical products… then solicited investors to provide funds to pay for the manufacture of products needed to fill these non-existent purchase orders."  FBI Special Agent Valerie Donahue agreed that "the pattern of Global's receipt and disbursement of funds is consistent with the operation of an investment fraud scheme,..."  Mabrook drew up fraudulent purchase orders with non-existent clients as documentation for supposed investments.

13. On January 9, 1997, Global Chemical's Chicago headquarters was raided by FBI Agents as part of a money laundering and fraud investigation.  The organizations named in the Search Warrant included NAMA Inc. and the corporate entity founded by Al-Ali's brother and business partner Bachir Kabbara at 360 S. Washington St. in Falls Church.  Days later, IIRO's

Northern Virginia offices run by Sulaiman Al-Ali were raided by FBI Agents as part of the same terrorism, money laundering and fraud investigation. The individuals and organizations named in the Search Warrant included Global Chemical Corp, Nama Inc., Defendant Taibah International Aid Association, Defendant Sulaiman Al-Ali, and Bachir Kabarra. In an Online Chat session posted on March 22, 2002, Defendant Mohammed Omeish wrote:

> "I used to work with International Islamic Relief Organization [in the U.S.]. This organization ended its work about three years ago. The reason was …a decision of the administrative council at that time…The investigation to which IIRO was subject was for its being an investor in a commercial organization in Chicago which was raided by the authorities for a background of supporting terrorism, and IIRO was a chief investor. What touched the company touched the organization."

14. Soon thereafter, in August 1998, according the deposition of BMI President Soliman Beheiri, Al-Ali suddenly decided to abandon his properties in Northern Virginia and San Diego and promptly returned to Saudi Arabia after almost seven years of residence in the U.S. At this time, Beheiri received instructions from MWL and IIRO superiors in Saudi Arabia which, abruptly and for the first time, told him to "cancel the validity of [Al-Ali's] signature in regard to all of our accounts with your firm." Soon afterwards, MWL officials discounted all responsibility for the highly questionable investment decisions made by Sulaiman Al-Ali, apparently at their behest. Meanwhile, millions of dollars worth of MWL/IIRO/Sanabel donations designated for humanitarian causes disappeared with no apparent explanation.

15. During a U.S. Treasury interrogation of Soliman S. Biheiri, the agents wrote:

> "he found it very strange that Al-Ali opened up the office of the International Islamic Relief Organization (IIRO) in the United States as "International Relief Organization". Biheiri told the agents that Al-Ali's IRO was one and the same organization as the IIRO in Saudi Arabia. He related that he suspected that the IIRO's U.S. office had been deliberately named the IRO, so that one could not make the connection between the two organizations."

16. On IIRO – North America letterhead, Dr. Sulaiman A. Al-Ali requests all Muslims to "support IRO to provide the [Bosnian] refugees with immediate help," and to "donate generously". The appeal was sent out in English and in Arabic text.

17. Plaintiffs specifically incorporate all allegations from the Third Amended Complaint relating to Defendant International Islamic Relief Organization and the Muslim World League as they relate to Defendant Sulaiman Al-Ali. Sulaiman Al-Ali has engaged in the material support of al Qaeda and international terrorism, has aided and abetted and conspired to advance their goals, proximately causing the events of September 11, 2001.