UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

| | |
|---|---|
| Thomas Burnett, Sr., *et al.*<br>        - against –<br>Al Baraka Investment & Development Corp., *et al.*, | 03 CV 9849 (RCC) |

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF
DMI ADMINISTRATIVE SERVICES S.A.

June 4, 2004

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 5

    I.    THIS COURT HAS PERSONAL JURISDICTION OVER DMI ........................................ 5

        A.    DMI Is Subject to Jurisdiction in this Court Because, in Providing Financial Support to al Qaeda, DMI Directed Its Conduct at the United States .............................................................................................. 6

        B.    DMI Is Subject to Jurisdiction in This Court Because It Conspired With al Qaeda to Attack the United States ................................................ 8

    II.    THE COMPLAINT STATES CLAIMS AGAINST DMI ............................................... 11

        A.    Applicable Legal Standards ...................................................................... 11

        B.    Plaintiffs Adequately Plead Their Claim Against DMI Under the Anti-Terrorism Act ................................................................................ 13

        C.    The Complaint States a Claim Against DMI Under the ATCA ............... 18

        D.    The Complaint States Claims Against the DMI Under RICO ................. 19

        E.    The Complaint States Common Law Claims Against DMI ..................... 20

    III.    IF THE COURT FINDS PLAINTIFFS CLAIMS TO BE INSUFFICIENT, PLAINTIFFS SHOULD BE GIVEN LEAVE TO RE-PLEAD ................................................................ 22

CONCLUSION ................................................................................................................. 23

i

# TABLE OF AUTHORITIES

*Page*

## Cases

*All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215 (S.D.N.Y. 1992) ........................... 8

*Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) ..................... 8, 9

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ....................................... passim

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ................................................................. 6

*Burnett v. Al Baraka Investment & Development Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) .. 18, 19

*Calder v. Jones*, 465 U.S. 783 (1984) .................................................................. 6, 7, 8

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ............. 8, 9

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................. 12, 13

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000) ................................................... 6, 7, 8

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) ................................... 19

*Dixon v. Mack*, 507 F. Supp. 345 (S.D.N.Y. 1980) ..................................................... 8, 9

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) ............................................ 11

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ..................................... 21

*Hade v. Kott*, 1993 U.S. Dist. LEXIS 2714 (S.D.N.Y. Mar. 8, 1993) ................................. 6

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................. 14, 15, 20, 21

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ....................................... 14, 17

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987) ....................................... 19

*In re Southeast Banking Corp.*, 69 F.3d 1539 (11th Cir. 1995) ......................................... 12

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001) ............................... 5

*Marine Midland Bank NA v. Miller*, 664 F.2d 899 (2d Cir. 1981) ............................... 11

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ........................................ 11

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y. 2003) ................................................................................ 19

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) ....... 6, 7, 8

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) .................................. 6, 7, 8

*Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521 (D.C. Cir. 2001) ........ 11

*Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95 (E.D.N.Y. 2000) .................................... 9

*Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217 (S.D.N.Y. 2003)) ...................... 22

*Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) .......................... 11

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)........................................................................... 12

*World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)............................................................... 9

*Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555 (2d Cir. 1985)................................... 5

*York v. Assoc. of the Bar of the City of New York*, 286 F.3d 122 (2d Cir. 2002) .................... 5, 13

## Statutes

18 U.S.C. § 2333................................................................................................... 1, 13, 14, 15

18 U.S.C. § 2339A .................................................................................................... 14, 17

18 U.S.C. § 2339B ............................................................................................ 14, 15, 17

18 U.S.C. § 2339C .................................................................................................... 14, 17

28 U.S.C. § 1350....................................................................................................... 18

Torture Victim Protection Act, codified at 28 U.S.C. § 1350, note............................................. 22

## Rules

F.R.C.P. 4............................................................................................................... 5

F.R.C.P. 8....................................................................................................... 11, 12, 13

F.R.C.P. 11............................................................................................................ 12, 13

F.R.C.P. 12................................................................................................................. 6

F.R.C.P. 56............................................................................................................... 12

## Legislative History

S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 ................................... 1, 13, 16

## Other Authorities

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure,  (2d ed. 1990) ............ 11

## INTRODUCTION

In this action, plaintiffs, victims and survivors of the September 11 terrorist attacks, seek to hold accountable those who financed and sponsored the terrorist network that perpetrated those attacks.  As demonstrated in plaintiff's 400-page Third Amended Complaint (sometimes referred to as the "3AC" or the "Complaint"), there is now a vast (and growing) body of evidence that a network of banks, corporations, wealthy individuals, and so-called "charities" has aided, abetted, funded, and provided material support to al Qaeda and Osama bin Laden.  Without this support, the al Qaeda terrorists could not have planned and carried out their attacks.  As one court has eloquently put it:  "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence."  *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002).  If you take away those resources, you cut off the life-blood of terrorist violence.   But, as the *Boim* court recognized:   "The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts."   *Id.* To this end, Congress enacted the Anti-Terrorism Act, 18 U.S.C. § 2333, to "interrupt, or at least imperil, the flow of money" to terrorists through the "imposition of liability *at any point along the causal chain of terrorism*." S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372, *22. (Emphasis added.)  That is what plaintiffs in this lawsuit seek to do.

An Independent Task Force sponsored by the Council on Foreign Relations concluded in its 2002 report on Terrorism Financing that al Qaeda's financial network is "notably and deliberately decentralized, compartmentalized, flexible and diverse in its methods and targets." 3AC, Introduction at p. 203.  It is characterized by "layers and redundancies"; it "raises money from a variety of sources and moves money in a variety of ways."  *Id.* at 204.

In its motion to dismiss, defendant DMI Administrative Services S.A. ("DMI") seeks to exploit the decentralized and compartmentalized nature of the network that finances and sponsors unspeakable acts of terrorism.  It does so by focusing on individual allegations in isolation, ignoring the complex web of connections that link various individuals, banks, bank holding companies, and terrorists.  Defendant portrays each connection as being innocent in and of itself.  In so doing, it weaves a deception.  Viewing these connections in proper perspective, an entirely different picture emerges: DMI is a major participant that knowingly provided material support, in the form of banking and financial services, to the September 11 terrorists. That it hid its involvement in corporate layers designed to make it difficult to trace the money back to its source in no way mitigates DMI's culpability, but rather suggests its awareness from the beginning of the illicit, if not immoral, nature of the activities it was supporting.

As alleged in the Complaint, DMI was one of several banking entities with overlapping ownership and management that, in the early 1990's, set up a financial infrastructure in Sudan for Osama bin Laden and his growing terrorist organization.[1]  In 1991, bin Laden re-located to Sudan, *see* 3AC ¶ 71, although there is evidence that he had surveyed investment opportunities there as early as 1983.  *Id.* at ¶ 68.  Once ensconced there, bin Laden set up terrorist recruitment and training facilities, funded by, or under the guise of, legitimate business enterprises in which

---

[1]  Plaintiffs recognize that DMI is not, itself, a bank, but a company that provides management services to related banks and financial institutions, *see* DMI Br. at 19 n.12.  To the extent that DMI controls the related banks and financial institutions it "manages," however, it may be held liable for their conduct.  Plaintiffs also are aware (and DMI acknowledges, *see* DMI Br. at 3 n.1) that DMI is related to another entity, DMI Trust, which is also part of the cluster of banking entities that provided financial support and services to al Qaeda and which has itself been named a defendant in this lawsuit.  DMI provides administrative services to DMI Trust.  Plaintiffs are still in the process of gathering information about the two DMI entities, but evidence obtained through plaintiffs' investigation demonstrates that both entities assisted bin Laden in financing his terrorist infrastructure.  Plaintiffs are not required at this stage of the case to parse out precisely which actions were those of the trust and which were those of the administrative services company.

bin Laden was engaged.  *Id.* at p. 211.  These enterprises, and the terrorist recruitment and training they were designed to support, were funded by a cluster of inter-related banks and banking parent companies, including DMI and Islamic Investment Bank of the Gulf, Faisal Islamic Bank, Tadamon Islamic Bank ("Tadamon") and Al Shamal Islamic Bank ("Al Shamal"), all of which are related to DMI.[2]

Complex layers of direct and indirect subsidiaries, related companies and interlocking management and investors work to conceal the relationship between DMI and al Qaeda, but an examination of the banks that facilitated the growth of al Qaeda show that DMI was omnipresent through a variety of vehicles.  For example, one of the main founders of Al Shamal was Faisal Islamic Bank ("Faisal Bank"), an indirect subsidiary of DMI.[3]  3AC ¶¶ 73, 98-100.  Al Shamal was then capitalized by bin Laden himself as a vehicle to provide funding to his terrorist activities.  *See* 3AC at p. 211.  Even after September 11, 2001, Al Shamal continued to finance and materially support international terrorism and there were indications that bin Laden remained the leading shareholder of the bank.  *Id.* at ¶ 83.  Faisal Bank has been separately implicated in al Qaeda's terrorist activities:  in a 2001 trial in the United States arising from the 1998 bombings

---

[2]   It is important to note that the relationship between Islamic financial institutions and their customers is akin to the relationship between Western business partners, and completely unlike the more arms-length Western banking relationship between customers and banks.   See Plaintiffs' Response to Al Rajhi Bank's Rule 12(e) Request To Plaintiffs, Exhibit 1 ("Al Rajhi 12(e)"), ¶ 12.  This relationship derives from the Islamic prohibition on the collection or payment of interest, which requires investors to invest funds either in private businesses or partnerships rather than in traditional interest-bearing accounts. Under this system, Islamic banks serve as an active business partner and agent with their customers in a partnership or collaboration to manage and invest the customer's capital in a mutually beneficial way.  *Id.* As alleged in the Complaint, DMI operates strictly under Islamic rules.  3AC ¶ 97.  For this reason, DMI is wrong when it contends that it cannot be held liable for aiding and abetting al Qaeda on the basis of bank accounts maintained by notorious terrorists at banks controlled by DMI.

[3]   As alleged in the Complaint, the main shareholder of Faisal Bank is Islamic Investment Company of the Gulf ("IICG"), a wholly-owned subsidiary of DMI.  *See* 3AC ¶ 99.  DMI denies that Faisal Bank is a *direct* subsidiary, *see* DMI Br. at 3 n.1, and wholly ignores the allegation that it is a major shareholder of Faisal through the vehicle of its 100% subsidiary, IICG.

of two U.S. embassies in East Africa, Faisal Bank was identified as holding and managing bank accounts for al Qaeda operatives in connection with those bombings.

DMI tries to portray its connection to Al Shamal and to Faisal as too attenuated to implicate DMI in terrorist financing, but Al Shamal and Faisal were not the only connections plaintiffs allege between DMI and al Qaeda.   Plaintiffs further allege that Tadamon Islamic Bank facilitated bin Laden's terrorist activities while bin Laden was operating in Sudan.  *Id.* at ¶¶ 107-110.   As alleged in the Complaint, Tadamon is (or was at the relevant time) a major shareholder of Al Shamal and has held a seat on Al Shamal's Provisional Board of Directors.  *Id.* at 110.   And, as further alleged in the Complaint, Tadamon, as it turns out, is an also indirect subsidiary of DMI through Faisal Bank. 3AC ¶ 108 ("Defendant Faisal Islamic Bank Sudan, a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) EC, whose parent is Dar Al Mal Al Islami, was the main shareholder of Tadamon Islamic Bank as of 1995.").  Put another way, what the Third Amended Complaint alleges is that, following the ownership trail of three financial supporters of al Qaeda in Sudan, one finds DMI at the top of all of them.

The Complaint alleges another thread connecting DMI, Al Shamal, and Faisal Bank:  all have been chaired by Mohammed al-Faisal al-Saud, a member of the Saudi royal family who is also a defendant in this case.  *See* 3AC ¶ 74.  Mohammed al-Faisal is alleged to have provided financial support, in the form of financial infrastructure (such as bank accounts) to al Qaeda through Faisal Bank, one of the common links in the chains connecting DMI to both Al Shamal and Tadamon, and through Al Shamal and DMI itself.  *See id.* at ¶¶ 100, 342, 364.  Moreover, plaintiffs allege that Mohammed al-Faisal also chairs Islamic Investment Company of the Gulf, the wholly-owned DMI subsidiary through which DMI holds its interest in Al Shamal and Tadamon.  *Id.*at ¶ 99.

That the same individual and the same companies, direct and indirect subsidiaries of DMI, turn up again and again in plaintiffs' allegations as financiers to Osama bin Laden and al Qaeda could be innocent coincidence as DMI attempts to suggest – but this Court is not required to assume that is the case.[4]   As alleged in the Complaint, this cluster of banks knowingly provided financial support to bin Laden and to his growing terrorist network.  Plaintiffs further allege that DMI is at the top layer of this cluster, the entity behind all the rest.  Plaintiffs sufficiently allege DMI's role in providing this support to state claims against it; the motion to dismiss should be denied.

## ARGUMENT

## I.   THIS COURT HAS PERSONAL JURISDICTION OVER DMI

DMI contends that it is not subject to jurisdiction in this Court because it lacks minimum contacts with the United States.[5]  DMI is wrong.  It is subject to jurisdiction because, as alleged in the Third Amended Complaint, in supporting Osama bin Laden and al Qaeda in their terrorist war against America, DMI purposefully directed its conduct at the United States.  No more is required to satisfy the requirements of due process.  Moreover, plaintiffs note that, at this stage of the case, before plaintiffs have been given the opportunity to take discovery, "plaintiffs may defeat a jurisdiction-testing motion by asserting legally sufficient allegations of jurisdiction,"

---

[4]  On the contrary, on this motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."  *York v. Assoc. of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002).  Moreover, the Court is to grant plaintiffs the benefit of all inferences that can be derived from the facts alleged. *See, e.g., Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 562 (2d Cir. 1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader").

[5]  The requisite "minimum contacts" in this case are with the United States as a whole, *see* F.R.C.P. 4(k)(2); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001); *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 & n.10 (7th Cir. 2000).

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), and the Court must "credit a plaintiff's averments of jurisdictional facts as true. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).[6]

> **A.   DMI Is Subject to Jurisdiction in this Court Because, in Providing Financial Support to al Qaeda, DMI Directed Its Conduct at the United States**

A defendant is subject to jurisdiction in the United States if he "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted). Physical presence is *not* a requirement. *Id.* at 475. Where a defendant's intentional, and allegedly tortious, actions were expressly aimed at the forum, the "due process" requirement of minimum contacts is satisfied. *See Calder v. Jones*, 465 U.S. 783, 789 (1984).

Three recent cases involving terrorism against Americans apply this test and hold that due process is not violated when those who deliberately target Americans are made to answer in American courts of law. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998); *Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000 (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns).[7]

---

[6]   This is true even where plaintiffs submit affidavits in response to the motion challenging jurisdiction, and the consideration of such extrinsic evidence on a motion brought pursuant to F.R.C.P. 12(b)(2) does not convert the motion into one for summary judgment. *See Hade v. Kott*, 1993 U.S. Dist. LEXIS 2714, *20-21 (S.D.N.Y. Mar. 8, 1993).

[7]   For a detailed discussion of the due process requirements applicable here, plaintiffs respectfully refer this Court to *Plaintiffs' Memorandum of Law in Support of Their Prima Facie Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction* and also to *Plaintiffs' Memorandum of Law in Opposition to Prince Mohammed Al*

Here, the allegations in the Complaint support the inference that DMI deliberately targeted Americans because, at the time it provided financial support to bin Laden and al Qaeda, it knew that the primary targets of al Qaeda's terrorist agenda were the United States and Americans. Bin Laden had declared as much, over and over again and had acted on his declarations as early as 1993, in the first bombing of the World Trade Center.[8] Under *Calder*, *Pugh*, *Rein,* and *Daliberti*, no more is required to subject DMI to personal jurisdiction in the United States.

DMI claims that even if Al Shamal, Faisal Bank, and Tadamon directed their conduct at the United States when they provided material support to al Qaeda, DMI cannot be deemed to have done so. In making this argument, DMI relies on the corporate separateness of these entities, but ignores the allegations of the Complaint. Plaintiffs have alleged that *DMI* has involved itself in funding al Qaeda, using its subsidiaries as the conduits for this activity. *See* 3AC ¶ 98. Thus, plaintiffs have alleged that DMI used the other corporate entities as instruments for its own provision of financial support to bin Laden and al Qaeda. This is altogether different from the mere allegation that the subsidiaries engaged in certain activity and that the parent should be held liable for it.

---

*Faisal Al Saud's Motion to Dismiss* and *Plaintiffs' Memorandum Of Law In Opposition To Motion To Dismiss Of Defendant The National Commercial Bank*, which are hereby incorporated.

[8]   For the extensive factual record detailing bin Laden's very public pronouncements that the target of his terrorist jihad was the United States, plaintiffs respectfully refer this Court to *Plaintiffs' Memorandum of Law in Support of Their Prima Facie Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction,* the accompanying declaration of Jodi Westbrook Flowers and the exhibits attached thereto and also to *Plaintiffs' Consolidated Memorandum Of Law In Opposition To Sultan Bin Abdulaziz Al-Saud's Motion To Dismiss Certain Consolidated Complaints,* the accompanying affirmation of Andrea Bierstein, and its exhibits.

**B.      DMI Is Subject to Jurisdiction in This Court Because It Conspired With al Qaeda to Attack the United States**

DMI is also subject to jurisdiction here because, as alleged in the Complaint, it conspired with al Qaeda to attack the United States.  Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum. *See All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over Australian defendants via conspiracy theory by imputing forum acts of co-conspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory). To assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the state to the out-of-state conspirator." *All State Life Ins. Co.*, 782 F. Supp. at 221 n.6. And by imputing forum acts of their co-conspirators to non-resident defendants, this Court has repeatedly found that such non-resident defendants have minimum contacts with the forum to satisfy Due Process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the suit, supplies the necessary minimum contacts. . . ."); *Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfying Due Process).

Consistent with the logic of *Calder*, *Pugh*, *Rein*, and *Daliberti*, the conspiracy jurisdiction cases from this Court explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court

8

there." *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 WL 672009, *6 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)); *see also Chrysler Capital Corp.*, 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Thus, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their coconspirators satisfies Due Process.

DMI recognizes the existence of conspiracy jurisdiction, but claims that plaintiffs have not sufficiently pleaded that it conspired with al Qaeda. But plaintiffs have satisfied all the requirements for conspiracy jurisdiction; they have "(1) establish[ed] a *prima facie* case of conspiracy; (2) allege[d] specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate[d] the commission of a tortious act in [the forum] during, and pursuant to, the conspiracy. *See Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 120 (E.D.N.Y. 2000).

The *prima facie* showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *Id.*; *see also Chrysler Capital*, 778 F.Supp. at 1267. Fairly read, the Third Amended Complaint alleges an agreement among Osama bin Laden and numerous others to recruit and train terrorists to attack the United States. The Complaint further alleges that DMI assisted bin Laden in this plan by establishing Al Shamal and other banking entities to supply al Qaeda with the necessary financial infrastructure to carry out its plans. The resulting damage or injury is all too plainly apparent.

Plaintiffs also sufficiently allege that facts warranting the inference that the defendant was a member of the conspiracy. Here, plaintiffs allege that certain indirect subsidiaries of DMI, including Al Shamal, were set up with the purpose of providing financial services to Osama bin Laden to permit him to recruit and train terrorists to wage war against the United States. *See supra* pp. 1- 5. These facts give rise to an inference that DMI was a member of bin Laden's conspiracy to commit terrorist attacks against the United States. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (for civil conspiracy, tacit, as opposed to explicit, understanding is sufficient to show agreement; court may infer agreement.).

DMI argues that plaintiffs must show that the perpetrators in the United States acted "for the benefit, with the knowledge and consent of, and under some control by" DMI in order to subject DMI to jurisdiction on the basis of its role in the conspiracy. *See* DMI Br. at 9. Even if that is so, those requirements are met here.[9] For, to the extent that DMI is alleged to have been, directly or indirectly, one of al Qaeda's bankers, its control over the money in the various accounts maintained by bin Laden, *see* 3AC ¶ ¶ 77-82, would provide the requisite control over the conspirators. DMI's knowledge of al Qaeda's plans to commit terrorist acts in the United States can be more generally inferred from the 1993 bombing of the World Trade Center and from bin Laden's public pronouncements of his war on the United States. *See* Plaintiffs' Memorandum of Law in Support of Their Prima Facie Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction, the accompanying declaration of Jodi Westbrook Flowers and the exhibits attached thereto and Plaintiffs' Consolidated

---

[9]  In *Grove Press, Inc. v. Angleton*, 649 F.2d 121 (2d Cir. 1981), the Court listed these elements as requisites for a finding of *agency*.  Since then, some, but not all, courts have used them as factors in determining whether plaintiffs have sufficiently connected a defendant to the conspiracy that is alleged to be the basis for jurisdiction.  *Compare, e.g., Chrysler Capital*, 778 F. Supp. at 1266-70 *with All State Life.*, 782 F. Supp. at 222-23.

Memorandum Of Law In Opposition To Sultan Bin Abdulaziz Al-Saud's Motion To Dismiss Certain Consolidated Complaints, the accompanying affirmation of Andrea Bierstein, and exhibits.  Similarly, its consent to these attacks can be inferred from its provision of financial services to bin Laden specifically for the purpose of recruiting and training terrorists.  On the basis of its alleged conspiracy with al Qaeda to attack the United States, then, DMI can be deemed to have sufficient contacts with the United States to subject it to jurisdiction in U.S. court.[10]

## II.   THE COMPLAINT STATES CLAIMS AGAINST DMI

### A.   Applicable Legal Standards

F.R.C.P. 8(a) sets forth the standard against which plaintiffs' complaint is measured.  It provides that a complaint must contain:

---

[10]   In any event, plaintiffs should be permitted to take jurisdictional discovery. A plaintiff faced with a motion to dismiss for lack of personal jurisdiction "is entitled to reasonable discovery." *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues"); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) ("generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue"); *Marine Midland Bank NA v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (court may decide challenge to personal jurisdiction "on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion"); *Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) (where plaintiff had not made prima facie showing of jurisdiction, but had made "a sufficient start toward establishing personal jurisdiction" court order jurisdictional discovery).  Moreover, "[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery.  5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1351, at 253-59 (2d ed. 1990).

In this instance, where DMI is alleged knowingly to have provided financial services to bin Laden, discovery on the extent of DMI's involvement with al Qaeda can be expected to yield information on (a) the extent to which DMI was directing its conduct at the United States when it provided financial services to al Qaeda and (b) the extent to which DMI, through its control of entities where bin Laden had his bank accounts, had the ability to control the activities of the September 11 perpetrators in the United States.

> (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.

In *Conley v. Gibson*, 355 U.S. 41, 47 (1957), the Supreme Court held that Rule 8 does "not require a claimant to set out in detail the facts upon which he bases his claim." Rather, the Court held, "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id*. More recently, in *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002), the Supreme Court re-iterated that a complaint need simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." The Court carefully differentiated what a plaintiff must prove from what must be pleaded, noting that Rule 8 "establishes a pleading standard without regard to whether a claim will succeed on the merits." 534 U.S. at 515.

In addition, Rule 8 should be read in light of the obligations of counsel under F.R.C.P. 11(b), the provisions for discovery set out in F.R.C.P. P. 26 – 37, and the procedure for obtaining summary judgment which may eventually be employed in this case under F.R.C.P. 56. Under Rule 11(b), counsel's signature is a representation that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Moreover, this belief must be formed "after an inquiry reasonable under the circumstances." *Id*. Rules 26 through 37 permit parties to gather evidence in support of their claims after the filing of the Complaint, while Rule 56 permits claims to be disposed of summarily where warranted. Read together, these rules envision broad notice pleading limited primarily by counsel's obligations to make reasonable inquiry and eschew frivolous allegations, with specific factual evidence to be obtained and evaluated later. *See In re Southeast Banking Corp*., 69 F.3d 1539, 1552 n.5 (11th Cir. 1995) ("Rule 8(a)(2) must be read in the context of Rule 11's prohibition on pleadings

formed without reasonable inquiry under the circumstances."); *see also Conley*, 355 U.S. at 47-48 ("simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues").[11]

Moreover, as noted above, *see* footnote 4, in ruling on this motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true," *York*, 286 F.3d at 125, and grant plaintiffs the benefit of all inferences that can be derived from the facts alleged. *Yoder,* 751 F.2d at 562.

**B.      Plaintiffs Adequately Plead Their Claim Against DMI Under the Anti-Terrorism Act**

DMI claims that plaintiffs have failed to plead a sufficient causal connection between its actions and the September 11 terrorist attacks to sustain a claim under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, or any other cause of action.   In making this argument, DMI completely ignores Congress's express direction that the ATA is intended to "impos[] liability *at any point along the causal chain of terrorism*."   S. Rep. No. 342, 1992 WL 187372, *22. (Emphasis added.)   Consistent with this instruction, it is sufficient that plaintiffs plead, as they have, that this defendant knowingly provided material support to al Qaeda and/or aided and abetted al Qaeda in its terrorist agenda.   Moreover, the law is clear that the assistance provided by DMI need not have been used directly in the September 11 attacks.   Under the ATA, DMI is liable if it provided any material support to al Qaeda with knowledge of its terrorist agenda or if it aided and abetted al Qaeda or Osama bin Laden in their course of terrorist conduct.  *See Boim*,

---

[11]     These rules are particularly significant here, because DMI has stated its intention to seek sanctions under Rule 11 while missing entirely the relationship between that rule and the reduced pleading standard of Rule 8, which together require attorneys to make good faith inquiry and assume that they have done so in assessing the adequacy of their pleading.

291 F.3d 1000; *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).

The Anti-Terrorism Act permits a private cause of action for injuries resulting from international terrorism.[12]   There can be no doubt that the acts of September 11 were acts of "international terrorism" within the meaning of § 2333 and DMI does not contend otherwise.

In *Boim,* the court recognized two theories of causation under which a civil suit may be sustained under § 2333.[13]  First, the court concluded, a plaintiff may recover under § 2333 if the defendants violated the criminal provisions of the ATA. *See Boim*, 291 F.3d at 1012-14.  The relevant criminal provisions, set forth at 18 U.S.C. §§ 2339A, 2339B, and 2339C, impose liability on those who provide "material support" to acts of terrorism or to designated terrorist

---

[12]   The statute provides, in relevant part:  "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.". 18 U.S.C. § 2333.  The term "international terrorism" is defined to include "activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State . . . ."  18 U.S.C. § 2331(1).

[13]   Some cases – and many of the defendants in this action – have focused on the phrase "by reason of an act of international terrorism" in § 2333 to define the requirements of causation under the ATA, but a closer reading demonstrates that this phrase cannot be the locus of the ATA's causation requirement. The ATA provides that a U.S. national who has been injured "by reason of an act of international terrorism. . . may sue therefore . . . ." Thus, the phrase "by reason of" is used to define the required connection between the plaintiff's injury and the "act of international terrorism." It describes the class of persons who are entitled to maintain a cause of action – those injured "by reason of an act of international terrorism," as opposed to those injured by some other cause.  The statute, however, does not define *whom* the person injured by reason of terrorism may sue and thus does not prescribe the causal connection between the act of terrorism and the defendant.   The scope of the causal link thus is not rooted in the language of § 2333, but in common law principles of causation and in the totality of the statutory scheme created by the Anti-Terrorism Act.

organizations.[14]  Provision of material support gives rise to civil liability under § 2333 so long as the support was provided knowingly and intentionally.  *Boim*, 291 F.3d at 1015.

The second theory of causation endorsed by the Seventh Circuit permits recovery under § 2333 where the defendants have aided and abetted an act of international terrorism.  *Boim*, 291 F.3d at 1021.[15]  With regard to this prong, it is not necessary for plaintiffs to allege that DMI knew specifically about the September 11 attacks.  Rather, it is enough that, when it provided financial support to bin Laden and al Qaeda, it knew that al Qaeda was preparing to engage in some kind of terrorist activity.  *See Halberstam*, 705 F.2d at 489. *See also, infra,* Point II.E.

Here, the Third Amended Complaint alleges that DMI provided "material support" to al Qaeda in violation of 18 U.S.C. § 2339B and that it aided and abetted al Qaeda in its terrorist enterprise.  Specifically, as discussed above, the Complaint alleges that DMI, operating through a variety of direct and indirect subsidiaries (including Faisal Bank, Tadamon, and Al Shamal) provided financial infrastructure and banking services to Osama bin Laden for his terrorist recruitment and training programs.  *See supra* at pp. 1- 5.  Under *Boim,* these allegations state claims against DMI for violations of the Anti-Terrorism Act.

DMI claims, however, that the allegations of the Third Amended Complaint are impermissibly vague and do not provide reasonable notice of the conduct that forms the basis of plaintiffs' claims.  This is nonsense.  Fairly read, the Complaint alleges that, through various subsidiaries and entities that it controls, DMI provided banking services to bin Laden and al

---

[14]  The phrase "material support" refers not to the amount of support, but to its nature – "the type of aid provided rather than whether it is substantial or considerable."  *See Boim*, 291 F.3d at 1015.

[15]   Plaintiffs respectfully refer the Court to the  more detailed discussions of the causation requirements of the ATA in their memoranda of law submitted in opposition to motions to dismiss filed in *Burnett* claims by the Saudi Binladin Group, the Khalid bin Mafouz, and the National Commercial Bank.

Qaeda with knowledge of the terrorist uses to which those services were being put.  *See* 3AC ¶¶ 45, 46, 67-83, 97-102, 365.  Indeed, DMI acknowledges that plaintiffs allege that it "rais[ed], facilitate[ed] and transferr[ed] money to terrorist organizations," *see* DMI Br. at 12, but claims that it cannot discern what lawful financial activities would be excluded from this allegation. This assertion would be nonsense if it were not also frightening.  Raising money for, and transferring money to, terrorist organizations is not "lawful financial activity," *see* 18 U.S.C. §§ 2339B, 2339C; *see also Humanitarian Law Project*, 205 F.3d at 1136 (contribution to terrorist organization with knowledge of its terrorist activities violates criminal provisions of ATA even if donor intended contribution to support group's non-terrorist activities); *Boim*, 291 F.3d at 1012-14 (defendant who violated criminal provisions of ATA by providing material support to terrorist organization may be liable in civil suit by victim of resulting act of international terrorism).  In light of these allegations, DMI cannot in good faith claim that it has "no idea as to what conduct is the supposed basis of plaintiffs' claims against it." *See* DMI Br. at 11.[16]

DMI also claims that plaintiffs must allege that DMI provided its support directly to the terrorists who carried out the September 11 attacks, *see* DMI Br. at 13, but that is not the law. Rather, as previously noted, Congress expressly stated its intention that the ATA be used to "interrupt, or at least imperil, the flow of money" to terrorists through the "imposition of liability *at any point along the causal chain of terrorism*."  S. Rep. No. 342, 1992 WL 187372, *22 (emphasis added).  Thus, it is sufficient that DMI knowingly provided material support to those who instigated and planned the September 11 attacks.  Nor is it necessary for plaintiffs to show

---

[16]  Indeed, if DMI were in any genuine doubt about what it is alleged to have done, it would have accepted plaintiffs' offer of a more definite statement and addressed its motion to dismiss, if it had one, to that amended pleading. Its refusal to do so makes clear the disingenuous of its claim that it does not know what it has been accused of.

that the specific dollars that DMI provided were used in the September 11 attacks.  As the Ninth

Circuit held in *Humanitarian Law Project*, 205 F.3d at 1136, the knowing provision of "material

support" to a designated terrorist entity violates § 2339B regardless of whether the donor

intended to support the terrorist activities of the group and regardless of whether the particular

dollars provided to the organization can be traced to the resulting acts of terrorism.  The court

explained:

> [A]ll material support given to such organizations aids their unlawful goals.
> Indeed, as the government points out, terrorist organizations do not maintain open
> books.  Therefore, when someone makes a donation to them, there is no way to
> tell how the donation is used.  Further . . . even contributions earmarked for
> peaceful purposes can be used to give aid to the families of those killed while
> carrying out terrorist acts, thus making the decision to engage in terrorism more
> attractive.  *More fundamentally, money is fungible; giving support intended to
> aid an organization's peaceful activities frees up resources that can be used for
> terrorist acts.*

*Id.* (emphasis supplied).   Far from requiring direct participation in a particular terrorist act, then,

§ 2339B does not even require support for, or agreement with, the violent portion of a terrorist

group's agenda; rather, the statute recognizes that even the provision of "humanitarian" support

to such a group inevitably redounds to the benefit of the group's terrorist purposes.[17]  Thus,

under § 2339B, anyone who knowingly contributes to the terrorist "factory" is responsible for all

---

[17]   That direct participation is not a requirement is further made clear in § 2339C, which makes
it a crime knowingly to provide funds for terrorist acts and further provides that "[f]or an act to
constitute an offense set forth in this subsection, it shall not be necessary that the funds were
actually used to carry out a predicate act."  18 U.S.C. § 2339C(a)(3).

   Nor is it relevant that § 2339C was added after the events of September 11.  In *Boim*, the
court noted that much of the defendants' alleged conduct occurred prior to the passage of
§§ 2339A and 2339B.  The court rejected defendants' argument that these sections could not be
used to set the standard for liability under § 2333.  It held:  "We are using sections 2339A and
2339B not as independent sources of liability under section 2333, but to amplify what Congress
meant by 'international terrorism.'"  291 F.3d at 1016.  In the same way, § 2339C amplifies
Congress's purpose in enacting § 2333; use of this provision as a guide to interpreting § 2333,
which was enacted in 1992, does not impose retroactive liability on DMI.

of the terrorist acts that come out of that "factory."[18]  Plaintiffs allege that DMI helped to fund the factory.  The need not allege that DMI purchased the specific "weapons" for the September 11 attacks when it provided the financing that allowed bin Laden to train terrorists and to set up a vast terrorist infrastructure which in turn enabled multiple acts of international terrorism, including those attacks.

DMI also asserts that because the ATA provides a cause of action only to U.S. nationals, the ATA claims of non-U.S. nationals should be dismissed.  DMI has apparently not bothered to read the Complaint it asks this Court to dismiss, because no such claims have been brought.  Rather, the Complaint explicitly states that claims under the ATA are brought on behalf of "the estates, survivors and heirs of the decedents who are nationals of the United States," *see* 3AC ¶ 652, and accordingly seeks relief under the ATA only for plaintiffs who are U.S. nationals. *Id.* at p. 383.

### C.    The Complaint States a Claim Against DMI Under the ATCA

DMI claims that plaintiffs fail to state a claim under the Alien Tort Claims Act, 28 U.S.C. § 1350, but its argument amounts to no more than a repetition of its assertion that plaintiffs have failed to connect it to the attacks of September 11.  Because plaintiffs sufficiently allege the causal connection between DMI's financial support and the terrorist fruits of that support, however, *see* Point II, they state claims for torts, including violations of international law. Plaintiffs note that the question is not whether DMI's role, standing alone, would be sufficiently egregious to subject it to liability; DMI can be held liable under the ATCA as an aider and abettor.  *See Burnett v. Al Baraka Investment & Development Corp.*, 274 F.Supp.2d 86 (D.D.C.

---

[18]    As noted above, the Seventh Circuit in *Boim* held that § 2333 incorporates the standards of § 2339B because it would make no sense to conclude "that Congress imposed criminal liability . . . on those who financed terrorism, but did not intend to impose civil liability on those same persons. . . ." 291 F.3d at 1014.

2003) ("*Burnett I*") (ATCA encompasses aiding and abetting liability); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y. 2003) (same).[19]  As noted above, plaintiffs sufficiently plead that DMI aided and abetted the terrorist attacks of September 11.[20] The alien plaintiffs thus are entitled to maintain their claims under the ATCA.  (DMI also asserts that the ATCA claims of U.S. nationals should be dismissed, but, as with DMI's similar argument concerning the ATA, no such claims have been brought.  Rather, the Complaint explicitly states that claims under the ATCA are brought on behalf of plaintiffs "who are estates, survivors, heirs and family members of those killed or injured who were non-United States citizens (or 'aliens')."  *See* 3AC ¶ 657.)

### D.    The Complaint States Claims Against the DMI Under RICO

DMI contends that plaintiffs lack standing to assert their RICO claims because, they assert, plaintiffs do not allege an injury to business or property.  DMI Br. at 23-24.  Plaintiffs recognize that in *Burnett I*, 274 F.Supp.2d 86,, the D.C. court adopted this argument and held that plaintiffs lack standing to pursue their RICO claims.  Plaintiffs respectfully disagree and note that this Court is not bound by the ruling of the D.C. court.  *See In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987) ("transferee district court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect"); *Degulis v. LXR Biotechnology*, *Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996). Plaintiffs hereby incorporate by reference the argument regarding RICO standing set forth in their opposition to the motions filed by Al Rajhi Bank, Al Haramain, and

---

[19]    Plaintiffs respectfully refer this Court to, and incorporate by reference, their arguments concerning the ATCA set forth in *Plaintiffs' Memorandum Of Law In Opposition To Motion To Dismiss Of Arab Bank PLC.*

[20]    DMI apparently does not contest that the September 11 attacks constitute violations of international law for which it can be held liable.  *See Plaintiffs' Memorandum Of Law In Opposition To Motion To Dismiss Of Arab Bank PLC.*

Dr. Khudiera.

### E.     The Complaint States Common Law Claims Against DMI

DMI's primary argument that plaintiffs' common law claims should be dismissed is simply a repetition of its arguments with respect to the claims under the ATA and the ATCA – that is, DMI contends that plaintiffs have failed adequately to allege a causal connection between DMI and the events of September 11, 2001.[21]  Thus, for example, DMI claims that it cannot be held liable for wrongful death, because its actions were not wrongful and it did not cause the deaths on September 11.   As demonstrated above, however, plaintiffs adequately allege the causal connection between these defendant's acts and the September 11 attacks. Plaintiffs further allege that DMI's conduct was wrongful because they allege that DMI knowingly provided financial support to terrorists.

Similarly, plaintiffs adequately allege that DMI aided and abetted and conspired with al Qaeda in connection with its terrorist attacks on the United States.   Under the common law doctrine of aiding and abetting, plaintiffs need not plead a direct link to the specific attacks of September 11.  In *Halberstam v. Welch*, which contains a thorough and scholarly examination of the common law of aiding and abetting and conspiracy, the D.C. Circuit explained the three requisites for holding a defendant liable for aiding and abetting:   "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."  705 F.2d at 477.  In applying these elements to the facts before it, the *Halberstam*

---

[21]    DMI relies primarily on New York law, although it also cites Virginia and Pennsylvania law. Plaintiffs do not concede that New York law applies.   For purposes of this motion, however, plaintiffs have identified no differences in potentially applicable laws that would require this Court to determine now what law governs plaintiffs' claims.

court held that the defendant Hamilton could be liable for aiding and abetting her co-defendant Welch in the murder of the plaintiff's husband during the course of a burglary.  Hamilton was not present at the burglary and claimed not to have known that Welch was a burglar at all. Finding that Hamilton had assisted Welch for years in disposing of large quantities of jewelry and precious metals, the Court held:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries.  Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night--whether as a fence, burglar, or armed robber made no difference--because *violence and killing is a foreseeable risk in any of these enterprises.*

*Halberstam*, 705 F.2d at 489 (emphasis added).  Thus, the Court reasoned, Hamilton was liable not only for the burglaries – whether she knew about them or not – but also for the murder that Welch committed during the course of one of them.  *Id.*[22]

In *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998), the court applied the same standard used in *Halberstam*, holding:  "[A] plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises . . . Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient . . . ."  999 F. Supp. at 18.  More recently, and more pertinent to the facts of this case, in *Smith v. Islamic Emirate of Afghanistan*, 262

---

[22]  It is important to emphasize that in *Halberstam*, the court found that Hamilton "knew" that Welch was involved in personal property crimes – and thus could be held liable for the murder that Welch committed during one of his burglaries – without any direct evidence of that knowledge. 705 F.2d at 486-87.  As noted above, Hamilton denied knowing that Welch was engaged in criminal activities.   But the court was able to infer that Hamilton must have known because she carefully logged all of Welch's sales of jewelry and precious metals but had no records of any purchases, because of the extravagant lifestyle that she enjoyed as a result of Welch's crimes, and because of Welch's mysterious evening absences over the course of their relationship.  The court applied common sense to determine that a person in Hamilton's position must have known that Welch was committing crimes and the D.C. Circuit upheld liability based on that inferred knowledge.  705 F.2d at 486-87.

F.Supp.2d 217, 232 (S.D.N.Y. 2003), the court granted a default judgment to plaintiffs against Iraq for injuries arising out of the September 11 attacks after plaintiffs provided "a sufficient basis for a reasonable jury to draw inferences which could lead to the conclusion that Iraq provided material support to al Qaeda and that it did so with knowledge and intent to further al Qaeda's criminal acts."

Similarly, as described above, *see* Point I.B, plaintiffs adequately allege that DMI conspired with al Qaeda and the other defendants to carry out terrorist acts. [23]

## III.   IF THE COURT FINDS PLAINTIFFS CLAIMS TO BE INSUFFICIENT, PLAINTIFFS SHOULD BE GIVEN LEAVE TO RE-PLEAD

If for any reason, this Court finds that plaintiffs have failed to state a claim against DMI, plaintiffs respectfully ask that they be given leave to re-plead their claims through a Rule 12(e) more definite statement.  DMI claims that there is no reasonable prospect that plaintiffs can remedy any defect in their pleading, but this is not so.  As plaintiffs have informed DMI's counsel, plaintiffs are in possession of a wealth of additional information about DMI not contained in the Third Amended Complaint.  Indeed, plaintiffs offered to provide DMI a more definite statement under F.R.C.P. 12(e), but DMI preferred to proceed with its motion addressed to the old pleading, knowing full well that plaintiffs are in a position to make more specific

---

[23]   DMI has moved to dismiss plaintiffs' claim under the Torture Victim Protection Act ("TVPA"), codified at 28 U.S.C. § 1350, note. Plaintiffs do not currently intend to pursue this claim against this defendant. Plaintiffs reserve the right, however, to re-plead this claim against DMI should additional information become available in discovery demonstrating that it acted "under actual or apparent authority, or color of law, of any foreign nation" in connection with its support of al Qaeda.

DMI also seeks dismissal of plaintiffs' claim for punitive damages on the ground that, under New York law, punitive damages are a remedy, not a cause of action. *See* DMI Br. at 24. DMI presents no argument that plaintiffs are not entitled to recover punitive damages in this lawsuit.  Since it is clear that punitive damages are available in connection with the claims that plaintiffs assert, and because the question of what law governs plaintiffs' claims remains open, this Court should not dismiss plaintiffs' claim for punitive damages because of this technicality of New York law.

allegations than those contained in the Third Amended Complaint.[24]  The claims in this case are too serious to be adjudicated other than on their merits.  Because plaintiffs are in a position to make additional, more specific allegations against DMI, they should be given leave to re-plead if the Court finds their existing Complaint against this defendant deficient in any way.

## CONCLUSION

For the foregoing reasons, DMI's motion to dismiss should be denied in its entirety.

Dated: New York, NY
       June 4, 2004

Respectfully submitted,

/s/
_____
Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael E. Elsner, Esq.
William H. Narwold, Esq.
Ingrid L. Moll, Esq.
Robert T. Haefele, Esq.
Elizabeth Smith, Esq.
Justin B. Kaplan, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

Jayne Conroy, Esq. (JC-8611)
Paul J. Hanly, Jr., Esq. (PH-5486)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN
& SHERIDAN, LLP
415 Madison Avenue

---

[24] In particular, plaintiffs are prepared to allege more specifically the relation between the DMI entities that have been named as defendants (the trust and the administrative services company) and the other banking entities, including Faisal Bank, Tadamon, and Al Shamal, that provided financial support to bin Laden.  Plaintiffs also would provide more specific information about relationships between, and transfer of funds from, DMI-related entities to specially-designated terrorist entities, and about the role of specific individuals, including Hassan Al Turabi, the founder of the National Islamic Front in Sudan and an early supporter of al Qaeda, in running DMI.

23

New York, NY 10017-1111
Telephone: (212) 401-7600

William N. Riley, Esq.
Amy Ficklin DeBrota, Esq.
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone: (317) 848-7939

Harry Huge, Esq.
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone: (202) 824-6046

Allan Gerson, Esq.
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel: (202) 966-8557

Chip Robertson, Esq.
Mary Winter, Esq.
BARTIMUS, FRICKLETON, ROBERTSON & OBETZ
200 Madison Avenue, Suite 1000
Jefferson City, MO 65101
Telephone: (573) 230-4665

Jack Cordray, Esq.
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone: (843) 577-9761

Attorneys for Plaintiffs