# Exhibit 1

RONALD E. LE FEVRE
District Counsel
LEONARD ROSENBERG
Assistant District Counsel
SHILPA KHAGRAM
General Attorney
U.S. Immigration and Naturalization Service
P.O. Box 26449
San Francisco, California 94126-6449
(415) 705-4604

UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION & NATURALIZATION SERVICE

BEFORE THE BOARD OF IMMIGRATION APPEALS

|  |  |  |
|---|---|---|
| In the Matter of: | ) | File:   A29-457-661 |
|  | ) | San Francisco |
| Mohammad J. A. KHALIFAH | ) |  |
|  | ) |  |
| Respondent, | ) |  |
|  | ) | IN SERVICE |
| In Bond Proceedings | ) | CUSTODY |

GOVERNMENT'S RESPONSE BRIEF
IN SUPPORT OF DECISION OF THE IMMIGRATION JUDGE
DENYING RESPONDENT BOND

## STATEMENT OF THE CASE AND FACTS

The INS hereby adopts the statement of the case and facts as set forth in the well-written decision of the Immigration Judge (IJ) dated January 9, 1995 (Dec.) denying respondent release from custody.  Additional factual discussion is set forth below in connection with the argument.

### STATEMENT OF THE ISSUE

Whether respondent, an identified international terrorist who has been convicted for terrorism and sentenced to death in Jordan, and whose presence in the United States has been determined as contrary to foreign policy by the Secretary of State of the United States, established that he is not a flight risk, nor a threat to the national security.

### ARGUMENT

I.   THE IMMIGRATION JUDGE PROPERLY DENIED
     RESPONDENT BOND ON THE BASIS THAT HE IS
     A FLIGHT RISK

It is well-settled that the Attorney General has consitutional authority to detain an alien without bond if there is reasonable cause to believe that he may flee rather than face deportation or if he poses a threat to the national security.  See section 242(a) of the Immigration and Nationality Act (Act); Carlson v. Landon, 342 U.S. 524 (1952), aff'g 187 F.2d 991 (9th Cir. 1951); Doherty v. Thornburgh, 943 F.2d 204 (2nd Cir. 1991), cert.

dismissed sub nom. <u>Doherty v. Barr</u>, 112 S.Ct. 1254 (1992);

<u>O'Rourke v. Warden, Metropolitan Correction Center</u>, 539 F. Supp

1131 (S.D. N.Y. 1982); <u>Matter of Moise</u>, 12 I&N Dec. 102 (BIA

1967); <u>Matter of S-Y-L-</u>, 9 I&N Dec. 575 (BIA 1962).  The

discretion of the Attorney General with respect to denying bail

in deportation cases can be overridden only where it is clearly

shown that it was without reasonable foundation.  <u>See id.</u>  An

alien's involvement in activities that are subversive, terrorist,

and criminal can be given overriding significance and justify

incarceration, as there is no other available mechanism which

ensures the availability of such persons during their deportation

proceedings.  <u>See id.</u>  Pending criminal charges as well as the

possibility of a life or death sentence as the result of those

charges may establish that an alien is a poor bail risk.  <u>See id.</u>

Moreover, information in the record which demonstrates that an

alien may not return to the country designated for deportation by

avoiding the American legal process is evidence of an

exceptionally poor bail risk and justifies a denial of bond.  <u>See

id.</u>

The Board of Immigration Appeals (BIA), acting pursuant to its

authority delegated from the Attorney General pursuant to 8

C.F.R. § 3.1(d) of the Act, has construed section 242(a) of the

Act to provide that the determination to release an alien pending

deportation proceedings is not a discretionary form of relief.

<u>O'Rourke v. Warden, Metropolitan Correction Center</u>, <u>supra</u>.

2

Rather, an alien should be detained or required to post bond when he is determined to be a threat to the national security or a poor bail risk.  <u>Matter of Patel</u>, 15 I&N Dec. 666 (BIA 1976). The Board had held among the factors that should be considered in assessing the need for a bond is whether or not an alien has: (1) an arrest record; (2) a record of involvement in subversive activities; (3) a record of involvement in immoral activities; (4) family relationships or other contacts in a community; (5) an employment history in a community, and (6) whether or not an alien has advised the Service of past changes of address.  <u>Id.</u>, at 666-67.

Based on the foregoing considerations, the IJ's decision to deny respondent bond on the basis that he is a flight risk was entirely supported by the record.  The highest officials of two governments, the United States and Jordan, have identified respondent as an international terrorist.  <u>See</u> Exhibits 1, 2, 3. Indeed, the current Ambassador of Jordan, Fayez A. Tarawneh, has specifically requested that the United States effect the return of the "fugitive" Mohammad Jamal Khalifah to the Hashemite Kingdom of Jordan by "any means available under United States law."  Exhibit 2, Letter of Fayez A. Tarawneh, Ambassador of Jordan, dated 12/22/94.

Attached to the Ambassador's letter is an actual verification of the verdict against respondent in Jordan.  <u>See</u> Exhibit 2, Letter

3 .

of Maj. Gen. Mohammad Manko, Attorney General for State Security
Court of Jordan, dated December 1994.  Major General Manko's
letter plainly refers to respondent by name and characterizes him
as an "escaped suspect."  See id.  Not only does Major General
Manko set forth the charges against respondent, he also
delineates the incidents which led to respondent's conviction.
See id.  In particular, this correspondence confirms that
respondent "approved the idea of supporting and financially
funding the organization in Jordan which aims at conducting
terrorist acts in Jordan."  See id.  Major General Manko verifies
that respondent was on December 21, 1994 judged in absentia in
front of the Jordanian security court and sentenced to death.
See id.

The letters of Mr. Philip C. Wilcox, Jr., written in his official
capacity as the Coordinator of Counterterrorism for the United
States Department of State, and specifically addressed to the IJ,
explicitly explain respondent's terrorist activities.  Exhibit 1,
Letters of Mr. Wilcox, dated 12/16/94, 12/20/94; Exhibit 2,
Letter of Mr. Wilcox dated 12/23/94.  Mr. Wilcox specifically
reveals that the United States Department of State believes, on
the basis of reliable information, that respondent "has engaged
in a repeated pattern of providing financial, logistical and
training assistance to international terrorists, in addition to

4

the acts of terrorism for which he is being tried in Jordan."[1]
Exhibit 1, Letter of Mr. Wilcox, dated 12/20/94. As to
respondent's terrorist acts in Jordan, the evidence clearly
establishes respondent had been indicted and convicted for his
role in a series of bombing attacks on cinemas and other related
targets. Mr. Wilcox points out that at least several civilians
were injured during these acts of violence. Exhibit 1, Letter of
Mr. Wilcox dated 12/16/94. In three of his four letters to the
IJ, Mr. Wilcox unreservedly declares that respondent is an
international terrorist, and if freed from U.S. custody, he would
continue to engage in terrorist actions and present a threat to
the U.S. national security. See Exhibit 1, Letters of Mr. Wilcox
dated 12/16/94 and 12/20/94; Exhibit 2, Letter of Mr. Wilcox
dated 12/23/94 (emphasis supplied).

The record also contains a three-page letter to Janet Reno, the
Attorney General of the United States, from the Secretary of
State of the United States, Warren Christopher regarding
respondent herein. Exhibit 3. Mr. Christopher identifies
respondent as an international terrorist, and concludes that "the
presence or activities of Mohammad Khalifah in the United States

---

[1] Mr. Wilcox informs that respondent's terrorist connections
include the following: (1) providing support to terrorist groups
in the Philippines, which have undertaken bombings of civilian
targets in that country, including theaters, and have kidnapped
American citizens; (2) organizing efforts by former fighters in
Afghanistan to provide training and assistance in the Philippines
to terrorists; (3) having extensive ties to the HAMAS
organization; and (4) having links to the Gama't Islamiyya
terrorist group. Exhibit 1, Letter of Mr. Wilcox, dated 12/20/94.

would have potentially serious adverse foreign policy
consequences for the United States." Id. (emphasis supplied).
Mr. Christopher determines, "permitting Mr. Khalifah's presence
in the United States would potentially undermine our longstanding
and successful policy of international legal cooperation to bring
about the prosecution of terrorists." Id. (emphasis supplied).
Mr. Christopher requests that the United States Attorney General
take all reasonable steps to ensure respondent's deportation from
the United States to Jordan. Id.

Moreover, the Acting Attorney General of the United States has
personally written the IJ in these proceedings, exercising the
power of the Attorney General pursuant to section 243(a) of the
Act, 8 U.S.C. 1253(a). Exhibit 11. The Acting Attorney General
specifically concludes that if the respondent is found to be
deportable at the conclusion of his deportation hearing,
deportation to any country other than Jordan would be
"prejudicial to the interests of the United States." Id. The
Acting Attorney General specifically designates and directs
Jordan as the country for respondent's deportation. Id.[2]

---

[2] The Attorney General may reject a respondent's
designation, where it would prejudice U.S. interests. Doherty v.
DOJ, 908 F.2d 1108, 1113 (2d Cir. 1990) (AG's broad discretion to
designate country of deportation and to reject respondent's,
where would prejudice U.S. interests is essentially
unreviewable), rev'd on other grounds, 502 U.S. 314, 112 S. Ct.
719 (1992). Accord Palciauskas v. INS, 939 F.2d 963, 968-69
(11th Cir. 1991).

It is clear from the record that respondent has been and continues to do everything within his power to avoid personally facing prosecution in Jordan.  Respondent, while in England, was well-aware that there was an outstanding warrant for his arrest in Jordan.  See Exhibit 1, Form I-213; Tr. at 140; Exhibit 14. Respondent has been traveling through countries such as Saudi Arabia, the United Kingdom, the Philippines as well as the United States, but readily admits he simply will not go to Jordan.  Tr. at 141.  Respondent absolutely refuses to turn himself in to the Jordanian authorities because he faces re-prosecution for terrorism with a possible death sentence.

Accordingly, it cannot be controverted that respondent is, in fact, an identified international terrorist.  Respondent has been convicted in absentia for his participation in a terrorist conspiracy in Jordan.  Respondent has been sentenced to death as a result of this conviction.  While it true that respondent will be re-tried on these charges if and when brought to Jordan, see Dec. at 13; Resp. Brief at 20; Exhibit 3, it is also clear that he may well be convicted once again and once again sentenced to death in Jordan.  Moreover, the Secretary of State himself has explicitly determined respondent's presence in the United States as an adverse foreign policy influence.  Although the Attorney General has specifically directed his deportation to Jordan, respondent has no intention whatsoever of going to Jordan.  If released from Service custody, absolutely no amount of money or

7

other bond conditions would ensure that respondent will surrender
himself for deportation to Jordan.  As the IJ correctly held,
respondent is too extreme a flight risk to be granted release
from custody.  See Dec. at 12; Dec. dated 1/19/95 at 3; Carlson
v. Landon, supra; Doherty v. Thornburgh, supra; O'Rourke v.
Warden, Metropolitan Correction Center, supra; Matter of Patel,
supra; Matter of Moise, supra; Matter of S-Y-L, supra.

Respondent has raised a number of arguments in his lengthy
opening brief, all nonmeritorious at best.  They will be
addressed seriatim.

## A. State Department's Invalidation of Respondent's Visa

In assessing that respondent is a flight risk, the IJ properly
relied on the fact that the Department of State took the
"unusual" step of exercising its authority under section 221(i)
of the Act to invalidate respondent's visa after entry.  See Dec.
at 12; Exhibit 1.  Respondent's erroneous contention -- that
there is "no rational connection" between the invalidation of
respondent's visa and his being a flight risk -- is wrong.  See
Resp. Brief at 6.[3]  It is certainly not common for the Secretary
of State to intervene in immigration cases.  Indeed, this only
occurs in certain limited instances as set forth in the Act.  The

---

[3] Indeed, respondent virtually conceded as much when he
argues that respondent's "lawful" admission on that visa tends to
show he is not a flight risk.  Cf. Resp. Brief at 17.

IJ explicitly stated that in invalidating respondent's visa, the Department of State "has stated a serious ground of exclusion." Dec. at 12. It is rare for the State Department to invalidate an alien's visa because he is excludable from the United States for having engaged in a terrorist activity. See Exhibit 1, Certification of Revocation dated 1/6/994.

Respondent erroneously insists that since the INS offered the State Department's revocation for background purposes to show how respondent was placed in deportation proceedings, the IJ could not use it as a basis to find respondent is a flight risk. See Resp. Brief at 6, n.3; Tr. at 67. Actually, given the overwhelming evidence that respondent is an extreme flight risk, as detailed above, there was, in fact, no need for the IJ to rely on the invalidation as a flight factor. Respondent, however, has failed to cite to any authority for his contention that the visa invalidation cannot be considered. In this same footnote, respondent once again mistakenly argues that "there is nothing in the record to indicate how often such a revocation occurs or why it would be "unusual." See Resp. Brief at 6 n.3. There is absolutely nothing USUAL about the Secretary of State revoking a visa on the basis that respondent is excludable due to his involvement in terrorist activities. On the contrary, the IJ properly took administrative notice of this circumstance and respondent has had the opportunity, but offered nothing of

9

substance to rebut it).   Cf. Acewicz v. INS, 984 F.2d 1056, 1060
(9th Cir. 1993).

Respondent attempts to undercut the IJ's reasoning, arguing that
the Certification of Revocation was never properly received into
evidence.   See Resp. Brief at 7.   Respondent indicates that the
Certification of Revocation was never authenticated by its author
and it was not subject to cross-examination.   See id.   First,
this official record speaks for itself -- the fact of the
revocation is not hearsay.   Second, respondent's arguments
misapprehend the very nature of bond proceedings.   ALL relevant
information provided to the IJ is applicable in bond proceedings.
8 C.F.R. § 3.19(d) (1994) ("The determination of the Immigration
Judge as to custody status or bond may be based upon any
information that is available to the Immigration Judge or that is
presented to him or her by the alien or the Service.") (emphasis
added); Matter of Chirinos, 16 I&N Dec. 276 (BIA 1977).   As
discussed in greater detail below, respondent does not have any
constitutional, statutory, regulatory or case-law authority to
require further authentication of the document or to cross-
examine the maker of such documents in bond proceedings.   See
Part III of Argument, infra.   As such, the IJ's reference to and
reliance on the Certification of Revocation was altogether
appropriate.

Respondent wrongly asserts that the IJ should not have given significance to the Certification of Revocation because the allegations regarding the revocation and the deportation charge pursuant to those allegations had been withdrawn by the INS. See Resp. Brief at 6-7. Respondent argues that the IJ considered the allegations in the letters of Philip C. Wilcox, Coordinator of Counterterrorism for the State Department, without giving respondent the opportunity to cross-examine him. See id., at 7. As discussed below, respondent has no right to cross-examine witnesses in bond proceedings. Moreover, respondent neglects the obvious fact that the State Department's revocation of respondent's visa is in and of itself highly significant. Simply because the INS in the appropriate exercise of its broad prosecutorial discretion, cf. Matter of Ramirez-Sanchez, 17 I&N Dec. 503, 505 (BIA 1980), withdrew certain charges in lieu of another charge does not preclude the IJ from relying on the Certification of Revocation, or, for that matter, any other evidence in the record. Respondent is well-aware that his visa was revoked because he has been identified as a terrorist by the Governments of Jordan and the United States. This provides every motive for respondent to escape. Respondent's challenge to the IJ's rationale is without merit.

B. Respondent's ███████ of Deportation to Jordan

11

In denying respondent bond on the basis that he is a flight risk, the IJ properly took into account that two sovereign nations, Jordan and the United States, urgently wish respondent to be deported to Jordan. See Dec. at 12-13. The IJ logically coupled this factor with the fact that respondent has been convicted and sentenced to death in Jordan for conspiracy to commit terrorist acts. See id. The IJ therefore correctly held that this provides "strong motivation to evade the deportation proceedings that might conceivably lead to the execution of the Jordanian judgment." See id.

Respondent contends, "there is no explanation why, ipso facto, Respondent is a flight risk because of these governments' 'urgent wishes.'" Resp. Brief at 8. Respondent adds that if that were true, "every alien in deportation proceedings would be considered a flight risk and should not be allowed bond; for in every deportation case it is apparent that the U.S. Government wishes the alien to be deported."[4] Id. Any aliens placed in deportation proceedings are eligible for some form of relief from

---

[4] Respondent also adds that if "this rationale were applied in criminal proceedings," a defendant would never be allowed bail, since in a criminal cases the government through its prosecuting attorneys, believes that the defendant is guilty and should be incarcerated." Resp. Brief at 8. Respondent interposes similar arguments relating to criminal proceedings throughout the bond proceedings as well as his opening brief. As discussed in greater detail below, criminal law principles simply do NOT apply to immigration proceedings. Respondent's false analogies in this regard must clearly fail. Cf. Florida v. Royer, 460 U.S. 491, 528 (1983) (Rehnquist, J., dissenting) ("[I]f my aunt were a man, she would be my uncle.").

deportation.  Respondent has been put on notice that the Service
opposes any relief from deportation and intends to deport him to
Jordan.  It is anything but typical that a respondent is
identified by high level officials of this country and the
country of deportation as an international terrorist, and that he
is documented to be under a death sentence in a country of
deportation designated by the Attorney General.

Respondent is likely to flee from his pending deportation
proceedings if released on any bond, because, as the IJ's
decision explicitly spells out, he has been convicted in Jordan
for terrorism and has been sentenced to death.  See Dec. at 13;
Decision of the IJ Denying Respondent's Motion to Reopen and
Reconsider (Dec. dated 1/19/95), at 3.  Respondent's contentions
-- that the compelling wishes of these two governments do not
establish he is a flight risk under these circumstances -- are
simply wrong.

Respondent argues that he has "travelled openly under his own
name and passport, and openly conducted business with many
governments of the world."  See Resp. Brief at 17; Tr. at 140-41.
Regardless of where he has travelled in the past, respondent has
no intention whatsoever to face the outstanding criminal
consequences for terrorism in Jordan.

13

Nothing can obfuscate the overriding fact that respondent's
determined efforts to avoid deportation to Jordan clearly
demonstrate that he has <u>every</u> motive to flee if released on bond.

C. <u>U.S. Government's Foreign Policy Concerns</u>

Respondent contends that the IJ's consideration of the "urgent
wishes" of the governments of Jordan and the United States to
deport respondent to Jordan is in deference to the foreign policy
issues addressed in the letters of the Secretary of State of the
United States, Warren Christopher, and Philip C. Wilcox, Jr., the
Coordinator for Counterterrorism for the State Department.  <u>See</u>
Resp. Brief at 9, 13.  Respondent argues that "governmental
wishes based on foreign policy concerns have no place in bond
proceedings where a person's liberty and due process rights are
implicated."  <u>Id.</u>, at 9.  Respondent's contention is again
without merit.  Foreign policy concerns made by the highest
officials of the United States including the Secretary of State,
are hardly "irrelevant in determining whether respondent is a
flight risk."  <u>Cf. id.</u>, at 13.  These documents are
unquestionably proper for consideration, since these officials
were acting pursuant to their constitutional and statutory duties
to protect the United States' national and international security
interests, which have been placed in jeopardy as a direct result

Respondent claims that the documents he submitted attest to his humanitarian and charitable efforts on behalf of the poor and needy in the Philippines. See Resp. Brief at 18. Respondent refers to his work with such organizations as the ████████████ ████████ and the ████████████████████████████████████ See id. Respondent asserts that this is a reflection of his character, and a significant positive equity which justifies a low bond. See id., at 18; Tr. at 149-59. As the INS argued during the bond hearing, the true reflection of respondent's character is mirrored in Mr. Christopher's letter. Tr. at 146. This letter, in addition to the letters of Mr. Wilcox, Ambassador Fayez A. Tarawneh, as well as Major General Mohammad Manko, verify that respondent's absurd assertion -- that his work is focused only on humanitarian activities and the rejection of violence -- is a tremendous hoax. Even in the Philippines, respondent has been providing support to terrorist groups which have undertaken bombings of civilian targets in that country, including theaters, and have kidnapped American citizens. See Exhibit 1, Letter of Mr. Wilcox, dated December 20, 1994. The INS attempted to question respondent about these terrorist activities in the Philippines, as well as in other countries, but he invoked his Vth Amendment right against self-incrimination. As argued below, the Board should draw adverse inferences from respondent's refusal to testify regarding his terrorist activities.

14

of respondent's presence in the United States.[5] Respondent's assertions to the contrary require no further response.

## D. Respondent's In Absentia Conviction for Terrorism

Respondent attempts to undermine the IJ's sagacious theory in denying him bond by claiming that the Court erred in relying on the foreign in absentia conviction. See Resp. Brief at 9. Respondent claims there is no support in the record for the IJ's finding that he was convicted on charges of terrorism in Jordan. Id. Respondent is grossly mistaken. Initially, as the IJ correctly points out, "it does appear to be undisputed by both parties at this point that the respondent has been subjected to a death penalty in Jordan, that the proceedings were held in absentia, and that the proceedings related to accusations of terrorism. These basic conclusions can be drawn from the Service's submissions, and from many of the respondent's

_____

[5] In making his decision, the IJ correctly ruled that respondent is a flight risk irrespective of the Wilcox letters. See Dec. at 12. As to the extraordinary letter of Mr. Christopher, respondent argues that the only relevant aspect of this letter to bond proceedings is the Secretary's determination that, "to permit Mr. Khalifah to remain at large in the United States would have potentially serious adverse foreign policy consequences in several respects." Tr. at 13. Respondent is entirely mistaken in attempting to minimize the gravamen of the Secretary's conclusion, which is based on the fact that respondent is an identified international terrorist. Not only do these documents collectively confirm that respondent will disappear if released from Service custody, but as set forth in detail below, they also prove respondent is a serious threat to the national security.

16

submissions, among them Exhibit 7, Items 1 and 13."   Dec. at 7-8
(emphasis supplied); Tr. at 138.   It is plain that respondent
through counsel has conceded at several points that he has been
convicted in absentia and sentenced to death in Jordan.   See 8
C.F.R. § 3.1(d)(1-a)(i) (BIA may summarily dismiss portion of
appeal from finding of fact conceded by party).

Respondent incorrectly contends that respondent's in absentia
conviction should have been accorded no weight, since respondent
would be provided with a new trial if returned to Jordan.   See
Resp. Brief at 20-21.   As the IJ has repeatedly ruled, "whether
or not the Jordanian conviction is 'infirm' or not, the
conviction and the possibility of further proceedings in Jordan
do exist.   The conviction and the possibility bear on 'risk of
flight' as stated in the Court's decision of January 9, 1995."
Dec. dated 1/19/95 at 2.   Respondent's contentions to the
contrary simply miss the mark.

Respondent contends that the IJ erred in not examining the
circumstances which led to his conviction, which purportedly were
sufficient to preclude it from consideration in the bond
proceedings.   See Resp. Brief at 21, 25.   Respondent claims the
IJ ignored his submissions regarding the inhumane and
untrustworthy nature of the proceedings employed by the Jordanian
State Security Court to obtain the conviction.   See id., at 21-
28.   In this regard, as respondent well knows, not only did the

17

IJ consider this information, but he convincingly used it is a factor in holding that respondent irrefutably _is_ a flight risk. _Cf._ Dec. at 13.

Respondent argues that the inherent unreliability of the conviction is due to it being solely based on the recanted confession of Al-Hasheikeh, a co-conspirator, which was purportedly obtained under torture. _See_ Resp. Brief at 25-28. Respondent urges that this, along with the submitted materials from Amnesty International regarding the torturous treatment of prisoners, establishes the invalidity of the Jordanian court's verdict in this case. _See_ _id._ In reality, as the IJ aptly determined, "respondent's own submissions exhibit his strong distrust of the Jordanian system in which he might be tried. This distrust, coupled with the evident power of the system, and the serious consequences that might flow to respondent, leads to the conclusion that flight is a serious risk in this case." Dec. at 13.[6]

That respondent was and may again be convicted in Jordan based on such evidence and that he faces a possible death sentence for his part in the terrorist conspiracy does not violate respondent's

_____

[6] As the INS argued at respondent's bond hearing, the purported recantation by a principal defendant is not worth much. _See_ Tr. 128-143.  It is hardly unusual for a defendant to disavow a prior inculpatory statement.  What _is_ material is how the trier-of-fact handles the disavowal.  Here, respondent was convicted, despite any recantation.

18

right to due process in his deportation, much less bond
proceedings.  Cf. Bastanipour v. INS, 980 F.2d 1129, 1132 (7th
Cir. 1992) (rejecting Bastanipour's argument that he faces
persecution as a drug trafficker, since it is punishable in Iran
by death "frequently administered after summary proceedings that
would be regarded in this country as a travesty of due process
law."); Matter of Linnas, 19 I&N Dec. 302, 310 (BIA 1985)
("Although the respondent has been sentenced to death in the
Soviet Union in what appears to have been a sham trial, the
Constitution does not extend beyond our borders to guarantee the
respondent fairness in judicial proceedings in the Soviet Union.
Moreover, under our immigration laws there is no requirement that
a foreign conviction must conform to our constitutional
guarantees.  Thus, due process is not violated by the
respondent's deportation to the U.S.S.R."  (citations omitted)),
aff'd, Linnas v. INS, 790 F.2d 1024, 1032 (2d Cir.) (deportee has
no constitutional right to due process in native country), cert.
denied, 479 U.S. 995 (1986).

E. Accuracy of Wilcox Letters

Respondent makes much of Mr. Wilcox's statement to the IJ that
respondent had been convicted of all three of the charges for
which he was indicted, when he had actually been convicted of one
charge, namely, participating in a conspiracy with the intention

of committing terrorist acts.  <u>See</u> Resp. Brief at 10;[7] Exhibit 1,

Letter of Mr. Wilcox, dated 12/16/94; Exhibit 2, Letter of Mr.

Wilcox dated 12/23/94.  Respondent unduly contends that this

makes the government's submissions unreliable.  <u>See</u> <u>id.</u>, at 10.

However, as acknowledged by respondent, Mr. Wilcox notified the

IJ of this discrepancy in a subsequent correspondence.  <u>See</u> Resp.

Brief at 10; Exhibit 4, Letter of Mr. Wilcox dated 1/5/95.

Moreover, Mr. Wilcox explicitly stated to the IJ that respondent

has been convicted.  Respondent's claim, that this correspondence

does not demonstrate that there is a conviction because he could

not cross-examine Mr. Wilcox, is utterly meritless.  <u>See</u>

Argument, Part III, <u>infra</u>.  More importantly, there is absolutely

no evidence in the record to rebut the fact that respondent has

been convicted and sentenced to death by the Jordanian Government

as a result of the court's finding as to his participation in a

terrorist conspiracy.  This conviction is a reality, as is

Jordan's request that respondent be returned to face trial

therefore, as is the Secretary of State's request to the Attorney

General to effectuate this, as is respondent's likelihood to flee

to avoid this life-threatening consequence.

F. <u>Accuracy of Jordanian Government's Submissions</u>

---

[7] Here, again, respondent concedes the <u>in absentia</u>
conviction.

20

Respondent, in another failed effort to discredit the
overwhelming evidence against him, contends that the letters of
the Jordanian Ambassador, Fayez A. Tarawneh, and the attached
indictment and verdict signed by the Major General for the State
Security Court of Jordan, Major General Mohammad Manko, are not
sufficient to establish respondent's Jordanian conviction.  See
Resp. Brief at 10.  Respondent claims the Jordanian Ambassador
did not assert that he had been convicted of any charge.  Id.
However, as stated by the IJ, the Ambassador identifies
respondent as a "fugitive", and requests that the United States
State Department "effect" his return to Jordan "by way of
extradition, deportation, expulsion or by any other means
available under United States law."  Dec. at 6; Exhibit 2, Letter
of Fayez A. Tarawneh, Ambassador of Jordan, dated 12/22/94.

While respondent alleges that the "the authenticated original
copy of the verdict" referred to in the Ambassador's letter was
never presented to the Court, the INS specifically clarified to
the IJ that General Manko's correspondence IS, in fact, that very
indictment and verdict.  Tr. at 71-76.  Additionally, the IJ and
respondent were shown the authenticated original document during
the course of the bond proceedings.  Id.  Indeed, respondent's
counsel conceded that he had seen the actual authenticated
document.  Id.  As the INS properly contended, and the IJ
correctly held, "the Jordanian letter verifies the Respondent's

21

conviction and sentence of death."[8]  Dec. at 6; Tr. 71-76.

Moreover, respondent's Jordanian conviction and death sentence

are further illustrated by Exhibit 6, a judgment in the Jordanian

proceedings which states that respondent was convicted for

participating in a conspiracy to commit terrorist acts and

sentenced to death on December 19, 1994.  See Exhibit 6.

Respondent's arguments are simply unfounded.


Respondent argues that the IJ had to rely on the documentation

that respondent, himself, submitted to demonstrate he had

actually been convicted in Jordan.  Resp. Brief at 11.

Respondent cites to the statement of Douglas Horngrad, his own

attorney, which the IJ used in determining that "respondent's own

submissions" establish he was "convicted of participation with

the intention of committing terrorist acts."  Dec. at 7-8; Dec.

dated 1/19/95 at 2; Exhibit 7(1), Declaration of Douglas

Horngrad.  Respondent argues that the Horngrad declaration states

that respondent was acquitted of two charges, and "makes no

reference whatsoever to any conspiracy conviction."  Resp. Brief

at 12.  The Horngrad declaration attempts to defend respondent by

calling into question the circumstances by which respondent was

_____

[8] Respondent asserts that General Manko's correspondence is
unreliable because it refers to the respondent as the twenty-
fourth suspect, whereas in the original indictment he was
referred to as the twenty-fifth suspect.  See Resp. Brief at 11,
n.6.  As the IJ properly determined in light of this same
argument made by respondent at the bond hearing, General Manko's
verdict "does appear to name the Respondent, and its recitations
in general do appear to refer to the Respondent."  Dec. at 7.

implicated.  Id.  In so doing, respondent is conceding that there

was a trial in Jordan in his absence, that he was implicated for

terrorism, that evidence was received against him, and that the

declarant fails to dispute that respondent was found guilty of

conspiracy to commit terrorist acts.


Most significantly, Warren Christopher, the Secretary of State of

the United States, explicitly declared to the Attorney General

that, "Mr. Khalifah has been identified to us by the Government

of Jordan as a terrorist.  He is accused of involvement in

terrorist attacks against cinemas in Jordan, and has been

convicted in absentia."  Exhibit 3 (emphasis supplied).

Accordingly,  respondent's allegations that "the INS failed to

prove the fact of the alleged conviction," and "although the IJ

was apparently convinced respondent has been convicted, there is

no support in the record for such a finding" are obviously belied

by the record.  Resp. Brief at 9; 12.


G. Electronic Monitoring


Respondent argues that he should be released on a low bond, with

conditions to ensure his adequate monitoring, namely, a house

arrest program with an electronic monitoring system referred to

as Volunteers of America.  See Resp. Brief at 1, 20, 40.

Respondent's suggestion, that the monitoring aspect of the

program with its "beeping" sound would lead to respondent's re-

23

arrest if he tried to escape is based on pure speculation at best.  See id.

Respondent cites to section 242(a) of the Act as support for this alternative proposition.  See Resp. Brief at 14.  Respondent clearly misstates the law.  While it is true, as delineated in section 242(a) of the Act, that the Attorney General may detain an alien, release the alien on bond, or release the alien under an order of supervision during the pendency to the deportation proceedings, this authority does NOT extend to the IJ or the Board.  The IJ and the Board only have jurisdiction to continue an alien in Service custody, or to release him under bond or his own recognizance, but lack the authority to impose such other alternative semi-custodial environments as "house arrest" with or without electronic monitoring.  Cf. 8 C.F.R. § 242(d) (1984).[9] Moreover, the IJ clearly did not believe that bond, with an electronic monitoring system or house arrest, "is sufficient to

---

[9] Respondent contends that in Matter of San Martin, 15 I&N Dec. 167 (BIA 1974), the Board held that the Bail Reform Act is applicable to bond redetermination hearings.  Resp. Brief at 18. Respondent argues that on this basis the Board should allow respondent bail under conditions necessary to ensure his appearance.  Id., at 20, citing Matter of San Martin, at 168. While the Bail Reform is analogous, it is certainly not controlling on bond proceedings.  See Matter of San Martin, at 168; see also Matter of De La Cruz, Interim Decision 3155, at 8 n.5 (BIA 1991).  Cf. Matter of Drysdale, Interim Decision 3221 (BIA 1994).  Therefore, caselaw construing the Bail Reform Act is not controlling in immigration proceedings.

24

secure attendance at the deportation proceeding." Dec. at 13.[10]

In this regard, the IJ properly questioned the success rate of

Volunteers of America, and further, properly determined that this

organization "does not appear to deal with long term cases, or

cases in which the critical nature of the consequences are so

great as in this case, and the Court does not believe that a

private organization should be called on to monitor a case where

risk of flight is so great, and governmental interest so strong."

Dec. at 13-14.


In any event, based on the fact that respondent is an extreme

flight risk, there is no question that he should remain in

Service custody. Nothing less will prevent him from fleeing the

jurisdiction. Accordingly, the IJ's "belief that the

circumstances combine to demonstrate that there is a serious risk

that the Respondent in this case would flee," so that no amount

of money would ensure respondent's appearance is clearly

substantiated by the record. Dec. at 12; Carlson v. Landon,

supra; Doherty v. Thornburgh, supra; O'Rourke v. Warden,

---

[10] While respondent suggests that the Board should set a
bail at a "reasonable" amount, and recommends $50,000.00, this
would hardly deter respondent from fleeing. According to
respondent's brother, respondent is affiliated from with the
Binladin family, because one of his wives is from that family.
Tr. at 219. Respondent's brother further corroborated respondent
is affiliated with the Binladin Company. Id., at 220-22.
Indeed, respondent listed the Binladen Company in Saudi Arabia as
his specific address when applying for a visa to the United
States. Exhibit 16. As stated by respondent's brother, the
family is very wealthy. Tr. at 219. With such an abundant
monetary resource available to him, no amount of bail will deter
respondent from absconding.

Metropolitan Correction Center, supra; Matter of Patel, supra;

Matter of Moise, supra; Matter of S-Y-L, supra.

      II.  RESPONDENT'S SHOULD ALSO BE DENIED
           BOND BECAUSE HE IS A THREAT TO THE
           NATIONAL SECURITY

An alien should not be released on bond if he is a threat to the

national security.   Carlson v. Landon, supra; Doherty v.

Thornburgh, supra; O'Rourke v. Warden, Metropolitan Correction

Center, supra; Matter of Patel, supra; Matter of Moise, supra;

Matter of S-Y-L, supra.   Here, not only is respondent a serious

flight risk as the IJ correctly concluded, but he is also a

threat to the national security.   The Board in its de novo

review, see, e.g., Matter of De La Cruz, Interim Decision 3155,

at 4 (BIA 1991), should find that respondent must be denied bond

in light of the overwhelming evidence that he poses a threat to

the national security.

That respondent is a grave threat to the national security is

clearly established by the evidence discussed in detail above.

In particular, the letter of the Secretary of State in and of

itself proves that respondent is such a dangerous threat.

Exhibit 3.   Mr. Christopher identifies respondent as an

international terrorist, and requests that his deportation be

expedited to Jordan.   Id.   The Secretary further states that, due

to the facts that respondent is an identified terrorist and that

26

kidnapping, provisions for assassinating priests and Christians,
provisions for bombing churches and places of worship and
provisions for martyrdom operations.  See id.  As part of its
practical program, the school curriculum includes "making simple
explosives" and "a round (training cycle) on weapons and
explosives, full military training."  See id.

After respondent had objected to Exhibits 9 and 10 on the basis
of their authenticity at the bond hearing, the INS, as part of
its rebuttal, requested that respondent testify.  See Tr. at 226.
Respondent refused to testify on the basis that there was an
ongoing FBI investigation in his case.  Tr. at 226-27; Exhibit
17.  Respondent invoked his Vth Amendment privilege against self-
incrimination to the Government's inquiries, which included
questions about his nickname, the terrorist manual found in his
luggage, as well all the statements made about him in the Wilcox
and Christopher letters.  Tr. at 226-231.[11]  Based on the
respondent's refusal to testify, adverse inferences can and

_____

[11] The undersigned inadvertently referred to Exhibits 9 and
10 as Exhibits "6 and 7" at this point in the bond proceedings.
See Tr. at 231.  This discrepancy arose because the IJ had
originally marked these documents as Exhibits 6 and 7, but
refused to consider them in light of respondent's counsel's
objections regarding the absence of the Arabic language document
which corresponded to the English translation.  See Tr. at 42.
The INS did obtain the Arabic version of that letter in the
course of the proceedings, and the IJ then proceeded to mark
these submissions as Exhibits 9 and 10.  See Tr. at 90-93.  As
was apparent from the content of the Government's inquiries, the
questions directed to respondent's were clearly in the context of
Exhibits 9 and 10.

As the INS observed in its response to this motion, there is no
explanation whatsoever as to why respondent was carrying a
purported "proposal" for terrorist instruction with him to the
United States over two years after it was written.  Nor is there
any statement as to why, if respondent does in fact reject
violence as Ahmad Al-Hanwi alleges, he still travels with a
manual describing how to set up terrorist training.  If anything,
this document further authenticates Exhibit 10, the terrorist
school manual seized from an FBI search of respondent's luggage.
By attempting to counter any inference the IJ may have made from
Exhibit 10, respondent, in essence, has shown it was not by
random chance it was found in his luggage.  See Resp. Motion
dated 1/13/95 at 6, Exhibit B.  There is no logical reason for
respondent to carry around such a terrorist training manual,
except that it pertains to him in its entirety.  Thus, even
without drawing adverse inferences from respondent's silence, it
is patently clear, as the IJ unreservedly held in his decision
denying respondent's motion, "the motion does now provide the
linkage between respondent and Exhibits 9 and 10."  See Dec.
dated 1/19/95 at 2 (emphasis supplied).

Nevertheless, adverse inferences should be drawn that respondent
has been engaged in instructing others in international
terrorism, e.g., the making of explosives and the assassination
of priests and Christians.  With the adverse inferences that

should have be drawn from the content of the manual, as well as
respondent's possession of it and his reputed alias appearing on
it as the author, it should be concluded that respondent is, in
fact, engaged in international terrorism in Jordan, the
Philippines and now the United States.  See, e.g., U.S. v.
Alderete-Deras, 743 F.2d 645 (9th Cir. 1984); Cabral-Avila v.
INS, 589 F.2d 957 (9th Cir. 1978); cert. denied, 440 U.S. 920
(1979); Matter of Guevara, Interim Decision 3143 (BIA 1991).
Moreover, since respondent failed to testify regarding the
terrorist allegations raised in the Government's (as well as his
own) submissions, he simply failed to show he merits the
discretionary relief of release on bond.  See section 242(a)(1)
of the Act (setting forth AG's discretionary authority to provide
for custody or release of aliens in deportation proceedings);
Kimm v. Rosenberg, 363 U.S. 405, 408 (1960); Matter of Marques,
16 I&N Dec. 314 (BIA 1977), aff'd sub nom. Marques-Uria v. INS,
577 F.2d 751 (9th Cir.) (table citation), cert. denied, 439 U.S.
1003 (1978).

Based on all the evidence in the record discussed above,
respondent should be denied bond on the sound independent basis
that he is BOTH a flight risk and a threat to the national
security.

31

III.        THE IMMIGRATION JUDGE PROPERLY DENIED
            DENIED RESPONDENT'S MOTIONS

An alien's right to confrontation in deportation proceedings is
statutory, i.e., "a reasonable opportunity to examine the
evidence against him . . . and to cross-examine the witnesses
presented by the Government." Section 242(b)(3) of the Act; see
also 8 C.F.R. § 242.16. "The procedure so prescribed shall be
the sole and exclusive procedure for determining the
deportability of an alien . . . ." Id. This limited
confrontation right is warranted because a deportation proceeding
is a "purely civil action . . . intended to provide a streamlined
determination of eligibility to remain in this country, nothing
more." INS v. Lopez-Mendoza, 468 U.S. 1032, 1038-39 (1984); see
Espinoza v. INS, 45 F.3d 308 (9th Cir. 1995); El Rescate Legal
Services, Inc. v. EOIR, 959 F.2d 742, 751 (9th Cir. 1991).

It is well-settled that the Sixth Amendment and the Federal Rules
of Evidence, Civil Procedure, and Criminal Procedure have no
application to administrative deportation proceedings. Trias-
Hernandez v. INS, 528 F.2d 366, 368-369 (9th Cir. 1975); Martin-
Mendoza v. INS, 499 F.2d 918, 921 (9th Cir. 1974); Marlowe v.
INS, 457 F.2d 1314, 1315 (9th Cir. 1972); Navarette-Navarette v.
Landon, 223 F.2d 234, 237 (9th Cir. 1955); Hyun v. Landon, 219
F.2d 404, 407-408 (9th Cir. 1955).

Neither the constitution nor the Administrative Procedure Acts

confers a right to discovery in federal administrative

proceedings. <u>Kenrich Petrochemicals, Inc. v. NLRB</u>, 893 F.2d

1468, 1484 (3d Cir. 1990); <u>NLRB v. Valley Mold Co.</u>, 530 F.2d 693,

695 (6th Cir.), <u>cert. denied</u>, 429 U.S. 824 (1976): <u>Frilette v.</u>

<u>Kimberlin</u>, 508 F.2d 205, 208 (3d Cir. 1974) (en banc), <u>cert.</u>

<u>denied</u>, 421 U.S. 980 (1975); <u>NLRB v. Interboro Contractors, Inc.</u>,

432 F.2d 854, 858-859 (2d Cir. 1970), <u>cert. denied</u>, 402 U.S. 915

(1971). The Board of Immigration Appeals has long held that the

Federal Rules of Civil Procedure are specifically inapplicable to

deportation proceedings and there is no requirement that a

request for discovery be honored. <u>Matter of Magana</u>, 17 I&N Dec.

111, 115 (BIA 1979). <u>Accord Matter of Benitez</u>, 19 I&N Dec. 173,

174 (BIA 1984). <u>See Marroquin-Manriquez v. INS</u>, 669 F.2d 129 (3d

Cir. 1983), <u>cert. denied</u>, 467 U.S. 1251 (1984); <u>Matter of Kulle</u>,

19 I&N Dec. 318, 335 (BIA 1985), <u>aff'd</u>, 825 F.2d 1188, 1194 (7th

Cir. 1987), <u>cert. denied</u>, 484 U.S. 1042 (1988).


The standards which apply to bond proceedings are explicitly set

forth in 8 C.F.R. § 3.19(d) (1994) ("The determination of the

Immigration Judge as to custody status or bond may be based upon

<u>any</u> information that is available tot he Immigration Judge or

that is presented to him or her by the alien or the Service.")

(emphasis added) and in <u>Matter of Chirinos</u>, <u>supra</u>. In <u>Matter of</u>

<u>Chirinos</u>, the Board held that in bond proceedings, "there is no

requirement of a formal hearing." <u>Id.</u> at 277. The "primary

consideration in a bail determination is that the parties be able
to place the facts as promptly as possible before an impartial
arbiter." Id.  The Board "not only countenance[s], but will
encourage, informal procedures so long as they do not result in
prejudice. Id.

Moreover, bond proceeding are "separate and apart from"
deportation proceedings, 8 C.F.R. § 3.19(d) (1994); Gornicka v.
INS, 681 F.2d 501, 505 (7th Cir. 1982), so a respondent is not
entitled to the same rights to confrontation in bond proceedings
as he is in deportation proceedings.  Compare section 242(b) of
the Act; 8 C.F.R. § 242.16(a) (1994) (including advisals in
deportation proceedings as to rights to confront adverse
evidence) with section 242(a) of the Act; 8 C.F.R. 242.2(d)
(1994) (including no such advisals in bond proceedings).

Respondent argues that the IJ's refusal to compel the production
of exculpatory evidence violated his due process rights.  Resp.
Brief at 30-31.  Respondent further argues that since the IJ
implicitly relied on the Wilcox letters, and specifically based
his decision on the Christopher letter, and since those letters
contained many outrageous allegations against him, the IJ erred
by both admitting those letters into evidence and refusing to
compel the authors' presence in court for cross examination
purposes.  See id., at 34-39.  Respondent's contentions are

34

entirely fallacious, and have no basis whatsoever in immigration law and procedure.

Applying the foregoing to respondent's allegations, it is more than clear the IJ properly denied respondent's motions.  See Dec. at 12.  Respondent does not have any constitutional, statutory, regulatory or case-law authority in bond proceedings to obtain exculpatory evidence, cross-examination witnesses, nor preclude any relevant evidence from consideration in bond proceedings. Contrary to the meritless contentions made by respondent in his brief, respondent does not have the same procedural rights in bond proceedings as in deportation proceedings, much less than in criminal court trials.  As such, respondent's reliance on cases such as Brady v. Maryland, 373 U.S. 83 (1963), is wholly misplaced.

Respondent asserts that other IJ's have required the government to comply with due process and provide the respondent with exculpatory evidence.  Resp. Brief at 32.  Specifically, respondent refers to an unrelated deportation -- not bond -- proceeding in Los Angeles, Matter of Hamide, et al., A19 265 560. See id.  Respondent claims that in that case, two judges, Immigration Judge Ingrid K. Hrycenko and later Immigration Judge Bruce J. Einhorn, ordered the government to provide exculpatory evidence to respondents.  See id.  Respondent refers to the two orders which are attached to his Motion for Exculpatory Evidence

as Exhibits A and B in this case. However, respondent completely
failed to mention that the most recent Order of the IJ in that
proceeding specifically states that, "the Court's decision to
issue discovery Orders . . . were purely discretionary, and <u>not</u>
required by constitutional, statutory, case or regulatory law."
<u>See</u> true copy of Order of Judge Bruce J. Einhorn, dated 12/21/94
at 5, attached to Government's Request for Clarification of Time
to Submit Response dated 1/30/94 (emphasis supplied).

Respondent raises due process concerns and argues that the IJ's
denial of his motions is prejudicial error. Resp. Brief. at 34.
Additionally, respondent asserts that <u>Matter of Chirinos</u> is
unconstitutional. Contrary to respondent's unsubstantiated
contentions, <u>Matter of Chirinos</u> fully comports with procedural
due process in the context of bond proceedings, <u>i.e.</u>, the
informal bond hearing procedures pronounced by the Board
rationally serve a purpose that is lawful for the Board to seek.
<u>See</u> <u>Reno v. Flores</u>, 113 S.Ct. 1439, 1449-51 (1993); Dec. at 10-11
(IJ's reasoning for having such informal procedures). <u>See also</u>
<u>INS v. Lopez-Mendoza</u>, 468 U.S. 1032, 1039 (1984) (stressing the
intended "streamlined" nature of deportation proceedings).
Accordingly, respondent's contentions are simply unfounded. The
IJ's decision to deny respondent's motions is unassailable.

## CONCLUSION

Based on the foregoing, the IJ's decision to deny respondent bond should be affirmed.

Respectfully submitted,

DATED:   March 10, 1995

SHILPA KHAGRAM
General Attorney
Office of the District Counsel
Immigration and Naturalization
    Service

37