## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | **03-MDL-1570** |
| | ) | |
| **In re Terrorist Attacks on September 11, 2001** | ) | **ECF Case** |
| | ) | |
| | ) | |

**Relates to:**
*Ashton v. Al Qaeda Islamic Army,* **02-CV-6977 (RCC)**
*Burnett v. Al Baraka Investment & Development Corp*., **03-CV-5738 (RCC)**
*Federal Insurance Co. v. Al Qaida*, **03-CV-6978 (RCC)**
*Salvo v. Al Qaeda Islamic Army*, **03-CV-5071 (RCC)**

## MEMORANDUM IN SUPPORT OF CONSOLIDATED
## MOTION TO DISMISS OF PRINCE NAIF BIN ABDULAZIZ AL-SAUD

**James M. Cole (admitted *pro hac* vice)**          **Michael G. Biggers (MB 4743)**
**D.C. Bar No. 385857**

**James J. Murphy (admitted *pro hac* vice)**
**D.C. Bar No. 227926**

**BRYAN CAVE LLP**                    **BRYAN CAVE LLP**
**700 Thirteenth Street, N.W.**             **1290 Avenue of the Americas**
**Washington, DC  20005**               **New York, NY 10104**
**Phone: (202) 508-6000**              **Phone: (212) 541-2000**
**Fax: (202) 508-6200**                **Fax:   (212) 541-4630**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

I.   **Factual Background** ............................................................................... **5**

    *A.*   *Prince Naif's Governmental Status* ................................................ 5

    *B.*   *Applicable Precedent* ..................................................................... 5

    *C.*   *The Allegations Against Prince Naif* ............................................. 6

II.   **Discussion** ........................................................................................... **11**

    *A.*   *The Court Lacks Subject Matter Jurisdiction In That Prince Naif Is Entitled to Sovereign Immunity From Suit.* ................................................... 11*

    *B.*   *The Allegations of the Complaints Regarding Prince Naif Are Legally Insufficient to Establish a Prima Facie Basis for Personal Jurisdiction.* ........................................ 18*

CONCLUSION...........................................................................................24

i

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE(S)**

*Ball v. Metallurgie  Hoboken-Overpelt, S.A.,*
    902 F.2d 194 (2d Cir. 1990)......................................................................18

*Bellepointe, Inc. v. Kohl's Department Stores, Inc.,*
    975 F. Supp. 562 (S.D.N.Y. 1997).............................................................20

*Berkovitz by Berkovitz v. United States,*
    486 U.S. 531 (1988) ..................................................................................13

*Bettis v. Islamic Republic of Iran,*
    315 F.3d 325 (D.C. Cir. 2003) ..................................................................17

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) .............................................................................21, 22

*Burnett v. Al Baraka Investment & Development Corp.,*
    274 F. Supp. 2d 86 (D.D.C. 2003) ............................................................15

*Burnett v. Al Baraka Investment & Development Corp.,*
    292 F. Supp. 2d 9 (D.D.C. 2003) ........................................................passim

*Cabiri v. Government of Republic of Ghana,*
    165 F.3d 193 (2d Cir. 1999)......................................................................15

*Daliberti v. Republic of Iraq,*
    97 F. Supp. 2d 38 (D.D.C. 2000) .........................................................19, 21

*Doe v. Islamic Salvation Front,*
    257 F. Supp. 2d 115 (D.D.C. 2003) ..........................................................16

*Fagot Rodriguez v. Republic of Costa Rica,*
    297 F.3d 1 (1st Cir. 2002).....................................................................12, 13

*First Chicago International v. United Exchange Co,*
    836 F.2d 1375 (D.C. Cir. 1988) ................................................................20

*Flatow v. Islamic Republic of Iran,*
    999 F. Supp. 1 (D.D.C. 1998) ..............................................................20, 21

*Grandon v. Merrill Lynch & Co.,*
    147 F.3d 184 (2d Cir. 1998)......................................................................18

*Greenspun v. Del E. Webb Corp.*,
   634 F.2d 1204 (9th Cir. 1980) ...................................................................20

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) .................................................................24

*Helicopteros  Nacionales de Colombia S.A. v. Hall*,
   466 U.S. 408 (1984) ...................................................................................19

*Hirsh v. State of Israel*,
   962 F. Supp. 377 (S.D.N.Y.), *aff'd*, 1997 WL 796153, 133 F.3d 907 (2d Cir.
   1997) ...........................................................................................................15

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ...................................................................................19

*Jazini v. Nissan Motor Co.*,
   148 F.3d 181 (2d Cir. 1998).......................................................................20

*Keeton v. Hustler Magazine Inc.*,
   465 U.S. 770 (1984) ...................................................................................22

*Kline v. Kaneko*,
   685 F. Supp. 386 (S.D.N.Y. 1988).............................................................15

*Lehigh Valley Industries, Inc. v. Birenbaum*,
   527 F.2d 87 (2d Cir. 1975)..........................................................................23

*Letelier v. Republic of Chile*,
   488 F. Supp. 665 (D.D.C. 1980) ...............................................................14

*Liu v. Republic of China*,
   892 F.2d 1419 (9th Cir. 1989) ...................................................................14

*MacArthur Area Citizens Association v. Republic of Peru*,
   809 F.2d 918, *modified*, 823 F.2d 606 (D.C. Cir. 1987) .................................12, 16, 17

*Meany v. CHS Acquisition Corp.*,
   103 F. Supp. 2d 104 (N.D.N.Y. 2000).......................................................10

*Milliken v. Meyer*,
   311 U.S. 457 (1940) ...................................................................................19

*Murphy v. United States*,
   653 F.2d 637 (D.C. Cir. 1981) ...................................................................15

*Naartex Consulting Corp. v. Watt*,
    722 F.2d 779 (D.C. Cir. 1983) ..................................................................23

*Napolitano v. Tishman Construction Corp.*,
    No. 96 CV 4402 (SJ), 1998 WL 102789 (E.D.N.Y. Feb. 26, 1998)...........................12

*In re Papandreou*,
    139 F.3d 247 (D.C. Cir. 1998) ..................................................................11

*Pittman by Pittman v. Grayson*,
    149 F.3d 111 (2d Cir. 1998)......................................................................24

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
    290 F. Supp. 2d 54 (D.D.C. 2003) .............................................................21

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
    995  F. Supp. 325 (E.D.N.Y.), *aff'd in part dism'd in part*, 162 F.3d 748 (2d
    Cir. 1998) ...........................................................................................20

*Risk v. Halvorsen*,
    936 F.2d 393 (9th Cir. 1991) ....................................................................12

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ...............................................................................11

*Ungar v. Islamic Republic of Iran*,
    211 F. Supp. 2d 91 (D.D.C. 2002) ..................................................15, 16, 24

*United States v. S.A. Empresa de Viacao Aerea Rio Gardense (Varig Airlines)*,
    467 U.S. 797 (1984) ...........................................................................12, 13

*Vermeulen v. Renault, U.S.A., Inc.*,
    985 F.2d 1534 (11th Cir. 1993) ...........................................................19, 20

**STATUTES**                                                                      **PAGE(S)**

Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1603(b) .................................6, 11

28 U.S.C. § 1604 ..........................................................................................................11

28 U.S.C. § 1605(a)(2) .................................................................................................12

28 U.S.C. § 1605(a)(5)...........................................................................................12, 14

28 U.S.C. § 1605(a)(7)...........................................................................................17, 21

Federal Tort Claims Act (FTCA), 28 U.S.C.A. § 2680 ...............................................12

Fed. R. Civ. P. 4(m) .......................................................................................................1

Fed. R. Civ. P. 8(a)(2) .................................................................................................24

Fed. R. Civ. P. 12(h) (2) and (3) ..................................................................................5

## MEMORANDUM IN SUPPORT OF CONSOLIDATED
## MOTION TO DISMISS OF PRINCE NAIF BIN ABDULAZIZ AL-SAUD

His Royal Highness Prince Naif bin Abdulaziz Al-Saud ("Prince Naif" or "His Highness"), the Minister of Interior of the Kingdom of Saudi Arabia, moves to dismiss the multiple complaints ("Complaints") filed in this consolidated proceeding in which he is named as a defendant.[1]  Pursuant to this Court's Order dated March 9, 2004, Prince Naif was authorized to address these several Complaints with a single, consolidated Motion to Dismiss; Plaintiffs have similarly been directed to respond in a consolidated opposition. [2]  (Exhibit 1).

Prince Naif has been served with process in the *Burnett, Ashton* and *Federal Insurance* cases.  No attempt at service has been made, to our knowledge, in the *Salvo* case despite our notifying their counsel of an acceptable procedure for serving Prince Naif under the Foreign Sovereign Immunities Act (FSIA).  (Exhibit 2).  To facilitate the court's decision-making, this motion is directed at all four cases to allow for the possibility that proper service will eventually be effected by the plaintiffs in *Salvo*.[3]

## INTRODUCTION

The horrific acts of September 11, 2001, were not only a tragedy for the people and families directly hurt by these barbarous attacks, but also a tragedy for our country and the

---

[1]  Prince Naif is named as a defendant in *Burnett, et al. v. Al Baraka Investment & Development Corp., et al.*, C.A. No. 1:02-1616 (D.D.C.), and 03 CV 5738 (RCC); *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02 CV 6977 (RCC); *Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03 CV 5071 (RCC); and *Federal Insurance Co., et al. v. Al Qaida, et al.*, 03 CV 6978 (RCC).  Prince Naif was also named as a defendant in *York, et al. v. Al Qaeda Islamic Army, et al.*, 03 CV 5493 (RCC), which was voluntarily dismissed.  The complaint in *Salvo* is identical to that originally filed in *Ashton*, so will not be addressed separately in this brief.

[2]  In a subsequent order of March 17, 2004 (endorsed on our letter of March 15, 2004), the Court altered the schedule for filing of this motion and the opposition thereto, but left unchanged its March 9, 2004 order for a consolidation of both this motion and the opposition.

[3]  The continued failure of the *Salvo* plaintiffs to serve Prince Naif independently warrants dismissal of their complaint against him.  Fed. R. Civ. P. 4(m).  We respectfully ask the Court to do so on this ground, as well as the other grounds set forth in this brief.

world.  The Complaints in this consolidated action, however, exploit the emotion and unfortunate prejudice resulting from those terrible events to try, without any justification, to implicate Prince Naif in these acts.  By relying on his position as a prominent member of the Saudi Royal Family and the Saudi Government, the Complaints seek, unsuccessfully, to connect Prince Naif to the actions of those who were actually responsible for these acts of terrorism in the hope that it will embarrass him and force him to buy peace.

But the truth is that, far from having supported the heinous campaign of terrorism waged by Osama bin Laden, Prince Naif has been one of his most formidable adversaries.  In 1994, at the urging of Prince Naif, then as now the Saudi Minister of Interior, the Kingdom stripped Osama bin Laden of his Saudi citizenship.  Also in 1994, Prince Naif ordered all of bin Laden's assets in Saudi Arabia frozen so they could not be used for terrorist purposes.  Moreover, in his role as Honorary President of the Council of Arab Ministries of Interior and Justice, Prince Naif presided over the 1988 joint Meeting of the Arab Ministers of Interior and Justice at which the Convention on Fighting Terrorism was adopted.

Bin Laden responded to these protective measures by Prince Naif with venomous hostility.  In a *Fatwah* (Declaration of War) issued in 1996, bin Laden railed against the "oppressive and illegitimate behavior and measures of the [Saudi] ruling regime", and accused Prince Naif, in particular, of serious wrongdoing.  Exhibit 3 to Plaintiffs' Consolidated Memorandum of Law In Opposition To Sultan Bin Abdul-Aziz's Motion to Dismiss Certain Consolidated Complaints (Docket #156) at 4, 7-8.

According to bin Laden's 1996 Declaration of War, Prince Naif, along with Prince Sultan, was responsible for "push[ing] the country into a civil war."  *Id.* at 7.  It alleged that Prince Naif employed a former Egyptian Minister of Interior to assist His Highness in "sins and

aggressions" against the Saudi people.  *Id.* at 8.  Bin Laden further alleged that "officials from the Ministry of the Interior" (headed by Prince Naif) were "leashed out to  mislead and confuse the nation."  *Id.*

These calumnies by bin Laden against Prince Naif, derived from Plaintiffs' own evidence, are completely at odds with the allegations of their Complaints that His Highness supported, sponsored, aided, abetted and conspired with the al Qaeda network.  (*See* p. 7, *infra*.) Equally inconsistent are the claims that, among bin Laden's alleged co-conspirators, and therefore, under the theory of the Complaints, joint tortfeasors with Prince Naif, were organizations such as the self-styled Committee for the Defense of Legitimate Rights (CDLR) and the Advice and Reformation Committee (ARC) that "seek to overthrow the Saudi government to replace the regime."  *Burnett* ¶ 561.  The CDLR is alleged to have posted bin Laden's 1996 *Fatwah* on its website with an introduction stating that the Saudi regime is "the source of the current evil of the occupation" and has become so "intertwined and interconnected" with the United States that they "have become one ORGANICALLY connected evil!!"  *Burnett* ¶ 585 (emphasis in original).  It is beyond credulity to assert that Prince Naif, either individually or as a senior official of the Saudi government, would support the goals of these organizations, which include the overthrow of him, his family, and his government.

These internal contradictions in Plaintiffs' Complaints and evidentiary documents illustrate the speciousness — indeed, the irrationality — of the central theory in their allegations against Prince Naif:  that he somehow shares both the goals of bin Laden and his terror network and their responsibility for the injuries suffered by Plaintiffs.  Prince Naif and the Kingdom are the enemies, not the collaborators, of these terrorists.  And they are the firm allies of the United States against the forces of terrorism.  As President Bush has said:  "America and Saudi Arabia

3

face a common terrorist threat, and we appreciate the strong, continuing efforts of the Saudi government in fighting that threat."   Remarks by the President at Reenlistment of Service Members, the East Room, July 1, 2003,

http://www.whitehouse.gov/news/releases/2003/07/20030701-9.html

The Complaints each contain only a few paragraphs that explicitly relate to Prince Naif. These paragraphs are conclusory and some have little or no relationship to the terrorist attacks of 9/11 for which this lawsuit seeks redress.  Instead of facts, the Complaints try to insinuate an association between Prince Naif and those who are truly culpable in this matter, hoping that because he is a prominent member of the Saudi Royal Family and the Saudi Government, he will automatically be viewed as involved in some fashion.  But it is facts and law, not innuendo and prejudice, on which lawsuits are decided in the courts of the United States.  And it is the utter lack of any facts to suggest that Prince Naif had any role in the September 11, 2001, terrorist actions that are his source of comfort and protection in this Court.

Finally, Plaintiffs' accusations are particularly objectionable given their potential impact on the conduct of the foreign policy of the United States, and the risk to the war on terrorism these allegations may cause.  U.S./Saudi cooperation and bilateral relations are at a critical juncture.  The alliance of these two countries and their combined efforts against terrorist activities is vital.  The pressing of these Complaints could damage that relationship and, by their very nature, implicate the political and constitutional constraints embodied in the Foreign Sovereign Immunities Act, the Act of State Doctrine, International Comity and the Political Question Doctrine. [4]/

---

[4]/   Prince Naif reserves his arguments as to grounds supporting dismissal other than FSIA, personal jurisdiction and service.  Those other grounds include issues relating to justiciability and the failure of plaintiffs to state a claim for relief, pending a decision on the threshold jurisdictional arguments advanced in this motion based on

I.      **Factual Background**

A.      **Prince Naif's Governmental Status**

Prince Naif is the son of King Abdul al-Aziz bin Saud, founder of modern Saudi Arabia,

and the brother of the current King, Fahd bin Abdul-al-Aziz.  Prince Naif has devoted his entire

professional career to government service.  He currently serves as the Saudi Arabian Minister of

Interior, and has held that position since 1975.  The Ministry of the Interior is responsible for

Saudi public security, civil defense, fire service, police, passports, special security and

investigative forces, and other aspects of the security and protection of human life and property

in the Kingdom.  The Ministry is responsible for maintenance of the Kingdom's laws.

http://www.saudinf.com/main/c5116.htm; http://www.saudinf.com /main/c6p.htm.  Prince Naif

is also a member of the Saudi Council of Ministers, the government body responsible for drafting

and overseeing the implementation of internal, external, financial, economic, educational and

defense policies and general affairs of state for the Kingdom.  http://www.saudinf.com/main

/c51.htm.  Prince Naif has, and has had, numerous additional government positions and

responsibilities.

B.      **Applicable Precedent**

On November 14, 2003, Judge James Robertson of the United States District Court for

the District of Columbia ruled on motions to dismiss filed in *Burnett v. Al Baraka Investment &*

*Development Corp.*, 292 F. Supp. 2d 9 (D.D.C.), by Prince Sultan and Prince Turki, two other

senior Saudi governmental officials and members of the Royal family who are codefendants here

with Prince Naif.  Judge Robertson dismissed the complaints against Prince Sultan and Prince

---

his entitlement to foreign sovereign immunity and his lack of any personal contacts with the forum.  *See* Fed. R.
Civ. P. 12(h) (2) and (3).

Turki for lack of subject matter jurisdiction in that each is entitled to immunity from suit as an "agency or instrumentality of a foreign state" under the FSIA, 28 U.S.C. § 1603(b).  In addition, as to Prince Sultan, the court dismissed claims based on his alleged personal contributions to certain charities because of a lack of personal jurisdiction.  These are precisely the grounds advanced here in support of the motion to dismiss Prince Naif (as well as being the bases for the motions to dismiss re-filed here by Prince Sultan and Prince Turki).

We submit that Judge Robertson's decision in *Burnett* is deserving of great deference, not only as the law of the case, but also for its cogent analysis which is fully consistent with Second Circuit law.  Applying Judge Robertson's decision to the claims against Prince Naif in the consolidated Complaints would compel their dismissal.  To this end, Prince Naif adopts, and incorporates herein by reference, the arguments and authorities concerning the weight that should be given to Judge Robertson's decision, as set out in the Motion to Dismiss filed in these cases by Prince Sultan (Sultan Motion to Dismiss Certain Consolidated Complaints at 10-13), and adopted also by Prince Turki (Turki Motion to Dismiss Consolidated Cases at 9).

C.     **The Allegations Against Prince Naif**

Nowhere in the Complaints is it alleged that Prince Naif had knowledge of, participated in, or otherwise played any direct role in the terrorist attacks of September 11, 2001 by which Plaintiffs were injured.  Rather, as Judge Robertson summarized the similar allegations against Prince Sultan and Prince Turki in his decision dismissing the *Burnett* complaint as to them:

> In simple terms, these allegations amount to claims that Prince Turki and Prince Sultan, acting in their official capacities, funded or provided material resources to those who funded or provided material resources . . . to the terrorists who perpetrated the September 11th attacks.

292 F. Supp. 2d at 19.

Judge Robertson went on to find such allegations, as applied to defendants entitled to governmental immunity, so attenuated from any actionable claims as to require dismissal. *Id*. at 20.

In the four Complaints, Plaintiffs make essentially the same claims against Prince Naif as those which Judge Robertson found could not stand against Prince Turki and Prince Sultan in *Burnett*; that is, that he supported organizations that allegedly supported the 9/11 terrorists. With one exception, the allegations against Prince Naif in the consolidated Complaints address his official actions as Minister of the Interior. [5/] These allegations can be separated into the following categories:[6/]

- Prince Naif is grouped with other Saudi Royalty in a conclusory allegation that they aided and abetted or materially sponsored Osama bin Laden, al Qaeda and international terrorism "as described herein." *Burnett* ¶ 342; *Ashton* ¶ 255; *Federal Insurance* ¶ 66. Plaintiffs thus commit to fleshing out this generalized conclusion with required factual detail in other paragraphs of the Complaints. To the extent specifics are provided elsewhere in the Complaints about Prince Naif, however, with one exception they describe only actions taken in the performance of official duties.

---

[5/] The *Federal Insurance* Plaintiffs, in their original complaint, only made allegations concerning Prince Naif in his official capacity. In their amended complaint, however, these Plaintiffs added the claim that Prince Naif contributed personal funds to Saudi-based charities that supported al-Qaeda. *See* pp. 10-11, *infra*.

[6/] References are to the *Burnett* Third Amended Complaint, the *Ashton* Third Amended Complaint (the Fourth Amendment did not alter the body of the *Ashton* Complaint), and the *Federal Insurance* First Amended Complaint.

- Prince Naif, as Minister of the Interior, "by function," has supervisory authority over charities in Saudi Arabia, *Burnett* ¶ 382; *Ashton* ¶ 286; *Federal Insurance* ¶¶ 433, 435. Certain of these charities are listed by the *Federal Insurance* Plaintiffs (¶ 435) and each is described as "an agency, instrumentality and organ of the kingdom of Saudi Arabia": specifically, the Saudi Joint Relief Committee (SJRC ¶ 124), Muslim World League (MWL ¶¶ 114-115), International Islamic Relief Organization (IIRO ¶ 131), Saudi Red Crescent (¶ 191), World Assembly of Muslim Youth (WAMY ¶ 151), and al Haramain Foundation (¶ 168).

- Prince Naif is head of the Saudi Committee for Support of the Intifada al Quds, which distributed funds to families of Hamas terrorists. *Burnett* ¶ 379; *Ashton* ¶ 287; *Federal Insurance* ¶ 439.[7] The Intifada Committee is characterized in the Complaints as a Saudi governmental entity, based on the allegation that an official letter was sent on behalf of Palestinian President Yasser Arafat, asking the Saudi Government to direct this funding to an organization associated with President Arafat instead of to Hamas. *Burnett* ¶ 380.

- Because of his position as Minister of the Interior, Prince Naif heads the Saudi Committee for Relief of Afghans, which supervises the al Haramain Foundation, an alleged sponsor of terrorism. *Burnett* ¶ 382; *Ashton* ¶ 286, *Federal Insurance* ¶ 437. By function of his office, he

---

[7] There are no allegations purporting to link alleged support for Hamas to support for al Qaeda or the 9/11 terrorists.

generally controls the activities of Islamic Charities and is empowered to verify their legality and conduct.  *Burnett* ¶ 382; *Ashton* ¶ 286.

- Generalized allegations against Prince Naif, in his official capacity as Minister of Interior, assert:  that he has aided, abetted and materially supported al Qaeda, including monetary payoffs, *Burnett* ¶ 381; *Ashton* ¶ 288; *Federal Insurance* ¶ 434; that under his official supervision, $74 million was diverted to al Qaeda through the SJRC, *Federal Insurance* ¶¶ 126, 436; and that he has used his official position to "protect al Qaeda's support infrastructure," *Id.* ¶ 438.  The "monetary payoffs" claimed to have been made by Prince Naif and others to Osama bin Laden and al Qaeda are not specifically identified in the Complaints.  The only "payoff" described in the Complaints is alleged to have been made by "a group of Saudi princes and prominent Saudi business leaders" to al Qaeda in 1996, after the bombing of the Khobar Towers in Saudi Arabia, to "ensure that al Qaeda never again attack targets within the borders of the Kingdom of Saudi Arabia."  *Burnett* p. 212 and ¶ 347; *see also Ashton* ¶ 112.  Prince Naif emphatically denies any involvement in or even knowledge of any such "payoff."  Accepting the unfounded allegation as true, however, such a payment, made by the Saudi Government to "safeguard Saudi Arabia" -- to protect the internal security of the state -- can only be government action. [8/]

---

[8/]  Numerous allegations either attack all Defendants generically with sweeping accusations, expressed in sensational terms (*e.g.*, "Defendants clearly knew, or clearly should have known, they were providing material support, aiding and abetting and enabling the terrorists that brutalized America and the world on September 11,

Pervading these allegations are alleged actions by a Cabinet Minister, acting in his official capacity.  In essence, Prince Naif, whose governmental position is affirmatively pled by all Plaintiffs, is charged with distributing government money to agencies of the government.[9/]  It would be difficult for a defendant to provide a more explicit description of official conduct by a sovereign than Plaintiffs themselves have stated on the faces of their Complaints.  As such, the conduct of Prince Naif falls squarely within the ruling of Judge Robertson in *Burnett* finding sovereign immunity for official action.

As noted previously (n.5), the original Complaint of the *Federal Insurance* plaintiffs conformed to the earlier filed Complaints in *Burnett* and *Ashton* in stating -- either specifically or by fair inference -- that the involvement with Islamic charities and other organizations allegedly attributable to Prince Naif was governmental.  Then, following Judge Robertson's decision dismissing the *Burnett* complaint as to Prince Sultan and Prince Turki, the *Federal Insurance* plaintiffs obviously went to school on Judge Robertson's holding that Prince Sultan did not enjoy sovereign immunity for contributions he allegedly made to certain charities in his personal capacity, as distinguished from his official role.  *Burnett*, 292 F. Supp. 2d at 21.  Clearly attempting to take advantage of this opening, the *Federal Insurance* plaintiffs  added in their amended complaint the claim that "Prince Naif made significant personal contributions to

---

2001", *Burnett*, p. 217), or stigmatize large groups, consisting principally of persons who are not Defendants here, as supporters of terrorism (e.g., *Burnett*:  "Saudi officials", p. 205; "the Saudi Royal family", ¶ 339, ¶ 431; "prominent Saudis", p. 212; *Ashton*:  "a large number of Saudi citizens and members of the Saudi royal family … support BIN LADEN", ¶ 250; "a group of Saudi princes and prominent Saudi business leaders … agreed to [support] OSAMA BIN LADEN's terrorist network, ¶ 260"; *Federal Insurance*:  Support for al Qaeda by "members of the Saudi Royal Family, and prominent members of Saudi society", ¶ 398.  Such broad and conclusory allegations "are meaningless as a practical matter . . . ."  *Meany v. CHS Acquisition Corp.*, 103 F. Supp. 2d 104, 107 (N.D.N.Y. 2000).

[9/]    Even if these entities were not found to be agencies or instrumentalities of the Saudi Government, Prince Naif's alleged role as described in the Complaints would still be governmental as it would involve the governmental supervision of the entities and/or the provision of governmental funds to the entities.

10

. . . charities he knew to be sponsors of al Qaeda's global operations" (¶ 442), and that he "knew and intended that the [personal] contributions would be used to fund al Qaeda's global operations and acts of international terrorism." (¶ 443). Even with the benefit of their much vaunted worldwide investigations, neither the *Burnett* nor *Ashton* Plaintiffs felt justified in expanding their claims to include allegations of personal contributions to Islamic charities by Prince Naif. Nothing in the *Federal Insurance* amended complaint suggests any new or superior knowledge that would lend plausibility to these added claims. At least on the surface, the amendment suggests opportunistic, rather than fact-based, pleading by the *Federal Insurance* plaintiffs.

Of course, the allegations as to Prince Sultan's alleged personal contributions in *Burnett* foundered on the lack of jurisdiction over his person as found by Judge Robertson (229 F. Supp. 2d at 23). And so the similar *Federal Insurance* allegations against Prince Naif (of dubious credibility in any case, given the circumstances under which they were pled) must fail here on the same basis. *See* Section II. B., *infra*.

## II.     Discussion

### A.     The Court Lacks Subject Matter Jurisdiction In That Prince Naif Is Entitled to Sovereign Immunity From Suit.

"Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993); *see also* 28 U.S.C. § 1604. Moreover, by affirmatively pleading that Prince Naif is a Cabinet Minister of a foreign state, Plaintiffs acknowledge that he is an "agency or instrumentality" of a foreign state, 28 U.S.C. § 1603(b), and entitled to the same immunity as the state itself. *In re Papandreou*, 139 F.3d 247, 251-52 (D.C. Cir. 1998) (Greek Minister of Tourism qualified for sovereign immunity under FSIA).

11

Plaintiffs contend, however, that the immunity otherwise afforded to Prince Naif as a Cabinet Minister of a foreign state is vitiated by the FSIA "non-commercial tort" exception to immunity, 28 U.S.C. § 1605(a)(5).[10/] The noncommercial tort exception eliminates the immunity otherwise provided to a foreign official if that official commits a tort in the United States while engaged in the performance of governmental duties.  28 U.S.C. § 1605(a)(5).  The noncommercial tort exception does not apply, however, and an alleged tortfeasor retains sovereign immunity if the "claim [is] based upon the exercise or performance [of] . . . a discretionary function regardless of whether the discretion be abused."  28 U.S.C. 1605(a)(5)(A); *Napolitano v. Tishman Constr. Corp.*, No. 96 CV 4402 (SJ), 1998 WL 102789, at *4 (E.D.N.Y. Feb. 26, 1998); *Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1 (1st Cir. 2002).

The discretionary function "exception to the exception" is modeled on nearly identical language in the Federal Tort Claims Act (FTCA), 28 U.S.C.A. § 2680.  *Rodriguez*, 297 F.3d at 9; *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 920, *modified*, 823 F.2d 606 (D.C. Cir. 1987).  "[G]uidance on what acts should be deemed discretionary for FSIA purposes can be drawn from decisions construing the [FTCA]"); *Rodriguez*, 297 F.3d at 9; *MacArthur Area Citizens Ass'n*, 809 F.2d at 920; *Risk v. Halvorsen*, 936 F.2d 393 (9th Cir. 1991).  The Supreme Court described the policy basis for the FTCA discretionary function exception in *United States v. S.A. Empresa de Viacao Aerea Rio Gardense (Varig Airlines)*, 467 U.S. 797, 814 (1984), as being the desire of Congress to "prevent judicial second-guessing of legislative

---

[10/]  The *Burnett* Plaintiffs argued, in regard to Prince Turki and Prince Sultan, that the "commercial activity" exception, 28 U.S.C. § 1605(a)(2), also applied.  But after Judge Robertson's exhaustive analysis and rejection of this argument in *Burnett,* 292 F. Supp. 2d at 16-18, they appear to have abandoned it.  *See* Plaintiffs' Consolidated Memoranda of Law in Opposition to the Motions to Dismiss of Prince Sultan and Prince Turki.

and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."

The Supreme Court set out more clearly defined criteria for application of this FTCA exception in *Berkovitz by Berkovitz v. United States*, 486 U.S. 531 (1988), stating (at 536) that "conduct cannot be discretionary unless it involves an element of judgment or choice", and (at 537) that a government official's action is deemed to be discretionary if it "involves the permissible exercise of policy judgment." *See also Rodriguez*, 297 F.3d at 9-10; *Risk*, 936 F.2d at 395-96.

As Judge Robertson has already determined with respect to the activities alleged of Prince Sultan and Prince Turki, taking action to protect Saudi Arabia from terrorism, and governmental supervision of Islamic charitable organizations, both clearly involve the exercise of judgment and discretion and "making 'decisions grounded in social, economic, and political policy.'" *Burnett*, 292 F. Supp. at 21 (quoting *S.A. Empresa de Viacao Aerea Rio Grandense* ("*Varig Airlines*"), 467 U.S. at 814). Such activities are the essence of a discretionary or planning function and are "squarely covered by the 'discretionary function' language of" the noncommercial tort exception. *Burnett*, 292 F. Supp. 2d at 20.

The allegations against Prince Naif with respect to his supervision of charities fall into the same category. Also, if Prince Naif participated in "payoffs" to al Qaeda (which he did not) to "ensure that al Qaeda would never again attack within the borders of Saudi Arabia," *Burnett*, p. 212, that too would have been a discretionary act. Any such payment would have involved judgment and choice about whether a policy of making such payments is prudent, to whom such a payment should be made, and how much should be paid.

Plaintiffs cite *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980), and *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989), to support their contention that the discretionary function "exception to the exception" does not apply when the allegation is that a tortfeasor has engaged in terrorist attacks. Judge Robertson aptly distinguished those cases as having "involved causal links significantly shorter and more direct than those alleged here." *Burnett*, 292 F. Supp. 2d at 21. Moreover, courts in the Second Circuit have never adopted this reading of the noncommercial tort exception to the FSIA. There is no reason to do so now, when the Saudi Princes' alleged actions are far removed in time and place from the terrorist actions and the chain of causation linking them is tenuous or non-existent.

Accordingly, even if Plaintiffs were able to satisfy the fundamental requirements of the FSIA noncommercial tort exception, immunity would still attach to Prince Naif because he was performing, in every instance alleged in the Complaints (except for the personal contributions alleged in *Federal Insurance*), a discretionary function as described in § 1604(a)(5)(A).

But aside from the application of the discretionary function doctrine, Plaintiffs have failed to satisfy even the threshold requirements for this FSIA exception, in three respects. First, the actions of Prince Naif alleged in the Complaints did not occur within the United States. Second, their pleadings do not establish the essential chain of causation between the alleged actions of Prince Naif and the injuries claimed by Plaintiffs. Third, their allegations of "material support" for al Qaeda invoke not the noncommercial tort exception, but the state sponsored terrorism exception, which does not apply to Saudi Arabia.

While it is undisputed that the tragic injuries and deaths of September 11th, on which Plaintiffs' claims are based, occurred in the United States, it is equally beyond dispute that the allegedly tortious actions of Prince Naif described in the Complaint were ***not*** performed in the

United States.  In this Circuit, the law is clear:  "[t]he noncommercial tort exception applies only where both the tort and injury take place within the territorial jurisdiction of the United States." *Hirsh v. State of Israel*, 962 F. Supp. 377, 383-84 (S.D.N.Y.), *aff'd*, 1997 WL 796153, 133 F.3d 907 (2d Cir. 1997); *Cabiri v. Government of Republic of Ghana*, 165 F.3d 193, 200 n.3 (2d Cir. 1999); *Kline v. Kaneko*, 685 F. Supp. 386, 391-92 (S.D.N.Y. 1988).  None of the contributions or other support that Prince Naif is claimed to have provided, indirectly, are alleged in the Complaint to have taken place in the United States.  Indeed, inasmuch as his alleged "tortious" actions on which Plaintiffs' claims are based are those, for the most part, of a Cabinet Minister, and in the absence of any allegations to the contrary, it can be inferred that they took place at the seat of the Saudi Government, in the Kingdom of Saudi Arabia.  Plaintiffs' Complaints thus fail to allege facts as to the location of the "entire tort" in the United States sufficient to invoke the noncommercial tort exception.

Second, Plaintiffs' claims against Prince Naif must be rejected because they fail to establish that his actions were a proximate cause of Plaintiffs' injuries.  "Proximate cause is defined as 'a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances.'"  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (quoting *Murphy v. United States*, 653 F.2d 637, 648 n.48 (D.C. Cir. 1981)).

In *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002), the family of victims killed by Palestinian terrorists brought an action against the Islamic Republic of Iran, the Iranian Ministry of Information and Security and three Iranian government officials.  Despite the defendants' failure to appear and defend, the court refused to issue a default judgment because the plaintiffs had not "established a legally sufficient evidentiary basis for a reasonable jury to

15

find that the acts of the defendants were a necessary condition or 'but for' cause of the

[decedents'] deaths." *Id.* at 98.  Although the plaintiffs established that Iran provided financial

support to Hamas, and that the decedents' killers received some funding and weapons from

Hamas, plaintiffs failed to link the particular support provided by Iran to the decedents' murders.

*Id.*; *see also Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115 (D.D.C. 2003) (conclusory

statements about defendant's role, and evidence of public statements by defendant condoning

violence, were too tenuous to support finding of liability and failed to link defendant to acts

committed by terrorists).  Although Judge Robertson did not believe it would be appropriate to

address causation as a general matter in the other Saudi Princes' motions to dismiss, relying on

D.C. Circuit law, he explained that the legislative history of the FSIA "counsels that the

[noncommercial tort] exception should be narrowly construed so as not to encompass the farthest

reaches of common law." *Burnett*, 292 F. Supp. 2d at 19 (quoting *MacArthur Area Citizens*

*Ass'n,* 809 F.2d at 921.  Judge Robertson concluded that "[i]n the FSIA context, plaintiffs'

allegations that (i) [Saudi Princes] funded (ii) those who funded (iii) those who carried out the

September 11th attacks would stretch the causation requirement of the noncommercial tort

exception not only to 'the farthest reaches of the common law,' but perhaps beyond, to terra

incognita." *Id.* at 20

      Prince Naif is alleged to be one of those Saudi Princes who provided such funding.  Just

as with Prince Sultan and Prince Turki, it would be an unconscionable extension of logic, and

contrary to the legislative intent underlying the FSIA, for this Court to endorse the Plaintiffs'

convoluted chain of causation, tracing from the tragic events of September 11, 2001 back

through an unknown number of actors with various motives – some no doubt evil, but some

perhaps blameless – to the dispensation of government funds by Prince Naif.  *MacArthur Area*

*Citizens Ass'n*, 809 F.2d at 921 ("the 'tortious act' exception was designed [by Congress] primarily to remove immunity for cases arising from traffic accidents").  No foreign official can be assured of immunity from the most fanciful claims if Plaintiffs' reasoning were to be adopted. Concomitantly, other governments may be emboldened, in retaliation, to lower the bars against suits in their courts naming U.S. officials as defendants.  Plaintiffs should not be allowed to hale into an American court the senior official of a friendly nation (itself victimized by terrorism and allied with this country in fighting it) on the basis of such attenuated claims.

Finally, the internal logic of the FSIA suggests that Plaintiffs' allegations are insufficient to bring Prince Naif within the noncommercial tort exception.  Plaintiffs allege that Prince Naif "engaged in material support . . . to Osama bin Laden's al Qaeda."  *Burnett* ¶ 381, *Ashton* ¶ 288, *Federal Insurance* ¶ 434.  Although the provision of "material support" for acts of torture or terrorism is a key phrase in the state sponsored terrorism exception found in 28 U.S.C. § 1605(a)(7), this phrase is not a basis for the noncommercial tort exception in § 1605(a)(5).  The exception in § 1605(a)(7) applies, moreover, to "only a defendant that has been specifically designated by the State Department as a 'state sponsor of terrorism,'" *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003).  The Kingdom of Saudi Arabia has not been so designated and thus the exception in § 1605(a)(7) cannot operate to remove the sovereign immunity of either the Kingdom or its agents or instrumentalities.

As Judge Robertson pointed out in *Burnett*, the presumption is that Congress chose the language of § 1605(a)(7) intentionally and purposefully.  *Burnett*, 292 F. Supp. 2d at 20 n.5.  The FSIA was amended in 1996 by the Anti-Terrorism and Effective Death Penalty Act (AEDPA) to add the state sponsored terrorism exception, no doubt because the FSIA as it existed prior to the AEDPA amendment was deemed inadequate to encompass all of the situations in which

Congress wanted to remove sovereign immunity.  It follows that the noncommercial tort

exception was deemed by Congress in 1996 *not* to cover the provision of "material support" to

alleged terrorist organizations.  Such a reading of this exception compels the conclusion that

Plaintiffs, in alleging that Prince Naif "engaged in material support" of al Qaeda, are attempting

improperly to translate a component of the state sponsored terrorism exception into the

noncommercial tort exception where it has no application.

For all these reasons, Plaintiffs have not pled facts that, even if credited, would be

sufficient to deprive Prince Naif of the sovereign immunity to which he is entitled as a high-

ranking official of a foreign nation.

> **B.   The Allegations of the Complaints Regarding Prince Naif Are Legally
> Insufficient to Establish a *Prima Facie* Basis for Personal Jurisdiction.**

To withstand a motion to dismiss for lack of personal jurisdiction, Plaintiffs must make a

*prima facie* showing of jurisdiction through legally sufficient allegations.  *Ball v. Metallurgie*

*Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990).  Whatever may be the bounds of legal

sufficiency in this respect, they are not tested by Plaintiffs' Complaints, which have in common a

distinct absence of factual allegations forming any basis for Prince Naif to be subject to the

exercise of jurisdiction in this forum.

Even accepting their allegations as true for purposes of this motion, *Grandon v. Merrill*

*Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998), not one of the Complaints contains a single

factual claim connecting Prince Naif to the United States, much less to this particular

jurisdiction.  He is not alleged to have any contacts with this country, whether personal or in

relation to any business conducted here.  To the contrary, each of the Complaints identifies him

as Minister of the Interior for the Kingdom of Saudi Arabia.  Thus, by reasonable inference, he is

shown on the face of the Complaints to be a resident of Saudi Arabia.  *See Burnett* ¶ 382; *Ashton* ¶ 286; *Federal Insurance* ¶ 433.

Due process[11/] requires that a defendant not be subjected to the exercise of jurisdiction unless he has the necessary minimum contacts with the forum, and the exercise of jurisdiction is consistent with "'traditional notions of fair play and substantial justice.'"  *International Shoe Co. v. Washington*, 326 U.S. 310, 316  (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

In *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993)  (an FSIA case), the Court of Appeals summed up the applicable principles:

> To constitute constitutionally minimum contacts, [for purposes of specific jurisdiction], the defendant's contacts with the applicable forum must satisfy three criteria.   First, the contacts must be related to the plaintiff's cause of action or have given rise to it.   Second, the contacts must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum  .  .  .  , thus invoking the benefits and protections of its laws."   Third, the defendant's contacts with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there"

(citations and footnotes omitted).

Specific jurisdiction over a defendant can be exercised only in a suit "arising out of or related to the defendant's contacts with the forum."  *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).[12/]  Accordingly, for the Complaints to establish a

---

[11/]  Plaintiffs contended in their arguments before Judge Robertson in *Burnett* that agents of a foreign state have no rights under the Due Process Clause (Plaintiffs' Memorandum of Law in Opposition to Motion of Prince Sultan to Dismiss the Claims Against Him at 28-30).  Judge Robertson's opinion did not touch on this argument, possibly because, while the question has not been definitively ruled on, other courts, including the Supreme Court, have chosen to assume the application of Due Process principles in FSIA cases, at least as to personal jurisdiction issues.  *See* authorities summarized in *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 49 (D.D.C. 2000).

[12/]  By contrast, "general jurisdiction" may be exercised over a defendant only when the plaintiff can identify substantial, continuous, and systematic contacts between the defendant and the jurisdiction.  *Id*. at 414 and n.9.  Plaintiffs plainly have not attempted to assert "general jurisdiction" in this case.

sufficient *prima facie* basis for the exercise of specific jurisdiction over Prince Naif, they "must allege specific acts connecting [the] defendant with the forum", *Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208 n.5 (9th Cir. 1980), *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998); *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564 (S.D.N.Y. 1997); and those acts must have given rise to the September 11th terrorist attacks. *See First Chicago Int'l v. United Exch. Co*, 836 F.2d 1375, 1377 n.2 (D.C. Cir. 1988).

By no stretch can Plaintiffs be said to have met this standard, regardless of whether the "applicable forum" in this case is construed to be the United States or New York.[13]  As stated, none of the Complaints allege contacts by Prince Naif, a resident of Saudi Arabia, with the United States; neither do they make any effort to connect Prince Naif directly to the destruction wreaked by the terrorist attacks in New York, Virginia, and Pennsylvania out of which their claims for damages arise.  It is enough, Plaintiffs contend, to show that organizations to which Prince Naif allegedly provided material support thereafter funded al Qaeda (as he allegedly knew they would) which, in turn, organized and financed the 9/11 attacks.  Prince Naif, according to Plaintiffs, thereby deliberately targeted Americans, creating a sufficient nexus for the exercise of personal jurisdiction notwithstanding the absence of any contacts between him and the forum. To support their argument, they rely on district court decisions in cases involving foreign state defendants such as *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y.), *aff'd in part dism'd in*

---

[13/]   Plaintiffs apparently take the position that attacks aimed at the  United States or its citizens are enough to justify the exercise of personal jurisdiction by any court of the United States.  Moreover, they contend that their claims under RICO and the Antiterrorism Act of 1990 (ATA) permit nationwide service of process in certain circumstances and thus, in those circumstances, warrant a national test of the sufficiency of a defendant's contacts.  Prince Naif has reserved his position that Plaintiffs fail to state a claim under these statutes (*see* n.4, *supra*), but as set out in the text, whether the correct standard requires minimum contacts with the entire United States or with the particular jurisdiction in which this Court is located, Plaintiffs have not met it.

*part*, 162 F.3d 748 (2d Cir. 1998); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000); and *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003).

These cases are distinguishable from the present case.  First, in each case all of the defendants were governments or the agents of governments that had been designated by the State Department as state sponsors of terrorism.  Second, personal jurisdiction was found based on the fact that the lawsuits were brought under the exception to Foreign Sovereign Immunity applicable to acts of designated terrorist states, § 1605(a)(7).  *Flatow*, 999 F. Supp. at 22 ("The state sponsored terrorism exception . . . provides an express jurisdictional nexus based upon the victim's United States nationality.").  In fact it is this designation that plays a significant role in the provision of notice to such a government and its agents that they will be haled into court in the United States for terrorist acts they commit.  *Id.* at 23.  Saudi Arabia has never been so designated, and neither the Kingdom nor its agencies or instrumentalities are subject to suit under this FSIA exception.

Although the district court in *Pugh* undertook an analysis of personal jurisdiction over individual defendants in their personal, non-official capacities, that analysis does not support the *Federal Insurance* allegations as to Prince Naif's personal actions.  In *Pugh*, the individual defendants were alleged either to have personally taken part in the actual bombing of the aircraft or personally ordered that bombing to be done.  Indeed, each of them was convicted of this crime *in absentia* by a French court.[14]  Such direct and personal activity is a far cry from the allegations leveled against Prince Naif in his personal capacity in this case.  At worst, he is

---

[14]  Moreover, the decision in *Pugh* (now being appealed) relies on "forseeability" as the determinative factor in finding personal jurisdiction.  This analysis is directly contradicted by the Supreme Court's opinion in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485 (1985).

alleged to have contributed money to Islamic charities that he knew supported al Qaeda and intended that these contributions be "used to fund al Qaida's [sic] global operations and acts of international terrorism." *Federal Insurance* ¶¶ 442, 443.  There is no allegation that Prince Naif ever planned, intended or knew that the acts of international terrorism would take place in the United States.  In fact, both before and after September 11, 2001, most of al Qaeda's acts of international terrorism took place outside of the United States and against both United States and non-United States targets.  Against this background, the unsubstantiated allegations that Prince Naif funded al Qaeda are not enough to confer personal jurisdiction in this case.

In *Burnett*, Judge Robertson conducted the correct analysis of the factors (as quoted above in *Vermeulen*) necessary to exercise personal jurisdiction over Prince Sultan in that case, and thus Prince Naif here.  Judge Robertson cited *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485 (1985), and *Keeton v. Hustler Magazine Inc.*, 465 U.S. 770, 774-75 (1984), for the principle that Plaintiffs must allege conduct "expressly aimed" or "purposefully directed" at the United States to satisfy due process.  *Burnett*, 292 F. Supp. 2d at 23.  It is not enough that a defendant might foresee a consequence of his action occurring in the United States, rather "'[I]t is essential … that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . .'"  *Burger King*, 471 U.S.  at 474-75 (citation omitted).

Plaintiffs have not pled any facts to suggest that Prince Naif's activities constituted such "purposeful availment."  Even the *Federal Insurance* Plaintiffs, who amended their complaint to include a claim of personal contributions by Prince Naif to charities funding al Qaeda following the *Burnett* decision, were not able to allege facts that showed Prince Naif "invoking the benefits and protections of [United States] laws" so as impute to him a reasonable grounds for believing

22

he might be haled into a U.S. court to account for his contributions.  *Id.*  The Federal Insurance

First Amended Complaint alleges no more than knowledge and intent on the part of Prince Naif

that his contributions would be used to fund al Qaeda's "global" (not specifically U.S.-targeted)

operations and terrorist acts.  *Federal Insurance* ¶¶ 442, 443.  In short, Plaintiffs' Complaints do

not meet the Due Process requirements that *Vermeulen*, *Burger King*, and *Keeton* hold are

necessary for the exercise of personal jurisdiction over a foreign defendant.

   Finally, Plaintiffs cannot claim to have captured Prince Naif in their jurisdictional net by

broad allegations, without specific factual content, that Defendants, in general, conspired with or

aided and abetted the conduct of terrorists within the jurisdiction of this Court.  "'[T]he bland

assertion of conspiracy or agency is insufficient to establish [personal] jurisdiction.'"  *Naartex*

*Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983) (quoting *Lehigh Valley Indus., Inc.*

*v. Birenbaum*, 527 F.2d 87, 93-94 (2d Cir. 1975)).

   That Plaintiffs allege no more than a "bland assertion of conspiracy" is beyond dispute.

They do not allege facts to show that Prince Naif agreed to support terrorism in general or to

attack U.S. interests in particular.  There are no allegations about ***any*** agreement, much less the

nature and extent of such an agreement.  There is no suggestion of a common and unlawful plan

whose goals and common objective were known to Prince Naif.  There is no claim that Prince

Naif was pursuing the same goal as any other alleged conspirator, or that Prince Naif was in

contact with any other alleged conspirator.  There is no allegation that Prince Naif knew of the

existence of a larger conspiracy and of the necessity for other participants in that conspiracy.  No

interdependence between Prince Naif and any other defendant is alleged, and no overlap between

Prince Naif and the alleged participants among the various operations alleged to comprise a

single conspiracy is alleged.  Given the paucity of specific allegations of conspiracy claims

against Prince Naif, personal jurisdiction has not been established on the basis that he was a co-conspirator. *Ungar*, 211 F. Supp. 2d at 100 (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).

Similarly, the Complaints put no flesh on the bare bones of allegations that Prince Naif aided and abetted terrorists subject to this Court's jurisdiction. They do not allege that Prince Naif specifically knew about the intended actions of September 11, 2001 terrorists or that he actually assisted in the perpetration of that wrongdoing. *Pittman by Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998). Therefore, neither can these allegations, any more than those broadly alleging a conspiracy, warrant haling Prince Naif into this Court as an aider or abettor of terrorists who attacked the United States.

In summary, the Complaints fail in their allegations of personal jurisdiction over Prince Naif. They do not allege facts sufficient to show that he purposefully availed himself of the privilege of conducting business within the United States, or that he conspired with, or aided and abetted, others who did so. The Complaints should be dismissed for lack of personal jurisdiction over Prince Naif.

## **CONCLUSION**

While Plaintiffs' massive Complaints flout the requirement of Fed. R. Civ. P. 8(a)(2) that a pleading set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," they do not use those extravagant numbers of pages to say anything material about Prince Naif. Rather, they take advantage of a national tragedy to file a sprawling, discursive narrative that, primarily through guilt by association, attempts to tar many categories of individuals and institutions with complicity in terrorism.

Notwithstanding their verbosity, Plaintiffs' factual allegations are not sufficient to vitiate the sovereign immunity that attaches to Prince Naif in his position as Minister of Interior for the Kingdom of Saudi Arabia – an official capacity that Plaintiffs acknowledge.  Further, the averments of personal jurisdiction are legally insufficient to state even a *prima facie* basis.  The Court therefore has neither subject matter jurisdiction nor personal jurisdiction in this case, and for these reasons the Complaints against Prince Naif should be dismissed in their entirety.

Respectfully submitted,


/s/
_____

**James M. Cole (admitted *pro hac* vice)**          **Michael G. Biggers (MB 4743)**
**D.C. Bar No. 385857**

**James J. Murphy (admitted *pro hac* vice)**
**D.C. Bar No. 227926**

**BRYAN CAVE LLP**                          **BRYAN CAVE LLP**
**700 Thirteenth Street, N.W.**             **1290 Avenue of the Americas**
**Washington, DC  20005**                   **New York, NY 10104**
**Phone: (202) 508-6000**                   **Phone: (212) 541-2000**
**Fax: (202) 508-6200**                     **Fax:    (212) 541-4630**