UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re TERRORIST ATTACKS on<br>SEPTEMBER 11, 2001 ) ) ) ) | 03 MDL 1570 (RCC) |
| ) | |
| KATHLEEN ASHTON et al., ) ) | |
| Plaintiffs, ) | |
| v. ) | 02 CV 6977 (RCC) |
| ) | |
| AL QAEDA ISLAMIC ARMY et al., ) ) | |
| Defendants. ) ) | |

## ASHTON PLAINTIFFS' OPPOSITION TO
## NATIONAL COMMERCIAL BANK'S MOTION TO DISMISS

KREINDLER & KREINDLER LLP
100 Park Avenue
New York, NY 10017-5540
Phone: (212) 687-8181
Fax: (212) 972-9432

**TABLE OF CONTENTS**

I.      OVERVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     AT THE PLEADING STAGE, PLAINTIFFS' BURDEN
        IS MINIMAL AND ALL FACTS AND INFERENCES
        ARE CONSTRUED IN PLAINTIFFS' FAVOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    THE FSIA DOES NOT BAR PLAINTIFFS' CLAIMS

        A.      NCB Is Not Protected by The FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Even If The FSIA Covered NCB, It Is Still Liable Under The
                FSIA's "Tortious Act" Exception   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.      The State-Sponsor of Terrorism Exception Does Not Bar the Action . . . . . . . . . 12

IV.     PLAINTIFFS' CLAIMS ARE JUSTICIABLE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V.      NCB IS SUBJECT TO PERSONAL JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      At a Minimum, Plaintiffs Should Be Allowed To Conduct
                Jurisdictional Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.     PLAINTIFFS STATE A CLAIM AGAINST NCB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.      NCB is Liable Through Criminal Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.      NCB is Liable For Aiding and Abetting and Conspiring With Terrorists . . . . . . 21

        C.      Plaintiffs Have Properly Alleged Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Andre Emmerich Gallery, Inc. v Segre*, 1997
U.S.Dist. LEXIS 16899 (S.D.N.Y. Oct. 29, 1997) ............................ 15

*Antares Aircraft L.P. v. Federal Republic of Nigeria*,
948 F.2d 90 (2nd Cir. 1991) .................................................. 3

*Baker v. Carr*, 369 U.S. 186 (1962) ........................................ 12

*Bank of China v. NBM L.L.C.*, 2002 WL 1072235
(S.D.N.Y. May 28, 2002) .................................................... 7

*Bell v. Hood*, 327 U.S. 678 (1946) ......................................... 10

*Boim v. Quranic Literacy Institute*,
291 F.3d 1000 (7th Cir. 2002) ......................... 1, 10, 13, 19, 20, 21, 22, 25

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ........................ 15

*Burnett v. Al Baraka Investment & Development Corp.*,
274 F. Supp.2d 86 (D.D.C. 2003) ......................... 2, 4, 12, 14, 20, 23, 24

*Burnett v. Al Baraka Investment & Development Corp.*,
292 F. Supp.2d 9 (D.D.C. 2003) ........................................ 10, 11

*Cabiri v. Ghana*, 165 F.3d 193 (2nd Cir. 1998) .............................. 10

*Calder v. Jones*, 465 U.S. 783 (1984) ...................................... 14

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991) ...................................... 15, 23

*Compagnie Noga v. Russian Federation*, 2004 WL 504604
(S.D.N.Y. Sept. 19, 2002), vacated, 361 F.3d 676 (2nd Cir. 2004) ............ 9

*Conley v. Gibson*, 355 U.S. 41 (1957) ..................................... 3, 4

*Cutco Industrial, Inc. v. Naughton*, 806 F.2d 361 (2nd Cir. 1986) ............ 4

*Daliberti v. Iraq*, 97 F. Supp.2d 38 (D.D.C. 2000) .......................... 15

*Dole Food Co. v. Patrickson*, 123 S.Ct. 1655 (2003) ...................... 4, 8, 9

*Filler v. Hanvit Bank*, 2003 WL 21729978
(S.D.N.Y. July 25, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Filus v. Lot Pol. Airlines*, 819 F. Supp. 232 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*First National City Bank v. Banco Para el Comercio
Exterior de Cuba*, 462 U.S. 611 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*General Electric Co. v. AAMCO Transmissions, Inc.*,
962 F.2d 281 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Goquiolay v. Philippines Nat'l Bank*, No. 90 Civ.893, 1990 WL
144118 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Grandon v. Merrill Lynch & Co., Inc.*,
147 F.3d 184 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hanil Bank v. Pt. Bank Negara Indonesia* (Persero),
148 F.3d 127 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hirsh v. State of Israel*, 962 F.Supp. 377 (S.D.N.Y.) *aff'd*,
133 F.3d 907 (2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . 6, 7

*Investment Properties International, Ltd. v. IOS Ltd.*,
459 F.2d 705 (2nd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Japan Whaling Association v. America Cetacean Society*,
478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kadic v. Karadzic*, 70 F.3d 232 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kamen v. America Telegraph & Telegraph Co.*,
791 F.2d 1006 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
Negara*, 313 F.3d 70 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lehigh Valley Industrial v. Birenbaum*, 527 F.2d 87 (2nd Cir. 1975) . . . . . . . . . . . . . . . 15

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . 10

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 9

*In re Magnetic Audiotape Antitrust Litigation*,
334 F.3d 204 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Marine Midland Bank, N.A. v. Miller*,
664 F.2d 899 (2nd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*NCB v. Morgan Stanley*, 1997 WL 634292
(S.D.N.Y. October 15, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*O'Connell Machinery Co. v. M.V. "AMERICANA"*,
734 F.2d 115 (2nd Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Olsen v. Government of Mexico*, 729 F.2d 641 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . 11

*Price v. Libya*, 294 F.3d 82 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F. Supp. 325 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . 16

*Robinson v. Government of Malaysia*,
269 F.3d 133 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228
D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*S Davis International v. Yemen*, 218 F.3d 1292
(11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Ski Train Fire in Kaprun, Austria on November 11, 2000*,
198 F. Supp.2d 420 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 24

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,
647 F.2d 300 (2nd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
30 F.3d 148 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Whitaker v. American Telecasting, Inc.*, 261 F.3d 196 (2nd Cir. 2001) . . . . . . . . . . . . . 3, 4

*W.S. Kirkpatrick & Co., Inc. v. Environmental Techtonics Corp.*,
493 U.S. 400 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*York v. Associate of the Bar of the City of New York*,
286 F.3d 122 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Zappia Middle East Construction v. The EMIRATE
OF ABU DHABI*, 215 F.3d 247 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Zuchowicz v. U.S.*, 140 F.3d 381 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## FEDERAL STATUTES

28 U.S.C. § 1330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 2331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. §§ 2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 20, 21

18 U.S.C. §2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

18 U.S.C. § 2339C (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

28 U.S.C. § 1605(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10, 12

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## MISCELLANEOUS

H.R. Rep. No. 94-1487 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

MOORE'S FEDERAL PRACTICE § 12.31[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## I.    **OVERVIEW**

**[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence. . . . The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts.**

*Boim v. Quranic Literacy Institute*, **291 F.3d 1000, 1021 (7th Cir. 2002) (emphasis added).**

The National Commercial Bank ("NCB") knowingly and intentionally provided material support to al Qaeda. Throughout the 1990's, NCB was a private commercial bank, owned by defendant KHALID BIN MAHFOUZ ("KBM") and other members of the Mahfouz family. *See* Plaintiffs' Fourth Amended Complaint ("4AC") ¶¶ 5, 23, 563.[1] KBM used his control of NCB to intentionally transfer funds to organizations supporting terrorism, including a $3 million transfer to defendant MUWAFFAQ ("Blessed Relief") FOUNDATION, for the purpose of financing al Qaeda. *See* 4AC ¶ 571. A 1998 bank audit of NCB confirmed that $74 million dollars had been sent to defendant IIRO, an al Qaeda front "charity" connected to defendant OSAMA BIN LADEN's brother-in-law. *Id.* ¶ 570. As a result of the 1998 audit, KBM was dismissed from the bank and placed under house arrest, *Id.* ¶ 571, and the Public Investment Fund ("PIF"), a separately chartered sub-agency of the Kingdom of Saudi Arabia's Finance Ministry, acquired a majority of NCB's shares. *See* Exhibit 4 to NCB's Moving Brief (Affidavit of Abdallah Bin Hamad Al-Wohaibi). Plaintiffs allege that NCB knew that it was materially sponsoring, aiding and abetting al Qaeda, OSAMA BIN LADEN and international terrorism. 4AC ¶ 570. Plaintiffs further allege that NCB, under KBM's leadership, conspired with those who financed, planned,

---

[1] Between 1986 and 1990, KBM was Chief Operating Officer of the Bank of Credit and Commerce International ("BCCI") and in 1992, the State of New York brought criminal charges against KBM for his participation in a scheme to defraud in violation of New York Penal Law. 4AC ¶ 564, ¶ 566. In the course of investigating BCCI for laundering drug money, the CIA learned that BCCI supported international terrorism. *Id.* ¶¶ 567-568.

supported and carried out the September 11, 2001 terrorists attacks. *Id.* ¶¶ 5, 23.   Plaintiffs adequately allege claims against NCB, pursuant to the Anti-Terrorism Act (the "Anti-Terrorism Act" or "Act"), 18 U.S.C. § 2333, and common law.

NCB is *not* an "agency or instrumentality" of a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA") because it is *not* owned directly by the Kingdom of Saudi Arabia (the "Kingdom'). The Kingdom's indirect ownership does not entitle NCB to sovereign status.[2]

This lawsuit does not have political implications that would require the Court to abstain; there is no potential impact on the Executive Branch's ability carry out foreign policy. *Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp.2d 86, 110 n.19 (D.D.C. 2003) ("*Burnett I*") (claims against private bank did not raise issues of justiciability).   While the Executive Branch has the power to intervene in this law suit, it has declined to do so.[3]   Moreover, NCB was a *private* commercial bank when it engaged in the acts alleged and plaintiffs' allegations do not concern NCB activity after the PIF acquired NCB shares.

NCB supported al Qaeda when defendant OSAMA BIN LADEN publicly announced his intention to target the United States.   Indeed, during the 1998 period when NCB was providing support to al Qaeda, BIN LADEN announced:

> The ruling to kill Americans and their allies - civilians and military - is an
> individual duty for every Muslim who can do it in any country in which it
> is possible to do.

---

[2]   Even if NCB were an agency of the Saudi government, it would still be amenable to suit under the "tortious act" exception to the FSIA. 28 U.S.C. § 1605(a)(5).

[3]   *See* Exhibits 3-5 attached to Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of Defendant The National Commercial Bank in the *Burnett* action (the "*Burnett* opposition brief").

*See* 4AC ¶ 120. In that same period the U.S. enacted the Anti-Terrorism Act, which imposed criminal and civil penalties on terrorism supporters. NCB is subject to personal jurisdiction because it knowingly and intentionally provided al Qaeda with material support to aid its attacks on the U.S. and its citizens. NCB directed its conduct at the U.S. and could reasonably anticipate being "haled into court" here.

Plaintiffs properly allege proximate cause because the September 11 terror attacks were the foreseeable consequence of NCB's intentional support of al Qaeda, the very conduct at which Congress directed the Anti-Terrorism Act. The attacks were the "natural and probable" consequence of NCB's support of anti-U.S. terrorism.

## II.   AT THE PLEADING STAGE, PLAINTIFFS' BURDEN IS MINIMAL AND ALL FACTS AND INFERENCES ARE CONSTRUED IN PLAINTIFFS' FAVOR

In reviewing NCB's motion to dismiss under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all material factual allegations in the complaint." *York v. Assoc. of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002). The Court may resolve disputed factual issues pertaining to subject matter jurisdiction by reference to evidence outside the pleadings. *Antares Aircraft L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991) (subject matter jurisdiction challenged under FSIA), *vac'd on other grounds*, 505 U.S. 1215 (1992). The Court must deny NCB's Fed. R. Civ. P. 12(b)(6) motion unless it appears certain that plaintiffs can prove no set of facts entitling them to relief. *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir. 1998); *accord Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Plaintiffs need only make a *prima facie* showing of personal jurisdiction to defeat NCB's Fed. R. Civ. P. 12(b)(2) motion. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d

Cir. 2001); *Cutco Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir. 1986); *see also In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction"). All allegations are construed in the light most favorable to plaintiffs and doubts are resolved in the plaintiffs' favor. *Whitaker*, 261 F.3d at 208; *Burnett I*, 274 F. Supp.2d at 96.

The complaint need only contain a short and plain statement of the court's jurisdiction, a short and plain statement of plaintiffs' claims and a demand for relief. *See* Fed. R. Civ. P. 8(a). Rule 8(a) does "not require a claimant to set out in detail the facts upon which he bases his claim." *Conley*, 355 U.S. at 47.

## III.    **THE FSIA DOES NOT BAR PLAINTIFFS' CLAIMS**

### A.    NCB Is Not Protected by The FSIA

The PIF's 1999 purchase of NCB shares does not confer sovereign immunity to NCB. NCB points to an allegation in the 4AC that NCB is owned by the Kingdom. That allegation is clearly erroneous based upon the Affidavit of Abdallah Bin Hamad Al-Wohaibi supplied by NCB as Exhibit 4-A of its moving brief. Plaintiffs have moved to amend the complaint to properly allege that the PIF, not the Kingdom, owns the majority of NCB shares. *See* plaintiffs' motion to amend.

NCB's argument that it is entitled to sovereign status under the FSIA fails because only direct ownership by the foreign state satisfies the statutory requirement of § 1603(b)(2). *Dole Food Co. v. Patrickson,* 123 S.Ct. 1655, 1660 (2003). "A corporation is an instrumentality of a foreign state under the FSIA only if the foreign state **itself** owns a majority of the corporation's shares." *Id.* at 1662 (emphasis added). NCB is not entitled to FSIA protection because it is not

-4-

owned <u>directly by the Kingdom</u>. *Id.* at 1659. The PIF is merely an agency or instrumentality of the Kingdom and the PIF's ownership interest in NCB does not confer sovereign status to NCB.

The FSIA defines an "agency or instrumentality" to mean any entity –

> (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

NCB concedes that 69% of NCB's common stock shares is owned by the PIF. The Kingdom, by NCB's own admission, has <u>no</u> direct interest in NCB. NCB's argument that the PIF is simply part of the Kingdom's Ministry of Finance is contradicted by the facts.

The PIF is separately chartered, can hold property, has its own Board of Directors, has a separate budget, has an account with Saudi Arabian Monetary Authority and may enter into contracts approved by its Board of Directors. *See* NCB Exhibit 4-B. All of these are indicia of a separate person, rather than the state itself. *See, e.g., First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 624 (1983) ("Increasingly . . . governments throughout the world have established separately constituted legal entities to perform a variety of tasks."); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 76 n.4 (2d Cir. 2002) ("A typical governmental instrumentality is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law.").[4]

---

[4] According to the Ministry of Finance website, the PIF is a "specialized credit institution," in the same category as the Saudi Arabian Agricultural Bank, the Saudi Credit Bank, and the Saudi Industrial Development Fund. The Saudi Arabian Monetary Authority also classifies PIF as a "specialized credit institution." These entities are agencies or instrumentalities <u>of</u> the Saudi state, not part of the state itself. The "Saudi Arabian Information

(continued...)

The FSIA's legislative history supports the conclusion that NCB is separate from the Kingdom. The House Report states that a separate legal person included entities that "can sue or be sued in its own name, contract in its own name or hold property in its own name." HR Rep. No. 94-1487, reprinted in 1976 U.S.C.C.A.N. at 6614 (emphasis added). Since the PIF, not the Kingdom, owns NCB's shares and can enter into contracts, the PIF must be considered a separate legal person.

Under the "legal characteristics" test used by Judge Mulkasey in *Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996), PIF is clearly a separate legal person from the Kingdom. The PIF's separate charter and the fact that it can purchase and hold property in its own name (e.g., NCB shares) and enter into contracts shows that it is separate from the Kingdom. *See id.* at 684.

*Hyatt* is on point. In *Hyatt*, Judge Mulkasey addressed the FSIA status of a Finnish Bank owned by the Finnish Government Guarantee Fund (the "GGF"). An Act of the Finnish Parliament established GGF and it had the mission to safeguard the activities of deposit banks and claims of creditors. The GGF's Board, like the PIF's Board, was government selected. Like the PIF, the GGF could own shares in companies. *Id.* at 685. Judge Mulkasey held:

> The GGF is an agency or instrumentality of Finland under the "legal characteristics" test. . . . [I]t is a separate legal person: the GGF can sue and be sued, own property, and contract, all in its own name. . . . Although the Finnish government exercises some control over the GGF through its management structure and budget, the GGF functions as a separate legal person. Thus, the GGF is an agency or instrumentality of a foreign state and not a political subdivision.

---

[4](...continued)
Resource," a Saudi Ministry of Culture and Information website, provides links to "Commercial Banks in Saudi Arabia." NCB is on the list – along with Riyadh Bank, Saudi American Bank, Al Rajhi Banking and Investment Corp., and other privately-owned banks. By contrast, banks that are agencies of the Saudi government, such as the Saudi Arabian Agricultural Bank and the Saudi Credit Bank are not included on the list of "Commercial Banks." Similarly, the website for the Saudi Arabian Monetary Agency provides links to commercial banks in Saudi Arabia. Again, NCB is listed, along with Riyadh Bank, Saudi American Bank and Al Rajhi Bank. *See Burnett* plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of defendant The National Commercial Bank at p. 15 and Notes 10-13.

*Hyatt*, 945 F. Supp. at 685. Because GGF was an agency or instrumentality of the government, its ownership of the bank at issue did not entitle the bank to sovereign immunity. *Id.* Similarly, because the PIF is an agency or instrumentality of the Kingdom, PIF's ownership of NCB shares does not entitle NCB to sovereign immunity.

In *Bank of China v. NBM L.L.C.*, 2002 WL 1072235 (S.D.N.Y. May 28, 2002), Judge Chin held that the Bank of China (Hong Kong) Limited was not entitled to FSIA protection because it was not owned directly by the Peoples Republic of China, but rather by the Bank of China Head Office, itself an agency or instrumentality of the government. *See id.* at **4-6. Similarly, in *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 198 F. Supp.2d 420 (S.D.N.Y. 2002), Judge Scheindler held that GBK, an Austrian ski resort operator, owned by an agency or instrumentality of the Austrian government, was not entitled to FSIA protection. Judge Scheindler held:

> While GBK's parent corporation . . . is afforded protection as a "foreign state" because it is an agency or instrumentality of Austria . . ., it is not a "foreign state or political subdivision thereof," . . . . As a result, GBK cannot satisfy the second prong of the Act's definition of agency or instrumentality. . . .

*Id.* at 426; *see also Filler v. Hanvit Bank*, 2003 WL 21729978 (S.D.N.Y. July 25, 2003) (In light of *Dole*, vacating ruling that bank owned by the Korean Deposit Insurance Corporation, an agency or instrumentality of the Republic of Korea, was entitled to FSIA protection.).

The same result is required under the D.C. Circuit's "categorical approach." In *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148 (D.C. Cir. 1994), the court held that to determine whether an entity is a separate agency from the government is a "categorical approach" that turns on "whether the core functions of the foreign entity are predominantly governmental or commercial . . . ." *Id.* at 151. It held that the Bolivian Air Force was the

Bolivian government itself, not its agency or instrumentality, because "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Id.* at 153. *See also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234-35 (D.C. Cir. 2003) ("Iran Ministry of Foreign Affairs was treated as Iran government because "[t]he conduct of foreign affairs is an important and 'indispensable' governmental function.").

Applying the "core function" test, it is clear that the PIF is a separate entity and thus an agency, or instrumentality rather than the Kingdom itself. The PIF Charter states that it is dedicated to the financing of investments of a "**commercial** nature whether they belong to the Government or the industrial lending institutions connected to it or to its public corporations connected to it or to its public corporations and whether these projects or taken independently or in partnership . . . with private institutions." *See* NCB Exhibit 4-B, PIF Charter at p. 1. Accordingly, the "core functions" of PIF are commercial, not governmental, and the PIF's commercial function is not "so closely bound up with the structure of the state," *Transaero*, 30 F.3d at 153, that the entity performing them must be deemed to be the foreign state itself. Nor are they "indispensable" governmental functions, *see Roeder*, 333 F.3d at 234-35, that are among the "necessary concomitants of sovereignty," *see Transaero*, 30 F.3d at 153.

Because the PIF's core functions are commercial, not governmental, and because it is a "separate person" from the Kingdom, it is a Kingdom "agency or instrumentality." Under *Dole*, that means that NCB is not entitled to any FSIA protection. *See Dole*, 123 S.Ct. at 1662 ("A

corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares").[5]

>   B.   Even If The FSIA Covered NCB, It Is Still Liable Under The
>        FSIA's "Tortious Act" Exception

Even if NCB were entitled to the FSIA status, which it is not, it would not be entitled to immunity because the activities at issue fall under the "tortious act" exception set forth in 28 U.S.C. § 1605(a)(5). There is no immunity when "money damages are sought against a foreign state for personal injury or death or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1605(a)(5).

NCB's argument that the FSIA's tortious act exception does not apply is without merit because plaintiffs sufficiently allege claims against NCB under the Anti-Terrorism Act, as well as for common law torts including wrongful death. NCB essentially argues that plaintiffs do not

---

[5] NCB's reliance on the pre-*Dole* Second Circuit decision *O'Connell Machinery Co. v. M.V. "AMERICANA"*, 734 F.2d 115 (2nd Cir. 1984) is misplaced. *O'Connell* turned on the government's "direct control" of the sub-agency at issue in the case. *See id.* at 116. ("[A] majority of the shares of the Italian line is owned by [FINMARE]. FINMARE, in turn, is under the direct control of the . . . public financial entity which coordinates the management of commercial enterprises of the Italian government.) The *Dole* court, however, rejected control as benchmark of instrumentality status. *See Dole*, 123 S.Ct. at 1662 ("Majority ownership by a foreign state, not control, is the benchmark of instrumentality status"). The *O'Connell* decision doesn't address whether FINMARE is a separate person from the Italian government and the double tiering of administrative agencies by the Italian government requires a much closer analysis in light of *Dole*. *Zappia Middle East Construction v. The EMIRATE OF ABU DHABI*, 215 F.3d 247 (2nd Cir. 2000) is another pre-*Dole* decision wrongly relied upon by NCB. In *Zappia* it was "undisputed" that defendants The Emirate of Abu Dhabi, its wholly owned investment authority ("ADIA") and commercial bank ("ADCB") owned by ADIA were all either foreign sovereigns or instrumentalities of a foreign sovereign. But *Dole* would not provide ADCB FSIA status since the government's ownership is indirect. *See Dole*, 123 S.Ct. at 1662. The other decisions NCB relies upon are also easily distinguished. *See*, e.g., *Compagnie Noga v. Russian Federation*, 2004 WL 504604 (S.D.N.Y. Sept. 19, 2002), vacated, 361 F.3d 676 (2d Cir. 2004); *Magness v. Russian Federation*, 247 F.3d 609, 613 n. 7 (5th Cir. 2001) (Russian Ministry of Culture is a political subdivision of the USSR, but under the core functions analysis, the Russian State Diamond Fund is a separate legal entity); *S Davis Int'l v. Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000); *Filus v. Lot Pol. Airlines*, 819 F. Supp. 232, 236-37) (Ministry of Civil Aviation was a constituent part of the USSR. Here the PIF clearly is not a constituent part of the Kingdom of Saudi Arabia).

sufficiently state a cause of action; this is not a proper basis to deny jursidiction. *See Bell v. Hood,* 327 U.S. 678, 682 (1946) ("jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action").

NCB's argument that the "entire tort" did not take place in the U.S. misses the point. The September 11, 2001 attacks took place in the U.S. within the meaning of 28 U.S.C. § 1605(a)(5). *Burnett v. Al Baraka Investment & Development Corp.*, 292 F. Supp.2d 9, 19 n.4 (D.D.C. 2003) ("*Burnett II*"). It was in the U.S. that nineteen terrorists commandeered four different aircraft and murdered thousands of U.S. citizens. The decisions that NCB relies upon are easily distinguished.[6]

NCB wrongly focuses on its part in the September 11, 2001 attacks - financing al Qaeda - rather than the tort itself which took place in the United States. Plaintiffs allege that NCB is liable for aiding and abetting the attack on America and conspiring with the terrorists. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002) (Anti-Terrorism Act permits recovery where defendant has provided material support to, or aided and abetted, international terrorism); *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 288 (2d Cir. 1992) (describing circumstances when "an individual may be subject to liability for the tortious conduct of another as an aider and abettor"). NCB does not escape liability simply because it allegedly supported the terrorists outside of the U.S. *See Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.D.C. 1980) (Chile not immune from suit for assassination in the U.S. supported by the Chilean government's intelligence agency); *Liu v. Republic of China*, 892 F.2d 1419 (9th

---

[6] *See Cabiri v. Ghana,* 165 F.3d 193, 200 (2nd Cir. 1998) (concerning allegations of torture that took place in Ghana, not the United States; allegations centered on a misrepresentation claim which fell under FISA's provision preserving immunity for misrepresentation); *Hirsh v. State of Israel*, 962 F. Supp. 377, 383-84 (S.D.N.Y.) (Holocaust survivors' claim against Israel and Germany did not fall within the non-commercial tort exception), *aff'd,* 133 F.3d 907 (2nd Cir. 1997*); Goquiolay v. Philippines Nat'l Bank,* No. 90 Civ. 893, 1990 WL 144118 (S.D.N.Y. 1990) (tortious conduct and injury occurred outside the United States).

-10-

Cir. 1989) (Republic of China not immune under FSIA where Taiwan official allegedly arranged in Taiwan the murder of a Taiwan expatriate in the United States).

There is absolutely no support for NCB's dangerous suggestion that foreign governments or their agencies can support terror attacks on U.S. citizens in the U.S. and escape jurisdiction if they can show that the some of the planning and funding for the murders occurred outside the U.S. It would frustrate the purpose of the tortious act exception if NCB could escape liability on this argument. *See Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984) (Tortious act exception applied in law suit against Mexican government where Mexican government aircraft crashed in California; tortious conduct that occurred outside the country does not affect jurisdiction if a single tort occurred in the United States.).

This Court should not follow Judge Robertson's ruling in *Burnett II* to the extent that the ruling is based on an improperly narrow view of the "tortious act" exception, which runs contrary to Second Circuit law. *Burnett II* held that the standard of causation under the "tortious act" exception is more stringent than the standard of causation applicable to the underlying tort. 292 F. Supp.2d at 19-20. The Second Circuit has held, however, that the substantive state or federal rule that governs plaintiffs' cause of action is used to resolve the threshold question of the court's jurisdiction under the FSIA. *Robinson v. Government of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001). In reaching this conclusion, the Second Circuit relied on the FSIA legislative history, which states that the purpose of the "tortious act" exception is to permit a plaintiff "to maintain an action against [a] foreign state *to the extent otherwise provided by law*." H.R. Rep. No. 94-1487, at 21, reprinted in1976 U.S.C.C.A.N. at 6620 (emphasis added). For that reason, the Second Circuit held that a plaintiff is required to meet the same standard to fall within the "tortious act" exception as would be required to prevail on the merits. *Robinson*, 269 F.3d at 143.

Even if a heightened standard applied, plaintiffs have sufficiently alleged a direct link between NCB and al Qaeda. Plaintiffs allege that NCB intentionally financed BIN LADEN and al Qaeda. *See* 4AC ¶ 573. Under KBM's leadership, NCB provided substantial financial support to defendants SAUDI RED CRESCENT, IIRO and the MUWAFFAQ FOUNDATION, all al Qaeda fronts. *Id.* ¶¶ 570-71. NCB's support of al Qaeda was intentional; its Chief Executive Officer, KBM, had close ties to BIN LADEN. *Id.* ¶¶ 571-72.

      C.     The State-Sponsor of Terrorism Exception Does Not Bar the Action

Plaintiffs do not allege that FSIA's State Sponsor of Terrorism Exception, 28 U.S.C. § 1605(a)(7), applies to NCB's liability. Plaintiffs maintain that NCB is a commercial private bank not entitled to FSIA protection. That said, even if NCB were entitled to FSIA protection, the State Sponsor of Terrorism exception is irrelevant because FSIA's non-commercial tort exception applies.

      IV.    **PLAINTIFFS' CLAIMS ARE JUSTICIABLE**[7]

The political question, act of state and international comity doctrines do not bar this action. Claims against a <u>private</u> bank do not implicate the political concerns advanced by NCB. *See Burnett I*, 274 F. Supp.2d at 110 n.19. Moreover, even if NCB currently were considered an agency or instrumentality of the Kingdom, plaintiffs' claims do not raise political concerns because NCB was a private bank when plaintiffs allege it supported al Qaeda.

The Supreme Court has ruled that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186,

---

[7] NCB submits two Declarations of Ambassador Chas W. Freeman, Jr., which are contradicted by Declarations from William F. Wechsler, M.W. Michael Reisman and The Honorable Jeane J. Kirkpatrick, submitted by the *Burnett* plaintiffs. Ambassador Freeman does not address NCB's status and appears to assume that it is part of the Kingdom. This action, which is not against the Kingdom, has had no discernable affect on the relations between the United States and Saudi Arabia. Furthermore, the Executive Branch has not sought to intervene, which suggests that Ambassador Freeman's opinion is rather overstated.

211 (1962). Just because cases "present issues that arise in a politically charged context, that does not transform them into cases involving non-justiciable political questions." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). Rather, the "political question" doctrine excludes from the court's consideration only "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" to other branches of government. *Japan Whaling Ass'n. v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

Congress made the relevant policy choices and value determinations in enacting the Anti-Terrorism Act. Congress decided that "the imposition of liability at any point along the causal chain of terrorism . . ." would "interrupt, or at least imperil, the flow of money" to terrorists. *Boim*, 291 F.3d at 1011. The President signed the Anti-Terrorism Act into law - - showing Executive Branch approval of the Act's goals. The Executive Branch has never suggested that adjudication of this case in any way interferes with its conduct of foreign relations. The Executive Branch's abstention from this lawsuit speaks volumes.

Plaintiffs have not filed a lawsuit against the Kingdom and this lawsuit has nothing to do with any determination of the Executive Branch concerning whether to designate the Kingdom as a state sponsor of terrorism. This lawsuit only asks the Court to decide whether a private commercial bank helped al Qaeda to attack Americans in the U.S.

NCB's contention that the "act of state" doctrine bars this lawsuit also should be rejected. Indeed, there is no act of the Kingdom implicated in this suit. As the Supreme Court made clear in *W.S. Kirkpatrick & Co., Inc. v. Environmental Techtonics Corp.*, 493 U.S. 400, 405 (1990), the act of state doctrine only applies if the lawsuit "requires the Court to declare invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign

-13-

sovereign." *Id.* (citations omitted). As in *Kirkpatrick*, because there is no "act of state" that this action seeks to invalidate, the act of state doctrine does not apply.

## V. **NCB IS SUBJECT TO PERSONAL JURISDICTION**[8]

The 4AC alleges that NCB intentionally supported terrorists whose express aim was to cause injury in the U.S. Due process is satisfied by asserting personal jurisdiction over non-resident defendants who allegedly engage in intentional, tortious conduct "expressly aimed at" the forum even where none of the defendants' conduct occurred in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984); *see also Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y.), *aff'd in relevant part,* 162 F.3d 748 (2d Cir. 1998) (Libya's "intentional, tortious acts that were expressly aimed at the United States" in the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish personal jurisdiction). Accordingly, NCB is subject to personal jurisdiction because plaintiffs have well plead that NCB intentionally supported al Qaeda whose stated goal was to attack the U.S.

*Rein* provides the model analysis for asserting personal jurisdiction over foreign terrorist supporters who target the U.S. There, as here, defendants were charged not "with mere untargeted negligence," but rather with "intentional tortious actions that were expressly aimed at the United States" through their support of terrorists who destroyed a U.S. flag aircraft. *Rein,* 995 F. Supp. at 330 (citing *Calder*, 465 U.S. at 789). Ruling that where the "effects" of defendants' extraterritorial conduct on the U.S. "are sufficient to provide fair warning such that the foreign [defendants] may be subject to the jurisdiction of the courts of the United States," *id.* (citing

---

[8] The Anti-Terrorism Act provides for nationwide service of powers so the "relevant due process injury . . . is whether the defendant has minimum contacts with the United States." *See Burnett I*, 274 F. Supp.2d at 95-96 (personal jurisdiction proper in ATA case when defendants have minimum contacts with United States as a whole.) While only claims of United States nationals are covered by the Anti-Terrorism Act, claims of plaintiffs who are foreign nationals may be adjudicated in this Court under the theory of pendant venues. *See Burnett I*, 274 F. Supp.2d at 98.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)), the assertion of personal

jurisdiction over such defendants is due process:

> Any foreign [defendant] would know that the United States has substantial
> interests in protecting its flag carriers and its nationals from terrorist activities and
> should reasonably expect that if these interests were harmed, it would be subject
> to a variety of potential responses, *including civil actions in United States courts*.

*Rein*, 995 F. Supp. at 330 (emphasis added). The U.S. has the highest interests in protecting its

citizens from terrorists, and NCB should reasonably expect to be haled into this Court for

supporting terrorists whose goal was to attack the U.S.

Likewise, in *Daliberti v. Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000), the Court rejected the

personal jurisdiction challenge of a terror sponsor who argued that "[b]ecause all of [defendant's]

conduct alleged in the complaint occurred outside the borders of the United States, defendant . . .

had no 'fair warning that a particular activity [would] subject [it] to the jurisdiction'" of a United

States court. *Id.* at 53 (citing *Burger King Corp.*, 471 U.S. at 472). The Court held that because

"[a]ll states are on notice that state sponsorship of terrorism is condemned by the international

community . . . [i]t is reasonable that Iraq be held to answer in a United States court for acts of

terrorism against United States citizens." *Id.* at 54. Accordingly, the assertion of personal

jurisdiction over a foreign terror supporter who targeted U.S. citizens satisfies due process. *Id.*

Furthermore, plaintiffs have properly alleged that NCB conspired with al Qaeda to attack

U.S. interests. The Court has personal jurisdiction over NCB based upon the acts done by its co-

conspirators, al Qaeda and the September 11, 2001 terrorists. *See Lehigh Valley Indus. v.*

*Birenbaum,* 527 F.2d 87, 92-94 (2nd Cir. 1975); *Andre Emmerich Gallery, Inc. v Segre*, 1997 U.S.

Dist. Lexis 16899 at *6 (S.D.N.Y. Oct. 29, 1997); *Chrysler Capital Corp. v. Century Power*

*Corp.,* 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).

-15-

The Court's jurisdiction over NCB is even clearer if NCB were entitled to FSIA protection, which it is not. The FSIA confers jurisdiction whenever a foreign sovereign is subject to suit under one of the exceptions set forth in the statute. *See* 28 U.S.C. § 1330(b). As a foreign sovereign, NCB may not be entitled to due process protection. *See Price v. Libya*, 294 F.3d 82, 96 (D.C. Cir. 2002) ("foreign states are not 'persons' protected by the Fifth Amendment."). The D.C. Circuit has held that the Fifth Amendment "poses no obstacle" to the personal jurisdiction over foreign sovereigns conferred by Congress in the FSIA. *Id.* at 99. In *Hanil Bank v. Pt. Bank Negara Indonesia (Persero),* 148 F.3d 127 (2d Cir. 1998), the Second Circuit called into question its prior ruling that afforded due process protection to foreign states. *See id.* at 134 (calling into question its conclusion in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981) that foreign states are considered "persons" for due process purposes). The *Hanil* court discussed the Supreme Court's decision in *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607 (1992) and indicated that, in light of *Weltover,* providing due process protection to foreign sovereign or their agencies may be improper. *Id.* The court did not decide the issue because its disposition was not necessary, but plaintiffs submit that when called upon the Second Circuit will hold that foreign sovereigns and their agencies are not entitled to due process protection. Accordingly, NCB who desperately seeks FSIA protection would have to accept the FSIA's burden - - a lack of due process protection and clear personal jurisdiction.

A.      At a Minimum, Plaintiffs Should Be Allowed
        To Conduct Jurisdictional Discovery

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *See, e.g., Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (district court may permit jurisdictional discovery to help resolve Rule 12(b)(2) motion); MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) ("Generally, the district court

should allow discovery if the jurisdictional claim has a reasonable basis and it appears that pertinent facts may be uncovered.").

Especially where, as here, pertinent jurisdictional facts lie within the control and knowledge of the defendant contesting jurisdiction, it would be unfair to deny plaintiffs the opportunity to conduct jurisdictional discovery. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("Under Rule 12(b) . . . in resolving claims that they lack jurisdiction, courts . . . have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party"); *Investment Properties Int'l, Ltd. v. IOS Ltd.,* 459 F.2d 705, 707-08 (2d Cir. 1972) (error to deny plaintiffs "opportunity to utilize discovery to develop basic jurisdictional facts from data solely within the defendants' possession").

Discovery would reveal even more substantial jurisdictional contacts between NCB and the United States than those alleged. NCB was a party in several lawsuits in the United States. *See* accompanying Affidavit of John Fawcett ("Fawcett Aff.") at ¶ 7. It filed an action in this court against Morgan Stanley and other defendants arising out of U.S. investments. *See NCB v. Morgan Stanley*, 1997 WL 634292 (S.D.N.Y. Oct. 15, 1997). A wholly-owned subsidiary, NCB Securities Ltd. had an office at 420 Lexington Avenue, New York, New York. Fawcet Aff., ¶ 5 and Exh. 1. Also, plaintiffs believe that jurisdiction discovery will show NCB facilitated and participated in fund-raising activities with "charities" that supported al Qaeda. See id., ¶ 8 and Exhibit 5; *Burnett* opposition brief at p. 49 and Exhibit 1. Plaintiffs contend that discovery will help determine the extent NCB was involved in terrorist fund raising in the United States and the extent of its business interests here.

-17-

VI.   **PLAINTIFFS STATE A CLAIM AGAINST NCB**

NCB offers a conclusory argument that the Complaint should be dismissed for failure to

state a claim.  It asserts that plaintiffs failed to allege that NCB knowingly and substantially

assisted the September 11 attacks, failed to allege the requisite unlawful agreement necessary to

state a conspiracy claim and cannot show proximate cause. *See* NCB Moving Brief at pp. 24-25.

NCB is wrong on the facts alleged and the legal requirements.

Plaintiffs allege that NCB, under the leadership of KBM, knowingly and intentionally

provided substantial material support to al Qaeda and BIN LADEN to attack the U.S. and U.S.

citizens and that the September 11, 2001 terror attacks were the proximate result of NCB's

terrorism support.

The Anti-Terrorism Act, 18 U.S.C. §2333(a) provides a civil cause of action for United

States nationals injured as a result of international terrorist.  Specifically, it states that:

> Any national of the United States injured in his or her person, property, or
> business by reason of an act of international terrorism or his or her estate,
> survivors, or heirs, may sue therefor in any appropriate district court of the
> United States and shall recover threefold the damages he or she sustains
> and the cost of the suit, including attorney's fees.

"International terrorism" is specifically defined in 18 U.S.C. § 2331(1) as activities that:

(A)   involve violent acts or acts dangerous to human life that are a violation of the
      criminal laws of the United States or any State, or that would be a criminal
      violation if committed within the jurisdiction of the United Sates or of any state;

(B)   appear to be intended
      (i) to intimidate or coerce a civilian population;
      (ii) to influence the policy of a government by intimidation or coercion; or
      (iii) to affect the conduct of a government by assassination or kidnaping; and

(C)   occur primarily outside the territorial jurisdiction of the United States, or
      transcend national boundaries in terms of the means by which they are
      accomplished, the persons they appear intended to intimidate or coerce, or the
      locale in which their perpetrators operate or seek asylum.

*Id.*

*Boim* recognized a cause of action under the Anti-Terrorism Act for aiding and abetting and for the funding of terrorist activities and known terrorist organizations. In *Boim*, a seventeen year old U.S. citizen was gunned down in Israel's West Bank territory. The gunmen were acknowledged members of Hamas, a known terrorist organization. The victim's parents filed a civil action in the United States District Court for the Northern District of Illinois under the Anti-Terrorism Act against several nonprofit entities that the Boims alleged solicited and laundered funds to provide financial support to Hamas terrorist activities. The nonprofits moved to dismiss for failure to state a claim upon which relief could be granted. The District Court denied the motion and the Seventh Circuit affirmed.

Pointing at length to the Anti-Terrorism Act's legislative history, the Seventh Circuit emphasized Congress' intent to reach beyond those persons who themselves commit the violent act that causes the injury and impose liability "at any point along the causal chain of terrorism," *Boim*, 291 F.3d at 1011 (citations omitted), particularly terror financiers:

> Congress' purpose here [in enacting the Anti-Terrorism Act] could not be met unless liability attached beyond the persons directly involved in acts of violence. The statute would have little effect if liability were limited to the persons who pull the trigger or plant the bomb because such persons are unlikely to have assets, much less assets in the United States, and would not be deterred by the statute. Also, and perhaps more importantly, *there would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence.* Moreover, the organizations, businesses and nations that support and encourage terrorist acts are likely to have reachable assets that they wish to protect. *The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts.*

*Id.* at 1021 (citations omitted and emphasis added).

Congress intended to impose "liability at *any point along the causal chain of terrorism.*"

P.L. 102-572, Federal Courts Administration Act of 1992, Senate Report 102-342 (July 27, 1992)

-19-

at 22 (emphasis added). The *Boim* court acknowledged that the legislative history of the Anti-Terrorism Act evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of intentional terrorism to the full reaches of traditional tort law. *Boim*, 291 F.3d at 1010. Comparing the statute to a traditional tort, the court found that the statute essentially contains all of the elements of a traditional tort: breach of a duty (i.e., committing an act of intentional terrorism) injury to the person, property or business of another and causation (injured by reason of). *Id.*

In the end, *Boim* delineated two paths to proving a claim supporting civil liability: i) by proving violations of the criminal counterparts to § 2333 – 18 U.S.C. § 2339A and § 2339B; or ii) by proving the elements of traditional tort aiding and abetting theory. Plaintiffs have adequately alleged facts that support both theories of liability.

A.      NCB is Liable Through Criminal Violations

*Boim* concluded that because Congress intended to impose criminal liability for funding terrorism, that it also intended to impose civil liability for the "at least as broad a class of violent terrorist acts" in 18 U.S.C. §§ 2333 and 2331(1) and that therefore, the criminal provisions of the Anti-Terrorism Act are a clear indication of Congress' intent to consider financial support of a terrorist organization to be an act of international terrorism under 18 U.S.C. § 2333. *Boim*, 291 F.3d at 1015. Conduct therefore, which violates 18 U.S.C. § 2339A or § 2339B is sufficient to meet the definition of international terrorism under 18 U.S.C. §§ 2333 and 2331(1). *Id.; see Burnett I*, 274 F. Supp.2d at 106 ("Liability can be established by proving violations of the criminal counterparts of 18 U.S.C. § 2333 and § 2339A").

Looking to the conduct specifically outlined in the criminal counterparts to 18 U.S.C. § 2333, § 2339A prohibits the providing of material support for an extensive list of specific

-20-

violent crimes associated with terrorism. The statue defines material support as "currency or other financial securities, financial services, lodging training safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A. The *Boim* court held that "even small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability in § 2333." *Boim, 291 F.3d* at 1015.

Section 2339B extends criminal liability to those who knowingly provide material support to foreign terrorist organizations:

> Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years . . .

Under *Boim,* conduct which could be considered a violation of either section, will be considered an act of international terrorism subject to civil liability under § 2333. Here, plaintiffs have clearly alleged that NCB participated in acts giving rise to criminal liability under these sections.

B.     NCB is Liable For Aiding and Abetting and Conspiring With Terrorists

The *Boim* court also found that liability under the Anti-Terrorism Act may be based upon aiding and abetting an act of international terrorism or conspiracy with terrorists. Looking once again to the legislative history, the court found that Congress intended to include general tort law principles within the boundaries of § 2333 and to make the civil liability provisions of § 2333 at least as extensive as the criminal provisions under § 2339A and B. *Id* at 1020. The definition of "international terrorism" under § 2331(1)(A) includes activities that:

> involve violent acts or acts dangerous to human life that are a violation of
> the criminal laws of the United States or any State, or that would be a
> criminal violation if committed within the jurisdiction of the United Sates
> or of any state

*Id.* The *Boim* court found that, "[t]his language, embracing activities that 'involve' violent acts,

taken at face value, should certainly cover aiding and abetting violent acts." *Id.* at 1020. The

court noted that if liability were not extended to aiders and abettors who knowingly and

intentionally fund acts of terrorism, it would frustrate Congressional intent to "cut off the flow of

money to terrorists at every point along the causal chain." *Id.* at 1021. Liability therefore extend

beyond those immediately involved in acts of violence.

Under traditional tort theories of aiding and abetting, plaintiffs need not show a direct

link between defendants' activities and the attacks of September 11. Instead, plaintiffs need only

plead facts which show that: i) the party whom defendant aids must perform a wrongful act that

causes an injury; ii) the defendant must be generally aware of his role as part of an overall illegal

or tortious activity at the time that he provides the assistance; and iii) the defendant must

knowingly and substantially assist the principal violation. *Halberstam v. Welch* 705 F.2d 472,

477 (D.C.Cir. 1983). In *Halberstam,* a wrongful death case, the court held that the defendant

Hamilton could be liable for aiding and abetting her co-defendant Welch in the murder of

plaintiff's husband during a burglary even though she was not present at the burglary. The court

found that Hamilton was liable for aiding and abetting the murder/burglary because she knew

that Welch was involved in some type of crime in which violence and killing was always a

foreseeable risk and assisted him in disposing of stolen goods. Essentially, Hamilton provided

general assistance to Welch which facilitated his criminal activities and while she did not provide

specific assistance in the crime for which she was held liable, she was found to have aided and

abetted Welch in committing it. *Id.*

-22-

Thus, under the framework outlined in *Halberstam*, plaintiffs need only show that NCB knew that it was supporting al Qaeda, a known terrorist organization, that it desired to assist the illegal activities of al Qaeda, and took some action to assist these illegal activities. Plaintiffs need not show that NCB knew that al Qaeda was going to commit the horrific acts of September 11, 2001, but only that NCB knew that they were assisting terrorists in committing violent activities aimed at the U.S. Death and destruction to the U.S. was the well-publicized aim of al Qaeda and its terrorist network. By providing assistance and services to the terrorist network, NCB knew or should have known that acts of violence against U.S. citizens were a foreseeable consequence.

Plaintiffs also properly allege that NCB conspired with the terrorists, which requires "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *See Burnett I*, 274 F. Supp.2d at 105; *Chrysler Capital*, 778 F. Supp. at 1267. Plaintiffs' allegations that NCB intentionally financed defendant OSAMA BIN LADEN and al Qaeda support an inference that there was an agreement among NCB, through its Chairman, KBM, and the terrorists. The September 11, 2001 attacks were the overt acts done in furtherance of the conspiracy. *See Burnett I*, 274 F. Supp.2d at 105.

      C.      <u>Plaintiffs Have Properly Alleged Causation.</u>

Plaintiffs need not allege that the financial support NCB provided to OSAMA BIN LADEN and al Qaeda were used by the terrorists in committing the September 11, 2001 attacks. *See,* e.g., 18 U.S.C. § 2339C (a)(3) ("For an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out the predicate

-23-

act."). As Judge Robertson held, "such specificity cannot be required at the pleading stage." *Burnett I,* 274 F. Supp. 2d at 86 (citing *Swierkiewicz*, 534 U.S. at 512-13). That being said, plaintiffs have alleged that NCB provided substantial support to al Qaeda to support its terrorist goals during a time when OSAMA BIN LADEN had publicly announced a fatwa to kill Americans. *See* 4AC ¶120. Accordingly, plaintiffs should be entitled to an inference that NCB's financial support helped fund the September 11, 2001 attacks.

Furthermore, NCB's support for al Qaeda supported the September 11, 2001 terrorist attacks even if NCB's money wasn't used by the nineteen terrorists who carried out the attack. The September 11, 2001 attacks could not have happened if al Qaeda had not received funding for years prior to the attacks - funding used to build terrorist training camps, recruit and indoctrinate young men to become terrorists and otherwise spread its message of hate and violence against the U.S.

The Court should also consider Congress' goal of cutting off terrorist funding when it enacted the Anti-Terrorism Act. Forcing plaintiffs to plead and prove but for causation would frustrate this goal given the difficulty of tying particular cash support to the September 11, 2001 attacks. General tort principles suggest that it should be NCB's burden of proving lack of but for causation. Judge Calabresi:

> [I]f (a) negligent act was deemed wrongful because that act increased the chances that a particular type of accident would occur, and (b) a mishap of that very sort did happen, this was enough to support a finding by the trier of fact that the negligent behavior caused the harm. Where such a strong causal link exists, it is up to the negligent party to bring in evidence denying but for cause and suggesting that in the actual case the wrongful conduct had not been a substantial factor.

*Zuchowicz v. U.S.*, 140 F.3d 381, 390-91 (2nd Cir. 1998). Judge Calabresi's reasoning can be applied to NCB's support of al Qaeda, which substantially increased the likelihood that terrorists would attack the U.S.

Plaintiffs properly allege that the September 11, 2001 terrorist attacks were the proximate cause of NCB's support of al Qaeda. NCB's intentional support of al Qaeda violates the Anti-Terrorism Act because it increased the risk that al Qaeda would commit the September 11, 2001 terrorist attacks. *See Boim*, 291 F.3d at 1021. The terror attacks were the foreseeable result of NCB's long and substantial support for terrorists.

### VII.   **CONCLUSION**

For the foregoing reasons, this Court should deny NCB's motion to dismiss.

Dated: New York, New York
       May 13, 2004

                                KREINDLER & KREINDLER
                                *Plaintiffs Liaison Counsel*

                      By:       /s/
                                _____
                                James P. Kreindler (JK7084)
                                Marc S. Moller (MM0143)
                                Justin T. Green (JG0318)
                                Andrew J. Maloney, III (AM8684)
                                100 Park Avenue
                                New York, NY 10017-5590
                                Phone: (212) 687-8181
                                Fax: (212) 972-9432

                                Barasch McGarry Salzman Penson & Lim
                                11 Park Place
                                New York, NY 10007
                                Phone: (212) 385-8000
                                Fax: (212) 385-7845

                                Baumeister & Samuels, P.C.
                                One Exchange Plaza
                                New York, NY 10006
                                Phone: (212) 363-1200
                                Fax: (212) 363-1346

Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street (34th Floor)
New York, NY 10017
Phone:  (212) 661-0011
Fax:  (212) 953-6483

Law Firm of Aaron J. Broder
     & Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY 10118
Phone:  (212) 244-2000

Jaroslawicz & Jaros, Esqs.
150 William Street
New York, NY 10038
Phone:  (212) 227-2780

-26-