UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ ) | |
| ) | |
| In re TERRORIST ATTACKS on ) | |
| SEPTEMBER 11, 2001 ) | 03 MDL 1570 (RCC) |
| _____ ) | |
| ) | |
| KATHLEEN ASHTON et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | 02 CV 6977 (RCC) |
| ) | |
| AL QAEDA ISLAMIC ARMY et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**ASHTON PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
SAUDI BIN LADEN GROUP'S MOTION TO DISMISS**

KREINDLER & KREINDLER LLP
100 Park Avenue
New York, NY 10017-5540
Phone:  (212) 687-8181
Fax: (212) 972-9432

## **TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PLAINTIFFS ALLEGE THAT THE SAUDI BIN LADEN GROUP PROVIDED
      SUBSTANTIAL SUPPORT TO OSAMA BIN LADEN AND AL QAEDA . . . . . . . . . . 1

III.  SBG'S MOTION TO DISMISS IS WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   STANDARD ON MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    THIS COURT HAS PERSONAL JURISDICTION OVER SBG . . . . . . . . . . . . 5

            1.    SBG's Conduct Was Sufficiently Directed at the
                  United States to Satisfy the "Minimum Contacts" Test . . . . . . . . . . . . . 6
            2.    SBG's Conduct Gives Rise To Conspiracy Theory Jurisdiction . . . . . . . . 8
            3.    Plaintiffs Are Entitled to Discovery Concerning
                  SBG's Additional Contacts with the United States . . . . . . . . . . . . . . . . 9

      B.    REQUIREMENTS OF THE ATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    The Statute and its Interpretation Under *Boim v.*
                  *Quranic Literacy Institute* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.    Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      C.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE ATA . . . . . . . . . . . 15

            1.    Liability Through Criminal Violations . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            2.    Liability Through General Tort Principles . . . . . . . . . . . . . . . . . . . . . . . 17
                  a.    Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                  b.    Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE TVPA . . . . . . . . . . 20

            1.    The TVPA Applies to Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            2.    The TVPA's State Action Requirement Has Been Met . . . . . . . . . . . . . 22

      E.    PLAINTIFFS HAVE ADEQUATELY PLEAD
            STATE LAW CLAIMS AGAINST SBG . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
782 F. Supp. 215 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Andre Emmerich Gallery, Inc. v. Segre*, 1997 U.S. Dist.
LEXIS 16899 (S.D.N.Y. Oct. 29, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Atkins v. County of Orange*, 251 F. Supp.2d 1225 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . 3

*Beaneal v. Freeport-McMoRan, Inc.*,
969 F. Supp. 362 (E.D. La. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Bellepointe, Inc. v. Kohl's Department Stores*,
975 F. Supp. 562 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Boim v. Quranic Literacy Institute, et al.*,
291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15, 16, 17, 22

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Burnett v. Al Baraka Investment Corp.*,
274 F. Supp.2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 13, 19

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) . . . . . . . . . . . . . . . . . . . 23

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*,
367 U.S. 886 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Calder v. Jones*, 465 U.S. 783 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Central Bank of Denver v. First Interstate Bank of Denver*,
511 U.S. 164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chance v. Armstrong*, 143 F.3d 698 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . 4

*Daliberti v. Iraq*, 97 F. Supp.2d 38 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dennis v. Sparks*, 449 U.S. 24 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Fassett v. Delta Kappa Epsilon* (New York), 807 F.3d 1150 (3d Cir.1986) . . . . . . . . . 18

*First City, Texas Houston, N.A. v. Rafidain Bank,*
281 F.3d 48 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . 6

*Friedman v. Bayer Corp.*, 99 Civ. 3675, 1999 WL 33457825
(E.D.N.Y. Dec. 15, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Grove Press, Inc. v. Angelton*, 649 F.2d 121 (2nd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . 8

*Halberstam*, 705 F.2d at 471 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

*Highlands Insurance Co. v. PRG Brokerage, Inc.*, 01 Civ. 2272, __
F. Supp.2d __, 2004 WL 35439 (S.D.N.Y. Jan. 6, 20040 . . . . . . . . . . . . . . . . . . . . . . . 3

*IUE AFL-CIO Pension Fund v. Herrmann,*
9 F.3d 1049 (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ideal Steel Supply Corp. v. Anza*, 254 F. Supp.2d 464 (S.D.N.Y. 2003) . . . . . . . . . . . . 3

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . . . . 6

*Kadic v. Karadzic*, 70 F.3d 232 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kashi v. Gratsos*, 790 F.2d 1050 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lehigh Valley Industrial, Inc. v. Birenbaum*, 527 F.2d 87 (2nd Cir. 1975) . . . . . . . . . . . 8

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Magnetic Audiotape Antitrust Litigation,*
334 F.3d 204 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Morrissey v. Curran*, 567 F.2d 546 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Munsey v. Webb*, 233 U.S. 150 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*PDK Laboratories, Inc. v. Friedlander*, 103 F.3d 1105
(2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Palestine Information Office v. Shultz*, 853 F.2d 932
D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F. Supp. 325 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Estate of Rodriguez v. Drummond Co., Inc.*,
256 F. Supp.2d 1250 (N.D. Ala. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Second Amendment Foundation v. United States Conference of Mayors*,
274 F.3d 521 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Simmons v. Abruzzo*, 49 F.3d 83 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sinaltrainal v. The Coca Cola Co.*, 2003 WL 1846195
(S.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Temperomandibular Joint (TMJ) Implants Products
Liability Litigation*, 113 F.3d 1484 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*U.S. v. Greenfield*, 44 F.3d 1141 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Woodford v. Community Action Agency of Greene County*,
239 F.3d 517 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Zuchowicz v. United States*, 140 F.3d 381 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 14

## STATE CASES

*Bastein v. Sotto*, 749 N.Y.S.2d 538 (N.Y.A.D. 2nd Dept. 2002) . . . . . . . . . . . . . . . . . . 25

*Goff v. Clark*, 755 N.Y.S.2d 493 (N.Y.A.D. 3rd Dept. 2003) . . . . . . . . . . . . . . . . . . . . . 25

*Jantzen v. Leslie Edelman of N.Y., Inc.*, 206 A.D.2d 406, 614 N.Y.S.2d 744
(2d Dept. 1994), cited in MTD at 24 (2nd Dept. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Palsgraf v. Long Island R. R. Co.*, 248 N.Y. 339 (N.Y. 1928) . . . . . . . . . . . . . . . . . . . . 14

## FEDERAL STATUTES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 1350, note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

18 U.S.C. § 2331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

18 U.S.C. § 2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

18 U.S.C. § 2339C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. P. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

## MISCELLANEOUS

*Wex. S. Malone, Ruminations on Cause-in-Fact,* 9
Stan.L.Rev. 60 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE,
§ 1351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*4 Fowler v. Harper, Fleming, James, Jr., and Oscar S. Gray*
THE LAW OF TORTS § 20.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Restatement (Second) Torts § 876 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

W. Page Keeton et al., PROSSER AND KEETON ON TORTS
§ 43 (5th ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## I.    <u>INTRODUCTION</u>

Plaintiffs' substantive and jurisdictional claims against the Saudi Bin Laden Group ("SBG") are based on the material support it provided to Osama Bin Laden ("Bin Laden") and al Qaeda, especially when al Qaeda was operating in and assisted by the Sudan, a defendant in these suits and a country the U.S. has designated as a "State Sponsor of Terrorism."  The facts supporting plaintiffs' claims have been alleged in the Fourth Amended Complaint ("4AC")[1] and, when taken as true as they must be here, establish SBG's amenability to personal jurisdiction and its liability under the Anti-Terrorism Act ("ATA"), the Torture Victim Protection Act ("TVPA") and state law.  Accordingly, SBG's motion to dismiss must be denied.

## II.    **PLAINTIFFS ALLEGE THAT THE SAUDI BIN LADEN GROUP PROVIDED <u>SUBSTANTIAL SUPPORT TO OSAMA BIN LADEN AND AL QAEDA</u>**

SBG played an integral role in developing al Qaeda.  SBG's support of Bin Laden and al Qaeda started in the Sudan, a country designated by the U.S. as a "State Sponsor of Terrorism" that has supported, encouraged, sponsored, aided and abetted and conspired with groups that use terror to attain their goals. 4AC ¶ 18.  Bin Laden ran terrorist training camps and "guest houses" in Sudan. *Id.* at ¶ 45.  Sudan has provided financing, training, protection and weapons for Bin Laden and al Qaeda. *Id.* at ¶¶ 18 & 32.  Bin Laden centered his operations in Sudan from 1991 through 1995. *Id.* at ¶ 47.  At one time, there were 1000 to 2000 al Qaeda members in Sudan. *Id.* at ¶ 72.

The government of Sudan welcomed Bin Laden, when he embarked on infrastructure projects and business ventures with or on behalf of the government. 4AC ¶¶ 48 & 49.  SBG provided substantial support to Bin Laden, *id.* at ¶¶ 50 & 548, including financial assistance and

_____

[1]  SBG has moved to dismiss Plaintiffs' Third Amended Complaint (3AC).  However, most other defendants in this action have moved to dismiss Plaintiffs' Fourth Amended Complaint (4AC).  The substance of the two complaints is identical; the 4AC only adds several additional parties not relevant to this opposition.  Therefore, in the interest of brevity and consistency, only the 4AC will be referenced.

engineering support for Sudanese construction projects. *Id.* at ¶¶ 546 & 549.[2]  This assistance

enabled Bin Laden to offer safe haven and employment to al Qaeda members. *Id.* at ¶ 50.

Plaintiffs allege that SBG maintained a close relationship with Bin Laden even after the

Bin Laden family purportedly disowned him. *Id.* at ¶ 552.  Bin Laden is still listed on SBG

corporate records. *Id.* at ¶ 558.

SBG subsidiary Al Hijra was headed by Muslim activists who were directly involved with

al Qaeda. 4AC ¶¶ 553, 554 & 549.  Al Hijra worked with Sudanese military officials to transport

and supply provisions to terrorists training in Bin Laden's terror training camps. *Id.* at ¶ 57.

While SBG and Bin Laden worked to build the infrastructure necessary for the al Qaeda

operations in Sudan (and for Sudan's own use, as a State Sponsor of Terrorism), Bin Laden and

al Qaeda began to export terror abroad.

SBG sheltered and directly supported al Qaeda operatives, including Mohammed Jamal

Khalifa, an official in the International Islamic Relief Organization ("IIRO"), a "charity"

fronting for al Qaeda. 4AC at ¶¶ 316 & 555.  Tarek Bin Laden, a member of SBG's Board of

Directors, was the IIRO general supervisor. *Id.* at ¶ 556.  IIRO was involved in the plots to

assassinate President Clinton and Pope John Paul II, the plot to blow up twelve U.S. airliners

simultaneously (which ultimately formed the blueprint for the September 11, 2001 attacks), and

the 1998 embassy bombings in Kenya and Tanzania. *Id.* at ¶ 310.  IIRO was headquartered in

Sudan near Bin Laden's personal office. *Id.* at ¶ 317.

In sum, SBG, directly and through its subsidiaries, is a co-conspirator which

intentionally, willfully and knowingly financed, supported and worked with Bin Laden and al

Qaeda, thereby enabling al Qaeda to attack the U.S. and its citizens. 4AC ¶¶ 5 & 24.

---

[2]  SBG directly engaged in construction projects involving the Tahaddi road and the Port Sudan airport through two of its subsidiaries. 4AC ¶ 550.  The airport was built in conjunction with the Sudanese government. *Id.* at ¶ 551.

III.    **SBG'S MOTION TO DISMISS IS WITHOUT MERIT**

SBG's motion to dismiss ("MTD") is flawed in several respects.  First, it premises arguments on a heightened pleading standard, such as that required of fraud claims, which is inapplicable in the present action. *See Burnett v. Al Baraka Inv. Corp.*, 274 F. Supp.2d  86, 95-96 (D.D.C. 2003).  SBG attempts to invoke this standard by quoting fraud cases such as *Highlands Ins. Co. v. PRG Brokerage, Inc.,* 01 Civ. 2272, _____ F. Supp.2d _____, 2004 WL 35439 (S.D.N.Y. Jan. 6, 2004) and *Ideal Steel Supply Corp. v. Anza*, 254 F. Supp.2d 464, 467 (S.D.N.Y. 2003).  MTD at 3.  In an effort to persuade the Court to apply a stricter pleading standard in this case, SBG misquotes *Ideal Steel*.  SBG writes, "[w]here, as here, the 'mere assertion' of a claim 'has an almost inevitable stigmatizing effect,' courts should 'flush out' frivolous and unsupported allegations 'at an early stage.'" MTD at 3 (citing *Ideal Steel,* 254 F. Supp.2d at 467).  By contrast, the passage in its full context states:

> Where, as here, a complaint alleges (mail and/or wire) fraud, the pleading requirements of Fed. R. Civ. P. 9(b) apply.  'Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device. Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, ...courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'

*Ideal Steel,* 254 F. Supp.2d at 467 (internal citations omitted).  SBG relies on its misquotes to support its argument that the Court should review the 4AC pursuant to the heightened level of scrutiny required by Fed. R. Civ. P. 9(b) even though the 4AC contains no claims that warrant a heightened standard. *See Burnett,* 274 F. Supp.2d at 95-96.

Second, SBG's MTD focuses too narrowly on one specific section of the 4AC and ignores relevant allegations contained in other sections.  It is well-settled that complaints must be read as a whole to determine whether claims have been stated. *Atkins v. County of Orange*, 251 F. Supp.2d 1225, 1231-32 (S.D.N.Y. 2003).  SBG's motion draws only from allegations

contained in paragraphs 541 through 558, which admittedly come under the heading "Saudi Bin

Laden Group," but which do not constitute all relevant allegations.  Indeed, the 4AC alleges how

SBG, acting with dozens of other wealthy businesses, banks and individuals, provided funds,

financial services, supplies and other forms of "material support" to al Qaeda thereby providing

financial resources and capability to mount attacks on the U.S., such as the Embassy Bombings

in Africa and the September 11 attacks.

        Third, the section entitled "Background" is replete with factual challenges to Plaintiffs'

allegations and self-serving statements touting SBG's history of cooperation with the U.S. and

SBG's alleged record as a good global citizen.  MTD at 1-3.  Such superfluity is irrelevant to the

motion at issue.  Motions to dismiss are decided by looking to the allegations in a plaintiff's

complaint; it is those allegations alone that are to be taken as true. *See* "Standard on Motion to

Dismiss," *infra*.  SBG has also attached exhibits to its motion in an inappropriate effort to draw

the Court's attention outside the four corners of the 4AC and to induce the Court to make

preliminary factual findings.

## VI.    STANDARD ON MOTION TO DISMISS

        To defeat a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction

made before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings

and affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d

Cir. 1986); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  In evaluating

plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and

affidavits in the light most favorable to plaintiffs and resolve all doubts in their favor. *PDK Labs,*

103 F.3d at 1108.  In addition, the Court must draw all inferences in plaintiffs' favor.  *IUE AFL-*

*CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).  To make a *prima facie*

showing of jurisdiction, plaintiffs need only "plead facts which, if true, are sufficient in

themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores*, 975 F. Supp. 562, 565 (S.D.N.Y. 1997).

Similarly, the Court should not grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless it "appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957); *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir.1995). The court must presume that the allegations in the complaint are true and give plaintiff the benefit of every reasonable inference that may be drawn therefrom. *Lee v. Bankers Trust Co.,* 166 F.3d 540, 543 (2d Cir.1999). A plaintiff is not required to prove her case at the pleading stage; indeed, "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency of Greene County,* 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

The analysis of Fed. R. Civ. P. 12(b)(6) and 12(b)(2) motions is conducted  in the context of Fed. R. Civ. P. 8(a)(2). That rule requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Chance,* 143 F.3d at 701. The "short and plain statement" must simply give the defendant fair notice of what the plaintiffs' claim is and the grounds upon which it rests. *Burnett,* 274 F. Supp.2d at 103. Plaintiffs are not required to prove their case at this early litigation stage.

## V.    ARGUMENT

### A.    THIS COURT HAS PERSONAL JURISDICTION OVER SBG

This Court has personal jurisdiction over SBG because of its sufficient contacts with the U.S., and because its knowing support of terrorism specifically directed at the U.S. satisfies the

due process requirements for the assertion of jurisdiction in this country.  Alternatively,

plaintiffs' allegations are sufficient to warrant jurisdictional discovery.

1.      SBG's Conduct Was Sufficiently Directed at the
        United States to Satisfy the "Minimum Contacts" Test

Asserting jurisdiction over SBG is consistent with due process because, as alleged in the

4AC, the SBG supported terrorists who targeted the U.S.

The horrific events of September 11, 2001 must be considered as part of the due process

analysis.  As the Supreme Court has explained, "'[d]ue process' is not a technical conception

with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant*

*Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961).  Consequently, the Supreme

Court has rejected using a rigid formula for discerning the contacts necessary to satisfy due

process, opting instead for an evaluation of each case's own unique facts and circumstances.

*International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The Supreme Court has also stated that "reasonableness considerations sometimes serve

to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than

would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985).

Following this logic, the D.C. Circuit has recognized that policy considerations may play a part

in determining what process is due in a particular situation. *See Palestine Information Office v.*

*Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999

F. Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could

significantly lower the threshold of constitutional requirements").

In *Burger King*, the Supreme Court held that the requirements of due process were

satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and

the litigation results from injuries that 'arise out of or relate to' those activities." 471 U.S. at 472 (citations omitted).  Physical presence in the forum is *not* a requirement. *Id.* at 475.

Intentional conduct calculated to cause injury in the forum satisfies the due process requirements for jurisdiction, even if the defendants' conduct occurred outside the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984).  In *Calder*, defendants were employees of a national weekly newspaper in Florida that was alleged to have printed a libelous story. *Id.* at 785-86.  Plaintiff was a California resident and entertainer with a television career centered in California. *Id.* at 783.  Defendants had no contacts with California other than occasional trips and phone calls. *Id.* at 785-86.  Nonetheless, the court held that assertion of jurisdiction in California comported with due process because the article was drawn from California sources and "the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788-89.

*Calder* distinguished intentional torts from allegations of "untargeted negligence" and held that jurisdiction was warranted because the defendants' intentional actions were "expressly aimed at California." 465 U.S. at 788-89.  Because defendants knew that plaintiff would suffer injury where she lived and worked, the court held that defendants should reasonably anticipate being haled into court in California. *Id.* at 790.

Like the *Calder* defendants, SBG is accused of intentional tortious acts.  Bin Laden and al Qaeda targeted the U.S; the locations of the September 11, 2001 attacks were not incidental. Therefore, as alleged in the 4AC, by supporting and aiding Bin Laden and al Qaeda, SBG directed its tortious activity at the U.S.

Two cases involving terrorism against U.S. citizens further demonstrate that due process is not violated when those who deliberately target the U.S. are made to answer in U.S. courts.  In *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998), *aff'd*

*in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998), the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction. *Id*.  Similarly, in *Daliberti v. Iraq*, 97 F. Supp.2d 38, 53-54 (D.D.C. 2000), the court found that state sponsors of terrorism were provided sufficient warning of the seriousness with which the U.S. views terrorist attacks against Americans that it was reasonable for them to be held accountable for such acts in U.S. courts.  Accordingly, the court found that the assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" and that defendant's targeting of Americans provided a sufficient nexus with the U.S. to satisfy due process concerns. *Id*.

In *Rein* and *Daliberti* the terrorists targeted U.S. citizens abroad.  Here, by contrast, the terrorists and their sponsors murdered U.S. citizens on U.S. soil.  Persons who provide the means, financial or otherwise, for terrorists to come to the U.S. and commit acts of murder cannot be said to lack sufficient contacts to make them amenable to jurisdiction in this country.

2.    SBG's Conduct Gives Rise To Conspiracy Theory Jurisdiction

New York's Civil Practice Law and Rules § 302(a)(2) confers jurisdiction over a nondomiciliary who "in person or through an agent . . commits a tortious act within the state." The term "agent" under that provision has been broadly construed to include a defendant's co-conspirators. *Grove Press, Inc. v. Angelton*, 649 F.2d 121, 122-23 (2d Cir. 1981); *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 92-94 (2d Cir. 1975).  Under this theory, courts in New York have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators. *See Andre Emmerich Gallery, Inc. v. Segre,* 1997 U.S. Dist. LEXIS 16899 at *6 (S.D.N.Y. Oct. 29, 1997); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260,

-8-

1266 (S.D.N.Y. 1991) (holding that "[i]t is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2)").

To establish jurisdiction over a nonresident defendant on the basis of the New York acts of a co-conspirator, the plaintiff must: (1) establish a *prima facie* case of conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate the commission of a tortious act in New York, during, and pursuant to, the conspiracy. *See Allstate Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992); *Chrysler Capital*, 778 F. Supp. at 1266.

Under New York law a *prima facie* showing of conspiracy entails allegations of the primary tort and the following four elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose, and; (4) the resulting damage or injury. *Chrysler Capital*, 778 F. Supp. at 1267 (*citing Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986)).

Plaintiffs' allegations regarding SBG's intentional involvement in nurturing and developing al Qaeda and Bin Laden's terrorist network, which directly furthered their terrorist operations, including the attacks of September 11, 2001, satisfy all necessary elements under New York law for conspiracy theory jurisdiction.

3.    Plaintiffs Are Entitled to Discovery Concerning
      SBG's Additional Contacts with the United States

If the Court finds that SBG's directed conduct at the U.S. is insufficient to support the exercise of jurisdiction over it, plaintiffs should be allowed jurisdictional discovery.  It is well settled that "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery." *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204,

206-08 (2d Cir. 2003); *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 50 (2d

Cir. 2002); *Morrissey v. Curran*, 567 F.2d 546, 551 (2d Cir. 1977); and *Second Amendment*

*Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001).  Moreover,

"[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss

for lack of personal jurisdiction to enable a party to conduct discovery." 5A Charles A. Wright &

Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990).

      Plaintiffs believe that jurisdictional discovery will reveal substantial contacts between

SBG and the U.S.  According to a 2001 *New Yorker* magazine article, SBG has extensive

international commercial ties; the company employed 32,000 people in 30 countries. *See* "The

House of Bin Laden," *New Yorker*, November 12, 2001, provided as *Exhibit 1* to accompanying

affidavit of John Fawcett.  Plaintiffs expect that discovery will reveal that SBG owns, manages

and/or otherwise controls Global Diamond Resources, Inc., a Nevada corporation.  Additionally,

until recently, the company had a $2 million stake in the Carlyle Group, a U.S. private equity

firm with a large interest in defense contracting. *Id.,* ¶ 4 and Fawcett Aff., Exh. 2.  Although

SBG has sold its stake in the Carlyle Group, it appears that it has maintained ties with other U.S.

entities and that much of its banking and equity investments are handled in the United States. *See*

Fawcett Aff., Exh. 1.  CNN reporter Alan Frank noted in a September 28, 2001 interview that, as

of that date, SBG had ongoing sales deals or joint ventures with Motorola, General Electric,

Nortel and Tellabs.  SBG contributed one million dollars to Harvard University in 1993 and

again in 1994. *Id*.  Also, Bin Laden family members own numerous properties in the U.S. *See id.,*

Exh. 5.  SBG has also retained Hullin Metz, a New York public relations firm. Fawcett Aff., ¶ 6

and *id.*, Exh. 4.

      Moreover, plaintiffs allege that, until recently, the company had an address in Rockville,

Maryland, although SBG contends that the address was maintained by a now-defunct affiliate.

-10-

*Compare* 4AC ¶ 545. & MTD at 7; *see also See* Fawcett Aff., Exh. 7.  Curiously, however, the

evidence submitted by SBG only demonstrates that an entity called SBG (USA), Inc., previously

known as Cromwell Corporation, was dissolved in 1999.

Finally, plaintiffs allege that SBG exports products to the United States and has

participated in at least one U.S.-Saudi business conference in Washington, D.C.  *See* Fawcett

Aff., Exhs. 8 & 9.  Plaintiffs also allege that one of SBG's directors maintains an address in the

U.S.  *Id.*, Exh. 6.

B.      **REQUIREMENTS OF THE ATA**

1.      The Statute and its Interpretation Under *Boim v. Quranic Literacy Institute*

SBG argues that plaintiffs must plead and prove that "but for" its illegal activities, the

September 11, 2001 attacks would not have occurred. This argument distorts the requirements of

the ATA and state law.  Plaintiffs must simply show that SBG violated one of the ATA's

criminal provisions and that the violation was a substantial factor in bringing about the plaintiffs'

harm or, alternatively, establish SBG's liability pursuant to general tort law principles.

The ATA provides a civil cause of action for United States nationals injured as a result of

international terrorism.  Specifically, it states that:

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism,
> or his or her estate, survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the cost of the suit,
> including attorney's fees.

18 U.S.C. § 2333(a).  "International terrorism" is specifically defined in 18 U.S.C. § 2331(1) as

activities that

> (A)     involve violent acts or acts dangerous to human life that are a violation of the
>         criminal laws of the United States or any State, or that would be a criminal
>         violation if committed within the jurisdiction of the United Sates or of any State;

-11-

(B)    appear to be intended
(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by assassination or kidnaping; and

(C)    occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

The seminal decision interpreting the ATA is *Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000 (7th Cir. 2002).  In *Boim*, a seventeen year old American citizen was gunned down in Israel's West Bank territory by members of Hamas.  The decedent's parents filed a civil action under the ATA against several nonprofit entities that the Boims alleged solicited and laundered funds to provide financial support to Hamas' terrorist activities.

The Seventh Circuit recognized two distinct avenues for civil liability: one for providing "material support" to international terrorists in breach of the criminal provisions of §§ 2339A and 2339B; and the other under general tort law principles that are subsumed in the ATA, including liability for aiding, abetting or conspiring with terrorists.  After enunciating that any violation of §§ 2339A and 2339B gives rise to civil liability under the ATA so long as proximate cause is also shown, the court turned its attention to the general tort avenue, focusing primarily on the supporters of those who physically perpetrate the specific acts of violence.  Pointing to the ATA's legislative history, the court emphasized that Congress intended the ATA to reach beyond those persons who directly commit the acts that cause injury, and impose liability "**at any point** along the causal chain of terrorism," *Id.* at 1011 (citations omitted and emphasis added).  The court expressly noted that the breadth of the general tort principles avenue extends to those who provide financing for the commission of terrorist acts:

The statute would have little effect if liability were limited to the persons who pull the trigger or plant the bomb because such

-12-

> persons are unlikely to have assets, much less assets in the United
> States, and would not be deterred by the statute. . . . perhaps most
> importantly, there would not be a trigger to pull or a bomb to blow
> up without the resources to acquire such toils of terrorism and to
> bankroll the persons who actually commit the violence.

*Id.* at 1021.

    2.   <u>Causation</u>

Plaintiffs need not allege that Bin Laden and al Qaeda used SBG's support to conduct the September 11, 2001 terror attacks. *See* 18 U.S.C. § 2339C(a)(3); *Burnett,* 274 F. Supp.2d at 107 ("[s]uch specificity cannot be required at the pleading stage").

In determining causal issues regarding Bin Laden's support, the Court should recognize Congress' goal of cutting off terrorism funding. *Cf.* Wex S. Malone, RUMINATIONS ON CAUSE-IN-FACT, 9 Stan. L. Rev. 60, 72-73 (1956) (finding that the rigor with which courts hold plaintiffs to their burden of proof on factual cause depends on the importance of the claim being enforced and the connection between the harm and the interests the legal claim seeks to protect). This reasoning suggests that plaintiffs need only prove that a defendant's donations contributed to the September 11 attacks.

This conclusion is implied by a relevant causal inquiry articulated by Judge Calabresi:

> [I]f (a) a negligent act was deemed wrongful *because* that act
> increased the chances that a particular type of accident would
> occur, and (b) a mishap of that very sort did happen, this was
> enough to support a finding by the trier of fact that the negligent
> behavior caused the harm.  Where such a strong causal link exists,
> it is up to the negligent party to bring in evidence denying *but for*
> cause and suggesting that in the actual case the wrongful conduct
> had not been a substantial factor.

*Zuchowicz v. United States*, 140 F.3d 381, 390-91 (2d Cir. 1998); *see also* 4 Fowler V. Harper, Fleming James, Jr., and Oscar S. Gray, THE LAW OF TORTS § 20.2, at 94-101 (2d ed. 1986) (providing citations to cases taking a lenient view of plaintiff's burden on causation).

Support of a known terrorist organization with the avowed purpose of attacking the U.S. increases the chance of a terrorist attack; without funds terrorists would be significantly limited in their capabilities to further their goals.  Because support of Bin Laden and al Qaeda increased the chance of terror attacks like the September 11, 2001 terror attacks, plaintiffs have adequately alleged that SBG's tortious conduct was a substantial factor in causing plaintiffs' injuries.

"Foreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." *Boim*, 291 F.3d at 1012 (citations omitted). Foreseeability is built into the ATA because §§ 2339A and 2339B require that the material support be offered with knowledge of and/or intent to further the terrorist activities.  In other words, if a person supports a terrorist group with knowledge of the fact that the terrorists will use the money to engage in terrorist acts, or with the intent that they do so, the person providing the support can obviously foresee that the terrorist acts may occur.  Indeed, it can be assumed that the supporting person intends that such acts will happen. *See id.* at 1015 (holding that violations of §§ 2339A and/or 2339B will give rise to civil liability under § 2333 provided that knowledge and intent are also shown).

SBG need not have foreseen the September 11, 2001 attacks. *See, e.g., Palsgraf v. Long Island R. R. Co.*, 248 N.Y. 339, 344 (N.Y. 1928) (holding that "[i]t was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.") (quoting *Munsey v. Webb*, 233 U.S. 150, 156 (1913)); *see also* W. Page Keeton et al., PROSSER AND KEETON ON TORTS § 43, p. 299 (5th ed. 1984) (observing the "quite universal agreement that what is required to be foreseeable is only the 'general character' or 'general type' of the event or harm, and not its 'precise' nature, details, or above all manner of occurrence") (citations omitted).  Plaintiffs need

-14-

only allege that SBG intended, knew or could foresee that some event such as the attacks might result from their support of terrorism.

### C.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE ATA

Considering the *Boim* decision, plaintiffs, to prevail, need only show: 1) that SBG knowingly provided material support to a recognized terrorist organization with the intent to support that organization's illegal activities; and/or 2) that it aided, abetted or conspired in acts of international terrorism.  Plaintiffs have adequately plead facts which support both of these theories of liability.

### 1.    Liability Through Criminal Violations

The *Boim* court concluded that the criminal provisions of the ATA are a clear indication of Congress' intent to deem financial support of a terrorist organization to be an act of international terrorism under § 2333. *Boim,* 291 F.3d at 1015.  ATA § 2339A prohibits the provision of "material support" for an extensive list of specific violent crimes associated with terrorism.  Material support is further defined in the statute as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A.  Section 2339B extends criminal liability to those who knowingly provide material support to foreign terrorist organizations:

> Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years . . . .

18 U.S.C. § 2339B.  When considering the presence of "material support," "even small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability in §2333." *Boim*, 291 F.3d at 1015.

Under *Boim,* conduct that violates either section will be considered an act of international terrorism subject to civil liability under § 2333.  Here plaintiffs have alleged that SBG participated in acts giving rise to criminal liability under the ATA.  Plaintiffs have alleged that SBG sheltered and directly supported operatives of al Qaeda, including providing them with employment in Sudan. *See* Section II *supra*.  Plaintiffs have also described how SBG aided in the construction of the infrastructure in Sudan that was critical to the operations of Bin Laden and al Qaeda in the first half of the 1990s, and which allowed them to prosper and grow to the point of being able to carry out the attacks of September 11, 2001. *Id.*  The 4AC alleges that SBG was an integral part of the development of al Qaeda, and that it continued to support Bin Laden and his terror network.

Death and destruction in the U.S. was al Qaeda's well-publicized aim.  The September 11, 2001 terrorist attacks were the foreseeable result of SBG's support for Bin Laden and al Qaeda.  The support provided by SBG directly or indirectly to Bin Laden and al Qaeda increased the risk and the possibility that such an event could and would occur.  These allegations are contained in the 4AC when it is read as a whole.  Plaintiffs have therefore stated a cause of action against SBG pursuant to the criminal violations provision of the ATA.

### 2.    Liability Through General Tort Principles

The *Boim* court also acknowledged that the ATA's legislative history evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of intentional terrorism to the full reaches of traditional tort law. *Boim,* 291 F.3d at 1010 (citations omitted).  Comparing the statute to a traditional tort, the court found that the ATA contains all of

-16-

the elements of a traditional tort: breach of a duty (i.e., committing an act of intentional terrorism), injury to the person, property or business of another and causation (injured by reason thereof). *Id.* at 1010.

    a.    <u>Aiding and Abetting</u>

In analyzing the reach of the general tort principles avenue, the *Boim* court found that liability under the ATA may be based upon aiding and abetting an act of international terrorism. *Id.* at 1021. The definition of "international terrorism" under §2331(1)(A) includes activities that:

> ...involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State, or that would be a criminal violation if committed within the jurisdiction of the United Sates or of any state.

18 U.S.C. §2331(1)(A). The court concluded that, "[t]his language, embracing activities that 'involve' violent acts, taken at face value, should certainly cover aiding and abetting violent acts." *Boim,* 291 F.3d at 1020. The court noted that if liability were not extended to aiders and abettors who knowingly and intentionally fund acts of terrorism, congressional intent to "cut off the flow of money to terrorists at every point along the causal chain" would be frustrated. *Id.* at 1021. Liability therefore extends beyond those immediately involved in acts of violence.

Under traditional tort doctrines of aiding and abetting, plaintiffs need only plead facts showing that: i) the party whom defendant aids must perform a wrongful act that causes an injury; ii) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and iii) the defendant must knowingly and substantially assist the principal violation. *Halberstam v. Welch* 705 F.2d 472, 477 (D.C. Cir. 1983).[3]

---

    [3] *Halberstam* has been recognized as an authoritative opinion on the topic of civil liability for aiders and abetters. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 181 (1994) (describing *Halberstam* as "a comprehensive opinion on the subject"); *In re Temperomandibular Joint (TMJ) Implants Products*

In *Halberstam,* a wrongful death case, the court held that defendant Hamilton could be liable for aiding and abetting her co-defendant Welch in the murder of plaintiff's husband during a burglary even though she was not present at the burglary.  Indeed, the court found Hamilton liable because she knew that Welch was involved in some type of crime, in which violence and killing was always a foreseeable risk, and she assisted him in disposing of large quantities of stolen goods.  Hamilton provided general assistance to Welch that facilitated his criminal activities and while she did not provide specific assistance in the crime for which she was held liable, she was found to have aided and abetted Welch in committing it. *Halberstam*, 705 F.2d at 471.

Thus, under the framework outlined in *Halberstam*, plaintiffs need only show that SBG knew it was supporting a terrorist organization, provided substantial assistance to that organization (thus raising the likelihood of terrorist activities), and could foresee that such assistance would result in a terrorist attack like that which occurred on September 11, 2001.  It is not necessary for plaintiffs to show that SBG specifically knew that al Qaeda was going to commit the horrific acts of September 11, 2001, only that it knew that it was assisting terrorists in committing terrorist activities aimed at the United States.  *(See discussion of foreseeability, supra).*

As detailed in the 4AC, SBG provided essential assistance, services and support to Bin Laden and al Qaeda, whose goal was to bring terror to the U.S. and its citizens.  Given the growing level of terrorist activity that occurred while SBG was building the infrastructure in Sudan, which aided Bin Laden and al Qaeda, and in light of that SBG's other acts of aiding and abetting terrorists, it knew that attacks such as the September 11, 2001 attacks were a foreseeable

---

*Liability Litigation*, 113 F.3d 1484, 1495-96 (8th Cir. 1997) (relying on the *Halberstam* discussion of civil aiding/abetting liability); *Fassett v. Delta Kappa Epsilon (New York)*, 807 F.3d 1150, 1162-64 (3d Cir.1986) (same).

consequence of its support, and it knew that its support significantly increased the possibility that

such attacks would occur.  Accordingly, plaintiffs have stated a claim against SBG under the

ATA for aiding and abetting.

>        b.      Conspiracy

In addition to a cause of action for aiding and abetting, the ATA, when read in

conjunction with general tort principles, also provides a cause of action based on conspiracy. *See*

*Burnett,* 274 F. Supp.2d at 107.  Conspiracy requires: i) an agreement between two or more

persons; ii) to participate in an unlawful act, or a lawful act in an unlawful manner; iii) an injury

cause by one of the parties to the agreement; and iv) which overt act was done pursuant to and in

furtherance of the scheme. *Id.*  *Burnett* also noted that "[a] conspirator may be liable for an injury

even if he or she did not plan or know about the particular act that caused the injury so long as

the purpose of the act was to advance the overall object of the conspiracy." *Id.* at 105.

The facts that give rise to a claim against SBG for aiding and abetting also establish a

conspiracy claim.  The agreement at issue was for SBG to provide employment, infrastructure

and other support to Bin Laden and al Qaeda.  The unlawful acts were the resulting September

11, 2001 attacks (although knowledge of that specific plan was not required for proximate

cause).  The injury element is obvious: thousands of deaths and injuries caused by the attacks

carried out by al Qaeda, a party to the conspiracy and the direct beneficiary of SBG's support.

Finally, the attacks were carried out pursuant to the scheme of the conspiracy.  The 4AC clearly

alleges facts sufficient to support a conspiracy claim against SBG.

Once it has been shown that someone participates in a conspiracy, there are certain

requirements the individual must satisfy in order to withdraw from the conspiracy and be

immunized from liability thereafter.  Specifically, "[u]nless a conspirator produces affirmative

evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last

overt act by any of the conspirators." *U.S. v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995).  In

the present case, SBG contends that its putative disavowal of Bin Laden constitutes withdrawal.

That claim, however, requires proof beyond a mere public pronouncement.  After all, SBG could

and did publically distance itself from the terrorists while continuing to covertly support them.

Consequently, SBG's contention merely raises a factual issue regarding its purported efforts to

break ties with Bin Laden and al Qaeda.

### D.     PLAINTIFFS HAVE STATED A CLAIM UNDER THE TVPA

SBG alleges that Plaintiffs have failed to state a claim against it under the TVPA because

that statute does not apply to corporations and because the state action requirement has not been

met.  SBG is wrong, however, on both points.

#### 1.     The TVPA Applies to Corporations

The TVPA provides, in relevant part:

> Sec. 2.  Establishment of a Civil Action.
>
> (a) Liability.  An individual who, under actual or apparent
> authority, or color of law, of any foreign nation-
> > (1) subjects an individual to torture shall, in a civil
> > action, be liable for damages to that individual; or
> > (2) subjects an individual to extrajudicial killing
> > shall, in a civil action, be liable for damages to the
> > individual's legal representative, or to any person
> > who may be a claimant in an action in an action for
> > wrongful death.

28 U.S.C. § 1350, note.  In *Estate of Rodriguez v. Drummond Co., Inc.*, 256 F. Supp.2d 1250

(N.D. Ala. 2003), the district court held that corporations can be considered "individuals"

pursuant to the language of the TVPA, and consequently may be held liable thereunder. *Id.* at

1266.  In support of its holding, the court cited a similar, unpublished opinion from the Southern

District of Florida. *Id.* at 1266-67 (citing *Sinaltrainal v. The Coca Cola Co.,* 2003 WL 1846195

(S.D. Fla. 2003) (holding that the term "individual" in the TVPA includes corporations)).

SBG cites *Beaneal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362 (E.D. La. 1997) in support of its position. While the *Beanal* court did exclude corporations from the TVPA's definition of "individual," it appears to be the first opinion addressing the issue, and other courts have not expressly followed the decision. Furthermore, SBG's reliance on *Friedman v. Bayer Corp.*, 99 Civ. 3675, 1999 WL 33457825 (E.D.N.Y. Dec. 15, 1999) for the proposition that corporations are not "individuals" under the TVPA is misplaced.

*Friedman* is an unpublished, two-page opinion that summarily dismissed all claims of holocaust survivors against corporations alleged to have aided the Germans in atrocities that occurred between 1939 and 1945. *Id.* at *1. With regard to the definition of "individual," the court stated only that "[t]his statute **has been held** to apply to individual defendants but not to corporations." *Id.* at *2 (citing *Beanal*, 969 F. Supp. at 381-82) (emphasis added). No further analysis was provided, and the court immediately moved on to other aspects of the TVPA that clearly warranted dismissal of the plaintiffs' claims. Specifically the court stated:

> Finally, the TVPA sets forth a ten-year statute of limitations for claims brought under its provisions. Plaintiffs filed their complaint in June 1999, more than fifty years after the events giving rise to their claims. Accordingly, defendants' motions to dismiss plaintiffs' TVPA claims are granted.

*Id.* The *Friedman* plaintiffs' TVPA claims were dismissed on limitations grounds; the court's passing reference to the *Beanal* opinion cannot be viewed as an adoption of the narrow definition of "individual."

Including corporations within the TVPA's definition of "individual" closely follows the approach used in other statutes. The term "individual" is synonymous with the term "person," which is commonly viewed to include corporations in other areas of the law. *Rodriguez*, 256 F. Supp.2d at 1267. Additionally, the reasoning used by the Seventh Circuit in analyzing the

ATA's scope in *Boim*, is equally applicable in determining the intended scope of the term

"individual" in the TVPA.  The *Boim* court wrote:

> The statute would have little effect if liability were limited to the
> persons who pull the trigger or plant the bomb because such
> persons are unlikely to have assets, much less assets in the United
> States, and would not be deterred by the statute. . . .

*Boim,* 291 F.3d at 1021.  The same logic holds true for the TVPA.  If the goal of the TVPA is to

aid in prevention of terrorism and torture, then it makes no sense to limit its scope to the

individual actors who likely have no assets and who merely effectuate the goals of their

superiors and supporters.  Accordingly, this Court should find that the term "individual," as used

in the TVPA, applies to corporations.

      2.    <u>The TVPA's State Action Requirement Has Been Met</u>

      There are three methods for establishing the "state action" required by the TVPA: actual

authority; apparent authority; and color of law. 28 U.S.C. § 1350, note. The statute does not

define these terms.  Instead, in construing them, courts are instructed to look to principles of

agency law to determine the existence of actual or apparent authority, and to jurisprudence under

42 U.S.C. § 1983[4] for color of law. *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995).  Since

the facts alleged by plaintiffs set forth the state action requirement under the color of law theory,

only that notion will be discussed.

      A private individual, or in this case, a corporation, acts under color of law within the

meaning of § 1983 when he acts together with state officials or with significant state aid. *Lugar*

---

[4]  That provision states:

Every person who, under color of any statute, ordinance, regulation, custom or usage of any State
or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the
United States of other person within the jurisdiction thereof to the deprivation of any rights,
privileges or immunities secured by the Constitution and laws, shall be liable to the party injured
in an action at law, suit in equity, or other proper proceeding for redress...

*v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  Stated another way, private actors are considered state actors if they are willful participants in a challenged joint action with the state or its agents. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

In one illustrative case, the owner of a restaurant (which was a private enterprise) who leased his business space from a local parking authority was found to be acting under color of law  when he refused to serve a black patron. *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).  In explaining its decision the Supreme Court held:

> The land and building were publicly owned.  As an entity, the building was dedicated to 'public uses' in performance of the Authority's 'essential government functions.'  The costs of the land acquisition, construction, and maintenance are defrayed entirely from  donations by the City of Wilmington, from loans and revenue bonds and from the proceeds of rentals and parking services out of which the loans and bonds were payable....
>
> The State has so far insinuated itself into a position of interdependence with Eagle [the restaurant] that it must be recognized as a joint participant in the challenged activity...

*Id.* at 723-24.

In the present case, the challenged activity includes SBG's efforts to build roads and airports in Sudan that enabled Bin Laden and al Qaeda to operate, grow and thrive there. Plaintiffs' 4AC clearly alleges that such activity by SBG was done jointly and/or with the support of the government of Sudan.  Moreover, the support that SBG provided to Bin Laden and al Qaeda in the form of state-sponsored infrastructure gave the terrorists the footing they needed ultimately to plan and carry out the attacks of September 11, 2001.  The 4AC has therefore met the necessary state action requirement of the TVPA.

### E.   PLAINTIFFS HAVE ADEQUATELY PLEAD STATE LAW CLAIMS AGAINST SBG

SBG's argument that plaintiffs' State law claims should be dismissed is simply a repetition of their arguments with respect to the claims under the ATA and the TVPA – that is, it essentially contends that plaintiffs have failed adequately to allege causation, conspiracy, and aiding and abetting.  As demonstrated above, however, plaintiffs adequately allege the causal connection between SBG's acts and the September 11 attacks and, similarly, adequately allege that SBG aided and abetted those attacks.

SBG also contends that plaintiffs may not maintain their wrongful death action against it because, it asserts, "New York law does not support a wrongful death claim against those who simply created the conditions that allowed others to perpetrate . . . heinous crimes." MTD at 24.  But SBG is not alleged merely to have "created the conditions that allowed others" to commit the September 11 attacks; it is alleged to have aided, abetted and/or conspired with Bin Laden and al Qaeda, who carried out the attacks.

There can be no doubt that aiders, abettors and co-conspirators may be liable for wrongful death. *See* Restatement (Second) Torts § 876 (1979).  Indeed, *Halberstam*, 705 F.2d 472, was itself a wrongful death case in which liability was imposed on the defendant, in large part, because she provided financial assistance to the direct perpetrator of the murder in question.  The holding in *Jantzen v. Leslie Edelman of N.Y., Inc*., 206 A.D.2d 406, 614 N.Y.S.2d 744 (2d Dept. 1994), cited in MTD at 24, has no bearing on this case.  There, a defendant unwittingly sold a gun used to kill the plaintiff's decedent, and the court found that such action did not rise to the level of aiding and abetting or conspiracy.  In this case, by contrast, the 4AC sufficiently alleges that SBG aided, abetted and/or conspired with those responsible for the September 11 murders.

-24-

The facts alleged in the 4AC and discussed in detail above give rise to plaintiffs' claims for assault, battery and intentional murder.  To sustain a cause of action for assault, there must be proof of physical conduct placing plaintiff in imminent apprehension of harmful contact. *Bastein v. Sotto*, 749 N.Y.S.2d 538, 539 (N.Y.A.D. 2d Dept. 2002).  A battery essentially consists of an intentional, offensive, wrongful bodily contact. *Goff v. Clark*, 755 N.Y.S.2d 493, 495 (N.Y.A.D. 3d Dept. 2003).  Intentional murder requires the killing of another with some intent to do so. 6 N.Y.PRAC. § 6:12.  The 4AC sufficiently states that SBG provided substantial material support to those responsible for the September 11 murders, that it did so with knowledge of  and/or intent to bring about such terrorist acts, and that its support caused or contributed to those acts. Plaintiffs' allegations are sufficient to fulfill the required elements of the above-listed state law claims, especially when viewed in light of the allegations of aiding, abetting and conspiracy.

## VI.   <u>CONCLUSION</u>

For the reasons stated above, plaintiffs respectfully request that SBG's Motion to Dismiss be denied in all respects.

Dated: New York, New York
      May 14, 2004

Respectfully Submitted,

KREINDLER & KREINDLER, LLP

By:_____/S/_____
     Marc S. Moller (MM0143)
     James P. Kreindler (JK7089)
     Justin T. Green (JG0318)
     Andrew J. Maloney (AM8684)
     William O. Angelley (WA5862)
     100 Park Avenue
     New York, New York 10017
     Phone:  (212) 973-3486
     Facsimile:  (212) 972-9432

#145927