**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

**In re Terrorist Attacks on September 11, 2001**                    **03 MDL 1570 (RCC)**
                                                                     **ECF Case**


-----------------------------------------------------------x

**KATHLEEN ASHTON,** *et al.*,

                                                                     **02 CV 6977 (RCC)**
                         **Plaintiffs,**                             **ECF Case**
        **v.**

**AL QAEDA ISLAMIC ARMY,** *et al.*,

                         **Defendants.**

-----------------------------------------------------------x



## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PRINCE MOHAMMED AL FAISAL AL SAUD'S MOTION TO DISMISS

                              KREINDLER & KREINDLER LLP
                              James P. Kreindler (JK7084)
                              Marc S. Moller (MM0143)
                              Justin T. Green (JG0318)
                              Andrew J. Maloney, III (AM8684)
                              Vincent I. Parrett (VP5092)
                              100 Park Avenue
                              New York, New York 10017-5590
                              Tel:  (212) 687-8181
                              Fax: (212) 972-9432

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Allegations Against Prince Mohammed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  Plaintiffs' Claims Against Prince Mohammed Are Well Pleaded . . . . . . . . . . . . . . . . . . . . 4

    A.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  The 4AC Gives Prince Mohammed Notice Of Anti-Terrorism
       Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.  The 4AC Makes A *Prima Facie* Showing Of Cause Under
              General Tort Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                a.  The 4AC Makes The Required Showing Of Causal
                   Link In This ATA Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                b.  The 4AC Makes a *Prima Facie* Showing of
                   Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.  The 4AC Gives Prince Mohammed Notice Of
       Aiding-And-Abetting Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.  The 4AC Gives Prince Mohammed Notice Of
       Conspiracy Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.  This Court Has Personal Jurisdiction Over Prince Mohammed . . . . . . . . . . . . . . . . . . . . 16

    A.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.  This Court Has Personal Jurisdiction Over Prince Mohammed
       Because He Knowingly And Intentionally Provided Financial
       Support For Al Qaeda Attacks Targeting America . . . . . . . . . . . . . . . . . . . . . . . 16

    C.  This Court Has Personal Jurisdiction Over Prince Mohammed
       Because Prince Mohammed Knew & Intended That the Acts of
       His Al Qaeda Co-Conspirators Would Impact the United States . . . . . . . . . . . . . 20

    D.  This Court Has Personal Jurisdiction Over Prince Mohammed
       Because Of His Continuous & Systematic Activities in the United States . . . . . . . 22

E.      Plaintiffs Should Be Allowed to Conduct Jurisdictional Discovery . . . . . . . . . . . 24

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

Page(s)

*Abkco Industries, Inc. v. Lennon*, 384 N.Y.S.2d 781
(1st Dep't 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*All State Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215
(S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Andre Emmerich Gallery, Inc. v. Segre,* 1997 U.S. Dist. LEXIS 16899
(S.D.N.Y. Oct. 29, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Boim v. Quranic Literary Institute,* 291 F.3d 1000
(7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 11, 12

*Branum v. Clark*, 927 F.2d 698 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Burnett v. Al Baraka,* 274 F. Supp. 2d 86
(D.D.C. 2003) ("Burnett I") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 12, 14, 15, 17

*Calder v. Jones*, 465 U.S. 783 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Chrysler Capital Corp. v. Century Power Corp.,* 778 F. Supp. 1260
(S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 21

*Conley v.  Gibson,* 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cutco Industries, Inc. v. Naughton,* 806 F.2d 361 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . 16

*Dixon v. Mack,* 507 F. Supp. 345 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp.
802 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*In Re September 11 Litigation*, 280 F. Supp. 2d 279 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . 10

*International Marketing, Ltd. v. Archer-Daniels-Midland Co.*,
192 F.3d 724 (7th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . 17, 21, 24

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993) . . . . . . . . . . . . . . 16

*Jackson National Life Insurance Com. v. Merril Lynch & Co.*,
32 F.3d 697 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Kamen v. American Telegraph & Telegraph Co.*, 791 F.2d 1006
(2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kashi v. Gratsos*, 790 F.2d 1050 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Klein v. National R.R. Passenger Corp.*, 1988 U.S. Dist. LEXIS 11696
(S.D.N.Y. Oct. 7, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lamarca v. United States*, 31 F. Supp. 2d 110 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . 10

*Laufer v. Ostrow*, 55 N.Y.2d 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Meyers v. Epstein*, 282 F. Supp. 2d 151 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . 10

*PDK Labs v. Friedlander,* 103 F.3d 1105 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 16

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
244 F. Supp. 2d 289 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54
(D.D.C. Oct. 27, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 20, 21

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325
(E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 21

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 7, 10

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*United States v. Berger*, 224 F.3d 107 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Greenfield*, 44 F.3d 1141 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 16

-iv-

*United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) . . . . . . . . . . . . . . . . . 16

*Wiwa v. Royal Dutch Petroleum Co.,* 2002 U.S. Dist. LEXIS 3293
(S.D.N.Y. Feb. 28, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) . . . . . . . . . . . . . . . 17, 21

*Zuchowicz v. United States,* 140 F.3d 381 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 6, 9

## STATUTES

Alien Tort Claims Act, 28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

Anti-Terrorism Act, 18 U.S.C. § 2331 et seq . . . . . . . . . . . . . 1, 4, 5, 6, 7, 8, 11, 12, 14, 15

N.Y. Est. Powers & Trusts Law §§ 5-4.1(1), 11-3.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Torture Victim Protection Act, 28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

## RESTATEMENT

Restatement (Third) of Torts § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Restatement (Third) of Torts § 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Restatement (Third) of Torts § 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restatement (Second) of Torts § 876 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## MISCELLANEOUS

Prosser and Keeton on Torts § 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

William L. Prosser, Transferred Intent, 45 Tex. L. Rev. 650, 662 (1967) . . . . . . . . . . . . . 8

I.    **Introduction**

Under the Anti-Terrorism Act[1] central to the United States war on terrorism, whoever

knowingly provides financial or logistical support to terrorist organizations has himself committed

an act of international terrorism, as well as having aided and abetted the terrorists who ultimately

detonate bombs or fly aircraft into major American landmarks.  None of the terror financiers who

knowingly and intentionally provided currency and financial services to al Qaeda to attack the

United States can escape that they themselves have committed acts of international terrorism

subject to civil liability in United States Courts.

II.    **Allegations Against Prince Mohammed**

The *Ashton* Plaintiffs' Fourth Amended Complaint ("4AC") alleges that Prince Mohammed

Al Faisal Al Saud ("Prince Mohammed") knowingly and intentionally provided currency and

financial services needed by al Qaeda to launch terrorist attacks against the United States, including

1998 U.S. Embassy attacks and the September 11 attacks.   4AC ¶¶ 23, 46, 48-54, 63-66, 105-108,

120, 130-36, 152-155, 188, 255, 274-276, 387, 580, 582, 610.  The 4AC alleges that Prince

Mohammed knowingly and intentionally provided al Qaeda currency, financing, financial services

and support, bank accounts and facilities through Faisal Islamic Bank-Sudan and Al Shamal Islamic

Bank.   ¶¶48-54, 57, 59-66, 188, 255, 274-76, 387, 580, 582.

For over twenty years until 2002, Prince Mohammed wielded his power as chairman and

principal shareholder of Dar Al Maal Al Islami ("DMI"), which owns, manages, controls and/or

directs Faisal Islamic Bank-Sudan and Al Shamal Islamic Bank, to use those banks to provide al

Qaeda financial and logistical support.  4AC ¶¶ 51, 54, 59-66, 274-276, 580.

The relationship between Faisal Islamic Bank-Sudan or Al Shamal Islamic Bank, controlled

---

[1] 18 U.S.C. § 2331 *et seq.* ("ATA"); section 2333 provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism. . ."  18 U.S.C. §2333.

and directed by Prince Mohammed, and its al Qaeda "customers" is akin to the relationship between Western business partners, and completely unlike the arms-length Western banking relationship between customers and banks. 4AC ¶¶ 49-54, 57, 63-66, 86, 255, 274-276, 387, 580. *Id.* Because an Islamic bank serves as an active business partner with its "customers" in a partnership or collaboration to manage and invest the customers' capital in a mutually beneficial way, the Islamic bank is required to know the business involved in a transaction with its customers, as well as the source of its funding and its objectives. *Id.*

Specifically, in 1991 Prince Mohammed, acting in concert with Sudan's National Islamic Front leader Hassan Al Turabi, knowingly provided financial and logistical support for Osama Bin Laden to move al Qaeda's base of operations to Sudan. Al Qaeda used Sudan as a safe haven and training ground to launch terrorist attacks against America. 4AC ¶¶ 44, 48-54, 57, 63-66. Prince Mohammed knowingly helped Osama Bin Laden "invest" Fifty Million Dollars ($50,000,000) in Al Shamal Islamic Bank, knowing that al Qaeda would use those investment accounts to bankroll attacks against America. 4AC ¶¶ 49, 59-66, 387. And the Complaint alleges that Prince Mohammed continued to use Faisal Islamic Bank-Sudan and Al Shamal Islamic Bank to support al Qaeda training and attacks against America, *after* Osama Bin Laden issued his 1996 fatwa declaring *jihad* on American men, women and children. 4AC ¶¶ 44, 48-54, 57, 63-66, 115, 274-276, 580.

The February 2001 testimony of al Qaeda financial officer Jamal Ahmed Al Fadl, during the the trial on the 1998 U.S. Embassy bombings, confirms that al Qaeda operatives used Faisal Islamic Bank-Sudan and Al Shamal Islamic Bank accounts knowingly provided by Prince Mohammed to finance al Qaeda attacks on America. 4AC ¶¶ 59-66, 275. Al Fadl's testimony also confirmed that Osama Bin Laden himself used the Al Shamal Islamic Bank accounts knowingly provided by Prince Mohammed to finance al Qaeda attacks on America. 4AC ¶¶ 63-64.

Through DMI and its affiliates, the links between Prince Mohammed and al Qaeda run deep:

- DMI chair Prince Mohammed co-founded Faisal Islamic Bank with defendant Youssef Nada, who was specially designated by the United States on November 6, 2001 as a Global Terrorist for funding al Qaeda;  4AC ¶¶ 330, 337; Mr. Nada is the director of defendant Al Taqwa Bank (a Specially Designated Global Terrorist entity) and is a leading member of the Muslim Brotherhood, an ally of al Qaeda through defendants Ayman Al Zawahiri.  4AC ¶¶ 39, 337.

- Prince Mohammed chose Defendant Yusuf Al Qardawi to sit on the *sharia* (Islamic law) board of three DMI companies chaired by Prince Mohammed.  In May 2001, Mr. Qardawi issued a fatwa declaring: "The suicide mission is the loftiest form of *jihad*.  We are talking about a heroic act of sacrifice and sanctification [to] fight[] the enemies of Allah, with new weapons that fate awarded. . .").  4AC ¶¶ 531, 534.

- Al Shamal Islamic Bank, owned, managed, directed and/or controlled by Prince Mohammed, was chaired by defendant Sheik Adel Galil Batterjee, whom Osama Bin Laden chose to raise funds for al Qaeda through Benevolence International Foundation ("BIF").  In 1993, Saudi Arabia closed the predecessor to BIF for its ties to terrorism.  And the assets of BIF were frozen by the U.S. Department of Treasury on suspicion that the BIF was funding al Qaeda. 4AC ¶¶ 51; 407.

- DMI's wholly-owned subsidiary Islamic Investment Company of the Gulf ("IIIG"), chaired by Prince Mohammed, in 1995 provided $11 Million to defendant "charity" Al Haramain Islamic Foundation, which had been designated by the U.S. Department of State as a terrorist entity for providing material support to al Qaeda. 4AC ¶¶ 54, 467, 468.   Prince Mohammed's fellow member of the Boards of IIIG and DMI is Osama Bin Laden's brother, Haydar Bin Laden.  4AC ¶¶ 580, 581.

III.    **Plaintiffs' Claims Against Prince Mohammed Are Well Pleaded.**

-3-

### A.      Legal Standards

A Fed.R.Civ.P. 12(b)(6) motion to dismiss must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the 4AC, but "merely to assess the legal feasibility" of the 4AC. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). In evaluating whether plaintiffs could ultimately prevail, the Court must take the facts alleged in the 4AC as true and draw all reasonable inferences in favor of plaintiffs. *Jackson Nat'l Life Ins. Com. v. Merril Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir. 1994). Rule 12(b)(6) is read with Rule 8(a)(2), which only requires the 4AC to give a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). That "short and plain statement" required by Rule 8(a) "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,'" *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley*, 355 U.S. at 47); *see also*, *International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 733 (7th Cir. 1999) ("The only function the pleadings must serve is to give notice of the claim; the development of legal theories and the correlation of facts to theory come later in the process.")

### B.      The 4AC Gives Prince Mohammed Notice Of Anti-Terrorism Act Claims.

Under the ATA, "Congress considered the provision of material support to terrorists an act of international terrorism," expressly defining "material support" as "currency or . . . financial services." *Boim v. Quranic Literary Inst.*, 291 F.3d 1000, 1015-16 (7th Cir. 2002). To achieve "Congress' goal of cutting off funding for terrorism," anyone who commits the act of international terrorism of knowingly providing currency or financial services to terrorist organizations is subject

-4-

to direct civil liability under ATA section 2333.  *Id.* [2]

As set forth above, the 4AC alleges that Prince Mohammed himself committed acts of international terrorism by knowingly and intentionally providing currency and financial services needed by al Qaeda to launch terrorist attacks against the United States, including the September 11 attacks.  *See* 4AC, *supra*.  That provides fair notice to Prince Mohammed of the direct ATA section 2333 claim against him.[3]

Prince Mohammed does not dispute that knowingly providing financial services to al Qaeda to launch terrorist attacks is itself an act of international terrorism subject to ATA section 2333 liability.  Rather, Prince Mohammed's *only* Rule 12(b)(6) argument is that plaintiffs have not properly pleaded the causal link between his knowing provision of financial services and the September 11 attacks. Mohammed Br. at 12-23.  That simply is not the case.  The 4AC shows that al Qaeda terror attacks on America, including the September 11 attacks, were a foreseeable consequence of Prince Mohammed's knowing provision of financial support to al Qaeda waging war

---

[2] The Seventh Circuit explained that ATA sections 2339B ["knowingly provid[ing] material support or resources to foreign terrorist organizations"] and 2339A [defining 'material support or resources' as "currency or . . . financial services"] "elucidate" and "amplify what Congress meant by 'international terrorism'" subject to civil liability under ATA section 2333. *Boim*, 291 F.3d at 1016. Accordingly, *Boim* held:

> [T]he Congressional record for section 2333 indicates an intention to cut off the flow of money in support of terrorism generally. S. Rep. 102-342 at 22 (1992). . . .  If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under section 2333 . . . .  Sections 2339A and 2339B provide criminal liability for the provision of material support, and section 2333 provides civil liability.  The Boims may thus show that [defendants] committed an act of international terrorism subject to civil liability under section 2333 by proving that [defendants] provided material support to terrorist organizations.

*Boim*, 291 F.3d at 1014-16.

[3]  *Boim* held that the ATA imposes both: (1) direct civil liability under section 2333 for whoever "knowingly provides material support or resources for foreign terrorist organizations" [§2339B] where the term 'material support' "relates to the type of aid provided [§2339A:  financial services] rather than whether it is substantial or considerable;" *Boim*, 291 F.3d at 1015-16, and (2) aiding-and-abetting liability for giving "substantial assistance or encouragement" to those who commit acts of international terrorism. *Id.* at 1018; *see Burnett v. Al Baraka*, 274 F. Supp. 2d 86, 107 (D.D.C. 2003) (explaining *Boim*: Civil "[l]iability can be established by proving violations of . . . § 2333A or §2339B, or, the Seventh Circuit held, by resort to traditional aiding and abetting theory").

on America.  Prince Mohammed continued to finance al Qaeda *after* al Qaeda openly declared and

commenced waging *jihad* "*to kill the Americans and their allies – civilians and military*" through

terrorist attacks on the United States, including the (1) 1993 World Trade Center bombing, (2) 1993

attacks on American soldiers in Somalia, (3) 1995 plot to blow up twelve American aircraft

simultaneously, and (4) 1998 U.S. Embassy attacks in Africa.  4AC ¶¶ 120, 46, 98-112 130-136,

152-155, 310.  *See Burnett v. Al Baraka*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) ("*Burnett I*"),

finding *prima facie* showing of proximate cause:

> Any terrorist act, including the September 11 attacks, might have been the natural and
> probable consequence of knowingly and intentionally providing financial support to al
> Qaeda, given the 3AC's allegations that, prior to September 11, al Qaeda and Osama Bin
> Laden had proclaimed their intentions to commit murderous terrorist activities against the
> United States and its citizens, and had accompanied these words with actions by
> implementing, and publicly acknowledging responsibility for, such terrorist schemes as the
> 1993 bombings of the World Trade Center, the 1998 attack of U.S. embassies in Kenya and
> Tanzania, and the 2000 attack of the U.S.S. Cole in Yemen.

Indeed, Prince Mohammed's knowing provision of financial support and services to al Qaeda

was a "causal link" in the September 11 attacks precisely because by knowingly and intentionally

financing al Qaeda attacks on America, Prince Mohammed "increased chances that such harm

[terror attacks on America] would occur."  *Zuchowicz v. United States*, 140 F.3d 381, 389 (2d Cir.

1998) (Calabresi, J., articulating test for "causal link").  The Seventh Circuit in *Boim* explained the

causal link as follows:

> [T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire
> such tools of terrorism and to bankroll the persons who actually commit the violence.
> Moreover, the organizations, businesses and nations that support and encourage terrorist acts
> are likely to have reachable assets that they wish to protect.  The only way to imperil the
> flow of money and discourage the financing of terrorist acts is to impose liability on those
> who knowingly and intentionally supply the funds to the persons who commit the violent
> acts.

*Boim*, 291 F.3d at 1021.

Moreover, the fact-driven issue of proximate cause should not be resolved by a Rule 12(b)(6)

motion before plaintiffs have had the chance to develop the facts of their case through discovery. *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1996) ("Questions regarding what is normal or foreseeable, like other questions of proximate cause, are generally issues for the trier of fact"); *Klein v. National R.R. Passenger Corp.*, 1988 U.S. Dist. LEXIS 11696 at * 7-8 (S.D.N.Y. Oct. 7, 1988) ("pivotal questions of foreseeability and proximate cause are so intertwined with the facts of the case and subject to varying inferences, that such questions are ordinarily left for the jury").  Let Prince Mohammed tell the jury that his provision of financial support to al Qaeda waging war on America did not "le[a]d in any way to the events of September 11."  Mohammed Br. at 16.

That said, plaintiffs submit that causation in an ATA claim is best viewed as follows:

1. The 4AC Makes A *Prima Facie* Showing Of Cause Under General Tort Principles.

Since the ATA "extend[s] civil liability for acts of international terrorism to the full reaches of traditional tort law, . . . causation may be demonstrated as it would be in traditional tort law." *Boim*, 291 F.3d at 1010, 1015.

Questions pertaining to the appropriate scope of liability involve the related concepts of reasonable foreseeability and proximate cause.  Each of these issues is governed by the following basic principle:

> In general, the moral culpability of the actor, as reflected in the reasons for and intent in committing the tortious acts, the seriousness of the harm intended and threatened by those acts, and the degree to which the actor's conduct deviated from the appropriate standard of care are important factors in determining the scope of liability.

Restatement(Third) of Torts: Liability for Physical Harm(Basic Principles) §32 (Ten. Draft No. 2 March 25, 2002).

Since plaintiffs allege intentional tortious conduct – knowingly and intentionally supporting

al Qaeda terrorist attacks targeting American civilians – the Court should liberally interpret principles regarding the scope of tort liability in favor of the plaintiffs. *Cf.* William L. Prosser, Transferred Intent, 45 Tex. L. Rev. 650, 662 (1967) ("It has been said more than once that in cases of intentional wrong the law will be considerably more liberal to the plaintiff in finding liability for consequences.")

        a.      The 4AC Makes The Required Showing Of Causal Link In This ATA Case.

In *Burnett I*, Judge Robertson ruled that to survive a Rule 12(b)(6) motion, an ATA claim against defendants for knowingly financing terrorists need not specifically "allege[] that the funds provided by defendants were used by the terrorists in committing the murder" of plaintiffs' decedents. *Burnett I*, 274 F. Supp. 2d at 107. Judge Robertson reasoned that "such specificity cannot be required at the pleading stage," in light of the Supreme Court's recent holding in *Swierkiewicz* that the "short and plain statement" required by Rule 8 "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which its rests.'" *Id.*

Moreover, an onerous "but for" evidentiary standard should not be required in an ATA case. Where plaintiffs claim that a defendant knowingly donated small sums to a known terrorist organization for the purpose of helping that organization attack America, plaintiffs might have a difficult time proving that those specific funds were used in a particular terrorist attack. If liability were denied for this reason, Congress' intent in enacting the Anti-Terrorism Act to cut off funding for terrorism would be frustrated. *See Boim*, 291 F.3d at 1015 ("Congress' goal of cutting off funding for terrorism would be seriously compromised if terrorist organizations could avoid liability by simply pooling together small donations to fund a terrorist act.").

General tort principles make clear than plaintiffs do not have to prove that "but for" the

financial support made by each particular defendant, the terrorist attacks on September 11 would not

have occurred.  Circuit Judge Calabresi articulated the relevant principle, which he derived from

opinions of Chief Judge Cardozo and Chief Justice Traynor:

> [I]f (a) a negligent act was deemed wrongful *because* that act increased the chances that a
> particular type of accident would occur, and (b) a mishap of that very sort did happen, this
> was enough to support a finding by the trier of fact that the negligent behavior caused the
> harm.  Where such a strong causal link exists, it is up to the negligent party to bring in
> evidence denying *but for* cause and suggesting that in the actual case the wrongful conduct
> had not been a substantial factor.

*Zuchowicz*, 140 F.3d at 390-91. (emphasis in original)

Here, the financial support and services Prince Mohammed intentionally provided to al

Qaeda, knowing al Qaeda's avowed purpose to attack the Unites States, "increased the chances" that

an al Qaeda terrorist attack against the United States would occur.  Without financial support the

terrorists would be significantly limited in their capabilities to carry out their attacks.  And because

"a mishap of that very sort did happen" on September 11, plaintiffs' burden of pleading causal link

is satisfied.  *Id.*

> b.     The 4AC Makes A *Prima Facie* Showing of Proximate Cause.

Prince Mohammed wrongly suggests that to plead proximate cause, plaintiffs must allege

that the exact "events of September 11" were a foreseeable consequence of Prince Mohammed's

support of al Qaeda.  Mohammed Br. At 16.  Not so. To establish proximate cause:

> The requirement that the injury must be one that was reasonably to be foreseen does not
> mean that the exact occurrence or the precise injury resulting from the act need be foreseen,
> all that is necessary is that the person charged with [the wrongful act] should have been able
> to foresee that some injury to some person might result from his act.

*Lamarca v. United States*, 31 F. Supp. 2d 110, 127 (E.D.N.Y. 1998).

Indeed, District Judge Hellerstein has already addressed the proximate causation issue in

September 11 tort litigation, and held:  "Virginia law does not require Boeing to have foreseen precisely how the injuries suffered on September 11, 2001 would be caused, as long as Boeing could reasonably have foreseen that 'some injury' from its negligence 'might probably result.'"  *In Re September 11 Litigation*, 280 F. Supp. 2d 279, 309 (S.D.N.Y. 2003); *see also, Stanford*, 89 F. 3d at 127(to establish proximate cause, "[n]either the precise hazard nor the exact consequences [of the wrongful act] need be foreseen"); W. Page Keeton *et al.*, Prosser and Keeton on Torts § 43, p. 299 (5th ed. 1984) (observing the "quite universal agreement that what is required to be foreseeable is only the 'general character' or 'general type' of the event of the harm, and not its 'precise' nature, details, or above all manner of occurrence").

Moreover, the concept of reasonable foreseeability is applied more expansively for intentional torts and reckless torts as compared to negligence.  *See Meyers v. Epstein*, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003) ("responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent or is not at fault") (citing Keeton, Prosser & Keeton on the Law of Torts, at § 8, at 37 n.27 (5th ed. 1984) ("For an intended injury the law is astute to discover even very remote causation.").

Foreseeability is also dependant on the severity and nature of the harm threatened.  *See* Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) § 3 cmt. g (Tent. Draft No. 1, 2001).  For example, even though the likelihood of meltdown at a nuclear reactor is thought to be exceedingly low, the exceptional severity of the consequences has made that risk both foreseeable and subject to stringent safety standards.

Once the concepts of reasonable foreseeability and proximate cause are understood in this light, it becomes clear that the 4AC makes a *prima facie* showing of proximate cause.  In making

-10-

this determination, "go back to the reasons for finding the defendant engaged in tortious conduct."

Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) § 29 cmt. f. (Tent.

Draft No. 2, March 25, 2002).  Knowingly providing financial support to al Qaeda is tortious –

indeed is itself an act of international terrorism under ATA section 2333 – precisely because it

increases the risk that al Qaeda will intentionally kill American civilians in terrorist attacks.  Since

"the harms risked by that tortious conduct include the general sort of harm [death by al Qaeda

terrorist attack] suffered by the plaintiff, the defendant is subject to liability for the plaintiff's harm."

Restatement (Third) of Torts § 29 cmt. f.

### C.   The 4AC Gives Prince Mohammed Notice Of Aiding-And-Abetting Claims.

The 4AC also asserts aiding-and-abetting claims against Prince Mohammed under the Anti-

Terrorism Act, Alien Tort Claims Act,[4] the Torture Victim Protection Act,[5] wrongful death,

survival statutes, and the common law.  The language, structure, and legislative history of the ATA,

ATCA, and TVPA provide for aiding-and-abetting liability.  *Boim*, 291 F.3d at 1021 (aiding and

abetting liability lies under ATA[6]); *Presbyterian Church of Sudan v. Talisman Energy Inc.,* 244 F.

Supp. 2d 289, 321 (S.D.N.Y. 2003) ("ATCA suits [may] proceed based on theories of conspiracy

and aiding and abetting"); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 U.S. Dist. LEXIS 3293 at *

---

[4] The ATCA provides a civil action for aliens injured by torts "committed in violation of the law of nations."   28 U.S.C. §1350.  *Kadic v. Karadzic*, 70 F.3d 232, 239-241 (2d Cir. 1995).

[5] The TVPA imposes civil liability on anyone "who, under actual or apparent authority, or color of law, of any foreign nation . . .  subjects an individual to extrajudicial killing."  28 U.S.C. §1350 (note).

[6] As *Boim* explained, "failing to extend [ATA] section 2333 liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation." *Boim*, 291 F.3d at 1019.

49-51 (S.D.N.Y. 2002) (aiding and abetting liability lies under TVPA). [7]

Under the ATA, Congress intended "to import into section 2333 civil tort law principles as expressed in the Restatement Second of Torts," *Boim*, 291 F.3d at 1017, and Restatement Section 876 imposes aider-and-abettor liability on a defendant who "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself."  Restatement (Second) of Torts § 876(b); *see also, Wiwa*, 2002 U.S. Dist. LEXIS 3293 at *50 (invoking Section 876(b) to impose aider-and-abettor liability under TVPA).

Prince Mohammed does not dispute that the September 11 attacks were acts of international terrorism committed in violation of the law of nations that caused extrajudicial killings.  And the 4AC alleges that by knowingly providing al Qaeda financial support and services, Prince Mohammed provided al Qaeda substantial assistance to launch terrorist attacks against America, including the September 11 attacks.  *See* 4AC *supra*.  That is enough to provide fair notice to Prince Mohammed of the aiding-and-abetting claims against him under the ATA, ATCA, and TVPA.

The same is true under New York's wrongful death and survival statutes, *see* N.Y. Est. Powers & Trusts Law §§ 5-4.1(1), 11-3.2, as well as under common law intentional tort claims of assault, battery, and intentional infliction of emotional distress.  *See Burnett I,* 274 F. Supp. 2d at 108 ("A terrorist attack on civilians is of course intended to cause emotional distress to the victims' families. . . .  Family members here were not physically present at the World Trade Center, or at the Pentagon, or at Shanksville, but the whole world was virtually present, and that is enough.")

---

[7] To satisfy the TVPA's "state action" requirement, District Judge Kimba Wood in *Wiwa* recently explained "[w]here there is a substantial degree of cooperative action between the state and private actors in effecting the deprivation or rights, state action is present."  *Wiwa*, 2002 U.S. Dist. LEXIS 3293 at * 40 (citing *Kadic*, 70 F.3d at 245:  "A private individual acts under color of law . . . when he acts together with state officials or with significant state aid." ).  Here, as the 4AC alleges that Prince Mohammed and al Qaeda willfully acted in concert with defendants Sudan and Taliban to launch terrorist attacks against America, state action is well pleaded.  *See* 4AC ¶¶ 10-12, 18, 23, 46-92, 181-82, 255, 274-276, 308, 580, 610.

To make a *prima facie* showing of causation under aiding-and-abetting claims, plaintiffs need not show a direct causal link between defendants' activities and the September 11 attacks. Instead, plaintiffs need only plead facts that show: (i) the party whom defendant aids must perform a wrongful act that causes an injury; (ii) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (iii) the defendant must knowingly and substantially assist the principal violation. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983). In *Halberstam,* a wrongful death case, the court held that defendant could be liable for aiding and abetting her co-defendant Welch in the murder of plaintiff's husband during a burglary even though defendant was not present at the burglary. The court found that defendant was liable for aiding and abetting the murder/burglary because she knew that Welch was involved in some type of crime in which violence and killing was a foreseeable risk, and assisted him in disposing of large quantities of stolen goods. Defendant provided general assistance to Welch which facilitated his criminal activities, and while she did not provide specific assistance in the crime for which she was held liable, she was found to have aided and abetted Welch in committing it. *Id.*

Thus, under the framework set forth in *Halberstam*, plaintiffs need only show that Prince Mohammed knew that he was supporting al Qaeda, a known terrorist organization, that he desired to assist the illegal activities of al Qaeda, and that he took some action to assist these illegal activities. Plaintiffs need not show that Prince Mohammed knew that al Qaeda was going to commit the horrific acts of September 11, only that Prince Mohammed knew that he was assisting terrorists in committing terrorist activities aimed at the United States. Death and destruction in the United States was the well-publicized aim of al Qaeda and its terrorist network. By providing financial support and services to al Qaeda, Prince Mohammed knew that acts of violence against United States

-13-

citizens were a foreseeable consequence of his support.

**D.     The 4AC Gives Prince Mohammed Notice Of Conspiracy Claims.**

The 4AC also makes a *prima facie* showing of conspiracy between Prince Mohammed and al Qaeda to injure the United States through terrorist attacks (with Prince Mohammed as one of the terrorist financiers and al Qaeda as terrorist footsoldiers).  Under New York law, a *prima facie* showing of conspiracy entails allegation of the primary tort[8] and the following four elements:

1.     A corrupt agreement between two or more parties;

2.     An overt act in furtherance of the agreement;

3.     The parties' intentional participation in the furtherance of a plan or purpose, and;

4.     The resulting damage or injury.

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991) (*citing Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986)).

Pleading each of those elements, the 4AC alleges:

1.     That Prince Mohammed and al Qaeda agreed to injure the United States through acts of international terrorism;[9]  4AC ¶¶ 5, 23, 51, 105-08, 120, 130-36, 152-55, 188, 255, 274-76, 580;

2.     That the September 11 attacks were acts done in furtherance of that common scheme; 4AC ¶¶ 23, 188, 610;

3.     That since 1991 Prince Mohammed actively participated in that conspiracy by

---

[8] Prince Mohammed does not dispute that his co-conspirator al Qaeda violated, *inter alia*, Anti-Terrorism Act § 2333 in the September 11 attacks.

[9]  In *Burnett I*, Judge Robertson found that "plaintiffs' allegations about Al-Haramain's financing of al Qaeda support an inference that there was an agreement concerning the commission of terrorist acts."  274 F. Supp. 2d at 105  (upholding ATA conspiracy claims).  Likewise, 4AC's allegations that (since 1991) Prince Mohammed knowingly provided al Qaeda financial support and services to attack America imply agreement between Prince Mohammed and al Qaeda to injure America through terrorist attacks.  *See also, Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (to establish civil conspiracy, "[p]roof of tacit, as opposed to explicit, understanding is sufficient to show agreement.  A court may infer agreement.").

knowingly providing al Qaeda funding, financing, financial services and support, banking accounts

and facilities, through Faisal Islamic Bank and Al Shamal Islamic Bank, which Prince Mohammed

owned, managed, controlled or directed; 4AC ¶¶ 48-54, 63-66, 255, 274-276, 387, 580, 582; and

        4.      That the September 11 attacks caused plaintiffs' decedents' deaths. 4AC ¶¶ 23, 610.

Hence, the 4AC makes a *prima facie* showing of conspiracy between Prince Mohammed and

al Qaeda to injure the United States through terrorist attacks, which gives Prince Mohammed fair

notice of conspiracy claims against him under the ATA, the ATCA, the TVPA, wrongful

death/survival statutes, and the common law. *See Burnett I*, 274 F. Supp. 2d at 105, 107 (civil

conspiracy lies under ATA); *Presbyterian Church of Sudan,* 244 F. Supp. 2d at 321 (civil conspiracy

lies under ATCA); *Wiwa,* 2002 U.S. Dist. LEXIS 3293 at * 50 (civil conspiracy lies under TVPA).

 Also, a co-conspirator's responsibility for the September 11 attacks is clear once plaintiffs

have shown that the attacks were carried out in furtherance of the conspiracy to injure America:  "A

conspirator may be liable for an injury even if he or she did not plan or know about the particular

overt act that caused the injury, 'so long as the purpose of the act was to advance the overall object

of the conspiracy.'"  *Burnett I*, 274 F. Supp. 2d at 105 (quoting *Halberstam*, 705 F.2d at 487).

Moreover, under Second Circuit precedent, once a *prima facie* case of conspiracy is shown,

then "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a

conspiracy is presumed to continue until the last overt act by any of the conspirators."  *United States

v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1976).  And the burden of demonstrating withdrawal lies

on the defendant.  *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000).[10]  Hence, as the 4AC

---

[10]  To withdraw from a conspiracy, a defendant must show: (1) "affirmative acts inconsistent with the object of the conspiracy," that are (2) "communicated in a manner reasonably calculated to reach co-conspirators.*" United States v. United States Gypsum Co.*, 438 U.S. 422, 464-65 (1978).  Mere cessation of activity is not enough.  *United States v. Greenfield*, 44 F.3d 1141, 1149 (2d Cir. 1995).

makes a *prima facie* showing of conspiracy between Prince Mohammed and al Qaeda to injure the

United States through terrorist attacks, and since Prince Mohammed puts forth no evidence whatever

that Prince Mohammed withdrew from that conspiracy, his participation in that conspiracy is

*presumed* to continue through the September 11 attacks done in furtherance thereof.

**IV.     This Court Has Personal Jurisdiction Over Prince Mohammed.**

> **A.     Legal Standards**

To defeat a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction made

before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings and

affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.

1986).  In evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all

pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs'

favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997).  In addition, the Court "must

read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension

Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993).[11]

> **B.     This Court Has Personal Jurisdiction Over Prince Mohammed Because He
> Knowingly & Intentionally Provided Financial Support For Al Qaeda Attacks
> Targeting America.**

Prince Mohammed's only Rule 12(b)(2) argument is that "there is no constitutional basis for

this Court to assert personal jurisdiction over Prince Mohammed" because plaintiffs have not

---

[11]  Plaintiffs hereby incorporate Plaintiffs' Memorandum of Law in Support of Their *Prima Facie* Showing of
Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction, which provides an
excellent overview of the jurisdictional links among terrorist organizations and their sponsors.

pleaded that Prince Mohammed "has had any contacts whatever with the United States."[12]
Mohammed Br. at 6.  We beg to differ.

In "ascertaining whether a defendant meets the 'minimum contacts' test, the single most
important consideration is whether a defendant's 'conduct and connection with the forum State are
such that he should reasonably anticipate being haled into court there.'" *Pugh v. Socialist People's
Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54, 59 (D.D.C. Oct. 27, 2003) (quoting *World-Wide
Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Here, because Prince Mohammed
knowingly and intentionally provided al Qaeda financial support for attacks targeting America,
including the September 11 attacks, *see* 4AC *supra*, Prince Mohammed should have reasonably
anticipated being haled into Court in America.  And because Prince Mohammed should have
anticipated as much, the exercise of personal jurisdiction over Prince Mohammed would "not offend
'traditional notions of fair play and substantial justice.'" *World-Wide Volkswagen Corp.*, 444 U.S. at
292 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

In his recent *Pugh* decision, District Judge Thomas Penfield Jackson upheld personal
jurisdiction over individual Libyan defendants in their personal capacities who conspired to bomb a
French aircraft over Niger *en route* from Congo to Paris, killing 170 passengers, including seven
Americans.  *Pugh*, 290 F. Supp. 2d at 56, 58-60.  *Pugh* reasoned:

> [T]he individual defendants . . . conspired to sabotage and succeeded in destroying a civilian
> commercial aircraft filled to capacity with innocent and unsuspecting passengers while in
> flight.  As the plane they chose to destroy was on an international flight and expected to stop
> in several nations before reaching its final destination, the individual defendants could and
> should have reasonably postulated that passengers of many nationalities would be on board,

---

[12]   Prince Mohammed does not contest that the relevant forum for due process analysis in this ATA case is the
United States as a whole.  *See Burnett I,* 274 F. Supp. 2d at 95-96 (personal jurisdiction proper in ATA case where
defendants have minimum contacts with United States as a whole)

> from which they could also expect they might be haled into the courts of those nations whose citizens would die.  Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether foreseeable that *some* Americans would be aboard the plane, whose lives would be lost, *and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions. . . .*

*Id.* at 59 (emphasis added).  Congress has passed many United States statutes over the past twenty years that impose sanctions on those who commit acts of international terrorism; therefore, the "interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years."  *Id.*  Hence, Judge Jackson concluded that Due Process is not offended by the exercise of personal jurisdiction in a civil action over foreign defendants who conspire to commit acts of international terrorism that risk injuring Americans:

> Thus, in light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity.  And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any 'traditional notions of fair play and substantial justice.'

*Id.* at 59-60.  And since our Constitution allows the exercise of personal jurisdiction over foreign defendants who "should have anticipated the possibility of being haled into court in the United States" for conspiring to bomb a French plane flying from Congo to Paris "at the risk of killing Americans," *id.,* our Constitution likewise allows this Court to exercise personal jurisdiction over Prince Mohammed who knowingly financed al Qaeda attacks specifically targeting and killing thousands of American civilians on American soil.

Likewise, in *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998), *aff'd in part,* 162 F.3d 748 (2d Cir. 1998), District Judge Thomas C. Platt exercised personal jurisdiction over Libyan defendants based on their "intentional, tortious acts that were expressly

-18-

aimed at the United States" by supporting terrorists who killed U.S. citizens by bombing a United

States flag aircraft over Lockerbie, Scotland.  *Id.,* 995 F. Supp. at 330 (citing *Calder v. Jones*, 465

U.S. 783, 789 (1984)).  Reasoning that because the "effects" of the defendants' extraterritorial

conduct upon the United States "are sufficient to provide fair warning such that the foreign

[defendants] may be subject to the jurisdiction of the courts of the United States," *id.* at 330 (citing

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)), the assertion of personal jurisdiction

over non-resident defendants who support and enable terrorist attacks against the United States is

Due Process:

> Any foreign [defendant] would know that the United States has substantial interests in
> protecting its flag carriers and its nationals from terrorist activities and should reasonably
> expect that if these interests were harmed, it would be subject to a variety of potential
> responses, *including civil actions in United States courts*.

*Rein*, 995 F. Supp. at 330 (emphasis added).

   *Rein* and *Pugh* find clear support in *Calder v. Jones*, where the Supreme Court held that Due

Process extends personal jurisdiction over non-resident defendants who knowingly engage in

conduct "calculated to cause injury" in the forum.  *Calder*, 465 U.S. 783, 791 (1984).  In *Calder*, the

plaintiff, a famous entertainer, brought suit in her home state of California, pleading that she

suffered intentional infliction of emotional distress and invasion of privacy because of a defamatory

article written by defendants in Florida.  *Id.* at 785.  Dispensing with argument that the Constitution

does not permit jurisdiction over these non-resident defendants, the Court ruled:

> [Defendants] are not charged with mere untargeted negligence.  Rather, their intentional, and
> allegedly tortious, actions were expressly aimed at California.  [Defendant] South wrote and
> [defendant] Calder edited an article that they *knew would have a potentially devastating
> impact* upon [plaintiff.]  And they *knew that the brunt of that injury would be felt by
> respondent in the State in which she lives and works*. . . .  Under these circumstances,
> [defendants] must 'reasonably anticipate being haled into court there' to answer. . . .  An
> individual injured in California need not go to Florida to seek redress from persons who,

-19-

though remaining in Florida, knowingly cause the injury in California.

*Id.* at 789-90 (emphasis added).

Applying *Calder, Rein* and *Pugh* to the case at bar, when Prince Mohammed knowingly

provided financial support and services for al Qaeda attacks targeting America, including the 1998

bombings of U.S. Embassies in Kenya and Tanzania and the September 11 attacks, *see* 4AC *supra*,

Prince Mohammed knew that those attacks would have a devastating impact on America.

Accordingly, Prince Mohammed "should [have] reasonably anticipate[d] being haled into court

there." *World Wide Volkswagen Corp.*, 444 U.S. at 297.

**C.     This Court Has Personal Jurisdiction Over Prince Mohammed Because Prince
         Mohammed Knew & Intended That The Acts Of His Al Qaeda Co-Conspirators
         Would Impact The United States.**

The Second Circuit recognizes conspiracy-based personal jurisdiction: "Many courts in this

Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory."

*All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (asserting

personal jurisdiction over Australian defendants via conspiracy theory by imputing forum acts of co-

conspirators done in furtherance of conspiracy) (citing *Chrysler Capital Corp.*, 778 F. Supp. at

1266-70 (asserting personal jurisdiction over non-resident defendant via conspiracy theory)).  To

assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the

state to the out-of-state conspirator." *All State Life Ins. Co.*, 782 F. Supp. at 221 n.6.  And by

imputing forum acts of their co-conspirators to non-resident defendants, this Court has repeatedly

found that such non-resident defendants have minimum contacts with the forum to satisfy Due

Process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in

allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the

suit, supplies the necessary minimum contacts [under] *International Shoe*, 326, U.S. 310, 316

(1945)."); *Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899 at * 17 (S.D.N.Y. 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfying Due Process).

Consonant with the logic of *Calder, Pugh,* and *Rein, supra*, the Second Circuit conspiracy jurisdiction cases of *Dixon* and *Andre Emmerich Gallery* explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court there." *Dixon,* 507 F. Supp. at 352; *Andre Emmerich*, 1997 U.S. Dist. 16899 at * 17 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)); *see also, Chrysler Capital Corp.*, 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Hence, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their co-conspirators satisfies Due Process.

Not disputing that the forum acts of a co-conspirator may be imputed to a foreign defendant to establish his minimum contacts, Prince Mohammed argues that the plaintiffs have not well pleaded conspiracy. Mohammed Br. at 10. We disagree. As explained above, the 4AC makes a *prima facie* showing of conspiracy between Prince Mohammed and al Qaeda to injure America.[13] Hence, by imputing the September 11 forum contacts of his al Qaeda co-conspirators to Prince Mohammed, this Court may assert personal jurisdiction over Prince Mohammed in accordance with Due Process.

---

[13] *See* pages 14-16, *supra* ("The 4AC gives Prince Mohammed Notice of Conspiracy Claims.")

**D.     This Court Has General Personal Jurisdiction Over Prince Mohammed Because Of His Continuous & Systematic Activities In The United States.**

Prince Mohammed, a graduate of Swarthmore College near Philadelphia and the Menlo Business School near San Francisco, reaped the benefits and protection of United States law through his long-standing, continuous activities in the United States, including:

*Manhattan Apartment*.  In April 1978, the *New York Times* interviewed Prince Mohammed about his idea of towing a 100 million ton iceberg to Saudi Arabia.  Prince Mohammed "was interviewed . . in his lovely appointed six-room apartment overlooking Central Park."[14]

*Soliciting U.S. capital*.  In 1974, when interviewed by the *Wall Street Journal*, Prince Mohammed stated that he sent "written invitations to several American firms" to attract U.S. investment in Saudi Arabia's water desalinization projects.[15]

*Presence in United States to Promote Islamic Banking*.  On October 1, 1999, Prince Mohammed delivered the opening address at the Harvard University Forum on Islamic Finance in Cambridge, Massachusetts:

> Al Saud briefly covered the history of Islamic finance, from its inception to the present day, and drew parallels between the motives, modes, and benefits of conventional and Islamic finance.  He also highlighted the benefits that Islamic finance is likely to bring when practiced in western nations.[16]

*Prince Mohammed and DMI invest in U.S. market*.  In May 2001, Prince Mohammed and DMI purchased and held a 35% share in Boston Capital, a Massachusetts-based real estate financing

---

[14] Youssef Ibrahim, "Saudi Will Deliver Icebergs – at a Price," *New York Times*, April 15, 1978.

[15] Neil Ulman, "A Cold Shoulder: Officials in Mideast Claim Americans Shun Business Opportunities," *Wall Street Journal*, June 25, 1974.

[16] 'Third Harvard University Forum on Islamic Finance,' Harvard University, Cambridge, MA (October 1, 1999)

firm with "holdings in 48 states and the U.S. Virgin Islands."[17]

Moreover, as of October 2001, Prince Mohammed and DMI had invested at least $200 Million in an equity fund launched and managed by Washington, D.C.-based Emerging Markets Partnership, a private equity firm.[18]

Moreover, Prince Mohammed uses DMI's subsidiary Crescent International ("Crescent") to bolster his and DMI's financial interests in U.S. markets.  As put by the 1999 SEC filing by Franklin Telecommunications ("Franklin") when Crescent acquired shares of Franklin's stock, "DMI may be deemed a beneficial owner of the shares of Common Stock of Franklin beneficially owned by Crescent by reason of the ownership by DMI of 100 percent of the capital stock of Crescent."[19] Identical language appears in the 2000 SEC filing by American Access Technologies ("AATK") when Crescent acquired shares of AATK's stock.[20]  Prince Mohammed is listed as a controlling board member of DMI on the SEC filings for Franklin and AATK.

Moreover, in 1998 Crescent and DMI filed a joint Acquisition Statement with the SEC for the purchase of 147,984 shares of  InfoCure common stock at $2,500,000; Prince Mohammed's name and signature appear on the InfoCure filing as authorizing the stock purchases for DMI.[21]

*Prince Mohammed and Faisal Finance invest in U.S. market*.   Prince Mohammed uses DMI's subsidiary Faisal Finance to bolster his and DMI's financial interests in U.S. markets, e.g.,

---

[17] Boston Capital website: http://www.bostoncapital.com/aboutIndex.html.

[18] Otis Bilodeau, "Private Equity True Believers," *The Daily Deal*, October 23, 2001; *see also* Emerging Market Partnership website: http://www.empwdc.com/EMPIDBFund.htm.

[19] SEC filing SC 13D, "General statement of acquisition of beneficial ownership," September 24, 1999.

[20] SEC filing SC 13G, "Statement of acquisition of beneficial ownership by individuals," May 12, 2000.

[21] SEC filing SC 13D, "General statement of acquisition of beneficial ownership," December 22, 1998.

Faisal Finance owned shares in many United States companies, including:  Sun Microsystems (43,706 as of 1998); Medcross Inc. (100,000 as of 1997); Spectrum Holobyte Inc. (72,727 as of 1997); Celgene Corp. (3,479 as of 1997); Holmes Protection (2,490,918 as of 1992).

These continuous activities "resulted in a large volume of interstate business, in the course of which [Prince Mohammed] received the benefits and protections of the laws of the [United States], including the right to resort to the courts for the enforcement of its rights." *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945).  Accordingly, "[i]t is evident that these operations establish sufficient contacts or ties with the [United States] forum to make it reasonable . . . to justify suit against [Prince Mohammed] on causes of action arising from dealings entirely distinct from those activities." *Id.* at 318, 320.  Hence, general jurisdiction lies.[22]

### E.    Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery.

At minimum, this Court should exercise its broad discretion to permit plaintiffs to conduct jurisdictional discovery.  Especially where, as here, pertinent jurisdictional facts lie only within the control and knowledge of defendants contesting jurisdiction, it would be fundamentally unfair for this Court to deny plaintiffs the opportunity to conduct discovery of facts demonstrating jurisdiction. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("Under Rule 12(b) . . . in resolving claims that they lack jurisdiction, courts . . . have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party").

---

[22]    *See Laufer v. Ostrow,* 55 N.Y.2d 305, 310 (1982) (citing *International Shoe Co.,* 326 U.S. at 316) (asserting general jurisdiction over non-resident defendant where "the aggregate of the corporation's activities in the State [are] such that it may be said to be 'present' in the State 'not occasionally or casually, but with a fair measure of permanence and continuity' and . . . the quality and nature of the corporation's contacts with the State [are] sufficient to make it reasonable and just according to 'traditional notions of fair play and substantial justice' that it be required to defend the action here); *Abkco Industries, Inc. v. Lennon*, 384 N.Y.S.2d 781, 783-84 (1st Dep't 1976) (applying general jurisdiction test to individuals as well as corporations); 2 Weinstein, Korn & Miller, New York Civil Practice ¶ 301.15, at 3-30 (2003) ("there is an abundance of well-reasoned authority that has imposed general jurisdiction in New York on noncorporate defendants") (citing cases).

Discovery will expose links between Prince Mohammed and terrorists targeting America:

• Through 2002, Prince Mohammed knowingly provided al Qaeda financial services in Al Shamal Islamic Bank, long *after* Osama Bin Laden's assets were officially frozen by Saudi Arabia in 1994.[23]  On September 26, 2001, Senator Carl Levin stated that Al Shamal Islamic Bank continues to offer financial support and services to al Qaeda and that Osama Bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities.[24]

• Prince Mohammed knowingly provided financial services to U.S.-designated terrorists Wa'el Julaidan and Yassin Kadi, who have engaged in or supported al Qaeda terrorist attacks on America.[25]  In 2003, Swiss authorities froze accounts belonging to Julaidan and Kadi in DMI subsidiary Faisal Finance, managed and controlled by Prince Mohammed.[26]

• The Al Shamal Islamic Bank account that Prince Mohammed knowingly provided to al Qaeda operative Jamal Ahmed Al Fadl was used by Al Fadl to transfer $250,000 via the Bank of New York for the purchase of stinger missiles and an airplane for Osama Bin Laden.[27]

## V.    Conclusion

For the foregoing reasons, this Court should deny Prince Mohammed's motion to dismiss.

---

[23] *See* Al Shamal Islamic Bank Statements at http://www.shamalbank.com/Statment.htm.

[24] Statement of Senator Carl Levin, Hearing on National Money Laundering Strategy for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (September 26, 2001)

[25]   4AC ¶¶ 304, 312, 329, 341, 484.

[26] Le Temps, "A Geneve, un membre fondateur d'Al-Quida en ligne de mire" (article by Sylvain Besson, Dec. 4, 2003) (discussing seizure of Julaidan's accounts in Faisal Finance); *One 1997 E35 Ford Van*, 50 F. Supp. 2d at 798-805 (detailing Kadi's bank transactions through Faisal Finance in support of international terrorist activities).

[27] Testimony of Essam Al Riddi*, U.S.A. v. Osama Bin Laden* (February 14, 2001).

Dated: May 13, 2004
    New York, New York

        KREINDLER & KREINDLER LLP
        Plaintiffs Liaison Counsel

By:       /s/
        James P. Kreindler (JK7084)
        Marc S. Moller (MM0143)
        Justin T. Green (JG0318)
        Andrew J. Maloney, III (AM8684)
        Vincent I. Parrett (VP5092)
        100 Park Avenue
        New York, NY  10017-5590
        Phone: (212) 687-8181
        Fax:  (212) 972-9432

        Barasch McGarry Salzman Penson & Lim
        11 Park Place
        New York, NY 10007
        Phone:  (212) 385-8000
        Fax:  (212) 385-7845

        Baumeister & Samuels, P.C.
        One Exchange Plaza
        New York, NY 10006
        Phone:  (212) 363-1200
        Fax:  (212) 363-1346

        Speiser, Krause, Nolan & Granito
        Two Grand Central Tower
        140 East 45th Street (34th Floor)
        New York, NY 10017
        Phone:  (212) 661-0011
        Fax:  (212) 953-6483

        Law Firm of Aaron J. Broder
          & Jonathan C. Reiter
        350 Fifth Avenue, Suite 2811
        New York, NY 10118
        Phone:  (212) 244-2000

        Jaroslawicz & Jaros, Esqs.
        150 William Street
        New York, NY 10038
        Phone:  (212) 227-2780