**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re Terrorist Attacks on September 11, 2001                **03 MDL 1570 (RCC)**
                                                             **ECF Case**


------------------------------------------------------------x

**KATHLEEN ASHTON**, *et al.*,
                                                             **02 CV 6977 (RCC)**
                         **Plaintiffs,**                      **ECF Case**
        **v.**

**AL QAEDA ISLAMIC ARMY**, *et al.*,

                         **Defendants.**

------------------------------------------------------------x



**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INTERNATIONAL**
**ISLAMIC RELIEF ORGANIZATION'S MOTION TO DISMISS**


                                    KREINDLER & KREINDLER LLP
                                    James P. Kreindler (JK7084)
                                    Marc S. Moller (MM0143)
                                    Justin T. Green (JG0318)
                                    Andrew J. Maloney, III (AM8684)
                                    Vincent I. Parrett (VP5092)
                                    100 Park Avenue
                                    New York, New York 10017-5590
                                    Tel:  (212) 687-8181
                                    Fax: (212) 972-9432

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Allegations Against IIRO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        A.    IIRO Provided Financial & Logistical Support To
              Al Qaeda To Attack America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        B.    IIRO's Presence In The United States . . . . . . . . . . . . . . . . . . . . . . 2
        C.    IIRO's Connections With Other Al Qaeda "Charity" Fronts . . . . . . . . . . . . . . 3

III.    Plaintiffs' Claims Against IIRO Are Well Pleaded . . . . . . . . . . . . . . . . . . . . . . . . . 4
        A.    Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B.    The 4AC Gives IIRO Notice Of Anti-Terrorism Act Claims . . . . . . . . . . . . . . 4

              1.    The 4AC Makes A *Prima Facie* Showing Of Cause
                    Under General Tort Principles . . . . . . . . . . . . . . . . . . . . . . . . . 7

                    a.    The 4AC Makes The Required Showing Of
                          Causal Link In This ATA Case . . . . . . . . . . . . . . . . . . . . . 8
                    b.    The 4AC Makes A *Prima Facie* Showing
                          Of Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    The 4AC Gives IIRO Notice Of Aiding-And-Abetting Claims . . . . . . . . . . . . 11
        D.    The 4AC Gives IIRO Notice Of Conspiracy Claims . . . . . . . . . . . . . . . . . . 14

        IV.   This Court Has Personal Jurisdiction Over IIRO . . . . . . . . . . . . . . . . . . . . 16

              A.    Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              B.    This Court Has Personal Jurisdiction Over IIRO Because
                    IIRO Knowingly & Intentionally Financed Al Qaeda
                    Attacks Targeting America . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              C.    IIRO Has Minimum Contacts With The United States
                    Because IIRO Maintained A Branch Office In Virginia
                    Through 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

              D.    This Court Has Personal Jurisdiction Over IIRO Because
                    IIRO Knew & Intended That The Acts Of Its Al Qaeda
                    Co-Conspirators Would Impact The United States . . . . . . . . . . . . . . . 22

              E.    Plaintiffs Should Be Allowed To Conduct
                    Jurisdictional Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## TABLE OF AUTHORITIES

### CASES

*All State Life Insurance Co. v. Linter Group Ltd.*, 782 F. Supp. 215
(S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899
(S.D.N.Y. Oct. 29, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Boim v. Quranic Literary Institute*, 291 F.3d 1000
(7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 9, 11, 12, 13

*Branum v. Clark*, 927 F.2d 698 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . 19

*Burnett v. Al Baraka*, 274 F. Supp. 2d 86
(D.D.C. 2003) ("*Burnett I*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 12, 15, 17, 20

*Calder v. Jones*, 465 U.S. 783 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260
(S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22, 23

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) . . . . . . . . . . . . . . . . 16

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802
(S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Dixon v. Mack*, 507 F. Supp. 345 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . 13, 15

*In Re September 11 Litigation*, 280 F. Supp. 2d 279
(S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

International Marketing, Ltd. v. Archer-Daniels-Midland Co.,
192 F.3d 724 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*International Shoe Co. v. Washington*, 326 U.S. 310, 316 ( 1945) . . . . . . . . . . . . . 17, 23

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993) . . . . . . . . . . . . 17

*Jackson National Life Insurance Com. v. Merril Lynch & Co.*,
32 F.3d 697 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Kamen v. American Telegraph & Telegraph Co.*,
791 F.2d 1006 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kashi v. Gratsos*, 790 F.2d 1050 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Klein v. National R.R. Passenger Corp.*, 1988 U.S. Dist. LEXIS 11696
(S.D.N.Y. Oct. 7, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lamarca v. United States*, 31 F. Supp. 2d 110 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . 10

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Meyers v. Epstein*, 282 F. Supp. 2d 151 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . 10

*PDK Laboratories v. Friedlander*, 103 F.3d 1105
(2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Presbyterian Church of Sudan v. Talisman Energy Inc.*,
244 F. Supp. 2d 289 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

*Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54
(D.D.C. Oct. 27, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 20, 23

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F. Supp. 325 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 23

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217
(S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996) . . . . . . . . . . . . . . . . 7, 10

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*United States v. Berger*, 224 F.3d 107 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Greenfield*, 44 F.3d 1141(2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . 16

*United States v. United States Gypsum Co.*, 438 U.S. 422
(1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 U.S. Dist. LEXIS 3293
(S.D.N.Y. Feb. 28, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) . . . . . . . 17, 20, 23

*Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 6, 9

## STATUTES

Alien Tort Claims Act, 28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

Anti-Terrorism Act, 18 U.S.C. § 2331 et seq . . . . . . . . . . . 1, 4, 5, 7, 8, 11, 12, 13, 15, 17

N.Y. Est. Powers & Trusts Law §§ 5-4.1(1), 11-3.2 . . . . . . . . . . . . . . . . . . . . . . . . . 12

Torture Victim Protection Act, 28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

## RESTATEMENT

Restatement (Third) of Torts § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Restatement (Third) of Torts § 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Restatement (Third) of Torts § 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restatement (Second) of Torts § 876                                                    12

## MISCELLANEOUS

Prosser and Keeton on Torts § 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

William L. Prosser, Transferred Intent, 45 Tex. L. Rev. 650, 662 (1967) . . . . . . . . . . . 8

## I.     Introduction

Under the Anti-Terrorism Act[1] central to the United States war on terrorism, whoever knowingly provides financial or logistical support to terrorist organizations has himself committed an act of international terrorism, as well as having aided and abetted the terrorists who ultimately detonate bombs or fly aircraft into major American landmarks.  None of the terror "charities" such as International Islamic Relief Organization ("IIRO") that knowingly and intentionally provided financial support to al Qaeda to attack the United States can escape that they themselves have committed acts of international terrorism subject to civil liability in United States Courts.

## II.     Allegations Against IIRO

### A.     IIRO Provided Financial & Logistical Support To Al Qaeda To Attack America.

The *Ashton* Plaintiffs' Fourth Amended Complaint ("4AC") alleges that IIRO is an al Qaeda "charity" front that knowingly and intentionally provided al Qaeda funds and recruits for terrorist attacks against America, including the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks.  4AC ¶¶ 23, 310, 316, 318, 322, 437, 556, 610.

The 4AC alleges that IIRO knowingly and intentionally provided al Qaeda Sixty Million Dollars ($60,000,000) to fund al Qaeda terrorist training camps in Afghanistan, where several of the September 11 hijackers were trained and indoctrinated in *jihad* against America.  *Id.* ¶¶ 229, 322, 556.  These IIRO-financed camps fueled radical extremist ideology and fostered inner resolve among recruits to launch suicide attacks to kill United States civilians, as on September

---

[1] 18 U.S.C. § 2331 *et seq.* ("ATA"); section 2333 provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism. . ."  18 U.S.C. §2333.

11.  *Id.*

The 4AC alleges that less than thirty percent (30%) of IIRO funds go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaeda.  *Id.* ¶¶ 310, 316.  Not only did IIRO finance al Qaeda, IIRO actively recruited and provided new personnel for al Qaeda to carry out terrorist attacks against the United States, and IIRO bankrolled sanctuaries for al Qaeda operatives around the world.  *Id.* ¶¶ 310, 315, 322, 574.  Indeed, one of the September 11 hijackers declared that he worked for IIRO's Fazeh Ahed. *Id.* ¶ 322.

Throughout the 1990s, IIRO in Southeast Asia, headed by Osama's Bin Laden's brother-in-law Mohamad Jamal Khalifa, became a center of al Qaeda financing activity – collecting, laundering, and providing funds for al Qaeda operations against the United States, including al Qaeda's 1993 World Trade Center bombing and the 1995 plot to blow up twelve American airlines.  *Id.* ¶¶ 310, 316, 437.

After the 1998 U.S. Embassy bombing in Kenya, the Kenyan Government de-registered IIRO in Kenya.   *Id.* ¶ 318.  After the September 11 attacks, Pakistan deported scores of IIRO workers who were "aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaeda."  *Id.* ¶ 322.  These official Government actions confirm the open and notorious fact reported by the Arab publication *Rose Al-Yusuf* that "IIRO is firmly entrenched with Osama Bin Laden's al Qaeda organization." *Id.* ¶ 315.

### B. IIRO's Presence In The United States.

In the United States, IIRO financed al Qaeda terrorist attacks against America from IIRO's office in Virginia before, on, and after September 11, 2001.  *Id.* ¶¶ 311, 313, 322, 326.  IIRO calls its Virginia office International Relief Organization ("IRO").  *Id.* ¶ 311.  IRO and IIRO are the *same* entity.  *Id.* ("In the United States, IIRO operates under the name IRO").

Defendant Mohammed Omeish is President of IIRO's Virginia office, which sends money back and forth between the Virginia Office and IIRO in Saudi Arabia.  *Id.* ¶¶ 311, 313.   IIRO's Virginia office also sends money to related terrorist organizations targeting the United States.  *Id.* After the September 11 attacks financed by IIRO and others, the FBI raided IIRO's Virginia office seeking evidence documenting its support of  al Qaeda.  *Id.* ¶ 322.

IIRO also established the endowment fund Sanabil al-Khair to provide stable financing for the activities of IIRO in both Saudi Arabia *and* in America.  *Id.* ¶ 323.  The corporate records of Sanabil al-Khair, which incorporated in the United States under two separate names, Sana-Bell, Inc. and Sanabel al-Kheer, Inc., reveal the same address as IIRO's office in Hernon, Virginia.  *Id.* Additional contacts of IIRO with the United States are discussed in the argument below on personal jurisdiction.

### C.      IIRO's Connections With Other Al Qaeda "Charity" Fronts

IIRO works with numerous other al Qaeda affiliated charities. *Id.* ¶ 320.  IIRO shares the same address in the United Kingdom as International Development Foundation, a charity affiliated with defendant Khaled bin Mahfouz, a senior al Qaeda financier.  *Id.*  The U.S.-based Success Foundation, IIRO's sister company, is also funded by Khaled bin Mahfouz.  *Id.*  Success Foundation sends money back and forth from the United States to IIRO; the Success Foundation also sends money to terrorist organizations targeting the United States.  *Id.* ¶ 311.

IIRO also provides financial support to the Saudi Joint Relief Committee, an al Qaeda charity in Bosnia and elsewhere. *Id.* ¶ 320.   IIRO, through Osama's Bin Laden's brother-in-law Mohamad Jamal Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaeda charity front.  *Id.*  IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with al Qaeda, including:  Global

Relief Foundation, Taibah International, Islamic African Relief Agency, and the World Assembly of Muslim Youth. *Id.*

**III.   Plaintiffs' Claims Against IIRO Are Well Pleaded.**

IIRO's motion to dismiss under Fed.R.Civ.P. 12(b)(6), based on its feigned inability to understand from the 4AC "what plaintiffs' claims are against it," must be denied.  IIRO. Br. At 19.

**A.   Legal Standards**

A Rule 12(b)(6) motion to dismiss must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the 4AC, but "merely to assess the legal feasibility" of the 4AC.  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether plaintiffs could ultimately prevail, the Court must take the facts alleged in the 4AC as true and draw all reasonable inferences in favor of plaintiffs. *Jackson Nat'l Life Ins. Com. v. Merril Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir. 1994).

Rule 12(b)(6) is read with Rule 8(a)(2), which only requires the 4AC to give a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2). That "short and plain statement" required by Rule 8(a) "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,'" *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley*, 355 U.S. at 47); *see also*, *International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 733 (7th Cir. 1999) ("The only function the pleadings must serve is to give notice of the claim; the development of legal theories and the correlation of facts to theory come later in the process.")

### B.      The 4AC Gives IIRO Notice Of Anti-Terrorism Act Claims.

Under the ATA, "Congress considered the provision of material support to terrorists an act of international terrorism," expressly defining "material support" as "currency or . . . financial services" -- i.e., in terms of the "the type of aid provided rather than whether it is substantial or considerable." *Boim v. Quranic Literary Inst.*, 291 F.3d 1000, 1015-16 (7th Cir. 2002). To achieve "Congress' goal of cutting off funding for terrorism," anyone who commits the act of international terrorism of knowingly financial and logistical support to terrorist organizations is subject to direct civil liability under ATA section 2333. *Id.* [2]

As set forth above, the 4AC alleges that IIRO itself committed acts of international terrorism by knowingly and intentionally providing currency, financial services, money laundering services, recruits, personnel, training, and facilities to al Qaeda to launch terrorist attacks against the United States, including the September 11 attacks that caused plaintiffs' injuries. 4AC ¶¶ 23, 46, 188, 229, 266, 269-70, 296, 310-20, 322-23, 332, 468, 523, 525, 527, 556-557, 560, 569, 570, 574, 610. That provides fair notice to IIRO of the direct ATA section 2333 claim against it.[3]

---

[2] The Seventh Circuit explained that ATA sections 2339B ["knowingly provid[ing] material support or resources to foreign terrorist organizations"] and 2339A [defining 'material support or resources' as "currency or . . . safehouses, . . . facilities, weapons . . . personnel"] "elucidate" and "amplify what Congress meant by 'international terrorism'" subject to civil liability under ATA section 2333. *Boim*, 291 F.3d at 1016. Accordingly, *Boim* held:

> [T]he Congressional record for section 2333 indicates an intention to cut off the flow of money in support of terrorism generally. S. Rep. 102-342 at 22 (1992). . . . If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under section 2333 . . . . Sections 2339A and 2339B provide criminal liability for the provision of material support, and section 2333 provides civil liability. The Boims may thus show that [defendants] committed an act of international terrorism subject to civil liability under section 2333 by proving that [defendants] provided material support to terrorist organizations.

*Boim*, 291 F.3d at 1014-16.

[3] *Boim* held that the ATA imposes both: (1) direct civil liability under section 2333 for whoever "knowingly provides material support or resources to foreign terrorist organizations" [§2339B] where the term 'material support' "relates to the type of aid provided [§2339A: financial services] rather than whether it is substantial or considerable;" *Boim*, 291 F.3d at 1015-16, and (2) aiding-and-abetting liability for giving "substantial

IIRO does not dispute that knowingly providing financial support to al Qaeda to launch terrorist attacks is itself an act of international terrorism subject to ATA section 2333 liability. Rather, IIRO protests that plaintiffs have not pleaded a "causal link" between IIRO's funding of al Qaeda and the September 11 attacks.  IIRO Br. at 20.  That simply is not the case.  The 4AC shows that al Qaeda terror attacks on America, including the September 11 attacks, were a foreseeable consequence of IIRO's knowing provision of financial support and recruits to al Qaeda waging war on America.  IIRO continued to finance al Qaeda *after* al Qaeda openly declared and commenced waging *jihad* "*to kill the Americans and their allies – civilians and military*" through multiple terrorist attacks on the United States, including the 1993 World Trade Center bombing, the 1998 U.S. Embassies attacks, and the 2000 U.S.S. Cole attack.  4AC ¶¶ 120, 46, 105-108, 130-136, 152-155.  *See Burnett v. al Baraka*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) ("*Burnett I*"), finding *prima facie* showing of proximate cause:

> Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda, given the 3AC's allegations that, prior to September 11, al Qaeda and Osama Bin Laden had proclaimed their intentions to commit murderous terrorist activities against the United States and its citizens, and had accompanied these words with actions by implementing, and publicly acknowledging responsibility for, such terrorist schemes as the 1993 bombings of the World Trade Center, the 1998 attack of U.S. embassies in Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in Yemen.

Indeed, IIRO's knowing provision of financial support and logistical support to al Qaeda was a "causal link" in the September 11 attacks precisely because by knowingly and intentionally financing al Qaeda attacks on America, IIRO "increased chances that such harm [terror attacks on America] would occur." *Zuchowicz v. United States*, 140 F.3d 381, 389 (2d Cir. 1998)

---

assistance or encouragement" to those who commit acts of international terrorism.  *Id.* at 1018; *see Burnett v. Al Baraka*, 274 F. Supp. 2d 86, 107 (D.D.C. 2003) (explaining *Boim*: Civil "[l]iability can be established by proving violations of . . . § 2333A or §2339B, or**,** the Seventh Circuit held, by resort to traditional aiding and abetting theory").

(Calabresi, J., articulating test for "causal link").    The Seventh Circuit in *Boim* explained the

causal link as follows:

> [T]here would not be a trigger to pull or a bomb to blow up without the resources to
> acquire such tools of terrorism and to bankroll the persons who actually commit the
> violence.  Moreover, the organizations, businesses and nations that support and encourage
> terrorist acts are likely to have reachable assets that they wish to protect.  The only way to
> imperil the flow of money and discourage the financing of terrorist acts is to impose
> liability on those who knowingly and intentionally supply the funds to the persons who
> commit the violent acts.

*Boim*, 291 F.3d at 1021.  Hence, IIRO's financial support of al Qaeda was a substantial factor

causing the September 11 attacks.

Moreover, the fact-driven issue of proximate cause should not be resolved by a Rule

12(b)(6) motion before plaintiffs have had the chance to develop the facts of their case through

discovery.  *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1996) ("Questions

regarding what is normal or foreseeable, like other questions of proximate cause, are generally

issues for the trier of fact"); *Klein v. National R.R. Passenger Corp.*, 1988 U.S. Dist. LEXIS

11696 at * 7-8 (S.D.N.Y. Oct. 7, 1988) ("pivotal questions of foreseeability and proximate cause

are so intertwined with the facts of the case and subject to varying inferences, that such questions

are ordinarily left for the jury").  Let IIRO tell the jury that IIRO's provision of financial and

logistical support to al Qaeda waging war on America bears no "causal link" to the September 11

attacks.  IIRO Br. at 20.

That said, plaintiffs submit that causation in an ATA claim is best viewed as follows:

1.  The 4AC Makes A *Prima Facie* Showing Of Cause Under General Tort Principles.

Since the ATA "extend[s] civil liability for acts of international terrorism to the full

reaches of traditional tort law, . . . causation may be demonstrated as it would be in traditional tort

law."  *Boim*, 291 F.3d at 1010, 1015.

7

Questions pertaining to the appropriate scope of liability involve the related concepts of reasonable foreseeability and proximate cause.  Each of these issues is governed by the following basic principle:

> In general, the moral culpability of the actor, as reflected in the reasons for and intent in committing the tortious acts, the seriousness of the harm intended and threatened by those acts, and the degree to which the actor's conduct deviated from the appropriate standard of care are important factors in determining the scope of liability.

Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) §32 (Ten. Draft No. 2 March 25, 2002).

Since plaintiffs allege intentional tortious conduct – knowingly and intentionally supporting al Qaeda terrorist attacks targeting American civilians –  the Court should liberally interpret principles regarding the scope of tort liability in favor of the plaintiffs.  *Cf.*  William L. Prosser, Transferred Intent, 45 Tex. L. Rev. 650, 662 (1967) ("It has been said more than once that in cases of intentional wrong the law will be considerably more liberal to the plaintiff in finding liability for consequences.")

> a.    The 4AC Makes The Required Showing Of Causal Link In This ATA Case.

In *Burnett I*, Judge Robertson ruled that to survive a Rule 12(b)(6) motion, an ATA claim against defendants for knowingly financing terrorists need not specifically "allege[] that the funds provided by defendants were used by the terrorists in committing the murder" of plaintiffs' decedents.  *Burnett I*, 274 F. Supp. 2d at 107.  Judge Robertson reasoned that "such specificity cannot be required at the pleading stage," in light of the Supreme Court's recent holding in *Swierkiewicz* that the "short and plain statement" required by Rule 8 "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which its rests.'"  *Id.*

Moreover, an onerous "but for" evidentiary standard should not be required in an ATA case.  Where plaintiffs claim that a defendant knowingly donated small sums to a known terrorist

organization for the purpose of helping that organization attack America, plaintiffs might have a difficult time proving that those specific funds were used in a particular terrorist attack. If liability were denied for this reason, Congress' intent in enacting the Anti-Terrorism Act to cut off funding for terrorism would be frustrated. *See Boim*, 291 F.3d at 1015 ("Congress' goal of cutting off funding for terrorism would be seriously compromised if terrorist organizations could avoid liability by simply pooling together small donations to fund a terrorist act.").

General tort principles make clear than plaintiffs do not have to prove that "but for" the financial support made by each particular defendant, the terrorist attacks on September 11 would not have occurred. Circuit Judge Calabresi articulated the relevant principle, which he derived from opinions of Chief Judge Cardozo and Chief Justice Traynor:

> [I]f (a) a negligent act was deemed wrongful *because* that act increased the chances that a particular type of accident would occur, and (b) a mishap of that very sort did happen, this was enough to support a finding by the trier of fact that the negligent behavior caused the harm. Where such a strong causal link exists, it is up to the negligent party to bring in evidence denying *but for* cause and suggesting that in the actual case the wrongful conduct had not been a substantial factor.

*Zuchowicz*, 140 F.3d at 390-91. (emphasis in original)

Here, the financial and logistical support IIRO intentionally provided to al Qaeda, knowing al Qaeda's avowed purpose to attack the Unites States, "increased the chances" that an al Qaeda terrorist attack against the United States would occur. Without financial support the terrorists would be significantly limited in their capabilities to carry out their attacks. And because "a mishap of that very sort did happen" on September 11, plaintiffs' burden of pleading causation is thus satisfied. *Id.*

           b.     The 4AC Makes A *Prima Facie* Showing Of Proximate Cause.

IIRO wrongly suggests that to plead proximate cause, plaintiffs must allege IIRO must have foreseen precisely that the September 11 attacks would result from IIRO's financial and

logistical support of al Qaeda.  IIRO Br. at 5, 20.  Not so.  To establish proximate cause:

> The requirement that the injury must be one that was reasonably to be foreseen does not mean that the exact occurrence or the precise injury resulting from the act need be foreseen, all that is necessary is that the person charged with [the wrongful act] should have been able to foresee that some injury to some person might result from his act.

*Lamarca v. United States*, 31 F. Supp. 2d 110, 127 (E.D.N.Y. 1998).

Indeed, District Judge Hellerstein has already addressed the proximate causation issue in September 11 tort litigation, and held:  "Virginia law does not require Boeing to have foreseen precisely how the injuries suffered on September 11, 2001 would be caused, as long as Boeing could reasonably have foreseen that 'some injury' from its negligence 'might probably result.'" *In Re September 11 Litigation*, 280 F. Supp. 2d 279, 309 (S.D.N.Y. 2003); *see also, Stanford*, 89 F. 3d 117 (to establish proximate cause, "[n]either the precise hazard nor the exact consequences [of the wrongful act] need be foreseen"); W. Page Keeton *et al.*, Prosser and Keeton on Torts § 43, p. 299 (5th ed. 1984) (observing the "quite universal agreement that what is required to be foreseeable is only the 'general character' or 'general type' of the event of the harm, and not its 'precise' nature, details, or above all manner of occurrence").

Moreover, the concept of reasonable foreseeability is applied more expansively for intentional torts and reckless torts as compared to negligence.  *See Meyers v. Epstein*, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003) ("responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent or is not at fault") (citing Keeton, Prosser & Keeton on the Law of Torts, at § 8, at 37 n.27 (5th ed. 1984) ("For an intended injury the law is astute to discover even very remote causation.").

Foreseeability is also dependant on the severity and nature of the harm threatened.  *See* Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) § 3 cmt. g (Tent.

Draft No. 1, 2001).  For example, even though the likelihood of meltdown at a nuclear reactor is thought to be low, the exceptional severity of the consequences has made that risk both foreseeable and subject to stringent safety standards.

Once the concepts of reasonable foreseeability and proximate cause are understood in this light, it becomes clear that the 4AC makes a *prima facie* showing of proximate cause.   In making this determination, "go back to the reasons for finding the defendant engaged in tortious conduct."  Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) § 29 cmt. f. (Tent.  Draft No. 2, March 25, 2002).  Knowingly providing financial and logistical support to al Qaeda is tortious – indeed is itself an act of international terrorism under ATA section 2333 – precisely because it increases the risk that al Qaeda terrorists will intentionally kill American civilians in terrorist attacks.  Since "the harms risked by that tortious conduct include the general sort of harm [death by al Qaeda terrorist attack] suffered by the plaintiff, the defendant is subject to liability for the plaintiff's harm."  Restatement (Third) of Torts § 29 cmt. f.

## C.   The 4AC Gives IIRO Notice Of Aiding-And-Abetting Claims.

The 4AC also asserts aiding-and-abetting claims against IIRO under the Anti-Terrorism Act, the Alien Tort Claims Act,[4] the Torture Victim Protection Act,[5]  wrongful death/survival statutes, and the common law.  The language, structure, and legislative history of the ATA, ATCA, and TVPA provide for aiding-and-abetting liability.  *Boim*, 291 F.3d 1021 (aiding and abetting liability lies under ATA [6]); *Presbyterian Church of Sudan v. Talisman Energy Inc.,* 244

---

[4] The ATCA provides a civil action for aliens injured by torts "committed in violation of the law of nations."  28 U.S.C. §1350.  *Kadic v. Karadzic*, 70 F.3d 232, 239-241 (2d Cir. 1995).

[5] The TVPA imposes civil liability on anyone "who, under actual or apparent authority, or color of law, of any foreign nation . . .  subjects an individual to extrajudicial killing."  28 U.S.C. §1350 (note).

[6] As *Boim* explained, "failing to extend [ATA] section 2333 liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation."

F. Supp. 2d 289, 321 (S.D.N.Y. 2003) ("ATCA suits [may] proceed based on theories of conspiracy and aiding and abetting"); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 U.S. Dist. LEXIS 3293 at * 49-51 (S.D.N.Y. 2002) (aiding and abetting liability lies under TVPA).[7]

Under the ATA, Congress intended "to import into section 2333 civil tort law principles as expressed in the Restatement Second of Torts," *Boim*, 291 F.3d at 1017, and Restatement Section 876 imposes aider-and-abettor liability on a defendant who "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself." Restatement (Second) of Torts § 876(b); *see also, Wiwa*, 2002 U.S. Dist. LEXIS 3293 at *50 (invoking Section 876(b) to impose aider-and-abettor liability under TVPA).

IIRO does not dispute that the September 11 attacks were acts of international terrorism committed in violation of the law of nations that caused extrajudicial killings. And the 4AC alleges that by knowingly providing al Qaeda financial and logistical support, IIRO provided al Qaeda substantial assistance to launch terrorist attacks against America, including the September 11 attacks. *See* 4AC *supra*. That is enough to provide fair notice to IIRO of the aiding-and-abetting claims against it under the ATA, ATCA, and TVPA.

The same is true under New York's wrongful death and survival statutes, *see* N.Y. Est. Powers & Trusts Law §§ 5-4.1(1), 11-3.2, as well as under common law intentional tort claims of

---

*Boim*, 291 F.3d at 1019.

[7] To satisfy the TVPA's "state action" requirement, District Judge Kimba Wood in *Wiwa recently* explained "[w]here there is a substantial degree of cooperative action between the state and private actors in effecting the deprivation or rights, state action is present." *Wiwa,* 2002 U.S. Dist. LEXIS 3293 at * 40 (citing *Kadic*, 70 F.3d at 245: "A private individual acts under color of law . . . when he acts together with state officials or with significant state aid." ). Here, as the 4AC alleges that IIRO and al Qaeda willfully acted in concert with the Sudan and Taliban to launch terrorist attacks against America, state action is well pleaded. *See* 4AC ¶¶ 10-12, 18, 23, 47-92, 181-82, 308, 310-32, 610.

assault, battery, and intentional infliction of emotional distress.  *See Burnett I,* 274 F. Supp. 2d at

108 ("A terrorist attack on civilians is of course intended to cause emotional distress to the

victims' families. . . .  Family members here were not physically present at the World Trade

Center, or at the Pentagon, or at Shanksville, but the whole world was virtually present, and that

is enough.")

        To make a *prima facie* showing of causation under aiding-and-abetting claims, plaintiffs

need not show a direct causal link between defendants' activities and the September 11 attacks.

Instead, plaintiffs need only plead facts that show that: (i) the party whom defendant aids must

perform a wrongful act that causes an injury; (ii) the defendant must be generally aware of his

role as part of an overall illegal or tortious activity at the time that he provides the assistance; and

(iii) the defendant must knowingly and substantially assist the principal violation.  *Halberstam v.*

*Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983).  In *Halberstam,* a wrongful death case, the court held

that defendant could be liable for aiding and abetting her co-defendant Welch in the murder of

plaintiff's husband during a burglary even though defendant was not present at the burglary.  The

court found that defendant was liable for aiding and abetting the murder/burglary because she

knew that Welch was involved in some type of crime in which violence and killing was a

foreseeable risk, and assisted him in disposing of large quantities of stolen goods.  Defendant

provided general assistance to Welch which facilitated his criminal activities, and while she did

not provide specific assistance in the crime for which she was held liable, she was found to have

aided and abetted Welch in committing it.  *Id.*[8]

        Thus, under the framework set forth in *Halberstam*, plaintiffs need only show that IIRO

_____

        [8] *See also, Boim*, 291 F.3d at 1023 (for ATA aiding-and-abetting claim, plaintiffs need show only that
defendants knew of the terrorist organization's illegal activities, that they desired to assist in those activities, and that
they engaged in some act in furtherance thereof).

knew that it was supporting al Qaeda, a known terrorist organization, that IIRO desired to assist

the illegal activities of al Qaeda, and that IIRO took some action to assist these illegal activities.

Plaintiffs need not show that IIRO knew that al Qaeda was going to commit the horrific acts of

September 11, only that IIRO knew that it was assisting terrorists in committing terrorist

activities aimed at the United States.  Death and destruction in the United States was the well-

publicized aim of al Qaeda and its terrorist network.  By providing assistance and services to al

Qaeda, IIRO knew that acts of violence against United States citizens were a foreseeable

consequence of its support.[9]

### D. The 4AC Gives IIRO Notice Of Conspiracy Claims.

The 4AC also makes a *prima facie* showing of conspiracy between IIRO and al Qaeda to

injure the United States through terrorist attacks (with IIRO as one of the terrorist financiers and

al Qaeda as terrorist footsoldiers).  Under New York law, a *prima facie* showing of conspiracy

entails allegation of the primary tort[10] and the following four elements:

1.  A corrupt agreement between two or more parties;
2.  An overt act in furtherance of the agreement;
3.  The parties' intentional participation in the furtherance of a plan or purpose, and;
4.  The resulting damage or injury.

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991) (*citing*

*Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986)).

Pleading each of those elements, the 4AC alleges:

---

[9] *See Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 232 (S.D.N.Y. 2003) (granting default judgment to plaintiffs against Iraq for injuries arising out of the September 11 attacks after plaintiff provided "a sufficient basis for a reasonable jury to draw inferences which could lead to the conclusion that Iraq provided material support to al Qaeda and that it did so with knowledge and intent to further al Qaeda's criminal acts.")

[10] IIRO does not dispute that its co-conspirator al Qaeda violated, *inter alia*, Anti-Terrorism Act § 2333 in the September 11 attacks.

14

1.    That IIRO and al Qaeda agreed to injure the United States through acts of international terrorism;[11]  4AC ¶¶ 23, 46, 310-20, 322, 437, 556, 610.

2.    That the September 11 attacks were acts done in furtherance of that common scheme; 4AC ¶¶ 23, 188, 610;

3.    That IIRO actively participated and co-operated in that conspiracy by knowingly and intentionally providing currency, financial services, money laundering services, recruits, personnel, training, and facilities to al Qaeda to launch terrorist attacks against America; 4AC ¶¶ 229, 266, 269-70, 296, 310-20, 322-23, 332, 468, 523, 525, 527, 556-557, 560, 569, 570, 574; and

4.    That the September 11 attacks caused plaintiffs' decedents' deaths. 4AC ¶¶ 23, 610.

Accordingly, the 4AC makes a *prima facie* showing of conspiracy between IIRO and al Qaeda to injure the United States through terrorist attacks, thereby giving IIRO fair notice of conspiracy claims against it under the ATA, the ATCA, the TVPA, wrongful death/survival statutes, and the common law. *See Burnett I*, 274 F. Supp. 2d at 105, 107 (civil conspiracy lies under ATA); *Presbyterian Church of Sudan,* 244 F. Supp. 2d at 321 (civil conspiracy lies under ATCA); *Wiwa,* 2002 U.S. Dist. LEXIS 3293 at * 50 (civil conspiracy lies under TVPA).

Also, a co-conspirator's responsibility for the September 11 attacks is clear once plaintiffs have shown that the attacks were carried out in furtherance of the conspiracy to injure America: "A conspirator may be liable for an injury even if he or she did not plan or know about the particular overt act that caused the injury, 'so long as the purpose of the act was to advance the

---

[11]  In *Burnett I*, Judge Robertson found that "plaintiffs' allegations about Al-Haramain's financing of al Qaeda support an inference that there was an agreement concerning the commission of terrorist acts." 274 F. Supp. 2d at 105 (upholding ATA conspiracy claims). Likewise, 4AC's allegations that (since the early 1990s) IIRO knowingly financed al Qaeda attacks against America imply agreement between IIRO and al Qaeda to injure America through terrorist attacks. *See also, Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (to establish civil conspiracy, "[p]roof of tacit, as opposed to explicit, understanding is sufficient to show agreement. A court may infer agreement.").

overall object of the conspiracy.'"  *Burnett I*, 274 F. Supp. 2d at 105 (quoting *Halberstam*, 705 F.2d at 487).

Moreover, under Second Circuit precedent, once a *prima facie* case of conspiracy is shown, then "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."  *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1976).  And the burden of demonstrating withdrawal lies on the defendant.  *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000).[12]  Hence, as the 4AC makes a *prima facie* showing of conspiracy between IIRO and al Qaeda to injure the United States through terrorist attacks, and since IIRO puts forth no evidence whatever that IIRO withdrew from that conspiracy, IIRO's participation in that conspiracy is *presumed* to continue through the September 11 attacks done in furtherance thereof.

## IV.  **This Court Has Personal Jurisdiction Over IIRO.**

IIRO moves to dismiss for lack of personal jurisdiction on due process grounds, saying that the 4AC fails to plead that IIRO "has the requisite minimum contacts with the United States for this Court to exercise personal jurisdiction over it."  IIRO Br. at 14, 5, 7-14.  We beg to differ.

### A.    **Legal Standards**

To defeat a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction made before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings and affidavits that jurisdiction exists."  *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).  In evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all

---

[12]  To withdraw from a conspiracy, a defendant must show: (1) "affirmative acts inconsistent with the object of the conspiracy," that are (2) "communicated in a manner reasonably calculated to reach co-conspirators." *United States v. United States Gypsum Co.*, 438 U.S. 422, 464-65 (1978).   Mere cessation of activity is not enough. *United States v. Greenfield*, 44 F.3d 1141, 1149 (2d Cir. 1995).

pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in

plaintiffs' favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997). In addition, the

Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE*

*AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993). Under this standard,

IIRO's Rule 12(b)(2) motion fails.[13]

**B.     This Court Has Personal Jurisdiction Over IIRO Because IIRO Knowingly &
         Intentionally Financed Al Qaeda Attacks Targeting America.**

In "ascertaining whether a defendant meets the 'minimum contacts' test, the single most

important consideration is whether a defendant's 'conduct and connection with the forum[14] State

are such that he should reasonably anticipate being haled into court there.'" *Pugh v. Socialist*

*People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54, 59 (D.D.C. Oct. 27, 2003) (quoting

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Here, because IIRO

knowingly and intentionally provided financial and logistical support for al Qaeda attacks

targeting America, including the September 11 attacks, *see* 4AC *supra*, IIRO should have

reasonably anticipated being haled into Court in America. And because IIRO should have

anticipated as much, the exercise of personal jurisdiction over IIRO would "not offend

'traditional notions of fair play and substantial justice.'" *World-Wide Volkswagen Corp.*, 444 U.S.

at 292 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

---

[13]   Plaintiffs hereby incorporate Plaintiffs' Memorandum of Law in Support of Their *Prima Facie* Showing
of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction, which provides an
excellent overview of the jurisdictional links among terrorist organizations and their sponsors.

[14]   IIRO concedes that the relevant forum for due process analysis in this ATA case is the United States as
a whole. IIRO Br. at 7 ("the appropriate question is whether IIROSA has sufficient 'minimum contacts' with the
United States for the Court to exercise personal jurisdiction over it.") (citing *Burnett I,* 274 F. Supp. 2d at 95-96)
(personal jurisdiction proper in ATA case where defendants have minimum contacts with United States as a whole)

In his recent *Pugh* decision, District Judge Thomas Penfield Jackson upheld personal jurisdiction over individual Libyan defendants in their personal capacities who conspired to bomb a French aircraft over Niger *en route* from Congo to Paris, killing 170 passengers, including seven Americans.  *Pugh*, 290 F. Supp. 2d at 56, 58-60.  *Pugh* reasoned:

> [T]he individual defendants . . . conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight.  As the plane they chose to destroy was on an international flight and expected to stop in several nations before reaching its final destination, the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die.  Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether foreseeable that *some* Americans would be aboard the plane, whose lives would be lost, *and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions.* . . .

*Id.* at 59 (emphasis added).  Congress has passed many United States statutes over the past twenty years that impose sanctions on those who commit acts of international terrorism; therefore, the "interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years."  *Id.*  Hence, Judge Jackson concluded that Due Process is not offended by the exercise of personal jurisdiction in a civil action over foreign defendants who conspire to commit acts of international terrorism:

> Thus, in light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity.  And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any 'traditional notions of fair play and substantial justice.'

*Id.* at 59-60.  And since our Constitution allows the exercise of personal jurisdiction over foreign defendants who "should have anticipated the possibility of being haled into court in the United

States" for conspiring to bomb a French plane flying from Congo to Paris "at the risk of killing Americans," *id.,* our Constitution likewise allows this Court to exercise personal jurisdiction over IIRO who knowingly financed al Qaeda attacks specifically targeting and killing thousands of American civilians on American soil.

Likewise, in *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998), *aff'd in part,* 162 F.3d 748 (2d Cir. 1998), District Judge Thomas C. Platt exercised personal jurisdiction over Libyan defendants based on their "intentional, tortious acts that were expressly aimed at the United States" through their support of terrorists who killed our citizens by bombing a United States flag aircraft over Lockerbie, Scotland. *Id.,* 995 F. Supp. at 330 (citing *Calder*, 465 U.S. at 789). Reasoning that because the "effects" of the defendants' extraterritorial conduct upon the United States "are sufficient to provide fair warning such that the foreign [defendants] may be subject to the jurisdiction of the courts of the United States," *id.* at 330 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)), the assertion of personal jurisdiction over non-resident defendants who support and enable terrorist attacks against the United States is Due Process:

> Any foreign [defendant] would know that the United States has substantial interests in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, *including civil actions in United States courts*.

*Rein*, 995 F. Supp. at 330 (emphasis added).

*Rein* and *Pugh* find clear support in *Calder v. Jones*, where the Supreme Court held that Due Process extends personal jurisdiction over non-resident defendants who knowingly engage in conduct "calculated to cause injury" in the forum. *Calder*, 465 U.S. 783, 791 (1984). In *Calder*, the plaintiff, a famous entertainer, brought suit in her home state of California, pleading that she

suffered intentional infliction of emotional distress and invasion of privacy because of a

defamatory article written by defendants in Florida.  *Id.* at 785.  Dispensing with argument that

the Constitution does not permit jurisdiction over these non-resident defendants, the Court ruled:

> [Defendants] are not charged with mere untargeted negligence.  Rather, their intentional,
> and allegedly tortious, actions were expressly aimed at California.  [Defendant] South
> wrote and [defendant] Calder edited an article that they *knew would have a potentially
> devastating impact* upon [plaintiff.]  And they *knew that the brunt of that injury would be
> felt by respondent in the State in which she lives and works*. . . .  Under these
> circumstances, [defendants] must 'reasonably anticipate being haled into court there' to
> answer. . . .  An individual injured in California need not go to Florida to seek redress
> from persons who, though remaining in Florida, knowingly cause the injury in California.

*Id.* at 789-90 (emphasis added).

Applying *Calder, Rein* and *Pugh* to the case at bar, when IIRO knowingly financed and

provided recruits for multiple al Qaeda attacks targeting America, including 1993 World Trade

Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995

plot to assassinate former President William Jefferson Clinton, the 1998 bombings of U.S.

Embassies in Kenya and Tanzania, the plot to destroy U.S. Consulates in India in 1999, and the

September 11 attacks, *see* 4AC *supra*, IIRO knew that those attacks would have a devastating

impact on America.  Accordingly, IIRO "should [have] reasonably anticipate[d] being haled into

court there."  *World Wide Volkswagen Corp.*, 444 U.S. at 297.

### C.    IIRO Has Minimum Contacts With The United States Because IIRO Maintained A Branch Office In Virginia Through 2002.

As succinctly put by Judge Robertson *Burnett I* when he asserted personal jurisdiction over

IIRO's "umbrella organization" Muslim World League ("MWL"), "[i]f MWL maintains branch

offices in New York and Virginia, then it has minimum contacts with the United States."

*Burnett I,* 274 F. Supp. 2d at 96.  Likewise, as the 4AC alleges that IIRO maintained a Virginia

office before, on, and after September 11, 2001, the 4AC alleges IIRO's minimum contacts with

20

the United States.  4AC ¶¶ 311, 313, 322, 326.

Notably, IIRO does not dispute the 4AC's allegations that IIRO maintained a Virginia office *and* that its Virginia office was raided by the FBI *after* September 11, 2001 because of IIRO's notorious support of al Qaeda.  *Id.*  Instead, IIRO weakly states that it "*currently* has no foreign office in the United States."  IIRO Br. at 2 (emphasis added).  Of course, whether or not IIRO *currently* has a U.S. office is immaterial to the minimum contacts analysis, because IIRO certainly did have a U.S. office before, on, and after September 11, 2001, from which it provided financial support for multiple terror attacks, including the September 11 attacks.  *See* 4AC *supra*; *see also, Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996) (in deciding a Rule 12(b)(2) motion, the Court must look at contacts for a reasonable period before the filing of the Complaint).[15]

Other documentary evidence confirms IIRO's presence in the United States.  As set forth in its Certificate of Incorporation issued by the Commonwealth of Virginia, IIRO was authorized to do business in Virginia as IRO on July 22, 1991.  *See* Exhibit 1, Commonwealth of Virginia, Certificate of Incorporation.  And on March 2, 1993, IRO filed a certificate "required to be filed by a corporation conducting business in the State of Virginia under an assumed or fictitious name," wherein IRO expressly stated that it was "*conducting the business of . . . International Islamic Relief Organization*."  *See* Exhibit 2, Commonwealth of Virginia, Certificate Required To Be Filed By Corporation Doing Business Under Assumed Name.

Moreover, IIRO's offices in Virginia were managed by Sulaiman A. Al Ali, who,

---

[15] Here, the initial Complaint was filed on September 4, 2002, within months of the FBI raid on IIRO's Virginia office because of its sponsorship of al Qaeda.

according to the deposition of his former U.S. business partner Soliman Biheiri, came to the

United States in the Summer of 1991 to establish IIRO's presence in America.  *See* Exhibit 3,

Soliman Biheiri Deposition in *Sana-Bell, Inc. v. BMI*, pp. 75-76, 110-111 (Oct. 27, 1999).  Biheiri

stated that Al Ali came to the United States with $10 million dollars to invest through IIRO and

Sana-Bell, with the goal of generating a sufficient return to support IIRO's mission in the United

States.  *Id.*  During a U.S. Treasury Department interrogation of Biheiri, the agents wrote:

> [H]e found it very strange that Al Ali's opened up the office of the International Islamic
> Relief Organization (IIRO) in the United States as 'International Relief Organization.'
> Biheiri told the agents that Al Ali's IRO was one and the same organization as the IIRO in
> Saudi Arabia.  He related that he suspected that the IIRO's U.S. office had been
> deliberately named the IRO, so that one could not make the connection between the two
> organizations.

*See* Exhibit 4, Department of Treasury, United States Customs Service, Case No.
DC02PU02DC0005, Interview of Soliman Biheiri p. 13 (July 14, 2003).

To be sure, IIRO fervently disputes that IIRO and IRO are the same organization.  IIRO

Br. at 13.  That fact-driven dispute, however, should not be resolved at this early stage of the

litigation before plaintiffs have had the chance to develop the facts of their case through

discovery.

    **D.**    **This Court Has Personal Jurisdiction Over IIRO Because IIRO Knew &
    Intended That The Acts Of Its Al Qaeda Co-Conspirators Would Impact The
    United States.**

As IIRO concedes, "the Second Circuit recognizes conspiracy-based personal

jurisdiction."  IIRO Br. at 14.  "Many courts in this Circuit have asserted personal jurisdiction

over absent defendants pursuant to a conspiracy theory."  *All State Life Ins. Co. v. Linter Group

Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (asserting personal jurisdiction over Australian

defendants via conspiracy theory by imputing forum acts of co-conspirators done in furtherance

of conspiracy) (citing *Chrysler Capital Corp.*, 778 F. Supp. at 1266-70 (asserting personal jurisdiction over non-resident defendant via conspiracy theory)).  To assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the state to the out-of-state conspirator."  *All State Life Ins. Co.*, 782 F. Supp. at 221 n.6.  And by imputing forum acts of their co-conspirators to non-resident defendants, this Court has repeatedly found that such non-resident defendants have minimum contacts with the forum sufficient to satisfy Due Process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the suit, supplies the necessary minimum contacts [under] *International Shoe*, 326, U.S. 310, 316 (1945)."); *Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899 at * 17 (S.D.N.Y. 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfying Due Process).

Consonant with the logic of *Calder, Pugh,* and *Rein, supra*, the Second Circuit conspiracy-jurisdiction cases of *Dixon* and *Andre Emmerich Gallery* explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court there."  *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 U.S. Dist. 16899 at * 17 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)); *see also, Chrysler Capital Corp.*, 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum).  Hence, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their co-conspirators satisfies Due Process. Not disputing that the forum acts of a co-conspirator may be imputed to a foreign defendant to

23

establish its minimum contacts with the forum, IIRO argues that plaintiffs have not pleaded "a *prima facie* case of conspiracy."  IIRO Br. at 15.  We disagree.  As explained above, the 4AC makes a *prima facie* showing of conspiracy between IIRO and al Qaeda to injure America.[16]  Hence, even apart from IIRO doing business in the United States through its Virginia office, by imputing the September 11 forum contacts of its al Qaeda co-conspirators to IIRO, this Court may assert personal jurisdiction over IIRO in accordance with Due Process.

### E.    Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery.

At minimum, this Court should exercise its broad discretion to permit plaintiffs to conduct jurisdictional discovery.  Especially where, as here, pertinent jurisdictional facts lie only within the control and knowledge of defendants contesting jurisdiction, it would be fundamentally unfair for this Court to deny plaintiffs the opportunity to conduct discovery of facts demonstrating jurisdiction.  *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("Under Rule 12(b) . . . in resolving claims that they lack jurisdiction, courts . . . have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party.")

In this case, there is every reason to believe that jurisdictional discovery will expose substantial contacts between IIRO and the United States.  For instance, the 4AC alleges that IIRO maintained an office in Virginia through 2002 that operated under the name IRO, which IIRO used to finance al Qaeda attacks against America until the FBI raided that office *after* the September 11 attacks.  4AC ¶¶ 311, 322. IIRO protests that it "*currently* has no foreign office in the United States," yet concedes that IRO did not cease to exist until 2002.  *See* IIRO Br. at 2, 3.

---

[16] *See* pages 14-16, *supra* ("The 4AC gives IIRO Notice of Conspiracy Claims.")

The 4AC alleges that IIRO and IRO are the one and the same organization, which IIRO disputes. 4AC ¶¶ 311, 322; IIRO Br. at 3.  While plaintiffs assert that the 4AC well pleads IIRO's presence in America, jurisdictional discovery would expose beyond all doubt IIRO's presence in America.

Furthermore, plaintiffs are entitled to discover facts in support of their conspiracy jurisdiction argument that by imputing the September 11 forum contacts of its al Qaeda co-conspirators to IIRO, this Court may assert personal jurisdiction over IIRO.[17]  Here, jurisdictional discovery would more fully reveal the full nature and extent of IIRO's participation in that conspiracy with al Qaeda to injure America, including IIRO's role in the September 11 attacks.

**V.     Conclusion**

For the foregoing reasons, this Court should deny IIRO's motion to dismiss.

Dated: New York, New York
       May 13, 2004

                              KREINDLER & KREINDLER LLP
                              Plaintiffs Liaison Counsel

                    By:      _____/s/_____
                              James P. Kreindler (JK7084)
                              Marc S. Moller (MM0143)
                              Justin T. Green (JG0318)
                              Andrew J. Maloney, III (AM8684)
                              Vincent I. Parrett (VP5092)
                              100 Park Avenue
                              New York, NY  10017-5590
                              Phone: (212) 687-8181
                              Fax:  (212) 972-9432

                              Barasch McGarry Salzman Penson & Lim
                              11 Park Place
                              New York, NY 10007
                              Phone:  (212) 385-8000

---

[17] *See* pages 23-24, *supra.* ("This Court Has Personal Jurisdiction Over IIRO Because IIRO Knew & Intended That The Acts Of Its Al Qaeda Co-Conspirators Would Impact The United States.")

Fax:  (212) 385-7845

Baumeister & Samuels, P.C.
One Exchange Plaza
New York, NY 10006
Phone:  (212) 363-1200
Fax:  (212) 363-1346

Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street (34th Floor)
New York, NY 10017
Phone:  (212) 661-0011
Fax:  (212) 953-6483

Law Firm of Aaron J. Broder
    & Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY 10118
Phone:  (212) 244-2000

Jaroslawicz & Jaros, Esqs.
150 William Street
New York, NY 10038
Phone:  (212) 227-2780