UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ )
                                )
In Re TERRORIST ATTACKS on      )
SEPTEMBER 11, 2001              )      03 MDL 1570 (RCC)
_____ )
                                )
KATHLEEN ASHTON et al.,         )
                                )
                    Plaintiffs, )
          v.                    )      02 CV 6977 (RCC)
                                )
AL QAEDA ISLAMIC ARMY et al.,   )
                                )
                    Defendants. )
_____ )

**ASHTON PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
SALEH KAMEL AND AL BARAKA INVESTMENT
<u>DEVELOPMENT CORP.'S MOTION TO DISMISS</u>**

KREINDLER & KREINDLER LLP
100 Park Avenue
New York, NY 10017-5540
Phone:  (212) 687-8181
Fax: (212) 972-9432

## Table of Contents

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    SALEH KAMEL AND AL BARAKA INVESTMENT AND
       DEVELOPMENT CORPORATION SUPPLIED
       AL QAEDA'S FINANCIAL INFRASTRUCTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   PROPOSED AMENDMENTS TO THE COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . 5

IV.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     PLAINTIFFS' BURDEN AT THE PLEADING STAGE IS MINIMAL   . . . . . . 7

       B.     PLAINTIFFS' COMPLAINT STATES A CLAIM UNDER THE
              ANTI-TERRORISM ACT (ATA), 18 U.S.C. §2333(a) . . . . . . . . . . . . . . . . . . . 6

              1.     Defendants Have Committed Acts of
                     International Terrorism as Defined by the Statute . . . . . . . . . . . . . . . . . 10

              2.     General Tort Law Principles Govern the Application of the ATA . . . . . 11

                     a.     Aiding and Abetting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                     b.     Civil Conspiracy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

              3.     Plaintiffs Have Properly Pled Causation . . . . . . . . . . . . . . . . . . . . . . . . 14

       C.     SUBJECT MATTER JURISDICTION IS PROPERLY
              VESTED IN THIS COURT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Boim v. Quranic Literacy Institute, et al.*,
291 F.3d 1000 (7TH Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Burnett v. Al Baraka*, 274 F.Supp.2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . *passim*

*Central Bank of Denver v. First Interstate Bank of Denver*,
511 U.S. 164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hartford Fire Insurance Co. v. California*,
509 U.S. 764 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Lamarca v. United States*, 31 F.Supp.2d 110 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . 14

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 6

*North South Finance Corp. v. Al-Turki*,
100 F.3d 1046 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Stanford v. Kuwait Airways, Corp.*, 89 F.3d 117 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 14

*Swierkiewicz v. Sorema*, 534 U.S. at 512-413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

*Woodford v. Community Action Agency of Greene County*,
239 F.3d 517 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 14, 15

### FEDERAL STATUTES

18 U.S.C. §2331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 12, 16

28 U.S.C. §2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

18 U.S.C. §2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 6

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

## OTHER AUTHORITIES

2A *Moore's Federal Practice* ¶ 8.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

P.L. 102-572, Federal Courts Administration Act of 1992,
Senate Report 102-342 (July 27, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Restatement (Third) of Foreign Relations §403 (1986) . . . . . . . . . . . . . . . . . . . . . . 15, 16

Plaintiffs submit this Memorandum of Law in Opposition to Al Baraka Investment and Development Corporation and Saleh Abdullah Kamel's motion to dismiss.[1]

## I.       OVERVIEW

Defendants seek dismissal of plaintiffs' complaint, charging that the pleadings fail to state a cause of action, or alternatively, that this court does not possess subject matter jurisdiction over these claims.  Since plaintiffs have pled far more than the notice pleading standards of Fed. R. Civ. P. 8(a) and the Anti-Terrorism Act require to survive such a motion, defendants' motion must be denied.

Plaintiffs allege that for many years Saleh Abdullah Kamel ("Kamel") and his company, Al Baraka Investment and Development Corporation ("ABIDC") (collectively "defendants") supported international terrorism by providing financial support and assistance to al Qaeda. Plaintiffs further allege that Kamel and ABIDC provided the financial infrastructure through which Osama Bin Laden and al Qaeda ran their worldwide terrorist operations. Thus, Kamel and ABIDC knowingly provided material support to terrorists in violation of the Anti-Terrorism Act, 28 U.S.C. §2333 ("ATA").

Despite defendants' effort to avoid detection by fashioning deliberately complex financial networks, the interrelationships between major shareholders, chairs and directors of the various financial institutions providing support to al Qaeda demonstrate that defendants were intentionally and surreptitiously providing material support to terror organizations before 9/11. Defendants' support of al Qaeda culminated in direct monetary support to specific September 11th al Qaeda terrorists when Omar Al-Bayoumi, the Director of Finance of an ABIDC wholly owned subsidiary, paid the rent for the San Diego apartment of two of the nineteen highjackers

---

[1]Defendants Al Baraka and Kamel attempt to incorporate their entire 61 page brief from their motion in the *Burnett* case by filing a "summary version of the memo filed in *Burnett.*"  This appears to be an attempt to circumvent the page restrictions in this district.  Plaintiffs only respond here to that "summary" filed in support of defendants' motion to dismiss in the *Ashton* case.

in the months leading up to September 11th.   4AC ¶592.  4th Amended Complaint[2] ("4AC").

Plaintiffs' factual allegations are more than sufficient to defeat defendants' motion.  Fed. R. Civ. P. 8(a) requires only that the complaint contain a short and plain statement of the court's jurisdiction, a short and plain statement of plaintiffs' claims, and a demand for relief.  *See Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Fed. R. Civ. P. 8(a) does "not require a claimant to set out in detail the facts upon which he bases his claim."  "All that is required is fair notice to defendant "of what the plaintiff's claim is and the grounds upon which it rests." *Id.; see Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 515 (Rule 8 "establishes a pleading standard without regard to whether a claim will succeed on the merits."); *Burnett v. Al Baraka*, 274 F.Supp.2d 86, 103, 107, 110 (D.D.C. 2003) ("*Burnett I*").  Plaintiffs have met these requirements.

This court has subject matter jurisdiction under the ATA and the Alien Tort Claims Act. *See Burnett I* at 95.  Al Baraka and Kamel's effort to defeat subject matter jurisdiction based upon an alleged pleading deficiency fails for three reasons.  First, it wrongly assumes that the ATA requires that Plaintiffs show a direct "but for" link between defendants' material support of al Qaeda and the specific September 11th attacks.  *See Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000, 1015. (7th Cir. 2002).  Second, even if such a requirement did exist, it wrongly assumes that an alleged pleading deficiency relating to causation would deprive this Court of subject matter jurisdiction.  Finally, plaintiffs have in fact established such a link by showing that defendants' emissary paid rent for two al Qaeda highjackers.

Since the 4AC properly pleads causes of action pursuant to the ATA and common law, and since defendants have been properly put on notice of plaintiffs' claims, defendants' motion must be denied.

---

[2]  Kamel and Al Baraka have moved to dismiss Plaintiffs' Third Amended Complaint (3AC).  However, most other defendants in this action have moved to dismiss Plaintiffs' Fourth Amended Complaint (4AC).  The substance of the two complaints is identical; the 4AC only adds several additional parties not relevant to this opposition.  Therefore, in the interest of brevity and consistency, only the 4AC will be referenced.

## II.   SALEH KAMEL AND AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION SUPPLIED AL QAEDA'S FINANCIAL INFRASTRUCTURE

*Saleh Kamel's Support of Terror*.

Kamel is the chairman of Dallah Al Baraka Group, LLC, ("Dallah Al Baraka") a financial services and related business enterprise. 4AC ¶52, 587. Kamel is one of Saudi Arabia's most prominent and influential businessmen and a leading promoter of Islamic banking and financial institutions. *Id.* ¶587. ABIDC is a subsidiary of Dallah Al Baraka and is a principal provider of financial services for the Dallah organization. *Id.* ¶583. In 1983-1984, Kamel founded Al Shamal Islamic Bank ("Al Shamal Bank" or "Al Shamal") as a joint venture with the government of Sudan and a private Sudanese company. *Id.* ¶52, 594. Under Sudanese banking regulations, Al Shamal Bank was considered a joint ownership commercial bank. *Id.* ¶86. Kamel's active participation in Al Shamal's business and banking affairs is an important factor supporting jurisdiction and ultimately, liability in this case.

In 1984, Al Shamal issued shares to its primary founders: Kamel, ABIDC, the Sudanese Government, defendant Faisal Islamic Bank - Sudan, and Kamel's brother, Omar Abdullah Kamel. 4AC, ¶53. In 1991, Osama Bin Laden joined the venture by investing $50 million in Al Shamal Bank. *Id.* ¶49, 51. At that time, Abed Abdul Jalil Batterjee, Al Shamal's chairman, was a known terrorist supporter who remains under investigation by the FBI for funding al Qaeda through at least two suspect charities - Benevolence International Foundation and the World Assembly of Muslim Youth. *Id.* ¶51, 55, 57. Notably, the Saudi arm of Benevolence International Foundation was shut down by the Saudi government for having terrorist ties. *Id.* ¶391. Bin Laden also maintained accounts at Al Shamal Bank for the Al Hirjah Construction and Development company, an al Qaeda front for providing transport and provisions for terrorists in training camps and for Wadi Al Aqiq. *Id.* ¶57, 58. In addition to Bin Laden, other al Qaeda operatives are also known to have had accounts at Al Shamal. *Id.* ¶63, 64 In short, Al Shamal Bank was a critical piece of the terrorist financial network, used to hold, invest and

divert funds to the leaders of al Qaeda. *Id.* ¶63, 387. A 2002 Congressional Research Service Report identifies Al Shamal as part of the network of businesses created in Sudan to support Bin Laden's terrorist network. *Id.* ¶50.

Defendants Kamel and ABIDC invested substantial sums of money in another Islamic bank tied to al Qaeda, Tadamon Islamic Bank (which in turn is a major shareholder in Al Shamal). 4AC ¶69. Tadamon Islamic Bank managed the accounts of several al Qaeda operatives. *Id.* ¶70.

### ABIDC's Financial Support of Terror

ABIDC is a wholly owned subsidiary of defendant Dallah Al Baraka. Its investments include 43 subsidiaries, mostly banks in Arab and Islamic countries. 4AC, ¶583 Most are known or registered as "Al Baraka Bank." *Id.* Through various means, Al Baraka banks provided Osama Bin Laden and al Qaeda with financial support. *Id.* ¶585. For example, Al Baraka banks provided funding to Al Haramain, a charity known to have provided funds to al Qaeda, as confirmed by Al Haramain chairman Aqeel Al Aqeel. *Id.* ¶585, 598. Al Baraka Turkey was used to transfer funds for Bin Laden's operations in the Bosnian branch of Al Haramain. *Id.* ¶598.

## III.   PROPOSED AMENDMENTS TO THE COMPLAINT

Plaintiffs have moved this Court for permission to amend the complaint to add additional factual allegations against defendants Kamel and ABIDC. Although plaintiffs submit that the 4AC currently alleges sufficient facts to require dismissal of defendants' motions, plaintiffs' continuing investigation has revealed additional information that supports their claims. If plaintiffs' motion to amend is granted, the following factual allegations will also be included in plaintiffs' complaint:

- Kamel was a founder and an original trustee of Sana-Bell, Inc., U.S., a SAAR network entity, and the investment branch of the International Islamic Relief

Organization ("IIRO").[3]

- ABIDC invested $2-3 million per month with BMI, a Muslim Brotherhood investment fund established in the United States, run by defendant Soliman Biheiri and used to provide financial support to terror operations. By design, defendant BMI had no responsibility to report back to ABIDC regarding the purported investment of these funds, which were instead used by BMI to fund terrorist acts.

- Kamel also partnered with Youssef Nada[4] and Prince Mohammed al Faisal al Saud in founding Faisal Islamic Bank - Sudan (of which ABIDC was a shareholder).

- Dallah Al Baraka employed Abdul Sattar Abu Ghuddah, a preference shareholder in designated terror sponsor Bank al Taqwa, as the head of its sharia board.

- Some of the subsidiary companies of defendant Dallah Al Baraka, and the Al Baraka Islamic banks employed Youssef al Qardawi, a prominent member of the Muslim Brotherhood and a major shareholder in Bank Al Taqwa, as the chair of their sharia boards.[5]

- Kamel and ABIDC invested substantial sums of money in Bank Al Taqwa.

- As of October 2000, Bank Al Taqwa was providing a line of credit to one of Bin Laden's close associates.

- As late as September, 2001, defendant Youssef Nada, the head of Bank Al Taqwa and Kamel's business partner in Faisal Islamic Bank- Sudan, was providing Bin Laden with financial assistance.

- Kamel personally donated large sums of money to IIRO and advocated that all *Zakat* collected worldwide, should be sent to IIRO.

- Kamel was included on the "Golden Chain" - a list of wealthy donors to Osama Bin Laden's cause at a time when Bin Laden was publically advocating a war against "infidels" - primarily the United States, its citizens and interests.

---

[3] The SAAR network, comprised of more than one hundred businesses and individuals, is a sophisticated arrangement of for-profit and non-profit entities that serve as front groups for extremist Islamic terror groups, including al Qaeda.  4AC ¶334, 338. On March 20-21, 2002, the offices of many SAAR network organizations were raided by the Joint Terrorism Task Force, Operation Greenquest which was created after September 11, 2001 to identify and locate the sources of terrorist funding.  *Id.*  ¶335. Defendant IIRO is a charity front tied to al Qaeda. *Id.* ¶310.

[4] Youssef Nada is a prominent member of the Muslim Brotherhood and is also a U.S. designated terror sponsor. 4AC, ¶330. Nada is the head of Bank Al Taqwa, another U.S. designated terror sponsor entity.  *Id.,* ¶337

[5] Qardawi issued at least two *fatwas* advocating the use of violence, one of which declared: "The suicide mission is the loftiest form of jihad.  We are talking about a heroic act of sacrifice and sanctification..." 4AC ¶ 531, 534.

## IV.   ARGUMENT

### A.   PLAINTIFFS' BURDEN AT THE PLEADING STAGE IS MINIMAL

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) must be denied unless it "appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957); *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).  It is axiomatic that the court must presume that the allegations in the complaint, and all reasonable inferences that can be drawn from them, are true, and plaintiff must be given the benefit of every reasonable inference that may be drawn from the complaint.  *Lee v. Bankers Trust Co.,* 166 F.3d 540, 543 (2d Cir.1999).  "A plaintiff is not required to prove her case at the pleading stage; indeed, "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency of Greene County,* 239 F.3d 517 (2d Cir. 2001), (citing  2A *Moore's Federal Practice* ¶ 8.13, at 8-68 (2d ed.1989)); *see, e.g., Geisler v. Petrocelli,* 616 F.2d 636, 639-40 (2d Cir.1980)  (pleading of evidence beyond allegations contravenes proper pleading procedure). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (internal quotation marks omitted).  Fed. R. Civ. P. 8(a)(2) requires only that a complaint contain a "short plain statement of the claim showing that the pleader is entitled to relief ." *Id.*   There is no heightened standard of pleading applicable to this case (as there is, for example, in fraud cases under Fed. R. Civ. P. 9(b)).  *Burnett I,*  95-96.

**B.     PLAINTIFFS' COMPLAINT STATES A CLAIM UNDER THE ANTI-TERRORISM ACT (ATA), 18 U.S.C. §2333(a)**

Kamel and ABIDC assert that the 4AC should be dismissed because plaintiffs have not adequately plead facts which show that their actions were the proximate cause of or a substantial factor in causing plaintiffs' injuries. Kamel and ABIDC are wrong on both the facts and the law. Plaintiffs need only allege that defendants provided "material support" to al Qaeda, or "aided and abetted" such organizations, or conspired with such organizations, to commit terrorist attacks against the U.S. *Boim v. Quranic Literary Institute, et al.,* 291 F.3d 1000(7th Cir. 2002).

Plaintiffs have alleged that Kamel, individually and through his businesses, Dallah Al Baraka and ABIDC, provided material support in the form of funding and logistical support to al Qaeda and Bin Laden to attack the United States, its citizens and interests, culminating in actually paying the rent for two of the 9/11 highjackers staying in the United States.  4AC, ¶585, 594, 595. The September 11th attacks were a proximate result of their support of al Qaeda. Plaintiffs allegations clearly state a claim against Kamel and ABIDC under the ATA and general tort law principles.

 To recover under the ATA plaintiffs need only show that defendants: 1) knowingly provided material support to a recognized terrorist organization with the intent to support that organization's illegal activities; and/or 2) aided and abetted acts of international terrorism; and/or 3) participated in a conspiracy to support or commit an act of international terrorism; and 4) could foresee that their support would contribute to the commission of a terrorist act. *See Boim* 291 F.3d at 1012-2.  Plaintiffs have adequately alleged each element.

In creating a civil cause of action for United States nationals injured as a result of international terrorism the ATA provides that:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit,

including attorney's fees.

*Id.*

"International terrorism" is specifically defined in 18 U.S.C. § 2331(1) as activities that

(A)     involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State, or that would be a criminal violation if committed within the jurisdiction of the United Sates or of any state;

(B)     appear to be intended
        (i) to intimidate or coerce a civilian population;
        (ii) to influence the policy of a government by intimidation or coercion; or
        (iii) to affect the conduct of a government by assassination or kidnaping; and

(C)     occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

*Id.*

*Boim v. Quranic Literacy Institute* recognized a cause of action under the ATA for aiding and abetting and for conspiring with terrorists.  In *Boim*, a seventeen year old American citizen was gunned down in Israel's West Bank territory.  The gunmen were members of Hamas, a known terrorist organization.   His parents filed a civil action in the United States District Court for the Northern District of Illinois under the ATA against several nonprofit entities that the Boims alleged solicited and laundered funds to provide financial support to Hamas terrorist activities.  The nonprofits moved to dismiss for failure to state a claim upon which relief could be granted.  The District Court denied the motion and the Seventh Circuit affirmed.

Pointing at length to the legislative history of the statute, the Seventh Circuit emphasized Congress' intent to reach beyond those persons who themselves commit the violent act that directly causes the injury and impose liability *"at any point along the causal chain of terrorism," Id.*  at 1011 (citations omitted), particularly on those who provide the finances for the commission of terrorist acts:

The statute would have little effect if liability were limited to the persons who pull the trigger or plant the bomb because such

-8-

> persons are unlikely to have assets, much less assets in the United
> States, and would not be deterred by the statute. . . . perhaps most
> importantly, there would not be a trigger to pull or a bomb to blow
> up without the resources to acquire such toils of terrorism and to
> bankroll the persons who actually commit the violence.  Moreover,
> the organizations, businesses and nations that support and
> encourage terrorist acts are likely to have reachable assets that they
> wish to protect. *The only way to imperil the flow of money and
> discourage the financing of terrorist acts is to impose liability on
> those who knowingly and intentionally supply the funds to the
> persons who commit the violent acts.*

*Id.* at 1021 (emphasis added); *see* P.L. 102-572, Federal Courts Administration Act of 1992,

Senate Report 102-342 (July 27, 1992) at 22 (Congress intended to impose "liability at any point

along the causal chain of terrorism").

The *Boim* court also acknowledged that the legislative history of the ATA evidences an

intent by Congress to codify general common law tort principles and to extend civil liability for

acts of international terrorism to the full reaches of traditional tort law. *Id.* at 1010 (citations

omitted).  Comparing the statute to a traditional tort, the court found that the statute contains all

of the elements of a traditional tort: breach of a duty (i.e., committing an act of international

terrorism), injury to the person, property or business of another and causation (injured by reason

of).  *Boim* at 1010.

*Boim* ultimately delineated two paths to proving a claim supporting liability:  i) by

proving conduct which is "international terrorism" as defined in the criminal counterparts to

§2333 - 18U.S.C. §2339A and §2339B; and, ii) by proving the elements of traditional tort aiding

and abetting theory and/or conspiracy. Plaintiffs have adequately plead facts which support both

of these theories of liability.

1. **Defendants Have Committed Acts of
   International Terrorism as Defined by the Statute**

*Boim* concluded that because Congress intended to impose criminal liability for funding terrorism, that it also intended to impose civil liability for the "at least as broad a class of violent terrorist acts" as in §§2333 and 2331(1), and that therefore, the criminal provisions of the ATA are a clear indication of Congress' intent to consider financial support of a terrorist organization to be an act of international terrorism under §2333. *Boim* at 1015.   Therefore, conduct which violates §2339A or §2339B is sufficient to meet the definition of international terrorism under §§2333 and 2331(1).  *Id; see Burnett I*, 274 F. Supp.2d at 106.  ("Liability can be established by proving violations of the criminal counterparts of 18 U.S.C. §2333 and §2339A").

Looking to the conduct specifically outlined in these criminal counterparts to §2333, §2339A prohibits the provision of "material support" for an extensive list of specific violent crimes associated with terrorism.  By definition, material support includes "currency or other financial securities, financial services . . ."  18 U.S.C. §2339A.  Under this definition,  "even small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability in §2333." *Boim* at 1015.   Section 2339 B then extends criminal liability to those who knowingly provide material support to foreign terrorist organizations:

> Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years . . .

*Id.*

Under *Boim,* conduct which could be considered a violation of either section, will be considered an act of international terrorism subject to civil liability under §2333.  This recognizes Congress' unequivocal intent to "interrupt or at least imperil the flow of money" to terrorist organizations by imposing liability for financing terrorist activities, *no matter how small.  Boim* at 1011 (emphasis in original).  The 4AC clearly alleges that Kamel and ABIDC provided both money and financial services to al Qaeda and thereby provided material support to a terrorist organization.

-10-

Kamel used Al Shamal to provide financial support to al Qaeda and Bin Laden.  The chairman of Al Shamal when Kamel was still a prominent shareholder and officer, was Abed Abdul Jalil Batterjee - a known terrorist.  4AC ¶51.  Using Al Shamal, Batterjeee funded al Qaeda through at least two suspect charities.  *Id.* ¶51, 57.  In addition to his personal investments, Bin Laden used Al Shamal to supply funds for the Al Hirjah Construction and Development company, a front for providing transport and provisions for terrorists in training camps.  *Id.* ¶57, 58.  When viewed in the context of the Islamic banking system, which requires a financial institution to "know its customer," it is reasonable to infer that Kamel knew that he was providing financial support for terror operations and intended to support their well-publicized aims.

Likewise, plaintiffs have alleged that ABIDC, through its many subsidiary banks, investment funds, and the charities it donated to, provided Bin Laden and al Qaeda with financial support.  For example, ABIDC provided funding for Al Haramain, a charity front which provided al Qaeda with funds. 4AC ¶ 585, 598.  In addition, ABIDC invested $2-3 million per month in the SAAR network entity BMI, a Muslim Brotherhood investment fund established in the United States and a known al Qaeda front.  *Id.* ¶334.  These allegations, when taken as true, show that Kamel and ABIDC were providing material support to al Qaeda and Bin Laden through their support of SAAR and other al Qaeda front charities - - to say nothing of paying the San Diego rent for two of the 9/11 suicide highjackers.

### 2.    General Tort Law Principles Govern the Application of the ATA

*Boim* held that Congress expressed an intent to expand the reach of the §2333 to the limits of general tort law principles,  and to make the civil liability provisions of §2333 at least as extensive as the corresponding criminal provisions under §2339A and B.  *Id* at 1020.  The definition of "international terrorism" under §2331(1)(A) includes activities that

involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State, or that would be a criminal violation if committed

within the jurisdiction of the United Sates or of any state[.]

*Id.*  The *Boim* court found that, "[t]his language, embracing activities that "involve" violent acts, taken at face value, should certainly cover aiding and abetting violent acts," and noted that if liability were not extended to aiders and abettors who knowingly and intentionally fund acts of terrorism, Congressional intent to "cut off the flow of money to terrorists at every point along the causal chain" would be frustrated. *Id.*  at 1020-21.   Liability must therefore extend beyond those who physically detonate bombs or hijack aircraft.

### a.    Aiding and Abetting

Plaintiffs adequately plead a cause of action for aiding and abetting under the ATA. Plaintiffs need only plead facts which show that: i) the defendants aided those who financed, organized and perpetrated the 9/11 attacks; ii) the defendants were generally aware of their role as part of an overall illegal or tortious activity at the time that they provided the assistance; and iii) the defendant must knowingly and substantially assist the principal violation.  *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983); *see also Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 181 (1994) (describing Halberstam as "a comprehensive opinion on the subject").  In *Halberstam,* a wrongful death case, the court held that the defendant Hamilton could be liable for aiding and abetting her co-defendant Welch in the murder of plaintiff's husband during a burglary even though she was not present at the burglary.  The court found that Hamilton was liable for aiding and abetting the murder/burglary because she knew that Welch was involved in some type of crime, in which violence and killing was always a foreseeable risk, and assisted him in disposing of large quantities of stolen goods. Essentially,  Hamilton provided general assistance to Welch which facilitated his criminal activities, and while she did not provide specific assistance in the crime for which she was held liable, she was found to have aided and abetted Welch in committing it. *Id.*

Applying *Halberstam* to this case, plaintiffs need only show that defendants knew that

they were supporting al Qaeda and Bin Laden (whether directly or indirectly makes no difference), that they provided substantial assistance to organizations that aided and abetted al Qaeda, and could foresee that such assistance would result in a terrorist attack against U.S. citizens.  Plaintiffs need not allege or prove that defendants knew that al Qaeda was going to commit the specific horrific acts of September 11th but only that defendants knew that they were assisting terrorists in committing terrorist activities aimed at the United States.  Death and destruction in the United States was the well publicized aim of al Qaeda and its terrorist network.  By providing assistance and services to the terrorist network, defendants knew that acts of violence were a foreseeable consequence of their support.

    **b.**  **Civil Conspiracy**

  In addition to cause of action for aiding and abetting, the ATA, when read in conjunction with general tort principles, also provides for a cause of action based on conspiracy.  *See Burnett I,* 274 F. Supp. 2d at 105. Conspiracy requires: i) an agreement between two or more persons; ii) to participate in an unlawful act, or a lawful act in an unlawful manner; iii) an injury caused by one of the parties to the agreement; and iv) which overt act was done pursuant to and in furtherance of the scheme." *Id.* at 105.  The court in *Burnett I* also noted that "[a] conspirator may be liable for an injury even if he or she did not plan or know about the particular act that caused the injury so long as the purpose of the act was to advance the overall object of the conspiracy." *Id.*  at 105 (internal quotations omitted).

  Plaintiffs' allegations that Kamel and ABIDC intentionally financed and provided logistical support to defendant Bin Laden and al Qaeda support an inference that there was an agreement between Kamel and ABIDC, through its shareholders and chairman Bayoumi, and the terrorists to participate in terrorism.  The September 11, 2001 attacks were the overt acts done in furtherance of the conspiracy.  *See Burnett I*, 274 F. Supp.2d at 105.

  **3.**  **Plaintiffs Have Properly Pled Causation**

Plaintiffs need not allege that the financial and other support Kamel and ABIDC provided to al Qaeda were used by the specific terrorists who committed the attacks of September 11th in those attacks (although in fact it was).  "[S]uch specificity [is] not required at the pleading stage."  *Burnett I* at 107 (citing *Swierkiewicz*, 534 U.S. at 512-413).  Proximate cause does not require a direct link or even foreseeability of the precise events.  *Stanford v. Kuwait Airways, Corp.,* 89 F. 3d 117, 127 (2d Cir. 1996).  It is sufficient that defendants should have been able to foresee that some injury to some person might result as a consequence of their acts.  *Lamarca v. United States,* 31 F. Supp.2d 110, 127 (E.D.N.Y. 1998).  Even though plaintiffs need not allege that defendants' support was given directly to the 9/11 highjackers, plaintiffs have in fact done so - - alleging that one of defendants' employees paid the rent for two of the 9/11 highjackers.  In any event, by knowingly providing Bin Laden and al Qaeda with financial support and services, Kamel and ABIDC knew that they were supporting an organization whose aim was to commit terror attacks.  Therefore, it was foreseeable that with their assistance, injury to some persons might result.  Whether Kamel or ABIDC knew any of the details of the 9/11 plot in advance is irrelevant.

Furthermore, the Court should also consider Congress' goal of cutting off terrorist funding when it enacted the Anti-Terrorism Act.  Given the difficulty in tying specific cash support to the September 11th, 2001 attacks, forcing plaintiffs to plead and prove but for causation would frustrate this goal.  As Judge Calabresi noted:

> [I]f (a) negligent act was deemed wrongful because that act increased the chances that a particular type of accident would occur, and (b) a mishap of that very sort did happen, this was enough to support a finding by the trier of fact that the negligent behavior caused the harm.  Where such a strong causal link exists, it is up to the negligent party to bring in evidence denying but for cause and suggesting that in the actual case the wrongful conduct had not been a substantial factor.

*Zuchowicz v. United States,* 140 F.3d 381, 390-91(2d Cir. 1998).  Judge Calabresi's reasoning applies to Kamel and ABIDC's support of al Qaeda, which at the very least increased the

likelihood that terrorists would attack the United States.

Plaintiffs properly allege that Kamel and ABIDC's logistical support, financing and funding of al Qaeda increased the risk that al Qaeda would be able to commit terrorist attacks, and they intended it to do so.  The September 11, 2001 terror attacks were thus a foreseeable result of their support.

**C.      Subject Matter Jurisdiction Is Properly Vested in this Court**

The *Burnett* court has already held that the Anti-Terrorism Act and the Alien Tort Claims Act confer subject matter jurisdiction on this Court.  *Burnett I,* 274 F. Supp. 2d at 95. Nevertheless, defendants claim that the subject matter jurisdiction of this Court is limited by principals of international law, namely the Restatement (Third) of Foreign Relations §403.  This is purely an attempt to recast their substantive argument regarding the complaint as one relating to subject matter jurisdiction.  Essentially, defendants contend that their challenges to the causal connection between their conduct and the September 11th attack is somehow jurisdictional.  This argument is plainly without merit.

Kamel and ABIDC rely on cases construing the Sherman Anti-Trust Act which require a specific link between the alleged anti-competitive acts and the United Sates.  Kamel and ABIDC's Moving Brief at pp. 14-18.  These cases are simply not applicable here.  Defendants' assertion that *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) stands for the proposition that the applicability of a statute to extraterritorial conduct is a jurisdictional question is  misplaced.  In *Hartford*, the Supreme Court addressed the defendants' concerns about the extraterritorial reach of that particular statute, and considered whether the court should exercise the jurisdiction bestowed upon it.   That the Court considered the provisions in the Restatement (Third) of Foreign Relations for guidance in reaching its conclusion is not controlling here.

Likewise, Kamel and ABIDC's assertion that by including the phrase "by reason of international terrorism" in the ATA, Congress was "marr[ying] the statue to the Restatement's requirements," thus converting a substantive element to a jurisdictional element, is baseless. Defendants seem to say that because the Restatement (Third) of Foreign Relations contains a clause focusing on the causal connection between the defendant's acts and the plaintiff's injury, any statute that requires such a connection imports the Restatement (Third) of Foreign Relations into its reach and converts a substantive causation element into a jurisdictional prerequisite.

Defendants' reliance on *North South Finance Corp. v. Al-Turki,* 100 F.3d 1046 (2d. Cir. 1996) and other securities cases is deliberately misleading.  In *North South Finance*, the Second Circuit examined at the narrow question of the extraterritorial application of RICO in the context of securities fraud, noting that the statute was silent on that issue.   This is not the situation here. By its very wording the ATA contemplates extraterritorial application.  The court need only look at 18 U.S.C. §2331(1)(C) which defines international terrorism as acts which, "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."   No logical interpretation of this statute could question the scope of its extraterritorial reach.

Moreover, defendants' argument that causation is a jurisdictional element is premised on the notion that there must be a direct link between defendants' conduct and plaintiffs' injuries. Defendants go on to analyze plaintiffs' allegations under standards developed for securities and antitrust actions where a direct link is a jurisdictional requirement.  This is simply not the case under the ATA.  As *Boim* makes abundantly clear, there is no requirement that defendants' material support of terrorist organizations was used specifically to carry out the September 11th attacks.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Saleh Kamel and Al Baraka Investment & Development Corp.'s motion to dismiss.

Dated: New York, New York
      May 14, 2004

KREINDLER & KREINDLER LLP
*Plaintiffs Liaison Counsel*

By:    _____/S/_____
      James P. Kreindler (JK7084)
      Marc S. Moller (MM0143)
      Justin T. Green (JG0318)
      Andrew J. Maloney, III (AM8684)
      Susan D. Bainnson (SB3800)
      100 Park Avenue
      New York, NY  10017-5590
      Phone: (212) 687-8181
      Fax:  (212) 972-9432

      Barasch McGarry Salzman Penson & Lim
      11 Park Place
      New York, NY 10007
      Phone:  (212) 385-8000
      Fax:  (212) 385-7845

      Baumeister & Samuels, P.C.
      One Exchange Plaza
      New York, NY 10006
      Phone:  (212) 363-1200
      Fax:  (212) 363-1346

      Speiser, Krause, Nolan & Granito
      Two Grand Central Tower
      140 East 45th Street (34th Floor)
      New York, NY 10017
      Phone:  (212) 661-0011
      Fax:  (212) 953-6483

Law Firm of Aaron J. Broder
& Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY 10118
Phone:  (212) 244-2000

Jaroslawicz & Jaros, Esqs.
150 William Street
New York, NY 10038
Phone:  (212) 227-2780