UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | MDL No. 1570 (RCC)<br>ECF case |

This document relates to:  *Thomas Burnett, Sr. v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849

*BURNETT* PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO F.R.C.P. 54(B) TO RE-CONSIDER NON-FINAL RULING DISMISSING CLAIMS AGAINST DEFENDANTS SULTAN BIN ABDULAZIZ AL-SAUD AND TURKI AL-FAISAL BIN ABDULAZIZ AL-SAUD

June 18, 2004

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

    I.    THIS COURT HAS THE POWER TO RE-VISIT THE D.C. COURT'S NOVEMBER 14 RULING AND SHOULD EXERCISE THAT POWER IN THE INTERESTS OF CONSISTENCY AND JUDICIAL EFFICIENCY ................................................................. 2

    II.    SULTAN AND TURKI AL-FAISAL ARE NOT ENTITLED TO SOVEREIGN IMMUNITY ..... 6

        A.    Sultan and Turki Al-Faisal's Conduct Had a Sufficient Causal Connection to the Events of September 11 to Fall Within the "Tortious Act" Exception to the FSIA ....................................................... 7

            1.    *Under Common Law Principles of Causation, Sultan's Support of Al Qaeda's Charity Conduits Provides a Sufficient Causal Connection to the September 11 Attacks* ............. 8

            2.    *Turki Al-Faisal's Assistance to Bin Laden Provides a Sufficient Causal Connection to the Terrorist Attacks of September 11* ................................................................................. 14

        B.    The "Discretionary Function" Clause Does Not Protect Sultan or Turki Al-Faisal From Liability Because It Would Be Against Public Policy for this Court to Recognize Discretion to Commit or Support Terrorist Acts ....................................................................... 15

    III.    THIS COURT HAS PERSONAL JURISDICTION OVER SULTAN AND TURKI AL-FAISAL ................................................................................... 17

CONCLUSION ................................................................................................................. 19

i

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Aramony v. United Way of America*, 254 F.3d 403 (2d Cir. 2001) ................................................ 2

*Astarte Shipping Co. v. Allied Steel & Export Service*, 767 F.2d 86 (5th Cir.1985) ..................... 3

*Burnett v. Al Baraka Invest. & Devel. Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003).............. 1, 8, 15, 16

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) ............................. 3, 4, 5

*Devilla v. Schriver*, 245 F.3d 192 (2d Cir. 2001) ........................................................................ 2

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................................................................. 15

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987)........................................... 3

*In re Long Distance Telecom. Litig.*, 612 F.Supp. 892 (E.D.Mich.1985), *rev'd in part on other
grounds*, 831 F.2d 627 (6th Cir.1987) ................................................................................. 5

*In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671 (D.C.Cir.1981)...................................... 5

*In re Terrorist Attacks on September 11, 2001*, Docket No. 1570, Transfer Order
(J.P.M.L. Dec. 9, 2003)................................................................................................... 1, 3

*Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.D.C.1980)............................................... 15, 16

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir.1989) ...................................................... 15, 16

*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987)................... 8

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)................................................................... 3, 4, 5

*Newton v. Thomason*, 22 F.3d 1455 (9th Cir. 1994)..................................................................... 3

*Rezzonico v. H&R Block, Inc.*, 182 F.3d 144 (2d Cir. 1999)....................................................... 2

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)......................................... 7, 8

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ............................................................................... 3

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2003) ....................... 7

**Statutes**

28 U.S.C. § 1407.................................................................................................................... 3, 4

28 U.S.C. § 1605(a) ................................................................................................ 6, 15

**Rules**

F.R.C.P. 54(b) ............................................................................................................ 2

**Other Authorities**

H.R. Rep. No. 94-1487, at 21, 1976 U.S.C.C.A.N. at 6620 ......................................... 7

## INTRODUCTION

Defendants Sultan bin Abdulaziz al-Saud ("Sultan") and Turki Al-Faisal bin Abdulaziz al-Saud ("Turki Al-Faisal"), members of the Saudi royal family and Saudi government officials, are alleged to have knowingly financed and/or assisted Al Qaeda in its self-declared war against the United States, its citizens, and its residents.  On November 14, 2003, the district court in Washington, D.C. held that Sultan and Turki Al-Faisal were entitled to sovereign immunity and dismissed the claims against them. *Burnett v. Al Baraka Invest. & Devel. Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003) (the "November 14 Opinion").  Less than a month later, the Judicial Panel on Multidistrict Litigation transferred this case to this Court and consolidated it with several other, similar proceedings.  *In re Terrorist Attacks on September 11, 2001*, Docket No. 1570, Transfer Order (J.P.M.L. Dec. 9, 2003) ("Transfer Order").  Sultan and Turki Al-Faisal subsequently moved to dismiss the claims against them in the remainder of the pending cases on the same grounds accepted in the November 14 Opinion.  Those motions are currently pending before this Court.[1]  In order to assure uniformity on the identical issue in these consolidated cases, plaintiffs now seek reconsideration of the D.C. court's non-final ruling.  Moreover, because the ruling of the D.C. district court was erroneous and was based on D.C. Circuit precedent inapplicable in this Court, upon reconsideration, this Court should not follow the November 14 Opinion, but should, instead, deny Sultan's and Turki Al-Faisal's motions to dismiss the claims against them.

---

[1]  Sultan filed a consolidated motion in *Ashton*, *Barrero*, *Salvo*, *Tremsky*, and *Burnett*-SDNY (the "Sultan Consolidated Motion").  Turki Al-Faisal similarly filed a consolidated motion in those cases (the "Turki Consolidated Motion").  Those motions are fully briefed.  Sultan and Turki Al-Faisal filed separate motions in *Federal Insurance*, which plaintiffs expect will be fully briefed on or before the time briefing is completed on this motion.

**ARGUMENT**

**I.   THIS COURT HAS THE POWER TO RE-VISIT THE D.C. COURT'S NOVEMBER 14 RULING AND SHOULD EXERCISE THAT POWER IN THE INTERESTS OF CONSISTENCY AND JUDICIAL EFFICIENCY**

This Court has the power to re-visit the D.C. court's November 14.  Rule 54(b) of the Federal Rules of Civil Procedure expressly provides that an order dismissing fewer than all of the defendants from an action "*is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties." F.R.C.P. 54(b) (emphasis added).  *See also Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) ("rulings of the district court are subject to revision by that court 'at any time before the entry of final judgment'").  The only exception to this rule is where the court issuing the order "direct[s] entry of a final judgment as to one or more but fewer than all of the . . . parties . . . ." F.R.C.P. 54(b).  The D.C. court neither issued such a directive with respect to the claims against Sultan and Turki Al-Faisal nor made the findings required to support one.  No final judgment was entered.  Accordingly, the order of the D.C. court was not final and it is, accordingly, subject to revision at any time in this Court.

The so-called "law of the case" doctrine does not in any way alter this Court's power to reconsider the November 14 ruling of the D.C. court.  As applicable to non-final rulings, the "law of the case" doctrine is wholly discretionary; it "does not constitute a limitation on the court's power." *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001); *accord Aramony v. United Way of America*, 254 F.3d 403, 410 (2d Cir. 2001) (law of the case "does not limit a court's power to reconsider its own decisions prior to final judgment").

Not only does this Court have the power to re-visit and revise the November 14 order of the D.C. court, under the circumstances of this case it should exercise its discretion to do so.

Since the time that the D.C. court issued its ruling, this case has been transferred to this Court

pursuant to 28 U.S.C. § 1407.  *See* Transfer Order.  As the Second Circuit has recognized:

> A transfer under 28 U.S.C. § 1407 'transfers the action lock, stock, and barrel.
> The transferee district court has the power *and the obligation* to modify or rescind
> any orders in effect in the transferred case which it concludes are incorrect.'

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987) (emphasis added);

*see also Astarte Shipping Co. v. Allied Steel & Export Service*, 767 F.2d 86 (5th Cir.1985)

(same); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996) (re-

considering ruling of district court in Texas after transfer).

Such reconsideration is especially necessary where the transferee court is located in a

different circuit than the transferor court.  For the Second Circuit also has held that "a transferee

federal court should apply its interpretations of federal law, not the constructions of federal law

of the transferor circuit."  *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993).  The *Menowitz*

Court explained the reasons for this rule, which contrasts with the so-called "*Van Dusen*" rule

applicable in diversity cases:

> Although federal courts sometimes arrive at different constructions of federal law,
> federal law (unlike state law) is supposed to be unitary.  Thus, the rule of *Van
> Dusen* does not apply by analogy where a case is transferred under § 1407 to a
> federal court that has a different construction of relevant federal law than the
> federal court in which the action was filed.  Federal courts comprise a single
> system applying a single body of law, and no litigant has a right to have the
> interpretation of one federal court rather than that of another determine his case.

*Menowitz*, 991 F.2d at 40.[2]  *See also Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994)

(on questions of federal law, transferee court applies law of its own circuit).  In addition, the

Second Circuit noted that application of the *Van Dusen* principle to federal law "runs contrary to

---

[2]  Under *Van Dusen v. Barrack*, 376 U.S. 612 (1964), where the action was properly commenced
in the transferor court, a transferee federal court sitting in diversity applies the same state law as
would have been applied by the transferor court.

the principle that, until the Supreme Court speaks, the federal circuit courts are under duties to arrive at their own determinations of the merits of federal questions presented to them . . . ." *Menowitz*, 991 F.2d at 40. Thus, the Second Circuit admonished that "if a federal court simply accepts the interpretation of another circuit without independently addressing the merits, it is not doing its job." *Id.* at 40.

Moreover, when a case is transferred under § 1407, it also is coordinated or consolidated with similar cases originally filed in other district courts.[3] The application by the transferee court of the law of its own circuit "also serves the goals of administrative efficiency" because "it would be unwieldy, if not impossible, for a court to apply differing rules of federal law to various related cases consolidated before it." *Menowitz*, 991 F.2d at 41.

Judge Sweet of this court applied these principles in *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996), a case with nearly identical circumstances that provides guidance here. In *Degulis*, six actions were consolidated in the Southern District of New York. One of those actions, the "*Weiss* action" had been commenced in the Southern District of Texas. Prior to the transfer of the *Weiss* action to New York, the defendants in that action moved to dismiss; the district court in Texas denied the motion. After the transfer was accomplished, defendants in four of the other cases moved to dismiss. One of the *Weiss* defendants then sought reconsideration, pursuant to F.R.C.P. 54(b), of the Texas court's denial of its motion to dismiss. 928 F.Supp. at 1306.

The court agreed to re-consider the ruling of the Texas court. In language strikingly applicable to this case, Judge Sweet held:

---

[3]   Section 1407(a) provides: "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."

Regardless of the merits of the Texas Court's decision, here compelling reasons exist for reconsideration.   The peculiar circumstances of the transfer and the posture of the related actions in this case argue strongly for it. Reconsideration following transfer by the JPML can ensure consistent pretrial rulings.   *See In re Long Distance Telecom. Litig.*, 612 F.Supp. 892, 902-03 (E.D.Mich.1985), *rev'd in part on other grounds*, 831 F.2d 627 (6th Cir.1987).   Moreover, transfer of an action by the JPML can constitute, as here, the type of 'significant' and 'fundamental' change warranting reconsideration of the order by the transferee court.  *Id.* at 903.   Here, the Court has before it motions to dismiss in four of the other related actions, which involve in large part the same facts and legal issues. To achieve consistent rulings on the motions to dismiss currently pending before the Court in all of the Blech Securities matters, it is appropriate, regardless of the merits of the Texas Court's order, to readdress the TBC Defendants' motion to dismiss in *Weiss.*   *See In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 678 (D.C.Cir.1981) ("Proper coordination of complex litigation may be frustrated if other courts do not follow the lead of the transferee court.").

*Degulis*,  928 F.Supp. at 1309.

This case presents even more compelling reasons for re-consideration than were present in *Degulis*.  Prior to transfer to this Court, the court in the District of Columbia ruled on motions to dismiss filed in the *Burnett* action by Sultan and Turki Al-Faisal.  These same defendants have now filed, in this Court, motions to dismiss the other actions pending against them; they have asserted the very same grounds that were asserted in the District of Columbia.  (In *Degulis*, by contrast, the new motions were presented by different defendants, but presented overlapping issues.)  If the transfer and consolidation of *Burnett* with the other cases does not result in consist rulings on the legal issues presented by these defendants, it would fail of its essential purpose.

Nor can this Court achieve consistency by simply adopting the ruling of the D.C. court in the other actions without making an independent analysis of the issues.  The D.C. ruling was based in significant part on interpretations of the D.C. Circuit that are inapplicable in this Court. As the Second Circuit cautioned in *Menowitz*, were this Court to accept "the interpretation of another circuit without independently addressing the merits, it [would not be] doing its job."  991 F.2d at 40.  Moreover, plaintiffs in the other actions were not party to the *Burnett* action in D.C.

Because this Court must address the Sultan and Turki Al-Faisal motions to dismiss in *Ashton,
Barrero, Salvo, Tremsky,* and *Federal Insurance* on their merits, consistency can be achieved
only by re-consideration of the D.C. court's ruling, to ensure harmony among the rulings in all
three cases.  This Court should exercise its discretion and re-consider the November 14 ruling of
the district court in D.C. dismissing the *Burnett* plaintiffs' claims against Sultan and Turki Al-
Faisal.  Moreover, upon reconsideration, this Court should deny Sultan's and Turki Al-Faisal's
motions to dismiss.

## II.   SULTAN AND TURKI AL-FAISAL ARE NOT ENTITLED TO SOVEREIGN IMMUNITY

Sultan and Turki Al-Faisal are not entitled to sovereign immunity because this case falls
within the "tortious act" exception to the Foreign Sovereign Immunities Act ("FSIA").  Under
the FSIA, a foreign sovereign and its agents or instrumentalities have no immunity in any case:

> in which money damages are sought against a foreign state for personal injury or
> death or damage to or loss of property, occurring in the United States and caused
> by the tortious act or omission of that foreign state or of any official or employee
> of that foreign state while acting within the scope of his office or employment . . .

28 U.S.C. § 1605(a)(5).  Plaintiffs in this case seek money damages for personal injury and/or
death based on tortious conduct.  As set forth in detail in *Plaintiffs' Consolidated Memorandum
Of Law In Opposition To Sultan Bin Abdulaziz Al-Saud's Motion To Dismiss Certain
Consolidated Complaints* ("Consolidated Sultan Opposition Brief") and in *Plaintiffs'
Consolidated Memorandum Of Law In Opposition To Turki Al-Faisal Bin Abdulaziz Al-Saud's
Motion To Dismiss Certain Consolidated Complaints* ("Consolidated Turki Opposition Brief"),
plaintiffs' claims fall squarely within this exception.[4]

---

[4]  Plaintiffs note that although they have "the burden of going forward with evidence showing
that . . . immunity should not be granted . . . the ultimate burden of persuasion remains with the
alleged foreign sovereign" to show that the claimed exception does not apply and that immunity

In the November 14 Opinion, the D.C. court held that the "tortious act" exception did not apply.  For the reasons described below, that ruling was erroneous and not consistent with Second Circuit law and should not be followed.

### A.     Sultan and Turki Al-Faisal's Conduct Had a Sufficient Causal Connection to the Events of September 11 to Fall Within the "Tortious Act" Exception to the FSIA

The D.C. court found that plaintiffs' allegations against Sultan and Turki Al-Faisal did not fall within the "tortious act" exception because, the court believed, plaintiffs had not sufficiently alleged that their injuries were "caused by" the conduct of those defendants.  In reaching this conclusion, the court applied a different standard of causation to the "tortious act" exception of the FSIA than would be applicable to plaintiffs' underlying claims.  292 F.Supp.2d at 19-20.  There was no basis for this approach.

Rather, as the Second Circuit has held, the substantive state or federal rule that governs plaintiffs' cause of action is used to resolve the threshold question of the court's jurisdiction under the FSIA.  *Robinson v. Government of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001)  In reaching this conclusion, the Second Circuit relied on the legislative history of the "tortious act" exception, which specifically states that the purpose of the "tortious act" exception is to permit a plaintiff "to maintain an action against [a] foreign state *to the extent otherwise provided by law*."  H.R. Rep. No. 94-1487, at 21, 1976 U.S.C.C.A.N. at 6620 (emphasis added).  For that reason, the Second Circuit in *Robinson* held that a plaintiff is required to meet the same standard to fall within the "tortious act" exception as would be required to prevail on the merits.  269 F.3d at 143.

---

should be granted. *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2003).

The D.C. district court relied, for its contrary conclusion, on *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987), but that case (which is not binding on this Court) never addressed whether the standard to be applied to the elements of the "tortious act" exception was different from the standard applicable to the underlying tort.  Rather, in *MacArthur Area Citizens*, the court simply stated, in the context of a zoning dispute, that the "tortious act" exception should be construed narrowly.  Unlike *MacArthur Area Citizens*, however, the *Robinson* specifically addresses the issue before this Court and makes clear that the court in D.C. erred in finding that the element of "causation" is different under the "tortious act" exception than it is under the underlying substantive law.  Because the D.C. court erroneously held, in the November 14 Opinion, that plaintiffs were required to plead a tighter causal connection under the FSIA than would be required to maintain their claims, *see* 292 F.Supp.2d at 19-20, that decision should not be followed here.[5]

Applying the *Robinson* standard, plaintiffs sufficiently demonstrate that Sultan's and Turki Al-Faisal's tortious conduct caused their injuries, for purposes of the FSIA, to the extent that they demonstrate the element of causation for their underlying common law claims.

      *1.*    *Under Common Law Principles of Causation, Sultan's Support of Al Qaeda's Charity Conduits Provides a Sufficient Causal Connection to the September 11 Attacks*

Plaintiffs already have demonstrated that they have sufficiently established causation for their common law claims in prior briefing and, rather than repeat the argument set forth therein, plaintiffs hereby incorporate by reference the arguments about causation in *Plaintiffs'*

---

[5]  Nor can the D.C. court's decision be read simply as requiring a higher degree of *evidentiary proof* at the pleading stage, rather than as requiring a different legal standard of causation.  The November 14 Opinion did not dismiss plaintiffs' claims for lack of sufficient evidentiary proof of their theory of causation, but rather because the court rejected that theory, even as it acknowledged that the same theory of causation could suffice for the underlying claims.  292 F.Supp.2d at 19-20.

*Memorandum Of Law In Opposition To Motion Of Prince Sultan To Dismiss The Claims Against Him* ("D.C. Sultan Opposition Brief") and *Plaintiffs' Sur-Reply Memorandum Of Law In Further Opposition To Motion Of Sultan Bin Abdulaziz Al-Saud To Dismiss The Claims Against Him* ("D.C. Sultan Sur-Reply"), submitted in the D.C. Court, and in the Consolidated Sultan Opposition Brief.

Plaintiffs emphasize that the causal connection between Sultan and the attacks of September 11 does not depend merely on the foreseeability that al Qaeda would commit terrorist acts against the United States.  Rather, the evidence shows that Sultan *knew* that the charities he supported were funneling money to al Qaeda and that he acted to assist al Qaeda by continuing to provide funds even after he was specifically charged with controlling the flow of money to terrorist conduits.  In that context, his intention to support al Qaeda can be inferred.

Specifically, as demonstrated in plaintiffs' submissions accompanying the Consolidated Sultan Opposition Brief,[6] incorporated by reference herein, in 1994, Sultan was charged with the task of reviewing and controlling the flow of money to overseas charities, to prevent the diversion of such funds to al Qaeda.  Although Sultan now denies that he ever had such responsibilities, contemporaneous accounts show that, at the time, Saudi Arabia touted this measure as an effort in the war against terrorism.[7]  For example, in 1996, the New York *Times*

---

[6]   These submissions consist of the Affirmation of Andrea Bierstein (the "Bierstein Consolidated Aff.") and the exhibits accompanying it.  Rather than burden the Court with duplicate copies of these copies, the *Burnett* plaintiffs respectfully request that the Court treat those documents as fully submitted in connection with this motion as well as the Consolidated Motion.

[7]   In the D.C. court, and in this Court in connection with the Consolidated Sultan Motion, Sultan submitted documentary evidence in support of his arguments that he is entitled to sovereign immunity and that this Court lacks personal jurisdiction over him, while at the same time opposing plaintiffs' efforts to take discovery in connection with the documents submitted.  Although plaintiffs appreciate the policies that limit discovery from one claiming sovereign immunity, they note the fundamental unfairness of permitting Sultan to submit affidavits and documents from Saudi Arabia to which plaintiffs have no opportunity to respond.  Accordingly,

reported on the efforts of Saudi Arabia to address the problem of terrorist financing.   After

describing the problem of Islamic charities being used to finance terrorism, the article reported

that in 1993, "the Saudis issued a royal decree banning the collection of money in the kingdom

for charitable causes without official permission.  *And in 1994, King Fahd set up a Supreme

Council of Islamic Affairs headed by his brother, Prince Sultan, the Defense Minister, to

centralize and supervise aid requests from Islamic groups*."  *See* Bierstein Consolidated Aff. Ex.

9 (filed with Consolidated Sultan Opposition) (emphasis added).  In 1993, the Washington *Post*

had similarly reported that "After the World Trade Center bombing in February [1993], several

regional governments attempted to clamp down in a coordinated fashion on centers of support

for these radical war veterans, according to officials. . . . In April, Saudi Arabia announced a ban

on private charitable contributions sent overseas without approval from Riyadh's generally pro-

Western government."  Bierstein Consolidated Aff., Ex 10.  The article further explained:

> The announcement marked a public reversal of Saudi policy during the 1980's. . .
> . [O]fficial funding [of Islamic militants] has been stopped or drastically reduced
> in some cases, according to many Western and Middle East officials and Islamic
> activists interviewed, as well as published statements by members of the Saudi
> royal family. . . . The April announcement marked an apparent attempt by Riyadh
> to extend this new outlook to private funding by wealthy Saudis whose activities
> were earlier encouraged or tolerated.

*Id.  See also* Bierstein Consolidated Aff., Ex. 11 at p. 17.  Thus, while Sultan now claims that he

had no responsibility for ensuring that charitable donations were not diverted to al Qaeda,

beginning in the mid-1990's, the Saudi government assured the world of precisely the opposite,

---

plaintiffs respectfully request that this Court either disregard such evidence or permit plaintiffs to
take discovery on the issues raised therein.

that it was monitoring such donations to prevent their diversion to terrorist causes and that King

Fahd had put his brother in charge of that project.[8]

Moreover, Sultan was well-positioned to monitor charitable donations to ensure that they

did not fall into terrorist hands, because he was the recipient of information from France and the

United States about the charities that were supporting bin Laden and his terrorist cause.  *See*

Consolidated Sultan Opposition Brief at 6-8.  He also participated in a joint initiative with the

United States to share intelligence information on terrorist financing and al Qaeda.  *See* Turki al-

Faisal, "Allied Against Terrorism," *Washington Post*, Sept. 17, 2002, Bierstein Consolidated

Aff., Exhibit 16.  Nonetheless, in the years following the formation of the Council headed by

Sultan, Sultan donated millions of dollars to precisely the organizations designated as terrorist

fronts.  *See* Consolidated Sultan Opposition Brief at 8-12.[9]  Nor could Sultan have been in any

---

[8]    In other filings, Sultan has disputed that he had any responsibility for ensuring that charitable donations were not diverted to terrorists, but the evidence he has submitted does not support his conclusion.  Rather, the declaration that Sultan has provided admits that the Supreme Council for Islamic Affairs was responsible for "planning *and oversight* of Saudi Islamic activities abroad in accordance with ways of the people of sunna and jama'a," *see* Declaration of Sara Kropf (filed in connection with the Consolidated Sultan Motion), Exhibit 2, ¶ 5 (emphasis added) -- that is, consistent with the practices of the Sunni Islamic community.  In 1993 and 1994, Saudi Arabia presented this to the world as an effort to ensure that Saudi charities operating abroad used their money for proper charitable purposes and not to finance terrorism.  But regardless of how it was presented, it would not be possible for the Council to ensure that these overseas Islamic activities were "in accordance with the ways of the people of the sunna and jama'a" without knowing what those activities were.  Even applying the description in Sultan's own submission, it is clear that the Council was charged with knowing what organizations like IIRO, Muslim World League, and Al Haramain, which were heavily supported by the Saudi government, were actually doing with the money they were given.

[9]    Additional evidence continues to support plaintiffs' contention that the organizations that Sultan supported were, in fact, deeply entwined with al Qaeda.  On June 3, 2004, the Saudi government announced that it was dissolving Al Haramain Islamic Foundation because of its links to al Qaeda.  *See* Douglas Jehl, "Saudis Are Shutting Down a Charity Tied to Terrorists," New York *Times* Online, June 3, 2004, attached as Exhibit A to Affirmation of Andrea Bierstein in Support of Motion to Re-Consider Non-Final Ruling Dismissing Defendant Sultan Bin Abdulaziz ("Bierstein Re-Consider Aff.").  Indeed, a statement from the U.S. Treasury Department noted that "Al-Haramain's worldwide operation represented the 'principal' Islamic

doubt about the purposes to which al Qaeda would put the donated funds that were diverted to it. Throughout the mid-1990's, bin Laden made numerous statements in which he identified the United States as his target.  *See* Consolidated Sultan Opposition Br. at 3-5.  Even without these unequivocal pronouncements, bin Laden's intentions were written clearly in his actions, including the 1993 World Trade Center bombing, as well as numerous other plots against the United States that were foiled in the mid-1990's.  *Id.*; *see also Plaintiffs' Memorandum of Law in Support of Their Prima Facie Showing of Personal Jurisdiction and in Opposition to Defendants' Challenges to Personal Jurisdiction* ("Personal Jurisdiction Brief").

Nonetheless, since 1994, Sultan has provided more than six million dollars in personal and Saudi government funds to charities that raised money for, and diverted funds, equipment and personnel to, Osama bin Laden and Al Qaeda.  *See* 3AC ¶¶ 354, 359-62; Consolidated Sultan Opposition Brief at 11-12; Bierstein Consolidated Aff., Exhibits 21-23.

Thus, as a result of meetings with U.S. and French officials, and as a result of his participation in the intelligence-sharing initiative, Sultan knew which charities were funneling money to al Qaeda; he knew that al Qaeda was using the money to commit terrorist acts; and he donated millions of dollars to the very charities involved in terrorist financing.  This evidence suffices to demonstrate that under traditional common-law notions of aiding and abetting, Sultan may be held liable for the murders of September 11 because his role in funding the various

---

charity providing support for the al-Qaida network and promoting militant Islamic doctrine worldwide."  Les Zaitz, "Terror-Linked Charity Cut Off," *The Oregonian,* June 3, 2004 (from website, www.oregonlive.com, attached as Exhibit B to the Bierstein Re-Consider Aff.  But while the Saudi shut-down of Al Haramain is news, Al Haramain's involvement in terrorism is not – as reported in the New York *Times*, "[t]he shutdown of Al Haramain had been a major goal for both the Clinton and Bush administrations."  Bierstein Re-Consider Aff., Ex. A.  And Sultan, who beginning in 1997, participated in a joint initiative with the United States to share intelligence information and who met with officials of the Clinton administration to dismiss U.S.

charity conduits for al Qaeda may be deemed one of the causes of those murders.   The causation element of the "tortious act" exception requires no greater showing.  *See Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983); Consolidated Sultan Opposition Brief; *see also Plaintiffs' Memorandum Of Law In Opposition To Motion Of Defendant Khalid Bin Mahfouz To Dismiss The Complaint Or, In The Alternative, For A More Definite Statement; Plaintiffs' Memorandum of Law in Opposition to Motion of Defendants Saudi Binladin Group, Bakr Binladin, Omar Binladin And Tariq Binladin To Dismiss The Complaint Or, In The Alternative, For A More Definite Statement*.

That Osama bin Laden also denounced Saudi Arabia in no way mitigates Sultan's knowledge or culpability.  Quite the opposite:  it may explain his motive, for it is certainly possible that Sultan was paying "protection money" to ensure that bin Laden kept his terrorist attacks outside Saudi Arabia and targeted the United States instead.[10]  But while that could explain why Sultan gave money to al Qaeda conduits to assist in al Qaeda's illegal activities, it would not lessen his liability.  Animus or malevolence towards the United States is not an element of plaintiffs' claims – it is sufficient that Sultan knew the purpose for which the money would be used and gave money to advance that purpose, *see Halberstam*, 705 F.2d at 477-78, regardless of what led him to conclude that terrorist attacks against the United States would be a desirable objective to support.

---

concerns about the diversion of charitable donations to al Qaeda, *see* Bierstein Consolidated Aff., Exs. 13-16, would have been well aware of that.

[10]   In this regard, it is surely no coincidence that the Saudi government shut down Al Haramain only after al Qaeda began carrying out terrorist attacks within Saudi Arabia.  *See*, *e.g.*, Bierstein Re-Consider Aff., Ex. B.

2.    *Turki Al-Faisal's Assistance to Bin Laden Provides a Sufficient Causal Connection to the Terrorist Attacks of September 11*

As with Sultan, Turki Al-Faisal's assistance to bin Laden establishes a causal connection to the attacks of September 11.  Turki Al-Faisal was the head of the Saudi intelligence agency until August 30, 2001.  *See* 3AC ¶¶ 341, 343.[11]  Turki Al-Faisal has been identified in a sworn statement as "the facilitator of . . . money transfers in support of the Taliban, al Qaeda, and international terrorism." 3AC ¶ 346.  In addition, the Complaint alleges that in 1998, Turki Al-Faisal reached an agreement with Osama bin Laden and his followers pursuant to which bin Laden agreed not to use his terrorist infrastructure to subvert the royal family's control of Saudi Arabia and Turki Al-Faisal agreed that the Saudis would make no demands for the extradition of terrorist individuals, such as Osama bin Laden, and/or for the closure of terrorist facilities and camps.  3AC ¶ 348.  The Complaint further alleges that under Prince Turki's direction, the Saudi intelligence service, of which he was director from 1977 through August, 2001, "served as facilitator of Osama bin Laden's network of charities, foundations, and other funding sources." 3AC ¶ 350.

Thus, Turki Al-Faisal is alleged to have provided material support to Osama bin Laden directly and, further, is alleged to have done so with knowledge of bin Laden's terrorist activities and indeed with the specific purpose of deflecting those activities to other countries and away from Saudi Arabia.   In short, Turki Al-Faisal gave assistance to Osama bin Laden to carry out terrorist attacks on other countries, specifically the United States, so that bin Laden would not attack Saudi Arabia.  Rather than repeat their arguments establishing that these allegations demonstrate a sufficient causal connection between Turki Al-Faisal and the attacks of September

---

[11]  Citations in the form "3AC ¶ __" are references to the Third Amended Complaint in *Burnett,* 03 CV 9849.

11, plaintiffs hereby incorporate by reference the arguments about causation set forth in *Plaintiffs' Memorandum Of Law In Opposition To Motion Of Prince Turki To Dismiss The Claims Against Him* ("D.C. Turki Opposition") and *Plaintiffs' Sur-Reply Memorandum Of Law In Further Opposition To Motion Of Turki Al-Faisal Bin Abdulaziz Al-Saud To Dismiss The Claims Against Him* ("D.C. Turki Sur-Reply"), submitted in the D.C. Court, and in the Consolidated Turki Opposition Brief.

### B. The "Discretionary Function" Clause Does Not Protect Sultan or Turki Al-Faisal From Liability Because It Would Be Against Public Policy for this Court to Recognize Discretion to Commit or Support Terrorist Acts

Because it (erroneously) concluded that plaintiffs' claims fell outside the language of the "tortious act" exception, the D.C. court found it "unnecessary to decide whether the 'discretionary function' exception (to the exception) also applies." November 14 Opinion, 292 F.Supp.2d at 20. Nonetheless, the court went on to find, in *dictum*, that the "discretionary function" clause also operated to bar plaintiffs' claims.[12] This Court should not follow this *dictum*.

As set forth in detail in the prior briefing in the District of Columbia and in this Court (incorporated by reference herein, as noted above), the allegations against Sultan and Turki Al-Faisal fall outside the "discretionary function" clause. *See Liu v. Republic of China*, 892 F.2d 1419 (9th Cir.1989); *Letelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C.1980). As the D.C. court recognized in the November 14 Opinion, "terrorist acts cannot be considered 'discretionary'. . . ." 292 F.Supp.2d at 21. The court nonetheless stated that Sultan's alleged financial support of al Qaeda fell within the "discretionary function" clause, again relying on an

---

[12] The "discretionary function" clause, 28 U.S.C. § 1605(a)(5)(A), precludes application of the "tortious act" exception to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function, regardless of whether the discretion be abused."

overly restrictive view of the requisite causal connection between defendants' acts and the terrorist attacks of September 11.  As noted above, the D.C. court improperly imported into the FSIA a more restrictive notion of causation than that required to establish plaintiffs' underlying causes of action.

Moreover, with respect to Sultan, as demonstrated above, the evidence submitted in this Court demonstrates that the connection between Sultan and the September 11 attacks was not so attenuated as the D.C. court believed.  Charged with overseeing Saudi charities operating abroad to ensure that their activities were in accordance with Saudi religious practice, Sultan did not merely carry out his duties negligently or abuse his discretion. Instead, he used his position to accomplish precisely the opposite of that which he was charged to do and to support gross violations of international law and human rights.  For in the years following the formation of the Council headed by Sultan, and during the period where he received multiple briefings from French and American intelligence sources about the role of Saudi charities in financing terrorism, Sultan donated millions of dollars to precisely the organizations designated as terrorist fronts.  *See supra,* pp. 9- 12; *see also* Consolidated Sultan Opposition Brief at 8-12.  This deliberate, knowing support of precisely those organizations committed to terrorist attacks on the United States was outside any kind of official discretion that can be recognized in this Court. *See Letelier*, 488 F.Supp. at 673 ("discretionary function" clause does not extend to acts of assassination); *see also Liu,* 892 F.2d at 1431 (FSIA did not protect discretion of Taiwanese official to plan and direct assassination in the United States).  Given that even the D.C. court, in the November 14 Opinion, recognized that "terrorist acts cannot be considered 'discretionary,'" 292 F.Supp.2d at 21, this Court should not permit Sultan to evade accountability for his deliberate financing of anti-U.S. terrorism through invocation of the "discretionary function"

clause.  Sultan had no discretion to finance terrorists for the purpose of attacking the United States and, under the "tortious act" exception, he should not be accorded sovereign immunity.

## III.   THIS COURT HAS PERSONAL JURISDICTION OVER SULTAN AND TURKI AL-FAISAL

This Court also should re-visit the D.C. court's rulings that it lacked personal jurisdiction over Sultan and Turki Al-Faisal.  In supporting al Qaeda through its various charity fronts, Sultan was well aware that the target al Qaeda planned to attack was the United States.  Having aided and abetted these attacks with knowledge of their target, Sultan should not be heard to complain of the unfairness of being made to answer for his acts in an American court.  Plaintiffs hereby refer to and incorporate by reference their arguments concerning personal jurisdiction set forth in the D.C. Sultan Opposition, the D.C. Sultan Sur-Reply, the Consolidated Sultan Opposition Brief and the Personal Jurisdiction Brief.

Similarly, having assisted bin Laden with the purpose of deflecting al Qaeda's terrorist attacks away from Saudi Arabia and towards the United States, Turki Al-Faisal should not be heard to complain of the unfairness of being made to answer for his acts in an American court. Indeed, plaintiffs note that, in directing bin Laden's terrorist activities away from Saudi Arabia, Turki Al-Faisal could have been in no doubt about where those activities would be directed.  Bin Laden's *fatwas* against the United States, his pronouncements urging his followers to "kill the Americans and plunder their money wherever and whenever they find it," *see* Jihad Against Jews and Crusaders, *World Islamic Front Statement,* 23 February 1998,[13] and his attacks against the United States beginning in 1993 and including the first World Trade Center bombing, the bombing of the U.S. embassies in East Africa, and the bombing of the U.S.S. Cole, made all too

---

[13]  A copy of this document is annexed as Exhibit 5 to the Bierstein Consolidated Aff.

clear that bin Laden had only one other target and that was the United States.  In assisting al Qaeda in exchange for promises not to attack Saudi Arabia, Turki Al-Faisal in effect told bin Laden, "I will help you if you attack the United States instead of Saudi Arabia."  In so doing, he specifically directed his conduct at the United States and can be subjected to personal jurisdiction here.   Plaintiffs hereby refer to and incorporate by reference their arguments concerning personal jurisdiction set forth in the D.C. Turki Opposition, the D.C. Turki Sur-Reply, the Consolidated Turki Opposition Brief, and the Personal Jurisdiction Brief. [14]

---

[14]   In the November 14 Opinion, the D.C. court dismissed plaintiffs' claims against Sultan and Turki Al-Faisal on grounds of sovereign immunity and personal jurisdiction.  To the extent that these defendants raised there or raise in this Court additional grounds for dismissal, plaintiffs respectfully refer to and incorporate by reference the arguments presented in the D.C. Sultan Opposition, the D.C. Sultan Sur-Reply, the Consolidated Sultan Opposition Brief, as well as the D.C. Turki Opposition, the D.C. Turki Sur-Reply, and the Consolidated Turki Opposition Brief.

## CONCLUSION

For the foregoing reasons, this Court should re-consider Sultan's and Turki Al-Faisal's motions to dismiss and, upon reconsideration, should deny those motions in their entirety.

Dated: New York, NY                     Respectfully submitted,
      June 18, 2004

/s/_____
Ronald L. Motley, Esq.
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
William H. Narwold, Esq.
Ingrid L. Moll, Esq.
Justin B. Kaplan
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY  BIERSTEIN & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq.
Amy Ficklin DeBrota, Esq.
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, Indiana 46240
Telephone:  (317) 848-7939

Harry Huge, Esq.
HARRY HUGE LAW FIRM, LLP
Market Square North
1401 Ninth Street, N.W., Suite 450
Washington, D.C. 20004
(202) 824-6046

Allan Gerson, Esq.
Attorney At Law

4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Edward D. Robertson, Esq.
Mary Doerhoff Winter, Esq.
BARTIMUS, FRICKLETON, ROBERTSON
  & OBETZ
200 Madison Street, Suite 1000
Jefferson City, MO 65101
Telephone:  (573) 659-4454

Jack Cordray, Esq.
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone: (843) 577-9761

Attorneys for *Burnett* Plaintiffs