# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: TERRORIST ATTACKS ON | ) | 03-MDL-1570(RCC) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| _____ | ) | |

This document relates to:

*Ashton* v. *Al Qaida Islamic Army*, No. 02-CV-6977 (RCC)
*Barrera* v. *Al Qaeda Islamic Army*, No. 03-CV-7036 (RCC)
*Burnett* v. *Al Baraka Inv. & Dev. Corp.*, No. 03-CV-5738 (RCC)
*Burnett* v. *Al Baraka Inv. & Dev. Corp.*, No. 03-CV-9849 (RCC)
*Federal Insurance Co.* v. *Al Qaida*, No. 03-CV-6978 (RCC)
*Salvo* v. *Al Qaeda Islamic Army*, No. 03-CV-5071 (RCC)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SAUDI HIGH COMMISSION'S MOTION TO DISMISS

---

Lawrence S. Robbins (LR 8917)
Roy T. Englert, Jr.
Alan E. Untereiner
Max Huffman
*Robbins, Russell, Englert, Orseck &*
  *Untereiner LLP*
1801 K Street, N.W., Suite 411
Washington, D.C.  20006
Tel:    (202) 775-4500
Fax:    (202) 775-4510

*Attorneys for Defendant Saudi*
*High Commission*

June 25, 2004

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Saudi High Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Allegations Relating to SHC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    SHC Is Immune from Suit Under the FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    SHC Is a "Foreign State" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.    The State-Sponsor-of-Terror Provision Is the Only FSIA Exception that Could Possibly Cover the Kind of Conduct Alleged by Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.    Neither of the Exceptions to FSIA Immunity that Plaintiffs Allege Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.    The Conduct Alleged of SHC Does Not Meet the Commercial Activity Exception . . . . . . . . . . . . . . . . . . . . . . . . 17

                a.    Plaintiffs do not allege "commercial activity" . . . . . . . . . 17

                b.    Plaintiffs do not allege a direct effect . . . . . . . . . . . . . . . 18

            2.    The Conduct Alleged Does Not Meet the Non-Commercial Tort Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                a.    Plaintiffs do not allege causation . . . . . . . . . . . . . . . . . . 19

                 b.    Plaintiffs allege only discretionary acts . . . . . . . . . . . . . 20

                c.    The "entire tort" requirement is not satisfied . . . . . . . . . 22

**TABLE OF CONTENTS (cont'd)**

**Page**

II.   This Court Lacks Personal Jurisdiction Over SHC, Which Has No
      Contacts with the United States or with the State of New York . . . . . . . . . . . . . 23

III.  Plaintiffs' Insufficient Allegations of Causation Require Dismissal for
      Failure to State a Claim on Which Relief May Be Granted . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**:

*Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) . . . . . . . . . . 6, 11, 22

*Asociacion de Reclamantes* v. *United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984) . . . . . . 22

*Ball* v. *Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194 (2d Cir. 1990) . . . . . . . . . . . . . 10, 23

*Boim* v. *Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 24

*Burnett I*, 274 F. Supp. 2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Burnett II*, 92 F. Supp. 2d 9 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cabiri* v. *Gov't of Republic of Ghana*, 165 F.3d 193 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 22

*Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998) . . . . . . 23

*Creighton, Ltd.* v. *Gov't of the State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999) . . . . . . . . . . . . . 23

*De Letelier* v. *Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dep't of Employ't* v. *United States*, 385 U.S. 355 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Doe* v. *Islamic Salvation Front*, 257 F. Supp. 2d 115 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . 24, 25

*El-Fadl* v. *Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 7

*EOTT Energy Operating Ltd. Partnership* v. *Winterthur Swiss Ins. Co.*, 257 F.3d
    992 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) . . . . . . . . . . . . . 10, 25

*Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) . . . . . . . . 6

*Gibbons* v. *Republic of Ireland*, 532 F. Supp. 668 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . 14

*Gilson* v. *Republic of Ireland*, 682 F.2d 1022 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*GTE New Media Servs. Inc.* v. *BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) . . . . . . . . . . 23

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Hirsh* v. *State of Israel*, 962 F. Supp. 377 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . 10

*Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kelly* v. *Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000)  . . . . . . . . . . . . . . . . . . . . . 12

*Leutwyler* v. *Office of Her Majesty Queen Rania Al-Abdullah*,
    184 F. Supp. 2d 277 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Maalouf* v. *Swiss Confed'n*, 208 F. Supp. 2d 31 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*MacArthur Area Citizens Ass'n* v. *Republic of Peru*,
    809 F.2d 918 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 14, 20

*Macharia* v. *United States*, 334 F.3d 61 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Magness* v. *Russian Fed'n*, 247 F.3d 609 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Moran* v. *Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*O'Connell Mach. Co.* v. *M.V. "Americana"*, 734 F.2d 115 (2d Cir. 1984)  . . . . . . . . . . . . . . . . 13

*Persinger* v. *Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . 22

*Phoenix Consulting, Inc.* v. *Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000) . . . . . . . . . . . . . 9

*Price* v. *Socialist People's Libyan Arab Jamahiriya* 294 F.3d 82 (D.C. Cir. 2002) . . . . . . . 15, 16

*Princz* v. *Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994)  . . . . . . . . . . . . . . . . . . 19

*Reiss* v. *Société Centrale du Groupe des Assurances Nationales*,
    235 F.3d 738 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Republic of Argentina* v.  *Weltover, Inc.*, 504 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . 17, 18, 19

*Republic of Austria* v. *Altmann*, No. 03-13 (U.S. June 7, 2004) . . . . . . . . . . . . . . . . . . . . . . 11, 16

*Robinson* v. *Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . 9, 14, 19, 20

*S & Davis Int'l.* v. *Republic of Yemen*, 218 F.3d 1292 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . 13

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Saudi Arabia* v. *Nelson*, 507 U.S. 349 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schooner Exchange* v. *McFaddon*, 7 Cranch 116 (1812) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Stern* v. *Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . 14

*Tex. Trading & Milling Corp.* v. *Fed'l Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981) . . . 7, 23

*Transaero, Inc.* v. *La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994) . . . . . . . . . . . . . 13

*Transatlantic Shiffahrts-kontor GMBH* v. *Shanghai Foreign Trade Corp.*,
    204 F.3d 384 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tuck* v. *Pan Am. Health Org.*, 668 F.2d 547 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ungar* v. *Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Gaubert*, 499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Varig Airlines*, 467 U.S. 797 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*USX Corp.* v. *Adriatic Ins. Co.*, 345 F.3d 190 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480 (1983) . . . . . . . . . . . . . . . . . . . . . . . 16

*Virtual Countries, Inc.* v. *Republic of S. Africa*, 300 F.3d 230 (2d Cir. 2002) . . . . . . . . . . 18, 19

**Statutes and Rules**:

18 U.S.C. § 2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 2334(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1603(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

28 U.S.C. § 1603(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

28 U.S.C. § 1603(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

28 U.S.C. § 1605(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

v

## TABLE OF AUTHORITIES (cont'd)

Page(s)

28 U.S.C. § 1605(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1605(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14, 15, 16

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 11(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Fed. R. Civ. P. 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Fed. R. Civ. P. 12(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Miscellaneous**:

BLACK'S LAW DICTIONARY (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Department of the Treasury, Office of Public affairs, *Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain in the Fight Against Terrorist Financing* (Jan. 22, 2004), available at http://www.treasury.gov/ press/releases/js1108.htm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

H.R. REP. No. 94-1487 (1976), reprinted in 1976 U.S.C.C.A.N. 6604 . . . . . . . . . . . . . . . *passim*

President George W. Bush, *Remarks After Meeting With Crown Prince of Saudi Arabia* (Apr. 25, 2002), available at http://www.whitehouse.gov/news/releases/2002/04/ 20020425-4.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Secretary of State Colin L. Powell, *Interview by Michael Smerconish of WPHT Radio, Philadelphia* (Jan. 21, 2004), available at http://www.state.gov/secretary/rm/ 28292.htm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

WEBSTER'S NEW WORLD DICTIONARY (3d Collegiate ed. 1988) . . . . . . . . . . . . . . . . . 12

6/24/03 *Burnett* Hearing Tr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20, 24

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SAUDI
## HIGH COMMISSION'S MOTION TO DISMISS

In their shotgun approaches to the complaints consolidated before this Court, plaintiffs have sued many who had nothing to do with the September 11 terrorist attacks and who do not support or condone terrorism.  The Saudi High Commission (SHC) – an agency of the Kingdom of Saudi Arabia (KSA), created to assist victims of Serb genocide in Bosnia-Herzegovina – is one of those defendants.  Plaintiffs' choosing to sue SHC is especially misguided because SHC's very mission is to alleviate suffering by victims and survivors of violence that, like the terrorist attacks on September 11, is too terrible to comprehend.  And it also is a mistake to lash out against an agency of KSA – a nation that, like the United States, knows the pain of senseless Al Qaeda violence.  This Nation's leaders repeatedly have hailed KSA as a staunch ally in the efforts to bring terrorists to justice and to prevent future atrocities.[1]

Other defendants that also are agencies or instrumentalities of KSA already have entered appearances and moved to dismiss plaintiffs' claims.[2]  In the cases of Their Royal Highnesses Prince

---

[1] See, *e.g.*, President George W. Bush, *Remarks After Meeting With Crown Prince of Saudi Arabia* (Apr. 25, 2002) ("The Crown Prince and I had a very cordial meeting that confirmed the strong relationship between Saudi Arabia and the United States of America.  * * *  It's a strong and important friendship, and he knows that and I know that * * *.  And we're constantly working with him and his government on intelligence-sharing and cutting off money.  * * *  It's in his interest that we rout out terror."), available at http://www.whitehouse.gov/news/ releases/2002/04/20020425-4.html; Secretary of State Colin L. Powell, *Interview by Michael Smerconish of WPHT Radio, Philadelphia* (Jan. 21, 2004) ("The Saudis are friends.  We have been friends with the Saudis for many years, and we want to remain friends with the Saudis.  * * *  Frankly, we need their partnership.  We need their friendship."), available at http://www.state.gov/secretary/rm/28292.htm; Department of the Treasury, Office of Public Affairs, *Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain in the Fight Against Terrorist Financing* (Jan. 22, 2004) ("Like the United States, the Saudis have been victims of al-Qaida.  They are an important partner in the war on terrorist financing, and have taken important and welcome steps to fight terrorist financing."), available at http://www.treasury.gov/press/releases/js1108.htm.

[2] See the memoranda of law in support of the motions to dismiss by Prince Naif bin Abdulaziz Al-Saud (filed June 11, 2004); Prince Sultan bin Abdulaziz Al-Saud (filed May 10, 2004) (5/10/04 Sultan Mot.); Prince Turki Al-Faisal bin Abdulaziz Al-Saud (filed May 10, 2004) (5/10/04 Turki Mot.); Prince Salman bin Abdulaziz Al-Saud (filed May 10, 2004) (5/10/04 Salman Mot.); and National Commercial Bank (filed March 19, 2004) (3/19/04 NCB Mot.).

Sultan bin Abdulaziz Al-Saud and Prince Turki Al-Faisal bin Abdulaziz Al-Saud, Judge Robertson dismissed the complaint in *Burnett* v. *Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9 (D.D.C. 2003) (*Burnett II*), on the twin grounds of immunity from suit under the Foreign Sovereign Immunities Act and lack of personal jurisdiction.  The reasoning in *Burnett II* and in other defendants' legal memoranda applies with equal force to SHC, and we urge the Court to keep that opinion, and those memoranda, in mind.

This Court should dismiss plaintiffs' claims against SHC (1) under Fed. R. Civ. P. 12(b)(1), because SHC is absolutely immune from suit in courts of the United States; (2) under Rule 12(b)(2), because SHC has *no* contacts with the United States or with New York; and (3) under Rule 12(b)(6), because all of the complaints fail to state claims on which relief can be granted.[3]

## BACKGROUND

A.     **The Saudi High Commission.**  SHC was formed in 1993 at a time of civil war in the former Yugoslavia.  The Bosnian Muslims and Croats reached a peace agreement and formed the Federation of Bosnia-Herzegovina in 1994 – but  the Bosnian Serbs, supported by neighboring Serbia under the dictator Slobodan Milosevic, continued the war.  Serbian atrocities included the destruction of historical treasures – mosques, libraries, and entire ancient cities – as well as brutal massacres of thousands of civilians.  Decl. of Saud bin Mohammad Al-Roshood ¶ 3 (Exh. A to the Decl. of Max Huffman) (*Al-Roshood Decl.*).  The United States hosted talks at Wright-Patterson Air Force Base, and the 1995 Dayton Peace Accord ended the fighting.  *Al-Roshood Decl.* ¶ 4.

During and after the civil war, there was much interest among the citizenry and the govern-

---

[3] Other grounds for dismissal exist, including the nonjusticiability of the claims by plaintiffs against a foreign government or its agency or political subdivision, alleging quintessentially sovereign acts, and multiple failures to state claims on which relief may be granted.  SHC reserves those arguments until after the issues presented by this motion have been decided.  See Fed. R. Civ. P. 12(h)(2).

2

ment of KSA in supporting humanitarian causes in Bosnia-Herzegovina.   In Decision No. 17419, dated 2/12/1412 (1993 Gregorian), the President of the Council of Ministers of Saudi Arabia, King Fahad bin Abdulaziz Al-Saud, decreed the formation of SHC by High Order.  The same High order named as President of SHC his Royal Highness Prince Salman bin Abdulaziz Al-Saud, a Saudi Royal Family member who is a high-ranking government official and the Governor of Riyadh Province.  King Fahad vested in SHC and its President, Prince Salman, sole authority to collect donations and provide aid and humanitarian relief in Bosnia-Herzegovina, so KSA would "speak with one voice" as a nation toward Bosnia-Herzegovina.  *Id.* ¶¶ 5, 6.

SHC, acting on behalf of KSA, has funded a broad range of humanitarian relief efforts and provided foreign aid directly to the Bosnian government.  Throughout its efforts in Bosnia-Herzegovina, SHC has worked closely with the United Nations High Commission for Refugees and the United Nations Educational, Scientific and Cultural Organization, which had missions overlapping that of SHC.  *Id.* ¶¶ 15-19.  In two specific instances, SHC has directed its relief efforts to other geographic locales – once in Egypt, following an earthquake, and once in Somalia, in response to a famine.  *Id.* ¶¶ 22-23.

SHC is an agency of KSA.[4]  Decl. of Dr. Mutlib bin Abdullah Al-Nafissa ¶ 3 (Exh. C to the Decl. of Max Huffman) (*Al-Nafissa Decl.*).   The President of the Council of Ministers has the authority to order the formation of a government entity such as SHC.  *Id.* ¶ 4.  Formation by High Order is a different procedure from that by which private charities are formed.  *Id.* ¶ 5.  As an agency of KSA, SHC is subject to suit in the Board of Grievances, which exercises jurisdiction over government organs' administrative decisions not of a sovereign nature.  *Id.* ¶ 8.  Actions by SHC are

---

[4]  Much like the American National Red Cross, which is an instrumentality of the U.S. government, SHC receives funding in part from private sources.  See *Al-Roshood Decl.* ¶ 24. Compare *Dep't of Employ't* v. *United States*, 385 U.S. 355, 358-360 (1966).

necessarily in keeping with the foreign, political, social, and economic policies of KSA, and properly are viewed as actions of KSA. *Id.* ¶¶ 3, 10.  Prince Salman is head of both decisionmaking bodies within SHC – the Executive Committee and the Supreme Commission. *Al-Roshood Decl.* ¶ 7.  SHC is staffed primarily with civil servants on detail from other ministries of KSA. *Id.* ¶ 10.

Approximately half of all SHC's donations have been in the form of foreign aid to the Bosnian government. *Al-Roshood Decl.* ¶¶ 12-13, 20-21.  Prince Salman and the Executive Committee and Supreme Commission make discretionary decisions how to spend humanitarian and foreign assistance funds. *Al-Nafissa Decl.* ¶ 9.  SHC's discrete relief efforts in Egypt and in Somalia were undertaken at the specific direction of King Fahad, although the details were discretionary.  *Al-Roshood Decl.* ¶¶ 22-23; *Al-Nafissa Decl.* ¶ 9.  In no case has SHC humanitarian relief or foreign aid been given for "commercial purposes," and in no case has SHC expected, or received, anything in return for the donation of money.  *Al-Roshood Decl.* ¶ 14.

**B.      Allegations Relating to SHC.**  Plaintiffs' sparse allegations regarding SHC have the feel (and legal effect) of "Headline News" sound-bites, and they utterly fail to provide any basis for the Court to assert subject-matter jurisdiction over claims against an agency of KSA; for the Court to assert personal jurisdiction over an entity with no connection to the United States; or for the Court to entertain any substantive claim for relief.  Regarding personal jurisdiction, plaintiffs make *no* allegations of contacts that SHC has with the United States.  The only allegation relevant to the Foreign Sovereign Immunities Act (FSIA) states (accurately) that "[t]he Saudi High Commission is an agency, instrumentality and organ of the Kingdom of Saudi Arabia." *Fed. Ins.* Compl. ¶ 181.

Plaintiffs' substantive allegations are a hodgepodge of vague and conclusory statements apparently designed to create impressions about some imagined role that SHC has had in funding world terror.  Plaintiffs allege that SHC has been "criticized"; that it employed an Algerian suspected

of ties to other Algerians who, in turn, were suspected of ties to Al Qaeda; that computers found in offices used by SHC in Bosnia had pictures of the World Trade Center and other seemingly nefarious materials; that people disguised as SHC relief workers entered Bosnia-Herzegovina; and that SHC has "materially supported" al Qaeda.  These allegations were detailed with specificity by Prince Salman in his motion to dismiss.  5/10/04 Salman Mot. 4-5 and Exh. D.

Plaintiffs make a few other, equally vague, allegations about SHC (but not about Prince Salman) that at most might support a claim that SHC donations, after being given for charitable purposes, were passed on by others, through several hands, and ultimately supported bin Laden in some undefined manner.  "In a 1995 interview, Osama Bin Laden [said], 'The bin-Laden Establishment's aid covers 13 countries . . . this aid comes in particular from the Saudi High Commission.'"  *Ashton* Compl. ¶ 462; *Barrera* Compl. ¶ 464.  "The * * * Saudi High Commission has been identified by Bosnian intelligence as a source of Taibah's funds" (*Ashton* Compl. ¶ 376; *Barrera* Compl. ¶ 378; *Burnett* (NY & DC) ¶ 298; see *Fed. Ins.* Compl. ¶ 243) – as has some entity called the "Saudi Relief Commission" (*Ashton* Compl. ¶ 384; *Barrera* Compl. ¶ 386; *Salvo* Compl. ¶ 583; *Burnett* (NY & DC) ¶ 306).  The head of the Zagreb office of SHC allegedly was a member of a group that planned a 1993 bombing in Croatia (which apparently never took place).  *Fed. Ins.* Compl. ¶ 138.  Like all the others, these allegations demonstrate neither any connection between SHC charitable donations and the September 11 attacks, nor any level of knowledge that SHC funds might be used improperly.  Finally, there is one allegation that "[t]he September 11th Attack was a direct, intended and foreseeable product of Saudi High Commission's participation in al Qaida's jihadist campaign."  *Fed. Ins.* Compl. ¶ 189.  None of the other complaints makes this conclusory and unsubstantiated allegation.

C.    **The Proceedings.**  Judge Robertson's holdings in *Burnett I*, 274 F. Supp. 2d 86 (D.D.C. 2003), and *Burnett II* are highly relevant to the arguments in this Memorandum.

5

1. The primary importance of *Burnett I* concerns personal jurisdiction. The court held that the appropriate analysis inquired of minimum contacts with the whole United States, because of the nationwide service provisions of the Antiterrorism Act, 18 U.S.C. § 2334(a). With respect to defendant Al Rajhi Banking & Investment Corp., the court noted that plaintiffs' factual showing of (1) litigation initiated in Texas by its wholly owned subsidiary, and (2) an Internet website advertising a fund-transferring service in the United States, did "not satisfy [plaintiffs'] jurisdictional burden, but [was] enough (barely) to warrant limited jurisdictional discovery." 274 F. Supp. 2d at 97. Judge Robertson's opinion in *Burnett I* is clear that dismissal, not jurisdictional discovery, would have been appropriate but for plaintiffs' demonstration of the two attenuated contacts with the United States. See *ibid.*

2. In *Burnett II*, Princes Sultan and Turki – who are, like SHC, statutory "foreign states" – moved to dismiss on grounds of immunity under the FSIA and personal jurisdiction. Judge Robertson noted the accepted standards for FSIA immunity:

> "The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court," [and] "must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity."

292 F. Supp. 2d at 14 (quoting *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)). The court also noted the unique treatment given to a motion to dismiss based on FSIA arguments, which "'provides protection from *suit* and not merely a defense to liability.'" 292 F. Supp. 2d at 14 (quoting *Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, 905 F.2d 438, 440 n.3 (D.C. Cir. 1990)) (emphasis added).

a. Princes Sultan and Turki presented declarations attesting to their status as instrumentalities of KSA, and attesting to the official and discretionary nature of all of the conduct alleged by plain-

tiffs in that case.  292 F. Supp. 2d at 15, 16.  Opposing the motions to dismiss, plaintiffs "made no showing that any of Prince Turki's actions were taken in other than in his official capacity[,] * * * compel[ling] the conclusion that the allegations  * * * only relate to actions he took in his official capacity."  *Id.* at 15.  In the absence of such a factual showing by plaintiffs, discovery on the FSIA defense was not allowed, as it would have "'frustrate[d] the significance and benefit of entitlement to immunity from suit.'"  *Id.* at 15-16 (quoting *El-Fadl* v. *Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996)).

b. Judge Robertson also held that the "commercial activity" exception to FSIA immunity did not apply to the conduct alleged.  292 F. Supp. 2d at 16-21 (citing 28 U.S.C. § 1605(a)(2), (a)(5)).  "'Crucial to each of the three clauses of § 1605(a)(2) is the phrase "commercial activity."'"  292 F. Supp. 2d at 17 (quoting *Tex. Trading & Milling Corp.* v. *Fed'l Republic of Nigeria*, 647 F.2d 300, 307 (2d Cir. 1981)).  And "[t]he act of contributing to a foundation is not within our ordinary understanding of 'trade and traffic or commerce,' nor, apparently, was it within the contemplation of the Congress that enacted the FSIA in 1976."  292 F. Supp. 2d at 18 (citing H.R. REP. NO. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615.  Allegations that Prince Sultan contributed to charities did not satisfy the exception.  292 F. Supp. 2d at 18.

c. The "non-commercial tort" exception did not apply either.  Plaintiffs had failed to allege that any activities by Princes Sultan or Turki *caused* the September 11 attacks as required by Section 1605(a)(5).  To find causation based on allegations that "Prince Turki or Prince Sultan funded * * * those who funded * * * those who carried out the September 11th attacks would stretch the causation requirement * * * not only to the 'furthest reaches of the common law,' but perhaps beyond, to terra incognita."  *Id.* at 20 (quoting *MacArthur Area Citizens Ass'n* v. *Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987)).  Judge Robertson noted that the specific "state sponsor of terror" exception of 28

U.S.C. § 1605(a)(7) *clearly* applied to the claims plaintiffs sought to allege – "the provision of material support or resources" – buttressing the conclusion that the non-commercial tort exception, which does *not* describe these claims, did not apply.  292 F. Supp. 2d at 20 n.5.[5]  Finally, Judge Robertson also held that the conduct alleged of Prince Sultan – "making recommendations to the Council of Ministers about requests for assistance * * * or, * * * deciding what disbursements should be made" – was "clearly" exercising a discretionary function, which necessarily rendered the non-commercial tort exception inapplicable to that conduct.  *Id.* at 20-21.

d.  Judge Robertson described as "desultory" plaintiffs' effort to allege personal jurisdiction over Prince Sultan.  None of the contacts alleged had anything to with the causes of action in the complaint, and plaintiffs did not demonstrate "how their showing of minimum contacts might be enhanced by jurisdictional discovery."  *Id.* at 21-22.  The court rejected an attempt to argue "purposeful availment" under *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462 (1984), because there were no allegations that Princes Sultan and Turki directed anything toward the United States.

## ARGUMENT

The multiple failings of the claims against Princes Sultan and Turki in *Burnett* are endemic to the complaints against SHC consolidated before the Court in this MDL proceeding, and require dismissal of the complaints against SHC.  The FSIA and the Due Process Clause do not permit agencies and political subdivisions of foreign sovereigns, with no connection to the United States, to be sued in U.S. courts for quintessentially sovereign acts.  And plaintiffs' substantive claims could fare no better: it is pure fancy to believe that an agency that did not commit, did not contribute to, did not encourage, and did not condone the September 11 attacks somehow caused those attacks to occur.

---

[5]  The state-sponsor-of-terror exception is inapplicable because Saudi Arabia has not been "designated" by the Secretary of State.  Section 1605(a)(7)(A); see pp. 14-16, *infra*.

The most glaring deficiency of the various allegations against SHC is plaintiffs' utter failure to plead any conduct that *caused* the September 11 attacks.  Lead counsel for the *Burnett* plaintiffs has conceded that plaintiffs failed to allege, and would not be able to prove, any direct link between an act or omission of most defendants and the September 11 attacks.  "If that's the burden, Judge, we don't have a case against most of these defendants."  6/24/03 *Burnett* Hearing Tr. 78.  But that is *precisely* plaintiffs' burden.  Causation is an essential element of pleading and proving both the commercial activity exception (see Section 1605(a)(2) (act alleged must "*cause*[] a direct effect in the United States") (emphasis added)) and the non-commercial tort exception to FSIA immunity (see Section 1605(a)(5) (claims for injury "*caused* by the tortious act or omission" of a foreign state or agency) (emphasis added)).  Some form of causation is also essential to any theory of personal jurisdiction that does not require actual physical contacts with the United States.  See *Calder* v. *Jones*, 465 U.S. 784 (1984) (discussing the "potentially devastating impact" of the defendant's conduct, which was "expressly aimed" at the forum state); *Burnett II*, 292 F. Supp. 2d at 22-23.  And, without any allegations of causation, plaintiffs cannot succeed on any of their substantive claims.

In resolving this motion to dismiss under Fed. R. Civ. P. 12(b)(1) because of FSIA immunity, the Court "'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling.'"  *Robinson* v. *Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (quoting *Phoenix Consulting, Inc.* v. *Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Courts give "great weight" to submissions made by foreign defendants regarding the scope of their official responsibilities (*Leutwyler* v. *Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001)), and it is error to "fail[] to look beyond the pleadings to factual submissions, including affidavits."  *Robinson*, 269 F.3d at 140-141.  The importance of this preliminary jurisdictional assessment was highlighted by the Second Circuit in *Robinson* (*id.* at 141 (quoting

9

*Moran* v. *Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994))):

> The district court's review of the evidence before it on a motion to dismiss based on an assertion of sovereign immunity has particular significance because of the necessity of resolving that issue early on if possible. "Sovereign immunity under the FSIA is immunity from suit, not just from liability." Such immunity is effectively lost if a case is permitted to go to trial.

SHC submits the Declarations of Dr. Al-Nafissa and Mr. Al-Roshood in support of its FSIA defense. Dr. Al-Nafissa is a member of the Council of Ministers, the highest governing body in KSA. Throughout his distinguished career with the government of KSA, Dr. Al-Nafissa, a U.S.-educated Saudi lawyer, has performed legal work for KSA. In his current position as Minister of State, Dr. Al-Nafissa is tasked with reviewing all legal issues that come before the Council of Ministers and with providing legal advice to the Council. *Al-Nafissa Decl.* ¶ 1. King Fahad authorized Dr. Al-Nafissa to make the declaration, which describes the legal status of SHC under KSA law. *Id.* ¶ 2. Mr. Al-Roshood is the Director of the Executive Office of SHC. *Al-Roshood Decl.* ¶ 1. His declaration describes factual issues pertaining to the formation and operation of SHC. *Id.* ¶ 2.

On this motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiffs bear the burden of proof. See *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). "If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Ball* v. *Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

As for the Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court should consider only the "well-pleaded allegations" of the complaints. "[C]ourts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened." *First Nationwide Bank* v. *Gelt Funding Corp.*, 27

F.3d 763, 772 (2d Cir. 1994).

I.        **SHC Is Immune from Suit Under the FSIA**

Plaintiffs do not allege any basis for this Court to assert subject-matter jurisdiction over their claims against SHC. The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Amerada Hess*, 488 U.S. at 434.[6] A foreign state or its agency or political subdivision – like SHC (see *infra*) – is immune from suit unless one of the "statutorily defined exceptions" permits jurisdiction. *Reiss* v. *Société Centrale du Groupe des Assurances Nationales*, 235 F.3d 738, 747 (2d Cir. 2000). See 28 U.S.C. § 1604.

The structure of the FSIA is much like that of the Federal Tort Claims Act (FTCA): foreign states – a defined statutory term that includes agencies and political subdivisions of foreign states – are "immune from the jurisdiction of the courts of the United States" (28 U.S.C. § 1603(a)), unless a plaintiff can demonstrate that one of an enumerated list of narrowly drawn exceptions applies. *MacArthur Area Citizens*, 809 F.2d at 919-920; see *id.* at 921-922 (interpreting the "discretionary function" provision of the FSIA, 28 U.S.C. § 1605(a)(5)(A), by reference to the "discretionary function" provision of the FTCA, 28 U.S.C. § 2680(a)).

A.        **SHC Is a "Foreign State"**

SHC is an agency of KSA. See p. 3, *supra*. See also *Fed. Ins.* Compl. ¶ 181 (SHC "is an agency, instrumentality and organ of the Kingdom of Saudi Arabia."). Under the FSIA (28 U.S.C. § 1603(b)):

---

[6] "'Th[e] perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to wave [sic] the exercise or a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation.'" *Republic of Austria* v. *Altmann*, No. 03-13, slip op. 9-10 n.9 (U.S. June 7, 2004) (alterations in original) (quoting *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 137 (1812) (Marshall, C.J.)).

> An "agency or instrumentality of a foreign state" means any entity – (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state * * *, and (3) which is neither a citizen of a State of the United States * * * nor created under the laws of any third country.

As the legislative history of the FSIA states, "entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including * * * a department or ministry which acts and is suable in its own name."  1976 U.S.C.C.A.N. at 6614.

"The first criterion [of Section 1603(b)] * * * is intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name." *Ibid.*  SHC is an identifiable legal entity with its own organizational chart, headed by a high-ranking government official, Prince Salman.  See *Al-Roshood Decl.* ¶¶ 6-11.  SHC is subject to suit in Saudi Arabia for non-discretionary acts.  See p. 3, *supra.*  And SHC does "contract" and "hold property in its own name," in support of its humanitarian and foreign aid efforts.  See *Al-Roshood Decl.* ¶ 13.

Second, SHC is an organ of KSA.  This fact is specifically alleged in one of the complaints. See *Fed. Ins.* Compl. ¶ 181.  In any event, the fact is beyond cavil.  Although the term is not defined in the statute, an "organ" of government is "a[n] * * * instrument for the performance of some action."  Webster's New World Dictionary 954 (3d Collegiate ed. 1988).[7]  SHC is a government agency under KSA law, staffed with civil servants, funded primarily by KSA, and formed by High

---

[7] When evaluating whether an entity is an "organ," other circuits have considered:

> (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies * * *; and (6) the entity's obligations and privileges under the foreign state's laws.

*USX Corp.* v. *Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003) (citing *EOTT Energy Operating Ltd. Partnership* v. *Winterthur Swiss Ins. Co.*, 257 F.3d 992, 997 (9th Cir. 2001), and *Kelly* v. *Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 846-847 (5th Cir. 2000)).  All six factors support treating SHC as an organ of KSA.

Order of King Fahad to effect government policy regarding Bosnia-Herzegovina.  See pp. 3-4, *supra*.

Third, SHC is not a citizen of either the United States or of any third country.  SHC has no connection to the United States and has no legal status in any country other than Saudi Arabia.  SHC's status as an agency of KSA under Section 1603(b) cannot reasonably be doubted.

Alternatively, SHC should be considered a "political subdivision" of KSA.  See Section 1603(a).  "[P]olitical subdivisions were intended to include 'all governmental units beneath the central government.'"  *O'Connell Mach. Co.* v. *M.V. "Americana"*, 734 F.2d 115, 116 (2d Cir. 1984) (quoting 1976 U.S.C.C.A.N. at 6613).  A "public financial entity which coordinates the management of the commercial enterprises of the Italian Government" fit that definition.  *O'Connell Mach.*, 734 F.2d at 116.  Arguably, SHC has no function *but* a governmental one: to create and to carry out KSA foreign policy related to providing humanitarian assistance and foreign aid in Bosnia-Herzegovina.  See pp. 3-4, *supra*.  See also BLACK'S LAW DICTIONARY 1159 (6th ed. 1990) ("political subdivision" means an entity constituted to "carry[] out * * * functions of state which * * * have always been regarded as public"); 3/19/04 NCB Mot. 8-9 (discussing the Saudi Arabian Public Investment Fund).  Courts have treated ministries of foreign sovereigns as political subdivisions.  See *Magness* v. *Russian Fed'n*, 247 F.3d 609, 613 n.7 (5th Cir. 2001) (holding that the Russian Ministry of Culture is a political subdivision of Russia); *S & Davis Int'l* v. *Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000) (noting that the Ministry of Supply and Trade is a political subdivision of Yemen).  Likewise with military entities.  *Transaero, Inc.* v. *La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) (air force was a political subdivision because "the powers to declare and wage war" are essentially sovereign).  If not an agency of KSA, SHC is a political subdivision.  And whether SHC is a political subdivision or an agency of KSA does not affect the jurisdictional analysis.  See Section 1603(a) ("foreign state" includes political subdivisions and agencies).

Once this Court holds that SHC is a foreign state, plaintiffs "ha[ve] the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted." *Robinson*, 269 F.3d at 141; see 28 U.S.C. § 1604; *MacArthur Area Citizens*, 809 F.2d at 78. "[A] foreign state, including its agencies and instrumentalities, is presumptively immune from suit in U.S. courts unless a specific FSIA exception to immunity applies." *Transatlantic Shiffahrts-kontor GMBH* v. *Shanghai Foreign Trade Corp.*, 204 F.3d 384, 388 (2d Cir. 2000). The exceptions are narrow, and "'immunity remains the rule rather than the exception.'" *MacArthur Area Citizens*, 809 F.2d at 78 (quoting *Gibbons* v. *Republic of Ireland*, 532 F. Supp. 668, 671 (D.D.C. 1982)).

### B. The State-Sponsor-of-Terror Provision Is the Only FSIA Exception that Could Possibly Cover the Kind of Conduct Alleged by Plaintiffs

The state-sponsor-of-terror exception to FSIA immunity, 28 U.S.C. § 1605(a)(7), provides "the antiterrorism provisions of the FSIA," *Stern* v. *Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003), and creates the *exclusive basis* for subject-matter jurisdiction over a suit against a foreign sovereign or its agency or political subdivision alleging terrorist acts:

> A foreign state shall not be immune * * * in any case * * * not otherwise covered by paragraph (2) [the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such act * * * except that the court shall decline to hear a claim under this paragraph – (A) if the foreign state was not designated as a state sponsor of terrorism * * *.

The plain text precludes the application of any exception *but* this one or the commercial activity exception (Section 1605(a)(2)) – which even plaintiffs implicitly acknowledge does not apply here (see p. 14, *infra*) – to claims involving "the provision of material support or resources" for terrorism. Moreover, as Judge Robertson noted, Congress's failure to include "the provision of material support or resources" as a category of conduct excepted from immunity under the non-commercial tort

exception, Section 1605(a)(5), creates a "powerful presumption" that Congress meant to exclude such conduct from the reach of that exception. *Burnett II*, 292 F. Supp. 2d at 20 n.5.

Indeed, before the enactment of Section 1605(a)(7), lawsuits alleging state-sponsored terrorism were understood not to be within the subject-matter jurisdiction of U.S. courts, although both other exceptions *were* in existence. See *Price* v. *Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88-89 (D.C. Cir. 2002). "Under the original FSIA" – which included both the commercial activity and non-commercial tort exceptions in identical form to the current statute – the types of conduct listed in Section 1605(a)(7), if "committed abroad[,] were immunized forms of state activity." *Id.* at 88. Plaintiffs' apparent claims of "provision of material support or resources" to terrorists are thus governed by the state-sponsor-of-terror exception – *not* by any other exception.

Plaintiffs have argued that Section 1605(a)(7) was added to the FSIA to permit suits over conduct "committed abroad," so the section does not inform the immunity analysis for conduct in the United States. See 5/14/04 Opp. to Sultan Mot. 21 (citing *Price*, 294 F.3d at 88). Plaintiffs' argument ignores the fact that Section 1605(a)(7) – not (a)(5) and not (a)(2) – deals with "provision of material support or resources," and thus it is the appropriate exception for plaintiffs' claims, wherever the conduct occurs. See *Burnett II*, 292 F. Supp. 2d at 20 n.5. Even if plaintiffs' argument were correct, however, conduct "committed abroad" is exactly what plaintiffs allege of SHC. Plaintiffs could not possibly hope for more from their opaque allegations in the complaints than a finding that SHC "provi[ded] material support and resources" to Al Qaeda *in Bosnia* – immunized conduct before the addition of Section 1605(a)(7). Congress cured that deficiency in the statute by adding a provision that would eliminate such immunity *only* for specifically designated terrorist states.[8]

---

[8]   Allowing plaintiffs to circumvent Section 1605(a)(7)'s prohibition on jurisdiction over suits alleging the "provision of material support or resources" against non-designated states by suing under the commercial activity or non-commercial tort exceptions would have the untoward effect of granting greater protections to a designated

Plaintiffs' allegations might support jurisdiction against a designated terrorist state like Iran, but they are of no moment against an agency of a U.S. ally.  Reflecting a "delicate legislative compromise" that took into account the Executive Branch's concern that "the American government [might be subject] to suits in foreign countries for actions taken in the United States," Section 1605(a)(7) permits suit only against a defendant "specifically designated by the State Department as a 'state sponsor of terrorism.'"  *Price*, 294 F.3d at 89.  Congress left to the Executive, as a classic "political question," the determination whether a foreign sovereign may be haled into U.S. courts to answer claims of terrorism or "provision of material support or resources" to terrorists.[9]  See *Republic of Austria* v. *Altmann*, No. 03-13, slip op. 10 (U.S. June 7, 2004) ("this Court has 'consistently . . . deferred to the decisions of the political branches – in particular, those of the Executive Branch – on whether to take jurisdiction' over particular actions against foreign sovereigns and their instrumentalities") (quoting *Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)).  By designating certain states as sponsors of terrorism, thereby opening them to suit under Section 1605(a)(7), the Executive Branch has disavowed any foreign policy interest in ensuring those states' immunity from suit.  But, as regards allies of the United States, like KSA, that are *not* so designated, the Executive Branch has precluded these suits as against foreign policy interests.

### C.   Neither of the Exceptions to FSIA Immunity that Plaintiffs Allege Applies

In their misguided attempt to escape the FSIA's express prohibition on suits alleging terrorist conduct or support against sovereign defendants *not* designated as state sponsors of terror, plaintiffs

---

terrorist state like Iran (sued as a state sponsor of terror) than to a U.S. ally like KSA.  Section 1605(a)(7)(B) contains specific protections – including the requirements that a defendant sued for terrorist acts be given "a reasonable opportunity to arbitrate the claim" and that the claimant and victim have been "national[s] of the United States" at the time of the act complained of – that are not available under the other exceptions.

[9]   The political question doctrine provides a basis, sufficient in itself, for this Court to dismiss the claims against any agency or instrumentality of the Kingdom of Saudi Arabia, including SHC.  See 3/19/04 NCB Mot. 18-20.

rely on two exceptions to immunity – the commercial activity exception (Section 1605(a)(2)) and the non-commercial tort exception (Section 1605(a)(5)) – that have nothing to do with the claims brought against SHC.  The Court's analysis of the exceptions also should be informed by their purposes: "[The] FSIA was written in great measure to ensure that 'our citizens will have access to the courts in order to resolve *ordinary* legal disputes.'"  *Gilson* v. *Republic of Ireland*, 682 F.2d 1022, 1028 & n.29 (D.C. Cir. 1982) (emphasis added) (quoting 1976 U.S.C.C.A.N. at 6605).

### 1.   The Conduct Alleged of SHC Does Not Meet the Commercial Activity Exception

The commercial activity exception is patently inapplicable to plaintiffs' claims – so much so that plaintiffs themselves have abandoned reliance on this exception when opposing other motions to dismiss.  See, *e.g.*, 5/14/04 Opp. to Sultan Mot.; 5/14/04 Opp. to Turki Mot.

*a. Plaintiffs do not allege "commercial activity."*  Plaintiffs allege broadly that SHC gave money in the form of humanitarian aid to somebody who gave it to somebody else – with the money ultimately making its way into the hands of terrorists.  A "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act" (28 U.S.C. § 1603(d)) – activity undertaken by a government "in the manner of a private player within [the market]." *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 614 (1992).[10]  The conduct alleged of SHC cannot, under any understanding of the phrase, be considered "commercial activity."

---

[10] Congress gave examples of the type of activities it considered "commercial" – generally those "customarily carried on for profit" and procurement, construction, and employment contracts.  1976 U.S.C.C.A.N. at 6614-6615.  By contrast, "a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute commercial activity." 1976 U.S.C.C.A.N. at 6615.  See *Burnett II*, 292 F. Supp. 2d at 18.  In *Tuck* v. *Pan American Health Organization*, 668 F.2d 547 (D.C. Cir. 1981), claims arising from the administration of an international health organization did not constitute "commercial activity" as required to subject the organization to suit under the FSIA.  668 F.2d at 550.  Neither can SHC's foreign aid and humanitarian relief – for which SHC never sought, or received, compensation (*Al-Roshood Decl.* ¶ 14) – be considered commercial.

In *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 356, 361 (1994), the Court rejected an argument that tortious conduct against an American citizen employed by a hospital in Saudi Arabia, allegedly undertaken in the context of operating the hospital, was within the commercial activity exception. "The conduct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood * * * as peculiarly sovereign in nature." *Id.* at 361.

This Circuit has stated the similar rule that criminal activity – even if undertaken as part of an overall transaction that is commercial in nature – cannot be "commercial activity." *De Letelier* v. *Republic of Chile*, 748 F.2d 790, 797 (2d Cir. 1984) ("alleged 'kidnapping' by a foreign state is not 'commercial activity' because a private person cannot lawfully engage in that activity"). Assuming for the sake of argument that there is any veracity to plaintiffs' unsupported innuendo about carelessly spent SHC funds supporting terrorist causes, such mis-allocation of funds is no more commercial in character than was "abuse of the power of its police by the Saudi Government" in *Nelson*. And even reading more into the complaints than is there – to allege that SHC supported terrorism – would be reading them to allege criminal, not *commercial*, activity.

*b. Plaintiffs do not allege a direct effect.* Nor can plaintiffs plead or prove the "direct effect" prong of the commercial activity exception, which requires that the claims be "based * * * upon an act outside the territory of the United States" that "causes a direct effect in the United States." Section 1605(a)(2). Congress intended this exception to apply only if the effect in the United States was "a direct and foreseeable result" of the commercial conduct. 1976 U.S.C.C.A.N. at 6618. "'An effect is direct if it follows as an *immediate* consequence of the defendant's activity.'" *Virtual Countries, Inc.* v. *Republic of S. Africa*, 300 F.3d 230, 236 (2d Cir. 2002) (emphasis in original) (quoting *Weltover*, 504 U.S. at 611). There is "no jurisdiction where the direct effect was dependent

18

on an intervening factor." *Virtual Countries*, 300 F.3d at 237 (internal quotations omitted).  Thus, in *Princz* v. *Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994), the court held that Germany's immunity under the FSIA was not pierced by the commercial activity exception, although the plaintiff, a Jewish man enslaved by the Nazi regime, had been leased out by his captors to private industry for profit.  Although the plaintiff alleged that the work he did as a slave supported the Nazi war effort, postponing the Allied victory, "[m]any events and actors necessarily intervened between any work that Mr. Princz performed * * * and any effect felt in the United States."  *Ibid.*

Plaintiffs' allegations against SHC do not state a claim of a direct effect on the United States – indeed, the conduct plaintiffs allege is at best many layers removed from the September 11 attacks.  Compare *Burnett II*, 292 F. Supp. 2d at 20 (reading the *Burnett* complaint to allege that "Prince Turki or Sultan funded * * * those who funded * * * those who carried out the September 11 attacks," and holding that chain of causation too attenuated).  Because plaintiffs do not plead, and cannot prove, that the September 11 attacks were an "immediate consequence of" (*Weltover*, 504 U.S. at 611) the conduct alleged of SHC, plaintiffs cannot make out the commercial activity exception to the FSIA.

### 2.    The Conduct Alleged Does Not Meet the Non-Commercial Tort Exception

The non-commercial tort exception is inapplicable because plaintiffs do not allege that SHC caused the September 11 attacks (*Robinson*, 269 F.3d at 139-140); because they allege conduct "based upon the exercise or performance * * * [of] a discretionary function" (Section 1605(a)(5)(A)); and because the alleged conduct did not occur in the United States.

*a.  Plaintiffs do not allege causation.*  As the court noted in *Burnett II*, the causation requirement of Section 1605(a)(5) was not meant "'to encompass the farthest reaches of common

law.'" 292 F. Supp. 2d at 19 (quoting *MacArthur Area Citizens*, 809 F.2d at 921).   Whether one

views plaintiffs' burden to prove causation under the non-commercial tort exception as a "heightened

pleading standard" (5/10/04 Salman Mot. 15) or just a higher hurdle that must be surmounted before

plaintiffs may proceed with their substantive claims, it *is* clear that jurisdiction cannot be conferred

under the non-commercial tort exception over "tort" claims that rely on an excessively attenuated

chain of causation.  *Burnett II*, 292 F. Supp. at 19-20.   Here, plaintiffs allege that some recipient of

humanitarian funds gave money to somebody else, who passed it on – and the money ultimately

supported some terrorist act.   This indirect and attenuated chain is the best plaintiffs can allege: "As

every expert pointed out, this is not a simple jump from a contribution to Al Haramain where the

person who receives the money says I'm going to send a thousand dollars to Mohammad Atta so he

can get some flight simulator.  If that's the burden, Judge, we don't have a case against most of these

defendants." 6/24/03 Hearing Tr. 77-78 (*Burnett* lead counsel Ronald Motley).  And it was just such

an attenuated chain that Judge Robertson held did not suffice.  *Burnett II*, 292 F. Supp. 2d at 20.

   *b.  Plaintiffs allege only discretionary acts.*  All of the conduct plaintiffs allege was undertak-

en pursuant to discretion vested in Prince Salman as head of SHC, and is therefore specifically *out-

side* the reach of the exception to immunity.  See *Robinson*, 269 F.3d at 140; Section 1605(a)(5)(A).

   One court recently analyzed the discretionary function exception to the FTCA, on which the

discretionary function provision of Section 1605(a)(5)(A) is based (see 1976 U.S.C.C.A.N. at 6620;

*MacArthur Area Citizens*, 809 F.2d at 921-922), in a manner that is instructive here.  In *Macharia*

v. *United States*, 334 F.3d 61, 65-67 (D.C. Cir. 2003), the plaintiffs, citizens of Kenya injured in the

1998 explosion outside the U.S. embassy in Nairobi, argued that the United States was negligent in

failing to take greater precautions against, and to warn citizens of, such a terrorist attack.  334 F.3d

at 63.  The court applied the two-part test from *United States* v. *Gaubert*, 499 U.S. 315, 321-322

(1991), which asks first whether the action or omission complained of was undertaken following a prescribed course of conduct, and second whether the exercise of judgment "is of the kind that the discretionary function exception was designed to shield." *Macharia*, 334 F.3d at 65.

Because the plaintiffs failed to allege a governmental policy that prevented the exercise of discretion by the defendants, the first step in the *Gaubert* test was met. *Macharia*, 334 F.3d at 65-66. On the second step, the court held that foreign relations considerations and evaluations as to how best to expend State Department funds underlay security decisions – the type of "considerations of public policy" protected by the exemption. *Id.* at 65-67. SHC's entitlement to the discretionary function exception under the FSIA is very similar. See *Maalouf* v. *Swiss Confed'n*, 208 F. Supp. 2d 31, 35-36 (D.D.C. 2002) (citing cases interpreting the FTCA, including *Gaubert*, for the appropriate interpretation of the discretionary function exception under the FSIA). No regulations hamper the exercise of discretion by Prince Salman and SHC. King Fahad decreed the creation of SHC under Prince Salman's leadership, leaving decisions as to how to carry out its work to Prince Salman and the Supreme Commission and Executive Committee. See pp. 3-4, *supra*. And the decisions by Prince Salman and SHC are fundamental policy decisions about KSA's relationship with Bosnia-Herzegovina. See *Al-Nafissa Decl.* ¶ 10.

Plaintiffs have argued that "courts have refused to recognize a foreign official's 'discretion' to violate international law or commit crimes against humanity." 5/14/04 Opp. to Sultan Mot. 18. But this argument begs the question of what plaintiffs allege that SHC did. Plaintiffs nowhere have alleged that SHC *committed* the September 11 attacks (as indeed it did not). Plaintiffs nowhere have alleged that SHC *ordered* the September 11 attacks (as again it of course did not) – and plaintiffs' omissions are not accidental; any such utterly false and insupportable allegations would be sanctionable under Fed. R. Civ. P. 11(b)(3). Instead, plaintiffs' allegations about SHC are no more than

suggestions that SHC's relief and foreign aid funds ultimately supported terrorist causes. But deciding where and how to provide foreign aid and humanitarian relief was discretionary. See *Al-Nafissa Decl.* ¶ 9. Compare *Burnett II*, 292 F. Supp. 2d at 20-21 (recommendations to the Council of Ministers about requests for assistance * * * [were] clearly * * * 'decisions grounded in social, economic, and political policy'") (quoting *United States* v. *Varig Airlines*, 467 U.S. 797, 814 (1984)).

     *c. The "entire tort" requirement is not satisfied.* The law also is clear that the "tortious act or omission must occur within the jurisdiction of the United States" for the non-commercial tort exception to apply. 1976 U.S.C.C.A.N. at 6619. Judge Robertson rejected this argument in *Burnett II* (292 F. Supp. 2d at 19 n.4), but that holding strayed from the understandings of the FSIA by Congress in the legislative history; by the Supreme Court; by this Circuit; and by the D.C. Circuit.

     As the Supreme Court explained in *Amerada Hess*, Congress demonstrated in the commercial activity exception its ability to except from immunity conduct committed overseas with a direct effect in the United States, and thus its failure to do so in the non-commercial tort exception has meaning. See 488 U.S. at 441. This Circuit later noted:

> Although cast in terms that may be read to require that only the injury rather than the tortious acts occur in the United States, the Supreme Court has held that this exception "covers only torts occurring within the territorial jurisdiction of the United States."

*Cabiri* v. *Gov't of Republic of Ghana*, 165 F.3d 193, 200 n.3 (2d Cir. 1999) (quoting *Amerada Hess*, 488 U.S. at 441). See also *Hirsh* v. *State of Israel*, 962 F. Supp. 377, 383-384 (S.D.N.Y.) ("both the tort and the injury [must] take place" in the United States ), aff'd, 133 F.3d 907 (2d Cir. 1997). The D.C. Circuit also follows this rule. See *Asociacion de Reclamantes* v. *United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (Scalia, J.); *Persinger* v. *Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984) (Bork, J.). Plaintiffs make no allegations in the complaint of any conduct by SHC in the United States. For this reason as well, Section 1605(a)(5) does not apply.

## II.  This Court Lacks Personal Jurisdiction Over SHC, Which Has No Contacts with the United States or with the State of New York

As Judge Robertson recognized in *Burnett II*, even if the Court thinks it appropriate to exercise subject-matter jurisdiction over the claims against SHC in this case, plaintiffs still must allege jurisdictional facts sufficient to comport with due process (292 F. Supp. 2d at 21-22) – a requirement that applies equally when the defendant is a foreign state or its agency or political subdivision.  See *Tex. Trading*, 647 F.2d at 313.  Limited jurisdictional discovery may be permitted only "'if a party *demonstrates* that it can supplement its jurisdictional allegations through discovery.'"  *Burnett I*, 274 F. Supp. 2d at 97 (emphasis added) (quoting *GTE New Media Servs. Inc.* v. *BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000)).  Plaintiffs cannot take jurisdictional discovery without first making a legally sufficient *prima facie* showing of personal jurisdiction.  See *Ball*, 902 F.2d at 197.

Repeated opportunities to allege jurisdictional facts have not produced *any* allegations, in *any* of the complaints, providing a basis for this Court to assert personal jurisdiction over SHC (or over other foreign sovereign defendants).  "[W]hen lack of personal jurisdiction is raised as a defense, due process requires that for the case to go forward the absent defendant must 'have had certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Creighton, Ltd.* v. *Gov't of the State of Qatar*, 181 F.3d 118, 127 (D.C. Cir. 1999) (quoting *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945)).  Plaintiffs should not be permitted to burden the Court and SHC further with pointless attempts to allege contacts with the U.S. that do not exist.  See *Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless PLC*, 148 F.3d 1080, 1089 (D.C. Cir. 1998) (failure to allege anything that might satisfy the minimum-contacts requirement for personal jurisdiction, both in the complaint and in response to a motion to dismiss, precluded jurisdictional discovery).

23

Any effort to assert personal jurisdiction based on "purposeful availment" under *Burger King* also must fail. Plaintiffs have not alleged that SHC directed anything at the United States (much less at the World Trade Center or the Pentagon). The only specific instances of terrorist conduct that plaintiffs allege to be at all connected to SHC are two failed bomb plots in Sarajevo and Croatia. See p. 5, *supra*. Compare *Burnett II*, 292 F. Supp. 2d at 22-23.

### III. Plaintiffs' Insufficient Allegations of Causation Require Dismissal for Failure to State a Claim on Which Relief May Be Granted

Under Federal Rule of Civil Procedure 12(b)(6), this Court should dismiss all of plaintiffs' claims against SHC because plaintiffs do not (and cannot) allege that anything SHC did caused the September 11 attacks – much less anything resembling proximate, or legal, cause. Causation was not proved in *Ungar* v. *Islamic Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002), although the court accepted both (1) that Iran "provided extensive support to HAMAS" and (2) that HAMAS members killed the decedents. The court held that the "proof [did] not link that support to the Ungar murders specifically." *Ibid.*; see also *Doe* v. *Islamic Salvation Front*, 257 F. Supp. 2d 115 (D.D.C. 2003) (plaintiffs' failure to show a direct link between a particular defendant and alleged acts of terrorism, and reliance on "conclusory statements" about the defendant's role, warranted dismissal). The showing in *Ungar* was far more substantial than even the most creative possible interpretation of the allegations brought against SHC in the various complaints. In *Ungar*, unlike this case, plaintiffs did show that the defendant "provided extensive support" to an organization whose members committed the crime. The complaints in this case fail to go that far, and certainly no allegation "link[s]" any SHC monies "to the [September 11 attacks] specifically." "If that's the burden" – and it is – "[plaintiffs] don't have a case." 6/24/03 Hearing Tr. 78.

Plaintiffs have placed much reliance on *Boim* v. *Quranic Literacy Inst.*, 291 F.3d 1000 (7th

24

Cir. 2002), a case interpreting the causation requirement for the Antiterrorism Act, 18 U.S.C. § 2333. But in *Boim*, consistent with *Ungar* and *Doe*, the Seventh Circuit held:

> to the extent that the Boims urge a reading of [Section 2333] that would lead to liability for merely giving money to Hamas, a group which then sponsored a terrorist act in the manner the Boims have alleged, we agree with the district court, the defendants and the government that those allegations would be inadequate.

*Id.* at 1011. "[F]unding *simpliciter* of a terrorist organization[] is insufficient because it sets too vague a standard, and because it does not require a showing of proximate cause." *Id.* at 1012. Instead, the Seventh Circuit held that "foreseeability is the cornerstone of proximate cause," and must be proved for civil liability under the ATA. *Ibid.* Therefore, in *Boim*, the court held that the plaintiffs had pleaded causation by alleging that money raised and funneled to Hamas was used directly to fund a terrorist attack that caused the death of their son. 291 F.3d at 1004. Not so in this case. Apart from a conclusory legal statement in one complaint (see *Fed. Ins.* Compl. ¶ 189) – which is utterly unsupported by the factual allegations, and therefore should be rejected outright (see *First Nationwide Bank*, 27 F.3d at 772) – plaintiffs do not allege any facts that might indicate that the September 11 attacks were the foreseeable result of activities by SHC.

## CONCLUSION

This Court should dismiss plaintiffs' claims in their entirety under Rule 12(b)(1) for a lack of subject-matter jurisdiction; under Rule 12(b)(2) for a lack of personal jurisdiction; and under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

June 25, 2004                                           Respectfully submitted,


                                                        __/S/ [Lawrence S. Robbins/mh]___
                                                        LAWRENCE S. ROBBINS (LR 8917)
                                                        [additional counsel and addresses listed on
                                                        front cover]