UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:  *Thomas Burnett, Sr. v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS OF DEFENDANT HAMAD AL-HUSAINI

June 30, 2004

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES..................................................................................................... ii

INTRODUCTION .................................................................................................................3

ARGUMENT .......................................................................................................................4

I.     THIS COURT HAS PERSONAL JURISDICTION OVER AL-HUSAINI BECAUSE HE PURPOSEFULLY DIRECTED HIS CONDUCT AT THE UNITED STATES...........................4

      A.     A Defendant Who Purposefully Directs His Conduct at the United States Can Reasonably Expect to be Haled Into Court Here, Even if the Defendant Was Never Physically Present .........................................5

      B.     The Complaint Adequately Alleges, and the Evidence Demonstrates, that, in Supporting Al Qaeda, Al Husaini Purposefully Directed His Conduct at the United States Because Al Qaeda Had Publicly Announced that the United States Was the Target of Its Terrorist Activities ...............................................................10

           1.     *Al-Husaini Provided Material Support to Al Qaeda* .....................10

           2.     *Al Qaeda Openly and Publicly Announced its Terrorist Agenda and Targeted the United States*.........................................13

II.     AL-HUSAINI WAS PROPERLY SERVED ...................................................................18

CONCLUSION...................................................................................................................19

## TABLE OF AUTHORITIES

*Page*

## Cases

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987) .................. 6

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ............................................... 12

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985). ...................................................................... 6

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961).............. 5

*Calder v. Jones*, 465 U.S. 783 (1984)...................................................................................... 6, 7

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ................................... 4

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000).................................................................... 7, 9

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998)................................ 6

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................ 5

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993).................................. 5

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988).................................. 6

*PDK Labs v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997)........................................ 5

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) ........ 7, 8, 9

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998),
    *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) ........................................ 7, 9

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)................................ 5

## Statutes

18 U.S.C. § 2333..................................................................................................... 4

28 U.S.C. § 1653..................................................................................................... 5

Fed.R.Civ.P. 12(b)(2)................................................................................................ 4

Fed.R.Civ.P. 4(k)(2)................................................................................................ 4

# INTRODUCTION

Defendant Hamad Al-Husaini seeks to dismiss the Complaint for want of personal jurisdiction and for defective service of process.[1]  Essentially, Al-Husaini argues that he cannot be made to answer for the murderous attacks on the United States perpetrated on September 11, 2001, because he claims to have had insufficient contact with the United States to satisfy the requirements of due process.  This argument is wrong.  Al-Husaini – a member of the "Golden Chain" and thus one of the earliest direct financial sponsors of al Qaeda -- aimed his conduct at the United States when he provided material support to Osama bin Laden and al Qaeda, with knowledge that al Qaeda was engaged in terrorist activities targeted primarily and specifically at the United States and its citizens and residents.  The deliberate targeting of the United States satisfies the minimum contacts test, even if the defendant never entered the United States. The principle is a simple one: no one is entitled deliberately to plot, launch, or provide financing for

---

[1]    Al-Husaini's motion is one of a group of 11 nearly identical motions filed simultaneously by the law firm of Bernabei & Katz on behalf of 11 of the defendants (Shahir Abdulraoof Batterjee, Abdullah Omar Naseef, Abdullah Muhsen Al Turki, Saleh Al-Hussayen, Sheik Salman Al-Oadah, Safar Al-Hawali, Abdul Rahman Al Swailem, Mohammed Ali Sayed Mushayt, Abdullah Bin Saleh Al-Obaid, and Saudi Red Crescent) in this case.  The motion brought on behalf of Al-Husaini is styled as one brought pursuant to F.R.C.P. 12(b)(1) (lack of subject matter jurisdiction), 12(b)(2) (lack of personal jurisdiction) and 12(b)(5) (improper service of process), but contains no argument whatsoever concerning subject matter jurisdiction. Accordingly, plaintiffs treat this motion as challenging personal jurisdiction and service of process only. (Some of the 11 motions do challenge subject matter jurisdiction, under the Foreign Sovereign Immunities Act, and it is reasonable to assume that the reference to Rule 12(b)(1) in Al-Husaini's motion papers was intended to apply to those motions and overlooked here.)

    Because these motions make virtually identical (in many instance, *verbatim*) arguments, plaintiffs proposed to defendants' counsel that plaintiffs submit one consolidated response (of somewhat longer length than a single brief, but considerably shorter than the 275 pages allotted by the local rules to these 11 briefs) and that defendants submit a single, consolidated reply (again, of an adjusted length).  Defendants refused and accordingly, plaintiffs now file a separate response to each motion.  Plaintiffs have attempted to avoid duplication and hereby incorporate and cross-reference each of their responses into each of the others.

attacks on the United States and evade U.S. justice merely because the attacks could be planned, supported or financed from afar.

Al-Husaini's challenge to service of process fares no better.  The method of service used here – service by publication – was specifically approved by the district court in Washington, D.C.  Moreover, it worked.  Al-Husaini received notice of this action, retained counsel and has appeared to defend himself.  His argument that the notice approved by the Court was not reasonably calculated to apprise him of the pendency of this action when in fact it did precisely that rings hollow and should be rejected.  The motion to dismiss should be denied in its entirety.

## ARGUMENT

## I.   THIS COURT HAS PERSONAL JURISDICTION OVER AL-HUSAINI BECAUSE HE PURPOSEFULLY DIRECTED HIS CONDUCT AT THE UNITED STATES

Al-Husaini contends that he is not subject to jurisdiction in this Court because he lacks minimum contacts with the United States.  Defendant is wrong:  he is subject to jurisdiction because, in supporting Osama bin Laden and al Qaeda in their terrorist war against America, Al-Husaini purposefully directed his conduct at the United States.  No more is required to satisfy the requirements of due process.[2]

To defeat a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction made (like this one) before discovery, plaintiffs "need make only a prima facie showing by [their] pleadings and affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Indeed, plaintiffs are not required to know or to plead all possible

---

[2]   Al-Husaini also claims that the District of Columbia long-arm statute does not authorize jurisdiction here.  But plaintiffs do not rely on the D.C. long-arm statute.  Rather, they rely on Fed.R.Civ.P. 4(k)(2) which authorizes jurisdiction over foreign defendants in the United States for federal claims (including plaintiffs' claims under the Anti-Terrorism Act, 18 U.S.C. § 2333) where jurisdiction is not otherwise available, subject only to the due process limits of the Constitution.  In the context of Rule 4(k)(2), the relevant minimum contacts are with the United States as a whole.

jurisdictional grounds from the outset of the case, to the contrary, the relevant statutory scheme anticipates and allows for liberal amendments as to jurisdiction. *See* 28 U.S.C. § 1653. That is particularly true where the factual predicates are complex and the parties numerous, as herein. Moreover, in evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *PDK Labs v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  In addition, the Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).  Here, plaintiffs have satisfied their burden to make a prima facie showing that jurisdiction exists.

> **A.    A Defendant Who Purposefully Directs His Conduct at the United States Can Reasonably Expect to be Haled Into Court Here, Even if the Defendant Was Never Physically Present**

The standard for determining whether a defendant has sufficient contacts with the forum is not a rigid one, nor can it be applied without reference to the nature of the underlying claims against the defendant.  As the Supreme Court has explained, "'[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961).  It is for this reason that the Supreme Court has rejected a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an approach whereby each case could be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The issue is whether the defendant should "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("defendant's conduct and connection with the forum

State are such that he should reasonably anticipate being haled into court there"); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987).

More recently, the Supreme Court has stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985).   The D.C. Circuit, too, has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").

If ever a case called for recognition of the policy considerations that determine what process is due, it is this one.   The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the cold-blooded manner in which U.S. residents were attacked for no reason other than that they were here, on United States soil.   The policies of "fair play" and "substantial justice" cannot be applied without recognition of the deliberate murderous attacks on the United States that gave rise to plaintiffs' claims.

In *Burger King*, the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472 (citations omitted).   Physical presence is *not* a requirement.   *Id.* at 475.

In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum. *Calder v. Jones*,

465 U.S. 783, 789 (1984).   Thus, the *Calder* Court concluded:   "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."  465 U.S. at 790.

Al-Husaini recognizes that *Calder* is controlling here, *see* Al-Husaini Br. at 6-7, but he misunderstands the meaning of the case.  Relying solely on the ruling of the D.C. district court with respect to two other defendants in this case, *see Burnett v. Al Baraka Invest. & Devel. Corp.*, 292 F.Supp.2d 9 (D.D.C. Nov. 14, 2003) ("*Burnett II*"), Al-Husaini asserts that he, too, did not purposefully direct his conduct at the U.S. sufficient to be subject to jurisdiction here. But the ruling in *BurnettII* is at odds with three other recent cases involving jurisdiction over those who participate in terrorist attacks on Americans. *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003); *Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998).  These cases make clear that where terrorists target Americans, they should reasonably foresee being haled into court in the United States, such that due process is not violated by the assertion of jurisdiction over them.  The record before this Court (different from the record that was before the court when it ruled in *Burnett II*) demonstrates that bin Laden and al Qaeda not only targeted the United States from the early 1990's on, but also announced, publicly and repeatedly, that they were doing so.  In this context, Al-Husaini's support of al Qaeda amounted to purposeful direction of their conduct at the United States sufficient to satisfy the "minimum contacts" test.

In *Pugh*, the D.C. district court analyzed the minimum contacts of certain Libyans accused of conspiring in the terrorist downing of a French commercial aircraft en route from Brazzaville, Congo to Paris, with an intermediate stop in Chad.  The passengers, all of whom

were killed, were from 17 different countries; seven passengers were Americans and the action was brought by their survivors.  The individual defendants were accused of conspiring (in their individual capacity, and not merely as members of the Libyan government) to sabotage the plane.  Applying the *World-Wide Volkswagen* test that requires the court to look at whether the defendant "should reasonably anticipate being haled into court" in the United States, the court in *Pugh* held:

> Taking the factual allegations of the complaint as true for present purposes, the individual defendants in the instant action conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight. As the plane they chose to destroy was on an international flight and expected to stop in several nations before reaching its final destination, the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die. Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d at 59.  In language especially relevant to this case, the *Pugh* court continued:

> The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. Congress has not been indifferent to providing judicial sanctions for terrorist acts committed abroad. Beginning at least five years before the UTA Flight 772 bombing, a succession of federal statutes had evinced an intent to assure the criminal prosecution of foreign individuals who committed terrorist acts overseas against U.S. persons or property. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

*Id.*  Accordingly, the court held:

> [I]n light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional

8

targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being "haled into court" in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any "traditional notions of fair play and substantial justice."

*Id.* at 60-61.   Thus, in *Pugh*, the defendants were found to have purposefully directed their conduct at the United States sufficiently to subject them to jurisdiction in an American court even though the plane they attacked was a French carrier and the flight was not scheduled to, and did not, take off or land in the United States.

Similarly, in *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998), the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction.   Like the attack in *Pugh*, the attack at issue in *Rein* did not take place in the United States, but rather over Scotland.   Nonetheless, the court found that the targeting of an American-flagged carrier provided a sufficient nexus for the assertion of jurisdiction.   *See also Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns). In all three cases, *Rein*, *Pugh*, and *Daliberti*, the attacks on Americans took place abroad.   In none were the defendants alleged to have taken any steps in the United States in furtherance of the plots.   Yet in all three cases, the court found that defendants had sufficiently targeted Americans and had sufficient notice that United States law and United States courts would subject them to liability so that the assertion of personal jurisdiction was constitutional.   Here, by contrast, the entire September 11 attack was

9

focused specifically on, and took place in, the United States.  Moreover, as discussed below, *see* Point I.B.2, the evidence demonstrates that the perpetrators of the attacks had announced their intention to attack the United States at the time Al-Husaini provided material support to their terrorist projects.   Under *Calder*, *Rein, Pugh,* and *Daliberti*, no more is required to satisfy the "minimum contacts" test and subject Al-Husaini to jurisdiction in the United States.

> **B.     The Complaint Adequately Alleges, and the Evidence Demonstrates, that, in Supporting Al Qaeda, Al Husaini Purposefully Directed His Conduct at the United States Because Al Qaeda Had Publicly Announced that the United States Was the Target of Its Terrorist Activities**

The Third Amended Complaint and the evidence submitted sufficiently make out a *prima facie* case that, in supporting al Qaeda, Al-Husaini purposefully directed his conduct at the United States so as to subject him to jurisdiction in the Courts of the United States.[3]

> *1.     Al-Husaini Provided Material Support to Al Qaeda*

The evidence shows that Al-Husaini provided material support to Osama bin Laden and al Qaeda.  Indeed, it appears that he was one of the earliest contributors to al Qaeda, a member of the so-called "Golden Chain."  The "Golden Chain" is a list of wealthy financial sponsors and supporters of al Qaeda; the document was seized by the Bosnian police on March 2002 and presented as evidence by the United States government in criminal prosecutions of al Qaeda. The Golden Chain document, in its original Arabic accompanied by an English translation, was

---

[3]  Al-Husaini was named as a defendant in May, 2003, after the filing of the Third Amended Complaint.  He was added through the procedure set forth in the D.C. court's Case Management Order #1, which called for the filing of a list of names of additional defendants.  Al-Husaini never requested a more definite statement containing specific allegations against him. Accordingly, with respect to Al-Husaini's specific role, plaintiffs rely on the evidence submitted in connection with this memorandum.  With respect to such matters as the manner in which al Qaeda used the material support it received, al Qaeda's targeting of the United States, bin Laden's public pronouncements about his intentions to attack the United States, and the September 11 attacks themselves, plaintiffs rely on the allegations in the Third Amended Complaint, allegations in other, supplemental pleadings, and on evidence submitted herewith and in connection with other filings, where specifically noted.

presented by the United States government as an exhibit in the Department of Justice's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements in the case of *U.S. v. Arnaout* (N.D.-Ill.) filed on January 29, 2003.  A copy of the government's proffer is annexed to the Affirmation of Andrea Bierstein dated June 30, 2004 ("Bierstein Aff.") as Exhibit 1. The "Golden Chain" document itself (including the English translation offered by the government) is Exhibit 2 to the Bierstein Aff.)  According to the United States government, the Golden Chain document is a list of people referred to within al Qaeda as the "Golden Chain," all wealthy donors to their extremist cause.  *See* Exhibit 1.  Al-Husaini's name appears on the Golden Chain document.  *See* Exhibit 2.[4]

Al-Husaini's connection to al Qaeda continued after his initial contributions: one of his family companies is a principal supporter of al-Waqf-al-Islami, a Dutch entity that has played a major role in the recruitment of terrorists, including six of the September 11 hijackers.  *See* Ian Johnson and David Crawford, "Radical Foundation:  In 'Law' Seminars, A Saudi Group Spreads Extremism," *The Wall Street Journal*, April 15, 2003.[5]  The *Wall Street Journal* reported:

> As European government investigators explore the roots of terrorism, they are discovering foundations such as Al-Waqf. Muslim foundations and charities initially came under the microscope for channeling money to terrorists. Now,

---

[4]  Al Husaini's description of himself, in an affidavit submitted to this Court, as merely a "watch retailer in Damman, Saudi Arabia" is clever, but disingenuous.  In fact, Al Husaini is a co-founder and co-owner (with Abdulrahman Al Husaini) of Al Husaini and Co., which has eight offices in Saudi Arabia (in Jeddah, Riyadh, Damman, Al Hasar, Abha, Geizen, Mecca, and Medina).  Al Husaini and Co. is an importer, retailer, distributor, and wholesaler of watches, clocks, and accessories from Europe and the Far East. *See* Bierstein Aff., Exhibit 3.  It is affiliated with other companies owned by the Al Husaini family, including Al Husaini Trading Co., the distributor of Seiko and Longines watches in Saudi Arabia.  Hamad Al Husaini is also the chairman of Akel Trading Co., an importer and distributor of agricultural equipment, pumps, electrical and mechanical equipment and irrigation systems with offices in Dammam, Buraydah, Riyadh, Sajir, Hail, and Aljalah, Saudi Arabia.  *See* Bierstein Aff., Ex. 4. He is also the CEO of Akel Agricultural Investment Co., wholesalers of farm and garden machinery.  *Id.* at Ex. 5.

[5]  A copy of this article, as it appeared on *The Wall Street Journal* website, is Exhibit 6 to the Bierstein Aff.

investigators are taking another look at whether these groups are encouraging terrorism by teaching an intolerant and xenophobic strain of Islam.

*Id.*  Moreover, the *Journal* reported, Spanish terrorism investigators believe that the Al-Husaini family transferred money to Muhammad Galeb Zouaydi, who is awaiting trial in Spain as one of al Qaeda's principal financiers in Europe.  *Id.*

Al Qaeda could not have trained terrorists, including the 19 September 11 hijackers, and could not have carried out its attacks without financial assistance provided by men like Al-Husaini.  As the Seventh Circuit has explained:  "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence."  *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002).  If you take away those resources, you cut off the life-blood of terrorist violence.  That is especially true here, where bin Laden set up a vast terrorist infrastructure to recruit, train, support, and equip the men who would carry out the attacks.  That infrastructure included sophisticated propaganda resources, including websites, videotapes, books, articles, and a network of clerics and zealots to spread bin Laden's message.  *See* Gabriel Weimann, www.terror.net:  How Modern Terrorism Uses the Internet, U.S. Institute of Peace (March 2004).  (A copy of this article is annexed to the Bierstein Aff. as Ex. 7.)  It also included a complex of approximately 20 training camps in Afghanistan, each one designed to train terrorists in a different aspect of their deadly tasks, and trucks to transport the trainees to the camps.  It was also necessary to obtain false documents for large numbers of persons so that the terrorists could travel to training centers, planning meetings, and ultimately, to their targets.  Surveillance of the intended targets was also a necessary component; so were the resources to support large numbers of terrorists while they planned and trained for their mission.  *See* Bierstein Aff., Ex. 8. While the actual equipment used to carry out any particular attack may not have been especially

expensive, the support system that stood behind it and made it possible required large amounts of money and further required that they money be transferred to the particular location where it was needed.  As noted above, Al-Husaini provided funds to al Qaeda in its early stages, when it was essentially a start-up operation.  As a member of the Golden Chain, he helped it to build the infrastructure that would eventually support the September 11 attacks.

In providing this financial assistance to al Qaeda, Al-Husaini purposefully directed his conduct at the United States because, as demonstrated below, the evidence that plaintiffs have gathered to date shows that, throughout the 1990's, al Qaeda's target was the United States. Moreover, Osama bin Laden announced this, repeatedly and publicly, so that individuals like Mr. Al-Husaini who provided material support in that period plainly knew that they were targeting the United States when they assisted al Qaeda with its terrorist agenda.

2.      *Al Qaeda Openly and Publicly Announced its Terrorist Agenda and Targeted the United States*

It has been publicly known since the mid-1990s, if not well before, that Osama bin Laden and his Al Qaeda terrorist network had launched an international campaign of terror directed at the United States.  In July 1996, bin Laden told the British newspaper, *The Independent*, that al Qaeda terrorists had "hit their main enemy, which is the Americans." *See* Youssef M. Ibrahim, "Saudi Exile Warns More Attacks Are Planned," New York *Times*, July 11, 1996, Bierstein Aff., Exhibit 9.  That same summer, the Committee for the Defense of Legitimate Rights (CDLR), a Saudi Islamist dissident movement affiliated with bin Laden, released Osama bin Laden's "Declaration of War" on the internet.  In the statement, bin Laden declared:  "My Muslim Brothers of The World: Your brothers in Palestine and in the land of the two Holy Places are calling upon your help and asking you to take part in fighting against the enemy - *your enemy and their enemy - the Americans* and the Israelis." (Emphasis added.) *See* Osama bin Laden,

13

*'Declaration of War Against the Americans Occupying the Land of the Two Holy Places,'*
August 1996, Bierstein Aff., Exhibit 10.

The following year, bin Laden told Peter Arnett, correspondent for CNN, "We declared *jihad against the US government* . . . ." *See* Osama bin Laden Interview with Peter Arnett, *CNN*, March, 1997, Bierstein Aff., Exhibit 11 (emphasis added). Moreover, he added, "if the American government is serious about avoiding the *explosions inside the U.S.*, then let it stop provoking the feelings of 1,250 million Muslims . . . ." *Id.* (emphasis added).

In 1998, bin Laden made even more explicit his declaration of war against the United States and all Americans, wherever they happen to be. He issued a *fatwa* in which he stated: "We—with God's help—call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to *kill the Americans* and plunder their money wherever and whenever they find it." (Emphasis added.) *See* Jihad Against Jews and Crusaders, *World Islamic Front Statement,* 23 February 1998, Bierstein Aff., Exhibit 12. Osama bin Laden and other Middle Eastern terrorist leaders in attendance at the meeting agreed that "the ruling to *kill the Americans* and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it." *Id.* (Emphasis added.) In an interview with ABC television, bin Laden explained his targeting of the United States:

> Our battle with the Americans is larger than our battle with the Russians. The Americans made a very stupid mistake that no one has made before. They attacked the Muslim symbol, the Kibla [Saudi Arabia], of 200 million people. The reaction was very encouraging by the Muslim scholars and the youth. We predict a black day for America and the end of the United States as United States, and it will be separate states, and will retreat from our land and collect the bodies of its sons back to America, Allah willing.

> Once again, I have to stress the necessity of focusing on the Americans and the Jews for they represent the spearhead with which the members of our religion have been slaughtered. Any effort directed against America and the Jews yields positive and direct results, Allah willing. It is far better for anyone to kill a single American soldier than to squander his efforts on other activities.

Transcript of Interview with Osama Bin Laden, ABC News, May 28, 1998, Bierstein, Aff., Exhibit 13.  That same year, one of al Qaeda's spiritual leader, Sheikh Omar Abdel Rahman, who led the 1993 World Trade Center bombing plot, issued his own *fatwa* which called on all Muslims to kill American infidels:

> Oh, Muslims everywhere!  Cut the transportation of their countries, tear it apart, destroy their economy, burn their companies, eliminate their interests, sink their ships, shoot down their planes, kill them on the sea, air, or land.  Kill them when you find them, take them and encircle them, paralyze their every post.  Kill those infidels . . . .

"Dr. Omar AbdurRahman's [*sic*] Latest Statement," Supporters of Shariah website archive, Nov./Dec. 1998, Bierstein Aff., Exhibit 14.

In June, 2001, bin Laden was still urging his followers to attack the United States, announcing: "to all mujahideens... it's time to penetrate America and Israel and hit them where it hurts the most." *See* "Video Shows Bin Laden Urging Muslims to Prepare for Fighting," www.cnn.com, June 21, 2001, Bierstein Aff., Ex. 15.

These *fatwas* proved to be more than just empty, albeit virulent, threats.  Throughout the 1990's, Osama bin Laden and al Qaeda carried out a series of attacks on the United States that removed any doubt about the seriousness of their intentions or the identity of their target. These attacks included the 1993 World Trade Center bombing, the 1998 bombing of two U.S. embassies in East Africa, and the 2000 attack on the *USS Cole*.  Other unsuccessful plots included the plan to blow up the Lincoln and Holland tunnels in New York City and "Plan Bojinka," a harrowing scheme developed in the Philippines to simultaneously blow up as many as a dozen American commercial air flights over the Pacific Ocean.  The plan was foiled in 1995, but there was no doubt that the terrorist threat was real and that it was directed against America. *See* Evan F. Kohlmann, "Al Qaida Openly Targeted the United States," (May 10, 2004), a copy of which is annexed to the Bierstein Aff. at Exhibit 16; *see also* 3AC at pp. 216-217 & ¶ 493

(alleging that al Qaeda's attacks were aimed at the United States and its citizens and that defendants who supported al Qaeda were on notice of that fact).

Even al Qaeda's activities elsewhere were designed to further its ultimate attack on the United States.  Thus, Al Qaeda member Abu Adel Aziz told the FBI about his directives from Osama bin Laden and indicated that al Qaeda was seeking to use regional jihads such as those in Bosnia and Kashmir as "a base for operations... against al Qaeda's true enemy, the United States." "Government's Response to Defendant's Position Paper as to Sentencing Factors," *U.S. v. Arnaout*, Case #: 02 CR 892 (N.D.-Ill.) at 31-32.  (Bierstein Aff., Ex. 17)

Al Qaeda's calls for attacks on the United States were not kept secret; rather they were spread through a multitude of books, statements, magazines, publications, and other propaganda openly calling for America's destruction.  Before (and after) the September 11 attacks, thousands of global jihad websites have assisted al Qaeda in publicizing its message.  *See* www.terror.net, Bierstein Aff., Ex. 7.  Featuring up-to-date news from various lands of jihad, claims for attacks, communiqués and statements from various al Qaeda leaders and operatives, analytical pieces on global jihad strategies and tactics, and even gruesome terrorist manuals and handbooks, these websites have served to extol al Qaeda's campaign of destruction and to recruit additional members and financiers for al Qaeda's war against America.   This propaganda ensured that those who supported al Qaeda were well aware that al Qaeda's main target was the United States.  Defendant and others like him nonetheless provided assistance to bin Laden and al Qaeda; in doing so, they purposefully directed their conduct at the United States, al Qaeda's avowed target.

Moreover, it is clear that bin Laden's messages were heard.  For example, on July 15, 1999, Sheikh Omar Bakri Mohammed issued an open letter over the Internet to Usama Bin

Laden titled "O' Osama, Let Us Hear the Good News."  Omar Bakri lauded as a victory the "decision to confront the American alliance."  Moreover, Bakri characterized Muslim insurgencies in "Afghanistan, Palestine, Lebanon, Bosnia, Somalia, Arabia, Tanzania, Kenya, Eritrea, The USA, Chechenya [*sic*], Philippines, Burma, China, Kashmir, Uzbekistan and others" as "a victory which America and its alliance never expected," clearly reflecting an understanding that wherever bin Laden and al Qaeda struck, their target was "America and its alliance."  *See* Bierstein Aff., Ex. 18.   The U.S., too, understood bin Laden's message targeting America; the FBI named him as a "Ten Most Wanted Fugitive" and offered a $5 million reward for his capture.  *See* Bierstein Aff., Ex. 19.  And a press release issued by the office of the United States Attorney for the Southern District of New York in November, 1998, described bin Laden and al Qaeda as engaged in a worldwide terrorist conspiracy "to murder United States nationals."  *See* Bierstein Aff., Ex. 20.   That this interpretation was correct was confirmed in Sheikh Omar Bakri's July, 1999 open letter, which deemed the designation of bin Laden as "public enemy number one against the interests of the USA" a victory for al Qaeda.  *See* Bierstein Aff., Ex. 18.

In sum, bin Laden announced loud and clear and repeatedly that he and al Qaeda were targeting the United States.  These pronouncements were heard and understood in the Middle East and in the United States.  Those, including Al-Husaini, who provided material support to bin Laden and al Qaeda knew that the purpose of this terrorist organization was to attack the United States and its nationals.  In providing support to a terrorist campaign that was specifically focused on the United States, they purposefully directed their conduct at the United States and cannot claim surprise at being made answerable for their acts in an American court.  No more is required to satisfy the demands of due process.

## II.     AL-HUSAINI WAS PROPERLY SERVED

Al-Husaini also argues that he has not been properly served.  (Al-Husaini Memorandum at 10-13.)  Al-Husaini makes the identical arguments about service by publication made by his co-defendant Sheikh Salman Ol-Oadah.  Plaintiffs have addressed each of those arguments in their opposition brief to Sheikh Salman Ol-Oadah's Motion to Dismiss.  Rather than repeat those arguments here, plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

As demonstrated in plaintiffs' memorandum of law in opposition to Al-Oadah's motion to dismiss, service by publication on defendants in the Middle East, including Hamad Al Husaini, was proper.  On March 24, 2003, Plaintiffs filed a motion for leave to serve by publication defendants located in Saudi Arabia, Sudan and United Arab Emirates.  *Burnett* D.D.C. Docket No. 95, 3.  (A copy of plaintiffs' March 24, 2003 motion is annexed to the Affirmation of Andrea Bierstein submitted in opposition to the motion to dismiss filed by Sahir Batterjee, which is incorporated herein.)  In that motion, plaintiffs asked for an extension of time to serve all originally named defendants and, by implication, any defendants added subsequently that are either at large or in the region of the Gulf States, and specifically in Saudi Arabia, Sudan and United Arab Emirates.  Additionally, the Plaintiffs asked for permission to serve by publication defendants that were listed in the Exhibit A attached to the motion, which included Al-Husaini. Because his name clearly appears on Exhibit A, Al-Husaini's assertion, on page 10 of his memorandum of law, that he was not named in the motion is inexplicable.  On March 25, 2003, the Court granted the March 24, 2003 request to serve certain Defendants by publication. On May 2, 2003, Al-Husaini was added as a defendant, see Burnett D.D.C. Docket No. 139, and was served by publication in *Al-Quds Al-Arabi* on June 3, 11, 18 and 24, and July 12 and 14,

18

2003 and in the *International Herald Tribune* on May 23, 30, June 6, 13, 20, and 27, 2003.

Thereafter, Al-Husaini appeared and filed this motion to dismiss.  In short, plaintiffs served Al-Husaini in accordance with the Court's March 25, 2003 order granting their March 24, 2003 request to serve certain defendants by publication and the notice successfully apprised him of this lawsuit.

CONCLUSION

For the foregoing reasons, defendant's motion to dismiss pursuant to Rule 12(b)(1), 12(b)(2) and 12(b)(5) should be denied in its entirety.

Dated: New York, NY                              Respectfully submitted,
       June 30, 2004


                              /s/_____
                              Ronald L. Motley, Esq.
                              Jodi Westbrook Flowers, Esq.
                              Donald A. Migliori, Esq.
                              Michael Elsner, Esq. (ME-8337)
                              William H. Narwold, Esq.
                              Ingrid L. Moll, Esq.
                              Justin B. Kaplan
                              MOTLEY RICE LLC
                              28 Bridgeside Boulevard
                              P.O. Box 1792
                              Mount Pleasant, South Carolina 29465
                              Telephone:  (843) 216-9000

                              Paul J. Hanly, Jr., Esq. (PH-5486)
                              Jayne Conroy, Esq. (JC-8611)
                              Andrea Bierstein, Esq. (AB-4618)
                              HANLY CONROY  BIERSTEIN & SHERIDAN, LLP
                              415 Madison Avenue
                              New York, NY 10017-1111
                              Telephone:  (212) 401-7600

                              William N. Riley, Esq.
                              Amy Ficklin DeBrota, Esq.
                              RILEY DEBROTA LLP
                              3815 River Crossing Parkway, Suite 340
                              Indianapolis, Indiana 46240

Telephone:  (317) 848-7939

Harry Huge, Esq.
HARRY HUGE LAW FIRM, LLP
Market Square North
1401 Ninth Street, N.W., Suite 450
Washington, D.C. 20004
(202) 824-6046

Allan Gerson, Esq.
Attorney At Law
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Edward D. Robertson, Esq.
Mary Doerhoff Winter, Esq.
BARTIMUS, FRICKLETON, ROBERTSON
   & OBETZ
200 Madison Street, Suite 1000
Jefferson City, MO 65101
Telephone:  (573) 659-4454

Jack Cordray, Esq.
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone: (843) 577-9761

Attorneys for *Burnett* Plaintiffs