# Exhibit 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

*JUN 1 2 2003*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 02 CR 892 |
| | ) | |
| ENAAM M. ARNAOUT | ) | Hon. Suzanne B. Conlon |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully submits the following Response to

Defendant Enaam M. Arnaout's Position Paper as to Sentencing Factors ("Pos. Paper").

## I.   DEFENDANT'S OBJECTIONS TO THE LOSS CALCULATIONS

Defendant objects to the U.S. Probation Office's Presentence Report's ("PSR's") estimate

of the loss amount under U.S. Sentencing Guideline ("U.S.S.G.) § 2B1.1 of $438,238.  Pos. Paper

at 1-2.

The parties agree with the PSR that the fraud guideline, U.S.S.G. § 2B1.1, applies to the

offense of conviction.  Under § 2B1.1, the base offense level is 6, and that level is increased by the

amount of "loss." The amount of "loss" may be a reasonable estimate where an exact amount cannot

be determined and may be based on a number of factors, including "the scope and duration of the

offense." U.S.S.G. § 2B1.1 Note 2(C).

### A.   Estimating Loss

To determine an appropriate "loss" amount, the government added the known costs of goods

that defendant's charity, Benevolence International Foundation, Inc. ("BIF"), supplied to fighters,

and the estimated value of goods that BIF supplied to fighters when the actual cost was unknown.

194

The government included in its estimate only those items which the government could prove with supporting documents that BIF provided or attempted to provide to fighters. As outlined below, this method of determining loss yields an amount in excess of $400,000 but less than $1,000,000, resulting in a 14-level increase to defendant's total offense level under § 2B1.1(b)(1).

Notably, this method of determining loss provides a conservative estimate for purposes of calculating defendant's Guidelines range. While the government believes that this estimate should be used for sentencing purposes, a number of other factors arguably call for an even higher loss amount, including the fact that the vast majority of donors to BIF would likely not have donated had BIF not received tax-exempt status from the IRS or otherwise been truthful to the public about its expenditures. Moreover, a conservative estimate of the federal taxes BIF would have been obligated to pay had it not deceived the IRS and obtained tax-exempt status, but received the same amount of donations as reported to the IRS in 1994 to 2001, is $543,354. *See* Ex. 1 (table setting forth applicable tax rates and chart summarizing BIF's tax obligations prepared by IRS Auditor Shari Schindler, CPA).[1]  Finally, it is likely that not all of BIF's support to violent groups was memorialized in documents recovered by the government. In fact, the amounts listed here do not include any expenditures in Sudan, even though BIF documents demonstrate that BIF financially supported violent groups there.[2]

---

[1]        For ease of reference, the exhibits cited in this filing have been bound separately.

[2]        Defendant claims that *his* BIF never spent money in Sudan, and that his solicitations to the public about BIF's work in Sudan were an effort to "'puff' its accomplishments by taking credit for the activities of a separate organization." Pos. Paper at 6. The government has no estimate of the amount of donations BIF received for Sudan relief as a result of its purportedly fraudulent "puffing."

**B.** **Undisputed Amounts**

Defendant admits to misappropriating **$196,653** of donors' funds to purchase the following items: boots for Chechen fighters ($89,900); uniforms for Chechen fighters ($66,053); boots for the Bosnian commando group "Black Swans" ($6200); an ambulance for the Bosnian army ($7500); blankets for the "Black Swans" ($300); and tents for Bosnian soldiers ($24,000). As defendant is aware, the government possesses documentary proof on each of these items. The documents are not attached because the amounts are undisputed, and the government will have them available at the sentencing hearing.

**C.** **Disputed Amounts**

The items in dispute, along with the evidentiary support for including these items, are discussed below.

**1.** **Support Provided to Chechen Fighters**

A)    **$34,500** for shoes for Chechen fighters. While defendant acknowledges that the cost of uniforms ($66,053) for the same individuals should be included in the loss amount, he inexplicably ignores the cost of the shoes that accompanied those uniforms ($34,400). *See* Ex. 2 (stating that the contents of the shipment were 1500 pairs of shoes costing $34,500; and $66,053 worth of 1500 pairs of thermal underwear, 1500 belts, 1500 pairs of socks, material for 3000 pants and shirts and 1500 jackets, along with lining, zippers and buttons).

B)    **$6775** for a mobile x-ray machine and **$3225** cash for fighters in Chechnya.[3] BIF gave the x-ray machine and cash to Essa Abzoutov for use by fighters in Chechnya. *See* Ex. 3 at 3.

_____

[3]    The government's previously estimated the cost of the x-ray machine to be $8000, but it has reduced that amount in response to the suggestion that the $3225 cash delivered to fighters was the difference between the cost of the x-ray machine and $10,000 allocated for that purchase.

Defendant contends now that this x-ray machine and cash were not for fighters and/or did not involve BIF funds. Pos. Paper at 5. This argument is contradicted by a detailed report recovered from BIF in Illinois which states:

> The above visit was made by the undersigned on behalf of Benevolence International Foundation and at the request of Mr. Suleman Ahmer, Operations Manager, B.I.F. North America/Pakistan.
>
> * * * * *
>
> Attempts were made by us to locate Mr. Essa Abzoutove, contact man of Chechen Logistics Cell in Baku.
>
> * * * * *
>
> Accompanied G.M. . . . to the office of Mr. Khasan G. Khazutev, Vice Prime Minister of the Cabinet of Ministers of the Chechen Republic (See copy of his calling card, attached). G.M. Explained to him the purpose of my visit and B.I.F.'s desire to provide financial and material support to the Chechen cause. *Mr. Khazutev welcomed B.I.F.'s humanitarian help and assured to become an effective conduit to pass on the proposed aid, cash or kind, most expeditiously to the Mujahideen.* After being convinced of our bonafides, he showed us two letters issued by the office of President Dzokhar Dudayev . . . which contained the names of the Chechen based in Baku and other cities of Azerbaijan who were designated to receive the donations in cash or kind. These letters were signed by President Dudayev himself . . . . G.M. appreciated our being taken into confidence but discreetly asked for a photocopy of the letters for B.I.F.'s purposes. Mr. Khazuyev, as expected, said it could be considered later.
>
> * * * * *
>
> G.M. came to meet me along with Essa and his fellow Mujahid Buda? [question mark in original] Essa was visibly moved by B.I.F.'s help by sending the much needed X-Ray machine. . . . He also acknowledged the receipt of amount given by G.M. ($3225/- sent through Mr. Asad Ullah and the amount paid to him earlier on by G.M.)
>
> * * * * *
>
> *Essa also showed interest in anti-mine steel-sole boots for Chechen fighters. . . . It appears that Suleman Ahmer is making some inquiries about the manufacture/supply of such boots.*[4]
>
> * * * * *
>
> Met couple of Hisb's Mujahideen. Exchanged views on latest situation; role of B.I.F. in distress areas like Bosnia, Sudan and now Chechnya etc.
>
> * * * * *
>
> G.M. therefore concluded that *any aid from us in cash or kind should better be routed through Essa or any other tried and/or trusted Chechen who is deeply committed to the cause and has active field participation in the ongoing Jehad.*

---

[4] Defendant admits that BIF later purchased 2900 pairs of these boots and delivered them to Chechen rebels.

4

Ex. 3 (emphasis added).

A copy of a receipt for the x-ray machine was found at BIF's Illinois office. Ex. 4. It states that the x-ray machine was "[r]eceived with thanks from Benevolence International Foundation, P.O. Box, 548, Worth, Illinois, USA, 60482." *Id.* The receipt makes clear: "As arranged this unit will be transported to Chechnya for the use of Chechen Mujahideen." *Id.* The receipt is signed by Abzoutov, Sarfaraz, and Gul Mohammed, who worked for both BIF and Gulbuddin Hekmatyar's *Hezb e Islami* in Baku, Azerbaijan. *Id.*

These documents plainly show that the x-ray machine and cash were for fighters. In addition, if the x-ray machine and cash were unrelated to BIF, as defendant suggests, Sarafraz's report would not state that his trip was made "on behalf of Benevolence International Foundation" and Abzoutov's receipt would not thank BIF by name and address.

C)   **$75,377** for single-use chemical handwarmer and bootwarmer packets. Defendant maintains that these items were purchased for the benefit of refugees in cold climates. However, is far more likely than not that the handwarmers and bootwarmers, like the boots BIF bought, were for use by Chechen fighters in combat. BIF attempted to send them in December 2000 to Essa Abzoutov, the same person who previously requested the boots from BIF expressly for Chechen fighters and received cash and an x-ray machine for Chechen fighters. Ex. 5 (directions to handwarmer company to ship the materials to Abzoutov). Indeed, Abzoutov is described in the BIF report quoted above as a "contact man of Chechen Logistics cell," and the report states that aid from BIF to Chechnya "better be routed through Essa or any other tried and/or trusted Chechen who is deeply committed to the cause and has active field participation in the ongoing Jehad." Ex. 3 at 3, 4. The handwarmers were sent to Turkey for ultimate delivery into Chechnya – the same route BIF

used to deliver uniforms in Chechnya. *See* Ex. 2 (noting that the uniforms were sent "to Baku from Istanbul").

Common sense also suggests these were for fighters. The packets only stay warm for around eight hours and then are useless. They are primarily used for skiing, hunting, fishing, short-duration activities like waiting for a bus in a cold city. To assist refugees, the money would be better spent on gloves or other warm clothing.

Finally, defendant's unsupported statement in his Position Paper that these items were never delivered is immaterial. Pos. Paper at 4. The fraud was complete when the handwarmers were purchased for fighters using donor funds.

### 2.  Support Provided to Bosnian Fighters

The disputed support to Bosnian fighters centers on 2500 square meters of plastic, 2000 uniforms, 2000 pairs of boots, and 10 "mass communication" stations (there is a separate dispute about a second ambulance, discussed below). As for the plastic, uniforms, boots, and mass communication stations, defendant acknowledges that he did in fact provide these items to a Bosnian military unit, and he states that their value should be included in the loss amount. Pos. Paper at 8. He claims through his attorneys however to have found all of these items after they were abandoned and that they were "salvaged by BIF-USA when it took over a storage facility in Bosnia" and "they would have cost BIF-USA money to continue to store." Pos. Paper at 3-4. Defendant provides no support whatsoever for this assertion, and the evidence contradicts him.

A "Letter of Gratitude" from a Bosnian military unit recovered from BIF's Illinois office thanks BIF for the plastic, uniforms, boots, and mass communication stations. Ex. 6. The letter contradicts defendant's explanation that he delivered the items when BIF took over a storage facility

6

and desired to avoid storage costs for the items, as it expressly notes that the items were supplied by

BIF "from the end of 1992 to June, 1994." Common sense suggests that this valuable property was

not simply abandoned and then parsed out to a military unit over a year and a half period for no

apparent reason. The body of the letter is also inconsistent with defendant's one-time salvage story:

it thanks BIF for its "noted assistance and collaboration with this military unit" and states that the

unit hopes that "this mutual collaboration will continue." *Id.* Based on the text of the letter and

defendant's admitted history of surreptitiously purchasing items for fighters, including boots and

uniforms, a preponderance of the evidence demonstrates that defendant did not simply "salvage"

these boots and uniforms with other items, but instead obtained them for the military's use.

The government estimates of the costs of these items are discussed below, followed by a

discussion of the ambulance in dispute.

A)      **$40,000** for the 2000 pairs of boots received by the Bosnian military from BIF. *See*

Ex. 6. This estimate is based conservatively on a cost of $20 per pair of boots. The government

used a figure less than the amount BIF spent on boots for Chechen fighters and the amount estimated

to have been spent on boots for the "Black Swans" ($32) because there is no indication that these

boots were "anti-mine" like the ones provided to the Chechens, the quantity provided was much

larger than the quantity BIF gave the "Black Swans," and there is no indication that the Bosnian

military required high-quality boots. The estimate does not include costs for transporting the items

to Bosnia during a war.

B)      Approximately **$4982** for the 2500 square meters of nylon received by the Bosnian

military from BIF. *See* Ex. 6. This estimate is based on a quote from a retailer obtained by FBI

Special Agent Tom Simon of $2.77 per roll of nylon, with one roll measuring 36 inches by 60

7

inches. *See* Ex. 7. The estimate does not include costs for transporting the items to Bosnia during a war.

        C)     Approximately **$1000** for the ten "mass communication stations" received by the Bosnian military from BIF. *See* Ex. 6. This conservatively assumes that the "mass communication stations" are walkie-talkies or something similar, and estimates $100 per unit, a typical cost of a professional-quality walkie-talkie.

        D)     Approximately **$88,000** for the 2000 uniforms received by the Bosnian military from BIF. *See* Ex. 6. This estimate is based on a cost of $44 per uniform, the undisputed amount BIF spent on the uniforms it provided in Chechnya. Again, no transportation costs are included.

        E)     Approximately **$7500** for a second ambulance BIF provided to fighters in Bosnia. This ambulance should be included because a photograph recovered from BIF's Illinois office shows the ambulance being delivered to a Bosnian soldier. Ex. 8. This ambulance is different than the ambulance defendant admits to providing to fighters, as that ambulance was manufactured by Volkswagen (*see* Ex. 9, a letter of thanks from a Bosnian Army unit commander acknowledging receipt of a Volkswagen ambulance), while the ambulance in the photo was manufactured by Ford. *See* Ex. 10. The government estimates the cost of the ambulance to be $7500, based on an interview conducted of a manager of a used ambulance dealer (Ex. 10) and defendant's acknowledgment that a fair estimated value of the other ambulance he provided to Bosnian fighters is $7500.

### D.    <u>Loss Totals</u>

        The sum of the undisputed loss amount ($196,653) and the disputed loss amount demonstrated by documentary evidence ($261,359) is **$458,012**.   Pursuant to U.S.S.G.

8

§ 2B1.1(b)(1)(H), this results in a 14-level increase to defendant's total offense level.[5]

## II.   U.S.S.G. § 3A1.4

Defendant objects to the PSR's recommended application of the terrorism enhancement in U.S.S.G. § 3A1.4.[6]   However, defendant misinterprets the law and misstates the facts regarding this issue.

### A.   Meaning of § 3A1.4

It is clear that in order to apply the terrorism sentencing enhancement, the crime of conviction itself need not be a "federal crime of terrorism" as defined in 18 U.S.C. § 2332(b)(G)(5).[7]   First, as

---

[5]      If the Court finds that the "disputed loss" attributable to defendant is at least $3,348, but does not exceed $203,348, then defendant's total offense level is increased 12 levels under U.S.S.G. § 2B1.1(b)(1)(G).   Merely including the known cost of the shoes ($34,500) which accompanied the uniforms that defendant concedes should be included brings the loss amount within § 2B1.1(b)(1)(G).

[6]      This provision specifies:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4 (2000).

[7]      Application Note 1 explains that "'Federal crime of terrorism' is defined at 18 U.S.C. § 2332b(g)(5)."   That subsection, which supplies definitions for the crime of "Acts of terrorism transcending national boundaries," provides:

(5) the term "Federal crime of terrorism" means an offense that--

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(continued...)

9

a matter of drafting, the Sentencing Commission deliberately chose language that applied the enhancement to "a felony that *involved, or was intended to promote*, a federal crime of terrorism," and not language that specified that the crime of conviction itself be a federal crime of terrorism. (Emphasis added.)  Because the language in § 3A1.4 is clear, the Court need not explore the legislative history to determine its meaning.  *See United States v. Mueller*, 112 F.3d 277, 281 (7th Cir. 1997) (instructing courts to construe the plain language of a sentencing guideline before examining the guideline's history); *cf. Newsom v. Friedman*, 76 F.3d 813, 816 (7th Cir. 1996), *cited in Mueller*, 112 F.3d at 281 ("A court may examine legislative history when it encounters language in a statute that is undeniably ambiguous, but it should be the final option. A court's first obligation when construing the meaning of a law enacted by Congress is to consider the statutory language itself.").  Nevertheless, as discussed below, the legislative history of the provision shows that it was drafted to include crimes that supported terrorism but where the terrorist purpose was not an element of the crime.

Prior to the 1995 enactment of the upward *adjustment* in § 3A1.4, the Sentencing Guidelines addressed the sentencing effect of "Terrorism" in an upward *departure* provision, U.S.S.G. § 5K2.15 (1994).  Section 5K2.15 provided: "If the defendant committed the offense *in furtherance of* a terroristic action, the court may increase the sentence above the authorized guidelines range."

---

[7](...continued)
(B) is a violation of--

    (i) ... 956(a)(1) (relating to conspiracy to murder, kidnap or maim persons abroad), ... 2332b (relating to acts of terrorism transcending national boundaries), ... 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) ...

18 U.S.C. § 2332b(g)(5).

U.S.S.G. § 5K2.15 (1994) (emphasis added). Section 5K2.15 was added in 1989 to specifically provide for "an upward departure when the offense is committed for a terroristic purpose," but the Commission stated that this did "not make a substantive change" because "[s]uch conduct is currently included in the broader policy statement at § 5K2.9 (Criminal Purpose) and other policy statements." U.S.S.G. App. C, Amendment 292, *citing United States v. Kikumura*, 706 F. Supp. 331 (D.N.J. 1989). Section 5K2.9 has always permitted upward departures "[i]f the defendant committed the offense *in order to facilitate or conceal* the commission of *another* offense." U.S.S.G. § 5K2.9 (2000) (emphasis added).

In the 1995 amendment which added § 3A1.4's upward adjustment "in place of the upward departure provision at § 5K2.15," § 5K2.15 was "deleted in its entirety." U.S.S.G. App. C, Amendment 526 (1995). The Sentencing Commission added § 3A1.4 to address the directive of Congress in § 120004 of the Violent Crime Control and Enforcement Act of 1994. *See* U.S.S.G. App. C, Amendment 526 (1995). Title XII of that Act broadened the law enforcement response to terrorism, extending the statute of limitations, authorizing jurisdiction over acts on foreign vessels, and creating new offenses penalizing counterfeiting abroad and providing material support to terrorists. Section 120004 directed the Commission "to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that *involves or is intended to promote* international terrorism, *unless* such involvement or intent is itself an element of the crime." Pub. L. 103-322, § 120004, 108 Stat. 2022 (Sept. 13, 1994) (emphasis added), *reprinted at* 28 U.S.C. § 994 Notes. The language of § 120004 was adopted from

11

the Senate version of the bill.[8] Identical language had been used in some earlier versions dating to 1993.[9] The rejected House version also contained the same "involves or is intended to promote" language, but specified a minimum number of levels for the upward adjustment.[10]   Thus, the originating language made clear that the enhancement was for offenses where terrorism was *not* an element of the crime of conviction.

In the wake of the 1995 Oklahoma City bombing attack, an emergency amendment to § 3A1.4 in 1996 (made permanent in 1997) substituted "federal crime of terrorism" for "international terrorism," and changed the statutory definition from 18 U.S.C. § 2331 (defining "international terrorism") to § 2332b(g) (defining "federal crime of terrorism").   U.S.S.G. App. C, Amendments

---

[8]     H.R. Conf. Rep. 103-711, *235, 392 (August 21, 1994), *reprinting* H.R. 3355, § 120004, *reprinted in* 1994 U.S.C.C.A.N. 1980, 1981; H.R. Conf. Rep. 103-694, *259 (August 10, 1994), *reprinting* H.R. 3355, § 120004.

[9]     139 Cong. Rec. S17095-03, *S17116 (November 24, 1993) & 139 Cong. Rec. S16232-03, *S16246 (November 18, 1993), *reprinting* H.R. 3355, § 724 (same); 139 Cong. Rec. S16234 (November 18, 1993), *reprinting* S. 1607, Amendment 1216, § 724 (same); 139 Cong. Rec. S12388-04, *S12408, *S12443 (September 23, 1993), *reprinting* S. 1488, § 724 (same, and commenting "Enhances penalties for any felony, whether committed within or outside the U.S., that involves or is intended to promote international terrorism.");139 Cong. Rec. H6956-02, *H6959 (September 23, 1993) (same comment).   Another, contemporaneous Senate version, non-mandatory in nature, also used the "involves, or is intended to promote" language. 139 Cong. Rec. S195-02, *S308 (January 21, 1993), *reprinting* S.6, § 711 ("The United States Sentencing Commission shall study and, if warranted, amend its sentencing guidelines to provide an increase in the base offense level for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime."); 139 Cong. Rec. S288 (January 5, 1993), *reprinting* S.9, § 711 (same).

[10]     *See, e.g.,*139 Cong. Rec. H10191-02, *H10215, *H10229 (November 19, 1993), *reprinting* H.R. 3351, § 422 ("The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an increase of not less than three levels in the base offense level for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.").

539 (1996) & 565 (1997). These amendments implemented § 730 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1303 (April 23, 1996), "so that the adjustment in § 3A1.4 (relating to international terrorism) applies *more broadly* to a 'Federal crime of terrorism' as defined in . . . § 2332b(g)." U.S.S.G. App. C, Amendments 539 (1996) & 565 (1997) (emphasis added).

Thus the language referencing "only to federal crimes of terrorism" that is so often cited by the defendant should not be read as an effort to shrink the expanse of § 3A1.4 but rather to expand coverage to conduct that involves or is intended to promote a federal – including domestic – crime of terrorism.

In a case directly on point, *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001) the Sixth Circuit addressed the issue of the application of Guideline § 3A1.4 to a case where the defendant was convicted of conspiracy in violation of 18 U.S.C. § 371. The Sixth Circuit held that:

> Based on our interpretation of the word "involved" and the phrase "intended to promote," as well as our understanding of the relevant conduct provision, we believe that this statement of law is correct: the defendant need not have been convicted of a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5) for the district court to find that he intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime.

*Graham*, 275 F.3d at 517 (footnote omitted).

Defendant would have the court read the legislative history out of context to eviscerate the plain meaning of the statute and, in effect, redact the words "involved or intended to promote" from the Guideline. In defendant's view, however, the Sentencing Commission, Congress (in subsequent acts which did not address the issue), the Sixth Circuit in *Graham*, the parties and trial judge in the *John Walker Lindh* case, and the government and probation office in this case all overlooked Congressional direction to strike the words "involved and intended to promote" from § 3A1.4. Not

13

so.

Indeed, contrary to defendant's contention, the Application Notes to § 3A1.4 make clear the consistent view that the Guidelines Commission gives common meaning to the plain language "involved or intended to promote." Thus, Application Note 2 to 3A1.4 provides: "For purposes of this guideline, an offense that involved . . . obstructing an investigation of a federal crime of terrorism, shall be considered to have *involved, or to have been intended to promote*, that federal crime of terrorism" (emphasis added). In other words, it is clear that a conviction for obstruction of justice could support such an enhancement even though the obstruction charge is not an enumerated "federal crime of terrorism." Similarly, the commentary in Application Note 4 indicating that an upward departure may be warranted where § 3A1.4 does not apply by its terms cites the example where an offense involved retaliating against government conduct but "the offense involved or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. 2332(b)(g)(5)(B)[.]"

**B.    Application of U.S.S.G. § 3A1.4**

     **1.    Obstruction of Justice**

As the Court is well aware, there is a substantial factual dispute between the parties as to defendant's and BIF's relationship with *al Qaeda*, discussed in detail below. However, even before resolving those factual disputes, the Court can apply § 3A1.4 based on the obstruction conduct alone.

Application Note 2 to § 3A1.4 expressly provides that "obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." Unlike legislative history, Application Notes to the Sentencing Guidelines are binding on courts unless they contradict the plain meaning of the text of the

14

Guidelines. *United States v. Garecht*, 183 F.3d 671, 674 (7th Cir. 1999).

Because defendant obstructed an investigation of a federal crime of terrorism, namely, the government's investigation of whether he violated 18 U.S.C. § 2339A, among other offenses, and because that obstruction is relevant conduct under § 1B1.3 (which covers among other conduct all of a defendant's acts that occurred in the course of attempting to avoid detection or responsibility for an offense), then § 3A1.4 applies.

Defendant complains that § 3A1.4 is so drastic that a clear and convincing standard of proof should apply. Pos. Paper at 21-24. First, as defendant notes, the Seventh Circuit has never held that such a standard applies at sentencing. *See United States v. Smith*, 308 F.3d 726, 745 (7th Cir. 2002) (citing *United States v. Rodriguez*, 67 F.3d 1312, 1322-23 (7th Cir. 1995) (finding preponderance of evidence appropriate for relevant conduct determination that extends sentence from 51-63 months to life in prison)); *United States v. Masters*, 978 F.2d 281, 283-85 (7th Cir. 1992) (same for sentence increase from 33-41 months to 40 years)). Second, this is certainly not a case of "the tail wagging the dog," as defendant asserts. Defendant faces a maximum sentence of 240 months – within three levels of the guidelines range determined by the Probation Office omitting the enhancement, and within one level of the range advanced by the government here omitting the enhancement. Finally, even under a clear and convincing standard, defendant's repeated, material lies under oath to a federal court in the course of a civil lawsuit against high-level government officials amount to obstruction.

In fact, during the presentence investigation, defendant conceded that he obstructed justice in this case, but now that he realizes the serious consequences of obstructing federal investigations of terrorism, he has done an about-face. Nevertheless, it remains clear that defendant obstructed

15

justice in this case, as set forth in Section IV. below concerning the obstruction enhancement.
Accordingly, § 3A1.4 applies.

**2.      Defendant's Support to Fighters in Chechnya Triggers § 3A1.4**

Defendant's support to fighters in Chechnya "involved" and "was intended to promote" a
federal crime of terrorism, as defined in § 3A1.4 and 18 U.S.C. § 2332b(g)(5). Defendant disputes
this on three grounds: 1) defendant's support came too early to be considered to have involved or
been intended to promote a federal crime of terrorism; 2) the materials defendant provided cannot
be "material" support; and 3) defendant did not have the requisite intent because he thought he was
supporting "lawful combatants." Pos. Paper at 24-30.

**a.      Timing of Defendant's Actions**

Defendant is correct that most of the items he admits to providing to fighters were provided
before April 24, 1996, and therefore did not violate 18 U.S.C. § 2339A with the intent to carry out
a violation of § 956, because § 956 was not added in § 2339A prior to that date. Defendant ignores
his substantial activity after April 24, 1996, which does warrant application of the enhancement.

First, while defendant correctly states that the 2900 pairs of anti-mine combat boots were sent
in November 1995, he ignores the fact that he agreed to ship 5000 more pairs after August 7, 1996,
and raised a substantial amount of money toward that goal in 1996 and 1997. *See* Ex. 11 (request
for 5000 additional pairs of boots dated August 7, 1996); Ex. 12 (BIF solicitation to donors on
September 8, 1996, stating that BIF distributed 2900 pairs of anti-mine boots the previous year and
has received a request for 5000 more, concealing that the boots are for fighters, and noting that BIF
had raised $106,149 for the next shipment of boots); and Ex. 13 (form solicitation letter dated
January 20, 1997, signed by defendant, falsely stating that the previous shipment of anti-mine boots

16

and the shipment for which he was raising funds "will go a long way to minimizing the damage that land mines are causing to the civilian population in Chechnya"). Indeed, as Exhibit 11 shows, the 5000, like the previous 2900, were destined for Sheikh Fathi in Chechnya (discussed below).[11] Again, these were for ultimate distribution to Chechen fighters.

Section 2339A prohibits attempts and conspiracies to provide material support, concealing the nature of material support, and attempts and conspiracies to conceal the nature of material support. Defendant did all of those things. Moreover, defendant knew that the boots would be used to equip fighters under Sheikh Fathi in their efforts to kill persons in a foreign country, thereby violating 18 U.S.C. § 956.

The same analysis applies to defendant's purchase in late 2000 of over $75,000 worth of handwarmers and bootwarmers for Essa Abzoutov, a conduit to Chechen fighters, and his efforts to conceal the nature of that support.

Additionally, defendant's false sworn declarations in 2002 – concealing and attempting to conceal his provision of material support – violate § 2339A.

Defendant contends that none of this was calculated "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" as required in § 2332b(g)(5) for an offense to be a "federal crime of terrorism." As detailed above, defendant need

---

[11]     Although Sheikh Fathi thanked BIF for only 2500 pairs of boots, it is clear that he is referring to the shipment of 2900 pairs of anti-mine boots, which cost $32 per pair. *See* Ex. 12 (BIF letter dated September 8, 1996 stating: "Last year BIF distributed 2,900 pairs to the localities where the mines are reported to be scattered. These winter shoes provide a degree of protection as they have reinforced soles. . . . In the end of July BIF received another request for these shoes for this upcoming winter. A minimum of 5,000 pairs was requested. BIF has decided to go ahead with this project. . . . The cost of the shoes is $29.50 per pair. Including the shipment, the cost per pair is $32.00. " (Emphasis in original.).)

not himself commit the federal crime of terrorism for § 3A1.4 to apply, but his offense must "involve" or be "intended to promote" such a crime. Every fighter defendant supported was trying to influence the conduct of the government against which they were fighting using force or coercion. *See*, *e.g.*, Ex. 14 at 2 (report of defendant's description of a fighter under Sheikh Fathi who commands hundreds of *mujahideen* charged with ensuring that the "president" in Chechnya does not blatantly violate Islamic principles). In other words, defendant was not equipping people who were trying to settle forcefully private scores, he was equipping people fighting governments.

### b. Materials Defendant Provided

Defendant contends in an undeveloped argument that the specific materials he provided as a matter of law cannot constitute material support. Pos. Paper at 26. 18 U.S.C. § 2339(b) explicitly states that material support includes not only weapons and expert advice but "other physical assets" except for medicine or religious materials. Accordingly, defendant's argument is meritless.

### c. Lawful Combatant Immunity

Defendant again claims without support that the fighters he supported were "lawful combatants" as defined by the Geneva Convention, and because they are immune from prosecution, he enjoys some form of derivative immunity for supporting them. This Court rejected this argument in a Memorandum Opinion and Order on January 3, 2003.

The government maintains that this issue of whether combatants are "lawful" or "unlawful" is a nonjusticiable political question reserved for the Executive Branch. In any event, as in *Lindh*, defendant has failed to make any showing that he is entitled to unlawful combatant immunity. *United States v. Lindh*, 212 F.Supp. 2d 541, 557 (E.D. Va. 2002) (citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975)). Defendant has offered no evidence in support of the argument that he is entitled

18

to immunity.

Moreover, defendant now contends (without any support) that he supported only organized armies and not irregular *mujahideen* units. As discussed in more detail below, this is false. Indeed, defendant supplied and attempted to supply anti-mine boots to Sheikh Fathi in Chechnya, whom defendant described as follows:

> He is one of the most significant figures in the Islamic movement in Chechnya. By profession, he was an electronic engineer and helped the Afghan Jihad through his skills in electronics. . . . Fathi started receiving Mujahideen, especially Arabs, from other Muslim countries. . . . At the time of his death, Sh. Fathi was busy in another great task: organizing and structuring his Islamic group. He died before completing the task of structuring his movement completely.

Ex. 14 at 1-2. As defendant knew, Sheikh Fathi was not part of an organized army of lawful combatants.

### d.   Defendant's Relationship with *al Qaeda*

As discussed above, application of § 3A1.4 is appropriate regardless of defendant's relationship with *al Qaeda*, although defendant's involvement with *al Qaeda* separately warrants application of § 3A1.4. That relationship is the topic of substantial factual dispute. For purposes of clarity, the facts regarding that relationship are set out in a separate section, Section VIII below.

## III.   APPLICATION OF §§ 2B1.1(B)(7)(A) AND 3B1.3

Defendant contends that application of the two-level enhancement in § 2B1.1(B)(7)(A) (for an offense involving the misrepresentation that the defendant was acting on behalf of a charitable organization) and the two-level enhancement in § 3B1.3 (for abuse of a position of public or private trust) is impermissible "double-counting." The government disagrees.

"'Double counting occurs when identical conduct is described in two different ways so that

19

two different adjustments apply.'" *United States v. Parolin*, 239 F.3d 922, 928 (7th Cir. 2001)

(quoting *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994) (brackets omitted)); *see also*

*United States v. White*, 222 F.3d 363, 376 (7th Cir. 2000) ("'Double counting occurs when the court

assesses more than one enhancement to the offense level for a single offense based on the same

underlying conduct.'") (quoting *United States v. Mancillas*, 183 F.3d 682, 710 (7th Cir. 1999)

(brackets omitted)).

As to § 2B1.1(B)(7)(A), defendant defrauded his victims by contending that their money was

going to purely humanitarian causes via BIF. For purposes of this guideline, it is irrelevant whether

defendant was BIF's executive director or file clerk – or whether he in fact worked for BIF. The

guideline applies because the nature of his fraudulent misrepresentations was that money received

was for charitable purposes.

The abuse of trust enhancement in § 3B1.3 takes into account that defendant was employed

and acted as the executive director of a large charity trusted by many members of the public, which

received tax-exempt status from the IRS. Defendant clearly abused the trust the donors placed in

him as BIF's executive director, as well as the benefits of tax-exempt status, which defendant touted

in BIF's mass solicitations for donations.

In support of his argument that the two enhancements are the same, defendant relies upon

an unpublished Fourth Circuit opinion, *United States v. Williams*, 2002 WL 58160 (4th Cir. Jan. 6,

2002), even though under the Fourth Circuit's Local Rule 36(c), citation of the opinion in a brief to

the Fourth Circuit or a district court within the Fourth Circuit is disfavored. The defendant in

*Williams* impersonated a United States Marshal and used a fake badge to obtain $700 from a victim

who thought she was purchasing a car seized by the government. *Id.*, 2002 WL 58160, at *1. At

20

sentencing, the district court applied a two-level enhancement matching the enhancement currently found in § 2B1.1(b)(7)(A) because the defendant misrepresented that he was acting on behalf of a government agency. *Id.* The district court also applied a two-level enhancement for abuse of a position of trust, because defendant purported to be a law enforcement official. *Id.*, 2002 WL 58160, at *2. The Fourth Circuit held that application of both enhancements was double counting because both punished the defendant for "the same abuse of trust" – falsely purporting to be a U.S. Marshal. *Id.*, 2002 WL 58160, at *4. In reaching this conclusion, the court stressed that the defendant "held no position of public or private trust with respect to [the victim] other than representing himself to be a federal Marshal." *Id.*

The facts in the present case are in fact far closer to the Seventh Circuit case defendant tries to distinguish, *United States v. Lilly*, 37 F.3d 1222 (7th Cir. 1995). In *Lilly*, a pastor sold fraudulent Certificates of Deposit (CDs) to members of his church, misrepresenting that the CDs would be used to expand the church and finance a retirement center. *Id.* at 1224. Instead, the pastor spent the money on items for himself and members of his family. *Id.* at 1225. At the pastor's sentencing hearing, the court applied an abuse of trust enhancement because the pastor was entrusted with control of the church's bank accounts which allowed him to conceal his scheme, and because he was trusted by churchmember investors who thought he would use their money to benefit the church. *Id.* at 1227. Separately, the court applied an enhancement because defendant misrepresented to all victims – including non-churchmembers – that he was acting on behalf of a charitable or religious organization. *Id.* at 1227-28.

Here, defendant purported to be working on behalf of a charity, warranting application of § 2B1.1(B)(7)(A) regardless of whether defendant actually worked for a charity. Defendant's abuse

21

of his position of public and private trust as BIF's executive director, which allowed him to surreptitiously support fighters and conceal those efforts, separately warrants application of § 3B1.3. Because this is not identical conduct described in two different ways, both enhancements properly apply.

## IV.   **APPLICATION OF § 3C1.1 FOR OBSTRUCTION OF JUSTICE**

Realizing now that his obstruction of a terrorism investigation requires application of the terrorism enhancement in U.S.S.G. § 3A1.4, defendant has abandoned his concession to the Probation Office that the obstruction of justice enhancement in § 3C1.1 applies in this case. In fact, he is now unwilling to concede the obvious: that his two declarations under oath to a U.S. District Court were deliberately false. *See* Pos. Paper at 35 and 36 (suggesting that the statements could have been the result of "confusion, mistake or faulty memory" and noting that English is not defendant's first language).

Defendant filed two false, sworn affidavits to the U.S. District Court, with one purporting to "correct" the other. Despite his efforts to correct his affidavit, each of the affidavits contained the following lies:

- Pursuant to Islamic law, BIF is required to maintain the donations of *zakat* in a non-interest bearing account and to use those funds only to assist the poor and needy. *BIF abides strictly by those requirements.*

- With the help of its field staff, BIF ensures that the donations it receives are spent *solely* for charitable, humanitarian purposes.

- BIF *has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature.* BIF abhors terrorism and all forms of violence against human beings.

Declarations of Enaam Arnaout, attached at Exs. 15 and 16, ¶¶ 5, 6 and 7 (emphasis added).

22

The declarations were filed in a lawsuit in which BIF claimed in its Complaint, *inter alia.*, that it was "a law abiding faith-based charity." See Complaint at 1, ¶ 1, attached as Ex. 17.  The declaration (and later the corrected declaration) was Exhibit A to BIF's motion for preliminary injunction, seeking return of its property and the unblocking of its funds. Ex. 18 at 3 (Judge Alesia's Memorandum Opinion and Order staying case).  After defendant was charged with lying in the declaration, Judge Alesia stayed the civil lawsuit, stating that the veracity of defendant's statements in his declaration was a "critical issue" in the case.  *Id.* at 10.  Approximately two weeks after defendant's guilty plea, BIF requested that its complaint be dismissed with prejudice and without costs. See Minute Order, attached as Ex. 19.

As BIF's Complaint and Judge Alesia's Memorandum Opinion make clear, BIF's funds were blocked pending investigation of BIF for possible violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06. See Ex. 17 at Appendix A (Department of the Treasury Blocking Notice attached to BIF's Complaint) and Ex.18 at 3.  IEEPA's concern is with international financial transactions with persons or group who planned, authorized, aided, or engaged in hostilities or attacks against the United States.  50 U.S.C. § 1702.  Defendant's suggestion that this was unrelated to the investigation which led to his conviction is wrong. Pos. Paper at 36 ("[T]he government has offered no indication that it was investigating the instant offense – a scheme to defraud BIF-USA's donors – at the time the misrepresentations were made."). Any investigation into whether BIF spent its funds on violent activity necessarily implicates whether BIF deceived its donors.  Moreover, the obstruction enhancement applies for obstructive acts occurring during the course of investigation of the offense of conviction, "any relevant conduct," and "an otherwise closely related case." U.S.S.G. § 3C1.1, Note 1.  At the very minimum, BIF's civil

23

lawsuit was "closely related" to the investigation.

Defendant relies on *United States v. Jackson*, 935 F.2d 832, 849 (7th Cir. 1991), in support of an argument that the obstruction enhancement does not apply because his conduct did not have a "significant" impact on the administration of justice. Defendant ignores Application Note 4(b) to U.S.S.G. § 3C1.1, which expressly states that the obstruction enhancement applies to a defendant who commits perjury,[12] as well as Application Note 4(f), which states that the enhancement applies to a defendant who provides materially false information to a judge or magistrate. Furthermore, defendant's assertion that his false sworn declarations made in an effort to have BIF's funds unblocked and filed in his charity's federal lawsuit against the U.S. Attorney General, the U.S. Secretary of State, the Secretary of the Treasury, the Director of the FBI, and the Director of Treasury's Office of Foreign Asset Control, did not significantly affect the administration of justice is unfounded. Even if defendant's perjury did not ultimately have a significant impact on the administration of justice, his *attempt* to obstruct justice warrants application of the enhancement. *See United States v. James*, 328 F.3d 953, 957 (7th Cir. 2003) ("What is more, the enhancement is authorized not only for successful obstruction but also for any attempt to obstruct or impede the administration of justice. U.S.S.G. § 3C1.1. A defendant who commits perjury at trial does not evade the enhancement just because the jurors see through the facade.").

Finally, other evidence plainly demonstrates defendant's drive to thwart investigations. First, defendant wanted to make sure BIF's founder, Adel Batterjee, was updated on the progress of investigations – even though he now contends that Batterjee had nothing to do with his BIF. In a

---

[12]     For guidelines enhancement purposes, perjury is defined as it is under the federal perjury statute: willfully giving under oath, rather than as a result of confusion, mistake, or faulty memory, a materially false statement. *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002).

February 12, 2002 telephone conversation, defendant asked his brother to pass along to Batterjee three things: "first information, tell him about the connection [to Saudi Arabia] subject, the second information about the subject, thinking there is a mafia behind it, and the, the third matter, that, they took the, our director from ninety-three and ninety-four from Bosnia." Ex. 20 at 15 (translated transcript of recorded conversation). With regard to the third item, defendant explained that "they" took the former director of BIF's Bosnian office (referring to al Hajj Boudella, one of the 9 trainers brought to Bosnia from the Sada training camp in Afghanistan at defendant's direction) "in a special plane" "[t]o Cuba." *Id.* Defendant added: "[J]ust tell him [referring to "Abu Sulafa," an alias for Adel Batterjee] ninety-three, ninety-four, and Abu Sulafa will know what you are talking about." *Id.* He elaborated: "Yeah, ninety-three, the director of those days. It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how. . . . Yes, in ninety-two and ninety-three, the work there was Abu Sulafa's. . . . And the work was the type of two-edged razor. So the owner of the job, the director who was on the job there, whom I was responsible for, is now with them. . . . So I mean, after him, after him, after him, after him, after him, after him as long as it takes[.]" *Id.* at 16.

On March 21, 2002, following the search of BIF's Bosnian offices, defendant Arnaout spoke to Munib Zaharigac, the director of BIF's Sarajevo office. (As discussed below, Zaharigac is the same person he instructed in 2000 to withhold information about Mamdouh Salim from Croatian authorities because he knew that Salim was in American custody.) Ex. 21. Zaharigac informed defendant that he was in jail and that "they" came to his house and those of some relatives and "took all the things." *Id.* at 2. Defendant coached Zaharigac: "I just sent a, a, a message to Alen, advised him . . . that each, each one of you . . . gives information about himself, not to give information

about the others. . . . Meaning we now, I don't know a thing about you, I know you, that you are a good, excellent man working with us. I don't know your life . . . . Meaning each one gives information about, about himself, about his person. . . . About the others, what do you know about me, you don't know a thing about me, what do you know about me?" *Id.* at 3-6.

These conversations, when examined in connection with defendant's multiple, clear lies to a U.S. District Court, leave no doubt that defendant intended to obstruct justice.

## V.   ACCEPTANCE OF RESPONSIBILITY

Remarkably, even though defendant maintained his innocence through false declarations and otherwise until the day of trial, he claims that he should receive a one-level deduction in his total offense level pursuant to U.S.S.G. § 3E1.1(b)(2), which allows such a deduction for "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." A defendant bears the burden to "'clearly demonstrate acceptance of responsibility by a preponderance of the evidence.'" *United States v. Hendricks*, 319 F.3d 993, 1009 (7th Cir. 2003) (quoting *United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir.1996)).

By the time he pled guilty, the government had spent months preparing for trial, had flown witnesses to Chicago at substantial expense, and lost weeks of translator resources diverted from other matters preparing final transcripts for trial. More significantly, jury questionnaires had been distributed to potential jurors, and half of those questionnaires were reviewed and discussed by the parties and the Court, leading to the striking of certain potential jurors, and the Court had ruled upon numerous trial motions. Two attorneys for the government traveled to Toronto, Canada to participate in the evidentiary deposition of a defense witness. Certainly, defendant did not permit

26

the government to avoid preparing for trial and permit the Court to allocate its resources efficiently. Considering that some potential jurors had been screened and a defense witness testified at an evidentiary deposition, the trial essentially had already begun.

Even more remarkably, defendant indicates that he was always willing to admit to engaging in fraud but the government prevented him from doing so. This is simply false. Defendant acknowledged no wrongdoing until the eleventh hour, and only after his star witness, a former BIF board member, testified under oath in an evidentiary deposition that he would "be shocked" to learn that BIF provided items to fighters in Bosnia and that BIF's donors would "be shocked" to learn that defendant had a meeting about providing boots to Chechen fighters. Ex. 22. Defendant's current claim that he was willing to acknowledge his fraud is particularly ironic considering that a week and a half before trial, his attorneys moved the Court to order the deposition described above, promising that the witness "will provide broadly exculpatory testimony showing that BIF-USA donors were not defrauded and BIF-USA did not provide material support to militant or terrorist groups." Defendant's Motion to Depose Foreign Witness at 2, attached as Ex. 23.

The government contends that as a result of his recent denial of obstruction of justice, defendant is not entitled to *any* deduction for acceptance of responsibility. As Application Note 4 to § 3E1.1 explains, conduct resulting in an obstruction of justice enhancement ordinarily indicates that the defendant has not accepted responsibility, however, there may be "extraordinary cases" in which the obstruction enhancement and acceptance of responsibility deduction both apply. This is not such a case, as defendant is unwilling to acknowledge that he knowingly lied to a district court and claims that his false statements could be the result of mistake, confusion, or a misunderstanding of English. *See* U.S.S.G. § 3E1.1, Note 1(a) ("[A] defendant who falsely denies, or frivolously

27

contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility"). Certainly, a defendant who does so does not qualify as the "extraordinary case" where credit for acceptance of responsibility should be given despite obstructive conduct.

## VI.   **DEFENDANT'S MISCELLANEOUS OBJECTIONS**

Section II. of defendant's Position Paper lists eight miscellaneous objections to the PSR. They are discussed below.

1)    The government agrees with defendant's correction regarding the dismissal of the indictment in Case Number 02 CR 414.

2)    The government disagrees with defendant's contention that Count 3 of the Second Superseding Indictment was inadequately pled. As the Court will recall, the government voluntarily dismissed this count without prejudice prior to trial based on Speedy Trial Act concerns. Regardless, the issue does not affect defendant's sentence.

3)    The government has no reason to dispute that defendant married Fatin Ahmed Ratiu Al-Makri in Saudi Arabia rather than Pakistan.

4)    The government has no reason to dispute defendant's contention that he entered the United States on June 20, 1990.

5)    The government has no reason to doubt the accuracy of medical records provided to the Probation Office by the MCC. Nevertheless, the issue does not affect defendant's Sentencing Guidelines calculations.

6)    The government again has no reason to doubt the accuracy of information provided to the Probation Office by the MCC, but the issue does not affect defendant's Sentencing Guidelines

28

calculations.

7)    The government agrees that defendant never acted as a director of an office in Saudi Arabia, but there is ample proof that there was a BIF office in Saudi Arabia related to the BIF office in Illinois.  Again, the issue does not affect defendant's Sentencing Guidelines calculations.

8)    The government has no reason to dispute defendant's statements regarding the value of his Sarajevo apartment.

## VII.   GUIDELINES SUMMARY

The defendant's Position Paper concludes with his Guidelines calculations.   The government's calculations are listed below.  Items marked with an * are enhancements included in the PSR which are not disputed in defendant's Position Paper or elsewhere and therefore have not been discussed in this filing.

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)) | 6 * |
| Loss greater than $400,000 and less than $1,000,000  (§ 2B1.1(b)(1)(H)) | 14 |
| More than 50 victims (§ 2B1.1(b)(2)(B)) | 4 * |
| Misrepresentation of action on behalf of a charity (§ 2B1.1(b)(7)(A)) | 2 * |
| Substantial portion of scheme committed outside U.S.  (§ 2B1.1(b)(8)(B)) | 2 * |
| Involved or was intended to promote federal crime of terrorism  (§ 3A1.4) | 12 |
| Leader/organizer of criminal activity; at least 5 participants  (§ 3B1.1(a)) | 4 * |
| Abuse of position of public or private trust  (§ 3B1.3) | 2 |
| Obstruction of Justice  (§ 3C1.1) | 2 |
| Acceptance of Responsibility | 0 |
| **Total Offense Level:** | **48** |

Because § 3A1.4 places defendant in Criminal History Category VI, his Guidelines range is life; however, his sentence cannot exceed 240 months imprisonment because of the maximum in the statute of conviction. If the Court does not apply § 3A1.4, defendant is in Criminal History Category I, with a total offense level of 36, for a Guidelines range of 188-235 months imprisonment. As set forth in the government's Alternative Motion for Upward Departure, if the Court does not apply § 3A1.4, an upward departure resulting in a sentence of 240 months would be appropriate.

## VIII.  DEFENDANT'S RELATIONSHIP WITH *AL QAEDA*

As set forth below, for nearly a decade, defendant worked with various members or associates of *al Qaeda* and provided them logistical and other assistance while they were engaged in violence. These facts paint an accurate picture of defendant's conduct – his knowing dealings with persons engaged in violence – that contradicts his self-portrait as a "goodwill ambassador." Second, they demonstrate that defendant's racketeering conduct "involved and intended to promote" a federal crime of terrorism, including efforts to assist Sheik Fathi's fighters with anti-mine boots and to provide uniforms to Chechen fighters. Third, they place in context the statements defendant swore to in his two affidavits, discussed above, which are plainly false. Finally, they make plain that defendant's unlawful conduct is far different than that in a typical fraud case. Defendant's conduct allowed violent persons (both inside and outside of the *al Qaeda* network) to flow to areas of conflict and survive there under the cover of an American charity.

### A.    Background

As defendant now acknowledges, defendant became well-acquainted with Usama Bin Laden and *al Qaeda* in the 1980s, having spent significant time in bin Laden's *al Masada* camp in Afghanistan and then living in Bin Laden's house. In 1997, defendant arranged to preserve in

electronic form historical documents concerning Usama Bin Laden and *al Qaeda* as well as other persons and groups. These items, which have been discussed in detail in the government's *Santiago Proffer* and other filings, include the August 1988 minutes of the founding of *al Qaeda* and handwritten notes taken by defendant himself in October 1988 of a *shura* ("consultation") council meeting at Bin laden's house involving Bin Laden and others that occurred two months after *al Qaeda* had been formed. Ex. 24.

In or about 1993, Bin Laden advised *al Qaeda* member Jamal Ahmed al Fadl that *al Qaeda* was using several charities to fund its operations overseas, specifically naming *al Birr*, which translates in English to "Benevolence."[13]  Al Fadl understood from conversations with Bin Laden and others in *al Qaeda* that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for *al Qaeda* operations. The charities also provided assistance for *mujahideen* who traveled.

**B.**   ***al Qaeda* and BIF in Bosnia**

According to al Fadl, in Fall 1992, *al Qaeda* dispatched al Fadl from Sudan to Zagreb, Croatia, to gather information for Bin Laden about Bosnia and the prospects of acquiring businesses in Croatia for use by *al Qaeda*. Al Fadl traveled to Zagreb where he met with defendant and *al Qaeda* members Abdel Rahman al Dosari a/k/a "Hown" (a mortar expert and leader of the *al Qaeda* fighters in Bosnia) and Abu Zubair al Madani. Hown told al Fadl that *al Qaeda* was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses. He also said that "*al Birr*" was providing money for weapons for *al Qaeda*. Hown explained that *al Qaeda*'s goal in Bosnia was to establish a base for operations in Europe against *al*

---

[13]      The government is prepared to call al Fadl at sentencing if necessary.

*Qaeda*'s true enemy, the United States.[14]

As discussed below, al Fadl's account is corroborated by items seized from BIF and admissions by defendant. Moreover, it further demonstrates the inaccuracy of defendant's statement that BIF's support was "not provided to irregular *mujahideen* units but to legitimate Bosnian and Chechen armies." Pos. Paper at 26.

Defendant admits that in his first trip to Bosnia in 1992, he traveled with a group to an area known as Tesanj, or Tishin. The group included a fighter later eulogized in a video soliciting funds for *mujahideen* in Bosnia and distributed under the logo of BIF's predecessor organization, *Lajnatt al Birr al Dawalia* ("LBI"). Over one thousand copies of this tape were sent to the United States from Saudi Arabia in late 1992, and the tape was played at a convention in Detroit, Michigan. BIF distributed all of the tapes, including one later found in a Chicago area mosque. After arriving with this fighter in Tesanj, defendant met with "Hown" and others, and he observed that those gathered were armed and ready to fight.

Defendant also admitted what the government learned from other sources: that BIF offices and facilities were used to transport dozens of fighters into Bosnia from Croatia. The fighters were met at the airport by BIF employees, taken to a BIF guesthouse and then transported into Bosnia in BIF vehicles by BIF employees and on to Tesanj, where they were delivered to a BIF schoolhouse. The fighters transported included a number of participants in the "Battle of Tishin" in December 1992, which is described on an authoritative website of the *mujahideen*. See Ex. 25. In fact, by his own account, defendant arrived at the schoolhouse within a day of the Battle of Tishin, seeing some

---

[14]    Al Fadl understood that Bin Laden had concerns about whether the *jihad* in Bosnia was a "true" *jihad* that Muslim fighters could win, but *al Qaeda* had an interest in participating in the conflict and to have fighters gain training and experience.

of the BIF sponsored fighters seriously wounded, only some of whom survived.  None of these fighters were part of the Bosnian army at the time.

The fighters who were transported into Bosnia by BIF included *al Qaeda* member Abu Zubair al Madani, described above.  Defendant arranged the his transportation along with five others to Bosnia at the specific request of Adel Battergy.  Abu Zubair al Madani was killed in Bosnia in the Fall 1992 and was eulogized on the LBI fundraising video.  Ex. 26 (transcript of video).

Other fighters sponsored by BIF included Khalid Harbi and Abu Assim al Makkee.  Harbi, also known as Sheik Abu Sulaiman al Makki, led of the group of *mujahideen* that BIF transported into Bosnia.  He was injured and partially paralyzed in the Battle of Tishin and transported out of Bosnia by Defendant and BIF.[15]  Abu Asim al Makkee, who was also wounded in the Battle of Tishin, was later imprisoned in Saudi Arabia and then released.  He has been named by the State Department as a Specially Designated Global Terrorist.

Defendant also admitted to information previously received by the government: that he dispatched a BIF employee in the latter part of 1992 to travel to Afghanistan to bring to Bosnia trainers from the "Sada" camp in Afghanistan.[16]  These trainers, nine in all, included al Hajj

---

[15]    Khaled Harbi a/k/a "Abu Suleiman al Makki" appeared on a videotape of a meeting with Usama Bin Laden and *al Qaeda* military commander Muhamed Atef after the September 11 attacks.  On the video Bin Laden describes the planning of the attacks and how they occurred.  An individual on the videotape who appears unable to stand is referred to as "Suleiman," and initial reports identified the person as Suleiman al Ghamdi.  Saudi officials and Islamic figures later identified the person alternately as "Suleiman al Makkee" and "Khalid Harbi" – the same person. *See, e.g.*, Ex. 27.  While this videotape does not implicate defendant in any way in the September 11 plots, it does reinforce that the fighters he provided support to were the "irregular *mujahideen*" he denies assisting.

[16]    The Sada camp was described in 1988 in the founding minutes of *al Qaeda* as an open camp for which the best "brothers" would be selected to join *al Qaeda*.

Boudella, who was primarily in charge of the school in Tesanj. Al Hajj Boudella is the BIF director whom defendant believed was taken to Guantanamo Bay, Cuba, as he attempted to inform Batterjee in the conversation recounted above. Al Hajj Boudella is seen in photographs seized from BIF in a military headquarters building in Bosnia where he trained Bosnian fighters. *See* Ex. ___ .

This group of trainers from the Sada camp also included two *mujahideen* who were later killed in the Battle of Tishin. One was Abu Abdallah al Falastini, later described on a *mujahideen* website as follows: "A 25 year-old experienced military trainer of the *mujahideen* both in Afghanistan and Bosnia. Many *mujahideen* received military training through his hands." Ex. 25. In fact, contrary to defendant's assertions in his position paper that BIF was not involved in military training, photographs recovered in Bosnia show a building bearing an insignia of a Bosnian military unit *and* a logo similar to BIF's. This is consistent with a response in an internal BIF questionnaire in 1998, asking, "What do you think is the best thing that BIF has done in Bosnia?," with an employee's response, "Military training of soldiers during the war[.]" Ex. 26 at 1, item 8. Defendant and BIF also arranged for false documentation for a BIF employee who posed as journalist to travel on a United Nations flight into Bosnia in late 1993 for the purpose of transporting a sum of German currency to another organization.

In 1998, defendant facilitated the travel of influential *al Qaeda* figure Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," in Bosnia. Defendant knew that Salim was close to Usama Bin Laden in Afghanistan. Numerous documents in defendant's *al Qaeda* archive discussed Salim, including notes of a meeting of a *shura* council in October 1998 at Bin Laden's house, about which defendant took handwritten notes. Defendant by his own admission later heard that Salim was the director of several Bin Laden businesses in the Sudan, and defendant saw Salim in Turkey in 1997. Defendant

34

claims that Salim told him that he separated from Bin Laden when Bin Laden returned to Afghanistan from Sudan (which would be Summer 1996) and disagreed with Bin Laden's relationship with the Taliban, but Salim continued to admire and respect Bin Laden. Salim told defendant that he was reluctant to return to Saudi Arabia because of his prior relationship with Bin Laden (who had by this time boasted of responsibility for involvement in attacks on American forces in Yemen in December 1992 and in Somalia in 1993 and declared war on American military personnel and civilians).

At defendant's suggestion, which he acknowledges, Salim traveled to Bosnia in May 1998 and stayed at the Metalurg Hotel. Defendant assigned a BIF employee as Salim's driver and translator and introduced Salim to BIF employees. BIF provided Salim a letter bearing defendant's signature stamp falsely describing Salim as a director of BIF in order to facilitate his travel. Ex. 30. In 2000, Croatian police asked a BIF employee whether the employee knew a visitor named Mamdouh Salim from the Sudan. Defendant, who was present for the inquiry, told Munib Zaharigac (then a Bosnian intelligence officer) not to tell the Bosnian authorities about Salim, who defendant knew had been brought to the U.S. to face criminal charges.

### C.   *al Qaeda* **and BIF in Sudan**

Defendant struggles mightily to distance himself from any link to the BIF office in the Sudan, with good reason – documents recovered in the BIF's Illinois office explicitly prove that BIF in Sudan directly supported *al Qaeda*. One such report explains:

From its first day, the BIF aimed to support Jihad and Mujahideen, by

- Assisting in military and logistical support.
- Assisting in providing medical care for the Mujahideen in the field.
- Assisting in providing training, running camps, providing shelter, and in what

accompanies these services, such as providing education, Da'awah, and looking after the families of Mujahideen and taking care of the orphans.
- Providing moral and political support for the Mujahideen.

\* \* \* \* \*

By the grace of Allah, the services of the BIF in the Sudan started in May 1991, after the agreement of *the base* in Sudan with the Sudanese Government. The BIF was able in a short span of time to occupy a distinguished place among the organizations which work in the relief and service work in the country[.]

Ex. 31. While the report does not further identify "the base" that reached an agreement with the Sudanese government in May 1991, literally translated from English to Arabic, "the base" is "*al Qaeda*."

As al Fadl can testify, Bin Laden and *al Qaeda* in fact relocated from Afghanistan to Sudan at that time, where they operated in partnership with elements of the Sudanese government. In 1993 and 1994, al Fadl worked as an *al Qaeda* member in the Sudan under the supervision of Loay Bayazid and Mamdouh Salim, both of whom are discussed below. Al Fadl identified a photograph recovered in the BIF Illinois office as a training camp in Sudan sponsored by *al Qaeda* (Ex. 32), at which Saif ul Islam (also discussed further below) served as trainer.

Documents recovered from BIF refute defendant's current claims that there is no relationship between the BIF in Sudan and what he calls "BIF-USA." While defendant clearly did not control BIF's Sudan office – unlike BIF's Illinois, Bosnia and Chechnya offices – he certainly coordinated efforts with BIF's Sudan office. For example, "BIF-USA's" letterhead previously listed BIF's Sudan address along with BIF's Illinois address. *See* Ex. 33 (fundraising letter signed by defendant as "Executive Director" of BIF). And as defendant acknowledges, "BIF-USA" printed in its newsletters and in solicitations to donors updates about its purportedly charitable projects in Sudan – claiming to have sent "millions of dollars in aid to Sudan" (Ex. 34 at 2) – although he now claims

36

that was "puffing" apparently designed to mislead donors.   Elsewhere, a report from a BIF representative reflect that the representative talked to *Hezb e Islami* officials in Azerbaijan about the "role of BIF in distress areas like Bosnia, Sudan and now Chechnya[.]" Ex. 3 at 3.

BIF's Illinois files included partial budgets for the BIF's Sudan offices, a 1995 quarterly report for the Sudan office documenting humanitarian work (Ex. 35) and an "Operational Plan & Budget Balance" for Sudan for 1995-1996. BIF also had organizational charts for BIF in Sudan, photographs which were apparently taken by defendant in Sudan in 1994. *Id.* Separately, a 1999 "Agenda for Enaam" tasks defendant to "Approve the budget for all BIF" and with "Coordination with BIF Sudan." Ex. 36.

Those in Sudan thought their work was related to defendant's work, as shown in notes found at BIF in Illinois describing a visit to BIF in Sudan by Ambassador Melissa Wells, a presidential envoy from the U.S. who worked in Sudan as part of international peace efforts. Exs. 37 and 38. BIF recorded that on June 15, 1994, Ambassador Wells met with the director of BIF's office in Kadugli, Sudan. BIF reports that in response to Ambassador Wells's question "from where BIF gets the financial support," BIF's Kadugli director stated: "BIF has fundraising offices in the U.S., Canada ((Ottawa)), Qatar ((Doha)), Saudi Arabia ((Jeddah))and other Arab countries. Through their offices, BIF collects funds from donors and sends them to Sudan to be spend (sic) on the needy, orphans, the poor, and the deportees." Ex. 37 at 1-2. The Director also said that BIF works in "Sudan, Somalia, Bosnia, Afghanistan, Burma, Bangladesh and Pakistan." *Id.* at 2.

Regardless, defendant admits meeting with representatives of BIF's Sudan office and Battergy in Saudi Arabia in 1993. Defendant learned at that meeting that two other BIF employees from Sudan had been detained by Saudi authorities shortly after their arrival. Remarkably, it appears

37

that their detention was reported to Usama Bin Laden. Al Fadl independently knew that around 1993, a BIF employee in Sudan traveled to Saudi Arabia to meet with Batterjee but was detained and questioned by Saudi authorities. After he was released, the BIF employee returned to Sudan where he met with Usama Bin Laden, who questioned him about what had happened. Madani al Tayyib, then *al Qaeda*'s chief financial officer, told al Fadl that the Saudi authorities must have questioned the employee because they had found documents linking "*al Birr*" to Bin Laden. Tayyib later indicated that the problem had been fixed, although BIF's operations in Saudi Arabia were apparently curtailed at that time.

In early 1994, defendant met with Mohamed Bayazid in Sudan. Contrary to the assertions in defendant's filing, the evidence is clear that defendant was well aware of Bayazid's close ties to Usama Bin Laden and *al Qaeda.* Indeed, much of the historical *al Qaeda* archive seized from the BIF offices, which defendant arranged to have electronically scanned, were materials defendant took from the homes of Bin Laden and Bayazid, including notes handwritten by defendant of a meeting attended by Bayazid and Bin Laden. Ex. 24. Indeed, defendant now believes that Bin Laden obtained the idea to start *al Qaeda* from Bayazid, and defendant understood that Bayazid had traveled to Sudan around 1989 as Bin Laden's first ambassador to Sudan. Defendant claims that he first formed the impression during his 1994 Sudan trip that Bayazid had separated from Bin Laden.

When defendant visited BIF personnel in Sudan, he learned quickly that the BIF office was very tight with the National Islamic Front ("NIF") and that some of the BIF employees were NIF members. Defendant contacted Bayazid, who then visited defendant at a BIF guesthouse. Photographs show defendant and BIF personnel with Bayazid. Exs. 39 and 40. Bayazid later

traveled at BIF expense to BIF in Illinois, and September 1994 minutes of a BIF meeting in Illinois

recorded Bayazid as "President" of the meeting. Ex. 41.

### D.    *al Qaeda* and BIF in Chechnya

BIF's activities in Chechnya began after a meeting between a BIF representative and Sheikh

Fathi, discussed above. Sheikh Fathi followed that meeting with a letter to Adel Battergy and

defendant. Ex. 42. Later, defendant personally met with Sheik Fathi in Chechnya on two occasions.

Defendant recounted the information he gathered in these meetings and others to a BIF fundraiser

on October 18, 1999. Ex. 14. The fundraiser noted:

> Enaam Arnaout, the CEO of the Benevolence International Foundation . . . has made six trips
> to Daghestan/Chechnya area and has collected invaluable information on the history and
> details of the Islamic movement. *Most of this information is collected through personal
> contacts and log (sic) term relationship (sic) with many key people in the movement*
> [emphasis added]. . . . One greatly significant figure in the Islamic movement in Chechnya
> is *Sheikh Fathi* (a BIF friend who died recently while Enaam was there). . . . He is one of
> the most significant figures in the Islamic movement in Chechnya. By profession, he was
> an electronic engineer and had helped the Afghan Jihad through his skills in electronics. He
> stayed in Afghanistan from 1982 to 1992 and then moved to Chechnya. Coming from
> Ikhwan-salafi background, he had a broad-based knowledge of Islamic movements.

*Id.* (emphasis added). As quoted elsewhere, defendant explained that Sheik Fathi started a group that

began receiving *mujahideen* from other countries, and he died before "structuring his movement

completely." *Id.*

Defendant continued:

> One of Sh. Fathi's legacies, probably the leader of the group after him, is *Arabi*, a Chechen
> student of Sheikh Fathi. He commands of a group of about 600 mujahideen situated in the
> capital to keep a watch on the president to ensure that the president does not blatantly violate
> Islamic principles.

Defendant also described certain individuals as follows::

> *Saif-ul-Islam*, the BIF officer in Chechnya, is an Egyptian lawyer who is very

39

knowledgeable. He also came there through Sh. Fathi.

*****

***Shamil Basayev*** was another officer in Russian (sic).[17]  As a defender of Chechnya, he became surrounded by Sufis.  He is criticized by some and has shown signs of corruption in the past.  However, lately he was trained and Islamically educated by Khattab the leader of Arab Mujahideen.

*****

***Khattab*** is a Saudi mujahed who went to Afghanistan before the age of 20, fought there till he moved to Tajikistan and later to Chechnya.  His group of mujahideen saved Chechnya from Russian onslaught during the last war with great courage and is greatly respected by the Chechens.

*Id.* at 1-2.

Contrary to defendant's claim that the "Chechen separatist movement was widely supported internationally as it attempted to establish self-governance and independence from Russia," both sides in the Chechen conflict have been criticized by Amnesty International for "serious abuses of human rights and breaches of international humanitarian law."  *See* Amnesty International report, attached as Ex. 43 . "Arabi," whose full name is Arabi Barayev, was publicly named by the Chechen Deputy Prime Minister as being responsible for the beheading deaths of four British telecommunications workers in Chechnya in December 1998.  Ex. 44.  Shamil Basayev took over 1000 people hostage after capturing a hospital in Chechnya in June 1995, the same time BIF was arranging the purchase and delivery of boots to Chechen fighters.[18]  In the subsequent fighting, 100 hostages were killed.  *see* Amnesty International Press Release on July 17, 1995, at 2, attached as

---

[17]      To be clear, "officer" does not refer to BIF officer.

[18]      After delivery of the boots, in January 1996, an urgent request for binoculars, night vision goggles and other items – written partly in Urdu as a sort of code – for an apparent fighting unit in Chechnya was transmitted to Baku, Azerbaijan for defendant from the *"aks janub"* contact (meaning the contact from the North, an apparent reference to a contact in Chechnya).  Ex. 45. According to the testimony of defense witness Muzaffar Khan, Khan gave defendant this document after Khan received it.  Ex. 46.  Defendant claims that he cannot recall seeing the document.

Ex. 47 ("[Basayev] stated that he was acting without the knowledge or consent of the President. . .
. Basayev was also quoted as saying that he and his men would fight to the death, and shoot the hostages if necessary, to achieve their demands that Russian forces declare a ceasefire and disengage from the Chechen Republic"). Khattab, or Ibn al Khattab, who was aligned with bin Laden, led groups of fighters in incursions into Daghestan from Chechnya in September 1999. In 1995, *al Qaeda*'s chief financial officer asked *al Qaeda* member al Fadl to travel to Chechnya to join with *al Qaeda* in the fighting. Al Fadl – whose trip was later cancelled for personal reasons – was told that he would be joining up with Khattab, who had fought alongside Bin Laden in Afghanistan.

In 1998, Saif ul Islam, an *al Qaeda* military commander, served as the BIF officer in Grozny, Chechnya. Saif ul Islam was identified as an *al Qaeda* member by two different witnesses (both *al Qaeda* members) at a federal trial in the Southern District of New York: al Fadl and L'Houssaine Kherchtou. Al Fadl described Saif ul Islam as a member of al Qaeda's military committee , and he saw Saif ul Islam with explosives in the Sudan. Ex. 48.[19] Al Fadl has elsewhere described Saif ul Islam as an important *al Qaeda* figure who participated in training persons in Somalia in the early 1990's for an eventual attack on the American forces there and later underwent explosives training in Lebanon by Hezballah after *al Qaeda* forged a relationship with Iranian intelligence. L'Houssaine Kherchtou also identified Saif ul Islam as a member of al Qaeda's military committee. Ex. 49.

The foregoing information is corroborated by the recovery in August 1997 of the photograph of Saif ul Islam from an *al Qaeda* location in Nairobi, Kenya.[20] Ex. 50. Similarly, a wiretap on a

---

[19]     A transcript of al Fadl's trial testimony was recovered on a computer at BIF's office in Illinois in December 2001.

[20]     The location was the home of Wadih el Hage, who was convicted of conspiracy to
(continued...)

41

telephone associated with that location captured conversations between *al Qaeda* operatives and Saif ul Islam in April 1997 during which messages were passed between Saif ul Islam and *al Qaeda's* then military commander Muhammed Atef and during which Saif ul Islam explained his difficulty in maintaining contact with the leadership in Afghanistan. Ex. 51.

Remarkably, even defendant admits in part that he knew of Saif ul Islam's relationship with *al Qaeda* when he hired him for BIF's office in Chechnya, though one would never know it from his court filings. Defendant admits being told by Saif ul Islam that Saif ul Islam had been a member of the Egyptian Islamic Group (which has been officially designated a terrorist organization by the United States) and had gone to Afghanistan. Saif ul Islam told defendant that he had then joined *al Qaeda*. Saif ul Islam claimed he had spent time in the Sudan, had then been to "Africa" where he starved for days (an apparent reference to his involvement in Somalia) and that he had then gone to Chechnya where he became involved in fighting in 1995. Despite his knowledge that Saif ul Islam had been involved with *al Qaeda*, defendant employed him in 1998 – after al Qaeda's declaration of war against American civilians was public – and never advised anyone in BIF (much less donors or any government) of the fact that the lead officer of the charity in Chechnya was at least an important "former" *al Qaeda* member.

Later, in about September 1999, defendant met again with Saif ul Islam and noticed weapons (including a Kalashnikov) behind the door. Defendant claims he was told by Saif ul Islam that Saif ul Islam had just crossed the border into Daghestan with a group seeking to support the forces of Shamil Basayev and Ibn al Khattab as the latter two had made an incursion into Dagestan shortly

---

[20](...continued)
kill United States nationals in 2001. The relevant photographs were recovered from his Nairobi home which was often used by Harun al Fadhl, an indicted fugitive in the 1998 embassy bombings.

before. (In fact, it was reported in the open press that in August 1999 Basayev led fighters in to Dagestan and taken over two villages.)

## IX.   <u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that defendant's sentence include a term of imprisonment of 240 months.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

JOHN C. KOCORAS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-7602

## CERTIFICATE OF SERVICE

The undersigned attorney, John C. Kocoras, certifies that he is employed in the Office of the

United States Attorney for the Northern District of Illinois; that on the 12th day of June 2003, he

served a copy of the foregoing GOVERNMENT'S RESPONSE TO DEFENDANT'S POSITION

PAPER AS TO SENTENCING FACTORS via messenger to:

> Mr. Joseph Duffy, Esq.
> Stetler & Duffy Ltd.
> 140 South Dearborn Street
> Suite 400
> Chicago, Illinois 60603

JOHN C. KOCORAS
Assistant U.S. Attorney