**EXHIBIT 3**

**Testimony of**

**Matthew Epstein**

**with Evan Kohlmann**


**Before the**

**House Committee on Financial Services Subcommittee on Oversight and Investigations**

**"Progress Since 9/11: The Effectiveness of U.S. Anti-Terrorist Financing Efforts"**


# Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities


**March 11, 2003**


Matthew Epstein & Evan Kohlmann
Senior Terrorism Analysts
The Investigative Project
5505 Conn. Ave. NW, Suite 341
Washington, DC 20015

Phone 202.363.8602   Fax  202.966.5191

Email: Stopterror@aol.com

## INTRODUCTION

The roots of the modern Al-Qaida financial network can be directly traced to lessons learned during the early days of the Soviet-Afghan jihad. As the 1980s drew to a close, thousands of idealistic Islamic fundamentalist volunteers arrived in Central Asia, often with no local guide or requisite accommodations. At the time, several wealthy Arabian Gulf charitable organizations, under the guise of aiding Afghan and Pakistani refugees, stepped forward to help channel the jihadi recruits where they were most needed. These wealthy NGOs, sponsored by a number of prominent Gulf businessmen, provided weapons, guesthouses, and travel papers to needy members of the quickly-coalescing Al-Qaida movement. Medical ambulances belonging to the Saudi Red Crescent and other fundamentalist-run relief groups were even diverted to bring Arab fighters back and forth from combat operations.[1] By clothing their militant activity with charitable ideals, Arab-Afghan leaders discovered that they were able to slip below the radar of many international intelligence agencies. Likewise, a well-informed Saudi figure boasted to the Washington Post, "No one can control the flow of money from Saudi Arabia… It is not one person—it is a thousand. We are here. Money comes to us from inside Saudi Arabia. We have private talks with businessmen. Sometimes directly, sometimes indirectly. But it comes."[2]

The efficiency and success of the Afghan jihad financing model was quite an accomplishment for Usama Bin Laden and his international allies—so much so that operations continued even after the end of the Soviet-Afghan war and the expulsion of Bin Laden to the Sudan. In approximately 1993, in conversations with former senior Al-Qaida lieutenant Jamal Ahmed Al-Fadl, Usama Bin Laden identified three Muslim charities as the primary sources of Al-Qaida financial and fundraising activity:[3]

**1.) Muslim World League, "MWL" (*Al-Rabita Al-Alami Al-Islamiyya*)**

**2.) Benevolence International Foundation, "BIF" (*Lajnat Al-Birr Al-Dawaliyya/Lajnat Al-Birr Al-Islamiyya*)**

**3.) Qatar Charitable Society, "QCS" (*Jamaat Qatar Heira*)**

These three organizations served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping "to move funds to areas where Al-Qaeda was carrying out operations."[4] According to a U.S. Justice Department brief on the subject:

"[Al-Fadl] understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money

---

[1] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 187*.

[2] Coll, Steve and Steve LeVine. "Global Network Provides Money, Haven." The Washington Post. August 3, 1993. *Page A1*.

[3] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 25*.

[4] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Pages 28-29*.

for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building moques or schools or feeding the poor or the needy."[5]

Standing orders were left by Bin Laden to keep all transactions involving the charitable groups in cash only; by this method, these NGOs were manipulated as a secret laundry to make Al-Qaida's financial network virtually invisible.  The charities would then create false documentation for the benefit of unwary donors, purportedly showing that the money had actually been spent on orphans or starving refugees.  In fact, according to some former employees of these organizations, upwards of 50% of their total funding was secretly diverted directly to Al-Qaida and Usama Bin Laden.[6]


## THE MUSLIM WORLD LEAGUE (MWL)

The multi-million dollar Muslim World League (MWL), founded in 1962 to "promote Islamic unity," is one of the largest of the Saudi Islamic evangelical charities.[7]  On its current website, MWL lists its main objectives as "to disseminate Islamic Dawah and expound the teachings of Islam.  To defend Islamic causes in a manner that safeguards the interests and aspirations of Muslims, solves their problems, refutes false allegations against Islam, and repels inimical trends and dogma which the enemies of Islam seek to exploit in order to destroy the unity of Muslims and to sow seeds of doubt in our Muslim brethren."[8]  In 1997, Prince Majid bin Abdel Aziz, emir of the Mecca province, attended a meeting of the MWL Constituent Council in Saudi Arabia and delivered a speech on behalf of King Fahd.  During his lecture, he called MWL "an outstanding Muslim body" that "has devoted its concern to Muslim affairs, and… the spreading of the Islamic call in accordance with the Islamic rite."[9]

As part of this mission over the past two decades, MWL has also secretly provided critical financial and organizational assistance to Islamic militants loyal to Al-Qaida and Usama Bin Laden.   Bin Laden's original jihad mentor, Shaykh Abdallah Yousif Azzam, was first sponsored by the Muslim World League to open and head a branch office in Peshawar, Pakistan, in order to aid arriving Arab-Afghan volunteer fighters starting in the early 1980s.  The Peshawar office was financed by Usama Bin Laden, and later was subsidized by large donations from the Kingdom of Saudi Arabia.[10]  Simultaneously, the Egyptian MWL branch office served as the

---

[5] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Pages 28-29.*
[6] Dugger, Celia W.  "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say."  The New York Times.  January 21, 1999.  *Page 4.*
[7] "Saudi Arabian Information Resources: Muslim World League."  http://www.saudinf.com/main/k312.htm.  March 1, 2003.
[8] "About the Muslim World League."  http://www.arab.net/mwl/about.htm
[9] "AT THE OPENING OF THE MUSLIM WORLD LEAGUE MEETING: THE CUSTODIAN OF THE TWO HOLY PLACES CALLS FOR ISLAMIC SOLIDARITY TO OVERCOME OBSTACLES."  Ain al-Yaqeen.  December 15, 1997.  http://www.ain-al-yaqeen.com/issues/19971215/feat1en.htm.
[10] Muhammad, Basil.  Al-Ansaru l'Arab fi Afghanistan.  The Committee for Islamic Benevolence Publications; ©1991.  *Page 193.*

"third route to the Al-Ansar House in Jedda."  The Al-Ansar House was one of Bin Laden's "guest houses" used to funnel recruits to terrorist training camps.[11]

The Peshawar, Pakistan MWL branch office was taken over for a time by Wael Hamza Jalaidan (a.k.a. Abu Al-Hasan Al-Madani), an old friend of Usama Bin Laden and Abdallah Azzam, and one of the original founders of Al-Qaida.[12]  In a 1999 interview with Qatar-based Al-Jazeera television, Bin Laden discussed the assassination of Abdallah Azzam ten years earlier and the founding of Al-Qaida.  He recalled, "We were all in one boat, as is known to you, including our brother, Wa`el Julaidan."[13]  Jalaidan also served as the veteran director of the Saudi Red Crescent in Pakistan during the critical years of the Soviet-Afghan jihad.[14]

In February 2000, Jalaidan was appointed to the Board of Trustees of the Rabita Trust (another financial arm of MWL in Pakistan) and served as its Director General.[15]  Soon thereafter, U.S. officials sent a confidential memorandum to UN police forces in southeastern Europe titled "Secret: US office only-Release to UNMIK [the U.N. administration in Kosovo]."  The document named MWL representative Wael Jalaidan as an associate of Usama Bin Laden and stated that Jalaidan had directly assisted Bin Laden to "move money and men to and from the Balkans."[16]  Finally, in the wake of September 11, the MWL's Rabita Trust itself was officially designated by the U.S. government as an organization that provided illegal logistical and financial support to Al-Qaida.[17]

U.S. authorities have also alleged personal contacts between Jalaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah.  Under interrogation by U.S. authorities, the latter claimed that he accompanied Jalaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000.  Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Jalaidan met personally with Usama bin Laden and former Al-Qaida military chief Mohammed Atef (a.k.a. Abu Hafs Al-Masri).  As a result, on September 6, 2002, the U.S. and Saudi governments announced an unprecedented joint action to freeze Jalaidan's assets and to specially designate him as a supporter of international terrorism.[18]

---

[11] Sharaf-ad-din, Nabil.  "Usama BinLaden - A Millionair[sic] Finances Extremism in Egypt and Saudi Arabia."  _Rose Al-Yusif_.  No. 3388.  May 17, 1993.

[12] Sharaf-ad-din, Nabil.  "Usama BinLaden - A Millionair[sic] Finances Extremism in Egypt and Saudi Arabia."  _Rose Al-Yusif_.  No. 3388.  May 17, 1993.  See also: Muhammad, Basil.  _Al-Ansaru l'Arab fi Afghanistan_.  The Committee for Islamic Benevolence Publications; ©1991.  _Page 26_.

[13] Office of Public Affairs; United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

[14] Muhammad, Basil.  _Al-Ansaru l'Arab fi Afghanistan_.  The Committee for Islamic Benevolence Publications; ©1991.  _Page 187_.

[15] Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

[16] Cited in news report by British Broadcasting Company (BBC).  April 3, 2000.

[17] Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

[18] Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

### *The International Islamic Relief Organization (IIRO)*

The IIRO (which has many branches the world over) was established in 1978 and is headquartered in Jeddah, Saudi Arabia.[19]  IIRO serves as a major financial sub-branch of the Muslim World League and reportedly receives 70% of its charitable funding directly from the Saudi government.[20]  According to Dr. Ahmed Mohammed Ali, a past Secretary General of the MWL, the League provides "humanitarian assistance" through the arms of IIRO.[21]

However, the supposedly "humanitarian" facade of IIRO hides a covert agenda of the group.  Even since the early days of the Soviet-Afghan jihad, IIRO enabled Muslim World League to provide Arab-Afghan military with a covert international military and financial infrastructure.  U.S. counterterrorism investigators have discovered a letter under the MWL/IIRO letterhead among numerous Al-Qaida documents recovered in Bosnia-Herzegovina.  The letter, dating from the late 1980s, summarized a meeting held between Al-Qaida leaders and representatives of Muslim charitable organizations in which the attendees ultimately agreed to launch "attacks" from MWL offices in Pakistan.[22]

Not surprisingly, one of the most influential members of IIRO's board of directors is Tariq Binladin, a close family relation of Usama Bin Laden.[23]  Western intelligence sources have traced IIRO money transfers to bank accounts in London, England and Amman, Jordan; which is then channeled through front groups to Palestinian Hamas backed organizations in Gaza and the West Bank.[24]  Indian intelligence also has reported that IIRO offices in Pakistan and Afghanistan maintain a training camp in Kunduz, Afghanistan for combatants in Bosnia, Chechnya, and Kashmir.[25]  Fayez Ahmed Alshehri, one of the September 11 airline hijackers, told his father he was going to go work for the IIRO and never saw his family again.[26]  Even Mohammed Al-Zawahiri, leader of the Egyptian Islamic Jihad's military wing and the brother of Dr. Ayman Al-Zawahiri (Bin Laden's personal physician and top advisor), worked and traveled around the world on behalf of IIRO.[27]  Following the arrest of Mohammed Jamal Khalifa in California in 1994, the State Department issued affidavits attesting to the fact that the IIRO—whose chapter in the Philippines Khalifa had headed-- was a terrorist group.

As a result of the overwhelming evidence assembled against IIRO, the Canadian government (among others) has classified it as "secretly fund[ing] terrorism," officially branding

---

[19] "IIRO – Welcome."  http://www.arab.net/iiro.

[20] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99. Federal Court of Canada.  November 2, 1999.  Page 13.

[21] Ahmed, Iftikhar.  "Counter anti-Islam propaganda, says MWL sec-general."  Moneyclips.  May 6, 1995.

[22] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 31.*

[23] Dugger, Celia W.  "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say."  The New York Times.  January 21, 1999.  *Page 4.*

[24] Chesnoff, Richard.  "IT'S MORE THAN JUST WHO PLANTS THE EXPLOSIVES."  New York Daily News. July 31, 1996.

[25] Ba-Isa, Molouk Y. and Saud Al-Towaim.  "Another Saudi ' hijacker' turns up in Tunis."  Middle East Newsfile. September 18, 2001.

[26] Ba-Isa, Molouk Y. and Saud Al-Towaim.  "Another Saudi ' hijacker' turns up in Tunis."  Middle East Newsfile. September 18, 2001.

[27] "Official sources deny reports on UAE's extradition of Islamist."  Al-Hayat.  June 7, 2000.

it a terrorist charity.[28]  According to Canadian court documents, Mahmoud Jaballah, a suspected Egyptian Al-Jihad militant jailed in Canada and accused of having contact with Al-Qaida operatives, spent three years working for the International Islamic Relief Organization in Pakistan.  The Canadian Security and Intelligence Service CSIS "believes that Jaballah continues to actively support [Al-Jihad's] terrorist agenda."  As a result of their investigation, CSIS concluded that "the degree of Jaballah's dedication to the cause is such that Jaballah would resort to violence and would direct others to resort to violence if he was ordered to do so by leaders such as Osama Bin Laden or Dr. Ayman Al-Zawaheri."[29]  Among others, Jaballah was suspected of cooperating with senior Canadian Al-Qaida lieutenant Ahmad Saeed Khadr (a.k.a. Abdel Rahman Al-Kanadi), considered to be a highly influential figure in the international terrorist financing network.[30]

During Jaballah's immigration trial, Mr. Arafat El-Asahi, the director of IIRO in Canada and a full-time employee of the Muslim World League, was called to testify on Jaballah's behalf.  The director admitted that Jaballah had "worked as a Principle of one of our organizations in Pakistan" and that he had been recommended by IIRO's administrators in Pakistan as having "excellent character and good behaviour."[31]  El-Asahi also offered the following sworn testimony:

> Q. "During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?"
>
> A. "Let me tell you one thing.  The Muslim World League, which is the mother of IIRO, is a fully government funded organization.  In other words, I work for the Government of Saudi Arabia.  I am an employee of that government.  Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please… I am paid by my organization which is funded by the [Saudi] government.  Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us.  They ask us about the people who are doing this project.  Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia…. The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia.  If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."[32]

In various war-torn parts of the Muslim world, from Bosnia to the Philippines, IIRO was used by Arab-Afghan mujahideen as a major conduit for smuggling money, men, and weapons to and from the combat zone.  According to Dr. Farid Qurashi, IIRO's former "general supervisor," "IIRO was the first relief organization to enter Bosnia-Herzegovina and the Balkan region.  From

---

[28] Evidence introduced by the Canadian government in the trial of Mahmoud Es-sayy Jaballah

[29] "Respondent's (Moving Party) Motion Record."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  June 2, 1999.  *Pages 61-62.*

[30] "Respondent's (Moving Party) Motion Record."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  June 2, 1999.  *Page 10.*

[31] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Page 85.

[32] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Pages 81-88.

the very beginning of the Bosnia war, we were there to help."[33]  But IIRO had a much larger agenda in the Balkans than Dr. Qurashi was willing to betray.  According to Serbian sources, IIRO in Bosnia (a.k.a. "IGASA,") was managed primarily by three men: Abdel Aziz Zaher (a.k.a. Abu Anas), Jamal Al-Jibouri (a.k.a. Abu Mahmoud Al-Iraqi), and Djamel Lamrani (a.k.a. Abu Musab Al-Djazairi).  Zaher was expelled from his residence in Belgrade at the beginning of 1993 after being tied not only to IIRO, but also to two other international Muslim organizations suspected of aiding armed fundamentalist militant groups: Al-Rabita Al-Alami Al-Islamiyya (the Muslim World League) and the Sanabil Relief Agency.[34]  During the following Serb official inquiry into Zaher, investigators reportedly discovered PLO Force 17 terrorist training manuals in the Belgrade offices of Sanabil Relief.  In the aftermath of his expulsion from Yugoslavia, Zaher moved his base of operations to Vienna, a city that became a hotbed of European Al-Qaida activity, particularly during the Bosnian war.[35]

Starting in 1992, Zaher's top lieutenant at IIRO, Jamal Al-Jibouri (based in Skopje) was allegedly personally responsible for general oversight of a massive logistics operation to provide Muslim militants in the Balkans with weapons and ammunition.[36]  By September 1992, only a few months into the war, Serb troops examining the bodies of dead Arab-Afghan guerillas in Bosnia were discovering humanitarian aid worker identification cards printed for young Saudi Muslim militants by the Peshawar, Pakistan IIRO office.  At the time, the IIRO issuing bureau in Peshawar was being run by senior Egyptian Al-Gama`at Al-Islamiyya terrorist leader Abu Talal Al-Qasimy (a.k.a. Talaat Fouad Qassem).[37]

Following the 1998 U.S. Embassy bombings in East Africa, IIRO's chapter in Nairobi was deregistered by the government of Kenya for its alleged connection to the terrorists responsible for the devastating blasts.  In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta.  This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia.  After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994.  Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir.  As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters.  Nasir was eventually instructed by

---

[33] "IIRO saves forty thousand Bosnians from starvation."  Moneyclips.  July 4, 1993.

[34] There is some reason to believe that the Sanabil Relief Agency is a branch of Sanabel al-Kheer, an endowment fund established by IIRO.  See: http://www.surf-as.org/regionallinks/factsheets/International%20Islamic%20Relief.doc.  January 2001.

[35] Vujicic, D.  "Bombs in the Name of the Almighty: Part II."  Vecernje Novosti (Belgrade).  September 27, 2001.  Page 13.

[36] Vujicic, D.  "Bombs in the Name of the Almighty: Part II."  Vecernje Novosti (Belgrade).  September 27, 2001.  Page 13.

[37] Compass Newswire.  November 1, 1995.  See also: Emerson, Steven.  "An Investigation into the Modus Operandi of Terrorist Networks in the United States: The Structure of Osama Bin Laden, Al-Qaeda, Hamas and other Jihadist Organizations in the United States."  Testimony given before the House Subcommittee on National Security, Veterans Affairs and International Relations of the House Committee on Government Reform.  October 11, 2001.

Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.[38]

In the Philippines, according to the Philippine military's southern command, the IIRO local office in Zamboanga City is the prime coordinating center for the Abu Sayyaf organization, a coalition of secessionist Islamic militants in the southern region of the country. The southern Philippines IIRO office, established in 1992, was under the direct control and guidance of Mohammad Jamal Khalifa, the 37-year-old brother-in-law of Usama Bin Laden. Khalifa, known to be close to Usama, was detained by American law enforcement officials as he attempted to return from San Francisco to the Philippines on December 16, 1994. Travelling with Khalifa on this occasion was Mohamed Loay Bayazid (a.k.a. Abu Rida Al-Suri), one of the founders and key international operatives of Al-Qaida. After searching Khalifa's electronic organizer and personal addressbook, agents found entries for two telephone numbers of intimate associates of Ramzi Yousef, the convicted bombmaker in the February 1993 World Trade Center attack. They also discovered documents on Khalifa "referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that…others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year)."[39] Four days later, a State Department cable to the American Embassy in Khartoum, Sudan referred to Khalifa as a "known financier of terrorist operations."[40]

### *Sanabel Al-Kheer ("Seeds of Charity")*

Within IIRO itself, a separate branch was established in Saudi Arabia in 1987 (which IIRO "owns or controls") to make investments designed to support IIRO's charitable operations. That branch is known as Sanabel Al-Kheer (a.k.a. Seeds of Charity, Sana-Bell Al-Khaer, Sanabel Al-Khayr, The Charity Bonds Project). The leadership of IIRO aimed to collect 100 million Saudi Riyals annually for 10 years, to create a total base capital investment for Sanabel Al-Kheer of 1 billion Saudi riyals ($267 million). The goal was to generate sufficient profits to cover the costs of IIRO's international operations and make it a self-sufficient entity.[41]

The fiscal oversight of Sanabel and IIRO seems to have been the responsibility of the "number two man" in Jeddah, Ghazi Mahfooz Felemban, IIRO Assistant Secretary-General for Finance and Investment. Felemban is a well known economics professor at King Abdulaziz University and an investment specialist who has worked on key financial programs with the Saudi Arabian Monetary Agency (SAMA), the Islamic Development Bank, Al-Rajhi Investments and Banking Corporation, and the Saudi Cairo Bank.[42]

According to Dr. Ahmad Muhammad Ali, Secretary General of MWL in a 1995 interview:

---

[38] Dugger, Celia W. "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say." The New York Times. January 21, 1999. *Page 4.*

[39] Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414.

[40] Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414.

[41] "Islamic relief organization sets up income-bearing scheme." Arab News. March 8, 1992.

[42] Siddiqi, Mazhar Hasan. "Personality Profile: A born volunteer and friend of the poor." The Saudi Gazette. August 18, 1996.

> "[M]uch of [IIRO and Sanabel's] funding has been made possible by financial assistance from the Saudi government including King Fahd Bin Abdul Aziz, Deputy Prime Minister and Commander of the National Guard Crown Prince Abdullah Bin Abdul Aziz and Chairman of the Board of Trustees of the Saudi Benevolent Society, [and] Second Deputy Prime Minister and Minister of Defense and Aviation Prince Sultan Bin Abdul Aziz."[43]

Between 1992 to 1998, IIRO and Sanabel Al-Kheer held numerous high profile fundraising events together in Saudi Arabia.  As Dr. Ali correctly noted, many of the largest donations to the two charities came directly from the Saudi royal family:

- In July 1992, Sanabel Al-Kheer and IIRO sponsored a fundraising drive in Jeddah for the Muslims of Bosnia.  The conference was inaugurated by Prince Saud ibn Abdul Mohsen, acting governor of Makkah, and acting chairman of Sanabel Al-Kheer.  Over SR19 million was collected in one day.  The largest single donors reportedly included Prince Saud ibn Abdul Mohsen and Bakr Bin Laden.  Several months later, Sanabel Al-Kheer reported that it had transferred SR12 million collected on July 5 directly to IIRO to underwrite its "charitable operations" in the Balkans.[44]

- In December 1993, IIRO held another yearly fundraising drive to help support embattled Bosnian Muslims.  IIRO collected an additional SR15 million, which put the organization on a base capital level of nearly SR82 million.  Prince Saud ibn Abdul Mohsen spoke again as an honorary trustee and noted "the continuous support and encouragement of the Custodian of the Two Holy Mosques King Fahd" in promoting IIRO operations.[45]

- In February 1994, IIRO organized another annual Sanabel Al-Kheer fundraising convention in Riyadh.  During the traditional opening speech, Prince Salman Bin Abdul Aziz, Governor of Riyadh, told of how he had personally solicited "donations from a number of benevolent Saudi people" for Sanabel and IIRO totalling SR6,979,462.[46]  Over SR3.7 million was raised in the Saudi Cultural Festival Palace for IIRO/Sanabel.  The royal function was attended by Shaykh Abdulaziz bin Baz (General Mufti of Saudi Arabia).[47]  A few months later, IIRO officials stated that in the year 1994, the charity had raised more than SR90 million from wealthy benefactors in Saudi Arabia.

- On February 23, 1995, IIRO held its eighth annual charity festival in Riyadh in conjunction with Sanabel Al-Kheer.  Donations totaling SR8 million ($2.13 million) included: SR1 million from Prince Salman bin Abdel Aziz; SR2 million from the Al-Jomaih Co.; SR1 million from Prince Al-Waleed bin Talal bin Abdel Aziz; and, at least SR500,000 from Abdulrahman Al-Jeraisy on behalf of his company.

- On February 5, 1996, the IIRO and Sanabel Al-Kheer annual fundraising drive raised more than SR6 million at the Cultural Palace in Riyadh.  Large donations included:

---

[43] "Prince Salman Opens Fundraising Campaign for IIRO."  Info-Prod Research (Middle East) Ltd. – Middle East News Items.  February 28, 1995.

[44] "Islamic Intn'l Relief Organisation receives SR12m for Bosnia fund."  The Saudi Gazette.  February 11, 1993.

[45] Bashir, Abdul Wahab.  "IIRO raises SR15m in-funds."  Arab News.  December 22, 1993.

[46] "Saudis back fund-raising for Bosnian Muslims."  The Saudi Gazette.  February 26, 1994.

[47] Hassan, Javid.  "Riyadh Governor Prince Salman donates SR1m to IIRO."  Arab News.  February 23, 1994.

SR1 million from Prince Salman Bin Abdul Aziz; SR1 million from Prince Sattam Bin Abdul Aziz (deputy governor of Riyadh); SR1 million from Abdulaziz Al-Jomaih; and, SR10,000 from Shaykh Abdulaziz Bin Baz.[48]

- In January 1997, Dr. Farid Qurashi organized the tenth annual fundraising drive of IIRO – Sanabel.  IIRO collected over SR17 million.  Qurashi was quoted as saying that IIRO had successfully raised a grand total of SR2.3 billion (about $615 million) between 1986 and 1995.  In addition to that, according to Qurashi, Sanabel Al-Kheer's global investments had returned SR425 million in profits by the start of 1997.[49]

- In December 1998, at the 12th annual Sanabel al-Kheer/IIRO charity drive, IIRO netted over SR6 million, including: SR5 million from Prince Sultan bin Abdelaziz bin Saud (Second Deputy Premier and Saudi Defense Minister); SR1 million from Riyadh Governor Prince Salman; and, SR10,000 from Shaykh Abdulaziz bin Baz.[50]


## A Case Study: MWL - IIRO - Sanabel Al-Kheer Operations in the United States

On July 22, 1991, the U.S. branch of IIRO ("The International Relief Organization, IRO") was first officially established at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali, wealthy businessman, member of IIRO's Executive Committee, and a member of the Shura (Consultative) Council of the Kingdom of Saudi Arabia.[51]  IIRO in America was established to fund "institutions, groups, and individuals whose projects, programs and situations fall in one of [IIRO's] service program areas… Institutions, groups and individuals submit proposals for assistance or cooperation.  Proposals are reviewed to determine eligibility and validity.  Once approved, [IIRO's] administration decides on the size and amount of help."[52]  Even inside the U.S., IIRO received significant funding from official Saudi sources: on January 18, 1996, Sulaiman bin Al-Ali reported to Arab journalists that Prince Bandar ibn Sultan, Saudi Ambassador in Washington, had donated SR500,000 worth of computer equipment directly to the IIRO office in Washington D.C.[53]

According to the deposition of Dr. Al-Ali's former U.S. business partner Soliman Beheiri, Al-Ali came to the United States in the Summer of 1991 to establish IIRO.  Beheiri stated that Al-Ali came to the United States with $10 million dollars to invest through IIRO and Sana-Bell, with the goal of generating a sufficient return on investment to support IIRO's

---

[48] Awkasho, Rashad.  "SR6m raised in three hours at Sanabel Al-Khair drive."  Saudi Gazette.  February 5, 1996.

[49] "IIRO bags SR17m in one night for Sanabel Al-Khair."  The Saudi Gazette.  January 23, 1997.

[50] Khan, M. Ghazanfar Ali.  "SR6m collected at Sanabel Al-Khair."  Arab News.  December 24, 1998.

[51] IIRO was originally organized as International Relief Organization in the U.S on July 22, 1991. On February 18, 1992, International Islamic Relief Organization was formed. The two organizations are one-and-the-same, and therefore will be referred to as IIRO herein.  Virgina Secretary of State, Corporate Record, International Relief Organization and International Islamic Relief Organization.  See also: http://www.saudiembassy.net/gov_profile/shura00.html, November 6, 2002.

[52] IRS 990 form for the "International Relief Organization" for Fiscal Year 1992.

[53] "Bandar donates computers."  Moneyclips.  January 19, 1996.

9

mission in the United States.[54]  Beheiri further testified how, in November 1991, Sulaiman Al-Ali introduced Biheiri to Dr. Abdulrahim Saati, a university professor of economics in Jeddah. Al-Ali introduced Saati as a "welcoming from Saudi Arabia from the office of the International Islamic Relief Organization to visit his office here to find out how he's progressing in establishing the organization here, and also assisting them in buying the building they have bought in Falls Church."[55]

Sana-Bell, Inc. (the U.S. branch of Sanabel Al-Kheer) was organized as a District of Columbia non-profit company on July 28, 1989.[56]  In a civil lawsuit filed with the USDC for the District of Maryland, Sana-Bell described itself as an American non-profit corporation deserving of tax-exempt status and headquartered in Jeddah, Saudi Arabia.[57]  The Board of Trustees for Sana-Bell, Inc., as listed on their Articles of Incorporation filed in Washington D.C., includes longtime Saudi MWL executives Dr. Abdulrahim Al Saati, Dr. Farid Yasin Qurashi and Ibrahim Afandi.[58]

Dr. Sulaiman Al-Ali was himself later named as a member of Sana-Bell's Investment Committee and claimed to be the sole corporate executive responsible for executing and managing Sana-Bell investments.[59]  In April of 1998, the President of the "SanaBel Committee," [sic] writing on the letterhead of the Office of the Secretary General of the Muslim World League wrote to Mirza to confirm that Alali "rejoin[ed]" the Sana-Bell Al Kheir Committee and that Al-Ali would be "responsible for Sanabel in U.S.A."[60]  In July 1998, Dr. Abdullah Al-Obaid, Secretary General of the Muslim World League and Chairman of IIRO, wrote to Mirza and indicated that Al-Ali was a "member of the Executive Committee" of Sanabell S.A. of IIRO, and that he assisted in the review of its investments. Al-Obaid noted that part of the proceeds of these investments were used to establish Sana-Bell, Inc in the U.S.[61]  According to the deposition of Soliman Biheiri, "money transferred from Sana-Bell account to [Sulaiman Al-Ali's] office here was big, and I have a record of that.  That can come close to over $1 million."[62]

---

[54] Deposition of Soliman Beheiri, Sana-Bell, Inc v. BMI Real Estate Development, October 27, 1999, Beta Reporting, pp. 75-76, 110-111.

[55] Deposition of Soliman S. Biheiri.  The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  United States District Court for the District of Maryland (Southern Division).  Case No. 98-CV-4177 (PJM).  Filed October 27, 1999.  *Pages 91-96; 105.*

[56] District of Columbia Department of Consumer Affairs and Regulatory Affairs, Corporate Record, Sana-Bell, Inc., 7/28/1989.  See also, The Sana-Bell, Inc. v. BMI Real Estate Development, Complaint filed by Plaintiff Sana-Bell, Inc., December 23, 1998.

[57] The Sana-Bell, Inc. v. BMI Real Estate Development, Complaint filed by Plaintiff Sana-Bell, Inc., December 23, 1998.

[58] Washington D.C. Secretary of State Corporate Record, Sana-Bell, Inc.

[59] "Defendant's Opposition to Plaintiff's Motion for Summary Judgment ."  The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  United States District Court for the District of Maryland (Southern Division).  Case No. 98-CV-4177 (PJM).  January 21, 2000.  Pages 5 and 10.

[60] Exhibit M to The Sana-Bell, Inc. v. BMI Real Estate Development, Defendant's Opposition to Plaintiff's Motion for Summary Judgment., p.10, January 21, 2000.

[61] Exhibits A-1 & A-2 to The Sana-Bell, Inc. v. BMI Real Estate Development, Defendant's Opposition to Plaintiff's Motion for Summary Judgment., p.10, January 21, 2000.

[62] Deposition of Soliman S. Biheiri.  The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  United States District Court for the District of Maryland (Southern Division).  Case No. 98-CV-4177 (PJM).  Filed October 27, 1999.  *Pages 242-243.*

IIRO's form 1023 discloses that Sulaiman Al-Ali had strong relationships with other Islamic relief organizations, specifically, the Kuwaiti based Lajnat al-Dawa.[63] On January 9, 2003, the Office of Foreign Assets Control of the United States Department of Treasury listed the Kuwaiti Lajnat al-Dawa as a specially designated global terrorist (SDGT), and blocked all of its assets pursuant to the International Emergency Economic Powers Act. Lajant al-Dawa was a critical component of the Al-Qaeda network, delivering both financial and operational support. Indeed, during a videotaped interview from the late 1980's, Al-Qaeda founder Abdullah Azzam mentioned two relief organizations that supported the Arab Mujahideen in Afghanistan. One of those organizations was the Kuwaiti Lajnat al-Dawa. Recently captured 9/11 mastermind Khalid Sheikh Mohammad and his older brother Zahed headed the Lajnat al-Dawa operations in Peshawar, Pakistan.[64]

A search of the Person Locator (P-SRCH) database on Lexis-Nexis indicates that Sulaiman A. Al-Ali's former name is Sulaiman Kabbara.  He has two brothers residing in the Northern Virginia area: Bachir and Amal Kabbara.[65]  On September 30, 1993, on behalf of himself, Amal, and Sulaiman, Bachir Kabbara incorporated "3 Brothers Of Virginia Paging Inc." using the same business address as IIRO: 360 S. Washington St. in Falls Church, Virginia.[66]  On November 1, 1993, Bachir Kabbara also incorporated "NAMA, Inc." using the 360 S. Washington St. address.[67]

Al-Ali's brother Bachir Kabbara had formerly served as the Imam of the radical Islamic Center of Tucson, Arizona from 1990 to 1992.[68]  One of Bachir Kabbara's predecessors as leader of the Tucson center was none other than MWL official and senior Bin Laden advisor Wael Jalaidan himself.[69]  Between 1985 and 1993 (including times at which Kabbara was in charge), the Islamic Center of Tucson served as the de-facto headquarters of Al-Qaida in the United States.  The mosque was integral in disseminating *Al-Jihad*, the Arabic-language publication of the Peshawar, Pakistan-based "Mujahideen Services Office."  As a result, the Islamic Center spawned the Al-Kifah Refugee Center, the Arab-Afghan jihad fundraising outlet tied to the 1993 World Trade Center bombing.  While he lived in Arizona, Wadih el-Hage, Usama Bin Laden's former personal secretary, was a regular attendee at the Tucson mosque at this time.[70]  Phoenix Memo author FBI Agent Kenneth Williams believes that "El-Hage established a Usama Bin Ladin support network in Arizona while he was living there and that this network is still in place."[71]  El-Hage has admitted in sworn federal grand jury testimony to overhearing, at meetings at Kabbara's mosque, conversations between other worshippers that particular dissident Muslim leaders "should be killed" as "infidels."[72]

---

[63] IIRO Form 1023 filed with the IRS, September 13, 1991.

[64] McDermott, Terry, *The Plots and Designs of Al-Qaeda's Engineer*. Lost Angeles Times. December 22, 2002.

[65] AutotrackXP report on "Sulaiman A. Al-Ali." November 12, 2002.

[66] Virginia Fictitious Business Names Database entry for "3 Brothers Of Virginia Paging Inc."  Filing date September 30, 1993.

[67] Virginia Secretary of State Corporate Record for "NAMA, Inc."  Filing date November 1, 1993.

[68] State of Arizona Annual Report for "Islamic Center, Tucson."  Filed June 5, 1991.

[69] State of Arizona Annual Reports for "Islamic Center, Tucson."  Filed May 21, 1984 and February 12, 1985.

[70] United States of America v. Usama bin Laden et al.  February 15, 2001.  Page 789.

[71] "The FBI's Handling of the Phoenix Electronic Communication and Investigation of Zacarias Moussaoui Prior to September 11, 2001."  Eleanor Hill, Staff Director, Joint Congressional Inquiry Staff.  September 24, 2002.  Page 4.

[72] United States of America v. Usama bin Laden et al.  February 15, 2001.  Page 790.

According to the IRS 990 forms between 1992 and 1998, using supposedly charitable funds in IIRO and Sana-Bell accounts, Sulaiman Al-Ali made the following disbursements to other Muslim organizations suspected of connections to terrorism:

- $4,212,318 destined for IIRO operations in Bosnia and Somalia – 1992 & 1996. Paradoxically, rather than being distributed directly to the relief zones, this money was apparently re-routed back through the IIRO central offices in Jeddah, Saudi Arabia.[73]

- $36,322 to the Horn of Africa Relief Agency (HARA) – 1992. HARA was used as a front to provide support to various Al-Qaida affiliates, including the Eritrean Islamic Jihad Movement (EIJM).[74] At the time IIRO made its $36,322 donation, HARA donor forms distributed in the U.S., titled "Eritrean Islamic Jihad Movement," advertised: "This pledge will support an orphan or the training of a Mujahid ["holy warrior"] or his family while he is in Jihad." Three payment options were listed: a $3,000 suggested yearly donation to help train a "Mujahid," $700 to "take care of a Mujahid's family," and $420 to support an orphan.[75]

- $23,780 to the Holy Land Foundation (HLF) – 1996 & 1997. On December 4, 2001, the Office of Foreign Asset Control (OFAC) of the United States Department of Treasury designated the Holy Land Foundation (HLF) as a specially designated terrorist (SDT), as a specially designated global terrorist (SDGT), and blocked all of its assets pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. (IEEPA), and Executive Orders 13224 and 12947.[76] According to Judge Gladys Kessler, who upheld the OFAC ruling against HLF, "the administrative record contains ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas."[77]

- $10,000 to the Islamic African Relief Agency (IARA) – 1992. IARA is a Sudanese based Islamic charity group, headquartered in Khartoum with U.S. branch offices in Columbia, Missouri; Baltimore, Maryland; Norman, Oklahoma; Orlando, Florida; and elsewhere.[78] In December 1999, two federal grants totaling $4.2 million dollars from the U.S. Agency for International Development (USAID) to IARA were cut off when the U.S. State Department determined that they were not in America's "national

---

[73] http://www.aidandtrade.com/iat/newyork/current/2001exhibitors-view.asp?cp=226. November 6, 2002.
[74] U.S. v. Usama bin Laden, et al. United States District Court for the Southern District of New York. 116 F. Supp. 2d 489; 2000 U.S. Dist. LEXIS 14507. October 5, 2000, Decided. October 5, 2000, Filed. Testimony from Government Witness CS-1 (Jamal Mohamad Ahmed Al-Fadl), February 6, 2001; Pages 327-328.
[75] "Eritrean Islamic Jihad Movement." Donor pamphlet printed by HARA. P.O. Box 741940, Los Angeles, CA. 90004-8940. Found amongst material taken from the Al-Kifah Refugee Center in Brooklyn, NY.
[76] "Memorandum Opinion." Holy Land Foundation for Relief and Development v. John Ashcroft et al. United States District Court for the District of Columbia. Civil Action No. 02-442 (GK). Filed August 8, 2002. *Page 1.*
[77] "Memorandum Opinion." Holy Land Foundation for Relief and Development v. John Ashcroft et al. United States District Court for the District of Columbia. Civil Action No. 02-442 (GK). Filed August 8, 2002. *Page 19.*
[78] Islamic African Relief Agency, IRS 1023 Form.

security interests."[79]  Orlando, Florida resident Ziyad Khaleel was detained by Jordanian authorities on December 29, 1999, on charges of being a "procurement agent" for Usama Bin Laden.[80]  Khaleel, who was one of only eight U.S. regional IARA fundraising directors and the former IARA website administrator, is also responsible for the maintenance of a variety of radical Islamic Internet sites, including the official Hamas homepage (http://www.palestine-info.net).[81]

- $17,500 to Taibah International Aid Association – 1995 & 1996.  Taibah, with offices located in IIRO's building at 360 S. Washington, claimed to the IRS that it was "a missionary in the United States to promote the Muslim faith" and to aid needy Muslims around the world.[82]  However, Taibah International has been under investigation in Bosnia since shortly after September 11, 2001, when the Interior Ministry claimed to have averted a terror attack involving a computer consultant and suspected Al-Qaida member working for Taibah.[83]  The Bosnian report further found evidence of "fictitious declarations of affiliation and employment" and of visas for entry into Bosnia for suspected militants.  It concluded that "large cash sums were withdrawn by [Taibah] management... which were never accounted for," indicating "a wide scope for possible illegal spending."[84]

In addition to mere charitable donations, Sulaiman Al-Ali also made several major financial investments in the United States on behalf of IIRO and Sana-Bell, Inc.  In December 1992, Dr. Al-Ali transferred over $2.1 million in Sana-Bell charitable assets to investment projects controlled by BMI, Inc. (a.k.a. Bait ul-Mal), a company founded in Secaucus, New Jersey by Soliman Beheiri.[85]  According to a sworn statement filed by FBI Special Agent Robert Wright, BMI "had receive financing from [Yassin Kadi] and United States designated HAMAS terrorist [Musa abu Marzook]."[86]  In October 2001, the U.S. Treasury Department froze the assets of Yassin Kadi and listed him as a Specially Designated Global Terrorist, citing his financial support for Al-Qaeda through a "relief" organization called Muwafaq, or Blessed Relief.  Agent Wright had initially investigated BMI as part of an ongoing Hamas fundraising investigation in the United States.  According to an Affidavit filed by Wright, Yassin Kadi put up $820,000 for a real estate deal structured to funnel proceeds to Hamas operative Mohammed Salah.[87]

[79] Miller, Judith.  "Some Charities Suspected of Terrorist Role."  The New York Times.  February 19, 2000.
[80] Lorch, Donatella and Daniel Klaidman.  "The Plot Thickens."  Newsweek.  February 7, 2000.
[81] Internic domain records.  (http://www.networksolutions.com/cgi-bin/whois/whois/)
[82] Simpson, Glenn R.  "Report Links Charity To an al Qaeda Front."  The Wall Street Journal.  September 20, 2002.  See also: IRS Form 990 for IIRO, 1995.
[83] Simpson, Glenn R.  "Report Links Charity To an al Qaeda Front."  The Wall Street Journal.  September 20, 2002.
[84] Simpson, Glenn R.  "Report Links Charity To an al Qaeda Front."  The Wall Street Journal.  September 20, 2002.
[85] The Sana-Bell, Inc. v. BMI Real Estate Development, Plaintiff's Proposed Findings of Fact and Conclusions of Law., p.1, February 24, 2002. Defendants' Proposed Findings of Fact and Conclusions of Law.  The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  United States District Court for the District of Maryland (Southern Division).  February 24, 2000.  Page 9.  See also: Limited Partnership Withdrawal Agreement; BMI Leasing Limited Partnership and Sana-Bell Inc.  Dated January 1, 1996.  Document submitted as an exhibit attached to "Memorandum in Support of Plaintiff's Motion for Summary Judgment."  The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  United States District Court for the District of Maryland (Southern Division).  Case No. 98-CV-4177 (PJM).  Filed December 15, 1999.  See also: Secretary of State, State of New Jersey, BUM, Inc, March 19, 1986.
[86] Sworn Statement, FBI Special Agent Robert G. Wright, Jr. Chicago, Illinois.
[87] AFFIDAVIT of FBI Agent Robert Wright, filed in connection with U.S. v. One 1997 E35 Ford Van, et al, United State District Court for the Northern District of Illinois, Eastern Division, June 9, 1998, p 17.

13

Moreover, "a note specifying that $820,000 was due and payable on December 31, 1993, [provided] that, 'All payments are to be made to Kadi International Corp., c/o BMI, Inc., One Harmon Plaza, Secaucus, New Jersey.'"[88]

The $2.1 million invested by Sana-Bell in BMI ultimately became the subject of a civil lawsuit after the money disappeared entirely (it remains unaccounted for to this day). During the suit, Soliman Beheiri purportedly confessed that he had mishandled Sana-Bell's investments and was willing to "go to jail" to put this all behind him.[89] Beheiri eventually defaulted in the suit and fled the country when faced with producing a financial accounting.[90] According to Agent Robert Wright's sworn statement, an accountant at BMI later called another FBI agent to discuss his concerns that "funds the accountant was transferring overseas on behalf of [BMI] may have been used to finance the embassy bombings in Africa."[91]

Through IIRO and Sana-Bell, Dr. Sulaiman Al-Ali also invested vast sums into other parallel fraudulent investment schemes tied to suspected terrorist financing. One of these was known as the Global Chemical Corporation (a.k.a. Amana Industrial and Trading), a defunct Illinois for-profit entity in Chicago, Illinois.[92] According to FBI Special Agent Valerie Donahue, since November 1993, IIRO disbursed approximately $1,225,975 to Global Chemical and Amana.[93] IIRO 990 records from 1995 quoted Al-Ali's total investment in Amana/Global Chemical at closer to $2,189,434. According to one Global Chemical administrator, Al-Ali was able to marshal these funds because "he's originally from Saudi Arabia, and he knew a lot of businessmen overseas in the Gulf area, and he… was the potential person to generate that money from different businessmen. And we looked… up to him to really generate that funding for this big project… and he stepped up to the plate and he said, yeah, I know a lot of people that I can generate that money."[94]

In a ten-count federal grand jury indictment returned in October 1996, Global Chemical President Mohammed Mabrook was charged with fraudulently obtaining at least $1,000,000 from various investors.[95] As part of this scheme, Mabrook allegedly "created fictitious documents purporting to reflect customer orders for hundreds of thousands of dollars' worth of Global Chemical products… then solicited investors to provide funds to pay for the manufacture

---

[88] AFFIDAVIT of FBI Agent Robert Wright, filed in connection with U.S. v. One 1997 E35 Ford Van, et al, United State District Court for the Northern District of Illinois, Eastern Division, June 9, 1998, p 17.

[89] Gross, Richard A. (counsel for the plaintiff). "Plaintiff's Proposed Findings of Fact and Conclusions of Law." The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al. United States District Court for the District of Maryland (Southern Division). Case No. 98-CV-4177 (PJM). Filed February 24, 2000. *Page 4.*

[90] Confidential source interview with Robert Krebs, November 4, 2002.

[91] March 21, 2000, Sworn Statement of Special Agent Robert Wright obtained through the Freedom of Information Act.

[92] Sworn Affidavit of FBI Special Agent Valerie Donahue. Cook County, Illinois. United States of America v. Mohammed Mabrook. United States District Court Northern District of Illinois, Eastern Division. Case #: 98 CR 271. *Page 1.* See also: Bank records of Global Chemical seized in 1997 FBI raids of Global Chemical.

[93] Sworn Affidavit of FBI Special Agent Valerie Donahue. Cook County, Illinois. United States of America v. Mohammed Mabrook. United States District Court Northern District of Illinois, Eastern Division. Case #: 98 CR 271. *Page 2.*

[94] Direct Examination of Khaled Y. Falah. United States of America v. Mohammed Mabrook. United States District Court Northern District of Illinois, Eastern Division. Case #: 98 CR 271. *Page 593.*

[95] Special October 1996 Grand Jury Indictment. United States of America v. Mohammed Mabrook. United States District Court Northern District of Illinois, Eastern Division. Case #: 98 CR 271. *Page 2.*

14

of products needed to fill these non-existent purchase orders."[96]  FBI Special Agent Valerie Donahue agreed that "the pattern of Global's receipt and disbursement of funds is consistent with the operation of an investment fraud scheme,..."[97]  Mabrook drew up fraudulent purchase orders with non-existent clients as documentation for supposed investments.

On January 9, 1997, Global Chemical's Chicago headquarters was raided by FBI Agents as part of a money laundering and fraud investigation.  The organizations named in the Search Warrant included NAMA Inc., the corporate entity founded by Al-Ali's brother and business partner Bachir Kabbara at 360 S. Washington St. in Falls Church.[98]  Days later, IIRO's Northern Virginia offices run by Sulaiman Al-Ali were raided by FBI Agents as part of the same terrorism, money laundering and fraud investigation.  The individuals and organizations named in the Search Warrant included Global Chemical Corp, Nama Inc., Taibah International Aid Association, Sulaiman Al-Ali, and Bachir Kabarra.[99]  In an Online Chat session posted on March 22, 2002, Mohammed Omeish wrote:

> "I used to work with International Islamic Relief Organization [in the U.S.].  This organization ended its work about three years ago.  The reason was …a decision of the administrative council at that time…The investigation to which IIRO was subject was for its being an investor in a commercial organization in Chicago which was raided by the authorities for a background of supporting terrorism, and IIRO was a chief investor. What touched the company touched the organization."[100]

Soon thereafter, in August 1998, according to the deposition of BMI President Soliman Beheiri, Al-Ali suddenly decided to abandon his properties in Northern Virginia and San Diego and promptly returned to Saudi Arabia after almost seven years of residence in the U.S.[101]  At this time, Beheiri received instructions from MWL and IIRO superiors in Saudi Arabia who, abruptly and for the first time, told him to "cancel the validity of [Al-Ali's] signature in regard to all of our accounts with your firm."  Soon afterwards, MWL officials discounted all responsibility for the highly questionable investment decisions made by Sulaiman Al-Ali, apparently at their behest.  Meanwhile, millions of dollars' worth of MWL/IIRO/Sanabel donations designated for humanitarian causes disappeared with no apparent explanation.

## *SUCCESS FOUNDATION*

Within the United States, the IIRO also works through another related organization, the Success Foundation. IIRO and Success Foundation are in reality one and the same.  Created shortly before the U.S. Embassy bombings in East Africa in 1998, the Success Foundation was a

---

[96] Special October 1996 Grand Jury Indictment.  United States of America v. Mohammed Mabrook.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 98 CR 271.  *Page 2.*
[97] Sworn Affidavit of FBI Special Agent Valerie Donahue.  Cook County, Illinois.  United States of America v. Mohammed Mabrook.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 98 CR 271.  *Page 16.*
[98] Attachment B In the Matter of the Search of 5234 So. Kolmar, Chicago Il, January 9, 1997.
[99] Attachment B In the Matter of the Search of: 360 S. Washington, 3rd Floor, Falls Church VA, USDC Eastern District of Virginia, Filed January 30, 1997.
[100] Islam Online chat session with Mohammad Omeish, March 22, 2002.
[101] Deposition of Soliman S. Biheiri.  The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  United States District Court for the District of Maryland (Southern Division).  Case No. 98-CV-4177 (PJM).  Filed October 27, 1999.  *Page 66.*

recipient of $15,000 from IIRO (according to IIRO's Tax Form 990 filed with the IRS in 1998) that was earmarked for "educational expenses." Line item 80 in Success Foundation's Tax Form 990 for 2000 filed with the IRS lists the "International [Islamic] Relief Organization" as an organization to which it is related, though this information is lacking in IIRO's parallel form.

In its corporate record registered with the Virginia Secretary of State, IIRO lists its office as:

> P.O. BOX 8125
> Falls Church, VA 22041

On the Success Foundation's Income Tax Form 2758 for calendar year 1999, used for an application to extend time to file information with the IRS, the organization lists the exact same address. Furthermore, IIRO lists its phone number on its 1999 Income Tax Form 990 as (703) 820-7199. Success Foundation lists the same number on its 1999 Income Tax Form 990, despite bearing a different address.

The leadership is closely shared between the IIRO and Success Foundation. In 1992, IIRO on its Income Tax Form 990 listed Khaled Nouri as its Treasurer. In 1999 and 2000, IIRO on its Income Tax Form 990 listed Mohamed Omeish as its President and Secretary. In 1999, Success Foundation listed on its Income Tax Form 990 that Mohamed Omeish was its Director and President and also listed Khaled Nouri as another Director. Success Foundation listed in both its 1999 and 2000 Tax Form 990 Mohamed Omeish as its President, Abdurahman Alamoudi (who has served as a long time official of the American Muslim Council) as its Secretary, and Khaled Nouri as its Treasurer. Alamoudi's signature appears on Success Foundation's Income Tax Form 2758 requesting an extension of time to file the organization's income tax return. Alamoudi's position is listed as Chairman.


## BENEVOLENCE INTERNATIONAL FOUNDATION (BIF)

*Lajnat Al-Birr Al-Islamiyya*, the precursor to BIF, was established in 1987 in Pakistan and Saudi Arabia by Shaykh Adel Batterjee, a powerful and religious Saudi business magnate in Jeddah. It was founded as an "affiliate" branch of the World Assembly for Muslim Youth (WAMY), an organization heavily funded by the Saudi government, whose office in Washington D.C. was once headed by Abdullah Bin Laden.[102] WAMY sponsors various "humanitarian" causes, including Muslim religious youth camps around the world. The following is an excerpt from an officially sanctioned song to be performed by campers, as printed in an English-language WAMY training manual obtained in London:

> "Youth of [Islam] are the guided youth. Come! Come to a final decision: The Prophet has called out and so has the Qur'an. So blessed is the servant who responds when he is called… Bring back the glory to it's lions, And restore the zeal to its soldiers. Flatten evil in its cradle, And unsheath the swords… Hail! Hail! O sacrificing soldiers! To us!

---

[102] Basaddiq, Omar. "Islamic Charity Committee moves to new premises." Arab News. May 21, 1994. See also: IRS 990 forms for the "World Assembly of Muslim Youth" submitted for Fiscal Years 1993 through 1999.

To us!  So we may defend the flag.  On this Day of Jihad, are you miserly with your blood?!"[103]

From its inception, Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the jihad in Afghanistan.  The Jeddah-based charitable group went to great lengths to protect the reputation of its prestigious donors.  In 1993, Shaykh Batterjee publicly stepped down as head of BIF in exchange for a more behind-the-scenes role.  Several years afterwards, the individual who took over Benevolence from Batterji, Enaam Arnaout (a.k.a. Abu Mahmoud Al-Hamawi), instructed his staff to disavow any knowledge of the "founders": "[t]ell him that all we know about them is that they are Saudi Business men and that they left the organization in May 93.  Donot[sic] disclose any other information."[104]

Nevertheless, in approximately 1993, when the manager of BIF's main office in the Sudan traveled to Saudi Arabia to meet with local donors, he was arrested and held for several weeks by Saudi authorities while being subjected to repeated interrogation by Saudi intelligence regarding the now apparent relationship between BIF and Usama Bin Laden.  According to Jamal Ahmed Al-Fadl, Al-Qaida Treasurer Madani Al-Tayyib worried that the arrest could only mean that the Saudi regime had uncovered documents and records linking BIF directly to Usama Bin Laden.  When the Sudanese administrator was finally freed and able to return to Khartoum, Bin Laden hastily convened a meeting to determine whether he had divulged any sensitive information regarding Al-Qaida's relationship with BIF.  Yet, in the end, Bin Laden worried needlessly; though the Saudis had indeed uncovered evidence of a BIF-Al-Qaida connection, no apparent steps were taken to close this source of funding or support.  Several months later, Al-Tayyib indicated to Al-Fadl that "the problem had been fixed" and no more was spoken of the incident.[105]

But by then, it was hardly a secret that BIF was involved in more than just charitable activities.  The entity openly advertised itself in its Arabic-language fundraising appeals as a "trustworthy hand for the support of [both] the mujahideen and refugees" in Bosnia.[106]  Similarly, documents taken from BIF's U.S.-based offices in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations and support of jihad in Bosnia-Herzegovina… Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands."[107]  Another handwritten note

---

[103] "Islamic Camps Objectives, Program Outlines, Preparatory Steps."  World Assembly of Muslim Youth (WAMY); Riyadh, Saudi Arabia.  Prepared by the Camps & Conference Unit of the World Assembly of Muslim Youth 1987.  Translated (with additions) by Abu-Bakr M. Asmal 1990.  Obtained at the WAMY Western Europe Office; 46 Goodge Street; London, UK.

[104] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Pages 28-29.*

[105] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 26.*

[106] Institute for Study and Documentation.  "The Balkan War."  Video produced by the Committee for Islamic Benevolence, Saudi Arabia (*Lajnat al-Birr al-Islamiyya*).

[107] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division.  Case number: 02CR0414.  *Page 29.*

found in Illinois by investigators revealed BIF's supreme "unwritten law": "no matter how poor/sick – first priority is for mujahideen."[108]

The raid of BIF's Illinois office also turned up a number of other documents directly related to the war in Bosnia: a receipt dated July 21, 1994, from the "Black Swans" Bosnian Muslim commando brigade for 300 blankets and 200 pairs of boots obtained from BIF; a receipt from the BiH army dated June 3, 1994, for 2,000 uniforms, 2,000 pairs of shoes, and ten "mass communication stations" donated by BIF to "this military unit"; a request dated December 31, 1994, from the Bosnian military for a combat ambulance (later delivered as promised in January 1995); and, a memorandum to BIF director Enaam Arnaout dated November 17, 1995 describing the recent contribution of 200 tents to the Muslim army.[109]  In an interview conducted in 1992, BIF founder Adel Batterjee denied that his brainchild was actively encouraging its employees to aid or join the militant *mujahideen* operating in the Balkans; however, he also nonetheless added, "if a relief worker decides that he wants to join the fighting forces, we would not stop him."[110]

As Al-Qaida leaders working for other fraudulent charities in the Caucasus had discovered, the BIF leadership agreed that "the best way" to transfer supplies into Chechnya was through Azerbaijan.  Consequently in late 1995, Gul Mohamed, an aide to the militant Afghan fundamentalist warlord Gulbuddin Hekmatyar, established a BIF branch office in Baku to "serve as a conduit of relief supplies."[111]  At the end of the supply chain in the Chechen capital Grozny, Al-Qaida lieutenant Saif ul-Islam al-Masri (a.k.a. "Abu Islam al-Masri") served as BIF's local charge d'affaires.  Saif ul-Islam was a member of Al-Qaida's military committee and had graduated from an expert training course in explosives conducted by the Iranian-backed Hezbollah terrorist group in Southern Lebanon.  Saif also claims to have trained Somali Muslim militiamen to shoot down U.S. helicopters during the United Nations humanitarian mission in the Horn of Africa in the early 1990s.  Saif's passport photograph was similarly recovered during a search in 1997 of Kenyan residences suspected of belonging to a local Al-Qaida cell.[112]  At the time, he was in direct contact via telephone from Baku with the Kenyan terror cell led by Wadih El-Hage, a U.S. citizen working as personal secretary to Usama Bin Laden.  As part of his command duties, El-Hage was tasked with relaying messages between Saif ul-Islam in the Caucasus and the military committee of Al-Qaida in Afghanistan, primarily Muhammed Atef (Abu Hafs Al-Masri) and Bin Laden himself.[113]

---

[108] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 57.*

[109] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Pages 67-69.*

[110] Hedges, Chris.  "Muslims from afar joining 'Holy War' in Bosnia."  The New York Times.  December 5, 1992.

[111] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 82.*

[112] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Page 27.*

[113] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  *Pages 77-78.*

According to notes taken by influential BIF fundraiser Uwaymir Anjum, Saif ul-Islam "came [to Chechnya] through" Shaykh Fathi Mohamed, BIF's initial contact in the region.[114]  In his notes, Anjum indicated that Fathi had trained and organized in Afghanistan for a decade during the 1980s before moving to the Vedeno district in Chechnya in 1992.  Starting as part of the Muslim Brotherhood, Fathi broke off to take "more broad and daring approaches... Fathi started receiving Mujahideen, especially Arabs, from other Muslim countries."[115]  Anjum continued, "One of Sh. Fathi's legacies, probably the leader of the group after him, is Arabi, a Chechen student of Sheikh Fathi.  He commands a group of about 600 mujahideen situated in the capital to keep a watch on the president to ensure that the president does not blatantly violate Islamic principles."[116]  Hundreds of thousands of charitable dollars that BIF was raising under the guise of aiding helpless Chechen refugees was actually going to furnish militant Muslim holy warriors loyal to Shaykh Fathi Mohamed, the Saudi Arab-Afghan Ibn ul-Khattab, and the Chechen Islamist warlord Shamil Basayev (among others) with mine-proof boots, uniforms, medical equipment, and spending cash for travel and weapons.[117]

Inside the United States, in Illinois, BIF was led by, among others, Al-Qaida senior lieutenants Enaam Arnaout and Mohamed Loay Bayazid (a.k.a. Abu Rida Al-Suri).  Bayazid is reputed to be one of Bin Laden's earliest confidantes from the days of the Soviet-Afghan war, and has even attempted to arrange for the purchase of radiological weapons by Al-Qaida.  Yet, the militant known as "Abu Rida the Syrian" was also very familiar with the United States, where he had lived -- in Tucson, Arizona; Kansas City, Missouri; and Chicago, Illinois.  Minutes of a BIF meeting held in Chicago on September 15, 1994, state: "Mr. Loay Baizid, president BIF presided the meeting which was started at 9:00 a.m. and lasted until 10:30 a.m."  A 1994 unsigned "Memorandum of Action" for BIF's Board of Directors confirms that Bayazid was appointed to this position in order "to fill the vacancy created by the resignation of Mr. Jamal Nyrabeh."  Finally, a check register belonging to Enaam Arnaout shows an outlay of $4,742 to Bayazid from an account containing a total of only $10,000.[118]

Others who worked at the Illinois office with Arnaout and Bayazid could not help but notice the inconsistencies in their supposedly humanitarian work.  In a handwritten note recovered by the FBI, a BIF employee wrote unhappily: "That is our mission – Lying to the people."[119]  However, some of BIF's other staff members openly embraced the jihadi philosophy

---

[114] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892. January 31, 2003. *Page 77*.
[115] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892. January 31, 2003. *Page 76*.
[116] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892. January 31, 2003. *Page 77*.
[117] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892. January 31, 2003. *Page 75*.
[118] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892. January 31, 2003. *Page 50*.
[119] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892. January 31, 2003. *Page 57*.

espoused by Al-Qaida.  Suleman Ahmer, BIF's former operations manager in the United States, was an unabashed supporter of cooperation with radical Islamic movements around the world. In an October 1997 letter to Arnaout, Ahmer expressed surprise that the organization would even claim to sponsor relief activities: "we have never worked in the countries which are affected by natural disasters and… we may never work in this area.  But somehow in so many of our publications we have that BIF works in areas affected by wars and natural disasters.  I wonder where it came from and so on."[120]  Ahmer managed to convince Arnaout and the other BIF administrators to create two mission statements, one detailing supposed relief work for public consumption and one an internal document emphasizing "making Islam supreme" for the benefit of the fundamentalist board members—"It was decided that Suleman would present a draft for both."[121]  Meanwhile, only a year earlier, Ahmer glamorized the struggle of the Arab mujahideen fighting in Bosnia to a Muslim youth camp held in South Florida:

> "…the Bosnians were well away from Islam… They couldn't even say the word 'jihad.' They used to call 'mujahedin,' 'muhajedin.'  It took them many months to learn the right word."[122]

But, Ahmer insisted that the effort was not made in vain; after witnessing the fearlessness of the foreign mujahideen battalion loyal to Al-Qaida, the Bosnians responded, "if this really, if this is what Islam teaches you, we are fools if we don't practice Islam."[123]

In the New York area, BIF was represented by a senior Bosnian diplomat and "Minister Counsellor" at the Bosnian Mission to United Nations in Manhattan: Saffet Abid Catovic.  Since 1993, Catovic has been a prominent charitable fundraiser for the Balkans and an outspoken voice at the UN mission on Islamic religious and political issues.[124]  He has had a close relationship with the Kingdom of Saudi Arabia and, in interviews in 1994, he publicly thanked the Saudis for their generous financial assistance to Bosnian religious projects.[125]  However, he has since noted: "there was no way to do wire transfers into Bosnia; it had to be physically carried—the funds had to be physically carried in to give the people, uh, financial help… it's not unusual."[126]

Given his fundamentalist activism in the northeastern United States, it is clear that Catovic was also using his position to advocate "holy struggle" against the opponents of radical Islam, including inside the United States.  Testifying in Immigration court, Catovic denied

---

[120] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003. *Page 53*.

[121] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003. *Page 54*.

[122] "Jihad, The Misunderstood Word."  Lecture given by Suleman Ahmer at the World Assembly of Muslim Youth (WAMY) Okeechobee Summer Da`wah Camp.  July 26, 1996.  Videotape obtained from the Meccacentric Da`wah Group.

[123] "Jihad, The Misunderstood Word."  Lecture given by Suleman Ahmer at the World Assembly of Muslim Youth (WAMY) Okeechobee Summer Da`wah Camp.  July 26, 1996.  Videotape obtained from the Meccacentric Da`wah Group.

[124] Mehdi, Anisa.  "CATCH THE SPIRIT: PROGRAM #93-23 (BOSNIA)."  1.5 hour VHS videocassette produced by the United Methodist Church featuring Saffet Abid Catovic, Rev. Samuel B. Phillips, Stephen W. Walker, and Kathleen M. Pratt.  UMCom; ©1993.

[125] Shaikh, Habib.  "U.N. subject to whims of 'Big Five': Catovic."  Arab News.  July 17, 1994.

[126] Individual Hearing of Mazen Al-Najjar and Fedaa Al-Najjar.  United States Immigration Court; Orlando, Florida. Judge Dan Dowell presiding.  October 8, 1996. *Page 858*.

supporting the blind Shaykh Omar Abdel Rahman (head of the Egyptian Al-Gama`at Al-Islamiyya terror organization) but nonetheless added, "I admire his recitation of the Koran… [h]e's a blind man who recites Koran very beautifully."[127]   During his testimony, Catovic also admitted to having met Ramadan Abdullah Shallah, the current General Secretary of the Palestinian Islamic Jihad (PIJ), "once or twice" at terrorist fundraising conferences held in the United States by the Tampa-based Islamic Committee for Palestine (ICP).[128]

New York police who arrested El Sayyid Nosair, the assassin of militant Jewish leader Meir Kahane and co-conspirator in the February 1993 World Trade Center bombing, found Saffet Catovic's business card from the New York City Health and Hospitals Corporation amongst Nosair's personal effects.  In a videotaped theological lecture published by an Islamic media outlet in New Jersey, Catovic introduced Siddig Ali (also later convicted of a central role in a fundamentalist conspiracy to bomb New York landmarks in 1993) to speak on the subject of "Jihad: The Forgotten Duty."  Catovic offered heartfelt praise of Siddig, and told his camera audience that they should feel "honored to have our dear brother from Sudan, a land which is participating in the Jihad in the struggle itself, and by the mercy of Allah, has almost succeeded in gaining that victory totally and completely."   Siddig Ali ordered to his followers amongst viewers:

> "If the Da`wa [Islamic Call] is confronted, anybody, anywhere, by any power, then the sword is to be absolutely used and implemented… But let's come back to our Muslims that are with us today and Brother Saffet just showed us today a video of what is going on today in Muslim Bosnia.  What happened to our involvement as Muslims, to attack the core of this disease? …Allah (SWT) warned us in the Qur`an when he said, 'O you who believe, what is the matter with you, that when it is time that you are asked to go forth to fight in the cause of Allah, you cling heavily to the earth?  …As if we came back from our respective countries with the same defeatist mentality, that we cannot announce and pronounce these ayat [verses] of Jihad… because we are still afraid that the CIA or the FBI or the authorities or countries are going to be behind us… [and we do not] confront the kuffar [infidels] who has taken our own sisters, our brothers, as slaves in Bosnia."[129]

It is, of course, fundamentally significant that Catovic, a senior official at BIF (an organization now officially recognized by the U.S. government as an Al-Qaida terrorist front group), had such a close relationship with Siddig Ali, one of the lead conspirators in the 1993 New York terror plots.

On November 24, 2000, the Dorral Forrestal Conference Center in Princeton, New Jersey hosted a three-day local Muslim "spiritual retreat."  One of the speakers at the event was Saffet Catovic, whose lecture was titled "Political and Social Jihad."  In an article about the retreat, the author explained, "Brother Saffet Catovic has been active in the Bosnian Jihad for many years."[130]  Between August 20-26, 2001, Catovic was a featured invitee and speaker at a "Jihad

---

[127] Individual Hearing of Mazen Al-Najjar and Fedaa Al-Najjar.  United States Immigration Court; Orlando, Florida. Judge Dan Dowell presiding.  October 8, 1996.  *Page 829.*

[128] Individual Hearing of Mazen Al-Najjar and Fedaa Al-Najjar.  United States Immigration Court; Orlando, Florida. Judge Dan Dowell presiding.  October 8, 1996.  *Pages 830-831.*

[129] "Jihad: The Forgotten Duty, by Br. Siddig Ali, and Jihad in Kashmir and Bosnia."  Islamic Educational Video Series from The International Institute of Islamic Research [Director: Shaykh Zahiruddin Shafi].  P.O. Box 1653, Burlington, NJ 08016.  (609)387-5070.

[130] Iqbal, Sameera.  "Seeking the Love of Allah."  *Al-Nasihah*.  The newsletter of the Islamic Society of Rutgers University.  Vol. 1; Issue 4.  November/December 2000.  Page 12.

Camp" organized for Muslim men between the ages of 14 and 25, sponsored by the northeast regional branch of the "Young Muslims of North America." Though there was no explicit mention of any martial purpose, the flyer was printed in camouflage colors and the text was in military-style block print.[131] The conference registration form began with a quote from the Qur`an:

> "Jihad is ordained for you (Muslims) though you dislike it, and it may be that you dislike something which is good for you and that you like something which is bad for you. Allah knows but you do not know."[132]

One of the other lecturers at the Jihad Camp (who has teamed up with Catovic at many other speaking events) was Imam Siraj Wahaj, a radical African-American Muslim cleric, listed by U.S. Attorney Mary Jo White in 1995 as an "unindicted person who may be alleged as [a] conspirator" in the 1993 World Trade Center bombing.[133]

In the aftermath of the September 11 terrorist attacks, the U.S. government froze the assets of BIF and commenced legal action against one of its principle directors and founders, Illinois-resident Enaam Arnaout. In February 2002, Arnaout worriedly contacted his brother "Dr. Hisham" to discuss how "they" had taken the former director of BIF's office in Bosnia "in a special plane… [t]o Cuba." Arnaout, convinced of his own inevitable fate, explained to Hisham how he would attempt to shoulder the blame and exonerate BIF's Saudi founders. He somberly reflected, "It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how."[134] Less than a month later, the razor did fall; Bosnian police raided BIF's regional headquarters in Sarajevo and detained its manager, Munib Zahiragic, a former Muslim intelligence officer affiliated with the Bosnian Foreign Ministry. Zahiragic reportedly turned over nearly 100 top-secret documents about suspected fundamentalist terrorists operating in Bosnia, including transcripts of communications between BIF management and senior commanders of Al-Qaida based in Afghanistan.[135] Also found were three firearms, a ski mask, numerous military manuals on topics including small arms and explosives, fraudulent passport materials, and photographs of Usama Bin Laden.[136]

Frantically, Enaam Arnaout, about to be arrested himself in the U.S., contacted Zahiragic in jail to discover the extent of the damage caused by the raids. The latter admitted on the phone, "[T]hey took things… I had documents from, from, intelligence, where I worked before, and I had various documents, from the, from the, from the, what is it called, from the job." Arnaout, not realizing how much Zahiragic had already betrayed, ordered the Bosnian spy, "not to give

---

[131] http://www.ymusa.org/northeast/JihadCamp1.jpg. August 3, 2001.
[132] http://ymusa.org/northeast/. August 3, 2001.
[133] "Re: United States v. Omar Ahmad Ali Abdel Rahman, et al." List of 173 possible co-conspirators submitted by Mary Jo White. February 5, 1995.
[134] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 74.*
[135] Whitmore, Brian. "Bosnian Charities Tied to Terror." The Boston Globe. July 2, 2002. Page 1.
[136] Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414. *Page 10.*

information about the others… Meaning we now, I don't know a thing about you… I don't know your life… [W]hat do you know about me, you don't know a thing about me."[137]

In a sadly ironic (if not a bit a comic) footnote, BIF posted a letter of recommendation on its website dated October 15, 2001, from the Director of the Newark Police Department, Joseph J. Santiago. Santiago had written to Saffet Catovic to "personally thank you and your organization 'Benevolence International Foundation'… for your ongoing and continuing efforts in demonstrating to the community that you are an organization of concern and compassion… Your organization exemplifies the true spirit of what America is all about."[138]

### *BIF & U.S. Financial Institutions*

According to its IRS Forms 990, in the United States alone, BIF collected over $12,800,000 in charitable contributions between 1993 and 1999.[139] BIF's methods of accepting donations included:

- Personal checks sent to Benevolence International Foundation, PO Box 548, Worth, IL 60482, LaSalle Bank NA, Account Number: 5201184396.[140]

- Wire transfers to BIF's bank account in Illinois.[141] On its website, BIF provides the following bank account information for donations in the form of wire transfers: LaSalle Bank NA, 15862 S. LaGrange Rd., Orland Park, IL 60462, (708) 349-4004, Routing Number: 07100505.[142]

- Donate stock through National Financial Services Corp., 1415 West 22nd St., Suite 100, Oak Brook, IL 60523, 1-800-544-8666, Account Number: X93-145335, Federal/Tax ID# 36-3823186, DTC #: 226.[143]    National Financial Services Corp. is a Fidelity Investments brokerage firm.

The indictment of BIF Director Enaam Arnaout reveals extensive use of U.S. financial institutions to raise and launder money for Al-Qaeda, including the following transactions:

- "Arnaout and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud."[144]

---

[137] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 103.*

[138] Santiago, Joseph J.; Police Director, Newark Department of Police. Letter dated October 15, 2001, addressed to Saffet Abid Catovic, Director of Public Relations. P.O. Box 548, Worth, IL 60482.

[139] Benevolence International Foundation IRS Forms 990, 1993 – 1999.

[140] http://www.benevolence.org/MakeAPledge/bankinfo.asp, February 12, 2003.

[141] http://www.benevolence.org/MakeAPledge/bankinfo.asp, February 12, 2003.

[142] http://www.benevolence.org/MakeAPledge/bankinfo.asp, February 12, 2003.

[143] http://www.benevolence.org/MakeAPledge/bankinfo.asp, February 12, 2003.

[144] United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois Eastern Division. April 2002. Pgs. 9-10.

- "Between June 2000 and September 2001, members of the conspiracy caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland (the 'Swiss Bank Account') to BIF's checking account in the United States.  Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas."[145]

- "In a schedule of donations exceeding $5,000 attached to BIF's Form 990 Tax Return for its fiscal year 2000, executed by defendant ARNAOUT under the penalty of perjury, BIF substantially understated the amount of funds it received from the Swiss Bank Account and did not attribute a substantial portion of the funds to a known source."[146]

- "On or about April 21, 2001…[Arnaout] conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds of a specified unlawful activity, namely mail fraud."[147]

- "On or about October 1, 2001, [Arnaout], for the purpose of executing the scheme to defraud knowingly caused to be transmitted by means of wire communication, …an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey."[148]

According to the Government's Evidentiary Proffer in the matter of USA v. Enaam Arnaout:

- "On February 22, 2000, [www.qoqaz.net[149]] posted donation links on the website for two charities, one of which was BIF.  Records obtained from Citibank reveal that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen wire transfers from its checking account, number 980110435, in the amount of $685,560, to the bank accounts of the Georgian Relief Association MADLEE (MADLEE) in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Latvia.  MADLEE's director is Marat

---

[145] United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois Eastern Division.  April 2002. Pg. 13.

[146] United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois Eastern Division. April 2002. Pgs. 13-14.

[147] United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois Eastern Division. April 2002. Pg. 22.

[148] United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois Eastern Division. April 2002. Pg. 25.

[149] www.qoqaz.net is an al-Qaeda affiliated website dedicated to the financial and political support of the Chechnyan Mujahideen.

Avlarigov, whose brother, Chamsoudin Avlarigov, is affiliated with the Chechen mujahideen."[150]

## QATAR CHARITABLE SOCIETY (QCS)

Another purported humanitarian organization engaged in the active financing of Al-Qaida and other designated international terror groups is the Qatar Charitable Society (QCS), the oldest and largest such group in Qatar.[151]  QCS is a part of the Islamic Coordination Council (ICC), a coordinating body of Muslim charitable groups established in 1985 in Peshawar, Pakistan to maximize the financial assistance reaching Afghanistan.[152]  Shaykh Abdullah Azzam, an initial founder of Al-Qaida, was a member of the ICC leadership prior to his assassination in Peshawar in 1989.[153]  Other ICC members include the International Islamic Relief Organization (IIRO), the Saudi Red Crescent Society, and the World Assembly of Muslim Youth .[154]

Much like the various Saudi charities that have funded Al-Qaida over the past decade, QCS also draws much of its funding primarily from official sources.  The organization also has strong and longstanding fundamentalist contacts within the Qatari government itself.  In October 2002, the Emir of Qatar, Shaykh Hamad bin Khalifa Al Thani, and the Qatari Foreign Minister, Shaykh Hamad bin Jassem bin Jabr Al Thani, invited the President of QCS, Shaykh Abdul Aziz bin Abdulrahman Al Thani, to join them in high-level meetings with the visiting United Nations High Commissioner for Relief, Ruud Lubbers.[155]  An advertisement for QCS' relief activities in Kosovo speaks of a collaborative partnership with the state-supported Qatar Red Crescent Society.[156]  Moreover, until recently, a WHOIS lookup of the Qatar Charitable Society's website (www.qsociety.org) listed Hashem Hussein as both the Administrative and Billing Contact for the site.  His corresponding e-mail address, "hashim@MMAA.GOV.QA," indicates that Mr. Hussein was an employee of the Qatari Ministry of Municipal Affairs and Agriculture.

According to its website, the Qatar Charity Society innocently "aims to offer relief and help to orphans, victims of war and disasters by supporting them financially, socially and culturally up to the age of 18.  QCS aids widows to meet living expenses particularly those who lost all relatives and friends."[157]  By 1995, QCS claimed to have initiated over 250 projects worldwide in 35 countries including India, Pakistan, Bangladesh, Afghanistan, Somalia, Sudan, Bosnia, the Palestinian territories, Yemen, and the Philippines.[158]  In one fiscal quarter of 1997 alone, QCS was reportedly engaged in worldwide projects estimated at a total value of over 3.5

---

[150] United States Of America v. Enaam M. Arnaout. Government's Evidentiary Proffer Supporting The Admissibility Of Coconspirator Statements. United States District Court Northern District Of Illinois Eastern Division. January 6, 2003. Pg. 94.

[151] "Voluntary and Charitable Organizations."  http://www.dohaislamicsummit.org/qatar/english/islamic-e.htm. March 1, 2003.

[152] Agency Co-ordinating Body for Afghan Relief (ACBAR).  July 1, 1998.

[153] Wiktorowicz, Quintan,  "The new global threat: transnational Salafis and Jihad."  Middle East Policy.  No. 4; Vol. 8; Pg. 18; ISSN: 1061-1924, December 1, 2001.

[154] http://www.yellowpages.liwal.net/asistance/icc.htm.  March 1, 2003.

[155] "UNHCR briefing notes: Liberia, Côte d'Ivoire, Rwanda."  http://www.reliefweb.int.  Dated October 11, 2002.

[156] "Urgent Relief for the Muslems of Kosovo."  http://www.qcharity.org/qenglish/images/kosovo/new_page_2.htm. March 1, 2003.

[157] http://www.qcharity.org/qenglish/index.html.  March 1, 2003.

[158] "Qatar organization carry out welfare projects."  Riyadh Daily.  January 13, 1995.

million Qatari Riyals.[159]  QCS advertised 20 numbered bank accounts in the Qatar Islamic Bank and the Qatar International Islamic Bank ready to receive wired donations from at home and abroad.[160]

However, as is the case with both MWL and BIF, QCS' charitable mission represented little more than an excuse to provide material support to terrorists.  In trial proceedings surrounding the prosecution of individuals associated with the conspiracy to bomb the U.S. Embassies in Kenya and Tanzania in 1998, QCS was first named by as a major financial conduit for Al-Qaida.  Former Al-Qaida member and star government witness Jamal Al-Fadl testified how he had worked closely with QCS in 1993.[161]  Al-Fadl was asked to discuss Dr. Abdullah Mohamed Yousef, a fundamentalist veterinarian and director of QCS.  He explained:

> "The guy [Yousef], he runs a group, he is one of our membership, one of the al Qaeda group membership, and also he is [Sudanese] Islamic National Front membership, and he was in Afghanistan.  So he helped our people for the travel, documents, and also if some money come from the Gulf area to the organization, he gives the group some money from that money."[162]

In the Sudan, QCS was actively aiding radical quasi-official militias associated with the National Islamic Front (NIF) in fighting Christian and animist groups in the south of the country.  In a fundraising brochure for the Sudan distributed by QCS in Qatar, the Society appealed to its donors to help protect "our brotherly Sudan" from "wild savage invaders," who were accused of "destroying the Sudanese territorial integrity, security, stability, and unity."  The brochure further noted, "Every tiny support is great and important especially in this holy month, Ramadan.  It is the month of Allah[sic] blessings… and the month of 'Jihad' in one's person, one's wealth, and one's dwellings.  Support for those brave heroes who are sacrificing their persons will be of great mercy, forgiveness and freeing from the Hell fire."[163]  During one short period of 1999 alone, the chairman of the Qatar Charitable Society reported the transfer of 1 million Qatari Riyals in the form of "emergency aid" to the Sudan.[164]

In 1995, Bin Laden reportedly confirmed to Jamal Al-Fadl that $20,000 supplied by Dr. Abdullah Yousef through QCS was used by Al-Qaida to bankroll the attempted assassination plot that year against Egyptian President Hosni Mubarak in nearby Addis Ababa, Ethiopia.  At the time, Bin Laden sternly rebuked the financiers of the abortive terror plot for their carelessness in concealing the true source of the funds, and expressed serious concerns that "al Qaeda's abilities to use charities to fund operations might be compromised as a result."[165]

During the mid-1990s, Dr. Yousef also used the resources of the Qatar Charitable Society to help underwrite the financial needs of the Eritrean Islamic Jihad Movement (EIJM).[166]  At the time, EIJM recruits, seeking to overthrow their own government and replace it with an Islamic

---

[159] "Projects carried out by Qatar Charitable Society."  Middle East News Items.  Info-Prod Research (Middle East) Ltd.  September 8, 1997.

[160] http://www.qcharity.org/qenglish/banks.htm.  March 1, 2003.

[161] United States of America v. Usama Bin Laden, el al. February 6, 2001. Testimony Transcript; Page 329.

[162] United States of America v. Usama Bin Laden, el al. February 6, 2001.  Testimony Transcript; Page 330.

[163] http://www.qcharity.org/qenglish/helpsuda.htm.  Dated December 27, 1997.

[164] Al-Rayah.  August 16, 1999.

[165] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division.  Case #: 02 CR 892.  January 31, 2003.  Page 103.

[166] United States of America v. Usama Bin Laden, el al.  February 6, 2001.  Testimony Transcript; Page 330.

regime, were receiving military training from senior Al-Qaida lieutenants in the Sudan after having been recruited to follow Usama Bin Laden's international agenda. Several years later, the Deputy Emir of EIJM, Abul Bara' Hassan Salman, confirmed in an interview, "As for the latest Christian onslaught which is being led by America… I say to the Muslim people everywhere: supporting Jihad and the Mujahideen is the way to remove the nightmare of degradation and humiliation which has rested on the chests of our community in its various forms."[167]

Outside of Africa, the Qatar Charitable Society was also extremely active in the Balkans and the turbulent Muslim republics of the Caucasus. In November 1994, one Egyptian QCS "aid worker" was killed and another badly burned in a mysterious "gas explosion" in Sarajevo.[168] QCS also helped distribute a collection of fundamentalist articles titled "Obstacles to the Islamic Resurgence" edited by former Bosnian President Alija Izetbegovic.[169] In the wake of September 11, Izetbegovic stepped down amid controversy that his administration had provided safe haven and travel documents to hundreds of Muslim militants loyal to Al-Qaida.[170] More recently, a VIP social event was organized by QCS in Bosnia to inaugurate a new relief project ordered by a "Decree of His Excellency the Emir [of Qatar]." The party was attended by, among others, Ambassadors from Egypt, Saudi Arabia, Libya, and Iran.[171]

In October 2001, the Azerbaijan Ministry of Justice forcibly closed down its own local QCS office for, "under the disguise of charity," conducting "damaging activities that violate our national interests, as well as [cooperating] with terrorist structures and [distributing] propaganda inciting radical sectarianism, religious hatred and fanaticism."[172] In 1995, a QCS office founded in neighboring Daghestan (adjacent to Chechnya) dispensed over 3 million Qatari Riyals in less than two years.[173] Russian intelligence became suspicious when they discovered that the QCS branch was being run by an Egyptian citizen named Yasir Ibrahim. Daghestani state tax police initiated an inquiry into the organization, and uncovered forged documents and invoices detailing hundreds of thousands of dollars of illicit financial transactions. From the evidence they collected, investigators estimated that QCS had given perhaps as much as $1 million to unspecified "Chechen extremists." Yet, the true numbers will likely never be known because, as the Russians discovered to their dismay, "most of the 'charitable contributions'… were not recorded anywhere. The same goes for how the money was distributed."[174]

By liquidating charity bank accounts into untraceable cash withdrawals in war-torn states (often with no reliable banking systems), QCS was able to make this money simply disappear. Journalists confronted Qatari Foreign Minister Hamad Bin Jasim Bin Jabr Al-Thani with Russian

---

[167] "'The Governing Regime is a Terrorist Regime Which Acts With Enmity Against the Eritrean People': An Interview with the Deputy Amir of the Eritrean Islamic Jihad Movement – Abul Bara' Hassan Salman." _Nida'ul Islam_. Issue 22; February-March 1998.

[168] "Egyptian aid worker, injured in gas explosion, due for evacuation." Agence France Presse. November 26, 1994.

[169] http://www.qcharity.org/qenglish/book_1.jpg. March 1, 2003.

[170] "Former Bosnian president says mojahedin and terrorists not synonymous." HINA News Agency. Broadcast in English in Zagreb. October 9, 2001. 1334 GMT. See also: "Muslim leader denies there are Bin-Ladin's supporters in Bosnia." SRNA News Agency. Broadcast in Serbo-Croat language in Bijeljina. October 9, 2001. 718 GMT.

[171] "Qatar Relief Organization Builds 112 Houses for the Bosnian Returnees." _Al-Rayah_. August 31, 2002.

[172] "Azerbaijan closes offices of Arab relief organizations due to illegal activity." Interfax News Agency. April 10, 2002. See also: "Azerbaijan shuts down Kuwaiti, Qatar charity organizations." Turan News Agency (Baku). Broadcast in Russian language. April 9, 2002; 1530GMT.

[173] "Charity denies Russian charges of assisting Dagestan rebels." _Al-Rayah_. September 20, 1999.

[174] _Segodnya_ (Moscow). November 16, 1999.

allegations that QCS was openly and actively supporting "certain Arab individuals… fighting with the Chechen fighters."  With little reflection, Al-Thani flatly admitted that, indeed, this might be the case:

> "[W]e as a government cannot control the aid going abroad, some of which may go for humanitarian goals, and some may start as humanitarian but end up in another way. However, there is no monitoring because people are sympathizing...  We as a government may be able to control our sympathy, although in the end we are only human beings and Muslims… [t]herefore we cannot restrain the people's feelings in this regard."[175]

Even after the September 11 suicide hijackings, the Qatari regime continued to refuse to restrict the fundraising and religious activism of pro-Al-Qaida religious charities, including the Qatar Charitable Society.[176]  In September 2001, the very month that Al-Qaida struck at America, QCS' official newsletter carried an article titled "Jihad is the Solution!"  The author urged faithful Muslims:

> "The only way to liberate Palestine is the holy Jihad which mobilizes all potentialities in the Arab and Islamic countries, and in which all Muslims stand as one behind the Mujahideen and support them in their Jihad… The time has come for Muslims to follow in the footsteps of Salahudeen and to restore Jerusalem and Palestine to the Arabs and the Muslims.  For Jerusalem is in your hands, Oh, Muslims.  There is no solution to the matter save Jihad.  'You shall readily mobilize, light or heavy, and strive with your money and your lives in the cause of GOD. This is better for you, if you only knew.' (Quran 9:41)"[177]

---

[175] Bin Qinnah, Khadijah.  "Minister denies Russian report on funding for Chechen militants."  _Al-Jazeera Television_.  Broadcast in Arabic language.  November 22, 1999; 2040GMT.

[176] Trabelsi, Habib.  "Noose tightens around Islamic charities in Gulf."  _Agence France Presse_.  October 3, 2001.

[177] Al-Imari, Dr. Abdelqader Muhammad.  "Oh Muslims, Jerusalem is calling you!  Jihad is the Solution!"  _Qatar Charitable Society Magazine_.  September 2001.  http://www.qcharity.org/maga/.

# Al-Qaeda

# Arabian Gulf Financiers



Benevolence International Foundation

Global Relief Foundation

International Islamic Relief Organization

Overseas Accounts

Wire Transfers

Bulk Cash

# US Front Companies & "Charities"

**Al-Qaeda**

**Arabian Gulf Financiers**

Benevolence International Foundation

Global Relief Foundation

International Islamic Relief Organization

Overseas Accounts

Wire Transfers

Bulk Cash



**US "Charities"**

BMI Inc

Global Chemical Corp

**US Front Companies**