# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEE
# FOR PERSONAL INJURY AND DEATH CLAIMS
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| | |
|---|---|
| Ronald L. Motley, (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br><br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br><br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC |

January 10, 2020

**VIA ECF**

The Honorable George B. Daniels  
U.S. District Judge  
United States District Court  
Southern District of New York  
Daniel P. Moynihan U.S. Courthouse  
500 Pearl Street  
New York, NY 10007

The Honorable Sarah Netburn  
U.S. Magistrate Judge  
United States District Court  
Southern District of New York  
Thurgood Marshall U.S. Courthouse  
40 Foley Square  
New York, NY 10007

Re:   *In Re: Terrorist Attacks on September 11, 2001*  
       Case No. 03 MDL 1570 (GBD)(SN)

Dear Judge Daniels and Magistrate Judge Netburn:

   We write today in furtherance of this Court's directive to (1) provide relevant background and history on the September 11th Victims Compensation Fund ("VCF") (parts 1 and 2); (2) provide additional analysis on the implications of the recent United States Victims of State Sponsored Terrorism Fund Clarification Act (to allow for the Court to guide the parties as to its reading of the new law); (3) frame the issues related to causation and damages for any potential personal injury claims related to the September 11, 2001 terrorist attacks; (4) provide an overview for the Court of the legal precedent for personal injury damage determinations in terrorism cases; and (5) offer suggested next steps moving forward to adjudicate the key issues and claims in a timely manner. We will take these topics in turn.

   I.   The History of the VCF

   Undersigned counsel is unaware of any firms that intend to seek final judgments for individuals who were compensated by the VCF solely for latent injuries (such as cancers, sinus and/or respiratory issues, or gastrointestinal issues) allegedly arising from post-attacks exposure in the southern portion of Manhattan. While the Court's guidance on how to address causation for these non-immediate injuries is important for the overall progression of this litigation, undersigned counsel are solely seeking final damages judgment at this time for wrongful death claims for

individuals killed on September 11, 2001, solatium claims for family members of these wrongful death claimants, and personal injury plaintiffs who sustained physical injury on the day of September 11, 2001.

Nevertheless, to comply with this Court's directive, we offer the following history of the VCF to provide a backdrop as to how the VCF has addressed issues of factual causation that would pertain to this Court's analysis of any personal injury claims that may have been compensated by the VCF.

The VCF is a broad compensatory program that, as concerns health-claims, is based on a series of presumptions. A determination of eligibility for the VCF based on a health-injury is presumed provided a claimant meets two eligibility criteria: (1) presence in the World Trade Center ("WTC") exposure zone for a sufficient number of hours (which differs based on the claimant's location in relation to the WTC) as well as Shanksville, PA, and the Pentagon; and (2) diagnosis of an illness or injury that has been included by regulation as eligible for compensation. Once the two criteria are met pursuant to rules promulgated by the VCF Special Master, eligibility is established under the VCF and no showing of duty, breach or causation is required.[1]

Originally, Congress created the VCF as part of the Air Transportation Safety and System Stabilization Act ("ATSSSA") in the days following the terror attacks. *See* Pub. L. 107-42 (Sept. 22, 2001). The ATSSSA was intended to stabilize the United States air transportation system in the wake of the terror attacks. Congress included a provision in the ATSSSA that limited airlines' liability to their insurance coverage. *Id.* at § 408(a). To counter that limitation, the ATSSSA created the September 11th Victim Compensation Fund to benefit September 11th victims and their families as an alternative to the uncertainty of litigation against the airlines.

At its outset, the VCF was open to "any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001." *Id.* at § 403. The first iteration of the VCF has become known as "VCF1." The VCF1 required that a claimant present medical records of treatment received for physical injuries within 72 hours of the attack to corroborate a claim that the injuries were sustained on the day of the attacks, as the VCF1 was intended to compensate only for those deaths or injuries that occurred on September 11, 2001. VCF1 had a statutory limitations period of two years from the date that regulations for administration of the VCF were promulgated during which claims were required to be filed. The VCF1 operated from 2002 to 2004.

Congress passed the James Zadroga 9/11 Health and Compensation Act of 2010 ("Zadroga Act"), Pub. L. 111-347 (Jan. 2, 2011), creating what has been colloquially referred to as the "VCF2" or the "Zadroga Fund." The Zadroga Act also established the World Trade Center Health Program ("WTC Health Program"). The Zadroga Act amended the VCF eligibility section of the ATSSSA to include illnesses or injuries based on exposure in the "immediate aftermath" of the terror attacks and defined immediate aftermath as the period between September 11, 2001 and

---

[1] Similarly, eligibility does not take into account any other external factors that might have contributed to a medical diagnosis, such as a pre-existing health condition, habits (smoking, alcohol consumption, genetics, etc.) or other environmental exposures.

2

May 30, 2002.[2] *Id.* at § 201(3). It also defined the September 11, 2001 crash site for the purposes of eligibility as any area contiguous to the crash site that the Special Master determined was sufficiently close to present a demonstrable risk of physical harm resulting from the impact of the aircraft, subsequent fire, explosions, or building collapses, and routes of debris removal. *Id.* at § 201(4).

Because the Zadroga Act simply amended a statute that created a program for people killed or injured on September 11, 2001, there were three conspicuous things missing from the new statute. First, there was no geographical description of the "crash site" to establish an exposure zone; second, there was no indication of the exposure hours that would be required; and third, and most importantly, there was no indication of what "physical injuries" would be compensable. Almost all illnesses and injuries potentially related to WTC exposure are injuries that exist in the ordinary population, albeit not in the concentration seen here.

These issues were addressed when the United States Department of Justice issued regulations for administration of VCF2. The Department of Justice decided that the exposure zone would extend from the southern tip of Manhattan north to Canal Street and from the Hudson River to the East River. With respect to hours of exposure and eligible illnesses and injuries, the VCF2 was able to borrow from the WTC Health Program section of the statute that set forth specific injuries eligible for treatment by the Health Program, and set some exposure hour requirements.[3]

The list of WTC Health Program eligible injuries in the statute included aero-digestive disorders, musculoskeletal disorders and traumatically induced psychological disorders. No cancers were included in the original Zadroga Act.

There was, however, a mechanism in the statute to add illnesses in the future as appropriate. A Scientific/Technology Advisory Committee ("STAC") was established to examine and recommend new conditions upon the filing of a petition with the National Institute of Occupational Safety and Health ("NIOSH"). NIOSH was the federal agency tasked with running the WTC Health Program, and it certifies the medical conditions that are compensable under the VCF.

In late 2011, members of New York's Congressional delegation filed a petition to add cancer to the list of WTC Health Program eligible illnesses. More than 50 cancers were added in 2012, despite the absence of definitive epidemiological evidence demonstrating that exposure to the airborne toxins in the WTC zones caused these cancers. For the Court's information, we refer to https://www.cdc.gov/wtc/training_cancer_2.html where members of the STAC explain how they

---

[2] The ATSSSA included language related to the "immediate aftermath" in VCF1; however, this terminology was not defined as broadly as the Zadroga Act subsequently defined the term.

[3] Center for Disease Control, *Covered Conditions*, WORLD TRADE CENTER HEALTH PROGRAM, https://www.cdc.gov/wtc/conditions.html (for list of covered or "certified" conditions); VICTIMS COMPENSATION FUND, POLICIES AND PROCEDURES 13-15, https://www.vcf.gov/pdf/VCFPolicy.pdf (last updated December 2019).

3

came to include cancers in order to broaden the claimant pool. In accepting the STAC recommendation to add cancers, the Administrator of the WTC Health Program stated:[4]

> Due to the long latency period between exposure and cancer diagnosis for most types of cancer, many epidemiological studies of cancer associated with particular exposures are produced years after a given exposure event. Waiting for definitive, scientifically-unassailable epidemiologic results before adding types of cancer to the List would prevent treatment of currently-enrolled WTC responders and survivors.

Though the illnesses, injuries and cancers that WTC Health Program recognizes exist in the non-WTC exposed population, the WTC Health Program set minimum latency periods – that is, the length of time between exposure and diagnosis – that is shorter than is generally recognized in the medical literature. Consistent with its goal of broad inclusivity, the WTC Health Program Administrator chose the shortest possible latency periods and applied them across the board.

Once eligible illnesses and required exposure durations were established as outlined above, and a claimant who has an eligible health condition can demonstrate proof of presence in the exposure zone, eligibility for the VCF2 is automatic. In other words, a claimant need not establish traditional proximate causation in order to be eligible for the VCF2. As befits its design as a broad, salutary program, instead of causation, the VCF2 speaks in terms of presumptions or associations.

VCF2 requirements for establishing proof of presence and exposure duration vary and have also changed and evolved over the years.

Since 2017, the VCF2 generally requires a claimant be certified for a condition by the WTC Health Program in order to file a claim. The WTC Health Program has slightly less stringent proof of presence requirements than the VCF2, and if a claimant is certified by the WTC Health Program, he or she only has to demonstrate to the VCF2 presence in the exposure zone, not the duration of the presence.[5]

Before 2017, claimants could provide medical records to the VCF2 showing an eligible physical injury and proof of presence in the exposure zone, and the claimants could themselves attest to their exposure hours.

While the VCF2 has been consistently strict with respect to proof of presence both before and after 2017, it now can rely on the WTC Health Program when establishing presence.

Consistent with the goals of the VCF program, intended to assist those at and around the WTC, the Pentagon, and Shanksville, PA after the deadliest terrorist attacks ever suffered on United

---

[4] Department of Health and Human Services, "World Trade Center Health Program; Addition of Certain Types of Cancer to the List of WTC-Related Health Conditions," 77 Federal Register 56138, September 12, 2012.

[5] *See* Exhibit 1 ("Policy and Procedures for Certification of Physician Determinations for Aerodigestive and Cancer Health Conditions," WTC Health Program, Feb. 20, 2015).

States soil, eligibility determinations for both the WTC Health Program and VCF presume that WTC exposure caused or contributed to the illness without consideration of age, other environmental, occupational or external risk factors.[6] Once presence is established by affidavit, all a claimant needs to show is the existence of an eligible illness or injury—not the proximate causation standard that is undertaken in the intentional tort scenario.[7] This relaxed approach has been adopted by other federal agencies, as well.[8] The Court would be justified in taking judicial notice of this backdrop and history.

With that background and history, we turn now to the analysis of the United States Victims of State Sponsored Terrorism Clarification Act.

## II.    United States Victims of State Sponsored Terrorism Fund Clarification Act

Under the United States Victims of State Sponsored Terrorism Clarification Act ("Clarification Act"), the law broadened categories of claimants eligible for compensation from the United States Victims of State Sponsored Terrorism Fund ("VSSTF").[9] The central reason for the change was to correct the unfair exclusion of estates, spouses, and dependent children who had participated in VCF 1 from receiving VSSTF payments. Before the amendment, any individual or estate that received an award or an award determination from the VCF were prohibited from compensation under the VSSTF. The Clarification Act eliminated these prohibitions and the VSSTF no longer bars or hinders VCF awardees from participation in the VSSTF assuming they are otherwise eligible.

Those who drove the recent legislative effort resulting in the clarification act insist the fair reading of the new law only opens the VSSTF to those killed or injured on the day of September 11, 2001. This reading excludes those whose injuries, discussed above, are more remote in time or causation.

### A.    The Drafters Understood that VCF2 Claims Were Not Included in the Clarification Act

---

[6] For example, a 90-year-old man with prostate cancer and a 25-year-old man with prostate cancer are viewed equally. A 70-year old who has smoked a pack of cigarettes every day for 50 years and develops chronic obstructive pulmonary disorder is viewed medically equal to the 30-year old non-smoker who has the same disease.

[7] *Supra* n. 3.

[8] The Public Safety Officers' Benefits Program (the "PSOB") is a federal program that provides compensatory benefits to survivors of deceased law enforcement officers, firefighters, and first responders. Historically, the PSOB employed a proximate cause standard in assessing compensable injuries. Then, in 2018, the PSOB decided to deviate from its causation- based model and adopt a presumption-based model in order to include "a WTC-related health condition" in its definition of "injury."

[9] 34 U.S.C. 20144 (Nov. 22, 2019).

5

During the legislative process of the creation of the "Clarification Act," the stakeholders—Senator Schumer, Senator Graham, Senator Isakson[10], Congressman Smith, Congressman Nadler, Speaker Pelosi, and their staff members—were of the view the VCF2 or Zadroga had satisfied the VCF2 injury claims.[11] When the VSSTF was created by statute in 2015, the stakeholders were limiting the references to the ATSSSA to its initial rending in Pub. Law 107-42 which would have limited it to VCF1-related personal injury claims.

This determination appears to be intended in the Clarification Act as enacted, as well. The VSSTF posts on its website a printout of 34 U.S.C. § 20144 which includes a section titled

---

[10] Cindy Morley, *Isakson spearheads bipartisan effort aiding 9/11 victims*, Insider Advantage, https://insideradvantage.com/2019/11/22/isakson-spearheads-bi-partisan-efforts-aiding-911-victims/

[11] *See* Exhibit 2 (YSVSST Newsletter Art. Jan. 2020); *see also* Senator Charles Schumer, *Schumer Announces: 9/11 Widows and Children Will Gain Access To Special Terror Victims Fund As Part Of Bipartisan Spending Bill Which Gets Vote This Week; Senator Says Deal He Pushed Will Help More NY Families*, Press Release (Nov. 19, 2019), https://www.schumer.senate.gov/newsroom/press-releases/schumer-announces-9/11-widows-and-children-will-gain-access-to-special-terror-victims-fund-as-part-of-bipartisan-spending-bill-which-gets-vote-this-week-senator-says-deal-he-pushed-will-help-more-ny-families; *see also* 116 CONG. REC. H9040 (daily ed. Nov. 19, 2019) (statement of Rep. Smith):

> Mr. SMITH of New Jersey. Mr. Speaker, the Continuing Resolution before us today not only keeps our government open and operating until December 20, 2019--as we finalize the 2020 budget--but it also extends authorities for critical services...
>
> Of particular significance to thousands of 9/11 survivors--and a giant step forward for justice--the CR also reforms the US Victims of State Sponsored Terrorism (USVSST) Fund to ensure that immediate family members--the spouses and children of the victims of 9/11--are, for the first time, given rightful access to the judgements they have won in court against the perpetrators of the attack on our Nation.
>
> The USVSST was established by Congress in December 2015 to compensate victims of international state-sponsored terrorism. It is funded entirely by criminal and civil penalties collected by the US government from foreign entities that violate U.S. sanctions--primarily related to Iran. In addition to compensating Americans who were held hostage NBC during the Iranian Hostage Crisis of 1979-1981, the 2015 legislation also sought to award any persons who have won legal judgments in a U.S. federal district court against a state sponsor of terrorism arising from acts of international terrorism.
>
> Is there any more deserving group of victims of state sponsored acts of terrorism than those who lost their parents or spouses on September 11, 2001? I don't think so.
>
> Yet, remarkably through a misinterpretation of the 2015 law by the fund's Special Master, the immediate family members--i.e. the dependents--were barred from participating--that's unfair, unjust and unconscionable.
>
> In 2017 and 2019, the fund granted awards to the Iranian hostages, their relatives, victims of U.S. embassy bombings and the Marine barracks in Lebanon--and to more distant relatives of those who were killed on 9/11. But the spouses and children of 9/11 victims were denied, barred and shown the door.
>
> With the deadline for the 2020 round of awards approaching, this past September I hosted a town meeting in Wall Township, New Jersey. Widely attended by spouses and children from across the entire tri-state area, the meeting exposed anew the struggles these survivors continue to face, the sacrifices they have endured, the efforts they have made to hold state sponsors of terrorism accountable for the deaths of their loved ones, and the madness in the decision to bar them from the USVSST.
>
> The technical correction in the CR reflects a bipartisan agreement, an equitable fix to the USVSST that permits 9/11 spouses and children to pursue their judgements in the fund while continuing the participation of other victims as well...

"References in Text."[12]  The "References in Text" section printed on the VSSTF's website, and part of the codified version of the Clarification Act, states "Section 405 of the Air Transportation Safety and System Stabilization Act, referred to in subsec. (j)(12) to (14), is section 405 of Pub. L. 107-42, which is set out in a note under section 40101 of Title 49, Transportation."  The import of this notation is that: (1) Public Law 107-42 refers solely those who were injured or killed on September 11, 2001 (not injuries sustained subsequently) and (2) by referring to Public Law 107-42,  Congress appears to intend to adopt  the statutory language from VCF1 when defining the term "9/11 victim" in the Clarification Act, which did not include the enlarged category of claims of individuals who sustained injury due to exposure between September 11, 2001 and May 1, 2002 (but who were included in the Zadroga Act for purposes of VCF2.)  The Clarification Act defines a "9/11 Victim" as a "United States person … who is an individual described in section 405(c)(2) of the Air Transportation Safety and System Stabilization Act (49 U.S.C. 40101 note)." 34 U.S.C. § 20144(j)(14).  If section 405(c)(2) is limited—as the "References in Text" states—to the language of the ATSSSA enacted in 2001, then an eligible 9/11 victim is limited to "an individual who (i) was present at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and (2) suffered physical harm or death as a result of such an air crash." Pub. L. 107-42 § 405(c)(2)(A).[13]

In sum, under the interpretation of the Clarification Act, when interpreting this law, the Court should look towards the "Notes" to understand what the drafters intended.

Another reading of the law argues that Note is irrelevant where the statute itself is clear.

### B. Plain Language Interpretation

The statutory language of the Clarification Act defines "9/11 Victim" as follows:
"a United States person who has an eligible claim under subsection (c) who is an individual described in section 405(c)(2) of the Air Transportation Safety and System Stabilization Act (49 U.S.C. 40101 note).'(Section 405).[14]

Where the two interpretations of the Clarification Act diverge is on which version of the ATSSSA applies here: the original version under Public Law 107-42 (creating VCF1) or the ATSSSA as it exists today.  The Zadroga Act, in 2011, amended the ATSSSA when creating the VCF2 and changed the definition of a "9/11 victim  The plain language of the Clarification Act, however, makes reference generally to the ATSSSA and not to either of these two legislative enactments of the ATSSSA.   This was perhaps a drafting oversight, if the intent was to only "open" previously barred VCF1 Claims.

---

[12] *Supra* n. 9.

[13] In addition, passengers and flight crew of the four planes (excluding the hijackers) and personal representatives of decedents were also included as eligible to file claims with the VCF1. Pub. L. 107-42 § 405(c)(2)(B)-(C).

[14] 34 U.S.C. § 20144(j)(14).

In short, under the plain language reading of the law, by referring to section 405(c)(2), the Clarification Act could incorporate the eligibility criteria for VCF1 or VCF2 as section 405 is the current statutory language for eligibility criteria for VCF2.  Section 405(c)(2) of the ATSSSA states:

> (c) Eligibility.—
> (1) In general.—A claimant shall be determined to be an eligible individual for purposes of this subsection if the Special Master determines that such claimant—
>   (A) is an individual described in paragraph (2); and
>   (B) meets the requirements of paragraph (3).
> (2) Individuals.—A claimant is an individual described in this paragraph if the claimant is—
>   (A) an individual who—
>     (i) was present at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), the site of the aircraft crash at Shanksville, Pennsylvania, or any other 9/11 crash site at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and
>     (ii) suffered physical harm or death as a result of such an air crash or debris removal;
>   (B) an individual who was a member of the flight crew or a passenger on American Airlines flight 11 or 77 or United Airlines flight 93 or 175, except that an individual identified by the Attorney General to have been a participant or conspirator in the terrorist-related aircraft crashes of September 11, 2001, or a representative of such individual shall not be eligible to receive compensation under this title; or
>   (C) in the case of a decedent who is an individual described in subparagraph (A) or (B), the personal representative of the decedent who files a claim on behalf of the decedent.[15]

It is the term "immediate aftermath" that was modified by the Zadroga Act.  Now, the ATSSSA defines "immediate aftermath" as "any period beginning with the terrorist-related aircraft crashes of September 11, 2001, and ending on May 30, 2002."  Further, the ATSSSA definition of "crash site" was amended to include "any area contiguous to a site of such crashes that the Special Master determines was sufficiently close to the site that there was a demonstrable risk of physical harm resulting from the impact of the aircraft or any subsequent fire, explosions, or building collapses (including the immediate area in which the impact occurred, fire occurred, portions of buildings fell, or debris fell upon and injured individuals); and any area related to, or along, routes of debris removal, such as barges and Fresh Kills."

Because the reference in the Clarification Act is to the ATSSSA rather than the language in Public Law 107-42 (creating the initial VCF), section 405(c)(2)(A) of the ATSSSA as it currently exists on its face includes both VCF1 and VCF2 personal-injury claimants.  This interpretation is

---

[15] 49 U.S.C. § 40101, note.

based on a simple review of the statutory language that Congress enacted by virtue of the Clarification Act.[16]

### C. FSIA Proof Requirements

Under the Foreign Sovereign Immunities Act ("FSIA"), upon which this Court's jurisdiction over the suit against the state-sponsors of terrorism is premised, the Court must determine whether the plaintiffs have established their claims "by evidence satisfactory to the court."[17] In evaluating the plaintiffs' proof, the Court may "accept as true the plaintiffs' uncontroverted evidence."[18] In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit.[19]

   i. Causation

To obtain damages under the FSIA, the claimant must prove that "consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of

---

[16] The plain language reading of the statute is in line with VCF2 Special Master Rupa Bhattacharya's, the VCF2 Special Master who has issued specific rules as to claimants with claims in both the VCF2 and in the USVSSTF cited above. The VCF2 Special Master recently wrote:

> On November 21, Congress passed an interim Continuing Resolution that included the United States Victims of State Sponsors of Terrorism Fund ("USVSST") Clarification Act, which makes certain changes to eligibility for the USVSST. The changes are designed to make 9/11 victims, widows, and dependents – all of which are defined terms in the Clarification Act – eligible to make USVSST claims and receive USVSST awards even if they had already applied for or received compensation from the VCF, whether in the first iteration of the VCF ("VCF1") that operated from 2001-2004, or the current iteration of the VCF ("VCF2"). For some VCF1 and VCF2 claimants, this is a legislative reversal of the USVSST's Special Master's prior determination that some of these claimants would not be compensated by the USVSST. For specifics on USVSST eligibility, information on how to make a USVSST claim, or the time frame in which do so, consult the materials provided by the USVSST on their website.

VCF *supra* n. 3 at 5.

The VCF2 Special Master also noted that if a claim is pending in VCF2 for personal injury, and a claimant then becomes eligible and compensated by the VSSTF, then their claim would be placed on hold pending all payments from the VSSTF which would constitute an offset for the VCF2 pending claim. Further, to the extent that an individual received a VCF2 award and then obtained a judgment in this Court against Iran for the same injuries and received compensation from the VSSTF, then such compensation would need to be reported to the VCF2 for the possibility of having to repay the VCF2 with any VSSTF recoveries. Because of these potential claw-back or offset issues, many people will be advised to participate in the fully funded VCF2 rather than asserting claims against Iran payable by the VSSTF.

[17] *Havlish v. bin Laden*, 2011 WL 13244047, at *2 (S.D. N.Y. Dec. 22, 2011) (citing 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003)).

[18] *Id*. (citing *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C. 2000); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 268 (D.D.C. 2003)).

[19] *Id*. (citing *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 19 (D. D.C. 2002)).

the American rule on damages.'"[20]  This principle lays out the standard for causation under the FSIA.  The claimants must demonstrate that it is reasonably certain that their injuries occurred as a result of defendants' conduct resulting in the September 11, 2001 attacks.  Here, the Court has already held Iran responsible.[21]

In the events of September 11, 2001, al Qaeda terrorists deliberately set out to hijack and crash airplanes into important and well-populated buildings in major cities in the United States.  Not only was it a likely result that the victims in the buildings would die or be severely injured, there was also reasonable certainty that the victims in the immediate area of the attacks would be injured or killed by the effects of the crashed planes.  The question before this Court is how far out the causation chain is to extend.

In the course of these horrific events, people were injured and killed inside and outside the targeted buildings in addition to passengers and flight crew aboard the four airplanes that were hijacked.  For those injured who were not inside the damaged buildings, their injuries were reasonably likely to occur, as it is entirely foreseeable that buildings hit by a hijacked airplane drop heavy debris and destruction throughout the surrounding areas.  As a result of the attacks and the immediate aftermath, those present on the day-of suffered a host of acute traumatic injuries.[22]

In sharp contrast to the deaths and acute day-of injuries, the issue of latent injuries, such as cancers, require an examination of the remoteness issues for purposes of causation.  In the Restatement Second, the authors stated "[i]f the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable."[23]  The word "substantial" is used "to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause."[24]  Although this is stated in the context of tort of negligence, the authors indicate that the rules of causation for negligent conduct are also applicable to intentional conduct.[25]

---

[20] *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 76 (D.D.C. 2010) (citing *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005)) (brackets in original).

[21] *Burnett v. The Islamic Republic of Iran*, Default Judgment Order, 15-cv-9903, ECF No. 85 (Jan. 31, 2017); *Havlish v. bin Laden*, Default Judgment Order, 03–CV–9848, ECF No. 316 (Dec. 3, 2012); *Ashton v. Al Qaeda Islamic Army*, Default Judgment Order, 02-cv-6977, ECF No. 785 (March 9, 2016).

[22] As noted, the government agencies like NIOSH and the CDC have certified the specific injuries and conditions presumed to be caused by the terror attacks of September 11th.  Among the covered conditions are acute traumatic injuries.  The WTC Health Program and VCF define this type of injury as an injury "caused by and occurring immediately after a one-time exposure to energy such as heat, electricity or impact from a crash or fall…. " *See* VCF, *supra* n. 3 at 14.

[23] Restatement (Second) of Torts § 435 (1965).

[24] Restatement (Second) of Torts § 431 (1965).

[25] Restatement (Second) of Torts § 87, cmt. l (1979).

The WTC Health Program—and thus VCF as well—have an extensive list of cancers and other latent diseases that are recognized as being associated with the September 11, 2001 attacks.[26] The governmental agencies that supervise and run these programs have determined that these latent diseases are presumed to have been caused by the attacks on New York City, the Pentagon, and Shanksville, PA. However, as noted above, the presumptions adopted by these administrative programs may not equate with legal proximate causation. It is unknown to the plaintiffs whether these injuries are too remote in time for the Court to adopt the VCF's presumptions or whether these injuries were foreseeable results of the crashed airplanes, such that the Court might conclude that the latent injuries like cancer are proximately caused by the attacks. Given this uncertainty, plaintiffs seek a ruling from this Court on the latency issues. Plaintiffs ask this be done by this Court, whether done itself or by a Special Master.

      ii.      Damages Precedent in Personal Injury Cases

The adverse impact of September 11, 2001 continues almost two decades later. Courts themselves have acknowledged the atrocity and long-lasting effects of international terrorism. This Court has held and recognized plaintiffs "suffered profound agony and grief as a result of the tragic events of September 11th under extraordinarily tragic circumstances and leaving an indelible impact on the lives of the victims' families, and the frequent reminders that each of the individual Plaintiffs face daily."[27]

The courts have well-established case law regarding the measurement of pain and suffering damages in personal injury cases under the FSIA which act as a guide for damage awards for plaintiffs injured during the horrific events of September 11, 2001. In *Cohen v. Islamic Republic of Iran*, the court discussed that it has "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages" in previous cases.[28] The $5 million baseline then may be adjusted based on the "nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment."[29] With less severe injuries, the courts have awarded damages in the $2-$3 million range. Permanent injuries or impairment may justify an award between $7 to 12 million.[30] In providing examples of injuries, the Cohen court stated:

---

[26] *Supra* n. 3.

[27] *Havlish v. bin Laden*, No. 03-Civ-9848, slip op. at 4 (S.D.N.Y. Oct. 3, 2012) (Memorandum Decision and Order) (ECF 316), consolidated in part with In Re Terrorist Attacks on September 11, 2001, No. 03-MDL-1570 (S.D.N.Y.) (awarding spouses $12.5 million; parents $8.5 million; children $8.5 million; siblings $4.25 million; and the decedent a presumptive $2 million) (internal citations omitted).

[28] *Cohen v. Islamic Republic of Iran,* 268 F. Supp. 3d 19, 24 (D.D.C. 2017); *see Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *see also Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

[29] *See Peterson*, 515 F. Supp. 2d at 52.

[30] *Cohen*, 268 F. Supp. 3d at 24 (citing *Wultz*, 864 F. Supp. 2d at 38).

11

> An upward adjustment to $7–12 million has been found appropriate in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead.' A downward departure to $1.5–3 million has been found appropriate where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries' or 'severe emotional injury accompanied by relatively minor physical injuries,' The award of damages for physical injuries 'assume[s] severe psychological injuries.'[31]

Unlike the VCF regulatory scheme, in the terror context, Courts have considered both physical and mental injuries in assessment of damages.[32]

Here, Judge Maas ordered the upward deviation for solatium claims resulting from the September 11, 2001 terror attack. His decision remarked that:

> [a] review of those submissions makes clear that all of the Individual Plaintiffs have suffered profound agony and grief as a result of the tragic events of September 11th. Worse yet, the Individual Plaintiffs clearly are faced with frequent reminders of the events of that day. Considering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures….[33]

Judge Maas clearly shows that the attacks on September 11, 2001 require an upward deviation from what the usual framework in the terrorism context as the deadliest attack on United States soil. This same reasoning is applicable to the personal injury claims. Each survivor has suffered traumatic injuries as a result of the attacks and continues to live with the aftereffects of their injuries. Therefore, it would be appropriate in the personal injury cases to grant a similar upward deviation as the one granted for solatium claims.

In its assessment of the injuries, the court may look at medical records as well as individual testimony.[34] Although nothing states medical records are required for the determination of an award, the court looks more suspiciously upon plaintiffs who offer no documentation to support

---

[31] *Barry v. Islamic Republic of Iran*, 2019 WL 4194824 at *10 (D.D.C. Sept. 4, 2019) (internal citations omitted).

[32] *Id.*; *Cohen*, 268 F. Supp. 3d at 24.

[33] *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 CIV. 9848 GBD FM, 2012 WL 3090979, at *5 (S.D.N.Y. July 30, 2012), report and recommendation adopted, No. 03 MDL 1570 GBD FM, 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012) (internal citations omitted).

[34] *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 36 (D.D.C. 2016) (citing *Harrison v. Republic v. Republic of Sudan*, 882 F. Supp. 2d 23, 49 (D.D.C. 2012)) (awarding a range of $850,000 for solely psychological injuries and $2 to $2.5 million for psychological injuries accompanied by physical injuries).

their claims.[35]  Cases decided in the terrorism context by other courts are relevant and instructive here.  Attached for the Court's convenience is a summary of a sampling of relevant case law on personal injury damage awards in the terror context decided since 2001.[36]

### D. Next Steps to Determine Personal Injury Damages for Day-Of Injuries

Terrorism damage awards under the FSIA are not meant only to compensate, they are also meant to punish and deter.[37]  As Exhibit 3 demonstrates, there is a wealth of precedent for this court to draw upon in making damage determinations on the non-controversial aspects of the Clarification Act, namely, the inclusion of the on-the-day personal injuries in the USVSST.  In analyzing the day-of injuries on September 11, 2001, the follow incidents occurred where the Court plainly may conclude proximate cause exists:

1) IMPACT INJURY

   Persons physically injured by the impact of the aircraft hitting the WTC I, WTC II, Pentagon, and WTC Marriot (jet fuel burns or blast injuries, jet fuel exposure and damage, broken backs/necks/limbs, paraplegics, orthopedic trauma);

2) ESCAPE INJURY

   Persons physically injured during the escape from the buildings (those injured descending the long dark staircases, those injured in elevators (i.e. during free falls), those who were trampled while escaping, those who fell and were injured while the Pentagon or WTC, resulting in broken bones, crushed limbs, trauma lacerations, bruising, etc.);

3) BUILDING COLLAPSE INJURY

   Persons physically injured in either the WTC I or II buildings or Marriot WTC collapse at and around Ground Zero (explosion-like injuries, being buried in rubble, eye or ear damage, head injuries, crushed limbs, multi-system acute traumas, shrapnel like injuries from glass or metal, etc.);

4) FALLING DEBRIS INJURY

   Persons injured at Ground Zero or Pentagon by falling debris (TBIs, concussions, crushed limbs, variety of physical injuries and traumas);

5) PULMONARY TRAUMA INJURIES

---

[35] *See Spencer v. Islamic Republic of Iran*, 2014 WL 12773915 (D.D.C. February 3, 2014) (plaintiff offered no documentation for his "constellation of maladies.").  Here, for a variety of reasons, a percentage of the on-the-day personal injury claims have limited or no medical records.

[36] *See* Exhibit 3 (Personal Injury Damage Precedent from D.C. Circuit).

[37] *See Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016); *see also Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 13 (D.D.C. 2001); *see also Cohen*, 268 F. Supp. 3d at 247.

>Persons who breathed in large quantities of smoke, debris, chemicals, WTC Dust, jet fuel or related toxins at Ground Zero, Pentagon, or Shanksville, PA and whose lungs were burned, damaged and injured on 9/11.

6) LATENT INJURIES (CANCERS)

For the reasons stated above, these cases are not contemplated at this time.[38]

Certain plaintiffs experienced more than one of these traumas. Where a plaintiff experienced more than one traumatic event and suffered more than one traumatic injury as described below, a multiplier should be employed by the court to recognize multiple traumas and injuries.

Recognizing there may not always be bright lines between injury types, and injury cases are fact dependent, another means to group the injuries are by their severity, duration, and permanence:

- <u>Devastating</u>: burns, loss of limbs or digits or mobility, severe pulmonary traumas, strokes, paraplegia, Traumatic Brain Injuries, disfigurement, pulmonary traumatic exposures, acute systemic trauma.

- <u>Severe</u>: multiple broken bones, falls, being buried, being trampled, orthopedic trauma, muscular trauma, mental health trauma and disorders, head injuries, pulmonary or neurological traumas.

- <u>Significant</u>: single broken bones, cuts/lacerations/bruises, mental health disorders, concussions, sprained ankles, being covered in dust, soft tissue sprains/cuts/bleeds.

Plaintiffs are not submitting cases involving PTSD-only or mental without a physical component. The personal injuries and traumas from September 11, 2001 run the gamut. Some groupings beyond the temporal scope makes sense, i.e. is the injury moderate, severe, permanent, or disfiguring, and what has the impact been on the person. The declarations to be submitted by the individuals will cover these points.

Counsel currently plans to file approximately 50 day-of personal injury cases prior to the deadline.

The day-of personal injury victims will be providing the Court with concise (3 page) sworn declarations recounting their experiences on September 11, 2001, and injuries they suffered. The declarations contain HIPAA protected information and as such Plaintiffs propose they be submitted either *in camera* or under seal. Supporting documentation, such as medical records, will

---

[38] Whether latent physical injuries (i.e. cancer) of survivors were a reasonably foreseeable result of the deadly terror attacks of September 11, 2001 remains an open question for this Court's determination. As such, plaintiffs look to the Court for guidance on the meaning of the statute and the issues raised herein prior to proceeding on the remote (cancer) claims.

be appended. Plaintiffs suggest providing hard copies of the declarations *in camera* along with a zip drive with the attachments.

Plaintiffs' counsel propose submitting 50 day-of personal injury cases on or before January 31, 2020.

Alternatively, Plaintiffs can submit ten (10) cases on January 17, 2020; ten (10) cases on January 24, 2020; ten (10) cases on January 31, 2020; and any remaining cases by February 7, 2020 in order to roll the submissions.

If the Court prefers, Plaintiffs could submit declarations and supporting materials for some subsets of individuals who fall within these different categories of injuries at issue to allow the Court to assess their individualized damages amounts. This could help establish parameters for adjudicating and assessing day-off personal injury claims going forward within a framework to allow the Court (or a Special Master—both Ellen Reisman and Roger Frankel are still available to serve) to issue judgments on behalf of the 50 moving personal injury plaintiffs.

Respectfully Submitted,

By: */s/ Jodi Westbrook Flowers*
JODI WESTBROOK FLOWERS
JOHN EUBANKS
*For Burnett Plaintiffs*

By: */s/ James P. Kreindler*
JAMES P. KREINDLER
MEGAN BENNETT
*For Ashton Plaintiffs*

By: */s/ Jerry S. Goldman*
JERRY S. GOLDMAN
*For O'Neill Plaintiffs*