# Exhibit 4

**WRITTEN TESTIMONY**
**OF**
**JEAN-CHARLES BRISARD**
**INTERNATIONAL EXPERT ON TERRORISM FINANCING**
**LEAD INVESTIGATOR, 911 LAWSUIT**
**CEO, JCB CONSULTING INTERNATIONAL**

**BEFORE**

**THE COMMITTEE ON BANKING, HOUSING AND URBAN AFFAIRS**
**UNITED STATES SENATE**

**OCTOBER 22, 2003**

Chairman Shelby, Senator Sarbanes and distinguished members of this Committee, thank you for inviting me to testify today about the global war on terrorism financing.

I started investigating terrorism financing networks in 1997 for the French government, since then, I have provided expertise to various governments and to the United Nations. Since June 2002, I have been leading an international investigation for the 9/11 Families United to Bankrupt Terrorism in the course of an action brought by 4,000 family members before the US District Court of Washington, D.C. suing several entities, banks, companies, charities and individuals that provided financial or logistical support to the Al-Qaida network.

In that respect, our investigation is today active in various regions of the world and has been able to recover a considerable amount of information on Al-Qaida support networks through procedures of judicial or political cooperation established with more than 30 countries.

To date, our effort is probably a unique example of non-State cooperation and investigation on terrorism.

This process, through cooperation and interviews with hundreds of law enforcement officials, provides us with an independent, although global, perspective on assessing inter-governmental efforts on terrorism financing.

Above all, the current process has been able to uncover major documents and items related to the funding of the Al-Qaida organization, and I would like to share some of our findings with you today. These findings help understand both the global context of terrorism funding and the ways and means used by Al-Qaida on a regular basis to raise and move funds for operational purposes.

Since September 11, 2001, the world, and especially the United States, is facing the most innovative form of terrorism. Al-Qaida is not only a militant-based or a combatant

organization, it is also a financial network combining the most modern tools of finance with the oldest transactional instruments.

For thirty years, Western countries mostly dealt with simple terrorist organizations, mainly disorganized local entities in Europe, Middle-East and Asia, or State-sponsored entities such as Hezbollah.

Al-Qaida has reshuffled our knowledge and assessment of terrorist organizations by creating a complex confederation of militant bases and aggregating financial support networks.

To support its criminal objectives, this organization has been able to build a complex and intricate web of political, religious, business and financial instruments or supports.

## Al Qaida financials

US Treasury Department General Counsel David Aufhauser recently estimated that Al-Qaida had an annual budget of upwards of $35 million before 9/11. This figure, he believes, is today between $5 million to $10 million.

This statement is important, as it is the first public estimate made available by a US official.

In December 2002, in my report to the UN Security Council, I valued Al-Qaida annual income at $50 million and global assets within a ten year period between $300 million and $500 million. The UN Al-Qaida Monitoring Group had previously estimated Al-Qaida annual income at $16 million in August 2002. An intelligence report also indicated in 2002 that Saudi Arabia alone was accounting for $1million to $2 million a month through mosques and other fundraising methods.

These figures are a clear indication of a massive financial support to Al-Qaida prior to 9/11 derived from other means that the commonly referred credit card frauds, tax frauds or other "petty" money laundering crimes.

Until now, intelligence and law enforcement agencies have based their assumption on the fact that simple criminal devices don't need a lot of money. This trend has proven to be correct when dealing with simply structured organizations of the Palestinian type in the 70s and Algerian type in the 80s.

The idea also proved correct regarding al-Qaida at the operational level, where local and national cells, mostly dormant cells, happened to live in modest conditions.

But to apply that idea to the entire al-Qaida network is not only irrelevant but simply turns to an end the war against terrorism financing.

Al-Qaida clearly distinguishes in its training manual and in other documents, its organizational funds and its "operational funds". The operational funds have two main

objectives, the first is to invest in projects that offer financial return to entertain local cells, and the second is to carry out terrorist operations.

Apart from the operational level, one must not confuse the requirements of al-Qaida in terms of daily logistics and the super-structure level, which is the real innovation introduced by Usama bin Laden. The first purpose of money for al-Qaida at this level is to entertain the broad network of organizations, to fund them to stabilize and leverage their support and to develop their reach. Over the years, al-Qaida financially supported several entities, from Libya to the Philippines, from Indonesia to Somalia. Figures here range in millions of dollars.

The second purpose of money at the super-structure level has been to pay for protection and asylum. Since 1991, al-Qaida and Usama Bin Laden had to resettle in various countries after the opposition movement was banned from Saudi Arabia. It was the case in Sudan and later in Afghanistan.

According to various intelligence estimates, less than 10% of the annual income of the organization went to operational planning and execution, while 90% was used for the network infrastructure, mainly facilities, organization, communication and protection.

This money primarily originates from wealthy donors in the Middle-East. In the course of our investigation for the 9/11 families, and as part of a judicial cooperation process with the state of Bosnia Herzegovina, we uncovered major evidence proving this factor.

The Golden Chain list of wealthy Saudi sponsors is an internal Al-Qaida document seized by the Bosnian police during searches in the offices of Benevolence International Foundation in Sarajevo in March 2002. Our team was granted access to this document, among others, following an order of the Supreme Court of Bosnia Herzegovina ordering the US government to release this material.

The Golden Chain lists the top 20 Saudi financial sponsors of Al-Qaida. It includes 6 bankers and 12 businessmen, among which there are 2 former ministers.

According to our estimates, their cumulative corporate net worth totals more than $85 billion dollars, or 42% of the Saudi annual GNP and equivalent to the annual GNP of Venezuela.

They include former leading Saudi banker Khalid Bin Mahfouz, businessman Saleh Abdullah Kamel, the Bin Laden family, and several bankers representing the three largest Saudi banks (National Commercial Bank, Riyadh Bank and Al Rajhi Bank).

Most of them are or were involved, apart from their legitimate businesses, in charity organizations as founders or board members.

**Fundraising methods**

3

At the very beginning of al-Qaida financing is an institutional confusion between religion and finance that plays both as a common and traditional religious justification and still poses real and unanswered questions regarding the use or abuse of legitimate money by such organizations.

The fundamental question refers to the way eminent religious tools created to cope with poverty and charity among Muslims were diverted and abused to serve terror aims around the world. The related issue is how to manage and control religious tools and principles, and forbid any abuse, while for instance several prominent scholars interpret the rule of God as permitting such abuses.

The main financial vehicle to fund Islam was set up under the Islamic rule of Zakat, a legal almsgiving required as one of the five pillars of Islam on current assets and other items of income. Zakat has been described as the "cornerstone of the financial structure in an Islamic State".

According to the Koran, Zakat is a way of purification. Possessions are purified by setting aside a proportion for those in need, and, like the pruning of plants, this cutting back balances and encourages new growth. This principle is an obligation for every Muslim.

According to the Koran, only the poor and needy deserve Zakat.

Basically, Zakat takes three forms, depending on its recipients, Feesabeelillah (in the way of Allah), Lil-Fuqara (for the poor), and Lil-Masakeen (for the needy).

Only the first form of Zakat has raised questions and various interpretations among Muslim scholars, mostly those influenced by Wahabbism doctrine of Islam.

Feesabeelillah is used to describe money spent in fighting for the cause of Allah (Jihad).

Jihad refers to striving for excellence on one of several levels. The first involves individual efforts, spiritual and intellectual, to become a better Muslim. The second addresses efforts to improve society. The third and last level, or "holy war," involves self-defense or fighting against oppression.

The personal jihad states that the most excellent jihad is that of the soul. This jihad, called the Jihadun-Nafs, is the intimate struggle to purify the soul of satanic influence — both subtle and overt. It is the struggle to cleanse one's spirit of sin. This is the most important level of jihad.

The verbal jihad is based of Prophet words that "The most excellent jihad is the speaking of truth in the face of a tyrant." He encouraged raising one's voice in the name of Allah on behalf of justice.

Finally, physical jihad is combat waged in defense of Muslims against oppression and transgression by the enemies of Allah, Islam and Muslims. We are commanded by Allah to lead peaceful lives and not transgress against anyone, but also to defend

ourselves against oppression by "fighting against those who fight against us." This "jihad with the hand" is the aspect of jihad that has been so profoundly misunderstood in today's world.

According to Al Azhar's Islamic Research Academy, the concept of jihad refers to the "defense of the nation against occupation and the plunder of its resources". But it does not cover the killing of innocent people, the elderly, women, and children, which is forbidden by Islam. The teachings of Islam also forbid the destruction of buildings and establishments not connected with a specific battle. The statement drew a distinction between violence perpetrated by oppressors who have no respect for what is sacred and violence as a legitimate defense launched by the weak to win their rights.

There is a clear distinction between the Koran's concept of a defensive jihad and the usurped form of offensive jihad developed by several scholars, including Omar Abu Omar (aka Abu Kutada), al-Qaida principal in the UK, who influenced a trend to support those "fighting in the Cause of Allah" (the Mujahideen), thus justifying Zakat for un-legitimate violence against peaceful nations.

In January 2002, for example a conference of Islam's Ulema religious scholars in Beirut, Lebanon, clearly stated in its final statement that :

*"Hezbollah in Lebanon, Hamas, Islamic Jihad and all resistance forces vividly express the will of the nation. They constitute the first line in the defense of peoples and states and their rights, causes and sanctities. Through their jihad and mujahidin, they represent the honor, pride and dignity of Muslims everywhere and reflect the human ambitions of all oppressed peoples in the world. If the masters and protectors of the Zionist entity in the US administration are targeting the resistance because it poses a real threat to this entity, we view this resistance as the noblest and most sacred phenomenon in our contemporary history."*

Over time, this legal religious duty has been usurped and abused by terrorists and their supports.

The al-Qaida network extensively utilized the weakness of legal rules to rely on funds diverted from the Zakat and other direct donations through Islamic banks and since 1998, Usama bin Laden made regular calls for Muslims to donate through the Zakat system to his organization.

In December 1998, during an interview with ABC News, Usama bin Laden stated that :

*"Muslims and Muslim merchants, in particular, should give their zakat and their money in support of this state [Taliban regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God".*

Usama bin Laden addressed the same issue in a seized video tape filmed during a wedding party in January 2001 :

*"Deserve credit those traders and businessmen who give Zakat so that they can help arm that ill-equipped Lashkar"*.

In September 2001, in an interview with Pakistani newspaper Ummat, he declared that:

*"Al-Qaida was set up to wage a jihad against infidelity, particularly to counter the onslaught of the infidel countries against the Islamic states. Jihad is the sixth undeclared pillar of Islam. [The first five being the basic holy words of Islam ("There is no god but God and Muhammad is the messenger of God"), prayers, fasting (in Ramadan), pilgrimage to Mecca and giving alms (zakat).]"*.

Other Al-Qaida leaders made similar references, for example Mahfouz Walad Al-Walid, aka Abu Hafs, during an interview with al-Jazeera on November 30, 2001 :

*"We think that the cause in which there is a possibility for all Muslims to participate in supporting by means of money, men, or any kind of help, is the cause of Afghanistan"*.

The Koran only gives general principles and guidelines regarding the collection of Zakat, and most of the tax regulations are recent. Zakat is levied pursuant to Royal Decree No. 17-2-28-2077 of 1380 A.H. (1960) on Saudi nationals, both corporate (wholly Saudi-owned companies) and individuals, and on the Saudi share of profits of companies owned jointly with foreigners. Citizens and companies of the Gulf Cooperation Countries (GCC) who are resident in Saudi Arabia and do business in Saudi Arabia are treated as Saudis.

Zakat is calculated on capital and earnings from and on all proceeds, profits and gains from business, industry or personal work, and on property or monetary acquisitions of whatever type or description. These include commercial and financial transactions and dividends, livestock, and crops.

Based on recent figures, Zakat funds are estimated annually around $10 billion in Saudi Arabia alone.

Monitoring of charitable donations through Zakat happened to be baseless, while most of Gulf countries lack effective legal systems that impose strict rules of transparency, accounting and auditing requirements, thus turning a legal religious duty into an illegal money-laundering instrument.

The Zakat funds are controlled by the Department of Zakat and Income taxes (Directorate General of Zakat & Income Tax (DZIT) of the Saudi Ministry of Finance and National Economy. Authority of the Department is based on the Royal Decree No. 3321, dated 21/01/1370HD and the Ministerial Resolution No. 393, dated 06/08/1370H, which include instructions for organizing, auditing, and collecting "Zakat" from all Saudis obligated to pay it.

The Department duties include examining, assessing and taking necessary action to ensure payment of Zakat.

Zakat payment is individual or may be organized at each business level by a special committee that determines the recipients and channels donations to these entities.

John B. Taylor, Undersecretary of Treasury for International affairs, stated in April 2002, that to prevent terrorists from "abusing" these institutions was a main goal in the war against terrorism financing.

The Saudi kingdom in its report to the Security Council pursuant to paragraph 6 of SC resolution 1373 (2001) concerning counter-terrorism, stated that "It is a basic principle of the Islamic Shariah that whatever leads to the forbidden is itself forbidden". That principle will remain baseless as far as there is no legal instrument to enforce it.

Moreover, legal measures taken by the kingdom, especially the 1976 Fundraising for Charitable Purposes Regulation, didn't prevent misuse of Zakat funds, as acknowledged by the governor of the Saudi Arabian Monetary Agency who recognized that "some of them take their dollars and they transfer them to accounts in Europe and use it for God knows what".

In 1999, the Kingdom approved amendments to existing money laundering laws intended to bring them into compliance with international regulations, but these amendments have not been implemented.

In November 2002, Prince Salman bin Abdul Aziz said the country was not responsible if "some change the work of charity into work of evil". He stated that he had personally taken part in the activities of those organizations, "and I know the assistance goes to doing good. But if there are those who change some work of charity into evil activities, then it is not the kingdom's responsibility, nor it people, which helps its Arab and Muslim brothers around the world." The prince, King Fahd's brother, added that if beneficiaries had used assistance "for evil acts, that is not our responsibility at all".

Also in November 2002, Adel Al Jubeir, spokesman for the Saudi Kingdom acknowledged that situation by saying that "People have now taken advantage of our charity, of our generosity, of our naivety, if you want to call it that, of our innocence", and calling for a global audit of every charity in the Kingdom.

He also acknowledged the lack of real financial control. "A number of our charities, especially those operating outside Saudi Arabia did not have sufficient financial control mechanisms to ensure that the funds that were raised and that were spent actually went to where they were supposed to go" citing "a massive fraud in the name of religion".

The Kingdom of Saudi Arabia repeatedly tried to establish legal rules to govern Zakat and charities donations.

In 1994, the Saudi Kingdom issued a royal decree banning the collection of money in the Kingdom for charitable causes without official permission. King Fahd set up a Supreme Council of Islamic Affairs (al-Majlis al-A'la lil-Shu'un al-Islamiyya), headed by his brother Prince Sultan to centralize, supervise and review aid requests from

Islamic groups. This council was established to control the charity financing and look into ways of distributing donations to eligible Muslim groups.

Coordination efforts have also been carried out by the Kingdom to deal with specific goals and several bodies were created over time to centralize donations for specific countries and regions.

Efforts to coordinate the recipients of money have been largely undermined by the composition and management of these bodies. For example, the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC) included the International Islamic Relief Organization (IIRO), the Saudi Red Crescent Society, the Muslim World League, the World Assembly of Muslim Youth (WAMY), Al-Haramain Islamic Foundation, Islamic Endowments and Makka Establishment, some of which have already been designated as terrorist supports.

Between 1998 and 2000, more than $74 million was diverted to local bureaus of the SJRC that happened to be controlled by or to harbor terrorists, while the Committee was supposed to be supervised by the Minister of Interior, Prince Naif bin Abdul Aziz.

In June 1998, the CIA and Albanian authorities raided several houses and offices of members of an associate of the SJRC in Tirana. In July 1998, its Director Muhamed Hasan Mahmud, an Egyptian national, was arrested on charges of making false documents and arms possession. He was connected to a 1992 terrorist attack against the Egyptian Parliament. Several of its members and directors were later arrested in connection with the US Embassy bombing in Kenya and Tanzania of August 1998.

Similarly, the United Nations Mission in Kosovo (UNMIK) raided a house rented by the SJRC in Pristina in April 2000, stating the organization was acting as a cover for several Usama bin Laden operatives, including SJRC former directors Adel Muhammad Sadi Bin Kazem and Wael Hamza Julaidan (Secretary General of the Rabita Trust in Pakistan and co-founder of Al-Qaida), designated as terrorist by the United States government in 2002.

Furthermore, in documents obtained from the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance, offices of the Saudi High Commission in Bosnia Herzegovina, the coordinating body for charities in the country, clearly appear to be a front for radical and terrorism-related activities, noting that documentation was found in 2001 "for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other)".

Through these various unsuccessful attempts to regulate or control the recipients of Zakat or donations, one must question the real ability and willingness of the Kingdom to exercise any control over the use of religious money in and outside the country.

The result of that weak policy toward donations made for so-called charitable purposes and the unwillingness of the Saudi government to consider its responsibility in that regard is a major setback in the war against terrorism financing.

Saudi Arabia has repeatedly claimed to have taken steps to counter terrorism financing since September 11, 2001, as if the Kingdom discovered at that date that several of its prominent citizens were funding a terrorist organization. The Saudi cooperation in the war against terrorism financing is largely insufficient, if not inconsistent.

We don't believe in the "innocence" of the Kingdom in that respect. Saudi Arabia has been mostly negligent, and to some extent, irresponsible in letting suspected organizations receive funds and continue their operations while being fully aware of their links to terrorists.

For example, according to documents seized by the Israeli authorities in the Palestinian territories, the Saudi Arabian Committee for Support of the Intifada al Quds was fully informed by the Palestinian officials that it was sending funds to Hamas, a terrorist organization.

In a letter written in 2000 to the Chairman of the Saudi committee, a representative of Palestine stated that "The Saudi committee responsible for transferring the contributions to beneficiaries is sending large sums to radical committees and associations including the Islamic Association which belongs to Hamas, the Al-Atzlach Association [most likely the Al-Salah Association, a known agency of the Hamas in Gaza], and brothers belonging to the Jihad in all areas", adding that "This has a bad effect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody".

Similar warnings were raised in Bosnia in 2000 by a Bosnian association called "Mothers of Srebrenica and Podrinje". In a letter to Prince Salman, it was clearly claimed that the High Committee for Bosnia Herzegovina didn't meet its goal in terms of financial help, namely accusing the director of the Sarajevo office of diverting $100 million collected after Srebrenica's fall in July 1995, for Srebrenica inhabitants.


**Financial conduits**

Saudi Arabia is present at every stage of Al-Qaida financing, but primarily as the major source of funding. This is an indication that Osama Bin Laden has been able to leverage his family position in the Kingdom to gain access to major sources of funding. It is also a sign that Saudi Arabia is offering several essential conducts for Al-Qaida funding.

Over the years Al-Qaida used various conduits for moving money to its operational cells, mainly well established channels.

In that regard, international investigations have uncovered only a few, if none usage of offshore facilities in Al-Qaida financial instruments.

With the exception of a few banking institutions based and operated from offshore centers such as the Bahamas and Switzerland, namely al Taqwa Bank and Dar Al Maal Al Islami (DMI) no such examples can be found around the world.

The nature of the al-Qaida network is that it uses business covers to finance its operations. One of the main characteristics of this network has been its ability to operate behind a traditional economic and financial network.

Furthermore, financial investigations determined that terrorists didn't need offshore centers simply because they had the ability and the tools to deviate money from their recipient in order to finance their operations in their own countries.

In that respect, the Zakat religious tax system imposed on each transaction to finance charitable Muslim needs, raises in its practical consequences, the same nature of questions as does any offshore business by allowing to deviate under no control large sums of money to suspicious entities.

Zakat is the most important source of financial support for the al-Qaida network, essentially because it is the most common and unregulated way to raise donations in Saudi Arabia. Until recently, it was also the most undocumented means to funnel money to these networks.

In several cases, money originating from Islamic banks and charities in the Gulf was laundered through Western and specifically US, correspondents, whether banks or charities, before reaching their recipients.

In that respect, most of the financial revenue of al-Qaida is raised through legal means.

The same applies to the Hawala alternative remittance system, at least before 9/11.

This informal system to transfer money has been regarded as a primary tool for moving money and has been subsequently targeted by counter-terrorism financial institutions. However, the system, mostly in use in Pakistan, India, the Gulf countries and Southern Asia, is essentially an "end user" tool for terrorists on the ground, in remote areas, used to transfer money for operational purposes. It has never been a primary tool or instrument for moving money, although this instrument is believed to have regained importance after 9/11, with an extensive use in, for example, tribal areas of Pakistan and Afghanistan.

Its importance in "end-user dealings" could be reduced by facilitating cheap, fast remittances across international boundaries, and by doing away with dual and parallel exchange markets, which are always an incentive to keep transactions underground.

Another post-9/11 trend has been the extensive use of couriers to funnel money.

Al-Qaida's main financial transactions are essentially organized through three principal channels: the Islamic Banking system, business transactions and charities.

## 1. The Islamic Banking system

Beginning in the late 1970s, Saudi Arabia and other Gulf countries created a banking system aimed at promoting and propagation (Dawa) of Islam around the world.

In 1974 the OIC summit in Lahore voted to create the inter-governmental Islamic Development Bank (IDB). Based in Jeddah, it became the cornerstone of a new banking system inspired by religious principles. In 1975 the Dubai Islamic Bank - the first modern, non-governmental Islamic bank - was opened. In 1979 Pakistan became the first country to embark on full Islamization of its banking sector.

The creation of the Bank of Credit and Commerce International (BCCI) in 1972, and its downfall in 1991, temporarily slowed the trend of Islamic banking. The bank's main fraud scheme was to allocate large loans without real guarantees, in return for investments in the bank's capital, a practice known as "loan back". This way, the main loan beneficiaries were the shareholders themselves.

Saudi Islamic support was channeled through a complex banking system that had at its center two entities created in the early 1980s: Dar-Al-Maal Al Islami (DMI), founded in 1981 and chaired by Mohammed Al-Faisal, and Dallah-Al-Baraka, founded in 1982.

Endowed with enormous funding ($1 billion in the case of DMI), these institutions were rooted in both the Saudi kingdom's desire to spread its financial pre-eminence in the Arab world, and in its support for the radical Islamic cause. Add to that the desire, already perceptible during the inception of the BCCI, to create an international financial network capable of sustaining the economic vitality of the Arab countries in the eyes of large Western banks.

DMI, or "The House of Islamic Money", is located in Switzerland. It was created on July 29, 1981. Until October 1983, its president was Ibrahim Kamel. He was replaced on October 17, 1983, by Prince Mohammad Al Faisal Al Saud,. DMI is one of the central structures in Saudi Arabia's financing of international Islam. Its main subsidiaries are the Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, and Faisal Finance. These high-level establishments enjoy enormous power in the countries where they are settled, principally in the Gulf and Sudan.

Functioning on an Islamic method, DMI adheres to the Zakat system. After the transaction is made, the funds earmarked as Zakat disappear and are off the books. Later, under no financial regulation, the money may be used to fund radical Islamic groups.

Islamic banking institutions operate by participating in investments, sharing profits on projects, and earning fees for services performed.

One of the duties of Islamic banking institutions is to contribute and manage Zakat funds.

Relying on Islamic banking, Usama bin Laden himself, in partnership with several Saudi and Gulf Islamic banks, founded a banking institution in Sudan, Al Shamal Islamic Bank, that provided funding for terrorist operations, as confessed by several Al-Qaida members in 2001 during the US African Embassy Bombing trial.

Several banks helped transfer funds to al-Qaida through the Zakat system, by direct donations or by knowingly providing means to raise or transfer funds to the terrorist organization. Some of them even controlled the Zakat funds beneficiaries, including charities that have provided financial and logistical support to al-Qaida.

Islamic banking facilities, instruments and tools have provided an essential support to the al-Qaida organization and operations.

The banking system, whether knowingly or not, have acted as an instrument of terror, to raise, facilitate and transfer money to terrorist organizations.

Governed by Islamic Law (Sharia'a) that regulates commerce and finance in the Fiqh Al Mua'malat, (transactions amongst people), modern Islamic banks are overseen by a Shari'a Supervisory Board of Islamic Banks and Institutions ("The Shari'a Committee").

At the state level, the Saudi Arabian Monetary Authority (SAMA), established in 1952, is the controlling body for the banking sector. For that purpose, it can ask a bank for any information it deems necessary and has the power to inspect accounts and records.

Since Sept. 11, 2001, SAMA has addressed circulars to Saudi banks to investigate the extent to which they may have assets belonging to the individuals and entities that appear in the lists of those suspected of having links to terrorism, and it has asked banks to scrutinize accounts and audit all financial operations that affect them.

Furthermore, SAMA instructed commercial banks to establish a Self-Supervisory Committee to closely monitor and fight terrorism funding and to coordinate all efforts to freeze the assets of the identified individuals and entities. The Committee is composed of senior officers from banks responsible for Risk Control, Audit, Money-Laundering Units, Legal and Operations, and operates in the presence of SAMA officials.

The Saudi Government has also taken steps to combat money laundering. This includes the establishment of anti-money-laundering units, with trained and dedicated specialized staff. These units work with SAMA and law enforcement agencies.

Another institutional initiative is the creation of a specialized Financial Intelligence Unit (FIU) in the Security and Drug Control Department of the Ministry of Interior. This unit is specially tasked with handling money-laundering cases.

Most of these bureaucratic measures, while creating the impression that the Saudi government is taking appropriate actions to counter terrorist funding, have proved ineffective in countering networks that can easily evade the controls.

Indeed targeting money laundering turned to be ineffective, as the practice refers to the cleaning of illegal gains from drug trafficking and other criminal activities. In contrast, the funding of terrorism involves using legitimate income to finance illegal activity, the reverse process.

Similar doubts can also be raised as to the extent of the SAMA willingness to effectively control these institutions, especially when illegal practices involve the use of Zakat funds.

For example, it was only in 1999, after several months of fierce international pressure, that SAMA directed an audit on the National Commercial Bank (NCB), chaired at the time by Osama bin Laden's brother in law, and one of his major financial supporters in the Kingdom. After the audit revealed several millions of dollars were diverted to terrorist organizations, its Chairman was finally replaced, but remained until last year, along with his family, a major shareholder of the bank with a controlling vote at its board of directors.

Furthermore, documents made available to the 9/11 families clearly established that the NCB was still facilitating banking transactions for terrorists after that date. The same applies to other major banks of the kingdom including Al-Rajhi Bank, Al-Baraka Bank, Arab Bank and the Saudi American Bank, which funneled money to or from the Spanish Al-Qaida cell from 1996 until 2001.

Other banks, including Swiss-based DMI, as recently revealed by the investigation of the families have funneled money to organizations founded or used by terrorists, such as Al-Haramain Islamic Foundation and Maktab ul Khedamat (Bureau of Services) in Peshawar.

The confusion observed at the State level in Saudi Arabia between religious aims and financial instruments has created over the years a window of opportunities for fundamentalist organizations to consolidate and expand their reach.


## 2. Penetration of the business sector

Al-Qaida is probably the most successful example of a terrorist organization acting under the umbrella of business entities.

The organization succeeded in building a large array of banking and corporate covers for its illegal activities in several countries.

The ability of the terrorist network to penetrate the business sector has been a major factor for moving and receiving money through legal instruments.

Operational cells of al-Qaida have been able established umbrella organizations, registered under local laws. Most of them are involved in the construction, the real estate and public building sectors. In addition, many trade companies based in Saudi Arabia provided financial support to create and run the local companies.

The legal statute of the Establishment in Saudi Arabia offers soft regulations, if any, in terms of accounting rules and legal publications.

Two examples of the abuse of legitimate businesses illustrate the ability of the terrorist organization :

The first is given by the network formed between 1983 and 1996 in Sudan, that crystallized for several years the overall spectrum of facilities and tools at bin Laden's disposal to carry out its fundamentalist goals, through banks, companies and charities. This network included the protection provided by the State itself, a permanent factor in al-Qaida's history that explains its ability to remain an offensive organization.

When Usama bin Laden relocated to Sudan in 1991, he used its close relations with the then controlling power of Islamic leader Hasan al-Turabi, to set up several business ventures, to the extent of building symbiotic relationships with Sudanese leaders of the National Islamic Front (NIF).

In concert with NIF members, Usama bin Laden invested in several large companies and banks, and undertook civil infrastructure development projects.

The network of businesses controlled by Usama bin Laden included: Al Shamal Islamic Bank, funded and controlled by wealthy Saudi businessmen and bankers including Saleh Abdullah Kamel, Mohammed al-Faisal or Adel Abdul Jalil Batterjee; an import-export firm; several agricultural companies and a construction company settled in connection with his Saudi family conglomerate to build roads and airport facilities in Sudan.

Theses businesses enabled Usama bin Laden to offer safe haven and employment to Al-Qaida members, to provide bank accounts to several operatives, and to finance terrorist operations and facilities, mainly training camps and arms buying.

Most notably, this network was able to carry out legal financial transactions with Western banks and financial institutions, with the guarantee of his prominent Saudi associates.

Beginning in 1996, several business associates of al-Qaida developed a money laundering scheme involving Saudi and Spanish companies, to finance several al-Qaida operational cells or supports in Europe, Middle-East and Asia, including preparatory operations for the Sept. 11th attacks on the United States.

Through several front companies described by Spanish judge Baltasar Garzon as covers for Al-Qaida operations, Al-Qaida sponsors were able to funnel more than $1 million from companies and individuals based in Saudi Arabia to Germany and other Al-Qaida European cells between 1995 and 2001.

To date, this scheme represents the most direct uncovered link to the Sept. 11th attacks, regarding the operation's financing.

These companies, mainly involved in construction and real estate, were convicted in arms trafficking, credit card fraud and false documents (Credit card fraud and car smuggling). Along with illegal activities, these entities provided financial assistance to al-Qaida. They made false financial statements and laundered more than $2.5 million in 5 years. That amount hasn't been recovered yet by the investigators.

Several companies were used as umbrella organizations to facilitate al-Qaida operations in Europe through false contracts signed by a Saudi company controlled by Muhammad Galeb Kalaje Zouaydi, European chief financier for al-Qaida, who created several corresponding companies in Spain with several al-Qaida militants.

To date, the Saudi company, Mushayt for Trading Establishment, is still in activity and managed by several members of the Muslim Brotherhood.

The economic network maintained regular incomes for the cells in Europe or in the Middle East (Germany, Italy, Yemen, Syria, and Saudi Arabia). In addition these firms employed Ex-Fighters of Islam in Chechnya or Bosnia and radical Muslims.

The network also maintained close relations with Al-Qaida members and leaders in Europe, including hijacker Mohammed Atta, Said Bahaji and Ramzi Binalshibh, all related to Osama Bin Laden.

Money was funneled to the Hamburg cell through the Saudi Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar who provided the cell of hijackers with financial and logistical support. The network of companies also facilitated in 1997 the preliminary filming of the World Trade Center that was delivered to an Usama bin Laden courier in Europe.

Ghasoub Al Abrash Ghalyoun (aka Abu Musab), a Spanish cell member and business partner of Muhammad Zouaydi traveled to the United States in August 1997 to film future targets of Al-Qaida, including the World Trade Center.

In addition, Mushayt for Trading Establishment in Jeddah sheltered and supported economically other international Muslim radicals, including Nabil Nanakli Kosaibati Nabil, right-hand man of the al-Qaida Spanish cell leader, convicted for terrorist activities in Yemen on behalf of Saudi intelligence services.

As Muhammad Zouaydi and most of the al-Qaida Spanish members, Kosaibati is a Spanish national of Syrian origin. He acknowledged during his trial in 1997 that he was recruited and trained to use arms and explosives by the Saudi intelligence. During his trial confession he said that the Saudi intelligence "sent him to Yemen in 1996 as an active Saudi intelligence agent".

He also acknowledged he received $150,000 from the Saudi intelligence to kill the Yemeni Foreign minister. Documents also revealed that Kosaibati received $14,000 from Muhammad Zouaydi in 1996 and 1997 while living in Sanaa, Yemen on a monthly basis at the request of a lieutenant of Usama bin Laden.

Moreover, Muhammad Zouaydi sustained Islamic charities known as al-Qaida logistical bases. For example, he sent $227.000 to Nabil Sayadi in Belgium from his company Mushayt for Trading Establishment and through the Saudi National Commercial Bank. Nabil Sayadi is leading the Fondation Secours Mondial (Global Relief Foundation) in Belgium, designated on the UN terror list since October 22, 2002.

The Spanish network has also been able to entertain business relations at the highest level of the Saudi Kingdom.

In 1999, in his capacity of advisor-minister to King Fahd of Saudi Arabia, Abdullah al Turki entered in negotiations to become business partner of Muhammad Zouaydi, al-Qaida financier for Europe, for a construction project in Madrid, Spain, worth $ 2.3 million. Both agreed to participate as business partners and a contract was written on October 1, 1999 by Muhammad Zouaydi acting as representative of the Spanish company Proyectos y Promociones ISO, stating that both parties will finance 50% of the project and split the incomes 70/30 between Abdullah al Turki and Muhammad Zouaydi. As a guaranty for the operation, Muhammad Zouaydi sent a check of $ 1.1 million on September 15, 1999 with Abdullah al Turki as beneficiary. Several documents established that both men had business relations on a regular basis until at least year 2000.

Abdullah al Turki is currently Secretary General of the Muslim World League.

In the Al Qaida European economic networks, Muhammad Zouaydi (Aka Abu Talha) represents an illustration of the legal financial support. Indeed, Zouaydi is Syrian born and Spanish national. He's graduated in management, and passed years in Saudi Arabia as an accountant for the Royal Family. He's also the brother-in-law of Mohamed Baiahah (Aka Abu Khaled), known as a personal courier of Osama Bin Laden in Europe. Finally, he founded a trading company in Saudi Arabia, where he used Waqf donations and false contracts to finance the activities of al-Qaida cells in Europe.

The Spanish scheme illustrates terrorism financing using donations through a web of legally established companies transferring money through the Islamic Banking System, namely al-Rajhi Bank, National Commercial Bank, Faisal Islamic Bank and Saudi American Bank.


**3. Charities**

241 Saudi charity organizations are currently operating in Saudi Arabia and abroad.

These organizations receive annually between $3 billion to $4 billion, of which between 10% and 20% is sent abroad.

Resulting from confused usage of religious tools, several charities centered their efforts, not only on assisting needy around the world, but also in supporting and participating in the political goals of the few that viewed Islam as a way to combat Western influence.

Since 9/11, Saudi Arabia has repeatedly stated that charities were legitimate organizations.

Prince Sultan Bin Abdulaziz, Saudi Minister of Defense and an important donor to several of these charities, recently stated that they were "legitimate and well-established Muslim charities".

Such statements are overturned by an array of facts and evidence made available by several countries for the investigation of the 9/11 families suggesting that most of these so called charities were at best fronts of terrorist organizations, if not terrorism backbone, but in any case fictious charities.

As far as a charity, whatever its initial purpose and the help it is dedicating to the poor and needy, if it engages itself, willingly and knowingly, through its management, members or facilities, in providing substantial support to terrorism, this organization cannot be viewed anymore as legitimate. Otherwise, under which criteria should a donor be assured that the money raised by the organization won't ultimately benefit a terrorist group?

Saudi charities are present at every stage of terrorism.

Saudi charities have provided terrorist organizations with the essential ideological substrate. Most of these organizations have been founded or inspired by radical religious or political leaders. The Muslim World League was created in 1962 by former members of the Egyptian Muslim Brotherhood. His current Secretary General, Abdullah al Turki, is a former Minister of Religious Affairs of Saudi Arabia who was a fellow of Sheikh Abdullah Azzam, Osama Bin Laden spiritual mentor who founded in the 80s the Bait ul Ansar (Mujahideen Services Bureau) in Peshawar, financed by Usama bin Laden and embryo of the Al-Qaida terrorist organization. The International Islamic Relief Organization (IIRO) was founded by Usama bin Laden brother-in-law.

Saudi charities have provided protection and facilities to Al-Qaida members. This trend emerged years ago, since the very foundation of the Al-Qaida network. In documents seized in Bosnia and Herzegovina in 2002 during searches of Benevolence International Foundation offices, and obtained by the 9/11 families, charities appear as part of Al-Qaida, fully integrated in its organizational structure to the point of creating a symbiotic relationship with it, acting as umbrellas, safe houses and military bases for Al Qaida operatives.

The Saudi Red Crescent maintained passports for Al Qaida operatives to avoid searches and is referred to as an "umbrella" by Al Qaida operatives.

An official letter with the heading of the Muslim World League and International Islamic Relief Organization suggest using the name of the "league" (the Muslim World League) as, quote "an umbrella which you can stay under".

17

<u>Saudi charities have provided arms and logistics to the Al-Qaida network.</u> A message on the letterhead of the Saudi Red Crescent bureau in Peshawar requests that "weapons" be inventoried. The letter contains a note from Usama Bin Laden to its then director stating "we have an extreme need for weapons".

In a letter from Benevolence International Foundation directed to the World Assembly of Muslim Youth, BIF headquarters organizes the collaboration with the Benevolence Islamic Committee along with WAMY to provide military logistical support to Mujahideen efforts.

<u>Saudi charities have provided military bases for Al-Qaida</u>. In an other letter seized in Bosnia Herzegovina, the Muslim World League asks for the opening of its bureaus "for the Pakistanis", so the "attacks" will be launched from "league" (Muslim World League) offices.

<u>Saudi charities have provided military training for Al-Qaida terrorists</u>. From several intelligence sources and documents collected around the world, the investigation of the 9/11 families has been able to establish that several Saudi charities have funded at least 10 terrorist training camps in Afghanistan. The International Islamic Relief Organization (IIRO) funded at least 6 training camps referred as terrorist training camps by the US government, including the Darunta camp, a facility used for chemical and biological weapons testing.

<u>Saudi charities have provided an essential financial support to Al-Qaida.</u> Since the very beginning of Al-Qaida, Saudi charities have been associated with the financial structures and procedures of the organization. An internal document obtained by the 9/11 families contains a list of goals for the organization, in which are named organizations to be involved in securing money for al-Qaida, including Rabita Trust and Muslim World League.

Another internal document from BIF, includes a list of orders from Osama Bin Laden regarding the management of Islamic charities. At point 10 of this list, he urges the creation of a committee to receive donations and maintain an account and the spending for Al-Qaida, including: "the Crescent (Saudi Red Crescent), the Rabita (the Muslim World League) and the Relief agency".

In a letter signed by Abdullah Azzam, spiritual mentor of Usama bin Laden, it is mentioned that "at the forefront" of Islamic foundations that contributed to the Jihad "through financial support" is the Saudi Red Crescent.

Direct funding was revealed, for example, by former al-Qaida representative in Southern Asia Omar al Faruq confessions to the US authorities regarding Al Haramain Foundation. Al Faruq stated that "Al Haramain was the funding mechanism of all operations in Indonesia. Money was laundered through the foundation by donors from the Middle East". He also stated that the charity office was working under the control of a representative of Usama bin Laden.

The lack of a transparent financial practice of Saudi charities was notably established during controls of humanitarian organizations conducted by the Bosnian government. Documents made available by the Bosnian Financial Police show that Al Haramain Islamic Foundation, Benevolence International Foundation, Human Appeal International, International Islamic Relief Organization Igasa, and the High Saudi Committee for Help to BiH, "mostly had cash without bank accounts and proper documentation. A significant amount of money was transferred through personal bank accounts of their employees, and there was no documentation about the way of spending of that money".

Al Haramain Al Masjid Al Aqsa, a sister organization of Al Haramain in Bosnia Herzegovina still active in the country, had transferred money to Yassin Al Qadi, designated terrorist by the United States, and Wael Julaidan, a Saudi businessman also a designated terrorist, had a signature right over the account of the organization.

It is essentially the lack of internal regulation, along with the Kingdom's inability and unwillingness to control the Islamic charities, that enabled several of them to harbor, employ or support fundamentalists abroad, using or abusing their statute.

## The Saudi question

Saudi Arabia has become a major concern in the war against terrorism financing, and more generally, in the war against terrorism, as far as the kingdom is still harboring essential and constitutional elements of Al-Qaida: the ideological substrate, the human vector and the financial tools.

In June 2001, the late FBI Chief of Antiterrorism, John O'Neill, told me that "All the answers, all the keys enabling us to dismantle Bin Laden's network are in Saudi Arabia". Today, all of our leads and much of the evidence collected by the 9/11 families put Saudi Arabia on the central axis of terror and shows that this government was aware of the situation, was able to change the path of its organizations, whether banks, businesses or charities, but voluntarily failed to do so. Rather, the Saudi government repeatedly claimed since at least 1993 that the situation was under control while facilitating the reach and involvement of the charities and the financial institutions of the kingdom, or inciting its citizens to support the terror fronts when the highest ranking members of the royal family are pouring tens of millions of dollars each year to Islamic charities known for diverting money to Al-Qaida.

We've been able to establish that Saudi Arabia has been repeatedly warned and informed on the extent of the support that the kingdom's charities were providing to extremist or terrorist groups, but that it obviously failed to act upon this situation.

Saudi Arabia has been fully informed and warned by its US and European counterparts since at least 1994 that several major charities sponsored by the Kingdom, if not most of its charities, have been involved at various degrees, in supporting terrorism.

- In November 1994, French Interior Minister Charles Pasqua visited Saudi Arabia and met with several officials, including the Saudi Minister of Interior Prince Naif, to express his deep concern on the use of charities for other purposes, including funding of terrorist organizations.

- In 1996, a CIA report indicated that one third of the Islamic charities were linked to terrorism.

- In 1997, a joint security committee to share information on terrorism was established with the United States involving the CIA, the FBI and the NSA.

- In 1999 and 2000, several US officials traveled to Saudi Arabia to raise the same concern.

Despite clear warnings, Saudi Arabia's support to charities has been continuous and extensive over the time, even after 9/11.

Furthermore, most of the financial infrastructure is still in place, from banks to charities, including front companies and wealthy donors.

While officials of the US Treasury Department claim Saudi Arabia is the "epicenter" of terrorism financing, the Kingdom has only frozen a ridiculous amount of terrorist funds.

According to the latest figures available, since September 11, 2001, Saudi Arabia has frozen 41 bank accounts belonging to 7 individuals for a total of $5,697,400, or 4% of the total amount of terrorist-related funds frozen around the world.

The major issue regarding Saudi Arabia concerns its unwillingness until a recent period, to face Islamic terrorism as a threat. "We have never worried about the effect of these organizations on our country", these are the words of Prince Bandar Bin Sultan in September 2001.

This stand, indeed, had nothing to do with a misconception on the part of Saudi Arabia, it was part of a clear, calculated and determined policy, followed day by day by the highest level of the security apparatus, applied by the business architecture and supported by the rulers of the kingdom.

The same Saudi official acknowledged that the kingdom might have paid the price of its own protection. This is a major revelation of our investigation, substantiated by several testimonies, interviews and documents emanating from Osama Bin Laden himself, members of the Saudi governmental apparatus or foreign intelligence. It is believed that since 1994, Saudi Arabia has funneled money to Bin Laden for the purpose of his jihad around the world to preserve the political power of the Al-Saud family in the kingdom. Prince Bandar refuses to call it "protection money", and prefers the notion of, quote, "paying some people to switch from being revolutionaries to be nice citizens", which is leading to the very same consequence.

This trend also reverses a major argument of Saudi Arabia when it claims to be the first target of Al-Qaida. Although Bin Laden criticized the Saudi regime in several instances after the first Gulf war, the kingdom never faced Al-Qaida terrorist threat before May 12 of this year. Osama Bin Laden has targeted western interests in the kingdom while surprisingly avoiding to hurt any symbol of the monarchy. On the contrary, Al-Qaida served for years the very religious interests of its godfather in disseminating the wahhabi ideology in various regions of the world.

The truth is since the beginning of the war against terrorism financing, Saudi Arabia has been misleading the world, and we are still awaiting the Saudis to apply for themselves the very strong message of their ruler, Crown Prince Abdallah, who, in August 2003 made it clear that "whoever harbors a terrorist is a terrorist like him, whoever sympathize with a terrorist is a terrorist like him and those who harbor and sympathize with terrorism will receive their just and deterrent punishment". Saudi Arabia still maintains freely on its soil thousands of individuals or entities who provide financial support to the Bin Laden network, and the 9/11 families are still waiting for them to be investigated, sought and prosecuted with the same determination as the one applied to those who were carrying the guns and bombs they've paid for.

The point has been reached where the only alternative is for the kingdom to show clear evidence of its willingness to terrorize the terrorists, in other words, to dismantle the financial backbone of Al-Qaida, or to face liability for its negligence in acting against the terrorists and their associates. In that regard, the United States government or the US Congress could take appropriate measures to prevent unlawful actions from established banks, businesses or individuals by considering designating Saudi Arabia as a state sponsor of terrorism, if this state refuses to reverse its policy in three major areas, which more and more appear as roots of terrorism: wahhabism, with a radical religious doctrine that calls for intolerance and violence; charities, with organizations offering full-service to terrorist organizations, including recruitment of operatives; and finance, with banks, companies and wealthy businessmen still able to fund radical extremists.

## The war against terrorism financing

Until now, the war against terrorism financing has been mainly focused on the end-users entities and individuals, primarily to prevent further use of money for terrorist planning and operations.

While this objective is important, and has been successful in many areas, I doubt it could stand as a longtime pattern to win the war against the Al-Qaida network.

At the operational level, Al-Qaida and its affiliated organizations have been more active since 9/11 than in all the history of this terrorist group since its creation in 1988, with more than 40 bombings claimed by this organization or attributed to its network causing more than 1,000 deaths. Al-Qaida has been able to consolidate and spread its forces through other organizations. On the financial area, the efforts have mainly failed to assess and combat the roots of Al-Qaida.

I see several major obstacles:

- <u>A legal obstacle</u>, in the sense that law enforcement agencies are confronted with an array of different criteria and regulations to fight terrorism financing, while state cooperation depends on political will.

- <u>A cultural obstacle</u>. International cooperation is undermined by the "national approach" culture of most law enforcement and prosecution bodies around the world. Most of these agencies are focusing their investigations and leads on national based cells, while avoiding to share information of interest for their counterparts. In the course of our investigation and cooperation process, we experienced various situations where, for example a neighboring country was not aware of the involvement of an Al-Qaida cell on its own territory in Europe. Due to our action, Australia recently took actions against two Islamic leaders affiliated to the Spanish Al-Qaida cell uncovered one year and a half ago. Another cultural factor is due to the fact that several Islamic countries, although willing to help the US investigations, are concerned with the way they are carried out.

- <u>An enforcement obstacle</u>, as far as each state has its own sanction system, and that no international body is to date vested with a sanction mechanism to enforce decisions. During a recent conference, a director of the Financial Action Task Force on Money Laundering stated seriously that the highest sanction level in the organization was for other members to dismiss the uncooperative member-state.

- <u>Another obstacle</u> I see is based on political and diplomatic reasons to avoid addressing issues such as the sources of the funds, because they might involve state interests.

The war against those networks will only succeed if there is a clear intention from all the partners involved to disrupt the entire chain of financing, including above all its sources. We can dismantle all the fronts, all the intermediaries and all the channels of terrorism funding; it won't be enough to disrupt its financing as far as we don't cut the roots of it. Otherwise, they will find other ways and means as it's already the case through couriers or alternative systems, for the money to reach the terrorists.

I think time has come to raise these fundamental questions about the war against terrorism financing and its finality.

It is time to go after the shareholders of the Al-Qaida terrorist organization. Several examples are demonstrating that this war has been selective, if not discriminate in avoiding to address its roots.

The Muwafaq Ltd was incorporated in the Isle of Man in 1991. The same year, Muwafaq Foundation (also known as Blessed Relief) settled in Sudan with Yasin Al-Qadi acting as chairperson. Abdulrahman Bin Mahfouz, son of Khalid Bin Mahfouz, became trustee of Muwafaq Foundation while serving as member of the board and Vice

Chairman of the Executive Management Committee of the Saudi National Commercial Bank. Abdulrahman Bin Mahfouz later acknowledged in an interview that Muwafaq Foundation was the "brainchild" of his father, "who funded it with as much as $30 million". Yasin Al-Qadi has been designated as Specially Designated Global Terrorist by the United States on October 12, 2001 and a US Treasury Department statement added that "Muwafaq is an Al-Qaida front that receives funding from wealthy Saudi businessmen" (…) "Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief". Khalid Bin Mahfouz acknowledged himself that he was "the principal donor" and founder of the foundation. Yet, he is still at large.

Another example is provided by the Al Aqsa Islamic Bank, based in Palestine. On December 4, 2001, within the framework of the fight against the financial networks of terrorism, the United States announced the freezing of assets of several charities in the United States and two Palestinian financial companies believed to be support structures for the Hamas terrorist movement. One among these, the banking institution Al Aqsa Islamic Bank, was described as the "financial branch of Hamas" by the American authorities.

Yet, the financial sources and shareholders of the bank were not designated. The bank was established with $20 million in capital by several prominent financial groups or institutions, notably the Jordan Islamic Bank and the Saudi Dallah al Baraka Group. The Jordan Islamic Bank is the property of the Dallah al Baraka Group, led by Saleh Abdallah Kamel, shareholder of the same bank Usama bin Laden funded in Sudan via local trustees and companies.

Jordan Islamic Bank, a Dallah al-Baraka subsidiary, owns 14 percent of Al-Aqsa, according to al-Aqsa's acting general manager. In a statement, Saleh Abdullah Kamel acknowledged that Dallah al-Baraka owns another 12 percent directly.

Up until now, no financial measure has been taken against the assets of this Saudi shareholder, reducing the reach of the war against terrorism financing, as far as the financial sources usually use complex and multiple channels of investment.

The war against terrorism financing implies multiple cooperation processes, whether public or private, and relies on a strong commitment to a same and single objective from multiple partners.

To achieve this goal and extend the reach of current investigations, several measures could be taken at the national and international level:

- Implement preventive actions to preserve the financial institutions. The war against terrorism financing has implied increased obligations for banking and financial institutions. Most of these institutions are determined to enforce these regulations. They strongly believe that facilitating terrorism-related transactions would have an impact on their reputation and could cost legal actions and financial risks for their own assets. Their most pressing obligation is to be able to identify and check their transactions. This could only be achieved if governments provide enough information, not only on designated entities, but

also on suspected entities. In that regard, measures such as preventive freezing of assets of suspected entities or individuals could provide time to fully investigate and enforce sanction measures, while preserving the banking institutions. Secrecy in this field increases risks and uncertainty.

- <u>Ease designation criteria</u>. International investigations have identified several key institutions or individuals as cornerstones in terrorism financing, while no specific public action has been taken against them. Easing the designation criteria or implementing specific regulations to such cases could help secure future freezing of assets.

- <u>Promote international bodies</u>. Our experience in the field shows that the most important task of the US government is to promote international cooperation, mutual understanding and common tools to fight this form of trans-national terrorism. Most countries in the world are uninformed or not knowledgeable enough to really fight these networks. The implementation of an international information-sharing body is a pressing demand of several important partners of the United States in the war against terrorism. The effort carried out for the 9/11 families is also, on a day to day basis, to share information with states around the world, that turn to us for that purpose. Our independent and legitimate effort provides a basis for cooperation, whether with states or international organizations. I can announce today that as part of that effort, we will implement in the future months a global organization, in coordination with several states and international organizations, for the purpose of information-sharing in a secure basis. We strongly feel such an initiative is an imperative for the war against terrorism, the international security, the prosecution of those who funneled money to terrorists, and finally for the families who have a right to know and understand.

I'll leave my last words to Matthew Sellitto, who lost his son on September 11, 2001. He, more than I can, synthesized our common goal against terrorism financing: "I'll see my son again some day and I truly believe he'll ask, "Dad, when they murdered me, what did you do to find out who murdered me?" Well, I can tell him, look him right in the eye and say I did everything I can…to find out who murdered my son, why they murdered my son, who gave them the money to murder my son".