**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |
|---|---|

*This document relates to:*     Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)


**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE MOTION TO DISMISS**
**FILED BY MAR-JAC POULTRY, INC.**


COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

I.  INTRODUCTION ................................................................................... 1

II.  ALLEGATIONS AGAINST DEFENDANT MAR-JAC POULTRY, INC.................... 1

III.  ARGUMENT ....................................................................................... 5

   A.  Applicable Legal Standards ............................................................... 5

   B.  The Federal Plaintiffs Have Stated Claims Against Mar-Jac and Mar-Jac's Motion
       To Dismiss Is Properly Denied.............................................................. 7

   C.  The Federal Plaintiffs Have Adequately Alleged Claims Under the Anti-Terrorism
       and Effective Death Penalty Act .......................................................... 8

      1.  The Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant
          to General Tort Principles................................................................. 8

      2.  Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Based Upon
          Mar-Jac's Criminal Violations .......................................................... 10

      3.  The Federal Plaintiffs Have Adequately Pled Causation ........................... 11

   D.  The Complaint States a Claim Against Mar-Jac Under the Torture Victim
       Protection Act ................................................................................ 13

   E.  As Subrogees,  The Federal Plaintiffs Have Standing Under RICO, And They Have
       Sufficiently Pled A Claim Against Mar-Jac ............................................ 14

      1.  Standing .................................................................................... 15

      2.  The Federal Plaintiffs Have Stated A Claim Under RICO ....................... 16

   F.  The Federal Plaintiffs Have Sufficiently Pled Claims Against Mar-Jac for
       Conspiracy and Aiding and Abetting.................................................... 20

   G.  The Federal Plaintiffs Have Adequately Alleged State Common Law Claims......... 20

   CONCLUSION .................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

Asip v. Nielsen Media Research, Inc., 03-CIV-5866 (SAS), 2004 U.S. Dist. LEXIS 2350, at *
11-12 (S.D. N.Y. Feb. 18, 2004)........................................................................................ 7

Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S.
519, 536-37 (1983)........................................................................................ 18

Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000)................................................... 22

Bastein v. Sotto, 749 N.Y.S.2d 538, 539 (N.Y.A.D. 2d Dept. 2002). ........................................ 22

Boim v. Quranic Literacy Inst ................................................................................. 8

Boim v. Quranic Literacy Inst., 291 F.3d 1000 (7th Cir. 2002). ................................... 1, 8, 10

Brewer v. Brewer, 34 Fed. Appx. 28, 30 (2d Cir. 2002) ............................................ 22

Chance v. Armstrong, 143 F.3d 698 (2d Cir. 1998) ................................................. 6

Conley v. Gibson, 355 U.S. 41 (1957)..................................................................... 5, 6

Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998)........................... 23

Geisler  v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)................................................... 6

Goff v. Clark, 755 N.Y.S.2d. 493, 495 (N.Y.A.D. 3d Dept. 2003) ............................ 22

Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983). .......................... 8, 9, 11, 21

Holmes v. Security Investor Prot. Corp., 503 U.S. 258, 268 (1992) ........................... 18

Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350
(N.Y. 1993) .................................................................................................... 22

In re Phillip Servs. Corp. Secs. Litig., No. 98-CIV-0835 (MBM), 2004 U.S. Dist Lexis 9261
(S.D. N.Y. May 24, 2004).............................................................................. 6

Ivancic v. Olmstead, 66 N.Y.2d 349, 352, 497 N.Y.S.2d 326, 488 N.E.2d 72 (1985), cert. denied,
476 U.S. 1117 (1986)..................................................................................... 20

LaMarca v. United States, 31 F. Supp. 2d 110, 124 (E.D. N.Y. 1998) ........................ 21

Leatherman v. Tarrant County, 507 U.S. 163 (1993)................................................. 7

Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003).................................... 18

Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985) ......................... 11

Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996)...................................... 22

National Asbestos Workers Med. Fund v. Philip Morris, Inc., 74 F. Supp. 2d 221 (E.D. N.Y.
1999). ........................................................................................................ 15, 16, 18

Phillips v. Sun Oil Co., 307 N.Y. 328, 331 (N.Y. 1954). ......................................... 20

Pittman by Pittman v. Grayson, 149 F.3d 111, 122-23 (2d Cir. 1998)........................ 21

Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 320 (S.D. N.Y.
2003) ........................................................................................................... 14

Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995)........................ 1

Reiter v. Sonotone Corp., 442 U.S. 330, 338 (1979)................................................ 16

Salinas v. United States, 522 U.S. 52 (1997)........................................................... 19

Scribner v. Summers, 84 F.3d 554, 557 (2d Cir. 1996 ............................................. 20

Simmons v. Abruzzo, 49 F.3d 83 (2d Cir. 1995)...................................................... 5

Sparrow v. United Airlines, Inc., 216 F.3d 1111, 1115 (D.C. Cir. 2002)..................... 7

Swierkiewicz v.Sorema, 534 U.S. 506 (2002)......................................................... 6, 7

United States v. Louie, 625 F. Supp. 1327, 1333 (S.D. N.Y. 1985)....................... 17, 18

United States v. Turkette, 452 U.S. 576, 583 n.5 (1981)................................................. 17

Valdan Sportswear v. Montgomery Ward & Co., 591 F. Supp. 1188, 1191 (S.D. N.Y. 1984) ... 21

Von Bulow v. Von Bulow, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986) ............................... 19

Wantanabe Realty Corp. v. City of New York, 01-CIV-10137 (LAK), 2003 U.S. Dist. LEXIS
     21602, at * 16-17 n.31 (S.D. N.Y., 2003)........................................................... 21

Whyte v. Contemporary Guidance Servs., 03 CV 5544 (GBD) 2004 U.S. Dist. LEXIS 12447, at
     *13-14 (S.D. NY. July 2, 2004)......................................................................... 1

Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001)................................ 6

Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004) ........................................................ 5

Wynder, 360 F.3d at 77.......................................................................................... 6

## Statutes

18 U.S.C. § 1962(d) ............................................................................................ 19

28 U.S.C. § 1350 ................................................................................................ 13

Antiterrorism and Effective Death Penalty Act, 18 U.S.C. § 2331, *et seq* ............................ 8

**Fed. R. Civ. P.** 15(a); ........................................................................................ 1

**N.Y. Est. Powers & Trusts Law** § 11-3.2. .............................................................. 21

**N.Y. Est. Powers & Trusts Law** § 5-4.1 ................................................................ 21

USA Patriot Act of 2001, Pub. L. No. 107-056, 115 Stat. 391......................................... 2

## Rules

**Fed. R. Civ. P.** 12 .......................................................................................... 7

**Fed. R. Civ. P.** 8 & 12.................................................................................... 7

## Treatises

**Restatement (Second) of Torts** § 302................................................................... 23

I.      **INTRODUCTION**

The Federal Plaintiffs sued Mar-Jac Poultry, Inc. ("Mar-Jac") because the company is part of a vast constellation of entities -- the "SAAR Network" -- specifically set up to covertly provide money and support to al Qaida, and other international terrorists and terrorist groups. The Federal Plaintiffs allege that Mar-Jac knowingly participated in al Qaida's global conspiracy to commit terrorist attacks in the United States, of which the September 11, 2001 attack (the "Attack") was a natural, intended and foreseeable result.  When these factual assertions are taken as true, as they must be here, the Federal Plaintiffs' allegations state valid claims against Mar-Jac under the Anti-Terrorism Act (the "ATA"), the Torture Victim Protection Act (the "TVPA"), the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and several state common law tort theories.  Plainly, responsibility for international terrorism rests not only with those "who pull the trigger or plant the bomb" or pilot the airplanes, but also with those who facilitated those events through financial or other means.  Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1021 (7th Cir. 2002).

Therefore, Mar-Jac's motion to dismiss must be denied.  In the event, however, that this Court finds the Federal Plaintiffs' First Amended Complaint (the "Complaint" or "FAC") lacking, leave to amend should be granted.  See **Fed. R. Civ. P.** 15(a); see also Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995). Whyte v. Contemporary Guidance Servs., 03 CV 5544 (GBD) 2004 U.S. Dist. LEXIS 12447, at *13-14 (S.D. NY. July 2, 2004).

II.     **ALLEGATIONS AGAINST DEFENDANT MAR-JAC POULTRY, INC.**

The circumstances prompting this lawsuit are undoubtedly familiar to this Court.  On September 11, 2001, nineteen members of the al Qaida terrorist network hijacked four commercial airliners and used those planes as weapons in a coordinated terrorist attack on the

World Trade Center complex in New York and the Pentagon in Arlington, Virginia.  The Attack resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center complex.  FAC ¶¶ 70 & 71.  It is beyond dispute that the Attack was a direct, intended and foreseeable product of a larger conspiracy, spearheaded by the al Qaida movement, to commit acts of international terrorism against the United States, its nationals and allies.

Congress quickly reacted to the Attack and made its message clear:  "All Americans are united in condemning, in the strongest possible terms, the terrorists who planned and carried out the attacks against the United States on September 11, 2001, and in pursuing all those responsible for those attacks *and their sponsors* until they are brought to justice." See USA Patriot Act of 2001, Pub. L. No. 107-056, 115 Stat. 391 (emphasis added).

The Federal Plaintiffs' Complaint plainly asserts that Mar-Jac was one of those sponsors. Specifically, the Federal Plaintiffs' Complaint alleges that Mar-Jac aided and abetted, conspired with, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations ("FTOs"), associations, organizations or persons.  FAC ¶¶ 66, 73 & 223.  Mar-Jac funneled its financial and logistical sponsorship of al Qaida through a complex network of interrelated entities, the hereinbefore described SAAR Network.  Mar-Jac's activities can only be understood within the context of the terrorist mission of the SAAR Network and its individual leaders (the "SAAR Executive Defendants").[1]

As set forth in the Complaint, beginning in the 1980s, several prominent and wealthy sponsors of al Qaida's global *jihad* began establishing within the United States the SAAR Network, a network of interrelated purported charities, think tanks and for-profit businesses used

---

[1]     Some of those leaders are defined in another of the Federal Plaintiffs' briefs as the SAAR Executive Defendants.  See Pls.' Mem. of Law in Opp. to Mot. to Dis. Filed by SAAR Executive Defs. Taha Al-Alwani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza and Iqbal Unus.

to generate and surreptitiously transfer funds to al Qaida. FAC ¶ 222. By September 11, 2001, no fewer than sixty-five so-called charities and business enterprises functioned under the umbrella of the SAAR Network, including Mar-Jac, as well as fellow SAAR Network Entity defendants African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investment, Inc., Mena Corporation, Reston Investments, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., Success Foundation and the York Foundation.[2] FAC ¶¶ 223 & 224.

Most of the SAAR Network Entities are located at a single address in Herndon, Virginia, and have common officers, directors, and management. FAC ¶ 225-227. For example, SAAR Executive Defendant M. Yaqub Mirza is, or has been, an officer and/or director of twenty-nine SAAR Network Entities, including Mar-Jac, and maintains signatory authority over seventeen different bank accounts associated with fifteen different SAAR Network Entities. (Mirza is also the first organizer of the U.S offices of Muslim World League, notorious for its close association with and support of al Qaida. FAC ¶¶113-129.) SAAR Executive Defendant Dr. Jamal Barzinji was an officer of Mar-Jac as well as of Safa Trust and SAAR Foundation, two other SAAR Network Entities. Dr. Barzinji long has provided material support and resources to al Qaida. FAC ¶ 490. In his capacity as President of Safa Trust, Dr. Barzinji held authority over eighteen bank accounts for SAAR Network entities. According to federal authorities, Dr. Barzinji "committed and conspired to: transmit money internationally for the purpose of promoting offenses against foreign nations involving murder or the destruction of property by means of explosive, fire, kidnapping or extortion…; provide material support or resources to foreign terrorist organizations…; and provide material support or conceal or disguise the source of

---

[2] Many of the SAAR Network Entities were established, funded by and closely affiliated with defendant Suleiman Abdul Aziz al Rajhi ("al Rajhi"), for whom the SAAR Network is named. FAC ¶ 223.

ownership of material support intended for use in preparation for or in carrying out a terrorist act." FAC ¶490. Further, Dr. Barzinji has made substantial contributions to many of the so-called charities operating within al Qaida's infrastructure, with full knowledge that these funds would be used to support al Qaida's operations and terrorist attacks. FAC ¶ 490. The Federal Plaintiffs' Complaint alleges that Dr. Barzinji, as an officer of Mar-Jac, engaged in criminal activities consistent with his known activities as a member and manager of these SAAR Network Entities. FAC ¶¶ 490-491.

On March 20 and 21, 2002, federal authorities raided the SAAR Network facilities (the "SAAR Raid"), including Mar-Jac's Gainesville, Georgia operations. FAC ¶ 227. The SAAR Raid, conducted pursuant to a federal search warrant, was part of an ongoing federal investigation into money laundering, tax evasion activities, and ties to terrorist individuals and organizations. The ongoing investigation of the SAAR Network Entities and the SAAR Executives, which prompted the SAAR Raid, has revealed that SAAR Network Entities' funds had been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated "Global Terrorist Individuals" under Executive Order 13224 based on their material support and sponsorship of al-Qaida. FAC ¶ 228. The funds were transferred through Bank al-Taqwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin. FAC ¶ 259 & 261. Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense, but rather are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason, the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government. FAC ¶ 266. Both of those banks have been designated "Specially Designated Global Terrorist Entities" by the U.S. government pursuant to Executive Order 13224, based on their involvement in financing radical groups throughout the world, including al Qaida, both before and after the

Attack.  FAC ¶ 228.  As of late September 2001, al Qaida continued to receive financial assistance from Nada, through entities he controlled.  FAC ¶ 266.

In view of the detailed allegations regarding the SAAR Network's role in al Qaida's global conspiracy to attack the United States, Mar-Jac cannot credibly maintain that it is not sufficiently on notice of the nature of the claims asserted against it.  Indeed, when read as a whole, and in accordance with the mandates of Rule 8(a)(2), the Complaint sufficiently supports multiple claims, in that it alleges that Mar-Jac,[3] as part of the SAAR Network, knowingly provided material support and resources to al Qaida, that al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the Attack absent the sponsorship of Mar-Jac and the other defendants, and that Mar-Jac thus knowingly participated in the conspiracy with the intent to advance the commission of terrorist attacks against the United States, of which the Attack was a natural, intended and foreseeable consequence.  FAC ¶¶ 72 & 74.

## III.   ARGUMENT

### A.   Applicable Legal Standards

Mar-Jac moves to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n.8 (2d Cir. 2004); Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995).  Moreover, "[i]t is elementary that on a motion to dismiss, the Complaint must be read as a whole."  In re

---

[3]     Mar-Jac is liable for the culpable conduct of its officers, directors and managing agents operating through the Mar-Jac organization.  Meyer v. Holley, 537 U.S. 280, 285 (2003); Reid v. Am. Golf Corp., 2003 NY Slip Op 51203U, 2 (N.Y. Misc., 2003); Adams v New York City Tr. Auth., 88 N.Y.2d 116 (N.Y. 1996).

Phillip Servs. Corp. Secs. Litig., No. 98-CIV-0835 (MBM), 2004 U.S. Dist Lexis 9261, at * 32 (S.D. N.Y. May 24, 2004).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  Geisler  v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether the Federal Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them.  Wynder, 360 F.3d at 77.  The Federal Plaintiffs are not required to prove their case at the pleading stage; indeed, "[t]he pleading of evidence should be avoided."  Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive.  Swierkiewicz v.Sorema, 534 U.S. 506, 512-13 (2002).  Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); Wynder, 360 F.3d at 77.  Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Rule 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a).  See, e.g., Leatherman v. Tarrant County, 507 U.S. 163, 168-69 (1993).  As a judge in this District recently explained, "[s]uch simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues."  In re Initial Pub. Offering

Sec. Litig., 241 F. Supp. 2d 281, 322 (S.D. N.Y. 2003) (*quoting* Conley, 355 U.S. at 48).

Consequently, "[a]s the Supreme Court recognized in Swierkiewicz, one clearly written sentence

can satisfy Rule 8(a)(2)." Id. at 323.  By way of illustration, one Court of Appeals recently held

that the allegation, "I was turned down for a job because of my race," when included in a

complaint, would be sufficient to survive a Rule 12(b)(6) motion.  Sparrow v. United Airlines,

Inc., 216 F.3d 1111, 1115 (D.C. Cir. 2002).

**B.      The Federal Plaintiffs Have Stated Claims Against Mar-Jac and Mar-Jac's
Motion To Dismiss Is Properly Denied**

Mar-Jac's motion to dismiss is fatally flawed because it fails to consider the Complaint in

its entirety, and, with respect to Count VIII, the RICO Statement.   In the present case, the

Federal Plaintiffs have alleged that Mar-Jac is part of a vast network of organizations that

knowingly funded the activities of terrorists, including al Qaida, and that the Attack was a

natural, intended and foreseeable product of the conspiracy.  The Complaint further describes, in

considerable detail, the makeup and activities of the terrorist network of which Mar-Jac is a

member.  These allegations of the Federal Plaintiffs' Complaint are more than adequate to

provide Mar-Jac with fair notice of the claims and the grounds upon which they rest.  Asip v.

Nielsen Media Research, Inc., 03-CIV-5866 (SAS), 2004 U.S. Dist. LEXIS 2350, at * 11-12

(S.D. N.Y. Feb. 18, 2004).  To expect or require the Federal Plaintiffs to set forth every wrongful

act of Mar-Jac is as unreasonable as it is unnecessary at this stage of the proceedings.  It simply

is not required of notice pleading.  See **Fed. R. Civ. P.** 8 & 12.  Having stated a cognizable claim

against Mar-Jac, the Federal Plaintiffs are entitled to conduct discovery before they should be

called upon to present their evidence.

**C.** **The Federal Plaintiffs Have Adequately Alleged Claims Under the Anti-Terrorism and Effective Death Penalty Act**

A plaintiff may assert a valid claim under the Antiterrorism and Effective Death Penalty Act, 18 U.S.C. § 2331, *et seq.* (the "ATA") under either of two alternative approaches:  (1) pursuant to general tort principles, including concerted action theories of liability; or (2) by demonstrating that the defendant violated the ATA's criminal standards, and that the defendant's violation was a substantial factor in bringing about plaintiff's injuries.  Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1015, 1020 (7th Cir. 2002).  The Federal Plaintiffs have done both.

**1.** **The Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant to General Tort Principles**

In Boim, the Court of Appeals for the Seventh Circuit held that the legislative history of the ATA evinces a clear intent by Congress to codify general common law tort principles, and to impose civil liability for acts of international terrorism to the full reaches of traditional tort law. Boim, 291 F.3d at 1010.  Accordingly, the Boim court specifically embraced the use of concerted action theories of liability, such as aiding and abetting and conspiracy, to establish liability over a defendant under the ATA.  Id. at 1020.

The elements necessary to establish liability for a defendant's participation in a conspiracy to commit a tort are:  (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the overall scheme.  Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983).[4]

---

[4]    Although New York law likely controls the vast majority of the Federal Plaintiffs' claims, Halberstam long has been regarded as the leading case on concerted action liability, and the New York courts have repeatedly relied on Halberstam in analyzing conspiracy and aiding and abetting claims.  See Wahad v. FBI, 813 F. Supp. 224, 233 (S.D.N.Y. 1993); Rich-Taubman Assoc. v. Stamford Rest. Operating Co., Inc., 587 F. Supp. 875, 879 n.5 (S.D.N.Y. 1984); Merrill Lynch  Futures, Inc. v. Kelly, 585 F. Supp. 1245, 1254 (S.D.N.Y. 1984).

Civil liability for aiding and abetting will be imposed where:  (1) the party whom the defendant aids or abets performs a wrongful act that causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides substantial assistance to the wrongdoer.  Id. at 477.

When read as a whole, the Federal Plaintiffs' Complaint plainly and adequately states claims against Mar-Jac under the ATA, pursuant to aiding and abetting and conspiracy theories. At the threshold, the Complaint alleges that Mar-Jac has "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons."  FAC ¶ 66.  Further, the Complaint alleges that the Attack "was a direct, intended and foreseeable product of a larger conspiracy among the defendants, to commit acts of international terrorism against the United States, its nationals and allies."  FAC ¶ 72.  Describing the conspiracy, the Complaint states that it "included the provision of material support and resources to defendant al Qaida and affiliated foreign states, FTOs, persons, organizations, commercial entities and other parties."  FAC ¶ 73.  The Complaint also sets forth the consequences of Mar-Jac's participation, in that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74.  Thus, the Complaint  describes, in reasonable detail, the specific role of the SAAR Network, of which defendant Mar-Jac was an active member, in al Qaida's conspiracy to commit terrorist attacks against the United States.  See also FAC ¶¶ 222-232.

Read collectively, the forgoing allegations of the First Amended Complaint unambiguously allege that Mar-Jac knowingly and intentionally aided and abetted and conspired with al Qaida, in furtherance of the terrorist organization's calculated campaign to commit terrorist attacks against the United States, and that the Attack was a direct, intended and foreseeable product of that larger conspiracy. These allegations satisfy the liberal pleading requirements necessary to state a claim under the ATA pursuant to conspiracy and aiding and abetting theories of tort liability.

## 2. Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Based Upon Mar-Jac's Criminal Violations

The Federal Plaintiffs have also adequately pled claims against Mar-Jac under the ATA based upon Mar-Jac's violations of the ATA's criminal standards. The Boim court concluded that the ATA's criminal provisions are a clear indication of Congress' intent to deem financial support of a terrorist organization to be itself an act of international terrorism. Boim, 291 F.3d at 1015.

The Federal Plaintiffs have alleged that Mar-Jac participated in acts giving rise to liability under the ATA. Specifically, the Federal Plaintiffs have alleged that Mar-Jac was an active member of a network established to support terrorists, including al Qaida. See supra part II. Death and destruction in the United States was the well-publicized aim of al Qaida and its terrorist network. As is alleged in the Complaint, Mar-Jac, through the SAAR Network, provided funding and support to the al Qaida terrorist network. In light of these allegations, the Federal Plaintiffs have stated a cause of action against Mar-Jac pursuant to the criminal provisions of the ATA.

### 3.        The Federal Plaintiffs Have Adequately Pled Causation

Mar-Jac further argues that the Federal Plaintiffs have not adequately pleaded a causal link between its illicit conduct and the Attack, sufficient to sustain claims under the ATA and state common law theories.  In making this argument, Mar-Jac fundamentally misapprehends the elements of the Federal Plaintiffs' aiding and abetting or conspiracy theories, and ignores the allegations of the Complaint.  Under New York law, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of  their participation or culpability in the overall scheme."  Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985).  Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement."  Halberstam, 705 F.2d at 477 (emphasis added).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor.  Id.  Pursuant to these standards, Mar- Jac's participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties it inextricably to the Attack.[5]  As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the Federal Plaintiffs have properly and adequately alleged causation.  Accordingly, Mar Jac's causation-based arguments must be rejected.[6]

---

[5]        The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking as it as a whole."  Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962).

[6]        The decision of the United States District Court for the District of Columbia in Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91 (D.D.C. 2002), upon which defendant Mar-Jac relies in support of its causation arguments, does not alter the foregoing analysis.  In Ungar, the Court considered *sufficiency of the evidence*  presented by the plaintiffs to sustain their claims

While unnecessary to establish liability over Mar-Jac given the asserted concerted action theories, it should be noted that the Complaint does specifically allege that the Attack would not have been possible absent the sponsorship and support provided by Mar-Jac and the other defendants.  According to the Complaint, "[a]bsent the material, support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th attack." FAC ¶ 74.  Mar Jac conveniently ignores this and similar allegations of the First Amended Complaint in its Motion to Dismiss.  For purposes of the present motion, however, the allegations of the Complaint must be accepted as true.

Moreover, the Complaint also adequately alleges that the Attack was a foreseeable product of the conspiracy in which Mar-Jac knowingly participated, and of Mar-Jac's aiding and abetting of al Qaida.  Indeed, the Complaint unambiguously asserts that the Attack was a "direct, intended and foreseeable product" of that conspiracy.  While it would be improper to test the sufficiency of the evidence in support of that allegation in the context of the present Motion, it should be noted that al Qaida had unequivocally proclaimed its ambition to attack the United States, and had in fact done so, on numerous occasions over a period of several years prior to the Attack.  In 1996 and 1998, al Qaida issued *fatwas*, or religious decrees, authorizing attacks against the United States and its citizens.  In the 1998 *fatwa*, issued under the banner "the World Islamic Front for Jihad Against Jews and Crusaders," Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens -- civilian or military -- and their allies

---

that the defendant foreign state had conspired with, and aided and abetted, the individuals responsible for their injuries.  Id. at 99.  As a Motion to Dismiss Under Rule 12(b)(6) does not test the sufficiency of a plaintiff's evidence, Ungar is totally irrelevant to the present Motion.

everywhere.  FAC ¶ 30.  Just a few months later, al Qaida acted on that threat, bombing the U.S. embassies in Kenya and Tanzania, leaving 258 people dead and more than 5,000 injured.

As the conduct of terrorist attacks against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's stated objective, it is absurd to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as Mar-Jac is alleged to have done.

### D.   The Complaint States a Claim Against Mar-Jac Under the Torture Victim Protection Act

Plaintiffs have alleged facts sufficient to state a cause of action under the TVPA, 28 U.S.C. § 1350.  The Complaint describes in detail how the Islamic charitable system has been utilized to finance and otherwise support illegal al Qaida activities.  FAC ¶¶ 75-252.  Moreover, the allegations specific to Mar-Jac and the other SAAR Network Defendants state clearly that Mar-Jac is an active al Qaida sponsor, through the SAAR Network.  FAC ¶¶ 222-232.  Given the Complaint's allegations regarding how the SAAR Network is used to foster and finance terrorism, it can, at the very least, be reasonably inferred for Rule 12(b)(6) purposes that Mar-Jac was materially involved in aiding and abetting and/or conspiring with other defendants and with al Qaida in a manner intended to enable and proximately cause acts of violence and international terrorism, including the Attack.  Such conduct clearly violates the law of nations or, alternatively, otherwise constitutes actionable conduct under the TVPA.

Moreover, to sufficiently allege a TVPA cause of action against Mar-Jac, the Federal Plaintiffs need not allege that Mar-Jac was directly involved in the Attack itself.  Rather, it is sufficient for the Federal Plaintiffs to allege, as they have, that Mar-Jac conspired with or aided and abetted other defendants in a violation of the law of nations.  Indeed, federal courts have recognized that TVPA liability can be based on conspiratorial relationships or theories of aiding and abetting.  Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 320

(S.D. N.Y. 2003).  Here, the Complaint alleges a violation of the law of nations, *i.e.*, the Attack.

Such conduct is actionable under the TVPA.  The Complaint alleges that Mar-Jac facilitated,

fostered, financed, or otherwise supported terrorists who committed the Attack.  The Complaint

alleges Mar-Jac acted in collusion with the other SAAR Network Defendants and with other of

the SAAR Network Entities.  FAC ¶¶ 222-232.  The Complaint alleges an illegal relationship

among the SAAR Network Defendants and al Qaida.  The Complaint also alleges the Attack

could not have been carried out in the absence of financing and logistical support to al Qaida

through that relationship.  FAC ¶ 74.

Unquestionably, such allegations satisfactorily set forth the Federal Plaintiffs' claim that

Mar-Jac conspired with others to facilitate the terrorist activities of al Qaida, aided and abetted,

and that those activities resulted in the attack of September 11th.   Pursuant to Rules 8 and 12,

the Federal Plaintiffs have sufficiently alleged their claim - that Mar-Jac sponsored international

terrorism.  FAC ¶¶ 222-232.  The Complaint alleges a vast network of overlapping entities,

charities, corporations, banks, state sponsors, and individuals who financed and promoted

terrorism and also concealed the involvement of many of the important participants.  Based on

the extraordinary circumstances surrounding the events of September 11, 2001 and the complex

web of individuals and entities who conspired to commit acts of international terrorism against

the United States, it is implausible and unnecessary in notice pleading to require more.  The

Complaint when read as a whole sufficiently asserts a claim against Mar-Jac under the TVPA.

### E.    As Subrogees,  The Federal Plaintiffs Have Standing Under RICO, And They Have Sufficiently Pled A Claim Against Mar-Jac

Mar-Jac makes a two-pronged argument in opposition to the Federal Plaintiffs' RICO

claim:  (1) that the Federal Plaintiffs have failed to state a claim under RICO; and (2) that the

Federal Plaintiffs lack standing to bring a claim under RICO at all.  See Def.'s Br. at 11-13.  The

second prong of  Mar-Jac's argument is more logically dealt with first, because if the Federal

Plaintiffs lack standing, there is no need for this Court to inquire further.  The Federal Plaintiffs do have standing, however, as subrogees of both the individual and the property claimants.

### 1.   Standing

According to Mar-Jac, the Federal Plaintiffs do not have standing because, like the plaintiffs in Burnett, they have alleged personal injuries and economic losses derived therefrom. See Def.'s Br. at 12-13.  Mar-Jac overlooks, however, that subrogees such as the Federal Plaintiffs herein have standing to assert a RICO claim.  See National Asbestos Workers Med. Fund v. Philip Morris, Inc., 74 F. Supp. 2d 221 (E.D. N.Y. 1999).

In National Asbestos Workers, for example, Judge Weinstein allowed the plaintiff health insurers to bring subrogated RICO claims against tobacco manufacturers for the cost of treating their subrogors' smoking-related illnesses.  Id. at 228.  According to Judge Weinstein, "[t]he equitable doctrine of subrogation allows insurers, analogous in some respects to the plaintiffs, to bring their own claims for the recovery of the economic damages incurred as a result of tortious injury to their insureds."  Id.  Subrogation functions as a form of assignment, and RICO claims are assignable.  Id.

The tobacco manufacturers suggested that the plaintiffs could not state a subrogated RICO claim because the subrogee plaintiffs "stand in the shoes" of their subrogors and "the subrogors themselves have no RICO claims for the economic injuries associated with the treatment of smoking related illnesses."  Id. at 229.  Judge Weinstein found the tobacco companies' analysis unpersuasive.  According to Judge Weinstein, "[t]he recovery of pecuniary losses associated with physical injuries directly caused by racketeering conduct is consistent with the language of the RICO statute."  Id.  Moreover, "the most natural reading of the language in RICO supports the conclusion that pecuniary losses resulting from racketeering personal injuries

should be compensable under the statute, because the statute confers standing on 'any person

injured in his business or property by reason of [racketeering acts defined in the statute].'" Id.

(*citing* 18 U.S.C. § 1964(c)).

Further according to Judge Weinstein, the Supreme Court has recognized, albeit in

another context, that money is a form of property.  Id. (*citing* Reiter v. Sonotone Corp., 442 U.S.

330, 338 (1979)).  Therefore, "[v]ictims of racketeering who have been deprived of their

monetary resources as a direct result of racketeers' predicate acts should, under the most natural

interpretation of the phrase 'business or property,' recover their pecuniary losses."  Id.  Judge

Weinstein offered a hypothetical in National Asbestos Workers that illustrates the point well:

> Assume racketeers attack a manufacturing plant to coerce its
> owner and an employee, and in so doing throw the owner and her
> employee through a window.  Defendants argue that the racketeers
> should be made to pay for the costs of the broken window under
> RICO, but not for the pecuniary costs, such as medical bills or lost
> wages and profits, associated with the broken arms and legs of the
> owner and employee.  A line must be drawn under the "business
> and property" rubric of the statute, but it would seem more sensible
> to draw it between pain and suffering and outlays for repairing
> windows and limbs.

Id.

Thus, there is no doubt that, as the subrogees of the property and workers' compensation

insureds and as assignees of the workers' compensation claimants who suffered personal injury

or wrongful death, the Plaintiffs have standing to bring a claim under RICO.

2.     **The Federal Plaintiffs Have Stated A Claim Under RICO**

According to Mar-Jac, in the Complaint the Federal Plaintiffs have failed to allege a

violation of Section 1962(a) against it.  See Def.'s  Br. at 12.  The Federal Plaintiffs' RICO

Statement, however, will be provided pursuant to Case Management Order # 2, and is "deemed

an amendment to the Federal Insurance plaintiffs' . . . Amended Complaint, by incorporation by

reference."  See Case Mgmt. Order ¶ 14.  The RICO Statement will be filed subsequent to these

briefs, so Mar-Jac has not had the benefit of reviewing it.  Nevertheless, because it deemed an

amendment to the Complaint, the Federal Plaintiffs will not respond to Mar-Jac's arguments so

much as they will explain why they have, through both the Complaint and the RICO Statement,

stated a claim under RICO against Mar-Jac.

According to the RICO Statement, the Federal Plaintiffs bring their claims against Mar-

Jac pursuant to Sections 1962(c) and 1962(d).  The Enterprise, Radical Muslim Terrorism, is

comprised of the defendants named in the Complaint, and is a collection of persons,

organizations, businesses, and nations associated in fact with complex goals that consist of far

more than the desire to perpetrate the acts of racketeering outlined herein.  See RICO Statement

¶ 5.  Rather, Radical Muslim Terrorism utilizes acts of racketeering, including acts of money

laundering and other improprieties conducted by Mar-Jac, to further its overall common

purposes of:  (a) spreading a particularly virulent brand of radical Islam; (b) eliminating Western

influences in Islamic countries; and (c) punishing the United States for its perceived support of

Israel, all by sponsoring, supporting and funding acts of terror in the United States.  Id.  Thus, the

Federal Plaintiffs have sufficiently pled the existence of an enterprise:  "a group of persons

associated together for a common purpose of engaging in a course of conduct" or "an ongoing

organization, formal or informal."  United States v. Turkette, 452 U.S. 576, 583 n.5 (1981).

Further, the Federal Plaintiffs also have sufficiently pled Mar-Jac's participation in that

enterprise. Pursuant to Sections 1962(c),  "a proper RICO allegation does not require that each

member agree with the actions taken by other members of the enterprise but only that they

intended to 'participate in the enterprise.'"  United States v. Louie, 625 F. Supp. 1327, 1333

(S.D. N.Y. 1985).  In the Complaint, the Federal Plaintiffs allege that Mar-Jac has aided and

abetted, conspired with, and provided material support and resources to al Qaida and/or affiliated FTOs, associations, organizations or persons.  FAC ¶ 66.  Further according to the Complaint, Mar-Jac is a member of the SAAR Network, which was established and funded by, or closely affiliated with, defendant Suleiman Abdul Aziz.  FAC ¶ 223.  Plaintiffs further allege that Mar-Jac, along with the rest of the SAAR Network, long has acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and has provided material support and resources to al Qaida and affiliated FTOs.  FAC ¶ 226.

Moreover, the Federal Plaintiffs need not plead or prove that a predicate act furthered the purpose for which the organization was founded, but only that it was related to the enterprise.  Louie, 625 F. Supp. at 1333.  Thus, the question for the jury is not only the actions taken by Mar-Jac (in this case, money laundering and other crimes), but the motivation or intent underlying Mar-Jac's criminal activity and the acts' relationship to the enterprise (in this case, terrorism, which the plaintiffs allege Mar-Jac intended to support through money laundering).  Id.

The Federal Plaintiffs also have adequately alleged proximate cause under RICO.  This requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003) (citing Holmes v. Security Investor Prot. Corp., 503 U.S. 258, 268 (1992)).  Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is likely imprudent.  National Asbestos Workers, 74 F. Supp. 2d at 225. This Court's decision "should be guided by a flexible, case-by-case approach."  Id. (citing Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 536-37 (1983) and Holmes, 503 U.S. at 272 n.20.  Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static:  as society, its

needs, and its norms change, so too must the contours of tort liability and enforcement procedures."  Id.  Further, failure to explain the alleged injury in detail is not fatal.  Von Bulow v. Von Bulow, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986).  Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6).  Id.  The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts."  Id. (citations omitted).

Here, the Federal Plaintiffs allege that they were directly injured in their business and property by Mar-Jac's participation in worldwide terrorism as a "fully integrated component of al Qaida's logistical and financial support infrastructure" and by its provision of "material support and resources to al Qaida."  FAC ¶ 226.  Mar-Jac has participated in Radical Muslim Terrorism, and specifically in furthering al Qaida's goal of committing acts of terrorism against the United States, by providing al Qaida with "the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74.

The Federal Plaintiffs' damages – injuries, the loss of life and property damage that resulted from Mar-Jac's actions -- are not derivative of damage to a third party.  Rather, the Federal Plaintiffs' insureds and assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," i.e., terrorism.  Lerner, 318 F.3d at 124.  Thus, the Federal Plaintiffs have standing to bring claims under RICO.

A conspiracy of this nature is not a simple linear being, but is instead a complex, multi-dimensional web of relationships and intrigue.  The Supreme Court recently addressed the scope of RICO's conspiracy provision, 18 U.S.C. § 1962(d), in Salinas v. United States, 522 U.S. 52 (1997).  That holding establishes that the RICO statute is flexible enough to embrace the

complexity of the conspiracy alleged here, and the Federal Plaintiffs' allegations are sufficient, at this stage, to meet their burden.

For all these reasons, therefore, Mar-Jac's motion to dismiss Count VIII should be denied.

### F.    The Federal Plaintiffs Have Sufficiently Pled Claims Against Mar-Jac for Conspiracy and Aiding and Abetting

Mar-Jac alleges that the Federal Plaintiffs have failed to plead facts or circumstances to establish its participation in a civil conspiracy or to establish a claim for aiding and abetting. For the reasons stated in relation to the discussion of the Federal Plaintiffs' ATA claims, see *supra* part C, the Federal Plaintiffs respectfully submit that the Complaint adequately alleges claims under both theories of concerted action liability.

### G.    The Federal Plaintiffs Have Adequately Alleged State Common Law Claims

Mar-Jac challenges the Federal Plaintiffs' claims under New York common law for trespass, wrongful death, survival, assault and battery, and intentional and/or negligent infliction of emotional distress, negligence, and punitive damages. However, these claims have been sufficiently alleged in the Complaint, as discussed in detail above.

Under New York law, trespass is the "intentional invasion of another's property." Scribner v. Summers, 84 F.3d 554, 557 (2d Cir. 1996) (*citing* Ivancic v. Olmstead, 488 N.E.2d 72 (N.Y.1985), *cert. denied*, 476 U.S. 1117 (1986)). "To be liable, the trespasser 'need not intend or expect the damaging consequences of his intrusion[;]' rather, he need only 'intend the act which amounts to or produces the unlawful invasion.'" Phillips v. Sun Oil Co., 307 N.Y. 328, 331 (N.Y. 1954). As is alleged in the Complaint, Mar-Jac assisted and encouraged those who intentionally entered the World Trade Center property to perpetrate the Attack, knowing that the Attack constituted an intrusion. Under New York caselaw, such allegations support a claim for trespass. Wantanabe Realty Corp. v. City of New York, 01-CIV-10137 (LAK), 2003 U.S. Dist.

LEXIS 21602, at * 16-17 n.31 (S.D. N.Y., 2003) (*citing* Pittman by Pittman v. Grayson, 149 F.3d 111, 122-23 (2d Cir. 1998)).

New York law provides that a personal representative of a decedent may maintain a wrongful death action provided the defendant "would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." LaMarca v. United States, 31 F. Supp. 2d 110, 124 (E.D. N.Y. 1998) (*citing* **N.Y. Est. Powers & Trusts Law** § 5-4.1).  As is alleged in the Complaint, Mar-Jac is liable to such decedents because it knowingly provided material support to the terrorists who deliberately caused their death.  It is well established that the knowing provision of material support for homicide gives rise to liability for the resulting death. See Halberstam, 705 F.2d. at 483-84 (reviewing case law from a number of jurisdictions, citing the Restatement (Second) of Torts § 876(b) cmt. d, and concluding that five factors should be taken into consideration when considering whether the defendant offered enough assistance for liability:  the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; his relation to the tortious actor; and the defendant's state of mind).  In general, New York recognizes that those who aid and abet tortious conduct are jointly and severally liable with other participants, regardless of the degree of their participation or culpability in the overall scheme.  Valdan Sportswear v. Montgomery Ward & Co., 591 F. Supp. 1188, 1191 (S.D. N.Y. 1984).  The Federal Plaintiffs have thus sufficiently alleged the wrongful death claim.

In addition, New York recognizes survival actions "for injury to person or property . . . despite death of person in whose favor or against whom cause of action existed." **N.Y. Est. Powers & Trusts Law** § 11-3.2.  As is alleged in the Complaint, Mar-Jac knowingly provided material support to the terrorists who carried out the Attack.  As is noted above, it is well established that the knowing provision of material support for tortious acts gives rise to liability

for the resulting harm.  The Federal Plaintiffs thus have sufficiently alleged the elements of a survival claim for the injuries to persons and property resulting from the Attack.

To sustain a claim for assault under New York law, there must be physical contact placing an individual in imminent apprehension of harmful contact.  Bastein v. Sotto, 749 N.Y.S.2d 538, 539 (N.Y. App. Div. 2002).  A battery, under New York law, consists of an intentional, offensive, wrongful bodily contact.  Goff v. Clark, 755 N.Y.S.2d 493, 495 (N.Y.App. Div. 2003).  It is beyond dispute that the Attack involved both physical contact placing individuals in imminent apprehension of harmful contact and also intentional offensive, wrongful bodily contact.  As is alleged in the Complaint, Mar-Jac knowingly provided material support to the terrorists who carried out the Attack.  As is noted above, it is well established that the knowing provision of material support for tortious acts gives rise to liability for the resulting harm.  Thus, the Federal Plaintiffs have sufficiently alleged Mar-Jac's liability under a theory of assault and battery for the injuries to persons resulting from the Attack.

To state a claim under New York law for intentional infliction of emotional distress, the Federal Plaintiffs must allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress."  Brewer v. Brewer, 34 Fed. Appx. 28, 30 (2d Cir. 2002) (citing Howell v. New York Post Co., Inc., 612 N.E.2d 699, 702 (N.Y. 1993)).  To state a claim for negligent infliction of emotional distress, the Federal Plaintiffs must allege emotional distress caused by "defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety."  Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000) (citing Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996).

Mar-Jac argues that the Complaint does not allege that it intentionally engaged in extreme, intentional, or recklessly outrageous conduct that caused severe emotional distress.  No

person reasonably can contend that the Attack was not outrageous, extreme and intentional. Under notice pleading, the Federal Plaintiffs have stated a claim for intentional or negligent infliction of emotional distress.

Mar-Jac contends that it cannot be liable under a negligence theory because, it says, it owed no duty to the Federal Plaintiffs.  Mar-Jac's assertion that an individual has no duty to avoid committing acts of murder or intentional destruction of another's property is almost incomprehensible.  As a general principle of tort law, every individual has a duty to exercise reasonable care to avoid physical harm to others' person and property.  See **Restatement (Second) of Torts** § 302.  Without a doubt, Mar-Jac had a duty to recognize that its funds were being used to finance killings and destruction of property.  There can be no question that the violations of law described in the Federal Plaintiffs' Complaint state a claim sounding in both negligence and gross negligence.

Mar-Jac also claims that the Federal Plaintiffs are not entitled to punitive damages. Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998).  If the Federal Plaintiffs prove their allegations that Mar-Jac knowingly financed and provided material support to al Qaida giving its purpose to commit terrorist acts against innocent persons in the United States, Mar-Jac's conduct is sufficiently egregious and outrageous to warrant the imposition of punitive damages.

## <u>CONCLUSION</u>

For the reasons stated above, plaintiffs respectfully request that Mar-Jac's Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

COZEN O'CONNOR

By: _____/s/_____
STEPHEN A. COZEN, ESQUIRE
ELLIOTT R. FELDMAN, ESQUIRE
SEAN P. CARTER, ESQUIRE
MARK T. MULLEN, ESQUIRE
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:  (215) 665-2013

*Attorneys for Plaintiffs*

24

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

> *This document relates to:*          Federal Insurance Co. v. al Qaida
>                                       03 CV 06978 (RCC)

## [PROPOSED] ORDER

UPON CONSIDERATION OF Defendant Mar-Jac Poultry, Inc.'s Motion to Dismiss the

First Amended Complaint of Plaintiffs Federal Insurance Company, et al., and Federal Insurance

Company's opposition thereto, it is hereby

ORDERED that Defendant's Motion to Dismiss is DENIED.

Dated: _____
          New York, NY                    _____
                                          RICHARD CONWAY CASEY
                                          United States District Judge