**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | **03 MDL 1570 (RCC)** **ECF CASE** |
| This document relates to: THOMAS BURNETT, *et al,* v. AL BARAKA INVESTMENT & DEVELOPMENT CORP., *et al.* | 03 CV 9849 (RCC) |
| THOMAS BURNETT, *et al,* v. AL BARAKA INVESTMENT & DEVELOPMENT CORP., *et al.* | 03 CV 5738 (RCC) |
| KATHLEEN ASHTON, *et al,* v. AL QAEDA ISLAMIC ARMY, *et al.* | 02 CV 6977 (RCC) |

### DEFENDANT YASSIN ABDULLAH AL KADI'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS OR IN THE ALTERNATIVE FOR A MORE DEFINITE STATEMENT

Thomas P. Steindler (TS-6620)
Stanton D. Anderson (SA-1511)
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 756-8000

*Attorneys for Defendant*
*Yassin Abdullah Al Kadi*

Dated: July 15, 2004

# TABLE OF CONTENTS

Page

SUMMARY OF FACTS ................................................................................................. 2

ARGUMENT................................................................................................................... 3

I.      PLAINTIFFS HAVE NOT PROPERLY SERVED MR. KADI........................... 3

        A.      The Burnett Plaintiffs' Attempt To Serve Mr. Kadi By Publication
                Is Ineffective ............................................................................................... 3

                1.      The New York Burnett Action........................................................ 3

                2.      The Washington, D.C. Burnett Action........................................... 4

        B.      The Ashton Plaintiffs' Attempt To Serve Mr. Kadi By Registered
                Mail To A Post Office Box In Saudi Arabia Is Improper........................... 5

II.     THE COURT SHOULD DISMISS THE COMPLAINTS AGAINST MR.
        KADI FOR LACK OF PERSONAL JURISDICTION ......................................... 5

        A.      Plaintiffs Do Not Allege That Mr. Kadi Has Any Contacts With
                The District Of Columbia Or The Southern District of New York ........... 6

        B.      The Nationwide Contacts Test of the Anti-Terrorism Act Does Not
                Apply Because Mr. Kadi Was Not Served Pursuant To The Act,
                And It Does Not Cover The September 11 Attacks In Any Event ............. 6

        C.      The Court Lacks Jurisdiction Over Mr. Kadi Even Assuming A
                Nationwide Forum .................................................................................... 10

        D.      Plaintiffs' "Purposefully Directed" Theory of Specific Jurisdiction
                Is Without Merit....................................................................................... 11

        E.      The Exercise Of Personal Jurisdiction Over Mr. Kadi Would Not
                Comport With Traditional Notions Of Fair Play And Substantial
                Justice....................................................................................................... 16

                1.      The Exercise of Jurisdiction Would Violate Mr. Kadi's Due
                        Process Right To A Fair Trial...................................................... 18

                        a.      Saudi Nationals Accused of Financing The
                                September 11 Attacks Will Face Overwhelming
                                Prejudice At Trial In The United States........................... 18

**TABLE OF CONTENTS**
(continued)

Page

           b.      The U.S. War on Terrorism Has A Constitutionally-
                  Significant Chilling Effect On Mr. Kadi's Ability
                  To Assist In His Own Defense........................................ 20

III.    THE COMPLAINTS DO NOT STATE VALID CLAIMS ON WHICH
       RELIEF CAN BE GRANTED ............................................................. 22

      A.     The Foreign Sovereign Immunities Act and the Torture Victim
           Protection Act Do Not Apply To Mr. Kadi As A Private Citizen........... 22

      B.     The Anti-Terrorism Act Does Not Apply To The September 11
           Attack...................................................................................... 23

      C.     Plaintiffs Allege No Facts Demonstrating Actions By Mr. Kadi
           That Violate The Alien Tort Claims Act .................................. 23

      D.     Plaintiffs' RICO Claims Should Be Dismissed As In Burnett I.............. 24

      E.     Plaintiffs' State Law Negligence Claims Fail For Lack Of A Duty
           To Plaintiffs Or A Causal Link To Their Injuries..................................... 24

      F.     Plaintiffs' Other State Law Claims Are Unavailing ................................ 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

Page

Cases

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) .................. 22

*Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102 (1987).... 16, 17, 18

*Baily v. Systems Innovation*, 852 F.2d 93 (3d Cir. 1988) ................................................. 18

*Barkat Gems, Inc. v. Feldman*, No. 84 Civ. 0659 (WCC), 1989 U.S. Dist. LEXIS
    3423 (S.D.N.Y. Apr. 5, 1989)......................................................................................... 4

*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002)............................ 7, 8, 9, 23

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)....................................................... 17

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)........................................ 11, 17, 22

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9 (D.D.C. 2003)............... 12, 22

*Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 274 F. Supp. 2d 86 (D.D.C.
    2003) ....................................................................................................................... passim

*Calder v. Jones*, 465 U.S. 783 (1984)............................................................................... 11

*Ctr. for Nat'l Sec. Studies v. United States DOJ*, 331 F.3d (D.C. Cir. 2003).................. 21

*Davidson v. Riley*, 44 F.3d 1118 (2d Cir. 1995) ............................................................... 18

*Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174 (C.D. Cal. 1998)............................................ 6

*Drope v. Missouri*, 420 U.S. 162 (1975)........................................................................... 21

*Febesh v. Elcejay Inn Corp.*, 555 N.Y.S.2d 46 (App. Div. 1st Dept. 1990)..................... 24

*Geders v. United States.*, 425 U.S. 80 (1976) ................................................................... 21

*Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335 (S.D. Fla. 2002)........... 6

*Graval v. P.T. Bakrie & Bros.*, 986 F. Supp. 1326 (C.D. Cal. 1996) ................................. 5

*Green v. Bock Laundry Mach. Co.*, 490 U.S. 504 (1989)................................................. 18

*Hale v. Gibson*, 227 F.3d 1298 (10th Cir. 2000) .............................................................. 20

*Hart v. Stagner*, 935 F.2d 1007 (9th Cir. 1991)............................................................... 20

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................ 10, 11

# TABLE OF AUTHORITIES
(continued)

Page

*In re Oliver*, 333 U.S. 257 (1948) ........................................................................................ 21

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ....................................................... 5, 16

*Iragorri v. Int'l Elevator*, 203 F.3d 8 (1st Cir. 2000) ........................................................ 21

*Irvin v. Dowd*, 366 U.S. 717 (1961) ..................................................................................... 20

*Jung v. Neschis*, No. 01 Civ. 6993, 2003 U.S. Dist. LEXIS 5569, (S.D.N.Y. Apr. 4, 2003) ............................................................................................................................ 5

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) .................................................................. 22

*Keeton v. Hustler Magazine*, 465 U.S. 770 (1984) ............................................................. 11

*Klinghoffer v. S.N.C. Achille Lauro, et al.*, 739 F.Supp. 854 (S.D.N.Y. 1990) ................. 9

*Klinghoffer v. S.N.C. Achille Lauro, et al.*, 937 F.2d 44 (2d Cir. 1991) ........................... 11

*Lampe v. Xouth, Inc.*, 952 F.2d 697 (3d Cir. 1991) ............................................................. 5

*Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996) ............................................................... 18

*Lemons v. Skidmore*, 985 F.2d 354 (7th Cir. 1993) ............................................................ 18

*Mayes v. UVI Holdings, Inc.*, 723 N.Y.S.2d 151 (App. Div. 2001) ................................... 25

*Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000) ................................................................ 19

*Mt. States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) .................................... 14

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ................................ 4

*Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253 (2d Cir. 1991) ................................. 4

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ........................................................ 21

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ........................................................................... 19

*Ryan v. Brunswick Corp.*, No. 02-cv-0133E(F),  2002 U.S. Dist. LEXIS 13837 (W.D.N.Y. May 31, 2002) ................................................................................................... 3

*SEC v. Tome*, 833 F.2d 1086 (2d Cir. 1987) ......................................................................... 4

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) .................................................................. 19, 20

*United States  v. Abello-Silva*, 948 F.2d 1168 (10th Cir. 1991) ......................................... 20

## TABLE OF AUTHORITIES
(continued)

Page

*United States SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) .......................................... 6

*United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) .................................................. 21

*United States v. First Nat'l City Bank*, 379 U.S. 378 (1965)............................................. 18

*Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386 (KMW), 2002 U.S. Dist.
    LEXIS 3293 (S.D.N.Y. Feb. 28, 2002)............................................................................ 22

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)................................... 17

## Rules

Fed. R. Civ. P. 12(b)(1)...................................................................................................... 1

Fed. R. Civ. P. 12(b)(2)...................................................................................................... 1

Fed. R. Civ. P. 12(b)(6)...................................................................................................... 1

Fed. R. Civ. P. 12(e) .......................................................................................................... 2

Fed. R. Civ. P. 4(f)(2)(A).................................................................................................... 5

Fed. R. Civ. P. 4(f)(2)(C).................................................................................................... 5

Fed. R. Civ. P. 4(f)(3) ........................................................................................................ 3

## Statutes

18 U.S.C. § 2339A............................................................................................................. 20

18 U.S.C. § 2339C............................................................................................................. 20

18 U.S.C. § 3144............................................................................................................... 21

18 U.S.C. §2331................................................................................................................ 8

18 U.S.C. §2331(1) ........................................................................................................... 7

18 U.S.C. §2331(5)(C)....................................................................................................... 8

18 U.S.C. §2333(a) ........................................................................................................... 7

46 U.S.C. §761.................................................................................................................. 9

## TABLE OF AUTHORITIES
(continued)

Page

49 U.S.C. § 40101 ............................................................................................................ 24

49 U.S.C. § 408(b)(1) ...................................................................................................... 24

50 U.S.C. § 1801(c) ........................................................................................................... 7

## Other

136 Cong. Rec. S7592 (1990) ............................................................................................ 8

137 Cong. Rec. S8143 (1991) ............................................................................................ 9

66 Fed. Reg. 57833-57836 (Nov. 16, 2001) .................................................................... 21

H.R. Rep. No. 102-367 (1991) .......................................................................................... 22

Pub. L. No. 101-519; 104 Stat. 2250 (1990) ...................................................................... 9

Pub. L. No. 102-572 ........................................................................................................ 10

S. Rep. No. 102-249 (1991) ............................................................................................. 22

S. Rep. No. 102-342 (1992) ..................................................................................... 7, 9, 10

Plaintiffs accuse Yassin Abdullah Al Kadi (D91), a Saudi businessman and charitable benefactor, of sponsoring the heinous September 11th atrocities solely on the basis of speculation, inference, and innuendo. Because "it is difficult to imagine uglier or more serious charges" than those asserted in these cases, "fairness requires extra-careful scrutiny of plaintiffs' allegations as to any particular defendant." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 103-04 (D.D.C. 2003) ("*Burnett I*"). Even a lesser degree of scrutiny would compel dismissal of the above-captioned Complaints against Mr. Kadi, for the following fundamental reasons.[1]

First, as a threshold matter, plaintiffs have failed to serve Mr. Kadi properly under the Federal Rules of Civil Procedure or Saudi law, and the Complaints should be dismissed under Rule 12(b)(1).

Second, dismissal is also appropriate under Rule 12(b)(2) because the Court lacks personal jurisdiction over Mr. Kadi. Plaintiffs have alleged no contacts between Mr. Kadi and the states in which these cases are pending, and this deficiency is not cured by any asserted "nationwide contacts" or "purposeful direction" of Mr. Kadi's activities into the United States generally. Moreover, the exercise of personal jurisdiction over Mr. Kadi in this historically unique set of circumstances would defy traditional notions of fair play and substantial justice.

Finally, the Complaints substantively fail to state claims upon which relief can be granted, and should be dismissed as to Mr. Kadi in their entirety under Rule 12(b)(6).

---

[1] Mr. Kadi specifically moves to dismiss the Complaints against him in: (1) *Burnett, et al v. Al Baraka Investment & Development Corp., et al*, Case No. 03-CV-9849 (RCC) (formerly D.D.C. Case No. 02-CV-1616) (the "Washington, D.C. Burnett action"), (2) *Burnett, et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-CV-5738 (RCC) (the "New York Burnett action"), and (3) *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-CV-6977 (RCC) ("Ashton").

In the alternative, Mr. Kadi moves for a more definite statement of the claims against him under Rule 12(e).

## SUMMARY OF FACTS

Mr. Kadi is a prominent Saudi Arabian businessman and benefactor. He has publicly condemned terrorism in all of its forms, especially the horrific attacks of September 11, 2001. In all of Mr. Kadi's individual, business and charitable activities he has never supported, nor intended to support in any manner whatsoever, Osama bin Laden, al-Qaeda, or any other terrorist or terrorist organization. He considers those that support or participate in terrorism to be offensive to the Muslim faith and deserving of the most severe condemnation.

Mr. Kadi has substantial business interests in the Middle East and other regions. He is well-known within Saudi Arabia as well as in other parts of the world where he carries on business, and is a respected businessman and financier. Like other devout Muslims, Mr. Kadi devotes a significant portion of his time and resources to philanthropic activities. Among these was the formation in 1992, with five other Trustees, of a charity called "Muwafaq" or "Blessed Relief." Muwafaq was founded to address famine, poverty, lack of education, and under-development amongst Muslims in the world. Muwafaq was a well-respected charity which worked in conjunction with other charitable organizations including the United Nations High Commission on Refugees. Muwafaq wound up its activities in 1997.

On October 12, 2001, much to his horror, Mr. Kadi was designated by the United States Treasury Department as a Special Designated Global Terrorist. As discussed below, the designation appears to have been based on now-discredited media reports and false rumors, and Mr. Kadi has been working actively to challenge the designation.

2

Importantly, the designation does *not* establish ties to the United States for purposes of personal jurisdiction, or support an inference (contrary to fact) that Mr. Kadi is connected in any way to the infamous events of September 11, 2001.

In view of the heinous charges leveled against Mr. Kadi in these cases, as Judge Robertson observed in *Burnett I*, it is incumbent on the Court to ensure that he "does indeed have fair notice of what the plaintiffs' claim is and the grounds upon which it rests, and that no inferences are accepted that are unsupported by the facts set out in the 3AC." 274 F. Supp. 2d at 103-04. As demonstrated herein, plaintiffs' allegations against Mr. Kadi rest on assertions that are not supported by facts, and the Complaints against him should be dismissed.[2]

## ARGUMENT

## I.     Plaintiffs Have Not Properly Served Mr. Kadi

### A.     The *Burnett* Plaintiffs' Attempt To Serve Mr. Kadi By Publication Is Ineffective

#### 1.     The New York *Burnett* Action

Federal Rule of Civil Procedure 4(f)(3) allows service of process by alternative means, such as publication, but such alternative means must be "directed by the court." Fed. R. Civ. P. 4(f)(3); *Ryan v. Brunswick Corp.*, No. 02-cv-0133E(F), 2002 U.S. Dist. LEXIS 13837, at *6 (W.D.N.Y. May 31, 2002) ("service under Rule 4(f)(3) must be . . . directed by the court"). Despite this bedrock requirement, no order authorizing service by publication was ever sought or obtained by the plaintiffs in the New York *Burnett* action. *See* Docket Sheet in 03-CV-1578. Because the Southern District of New York

---

[2] The factual allegations pertaining to Mr. Kadi are set out as Exhibits A, B and C hereto. The allegations in all three cases are essentially identical.

never directed that service be made by publication, the service was invalid under Rule 4(f)(3), and the New York *Burnett* action must be dismissed as to Mr. Kadi.

### 2.     The Washington, D.C. *Burnett* Action

In contrast, plaintiffs in the Washington, D.C. *Burnett* action sought and obtained an *ex parte* order from Judge Robertson authorizing service on a number of defendants by publication, including Mr. Kadi.  Service by publication was improper, however, for several reasons.  First, Mr. Kadi has taken no steps to evade service, and his name and address are a matter of public record in Saudi Arabia.  *SEC v. Tome*, 833 F.2d 1086, 1094 (2d Cir. 1987) (service by publication "[c]ertainly will. . . not satisfy the requirements of due process" where a defendant's name and address are "known or may be obtained with reasonable diligence."); *Barkat Gems, Inc. v. Feldman*, No. 84 Civ. 0659 (WCC), 1989 U.S. Dist. LEXIS 3423, at \*12 (S.D.N.Y. Apr. 5, 1989).  Second, plaintiffs' attempted service by publication was clearly inadequate.  Notice was published in two papers: the *International Herald Tribune*, which plaintiffs do not dispute has a total circulation of 199 in Saudi Arabia, a nation of 24 million citizens; and *Al Quds Al Arabi*, a London-based newspaper which is *banned* in Saudi Arabia.  *Burnett,* D.D.C. Docket Sheet, 02-CV-1616, No. 244.  Plaintiffs' minimal attempt at service by publication plainly was not calculated to provide Mr. Kadi with fair notice of these cases, and was ineffective as a matter of law.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).  The Washington, D.C. *Burnett* action accordingly must be dismissed as to Mr. Kadi.[3]

---

[3] Although Mr. Kadi hereby responds to the Complaints, the Second Circuit has "reject[ed] the notion that 'actual notice' suffices to cure a void service . . . ."  *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 256 (2d Cir. 1991).

**B.**     **The *Ashton* Plaintiffs' Attempt To Serve Mr. Kadi By Registered Mail To A Post Office Box In Saudi Arabia Is Improper**

The *Ashton* Plaintiffs' attorneys have sought to serve Mr. Kadi by sending the

Complaint via registered mail to a post office box in Saudi Arabia. This purported form

of service is invalid for three reasons. First, service by registered mail is not permitted

under Saudi law (*see* Memorandum of Law of Saad Al Beraik, dated July 3, 2004

(Exhibit D)), and therefore fails because it was not made "in the manner prescribed by the

law of the foreign country for service in that country in an action in any of its courts of

general jurisdiction," as required by Rule 4(f)(2)(A). Second, and relatedly, service by

registered mail is *per se* improper under Rule 4(f)(2)(C) because it is prohibited by Saudi

law. *See Jung v. Neschis*, No. 01 Civ. 6993, 2003 U.S. Dist. LEXIS 5569, at *7-8

(S.D.N.Y. Apr. 4, 2003); *Graval v. P.T. Bakrie & Bros.*, 986 F. Supp. 1326, 1329 n.4

(C.D. Cal. 1996). Finally, and in any event, the registered mail was not sent to Mr. Kadi

by the clerk of the Court, as required by Rule 4(f)(2)(C)(ii). *See Lampe v. Xouth, Inc.*,

952 F.2d 697, 702 (3d Cir. 1991). Accordingly, the *Ashton* case must be dismissed as to

Mr. Kadi as well.

**II.     The Court Should Dismiss The Complaints Against Mr. Kadi For Lack Of Personal Jurisdiction**

The Due Process Clause of the 5th Amendment permits a court to exercise

personal jurisdiction only where the defendant has "certain minimum contacts . . . such

that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice.," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In judging

minimum contacts, the court focuses on the relationship between the defendant, the

forum, and the litigation. The threshold issue, therefore, is the determination of what

constitutes the proper forum. Under any variant of this analysis, it is plain that the Court lacks personal jurisdiction over Mr. Kadi.

### A. Plaintiffs Do Not Allege That Mr. Kadi Has Any Contacts With The District Of Columbia Or The Southern District of New York

As an initial matter, there is no dispute that the appropriate forum for the Washington, D.C. *Burnett* action is the District of Columbia, or that the appropriate forum for the New York *Burnett* action and *Ashton* is the Southern District of New York. There are *no* allegations, however, that Mr. Kadi has contacts with *either* forum. Accordingly, the Court lacks personal jurisdiction over Mr. Kadi with respect to all three cases, because Mr. Kadi has *no* contacts with the fora.

### B. The Nationwide Contacts Test of the Anti-Terrorism Act Does Not Apply Because Mr. Kadi Was Not Served Pursuant To The Act, And It Does Not Cover The September 11 Attacks In Any Event

Mr. Kadi's lack of contacts with either forum does not end the jurisdictional analysis, however, because Judge Robertson held in *Burnett I* that the Anti-Terrorism Act's ("ATA") provision for nationwide service of process renders the entire United States the relevant forum. *See Burnett*, 274 F. Supp. 2d at 95-96. As an initial matter, this ruling does not apply to Mr. Kadi because he was not served within the United States pursuant to the service provisions of the ATA, a prerequisite to the application of the statute's nationwide contacts analysis. *See Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1340 (S.D. Fla. 2002), *aff'd*, 54 Fed. Appx. 492 (11th Cir. 2002); *Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1183 (C.D. Cal. 1998); *see also United States SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997). As noted above, in the two *Burnett* cases, plaintiffs' only attempt to serve Mr. Kadi was by publication, while the *Ashton* plaintiffs sought to serve Mr. Kadi by registered mail to a post office box in Saudi

6

Arabia. Neither of these methods of service is authorized by the ATA, and the statute's nationwide contacts analysis therefore does not apply.[4]

Further, even if Mr. Kadi had been properly served under the ATA, it plainly does not apply to the September 11 attacks and therefore cannot confer the Court with personal jurisdiction over him. Although Judge Robertson used a nationwide forum test based on the nationwide service provisions of the ATA in *Burnett I*, 274 F. Supp. 2d at 95-96, Mr. Kadi respectfully submits that the ruling is incorrect for the simple reason that the ATA applies only to terrorist acts which occur primarily *outside* the United States.

The ATA, 18 U.S.C. §2333(a) (2004), provides a cause of action for "[a]ny national of the United States injured in his or her person, property or business by reason of an act of international terrorism." "International terrorism," in turn, is defined in 18 U.S.C. §2331(1) to include activities that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

This definition of international terrorism is drawn from the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801(c) (2004). *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1009 (7th Cir. 2002); S. Rep. No. 102-342 at 45 (1992) (Exhibit E). The text and the legislative history of the ATA make clear that the statute was intended to cover acts of terrorism which occur *abroad* and thus were not already within the scope of existing federal and state law remedies. Underscoring this interpretation, Congress

---

[4] Judge Robertson dismissed as to several defendants the claims brought under the RICO statute, which also provides for nationwide service of process. *See Burnett I*, 274 F. Supp. 2d at 101. For the same reasons articulated by Judge Robertson, the RICO claims should also be dismissed as to Mr. Kadi, thus negating the application of the statute's nationwide service provision.

defined the term "domestic terrorism" to pertain to activities that "occur primarily *within*

the territorial jurisdiction of the United States." 18 U.S.C. §2331(5)(C) (2004) (emphasis

added).[5]

The ATA legislation was originally introduced in 1990 by Senators Grassley,

Heflin, and a number of additional co-sponsors. The description of the bill stated:

> S. 2465. A bill to provide a new civil cause of action in Federal
> law for acts of *international terrorism* that provides extraterritorial
> jurisdiction over *terrorist acts abroad* against U.S. nationals.

136 Cong. Rec. S7592 (1990) (Exhibit G) (emphasis added). The legislative history

explains that the bill was motivated, in part, by the circumstances surrounding efforts by

the family of Leon Klinghoffer to obtain judicial relief in American courts for

Mr. Klinghoffer's murder by PLO terrorists on the Italian cruise ship *Achille Lauro*. *Id.*

(Statement of Sen. Grassley). Because the terrorists acts aboard the *Achille Lauro*

occurred outside the United States, the application of existing federal and state laws to

obtain relief faced significant obstacles. As Senator Grassley stated:

> Unfortunately, victims who turn to the common law of tort or
> Federal statutes, find it virtually impossible to pursue their claims
> because of reluctant courts and numerous jurisdictional hurdles.

*Id.*

In the *Klinghoffer* case, the district court ultimately found that the family's claims

against the PLO were cognizable in federal court under federal admiralty jurisdiction and

---

[5] The *Boim* court was the first to interpret the meaning of "international terrorism" in 18 U.S.C. §2331. The controversy there centered on the definition of the word "involve" as it is used in the definition of "international terrorism" and thus is not directly relevant here. In its analysis, however, the *Boim* court observed that the definition of "international terrorism" in §2331 was taken verbatim from the Foreign Intelligence Surveillance Act, and noted that "[n]o court has yet expounded on the meaning or scope of 'international terrorism' as it is used in FISA either, so we are not aided by that origin." 291 F.3d at 1009. There do not appear to be any published decisions since *Boim* which interpret the definition of "international terrorism," either in the context of the FISA or the ATA. The *Boim* court examined the statutory text and the legislative history of the statue for guidance, noting that the legislative history was

the Death on the High Seas Act (46 U.S.C. §761) because the tort occurred in navigable

waters. *Klinghoffer v. S.N.C. Achille Lauro, et al.*, 739 F. Supp. 854, 858-59 (S.D.N.Y.

1990). The ATA was intended to codify that ruling and to expand it to cover land-based

acts of terrorism which occur *outside* the United States. Accordingly, in its amicus brief

in *Boim*, the government explained:

> Building on the Klinghoffer litigation, Congress and the State
> Department wanted through [the ATA] to ensure that torts from
> terrorist activity would be actionable even if they occurred on land
> in a foreign country: "This bill * * * expands the Klinghoffer
> opinion. Whereas that opinion rested on the special nature of our
> admiralty laws, this bill would provide general jurisdiction to our
> Federal courts and a cause of action for cases in which an
> American has been injured by an act of terrorism overseas. This
> bill is a welcome addition to our arsenal against terrorists."

Brief of United States, As Amicus Curiae Supporting Affirmance in *Boim,* 291 F.3d at 13

(quoting Antiterrorism Act of 1990, Hearings before the Subcomm. on Courts and

Administrative Practice of the Senate Committee on the Judiciary, 101st Cong., 2d Sess.,

at 12 (Statement of Alan Kreczko, Deputy Legal Advisor, U.S. Dept. of State)) (Exhibit

F).[6]

---

discussed at length in the Brief for the United States as Amicus Curiae Supporting Affirmance filed in that case. For the Court's reference, a copy of the United States' amicus brief in *Boim* is attached as Exhibit F.

[6] The unusual procedural history of the ATA further confirms its application only to terrorist acts committed *abroad*. The law was enacted by mistake on November 5, 1990 as part of the Military Construction Appropriations Act. *See* Pub. L. No. 101-519; 104 Stat. 2250 (1990), *reprinted in* 1990 U.S.C.C.A.A.N. 3283-12. The Conference Committee had intended to delete the provision from the legislation, but the enrolling clerk erred and the provisions were enacted. *See* S. Rep. No. 102-342, at 22 (1992) (Exhibit E); 137 Cong. Rec. S8143 (1991) (Statement of Sen. Grassley) (Exhibit H). The law was repealed in 1991 after being in effect for 5 months (*id.*), then was re-introduced by Senator Grassley later that year. The description of the bill which accompanied the re-introduction confirmed the original intention of the legislation to address conduct occurring *outside* the United States:

> A bill (S740) to provide a new civil cause of action in Federal law for international
> terrorism that provides *extraterritorial jurisdiction* over terrorist acts *abroad* against
> United States nationals.

137 Cong. Rec. S8143 (1991) (Exhibit H) (emphasis added). President Bush also confirmed the extraterritorial scope of the statute when he signed the legislation into law. He stated that the ATA was intended to be a remedy "for Americans *injured abroad* by senseless acts of terrorism." President George

As the foregoing legislative history demonstrates, Congress plainly intended the ATA to cover terrorist acts which occur *outside* the United States, and to provide a remedy where none otherwise was available. The existing tort system already provided (and still provides) a remedy for those harmed by terrorist acts within the United States. As the Senate Report which accompanied the legislation states, the ATA "would allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed." S. Rep. No. 102-342 at 22 (1992) (Exhibit E). In short, traditional tort law provides a remedy for the victims of 9/11. The ATA does not.

Because the ATA does not apply in this case, its nationwide service of process provisions do not apply either, and Judge Robertson's prior ruling to the contrary should be reconsidered and set aside, and the Complaints dismissed as to Mr. Kadi for lack of personal jurisdiction.

### C.      The Court Lacks Jurisdiction Over Mr. Kadi Even Assuming A Nationwide Forum

Even assuming, *arguendo*, that the proper forum is the entire United States, the Complaints still fail to establish personal jurisdiction over Mr. Kadi. Because the instant litigation does not arise out of Mr. Kadi's alleged contacts with the United States, general jurisdiction is required based on "continuous and systematic" contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).

The complaints allege only two contacts with the United States. First, plaintiffs allege that Mr. Kadi incorporated Blessed Relief in Delaware in 1992. This is a single,

---

H. W. Bush, Statement Upon Signing S. 1569 (P.L. No. 102-572) (Nov. 2, 1992) *reprinted in* 1992

one-off event that is far too remote in time to be relevant to a jurisdictional analysis. *See Klinghoffer v. S.N.C. Achille Lauro, et al.*, 937 F.2d 44, 52 (2d Cir. 1991) (personal jurisdiction must be established as of the time of filing of lawsuit).[7]

Second, plaintiffs allege that Mr. Kadi served as a director of a Nevada company, Global Diamond Resources. This allegation is irrelevant, however, because a court does not have jurisdiction over individual officers or directors of a corporation merely because it may have jurisdiction over the corporation. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (jurisdiction over corporate employees does not automatically follow from jurisdiction over the corporation). As the Supreme Court held in *Keeton*, "[e]ach defendant's contacts with the forum State must be assessed individually." *Id.* The bald allegation that Mr. Kadi held the position of director of a Nevada company does not establish his presence in the United States for jurisdictional purposes, much less the "continuous and systematic" presence required under the law. *Helicopteros*, 466 U.S. at 415-16.

## D. Plaintiffs' "Purposefully Directed" Theory of Specific Jurisdiction Is Without Merit

Plaintiffs advance a theory that personal jurisdiction can be established by allegations that defendants "aimed" their activities at the United States by providing material support to Osama bin Laden and al Qaeda, with knowledge that al Qaeda was targeting the United States and its citizens. Plaintiffs rely principally on *Calder v. Jones*, 465 U.S. 783 (1984), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), for the

---

U.S.C.C.A.N. 3942 (Exhibit I) (emphasis added).
[7] Moreover, Blessed Relief *never* opened an office or conducted any activities in the United States after the entity was incorporated.

11

proposition that personal jurisdiction can be established over a foreign person who purposefully directs his activities to the forum.[8]

This argument has already been considered and rejected by Judge Robertson in the context of the personal claims against defendant Prince Sultan. *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 22-23 (D.D.C. 2003) ("*Burnett II*"). The allegations against Mr. Kadi are far more attenuated than those against Prince Sultan.

The Terrorist Designation Allegation. Plaintiffs allege that Mr. Kadi was designated as a "terrorist entity and sponsor" by the United States Government. As discussed above, Mr. Kadi categorically denies any association with terrorism and he is working actively to challenge his designation, which appears to have been based on now-discredited media reports and speculation. In any event, however, the designation does not support an inference that Mr. Kadi is causally linked to the events of September 11. There are many disparate terrorist groups around the world, most of which are not connected to the September 11 attacks. Even if (contrary to fact) Mr. Kadi's designation had some legitimate basis, it does not establish that he had any link to the events of September 11.

Plaintiffs contend that a "United States Department of Treasury Press Release" dated October 12, 2001 explains that "Yasin al-Qadi (heads) the Saudi-based Muwafaq (or "Blessed Relief") Foundation, an al Qaeda front that transfers millions of dollars from wealthy Saudi businessmen to bin Laden." If such a press release existed, it appears to have been withdrawn by the Treasury Department, as none of the Treasury Department's press releases currently available that were issued on October 12, 2001 refer to Blessed

---

[8] The "purposefully directed" theory of specific jurisdiction is not applicable, even in theory, to the Washington, D.C. *Burnett* action, given that none of the September 11 attacks occurred in Washington,

Relief or Muwafaq in any way.[9]  The Treasury Department's press releases that are available do not suggest that Blessed Relief had anything to do with the designation of Mr. Kadi.  In any event, there is no time frame alleged for any such financial support, and thus no facts are alleged which would justify an inference of a causal connection to the September 11 attacks.

The "Blessed Relief" (Muwafaq) Allegations.  Plaintiffs claim that from 1992 to 1997, Mr. Kadi ran Blessed Relief, an organization purportedly registered in the Channel Islands in 1992 and run from Jeddah, Saudi Arabia.  Mr. Kadi is further alleged to have incorporated the United States branch of Blessed Relief in Delaware in 1992.  The organization supposedly transferred "millions of dollars" to Osama bin Laden, as revealed in an asserted audit that was conducted in the mid-1990's.[10]  Accordingly, any such transfers of funds to Osama bin Laden that are the subject of these allegations, and which Mr. Kadi vigorously denies, must have been made prior to the mid-1990's. Further, the outside date alleged for Mr. Kadi's involvement with Blessed Relief is 1997 -- fully four years prior to September 11, 2001.  Even if these outrageous and false allegations that Blessed Relief was involved in financing Osama bin Laden were true, they are too remote in time from September 11 to be at all relevant.

The allegations about Muwafaq appear to be a repeat of unsupported statements and allegations originally made in an October 29, 1999 article entitled "Saudi money aiding bin Laden: Businessmen are financing front groups" by the former and now

_____

D.C.

[9] *See* http://www.ustreas.gov/press/releases/archives/2001110.html (last visited July 1, 2004).

[10] The alleged "audit" report was disclosed by the *Burnett* plaintiffs' "lead investigator," Jean-Charles Brisard, in a defamation action in Europe filed by another defendant, Khalid bin Mahfouz, against an English newspaper. See Witness Statement of Jean-Charles Brisard of 5/21/03 and Attached Ex. JCB 14 ("Extracts from Saudi government audit of National Commercial Bank") (Exhibit J).  The document does

13

discredited USA Today reporter Jack Kelly. Mr. Kelly was forced to resign after being

exposed for fabricating articles, including the October 29, 1999, article referenced above.

That article has since been withdrawn by USA Today and is no longer publicly available.

The newspaper stated:

> A story on Oct. 29, 1999, titled "Saudi money aiding bin Laden,"
> contained several errors. . . . The story was written by Jack Kelley,
> a reporter who was found recently to have fabricated several high-
> profile stories. In this case, the story's assertions have been widely
> reported and subsequently retracted by others.

USA Today (Apr. 13, 2004) at A2.

The Global Diamond Resources Allegations. Mr. Kadi is also alleged to be a

member of the board of directors of a company called Global Diamond Resources in

Nevada. Plaintiffs also claim that representatives of the bin Laden family are on the

board of directors. This company purportedly owns three mines in South Africa.

Plaintiffs allege that following September 11, 2001, with the increased difficulty al Qaeda

now faces in moving its money through its traditional financial channels, al Qaeda has

been converting more of its assets into diamonds.

Tellingly, plaintiffs do *not* allege that Mr. Kadi is involved in the financing of

terrorism through Global Diamond Resources, or that the company has purchased or sold

(or facilitated the purchase or sale) of diamonds associated in any way with al Qaeda.

Plaintiffs seek instead to create a prejudicial and factually baseless *inference* of such as

association. The Court, of course, need not accept inferences that are "unsupported by

the facts set out in the complaint." *Mt. States Legal Found. v. Bush*, 306 F.3d 1132, 1134

(D.C. Cir. 2002). Indeed, no inferences of any relevance are justified by plaintiff's

---

not even mention Osama bin Laden, al Qaeda, or terrorism, and provides absolutely no basis for any
inference that Muwafaq ever provided financial support to Osama bin Laden or al Qaeda.

allegations. For example, the mere claim that Mr. Kadi is on the board of directors of an American company with representatives of the bin Laden family does not justify an inference that Mr. Kadi is involved in financing terrorism. Surely it cannot be the case that every business associate of the bin Laden family suddenly becomes subject to an inference that he is involved in financing terrorism. And the fact that al Qaeda has allegedly been converting its assets to diamonds *after* September 11, 2001 does not justify an inference that: (1) Global Diamond Resources was providing diamonds to al Qaeda; (2) Mr. Kadi knew about such transactions; or (3) that these transactions took place *prior* to September 11 (the only relevant time period). Plaintiffs' wild leaps of logic are unjustified. There is no direct allegation that Global Diamond Resources was providing diamonds to al Qaeda, and absolutely no basis -- none whatsoever -- for such an inference.

The M.M. Badkook Co. Allegations. Mr. Kadi is also alleged to be a Vice President of a Saudi Arabian company called M.M. Badkook Co., which is owned by his "partner" in Blessed Relief, Talal Mohammed Badkook. (Mr. Badkook was actually a director of Blessed Relief, not a partner.) Mr. Badkook, in turn, is allegedly a member of the Al-Mustaqbal group along with Saleh Mohamed bin Laden and Abdullah Saleh Kamel. Again, plaintiffs proffer no allegation that M.M. Badkook is involved in financing terrorism; they seek only to impute guilt by association. Moreover, although the Complaints designate no time period for this set of allegations, Mr. Kadi has not been involved in M.M. Badkook Co. since 1990. These allegations afford absolutely no basis for an inference that Mr. Kadi was involved in financing the attacks of September 11, 2001, a full eleven years later.

The National Management Consultancy Center Allegation.  Mr. Kadi is alleged to

be the Chairman of the National Management Consultancy Center ("NMCC").  Again, it

is completely unclear what, if any, wrongdoing the NMCC is alleged to have carried out.

There is no allegation that the NMCC is involved in financing terrorism, nor is there any

other allegation apart from the claim that the NMCC lists the same address as Blessed

Relief in Jeddah.  This allegation also provides no basis for an inference that Mr. Kadi

was involved in supporting terrorism.

In short, there is no basis for concluding that Mr. Kadi's activities were causally

related to the September 11 attacks or that he "purposefully directed" his activities at the

United States.  Plaintiffs' alternative jurisdictional theory is without merit.

### E.   The Exercise Of Personal Jurisdiction Over Mr. Kadi Would Not Comport With Traditional Notions Of Fair Play And Substantial Justice

Even if the Court were to conclude that plaintiffs have established minimum

contacts with the appropriate forum, the Due Process Clause forbids the exercise of

personal jurisdiction under circumstances that would offend "traditional notions of fair

play and substantial justice."  *Asahi Metal Indus. Co. v. Superior Court of California*, 480

U.S. 102, 113 (1987); *Int'l Shoe Co.* 326 U.S. at 316.  This second prong of the Due

Process analysis for personal jurisdiction was recognized by Judge Robertson in *Burnett*

*I:*

> Several cases have held that, in cases of nationwide service of process, minimum contacts with the United States may not be the stopping point of the inquiry; rather, the traditional requirement that the assertion of personal jurisdiction "comport with 'fair play and substantial justice'" . . . applies in such cases. . . . Thus, in the "rare" cases where a defendant who has minimum contacts with the United States nonetheless "will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum" . . . and this inconvenience "rise[s] to a level of constitutional concern"

16

> . . . the assertion of personal jurisdiction may not satisfy due
> process."

274 F. Supp. 2d at 96 n.5 (citations omitted).

In *Burnett I*, the Court stated that none of the defendants in the first round of motions to dismiss had made, or attempted to make, a showing of "constitutionally significant inconvenience" of litigating in plaintiffs' chosen forum. *Id*. We respectfully submit that such a showing is not difficult to make. The events of September 11 are unparalleled in American history. It should not be surprising that civil litigation arising out of these events represents one of those "rare" cases in which the exercise of personal jurisdiction over non-resident foreign nationals does not comport with Due Process.

The Supreme Court has held that the evaluation of whether the assertion of personal jurisdiction comports with "fair play and substantial justice" depends on several factors, including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi*, 480 U.S. at 113.[11] The constitutional standard is whether the litigation is "'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King*, 471 U.S. at 478, quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972).

Where, as here, the defendant is a foreign national, the Supreme Court has held that special considerations apply. Writing for a unanimous Court in *Asahi*, Justice O'Connor stated that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of

---

[11] In *Asahi*, the Court went on to state that a court "must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'" *Asahi*, 480 U.S. at 113, quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). These factors relate to the status of the several states within our federal system and thus would not appear to have a direct bearing on a Fifth Amendment Due Process analysis.

stretching the long arm of personal jurisdiction over national borders." 480 U.S. at 114.

The *Asahi* Court quoted Justice Harlan, who previously noted that "[g]reat care and

reserve should be exercised when extending our notions of personal jurisdiction into the

international field . . . ." *United States v. First Nat'l City Bank*, 379 U.S. 378, 404

(1965), (Harlan, J., dissenting).

### 1.   The Exercise of Jurisdiction Would Violate Mr. Kadi's Due Process Right To A Fair Trial

Trial of this case in the United States would deny Mr. Kadi's right to a fair trial,

guaranteed by the Due Process Clause of the Fifth Amendment,[12] for at least two reasons:

(1) the prejudice resulting from the horror of the September 11 attacks; and (2) the

chilling effect of the U.S. Government's "war on terrorism" on the ability of those

accused of some relationship to terrorism to travel to the United States.

### a.   Saudi Nationals Accused of Financing The September 11 Attacks Will Face Overwhelming Prejudice At Trial In The United States

Surely little needs to be said about the prejudice that would be faced by a Saudi

national such as Mr. Kadi accused of financing the September 11 attacks. It has been

widely reported that 15 out of the 19 hijackers were Saudi nationals.[13] Osama bin Laden

is from Saudi Arabia. Polls show that more than 60 percent of Americans hold an

"unfavorable" opinion of Saudi Arabia.[14] A more recent Time/CNN poll shows that 72%

---

[12] Due Process protections apply to a non-resident foreign national when a U.S. court seeks to assert jurisdiction. See *Asahi*, 480 U.S. at 102 (applying Due Process protections to foreign corporation when state court sought to exercise jurisdiction). The Fifth Amendment's Due Process Clause applies in civil as well as criminal cases. *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510 (1989) ("civil litigants in federal court share equally the protections of the Fifth Amendment's Due Process Clause); *Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996); *Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993); *Baily v. Systems Innovation, Inc.*, 852 F.2d 93, 98 (3d Cir. 1988); *Davidson v. Riley*, 44 F.3d 1118 (2d Cir. 1995).
[13] Official: 15 of 19 Sept. 11 hijackers were Saudi, USA Today (Feb. 6, 2002).
[14] Saudi Arabia Selling New Image To Skeptical Americans, The Atlanta Journal Constitution, July 4, 2003.

of Americans believe Saudi Arabia cannot be trusted as an ally.[15]  Pundits have inflamed

public opinion by appearing on nationally-broadcast television programs and asserting

that "Bin Laden is the most popular person in Saudi Arabia."[16]

Taking their cue from public and media sentiment, plaintiffs' lawyers have been

doing everything in their power to incite passions against Saudi defendants even

further.[17]  While the court publicly rebuked Mr. Motley in the May 25, 2004 hearing for

trying this case in the press, it is unreasonable to assume that the prejudice against those

accused of involvement in the September 11 attacks will diminish even if plaintiff's

lawyers desist from this behavior.  No matter when the case is tried, the prejudice against

any Saudi national accused of financing the September 11 attacks will be

overwhelming.[18]

The Supreme Court has held that in certain rare cases, massive pre-trial publicity

renders it virtually impossible for a defendant to receive a fair trial; in such cases,

prejudice is presumed.  *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Sheppard v. Maxwell*,

384 U.S. 333 (1966); *see also Moore v. Johnson*, 225 F.3d 495, 504-05 (5th Cir. 2000);

---

[15] Beyer, *After 9/11: The Saudis: Friend or Foe*, Time Magazine, Sept. 15, 2003, at 38.

[16] Could Next Gulf War Be With Saudi Arabia: Interview with Robert Baer, Good Morning America, July 15, 2003.

[17] Isikoff and Hosenball, *Terror Watch: The Saudi-Al Qaeda Connection*, Newsweek, Sept. 10, 2003; Bartleme, *Investigators Tie Letters To Taliban Chief*, The Post and Courier (Charleston, S.C.), September 13, 2003; Bartleme, *9-11 Lawsuit Uncovers Wealth of Information About Al-Qaida*, The Post and Courier (Charleston, S.C.), Sept. 11, 2003; Bartelme, The *King of Torts vs. al-Quaida [sic] Inc.*, The Post and Courier, June 22, 2003 (commenting on his difficulty remembering the Arabic names of the defendants, the *Burnett* plaintiffs' lead counsel, Ronald L. Motley, is quoted as saying: "Sometimes, the best I can do is call them Scumbag One and Scumbag Two."); Jennifer Senior, New York Times (Sunday Magazine), Mar. 14, 2004, at 36, col. 1 (with C-Span cameras present: "Let's pick on the Saudis for a moment.  I love to pick on the Saudis."); Bartelme, The Post and Courier, Oct. 18, 2003, at 1A (regarding claims of sovereign immunity:  "there's no immunity for murder."); Maximillian Potter, *Making Saudi Arabia Pay*, GQ, June 2003, at 182 ("At bottom it's pretty simple.  The Saudis struck a deal with the Devil . . .")

[18] Because we are mindful of the admonition that a brief should be just that – brief - we have not endeavored here to submit a more comprehensive record to support the contention that prejudice should be presumed.  Given the horrific nature of the September 11th attacks and the ubiquity of its media coverage, one would think that such a step should be unnecessary.  If, however, the Court feels a more fulsome record is warranted, we would be happy to supplement the record as directed by the Court.

*Hale v. Gibson*, 227 F.3d 1298, 1332-33 (10th Cir. 2000); *United States v. Abello-Silva*,

948 F.2d 1168, 1176-78 (10th Cir. 1991); *Hart v. Stagner*, 935 F.2d 1007, 113-15 (9th

Cir. 1991).  In these presumption cases, the Court has held that the prejudice to the

defendant would be so pervasive that it cannot be cured through the voire dire process,

even if the potential jurors state that they would render an impartial verdict.  *Irvin v.*

*Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he

would be fair and impartial . . . but . . . such a statement of impartiality can be given little

weight."); *Sheppard*, 384 U.S. at 351 (same).  There can hardly be a case in American

history where the presumption of prejudice is more directly applicable than in this case.

Because of the overwhelming prejudice the Saudi defendants would face here, this case

should be tried in a neutral forum outside the United States, whether in a judicial

proceeding, as occurred in the Lockerbie case,[19] or in some form of international

arbitration.

      **b.**      **The U.S. War on Terrorism Has A Constitutionally-Significant Chilling Effect On Mr. Kadi's Ability To Assist In His Own Defense**

The U.S. Government's war on terrorism also has the effect of denying Mr. Kadi

the right to a fair trial in the United States.  Witnesses from the Middle East who Mr.

Kadi may seek to call to testify in his defense and Mr. Kadi himself risk detention and

arrest if they come to the United States.  Financing or providing material support to

terrorism is a federal crime.  *See* 18 U.S.C. § 2339A (2004) ("Providing material support

to terrorists"); § 2339C ("Prohibitions against the financing of terrorism").  Moreover, the

President has authorized the detention of persons accused of aiding and abetting

---

[19] *Her Majesty's Advocate v. Megrahi*, No. 1475/99, slip op. (High Ct. Judiciary at Camp Zeist Jan. 31, 2001), *reprinted in* 40 ILM 582 (2001).

terrorism, Military Order of November 13, 2001, Detention, Treatment, and Trial of

Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57833-57836 (Nov. 16,

2001), § 2(a)(1)(ii), and the government has detained hundreds of persons suspected of

association with terrorism under the material witness statute, 18 U.S.C. § 3144 (2000).[20]

The right to a fair trial, of course, includes the right to consult with counsel and

assist in one's defense. *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975). This right is

impaired if a defendant cannot cooperate in an active manner with his lawyer. *Geders v.*

*United States*, 425 U.S. 80 (1976) (rights violated where judge issued order that

defendant not consult with his attorney). The right to a fair trial also includes the right to

testify on one's own behalf, *In re Oliver*, 333 U.S. 257, 273 (1948), and to be able to

obtain the live testimony of witnesses at trial. *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8,

17 (1st Cir. 2000). These basic rights would be violated by requiring Mr. Kadi to stand

trial in the United States.

For these reasons, the exercise of personal jurisdiction over Mr. Kadi would

violate his right to a fair trial guaranteed by the Due Process Clause of the Fifth

Amendment. "So basic to our jurisprudence is the right to a fair trial that it has been

called 'the most fundamental of all freedoms.'" *Nebraska Press Ass'n v. Stuart*, 427

U.S. 539, 586 (1976) (Brennan, J., concurring). As such, the exercise of jurisdiction over

Mr. Kadi in this case would not comport with traditional notions of "fair play and

substantial justice." Indeed, it is difficult to conceive of a more aggravated circumstance

in which the litigation is "'so gravely difficult and inconvenient' that a party unfairly is at

---

[20] *See Ctr. for Nat'l Sec. Studies v. United States DOJ*, 331 F.3d 918, 921 (D.C. Cir. 2003); *see generally,*
*e.g., United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) (upholding perjury indictment of individual
detained shortly after September 11 under material witness statute).

a 'severe disadvantage' in comparison to his opponent." *Burger King*, 471 U.S. at 478.

For this reason as well, the Complaints must be dismissed as to Mr. Kadi.

### III.    The Complaints Do Not State Valid Claims On Which Relief Can Be Granted

#### A.    The Foreign Sovereign Immunities Act and the Torture Victim Protection Act Do Not Apply To Mr. Kadi As A Private Citizen

Each of the complaints alleges a claim under the Foreign Sovereign Immunities

Act ("FSIA").  The FSIA applies only to foreign states and its agents and/or

instrumentalities.  *See, e.g., Burnett II*, 292 F. Supp. 2d at 14; *Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  Mr. Kadi is a private citizen,

not a government official.  Accordingly, the FSIA does not apply to Mr. Kadi and the

FSIA claim against him should be dismissed.

Similarly, the Torture Victim Protection Act ("TVPA") requires state action to

establish liability.  *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995); H.R. Rep. No. 102-

367, at 5 (1991) ("The bill does not attempt to deal with torture or killing by purely

private groups.").  Plaintiffs do not allege that Mr. Kadi, a private businessman, was

acting "under actual or apparent authority, or color of law, of any foreign nation," 70

F.3d at 238, or that he was acting in concert with any state actor.  Moreover, the TVPA is

intended to cover torture or extrajudicial killing which occurs *outside* the United States.

*Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386 (KMW), 2002 U.S. Dist. LEXIS

3293 *10 (S.D.N.Y. Feb. 28, 2002); H.R. Rep. No. 102-367, at 4 (1991) ("the TVPA

[extends] a civil remedy * * * to U.S. citizens who may have been tortured abroad"); S.

Rep. No. 102-249, at 3-4 (1991) (the TVPA provides "a civil cause of action in U.S.

court for torture committed abroad").  The September 11 attacks occurred within the

United States, and for this reason as well are not covered by the TVPA. Accordingly, the TVPA claim against Mr. Kadi must be dismissed.

### B.   The Anti-Terrorism Act Does Not Apply To The September 11 Attack

As discussed above, the ATA does not apply to terrorist acts which occur in the United States, and thus is inapplicable in this case. Accordingly, the ATA claim must be dismissed as against Mr. Kadi. Further, even if the ATA did apply here, plaintiffs cannot establish (and do not allege) that Mr. Kadi's actions were the proximate cause of their injuries. *See Boim*, 291 F.3d at 1011-12.

### C.   Plaintiffs Allege No Facts Demonstrating Actions By Mr. Kadi That Violate The Alien Tort Claims Act

Plaintiffs allege a violation of the Alien Tort Claims Act ("ATCA") but, as the Court noted in *Burnett I*, none of the defendants in this case have been sued as a direct perpetrator of a tort covered by the ATCA. 274 F. Supp. 2d at 100 ("no defendant in this case is sued as a direct perpetrator of a tort committed in violation of the law of nations"). Liability under the ACTA, however, requires proof that the defendants were aiders and abettors or co-conspirators. *Id.*

Both of these joint liability theories require (1) knowledge, and (2) proximate causation. None of the allegations regarding Mr. Kadi satisfy either prong of this test, and thus the ATCA claims, which depend on theories of "aiding and abetting" and conspiracy, fail as well and should be dismissed.

23

### D.      Plaintiffs' RICO Claims Should Be Dismissed As In *Burnett I*

As noted above, in *Burnett I*, the Court held that plaintiffs' RICO claims should

be dismissed for lack of standing. 274 F. Supp. 2d at 101. This ruling should apply

equally to Mr. Kadi, and the RICO claims against him should be dismissed.[21]

### E.      Plaintiffs' State Law Negligence Claims Fail For Lack Of A Duty To Plaintiffs Or A Causal Link To Their Injuries

Judge Robinson held in *Burnett I* that "plaintiffs' negligence claims must be

dismissed for failure to state a claim" because the 3AC does not "allege that defendants

owed [the plaintiffs] any duty." 274 F. Supp. 2d at 108. This ruling should apply equally

to Mr. Kadi in each of these cases, and the negligence claims against him should be

dismissed. Even if Judge Robertson's ruling did not apply here, however, for the reasons

set out above, plaintiffs have failed to plead sufficient facts to show a causal link between

any acts of Mr. Kadi and the injuries suffered, which is fatal to any negligence claim.

*Febesh v. Elcejay Inn Corp.*, 555 N.Y.S.2d 46, 47 (App. Div. 1st Dept. 1990) (negligence

claim requires allegation of causation between the breach and the resulting injury).

### F.      Plaintiffs' Other State Law Claims Are Unavailing

Plaintiffs assert state common law claims for wrongful death, survival, and

intentional infliction of emotional distress. These claims must be dismissed. Defendants

are not alleged to be the direct perpetrators of these torts, but are potentially liable under

theories of aiding and abetting or co-conspiracy. As described above, the allegations are

---

[21] All of the federal claims, including the ATA, ATCA, RICO, TVPA, are also subject to dismissal on a separate ground provided by the Air Traffic Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101 notes. We are mindful of Judge Robertson's ruling in *Burnett I* that the ATSSSA does not apply. We respectfully disagree with the ruling herein for purposes of preserving the issue for appeal. Were the ATSSSA to apply, it would preclude plaintiffs from bringing *any* other federal claims for recovery. Section 408(b)(1) provides that the federal cause of action created by this statute "shall be the *exclusive* remedy for damages" arising out of the September 11 attacks. By establishing this new cause of action as

not sufficient to establish any element of the aiding and abetting or conspiracy claims as they relate to Mr. Kadi. Since the complaints fail to state a claim for aiding and abetting or conspiracy, both these claims and the wrongful death, survival, and intentional infliction of emotions distress claims must be dismissed.[22]

## CONCLUSION

Accordingly, for these and such other reasons as may appear just to the Court, Mr. Kadi respectfully requests that his motion to dismiss be granted and that the Complaints against him be dismissed with prejudice. In the alternative, Plaintiffs should be required to submit a more definite statement to provide Mr. Kadi with adequate notice of the claims against him.

Dated: July 15, 2004                    Respectfully submitted,

                    MCDERMOTT WILL & EMERY LLP

                    By:   /s/ Thomas P. Steindler
                       Thomas P. Steindler (TS-6620)
                       Stanton D. Anderson (SA-1511)
                       600 Thirteenth Street, N.W.
                       Washington, D.C. 20005
                       Telephone: (202) 756-8000

                       *Attorneys for Defendant*
                       *Yassin Abdullah Al Kadi*

---

the *exclusive* remedy for damages arising out of September 11, Congress intended to preclude other remedies, including remedies provided under other federal statutes.

[22] Plaintiffs' claim for punitive damages must also be dismissed; punitive damages are a remedy, not an independent cause of action. *Mayes v. UVI Holdings, Inc.*, 723 N.Y.S.2d 151, 157 (App. Div. 2001).