# EXHIBIT
# E

# (Part 1 of 2)

# Calendar No. 568

| 102D CONGRESS 2d Session | SENATE | REPORT 102–342 |
| --- | --- | --- |

---

## FEDERAL COURTS STUDY COMMITTEE IMPLEMENTATION ACT

———

JULY 27 (legislative day, JULY 23), 1992.—Ordered to be printed

———

Mr. BIDEN, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany S. 1569]

The Committee on the Judiciary, to which was referred the bill (S. 1569) to implement the recommendations of the Federal Courts Study Committee, and for other purposes, having considered the same, reports favorably thereon with an amendment in the nature of a substitute, and recommends that the bill as amended do pass.

## CONTENTS

| | Page |
| --- | --- |
| I. Purpose | 16 |
| II. Legislative History | 16 |
| III. Discussion | 17 |
| IV. Vote of the Committee | 22 |
| V. Section-by-Section Analysis | 23 |
| VI. Cost Estimate | 47 |
| VII. Regulatory Impact Statement | 49 |
| VIII. Changes in Existing Law | 50 |

The amendment is as follows:

Strike all after the enacting clause and insert the following:

That this Act may be cited as the "Federal Courts Study Committee Implementation Act of 1992".

"(9) if approved by the district court, be authorized to carry firearms under such rules and regulations as the Director of the Administrative Office of the United States Courts may prescribe; and".

(b) Section 3154 of title 18, United States Code, is amended—

(1) by redesignating paragraph (12) as paragraph (14); and

(2) by inserting after paragraph (11) the following new paragraphs:

"(12)(A) As directed by the court and to the degree required by the regimen of care or treatment ordered by the court as a condition of release, keep informed as to the conduct and provide supervision of a person conditionally released under the provisions of section 4243 or 4246 of this title, and report such person's conduct and condition to the court ordering release and the Attorney General or his designee.

"(B) Any violation of the conditions of release shall immediately be reported to the court and the Attorney General or his designee.

"(13) If approved by the district court, be authorized to carry firearms under such rules and regulations as the Director of the Administrative Office of the United States Courts may prescribe.".

SEC. 703. GOVERNMENT RATES OF TRAVEL FOR CRIMINAL JUSTICE ACT ATTORNEYS AND EXPERTS.

The Administrator of General Services Administration, in entering into contracts providing for special rates to be charged by Federal Government sources of supply, including common carriers and hotels (or other commercial providers of lodging) for official travel and accommodation of Federal Government employees, shall provide for charging the same rates for attorneys, experts, and other persons traveling primarily in connection with carrying out responsibilities under section 3006A of title 18, United States Code, including community defender organizations established under subsection (g) of that section.

SEC. 704. TECHNICAL CORRECTION.

Section 3143(b)(1) of title 18, United States Code, is amended by striking out "paragraph (b)(2)(D)" and inserting in lieu thereof "subparagraph (B)(iv) of this paragraph".

# TITLE VIII—FOREIGN RECORDS OF REGULARLY CONDUCTED ACTIVITY

SEC. 801. FOREIGN RECORDS OF REGULARLY CONDUCTED ACTIVITY.

(a) AMENDMENT TO TITLE 28, UNITED STATES CODE.—Chapter 115 of title 28, United States Code, is amended by adding at the end thereof the following new section:

"§ 1747. Foreign records of regularly conducted activity

"(a)(1) In a civil proceeding in a court of the United States, including the United States Claims Court and the United States Tax Court, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that—

"(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

"(B) such record was kept in the course of a regularly conducted business activity;

"(C) the business activity made such a record as a regular practice; and

"(D) if such record is not the original, such record is a duplicate of the original;

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

"(2) A foreign certification under this section shall authenticate such record or duplicate.

"(b) As soon as practicable after a responsive pleading has been filed, a party intending to offer in evidence under this section a foreign record of regularly conducted activity shall provide written notice of that intention to each other party. A motion opposing admission in evidence of such record shall be made by the opposing party and determined by the court before trial. Failure by a party to file such motion before trial shall constitute a waiver of objection to such record or duplicate, but the court for cause shown may grant relief from the waiver.

"(c) As used in this section, the term—

"(1) 'foreign record of regularly conducted activity' means a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, maintained in a foreign country;

"(2) 'foreign certification' means a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person, that if falsely made, would subject the maker to criminal penalty under the law of that country; and

"(3) 'business' includes business, institution, association, profession, occupation, and calling of every kind whether or not conducted for profit.".

(b) CONFORMING AMENDMENT.—The table of sections of chapter 115 of title 28, United States Code, is amended by inserting after the item relating to section 1746 the following item:

"1747. Foreign records of regularly conducted activity."

(c) EFFECTIVE DATE.—The amendments made by this section are effective on the date of enactment of this Act.

# TITLE IX—STATE JUSTICE INSTITUTE REAUTHORIZATION

## SEC. 901. AUTHORIZATION OF APPROPRIATIONS.

Section 215 of the State Justice Institute Act of 1984 (Public Law 98–620; 42 U.S.C. 10713) is amended to read as follows:

"There are authorized to be appropriated to carry out the purposes of this title $20,000,000 for fiscal year 1993, $20,000,000 for fiscal year 1994, $25,000,000 for fiscal year 1995, and $25,000,000 for fiscal year 1996. Amounts appropriated for each year are to remain available until expended.".

## SEC. 902. INTERAGENCY AGREEMENTS.

Section 206(b) of the State Justice Institute Act of 1984 (42 U.S.C. 10705) is amended by—

(1) striking out paragraph (3) and inserting in lieu thereof the following:

"(3) Upon application by an appropriate State or local agency or institution and if the arrangements to be made by such agency or institution will provide services which could not be provided adequately through nongovernmental arrangements, the Institute may award a grant or enter into a cooperative agreement or contract with a unit of State or local government other than a court.";

(2) redesignating paragraph (4) as paragraph (5); and

(3) adding after paragraph (3) the following new paragraph:

"(4) The Institute shall have authority to enter into contracts with Federal agencies to carry out the purposes of this title.".

## SEC. 903. EFFECTIVE DATE.

The provisions of this title shall take effect on the date of enactment of this Act.

# TITLE X—TERRORISM CIVIL REMEDY

## SEC. 1001. TERRORISM CIVIL REMEDY.

(a) REINSTATEMENT OF LAW.—The amendments made by section 132 of the Military Construction Appropriations Act, 1991 (104 Stat. 2250), are repealed effective as of April 10, 1991.

(b) TERRORISM.—Chapter 113A of title 18, United States Code, as amended by subsection (a), is amended—

(1) in section 2331 (as in effect prior to enactment of the Military Construction Appropriations Act, 1991) by striking subsection (d) and redesignating subsection (e) as subsection (d);

(2) by redesignating section 2331 (as in effect prior to enactment of the Military Construction Appropriations Act, 1991) as section 2332 and amending the heading for section 2332, as redesignated, to read as follows:

"§ 2332. Criminal penalties";

(3) by inserting before section 2332, as redesignated by paragraph (2), the following new section:

## "§ 2331. Definitions

"As used in this chapter—
"(1) the term 'act of war' means any act occurring in the course of—
"(A) declared war;
"(B) armed conflict, whether or not war has been declared, between two or more nations; or
"(C) armed conflict between military forces of any origin;
"(2) the term 'international terrorism' means activities that—
"(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
"(B) appear to be intended—
"(i) to intimidate or coerce a civilian population;
"(ii) to influence the policy of a government by intimidation or coercion; or
"(iii) to affect the conduct of a government by assassination or kidnapping; and
"(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;
"(3) the term 'national of the United States' has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act; and
"(4) the term 'person' means any individual or entity capable of holding a legal or beneficial interest in property.''; and
(4) by inserting after section 2332, as redesignated, the following new sections:

## "§ 2333. Civil remedies

"(a) ACTION AND JURISDICTION.—Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.
"(b) ESTOPPEL UNDER UNITED STATES LAW.—A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 902 (i), (k), (l), (n), or (r) of the Federal Aviation Act of 1958 (49 U.S.C. App. 1472 (i), (k), (l), (n), and (r)) shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.
"(c) ESTOPPEL UNDER FOREIGN LAW.—A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

## "§ 2334. Jurisdiction and venue

"(a) GENERAL VENUE.—Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.
"(b) SPECIAL MARITIME OR TERRITORIAL JURISDICTION.—If the actions giving rise to the claim occurred within the special maritime and territorial jurisdiction of the United States, any civil action under section 2333 against any person may be instituted in the district court of the United States for any district in which any plaintiff resides or the defendant resides, is served, or has an agent.
"(c) SERVICE ON WITNESSES.—A witness in a civil action brought under section 2333 may be served in any other district where the defendant resides, is found, or has an agent.
"(d) CONVENIENCE OF THE FORUM.—The district court shall not dismiss any action brought under section 2333 on the grounds of the inconvenience or inappropriateness of the forum chosen, unless—
"(1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;
"(2) that foreign court is significantly more convenient and appropriate; and

"(3) that foreign court offers a remedy that is substantially the same as the one available in the courts of the United States.

## "§ 2335. Limitation of actions

"(a) IN GENERAL.—Subject to subsection (b), a suit for recovery of damages under section 2333 shall not be maintained unless commenced within 4 years from the date the cause of action accrued.

"(b) CALCULATION OF PERIOD.—The time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or any concealment of the defendant's whereabouts, shall not be counted for the purposes of the period of limitation prescribed by subsection (a).

## "§ 2336. Other limitations

"(a) ACTS OF WAR.—No action shall be maintained under section 2333 for injury or loss by reason of an act of war.

"(b) LIMITATION ON DISCOVERY.—If a party to an action under section 2333 seeks to discover the investigative files of the Department of Justice, the attorney for the Government may object on the ground that compliance will interfere with a criminal investigation or prosecution of the incident, or a national security operation related to the incident, which is the subject of the civil litigation. The court shall evaluate any objections raised by the Government in camera and shall stay the discovery if the court finds that granting the discovery request will substantially interfere with a criminal investigation or prosecution of the incident or a national security operation related to the incident. The court shall consider the likelihood of criminal prosecution by the Government and other factors it deems to be appropriate. A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

"(c) STAY OF ACTION FOR CIVIL REMEDIES.—(1) The Attorney General may intervene in any civil action brought under section 2333 for the purpose of seeking a stay of the civil action. A stay shall be granted if the court finds that the continuation of the civil action will substantially interfere with a criminal prosecution which involves the same subject matter and in which an indictment has been returned, or interfere with national security operations related to the terrorist incident that is the subject of the civil action. A stay may be granted for up to 6 months. The Attorney General may petition the court for an extension of the stay for additional 6-month periods until the criminal prosecution is concluded or dismissed.

"(2) In a proceeding under this subsection, the Attorney General may request that any order issued by the court for release to the parties and the public omit any reference to the basis on which the stay was sought.

## "§ 2337. Suits against Government officials

"No action shall be maintained under section 2333 against—

"(1) the United States, an agency of the United States, or an officer or employee of the United States or any agency thereof acting within the officer's or employee's official capacity or under color of legal authority; or

"(2) a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within the officer's or employee's official capacity or under color of legal authority.

## "§ 2338. Exclusive Federal jurisdiction

"The district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter.".

(c) TECHNICAL AMENDMENTS.—(1) The chapter analysis for chapter 113A of title 18, United States Code is amended to read as follows:

### "CHAPTER 113A—TERRORISM

"Sec.
"2331. Definitions.
"2332. Criminal penalties.
"2333. Civil remedies.
"2334. Jurisdiction and venue.
"2335. Limitation of actions.
"2336. Other limitations.
"2337. Suits against government officials.
"2338. Exclusive Federal jurisdiction.".

(2) The item relating to chapter 113A in the part analysis for part 1 of title 18, United States Code, is amended to read as follows:

"113A. Terrorism.................................................................................................... 2331".

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall apply to any pending case or any cause of action arising on or after 4 years before the date of enactment of this Act.

# TITLE XI—EFFECTIVE DATE

**SEC. 1101. EFFECTIVE DATE.**

Except as otherwise provided in this Act, the provisions of this Act and the amendments made by this Act shall be effective on and after January 1, 1993.

## I. PURPOSE

S. 1569 would implement recommendations of the Federal Courts Study Committee, created by Congress to analyze the courts of the United States and to develop a long-term plan for the judicial system.

In addition to addressing a number of Federal Court Study Committee recommendations, S. 1569 would reform the Judicial Survivors' Annuities System. This legislation would also make miscellaneous court improvements, with emphasis on the following areas: judicial financial administration; jury matters; judiciary personnel administration, benefits, and protections; and criminal law. Finally, S. 1569 would provide for: the admission in evidence of foreign business records during Federal civil litigation; the reauthorization of the State Justice Institute; and a civil cause of action in Federal court for victims of terrorism.

## II. LEGISLATIVE HISTORY

Title I of the Judicial Improvements and Access to Justice Act [1] established the Federal Courts Study Committee. Based on its 15-month study of the problems of the Federal courts, that committee issued a report in April of 1990 which included numerous recommendations for change and improvements in the Federal courts.[2]

The 101st Congress saw the first phase of Federal Courts Study Committee legislative recommendations enacted into law as title III of the Judicial Improvements Act of 1990.[3] That legislation included many modest, but nonetheless necessary, committee recommendations.

In the 102d Congress, S. 1569, the Federal Courts Study Committee Implementation Act, was introduced by Senator Howell Heflin on July 26, 1991. The Senate Judiciary Subcommittee on Courts and Administrative Practice, chaired by Senator Heflin, held two hearings on S. 1569.

The first hearing, held on October 3, 1991, included testimony on the following Federal Courts Study Committee recommendations: establishment of bankruptcy appellate panels; Supreme Court authority to prescribe rules for appeal of final and interlocutory decisions; abolition of the Temporary Emergency Court of Appeals; and exhaustion of State remedies prior to filing State prisoners' civil rights suits in Federal court. The subcommittee heard testimony from the Honorable Joseph F. Weis, Jr., judge of the U.S. Court of

[1] Public Law 100-702.
[2] Report of the Federal Courts Study Committee. Apr. 2, 1990.
[3] Public Law 101-650.

Appeals for the Third Circuit and Chairman of the Federal Courts Study Committee; the Honorable Diana Gribbon Motz, associate judge of the Maryland Court of Special Appeals; William K. Slate II, President of the Justice Research Institute and Director of the Federal Courts Study Committee; Stephen C. Bransdorfer, Deputy Assistant Attorney General for the Civil Division of the U.S. Department of Justice; the Honorable Helen Wilson Nies, Chief Judge of the U.S. Court of Appeals for the Federal Circuit; and the Honorable Ralph R. Mabey, attorney.

The second hearing, conducted on October 17, 1991, included testimony on the Federal Courts Study Committee recommendation regarding transfer of jurisdiction for modification of supervised release. In addition, the subcommittee heard testimony on S. 1673, the "Judicial Survivors' Annuities Improvements Act" (subsequently included as title II of S. 1569). Witnesses at the October 17 hearing included the Honorable Joseph F. Weis, Jr., judge of the U.S. Court of Appeals for the Third Circuit and Chairman of the Federal Courts Study Committee; J. Vincent Aprile II, general counsel for the Frankfort, KY, Department of Advocacy; Paul L. Maloney, Deputy Assistant Attorney General for the Criminal Division of the U.S. Department of Justice; the Honorable Deanell Reece Tacha, judge of the U.S. Court of Appeals for the Tenth Circuit and Chairman of the Judicial Conference Committee on the Judicial Branch; and the Honorable Betty Fletcher, judge of the U.S. Court of Appeals for the Ninth Circuit and President of the Federal Judges Association.

On March 31, 1992, the Subcommittee on Courts and Administrative Practice, a quorum being present, considered a substitute version of S. 1569 and, after adopting an amendment offered by Senator Thurmond, reported (by voice vote) the substitute bill, as amended, to the full Judiciary Committee.

After consultation with members of the committee and based on comments submitted by various individuals and groups, a modified version of S. 1569 was offered by Senator Heflin at the June 25, 1992, executive business meeting of the Committee on the Judiciary. This substitute bill was reported favorably out of committee by unanimous consent.

## III. DISCUSSION

### A. FEDERAL COURTS STUDY COMMITTEE

Responding to the mounting public and professional concern with the Federal courts' congestion, delay, expense, and expansion, the 100th Congress in November of 1988 created within the Judicial Conference of the United States a 15-member Federal Courts Study Committee.[4] The committee was directed, by April of 1990, to "make a complete study of the courts of the United States and of the several States and transmit a report to the President, the Chief Justice of the United States, the Congress, the Judicial Conference of the United States, the Conference of Chief Justices, and the State Justice Institute on such study."

[4] Public Law 100-702.

The statute specifically directed the Federal Courts Study Committee to analyze alternative dispute resolution, Federal court structure and administration, intracircuit and intercircuit conflicts in the courts of appeals, and the types of disputes currently embraced by Federal jurisdiction. In broader terms, it directed the committee to "recommend revisions to be made to laws of the United States as the Committee, on the basis of such study, deems advisable," to "develop a long-range plan for the judicial system," and to "make such other recommendations and conclusions it deems advisable."

In December 1988, Chief Justice William H. Rehnquist appointed the committee members, who were "representative of the various interests, needs and concerns which may be affected by the jurisdiction of the Federal courts." The committee consisted of members of the Federal executive, legislative and judicial branches and representatives from State governments, universities and private practice.[5]

The Federal Courts Study Committee report, issued on April 2, 1990, included over 100 recommendations for improvement of the Federal courts. Some recommendations can be implemented by the judiciary without congressional action, while other recommendations require legislation. The recommendations warranting legislation are wide-ranging and diverse in scope, with most of the modest, noncontroversial provisions enacted into law during the 101st Congress.[6]

The core of S. 1569 is title I, which implements some of the remaining recommendations of the Federal Courts Study Committee. This legislation represents an ongoing effort to improve the efficiency and fairness of the Federal courts system.

## B. JUDICIAL SURVIVORS' ANNUITIES SYSTEM

The Judicial Survivors' Annuities System (JSAS) was created to provide annuities to the surviving spouse and any surviving eligible children of a Federal judicial officer. JSAS provides death benefit coverage throughout the lifetime of judicial officials of the United States who elect, within 6 months of taking office or getting married, to be covered by the plan. The participant must contribute 5 percent of salary (or annuity) earned each pay period, until death, despite divorce or death of the spouse.

JSAS was expanded in 1988 to extend eligibility to roughly 600 bankruptcy judges and magistrate judges. Currently, the system covers about 725 active and retired judicial officers, and pays annuities to 225 survivors. Approximately 40 percent of more than 1,800 eligible judicial officials have elected to participate in JSAS. The participation rate of newly appointed judges is lower and has de-

---

[5] The committee was comprised of five Federal judges, including Judge Joseph Weis, Jr., who chaired the committee, Judge Jose Cabranes, Judge Levin Campbell, Judge Judith Keep and Judge Richard Posner; Washington Supreme Court Justice Keith Callow; Edward Dennis, Assistant Attorney General, Criminal Division, U.S. Department of Justice; former Solicitor General Rex Lee; two private practitioners, Diana Gribbon Motz and Morris Harrell; Vince Aprile II, general counsel of a State public advocacy program; and four Members of Congress, including Senators Howell Heflin, chairman of the Senate Judiciary Subcommittee on Courts and Administrative Practice, and Charles Grassley, ranking minority member of the subcommittee; and Representatives Robert Kastenmeier and Carlos Moorhead.
[6] See supra note 3.

clined to about 25 percent over the past few years. The current low level of participation has been attributed to the fact that judges pay a substantial amount which represents most of the cost of JSAS. In 1991, the total cost of JSAS averaged 6.1 percent of salary. Of that 6.1 percent, judicial officers pay 5 percent of salary of annuity, and the Government pays 1.1 percent. As a result, judges can often find Life insurance products that appear to provide better benefits for the JSAS contribution.

Most civilian and military employees of the Federal Government are covered by one of two retirement systems; civilian employees are covered by the Civil Service Retirement System (CSRS) or, if they were hired after 1983, the Federal Employees Retirement System (FERS). Military employees are covered by the Military Retirement System. Each retirement system provides death benefits to surviving spouses and children. There are variations on the basic retirement and survivor benefits for certain groups such as Members of Congress.

The total cost of JSAS is based on several long-term economic assumptions. The 5-percent contribution rate of judges was established by legislation in 1986 in light of the total cost of JSAS estimated at that time. The total cost of JSAS, however, is recalculated annually based on actual experience as documented in annual actuarial reports submitted to Congress. In hindsight, the 5-percent contribution rate was based on estimates of the future cost of JSAS that proved to be much too high.

The total JSAS contribution has fluctuated significantly in the past. Until 1986, the Government and judges were each required to contribute 4.5 percent of salary, even though unexpectedly high earnings on the fund during the early 1980's reduced the amount necessary to fund JSAS. As a result of amendments to JSAS in 1986, the judges contributed 5 percent of salary, while the Government's contribution steadily declined so that during 4 of the last 5 years, no Government contributions have been made to JSAS. The 1986 change in law anticipated that the Government would pay up to 9 percent of payroll as its share of the cost of the program.

Title II of S. 1569 would reduce the contribution of JSAS participants to 1.5 percent of salary before retirement and 3.5 percent of annuity after retirement. This proposal would reallocate the cost of JSAS more fairly and accomplish the unfulfilled objectives of the 1986 legislation, which were intended to attract more participation in JSAS. It is expected that approximately 80 percent of all judges would elect JSAS if it is revised consistent with this legislation. The Government's added share of cost is estimated at 4.2 percent of the salaries of participating judges, still short of the 9-percent figure anticipated by the 1986 proposal.

### C. JUDICIAL FINANCIAL ADMINISTRATION

This title deals with funding issues for the judiciary. It makes needed changes in the filing fee area, provides a permanent base of funding for the collection of fines, and extends the authorization for the Automation Fund.

### D. JURY MATTERS

Title IV allows the courts to make it easier for citizens to serve on Federal juries in a variety of ways: the courts can offer easier travel when weather conditions necessitate, reimburse citizens for property stolen while sitting on a jury, and allow worker's compensation when necessary. In addition, successful experimentation with expanding the jury pool will become a permanent part of the Federal jury system.

### E. MISCELLANEOUS COURT IMPROVEMENTS

This title makes amendments that allow for courts of appeals to terminate a regular session of court if there is insufficient business, phases out reports that are duplicative, allows for courts to recycle, changes effective dates that need modifying, corrects and clarifies language in previous judiciary-related bills, and allows for prevailing parties in the Court of Veterans' Appeals to take advantage of the Equal Access to Justice Act provisions.

### F. JUDICIARY PERSONNEL ADMINISTRATION, BENEFITS AND PROTECTIONS

Title VI brings the retirement plans for the Directors of the Administrative Office of the U.S. Courts and the Federal Judicial Center more in line with other Federal retirement programs, provides that judicial retirement funds are provided protection similar to other Federal retirement programs, corrects an inequity in court reporters' retirement, and allows the Federal Judicial Center to make changes to its personnel system.

### G. CRIMINAL LAW MATTERS

Title VII allows district courts to set policy for the collection of information in certain cases, provides authority to supervise certain persons released into the Federal probation system, and provides authority for nationwide rules for carrying weapons for certain Federal judicial employees. In addition, the title corrects a drafting error in a present statute and allows Criminal Justice Act attorneys access to Government rates for travel.

### H. ADMISSIBILITY OF FOREIGN RECORDS IN FEDERAL CIVIL LITIGATION

Title VIII is identical to S. 1613, introduced by Senator Strom Thurmond on behalf of the U.S. Department of Justice. This provision is the civil analog to 18 U.S.C. 3505, which governs the admissibility of foreign business records in Federal criminal proceedings. Specifically, in Federal civil litigation, title VIII would provide for the admission into evidence of foreign business records of regular conducted activity.

As part of the Comprehensive Crime Control Act of 1984, Congress enacted section 3505 of title 18, United States Code, in order to facilitate the introduction of foreign business records into evidence in Federal criminal proceedings. The Justice Department's experience with this procedure has been extremely favorable and the purpose of title VIII is to make the same procedure available in Federal civil litigation.

### I. STATE JUSTICE INSTITUTE

Title IX is identical to S. 2283, introduced by Senator Heflin. This section would reauthorize the State Justice Institute (SJI) for fiscal years 1993 ($20 million), 1994 ($20 million), 1995 ($25 million), and 1996 ($25 million). Congress originally authorized SJI for 4 years in the State Justice Institute Act of 1984,[7] then reauthorized it for another 4 years through fiscal year 1992. Senator Heflin was also responsible for introducing the original legislation establishing SJI and its reauthorization legislation as well.

The mission of SJI is to award grants to improve the administration of justice in the State courts. Since the time SJI actually became operational in early 1987, it has awarded approximately $50 million in grants to support nearly 500 projects to meet its congressional mandate.

SJI grants support educational programs for judges and court staff, demonstrations of new procedures and new technologies in the courts, research on important emerging issues in the law and the administration of justice, and technical assistance to help State and local courts discharge their responsibilities with both greater efficiency and greater justice.

SJI has taken a leadership role in helping the State courts cope with the overwhelming burden of their drug-related cases. In November of 1991, in collaboration with the Department of Justice Bureau of Justice Assistance, SJI convened a National Conference on Substance Abuse and the Courts. Teams from 33 States came to Washington to learn how to develop successful case management programs, design effective diversion, treatment and sentencing programs, and establish critically important working relationships with criminal justice agencies, treatment providers, and community resources. The conference enabled justice system leaders and other key officials to meet without the pressure of their day-to-day activities and work together to develop a plan of action to implement in their home jurisdictions. In order to bring the action plans to fruition, SJI established a special March 1, 1992, deadline solely for proposals seeking funding to begin to implement those plans.

SJI also supported an indepth national search to identify successful court programs to handle drug cases and distribute information about them to judicial leaders nationwide. The Institute has also granted funds to American University to support an ongoing technical assistance program that brings leading experts to local courts to help them develop customized ways to improve the way they handle their drug caseloads.

In addition, the Institute helped educate State court trial judges about the Bankruptcy Code through a grant to the American Bankruptcy Institute (ABI). The work of the Federal bankruptcy courts—burdened by close to 1 million filings per year—provides an enormous opportunity for tension between the State and Federal judiciary. By enabling ABI to educate State court judges about this complex area of the law, SJI serves an important role in reducing the tensions between the Federal and State courts.

---

[7] 42 U.S.C. 10701.

SJI also plays a critical role in supporting improvements in the working relationship between the State and Federal courts in areas such as habeas corpus review, mass torts, and joint judicial planning. One of SJI's most important contributions in this area is its support of the State Judges Asbestos Litigation Committee. The Institute's grant enables judges hearing a significant portion of the 60,000 asbestos cases pending in the State courts to meet on a regular basis to discuss common issues, including case management practices, new trends in the litigation, and coordination with the asbestos cases pending in Federal court. An SJI grant also supports an analysis of the asbestos judges' case management procedures for the purpose of developing a manual for future State and Federal judges hearing mass tort cases.

The demand for SJI funds has grown significantly each year of its current authorization. The Institute has operated at a very modest funding level, and title IX would provide only a limited increase to enable the Institute to respond to the State courts' great need for Federal assistance over the next 4 years.

### J. TERRORISM CIVIL REMEDY

Title X is known as the Civil Remedies for Victims of Terrorism. This legislation was first introduced in the 101st Congress (as S. 2465) by Senator Charles Grassley. On July 25, 1990, the Senate Judiciary Subcommittee on Courts and Administrative Practice held a hearing on the Bill. It passed the subcommittee on September 25, 1990, and was thereafter incorporated into the fiscal year 1992 Military Construction Appropriations bill. In Conference, the conferees intended to delete the provisions of Civil Remedies for Victims of Terrorism. The enrolling clerk, however, erred and the provisions were included in Public Law 101–519 of November 5, 1990.

The Civil Remedies sections of the Military Construction Appropriations Act were repealed in 1991, and Senator Grassley reintroduced the bill, S. 740, in the 102d Congress. The Senate passed this bill by voice vote on April 16, 1991.

Title X would allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed. By its provisions for compensatory damages, tremble damages, and the imposition of liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money.

### IV. VOTE OF THE COMMITTEE

On June 25, 1992, the Committee on the Judiciary by unanimous consent approved an amendment in the nature of a substitute by Senator Heflin. The committee ordered the Federal Courts Study Committee Implementation Act of 1992, as amended, favorably reported.

# V. Section-by-Section Analysis

## TITLE I—IMPLEMENTATION OF FEDERAL COURTS STUDY COMMITTEE RECOMMENDATIONS

### Section 101. Establishment of bankruptcy appellate panels

This section further implements a recommendation of the Federal Courts Study Committee found on page 74 of the Study Committee Report, which called for Congress to require each circuit to establish bankruptcy appellate panels (BAPs), with an opt-out provision. The Judicial Improvements Act of 1990 [8] included the counterpart Study Committee recommendation authorizing the creation of multicircuit BAPs by two or more small circuits.

BAP's clearly reduce the workload of district court judges since an appeal decided by a BAP need not be heard by a district court judge. BAP's may also reduce the number of appeals to the courts of appeals.

The BAPs' well-studied success in the ninth circuit warrants their use nationwide. A study of the ninth circuit BAP by the Federal Judicial Center noted that 25 percent of the district courts' bankruptcy decisions are appealed to the court of appeals, compared to 10 percent of the BAP's decisions. According to the study, in 1987, the BAP may have reduced the number of bankruptcy appeals taken to the ninth circuit by 135—a 40-percent decrease. Experience in 1988 was similar: district court decisions were three times as likely as BAP decisions to be the subject of an appeal.

BAP's may reduce appeals to the courts of appeals because attorneys have more confidence in the correctness of their decision or believe that these decisions will be more difficult to overturn on appeal. BAP's also contribute to the development of more predictable and coherent bankruptcy law. The BAP is a small, collegial court that can keep up with changing doctrines in bankruptcy law. In addition, BAP's publish opinions more frequently than the district courts. In 1987 and 1988, for example, the BAP was 2.5 times more likely than the district court to publish an opinion in a bankruptcy case. This, in turn, enhances the parties' ability to plan their out-of-court conduct.

Under existing law, a judicial council of a circuit, or, if authorized by the Judicial Conference of the United States, the judicial councils of two of more circuits, may establish a bankruptcy appellate panel. If the parties consent, the BAP will hear and determine the appeal. Otherwise, the district court will hear the appeal. An appeal from either a bankruptcy appellant panel or a district court shall be taken in the same manner as appeals in civil matters generally are taken to the courts of appeals.[9]

Section 101 of S. 1569 would require each circuit to establish a BAP, unless that circuit's judicial council establishes its circuit has insufficient judicial resources to do so. In determining whether its circuit has insufficient resources to establish a BAP, the judicial council shall take into account the bankruptcy judges' caseloads,

---

[8] See supra note 3.
[9] 28 U.S.C. 158.

the geographical dispersion of bankruptcy judges in the circuit, and the opportunity to establish a joint panel with another circuit.

If a judicial council certifies that its circuit has insufficient resources to establish a panel, it shall within 90 days file a report with the Administrative Office of the U.S. Courts describing why the circuit's judicial resources are insufficient. Panels established under section 101 shall operate for 3 years or until a majority of the bankruptcy judges requests the council to discontinue the panel, whichever is earlier. Thereafter, the council may again establish a panel. The council may reconsider its decision not to establish a panel at any time.

Panels shall be comprised of three bankruptcy judges to hear and determine, upon consent of all the parties, appeals of bankruptcy decisions. If the appellee does not wish to have his or her case heard by a BAP, he or she will have 30 days after service of notice of appeal to elect to have the appeal heard by a Federal district court.

### Section 102. Supreme Court authority to prescribe rules for appeal of interlocutory decisions

This section further implements a recommendation of the Study Committee found on page 95 of its report, which called for Congress to consider delegating to the Supreme Court the authority to define circumstances in which orders and actions of district courts not otherwise subject to appeal under acts of Congress may be appealed to the courts of appeals.

The Judicial Improvements Act of 1990 [10] included the counterpart Study Committee recommendation, which called for Congress to delegate to the Supreme Court the authority under the Rules Enabling Act to define what constitutes a final decision for purposes of 28 U.S.C. 1291. Section 1291 permits the appeal of a "final" decision of the district court.

The state of law on when a district court ruling is an appealable interlocutory action strikes many observers as unsatisfactory in several respects. The area has produced much purely procedural litigation. Courts of Appeals often dismiss appeals as premature. Litigants sometimes face the possibility of waiving their right to appeal when they fail to seek timely review because it is unclear when a decision is "final" and the time for appeal begins to run. Decisional doctrines—such as "practical finality" and the "collateral order" rule—blur the edges of the finality principle, require repeated attention from the Supreme Court, and may in some circumstances restrict too sharply the opportunity for interlocutory review.

Section 102 of S. 1569 would permit the Supreme Court to expand the appealability of interlocutory determinations by the courts of appeals. In other words, the Supreme Court may authorize additional categories of interlocutory appeal permitted by Congress in 28 U.S.C. 1292.

---

[10] See supra note 3.

*Section 103. Abolition of Temporary Emergency Court of Appeals*

Congress created the Temporary Emergency Court of Appeals (TECA) in 1971 as part of the Economic Stabilization Act Amendments, which established price controls long since abolished. The court has jurisdiction over appeals arising from that statute and regulations issued under it. The Chief Justice assigns judges, for temporary service on the court, from the roster of active and senior article III judges. Whatever may have been the value of the court in earlier years, its caseload is now so small as to justify its abolition. Since 1987, the Judicial Conference has endorsed legislation to that end.

Section 103 of S. 1569 encompasses the Federal Courts Study Committee recommendation found on page 73 of the Study Committee Report. It would abolish TECA and vest its remaining caseload in the Court of Appeals for the Federal Circuit.

*Section 104. Jurisdiction for magistrate judges for modification of conditions or revocation of probation or supervised release after imprisonment*

This section would amend 18 U.S.C. 3401 to authorize a U.S. magistrate judge to revoke, modify or terminate the supervised release or probation of a defendant that a magistrate judge has sentenced. In addition, if a district court delegates a final revocation of supervised release hearing to a magistrate judge, the magistrate judge shall follow procedures similar to those used in final probation revocation.

Section 104 would overturn a recent decision by the United States Court of Appeals for the Fifth Circuit, *United States* v. *Williams,*[11] holding that magistrate judges lack authority to revoke or modify the supervised release of a defendant the magistrate judge has sentenced. A magistrate judge currently has statutory authority to revoke the probation of probationers he or she has sentenced.[12]

Magistrate judges have routinely conducted both preliminary and final probation revocation proceedings under authority of 28 U.S.C. 636(b)(3). Two circuits, however, held that Congress did not intend to permit the assignment of final probation revocation functions to magistrate judges.[13] This section specifically authorizes a magistrate judge to conduct both the preliminary and final revocation of supervised release hearings. It contemplates that if a court delegates a final revocation of supervised release hearing to a magistrate judge, the magistrate judge will prepare proposed findings of fact and recommendations as provided in 28 U.S.C. 636(b)(1)(B), thereby following procedures similar to those used in final probation revocation. The district judge may make a *de novo* determination and act on the proposed findings of fact and recommendations as provided in 28 U.S.C. 636(b)(1).

Section 104 of S. 1569, supported by the Judicial Conference and the Department of Justice, is derived from a broad Federal Courts

---

[11] 919 F.2d 266 (5th Cir. 1990).
[12] 18 U.S.C. 3401(d).
[13] See *United States* v. *Curry,* 767 F.2d 328 (7th Cir. 1985), and *Banks* v. *United States,* 614 F.2d 95 (6th Cir. 1980).

Study Committee recommendation, found on page 79 of the Study Committee Report, suggesting a statutory change to allow the district courts to take fuller advantage of magistrate judges, and a thorough study of the constitutional range of duties that magistrate judges may exercise.

## Section 105. Exhaustion of remedies

This section implements a recommendation of the Federal Courts Study Committee found on page 48 of the Study Committee Report, which called for Congress to amend 42 U.S.C. 1997e to direct Federal courts in State prisoner suits brought under 42 U.S.C. 1983 to require exhaustion of State institutional remedies for a period of 90 days (the Study Committee recommended a period of 120 days), if the court or the Attorney General of the United States is satisfied that the remedies are plain, speedy and effective. Furthermore, the Study Committee recommended that Congress delete 42 U.S.C. 1997e(b)'s minimal standards for State institutional remedies.

The number of civil rights suits filed by prisoners in Federal courts, under the provisions of 42 U.S.C. 1983, is formidable. In the 12-month period ending in December 1990, State prisoners filed over 25,000 civil rights suits in the district courts—representing approximately 11 percent of all Federal civil filings. Almost 5,000 appeals of this nature were lodged in the courts of appeals.

42 U.S.C. 1997e authorizes district courts to require State prisoners filing section 1983 actions to exhaust the prisoner's administrative grievance procedures, if the U.S. Attorney General has certified, or the district court has determined, that the procedures are in "substantial compliance" with the statutory "minimum requirements." Section 1997e has failed to fulfill the benefits hoped for when it was enacted in 1980. This appears to be partially the result of a cumbersome process for States to obtain Department of Justice certification; but the main reason seems to be resistance by prison administrators to some of the statutory minimum standards, specifically the requirements of inmate participation in the grievance system's design and administration, and independent review of a person of entity not under supervision or control of the institution.

Therefore, section 105 of S. 1569 would delete the statutory minimum standards for certification of a State administrative process. Instead, a State would be allowed to persuade either a Federal court or the Attorney General of the United States that its administrative procedure for resolving grievances is fair and effective. If such a finding is made, the court shall, if it finds such a requirement to be appropriate and in the interests of justice, continue the case for a period of 90 days, during which time grievance procedures would continue. Exhaustion of remedies shall not be required when the prisoner alleges facts which show a risk of substantial or irreparable harm.

## Section 106. Parties' consent to determination by bankruptcy court

28 U.S.C. 157 provides that in noncore proceedings, the bankruptcy judge may conduct hearings but the judge's findings become final only if the parties consent. In the absence of such consent, the bankruptcy judge's findings must be submitted to the district court

and have no force unless the district court adopts them after review.

The Federal Courts Study Committee Report noted that the statutory language does not specify whether the consent must be express or may be implied, although Bankruptcy Rules 7008 and 7012 appear to require express consent.

Section 106 of S. 1569 embodies the Federal Courts Study Committee recommendation found on page 76 of its report. Here, a bankruptcy judge's findings in noncore proceedings become final unless a party objects within 10 days (the Study Committee recommendation calls for a period of 30 days). The 10-day period makes this provision parallel to that of Rule 8002 of the Bankruptcy Rules.

Section 106 would eliminate the need for district court review in noncore proceedings when no timely objections have been filed. Implied consent will eliminate problems in default cases where the plaintiff often finds it difficult to obtain express consent. The section promotes the economical use of resources, both judicial and those of the parties.

## Section 107. Intercircuit transfers

Section 107 would implement a recommendation of the Study Committee located on page 155 of the Federal Courts Study Committee Report, allowing judges of the courts of appeals a regular opportunity to sit on other courts of appeals from time to time, on an exchange basis, as a means of promoting education in court administration.

Such a program would represent a cost-effective means of familiarizing judges of the courts of appeals with management and administrative techniques that appear to work effectively in other courts, and thus allow them to consider those techniques for adaption and possible adoption in their own courts.

### TITLE II—JUDICIAL SURVIVORS' ANNUITIES IMPROVEMENTS

Section 201. This section contains revisions in the Judicial Survivors' Annuities System (JSAS).

Subsection (a) amends section 376(a)(1) of title 28, United States Code, which sets forth the time periods during which judicial officials can elect to come within the purview of JSAS. This amendment renews the opportunity of incumbent judicial officials to participate in JSAS by allowing them to elect coverage within 6 months after the enactment of this legislation.

Subsection (b) reduces the contributions required from judicial officials from the present level of 5 percent of salary to 1.5 percent of salary while the judicial official remains in office. Upon retirement from office, the contribution rate for a judicial official would rise from 1.5 percent of salary to 3.5 percent of retirement salary, including any annuity treated as retirement salary under section 376(a)(2) of title 28, United States Code. The amendment makes clear, however, that article III judges who retire from regular active service, but remain in office as senior judges under section 371(b) of title 28, and other retired judicial officials who perform

service on a recall basis, are subject to the 1.5-percent contribution rate.

This subsection also addresses an anomaly with respect to judicial officials who leave office entitled only to a future "deferred retirement salary." Under present law, the spouse and dependents of a judicial official are entitled to receive survivors' benefits only if the judicial official dies while in office or while receiving retirement salary. That provision is designed for life-tenured article III judges who are not entitled to receive any deferred retirement salary if they leave office prior to meeting the age and service requirements contained in section 371(c) of title 28, United States Code. Bankruptcy and magistrate judges, however, are entitled, under section 377(b) and (c) of title 28, to receive a deferred retirement salary at age 65 after completing at least 8 years of creditable service or if not reappointed at the expiration of the term of office despite an expressed willingness to serve. The current JSAS requirement of immediate retirement salary upon leaving office places the spouse and dependents of bankruptcy and magistrate judges at financial risk while the judge is out of office and not yet receiving retirement salary until he or she reaches the age of 65. To correct this problem, a new paragraph (2) is added to section 376(b) of title 28, which allows these judges to elect to continue contributions during the period of separation from office until the date on which retirement salary payments are received (*i.e.*, at age 65). The sum to be contributed in that context would be equal to the higher 3.5-percent rate applicable to retired judicial officials, and is based on the retirement salary payable at age 65.

Subsection (c) makes conforming amendments to section 376(d) of title 28, United States Code, with respect to the deposits necessary to credit service performed by a judicial official before he or she elects to participate in JSAS. The amount of the required deposits is reduced from 5 percent to 3.5 percent of the salary or retirement salary received for the past creditable service.

Subsection (d) amends section 376(g) of title 28, United States Code, to clarify the provisions for refunds of JSAS contributions. Under current law, a judicial official's salary deductions and deposits for prior creditable service may be refunded only if he or she resigns before becoming entitled to receive retirement salary. That provision does not adequately address the situation of non article III judicial officials who may not be reappointed or retained in office until retirement. This amendment provides that judicial officials who leave office prior to becoming eligible for retirement, and who do not elect to continue JSAS coverage under section 376(b) as amended by subsection (b) of this legislation, are entitled to receive a refund of prior contributions. It also reduces the amount of that refund by 1.5 percent of any salary received for service with respect to which deductions or deposits were made.

Subsection (e) amends section 376(h) of title 28, United States Code, to conform with the amendments made to section 376(b) and (e). This amendment provides that the survivors of a judicial official who leaves office eligible to receive a deferred retirement salary at a later date, and who elects to continue JSAS coverage and makes the requisite contributions, are entitled to receive survi-

vors' benefits if the judicial official dies before receiving that retirement salary.

Subsection (f) amends section 376(k) of title 28, United States Code, to include those years during which a judicial official is separated from office and continues to contribute 3.5 percent of retirement salary under section 376(b) (1) or (2) of title 28, as amended by subsection (b) of this legislation. Service as a senior judge under sections 371(b) or 372(a) of title 28, and service in recall status under sections 155(b), 178(d), 373(c)(4), 375, or 636(h) of title 28, remain creditable for purposes of computing the annuities payable to the survivors of eligible judicial officials. In computing those annuities credit will now be given for all years in which contributions to JSAS were made.

Subsection (g) amends section 376(l) of title 28, United States Code, which sets forth the method for computing survivors' annuities. Currently, the amount of an annuity is based solely on the judicial official's years in office and the average of the highest 3 years of salary he or she received while in office. This amendment provides credit for those years in which a judicial official is separated from office but continues to contribute to JSAS while either receiving retirement salary or awaiting a deferred retirement salary for which he or she is eligible. It also provides that the survivors' annuity is based on the greater of either (1) the average annual salary received during the 3 years in office when the annual salary was highest, or (2) the average annual retirement salary received during the 3 years after leaving office in which the annual retirement salary was highest.

Subsection (h) adds a new subsection to section 376 of title 28, United States Code, to allow termination of JSAS coverage for a judicial official who ceases to be married through death or divorce. Under present law, a judicial official must continue to contribute to JSAS even after his or her spouse dies or divorces. This amendment allows a judicial official in that situation to revoke his or her election to participate in JSAS, and thus to stop making contributions, so long as any spouse or former spouse is notified in accordance with regulations prescribed by the Director of the Administrative Office of the United States Courts. A judicial official who revokes the election for that reason is not entitled to a refund of prior contributions but may renew coverage upon remarriage if still in office at the time.

Subsection (i) provides, for those judicial officials who are enrolled in JSAS on the date of enactment of this legislation, a one-half percent reduction in the contribution rate for every month (not exceeding 18) in which the judicial official previously contributed to the program at the higher 5-percent rate.

Subsection (j) provides, equitable treatment for those judicial officials who, following earlier revisions in JSAS, elected to terminate participation in the program and received refunds of past contributions. Under present law, a judicial official may elect to reenter the program only if he or she redeposits the full amount of the refund plus interest. For those judicial officials who terminated JSAS coverage after the 1986 amendments, the median amount to be redeposited would be approximately $40,000, and some redeposits would be significantly higher. If required all at once, these substantial re-

payments—which would be based on the previously higher contribution rates—could deter these individuals from reentering the program, thereby frustrating the goal of expanded participation.

Under this provision, any judicial official who wishes to resume participation in JSAS, but elects not to make the required redeposit in a lump sum, must first contribute an amount equal to the most recent 18 months of JSAS contributions that were refunded when that judicial official previously terminated coverage. Thereafter, he or she must make installment payments, in amounts and under conditions determined by the Director of the Administrative Office of the United States Courts, until the total redeposit is made.

Section 202. This section amends several sections of chapter 87 of title 5, United States Code, which governs the Federal Employees' Group Life Insurance program. These amendments, which are applicable to judges retiring on or after August 1, 1987, provide non-life tenured judges (i.e., judges of the United States Claims Court, judges of the territorial district courts, magistrate judges, and bankruptcy judges) similar rights to article III judges regarding life insurance coverage after leaving office. It allows them to maintain group coverage without dimunition following retirement with an immediate annuity, and to convert to individual coverage in other cases. In addition, there are several technical amendments that reinsert provisions allowing article III judges to continue optional and family coverage after assuming senior status or retirement from office. Those provisions were originally included in Public Law 98–353, but were deleted inadvertently by Public Law 99–336.

Section 203. This section amends section 8901(3) of title 5, United States Code, relating to coverage under the Federal Employees' Health Benefits Program. Under present law, a spouse or other family member of an article III, territorial district court, Claims Court, bankruptcy, or magistrate judge is eligible for continued group health insurance coverage following the judge's death only if that judge elected JSAS coverage. Because most judges do not participate in JSAS, their survivors are ineligible to retain group health insurance coverage. This amendment allows the surviving family members of any deceased judge to continue their health insurance coverage under the same terms and conditions that govern coverage of survivor annuitants of other federal employees.

Section 204. This section provides that this title and the amendments made thereby take effect on the date of enactment.

### TITLE III—JUDICIAL FINANCIAL ADMINISTRATION

*Section 301. Award of filing fees in favor of the United States*

Subsection (a) of this section adds a new paragraph to 28 U.S.C. 2412 that permits the filing fee prescribed under 28 U.S.C. 1914(a) to be taxed as a cost in favor of the United States when the United States prevails as plaintiff. It also expressly provides that the litigating agency need not have paid the fee upon commencing the action to obtain this element of costs.

Subsection (b) amends 28 U.S.C. 1931 to provide the same treatment for the filing fees taxed under section 2412(b) as for civil filing fees that are paid to the clerks of the court by plaintiffs other

than the United States. Under the present section 1931, $60 of each filing fee is deposited into a special fund of the Treasury to be available to offset funds appropriated for the operation and maintenance of the courts of the United States.

Under current law, a prevailing private plaintiff in a Federal civil action is routinely permitted to recover its filing fee from the defendant. A prevailing U.S. plaintiff is not. The reason is that private plaintiffs are required to pay filing fees at the start of a civil action, and U.S. plaintiffs are not. The net effect is twofold: first, defendants losing to the United States escape paying an element of costs paid by virtually every defendant losing to a private plaintiff; and second, the cost to the court of adjudicating meritorious civil actions brought by the United States cannot be defrayed to the extent of the filing fee. This section corrects these anomalies by permitting prevailing U.S. plaintiffs to recover the amount of the filing fee, which is then made available to the judiciary.

The current case law suggests that, if the United States paid the filing fee, it could seek to recover it from its adversary in each case where it prevails. The volume of the Government's filings, however, would add a very large number of receipt and payment transactions to the workload of the clerks of court, if the fee were paid when each complaint is filed, as with other litigants. Alternatively, the United States could make regular, aggregate payments representing its filing fees for a given period, based on estimated or actual figures. Either system, though, would require the Justice Department to pay out several million dollars a year, which would become unavailable for their general operations even after an award of costs. The mechanism proposed by this section would avoid this dilemma without imposing any greater burden on the losing party.

*Section 302. Judiciary Automation Fund*

This section extends the authorization for the Judiciary Automation Fund by 5 years, to September 30, 1999, and makes technical changes in the language to clarify the purposes for which the funds can be spent.

These changes include:

612(a)—Changes to this subsection reflect the practice in the first years of the statute that the Fund was mainly applicable to the activities funded under the Courts of Appeals, District Courts, and Other Judicial Services appropriations. As examples, activities in the Supreme Court and the Federal Judicial Center have not been covered by the Fund. Other agencies of the Judiciary would be authorized to use the Fund if they deemed it appropriate.

612(b)(1)—Reference is made to authority to collect fees for the benefit of the Fund, as specified in section 404 of Public Law 101-515. This fee authorization statue, enacted after the Fund was established, directs certain fees to be deposited in the Fund.

612(e)—The amount of $75,000,000 available for contracting in advance of availability of amounts in the Fund has been changed to the estimate of deposits into the Fund during the fiscal year in which the obligation is being made.

612(i)—A change in reprogramming authority is made to accommodate the requirements of discretionary spending by Clerks of Court and other court unit executives under the "budget decentralization" authorized by the Judicial Conference and approved by the Congress. Up to $1 million may be transferred from the Fund, under Conference approval, before permission of the Appropriations Committees is required for transfers. Such transfers can only be made to the appropriation from which the funds originated.

612(l)—The Fund authorization is extended to 5 years, from the end of fiscal year 1994, September 30, 1994, to the end of fiscal year 1999, September 30, 1999.

### Section 303. Victims' rights funding

Records maintained by the Department of Justice indicate that as of the end of fiscal year 1991, there were 96,500 unpaid criminal debts totalling approximately $1.26 billion. This funding would provide the U.S. courts with the ability to establish a central database of information on assessment, fine, and restitution payments. For the first time, there would be a nationwide accounting and collection of these fines.

The remainder of the language reflects percentages of grants to victims' rights groups.

### Section 304. Filing fees

This language would clarify the portion of filing fees to be deposited into the special fund of the Treasury used to offset operations and maintenance costs of the courts when the courts authorize a filing fee of less than $120.

### TITLE IV—JURY MATTERS

### Section 401. Jury selection lists

The Jury Act at 28 U.S.C. 1863 requires that, with limited exceptions, prospective jurors must be selected from voter lists. In order to obtain better representation of minorities and otherwise advance the policy of universal service, district courts may supplement voting lists, but they are not authorized to supplant them. Uniquely in the State of Massachusetts, however, an alternative to voter lists exists that both improves the representatives of juries and enhances administrative efficiency. This section allows the district of Massachusetts to rely on this alternative source, a comprehensive resident list, exclusively.

The 1988 resident lists contained 4,497,421 names, while only 3,274,777 voters were registered throughout the State. Accordingly, use of these lists will include all registered voters in the district as well as all nonvoters, thus complying fully with the objectives of the Jury Act that all citizens have the opportunity to be considered for service and that juries be selected from a fair cross-section of the community. Additionally, the resident lists are imprinted on electronic tape, and their use would substantially simplify the process and reduce the cost of filing the master wheel. The court calculated in 1989 that creating the master wheel through use of voter lists would cost nearly $30,000 for Boston alone, while use of the

resident lists would cost only $13,400. Comparable savings were predicted for the jury wheels in Springfield and Worcester.

To fill efficiently its master wheel after the 1988 election, the district court amended its jury selection plan (with approval of a panel of the circuit council as required by section 1863(a)), to authorize use of resident lists in lieu of voter lists, and the court has been selecting juries from this source. This amendment ensures that this practice complies not only with the spirit, but also the letter of the Jury Act.

### Section 402. Expanded workers' compensation coverage for jurors

The Jury Act currently extends Federal Employees' Compensation Act (workers' compensation) coverage to persons summoned for jury duty in the Federal courts when they are "(A) in attendance at court pursuant to a summons, (B) in deliberation, (C) sequestered by order of a judge, or (D) at a site, by order of the court, for the taking of a view."[14] This amendment also extends FECA protection to jurors while they are traveling to or from court.

Although claims by commuting jurors have not arisen frequently, they do in fact occur. The Department of Labor, which administers FECA, recently denied compensation to a special grand juror in the district of Maryland who was injured while enroute from her home to the courthouse. The basis for the holding was that, "A juror is not covered while traveling to and from home."[15] The file does not reveal whether this individual had access to other protection, such as her automobile insurance, but the fact remains that without workers' compensation coverage jurors may well be unprotected while traveling to and from court. Another case is pending in the State of Washington, where a juror was seriously injured.

Jurors appear in court under compulsion of law; they are not free to decline to come to court at the time and place directed. The fact that they might have to travel a long distance—often across an entire judicial district—or suffer significant inconvenience in doing so does not in and of itself relieve them of this legal obligation. Additionally, while regular employees must bear their own trave' costs, the Jury Act at section 1871(c) provides that jurors shall ceive mileage reimbursement for their expenses of commuti and from the courthouse, as well as reimbursement of toll ' and (in the discretion of the court) parking expenses. T' matter of law the Jury Selection and Service Act can b' providing that jury service "begins" when a juror st' or her door. Statutory consistency suggests that FF' in accord.

The time, date, and location of juror's servic them, and there is nothing they can do to mands with which they are faced. Jurors ot city or location with which they are complete under the stress and anxiety of being called upo most serious public service. Jurors also serve for period of time, so that they typically cannot ease trav organizing car pools or using public transportation. h

---

[14] 28 U.S.C. 1877(b)(2).
[15] Department of Labor File No. A25–316984, Re: Mary Shauck (Apr. 28, 1988).

ways, then, jurors are different from and at a much greater disadvantage than normal employees. The courts in both a legal and practical sense take control of jurors' lives from the moment they depart their homes until the moment they return, making it fitting that FECA protection be extended appropriately.

The number of occasions on which FECA claims will be filed by commuting jurors cannot be estimated with any precision, but the number is likely to be exceedingly small. The dollar value of benefits provided by the Labor Department likewise will be insignificant, since the Jury Act at section 18779(b)(1) deems jurors to be paid at the minimum rate of GS-2 of the General Schedule.

### Section 403. Compensation for loss of damage to personal property of jurors

The Military Personnel and Civilian Employee's Claims Act [16] permits the Director of the Administrative Office of the United States Courts to compensate judicial branch employees under some circumstances for the loss of, or damage to, personal property incident to their official service. No such authority exists, however, for jurors serving in Federal courts, for absent specific inclusion they do not fit within the general statutory definition of "employee." [17] Courts have often been embarrassed by the theft from the courthouse of jurors' personal effects, coats in particular, and this embarrassment is compounded by the absence of any authority to compensate the victims from Federal funds. This amendment permits the Director of the Administrative Office to adopt guidelines for paying such claims.

Under existing law, the only way in which the Government can provide restitution to a juror whose property is lost or damaged is through a Federal tort claim, which requires the Director to determine that a court employee negligently caused the loss. [18] If the problem is caused by an employee of another agency, the Administrative Office must forward the claim to it. There is usually scant evidence to support a real determination; thus the tort claim procedure is susceptible of being a pretext. By specifically authorizing the Director to compensate jurors for their personal property claims, these problems are avoided. Extension of this benefit also is consistent with other employee-like protections afforded jurors, such as payment of Government travel allowances and coverage under the Federal Employees' Compensation Act, [19] and is not likely to result in anything more than negligible costs.

### Section 404. Grand jury travel

Current lay provides for reimbursement of the travel expenses of petit and grand jurors exclusively through the payment of a mileage allowance not to exceed that paid to supporting court personnel in travel status using privately owned automobiles, "regardless of the mode of transportation actually employed" by jurors in trav-

---

[16] 31 U.S.C. 3721.
[17] See, e.g., *Sellers* v. *United States*, 672 F. Supp. 446 (D. Idaho 1987), holding that jurors are not "employees" under the Federal Tort Claims Act.
[18] 28 U.S.C. 2671–2680.
[19] 28 U.S.C. 1871(c) and 1877.

eling to and from court.[20] Only jurors serving outside the contiguous 48 United States are permitted to be reimbursed their actual reasonable transportation expenses.[21]

In the vast majority of cases, this system adequately reimburses jurors of their costs of travel to attend court. In some rural districts, however, jurors must travel very large distances over roads that can be impassable in inclement weather. During such inclement weather, travel by air is the only viable means of attending court, but the prescribed mileage allowance typically falls short of providing full reimbursement for air travel costs. The resulting financial loss can fall especially hard on grand jurors, because they generally serve for longer periods of time and make more frequent trips to and from court than petit jurors. Further, tribes of Native American and other groups may reside exclusively in the outlying portions of some of these rural districts. Failure to provide the means for members of such groups to travel by air in times of inclement weather to perform grand jury service could result in grand juries that are not representative of the general population of the district.

To cure these problems, the amendment permits reimbursement of grand jurors' actual reasonable costs of air travel when weather conditions warrant and when the travel is certified by the chief judge of the district court in which the grand juror serves. The Judicial Conference is to promulgate guidelines governing implementation of this amendment.

*Section 405. Permanent authorization for optional use of new jury selection process*

This amendment makes permanent a grant of authority to experiment with a one-step jury selection procedures.

As originally, enacted, section 1878 authorized the Judicial Conference of the United States to designate up to 10 district courts to participate in a 2-year experiment in which jurors would be qualified and summoned in one step, rather than two separate steps prescribed by the Jury Selection and Service Act. (Many State courts have found such a procedure advantageous.)

The results of the experiment were highly favorable: eight courts found the one-step process successful and desire to implement it permanently; one court did not find it successful; and one court found the results inconclusive. A detailed report on the experiment has been prepared by the Administrative Office of the United States Courts.

The courts with positive experiences found the one-step process to be more cost effective because it reduced the total number of mailings and related clerical efforts and paperwork. Further, potential jurors were "fresher" because the delay between qualification and appearance was eliminated or substantially reduced. Finally, it was determined that not only were the principles of randomness and nondiscrimination in the Jury Act not adversely affected, but in fact two courts found the one-step process to provide

[20] 28 U.S.C. 1871(c)(1).
[21] *Id.* at section 1871(c)(4).

a more random and diversified group of citizens called for jury duty.

Based upon the successful pilot, the Judicial Conference in March 1990 endorsed enactment of legislation to authorize permanently all district courts to employ a one-step summoning and qualification process. Use of the one-step process is merely an option, however. Individual courts remain free to continue to use the two-step procedures otherwise called for in the Jury Act, or they may experiment with the one-step process, and, if it proves unsuccessful, return to the former procedure.

The amendment also contains a savings clause to "grandfather" courts participating in the original one-step experiment, so that these courts are authorized to continue using the one-step process beyond the formal expiration of the 2-year experiment on January 1, 1992.

### TITLE V—MISCELLANEOUS

## Section 501. Pretermission of regular sessions of courts of appeals

Upon the recommendation of the Judicial Conference, this section would amend section 48(c) of title 28 to permit courts of appeals to pretermit any regular session of court at any place for insufficient business or other good cause *without seeking the consent of the Judicial Conference.* The change would eliminate unnecessary administrative actions imposed on the Judicial Conference that can better be handled in changing circumstances at the local court.

## Section 502. Reports and statistics

Subsection (a) of this section phases out a report required by the Right to Financial Privacy Act of 1978 as duplicating information reported by administrative agencies under the same act.

Subsection (b) of this section transfers the reporting requirement for fees and expenses under the Equal Access to Justice Act of the Department of Justice. This provision would ensure that the report would be prepared by the Federal agency with the most complete data base on the subject matter.

Subsection (c) would allow the Federal Judicial Center an additional 9 months to submit to the Congress and the Judicial Conference that report on its study of "the full range of structure alternatives for the Federal Courts of Appeals," as required by subsection 302(c) of the Judicial Improvements Act of 1990.[22] The Center's study is fully underway, but other demands on staff time, including the higher-than-anticipated technical assistance to the courts for implementation of the Civil Justice Reform Act, and the magnitude of the study itself, make it unlikely that the study can be completed in time to ensure full review by the Center Board and any necessary changes to the final report within the original deadline of December 1, 1992.

---

[22] See supra note 3.