# EXHIBIT E

(Part 2 of 2)

*Section 503. Recycling and reuse of recyclable materials*

Clear authority must be obtained for recycling of materials and application of the proceeds to procurement of replacement property. Many courts have requested that the Administrative Office approve recycling arrangements under which they would receive some benefit for creative uses of recyclable materials. Lacking the necessary authority, the office has been unable to approve some of the proposed arrangements. The public interest would be served by permitting courts to apply the proceeds of their recycling efforts to procurement of replacement items.

This section would provide economic incentives for recycling. Increased recycling would have a salutary effect on the environment by reducing energy and raw material consumption. An additional benefit would be a modest reduction of expenditures on additional supplies.

*Section 504. Bankruptcy rulemaking*

Section 401 of the Judicial Improvements and Access to Justice Act [23] substantially amended the Rules Enabling Act contained in chapter 131 of title 28, United States Code. Among the modifications made by the amendments was a change in the effective date of new procedural rules from August 1 to December 1 of the year in which the rules are transmitted to the Congress by the Supreme Court. Section 2075 of title 28, which governs bankruptcy procedural rules, was left intact by the 1988 bankruptcy procedural rules, was left intact by the 1988 amendments. One of the results of the exclusion of bankruptcy rules from the 1988 amendments is that the bankruptcy rules retained their original effective date of August 1.

The Judicial Conference Committee on Rules of Practice and Procedure and its Advisory Committee on Bankruptcy Rules believes that all rules of procedure should have the same effective date. Accordingly, the committees requested that chapter 131 of title 28 be amended to conform the effective date and other procedures for bankruptcy rulemaking to those prescribed for other bodies of court rules.

The effect of this section is to conform the procedure for prescribing bankruptcy rules to that used for other types to procedural rules.

Subsection (a) would amend section 2073 of title 28 to:
    (1) authorize the Judicial Conference to appoint a committee to recommend bankruptcy rules,
    (2) require the committee to support any proposed rules with explanatory notes and appropriate reports, and
    (3) same (from invalidation) any bankruptcy rule prescribed under procedures not in compliance with section 2073.

Subsection (b) would make bankruptcy rules effective on December 1 of the year in which they are transmitted to the Congress by the Supreme Court.

---

[23] See supra note 1.

*Section 505. Venue in diversity*

Section 311 of the Judicial Improvements Act of 1990 [24] amended 28 U.S.C. 1391 by adding subsections (1), (2), and (3) under 1391 (a) and (b). The amendment inadvertently failed to include at the end of section 1391(a)(3) the phrase "if there is no district in which the action may otherwise be brought." Without such language, which is found in subsection (b)(3), any independent venue requirement for diversity cases seems to be abolished. The Judicial Conference believes this result was unintended and should be corrected by this technical amendment.

In addition to amending the statute to align more closely the diversity venue provisions with the venue provisions in Federal question cases, there is a more important reason to amend the new section 1391(a)(3). Personal jurisdiction based on service in the State has been reconfirmed. Venue seems a desirable protection against misuse of such jurisdiction. Transfer is an alternative remedy, and a much more effective remedy now that venue can be based on the location of a substantial part of the events or omissions underlying the claim. Nonetheless venue seems a useful additional protection.

The function of section 1391(a)(3) as proposed by the Conference's amendment would more closely parallel the safety valve function of 1391(b)(3) as enacted. The central venue rule provides venue in any district in which a substantial part of the events or omissions occurred, with an alternative for any district in a State in which all defendants reside. However, a safety valve is desirable to ensure that venue requirements do not defeat the possibility of suit in any Federal court even though subject matter and personal jurisdiction are available.

*Section 506. Summaries of reports to Congress*

This section reduces the burden of a reporting requirement created by the Civil Justice Reform Act of 1990.[25] Currently, each Federal district court is required to submit to the Director of the Administrative Office of U.S. Courts as assessment of the state of that court's civil and criminal dockets. Thus far, the average length of a report from a given district is approximately 100 pages. The Civil Justice Reform Act would, in turn, require the Administrative Office of U.S. Courts to send copies of these reports to *each* district court.

Section 506 would call for only a *summary* of each report to be transmitted to the other district courts.

*Section 507. Bankruptcy administrator program*

Section 341(a) of title 11, U.S. Code, the Bankruptcy Code, requires that a meeting of creditors be held within a reasonable time after a bankruptcy case is filed. Pursuant to section 343 of the Bankruptcy Code, the debtor is required to appear at the meeting and to submit to examination under oath. The U.S. trustee, who presides at the meeting, is authorized to administer the oath required by section 343. The meeting of creditors is a crucial event in

---

[24] See supra note 3.
[25] Id.

a bankruptcy case because the U.S. trustee, the case trustee, creditors and other parties may examine the debtor and because the examination is conducted under oath.

Pursuant to the Bankruptcy Judges, U.S. Trustees, and Family Farmer Bankruptcy Act of 1986,[26] the U.S. trustees have responsibility for trustee oversight and estate administration in bankruptcy cases nationwide, except in the six judicial districts in Alabama and North Carolina. The 1986 act authorized bankruptcy administrators, who are independent officers of the judiciary, to perform similar trustee oversight and estate administration functions in those six districts. Section 317 of the Federal Courts Study Committee Implementation Act of 1990 [27] extended the bankruptcy administrator program through the year 2002 and granted bankruptcy administrators standing.

Although both U.S. trustees and bankruptcy administrators preside at meetings of creditors and examine debtors under oath, sections 341 and 343 do not explicitly authorize bankruptcy administrators to preside at these meetings or to administer the oath. To the extent that bankruptcy administrators perform these functions, they do so pursuant to regulations adopted by the Judicial Conference or to court orders. In order to clarify bankruptcy administrators' authority and to facilitate estate administration in Alabama and North Carolina, bankruptcy administrators and their designees should be given the same statutory authority as U.S. trustees to preside at meetings of creditors and to administer oaths.

*Section 508. Costs and fees in the United States Court of Veterans Appeals*

A March 13, 1992, decision of the United States Court of Veterans Appeals (court), in *Jones and Karnas* v. *Derwinski*,[28] denied the right of plaintiffs to recover attorney fees under the Equal Access to Justice Act (EAJA).[29] This ruling has resulted in a substantial burden on veterans bringing cases to the court, aggravating the situation in which a majority of cases are being brought pro se, thereby creating additional work for the court.

The objective of EAJA is to eliminate financial deterrents to individuals attempting to defend themselves against unjustified Government action. Veterans are exactly the type of individuals the statute was intended to help. Therefore, section 508 amends EAJA to clarify that it applies to the Court of Veterans Appeals, overruling the *Jones and Karnas* decision.

The Committee intends to make clear that EAJA applies to the court to the full extent of the law, including the principles contained in *Sullivan* v. *Hudson*,[30] and *Center for Science in the Public Interest* v. *Regan*.[31]

The intent of section 508 is to clarify the inclusion of the Court of Veterans Appeals as a "court" for purposes of EAJA. It is not the intent of the committee, by specifying the Court of Veterans

---

[26] Public Law 99-554.
[27] Title III of Public Law 101-650.
[28] 2 Vet. App. 231 (1992).
[29] 28 U.S.C. 2412.
[30] 109 S.Ct. 2248 (1989).
[31] 802 F.2d 518 (D.C. Cir. 1989).

Appeals, to exclude any other nonarticle III courts having jurisdiction of an action from qualifying as a "court" under EAJA.

*Section 509. Court to be held at Lancaster, PA*

This section would amend section 28 U.S.C. 118(a) to authorize the holding of court in Lancaster, PA.

### TITLE VI—JUDICIARY PERSONNEL ADMINISTRATION, BENEFITS, AND PROTECTIONS

*Section 601. Judicial retirement matters*

Subsection 601(a) provides a greater degree of equity and parity in crediting prior Federal service for purposes of retirement by the Directors of the Administrative Office of the United States Courts and the Federal Judicial Center under 28 U.S.C. 611 and 627. These officials currently may receive retirement credit for prior service in any Presidential appointment in the executive branch, but they may receive credit for prior service in the legislative branch only as a Senator or Representative. Subsection 601(a) allows credit for prior legislative branch service of a comparable rank and responsibility to the executive branch service that is currently creditable. Credit is allowed to a Member of Congress or as staff director or chief counsel for a committee or subcommittee. Other changes to 28 U.S.C. 611 and 627 are clarifying and conforming amendments.

Subsections (b) and (c) correct omissions from Public Law 100–659, the Retirement and Survivors' Annuities for Bankruptcy Judges and Magistrates Act of 1988.[32] Section 377(o) of that act established in the Treasury the Judicial Officers' Retirement Fund (JORF) for the payment of annuities and refunds under the Act. Currently, payments from the JORF, the Claims Court Judges' Retirement Fund, and the Judiciary Trust Funds are susceptible to being suspended during periods of budgetary constraint. Section 905(g) of the Balanced Budget and Emergency Deficit Control Act includes all other Federal retirement funds and excludes such funds from sequestration orders.

*Section 602. Full-time status of court reporters*

This section corrects an inequity caused by the unique nature of court reporter work that unjustly penalizes court reporters at retirement. Sections 8339(o) and 8415(e) of title 5 were added in 1986 by the Omnibus Budget Reconciliation Act of 1985 to eliminate the availability of windfall retirement annuities for part-time employees. The Office of Personnel Management has issued a formal opinion which could deprive court reporters who are not on a regularly scheduled 40-hour weekly tour of duty, in the courthouse, of a full retirement annuity, irrespective of receipt of a full-time salary and concomitant full retirement contributions. Under this opinion, court reporters who wish to receive a retirement annuity based upon "full-time" service (as opposed to part-time service and a resulting reduction in annuity) must either

>   (a) work a scheduled tour of duty in the courthouse of 80 hours per pay period; or

---

[32] 28 U.S.C. 377.

(b) maintain records of the actual hours worked on Federal business and work a minimum of 2080 hours per year on that business.

In order that annuities not be reduced solely due to the lack of a regularly scheduled tour of duty if the reporter is paid a full salary as fixed by the Judicial Conference, the Conference, at its September 1988 session, recommended the proposed legislative change to define court reporters as "full-time" employees for annuity purposes if they are paid full-time salaries.

*Section 603. Federal Judicial Center*

Subsection (a) would specifically authorize the Federal Judicial Center, the research and education agency of the Federal courts, to provide briefings and other assistance to judges and other officials of foreign countries who are referred to it by other Federal agencies, by various private organizations, or by direct contact from the country in question. This assistance requires no resources other than occasional staff time and modest hospitality provided through the Center's representation fund. The number of foreign visitors has increased in the last 2 years (as changes have taken place in Eastern Europe and elsewhere) reflecting judges' and legal officials' interest in applying the United States' experience to their countries' efforts to promote the rule of law. At the Center, visitors learn about the United States legal system, the Federal court system, or the work of the Judicial Center, and Center personnel learn about judicial administration techniques that have proven successful in other countries. The Center may provide one or two foreign judges per year with brief residencies at the Center to observe and participate in its work (although the center provides them no salaries, expenses, or travel costs).

Subsection (b) would authorize the Director of the Federal Judicial Center to set the compensation of a limited number of Center professional employees at levels equivalent to level IV of the Executive Schedule pay rates. This provision restores the historic parity in the salary levels of the Center's senior staff and those of its sister agency, the Administrative Office of the United States Courts (as well as with the SES structure in comparable executive branch agencies). The proposed amendment is drawn directly from Section 3(a)(10) of the Administrative Office of the United States Courts Personnel Act of 1990.

Subsection (c) would allow the Federal Judicial Center to impose a technical adjustment in the salary schedule for its secretarial and clerical personnel. Under the current statue, the salaries of Center secretarial and clerical personnel are determined by the General Schedule pay rates; the Center's 28 secretarial and clerical employees are the only employees in the entire judicial branch whose salary is so determined. All other Center employees are compensated according to the Center's own salary schedule.

## TITLE VII—CRIMINAL LAW

*Section 701. Authority to limit collection of pretrial information in class a misdemeanor cases*

The Judicial Conference recommends that 18 U.S.C. 3154 be amended to authorize the courts to remove the requirement for pretrial services reports in Class A Misdemeanor cases. The Conference concluded that allowing individual districts to set policy in this area would provide the necessary flexibility to address the concerns of different districts.

*Section 702. New authority for probation and pretrial services officers*

While the number of offenders in the category of the Insanity Defense Reform Act is not large, those that are released often need a wide variety of social, psychiatric, and psychological services. The probation office is often asked to be involved, even though there is no statutory authority for officers to perform services for such persons.

In addition, probation and pretrial services officers may presently carry weapons under circumstances specified by the Judicial Conference and if State law permits. In some jurisdictions, State law prohibits or limits officers from carrying weapons, even where the officer has court approval to do so. In Puerto Rico, for example, officers must pay a license fee of several hundred dollars to carry firearms. Laws in Missouri have been interpreted to prohibit officers from carrying weapons at all.

There are sound reasons supporting a Federal law which would supersede State law. Such a statute would correct the situation in which the security of U.S. Probation and Pretrial Services Officers is left to the vagaries of the State law. It would also remove the uncertainty of the authority of officers who must cross State lines in the course of their duties. Finally, it would clarify the removability from State court of a civil action arising out of the use of a firearm by an officer under 28 U.S.C. 1442. There would be no change to the self-defense policy. The firearms would be carried pursuant to regulations promulgated by the Director so that appropriate training and safety standards could be stipulated.

The clarification of the duties of the probation and pre-trail services officers, as amended in 18 U.S.C. 3603 and 3154, in no way alters the statutory responsibility of the Attorney General to pay for medical, psychiatric or psychological services provided for individuals found not guilty only by reason of mental disease or defect.

*Section 703. Government rates of travel for Criminal Justice Act attorneys and experts*

Attorneys appointed under 18 U.S.C. 3006A perform a vital service to the criminal justice system. They work for the Government, but are not Government employees. Similarly, community defender organizations provide services to the Federal courts in the same manner as Federal public defender organizations. Allowing them to access Government rates for travel and lodging as well as other sources of supply will help to encourage their important participation and reduce taxpayer costs.

*Section 704 Technical correction*

This amendment corrects a drafting error.

TITLE VIII—FOREIGN RECORDS OF REGULARLY CONDUCTED ACTIVITY

The proposed legislation would enact a new section 1747 of title 28, United States Code, which would regulate the admissibility of foreign business records in Federal civil proceedings including proceedings before the United States Claims Court and the United States Tax Court. The proposal is analogous to 18 U.S.C. 3505, which applies to the introduction into evidence in Federal criminal proceedings of foreign records of regularly conducted activity.

Proposed section 1747 is based upon rule 803(6) of the Federal Rules of Evidence, the business record exception to the hearsay rule. The theory underlying that exception is that "under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the trial even though he may be available." [33]

Subsection (a)(1) of proposed section 1747 provides that a "foreign record of regularly conducted activity" is not to be excluded as hearsay if that record is attested to by a "foreign certification." The term "foreign record of regularly conducted activity" is defined in subsection (c)(1) of section 1747 to mean a "memorandum, report, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, maintained in a foreign country." This definition, except for the phrase "maintained in a foreign country," is taken verbatim from rule 803(6) of the Federal Rules of Evidence and should be interpreted in the same manner as the similar language in rule (803)(6) in subsection (c)(2) of section 1747 to mean a written declaration by the custodian of the record, made in a foreign country, which, if falsely made, would subject the custodian to criminal penalties (such as for perjury or false statement) under the laws of the country.

Subsection (a)(1) requires that the foreign certification be signed and attest to four matters that provide circumstantial guarantees of trustworthiness of the record. This language in subsection (a)(1) is derived from rule 803(6) of the Federal Rules of Evidence, and the language in subsection (a)(1) (A), (B), (C) and (D) should be interpreted in the same manner as comparable language in Rule 803(6) is interpreted.

First, the certification must state that the record was made at or near the time of the occurrence of the matters set forth in the record, and was made by (or from information transmitted by) someone with knowledge of the matters set forth in the record. Second, the certification must state that the record was kept in the course of a regularly conducted business activity. Subsection (c)(3) of section 1747, in language taken verbatim from rule 803(6) of the Federal Rules of Evidence, defines "business" to include "business, institution, association, profession, occupation, and calling of every

---

[33] Advisory Committee Note, rule 803, Federal Rules of Evidence.

kind, whether or not conducted for profit." [34] Third, the certification must state that the business activity regularly made records like the record involved. Fourth, if the record is not the original, the certification must further attest that the record is a duplicate of the original.

Subsection (a)(1) permits the court to decline to admit the business record into evidence even though the record is accompanied by a foreign certification setting forth the required information if the court finds that the source of information for the record, or the method of circumstances of preparing the record, indicates that the record lacks trustworthiness. This standard was taken from rule 803(6) of the Federal Rules of Evidence, and the language in subsection (a)(1) should be interpreted in the same manner as the comparable language of rule 803(6).

Rule 901(a) of the Federal Rules of Evidence provides, as a condition precedent to the admissibility of a document, that there be introduced "evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b)(10) provides that a document can satisfy this authentication requirement by "any method * * * provided by Act of Congress * * *". The information provided in the certification, which is provided under the threat of criminal penalty for perjury or false statement, will establish that the document is genuine. Subsection (a)(2) of section 1747 therefore provides that the foreign certification serves to authenticate the record, and the authentication requirement of rule 901 of the Federal Rules of Evidence.

Subsection (b) of section 1747 is intended to promote the resolution before trial of questions concerning the admissibility of foreign business records. Subsection (b) requires that the party intending to offer the foreign business record provide written notification of that intention to all parties to the case. Any objection to the admissibility of the foreign record must be made in writing and filed with the court before trial, and the court must decide the motion before trial. Failure of a party to raise an objection before trial constitutes a waiver of the objection. The court, for good cause shown, however, can grant relief from the waiver. Upon enactment, this legislation would apply to pending cases. The amendments are procedural in nature and do not affect any substantive rights.

TITLE IX—STATE JUSTICE INSTITUTE REAUTHORIZATION

*Section 901. Authorization of appropriations*

This section would amend 42 U.S.C. 10713 to reauthorize the State Justice Institute (SJI) for fiscal years 1993 ($20 million), 1994 ($20 million), 1995 ($25 million), and 1996 ($25 million). The amendment would also provide that amounts appropriated are to remain available until expended.

---

[34] As one commentator has noted (P. Rothstein, "Federal Rules of Evidence, Practice Comments" at 374.3 (2d 1983)): [Rule 803(6)] makes it clear, by means of its broad definition of business, that the "business record exception" applies not only to business records, and not only to business, professional, occupational, etc., records, as in the Federal Business Records Act, 28 U.S.C. 1732, but to the records of any regularly conducted organized activity. It broadens also the kinds of things that may be reported beyond acts, transactions, occurrences, and events, as in the Federal Business Records Act, to include "conditions," "opinions," and "diagnoses" (i.e., conclusions, which have caused a problem in the past).

*Section 902. Interagency agreements*

The first change in this section amends subsection 206(b)(3) of the SJI Act by deleting references to contracts the Institute may enter into with Federal agencies. The second amendment creates a new subsection 206(b)(4) authorizing the Institute to enter into contracts with Federal agencies without the conditions set forth in subsection (3). The third amendment redesignates current subsection (4) as subsection (5).

### TITLE X—TERRORISM CIVIL REMEDY

This title would provide a civil cause of action in Federal court for victims of terrorism.

*Section 2331. Definitions*

The definition of international terrorism is drawn from the Foreign Intelligence Surveillance Act, 50 U.S.C. 1801(c). It consists of activities that:

> (a) are acts of violence that would, if committed in the United States, violate States or Federal criminal laws:
> (b) appear to be intended to intimidate or coerce a civilian population or a government or to affect, through assassination or kidnapping, a government's conduct; and
> (c) occur primarily outside the territorial jurisdiction of the United States or in ways that transcend national boundaries.

The definition of "person" reflects the experience of the Racketeering Influenced and Corrupt Organizations (RICO) Act, 28 U.S.C. 1961(3).

*Section 2333. Civil remedies*

This section creates the right of action, allowing any U.S. national who has been injured in his person, property, or business by an act of international terrorism to bring an appropriate action in a U.S. district court. The substance of such an action is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts. This bill opens the courthouse door to victims of international terrorism.

This section extends the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines.

This section also creates a rule of estoppel that would permit civil plaintiffs to introduce evidence of criminal conviction—both U.S. and foreign—to establish conclusively civil liability for the same act. This section does not, however, require that a civil action be preceded by American or foreign criminal prosecution of the terrorists guilty of the act in question.

*Section 2334. Jurisdiction and venue*

This section establishes reasonable venue rules that take into account the unusual mobility of terrorists, their organizations, and their financiers.

*Section 2335. Limitation of actions*

This section provides for a 4-year statute of limitations, but in recognition of the peculiar characteristics of terrorism, it tolls the limitation during any periods when the terrorists have concealed their acts or identities or remain outside the United States.

*Section 2336. Other limitations*

This section excludes from the scope of any civil action a claim brought on account of "an act of war." The intention of this provision is to bar actions for injuries that result from military action by recognized governments as opposed to terrorists, even though governments also sometimes target civilian populations. Injuries received by noncombatants as a result of open, armed conflict, including civil war, should not be actionable.

The section also provides that a stay of discovery may be sought by the Department of Justice, in the event of a pending criminal investigation or prosecution of the incident. The Department of Justice may object to the discovery request in certain limited circumstances—if compliance will interfere with a criminal investigation or a national security operation related to the incident. The objection will be heard by the judge, in camera, and it is within the court's discretion as to whether to grant the stay of discovery. In no case shall a stay of discovery be grounds for dismissal of the case.

This section also provides that a stay of the civil action may be sought by the Attorney General of the United States. The court has discretion as to whether to grant the stay and may only grant a stay if the continuation of the civil action will substantially interfere with a criminal prosecution which involves the same subject matter and in which an indictment has been returned, or if it will interfere with national security operations related to the terrorist incident that is the subject of the civil action. A stay may be granted for up to 6 months and may be renewed for additional 6-month periods until the criminal prosecution is completed or dismissed.

Sections (b) and (c) were added to afford the Department of Justice the discretion it needs to conduct criminal investigations and prosecutions. These sections merely set forth well recognized standards for Government intervention in civil actions. The Department of Justice, under rule 26 of the Federal Rules of Civil Procedure, has the authority to assert a privilege against discovery of its investigative files. These provisions do not enhance the rights of the U.S. Government. These sections are not, however, intended to prevent victims and their survivors from conducting civil litigation against terrorists. It is expected the Department of Justice will demonstrate to the court's satisfaction that there is a live investigation and a significant likelihood of prosecution, or conduct of a national security operation, in order to stay the discovery. In instances where the Attorney General seeks to stay a civil action, the Attorney General will have a heavy burden of proof in order to establish that the continuation of the civil action will substantially interfere with a criminal prosecution underway or the conduct of a national security operation related to the terrorist incident which gave rise to the civil action. Moreover, the victims or their survi-

vors are entitled to be heard at the Department of Justice or Attorney General's arguments on behalf of a stay.

*Section 2337. Suits against Government officials*

This section prohibits civil actions against the United States, U.S. officials, foreign states or foreign officials. This provision maintains the status quo, in accordance with the Foreign Sovereign Immunities Act, with respect to sovereign states and their officials: there can be no cause of action for international terrorism against them.

### TITLE XI—EFFECTIVE DATE

Unless otherwise provided in this act, the effective date for this legislation is January 1, 1993.

### VI. COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*July 24, 1992.*

Hon. JOSEPH R. BIDEN, Jr.,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 1569, the Federal Courts Study Committee Implementation Act of 1992.

This bill would affect direct spending and receipts, and thus would be subject to pay-as-you-go procedures under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

ROBERT D. REISCHAUER,
*Director.*

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: S. 1569.
2. Bill title: Federal Courts Study Committee Implementation Act of 1992.
3. Bill status: As ordered reported by the Senate Committee on the Judiciary on June 25, 1992.
4. Bill purpose: This bill would make many changes and additions to laws related to the operation of the federal judicial system.
5. Estimated cost to the Federal Government:

[By fiscal years, in millions of dollars]

|  | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Direct spending: |  |  |  |  |  |
| Estimated budget authority | 5 | 5 | 5 | 5 | 5 |
| Estimated outlays | 2 | 1 | (¹) | −1 | −1 |
| Revenues ² | 2 | 2 | 2 | 2 | 2 |

[By fiscal years, in millions of dollars]

|  | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Spending subject to appropriation: | | | | | |
| Estimated authority level | 20 | 20 | 25 | 25 | (1) |
| Estimated outlays | 5 | 13 | 19 | 23 | 18 |

[1] Less than $500,000.
[2] Net of income and payroll tax offsets.

This legislation also contains a number of other provisions that would result in costs or savings to the Federal Government. We estimate that the net effect of these provisions would be less than $500,000 annually.

The costs of this bill fall within budget function 750.

Basis of estimate: Title II of S. 1569 would modify the Judicial Survivors' Annuities System [JSAS]. The JSAS provides benefits to surviving spouses and surviving eligible children of judicial officials. Currently, there are about 1,800 judicial officials who are eligible to participate in the program. About 40 percent, or 725 of them, now participate in the program. Judicial officials pay 5 percent of their salary or annuity to participate in the program, while the Federal Government contributes about 1 percent. The Federal Government's contribution rate changes from year to year. S 1569 would lower judicial officials' contributions to the fund to 1.5 percent of their salary or 3.5 percent of their annuity. The Federal Government's contribution would subsequently be increased. The Administrative Office of the U.S. Courts estimates that reducing the employee contribution would increase the participation rate to 80 percent. Total employee contributions, which are revenues to the Federal Government, would be insignificantly reduced by this section. Employer contributions, which are paid from appropriated funds, would increase by about $5 million in each fiscal year. Such payments are intragovernmental transactions and would be offset within the Federal budget. CBO estimates that there would be an insignificant increase in payments from the Judicial Survivors' Annuities Fund in each fiscal year 1993 through 1997.

Title III of S. 1569 would permit a judgment for costs awarded in favor of the United States in an action brought by the United States to include an amount equal to the Federal district court filing fee, usually $120. Under current law, the United States neither pays a filing fee nor receives the fee as part of a judgment for costs. There are about 17,000 judgments awarded annually in favor of the United States in actions brought by the United States. Assuming that the $120 is awarded in every case, enactment of this provision would result in additional receipts to the Federal Government of about $2 million annually—net of payroll and income tax offsets—beginning in fiscal year 1993.

Title III also would extend the authorization for the Judiciary Automation Fund from its current sunset of September 30, 1994, to September 30, 1999. Operation of the fund has no net effect on the budget. Moreover, the budget resolution baseline assumes continuation of the fund after September 30, 1994. Therefore, we would record no additional spending and no pay-as-you-go scoring for this provision

In addition, title III would change the priority of spending from the Crime Victims Fund. Under current law, the first $150 million in deposits into the Crime Victims Fund is allocated for grants to aid victims of crime, and the next $2.2 million is made available to the judicial branch for administrative costs. The bill would allocate the first $6.2 million in deposits in each of fiscal years 1992–95 and the first $3 million in each fiscal year thereafter to the judicial branch for administrative costs, while all additional deposits would be used for grants to aid victims of crime. This provision would not affect the total amount of deposits into the Crime Victims Fund. However, outlays from the fund would increase by $2 million in fiscal year 1993 and by a small amount in 1994 and would decrease thereafter because funds for administrative costs are spent faster than funds for grants. Over time, the net outlays from the fund would not change.

Title IX of the bill would authorize appropriations of $20 million for each of fiscal years 1993 and 1994 and $25 million for each of fiscal years 1995 and 1996 for the State Justice Institute. We assume that the full amounts authorized would be appropriated for each fiscal year. Outlay estimates are based on historical spending patterns for the State Justice Institute.

6. Pay-as-you-go considerations: The Budget Enforcement Act of 1990 sets up pay-as-you-go procedures for legislation affecting direct spending or receipts through 1995. The benchmark against which changes in direct spending or receipts are measured is the baseline as described in the act. The estimated pay-as-you-go effects of S. 1569 are shown in the table below. They result from changes in the Judicial Survivors' Annuities System and in the allocation of spending from the Crime Victims Fund.

[By fiscal years, in millions of dollars]

|  | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|
| Change in outlays | 0 | 2 | 1 | 0 |
| Change in receipts | 0 | 2 | 2 | 2 |

7. Estimated cost to State and local government: None.
8. Estimate comparison: None.
9. Previous CBO estimate: None.
10. Estimate prepared by: Cathy Ellman—Retirement Provisions; John Stell—Receipts; Mark Grabowicz—All other provisions.
11. Estimate approved by:

C.G. NUCKOLS,
*Assistant Director for Budget Analysis.*

VII. REGULATORY IMPACT STATEMENT

Pursuant to paragraph 11(b), rule XXVI, of the Standing Rules of the Senate, the committee, after due consideration, concludes that the act will not have a direct regulatory impact.

VIII. CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets; new matter is printed in italic; existing law in which no change is proposed is shown in roman):

# UNITED STATES CODE

\* \* \* \* \* \* \*

# TITLE 2—THE CONGRESS

\* \* \* \* \* \* \*

### CHAPTER 20—EMERGENCY POWERS TO ELIMINATE BUDGET DEFICITS

**Subchapter I—Elimination of Deficits in Excess of Maximum Deficit Amount**

\* \* \* \* \* \* \*

§ 905. Exempt programs and activities

\* \* \* \* \* \* \*

(g) OTHER PROGRAMS AND ACTIVITIES.—(1)(A) The following budget accounts and activities shall be exempt from reduction under any order issued under this subchapter:
—Activities resulting from private donations, bequests, or voluntary contributions to the Government;

\* \* \* \* \* \* \*

—Payment of Vietnam and USS Pueblo prisoner-of-war claims (15-0104-0-1-153);
—Payment to civil service retirement and disability fund (24-0200-0-1-805);
—*Payment to Judiciary Trust Funds (10-0941-0-1-752);*
—Payment to copyright owners (03-5175-0-2-376);

\* \* \* \* \* \* \*

(B) The following budget accounts and activities shall be exempt from reduction under any order issued under this subchapter:
—Black lung benefits (20-8144-0-7-601);
—Central Intelligence Agency retirement and disability system fund (56-3400-0-1-054);
—Civil service retirement and disability fund (24-8135-0-7-602);
—Comptrollers general retirement system (05-0107-0-1-801);
—Foreign service retirement and disability fund (19-8186-0-7-602);
—*Judicial survivors' annuities fund (10-8110-0-7-602);*
—*Judicial Officers' Retirement Fund (10-8122-0-7-602);*
—*Claims Court Judges' Retirement fund (10-8124-0-7-602);*

—Longshoremen's and harborworkers' compensation benefits (16-9971-0-7-601);

\* \* \* \* \* \* \*

# TITLE 5—GOVERNMENT ORGANIZATION AND EMPLOYEES

\* \* \* \* \* \* \*

## PART III—EMPLOYEES

\* \* \* \* \* \* \*

### Subpart G—Insurance and Annuities

\* \* \* \* \* \* \*

#### CHAPTER 87—LIFE INSURANCE

\* \* \* \* \* \* \*

§ 8701. Definition

(a) For the purpose of this chapter, "employee" means—
(1) \* \* \*

\* \* \* \* \* \* \*

(9) an individual appointed to a position on the office staff of a former President under section 1(b) of the Act of August 25, 1958 (72 Stat. 838); [and]

(10) an individual appointed to a position on the office staff of a former President, or a former Vice President under section 4 of the Presidential Transition Act of 1963, as amended (78 Stat. 153), who immediately before the date of such appointment was an employee as defined under any other paragraph of this subsection; *and*

*(11) a judicial official, including a judge of the United States Claims Court (i) who is in regular active service, or (ii) who is retired from regular active service under section 178 of title 28, United States Code; a judge of the District Court of Guam, the District Court of the Northern Mariana Islands, or the District Court of the Virgin Islands (i) who is in regular active service, or (ii) who is retired from regular active service under section 373 of title 28, United States Code; a bankruptcy judge or a magistrate judge (i) who is in regular active service, or (ii) who retired after attaining age 65 from regular active service under chapter 83 or 84 of this title, section 377 of title 28, or section 2(c) of the Retirement and Survivors' Annuities for Bankruptcy Judges and Magistrates Act of 1988 (28 U.S.C. 377 note; Public Law 100-659);*

\* \* \* \* \* \* \*