# EXHIBIT G

subdivision thereof may be acquired by donation or exchange only.

(3) Federally-owned lands, waters, or interests therein located within the conservation area may be transferred out of Federal ownership only in connection with an exchange for lands, waters, or interests therein owned by the State of Nevada or a political subdivision thereof.

(c) INCORPORATION OF ACQUIRED LANDS.—Any lands, waters, or interests therein within the boundaries of the conservation area which after the date of enactment of this Act may be acquired by the United States shall be incorporated into the conservation area and managed accordingly, and all provisions of this Act and other laws applicable to conservation areas shall apply to such incorporated lands.

SEC. 203. WITHDRAWAL.

Except as authorized in this Act, and subject to valid and existing rights, all Federal lands within the conservation area and all lands and interests therein which are acquired by the United States after the date of enactment of this Act are withdrawn from all forms of entry, appropriations, or disposal under the public land laws, from location, entry, and patent under the mining laws, and from operation under the mineral leasing and geothermal leasing laws.

SEC. 204. COOPERATIVE AGREEMENTS.

In order to encourage unified and cost-effective management and interpretation of natural and cultural resources in southern Nevada, the Secretary is authorized and encouraged to enter into cooperative agreements with other Federal, State, and local agencies and nonprofit entities providing for the management and interpretation of natural and cultural resources in southern Nevada.

SEC. 205. COORDINATED MANAGEMENT.

The Secretary shall coordinate management of the conservation area with surrounding State and Federal lands in such a manner as best to meet the present and future need of the American people.

SEC. 206. WATER RIGHTS.

(a) RESERVATION OF RIGHTS.—Congress expressly reserves to the United States the amount of water reasonably required to carry out the purposes for which the conservation area is established under this Act.

(2) The priority date of the rights reserved in paragraph (1) shall be the date of enactment of this Act.

(b) EXISTING RIGHTS.—Nothing in this section shall affect any existing valid or vested water right or application for water rights pending as of the date of enactment of this Act that are subsequently granted.

(c) FUTURE RIGHTS.—Nothing in this section shall be construed as establishing a precedent with regard to any future reservation of water rights, nor shall it affect the interpretation of any other Act or any reservation of water rights.

SEC. 207. DEFINITIONS.

For the purposes of this Act—

(1) the term "public lands" has the meaning stated in section 103(e) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702(e)); and

SEC. 208. AUTHORIZATION OF APPROPRIATIONS.

There is authorized to be appropriated such sums as may be necessary to carry out the purposes of this Act.

---

By Mr. GRASSLEY (for himself, Mr. HEFLIN, Mr. HATCH, Mr. HUMPHREY, Mr. BIDEN, Mr. SPECTER, Mr. SIMON, Mr. LEVIN, Mr. LIEBERMAN, Mr. MURKOWSKI, and Mr. DECONCINI):

S. 2465. A bill to provide a new civil cause of action in Federal law for acts of international terrorism that provides extraterritorial jurisdiction over terrorist acts abroad against U.S. nationals; to the Committee on the Judiciary.

### ANTITERRORISM ACT OF 1990

Mr. GRASSLEY. Mr. President, I rise today to introduce, along with Senator HEFLIN, the Anti-Terrorism Act of 1990. Other cosponsors include: Senators HATCH, HUMPHREY, BIDEN, SPECTER, SIMON, LEVIN, LIEBERMAN, MURKOWSKI, and DECONCINI. This bill will, for the first time, provide for Federal civil remedies against acts of international terrorism.

In recent years, Congress has enacted several laws extending American criminal jurisdiction to acts of international terrorism against our citizens. However, our civil justice system provides little civil relief to the victims of terrorism.

We all remember the tragic case of the PLO terrorists who seized the Italian cruiseliner *Achille Lauro*.

They took 97 passengers captive including Leon and Marilyn Klinghoffer. These terrorists did not stop at surrounding the passengers with guns and explosives. They took the wheelchair bound Mr. Klinghoffer to the side of the boat where they shot him and pushed him into the sea.

In seeking justice, Mrs. Klinghoffer turned to the tort laws of her home State of New York. In Klinghoffer versus John Doe, treasurer of the Palestinian Liberation Organization, Mrs. Klinghoffer seeks compensation from those who are responsible for torts, including wrongful death, assault, battery, false imprisonment, and intentional infliction of emotional distress. This case is still pending in court.

Unfortunately, victims who turn to the common law of tort or Federal statutes, find it virtually impossible to pursue their claims because of reluctant courts and numerous jurisdictional hurdles.

Tragically, we have many more victims who will have no remedy. The Stethem family, who lost their son Robert to the hands of PLO terrorists, have not wandered from our memory.

The hundreds of victims of Pan Am 103, are still in our hearts. Narcoterrorism threatens to produce more American victims.

Just last year, Congress authorized the State Department to increase the rewards for combating terrorism.

We know the importance of providing a monetary incentive in order to gain crucial information on terrorists.

This bill will serve as a further incentive to those with the deep pockets, such as the airline industry, to spend resources and go after terrorists: This bill establishes an express cause of action to gain compensation as fruit of their efforts.

Specifically, this bill will amend title 18, United States Code section 2331.

This title already provides for criminal prosecution of terrorists. This legislation will serve as an appropriate civil counterpart to the criminal statute.

The civil remedies section provides:

First, the first section, section 2331, defines terrorism as: violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State. These are acts directed toward a civilian population not directed against military personnel or installations.

Second, section 2332 contains the criminal penalties, currently codified under section 2331. This legislation does not change the substance of the criminal penalties section, it merely reclassifies it.

Third, section 2333(a) provides that any national of the United States injured by an act of international terrorism may sue in U.S. district court for treble damages, attorney's fees and costs.

Subsection (b) provides that any final judgment rendered in favor of the United States in any criminal proceeding shall not prevent the defendant from denying the essential elements of the criminal offense in any subsequent civil proceeding.

Subsection (c) provides that a conviction in any foreign state criminal proceeding will be accorded full faith and credit and prevents defendant from denying the allegations of the criminal offense.

Section 2334 grants district court jurisdiction.

Section 2335 sets a 3-year statute of limitations for bringing suit.

Section 2336 states that no suit can be maintained under section 2333 of this chapter for: injury or loss by reason of an act of war.

This section codifies the court-fashioned act of state doctrine, by barring claims arising from official acts of foreign governments.

Finally, section 3 amends title 18, United States Code sections 1603 and 1605, the Foreign Sovereign Immunities Act, to provide for civil actions against a State where that State has entered the commercial arena and therein conducts terrorism.

With the enactment of this legislation, we set an example to the world of how the United States legal system deals with terrorists. If terrorists have assets within our jurisdictional reach, American citizens will have the power to seize them.

We tell the world that we know terrorism when we see it, and we are not shy about combating it.

This legislation reaffirms our commitment to the rule of law: the people

of the United States will be able to bring terrorists to justice the "American Way"; by using the framework of our legal system to seek justice against those who follow no framework and defy all notions of morality and justice.

Thank you, Mr. President, and I ask unanimous consent that the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 2465

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Antiterrorism Act of 1990".

SEC. 2. TERRORISM.

(a) TERRORISM.—Part 1 of title 18, United States Code, is amended by adding immediately after chapter 113 of the following new chapter:

"CHAPTER 113A—TERRORISM

"Sec.
"2331 Definitions.
"2332 Criminal penalties.
"2333 Civil remedies.
"2334 Jurisdiction and venue.
"2335 Limitation of actions.
"2336 Other limitations.

"§ 2331 Definitions

"As used in this chapter—
"(1) the term 'international terrorism' means activities that—
"(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
"(B) appear to be intended—
"(i) to intimidate, coerce, or retaliate against a civilian population;
"(ii) to influence the policy of a government by intimidation, coercion, or retaliation, other than by attacks directed against military personnel or installations; or
"(iii) to affect the conduct of a government by assassination or kidnapping; and
"(C) occur totally outside the United States, or transcend national boundaries in terms of the means by whch they are accomplished, the persons they appear intended to intimidate, coerce, or retaliate against, or the locale in which their perpetrators operate or seek asylum;
"(2) the term 'national of the United States' has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act;
"(3) the term 'person' means any individual or entity capable of holding a legal or beneficial interest in property; and
"(4) the term 'act of war' means any act occurring in the course of—
"(A) declared war;
"(B) armed conflict, whether or not war has been declared, between two or more nations; or
"(C) armed conflict between military forces of any origin.

"§ 2332. Criminal penalties

"(a) HOMICIDE.—Whoever kills a national of the United States, while such national is outside the United States, shall—
"(1) if the killing is murder as defined in secton 1111(a) of this title, be fined under this title or imprisoned for any term of years or for life, or both;
"(2) if the killing is a voluntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than 10 years, or both; and
"(3) if the killing is involuntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than 3 years, or both.
"(b) ATTEMPT OR CONSPIRACY WITH RESPECT TO HOMICIDE.—Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall—
"(1) in the cause of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and
"(2) in the case of a conspiracy by two or more such persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both.
"(c) OTHER CONDUCT.—Whoever outside the United States engages in physical violence—
"(1) with intent to cause serious bodily injury to a national of the United States; or
"(2) with the result that serious bodily injury is caused to a national of the United States,
shall be fined under this title or imprisoned not more than 5 years, or both.

"§ 2333. Civil remedies

"(a) ACTION AND JURISDICTION.—Any national of the United States injured in his person, property, or business by reason of an act of international terrorism may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he sustains and the cost of the suit, including attorney's fees.
"(b) ESTOPPED UNDER UNITED STATES LAW.—A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 1472 (i), (k), (l), (n), or (r) of title 49 App. shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.
"(c) ESTOPPED UNDER FOREIGN LAW.—A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

"§ 2334. Jurisdiction and venue

"(a) GENERAL VENUE.—Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district in which all plaintiffs reside or the defendant resides, is found, or has an agent.
"(b) SPECIAL MARITIME OR TERRITORIAL JURISDICTION.—If the actions giving rise to the claim occurred within the special maritime and territorial jurisdiction of the United States, as defined in section 7 of this title, then any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district in which all plaintiffs reside or the defendant resides, is found, or has an agent.

"(c) CONVENIENCE OF FORUM.—The district court shall not dismiss any action brought under section 2333 on the grounds of the inconvenience or inappropriateness of the forum chosen, unless the action may be maintained in a more convenient or more appropriate foreign court that has jurisdiction over the subject matter and over the defendant or defendants.

"§ 2335. Limitation of actions

"(a) IN GENERAL.—Subject to subsection (b), a suit for recovery of damages under section 2333 of this chapter shall not be maintained unless commenced within 3 years from the date the cause of action accrued.
"(b) CALCULATION OF PERIOD.—The time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or any concealment of his whereabouts, shall not be reckoned within this period of limitation.

"§ 2336. Other limitations

"No action shall be maintained under section 2333 of this chapter for injury or loss by reason of an act of war.".
(b) TABLE OF CONTENTS.—The table of contents of part 1, title 18, United States Code, is amended by striking:

"113A. Extraterritorial jurisdiction over terrorist acts abroad against United States nationals..................... 2331"

and inserting in lieu thereof:

"113A. Terrorism.................................. 2331".

(c) REPEAL.—Section 2331 of title 18, United States Code, is repealed.

SEC. 3. AMENDMENTS TO THE FOREIGN SOVEREIGN IMMUNITIES ACT.

(a) GENERAL EXCEPTIONS.—Section 1605 of title 28, United States Code, is amended—
(1) in paragraph (5) of subsection (a) by striking "or" at the end thereof;
(2) in paragraph (6) of subsection (a) by striking the period at the end thereof and inserting in lieu thereof "; or"; and
(3) in subsection (a) by adding at the end thereof the following paragraph:
"(7) in which damages are sought for injuries sustained by reason of an act of international terrorism, as defined in section 2331, title 18, United States Code, or of any other violation of the law of nations which was perpetrated by or aided by that foreign state or by any official or employee of that foreign state while acting within the scope of his office or employment.".
(b) DEFINITIONS.—Section 1603 of title 28, United States Code, is amended by inserting at the end thereof the following subsection:
"(f) The term 'aided by' a foreign state means carried out—
"(1) by an agent or agents of that foreign state;
"(2) at the direction, instruction, request, or suggestion of that foreign state; or
"(3) with financial, material, or logistical support from that foreign state.".

Mr. HEFLIN. Mr. President, I rise today to join Senator GRASSLEY in introducing the Antiterrorism Act of 1990. This legislation will provide a new civil cause of action in Federal law for acts of international terrorism, by establishing extraterritorial jurisdiction over terrorist acts abroad against U.S. nationals.

There have been several alarming trends in terrorist attacks against U.S.

citizens over the course of the last 10 years, during which time approximately 384 American citizens were killed. The first trend is the rise in attacks involving innocent bystanders, and the second is an intent to cause mass casualties.

In recent years, certain incidents of terrorism against American citizens have been particularly horrific. For example, on October 7, 1985, four Palestinian gunmen hijacked the Italian cruise ship *Achille Lauro* off Alexandria, Egypt. While off the Syrian port of Tartus, the terrorists killed wheelchair-bound American Leon Klinghoffer. On December 21, 1988, Pan Am flight 103, just out of London en route to New York City, exploded in the air over Lockerbie, Scotland. There is overwhelming evidence that a bomb in the cargo hold of the plane caused the crash.

The bombing of Pan Am flight 103 and the loss of all 289 passengers onboard may have signaled the beginning of a new Iranian terrorist campaign against the United States. There is also a threat that improved prospects for peace negotiations between Israel and Palestinian groups will generate a new round of terrorism by radical Arab groups. Historically, those who oppose peace talks with Israel have used terrorist tactics to undermine the peace process whenever there are signs of progress between the groups. If this happens, we could see a rise in Middle East terrorism.

While Congress has enacted various laws aimed at extending American criminal jurisdiction for acts of international terrorism against our citizens, there are currently no laws expressly providing Federal civil remedies against these outrageous acts. Therefore, this bill would amend title 18, United States Code, section 2331 by providing a plaintiff a civil cause of action in U.S. District court for injuries caused by acts of international terrorism.

The time has come to provide victims of terrorism with a means of civil redress, and I am proud to join in introducing this legislation.

By Mr. ARMSTRONG:
S. 2467. A bill to amend the Internal Revenue Code of 1986 to provide civil damages for certain careless collection actions; to the Committee on Finance.

CIVIL DAMAGES FOR CARELESS COLLECTION ACTIONS

● Mr. ARMSTRONG. Mr. President, Mrs. Kay Council testified recently before the Internal Revenue Service Oversight Subcommittee of the Senate Finance Committee. I commend her testimony to my colleagues, but only if they've steeled themselves beforehand to read of gross injustice done to an American taxpayer by her Government.

Mrs. Council relates her story of gross carelessness by the IRS. Through its actions, the IRS caused Mrs. Council to lose tens of thousands of dollars and, far more importantly, her husband. Near the end of a 9-year running battle with the Service, Alex Council committed suicide so his life insurance policy could provide his wife with the money she needed to defend herself. Four months later, the Tax Court ruled in favor of Mrs. Council, all liens were ordered dropped, and the Service was ordered to pay Mrs. Council's attorneys $27,900, a small fraction of the costs she has had to pay.

I ask unanimous consent to include her harrowing story.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

Mr. Chairman: My name is Kay M. Council. I live in High Point, North Carolina. I am 48 years old, and I am a widow. I came home one evening in June 1988 and found the lights on, the house empty and a note from my husband:

"MY DEAREST KAY—

"I have taken my life in order to provide capital for you. The IRS and its liens which have been taken against our property illegally by a runaway agency of our government have dried up all sources of credit for us. So I have made the only decision I can. It's purely a business decision. I hope you can understand that.

"I love you completely,
ALEX.

"You will find my body on the lot on the north side of the house."

I don't remember many details from the rest of that night, but I will never get over what I lost that night—what the IRS did to us, what it drove my husband to do. He was 49 years old.

Four months later, finally able to pay our attorneys with money from Alex's life insurance, I went to court and beat the IRS. The court entered a judgment barring the IRS from collecting $300,000 in tax, penalties and interest it claimed that we owed. The court agreed that we owed nothing. The court ordered the IRS to cancel the tax lien that it had placed on our property, an illegal tax lien that had ruined our personal finances and our business.

Alex had a development company that was building a residential development in Pfafftown, N.C., the town where we lived. When the IRS placed the illegal lien on our property in May 1987, he was preparing to start another development. But no one wants to lend money to someone who has a tax lien. So the development fell though.

After the IRS acted illegally, our business was practically ruined. Our income from the business then barely covered our living expenses. We owed $112,000 on a construction loan for our home but could not refinance it because of the lien. We faced losing our home when the loan came due.

People talk to me about being angry at Alex for what he did. I try to be but when I sit down and think this out, he was right. There was no other way, except to just give up. If we had given up, we would have lost our home and our business, and we still could not have paid the IRS all that they claimed we owed. We could not give up—Alex could not give up—because we knew the IRS was wrong.

The IRS was wrong from the day they sent us the first notice. They were wrong. We were innocent from day one, and the court decisions and court orders say that. But look at what was done to my life. People sit back and say, "Well, this is a terrible story but it's surely an exception to the rule, and this sort of thing could never happen to me."

They are wrong. This kind of thing should never have happened to me and Alex. We weren't criminals. We weren't trying to do anything wrong, and we didn't do anything wrong. We just got caught up in the middle of a big IRS screw-up, and we couldn't get out of it.

It began in 1979. We were living in a suburb of San Francisco, where Alex was a vice president of a mortgage insurance company that he had helped start. Alex received a bonus. We invested the money in real estate and in oil and gas leases. On the advice of our accountant and our financial consultant, we also bought rights to two paintings offered by an art company in New York. The idea was that we could sell lithographs of the paintings and use other marketing tools available to eventually recoup our investment and make a profit. It was to have been a little business for me to run. But it didn't work out, and we claimed a write-off of about $70,000 in our 1979 tax return.

The IRS audited the return and told us that our accountant was wrong, that it did not consider the art investment a legitimate tax write-off. We expected the IRS to deny the write-off and send a notice of deficiency that would give us 90 days to petition the Tax Court. We planned to fight the claim in Tax Court. If we had lost, we could have scraped together the money and paid the tax. But the IRS did not do that.

If we had received the notice, my husband would be alive. We could have fought the notice and paid the tax if we lost. There were other people who got such notices through the same process; they were fortunate enough that they got theirs and they were able to pay them. They lost money, but they didn't go through the hell that the IRS put us through.

We didn't hear from the IRS during the next couple of years. We lost money on our investments in California, and in 1983 we moved back home to North Carolina, where Alex started the housing development. Then the IRS sent us a bill for $183,021—tax of $115,895 plus penalties and interest. This was in September 1983, four months after the statute of limitations ran out. We were dumbstruck.

In an affidavit filed in federal court in November 1987, Alex described his attempts to find out what had happened.

"Prior to this bill, neither my accountant . . . nor I had received an audit report, a 30-day letter, a 90-day letter or any other notice of assessment. Since that time I have been attempting to determine why I never received these documents or any other notice, which foreclosed any administrative or Tax Court review of the proposed deficiency . . . which efforts were wholly unsuccessful until very recently. The only communication I had received from the IRS since 1983 indicated receipt of my letters requesting the above information, bills threatening collection procedures, and notices of intent to levy on my assets."

The IRS maintained that it had sent us a certified letter containing the required notice of deficiency three weeks before the statute of limitations ran out. We never re