UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON<br>SEPTEMBER 11, 2001 | Civil Action No.<br>03 MDL 1570 (RCC)<br>ECF Case<br><br>**DECLARATION OF**<br>**KENNETH A. CAURSO IN SUPPORT**<br>**OF DEFENDANT YOUSEF JAMEEL'S**<br>**MOTION TO DISMISS ACTION**<br>**ORIGINALLY COMMENCED IN S.D.N.Y** |

This document relates to:

   Thomas E. Burnett, Sr., et al. v. Al Baraka
   Investment and Development Corp., et al.,
   03 CV 5738 (RCC) (originally filed in the Southern District of New York)

      KENNETH A. CARUSO declares the following:

      1.     I am a member of the Bar of this Court and a member of the firm of Chadbourne & Parke LLP, counsel to defendant Yousef Jameel. I submit this declaration in support of Mr. Jameel's Motion to Dismiss Action Originally Commenced in S.D.N.Y.

      2.     Exhibit A is a copy of the Notice of Annual Meeting of Stockholders filed by Global Natural Resources Inc. ("GNR"), as obtained from the Securities and Exchange Commission and dated July 19, 1985. At page 4, Mr. Jameel is identified as having been a member of a Board Committee, and thus, a member of the Board of Directors, in 1984. At page 3, in a listing of continuing directors and nominees for election as director, Mr. Jameel is not listed. Thus, he ceased to be a director of GNR by 1985.

      I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 16, 2004.

                                                      /s/ Kenneth A. Caruso
                                                      KENNETH A. CARUSO

# Exhibit A

G 496450

DEF 14A

ORIGINAL
L 44-469

# GLOBAL NATURAL RESOURCES INC.

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## TO BE HELD AUGUST 15, 1985

SECURITIES AND EXCHANGE COMMISSION
RECEIVED
JUL 22 1985
OFFICE OF APPLICATIONS
AND REPORT SERVICES

To The Stockholders of
Global Natural Resources Inc.

NOTICE IS HEREBY GIVEN that the Annual Meeting of the Stockholders of Global Natural Resources Inc., a New Jersey corporation, will be held at the Remington, 1919 Briar Oaks Lane, Houston, Texas on August 15, 1985 at 11:00 a.m., Houston time, for the following purposes:

(1) To elect two directors for a term of one year, one director for a term of two years, and two directors for a term of three years.

(2) To consider and act upon the appointment of Peat, Marwick, Mitchell & Co. as independent public accountants for the fiscal year ending December 31, 1985.

(3) To transact such other business as may properly come before the meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on July 15, 1985 as the record date for the determination of stockholders entitled to notice of and vote at the meeting.

A copy of the Annual Report on Form 10-K for the year ended December 31, 1984 has previously been mailed to stockholders or is enclosed herewith.

By order of the Board of Directors

Mhari M. Peschel, Secretary

July 19, 1985

**YOUR VOTE IS IMPORTANT REGARDLESS OF THE NUMBER OF SHARES YOU MAY OWN. MANAGEMENT SINCERELY DESIRES YOUR PRESENCE AT THE MEETING. HOWEVER, SO THAT WE MAY BE SURE THAT YOUR VOTE WILL BE INCLUDED, PLEASE SIGN AND RETURN THE ENCLOSED PROXY PROMPTLY. YOUR PROXY MAY BE REVOKED AT ANY TIME BEFORE IT IS VOTED.**

# GLOBAL NATURAL RESOURCES INC.
5300 Memorial Drive
Houston, Texas 77007

## PROXY STATEMENT

The Board of Directors of Global Natural Resources Inc. (which together with its predecessor, Global Natural Resources PLC is referred to herein as the "Company") is furnishing this proxy statement in connection with the solicitation of proxies for use at the annual meeting (the "Annual Meeting") of stockholders of the Company to be held at the Remington, 1919 Briar Oaks Lane, Houston, Texas at 11:00 a.m. on August 15, 1985 (and any adjournment thereof). Solicitation of proxies will be primarily by mail, but proxies may also be solicited personally or by telephone or telegraph by officers, directors and regular employees of the Company. The Company will bear the cost of such solicitation. The Company will make arrangements with brokerage firms, banks and other nominees to forward proxy materials to beneficial owners of shares and will reimburse such nominees for their reasonable costs.

All properly signed and submitted proxies will be voted, and where a choice has been specified by the stockholder as provided on the proxy, the proxy will be voted in accordance with the specification so made. In the absence of any contrary specification, all proxies received by the Company will be voted for the election of the nominees identified herein and in favor of the other proposal described in this proxy statement.

Only stockholders of record at the close of business on July 15, 1985 will be entitled to notice of and to vote at the Annual Meeting.

Any stockholder giving a proxy may revoke it at any time prior to its use at the Annual Meeting by giving written notice of revocation, by signing and delivering to the secretary of the Company a proxy bearing a later date or by voting in person at the Annual Meeting.

The date of this proxy statement is July 19, 1985. Mailing of proxy solicitation materials is expected to commence on or about July 22, 1985.

## VOTING SECURITIES AND PRINCIPAL HOLDERS THEREOF

On May 31, 1985 the Company had issued and outstanding 23,312,961 shares of common stock, $1.00 par value ("Common Stock"), of which 4,288,345 shares were registered in the name of Hambros Channel Islands Trust Corporation Limited ("Trust Shares"), and had 957,915 shares of Common Stock held in treasury. Each share of Common Stock (other than the Trust Shares and treasury shares) is entitled to one vote and may be voted in person or by proxy. The Trust Shares and treasury shares are not entitled to vote in respect of any matter submitted to a vote of the stockholders of the Company at the Annual Meeting

The following table sets forth, as of May 31, 1985, the number and percent of shares of Common Stock known to the Company owned of record or beneficially by each director, by all directors and

executive officers of the Company as a group, and by the only person known to the Company to own 5% or more of the Common Stock. Unless otherwise noted, such person owns such shares of record and exercises sole voting power and investment power over them.

| Name of Beneficial Owner | Number of Shares | Percent of Class |
|---|---|---|
| Jaymont Energy Incorporated(a) | 2,288,918 | 9.8% |
| Directors: | | |
| Frank G. Beatty(b) | 47,901 | 0.2% |
| Roger C. Chapman | 3,000 | * |
| Dr. John R. Dempsey(c) | 56,700 | 0.2% |
| Joseph R. Gutgsell(a) | 2,288,918 | 9.8% |
| J. Charles Hollimon | 10,000 | * |
| John E. McFarlane(d) | 1,075,037 | 4.6% |
| John M. O'Mara(e) | 2,000 | * |
| Walter H. Saunders(f) | 11,200 | * |
| Christian-Michael Stever | 0 | 0 |
| All Directors and Officers as a Group(g) | 3,519,160 | 15.1% |

* Less than 0.1 percent.

(a) Includes 294,020 shares of Common Stock covered by a voting agreement pursuant to the terms of which Jaymont Energy Incorporated ("Jaymont") exercises voting control over such shares. The Company has been advised that the owner of such shares disposed of them subsequent to May 31, 1985, and that such shares are no longer subject to the voting agreement. Mr. Gutgsell is a vice president of Jaymont and in such capacity shares voting and investment control over the shares of Common Stock owned by Jaymont.

(b) Includes 12,000 shares of Common Stock which Mr. Beatty had at May 31, 1985 the right to acquire upon the exercise of options, at a price $5.625 per share. Such shares are considered to be outstanding for purposes of calculating Mr. Beatty's percent ownership set forth in the last column.

(c) Includes 26,700 shares of Common Stock owned by a company in which Dr. Dempsey owns a controlling interest and 25,000 shares of Common Stock owned by a third party which has orally agreed to give Dr. Dempsey a proxy covering such shares.

(d) Includes 3,000 shares of Common Stock which Mr. McFarlane had at May 31, 1985 the right to acquire upon the exercise of options at a price of $5.625 per share. Such shares are considered to be outstanding for purposes of calculating Mr. McFarlane's percent ownership set forth in the last column. In addition, includes 360,000 shares of Common Stock owned beneficially and of record by Dr. Robert F. McFarlane. Dr. McFarlane, a brother of Mr. McFarlane, has appointed Mr. McFarlane his proxy with respect to such shares.

(e) Mr. O'Mara has purchased for his own account an additional 4,100 shares of Common Stock since May 31, 1985, and therefore owns an aggregate of 6,100 shares beneficially and of record. In addition, Mr. O'Mara sits on the investment committee of Baldwin & Lyons, Inc., an insurance company, and in such capacity shares voting and investment control over 150,000 shares of Common Stock which are held by such insurance company as part of its investment portfolio. Such 156,100 shares constitute 0.7% of the outstanding Common Stock of the Company.

(f) Includes 4,000 shares of Common Stock which Mr. Saunders had at May 31, 1985 the right to acquire upon the exercise of options, at a price of $5.625 per share. Such shares are considered to be outstanding for purposes of calculating Mr. Saunders' percent ownership set forth in the last column.

(g) Includes 34,000 shares of Common Stock covered by stock options exercisable on May 31, 1985.

2

## ELECTION OF DIRECTORS

At this time the number of directors constituting the entire board is nine. The Board of Directors is divided into three classes, and each director serves a term of three years. At the Annual Meeting, two directors are to be elected for a term of one year, one director is to be elected for a term of two years, and two directors are to be elected for a term of three years. Because Frank G. Beatty, Chairman of the Board and past chief executive officer of the Company is retiring and is not standing for re-election as a director, the number of directors will be reduced after the Annual Meeting to eight. In addition, Mr. Walter H. Saunders, a continuing director whose term expires in 1987, has indicated his intention to resign from the Board of Directors at some time after the Annual Meeting.

Each nominee has been designated by the Board of Directors and is currently a member of the Board of Directors. If any nominee becomes unavailable for election to the Board of Directors, the persons appointed as proxies, will have discretionary authority in that instance to vote the proxy for such other person, if any, as may be designated by the Board of Directors. However, the Board of Directors has no reason to believe that any nominee named herein will be unable to accept nomination or election.

Following is certain information concerning the nominees for election, the directors whose terms are continuing, and the executive officers of the Company who are not directors.

| Name and Principal Occupation During the Last Five Years | Age | Served as a Director Since | Year Term Expires |
|---|---|---|---|
| **Nominees for Election as Directors** | | | |
| a. For a term expiring in 1986: | | | |
| J. Charles Hollimon  Independent oil and gas operator, San Antonio, Texas; Private investments | 37 | 1985 | 1986 |
| John M. O'Mara  Senior Vice President, Wertheim & Co., investment banking, New York, New York | 57 | 1985 | 1986 |
| b. For a term expiring in 1987: | | | |
| Roger C. Chapman  Managing Partner, Chapman Oil Company 1985-present; President, Roger Chapman Inc., oil and gas operator, Houston, Texas prior thereto; a director of Chapman Energy, Inc., Bayou Resources, Inc., and Giant Piper Exploration, Inc. | 58 | 1985 | 1987 |
| c. For a term expiring in 1988: | | | |
| Dr. John R. Dempsey  President and Chief Executive Officer of the Company, 1984-present; Director of Scientific Software—Intercomp, Inc., Denver, Colorado, 1983-1985; President and Chief Executive Officer of Intercomp Resources, Inc., petroleum engineering and consulting, Houston, Texas, prior thereto | 50 | 1984 | 1988 |
| Joseph R. Gutgsell  Real estate investments. Senior Vice President, Jaymont Properties Incorporated, New York, New York; and Vice President, Jaymont Energy Incorporated, New York, New York | 35 | 1985 | 1988 |
| **Continuing Directors** | | | |
| John E. McFarlane  Vice Chairman of the Company since 1982. Prior to that time, President of McFarlane Oil Company, Inc. until it was acquired by the Company in September 1982. | 39 | 1982 | 1986 |
| Walter H. Saunders  Self-employed. Director of Stralem Fund, Inc., and The Reserve Fund, Inc., each a registered investment company located in New York, New York. | 79 | 1971 | 1987 |
| C. Michael Stever  Partner, Stever and Beiten, law firm, Munich, West Germany | 46 | 1983 | 1987 |

3

The Board of Directors held seven meetings during 1984. No incumbent director attended fewer than 75% of the aggregate of the total number of meetings of the Board (held during the period for which such director was a member of the Board) and the total number of meetings held by all committees of the Board on which such director served (during the periods that he served).

The Board of Directors has an Audit Committee and Compensation Committee. The Audit Committee recommends to the Board of Directors the appointment of the independent auditors and meets with the independent auditors to review with them the scope and results of their examinations, the adequacy of the Company's system of internal accounting controls and to approve services performed by the auditors. The Audit Committee met twice during 1984. The Audit Committee is currently composed of Messrs. O'Mara, Saunders and Stever.

The functions of the Compensation Committee include consultation with and advice to senior management of the Company about the compensation of the Company's executive officers and certain eligible directors. The Compensation Committee submits to the Board of Directors its recommendation with respect to the cash compensation of the Company's executive officers. The Compensation Committee met five times in 1984. The Compensation Committee is currently composed of Messrs. McFarlane, O'Mara, Saunders and Stever.

The Board of Directors, at the November 20, 1984 meeting, formed a temporary Executive Search Committee to negotiate the employment of a permanent Chief Executive Officer of the Company. The members of that Committee were the Messrs. Beatty, Jameel, McFarlane and Stever. Such committee has been dissolved and its functions assumed by the Compensation Committee.

The Company has no nominating committee. There is no family relationship between any director or officer of the Company and any other director or officer.

Pursuant to the Company's Restated Certificate of Incorporation, the Board of Directors can from time to time increase the number of directors (to no more than nine) and fill vacancies on the Board of Directors whether created by resignation or expansion. Any director appointed by the Board of Directors to fill a vacancy, whether created by resignation of a director or expansion of the Board shall hold office until the next succeeding annual meeting of stockholders. Messrs. Chapman, Dempsey, Guigseli, Hollimon and O'Mara have been appointed to fill vacancies since the last meeting of stockholders.

## EXECUTIVE OFFICERS

The Company's executive officers are elected by the Board of Directors, each such officer to serve for a term of one year or until his successor is elected and qualifies. The following table sets forth the names, ages and positions of the Company's current executive officers:

| Name | Age | Current Position |
|---|---|---|
| John R. Dempsey | 50 | President and Chief Executive Officer |
| Frank O. Beatty | 64 | Chairman of the Board |
| John E. McFarlane | 39 | Vice Chairman of the Board |
| Walter E. Belt, Jr. | 63 | Vice President—Land of Global Natural Resources Corporation of Texas ("GNR"), wholly owned subsidiary of the Company |
| Mhari M. Peschel | 32 | Vice President—Finance, Secretary and Treasurer |
| Gary L. Trotter | 36 | Vice President—Operations of GNR |

See "Election of Directors" for information with respect to Dr. Dempsey and Mr. McFarlane.

Mr. Beatty has served the Company as Chairman of the Board for more than the last five years. Prior to November 1984 he was also Chief Executive Officer of the Company.

Mr. Belt has served the Company as Vice President—Land of GNR since 1984. He was Vice President—Land of Tenkay Resources, Inc., Houston, Texas, 1982-83 and a land partner of Trio Exploration Consultants, Houston, Texas, prior thereto.

Ms. Peschel has been employed by the Company in positions of increasing responsibility since 1978.

4

Mr. Trotter has served the Company as Vice President—Operations of GNR since 1984. He was an engineering manager of Benton Resources Corp., Houston, Texas, 1982-83; an engineering consultant, 1981-82; and a division operations manager of Houston Oil & Minerals Corporation, Houston, Texas, 1980-81.

## EXECUTIVE COMPENSATION AND MANAGEMENT TRANSACTIONS

The following table sets forth the amount of cash compensation that the Company and its subsidiaries paid during 1984 to each of the five most highly compensated executive officers of the Company whose aggregate cash compensation exceeded $60,000, and all executive officers of the Company as a group.

| Name of Individual or Number of Persons in Group | Capacities in Which Served | Cash Compensation |
|---|---|---|
| Frank G. Beatty | Chairman of the Board of Directors, President | $222,067 |
| John E. McFarlane | Vice Chairman of the Board of Directors | $160,653 |
| J. L. Boswell (a) | President of the United States operating subsidiaries | $386,138 |
| Gary L. Trotter | Vice President—Operations of GNR | $101,000 |
| Mhari M. Peschel | Vice President—Finance, Secretary and Treasurer | $ 97,847 |
| All executive officers as a group (7 persons) | | $1,131,386 |

(a) Mr. Boswell resigned in December 1984. Pursuant to the terms of the agreement effecting his termination, he received a cash payment of $240,000 (which amount is reflected in the above table) and the right to continue to receive certain employee benefits.

### Directors' Fees

Directors who are also officers of the Company do not receive fees for attending meetings of the Board of Directors and committees thereof. Each other director receives (i) a fee of $1,562.50 per quarter of the fiscal year for which he serves as a director, (ii) an additional fee of $1,000 per meeting for each meeting of the Board of Directors in excess of one meeting per quarter not to exceed $2,000 in any one year, and (iii) $350 for each meeting of the Audit Committee and the Compensation Committee.

### Certain Transactions

Until November 1984, Mr. Beatty was employed as Chairman of the Board and Chief Executive Officer of the Company under an agreement with the Company providing for an annual salary of $200,000 expiring in 1989. At that time he was terminated as Chief Executive Officer of the Company and the employment agreement was replaced by a consulting agreement relating to Mr. Beatty's services, providing for an annual retainer of $220,000, also expiring in 1989. Under his consulting arrangement, Mr. Beatty will retain certain previously awarded employee benefits. Mr. Beatty is not standing for reelection as a director of the Company at the Annual Meeting.

Dr. Dempsey has been employed as President and Chief Executive Officer of the Company since November 1984 and been paid $25,000 per month for his services pursuant to an arrangement which expired June 30, 1985. Effective July 1, 1985, the Company began to compensate Dr. Dempsey at the rate of $275,000 per annum. The Company and Dr. Dempsey have agreed in principle to enter into an employment agreement providing (i) for an annual salary of $275,000, (ii) that Dr. Dempsey will devote his full time to the discharge of his duties as President and Chief Executive Officer, (iii) for a three year term, renewable for an additional two years at the option of the Company, (iv) for the grant of a qualified stock option covering the Common Stock of the Company to Dr. Dempsey in the maximum amount currently permitted by law, (v) for the payment to Dr. Dempsey of an amount equal to three times his base annual compensation upon the occurrence of a change of control of the Company not approved by

5

the Board of Directors and (vi) that Dr. Dempsey will agree to maintain the confidentiality of the Company's proprietary information and not to compete with the Company for a period of years following termination of his employment by the Company.

In addition, the Company has agreed in principle to acquire, in exchange for 1,050,000 shares of Common Stock of the Company, all of the outstanding shares of capital stock of Texas International Oil Corporation ("TIO"). In such transaction, Dr. Dempsey will receive approximately 64.3% of the shares of Common Stock issued by the Company. Such agreement in principle contemplates that (i) 100,000 shares of the Common Stock of the Company to be issued in the transaction will be held in escrow for a period of two years after consummation of the transaction, (ii) that the shares of Common Stock of the Company to be issued in the transaction will be "restricted" and that the recipients thereof will have no rights to registration under the Securities Act of 1933 or any state statute, and (iii) that Dr. Dempsey and Dewey Stringer, President of TIO, will enter into employment agreements with the Company. It is anticipated that Mr. Stringer's employment agreement with the Company would be on terms substantially similar to those of Dr. Dempsey's agreement, other than those terms relating to remuneration and capacity of service.

TIO was organized in 1981 to acquire oil and gas properties owned by distressed operators. In addition, TIO receives fees for management of oil and gas properties on behalf of various financial institutions which have acquired such properties through foreclosure from distressed operators. TIO generally shares in the revenues attributable to its interest in such properties as well as receiving management fees for operating them. TIO has from time to time acquired properties from the Federal Deposit Insurance Corporation.

The understandings relating to the foregoing employment contracts and the Company's acquisition of TIO are the subject of oral agreements in principle. As of the date of this Proxy Statement, definitive documentation of such arrangements has not been prepared. In the process of negotiation of such definitive agreements the above-described agreements in principle will be subject to additions and amendments.

In April 1985 Mr. McFarlane and the Company have entered into a consulting agreement, pursuant to which Mr. McFarlane will be paid $175,000 per annum for a three year term.

Ms. Peschel is employed under the terms of an agreement with a subsidiary of the Company at an annual salary of $90,000. The agreement, which expires in March 1986, may be terminated at any time for cause, or in certain circumstances by reason of Ms. Peschel's illness or incapacity. The agreement provides for three months' continuation of salary in the event it is terminated by reason of illness or incapacity.

Stock Options

The Company has established the 1980 Stock Option Plan, which was approved by the Company's stockholders in 1981 and which reserved 600,000 authorized and unissued shares of Common Stock for issuance pursuant to options to directors, officers and key employees. The purpose of the Plan is to promote the interests of the Company and its stockholders by retaining and attracting employees and directors of outstanding competence and giving such persons the opportunity to secure or increase a proprietary interest in continued success of the Company.

As of June 1, 1985, no shares of Common Stock had been issued upon the exercise of options granted pursuant to the Plan, and 226,500 shares of the Company's authorized and unissued Common Stock were subject to unexercised outstanding options, of which options for 49,600 shares were exercisable at such date.

The Plan is administered by the Compensation Committee of the Board of Directors.

No incentive stock option ("ISO") granted to an optionee pursuant to the Plan may be exercised while there is outstanding any ISO granted under the Incentive Plan or any other ISO qualifying as such under Section 422A of the Code that was previously granted to such optionee to purchase shares of Common Stock or stock of any parent or subsidiary of the Company. The sum of the fair market value of the Common Stock for which an optionee may be granted ISOs under the Incentive Plan and the fair market value of the stock for which such optionee may be granted stock options under all other such plans of the Company or its subsidiary may not, in any calendar year, exceed $100,000 plus any unused limit carryover from prior year, as defined in Section 422A of the Code.

ISOs granted under the Plan are intended to qualify as such under Section 422A of the Code. The grant of an ISO under the Plan will not, by itself, result in the recognition of taxable income to the optionee

6

at the time of such grant. Optionees will also not recognize any income at the time of exercise of an ISO. The difference between the fair market value of this stock at the time of exercise and the exercise price will, however, be a tax preference item for the purposes of the alternative minimum tax. Any gain on the subsequent disposition of the ISO stock will be treated as a long-term capital gain provided the ISO stock is held for the required holding period, which is two years from the date of grant and one year from the date of exercise. Generally, if the shares are not held for that period, the optionee will recognize ordinary income upon disposition in an amount equal to the excess of the fair market value on the date of exercise of the shares acquired pursuant to the ISO over the exercise price, or, if less, the gain on disposition. In addition, if the fair market value on disposition exceeds the fair market value at the time of exercise, the optionee will recognize a capital gain equal to the excess of the amount realized on such disposition over the fair market value of this stock at the time of exercise.

In the event of an increase or decrease in the number of outstanding shares of the Company due to a stock dividend, recapitalization, combination or certain other corporate events, the Plan provides for appropriate adjustments by the Board of Directors or the Committee in the maximum number of shares as to which ISOs may be granted under the Plan and the number of shares and exercise prices provided in then outstanding ISOs.

The Board of Directors of the Company may alter, amend, or terminate the Incentive Plan, provided however, that it may not, without approval of the stockholders, among other things, (i) increase the maximum number of shares covered by the Plan, (ii) reduce the option price, (iii) extend the term of any option of the Plan, or (iv) amend the definition of "eligible persons" under the Plan.

The Stock Option Plan provides that the exercise price for shares covered by an option shall be the market price of shares of Common Stock at the date of grant. Options become exercisable 20% per year commencing on the date of grant and may be immediately exercisable upon approval of the Board in certain circumstances.

The following table shows for the period January 1 1984 to June 1, 1985, with respect to the Plan and as to each of the five most highly compensated executive officers of the Company and as to all executive officers as a group, (i) the number of shares for which options were granted, (ii) the average per share option exercise price, (iii) the net value of shares or cash realized upon the exercise of such options granted during such period or prior thereto, (iv) the number of shares sold during such period by persons exercising options, (v) the number of shares remaining unexercised at the end of such period and (vi) the potential unrealized value of shares underlying outstanding options that remained unexercised at the end of such period and as to which the market price exceed the exercise price.

|  | Frank G. Beatty | John E. McFarlane | J. L. Boswell | Gary L. Trotter | Mbari M. Peschel | All Executive Officers as a Group(1) |
|---|---|---|---|---|---|---|
| Common Stock |  |  |  |  |  |  |
| Granted January 1, 1984 to June 1, 1985: | 60,000 | 15,000 | 25,000 | 10,000 | 25,000 | 145,000 |
| Average per share exercise price | $5.625 | $5.625 | $5.625 | $5.625 | $5.625 | $5.625 |
| Exercised January 1, 1984 to June 1, 1985: |  |  |  |  |  |  |
| Net value realized in shares (market value less exercise price) or cash | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales January 1, 1984 to June 1, 1985 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unexercised at June 1, 1985(2) | 60,000 | 15,000 | 0 | 10,000 | 35,000 | 140,000 |
| Potential unrealized value (market value less exercise price)(3) |  |  |  |  |  |  |

---

(1) Information is not included for periods during which any person was not an executive officer. In addition, 35 employees other than executive officers included above hold options for a total of 86,500 shares at an average exercise price of $5.625 per share, all of which options were granted during the period from January 1, 1984 to June 1, 1985.

(2) All options held by Mr. Boswell expired March 11, 1985.

(3) This computation is not meaningful because in every instance the exercise price exceeds the market value of shares of Common Stock as of June 1, 1985.

**Pension Plan**

The Company has a defined benefit pension plan (the "Pension Plan") which covers employees and employees of affiliated companies, who are at least 25 years old (but have not reached age 60 when hired) and complete certain service requirements.

The Company pays the entire cost of the Pension Plan, the amount of the contribution being determined annually on an actuarial basis. The annual actuarial valuation of the Pension Plan is performed using the entry age normal actuarial cost method under which contributions are determined for all participants as a group and individual participant contributions are not readily available. Aggregate contributions to the Pension Plan for 1984 were approximately 12% of total remuneration of participants covered under the plan.

The following table shows the estimated annual benefits payable upon retirement at age 65 to persons in specified compensation and years of service classifications under the Pension Plan.

| Average Salary | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 40 Years |
| $ 50,000 | 29,120 | 29,120 | 29,120 | 29,120 | 29,120 | 29,120 |
| 75,000 | 46,620 | 46,620 | 46,620 | 46,620 | 46,620 | 46,620 |
| 100,000 | 64,120 | 64,120 | 64,120 | 64,120 | 64,120 | 64,120 |
| 125,000 | 81,620 | 81,620 | 81,620 | 81,620 | 81,620 | 81,620 |
| 150,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 |
| 200,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 |
| 250,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 |

The term "average salary" in the table refers to highest 60 month average compensation which includes bonuses and overtime pay before the normal retirement date.

The normal retirement benefit is a monthly retirement income equal to 70% of "average salary" minus 70% of the primary social security benefit limited in 1984 to $90,000 (a limitation imposed by the Internal Revenue Code). Messrs. Beatty, McFarlane and Boswell have 14, 10 and 1 estimated credited years of service, respectively, and Ms. Peschel has seven estimated credited years of service.

**Supplemental Retirement Plan**

Senior executives of the Company are eligible, as and when designated participants by the Compensation Committee, to participate in the Company's Supplemental Retirement Plan. However, the Company does not anticipate designating additional participants.

The plan provides for retirement benefits for 15 years, equal in annual amount to 70 or 80 percent of salary plus bonuses paid to the participant during the twelve consecutive months preceding termination of his employment less (i) actual or assumed Social Security benefits and (ii) the annualized actual or assumed retirement benefits payable to the participant under the "pension plan." Full benefits are payable only in the event the participant's employment is terminated (a) at or after age 65 or (b) at or after age 60 but before age 65 after at least 15 years of service or (c) without cause (except that in such event the benefits payable are reduced by $1/360$th for each month, up to a maximum of $100/360$ths, by which the benefit commencement date precedes the participant's 65th birthday) or (d) in the event the participant becomes totally disabled before age 65 and remains disabled until such age. Reduced benefits (determined in accordance with a vesting schedule) are payable if the participant's employment is terminated otherwise than for cause before age 65, but after at least ten years (but less than 15 years) of service. Participants terminated before age 65 may elect to have payments of benefits commence before age 65, in which event benefits payable (other than to participants terminated without cause) are reduced by $1/360$th for each month by which the payment commencement date precedes the participant's 65th birthday. No benefits are payable in the event of a participant's death before payment of benefits is scheduled to commence. The plan is not "qualified" within the meaning of the Internal Revenue Code of 1954, as amended, and is unfunded.

8

Amounts accrued during 1984 for benefits under this plan to Mr. Beatty were $168,000. No other officer or director currently has any vested interest.

Savings and Stock Investment Plan and Trust

As of January 1, 1984, the Company adopted the Tax Deferred Savings and Stock Plan & Trust (the "Savings Plan"). The Savings Plan is a profit sharing plan designed to qualify under Section 401(a) of the Internal Revenue Code of 1954, as amended (the "Code") and includes a cash or deferred arrangement intended to qualify under Section 401(k) of the Code. Terms used herein that are defined in the Savings Plan shall have the same meanings as provided in the Savings Plan.

Each participant may make an election to contribute up to 15% of his Compensation from the Company and its participating subsidiaries (collectively, the "Employer") to the Savings Plan. Such contributions are made pursuant to an election to participate binding for the year with respect to which it is made, and, subject to the satisfaction of certain nondiscrimination requirements under Section 401(k) of the Code, are excludable from the participant's income for federal income tax purposes.

Subject to the approval of the Board of Directors of the Employer, the Employer will make a matching contribution for each Plan Year equal to 60 percent of the participant's contributions, up to 10 percent of the participant's Compensation, made to the Savings Plan pursuant to a participant's election.

All amounts contributed or transferred to the Savings Plan are held in trust by RepublicBank Houston, National Association (the "Trustee") and principally invested in shares of Common Stock (at the employee's direction up to 25% of employee contributions may be invested in a pooled investment fund).

The Savings Plan Committee is composed of three individuals who are employees of the Company and who were appointed by and serve at the pleasure of the Company. The Company's Board of Directors may amend or terminate the Savings Plan, in whole or in part, at any time.

Upon a participant's retirement, disability or death, the amounts credited to all accounts maintained for such participant will be fully vested and distributed to such participant (or in the event of the participant's death, to his designated beneficiaries) in a single distribution in the form of cash or Common Stock as elected by the participant or beneficiary. If a participant's employment with his Employer terminates for any reason other than his retirement, disability or death, such participant will be entitled to receive the full amounts credited to his interest in all of his Account, plus the following portion of the amounts credited to his Employer Matching Contribution Account, depending upon such participant's years of service with the employer at the time of such termination of employment.

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

Any portion of a participant's Employer Matching Contribution Account that is not vested under the foregoing schedule will be forfeited upon his termination of employment (subject to certain restoration rights in the event of such participant's reemployment by the Employer within one year). Amounts forfeited from a participant's Employer Matching Contribution Account will be used to reduce the amount of future matching contributions the Employer is required to make to the Savings Plan.

In addition to the distributions described above, a participant may periodically withdraw all or any portion of the amounts credited to his Account, subject to the Permitted Withdrawal conditions and procedures set forth in the Savings Plan.

During 1984, the Company made contributions of $6,000, $6,000, $8,222, $2,700 and $2,160 on behalf of Messrs. Beatty, McFarlane, Boswell, Ms. Peschel and Mr. Trotter, respectively.

9

Royalty Incentive Plan

Certain employees, as and when determined by the Compensation Committee, are eligible to participate in the Company's Royalty Incentive Plan. The Royalty Incentive Plan was intended for employees who participated in the management of the Company. Pursuant to the plan during each fiscal year, the Company is required to contribute an interest in 100 percent of the Company's revenues from each well drilled in the United States or Canada under any agreement entered into during such year (or, in the case of long-term agreements covering more than one well, each well drilled thereunder during such year) and in all wells subsequently drilled within an area of interest associated with any such well, but excluding wells drilled on lease permits acquired by the Company prior to August 7, 1970, and on properties in the Canadian Arctic in which the Company had an interest on January 1, 1981. Each year, the Board of Directors designates participants (from among eligible employees determined by the Compensation Committee), allocating the contributed interests among participants in proportion to their base compensation except that up to fifty percent of the interests contributed may be awarded as compensation for outstanding performance or as an inducement to employment.

Pursuant to a policy announced by the Board of Directors in December 1983, no awards of interests are been made under this plan since December 31, 1983.

## INDEPENDENT ACCOUNTANTS

The firm of Peat, Marwick, Mitchell & Co. has acted as independent accountants of the Company for the year ended December 31, 1984 and since 1976. The Board of Directors desires to continue the services of that firm for the year ending December 31, 1985. Accordingly the Board will recommend to the meeting that stockholders approve the appointment by the Board of Directors of Peat, Marwick, Mitchell & Co. to audit the financial statements of the Company for the year ending December 31, 1985, and the persons designated as proxies intend to vote for the appointment of that firm unless instructed otherwise. This vote is not required by the bylaws of the Company. However, the Board of Directors will appoint other independent public accountants upon the recommendation of the Audit Committee if the appointment of Peat, Marwick, Mitchell & Co. is not approved by a vote of a majority of the shares represented and voting thereon at the Annual Meeting.

A representative of Peat, Marwick, Mitchell & Co. is expected to be present at the Annual Meeting and will have an opportunity to make a statement if he desires to do so and be available to respond to appropriate questions.

Audit services of Peat, Marwick, Mitchell & Co. in 1984 included the examination of the consolidated financial statements of the Company included in the Annual Report on Form 10-K for the year ended December 31, 1984 filed with the Securities and Exchange Commission and advice and assistance on accounting and tax matters.

## SUBMISSION OF STOCKHOLDER PROPOSALS

The Company is mailing proxy solicitation material to all stockholders on or about July 22, 1985 in connection with the 1985 Annual Meeting of Stockholders. Any stockholder wishing to present a proposal for consideration at the 1986 annual meeting of stockholders must submit such proposal to the Company on or before March 22, 1986.

## OTHER MATTERS

Management of the Company does not know of any other matter to be acted upon at the Annual Meeting, and so far as is known to management, no matters are to be brought before the Annual Meeting except as specified in the notice thereof. However, if any other matters should come before the Annual Meeting, it is intended that proxies will be voted in respect thereof in accordance with the judgment of the persons holding such proxies.

By the Order of the Board of Directors

Mhari M. Peschel, Secretary

# GLOBAL NATURAL RESOURCES INC.
## PROXY FOR 1985 ANNUAL MEETING OF STOCKHOLDERS
## SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

John R. Dempsey, and John E. McFarlane, and either of them with full power of substitution, are hereby authorized as attorneys and proxies of the undersigned to represent and to vote the common stock of the undersigned at the Annual Meeting of Stockholders of Global Natural Resources Inc. (the "Company") to be held in the Remington, 1919 Briar Oaks Lane, Houston, Texas, at 11:00 a.m., and at any adjournment(s) thereof, with authority to vote as follows:

1. ELECTION OF DIRECTORS

☐ FOR all nominees listed below    ☐ WITHHOLD AUTHORITY
(except as marked to the contrary)    to vote for all nominees listed below

| Class I – term ending 1987 | Class II – term ending 1988 | Class III – term ending 1986 |
|---|---|---|
| Roger C. Chapman | John R. Dempsey | J. Charles Hollimon |
|  | Joseph R. Gurgsell | John M. O'Mara |

(INSTRUCTION: To withhold authority to vote for any individual strike a line through the nominee's name)

2. Approve the selection of Peat, Marwick, Mitchell & Co. as independent public accountants for the fiscal year ended December 31, 1985.

☐ FOR    ☐ AGAINST    ☐ ABSTAIN

(Continued and to be signed on other side)

---

In accordance with their discretion, said attorneys and proxies are authorized to vote upon such other matters as may properly come before such meeting or any adjournment(s) thereof.

This proxy, if properly signed, will be voted in accordance with the specification made hereon. IF NOT OTHERWISE SPECIFIED, THIS PROXY WILL BE VOTED FOR THE PROPOSAL.

Receipt is hereby acknowledged of the Notice of Annual Meeting and Proxy Statement of Global Natural Resources Inc. dated July 19, 1985.

_____

_____
Signature(s)

Dated _____ 1985
(Please sign exactly as name appears hereon, and return in accompanying postage-prepaid envelope. When signing as attorney, executor, administrator, trustee, guardian, etc., give full title of such. For Joint Accounts each joint owner should sign.)

