UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001

Civil Action No.
03 MDL 1570 (RCC)
ECF Case

This document relates to:

    Thomas E. Burnett, Sr., et al. v. Al Baraka
    Investment and Development Corp., et al.,
    03 CV 9849 (RCC) (originally filed in the District of Columbia)

MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY  10112
(212) 408-5100

Viet D. Dinh
600 New Jersey Ave., NW
Washington, DC  20001
(202) 662-9324

Attorneys for Defendant
  Yousef Jameel

Kenneth A. Caruso
Marvin R. Lange
Jeffrey I. Wasserman

Viet D. Dinh
Brian Benczkowski

     Of Counsel

Table of Contents

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ...............................................................................................................7

    POINT I

        THE COURT LACKS PERSONAL JURISDICTION ......................................7

        A.  The Court Lacks Jurisdiction Under The District Of Columbia Long-Arm Statute......7

        B.  The Exercise Of Jurisdiction Would Not Comport With Due Process..........................8

    POINT II

        THE COMPLAINT FAILS TO STATE A CLAIM
        UPON WHICH RELIEF CAN BE GRANTED ............................................................10

        A.  Civil Liability Is Barred Because The 9/11 Attacks Were An Act Of War................10

        B.  The Complaint Does Not Permit An Inference Of Knowledge And Intent................14

          1.  The Absence of Allegations as to Timing................................................16

          2.  The "Golden Chain"/Batterjee/BIF ..........................................................17

          3.  Charitable Contributions..........................................................................19

          4.  Other Allegations.....................................................................................20

        C.  Mr. Jameel's Alleged Conduct Is Too Remote
        To Constitute The Proximate Cause Of Plaintiffs' Injuries ........................................22

CONCLUSION...........................................................................................................25

Table of Authorities

Page(s)

Federal Cases

In re Am. Express Co. Shareholder Litig.,
    39 F.3d 395 (2d Cir. 1994)..................................................................22-23

Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,
    42 F.3d 1421 (3d Cir. 1994)..................................................................15

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,
    171 F.3d 779 (2d Cir. 1999)..................................................................9

Boim v. Quranic Literacy Inst.,
    291 F.3d 1000 (7th Cir. 2002) .............................................14, 15, 17, 22

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985)..................................................................9

Burnett v. Al Baraka Inv. & Dev. Corp.,
    274 F. Supp. 2d 86 (D.D.C. 2003)..................................................15, 16, 24

Burnett v. Al Baraka Inv. & Dev. Corp.,
    292 F. Supp. 2d 9 (D.D.C. 2003)..................................................8, 9

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
    511 U.S. 164 (1994)..................................................................15

Citibank, N.A. v. K-H Corp.,
    968 F.2d 1489 (2d Cir. 1992)..................................................................24

Cortec Indus., Inc. v. Sum Holding L.P.,
    949 F.2d 42 (2d Cir. 1991)..................................................................16

Crane v. Carr,
    814 F.2d 758 (D.C. Cir. 1987)..................................................................8

Dames & Moore v. Regan,
    453 U.S. 654 (1981)..................................................................13, 14

Doe v. GTE Corp.,
    347 F.3d 655 (7th Cir. 2003) ..................................................................15

Table of Authorities
(continued)

Page(s)

Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,
    282 F.3d 83 (2d Cir. 2002)................................................................................................15

First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002).............................................................................7

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994)..............................................................................................24

Hamdi v. Rumsfeld,
    542 U.S. __, 124 S. Ct. 2633 (2004)..............................................................................12

Hayman Cash Register Co. v. Sarokin,
    669 F.2d 162 (3d Cir. 1982)............................................................................................24

Holmes v. Sec. Investor Prot. Corp.,
    503 U.S. 258 (1992).........................................................................................................22

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995)..............................................................................................24

Kavowras v. The New York Times Co.,
    328 F.3d 50 (2d Cir. 2003)..............................................................................................16

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,
    191 F.3d 229 (2d Cir. 1999).......................................................................................23, 24

Lippe v. Bairnco Corp.,
    218 B.R. 294 (S.D.N.Y. 1998)........................................................................................15

McCarthy v. Higgins,
    2000 WL 1134479 (S.D.N.Y. Aug. 10, 2000)................................................................9

Menowitz v. Brown,
    991 F.2d 36 (2d Cir. 1993)................................................................................................7

Metro. Life Ins. Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996)................................................................................................7

Table of Authorities
(continued)

Page(s)

Nascone v. Spudnuts, Inc.,
    735 F.2d 763 (3d Cir. 1984)..................................................................24

Ozanic v. United States,
    188 F.2d 228 (2d Cir. 1951)..................................................................13

Perry v. Criss Bros. Iron Works, Inc.,
    741 F. Supp. 985 (D.D.C. 1990).............................................................8

Rasul v. Bush,
    2004 WL 943637 (U.S. Apr. 20, 2004) ................................................13

In re September 11 Litig.,
    280 F. Supp. 2d 279 (S.D.N.Y. 2003)..................................................23

Smith ex rel. Smith v. Islamic Emirate of Afghanistan,
    262 F. Supp. 2d 217 (S.D.N.Y. 2003)..............................................15, 22

Sosa v. Alvarez-Machain,
    542 U.S. __, 124 S. Ct. 2739 (2004)....................................................24

Ungar v. Islamic Republic of Iran,
    211 F. Supp. 2d 91 (D.D.C. 2002)........................................................23

United States v. Baxter Intern., Inc.,
    345 F.3d 866 (11th Cir. 2003) ..............................................................14

United States v. Bin Laden,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000).....................................................11

United States v. Pink,
    315 U.S. 203 (1942).............................................................................13

Wiwa v. Royal Dutch Petro. Co.,
    2002 WL 319887 (S.D.N.Y. Feb. 28, 2002).........................................24

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980)...............................................................................9

Table of Authorities
(continued)

Page(s)

State Cases

Maheshwari v. City of New York,
    2004 WL 964317 (N.Y. May 6, 2004)............................................................................23

Federal Statutes, Rules and Regulations

Fed. R. Civ. P. 4(K)(1)(A) .............................................................................................7

Fed. R. Civ. P. 12(b)(2)..............................................................................................1, 7

Fed. R. Civ. P. 12(b)(6)..................................................................................................1

64 Fed. Reg. 55,112 (Oct. 8, 1999)................................................................................5

66 Fed. Reg. 57,833 (Nov. 16, 2001)...........................................................................13

67 Fed. Reg. 45,287 (July 8, 2002)..............................................................................13

S.J. Res. 365, 99th Cong., 100 Stat. 756 (1986) .......................................................4, 18

Pub. L. No. 102-572, 106 Stat. 4506 ...........................................................................17

Pub. L. No. 107-40, 115 Stat. 224 ...............................................................................12

102 S. Rpt. 342 (1992)..................................................................................................11

8 U.S.C. § 1440.............................................................................................................13

18 U.S.C. § 2331...........................................................................................................10

18 U.S.C. § 2332b.........................................................................................................15

18 U.S.C. § 2333.....................................................................................10, 11, 14, 15, 22

18 U.S.C. § 2336...............................................................................................10, 11, 14

18 U.S.C. § 2339A........................................................................................................14

Table of Authorities
(continued)

Page(s)

18 U.S.C. § 2339B ...................................................................................................15

28 U.S.C. § 1367......................................................................................................24

28 U.S.C. § 1407.......................................................................................................7

49 U.S.C. § 40101 et seq...........................................................................................14

State Statutes

D.C. Code § 13-422 ...................................................................................................7

D.C. Code § 13-423 ...................................................................................................8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001

Civil Action No.
03 MDL 1570 (RCC)
ECF Case

This document relates to:

    Thomas E. Burnett, Sr., et al. v. Al Baraka
    Investment and Development Corp., et al.,
    03 CV 9849 (RCC) (originally filed in the District of Columbia)

MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS

    Defendant Yousef Jameel respectfully submits this memorandum of law in support of his motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction, or Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted.[1]

PRELIMINARY STATEMENT

    The attacks of September 11, 2001, were an act of war against the United States and a personal tragedy for plaintiffs. Plaintiffs may have a right to redress, but not from Mr. Jameel. He had nothing to do with 9/11. The Complaint alleges nothing to link Mr. Jameel to the events of that day or even to the United States. Thus, the Complaint should be dismissed for want of personal jurisdiction or failure to state a claim.

    No one can rationally suggest that Mr. Jameel harbors any animus against the United States. Indeed, plaintiffs do not, and cannot, allege facts that provide the slightest basis for a

---

[1]   "Complaint" includes the Third Amended Complaint ("TAC") and the Plaintiffs' More Definite Statement as to Defendant Yousef Abdul Latif Jameel, dated March 16, 2004 ("MDS").

motive or reason why Mr. Jameel would ally himself with the 9/11 terrorists, or would intend to cause any harm to the United States.  To the contrary, Mr. Jameel was educated at the American University in Cairo.  In gratitude for the ideals that the American University taught him, Mr. Jameel has been a principal benefactor of that institution.  "Since 1989, the Jameel Center has stood at the center of the Greek Campus as a symbol of the generosity and support of Yousef Abdul Latif Jameel '68, one of AUC's most devoted alumni."  A new graduate school will be named the Jameel School of Business, Economics and Communication.[2]

The Complaint would convert charitable giving into a no-boundaries, no-fault, and no-limits terrorism risk insurance policy.  Plaintiffs' passion is understandable, but passion does not excuse the indiscriminate fervor of their representatives.  Their counsel proudly professed, "I looove to pick on the Saudis."[3]  Demonizing Saudi Arabia as "the ultimate of the evil empire,"[4] counsel has even confessed his inability to distinguish among individual Arabs:  "Sometimes, the best I can do is call them Scumbag One and Scumbag Two."[5]  Such prejudice is professionally objectionable and morally repugnant.  And it carries real costs when it entangles individuals like Mr. Jameel in the dragnet of indiscriminate litigation.  As one former plaintiff said of plaintiffs'

---

[2]   Long Lasting Ties, Am. Univ. in Cairo, at http://www.aucegypt.edu/support/campaign/jameel.html. All cited websites were last viewed on July 14, 2004.  (Annexed as Exhibit A to Declaration of Kenneth A. Caruso, dated July 16, 2004.  Other exhibits to this declaration are referred to as "Ex. __.")

[3]   Jennifer Senior, A Nation Unto Himself, N.Y. Times Mag., Mar. 14, 2004, at 36, 39.  Ex. B.

[4]   Families of Victims of 9/11 Hold News Conference to Announce Legal Action to Sever Financial Channels Which Support the Al Qaida Network, August 15, 2002, LEXIS, Nexis Library, FDCH Political Transcripts file.  Ex. C.

[5]   Tony Bartelme, The King of Torts vs. al-Quaida Inc., Charleston Post and Courier, June 22, 2003, available at http://www.charleston.net/stories/062203/911_22alqstory.shtml.  Ex. D.

lead investigator, "He's a conspiracy nut.  It's six degrees of separation stuff.  By his standards, I'm linked to al-Qaida."[6]

In this case, fervor has overtaken judgment.  Even assuming that Mr. Jameel made the contributions alleged in the Complaint -- allegations that Mr. Jameel will dispute as and when necessary and appropriate -- the Complaint alleges no facts that distinguish Mr. Jameel from the thousands of other unwitting donors, like Microsoft, UBS, and Compaq.[7]  When Enaam Arnaout, the head of Benevolence International Foundation, pleaded guilty to racketeering charges, the U.S. Attorney General emphasized that Arnaout supported terrorism "with funds that donors thought were going for peaceful purposes."[8]  According to the Department of Justice, the donors "were law-abiding Muslims who were obligated by Islamic principles to donate to charity."[9]  The Complaint alleges nothing to contradict these statements by the United States government, and nothing to distinguish Mr. Jameel from any "victim donor," even assuming he donated.

Mr. Jameel did not and does not support terrorism in any form.  He is outraged and saddened by the implications and innuendo to the contrary.  And there is nothing but implication

---

[6]   Mary Jacoby, A Bulldog Lawyer's Civil War on Terror, St. Petersburg Times, Mar. 4, 2003, available at http://www.sptimes.com/2003/03/04/news_pf/Worldandnation/A_bulldog_lawyer_s_ci.shtml.  Ex. E.

[7]   Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements at 98 (January 6, 2003), U.S. v. Arnaout, No.02-CR-892 (N.D.Ill. 2003) (hereinafter, the "Arnaout Proffer"), available at http://news.findlaw.com/hdocs/docs/bif/usarnaout10603prof.pdf.  Ex. F.

[8]   Press Release, U.S. Dep't of Justice, Statement of Attorney General John Ashcroft on the Guilty Plea of Enaam Arnaout (Feb. 10, 2002), available at http://www.usdoj.gov/opa/pr/2003/February/03_ag_083.htm.  Ex. G.

[9]   Press Release, U.S. Dep't of Justice, Benevolence Director Pleads Guilty to Racketeering Conspiracy and Agrees to Cooperate with the Government (Feb. 10, 2002), available at http://www.usdoj.gov/usao/iln/pr/2003/pr021003_01.pdf.  Ex. H.

and innuendo, for the Complaint contains no legal basis and no facts to support any link between Mr. Jameel and the 9/11 attacks.

Most tellingly, the Complaint all but ignores the timing of Mr. Jameel's alleged contributions and activities. This is no mere technical quibble. The failure to date specific activities is fatal to plaintiffs' theory of jurisdiction and liability: that Mr. Jameel knowingly and intentionally supported activities aimed at the United States that culminated in the 9/11 attacks.

Plaintiffs assume that Osama bin Laden has always been, and has always been known to be, an enemy of America, determined to inflict terror on U.S. soil. That assumption, however, is false. Throughout the 1980s, bin Laden was a leader of the mujahideen, closely allied with and handsomely supported by the United States to end the Soviet occupation of Afghanistan.[10] Indeed, Congress formally declared its support for the mujahideen in 1986, S.J. Res. 365, 99th Cong., 100 Stat. 756 (1986) (Ex. J), and it was not until September 13, 1991, that the United States agreed with the Soviet Union to end military assistance to the mujahideen.[11]

Moreover, as plaintiffs admit, al Qaeda did not announce its intention to wage jihad against the United States until 1996. TAC ¶ 575. That announcement was directed only against military forces and sought their removal from the Arabian Peninsula.[12] Not until 1997 or 1998

---

[10]   See Kenneth Katzman, Afghanistan: Current Issues and U.S. Policy, Congressional Research Service Report for Congress, August 27, 2003 at CRS-2, available at http://fpc.state.gov/documents/organization/24047.pdf.  Ex. I.

[11]   See James A. Baker and Boris D. Pankin, US-Soviet Joint Statement on Afghanistan (Sept. 13, 1991), in Dep't of State Dispatch, September 16, 1991, available at http://dosfan.lib.uic.edu/ERC/briefing/dispatch/1991/html/Dispatchv2no37.html.  Ex. K.

[12]   See Overview of the Enemy, Staff Statement No. 15, National Commission on Terrorist Attacks upon the United States ("Commission Statement No. 15"), at 7, available at http://www.9-11commission.gov/hearings/hearing12/staff_statement_15.pdf. (Ex. L): "In August 1996, Bin Ladin made public his war against the United States.  In his 'Declaration of Holy War on the Americans Occupying the Country of the Two Sacred Places' (Mecca and Medina in Saudi Arabia), Bin Ladin

(Cont'd on following page)

4

did al Qaeda announce its intention to kill American civilians.  Commission Statement No. 15, at 7-8.  Not until 1998 did a grand jury indict bin Laden.[13]  Not until 1999 did the United States publicly designate al Qaeda as a foreign terrorist organization.[14]  And not until 1999 did bin Laden authorize the 9/11 plot -- the torts that injured plaintiffs.[15]

Thus, plaintiffs' failure to allege dates and timing is fatal to their case.  The Complaint, taken as true, alleges activities, innocuous on their face, that may well have taken place long ago, while bin Laden was allied with the United States or, at minimum, before there was any reason to know his intentions.  Such conduct cannot support any inference that Mr. Jameel targeted the United States or knowingly and intentionally supported the 9/11 attacks.  The Complaint glosses over this fatal flaw by simply ignoring the dates, much as it ignores other inconvenient facts.

For example, from an allegation that one "Yousef Jameel" appears on a list of names labeled "Osama History," MDS ¶ 14, plaintiffs would conclude that this Mr. Jameel "donated funding via the Golden Chain to al Qaeda."  Id. ¶ 19.  That conclusion, however, ignores the very document on which plaintiffs rely -- the so-called "Golden Chain," which on its face is only a handwritten draft of names, possibly potential donors, and not a list of actual donors.  Ex. O.  But even leaving that aside, the allegation -- devoid of timing -- does nothing to link Mr. Jameel to

---

(Cont'd from preceding page)

called on Muslims worldwide to put aside their differences and join in deadly attacks against U.S. forces to compel their withdrawal from the Arabian Peninsula."

[13]  Press Release, U.S. Dep't of Justice (June 7, 1999), available at http://www.fbi.gov/pressrel/pressrel99/prbinlad.htm.  Ex. M.

[14]  64 Fed. Reg. 55,112 (Oct. 8, 1999).

[15]  Outline of the 9/11 Plot, Staff Statement No. 16, National Commission on Terrorist Attacks upon the United States, at 2, available at http://www.9-11commission.gov/hearings/hearing12/staff_statement_16.pdf.  Ex. N.

the 9/11 attacks.  The Complaint omits any mention of when the so-called "Golden Chain"

document was written, but plaintiffs' own lead investigator accepts that it is dated in 1988 --

when bin Laden was allied with the United States.[16]  This, no doubt, explains why the U.S.

Department of Justice described the document as a list of donors to "mujahideen efforts" -- our

allies -- not to al Qaeda, as plaintiffs suggest.[17]  Indeed, plaintiffs' own Complaint dates the

founding of al Qaeda to 1989.  TAC p. 209.  Thus, even accepting plaintiffs' false allegation that

Mr. Jameel contributed to Osama bin Laden at the time of the "Golden Chain" document, such a

contribution would in no way support any inference that he contributed to al Qaeda, agreed with

its subsequent declaration of war, supported its subsequent plans to attack the United States, or

was complicit in the 9/11 attacks.

Likewise, the Complaint repeatedly alleges that Mr. Jameel made contributions to

charitable organizations.  Most of the supposed contributions, however, are undated, and suffer

the same fatal flaw as the Osama History.  As to those that contain dates, only one of the

organizations named in the Complaint has ever been publicly designated by the U.S. government

as a terrorist organization, and that designation occurred after 9/11.  Thus, even indulging in the

assumption that Mr. Jameel in fact made these contributions, plaintiffs allege no facts to support

an inference that Mr. Jameel knew, at the time of the contributions, that the charities were

involved in terrorism, were fronts for al Qaeda, or would direct the money toward attacks on the

United States.  Thus, the allegations do nothing to support plaintiffs' claim that Mr. Jameel

directed his activities at the United States or that he contributed to the 9/11 attacks.

---

[16]   Witness Statement of Jean-Charles Brisard, (May 21, 2003), in Bin Mahfouz v. Beaton, et al, UK
       HCJ No. HC 03X00518 ("Brisard Witness Statement"), at ¶ 7.  Ex. P.

[17]   Arnaout Proffer, supra note 7, at 30.

ARGUMENT

POINT I

THE COURT LACKS PERSONAL JURISDICTION

Plaintiffs have not made legally sufficient allegations that the court has personal jurisdiction over Mr. Jameel pursuant to District of Columbia law and the U.S. Constitution. "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). The first inquiry is whether the plaintiff has shown that an applicable long-arm statute reaches the defendant. If so, then the court considers whether the exercise of jurisdiction comports with due process. Id. at 567.

A.   The Court Lacks Jurisdiction Under The District Of Columbia Long-Arm Statute

Rule 4(k)(1)(A) governs the territorial limits of effective service, see, e.g., First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 392 (S.D.N.Y. 2002), and specifies that the court has jurisdiction only over a defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." This rule requires the Court to apply the District of Columbia long-arm statute.[18]

Plaintiffs do not, and cannot, contend that the courts of the District of Columbia have general jurisdiction over Mr. Jameel, who is not, and cannot be alleged to be, "a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia." D.C. Code § 13-422.

---

[18]   The Judicial Panel on Multidistrict Litigation transferred this action from the District of Columbia pursuant to 28 U.S.C. § 1407. Accordingly, with respect to issues of federal law, this Court applies the law of this Circuit. With respect to issues of state law, however, this Court applies the law that the transferor court would have applied. Menowitz v. Brown, 991 F.2d 36, 40-41 (2d Cir. 1993).

And, a court of the District of Columbia does not have specific jurisdiction over Mr.

Jameel.  D. C. Code § 13-423 provides, in pertinent part:

> (a)  A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --
>                              * * *
>        (3)  causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
>        (4)  causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

Plaintiffs do not, and cannot, contend that Mr. Jameel engaged in any "act or omission in the

District of Columbia . . . ."  D.C. Code § 13-423(a)(3).

Instead, plaintiffs' theory is that Mr. Jameel acted outside the country, causing injury in

the District.  D.C. Code § 13-423(a)(4).  But the 9/11 attacks did not cause injury in the District

of Columbia; they caused injury in Virginia, Pennsylvania and New York.  See, e.g., Perry v.

Criss Bros. Iron Works, Inc., 741 F. Supp. 985, 987 (D.D.C. 1990).  In any event, subparagraph

13-423(a)(4) requires plaintiffs to establish, in addition, what then-Judge Ruth Bader Ginsburg

calls a "plus factor," Crane v. Carr, 814 F.2d 758, 763 (D.C. Cir. 1987) -- that Mr. Jameel

"regularly" does or solicits business, engages in some other "persistent" course of conduct or

derives "substantial" revenue from goods or services in the District of Columbia.  Plaintiffs do

not, and cannot, allege that Mr. Jameel engages in conduct that constitutes one of the "plus

factors."

B.     The Exercise Of Jurisdiction Would Not Comport With Due Process

Plaintiffs have not alleged specific facts to support any inference that Mr. Jameel

"expressly aimed" or "purposefully directed" his actions at the United States, and therefore could

reasonably foresee being haled into court here.  Burnett v. Al Baraka Inv. & Dev. Corp., 292 F.

Supp. 2d 9, 22-23 (D.D.C. 2003) ("Burnett II"), citing cases.  See Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 476 (1985); World-Wide Volkswagen Corp. v. Woodson, 444 U.S.

286, 296-99 (1980).  Plaintiffs rely on a general allegation that the acts of all defendants

"caused" plaintiffs' injuries, TAC ¶ 649, and the unsupported conclusory allegation that Mr.

Jameel acted "with knowledge that the funds would be used to support al Qaeda and its

international terrorist agenda in attacking the United States."  MDS ¶ 10.  Such conclusions, in

the absence of specific supporting facts, are insufficient to establish personal jurisdiction.  See,

e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 793 (2d Cir. 1999);

McCarthy v. Higgins, 2000 WL 1134479, at *2 (S.D.N.Y. Aug. 10, 2000) (Casey, J.).

Equally important, as discussed more fully in Point II(B) below, plaintiffs' allegations,

even assumed to be true, simply do not demonstrate that Mr. Jameel knowingly directed

activities at the United States.  As Judge Robertson earlier held in this case, it is not enough that

plaintiffs allege that a defendant "personally donated money to the IIRO, the WML, the WAMY,

and Al-Haramain, knowing that those foundations funded terrorist organizations including Al

Qaeda." Burnett II, 292 F. Supp. 2d at 22-23.  A fortiori, dismissal follows where, as here,

plaintiffs allege no facts that permit an inference that Mr. Jameel contributed to charities or

individuals with the knowledge that they funded terrorism, let alone with the required intent to

direct the effects of his actions at the United States and the District of Columbia.  Finally,

plaintiffs allege no facts to defeat the conclusion that the 9/11 attacks were caused by the

superseding criminal acts of the 9/11 hijackers and therefore were not foreseeable by Mr. Jameel.

POINT II

THE COMPLAINT FAILS TO STATE A CLAIM
UPON WHICH RELIEF CAN BE GRANTED

Plaintiffs assert a claim under the ATA, 18 U.S.C. § 2333, which provides:

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism, or
> his or her estate, survivors, or heirs, may sue therefor in any
> appropriate district court . . . .

Plaintiffs' claim fails.  First, it cannot "be maintained" under section 2333 because the 9/11 attacks constituted "an act of war" within the meaning of 18 U.S.C. § 2336(a).  Second, even if the 9/11 attacks were actionable under section 2333, the Complaint does not allege facts sufficient to permit the inference that Mr. Jameel knowingly and intentionally violated the ATA.  Third, as a matter of law, Mr. Jameel's alleged conduct is too remote from the 9/11 attacks to constitute the proximate cause of plaintiffs' injuries.[19]

A.     Civil Liability Is Barred Because The 9/11 Attacks Were An Act Of War

Plaintiffs cannot maintain this action under section 2333 because the 9/11 attacks constituted "an act of war" within the meaning of 18 U.S.C. § 2336(a).  Section 2336(a) provides: "No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war."  18 U.S.C. § 2331(4), in turn, defines "act of war" as:

> any act occurring in the course of--
> (A) declared war;
> (B) armed conflict, whether or not war has been declared, between two
> or more nations; or
> (C) armed conflict between military forces of any origin.

---

[19]    In addition, the 9/11 attacks "occur[red] primarily within the territorial jurisdiction of the United States," 18 U.S.C. § 2331(5)(C), and therefore were acts of "domestic terrorism" for which section 2333 does not provide a cause of action.

Plaintiffs would turn centuries-old practice on its head by asking a court to provide a remedy for war. Section 2336(a), however, preserves the norm by preventing civil plaintiffs from conducting and interfering with foreign policy and from seeking redress for military conflict through the court. Instead, such plaintiffs can seek redress through alternative compensation mechanisms.

The plain text of the ATA makes clear that an "act of war" is broader than a declared war or an armed conflict between nations. By specifically including "armed conflict between military forces of any origin" within the act of war exception, Congress expressed its understanding that war can be waged without formal declaration and by non-state actors.[20] The legislative history confirms that "[i]njuries received by noncombatants as a result of open, armed conflict, including civil war, should not be actionable." 102 S. Rpt. 342, at 46 (1992).

Of course, not all, or even most, acts of international terrorism also constitute an "act of war" under section 2336(a). Otherwise, civil liability in section 2333 would be an empty vessel. But the 9/11 attacks crossed the line, wherever it may be drawn. Unlike any other terrorist attack, the 9/11 attacks have been recognized by the President, the Congress, the international community -- and even plaintiffs -- as an act of war.

---

[20] There is little question that al Qaeda is a "military force" under section 2336. Its command structure includes a "military committee" to approve military operations; its training manual demands "listening and obedience," which is "expressed by how the member obeys the orders given to him." The Al Qaeda Training Manual, Second Lesson, available at http://www.usdoj.gov/ag/trainingmanual.htm. Ex. Q. It has military camps where its members "received military and intelligence training." United States v. Bin Laden, 92 F. Supp. 2d 225, 226-7 (S.D.N.Y. 2000). See generally Commission Statement No. 15 at 2-3 ("Al Qaeda was intended to serve as a foundation upon which to build a global Islamic army"; its military committee is "responsible for proposing targets, gathering ideas for and supporting operations, and managing training camps").

Plaintiffs have admitted in this case that the 9/11 attacks "meet the definition of an armed conflict."  Plaintiffs' Memorandum of Law in Opposition to Al Haramain Islamic Foundation, Inc.'s Motion to Dismiss, dated April 3, 2003, at 26.  Plaintiffs further state:

> Al Qaeda-directed attacks on the United States and its citizens have been plotted and ongoing for years prior to September 11th.  Included in these armed conflicts are the bombing of U.S. Embassies in Africa in 1998, and the bombing of a U.S. Navy warship, the U.S.S. Cole, in a Yemeni port in 2000.  The United States openly engaged in military attacks on al Qaeda training camps in response to the 1998 attack, and undoubtedly non-publicized military operations were underway.

Id., at 26-27 (citations omitted).

Within days of the attacks, Congress passed the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224, to empower the President to retaliate militarily against those responsible for the 9/11 attacks.  Congress found that the 9/11 attacks "render it both necessary and appropriate that the United States exercise its rights to self-defense" and thus authorized the use of military force pursuant to section 5(b) of the War Powers Resolution.  See Hamdi v. Rumsfeld, 542 U.S. __, 124 S. Ct. 2633, 2641 (2004) (noting that the President is "waging war" pursuant to the AUMF).

On September 12, 2001, the 19 countries in the North Atlantic Treaty Organization determined (for the first time in its history) that the 9/11 attacks constituted an "armed attack" from abroad that triggered the collective defense obligation under Article 5 of the Treaty.[21]

The President, likewise, declared unequivocally that "[o]n September the 11th, enemies of freedom committed an act of war against our country."[22]  This declaration was not mere

---

[21]  Secretary General Lord Robertson, Statement at NATO Headquarters (Oct. 2, 2001), available at http://www.nato.int/docu/speech/2001/s011002a.htm.  Ex. R.

[22]  http://www.whitehouse.gov/news/releases/2001/09/20010920-8.html.  Ex. S.

rhetoric, but was reinforced with legal authority.  For example, Section 1 of the <u>Military Order of November 13, 2001: Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism</u>, 66 Fed. Reg. 57,833 (Nov. 16, 2001), provides:

> (a) International terrorists, including members of al Qaeda, have carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that <u>has created a state of armed conflict</u> that requires the use of the United States armed forces.

<u>Id</u>. at 57,833 (emphasis added).  On July 3, 2002, the President signed Executive Order 13269 to grant expedited citizenship to foreigners serving in the United States military.  Consistent with the requirements of 8 U.S.C. §1440, the President "designate[d] as a period in which the Armed Forces of the United States were engaged in <u>armed conflict with a hostile foreign force</u> the period beginning on September 11, 2001."  67 Fed. Reg. 45,287 (July 8, 2002) (emphasis added).  These and other actions provide ample basis for the Solicitor General's recent statement before the Supreme Court: "The United States is at war."  <u>Rasul</u> v. <u>Bush</u>, 2004 WL 943637, at *21 (U.S. Apr. 20, 2004).

Disallowing private civil litigation to remedy acts of war comports with long-standing practice.  Private civil litigation against belligerents can prolong a war and complicate any effort to terminate hostilities.  <u>See</u> <u>Dames & Moore</u> v. <u>Regan</u>, 453 U.S. 654, 679 (1981); <u>United States</u> v. <u>Pink</u>, 315 U.S. 203, 224-25 (1942); <u>Ozanic</u> v. <u>United States</u>, 188 F.2d 228 (2d Cir. 1951).  Thus, claims arising out of war have historically been treated through diplomatic and political channels, not through private civil litigation.  <u>See</u> <u>Dames & Moore</u>, 453 U.S. at 680 nn.8, 9 (tracking the history of diplomatic and political resolutions of war claims, from the Wilmington Packet in 1799, through "no fewer than eighty" such agreements from 1817 to 1917, to "at least 10" such agreements from 1952 to 1981).  Congress wrote section 2336(a) against this backdrop,

13

with which it was no doubt very familiar.  United States v. Baxter Intern., Inc., 345 F.3d 866, 900 (11th Cir. 2003).

This reading of section 2336(a) does not leave plaintiffs without a remedy.  The political branches have already provided plaintiffs with alternative remedies, such as the no-fault compensation provided by the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 et seq.  And history teaches that plaintiffs may well have additional remedies in the future, perhaps against assets currently blocked by the Executive Branch.  See Dames & Moore, 453 U.S. at 673 (diplomatic and political settlements of private war claims "permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency . . . . [to] serve as a 'bargaining chip' to be used by the President when dealing with a hostile country").

B.    The Complaint Does Not Permit An Inference Of Knowledge And Intent

Even if section 2333 can give rise to a cause of action for the 9/11 attacks, the Complaint does not state a claim upon which relief can be granted against Mr. Jameel.  Reading the Complaint liberally, plaintiffs allege that Mr. Jameel violated section 2333 in three ways -- (1) as a principal, by providing "material support" to the 9/11 hijackers in violation of 18 U.S.C. § 2339A, (2) by aiding and abetting the 9/11 hijackers and (3) by conspiring with the 9/11 hijackers.  See Boim v. Quranic Literacy Inst., 291 F.3d 1000 (7th Cir. 2002).  The statute, however, creates no such causes of action.  And the contention that Mr. Jameel has violated the statute by the acts alleged here is neither supported nor supportable.

The statute creates a cause of action in favor of a U.S. national injured "by reason of an act of international terrorism."  The statute does not create a cause of action for a violation of section 2339A, or a cause of action against persons who aid and abet or conspire with persons who violate section 2333.  Indeed, when Congress wished to provide for accessorial liability in

14

the ATA, it did so explicitly.  See, e.g., 18 U.S.C. §§ 2332b(b)(2), 2339B(a)(1).  It did not do so when it created a civil cause of action in section 2333.  The Court should not imply causes of action that Congress could have specified but did not.  See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994); Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1430 (3d Cir. 1994) ("[A]iding and abetting liability is not a well-settled mechanism for imposing civil liability."); Lippe v. Bairnco Corp., 218 B.R. 294, 304 (S.D.N.Y. 1998).

In any event, even under Boim, a plaintiff must plead (and ultimately prove) that the defendant acted knowingly and intentionally.  Boim, 291 F.3d at 1011-12, 1015.  Accord, Burnett v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 102 (D.D.C. 2003) ("Burnett I"); Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 226 (S.D.N.Y. 2003).  Thus, in this case, plaintiffs must plead (and ultimately prove) that Mr. Jameel (a) acted with knowledge that the hijackers would commit the torts at issue and (b) acted with the "intent to further" the hijackers' "violent criminal acts," Boim, 291 F.3d at 1011 -- that is, with the intent to support the hijackers and to "help [their] activities succeed," id. at 1023.  See also Doe v. GTE Corp., 347 F.3d 655, 659 (7th Cir. 2003) (holding that aiding and abetting liability requires "culpable assistance to a wrongdoer, which requires a desire to promote the wrongful venture's success").

The applicable pleading requirement is well-settled.  Plaintiffs must "allege facts from which [the requisite] intent [and knowledge] on the part of the defendant[] reasonably may be inferred."  Dougherty v. Town of North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 91 (2d Cir. 2002) (citing authorities).  When searching for such facts, the Court examines the Complaint, documents that are "integral" to the Complaint, and documents of which the Court

may take judicial notice.  See, e.g., Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48

(2d Cir. 1991); Kavowras v. The New York Times Co., 328 F.3d 50, 57 (2d Cir. 2003).  And

where, as here, plaintiffs make particularly inflammatory charges, the Court should employ

"extra-careful scrutiny" when assessing the adequacy of allegations.  Burnett I, 274 F. Supp. 2d

at 103-04.

Mr. Jameel denies and objects to the false allegations that he contributed to any

organization that perpetrated the 9/11 attacks.  But even assumed to be true, the Complaint does

not allege facts sufficient to permit the inference that Mr. Jameel knowingly and intentionally

violated the ATA.  To the contrary, the absence of specificity in plaintiffs' allegations --

particularly with respect to crucial issues of timing -- coupled with patently obvious

mischaracterizations of the facts, compel dismissal.  Plaintiffs have now pleaded their case five

times -- in the initial complaint, three amendments and the MDS.  At this point, their failure to

make the requisite allegations against Mr. Jameel is telling -- and fatal to their claims.

1.      The Absence of Allegations as to Timing

Plaintiffs' allegations against Mr. Jameel fail to specify when many of the alleged acts

took place.  That silence speaks volumes, because timing is essential to plaintiffs' attempt to

ascribe the requisite knowledge and intent to Mr. Jameel and to link his alleged activities to the

9/11 attacks.  Such knowledge, intent, and causation can be inferred if, and only if, at the time

Mr. Jameel engaged in the alleged activities, he knew and intended that those activities would

support the 9/11 attacks.  Without allegations of timing, the plaintiffs cannot pinpoint Mr.

Jameel's alleged activities to the moving target of al Qaeda's intentions and plans against the

United States.

As discussed above, throughout the 1980s Osama bin Laden was an ally of the United

States in the fight against the Soviets in Afghanistan.  Plaintiffs cannot seriously contend that

assistance to bin Laden at such time is actionable.  Moreover, as plaintiffs acknowledge, TAC ¶ 575, al Qaeda did not announce its intention to wage jihad against the United States until 1996; bin Laden was not indicted until 1998; the United States did not designate al Qaeda as a foreign terrorist organization until 1999; and the 9/11 attacks were not authorized until 1999.  Absent factual allegations to distinguish Mr. Jameel from other unwitting donors, which plaintiffs do not and cannot make, the failure to link his activities temporally to al Qaeda's public intentions is fatal to plaintiffs' claim.

Moreover, timing is critical because Congress did not enact section 2333 until 1992.  See Pub. L. No. 102-572, 106 Stat. 4506.  Conduct that occurred prior to that enactment cannot be actionable.  Boim, 291 F.3d at 1016.

2.    The "Golden Chain"/Batterjee/BIF

Most of plaintiffs' allegations center around the allegation that one "Yousef Jameel" appears on a list of names labeled "Osama History."  MDS ¶ 14.  Plaintiffs transform this nugget into the inflammatory allegation that Mr. Jameel "donated funding via the Golden Chain to al Qaeda."  Id. ¶ 19.  Because the name Yousef Jameel is listed next to that of Adel Abdul Batterjee, Mr. Jameel is further alleged to have made the supposed donations by giving funds to Batterjee, id. ¶ 15, and to BIF, which Batterjee founded.  Id. ¶ 18.

This linguistic legerdemain, however, rests on a number of false assumptions.  First, the Complaint assumes that the so-called "Golden Chain" document is authoritative and final.  Contrary to plaintiffs' allegation, however, the U.S. government did not describe the document as "a list of people referred to within al Qaeda as the 'Golden Chain,' all wealthy donors to their extremist cause."  Id. ¶ 13.  Rather, the government described the document as "a handwritten

draft list of the people referred to within al Qaeda as the 'Golden Chain,' wealthy donors to mujahideen efforts."[23]

Second, the Complaint assumes that the writings indicate involvement with the al Qaeda network -- an assumption contradicted by plaintiffs' own expert, who accepts that the document was dated in 1988,[24] which, as plaintiffs concede, pre-dates the formation of al Qaeda.  TAC p. 209.  As the government characterization makes clear, the document, whatever its meaning, is linked not to al Qaeda but to the mujahideen, whose efforts were expressly supported by Congress.  See S.J. Res. 365, 99th Cong., 100 Stat. 756 (1986) (Ex. J).

Third, plaintiffs wrongly assume that the Osama History lists actual contributors.  It is, however, simply a list of names.  It does not "identif[y] Defendant Jameel's name as one of the sources of funding to al Qaeda."  MDS ¶ 12.  Absent some other facts, which plaintiffs have not pled, the document has no probative value at all.

More important, even if the Court indulges in all of these heroic assumptions, the Golden Chain allegations beg the key question unanswered by the Complaint against Mr. Jameel:  So what?  Plaintiffs' lead investigator accepts that the document is dated in 1988.  Even assuming, counterfactually, that Mr. Jameel contributed to Osama bin Laden (either directly or through Batterjee), his contribution in no way supports any inference that he (1) contributed to an as-yet-to-be-formed al Qaeda, (2) agreed with its subsequent declaration of war, (3) supported its subsequent plans -- not approved until 1999 -- to carry out the 9/11 attacks, or (4) was complicit in the 9/11 attacks.  Plaintiffs would have to defend each of these illogical and impossible

---

[23]   See Arnaout Proffer, supra note 7, at 30.

[24]   Brisard Witness Statement, supra note 16, at ¶ 7.

inferences to state a claim against Mr. Jameel (or to establish jurisdiction) based on the Golden Chain list.[25]

Another court has recognized that the list has no probative value.  In defending a libel action in England brought by Mr. Jameel, the <u>Sunday Times</u> relied on the Golden Chain document to justify a false statement that Mr. Jameel was linked to Osama bin Laden.  The Court denied the <u>Sunday Times</u>' motion for summary judgment, reasoning:

> [T]he list is in manuscript; its author is unknown, as is the source of the author's information; there is nothing in the list to suggest that the individuals named have made donations, rather than that they are potential donors; the list had been dated by Mr. Brisard, the lead investigator in the <u>Burnett</u> case, to 1988 at which time OBL was engaged in resisting the Soviet incursions into Afghanistan with the approval of western governments; there is nothing to link the list to Al-Qaeda; any money which was donated was apparently to be applied to fund fighters in Chechnya and Bosnia and not the atrocities which took place many years later in New York.[26]

3.   <u>Charitable Contributions</u>

Throughout the More Definite Statement, plaintiffs allege that Mr. Jameel made contributions to charitable organizations.  Aside from bald conclusions, however, plaintiffs allege no facts to support an inference that Mr. Jameel knew at the time of any purported contribution that the charity was involved in terrorism, was a front for al Qaeda, or would pass the money on to terrorists.  MDS ¶¶ 18, 21-25, 36, 41-42.  Similarly, in none of these instances do plaintiffs allege facts from which it can be inferred that Mr. Jameel knew that al Qaeda

---

[25]   The infirmities in plaintiffs' allegations concerning the Golden Chain apply equally to the companion allegations concerning Batterjee and BIF.  Those allegations fail for the additional reasons that they are devoid of facts that would permit an inference that Mr. Jameel knew at the time of the alleged donation (a) that Batterjee was a member of al Qaeda, (b) that Batterjee or BIF would give Mr. Jameel's money to al Qaeda, or (c) that al Qaeda intended to attack the United States.

[26]   <u>Jameel</u> v. <u>Times Newspapers Limited</u>, [2003] EWHC 2609 (Q.B.) (Nov. 7, 2003) at ¶ 35.  Ex. T.

intended to attack the United States.  The Complaint provides few dates from which any inference can be drawn.  For the five alleged contributions that came with dates,[27] only one organization has ever been designated as a terrorist financier by the United States government, and that designation was made after 9/11.[28]

To be sure, plaintiffs do allege that "it has been widely reported" -- without specifying when or by whom -- that a charity provided material support to al Qaeda, MDS ¶ 24, or that unspecified officials "throughout the world" have -- at an unspecified time -- stated that another charity provided support for terrorism.  Id. ¶ 27.  These vague assertions, however, fall far short of factual allegations that would permit an inference that Mr. Jameel knew of the charities' nature and intentions at the time of the alleged contributions.

4.      Other Allegations

Plaintiffs' other allegations do nothing to salvage their claim.

The allegation that Mr. Jameel is "identified" as "having purchased a satellite phone for Osama bin Laden," ¶ 19 -- which Mr. Jameel denies -- fails because it does not state when Mr. Jameel supposedly purchased this phone for bin Laden.  For all that appears -- and the Complaint does not allege otherwise -- the phone was allegedly purchased well before anyone knew of al Qaeda's intent to attack the United States.  Indeed, accepting the allegations, the satellite phone must have been purchased no later than July 1996.  The Complaint attributes the allegation

---

[27]  Plaintiffs allege that Mr. Jameel contributed to Saudi Red Crescent Society in April and December of 1999, MDS ¶¶ 21, 23, to Al-Haramain Islamic Foundation, International Islamic Relief Organization, and the World Assembly of Muslim Youth in December 1999, id. ¶ 25, and to Abad Islamque on November 30, 1990.  Id. ¶ 41.

[28]  See U.S. Dep't. of the Treasury, Specially Designated Nationals and Blocked Persons (June 30, 2004) available at http://www.treas.gov/offices/eotffc/ofac/sdn/t11sdn.pdf.  Ex. U. The United States named Al-Haramain Islamic Foundation as Specially Designated National on March 11, 2002.  U.S. Dep't of the Tresaury, available at http://www.treas.gov/offices/eotffc/ofac/sdn/sdnew02.txt.  Ex. V.

concerning the phone entirely to Jamal Ahmed Al-Fadl.  MDS ¶ 19.  Al-Fadl left al Qaeda

between May and July of 1996,[29] and al Qaeda's first declaration of war was disseminated later

than that, on or about August 23, 1996.  TAC ¶ 575.  As noted earlier, the 9/11 plot was not

authorized until three years after that.

The allegation -- which Mr. Jameel denies -- that Mr. Jameel had "communications" with

Sami Al-Arian "pertain[ing] to a plan to obtain palletized urea fertilizer . . . ., [which,] [u]pon

information and belief . . . was intended to be used for terrorist activities," ¶¶ 39-40, fails for

numerous reasons.  It has absolutely no connection to the 9/11 attacks.  It also lacks a date, lacks

any allegation that plaintiffs were injured by reason of Mr. Jameel's alleged "communications,"

lacks any allegation that Al-Arian is connected to al Qaeda, and lacks any allegation that at

whatever time these "communications" took place, Mr. Jameel (1) knew that Al-Arian was

linked to al Qaeda, and (2) knew that al Qaeda intended to attack the United States.

Finally, failing in facts, plaintiffs would taint by innuendo and ascribe liability by

association.  Plaintiffs allege that, after September 11, the United States requested Saudi

authorities to monitor the accounts of Mr. Jameel's company.  ¶ 16.  This allegation, of course,

does nothing to advance plaintiffs' case.  As a matter of law and logic, plaintiffs sustained no

injury by reason of any alleged government monitoring of bank accounts after September 11.

But, in any event, this charge is false and has been adjudicated to be libelous by a competent

court in an action brought by another member of Mr. Jameel's family.  The allegation is an

---

[29]   Testimony of Jamal Ahmed al-Fadl, United States v. Usama Bin Laden, S(7) 98 Cr. 1023 (S.D.N.Y.)
(February 7, 2001) at 392, available at http://cns.miis.edu/pubs/reports/pdfs/binladen/070201.pdf.  Ex.
W.

almost verbatim copy of a <u>Wall Street Journal Europe</u> article published in February 2002.[30]  On

February 7, 2002, in response to the article, the Saudi Arabia Monetary Agency ("SAMA")

issued a press release stating that SAMA is "not monitoring the accounts of any persons or

private organizations, be they important or unimportant."[31]  After a full trial, in which the

defendant publication did not even try to show that the allegation was true, an English jury found

the allegation libelous and awarded damages for the defamation.[32]

C.      Mr. Jameel's Alleged Conduct Is Too Remote
        <u>To Constitute The Proximate Cause Of Plaintiffs' Injuries</u>

        The ATA permits recovery for injuries "by reason of" an act of international terrorism.

18 U.S.C. § 2333.  Plaintiffs therefore bear the burden of pleading (and ultimately proving) that

Mr. Jameel's conduct was the proximate cause of the 9/11 attacks.  <u>Boim</u>, 291 F.3d at 1011-12;

<u>Smith</u>, 262 F. Supp. 2d at 226.  Plaintiffs, however, cannot carry this burden.

        Liability for injury "by reason of" a defendant's conduct requires "a showing that the

defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as

well."  <u>Holmes</u> v. <u>Sec. Investor Prot. Corp.</u>, 503 U.S. 258, 268 (1992).  "Proximate cause"

requires "some direct relation between the injury asserted and the injurious conduct alleged."  <u>Id</u>.

at 259.  The defendant's acts must have been "a substantial factor" leading to the injury, and the

injury must have been "reasonably foreseeable or anticipated as a natural consequence" of the

acts.  <u>In re Am. Express Co. Shareholder Litig.</u>, 39 F.3d 395, 400 (2d Cir. 1994) (quotations

---

[30]    James Dorsey, <u>Saudi Officials Monitor Certain Bank Accounts</u>, Wall St. J. Eur., Feb. 6, 2002 at 1. Ex. X.

[31]    Press Release, Saudi Arabian Monetary Agency (Feb. 7, 2002).  Ex. Y.

[32]    Order After Trial (Dec. 19, 2003) in <u>Mohammed Abdul Latif Jameel</u> v. <u>The Wall Street Journal Europe</u>, UK HCJ No. HQ 02 X00582.  Ex. Z.

omitted).  See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229,

235-36 (2d Cir. 1999).  Thus, plaintiffs must establish not only that defendant's alleged charitable

contributions constituted acts of international terrorism, but that those contributions were the

proximate cause of the injuries sustained in the 9/11 attacks.

　　　　Plaintiffs' Complaint fails because it does not allege any facts to contradict that, as a

matter of law, plaintiffs' injuries were caused by the 9/11 hijackers' criminal acts, which

superseded Mr. Jameel's alleged acts and broke the chain of causation.[33]  "An intervening act

may break the causal nexus when it is extraordinary under the circumstances, not foreseeable in

the normal course of events, or independent of or far removed from the defendant's conduct.

Here, as an independent act far removed from defendants' conduct, the criminal assault broke the

causal nexus.  The attack was extraordinary and not foreseeable or preventable in the normal

course of events."  Maheshwari v. City of New York, 2004 WL 964317, at *3 (N.Y. May 6,

2004) (quotations omitted).[34]

　　　　In any event, plaintiffs do not allege a link between Mr. Jameel's alleged conduct and

9/11 attacks, much less the requisite "direct relation" between his conduct and the 9/11 injuries.

See Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 99 (D.D.C. 2002).  Plaintiffs do not

allege how Mr. Jameel's acts led to plaintiffs' injuries or how or why he could have foreseen or

---

[33]　Indeed, bin Laden authorized the 9/11 plot in 1999.  See n.15 supra.  Absent specific allegations of
fact sufficient to permit an inference that Mr. Jameel knowingly and intentionally participated in the
9/11 plot, conduct that preceded bin Laden's authorization cannot be a proximate cause of the
plaintiffs' injuries.

[34]　In re September 11 Litig., 280 F. Supp. 2d 279, 301-02 (S.D.N.Y. 2003), is not to the contrary.  The
court there held that the defendants owed plaintiffs a duty to exercise reasonable care to provide a
safe environment; that the duty to adopt fire-safety precautions applies to fires caused by criminals;
and that large-scale fire was precisely the type of risk against which the defendants had a duty to
safeguard.  Because Mr. Jameel owed no such duties to plaintiffs, such considerations do not apply
here.

23

anticipated the 9/11 attacks.  Instead, plaintiffs rely on the general allegation that the acts of all

defendants "caused" plaintiffs' injuries.  TAC ¶ 649.  Such an allegation, however, is plainly

insufficient.  "[C]ourts do not accept conclusory allegations on the legal effect of the events

plaintiff has set out if these allegations do not reasonably follow from his description of what

happened."  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994)

(internal quotation and citation omitted) (modification in original).  Even under the notice

pleading standard, courts do not accept inferences that are unsupported by the facts alleged in a

complaint.  See, e.g., Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495-96 (2d Cir. 1992);

Burnett I, 274 F. Supp. 2d at 103.[35]

---

[35]  Plaintiffs' other federal claims also should be dismissed.  Plaintiffs fail to state a claim under the
Torture Victims Protection Act ("TVPA").  (1) The TVPA creates a cause of action only against
persons who act "under actual or apparent authority, or color of law, of any foreign nation" -- i.e.,
state actors.  Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995).  Plaintiffs do not, and cannot, allege
that Mr. Jameel was a state actor; (2) the TVPA creates a cause of action for "torture" or
"extrajudicial killing."  Plaintiffs do not, and cannot, allege that Mr. Jameel engaged in any such
conduct; and (3) the TVPA does not create a cause of action for aiding and abetting or conspiracy.
Thus, even if the 9/11 hijackers violated the TVPA, Mr. Jameel cannot be liable to plaintiffs.  But see
Wiwa v. Royal Dutch Petro. Co., 2002 WL 319887, at *15-16 (S.D.N.Y. Feb. 28, 2002).

Plaintiffs fail to state a claim under the Alien Tort Statute ("ATS").  (1) The ATS does not impose
liability on private, non-state actors, (2) Mr. Jameel's alleged conduct did not violate international
law, (3) the ATS does not create a cause of action for aiding and abetting or conspiracy and (4) the
9/11 hijackers did not violate the ATS.  See Sosa v. Alvarez-Machain, 542 U.S. __, 124 S. Ct. 2739,
2755 (2004) (ATS is purely jurisdictional to enforce a limited number of international law violations).

Plaintiffs also allege RICO claims but the transferor court dismissed those claims for lack of RICO
standing.  See Burnett I.  That decision is the law of the case.  See Nascone v. Spudnuts, Inc., 735
F.2d 763, 773 n.9 (3d Cir. 1984); Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 168-69 (3d
Cir. 1982).  It also is correct based on precedent in this Circuit.  See, e.g., Laborers Local 17 Health &
Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 241 (2d Cir. 1999).

Plaintiffs' state law claims should be dismissed pursuant to 28 U.S.C. §§ 1367(c)(1) and (3).

CONCLUSION

For the foregoing reasons, the Third Amended Complaint should be dismissed.

Dated:  New York, New York
        July 16, 2004

                              CHADBOURNE & PARKE LLP


                              By  _____/s/ Kenneth A. Caruso_____
                                    Kenneth A. Caruso (KC-7769)
                                       A Member of the Firm
                                 30 Rockefeller Plaza
                                 New York, New York  10112
                                 (212) 408-5100


                              By  _____/s/ Viet D. Dinh_____
                                       Viet D. Dinh (VD-1388)
                                       Pro Hac Vice (application pending)
                                  600 New Jersey Ave., NW
                                  Washington, DC 20001
                                  (202) 662-9324


                              Attorneys for Defendant Yousef Jameel


Of Counsel:
     Kenneth A. Caruso
     Marvin R. Lange
     Jeffrey I. Wasserman

     Viet D. Dinh
     Brian Benczkowski


25