# Exhibit A



Alumni | Capital Campaign | News and Events | Publications | Support AUC | AUC Home

- Campaign Home
- About the Campaign
- Welcome Letter
- Campaign Objectives
- News and Events
- Campaign FAQ
- Support the Campaign
- Naming Opportunities
- Contact Us

Make a Gift
*Online*

Read our
e-newsletter

## Long Lasting Ties



Since 1989, the Jameel Center has stood at the center of the Greek Campus as a symbol of the generosity and support of Yousef Abdul Latif Jameel '68, one of AUC's most devoted alumni.

Today, continuing his generosity, Jameel has donated $10 million to construct the School of Business, Economics and Communication on AUC's new campus, which will be named after his family. Jameel also provides funding for education and MBA scholarships at the university.

Exemplifying the qualities of a business leader and a visionary pioneer in several industries, Jameel built one of Saudi Arabia's most important and diversified corporations. After graduating from AUC with a B.A. in economics, Jameel, the eldest son of an established Saudi Arabian businessman, the late Sheikh Abdul Latif Jameel, went to work for his father's Toyota auto agency in Jeddah. Determined to learn more about the family business, Jameel spent six months in Japan where he lived in the dormitory with mechanics, learning to service the cars and taking technical courses. Under his leadership, the Jameel Company quickly grew to become the sole agent for Toyota in Saudi Arabia.

Building on his success in the auto industry, Jameel utilized his keen business sense to diversify into other fields. Today, his heirs own an international group, headquartered in Dubai, which focuses on high technology and innovation and actively supports projects led by leading scientists and research and development teams in several universities in the West.

Carrying forward his late father's devotion to education, Jameel believes it is the "key to the success of our future generations," adding that "universities like AUC, which have spearheaded high-quality educational programs, should be supported whenever possible."

Updated January 2004
Copyright © The American University in Cairo
Site feedback

# Exhibit B

5 of 5 DOCUMENTS

Copyright 2004 The New York Times Company
The New York Times

March 14, 2004 Sunday
Correction Appended
Late Edition - Final

SECTION: Section 6; Column 1; Magazine Desk; Pg. 36

LENGTH: 7919 words

HEADLINE: A Nation Unto Himself

BYLINE: By Jennifer Senior.

Jennifer Senior is a contributing writer for the magazine. She last wrote about Gov. George E. Pataki.

BODY:
[Intruders in the House of Saud]
Part II
If, in the future, the war on terrorism is fought in the orderly confines of the courtroom and not just in the caves of Tora Bora, then incriminating documents could become the equivalent of smart bombs. Ronald L. Motley, who has made a career of coaxing such documents from the shadows, made this clear in our very first phone conversation, during which he could barely contain his delight. "Have you heard of Mohammed Fakihi?" he demanded, in a drawl rich enough to fill a doughnut. "Investigated by the German police?"

Well, no --.

"That fella had a computer," he continued. "And do you know what I did with that computer?"

He allowed a capacious pause.

"I'll tell you what I did," he said. "I bought it."

As a trial lawyer, Motley thinks of terrorism not just as a form of war, but as a business -- a depraved, ruthlessly efficient business, whose financiers must be exposed and held accountable for their role in sowing harm. In the case of Sept. 11, Motley, like many in the American intelligence community, concluded that the 19 hijackers would never have been able to carry out their plans without generous Saudi assistance. Nineteen months ago, he filed a civil lawsuit in federal court in Washington charging that a wide variety of parties from the kingdom sponsored the attacks, either directly or indirectly, by making donations to institutions that they knew fostered terrorism. Among the case's 205 defendants are seven Saudi charities, including the largest in the Muslim world; three Saudi financial institutions, including one that is now state-run; dozens of prominent Saudi individuals; and perhaps most audaciously, several members of the royal family, for whom Motley has a rich assortment of epithets. Though Motley is not the only tort lawyer in the United States to have filed an international lawsuit in connection with Sept. 11, his case is by far the largest and most lavishly financed of its kind: he has already spent more than $12 million, most of it his own money or his firm's, investigating the case. The families of 1,667 people who died that day, as well as 1,197 men and women who sustained injuries, have signed on.

With all due respect, I asked Motley, how did he, rather than the F.B.I. or the C.I.A., gain custody of Fakihi's computer?

"Well, think about it this way," he said. "If you had information -- a computer hard drive, a Mullah Omar document or whatever your currency might be -- would you necessarily want to give it to the F.B.I.? Why, you might wind up in Guantanamo Bay. Which is not a pleasant place to be, I understand."

Nor does it hurt, one imagines, that when it comes to procuring the hard drives of individuals with potentially valuable information, Motley is willing to pay a handsome fee. (Though in this case, the seller, who Motley said was on the lam, charged only $4,000, on the condition that Motley's people also take his car off his hands.)

Motley built a successful legal career by winning quixotic lawsuits -- first against asbestos companies, which made him an extravagantly wealthy man, and then as a central player in the huge, 46-state case against Big Tobacco, at a time when going after cigarette manufacturers was a demonstrable route to bankruptcy. But whatever risks he took in suing multibillion-dollar corporations pale in comparison to this terrorism case. In trying to use domestic courts to redress the problem of global terror, Motley is potentially subverting, or at least opening to redefinition, the very notion of diplomacy. He and his clients are effectively acting as their own nation. This is naturally worrisome to international-relations professionals, who wonder whether profit-seeking trial lawyers have the legitimacy, expertise or proper motivations to be making foreign policy. "That's why we have a government," said Sean D. Murphy, who served as a State Department lawyer from 1987 to 1998. "It's elected to make some of the hard calls about how to handle foreign countries."

That may be so. The problem, as Motley sees it, is that sometimes governments are not in the position to make those hard calls, whether it be for political or for commercial reasons. So instead, they make easy ones. They resort to gentle persuasion, and their pleas fall on deaf ears. "Since 1999," Motley said later, "officials at the highest levels of our government have tried repeatedly to warn the Saudis about terrorism funding. And what did they do? They ignored them."

He took another dramatic pause.

"Which is why our defendants," he concluded, "ought to be held accountable in an American court."

Unlike most of the litigation filed in the aftermath of Sept. 11, which involves a fairly traditional body of laws and assumes a predictable pattern (the victims' families suing the airlines suing the insurers), the sweeping antiterrorism case brought by Ron Motley relies on new and evolving legal terrain, and its key defendants live in a Muslim monarchy halfway around the world. The United States also happens to consider this monarchy an ally, no matter how imperfect it may be. While Motley is aiming at other foreign parties, too, and while he is not suing the kingdom of Saudi Arabia itself, he is making a rather provocative statement by going after the kingdom's prominent citizens, banks and even some of its leaders. The State Department, while not formally weighing in against the suit, is watching it warily: the last thing it desires is the transformation of the American legal system into a blunt instrument of foreign policy. Bankrupting terrorism is certainly a national priority, even an urgent one, but hardly the task the diplomatic corps wants to entrust to a man who once, during closing arguments, wore a toy stethoscope in court.

Motley insists, frequently and not always convincingly, that he doesn't mean to make a national nuisance of himself; he is simply trying to address a fundamental injustice. Why, in the context of terrorism, should the needs of the state be privileged above the rights of the victims? Or, put another way, why should the flesh-and-blood targets of terrorist attacks -- the deceased and the bereaved -- take a back seat to the less tangible target, the state?

"Going through the court system and trying to take their money is the only recourse I have," explained Deena Burnett, the first client to sign on to Motley's suit. Her husband, Thomas, was on United Airlines Flight 93, which crashed into the empty field in Shanksville, Pa. "I can't join the military. It would be impractical for me to go abroad. But if I can put a stranglehold on their finances," she said, "it assists our president in the war on terrorism."

Whether George W. Bush is grateful for her assistance is another matter. As Motley, a generous donor to the Democratic Party, is fond of pointing out, the president's ties to the Saudi kingdom are personal as well as political: his father, George H.W. Bush, was until recently a senior adviser to the Carlyle Group, an investment firm that counted bin Laden family members among its investors until October 2001. James Baker, whom Bush recently sent abroad seeking help to reduce Iraq's debt, is still a senior counselor for the Carlyle Group, and Baker's Houston-based law firm, Baker Botts, is representing the Saudi defense minister in Motley's case.

Yet however committed a Democrat Motley might be, Burnett v. Al Baraka Investment and Development Corporation, as the case is known, could hardly be described as a partisan crusade. Allan Gerson, a Washington lawyer and Motley's co-counsel, worked in the Reagan Justice Department. Private legal actions against terrorist financiers also

have the support of a number of prominent Congressional Republicans, who have shown dwindling patience with the Bush administration's gingerly approach to Saudi diplomacy. Senator Arlen Specter, the Pennsylvania Republican, strongly supports Motley's investigation. Charles Grassley, an Iowa Republican and chairman of the Senate Finance Committee, was one of the original proponents of the legislation Motley is relying on for his case. In December, Grassley sent a sternly worded letter to the Treasury Department, demanding to know why the United States was slower than Europe to freeze certain Saudi assets. Last July, Richard Shelby, an Alabama Republican and former chairman of the Senate Intelligence Committee, publicly chastened the administration for classifying 28 pages reportedly about the Saudis from a Congressional report on Sept. 11.

Recently, I asked Shelby if he was nervous that Burnett might complicate life for the president. His answer was blunt. "If Ron Motley can help unravel the mystery of a lot of terrorist financing," he said, "I don't care who the president of the United States is. Or where the trail leads."

Assuming the answer is Saudi Arabia, what does that make Motley's case, exactly? A glorified, globalized tort suit? Or an example of a new wartime jurisprudence, one that fights terrorism with lawyers as well as guns and statesmen? The answer, in a sense, is both, and it could be the new way of the world. Those who take a dim view of Motley's work, dismissing it as nothing more than worldwide ambulance chasing, will be startled to learn that it is theoretically possible, in today's borderless society, to follow a screaming siren all the way to Riyadh. "Telling U.S. courts not to evaluate international tort claims is like King Canute telling the tide not to come in," said Harold Hongju Koh, the international law expert and next dean of Yale Law School. "I'm sorry, but the sun is coming up tomorrow, and it's called globalization."

Last fall Motley stood at a podium of a hotel conference room in suburban Virginia, addressing a large gathering of families of airline-disaster victims. "Let's pick on the Saudis for a moment," he said, grinning as the C-Span cameras rolled. He's regulation height, with a face that reddens easily and hair that's prone to feathering behind his ears. "I loooove," he continued, "to pick on the Saudis."

Motley, 59, is usually a dervish of energy and restless tics. His eyes dart and his fingernails tip-tap; in conversation he regularly interrupts himself. But not here. As soon as he stands before a crowd, armed with a PowerPoint presentation and a linear legal argument, that energy field of mayhem disappears.

"I think," he said, "that we should be very angry with the Saudis."

In order to justify his latest legal undertaking, Motley must establish that the Arabian Peninsula is the fund-raising capital for merchants of terror. Though the allegation has always drawn adamant denials from the Saudis -- their Washington embassy refuses to comment on Motley's case -- it is not, from the intelligence-community point of view, a particularly controversial point. In the months after Sept. 11, Treasury and National Security officials appeared before Congress, declaring Saudi Arabia the epicenter of terrorism financing. (This, in fact, was the precise phrase used by David Aufhauser, a former general counsel to the Bush Treasury Department who was also chairman of the National Security Council's committee on terrorist financing.) Perhaps the most scathing declaration on the subject appeared in a report from the Council on Foreign Relations, issued 17 months ago: "It is worth stating clearly and unambiguously what official U.S. government spokespersons have not. For years, individuals and charities based in Saudi Arabia have been the most important source of funds for Al Qaeda, and for years the Saudi officials have turned a blind eye to this problem."

While Motley suggests that Saudi money occasionally takes a direct path into Al Qaeda's coffers -- generally via wealthy individual donors -- it more frequently takes a circuitous route, either through the clean-and-rinse cycle of quasi-legitimate businesses or, more commonly, through a highly complex web of Muslim charities, which receive a steady stream of alms from both individuals and Saudi banks. Some of the charities named in Motley's suit are already the subjects of federal criminal investigations. But others, like the Muslim World League, are highly esteemed in the Arab world.

"Here's how I would explain to a jury all this legal mumbo jumbo," Motley told the crowd in the hotel conference room. The graphic behind him changed to a cartoon of heaving smokestacks and tangled pipes. "This," he said, "is a terrorist factory. Let's call it Al Qaeda Inc. And those smokestacks are spewing out terror, hatred, jihad, suicide bombers. So who's liable if you've lost a loved one to Al Qaeda Inc.?" He looked around. "It's the bank that loaned the money. It's the architect who designed the factory, knowing it was going to be spewing out hatred. It's the suppliers who supplied the factory with ingredients to manufacture terrorist acts. They're all responsible, each and every one." He thumped the podium. "That's the law of the United States."

Congress has indeed passed several antiterrorism laws over the last dozen years. In 1992, it enacted a law that said terror victims could sue for civil damages; in 1994, it explicitly criminalized providing "material support" for terrorist activities, making sure the definition included not just money but also lodging, training, personnel, telecommunications equipment, false documents, safe houses, transportation -- as broad a range of terrorism services as the authors of the bill could identify. In 1996, Congress also made it possible to file civil suits against foreign governments identified by the State Department as sponsors of terrorism.

The problem with these statutes -- particularly those involving "material support" -- is that they are vague, largely untested and now being challenged partly on First Amendment grounds. For now, Motley is relying on just a handful of precedents to make his case, hoping they aren't overturned along the way. The most important emerged from the Seventh Circuit in the summer of 2002, when the appeals court refused to dismiss a case against several American-based institutions alleged to have contributed to the Palestinian militant group Hamas; the court declared that the institutions could, under certain circumstances, be held liable for the Hamas killing of an American student, David Boim, in the West Bank, even if the charities had nothing to do with the specific planning of the murder. "Civil liability for funding a foreign terrorist organization," the opinion stated, "does not offend the First Amendment so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping." The case, commonly known as Boim, is now in federal court in Chicago.

Of course, with a case involving 205 defendants, many of them armed with the finest legal representation that money can buy, Motley can expect a world's worth of obstacles before Burnett ever gets that far. There will be motions to dismiss, extensions, delays -- all manner of procedural jujitsu that will probably keep the case going for years. Perhaps the biggest procedural obstacle of all is the question of jurisdiction: unlike Boim, Motley's case goes mainly after parties abroad. While collectively they have substantial American assets, it's unclear whether American courts will feel comfortable asserting jurisdiction over them. "The courts," Gerson said, "have to become involved in dealing with the reality of foreign affairs."

From behind the podium, Motley told the audience that he was about to run what he said was a surveillance video made in 1997 by the Madrid Qaeda cell. He warned it would be chilling. "When we intervened with the Spanish prosecution of this case," he explained, "the judge gave it to us."

For Motley, Burnett is a case not ultimately about foreign policy but about facts, which means that proving his defendants knowingly provided material support to terrorists is his other significant legal challenge. For the last two years, he has bankrolled a worldwide intelligence-gathering operation that makes the discovery process, ordinarily marked by subpoenas and dry depositions, read like a Tom Clancy novel. One process server he hired, he told me, disappeared in Saudi Arabia. Motley himself has received death threats, prompting him to hire a 350-pound former Army sergeant, the same bodyguard who accompanied him during the tobacco years.

Around the globe, Motley has hired 10 foreign "informants" -- including a former Taliban official -- whom he insists on referring to by code names (Arnold, the Albanian, the Muslim, Top Source). He has also hired Jean-Charles Brisard, a French intelligence expert, to persuade foreign governments to cooperate with his suit. Brisard is the author of the European best seller "Forbidden Truth," which posited that before Sept. 11 the Bush administration tried to coerce the Taliban into surrendering Osama bin Laden in exchange for a lucrative oil pipeline.

Motley asked his assistant to show the video. The footage at first looked like any tourist video -- a busy Manhattan streetscape, food vendors and people whizzing by, a seemingly reverential shot of the green sign that says Wall Street. Then the camera slowly panned up and down the length of the World Trade Center, while a voice spoke in Arabic. The subtitle translated: "I'll knock them all down."

From the very earliest days of his career, Motley showed the kind of passion, cocksureness and hallucinatory sense of possibility that have long made trial lawyers a metabolically distinctive species. He lived on credit cards, spent weeks on the road, drank hard in the evening and jogged long in the morning. He took on projects that seemed like surefire losers, sometimes to the utter disgust of his colleagues. To this day, said his partner, Joe Rice, "Ron just assumes there'll be money there to pay the bills."

Yet few who know Motley, including his adversaries, would dispute his talents as a lawyer. He thinks quickly, possesses a gift for making difficult concepts accessible and can quote, almost verbatim, documents and testimony he read months before. In the courtroom, he lurches between ruthlessness and shameless vaudeville but still manages to endear himself to juries, probably because his antics -- like bringing water guns to court -- provide relief from the undertaker-sonorousness of most defense lawyers. Slowness he finds infuriating, especially these days, as he waits for

documents from his more leisurely and bureaucracy-prone counterparts in Europe. ("They meet more often than the elders of the Church of the Nazarene," Motley complained. "And probably get less done.")

But underneath the comedy runs a hard streak of determination. "With Ron, there's this huge sense of wanting to beat the pants off Goliath," said Paul Hanly, a New York lawyer also working on the Burnett case, who in previous years opposed Motley as a defense attorney. "And then there's this whole populist thing -- that he's up against the Republican-funded, blue-chip, white-shoe Wall Street law firms who wouldn't have hired him as a paralegal when he graduated from law school."

Motley grew up in North Charleston, S.C. From the time he was tall enough to reach the nozzle, he pumped gas at his father's service station in a mostly black, working-class section of town. He attended the University of South Carolina, had a brief stint as a high-school history teacher, then returned to the university for law school. His ascent after graduation was swift. He had his own name on the law-firm door by 1975. He became the youngest president of the South Carolina Trial Lawyers Association in 1977. During the early 1980's, he formed an archipelago of agreements with law firms around the country, trying asbestos cases by the dozen. Then, in 1993, the Mississippi attorney general, Michael Moore, recruited Motley and a handful of other lawyers to lead an improbable assault against Big Tobacco on behalf of his state. The case ultimately swelled into a gargantuan project involving dozens of plaintiffs' lawyers representing 46 states and five United States territories. Motley's firm represented 25 government entities and, in a remarkable settlement in 1998, secured $246 billion for them over the course of 25 years.

Motley's firm reaped an estimated $2 billion in fees from the tobacco settlement, too, but the money seemed only to fuel an already festering tension between Motley and his partners. As he was gambling on Big Tobacco, they were toiling away on less risky, less glamorous cases, trying to keep the firm solvent. Then Motley started talking about 9/11 litigation, even though he'd never tried a single international case in his life. The partnership, Ness, Motley, Loadholt, Richardson & Poole, dissolved in 2002. Motley and Rice went on to form their own firm, based in Mount Pleasant, S.C.

Motley's fans concede that to know him is to appreciate his pandemonium, but he also has a quieter side. "He has this reputation for being a brash, successful plaintiffs' lawyer," said Marc Kasowitz, who faced Motley in the tobacco years as a lawyer for the Liggett Group. "But in person, he's very straightforward, actually, and sort of a sensitive guy." During the asbestos years, Rice recalled, Motley took breaks from his depositions of witnesses with lung disease to go outside and cry.

Opportunistic and compassionate, bombastic and fragile, undisciplined and focused -- it's a binary personality code that applies to a lot of successful people, and it applies rather vividly to Motley, who for all his bluster still stands with the sloped posture of someone who's both heartsick and disappointed in himself. He is three times divorced, admits he still drinks more than he should and now regrets, in ways he could hardly have imagined, that he saw too little of his two children as they were growing up. When Thomas Burnett's father phoned in the winter of 2001, inquiring about a potential Sept. 11 lawsuit, what drew Motley in were doubtless the same things that always did -- money, publicity, outrage, intellectual sport. But there was something else, too, and that was a terrible sense of identification: his own 28-year-old son, Mark, had died just 10 months before, following experimental surgery for epilepsy. When he met the Burnetts in person three months later, he told them so.

"Understand, it's not like I use it as a marketing tool," Motley told me. "But people who haven't been through it, they don't know what it's like to be in the fog of death." He was silent for a second. "Like I'm told I did my son's eulogy. I'm told I got up that morning, wrote it out and never read from a script. I'm told that it was the most eloquent thing anybody's ever heard. And I don't remember a word I said."

Twitching his eyes and bouncing his knees, Motley sat in the pillowed corner of a common room at the Pentagon City Ritz-Carlton last October, drowning in his own adrenaline. He was preparing for a hearing in Washington the next day, during which a judge was to entertain motions to dismiss the two highest-profile defendants in his case: Prince Turki al-Faisal, the former head of Saudi intelligence, and Prince Sultan bin Abdel Aziz, the Saudi minister of defense.

"Say," he shouted to a colleague. "Have you gotten that memo on the Prince of Baloney yet?" Motley was referring to Prince Turki, whom he also once referred to on television as "Prince Cooked Goose." He turned and elaborated. "Turki gave a speech last night and labeled our charges baloney. So now we have a new name for him."

Gerson, rabbinical and elegant in a three-piece suit -- Motley was in sweats -- gently admonished him, suggesting that perhaps he ought not call the princes names.

As a trial lawyer, Motley is a generalist. Though clearly important to him, Burnett ultimately amounts to another chapter in a long and varied career. The same cannot be said of Gerson. Thoughtful, arrogant and tangibly intense, he has spent most of his adult life contemplating the relationship between individuals and nations -- first as chief counsel to the American delegation to the United Nations under Jeane Kirkpatrick, then as a lawyer in the Reagan Justice Department working on international affairs. When Gerson discusses Burnett, he talks in sweeping, conceptual terms, not tactical ones. His attitude toward the case borders on the messianic.

Like many specialists in international law, Gerson said he believes that domestic courts have a role to play in holding foreign parties accountable for their misdeeds. He came of age as a doctoral student at Yale under the tutelage of Myers McDougal, the eminence grise of international law, who preached that lawyers had a legitimate role in advancing political objectives. As soon as he entered the private sector, he began to put this philosophy into practice, becoming the first lawyer to file a civil suit against Libya for the bombing of Pan Am Flight 103 over Lockerbie, Scotland. Shortly after Sept. 11, he had an idea for a similar suit aimed at Saudis. A colleague introduced him to Motley in the spring of 2002, at the private-jet area of Dulles airport, where Motley had diverted his plane in order to meet him. Having already agreed to represent the Burnetts, Motley was digging a tunnel in the same direction. The two men -- a Democratic trial lawyer and a neoconservative Reaganite -- made a verbal agreement that afternoon.

What Gerson sees in Burnett is the perfect opportunity for the judiciary to play a critical role in the war on terror, punishing those enemies of the United States that the executive branch, hamstrung by diplomatic considerations, cannot. "If we left justice solely to the U.S. government, when it has so many commercial and other interests with countries like Saudi Arabia, what action would be taken?" he asked. "We've refused to join the international criminal court. And trying to accuse a foreign country of criminal activity gets us into a terrible diplomatic mess. So why shouldn't they be held responsible in our courts?"

To those accustomed to the genteel rites of diplomacy, the adversarial American court system may seem an unfortunate forum to engage questions of international wrongdoing. In an affidavit in the Burnett case, Charles Freeman, a former ambassador to Saudi Arabia, disparagingly referred to this solution as "the privatization of foreign policy." Gerson prefers to call it the privatization of justice. Absent the judiciary, he argues, victims of terror have no other means of redressing wrongs. "Freeman's notion, which represents institutionalized State Department dogma, is like the old idea that the Post Office is only something that the U.S government can do -- it's so antiquated it's absurd," he said. "The idea is that the government is obligated only to itself and responsible to no one. Well, that idea has been eroding with the advent of contemporary human rights. This is the great human rights case. It's the right to be free from terrorism."

American civil courts are not unfamiliar with lawsuits involving international human rights. Since 1980, lawyers have made shrewd use of an obscure 1789 law called the Alien Tort Claims Act, originally intended to combat piracy, which gives American courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." As a result, American judges have heard from Guatemalan victims of torture, from Haitian dissidents and from survivors of the Bosnian genocide. In the last decade, the same law has also been used in an attempt to hold multinational corporations accountable for malfeasance -- like Unocal, for example, for its alleged use of forced labor to provide security for oil pipelines in Myanmar.

The difference between Alien Tort cases and Burnett, however, can be measured in light years. Alien Tort cases are generally brought by human rights lawyers, working for a pittance, hoping to turn a 215-year-old law into an instrument of justice for citizens around the globe. Burnett is being brought by a plaintiffs' lawyer, toiling for a cut of the proceeds, hoping to use laws recently enacted by a law-and-order Congress to punish those who have brought harm to Americans. One can see how tastelessly opportunistic it might seem from the point of view of the human rights community: plaintiffs' lawyers, swooping in, turning a handsome profit off history's ugliest moments. Yet some human rights experts see real value in Burnett. "It seems like a righteous case brought by an experienced lawyer," said Paul Hoffman, the human rights attorney involved in the Unocal suit. "And who else has the kind of resources for it? Who else has that kind of cash up front?"

Motley does, of course. Yet there aren't many precedents for spectacular payoffs in cases like this one. Almost none of the plaintiffs who have sued successfully using the Alien Tort Claims Act have been able to collect from the hostile foreign parties they've targeted; generally, they are awarded default judgments when the defense doesn't show up in court. And most of the successful cases using antiterrorism statutes have been directed at countries on the State Department list of terrorism sponsors, like Iran and Cuba, whose American assets, if there are any, are generally frozen. The victories in all these cases are mainly moral rather than financial. In going after wealthy Saudis and Saudi financial

institutions with considerable assets in the United States, Motley is part of the first generation of lawyers trying these cases who might actually be able to collect.

Unless, that is, the Bush administration tries to block the suit. As a rule the administration favors a limited role for the judiciary in international cases. Later this month, it will argue before the Supreme Court against the use of the Alien Tort statute for human rights cases, absent a law from Congress explicitly allowing as much. Even with an imprimatur from Congress, the president clearly doesn't like Motley's use of the antiterrorism statutes; back in October 2002, news articles reported "administration officials" saying that the government was considering asking the courts to dismiss the suit. Victims' families reacted with the outrage you'd expect. The administration never intervened.

But should the administration consider Motley's suit a threat? David Aufhauser, the former general counsel to the Treasury Department, said he believes that private and government action against terrorism are not mutually exclusive pursuits. "If brought soberly and with substance, private actions can be of material assistance to the government," he said. "Because I can tell you: the bankers of terror are cowards. They have too much to lose by transparency. Name, reputation, affluence, freedom, status. They're the weak link in the chain of violence. They are not beyond deterrence."

Jean Charles-Brisard, Motley's chief European investigator, was a bit late to arrive at La Reserve Hotel in Geneva one afternoon last December, but it didn't seem to matter. The witness he was meeting, Carmen bin Laden, wasn't ready to speak with him anyway, because she was still talking to a pair of foreign journalists about "Inside the Opaque Kingdom," her chronicle of tribulations within the bin Laden family. When she finally finished, she walked over to Brisard, magisterially shook his hand and took a seat on a hard maroon couch. She was trim, plump-lipped, imposing and, in her own way, spectacular. Her face was stretched as taut as a volleyball net, and her coat collar was a vivid species of fur. She pulled out a cigarette.

Carmen bin Laden is Osama's Swiss-born sister-in-law. She is currently embroiled in a bitter divorce from his half-brother Yeslam, who is a defendant in Burnett. This makes her, like many of the witnesses in Motley's case, fairly rich in ulterior motives. Her discussion with Brisard did not last long. After just a few minutes, she received a phone call and abruptly left. Brisard turned to me and apologized for her "bizarre" behavior. "She's not a key witness," he said. "She's a contextual witness."

Over the course of their investigation, Motley's team has learned what the professional intelligence community has long known: the information trade often involves questionable types. Michael Elsner, an associate at Motley Rice who often accompanies Brisard on these trips, told me of once receiving a phone call from a Russian fellow named Igor who said just enough about Islamic banks and charities operating in Chechnya to earn himself an invitation to chat. The man who showed up was bald, rotund and almost permanently attached to a shining silver briefcase. "He was supposed to get us things," Elsner said. Yet he never returned. It's probably just as well. A background check revealed that Igor had a small problem with embezzling.

With his $12 million, Motley has begun an investigation that even most nation-states could not afford. But money alone is not enough to form an ersatz C.I.A. Motley sought out former intelligence agents, journalists and professors, all of whom spent their lives obsessing about Al Qaeda. Some turned out to be shady and unreliable. Yet Motley has had some success. Early on, one of his sources in Afghanistan learned of a Taliban fighter who was selling a computer file that he claimed had belonged to Muhammad Atef, military commander for Al Qaeda until he was killed in November 2001 in Afghanistan. The seller wanted $80,000. Motley wired it to Dubai. Motley's team also discovered a document supposedly signed by Mullah Omar containing a directive to turn over $2 million "in Saudi Arabia aids" to a terrorist in central Asia. That got attention in the press.

But Motley also concedes that his team had a hard time separating wheat from chaff when it began its investigation two years ago. Fakihi's computer, which Motley was so pleased to have obtained, for example, ended up adding little to the information he'd already collected. The car that came with it is still sitting somewhere in Europe.

Motley is now focusing on the documents culled by foreign governments, which have already been vetted and, presumably, authenticated. This is where Brisard comes in. Though his book was criticized in the United States, he is nevertheless considered an expert on Al Qaeda's financing stream, particularly its Saudi tributaries, and has written a well-respected report on the subject for the United Nations Security Council. So far Brisard has gotten his hands on two million pages of documents from 35 foreign governments, some of them quite tantalizing: Swiss bank records of Osama bin Laden; Albanian intelligence reports on bin Laden business dealings; information from 34 Bosnian hard drives from the offices of Al Haramain Charitable Foundation, which Brisard said he managed to get instead of the F.B.I. (Why? I asked. "Because the U.S. promised to give them the technology to recover the deleted files, but didn't," Brisard

answered. "And we did.") Recently, added Motley, an Oregon federal prosecutor investigating Al Haramain called him, wondering whether he could have a look at those files. Motley said he obliged.

One may wonder why these countries would bother cooperating with an American civil lawsuit. Motley has a characteristically blunt explanation. "Please -- these countries have their own parochial agendas," he said. "Radical Islamic fundamentalism is a huge problem in France. A huge problem in Spain. A terrible problem in Germany. And look at Chechnya! Why do you need to look any further at why Russia's gonna help us? Or look at Jordan. It's a secular kingdom! They're certainly not rah-rah-rah on the Wahhabi movement."

How this formidable pile of information will be interpreted by the courts -- if Motley's case ever gets that far -- remains to be seen. For the lay person, any foray into the intelligence world is surreal and initially intoxicating; who wouldn't respond to the formation minutes of Al Qaeda, which the team obtained from Bosnia? If genuine, this and many of Motley's documents are certainly of historical relevance, but whether they're of legal relevance, demonstrating that Motley's defendants knew they were providing material support to terrorists, is another question entirely.

"The claim against my client is that it gave money to charities and the money ended up in the hands of terrorists," said Christopher Curran, the lawyer for Al Rajhi Bank, one of the banks being sued by Motley. "But these were government-regulated and government-approved charities that held themselves out as bona fide charitable organizations. When we Americans donate our clothes to Goodwill or our funds to the United Way, do we really know where it's all going? Don't we also rely on government regulation and the representations of the charities themselves?"

Even if Motley compiles enough evidence to prove his defendants knowingly financed terrorism, it may not be enough: the judge must still agree that it is appropriate for an American court to assert jurisdiction over them. In the cases of the Saudi Princes Turki and Sultan, for example, the judge did not. In November the United States District Court in Washington ruled that the allegations against the princes, as Saudi officials, were not enough to surmount sovereign immunity, a powerful privilege that protects states and their officials not just from liability but also from lawsuits themselves.

The ruling didn't affect Motley's banking, charity and nonsovereign defendants, but his team was devastated when it heard the news. "The judge proceeded as if it were a time of peace," Gerson said, "and it's a time of war."

For Gerson and Motley, war means interpreting the antiterrorism statutes as aggressively as possible. But even people sympathetic with their efforts think there are limits. Like suing sovereigns. "Look," said Aufhauser, the former Bush administration official, "you have to be mindful that bringing them into an American court is an invitation for enormous mischief abroad, potentially against former and current U.S. officials . . . like me."

The United States more or less had to cope with this problem last year, when Iraqi families, using Belgium's "universal jurisdiction" law (now amended to give immunity to world leaders), tried to call Colin Powell, former President Bush and Dick Cheney into court for the bombing of a civilian shelter during the gulf war in 1991. Youssef M. Ibrahim, a former New York Times reporter who is now the managing director of Strategic Energy Investment Group, a consulting firm based in Dubai, told me that two lawyers in Saudi Arabia are flirting with the idea of recruiting Iraqi clients to sue Donald Rumsfeld for the use of depleted uranium munitions in Iraq. What if their targets don't stop with Rumsfeld? And what if they also sue Lockheed Martin and Northrop Grumman for making those arms? Or their engineers for designing them?

For those who believe the executive branch should be wholly in charge of foreign policy, Burnett feels like a mockery of international relations, a flagrant end run around the institutions designed to engage the world community. "If people think we should be tougher on these countries, we have a democratic process to try to bring that about," said Murphy, the former State Department official. "They can vote, they can lobby, they can form networks and lobby even better. But it shouldn't be dictated by the initiatives of just a few victims."

Particularly, the argument goes, when Saudi Arabia has an incentive to finally address the problem of terrorist financing itself. In May and November 2003, terrorists blew up housing complexes in Riyadh, which reportedly spurred more on-the-ground intelligence cooperation between the United States and Saudi Arabia than ever before. The Treasury Department, charged with tracing terrorism dollars, noted in an announcement in January that it worked jointly with Saudi Arabia to close down four offices of the charity Al Haramain outside the kingdom. Would now be the time to humiliate Saudi Arabia with a lawsuit, just as our objectives are finally starting to align?

"Basically, this is U.S. diplomacy by contingency-fee lawyer," said Curran, the defense lawyer. "No one disputes that all of those responsible for 9/11 should be tracked down and held fully responsible. But in this case, allegations

have been made indiscriminately against some of the most prominent and reputable Saudi organizations and citizens -- many of whom are Western-oriented and could play a major role in fostering constructive relations between our two countries. These lawsuits undermine that possibility."

Meanwhile, the American budget and trade deficits continue to grow. Is now the time to scare away the foreign investors who are pouring money into the American economy and buying Treasury bonds? Less than a year after Sept. 11, The Financial Times reported, Saudi investors had already withdrawn as much as $200 billion from the United States. "At the end of the day, I believe this president will prevent this lawsuit," Ibrahim said. "There's nothing more cowardly, as you know, than capital."

Some human rights lawyers, though reasonably convinced of the merits of Motley's case, also balk at the "material support" clauses it relies so heavily upon, believing they've been defined too broadly and could therefore unwittingly penalize those who give money to groups they consider politically legitimate. "When Nelson Mandela came to Yankee Stadium, should all the people who put $10 in the hat be treated as terrorists?" asked David Cole, a human rights lawyer who is leading an aggressive challenge to these statutes. Cole pointed out that not long before, the United States government had labeled the African National Congress a terrorist organization. "Are we going to go down the road of guilt by association in the name of fighting terrorism, just as we did in the name of fighting Communism?" Cole said. "That's my principal concern."

Motley would point out that he is not going after $10 donors in his lawsuit, but the gulf states may not view it that way. "I give to charity personally," said Khaled Al-Maeena, editor in chief of The Arab News, an English-language newspaper published in Jidda. "You can quote me on this. A lot of people supported the Afghan struggle against the Soviet Union. Some of that money may have been siphoned. But that does not mean we are responsible for Sept. 11. Who are these people who are accusing them? They are fat-cat lawyers -- fat-cat lawyers who want to make money."

Indeed, perhaps the most discomfiting aspect of the Burnett case is the message it sends abroad. The United States already has an international reputation for unquenchable litigiousness. And Motley, often prone to rhetorical excess -- like referring to Prince Turki as Prince Cooked Goose -- hardly seems like the most sensitive champion of private action against foreign defendants. The average Saudi may read about Burnett and feel not deterred but further inflamed: the United States walked away from the Kyoto treaty; it attacked Iraq with only meager international support; it repeatedly flouted the desires of the United Nations. And now, the United States, whose citizens are among the richest and luckiest on Earth, has responded to its misfortune with a trillion-dollar lawsuit aimed at, of all things, some of the most prominent relief organizations in the Middle East.

"A judgment will cause great resentment on the part of the people here," Al-Maeena concluded, with a sigh so audible it temporarily muffled our connection across the globe. "And it will be fuel, I think, for our own extremists."

In mid-December, the Motley team got some disorienting though not entirely unexpected news. A panel of federal judges ordered the consolidation of all Sept. 11 cases involving foreign defendants into the Southern District of New York. It's for the pretrial phase only, in order to spare the defendants the hassle of showing up in multiple courts for multiple lawsuits, but it nevertheless has its consequences. Motley, who had been following his own rhythms, must now reach a power-sharing agreement with the lawyers representing a dozen or so other cases, and their styles, defendants and theories of liability are not necessarily the same. As it turns out, Motley's first attempt at court-driven diplomacy may not involve his defendants but his new colleagues. And lawyers, of course, get along only slightly better than warring nations. So far, no agreement has been reached.

Because Motley has served the most defendants and is representing the most wrongful death claims, he will doubtless have leverage in this deal. And some of the other lawyers now involved in this case could prove a real asset to Motley's team. Like James Kreindler, for example. Though Gerson was the first to sue Libya in the case of Pan Am 103, it was Kreindler, an airline litigation expert, who ultimately represented most of the families. His faint New York patois and familiarity with the folkways of the Southern District also can't hurt; he seems to have a genuine rapport with the new judge in this case, Richard C. Casey.

But Kreindler has spent only $2million so far on his suit. A good portion of it went toward examining Al Qaeda's ties with Iraq, which now appears to be moot -- even if he could provide proof, the Bush administration has declared Iraq's assets off-limits. Most important, though, Kreindler's approach to his lawsuit is very different from Motley's. "You have to handle this case in a delicate way," he said, "in a way that doesn't burn bridges with our government." He stressed that he's a Democrat. "But I believe in letting the government go first in their criminal prosecutions, and it takes

years for the government to do its work. But when that's done, you have the weight of the government behind you when you make allegations."

This approach does not harmonize well with Motley's instincts. Patience is not his strong suit. "Jim is the Job of the trial bar for waiting so long on Pan Am 103," he said. "But my clients don't want to wait. They want the trial last week."

And yet they may have no choice. The court system, their chosen means of justice, is a fundamentally slow, lumbering thing, and with so many different lawyers and philosophies now thrown in the mix, it seems now to be even slower. Motley's clients, like Motley himself, may have to accept that legal solutions to misfortune, as gratifying and empowering as they seem, still don't give their victims full control.

Still, Motley is proceeding apace, serving defendants and collecting documents from around the globe. And Bush has yet to interfere. Last year, at a Republican fund-raiser in Little Rock, Deena Burnett said she asked the president what he thought of the lawsuit she had initiated. The two were standing side by side, waiting to have their picture taken together. She said that Bush turned and looked at her, just before the flashbulb popped. "You just keep doing what you're doing," he said.


URL: http://www.nytimes.com

CORRECTION-DATE: March 28, 2004

CORRECTION:

An article on Page 36 of The Times Magazine today about Ron Motley, an American lawyer filing a suit against prominent Saudis and Saudi organizations over supposed connections to the Sept. 11 terrorist attacks, misstates a phrase in some copies in a quotation from Richard Shelby, an Alabama senator who has criticized the Bush administration for classifying information that may be about the Saudis. He said: "If we can help unravel the mystery of a lot of terrorist financing, I don't care who the president of the United States is. Or where the trail leads." He did not say "If Ron Motley can help unravel. . . ."

In some copies the article also omits Mr. Motley's assertion about the administration's response to his investigation. He said it had refused to help him.

An article on March 14 about Ron Motley, an American lawyer filing a suit against prominent Saudis and Saudi organizations over supposed connections to the Sept. 11 terrorist attacks, misspelled the given name of a Yale professor who was an early influence on Allan Gerson, Motley's co-counsel in the case. He was Myres McDougal, not Myers.

GRAPHIC: Photos: Ron Motley
A drawer in Motley's office containing background material and what Motley says is evidence in the 9/11 suit against 205 defendants.
Allan Gerson, Motley's co-counsel in the 9/11 suit and a former member of the Reagan administration, was the first lawyer to file a civil suit against Libya after the 1988 bombing of Pan Am Flight 103.
 Motley and his bodyguard outside Charleston, S.C. Motley says he has received death threats in connection with the 9/11 suit. (Photographs by Jeff Riedel for The New York Times)

LOAD-DATE: March 14, 2004

# Exhibit C

1 of 3 DOCUMENTS

Copyright 2002 eMediaMillWorks, Inc.
(f/k/a Federal Document Clearing House, Inc.)
FDCH Political Transcripts

August 15, 2002 Thursday

**TYPE:** NEWS CONFERENCE

**LENGTH:** 9249 words

**HEADLINE:** FAMILIES OF VICTIMS OF 9/11 HOLD NEWS CONFERENCE TO ANNOUNCE LEGAL ACTION TO SEVER FINANCIAL CHANNELS WHICH SUPPORT THE AL QAIDA NETWORK

**SPEAKER:**
FAMILIES OF VICTIMS OF 9/11

**BODY:**

FAMILIES OF VICTIMS OF 9/11 HOLD NEWS CONFERENCE

AUGUST 15, 2002

SPEAKERS: RON MOTLEY
ATTORNEY FOR FAMILIES WHO SUFFERED LOSSES
FROM THE ATTACKS OF 9/11

ALLEN GERSON, PH.D.
CO-LEAD COUNSEL

TOM BURNETT, SR.
FATHER OF THOMAS E. BURNETT, JR.

BEVERLY BURNETT
MOTHER OF THOMAS E. BURNETT, JR.

DEENA BURNETT
WIFE OF THOMAS E. BURNETT, JR.

MOTLEY: Welcome everyone. My name is Ron Motley. I'm a lawyer from Charleston, South Carolina, and I am lead trial counsel for this case that was brought this morning on behalf of over 600 families who suffered losses as a result of the atrocities of September the 11th.

The format today will be to have some of the families speak to you personally from their hearts about why they've taken this action, what they expect to accomplish from this action, and then I will introduce you to several of our investigators, and then I will explain the legal bases for the case, and then answer questions that relate to the case itself, the defendants and the theories.

FDCH Political Transcripts August 15, 2002 Thursday

And you can feel free to ask the families any questions that you see fit.  If it's a question that's more appropriately answered by a member of the legal team, I will do it or Mr. Gerson will do it.  Mr. Gerson is my co-lead counsel.  He's the author of a book on terrorism and was one of the leading attorneys in the Lockerbie flight 103 disaster, which is being currently negotiated with the Libyan government.

With that, I'd like to introduce first to you Tom Burnett, Sr., Beverly Burnett, the mother and father of Thomas E. Burnett, who died at age 38, who was the leader of the charge on the cockpit of flight 93, successfully causing that plane not to reach its target, the White House, and his wife Deena, all of whom are here and all of whom have something they want to say to you.  And then I will introduce you to others who also want to speak.

Tom?

BURNETT: Thanks, Ron.

I'm pleased to be here, and I welcome you people.  It's my pleasure to meet some of the other families who have suffered losses.  I have prepared a statement that I'd like to read.

Our son, Thomas E. Burnett, Jr. was a hero on flight 93.  He was drafted unknowingly as one of the first citizen-soldiers of the war on terrorism.  And he did serve his country with calm, with decisiveness, with leadership and with courage.  Thanks to the extraordinary character shown by him and his fellow passengers, hundreds, and perhaps thousands of lives were saved in Washington, D.C.

It's with Tom's leadership, courage and patriotism in mind that I stand here proudly to announce that my wife and I, along with many other families and survivors of September 11 are taking unprecedented legal action against those whose money financed the unspeakable evil that occurred on that tragic day.

T. BURNETT: In taking this action, we will move terrorist financing schemes out of the shadows and into the light of day, exposing for the world the underbelly behind the atrocities of 9/11 and leaving those with evil intentions no where to hide and no place to escape accountability.  We will succeed because we have the facts and the law on our side, because we have an unparalleled legal and investigative team representing the best talent and expertise in the area of international law and finance on our side and because we have justice and morality on our side.

Nothing could be a greater tribute to Tom's memory. Tom's last words were, "we're going to doing," and today we're going to do something, too.

Thank you.

D. BURNETT: On the morning of September 11 the phone rang and the lives of my three daughters and myself changed forever.  It was Tom calling from the cabin of Flight 93.  In a series of four conversations that I will hear and over in my memory for the rest of my life, Tom told me that his plane was hijacked.  I told him what happened at the World Trade Center.  And he calmly assessed the situation and then acted.

He told me, "I'm putting a plan together, and there's a group of us who's going to take back the airplane." He later said, "It's up to us.  I think we can do it."

Those words, I think, mean just as much to those of us standing here today. It's up to us, and I think we can do it. It's up to us to bankrupt the terrorist and those who financed them so they will never again have the resources to commit such atrocities against the American people, as we experienced on September 11.

D. BURNETT: Our American troops are halfway around the world, laying their lives on the line every day to fight the war against terrorism.  They're doing all they can.  It's up to us, here in America, to do all we can.

By filing this lawsuit, this is our only source of retribution, our only source of action to help stop them.  And so, we'll use the court system, but it's going to be a tough fight, and we're probably going to need your help.

In the coming months, we'll need letters written to congressmen and senators to encourage the Senate Intelligence Committee to stand in our favor and to help provide documents and records and information that will help us to freeze the assets of the defendants named in this lawsuit.

And I'm sure that, over the coming months, we'll be back to appeal to you to help us in any way that you can and to act with courage, as my husband and the passengers on Flight 93 did.  They acted.  They acted with courage and honor and valor, and now it's up to us to do the same.

MOTLEY: Matt Sellitto is the father of a remarkable young man, Matthew Carmen Sellitto, who was 23 years old, who worked for Cantor Fitzgerald on the 105th floor of One World Trade Center.

I've come to know the Sellitto family personally. I'm very proud of their courage in bringing this action. And, Matt, the father of Matthew Carmen Sellitto, would like to say a few words.

MATTHEW SELLITTO, FATHER OF MATTHEW CARMEN SELLITTO: Good morning.

My son, Matthew Sellitto, was just 23 years old, working in an excellent job that he looked forward to from the age of 13. He worked at Cantor Fitzgerald on the 105th floor of One World Trade Center. He was strong, young and determined to become a success. He felt that he was on top of the world, both literally and figuratively.

His loss is incomprehensible to me. My heart continues to ache, and will ache for the rest of my life. Yet my wife, my son, Jonathan (ph), and I are more committed than ever to honor Matthew's values and determination in the best way possible.

Matthew stood out for his ability to beat the odds, his tenacity, his knack for always doing the right thing. He was the first one to work in the morning and the last one to leave at night. That is why I honor him deeply and profoundly by joining this action today, for this is the right thing to do.

If the odds are stacked against us, we will beat them. And we will pursue this action until justice is served and terrorism is stopped. Congress and the president have given us the tools to accomplish this essential goal, tools that build on the existing justice system, which empowers us to have our day in court against those who murdered my son.

SELLITTO: I was raised in a family that was taught stealing is wrong. But the person who buys the stolen goods knowing they are stolen is even more wrong.

I use this analogy because I feel the terrorists were wrong, but the people who aided and abetted and allowed them to do this are more wrong.

It does not matter whether the weapon of choice is a gun, a bomb, a box cutter, a pen used to write a check or the computer mouse clicked to transfer funds. The banks, so-called charities and the individuals named in this action have the blood of my son on their hands, and they have the blood of more than 3,000 other precious, irreplaceable people on their hands. And we will hold them accountable.

To my son, Matthew, God bless you. To our country, please help us. And I leave you with God bless America.

MOTLEY: Thank you, Matt.

April Gallup (ph) and her baby son Elijah (ph) were injured in the attack on the Pentagon. April (ph), and I'm sure Elijah (ph), will have something to say to you. She would like to speak to you about what she has suffered and why she's bringing this action.

April (ph)?

APRIL GALLUP (ph), WOMAN INJURED AT PENTAGON ON SEPTEMBER 11: On 11th September, my son was with me that day to prepare him for day care at the Pentagon. What could be safer, I thought to myself. It would be more convenient, safer. I could pop in and eat lunch with him if he wasn't feeling well.

Little did we know what evil plans were in store for us. In a spilt second, it seemed as if a bomb had gone off. That blast blew Elijah (ph) from his stroller, and then fire erupted all around. I could hear him, but I couldn't see him. I was trapped from the waist down. There was fire and smoke. And I feared that there was no way we were going to get out.

Eventually, I was able to free myself and someone else who was trapped, and then we both started feeling and searching for Elijah (ph). The smoke was so thick we couldn't see anything. Then, thank God, we found Elijah (ph) under a pile of wreckage.

With the help of other brave souls, we were able to get out of the building. I am one of the fortunate ones. I survived to tell our story, and I still have my magnificent son, as you can see here, with me, and I thank God every day for this blessing, this miracle. And I now understand the miracle of life.

But this gratitude doesn't diminish the pain and the suffering that we still feel from the injuries, the hardships we have endured, the trauma that still rocks us, or my desire to make the enemy pay. They will pay through the actions that

FDCH Political Transcripts August 15, 2002 Thursday

we take today.  We will hold those who bankrolled terrorism accountable, win justice for the families and survivors, and send a clear and unmistakable message around the world that anyone -- and I mean anyone -- who finances, supports or enables terrorists will pay a fearsome price.

This action is a profoundly patriotic act because we are exercising uniquely American rights and because we will help protect Americans from future acts of terrorism.

Proud as I was to receive the Purple Heart, I will be even prouder when we bankrupt the sponsors of terrorism and bring them to justice.

Thank you very much.

MOTLEY: Thank you, April (ph).

Terry (ph) Strada is the wife of Thomas Strada, who was a bond broker for Cantor Fitzgerald and who perished in Tower One of the World Trade Center.

MOTLEY: She wants to speak to you about why she's participating along with the other 600 families in this lawsuit.

TERRY (ph) STRADA, WIFE OF THOMAS STRADA, VICTIM OF WORLD TRADE CENTER ATTACK ON 9/11: September 11 is a national tragedy.  It is a worldwide catastrophe reaching far across the oceans, affecting and hurting thousands of people.  It will live in our hearts, and it is embedded in our minds forever. It is all of those things and more.

It is the day my husband, like countless others, woke up to a beautiful Tuesday morning, ready to start his day like any other. Only for Tom and I, it was a little different.  We had just brought home our third child, Justin Thomas (ph), on Saturday.  Our family was complete, and we had everything to live for.  Our lives were rich with love for each other and love for our three young children.  He was a devoted family man.  My children had the best possible father.  He adored them and lived his life for them.

They lost their innocence and the life they were supposed to have. They will never see, play or hug their daddy again.  My husband will never hold them or watch them grow up, and I will never feel his arms around me again.

He made our life full, fun and happy.  Our lives were rich beyond what money could buy; we had it all.

Then, hijacked planes crashed into the twin towers and took it all away from us.  It took over 3,000 innocent, beautiful people that day.  It took fathers, mothers, sons, daughters, brothers, sisters, fiances, lovers and friends.  It took people with bright futures and loving families from all of us.

Americans lost their sense of security, and fear crept into our hearts.  Terrorism was witnessed live and up close around the world. It came without warning and shattered lives, destroyed couples' futures.  It frightened our children to their core and crippled parents as they watched their own children disappear.

Terrorism came to America, but it caused pain around the world. Terrorism must be seen for what it is: An act of cowardice against innocent people, an act of hatred towards each and every one of us.

We must not just speak out against it, we must act out against it.  And this is who Ness Motley (ph) is doing.  It is filing a suit that will go after terrorism in a vital way.  By taking their assets, the actual dollars that fund the Al Qaida and terrorists, we can cripple them, we can bankrupt them, we can stop them.

Terrorism is a threat to the very lives and freedoms we are all entitled to live.  It is in my husband's name, Tom Strada, on behalf of my children, Thomas (ph), Caitlin (ph) and Justin (ph), in remembrance of his Cantor friends, and in honor of every person that died with him that I wish to do what I can to bring this to an end.

Thank you.

MOTLEY: Thank you, Terry (ph).

Ellen (ph) Saracini is the wife of Victor Saracini, age 51, who was the captain of United Airlines Flight 175.

ELLEN (PH) SARACINI, WIFE OF UNITED AIRLINES PILOT VICTOR SARACINI: Good morning.  My name is Ellen (ph) Saracini.  My husband is Captain Victor J. Saracini from United flight 175 that was hijacked and struck the South Tower of the World Trade Center on September 11 at 9:03 a.m.

SARACINI: This is now what we all have to live with.

I stand here today without my husband, the one I chose to be with, my companion to love and to honor.  I lost my best friend.  He stood by my side and made me whole.  But I am not alone, by side are those whose lives were irrevocably changed.  And as I look out at all of you, I see your lives were changed also.  You all share in our sorrow and our pain.

As Americans, we lost our innocence.  We were totally unprepared for the actions of those who have no clue about what life is about.  We will now take legal action to identify individuals and entities that lend financial support to bin Laden and his terrorist network.  This is now a defining time when we show terrorists that we will not stand still and allow them to do as they please.

I join with the families of September 11 to strike back at the terrorists.  The plaintiffs and the families of those killed in the attacks, we are united in both our grief and our resolve to root out the perpetrators of this evil and all who support them.  We want the world to understand that we will do everything in our power to prevent these cowards from ever inflicting harm on anyone again.

Thank you for your concerns and thank you for being here.

MOTLEY: Thank you, Ellen (ph).

Vickie Schumaker (ph) is the mother of Alan D. Kleinberg, who was a Cantor Fitzgerald securities trader in Tower One of the World Trade Center.

Ms. Schumacher (ph)?

VICKIE SCHUMACHER (PH), MOTHER OF ALAN D. KLEINBERG: Hello.

My son, Alan, was my pride and joy.  On September 11, he was murdered while he was sitting at his desk.  Our family, needless to say, will never be the same.  We struggle day-to-day, one day at a time, my daughter-in-law, my grandchildren, Alan's sisters, Alan's grandparents.

It is urgent, very urgent, that any individual or corporation that is funding terrorism must be stopped.  And they must be stopped within the guidelines of the law, even though they don't really work within the guidelines of the law themselves.  And we must stop them now so this can never happen again.

And I'm doing this for you, Alan, my son, we're doing this for you, we're doing this for all the other victims of that day, of that horrendous day.

And I want to thank Mr. Motley and his team for helping us with this battle.

Thank you.

MOTLEY: Dr. Steven (ph) Alderman and his wife, Liz, lost their son, Peter, at the World Trade Center.  Dr. Alderman has asked to have the opportunity to address you.

DR. STEVEN (PH) ALDERMAN, FATHER OF PETER CRAIG ALDERMAN: Good morning.  I just wish to read a short personal statement.

On September 11, 2001 our 25-year-old son, Peter, was attending a conference on Windows at the World when a sneak attack on the United States converted the World Trade Center into a slaughter house.  Peter was vaporized.  We will never know the depth of his suffering or the extent of his fear before he died.  His body was never recovered.

Although we cannot prove that high-ranking Saudi officials committed this atrocity, we know for a certainty that they were the terrorist's travel agents who delivered them well-feed, well-trained and well-equipped to the World Trade Center that day.

ALDERMAN: Since childhood, Pete passionately believed in fairness and justice.  He can no longer seek these for himself.  In his stead, his mother and I, working with Ness, Motley and Gerson, will obtain accountability from these Saudis for this act of barbarism.

We are implacable.  We are prepared to pursue them for the rest of our lives, or until they admit their complicity and culpability. Thank you.

MOTLEY: Thank you, Dr. Alderman.  The 600 family members who have -- I'm sorry.

FDCH Political Transcripts August 15, 2002 Thursday

(UNKNOWN): I just decided to say something, because this is very difficult for me.  My daughter was 36 years old and she worked the Port Authority of New York and New Jersey.  She worked on the 64th floor, and before she died -- killed, murdered, the word -- she was on the phone, she called her father up, and she says, "Daddy," and hysterical crying she couldn't stop.  And he calmed her down, and he put on the television set because we were watching the children we babysit for her three days a week, and two days a week.

And he put on the television and he saw the flames, which in the papers, all the time, we're reminded.  We never have a moment's peace because there's always something going on and now September the 11th is coming up and we've decided we're not going to any more memorials for her, because it's too heart-rending.  And my husband, he can't handle it.  I don't know how I handle it.  I think my daughter's spirit is with me, because she was very strong, and she was a backbone for me at lots and lots of times, through all the illnesses I've been through, she was there for me.

I don't have that now.  I have my wonderful son, but it's not having the daughter.  It's a different feeling.  But I want to get these -- I should like to use a word that I shouldn't use, but I won't do it, because it wouldn't be lady-like.  But I want to get these terrorists, Saddam Hussein, the Saudis, the Iraqs, anyone who had anything to do with -- the people with the money in the banks, the people that we're holding, this money that the government has.  It's right there.

We can't go out and fight.  We can't do anything.  We just stand around and just suffer in silence, because there's not a thing we can do.  But this is the only thing we can do, and thank God for Mr. Motley and Allen -- sorry for using his first name, and Guy (ph) Molinaro and John D'Amato (ph) on Staten Island, because they are our backbone.  And that's the only thing we can do to stop this pipeline of money going to these terrorists.

Because without that money, what are they going to do?  All they have is all these people who are brainwashed, and they're peasants.  They have no money, they don't know what's going on.  All they're told by these people, that Allah, they'll go to heaven and have all these mistresses up there.  They're going to have a wonderful life in heaven, better than on this earth.

They're crazy, because this is this earth that we're on is where it's wonderful.  This is heaven on earth.  Even though we're going through tragedy right now, this is our life and none of us know what the future is if we all die.  So we have to think of our children, our grandchildren, think what my son in law is going through, raising the twins on his own.  And the hardest thing is us as parents, because losing a child and all those wonderful people that died, innocent people in the World Trade Center, have loving families, have wonderful families to go home to.  Now, those families are going to suffer .

There's no such thing as closure.  People say, "Oh, you have closure."  Because Maya (ph) was lucky, can you say -- that's a joke.  I'm lucky I found my daughter.  They found her.  She was in Bellevue Hospital for about three weeks.  She wore one of these bracelets because she suffered from asthma and allergies.  This must have got pulled off on the staircase when she was on the -- they walked down to the 24th floor.

(UNKNOWN): There were 14 of them.  Two of them -- I think Pasquel (ph), he was in the paper -- they were very fortunate.  They survived when the stairs collapsed, the walls caved in.  How I know this, because the people who survived told us that they were all holding hands, the 14 of them, walking down the stair -- 16, and out of those 16, two perished.  The others -- no, excuse me.  Two were alive, they were, and they were allowed to tell their story on television, and they all were the same group from the same office.

And I can't say any more, because it's too hard.  I just want you to know that we need your help, because it's not the money that we really -- we care, it's just getting -- it's vindictive, we want to do something to get at these people because there's nothing else that we can do.  And I hope we can have your support.  Thank you.

MOTLEY (?): Several others who are here wanted to say something. I wanted to share with you, a lady cannot be here today, who gave me a source of inspiration.  This is her son, Carl Molinaro, and he was killed rescuing people at the World Trade Center.

He is one of literally dozens of firefighters who have joined this lawsuit in the last few days.  And every time I feel despondent or over-stressed, I pull this picture out, I keep it close to me, and on the back of it is a fireman's prayer.  I will be glad to show this to anyone who wishes to see it.

Several other family members want to speak to you briefly, and then I will try to address the merits of the lawsuit.

FDCH Political Transcripts August 15, 2002 Thursday

PATRICIA GAMBINO (ph), SISTER OF MICHAEL WEINBERG: My name is Patricia Gambino (ph), and my brother Michael Weinberg -- firefighter Michael Weinberg, was on vacation on September 11th. I was in the South Tower on the 72nd floor. I managed to make it out of the building. My brother was killed.

So for me it's, sort of, an obligation on behalf of him and, more importantly, for the American people to prevent this from every happening again.

Thank you.

TARA BANE (ph), WIFE OF MICHAEL BANE: Hello. My name is Tara Bane (ph). And I lost my husband on September 11th, Michael Bane. He worked in One World Trade Center, the 100th floor.

I agree with everyone who has spoken here today, but there are just two other points I wanted to make.

Shortly after I found out the news of the planes hitting the towers and them then collapsing, I was on the phone with my father and he said to me, "Tara (ph), no matter what happens, your life will never be the same." And recently I remembered that discussion with him. And as the days went on and we just sat and waited, one of the strongest feelings I remember was feeling so helpless that we couldn't do anything and we had to wait and hear if they found him, if he was alive, if they found anyone else.

A few weeks after the event of September 11th, I was at a memorial that my husband's company had at St. Patrick's Cathedral. And I looked around the church and there were over 3,500 people there. And at that point the count was up to 6,000, and I was sickened by looking at the number of people in that room and realizing more than that had died at the hands of terrorists.

So as the months gone on, I can't do -- I have to do something. I cannot sit back and wait and see if something like September 11th happens again, because the horror that I went through and the horror that all of us here have went through, I wouldn't wish that on anyone. And if I'm capable of helping to bring a halt to terrorism, I have to do that. And I appreciate everyone's support here, and I know it's a battle, and we all have to fight together to keep our country what it was.

Thank you.

MOTLEY (?): The 600 families who have agreed to participate in this suit -- and I'm told by former Borough President Molinari and Mr. D'Amato (ph) that another 50 have called this morning -- we expect by the end of September to have upwards of 1,000 victims' family members who are participating in this lawsuit.

MOTLEY (?): There are members of the United States armed services who are participating, firefighters, police officers, emergency technicians, those who helped clean up after the towers collapsed, flight attendants, pilots, passengers, people who worked in the World Trade Center, people who worked at the Pentagon and people who were injured at the Marriott Hotel.

As of 5 o'clock yesterday, among the 600-plus family members are residents of New York, Virginia, Texas, Connecticut, Massachusetts, Maryland, New Jersey, Pennsylvania, Minnesota, California, Kansas, North Carolina, Georgia, Arizona, the District of Columbia, Arkansas, Nevada, my home state of South Carolina, Kentucky, Florida, Missouri, and foreign countries, such as Canada -- now, somebody wrote down Puerto Rico as a foreign country, but I don't think it is -- Puerto Rico, Paraguay, Argentina, South Africa, France and Switzerland.

The complaint, which is available to those who want to read it, is 258 pages in length.

I would like to take a moment to introduce you to two of our principal investigators. We have five investigators who have been working tirelessly. We have an accumulated experience of investigating terrorism, international financing of terrorism and the activities of Al Qaida for over 40 years.

John Charles Bersaud (ph) is here from France. He wrote the principal report and was the principal author of the report of the French National Assembly, their congress, which was given to our government and to our Intelligence Committee. And he is serving as a consultant to the Senate Intelligence Committee. John Charles (ph) will be interviewed tonight on CNN with respect to his activities.

But I wanted to show you -- for those of you who wonder what we've been doing for the last five months -- this is the report on just one bank and on their activities. This is a report on one of the bank defendants. This is a 258-page complaint.

FDCH Political Transcripts August 15, 2002 Thursday

Now, in federal court in the United States, we're not obligated as lawyers to do any more than file a short, plain and concise statement of the facts. But in consultation with our clients, we decided to lay out all the facts as we know them today. And even as I speak, we continue to receive reports from our investigators, which include the Search for International Terrorist Entities -- or SITE -- Institute, which is a resource for those seeking information about terrorist activities around the world, based in Washington, D.C.

The SITE Institute provides information through media outlets in an effort to educate the public on issues surrounding terrorism. The SITE Institute's director, Rita Katz (ph), is here. She has spent years studying and understanding the threat that our society suffers from those who fund terrorism. She is the foremost expert in her field and her insights continually appear in several prominent publications and television shows.

We have four other investigators who are currently -- this is Rita (ph) and John Charles Bersaud (ph). We have four other investigators who are currently in the field in various countries, gathering information. I'm proud to say that the intelligence services of five foreign countries have cooperated with us, turned over information to us, including foreign countries in Central Asia. We are accumulating this information on a daily basis. But we felt that we have sufficient information at this time to bring this complaint prior to September the 11th.

I'll show you one of Rita's (ph) handiworks. This is just one volume of the exhibits to her report on one charity, which was illegitimately and illegally raising funds for Al Qaida, which money was laundered through various banks and placed into the hands of the terrorists.

MOTLEY (?): They will be available to answer questions for you at the end of this presentation.

I have taken the liberty -- this statement was issued by an Al Qaida spokesman in June of 2002. This is Osama bin Laden's grand plan. These are his words, not mine.

"We have not reached parity with them yet" -- meaning us, America. "We have the right to kill 4 million Americans, 2 million of them children, and to exile twice as many and wound and cripple hundreds of thousands. Furthermore, it is our right to fight them with chemical and biological weapons. America is kept at bay by blood alone." June 12th, 2002.

We are dealing here with the ultimate of the evil empire. This lawsuit is being brought to make accountable those who have knowingly participated, aided and abetted the funding of Al Qaida and the Taliban. These activities began in the mid-1980s.

One of the main goals of this lawsuit is to allow the families to ventilate, to publicly air the facts as we learn them. And we learn them more and more every day. But we felt like, and in consultation with these families and in meetings with them in New York and New Jersey, in Maryland and other locations, they wanted us to do something once we had solid evidence.

We have solid evidence. I have displayed for you some of the evidence. Here's the money trail that lists the defendants, the individuals, the banks, the charities.

In the complaint we detail how the money got sent to various places. We name names, we name places and we name events. This in no way means that the investigation is over. When a lawsuit is filed, it's filed based upon sufficient evidence so that we can look a federal judge in the eye and say, "Judge, we have enough evidence to warrant filing a complaint and we want to take discovery."

We have no delusions here. I have asked Dr. Jeff Wigand, a veteran of the tobacco wars, who was trashed by an investigator on behalf of the tobacco companies -- I won't mention his name -- and he's here to help the victims understand that this is a three- to four-year struggle.

We will take discovery of these defendants. We fully expect the Saudi nationals and the Gulf state banks to fight. But if they fight, they must fight here. They must cross the oceans and appear in court here in Washington, D.C.

We picked Washington, D.C., because this court, in Washington, D.C., has had experience in interpreting the anti-terrorist laws that were enacted in the 1990s, mainly with the bravery of the victims of flight 103, with the leadership of Allen Gerson, who I'm going to ask to speak ti you in a moment.

Now, some of you may say, "How is it foreseeable that fundamental Islamic terrorists would hijack airplanes and fly them into some of American's most cherished landmarks?" The answer to that question was known to the United

States government in 1995. Computer tapes were seized in Manila at a meeting of Al Qaida in 1995 which described something called the Bojinka plan.

The Bojinka plan was a mastermind plan to hijack 12 airplanes and fly them into the Pacific Ocean, killing all aboard. The backup plan to the Bojinka plan was to do exactly what was done on September the 11th, 2001. By name -- by name the Al Qaida operatives listed the World Trade Center as a destination for a hijacked terrorist jetliner -- by name.

By name, they listed the White House. By name, they listed Langley, where the CIA is headquartered, the Sears Tower, landmarks in San Francisco.

MOTLEY (?): Al Qaida, and bin Laden and their financiers had been planning this assault on America for six years prior to the launching of this assault. This was a carefully orchestrated and planned attack on the very fabric of American society.

This was not the first time that Al Qaida has struck at American interests. They killed American servicemen in Somalia. They attempted to blow up the World Trade Center previously. They destroyed two American embassies in Africa. They attacked the United States destroyer the USS Cole. They were recently stopped from attacking yet another USS military war vessel. One of their members was stopped for a traffic violation on his way to the Los Angeles Airport with a trunk full of plastic explosives that could have killed thousands of people.

Even as we speak, our government has admitted that there are probably sleeper cells of terrorists in this country planning yet another atrocity. It is the goal -- and I think I speak with unanimity for all the 600-plus family members who are backing this lawsuit -- it's the goal here to achieve accountability, to publicize the facts as we learn them. And there's plenty of facts in here. Some of you may have a good night's sleep reading through some of these facts. Some of you may not sleep at all when your read about what the terrorists did and how these folks knowingly funded terrorism.

You may not know this, but on the Saudi Arabian -- Kingdom of Saudi Arabia's web site, they boast of $150 million they've paid to so-called martyrs who strap bombs on their bodies and get on buses, enter universities, and kill innocent citizens: Americans, Israelis, Palestinians alike. That kingdom sponsors this terrorism, it sponsors Hamas. It pays the victims, the so-called martyrs, for killing people. This is an insidious group of people.

I have no doubt that the list of defendants will increase as we receive additional reports, but we have received sufficient information, unequivocal information, confirmed recently by the RAND report to the Department of Defense, by the French government, by sources within Spain, Bosnia and Italy, that these defendants are responsible in the main for the funding of Al Qaida and bin Laden.

The complaint alleges causes of action based on various federal statutes. And at this time, before I turn it over for questions, and I'm going to turn it over for questions, not speeches, I will ask Mr. Gerson -- Allen Gerson is the author of a very well-known book on the Lockerbie flight 103 experience, and helped shepherd the legislation through the Congress of the United States, which allows these families today to stand before you, and before our courts, seeking the implication of the rule of law of our country.

They can run, and they can hide, but they will not escape. There's no cave big enough in Afghanistan to hide these banks.

Allen?

GERSON: Good morning. I would like to first say what an enormous honor and privilege it is for me to be here today, this historic moment, in the company of all of all of these courageous individuals who, despite their enormous losses, have found the strength to confront the perpetrators of terror and to seek accountability. I want to publicly tell you how terribly proud I am to be associated with Ron Motley, with Ness, Motley and the entire team that we have assembled on behalf of all of these families.

I'd like to simply share something with you that the rest of my team is not aware of. Late last night I checked my e-mail, and I received the following message from a very prominent former U.S. official, a former national security adviser to the president, and this is what he had to say: "The suit is a very worthy project. Discovery and the suit can lead to a vital contribution to national security, and at a minimum expose the Saudis and others for what they really are."

And then there is a personal note.  He says, "Keep in mind that the defendants in this suit will spend whatever they think is required on Washington lobbyists and PR to defeat and defame you." And he ends in these words: "Hang tough."

And I can assure you that we will hang tough.  I can assure you that the fundamental principle, which he articulated in this note, that national security and the U.S. national interest are inextricably linked, is a principle we want to espouse today, because that requires taking recognition of the rights of ordinary American citizens, a right which has been guaranteed to them by the U.S. courts, to hold the perpetrators of terrorism accountable.

In our complaint, we also make reference to the historic legacy of Nuremberg, especially the later Nuremberg cases called the industrialists and bankers cases.  Now, those cases made clear that it is not only those individuals that pull the trigger or that plant the bombs, or that engage in genocide that will be held accountable, but also those who help finance it by whatever means.  We think the difference between the horrors of September 11th and genocide is simply a question of degree, and we intend to hang tough in making sure that those, as others have said, have used simply a click on a computer or written a check, that it makes no difference.

And through that, we seek, one, exposure and, two, accountability.  Not for it's own sake, but accountability as a legacy to all the other -- to all Americans, to the realization that those countries, those individuals, those banks that have financed terrorism in the expectation that it is a cost-free endeavor will be proven wrong.

GERSON: They will have to pay a price.  And through that price, we intend to assure that there will be deterrence against the commission of such future acts.

Thank you.

MOTLEY: I will be glad to entertain questions from the media.

QUESTION: Ron, what do you expect to accomplish by suing members of the Saudi royal family?  And can you tell us a little bit about your allegations against them?

MOTLEY: Well, the allegations against them are contained in the complaint.  They're very elaborate, and I'll be glad to point you to the pages.

But what we seek to accomplish here, is certain members of the Saudi royal family have been very active supporters of and aiders and abettors of the funding of Al Qaida and bin Laden himself.

We received through French intelligence sources, the interpretation -- I can't speak French like Mr. Bersaud (ph) -- an interpretation of a secretly recorded meeting between representatives of bin Laden and three Saudi princes in which they sought to pay him hush money to keep bin Laden from attacking their own enterprises in Saudi Arabia, all of which is elaborated in the complaint in great detail.  And if you want, I'll tell you the pages that it's on, OK?

QUESTION: Have you alerted the Justice Department to your lawsuit, and what does the administration think?  And who was the national security adviser who said, "Hang tough" -- former national security adviser?

MOTLEY: I'll have to defer to him on that, then I'll answer your question.

GERSON: Since I received that message late last night, I have to await his permission.  But I can assure you it was a prominent, former national security adviser to the president.

MOTLEY: The other part of your question is, have we alerted the Department of Justice?  The answer to that question is, in various back-channel ways we have advised certain members, former advisers to the Justice Department of what we are embarking upon.

To answer your question about cooperation, we've met with the State Department on three occasions.  And we have received a grand total of zero pieces of paper and zero help.

Most of our help -- these victims have been very active in lobbying for an independent commission, such as investigated Pearl Harbor.  It passed the House of Representatives in a weakened form. It's now in the United States Senate.  With the help of all these folks and all the other victims and their victim's organizations, we hope that the Senate will pass a bill which will allow an independent investigation of all facets of this, and hopefully that information will be forthcoming.  But we have no reason to believe that we will be given cooperation or documents from the State Department.

FDCH Political Transcripts August 15, 2002 Thursday

We have, however, received documents from other foreign countries which turned over documents to the State Department.  So we're exploring those sources.

QUESTION: You mentioned that Canadians were part of this suit. Have you found any Canadian connection with terrorist money?  And is the Canadian government one of these states that is helping you in this investigation?

MOTLEY: We have not asked for, nor received any assistance from the Canadian government.  There are several Canadian nationals who were killed on September the 11th.  One of the -- and this is set forth again in the complaint.  I hate to keep referring you to the complaint, but it's 258 pages long and I have not committed it to memory.  There is a reference in here to activities of one of the Islamic charities in Canada.

My expert, Ms. Katz (ph), tells me there's more than one.

QUESTION: Sir, since 9/11 there's been a financial war on terrorism conducted by the Treasury Department of the U.S. government and other foreign countries, Operation Greenquest, et cetera, et cetera.  And since 9/11 they've frozen or blocked the assets of some of these charities and banks and individuals mentioned in that list right there.  Do you think there's an overlap?  Is this lawsuit being redundant in that sense, because some of these assets have already been blocked?  It's over $100 million now, I think, just in U.S. alone.  And given the fact that some of these assets have been blocked and frozen already, how will you get access to their assets?

MOTLEY: Well, number one, they didn't freeze all the assets that needed to be frozen.  They didn't seize the assets of certain of the operation centers, particularly in Bosnia.  They didn't freeze the assets of everybody whose assets needed to be frozen.  There are plenty of assets of these banks, which -- some of whose assets were not frozen.

And when you get right down to it, while the government may have frozen it, it's not helping these folks out at all.  Being frozen by the United States government is not the same thing as these families being compensated for their loses, nor, sir, does it allow them to expose what happened.  The freezing of an asset doesn't help them understand what happened.  They want to know what happened.  They want to air it.  They want to make it public.  They want the public to know about it.  And they want the Congress to do something about it.

And by the way, all of these charities did not have their assets frozen.  Most of the banks had nothing frozen and none, with one exception, these individuals had their assets frozen.

You have people on this list, by the way, who have hundreds of millions of dollars in assets in the United States that have not been touched.  Why do I think that's the case?  This is a good place to invest money.

QUESTION: (OFF-MIKE) United States government is not doing enough? Are they purposely overlooking...

MOTLEY: They do not have sufficient evidence or belief.  If you understand, they have to operate under a very strict set of rules which don't apply to these lawsuits.

MOTLEY: We're entitled to sue defendants that we think are responsible.  The standard under our civil justice system is preponderance of the evidence, which is 51 percent.  They have a much more rigid standard.  You'd have to ask them why they didn't seize more than they did.  At least they did something.

QUESTION: Can you estimate how much in reparations you're seeking from these defendants?

GERSON: Well, that's a difficult question.  First of all, as I stated earlier, over 600 family members have now joined the suit.  My colleagues from Staten Island who tell me they had 50 more sign up already this morning.  We had meetings with five other victims groups. We expect to have more than 1,000 by the end of August.

Until we have an idea of how many victims' families are involved, it's very difficult to assess what the damages will be.  In federal court, you're not required to say how much you seek in damages, but under some of the federal statutes that we're pursuing under, you can receive trebled damages, like Enron if they ever get a hold in the court.  You don't just give back the dollars you stole from the pensioners, you give back the dollars times three.  So, whatever the damages we have under one of the federal statutes will be treble.

So it's difficult to give you an idea, but it's in excess of hundreds of billions of dollars.  We're seeking an excess of what we collected against the tobacco companies which was $365 billion, I'll put it that way.

QUESTION: (OFF-MIKE) if you could -- really kind of -- just summarize, explain your legal strategy.  Would you just do that?

FDCH Political Transcripts August 15, 2002 Thursday

GERSON: Yes, ma'am. We have several statutes that permit victims to sue people who aid and abet -- I think you all understand what that means -- or support -- knowingly contribute financial support.  A case that this summer was decided by the Court of Appeals -- Federal Court of Appeals in the 7th Circuit lays out all of the factors that you can use to employ -- to bring terrorists to bay -- one of which is providing money for martyrs, which Saudi Arabia has done with respect to Hamas; we know that already.  We hope to be able to establish, and have established for at least one of the families of the hijackers, that they provided funding for them.

The other causes of action are based on federal common law. There's the Anti-Terrorist Act of 1996, and there's what's known as the Flatow Amendment, which allow these folks a more liberal standard of damages, much more liberal than are being applied in the federal compensation fund, where as you may know the families are limited and the money they can recover for the loss, the grief and sorrow and humiliation that they feel at the loss of a loved one.  The federal statutes have no such artificial limits that the federal compensation fund has.

And while I'm saying this, let me say this about that.  The Patriot Act of the year 2001 specifically states that the victims can sue the airlines, the World Trade Center, the people who failed to implement a fire escape program, or they can go into the federal compensation fund.  But in addition to that right, the Patriot Act of 2001 specifically entitles, enables and encourages victims of terrorism to bring this kind of lawsuit.

So they have two rights: go to the federal fund and sue the terrorists.

QUESTION: I don't know the answer to this.  As I understood it, part of the victim compensation fund, part of the stipulations about that is if you sued, you can't sue a bank unless they knowingly contributed to the terrorist act, or else they are no longer eligible for the fund.  Is that correct?

MOTLEY: No, ma'am, that's not correct.  The 1996 Anti-Terrorist Act, which survived the Patriot Act, defines who you can sue and why you can sue it.  There's no bank mentioned in the federal compensation fund.

There are certain protected defendants, anybody who had a big tin cup after September 11th and money to hire a lobbyist rushed to Washington and the airlines received a bail-out bill, as did Mr. Silverstein, New York City and several other entities, but no banks.

QUESTION: I notice on some of your charts that you mention the Holy Land Foundation, which is based in Richardson, Texas.  I didn't see it in the complaint.

I also noticed that you mentioned Hamas supporting at least, you believe, one of the families of the terrorists.  Do you anticipate...

MOTLEY: I didn't say Hamas, I said Saudi and other Gulf state entities supported one of the terrorists.

QUESTION: Why is it that the Holy Land Foundation is not yet part of this complaint?

MOTLEY: I didn't know they weren't.

QUESTION: They weren't listed in your...

MOTLEY: My expert on Islamic charities will answer this. Rita Katz (ph).

KATZ (ph): One of the things we're trying to show in this chart is basically the connection.  The Al Qaida network doesn't fund -- or the Islamic banking, the Saudi banking, don't fund only Al Qaida. They fund terrorism, and this is what we want to fight.

The Holy Land Foundation had received funds from some of the charities that have been named in this lawsuit. Moreover, if you check the Israeli's records on who funds Hamas, you will see that it's the same charities as the ones that have been named by the United States government and many other governments as Al Qaida sources.

This basically also shows part of the example that the Bin Laden training camps are not only for Al Qaida.  You can't go only after Al Qaida as Al Qaida.  You go after terrorism.  Al Qaida training camp has served Abu Sayyaf group, Gamal Islamia, Hamas, Palestinian Islamic Jihad, Hezbollah.  So it won't be a surprise to see that the same charities fund the same, different terrorist organizations.

Did I answer you question?

QUESTION: Yes.

MOTLEY: I didn't understand it either, but ...

QUESTION: Could you talk just a bit about the international reach and what difficulties you'll have in pursuing overseas assets through a federal court in Washington, D.C.?

MOTLEY: Well, we have -- the United States has entered treaties with various governments, including Great Britain, where the Saudis have an awful lot of money -- the ones we've named, they have a lot of money in London. There are treaties with other nations that allow us to go after collecting it.

But listen, 22 percent of Citigroup is owned by Saudi interests. Some of these banks have branches in the United States.  Some of these Islamic religious foundations have assets in the United States, some of which haven't been seized. They have offices in the United States.

Believe me, there's an abundance of assets of the defendants that have been named that exist in the United States so as we won't have to go and apply for treaties.  There's a lot of assets here, we will be going after those assets.

They own a lot of property in the United States.  The United States is their favorite venue for investment, and we feel very confident we'll be able to collect these judgments when we receive them.  And we feel very confident that we will receive these judgments, because these folks are guilty.  They're guilty as hell.

QUESTION: There are a lot of statements from the U.S. government and from the Saudi government which -- over the last month, they've said that they do not believe the Bin Laden family group, Osama bin Laden's family's company had participated.  Yet I see you've named them as defendants.  Can you tell us why you think in fact some of bin Laden's relatives have funded his operations?

MOTLEY: Well, as an interesting fact only two airplanes took off after September 11th in the United States.  One of those airplanes contained members of the Bin Laden Group, who President Bush allowed to take off when no other plane could take off so that they could gain safe haven in Saudi Arabia.  That might give you a clue.

Secondly, we are able to trace an awful lot of money through the Sudanese government and there's an awful lot of allegations in the complaint, I hate to keep referring you to the complaint but I'll show you the paragraphs in the complaint -- there's actually been a book written about the Bin Laden Group and their connections with the funding of Al Qaida.

I don't think Mr. bin Laden, if he's still alive, is quite the black sheep that he's been portrayed to be.  I think he's more like a goat.

QUESTION: You talked a moment ago about Saudi Arabia and entities within that kingdom funding a terrorist. Are you talking about one of the 9/11 hijackers?

MOTLEY: Yes.

QUESTION: Which one?  And what were they doing?

MOTLEY: The complaint will elaborate on that.

QUESTION: OK.  And the second question is for John Paul (ph).

John Paul (ph), can you...

MOTLEY: It is John Charles (ph).

QUESTION: John Charles (ph), sorry.

MOTLEY: I know almost everybody in France is named John Paul (ph), but he's not.

(LAUGHTER)

QUESTION: You have different countries here.  You have the Republic of Sudan mentioned.  You have Saudi Arabia mentioned. Anything in your investigation, sir, having to do with Iraq?

BERSAUD (ph): Well, again, it's the beginning of the -- we're just introducing the lawsuit today.  It's just the beginning.  Facts will come; more facts will come.

I think, well, we did our job, we identified those people responsible for financing and funding and harboring whatever those networks.  That's the essential.

FDCH Political Transcripts August 15, 2002 Thursday

Today I think it's historic for in the war -- it's an historic day, again, in the war against terrorism.  The message is clear, it's sent to those people, as the families said earlier:  Whoever you are, wherever you are, whether a public or a private entity or individual, we'll bring you to justice and you'll be accountable for the atrocities you committed.  That is the essential for me today, just to think about the families.

And again, the facts will come, more facts.

QUESTION: It's another question might refer to the big pages, but do you know how many Canadian plaintiffs there are, and do you expect some more?

MOTLEY: Three, and we've been contacted by two additional families. So there's three at this time.  I think there are nine or 13 French nationals, four or five Swiss nationals, several from South America.

We're getting calls all the time.  It takes a while to process these cases.  We have rather elaborate information sheets that we ask them to fill out, and you'll notice in the complaint there are a number of what we call Doe -- John and Jane Doe plaintiffs, and the reason for that is that we just have not had the time to process all these names.

We will file an amended complaint within 30 days, which is our right under the federal law, and we will probably be adding several Gulf state oil companies and some additional banks, and we will fill in the names of the Does.

There are some folks who, for privacy and security reasons, do not want their names in the complaint, and the procedure there is that we list them as Does, Jane or John Doe, and then we turn over a registry to the court, to be kept under seal by the court with the identity of those victims until such time as the court orders that their identities be revealed.  That's the procedure.

QUESTION: It sounds as if you have two goals: first of all to receive compensation for the families, and secondly to financially disable the terrorist networks.

The U.S. assets it sounds like you can achieve the compensation goal, but some of these organizations are just huge.  Can you really go after enough assets worldwide to disable them financially?

MOTLEY: We're going to give our best shot, sir.  We'll leave no stone unturned, I can assure you of that.

OK, I guess my PR guy says that's it.  Thank you very much for coming.

END


**NOTES:**
[????] - Indicates Speaker Unknown
  [--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**PERSON:** THOMAS E BURNETT JR (94%);

**LOAD-DATE:** August 16, 2002