# Exhibit J



PL 99-354, 1986 SJRes 365                                                                                                Page 1
 PL 99-354, July 2, 1986, **100 Stat 756**
**(Publication page references are not available for this document.)**

## UNITED STATES PUBLIC LAWS
### 99th Congress - Second Session
### Convening January 21, 1986

Copr. ©  West Group 1998.  No Claim to Orig. U.S. Govt. Works

**DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)**
Additions and Deletions are not identified in this document.

PL 99-354 (SJRes 365)
July 2, 1986

Joint Resolution

Welcoming the Afghan Alliance.

Whereas more than one hundred and twenty thousand Soviet troops currently remain in Afghanistan as a result of their illegal invasion in December of 1979;

Whereas these forces have decimated the nation of Afghanistan directly causing: the largest refugee population in the world, with three million Afghans living in exile in Pakistan; over one million war-related casualties; the internal displacement of hundreds of thousands of Afghans; and deprivation and suffering for the majority of Afghanistan's population;

Whereas the most recent United Nations Human Rights Commission report concludes that the continuation of a military solution in Afghanistan will "lead inevitably to a situation approaching genocide";

Whereas the international community has repeatedly condemned the continued Soviet occupation of Afghanistan and has in seven resolutions approved by the United Nations General Assembly called for "the immediate withdrawal of foreign troops from Afghanistan";

Whereas the Afghan Mujahideen have valiantly resisted the Soviet forces for more than six years, and have inspired freedom loving people throughout the world with their courage and determination;

Whereas on May 16, 1985, the Afghan resistance took an historic step by forming the Islamic Unity of Afghan Mujahideen, representing a unified coalition of the major Afghan organizations dedicated to ending the Soviet occupation;

Whereas during the week of June 15, 1986, the current spokesman of this alliance will travel to the United States on behalf of the Afghan people to meet with the President and senior American officials: Now,

Copr. ©  West 2004 No Claim to Orig. U.S. Govt. Works

 PL 99-354, July 2, 1986, **100 Stat 756**
**(Publication page references are not available for this document.)**

therefore, be it

 Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the United States --

 (1) reaffirms its support for the valiant struggle of the Afghan people; and

 (2) welcomes the delegation of the Islamic Unity of Afghan Mujahideen led by Spokesman Burhanuddin Rabbani on the occasion of his first official visit to the United States of America.


Approved July 2, 1986.


 LEGISLATIVE HISTORY -- S.J. Res. 365:

 CONGRESSIONAL RECORD, Vol. 132 (1986): June 18, considered and passed Senate. June 24, considered and passed House.

PL 99-354, 1986 SJRes 365

END OF DOCUMENT

Copr. ©  West 2004 No Claim to Orig. U.S. Govt. Works

# Exhibit K

US Department of State
**Dispatch,**
**Vol 2, No 37, September 16, 1991**


Title:
**Democracy's Season**


Baker

Source:          Secretary Baker

Description:     Address before the CSCE Meeting on the Human Dimension,
                 Moscow

Date:            Sep 11, 19919/11/91

Category:        Speeches, Testimony, Statements

Region:          Eurasia, E/C Europe

Country:         Yugoslavia (former), USSR (former)

Subject:         Democratization, CSCE, Regional/Civil Unrest,
                 Human Rights

[TEXT]

When, a little over 1 year ago, I addressed the Copenhagen CSCE
[Conference on Security and Cooperation in Europe] meeting, I looked
around and saw the changing face of Europe.  Arrayed at the table
were delegates from a reforming Soviet Union, from two Germanies
only a few months shy of unification, and from the new Central and
East European democracies.

        In the intervening months, the transformation of Europe has
continued without pause.

        The difficult task of consolidating democracy and
establishing
market economies had advanced across Central and Eastern Europe.
Germany is united, and Albania is open.  Latvia, Lithuania, and
Estonia, deprived of their independence by force half a century ago,
have at last taken their rightful place among us.

        But not all of the changes in Europe have been so peaceful.
We
remain deeply saddened and concerned by the tragic bloodshed in
Yugoslavia.  To those who would persist in the threat or use of
force, we say:  There is no honor in it; no lasting gain, no future.
You cannot achieve prosperity and security for your people by force.
You can only reap a whirlwind of misery, turmoil, and loss.

        I wish to make it clear to all parties--and most of all to the
Serbian leadership and the Yugoslav Federal Army--that with every

use of aggressive force they further isolate themselves from the new Europe and raise the costs to their own people of an already severe economic crisis.  We doubt the peoples of Yugoslavia truly wish to pay the high price of political and economic exile.  We join other members of CSCE in reiterating our strong support for the European Community's continuing efforts to bring about a genuine cease-fire and political settlement.  We urge all parties to reach out of the abyss of violence into which they have descended and grasp hold of this opportunity for peace.  The rest of Europe is moving forward to political and economic freedom.

**Guidelines for Democratic Action**

No one is moving forward more vigorously than the peoples of the Soviet Union.  For the peoples of this land, this is truly democracy's season.  And, with you, the American people rejoice in its coming. Here in Moscow, we breathe the warm wind of new-won freedoms. But we know that difficult winter months are ahead, and spring is distant.

        The peoples of this vast land face tremendous challenges ahead in the coming weeks and months.  But for the first time, after decades of totalitarianism and central planning, each and every citizen knows now that the hard choices are genuinely his or hers to make.  Each Soviet citizen now has an unprecedented opportunity to gain control of his or her own destiny.  And how the men and women of this country choose to meet the challenges ahead will surely test--and reveal--the strength of their commitment to democratic values.  The scope, depth, and consequences of the decisions that the citizens of this country are now making are indeed unprecedented.  But in shaping their democratic future, they are not without guidelines for action, or standards of accountability.

        At this time of change in all aspects of Soviet national life, we should take this opportunity to address all Soviet citizens and their leaders.  My message is simple:  The courage you showed in August must be continued and consolidated now in enduring political and economic freedom.  As you work to build democracy and free markets, the West will stand with you.  The path ahead is charted by enduring principles, universal democratic principles that can help you meet the challenge of change peacefully and legitimately.

        In particular, I'd urge you to follow five fundamental principles.

        One, it's important that you determine the future of this country peacefully, consistent with democratic values and practices and the principles of the Helsinki Final Act.  If, indeed, your ultimate objective is a thriving democracy, you can do nothing less.  Intimidation, illegality, and violence are not handmaidens of democracy, they are the harbingers of despotism.  Just as you faced down tanks, see these evils of intolerance squarely for what they are.

        Two, we urge all to respect existing borders, internal and external; any change of borders should only occur legitimately by peaceful and consensual means, consistent with CSCE principles. The agreements recently achieved by some republics underscore this principle.  The alternative is spiraling instability.  Autarky,

score-settling and the threat or use of force for territorial gain cannot be legitimate elements of the new Euro-Atlantic community. European history is replete with too many examples of how such irresponsible behavior has led to immense suffering on this continent.

Three, we urge support for democracy and the rule of law.  We support peaceful change only through orderly democratic processes, especially elections.  As Dr. [Andrei] Sakharov so often said: Democratic means are the only way to achieve democratic ends. CSCE's Office for Free Elections, which we hope soon will become an Office for Democratic Institutions, can be constructive in this effort.

Four, we urge you to safeguard human rights, based on full respect for the individual and including the equal treatment of minorities.  In a thriving, pluralistic society--and certainly in any multinational system--every citizen at one time or another, and with regard to one issue or another, finds himself or herself in the minority.  As Thomas Jefferson put it in his Inaugural Address over 200 years ago:  "Though the will of the majority is in all cases to prevail, that will, to be rightful, must be reasonable; the minority possess their equal right, which equal laws must protect, and to violate would be oppression."  Consistent with commitments made in Copenhagen, and Geneva, leaders at all levels of government must forthrightly condemn and combat racial and ethnic hatred, anti-semitism, xenophobia and discrimination, as well as persecution on religious and ideological grounds.

Five, we urge you to respect international law and obligations, especially adherence to the provisions of the Helsinki Final Act and the Charter of Paris.  This will best prepare you to join in the democratic commonwealth of nations.  The right to participate in this commonwealth is not a function of power or geography.  It is a function of values--shared values.

These five principles embody those shared democratic values. They represent the path to a new future, to full membership in the democratic commonwealth.  That's why today, here in Moscow, I'd like to repeat the request I made a week ago:  I urge all leaders--at all levels of government--to voice their support for these principles.  And I'd urge all the members of CSCE to voice their support, too.

CSCE has no divisions of tanks.  It has instead the moral authority that flows from principles like these.  But as we saw on the streets of this city, 3 weeks ago, at critical moments people armed with principles have overwhelmed tanks.

Clearly, these principles are not just guides to action but also standards of accountability.  Those who follow these principles should know they are building the only sure basis for our support and assistance--a common bond held solid by enduring values. Those who fail to heed these principles, who irresponsibly trample on the rights of others while neglecting their own obligations need to know something, too:  They risk [losing] positive relations and support from the outside when their actions undercut the basic principles upon which democracy and the CSCE are built.

**Moscow Meeting on the Human Dimension**

Let me turn now to the agenda of this meeting.  This Moscow
meeting is no occasion to indulge in euphoric self-congratulation.
Those very people who successfully defied and defeated the coup
know only too well that respect for human rights, the rule of law,
and democratic processes have yet to be consolidated here in the
Soviet Union.  There can be no clearer indication of how deeply this
is understood than the fact that one of the very first acts of the
Extraordinary Congress of People's Deputies was the passage of a
declaration on human rights and freedoms-- the first such
declaration in the history of the Soviet Union.

        Elsewhere, in Central and Eastern Europe, democracy's hard
work continues.  Here, too, turning CSCE's human dimension
commitments into reality remains a major challenge for citizens
and their governments alike.

        For two centuries, we Americans have placed the highest
priority on translating our own Bill of Rights into daily practice and
we know well that fine intentions and noble words on parchment--
while a splendid beginning--do not a democracy make.  Democracy
derives its life from the citizen.  Similarly, the CSCE process is
only as meaningful as the positive impact it can have on the lives of
our peoples.

        That is why my government considers it vitally important
that
we make full use of the opportunity presented by the Moscow
meeting for a thorough review of implementation.

        In particular, we'd like to see this meeting endorse the
proposal I made in June in my speech in Berlin to broaden the Office
of Free Elections into an Office for Democratic Institutions.  We
would also like to see adoption of our proposal to strengthen the
human dimensions mechanism to allow CSCE to better help resolve
human rights issues, including those involving national minorities.
Our approach includes provision for a mediation function, giving
CSCE greater ability and flexibility to deal with increasingly
pressing problems.

        In Berlin in June, I also proposed CSCE involvement to help
move toward defense conversion efforts and to cope with potential
migration problems in Europe.  I hope we can discuss these
proposals and move forward with concrete action in these areas.

        We recognize that there is no set formula for putting
democratic principles into practice that can serve for all times, all
places, all peoples, and all circumstances. But it is in the
thoughtful and determined search for solutions by citizens and their
elected leaders that democracies gain maturity and legitimacy in
the eyes of their citizens and the international community.

**Heroes for Our Time**

That is a search that began here in earnest 3 weeks ago.  It is a
search for which we all need to express words of deep appreciation

to absent friends of human rights and of this process.  In her "Poem Without a Hero," the great Russian poet Anna Akhmatova traced the momentous events of her age as she was fated to live them through revolution, civil war, the Terror, and foreign invasion.  The poem opens on the eve of World War I, in 1913, the first year of what Akhmatova called "not the calendar, but the real 20th century"--  a century of upheaval and human tragedy on an unprecedented scale. The poem ends, as it only could have, on a somber note.

Sadly, Akhmatova did not live long enough to see democracy's season arrive in her long-suffering native land.  Nor did countless millions for whom her poetry bears witness the human suffering and the nobility of the human spirit.  It came too late for the 11 Helsinki monitors who perished in Soviet prison camps, or in foreign exile, and who, before their deaths, were made to suffer long years of persecution for defending human rights.  It came too late as well for Sakharov, and for the three young men who gave their lives just last month defending the people's democratic principles against tanks.  All these courageous men and women hastened democracy's arrival.  These are the true heroes of our time.

So, I believe that it is only fitting that I close these remarks today urging that our work here in Moscow be worthy of their hopes, their courage, and their sacrifices.  Together, we can make a meaningful contribution to the consolidation of democracy for the peoples of the Soviet Union and throughout Europe.  By our efforts, we can help make 1991 the first real year of the 21st century--a century that we hope will give rise to a new Europe, a new Atlanticism, and a new world order based on human and democratic values, thriving market economies, and peaceful international relations. (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**International Covenant on Civil and Political Rights**


Boucher

Source:          State Department Deputy Spokesman Richard
                  Boucher

Description:   Washington, DC

Date:            Sep 10, 19919/10/91

Category:      Speeches, Testimony, Statements

Subject:        Human Rights, United Nations, International Law

[TEXT]

In keeping with his commitment to a new world order based upon respect for international law and human rights, President Bush has urged the Senate to renew its consideration of the International

Covenant on Civil and Political Rights with a view to providing advice and consent to ratification.

In letters addressed August 8 to the Chairman and ranking minority member of the Senate Committee on Foreign Relations, the President stressed that "US ratification of the Covenant on Civil and Political Rights at this moment in history would underscore our national commitment to fostering democratic values through international law." He noted that US ratification would also strengthen our ability to influence the development of appropriate human rights principles in the international community and provide an additional and effective tool in our efforts to improve respect for fundamental freedoms in many problem countries around the world.

The International Covenant on Civil and Political Rights was adopted by unanimous vote of the United Nations General Assembly on December 16, 1966. The Covenant amplifies the basic civil and political rights proclaimed in the Universal Declaration of Human Rights in 1948. At present, 95 states are parties to the Covenant, including all of the UN members of Western Europe. The Covenant was signed by President Carter in 1977 and was transmitted to the Senate in 1978.

The Covenant articulates the essential freedoms people must enjoy in a democratic society, including the fundamental principles incorporated in our own Bill of Rights. Among the basic human rights guaranteed by the Covenant are the rights of the individual to life, liberty and security of the person; to freedom from slavery, torture and arbitrary arrest; to fair trial and equality before the law; to freedom of thought, conscience and religion; to freedom of opinion, information and assembly; to vote and to participate in government; and other related rights. The Covenant provides for enjoyment of these rights without discrimination.

The Covenant establishes an implementing organ, the Human Rights Committee, composed of 18 individual experts. The Committee functions to oversee compliance by the States parties with their obligation to respect and ensure observance of the rights recognized in the Covenant. It does so primarily by considering reports from States Parties and, where appropriate, considering complaints by one State Party against another.

In his recent letters, President Bush promised assistance to the Senate Committee on Foreign relations in acting on the Covenant without delay. "Subject to a few essential reservations and understandings, it is entirely consonant with the fundamental principles incorporated in our own Bill of Rights," he said.

The Department of State, in consultation with other concerned departments of the United States government as well as interested parties on the Hill and in the private sector, will be developing the necessary reservations, understandings, and declarations, which the Administration will propose for approval by the Senate as part of its advice and consent to ratification of the Covenant. (###)


US Department of State Dispatch,

Vol 2, No 37, September 16, 1991

Title:
**New Opportunities in US-Soviet Relations**

Baker, Gorbachev

Source:          Secretary Baker, Soviet President Gorbachev

Description:     Opening statements at a news conference, Moscow, USSR

Date:            Sep 11, 19919/11/91

Category:        Speeches, Testimony, Statements

Region:          Eurasia, North America

Country:         USSR (former), United States

Subject:         Arms Control, Democratization,
                  Mideast Peace Process, Trade/Economics

[TEXT]

**President Gorbachev:**
  Good afternoon.  As we have
promised, we are reporting to you about our talks.  Let me say a
couple of words, then Secretary Baker will say a couple of words,
and then we'll respond to a few questions.

        Naturally, we have discussed with the Secretary of State the
situation that the Soviet Union, and the entire international
community, has just had to go through.  I thanked Secretary Baker
for the very clear and firm position adopted by President Bush and
by Secretary Baker during the coup, and for the solidarity of the
American people with democratic forces in the Soviet Union and the
President of the Soviet Union.  And I reported to the Secretary our
analysis of the situation and the lessons that we have learned from
the situation.

        We had a discussion that centered basically around two
things.  One is our cooperation--our economic cooperation--under
new conditions, and we discussed a number of very specific points
in that regard.  In that very substantive discussion, we have decided
that in his new situation with new circumstances [that] we will
develop new forms of cooperation to make that coordination
effective and to synchronize our efforts.

        The other area that we focused on was foreign policy and,
specifically our continued cooperation between the Soviet Union and
the United States.  I drew the attention of the Secretary to the
statement of the President of the Soviet Union and the leaders of
the republics, which specifically said that we remain committed to
the foreign policy course of recent years, which we have conducted
in close cooperation with the United States.  What is more, we
believe that the current situation, the new phase in the evolution of
our country--creates and opens up new opportunities for furthering
the course of that cooperation.

We agreed to continue to cooperate as before on the Middle East--specifically to advance the process toward a peace conference.  We continued the discussion that we began with President Bush during the summit--specifically our discussion at Novo Ogaryeva [President Gorbachev's dacha] with President Bush about our interaction and cooperation of Afghanistan.  We want to reach the desired result in the settlement of this problem . . . . The ministers will continue the discussion, and we believe that the discussion should result in new steps to accelerate the internal process in Afghanistan which will, we believe, result in democratic forms and some kind of national consensus in that country.  We have agreed that we will move toward the ratification of the CFE [Conventional Armed Forces in Europe] Treaty and of the START [Strategic Arms Reduction Talks] Treaty.

The Secretary of State was interested in learning more about what I and President Yeltsin said during the CNN interview--the CNN discussion--with the Americans about our further relationship with Cuba.  I once again reaffirmed to the Secretary that we intend to transfer our relations with Cuba to a plane of mutually beneficial trade and economic ties and that we will remove other elements from that relationship--the elements that were born in a different time in a different era.  In that context, I told the Secretary that we will soon begin discussions with the Cuban leadership about the control of the Soviet training brigade that was stationed in Cuba some time ago and that is still there.  To sum up, I would like once again to tell you my view--which the Secretary of State, I understand, supports--that we should not only continue the cooperation between the Soviet Union and the United States but we should develop that cooperation and take it further, because we do have new opportunities.

**Secretary Baker**
 Mr. President, I think that is a very complete summary of the discussions which we have had today.  Let me thank you very much for receiving me and our delegation on somewhat short notice.  The President felt it was very important for me to come to the Soviet Union as quickly as possible in the aftermath of the extraordinary events that have been taking place here.  I think you know how we feel about the outcome of those events.  I think you know that it was the strong hope of the United States during those critical days that the coup would not succeed.  It was, of course, our hope that you and your family would be safe, as we are pleased with the way things turned out, because we think that this will permit us to continue the cooperation between our two nations that had developed under your leadership and President Bush's leadership and will permit us indeed to enhance that cooperation.

There are new opportunities, and we do want to continue to cooperate with you and to cooperate with President Yeltsin and other reformers in the Soviet Union in order to assist in this dynamic transformation, political and economic, that you are going through.  And when I say I think there will be enhanced opportunities for cooperation, I don't limit that to political or economic.  I think that there will be enhanced opportunities on both the political and economic side.

I thank you for your statement with respect to the question of the training brigade in Cuba.  That will be very important in

terms of public opinion in the United States.  And I would add only
one comment to the very complete summary that I think you've given
of our talks.  And that is to say that we spent quite a bit of time
talking about the importance of quickly producing a credible
economic reform program for discussion with the international
financial institutions.  And there was complete agreement between
us on this question.  (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**New Opportunities in US-Soviet Relations**


Baker, Yelstin

Source:        Secretary Baker, Russian President Yelstin

Description:   Opening statements at the Supreme Soviet, Moscow,USSR

Date:          Sep 11, 19919/11/91

Category:      Speeches, Testimony, Statements

Region:        Eurasia, North America

Country:       USSR (former), United States, Japan,
                Afghanistan, Cuba

Subject:       Arms Control, Democratization, Trade/Economics

[TEXT]

**President Yeltsin:**
  What did we talk about?  Well,
we talked for a long time.  And, based on these notes, we looked at
20 issues--20 exactly.  These included: the issue of a new union and
the principles of its formation; questions of relations between the
center and the new sovereign republics; the question of the union
treaty; the issue of the implementation of our general programs
during this transitional, critical period for our country--technical
aid, humanitarian aid, and, joint programs.  We discussed which
programs to implement.

        Further, we discussed:  the question of Soviet-American,
Russian-American relations, from the viewpoint of reducing
strategic and tactical nuclear weapons; conventional arms; reforms
in the army; the question of the Japanese Northern [Territories], the
islands to which, so to speak, Japan is now laying claim--the
Kuriles Islands; the questions of the management of strategic
nuclear weapons and control of them--by whom it will be exercised,
so that there will be confidence among everyone, not only the
Americans but the entire world, that only the center, only one
person controls them in this country; the question of agreements
made over the next few years; the question of food deliveries,
especially in the first months of next year; the issue of ceasing aid
to Afghanistan, to Cuba, including the cessation of arms deliveries-

-have I listed twenty?  Well, I've had at least 10 to list, and you can
do the other 10.

**Secretary Baker:**
  For the benefit of our American
colleagues, Mr. President, let me quickly summarize, if I can, what
you've said.  You've said that we've covered a wide range of
subjects.  We talked about 20 different, specific items, and you're
quite right.  You've listed a number of them: relations between the
union and the republics, and between the republics themselves;
economic cooperation; the transformation that's going on here in the
Soviet Union, politically and economically; a number of different
foreign policy problems, including questions of Afghanistan, Cuba,
the Northern Territories, the Middle East.

        We talked at length, as you just mentioned, about the central
control--that is, one central control point for nuclear weapons
within the Soviet Union.  We talked about the future of
consultations between the United States and the Soviet Union, and
the republics of the Soviet Union, particularly, of course, the
Russian Republic.

        I should say, for the benefit of our traveling American press,
Mr. President, that I told you, and I want to repeat right here, that
it's the view of the American people, and the view of President Bush
and all of us, that the recent attempt at unconstitutional overthrow
of the duly constituted Government of the Soviet Union might well
have succeeded but for your courageous leadership in mounting the
defense right here outside the White House, and that the United
States, and, indeed, the world as a whole--those who believe in
freedom and in democracy and in human rights and in the benefits of
a free market economic program--owe you a vast debt of gratitude.

        Beyond that, I would simply say that we have had a very, very
full and productive dialogue across a very broad range of subjects,
and the ones I have just mentioned are not all of them. (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**US-Soviet Joint Statement on Afghanistan**


Description:     Text of Joint statement and commentary released by
                 Secretary Baker and Soviet Foreign Minister Pankin, Moscow,
                 USSR

Date:            Sep 13, 19919/13/91

Category:        Speeches, Testimony, Statements

Region:          South Asia

Country:         Afghanistan

Subject:         United Nations, Democratization,
                  Military Affairs

[TEXT]

**Joint Statement:**

  The United States and the USSR,
consistent with the UN General Assembly resolutions adopted at the
43rd, 44th, and 45th sessions and with their commitment to the
Geneva accords on Afghanistan, recognize the fundamental right of
the Afghan people to determine their own destiny free from outside
interference.  In this regard, they support the statement of the UN
Secretary General dated May 21, 1991, and reaffirm the need for a
political settlement in Afghanistan that ensures an independent and
non-aligned Afghanistan at peace with its neighbors and that
establishes a new, broad-based government through an electoral
process that respects Afghan political and Islamic traditions.  The
United States and the USSR agree that a transition period is
required to reach these goals.

        To this end, they call for and pledge to support a democratic
and free electoral process that is not subject to manipulation or
interference by anyone.  The results of the electoral process must
be respected and fully implemented by all.  They request the United
Nations, with the support of concerned governments, including those
of Islamic countries, to work with the Afghans to convene a
credible and impartial transition mechanism whose functions would
include directing and managing a credible electoral process fully
consistent with these principles.  This transition mechanism,
working closely with the UN and others as necessary, would have
independent authority with all powers required to prepare for,
conduct, and implement the results of this electoral process leading
to the establishment of a new government that will have the broad
support of the Afghan people.  The details of these and other powers
and functions would be decided through an intra-Afghan dialogue.

        The United States and the USSR agree that a cessation of
hostilities is essential for the peaceful conduct of elections during
the transition period and for a lasting political settlement.  To
facilitate this cessation, they agree to discontinue their weapons
deliveries to all Afghan sides.  They also agree that a cease-fire
and a cutoff of weapons deliveries from all other sources should
follow this step.  They agree further to work toward withdrawal of
major weapons systems from Afghanistan.

        The United States and the USSR also reiterate their
commitment to support an international humanitarian assistance
effort to promote the prompt repatriation of refugees and
reconstruction of Afghanistan.

        To these ends, they reaffirm their willingness to promote in
every way possible the efforts of the UN Secretary General to
contribute in practical ways to the early settlement of this
conflict.

        Commentary:  Today, the USSR and the United States issued a
joint statement on Afghanistan specifying agreed approaches of the
sides to a political settlement in that country along the lines of the
UN Secretary General's statement of May 21, 1991.

        Settlement of the issue of "negative symmetry," that is
discontinuation of Soviet and US arms supplies to the conflicting

Afghan sides, is one of the crucial elements of this agreement.  The
USSR and the United States agreed to cut off such supplies
beginning January 1, 1992.  They further agreed that neither the
USSR nor the US will intensify arms supplies to any Afghan side in
the interim.  It is also hoped that during the remaining time the
issue of the Soviet POWs will be settled.  The United States pledges
its best efforts to resolve this important humanitarian question.

        It is also expected that other countries involved in the
Afghan
conflict should also follow the USSR and the United States in
limiting their assistance to Afghanistan to humanitarian assistance
only.

        We expect that our joint steps will facilitate launching an
intra-Afghan negotiating process and should lead to a pause
followed by a complete cessation of military operations.(###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**US Efforts To Promote Progress and Democracy in the Baltic
                States**


Bush

Source:         President Bush

Description:    Excerpt from remarks during a meeting with the heads of
                the Baltic legations, Washington, DC

Date:           Sep 11, 19919/11/91

Category:       Speeches, Testimony, Statements

Region:         E/C Europe

Country:        Estonia, Latvia, Lithuania

Subject:        Democratization, United Nations,
                Trade/Economics

[TEXT]

Estonia, Latvia, and Lithuania are free again, and we welcome them
back to the commonwealth of freedom.

        It is our responsibility--all of us as Americans--to help the
Baltics integrate fully into the West; to nurture these young
democracies; to transform--help them transform their economies
toward a free market that we all know works so well.

        And I'm, therefore, very pleased to announce today a series of
measures--beginning measures--to start this process, which the
Secretary of State will be discussing with the Baltic leaders when

he visits the region in so many hours from now.

But first, I'm pleased to announce that--and this is a fait accompli, I'm pleased to say, also--that the United States will sponsor Estonia, Latvia, and Lithuania for membership in the United Nations at the General Assembly on September 17, just as we supported them for membership in the CSCE [Conference on Security and Cooperation in Europe] earlier this week.

Second, as many of you know, the United States safeguarded for over 50 years financial assets of the Baltic governments.  And we look forward to working with the independent Baltic states on arrangements for unfreezing the gold and other assets as soon as possible and move forward on that just as quickly as we can.

Third, we will move quickly to normalize our own economic relationship with the Baltics by extending the most-favored-nation treatment, and including them under the Trade Enhancement Initiative designed to increase their trade with the West.  And we'll also provide GSP [Generalized System of Preferences] and OPIC [Overseas Private Investment Corporation] benefits, and we'll continue the work we've already started to provide medicine for the Baltic hospitals.

Fourth, we will help the Baltics to integrate into the world economy. This is a big one, a very important one--economic integration.  We will encourage the IMF [International Monetary Fund] and the World Bank to work closely with the Baltics to prepare them for membership. We hope that membership in the European Bank for Reconstruction and Development will proceed on a fast track, and we will also support Baltic participation in the OECD [Organization of Economic Cooperation and Development] center for economies in transition.

And fifth, we will work closely with our allies in the G-24 [Group of 24] process to coordinate economic assistance to the Baltic states.  For our part, the United States intends to extend a variety of technical assistance and other programs under the Support for Eastern European Democracies Act.

Finally, I'm delighted to announce today that we will move immediately to establish a Peace Corps program for Estonia and Latvia and Lithuania.

Let me say in closing that as the United States was true to the Baltic States in captivity, we will continue to be true to them as democratic partners and the years ahead. (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**UN Security Council Resolutions on the Baltic States**


Description:   New York, New York

Date:          Sep 12, 19919/12/91

```
Category:        Fact Sheets

Region:          E/C Europe

Country:         Estonia, Latvia, Lithuania

Subject:         United Nations

[TEXT]
```

**Resolution 709 (Sept. 12, 1991)**


The Security Council,

        Having examined the application of the Republic of Estonia for
admission to the United Nations,

        Recommends to the General Assembly that the Republic of
Estonia be admitted to membership in the United Nations.

**Resolution 710 (Sept. 12, 1991)**


The Security Council,

        Having examined the application of the Republic of Latvia for
admission to the United Nations,

        Recommends to the General Assembly that the Republic of
Latvia be admitted to membership in the United Nations.

**Resolution 711 (Sept. 12, 1991)**


The Security Council,

        Having examined the application of the Republic of Lithuania
for admission to the United Nations,

        Recommends to the General Assembly that the Republic of
Lithuania be admitted to membership in the United Nations.  (###)


```
US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
```
**US-Mexico Binational Commission Meeting**


```
Baker

Source:          Secretary Baker

Description:     Opening statement at a news conference, US-Mexico
                  Binational Commission meeting, Mexico City, Mexico
```

Date:            Sep 9, 19919/9/91

Category:        Speeches, Testimony, Statements

Region:          North America

Country:         Mexico, United States

Subject:         Environment, Human Rights, Immigration,
                  Narcotics

[TEXT]

Ladies and Gentlemen, we've had a very full day, and we've had, I
think,   a very productive day. As [Mexican Foreign] Secretary
Solana has said--and, I think, as our joint statement attests--we
have accomplished a lot of substantive work in our meetings.

        I would like to highlight for you just six points.

        First of all, we agreed to push  ahead to completion a
comprehensive, integrated environmental plan to preserve our
common heritage of water, soil, and air along our very extensive
common border.

        Second, we agreed to strengthen our cooperation in
combatting drug trafficking, with an increased effort to combat
money laundering and the spread of trafficking in Central America.

        Third, we agreed to improve our joint efforts to protect
workers'   rights and enforce health and safety standards.

        Fourth, we agreed to increase our exchange programs among
teachers, students, journalists, and other professions.

        Fifth, we discussed how to remove the remaining barriers to
our very important agricultural trade.

        Sixth, we held important discussions on cooperation on
immigration and consular affairs, improvement of border crossings,
and we welcomed--for the first time--representatives of our
housing, transportation, and labor departments to the work of the
BNC [Binational Commission].

        In addition to the substance of what we have achieved here
today, I think that it's worth noting that this Binational Commission
is also a very unique process or procedure.

        There is no other country in the world with whom our
President's Cabinet meets as a whole regularly and systematically
to conduct important business at the highest level.  And, I think,
that that is as clear an  expression as could exist of the special
nature of the US-Mexican relationship.

        Most of you know, I think, that I will be flying from Mexico
directly on to Moscow, with a stop at Andrews [Air Force Base], and,
of course, a refueling stop in Shannon, Ireland.  But the fact that I'm
going from Mexico to Moscow, I think, provides a point of which we
ought to take note.

The dramatic and revolutionary changes that are taking place in the world today are not just going on in the Soviet Union and Eastern Europe.  There are equally dramatic changes, we believe, underway here in Mexico;  perhaps quieter, but equally dramatic.

Under President Salinas' leadership, Mexico has emerged from an economic crisis with renewed strength and confidence, restoring strong real growth and attracting investment from around the world.

We think that Mexico's success offers a lesson for the rest of the world that free market reforms combined with political courage and will reap real dividends for ordinary citizens.

Together with Canada, the two of us are negotiating the world's largest free trading regime uniting 360 million people and economic activity involving some $7 trillion in goods and services. And this North American Free Trade Agreement is the first step towards building a hemisphere in which trade is free--all the way from Alaska to Argentina.

Finally, as I said this morning, Mexico and the United States are pioneers in constructing something history has never known-- the world's first completely democratic hemisphere.  And I think that we are well on the way towards that goal.

So, ladies and gentlemen, I leave Mexico with increased confidence in the future of this great nation, the future of the US-Mexico relationship, and the future of our hemisphere as a whole.


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**US-Mexico Binational Commission Joint Statement**


Description:    Text of a joint statement, Mexico City, Mexico

Date:           Sep 9, 19919/9/91

Category:       Speeches, Testimony, Statements

Region:         North America

Country:        Mexico, United States

Subject:        Environment, Human Rights, Immigration,
                 Narcotics, Resource Management, Travel

[TEXT]

The ninth meeting of the US-Mexico Binational Commission took place in Mexico City on September 9, 1991.

The two delegations, convinced that their continuing dialogue

contributes to mutual understanding and cooperation, discussed the full bilateral agenda of the Binational Commission. They welcomed the positive spirit of cooperation that has grown increasingly stronger between the two governments in the context of mutual respect for national sovereignty and identity. They agreed that this effective cooperation has resulted in concrete progress in a wide variety of areas that contribute in a meaningful way to improving the quality of their peoples' lives.

During their most recent meeting, in Houston, Presidents Bush and Salinas reaffirmed the significance of the North American Free Trade Agreement as a vehicle for an enhanced quality of life through shared prosperity, and continued progress in economic reform, trade liberalization and development. Both delegations today reaffirmed their conviction that this agreement will symbolize the new dynamism characteristic of their relationship, and the tangible cooperation that underlies it. They emphasized the positive impact that ongoing negotiations towards a North American Free Trade Agreement [NAFTA] have had on prospects for economic growth in Mexico, the United States, and Canada. The delegations agreed that the successful ratification and implementation would result in even stronger growth and will be an important step toward expanded trade throughout the hemisphere.

The two delegations praised the substantial progress achieved on environmental issues, particularly in the development of an integrated environmental plan to address environmental concerns in the border region, as instructed by Presidents Bush and Salinas at the November 1990 Summit.

The delegations expressed satisfaction at the growing coordination and understanding between their governments in anti-narcotics activity. Citing the entry into force of the mutual legal assistance treaty, they emphasized the importance of its prompt and effective implementation. The delegations noted the establishment of the US/Mexico mixed permanent commission on narcotic substances and endorsed the results of its first meeting.

Both delegations supported the strong progress made in labor cooperation under the Joint Cooperative Program and discussed future joint activities in a number of key areas.

The delegations shared their concern about, and condemned, instances of violence on both sides of the border. They reaffirmed their commitment to intensifying efforts to reduce criminality and other causes of violence in the border region. In this context, both noted with satisfaction progress toward enhanced communication and coordination between authorities of the two nations. In keeping with their respective laws, they reviewed steps being taken in both countries to facilitate border crossings and trade so important to communities on both sides of the border. They reviewed with satisfaction the continuing improvements in construction and infra-structure programs at crossing points and emphasized the importance of coordinated planning for future requirements.

The delegations reviewed transportation issues. They agreed to have these topics incorporated into the Binational Commission and to include the respective secretaries in the next commission meeting.

The delegations welcomed the innovative new programs in culture, science, technology, and human resources being launched by the recently formed US-Mexico Commission for Educational and Cultural Exchange.

The two heads of the delegation reviewed the excellent state of bilateral relations between the US and Mexico and consulted on a wide range of international topics of mutual interest. They discussed the benefits of the Enterprise for the Americas Initiative and committed themselves to working for a successful conclusion to the GATT [General Agreement on Tariffs and Trade] Uruguay Round before the end of the year.

Both delegations exchanged views on the international situation in general. They fully endorsed the United Nations' peace efforts in El Salvador, expressing their desire that a definitive cease-fire and settlement can be reached soon on the basis of an agreed plan.

The 1991 US-Mexico Binational Commission Meeting, co-chaired by the US Secretary of State of the United States of America, James A. Baker, III, and the Secretary of Foreign Relations of Mexico, Fernando Solana, was organized in working groups which examined issues in specific areas:

-- The Migration and Consular Affairs Working Group was chaired by Gene McNary, Commissioner of the US Immigration and Naturalization Service and Miguel Limon Rojas, Under Secretary for Population and Migration Services of the Secretariat of Government.

-- The Financial Cooperation Working Group was chaired by Olin Wethington, Assistant Secretary of the US Treasury and Secretary Pedro Aspe of the Mexican Treasury and Public Credit.

-- The Trade and Investment Working Group was co-chaired by Secretary of State James A. Baker, III, and US Trade Representative Carla Hills on the US side, and the Secretary of Commerce and Industrial Development, Jaime Serra Puche and the Secretary of Foreign Relations, Fernando Solana on the Mexican side.

-- The Business Development, Fisheries, and Tourism Working Group was chaired by, respectively, Robert A. Mosbacher, US Secretary of Commerce and Secretary of Commerce and Industrial Development Jaime Serra Puche; by Secretary of Commerce, Robert A. Mosbacher and Mexican Secretary of Fisheries, Guillermo Jimenez Morales; by Secretary of Commerce, Robert A. Mosbacher and Secretary of Tourism, Pedro Joaquin Coldwell.

-- The Agricultural Working Group was chaired by US Secretary of Agriculture, Edward Madigan and Secretary of Agriculture for Mexico, Carlos Hank Gonzalez.

-- The Environmental Working Group was chaired by William Reilly, Administrator of the Environmental Protection Agency and Secretary for Urban Development and Ecology, Patricio Chirinos.

-- The Housing and Urban Development Working Group was chaired by the Secretary for Housing and Urban Development, Jack Kemp and Secretary of Urban Development and Ecology, Patricio

Chirinos.

       -- The Education, Cultural Affairs and Exchanges Working Group was chaired by Henry E. Catto, Director of the United States Information Agency, and Secretary of Education, Manuel Bartlett; and by US Assistant Secretary for Elementary and Secondary Education, John MacDonald and Victor Flores Olea, President of the National Council for Culture and the Arts, and Javier Barros Valero, Under Secretary of the Secretariat of Foreign Relations.

       -- The Labor Working Group was chaired by Deputy Under Secretary for International Labor Affairs, Shellyn McCaffrey and the Deputy Secretary of Labor, Norma Samaniego.

       -- The Legal Affairs and Anti-Narcotics Cooperation Working Group was co-chaired by Secretary of State James A. Baker, III, and Acting Attorney General, William Barr for the United States and the Attorney General of Mexico, Ignacio Morales Lechuga and Secretary for Foreign Relations, Fernando Solana on the Mexican side.

       -- The Border Cooperation Working Group was chaired by Donna Hrinak, US Deputy Assistant Secretary for Mexico and the Caribbean and Under Secretary for Foreign Relations, Sergio Gonzalez Galvez.

       In total, 11 US cabinet members and agency heads and 10 members of the Mexican cabinet participated. The high level of representation reflects the importance both nations attach to their relationship.

       In addition, US and Mexican representatives of their respective Departments of Labor and of Housing and Urban Development participated in new working groups established at this meeting for the first time.

       The expansion in the number of working groups and range of substantive themes treated reflect the mutual interest of both governments in meeting the new challenges of the bilateral and global agenda.

       Following is a more detailed review of the 1991 BNC Working Group discussions.

**Migration and Consular Affairs**

Both governments agreed that Cooperation on Migration and Consular Affairs is outstanding. Both sides noted a significant decrease in instances of alleged mistreatment of their respective citizens. Nevertheless, they both reaffirmed their commitment to satisfactorily conclude investigations of outstanding cases of alleged mistreatment. Positive initiatives by both governments and legal-judicial reforms by the Government of Mexico during the past year are indicative of the continued commitment of both governments to uphold the civil and human rights of individuals.

       Both countries expressed concern over the problems of child custody and child abduction and, in that regard, the US delegation expressed satisfaction to the Mexican delegation on their country's recent accession to the Hague Convention on the civil aspects of

International Child Abduction.

**Financial Cooperation**

The Financial Cooperation Working Group of the US-Mexico
Binational Commission discussed the current economic situation in
both countries.  It noted the remarkable progress of the Mexican
economy, both in terms of controlling inflation and restoring
economic growth.  The delegations also noted with satisfaction the
continuing progress of Mexico's privatization program.

        The representatives of the two governments commended the
progress secured thus far in the negotiation of a bilateral treaty to
avoid double taxation of income.  Following a review of ongoing
cooperative money-laundering control initiatives, the delegates
reaffirmed the commitment of their respective governments to
continued progress in this area.  The delegations noted that their
governments continue to work toward mutually satisfactory
solutions of issues in the areas of taxes and money laundering.
They also expressed their pleasure regarding progress made on
customs cooperation which has facilitated and increased the
bilateral flows of goods and services.

**Trade and Investment**

The delegations began with agreement on the need for a successful
conclusion of the Uruguay Round of international trade negotiations,
and exchanged ideas for reactivating the process.  Regarding the
NAFTA process, both delegations noted the substantial progress
achieved so far in the discussions in identifying issues and
exchanging information, and expressed confidence that the various
negotiating groups would be prepared to move to the negotiating
phase in the fall.  On the bilateral front, they took note of the
successful resolution of trade issues which had surfaced in the
previous year and saluted the cooperative, non-confrontational
manner in which these issues has been resolved.

**Business Development, Fisheries, and Tourism**

Business Development:  Discussions focused on business
development activities, most notably the successful promotion
efforts of the Joint Committee for Investment and Trade (JCIT) over
the past year.  Secretaries Mosbacher and Serra and other senior
trade officials led "Partnership for Growth" Conferences in 19
cities throughout the United States and Mexico, addressing over
three thousand business persons.

        Several business development missions were taken to Mexico
under JCIT auspices, including missions on environmental trade and
investment and on tourism trade and investment.  These missions
were enthusiastically received, generating significant investments
and sales and the potential for future joint ventures and business
leads.  In May 1991, the two secretaries met in Monterrey with US
and Mexican business leaders to discuss prospects for a North
American Free Trade Agreement.

        The delegations reaffirmed their commitment to continue to

promote trade and investment opportunities while NAFTA
negotiations are underway and discussed plans for additional
business development missions in 1991, including a new
environmental mission that will follow up on the successful
pollution control equipment mission of 1990 and a housing and real
estate mission.  The two delegations also agreed to give attention
to additional trade and investment opportunities for US Hispanic
businesses and to cooperate regarding trade data and other
statistical information.

     The increased attention to environmental protection in both
countries was welcomed by the two delegations.  They applauded
plans to establish a US-Mexico environmental business committee
to serve as a forum for technical cooperation, joint business
development activities, and information exchange with the purpose
of assisting small to medium sized Mexican businesses in meeting
environmental standards.  The delegations agreed to discuss this
cooperation on environmental affairs in future meetings of the
Binational Commission.

     Fisheries:  In the area of fisheries, Mexico discussed its
fisheries modernization program and explained the conditions
existing in Mexico to promote investment in fisheries and
aquaculture.  Both delegations expressed their common interest in
continuing cooperation by means of competent international
organizations or bilateral agreements to assure, consistent with
recognized scientific expertise, the reduction or elimination of the
capture of protected marine species during commercial fishing
operation and their decision to seek to resolve differences in this
regard.

     Both delegations examined the subject of development of
multilateral mechanisms for the protection of marine species
during commercial fishing operation and the issue of the application
of commercial sanctions based on environmental objectives.
Discussion on these issues will continue in future meetings.

     Tourism:  The delegations ratified the need to promote
increased tourism between both countries and agreed to move
towards the timely harmonization of tourism statistics, including
tourist and money flows.  They also discussed the need to increase
the scope of the "two-nations vacation" pilot program in other
countries.  The delegations also discussed the launching of a
jointly-funded consumer research study, surface transportation
issues, and tourism investment    seminars.

**Agriculture**

The two secretaries of agriculture were confident that the working
group's deliberations strengthened their mutual understanding and
cooperation in all areas, particularly with regard to the ongoing
NAFTA negotiations.  In this context, they recognized the
importance of exchanging agricultural data in order to have up-to-
date information in this important area.

     They noted the success of efforts to improve cooperation in
the areas of agricultural trade and development; two-way
agricultural trade between 1980 and 1990 rose from $3.5 billion to
more than $5 billion.

Progress similarly continues in identifying and resolving trade issues related to sanitary and phytosanitary restrictions. Since the last BNC meeting, several important issues in these fields have been resolved, including the removal of US restrictions on Mexican citrus imports and Mexican certification of new animal quarantine facilities in the United States.

**Environmental Cooperation**

The United States and Mexico reviewed the full range of activities in the environmental area, along the border, and in Mexico City, highlighting the success of cooperation in this area since the 1990 Binational Commission meeting.  Both sides emphasized their commitment to continued environmental cooperation.

Special attention was given to the progress being made in developing an integrated border environmental plan to address environmental concerns in the border region.  The delegation leaders agreed to a schedule of hearings on both sides of the border in order to obtain public input to the plan.  This will enable the two agencies to take views of the general public into account prior to completion of the plan, as instructed by the two Presidents at the November 1990 summit.

Both sides noted the success of efforts through the International Boundary and Water Commission (IBWC) to abate water pollution problems along the border.  At the BNC meeting, the two delegations agreed to continue to pursue the goal of effective protection of transboundary water resources.  The two delegations also reviewed cooperative activities under the 1989 Mexico City Environment Agreement, aimed at addressing environmental issues in the Mexico City region.  Mexico's recent accession to the convention for the International Trade in Endangered Species was welcomed as an important conservation measure.

**Housing and Urban Development**

The delegations agreed to strengthen their working relationship within the framework of the 1979 US-Mexico Agreement on Housing and Urban Development.

They also agreed to explore new ways to exchange information on housing stocks and on how to assist their citizens through social organization, the encouragement of private sector initiatives, and new methods of financing which would strengthen cooperation among those seeking housing.  These new approaches will be particularly relevant to reactivating cooperation in the areas of housing and urban development in the border region.  The first border meeting in this new phase of the Bilateral Agreement is under consideration for early 1992 and would involve local and state officials as well as representatives of private business organization and community associations.

**Education, Cultural Affairs, and Exchanges**

The two delegations expressed their satisfaction over programs

recently developed in the areas of educational and cultural
cooperation.  They were particularly pleased by advances associated
with the Memorandum of Understanding on Education and the
recently inaugurated US-Mexico Commission for Educational and
Cultural Exchange.  Both sides expressed their agreement to explore
forms of scientific cooperation based on programs that will be
established at a later date.

        With activities scheduled for 1992-93, was examined [stet].
This Annex is expected to be signed by the two secretaries of
education during the Border Educators' Conference.

        Discussions focused as well on advances achieved by the US-
Mexico Commission for Educational and Cultural Exchange that have
helped create a binational mechanism for financing scholarships and
educational and cultural exchange programs.  These developments,
representing public and private sector cooperation, have led to
initiatives establishing a new "Fund for Culture" and a debt
conversion program in science, technology, and human resources.
Both sides expressed their agreement to explore forms of scientific
cooperation based on programs that will be established at a later
date.

        The delegations took note of sustained increases in cultural
and educational exchange that, in recent months, have given these
activities a high profile in the spectrum of priority bilateral
affairs.  The working group examined the possibilities for enhanced
cooperation in the area of educational exchange in North America.

        At the same time, the working group established a framework
for additional collaboration in various areas of artistic and cultural
activity; notably strengthened communication and consultations on
library, museum, and publishing issues.  Progress also is being
achieved in promoting exhibitions and musical performances, by
distinguished orchestral groups and by soloists.  Special attention
was paid to the presentation in the United States of "Mexico:
Splendors of Thirty Centuries" as well as to the parallel
programming that has accompanied this successful exhibition.  Note
was taken as well of the numerous US artistic and cultural
exhibitions that have been presented in Mexico, especially the major
retrospective of Robert Motherwell's work which opens tonight
[Sept. 9, 1991] at the Rufino Tamayo Museum in Mexico City.

**Labor**


The labor working group noted with satisfaction the progress made
since the inception of their joint cooperative program.  The
establishment of a labor working group within the Binational
Commission was agreed to at the April 26 Coordinating Committee
Meeting of the BNC and a Memorandum of Understanding [MOU]
regarding cooperation was signed May 3.  At the September 9
meeting, activities under the MOU were reviewed, particularly those
related to occupational health and safety and to child labor,
productivity, on-the-job training, and labor statistics.  The
chairpersons reiterated their commitment to the joint cooperative
program already underway and agreed to undertake additional
activities related to the informal sector, comparative labor
relations systems and cooperative credit institutions for workers.

**Law Enforcement and Anti-Narcotics Cooperation**


The working group noted the increased cooperation between the two
nations in anti-narcotics investigations and noted with satisfaction
the success of the second Binational Prosecutors Conference held in
late January in Tucson, Arizona.  Arrangements were confirmed for
the third Binational Prosecutors Conference to be held in Mexico
later this fall and the importance of prompt and effective
implementation of the Mutual Legal Assistance Treaty was
emphasized.  The group confirmed the intent of the two governments
to cooperate on matters of money laundering and asset forfeiture
and renewed their commitment to seek prompt extradition and/or
domestic prosecution of fugitives from justice in both countries.
They applauded the establishment of the US/Mexico Mixed
Permanent Commission on Cooperation Against Narcotics
Trafficking and Drug Dependency and endorsed the accomplishments
of the Commission in enhancing counter-narcotics cooperation
between the two countries.

**Border Cooperation**


The group noted that two new international bridges were opened
during the year, construction began on a third one, and the
Binational Committee on Bridges and Border Crossings announced
approval by both governments of new land crossings projects.  Also,
the group noted that it has under consideration several projects and
proposals for new ports along the border.  In addition to the new
crossings, both countries are developing new techniques and
procedures to expedite the inspection process which at times
causes delays at certain crossings.

        The International Boundary and Water Commission [IBWC] is
nearing completion of its Nogales Expansion Project and has begun
work on the Nuevo Laredo and Tijuana sewage collection/treatment
projects.  Regarding the pollution of the New river in the
Mexicali/Calexico area, the IBWC reports that it is intensively
continuing technical discussions with the goal of signing during
1991 a Conceptual Minute Agreement for the long-term solution of
this border sanitation problem.

        Both delegations expressed their support for the annual
border
governors and border mayors conferences which supplement federal
efforts at increasing trade, tourism and other cross-border
activities.

        The delegations agreed that the IBWC will begin bilateral
testing of new and sturdier boundary markers at the Otay Mesa and
Mexicali/Imperial Valley sections of the border.

        At the conclusion of the Binational Commission meeting, the
delegations declared their satisfaction at the progress attained and
agreed to hold the tenth meeting of the commission in the United
States on a date in 1992 yet to be determined. (###)

**Background:  US-Mexico Binational Commission**

Former Presidents Ronald Reagan and Jose Lopez Portillo
established the US-Mexico Binational Commission when the Mexican
President visited Washington on June 9, 1981.  It serves as a forum
for regular meetings among cabinet-level officials from both
countries and is chaired by the US Secretary of State and the
Mexican Secretary of Foreign Relations.

        The Binational Commission normally meets once a year.
These
meetings are valued by both sides   as action-generating events
which, along with regular US-Mexico presidential summits, sustain
momentum toward mutual policy objectives.  They also demonstrate
the importance each country attaches to bilateral relations. (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:

**The US and Senegal:  Sharing A Common Commitment to Peace**


Bush, Diouf

Source:          President Bush, Senegal President Diouf

Description:      Remarks at a White House arrival ceremony, Washington,
                  DC

Date:            Sep 10, 19919/10/91

Category:        Speeches, Testimony, Statements

Region:          Subsaharan Africa, MidEast/North Africa

Country:         Senegal

Subject:         Democratization, Military Affairs

[TEXT]

**President Bush:**
 To President and Mrs. Diouf, ladies
and gentlemen, a sincere welcome.  On behalf of the United States
of America--long known for its fidelity to freedom and human
dignity--I am honored to welcome President Diouf, the President of
a nation which so clearly echoes those beliefs.

        A Senegalese proverb says:  "Misunderstandings don't exist;
only the failure to communicate exists."

        Mr. President, because you have communicated to the world
what Senegal embodies, there can be no misunderstanding about the
ideals and aspirations that link our two societies and peoples.

        For those who follow Senegalese history, it is obvious why
Senegal has become one of our closest friends in Africa.

        Ever since its independence in 1960, Senegal has adhered to

the principles of a democratic political system.  Your robust free
press can publish the full spectrum of political thought and opinion.
Like us, you have an independent judiciary--vital to any government
which operates by the rule of law.  And let me mention, too, your
enviable record in the field of human rights.

        These facts, of course, could describe, we think, our country,
the United States of America.  We both share a fundamental
commitment to the peaceful solution of conflicts.  We both believe
in the inalienable rights of all.  In Senegal it's said, "Man is the best
cure for his own ills."  Well, Mr. President, the whole world has
begun to vanquish the ills of tyranny and totalitarianism.  Bayonets
and barbed wire cannot conquer man's yearning to be free.

        Last year at this time, Senegal was preparing to send 500
soldiers to the Gulf to participate in Operation Desert Shield.
Shortly after the end of Operation Desert Storm, a tragic plane
crash in Saudi Arabia claimed the lives of 93 of those brave
Senegalese soldiers as they returned to their base near the Gulf
after a pilgrimage to Mecca.  So Senegal paid proportionately the
highest price of any coalition partner in freeing Kuwait from naked
aggression.

        We mourn your lost countrymen, but know that they died for
the noblest cause of all--the unstoppable tide of freedom that today
is changing history swiftly, dramatically.  Future generations will
look to our age and say:  "Here--here, in the 1990s--began the new
world order."

        And thus, we welcome not only an old and dear friend to
Washington, but a friend who shares our values, who will fight for
freedom, and who has a deep appreciation and respect for the
American way of life.  Mr. President, just as your people love
America, so does America love the nation of your birth.  God bless
you and Senegal and the United States of America.  And once again,
welcome to our shores.

**President Abdou Diouf:**
  Mr. President, the words of
welcome you have just spoken are those of a true friend.  I was
deeply moved by them and by the warmth of this beautiful ceremony.
Allow me, therefore, at the very outset to express heartfelt thanks
to you on behalf of my wife and on my own and that of the
delegation accompanying me.

        Mr. President and dear friend, Madam Bush, your excellencies,
ladies and gentlemen:  This is the third time in the space of 2 years
that I find myself in this great and beautiful country.  This time,
however, my visit is of special significance.  To begin with, it is my
first state visit and the second one by a Senegalese president.  It is
also significant because it takes place in the background of a
particular international setting marked by the end of an era and the
heralding of a new order on which we Senegalese and Americans are
pinning equal hopes.  Add to this the fact that, with the
strengthening of the Senegalese democracy, our approach becomes
more identical to yours, and this in turn makes your model more
appealing to us.

        Lastly, I note that, since the end of the Gulf war, I am the
first African president to be received on a state visit by your

country.  I fully appreciate the significance of this gesture, and I
should like to express my gratitude for the thoughtful
demonstration of friendship toward me and my country.

        At this juncture I should like to dedicate my profound
thoughts to the worthy sons of America fallen on the field of honor.
As my country suffered the loss of 93 soldiers in Saudi Arabia, I
can well appreciate the grief of those who lost their loved ones and
to whom I should like to offer once again my condolences.  We can
take comfort in the fact that their sacrifice has not been in vain,
for despite the Gulf war and its aftermath, despite the institutional
tremors that have shaken the Soviet Union over the past few weeks,
the international atmosphere is, happily, one of detente which our
peoples long for.

        The progress made in arms reduction with the signing of the
START [Strategic Arms Reduction Talks] Treaty, following the
adoption of the Paris Charter for a new Europe, the triumph of
democratic demands across the world and particularly in Africa, the
dismantling of the legal basis of apartheid--we still have to draw
inferences from it--are all encouraging signs as we approach the
end of the 20th century.

        Indeed, never before in the history of mankind has the sound
of freedom resounded so loudly and so far and wide.  Never have
freedom and peace combined so harmoniously for so many human
beings and peoples.  Yet, this is no permanent achievement.  Quite
the contrary, it is frail because of the major challenge that is still
confronting us--poverty.  This is a challenge to us all.  Mr.
President, I know that this cause is so dear to your heart.  I know
and I appreciate the efforts your government is making to face up to
it.

        Africa, which had apprehended that it would be marginalized
to the benefit of the countries of Eastern Europe, is now resolutely
committed to the fight for integration--a must for its development.
The adoption and signing at the June 1991 OAU [Organization for
African Unity] summit of the treaty establishing the African
Economic Community is a clear manifestation of this commitment.
In my capacity as the current Chairman of the ECOWAS [Economic
Community of West African States], I will leave no stone unturned
to translate that commitment into concrete achievements within
our subregion.  I am confident that countries like yours, together
with international institutions which have always been by our side,
will support us in our endeavors.

        Mr. President, I cannot end without expressing once again my
thanks for the warmth of your welcome, without renewing my
determination to continue striving with you for the triumph of our
common values and ideals for the greater well-being of all men and
the whole of mankind.  I hope that our efforts to that end will be
successful and I express my most sincere wishes for your and your
family's good health and happiness, and for the sustained prosperity
of the friendly American people. (###)

US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
## US Deplores Liberia-Sierra Leone Border Clashes

Tutwiler

Source:          State Department Spokesman Margaret Tutwiler

Description:     Washington, DC

Date:            Sep 6, 19919/6/91

Category:        Speeches, Testimony, Statements

Region:          Subsaharan Africa

Country:         Sierra Leone, Liberia

Subject:         Military Affairs, Regional/Civil Unrest

[TEXT]

The US Government opposes and deplores all armed incursions
across the Liberia-Sierra Leone border from either side.
Allegations that the US supports factions engaging in such
provocations are absurd.  Cross-border conflict is a threat to
regional stability and counterproductive to the cause of peace in
Liberia.  Violence cannot resolve the crisis in Liberia, and those
who resort to violence place the peace process and their own
credibility at risk.  The people of Liberia have already suffered
enough.  Restraint is especially critical now, as preparations for
the upcoming round of negotiations     in Yamoussoukro [Cote
d'Ivoire] proceed. (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
## US-Senegal:  A Special Relationship

Cohen

Source:          Heman J. Cohen, Assistant Secretary for African
                  Affairs

Description:     Excerpts from a briefing by Assistant Secretary for
                  African Affairs Herman J. Cohen on the meeting between
                  President Bush and President Diouf, the White House,
                  Washington, DC

Date:            Sep 10, 19919/10/91

Category:        Speeches, Testimony, Statements

Region:          Subsaharan Africa, MidEast/North Africa

Country:          Senegal

Subject:          Military Affairs

[TEXT]

President Abdou Diouf of Senegal is in the United States for a state
visit.  Today is the first day of a 3-day visit, and the first event
was a meeting with President Bush.  During the meeting, President
Bush expressed his appreciation for Senegal's cooperation in the
Gulf during the war.  He characterized the Senegalese participation
in Desert Shield and Desert Storm as a deep and serious
commitment to peace, freedom, and liberty in the world.

        President Bush also wanted to highlight, during this visit,
Senegal's commitment to democracy as one of the few multi-party
democracies in Africa today.  And President Bush also said that in
Africa there is a special relationship between the United States and
Senegal, and we are generally on the same wavelength on most
issues.  President Diouf congratulated President Bush for the vigor
and intelligence with which he led the world during the crisis in the
Gulf.  He agreed with President Bush's characterization of the
relationship as being excellent.  In the context of the bilateral
relationship, President Bush announced that we are forgiving $42
million worth of debt which Senegal incurred in the purchase of
agricultural commodities under Public Law 480 in previous years.
President Diouf expressed great appreciation for that
announcement.

        In connection with that, President Diouf said that Senegal
will continue its commitment to a free market system and to
structural economic reform.  There was a lengthy discussion on the
crisis in Liberia.  President Bush asked President Diouf for his
analysis.  President Diouf said it is a heartbreaking situation.  As
President of the Economic Community of West African States--
ECOWAS--President Diouf said this crisis has gone on much too
long; that action must be taken to bring it to a closure as soon as
possible; and that solution in Liberia can only be a democratic one.
And the first step is the silencing of the weapons.  He said that
there will be a meeting in Cote d'Ivoire on September 16 to work
out a solution.  And he assured President Bush that they would not
close that meeting until they've reached an agreement leading to the
disarmament of the parties and the holding of a democratic election
within 6 months in Liberia.

        President Diouf said if it would be useful, Senegal would be
willing to send troops to join the ECOWAS forces already there.  If
that would give a sense of confidence to the various parties, they
would be glad to make a troop  commitment....(###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**Country Profile:  Senegal**


Date:          Sep 16, 19919/16/91

```
Category:        Country Data

Region:          Subsaharan Africa

Country:         Senegal

Subject:         History, Trade/Economics

Official Name:   Republic of Senegal
```

**Geography**

Area: 196,840 sq. km. (76,000 sq. mi.); about the size of South
Dakota.
Cities: Capital--Dakar. Other cities--Thies, Kaolack, Saint-Louis,
Ziguinchor.
Terrain: Flat or rising to foothills.
Climate: Tropical/Sahelian--desert or grasslands in the north,
heavier vegetation in the south and southeast.

**People**

Nationality: Noun and adjective--Senegalese (sing. and pl.).
Population (est. 1990): 7 million.
Annual growth rate: 3%.
Ethnic groups: Wolof 43%, Fulani (Peulh) and Toucouleur 23%, Serer
15%, Diola, Mandingo, and others 19%.
Religions: Muslim 94%, Christian 5%, traditional 1%.
Languages: French (official), Wolof, Pulaar, Diola, Mandingo.
Education: Attendance--primary 60%, secondary 15%. Literacy--
28%.
Health: Infant mortality rate--78/1,000. Life expectancy--48 yrs.
Work force (3.4 million, 1989): Agriculture--70% (subsistence or
cash crops). Wage earners (250,000)--private sector 40%,
government and parastatal 60%.

**Government**

Type: Republic.
Independence: April 4, 1960.
Constitution: March 3, 1963, last revised 1984.
Branches: Executive--president (chief of state, commander in chief
of armed forces). Legislative--unicameral National Assembly
(single chamber with 120 deputies). Judicial--Supreme Court
(appointed by the president from sitting magistrates.)
Administrative subdivisions: 10 regions, 30 departments, 95
arrondissements.
Political parties: 17 political parties are registered; major parties
include the Socialist Party (PS), the Democratic Party of Senegal
(PDS), the People's Liberation Party (PLP), the Democratic
League/Movement for a Labor Party (LD/MPT), and the Independence
and Labor Party (PIT).
Suffrage: Universal at 21.
Defense (1989): $95.9 million.
Flag: Three vertical bands--green, yellow, red, with a green star
centered in the yellow band.

**Economy**

GDP (1989): $4.9 billion.
Annual growth rate: 6%.
Per capita GDP (1988): $630.
Inflation rate (1989): 2%.
Natural resources: Fish, phosphate.
Agriculture (22% of GDP): Products--peanuts, millet, sorghum,
manioc, rice, cotton.
Industry (24% of GDP): Types--fishing, agricultural product
processing, light manufacturing, mining.
Trade (1989): Exports--$778 million: seafood, peanut products,
phosphate rock. Major markets--France, other EC, US, Communaute
Financiere Africaine (CFA) zone. Imports-- $987 million: food,
consumer goods, petroleum, machinery, transport equipment. Major
suppliers--France, Nigeria, Algeria, Thailand, US.
Economic aid received (1988): $566 million from all sources, ($32
million from the US in 1989).

**Membership in International Organizations**

UN and some of its specialized and related agencies, Non-Aligned
Movement, Organization of the Islamic Conference (OIC),
Organization of African Unity (OAU), West African Monetary Union,
Interstate Committee to Combat the Sahel Drought (CILSS),
Economic Community of West African States (ECOWAS), West
African Economic Community (CEAO), Senegal River Development
Organization (OMVS), Gambia River Development Organization
(OMVG). (###)

**Regional Importance**

Former President Senghor advocated dialogue between nations and
believed negotiation and compromise to be the best means of
resolving international differences. To a large extent, President
Diouf has continued this policy. Senegal has traditionally supported
functional integration among French-speaking West African states
through the West African Economic Community. (###)


US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**Protecting the Antarctic Environment**


Date:         Sep 16, 19919/16/91

Category:     Fact Sheets

Region:       Polar Regions

Country:      Antarctica

Subject:        Environment, Resource Management,
                Science/Technology, International Law

[TEXT]

The United States is committed to protecting the Antarctic
environment and ensuring that human activities do not compromise
the opportunities this unique area offers for scientific research.
This commitment is a fundamental element of US-Antarctic policy
and complements our objective of maintaining Antarctica as a zone
for peaceful activity.  This also has been the primary goal of the
Antarctic Treaty since it entered into effect 30 years ago.  In an
effort to improve the protection of the Antarctic environment,
parties to the Antarctic Treaty, including the United States, have
recently completed negotiation of the Protocol on Environmental
Protection to the Antarctic Treaty which will provide further
environmental safeguards.

**The Antarctic Treaty System**


The Antarctic Treaty is open to any member of the United Nations
and provides the necessary international framework, consistent
with the UN Charter, to manage human activities in Antarctica.
Environmental protection is a priority issue at the Antarctic Treaty
Consultative Meetings open to the 26 Antarctic Treaty Consultative
parties as well as 14 treaty parties that attend as observers.
These meetings have led to a wide range of environmental
protection measures, which have elaborated the provisions of the
treaty and deal with new activities and circumstances, as well as
separate international agreements.

**Protocol on Environmental Protection**


A major addition to the Antarctic Treaty system will be the
Protocol on Environmental Protection to the Antarctic Treaty that
resulted from negotiations launched in 1990.  President Bush
announced on July 3, 1991, that the US  would sign the new protocol.
It builds upon the Antarctic Treaty and provides for improved
environmental protection measures that can be strengthened in the
future. In October 1991, Consultative Parties are expected to sign
the protocol in Madrid.  It sets forth basic principles on the
protection of the Antarctic environment, establishes an advisory
body, and provides for a system of annexes to incorporate detailed
mandatory rules for environmental protection.  The annexes
establish legally binding measures on the conservation of Antarctic
fauna and flora, waste disposal, marine pollution, and
environmental impact assessment procedures which will be subject
to compulsory and binding dispute settlement.  Future annexes could
be added following entry into force of the protocol.

        Except for scientific research, the protocol prohibits any
activities relating to Antarctic mineral resources  and provides
that this prohibition can be reviewed at any time after 50 years
following entry into force of the protocol.

**Conservation Issues**

The new protocol will complement the existing far-reaching agreements within the Treaty system to conserve living species in Antarctica. The 1964 Agreed Measures for the Conservation of Antarctic Fauna and Flora prohibits (except for scientific purposes) the taking of plants, birds and marine mammals native to the continent and establishes a system of specially protected areas in which human access is strictly limited. These measures are updated and strengthened in the protocol's annex on the conservation of flora and fauna.

There are also two other international treaties which address conservation issues. The 1980 Convention on the Conservation of Antarctic Marine Living Resources applies an innovative ecosystem approach to conservation. The parties (26 nations and the European Community) have made significant progress in understanding the interrelationships and population dynamics of the species found in Antarctic waters and in their protection and conservation. They have placed major restrictions upon commercial fisheries, including catch quotas, gear regulation, and area and seasonal closures, as well as a system of inspection of fishing vessels at sea. In addition, 14 countries are party to the 1972 Convention on the Conservation of Antarctic Seals, which provides a means for protecting seal populations from harvesting.

**Next Steps**

The Antarctic Treaty system incorporates a dynamic network of measures to protect the Antarctic environment. The successful negotiation and anticipated signing of the environmental protocol in 1991 testifies to the success of this system. Pending entry into force of the protocol, the United States will strive for early implementation of its stringent environmental measures.(###)

US Department of State Dispatch,
Vol 2, No 37, September 16, 1991

Title:
**Economic Policy Coordination:  The G-7 and the Dollar**

Date:          Sep 16, 19919/16/91

Category:      Fact Sheets

Region:        North America, Europe, East Asia

Country:       Japan, United States, Canada, United Kingdom,
                Italy, Germany

Subject:       Trade/Economics

[TEXT]

**Background**

Leaders of the seven largest industrialized democracies (United States, Japan, Germany, France, United Kingdom, Italy, and Canada) have met annually since 1975 to address global issues of common concern and to develop cooperative economic and political approaches.  These Group of Seven (G-7) summit meetings reflect a heightened recognition of the need for close cooperation as a result of the growing integration of the world economy and the globalization of financial markets.

Since 1985, more formal arrangements for the coordination of economic policies have been developed involving regular meetings of the finance ministers and central bank governors of the G-7 countries.  G-7 meetings are designed to foster more consistent and compatible economic policies and performance among the participants to achieve shared objectives of sustained global growth with low inflation, reduced trade imbalances, and greater exchange market flexibility.

**Plaza and Louvre Accords**

The divergence of economic policies and performance among the major industrial countries from 1982 to 1985 led to a sharp rise in the US dollar and the emergence of substantial trade imbalances. The US current account position went from rough balance to a deficit of more than $100 billion during this period, with faster growth in the United States than in most other major countries contributing to this outcome.

In September 1985, then-Treasury Secretary James A. Baker, III, and his counterparts from Japan, Germany, France, and the United Kingdom met as the Group of Five (G-5) at the Plaza Hotel in New York.  They agreed on coordinated economic and exchange rate policies to reduce global trade imbalances and to achieve a substantial depreciation of the US dollar, thereby bringing currency values more in line with fundamental economic realities.  The ensuing broad-based decline of the dollar indicates that coordination among the largest economies can have a potent effect on the international economy and currency markets.

At a February 1987 meeting at the Louvre in Paris, the G-7 agreed on specific policy commitments to improve global growth and reduce trade imbalances.  The substantial exchange rate changes that had occurred since the Plaza accord had brought currencies within ranges broadly consistent with economic fundamentals.  The group agreed to cooperate closely to foster stability of exchange rates around prevailing levels.

**Recent Developments**

The dramatic events of the past 2 years, including the changes in the Soviet Union, the move toward market-based economic systems in Eastern Europe, and the Persian Gulf crisis and its aftermath have posed many challenges to the G-7 countries.  External imbalances have lessened significantly, particularly in the United States.  Exchange rates sometimes have fluctuated significantly, as should be expected when economic fundamentals are changing so rapidly.  In this environment, the G-7 framework has provided an important forum for addressing challenges in a coordinated fashion.

**Milestones in the Coordination Process**

The coordination process has developed gradually in recent years
and is now an accepted feature of the international economy.
Milestones (in addition to the Plaza and Louvre accords) include:

      Tokyo Summit (May 1986).  Agreement was reached to
establish a framework for multilateral surveillance of economic
policies with economic indicators.  The G-7 was formed to conduct
the coordination effort, with the Managing Director of the
International Monetary Fund invited to participate.

      December 1987 Statement.  After the October 1987 stock
market crash, the G-7 agreed on coordinated monetary and fiscal
measures to sustain global growth, continue external adjustments,
and prevent a further decline of the    dollar.

      April 1988 Statement.  The G-7 agreed to use a commodity
price indicator as an additional economic measuring tool in the
surveillance and policy coordination process.

      September 1989 Statement.  The G-7 said that the rise in the
dollar that had occurred recently was inconsistent with long-run
economic fundamentals and would be resisted.  In 1989, G-7
countries used net interventions of more than $60 billion to limit
the dollar's rise. (###)

# Exhibit L



**Overview of the Enemy**

*Staff Statement No. 15*

Members of the Commission, with your help, your staff has developed initial findings to present to the public on the nature of the enemy that carried out the September 11 attacks. In this statement, we will focus on al Qaeda's history and evolution, and how this organization came to pose such a serious threat to the United States. These findings may help frame some of the issues for this hearing and inform the development of your judgments and recommendations.

This report reflects the results of our work so far. We remain ready to revise our understanding of events as our investigation progresses. This staff statement represents the collective effort of a number of members of our staff. Douglas MacEachin, Yoel Tobin, Nicole Grandrimo, Sarah Linden, Thomas Dowling, John Roth, Douglas Greenburg, and Serena Wille did much of the investigative work reflected in this statement.

We were fortunate in being able to build upon a great deal of excellent work already done by the Intelligence Community. Several Executive branch agencies cooperated fully in making available documents and personnel for interviews.

**Roots of al Qaeda**

In the 1980s a large number of Muslims from the Middle East traveled to Afghanistan to join the Afghan people's war against the Soviet Union, which had invaded in 1979. Usama Bin Ladin was a significant player in this group, then known as the "Afghan Arabs." A multimillionaire from a wealthy Saudi family, Bin Ladin used his personal wealth and connections to rich Arab contributors to facilitate the flow of fighters into Afghanistan.

He provided extensive financing for an entity called the "Bureau of Services" or Maktab al Khidmat. This Bureau operated a recruiting network in Muslim communities throughout the Middle East, Southeast Asia, Western Europe, and the United States. It provided travel funds and guest houses in Pakistan for recruits and volunteers on the road to the Afghan battlefield. Bin Ladin also used his financial network to set up training camps and procure weapons and supplies for Arab fighters. Major Afghan warlords who led forces in the battle against the Soviets also benefited from the use of these camps.

Following the defeat of the Soviets in the late 1980s, Bin Ladin formed an organization called "The Foundation" or al Qaeda.  Al Qaeda was intended to serve as a foundation upon which to build a global Islamic army.

In 1989, the regime in Sudan, run by a military faction and an Islamic extremist organization called the National Islamic Front, invited Bin Ladin to move there.  He sent an advance team to Sudan in 1990 and moved there in mid-1991.  Bin Ladin brought resources to Sudan, building roads and helping finance the government's war against separatists in the south.  In return, he received permission to establish commercial enterprises and an operational infrastructure to support terrorism.

By 1992, Bin Ladin was focused on attacking the United States.  He argued that other extremists, aimed at local rulers or Israel, had not gone far enough; they had not attacked what he called "the head of the snake," the United States.  He charged that the United States, in addition to backing Israel, kept in power repressive Arab regimes not true to Islam.  He also excoriated the continued presence of U.S. military forces in Saudi Arabia after the Gulf War as a defilement of holy Muslim land.

In Sudan, Bin Ladin built upon the al Qaeda organization he had established back in Afghanistan.  Al Qaeda had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts—purportedly grounded in Islamic law—to justify al Qaeda actions.



Included in the structure were:

--      The *"Shura"* or *Advisory Council*, an inner circle of Bin Ladin's close associates, most of whom had longstanding ties with him going back to the formative days in Afghanistan;

--       A *"Sharia"* and *Political Committee* responsible for issuing *fatwas*—edicts
         purporting to be grounded in Islamic Law directing or authorizing certain
         actions—including deadly attacks;

--       A *Military Committee* responsible for proposing targets, gathering ideas for and
         supporting operations, and managing training camps;

--       A *Finance Committee* responsible for fundraising and budgetary support for
         training camps, housing costs, living expenses, travel, and the movement of
         money allocated to operations;

--       A *Foreign Purchases Committee* responsible for acquiring weapons, explosives,
         and technical equipment;

--       A *Security Committee* responsible for physical protection, intelligence collection
         and counterintelligence; and

--       An *Information Committee* in charge of propaganda**.**

This organizational structure should not be read as defining a hierarchical chain of
command for specific terrorist operations.  It served as a means for coordinating
functions and providing material support to operations.  But once a specific operation was
decided upon it would be assigned to a carefully selected clandestine cell, headed by a
senior al Qaeda operative who reported personally to Bin Ladin.

With al Qaeda as its foundation, Bin Ladin sought to build a broader Islamic army that
also included terrorist groups from Egypt, Libya, Algeria, Saudi Arabia and Oman,
Tunisia, Jordan, Iraq, Lebanon, Morocco, Somalia, and Eritrea.  Not all groups from
these states agreed to join, but at least one from each did. With a multinational council
intended to promote common goals, coordinate targeting, and authorize asset sharing for
terrorist operations, this Islamic force represented a new level of collaboration among
diverse terrorist groups.

Bin Ladin set up training camps and weapons and supply depots in Sudan.  He used them
to support al Qaeda and other members of the Islamic army.  Bin Ladin's operatives used
positions in his businesses as cover to acquire weapons, explosives, and technical
equipment such as surveillance devices.  To facilitate these activities, Sudanese
intelligence officers provided false passports and shipping documents.  At this time al
Qaeda's operational role was mainly to provide funds, training, and weapons for attacks
carried out by allied groups.

Contrary to popular understanding, Bin Ladin did not fund al Qaeda through a personal
fortune and a network of businesses.  Instead, al Qaeda relied primarily on a fundraising
network developed over time.  Bin Ladin never received a $300 million inheritance.
From about 1970 until approximately 1994, he received about $1 million per year—a
significant sum, but hardly a $300 million fortune that could be used to fund a global

jihad.  According to Saudi officials and representatives of the Bin Ladin family, Bin Ladin was divested of his share of his family's wealth.  Bin Ladin owned a number of businesses and other assets in Sudan, although most were small or not economically viable.

**Launching Attacks on the United States**

A December 1992 explosion outside two hotels in Aden, Yemen—a stopover for U.S. troops en route to Somalia—killed one Australian tourist but no Americans.  U.S. intelligence would learn four years later that the attack was carried out by a Yemeni terrorist group whose leader was close to Bin Ladin, and whose members reportedly trained at a Bin Ladin-funded camp in Sudan that was run by a member of the al Qaeda Military Committee.

In October 1993, two Black Hawk helicopters were shot down and 18 U.S. soldiers were killed in Mogadishu, Somalia.  U.S. intelligence learned in the ensuing years that Bin Ladin's organization had been heavily engaged in assisting warlords who attacked U.S. forces in Somalia.  The head of the al Qaeda Military Committee, from a command center set up in Nairobi, Kenya, reportedly sent scores of trainers into Somalia, including experts in the use of rocket propelled grenades, the same kind of weapon used to shoot down the helicopters.  Operatives dispatched to Somalia were told their mission was "to kill U.S. troops, incite violence against U.S. personnel, and undermine the success of the U.S. mission."  Sources have described several of these operatives bragging that their work had caused the defeat of the Americans.  Bin Ladin and his senior associates touted the subsequent withdrawal of U.S. forces from Somalia in March 1994 as a victory for the mujahidin and a demonstration that the Americans could be forced to retreat.

Two additional attacks on U.S. forces in Saudi Arabia took place during 1995-96 for which the evidence of Bin Ladin's involvement is ambiguous.

On November 13, 1995, a car bomb exploded in Riyadh outside the Office of Program Management of the U.S.-trained Saudi Arabian National Guard.  Five Americans and two officials from India were killed.  Saudi authorities arrested four suspects, whom they quickly convicted and beheaded.  The Saudis televised confessions of three perpetrators indicating that their actions had been influenced by Bin Ladin, but there was no charge that Bin Ladin was directly involved.  Later, in a March 1997 CNN interview, Bin Ladin denied responsibility for the attack but said he was sorry he had not been a participant.

By this time U.S. intelligence learned that a year-and-a-half before the bombing of the Saudi National Guard facility, al Qaeda leaders and members of other aligned groups had decided to attack U.S. targets in Saudi Arabia and directed a team to ship explosives there.  The shipment was a case study in collaboration:  Bin Ladin supplied the money for purchasing the explosives; the Sudanese Ministry of Defense served as the conduit for bringing them into Sudan; they were stored briefly in the warehouse of one of Bin Ladin's business facilities; transported in a Bin Ladin company truck under the cover of Ministry of Defense invoice papers; moved to a warehouse provided by the Ministry of

Defense at Port Sudan on the Red Sea; and then transported on a Bin Ladin-owned boat to Islamic army operatives residing in Yemen. From there they were moved by land to the eastern part of Saudi Arabia. Bin Ladin and his organization's role in this attack remains unclear. The attack, however, was consistent with the described purpose of the shipment.

On June 26, 1996, an explosion ripped through a building in the Khobar Towers apartment complex housing U.S. Air Force personnel in Dhahran, Saudi Arabia. Nineteen Americans were killed and 372 others were injured. Subsequent investigation concluded that the attack had been carried out by a Saudi Shia Hezbollah group with assistance from Iran. Intelligence obtained shortly after the bombing, however, also supported suspicions of Bin Ladin's involvement. There were reports in the months preceding the attack that Bin Ladin was seeking to facilitate a shipment of explosives, to Saudi Arabia. On the day of the attack, Bin Ladin was congratulated by other members of the Islamic army.

In light of the historical animosity between Shia and Sunni Muslims, the confirmation of the Hezbollah role in the attack led many to conclude that Bin Ladin's Sunni-populated organization would not have been involved. Later intelligence, however, showed far greater potential for collaboration between Hezbollah and al Qaeda than many had previously thought. A few years before the attack, Bin Ladin's representatives and Iranian officials had discussed putting aside Shia-Sunni divisions to cooperate against the common enemy. A small group of al Qaeda operatives subsequently traveled to Iran and Hezbollah camps in Lebanon for training in explosives, intelligence and security. Bin Laden reportedly showed particular interest in Hezbollah's truck bombing tactics in Lebanon in 1983 that had killed 241 U.S. Marines. We have seen strong but indirect evidence that his organization did in fact play some as yet unknown role in the Khobar attack.

Bin Ladin also explored possible cooperation with Iraq during his time in Sudan, despite his opposition to Hussein's secular regime. Bin Ladin had in fact at one time sponsored anti-Saddam Islamists in Iraqi Kurdistan. The Sudanese, to protect their own ties with Iraq, reportedly persuaded Bin Ladin to cease this support and arranged for contacts between Iraq and al Qaeda. A senior Iraqi intelligence officer reportedly made three visits to Sudan, finally meeting Bin Ladin in 1994. Bin Ladin is said to have requested space to establish training camps, as well as assistance in procuring weapons, but Iraq apparently never responded. There have been reports that contacts between Iraq and al Qaeda also occurred after Bin Ladin had returned to Afghanistan, but they do not appear to have resulted in a collaborative relationship. Two senior Bin Ladin associates have adamantly denied that any ties existed between al Qaeda and Iraq. We have no credible evidence that Iraq and al Qaeda cooperated on attacks against the United States.

Whether Bin Ladin and his organization had roles in the 1993 attack on the World Trade Center and the thwarted Manila plot to blow up a dozen U.S. commercial aircraft in 1995 remains a matter of substantial uncertainty.

Ramzi Yousef, who was a lead operative in both plots, trained in camps in Afghanistan that were funded by Bin Ladin and used to train many al Qaeda operatives. Whether he was then or later became a member of al Qaeda remains a matter of debate, but he was at a minimum part of a loose network of extremist Sunni Islamists who, like Bin Ladin, began to focus their rage on the United States. Khalid Sheikh Mohammed, who provided some funding for Yousef in the 1993 WTC attack and was his operational partner in the Manila plot, later did join al Qaeda and masterminded the al Qaeda 9/11 attack. He was not, however, an al Qaeda member at the time of the Manila plot. A number of other individuals connected to the 1993 and 1995 plots or to some of the plotters either were or later became associates of Bin Ladin. We have no conclusive evidence, however, that at the time of the plots any of them was operating under Bin Ladin's direction.

What is clear is that these plots were major benchmarks in the evolving Islamist threat to the United States and foreshadowed later attacks that were indisputably carried out by al Qaeda under Bin Ladin's direction. Like the later attacks, they were aimed at demolishing symbols of American power and killing enormous numbers of Americans. Like Bin Ladin, Yousef was willing to employ any means to achieve these ends, and contemplated use of non-conventional weapons. In one of his television interviews Bin Ladin characterized Ramzi Yousef as a "symbol and a teacher" that would drive Muslims suffering from U.S. policy to "transfer the battle into the United States."

In May 1996, Bin Ladin left Sudan and moved back to Afghanistan. His departure resulted from a combination of pressures from the United States, other western governments, and Egypt, Saudi Arabia, and Libya, all three of which faced indigenous terrorist groups supported by Bin Ladin. The pressure on Sudan intensified in April 1996 when the UN sanctioned Sudan for harboring individuals from the group that had attempted to assassinate Egyptian President Mubarak in June 1995.

At the time of Bin Ladin's move to Afghanistan, the U.S. intelligence community had uncovered many details of his financial and business structures and their use to support terrorist groups. It was not until later in 1996, however, after he was back in Afghanistan, that new sources disclosed the nature of his organizational structure, his commitment to attacking the United States, and the involvement of his organization in attacks that had already been carried out.

**Changing Fortunes in Afghanistan**

Bin Ladin's departure from Sudan marked a setback for him. The Saudi government had frozen his assets three years earlier, and the Sudanese government expropriated his assets there after he left Sudan. The financial stresses contributed to strained relations with some of his associates, who used the move back to Afghanistan as an occasion to break from al Qaeda.

There were, nonetheless, some benefits to the move. In an effort to reduce external pressures, Sudan had made some efforts to keep Bin Ladin under control and prohibited him from making public diatribes. Afghanistan's lack of a central government gave him

greater latitude to promote his own agenda.  Moreover, al Qaeda had never entirely left the region: even when headquartered in Sudan, it had used Pakistan and Afghanistan as a regional base and training center supporting Islamic insurgencies in Tajikistan, Kashmir, and Chechnya.

In August 1996, Bin Ladin made public his war against the United States.  In his "Declaration of Holy War on the Americans Occupying the Country of the Two Sacred Places" (Mecca and Medina in Saudi Arabia), Bin Ladin called on Muslims worldwide to put aside their differences and join in deadly attacks against U.S. forces to compel their withdrawal from the Arabian Peninsula.

A month after this declaration, the Taliban, an Afghan faction supported by Pakistan, seized control of Kabul, the nation's capital.  Bin Ladin began cementing his ties with the Taliban, and they soon forged a close alliance.  The Taliban paid a great price for this alliance in the form of outside pressure, isolation, UN sanctions, and, after 9/11, the destruction of its regime.  But prior to 9/11, the Taliban also benefited from its relationship with al Qaeda: Bin Ladin provided significant financial support to the Taliban, and supplied hundreds, if not thousands, of fighters to support the Taliban in its ongoing war against other factions in northern Afghanistan.  From al Qaeda's perspective, the alliance provided a sanctuary in which to train and indoctrinate recruits, import weapons, forge ties with other jihad groups and leaders, and plan terrorist operations.  Al Qaeda fighters could travel freely within the country; enter and exit without visas or any immigration procedures; and enjoy the use of official Afghan Ministry of Defense license plates.  Al Qaeda also used the Afghan state-owned Ariana Airlines to courier money into the country.

There were also ideological ties.  Both the Taliban and Bin Ladin espoused the vision of a pure Islamic state.  Bin Ladin reportedly swore an oath of loyalty to Taliban leader Mullah Omar. Relations between Bin Ladin and the Taliban leadership were sometimes tense, and some Taliban leaders opposed the al Qaeda presence.  In the end, however, Mullah Omar never broke with Bin Ladin and al Qaeda.

Similarly, Pakistan did not break with the Taliban until after 9/11, although it was well aware that the Taliban was harboring Bin Ladin.  The Taliban's ability to provide Bin Ladin a haven in the face of international pressure and UN sanctions was significantly facilitated by Pakistani support.  Pakistan benefited from the Taliban-al Qaeda relationship, as Bin Ladin's camps trained and equipped fighters for Pakistan's ongoing struggle with India over Kashmir.

By early 1998, Bin Ladin was also in the early stages of what would become a merger of his al Qaeda and another major terrorist group, the Egyptian Islamic Jihad.  On February 23, 1998, Bin Ladin and the leader of the Egyptian Islamic Jihad, Ayman Zawahiri, published a *fatwa* that announced a "ruling to kill the Americans and their allies."  It was also signed by the heads of three other groups, but their signatures were more a matter of show than substance.  Unlike earlier statements, this *fatwa* explicitly instructed followers

to kill "civilians and military." The decree said this ruling was "an individual duty for every Muslim who can do it in any country in which it is possible to do it."

**New Attacks on the United States**

On August 7, 1998 nearly simultaneous truck bombs ravaged the U.S. embassies in the East African capitals of Nairobi, Kenya and Dar es Salaam, Tanzania. The Nairobi embassy was destroyed, and 213 people were killed, including 12 Americans. About 5,000 people were injured. In Dar es Salaam 11 more were killed, none of them American, and 85 were injured.

U.S. intelligence learned a few months later that the targeting of the U.S. embassy in Nairobi began in late 1993. It was one of more than a dozen potential targets analyzed by a team residing with the same Nairobi cell used to provide assistance to the Somalis. In January 1994, al Qaeda leaders concluded that the U.S. embassy in Nairobi would be easy to attack. Preparations for the attack did not begin in earnest until late spring 1998, and the bombs were only assembled a few days before the attacks. By the night before the embassy bombing, all al Qaeda members except the suicide squads and a few people assigned to clean up the evidence trail had left East Africa. Bin Ladin and other al Qaeda leaders in Afghanistan had also left for the countryside in expectation of U.S. retaliation.

The attacks on the U.S. embassies in East Africa in the summer of 1998 demonstrated a new operational form—they were planned, directed, and executed by al Qaeda, under the direct supervision of Bin Ladin and his chief aides.

On October 12, 2000, an explosives-laden boat tore through the side of the *U.S.S. Cole* anchored in Aden, Yemen. Seventeen members of the *Cole* crew were killed, and another 39 were wounded. In the course of the ensuing investigation, U.S. officials learned that an earlier attempt to attack a U.S. warship had been made in January 2000, aimed at the *U.S.S. The Sullivans*, but had failed because the boat was overloaded with explosives and sank. The boat was salvaged, a new martyr crew was selected, and the attack was successfully executed ten months later.

The operational commander of the attack was Abd al-Rahim al-Nashiri, who had previously assisted one of the East African embassy bombers. He had arrived in Yemen in late 1999 to supervise the purchase of the boat used in the attack, and to direct the casing and execution of the attacks. Nashiri was assisted by an al Qaeda member close to Bin Ladin, Tawfiq bin Attash ("Khallad"), who supplied the explosives used in the attack.

This attack followed the operational pattern demonstrated in the East African embassy bombings—it was directed by key al Qaeda operatives, using equipment and explosives purchased with al Qaeda funds, and executed by members of al Qaeda willing to be martyrs for the cause. By mid-November 2000, U.S. investigators were aware of the roles Nashiri and Khallad had played in the attack, and that they were senior al Qaeda operatives. The one part that could not be ascertained at the time was whether the attack

had been carried out under direct orders from Bin Ladin himself. This could not be confirmed until Nashiri and Khallad were captured in November 2002 and April 2003, respectively.

At the same time, however, two disrupted Millennium plots demonstrate that Bin Ladin remained willing to provide support to attacks initiated by more independent actors. Neither intended Millennium attack was a traditional al Qaeda operation: rather, both were planned and orchestrated by independent extremist groups which received training and assistance from al Qaeda-affiliated figures. One was a plot to destroy hotels and tourist sites in Amman, Jordan. It was planned and carried out by a Palestinian radical and his partner, an American citizen, who sought to kill Americans. The other was the attempted bombing of Los Angeles International Airport. It was orchestrated by Ahmed Ressam, who conceived and prepared for the attack on his own. Ressam commented after his arrest that he had offered to let Bin Ladin claim credit for the attack, in return for providing Ressam future funding. Both Ressam and the Jordanian cell took what they needed from al Qaeda-associated camps and personnel, but did not follow the traditional al Qaeda top-down planning and approval model.

**Terrorist Training Camps**

Many of the operatives in the African Embassy and *Cole* attacks attended training camps in Afghanistan, as did all 19 of the 9/11 hijackers. There was a mutually reinforcing relationship between the camps and terrorist operations: the camps provided operatives for terrorist attacks, and successful attacks boosted camp recruitment and attendance.

The training at al Qaeda and associated camps was multifaceted in nature. A worldwide jihad needed terrorists who could bomb embassies or hijack airliners, but it also needed foot soldiers for the Taliban in its war against the Northern Alliance, and guerrillas who could shoot down Russian helicopters in Chechnya or ambush Indian units in Kashmir. Thus, most recruits received training that was primarily geared toward conventional warfare. Terrorist training was provided mostly to the best and most ardent recruits.

The quality of the training provided at al Qaeda and other jihadist camps was apparently quite good. There was coordination with regard to curriculum, and great emphasis on ideological and religious indoctrination. Instruction underscored that the United States and Israel were evil, and that the rulers of Arab countries were illegitimate.

The camps created a climate in which trainees and other personnel were free to think creatively about ways to commit mass murder. According to a senior al Qaeda associate, various ideas were floated by mujahidin in Afghanistan: taking over a launcher and forcing Russian scientists to fire a nuclear missile at the United States; mounting mustard gas or cyanide attacks against Jewish areas in Iran; dispensing poison gas into the air conditioning system of a targeted building; and, last but not least, hijacking an aircraft and crashing it into an airport terminal or nearby city.

Trainees in the camps did not focus solely on causing the deaths of enemies.  Bin Ladin portrayed "martyrdom" in the service of jihad as a highly desirable fate, and many recruits were eager to go on suicide missions.

As time passed and al Qaeda repeatedly and successfully hit U.S. targets, Bin Ladin became a legendary figure among jihadists both inside and outside of Afghanistan.  He lectured at the camps.  His perceived stature and charisma reinforced the zeal of the trainees.  Bin Ladin also personally evaluated trainees' suitability for terrorist operations.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted would-be trainees and helped them get in and out of Afghanistan.  There are strong indications that elements of both the Pakistani and Iranian governments frequently turned a blind eye to this transit through their respective countries.

We can conservatively say that thousands of men, perhaps as many as 20,000, trained in Bin Ladin-supported camps in Afghanistan between his May 1996 return and September 11, 2001.  Of those, only a small percentage went on to receive advanced terrorist training.

### Funding al Qaeda in Afghanistan

After establishing itself in Afghanistan, al Qaeda relied on well-placed financial facilitators and diversions of funds from Islamic charities.  The financial facilitators raised money from witting and unwitting donors, primarily in the Gulf countries, and particularly in Saudi Arabia.  The facilitators also appeared to rely heavily on certain imams at mosques, also primarily in the Gulf countries, who were willing to divert mandatory charitable donations known as *zakat*.  Al Qaeda also collected money from employees of corrupted charities.  Operatives either penetrated specific foreign branch offices of large, international charities, particularly those with lax external oversight and ineffective internal controls, or controlled entire smaller charities, including access to their bank accounts.

There is no convincing evidence that any government financially supported al Qaeda before 9/11 (other than limited support provided by the Taliban after Bin Ladin first arrived in Afghanistan).  Some governments may have turned a blind eye to al Qaeda's fundraising activities.  Saudi Arabia has long been considered the primary source of al Qaeda funding, but we found no evidence that the Saudi government as an institution or senior officials within the Saudi government funded al Qaeda.  Still, al Qaeda found fertile fundraising ground in the Kingdom, where extreme religious views are common and charitable giving is essential to the culture and, until recently, subject to very limited oversight.  The United States has never been a primary source of al Qaeda funding, although some funds raised in the United States likely made their way to al Qaeda.  No persuasive evidence exists that al Qaeda relied on the drug trade as an important source of revenue, or funded itself through trafficking in diamonds from African states engaged in civil wars.

After raising money, al Qaeda frequently moved its money by *hawala*, an informal and ancient trust-based system for transferring funds.  Al Qaeda also used couriers as a secure, albeit slower, way to move funds.  Bin Ladin relied on the established *hawala* networks operating in Pakistan, the United Arab Emirates, and throughout the Middle East to transfer funds efficiently.  *Hawaladars* associated with al Qaeda may have used banks to move and store money, as did various al Qaeda fundraisers and operatives outside of Afghanistan, but there is little evidence that Bin Ladin or his core al Qaeda members used banks during this period.

Al Qaeda's money was distributed as quickly as it was raised—what was made was spent.  The CIA estimates that al Qaeda spent $30 million annually, including paying for terrorist operations, maintaining terrorist training camps, paying salaries to jihadists, contributing to the Taliban, funding fighters in Afghanistan, and sporadically contributing to related terrorist organizations.  The largest expense was payments to the Taliban, which totaled an estimated $10-20 million per year.  Actual terrorist operations were relatively cheap.  Although there is evidence that al Qaeda experienced funding shortfalls as part of the cyclical fundraising process (with more money coming during the holy month of Ramadan), we are not aware of any evidence indicating that terrorist acts were interrupted as a result.

**Al Qaeda Today**

Since the September 11 attacks and the defeat of the Taliban, al Qaeda's funding has decreased significantly.  The arrests or deaths of several important financial facilitators have decreased the amount of money al Qaeda has raised and increased the costs and difficulty of raising and moving that money.  Some entirely corrupt charities are now out of business, with many of their principals killed or captured, although some charities may still be providing support to al Qaeda.  Moreover, it appears that the al Qaeda attacks within Saudi Arabia in May and November of 2003 have reduced—perhaps drastically— al Qaeda's ability to raise funds from Saudi sources.  Both an increase in Saudi enforcement and a more negative perception of al Qaeda by potential donors have cut its income.

At the same time, al Qaeda's expenditures have decreased as well, largely because it no longer provides substantial funding to the Taliban or runs a network of training camps in Afghanistan. Despite the apparent reduction in overall funding, it remains relatively easy for al Qaeda to find the relatively small sums required to fund terrorist operations.

Prior to 9/11, al Qaeda was a centralized organization which used Afghanistan as a war room to strategize, plan attacks, and dispatch operatives worldwide.  Bin Ladin approved all al Qaeda operations, often selecting the targets and operatives.  After al Qaeda lost Afghanistan after 9/11, it fundamentally changed.  The organization is far more decentralized.  Bin Ladin's seclusion forced operational commanders and cell leaders to assume greater authority; they are now making the command decisions previously made by him.

11

Bin Ladin continues to inspire many of the operatives he trained and dispersed, as well as smaller Islamic extremist groups and individual fighters who share his ideology.  As a result, al Qaeda today is more a loose collection of regional networks with a greatly weakened central organization.  It pushes these networks to carry out attacks, and assists them by providing guidance, funding, and training in skills such as bomb-making or urban combat.

Al Qaeda remains extremely interested in conducting chemical, biological, radiological, or nuclear attacks.  In 1994, al Qaeda operatives attempted to purchase uranium for $1.5 million; the uranium proved to be fake.  Though this attempt failed, al Qaeda continues to pursue its strategic objective of obtaining a nuclear weapon.  Likewise, it remains interested in using a radiological dispersal device or "dirty bomb," a conventional explosive designed to spread radioactive material.  Documents found in al Qaeda facilities contain accurate information on the usage and impact of such weapons.

Al Qaeda had an ambitious biological weapons program and was making advances in its ability to produce anthrax prior to September 11.  According to Director of Central Intelligence George Tenet, al Qaeda's ability to conduct an anthrax attack is one of the most immediate threats the United States is likely to face.  Similarly, al Qaeda may seek to conduct a chemical attack by using widely-available industrial chemicals, or by attacking a chemical plant or a shipment of hazardous materials.

The Intelligence Community expects that the trend toward attacks intended to cause ever-higher casualties will continue.  Al Qaeda and other extremist groups will likely continue to exploit leaks of national security information in the media, open-source information on techniques such as mixing explosives, and advances in electronics.  It may modify traditional tactics in order to prevent detection or interdiction by counterterrorist forces.  Regardless of the tactic, al Qaeda is actively striving to attack the United States and inflict mass casualties.

# Exhibit M



# U.S. Department of Justice
### Federal Bureau of Investigation

**For Immediate Release**                    **Washington D.C.**
**June 7, 1999**                             **FBI National Press Office**
Usama Bin Laden's Wanted Poster

Attorney General Janet Reno and FBI Director Louis J. Freeh today placed Usama Bin Laden, the leader of a terrorist organization known as Al-Qaeda (The Base), on the list of "Ten Most Wanted Fugitives." Bin Laden is charged in connection with the August 7, 1998, bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. These attacks resulted in the deaths of more than 200 people, including twelve American citizens, and the wounding of more than 4,000 individuals.

Usama Bin Laden was indicted by a Federal Grand Jury on November 4, 1998, in the Southern District of New York, on charges of Murder of U.S. Nationals Outside the United States, Conspiracy to Murder U.S. Nationals Outside the United States, and Attacks on a Federal Facility Resulting in Death.

Usama Bin Laden was born in 1957 in Saudi Arabia. He is described as an Arab male, 6' 4" to 6' 6", approximately 160 pounds, with brown hair and brown eyes. Bin Laden has an olive complexion and a thin build. He walks with the aid of a cane. In the past, he has resided in Saudi Arabia, Sudan and Afghanistan.

Bin Laden has used the following aliases: Usama Bin Muhammad Bin Ladin, Shaykh Usama Bin Ladin, the Prince, the Emir, Abu Abdallah, Mujahid Shaykh, Hajj, and the Director.

Usama Bin Laden's organization, Al-Qaeda, is extensive and has the capability and willingness to inflict large-scale, random casualties. Bin Laden should be considered armed and extremely dangerous.

Usama Bin Laden is the 456th person to be placed on the FBI's "Ten Most Wanted Fugitives" list, which began in 1950. Since then, 427 fugitives have been apprehended or located, 133 of them as a result of citizen assistance.

The U.S. Department of State, Diplomatic Security Service, is offering a reward of up to $5 million for information leading directly to the apprehension or conviction of Usama Bin Laden. This reward is the largest amount ever offered for a fugitive wanted by the U.S. Government.

Individuals with information concerning Usama Bin Laden should take no action themselves, but instead immediately contact the nearest FBI office or local law enforcement agency. For any possible sighting outside the United States, contact the nearest U.S. Embassy or Consulate. Information can also be provided by calling a toll-free number:

1-800-HEROES-1

| 1999 Press Releases | FBI Home Page |

# Exhibit N



## Outline of the 9/11 Plot

### *Staff Statement No. 16*

Members of the Commission, your staff is prepared to report its preliminary findings regarding the conspiracy that produced the September 11 terrorist attacks against the United States. We remain ready to revise our understanding of this subject as our work continues. Dietrich Snell, Rajesh De, Hyon Kim, Michael Jacobson, John Tamm, Marco Cordero, John Roth, Douglas Greenburg, and Serena Wille did most of the investigative work reflected in this statement.

We are fortunate to have had access to the fruits of a massive investigative effort by the Federal Bureau of Investigation and other law enforcement agencies, as well intelligence collection and analysis from the Central Intelligence Agency, the National Security Agency, the State Department, and the Department of Defense.

Much of the account in this statement reflects assertions reportedly made by various 9/11 conspirators and captured al Qaeda members while under interrogation. We have sought to corroborate this material as much as possible. Some of this material has been inconsistent. We have had to make judgment calls based on the weight and credibility of the evidence. Our information on statements attributed to such individuals comes from written reporting; we have not had direct access to any of them.

**Plot Overview**

*Origins of the 9/11 Attacks*

The idea for the September 11 attacks appears to have originated with a veteran jihadist named Khalid Sheikh Mohammed (KSM). A Kuwaiti from the Baluchistan region of Pakistan, KSM grew up in a religious family and claims to have joined the Muslim Brotherhood at the age of 16. After attending college in the United States, he went to Afghanistan to participate in the anti-Soviet jihad. Following the war, he helped run a non-governmental organization in Pakistan assisting the Afghan mujahidin.

KSM first came to the attention of U.S. authorities as a result of the terrorist activity of his nephew Ramzi Yousef, the mastermind of the 1993 World Trade Center bombing. KSM provided a small amount of funding for that attack. The following year, he joined Yousef in the Philippines to plan what would become known as the "Bojinka" operation,

the intended bombing of 12 U.S. commercial jets over the Pacific in a two-day period. That plot unraveled, however, when the Philippine authorities discovered Yousef's bomb-making equipment in Manila in January 1995. During the course of 1995, Yousef and two of his co-conspirators in the Bojinka plot were arrested overseas and were brought to the United States for trial, but KSM managed to elude capture following his January 1996 indictment for his role in the plot.

By the middle of 1996, according to his account, KSM was back in Afghanistan. He had met Usama Bin Ladin there in the 1980s. Now, in mid-1996, KSM sought to renew that acquaintance, at a point when Bin Ladin had just moved to Afghanistan from the Sudan. At a meeting with Bin Ladin and Mohamed Atef, al Qaeda's Chief of Operations, KSM presented several ideas for attacks against the United States. One of the operations he pitched, according to KSM, was a scaled-up version of what would become the attacks of September 11. Bin Ladin listened, but did not yet commit himself.

*Bin Ladin Approves the Plan*

According to KSM, the 1998 East Africa embassy bombings demonstrated to him that Bin Ladin was willing to attack the United States. In early 1999, Bin Ladin summoned KSM to Kandahar to tell him that his proposal to use aircraft as weapons now had al Qaeda's full support. KSM met again with Bin Ladin and Atef at Kandahar in the spring of 1999 to develop an initial list of targets. The list included the White House and the Pentagon, which Bin Ladin wanted; the U.S. Capitol; and the World Trade Center, a target favored by KSM.

Bin Ladin quickly provided KSM with four potential suicide operatives: Nawaf al Hazmi, Khalid al Mihdhar, Walid Muhammad Salih bin Attash, also known as Khallad, and Abu Bara al Taizi. Hazmi and Mihdhar were both Saudi nationals—although Mihdhar was actually of Yemeni origin—and experienced mujahidin, having fought in Bosnia together. They were so eager to participate in attacks against the United States that they already held U.S. visas. Khallad and Abu Bara, being Yemeni nationals, would have trouble getting U.S. visas compared to Saudis. Therefore, KSM decided to split the operation into two parts. Hazmi and Mihdhar would go to the United States, and the Yemeni operatives would go to Southeast Asia to carry out a smaller version of the Bojinka plot.

In the fall of 1999, training for the attacks began. Hazmi, Mihdhar, Khallad, and Abu Bara participated in an elite training course at the Mes Aynak camp in Afghanistan. Afterward, KSM taught three of these operatives basic English words and phrases and showed them how to read a phone book, make travel reservations, use the Internet, and encode communications. They also used flight simulator computer games and analyzed airline schedules to figure out flights that would be in the air at the same time.

2

*Kuala Lumpur*

Following the training, all four operatives for the operation traveled to Kuala Lumpur, Malaysia. Khallad and Abu Bara were directed to study airport security and conduct surveillance on U.S. carriers, and Hazmi and Mihdhar were to switch passports in Kuala Lumpur before going on to the United States. Khallad—who traveled to Kuala Lumpur ahead of Hazmi and Mihdhar—attended a prosthesis clinic in Kuala Lumpur. He then flew to Hong Kong aboard a U.S. airliner and was able to carry a box cutter, concealed in his toiletries bag, onto the flight. He returned to Kuala Lumpur, where Hazmi and Mihdhar arrived during the first week in January 2000. The al Qaeda operatives were hosted in Kuala Lumpur by Jemaah Islamiah members Hambali and Yazid Sufaat, among others. When Khallad headed next to a meeting in Bangkok, Hazmi and Mihdhar decided to join him to enhance their cover as tourists.

Khallad had his meetings in Bangkok and returned to Kandahar. Khallad and Abu Bara would not take part in a planes operation; in the spring of 2000, Bin Ladin cancelled the Southeast Asia part of the operation because it was too difficult to coordinate with the U.S. part. Hazmi and Mihdhar spent a few days in Bangkok and then headed for Los Angeles, where they would become the first 9/11 operatives to enter the United States on January 15, 2000.

*Four Students in Hamburg*

While KSM was deploying his initial operatives for the 9/11 attacks to Kuala Lumpur, a group of four Western-educated men who would prove ideal for the attacks were making their way to the al Qaeda camps in Afghanistan. The four were Mohamed Atta, Marwan al Shehhi, Ziad Jarrah, and Ramzi Binalshibh. Atta, Shehhi, and Jarrah would become pilots for the 9/11 attacks, while Binalshibh would act as a key coordinator for the plot.

Atta, the oldest of the group, was born in Egypt in 1968 and moved to Germany to study in 1992 after graduating from Cairo University. Shehhi was from the United Arab Emirates (UAE) and entered Germany in 1996 through a UAE military scholarship program. Jarrah was from a wealthy family in Lebanon and went to Germany after high school to study at the University of Greifswald. Finally, Binalshibh, a Yemeni, arrived in Germany in 1995.

Atta and Binalshibh were the first of the four to meet, at a mosque in Hamburg in 1995. In 1998, Atta and Binalshibh moved into a Hamburg apartment with Shehhi, who had been studying in Bonn; after several months, the trio moved to 54 Marienstrasse, also in Hamburg. How Shehhi came to know Atta and Binalshibh is not clear. It is also unknown just how and when Jarrah, who was living in Greifswald, first encountered the group, but we do know that he moved to Hamburg in late 1997.

By the time Atta, Shehhi, and Binalshibh were living together in Hamburg, they and Jarrah were well known among Muslims in Hamburg and, with a few other like-minded students, were holding extremely anti-American discussions. Atta, the leader of the

group, denounced what he described as a global Jewish movement centered in New York City which, he claimed, controlled the financial world and the media.  As time passed, the group became more extreme and secretive.  According to Binalshibh, by sometime in 1999, the four had decided to act on their beliefs and to pursue jihad against the Russians in Chechnya.

*The Hamburg Students Join al Qaeda*

As Binalshibh is the only one of the four still alive, he is the primary source for an explanation of how the Hamburg group was recruited into the 9/11 plot.  Binalshibh claims that during 1999, he and Shehhi had a chance meeting with an individual to whom they expressed an interest in joining the fighting in Chechnya.  They were referred to another individual named Mohamedou Ould Slahi—an al Qaeda member living in Germany.  He advised them that it was difficult to get to Chechnya and that they should go to Afghanistan first.  Following Slahi's advice, between November and December of 1999, Atta, Jarrah, Shehhi, and Binalshibh went to Afghanistan, traveling separately.

When Binalshibh reached the camps in Kandahar, he found that Atta and Jarrah had already pledged *bayat*, or allegiance, to Bin Ladin, and that Shehhi had already left for the UAE to prepare for the anti-U.S. mission the group had been assigned.  Binalshibh followed suit, pledging *bayat* to Bin Ladin in a private meeting.  Binalshibh, Atta, and Jarrah met with Bin Ladin's deputy, Mohamed Atef, who directed them to return to Germany and enroll in flight training.  Atta was chosen as the emir, or leader, of the mission.  He met with Bin Ladin to discuss the targets: the World Trade Center, which represented the U.S. economy; the Pentagon, a symbol of the U.S. military; and the U.S. Capitol, the perceived source of U.S. policy in support of Israel.  The White House was also on the list, as Bin Ladin considered it a political symbol and wanted to attack it as well.  KSM and Binalshibh have both stated that, in early 2000, Shehhi, Atta, and Binalshibh met with KSM in Karachi for training that included learning about life in the United States and how to read airline schedules.

By early March 2000, all four new al Qaeda recruits were back in Germany.  They began researching flight schools in Europe, but quickly found that training in the United States would be cheaper and faster.  Atta, Shehhi, and Jarrah obtained U.S. visas, but Binalshibh—the sole Yemeni in the group—was rejected repeatedly.  In the spring of 2000, Atta, Shehhi, and Jarrah prepared to travel to the United States to begin flight training.  Binalshibh would remain behind and help coordinate the operation, serving as a link between KSM and Atta.

*California*

While the Hamburg operatives were just joining the 9/11 plot, Nawaf al Hazmi and Khalid al Mihdhar were already living in the United States, having arrived in Los Angeles on January 15, 2000.  It has not been established where they stayed during the first two weeks after their arrival.  They appear to have frequented the King Fahd Mosque in Culver City, possibly staying in an apartment nearby.  Much remains unknown about

their activities and associates while in Los Angeles and our investigation of this period of the conspiracy is continuing.

KSM contends that he directed the two to settle in San Diego after learning from a phone book about language and flight schools there.  Recognizing that neither Hazmi nor Mihdhar spoke English or was familiar with Western culture, KSM instructed these operatives to seek help from the local Muslim community.

As of February 1, 2000, Hazmi and Mihdhar were still in Los Angeles, however.  That day, the two al Qaeda operatives met a Saudi named Omar al Bayoumi.  Bayoumi told them that he lived in San Diego and could help them if they decided to move there.  Within a few days, Hazmi and Mihdhar traveled to San Diego.  They found Bayoumi at the Islamic Center and took him up on his offer to help them find an apartment.  On February 5, Hazmi and Mihdhar moved into a unit they rented in Bayoumi's apartment complex in San Diego.  While it is clear that Bayoumi helped them settle in San Diego, we have not uncovered evidence that he did so knowing that they were terrorists, or that he believed in violent extremism.

Hazmi and Mihdhar also received assistance from various other individuals in the Muslim community in San Diego.  Several of their new friends were foreign students in their early 20's who worshipped at the Rabat Mosque in La Mesa.  One of them, an illegal immigrant named Mohdar Abdullah, became particularly close to Hazmi and Mihdhar and helped them obtain driver's licenses and enroll in schools.  When interviewed by the FBI after 9/11, Abdullah denied knowing about the operatives' terrorist plans.  Before his recent deportation to Yemen, however, Abdullah allegedly made various claims to individuals incarcerated with him about having advance knowledge of the operatives' 9/11 mission, going so far as to tell one inmate that he had received instructions to pick up the operatives at Los Angeles International Airport, and had driven them from Los Angeles to San Diego.  Abdullah and others in his circle appear to have held extremist sympathies.

While in San Diego, Hazmi and Mihdhar also established a relationship with Anwar Aulaqi, an imam at the Rabat Mosque.  Aulaqi reappears in our story later.

Another San Diego resident rented Hazmi and Mihdhar a room in his house.  An apparently law abiding citizen with close contacts among local police and FBI personnel, the operatives' housemate saw nothing in their behavior to arouse suspicion.  Nor did his law enforcement contacts ask him for information about his tenants.

Hazmi and Mihdhar were supposed to learn English and then enroll in flight schools, but they made only cursory attempts at both.  Mihdhar paid for an English class that Hazmi took for about a month.  The two al Qaeda operatives also took a few short flying lessons.  According to their flight instructors, they were interested in learning to fly jets and did not realize that they had to start training on small planes.  In June 2000, Mihdhar abruptly returned to his family in Yemen, apparently without permission.  KSM was very

displeased and wanted to remove him from the operation, but Bin Ladin interceded, and Mihdhar remained part of the plot.

*The Hamburg Group Arrives in the United States*

On the East Coast, in May and June 2000, the three operatives from Hamburg who had succeeded in obtaining visas began arriving in the United States.  Marwan al Shehhi arrived first, on May 29, 2000, at Newark Airport in New Jersey.  Mohamed Atta arrived there five days later, on June 3.  He and Shehhi had not yet decided where they would train.  They directed inquiries to flight schools in New Hampshire and New Jersey, and, after spending about a month in New York City, visited the Airman Flight School in Norman, Oklahoma, where Zacarias Moussaoui would enroll the following February.  For some reason, Atta and Shehhi decided not to enroll there.  Instead, they went to Venice, Florida, where Ziad Jarrah had already started his training at Florida Flight Training Center, having arrived in the United States on June 27.  Atta and Shehhi enrolled in a different flight school, Huffman Aviation, and began training almost daily.  In mid-August, Atta and Shehhi both passed the Private Pilot Airman test.  Their instructors described Atta and Shehhi as aggressive and rude, and in a hurry to complete their training.

Meanwhile, Jarrah obtained his single engine private pilot certificate in early August 2000.  In October, Jarrah went on the first of five foreign trips he would take during his time in the United States.  He returned to Germany to visit his girlfriend, Aysel Senguen, the daughter of Turkish immigrants, whom Jarrah had met in 1996 and married in a 1999 Islamic ceremony not recognized under German law.

*The Fourth Pilot: Hani Hanjour*

By this point, in the fall of 2000, three 9/11 pilots were progressing in their training.  It was clear, though, that the first two assigned to the operation, Hazmi and Mihdhar, would not learn to fly aircraft.  It proved unnecessary to scale back the operation, however, because a young Saudi with special credentials arrived at an al Qaeda camp in Afghanistan.

Hani Hanjour had studied in the United States intermittently since 1991, and had undergone enough flight training in Arizona to obtain his commercial pilot certificate in April 1999.  His friends there included individuals with ties to Islamic extremism.  Reportedly a devout Muslim all his life, Hanjour worked for a relief agency in Afghanistan in the 1980s.  By 2000, he was back in Afghanistan where he was identified among al Qaeda recruits at the al Faruq camp as a trained pilot who should be sent to KSM for inclusion in the plot.

After receiving several days of training from KSM in Karachi, Hanjour returned to Saudi Arabia on June 20, 2000.  There he obtained a U.S. student visa on September 25, before traveling to the UAE to receive funds for the operation from KSM's nephew, a conspirator named Ali Abdul Aziz Ali.  On December 8, 2000, Hanjour traveled to San

Diego to join Nawaf al Hazmi, who had been alone since Mihdhar's departure six months earlier.

Once Hanjour arrived in San Diego and joined Hazmi, the two quickly relocated to Arizona, where Hanjour had spent most of his previous time in the United States.  On December 12, 2000, they were settling in Mesa, Arizona, and Hanjour was ready to brush up on his flight training.  By early 2001, he was using a Boeing 737 simulator.  Because his performance struck his flight instructors as sub-standard, they discouraged Hanjour from continuing, but he persisted.  He and Hazmi then left the Southwest at the end of March, driving across the country in Hazmi's car.  There is some evidence indicating that Hanjour may have returned to Arizona in June of 2001 to obtain additional flight training with some of his associates in the area.

*9/11 Operatives on the Move*

Back in Florida, the Hamburg pilots—Atta, Shehhi, and Jarrah—continued to train.  By the end of 2000, they also were starting to train on jet aircraft simulators.  Around the beginning of the New Year, all three of them left the United States on various foreign trips.  Jarrah took the second and third of his five foreign trips, visiting Germany and Beirut to see his girlfriend and family respectively.  On one trip, Jarrah's girlfriend returned with him to the United States and stayed with him in Florida for ten days, even observing one of Jarrah's training sessions at flight school.

While Jarrah took these personal trips, Atta traveled to Germany for an early January 2001 meeting with Ramzi Binalshibh.  Atta reported that the pilots had completed their training and were awaiting further instruction from al Qaeda.  After the meeting, Atta returned to Florida and Binalshibh headed to Afghanistan to brief the al Qaeda leadership.  As soon as Atta returned to Florida, Shehhi took his foreign trip, an unexplained eight-day sojourn to Casablanca.

After Atta and Shehhi returned to Florida, they moved on to the Atlanta area, where they pursued some additional training.  The two rented a small plane with a flight instructor and may have visited a flight school in Decatur, Georgia.  By February 19, Atta and Shehhi were on the move again, traveling to Virginia Beach, Virginia.  Here is a shot of Atta on February 20, withdrawing $4,000 from his account at a SunTrust Bank branch in Virginia Beach.  A bit later, Jarrah spent time in Georgia as well, staying in Decatur in mid-March.  At the end of March, he left again for Germany to visit his girlfriend.

At about this time, Hanjour and Hazmi were driving from Arizona toward the East Coast. After being stopped for speeding in Oklahoma on April 1, they finally arrived in Northern Virginia.  At the Dar al Hijra mosque in Falls Church, they met a Jordanian man named Eyad al Rababah, possibly through Anwar Aulaqi, the imam whom they had known in San Diego and who, in the interim, also had moved east in early 2001.

With Rababah's help, Hanjour and Hazmi were able to find a room in an apartment in Alexandria, Virginia.  When they expressed interest in the greater New York area,

7

Rababah suggested they accompany him to Connecticut, where he was in the process of moving.  On May 8, the group—which by now included al Qaeda operatives Ahmad al Ghamdi and Majed Moqed—traveled to Fairfield, Connecticut.  The next day, Rababah took them to Paterson, New Jersey to have dinner and see the area.  Soon thereafter, they moved into an apartment in Paterson.  At this time, we have insufficient basis to conclude that Rababah knew the operatives were terrorists when he assisted them.  As for Aulaqi, there is reporting that he has extremist ties, and the circumstances surrounding his relationship with the hijackers remain suspicious.  However, we have not uncovered evidence that he associated with the hijackers knowing that they were terrorists.

While Hanjour and Hazmi were settling in New Jersey, Atta and Shehhi were returning to southern Florida.  We have examined the allegation that Atta met with an Iraqi intelligence officer in Prague on April 9.  Based on the evidence available—including investigation by Czech and U.S. authorities plus detainee reporting—we do not believe that such a meeting occurred.  The FBI's investigation places him in Virginia as of April 4, as evidenced by this bank surveillance camera shot of Atta withdrawing $8,000 from his account.   Atta was back in Florida by April 11, if not before.  Indeed, investigation has established that, on April 6, 9, 10, and 11, Atta's cellular telephone was used numerous times to call Florida phone numbers from cell sites within Florida.  We have seen no evidence that Atta ventured overseas again or re-entered the United States before July, when he traveled to Spain and back under his true name.  Shehhi, on the other hand, visited Cairo between April 18 and May 2.  We do not know the reason for this excursion.

*The Muscle Hijackers*

While the pilots trained in the United States, Bin Ladin and al Qaeda leaders in Afghanistan started selecting the muscle hijackers—those operatives who would storm the cockpit and control the passengers on the four hijacked planes.  (The term "muscle" hijacker appears in the interrogation reports of 9/11 conspirators KSM and Binalshibh, and has been widely used to refer to the non-pilot hijackers.)  The so-called muscle hijackers actually were not physically imposing, as the majority of them were between 5'5" and 5'7" in height and slender in build.  In addition to Hazmi and Mihdhar, the first pair to enter the United States, there were 13 other muscle hijackers, all but one from Saudi Arabia.  They were Satam al Suqami, Wail and Waleed al Shehri (two brothers), Abdul Aziz al Omari, Fayez Banihammad (from the UAE), Ahmed al Ghamdi, Hamza al Ghamdi, Mohand al Shehri, Saeed al Ghamdi, Ahmad al Haznawi, Ahmed al Nami, Majed Moqed, and Salem al Hazmi (the brother of Nawaf al Hazmi).

The muscle hijackers were between 20 and 28 years of age and had differing backgrounds.  Many were unemployed and lacked higher education, while a few had begun university studies.  Although some were known to attend prayer services regularly, others reportedly even consumed alcohol and abused drugs.  It has not been determined exactly how each of them was recruited into al Qaeda, but most of them apparently were swayed to join the jihad in Chechnya by contacts at local universities and mosques in Saudi Arabia.

By late 1999 and early 2000, the young men who would become the muscle hijackers began to break off contact with their families and pursue jihad.  They made their way to the camps in Afghanistan, where they volunteered to be suicide operatives for al Qaeda.  After being picked by Bin Ladin himself for what would become the 9/11 operation, most of them returned to Saudi Arabia to obtain U.S. visas.  They then returned to Afghanistan for special training on how to conduct hijackings, disarm air marshals, and handle explosives and knives.  Next KSM sent them to the UAE, where his nephew, Ali Abdul Aziz Ali, and another al Qaeda member, Mustafa al Hawsawi, would help them buy plane tickets to the United States.

In late April 2001, the muscle hijackers started arriving in the United States, specifically in Florida, Washington, DC, and New York.  They traveled mostly in pairs and were assisted upon arrival by Atta and Shehhi in Florida or Hazmi and Hanjour in DC and New York.  The final pair, Salem al Hazmi and Abdulaziz al Omari, arrived New York on June 29 and likely were picked up the following day by Salem's brother, Nawaf, as evidenced by Nawaf's minor traffic accident while heading east on the George Washington Bridge.  Finally, on July 4, Khalid al Mihdhar, who had abandoned Nawaf al Hazmi back in San Diego 13 months earlier, re-entered the United States.  Mihdhar promptly joined the group in Paterson, New Jersey.

*Summer of Preparations*

In addition to assisting the newly-arrived muscle hijackers, the pilots busied themselves during the summer of 2001 with cross-country surveillance flights and additional flight training. Shehhi took the first cross-country flight, from New York to San Francisco and on to Las Vegas on May 24.  Jarrah was next, traveling from Baltimore to Los Angeles and on to Las Vegas on June 7.  Then, on June 28, Atta flew from Boston to San Francisco and on to Las Vegas.  Each flew first class, in the same type of aircraft he would pilot on September 11.

In addition to the test flights, some of the operatives obtained additional training.  In early June, Jarrah sought to fly the "Hudson Corridor," a low altitude "hallway" along the Hudson River that passed several New York landmarks, including the World Trade Center.  Hanjour made the same request at a flight school in New Jersey.

The 9/11 operatives were now split between two locations: southern Florida and Paterson, New Jersey.  Atta had to coordinate the two groups, especially with Nawaf al Hazmi, who was considered Atta's second-in-command for the entire operation.  Their first in-person meeting probably took place in June, when Hazmi flew round-trip between Newark and Miami.

The next step for Atta was a mid-July status meeting with Binalshibh at a small resort town in Spain.  According to Binalshibh, the two discussed the progress of the plot, and Atta disclosed that he would still need about five or six weeks before he would be able to provide the date for the attacks.  Atta also reported that he, Shehhi, and Jarrah had been able to carry box cutters onto their test flights; they had determined that the best time to

storm the cockpit would be about 10-15 minutes after takeoff, when they noticed that cockpit doors were typically opened for the first time.  Atta also said that the conspirators planned to crash their planes into the ground if they could not strike their targets.  Atta himself planned to crash his aircraft into the streets of New York if he could not hit the World Trade Center.  After the meeting, Binalshibh left to report the progress to the al Qaeda leadership in Afghanistan, and Atta returned to Florida on July 19.

In early August, Atta spent a day waiting at the Orlando airport for one additional muscle hijacker intended for the operation, Mohamed al Kahtani.  As noted in Staff Statement No. 1, Kahtani was turned away by U.S. immigration officials and failed to join the operation.  On August 13, another in-person meeting of key players in the plot apparently took place, as Atta, Nawaf al Hazmi, and Hanjour gathered one last time in Las Vegas.  Two days later, the FBI learned about the strange behavior of Zacarias Moussaoui, who was now training on flight simulators in Minneapolis.

*The Final Days*

In addition to their last test flights and Las Vegas trips, the conspirators had other final preparations to make.  Some of the pilots took practice flights on small rented aircraft, and the muscle hijackers trained at gyms.  The operatives also purchased a variety of small knives that they may have used during the attacks.  While we can't know for sure, some of the knives the terrorists bought may have been these, which were recovered from the Flight 93 crash site.  On August 22, Jarrah attempted to buy four Global Positioning System (GPS) units from a pilot shop in Miami.  Only one unit was available, and Jarrah purchased it along with three aeronautical charts.

Just over two weeks before the attacks, the conspirators purchased their flight tickets.  Between August 26 and September 5, they bought tickets on the Internet, by phone, and in person.  Once the ticket purchases were made, the conspirators returned excess funds to al Qaeda.  During the first week in September, they made a series of wire transfers to Mustafa al Hawsawi in the UAE, totaling about $26,000.  Nawaf al Hazmi attempted to send Hawsawi the debit card for Mihdhar's bank account, which still contained approximately $10,000.  (The package containing the card would be intercepted after the FBI found the Express Mail receipt for it in Hazmi's car at Dulles Airport on 9/11.)

The last step was to travel to the departure points for the attacks.  The operatives for American Airlines Flight 77, which would depart from Dulles and crash into the Pentagon, gathered in Laurel, Maryland, about 20 miles from Washington, DC.  The Flight 77 team stayed at a motel in Laurel during the first week of September and spent time working out at a nearby gym.  On the final night before the attacks, they stayed at a hotel in Herndon, Virginia, close to Dulles Airport.  Further north, the operatives for United Airlines Flight 93, which would depart from Newark and crash in Stony Creek Township, Pennsylvania, gathered in Newark.  Just after midnight on September 9, Jarrah received this speeding ticket as he headed north through Maryland along Interstate 95, towards his team's staging point in New Jersey.

10

Atta continued to coordinate the teams until the very end.  On September 7, he flew from Fort Lauderdale to Baltimore, presumably to meet with the Flight 77 team in Laurel, Maryland.  On September 9, he flew from Baltimore to Boston.  By this time, Marwan al Shehhi and his team for Flight 175 had arrived in Boston, and Atta was seen with Shehhi at his hotel.  The next day, Atta picked up Abdul Aziz al Omari, one of the Flight 11 muscle hijackers, from his Boston hotel and drove to Portland, Maine.  For reasons that remain unknown, Atta and Omari took a commuter flight to Boston during the early hours of September 11 to connect to Flight 11.  As shown here, they cleared security at the airport in Portland and boarded the flight that would allow them to join the rest of their team at Logan Airport.

The Portland detour almost prevented Atta and Omari from making Flight 11 out of Boston.  In fact, the luggage they checked in Portland failed to make it onto the plane.  Seized after the September 11 crashes, Atta and Omari's luggage turned out to contain a number of telling items, including: correspondence from the university Atta attended in Egypt; Omari's international driver's license and passport; a video cassette for a Boeing 757 flight simulator; and this folding knife and pepper spray, presumably extra weapons the two conspirators decided they didn't need.

On the morning of September 11, after years of planning and many months of intensive preparation, all four terrorist teams were in place to execute the attacks of that day.

*Financing of the 9/11 Plot*

We estimate that the 9/11 attacks cost somewhere between $400,000 and $500,000 to execute.  The operatives spent over $270,000 in the United States, and the costs associated with Zacarias Moussaoui—who is discussed at greater length below—were at least $50,000.  Additional expenses included travel to obtain passports and visas; travel to the United States; expenses incurred by the plot leader and facilitators outside the United States; and expenses incurred by the people selected to be hijackers but who ultimately did not participate.  For many of these expenses, we have only fragmentary evidence and/or unconfirmed detainee reports and can make only a rough estimate of costs.  Our $400,000-$500,000 estimate does not include the cost of running the camps in Afghanistan where the hijackers were recruited and trained, or the cost of that training.

We have found no evidence that the Hamburg group received funds from al Qaeda before late 1999.  They apparently supported themselves before joining the conspiracy.  Thereafter, according to KSM, they each received $5,000 to pay for their return to Germany from Afghanistan plus funds for travel from Germany to the United States.  KSM, Binalshibh, and plot facilitator Mustafa al Hawsawi, each received money— perhaps $10,000—to cover their living expenses while they fulfilled their roles in the plot.

In the United States, the operatives' primary expenses consisted of flight training, living expenses (room, board and meals, vehicles, insurance, etc.), and travel (casing flights, meetings, and the flights on 9/11).  All told, about $300,000 was deposited into the 19

hijackers' bank accounts in the United States.  They received funds in the United States through a variety of unexceptional means.  Approximately $130,000 arrived via a series of wire transfers from Ali Abdul Aziz Ali, who sent approximately $120,000 from Dubai, and Binalshibh, who sent just over $10,000 from Germany.  Shown here is the receipt for the largest wire transfer sent to the conspirators in the United States, $70,000 that Ali wired Marwan al Shehhi on September 17, 2000, just when Shehhi, Atta and Jarrah were in the middle of their flight training.  In addition to receiving funds by wire, the operatives brought significant amounts of cash and travelers checks with them into the United States, the largest amount coming with the 13 muscle hijackers who began arriving in April 2001.  Finally, several of the operatives relied on accounts in overseas financial institutions, which they accessed in the United States with ATM and credit cards.

The conspiracy made extensive use of banks in the United States, both branches of major international banks and smaller regional banks.  All of the operatives opened accounts in their own names, using passports and other identification documents.  There is no evidence that they ever used false social security numbers to open any bank accounts.  Their transactions were unremarkable and essentially invisible amidst the billions of dollars flowing around the world every day.

No credible evidence exists that the operatives received substantial funding from any person in the United States.  Specifically, there is no evidence that Mihdhar and Hazmi received funding from Saudi citizens Omar al Bayoumi and Osama Bassnan, or that Saudi Princess Haifa al Faisal provided any funds to the conspiracy either directly or indirectly.

To date, the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks.  Compelling evidence traces the bulk of the funds directly back to KSM, but from where KSM obtained the money remains unknown at this time.  Ultimately the question is of little practical significance.  Al Qaeda had many avenues of funding and a pre-9/11 annual budget estimated at $30 million.  If a particular source of funds had dried up, al Qaeda could have easily found enough money to fund an attack that cost $400,000-$500,000 over nearly two years.

**A Closer Look at Specific Aspects of the Plot**

Given the catastrophic results of the 9/11 attacks, it is tempting to depict the plot as a set plan executed to near perfection.  This would be a mistake.  The 9/11 conspirators confronted operational difficulties, internal disagreements, and even dissenting opinions within the leadership of al Qaeda.  In the end, the plot proved sufficiently flexible to adapt and evolve as challenges arose.

*Initial Changes in the Plot*

As originally envisioned, the 9/11 plot involved even more extensive attacks than those carried out on September 11.  KSM maintains that his initial proposal involved hijacking

ten planes to attack targets on both the East and West coasts of the United States.  He claims that, in addition to the targets actually hit on 9/11, these hijacked planes were to be crashed into CIA and FBI headquarters, unidentified nuclear power plants, and the tallest buildings in California and Washington State.  The centerpiece of his original proposal was the tenth plane, which he would have piloted himself.  Rather than crashing the plane into a target, he would have killed every adult male passenger, contacted the media from the air, and landed the aircraft at a U.S. airport.  He says he then would have made a speech denouncing U.S. policies in the Middle East before releasing all of the women and children passengers.

KSM concedes that this ambitious proposal initially received only a lukewarm response from the al Qaeda leadership in view of the proposal's scale and complexity.  When Bin Ladin finally approved the operation, he scrapped the idea of using one of the hijacked planes to make a public statement but provided KSM with four operatives, only two of whom ultimately would participate in the 9/11 attacks.  Those two operatives, Nawaf al Hamzi and Khalid al Mihdhar, had already acquired U.S. visas in their Saudi passports by the time they were picked for the operation.  According to KSM, both had obtained visas because they wanted to participate in an operation against the United States, having been inspired by a friend of theirs who was a suicide bomber in the August 1998 attack on the U.S. embassy in Kenya.

It soon became clear to KSM that the other two operatives, Khallad bin Attash and Abu Bara al Taizi—both of whom had Yemeni, not Saudi, documentation—would not be able to obtain U.S. visas.  Khallad, in fact, had already been turned down in April 1999, at about the same time that Hazmi and Mihdhar acquired their U.S. visas in Saudi Arabia.

Although he recognized that Yemeni operatives would not be able to travel to the United States as readily as Saudis like Hazmi and Mihdhar, KSM wanted Khallad and Abu Bara to take part in the operation.  Accordingly, by mid-1999, KSM made his first major adjustment, splitting the plot into two parts so that Yemeni operatives could participate without having to obtain U.S. visas.  He focused in particular on Southeast Asia because he believed it would be easier for Yemenis to travel there than to the United States.

The first part of the operation would remain as originally planned—operatives including Hazmi and Mihdhar would hijack commercial flights and crash them into U.S. targets. The second part, however, would now involve using Yemeni operatives in a modified version of the Bojinka plot: operatives would hijack U.S. commercial planes flying Pacific routes from Southeast Asia and explode them in mid-air instead of crashing them into particular targets.  (An alternate scenario, according to KSM, involved flying planes into U.S. targets in Japan, Singapore or Korea.)  All planes in the United States and in Southeast Asia, however, were to be crashed or exploded more or less simultaneously, to maximize the psychological impact of the attacks.

Khallad has admitted casing a flight between Bangkok and Hong Kong in early January 2000 in preparation for the revised operation.  According to his account, he reported the results from this mission to Bin Ladin and KSM.  By April or May 2000, however, Bin

Ladin had decided to cancel the Southeast Asia part of the planes operation because he believed it would be too difficult to synchronize the hijacking and crashing of flights on opposite sides of the globe.  Deprived of the opportunity to become a suicide operative, Khallad was re-deployed, first helping KSM communicate with Hazmi in California and later assisting in the *Cole* bombing, much as Binalshibh was assigned to assist the Hamburg pilots after failing to obtain a visa himself.

Hazmi and Mihdhar were particularly ill-prepared to stage an operation in the United States.  Neither had any significant exposure to western culture; Hazmi barely spoke English, and Mihdhar spoke none.  Given this background, KSM had real concerns about whether they would be able to fulfill their mission.  In fact, he maintains that the only reason the two operatives were included in the 9/11 plot was their prior acquisition of visas and Bin Ladin's personal interest in having them participate.

Unlike the other 9/11 hijackers—who were instructed to avoid associating with others in the local Muslim community—Hazmi and Mihdhar received specific permission from KSM to seek assistance at mosques when they first arrived in the United States.  According to KSM, he also directed them to enroll in English language classes as soon as possible so that they could begin flight training right away.  As KSM tells it, Hazmi and Mihdhar attempted to enroll in three language schools upon arriving in Los Angeles but failed to attend classes at any of them.  Once they moved to San Diego, Hazmi enrolled in English classes and, a little later, both took some flight training, but they failed to make progress in either area.

According to their flight instructors, Hazmi and Mihdhar said they wanted to learn how to control an aircraft in flight, but took no interest in take-offs or landings.  One Arabic-speaking flight instructor has recalled that the two were keen on learning to fly large jets, particularly Boeing aircraft.  When the instructor informed them that, like all students, they would have to begin training on single engine aircraft before learning to fly jets, they expressed such disappointment that the instructor thought they were either joking or dreaming.

KSM says now that he was surprised by the failure of Hazmi and Mihdhar to become pilots.  This failure, however, had little impact on the plot.  The setback occurred early enough to permit further adjustment.  Al Qaeda's discovery of new operatives—men with English language skills, higher education, exposure to the West, and, in the case of Hani Hanjour, prior flight training—soon remedied the problem.

*Additional Saudi Participants in the Plot*

In addition to the reassignment of operatives, the plot saw a variety of potential suicide hijackers who never participated in the attacks.  These al Qaeda members either backed out of their assignment, had trouble acquiring the necessary travel documentation, or were removed from the operation by al Qaeda leadership.

14

According to KSM, al Qaeda intended to use 25 or 26 hijackers for the 9/11 plot, as opposed to the 19 who actually participated.  Even as late as the summer of 2001, KSM wanted to send as many operatives as possible to the United States in order to increase the chances for successful attacks, contemplating as many as seven or more hijackers per flight.  We have identified at least nine candidate hijackers slated to be part of the 9/11 attacks at one time or another:

-- Ali Abd al Rahman al Faqasi al Ghamdi and Zuhair al Thubaiti were both removed from the operation by al Qaeda leadership.

-- Khalid Saeed Ahmad al Zahrani and Saeed Abdullah Saeed al Ghamdi, whom we discussed in Staff Statement No. 1, failed to acquire U.S. visas.

-- Saeed al Baluchi and Qutaybah al Najdi both backed out after Najdi was stopped and briefly questioned by airport security officials in Bahrain.

-- Saud al Rashid and Mushabib al Hamlan apparently withdrew under pressure from their families in Saudi Arabia.

-- And, as discussed in Staff Statement No. 1, Mohamed Mani Ahmad al Kahtani was denied entry by U.S. officials at the airport in Orlando on August 4, 2001.

For the most part, these operatives appear to have been selected by Bin Ladin in Afghanistan and assigned to KSM in much the same manner as the others.  All nine were Saudi nationals.  A tenth individual, a Tunisian named Abderraouf Jdey, may have been a candidate to participate in the 9/11 attack, or he may have been a candidate to participate in a later attack.  He withdrew, and we will discuss him later in connection with plans involving Moussaoui.  None of these potential hijackers succeeded in joining the 19.

*Internal Disagreement:  Atta, Jarrah, and Moussaoui*

Internal disagreement among the 9/11 plotters may have posed the greatest potential vulnerability for the plot.  It appears that, during the summer of 2001, friction developed between Atta and Jarrah—two of the three Hamburg pilots—and that Jarrah may even have considered dropping out of the operation.  What is more, it appears as if KSM may have been preparing another al Qaeda operative, Zacarias Moussaoui, to take Jarrah's place.

Jarrah was different from the other Hamburg pilots, Atta and Shehhi.  Given his background and personality, Jarrah seemed a relatively unlikely candidate to become an al Qaeda suicide operative.  From an affluent family, he studied at private, Christian schools in Lebanon before deciding to study abroad in Germany.  He knew the best nightclubs and discos in Beirut, and partied with fellow students in Germany, even drinking beer—a clear taboo for any religious Muslim.  His serious involvement with his girlfriend, Aysel Senguen, and close family ties resulted in almost daily telephone

conversations with them while he was in the United States.  He took five overseas trips within a ten-month span before September 11.

Jarrah also appears to have projected a friendly, engaging personality while in the United States.  Here he is, hair frosted, proudly displaying the pilot's certificate he received during his flight training in Florida.  Yet, this is the same person who, only a year earlier, had journeyed from Hamburg to Afghanistan and pledged to become one of Bin Ladin's suicide operatives.

Both KSM and Binalshibh have reported that Atta and Jarrah clashed over the extent of Jarrah's autonomy and involvement in planning the operation.  Binalshibh believes the dispute stemmed, at least in part, from Jarrah's frequent visits to and contact with his girlfriend and his family.  Further, unlike Atta and Shehhi—who had attended flight school together—Jarrah spent much of his time in the United States alone.  Binalshibh was supposed to have trained with Jarrah but failed to obtain a U.S. visa.  As a result, according to Binalshibh, Jarrah felt isolated and excluded from decision-making.  Binalshibh claims he had to mediate between Atta and Jarrah.

Jarrah's final trip to see his girlfriend, from July 25 to August 5, 2001, is of particular interest.  In contrast to his prior trips, this time Senguen bought him a one-way ticket to Germany.  Moreover, it appears that Atta drove him to the airport in Miami, another unusual circumstance suggesting that something may have been amiss.  Finally, according to Binalshibh, who met Jarrah at the airport in Duesseldorf, Jarrah said he needed to see Senguen right away.  When he had time to meet with Binalshibh a few days later, the two of them had an emotional conversation during which Binalshibh encouraged Jarrah to see the plan through.

Perhaps the most significant evidence that Jarrah was reconsidering his participation in the 9/11 plot resides in communications that took place between KSM and Binalshibh in mid-July 2001.  During the spring and summer of 2001, KSM had a number of conversations that appear to have concerned the 9/11 plot.  Both KSM and Binalshibh confirm discussing the plot during their mid-July conversation, which occurred just a few days before Jarrah embarked on his last trip to Germany.  At this point, Binalshibh had just returned from his meeting with Atta in Spain and was now reporting to KSM on the status of the plot.  Concerned that Jarrah might drop out of the operation, KSM emphasized to Binalshibh the importance of ensuring peace between Jarrah and Atta.  In the course of discussing this concern and the potential delay of the plot, moreover, KSM instructed Binalshibh to send "the skirts" to "Sally"—a coded reference instructing Binalshibh to send funds to Zacarias Moussaoui.  Atta and Jarrah were referred to as an unhappy couple.  KSM warned that if Jarrah "asks for a divorce, it is going to cost a lot of money."

There is good reason to believe that KSM wanted money sent to Moussaoui to prepare him as a potential substitute pilot in the event Jarrah dropped out.  Moussaoui attended al Qaeda training camps in Afghanistan.  Sent to Malaysia in September 2000 by Bin Ladin

and KSM to obtain pilot training, Moussaoui told terrorist associates there about his plans to crash a plane into the White House. He came to the United States in February 2001—armed with the fruits of Atta's flight school research—and started taking flight lessons at the Airman Flight School in Norman, Oklahoma, but stopped that training by early June. Shortly after he received $14,000 from Binalshibh in early August, however, Moussaoui rushed into an intensive flight simulator course at Pan Am International Flight Academy in Eagan, Minnesota. At about this same time, he also purchased two knives and inquired of two GPS manufacturers whether their units could be converted for aeronautical use—actions that closely resembled those of the 9/11 hijackers during their final preparations for the attacks. Moussaoui's August 16, 2001 arrest ended his simulator training and may have prevented him from joining the 9/11 operation.

The reports of the interrogations of Binalshibh and KSM regarding Moussaoui are not entirely consistent. According to Binalshibh, he understood that KSM was instructing him to send the money to Moussaoui in July 2001 as part of the 9/11 plot. Moreover, recounting a post-9/11 discussion he had with KSM in Kandahar, Binalshibh says KSM referred to Moussaoui as if he had been part of the 9/11 plot, noting that Moussaoui was arrested because he was not sufficiently discreet and had been an exception to Bin Ladin's strong overall record of choosing the right operatives for the plot.

KSM, on the other hand, denies that Moussaoui was ever intended to be part of the 9/11 operation and was slated instead to participate in a so-called "second wave" of attacks on the West Coast after September 11. KSM also claims that Moussaoui never had any contact with Atta in the United States, and we have seen nothing to the contrary. Notably, however, KSM also claims that by the summer of 2001 he was too busy with the 9/11 plot to plan the second wave attacks. Moreover, he admits that only three potential pilots were recruited for the alleged second wave, Moussaoui, Abderraouf Jdey, also known as Faruq al Tunisi (a Canadian passport holder), and Zaini Zakaria, also known as Mussa. By the summer of 2001, both Jdey and Zaini already had backed out of the operation. The case of Jdey holds particular interest, as some evidence indicates that he may have been selected for the planes operation at the same time as the Hamburg group.

In any event, Moussaoui's arrest did not cause the plot any difficulty. Jarrah returned to the United States on August 5 and, as subsequent events would demonstrate, clearly was resolved to complete the operation.

*Timing and Targets*

The conspirators' selection of both the date and the targets for the attacks provides another opportunity to examine the plot from within. Although Atta enjoyed wide discretion as tactical commander, Bin Ladin had strong opinions regarding both issues. The date of the attacks apparently was not chosen much more than three weeks before September 11. According to Binalshibh, when he met with Atta in Spain in mid-July, Atta could do no more than estimate that he would still need five to six weeks before he could pick a date. Then, in a mid-August phone call to Binalshibh, Atta conveyed the date for the attacks, which Binalshibh dutifully passed up his chain of command in a

message personally delivered to Afghanistan by Hamburg associate Zakariya Essabar in late August.

Bin Ladin had been pressuring KSM for months to advance the attack date.  According to KSM, Bin Ladin had even asked that the attacks occur as early as mid-2000, after Israeli opposition party leader Ariel Sharon caused an outcry in the Middle East by visiting a sensitive and contested holy site in Jerusalem that is sacred to both Muslims and Jews.  Although Bin Ladin recognized that Atta and the other pilots had only just arrived in the United States to begin their flight training, the al Qaeda leader wanted to punish the United States for supporting Israel.  He allegedly told KSM it would be sufficient simply to down the planes and not hit specific targets.  KSM withstood this pressure, arguing that the operation would not be successful unless the pilots were fully trained and the hijacking teams were larger.

In 2001, Bin Ladin apparently pressured KSM twice more for an earlier date.  According to KSM, Bin Ladin first requested a date of May 12, 2001, the seven-month anniversary of the *Cole* bombing.  Then, when Bin Ladin learned from the media that Sharon would be visiting the White House in June or July 2001, he attempted once more to accelerate the operation.  In both instances, KSM insisted that the hijacker teams were not yet ready.

Other al Qaeda detainees also confirm that the 9/11 attacks were delayed during the summer of 2001, despite Bin Ladin's wishes.  According to one operative, Khalid al Mihdhar disclosed that attacks had been delayed from May until July, and later from July until September.  According to another al Qaeda member in Kandahar that summer, a general warning—much like the alert issued in the camps two weeks before the *Cole* bombing and ten days before the eventual 9/11 attacks—was issued in July or early August of 2001.  As a result of this warning, many al Qaeda members dispersed with their families, internal security was increased, and Bin Ladin dropped out of sight for about 30 days until the alert was cancelled.

KSM claims he did not inform Atta or the other conspirators that Bin Ladin wanted to advance the date because he knew they would move forward when they were ready.  Atta was very busy organizing the late arriving operatives, coordinating the flight teams, and finalizing the targets.  In fact, target selection appears to have influenced the timing of the attacks.  As revealed by an Atta-Binalshibh communication at this time, recovered later from a computer captured with KSM, Atta selected a date after the first week of September so that the United States Congress would be in session.

According to KSM, the U.S. Capitol was indeed on the preliminary target list he had initially developed with Bin Ladin and Atef in the spring of 1999.  That preliminary list also included the White House, the Pentagon, and the World Trade Center.  KSM claims that while everyone agreed on the Capitol, he wanted to hit the World Trade Center whereas Bin Ladin favored the Pentagon and the White House.

Binalshibh confirms that Bin Ladin preferred the White House over the Capitol, a preference he made sure to convey to Atta when they met in Spain in the summer of

2001.  Atta responded that he believed the White House posed too difficult a target, but that he was waiting for Hani Hanjour and Nawaf al Hazmi to assess its feasibility.  On July 20, Hanjour—likely accompanied by Hazmi—rented a plane and took a practice flight from Fairfield, New Jersey to Gaithersburg, Maryland, a route that would have allowed them to fly near Washington, DC.   When Binalshibh pressed Atta to retain the White House as a target during one of their communications in early August, Atta agreed but said he would hold the Capitol in reserve as an alternate target, in case the White House proved impossible.  Based on another exchange between Atta and Binalshibh, as late as September 9—two days before the attacks—the conspirators may still have been uncertain about which Washington target they would strike.

*Dissent Among al Qaeda Leaders*

The attitude of the al Qaeda leadership toward the 9/11 plot represents one last area for insight.  As Atta made his final preparations during the summer of 2001, dissent emerged among al Qaeda leaders in Afghanistan over whether to proceed with the attack.  Although access to details of the plot was carefully guarded, word started to spread during the summer of 2001 that an attack against the United States was imminent.  According to KSM, he was widely known within al Qaeda to be planning some kind of operation against the United States.  Many were even aware that he had been preparing operatives to go to the United States, as reported by a CIA source in June 2001.  Moreover, that summer Bin Ladin made several remarks hinting at an upcoming attack, which spawned rumors throughout the jihadist community worldwide.  For instance, KSM claims that, in a speech at the al Faruq training camp in Afghanistan, Bin Ladin specifically urged trainees to pray for the success of an upcoming attack involving 20 martyrs.

With news of an impending attack against the United States gaining wider circulation, a rift developed within al Qaeda's leadership.  Although Bin Ladin wanted the operation to proceed as soon as possible, several senior al Qaeda figures thought they should follow the position taken by their Afghan host, Taliban leader Mullah Omar, who opposed attacking the United States.  According to one al Qaeda member, when Bin Ladin returned after the general alert in late July, he spoke to his confidants about problems he was having with Omar's unwillingness to allow any further attacks against the United States from Afghanistan.

KSM claims that Omar opposed attacking the United States for ideological reasons but permitted attacks against Jewish targets.  KSM denies that Omar's opposition reflected concern about U.S. retaliation but notes that the Taliban leader was under pressure from the Pakistani government to keep al Qaeda from engaging in operations outside Afghanistan.  While some senior al Qaeda figures opposed the 9/11 operation out of deference to Omar, others reportedly expressed concern that the U.S. would respond militarily.

Bin Ladin, on the other hand, reportedly argued that attacks against the United States needed to be carried out immediately to support the insurgency in the Israeli occupied

territories and to protest the presence of U.S. military forces in Saudi Arabia.  Bin Ladin also thought that an attack against the United States would reap al Qaeda a recruiting and fundraising bonanza.  In his thinking, the more al Qaeda did, the more support it would gain.  Although he faced opposition from many of his most senior advisers—including Shura council members Shaykh Saeed, Sayf al Adl, and Abu Hafs the Mauritanian—Bin Ladin effectively overruled their objections, and the attacks went forward.

# Exhibit O

بسم الله الرحمن الرحيم

١) ـــــــــــــــ ( ز ا ك )
٢) ـــــــــــــــ ( ر ا ئ )
٣) ـــــــــــــــ ( ا س م )
٤) ـــــــــــــــ ( ا بح )
٥) ا براهيم ـــــــ ( بح )
٦) ـــــــ كامل ( ر بح )
٧) ا براهيم ( ا س ا )
٨) ا ل ( ر ح )
٩) ـــــــ ( ا س ا )
١٠) ـــــــ ( ا س )
١١) ـــــــ ( ا ب )
١٢) ـــــــ ( ا ر )
١٣) ـــــــ ( ا ل )
١٤) ـــــــ ( ي ك )
١٥) ـــــــ ( م ح )
١٦) ـــــــ ( ب ح )

*(Parenthetical remarks in Italic are the translator's)*

*(Document name: **TAREEKHOSAMA/41/Tareekh Osama.108**)*

In the name of God, the most gracious, the most merciful

And spend for God's cause *(Quraanic verse)*

| | | |
|---|---|---|
| 1) | Suleiman Al-Rashid. | (Wail) |
| 2) | Abdel Qader Bakri. | (Wail) |
| 3) | Bin Laden Brothers. | (Usama) |
| 4) | Yousif Jameel. | (Baterji) |
| 5) | Ibrahim Afandi. | (Baterji) |
| 6) | Saleh Kamel. | (Baterji) |
| 7) | Al-Rajhi. | (Usama) |
| 8) | Al-Jumaih. Jeddah (S.A) | (Baterji) |
| 9) | Al-Sharbatly | (Usama) |
| 10) | *(Illegible)* Al-Naghi | (Usama) |
| 11) | Bin Mahfoodh | (Usama) |
| 12) | Abdel Qader Faqeeh | (Usama) |
| 13) | Salah Al-Din Abdel Jawad | (Wail) |
| 14) | Ahmad Turki Yamani | (Baterji) |
| 15) | Abdel Hadi Taher | (Wail) |
| 16) | Mohammed Omar *(illegible)* | (Baterji) |
| 17) | Al- Kuwait | (Usama) |
| 18) | Ahmad Al-Harbi | (Salem Taher) |

BOS000002

19)   Al-Issaei                    (Salem Taher)

20)   Hamad Al-Husaini          (Abu Mazin)

BOS000003

# Exhibit P

J.C. Brisard
Witness Statement
Dated:   21 May 2003

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

B E T W E E N:

KHALID SALIM A BIN MAHFOUZ

**Claimant**

- and -

(1) GRAEME BEATON
(2) PETER WRIGHT
(3) ASSOCIATED NEWSPAPERS LIMITED

**Defendants**

---

## WITNESS STATEMENT OF JEAN-CHARLES BRISARD

---

I, JEAN-CHARLES BRISARD, of 42, avenue Montaigne, 75008 Paris WILL SAY as follows:-

1. I am the lead investigator in the complaint filed in the US District Court for the District of Columbia ("the 9/11 Complaint") on 15 August 2002 by around 4,000 relatives of victims of the 11 September 2001 attacks on the US. I am leading a team which is conducting investigations in a number of jurisdictions including the United States, Europe, the Middle East and Africa.

2. I am an expert in the area of the financing of terrorism, having been involved in this field since 1997. From 1993 to 1997 I was the Assistant to the Chief Anti-Terrorism Prosecutor in Paris, Alain Marsaud.  From 1997 to 2001 I was a consultant with the French Intelligence Service advising them on the Al-Qaeda financial networks.  During this period I was commissioned by the President of the Security Council of the United Nations to prepare a report on the financing of terrorism which was published on 19 December 2002 (see "JCB1" for a copy of this report).  I also prepared a report for the French National Assembly on the same subject (attached at "JCB2").  This report was published in October 2001. Since 11 September 2001, I have testified in several Court proceedings on money laundering and terrorism financing networks.

3. Since 1997 I have been gathering evidence on the claimant in relation to allegations that he knowingly supported terrorism.  This has involved obtaining testimony from

intelligence sources, and other relevant witnesses and documentary evidence from (inter alia) US government reports, Court documents, police investigations, business registries and other reliable sources.

4.      I have been asked to give this witness statement by Mr Shanmuganathan of Taylor Wessing in support of the defendants' application to have this matter stayed pending the resolution of the libel action brought against me in (inter alia) Belgium ("the Belgian Claim") by the claimant with regard to a best selling book co-authored by me entitled "Forbidden Truth" ("the Book"). I understand from Mr Shanmuganathan that proceedings have also been issued against me in England by the claimant for libel with regard to the Book ("the English Claim"). I attach to this statement a copy of the relevant chapter of the Book which is the subject of the claims and a translation made by TransPerfect Translations Limited of the Belgian Claim (see "JCB3" and "JCB4" respectively). It should be noted that since the first public mention of the claimant in relation to terrorism financing (French National Assembly report in October 2001), the claimant has not until recently challenged the evidence brought against him. Moreover, my book was published in France in November 2001, then at the beginning of 2002 in, Germany, Italy, Japan and the United States among others, with worldwide publicity, yet the claimant, until recently, has never challenged by any means the publication or publicity on the Book.

5.      I confirm that I intend to vigorously defend both the Belgian Claim and if served, the English Claim. I also confirm that I intend to fully justify the truth of the allegation made in the Book that the claimant knowingly supported terrorism. The Court should also be aware that the claimant appears as a defendant in the 9/11 Complaint (see extracts from the 9/11 Complaint attached at "JCB5").

6.      For the purposes of the defendants' application I set out below the key evidence I have gathered to date. For reasons of confidentiality, in some instances, I am not in a position to reveal the identity of my sources. I should add that I also have evidence connecting the claimant with individuals and companies alleged to be involved in the financing of terrorism but I have been asked not to deal with this evidence because it is considered too detailed for the purposes for which this statement is prepared. I confirm that I intend to put this evidence before the Court in my defence of the English claim.

### THE GOLDEN CHAIN LIST

7. According to the US Federal Bureau of Investigation (the "FBI"), the Golden Chain list is a 1988 Al-Qaeda internal handwritten memorandum listing the people referred to within Al-Qaeda as "the Golden Chain", namely the twenty main donors to the terrorist organization. I attach at "JCB6" a copy of this list in its original Arabic form, the original translated version and an amended translated version. The amended translation was done by two certified translators used by the US District Court for the District of Columbia for the purposes of the 9/11 Complaint because it was clear to me because of my knowledge of Al-Qaeda funders that the original translated version was inaccurate. These documents were disclosed by the US Government to the US District Court Northern District of Illinois Eastern Division (attached at "JCB7"). As stated in the document the list was found in March 2002 by the Bosnian Government as a result of searches at the offices of Benevolence International Foundation in Sarajevo and handed over to the US Embassy in Sarajevo. The BIF is a charity suspected of funding terrorist organisations. I am informed by translators to the Court that the reference to "Mahfoodh" in this initial translation is inaccurate and the correct translation is "Mahfouz". Alongside each name is the intended recipient of the donation. The claimant's name is found next to Osama bin Laden. Whilst the claimant has admitted in a correction printed in the Wall Street Journal on 18 March 2003 (see "JCB8") that he gave a donation in the 1980s to a fund to support the Afghan resistance against the Soviet invasion, he denies making any donations to Osama bin Laden directly. Moreover, the claimant fails to admit that the war against the Soviet army was over at the time of Al-Qaeda's foundation in September 1988.

### BIN LADEN'S BROTHER-IN-LAW

8. James Woolsey, former CIA director, stated in a hearing of the Senate Judiciary Committee on Counterterrorism policy on 3 September 1998 (see attached transcript at "JCB9") that the claimant was the brother-in-law of Osama bin Laden. I set out below the relevant extract:

> "...is a protege of a Mr.Hafuz (sp), the chairman of the National Commercial Bank of Saudi Arabia. Mr. Hafuz's sister is married, I understand, to Mr bin Laden. So, there were somes times [should be "ties"] to Mr. bin Laden, financial and otherwise."

9. I understand that it has been reported in an LA Times article dated 26 February 2003 (attached at "JCB10") that Mr Woolsey is now stating that he was not referring to the

claimant in his testimony but a "Mr Hafous". This could not be the case as there has never been a Mr Hafous who has been the chairman of the National Commercial Bank ("the NCB"). At the relevant time (which I expand on below) the claimant was chairman of the NCB. In any event I have interviewed Joel Soler, an investigative journalist who, in preparing a documentary for Fox News on Osama bin Laden (which is yet to be broadcast), interviewed several cousins and a sister-in-law of Osama bin Laden who stated that Osama bin Laden was the brother-in-law of the claimant. Furthermore, a secret witness source, who is a former employee of the claimant, also confirmed that information for the purpose of the 9/11 Complaint.

### BANK OF CREDIT AND COMMERCE INTERNATIONAL

10.     The claimant was born in 1928.  I attach to my statement at "JCB11" copies of an extract from the ICC Company Directory and Companies House database on the Bank of Credit and Commerce International SA ("BCCI") which shows that the claimant was an executive director of BCCI and that his date of birth is given as December 1928.

11.     Between 1986 and 1999 the claimant was Director of BCCI.  Indeed a PriceWaterhouse report, commissioned by the liquidator of BCCI, refers to the claimant as Chief Operating Officer of the bank.  In 1986, he became one of its major shareholders, holding 20% of the shares with his brothers.

12.     The claimant was indicted in the United States District Court for the Southern District of New York on 1 July 1992 on charges of participation in a scheme to defraud in the first degree in violation of New York Penal Law §190.65, in connection with certain of the claimant's acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans and fraudulent conduct in failing to disclose the status of the claimant's interest in BCCI.

13.     Whilst the claimant was an executive director, BCCI was implicated in supporting terrorism, as reported in a 1992 US Senate report on the BCCI affair (see attached extracts from the report at "JCB 12"):

> "In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al – Bannah or Abu Nidal, and his terrorist organisation".

14.     The Senate Report detailed the initial involvement of BCCI in terrorism financial support:-

4

"BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organisations, who received payment at BCCI – London and other branches directly by Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the Bank's pan-third world and a pro-Islam ideology would have recommended it to Arab terrorist groups.

## NATIONAL COMMERCIAL BANK

15.  After his fathers' death in or about 1986, the claimant became President and Chief Executive Officer of the Saudi National Commercial Bank ("the NCB") until in or about 1999 and its principal shareholder with control over more than 50% of the Bank's capital.

16.  According to Vincent Cannistraro, the former CIA Chief of Counterterrorism, during a congress hearing in October 2001 (see attached transcript at "JCB13"), the NCB was operating during those years as a "financial conduit" for Osama bin Laden's operations. He stated:-

"How does the al-Qaeda organisation fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid the enterprises run by these men being attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funding contributions to Bin Laden through this mechanism".

17.  US authorities discovered suspicious transfers of tens of millions of dollars from the NCB to charity organisations associated with Osama bin Laden, some of which were controlled by the claimant's family. The Kingdom of Saudi Arabia therefore ordered an audit of the NCB in order to verify the allegations made by the US authorities. The audit uncovered massive transfers made to charity organisations with ties to Osama bin Laden, some of which were controlled by members of the claimant's family.

5

18.   Whilst I cannot reveal the details of how (and from whom) I obtained the document due to the confidentiality of my source, I confirm that I have obtained from Intelligence sources extracts from the Saudi Government's audit of NCB. I understand that the claimant is denying that this audit took place, although it was confirmed to me by an NCB source. A copy of the extracts (which have been translated) are attached at "JCB14". The audit points out that $3 million was transferred to the Muwafaq Foundation, which is suspected of supporting Osama Bin Ladin's activities (see below). According to a recent interview in Forbes magazine (attached at "JCB15"), Abdulrahman Khalid Salim Bin Mahfouz, the claimant's son, states that the Muwafaq Foundation was the "brainchild" of his father, "who funded it with as much as $30 million".

19.   The NCB facilitated through its agencies in Jeddah (branches #101 and #106 of Jeddah), Saudi Arabia, various financial transfers between Muhammed Galeb Kalaje Zouaydi, financial head of the Spanish Al-Qaeda cell, and Al-Qaeda operatives, for example, with Nabil Sayadi in Belgium. Mr Sayadi was in charge of the Al-Qaeda operations in Eastern Europe as stated in a Spanish criminal judicial procedure by the Anti-Terrorist Judge Balthazar Garzon Real. Whilst my source for this information is confidential I attach a copy of a bank transfer from Mr Zouaydi to Mr Sayadi which was obtained from the Spanish procedure (see "JCB16").

**MUWAFAQ FOUNDATION**

20.   According to an Office of Foreign Assets Control press release dated 12 October 2001 (attach at "JCB17"), the assets of Yasin Al-Qadi, chairman of the Muwafaq Foundation, were frozen on 12 October 2001 by the US Treasury Department as a Special Designated Global Terrorist, pursuant to executive order 13224 blocking property and prohibiting transactions with persons who threaten to commit or support terrorism. The US Authorities described Mr Al-Qadi as a "terrorist" and the Muwafaq Foundation, as an organisation that "financially supports terrorism" and "funnels money to the Al-Qaeda terrorist network"

**SEDCO AND IDF**

21.   The Bin Mahfouz family businesses are organised through a series of holding companies, including a conglomerate, the Saudi Economic and Development Company Llc ("SEDCO"). In 1997, some of the directors of SEDCO founded the charity organisation International Development Foundation ("IDF"). The charity was registered with the UK authorities on 22 October 1998. IDF executors include the

claimant's brothers, Mohammed Bin Salim Bin Mahfouz, Ahmed Bin Salim Bin Mahfouz, Abdelelah Bin Salim Bin Mahfouz and Saleh Bin Salim Bin Mahfouz.

22. According to a confidential intelligence source IDF has been involved in the financing of Al-Qaeda operations in Bosnia. I was told by my source that M. Al Jaffari, who is a member of International Islamic Relief Organisation ("IIRO") in Bosnia (which is considered by (amongst others) official US intelligence sources within the Central Intelligence Agency to be the main contributor to Al-Qaeda operations), and a Bin Mahfouz representative agreed that funds for Bosnian operations be wired through London IDF accounts to IIRO and "secure" charities in Sarajevo (the identities of the charities are yet to be determined) in order to help the "Afghan groups". This information confirms the close relationship between the IIRO's and IDF's offices in London. My source (who is monitoring these charities for the Bosnian government) told me that the fact that they share the same letterbox was confirmed and that the Bin Mahfouz charity has financial operations in Bosnia that may fund terrorist activists in the region.

### SAAR FOUNDATION

23. The claimant's US representative and legal counsel, Cherif Sedky, established the SAAR Foundation in the United States in about 1983 and acted as its secretary until dissolution in 2000. Mr Sedky is a member of the board of directors of two companies controlled by the claimant, Nimir Petroleum Llc and Credit Libanais SAL. In 2002 he was also acting as chief executive officer for Nimir Petroleum Limited in London. In March 2002, US law enforcement agents conducted searches over several Islamic charities based in Virginia, including the SAAR Foundation and IIRO, which is believed to have links to Al-Qaeda and other terrorist groups. I understand from a consultant specialising in this area (who is advising in the 9/11 Complaint) that proceedings are currently being considered by the US government against Mr Sedky and the SAAR Foundation.

### MOSSAD LIST OF TERRORISTS

24. I attach at "JCB18" a copy of a Mossad list dated 2003 (which I obtained from Israeli intelligence) of terrorist suspects and financiers of terrorism. The claimant is listed on page 8 of this list along with the BIF (page 4), the IIRO (page 7), the Muwafaq Foundation-Blessed Relief (page 12) and the NCB (page 12). Whilst I cannot disclose the name of my source, I can confirm that this was obtained from a former director of Israeli intelligence.

Case 1:03-md-01570-GBD-SN   Document 304-5   Filed 07/16/04   Page 88 of 107

**US INDICTMENT**

25. I have been informed by Luxembourg's Chief General Prosecutor Carlos Zeyen and the Chief of Judicial Police in Luxembourg, Pierre Kohnen, that Jimmy Gurulé, the Under-Secretary for Enforcement at the US Treasury Department, has requested that the claimant be investigated for association with a criminal organisation (being Al-Qaeda). Indeed I understand that a sealed indictment has been issued by the US Treasury Department against the Claimant in relation to terrorism financing.

26. I believe that I have sufficient evidence to justify my allegation that the claimant knowingly supported terrorism. It is my intention to justify the truth of my allegation and to vigorously defend any action brought against me by the claimant.

**Statement of truth**

I believe that the facts stated in this witness statement are true.

Full name:              JEAN-CHARLES BRISARD

Signed:

Date:

8

J.C. Brisard
Witness Statement
Dated:   21 May 2003

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

B E T W E E N:

KHALID SALIM A BIN MAHFOUZ
**Defendant**

- and -

**(1) GRAEME BEATON**
**(2) PETER WRIGHT**
**(3) ASSOCIATED NEWSPAPERS LIMITED**
**Defendants**

---

**WITNESS STATEMENT OF JEAN-
CHARLES BRISARD**

---

TAYLOR WESSING
Carmelite
50 Victoria Embankment
Blackfriars
London EC4Y 0DX

Tel  +44 (0)20 7300 7000
Fax +44 (0)20 7300 7100
DX  41 London

Ref: NXS

IN THE HIGH COURT OF JUSTICE            HC 03X00518

QUEEN'S BENCH DIVISION

BETWEEN:

KHALID SALIM A BIN MAHFOUZ

Claimant

- and –

(1) GRAEME BEATON

(2) PETER WRIGHT

(3) ASSOCIATED NEWSPAPERS LIMITED

Defendants

---

EXHIBITS TO WITNESS STATEMENT OF
JEAN-CHARLES BRISARD

---

INDEX

| | | |
|---|---|---|
| 1. | Exhibit "JCB 1" – | United Nations report on the financing of terrorism published on 19 December 2002 by Jean-Charles Brisard for JCB Consulting |
| 2. | Exhibit "JCB 2" – | Report prepared for the French National Assembly published in October 2001 by Jean-Charles Brisard |
| 3. | Exhibit "JCB 3" – | Copy of chapter 12 of "Forbidden Truth" by Jean-Charles Brisard and Guillaume Dasquié |
| 4. | Exhibit "JCB 4" – | Translation made by TransPerfect Translations Limited of the Belgian Claim |
| 5. | Exhibit "JCB 5" – | Extracts from the complaint filed in the US District Court for the districts of Columbia on 15 August 2002 ("the 9/11 Complaint") |
| 6. | Exhibit "JCB 6" – | A copy of "The Golden Chain" memorandum |
| 7. | Exhibit "JCB 7" – | Proffer from United States of America v. Enaam M. Arnaut |
| 8. | Exhibit "JCB 8" – | Correction printed in the Wall Street Journal on 18 March 2003 |
| 9. | Exhibit "JCB 9" – | Transcript of hearing of the Senate Judiciary Committee on Counterterrorism policy on 3 September 1998 |
| 10. | Exhibit "JCB 10" – | LA Times article dated 26 February 2003 |

# Exhibit Q

**UK/BM-14 TRANSLATION**

SECOND LESSON

NECESSARY QUALIFICATIONS AND CHARACTERISTICS

FOR THE ORGANIZATION'S MEMBER

**UK/BM-15 TRANSLATION**

Necessary Qualifications fro the Organization's members

1- Islam:

The member of the Organization must be Moslem.  How can an unbeliever, someone from a revealed religion [Christian, Jew], a secular person, a communist, etc. protect Islam and Moslems and defend their goals and secrets when he does not believe in that religion [Islam]?  The Israeli Army requires that a fighter be of the Jewish religion.  Likewise, the command leadership in the Afghan and Russian armies requires any one with an officer's position to be a member of the communist party.

2- Commitment to the Organization's Ideology:

This commitment frees the Organization's members from conceptional problems.

3- Maturity:

The requirements of military work are numerous, and a minor cannot perform them.  The nature of hard and continuous work in dangerous conditions requires a great deal of psychological, mental, and intellectual fitness, which are not usually found in a minor.  It is reported that Ibn Omar - may Allah be pleased with him - said, "During Ahad [battle] when I was fourteen years of age, I was submitted [as a volunteer] to the prophet - God bless and keep him. He refused me and did not throw me in the battle.  During Khandak [trench] Day [battle] when I was fifteen years of age, I was also submitted to him, and he permitted me [to fight].

4- Sacrifice:

He [the member] has to be willing to do the work and undergo martyrdom for the purpose of achieving the goal and establishing the religion of majestic Allah on earth.

5- Listening and Obedience:

In the military, this is known today as discipline.  It is expressed by how the member obeys the orders given to him. That is what our religion urges.  The Glorious says, "O, ye who believe! Obey Allah and obey the messenger and those charged with authority among you."  In the story of Hazifa Ben Al-Yaman - may Allah have mercy on him - who was exemplary in his obedience to Allah's messenger - Allah bless and keep him.  When he [Mohammed] - Allah bless and keep him - sent him to spy on the Kureish and their allies during their siege of Madina, Hazifa said, "As he [Mohammed] called me by name to stand, he said, 'Go get me information about those people and do not alarm them about me.'

**UK/BM-16 TRANSLATION**

As I departed, I saw Abou Soufian and I placed an arrow in the bow. I [then] remembered the words of the messenger - Allah bless and keep him - 'do not alarm them about me.' If I had shot I would have hit him."

6- Keeping Secrets and Concealing Information
[This secrecy should be used] even with the closest people, for deceiving the enemies is not easy. Allah says, "Even though their plots were such that as to shake the hills! [Koranic verse]." Allah's messenger - God bless and keep him - says, "Seek Allah's help in doing your affairs in secrecy."
It was said in the proverbs, "The hearts of freemen are the tombs of secrets" and "Moslems' secrecy is faithfulness, and talking about it is faithlessness." [Mohammed] - God bless and keep him - used to keep work secrets from the closest people, even from his wife A'isha- may Allah's grace be on her.

7. Free of Illness
The Military Organization's member must fulfill this important requirement. Allah says, "There is no blame for those who are infirm, or ill, or who have no resources to spend."

8. Patience
[The member] should have plenty of patience for [enduring] afflictions if he is overcome by the enemies. He should not abandon this great path and sell himself and his religion to the enemies for his freedom. He should be patient in performing the work, even if it lasts a long time.

9. Tranquility and "Unflappability"
[The member] should have a calm personality that allows him to endure psychological traumas such as those involving bloodshed, murder, arrest, imprisonment, and reverse psychological traumas such as killing one or all of his Organization's comrades. [He should be able] to carry out the work.

10. Intelligence and Insight
When the prophet - Allah bless and keep him - sent Hazifa Ben Al-Yaman to spy on the polytheist and [Hafiza] sat among them, Abou Soufian said, "Let each one of you look at his companion." Hazifa said to his companion, "Who are you?" The companion replied, "So-and-so son of so-and-so."

**UK/BM-17 TRANSLATION**

In World War I, the German spy, Julius Seelber [PH] managed to enter Britain and work as a mail examiner due to the many languages he had mastered.  From the letters, he succeeded in obtaining important information and sent it to the Germans.  One of the letters that he checked was from a lady who had written to her brother's friend in the fleet. She mentioned that her brother used to live with her until he was transferred to a secret project that involved commercial ships.  When Seelber read that letter, he went to meet that young woman and blamed her for her loose tongue in talking about military secrets.  He, skillfully, managed to draw out of her that her brother worked in a secret project for arming old commercial ships.  These ships were to be used as decoys in the submarine war in such a way that they could come close to the submarines, as they appeared innocent.  Suddenly, cannonballs would be fired from the ship's's hidden cannons on top of the ships, which would destroy the submarines.  48 hours later that secret was handed to the Germans.

11.  Caution and Prudence
In his battle against the king of Tomedia [PH], the Roman general Speer [PH] sent an emissary to discuss with that king the matter of truce between the two armies.  In reality, he had sent him to learn about the Tomedians' ability to fight.  The general picked, Lilius [PH], one of his top commanders, for that task and sent with him some of his officers, disguised as slaves.  During that mission, one of the king's officers, Sifax [PH] pointed to one of the [disguised] slaves and yelled, "That slave is a Roman officer I had met in a neighboring city.  He was wearing a Roman uniform."  At that point, Lilius used a clever trick and managed to divert the attention of the Tomedians from that by turning to the disguised officer and quickly slapping him on the face a number of times.  He reprimanded him for wearing a Roman officer's uniform when he was a slave and for claiming a status that he did not deserve.

**UK/BM-18 TRANSLATION**

The officer accepted the slaps quietly. He bowed his head in humility and shame, as slaves do. Thus, Sifax men thought that officer was really a slave because they could not imagine that a Roman officer would accept these hits without defending himself.

King Sifax prepared a big feast for Lilius and his entourage and placed them in a house far away from his camp so they could not learn about his fortifications. They [the Romans] made another clever trick on top of the first one. They freed one of their horses and started chasing him in and around the camp. After they learned about the extent of the fortifications they caught the horse and, as planned, managed to abort their mission about the truce agreement. Shortly after their return, the Roman general attacked King Sifax' camp and burned the fortifications. Sifax was forced to seek reconciliation.

B. There was a secret agent who disguised himself as an American fur merchant. As the agent was playing cards aboard a boat with some passengers, one of the players asked him about his profession. He replied that he was a "fur merchant." The women showed interest [in him] and began asking the agent - the disguised fur merchant - many questions about the types and prices of fur. He mentioned fur price figures that amazed the women. They started avoiding and regarding him with suspicion, as though he were a thief, or crazy.

12. Truthfulness and Counsel
The Commander of the faithful, Omar Ibn Al-Khattab - may Allah be pleased with him - asserted that this characteristic was vital in those who gather information and work as spies against the Moslems' enemies. He [Omar] sent a letter to Saad Ibn Abou Wakkas - may Allah be pleased with him - saying, "If you step foot on your enemies' land, get spies on them. Choose those whom you count on for their truthfulness and advice, whether Arabs or inhabitants of that land. Liars' accounts would not benefit you, even if some of them were true; the deceiver is a spy against you and not for you.

**UK/BM-19 TRANSLATION**

13.   Ability to Observe and Analyze
The Israeli Mossad received news that some Palestinians
were going to attack an Israeli El Al airplane.   That plane
was going to Rome with Golda Meir - Allah's curse upon her
- the Prime Minister at the time, on board.   The
Palestinians had managed to use a clever trick that allowed
them to wait for the arrival of the plane without being
questioned by anyone.   They had beaten a man who sold
potatoes, kidnaped him, and hidden him.   They made two
holes in the top of that peddler's cart and placed two
tubes next to the chimney through which two Russian-made
"Strella" [PH] missiles could be launched.   The Mossad
officers traveled the airport back and forth looking for
that lead them to the Palestinians.   One officer passed the
potato cart twice  without noticing anything.   On his third
time, he noticed three chimneys, but only one of them was
working with spoke coming out of it.   He quickly steered
toward the cart and hit it hard.   The cart overturned, and
the Palestinians were captured.[1]

14.   Ability to Act, Change Positions and Conceal Oneself
a. [An example] is what Noaim Ibn Masoud had done in his
mission to cause agitation among the tribes of Koraish,
those of Ghatfan, and the Jews of Koreitha.   He would
control his reactions and managed to skillfully play his
role.   Without showing signs of inconsistency, he would
show his interest and zeal towards the Jews one time and
show his concern about the Koraish at another.

b. In 1960, a car driven by an American colonel collided
with a truck.   The colonel lost consciousness, and while
unconscious at the hospital, he started speaking Russian

---

1. This story is found in the book A'n Tarik Al-Khida' "By Way of
Deception Methods," by Victor Ostrovsky [PH].   The author claims
that the Mossad wants to kill him for writing that book.
However, I believe that the book was authorized by the Israeli
Mossad.

**UK/BM-20 TRANSLATION**

fluently.  It was later discovered that the colonel was a
Soviet spy who was planted in the United States.  He had
fought in Korea in order to conceal his true identity and
to gather information and critical secrets.  If not for the
collision, no one would have suspected or confronted him.

# Exhibit R

Case 1:03-md-01570-GBD-SN   Document 304-5   Filed 07/16/04   Page 100 of 107



**NATO OTAN** On-line library

Updated: 02-Oct-2001

**NATO Speeches**

**NATO HQ**

**2 October 2001**

**Audio file**
(**.MP3/2.015Kb**)

# Statement

## by NATO Secretary General, Lord Robertson

This morning, the United States briefed the North Atlantic Council on the results of the investigation into who was responsible for the horrific terrorist attacks which took place on 11 September.

The briefing was given by Ambassador Frank Taylor, the United States Department of State Coordinator for Counter-terrorism.

This morning's briefing follows those offered by United States Deputy Secretary of State Richard Armitage and United States Deputy Secretary of Defense Paul Wolfowitz, and illustrates the commitment of the United States to maintain close cooperation with Allies.

Today's was classified briefing and so I cannot give you all the details. Briefings are also being given directly by the United States to the Allies in their capitals.

The briefing addressed the events of 11 September themselves, the results of the investigation so far, what is known about Osama bin Laden and the Al-Qaida organisation and their involvement in the attacks and in previous terrorist activity, and the links between Al-Qaida and the Taleban regime in Afghanistan.



The facts are clear and compelling. The information presented points conclusively to an Al-Qaida role in the 11 September attacks.

We know that the individuals who carried out these attacks were part of the world-wide terrorist network of Al-Qaida, headed by Osama bin Laden and his key lieutenants and protected by the Taleban.

On the basis of this briefing, it has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the

Washington Treaty, which states that an armed attack on one or more of the Allies in Europe or North America shall be considered an attack against them all.

I want to reiterate that the United States of America can rely on the full support of its 18 NATO Allies in the campaign against terrorism.



# Exhibit S





For Immediate Release
Office of the Press Secretary
September 20, 2001

## Address to a Joint Session of Congress and the American People

United States Capitol
Washington, D.C.

View the President's Remarks
Listen to the President's Remarks

9:00 P.M. EDT

THE PRESIDENT:  Mr. Speaker, Mr. President Pro Tempore, members of Congress, and fellow Americans:

In the normal course of events, Presidents come to this chamber to report on the state of the Union.  Tonight, no such report is needed.  It has already been delivered by the American people.

We have seen it in the courage of passengers, who rushed terrorists to save others on the ground -- passengers like an exceptional man named Todd Beamer.  And would you please help me to welcome his wife, Lisa Beamer, here tonight.  (Applause.)

We have seen the state of our Union in the endurance of rescuers, working past exhaustion.  We have seen the unfurling of flags, the lighting of candles, the giving of blood, the saying of prayers -- in English, Hebrew, and Arabic.  We have seen the decency of a loving and giving people who have made the grief of strangers their own.

My fellow citizens, for the last nine days, the entire world has seen for itself the state of our Union -- and it is strong.  (Applause.)

Tonight we are a country awakened to danger and called to defend freedom.  Our grief has turned to anger, and anger to resolution.  Whether we bring our enemies to justice, or bring justice to our enemies, justice will be done.  (Applause.)

I thank the Congress for its leadership at such an important time.  All of America was touched on the evening of the tragedy to see Republicans and Democrats joined together on the steps of this Capitol, singing "God Bless America."  And you did more than sing; you acted, by delivering $40 billion to rebuild our communities and meet the needs of our military.

Speaker Hastert, Minority Leader Gephardt, Majority Leader Daschle and Senator Lott, I thank you for your friendship, for your leadership and for your service to our country.  (Applause.)

And on behalf of the American people, I thank the world for its outpouring of support.  America will never forget the sounds of our National Anthem playing at Buckingham Palace, on the streets of Paris, and at Berlin's Brandenburg Gate.

We will not forget South Korean children gathering to pray outside our embassy in Seoul, or the prayers of sympathy offered at a mosque in Cairo.  We will not forget moments of silence and days of mourning in Australia and Africa and Latin America.

Nor will we forget the citizens of 80 other nations who died with our own:  dozens of Pakistanis; more than 130 Israelis; more than 250 citizens of India; men and women from El Salvador, Iran, Mexico and Japan; and hundreds of British citizens.  America has no truer friend than Great Britain.  (Applause.)   Once again, we are joined together in a great cause -- so honored the British Prime Minister has crossed an ocean to show his unity of purpose with America.  Thank you for coming, friend.  (Applause.)

On September the 11th, enemies of freedom committed an act of war against our country.  Americans have known wars -- but for the past 136 years, they have been wars on foreign soil, except for one Sunday in 1941.  Americans have known the casualties of war -- but not at the center of a great city on a peaceful morning.  Americans have known surprise attacks -- but never before on

thousands of civilians. All of this was brought upon us in a single day -- and night fell on a different world, a world where freedom itself is under attack.

Americans have many questions tonight. Americans are asking: Who attacked our country? The evidence we have gathered all points to a collection of loosely affiliated terrorist organizations known as al Qaeda. They are the same murderers indicted for bombing American embassies in Tanzania and Kenya, and responsible for bombing the USS Cole.

Al Qaeda is to terror what the mafia is to crime. But its goal is not making money; its goal is remaking the world -- and imposing its radical beliefs on people everywhere.

The terrorists practice a fringe form of Islamic extremism that has been rejected by Muslim scholars and the vast majority of Muslim clerics -- a fringe movement that perverts the peaceful teachings of Islam. The terrorists' directive commands them to kill Christians and Jews, to kill all Americans, and make no distinction among military and civilians, including women and children.

This group and its leader -- a person named Osama bin Laden -- are linked to many other organizations in different countries, including the Egyptian Islamic Jihad and the Islamic Movement of Uzbekistan. There are thousands of these terrorists in more than 60 countries. They are recruited from their own nations and neighborhoods and brought to camps in places like Afghanistan, where they are trained in the tactics of terror. They are sent back to their homes or sent to hide in countries around the world to plot evil and destruction.

The leadership of al Qaeda has great influence in Afghanistan and supports the Taliban regime in controlling most of that country. In Afghanistan, we see al Qaeda's vision for the world.

Afghanistan's people have been brutalized -- many are starving and many have fled. Women are not allowed to attend school. You can be jailed for owning a television. Religion can be practiced only as their leaders dictate. A man can be jailed in Afghanistan if his beard is not long enough.

The United States respects the people of Afghanistan -- after all, we are currently its largest source of humanitarian aid -- but we condemn the Taliban regime. (Applause.) It is not only repressing its own people, it is threatening people everywhere by sponsoring and sheltering and supplying terrorists. By aiding and abetting murder, the Taliban regime is committing murder.

And tonight, the United States of America makes the following demands on the Taliban: Deliver to United States authorities all the leaders of al Qaeda who hide in your land. (Applause.) Release all foreign nationals, including American citizens, you have unjustly imprisoned. Protect foreign journalists, diplomats and aid workers in your country. Close immediately and permanently every terrorist training camp in Afghanistan, and hand over every terrorist, and every person in their support structure, to appropriate authorities. (Applause.) Give the United States full access to terrorist training camps, so we can make sure they are no longer operating.

These demands are not open to negotiation or discussion. (Applause.) The Taliban must act, and act immediately. They will hand over the terrorists, or they will share in their fate.

I also want to speak tonight directly to Muslims throughout the world. We respect your faith. It's practiced freely by many millions of Americans, and by millions more in countries that America counts as friends. Its teachings are good and peaceful, and those who commit evil in the name of Allah blaspheme the name of Allah. (Applause.) The terrorists are traitors to their own faith, trying, in effect, to hijack Islam itself. The enemy of America is not our many Muslim friends; it is not our many Arab friends. Our enemy is a radical network of terrorists, and every government that supports them. (Applause.)

Our war on terror begins with al Qaeda, but it does not end there. It will not end until every terrorist group of global reach has been found, stopped and defeated. (Applause.)

Americans are asking, why do they hate us? They hate what we see right here in this chamber -- a democratically elected government. Their leaders are self-appointed. They hate our freedoms -- our freedom of religion, our freedom of speech, our freedom to vote and assemble and disagree with each other.

They want to overthrow existing governments in many Muslim countries, such as Egypt, Saudi Arabia, and Jordan. They want to drive Israel out of the Middle East. They want to drive Christians and Jews out of vast regions of Asia and Africa.

These terrorists kill not merely to end lives, but to disrupt and end a way of life.  With every atrocity, they hope that America grows fearful, retreating from the world and forsaking our friends.  They stand against us, because we stand in their way.

We are not deceived by their pretenses to piety.  We have seen their kind before.  They are the heirs of all the murderous ideologies of the 20th century.  By sacrificing human life to serve their radical visions -- by abandoning every value except the will to power -- they follow in the path of fascism, and Nazism, and totalitarianism.  And they will follow that path all the way, to where it ends:  in history's unmarked grave of discarded lies. (Applause.)

Americans are asking:  How will we fight and win this war?   We will direct every resource at our command -- every means of diplomacy, every tool of intelligence, every instrument of law enforcement, every financial influence, and every necessary weapon of war -- to the disruption and to the defeat of the global terror network.

This war will not be like the war against Iraq a decade ago, with a decisive liberation of territory and a swift conclusion.  It will not look like the air war above Kosovo two years ago, where no ground troops were used and not a single American was lost in combat.

Our response involves far more than instant retaliation and isolated strikes.  Americans should not expect one battle, but a lengthy campaign, unlike any other we have ever seen.  It may include dramatic strikes, visible on TV, and covert operations, secret even in success.  We will starve terrorists of funding, turn them one against another, drive them from place to place, until there is no refuge or no rest.  And we will pursue nations that provide aid or safe haven to terrorism.  Every nation, in every region, now has a decision to make. Either you are with us, or you are with the terrorists.  (Applause.)  From this day forward, any nation that continues to harbor or support terrorism will be regarded by the United States as a hostile regime.

Our nation has been put on notice:  We are not immune from attack.  We will take defensive measures against terrorism to protect Americans.  Today, dozens of federal departments and agencies, as well as state and local governments, have responsibilities affecting homeland security.  These efforts must be coordinated at the highest level.  So tonight I announce the creation of a Cabinet-level position reporting directly to me -- the Office of Homeland Security.

And tonight I also announce a distinguished American to lead this effort, to strengthen American security: a military veteran, an effective governor, a true patriot, a trusted friend -- Pennsylvania's Tom Ridge.  (Applause.)  He will lead, oversee and coordinate a comprehensive national strategy to safeguard our country against terrorism, and respond to any attacks that may come.

These measures are essential.  But the only way to defeat terrorism as a threat to our way of life is to stop it, eliminate it, and destroy it where it grows.  (Applause.)

Many will be involved in this effort, from FBI agents to intelligence operatives to the reservists we have called to active duty.  All deserve our thanks, and all have our prayers.  And tonight, a few miles from the damaged Pentagon, I have a message for our military:  Be ready.  I've called the Armed Forces to alert, and there is a reason.  The hour is coming when America will act, and you will make us proud.  (Applause.)

This is not, however, just America's fight.  And what is at stake is not just America's freedom.  This is the world's fight.  This is civilization's fight.  This is the fight of all who believe in progress and pluralism, tolerance and freedom.

We ask every nation to join us.  We will ask, and we will need, the help of police forces, intelligence services, and banking systems around the world.  The United States is grateful that many nations and many international organizations have already responded -- with sympathy and with support.  Nations from Latin America, to Asia, to Africa, to Europe, to the Islamic world.  Perhaps the NATO Charter reflects best the attitude of the world:  An attack on one is an attack on all.

The civilized world is rallying to America's side.  They understand that if this terror goes unpunished, their own cities, their own citizens may be next.  Terror, unanswered, can not only bring down buildings, it can threaten the stability of legitimate governments.  And you know what -- we're not going to allow it.  (Applause.)

Americans are asking:  What is expected of us?  I ask you to live your lives, and hug your children.  I know many citizens have fears tonight, and I ask you to be calm and resolute, even in the face of a continuing threat.

I ask you to uphold the values of America, and remember why so many have come here.  We are in a fight for our principles, and our first responsibility is to live by them.  No one should be singled out for unfair treatment or unkind words because of their ethnic

background or religious faith.  (Applause.)

I ask you to continue to support the victims of this tragedy with your contributions.  Those who want to give can go to a central source of information, libertyunites.org, to find the names of groups providing direct help in New York, Pennsylvania, and Virginia.

The thousands of FBI agents who are now at work in this investigation may need your cooperation, and I ask you to give it.

I ask for your patience, with the delays and inconveniences that may accompany tighter security; and for your patience in what will be a long struggle.

I ask your continued participation and confidence in the American economy.  Terrorists attacked a symbol of American prosperity.  They did not touch its source.  America is successful because of the hard work, and creativity, and enterprise of our people.  These were the true strengths of our economy before September 11th, and they are our strengths today. (Applause.)

And, finally, please continue praying for the victims of terror and their families, for those in uniform, and for our great country.  Prayer has comforted us in sorrow, and will help strengthen us for the journey ahead.

Tonight I thank my fellow Americans for what you have already done and for what you will do.  And ladies and gentlemen of the Congress, I thank you, their representatives, for what you have already done and for what we will do together.

Tonight, we face new and sudden national challenges.  We will come together to improve air safety, to dramatically expand the number of air marshals on domestic flights, and take new measures to prevent hijacking.  We will come together to promote stability and keep our airlines flying, with direct assistance during this emergency.  (Applause.)

We will come together to give law enforcement the additional tools it needs to track down terror here at home.  (Applause.)  We will come together to strengthen our intelligence capabilities to know the plans of terrorists before they act, and find them before they strike.  (Applause.)

We will come together to take active steps that strengthen America's economy, and put our people back to work.

Tonight we welcome two leaders who embody the extraordinary spirit of all New Yorkers:  Governor George Pataki, and Mayor Rudolph Giuliani.  (Applause.)  As a symbol of America's resolve, my administration will work with Congress, and these two leaders, to show the world that we will rebuild New York City.  (Applause.)

After all that has just passed -- all the lives taken, and all the possibilities and hopes that died with them -- it is natural to wonder if America's future is one of fear.  Some speak of an age of terror.  I know there are struggles ahead, and dangers to face.  But this country will define our times, not be defined by them.  As long as the United States of America is determined and strong, this will not be an age of terror; this will be an age of liberty, here and across the world.  (Applause.)

Great harm has been done to us.  We have suffered great loss.  And in our grief and anger we have found our mission and our moment.  Freedom and fear are at war.  The advance of human freedom -- the great achievement of our time, and the great hope of every time -- now depends on us.  Our nation -- this generation -- will lift a dark threat of violence from our people and our future.  We will rally the world to this cause by our efforts, by our courage.  We will not tire, we will not falter, and we will not fail.  (Applause.)

It is my hope that in the months and years ahead, life will return almost to normal.  We'll go back to our lives and routines, and that is good.  Even grief recedes with time and grace.  But our resolve must not pass.  Each of us will remember what happened that day, and to whom it happened.  We'll remember the moment the news came -- where we were and what we were doing.  Some will remember an image of a fire, or a story of rescue.  Some will carry memories of a face and a voice gone forever.

And I will carry this:  It is the police shield of a man named George Howard, who died at the World Trade Center trying to save others.  It was given to me by his mom, Arlene, as a proud memorial to her son.  This is my reminder of lives that ended, and a task that does not end.  (Applause.)

I will not forget this wound to our country or those who inflicted it.  I will not yield; I will not rest; I will not relent in waging this struggle for freedom and security for the American people.

The course of this conflict is not known, yet its outcome is certain.  Freedom and fear, justice and cruelty, have always been at war, and we know that God is not neutral between them.  (Applause.)

Fellow citizens, we'll meet violence with patient justice -- assured of the rightness of our cause, and confident of the victories to come.  In all that lies before us, may God grant us wisdom, and may He watch over the United States of America.

Thank you.  (Applause.)

                    END          9:41 P.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/09/20010920-8.html

