**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*          Federal Insurance Co. v. al Qaida
                                                        03 CV 06978 (RCC)


**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE MOTION TO DISMISS**
**FILED BY PRINCE TURKI AL-FAISAL BIN ABDULAZIZ AL-SAUD**


COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

**Table of Contents**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   APPLICABLE LAW .............................................................................................4
      A.    The Burden of Proof  is on the Party Claiming Immunity......................................4

III.  ARGUMENT .........................................................................................................5
      A.    Prince Turki Has Not Established That He is  Entitled to FSIA Protection ...........5

      B.    The Federal Plaintiffs' Claims Fall Within the Tortious Act Exception .................8
            1)    The Tortious Activity Exception Applies to all Torts ................................9
            2)    Plaintiffs Have Adequately Pled Causation...............................................13
            3)    Plaintiffs' Injuries Occurred in the United States .....................................15
            4)    Sections 1605(a)(5) and 1605(a)(7) are not Mutually Exclusive...............16
            5)    The Sponsorship of Terrorism is not a Discretionary Function................18

      C.    The Commercial Activity Exception Confers Jurisdiction Over Prince
            Turki...................................................................................................................20

      D.    This Court May Exercise Personal Jurisdiction Over Prince Turki......................22

      E.    Prince Turki is Not Entitled to Diplomatic Immunity ..........................................23

IV.   CONCLUSION......................................................................................................24

# TABLE OF AUTHORITIES

## CASES

Argentine Republic v. Amerada Hess Shipping Corp.,
488 U.S. 428 (1989)................................................................6

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990).................4

Berkovitz v. United States,
486 U.S. 531 (1988)............................................................18, 20

Birnbaum v. United States,
588 F.2d 319 (2d Cir. 1978)...................................................10, 20

Boim v. Quranic Literacy Institute,
291 F.3d 1000 (7th Cir. 2002) .................................................14

Bryks v. Canadian Broadcasting Corp.,
906 F. Supp. 204 (S.D. N.Y. 1995)...........................................6

Calder v. Jones,
465 U.S. 783 (1984)............................................................22

Cargill Int. S.A. v. M/T Pavel DyBenko,
991 F.2d 1012 (2d Cir. 1993)..................................................4

Chuidian v. Philippine National Bank,
912 F.2d 1095 (9th Cir. 1990) ...............................................6, 7

Continental Ore Co. v. Union Carbide & Carbon Corp.,
370 U.S. 690 (1962).............................................................14

Cruikshank v. United States,
431 F. Supp. 1355 (D. Hi. 1977)..............................................19

Daliberti v. Iraq,
97 F. Supp. 2d 38, 54 (D. D.C. 2000) ........................................23

In re DES Cases,
789 F. Supp. 552 (E.D. N.Y. 1992) ..........................................23

Dole Food Co. v. Patrickson,
538 U.S. 468 (2003)..............................................................7

Filetech S.A. v. France Telecom S.A.,
   157 F.3d 922 (2d Cir. 1998)....................................................................................5

Filus v. Lot Polish Airlines,
   907 F.2d 1328 (2d Cir. 1990)..................................................................................5

First American Corp. v. Sheikh Zayed bin Sultan Al-Nayhan,
   948 F. Supp. 1107 (D.D.C. 1996).............................................................................6

First City, Texas-Houston, N.A. v. Rafidian Bank,
   150 F.3d 172 (2d Cir. 1998)....................................................................................5

Flatow v. Islamic Republic of Iran,
   999 F. Supp. 1 (D.D.C. 1998)..........................................................................14, 17

Glickman v. United States,
   626 F. Supp. 171 (S.D. N.Y. 1985)....................................................................19, 20

Halberstam v. Welch,
   705 F.2d 472 (D.C. Cir. 1983).........................................................................12, 13

Hogan v. Wal-Mart Stores, Inc.,
   167 F.3d 781 (2d Cir. 1999)....................................................................................5

Ignatiev. United States,
   238 F.3d 464 (D.C. Cir. 2001)...............................................................................20

Joseph v. Office of Consulate General,
   830 F.2d 1018 (9th Cir. 1987) ................................................................................6

Keene Corp. v. United States,
   508 U.S. 200 (1993)...............................................................................................7

Klaxon Co. v. Stenton Electric Manufacturing Co.,
   313 U.S. 487 (1941)...............................................................................................5

Letelier v. Republic of Chile,
   488 F. Supp. 665 (D. D.C. 1980) ......................................................9, 10, 17,
                                                        19, 20

Liu v. Republic of China,
   892 F.2d 1419 (9th Cir. 1989) ..........................................................................17, 19

Lumbard v. Maglia,
    621 F. Supp. 1529 (S.D. N.Y 1985)..............................................................12, 13

Matteo v. Perez,
    98 Civ. 7426  1999 U.S. Dist. LEXIS 4871 (S.D. N.Y. 1999) .......................................6, 7

McDermott International, Inc. v. Wilander,
    498 U.S. 337 (1991)..........................................................................11

Merrill Lynch Futures, Inc. v. Kelly,
    585 F. Supp. 1245 (S.D. N.Y. 1984)..........................................................12

Mollan v. Torrance,
    9 Wheat. 537 (1824) ........................................................................7

Olsen v. Government of Mexico,
    729 F.2d 641 (9th Cir. 1984) .............................................................16, 18

Orikow v. United States,
    682 F. Supp. 77 (D. D.C. 1988) ...........................................................19

Pugh v. Socialist People's Libyan Arab Jamahiriya,
    290 F. Supp. 2d 54 (D. D.C. 2003) .........................................................23

Rajaa al Mukaddam v. Permanent Mission,
    136 F. Supp. 2d 257 (S.D. N.Y. 2001).....................................................4, 5

Rein v. Socialist People's Libyan Arab Jamahiriya,
    995 F. Supp. 325 (E.D. N.Y. 1998) .........................................................23

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
    246 F. Supp. 2d 285 (S.D. N.Y. 2003).......................................................5

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
    235 F.3d 738 (2d Cir. 2000)................................................................5

Republic of Argentina v. Weltover, Inc.,
    504 U.S. 607 (1992).....................................................................10, 11

Rich-Taubman Associate v. Stamford Restaurant Operating Co., Inc.,
    587 F. Supp. 875 (S.D. N.Y. 1984).........................................................12

Robinson v. Malaysia,
    269 F.3d 133 (2d Cir. 2001)..............................................................4, 5,
                                10, 11, 13

Simon v. Phillip Morris, Inc.,
    86 F. Supp.2d 95 (E.D. N.Y. 2000) ................................................................23

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002)...........................................................................................4

United States v. Goodwin,
    141 F.3d 394 (2d Cir. 1997)............................................................................21

Verlinden v. Central Bank of Nigeria,
    461 U.S. 480 (1983).........................................................................................11

Wahad v. FBI,
    813 F. Supp. 224 (S.D. N.Y. 1993).................................................................12

## STATUTES

28 U.S.C. § 1603 ..............................................................................................................6

28 U.S.C. § 1605(a)(2).....................................................................................................21

28 U.S.C. § 1605(a)(5).................................................................................................8, 9,
    16, 17, 21, 22

28 U.S.C. § 1605(a)(7).................................................................................................9,16,
    17, 18

18 U.S.C. § 1962 ..............................................................................................................8

18 U.S.C. § 2333 ..............................................................................................................8

28 U.S.C. § 2671, et seq...................................................................................................18

N.Y.C.P.L.R. § 302...........................................................................................................23

## TREATIES AND RESOLUTIONS

G.A. Res. 49/60, U.N. GAOR, 49th Sess. at 4-5 (1995) ................................................19

G.A. Res. 51-210, U.N. GAOR, 51st Sess., Annex 1 at 6 (1997) ..................................19

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502.................23, 24

I.      <u>**INTRODUCTION**</u>

Plaintiffs have sued Prince Turki al-Faisal Bin Abdulaziz al-Saud (Prince Turki), based on his participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and foreseeable product.

Ongoing investigations are slowly revealing the unprecedented scope and sophistication of that global conspiracy.  According to published reports, al Qaida maintained and operated at least twelve training camps in Afghanistan before the United States' military action forced the organization to disperse.  As many as 20,000 dedicated *jihadists*, including all nineteen of the September 11 hijackers, received indoctrination and training at those camps between 1996 and September 11, 2001. By September 11, al Qaida drew from the resources of a vast network of terrorist cells in more than 100 countries.  That network's strength was reinforced by al Qaida's strategic alliances with other like-minded terrorist organizations.  To this day, the depth and breadth of the organization's infrastructure enable it to mount attacks throughout the World, even though international efforts have resulted in the capture of more than 3,000 al Qaida members in over 100 countries since September 11.

Post 9/11 investigations have confirmed that al Qaida relied heavily on its global infrastructure to plan, support and coordinate the September 11th Attack, and that it would have been impossible for al Qaida to carry out an attack on that scale within the United States without that infrastructure.  According to the *Report of the Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, plans for the Attack were carefully vetted through al Qaida's most senior leadership over a period of six (6) years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaida's financial supporters.  The individual participants in the Attack were chosen from an

enormous pool of potential candidates, who were recruited, trained and indoctrinated using funds provided by the organization's supporters. Each of the hijackers received training at one or more of al Qaida's well funded training camps in Afghanistan. Until the last minute, details of the plot were revised through a global communication network, the existence of which also was made possible by the financial sponsorship of al Qaida's supporters. In these ways, and others too numerous and complex to detail herein, the success of the September 11th Attack depended critically on the sophistication and extensiveness of the organization's global resources.

By all accounts, the infrastructure that made the September 11th Attack possible was built over a period of many years, using the financial and logistical support of a vast network of charities, banks and wealthy donors.[1]   As the United Nations Security Council Committee Concerning al-Qaida and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al-Qaida with the very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaida.

*Second Report of the Monitoring Group Established Pursuant to Resolution 1363 (2001), on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them (December 2, 2003).*

Government officials and experts also agree that charities established and funded by the Kingdom of Saudi Arabia, and wealthy Saudi supporters, played a singularly important role in al

---

[1] The estimated costs of building and sustaining that infrastructure are staggering. David Aufhasuer, the former General Counsel of the Treasury Department, estimated that al Qaida needed $35 million to support its infrastructure on an annual basis prior to September 11.

Qaida's development and pursuit of its perverse ambitions. Indeed, David Aufhauser has described Saudi Arabia as the "epicenter" of al Qaida's financing. Almost three years after the September 11th Attack, Saudi Arabia is finally bowing to international pressure and itself acknowledging the pervasiveness of its charities' involvement in the sponsorship of al Qaida. In fact, on June 2, 2004, Saudi Arabia announced that it intended to dissolve ***all*** of its international charities as a "counter-terrorism" measure.

The Federal Plaintiffs claims against Prince Turki arise from his participation, in both his personal and official capacities, in the conspiracy outlined in general terms above. The allegations against Prince Turki are set forth in detail in the Federal Plaintiffs' 646 paragraph, 182 page Amended Complaint (Complaint or FAC). While the Complaint obviously must be read in its entirety, a summary of allegations which are particularly relevant to understanding the Federal Plaintiffs' claims against Prince Turki is attached hereto as Exhibit A.

Prince Turki has moved to dismiss the Federal Plaintiffs' claims, arguing that this Court lacks subject matter and personal jurisdiction to hear the case against him. In support of his contention that the Court lacks subject matter jurisdiction, Prince Turki invokes the protections of the Foreign Sovereign Immunities Act (FSIA) and Vienna Convention on Diplomatic Relations. For the reasons set forth below, Prince Turki's Motion should be denied in all respects.[2]

---

[2] Prince Turki also argues, without any support, that the earlier ruling of the D.C. district court in <u>Burnett</u> constitutes the "law of the case." As this is a separate action, involving different allegations and governed by distinct precedents, Prince Turki's "law of the case" argument is patently deficient. In fact, for the reasons set forth in the Federal Plaintiffs' Memorandum in Opposition to the Motion to Dismiss of Prince Sultan, incorporated herein by reference, the earlier decision in <u>Burnett</u> need be afforded no deference in this action.

## II.    APPLICABLE LAW

### A.    The Burden of Proof is on the Party Claiming Immunity

The applicable standards of review and parties' respective burdens of proof in a jurisdictional challenge vary depending upon the procedural posture of the litigation and, at least with respect to the FSIA, whether the defendant challenges the factual basis of the claim. Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001); Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990); Rajaa al Mukaddam v. Permanent Mission, 136 F. Supp. 2d 257, 260 (S.D. N.Y. 2001).[3]  The Supreme Court has not had occasion to comprehensively address the relevant standards of review and burdens of proof applicable in analyzing an immunity defense at differing stages of an FSIA action.  However, when read collectively and in light of the relevant pleading requirements of the Federal Rules of Civil Procedure, the Second Circuit's decisions in FSIA cases provide a road map for resolving the immunity defenses in this case.

Consistent with Rule 8, a plaintiff in an FSIA case need only provide the defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  In responding to the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA. Cargill Int. S.A. v. M/T Pavel DyBenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes such a showing, the burden of production shifts to the plaintiff to come forward with specific factual allegations which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in the FSIA. Robinson, 269 F.3d at 141-43.  To the extent the defendant challenges the accuracy of

---

[3] "While Ball involved a challenge to personal jurisdiction under Rule 12(b)(2), the holding applies to all jurisdictional testing motions, including challenges to subject matter jurisdiction under Rule 12(b)(1)." Rajaa al Mukaddam, 136 F.Supp.2d at 260 n. 11.

those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery relative to that disputed factual contention.  Rajaa al Mukaddam, 136 F. Supp. 2d at 261-62; Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); First City, Texas-Houston, N.A. v. Rafidian Bank, 150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990).  Upon completion of discovery, the Court should normally "afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction."[4]  Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 235 F.3d 738, 748 (2d Cir. 2000).  In the Second Circuit, defendants must understand "that the ultimate burden of proof in a FSIA jurisdiction case ultimately lies with them."  Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 246 F. Supp.2d 285, 288 (S.D. N.Y. 2003).[5]

## III.   ARGUMENT

### A.   Prince Turki Has Not Established That He is Entitled to FSIA Protection

The applicability of the FSIA to officials of a foreign state is questionable.   While a number of federal courts have concluded that officials of a foreign government are entitled to the protections of the FSIA, neither the Supreme Court nor the Second Circuit has had occasion to address the issue.   When addressed at all by the courts that have extended FSIA immunity to foreign officials, the typical analyses are that a suit against an individual acting in his official

---

[4] Consistent with these authorities, Plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the FSIA jurisdictional analysis.

[5] The law that the Court must apply in analyzing an immunity defense under the FSIA depends upon the issue under consideration.  Federal law and the Federal Rules of Civil Procedure control all constitutional and federal question issues, both substantive and procedural. The substantive law of New York applies to the vast majority of the Federal Plaintiffs' common law claims, as those claims arise out of tortious conduct and injuries occurring within this State. Klaxon Co. v. Stenton Elec. Mfg. Co., 313 U.S. 487 (1941).  The Federal Rules of Civil Procedure control all procedural issues, even on the common law claims.  Hogan v. Wal-Mart Stores, Inc., 167 F.3d 781, 783 (2d Cir. 1999).

capacity is the "practical equivalent" of a suit against the sovereign directly, or that reason dictates such extension because immunity is based on the nature of the act. Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1099-1103 (9th Cir. 1990); Bryks v. Canadian Broadcasting Corp., 906 F. Supp. 204, 210 (S.D. N.Y. 1995); First American Corp. v. Sheikh Zayed bin Sultan Al-Nayhan, 948 F. Supp. 1107, 1120 (D.D.C. 1996). However, it is beyond dispute that the actual language of the FSIA makes absolutely no mention of officials or agents in defining the term "foreign state." 28 U.S.C. § 1603. Given Congress' failure to specifically reference officials or agents of a foreign sovereign within the statute, the Federal Plaintiffs respectfully submit that Prince Turki cannot meet his burden of establishing that he is a foreign sovereign within the meaning of the FSIA. See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 441 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.")

Further, even those courts that have extended FSIA protections to foreign officials have recognized that the limited immunity afforded thereunder does not extend to consular or diplomatic officials of a foreign state, whose privileges and immunities are instead defined by the provisions of the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations. Matteo v. Perez, 98 Civ. 7426 (SAS), 1999 U.S. Dist. LEXIS 4871, *10-11 (S.D. N.Y. 1999); Joseph v. Office of Consulate Gen., 830 F.2d 1018, 1021 (9th Cir. 1987).

Consistent with the authorities cited above, Prince Turki is not entitled to any protections under the FSIA, even if the protections of that statute extend to foreign officials. Prince Turki currently serves as Saudi Ambassador to the United Kingdom and Ireland, a position to which he was appointed on January 18, 2003, and holds no other positions within the Saudi government. Given his status as a diplomatic agent at the time this action was filed on September 10, 2003,

the FSIA has absolutely no relevance to the assessment of this Court's jurisdiction over Prince Turki.  Matteo, 1999 U.S. Dist. LEXIS 4871 at * 10-11.

Although Prince Turki does not directly address this issue in his brief, he implies that the protections of the FSIA extend to him because the underlying claims arise from conduct undertaken by him during the time he served as Director of Saudi Arabia's Department of General Intelligence.  However, in light of the United States Supreme Court's recent decision in Dole Food Co. v. Patrickson, 538 U.S. 468 (2003), it is clear that Prince Turki's status at the time of the filing of the action, and not at the time of the underlying conduct, determines his entitlement to the protections of the FSIA.  Id. at 480.  In Dole Food, the Court held that instrumentality status under the FSIA must be determined at the time suit is filed, and cannot be attained based on some pre-suit relationship between the defendant and a foreign sovereign.  The Court reasoned that such a result was consistent with the "longstanding principle that the 'jurisdiction of the court depends upon the state of things at the time of the action brought.'"  Id. (quoting Keene Corp. v. United States, 508 U.S. 200, 207 (1993) (quoting Mollan v. Torrance, 9 Wheat. 537, 539 (1824)).  Furthermore, the Supreme Court expressly held that the rationales underlying its extension of the immunity afforded domestic officials beyond the conclusion of their service in the government were not implicated by the FSIA.  Id.  Pursuant to the Supreme Court's decision and reasoning in Dole Food, any possible right Prince Turki may have had to invoke the protections and immunities of the FSIA terminated prior to the filing of this action.  Accordingly, he may not invoke the FSIA to avoid liability in this case.

Further, even assuming that the FSIA extended to foreign officials and that Prince Turki's right to invoke the FSIA had not expired prior to the filing of this case, his Motion would fail, as the FSIA affords no protection in relation to the claims based on conduct undertaken in his personal capacity.  Chuidian, 912 F.2d at 1106.  The Complaint alleges, among other things, that

Prince Turki made personal contributions to charities he knew to be sponsors of al Qaida, with the knowledge and intent that those contributions would be used to support al Qaida's global *jihad*.  As to these claims, the FSIA affords no protection, and this Court possesses unqualified subject matter jurisdiction.

**B.       The Federal Plaintiffs' Claims Fall Within the Tortious Act Exception**

Even if Prince Turki could validly invoke the protections of the FSIA in relation to the claims asserted against him in this case, this Court possesses jurisdiction over him for those claims under the tortious act exception of the FSIA.   The tortious act exception confers jurisdiction over a foreign sovereign in any case:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or any official or employee of that foreign state   acting within the scope of his office or employment…

28 U.S.C. § 1605(a)(5).

The Complaint seeks monetary damages for personal injuries, wrongful deaths and property damage resulting from the September 11th Attack, under the following common law and statutory tort theories:  trespass, wrongful death, assault and battery, negligence, intentional and negligent infliction of emotional distress, 18 U.S.C. § 2333 and 18 U.S.C. § 1962.  Thus, the claims in this case fall squarely within the plain language of the foregoing exception.

In an effort to avoid application of the tortious act exception, Prince Turki raises five principal arguments.  First, Prince Turki urges this Court to look beyond the plain language of the tortious act exception and, based on the partial quotation of an anecdotal comment within the legislative history, construe the tortious act exception to apply only to traffic accidents and "similar" torts.  Second, Prince Turki asserts that the causal link between his alleged acts and

plaintiffs' injuries is too remote to attach liability.  Third, he argues, once again without any support in the language of the FSIA, that the "entire tort" must occur in the United States in order for the tortious act exception to apply.  Fourth, Prince Turki asserts that recognition of the plaintiffs' tort claims in the present case would somehow undermine Congress' intent in adopting the exception to immunity set forth in 28 U.S.C. § 1605(a)(7), which provides extra-territorial jurisdiction for certain categories of injury suffered outside of the United States.  Fifth, Prince Turki maintains that any participation by him in al Qaida's conspiracy to commit terrorist attacks within the United States constitutes a "discretionary function."  For the reasons set forth below, all of these arguments lack merit.

### 1)   The Tortious Activity Exception Applies to all Torts

Prince Turki's contention that the scope of the tortious act exception is limited to traffic accidents and similar incidents is contrary to the weight of authority and premised on a fundamentally invalid approach for analyzing the applicability of the tortious act exception.  In Letelier v. Republic of Chile, 488 F. Supp. 665 (D. D.C. 1980), the court considered whether claims against the Republic of Chile arising from the alleged assassinations of the former Chilean ambassador and foreign minister fell within the tortious act exception of the FSIA.  Id. at 665.  Chile urged the court to decline to exercise jurisdiction, arguing that "the intent of Congress was to include only …torts like automobile accidents within the exclusion from immunity embodied in section 1605(a)(5)."  Id.  The court rejected Chile's intent based argument, and found that the tortious act exception provided jurisdiction for the plaintiffs' claims.  In support of its conclusion, the court reasoned that the language of the tortious act exception was unambiguous, and that the interpretation of the exception should therefore be guided by the "words of the statute," rather than through recourse to isolated statements in the legislative history.  Id.  The Second Circuit embraced this same view of the tortious act exception

in <u>Robinson</u>, 269 F.3d at 142, n.2, holding that the test for determining the applicability of the tortious act exception is whether the foreign sovereign's "acts were tortious under the law of the State of New York . . . ."[6]

The decisions of <u>Letelier</u> and <u>Robinson</u> are consistent with the Supreme Court's directive that the courts refrain from engaging in intent based inquiries where the language of the FSIA is clear and unambiguous.   On this point, the holding of the Supreme Court in <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607 (1992), is instructive.  In <u>Weltover</u>, the Supreme Court considered whether the Republic of Argentina's default on certain bonds issued as part of a plan to stabilize its currency constituted an act taken "in connection with a commercial activity" within the meaning of the FSIA.  <u>Id.</u> at 609.  While the Supreme Court's analysis focused on the meaning of the term "commercial" under the FSIA rather than the phrase "tortious act," the Supreme Court announced an important policy regarding the interpretation of all provisions of the FSIA which bears directly on the defendant's "intent" based arguments.  In particular, the Supreme Court declared that the pivotal question in interpreting the applicability of the FSIA "is not what Congress 'would have wanted' but what Congress enacted in the FSIA."  <u>Id.</u> at 618. Consistent with this declaration, Congress's alleged intent in enacting the FSIA cannot be invoked to confer jurisdiction where it does not exist under the plain language of the Act, or to deprive jurisdiction where the plain language provides it.

In light of the foregoing authorities, this Court should decline to entertain the arguments advanced by Prince Turki based on anecdotal comments in the legislative history of the FSIA, or characterizations of Congress's alleged intent in enacting the tortious act exception.  In enacting the FSIA, Congress made a deliberate decision to use the unambiguous term "tortious."  By its

---

[6] The Second Circuit has held that the same test applies in determining the viability of claims against an official of the U.S. government under the Federal Tort Claims Act, a statute analogous to the FSIA.  <u>See</u> <u>Birnbaum v. United States</u>, 588 F.2d 319 (2d Cir. 1978) ("Purpose of the Act was to generally waive immunity … if torts of a private person would give rise to liability under State law.")

plain meaning, the word "tortious" embraces all actionable torts.  Consistent with the Second Circuit's decision in <u>Robinson</u> and the Supreme Court's directive in <u>Weltover</u>, that term should be afforded its plain meaning in interpreting the FSIA, and the tortious act exception construed to confer jurisdiction for all claims cognizable under the law of the State of New York.  <u>See also</u> <u>McDermott Int'l, Inc. v. Wilander</u>, 498 U.S. 337, 342 (1991) (stating that "we assume that when a statute uses [a term of art], Congress intended it to have its established meaning").

Although an analysis of Congress's intent is unnecessary in interpreting the plain language of the tortious act exception, it should be noted that the novel interpretation advanced by the defendants would actually frustrate one of Congress's paramount objectives in codifying the restrictive theory of foreign sovereign immunity – to provide clear and predictable standards for litigants in foreign sovereign immunity cases.  <u>Verlinden v. Central Bank of Nigeria</u>, 461 U.S. 480, 487-88 (1983).[7]  Under Prince Turki's formulation, the term "tortious act" does not embrace all recognized tort theories, but rather provides jurisdiction for only some undefined group of particular torts, which are (in some way) analogous to a negligent car accident.  If this novel view were adopted, injured parties would be left with no objective standards for determining whether injuries suffered as a result of the tortious conduct of a foreign sovereign were actionable, thereby restoring to the law of foreign sovereign immunity the very uncertainty Congress sought to eradicate in enacting the FSIA.  <u>Id.</u>  In order to avoid that result and ensure that Congress's paramount objectives in enacting the FSIA are realized, the substantive standards governing liability under the asserted tort theory must be employed in determining the applicability of the tortious act exception.

_____

[7] The Supreme Court's decision in <u>Verlinden</u> contains an insightful discussion of the history of the doctrine of foreign sovereign immunity in American law, and of the objectives underlying the enactment of the FSIA. <u>Verlinden</u>, 461 U.S. at 486-89.

When read in its entirety and in view of the applicable substantive standards of New York law, the Complaint asserts valid tort claims against Prince Turki, and those claims consequently fall within the tortious act exception.  While the Federal Plaintiffs obviously do not allege that Prince Turki hijacked or crashed the four planes on September 11th, New York has long recognized that individuals who conspire to commit a tort, or aid and abet the commission thereof, may be held liable for any resulting injuries.  Lumbard v. Maglia, 621 F. Supp. 1529, 1536 (S.D. N.Y 1985).   The elements necessary to establish liability for a defendant's participation in a conspiracy to commit a tort are:  (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the overall scheme.  Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983).[8]  Civil liability for aiding and abetting will be imposed where:  (1) the party whom the defendant aids or abets performs a wrongful act that causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides substantial assistance to the wrongdoer.  Id. at 477.

The specific factual allegations of the Complaint satisfy the elements of both theories of concerted action liability.  At the threshold, the Complaint alleges that Prince Turki has "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons."   FAC ¶ 66.   Further, the Complaint alleges that the Attack "was a direct, intended and foreseeable product of a larger

---

[8] Although New York law likely controls the vast majority of the Federal Plaintiffs' claims, Halberstam long has been regarded as the leading case on concerted action liability, and the New York courts have repeatedly relied on Halberstam in analyzing conspiracy and aiding and abetting claims.  See Wahad v. FBI, 813 F. Supp. 224, 233 (S.D. N.Y. 1993); Rich-Taubman Assoc. v. Stamford Rest. Operating Co., Inc., 587 F. Supp. 875, 879 n.5 (S.D. N.Y. 1984); Merrill Lynch  Futures, Inc. v. Kelly, 585 F. Supp. 1245, 1254 (S.D. N.Y. 1984).

conspiracy among the defendants, to commit acts of international terrorism against the United States, its nationals and allies." FAC ¶ 72. Describing the conspiracy, the Complaint states that it "included the provision of material support and resources to defendant al Qaida and affiliated foreign states, FTOs, persons, organizations, commercial entities and other parties." FAC ¶ 73. The Complaint further describes, in considerable detail, the specific nature of Prince Turki's participation in that conspiracy. See also FAC ¶¶ 398-426, 445-453. These specific factual allegations satisfy the requirements necessary to state claims against Prince Turki under conspiracy and aiding and abetting theories of tort liability at this stage of the litigation, and are therefore sufficient to bring those claims within the scope of the tortious act exception. Robinson, 269 F.3d at 142, n. 2.

**2)**     **Plaintiffs Have Adequately Pled Causation**

Under New York law, Prince Turki's extensive sponsorship of al Qaida ties him inextricably to the September 11th Attack, and provides a sufficient causal link to impose liability upon him for the Federal Plaintiffs' injuries. "[T]hose who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, *regardless of the degree of their participation or culpability in the overall scheme*." Lumbard, 621 F. Supp. at 1536 (emphasis supplied). Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement." Halberstam, 705 F.2d at 477 (emphasis supplied). Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor. Id.

Applying these concepts of concerted action liability, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing financiers and sponsors of the

- 13 -

terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot.[9]  As the United States District Court for the District of Columbia observed in <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1 (D.D.C. 1998):  "[a] plaintiff need not establish that the material support and resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises…[s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient…." <u>Id.</u> at 18.  The Seventh Circuit adopted the same standard in <u>Boim v. Quranic Literacy Inst.</u>, 291 F.3d 1000 (7th Cir. 2002), holding that plaintiffs who are victims of terrorism need show only that the defendant knew of the terrorist organization's illegal activities, desired to help those activities, and engaged in some affirmative act in support thereof.  <u>Id.</u> at 1023.

Pursuant to these standards, Prince Turki's participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties him inextricably to the Attack.[10]  As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the Federal Plaintiffs have properly and adequately alleged causation.  Accordingly, Prince Turki's causation-based arguments must be rejected.

The Complaint also sufficiently alleges that the Attack was a foreseeable product of the conspiracy in which Prince Turki knowingly participated, and of Prince Turki's aiding and abetting of al Qaida.  Indeed, the Complaint unambiguously asserts that the Attack was a "direct,

---

[9] These decisions are consistent with, and find additional support in, the express public policies of the Untied States.  As Attorney John Ashcroft has observed, the United States makes "no distinction between those who carry out terrorist attacks and those who finance organizations."  *Testimony of the Honorable John Ashcroft, Attorney General, United States Department of Justice, United States Committee on the Judiciary, March 4, 2003.*

[10] The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking as it as a whole."  <u>Continental Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690 (1962).

- 14 -

intended and foreseeable product" of that conspiracy.  FAC ¶ 72.  While it would be improper to test the sufficiency of the evidence in support of that allegation in the context of the present Motion, it should be noted that al Qaida had unequivocally declared, through statements and actions, that the primary objective of its global conspiracy was to attack the United States and kill its citizens.  For example, in 1996 and 1998, al-Qaida issued *fatwas*, or religious decrees, authorizing attacks against the United States and its citizens.  In the 1998 *fatwa*, Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens – civilian or military – "in any country in which it is possible to do it…"  During the decade preceding the September 11th Attack, al Qaida followed through on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests.[11]

As the conduct of terrorist attacks against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is absurd to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as Prince Turki is alleged to have done.

### 3)   Plaintiffs' Injuries Occurred in the United States

Prince Turki further alleges that this Court should decline to apply the tortious act exception of the FSIA, because certain conduct in support of al Qaida's conspiracy to attack America occurred outside of the United States.  Once again, Prince Turki's argument fails to meet the plain language of the tortious act exception, which requires simply that the plaintiff suffer "personal injury or death, or damage to loss of property, occurring in the United States…"

---

[11] Such attacks include:  the first World Trade Center bombing in 1993; the planned attacks against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993; the planned assassination of President Clinton in the Philippines; the planned bombing of 11 to 13 American jumbo jets over the Pacific in January 1995; the car bombing of the U.S. military mission in Riyadh, Saudi Arabia, in 1995; the truck bombing of the U.S. Housing area Khobar Towers in Dhahran, Saudi Arabia, 1996; the simultaneous bombings of the U.S. Embassies in Kenya and Tanzania in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide boat attack on the USS COLE in October of 2000.

28 U.S.C. § 1605(a)(5).   As the Federal Plaintiffs' claims undeniably arise from property damage, personal injury and wrongful deaths "occurring in the United States," those claims satisfy the unambiguous requirements of the statute.

The 9th Circuit's decision in <u>Olsen v. Government of Mexico</u>, 729 F.2d 641 (9th Cir. 1984) further undermines Prince Turki's position.  In <u>Olsen</u>, the plaintiffs brought claims against Mexico for the deaths of their parents, who were killed in a plane crash while being transferred by Mexico to the United States for incarceration.  <u>Id.</u> at 641.  Mexico moved to dismiss, arguing that the occurrence of contributing tortious acts or omissions outside of the United States barred application of the tortious act exception, and that Mexico was therefore immune.  <u>Id.</u> at 646.  The 9th Circuit rejected Mexico's argument, reasoning that Mexico's construction of the tortious act exception "would encourage foreign states to allege that some tortious conduct occurred outside the United States.  The foreign state would thus be able to establish immunity and diminish the rights of injured persons seeking recovery.   Such a result contradicts the purpose of the FSIA, which is to 'serve the interest of justice and….protect the rights of both foreign states and litigants in the United States Courts.'"  <u>Id.</u>

Consistent with the reasoning of the 9th Circuit in <u>Olsen</u>, the construction of the tortious act exception advocated by Prince Turki would undermine the purpose of the FSIA and should be rejected.  As both the tort and the injuries giving rise to the Federal Plaintiffs' claims occurred within the United States, those claims are actionable under the unambiguous language of the tortious act exception.

### 4)    <u>Sections 1605(a)(5) and 1605(a)(7) are not Mutually Exclusive</u>

Prince Turki's argument that recognition of Plaintiffs' claims under the tortious act exception would "render §1605(a)(7) meaningless"  is particularly disingenuous.

Congress created the exception set forth in §1605(a)(7) to create subject matter jurisdiction for claims arising from injuries sustained outside the United States.  For obvious reasons, the circumstances in which the courts of the United States may exercise such extra-territorial jurisdiction must be more limited than where the injury occurs here.  Thus, §1605(a)(7) is properly viewed as creating extra-territorial jurisdiction for certain specific types of torts, all of which fall within the broader umbrella of the tortious act exception where the resulting injury occurs in the United States.

This view of the interplay between the tortious act exception and §1605(a)(7) is supported by the case law.  As the District Court for the District of Columbia observed:

> As 28 U.S.C §1605(a)(5) already provides jurisdiction of a state-sponsored terrorist acts in the United States, the state-sponsored terrorism exception would be redundant if it were held to apply only within the United States.

Flatow, 999 F. Supp. at 15.  Indeed, well before Congress adopted § 1605(a)(7), the courts had consistently interpreted the tortious act exception to provide jurisdiction over foreign sovereigns for the types of conduct described in §1605(a)(7), where the resulting injury occurred in the United States.  For example, in Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989), the Court concluded that jurisdiction existed over Taiwan in a case arising from the assassination of a Taiwanese expatriate living in California.  Similarly, in Letelier, the Court found that the tortious act exception provided jurisdiction over Chile for the assassination of a former Chilean diplomat in Washington, D.C.  Letelier, 488 F. Supp. at 674.  On the most fundamental level, both of these cases involved claims based on a foreign sovereign's participation in an "extra-judicial killing," one of the specific categories of conduct for which Congress later provided extra-territorial jurisdiction under §1605(a)(7).  In light of Liu and Letelier, it is beyond dispute

- 17 -

that the tortious act exception provides jurisdiction over a foreign state for all the categories of conduct described in § 1605(a)(7), provided that the resulting injury occurs in the United States.

There is also a fundamental flaw in the defendant's argument that requires very little elaboration – § 1605(a)(7) only applies to injuries and deaths – not claims for property damage. The unmistakably clear language of (a)(7) excludes claims for the property damage suffered by the Federal Plaintiffs.  Congress certainly could not have removed claims for property damage under state law included in the tortious act exception of subsection (a)(5) by passing the exception in (a)(7) when, by its very terms, (a)(7) does not include property damage claims.

**5)      The Sponsorship of Terrorism is not a Discretionary Function**

Prince Turki also argues that the sponsorship of an international terrorist organization constitutes a "discretionary function" under the FSIA.  The discretionary function exception of the FSIA derives from a corresponding provision in the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., (FTCA), a statute enacted thirty years before the FSIA.  Olsen, 729 F.2d at 646. Thus, the principles developed by the Supreme Court and lower federal courts in construing the applicability of the discretionary function exception of the FTCA guide the interpretation of the corresponding provision of the FSIA.  Id.

Although the Supreme Court has yet to engage in a meaningful analysis of the discretionary function exception under the FSIA, it has had the opportunity to define the limitations of the discretionary function exception in FTCA cases.  In Berkovitz v. United States, 486 U.S. 531 (1988), the Supreme Court stated that "the nature of the conduct" must govern "whether the discretionary function exception applies in a given case."  Id. at 536-37.  In analyzing the nature of the conduct, the courts must consider "whether the action is a matter of choice for the acting employee."  Id. at 536.  The exception does not, however, extend to all acts which involve some exercise of judgment - the element of judgment exercised must be the kind

- 18 -

that the discretionary function exception was designed to shield.  Thus, the exception does not apply, for example, "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  Id.

Consistent with the limitations defined by the Supreme Court, lower courts have refused to extend the discretionary function exception to illegal, malevolent or extraordinary conduct of Government officials.  Glickman v. United States, 626 F. Supp. 171, 175 (S.D. N.Y. 1985); Orlikow v. United States, 682 F. Supp. 77, 81 (D. D.C. 1988); Cruikshank v. United States, 431 F. Supp. 1355, 1358-59 (D. Hi. 1977).  Consistent with the principles announced in FTCA cases, courts interpreting this exception have properly declared that foreign officials have no discretion to engage in conduct that contravenes international law or that violates the fundamental precepts of humanity.  Liu, 892 F.2d at 1431; Letelier, 488 F. Supp. at 673.

Here, the conduct which forms the basis of the Federal Plaintiffs' claims against Prince Turki violates U.S. and international law, and therefore cannot fall within the discretionary function exception of the FSIA.  In their Complaint, the Federal Plaintiffs allege that Prince Turki provided material support and resources to al Qaida.  Such conduct violates the criminal laws of the United States, including the provisions of the Anti-terrorism and Effective Death Penalty Act, enacted more than five years before the September 11th Attack, as well as RICO and any number of other relevant criminal statutes.  Moreover, the United Nations has repeatedly declared that the knowing financing and sponsorship of international terrorism violate the fundamental precepts of humanity and international law.  See G.A. Res. 49/60, U.N. GAOR, 49th Sess. at 4-5 (1995); G.A. Res. 51-210, U.N. GAOR, 51st Sess., Annex 1 at 6 (1997).

As the sponsorship, financing and aiding and abetting of terrorism are illegal and violate the most fundamental precepts of international law and human rights, such conduct cannot be

- 19 -

deemed "discretionary" within the meaning of the FSIA.[12]  Glickman, 626 F. Supp. at 175; Liu, 892 F.2d at 1431; Letelier, 488 F. Supp. at 673.

In addition to ignoring the relevant limitations on the scope of the discretionary function exception, Prince Turki's argument improperly focuses on the alleged motivation of the conduct underlying plaintiffs' claims, rather than on the nature of the act performed.  In his brief, Prince Turki alleges that any alleged sponsorship by him of al Qaida was motivated by a desire to protect Saudi citizens from attack within Saudi Arabia, and therefore discretionary.  As an initial matter, no such allegation is contained within the Federal plaintiffs' Complaint, and the Federal plaintiffs vigorously disagree with this characterization of the alleged motivation underlying Prince Turki's sponsorship of al Qaida.  Regardless, Prince Turki's alleged motivation in supporting al Qaida in its conspiracy to attack the United States is completely irrelevant to the discretionary function analysis, as it is the nature of the act, rather than the identity of the actor or the alleged motivation for the conduct, that controls the FSIA discretionary function analysis. Berkovitz, 486 U.S. at 536-37.  Simply stated, there exists no discretion to pursue any policy, no matter how arguably noble that policy may be, through an illegal or malevolent means.  See Birnbaum, 588 F.2d 319 (2d Cir. 1978) (finding that CIA agents' criminal conduct did not fall within discretionary function exception despite fact that CIA agents were acting in interests of nation).

C.      **The Commercial Activity Exception Confers Jurisdiction Over Prince Turki**

This Court also possesses jurisdiction over Prince Turki under the second and third clauses of the commercial activity exception of the FSIA, which provide:

---

[12] To the extent these acts violate the internal laws or policies of Saudi Arabia, that fact would also preclude that conduct from being deemed discretionary.  Liu, 892 F.2d at 1431.  Plaintiffs should be afforded discovery to explore that issue.  Ignatiev. United States, 238 F.3d 464, 467 (D.C. Cir. 2001).

> A foreign state shall not be immune … in any case … in which the action is based … upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

In the present case, certain of the conduct underlying the Federal Plaintiffs' claims against Prince Turki involves activities which are "commercial" under the FSIA.  Among other things, Prince Turki is alleged to have actively participated in the laundering of funds through al Qaida's charity fronts.  According to the Second Circuit:

> Money laundering is a quintessential economic activity.  Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity.  This is particularly so where the intent of the transaction is to conceal the source of those profits or to promote the unlawful activity and thereby yield greater economic rewards.

United States v. Goodwin, 141 F.3d 394, 399 (2d Cir. 1997).

As certain of the Federal Plaintiffs' claims against Prince Turki relate to his commercial activities, those claims will be actionable under the commercial activity exception in the event that they (1) are based upon an act performed in the United States which is connected to those commercial activities; or (2) arise from the direct effects of those commercial activities within the United States.  28 U.S.C. § 1605(a)(2).  The Federal Plaintiffs' claims meet both standards.

The Federal Plaintiffs' claims are based upon, *inter alia*, the commandeering of planes within the United States, and use of those planes as missiles to attack targets within America. The commercial activities of Prince Turki are inextricably connected with those acts, through the asserted concerted action theories of liability.  Accordingly, the Federal Plaintiffs' claims are based upon an act performed in the United States, connected to Prince Turki's commercial activities elsewhere.

- 21 -

In addition, the commercial activities underlying certain of the Federal Plaintiffs' claims against Prince Turki caused direct effects in the United States, including the Federal Plaintiffs' injuries.  As noted counter-terrorism experts have uniformly observed, terrorist attacks are the direct products of the money laundering services and funding provided by terrorist organizations' financial sponsors.

> September 11 taught several painful lessons, not the least of which is that those who conduct such support activity are terrorists of the same caliber as those who carry out the attack.  Indeed, the one key ingredient that enabled September 11 to happen was the fact that so many individuals and organizations and fronts were able to provide the kind of financial and logistical support for an operation of that magnitude.

Written testimony of Matthew A. Levitt, Washington Institute for Near East Policy, Committee on Banking, Housing, and Urban Affairs, United States Senate, Oct. 22, 2003.

In recognition of the international terrorism's dependence on the money laundering services of its sponsors, terrorist attacks are properly viewed as the direct effects of such commercial conduct.  As such, the Federal Plaintiffs' injuries constitute the direct effects of Prince Turki's commercial activities in support of al Qaida.

### D.    This Court May Exercise Personal Jurisdiction Over Prince Turki

The Supreme Court repeatedly has held that the due process clause of the Fourteenth Amendment permits personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  Calder v. Jones, 465 U.S. 783, 788 (1984).  In an action involving the harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence."  Id.

Three recent decisions applying the Calder test in cases involving terrorism against Americans confirm that due process is not violated by the exercise of jurisdiction by the federal courts over those who deliberately target our citizens.  Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F.Supp.2d 54 (D. D.C. 2003); Daliberti v. Iraq, 97 F. Supp. 2d 38, 54 (D. D.C. 2000); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D. N.Y. 1998).

In knowingly sponsoring al Qaida's campaign to attack America, Prince Turki necessarily directed his conduct at the United States.  Thus, the exercise of jurisdiction over him for claims arising from that conduct complies with due process.[13]

Prince Turki also is subject to personal jurisdiction pursuant to the "modified due process standard for mass torts" adopted on several occasions by courts in the Eastern District of New York in DES and tobacco cases.  See Simon v. Phillip Morris, Inc., 86 F. Supp. 2d 95, 129-37 (E.D. N.Y. 2000); In re DES Cases, 789 F. Supp. 552, 574-77 (E.D. N.Y. 1992).  "New York's interest in this dispute is intense, and the burden on [defendants] is minimal compared to the difficulty of the plaintiffs' litigating in [Saudi Arabia]."  Simon, 86 F. Supp. 2d at 137.[14]

### E.    Prince Turki is Not Entitled to Diplomatic Immunity

Prince Turki's contention that the provisions of the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502, (Vienna Convention) require dismissal is also

---

[13] To the extent the Court deems any claims to be subject to the FSIA, personal jurisdiction is satisfied by subject matter jurisdiction plus valid service.  For claims not covered by the FSIA, New York's long-arm statute, N.Y.C.P.L.R. § 302, controls the personal jurisdiction analysis.  "It is well-settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. §302(a)(2)."  Simon, 86 F. Supp.2d at 99 (citation omitted).  For the reasons set forth in greater detail in the Federal Plaintiffs' Opposition to the Motion to Dismiss of Prince Sultan, incorporated herein by reference, personal jurisdiction exists under both statutes in the present case.

[14] The courts of the United States in general, and New York in particular, have an undeniable and overwhelming appreciable interest in the World Trade Center litigation.  Simon, 86 F.2d at 131 (citation omitted).  Since New York has an appreciable state interest, in that this litigation raises serious issues that would affect or have a probable impact on the vindication of policies expressed in the laws of New York, the assertion of jurisdiction is prima facie constitutional.  Id.  Thus, the assertion of jurisdiction is considered constitutional unless, given the actual circumstances of the case, the defendants are unable to mount a defense in the forum state without suffering a relatively substantial hardship.  Id.  Moving Defendants can make no such showing here.

unconvincing.  The qualified immunities afforded under Article 31 of the Vienna Convention apply only to the jurisdiction of the "receiving State."  Article 40 merely precludes a third State from interfering with a diplomat's efforts to return to his post in his receiving State or own country.  As the United States is not Prince Turki's receiving State, and the Federal Plaintiffs are not seeking to interfere with his efforts to return to his receiving State while in transit, neither Article 31 nor 40 of the Vienna Convention apply here.  Moreover, all of the cases upon which Prince Turki relies in support of his assertion that diplomatic immunity applies were decided prior to the adoption of the Vienna Convention, and are therefore irrelevant.

**IV.**     **CONCLUSION**

For all of the foregoing reasons, the Federal Plaintiffs respectfully submit that the Motion to Dismiss of Prince Turki should be denied in its entirety.

Respectfully submitted,

COZEN O'CONNOR

By:     _____/s/_____
        STEPHEN A. COZEN (SC 1625)
        ELLIOTT R. FELDMAN (EF 8111)
        SEAN P. CARTER (SC 0636)
        MARK T. MULLEN (MM 2384)

- 24 -