**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*     Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)

**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE MOTION TO DISMISS**
**FILED BY PRINCE SULTAN BIN ABDULAZIZ AL-SAUD**

COZEN O'CONNOR
The Atrium – Third Floor
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:  (215) 665-2013

## Table of Contents

Page

I.    INTRODUCTION ................................................................................................1

II.   APPLICABLE LAW ..........................................................................................4

    A.    The Burden of Proof in a Jurisdictional Challenge is on the Party
Claiming Immunity................................................................................4

III.  ARGUMENT .....................................................................................................6

    A.    The Earlier Dismissal Order in a Separate Case is Not Entitled to
Deference. ..............................................................................................6

    B.    Prince Sultan Has Not Met His Burden of Establishing That He is
Entitled to FSIA Protection....................................................................7

    C.    The Federal Plaintiffs' Claims Fall Squarely Within the Tortious
Act Exception of the FSIA......................................................................8

        1)    The Sponsorship of International Terrorism is not a
Discretionary Function.................................................................9

        2)    Sections 1605(a)(5) and 1605(a)(7) of the FSIA are not
Mutually Exclusive ....................................................................13

        3)    Plaintiffs Have Adequately Pled Causation................................15

    D.    The Commercial Activity Exception Confers Jurisdiction Over
Prince Sultan .......................................................................................18

        1)    Federal Plaintiffs have alleged causes of action based upon
acts performed in the United States in connection with a
commercial activity elsewhere....................................................18

        2)    Federal Plaintiffs have alleged acts outside the United
States in connection with a commercial activity that caused
direct effects in the United States. .............................................20

    E.    This Court Has Personal Jurisdiction Over Prince Sultan Under the
FSIA and New York's Long Arm Statute................................................21

1)      This Court's exercise of jurisdiction over Prince Sultan
        under the FSIA does not violate due process..............................................22

2)      This Court has personal jurisdiction over defendant
        pursuant to New York's long arm statute. ................................................24

IV.   CONCLUSION..............................................................................................................25

**TABLE OF AUTHORITIES**

**CASES**

Argentine Republic v. Amerada Hess Shipping Corp.,
        488 U.S. 428 (1989).................................................................................7

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
        902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990)............................. 4-5

Berkovitz v. United States,
        486 U.S. 531 (1988)............................................................................. 9-10

Birnbaum v. United States,
        588 F.2d 319 (2nd Cir. 1978)............................................................... 12-13

Boim v. Quranic Literacy Institute,
        291 F.3d 1000 (7th Cir. 2002) ..................................................................16

In re Brooklyn Navy Yard Asbestos Litigation,
        971 F.2d 831 (2d Cir. 1992)......................................................................7

Bryks v. Canadian Broadcasting Corp.,
        906 F. Supp. 204 (S.D. N.Y. 1995)..............................................................7

Calder v. Jones,
        465 U.S. 783 (1984)...............................................................................22

Cargill Int'l. S.A. v. M/T Pavel Dybenko,
        991 F.2d 1012 (2d Cir. 1993).....................................................................4

Chuidian v. Philippine National Bank,
        912 F.2d 1095 (9th Cir. 1990) ................................................................ 7-8

Cofacredit S.A. v. Windsor Plumbing Supply Co.,
        187 F.3d 229 (2d Cir. 1999)....................................................................25

Continental Ore Co. v. Union Carbide & Carbon Corp.,
        370 U.S. 690 (1962)...............................................................................16

Cruikshank v. United States,
    431 F. Supp. 1355 (D. Haw. 1977) ................................................................11

In re DES Cases,
    789 F. Supp. 552 (E.D. N.Y. 1992) ...............................................................24

Devlin v. Transp. Communications Internatial Union,
    175 F.2d 121 (2d Cir. 1999) ...........................................................................6

Filetech S.A. v. France Telecom S.A.,
    157 F.3d 922 (2d Cir. 1998) .....................................................................5, 18

Filus v. Lot Polish Airlines,
    907 F.2d 1328 (2d Cir. 1990) .........................................................................5

First American Corp. v. Sheikh Zayed Bin Sultan Al-Nahyan,
    948 F. Supp. 1107 (D.D.C. 1996) ..................................................................7

First City, Texas-Houston, N.A. v. Rafidain Bank,
    150 F.3d 172 (2d Cir. 1998) ...........................................................................5

Flatow v. Islamic Republic of Iran,
    999 F. Supp. 1 (D.D.C. 1998) ................................................................13, 16

Glickman v. United States,
    626 F. Supp. 171 (S.D. N.Y. 1985) ........................................................10, 12

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) .....................................................................15

Harris v. VAO Intourist, Moscow,
    481 F. Supp. 1056 (E.D. N.Y. 1979) ...........................................................20

Hogan v. Wal-Mart Stores, Inc.,
    167 F.3d 781 (2d Cir. 1999) ...........................................................................5

Ignatiev v. United States,
    238 F.3d 464 (D.C. Cir. 2001) .....................................................................12

Johnson v. Manhattan Railway Co.,
    289 U.S. 479 (1933) .......................................................................................6

Klaxon Co. v. Stentor Elec. Mfg. Co.,
  313 U.S. 487 (1941)....................................................................................5

L'Europeene deBanque v. LaRepublica de Venezuela,
  700 F. Supp. 114 (S.D. N.Y. 1988)............................................................22

Letelier v. Republic of Chile,
  488 F. Supp. 665 (D.D.C. 1980) ....................................................... 11-12, 14

Liu v. Republic of China,
  892 F.2d 1419 (9th Cir. 1989) .......................................................... 11-12, 14

Lumbard v. Maglia, Inc.,
  621 F. Supp. 1529 (S.D. N.Y. 1985)...........................................................15

Olsen v. Gov't. of Mexico,
  729 F.2d 641 (9th Cir.), *cert. denied*, 469 U.S. 917 (1984)...............................9

Orlikow v. United States,
  682 F. Supp. 77 (D. D.C. 1988) .................................................................10

Price v. Socialist People's Libyan Arab Jamahiriya,
  294 F.3d 82 (D.C.Cir. 2002) .....................................................................22

Pugh v. Socialist People's Libyan Arab Jamahiriya,
  290 F. Supp. 2d 54 (D.D.C. 2003) .............................................................23

Rajaa al Mukaddam v. Permanent Mission of Saudi Arabia,
  136 F. Supp. 2d 257 (S.D.N.Y. 2001)........................................................4, 5

Rein v. Socialist People's Libyan Arab Jamahiriya,
  995 F. Supp. 325 (E.D.N.Y. 1998) ........................................................22, 23

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
  246 F. Supp. 2d 285 (S.D. N.Y. 2003)..........................................................5

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
  235 F.3d 738 (2d Cir. 2000).......................................................................5

Republic of Argentina v. Weltover,
  504 U.S. 607 (1992)........................................................................ 19, 21-22

Robinson v. Malaysia,
    269 F.3d 133 (2d Cir. 2001)...................................................................4-5, 15

Saudi Arabia v. Nelson,
    507 U.S. 349 327 (1993).........................................................................18

Simon v. Phillip Morris, Inc.,
    86 F.Supp. 2d 95 (E.D. N.Y. 2000) .........................................................24

Southway v. Central Bank of Nigeria,
    198 Fed.3d 1210, 1217 (10th Cir. 1999).....................................................19

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002).................................................................................4

Texas Trading & Milling Co. v. Federal Republic of Nigeria,
    647 F.2d 300 (2d Cir. 1981)..........................................................20, 21-22

United States Fidelity & Guaranty Co. v. Braspetro Oil Serv. Co.,
    199 F.3d 94 (2d Cir. 1999).......................................................................20

United States v. Goodwin,
    141 F.3d 394 (2d Cir. 1997)......................................................................19

Upton v. Empire of Iran,
    459 F. Supp. 264 (D. D.C. 1978), aff'd mem.,
    607 F.2d 494 (D.C. Cir. 1979)...................................................................20

Virtual Countries, Inc. v. Republic of South Africa,
    300 F.3d 230 (2d Cir. 2002).....................................................................21

Weltover, Inc. v. Republic of Argentina,
    941 F.2d 145, 151-53 (2d Cir. 1991), *aff'd*, Republic of
    Argentina v. Weltover, Inc., 504 U.S. 607 (1992)..........................................21

## STATUTES

28 U.S.C. §1330(b) ....................................................................................21

28 U.S.C. § 1603 ........................................................................................7

28 U.S.C. § 1605(a)(2)............................................................................18, 20

28 U.S.C. § 1605(a)(5)............................................................................................8, 13, 14, 21

28 U.S.C. § 1605(a)(7)................................................................................................9, 13-14

28 U.S.C. § 2671, et seq................................................................................................9

18 U.S.C. § 1962............................................................................................................8

18 U.S.C. 2333............................................................................................................8

N.Y.C.P.L.R. § 302(a)(2)..............................................................................................24

## TREATIES AND RESOLUTIONS

G.A. Res. 49/60 U.N. GAOR, 49th Sess. at 4-5 (1995) ..........................................11, 12

G.A. Res. 51-210, U.N. GAOR, 51st Sess., Annex 1 at 6 (1997) ................................12

I.      **<u>INTRODUCTION</u>**

Plaintiffs have sued Prince Sultan Bin Abdulaziz al-Saud (Prince Sultan), based on his participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and foreseeable product.

Ongoing investigations around the World are slowly revealing the unprecedented scope and sophistication of that global conspiracy.   According to published reports, al Qaida maintained and operated at least twelve training camps in Afghanistan before the United States' military action forced the organization to disperse.   As many as 20,000 dedicated *jihadists*, including all nineteen of the September 11 hijackers, received indoctrination and training at those camps between 1996 and September 11, 2001.   By September 11, al Qaida drew from the resources of a vast network of terrorist cells in more than 100 countries.   That network's strength was reinforced by al Qaida's strategic alliances with other like minded terrorist organizations. To this day, the depth and breadth of the organization's infrastructure enable it to mount attacks throughout the World, even though international efforts have resulted in the capture of more than 3,000 al Qaida members in over 100 countries since September 11.

Post 9/11 investigations have confirmed that al Qaida relied heavily on its global infrastructure to plan, support and coordinate the September 11th Attack, and that it would have been impossible for al Qaida to carry out an attack on that scale within the United States without that infrastructure.   According to the *Report of the Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, plans for the Attack were carefully vetted through al Qaida's most senior leadership over a period of six (6) years, while those leaders were safely ensconced in training camps and safe houses funded by al

Qaida's financial supporters.  The individual participants in the Attack were chosen from an enormous pool of potential candidates, who were recruited, trained and indoctrinated using funds provided by the organization's supporters.  Each of the hijackers received training at one or more of al Qaida's well funded training camps in Afghanistan.  Until the last minute, details of the plot were revised through a global communication network, the existence of which also was made possible by the financial sponsorship of al Qaida's supporters.  In these ways, and others too numerous and complex to detail herein, the success of the September 11th Attack depended critically on the sophistication and extensiveness of the organization's global resources.

By all accounts, the infrastructure that made the September 11th Attack possible was built over a period of many years, using the financial and logistical support of a vast network of charities, banks and wealthy donors.[1]  As the United Nations Security Counsel Committee Concerning al Qaida and the Taliban succinctly explained:

> From its inception, al Qaida has relied heavily on charities and donations from its sympathizers to finance its activities.  Charities provide al Qaida with the very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support.  These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.  Al Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al Qaida.

*Second Report of the Monitoring Group Established Pursuant to Resolution 1363 (2001), on Sanctions Against Al Qaida, the Taliban and Individuals and Entities Associated With Them (December 2, 2003).*

---

[1] The estimated costs of building and sustaining that infrastructure are staggering.  David Aufhasuer, the former General Counsel of the Treasury Department, estimated that al Qaida needed $35 million to support its infrastructure on an annual basis prior to September 11.

Government officials and experts also agree that charities established and funded by the Kingdom of Saudi Arabia, and wealthy Saudi supporters, played a singularly important role in al Qaida's development and pursuit of its perverse ambitions.  Indeed, David Aufhauser has described Saudi Arabia as the "epicenter" of al Qaida's financing.  Almost three years after the September 11th Attack, Saudi Arabia is finally bowing to international pressure and itself acknowledging the pervasiveness of its charities' involvement in the sponsorship of al Qaida.  In fact, on June 2, 2004, Saudi Arabia announced that it intended to dissolve ***all*** of its international charities as a "counter-terrorism" measure.

The Federal Plaintiffs claims against Prince Sultan arise from his participation, in both his personal and official capacities, in the conspiracy outlined in general terms above.  The allegations against Prince Sultan are set forth in detail in the Federal Plaintiffs' 646 paragraph, 182 page Amended Complaint (Complaint or FAC).  While the Amended Complaint obviously must be read in its entirety, a summary of allegations which are particularly relevant to understanding the Federal Plaintiffs' claims against Prince Sultan is attached hereto as Exhibit A.

Prince Sultan has moved to dismiss the Federal Plaintiffs' claims, arguing that this Court lacks subject matter and personal jurisdiction to hear the case against him.  In support of his contention that the Court lacks subject matter jurisdiction, Prince Sultan invokes the protections of the Foreign Sovereign Immunities Act (FSIA).   For the reasons set forth below, Prince Sultan's Motion should be denied in all respects.

## II.   APPLICABLE LAW

### A.   The Burden of Proof in a Jurisdictional Challenge is on the Party Claiming Immunity.

The applicable standards of review and parties' respective burdens of proof in a jurisdictional challenge vary depending upon the procedural posture of the litigation and, at least with respect to the FSIA, whether the defendant challenges the factual basis of the claim. Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001); Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990); Rajaa al Mukaddam v. Permanent Mission of Saudi Arabia, 136 F. Supp. 2d 257, 260 (S.D.N.Y. 2001).[2] The Supreme Court has not had occasion to comprehensively address the relevant standards of review and burdens of proof applicable in analyzing an immunity defense at differing stages of an FSIA action.   However, when read collectively and in light of the relevant pleading requirements of the Federal Rules of Civil Procedure, the Second Circuit's decisions in FSIA cases provide a road map for resolving the immunity defenses in this case.

Consistent with the liberal pleading requirements of Rule 8, a plaintiff in an FSIA case need only provide the defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002). In responding to the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA. Cargill Int'l. S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes

---

[2] "While Ball involved a challenge to personal jurisdiction under Rule 12(b)(2), the holding applies to all jurisdictional testing motions, including challenges to subject matter jurisdiction under Rule 12(b)(1)." Rajaa al Mukaddam, 136 F.Supp.2d at 260 n. 11.

such a showing, the burden of production shifts to the plaintiff to come forward with specific factual allegations which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in Section 1605 of the FSIA. Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001). To the extent the defendant challenges the accuracy of those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery relative to that disputed factual contention. Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990); Rajaa al Mukaddam, 136 F. Supp. 2d at 261-62.[3] Upon completion of discovery, the Court should normally "afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction." Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 235 F.3d 738, 748 (2d Cir. 2000). In the Second Circuit, defendants must understand "that the ultimate burden of proof in a FSIA jurisdiction case ultimately lies with them." Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 246 F. Supp.2d 285, 288 (S.D. N.Y. 2003).[4]

---

[3] Prior to discovery, a plaintiff may defeat a motion challenging personal jurisdiction by simply pleading legally sufficient allegations of jurisdiction. Ball, 902 F.2d 194.

[4] The law that the Court must apply in analyzing an immunity defense under the FSIA depends upon the issue under consideration. Federal law and the Federal Rules of Civil Procedure control all constitutional and federal question issues, both substantive and procedural. The substantive law of New York applies to the vast majority of the Federal Plaintiffs' common law claims, as those claims arise out of tortious conduct and injuries occurring within this State. Klaxon Co. v. Stenton Elec. Mfg. Co., 313 U.S. 487 (1941). The Federal Rules of Civil Procedure control all procedural issues, even on the common law claims. Hogan v. Wal-Mart Stores, Inc., 167 F.3d 781, 783 (2d Cir. 1999).

III.   **ARGUMENT**

A.   **The Earlier Dismissal Order in a Separate Case is Not Entitled to Deference.**

Before this action filed by the Federal Plaintiffs was consolidated with the Burnett and Ashton actions, Judge Robertson in the District of Columbia granted motions to dismiss filed by Princes Turki and Sultan.  Prince Sultan recognizes this is a separate action but contends that the ruling is nonetheless entitled to substantial deference as law of the case.  Prince Sultan is mistaken.  Judge Robertson's earlier ruling in a separate lawsuit, with different plaintiffs and different allegations,  and involving distinct precedents is not binding on this Court or entitled to any deference.

The Supreme Court has cautioned that while consolidation can advance judicial economy, "consolidation does not merge the suits into a single cause or change the rights of the parties, or make those parties who are parties in one suit parties in another."  Johnson v. Manhattan Ry. Co., 289 U.S. 479, 497 (1933).  Efficiency does not prevail at the expense of justice.  Devlin v. Transp. Communications International Union, 175 F.2d 121, 130 (2d Cir. 1999).

The Federal Plaintiffs filed their own lawsuit in this Court.  The Complaint contains different allegations than those addressed by Judge Robertson in the District of Columbia.  The five "prudential factors" provided by Prince Sultan for adopting the law of the case where it clearly does not apply do not override this Court's fundamental duty to decide this case on its merits, and in accordance with the distinct controlling precedents of this Circuit.  The Second Circuit has specifically cautioned that:

> The systematic urge to aggregate litigation must not be allowed to
> trump our dedication to individual justice, and we must take care

-6-

> that each individual plaintiff's – and defendant's – cause not be
> lost in the shadow of a towering mass litigation.

In re Brooklyn Navy Yard Asbestos Litigation, 971 F.2d 831, 853 (2d Cir. 1992) (citation omitted). The Federal Plaintiffs are entitled to individual justice and not swept together with claims filed by different parties in a different action in a different jurisdiction.

### B. Prince Sultan Has Not Met His Burden of Establishing That He is Entitled to FSIA Protection

The applicability of the FSIA to officials of a foreign state is questionable. While a number of federal courts have concluded that officials of a foreign government are entitled to the protections of the FSIA, neither the Supreme Court nor the Second Circuit has had occasion to address the issue. When addressed at all by the courts that have extended FSIA immunity to foreign officials, the typical analyses are that a suit against an individual acting in his official capacity is the "practical equivalent" of a suit against the sovereign directly, or that reason dictates such extension because immunity is based on the nature of the act. Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1099-1103 (9th Cir. 1990); Bryks v. Canadian Broadcasting Corp., 906 F. Supp. 204, 210 (S.D. N.Y. 1995); First American Corp. v. Sheikh Zayed Bin Sultan Al-Nahyan, 948 F. Supp. 1107, 1120 (D.D.C. 1996). However, it is beyond dispute that the actual language of the FSIA makes absolutely no mention of officials or agents in defining the term "foreign state." 28 U.S.C. § 1603. Given Congress' failure to specifically reference officials or agents of a foreign sovereign within the statute, the Federal plaintiffs respectfully submit that Prince Sultan cannot meet his burden of establishing that he is a foreign sovereign within the meaning of the FSIA. See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 441 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.") So, too, with individuals.

It is well established that the FSIA affords no protection in relation to the claims based on conduct undertaken in Prince Sultan's personal capacity.   <u>Chuidian</u>, 912 F.2d at 1106.   The Complaint alleges, among other things, that Prince Sultan made personal contributions to charities he knew to be sponsors of al Qaida, with the knowledge and intent that those contributions would be used to support al Qaida's global *jihad*.   FAC ¶ 431.   As to these claims, the FSIA affords no protection, and this Court possesses unqualified subject matter jurisdiction.

**C.**  **The Federal Plaintiffs' Claims Fall Squarely Within the Tortious Act Exception of the FSIA**

Even if Prince Sultan could validly invoke the protections of the FSIA in relation to the claims asserted against him in this case, this Court possesses jurisdiction over him for those claims under the tortious act exception of the FSIA.   The tortious act exception confers jurisdiction over a foreign sovereign in any case:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or any official or employee of that foreign state   acting within the scope of his office or employment…

28 U.S.C. § 1605(a)(5).

The Complaint seeks monetary damages for personal injuries, wrongful deaths and property damage resulting from the September 11th Attack, under the following common law and statutory tort theories:  trespass, wrongful death, assault and battery, negligence, intentional and negligent infliction of emotional distress, 18 U.S.C. § 2333 and 18 U.S.C. § 1962.  Thus, the Federal Plaintiffs' claims in this case fall squarely within the plain language of the foregoing exception.

In an effort to avoid application of the tortious act exception, Prince Sultan raises three principal arguments.  First, Prince Sultan maintains his actions constitute a discretionary power.  Second, Prince Sultan asserts the exception does not encompass claims for injuries caused by providing material support to terrorists because Congress explicitly assigned such claims to § 1605(a)(7).  Third, he argues that the Federal Plaintiffs have not met the "heightened pleading standard" of causation imposed by the FSIA.

### 1)      The Sponsorship of International Terrorism is not a Discretionary Function

Prince Sultan first argues that the sponsorship of an international terrorist organization constitutes a "discretionary function" of a foreign official under the FSIA.  The discretionary function exception of the FSIA mirrors a corresponding provision in the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (FTCA), a statute enacted thirty years before the FSIA.  Olsen v. Gov't. of Mexico, 729 F.2d 641, 646 (9th Cir. 1984), cert. denied, 469 U.S. 917 (1984).  In enacting the FSIA, Congress made clear that the discretionary function exception of the FSIA "corresponds to" the identical exception under the FTCA.  Id.  Thus, the principles developed by the Supreme Court and lower federal courts in construing the applicability of the discretionary function exception of the FTCA guide the interpretation of the corresponding provision of the FSIA.  Id.

While the Supreme Court has yet to engage in a meaningful analysis of the discretionary function exception under the FSIA, it has had the opportunity to define the limitations of the discretionary function exception in FTCA cases.  In Berkovitz v. United States, 486 U.S. 531 (1988), the Supreme Court stated that "the nature of the conduct" must govern "whether the discretionary function exception applies in a given case." Id. at 536-37.  In analyzing the nature

of the conduct, the courts must consider "whether the action is a matter of choice for the acting employee." Id. at 536.  The exception does not, however, extend to all acts which involve some exercise of judgment - the element of judgment exercised must be the kind that the discretionary function exception was designed to shield.  Thus, the exception does not apply, for example, "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Id.

Consistent with the limitations defined by the Supreme Court, lower courts have refused to extend the discretionary function exception to illegal, malevolent or extraordinary conduct of Government officials.  In Glickman v. United States, 626 F. Supp. 171 (S.D. N.Y. 1985), the plaintiff asserted claims under the FTCA arising from the CIA's alleged secretive administration of LSD to the plaintiff.  The United States sought dismissal of the claims under the FTCA discretionary function exception, arguing that "any decision concerning the implementation of a drug experimentation program would necessarily involve considerations of public policy."  The Court rejected the Government's broad reading of the discretionary function exception, reasoning as follows:

> [T]his assertion really does not reckon with the extraordinary nature of the allegations made by the plaintiff in this case.  What plaintiff is alleging is conduct of such a serious and malevolent nature as to be beyond any reasonable discretion on the part of a Government agency.  Plaintiff is alleging something which does not involve normal regulatory activities or the weighing of policy factors within the scope of Governmental power, but rather something which goes beyond the Constitutional powers of the Government, and seriously violates the Constitutional rights of a citizen.  It cannot be said that Congress meant to withdraw this kind of allegation from judicial scrutiny under the "discretionary function" exception.

Id. at 175; see also Orlikow v. United States, 682 F. Supp. 77 (D. D.C. 1988) (stating that the discretionary function exception does not extend to "extraordinary and malevolent" acts); Cruikshank v. United States, 431 F. Supp. 1355, 1358-59 (D. Haw. 1977) (holding that the government has no "discretion" to commit illegal acts).

Consistent with the principles announced in FTCA cases, courts interpreting the discretionary function exception of the FSIA have properly declared that foreign officials have no discretion to engage in conduct that contravenes international law or that violates the fundamental precepts of humanity. Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989); Letelier v. Republic of Chile, 488 F. Supp. 665 (D.D.C. 1980). Those cases are not distinguished as asserted by Prince Sultan.

Here, the conduct which forms the basis of the Federal Plaintiffs' claims against Prince Sultan violates U.S. and international law, and therefore cannot fall within the discretionary function exception of the FSIA. In their Complaint, the Federal Plaintiffs allege that Prince Sultan provided material support and resources to al Qaida. AC ¶ 431. Such conduct violates the criminal laws of the United States, including the provisions of the Anti-terrorism and Effective Death Penalty Act, enacted more than five years before the September 11th Attack, as well as RICO and any number of other relevant criminal statutes. Moreover, the United Nations has repeatedly declared that the knowing financing and sponsorship of international terrorism violate the fundamental precepts of humanity and international law. According to Resolution 49/60, adopted by the United Nations General Assembly on February 17, 1995:

> States, guided by the purposes and principles of the Charter of the United Nations and other relevant rules of international law, must refrain from organizing, instigating, assisting or participating in terrorist acts in territories of other States, or from acquiescing in or

> encouraging activities within their territories directed towards the
> commission of such acts…

G.A. Res. 49/60, U.N. GAOR, 49th Sess. at 4-5 (1995).

Similarly, pursuant to Resolution 51-210, adopted by the General Assembly on January

16, 1997:

> The States' members of the United Nations solemnly reaffirm their
> unequivocal condemnation of all acts, methods and practices of
> terrorism as criminal and unjustifiable, whether and by
> whomsoever committed, including those which jeopardize friendly
> relations among States and people and threaten the territorial
> integrity and security of States;
>
> They declare that knowingly financing, planning and inciting
> terrorist attacks are also contrary to the purposes and principles of
> the United Nations …

G.A. Res. 51-210, U.N. GAOR, 51st Sess., Annex 1 at 6 (1997),

As the sponsorship, financing and aiding and abetting of terrorism are illegal and violate

the most fundamental precepts of international law and human rights, "wherever **and by

whomsoever** committed," such conduct cannot be deemed "discretionary" within the meaning of

the FSIA.[5]  Glickman, 626 F. Supp. at 175; Liu, 892 F.2d at 1431; Letelier, 488 F. Supp. at 673.

In addition to ignoring the relevant limitations on the scope of the discretionary function

exception, Prince Sultan's argument also mischaracterizes the proper focus on the nature of the

act performed.  In his brief, Prince Sultan states that his subjective intent is irrelevant.  That is

true but, whether his intent is "malicious or benign," there exists no discretion to pursue any

policy through an illegal or malevolent means.  See Birnbaum v. United States, 588 F.2d 319

---

[5] To the extent these acts violate the internal laws or policies of Saudi Arabia, that fact would also preclude that
conduct from being deemed discretionary.  Liu, 892 F.2d at 1431.  Plaintiffs should be afforded discovery to explore
that issue.  Ignatiev v. United States, 238 F.3d 464 467 (D.C. Cir. 2001).

(2nd Cir. 1978) (finding that CIA agents' criminal conduct did not fall within discretionary function exception despite fact that CIA agents were acting in interests of nation).

### 2) Sections 1605(a)(5) and 1605(a)(7) of the FSIA are not Mutually Exclusive

Prince Sultan also alleges that Federal Plaintiffs' claims are essentially for providing material resources and support to terrorists and, as such, are not actionable under § 1605(a)(5) but only under § 1605(a)(7). This argument is particularly disingenuous.

Congress created the exception set forth in § 1605(a)(7) to create subject matter jurisdiction for claims arising from injuries sustained outside the United States. For obvious reasons, the circumstances in which the courts of the United States may exercise such extra-territorial jurisdiction must be more limited than where the injury occurs here. Thus, § 1605(a)(7) is properly viewed as creating extra-territorial jurisdiction for certain specific types of torts, all of which fall within the broader umbrella of the tortious act exception where the resulting injury occurs in the United States.

This view of the interplay between the tortious act exception and § 1605(a)(7) is supported by the case law. As the United States District Court for the District of Columbia observed in Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 15 (D.D.C. 1998):

> As 28 U.S.C §1605(a)(5) already provides jurisdiction of a state-sponsored terrorist acts in the United States, the state-sponsored terrorism exception would be redundant if it were held to apply only within the United States.

Indeed, well before Congress adopted § 1605(a)(7), the courts had consistently interpreted the tortious act exception to provide jurisdiction over foreign sovereigns for the types of conduct described in § 1605(a)(7), where the resulting injury occurred in the United States.

For example, in <u>Liu</u>, the Court concluded that jurisdiction existed over Taiwan in a case arising from the assassination of a Taiwanese expatriate living in California.  <u>Liu</u>, 892 F.2d at 1419. Similarly, in <u>Letelier</u>, the Court found that the tortious act exception provided jurisdiction over Chile for the assassination of a former Chilean diplomat in Washington, D.C.  <u>Letelier</u>, 488 F. Supp. at 674.  On the most fundamental level, both of these cases involved claims based on a foreign sovereign's participation in an "extra-judicial killing," one of the specific categories of conduct for which Congress later provided extra-territorial jurisdiction under § 1605(a)(7).  In light of <u>Liu</u> and <u>Letelier</u>, it is beyond dispute that the tortious act exception provides jurisdiction over a foreign state for all the categories of conduct described in § 1605(a)(7), provided that the resulting injury occurs in the United States.

There is also a fundamental flaw in the defendant's argument that requires very little elaboration – Section 1605(a)(7) only applies to injuries and deaths – not claims for property damage.  The unmistakably clear language of subsection (a)(7) excludes claims for the property damage suffered by the Federal Plaintiffs.  Congress certainly could not have removed claims for property damage under state law included in the tortious activity exception of subsection (a)(5) by passing the terrorism exception of subsection (a)(7) when, by its very terms, subsection (a)(7) does not include property damage claims.

-14-

### 3)      Plaintiffs Have Adequately Pled Causation

Under New York law,[6] Prince Sultan's extensive sponsorship of al Qaida ties him inextricably to the September 11th Attack, and provides a sufficient causal link to impose liability upon him for the Federal Plaintiffs' injuries.  "[T]hose who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, *regardless of the degree of their participation or culpability in the overall scheme*."  Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985) (emphasis supplied).  Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement."  Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983) (emphasis supplied).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor.  Id.

Applying these concepts of concerted action liability, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing financiers and sponsors of the terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot.[7]  As the United

---

[6] In this Circuit, the test for determining the applicability of the tortious act exception is whether the foreign sovereign's "acts were tortious under the law of the State of new York."  Robinson, 269 F.3d at 142, n. 2.  The Federal Plaintiffs have addressed the application of that test to the present case in detail in their Memorandum of Law in Opposition to the Motion to Dismiss of Prince Turki at pp. 9-13, and respectfully refer the Court to that discussion in lieu of restating it here.  For the reasons stated therein, Prince Sultan's conduct gives rise to tort liability under conspiracy and aiding and abetting theories, and jurisdiction therefore exists for those claims under the tort exception of the FSIA.

[7] These decisions are consistent with, and find additional support in, the express public policies of the Untied States.  As Attorney John Ashcroft has observed, the United States makes "no distinction between those who carry out terrorist attacks and those who finance organizations."  *Testimony of the Honorable John Ashcroft, Attorney General, United States Department of Justice, United States Committee on the Judiciary, March 4, 2003.*

States District Court for the District of Columbia observed in Flatow:  "[a] plaintiff need not establish that the material support and resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises…[s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient…." Flatow, 999 F. Supp. at 18.  The Seventh Circuit adopted the same standard in Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1023 (7th Cir. 2002), holding that plaintiffs who are victims of terrorism need show only that the defendant knew of the terrorist organization's illegal activities, desired to help those activities, and engaged in some affirmative act in support thereof.

Pursuant to these standards, Prince Sultan's participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties him inextricably to the Attack.[8]  As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the Federal Plaintiffs have properly and adequately alleged causation.  Accordingly, Prince Sultan's causation-based arguments must be rejected.

The Complaint also sufficiently alleges that the Attack was a foreseeable product of the conspiracy in which Prince Sultan knowingly participated, and of Prince Sultan's aiding and abetting of al Qaida.  Indeed, the Complaint unambiguously asserts that the Attack was a "direct, intended and foreseeable product" of that conspiracy.  FAC ¶ 72.  While it would be improper to test the sufficiency of the evidence in support of that allegation in the context of the present Motion, it should be noted that al Qaida had unequivocally declared, through statements and actions, that the primary objective of its global conspiracy was to attack the United States and

---

[8] The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking as it as a whole."  Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962).

kill its citizens.  For example, in 1996 and 1998, al Qaida issued *fatwas*, or religious decrees, authorizing attacks against the United States and its citizens.  In the 1998 *fatwa*, issued under the banner "The World Islamic Front For Jihad Against Jews And Crusaders," Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens – civilian or military – "in any country in which it is possible to do it…"

During the years preceding the September 11 attack, al Qaida followed through on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests, including:  the first World Trade Center bombing in 1993; the planned attacks against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993; the planned assassination of Pope John Paul in the Philippines, including the Americans in his entourage; the planned assassination of President Clinton in the Philippines; the planned bombing of 11 to 13 American jumbo jets over the Pacific in January 1995; the car bombing of the U.S. military mission in Riyadh, Saudi Arabia, in 1995; the truck bombing of the U.S. Housing area Khobar Towers in Dhahran, Saudi Arabia, 1996; the simultaneous bombings of the U.S. Embassies in Kenya and Tanzania in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide boat attack on the USS Cole in October of 2000.

As the conduct of terrorist attacks against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is absurd to suggest that the

Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as Prince Sultan is alleged to have done.[9]

> **D.     The Commercial Activity Exception Confers Jurisdiction Over Prince Sultan**

The second and third clauses of the commercial activity exception to immunity provide that:

> A foreign state shall not be immune…in any case…in which the action is based…upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

> **1)     Federal Plaintiffs have alleged causes of action based upon acts performed in the United States in connection with a commercial activity elsewhere.**

The Federal Plaintiffs have alleged causes of action that arise, *inter alia*, from the commandeering of airplanes that were then flown into the World Trade Center and Pentagon. These acts were performed in the United States.  FAC ¶70.  The concerted action liability theories advanced by the Federal Plaintiffs under New York law tie Prince Sultan inextricably to those events. [10]

Prince Sultan's participation in the conspiracy involved a form of money laundering in support of terrorists directly aimed at attacking the United States.  The commercial activities

---

[9] Not surprisingly, Prince Sultan denies the allegations of the Complaint.  Consistent with the precedents of the Second Circuit, the Federal Plaintiffs request the opportunity to conduct discovery regarding any disputed fact the Court deems material to the FSIA jurisdictional analysis.  Filetech S.A., 157 F.3d at 932.

[10] The phrase "based upon" in the commercial activity exception is read "most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993) (citation omitted).  The Federal Plaintiffs' theory of the case includes concerted action liability.

engaged in by Prince Sultan outside the United States consist of providing substantial funding and logistical support to several charities deeply involved in the sponsorship of al Qaida's global operations while Prince Sultan knew and intended that those contributions would be used to fund al Qaida's global operations and acts of international terrorism.

> Money laundering is a quintessential economic activity.  Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity.  This is particularly so where the intent of the transaction is to conceal the source of those profits or to promote the unlawful activity and thereby yield even greater economic rewards.

United States v. Goodwin, 141 F.3d 394, 399 (2d Cir. 1997).

When a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are commercial within the meaning of the FSIA.  Republic of Argentina v. Weltover, 504 U.S. 607, 614 (1992).  Terrorism is not a recognized sovereign activity peculiar to sovereigns such that it falls outside the scope of commercial activity.  Neither is money laundering.  Certainly, international terrorism entails precisely the type of conduct that private parties can, and do, perform.  Private parties can support international terrorism by many methods, including financial support and money laundering.  "Contrary to Defendants' position, we believe that illegal acts may be done 'in connection with' a commercial activity as to invoke the FSIA's commercial activity exception."  Southway v. Central Bank of Nigeria, 198 Fed.3d 1210, 1217 (10th Cir. 1999).  Congress intended the FSIA's commercial activity exception to encompass a broad spectrum of activities.  Id.  The criminal acts of a sovereign committed outside its own borders in the same manner as private parties always should be beyond the scope of immunity.

2)    **Federal Plaintiffs have alleged acts outside the United States in connection with a commercial activity that caused direct effects in the United States.**

The Federal Plaintiffs also allege that Prince Sultan committed numerous acts outside the United States in connection with their commercial activity elsewhere, described above, that had the direct effect of causing almost 3,000 deaths and the massive destruction of property in New York City.[11]

It is clear beyond doubt that moving defendants' acts had a direct effect in the United States. Acts of the state are in connection with a commercial activity when there is a substantial connection or causal link between the acts and the commercial activity. "An effect is 'direct' if it follows as an immediate consequence of the defendant's activity; the effect need not be substantial or foreseeable." United States Fidelity & Guaranty Co. v. Braspetro Oil Serv. Co., 199 F.3d 94, 98 (2d Cir. 1999) (citation omitted).

> Fortunately, a certain amount of case law interpret both components of the problematic phrase "direct" and "in the United States." For a paradigm of "direct," we look to the vivid examples of Harris v. VAO Intourist, Moscow, 481 F. Supp. 1056 (E.D. N.Y. 1979), and Upton v. Empire of Iran, 459 F. Supp. 264 (D. D.C. 1978), aff'd mem., 607 F.2d 494 (D.C. Cir. 1979). In Harris, a man lost his life in a hotel fire; in Upton, a man was injured when the roof of a building collapsed on him. Both men undoubtedly suffered "direct" effects.

Texas Trading, 647 F.2d at 311-12. Unlike Harris and Upton, the direct effects suffered by the Federal Plaintiffs indisputably all occurred in the United States, not foreign countries, and were

---

[11] This Court has subject matter jurisdiction pursuant to the third clause of the commercial activity exception even if it does not impute to Prince Sultan, through concerted-action liability, the acts that actually occurred in the United States. Even analyzed as acts outside the United States, they were in connection with commercial activities, including money laundering and financial support of terrorism, that caused direct, catastrophic effects here. "Given Congress's broad approach in the language of §1605(a)(2), it is not at all improbable that a suit could be brought under more than one clause." Texas Trading & Milling Co. v. Federal Republic of Nigeria, 647 F.2d 300, 311 n. 30 (2d Cir. 1981).

-20-

as undoubtedly "direct."[12]   Judge Kaufman in <u>Texas Trading</u> succinctly articulated the primary

issue:

> The question is, was the effect sufficiently "direct" and sufficiently
> "in the United States" that Congress would have wanted an
> American court to hear the case?  No rigid parsing of §1605(a)(2)
> should lose sight of that purpose.  We have no doubt that Congress
> intended to bring suits like these into American courts…and we
> hold that statutory subject matter jurisdiction here exists.

<u>Texas Trading</u>, 647 F.2d at 313 (citation omitted).  That critical question and the answer to it

remain the same under our facts even with the Supreme Court's admonition in <u>Weltover</u>:

Congress not only would have wanted an American court to hear this case, it enacted a statute

that gives this Court subject matter jurisdiction over the Prince Sultan.[13]

### E.   This Court Has Personal Jurisdiction Over Prince Sultan Under the FSIA and New York's Long Arm Statute.

Congress addressed personal jurisdiction over foreign sovereigns in the FSIA.

> Personal jurisdiction over a foreign state shall exist as to every
> claim for relief over which the district courts have jurisdiction
> under Section (a) where service has been made under Section 1608
> of this Title.

28 U.S.C. §1330(b).  Under the FSIA, subject matter jurisdiction plus valid service of process

equal personal jurisdiction.  <u>Texas Trading</u>, 647 F.2d at 308.  The Second Circuit has concluded

that constitutional due process safeguards apply to foreign states and that a statute cannot create

---

[12] Both *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236-38 (2d Cir. 2002) and *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 151-53 (2d Cir. 1991), *aff'd, Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) involved financial or reputational consequences of extra-territorial acts to corporations located in the United States.  In such situations, the Second Circuit logically requires that jurisdiction may not be predicated on trivial effects in the United States.  The concerns raised in such cases about Congress' intent to create subject matter jurisdiction based upon a "ripple effect" are not present here in light of the catastrophic effects that occurred in this country.

[13] Unlike the term "tortious act" in §1605(a)(5), "neither 'direct' nor 'in the United States' is a term susceptible of easy definition."  *Texas Trading*, 647 F.2d at 312.

personal jurisdiction where the Constitution forbids it.  Id. at 313; L'Europeene deBanque v. LaRepublica de Venezuela, 700 F. Supp. 114, 122 (S.D. N.Y. 1988).[14]  The Federal Plaintiffs have properly served Prince Sultan and this Court has subject matter jurisdiction under the FSIA for the reasons set forth above.

1)      **This Court's exercise of jurisdiction over Prince Sultan under the FSIA does not violate due process.**

The Supreme Court repeatedly has held that the due process clause of the Fourteenth Amendment permits personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  Calder v. Jones, 465 U.S. 783, 788 (1984).  The court properly focuses on the relationship among the defendant, the forum, and the litigation in judging minimum contacts.  Id.  In an action involving the harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence."  Id.  Such is the case here.  The Federal Plaintiffs have alleged that Prince Sultan was engaged in a conspiracy to attack and wage war against the United States, its nationals, interests, and allies.  The actions of the conspirators were expressly aimed at the United States such that, under the circumstances, they must reasonably anticipate being haled into court here.

Two recent cases involving the hijacking of airplanes outside the United States, but with United States citizens as passengers, provide support for exercising personal jurisdiction here. Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D.N.Y. 1998) involved the in-flight bombing and destruction of Pan Am Flight 103 with the loss of 189 United States

---

[14] The Supreme Court has assumed, without deciding, that foreign states are entitled to such protection. *Republic of Argentina*, 504 U.S. at 619.  The District of Columbia Circuit has held that foreign states are not persons protected by the Fifth Amendment.  *Price v. Socialist People's Libyan Arab Janahiriya*, 294 F.3d 82, 99 (D.C.Cir. 2002).  Of course, the federal government is bound by the Fifth Amendment and states by the Fourteenth Amendment.

-22-

citizens over Lockerbie, Scotland.  Judge Platt, in the Eastern District of New York, reasoned

that the destruction of the airplane, 189 deaths, and significant security concerns for the country

and its aviation industry arguably "has had extensive impacts" on the United States.  Id. at 330.

> Any foreign state would know that the United States has
> substantial interest in protecting its flag carriers and its nationals
> from terrorist activities and should reasonably expect that if these
> interests were harmed, it would be subject to a variety of potential
> responses, including civil actions in United States courts.

Id.

In Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F.Supp.2d 54 (D.D.C. 2003),

Libya challenged the personal jurisdiction of a federal court in the District of Columbia in a suit

involving the 1989 mid-air explosion of a French airline in Africa that killed seven United States

citizens.  The plaintiffs in Pugh alleged that the defendants "conspired to sabotage and succeeded

in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting

passengers while in flight."   Id. at 59.   The Court noted the United States' well known,

worldwide interest in preventing and punishing terrorism.  Congress had enacted several criminal

statutes dealing with such cases starting at least five years before the bombing.  These criminal

statutes contemplated jurisdiction in the United States over foreign nationals for activities abroad

regardless of other contacts with the United States.

> It logically follows that if a federal court may constitutionally
> exercise criminal jurisdiction over such individuals, the
> Constitution should be no bar to those same federal courts, in a
> civil action for damages, exercising civil *in personam* jurisdiction
> over those same individuals for the same acts.

Id.  In sum, this Court's exercise of personal jurisdiction does not violate Prince Sultan's due

process rights.

-23-

Prince Sultan is also subject to personal jurisdiction pursuant to the "modified due process standard for mass torts" adopted on several occasions by courts in the Eastern District of New York in DES and tobacco cases.  <u>Simon v. Phillip Morris, Inc.</u>, 86 F.2d 95, 129-37 (E.D. N.Y. 2000); and <u>In re DES Cases</u>, 789 F. Supp. 552, 574-77 (E.D. N.Y. 1992).  "New York's interest in this dispute is intense, and the burden on [defendants] is minimal compared to the difficulty of the plaintiffs' litigating in [Saudi Arabia]."  <u>Simon</u>, 86 F.2d at 137.[15]

> **2)     This Court has personal jurisdiction over defendant pursuant to New York's long arm statute.**

The exercise of personal jurisdiction over claims not subject to the FSIA is also subject to the same constitutional due process analysis above but jurisdiction exists through New York's long arm statute rather than the FSIA.  The New York statute provides, in part, that "a court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent commits a tortious act within the state."  N.Y.C.P.L.R. § 302(a)(2).  "It is well-settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. § 302(a)(2)."  <u>Simon</u>, 86 F. Supp.2d at 99 (citation omitted). As such, Prince Sultan's participation in al Qaida's conspiracy to attack the United States, and aiding and abetting of that terrorist organization, connects him with the subject transaction, charges him with the acts of and

---

[15] The courts of the United States in general, and New York in particular, have an undeniable and overwhelming appreciable interest in the World Trade Center litigation.  *Simon*, 86 F.2d at 131 (citation omitted).  Since New York has an appreciable state interest, in that this litigation raises serious issues that would affect or have a probable impact on the vindication of policies expressed in the laws of New York, the assertion of jurisdiction is *prima facie* constitutional.  *Id.*  Thus, the assertion of jurisdiction is considered constitutional unless, given the actual circumstances of the case, the defendants are unable to mount a defense in the forum state without suffering a relatively substantial hardship.  *Id.*  Prince Sultan can make no such showing here.

declarations of the co-conspirators, and permits this Court to exercise jurisdiction over him.

Cofacredit S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 240 (2d Cir. 1999).


**IV.   <u>CONCLUSION</u>**

      For all of the foregoing reasons, the Federal Plaintiffs respectfully submit that the Motion

to Dismiss of Prince Sultan should be denied in its entirety.

                           Respectfully submitted,

                           COZEN O'CONNOR

                     By:   _____/s/_____
                           STEPHEN A. COZEN (SC 1625)
                           ELLIOTT R. FELDMAN (EF 8111)
                           SEAN P. CARTER (SC 0636)
                           MARK T. MULLEN (MM 2384)
                           1900 Market Street
                           Philadelphia, PA  19103
                           Attorneys for Plaintiffs