**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*      Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)


**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE MOTION TO DISMISS**
**FILED BY SAAR NETWORK ENTITY DEFENDANTS**
**AFRICAN MUSLIM AGENCY, GROVE CORPORATE, INC.**
**HERITAGE EDUCATION TRUST, INTERNATIONAL INSTITUTE OF ISLAMIC**
**THOUGHT, MAR-JAC INVESTMENTS, INC., MENA CORPORATION, RESTON**
**INVESTMENTS, INC., SAFA TRUST, SANA-BELL, INC. STERLING CHARITABLE**
**GIFT FUND, STERLING MANAGEMENT GROUP, INC. AND YORK FOUNDATION**


COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.    ALLEGATIONS AGAINST THE SAAR NETWORK ENTITIES ..................................... 2

III.    ARGUMENT ...................................................................................................... 5

   A.   Applicable Standards on a Motion to Dismiss.................................................. 5

      1.   Rule 12(b)(2)................................................................................................ 5

      2.   Rule 12(b)(6) ............................................................................................... 6

   B.   This Court Has Personal Jurisdiction Over the SAAR Network Entities
       Under New York's Long Arm Statute and Pursuant to Both the
       Traditional Due Process Analysis and the Modified Due Process
       Standard for Mass Torts........................................................................................ 7

   C.   The Federal Plaintiffs Have Sufficiently Pled Allegations That the SAAR
       Network Entities Acted As Aiders and Abettors and Co-Conspirators in
       Violation of the ATA, TVPA, RICO and the State Common Law Claims ..................... 14

      1.   The Federal Plaintiffs Have Alleged Claims Pursuant to the Anti-Terrorism
         And Effective Death Penalty Act, 18 USC § 2331 ...................................................... 15

      2.   The Complaint States a Claim Against the SAAR Network Entities Under the Torture
         Victim Protection Act ........................................................................................... 18

      3.   RICO Liability ...................................................................................................... 19

      4.   The Federal Plaintiffs Have Adequately Alleged State Common Law Claims............ 23

   IV.   CONCLUSION .................................................................................................. 23

## TABLE OF AUTHORITIES

### CASES

Alexander v. Fritzen,
    503 N.E.2d 102 (N.Y. 1986)........................................................................8

Asahi Metal Industrial v. Superior Court,
    480 U.S. 102 (1987).................................................................................10

Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters,
    459 U.S. 519 (1983).................................................................................21

Ball v. Metallurgie Hoboken-Overpelt S.A.,
    902 F.2d 194 (2d Cir. 1990)......................................................................5

Boim v. Quranic Literacy Institute,
    291 F.3d 1000 (7th Cir. 2002) ...............................................................1, 15

Burger King v. Rudzewicz,
    471 U.S. 462 (1985).........................................................................9, 10, 11

Calder v. Jones,
    465 U.S. 783 (1984)...............................................................................10, 11

Chaiken v. VV Publ'g Corp.,
    119 F.3d 1018 (2nd Cir. 1997)...................................................................9

Chance v. Armstrong,
    143 F.3d 698 (2d Cir. 1998)......................................................................6

Chrysler Capital Corp. v. Century Power Corp.,
    778 F. Supp. 1260 (S.D. N.Y. 1991)..........................................................8

Cleft of the Rock Fdn. v. Wilson,
    992 F. Supp. 574 (E.D. N.Y. 1998) ......................................................8, 12

Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,
    187 F.3d 229 (2d Cir. 1999)......................................................................9

Conley v. Gibson,
    355 U.S. 41 (1957)...............................................................................6, 7

In re DES Cases,
    789 F. Supp. 552 (E.D. N.Y. 1992) ........................................................13

DigiGAN, Inc. v. iValidate, Inc.,
    2004 U.S. Dist. LEXIS 1324 (S.D. N.Y. Feb. 3, 2004).......................................5

Durante Brothers & Sons, Inc. v. Flushing National Bank,
    755 F.2d 239 (2d Cir. 1985)................................................8

Geisler v. Petrocelli,
    616 F.2d 636 (2d Cir. 1980)................................................6

Holmes v. Security Investor Prot. Corp.,
    503 U.S. 258 (1992)..........................................................21

Credit Lyonnais Secs. (USA), Inc. v. Alcantara,
    183 F.3d 151 (2d Cir. 1999)................................................6

In re Initial Public Offering Sec. Litigation,
    241 F. Supp. 2d 281 (S.D. N.Y. 2003).......................................7

Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,
    456 U.S. 694 (1982)..........................................................9

International Shoe Co. v. Washington,
    326 U.S. 310 (1945)..........................................................10

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,
    26 F. Supp. 2d 593 (S.D. N.Y. 1998).......................................8

Leatherman v. Tarrant County,
    507 U.S. 163 (1993)..........................................................7

Lerner v. Fleet Bank, N.A.,
    318 F.3d 113 (2d Cir. 2003)................................................21

Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.,
    10 F. Supp. 2d 334 (S.D. N.Y. 1998).......................................8

Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,
    264 F.3d 32 (2nd Cir. 2001)................................................9

Metropolitan Life Insurance Co. v. Robertson Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996)..............................................5, 10

National Asbestos Workers,
    74 F. Supp. 2d at 225 ......................................................21

In re Phillip Servs. Corp. Secs. Litig.,
    2004 U.S. Dist. LEXIS 9261 (S.D. N.Y. May 24, 2004) ...................................................6

Pitman v. Grayson,
    149 F.3d 111 (2d Cir. 1998)..........................................................................................8

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
    244 F. Supp. 2d 289 (S.D. N.Y. 2003)........................................................................18

Pugh v. Socialist People's Libyan Arab Jamahiriya,
    290 F. Supp. 2d 54 (D. D.C. 2003) .......................................................................11, 12

Rachman Bag Co. v. Liberty Mutual Insurance Co.,
    46 F.3d 230 (2d Cir. 1995).............................................................................................1

Rein v. Socialist People's Libyan Arab Jamahiriya,
    995 F. Supp. 325 (E.D. N.Y. 1998) ......................................................................11, 12

Salinas v. United States,
    522 U.S. 52 (1997).......................................................................................................23

Schenker v. Assicurazioni Generali S.p.A., Consolidated,
    2002 U.S. Dist. LEXIS 12845 (S.D. N.Y. July 15, 2002) ............................................9

Simmons v. Abruzzo,
    49 F.3d 83 (2d Cir. 1995) ..............................................................................................6

Simon v. Philip Morris, Inc.,
    86 F. Supp. 2d 95 (E.D. N.Y. Jan. 4, 2000) ...............................................8, 10, 12, 13

Sparrow v. United Airlines, Inc.,
    216 F.3d 1111 (D.C. Cir. 2002) ....................................................................................7

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002)...............................................................................................4, 6, 7

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,
    241 F.3d 135 (2nd Cir. 2001).........................................................................................9

United States v. Louie,
    625 F. Supp. 1327 (S.D. N.Y. 1985)......................................................................20, 21

United States v. Turkette,
    452 U.S. 576 (1981)......................................................................................................20

Von Bulow v. Von Bulow,
  634 F. Supp. 1284 (S.D. N.Y. 1986)......................................................22

Whyte v. Contemporary Guidance Servs.,
  2004 U.S. Dist. LEXIS 12447 (S.D. N.Y. July 2, 2004) ...................2

Woodford v. Community Action Agency,
  239 F.3d 517 (2d Cir. 2001)..............................................................6

Wynder v. McMahon,
  360 F.3d 73 (2d Cir. 2004)........................................................3, 6, 7

## STATUTES

18 U.S.C. § 1962(d) .................................................................................23

Anti-Terrorism and Effective Death Penalty Act, 18 U.S.C. § 2331......................1, 15

Fed. R. Civ. P. 8(a)(2) .............................................................................6

Fed. R. Civ. P. 15(a) ...............................................................................1

N.Y. C.P.L.R. §302(a)(2).........................................................................8

I.       **INTRODUCTION**

The Federal Plaintiffs sued African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation (hereinafter collectively referred to as the "SAAR Network Entities") because they are part of a vast constellation of individuals and entities - the "SAAR Network" - specifically established to covertly provide money and support to al Qaida and other international terrorists and terrorist groups.

The Federal Plaintiffs allege that the SAAR Network Entities knowingly participated in al Qaida's global conspiracy to commit terrorist attacks in the United States, of which the September 11, 2001 attack (the "Attack") was a natural, intended and foreseeable result.  When these factual assertions are taken as true, as they must be here, the Federal Plaintiffs' allegations state valid claims against the SAAR Network Entities under the Anti-Terrorism Act (the "ATA"), the Torture Victim Protection Act (the "TVPA"), the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and several state common law tort theories.  Plainly, responsibility for international terrorism rests not only with those "who pull the trigger or plant the bomb" or pilot the airplanes, but also with those who facilitated such unlawful activities through financial or other means.  Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1021 (7th Cir. 2002).

Accordingly, the SAAR Network Entities' motion to dismiss must be denied.  In the event, however, that this Court finds the Federal Plaintiffs' First Amended Complaint (the "Complaint" or "FAC") lacking in detail, leave to amend should be granted.  See **Fed. R. Civ. P.** 15(a); see also Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995).

Whyte v. Contemporary Guidance Servs., 03 CV 5544 (GBD) 2004 U.S. Dist. LEXIS 12447, at *13-14 (S.D. N.Y. July 2, 2004).

## II.   ALLEGATIONS AGAINST THE SAAR NETWORK ENTITIES

The circumstances prompting this lawsuit are undoubtedly familiar to this Court.  On September 11, 2001, nineteen members of the al Qaida terrorist network hijacked four commercial airliners and used those planes as weapons in an unprecedented terrorist attack which resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center complex.  FAC ¶¶ 70 & 71.  The Attack was the direct, intended and foreseeable product of a larger conspiracy, spearheaded by al Qaida, to commit acts of international terrorism against the United States, its nationals and allies.  FAC ¶¶ 72, 232, 600, 625, 632 & 640.  The Complaint alleges that the SAAR Network Entities were among the sponsors of terrorism whose participation in the conspiracy led to the Attack and its devastating consequences.  FAC ¶¶ 222-232.   Specifically, the Complaint alleges that the SAAR Network Entities aided and abetted, conspired with, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations, associations, organizations or persons.  FAC ¶¶ 66, 73 & 223.  The SAAR Network Entities funneled their financial and logistical sponsorship of al Qaida through a web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network (the "SAAR Executive Defendants").[1]

The SAAR Network Entities, however, make the startling claim that the SAAR Network itself is a "fiction" and an "invented network" that "has no recognized existence."  See Defs.' Br.

---

[1]   Some of those leaders are defined in another of the Federal Plaintiffs' briefs as the SAAR Executive Defendants.  See Pls.' Mem. of Law in Opp. to Mot. to Dis. Filed by SAAR Executive Defs. Taha Al-Alwani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza and Iqbal Unus; see also Pls.' Mem. of Law in Opp. to Mot. to Dis. Filed by Dr. Jamal Barzinji.

at 2-3.  According to defendants, the SAAR Network "is entirely an invention of Plaintiffs" that the Federal Plaintiffs rely on "to avoid all of the required steps of pleading an actual conspiracy." See Defs.' Br. at 3.  Despite the SAAR Network Entities' feigned surprise at such allegations, the existence of and actions of the SAAR Network have been, and continue to be, the subject of countless investigations by United States and European authorities.  It is acknowledged by all but the defendants themselves that the SAAR Network was invented for entirely different and far more malevolent purposes than the conduct of lawful business.  While the Federal Plaintiffs could cite countless official reports and investigations to buttress the existence of the SAAR Network,  Federal Plaintiffs will reserve such proof for discovery – the appropriate forum in which to present such evidence.   At this juncture, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them.   Wynder v. McMahon, 360 F.3d 73, 77 (2d Cir. 2004).  (See "Applicable Standards on Motion to Dismiss," infra.).

As set forth in the Complaint, beginning in the 1980s, several prominent and wealthy sponsors of al Qaida's global *jihad* began establishing the SAAR Network within the United States.  FAC ¶ 222.  By September 11, 2001, no fewer than sixty-five so-called charities and business enterprises functioned under the umbrella of the SAAR Network, including the SAAR Network Entities.  FAC ¶¶ 223 & 224.  Most of the SAAR Network Entities are located at a single address in Herndon, Virginia, and have common officers, directors, and management. FAC ¶ 225-227.

On March 20 and 21, 2002, federal authorities raided the SAAR Network facilities (the "SAAR Raid").  FAC ¶ 227.   The SAAR Raid, conducted pursuant to a federal search warrant, was part of an ongoing federal investigation into money laundering, tax evasion activities, and ties to terrorist individuals and organizations.  The ongoing investigation of the SAAR Network Entities and the SAAR Executives, which prompted the SAAR Raid, has revealed that the SAAR

Network Entities' funds had been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated "Global Terrorist Individuals" under Executive Order 13224 based on their material support and sponsorship of al-Qaida.  FAC ¶ 228.  The funds were transferred through Bank al-Taqwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin.  FAC ¶ 259 & 261.  Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense, but rather are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed.  For this reason, the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government.  FAC ¶ 266.  Both of those banks have been designated "Specially Designated Global Terrorist Entities" by the U.S. government pursuant to Executive Order 13224, based upon their involvement in financing radical groups throughout the world, including al Qaida, both before and after the Attack.  FAC ¶ 228.  As of late September 2001, al Qaida continued to receive financial assistance from Nada, through entities he controlled.  FAC ¶ 266.

At this stage of the litigation, the SAAR Network Entities are entitled to "a short and plain statement of the facts" supporting the Federal Plaintiffs' claims.  Swierkiewicz v.Sorema, 534 U.S. 506, 512-13 (2002).   They have been provided with this in the Complaint.  The Complaint sufficiently supports multiple claims, in that it alleges that the SAAR Network Entities,  as part of the SAAR Network, knowingly provided material support and resources to al Qaida, that al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the Attack absent the sponsorship of the SAAR Network Entities and the other defendants, and that the SAAR Network Entities thus knowingly participated in the conspiracy with the intent to advance the commission of terrorist attacks against the United

States, of which the Attack was a natural, intended and foreseeable consequence.  FAC ¶¶ 72 & 74.

III.   **ARGUMENT**

The SAAR Network Entities make two broad arguments in favor of dismissal:  (1) that the Federal Plaintiffs do not state a claim for conspiracy, aiding and abetting or material support for terrorism; and (2) the Court lacks personal jurisdiction over them.  Because defendants' second argument could be dispositive, it will be considered first.

A.   **Applicable Standards on a Motion to Dismiss**

1.   **Rule 12(b)(2)**

In ruling on those parts of the instant motion to dismiss brought pursuant to Rule 12(b)(2), for lack of personal jurisdiction, "the nature of the plaintiff's obligation varies depending on the procedural posture of the litigation."  DigiGAN, Inc. v. iValidate, Inc., No. 02-CV-420 (RCC), 2004 U.S. Dist. LEXIS 1324, at * 21 (S.D. N.Y. Feb. 3, 2004) (quoting Ball v. Metallurgie Hoboken-Overpelt S.A., 902 F.2d 194, 197 (2d Cir. 1990)).  As this motion was filed prior to discovery, the Federal Plaintiffs must make only a prima facie showing of jurisdiction in the allegations of the Complaint.  Id. at * 23 (citing Metropolitan Life Ins. Co. v. Robertson Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.")).

The SAAR Network Entities may challenge both the Federal Plaintiffs' theory of jurisdiction and the veracity of the factual allegations that purportedly support that theory, but this Court need not decide both challenges at the same time.  DigiGAN, No. 02-CV-420 (RCC), 2004 U.S. Dist. LEXIS 1324, at * 21 (citing Ball, 902 F. 2d at 197).  Instead, "the court may provisionally accept disputed factual allegations as true . . . The court need only determine

whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose." Id. (quoting Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 153 (2d Cir. 1999).

### 2.   Rule 12(b)(6)

In ruling on those parts of the present motion brought pursuant to Rule 12(b)(6), for failure to state a claim, it is important to remember that the motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n.8 (2d Cir. 2004); Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995). Moreover, "[i]t is elementary that on a motion to dismiss, the Complaint must be read as a whole." In re Phillip Servs. Corp. Secs. Litig., No. 98-CIV-0835 (MBM), 2004 U.S. Dist Lexis 9261, at * 32 (S.D. N.Y. May 24, 2004). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). In evaluating whether the Federal Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of plaintiffs. Wynder, 360 F.3d at 77. The Federal Plaintiffs are not required to prove their case at the pleading stage; indeed, "[t]he pleading of evidence should be avoided." Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of

the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); Wynder, 360 F.3d at 77. Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Rule 9(b), a federal court is prohibited from imposing more demanding requirements than those prescribed under Rule 8(a). See, e.g., Leatherman v. Tarrant County, 507 U.S. 163, 168-69 (1993). As a judge in this District recently explained, "[s]uch simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 322 (S.D. N.Y. 2003) (quoting Conley, 355 U.S. at 48). Consequently, "[a]s the Supreme Court recognized in Swierkiewicz, one clearly written sentence can satisfy Rule 8(a)(2)." Id. at 323. By way of illustration, one Court of Appeals recently held that the allegation, "I was turned down for a job because of my race," when included in a complaint, would be sufficient to survive a Rule 12(b)(6) motion. Sparrow v. United Airlines, Inc., 216 F.3d 1111, 1115 (D.C. Cir. 2002).

**B.     This Court Has Personal Jurisdiction Over the SAAR Network Entities Under New York's Long Arm Statute and Pursuant to Both the Traditional Due Process Analysis and the Modified Due Process Standard for Mass Torts**

The Federal Plaintiffs have made a *prima facie* showing that the SAAR Network Entities are subject to personal jurisdiction by virtue of their conduct in the United States. The SAAR Network Entities argue that the Complaint does not allege any facts showing that they have minimum contacts with this forum. The SAAR Network Entities' argument is misplaced, as this Court has personal jurisdiction over the SAAR Network Entities because they were participants in a conspiracy that resulted in catastrophic effects in this judicial district. In addition, the

Second Circuit recognizes a modified due process standard for mass torts in which territorial contacts are replaced with state interests as the constitutional touchstone of in personam jurisdiction. Accordingly, this Court has personal jurisdiction over the SAAR Network Entities.

New York's long arm statute, C.P.L.R. 302(a)(2), provides, in pertinent part, that "a court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent commits a tortious act within the state." N.Y. C.P.L.R. §302(a)(2); see also Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc., 10 F. Supp. 2d 334, 342 (S.D. N.Y. 1998). The term "agent" in this context has been read to include co-conspirators. Simon v. Philip Morris, Inc., 86 F. Supp. 2d 95, 119 (E.D. N.Y. Jan. 4, 2000); Cleft of the Rock Fdn. v. Wilson, 992 F. Supp. 574, 581 (E.D. N.Y. 1998); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D. N.Y. 1991). "Both state and federal courts have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp. 2d 593, 601 (S.D. N.Y. 1998). Accordingly, "[i]t is well-settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2)." Simon, 86 F. Supp. 2d at 99 (citations omitted); see also Levisohn, 10 F. Supp. 2d at 342; Chrysler Capital, 778 F. Supp. at 1266.

New York law does not recognize the substantive tort of civil conspiracy. Durante Bros. & Sons, Inc. v. Flushing Nat. Bank, 755 F.2d 239, 251 (2d Cir. 1985). Rather, allegations of a conspiracy connect the actions of separate defendants with an otherwise actionable tort. Alexander v. Fritzen, 503 N.E.2d 102, 103 (N.Y. 1986). Both conspiracy and aiding and abetting create concerted-action liability in New York. Pitman v. Grayson, 149 F.3d 111, 122 (2d Cir. 1998). Conspiracy requires an agreement to commit a tortious act while aiding and

abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer.  Id. at 122-23.  For the reasons set forth above, the conduct of the SAAR Network Entities constitutes both forms of concerted-action liability under New York law and, as such, connects each with the subject transaction, charges them with the acts of and declarations of their co-conspirators, and exposes the SAAR Network Entities to joint and several liability. Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 240 (2d Cir. 1999).  This Court therefore has personal jurisdiction over the SAAR Network Entities pursuant to the well-recognized conspiracy jurisdiction theory under New York law.

The exercise of personal jurisdiction must also be consistent with the Due Process Clause of the Fifth Amendment to the United States Constitution.  See Schenker v. Assicurazioni Generali S.p.A., Consolidated, No. 98-CIV-9186, 2002 U.S. Dist. LEXIS 12845, at * 5-6 (S.D. N.Y. July 15, 2002).  The Due Process Clause has been interpreted to protect individual liberty interests by limiting state courts' exercise of personal jurisdiction over non-resident defendants. See, e.g., Burger King v. Rudzewicz, 471 U.S. 462, 471-72 & n.13 (1985); Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702-03 & n.10 (1982).

Where, as here, the claim arises out of, or relates to, a defendant's contacts with the forum, i.e., the attack in New York, the plaintiff need only prove specific jurisdiction.  See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 152 (2nd Cir. 2001) (citing Chaiken v. VV Publ'g Corp., 119 F.3d 1018, 1027-28 (2nd Cir. 1997)).  Specific jurisdiction is determined by analyzing first whether the claim arises out of or relates to the defendant's contacts with the state, and then whether that defendant purposefully availed itself of the privilege of doing business in the forum so that it reasonably could foresee being haled into the court in the forum state.  See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 38 (2nd Cir. 2001).  Jurisdiction on the basis of the in-state effects of

intentional out-of-state conduct was held by the Supreme Court to be consistent with the requirement of the Due Process Clause in <u>Calder v. Jones</u>, 465 U.S. 783 (1984).

Thus, the Federal Plaintiffs must first adequately allege that the SAAR Network Entities established minimum contacts with the forum state to justify assertion of personal jurisdiction over them. This first prong of the bifurcated due process test -- "minimum contacts" -- has been described as a "fair warning" requirement. <u>Simon</u>, 86 F. Supp. 2d at 126. It "focuses on the relationship among the defendant, the forum and the litigation." <u>Id.</u> at 126 (quoting <u>Keeton v. Hustler Magazine</u>, 465 U.S. 770, 775 (1984) (internal quotations omitted)). The minimum-contacts prong is satisfied by a determination that "the defendant has 'purposefully directed' its activities at the forum." <u>Burger King</u>, 471 U.S. at 473 (<i>quoting</i> <u>Keeton</u>, 465 U.S. at 774).

The second phase of the due process inquiry assesses the reasonableness of exercising jurisdiction once "minimum contacts" have been established. <u>See</u> <u>Asahi Metal Indus. v. Superior Court</u>, 480 U.S. 102, 114 (1987); <u>Simon</u>, 86 F. Supp. 2d at 100-01. This analysis entails consideration of five factors: the burden on the defendant; the interest of the forum state in adjudicating the controversy; the interest of the plaintiff in obtaining convenient and effective relief; the interest of the interstate judicial system in obtaining the most efficient resolution of the dispute; and the shared interest of the states in furthering fundamental social policies. <u>Asahi</u>, 480 U.S. at 113.

The purpose of both the "minimum contacts" and "reasonableness" prongs of the analysis is to ensure that jurisdiction comports with "traditional notions of fair play and substantial justice. " <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945). Since these two prongs are interrelated, enhanced proof of one reduces the required showing of the other. <u>Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 568 (2d Cir. 1996). Consideration of reasonableness factors can sometimes "establish . . . jurisdiction upon a lesser showing of

minimum contacts than would otherwise be required." Burger King, 471 U.S. at 477 (citations omitted). By the same token, where activities are purposefully directed at the forum state, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id.

The Supreme Court has held that in an action involving the harm caused by an intentional tort, the plaintiff's contacts with the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence." Calder, 465 U.S. at 788. Such is the case here. The Federal Plaintiffs have alleged that the SAAR Network Entities were engaged in a conspiracy to attack and wage war against the United States, its nationals, interests, and allies. The actions of the conspirators were expressly aimed at the United States in general and New York in particular. Under the circumstances, they must reasonably anticipate being haled into court here.

Two recent cases involving the hijacking of airplanes outside the United States, carrying United States citizens as passengers provide support for exercising personal jurisdiction here.[2] Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D.N.Y. 1998) involved the in-flight bombing and destruction of Pan Am Flight 103 with the loss of 189 United States citizens over Lockerbie, Scotland. Judge Platt, in the Eastern District of New York, reasoned that the destruction of the airplane, 189 deaths, and significant security concerns for the country and its aviation industry arguably "has had extensive impacts" on the United States. Id. at 330.

> Any foreign state would know that the United States has substantial interest in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these

---

[2]     While the defendants in these two cited cases are foreign states, as opposed to corporate entities, the holdings in both comport with the principle that participation in terrorist activities aimed at the United States, permits a court to subject the participants to personal jurisdiction, even in the absence of other minimum contacts with the jurisdiction. Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D. N.Y. 1998) and Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F. Supp.2d 54 (D. D.C. 2003). The analysis also enables a New York court to exercise jurisdiction over Virginia entities who participated in a conspiracy directed at New York.

interests were harmed, it would be subject to a variety of potential responses, including civil actions in United States courts.

Id.

In Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F.Supp.2d 54 (D.D.C. 2003), Libya challenged the personal jurisdiction of a federal court in the District of Columbia in a suit involving the 1989 mid-air explosion of a French airline in Africa that killed seven United States citizens.  The plaintiffs in Pugh alleged that the defendants "conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight."  Id. at 59.  The Court noted the United States' well known, worldwide interest in preventing and punishing terrorism by reference to Congress' adoption of criminal statutes contemplating jurisdiction in the United States over foreign nationals for activities abroad regardless of other contacts with the United States.

> It logically follows that if a federal court may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

Id.

In addition, of those few New York cases that have directly considered the due process implications of the conspiracy theory of jurisdiction, at least two have found the "purposeful availment" or "purposefully directed" requirement satisfied by a showing that the defendant chose to participate in the conspiracy in question with the knowledge that overt acts in furtherance of it had been or likely would be committed in New York.  Simon, 86 F. Supp. 2d at 126-127 (*citing* Cleft of the Rock Fdn., 992 F. Supp. at 584-85 *and* Dixon v. Mack, 507 F. Supp. 345, 352 (S.D. N.Y. 1980)).

The SAAR Network Entities also are subject to personal jurisdiction pursuant to the "modified due process standard for mass torts" adopted on several occasions by courts in the

Eastern District of New York in DES and tobacco cases.  Simon, 86 F. Supp. 2d at 129-37; In re DES Cases, 789 F. Supp. 552, 574-77 (E.D. N.Y. 1992).  In Simon, Judge Weinstein reasoned that, because effective adjudication of mass torts requires the presence of essentially all the plaintiffs and all major defendants, continued reliance on defendant-forum contacts as a precondition for the exercise of personal jurisdiction would be inappropriate.  Simon, 86 F. Supp. 2d  at 129.  Jurisdictional due process has evolved over time from a strict geographical based doctrine into one rooted in the protection of individual liberty interests.  Id. at 130. "New York's interest in this dispute is intense, and the burden on [defendants] is minimal compared to the difficulty of the plaintiffs' litigating in [several hundred jurisdictions throughout the world]." Simon, 86 F. Supp. 2d at 137. [3]

Accordingly, this Court has personal jurisdiction over the SAAR Network Entities based upon New York's Long Arm statute, which does not violate constitutional due process.

---

[3]     The courts of the United States in general, and New York in particular, have an undeniable and overwhelming appreciable interest in the World Trade Center litigation.  Simon, 86 F. Supp. 2d at 131.  Since New York has an appreciable state interest, in that this litigation raises serious issues that would affect or have a probable impact on the vindication of policies expressed in the laws of New York, the assertion of jurisdiction is *prima facie* constitutional.  Id. Thus, the assertion of jurisdiction is considered constitutional unless, given the actual circumstances of the case, the SAAR Network Entities are unable to mount a defense in the forum state without suffering a relatively substantial hardship.  Id.  Moving SAAR Network Entities can make no such showing here.

### C.     The Federal Plaintiffs Have Sufficiently Pled Allegations That the SAAR Network Entities Acted As Aiders and Abettors and Co-Conspirators in Violation of the ATA, TVPA, RICO and the State Common Law Claims

Each of the SAAR Network Entities is identified in the Federal Plaintiffs' Complaint as having "aided and abetted, conspired with, and provided material support and resources to al Qaida and/or affiliated Foreign Terrorist Organizations ("FTOs"), associations, organizations or persons." FAC ¶ 66. The Federal Plaintiffs have alleged that SAAR Network Entities are part of a vast network of organizations that knowingly funded the activities of terrorists, including al Qaida. Still further, the Complaint expressly alleges the Attack was a direct, intended and foreseeable product of a larger conspiracy, including the provision of material support and resources provided by the SAAR Network Entities to commit acts of international terrorism against the United States, its nationals and allies. FAC ¶ 72. The Federal Plaintiffs further allege that absent the material support and resources provided by its co-conspirators, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the Attack. See FAC ¶¶ 70-74, 78. When read in its entirety, and pursuant to the liberal pleading provisions of Fed. R. Civ. P. 8(a)(2), the Complaint sufficiently alleges that the SAAR Network Entities are major supporters of al Qaida and the Complaint provides the SAAR Network Entities fair notice of the Federal Plaintiffs' claims.

The Federal Plaintiffs' Complaint contains over one hundred eighty pages in which the Federal Plaintiffs describe in detail a sophisticated and complex network of individuals and entities that have knowingly conspired to conceive, plan, fund and execute an international act of terrorism- the Attack. In doing so, the SAAR Network Entities have violated the Anti Terrorism Act, the Alien Claims' Torts Victim Act, the Racketeering Influenced and Corrupt Organization

Act and numerous common law duties.  Although the Complaint certainly does not accuse the SAAR Network Entities of having committed the direct act of flying two commercial jet liners into the World Trade Center Complex, the Complaint sufficiently alleges that SAAR Network Entities knowingly participated in the conspiracy which brought about the Attack, by providing material support to al Qaida with the reasonable anticipation that an act of international terrorism was a natural consequence of such conspiracy.

> **1.     The Federal Plaintiffs Have Alleged Claims Pursuant to the AntiTerrorism And Effective Death Penalty Act, 18 USC § 2331**

A plaintiff may assert a valid claim under the Anti-Terrorism and Effective Death Penalty Act, 18 U.S.C. § 2331, *et seq.* (the "ATA") under either of two alternative approaches:  (1) pursuant to general tort principles, including concerted action theories of liability; or (2) by demonstrating that the defendant violated the ATA's criminal standards, and that the defendant's violation was a substantial factor in bringing about plaintiff's injuries.  Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1015, 1020 (7th Cir. 2002).  The Federal Plaintiffs have done both.

> **a.     The Federal Plaintiffs Have Properly Alleged Claims Under the ATA Pursuant to General Tort Principles**

At the Court's direction to avoid duplication of arguments, the Federal Plaintiffs incorporate by reference certain sections of the *Federal Plaintiffs' Memorandum of Law in Opposition to Mar-Jac Poultry, Inc's Motion to Dismiss First Amended Complaint*, dated July 9, 2004 (hereinafter the "Mar-Jac Opp").  Specifically, the Federal Plaintiffs incorporate by reference the section entitled "The Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant to General Tort Principles."  See Mar-Jac. Opp. part C.1 at 8.

When read as a whole, the Federal Plaintiffs' Complaint plainly and adequately states claims against the SAAR Network Entities under the ATA, pursuant to aiding and abetting and conspiracy theories.  In this regard, the following allegations of the Complaint are illustrative:

> Defendants . . . have aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons, as described herein.

FAC ¶ 66.

> The entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

FAC ¶ 226.

> The September 11th Attack was a direct, intended and foreseeable product of the SAAR Network's participation in al Qaida's jihadist campaign.

FAC ¶ 232.

The Federal Plaintiffs' Complaint further alleges that the SAAR Network Entities were integral members of the SAAR Network, and describes in detail the SAAR Network's role in al Qaida's global conspiracy to commit terrorist atrocities against the United States.  See FAC ¶¶ 222-232.  Read collectively, the foregoing allegations of the Complaint unambiguously allege that the SAAR Network Entities knowingly and intentionally aided and abetted and conspired with al Qaida, in furtherance of the terrorist organization's calculated campaign to commit terrorist attacks against the United States, and that the September 11th Attack was a direct, intended and foreseeable product of that larger conspiracy.  These allegations satisfy the liberal pleading requirements necessary to state a claim under the ATA pursuant to conspiracy and aiding and abetting theories of tort liability.

b.     **The Federal Plaintiffs Adequately Alleged Claims Under the ATA Based on SAAR Network Entities' Criminal Violations**

The Federal Plaintiffs also have adequately pleaded claims against the SAAR Network Entities under the ATA based upon the SAAR Network Entities violations of the ATA's criminal standards.  The Federal Plaintiffs incorporate by reference the section entitled  "The Federal Plaintiffs Have Adequately Alleged Claims under the ATA Based Upon Mar-Jac's Criminal Violations."  See Mar-Jac. Opp. part C.2 at 10.

The Federal Plaintiffs have alleged that the SAAR Network Entities participated in acts giving rise to liability under the ATA.  Specifically, the Federal Plaintiffs have alleged that the SAAR Network Entities participated in a conspiracy to provide funding and support to the al Qaida terrorist network.  See *supra* part II.  Death and destruction in the United States was the well-publicized aim of al Qaida and its terrorist network.  As is alleged in the Complaint, the SAAR Network Entities provided funding and support to the al Qaida terrorist network.  In light of these allegations, the Federal Plaintiffs have stated a cause of action against the SAAR Network Entities pursuant to the criminal provisions of the ATA.

c.     **Federal Plaintiffs Have Properly Alleged Causation**

The Federal Plaintiffs incorporate by reference the section entitled "Federal Plaintiffs Have Adequately Pleaded Causation."  See Mar-Jac Opp. part C.3 at 11.  The Complaint adequately alleges that the SAAR Network Entities knowingly provided "material support and resources" and that the "Attack was a direct, intended and foreseeable product of a larger conspiracy among the SAAR Network to commit acts of international terrorism against the United States."  FAC ¶¶ 66 & 74.  These allegations are sufficient to state a claim of causation at this preliminary stage.

2. **The Complaint States a Claim Against the SAAR Network Entities
Under the Torture Victim Protection Act**

The Federal Plaintiffs have alleged facts sufficient to state a cause of action under the

TVPA.  The Complaint describes in detail how the Islamic charitable system has been utilized to

finance and otherwise support illegal al Qaida activities.  FAC ¶¶ 75-252.  Moreover, the

allegations specific to the SAAR Network Entities state clearly that that the SAAR Network

Entities are active al Qaida sponsors.  Id. at ¶ 66.

Given the Complaint's allegations regarding how the SAAR Network Entities fostered

and financed terrorism, it can, at the very least, be reasonably inferred for Rule 12(b)(6) purposes

that the SAAR Network Entities were materially involved in aiding and abetting and/or

conspiring with other defendants and with al Qaida in a manner intended to enable and

proximately cause acts of violence and international terrorism, including the Attack.  Such

conduct clearly violates the law of nations or, alternatively, otherwise constitutes actionable

conduct under the TVPA.  Moreover, to sufficiently allege a TVPA cause of action against the

SAAR Network Entities, the Federal Plaintiffs need not allege that the SAAR Network Entities

were directly involved in the Attack itself.  Rather, it is sufficient for Federal Plaintiffs to allege,

as they have, that the SAAR Network Entities conspired with or aided and abetted other of the

defendants in a violation of the law of nations.  Indeed, many federal courts have recognized that

TVPA liability can be based on conspiratorial relationships or theories of aiding and abetting.

Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 320 (S.D. N.Y.

2003).  Here, the Complaint alleges a violation of the law of nations, i.e., the Attack.  Such

conduct is actionable under the TVPA.  The Complaint alleges that SAAR Network Entities

facilitated, fostered, financed, or otherwise supported terrorists that committed the Attack.  The

Complaint alleges that the SAAR Network Entities acted in collusion with the other defendants.

FAC ¶ 73.  The Complaint alleges an illegal relationship among the SAAR Network Entities and al Qaida.   FAC ¶ 72-74.  The Complaint also alleges the Attack could not have been carried out in the absence of financing and logistical support to al Qaida through that relationship.  FAC ¶ 74.

Unquestionably, such allegations satisfactorily allege that the SAAR Network Entities conspired and aided and abetted with others to facilitate the terrorist activities of al Qaida, resulting in the Attack.  Pursuant to Rules 8 and 12, the Federal Plaintiffs have sufficiently alleged their claim --  that the SAAR Network Entities sponsored international terrorism.  The Complaint alleges a vast network of overlapping entities, charities, corporations, banks, state sponsors and individuals who financed and promoted terrorism, and also concealed the involvement of many of the important participants.  Based upon the extraordinary circumstances surrounding the events of September 11, 2001 and the complex web of individuals and entities who conspired to commit acts of international terrorism against the United States, its implausible, and unnecessary in notice pleading to require more.  The Complaint when read as a whole sufficiently pleads a claim against the SAAR Network Entities under the TVPA.

### 3.    RICO Liability

According to the SAAR Network Entities, in the Complaint the Federal Plaintiffs have failed to allege a violation of RICO.  See Defs.'  Br. at 8.  The Federal Plaintiffs' RICO Statement, however, filed on July 16, 2004 provided pursuant to Case Management Order # 2, is "deemed an amendment to the Federal Insurance plaintiffs' . . . Amended Complaint, by incorporation by reference."  See Case Mgmt. Order ¶ 14.  Because the RICO Statement was filed subsequent to the filing of Defendants' motion to dismiss, the SAAR Network Entities have not yet had the benefit of reviewing it.  Nevertheless, because it is deemed an amendment to the Complaint, the Federal Plaintiffs will not respond to the SAAR Network Entities' arguments so

much as they will explain why they have, through both the Complaint and the RICO Statement, stated a claim under RICO against The SAAR Network Entities.

According to the RICO Statement, the Federal Plaintiffs bring their claims against the SAAR Network Entities pursuant to Sections 1962(c) and 1962(d).  The Enterprise, Radical Muslim Terrorism, is comprised of the defendants named in the Complaint, and is a collection of persons, organizations, businesses and nations associated in fact with complex goals that consist of far more than perpetrating the acts of racketeering outlined herein.  See RICO Statement ¶ 5.  Rather, Radical Muslim Terrorism utilizes acts of racketeering, including acts of money laundering and other improprieties conducted by the SAAR Network Entities, to further its overall common purposes of:  (a) spreading a particularly virulent brand of radical Islam; (b) eliminating Western influences in Islamic countries; and (c) punishing the United States for its perceived support of Israel, all by sponsoring, supporting and funding acts of terror in the United States.  Id.  Thus, the Federal Plaintiffs have pled sufficiently the existence of an enterprise:  "a group of persons associated together for a common purpose of engaging in a course of conduct" or "an ongoing organization, formal or informal."  United States v. Turkette, 452 U.S. 576, 583 n.5 (1981).

Further, the Federal Plaintiffs also have pled sufficiently the SAAR Network Entities' participation in that enterprise.  Pursuant to Sections 1962(c),  "a proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.'"  United States v. Louie, 625 F. Supp. 1327, 1333 (S.D. N.Y. 1985).  In the Complaint, the Federal Plaintiffs allege that the SAAR Network Entities have aided and abetted, conspired with, and provided material support and resources to al Qaida and/or affiliated FTOs, associations, organizations or persons.  FAC ¶ 66.

Further according to the Complaint, the SAAR Network Entities are members of the SAAR

Network, which was established and funded by, or closely affiliated with, defendant Suleiman

Abdul Aziz.  FAC ¶ 223.  Plaintiffs further allege that the SAAR Network Entities, along with

the rest of the SAAR Network, long have acted as a fully integrated component of al Qaida's

logistical and financial support infrastructure, and have provided material support and resources

to al Qaida and affiliated FTOs.  FAC ¶ 226.

Moreover, the Federal Plaintiffs need not plead or prove that a predicate act furthered the

purpose for which the organization was founded, but only that it was related to the enterprise.

Louie, 625 F. Supp. at 1333.  Thus, the finder of fact must consider not only the actions taken by

the SAAR Network Entities (in this case, money laundering and other crimes), but also the

motivation or intent underlying the SAAR Network Entities' criminal activity and the acts'

relationship to the enterprise (in this case, terrorism, which the plaintiffs allege the SAAR

Network Entities intended to support through money laundering).  Id.

The Federal Plaintiffs also have alleged adequately proximate causation under RICO.

This requirement is satisfied if the defendant's injurious conduct is both the factual and the

proximate cause of the injury alleged.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir.

2003) (citing Holmes v. Security Investor Prot. Corp., 503 U.S. 258, 268 (1992)).  Because

"[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific

inquiry," dismissal at the pleadings stage of a RICO claim is likely imprudent.  National

Asbestos Workers, 74 F. Supp. 2d at 225.  This Court's decision "should be guided by a flexible,

case-by-case approach."  Id. (citing Associated Gen'l Contractors of Cal., Inc. v. California State

Council of Carpenters, 459 U.S. 519, 536-37 (1983) and Holmes, 503 U.S. at 272 n.20.  Indeed,

this Court's analysis of proximate causation "must remain flexible, rather than static:  as society,

its needs, and its norms change, so too must the contours of tort liability and enforcement procedures."  Id.  Further, failure to explain the alleged injury in detail is not fatal.  Von Bulow v. Von Bulow, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986).  Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6).  Id.  The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts."  Id. (citations omitted).

Here, the Federal Plaintiffs allege that they were directly injured in their business and property by the SAAR Network Entities' participation in worldwide terrorism as a "fully integrated component of al Qaida's logistical and financial support infrastructure" and by its provision of "material support and resources to al Qaida."  FAC ¶ 226.  The SAAR Network Entities have participated in Radical Muslim Terrorism, and specifically in furthering al Qaida's goal of committing acts of terrorism against the United States, by providing al Qaida with "the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74.

The Federal Plaintiffs' damages – injuries, the loss of life and property damage that resulted from the SAAR Network Entities' actions -- are not derivative of damage to a third party.  Rather, the Federal Plaintiffs' insureds and assignors were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," i.e., terrorism.  Lerner, 318 F.3d at 124.  Thus, the Federal Plaintiffs have standing to bring claims under RICO.

A conspiracy of this nature is not a simple linear being, but is instead a complex, multi-dimensional web of relationships.  The Supreme Court recently addressed the scope of RICO's

conspiracy provision, 18 U.S.C. § 1962(d), in <u>Salinas v. United States</u>, 522 U.S. 52 (1997).  That holding establishes that the RICO statute is flexible enough to embrace the complexity of the conspiracy alleged here, and the Federal Plaintiffs' allegations are sufficient, at this stage, to meet their burden.

For all these reasons, therefore, the SAAR Network Entities' motion to dismiss Count VIII should be denied.

**4.**     **The Federal Plaintiffs Have Adequately Alleged State Common Law Claims**

The Federal Plaintiffs incorporate by reference the section entitled "The Federal Plaintiffs Have Adequately Alleged State Common Law Claims."  <u>See</u> Mar-Jac Opp. part G at 20.

**IV.**     **CONCLUSION**

For the reasons stated above, Federal Plaintiffs respectfully request that the SAAR Network Entities' Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

COZEN O'CONNOR

By:     _____
        STEPHEN A. COZEN, ESQUIRE
        ELLIOTT R. FELDMAN, ESQUIRE
        SEAN P. CARTER, ESQUIRE
        MARK T. MULLEN, ESQUIRE
        1900 Market Street
        Philadelphia, PA  19103
        Tel.:  (215) 665-2000
        Fax:   (215) 665-2013

        *Attorneys for Plaintiffs*