**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to the Saudi High Commission, as**<br>**that term is defined herein** |

*This document relates to:*      Federal Insurance Co. v. al Qaida
                                                  03 CV 06978 (RCC)

**RICO STATEMENT**
**<u>APPLICABLE TO THE SAUDI HIGH COMMISSION</u>**

   Based on information currently available, plaintiffs submit this RICO statement
pursuant to the Case Management Order dated June 15, 2004 for defendant Saudi High
Commission, a/k/a the Saudi High Relief Commission.  Given the vastly complicated nature of
the conspiracy and other wrongdoing that led to the events of September 11, 2001, much
information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve
the right to amend this RICO statement as information is learned and verified and after discovery
is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.  The name of the defendant to whom this RICO statement pertains is the Saudi High
   Commission, a/k/a the Saudi High Relief Commission (the "Saudi High Commission").
   The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable.  All known wrongdoers are named as defendants in this action. Given the
   vastly complicated nature of the conspiracy and other wrongdoing that led to the events
   of September 11, 2001, however, much information is unavailable to plaintiffs, and the
   identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore
   reserve the right to amend this RICO statement as information is learned and verified and
   after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the
   chart attached hereto as Exhibit "B".

5.    (a)  <u>list of predicate acts and specific statutes violated</u>:

| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| defrauding the US Government | 18 U.S.C. § 371 |
| filing false or materially false tax returns | 26 U.S.C. § 7206(1), (2) |
| engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|-------|--------------|-------|
| mid-1990s to 9/11/2001 | The Saudi High Commission | Throughout this period, the Saudi High Commission conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| late 1990s to 9/11/2001 | The Saudi High Commission | The Saudi High Commission undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating,  Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Saudi High Commission |
| mid-1990s to 9/11/2001 | The Saudi High Commission | The Saudi High Commission agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism.

3

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed other of the defendants, including the Saudi High Commission, to surreptiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

    (a) The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

    (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Arab regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Saudi High Commission fits neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    (c) no.

    (d) The Saudi High Commission is associated with the Enterprise.

    (e) The Saudi High Commission is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f) The Saudi High Commission intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by the Saudi High Commission is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8.      The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Saudi High Commission funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.      The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.     The Enterprise, and the racketeering activities conducted by the Saudi High Commission, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.     Not applicable.

12.     Not applicable.

13.     Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14.     The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Saudi High Commission, and laundered funds from Islamic so-called charities and corporations.  The financial facilitators also raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the zakat, the mandatory charitable contributions required of all Muslims.  Al Qaida also collected money from employees of corrupted charities.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like the Saudi High Commission.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Saudi High Commission.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it

without the assistance provided by the Saudi High Commission.  The Saudi High Commission, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  The Saudi High Commission also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.    As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.    Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.    Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.    pendent state claims:

| **I** | Trespass |
|---|---|
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.    not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Saudi High Commission | The Saudi High Commission has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.  The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities.  The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly implicated in al Qaida operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania.  Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to al Qaida operations in Bosnia alone.  The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas.  Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | 1962(c)<br><br>1962(d) |