## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                                            )
IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001          )          03 MDL No. 1570 (RCC)
_____)          ECF Case


This document relates to:

C.A. No. 03-CV-9849 (RCC)
THOMAS E. BURNETT, SR., *et al.* v. AL BARAKA INVESTMENT & DEVELOPMENT CORP., *et al.*


### REPLY BRIEF IN SUPPORT OF HAMAD AL-HUSAINI'S
### MOTION TO DISMISS THE THIRD AMENDED COMPLAINT


Lynne Bernabei, Esquire  (LB2489)
Alan R. Kabat, Esquire  (AK7194)
Bernabei & Katz, PLLC
1773 T Street, N.W.
Washington, D.C. 20009-7139
(202) 745-1942

Attorneys for Defendant
 Hamad Al-Husaini (D209)

DATED:  July 23, 2004

**INTRODUCTION**

In his motion to dismiss (Docket No. 82), Hamad Al-Husaini (D209) argued that

dismissal was warranted, pursuant to Rules 12(b)(2) and 12(b)(5), Fed. R. Civ. P., because this

court lacks personal jurisdiction over him, since he has no contacts with this country, and

because plaintiffs' attempt to serve him by publication was substantively improper.  Plaintiffs'

Opposition (Docket No. 272) improperly makes new factual allegations, which appear nowhere

in the Complaint.  This Court may not consider such new allegations under clear Second Circuit

precedent.  However, even if this Court were to consider the "new allegations," they still fail to

provide any legally sufficient basis for keeping Mr. Al-Husaini in this lawsuit.

Finally, plaintiffs' counsel materially misrepresent a court document they filed regarding

service of process, and misrepresent Judge Robertson's order on service by publication, in a

desperate and improper attempt to make out proper service of process on Mr. Al-Husaini.

**ARGUMENT**

**I.      This Court Does Not Have Personal Jurisdiction Over Mr. Al-Husaini.**

Plaintiffs' Opposition fails to address the threshold issue:  this Court lacks personal

jurisdiction over Mr. Al-Husaini, a nonresident foreign defendant, because he has not done

anything that connects him to this forum, or to the acts that caused or supported the September

11 attacks.  Although plaintiffs now claim that Mr. Al-Husaini somehow supported al Qaeda

(Opp. at 10-17), the evidence they have presented does nothing to support their argument that he

supported or proximately caused the September 11 attacks.

Therefore, plaintiffs have failed to satisfy their burden to "allege facts constituting a

*prima facie* showing of personal jurisdiction," PDK Labs v. Friedlander, 103 F.3d 1105, 1108

(2d Cir. 1997) about Mr. Al-Husaini, either in the Complaint or in their new allegations.  At

most, plaintiffs argue that this Court should look at personal jurisdiction with respect to all

defendants (including al Qaeda and bin Laden) to determine personal jurisdiction over Mr. Al-

Husaini.  Opp. at 13-17.  This is contrary to the Supreme Court's mandate that "each defendant's

contacts with the forum state must be assessed individually."  Calder v. Jones, 465 U.S. 783, 790

(1984); PDK Labs, 103 F.3d at 1108 ("personal jurisdiction inquiries are necessarily fact

sensitive because each case is dependent upon its own particular circumstances.").[1]

Although Mr. Al-Husaini's motion to dismiss set forth three defenses to support his

argument that personal jurisdiction was improper, the only theory upon which plaintiffs now rely

is "specific jurisdiction," i.e., that he "purposefully directed his conduct at the United States."

See Opp. at 4.  They have conceded that jurisdiction is not proper under the other approaches.[2]

### A.     Plaintiffs Have Improperly, And Without Court Approval, Amended Their Complaint By Raising New Allegations In Their Opposition Brief.

Plaintiffs set forth several pages of new facts which they now aver support their claim

that Mr. Al-Husaini provided material support to al Qaeda.  See Opp. at 10-12.  Under clear

Second Circuit precedent, plaintiffs cannot amend their complaint by adding allegations for the

first time in an opposition to a dispositive motion.  See Wright v. Ernst & Young, LLP, 152 F.3d

---

[1] Contrary to plaintiffs' claim, it is plaintiffs' burden – and not defendants' – under Rule 8(a)(1), Fed. R. Civ. P., to plead facts in their complaint that would support the exercise of personal jurisdiction over each defendant. It is not defendants' burden to ask for a more definite statement under Rule 12(e), regarding personal jurisdiction. "Motions for more definite statements are generally disfavored," MTV Networks v. Curry, 867 F. Supp. 202, 207-08 (S.D.N.Y. 1994), since Rule 12(e) "is designed to correct only unintelligibility in a pleading, not merely a claimed lack of detail." FRA S.p.A. v. Surg-O-Flex of Amer., Inc., 415 F. Supp. 421, 427 (S.D.N.Y. 1976).

[2] It is settled law that when a defense is raised in a dispositive motion, but the plaintiff fails to respond to that defense, the plaintiff has conceded the defense. Edward B. Marks Music Corp. v. Continental Record Co., 222 F.2d 488, 493 (2d Cir. 1955); accord Stephenson v. Cox, 223 F. Supp. 2d 119, 121 (D.D.C. 2002) ("Furthermore, when a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.").

169, 178 (2d Cir. 1998); Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 526

(S.D.N.Y. 1977) ("a party is not entitled to amend his pleading through statements in his brief").

Contrary to plaintiffs' claim, 28 U.S.C. § 1653 does not allow the plaintiffs "liberal amendments

as to jurisdiction" (Opp. at 5), since Section 1653 "addresses only incorrect statements about

jurisdiction . . . and not defects in the jurisdictional facts themselves." Newman-Green v.

Alfonzo-Larrain, 490 U.S. 826, 831 (1989); accord Asset Value Fund Ltd. P'ship v. The Care

Group, 179 F.R.D. 117, 119 (S.D.N.Y. 1998) (quoting Newman-Green).

In essence, plaintiffs have created a "moving target" for the defendants, which Mr. Al-

Husaini has not had the opportunity to address in his motion to dismiss. If this Court permits

plaintiffs to amend their Complaint in this manner, then Mr. Al-Husaini must be given an

opportunity to move to dismiss the newly amended Complaint.

> **B.      Even Plaintiffs's New Allegations Regarding Mr. Al-Husaini Fail To Support The Exercise of Personal Jurisdiction Over Him.**

Even if this Court were to consider plaintiffs' new allegations about Mr. Al-Husaini, it

must still find that those allegations fail to support the exercise of personal jurisdiction over him.

Plaintiffs raise three new allegations about Mr. Al-Husaini. See Opp. at 10-17.

Plaintiffs allege that Mr. Al-Husaini was "a member of the 'Golden Chain' and thus one

of the earliest direct financial sponsors of al Qaeda." Opp. at 3. As a threshold matter, the

plaintiffs have neglected to inform the Court of the date that the Golden Chain was created. In

fact, plaintiffs' chief investigator, Jean-Charles Brisard, has acknowledged in a sworn court

statement that the Golden Chain was created in 1988. See Witness Statement of Jean-Charles

Brisard, at ¶ 7 (May 21, 2003) (attached hereto as Exhibit 1). This timing issue is critical,

because not until 1989 was al Qaeda even created, as plaintiffs' Complaint acknowledges. See

3

Third Am. Compl., at 209 ("In or around 1989, Osama bin Laden formed al Qaeda").

Moreover, it is unclear what this 1988 document, which lists twenty names, represents.

Two British courts in the Queen's Bench Division held that the Golden Chain was inadmissible

evidence in libel actions, since it could represent nothing more than a list of wealthy prospects to

solicit for funds.  One British court stated as follows about the so-called Golden Chain:

> Nor does it emerge clearly what the meaning of the document is -- whether, for
> example, it purports to be a list of donors or a list of those who might be
> approached for funding.  Nor is it clear who created the document or when it
> came into existence.[3]

A second British court held as follows:

> [T]he list is in manuscript; its author is unknown, as is the source of the author's
> information; there is nothing in the list to suggest that the individuals named have
> made donations, rather than that they are potential donors; the list had been dated
> by Mr. Brisard, the lead investigator in the *Burnett* case, to 1988 at which time
> OBL [Osama bin Laden] was engaged in resisting the Soviet incursions into
> Afghanistan with the approval of western governments; there is nothing to link
> the list to Al-Qaeda; any money which was donated was apparently to be applied
> to fund fighters in Chechnya and Bosnia and not the atrocities which took place
> many years later in New York.[4]

This Court should similarly reject plaintiffs' claims that the appearance of a person's

name on this 1988 list as being somehow indicative of support of terrorism.[5]  Even if this Court

---

[3] Al Rajhi Banking & Inv. Corp. v. Wall St. J. Europe, 2003 WL 21554735 (QBD), [2003] EWHC 1776, at ¶ 23 (Q.B. Jul. 21, 2003) (attached hereto as Exhibit 2).

[4] Jameel v. Times Newspapers Limited, [2003] EWHC 2609, at ¶ 35 (Q.B. Nov. 7, 2003) (attached hereto as Exhibit 3).

[5] One British court recently entered a default judgment against Mr. Brisard, plaintiffs' chief investigator, in a libel action arising from his allegations that wealthy Saudis were donors to bin Laden and al Qaeda.  See Mahfouz v. Brisard, [2004] EWHC 1735, at ¶¶ 32-33, 37 (Q.B. Jul. 1, 2004) (attached hereto as Exhibit 4).  Another British court upheld a jury verdict in a libel action against the *Wall Street Journal*, after rejecting that paper's defense based in part on that newspaper's claims about the "Golden Chain."  See Jameel v. Wall St. J. Europe, 2004 WL 62083 (QBD), [2004] E.M.L.R. 11, [2004] EWHC 37, at ¶¶ 8-9 (Q.B. Jan. 20, 2004) (attached hereto as Exhibit 5).

Even the *Wall Street Journal*, upon whose stories plaintiffs so heavily rely, has admitted that the Golden

were to consider the "Golden Chain," there are serious problems with plaintiffs' characterization

of this document.  Nowhere on the document is there any indication of who wrote it, and no

words indicating that it was called the "Golden Chain."  See Opp., Ex. 4, at 3.  Nor are the

persons listed identified as actual donors; no donations are listed.  Id.  The U.S. government's

proffer in the criminal case of United States v. Arnaout, upon which plaintiffs rely,[6] similarly

was rejected by U.S. District Judge Conlon, on the ground that the "Golden Chain" was

inadmissable hearsay in any conspiracy charge against Arnaout.  See United States v. Arnaout,

No. 02 CR 892, 2003 WL 255226, at *1-*2 (N.D. Ill. Feb. 4, 2003).  Similarly, this Court should

not give any weight to this list, as its meaning and use are unclear.

Even if Mr. Al-Husaini's name on the list somehow indicates that in 1988 he contributed

to the mujahedin, that proves nothing about any support to al Qaeda at a time after al Qaeda

began targeting the United States, which plaintiffs acknowledge was around 1996.  See Third

Am. Compl., ¶¶ 315, 576, 584-85; Opp. at 13-15 (citing documents from 1996-1999 and 2001).

Instead, 1988 was a time when the United States government itself was supporting, both

openly and covertly, the mujahedin in Afghanistan in their challenge to the Soviet-imposed

regime.  President Reagan repeatedly declared this country's strong support for the mujahedin

continuing through December 27, 1988.[7]  The Library of Congress' Congressional Research

Chain "was drawn up at a time when supporting the Afghan revolt against Soviet invaders – Mr. bin Laden's cause
at the time – was a top U.S. foreign-policy objective" and that it "doesn't show any continuing support for al Qaeda
after the organization began targeting Americans."  See G. Simpson, "Al Qaeda List Points to Saudi Elite," Wall St.
J., Mar. 18, 2003, at A7.

[6] See Opp., Ex. 1, at 27-28 (United States v. Arnaout, No. 02 CR 892 (N.D. Ill.), Government's Evidentiary
Proffer Supporting the Admissibility of Coconspirator Statements, at 27-28 (Jan. 6, 2003)).

[7] See Public Papers of the Presidents of the United States: Ronald Reagan, 1987, at 1324 (Nov. 12, 1987)
(while meeting with mujahedin delegation, "I expressed our nation's continued strong support for the resistance");
id., 1988, at 453 (Apr. 13, 1988) ("The Senate, in a unanimous vote, urged ... that we maintain our support for the

Service estimated that this support, the bulk of which was covert, ran to about $300 million per year from 1986 to 1990, for a total of about $3 billion throughout the 1980's.[8]  Therefore, at the time the list was created, the United States itself might well have been listed as a donor.  Not until late 1991 did the Soviets and the Americans agree to stop providing military support to any entity in Afghanistan, with the cut-off taking effect on January 1, 1992.[9]

Plaintiffs also present as a new allegation, a claim that one of Mr. Al-Husaini's "family companies is a principal supporter of al-Waqf-al-Islaami, a Dutch entity that has played a major role in the recruitment of terrorists, including six of the September 11 hijackers."  Opp. at 11. However plaintiffs cite no documentary evidence for these allegations, other than a newspaper article published months *after* the filing of their Third Amended Complaint.  Id. (citing Apr. 15, 2003 article).  This newspaper article is inadmissible hearsay.[10]  Moreover, the article does not say that the organization actively recruited terrorists.  It reads as follows:

---

Mujahidin.  And they were right."); id., at 490 (Apr. 21, 1988) ("We will continue to support the Mujahidin for as long as the Soviets support the Kabul regime."); id. at 614 (May 19, 1988) ("we must continue to support the Mujahidin" and "we're going to do whatever is necessary to support the Mujahidin"); id. at 1656 (Dec. 27, 1988) ("We are proud to have supported their brave struggle to regain their freedom, and our support for this noble cause will continue as long as it is needed.") (excerpts attached hereto as Exhibit 6).

[8] See Library of Congress, Congressional Research Service, CRS Report for Congress, "Afghanistan:  Post-War Governance, Security, and U.S. Policy," at CRS-2 (June 15, 2004); Library of Congress, Congressional Research Service, CRS Issue Brief, "Afghanistan:  Status, U.S. Role, and Implications of a Soviet Withdrawal," at CRS-1 (May 20, 1988) (excerpts attached hereto as Exhibits 7-8).

[9] See U.S.-Soviet Joint Statement on Afghanistan (Sept. 13, 1991), 2 U.S. Dep't of State Dispatch 683 (1991) (attached hereto as Exhibit 9).

[10] See Rule 801(c), Fed. R. Evid.; United States v. Microsoft Corp., 253 F.3d 34, 108 (D.C. Cir. 2001) (en banc) (per curiam) ("[W]e need to state a few words about the state of the record.  All we have are the published accounts . . . .  These accounts were not admitted in evidence.  They may be hearsay."); Metropolitan Council of NAACP Branches v. FCC, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a *New York Times* article is admissible evidence of the truthfulness of its contents.").

> In a report published last year on Islamic education in the Netherlands, the agency estimated that Al-Waqf helps finance about six primary schools in the Netherlands, in addition to the periodic seminars for adults.
>
> *     *     *
>
> Whatever its financial associations, Al-Waqf has helped create a milieu where the world is divided into Muslims and inferior non-Muslims, European investigators say.[11]

Whatever this article states about the Dutch entity's educational mission or religious teachings, the article does not that state, or even suggest, that this Dutch entity engaged in violence, or recruitment of persons to engage in imminent harm to others.[12]

Plaintiffs also make the general allegation that it was well known that bin Laden and al Qaeda had directed their activities against this country since the mid-1990's, so that persons "who provided material support in that period plainly knew that they were targeting the United States." See Opp. at 13. However, there is no evidence presented by plaintiffs, in either their Complaint, or their new allegations, that Mr. Al-Husaini ever provided material support to al Qaeda at any time after its inception in 1989. Plaintiffs rely on a report prepared by a law student, which states that "Bin Laden's first declaration of war" was in October 1996. Id., Ex. 16, at 18. This report nowhere mentions Mr. Al-Husaini, nor do any of the other voluminous documents regarding bin Laden that plaintiffs submitted (Opp. Ex. 7-15, 17-20). Clearly, the only reasonable inference that can be drawn from any of plaintiffs' new allegations, and newly attached documents, is that any activity that Mr. Al-Husaini may have engaged in (e.g., the

---

[11] See I. Johnson & D. Crawford, "Radical Foundation:  In 'Law' Seminars, a Saudi Group Spreads Extremism," Wall St. J., Apr. 15, 2003, at A1, A10.

[12] Finally, this Court can take judicial notice of the fact that the U.S. government has never designated the al-Waqf-al-Islaami as a terrorist organization, which contradicts plaintiffs' arguments regarding its alleged terrorist activities. See Department of the Treasury, Office of Foreign Assets Control, "Specially Designated Nationals and Blocked Persons" (July 23, 2004), <http://www.treas.gov/offices/eotffc/ofac/sdn/t11sdn.pdf>.

7

Golden Chain) took place <u>before</u> bin Laden had targeted the United States, and at a time when the U.S. government was supporting him and the mujahedin fighting the Soviets in Afghanistan.

Plaintiffs have presented no new evidence in their Opposition, and have pled no allegations in their Complaint, that would support any claim against Mr. Al-Husaini for terrorist activities, much less for participation in the September 11 attacks.  Nor do any of these facts support the exercise of personal jurisdiction over him.

**C.     This Court Cannot Exercise Personal Jurisdiction Over Mr. Al-Husaini Under The Specific Jurisdiction Theory.**

Plaintiffs' allegations also fail to support their "purposefully directed" claim under the specific jurisdiction theory.  Plaintiffs have not offered any competent evidence that Mr. Al-Husaini's activities – even as alleged by plaintiffs – were "expressly aimed" at the United States, as is required to allow the exercise of personal jurisdiction.  <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 474-76 (1985); <u>Calder</u>, 465 U.S. at 789-90.  At most, plaintiffs allege that Mr. Al-Husaini was listed as a donor or potential donor to the Afghanistan mujahedin during a time period when the U.S. government was also supporting the mujahedin, seven years <u>before</u> bin Laden announced that al Qaeda was targeting this country, and that one of Mr. Al-Husaini's companies may have supported a milieu out of which terrorists may somehow have arisen.[13]  Nor have plaintiffs set forth evidence to support any allegation that Al-Husaini was a "primary participant" in the September 11 attacks as is required for this Court to exercise personal jurisdiction over him.  *In re* Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003).

As a legal matter, plaintiffs rely primarily on three cases brought against Iraq and Libya

---

[13] Plaintiffs rely on the same *Wall Street Journal* article which is significantly at variance with their claim that one of Mr. Al-Husaini's family companies financially supported a Dutch entity.  In fact, the article only states that he is on the board of this entity, and does not mention any financial support.  <u>See</u> note 11, <u>supra</u>.

by victims of terrorism.  See Opp., at 6-9 (citing Pugh v. Socialist People's Libyan Arab

Jamahirya, 290 F. Supp. 2d 54 (D.D.C. 2003); Daliberti v. Iraq, 97 F. Supp. 2d 38 (D.D.C.

2000); Rein v. Socialist People's Libyan Arab Jamahirya, 995 F. Supp. 325 (E.D.N.Y. 1998)).

These cases are inapposite because they arose under the state-sponsored terrorism exception to

the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7).  Mr. Al-Husaini is not

covered by the FSIA, so plaintiffs could not bring any claims against him under this exception.

Moreover, the U.S. Court of Appeals for the D.C. Circuit subsequently held that this exception

does not create a cause of action, even against designated state sponsors of terrorism.  See Acree

v. Republic of Iraq, 370 F.3d 41, 59-60 (D.C. Cir. 2004); Cicippio-Puleo v. Islamic Republic of

Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  Thus, these cases deal with personal jurisdiction

under the state-sponsored terrorism exception to FSIA, and have no applicability to the question

of whether this Court may exercise personal jurisdiction over Mr. Al-Husaini.

### II.      Plaintiffs Have Not Properly Served Mr. Al-Husaini.

### A.      Judge Robertson Did Not Approve Service By Publication on Al-Husaini.

Mr. Al-Husaini refers this Court, and incorporates herein, the discussion of the plaintiffs'

improper service of process by publication in the reply brief filed by Mr. Al-Oadah (July 23,

2004).  As set forth in greater detail in Mr. Al-Oadah's reply brief, plaintiffs have fabricated a

court document, and blatantly misrepresented an order by Judge Robertson, in an attempt to

argue that they have properly served Mr. Al-Husaini and four other defendants.  See Reply Brief

in Support of Salman Al-Oadah's Motion to Dismiss the Third Amended Complaint, at Part II.A

(July 23, 2004) (incorporated by reference herein).  The minimum appropriate sanction to be

imposed on plaintiffs' counsel for submitting a fabricated court filing is to strike their opposition

to Mr. Al-Husaini's motion to dismiss, and thereby treat his motion as conceded.

**B.    Plaintiffs' Attempt to Serve By Publication was Substantively Improper.**

Even if this Court were to ignore plaintiffs' reliance on a fabricated court filing, it must

still find that plaintiffs' attempt to serve Mr. Al-Husaini by publication in two newspapers –

which he cannot read or access – was substantively improper.  Mr. Al-Husaini respectfully refers

this Court, and incorporates herein, the discussion of the plaintiffs' improper service of process

by publication in the reply brief filed by Mr. Al-Hussayen (July 23, 2004).  See Reply Brief in

Support of Saleh Al-Hussayen's Motion to Dismiss the Third Amended Complaint, at Part III.B

(July 23, 2004) (incorporated by reference herein).  This Court should find that Judge Robertson

did not authorize service by publication on Mr. Al-Husaini, and that plaintiffs' service did not

constitute adequate notice to him, so that there was no effective service of process.

## CONCLUSION

For the foregoing reasons, and those set forth in Mr. Al-Husaini's motion to dismiss, this

Court must dismiss plaintiffs' Third Amended Complaint for lack of personal jurisdiction and

improper service of process.

Respectfully submitted,

/s/ Lynne Bernabei

Lynne Bernabei, Esquire  (LB2489)
Alan R. Kabat, Esquire  (AK7194)
Bernabei & Katz, PLLC
1773 T Street, N.W.
Washington, D.C. 20009-7139
(202) 745-1942

Attorneys for Defendant
 Hamad Al-Husaini (D209)

DATED:  July 23, 2004

10

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2004, I caused the foregoing to be served electronically on counsel of record by the Court's Electronic Case Filing (ECF) System, pursuant to ¶ 9(a) of Case Management Order No. 2 (June 16, 2004).

/s/ Alan R. Kabat

Alan R. Kabat