**Exhibit 1**

Reply Brief in Support of Hamad Al-Husaini's
Motion to Dismiss the Third Amended Complaint

03 MDL No. 1570 (RCC) / C.A. No. 03-CV-9849 (RCC)

J.C. Brisard
Witness Statement
Dated: 21 May 2003

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

B E T W E E N:

KHALID SALIM A BIN MAHFOUZ

Claimant

- and -

(1) GRAEME BEATON
(2) PETER WRIGHT
(3) ASSOCIATED NEWSPAPERS LIMITED

Defendants

---

## WITNESS STATEMENT OF JEAN-CHARLES BRISARD

---

I, JEAN-CHARLES BRISARD, of 42, avenue Montaigne, 75008 Paris WILL SAY as follows:-

1.   I am the lead investigator in the complaint filed in the US District Court for the District of Columbia ("the 9/11 Complaint") on 15 August 2002 by around 4,000 relatives of victims of the 11 September 2001 attacks on the US. I am leading a team which is conducting investigations in a number of jurisdictions including the United States, Europe, the Middle East and Africa.

2.   I am an expert in the area of the financing of terrorism, having been involved in this field since 1997. From 1993 to 1997 I was the Assistant to the Chief Anti-Terrorism Prosecutor in Paris, Alain Marsaud. From 1997 to 2001 I was a consultant with the French Intelligence Service advising them on the Al-Qaeda financial networks. During this period I was commissioned by the President of the Security Council of the United Nations to prepare a report on the financing of terrorism which was published on 19 December 2002 (see "JCB1" for a copy of this report). I also prepared a report for the French National Assembly on the same subject (attached at "JCB2"). This report was published in October 2001. Since 11 September 2001, I have testified in several Court proceedings on money laundering and terrorism financing networks.

3.   Since 1997 I have been gathering evidence on the claimant in relation to allegations that he knowingly supported terrorism. This has involved obtaining testimony from

intelligence sources, and other relevant witnesses and documentary evidence from (inter alia) US government reports, Court documents, police investigations, business registries and other reliable sources.

4.      I have been asked to give this witness statement by Mr Shanmuganathan of Taylor Wessing in support of the defendants' application to have this matter stayed pending the resolution of the libel action brought against me in (inter alia) Belgium ("the Belgian Claim") by the claimant with regard to a best selling book co-authored by me entitled "Forbidden Truth" ("the Book"). I understand from Mr Shanmuganathan that proceedings have also been issued against me in England by the claimant for libel with regard to the Book ("the English Claim"). I attach to this statement a copy of the relevant chapter of the Book which is the subject of the claims and a translation made by TransPerfect Translations Limited of the Belgian Claim (see "JCB3" and "JCB4" respectively). It should be noted that since the first public mention of the claimant in relation to terrorism financing (French National Assembly report in October 2001), the claimant has not until recently challenged the evidence brought against him. Moreover, my book was published in France in November 2001, then at the beginning of 2002 in, Germany, Italy, Japan and the United States among others, with worldwide publicity, yet the claimant, until recently, has never challenged by any means the publication or publicity on the Book.

5.      I confirm that I intend to vigorously defend both the Belgian Claim and if served, the English Claim. I also confirm that I intend to fully justify the truth of the allegation made in the Book that the claimant knowingly supported terrorism. The Court should also be aware that the claimant appears as a defendant in the 9/11 Complaint (see extracts from the 9/11 Complaint attached at "JCB5").

6.      For the purposes of the defendants' application I set out below the key evidence I have gathered to date. For reasons of confidentiality, in some instances, I am not in a position to reveal the identity of my sources. I should add that I also have evidence connecting the claimant with individuals and companies alleged to be involved in the financing of terrorism but I have been asked not to deal with this evidence because it is considered too detailed for the purposes for which this statement is prepared. I confirm that I intend to put this evidence before the Court in my defence of the English claim.

## THE GOLDEN CHAIN LIST

7.  According to the US Federal Bureau of Investigation (the "FBI"), the Golden Chain list is a 1988 Al-Qaeda internal handwritten memorandum listing the people referred to within Al-Qaeda as "the Golden Chain", namely the twenty main donors to the terrorist organization. I attach at "JCB6" a copy of this list in its original Arabic form, the original translated version and an amended translated version. The amended translation was done by two certified translators used by the US District Court for the District of Columbia for the purposes of the 9/11 Complaint because it was clear to me because of my knowledge of Al-Qaeda funders that the original translated version was inaccurate. These documents were disclosed by the US Government to the US District Court Northern District of Illinois Eastern Division (attached at "JCB7"). As stated in the document the list was found in March 2002 by the Bosnian Government as a result of searches at the offices of Benevolence International Foundation in Sarajevo and handed over to the US Embassy in Sarajevo. The BIF is a charity suspected of funding terrorist organisations. I am informed by translators to the Court that the reference to "Mahfoodh" in this initial translation is inaccurate and the correct translation is "Mahfouz". Alongside each name is the intended recipient of the donation. The claimant's name is found next to Osama bin Laden. Whilst the claimant has admitted in a correction printed in the Wall Street Journal on 18 March 2003 (see "JCB8") that he gave a donation in the 1980s to a fund to support the Afghan resistance against the Soviet invasion, he denies making any donations to Osama bin Laden directly. Moreover, the claimant fails to admit that the war against the Soviet army was over at the time of Al-Qaeda's foundation in September 1988.

## BIN LADEN'S BROTHER-IN-LAW

8.  James Woolsey, former CIA director, stated in a hearing of the Senate Judiciary Committee on Counterterrorism policy on 3 September 1998 (see attached transcript at "JCB9") that the claimant was the brother-in-law of Osama bin Laden. I set out below the relevant extract:

    > "...is a protege of a Mr.Hafuz (sp), the chairman of the National Commercial Bank of Saudi Arabia. Mr. Hafuz's sister is married, I understand, to Mr bin Laden. So, there were somes times [should be "ties"] to Mr. bin Laden, financial and otherwise."

9.  I understand that it has been reported in an LA Times article dated 26 February 2003 (attached at "JCB10") that Mr Woolsey is now stating that he was not referring to the

3

claimant in his testimony but a "Mr Hafous". This could not be the case as there has never been a Mr Hafous who has been the chairman of the National Commercial Bank ("the NCB"). At the relevant time (which I expand on below) the claimant was chairman of the NCB.  In any event I have interviewed Joel Soler, an investigative journalist who, in preparing a documentary for Fox News on Osama bin Laden (which is yet to be broadcast), interviewed several cousins and a sister-in-law of Osama bin Laden who stated that Osama bin Laden was the brother-in-law of the claimant. Furthermore, a secret witness source, who is a former employee of the claimant, also confirmed that information for the purpose of the 9/11 Complaint.

BANK OF CREDIT AND COMMERCE INTERNATIONAL

10.     The claimant was born in 1928.  I attach to my statement at "JCB11" copies of an extract from the ICC Company Directory and Companies House database on the Bank of Credit and Commerce International SA ("BCCI") which shows that the claimant was an executive director of BCCI and that his date of birth is given as December 1928.

11.     Between 1986 and 1999 the claimant was Director of BCCI.  Indeed a PriceWaterhouse report, commissioned by the liquidator of BCCI, refers to the claimant as Chief Operating Officer of the bank.  In 1986, he became one of its major shareholders, holding 20% of the shares with his brothers.

12.     The claimant was indicted in the United Stated District Court for the Southern District of New York on 1 July 1992 on charges of participation in a scheme to defraud in the first degree in violation of New York Penal Law §190.65, in connection with certain of the claimant's acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans and fraudulent conduct in failing to disclose the status of the claimant's interest in BCCI.

13.     Whilst the claimant was an executive director, BCCI was implicated in supporting terrorism, as reported in a 1992 US Senate report on the BCCI affair (see attached extracts from the report at "JCB 12"):

> "In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al – Bannah or Abu Nidal, and his terrorist organisation".

14.     The Senate Report detailed the initial involvement of BCCI in terrorism financial support:-

*"BCCI's support of terrorism and arms trafficking developed out of several factors.   First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organisations, who received payment at BCCI – London and other branches directly by Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny.   Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the Bank's pan-third world and a pro-Islam ideology would have recommended it to Arab terrorist groups.*

## NATIONAL COMMERCIAL BANK

15.   After his fathers' death in or about 1986, the claimant became President and Chief Executive Officer of the Saudi National Commercial Bank ("the NCB") until in or about 1999 and its principal shareholder with control over more than 50% of the Bank's capital.

16.   According to Vincent Cannistraro, the former CIA Chief of Counterterrorism, during a congress hearing in October 2001 (see attached transcript at "JCB13"), the NCB was operating during those years as a "financial conduit" for Osama bin Laden's operations. He stated:-

*"How does the al-Qaeda organisation fund its worldwide network of cells and affiliated groups?   Several businessmen in Saudi Arabia and in the Gulf contribute monies.   Many of these contributions are given out of a sense of Islamic solidarity.   But much of the money is paid as "protection" to avoid the enterprises run by these men being attacked.   There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel.   It was evident that several wealthy Saudis were funding contributions to Bin Laden through this mechanism".*

17.   US authorities discovered suspicious transfers of tens of millions of dollars from the NCB to charity organisations associated with Osama bin Laden, some of which were controlled by the claimant's family.   The Kingdom of Saudi Arabia therefore ordered an audit of the NCB in order to verify the allegations made by the US authorities.   The audit uncovered massive transfers made to charity organisations with ties to Osama bin Laden, some of which were controlled by members of the claimant's family.

18. Whilst I cannot reveal the details of how (and from whom) I obtained the document due to the confidentiality of my source, I confirm that I have obtained from intelligence sources extracts from the Saudi Government's audit of NCB. I understand that the claimant is denying that this audit took place, although it was confirmed to me by an NCB source. A copy of the extracts (which have been translated) are attached at "JCB14". The audit points out that $3 million was transferred to the Muwafaq Foundation, which is suspected of supporting Osama Bin Ladin's activities (see below). According to a recent interview in Forbes magazine (attached at "JCB15"), Abdulrahman Khalid Salim Bin Mahfouz, the claimant's son, states that the Muwafaq Foundation was the *"brainchild"* of his father, *"who funded it with as much as $30 million"*.

19. The NCB facilitated through its agencies in Jeddah (branches #101 and #106 of Jeddah), Saudi Arabia, various financial transfers between Muhammed Galeb Kalaje Zouaydi, financial head of the Spanish Al-Qaeda cell, and Al-Qaeda operatives, for example, with Nabil Sayadi in Belgium. Mr Sayadi was in charge of the Al-Qaeda operations in Eastern Europe as stated in a Spanish criminal judicial procedure by the Anti-Terrorist Judge Balthazar Garzon Real. Whilst my source for this information is confidential I attach a copy of a bank transfer from Mr Zouaydi to Mr Sayadi which was obtained from the Spanish procedure (see "JCB16").

**MUWAFAQ FOUNDATION**

20. According to an Office of Foreign Assets Control press release dated 12 October 2001 (attach at "JCB17"), the assets of Yasin Al-Qadi, chairman of the Muwafaq Foundation, were frozen on 12 October 2001 by the US Treasury Department as a Special Designated Global Terrorist, pursuant to executive order 13224 blocking property and prohibiting transactions with persons who threaten to commit or support terrorism. The US Authorities described Mr Al-Qadi as a "terrorist" and the Muwafaq Foundation, as an organisation that "financially supports terrorism" and "funnels money to the Al-Qaeda terrorist network"

**SEDCO AND IDF**

21. The Bin Mahfouz family businesses are organised through a series of holding companies, including a conglomerate, the Saudi Economic and Development Company Llc ("SEDCO"). In 1997, some of the directors of SEDCO founded the charity organisation International Development Foundation ("IDF"). The charity was registered with the UK authorities on 22 October 1998. IDF executors include the

claimant's brothers, Mohammed Bin Salim Bin Mahfouz, Ahmed Bin Salim Bin Mahfouz, Abdelelah Bin Salim Bin Mahfouz and Saleh Bin Salim Bin Mahfouz.

22.    According to a confidential intelligence source IDF has been involved in the financing of Al-Qaeda operations in Bosnia. I was told by my source that M. Al Jaffari, who is a member of International Islamic Relief Organisation ("IIRO") in Bosnia (which is considered by (amongst others) official US intelligence sources within the Central Intelligence Agency to be the main contributor to Al-Qaeda operations), and a Bin Mahfouz representative agreed that funds for Bosnian operations be wired through London IDF accounts to IIRO and "secure" charities in Sarajevo (the identities of the charities are yet to be determined) in order to help the "Afghan groups". This information confirms the close relationship between the IIRO's and IDF's offices in London. My source (who is monitoring these charities for the Bosnian government) told me that the fact that they share the same letterbox was confirmed and that the Bin Mahfouz charity has financial operations in Bosnia that may fund terrorist activists in the region.

### SAAR FOUNDATION

23.    The claimant's US representative and legal counsel, Cherif Sedky, established the SAAR Foundation in the United States in about 1983 and acted as its secretary until dissolution in 2000. Mr Sedky is a member of the board of directors of two companies controlled by the claimant, Nimir Petroleum Llc and Credit Libanais SAL. In 2002 he was also acting as chief executive officer for Nimir Petroleum Limited in London. In March 2002, US law enforcement agents conducted searches over several Islamic charities based in Virginia, including the SAAR Foundation and IIRO, which is believed to have links to Al-Qaeda and other terrorist groups. I understand from a consultant specialising in this area (who is advising in the 9/11 Complaint) that proceedings are currently being considered by the US government against Mr Sedky and the SAAR Foundation.

### MOSSAD LIST OF TERRORISTS

24.    I attach at "JCB18" a copy of a Mossad list dated 2003 (which I obtained from Israeli intelligence) of terrorist suspects and financers of terrorism. The claimant is listed on page 8 of this list along with the BIF (page 4), the IIRO (page 7), the Muwafaq Foundation-Blessed Relief (page 12) and the NCB (page 12). Whilst I cannot disclose the name of my source, I can confirm that this was obtained from a former director of Israeli Intelligence.

## US INDICTMENT

25. I have been informed by Luxembourg's Chief General Prosecutor Carlos Zeyen and the Chief of Judicial Police in Luxembourg, Pierre Kohnen, that Jimmy Gurulé, the Under-Secretary for Enforcement at the US Treasury Department, has requested that the claimant be investigated for association with a criminal organisation (being Al-Qaeda). Indeed I understand that a sealed indictment has been issued by the US Treasury Department against the Claimant in relation to terrorism financing.

26. I believe that I have sufficient evidence to justify my allegation that the claimant knowingly supported terrorism. It is my intention to justify the truth of my allegation and to vigorously defend any action brought against me by the claimant.

### Statement of truth

I believe that the facts stated in this witness statement are true.

Full name:                    JEAN-CHARLES BRISARD

Signed:

Date:        91 - 05. - 5

8

J.C. Brisard
Witness Statement
Dated:    21 May 2003

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

B E T W E E N:

KHALID SALIM A BIN MAHFOUZ
**Defendant**

- and -

**(1) GRAEME BEATON**
**(2) PETER WRIGHT**
**(3) ASSOCIATED NEWSPAPERS LIMITED**
**Defendants**

---

**WITNESS STATEMENT OF JEAN-
CHARLES BRISARD**

---

TAYLOR WESSING
Carmelite
50 Victoria Embankment
Blackfriars
London EC4Y 0DX

Tel  +44 (0)20 7300 7000
Fax +44 (0)20 7300 7100
DX  41 London

Ref: NXS

IN THE HIGH COURT OF JUSTICE                              HC 03X00518

QUEEN'S BENCH DIVISION

BETWEEN:

### KHALID SALIM A BIN MAHFOUZ

**Claimant**

- and –

### (1) GRAEME BEATON

### (2) PETER WRIGHT

### (3) ASSOCIATED NEWSPAPERS LIMITED

**Defendants**

---

EXHIBITS TO WITNESS STATEMENT OF
JEAN-CHARLES BRISARD

---

### INDEX

1. Exhibit "JCB 1" – United Nations report on the financing of terrorism published on 19 December 2002 by Jean-Charles Brisard for JCB Consulting

2. Exhibit "JCB 2" – Report prepared for the French National Assembly published in October 2001 by Jean-Charles Brisard

3. Exhibit "JCB 3" – Copy of chapter 12 of "Forbidden Truth" by Jean-Charles Brisard and Guillaume Dasquié

4. Exhibit "JCB 4" – Translation made by TransPerfect Translations Limited of the Belgian Claim

5. Exhibit "JCB 5" – Extracts from the complaint filed in the US District Court for the districts of Columbia on 15 August 2002 ("the 9/11 Complaint")

6. Exhibit "JCB 6" – A copy of "The Golden Chain" memorandum

7. Exhibit "JCB 7" – Proffer from United States of America v. Enaam M. Arnaut

8. Exhibit "JCB 8" – Correction printed in the Wall Street Journal on 18 March 2003

9. Exhibit "JCB 9" – Transcript of hearing of the Senate Judiciary Committee on Counterterrorism policy on 3 September 1998

10. Exhibit "JCB 10" – LA Times article dated 26 February 2003