**Exhibit 2**

Reply Brief in Support of Hamad Al-Husaini's
Motion to Dismiss the Third Amended Complaint

03 MDL No. 1570 (RCC) / C.A. No. 03-CV-9849 (RCC)

2003 WL 21554735                                                                                    Page 1
2003 WL 21554735 (QBD), [2003] EWHC 1776

Al Rajhi Banking & Investment Corporation v. The Wall
Street Journal Europe
SPRL
H002X00924

High Court of Justice Queen's Bench Division

QBD

Before: The Honourable Mr Justice Eady

Monday 21st July, 2003

**Representation**

Desmond Browne Q.C. and Mark Warby Q.C (instructed by
Eversheds) for the Claimant.

Geoffrey Robertson QC. and Rupert Elliott (instructed by
Finers Stephens Innocent) for the Defendant.

**JUDGMENT**

MR JUSTICE EADY:

**1.** Much of the background to this expensive and hard
fought litigation is to be found in my earlier judgment of 12
June 2003: see [2003] EWHC 1358. I then refused the
Defendant permission to add a late plea of justification in
circumstances where the relevant article was published in
the Wall Street Journal on 6 February 2002, the proceedings
were commenced in July 2002 and the trial is due to take
place (on meaning and qualified privilege) shortly, starting
on 21 July of this year (i.e. next Monday) I shall try to avoid
repetition as far as possible.

**2.** I am now confronted with a yet further application for
permission to plead justification. Enormous industry and
energy has been expended on both sides, in addressing the
issues as they have taken shape, shimmered for a while and
then dislimned. The Defendant's formulation of the defence
has gone through, I believe, no less than seven shifts since
my judgment a month ago -- the final version of the
*Lucas-Box* meanings, as we then thought, having been fresh
minted on the morning of the hearing on 4 July. Vociferous
complaints have been made by Mr Browne Q.C. and Mr
Warby Q.C. appearing for the Claimant, as they have been
obliged to address an elusive and shifting target. It became
necessary, for example, for their dense and detailed skeleton
argument to be reformulated and thus for an adjournment to
be granted of a hearing due to take place on 1 July.
Inevitably also, for the last six weeks or so, at least, the
parties' advisers have been distracted from the task of

preparing for the imminent trial.

**3.** This is unique in my experience and it may turn out, for
all I know, to be the most expensive application to amend
ever made in a libel action. There is no doubt that the
respective legal advisers have fought hard to represent their
clients' best interests in the context of a defamatory
imputation which could hardly be more serious -- namely
that of involvement, or possible involvement, in the funding
of Al-Qaeda terrorism. The Wall Street Journal is not in a
position to prove direct involvement on the part of the
Claimant and, in view of the content of the article, it does
not need to do so. Even the Claimant does not suggest that
the article carried an imputation of direct responsibility. The
Defendant is, however, desperate to plead justification in
some lesser sense. The Claimant, on the other hand, clearly
wants to vindicate itself at the earliest opportunity,
unequivocally, and not to lose its trial date through what it
perceives to be obfuscation and delaying tactics.

**4.** Eventually, yet another version of the *Lucas-Box*
meanings was introduced by Mr Robertson Q.C., appearing
for the Defendant, in his reply on the third day of the
hearing (i.e. on 8 July). I observed on that occasion, in the
light of Mr Browne's understandable frustration, that it was
nonetheless appropriate for me to address the Defendant's
case, after counsel had had the opportunity of giving it
"their best shot", on the merits (if any) as they finally
emerged. The inconvenience and delay could be
compensated for in orders for costs.

**5.** Mr Browne reminded me of the principles of law which
need to be applied in such a case, and which I attempted to
summarise on 12 June. On the one side, it is vital to
ensure-that the Claimant should not achieve a hollow and
misleading vindication and, on the other hand, it wishes to
know precisely what is alleged against it and the case it has
to meet. This must be expressed in terms sufficiently clear
to avoid the trial being enveloped in a fog of prejudice. It
seems to me that I must avoid admitting allegations which
are incapable of proof or refutation.

**6.** Fundamentally, the application requires me to examine
the proposed *Lucas-Box* meanings in order to see whether
they are such that the article is capable of conveying them to
fair-minded readers and, if so, to decide if the pleaded
particulars are, in turn, capable of supporting the relevant
defamatory meaning(s). There are established principles to
guide the court in this exercise and, as I observed in Musa
King v. Telegraph Group Limited [2003] EWHC 1312 at
[39], the graver the allegations, the more important it is to
hold fast to these principles and not to dilute their purity.
The Claimant must know the case it has to meet.

Copr. © West 2004 No Claim to Orig. Govt. Works

**7.** The starting point for me is to focus on the sixth version of the *Lucas-Box* meanings as they emerged on 4 July, and then to consider the seventh version which was introduced as an alternative. So far as that was concerned, the parties agreed to address it in further submissions in writing, as it was too late to arrange another hearing. The sixth version was as follows:

"Alternatively, if and in so far as the said words in their natural and ordinary meaning bore or were understood to bear the meaning that: because of the nature of the Claimant's past association with persons or institutions reasonably suspected of links to terrorism:

 a. there were sufficient grounds for investigating whether the Claimant had been and/or was still knowingly or negligently involved in the funding of terrorist-related activity;

 or alternatively

 b. there were reasonable grounds to suspect that the Claimant had been knowingly or negligently involved in the funding of terrorist-related activity and/or may in the future allow use of its accounts for such funding

 they are true in substance and in fact."

**8.** The first of the two meanings is based upon the third and lowest tier of gravity identified by Brooke L J in Chase v News Group Newspapers Limited [2003] EMLR 218 at [45], namely where words may mean "that there are grounds for investigating whether [the claimant] has been responsible for such an act".

**9.** It is necessary to remember that there is little or no authority on imputations of this kind. So far, the lowest level of gravity has not been addressed in the authorities, apart from an acknowledgement of its existence. It may be, however, that it differs in quality from the second tier, "reasonable grounds to suspect", only as a matter of degree. It may well be that, just as with "reasonable grounds to suspect", there would be the possibility of supporting such a *Lucas-Box* meaning by way of strong circumstantial evidence. On the other hand, there is no example in the authorities of how "strong" the circumstantial grounds have to be in the context of level two -- let alone for level three.

**10.** I need to ask whether this new interpretation of the words complained of, duly introduced after the judgment of 12 June, is one which the words are capable of bearing. Could a reasonable reader construe the words complained of as meaning no more than that there were reasonable grounds to investigate? Or is the situation such as the Court of Appeal held to apply in Chase itself? There it concluded that the words indisputably went further and implied strong or reasonable grounds to suspect the Claimant of child murder.

**11.** It will be recalled that the headline refers to a focus on "those with potential terrorist ties". I said in my earlier judgment that I was unable to define what was meant by this phrase. That is not to say, however, that it is any the less capable of a defamatory imputation by reason of its lack of a precise meaning. Underneath, in the article itself, the word "suspected" is used twice. First, there is the reference to "legitimate entities and businessmen who may in the past have had an association with institutions suspected of links to terrorism". Next, there is the allegation that Al Rajhi bank accounts were being monitored "because of suspected associations of the companies in the past". Since the focus is already declared to have been on "those with potential terrorist ties", it is difficult to comprehend how a fair-minded reader is supposed to construe the "ties", "links" or "associations" variously referred to throughout the article as being other than the subject of at least reasonable suspicion; that is to say, as giving rise to suspicion of knowing or negligent involvement or -- because the possibility has also to be admitted of the use of the Claimant's accounts or facilities being "unwitting" -- of negligently permitting circumstances to arise where they were so used.

**12.** If I am right about this, there would be no room for a defamatory meaning at the lower level of gravity It is to be recalled that Mr Robertson at the first hearing, prior to the judgment of 12 June, took his stance firmly on the highest of the three levels of gravity identified in Chase. In view of the presentation and content of the article, it seems to me that (as was the position in Chase) the words are not capable of justification on any lesser basis than of establishing "reasonable grounds to suspect" the Claimant, through its owners and/or executives, of knowing or negligent involvement in the use of accounts for funnelling purposes. It is according to that criterion that any particulars of justification will have to measure up.

**13.** I pause to note that there is, as I have suggested above, a degree of uncertainty about level three of gravity as defined in Chase (i.e. "grounds for enquiry"). By contrast with level two ("reasonable grounds to suspect"), there is little authority as to the necessary ingredients. Indeed, in the judgment of Brooke L.J. he does not use the word "reasonable" to qualify "enquiry" as he does for "grounds to suspect". Mr Browne argues that it must be implicit; Mr Robertson that it must be a deliberate omission. If it was deliberate, it is by no means obvious what the significance would be.

**14.** Despite the absence of any recent authority on level three, it seems clear that the concept is reflected in the speeches of their Lordships in Lewis v. Daily Telegraph

2003 WL 21554735                                                                                    Page 3
2003 WL 21554735 (QBD), [2003] EWHC 1776

[1964] AC 234. Nonetheless, Mr Browne would be ready and willing on some suitable future occasion to argue that the distinction between levels two and three is illusory and that the only aspect of an allegation to the effect that there are grounds for an enquiry that could be defamatory is the underlying implication that there are reasonable grounds to suspect something reprehensible on the claimant's part. In other words, that there "may be something in it". Mr Browne recognises, however, that he is not able to advance that argument on the present applications in view of the clear classification of Brooke L.J. in Chase and of Robert Walker L.J. in Bennett v. News Group Newspapers [2002] EMLR 39. Indeed, I believe it would be difficult to reconcile his argument with Lord Devlin's speech in Lewis itself: see especially at p.285. That is not to deny, however, that there are unanswered questions about how level three of gravity is supposed to work. Does the conduct rule apply, for example? Will circumstantial evidence suffice? Do the grounds for enquiry have to pass any objective test or will it be justifiable on the basis of (say) police enquiries -- however capricious they may be? These are no doubt questions which will be addressed by appellate courts in due course. Meanwhile, however, I need not grapple with them in the present case (any more than the Court of Appeal needed to do so in Chase).

**15.** I should now consider the seventh version of the *Lucas-Box* meanings introduced in Mr Robertson's reply and confirmed in writing after the hearing was over:
"Alternatively, if and in so far as the words in their natural and ordinary meaning bore or were understood to bear the meaning that because of the Claimant's suspicious conduct in its past association with persons or institutions reasonably suspected of links to terrorism:
  a. there were sufficient grounds for investigating whether the Claimant had been and/or was still knowingly or negligently involved in the funding of terrorist-related activity;
  alternatively
  b. there were reasonable grounds to suspect that the Claimant had been knowingly or negligently involved in the funding of terrorist-related activity and/or may in the future allow use of its accounts for such funding
  they are true in substance and in fact".

**16.** So far as I understand it, the only material variation as compared with the sixth version, quoted above, is that the new concept is introduced of "the Claimant's suspicious conduct in its past association with ..." the relevant persons or institutions. The obscurity is to some extent compounded by the circularity of identifying the "reasonable grounds to suspect" as being the Claimant's "suspicious conduct". It seems to me, however, at however many removes the

grounds for suspicion may be placed by the pleader, the acid test remains that identified by Stuart-Smith L.J. in Evans v. Granada Television [1996] EMLR 429; namely, whether there are reasonable grounds, objectively judged, upon which to suspect the Claimant of reprehensible conduct.

**17.** I understand that the seventh version is put forward on the Defendant's behalf only by way of alternative to the sixth version -- and not by way of substitution for it. It follows that the Defendant's preferred choice is the formulation cited above, based upon "the nature of the Claimant's past association ...". It is to be noted that the "nature" is unspecified in the *Lucas-Box* meaning itself, and is no doubt to be found somewhere in the pleaded particulars, or in one or other version of the further information supplied following the judgment of 12 June it is also to be observed that any "association" on the part of a Claimant must itself an some way be reprehensible to play a part in a plea of justification As I said in the earlier judgment at [29]:
"I believe it is in accordance with principle not to permit justification by *mere* association. In other words, in order to pass muster, the pleaded association must itself be 'guilty'. If an association involves knowledge on the Claimant's part, by way of (say) co-operating with or aiding and abetting terrorists, then such an association may certainly be pleaded Here nothing of the sort is alleged."

**18.** Mr Browne reminded me at the outset of his skeleton argument of certain principles which need to guide these considerations I acknowledged their relevance in my earlier judgment, e g at [27]. Also, I should, I believe, be careful in addressing the largely unexplored territory of what may constitute "strong circumstantial evidence" and bear in mind that guilt by association will generally not suffice. Thus, for example, if there are instances of a "link" with one person who is said to have come under suspicion, by somebody, but the "link" is consistent with a completely innocent explanation, I cannot convert it into "reasonable grounds to suspect" because there also emerges a "link" with a second or third person said to come under suspicion where that "link", too, is consistent with ordinary commercial banking relations in an innocent context. Nought plus nought still comes to zero. It is particularly appropriate to bear that in mind where the Defendant expressly recognises, as here, that the pleaded grounds for suspicion "may be individually criticised".

**19.** The fundamental principle must be adhered to that the burden rests upon the Defendant to prove that there exist, objectively judged, reasonable grounds to suspect the Claimant of some conduct which would reprehensible.

Copr. © West 2004 No Claim to Orig. Govt. Works

2003 WL 21554735                                                                               Page 4
2003 WL 21554735 (QBD), [2003] EWHC 1776

**20.** It is particularly important to analyse material put forward where the underlying allegation is very serious and where, for understandable reasons, the law enforcement agencies in the United States may have acted in some cases, precipitately so as to give priority to national security and the safety of the public. In the present context, the Defendant's burden cannot be lowered, since the general principle must be applied that suspicion or action on the part of law enforcement agencies may not be substituted for the criterion of reasonable grounds objectively judged: see e.g. the earlier judgment at paragraph [30] and Musa King v. Telegraph Group [2003] EWHC 1312 at [37]-[39].

**21.** The grounds relied upon by the Defendant in this case, as most recently pleaded, may conveniently be grouped under nine heads. A good deal of criticism has been directed to earlier versions of the Defendant's case, but I propose to concentrate on the most up to date version they wish to put forward. I do not, however, lose sight of the submissions made on the Claimant's behalf that the radical and rapid shifts of position tend to reveal the paucity of the solid grounds to suspect. What the Claimant contends is that close scrutiny is required, for this reason, to avoid any possible sleight of hand.

**22.** All of this takes place against a background where the Defendant no longer seeks to defend the principal message in the article complained of, to the effect that SAMA was monitoring the Claimant's activities -- whether as a result of United States intervention or otherwise.

**(1) The Golden Chain**

**23.** This was relied upon in the previous rejected draft as well It is *said* to be a list of donors to Al Qaeda. It was apparently found in Bosnia. The first thing to note about it is that it does not purport to be the Claimant's document, or to contain information deriving from the Claimant. That is relevant because of the "conduct rule". Nor does it emerge clearly what the meaning of the document is -- whether, for example, it purports to be a list of donors or a list of those who might be approached for funding. Nor is it clear who created the document or when it came into existence. Even with the relaxation of the hearsay rule in civil litigation, after the Civil Evidence Act 1995, it is thus hard to see where the document fits into the framework of "reasonable grounds".

**24.** Reliance is, nevertheless, placed upon what is described as an admission of funding -- not by the Claimant but on behalf of someone else appearing on the list called bin Mahfouz. That relates to a donation of a quarter of a million US dollars some 15 years ago "... at the behest of the US

and Saudi officials seeking support for the Afghan resistance to the Soviet Union". That does not demonstrate, or provide reasonable grounds to suspect, funding of Osama bin Laden or Al Qaeda by the Claimant -- still less at any time after the objectives of that organisation diverged from those of the United States foreign policy, and were directed to a "global jihad" and a concentrated attack on Western capitalist societies.

**25.** It is worthy of note that in the Wall Street Journal for 18 March 2003, in an article by Mr Glenn Simpson, a co-author of the article here complained of, it was apparently accepted that "... the list does not show any continuing support for Al Qaeda after the organisation began targeting Americans".

**26.** It is now necessary to address that in the light of Mr Simpson's second witness statement provided for these proceedings. He has explained that his reference to "targeting of Americans" was a description of the time when Al Qaeda started to issue public statements unambiguously stating its policy of trying to kill Americans and publicly taking credit for such murders. He referred also to a press conference on 16 May 2003 at the Saudi Embassy in Washington where it was stated on behalf of the Crown Prince that the US--Saudi relationship has been a target of Osama bin Laden and Al Qaeda since the time of its formation. He therefore regards it as being the official position of the Saudi government that Al Qaeda has always had as its goal violent attacks on Saudi Arabia and the United States. Moreover, he believes that since the early eighties it has been a fundamental religious tenet of bin Laden and his mujahideen associates that the United States government and other Western secular regimes should be destroyed.

**27.** Nevertheless, given the requirement of the conduct rule, and the unknown origin of the document in question, it is impossible to see how the Claimant is supposed to answer the allegation. The plea is in my judgment impermissible.

**(2) Wadih El Hage**

**28.** This relates to two address books of Wadih El Hage retrieved in 1997 He was apparently a personal assistant to Osama bin Laden. In the address books there appear contact details (address and telephone number) for Saleh Al Rajhi. There is no indication as to why they were there or when they were entered. It does not provide reasonable grounds to suspect that the Claimant knowingly gave financial support to Al Qaeda -- which, so far as I can see, could be the only relevant and pleadable fact.

**29.** Considerable injustice to the Claimant might arise if this

Copr. © West 2004 No Claim to Orig. Govt. Works

2003 WL 21554735                                                                Page 5
2003 WL 21554735 (QBD), [2003] EWHC 1776

evidence were adduced because it would be forced into the position of having to prove its innocence when it may not be within its power to offer any explanation.

**30.** Mr Robertson argued that this kind of information is regularly introduced in criminal trials for the purpose of supporting a charge of conspiracy. Here too, he says, it should be admitted by a parity of reasoning. I need to be wary of this argument -- not least because the Defendant is *not* in this case alleging that the Claimant was part of a conspiracy.

**31.** Moreover, Mr Browne invited my attention to Archbold, paras. 15-358, 25- 16, and 33-60 to 33-60b, in order to show that even in conspiracy trials evidence of this kind would only be permitted in accordance with strict safeguards. It is not accurate to claim that it is "routinely admitted". It is necessary for there to be independent evidence of conspiracy between relevant persons. If there is such evidence as between (say) A and B, it may be that evidence of contact details about A in B's address book would become admissible. My attention was also drawn to Blake (1844). 6 .QB 126 and Jones [1997] 2 Cr. App.R. 119, 128.

**32.** Here, it is certainly the case that to admit the pleading about Wadih El Hage would flout the conduct rule. What is more, given the limited nature of the information, it would hardly qualify as "strong circumstantial evidence".

**(3) Tarik Hamdi**

**33.** The allegation is that Saleh Al Rajhi and Tarik Hamdi used the same address at 596 Grant Street, Herndon, Virginia, albeit not simultaneously. Again, I must look for something to found "reasonable grounds to suspect" knowing involvement in terrorism or the funding of terrorism. My attention has been drawn, however, to an acknowledgement by one of the Defendant's expert witnesses, Ms Rita Katz, in her anonymous book (at p 319) that there was no ground for alleging against Tarik Hamdi that he has been knowingly involved in terrorism merely from the fact that he once apparently supplied Osama bin Laden with a satellite phone. In any event, it is not even pleaded that Saleh Al Rajhi ever knew of Tarik Hamdi's existence.

**(4) The Hijackers**

**34.** There is nothing new here as compared to the original rejected draft. There is nothing to show that the Claimant Bank's relationship with Abdul Aziz Al Oman was special or unusual, or outside the normal bank/customer relationship. I understand that the Claimant has some two

million customers.

**(5) Yasin Al Qadi**

**35.** Here again the allegation resurfaces from the first draft. A link is said to exist between someone who was an executive on the Claimant's board, between 3 April 1999 and the Autumn of 2000, and one Yasin Al Qadi (who was designated in October 2001). They are said to have been fellow shareholders of an Isle of Man company, Muwaffaq Limited, which collected funds for Islamic causes. As it turns out, however, the case appears to have been put forward on false assumptions.

**36.** First, the man described as an executive on the Claimant's board, Abdul Aziz Al-Khereiji, was not on the board; nor anyone with a similar name. The case shifted somewhat just before the hearing, when it was suggested that he was on the board of a subsidiary of the Claimant between 4 March 1999 and 20 November 2000. Company search documents showed, however, not only that the dates were wrong but that the person who had been on that board was apparently Abdulaziz Al Khereiji of 50 Sloane Street, London, SW1X 9SN. He was employed by the subsidiary from 1992-1995 and was on the board for the last three months. He was described in the company records as a bank official. On the other hand, the person named as a shareholder was a person with a different name and a different address, i.e. Abdul Gani Abdulla Al Khereiji of P.O. Box 214, Jeddah.

**37.** It was also alleged that the Claimant's executive replaced Al Qadi as a director of Muwaffaq Limited on 22 November 1999, but the company search records show that this was Abdul Aziz Soliman Abdul Aziz Al Khereiji of P.O. Box 7112, Business Centre, Jeddah.

**38.** Nothing is alleged to suggest that the Isle of Man company is in any way disreputable or that any executive of the Claimant company was aware of anything untoward about Al Qaeda at any relevant time.

**39.** In the end, this ground was not pursued.

**(6) Mousa Marzook and Infocom**

**40.** In its final pleaded allegation (adjusted in the course of argument), the Defendant wishes to rely upon the fact that, in August 1997, the Claimant chose a company called Infocom based in Texas (and incorporated, so it is said, on 16 March 1992) to host its website in circumstances where "there are reasonable grounds to suspect that, alternatively grounds to investigate whether, it knew or should have

known that it was owned or operated by Mousa Marzook, and his relations", he having been head of HAMAS political bureau since October 1988, and designated by the United States government as a terrorist since 1995. Reliance is also placed on the allegation that the relationship continued after September 2001 when Infocom had been raided on suspicion of laundering money for HAMAS.

**41.** Reference is also made to various transfers of substantial sums of money from unspecified accounts held with the Claimants between January 1989 and July 1997. The payments to Marzook himself are said to have been made no later than December 1991 (obviously three or four years before his designation). There were also five payments said to have been made to his personal secretary, one Khatib, in 1992 and no less than 48 wire transfers to Infocom between 1991 and 1997. (There is no suggestion that it was public knowledge in 1992 that Khatib was Marzook's personal secretary. The Defendant's source appears to be an FBI interview two years later.)

**42.** These allegations have to be assessed against the background that Marzook and Infocom originally featured under the heading "Banking facilities for terrorist activities" (see below). They have been shifted out of that context as well as being changed significantly.

**43.** I need hardly say that I should give permission to plead any facts which were genuinely capable of supporting a meaning to the effect that there were reasonable grounds to suspect the Claimant, or those who own or run it, of knowingly supporting terrorism of any kind. This would include the authorisation of payments to those known to be involved in terrorism, or awareness of payments being made to such persons via accounts maintained with the Claimant bank. Since I am concerned with the concept of "grounds to suspect" the Claimant, I would also permit allegations to be made involving such payments to persons who were publicly known to be suspected of terrorist activity, since the public availability of that information at least provides grounds to suspect the Claimant of having that knowledge too. This would not involve unfairness to the Claimant, since the allegations could be refuted (as contemplated in Evans v. Granada Television) by showing, for example, that the Defendant was mistaken over the identity of the suspected individual, or that the Claimant did not in fact have any knowledge despite public awareness. Furthermore, I would grant permission for material of that kind even late in the day, because it would be wrong to risk an inappropriate vindication in this context.

**44.** Having said that, I still need to scrutinise any proposed pleading so as to distinguish genuine grounds from what

might, on close analysis, prove to be no more than unfocused smear. That is especially important when so many different versions have been brought forward and then put to one side because, presumably, even the Defendant's advisers have thought better of it.

**45.** It is necessary to have in mind that the principal source for the Marzook material seems to be one Robert Miranda of the FBI I have been provided with a 38 page affidavit from him. He refers at paragraph 45 to the various payments pleaded in para 8.34 of the proposed particulars. It is to be noted that he speaks of accounts "controlled by" Marzook and Khatib. It would thus appear that those recipient accounts may not have been known to have any connection with either of those men. He also makes clear that he does not know from which accounts the payments were made. Consequently, the Defendant was unable to supply the further information sought by the Claimant as to dates from which accounts the payments are alleged to have been made and as to whether anyone on behalf of the Claimant had knowledge of the transferee. The answer was that no further information could be given until after discovery. That is, I am afraid, hopeless. Since the Claimant has apparently some two million customers, I cannot envisage how its lawyers are supposed to give disclosure of relevant documents without notice of donors, recipients or dates.

**46.** I recognise, of course, that since McDonalds Corpn v Steel [1995] 3 All ER 615 it is not necessary to have "clear and sufficient evidence" to support a plea of justification. It will be sufficient if these are "reasonable grounds to suppose" that sufficient evidence will be available at trial. That embraces the possibility that such evidence will emerge from disclosure of documents by the Claimant, but vague optimism will not do. In view of the paucity of information about those alleged payments, there are no reasonable grounds to suppose that the Claimant's disclosure will plug the void.

**47.** That paucity is illustrated by the Defendant's second attempt at "further information" supplied on 25 June. When asked about the plea that "Marzook's name on the transfer should have been enough to cause an enquiry", back came a "bootstraps" response but cast in hypothetical form: "If it is the case that the transfers pleaded ... came from the same account with the Claimant then its own records evidenced the connection and was obvious to those supervising the account." It hardly needs to be pointed out that, if it is neither asserted that the transfers did come from the same account nor indicated which account, the Claimant is placed in an impossible position.

**48.** As to the wire transfers made to Infocom between 1991

2003 WL 21554735                                                                                      Page 7
2003 WL 21554735 (QBD), [2003] EWHC 1776

and 1997, I bear in mind that it is only said to have been incorporated in March 1992 and also that HAMAS was only designated three and half years after that. Even at that stage, there is nothing to suggest that the Claimant knew that there was a link between Marzook and Infocom or anything that should reasonably have put them on enquiry.

**49.** This allegation seems to have been in a permanent state of flux in ways that I need not catalogue, since I must concentrate on the latest version. Nevertheless, I must take note of the fact that there are discrepancies between the various pleaded versions of the defence and the further information supplied in two tranches after my judgment of 12 June. Mr Browne draws a contrast between the version there -- to the effect that the Claimant registered its domain name and website from 11 August 1997 ("a one-off process") and the pleaded case that Infocom hosted the website ("presumably a continuing process"). On the former scenario, subsequent events would have no bearing on the one-off act of registration.

**50.** The allegation has been put variously on the basis of Marzook owning or controlling Infocom, or having relations involved in establishing Infocom. Knowledge is attributed to the Claimant via a Dallas newspaper article of 8 April 1996 which, says Mr Browne, goes no further than to allege that Infocom was run by Marzook's wife's cousin Bayan El-Ashi and that, ten years ago, Mrs Nadia Marzook had invested a quarter of a million dollars in the company.

### (7) Banking Facilities for Terrorist Activities

**51.** This section needs to be carefully addressed since, as I have made clear, any reasonable ground to suspect the knowing grant of banking facilities to support terrorism would almost certainly require to be admitted. It underwent fundamental shifts as the pleading has gone through its many drafts and thus needs to be approached with a degree of scepticism. A number of the entities previously relied upon, at the time I refused permission on 12 June, have subsequently been abandoned. It is perhaps fair to say that the main reason why this generic allegation failed last time was that there was no allegation of knowledge, on the part of any relevant person, that any of the entities were supposed to have terrorist connections.

**52.** The way it is now put, as a first stage, is that the Claimant provided facilities and various banking services to certain entities. Reliance is then placed on particular answers given to requests for further information; namely, answers 7, 8 and 9 given on 18 June and answers 5-13 given on 25 June. It is to those that I must look, I assume, for reasonable grounds to suspect anything reprehensible. What

is now said is that there are reasonable grounds to suspect the Claimant of having provided the facilities or services either knowingly or negligently. This seems to have been toned down since the previous version which raised a plea of actual knowledge or negligence. That would appear not to have come about because of new information but rather because of a change of heart on the part of the pleaders as to what it was appropriate to plead.

**53.** I need to set out the entities to whom the services were provided. There are various bodies alleged to be "front" charities used for funding terrorism or compensating the families of terrorists killed in action. The Muslim World League ("MWL") is said to have pledged its support for Al Qaeda and to have held specified accounts with the Claimant which have been mentioned in advertisements and the press with a view to fund-raising. Likewise, the International Islamic Relief Organisation ("IIRO"), said to be an off-shoot of MWL.

**54.** Also, the Al Haramain Islamic Foundation is said to have maintained a large number of bank accounts with the Claimant. It has its headquarters in Riyadh. It was designated as a terrorist organisation on 11 March 2002 (i.e. after publication of the article) because of the supposed diversion of charitable funds to terrorist purposes, prior to 11 September 2001, via its Somalia and Bosnia--Herzogovina branches. It was a joint designation by the United States and Saudi-Arabian authorities.

**55.** The World Assembly of Muslim Youth ("WAMY") is alleged to have been formed by Ahmed Totonji in Saudi Arabia in the 1970s. Documents linking them with WAMY were found in the possession of conspirators responsible for the first World Trade Centre bombing of February 1993. It has maintained accounts at various branches of the Claimant. The head of the organisation is said to be Abdullah bin Laden, a relative of Osama, and a former Secretary-General is Adel Batterjee (also appearing on the Golden Chain list).

**56.** From 1999, the Claimant is alleged to have provided facilities for donation accounts to the Saudi Joint Relief Committee ("SJRC"). It was directed by Wa'el Julaidan, a founder of Al Qaeda.

**57.** Finally, money transfers are alleged to have been made direct from the claimant to Al Qaeda cells in Spain (to Prycote SA), Belgium (to Patricia Vinck and Nabil Sayad) and Germany (to Abdul Zammar).

**58.** I must next turn to "further information" (incorporated in the draft defence by reference). All of this post-dates the

Copr. © West 2004 No Claim to Orig. Govt. Works

2003 WL 21554735                                                                    Page 8
2003 WL 21554735 (QBD), [2003] EWHC 1776

judgment of 12 June. In broad terms, the allegation is that a competent "compliance officer" would have told the bank a good deal of specified information. It is spread over several pages of the documents served on 18 and 25 June, and I do not intend to regurgitate it in this judgment. It involves reference to a number of sources of information available to this Claimant or to the public and which should have been picked up by those charged with responsibility for carrying out the "duty to monitor public information about clients and to take immediate action if there is a suspicion that accounts are being used to get funds to terrorists to or through 'front' charities".

**59.** It is fair to say that the information sets out a number of allegations made by various people about the entities concerned, for example as reported in the media, but this does not in itself offend against the "repetition rule" (see my earlier judgment at paragraph 27.1). That is because the statements are not sought to be introduced as primary facts but rather as matters which ought to have been investigated or checked by officers of the Claimant.

**60.** The point is taken on the Claimant's behalf that the allegations made in paragraphs 7 and 8 of the 18 June document do not amount to support for knowledge or Nelsonian blindness, but go to "mere negligence". What is more, the very latest version of paragraph 8.35 of the proposed pleading no longer includes the allegation of reasonable grounds to suspect knowledge or Nelsonian blindness. I must confess that I have had some difficulty fathoming the intended meaning. There comes a point, however, when the target has to stop moving.

**61.** I propose, accordingly, to focus on the meaning at paragraph 8(b) of the latest draft. It seems to me that the surviving allegations in paragraph 8.35, backed by the relevant particulars in the two tranches of further information to which they relate, are capable of supporting "reasonable grounds to suspect that the Claimant had been knowingly or negligently involved in the funding of terrorist-related activity and/or may in the future allow use of its accounts for such funding".

**62.** I am conscious that I must not conduct a "mini-trial" and that I should proceed on the basis that the facts alleged can be proved at trial. I also have in mind that the Claimant knows, in this respect, the case it has to meet. There are no doubt various ways in which this could be done and it is not for me to speculate how the Claimant will put its case. It may, for example, be possible to show that the Defendant has got some of its facts wrong, or that none of the Claimant's staff knew of the publicly available facts relied upon, or that they had checked out the allegations and

satisfied themselves that the relevant funds were transferred for entirely innocent purposes.

**63.** The "conduct rule" would not seem to be offended, because the Claimant's accounts are said to have been used as conduits for the various payments and their staff *either* to have been aware of the reputation of the specified entities *or* to have fallen down in the duty of monitoring.

**64.** Another requirement is that the facts now pleaded should, at least in general terms, have subsisted at the time of publication. It is not, however, necessary for the Defendant or author(s) of the article to have had them in mind: see my earlier judgment at paragraphs 27.7 and 27.9. In those circumstances, the particulars must be confined to facts pre-dating this article.

**65.** It will be remembered that the Defendant also in this context relies on paragraph 9 of the "further information" of 18 June. This falls into a different category. It was supposed to be providing details of "negligently turning a blind eye". It is to be noted, however, that in the latest draft of 8 July "Nelsonian blindness" has been deleted. For this reason, paragraph 9 seems to be of historic interest only. The Claimant had sought particulars of who was on notice of which facts, and of any fact relied upon to show that relevant persons should have been on notice. It was said to be sufficiently pleaded in the draft amended defence served on 12 June, but I do not believe it was. It was added that the information was supplemented by the witness statements of Graham Rumney and Professor Paul Wilkinson. I have not mentioned these witnesses so far. It may be not be strictly necessary for me to do so. Their evidence nonetheless came in for a good deal of criticism from Mr Browne in the course of submissions.

**66.** Mr Rumney is a consultant specialising in "anti-terrorism financing, banking and management issues, including quality management". He refers to a report of 19 December 2002, which post-dates the publication complained of and could not be prayed in aid for "reasonable grounds to support" for that reason. He also identifies international awareness of the need for monitoring and the duty to which the Claimant would be subject in this respect. This may or may not be admissible evidence in due course, but it does not seem to me that paragraph 9 adds anything in the present context to paragraphs 7 and 8.

**67.** As to Professor Wilkinson, he goes so far as to state his belief that there were reasonable grounds for suspicion that the Claimant may have been knowingly or negligently involved in providing financial services used by terrorist organisations. I can hardly believe that expert evidence

2003 WL 21554735                                                                                                    Page 9
2003 WL 21554735 (QBD), [2003] EWHC 1776

would be admissible to prove that, which would be the primary issue for the jury, but I do not need to rule on that matter now. It may ultimately be for the trial judge, but it does. not seem to me to be appropriate (if that is what was intended) to incorporate any part of either of these expert reports into the pleaded case by reference.

**68.** In principle, I will permit the pleading under section (7) by way of amendment. It must be tidied up, however, so that the cross-reference to two tranches of further information is deleted and those particulars properly incorporated. I have in mind the information given in answers (7) and (8) on 18 June, but excluding the Infocom material, and the answers (5)-(13) given on 25 June. If there is any scope for confusion over what is permitted, which I cannot at the moment foresee, I shall hear submissions in due course.

**(8) SAAR**

**69.** Finally, it is said that the alleged links between the Al Rajhi family and the SAAR Foundation based at 555 Grove Street, Herndon, Virginia, provide further grounds to suspect either knowing or negligent involvement in the channelling of funds for terrorist purposes. Mr Browne submits that none of the allegations appear to be directed to the Claimant, its officers or the Al Rajhi family.

**70.** "SAAR" is said to be an acronym for Sulaiman Abdul Aziz Al Rajhi. Mr Browne says that no grounds are given to support this assertion; nor is it explained why there now appears to be bare assertion as opposed to the case earlier put forward, namely one confined to *belief*. I have to remember that at this stage I am concerned with pleaded allegations rather than the evidence to support them (save in so far as the evidence is adduced to explain delay). I have to assume that the acronym link can be proved at trial.

**71.** The organisation was apparently incorporated in Virginia in July 1983 and voluntarily dissolved on 28 December 2000. State records show that "a network of more than 100 intricately linked and mutually supporting organisations" were also based at 555 Grove Street. Most did not maintain a physical presence there or disclose much in the way of publicly available information.

**72.** The only connection alleged with the Claimant is via the Al Rajhi family and, in turn, the only connection with them is that they are said to be "the biggest donor". Yet no allegation is actually made that the Claimant or any family member was aware at the time of any such donation that it would or might be channelled away from charitable purposes and towards terrorist funding. Such knowledge is only alleged (in the further information of 18 June) against

the "operators" of SAAR, although it is now alleged for the first time that the Al Rajhis have "ultimate control" of SAAR (a concept which is not further defined).

**73.** The "operators" did not apparently include any member of the Al Rajhi family and consisted of the following named individuals: Yacub Mirza, Mohammad Jaghlit, Cherif Sedky, Hisham Al-Talib, Jamal Barzinji and Ahmed Totonji. The only link alleged between any of these persons and the Claimant is that Totonji is said to have been an executive at its Majis-al-Shura branch.

**74.** Mr Browne says that there is no allegation of knowledge or conduct on the part of any relevant person and therefore, whatever links there may actually be between SAAR Foundation and terrorist activity, there has in this pleading been no compliance with the "conduct rule". I am not sure that this is quite right since the Al Rajhis are alleged to have ultimate control and to have been the biggest donors. A further allegation is that "the Al Rajhis" asked Cherif Sedky to join the Foundation Board in 1994. That may or may not be true, but it is surely relevant both to the conduct rule and to "ultimate control". He was only asked to close it down according to the Defendant, but that in itself would support "ultimate control". Moreover, it was *not* dissolved for another 6 years.

**75.** These are allegations which may be wide-ranging but they are capable of being dealt with and the suspicion to which such factors inevitably give rise may at trial, for one reason or another, be dissipated, but I do not feel able to exclude them at this stage. I should make it clear, however, that in the introductory rubric to paragraph 8.42 the words "... a number known (*sic*) or reasonably suspected of terrorist-related activities, namely" should be deleted. The same applies to the words in the introduction to paragraph 8,43 "... also linked or reasonably believed to be linked to terrorist activities". This is for the reasons explained in my 12 June judgment at paragraphs 27 and 30.

**76.** I made it clear in my earlier judgment that I did not think it realistic, in the case of a corporate claimant, to shut out allegations about the human beings said to control or govern its affairs. The fact, therefore, that the SAAR allegations appear to relate to members of the Al Rajhi family rather than the Bank does not justify their exclusion.

**77.** There is another ingredient in the SAAR allegations which has caused a recent flurry of activity. It relates to the United States tax filing documents for the year 1998. There are apparently two versions, one of which suggests donations of 1.7 billion dollars (apparently the highest yearly total for a charity in United States history) where the

2003 WL 21554735                                                                                    Page 10
2003 WL 21554735 (QBD), [2003] EWHC 1776

other shows nil. There may be a perfectly good and sufficient explanation for this. It has not so far been given. Mr Browne submits, in effect, that his client does not have the burden of proof and that the Defendant's pleading should not be permitted to overturn that situation. As a general principle, that is of course quite right. But I am concerned with reasonable grounds for suspicion. That accounting discrepancy gives rise to suspicion, which may in due course be dispelled, but I must not hold a mini-trial or second guess the evidence at trial. More generally, the Defendant points to an apparent lack of publicly available information as to the methods of fund-raising, the amount of receipts and the charitable causes supported.

**78.** I will therefore permit the allegations about SAAR, as now formulated, to go forward as being capable at this stage of constituting reasonable grounds to suspect the Al Rajhi family of involvement in the financing of terrorism knowingly or negligently.

### (9) US Intelligence Interest

**79.** Finally I take note of the fact that the section of the earlier draft headed "US intelligence interest in the Claimant" is, quite rightly, no longer pursued. I therefore need to say no more about it.

### Conclusion

**80.** The next stage is for a final and definitive version of the defence to be served corresponding to the rulings I have given. The *Lucas-Box* meanings need to be narrowed down to "reasonable grounds to suspect" and the particulars of justification limited to correspond to sections (7) and (8), subject to the specific qualifications I have mentioned.

**81.** The consequence of those rulings is that, very late in the day, it has become necessary to vacate the trial date of 21 July. I shall need to give further directions as to statements of case and disclosure of documents, witness statements, and so on. Although I indicated that a trial could be accommodated in October, embracing both justification and qualified privilege, I rather suspect that it will not be possible for the parties to be ready in time. On these matters I will naturally now hear submissions from counsel as well as on the huge amount of costs thrown away by these late and shifting amendments.

Crown Copyright.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. Govt. Works