**Exhibit 3**

Reply Brief in Support of Hamad Al-Husaini's
Motion to Dismiss the Third Amended Complaint

03 MDL No. 1570 (RCC) / C.A. No. 03-CV-9849 (RCC)



Neutral Citation Number [2003] EWHC 2609 (QB)

Case No: HQ03X01775
HQ03X01813

## IN THE HIGH COURT OF JUSTICE
## QUEENS BENCH DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 7 November 2003

Before:

### THE HONOURABLE MR JUSTICE GRAY

---------------

Between:

| | |
|---|---|
| Mr YOUSEF JAMEEL | **First Claimant** |
| and | |
| HARTWELL PLC | **Second Claimant** |
| - and - | |
| TIMES NEWSPAPERS LIMITED | **Defendant** |

James Price QC and Justin Rushbrooke
(instructed by Peter Carter Ruck & Partners) for the Claimants
Stephen Suttle QC (instructed by Times Legal) for the Defendant

Hearing dates: 30 October 2003

---------------

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

*[signature]*
..............................
The Hon. Mr Justice Gray

Mr Justice Gray:

### The questions to be decided

1. There are two libel actions, the first brought by a claimant said in a newspaper article to be "linked" to Osama Bin Laden ("OBL") and his organisation Al-Qaeda. The First Claimant concerned is Yousef Jameel and the Defendant is Times Newspapers Limited, the publishers of the *Sunday Times*. The second action is brought by Hartwell PLC, which (in the words of the article) was bought by the Jameel family in 1990. The article of which complaint is made was published in the newspaper on 8 June 2003.

2. The principal questions which I am asked to decide are:

    i) whether the article is capable of bearing the meaning put on it on behalf of Mr Jameel, namely that it meant that there are "serious and substantial grounds for suspecting and/or which may prove" that Mr Jameel's family is associated with OBL in connection with terrorism and helped fund the terrorists who carried out the September 11th atrocities or

    ii) whether the article is capable of bearing no higher meaning than that put on it by the newspaper, namely that there were "sufficient grounds to enquire" whether Mr Jameel has been associated through funding with OBL and Al-Qaeda and/or whether he helped to fund the atrocities of 11th September and

    iii) if the latter, whether the plea of justification in that meaning is bound to succeed with the result that the *Sunday Times* is entitled to summary judgment.

3. The significance of the distinction between the shades of meaning set out at (i) and (ii) above is not confined to the degree of seriousness of the libel. The Defendant newspaper contends that, if the article bears the lower meaning at (ii) above (the "sufficient grounds to enquire" meaning), neither the so-called "repetition rule" nor the "conduct rule" as to the matters which may be relied on in support of the plea of justification are applicable. The case for the newspaper is that, if the article bears only the lower meaning, it can rely in support of the plea of justification on hearsay statements and in addition is not obliged to establish conduct on the part of the Claimant bringing suspicion on himself. I will revert to these questions later.

4. There is a further subsidiary issue whether the article is capable of bearing the defamatory meaning imputed to it on behalf of the Second Claimant, Hartwell PLC, or any meaning defamatory of that company. The *Sunday Times* suggests that the answers to both these questions are in the negative and that summary judgment should be entered in favour of the newspaper against Hartwell.

**The article complained of**

5.  Because much turns on the nuances to be found in the article, I will set it out in its entirety. It is headed by three photographs depicting respectively Mr Jameel, Hartwell's premises and the 'twin towers'. Underneath is a caption which reads: "Accused: Yousef Jameel's family firm bought the British car dealer Hartwell in 1990. Now he is alleged to have helped fund training for the terrorists who carried out the September 11 attacks". Beneath that is a headline in prominent type: "Car tycoon 'linked' to Bin Laden".

6.  The text of the article is as follows (paragraph numbers added):

    1  "A Saudi billionaire who helped to build one of Britain's biggest car dealerships is being sued by the families of victims of the September 11 terrorist attacks.

    2.  Yousef Jameel, whose family firm bought the British business Hartwell in 1990, is named in papers claiming more than $1 trillion damages from defendants accused of helping to fund Osama Bin Laden and his Al-Qaeda network.

    3.  Lawyers acting for the families say Jameel was one of the rich Saudi individuals and businesses, targeted by fundraisers acting for Muslim causes, including rebel fanatics, called 'the Golden Chain' because their net worth totalled more than £51billion.

    4.  Money from Saudia Arabia is said in court documents to have financed Al-Qaeda camps in Afghanistan where the hijackers trained. Jameel, whose family is one of the wealthiest in Saudia Arabia, is among 225 defendants named in papers filed in a Washington DC court.

    5.  Hartwell turns over more than £600m and employs 3,500 people in Britain. Its 48 outlets sell Audi, Volkswagen, Jaguar and Ford cars. Its other interests include property, software and financial services. It was bought by the Saudi-based Abdul Latif Jameel Group (ALJ).

    6.  The Jameel family first made its money through a Toyota franchise in Saudi, along with oil, shipping and real estate. Jameel recently transferred his shareholding in the £2billion a year company to his children.

    7.  Jameel's lawyers say he no longer has an interest in Hartwell. They also emphasise that there is no case to answer. He has never supported or made donations, either directly or indirectly, to Bin Laden. They add that he has not been contacted by the lawyers for the September 11

    case or served with papers, although he knew that a Yousef Jameel was cited as a defendant. They also point out that other wealthy Arab donors have been defrauded into innocently giving money for humanitarian causes which was used to fund Jihad fighters.

8. 'Mr Jameel recognises that because of his standing and prominence as a businessman in Saudi Arabia and his well known generosity it is understood, rightly or wrongly, that he is [the person named in the writ],' Jameel's lawyers said.

9. ALJ made a substantial donation for 'the rescue and help' of Muslims in Kosovo. In 1999 ALJ gave the Saudi Red Crescent about £1.3m. A charitable organisation modelled on the Red Cross and based in Riyadh, the Saudi Red Crescent is also named as a defendant in the September 11 action. Jameel's lawyer said his client was unaware of the donation.

10. Jameel was at the centre of a legal row in 1988 when he was accused by Carole Bailey, his British former wife, of kidnapping their daughter and holding her in Saudi Arabia. He had indicated in court that he would not prevent the girl's return to Britain and had persuaded the court to remove a £1m bond that would have been forfeit. It is understood that the row with Bailey has been resolved.

11. After their acrimonious divorce Jameel, who is in his late fifties, married Linda Richards, a former model with whom he has three daughters.

12. Jameel's name was added to the list of defendants after the name 'Yousef Jameel' was found on a computer disk seized by Bosnian police during searches of the offices of a charity known as the Benevolence International Foundation in Sarajevo in March last year.

13. That document, known as the Golden Chain list, was used in the case against the head of a Saudi-based charity that was said to have conned donors and misused their cash. Enaam Arnaout was accused by American authorities of funnelling money to Al-Qaeda, but admitted a lesser offence of sending money to Muslim fighters in Bosnia and Chechnya.

14. Jameel's lawyers said it was possible he was the person in the Golden Chain document. But it listed only wealthy individuals who could be asked for money: there was no evidence that they had donated. Jameel said he was

> approached by a fundraiser on the list but had never contributed.
>
> 15. He also pointed out that the draft list dated from 1988, 'when Bin Laden's role with the Afghanistan mujaheddin against the Soviet army was looked on favourably by Islamic and western governments alike'. He emphasised his close relations with America, saying he studied at the American University in Cairo and was appalled by the September 11 attacks.
>
> 16. On Friday lawyers for the September 11 families took the unusual step of publishing the names of Jameel and other defendants, including 37 individuals and eight charitable organisations, in the International Herald Tribune and Al-Quds, the Arabic newspaper, in an announcement of the start of legal proceedings. American courts allowed notice to be served in this way because of risks to bailiffs in Saudi Arabia.
>
> 17. Motley Rice, the American law firm, is representing 2,760 relatives of the September 11 victims. Its case says the 'actions of the defendants... were intentionally malicious, unconscionable, and in reckless disregard of the rights and safety of all the plaintiffs'. But there are no details of specific charges against Jameel."

## The approach to meaning

7. It is common ground that the principles to be applied when the court is invited to consider the meanings of which the words complained of are capable of bearing are those summarised in *Skuse v. Granada Television Limited* [1996] EMLR 278 at 285-287 and followed in *Gillick v. BBC* [1996] EMLR 267 at 272-3:

   i) the courts should give to the material complained of the natural and ordinary meaning which it would have conveyed to the ordinary reasonable [reader];

   ii) the hypothetical reasonable reader is not naïve but he is not unduly suspicious. He can read between the lines. He can read in an implication more readily than a lawyer and may indulge in a certain amount of loose thinking. But he must be treated as being a man who is not avid for scandal and someone who does not, and should not, select one bad meaning where other non-defamatory meanings are available;

   iii) while limiting its attention to what the defendant has actually said or written, the court should be cautious of an over-elaborate analysis of the material in issue;

iv) the court should not be too literal in its approach: (see *Lewis v. Daily Telegraph Limited* [1964] AC 234 at 277 per Lord Devlin and in particular "the lawyer's rule is that the implication must be necessary as well as reasonable. The layman reads in an implication much more freely; and unfortunately, as the law of defamation has to take into account, is especially prone to do so when it is derogatory").

v) a statement should be taken to be defamatory if it would tend to lower the claimant in the estimation of right-thinking members of society generally or affect a person adversely in the estimation of reasonable people generally.

vi) in determining the meaning of the material complained of the Court is not limited by the meanings which either the claimant or the defendant seeks to place upon the words.

**Levels of meaning**

8. Where a publication is concerned with misconduct on the part of an individual, it now seems clear on authority that there are three possible levels of meaning, namely

   i) that he is guilty of the misconduct alleged;

   ii) that there exist reasonable grounds to suspect that he is guilty of that misconduct and

   iii) that there is sufficient reason to enquire (or investigate) whether he has been guilty of the misconduct.

9. Level (i) causes no problem. The existence of level (ii) emerged clearly in *Lewis*, in which case Lord Reid said at 260:

   "...then it is said that if that is so, there can be no difference between an allegation of suspicious conduct and an allegation of guilt. To my mind, there is a great difference between saying that a man has behaved in a suspicious manner and saying that he is guilty of an offence, and I am not convinced that you can only justify the former statement by proving guilt".

   As that passage indicates, not only was it decided in *Lewis* that there is a difference between levels (i) and (ii) but also that an imputation at (ii) may be justified by proving that the person in question has behaved in a suspicious manner without having to prove actual guilt. The distinction between levels (ii) and (iii), whilst foreshadowed in *Lewis*, did not emerge clearly until *Bennett v. News Group Newspapers Limited* [2002] EMLR 860.

10. In *Bennett* the Defendant sought to justify by sub-paragraph 7(2) of the Defence the *Lucas-Box* meaning that sufficient grounds existed for investigating the allegations of drug-dealing and corruption which had been made against the Claimant, a police officer (that is, what I have described as a level (iii) meaning). The Defendant had subsequently obtained permission at first instance to add by sub-paragraph 7(4) the further alternative *Lucas-Box* meaning that the Claimant was reasonably suspected of involvement in such activities (that is, a level (ii) meaning). Giving the judgment of the court (which included Lord Bingham CJ and Hirst LJ) Robert Walker LJ said at 875:

> "A statement that a police officer is under investigation is no doubt defamatory, but the sting of the libel is not as sharp as a statement that he has by his conduct brought suspicion on himself. That point is reflected in a passage in the speech of Lord Devlin in *Lewis* already cited which refers to 'three categories of justification – proof of the fact of the enquiry, proof of reasonable grounds for it and proof of guilt'. We do therefore see a significant difference between sub-paragraphs (2) and (4). The latter calls the plaintiffs' conduct into question in a way that the former does not, and sub-paragraph (4) can be allowed as an amendment only if it is both a possible meaning and is capable of being supported by particulars which are not hearsay and (in the *Shah* sense) focus on the conduct of individual plaintiffs. A less stringent test is appropriate for sub-paragraph (2), as the plaintiffs' advisers seem to have gone some way to acknowledging, as noted above".

11. The distinction was confirmed by the Court of Appeal in *Chase v. News Group Newspapers Limited* [2003] EMLR 218. At paragraph 45 Brooke LJ, with whom the other members of the court agreed, said:

> "The sting of a libel may be capable of meaning that a claimant has in fact committed some serious act, such as murder. Alternatively it may be suggested that the words mean that there are reasonable grounds to suspect that he/she has committed such an act. A third possibility is that they mean that there are grounds for investigating whether he/she has been responsible for such an act".

### The rival contentions as to level of meaning

12. As I have already indicated, the argument between the parties in the present case is whether the meaning of the *Sunday Times* article falls within level (ii) or level (iii). Mr James Price QC for Mr Jameel submits that it conveys to readers that:

> "there are serious and substantial grounds for suspecting, and/or which may prove, that the Claimant is associated with Osama Bin Laden in connection with terrorism and that he helped fund

the training of the terrorists which carried out the September 11th atrocities".

Mr Stephen Suttle QC for the newspaper maintains that it is not capable of bearing the meaning for which Mr Price contends; rather it bears the lower meaning that:

"there were sufficient grounds to enquire whether the Claimant has been associated through funding with Osama Bin Laden and Al-Qaeda and/or whether he helped to fund the training of the terrorists who carried out the atrocities of 11[th] September 2001".

13. The argument for Mr Jameel proceeded as follows: Mr Price drew attention to the eye-catching photographs and to the caption. He described the headline of the article as being the "bane", that is the sting of the libel on his client. He relied on two authorities for the proposition that it is rarely possible for the text of an article to draw the sting of a defamatory headline. The first is *Charleston v. News Group Newspapers Limited* [1995] 2 AC 65, which as it happens was a case where it was accepted that the obviously defamatory headline and photographs were neutralised by the accompanying text. But Lord Nicholls said at 74C:

"This is not to say that words in the text of an article will always be efficacious to cure a defamatory headline. It all depends on the context, one element in which is the layout of the article. Those who print defamatory headlines are playing with fire. The ordinary reader might not be expected to notice curative words tucked away further down in the article. The more so, if the words are on a continuation page to which a reader is directed".

14. The second authority relied on was *Mitchell v. Faber and Faber Limited* [1998] EMLR 807. Hirst LJ said at 815:

"So far as the antidote is concerned, it seems to me that only in the clearest of cases would it be proper for a judge to rule that the sting of words, which are ex hypothesi capable of a defamatory meaning in themselves, is drawn by the surrounding context, so that in the result those words cease to be capable of a defamatory meaning. In my judgment the general though perhaps not universal rule should be that this is a matter for the jury and not the Judge to decide".

Reliance was also placed on dicta to a similar effect in *Cruise v. Express Newspapers* [1998] EMLR 780 at 786; *Sergi v. ABC* [1983] 2 NSWLR 418 and *Mark v. Associated Newspapers* [2002] EMLR 839.

15. This is not of course a case where rejection of the Claimant's pleaded meaning would result in the case being withdrawn from the jury because, for present purposes, it is accepted by Mr Suttle that the article is capable of bearing the lesser, but still defamatory, meaning for which he contends. Nor is it a case where the newspaper has included a bare denial by the Defendant, which appears to have been the situation contemplated in *Mark v. Associated Newspapers* (see paragraph 42). Nevertheless I accept that I should not readily accede to the suggestion that the passages relied on by the newspaper have the effect of reducing the meaning of the article to a level lower than would otherwise have been the case.

16. It appears to me that I must consider what meanings the *Sunday Times* article is capable of bearing by following the approach laid down in *Skuse* and *Gillick* and by determining what the article read as a whole would have conveyed to readers, giving due weight to the headline but reading it in the context of the text of the article as a whole.

## Decision on meaning

17. The caption to the photographs is couched in terms of allegation and accusation. The word "linked" in the headline is in inverted commas. It is clear from the text of the article that the link is made in the proceedings brought in the US on behalf of families of victims of the September 11th atrocity against no less than 225 defendants. Mr Jameel is said "by lawyers acting for families" to be one of the rich Saudi individuals, called "the Golden Chain", who had been "targeted" by fundraisers acting for Muslim causes including rebel fanatics (see paragraph 3 of the article). I accept that the ordinary reader might well not appreciate that the targeting is unrelated to the funding of the 11th September atrocity. Later in the article (paragraph 9) there is a reference to Mr Jameel's family group of companies having made a donation to an organisation which is also a defendant in the proceedings brought by the families of victims of 11th September. The article also refers (at paragraph 12) to Mr Jameel's name having been on "the Golden Chain list", which was found in Sarajevo and which featured in a prosecution brought against a man named Arnaout, who was accused (but not convicted) of funnelling money to Al-Qaeda without the knowledge of those who had donated it.

18. But those passages in the article have to be read in the context of what is to be found in other inter-woven passages which give Mr Jameel's side of the story mostly through the mouth of his solicitors. As Mr Suttle points out, these passages tell the reader the following:

    i)   that Mr Jameel had no case to answer;

    ii)  that Mr Jameel had never supported or made donations, either directly or indirectly, to OBL;

iii) that Mr Jameel had not been contacted by the lawyers for the plaintiffs in the US proceedings or served with papers, although he knew that a Yousef Jameel was cited as a defendant;

iv) that other wealthy Arab donors had been defrauded into innocently giving money for humanitarian causes which was used to fund Jihad fighters;

v) that Mr Jameel "recognises that because of his standing and prominence as a business man in Saudi Arabia and his well-known generosity it is understood, rightly or wrongly, that he is [the person named in the writ]";

vi) that Mr Jameel was unaware of the 1999 donation by ALJ to Saudi Red Crescent;

vii) that, whilst it was possible that Mr Jameel was the person named in the "Golden Chain" list, that document listed only persons who could be asked for money and that there was no evidence that they had donated;

viii) that Mr Jameel had been approached by a fundraiser named on the list but had never contributed;

ix) that the "Golden Chain" list was a draft only and dated from 1988, "when Bin Laden's role with the Afghanistan mujaheddin against the Soviet army was looked on favourably by Islamic and western governments alike";

x) that Mr Jameel had close relations with the USA, studied at the American university in Cairo and was appalled by the September 11th attacks;

xi) that there are no details in the particulars of claim in the US proceedings of any specific charges against Mr Jameel and

xii) that Mr Jameel no longer has any interest in Hartwell.

19. I have to ask myself whether, given the inclusion of those passages, the putative ordinary reasonable reader could reasonably understand the article to mean that there are serious and substantial grounds for suspecting and/or which may prove that Mr Jameel is associated with OBL in connection with terrorism and/or that he helped fund the training of terrorists who carried out the September 11 atrocities. I cannot accept that the words are capable of bearing that meaning. Although it is by no means a conclusive point, nowhere in the article does the author adopt or endorse the allegations made in the US proceedings. Moreover the article tells the reader in clear terms that it is reporting allegations made in those proceedings. In the light of the detailed refutation of them incorporated in the article, I do not accept that there is any

warrant for the ordinary reasonable reader taking it that the US lawyers must have had reasonable grounds for making the allegations against Mr Jameel.

20. As to the Golden Chain list, the reader is told that Mr Arnaout conned donors when he funnelled their money to Al-Qaeda. It is further made clear (paragraphs 14 and 15) that the donors named in the list are not said to have made donations and that Mr Jameel asserts that he made no contribution. In any event the article reports Mr Jameel's assertion that the list dates back to a time when the activities of OBL were looked on favourably by western governments. The article concludes by saying there are no specific charges levelled against Mr Jameel in the US proceedings.

21 In my judgment the article is not capable of bearing the level (ii) meaning put on it by Mr Jameel. I proceed therefore on the basis (accepted for present purposes on behalf of the *Sunday Times*) that the article bears the lesser, level (iii) defamatory meaning set out earlier in this judgment. Mr Suttle submits that a plea of justification is bound to succeed and that summary judgment should be entered for the newspaper. Since this is a jury action I accept that, in addressing that question, Mr Suttle must go so far as to be able to show that any other conclusion by the jury would be set aside by the Court of Appeal as being perverse: see *Alexander v. Arts Council of Wales* [2001] 1 EMLR 1840 and *Spencer v. Sillitoe* [2003] EMLR 207.

**The applicability, in a level (iii) case, of the so-called "repetition" rule and the "conduct" rule**

22 Before turning to the evidence, I have to consider whether, in a level (iii) case of sufficient grounds to enquire/investigate, the justifying defendant is bound by the so-called repetition and conduct "rules". If those rules do apply, Mr Suttle concedes that, far from being bound to succeed, his client's plea of justification would fail because, firstly, no conduct on the part of Mr Jameel is relied on and, secondly, the particulars of justification include a good deal of hearsay which would offend against the repetition rule. But Mr Suttle contends that neither rule applies in a case where the meaning sought to be justified is that there exist sufficient grounds to enquire/investigate whether the misconduct occurred rather than the higher level of meaning that there exist reasonable grounds for suspicion. Mr Price argues that both rules generally apply to both levels of meaning.

23. It might at first blush appear that the distinction between what I have called level (ii) and level (iii) meanings is artificial and over-refined. But, quite apart from the fact that the distinction is one which is clearly made in the authorities to which I have referred, it appears to me that there are real distinguishing features.

24. In the first place an imputation that there exist reasonable grounds for suspicion of misconduct generally (but not invariably – see *Chase* at 231 per Brooke LJ) arises because the person suspected has acted in such a way as to bring suspicion on himself. As Hirst LJ put it in *Shah*:

> "For these reasons I consider Mr Browne's submission is correct, and that it is an essential requisite of a defence of justification of reasonable suspicion that it should *focus* on some conduct on the plaintiff's part giving rise to reasonable suspicion.
>
> I choose the word 'focus' advisedly, in order to avoid any implication that such a defence must be exclusively confined to allegations of such conduct. Clearly it will be necessary, particular in the complicated case like the present, for the defendant to portray in some detail the relevant background, and also to set out material which connects together the main facts relied upon".

25. The second distinguishing feature is that sufficient grounds may exist for an enquiry or investigation in circumstances where the information available is incomplete and where it may comprise or consist in hearsay statements. To take a mundane example, a police officer to whom a complaint is made may justifiably conclude that further investigation into that complaint is required even if it is based exclusively on hearsay evidence.

26. I ask myself what follows from the existence of those two distinguishing features in terms of the permissible ambit of the particulars of justification. I start by considering whether the conduct rule applies to a plea of justification of the meaning that there are sufficient grounds for an enquiry/investigation. As I have already pointed out, such grounds may exist independently of any incriminating conduct on the part of the individual concerned. The state of the evidence may be such that there is no action or omission on the part of the individual such as to require an enquiry/investigation. But the evidence is nevertheless such as to call for an enquiry/investigation. This suggests that, as a matter of logic, there is no reason to impose the requirement that any plea of justification to a level (iii) meaning should be based on the conduct of the claimant. Indeed Mr Price accepted that the conduct rule will not always apply in cases where the meaning sought to be justified is a level (iii) meaning. The point is not free of authority. In the passage quoted earlier from the judgment in *Bennett*, Robert Walker LJ pointed out the significant difference between a level (ii) and a level (iii) meaning, saying "the former calls the plaintiff's conduct into question in a way that the latter does not".

27. That is not, however, to say that in every case where the imputation sought to be justified is the existence of sufficient grounds for enquiry/investigation, the plea of justification may succeed even if no conduct on the part of the claimant is relied on. I think Mr Price is right when he says that it all depends whether the article in question alleges conduct on the part of the claimant. If it does, then it will or may be necessary for the defendant, albeit seeking to justify at level (iii) only, to assert and prove that conduct as part of his defence of justification.

28. Is this such a case? Mr Price contends that the *Sunday Times* article included an allegation of conduct on the part of Mr Jameel, namely that he supported Muslim causes including rebel fanatics (paragraph 3). I do not so read the article: it says no more than that Mr Jameel was one of those "targeted" by fundraisers. The article does not appear to me to allege any conduct on the part of Mr Jameel. It is couched entirely in terms of what is alleged against him. Accordingly I cannot accept that it is fatal to the prospects of success for the plea of justification that it does not rely on any conduct on the part of Mr Jameel.

29. I turn to the repetition rule. The rationale of this rule is contained in the pithy statement of Lord Devlin in *Lewis* at page 248 that:

> "For the purpose of the law of libel a hearsay statement is the same as a direct statement and that is all there is to it".

It appears to be established that, in cases where the words impute actual guilt of misconduct or the existence of reasonable grounds to suspect such conduct, a defendant cannot rely on hearsay statements (or repetitions) in his particulars of justification. In such cases what the defendant has to establish is the existence of objectively reasonable grounds for asserting guilt or the existence of reasonable grounds for suspicion, as the case may be. In *Shah* May LJ put it thus at 269:

> "If a defendant wishing to justify a publication to the effect that there are reasonable grounds to suspect the plaintiff of discreditable conduct can rely on what he has been told by persons whom he regards as honest and reliable, it must follow that evidence would be admissible as to the reputed honesty and reliability of the defendant's informants. The practical problems which that might cause in a case such as *Hinduja's* case are obvious. In principle, however, evidence of this kind would be objectionable because it would introduce irrelevant considerations in purported proof of what the defendant has to establish. The defendant has to establish that there are objectively reasonable grounds to suspect the plaintiff. The evidence under consideration would be directed rather to an essentially subjective judgment of the honesty and credibility of third parties. In human terms, anyone is entitled to believe what third parties tell them. But such belief does not establish that what is reported is objectively credible."

Hirst LJ expressed himself in similar terms and Neill LJ agreed with both judgments.

30. The question which arises in the present case is whether that reasoning applies in cases where the imputation sought to be justified is the existence of sufficient grounds for enquiry/investigation rather than reasonable grounds for suspicion. As already pointed out, grounds for enquiry/investigation do not have to be shown to be "objectively reasonable". The point of the investigation is to discover whether they are so. I find it difficult to see how in principle hearsay material may not be relied on

to support the contention that sufficient grounds exist for enquiry or investigation. That appears to have been the view of Robert Walker LJ in *Bennett*. In the passage already quoted he appears to contemplate that a "less stringent test" is appropriate in a level (iii) meaning case, i.e. that hearsay statements may in a suitable case be relied on.

31. My conclusion is therefore that the *Sunday Times* is not to be shut out in the circumstances of the present case from relying in support of its plea of justification to the lesser meaning of sufficient grounds to enquire/investigate upon material which includes hearsay statements.

**The newspaper's claim for summary judgment**

32. I must next deal with the contention of the newspaper that a rejection by a jury of its plea of justification would be perverse. On this aspect of the case I will say no more than is necessary for my decision.

33. The *Sunday Times* can rely, firstly, on the fact that Mr Jameel has been joined as an additional defendant into the US proceedings. I accept that there will be circumstances where the mere commencement of legal proceedings against an individual will constitute sufficient grounds for enquiring into or investigating the claim against him. But I cannot accept that this is true of the claim commenced against Mr Jameel in the United States. It will suffice if I quote from the third Amended Complaint in *Burnett and Others v. Al Baraka and Others* which sets out the nature of the case against the additional defendants (including Mr Jameel) as follows:

> "633. Like the Defendants herein, the Additional Defendants engaged in negligent, grossly negligent, and/or intentional acts and breaches of duty which proximately caused the deaths and injuries of September 11 2001. Like the Defendants herein the Additional Defendants entered into a conspiracy, scheme and RICO enterprise".

There are no particulars whatever to indicate what facts and matters are relied on to make good these grave allegations against Mr Jameel. At no stage in the US proceedings does the claim against Mr Jameel appear to have received any endorsement or approval by any court in the US. Mr Jameel provides in his witness statement a detailed refutation of the charges which stands unchallenged by the newspaper.

34. I think that Mr Price is right when he submits that the only overt fact which can be advanced to justify the conclusion that there are sufficient grounds for enquiry into or investigation of Mr Jameel's association through funding with OBL is the Golden Chain list. (I agree that the contribution by the ALJ group to Saudi Red Crescent (or

Case 1:03-md-01570-GBD-SN  Document 331-5  Filed 07/23/04  Page 16 of 18

FROM OME ROMAN BUILDINGS                020-7831-2686            T-329    P.16/18   F-868
020 7831 2686

The Hon. Mr Justice Gray
Approved Judgment

Jameel - v - Times Newspapers Ltd

Red Cross) does not assist the newspaper). The Golden Chain list is exhibited to a witness statement provided to the *Sunday Times* by Mr Elsner, whose law firm is acting for the plaintiffs in the US proceedings. Mr Elsner describes the provenance and possible significance of the list and use to which it was apparently put in the criminal proceedings against Mr Arnaout. Mr Jameel has also made a witness statement in which he explains why he contends that the list has no probative value in relation to the meaning which the *Sunday Times* is seeking to establish.

35. In my judgment the list falls well short of establishing the existence of sufficient grounds for an enquiry or investigation. In brief my reasons are these: the list is in manuscript; its author is unknown, as is the source of the author's information; there is nothing in the list to suggest that the individuals named have made donations, rather than that they are potential donors; the list has been dated by Mr Brisard, the lead investigator in the *Burnett* case, to 1988 at which time OBL was engaged in resisting the Soviet incursions into Afghanistan with the approval of western governments; there is nothing to link the list to Al-Qaeda; any money which was donated was apparently to be applied to fund fighters in Chechnya and Bosnia and not the atrocities which took place many years later in New York. It is true that the Golden Chain list was attached to an Evidentiary Proffer filed in US criminal proceedings against Mr Arnaout in support of the admissibility of co-conspirator statements. But the Evidentiary Proffer was ruled inadmissible. In any event Mr Arnaout was not convicted of any offence implicating him in terrorist activities on the part of Al-Qaeda or OBL in the US; he pleaded guilty to defrauding donors by using their donations without their knowledge to fund activities for which they were unaware.

36. In these circumstances I cannot accept that, on the available material, it can be said that a jury would be perverse to reject the newspaper's plea of justification. The application for summary judgment therefore fails.

**The claim by Hartwell PLC**

37. The defamatory meaning which is asserted on behalf of Hartwell is that the *Sunday Times* article bore the meaning:

> "1. that there are serious and substantial grounds for suspecting, and/or which may prove, that the family which owns and runs Hartwell is associated with OBL in connection with terrorism, and that it helped fund the training of the terrorists who carried out the September 11th atrocities;
>
> 2. that accordingly there are reasonable grounds for concern that money generated by Hartwell's business may have been used for training the September 11th terrorists and/or may have been used to fund terrorism;
>
> 3. Hartwell is therefore a company which responsible persons and businesses should, or might reasonably wish to, have nothing to do with".

I now have to decide whether the article is capable of bearing those meanings. The principles to be applied are those set out above at paragraph 7.

38. Mr Jameel is described in the article as a "car tycoon" because of his association with Hartwell. What is the reader told of the nature of that association? Paragraph 1 says that Mr Jameel is a Saudi billionaire who helped build one of Britain's biggest car dealerships. In paragraph 2 (and in the caption) it is said that Mr Jameel's "family firm" bought Hartwell in 1990. From paragraph 6 the reader learns that Mr Jameel recently transferred his shareholding in the £2billion a year family company to his children. I accept that readers would infer from this that Hartwell was for a number of years a significant part of Mr Jameel's business empire.

39.  Mr Price asserts on behalf of Hartwell that the message conveyed to readers is that it is a company which was built by a man who stands accused of financing the 11th September terror and that such financing may prove to have come in part from Hartwell. He submits that "a rational reaction" would be to take one's business elsewhere. That would result in damage to Hartwell. As Lord Keith said in *Derbyshire County Council v. Times Newspapers* [1993] AC 534 at 547:

> "The authorities cited above clearly established that a trading corporation is entitled to sue in respect of defamatory matters which can be seen as having a tendency to damage it in the way of its business".

Reliance was also placed by Mr Price on paragraph 8.16 of the current edition of Gatley and on two cases dating back to the First World War which feature in the notes to that paragraph.

40. I remind myself that I am deciding what meaning the article is capable of bearing in relation to Hartwell, not what it actually meant. That is or would be for the jury to decide. But I cannot accept that the article is capable of bearing the meaning that there are serious and substantial or even reasonable grounds for suspecting that Hartwell, or money generated by its business, helped fund the September 11th atrocity. Nowhere does the article expressly so state. The US proceedings make no mention of Hartwell. It would in my opinion take a very suspicious-minded reader to read into the article such an implication (see the second principle in *Skuse* set out earlier). The reasons for rejecting the level (ii) meaning for which Mr Jameel contended apply with greater force to the corresponding level (ii) meaning contended for by Hartwell. I do not accept that it would be a rational reaction for potential customers or for the City to shun Hartwell because income derived from Hartwell by the family company ALJ *may* (my emphasis) have found its way into the hands of those training terrorists. Such would in my view be an irrational reaction especially given that the article makes clear that Mr Jameel no longer has any interest in Hartwell. Accordingly I reject the meanings pleaded on behalf of Hartwell.

41. Even if the article is not capable of bearing that higher meaning, is it nonetheless capable of bearing the lesser meaning that there is sufficient ground to enquire or

investigate whether Hartwell is implicated in funding terrorist activity? I do not think so. In my view the ordinary reasonable reader, not avid for scandal, would read the references to Hartwell in the article as doing no more than to tell readers of the connection between Mr Jameel and this country. I do not think that such a reader would jump to the conclusion that there was any reason to enquire or investigate whether a substantial English company such as Hartwell was implicated in funding an appalling act of terrorism. The comments made in the preceding paragraph of this judgment bear on this question as well. I am reinforced in my conclusion by the fact that readers of the *Sunday Times* article are informed clearly and early on (in the fourth paragraph) that the money which financed camps where the hijackers trained came "from Saudi Arabia" rather than from any English source. The article does not say or even imply that Hartwell money was involved.

42. In my judgment the article is not capable of bearing the lesser, or any, meaning defamatory of Hartwell PLC.