**Exhibit 5**

Reply Brief in Support of Hamad Al-Husaini's
Motion to Dismiss the Third Amended Complaint

03 MDL No. 1570 (RCC) / C.A. No. 03-CV-9849 (RCC)

2004 WL 62083                                                                                                                  Page 1
2004 WL 62083 (QBD), [2004] E.M.L.R. 11, [2004] EWHC 37

Mohammed Abdul Latif Jameel, Abdul Latif Jameel
Company Limited v. The Wall
Street Journal Europe SPRL
Case No: HQ 02 X00582

High Court of Justice Queen's Bench Division

QBD

Before : The Honourable Mr Justice Eady

Date: 20 January 2004, Hearing dates : 1-19 December 2003

Reasons for The Ruling on Privilege

**Representation**

Mr James Price QC and Mr Justin Rushbrooke (instructed by Peter Carter-Ruck and Partners) for the Claimants.

Mr Geoffrey Robertson QC and Mr Rupert Elliott (instructed by Finers Stephens Innocent) for the Defendant.

**APPROVED JUDGMENT**

The Hon. Mr Justice Eady

**1.** I am now required to give the detailed reasons for my ruling on the issue of qualified privilege. This is for the judge to resolve in the light of the jury's decisions on any relevant contested issues of fact. I announced my rejection of the defence on 19 December, at the end of last term, but it seemed convenient to everyone that I should set out my reasons fully in writing after the Christmas vacation.

**2.** I shall not repeat the content of earlier rulings and accordingly need say no more about the publication in this case than that it concerns an article published in the Wall Street Journal Europe for 6 February 2002 under the heading, on the front page, "Saudi Officials Monitor Certain Bank Accounts: Focus Is on Those With Potential Terrorist Ties". In the body of the article the Jameel Group is identified as being among those whose accounts are supposed to be monitored.

**3.** The parties addressed me at some length before the jury answered the agreed questions on 18 December and, next day, the opportunity was given for further argument as to how those answers bore upon the application of the legal principles to this particular case.

**4.** It is now almost inevitable that in cases of publication to the world at large, where the defence is that of qualified privilege, the jury will be asked to answer a series of questions in order for the court to arrive at the necessary factual substratum upon which to base the ruling. The questions will be directed no doubt largely to establishing the raw data for answering those of the ten non-exhaustive tests identified by Lord Nicholls in Reynolds v Times Newspapers Ltd [2001] 2 A.C.127, 205, as may be relevant to the case in hand. Any value judgments, and to a large extent also any inferences to be drawn from the raw data, are reserved to the judge in determining the ultimate question of whether privilege applies.

**5.** It is clearly desirable that, so far as possible, a jurors' "examination paper" should be framed in such a way as to enable them to give Yes or No answers. Otherwise, the questions may give rise to problems of drafting in committee or of catering for differences of emphasis as between jurors.

**6.** Such problems are also likely to arise in the context of meaning. It has long been recognised (as it is often said, since Fox's Libel Act of 1792) that it is for the jury to determine the meaning or meanings of words complained of. Of course, in reality, fair-minded readers of a newspaper article may differ, on any day of the week, as to the true implications or shades of meaning contained within it. Nevertheless, by convention, English law operates on the principle that for determining most issues in a libel action there is at least one definitive meaning in the light of which, for example, decisions have to be made on any defence of justification or on the level of compensation which is appropriate: see e.g. the discussion in the Court of Appeal in Slim v Daily Telegraph [1968] 2 Q.B. 157, 171-2, and in the Privy Council in Bonnick v Morris [2003] 1 A.C. 300, 309 at paragraphs [21] to [22]. On the other hand, I have never known a case in which a jury was asked to set out its definitive meaning or meanings. There may be examples where this has occurred, but it does seem to me that there are potentially serious problems about any such exercise. It is difficult to see how it would be possible to avoid asking the jurors to draft in committee, since they cannot generally be given a finite number of multiple option questions. They are not, as Diplock L.J. made clear in Slim, bound by either side's contentions on meaning. It is open for them to come up with their own particular meaning or meanings. Also, where there is room for differences between ordinary readers as to the interpretation of a newspaper article, there is no reason to suppose that all twelve jurors are necessarily going to fit into one straitjacket. Any differences between them, which are likely to be relatively minor and limited to matters of shading or emphasis, would not normally have to be revealed. If they are asked to produce a carefully drafted set of meanings, however, which remove any ambiguity

which has been left in the article *ex hypothesi* by the professional journalist or editor, there is much more scope for stalemate.

**7.** In this case, I resisted the suggestion that the jury should be asked to set out their own (defamatory) meaning, and counsel did not press it with any vigour. It would thus be wrong for me to seek now to impose my own meaning instead. All I should do is to accept that the jury found the words complained of to be defamatory of each of the Claimants, by reference to some level of gravity, and perhaps also to bear in mind the three tiers identified by the Court of Appeal in Chase v News Group Newspapers Ltd. [2003] EMLR 11. In accordance with Slim, however, I can also fix the highest level of gravity by reference to the Claimants' pleaded meaning. Here, that is expressed in terms of "reasonable grounds for suspicion", and thus I should not proceed on the basis, for example, that the jury could have found that the article conveyed a defamatory meaning as high as knowing involvement on either Claimant's part in the funding of terrorism (which would correspond to Level 1 in Chase). The Court of Appeal has held that this article is capable of carrying a lesser defamatory meaning than that of "reasonable grounds to suspect" and I should not therefore venture presumptuously into the territory of deciding the level of gravity on which the jury agreed (if they did). Nor is there any need to do so.

**8.** I must assume that the words are defamatory in some sense but not in one that is pitched any higher than "reasonable grounds to suspect" involvement in the funnelling of money to terrorists.

**9.** Mr Robertson invited me to conclude that the jury must have decided, in the light of their awards of damages (£30,000 and £10,000 respectively), that the words conveyed a meaning corresponding to the lowest tier of gravity listed by Brooke L. J. in Chase -- that is to say, that there must have been merely some "grounds for investigating". I am not prepared to make that leap, since it is by no means an obvious inference -- especially having regard to the restraint now shown on the fixing of levels of compensation since John v Mirror Group Newspapers [1997] Q.B. 586 (as to which this jury was given a firm direction). Moreover, it was fortunate that despite Mr Jameel's apprehension at the time of publication there was in fact no evidence of actual damage done to the reputation of either Claimant. Indeed the business continued to flourish.

**10.** In the present case, the Defendant's plea of qualified privilege was founded to a considerable extent on the quality and number of sources for the story; in particular, for the two intimately connected propositions that (a) the Jameel group of companies was on a list supplied by the United States government to the Saudi government and/or the Saudi Arabian Monetary Authority (SAMA) with a view to accounts being monitored, and (b) relevant accounts were being in fact monitored. I use the word "relevant" because there was a lack of precision about the Defendant's case. It is not clear whether they were conveying, or intending to convey, the idea that the accounts being monitored were those of members of the Jameel family, and/or of companies within the group, or that they were accounts in some unspecified way "associated with" the Jameel group.

**11.** At all events, there were supposedly five relevant individuals as to whom evidence was given by Mr Dorsey and who had been based in Saudi Arabia. They were identified as Sources A to E. But it should be said that Mr Dorsey stated in the witness box that Source A was not truly a source at all. He was merely a "lead" and he added that it would not have been possible, responsibly, to publish the story on the basis of his information alone. He went on, therefore, to give evidence as to how the story was supposed to have been "firmed up" in the light of what he was told by Sources B to E. Accordingly, by agreement of the parties, questions were formulated for the jury to answer on each of the five persons involved, because they were recognised as being central to the case on qualified privilege.

**12.** The jury's answers were clear. They accepted that Mr Dorsey was informed by a prominent Saudi businessman (referred to as Source A) in December 2001 that the Jameel group was on an unpublished list of names whose accounts were been monitored by SAMA at the request of the United States. They were asked also to give individual answers in respect of Sources B to E whether each of them had confirmed "the above" to Mr Dorsey. In each case the answer was negative.

**13.** Mr Robertson asks me not to proceed on the footing that the jury's answers entailed dishonesty on Mr Dorsey's part. I do not propose to do so. I am strictly bound by the answers of the jury, save in so far an answer may inevitably carry some implication. I accept, naturally, that the jury may have concluded that Mr Dorsey's evidence about the sources was mistaken, through faulty recollection, or that his evidence was prompted to an extent by wishful thinking. Nevertheless, I have to accept, it seems to me, that they rejected the Defendant's evidence in respect of those sources. Since Source A was only "a lead", it would appear that the remaining four corners of the Defendant's case on sources have been knocked away by the jury's answers.

**14.** It is clear also that the jury did not accept Mr Dorsey's

evidence in other respects (see Questions 6 and 7). They did not accept that Mr Dorsey left a recorded message at the Jameel group offices at about 9 a.m. on 5 February, the day before publication; nor did they accept Mr Dorsey's evidence that when he spoke to Mr Munajjed by telephone during the evening of 5 February he did *not* ask Mr Dorsey to wait until the following day for a comment from their side. To put it another way, they seem to have accepted Mr Munajjed's evidence from the witness box that he *did* make that request. These answers are relevant to another of Lord Nicholls' criteria; namely the extent to which the Claimants were given an opportunity to comment before publication.

**15.** It is true that Mr Dorsey and Mr Glenn Simpson, based in Washington, also gave evidence of some degree of confirmation of the story (or at least of answers or declination to comment, which they interpreted as confirmation). That evidence was, however, fundamentally disputed in cross-examination and the parties did not suggest formulating any question for the jury's decision on any of these points.

**16.** At all events, it seems clear to me that such answers as the jury did give to their questions, to a large extent based on the impression witnesses made in court, and also upon how consistent the contemporaneous documents appeared to be with their evidence, give rise to formidable obstacles so far as the Defendant's case on privilege is concerned. Even though the defence is left appearing somewhat forlorn, however, the jury's decisions were not necessarily, as a matter of law, fatal. I heard submissions on the defence of privilege both before and after the jury had delivered its answers and I should now attempt to deal with those on their merits.

**17.** The circumstances in which a publication of defamatory allegations to the world at large will attract qualified privilege was considered recently by the House of Lords in Reynolds v Times Newspapers Ltd [2001] 2 A.C. 127 and in McCartan Turkington Breen v Times Newspaper Ltd [2001] 2 A.C. 277. It is now almost commonplace to refer to a defence of privilege based on these principles as "Reynolds privilege" and indeed by no means unusual to hear it said that the majority (of three to two) in Reynolds created a new defence based on "responsible journalism". (Indeed, the Defendant's closing submissions were so headed.) This terminology is imprecise and suggests to some people that the test is not only flexible but also subjective. I need therefore to remind myself of the important requirement enunciated by the European Court of Human Rights in, for example, Goodwin v United Kingdom (1996) 22 EHRR 123, 140 that "... the relevant national law must be formulated with sufficient precision to enable the persons concerned -- if need be with appropriate legal advice -- to foresee, to a degree that is reasonable in the circumstances, the consequences which a given action may entail". It has to be recognised that there is no more "chilling effect" upon freedom of communication, or indeed upon the exercise of any other rights such as those of privacy and the protection of individual reputation, than uncertainty as to the lawfulness of one's actions.

**18.** There is no doubt that some thought that their Lordships' decision in Reynolds introduced not only greater flexibility into the law of privilege but also more, rather than less, uncertainty: see e.g. the decision of the New Zealand Court of Appeal in Lange v Atkinson [2000] NZCA 95, [2000] 3 NZLR 385. Also the learned editors of *Gatley on Libel and Slander* (10th edn.) sound a despondent note at para. 24.4. Having referred to "the width and uncertainty of the media privilege for publication to the world at large", they warn:
"Although 'Reynolds' privilege is stated to be an application of the traditional duty-interest test for qualified privilege, the range of factors to be taken into account in deciding whether or not publication took place on a privileged occasion is such that except in clear-cut cases, it will often be very difficult to advise a prospective claimant on the likely outcome, and the position has been made no easier by the development in Loutchansky v Times Newspapers Ltd of the test of responsible journalism."

**19.** It is obviously reasonable to conclude that it was not the intention of their Lordships to leave the law in a state of uncertainty, and I have very much in mind the words of Lord Nicholls at p. 202 E-F: "... the extent of this uncertainty should not be exaggerated. With the enunciation of some guidelines by the court, any practical problems should be manageable".

**20.** As for Loutchansky v Times Newspapers Ltd (Nos 2-5) [2002] Q.B. 783, if there were any inconsistency between the judgments in that case and the speeches in Reynolds, it would plainly be the duty of a judge at first instance to accord priority to the majority speeches in the House of Lords. Equally, however, I must strive to construe the Loutchansky judgments as being consistent with Reynolds and Turkington.

**21.** It is appropriate for judges in this jurisdiction to apply these recent decisions of their Lordships faithfully and for that purpose, while recognising that the aim was to ensure flexibility, to extract from the speeches principles that can be stated with clarity before turning to the individual facts of the case to apply them.

**22.** It is, of course, true that Lord Nicholls himself used the

phrase "responsible journalism" (e.g. at p. 202E) but it has to be seen in the context of the speech as a whole and his exposition of the common law. He was explaining that the effect of the common law duty-interest test is simply to set a standard which is *no higher than* journalists set for themselves and does not represent a disproportionate or excessive incursion into press freedom. It is clear that Lord Nicholls was comparing two standards. This does not necessarily mean that the two have to be conflated.

**23.** It is not possible to construe this passage, or the speeches as a whole, as supplanting the common law touchstone of "social or moral duty" by a different test such as "responsible journalism" or the exercise of "due professional skill and care". These may well be matters addressed *en route* to answering the primary question (of whether the particular circumstances gave rise to a duty), but they should not obscure its primacy. There are some passages in Bonnick v Morris [2003] 1 A.C. 300 which could give a contrary impression: see e.g. at [23] and [24]. It has been suggested that such passages might even entail the replacement of duty with negligence as the ultimate criterion. It would be inappropriate, however, for me to approach the advice of the Privy Council in this case as being in any way inconsistent with the law expounded in Reynolds and McCartan. (That would be especially perverse in the light of the fact that Lord Nicholls was a party to both decisions.) There can thus be no objection to my applying the principles and guidance to be found in the fuller and more detailed treatment of the law in Reynolds.

**24.** First, in judging a defence of qualified privilege, including where publication is to the general public, the tests to be applied are objective. The whole of Lord Nicholls' guidance is predicated upon that long established common law principle.

**25.** There is a passage in Loutchansky at para. [49] which, if read in isolation, might be thought to import an element of subjectivity, but that would be a perverse interpretation having regard to what the Master of the Rolls said at para. [40]. Having referred expressly to "the objective nature of the test", he continued:
"In the final analysis it must be for the court, not the journalist, to decide whether he was acting responsibly."

**26.** It cannot therefore be determinative of any issue (such as where the public interest lies, or whether there was an obligation to communicate the words at the time of publication, or whether the importance of the allegations required that further checks should be made) that the journalist or his editor had come to a certain conclusion on such a matter. The decision must be made by the court, as has long been recognised, in the light of all the circumstances. The law places that task squarely upon the trial judge.

**27.** It is as well to remember the words of Lord Cooke in McCartan Turkington Breen, at p.301G-H, to the effect that the Reynolds decision was less a breakthrough than a reminder of the width of the basic common law principles, although it was much more encouraging of their invocation than previous English decisions. The application of Lord Nicholls' well known non-exhaustive tests provides valuable guidance, although naturally the answers they yield, and their relative importance to one another, will vary infinitely according to the facts of the individual case. I need to have in mind, however, the purpose to which those tests are ultimately directed. When applying the guidelines, I should remember to have the wood in vision as well as the individual trees.

**28.** As Lord Cooke himself reminds us, in McCartan Turkington Breen, at p.300, the main principle for which the Reynolds case stands is that the classical interest/duty test is adaptable to a great variety of circumstances. Since "duty" is an ordinary English word, I feel bound to give it the plain meaning which it normally bears. I am thus unable to construe it as not, in some sense, connoting an obligation. It is no doubt easier to establish such an obligation "in the light of the attitudes and opinions of society" nowadays: see e.g. *Gatley* at para. 14.11. In some respects at least, we are living in an increasingly open society. People naturally feel entitled to more information about matters of genuine public interest than in the past. The ten non-exhaustive criteria assist in that policy objective of adapting the traditional test, in modern conditions, over an infinite range of factual concatenations. But they are always directed, as Lord Cooke's summary makes clear, at the ultimate question of whether the defendant had a social or moral duty to publicise the particular words complained of to the general public about the claimant. That must be judged at the time of publication.

**29.** In the light of the learned editors' concern in the passage I have cited from *Gatley* at para. 24.4, it is perhaps worth observing that this approach is exactly reflected in the Master of the Rolls' judgment in Loutchansky at para. [23]:
"At the end of the day the court has to ask itself the single question whether in all the circumstances the 'duty-interest test, or the right to know test' has been satisfied so that qualified privilege attaches. If, of course, it does, then, unless the claimant can prove malice, the defamatory publication is protected irrespective or whether it turns out to be true or false. So much at least of any analysis of Reynolds's case [2001] 2 A.C. 127 one might have thought

Case 1:03-md-01570-GBD-SN   Document 331-7   Filed 07/23/04   Page 6 of 13

to be uncontentious."

**30.** There is a sentence in *Gatley*, at para. 14.87, to the effect that the concept of "duty" as used in Reynolds "... seems little more than an indication that the defendant has abided by the practices of responsible journalism". Whether this is based on the words of Lord Nicholls at p. 202E I do not know. Although literally the sentence in *Gatley* would be consistent with what Lord Nicholls there said about "responsible journalism", it seems to me that its emphasis gives a somewhat dismissive assessment of their Lordships' concept of social or moral "duty" -- almost as though, despite reaffirming the "duty-interest" test, they meant to convey something less onerous. I cannot accept that.

**31.** The "duty test" may be regarded as the obverse of whether it was in the public interest, at that time, for the words to be published. That is to say, if it was truly in the public interest for them to be published, then any journalist having the information, and having made appropriate checks, would have a social or moral duty to communicate it. It is trite that this is quite different from asking the question whether the subject-matter of the words is, or was, of interest to the public: see e.g. Reynolds at p. 239, *per* Lord Hobhouse. The question is whether the particular defamatory allegations about the claimant, notwithstanding their gravity, were such that they should be communicated to the public at the material time -- irrespective of their truth or falsity. This was reaffirmed by the Master of the Rolls in Loutchansky in para. [41] at p. 809. Naturally, if the allegations are true there will be a defence of justification, but qualified privilege will protect defendants in respect of damaging information that turns out to be false -- provided always that the public *needed* to have that information straight away, true or not.

**32.** It can thus be readily appreciated that the defence exists ultimately not to afford journalists a special privilege, or a degree of protection which is not available to other citizens, but to protect the public itself in respect of allegations of which it would be wrong to deprive us. Because it can on occasion afford such protection to allegations of the gravest and most damaging kind, and which may though false remain uncorrected when the defence is upheld, it is tolerably plain that it can only be sustained after the closest and most rigorous scrutiny -- primarily, of course, by the application of Lord Nicholls' ten tests. Having said that, I must also acknowledge that in cases of genuine residual doubt the court should resolve the matter in favour of the relevant defendant.

**33.** A useful cross-check may sometimes be to ask whether the journalists concerned might be the subject of legitimate criticism if they withheld the *ex hypothesi* false allegations: see e.g. Loutchansky v Times Newspapers Ltd (Nos. 2-5) [2002] Q.B. 783, 811 at paras. [47]-[49]. This should not, however, be elevated into a test, in its own right, of comparable status to those identified by Lord Nicholls.

**34.** It is also to be remembered that the court must, where there is a cross-border publication or other international dimension, take this fully into account: see e.g. Lukowiak v Unidad Editorial SA [2001] EMLR 46 at [44]-[46]. The objective test of duty/interest must be applied as required by English law, but not on an artificial basis as though the words had only been published in England and for an exclusively English readership. It is simply part of the background against which the English criteria have to be applied; obviously, the court does not generally have to determine the legality of publication in some other jurisdiction, but the international dimension may play a part in judging whether a social or moral duty arose which extends as far as publication in this jurisdiction.

**35.** Since Lord Cooke made the observation that the Reynolds decision could not be characterised as a "breakthrough", it is perhaps worth remembering the considerations which led the majority to take a relatively restrained approach when they were invited, on behalf of the defendants, to extend the scope of privilege more fundamentally. The reasoning may be conveniently encapsulated in the words of Lord Nicholls at pp. 201E-202C:

"Readers and viewers and listeners can make up their own minds on whether they agree or disagree with defamatory statements which are recognisable as comment and which, expressly or implicitly, indicate in general terms the facts on which they are based.

With defamatory imputations of fact the position is different and more difficult. Those who read or hear such allegations are unlikely to have any means of knowing whether they are true or not. In respect of such imputations, a plaintiff's ability to obtain a remedy if he can prove malice is not normally a sufficient safeguard. Malice is notoriously difficult to prove. If a newspaper is understandably unwilling to disclose its sources, a plaintiff can be deprived of the material necessary to prove, or even allege, that the newspaper acted recklessly in publishing as it did without further verification. Thus, in the absence of any additional safeguard for reputation, a newspaper, anxious to be first with a "scoop", would in practice be free to publish seriously defamatory misstatements of fact based on the slenderest of materials. Unless the paper chose later to withdraw the allegations, the politician thus defamed would have no means of clearing his name, and the public would have no means of knowing where the truth lay. Some

further protection for reputation is needed if this can be achieved without a disproportionate incursion into freedom of expression.

This is a difficult problem. No answer is perfect. Every solution has its advantages and disadvantages. Depending on local conditions, such as legal procedures and the traditions and power of the press, the solution preferred in one country may not be best suited to another country. The defendant newspaper commends reliance upon the ethics of professional journalism. The decision should be left to the editor of the newspaper. Unfortunately, in the United Kingdom this would not generally be thought to provide a sufficient safeguard. In saying this I am not referring to mistaken decisions. From time to time mistakes are bound to occur, even in the best regulated circles. Making every allowance for this, the sad reality is that the overall handling of these matters by the national press, with its own commercial interests to serve, does not always command general confidence.

As highlighted by the Court of Appeal judgment in the present case, the common law solution is for the court to have regard to all the circumstances when deciding whether the publication of particular material was privileged because of its value to the public. Its value to the public depends upon its quality as well as its subject matter. This solution has the merit of elasticity. As observed by the Court of Appeal, this principle can be applied appropriately to the particular circumstances of individual cases in their infinite variety. It can be applied appropriately to all information published by a newspaper, whatever its source or origin."

**36.** Bearing those general considerations in mind, I turn to ask myself the question whether Mr Dorsey or the Defendant company, The Wall Street Journal Europe SPRL, had a social or moral duty to make these allegations in England and Wales, at the material time, and thus to name the Jameel group. It is not for me to make judgments about the public interest, or the extent of a professional journalist's responsibility, according to the criteria of any other jurisdiction; but, on the other hand, I do have the responsibility to make those judgments about the publication in England and Wales, which is the subject-matter of this action.

**37.** I propose to address each of Lord Nicholls' criteria, as set out at p.205, although I do not intend to approach them artificially as though they occupied separate compartments.

**38.** I turn first to the gravity of the underlying defamatory imputation here (i.e. possible involvement at some level in funnelling funds to terrorists), which is plainly at the higher end of the scale. Whatever the precise meaning to be attributed to the article, which is a matter for the jury, it plainly contemplates at least the possibility of "witting" involvement. One interpretation would be that the 150 accounts allegedly being monitored belonged to persons suspected of terrorist involvement. It is not suggested that what was taking place was a purely routine monitoring, such as would not reflect adversely upon anyone (e.g. analogous to screening luggage at an airport). In any event, the finger is clearly pointed at no more than a handful of entities or institutions.

**39.** The relevance of gravity, as it emerges from Lord Nicholls' speech, would appear to be as follows. In the case of a grave allegation the damage to reputation and/or the potential impact on a claimant's career or business activity is likely to be significant. Correspondingly greater responsibility needs to be exercised before adopting or repeating any such charges. So too, the greater the need to give an opportunity to the subject of the allegations for him to comment and to check, where necessary, for accuracy. Moreover, the public too would be entitled to greater accuracy in proportion to the increasing gravity of the defamatory allegations that are made. Gravity is thus not merely one factor to be taken into account, when addressing Lord Nicholls' guidelines; it permeates through and affects most, if not all, of the other tests he propounded.

**40.** I turn to the nature of the information and the question of whether the subject-matter is of public interest or concern. There is no doubt that the general subject-matter of terrorism, its prevention and the tracing of those responsible, are matters of the plainest public interest in all the jurisdictions in which the Wall Street Journal Europe is published. That too indicates that great circumspection is required before the finger is pointed towards anyone as being, to a greater or lesser extent, a suspected culprit. As Lord Hobhouse observed in Reynolds v Times Newspapers Ltd, at p.238A-B, there is no public interest in being misinformed. What matters is whether the public interest required that the Wall Street Journal, as published here, should identify these Claimants on 6 February 2002 as being on a list, emanating from law enforcement agencies in the United States, of persons whose financial transactions it would be appropriate to monitor.

**41.** That is a very different issue from the more general and uncontroversial one of whether terrorism is of itself a subject of public interest. It is clear from authorities well before Reynolds and McCartan Turkington Breen that more is required for privilege than that the subject of defamatory allegations should be of public interest: see e.g. Adam v Ward [1917] A.C. 309 and Blackshaw v Lord [1984] Q.B. 1. In view of Lord Cooke's remarks in Turkington, to which I have referred, I would not accept the proposition that such

older authorities have to be discarded as no longer offering relevant guidance. Indeed, Lord Nicholls expressed the conclusion in Reynolds at 204G "... that the established common law approach to misstatements of fact remains essentially sound".

**42.** The Court of Appeal in Blackshaw also made clear that the public will generally, where privilege is to be upheld, have an interest in receiving factual information rather than speculation, hunches or guesswork in circumstances where blame or suspicion is being publicly attributed for some form of wrong-doing.

**43.** It is obvious that, in the determination of qualified privilege, the degree of urgency for the information to be communicated to the public will often be a highly material fact. This is because the court is generally considering whether the public had a right to hear or receive the allegations *irrespective of their truth or falsity*. If there is no urgency, or a relatively low degree of urgency, there will generally be less excuse for failing to carry out checks or to afford an opportunity for comment. Urgency is also a matter to be judged objectively.

**44.** Over the past 20 years or so, it has been reaffirmed again and again, in European jurisprudence and in common law decisions, that enterprising and investigative journalism should be viewed as fundamentally important from the public point of view in a democratic society. What is more, in a number of decisions in this jurisdiction it has been accepted that the court must pay due regard to the perishability and ephemeral nature of some news material. (To what extent that applies in the present context, relating to the funding of terrorism, may be open to question, since sadly it is a subject of constant and continuing topicality in the world we now inhabit. Nevertheless, it is important not to lose sight of the point.) Equally, however, the need for the public to be kept up to date is not to be confused with the quite understandable need of editors and journalists to obtain a scoop or to publish ahead of their rival newspapers. That is why claims of urgency on the part of journalists need to be carefully scrutinised and measured against the true entitlement of the general public, which is to be kept up to date with accurate and responsibly researched information. As was noted by Sir John Donaldson MR in [Francome v MGN Ltd [1984] 1 WLR 892](), 898A, the media can be vulnerable to the error of confusing the public interest with their own interest. That is a consideration which has a special resonance when the court is required to assess claims to urgency.

**45.** When focusing on that issue in the present case, it is helpful for the court to have in mind what happened over the hours immediately after the publication on 6 February 2002. What occurs after publication is not strictly relevant, of course, but it simply illuminates what difference 24 hours would have made to the information the public received.

**46.** The evidence shows that the Claimants' representative Mr Munajjed asked Mr Dorsey, when he spoke to him on the evening of 5 February 2002 (Saudi time), to postpone publication so that he could contact Mr Jameel, who was in Japan on business, and thus give him a chance to check the accuracy of the monitoring allegations. This seems to have been accepted by the jury (see the answer to Question 7). As far as one can tell as a matter of first impression, that could only be achieved by someone making inquiries of relevant bankers and/or with SAMA which, as the regulatory authority in Saudi Arabia, was said to have imposed the monitoring requirement. Mr Dorsey declined and said that the story was going to be published forthwith and he would simply record in the article words to the effect that the Jameel group could not be contacted for comment.

**47.** I had originally assumed that this was because of some perceived urgency. Yet he told the court that he would, if asked, have been prepared to postpone the story for 24 hours -- but he did not volunteer this concession at the time. This part of Mr Dorsey's evidence confirms my own impression that there was no compelling reason why these allegations had to be published on 6 February. Thus there was no justification for depriving Mr Jameel of that entirely reasonable interval for checks to be carried out.

**48.** Sure enough, within the next 24 hours, Mr Jameel did look into matters as best he could and, what is more, SAMA had commented to the extent of denying the allegation of monitoring. If those details had been published, it can hardly be doubted that the importance of this front-page story would have been considerably blunted -- even to the extent, perhaps, that no such story could be published. It hardly needs to be said, however, that this factor would provide in itself no reason for rushing the article out.

**49.** The urgency issue must be assessed not by the circumstances which emerged on 6 February but on the situation as it was during the previous day or evening. There was even then no reason, however, to suppose that Mr Jameel would *not* have been able to make enquiries and give a cogent response, as in fact he did.

**50.** It can be seen here, once again, that Lord Nicholls' criteria tend to overlap and merge one with another. In particular, the issue of urgency and that of affording the subject of a proposed article an opportunity to comment are intimately connected.

**51.** It is to be noted that one of the priorities highlighted by the Wall Street Journal Europe witnesses, and in particular James Dorsey and Lora Western, was that of giving the named institutions, including the Jameel group, a proper opportunity to comment. When considering the "international dimension", I can detect no material distinction between the practice of journalists in this jurisdiction and those in the United States. As one might expect, it is widely recognised that those attacked or criticised in the media should be given a proper opportunity to comment beforehand.

**52.** Naturally, to be meaningful in that context a comment could only be made after a sufficiently long time to enable the Jameel group to make enquiries. In the nature of things, they would not be in a position to know immediately whether any part of the allegations was true. Mr Dorsey told the jury that Mr Munajjed had answers that he could have given but was stalling him. That is manifest nonsense. Mr Munajjed had no information that could enable him say whether the Jameel group was on a list supplied by the United States government to SAMA or whether, as a result, any monitoring of accounts was taking place. Nor did Mr Dorsey have any reason to assert the contrary.

**53.** In my judgment, it cannot conceivably have been so urgent to publish the article of 6 February 2002 as to justify denying the Claimants their opportunity to comment meaningfully and thus also depriving the Wall Street Journal of the opportunity of at least stating their side of the story. This latter consideration, of course, is another of the individual criteria identified by Lord Nicholls.

**54.** I now put to one side the matter of urgency and focus upon the content and quality of the allegations about the Claimants upon which, as Lord Nicholls observed in the passage cited above, their supposed value to the public depends. One factor that needs to be taken into account is that, according to the Defendant's own story, the United States government had assured the Saudi government that it would not reveal the names of any of the persons or entities whose accounts were supposed to be monitored. That is expressly stated in the body of the article complained of. The Defendant decided nonetheless that it was appropriate to reveal at least some of the names. I will assume for the moment, contrary to the direct evidence in this case from SAMA and the Saudi banks, that they had been provided with a list emanating from the United States government which included the name of the Jameel group. The question therefore arises why it was urgent, or even appropriate, for the Defendants to choose to reveal the names despite the United States government's own undertaking to maintain confidentiality.

**55.** This is closely linked to the other public policy consideration of how the public interest would be served by "blowing the gaffe" (in Mr Price's phrase) on what was supposed to be a secret monitoring operation. It is a matter of common sense that if monitoring is taking place its object is likely to be undermined if the exercise is made public. One would have thought the point hardly needed explaining, but there is clearly a risk that those who are or might be using the relevant accounts for terrorist funding would, on discovering that monitoring was taking place, be inclined to route the funds elsewhere. The surveillance would be correspondingly less likely to bear fruit.

**56.** Of course it is elementary in a democratic society that no government's determination of where the public interest lies has to be taken as definitive. To echo Sir John Donaldson's comment in Francome, from a different context, it might be thought that governments, even democratic governments, are liable to confuse their own interests with those of the general public.

**57.** Journalists, and indeed any other citizens, may take a different view from government as to where the public interest lies. Also, needless to say, an English judge who is required by law to make an assessment of the public interest will form an independent judgment and would in no way be bound by the view of the government of the United Kingdom or indeed of any other country. Nevertheless, the stance expressly stated by the Defendant to have been taken on this issue by the United States government is a matter which prompts the closest scrutiny of any contrary view -- not least when trying to take into account what was called in Lukowiak "the international dimension."

**58.** It has been suggested that the Claimants' argument involves journalists subjecting themselves to government diktat when it comes to judging the public interest. This is a crude misrepresentation of the case. All that is being argued is that, where there was an inter-governmental agreement not to reveal the names of those being investigated in the fight against terror, cogent grounds are required to show why the public interest called for that agreement to be breached. It is hardly self--evident.

**59.** It is not as though the maintaining of secrecy would in itself be at all surprising. It is exactly what one would expect when sensitive inquiries were called for into suspicions of involvement, direct or indirect, in such serious criminality. This important consideration echoes a number of the policy factors articulated by Lord Nicholls at p.205 and, in particular, his fifth criterion relating to the "status" of the defamatory information published. As he there indicated, a factor which may militate in favour of

according privilege is if the allegations have already been "the subject of an investigation which commands respect". It is clear from his Lordship's discussion at pp.195-196 that he had in mind such examples as are to be found in Allbutt v General Council of Medical Education and Registration (1889) 23 QBD 400 and Perera v Peiris [1949] A.C. 1. Here, on the Defendant's account at least, the very purpose of the United States government's supplying a list to the Saudi banking regulator was to ensure that discreet inquiries should be carried out into banking transactions, in order to see whether the suspicions were well founded.

**60.** I appreciate that the Defendant has suggested that the desire for secrecy was only, or primarily at least, on the part of the Saudi authorities. Nevertheless, against that background, the maintenance of discretion and confidentiality is exactly what one would expect. There had as yet been no "investigation which commands respect" (in Lord Nicholls' phrase) and certainly none of which the Defendant or Mr Dorsey then had knowledge. It is thus necessary to focus on why exactly the public interest required the names to be brought out into the glare of public scrutiny before the inquiries were complete.

**61.** Whatever defamatory imputation one derives from the words complained of in this case, it is hard to see what public interest would be served by this exposure on 6 February 2002. The Defendant's witnesses may have believed, and for present purposes I am prepared to assume they did believe, that the naming of the Jameel group was in the public interest. Since the test is, however, objective rather than subjective, that does not determine the issue. What is more, on the Defendant's own account, the United States government did not appear to believe that publicity was at that time appropriate, let alone necessary. Since that accords with my own assessment, I do not have any particular difficulty into taking into account the international dimension. I cannot see any basis for saying that the public in England and Wales needed to know, or were entitled to be told, that the Jameel group (or accounts "associated with" the group) were being monitored by SAMA.

**62.** The Defendant's case at trial was that United States officials both in Saudi Arabia and in Washington sanctioned the publishing of the names. That admits of only two possibilities. Either the assurance of confidentiality to the Saudis was a sham or the relevant officials were divulging the information in breach of confidence. There was a suggestion, somewhat surprisingly perhaps, that when the United States government gives an inter-governmental assurance of confidentiality this only means that they will not reveal the information by official means. Even if the United States officials in Saudi Arabia did reveal the information quasi-officially (a proposition apparently rejected by the jury), it does not seem to me that this affects my assessment of urgency or the public's need to know.

**63.** In these circumstances, any newspaper which chooses to make these factual allegations would be adequately protected by the defence of justification. This the Defendant in the present case has declined to plead. Since the sources are not adequate to that task, it is by no means obvious why there would be a social or moral duty to pass on what Mr Dorsey claims he was told. One argument raised was that the "elasticity" of the privilege defence should enable the courts to extend protection to the publication of factual information gathered from undemocratic or repressive societies, or from dangerous environments such as "war zones". Since one can take into account all the circumstances of publication, such factors may well play their part in judging the facts of a particular case. But there is no need to lay down a general rule about it. What I find curious here, on the other hand, is that some of the information in this case is said to have come from United States officials, both in Washington and in Saudi Arabia. The undemocratic nature of Saudi society, therefore, would appear to be something of a red herring. If there was an ostensibly secret list which contained the Jameel name, but which the United States government truly wished to make public, I do not understand why this would be so difficult to establish.

**64.** Another argument was that the United States government wished the information to be made public so that it would provide a warning to people that monitoring was taking place and, accordingly, it was in the public interest that the information should be revealed through the Wall Street Journal Europe. (Indeed, in relation to the meaning of the article, it was submitted that readers would not be likely to think the worse of the Claimants because they would understand from the article that the whole purpose of the exercise was simply to warn people that they might be monitored.) I find this unconvincing since, as I have said, I do not understand why the evidence for such a policy should have proved so elusive. It is difficult to accept that the government wanted it made public in February 2002 if no one was prepared to confirm it in December 2003.

**65.** I believe the Defendant's primary argument on the importance of this story, and of the public's right to know, was that we needed to be reassured in the light of earlier media coverage that the Saudi government was indeed actively co-operating in the fight against terror, and not merely paying lip-service to it. This is said to justify *inter alia* the naming of the Jameel Group on 6 February 2002. I

find this unpersuasive for two main reasons. First, the point had already been made in the Journal the day before (without mentioning the names). Indeed, Mr Dorsey himself had written on 3 December 2001 that a United States official had announced that the two governments had "... agreed to co-operate and to co-operate quietly". Secondly, assuming that this basic allegation was in the public interest, I do not understand why the public had to have the *names* of the individual Saudi businesses to make the point good. It could have been established in general terms by reference, for example, to the phrase "prominent Saudi businesses."

**66.** It is necessary to say a little more on the subject of "sources". It is relevant to Lord Nicholls' criteria. As he noted at p.205, "Some informants have no direct knowledge of the events. Some have their own axes to grind, or are being paid for their stories". Here the evidence does not disclose who the various sources for the story were, save in the most general terms. As they are fully entitled to, the Defendants have declined to identify their sources. It is thus not possible to know precisely the extent of their knowledge, or the scope for confusion between particular lists of persons to be monitored. I am quite prepared to assume for present purposes that none of them had any axes to grind, and I accept the unchallenged evidence that Mr Simpson (who was checking out the story in Washington) and Mr Dorsey did not pay for any information they obtained. I put to one side also, for this purpose, the jury's rejection of the Defendant's case on Sources B to E. It is important to recognise, however, that there is no compulsion to publish whatever a source may state. The reliability of the source may be a factor to take into account when deciding whether or not the information was such that the public have a right to receive it. Needless to say, even if one has an entirely impeccable source with direct knowledge, it does not follow that qualified privilege will attach to a repetition of anything he may say. It is not *ipso facto* in the public interest. The ultimate question is that posed by "the classical interest-- duty test" and whether it can be fulfilled in these particular circumstances.

**67.** Mr Robertson placed reliance, in the alternative, upon the Privy Council decision in Bonnick v Morris (cited above). It seems clear in the light of Bonnick that the "single meaning" principle applied in English defamation law to the determination of meaning is not to be taken as always applying to the determination of qualified privilege. Their Lordships recognised that "at first sight" legal logic might appear to call for a similar approach. This would have entailed applying Lord Nicholls' ten criteria to the supposedly definitive (albeit often artificial) single defamatory meaning attached to the words complained of. (Needless to say, if the words are not defamatory in any sense, there would be no need to go on to consider qualified privilege at all.) In a jury case it would naturally follow that one could only address qualified privilege after, and in the light of, the jury's decision on the single meaning. Although the logic is impeccable, this would apparently have the practical consequence that the jury would have to draft out in writing *the* single defamatory meaning upon which they all agreed. I was invited to direct the jury in this case to do just that, but I declined. This is quite contrary to the tradition that juries are not normally asked to spell out the meaning or meanings they have arrived at. As I have already noted, it would often involve drafting in committee (which experience shows can be a sterile exercise) and would also undermine the convenient obscurity of jury deliberations, which enables them to differ among themselves over the reasoning which has led to their joint conclusions.

**68.** It so happens, however, that the decision of the Privy Council in Bonnick not to operate the "single meaning" doctrine in a privilege context may have the incidental benefit that such exposure of the jury's thinking processes can generally be avoided. Their Lordships plainly recognised that, since the tests for qualified privilege have to be applied objectively, it would not be permissible to ask the question what the journalist himself believed he was alleging and then to decide whether he had a duty to publish *that*. The element of subjectivity which the Bonnick decision might appear to introduce was simply to take account of the fact that privilege of this kind involves judging a defendant's "conduct" -- not merely an analysis of what he or she has *said*. Needless to say, however, what one actually says is part of one's conduct. Attention cannot thus be focused only on intention or other mental processes.

**69.** Here, I was asked by Mr Robertson to leave to the jury a question asking whether any of those involved in the story intended to defame either of the Claimants. I again declined. It seemed to me to be contrary to the well established principle that a defendant's understanding of the words' meaning is irrelevant. Nor did it appear to me that this question was calculated to elicit a finding geared to the Bonnick decision. Unlike the unusual situation in that case, Mr Dorsey did not give evidence to the effect that he had perceived the article as not even being capable of bearing a relevant defamatory meaning (see paragraph [25] of the Bonnick judgment, set out below). He could hardly have done so if he expected to retain his credibility. It is in this context of some marginal interest, as Mr Price pointed out, that Mr Dorsey himself in one of his e-mails suggested that the article needed to be submitted for legal advice.

**70.** Where defamatory words are genuinely ambiguous, in the sense that they may readily convey different meanings

to different "ordinary reasonable readers", then the court may take into account such other meaning or meanings when considering privilege. This may sometimes, I suppose, entail the process of considering any other possible defamatory meaning (i.e. other than the "single" meaning attributed by the court) and determining whether, if that was his understanding at the time of publication, the journalist might objectively be judged to have had a social or moral duty to communicate *that* allegation. It might also be relevant to take such other meaning into account when judging, for example, what checks should have been carried out. If a journalist genuinely did not appreciate that the words could carry a certain defamatory implication, he could hardly be criticised for not checking it out. That scenario bears no relation to the present case.

**71.** The court has to attach whatever weight to this factor "it considers appropriate in all the circumstances". Naturally, wording of this kind might be thought "at first sight" to be somewhat woolly and imprecise in a context where it behoves the courts in the context of Article 10(2) only to impose such restrictions on freedom of speech as are "prescribed by law". Moreover, these need to be formulated with sufficient "precision" to enable journalists, and others, to foresee the consequences of their actions. But, on closer inspection, it may be simply that language is so subtle and complex that it is not possible to lay down general rules which will cater precisely for all situations. As their Lordships recognised, one must adopt a "practical and flexible" approach and avoid "undesirable legalism and rigidity": see especially at [24].

**72.** There are at least two potential problems in the light of Bonnick v Morris. First, I raised the question with counsel whether the "alternative" meaning that their Lordships were contemplating (at paragraph [24] of the judgment) would necessarily be a defamatory meaning or whether it might also be non-defamatory. The answer may depend perhaps on how the alternative meaning fits into the particular case. If one is considering whether there would have been a duty to publish words bearing that meaning, it would only make sense if it was indeed defamatory. Otherwise, judges would find themselves in the position sometimes of recognising, in the light of a jury's decision, that the offending article was defamatory but holding that it was nevertheless privileged because some people (including perhaps the author) thought it had a non-defamatory meaning. The matter could not surely be judged on the basis of a duty to publish a non-defamatory imputation.

**73.** On the other hand, suppose the objective is not so much to answer directly the primary question of duty, but rather to assess one of the subsidiary tests along the way. In determining whether it was reasonable or responsible not to have made further pre-publication checks, it might well be relevant to consider how the journalist understood the allegations he was making and, if he genuinely thought the words bore no defamatory imputation at all, it would be difficult to criticise him for not addressing such a meaning for the purpose of checks or (say) giving an opportunity to comment upon it.

**74.** The second question is closely related. It is necessary to ask how their Lordships' guidance is to be applied where, unlike in Bonnick itself, the decision on meaning has to be made by a jury. A judge has to approach the jury's finding on meaning with some caution and sensitivity. It is important not to give jurors the impression that the judge is by sleight of hand, in his ruling on qualified privilege, side-stepping their conclusions and giving weight to some different meaning. This may come close in some circumstances to giving the jury the impression that the judge is substituting his own view of meaning for theirs.

**75.** In this thorny terrain, I propose to have particular regard to paragraph [25] of their Lordships' judgment:
"This should not be pressed too far. Where questions of defamation may arise ambiguity is best avoided as much as possible. It should not be a screen behind which a journalist is 'willing to wound, and yet afraid to strike'. In the normal course a responsible journalist can be expected to perceive the meaning an ordinary, reasonable reader is likely to give his article. Moreover, even if the words are highly susceptible of another meaning, a responsible journalist will not disregard a defamatory meaning which is obviously one possible meaning of the article in question. Questions of degree arise here. The more obvious the defamatory meaning, and the more serious the defamation, the less weight will a court attach to other possible meanings when considering the conduct to be expected of a responsible journalist in the circumstances."
Here the Defendant contends that the words were not defamatory in any sense, but for present purposes I am constrained by the jury's finding that the words bore a defamatory meaning. In general terms, it was the Claimants' case that the meaning which an ordinary reader would infer is that there were grounds to suspect them of some degree of involvement in the funnelling of funds to terrorists -- and that there is at least the possibility of "witting" involvement. (Mr Hudson's suggestion, as the former Managing Editor, that no reasonable reader could conclude that the phrase "potential terrorist ties" in the headline could apply to the Jameel group was, I thought, disingenuous.) It does not, in the present context, seem to me to matter where on the scale of gravity this defamatory allegation falls, since the effect of the article was to link the Jameel group and Mr Jameel to

terrorism at *some* level. Wherever on the scale they were supposed to fit in, there was no conceivable duty to publish their names, in that context, at that stage.

**76.** The facts of Bonnick were unusual. It seems to me to have no relevance here for at least two reasons. First, this is not a case of an "implied" defamatory meaning in the sense contemplated by their Lordships at paragraphs [18] and [19]. Here the Jameel group is named expressly as being on a list and as being the subject of monitoring. Secondly, no responsible journalist could conceivably disregard the defamatory meaning pleaded by the Claimants (i.e. of "reasonable grounds for suspicion") since it was "obviously one possible meaning of the article in question". Had it not been at least a "possible" meaning, no doubt it would have been struck out of the Particulars of Claim. I have no hesitation in also characterising it as an "obvious" meaning. I conclude, therefore, that the Bonnick decision has no impact upon the issue of privilege in this case.

Crown Copyright.

END OF DOCUMENT