**Exhibit 1**

Reply Brief in Support of Safer Al-Hawali's
Motion to Dismiss the Third Amended Complaint

03 MDL No. 1570 (RCC) / C.A. No. 03-CV-9849 (RCC)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

U.S. DISTRICT COURT
DISTRICT OF IDAHO
MAR 12 2003
LODGED ___ M. REC'D ___
___ FILED ___

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) CASE NO. CR 03-048-N-EJL |
| Plaintiff, | ) |
| v. | )<br>)<br>) **ORDER** |
| SAMI OMAR AL-HUSSAYEN, | ) |
| Defendant. | )<br>) |

On March 11 and 12, 2003, the Court heard extensive testimony in connection with the Government's motion to detain Defendant Sami Omar Al-Hussayen, pursuant to 18 U.S.C. §§ 3142(f)(2)(A) and (B) (Docket No. 12), filed February 26, 2003.

## I.
## Procedural Background.

On February 27, 2003, the Defendant made his initial appearance on eleven counts contained in the Indictment (Docket No. 1). Seven of the charges allege visa fraud and the remaining four charges allege false statements in connection with applying for and receiving a student visa. At his initial appearance, defense counsel sought a voluntary continuance of the detention hearing beyond the time provided in the statute, pursuant to the requirements of 18 U.S.C. § 3142(f). Defense counsel explained that additional time was needed to prepare for the

Order - page 1

hearing and to contact members of the Defendant's family who currently reside outside of the United States. The Court granted the request and set the detention hearing for March 11, 2003.

At the hearing, the Government presented the testimony of Michael James Gneckow, a special agent for the Federal Bureau of Investigation ("FBI") assigned to the office located in Coeur d'Alene, Idaho. In addition, the Government presented testimony by proffer.

On behalf of the Defendant, the testimony of Abdul Rakmal Al-Hussayen was presented, who is the Defendant's older brother. He appeared by video conference from Toronto, Ontario, Canada. The Defendant's brother is also a Saudi citizen and is a physician who is allowed to live in Canada by virtue of his work and scholarship. He was unable to obtain permission from the U.S. Consulate in Canada to travel to Idaho to testify in person. The Defendant presented the testimony of Dr. John Dickinson, the Defendant's scholastic advisor at the University of Idaho. The Defendant also presented the testimony of Marwan Mossad, a student at University of Idaho and president of the Muslim Student Association. Mr. Mossad has known the Defendant for approximately one year and meets with the Defendant once or twice per day. The Defendant also presented testimony of Raul Sanchez, who is charged with ensuring student diversity at the University of Idaho in the capacity as an assistant to the President of the university. Finally, the Defendant also presented evidence by proffer.

## II.
## Factual Background

The evidence presented at the detention hearing reveals two marked depictions of the Defendant. On one hand, the Government has put forth evidence that may suggest the Defendant

is affiliated with people or groups that espouse terrorist beliefs.[1] On the other hand, the Defendant has put forth evidence that may suggest that he is a hard-working and well-respected student with plans to finish his education at the University of Idaho. The Defendant's witnesses, however, each stated that they were unaware of any of Defendant's associations or activities outside of his scholastic or community involvement. The same could be said for the Government's witness as well. When asked, Agent Gneckow was not totally aware of the aspects of the Defendant's scholastic and community involvement. In that sense, one side sees what the other side does not. The Court will develop these divergent sets of facts and, recognizing the two very different depictions of the Defendant, the Court will address the Government's Motion for Detention.

Defendant Sami Omar Al-Hussayen is a native and citizen of the Kingdom of Saudi Arabia and has a wife and three children.[2] At the time of his arrest, the Defendant was a student at the University of Idaho and was engaged in pursuing his Ph.D. in computer science, with an emphasis on computer security. He has been so engaged since approximately 1999 and, prior to that time, the Defendant had studied for and earned a master's degree in computer science from Ball State University in Muncie, Indiana. Before enrolling in the University of Idaho to pursue

---

[1]. This is not to say, however, that the Government put on evidence that the Defendant *espoused* terrorist beliefs.

[2]. The Defendant resided primarily in the United States since 1994, with periodic trips back to Saudi Arabia. Some of Defendant's children are United States citizens.

Order - page 3

his Ph.D., the Defendant returned to Saudi Arabia for a period of time.[3] Both the Government and the Defendant agree to these basic facts.

Proceeding in light of the basic facts above, the Government offers a factual scenario that it self-describes as being within the "context of international terrorism." Specifically, the Government spent considerable time outlining the basic tenets of clandestine terrorist groups and the characteristics of terrorist activities. The Government also offered evidence of certain radical sheikhs from Saudi Arabia, Salman Al-Ouda and Safar Alhawali. The Government has presented certain statements or proclamations by these sheikhs advocating violence and terrorist activities against the United States. The Government further alleges that these two sheikhs have ties to Usama Bin Laden. The Indictment and search warrant affidavit contain some of these statements which were posted on internet web pages. The Government presented evidence regarding intercepted phone and email communications between the Defendant and these two sheikhs. Specifically, the Defendant communicated with Sheikh Al-Ouda regarding the creation of a web-site. In addition, the Defendant had phone numbers for both of the sheikhs in his personal phone directory. The Government also alleges that the Defendant has great respect for and connection with the sheikhs.[4]

Along with being in contact with Sheikh Al-Ouda about the creation of a web-site, the Defendant also created and maintained several other web-sites. The Government alleges some of

---

[3]. At the time the Defendant attended Ball State, he was allowed to be in this country under the provisions of what is referred to as an F-1 "student" visa. However, at the time that the Defendant returned to the United States to pursue his Ph.D. at the University of Idaho, he was present in this country under the status of a J-1 "exchange" visa.

[4]. The Government did not provide the Court with written transcriptions of the intercepted phone calls or copies of the intercepted email.

the web-sites that the Defendant created contain content, including pictures, articles, and poems, that advocates terrorist activities or recruitment to engage in terrorist activities. The Government has not presented proof that the Defendant created such content.

Among the various web-sites that the Defendant created is the web-site for the Islamic Assembly of North America ("IANA"). The Defendant was also involved with IANA in other capacities. Specifically, the Defendant is the registered agent for IANA in the state of Idaho and the Government alleges that the Defendant played a key role as an executive of IANA and had a close relationship to the director of IANA. The Defendant also maintained six different bank accounts[5] and received wire transfers from his uncle, Salen Abdel Rahman Al-Hussayen, who resides in Saudi Arabia, in two amounts totaling nearly $100,000.00. After IANA exhausted a previous wire transfer from a Swiss bank account in the amount of $300,000.00, the Defendant sent the money to IANA in piecemeal amounts either by check or wire transfer. IANA's books refer to these sums of money as loans.

Upon execution of several search warrants in connection with this case, the Government retrieved picture files (.jpg) from Defendant's home computer and from the computer at his school workstation. Specifically, the computers contained numerous picture files, including pictures of the World Trade Center before and after the September 11 attacks, an aerial photograph of the Pentagon, Taliban soldiers, Usama Bin Laden, Sheikh Al-Ouda, and a map of California that pinpointed four bridges.

The Defendant's uncle who wired the large amounts of money visited the United States and ultimately stayed at the Marriot hotel in Herndon, Virginia on September 10, 2001. Three of

---

[5]. The Defendant also maintained a bank account in Ann Arbor, Michigan under a different name.

the hijackers of flight 77, which ultimately crashed into the Pentagon, also stayed that the same hotel on September 10, 2001.

The Defendant, however, offered evidence that he is a father and a student at the University of Idaho, who does not condone or support terrorist activities and who is actively involved in the community. The Defendant first offered the testimony of his brother Abdul Rakmal Al-Hussayen, who testified that the Defendant grew up in a middle class family in Saudi Arabia and lived a normal middle class life. The Defendant's brother also testified that, while he and the Defendant had been raised Muslim, they were never forced to practice the Muslim religion. He also testified that he loved and admired the Defendant and described the Defendant as a peaceful and kind man.

Defendant then called Dr. John Dickinson, who testified that the Defendant was welcome back into the doctoral program at the University of Idaho. Dr. Dickinson also wrote a letter to the Idaho Statesman that stated the Defendant was "pleasant, polite, and helpful" and stated that the Defendant was "consistently making progress toward completing his degree." Dr. Dickinson testified that he believed all of these statements were true. Dr. Dickinson stated, however, that the vast majority of his contact with the Defendant was within a scholastic setting.

The Defendant also offered the testimony of University of Idaho student Marwan Mossad, who testified that the Defendant was cheerful, balanced, and wise and a person who did not advocate violence. Mr. Mossad described a petition of approximately 250 signatures in support of the Defendant's release pending trial. The Defendant also called Raul Sanchez, who testified that the Defendant was welcome back at the University of Idaho and would not be a flight risk. Mr. Sanchez stated that the Defendant is a member of an advisory group for campus diversity

issues, which is mostly comprised of faculty members. Mr. Sanchez testified that the Defendant felt strongly that the persons responsible for the September 11 attacks should be prosecuted and that the Defendant felt those persons were not acting on behalf of Islam. Mr. Sanchez also recounted a visit to the Defendant's residence where he watched the Defendant interact with his children and described the encounter as endearing.

Each of the witnesses who testified on behalf of the Defendant stated that they were unaware of any of the Defendant's activities with IANA, Sheikhs Al-Ouda and Alhawali, the money transfers, and the rest of the Government's evidence.

### III.
### Standard of Review.

The Court considers the issue of detention pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3141-3156. The Government has moved to detain the Defendant without bail prior to trial. (Docket no. 12) Upon a motion brought either by the Government or *sua sponte* by the Court, a detention hearing will be held if the case appears to involve: (a) a serious risk that the defendant will flee, or (b) a serious risk that the defendant will obstruct justice or attempt to threaten a prospective witness or juror. 18 U.S.C. §§ 3142(f)(2)(A) and (B). "On a motion for pretrial detention, the government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight, and by clear and convincing evidence that the defendant poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991), *citing United States v. Motamedi*, 767 F.2d 1403, 1406-07 (9th Cir. 1985); 18 U.S.C. § 3142(f).

In analyzing whether there are conditions of release that will reasonably assure the appearance of the Defendant and the safety of others, the Court shall take into account the following factors:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). The weight of the evidence, however, is the least important of the foregoing factors. *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Finally, in interpreting the Bail Reform Act of 1984, the Ninth Circuit has explained that the Court should deny release only in rare circumstances and the propriety of release should be resolved in the Defendant's favor. *Gebro*, 948 F.2d at 1121.

## IV.
## Analysis.

In its motion, the Government asserts that it would introduce evidence at the detention hearing that there was a serious risk the Defendant would flee, obstruct justice, or pose a danger to any other person or the community. After hearing and reviewing the evidence presented at the detention hearing, the Court finds that Defendant Sami Omar Al-Hussayen should not be detained. Taking into consideration the risk of flight and danger to any other person or the community, along with the factors to be considered under 18 U.S.C. § 3142(g), the Court bases its determination upon the following findings of fact.

A.  **Risk of Flight**

In arguing that the Defendant poses a risk of flight, the Government mainly focuses on the Defendant's ability to participate in the doctoral program at the University of Idaho. Put bluntly, the Government asserts that the Defendant has no ability to participate in the doctoral program and that such participation is illusory or, at best, non-existent. The Government further argues that, absent the ability to participate in the doctoral program, the Defendant does not have any other significant tie to the community. Accordingly, the Government's argument therefore runs as follows: because the Defendant does not have the ability to participate in the doctoral program, it is more likely than not that he will flee.

The Court will analyze the statutory factors pursuant to 18 U.S.C. § 3142(g) to determine whether the Government has established by a preponderance of the evidence that the Defendant will flee.

With regard to the Government's argument that the Defendant does not have any other significant community ties beyond the doctoral program, the Court would point out that community ties are but one of the several items that the Court must analyze in making its determination. Specifically, ties to the community are one of many items that the Court will consider under the 18 U.S.C. § 3142(g)(3)(A) factor of "history and characteristics" of the Defendant. In any event, there is other evidence of the Defendant's ties to the community. Specifically, the Defendant has organized a blood drive, has organized peace vigils, and has arranged social gatherings on campus. Apart from these activities, Mr. Mossad testified that the Defendant was open to discussion about the Muslim religion with members of the community

and spoke with the press regarding the religion when other Muslims were afraid that they would be misunderstood.

Analyzing the *nature* of the offenses charged in isolation, the Court finds nothing that would lead to the conclusion that the Defendant constitutes a flight risk. Analyzing the *circumstances* of the offense charged, the Court concludes that it can fashion conditions of release that meet will ensure the Defendant's appearance at trial. The history and characteristics of the Defendant also suggest that he does not pose a flight risk. The Defendant offered testimony of several witnesses who each testified that the Defendant would not be a flight risk. This testimony is further supported by the petition containing approximately 250 signatures reflecting the same sentiment, i.e., that the Defendant would not flee. The petition also reflects the amount of community support that the Defendant has garnered by virtue of his community involvement. In addition, the Defendant also put forth testimony regarding the cultural importance placed on the family, which is also suggestive that the Defendant will not abandon his family and flee.

The evidence described above convinces the Court that the Defendant is not a flight risk. The prospect of the Defendant deserting his wife and three children and flee the United States, while not entirely inconceivable, appears extremely remote based on the evidence before the Court. In addition, the Defendant has presented evidence that the Government's investigation of certain members of the Muslim community in the Pullman-Moscow area had been leaked to the press several months ago. In fact, the Defendant was interviewed for the story and has taken no steps to leave the jurisdiction of the United States. The Defendant has ties to the community and there was extensive testimony in this regard. The Defendant appears to be welcome in the

Moscow-Pullman area. Accordingly, the Court concludes that the Government has not established, by a preponderance of the evidence, that the Court could not fashion release conditions which would adequately assure the presence of the Defendant at trial.

**B.     Danger to Any Other Person or to the Community**

The Government asserts that the charges in this case are brought "within the context of international terrorism." The Government supports this assertion by pointing to the technological, financial, and business aspects of the Defendant's alleged involvement and support of those who advocate violence against the United States. These facts, the Government argues, demonstrate by clear and convincing evidence that the Defendant poses a danger to the community.

Analyzing the *nature* of the offenses charged in isolation, the Court finds nothing that would lead to the conclusion that the Defendant constitutes a danger to the community. Analyzing the *circumstances* of the offenses charged, however, the Court is not as convinced. The Government states that the charges are brought "within the context of international terrorism" and it is this dimension of the case that is of concern. The Government's evidence, standing alone, paints a picture of a man who is affiliated with people or groups that espouse terrorist beliefs. Accepting this evidence at face value, the Court would conclude that the circumstances of the offense could lead to the conclusion that the Defendant poses a danger to the community. There is, however, the Defendant's side of this story. Each of the Defendant's witnesses testified in some fashion or another that the Defendant would not flee, that the Defendant was a respectable person, and that the Defendant did not espouse terrorist views.

Order - page 11

The Defendant argues with some force that in a democratic society that an individual who creates a web-site is not thereafter responsible for what may be posted on the site by a third person. The Court was initially concerned about the pictures recovered from the Defendant's home and university computers. At first blush, it appears the Defendant has a preoccupation with the events of September 11, 2001 and other terrorist activities world wide. However, as explained by Dr. Dickinson, whenever any person would access a news web-site, such as MSNBC, and the computer "loaded" that information, all of the pictures accompanying that days' story would permanently remain on the computer hard drive. Any person accessing these types of web site sources during the relevant time frame would have the same pictures or depictions on their computer. The Court has also considered the Defendant's argument that a "terrorist" who was assisting in the dissemination of information to assist terrorist activities would not have listed himself as the administrative contact with his name and post office address, nor would he have registered with the Secretary of State as the registered agent for IANA in the state of Idaho.

The financial transactions by the Defendant are of concern. At this juncture, the evidence indicates that the money was being used to pay the salaries and office expenses of the officials at IANA. The Government states the investigation is on-going and direct links between the funding of money to IANA in such a clandestine manner, as was employed here, would present a different picture of Defendant's danger to the community if the funds went to terrorist organizations.

The Court would point out that much of the Government's argument as to the danger that Defendant would pose to the community stems from his communications, either by computer or

by telephone, with certain people or groups and from his creation and maintenance of web-sites for certain people or groups. If the Court were able to restrict the Defendant's ability to engage in such communications, then much of the Government's concern regarding the danger to the community could be curtailed. The Court believes that it could fashion conditions of release that would prohibit using communicative devices, including personal computers, laptops, or email.

Taking all of the statutory factors into consideration and in light of other considerations, the Court concludes that conditions of release can be fashioned that would protect the safety of the community while this matter is awaiting trial.

### C.     Reopening of Hearing

The Government has represented that the investigation of the Defendant's activities is on-going. As provided by 18 U.S.C. § 3142(f), this hearing may be reopened at any time before trial if a finding is made by the Court that information exists that was not known to the movant at the time of the hearing and that it has material bearing on the issue of whether or not these conditions will reasonably assure the appearance of the Defendant as required or the safety of the community.

### D.     Conditions of Release

In light of the foregoing, the Court concludes that it can fashion conditions of release that ensure, first, the Defendant will appear at trial and, second, that preserve the safety of the community. Pursuant to 18 U.S.C. § 3142(h), when issuing a release order, the Court must include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct; and advise the person of the penalties for violating a condition of release, including the penalties for committing

Order - page 13

an offense while on pretrial release; the consequences of violating a condition of release, including the immediate issuance of a warrant for the person's arrest; and sections 1503 of this title (relating to intimidation of witnesses, jurors, and officers of the court), 1510 (relating to obstruction of criminal investigations), 1512 (tampering with a witness, victim, or an informant), and 1513 (retaliating against a witness, victim, or an informant).

The Court imposes the restrictions and conditions set forth in the accompanying Order of Release.

### ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that**, the Government's Motion for Detention (Docket No. 12), filed February 26, 2003, is DENIED.

DATED:     March 12, 2003.

MIKEL H. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

ja

United States District Court
for the
District of Idaho
March 13, 2003

\* \* CLERK'S CERTIFICATE OF MAILING \* \*

Re:  3:03-cr-00048

I certify that I caused a copy of the attached document to be mailed or faxed to the following named persons:

    Kim R Lindquist, Esq.
    US ATTORNEY'S OFFICE
    Box 32
    Boise, ID  83707

    David Z Nevin, Esq.     1-208-345-8274
    NEVIN HERZFELD BENJAMIN & MCKAY
    PO Box 2772
    Boise, ID  83701

    Scott McKay, Esq.       1-208-345-8274
    NEVIN HERZFELD BENJAMIN & MCKAY
    PO Box 2772
    Boise, ID  83701

    U.S. Marshal
    HAND DELIVERED

    Probation
    HAND DELIVERED

        _____ Chief Judge B. Lynn Winmill
        __✓__ Judge Edward J. Lodge
        _____ Chief Magistrate Judge Larry M. Boyle
        __✓__ Magistrate Judge Mikel H. Williams

    Visiting Judges:
        _____ Judge David O. Carter
        _____ Judge John C. Coughenour
        _____ Judge Thomas S. Zilly

                              Cameron S. Burke, Clerk

Date:  3-13-03                BY:  _____
                                   (Deputy Clerk)