**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | **MDL No. 03 MD 1570 (RCC)** |
| This document relates to:<br><br>FEDERAL INSURANCE COMPANY, et al,<br><br>              Plaintiffs,<br>        v.<br><br>AL QAIDA, et al.,<br>              Defendants. | NO. 03 CV 6978 (RCC) |

**MEMORANDUM OF LAW OF SALEH KAMEL AND AL BARAKA INVESTMENT**
**AND DEVELOPMENT CORPORATION IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**MARTIN MCMAHON & ASSOCIATES**

By:_____/s/_____
Martin F. McMahon, Esq., M.M., 4389
Christopher R. Smith, Esq., C.S., 5455
Martin McMahon & Associates
1150 Connecticut Ave., N.W.
Ste. 900
Washington, D.C.  20036
(202) 862-4343

*Attorneys for Defendants Saleh Abdullah Kamel*
*and Al Baraka Investment and Development*
*Corporation*

Dated: Washington, DC
July 30, 2004

1

## TABLE OF CONTENTS

**CONTENT**                                                    **PAGE NO.**

TABLE OF CONTENTS                                                    i

TABLE OF AUTHORITIES                                                 ii

I.      INTRODUCTION                                                 1

II.     THE BASES FOR FED. R. CIV. P. 12(b)(1) AND (6) RELIEF        1

III.    THE PLAINTIFFS ALLEGE THAT INDIVIDUAL
        DEFENDANT KAMEL AND THE ABIDC HOLDING
        COMPANY HAVE MADE NUMEROUS
        INVESTMENTS WITHIN AND OUTSIDE
        THE ISLAMIC BANKING SYSTEM                                  4

IV.     THESE ALLEGATIONS WARRANT DISMISSAL OF
        THE ASHTON AND BURNETT COMPLAINTS UNDER
        FED. R. CIV. P. 12(B)(6).  BLANKET CONCLUSORY
        LEGAL ALLEGATIONS, OF WHICH THERE ARE MANY,
        CANNOT SAVE THIS COMPLAINT                                  6

V.      LACK OF SUBJECT MATTER JURISDICTION IS
        A SEPARATE AND DISTINCT ALTERNATIVE BASIS
        FOR DISMISSING DEFENDANTS KAMEL AND ABIDC                   15

VI.     CONCLUSION                                                  20

## TABLE OF AUTHORITIES

**Cases:**                                                    **Page No.**

Albert v. Carovano,
851 F.2d 561 (2d Cir. 1988)                                   9, 13

Atuahene v. City of Hartford,
10 Fed. Appx. 33 (2d. Cir. 2001)                             7, 13

Boim v. Quranic Literacy Institute & H.L.F.,
291 F.3d 1000 (7th. Cir. 2002)                               17

Browning v. Clinton,
292 F. 3d 235 (D.C. Cir. 2002)                               11

Burnett v. Al Baraka Inv. and Dev. Corp.,
274 F. Supp.2d 86, 109 (D.D.C. 2003)                         3, 12

City of Philadelphia v. Beratta U.S. A. Corp.,
277 F.3d 415 (3d. Cir. 2002)                                 11

Consolidated Gold Fields PLC v. Minorco, S.A.,
871 F.2d 252 (2d. Cir.1989)                                  19

DiPonzio v. Riordan,
89 N.Y. 2d 578 (1997)                                        11, 19

First Nationwide Bank v. Gelt Funding Corp.,
27 F.3d 763 (2d. Cir. 1994)                                  13

Gaines-Tabb v. ICI Explosives USA Inc., 995 F. Supp. 1304
(D. Okla. 1996)                                              11

Galeri Gmurzynka v. Hutton,
257 F. Supp. 2d 621 (S.D.N.Y. 2003)                          8

Gauvin v.Trembatore,
682 F.Supp. 1067 (N.D. Cal. 1988)                            7, 13

Grand Lodge of Fraternal Order of Police v. Ashcroft,
185 F.Supp.2d 9 (D.D.C. 2001)                                15

Hartford Fire Insurance Co. v. California,
509 U.S. 764 (1993)                                                    15, 16

Holmes v. Securities Investor Protection Corp.,
503 U.S. 258 (1992)                                                    17, 18

Jameel v. Times Newspapers Limited,
2003 EWHC 2609 (Q.B. November 7, 2003)                                 9, 10

Jazini v. Nissan Motor Co., LTD.,
148 F.3d 181 (2d Cir. 1998)                                           8, 13

North South Finance Corp. v. Al- Turki,
100 F.3d 1046 (2d. Cir. 1996)                                         18, 19

Papasan v. Allain,
478 U.S. 265 (1986)                                                   7

Republic of Argentina v. Weltover,
504 U.S. 607 (1992)                                                   18

Schenker v. Assicurazioni Genereali S.p.A., Consol.,
No. 98 Civ. 9186, 2002 WL 1560788 at *10
(S.D.N.Y. July 15, 2002)                                              8

Tasso v. Platinum Guild Int'l.,
1997 WL 16066 at *6 (SDNY January 16, 1997, J. Preska)                14

Timberlane Lumber Co. v. Bank of America,
749 F.2d 1378 (9th. Cir. 1984)                                        20

Ungar v. Islamic Republic of Iran,
211 F. Supp. 2d 91 (D.D.C. 2002)                                      2

Ying Jing Gan v. City of New York,
996 F.2d 522 (2d Cir. 1993)                                           8

**Federal Rules and Statutes:**

18 U.S.C. 2333 (a)                                                    15, 17

Fed.R.Civ.P. 8(a)                                                     7, 8

Fed. R. Civ. P. 12(b)                                                 *Passim*

iii

**<u>Secondary Sources:</u>**

G. Crile, *Charlie Wilson's War* (2003)                              10

<u>Restatement (Second) Torts</u>, section 433(c) (1965)              12

<u>Restatement (Third) of Foreign Relations</u>, section 401(1)(c)    19

<u>Restatement (Third) of Foreign Relations</u>, section 403(2)(a)    16, 17

I. INTRODUCTION:

May it please the Court, Defendants Saleh K. Kamel ["Defendant Kamel"] and Al-Baraka Investment and Development Corp. ["Defendant ABIDC"] have already moved to dismiss the Burnett v. Al Baraka Investment & Development Corp. litigation, CA No. 03 CV 9849, and the Ashton v. Al-Qaeda Islamic Army litigation, CA No. 02 CV 6977.  Both motions have been fully briefed and are ready for oral argument.

In moving to dismiss the Burnett complaints under both Fed. R. Civ. P. 12(b)(1) and (6), Defendants Kamel and ABIDC extensively briefed two separate doctrines of law and addressed, ad seriatim, each and every cause of action contained therein and the basis for dismissing the same.  Since the allegations made against these Defendants and the causes of action contained in the Federal Insurance Company, et al. v. Al Qaida, et al., CA 03 CV 6978 ("Federal Insurance") Complaint are even less substantive than those contained in the Burnett litigation, Defendants Kamel and ABIDC will file herein a summary version of the memorandum of law filed in Burnett.

II. THE BASES FOR FED. R. CIV. P. 12(b)(1) AND (6) RELIEF:

In the Burnett litigation, these Defendants first argued that this Court did not have the requisite "subject matter jurisdiction" to hear the claims made against Defendants Kamel and ABIDC.  The argument was limited and specific as to these Defendants only; they have never argued that the Court lacked "subject matter jurisdiction" to hear claims with respect to other parties whom the allegations may show have a substantial and direct relationship to the September 11, 2001 attacks.

The second argument advanced was that, even if the Court afforded the Plaintiffs all

1

permissible inferences at this procedural stage, the complaint failed to state a viable cause of action against either Defendant.  The reason for a bi-furcated motion, premised on Fed. R. Civ. P. 12(b)(1) and (6), is that federal courts have recognized that the absence of causation may be both a jurisdictional, as well as a liability issue.  Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 98 (D.D.C. 2002).

One example from the pleadings [Federal Insurance para.322] which is illustrative of the over-lapping nature of these legal doctrines is that Defendants Kamel and ABIDC in 1983 invested in a bank, known as Al Shamal Bank, which entity allegedly had questionable transactions moving through it.  Based on the "subject matter jurisdiction" doctrine, the Defendants have argued that, assuming arguendo the truth of this allegation, this extraterritorial [occurring outside of the U.S.A.] investment activity did not have a direct and foreseeable effect on the U.S. nationals complaining herein, i.e, the 9/11 victims.

The flip side of this argument is that the Plaintiffs' injuries were not the direct, foreseeable and substantial effect of said investment activity on behalf of Defendants Kamel and ABIDC.  Under each approach, since the injuries at bar are not the "immediate consequence" or the reasonably foreseeable consequence of said investment activity, it is unreasonable, at least as to Defendants Kamel and ABIDC, for the Court to exercise subject matter jurisdiction and proceed to adjudicate the claims pled herein against them.

Two significant factors bear on the "unreasonable" analysis.  According to the Complaint, the alleged "investment activity" **were investments in businesses outside the U.S.A., which were all made either in 1983 or at some unidentified time period.**  The injuries, of course, occurred almost **twenty years** after the only dated investment, on September 11th, 2001.  Thus, the investment activity is either unidentified in time or too remote in time,

2

place and circumstances from the 9/11 tragedy and dismissal for lack of subject matter jurisdiction is appropriate.

For similar reasons, but based on Fed. R.Civ.P. 12(b)(6), the <u>Federal Insurance</u> complaint should also be dismissed because it fails to state a claim for which relief can be granted against Defendants Kamel and ABDIC.  The Complaint fails to allege specific, non-conclusory factual allegations showing that the alleged activities of these Defendants were the proximate cause of or a substantial factor leading to the Plaintiffs' injuries.  There is no allegation, e.g., that in January 2001, Defendant Kamel paid co-Defendant and hijacker Atta or his aviation school $1,700 to finance his flight training.

Finally, based on the law of the case doctrine stemming from Judge Robertson's "funnel" analysis contained therein, it is respectfully submitted that the <u>Federal Insurance</u> complaint fails, at least as to Defendants Kamel and ABIDC, as a matter of law, entirely apart from the Fed. R. Civ. P. 12(b)(1) and (6) analyses on which the instant motion is premised.  Judge Robertson opined therein that except for a general conclusory allegation made against all **Bank Defendants,** [neither Defendant Kamel nor Defendant ABIDC are "banks"] the <u>Burnett</u> complaint was deficient since the particular bank [Al Rajhi] "is alleged only to be the funnel. **Plaintiffs offer no support and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking services"** [emphasis added] <u>Burnett v. Al Baraka Inv. and Dev. Corp.,</u> 274 F. Supp.2d 86, 109 (D.D.C. 2003).

This holding that a "funnel" cannot be held responsible for the 9/11 tragedy makes the instant motion to dismiss even more compelling.  First, there is no allegation that either of these Defendants are "banks," so they cannot be deemed to be "funnels."  Moreover, as pled by the

3

Plaintiffs, these Defendants are, at most, "investors" in "funnels!"

**Query:**  If it is the "law of the case" that a bank/funnel cannot be held responsible for the

9/11 tragedy, how can a shareholder or "investor" in a "funnel" be held responsible?  It is

respectfully submitted that is a threshold question that this Court should have the Plaintiffs

address before hearing them on the merits of the Fed. R. Civ. P. 12(b)(1) and (6) motions.

### III. THE PLAINTIFFS ALLEGE THAT INDIVIDUAL DEFENDANT KAMEL AND THE ABIDC HOLDING COMPANY HAVE MADE NUMEROUS INVESTMENTS WITHIN AND OUTSIDE THE ISLAMIC BANKING SYSTEM

Individual Defendant Kamel, according to the instant complaint [Federal Insurance,

paras. 66, 101, 298, 322, 335, 486, 501-02]: (a) aided and abetted, conspired with and provided

material support and resources to Al Qaeda; (b) was a member of the Golden Chain of Al

Qaeda's principal sponsors; (c) heads ABIDC; (d) became a shareholder in Al Shamal Bank in

1983; (e) became a shareholder of Tadamon Islamic Bank in 1983; (f) co-founded Sana-Bell,

Inc.'s Washington, D.C. branch and knew and intended that it would be used to fund Al Qaeda;

(f) is Chairman of al Baraka Financial Institution; (g) has made contributions to many charities

with knowledge that those funds would be used to support Al Qaeda; and (h) through his for-

profit enterprises and involvement with charities and individuals operating within Al Qaeda

provided material support and resources to Al Qaeda.  As is quite clear, there are no allegations

that Defendant Kamel: (a) was or is a bank [a/k/a "a funnel"]; and (b) provided banking services.

 We represent to the Court that if these allegations had been advanced and were the subject of the

instant motion, they would be false.

More allegations have been made in the instant complaint against the holding company -

ABIDC, but in essence they are that the company has made numerous investments in various

financial enterprises, primarily based in the Middle East.  These allegations, like those made

against Defendant Kamel, are completely devoid of any factual linkage to the 9/11 tragedy.

While the name Osama bin Laden is mentioned [once in a substantive context] in relation to Defendants Kamel and ABIDC, it is the year 1983 [Federal Insurance, para. 320, 322].  In 1983, the Central Intelligence Agency was pumping millions of dollars into Afghanistan to fight America's and Saudi Arabia's mutual enemy, the Soviet Union, by arming the "freedom fighters," as President Reagan called them.  More importantly, that alleged assistance was provided six years before Al Qaeda was founded [Federal Insurance, para. 77] and eight years before Osama bin Laden moved to the Sudan [Federal Insurance, para.78], where allegedly he was receiving such assistance.

The allegations against ABIDC are that:

(1) ABIDC aided and abetted, conspired with and provided material support and resources to Al Qaeda [Federal Insurance, para. 66];

(2) ABIDC is itself a wholly owned subsidiary of Dallah Albaraka Group [Federal Insurance, para. 298];

(3) ABIDC became a shareholder in Al Shamal Bank in 1983 [Federal Insurance, para. 322];

(4) ABIDC became a shareholder in Tadamon Islamic Bank in 1983 [Federal Insurance, para. 335];

(5) ABIDC has maintained accounts ["Charity Accounts"] for IIRO, MWL, WAMY, BIF, Al Haramain, and other charities [Federal Insurance, para. 299];

(6) ABIDC provided a mechanism to allow Al Qaeda supporters to deposit funds directly into the Charity Accounts [Federal Insurance, para. 300];

(7) The Charity Accounts have been used to transfer funds to Al Qaeda cells throughout the world.  In particular, Al Haramain's accounts have been used to fund Al Qaeda's operations in Bosnia [Federal Insurance, para. 301];

(8) ABIDC knew that the Charity Accounts were being used to solicit and transfer funds to terrorist organizations [Federal Insurance, para. 302];

(9)   ABIDC provided support to Al Qaeda through its subsidiaries, Al Shamal Islamic Bank, Tadamon Islamic Bank and al Aqsa Bank [<u>Federal Insurance</u>, para. 304];

(10)   ABIDC knowingly provided financial services, material support and logistical support to Al Qaeda for Al Qaeda's global jihad [<u>Federal Insurance</u>, paras. 303, 305]; and

(11)   The 9/11 Attacks were the direct, intended and foreseeable produce ABIDC's participation in Al Qaeda's jihadist campaign [<u>Federal Insurance</u>, para. 306].

As the Court can observe, there are no allegations that ABIDC provides "banking services" or that the holding company is a "bank".  We similarly represent to the Court that if such allegations were the object of the instant motions to dismiss, they would be false.  In short, ABIDC is exactly what the Plaintiffs allege it to be - a holding company investment vehicle in the financial services sector for Dallah Albaraka Group, LLC, ["DACLLC"], its parent holding company.[1]

## IV. THESE ALLEGATIONS WARRANT DISMISSAL OF THE ASHTON AND BURNETT COMPLAINTS UNDER FED. R. CIV. P. 12(B)(6).  BLANKET CONCLUSORY LEGAL ALLEGATIONS, OF WHICH THERE ARE MANY, CANNOT SAVE THIS COMPLAINT

**Individual Defendant Kamel:**  The allegations made against Defendant Kamel fall into three categories:  a) Allegations that he is a shareholder in the Islamic banking system; b) General, conclusory allegations that he supports, aids and abets and conspires with others to commit acts of terrorism; and c) The allegation that he is a member of the Golden Chain.  The first category of broad investment allegations is simply legally insufficient.  It is hornbook law that a Court hearing a 12(b)(6) motion is "not bound to accept as true a legal conclusion couched as a factual allegation."  <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).  Plaintiffs are advancing

---

1 The <u>Federal Insurance</u> Complaint also names Dallah al Baraka Group, LLC as a defendant.  The only other complaint naming this defendant is the <u>Ashton</u> Complaint.  This is a defunct entity that no longer exists and the

6

the legal conclusion that Defendant Kamel [like "all defendants"] has and is per se supporting international terrorism because he has invested in an Islamic bank.

Similarly, the conclusory, non-specific legal allegations against Defendant Kamel and general catch-all allegations applicable to "all defendants" are legally insufficient as well.  For example, in paragraph sixty-six of the Federal Insurance Complaint, it is alleged that a four page list of Defendants, including Defendant Kamel, "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida…."  While these allegations are sensational in nature, they are legally insufficient as a matter of law.  This type of "group" allegation has been consistently rejected by our courts because it fails to meet even the liberal notice pleading requirements of Fed.R.Civ.P. 8(a), to wit: "By lumping all defendants together in each claim and providing no factual basis to distinguish their conduct, [the] complaint failed to satisfy [the] minimum standard [under Rule 8.]."  Atuahene v. City of Hartford, 10 Fed. Appx. 33,34 (2d. Cir. 2001).  See also Gauvin v.Trembatore, 682 F.Supp. 1067, 1071 (N.D. Cal. 1988) (rejecting a similar complaint where all of the defendants were "lumped together in a similar broad allegations").  Even a cursory review of the complaint reveals that nowhere is it alleged that Defendant Kamel ever planned or conspired with anyone, let alone Bin Laden or al Qaeda. Nor is it alleged that Defendant Kamel laundered or hid money for them.  More particularly, and as an example of a relevant time frame, vis-a-vis the year 1983, there is no allegation that in January, 2001 Defendant Kamel gave the hijackers monies to finance their aviation lessons or their prepatory reconnaissance passenger flights to and from various American cities.

Similar naked, non-individual specific and conclusory allegations of conspiracy were cited by the Supreme Court as an example of a claim that warranted dismissal **even under**

---

Court should note that the Ashton Plaintiffs voluntarily dismissed this alleged entity from their Complaint.

**liberal notice pleading rules**.  <u>See</u> <u>Papason v. Allain</u>, 478 U.S.265, 286 (1986).  And, "[s]uch wholly non-specific allegations cannot form the 'sole basis' for connecting the moving parties to alleged conspiracy."  <u>Schenker v. Assicurazioni Genereali S.p.A., Consol.,</u> No. 98 Civ. 9186, 2002 WL 1560788 at *10 (S.D.N.Y. July 15, 2002).  Although Rule 8 establishes a liberal pleading standard, "mere incantation of the words 'conspiracy' and 'acted in concert with' does not talismanically satisfy the Rule's requirements."  <u>Galeri Gmurzynka v. Hutton</u>, 257 F. Supp. 2d 621, 631 (S.D.N.Y. 2003).

While the Complaint contains some individual allegations against Defendant Kamel, these allegations are conclusory as well.  For example, Defendant Kamel is alleged to be "one of al Qaida's principal individual financiers."  [<u>Federal Insurance</u>, para. 501].  And, "through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, Saleh Kamel has long provided material support and resources to al Qaida."  [<u>Federal Insurance</u>, para. 502].  These allegations are no more than legal conclusions couched as facts, and on a motion to dismiss, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness."  <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 534 (2d Cir. 1993).  A Court should give no weight to legal conclusions couched as factual allegations.  <u>See</u> <u>Jazini v. Nissan Motor Co., LTD.,</u> 148 F.3d 181, 184 (2d Cir. 1998); <u>Albert v. Carovano</u>, 851 F.2d 561, 572-73 (2d Cir. 1988).  Accordingly, the Court should give no weight to these legal conclusions either.

The final category of allegations deserving analysis is the Golden Chain allegation [<u>Federal Insurance</u>, para. 101].  The "Golden Chain" is a dated, historical document that has been recently described by an English court, which took testimony on the document as falling "well short of establishing the existence of sufficient grounds for an enquiry or investigation:"

8

>In my judgment the [Golden Chain] list falls well short of establishing the existence of sufficient grounds for an enquiry or investigation. In brief my reasons are these: the list is in manuscript; its author is unknown, as is the source of the author's information; there is nothing in the list to suggest that the individuals named have made donations, rather than that they are potential donors; the list has been dated by Mr. Brisard, the lead investigator in the *Burnett* case, to 1988 at which time [Osama bin Laden] was engaged in resisting the Soviet incursions into Afghanistan with the approval of western governments; there is nothing to link the list to Al-Qaeda; any money which was donated was apparently to be applied to fund fighters in Chechriya and Bosnia and not the atrocities which took place many years later in New York. It is true that the Golden Chain list was attached to an Evidentiary Proffer filed in US criminal proceedings against Mr. Aranout in support of the admissibility of co-conspirator statements. But the Evidentiary Proffer was ruled inadmissible. In any event Mr. Aranout was not convicted of any offence implicating him in terrorist activities on the part of Al-Qaeda or [Osama bin Laden] in the US; he pleaded guilty to defrauding donors by using their donations without their knowledge to fund activities for which they were aware.

Jameel v. Times Newspapers Limited, 2003 EWHC 2609 (Q.B. November 7, 2003)(Gray, J.).

The significance of this ruling cannot be understated. Yousef Jameel was a defendant named in the *Burnett* litigation brought by the families of the victims of the September 11 attacks.[2] The London Times printed a story that Mr. Jameel was a defendant in the litigation and there was suspicion linking him to terrorism. The Defendant, Times Newspapers, moved for summary judgment on its defense of justification in a libel action brought by Mr. Jameel, relying on the Golden Chain document for its justification. The Court noted that the defense of justification would require the Times to show, where the publication essentially reports that there is an allegation of suspicious conduct by the plaintiff and that there is sufficient reason to enquire or investigate the conduct, that the Times was *subjectively reasonable* in relying on hearsay such as the Golden Chain document for its defense. In holding that "the [Golden Chain] list falls well short of establishing the existence of sufficient grounds for an enquiry or investigation" id., the Court held that it was not *subjectively reasonable* to rely on the Golden Chain document, a

9

document dating to "1988 at which time [Osama bin Laden] was engaged in resisting the Soviet incursions into Afghanistan with the approval of western governments." Id.

As the English court found, the document is untrustworthy and remote.  Given that the document dates to 1988 when both bin Laden and the United States were raising funds in a war against Soviet aggression in Afghanistan[3] and one year before al Qaeda was organized, [Federal Insurance, para. 77], the document fails to provide any basis for claiming that bin Laden was publicly advocating wars against --- primarily the United States, its citizen and interests." Accordingly, any donations or supported provided in 1988 cannot be causally linked to attacks against the Untied States thirteen years later.  This demonstrates that Plaintiffs' legal theory incorporates the remote connectivity concept of Six Degrees of Separation, yet fails to meet the legal requirements for pleading aiding and abetting or proximate cause.  Defendants submit that one court has already found this document to be untrustworthy and excessively remote in terms of proximate causation, and therefore, this Court should disregard this allegation as well.

In short, the Complaint does not contain the requisite and specific factual allegations showing that the alleged activities of individual Defendant Kamel were the proximate cause of or

---

2 Mr. Jameel is also a defendant in the litigation herein.
3   It is well known and well documented that the greatest provider of resources to the muhajideen fighters in Afghanistan during this time period was the United States of America through the covert support of both Congress and the Central Intelligence Agency that ultimately reached 750 million dollars per year.  G. Crile, *Charlie Wilson's War* (2003).  As Crile writes, the United States and Saudi Arabia were equal partners in raising money for the support of the mujahideen in Afghanistan.  Saudi Arabia matched the United States dollar for dollar, with the United States urging Saudi Arabia to support "your Muslim brothers . . . using the money for food, for the families, for clothing, for weapons, for repairing the mosques."  C. Crile, *Charlie Wilson's War* 165, 238, 276, 340 (2003).  In the epilogue of his book, Crile acknowledges that the terror attacks of September 11, 2001 are "unforeseen and unintended consequences" of American support for the Afghan resistance during the 1980s.  "Afghanistan was the largest and most successful covert operation ever mounted by the CIA.  But the scope and nature of this campaign has still not registered in the consciousness of most Americans.  Nor is it understood that such secret undertakings inevitably have unforeseen and unintended consequences, which in this case remained largely ignored.  None of the sponsors of the campaign, least of all Charlie Wilson, has ever felt responsible for the path the CIA-sponsored jihad has taken; perhaps that's because their intentions were so pure and because the specific objectives they sought were initially so overwhelmingly successful."  C. Crile, *Charlie Wilson's War* 508-09 (2003).

a substantial factor in leading to the plaintiff's injuries.  See Browning v. Clinton, 292 F. 3d 235, 249 (D.C. Cir. 2002).  The factual allegations made against Defendant Kamel are so "remote in time, place and circumstances," Browning, supra., revealing no "direct relation between the injury asserted and the injurious conduct alleged" and cannot satisfy the foreseeability requirements in cases such as this.  City of Philadelphia v. Beratta U.S. A. Corp., 277 F.3d 415, 423 (3d. Cir. 2002); DiPonzio v. Riordan, 89 N.Y. 2d 578, 657 N.Y.S. 2d 377 (1997); Gaines-Tabb v. ICI Explosives USA Inc., 995 F. Supp. 1304 (D. Okla. 1996).

**ABDIC Allegations:**  The allegations against Defendant ABDIC fall into one of the following three categories:  (a) Allegations that Defendant ABDIC invested in Islamic banks which supported Al Qaeda in some non-specific manner; (b) Allegations that ABDIC maintained accounts for charities that were used to transfer funds to Al Qaeda; and (c) General, non-specific conclusory allegations that ABDIC aided and abetted, conspired with others to support and provided material support to Al Qaeda.

The first two categories, when scrutinized, are seen for what they are - at most, that allegedly questionable transactions occurred at certain banks [a/k/a "funnel"] at a time when ABIDC held shares in those banks as an investor.  The most specific allegation is that ABIDC maintained accounts for Al Haramain, which served as a principal vehicle for funding Al Qaeda's operations in Bosnia [Federal Insurance, para. 301].  Given Judge Robertson's holding that "funnels" [a/k/a banks] cannot be held liable, herein Burnett, 272 F.Supp. 2d at 109, it is preposterous to suggest that an entity like ABIDC which, at most, holds shares or invested in an alleged "funnel," could ever be held liable.

The Court should also take note that Plaintiffs never allege dates as to when this

"funneling" allegedly occurred.  The only date alleged with regard to Defendant ABIDC is 1983, the date when Defendant ABIDC invested in Al Shamal Islamic Bank and Tadamon Islamic Bank [Federal Insurance, paras. 320, 334].  Time is a critical consideration in determining whether an actor's conduct is a substantial factor in bringing about harm to another.  Restatement (Second) Torts, section 433(c) (1965).  Here, of course, the Plaintiffs are alleging funneling at an unidentified time and investments made in 1983, which Plaintiffs somehow causally connect to the 9/11 tragedy.  However,

> "experience has shown that where a great length of time has
> elapsed between an actor's negligence and harm to another,
> a great number of contributing factors may have operated,
> many of which may be difficult or impossible of actual proof.
> Where the time has been long, the effect of the actor's conduct
> may thus have become so attenuated as to be insignificant and
> unsubstantial as compared to the aggregate of the other
> factors that have contributed"

Restatement (Second) Torts, section 433, comment f (1965).  The Second Circuit has recognized that even a five year period of time between the defendant's actions and the plaintiff's injury can suggest that external factors were a substantial cause.  See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d. Cir. 1994).  In sum, as the above case law makes abundantly clear, the allegation involving ABIDC's alleged conduct occurring in 1983 is per se immaterial and remote, and Plaintiffs fail to plead any date with regard to the legally insufficient allegations of funneling.

The final category of allegations against ABIDC are Plaintiffs' same old tired individual conclusory legal allegations against ABIDC and catch-all "grouping" allegations.  As with Defendant Kamel, Plaintiffs "grouping" allegations allege that ABIDC along with a slew of other Defendants "aided and abetted, conspired with, and provided material support and

resources to, defendant al Qaida…."  [Federal Insurance, para. 66].  Similarly, Plaintiffs non-specific legal allegations allege that "[t]he September 11th Attack was a direct, intended and foreseeable produce of ABIDC's [sic] participation in al Qaida's jihadist campaign"  [Federal Insurance, para. 306].  As argued above, the catch-all "grouping" allegations are legally insufficient because "[b]y lumping all defendants together in each claim and providing no factual basis to distinguish their conduct, [the] complaint fail[s] to satisfy [the] minimum standard [under Rule 8.]" Atuahene, 10 Fed. Appx. at 34.  See also Gauvin, 682 F.Supp. at 1071.  Likewise, the Court should disregard the non-specific legal conclusory allegations against ABIDC, which have been couched as factual allegations.  See Jazini, 148 F.3d at 184; Albert, 851 F.2d at 572-73.

While Judge Robertson's "funnel" holding, by itself, mandates ABIDC's dismissal, it is respectfully submitted that ABIDC can also be dismissed under either Fed. R. Civ. P. 12(b)(1) or (6).

**The al Bayoumi Allegations:**  There is one last allegation in the Federal Insurance Complaint that warrants analysis in the context of Defendants' motion to dismiss.  The claim is that one of Dallah Avco's [an entity related to ABIDC] employees, Omar al Bayoumi, is alleged to have met with and paid two months rent in San Diego for two of the September 11 hijackers [Federal Insurance, para. 412-13]  It is also alleged that Princess Haifa, wife of Prince Bandar, provide monthly checks to al Bayoumi, some of which "ended up in the hands of the two September 11th hijackers" [Federal Insurance, para. 420].

As paragraph 414 of the Complaint alleges, Al Bayoumi was employed by Dallah Avco, an aviation services subsidiary of Dallah Albaraka Group, LLC.  Assuming arguendo, that al Bayoumi did pay the rent for two of the September 11th hijackers, Judge Robertson's ruling is

13

that such an allegation is immaterial, to wit:

> The [third amended complaint] asserts claims against members of the al-Rajhi family who are bank officers but it makes no allegations that would support an inference that any al-Rajhi family member was acting within the scope of his bank employment when he allegedly provided support to al Qaeda, as would be necessary to impose vicarious liability on the bank for the acts of its o fficers and employees.

274 F.Supp. 2d at 109, fn. 8.  See e.g. Tasso v. Platinum Guild Int'l., 1997 WL 16066 at *6 (SDNY January 16, 1997, J. Preska).

With that analysis in mind, Defendants Kamel and ABIDC are even more remote from the Plaintiffs' causes of action than the al-Rajhi family members.  Al Bayoumi was neither an employee nor an officer of Defendants Kamel and ABIDC.  He is alleged to have been an employee of Dallah Avco, a subsidiary of DACLLC.  Thus, the al Bayoumi allegation does not serve as a basis for denying these Defendants the relief they seek pursuant to their Fed. R. Civ. P. 12(b)(1) and (6) motions.[4]

In sum, whether you take the individual allegations made against Defendants Kamel and the holding company ABIDC or the general, omnibus "all defendants" legal conclusory allegations, based on Judge Robertson's "funnel" holding and reasoning, these Defendants should be dismissed from both cases.  It is also respectfully submitted that there are alternative legal bases for dismissing these Defendants, premised on the instant motion filed herein on their behalf.

## V. LACK OF SUBJECT MATTER JURISDICTION IS A SEPARATE AND DISTINCT ALTERNATIVE BASIS FOR DISMISSING DEFENDANTS KAMEL AND ABIDC

---

[4] The Court should also take judicial notice that the recent 9/11 Commission Report at pp. 217-19 discounts the allegation that Bayoumi knowingly aided terrorists and issued a finding that Bayoumi is "an unlikely candidate for clandestine involvement with Islamic extremists."

14

While the relief requested is the same under the instant Fed. R. Civ. P. 12(b)(1) and (6) motions, the factual allegations at issue are given closer scrutiny under Fed. R. Civ. P. (1), since the motion inherently focuses on the court's power to hear the claims. Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F.Supp.2d 9,13 (D.D.C. 2001).  And, the plaintiff bears the burden of proof on the issue of jurisdiction.  Id.

The instant 12(b)(1) motion raises the issue as to the extra-territorial reach of the Antiterrorism Act of 1992, 18 U.S.C. section 2333 ["ATA"].  Contrary to the Plaintiffs' view, an unlimited causation chain stretching back to 1983, the Defendants assert that the power of Congress to prescribe with respect to extraterritorial conduct [even the ATA] is not unlimited.

Justice Scalia, e.g., in Hartford Fire Insurance Co. v. California, 509 U.S. 764, 813 (1993), noted that "there is a type of 'jurisdiction' relevant to determining the extraterritorial reach of a statute."  He wrote "[i]n sum, the practice of using international law to limit the extraterritorial reach of statutes is firmly established in our jurisprudence."  509 U.S. at 818.

In Hartford, the Supreme Court, in Part III of Justice Souter's opinion [509 U.S. 17 794-799], took up the question of whether certain antitrust claims "should have been dismissed as improper applications of the Sherman Act **to foreign conduct"** [emhasis added].  To resolve that question, the Court looked to the Restatement (Third) of Foreign Relations ["Restatement"], and more specifically section 403 thereof [extensively briefed in the Burnett memorandum, pp. 4,5]. A five member majority, after considering the factors articulated in section 403, concluded that they "would not counsel against exercising jurisdiction in the circumstances here."  Id. at 798.

The Court's rational in reaching that conclusion is especially instructive herein, i.e., that the requirements of section 403(2)(a) were satisfied since the majority found that the complaint

15

therein, unlike the <u>Federal Insurance</u> Complaint, had alleged a direct effect on U.S. commerce. Defendants Kamel and ABIDC, of course, are not arguing that the complaints fail to allege some effect on American soil; 3,000 American citizens were murdered, a barbaric act that Defendant Kamel has condemned.

What the Defendants do argue, however, is that the <u>Federal Insurance</u> allegations do not show that their alleged extraterritorial activities **had an effect on U.S. soil or met the proximate cause and foreseeable effects requirement of either the ATA ["by reason of"] or section 403 (2)(a) of the Restatement.**  The Defendants argue that the factors identified in section 403 of the Restatement substantially weigh against the reasonableness of exercising subject matter jurisdiction over the claims made herein against these defendants.  And, alternatively, that these same factors weigh against the conclusion that the ATA applies to the factual allegations made against them.

The federal statutes forming the bases for the various claims made herein recognize several of these limitations, e.g., Restatement section 403(2)(a)'s requirement that the alleged extraterritorial activities have a direct, foreseeable effect on the U.S. or its nationals.  In providing a civil cause of action under ATA, Congress specifically stated: "Any [U.S.] national injured ...**by reason of an act of international terrorism**... may sue therefore..." [emphasis added] ATA, 18 U.S.C. 2333 (a).

The above "by reason of" language is crucial and is essentially what the parties herein disagree about, with the Plaintiffs taking the position that it means unlimited liability, even for defendants who are merely investors in banks [a/k/a "funnels"].  This language has been extensively examined by the Seventh Circuit Court of Appeals, which construed the language to mean that Congress has prescribed only that **foreign conduct** where the injuries "might have

16

reasonably been anticipated as a natural consequence of the defendant's actions.  Boim v.

Quranic Literacy Institute & H.L.F., 291 F.3d 1000, 1011-12 (7th. Cir. 2002).

The Boim court recognized that this "by reason of" language requires a showing of

"proximate cause" as well as "foreseeability."  Id.  More importantly, it concluded that the ATA

cannot be construed in a manner that would attribute "almost unlimited liability to even remote

acts; **it must have meant something else."  [emphasis added]** Boim at 1020. Yet that is exactly

what the Plaintiffs are asking this Court to do in seeking to hold liable herein mere investors in a

bank [a/k/a "funnel"].

The Boim court examined Holmes v. Securities Investor Protection Corp., 503 U.S.

258,268 (1992) at length, where the Supreme Court had to determine the reach of the RICO

statute's "by reason of" language.  The Holmes opinion undercuts the Plaintiffs expansive

reading of the ATA's "by reason of" language by importing the tort concept of "proximate cause"

into the

statutory construction analysis.  Not surprisingly, the Court also recognized that at common law

the concept of "proximate cause" incorporated a requirement of "some **direct relation between**

**the injury asserted and injurious conduct alleged."**  [emphasis added] Id.

What is clear from the Defendants viewpoint is that in enacting the ATA civil remedy

Congress: (a) certainly had other similar statutory language and case law precedent to look to;

and (b) obviously married the statute to the well known Restatement's requirements.  Thus, the

Plaintiffs herein must allege that their injuries are not only a **direct** consequence of foreign

conduct taken by Defendants Kamel and ABIDC, but that the injuries arising out of the 9/11

tragedy are also the **foreseeable consequences of** such foreign conduct.

The Supreme Court has stated that, for jurisdictional purposes, an "effect" on the U.S. is

"direct if it follows as an immediate consequence of the defendant's activity."  Republic of

Argentina v. Weltover, 504 U.S. 607, 618 (1992) [construing the "commercial activity"

exception under the Foreign Sovereign Immunity Act].  The Second Circuit has addressed the

issue of "direct" effects of foreign-based conduct in the RICO, securities law and antitrust

settings.  In North South Finance Corp. v. Al- Turki, 100 F.3d 1046, 1050-52 (2d. Cir. 1996), the

Second Circuit affirmed dismissal of RICO claims under Fed.R.Civ.P. (12)(b)(1), citing the

"effects test," which is regarded as a jurisdictional requirement Id., at 1053, and has been

construed to mean that "transactions with only remote and indirect effects in the United

States do not qualify as substantial."  Id., at 1051.

    In addressing securities fraud arising out of foreign conduct, U.S. securities laws "may be

given extraterritorial reach whenever a predominantly foreign transaction has substantial effects

within the United States."  Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 261-

62 (2d. Cir.1989)", cited in North South Finance Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d.

Cir.1996).  However, "transactions with only remote and indirect effects in the United States do

not qualify as substantial."  Id. at 262, similarly cited.

    In North South Finance Corp. the Court also addressed the issue of antitrust liability

arising out of foreign conduct, to wit:  "It is also settled that antitrust liability may attach to

anticompetitive conduct occurring outside the United States, but having consequences here, if

the conduct is intended to and actually does have an effect on United States imports or exports

which the state reprehends."  North South Finance Corp., at 1052.  See Restatement 401(1)(c)

["conduct outside its territory that has or is intended to have substantial effect within its

territory"].

    The Plaintiffs not only have a problem in showing that Defendants' investment activity

18

dating back to 1983 had a "direct effect" on U.S. soil.  Plaintiffs' claims also fail as a matter of law because their injuries could not have been foreseen by the Defendants when the Defendants made their investments in Islamic banks in 1983.  The foreseeability analysis employed under Fed.R.Civ.P. 12(b)(1) necessarily implicates the doctrine of "remoteness," which has been addressed by numerous courts.

As one court observed:  "Although virtually every untoward consequence can theoretically be foreseen 'with the wisdom born of the event,' the law draws a line between remote possibilities and those that are reasonably foreseeable because 'no person can be expected to guard against harm from events which are so unlikely to occur that the risk...would commonly be disregarded." DiPonzio v. Riordan, 89 N.Y.2d 578, 583, 657 N.Y.S.2d 377,380 (1997).  There is also the "related problem" of the "need to analyze the relationship between the risk created by the actor's conduct and the actual occurrence that caused the harm."  Id.

The actor's conduct complained of herein involves various investments in and start-up of new financial institutions or business in the Middle East, occurring between 1983 and 1991.  This "conduct" obviously bears no relationship to the actual occurrence that caused the plaintiffs' harm on September 11th.  Even if the Court makes a giant leap of logic that there is some consequential relationship between this "conduct" and the occurrence of September 11th, it is the kind of "indirect consequence...at most, **a remote possibility at the time the conduct occurred and thus was not a foreseeable consequence."**  [emphasis added] Di Ponzio at 89 N.Y.2d 585, 657 N.Y.S.2d at 381.  See also Timberlane Lumber Co. v. Bank of America, 749 F.2d 1378, 1385 (9th. Cir. 1984), cert. den., 472 U.S. 1032 )1985) [investment decision to foreclose on assets in Honduras, which later has effect on plaintiff in the United States **does not meet foreseeability requirement for subject matter jurisdiction**].

19

Based on all of the above considerations, this Court has ample cause to grant Defendant Kamel and ABIDC's respective Fed.R.Civ.P. 12(b)(1) motions for lack of subject matter jurisdiction.

## VI. CONCLUSION

For good cause shown in this memorandum and the memoranda (initial and reply) filed in <u>Burnett</u> and <u>Ashton</u>, the Court should grant the motion to dismiss based on the law of the case doctrine or in the alternative, for lack of subject-matter jurisdiction, or the motion to dismiss for failure to state a claim for which relief can be granted, and dismiss this action and all claims against Saleh A. Kamel and Al Baraka Investment & Development Corp.

Respectfully Submitted,


_____ /s/
Martin McMahon, Esq., M.M., 4389
Christopher Smith, Esq., C.S., 5455
Martin McMahon & Associates
1150 Connecticut Ave., NW
Suite 900
Washington, D.C. 20036
(202) 862-4343

*Attorneys for Defendants*
*Saleh Abdullah Kamel and*
*Al Baraka Investment &*
*Development Corp.*

Dated: July 30, 2004

21