UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*
*Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.*, 03 CV 5738 (RCC)
*Federal Insurance Co. v. Al Qaida*, 03 CV 6978 (RCC)
*Barrera v. Al Qaeda Islamic Army*, 03 CV 7036 (RCC)
*Salvo v. Al Qaeda Islamic Army*, 03 CV 5071 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849 (RCC)

## AFFIRMATION OF VINCENT I. PARRETT IN OPPOSITION TO PRINCE SALMAN BIN ABDUL AZIZ AL-SAUD'S MOTION TO DISMISS CERTAIN CONSOLIDATED COMPLAINTS

Vincent I. Parrett, Esq., affirms as follows:

1.      I am an attorney admitted to practice in New York and in this Court, and I am an

associate of the law firm Kreindler & Kreindler LLP.  I submit this affirmation to transmit to the

Court the following documents submitted in opposition to the motion to dismiss filed by

defendant Prince Salman bin Abdul Aziz al-Saud in certain of the consolidated actions in this

proceeding:

2.      Exhibit 1 to this Affirmation is a true and accurate copy of the "Law on

Humanitarian Activities and Humanitarian Organizations of the Federation of Bosnia and

Herzegovina," which appeared in the *Official Gazette*, No. 35, in September 1998.

3.      Exhibit 2 to this Affirmation is a true and accurate copy of an article entitled

"Salman donates SR.1.5m in a major fund-raising event," which appeared in the *Middle East*

*Newsfile* on December 16, 1999.

4.      Exhibit 3 to this Affirmation is a true and accurate copy of an article entitled "60% Saudi-Owned Firm Buys Tex. Refinery, Plans Venture to Import Saudi Products," which appeared in Platt's Oilgram News on June 12, 1987.

5.      Exhibit 4 to this Affirmation is a true and accurate copy of an article entitled "Saudi Arabia – The Private Placements," which appeared in *Input Solutions, APR Review Gas Market Trends* on October 20, 2003.

6.      Exhibit 5 to this Affirmation is a true and accurate copy of an article entitled "From The White House," which appeared in the *Federal News Service* on July 27, 1989.

7.      Exhibit 6 to this Affirmation is a true and accurate copy of a news advisory reporting on Prince Salman's meeting with Governor William Schaefer of Maryland, which appeared on *PR Newswire* on July 19, 1989.

8.      Exhibit 7 to this Affirmation is a true and accurate copy of an article entitled "Bedminster man sues estate of Saudi prince for back pay," which appeared in *Associated Press Worldstream* on May 17, 2003.

9.      Exhibit 8 to this Affirmation is a true and accurate copy of a "charity" webpage of "Al-Birr Society in Ar-Riyadh" established by Prince Salman.

10.      Exhibit 9 to this Affirmation is a true and accurate copy of a U.S. Department of Treasury Press Statement entitled "Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism," which appeared on November 19, 2002.

11.      Exhibit 10 to this Affirmation is a true and accurate copy of an article entitled "Saudi Curb On Alms Targets Radicals' Cash," which appeared in *The Guardian (London)* on May 5, 1993.

12.     Exhibit 11 to this Affirmation is a true and accurate copy of an article entitled "Traditional Saudis Take Dim View Of Attempts To Modernize Islam," which appeared in *The Washington Post* on August 24, 1994.


Affirmed in New York, New York on July 30, 2004.


_____
Vincent I. Parrett

3

# EXHIBIT 1

# THE LAW ON HUMANITARIAN ACTIVITIES AND HUMANITARIAN ORGANIZATIONS OF THE FEDERATION OF BOSNIA AND HERZEGOVINA[1]

(The Official Gazette, No. 35, September 1998)

## I.      GENERAL PROVISIONS

### Article 1

This Law shall regulate the conditions for carrying out humanitarian activities, the conditions and procedure for the establishment and cessation of humanitarian organizations, and other issues pertinent to humanitarian organizations.

### Article 2

Humanitarian activities, as defined by this Law, shall encompass activities by which humanitarian aid in the form money, goods and services, without compensation and without conditions concerning territorial, national, religious, political and other affiliations, shall be provided to natural and legal persons who, through no fault of their own, find themselves in need for such aid (because of reduced health and working capability, state of war, elemental catastrophes, etc.).

### Article 3

A humanitarian organization shall be established for the purpose of performing humanitarian activities. A humanitarian organization shall acquire the status of a legal entity.

### Article 4

The Law on Citizens' Associations (Official Gazette of the Federation of BiH, No. 6/95) shall apply to the establishment, registration and other issues regarding the work of humanitarian organizations, unless otherwise determined by this Law.

### Article 5

The work of humanitarian organizations shall be guided by the laws and other legislative acts of the Federation of Bosnia and Herzegovina (hereinafter: Federation) and the laws of cantons as part of the overall economical, social and development plans, and especially through financial and other privileges and exemptions.

## II.      HUMANITARIAN ORGANIZATIONS

### Article 6

Humanitarian organizations shall be established as non-governmental organizations and shall voluntarily carry out their activities on the principles of humanity, impartiality and independence.

### Article 7

A humanitarian organization can be established by citizens, their families, a few citizens and their families, citizens' associations, religious communities and their organizations, and corporations and associations established by corporations and other legal persons (hereinafter: the founder).

Foreigners who are residents or temporarily reside in the Federation, pursuant to the regulations on the movement and residency of foreigners, may alone or with citizens of the Federation establish a humanitarian organization, in accordance to the provisions of this Law.

Humanitarian activities in the Federation can be carried out by humanitarian organizations which have their seat in another country (hereinafter: foreign humanitarian organizations), pursuant to the provisions of this Law.

### Article 8

The work of humanitarian organizations shall be public.

The manner of ensuring the publicity of the organization's work shall be provided in the organization's by-laws.

### Article 9

A humanitarian organization shall carry out its activities on the not-for-profit principle. The profit generated from the organization's principle and economic activities shall only be used to accomplish the organization's principle objectives, as stipulated in the by-laws.

### Article 10

In performing its activities, a humanitarian organization shall use its name and logo.

### Article 11

A humanitarian organization may be entrusted by law or by a decision of an authorized body of the concerned municipality to carry out social services which fall within the government's prerogatives, and especially to:

- to take part in supporting the victims of armed conflicts and natural disasters,
- to collaborate with health and civil protection services in taking care of the wounded and the sick,
- to take part in providing shelter to the evacuated population,
- to participate in organizing the return of displaced persons- refuges and persons forced to leave their homes .

### Article 12

A religious group shall be deemed to carry out humanitarian activities, without having to establish a separate legal entity, if there is an organizational unit of such group with a purpose of performing humanitarian activities pursuant to the provisions of this Law.

## III.     ESTABLISHMENT AND REGISTRATION OF HUMANITARIAN ORGANIZATIONS

### Article 13

The decision on the establishment of a humanitarian organization shall be in writing and shall be rendered by:

1.  a citizen-individual, if he or his family  is a founder,
2.  the founding assembly of the citizens' association with the required presence of at least 30 citizens who will vote and sign on the decision to establish a humanitarian organization,
3.  the authorized body of the citizens' association, if an association is the founder,
4.  the authorized body of a religious group or its organizational unit, if such a group or its unit is the founder,
5.  the authorized body of a corporation or an association established by the corporation, if a corporation or its association is the founder.

### Article 14

The decision on the establishment of a humanitarian organization shall contain, in addition to the data required by the Law on Citizens' Association, the amount of founding capital and the means of financing the organization's activities.

### Article 15

A humanitarian organization shall have by-laws.

### Article 16

A humanitarian organization shall enter into the registry of humanitarian organizations (hereinafter: the registry).

A humanitarian organization shall acquire the status of a legal person after its entry into the registry.

The registry shall be kept by the Federal Ministry of Social Affairs, Displaced Persons and Refugees (hereinafter: the Registration Ministry), if the by-laws of a humanitarian organization provide that it will be active in the territory of two or more cantons. If the by-laws provide that a humanitarian organization shall confine its activities to the territory of only one particular canton, the registry of such humanitarian organization shall be kept by

the cantonal ministry in charge for humanitarian aid.

The Federal Minister for Social Affairs, Displaced Persons and Refugees (hereinafter: the Minister) shall regulate the form and manner of keeping the registry.

The registry shall be open to public.

### Article 17

The humanitarian organizations which are not entered into the registry according to the provisions of this Law cannot perform their activities in the Federation.

### Article 18

The ministries referred to in the Article 16, Paragraph 3 of the Law shall render a decision on the request for entry into the registry within 15 days of receiving the request.

If the ministry referred to in Paragraph 1 of this Article establishes that the request for entry into the registry is incomplete, or if it establishes that some of the provisions of the by-laws do not comply with the provision of the Law, it will notify the applicant and request that appropriate amendments be made within 20 days of the applicant's receipt of notification.

If the applicant fails to make requested amendments or if he fails to submit the amendments within the deadline prescribed in Paragraph. 2, the ministry shall reject the request for entry into the registry.

### Article 19

Humanitarian organizations shall notify the registration body of any changes with respect to the provisions of the by-laws, the name and the seat of the organization, or the names of persons authorized to represent it, within 20 days of the occurred changes.

The ministry shall issue a decision on the entry of the amendments referred to in Paragraph 1 of this Article into the registry.

## IV.    PROPERTY OF HUMANITARIAN ORGANIZATIONS

### Article 20

A humanitarian organization can acquire property for carrying out its activities from:

- founding capital,
- membership fees, contributions and membership gifts,
- the federal budget, the budget of  a canton and municipality, in accordance with the decision of the  Federation's Government, the government of a canton or municipality, and upon the request of a humanitarian organization,
- donations of domestic and foreign natural and legal persons,
- other sources.

### Article 21

A humanitarian organization shall keep business books and draw up financial reports, in accordance to the Federal and cantons regulations.

## V.    FOREIGN HUMANITARIAN ORGANIZATIONS

### Article 22

Pursuant to the provisions of this Law, a foreign humanitarian organization is a humanitarian, non-governmental, organization which has a seat in another state, is established under the regulations of that state, and seek to perform humanitarian activities on the territory of the Federation.

This Law shall not apply to foreign humanitarian organizations established by the UN (UNESCO, UNICEF, UNCHR, etc.) or foreign governments, which are parties to special agreements concluded with the Government of the Federation.

### Article 23

A foreign humanitarian organization which seeks to carry out its activities in the territory of the Federation shall submit a request for the performance of its activities before it arrives in the Federation, but in any event no later than 10 days after its arrival.

A foreign humanitarian organization which seeks to perform its activities in the territory of two or more cantons shall submit the request for entry into the registry and the performance of humanitarian activity to the Registration Ministry, within the deadline set forth in Paragraph 1 of this Article. If it seeks to perform its activities in the territory of a canton, the request shall be submitted to the ministry in charge of humanitarian aid in the respective canton.

Along with the request for registry, the following documents must be submitted:

1.  act on the establishment and registration of a foreign humanitarian organization in a domiciled country,
2.  the by-law or other act of internal governance,
3.  decision of an authorized body on performing humanitarian activities and opening of a branch office in the Federation,
4.  program of activities,
5.  data on the branch office (name, seat, address),
6.  persons authorized to represent a humanitarian organization.

### Article 24

If the conditions set forth in the Law are met, the registration body shall issue a decision on entry into the registry of a foreign humanitarian organization.

If the organization's humanitarian activity is in the field of health care, education, economic developments or any other activity, the Registration Ministry shall, before enrolling into the

register, ask for the opinion of the Federation ministry in charge with the field in which the organization seeks to operate (hereinafter: the competent ministry).

The competent ministry shall deliver an opinion referred in Paragraph 2 of this Law to the Registration Ministry, within 5 days of receipt of the request.

### Article 25

The decision on the entry into the registry shall contain the date of the entry, the referral number of registration, the name of the foreign humanitarian organization, its seat, the branch's address in the Federation or canton where it seeks to perform its activities, and the names of persons authorized to represent the organization.

### Article 26

After entry into the registry, the competent ministry shall issue a permit to a foreign humanitarian organization for the realization of the proposed humanitarian project, on a form prescribed by the Registration Ministry.

If a foreign humanitarian organization seeks to perform its activities in the territory of two or more cantons, before the issuance of the permit, the Federation competent ministry shall request an opinion of the competent ministry of a canton in whose territory the organization seeks to accomplish the proposed project.

The competent ministry of a canton shall deliver the opinion referred to in Paragraph 2 of this Article to the Federation competent ministry, within eight days from the day of receipt of the request.

The competent Ministry of the Federation shall issue a permit referred to in Paragraph 1 of this Article, within 15 days after receipt of the request for issuing a permit.

### Article 27

A foreign humanitarian organization shall proceed with the realization of a humanitarian project in the Federation only after a permit for proceeding with the project has been issued, as referred to in Article 26 of this Law.

### Article 28

The authorized representatives of a foreign humanitarian organization and its personnel shall be obliged to posses and upon the request of the authorized bodies in the Federation or cantons present an identity card, which shall be issued by the competent ministry of the Federation or cantons on a prescribed form.

### Article 29

In carrying out its humanitarian activities, a foreign humanitarian organization shall observe laws and other regulations of the Federation or cantons, and especially those which are

referring to the activities of foreign legal and natural persons, financial management, employment, fulfillment of legal obligations etc.

A foreign humanitarian organization shall submit information on the realization of approved plans and programs to the ministry that approved the project at least once every 3 months.

### Article 30

Provisions of this Law shall also apply to foreign scientific and specialized organizations that perform their activities in the field of health care, education and other fields for humanitarian purposes.

Foreign organizations referred in Paragraph 1 of this Article shall not enter into the registry of humanitarian organizations, but are allowed to carry out their activities only after their request has been approved by the competent ministry, in accordance with this Law.

## VI.      CESSATION AND PROHIBITION OF WORK OF A HUMANITARIAN ORGANIZATION

### Article 31

A humanitarian organization shall cease to work:

1.  if the founder of a humanitarian organization decides to cease the work performed by the humanitarian organization
2.  if it is established that a humanitarian organization has ceased to perform its activities.

### Article 32

A humanitarian organization shall be prohibited from working under the following conditions:

1.  if it is not performing the activities for which it was established,
2.  if it works contrary to the provisions of its by-laws and this Law.

A procedure for the prohibition of work shall be instigated by the body authorized to supervise the legality of the work of a humanitarian organization.

The competent ministry shall render a decision on the prohibition of work by a humanitarian organization.

A humanitarian organization shall be erased from the registry after the decision of the authorized ministry has become enforceable.

On other questions pertinent to the cessation and prohibition of work by a humanitarian organization, the relevant provisions of the Law on Citizens' Association shall apply.

### Article 33

A decision on the entrance into the registry, cessation and prohibition of work by a humanitarian organization shall be published in the "Official Gazette of the Federation of

Bosnia and Herzegovina" for humanitarian organizations which are registered at the Federal level, or in the cantonal official gazette, for humanitarian organizations which are registered in cantons.

The costs of the publishing shall be borne by a humanitarian organization.

## VII.    SUPERVISION OF THE LEGALITY OF WORK OF A HUMANITARIAN ORGANIZATION

### Article 34

The Ministry shall supervise the legality of the work of foreign humanitarian organizations that carry out their activities in the territory of two or more cantons, and their compliance with this Law and other federal laws and regulations.

A competent ministry of a canton shall supervise the legality of the work of a foreign humanitarian organization that operates only in the territory of the concerned canton..

### Article 35

A federal inspector shall order a humanitarian organization to remedy all irregularities and shortcomings determined during the inspection and shall set a time-line for the removal of these irregularities and shortcomings.

An appeal can be launched against the decision of the federal inspector within 8 days of receipt of the decision.

An administrative procedure can be instigated against the Ministry's final decision.

## VIII.    FINAL PROVISIONS

### Article 36

A fine of 200 to 1000 KM shall be imposed for on a humanitarian organization if it:

1.  made the delivery of  humanitarian aid to citizens contingent on their territorial, national, religious or political affiliations (Article 2),
2.  performs activities which are contrary to the by-laws of the humanitarian organization (Article 15),
3.  acquires property contrary to the provisions of this Law (Article 20)
4.  does not keep business books or draws up financial reports in accordance to Article 21 of this Law,
5.  does not allow or interrupts the inspector in conducting its supervision, or if it fails to remedy irregularities and shortcomings determined by the inspector (Article 34 and 35).

For  misdemeanors stated in Para. 1 of this Article, a fine of 100 to 300 KM shall also be imposed on a responsible person of a humanitarian organization.

### Article 37

A fine of 200 to 800 KM shall be imposed on a humanitarian organization if:

1.  it starts its activities before entering into the registry,
2.  an authorized representative of a foreign humanitarian organization does not possess, or upon the request of the competent body refuses to present, an identity card,
3.  performs its activities contrary to the provision of this Law.

For the misdemeanors stated in Para. 1 of this Article, a fine of 150 to 300 KM shall also be imposed on a responsible person of a humanitarian organization.

## IX.    TRANSITIONAL AND FINAL PROVISIONS

### Article 38

Humanitarian organizations which are founded and registered before this Law came into force shall adjust its by-laws and other internal documents to the new Law and submit them to the competent ministry, within 6 months after the Law came into force.

The competent ministry shall enter the humanitarian organization referred to Para. 1 of this Article into the registry, pursuant to the provisions of this Law.

### Article 39

Regulations on the application of this Law shall be passed in 60 days from the day on which this Law comes into force.

### Article 40

Other regulations on humanitarian activities formerly applicable in the Federation of Bosnia and Herzegovina shall cease to be valid after this Law comes into force.

### Article 41

This Law shall come into force on the eighth day after its publication in the "Official Gazette of the Federation of Bosnia and Herzegovina".

---

[1] Translated by the International Center for Not-For-Profit Law (ICNL). This translation was made possible through the support provided by the ENI/DGSR/CS, ENI, U.S. Agency for International Development, under the terms of Grant No. EE-A-00-98-00015-00.

# EXHIBIT 2

Middle East Newsfile December 16, 1999

Copyright 1999 Moneyclips GCC Ltd.
Middle East Newsfile

December 16, 1999

**LENGTH:** 381 words

**HEADLINE:** Salman donates SR1.5m in a major fund-raising event

**BYLINE:** By a Staff Writer

ARAB NEWS

**BODY:**

RIYADH--Riyadh Governor Prince Salman has donated SR1.5 million in a major fund-raising event jointly organized by the International Islamic Relief Organization, the World Assembly of Muslim Youth, and the Al-Haramain Charitable Foundation.

More than SR7 million was raised during the annual function held at the Al-Khozama Center here on Tuesday evening. Other major donations came from Yousuf Abdul Latif Jameel (SR1 million), Abdul Rahman Al-Jeraisy (SR1 million), Saud Al-Mousa (SR1 million), Khaled Al-Barahim (SR500,000), Abdul Mohsen Al-Rusais (SR500,000), the Abdullah Al-Munjim and Sons Company (SR300,000), Omair Al-Qahtani (SR300,000), the Al-Fanous Establishment (SR200,000) and Abdul Kareem Al-Jasir (SR 150,000). The Minister of Islamic Affairs, Endowments, Propagation and Guidance, Sheikh Saleh Al-Sheikh, and the Saudi Arabian Grand Mufti, Sheikh Abdul Aziz Al-Sheikh, donated SR60,000 and SR30,000 respectively, while a Turkish expatriate donated SR150,000.

Speaking on the occasion, Prince Salman highlighted the great service and financial assistance given by the Kingdom through various agencies and charitable societies to alleviate the suffering of Muslims in various parts of the world. He started his speech by paying rich tribute to Sheikh Abdul Aziz ibn Baz, the late grand mufti of Saudi Arabia, and recalled his presence at charity events held over the past few years.

Prince Salman stressed the need for more coordination in charitable activities and highlighted the pivotal role played by the Kingdom in giving assistance to Muslims in countries across the world. "We can see that almost all the countries enjoy the fruits of humanitarian assistance given by agencies in the Kingdom. There are mosques, schools and other institutions that were constructed in these countries with financial assistance from the Kingdom," he said, adding that Saudi Arabia had set an exceptional example for charity work, whether in Bosnia or Chechnya or any other countries.

Sheikh Abdul Aziz Al-Sheikh said that it was in the interests of the Islamic brotherhood that Muslims should show mutual love and compassion. "It is the obligation of Muslims to strive hard to alleviate the suffering of other Muslim brothers and help them in distress," he said.

**LOAD-DATE:** January 6, 2000

# EXHIBIT 3

Copyright 1987 McGraw-Hill, Inc.
Platt's Oilgram News

June 12, 1987, Friday

**SECTION:** UNITED STATES; Vol. 65, No. 113; Pg. 3

**LENGTH:** 361 words

**HEADLINE:** 60% SAUDI-OWNED FIRM BUYS TEX. REFINERY, PLANS VENTURE TO IMPORT SAUDI PRODUCTS

**DATELINE:** Houston 6/11

**BODY:**

Arabian Shield Development Co. said it purchased an 18,500 b/d refinery in Silsbee, Tex., and is setting up plans with a Saudi partner to import an as-yet-undetermined volume of Saudi products into the U.S.

Company chairman Jack R. Crichton declined to disclose the purchase price of the refinery but noted that book value of the assets involved in the transaction is more than $5-million. American Shield, a subsidiary of Arabian Shield, acquired the refinery by purchasing from Marvin and Marie Bomer all the capital stock of Texas Oil & Chemical Co. II, Inc., which owned and operated the refinery through its South Hampton Refining Co. subsidiary.

"The refinery currently is taking condensate and natural gasoline and upgrading them to hexanes and pentanes and selling the products as a base for chemical use," Crichton said. "It's profitable operation."

Although unwilling to name the Saudi partner in the plan to import products because not all documents in the arrangement have been signed, Crichton said American Shield, South Hampton and Marvin Bomer have formed a joint venture to work with the Saudi company. American Shield will handle the trading activities, which Crichton said could involve sales in countries other than the U.S. "We'll be selling wherever we have a market," he said.

Into the Saudi Products Trade Game

Arabian Shield, headquartered in Dallas, is 60% owned by Saudis. Crichton said it's launching the plan to trade in Saudi products now because "once you own a refinery, you qualify to trade in petroleum products in Saudi Arabia. Unless you own a refinery, you can't get in the game."

Some two dozen persons hold the 60% of Arabian Shield held by Saudi interests, Crichton said. The main ones are Price Salman bin Abdul-Aziz, Prince Turki bin Abdul-Aziz, Prince Khaled bin Abdullah bin Abdul-Rahman and Kamal Adham, Saudi entrepreneur and former security chief. The company was formed in 1967 and has both oil and coal interests in the U.S.

Meantime, London-based, private Saudi-backed Attock Oil Co. recently bought the 120,000 b/d Texas City, Tex., refinery owned by Texas City Refining (ON 5/6).URL: http://www.platts.com

# EXHIBIT 4

1 of 3 DOCUMENTS

Copyright 2003 Gale Group, Inc.
IAC (SM) Newsletter Database (TM)
Copyright 2003 Input Solutions
APS Review Gas Market Trends

October 20, 2003

**SECTION:** No. 16, Vol. 61; Pg. 0

**IAC-ACC-NO:** 109296583

**LENGTH:** 2783 words

**HEADLINE:** SAUDI ARABIA - The Private Placements.

**AUTHOR-ABSTRACT:**
THIS IS THE FULL TEXT: COPYRIGHT 2003 Input Solutions Subscription: $ 600.00 per year. Published weekly. PO Box 3896, Nicosia, Cyprus

**BODY:**

Private Saudi businesses have built up an impressive overseas presence, ranging from the upstream end to oil refining and distribution. They are linked to the Saudi royal family in one way or another. Their downstream acquisitions abroad are seen as a backdoor way for Saudi oil and refined products to penetrate markets where Saudi Aramco has no presence, such as South America, Central Asia and Russia.

Saudi businessmen are generally cautious in their approach; and deals with foreign partners are reached without publicity. The main private operators involved in overseas upstream and downstream activities are the following:

Nimir Petroleum Co. Ltd (NPC): Nimir is incorporated in Bermuda and is involved in petroleum projects in Azerbaijan, Colombia, Indonesia, Oman, Kazakhstan, Russia, Tunisia, Venezuela and Yemen. Established in August 1991, it has rapidly built up branches registered in Bermuda, the Cayman Islands, Cyprus, Russia and the US. Nimir's owners are the Bin Mahfouz family of Jeddah, a well connected clan in Saudi Arabia, which originates from Hadhramaut in Yemen. It has an array of businesses inside and outside the kingdom. This family used to be referred to as the banker of the Saudi royals, because it used to control the National Commercial Bank (NCB), the largest bank in Saudi Arabia. But in May 1999 the state acquired 50% of NCB, removing from control the bank's chairman and CEO Khalid Bin Mahfouz.

Nimir, in Arabic meaning "tiger", was founded by Abdel Rahman and Sultan Bin Mahfouz. Khalid Bin Mahfouz is said to be overseeing its operations. The President and CEO of Nimir is Dr. Abdullah Mohammed Basodan, who originates from Hadhramaut and was previously in Saudi Aramco's planning department and an advisor to the oil ministry. Basodan is also a member of the board of Capital Investment Holdings of Bahrain, a firm controlled and chaired by Khalid Bin Mahfouz. Saudi Defence Minister Prince Sultan Ibn Abdel Aziz and his younger full-brother Prince Salman (emir of Riyadh) are said to have a stake in Nimir.

Operating and service companies in NPC include Nimir Petroleum Co. Europe Ltd. (NPCEL), Nimir Petroleum Co. USA Inc (NPC USA), Hocol (for Latin American operations) and Nimir Energy Services Ltd. (NESL). NPCEL, registered in Bermuda, identifies business opportunities for NPC.

NPCEL is based in Paris. NPC USA Inc. operates out of Dallas. Its job is to manage procurement and shipment of materials to NPC operations on Russia's Far Eastern island of Sakhalin and in Colombia. It provides administrative and human resource services to Petrosakh Joint Stock Co., another Nimir unit registered in Russia. NESL provides specialised services to NPC, including project management and support for technical, financial, accounting, legal, IT, risk management, and administrative needs. NESL, incorporated in Bermuda in 1991, operates out of London.

Nimir's activities cover the following countries:

-Yemen. Nimir's first move overseas was in September 1991 when it reached a production sharing agreement (PSA) with Yemen's oil ministry to develop West Ayad (Block 4) in Shabwa province. NPC won that concession after beating out more than a dozen international companies interested in the block, for a reported price of $ 500m - though the actual amount paid was less than that. NPC later got Arco to handle technical operations. In March 1992, NPC signed PSAs for Al Furt (Block 33), Qamar Gulf (Block 16) and South Sanau (Block 29). Block 16 is in Al Mahrah province bordering Oman and covers an 8,544 sq km area. Blocks 33 and 29 are in Hadhramaut and cover 7,500 sq km and 12,634 sq km. NPC also funded a partial modernisation of Aden's 170,000 b/d oil refinery. It leased a gas-oil separation plant (GOSP) in order to begin production at Shabwa in time for a target set by Sanaa, and invited foreign engineering firms to repair the production facility at East Ayad, which had been installed by Technoexport of the former Soviet Union. But Ayad's oil production has fallen to a negligible volume (see detailed survey of Yemen & who's who to be serialised in 2004).

-Russia. NPC entered Russia in October 1992 when Nimir Petroleum Petrosakh Ltd. (NPPL) acquired from Petrosakh Ltd. a 50% share in a Russian JV company which had operations in the Okruzhnoye field, in the Pogranichi Basin of Sakhalin island. Thus Petrosakh Joint Stock Co. (PJSC) was formed. PJSC commissioned its 5,000 b/d refinery on the island in April 1994. The output of the refinery is fuel oil (32%), gasoline (35%), diesel (20%) and kerosine (9%). In May 1995, NPPL raised its stake in PJSC to 95%. In 1996 new development and exploration wells were drilled and building work was completed on a marine terminal. PJSC activities involve oil gathering and separation, oil production, dehydration, gas compression and gas injection. It has built a tank farm for crude and refined products. It also has an arctic camp supporting year-round operations. Exports are sent through the Okruzhnoye terminal during the summer and via the Korsakov port in the winter. Products for consumption on the island are transported via road and rail. PJSC also does seismic and geological surveys to explore for new oilfields. PJSC meets 25% of the island's consumption needs and employs about 95% of its staff of some 500 people from among the Sakhalin islanders. NPC has invested more than $ 130m in Sakhalin.

-Azerbaijan. NPC has a stake in Azerbaijan International Oil Consortium (AIOC), consisting of a 50% share in a JV with Delta Oil Co. (another private Saudi group, see following pages), called Delta Nimir Khazar Ltd (DNKL). DNKL, established in 1994, has 1.68% in AIOC. DNKL is also a member of the North Absheron Operating Co. (NAOC) consortium, formed to develop the Ashrafi and Dan Ulduzu fields in the North Absheron ridge. In March 1997, Baku's parliament approved the contract on Ashrafi and Dan Ulduzu fields. The contract had been signed in December 1996 by Azeri state oil company SOCAR and Amoco (now part of BP), Unocal, Itochu and DNKL. The shares are: BP Amoco (30%), Unocal (25.5%), SOCAR (20%), Itochu (20%) and DNKL (4.5%).

-Colombia. NPC entered Colombia in November 1995 by purchasing all Hocol and Homcol shares from Shell. In May 1996, it began production of gas at the Montanuelo field. Hocol, now producing 45,000 b/d, operates a total of 16 blocks in Colombia mostly focused on the Upper Magdalena valley. It has made several discoveries in the past two years. Hocol has a 36% share in the Oleoducto Alto Magdalene pipeline which carries crude oil produced in the Upper Magdalena fields, and a 21% share in Oleoducto de Colombia (ODC) which transports Upper Magdalena oil as well as Central Llanos oil from Vasconia to the Covenas terminal. In addition, Hocol administers the 480-km ODC, which lies underground and includes sub-surface river crossings. About 35% of Hocol-produced crude oil is sent through the ODC for export, while 65% is shipped via pipeline to Ecopetrol's Barrancabermeja refinery.

-Venezuela. NPC, through Hocol which now is in charge of Nimir's Latin American E&P operations, made its entry into Venezuela on June 3, 1997 in a partnership with Pennzoil (Pepco). On that date a Pennzoil-led group won a $ 46m contract to operate the B2X-68/79 field. The shareholding in the group is as follows: Pennzoil (60%), Hocol (NPC - 20%), Ehcopek SA (10%) and Cartera de Inversiones Venezolanas CA (10%). The field is in eastern Lake Maracaibo. B2X-68/79 covers 10,000 acres. It had 39 active wells producing about 2,500 b/d. The minimum investment required during the first three years on B2X-68/79 was $ 12m. Now Hocol operates two blocks in Venezuela's Lake Maracaibo, and is looking for new opportunities elsewhere in Latin America.

-Oman. NPC was awarded Block 3 in Oman in January 1997. Under the deal, it was to invest $ 50.5m over an eight-year period. The block spans an area of 15,000 sq km in north-east Oman.

-Tunisia. On May 5, 1997, NPC and Petronas Carigali, Malaysia's NOC, got rights to explore the 7th November concession in a Gulf of Gabes area jointly administered by Libya and Tunisia. The rights were awarded by Libya/Tunisa Joint Oil. The block spans a 3,000 square km area. The 7th November field is estimated to have 260-300m barrels of

recoverable reserves. NPC and Petronas had to invest $ 30m over a five-year period. They were to drill up to five wells. NPC is the operator and holds 55%.

-Kazakhstan. In June 1997, NPC signed a 25-year deal to develop the North Buzachi field which, according to Nimir, has 1.5 bn barrels of oil in place and recoverable reserves of 500m barrels of 20o API crude. NPC was to invest $ 103.5m over a five-year period, with $ 30m in the first three years and $ 73.5m in the remaining two years. It was to drill three wells, applying steam injection or horizontal drilling, and start production by end-1997. It had a production target of 80,000 b/d, but this was not attained. North Buzachi lies next to the giant Kalakmas field on the main export route to Russia.

NPC has negotiated a 150,000 b/d complex refinery project in East Java as JV with P.T. Gigaraya International of Indonesia and Mitsui of Japan. This was to get crude oil from Saudi Arabia. NPC has held talks on downstream ventures in Ukraine and Moldova. In 1993 it was among firms negotiating with Elf Aquitaine on a new refinery at Leuna in east Germany. NPC joined Shell in Block 10 in Romania in 1992 but pulled out later that year after disappointing results. It left Malta in 1996 for similar reasons, after prospecting with Shell in Block 7 of the southern offshore region.

Corral Petroleum Holdings (CPH) is a Swedish-registered firm owned by Mohamed Hussein Al Amoudi, of a Jeddah-based merchant clan. CPH in the first quarter of 1999 assumed control over the refining and retail businesses in Morocco. This was done through a merger of the country's two refining firms in which CPH had held the majority since May 1997: Socit Anonyme Marocaine de l'Industrie de Raffinage (Samir) and Socit Chrifinne de Petroles (SCP). The smaller refinery, at Sidi Kacem, has a nameplate capacity of 1.5m t/y. Samir's refinery has a capacity of 6.25m t/y.

CPH's local unit, Corral Holdings Morocco (CHM) merged Samir and SCP so that their resources were pooled together to gain economies of scale and help CHM prepare a $ 700m programme for expansion. This was to include an upgrade of the two refineries, as gasoline and gasoil specifications in Morocco were to be changed by 2003. CHM was to increase their retail networks in a single system. The project was to upgrade and raise Samir's capacity from 6.25m to 8.25m t/y by 2005, with high quality gasoil/diesel to exceed 55% and that of fuel oil to fall below 15% (down from 33%) of production. Foster Wheeler made the FEED and was the PMC.

However, Samir's refinery was badly damaged by floods and fire in late November 2002. MCE Voest of Austria was contracted subsequently to assess the damage in 2003. As a result, the $ 700m has since been delayed and the suspension of refinery operations has caused Morocco to import products to meet its requirements. CHM holds a 67.33% equity in Samir.

CHM's 1,500 service stations throughout Morocco were also to be improved under a separate project. Having a monopoly on the local refining industry in Morocco, CHM was aiming to meet all the country's mogas and distillate requirements by 2010. CHM has been getting is crude oil needs from Saudi Aramco, Iraq, Iran and the spot market.

CHM's LPG retail network in Morocco has been expanded through a merger agreed in October 1998 with Tayssir Primagaz, Azizgaz, and Elf Intergaz (Elf now is part of Total). The merged entity has 85% of the LPG market and has invested in new plant and equipment for gas bottling centres to meet the growth in local demand. Previously CHM had 10 LPG filling units accounting for 40% of the filling sector but only 5% of the LPG market.

Corral's first move was on March 16, 1994, when it acquired Stockholm-based OK Petroleum AB (OKP) for $ 738m. In July 1994 OKP bought Sweden's 400 Texaco petrol stations, representing a 7% share of the market. The total deal was worth around $ 1.2 bn. Since mid-1996, OKP has been renamed Preem Petroleum. (Nimir had initially wanted to buy OKP but decided against it. Then Al Amoudi hired Nimir as a PMC prior to buying OKP. Nimir undertook the negotiation and acquisition of OKP, on behalf of Corral. Later Nimir got a PMC contract from Preem). Preem is the biggest refiner in Scandinavia with a capacity of 300,000 b/d, in two refineries: the 200,000 b/d Scanraff plant, jointly owned with Norsk Hydro, and the 100,000 b/d Preem refinery. A $ 200m upgrade at the latter refinery was completed in 2002. Preem Petroleum has extensive storage facilities. Preem has E&P concessions in three North Sea fields, in the Baltic and in Angola. In January 1995 it bought Polish oil company Va-Po, which has a storage farm in Poznan and 20 retail outlets. Now Corral owns some 500 retail outlets under the Preem brand name. Corral also owns Svenska Petroleum and Exploration, which produces 15,000-18,000 b/d of crude oil and has annual sales of around $ 160m.

In mid-1995 Corral teamed up with Dubai-based Gulf Interstate to take a 15% share in oil retailer Fortuna of Lebanon, at a cost of $ 50m. Corral's share has since been raised to 70% and Gulf Interstate is out. Fortuna has two units: Coral Oil and Speed Oil operating 150 retail outlets in Lebanon. Amoudi has bought from the Saudi firm Al

Mawarid Naft Services Co. which has the largest chain of petrol stations in the kingdom. Its stations are concentrated around Jeddah, Riyadh and Al Khobar.

Delta Oil Co., based in Jeddah, is part of Delta Investment Co. which groups about 50 prominent Saudi businessmen. Delta Oil was set up in 1993 to manage the group's energy interests. In 1994 it formed a "strategic partnership" with Nimir. Through this it has joined the AIOC and NAOC consortia in Azerbaijan (see Nimir profile). Delta Oil has been involved in repeatedly frustrated efforts to build a gas pipeline from Turkmenistan to Pakistan via Afghanistan. It has worked on this with Unocal of the US. Delta executives personally negotiated with Taliban leaders to get their backing for the project. Delta Oil's Chairman and CEO is Badr M. Ayban, who used to be a consultant in the Saudi state oil sector. His deputy is Nabil Al Khowaiter, who used to be with Aramco. Ray Harlow, previously head of Sun Oil Int'l, has been a key executive in Delta since September 1997. Delta had applied in 1992 for a licence to operate under the name of Arabian Petroleum Co. as a joint stock venture, which would have helped raise finance for its intended purchase of 50% in the downstream network of Belgian company Fina in the US. But Riyadh blocked the move in 1993.

In early 1999, Delta Oil acquired 26% in Centurion Energy Int'l of Canada. It bought $ 3m of shares in a private placement and paid $ 3.8m of an existing debenture. Centurion is active in oil exploration in Tunisia and Egypt. It has three concessions in Tunisia which produce 3,200 b/d.

Other Saudi companies involved overseas include the Dallah Al Barakah Group. One of the Saudi corporate giants, this Jeddah-based group is controlled by leading businessman Shaikh Saleh Al Kamel. His group has considered E&P deals in Kazakhstan and Uzbekistan for several oilfields. In November 1991 it opened a JV bank in Almaty to focus on oil and gas projects. The bank reportedly had about $ 150m in authorised capital, with Dallah holding 50%. In 1993, it disclosed plans for a refinery service venture in Moscow.

A little known Saudi firm, Ningharco, is part of a group led by Bridas of Argentina to build a Turkmenistan-Afghanistan-Pakistan gas pipeline rivalling that of Unocal-Delta. Arab Group International (AGI), based in Riyadh and headed by Prince Sultan Ibn Saud Ibn Abdullah Al Saud, had in 1995 agreed to take a 50% stake worth $ 345m in Arakis Energy of Canada, which had acreages in Sudan. AGI said is was ready to provide $ 405m to fund development of oilfields in central Sudan. The project's viability was questioned because it was located in a civil war zone.

In early 1998, Mobil and Alireza were reported to be planning to invest over $ 200m in converting a Panamanian bunkering centre into a hub supplying fuels to Latin America. In March 2003 Saudi tycoon Mohamed Bin Issa Al Jaber was negotiating to buy Phillip Holzmann's profitable US unit JA Jones for about $ 500m (see background in Vol. 54, No. 19).

**IAC-CREATE-DATE:** October 27, 2003

**LOAD-DATE:** October 29, 2003

# EXHIBIT 5

Federal News Service, JULY 27, 1989

Copyright 1989 Federal Information Systems Corporation
Federal News Service

JULY 27, 1989, THURSDAY

**SECTION:** FROM THE WHITE HOUSE

**LENGTH:** 3027 words

**HEADLINE:** CB
THE WHITE HOUSE
WASHINGTON, DC
REGULAR BRIEFING
BRIEFERS:
ALIXE GLEN
MICHAEL BOSKIN

**BODY:**
MS. GLEN: Michael Boskin is here to -- he's dashing off to a meetingT but he will make a brief comment on the second quarter gnp figures.  Regular briefing rules.

MR. BOSKIN: Thanks, Alixe.  Let me raise this slightly and I'll put it back down again.  (Referring to podium microphone.)

The Commerce Department reported this morning that the economy continued to grow at a modest pace in the second quarter, 1.7 percent after adjustment for inflation.  They revised the estimate of first quarter growth down slightly, and they revised upward sharply the estimate of GNP growth in 1987 and especially 1988.  The combination of those things leaves GNP -- the level of GNP substantially -- at the end of 1988 substantially above where we had thought it would -- we previously thought it was.

Q (Off-mike.)

MR. BOSKIN: Well, I'll give you the -- exact numbers?  You had to ask.  You people are --

Q I apologize for my colleague.

Q Hey, who won the tennis match?

MR. BOSKIN: That I won't give you an answer to.

Q It was a rigged match.  I mean it was an unfair deal all the way.

MR. BOSKIN: We're at about $4.12 trillion in 1982 dollars, in constant '82 dollars.  (So that's the first thing. ?)

Q Thanks.

MR. BOSKIN: The -- we grew the revision upward in 1988, for 1988 -- well, I'll give you the exact details.  I was trying to be general.  I'm racing to a meeting, but -- the revision upward for 1988 was from 2.8 to 3.4 percent, including the effect of the drought; and for 1987 from 5.0 to 5.4 percent; 1986 was revised downward slightly from 2.0 to 1.9.

Let me just put this in a certain perspective.  This is the first estimate of the GNP for the second quarter.  The Commerce Department makes three of them.  And as more data come in, they refine the estimates and they often change somewhat.  And then every year in July, collecting all the data they've been able to do, they revise backwards for the previous three years.  So both of those things were released this morning, and they've revised upward the estimates for '87 and '88 while they've provided the estimates -- very preliminary -- the first advanced report for the second quarter of 1989.

We believe the economy can sustain its growth, and we believe that it will sustain its growth.  We believe that the economy will continue to do well.  Okay, thank you.

Q -- inflation numbers today too?

MR. BOSKIN: Yeah, let me just take this one question.  I apologize for any new meaning.  The GNP deflator in the second quarter was 4.9 percent, up from 4.0 in the first quarter.  That is primarily due to the increase in energy prices.  If you looked at it exlcuding energy prices, there would not have been an increase.  An important point to note is that the data we have for June in the Produce Price Index and the Consumer Price Index shows the energy prices abating and the

overall inflation abating.  But obviously, when you average the whole quarter, April, May and June, June only gets roughly one-third of the weight, and we had some higher inflation in April and May, primarily due to energy price increases.

Thank you very much.

Q The GNP has gotten worse on your watch, correct?

Q Michael, do you think --

Q GNP has gotten worse.

MR. BOSKIN: The economy is continuing to -- will sustain (?) its moderate growth.

Q But could you just take one more question on that?

MR. BOSKIN: Sure.

Q The general trend has been steadily downward since '88, and I just wondered whether or not you attribute that to Fed policy or natural forces within the economy, or what?

MR. BOSKIN: Well, I think the Fed, concerned -- properly so -- about rising inflationary expectations last year, did gradually tighten monetary policy to try to have the economy grow at a more modest pace.  And it appears thus far that that's on track.

Q And do you feel that this modest pace is going to be sustained, or will this -- or will this downward growth pattern continue?

MR. BOSKIN: Well, we believe that modest growth will continue.  We believe it will sustain --

Q Modest growth?

MR. BOSKIN: Yes.  Okay.  I believe --

Q You don't call it "weak," "limp," "wimpy"?

MR. BOSKIN: I call it "modest" growth.  Thank you.

Q (Off mike.)

MS. GLEN: Except for Michael.  (Pause.)  I have to go to a meeting, too.  (Laughter.)

Okay.  Let's quickly run through today's schedule.  This morning, the President went by a meeting with "Say Yes to Education" students, which is a program that was started by a couple who are from Hartford, Connecticut.  They chose a school in an impoverished section of West Philadelphia, and working with the University of Pennsylvania and the School District of Philadelphia to pay for the college educations of an entire 6th grade class from Belmont Elementary School.  Many of them were learning disabled students.  At any rate, the Weisses (sp) have continued in these type of efforts, and started last year or two years ago a year-round tutoring and activities program which is now called "Say Yes to Education," and it's a very successful program that they are working on nationwide.

Q Can we have a picture of them?

MS. GLEN: Hmm?

Q Can we get a picture of them?

MS. GLEN: I guess if you want to, we could have a photo release.

Q (Off mike.)

MS. GLEN: No, no.  That was at 11:00 this morning -- or at 10:55.  He then addressed the Future Farmers of America at 11:00 in [Room] 450, where you were.  This is young leaders in agriculture throughout the country who are members of Future Farmers of America.  It's ag students that are about 14 to 21 years old, that are preparing for skills and careers in ag vocations.  There are about 7800 chapters in 50 states and Puerto Rico, the Virgin Islands, and DC.  Active membership is nearly 405,000.

The President is having lunch with the Vice President at 12:00 noon, and this afternoon, meeting with Prince Salman, the governor of Riyadh, Saudi Arabia.

Q Salman -- (correcting Ms. Glen's pronunciation of the Prince's name.)

MS. GLEN: Salman.  Prince Salman is the brother of King Fahd.  They are expected to discuss matters of mutual interest, including the opening of the Saudi cultural exhibition, called "Saudi Arabia Yesterday and Today," which the Prince is here to host tomorrow night at the Washington Convention Center.  The President and Prince Salman are also expected to discuss the upcoming visit of King Fahd which has now been rescheduled for September 14.

Q What was the actual reason that Fahd -- was Fahd sick, or why didn't he come?

MS. GLEN: No, it was originally scheduled for today.  But he advised us about 10 days ago that he would have to postpone the visit because he was tied up with the Arab League's efforts to resolve the crisis in Lebanon.

(Cross talk.)

MS. GLEN: I think we might do a photo release to the wires only.

Federal News Service, JULY 27, 1989

Q There was a report that the PLO has come up with a response to the election plan that is similar to the Labor Party's conditions for elections. But one of the stories said that the United States rejected the PLO's offer. Is that correct, and if so, why?

MS. GLEN: No. I mean, we've been working with all sides to support the election concept, and initiate dialogue between the Israelis and Palestinians in the Territories, and we're moving ahead.

Q Do you have a response to the PLO offer, which is very close to the Labor Party? Is there a reaction here?

MS. GLEN: I mean, they've told us privately and said publicly that they support the election concept as part of a comprehensive peace plan; the PLO. I mean, they've put a number of conditions on their support for elections; these conditions are not acceptable to us.

Q Why not? That's what I'm asking.

MS. GLEN: Well, we're continuing to discuss this with the PLO. Q But, the point is that, according to the reports, their conditions are very close to the Labor Party conditions in Israel. Why do we reject them?

MS. GLEN: I don't have specific reasons why we --

Q (Well, what are the conditions ?) and how do you know that these are not acceptable, and who said they weren't acceptable and so forth? I mean, what is the biplay here? When did you find out that the -- about these conditions, and when did we reject them, and how did we reject them?

STAFF: It's not a question -- it's not a question of when we found out about the conditons. We've had an ongoing dialogue with the PLO in Tunis through Ambassador Pelletreau, and they're aware of our positions. But it's not for us to determine what form of logisitics or manner the elections would take shape for the parties that are involved in negotiations.

Q While we're turning down conditions, obviously, we are --

STAFF: Part of the problem has revolved around the issues that their -- the preconditions seem to determine the political outcome before the actual elections in negotiations, and that's the reservations that we've raised.

Q Like what?

STAFF: Well, I say -- I can't get any more specific than that, Helen, at this stage.

Q Well, who turned it down?

Q Would everyone speak up a little, please?

Q Yeah, we'd like to hear what you're saying.

Q When does the briefing start?

MS. GLEN: Anyway, I don't have any more specifics. I'm sorry, Helen.

Q You're leaving us up in the air. You're saying we have turned down certain conditions, but you don't say who turned them down, why -- when they were turned down, why they were turned --

STAFF: We'll look into that and we'll try to get back to you.

Q Thanks.

Q (Off mike) -- try to find out why it is that the Labor Party goes along with it but we don't.

MS. GLEN: Anyway, let me also make one other announcement. President Bush is scheduled to meet with Soviet Marshal Sergei Akhromeyev in the Oval Office at 2:00 tomorrow. Mr. Akhromeyev retired as First Deputy Minister of Defense and Chief of the Soviet General Staff in December 1988, and since that time has served as a special national security adviser to Chairman Gorbachev.

Q (Off mike.)

MS. GLEN: They're expected to discuss security and arms control issues. The marshal came to the United States to testify before the House Armed Services Committee.

Also tomorrow, the President is going to speak to the National League of Families of POW and MIAs at their annual meeting tomorrow afternoon at 3:00 at the JW Marriott.

Q Is he going to Camp David afterwards?

MS. GLEN: I think he is going to Camp David this weekend -- yeah.

Q Alixe, normally these switches of parties are announced with ruffles and flourishes, and the one who's doing the switching likes to come out and talk about it. Was it Atwater's idea for Chief Turner to leave early without -- and not answering any questions? What was that all about?

MS. GLEN: No, I don't think so. I think partly it was a scheduling thing, but I think that Mr. Turner's having a meeting with the press tomorrow anyway, and he can further elaborate on why he decided to switch parties. But we're honored to have him join the Republican Party.

Q Atwater did suggest that he not have any meeting down here, and that wait till tomorrow?

MS. GLEN: No, no.

Q Okay.

Q Can you give us a little more background on that for those of us that -- did this just come up suddenly? When did he meet with the President?

MS. GLEN: I'm -- I mean, you'd really have to talk to Mr. Turner about it, I think, but I am led to believe that he -- he was the one that contacted local DC party officials, expressing his interest in switching parties, and --

Q And he came and met the President at what -- 11:30 or --

MS. GLEN: 11:30 today, yes.

Q But how did that get arranged? How did it come to pass that Turner was in the Oval Office switching parties?

MS. GLEN: Well, he -- working with the local GOP leaders, once they had -- once he had decided to make this move, got in touch with Lee and, you know, the meeting was arranged.

Q But when did it get on the President's schedule, is my question.

MS. GLEN: Oh, I'm not really sure.

Q Today? Yesterday? Last week?

MS. GLEN: Very recently. I mean, I think within the last --

Q 12 hours.

MS. GLEN: -- 24 hours, or whatever.

Q Alixe, is he still being considered for a drug policy job, or --

MS. GLEN: I'm not aware of anything. I'm not aware of anything. But we're looking forward to working with him on important DC issues.

Q Would the President campaign for whoever is the Republican nominee for mayor? (Laughter, inaudible comments.)

MS. GLEN: I don't know. We'll have to see.

Bernie?

Q Alixe, does the President agree with the Helms Amendment cutting funds for these two arts programs that the Senate voted on yesterday, two -- some controversial art projects?

MS. GLEN: I don't know specifically how the President feels. I'd have to take the question and get back to you on it. And also, Roman advises me that at the end of the briefing we will have a posting on your PLO questions, okay?

Q On the Judiciary -- Senate Judiciary -- Senate Judiciary Committee has approved the flag law, desecration law. Do you have a comment?

MS. GLEN: Well, I mean, there is no change in our position. You know, we maintain that any statute would be found unconstitutional in the federal courts. We still think that this will go to the floor and that the constitutional amendment will be passed. Certainly there is a lot of support for it, you know, but the statute is unconstitutional, it's not workable, it doesn't set a good precedent, and that the amendment is the only way to go. And if Congress is serious about this issue, which we think they are, the amendment will pass and go to the states for ratification. And we hope that happens very soon.

Q And you think it will happen?

MS. GLEN: We do. But the President has made it very clear, his position that an amendment is the only workable solution.

Q Well, would he veto a law? A bill, I mean?

Q Do you now have the votes for Lucas --

MS. GLEN: We don't think it'll come to that. I mean, you know --

Q Do you now have the votes to get Lucas out of that Committee?

MS. GLEN: Have the what?

Q The votes to get Lucas out of that Committee with a favorable recommendation?

MS. GLEN: According to this morning's papers, it's a tie right now. I think the Post --

Q Have you got the other --

MS. GLEN: Both. We think so, yes, yes. We think that he will pass, that he's an excellent candidate. He's had 30 years experience in these --

Q (Off mike.)

MS. GLEN: Yeah --

Q -- so I was wondering about whether you think you have the votes.

MS. GLEN: Yes, we do.

Q When you said you don't think it'll come to that, you don't think that this bill will be voted on in the Senate?

MS. GLEN: We -- we'd hope for a constitutional amendment. We think that's the way to go, and that's the way it will go.

Michael?

Federal News Service, JULY 27, 1989

Q Two Judiciary Committee questions.  First on the flag.  Jack Brooks said that if the law were to be found unconstitutional, that he would propose a constitutional amendment, and with that a lot of Republicans went along with voting for the law first.  Does the President have any objection to trying that first?

MS. GLEN: The Justice Department, and the President concurs, thinks that the law isn't workable, it's not constitutional, it can't happen.  But we also think that the constitutional amendment is going to be what results from what -- the debate going on on the Hill.

Q And the second question, on Brit's question.  Did the White House have anything to do with the postponement of the vote on Lucas today to lobby for more time?  Or are you upset with the fact that it's been put off to give your opponents more time?

MS. GLEN: It's really -- the scheduling of his -- of that vote is up to the Hill.  We're hoping for an early vote; we'd like to see them vote as soon as they do -- can.

Q Alixe, has the President made any phone calls on Lucas' behalf, or is he going to?

MS. GLEN: Not that I'm aware.  I don't think he has made any yet to date, but is prepared to if it seems necessary.

Q Doesn't the President feel some concern about Lucas' failure to understand the difference between de jure and de facto segregation?

MS. GLEN: I, you know, can't take that specific question.  The President obviously thinks that Mr. Lucas is the best candidate.  He's an excellent candidate, he's tenacious, he's committed, he's had decades of experience in law enforcement, practical experience in matters that he will face as the Assistant Attorney General for Civil Rights, and we're confident that he will --

Q Well, why don't civil rights people like him, then, if --

MS. GLEN: You'd have to ask them.  Many of them do.

Q Like who?

MS. GLEN: They've made themselves known.

Q They know who they are.

MS. GLEN: They know who they are!  (Laughter.)

Is that it?

(Cross talk.)

Q That's it, Alixe.

Q He's not going out tonight?

MS. GLEN: No, he's not going out tonight.

Thank you, Helen.

# EXHIBIT 6

PR Newswire, July 19, 1989

Copyright 1989 PR Newswire Association, Inc.
PR Newswire

July 19, 1989, Wednesday

**DISTRIBUTION:** TO CITY, ASSIGNMENT AND PHOTO DESKS

**LENGTH:** 329 words

**HEADLINE:** NEWS ADVISORY

**BODY:**

Who:    Gov. William Donald Schaefer and the Maryland International Division.

What:   A luncheon and seminar honoring the official U.S. visit of HRH Prince Salman bin Abdulaziz, governor of Riyadh Province, Saudi Arabia.

Where:  The Walters Art Gallery, 600 N. Charles St., Baltimore.

When:   Monday, July 24

10:45 a.m.: photo opportunity -- Prince Salman is greeted by Schaefer at The Walters Art Gallery, Charles Street entrance.

Walters Art Gallery-Graham Auditorium
11:15 a.m.: Signing of the Agreement of Mutual Cooperation
1 p.m: Business Seminar

World Trade Center and National Aquarium
1 p m.: Salman and his official delegation tour.

Note:

Schaefer and Salman will sign an Agreement of Mutual Cooperation in an effort to establish closer business and trade ties between Maryland and Riyadh Province.

Saudi Arabian mayors, officials and business executives will have the opportunity to meet with Maryland state representatives and business leaders during the official visit.

Immediately following the luncheon, Maryland will host a business seminar where the Saudi business delegation will inform attendees of upcoming development projects in the kingdom as well as special areas of interest to Maryland businesses.

------

All media representatives must register for credentials by 10:30 a.m. at the Center Street entrance of The Walters Art Gallery. Media representatives will be served lunch in the parlor room.

CONTACT -- Jane Howard or Marilyn Corbett, 301-333-6917, both of DEED, or Greg Harris of Image Dynamics, 301-539-7730.

# EXHIBIT 7

Source: News & Business > News > News, All (English, Full Text) ⓘ
Terms: **"prince salman" & "new jersey"** (Edit Search)

↙Select for FOCUS™ or Delivery
☐

*Associated Press Worldstream May 14, 2003 Wednesday*

Copyright 2003 Associated Press
All Rights Reserved
Associated Press Worldstream

These materials may not be republished without the express written consent of The
Associated Press

May 14, 2003 Wednesday

**SECTION:** INTERNATIONAL NEWS

**DISTRIBUTION:** Middle East; England

**LENGTH:** 450 words

**HEADLINE:** Bedminster man sues estate of Saudi prince for back pay

**BYLINE:** WAYNE PARRY; Associated Press Writer

**DATELINE:** NEWARK, **New Jersey**

**BODY:**
An American is suing the estate of a dead Saudi prince, claiming he is due more than $2
million in back salary and expenses for serving as the prince's personal assistant and
confidante.

The lawsuit, filed Wednesday in Superior Court in Somerset County, also seeks to have the
plaintiff, Robert Fort, declared the owner of a property he shared with Prince Fahd Bin
Salman Al Saud, claiming the prince promised it to him.

The suit also names the prince's widow, Princess Nouf Bin Khalid Al Saud, as a defendant.

Prince Fahd died in July 2001. He was the son of **Prince Salman** Bin Abdul Azziz Al-Saud,
who Fort's lawyer Bruce Nagel described as one of the principal members of the ruling family.

"Because this man had intimate knowledge of very sensitive political and economic issues,
they are trying to distance themselves from him," Nagel said. Asked whether it wouldn't
make more sense for the royal family to keep Fort happy given such knowledge, Nagel said,
"You would think so."

The lawyer representing the late prince's estate in the United States, Jim Shrager, did not
immediately return a call seeking comment Wednesday.

Nagel said the two struck up a friendship in 1977 when both were in college. The prince
asked Fort to tutor him and his staff in American culture and traditions, and help him with his
academic work, Nagel said.

It was not immediately clear Wednesday where the two went to college.

Case 1:03-md-01570-GBD-SN   Document 357   Filed 07/30/04   Page 34 of 48

In 1980, according to the lawsuit, the prince hired Fort to act as personal assistant for himself and his family. The lawsuit states that the prince promised Fort a salary and other benefits including private school tuition for Fort's children and auto leases.

In 1999, the lawsuit states, Fort asked for and got a raise from the prince, who agreed to pay him $2 million. But when the prince died, the money had not been paid, along with more than $140,000 in unreimbursed expenses, the lawsuit claims.

Some of the unpaid expenses included car lease payments for the prince, moving and storage charges, limousine rentals and expenses for a pheasant hunting trip the prince took in February 2001. Fort claims he billed the expenses to his personal credit card, expecting to be reimbursed by the prince.

"It is outrageous that Robert Fort paid tens of thousands of dollars in living expenses for the rich prince and now is left holding the bag," Nagel said.

The lawsuit also states that after the prince died, his father, **Prince Salman** Bin Abdul Azziz Al-Saud, reaffirmed the prince's obligations to Fort, and assured him he would continue working for the late prince's family. The suit asserts Fort was later fired by the royals, and has not been paid since.

**LOAD-DATE:** May 15, 2003

Source: News & Business > News > News, All (English, Full Text) [i]
Terms: **"prince salman" & "new jersey"**  (Edit Search)
View: Full
Date/Time: Thursday, July 29, 2004 - 6:42 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 8

# Prince Salman & Al-Birr Society

**Website URL:**
**http://www.riyadhksa.gov.sa/English/organizations/charity_org/riyadh_charity_org.htm**



## Charitable Institutions

**Al-Birr Society in Ar-Riyadh**

### Background

Al-Birr Society in Ar-Riyadh is a charitable society established in 1374H by HRH Prince Salman Bin Abdul Aziz who, as chairman if the board of directors and general assemblies, devotes attention to the society, actively supporting it administratively and financially.

### Objectives

- The society and its branches provide care and assistance to the elderly, patients, paralyzed people, orphans, widows, divorcees and families of prisoners.
- Establish charitable residential compounds.
- Provide Ifta'ar (breakfast) for people fasting in Ramadan, and receive surplus food from donors for further distribution to the poor in Ramadan.
- Establish schools for teaching of the Holy Qur'an and institutes for women to learn dressmaking and other skills.

### Achievements

- Provision of care to more than 1,500 families in the community.
- Establishment of a charitable residential compound in Ad'Diriyah



▸ Establishment of a charitable residential compound in Ad'Diriyah complete with all facilities.

**On-going Activities**

▸ Provision of care to more than 1,500 families.
▸ Establishment of a charitable residential compound in Ad'Diriyah complete with all facilities.
▸ Adopting orphans sponsoring program.
▸ Managing and investing private property dedicated for charitable purposes according to the wishes of their owners.
▸ Undertaking other activities such as provision of breakfast for fasting people during Ramadan, as well as receiving Zakat Al-Fitr, atoning sacrifice (Kefara), votive offering (Nazr), and sheep slaughtered in Eid Al-Adha (Greater Bairam) for further distribution to the poor and needy.
▸ Furnishing clothes for winter, school bags and supplies, Eid dresses and clothes and settling bills of some services.

**Branches**

The society has 14 branches dispersed in the quarters of Ar-Riyadh.

**Bank Accounts**

National Commercial Bank; account No. 301102670001030
Saudi American Bank; account No. 09907003603
Ar-Riyadh Bank; account No. 2010193539901
Al-Rajhi Banking and Investment Corporation; account No. 01008218627/6
National Arab Bank; account No. 01008218627/00/6

Tel.: +966-1-4050724 - 4056666 - 4023063

**Location**

East of Al-Asimah Institute and Ar-Riyadh schools.

**Address**

P.O. Box 4004 Ar-Riyadh 11491
Kingdom of Saudi Arabia

# EXHIBIT 9



Home Page ❧ King Abdulaziz Foundation ❧ King Abdulaziz Private Library ❧ King Abc
Board of Director ❧ Academic Activities ❧ Historical Materials ❧ King Abdulaziz Men
Research & Publication Department ❧ Darah Journal ❧ Oral History Center ❧ The
Lectures & Activites ❧ Geo Information Center ❧International Studies Center ❧ The

## Department of Treasury Designation Press Statement

### Website URL: http://www.ustreas.gov/press/releases/po3632.htm

**PRESS ROOM**

**FROM THE OFFICE OF PUBLIC AFFAIRS**

November 19, 2002
PO-3632

**Treasury Designates Benevolence International Foundation and Related Entities as
Financiers of Terrorism**

Today the US Treasury designated three entities as financiers of terrorism under Executive
Order 13224 and will ask the United Nations to add these names to the list of those whose
assets must be blocked by all member nations under UNSCR 1390.  The financial accounts
of the principal entity, Benevolence International Foundation, were blocked pending
investigation in December 2001.  The three closely linked but separately incorporated entities
designated today are Benevolence International Foundation, Benevolence International Fund
(Canada), Bosanska Idealna Futura (Bosnia), and their branch offices.

"UN designation of these financiers of terror will cut off their access to the global financial
system and strip them of their ability to fund evil," said Treasury Secretary Paul O'Neill.

Benevolence International Foundation ("BIF") is a U.S. tax-exempt not-for-profit organization
whose stated purpose is to conduct humanitarian relief projects throughout the world.  BIF
was incorporated in the State of Illinois on March 30, 1992. Although BIF is incorporated in
the United States, it operates around the world, in Bosnia, Chechnya, Pakistan, China,
Ingushetia, Russia, and other nations.  BIF operates as Benevolence International Fund in
Canada and as Bosanska Idealna Futura in Bosnia.

Enaam Arnaout, BIF's Chief Executive Officer and a member of the Board of Directors,
recently was indicted in the United States for operating BIF as a racketeering enterprise and
providing material support to organizations, including al Qaida, that are engaged in violent
activities.

Substantial evidence documents the close relationship between Arnaout and Usama bin
Laden, dating from the mid-1980s.  An article in the Arab News from 1988, reporting on bin
Laden's activities at the "al Masada" mujahideen camp in Afghanistan, included a photograph
of Arnaout and bin Laden walking together.  In a March 2002 search of BIF's offices, Bosnian
law enforcement authorities discovered a host of evidence linking Arnaout to bin Laden and
al Qaida.  Among the files were scanned letters between Arnaout and bin Laden, under their
aliases.

In one handwritten letter, bin Laden indicates that Arnaout is authorized to sign on bin

Laden's behalf.

Various documents also established that Arnaout worked with others -- including members of al Qaida -- to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida.

Arnaout claimed to the Chicago Tribune last winter that he did not know bin Laden personally, that he had never been to the "al Masada" camp (at which he had been photographed walking with bin Laden), and that he was working in a restaurant in the Persian Gulf area during the relevant time frame. BIF's counsel later acknowledged in court that "it would appear that the nature of [Arnaout's] contacts [with bin Laden] may have been of a deeper nature than what he described to the Tribune."

BIF also has provided additional support for and has been linked in other ways to al Qaida and its operatives.  First, BIF lent direct logistical support in 1998 to Mamdouh Mahmud Salim, a bin Laden lieutenant present at the founding of al Qaida. Salim was indicted for conspiring to kill U.S. nationals.  Testimony at the 2001 trial of United States v. Bin Laden, et al, implicated Salim in efforts to develop chemical weapons on behalf of al Qaeda in the 1990s.  As early as 1992, Salim and bin Laden made efforts to develop conventional weapons and to obtain nuclear weapons components.  BIF is also linked to Mohamed Loay Bayazid, who was implicated in the U.S. embassy bombings trial for his efforts, approved by Salim, to obtain weapons components on behalf of bin Laden in 1993-1994. Bayazid's driver's license application, dated September 12, 1994, identifies his address as the address of BIF's Illinois office.  In the late 1990s, Saif al Islam el Masry, a member of al Qaida's majlis al shura (consultation council), served as an officer in BIF's Chechnya office.

# EXHIBIT 10

Case 1:03-md-01570-GBD-SN   Document 8573   Filed 07/30/04   Page 42 of 48

Source: News & Business > News > News, All (English, Full Text) [i]
Terms: "the guardian" & "kathy evans" & 1993  (Edit Search)

✦Select for FOCUS™ or Delivery
☐

The Guardian (London), May 5, 1993

Copyright **1993 Guardian** Newspapers Limited
The **Guardian** (London)

May 5, **1993**

**SECTION:** THE **GUARDIAN** FOREIGN PAGE; Pg. 11

**LENGTH:** 501 words

**HEADLINE:** SAUDI CURB ON ALMS TARGETS RADICALS' CASH;
Gifts to charity have funded militant groups in other countries

**BYLINE: KATHY EVANS**

**BODY:**
SAUDI ARABIA'S interior ministry has moved to control the collection of donations for charities, one of the principal sources of funds for radical Islamic groups in the Arab world and Asia.

With their enormous wealth, Saudi private citizens and businessmen have long been a target of appeals from a motley collection of humanitarian causes and political movements in the Muslim world. Giving alms to the poor is a requirement of Islam.

Last week, under growing criticism from Arab regimes facing powerful Islamic movements, Saudi Arabia announced that in future all donations must pass through a fund headed by a member of the royal family, Prince Salman, the governor of Riyadh.

The decision to curb the flow of money came just days after a visit to Riyadh by the Egyptian defence minister, General Mohammed Tantawi. "The new ruling is just because [Hosni] Mubarak is in a panic," one exiled Arab radical said, referring to the Egyptian president.

In the past, the Muslim Brotherhood movement, banned in Egypt, received large sums from sympathisers in the kingdom, as did a number of other north African Islamic movements, and the Palestinian group, Hamas.

Already one foundation, Jamaat al Birr, or the Good Works Organisation, has been closed. Its head, Adel Batarji, a known political activist, has been detained by the police.

The little-noticed announcement on Saudi radio of the new ruling said the restriction would also apply to donations given outside the country by Saudi citizens.

Much of this private money was donated in mosques, where any individual was allowed to get up and make an appeal to the congregation. Many of these appeals were made by conmen who simply pocketed the money for themselves, and the new move is partially designed to curb their activities.

But hundreds of millions of dollars annually went to radical groups in Egypt, Sudan and Afghanistan, say Western diplomats and anti-terrorist experts. Officials of London-based Arab radical movements confirm these suspicions.

"Huge amounts came from Saudi Arabia," one exiled radical said. "Every Muslim who is devoted has no option but to support Islamic causes. "

The flow of donations has continued in the face of policy changes by the Saudi government. In Afghanistan, for example, Saudi private money goes to radical groups in large sums although the government's aid to the mojahedin was cut off two years ago.

Liberal Saudis say that in many cases radicals hijacked legitimate Muslim charities and diverted funds to their favourite causes. Other donations went directly to Arab political movements from their Saudi sponsors.

Islamic radicals said the new ruling would not end the flow of money. One militant said: "Religious Saudis simply will not trust the royal family to handle the money. And those who want to contribute to Islamic movements in the Middle East will continue to do so outside. The sympathy is there; they won't hesitate to send money. "

**LOAD-DATE:** May 13, **1993**

Source: News & Business > News > News, All (English, Full Text) ℹ
Terms: **"the guardian" & "kathy evans" & 1993**  (Edit Search)
View: Full
Date/Time: Friday, July 30, 2004 - 2:40 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 11

Source: News & Business > News > News, All (English, Full Text) ⓘ
Terms: "nora boustany" & "washington post" & "august 24, 1994"   (Edit Search)

*The Washington Post, August 24, 1994*

Copyright 1994 The **Washington Post**
The **Washington Post**

♦ View Related Topics

**August 24, 1994,** Wednesday, Final Edition

**SECTION:** FIRST SECTION; PAGE A22

**LENGTH:** 1338 words

**HEADLINE:** Traditional Saudis Take Dim View Of Attempts to Modernize Islam

**SERIES:** Occasional

**BYLINE: Nora Boustany, Washington Post** Foreign Service

**DATELINE:** RIYADH, Saudi Arabia

**BODY:**
Nowhere else in the Muslim world, it seems, is there such visible and sharp competition for God's attention as in Saudi Arabia.

At airports, in government buildings, in restaurants or in shopping malls -- where 3-year-olds are hauled off screaming when popcorn stands have to shut down at prayer time -- religion rules. Saudi Arabia is where the Prophet Muhammad's message landed and where Muslims go on pilgrimage to the holy sites of Mecca and Medina. When Muslims around the world kneel to pray, they face toward Mecca.

But Saudi Arabia is the scene of an undeclared battle between those who want to bring the kingdom into the modern age and those who fear that doing so could harm its cultural identity and religious heritage. Each side invokes its special Islamic character, and the Persian Gulf War, during which American and other foreign forces were based in Saudi Arabia, brought the conflict into sharper focus.

Since then, self-proclaimed reformers seeking a bigger say in how the monarchy conducts foreign policy and spends oil income have found in religion an unchallengeable cover for what are essentially political demands for power and participation.

At the same time, as religious militancy sweeps across the Arab world, Saudi Arabia has become more self-righteous about its orthodoxy while holding its society in a straitjacket of public morality. After female American soldiers came to help defend the kingdom four years ago, local religious sensitivities intensified, prompting a backlash by secularists. As a result, strict rules were temporarily lifted, but they have now been reimposed.

Saudi officials, who have observed the tremors of zealotry in Algeria and Egypt erupt into political opposition, note that this country can hardly be outdone in the realm of religious fundamentalism. Its rulers and most of its conservative population practice a rigorous form of Sunni Islam known as Wahhabism.

"If you look at what people are asking for, they want what is normal in Saudi Arabia," Prince

Bandar bin Sultan, the Saudi ambassador to Washington, observed in a recent interview.

"This is a conservative country by its own construction," echoed a Saudi cabinet minister. "Fundamentalists in other countries are trying to reinstate what was lost and what Saudis have been doing for years."

In the 1930s, King Abdul-Aziz ibn Saud forged what is today Saudi Arabia, drawing on the teachings of Muhammad Abdul Wahhab, an 18th-century preacher who developed the puritanical sect that bears his name. Since the founding of Saudi Arabia in 1932, the religious establishment has been accorded special consideration. Now the Council of Ulemas, made up of Islamic scholars, and the (Islamic) Judicial Court sit "to the right of the king," according to one Saudi physicist. But compromises and trade-offs always take place in the social and cultural realms, not on political or economic issues.

The appointed members of these bodies act as intermediaries between the state and the younger Islamic generation pushing for power. That class of mosque preachers, judges and professors has spoken out more daringly against corruption and financial mismanagement since the Persian Gulf War -- which cost the kingdom $ 65 billion -- and has promoted an even stricter application of the sharia, or Islamic law.

"They have a voice. They are the only lobby in the country. They are aggressive, obnoxious and very intimidating, and the government always succumbs to them," a Saudi secularist lamented. "The liberals are all cowards. I am one of them."

An Islamist-oriented lawyer agreed: "The reason is not that the clerics' were the only podiums available. The religious sector was the one that had more courage to take the risk and voice an opinion. Everyone is equally prohibited from demanding change."

Saudi groups in exile state they disavow militant piety or violence, but memories of the 1979 armed takeover of the Grand Mosque in Mecca by a fanatic claiming to be the expected mahdi, or messiah, linger.

Although calling for more openness and "human rights," reformers are seeking an even more puritanical application of Islamic rules to daily life and business, delaying advances in freedom of expression and political participation.

A weekly newspaper called Al Muslimun -- "The Muslims" -- once flourished with a circulation of 170,000. It has now sagged to 20,000 after attacks from the pulpits on its secular views.

"This is a law within the law," objected a U.S.-educated Saudi businessman who counts himself on the secular end of the social spectrum. "They [the ulemas] are appointing themselves as the guardians of society, whether we like it or not."

"It is not the government we fear, but the religious people," said a social scientist who has been denounced by preachers and threatened by telephone and in writing for expressing her views on marriage counseling.

While one sector of society describes the fastidious enforcement of morality as "social and emotional terror," others contend it is their religious right and duty to propagate virtue and fight vice, and even to interrogate, detain and punish violators. The interior minister, Prince Nayef, said, however, that members of the mutawa, the religious police, who exceed their limits in harassing society are now being punished or fired.

"This country is hypochondriac about its stability," a Saudi economist said.

"This is not a repressive society. This is not a tyranny like Iraq or Syria even, but people

disappear," one Saudi analyst observed. Publications distributed from London by the Committee for the Defense of Legitimate Rights give accounts of scores of arrests of people without due process and the reprimanding of clerics for giving sermons considered subversive.

The Saudi government has been quietly fighting extremism inside and outside its borders and also attempting to block use of Islamic charity organizations as channels for infiltration by militants.

"Ten major charities in Riyadh were suddenly dissolved and ordered to stop their activities by a direct order from Prince Salman, the governor of Riyadh," the Committee for the Defense of Legitimate Rights said in its July 11 weekly bulletin. The charities were closed down because of intelligence reports that the trustees of the groups were "Muslim activists."

A lawyer in Riyadh said if preachers give sermons seen as politically provocative, they are dismissed. "Now people are censuring themselves," he said. He added that several "philanthropic groups" that give "limited financial aid and sermons and propagate literature were told to shut down."

Last year, King Fahd created the Islamic Affairs Ministry so that the state can better control and regulate the activities of Islamic preachers, charity organizations, and universities and streamline the work of mullahs whose mission it is to proselytize the faith here and abroad.

"Societies that raise money from private individuals abroad cannot operate unless they have a license to do so," explained a Saudi official. The move followed reports from Algeria, Sudan and Egypt that wealthy Saudis were financing extremist movements on their soil.

With these moves, the Saudi state has seized the essentially Islamic initiative of taking care of the needy and also of limiting the dissemination of dissident ideas.

"Is freedom to speak more important than freedom to eat?" Bandar asked. "It's the economy, stupid. You fix the economy, you give people back their dignity, and you take away the majority of extremists."

A senior government minister cautioned, however, that no movement ought to be neglected, regardless of its impact on society.

Meanwhile, the growth of Islamic universities producing droves of unemployable men who take monthly government stipends while writing theses on esoteric matters of religious dogma has become a cause of concern. It is the ideas of those graduates and their yearning for empowerment of religion that pose a potential threat for the future.

**LOAD-DATE:** August 30, 1994

Source: News & Business > News > News, All (English, Full Text) ⓘ
Terms: "nora boustany" & "washington post" & "august 24, 1994" (Edit Search)
View: Full
Date/Time: Friday, July 30, 2004 - 2:42 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.