**United States District Court**
**Southern District of New York**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (RCC)
*Thomas Burnett, Sr. v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849 (RCC)
*Federal Insurance Co. v. Al Qaida*, 03 CV 6978 (RCC)
*Barrera v. Al Qaeda Islamic Army*, 03-CV-7036 (RCC)
*Salvo v. Al Qaeda Islamic Army*, 03-CV-5071 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.,* 03-CV-9849 (RCC)


## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PRINCE SALMAN BIN ABDUL AZIZ AL-SAUD'S MOTION TO DISMISS


KREINDLER & KREINDLER LLP
100 Park Avenue
New York, NY 10017-5540
Phone:  (212) 687-8181

MOTLEY RICE LLC
28 Bridgestone Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Phone: (843) 216-9000

COZEN O'CONNOR
45 Broadway, 16th Floor
New York, NY 10006
(212) 509-9400

HANLY CONROY BIERSTEIN &
SHERIDAN, LLP
415 Madison Avenue
New York, New York 10017
(212) 401-7600

## TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    STANDARD ON MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      LAW OF THE CASE" DOCTRINE IS INAPPLICABLE . . . . . . . . . . . . . . . . . 8
        B.      PRINCE SALMAN'S FSIA ARGUMENTS ARE WITHOUT MERIT  . . . . . . . 9

                1.      Prince Salman's Personal Support of Terrorist Fronts
                        Is Not Protected by the FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                2.      The SHC Should Not Be Considered An Instrumentality
                        of the Kingdom of Saudi Arabia  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                3.      Prince Salman Acted Beyond the Scope of His
                        Duties As Head of the SHC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                4.      The "Tortious Act" Exception to the FSIA
                        Precludes Immunity for the SHC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.      THIS COURT HAS PERSONAL JURISDICTION OVER
                PRINCE SALMAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                1.      Prince Salman's Conduct Was Sufficiently
                        Directed at the United States to Satisfy the
                        "Minimum Contacts" Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                2.      Prince Salman's Conduct Gives Rise To Conspiracy
                        Theory Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                3.      Plaintiffs Are Entitled to Discovery Concerning
                        Prince Salman's Additional Contacts with the United States  . . . . . . . . 21

        D.      PLAINTIFFS' HAVE ADEQUATELY PLED CAUSATION . . . . . . . . . . . . . 23

                1.      "But For" Causation Is Not Required  . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                2.      Prince Salman's Cited Authorities Are Inapplicable
                        and/or Misinterpreted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.      CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

## FEDERAL CASES

*All State Life Insurance Co. v. Linter Group Ltd.,*
782 F.Supp. 215 (S.D.N.Y. 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Am. Express Co. Shareholder Litigation,*
39 F.3d 395 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Andre Emmerich Gallery v. Segre,* 1997 WL 672009
(S.D.N.Y. Oct. 29, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Atkins v. County of Orange*, 251 F.Supp.2d 1225 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . 5

*Bellepointe, Inc. v. Kohl's Department Stores,*
975 F.Supp. 562 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Boim v. Quranic Literary  Institute*, 291 F.3d 1000
(7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25, 28

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Burnett v. Al Baraka Investment and  Development Corp.,*
274 F.Supp.2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Burnett v. Al Baraka Investment and Development Corp.,*
292 F.Supp.2d 9 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27, 28

*Cafeteria and Restaurant Workers Union, Local 473 v.*
*McElroy*, 367 U.S. 886 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Calder v. Jones*, 465 U.S. 783 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Cargill Int. S.A. v. M/T Pavel DyBenko*, 991 F.2d 1012
(2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Chance v. Armstrong*, 143 F.3d 698 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Christianson v. Colt Industrial Operating Corp.,*
486 U.S. 800 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Chrysler Capital Corp. v. Century Power Corp.,*
778 F.Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361

(2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Devlin v. Transport Communications International Union*,
175 F.2d 121 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*DiBlasio v. Novello*, 344 F.3d 292 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dixon v. Mack*, 507 F.Supp. 345 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922
(2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2nd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 7

*First City, Texas Houston, N.A. v. Rafidain Bank*,
281 F.3d 48 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*First City, Texas-Houston, N.A. v. Rafidian Bank*,
150 F.3d 172 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1
(D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Halberstam v. Welch*, 705 F.2d 472 (D.D. Cir. 19830 . . . . . . . . . . . . . . . . . . . . . . 6, 25

*Hogan v. Wal-Mart Stores, Inc.*, 167 F.3d 781
(2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Holmes v. Securities Investment Protection Corp.*,
503 U.S. 258 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*IUE AFL-CIO Pension Fund v. Herrmann*,
9 F.3d 1049 (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . . 16

*Johnson v. Manhattan Railway Co.*, 289 U.S. 479 (1933) . . . . . . . . . . . . . . . . . . . . . . 9

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
115 F.3d 1020 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Klaxon Co. v. Stenton Electric Manufacturing Co.*,
313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529
(S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Magnetic Audiotape Antitrust Litigation*,
334 F.3d 204 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Morrissey v. Curran*, 567 F.2d 546 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mukaddam v. Permanent Mission of Saudi Arabia to
the United Nations*, 136 F. Supp. 2d 257 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . 7, 21

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*,
102 F.3d 660 (2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*PDK Laboratoriess, Inc. v. Friedlander*, 103 F.3d 1105
(2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Palestine Information Office v. Shultz*, 853 F.2d 932
(D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F.Supp. 325 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reiss v. Societe Centrale DuGroupe Des Assurances Nationales*,
235 F.3d 738 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Robinson v. Government of Malaysia*, 269 F.3d 133
(2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Second Amendment Foundation v. United States Conference
of Mayors*, 274 F.3d 521 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Simmons v. Abruzzo*, 49 F.3d 83 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . 20

*Ungar v. Islamic Republic of Iran*, 211 F.Supp.2d 91
(D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Woodford v. Community Action Agency of Greene County*,
239 F.3d 517 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) . . . . . . . . . . . . . 16, 20

-iv-

## FEDERAL STATUTES

18 U.S.C. §1332b(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. §§1339A & 1339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

28 U.S.C. §1602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. §1605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

28 U.S.C. §1605(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 14

18 U.S.C. §2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

18 U.S.C. §2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Fed. R. Civ. P. 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Fed. R. Civ. P. 12(b)(6) and 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

First, 18 U.S.C. §2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1602, et seq . . . . . . . . . . . . . 4

18 U.S.C. §2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## MISCELLANEOUS

*Bosnian Act*, Article 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure,
§ 1351, at 253-59 (2nd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I.    **INTRODUCTION**

Plaintiffs have sued Prince Salman bin Abdul Aziz al-Saud (Prince Salman) based on his participation in, and aiding and abetting of, a global conspiracy to strike the United States through terrorist attacks, of which the September 11th attacks were natural, intended and foreseeable products.[1]   The substantive and jurisdictional claims against Prince Salman are based on the material support he provided, both personally and through his so-called charity, the Saudi High Committee for Assistance to Bosnia and Herzegovina ("the SHC"), to Osama Bin Laden ("Bin Laden") and al Qaeda.  The SHC is also a defendant here.  Plaintiffs have alleged the necessary facts supporting the claims against Prince Salman in their respective Complaints.[2] The alleged facts, when taken as true as they must be here, establish Prince Salman's amenability to personal jurisdiction and his liability under the Anti-Terrorism Act ("ATA"), the Torture Victim Protection Act ("TVPA") and common law tort theories.  Accordingly, the Court should deny Prince Salman's motion to dismiss.

Plaintiffs allege that Prince Salman has provided material support to Bin Laden and al Qaeda, personally and through the SHC, in keeping with his long history of funding Islamic extremism.  Ashton ¶¶ 255 & 289; Burnett ¶¶ 400 & 403; Federal ¶ 455.  In 1999, Prince Salman personally donated $400,000 to an event sponsored by the International Islamic Relief Organization ("IIRO")[3], the World Assembly of Muslim Youth ("WAMY")[4] and the Al-

---

[1] Plaintiffs have provided overviews of the scope, history and objectives of this global conspiracy in the following briefs previously filed with the Court:  The Federal Plaintiffs' Opposition to Prince Sultan's Motion to Dismiss at pp. 1-3; the Federal Plaintiffs' Opposition to Prince Turki's Motion to Dismiss at pp. 1-3; The Ashton and Burnett Plaintiffs'  Joint Opposition to Prince Sultan's Motion to Dismiss and The Burnett Plaintiffs' Opposition to Hamad Al-Hussaini's Motion to Dismiss.  As the conduct which forms the basis of the Plaintiffs' claims against Prince Salman can only be fully understood within this broader context, Plaintiffs' incorporate those descriptions by reference in lieu of restating them herein.

[2]  The Ashton plaintiffs' Fourth Amended Complaint will be referred to herein as "Ashton;" the Burnett plaintiffs' Third Amended Complaint will be referred to herein as "Burnett;" and the Federal plaintiffs' Complaint will be referred to herein as "Federal."

[3]  The IIRO has numerous connections with al Qaeda operatives, including Osama bin Laden.  Ashton ¶ 234; Burnett ¶ 234.  Osama bin Laden's brother-in-law, defendant Mohammed Jamal Khalifa, heads the IIRO office in the Philippines.  The IIRO has been a center of terrorist financing and training activity for al Qaeda

Haramain Islamic Foundation ("Al-Haramain")[5], each of which, at the time he made the donations, was a known and/or suspected terrorist front. Ashton ¶¶ 290 & 266; Burnett ¶ 401; Federal ¶ 461.

Prince Salman also used the SHC, an organization he founded in 1993, to support al Qaeda. Ashton ¶ 446; Burnett ¶ 392; Federal ¶ 454. The SHC has been criticized for supporting Islamic extremism, and in 2001 the Bosnian Financial Police raided the SHC's headquarters in Sarajevo. Ashton ¶¶ 447 & 451; Burnett ¶¶ 393 & 397; Federal ¶¶ 186 & 458. The raid uncovered SHC computer hard drives with photographs of the World Trade Center towers before and after the attacks of September 11, 2001, pictures of the U.S. embassies in Kenya and Tanzania and photos of the USS Cole. Ashton ¶ 451; Burnett ¶ 397; Federal ¶ 186 & 458. Also discovered were files on pesticides and crop duster aircraft, information on making false State Department badges and photographs and maps of Washington with several government buildings marked. *Id.* About 100,000 dollars of local currency was also found along with anti-Semitic and anti-U.S. material. *Id.* After analyzing the seized documents, the Bosnian Financial Police

---

operations, including the collection and laundering of money – across the world. Ashton ¶¶ 234 & 240; Burnett ¶¶ 234 & 240. The IIRO evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting al Qaeda members around the globe. Ashton ¶ 234; Burnett ¶ 234. For example, IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and the Brooklyn Bridge, the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in Kenya and Tanzania. Ashton ¶¶ 234 & 242; Burnett ¶¶ 234 & 242.

[4] WAMY has been identified by the United States Government as a "suspect terrorist organization" since 1996 - long before Prince Salman's $400,000 donation. Ashton ¶ 272; Burnett ¶ 362. It published a book, jointly with the IIRO, supporting Bin Laden and al Qaeda, and has sponsored and distributed a terrorist training manual. Ashton ¶¶ 442 & 443.

[5] Al Haramain is a purported charity that uses its non-profit status to support Bin Laden and his terror network. Ashton ¶ 467; Burnett ¶ 155. Twelve of its branch offices have had their assets frozen by the U.S. government because they were diverting funds to terrorists. Ashton ¶¶ 467, 473 & 481; Burnett ¶ 155. Al Haramain has also been implicated as providing funds for the 2002 Bali night-club bombing, and its web-site had a direct link to an al Qaeda web site. Ashton ¶¶ 487, 482 & 490; Burnett ¶ 175. Al Haramain was recently dissolved by the Saudi government because of its links to terrorism.

concluded that the SHC was a terrorist front.  Ashton ¶ 452; Burnett ¶ 398; Federal ¶¶ 187 & 459.

By mid-1993, Prince Salman knew or should have known of the threat posed by Islamic charities and the extremist activities of charities which were not compliant with charitable or Islamic zakat. In May 1993, the al-Birr charity, known in English as Benevolence International Foundation (BIF), an Islamic organization which he co-founded in the 1980s, was ostensibly shut down and banned from operating in the Kingdom of Saudi Arabia because of its active support for Islamic extremist activities. *See* Kathy Evans, "Saudi Curb on Alms Targets Radicals' Cash," The Guardian, May 5, 1993, Parrett Aff., Exhibit 10.

In July 1994, Salman ordered that ten major charities be "dissolved" and "ordered to stop their activities by a director order." The charities were closed down because of "intelligence reports that the trustees of the groups were Muslim activists." *See* Nora Boustany, "Traditional Saudis Take Dim View of Attempts to Modernize Islam," Washington Post, August 24, 1994, Parrett Aff., Exhibit 11.

But in remarkable disregard for international law and his own personal knowledge that Islamic charities were being used to divert funds to terrorist groups including al Qaeda, Prince Salman continued to personally direct the al-Birr Charitable Society in the Kingdom of Saudi Arabia, despite ordering its closure in 1993 for supporting Islamic extremist activities. *See* Kathy Evans, "Saudi Curb on Alms Targets Radicals' Cash," The Guardian, May 5, 1993, Parrett Aff., Exhibit 10.

Indeed, Prince Salman is currently listed on numerous charitable web sites as the chairman of al-Birr. *See* http://www.riyadhksa.gov.sa/English/organizations/ charity_org/riyadh_charity_org.htm;http:// www.darah.org.sa/site/html_e/prince.htm, Parrett

Aff., Exhibit 8.  Al-Birr (BIF) was designated by the Department of Treasury as a Specially

Designated Global Terrorist on November 19, 2002. *See* November 19, 2002, PO-3632,

"Treasury Designates Benevolence International Foundation and Related Entities as Financiers

of Terrorism," Department of Treasury Press Statement, Parrett Aff., Exhibit 9.

The SHC has channeled large amounts of money away from its purported charitable

purpose and toward the support of terrorism.  Ashton ¶ 454; Burnett ¶ 404.  In September 2000,

one year before the September 11, 2001 attacks, an organization called the Mothers of

Srebrenica and Podrinji alerted Prince Salman that his organization was not pursuing its putative

charitable purposes.  Ashton ¶¶ 454 & 455; Burnett ¶¶ 404 & 405; Federal ¶¶ 185 & 457.  The

organization noted, for example, that none of the 200 million local dollars raised in just one day

in 1995 were ever made available to the people of Bosnia and Herzegovina. *Id.*  Additionally,

U.S. investigators are currently investigating the SHC's finances and are focusing on $41 million

for which the SHC cannot or will not account.  Ashton ¶ 456; Burnett ¶ 407; Federal ¶ 184 &

460.

## II.     SUMMARY OF MOTION TO DISMISS

Prince Salman's motion to dismiss ("MTD") is flawed in several respects.  First, the

arguments asserted pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §

1602, et seq.: (1) ignore the plaintiffs' claims regarding Prince Salman's personal activities; (2)

are premised on the incorrect assumptions that the SHC is entitled to claim and is able to

establish status as a foreign sovereign; and (3) that Prince Salman's activities as head of the SHC

were performed within the course and scope of his duties.

Second, Prince Salman's MTD limits its focus to only those allegations contained in

paragraphs that mention him or the SHC specifically, and ignores the remainder of the relevant

contentions that tie him, directly and/or indirectly, to the terrorist acts alleged. Indeed, the complaints allege that Prince Salman, acting through various charities, foundations, organizations and individuals, provided funds and financial services to al Qaeda thereby providing resources and capabilities to mount attacks on the U.S., such as the Embassy Bombings in Africa and the September 11 attacks. See Section I, *supra*. It is well-settled that complaints must be read as a whole to determine whether claims have been stated. *Atkins v. County of Orange*, 251 F. Supp.2d 1225, 1231-32 (S.D.N.Y. 2003).

Third, Prince Salman's MTD is filled with factual challenges to Plaintiffs' allegations and self-serving statements touting his alleged honorable and benevolent service to the Kingdom of Saudi Arabia and the people of Bosnia and Herzegovina. Such superfluity is irrelevant to the motion at issue. Motions to dismiss under 12(b)(6) are decided by looking to the allegations in a plaintiff's complaint; it is those allegations alone that are to be taken as true. *See* "Standard on Motion to Dismiss," *infra*. Prince Salman has also improperly attached exhibits that attempt to address the substance of plaintiffs' claims in an inappropriate effort to draw the Court's attention outside the four corners of the complaints and to induce the Court to make preliminary factual findings. *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996) (holding that it was error for the court to rely upon information outside the four corners of the complaint when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)).

### III.   STANDARD ON MOTION TO DISMISS

To defeat a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction made before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings and affidavits that jurisdiction exists." *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). In evaluating

plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in their favor. *PDK Labs,* 103 F.3d at 1108.  In addition, the Court must draw all inferences in plaintiffs' favor. *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).  To make a *prima facie* showing of jurisdiction, plaintiffs need only "plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 565 (S.D.N.Y. 1997).

Similarly, the Court should not grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless it "appears beyond doubt that plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957); *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir.1995).  The Court must presume that the allegations in the complaints are true and give plaintiffs the benefit of every reasonable inference that may be drawn therefrom. *Lee v. Bankers Trust Co.,* 166 F.3d 540, 543 (2d Cir.1999).  Plaintiffs are not required to prove their claims at the pleading stage; indeed, "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency of Greene County,* 239 F.3d 517, 526 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).[6]

The analysis of Fed. R. Civ. P. 12(b)(6) and 12(b)(2) motions is conducted  in the context

---

[6]  It should also be noted that many of the issues raised in Prince Salman's motion to dismiss necessarily involve questions of fact.  For example, aiding and abetting, along with the criminal provisions of §§2339A and 2339B, discussed in section D, *infra*, require some level of knowledge and intent.  *Halberstam,* 705 F.2d at 477; 18 U.S.C. §§1339A & 1339B.  Similarly, conspiracy requires the showing of an agreement between two or more persons.  *Halberstam,* 705 F.2d at 477.  The presence or absence of these elements are necessarily fact questions that can generally only be derived through inferences based upon the totality of the facts of a case, including circumstantial evidence.  See *id.* at 480 & 486-89.  As such, they are not the proper subject of a motion to dismiss.  *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003).

of Fed. R. Civ. P. 8(a)(2).  That rule requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Chance,* 143 F.3d at 701. The "short and plain statement" must simply give the defendant fair notice of what the plaintiffs' claims are and the grounds upon which they rest. *Burnett v. Al Baraka Investment and Development Corp.,* 274 F. Supp.2d 86, 103 (D.D.C. 2003) (*"Burnett I"*).  Plaintiffs are not required to prove their claims at this early litigation stage.[7]

In responding to the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA. *Cargill Int. S.A. v. M/T Pavel DyBenko*, 991 F.2d 1012, 1016 (2d Cir 1993).  In the event that the defendant makes such a showing, the burden of production shifts to the plaintiff to come forward with specific factual allegations which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in the FSIA. *Robinson*, 269 F.3d at 141-43.  To the extent the defendant challenges the accuracy of those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery relative to that disputed factual contention. *Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*, 136 F. Supp. 2d 257, 261-62 (S.D.N.Y. 2001); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998); *First City, Texas-Houston, N.A. v. Rafidian Bank*, 150 F.3d 172, 177 (2d Cir. 1998); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990).  Upon completion of discovery, the Court should normally "afford the parties the opportunity to present

---

[7]  Notwithstanding this liberal standard, with regard to the conspiracy claims, plaintiffs emphasize that a defendant's agreement to participate in a conspiracy will almost always need to be deduced from circumstantial evidence, and that such evidence generally can only be assimilated after exhaustive discovery.

evidentiary material at a hearing on the question of FSIA jurisdiction."[8]  *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000).  In the Second Circuit, defendants must understand "that the ultimate burden of proof in a FSIA jurisdiction case ultimately lies with them." *Id.* at 288.[9]

## IV.   ARGUMENT

### A.   "LAW OF THE CASE" DOCTRINE IS INAPPLICABLE

Prince Salman argues that Judge Robertson's decision granting Prince Sultan's motion to dismiss in the *Burnett* action, which was rendered prior to the MDL transfer, should be the "law of the case" as to the *Burnett* plaintiffs, and should be given "substantial deference in the remaining cases."  MTD, pages 8-9.  The law of the case doctrine, however, is wholly inapplicable.  Indeed, the decision of the District Court for the District of Columbia in *Burnett* is inconsistent with the law of this Circuit regarding the scope of the tortious act exception, and consequently is entitled to no deference in deciding the motions to dismiss of Princes Salman.  *See Robinson v. Government of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001).

The law of the case doctrine states that "when a court decides upon a **rule of law**, that decision should continue to govern the same issues in subsequent stages of the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (emphasis added). The facts giving rise to plaintiffs' claims against Prince Salman and Prince Sultan are completely different and Judge Robertson's prior rulings were nothing more than an application of his

---

[8]  Consistent with these authorities, plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the FSIA jurisdictional analysis.

[9]  The law that the Court must apply in analyzing an immunity defense under the FSIA depends upon the issue under consideration.  Federal law and the Federal Rules of Civil Procedure control all constitutional and federal question issues, both substantive and procedural. The substantive law of New York applies to the vast majority of the Ashton and Federal Plaintiffs' common law claims, as those claims arise out of tortious conduct and injuries occurring within this State. *Klaxon Co. v. Stenton Elec. Mfg. Co.*, 313 U.S. 487 (1941).  The Federal Rules of Civil Procedure control all procedural issues, even on the common law claims. *Hogan v. Wal-Mart Stores, Inc.*, 167 F.3d 781, 783 (2d Cir. 1999).

interpretation of the law to the facts alleged against Prince Sultan. In doing so, Judge Robertson did not decide any issues of law.[10] He simply found: (1) that the acts of Prince Sultan, as alleged by the *Burnett* plaintiffs, fell within the scope of his official duties for purposes of the FSIA; (2) that no FSIA exceptions applied to those acts; and (3) that the facts alleged against Prince Sultan did not give rise to personal jurisdiction. *Burnett v. Al Baraka Investment and Development Corp.*, 292 F. Supp.2d 9 (D.D.C. 2003) ("*Burnett II*").

Prince Salman's "law of the case" argument is particularly disingenuous with respect to the Ashton and Federal actions, which are distinct lawsuits from Burnett, supported by distinct allegations and arguments. As the Supreme Court has noted, "consolidation does not merge the suits into a single cause or change the rights of the parties, or make those parties who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 497 (1933). Efficiency does not prevail at the expense of justice. *Devlin v. Transp. Communications International Union*, 175 F.3d 121, 130 (2d Cir. 1999). Consequently, the Court should deny Prince Salman's request to apply the law of the case doctrine.

### B.   PRINCE SALMAN'S FSIA ARGUMENTS ARE WITHOUT MERIT

Prince Salman argues that the Court lacks subject matter jurisdiction over the claims asserted against him, attempting to invoke FSIA protections. The FSIA, however, does not protect him from the personal tortious conduct alleged in the complaints.

### 1.   Prince Salman's Personal Support of Terrorist Fronts Is Not Protected by the FSIA

---

[10]  Judge Robertson did offer an interpretation of the meaning of the phrase "caused by" in §1605(a)(5). As discussed in section D.2., *infra*, however, Judge Robertson admits that his interpretation may not be correct. Moreover, the meaning of "caused by" is only relevant within the context of the FSIA. Section B, *infra*, makes clear that the FSIA is inapplicable to the acts alleged against Prince Salman. Accordingly, Judge Robertson's interpretation of "caused by" is not a "rule of law" upon which the law of the case doctrine can be based.

Plaintiffs allege that Prince Salman personally donated approximately $400,000 to organizations funding terrorist activities.  Ashton ¶ 290; Burnett ¶ 401.  Because he did not make these contributions on behalf of any foreign sovereign, agency or instrumentality thereof, the FSIA is inapplicable and affords Prince Salman no protection. *Jungquist v. Sheikh Sultan Bin Khalifa Al* Nahyan, 115 F.3d 1020, 1027 (D.C. Cir. 1997).  These allegations alone are sufficient to provide the Court with subject matter jurisdiction over the claims against Prince Salman.

       2.     <u>The SHC Should Not Be Considered An Instrumentality of the Kingdom of Saudi Arabia</u>

Plaintiffs also allege that Prince Salman provided material support to Bin Laden and al Qaeda by directing funds and support to them in his role as head of the SHC.  Prince Salman argues that the SHC is an instrumentality or organ of the government of Saudi Arabia, and that his actions are therefore protected by the FSIA, but he is wrong.  The SHC at all relevant times held itself out as a non-governmental organization and thus cannot now cloak itself in sovereign immunity.

The SHC was formed in 1993 purportedly "to organize and fund relief efforts in Bosnia-Herzegovina during the civil war in the former Yugoslavia."  MTD, page 3.  Any entity operating within Bosnia and Herzegovina as a humanitarian organization must comply with that country's Law on Humanitarian Activities and Humanitarian Organizations of the Federation of Bosnia and Herzegovina ("Bosnian Act"). *See Bosnian Act*, attached to the Affirmation of Vincent I. Parrett In Opposition To Prince Salman Bin Abdul Aziz Al-Saud's Motion To Dismiss Certain Consolidated Complaints ("Parrett Aff.") as Exhibit 1.  Attachment 3 to Exhibit B of Prince Salman's MTD is a copy of an audit of the SHC performed in 2002 by the Bosnian Ministry of Finance.  The audit shows, *inter alia*, that the SHC registered in Bosnia as a foreign

-10-

humanitarian organization operating within Bosnia and Herzegovina, pursuant to the terms of the Bosnian Act, as early as 1993.  MTD, Exhibit B, Attachment 3, pages 1-3.

Importantly, the Bosnian Act requires that a foreign humanitarian organization operating in Bosnia and Herzegovina must be "...a humanitarian, **non-governmental**, organization...." *See Bosnian Act*, Article 22, Parrett Aff., Exhibit 1.  (Emphasis added).[11]  The Bosnian Act also specifically addresses foreign humanitarian organizations established by the U.N. or by foreign governments.  Such organizations are excluded from the scope of the Bosnian Act because they operate pursuant to the terms of agreements reached directly with the government of Bosnia and Herzegovina. *See Bosnian Act*, Article 22, Parrett Aff., Exhibit 1.  The text of the audit attached as Exhibit B, Attachment 3 to the MTD plainly shows that the SHC is not one of these types of organizations, but instead operates as a private non-governmental entity pursuant to the terms of the Bosnian Act.

Accordingly, the SHC has, over the course of the past eleven years, presented itself to the government of Bosnia and Herzegovina as a private, **non-governmental** organization; which is the exact opposite of what Prince Salman is now arguing to the Court.  Since the SHC represented to the government of Bosnia and Herzegovina that it was a non-governmental organization, and since it acted as such for more than ten years and used Bosnia as a means to support al Qaeda, the SHC is estopped from asserting its status, if any, as an instrumentality of the Kingdom of Saudi Arabia.  Indeed, for purposes of resolving jurisdictional challenges, the

---

[11]   United Nations Resolution 1996/31 defines non-governmental organizations as entities that "have a representative structure and possess appropriate mechanisms of accountability to its members, who shall exercise effective control over its policies and actions through the exercise of voting rights or other appropriate democratic and transparent decision-making processes" and that are not "established by a governmental entity or intergovernmental agreement."  United Nations Resolution 1996/31, Consultative Relationship between the United Nations and Non-Governmental Organizations (25 July 1996).  A non-governmental organization may have members "designated by governmental authorities, provided that such membership does not interfere with the free expression of the views of the organization." *Id.*

-11-

Court should treat the SHC as a non-governmental organization pursuant to that entity's own representations to Bosnia and Herzegovina.[12]

3.  Prince Salman Acted Beyond the Scope of His Duties As Head of the SHC

Even if the Court finds that the SHC is not precluded from seeking the protections of the FSIA and is in fact an organ or instrumentality of the government of Saudi Arabia, Prince Salman is still not entitled to the protections of the FSIA because his actions as head of that organization went well beyond the ambit of his official duties.  The FSIA applies to a foreign official acting in an official capacity, but does not apply to one acting beyond the scope of his authority.[13]  *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C.Cir. 1997).  Such conduct is deemed personal.

The Bosnian audit of the SHC provides clear instruction as to the operational scope of that organization:

> - to provide food, clothing, shoes, medicine and other humanitarian articles to the war victims, children without parents, the old and to other citizens of the Republic of Bosnia and Herzegovina who need help,
>
> - to procure writings, printing, publishing and free of charge distribution of reports, magazines, books, leaflets, brocures and other documents with religious content,
>
> - to provide humanitarian aid and services to the Islamic Community of the Republic of Bosnia and Herzegovina,
>
> - to provide financial aid,

---

[12]  As discussed herein, the representations made by the SHC to the government of Bosnia and herzegovina render the question of that entity's "organ" status moot.  The SHC has filed its own motion to dismiss under the FSIA.  Plaintiffs will more fully address the arguments advanced in support of the SHC's FSIA defense in their opposition.  Plaintiffs incorporate that argument by reference herein.

[13]  The Burnett and Federal plaintiffs assert that the FSIA does not apply to officials of a foreign state even when acting within the scope of his authority because officials are not included in the definition of "foreign state" under the FSIA.  See 28 U.S.C. §1603.

- to build and support the construction and operation of school centers, schools, hospitals, clinics, companies and similar institutions, dry up or water the land, as well as to undertake other activities in order to meet, directly or indirectly, the needs of the poor, refugees, residents, as well as those of natural disasters' victims,

- to organize, facilitate or participate in the organization of meetings, speakers' platforms, lectures and exhibitions, as well as to perform other public events in accordance with the law,

- to improve, initiate or organize research or experimental works and publish results of these researches, and

- to employ necessary experts and support staff required by the Office's operational needs.

MTD, Exhibit 'B,' Attachment 3, page 2.  The SHC represented to the government of Bosnia and Herzegovina that this was its operational mandate, and the advancement of these goals was purportedly the reason for the SHC's existence.

Prince Salman offers the declaration of Dr. Mutlib Bin Abdullah Al-Nafissa, a member of the Saudi Arabian Council of Ministers, which states "[t]here are no specific regulations under Saudi Arabian law mandating how to disburse foreign and humanitarian aid to any particular cause or in any particular manner."  MTD, Exhibit "C," paragraph 9.  Price Salman, through Dr. Al-Nafissa, attempts to convince the Court that the absence of Saudi regulation over the SHC provides him, as its leader, with unlimited authority to act as he chooses.  The SHC, however, had clear limits on the scope of its operations and authority.  Prince Salman's duties, as leader of the SHC, were limited to the furtherance of those goals.  Nothing in the SHC's operational mandate authorizes that organization to provide financial and other support to terrorists.  Nothing in the mandate authorizes that entity to collect funds and divert them away from the people of Bosnia and Herzegovina.  Indeed, the Bosnian Financial Police noted, after a raid on the SHC's facility in Sarajevo, that the organization had gathered a substantial amount of

material that "does not belong in the scope of work of a humanitarian organization."  Ashton ¶ 452; Burnett ¶ 398.

Prince Salman, as head of the SHC, was responsible for the activities of that organization, and his use of the SHC to provide substantial support and assistance to terrorists exceeded the scope of his official duties.  Accordingly, even if the SHC is entitled to claim and able to establish status as an instrumentality of a foreign sovereign, the FSIA provides no protection to Prince Salman for the activities alleged in plaintiffs' complaints.

      4.     <u>The "Tortious Act" Exception to the FSIA Precludes Immunity for the SHC</u>

Whether the SHC is or is not is entitled to claim and able to establish status as an instrumentality of the Kingdom of Saudi Arabia, the "tortious act" exception to the FSIA precludes any immunity to which Prince Salman and the SHC might otherwise be entitled.[14]  28 U.S.C. §1605(a)(5) creates an exception to foreign sovereign immunity when "money damages are sought against a foreign state for personal injury or death...occurring in the United States and caused by the tortious act...of any official of that foreign state while acting within the scope of his office or employment..."  Because of this exception, neither the SHC nor Prince Salman is entitled to the protections of the FSIA.[15]

      **C.**      **THIS COURT HAS PERSONAL JURISDICTION OVER PRINCE SALMAN**

---

[14]  For the reasons set forth in their Memorandum of Law in Opposition to the Motion to Dismiss of Prince Turki at pages 20-22 and Memorandum of Law in Opposition to the Motion to Dismiss of Prince Sultan at pages 18-21, incorporated herein by reference, the Federal plaintiffs submit that Prince Salman's laundering of funds on behalf of al Qaeda subject him to the jurisdiction of this Court under the "commercial activity exception" of the FSIA.  See 28 U.S.C.§1605(a)(2).

[15]  Plaintiffs have already addressed the arguments raised by Prince Salman regarding the applicability of the tortious act exception in the following briefs: Federal plaintiffs' opposition to Prince Turki's motion to dismiss at pages 9-20; and opposition to Prince Sultan's motion to dismiss at pages 8-18.

This Court has personal jurisdiction over Prince Salman because of his contacts with the U.S., and because his knowing support of terrorism specifically directed at the U.S. satisfies the due process requirements for the assertion of jurisdiction in this country. Alternatively, plaintiffs' allegations are sufficient to warrant jurisdictional discovery.

       1.      Prince Salman's Conduct Was Sufficiently Directed at the
                  United States to Satisfy the "Minimum Contacts" Test

The "minimum contacts" test concerning the requirements of due process is satisfied because the intentional and tortious conduct of Prince Salman was expressly aimed, directed, targeted and intended to harm the United States and its residents. Prince Salman aimed his conduct at the United States when he provided material support to Bin Laden and al Qaeda (or to organizations that funneled money to al Qaeda), with knowledge that these organizations were engaged in terrorist activities aimed at the United States.

Al Qaeda has, since its inception, opposed the United States, and its leaders and members have publicly and actively sought to attack the United States and its interests. Ashton ¶¶ 33-37; Burnett, pp. 203-13. Indeed, in February 1998, Bin Laden and al Qaeda issued a public *fatwa*, printed in the Arabic newspaper Al Quds, which stated that "the ruling to kill Americans and their allies - civilians and military - is an individual duty for every Muslim who can do it in any country in which it is possible." Ashton ¶¶ 120-21; see also Burnett, p. 213. That *fatwa* was soon followed by terrorist attacks on the U.S. embassies in Kenya and Tanzania, the attack on the USS Cole, and a plan (albeit failed) to explode a large bomb at the Los Angeles International Airport on New Years Day of 2000. Ashton ¶¶ 130-36 and 149-55; Burnett, p. 213 & ¶ 621. Moreover, the plan to use highjacked airliners to attack the United States had been in existence

for some years prior to 2001, and the specific plan for September 11 was hatched sometime prior to the Spring of 2000.  Ashton ¶¶ 106, 108 & 171; Burnett, p. 212 & ¶ 34.

Prince Salman's 1999 personal contributions to known supporters of Bin Laden and al Qaeda must be viewed within this context, so must the support he provided as head of the SHC. As discussed in Section II, *supra*, the IIRO, WAMY and Al Haramain each had close and well-known ties to Bin Laden and/or al Qaeda at the time Prince Salman provided support.  Since attacks on the United States and its citizens had long been the publicized and well-known goal of al Qaeda and Bin Laden, by providing money to organizations whose primary reason for existence was funneling such funds to al Qaeda and Bin Laden, Price Salman purposefully directed his conduct at the United States.

The horrific events of September 11 must be considered as part of the due process analysis.  As the Supreme Court has explained, "'[d]ue process' is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961).  Consequently, the Supreme Court has rejected using a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an evaluation of each case's own unique facts and circumstances. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

One important factor in jurisdictional analysis is whether defendants "should reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Purposeful activity is the cornerstone of that analysis. *Id.*  In *Burger King v. Rudzewicz*, 471 U.S. 462, 472-76 (1985), the Supreme Court stressed that a key factor in determining the existence of "purposeful activity" was whether the litigation "arose out of or was related to" the defendants' activity connecting him to the forum.  The court balanced the

-16-

defendants' interest in avoiding suit in a remote forum against the plaintiffs' interest in suing in a convenient forum and the state's interest in furthering its fundamental social policies. *Id.* at 476-78. When these factors are weighed in the present case, particularly in light of the direct relation between the act complained of and the conduct at issue, and the policy implications herein, the scales of justice tip squarely in plaintiffs' direction.

The Supreme Court has also stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King,* 471 U.S. at 483-84. Following this logic, the D.C. Circuit has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements"). In the present case, the reasonableness of subjecting defendants alleged to have aided and abetted al Qaeda to jurisdiction in the United States is fair and accords with due process.

Intentional conduct calculated to cause injury in the forum satisfies the due process requirements for jurisdiction, even if the defendants' conduct occurred outside the forum. *Burger King,* 471 U.S. at 475; *Calder v. Jones*, 465 U.S. 783, 789 (1984). In *Calder*, defendants were employees of a national weekly newspaper in Florida that was alleged to have printed a libelous story. *Id.* at 785-86. Plaintiff was a California resident and entertainer with a television career centered in California. *Id.* at 783. Defendants had no contacts with California other than occasional trips and phone calls. *Id.* at 785-86. Nonetheless, the court held that assertion of jurisdiction in California comported with due process because the article was drawn from

-17-

California sources and "the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788-89.

*Calder* distinguished intentional torts from allegations of "untargeted negligence" and held that jurisdiction was warranted because the defendants' intentional actions were "expressly aimed at California." 465 U.S. at 788-89. Because defendants knew that plaintiff would suffer injury where she lived and worked, the court held that defendants should reasonably anticipate being haled into court in California. *Id.* at 790.

Like the *Calder* defendants, Prince Salman is accused of intentional tortious acts. He supported Bin Laden and al Qaeda who had targeted the U.S. The locations of the September 11, 2001 attacks were not accidental. Prince Salman purposefully directed his tortious activities at the U.S. when he funded the IIRO, WAMY and Al Haramain, all al Qaeda fronts. *See* Ashton ¶¶ 290 & 266; Burnett ¶ 401; Federal ¶ 461; *see also*, "Salman donates SR 1.5m in a major fund-raising event," *Middle East Newsfile,* December 16, 1999, Parrett Aff., Exhibit 2 (showing Prince Salman donated funds to the IIRO, WAMY and Al Haramain).

Two cases involving terrorism against U.S. citizens further demonstrate that due process is not violated when those who deliberately target the U.S. are made to answer in U.S. courts. In *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998), the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction. *Id.* Similarly, in *Daliberti v. Republic of Iraq*, 97 F. Supp.2d 38, 53-54 (D.D.C. 2000), the court found that state sponsors of terrorism had sufficient warning of the seriousness with which the U.S. views terrorist attacks against Americans so that it was

-18-

reasonable for them to be held accountable for such acts in U.S. courts.  Accordingly, the court found that the assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" and that defendant's targeting of Americans provided a sufficient nexus with the U.S. to satisfy due process concerns. *Id.*

In *Rein* and *Daliberti* the terrorists targeted U.S. citizens abroad.  Here, by contrast, the terrorists and their sponsors murdered U.S. citizens on U.S. soil.  Persons who provide the means, financial or otherwise, for terrorists to come to the U.S. and commit acts of murder cannot be said to lack sufficient contacts to make them amenable to jurisdiction in this country.

2.    Prince Salman's Conduct Gives Rise To Conspiracy Theory Jurisdiction

Prince Salman is also subject to jurisdiction here because, as alleged in the Complaint, he conspired with al Qaeda to attack the United States.  Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum. *See All State Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over absent defendants pursuant to a conspiracy theory by imputing forum acts of co-conspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.,* 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory).  To assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the state to the out-of-state conspirator." *All State Life Ins. Co.,* 782 F. Supp. at 221 n.6.  And by imputing forum acts of their co-conspirators to non-resident defendants, this Court has repeatedly found that such non-resident defendants have minimum contacts with the forum to satisfy Due Process. *Dixon v. Mack,* 507 F. Supp. 345, 352 (S.D.N.Y.

1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course complained of in the suit, supplies the necessary minimum contacts . . ."); *Andre Emmerich Gallery v. Segre,* 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfy Due Process).

Consistent with the logic of *Calder, Rein,* and *Daliberti*, the conspiracy jurisdiction cases from  this Court explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court there." *Dixon,* 507 F. Supp. at 352; *Andre Emmerich,* 1997 WL 672009 (both citing *World-Wide Volkswagen Corp.,* 444 U.S. at 295 (1980)); *see also Chrysler Capital Corp.,* 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effect" in the forum).  Thus, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their co-conspirators satisfies Due Process.

Plaintiffs have satisfied all the requirements for conspiracy jurisdiction; they have "(1) establish[ed] a *prima facie* case of conspiracy; (2) allege[d] specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate[d] the commission of a tortious act in [the forum] during, and pursuant to, the conspiracy. *See Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 120 (E.D.N.Y. 2000).

The *prima facie* showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's

intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *Id.; see also Chrysler Capital,* 778 F. Supp. at 1267.  Fairly read, the Complaints allege that Prince Salman, personally and through the SHC, provided funds to terrorist fronts known to support al Qaeda.  Such funds were donated pursuant to a broad-based plan for funneling money to terrorists and were given subsequent to Bin Laden's public announcements of his intent to attack the United States and his solicitation of support for that goal.  The resulting damage or injury is all too plainly apparent.  These allegations are clearly stated in the complaints and satisfy all necessary elements for conspiracy theory jurisdiction.

> 3.      Plaintiffs Are Entitled to Discovery

It is well settled that "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery." *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206-08 (2d Cir. 2003); *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 50 (2d Cir. 2002); *Morrissey v. Curran*, 567 F.2d 546, 551 (2d Cir. 1977); and *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001). Moreover, "[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery." 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990).  Similarly, a plaintiff should be afforded the opportunity to conduct discovery relative to any disputed issue of fact material to the court's analysis of a subject matter jurisdiction challenge under the FSIA.  *Mukaddam,* 136 F. Supp. 2d at 261-62.

For example, plaintiffs believe that jurisdictional discovery will reveal substantial contacts between Prince Salman and the U.S.  Specifically, Prince Salman holds a substantial amount of stock in the Arabian Shield Development Company, a Delaware corporation that is

headquartered in Dallas, Texas. *See* "60% Saudi-Owned Firm Buys Tex. Refinery, Plans Venture to Import Saudi Products," *Platt's Oilgram News*, June 12, 1987, Parrett Aff., Exhibit 3. Likewise, Prince Salman owns stock in Nimir Petroleum Co. Ltd., which owns and operates the Texas-based Nimir Petroleum Co. USA Inc. *See* "Saudi Arabia – The Private Placements," *Input Solutions*, October 20, 2003, Parrett Aff., Exhibit 4.

Not only has Prince Salman been hosted at the White House by President George H.W. Bush to discuss the opening of Saudi cultural exhibitions in Washington, D.C., *see* "From The White House," *Federal News Service*, July 27, 1989, Parrett Aff., Exhibit 5, but Prince Salman held a public press conference in Maryland with Governor William Schaefer to sign an Agreement of Mutual Cooperation to establish closer business and trade ties between Maryland and the Riyadh Province governed by Prince Salman. *See* "News Advisory," *PR Newswire*, July 19, 1989, Parrett Aff., Exhibit 6.  Moreover, Prince Salman's son, Prince Ahmed bin Salman, was educated in California and was the principal owner of the Thoroughbred Corporation, an entity organized to breed, train and race horses in the United States and abroad. Prince Ahmed bin Salman maintained a residence in the United States and upon his death in 2002, his estate was involved in a lawsuit in New Jersey for payment of wages to an employee. It has been reported in the press that Prince Salman agreed to "honor his son's obligations." *See* "Bedminster man sues estate of Saudi prince for back pay," *Associated Press Worldstream*, Parrett Aff., Exhibit 7.

### D.   PLAINTIFFS' HAVE ADEQUATELY PLED CAUSATION

Prince Salman's MTD does not address the specific legal theories asserted against him. Instead, he claims that the plaintiffs' complaints must be dismissed because they fail to show that he proximately caused the September 11, 2001 attacks.  MTD, page 20 (stating that, "plaintiffs

bear the burden of showing that Prince Salman's acts were a 'substantial factor' that foreseeably led to their injury, and that the September 11ᵗʰ attacks would not have occurred 'but for' his actions.") (citing *In re Am. Express Co. Shareholder Litigation*, 39 F.3d 395 (2d Cir. 1994) and *Holmes v. Securities Inv. Protection Corp.*, 503 U.S. 258 (1992)).  Prince Salman's statement of the relevant causal standard is simply wrong, however.

    1.    "But For" Causation Is Not Required

    Plaintiffs do not have to prove that "but for" the donations made by Prince Salman, the terrorist attacks of September 11 would not have occurred.  Instead, plaintiffs must simply show that Prince Salman violated one of the ATA's criminal provisions and that the violation was a substantial factor in bringing about the plaintiffs' harm or, alternatively, establish Prince Salman's liability pursuant to general tort law principles, such as aiding and abetting or conspiracy.[16]

    Prince Salman's liability under the ATA is demonstrated through the analysis of several provisions.  First, 18 U.S.C. §2339A creates criminal liability for donating material support to another knowing or intending that such support is to be used in preparation for or carrying out one of the violations listed therein.[17]  Similarly, under §2339B, a person can be held criminally liable for knowingly providing, attempting to provide or conspiring to provide material support to a foreign terrorist organization.

----

    [16]  Plaintiffs have previously submitted detailed discussions of the causal standards required for the ATA and aiding and abetting and conspiracy in their briefs opposing the motions to dismiss of several defendants, including: the Ashton plaintiffs' opposition to the Saudi Bin Laden Group's motion to dismiss at pages 11-24; the Ashton plaintiffs' opposition to Mar-Jac Poultry and the International Institute of Islamic Thought's motion to dismiss at pages 5-15; the Federal plaintiffs' opposition to Prince Turki's motion to dismiss at pages 13-15; and the Federal plaintiffs' opposition to Prince Sultan's motion to dismiss at pages 15-18.  In the interest of brevity, plaintiffs incorporate those discussions by reference herein.
    [17]  "Material support" is a defined term under §2339A(b) and includes currency or other financial securities, financial services, lodging, training, false documentation or identification, and facilities.  Thus as noted in *Boim*, the term "material support" relates to the type of aid rendered rather than whether it is substantial or considerable.  *Boim,* 291 F.3d at 1015.

Next, 18 U.S.C. §2333 provides a civil remedy for any person injured or killed by reason of an act of international terrorism.  The criminal violations of §§2339A and 2339B satisfy the definition of "international terrorism," which is contained in §2331.  *Boim v. Quranic Literary Institute,* 291 F.3d 1000, 1015 (7th Cir. 2002).  Consequently, a person can be held civilly liable for providing, e.g., currency to another: (1) if he knows or intends that the currency is to be used in preparation for or carrying out an act of terrorism; or (2) if the recipient is a foreign terrorist organization.[18]  Of course, for civil liability to attach, there must be damages.  The damages at issue are injury or death as stated in §2333.

Civil liability under §2333 also requires the claimant to be injured or killed "by reason of" the act of international terrorism, which is defined as, but is not limited to, violations of §§2339A and 2339B.  The *Boim* court interpreted this provision as importing standard tort law into §2333, and found that this causation element could be demonstrated in the traditional manner.  *Id.*  Accordingly, one who provides material support to terrorists in violation of §§2339A or 2339B may be held civilly liable if the donation caused the death or injury under common law tort principles.

Prince Salman argues that the contribution must be a but for cause of the injury.  Yet, tort law and the applicable statutes do not require such a showing.  The well-established doctrines of aiding and abetting and conspiracy allow causation to reach remote and even passive participants in a tortious act.  Conspiracy is expressly invoked numerous times in the criminal statutes cited by §2339A.[19]  Similarly, the *Boim* court found that aiding and abetting is included within the

---

[18]  The *Boim* court also noted, however, that civil liability for financing terrorism sweeps more broadly than the conduct prohibited by §§2339A and 2339B. *Id.*  Therefore, one can be held civilly liable for the broader category of international terrorism not expressly included in §§2339A and 2339B.

[19]  See, e.g., 18 U.S.C. §1993(8) (conspiracy to bring terrorist attacks against mass transportation systems); 18 U.S.C. §1332b(a)(1)(B) (conspiracy to create substantial risk of bodily injury by destroying a structure within the United States); see also, 18 U.S.C. 2339B (conspiracy to provide material support to foreign terrorist organizations).

-24-

scope of §2333: (1) as a matter of congressional intent; and (2) because the definition of "international terrorism" includes acts that violate the criminal laws of the United States, one of which, 18 U.S.C. §2, creates liability for aiding and abetting violations of any other criminal provisions. *Id.* at 1020.[20]

Therefore, since plaintiffs allege that Prince Salman donated funds to terrorist fronts with knowledge and intent that his donations would be used for terrorism against United States citizens, and since the intended recipient of his funds killed United States citizens in an act of international terrorism, Prince Salman can be held civilly liable if he is found to have aided and abetted or conspired with the terrorist actors. Indeed, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, *regardless of the degree of their participation or culpability in the overall scheme*." *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985) (emphasis added).

The causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983) (emphasis added). A conspirator need not actively participate in or benefit from the wrongful action in order to be found liable; nor must he have planned or even known about the injurious conduct. *Id.* at 481. Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor. *Id.* There is no "but for" causal requirement.

2.    Prince Salman's Cited Authorities Are Inapplicable and/or Misinterpreted

---

[20]   It should be noted once more that liability under conspiracy and aiding and abetting are available not just pursuant to the ATA, but also arising from common law tort principles.

Prince Salman argues that his donations were too remote from the events of September 11 to be a proximate cause thereof (essentially stating that the money passed through too many hands to link him to its ultimate use in terrorism).  In support of his position, Prince Salman relies primarily on three recent opinions: *Burnett II*; *Ungar v. Islamic Republic of Iran*, 211 F. Supp.2d 91 (D.D.C. 2002); and *Boim*.  Such reliance is misplaced, however, and none of these opinions, when read in light of the facts alleged against Prince Salman, call for the application of a causal standard different than that asserted by plaintiffs.

*Burnett II* and *Ungar* were both decided by Judge Robertson in the D.C. District Court and both discuss causation only within the context of the FSIA exceptions.  Indeed, in *Burnett II*, Judge Robertson expressly acknowledged that a precise formulation of the knowledge and intent required under non-FSIA cases was irrelevant to his analysis.  *Burnett II*, 292 F. Supp.2d at 19. He stated that "an attenuated chain of causation may or may not suffice to require a person without FSIA protection to answer for the September 11 attacks," but declined to decide that issue because it was simply not before him. *Id.* at 19-20.

Taken together, *Burnett II* and *Ungar* show only that Judge Robertson draws a distinction between the causal standards applicable in FSIA and non-FSIA cases.  In the former, he strictly construes the language of 28 U.S.C. §1605 to require the foreign sovereign defendants' actions to be a "but for" cause of the specific injury at issue. *Burnett II,* 292 F. Supp.2d at 19-20; *Ungar*, 211 F. Supp.2d at 99-100.  The latter, as noted above, he leaves undecided, and contrary to Prince Salman's assertion, that standard is the only one relevant to the present action.  Prince Salman's personal donations do not invoke FSIA protections, nor do his activities as head of the SHC.  Therefore, *Burnett II* and *Ungar* are irrelevant to the present matter.

-26-

It should be noted, nonetheless, that Judge Robinson's strict construction of the FSIA causation language does not comport with general tort principles, and even he admits that his interpretation may not be followed by higher courts. *Ungar*, 211 F. Supp.2d at 100 (noting that "appellate courts have not yet had an opportunity to review the standards being used by district judges to analyze the liability of state sponsors of terrorism, or to consider the proper role of causation in analyzing a specific factual record"). As discussed above, and confirmed by *Boim*, general tort principles do not require an act to be directly related to a particular injury in order to satisfy causation.

Notwithstanding, in *Burnett II*, Judge Robertson concluded that "legislative history counsels that the exceptions should be narrowly construed so as not to encompass the farthest reaches of common law." *Burnett II*, 292 F. Supp.2d at 19. Judge Robertson, however, offers no compelling legal justification for drawing a distinction between the causal standards in FSIA and non-FSIA cases. Indeed, there is none, and since he admits that he may well be wrong, the Court should disregard Judge Robertson's analysis on this point.

Prince Salman also misinterprets *Boim,* offering out-of-context citations in an attempt to convince the Court that causation requires some knowing and direct support of a specific act of terrorism. MTD, pages 23-24. *Boim*, however, reaches the exact opposite conclusion.

Pointing at length to the legislative history of the statute, the *Boim* court emphasized that Congress intended the ATA to reach beyond those persons who directly commit the acts that cause injury, and impose liability "**at any point** along the causal chain of terrorism," *Id.* at 1011 (citations omitted)(emphasis added). The court expressly noted that the breadth of the general tort principles avenue extends to those who provide financing for the commission of terrorist acts:

> The statute would have little effect if liability were limited to the persons who pull the trigger or plant the bomb because such persons are unlikely to have assets, much less assets in the United States, and would not be deterred by the statute. . . . perhaps most importantly, there would not be a trigger to pull or a bomb to blow up without the resources to acquire such toils of terrorism and to bankroll the persons who actually commit the violence.

*Id.* at 1021.  The Court further noted that "Congress' goal of cutting off funding for terrorism would be seriously compromised if terrorist organizations could avoid liability by simply pooling together small donations to fund a terrorist attack."  Clearly, *Boim* does not require a direct relationship between an act and a specific injury.

Yet, Prince Salman argues to the contrary relying on, and actually misquoting, one particular portion of the opinion that states, "the Boims' first theory of liability under section 2333, funding simpliciter of a terrorist organization, is insufficient because it sets too vague a standard, and because it does not require a showing of proximate cause."  Compare *Boim*, 291 F.3d at 1012 with MTD, page 23.  This cite, however, does not support Prince Salman's position.  Indeed, one of the primary points made by *Boim* is that "proximate cause" extends well beyond direct or "but for" cause.  *Boim,* 291 F.3d at 1011 (holding that the ATA "clearly is meant to reach beyond those persons who themselves commit the violent act that directly causes the injury").  Prince Salman's analysis is simply wrong.

It should be noted that the Boims' claims were ultimately dismissed by the Seventh Circuit, but not because of a lack of direct causation.  Instead, the court found no showing that the donors to Hamas were aware of the use to which their funds were being put.  By contrast, plaintiffs in the present case have made sufficient allegations of Prince Salman's knowledge that his donations were being used or foreseeably could be used for terrorism.

**V.**     **CONCLUSION**

-28-

For the reasons stated above, plaintiffs respectfully request that Prince Salman's Motion to Dismiss be denied in all respects.

Dated: New York, New York

July _____, 2004

<div style="margin-left:40%">

Respectfully submitted,

KREINDLER & KREINDLER, LLP

By:_____/S/_____
Marc S. Moller (MM0143)
James P. Kreindler (JK7084)
Justin T. Green (JG0318)
Andrew J. Maloney (AM8684)
William O. Angelley (WA5862)
100 Park Avenue
New York, New York 10017
Phone:  (212) 973-3486
Facsimile:  (212) 972-9432

MOTLEY RICE LLC

By:_____
28 Bridgestone Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Phone: (843) 216-9000

COZEN O'CONNOR

By:_____
45 Broadway, 16th Floor
New York, NY 10006
(212) 509-9400

HANLY CONROY BIERSTEIN & SHERIDAN, LLP

By:_____
415 Madison Avenue
New York, New York 10017
(212) 401-7600

</div>

#155161