**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (RCC)
*Thomas Burnett, Sr. v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849 (RCC)
*Federal Insurance Co. v. Al Qaida*, 03 CV 6978 (RCC)
*Salvo v. Al Qaeda Islamic Army*, 03 CV 5071 (RCC)

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO NAIF bin ABDULAZIZ al-SAUD'S MOTION TO DISMISS**

July 30, 2004

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTS ................................................................................................................................. 2

ARGUMENT ........................................................................................................................ 9

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE CLAIMS AGAINST
NAIF IN HIS OFFICIAL CAPACITY ........................................................................... 9

A.   The FSIA Provides No Immunity for Claims Arising from Naif's
Personal Contributions to Organizations Supporting Al Qaeda ................. 9

B.   Neither the Second Circuit nor the Supreme Court Has Extended
the Protection of the FSIA to Individual Officials of a Foreign
State   10

C.   Even if Naif is an "Agency or Instrumentality" of the Saudi
Government, the FSIA Provides No Immunity Because Plaintiffs'
Claims Fall Within the "Tortious Act" Exception ..................................... 11

1.   *Plaintiffs' Injuries Were Caused by Naif's Alleged Conduct
Within the Meaning of the "Tortious Act" Exception to the
FSIA   12*

2.   *The "Discretionary Function" Clause Does Not Immunize
Naif From the Claims Alleged in These Lawsuits* .......................... 17

3.   *The September 11 Attacks Took Place in the United States* .......... 18

4.   *Section 1605(a)(7) Does Not Preclude Application of the
"Tortious Act" Exception* ............................................................. 21

II.  NAIF'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION SHOULD BE
DENIED ................................................................................................................... 23

CONCLUSION .................................................................................................................... 27

# TABLE OF AUTHORITIES

*Page*

## Cases

*Antares Aircraft L.P. v. Federal Republic of Nigeria*, 948 F.2d 90 (2d Cir. 1991), *vac'd on other grounds*, 505 U.S. 1215 (1992) ................................................................................................2

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ........................ 11, 20

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ......................................... 1, 16

*Bryks v. Canadian Broadcasting Corp.*, 906 F. Supp. 204 (S.D. N.Y. 1995) ............................. 10

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003) ................................................................................. 12, 13, 14

*Cabiri v. Ghana*, 165 F.3d 193 (2d Cir. 1999) .................................................................... 18, 19

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990)............................................. 10

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ................................................. 23

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) .................................... 13

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998)............................. 15, 16, 21, 22

*Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983) ................................................. 14, 15, 16, 17

*Hirsh v. State of Israel*, 962 F.Supp. 377 (S.D.N.Y.), *aff'd*, 133 F.3d 907 (2d Cir. 1997)........... 19

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ............................................ 17

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987)......................................... 13

*In re Sept. 11 Litig.*, 280 F.Supp.2d 279 (S.D.N.Y. 2003) ........................................................... 16

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993)....................................... 23

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020 (D.C. Cir. 1997) ................... 9

*Kline v. Kaneko*, 685 F.Supp. 386 (S.D.N.Y. 1988)..................................................................... 19

*Lamarca v. United States*, 31 F.Supp.2d 110 (E.D.N.Y. 1998).................................................... 16

*Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980)................................................ 17, 21

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) ...................................................... 17, 21

*Lumbard v. Maglia*, 621 F. Supp. 1529 (S.D. N.Y 1985)............................................................. 14

*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987)........... 13, 14

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)....................................................................... 12

*Olsen v. Government of Mexico*, 729 F.2d 641 (9th Cir. 1984)................................................. 20

*PDK Labs v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997).......................................................... 23

*Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C. Cir. 1984) ..................................... 20

*Price v. Socialist People's Libyan Arab Jamahiriaya*, 294 F.3d 82 (D.C. Cir. 2002) ................ 22

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003)........ 25, 26

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)...................................... 13, 14

*Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217 (S.D.N.Y. May 7, 2003) .............. 16

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996) .................................................. 16

*Tachiona v. Mugabe*, 169 F.Supp.2d 259 (S.D.N.Y. 2001)......................................................... 11

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2003) ...................... 11

**Statutes**

22 U.S.C. § 254d............................................................................................................................ 11

28 U.S.C. § 1330................................................................................................................... 8, 9, 24

28 U.S.C. § 1602............................................................................................................................ 20

28 U.S.C. § 1603............................................................................................................................ 10

28 U.S.C. § 1604............................................................................................................................ 11

28 U.S.C. § 1605(a) .................................................................................................................. passim

28 U.S.C. § 1653............................................................................................................................ 23

**Rules**

F.R.C.P. 12....................................................................................................................................... 2

F.R.C.P. 54..................................................................................................................................... 13

**Other Authorities**

H.R. Report No. 103-702, 1994 WL 449323 (August 16, 1994) ................................................. 22

H.R. Report No. 94-1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604 ......................................................................................................... 11, 13

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 1972 WL 122692 (U.S. Treaty), T.I.A.S. No. 7502 ......................................................................................................... 11

## INTRODUCTION

In these consolidated actions,[1] plaintiffs, victims and survivors of the September 11 terrorist attacks and their insurers, seek to hold accountable those who financed and sponsored the terrorist network that perpetrated those attacks. As alleged in the various complaints in these actions, there is now a vast (and growing) body of evidence that a network of banks, corporations, wealthy individuals, and so-called "charities" conspired with, aided, abetted, funded, laundered money, and provided material support to Al Qaeda and Osama bin Laden. Without this support, Al Qaeda would not have been the potent, well-financed and lethal organization it grew to be and the Al Qaeda terrorists could not have planned and carried out their attacks. As one court has eloquently put it: "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002). If you take away those resources, you cut off the life-blood of terrorist violence. But, as the *Boim* court recognized: "The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Id.* That is what plaintiffs in this lawsuit seek to do.

Defendant Naif bin Abdulaziz al-Saud ("Naif") is alleged to have knowingly provided financial support to Al Qaeda in its self-declared war against the United States and its citizens

---

[1] This motion was filed in four actions: *Ashton v. Al Qaida Islamic Army*, 02-CV-6977; *Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-5738; *Federal Insurance Co. v. Al Qaida*, 03-CV-6978; and *Salvo v. Al Qaeda Islamic Army*, 03-CV-5071. Plaintiffs note, however, that there are two *Burnett* actions consolidated in this proceeding; Naif was served in 03-CV-9849, *not* in 03-CV-5738. Plaintiffs assume that the reference in the caption of Naif's motion to 03-CV-5738 is an error and that 03-CV-9849 is what was intended. Plaintiffs in all four actions respond to that motion in this memorandum of law.

and residents.  *Ashton* ¶ 255; *Burnett* ¶ 342, 381; *Federal* ¶¶ 434-38; *Salvo* ¶¶ 247, 283.[2] He asks this Court to dismiss the allegations against him on the ground that, as an official in the government of Saudi Arabia, he cannot be held answerable in a U.S. court.  Naif also claims that he has insufficient contact with the United States to be held accountable in his personal capacity.  But Naif is not entitled to sovereign immunity and, even if he were, his knowing support of terrorist groups committed to atrocious acts of mass murder falls outside the permissible scope of such immunity.  Moreover, Al Qaeda's deliberate targeting of the United States and the evidence supporting the inference that Naif was aware of that, coupled with Naif's financial support for al Qaeda, provides sufficient contact with the United States and with New York to subject Naif to jurisdiction in this Court.  Accordingly, Naif's motion to dismiss for lack of jurisdiction should be denied.

## FACTS[3]

Naif bin Abdul Aziz Al Saud, a brother of King Fahd and one of some 30,000 members of the Saudi royal family, is the Saudi Arabian Interior Minister.  He also serves on the Supreme Council for Islamic Affairs (the "Supreme Council"), *see* July 30, 2004 Affirmation of Andrea Bierstein in Opposition to Consolidated Motion to Dismiss of Prince Naif ("Bierstein Naif Aff."), Exhibit 1, and was the General Supervisor of the Saudi Joint Relief Committee ("SJRC"),

---

[2]  Citations in the form "*Case Name* ¶ __" are citations to paragraphs in the most recent complaint (the *Ashton* Fourth Amended Complaint, the *Burnett* Third Amended Complaint, the *Federal* First Amended Complaint, and the *Salvo* First Amended Master Complaint) in the case indicated.

[3]  Because Naif has brought his motion to dismiss under F.R.C.P. 12 (b)(1) and 12(b)(2), alleging that this Court lacks subject matter and personal jurisdiction, this Court may consider evidence beyond the allegations of the complaints at issue.  *See Antares Aircraft L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991 (court may resolve disputed factual issues pertaining to subject matter jurisdiction by reference to evidence outside the pleadings; ), *vac'd on other grounds*, 505 U.S. 1215 (1992).

*see* Bierstein Naif Aff., Exhibit 2, a consortium of charities comprising IIRO, Saudi Red Crescent, Muslim World League, WAMY, and Al- Haramain, *see Ashton* ¶ 484; *Burnett* ¶ 172; *Federal* ¶ 124; *Salvo* ¶ 510, each of which is a defendant in these actions and each of which is (or was) a front and/or conduit that raised and laundered money for, and/or provided funds, equipment and personnel to, Osama bin Laden and Al Qaeda.  *See Ashton* ¶ 269; *Burnett* ¶ 359; *Federal* ¶ 430; *Salvo* ¶ 261.[4]  Naif personally donated at least SR2 million to the SJRC. *See* Bierstein Naif Aff., Ex. 3.  He also organized fundraisers and telethons for SJRC, helping it to raise millions of dollars beyond what he personally donated. *Id.* These funds were then distributed by the constituent charities, all of whom operated as conduits for, or provided material support to, al Qaeda.  While many of those who gave money to Islamic charities may have been ignorant of the ultimate destination of their donations, Naif could not have been, for he was among those charged by the Saudi government with preventing charitable donations from going to terrorists.  As detailed below, through his work on the Supreme Council and as General Supervisor of SJRC, it is inconceivable that Naif was unaware of the support that the SJRCs constituent charities were providing to bin Laden.  Despite this knowledge, Naif personally provided millions of dollars to these very organizations that he knew to be providing funds to, and laundering money for, al Qaeda.

Al Qaeda's deliberate and pubic targeting of the United States throughout the 1990's has been detailed in other papers submitted by the plaintiffs in these actions. This all-too-familiar story will not be repeated in its entirety here.  Instead, plaintiffs respectfully incorporate by

---

[4]  For additional information and evidence about the constituent charities of SJRC, plaintiffs respectfully refer the Court to the papers filed in the *Burnett* action in opposition to the Sultan Consolidated Motion, in opposition to the motion to dismiss of the Saudi Red Crescent Society, and in opposition to the motion to dismiss of International Islamic Relief Organization, which are hereby incorporated by reference.

reference and refer this Court to the memoranda of law, affirmations and exhibits submitted in the *Burnett* action in opposition to (a) Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss Certain Consolidated Complaints ("Sultan Consolidated Motion"); (b) the Motion to Dismiss of Defendant Hamad Al-Husaini; and (c) the Motion to Dismiss of Defendant Saudi Arabian Red Crescent Society.

As plaintiffs have previously noted, in 1993, the Saudi government issued a ban on private charitable contributions sent overseas without the approval of the Saudi government. *See* May 14, 2004 Affirmation of Andrea Bierstein in Opposition to Sultan Consolidated Motion, dated ("Bierstein Sultan Aff."), Exhibits 9, 10.  In an article titled "*Saudi curb on alms targets radicals' cash; Gifts to charity have funded militant groups in other countries*," the *Guardian* newspaper reported that this measure represented a move by the Saudi Interior Ministry "to control the collection of donations for charities, one of the principal sources of funds for radical Islamic groups in the Arab world and Asia." *See* Bierstein Naif Aff., Exhibit 4.  Thus, Naif – who was the Interior Minister -- had specific knowledge as early as 1993 that charities in Saudi Arabia were being used to raise money for militants and terrorists and indeed, that charitable contributions were one of the primary source of funds for such groups.

The following year, the Supreme Council was established to monitor and approve Islamic charitable giving within Saudi Arabia and abroad.  *See* Bierstein Sultan Aff., Exhibits 9, 11. Naif was one of the members of the Council.

As contemporaneous press reports made clear, the Council, including Naif, was charged with the task of preventing the channeling of Saudi charitable donations to terrorists.  That was the very reason for its founding.  Nor were the members of the Council, such as Naif, left to figure out on their own who was supplying funding to the terrorists.  As described below,

between 1994 and September 11, 2001, Naif and/or his government received at least three official warnings from the United States and France regarding the used of charitable donations to Islamic charities as conduits for supporting terrorism.  In November, 1994, Charles Pasqua, then the French Interior Minister, made an official visit to Saudi Arabia where he met with Naif and other officials of the Saudi government.  As Mr. Pasqua describes in an affidavit for *Burnett* plaintiffs:

> In the course of the meetings with my Saudi counterparts, I raised the question of financial aid furnished by Saudi charitable organizations enjoying state support, in particular the World Islamic League [Muslim World League], to Islamist movements or terrorist groups.  I specifically warned my counterparts about this situation and officially requested that they put an end to it . . . .

*See* Bierstein Sultan Aff., Exhibit 12.  In June, 1999, the Saudi government received a similar visit from a U.S. delegation, sent specifically to warn the Saudis about the ways in which significant funds were being raised and laundered in their country to finance al Qaeda's terrorist attacks.  *See* Bierstein Sultan Aff., Exhibit 13.   That October, Naif's brother, Sultan, who was the head of the Supreme Council on which Naif sat, visited the United States for follow-up discussions with senior American officials on defense and terrorist financing issues.  Presumably, Sultan reported back to the Council any information he obtained that was relevant to the mission of the Council.  Indeed, through Sultan, the Council had regular access to U.S. information about terrorist financing:  beginning in 1997, Sultan participated in a joint initiative with the United States to share intelligence information on terrorist financing and al Qaeda.  *See* Bierstein Sultan Aff., Exhibit 16.  It can be presumed that the intelligence that was shared included a 1996 CIA finding that fully one-third of Islamic charities were linked to terrorism. *See* Affirmation of Andrea Bierstein in Opposition to Motion to Dismiss of Saudi Arabian Red Crescent Society ("Bierstein Red Crescent Aff."), Exhibit 4.  Thus, in the mid-to-late 1990s,

during the period when al Qaeda was building its infrastructure, training terrorists, and planning major attacks against the United States, the head of the Council on which Naif sat and which was charged with overseeing charitable donations to prevent the flow of funds to terrorists, personally received U.S. intelligence information about Osama bin Laden's use of money from Islamic charities and front companies to finance his sprawling terrorist network.

The inference is overwhelming that, through the Supreme Council, Naif knew that the SJRC and the charities that operated under its umbrella — The Muslim World League, the International Islamic Relief Organization ("IIRO"), Al-Haramain International Islamic Foundation, the World Assembly of Muslim Youth ("WAMY") – were major financial conduits for bin Laden and al Qaeda. *Ashton* ¶ 269; *Burnett* ¶ 359; *Federal* ¶ 431; *Salvo* ¶ 261; *see also* Plaintiffs' Consolidated Memorandum Of Law In Opposition To Prince Salman Bin Abdul Aziz Al-Saud's Motion To Dismiss.  Not that Naif needed Sultan or the U.S. government to tell him what SJRC was up to -- he was the SJRC's General Supervisor!  *See* Bierstein Naif Aff., Exhibit 2.

But despite (or because of?) Naif's dual role as the General Supervisor of the SJRC and a member of the Supreme Council, the SJRC's role in assisting al Qaeda continued unchecked. Between 1998 and 2000, while the SJRC was being supervised by Naif, more than $74 million was funneled to local bureaus of the SJRC that were being controlled by or harboring terrorists. *See* Bierstein Red Crescent Aff., Ex. 4.  Among the organizations to which the SJRC was funneling money under Naif was the Islamic Revival Foundation in Tirana, Albania.  In June of 1998, the CIA and Albanian authorities raided several houses and offices of members of the Islamic Revival Foundation, and several of its members and directors were later arrested in connection with the US Embassy bombing in Kenya and Tanzania. *Id.* In May 2000, the United

Nations Mission in Kosovo (UNMIK) raided a house rented by the SJRC in Pristina, Kosovo in response to reports of a possible terrorist attack on the U.S. office in the province.  UN and US officials stated that the organization was acting as a cover for several al Qaeda operatives, including Adel Muhammad Sadi Bin Kazem and former SJRC director Wael Hamza Jalaidan. Julaidan previously served as Secretary General of Rabita Trust (a specially-designated global terrorist entity) in Pakistan and was a co-founder of al Qaeda.  An intelligence document reviewed by the *BBC* stated that Jalaidan helped bin Laden "move money and men to and from the Balkans."  *See* Bierstein Sultan Aff., Exhibit 20.

As General Supervisor, Naif was obviously in a position to put a stop to SJRC's support of al Qaeda, but plainly he did not.  But Naif did not simply fail to stop SJRC from providing material support to al Qaeda – he organized fundraisers and made at least one large personal donation to the SJRC, thus augmenting the support that Al Qaeda received.  In a telethon in 1999, Naif donated SR2 million to the SJRC.  *See* Bierstein Naif Aff., Exhibit 3.  This money was to be distributed by SJRC's constituent organizations, including IIRO, Al-Haramain, WAMY, and MWL.  Through his role on the Supreme Council, his responsibilities as Interior Minister, and his position as General Supervisor of SJRC, Naif necessarily knew that the constituent organizations that made up SJRC were funneling money to al Qaeda.  Moreover, because of bin Laden's repeated public pronouncements (as well as the intelligence information that the U.S. government shared with the Saudi government), *see* Consolidated Memorandum of Law in Opposition to Consolidated Sultan Motion; Bierstein Sultan Aff. and exhibits thereto; *see also Burnett* plaintiffs' memorandum of law in opposition to motion to dismiss of Hamad Al-

Hussaini, and accompanying affirmation and exhibits, Naif could not help but be aware that al Qaeda's avowed target was the United States. [5]

Plaintiffs now seek to hold Naif accountable for his support of al Qaeda front groups which carried out the September 11 attacks against the United States of America.[6]

---

[5]  Nor was support of al Qaeda Naif's only foray into the support of international terrorism.  He served as chairman of the Saudi Arabian Committee for Support of the Intifada al Quds.  In that capacity, Naif led an intense effort to raise funds specifically for distribution to the families of suicide bombers who were successful in carrying out their operations and killing Israeli civilians. *See Burnett* ¶ 379; *Federal* ¶ 439; *Salvo* ¶ 282; *see also* "The Saudi Terror Subsidy," *The Weekly Standard,* May 20, 2002, included in Bierstein Naif Aff., Ex. 5.  A Washington Saudi embassy press release from January 2001 describes how the Committee distributed $33 million to "deserving Palestinians," including "the families of 2,281 prisoners and 358 martyrs."  *See id.* Then in July 2001 alone, Naif, the General Supervisor of the Committee directed the committee to disburse 5.57 million Saudi Riyals to those families. *See* "The Kingdom of Saudi Arabia and Palestine: Facts and Achievements," *Ain-Al-Yaqeen*, December 7, 2001, included in Bierstein Naif Aff., Ex. 5.

Naif's support for Palestinian terrorism is so well known that in July, 2003, New York Senator Charles Schumer took the extraordinary step of writing to Saudi Ambassador Prince Bandar to request that "Prince Nayef bin Abdel Aziz, the Interior Minister of Saudi Arabia, be relieved immediately of his responsibilities for overseeing Saudi Arabia's efforts to investigate and apprehend terrorists and people who support them." *See* Bierstein Naif Aff., Ex. 5.  In his letter, Senator Schumer explained that Naif "has a well documented history of suborning terrorist financing . . ." *Id.*  Moreover, although Naif is the Saudi official responsible for overseeing Saudi Arabia's counter-terrorism efforts, as late as November, 2002, Naif continued publicly to deny that Saudi nationals were involved in the September 11 attacks, blaming them instead on "Zionists."  *Id.; see also Federal* ¶ 440.

[6]  Naif makes much of the supposed irrationality of his support for bin Laden, given bin Laden's provocative statements about the government of Saudi Arabia and the Saudi royal family.  But whether Naif supported al Qaeda out of conviction or out of expedience, believing that al Qaeda could be induced to attack only the United States, and not Saudi Arabia, is irrelevant.  Nor does the supposed irrationality of such support demonstrate that it did not occur.  Indeed, the Saudi government's earlier support of Islamic militants is well documented.  As reported in the New York *Times* in 1996, Naif himself stated publicly that Riyadh had *stopped* financing Islamic militant groups, plainly admitting that it had previously done so; at the same time, he admitted that private Saudi support continued.  *See* Bierstein Sultan Aff., Exhibit 9.

**ARGUMENT**

## I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE CLAIMS AGAINST NAIF IN HIS OFFICIAL CAPACITY

The Foreign Sovereign Immunities Act ("FSIA") confers subject matter and personal jurisdiction on the district courts for claims against foreign states and their agencies or instrumentalities unless the sovereign (or agency or instrumentality) has immunity for that claim. 28 U.S.C. § 1330. Naif contends that, to the extent that he is alleged to have acted in his official capacity, the FSIA provides him with immunity and thus, he argues, the claims in these lawsuits fall outside the jurisdiction provided by § 1330. But the FSIA provides no immunity for Naif here.

### A.   The FSIA Provides No Immunity for Claims Arising from Naif's Personal Contributions to Organizations Supporting Al Qaeda

The FSIA provides no immunity for acts carried out in a personal capacity by those who happen to hold government office. *See, e.g., Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027 (D.C. Cir. 1997) (no immunity under FSIA for acts not committed in official capacity). Naif himself apparently concedes as much. *See* Naif Br. at 10-11. Naif contends, however, that plaintiffs' claims relate solely to acts carried out in his official capacity. But plaintiffs allege that Naif personally made payments to al Qaeda, *see Burnett* ¶ 381; *Ashton* ¶ 288; *Federal* ¶ 434 – and the evidence that plaintiffs have gathered to date demonstrates that at least some of these payments, made through SJRC as an intermediary, were made by Naif personally, as personal "charitable" donations. *See* Bierstein Aff., Exhibit 2. Indeed, the *Federal* plaintiffs specifically allege that Naif made personal donations to charities known to be sponsors of al Qaeda. *Federal*, ¶¶ 442-443. Naif dismisses these allegations as "opportunistic," ignoring that the *Federal* plaintiffs' later pleading had the advantage of additional information obtained

9

after the filing of the *Ashton* and *Burnett* complaints.  In any event, Naif's personal contributions to SJRC were reported in the press, so it can hardly be argued that plaintiffs lack a basis for this allegation.  *See* Bierstein Naif Aff., Exhibit 3.  To the extent that plaintiffs' claims arise from these personal contributions, the FSIA provides no immunity to Naif.

    **B.**       **Neither the Second Circuit nor the Supreme Court Has Extended the Protection of the FSIA to Individual Officials of a Foreign State**

Even as to allegations pertaining to Naif's official functions, the applicability of the FSIA to individual officials of a foreign state is questionable. The FSIA extends immunity to foreign states, their political subdivisions, and to any "agency or instrumentality" of a foreign state.  28 U.S.C. § 1603. While a number of federal courts have concluded that the term "agency or instrumentality" includes individual officials, *see, e.g., Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1099-1103 (9th Cir. 1990); *Bryks v. Canadian Broadcasting Corp*., 906 F. Supp. 204, 210 (S.D. N.Y. 1995); *First American Corp. v. Sheikh Zayed bin Sultan Al-Nayhan*, 948 F. Supp. 1107, 1120 (D.D.C. 1996), neither the Supreme Court nor the Second Circuit has had occasion to address the issue.

It is beyond dispute, however, that the actual language of the FSIA makes absolutely no mention of officials or agents in defining the terms "foreign state" and "agency or instrumentality." Indeed, the definition of "agency or instrumentality" includes the requirements that the "entity" be "an organ of a foreign state or political subdivision thereof, or a majority or whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . ."  28 U.S.C. § 1603(b)(2).  The legislative history of this provision is similarly devoid of reference to individual, natural persons who hold government office.  Rather, the relevant House Report states:

> The first criterion [section 1603(b)(1) ] ... is intended to include a corporation, association, foundation or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name....
>
> The second criterion [section 1603(b)(2) ] requires that the entity be either an organ of a foreign state ... or that a majority of the entity's shares or other ownership interest be owned by a foreign state....
>
> As a general matter, entities which meet the definition of an "agency or instrumentality of a foreign state" could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry....

H.R. Report No. 94-1487, 94th Cong., 2d Sess. ("House Report 94-1487"), *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6614.  Nothing in this report suggests that Congress intended to provide immunity to individual government officials.[7]

Given Congress' failure specifically to reference officials or agents of a foreign sovereign within the statute, plaintiffs respectfully submit that Naif cannot meet his burden of establishing that he is a foreign sovereign within the meaning of the FSIA. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.")

**C.   Even if Naif is an "Agency or Instrumentality" of the Saudi Government, the FSIA Provides No Immunity Because Plaintiffs' Claims Fall Within the "Tortious Act" Exception**

Even where the FSIA provides immunity from suit, the cloak of immunity is not absolute. Congress has carved out seven exceptions to immunity, specifically providing that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any

---

[7]   Plaintiffs note that those individual officials for whom immunity has the greatest foreign policy implications, foreign heads of state and foreign ambassadors accredited to the United States, are protected by other immunity doctrines -- diplomats under 22 U.S.C. § 254d and the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 1972 WL 122692 (U.S. Treaty), T.I.A.S. No. 7502., incorporated thereunder, and heads of state under the separate "head of state" immunity doctrine. *See Tachiona v. Mugabe*, 169 F.Supp.2d 259 (S.D.N.Y. 2001).

case" that falls within one of the seven enumerated categories.  28 U.S.C. § 1605(a).   Although

plaintiffs have "the burden of going forward with evidence showing that . . . immunity should

not be granted . . . the ultimate burden of persuasion remains with the alleged foreign sovereign"

to show that the claimed exception does not apply and that immunity should be granted. *Virtual*

*Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2003).

Plaintiffs' claims against Naif fall within one of the FSIA exceptions, the so-called

"tortious act" exception, which lifts immunity for any case:

> in which money damages are sought against a foreign state for personal injury or
> death or damage to or loss of property, occurring in the United States and caused
> by the tortious act or omission of that foreign state or of any official or employee
> of that foreign state while acting within the scope of his office or employment . . .

28 U.S.C. § 1605(a)(5).  Because plaintiffs' claims arise from deaths and injuries incurred in the

September 11 terrorist attacks, they are seeking money damages for personal injury and/or death

in the United States based on tortious conduct.  Their claims fall squarely within this exception.[8]

Naif makes four arguments why the "tortious act" exception should not be applied here,

but as demonstrated below, none is correct.

    1.    *Plaintiffs' Injuries Were Caused by Naif's Alleged Conduct Within the
Meaning of the "Tortious Act" Exception to the FSIA*

Naif argues that the "tortious act" exception does not apply because, Naif says, the

deaths and injuries on September 11 were not "caused" by his actions.  In making this argument,

Naif relies on the November 14, 2003 ruling of the D.C. court in the *Burnett* D.C. action.

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003).  Naif

---

[8]   For the reasons set forth in the *Federal* plaintiffs' Memorandum of Law in Opposition to the
Motion to Dismiss of Prince Turki, at pp. 20-22, and in their Memorandum of Law in Opposition
to the Motion to Dismiss of Prince Sultan, incorporated herein by reference, the *Federal*
plaintiffs submit that Naif's laundering of funds on behalf of al Qaeda subjects him to the
jurisdiction of this Court under the "commercial activity" exception to the FSIA, 28 U.S.C.
§ 1605(a)(2), as well.

urges this Court to adopt that ruling, even suggesting that it is "law of the case" (which it is not). In the context of these actions, however, this Court owes no greater deference to Judge Robertson's ruling than it owes to any other decision of the D.C. district court. Such decisions of a coordinate district court in another circuit *may* (but need not) be followed if they are persuasive and if they are in accordance with Second Circuit law, which is controlling in this consolidated proceeding. *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993) Judge Robertson's decision is neither persuasive nor in accordance with Second Circuit law and, accordingly, should not be followed.[9]

This Court should not follow the ruling in *Burnett* because that ruling is based on an improperly narrow view of the "tortious act" exception. In *Burnett*, the court held that the standard of causation under the "tortious act" exception is more stringent than the standard of causation applicable to the underlying tort. 292 F.Supp.2d at 19-20. There was no basis for this approach. Rather, as the Second Circuit has held, the substantive state or federal rule that governs plaintiffs' cause of action is used to resolve the threshold question of the court's jurisdiction under the FSIA. *Robinson v. Government of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001) In reaching this conclusion, the Second Circuit relied on the legislative history of the "tortious act" exception, which specifically states that the purpose of the "tortious act" exception is to permit a plaintiff "to maintain an action against [a] foreign state *to the extent otherwise*

---

[9] Even in the *Burnett* D.C. action itself, this Court is not bound by the ruling of the D.C. court. *See* F.R.C.P. 54 (b) (orders adjudicating claims against fewer than all defendants open to revision at any time before final judgment); *In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987) (following § 1407 transfer, district court has power and obligation "to modify or rescind any orders in effect in the transferred case which it concludes are incorrect"); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996) (re-considering ruling of district court in Texas after transfer). Accordingly, this Court need not follow the D.C. court in order to achieve uniformity in all the cases in this consolidated proceeding, as such

*provided by law*." House Report 94-1487 at 21, 1976 U.S.C.C.A.N. at 6620 (emphasis added).

For that reason, the Second Circuit in *Robinson* held that a plaintiff is required to meet the same

standard to fall within the "tortious act" exception as would be required to prevail on the merits.

269 F.3d at 143.[10]   Applying the *Robinson* standard, plaintiffs sufficiently demonstrate that

Naif's tortious conduct caused their injuries, for purposes of the FSIA, to the extent that they

demonstrate the element of causation for their underlying common law claims.  Because the D.C.

court erroneously held, in *Burnett*, that plaintiffs were required to plead a tighter causal

connection under the FSIA than would be required to maintain their claims, *see* 292 F.Supp.2d at

19-20, that decision should not be followed here.

 Plaintiffs allege that Naif proximately caused  the deaths and injuries in the September

11 attacks because he conspired with and/or knowingly aided and abetted al Qaeda in carrying

them out by providing financial support to known al Qaeda fronts.  Neither the law of conspiracy

nor the doctrine of aiding and abetting requires that plaintiffs plead a direct link between Naif's

conduct and the specific attacks of September 11.  Rather, "[T]hose who aid or abet or conspire

in tortious conduct are jointly and severally liable with other participants in the tortious conduct,

*regardless of the degree of their participation or culpability in the overall scheme.*" *Lumbard v.*

---

uniformity can be achieved in any event by modification of the D.C. court ruling in *Burnett*
itself, should this Court reach a different conclusion here than was reached there.

[10] The D.C. district court relied, for its contrary conclusion, on *MacArthur Area Citizens Ass'n
v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987), but that case (which is not binding on this
Court) never addressed whether the standard to be applied to the elements of the "tortious act"
exception was different from the standard applicable to the underlying tort.   Rather, in
*MacArthur Area Citizens*, the court simply stated, in the context of a zoning dispute, that the
"tortious act" exception should be construed narrowly.   Unlike *MacArthur Area Citizens*,
however, the *Robinson* specifically addresses the issue raised in *Burnett* and makes clear that
the court in D.C. erred in finding that the element of "causation" is different under the "tortious act"
exception than it is under the underlying substantive law.  In this respect, Sultan is simply wrong
when he argues that there has been no change in the applicable law – the law *has* changed,
because it is now Second Circuit, rather than D.C. Circuit, precedent that is controlling.

*Maglia*, 621 F. Supp. 1529, 1536 (S.D. N.Y 1985) (emphasis supplied).  Thus, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by one of the parties to the agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983) (emphasis supplied).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor. *Id.*

In *Halberstam*, the court held that the one defendant, Hamilton, could be liable for the murder of the plaintiff's husband committed by a co-defendant, Welch, during the course of a burglary.  Hamilton was not present at the burglary (or, by extension, the murder) and claimed not to have known that Welch was a burglar at all.  Finding that Hamilton had assisted Welch for years in disposing of large quantities of jewelry and precious metals, the Court held:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries.  Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night--whether as a fence, burglar, or armed robber made no difference--because *violence and killing is a foreseeable risk in any of these enterprises.*

*Halberstam*, 705 F.2d at 489 (emphasis added).  Thus, the Court reasoned, Hamilton was liable not only for the burglaries – whether she knew about them or not – but also for the murder that Welch committed during the course of one of them.  *Id.*[11]

---

[11]  It is important to emphasize that in *Halberstam*, the court found that Hamilton "knew" that Welch was involved in personal property crimes – and thus could be held liable for the murder that Welch committed during one of his burglaries – without any direct evidence of that knowledge. 705 F.2d at 486-87.  As noted above, Hamilton denied knowing that Welch was engaged in criminal activities.  But the court was able to infer that Hamilton must have known because she carefully logged all of Welch's sales of jewelry and precious metals but had no records of any purchases, because of the extravagant lifestyle that she enjoyed as a result of Welch's crimes, and because of Welch's mysterious evening absences over the course of their relationship.  The court applied common sense to determine that a person in Hamilton's position must have known that Welch was committing crimes and the D.C. Circuit upheld liability based on that inferred knowledge.  705 F.2d at 486-87.

In *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998), the court applied the same standard used in *Halberstam*, holding:  "[A] plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises. . . Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient . . . ."  999 F. Supp. at 18.  More recently, and more pertinent to the facts of this case, in *Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217, 232 (S.D.N.Y. 2003), the court granted a default judgment to plaintiffs against Iraq for injuries arising out of the September 11 attacks after plaintiffs provided "a sufficient basis for a reasonable jury to draw inferences which could lead to the conclusion that Iraq provided material support to al Qaeda and that it did so with knowledge and intent to further al Qaeda's criminal acts."  *See also Boim*, 291 F.3d at 1023 (plaintiffs need show only that defendants knew of the terrorist organization's illegal activities, that they desired to help those activities, and they engaged in some act of helping the illegal activities).

Under *Boim*, *Halberstam*, *Flatow*, and *Smith* plaintiffs need not allege nor prove that Naif participated in the planning or carrying out of the September 11 attacks or even that the assistance he provided was used specifically to assist in those attacks. *See Boim,* 291 F.3d 1000; *Halberstam*, 705 F.2d 472; *Smith*, 262 F.Supp.2d 217; *Flatow*, 999 F.Supp. 1.  Paraphrasing the words of *Halberstam*, it is not necessary that Naif knew specifically that al Qaeda was going to commit the atrocities of September 11.  Rather, it is enough that, when he provided assistance to al Qaeda, he knew that al Qaeda was involved in terrorist activity, because the attacks of

September 11 were a foreseeable risk of that terrorist activity.  *See Halberstam*, 705 F.2d at 489.[12]

The evidence that plaintiffs have amassed, *see, supra,* pp. 1-11 and Exhibits 1-24, shows that Naif *knew* that funds donated to the constituent parts of SJRC, including IIRO, Al Haramain, and WAMY, were being funneled to al Qaeda and its terrorist agenda.  That knowledge made it entirely foreseeable that donations to those organizations would be used to fund terrorist attacks, including the attacks of September 11, 2001.[13]  Nor is it necessary that the precise dollars (or riyals) that Naif donated were the ones that were funneled to al Qaeda or used in the September 11 attacks.  The money was fungible and every dollar that IIRO or Al Haramain received was one more it could send to bin Laden, regardless of which bill or coin it actually sent.  *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) (because money is fungible, any contribution to a designated  organization with knowledge that it engages in terrorist activity gives rise to criminal responsibility, regardless of whether the support given is intended for, or flows directly to, the group's terrorist activities).

>        2.        *The "Discretionary Function" Clause Does Not Immunize Naif From the Claims Alleged in These Lawsuits*

Naif also contends that his acts fall within the "discretionary function" exclusion of § 1605(a)(5)(A).  But courts have refused to recognize a foreign official's "discretion" to violate international law or the laws of their own country or to commit crimes against humanity.  *Liu v.*

---

[12]  The result is the same under general tort principles of causation. *See, e.g., Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1996); *In re Sept. 11 Litig.*, 280 F.Supp.2d 279, 309 (S.D.N.Y. 2003); *Lamarca v. United States*, 31 F.Supp.2d 110, 127 (E.D.N.Y. 1998). *See also* Plaintiffs' Memorandum of Law in Opposition to Prince Mohammed al-Faisal al-Saud's Motion to Dismiss.

[13]  That terrorist attacks, including those of September 11, *are* a foreseeable risk of terrorist activity is nearly a tautology that requires little elaboration, especially in light of the D.C.

*Republic of China*, 892 F.2d 1419 (9th Cir. 1989); *Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980).  Plaintiffs hereby incorporate by reference and respectfully refer the Court to their arguments on this point set forth in the their opposition to the Sultan Consolidated Motion; in the *Burnett* plaintiffs' Memorandum of Law in Opposition To Motion Of Prince Sultan To Dismiss The Claims Against Him submitted in the D.C. District Court; the Sur-Reply Memorandum Of Law In Further Opposition To Motion Of Sultan Bin Abdulaziz Al-Saud To Dismiss The Claims Against Him, also submitted in the D.C. District Court; in the *Federal* plaintiffs' Memorandum of Law in Opposition to Prince Turki's Motion to Dismiss at pp. 18-20; and in the *Federal* plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of Prince Sultan, at pp. 9-13.

### 3. *The September 11 Attacks Took Place in the United States*

Naif concedes that the deaths and injuries at issue in this case occurred in the United States, but nonetheless contends that the "tortious act" exception cannot be applied because Naif's actions did not occur here.  Naif is wrong.  To avoid burdening the Court with repetitive argument, plaintiffs hereby incorporate by reference and respectfully refer the Court to their argument on this point set forth in the the *Burnett* plaintiffs' Memorandum Of Law In Opposition To Motion To Dismiss Of Defendant The National Commercial Bank, filed in the D.C. District Court, and to the argument set forth in Plaintiffs' Consolidated Memorandum Of Law In Opposition To Motion Of Defendant Turki Al-Faisal Bin Abdulaziz Al-Saud To Dismiss And To Quash Service, filed in this Court.

The cases cited by Naif are not to the contrary. While all of them note that the "tortious act" exception requires that the tort in question must occur in the United States, none of them

---

Circuit's ruling in *Halberstam* that "violence and killing is a foreseeable risk" of criminal enterprises involving property crimes.  *Halberstam*, 705 F.2d at 489.

construes the meaning of that term in circumstances even remotely similar to this one.  In *Cabiri v. Ghana*, 165 F.3d 193 (2d Cir. 1999), for example, plaintiffs Bawol and Efua Cabiri alleged that Bawol Cabiri was detained and tortured in Ghana and that the Ghanian government lied to his wife about his whereabouts.  The court held that Efua Cabiri's claim for intentional infliction of emotional distress fell outside the "tortious act" exception to the FSIA because, regardless of how it was styled, it was in essence a claim arising from a misrepresentation and thus explicitly excluded from the reach of the "tortious act" exception, which, by its terms, does not apply to claims "arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contractual rights . . . ." *Cabiri*, 165 F.3d at 200-201; *see also* 28 U.S.C. § 1605(a)(5)(B).  The *Cabiri* court thus had no occasion to consider whether any of the "tortious acts" in question occurred in the United States; it merely noted, in a footnote that is plainly *dicta*, that "this exception "covers only torts occurring within the territorial jurisdiction of the United States."  165 F.3d at 200 n.3.  The court expressed no opinion as to whether the facts of *Cabiri* would fall within this definition, but the fact that Mr. Cabiri was tortured in Ghana, while the victims of the September 11 attacks were murdered in the United States, would render any such analysis inapplicable in this case.

*Hirsh v. State of Israel*, 962 F.Supp. 377 (S.D.N.Y.), *aff'd*, 133 F.3d 907 (2d Cir. 1997), also cited by Naif, is similarly off-point.   In *Hirsh*, Holocaust survivors sought to recover reparation payments pursuant to terms of a treaty entered into by Germany and Israel.  The court found that the only activity that had occurred in the United States was "the "signing and depositing of the treaty in U.N. headquarters in N.Y. as an international treaty or agreement" and that plaintiffs did not allege any tort arising from that signing. Here, by contrast, the attacks of September 11 took place in the United States and plaintiffs' claims arise from those attacks. In

that circumstance, the *Hirsh* court's recitation of the rule that the tort in question must "take place within the territorial jurisdiction of the United States" in no way undermines plaintiffs' claims.   Naif fares no better with his final citation, to *Kline v. Kaneko*, 685 F.Supp. 386 (S.D.N.Y. 1988).   That case arose from the abduction of plaintiff from her Mexico City apartment and her expulsion from Mexico.   The court found the "tortious act" exception inapplicable because "[t]he alleged kidnapping and burglary . . . occurred in Mexico City, not in the United States."   The court had no occasion to consider the applicability of that exception to an attack that took place wholly within the United States, but that was, in part, planned and financed elsewhere.

Indeed, if Naif's theory were correct and jurisdiction existed only where every single act in furtherance of the tort took place here, foreign governments could engage in assassinations and other crimes in the United States with impunity, simply by ensuring that at least one act in furtherance of the crime took place elsewhere.   That is surely not what Congress intended when it enacted the FSIA to "serve the interests of justice and . . . protect the rights of both foreign states and litigants in United States courts."   28 U.S.C. § 1602; *see Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984).[14]

---

[14]   The actual language of the "tortious act" exception also supports plaintiffs' position.   As noted above, the statute abrogates sovereign immunity for claims "in which money damages are sought against a foreign state for *personal injury or death or damage to or loss of property, occurring in the United States.*"   28 U.S.C. § 1605(a)(5).   The plain meaning of these words is that only the "injury or death," not the "tortious act or omission" that caused it, need occur in the United States.   Nonetheless, courts have been reluctant to construe the statute so broadly, most likely because of the amorphous nature of many injuries that cannot be said to "occur" in any particular locus.   *See, e.g.*, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) (economic loss from sinking of ship off Argentine coast felt in United States where contractual payments were due); *Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C. Cir. 1984) (emotional distress resulting from hostage-taking in Iran felt in United States).   In this case, however, there is nothing remotely amorphous about plaintiffs' injuries or where they occurred. Because plaintiffs are injuries are, sadly, so concrete, there can be no dispute about

4.      *Section 1605(a)(7) Does Not Preclude Application of the "Tortious Act" Exception*

Naif also claims that the existence of the "state-sponsored terrorism" exception to the FSIA, 28 U.S.C. § 1605(a)(7) (which all parties agree is inapplicable to the claims against this defendant), precludes reliance on any other FSIA exception. *See* Naif Br. at 17-18.      This argument is nonsense.   Nothing in the language or history of § 1605(a)(7) precludes the Court from hearing a claim against a foreign sovereign for an act of terrorism under any of the other exceptions to the FSIA set forth in other paragraphs of § 1605, so long as the requirements of that other exception are met.   Indeed, in those instances where Congress intended to preclude overlapping interpretations of the various exceptions, it specifically said so.   Thus, the "tortious act" exception can only be used in cases "not otherwise encompassed in paragraph (2)"; similarly, the "state-sponsored terrorism" terrorism exception only applies to cases "not otherwise covered by paragraph (2).  28 U.S.C. §§ 1605(a)(5), (a)(7).  If Congress had intended to limit the applicability of § 1605(a)(5) to cases that did not involve terrorism, it would have said so.

Thus, the "internal logic of the FSIA," as Naif would have it, in no way precludes plaintiffs' reliance on the "tortious act" exception in situations where the "state-sponsored terrorism" exception is inapplicable.   Each of the exceptions to sovereign immunity in § 1605 provides a separate and independent basis of jurisdiction over a foreign sovereign.   Use of the "tortious act" exception here in no way undermines the policies of the "state sponsored

---

where they occurred and thus, there is no reason to read the FSIA to mean anything other than what it says.   Moreover, and tragically, all too many of the claims in this case arise not from "personal injury" but rather from "*death . . . occurring in the United States*" 28 U.S.C. § 1605(a)(5).  The place of death is too concrete and fixed to introduce any uncertainty into this phrase.  There can be no question that the deaths in this case plainly took place in the United States and defendant cites no case that holds, or even suggests, that under those circumstances, any more is required.

terrorism" exception because the two exceptions address entirely different circumstances. Section 1605(a)(5) provides jurisdiction over all non-commercial torts, including acts of terrorism, that take place in the United States, while § 1605(a)(7) provides jurisdiction for acts that take place abroad, but is limited to acts of terrorism committed by designated state sponsors of terrorism.

This was the precise holding of the court in *Flatow,* 999 F.Supp. 1.  There, the court considered the extraterritorial application of § 1605(a)(7) to determine whether the then-recently enacted state-sponsored terrorism exception extended to acts of terrorism that occurred outside the United States.  Citing *Letelier* and *Liu*, the court reasoned:  "As 28 U.S.C. § 1605(a)(5) already provides jurisdiction over state-sponsored terrorist acts in the United States, the state sponsored terrorism exception would be redundant if it were held to apply only within the United States." *Flatow*, 999 F.Supp. at 15 (emphasis added; citations omitted).  *See also Price v. Socialist People's Libyan Arab Jamahiriaya*, 294 F.3d 82, 88 (D.C. Cir. 2002) ("Under the original FSIA, therefore, terrorism, torture, and hostage taking *committed abroad* were immunized forms of state activity.") (emphasis added).

Because the terrorism exception in § 1605(a)(7) sweeps so much more broadly than does the "tortious act" exception, encompassing conduct that takes place entirely outside the United States, it is understandable that Congress limited the circumstances in which this exception applies to suits involving terrorist acts and designated state sponsors of terrorism.  But there is no reason similarly to limit the liability of a foreign sovereign when the bomb explodes in the United States, rather than overseas, and nothing in the FSIA suggests that any such limitation was intended. Moreover, the considerations of foreign relations and diplomatic policy that may be implicated when Americans are injured in terrorist conflicts abroad have much less place, if

any, in the context of terrorist attacks at home.  The structure of the FSIA recognizes this distinction by lifting the immunity of a foreign sovereign more freely when Americans are injured at home than when they are injured abroad.  *Compare* 28 U.S.C. § 1605(a)(5), 28 U.S.C. § 1605(a)(7).  Indeed, it is notable that, in striking the balance of lifting immunity for acts that take place entirely outside the United States, but only for states that have been designated as sponsors of terrorism, Congress did not at the same time limit the existing "tortious act" exception, even though it clearly understood that that exception would apply to acts of terrorism committed in the U.S.  *See* H.R. Report No. 103-702, 1994 WL 449323 (August 16, 1994) at *4.

Indeed, plaintiffs cannot help but note that Naif's interpretation of the FSIA leads to a fundamental absurdity whereby a foreign sovereign may be sued if one of its employees accidentally runs down a pedestrian in the District of Columbia with his car, but has immunity if that employee blows up the pedestrian in a deliberate act of violence instead.  The FSIA does not countenance such absurdities.  Rather, it presents a coherent scheme in which injuries negligently or deliberately inflicted in the United States are actionable under § 1605(a)(5), while injuries inflicted abroad are actionable only in the more limited circumstances set forth in § 1605(a)(7).

## II.   NAIF'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION SHOULD BE DENIED

Naif contends that the allegations of the various complaints are insufficient to make a *prima facie* case for personal jurisdiction.  In making their *prima facie* case for personal jurisdiction, however, plaintiffs are not limited to their pleadings.  Rather, that case may be established through pleadings *and* affidavits.  *See Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).  Moreover, plaintiffs are not required to know or to plead all possible jurisdictional grounds from the outset of the case.  To the contrary, the relevant statutory scheme

anticipates and allows for liberal amendments as to jurisdiction. See 28 U.S.C. § 1653. That is particularly true where the factual predicates are complex and the parties numerous, as herein. Moreover, in evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *PDK Labs v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). In addition, the Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993). Here, plaintiffs have satisfied their burden to make a *prima facie* showing that jurisdiction exists.

At the outset, plaintiffs note that, with respect to claims against Naif in his official capacity, to the extent that Naif can be deemed an "agency or instrumentality" of the Saudi government but is not entitled to sovereign immunity, the FSIA confers personal jurisdiction. *See* 28 U.S.C. § 1330 ("personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction" over a foreign state that is not entitled to immunity).

Even if Naif is not an "agency or instrumentality" of the Saudi government or to the extent that plaintiffs' claims pertain to actions in Naif's personal capacity, Naif is subject to personal jurisdiction here because, in providing support to al Qaeda, which had announced its intentions to attack the United States, he purposefully directed his conduct here.  For a discussion of the legal standard applicable here, plaintiffs respectfully refer the Court, and incorporate by reference, the memorandum of law filed by the *Burnett* plaintiffs in opposition to the motion to dismiss filed by Hamad Al-Husaini and plaintiffs' Opposition to the Sultan Consolidated Motion.

Moreover, the evidence that plaintiffs have obtained to date shows that Naif purposefully directed his conduct at the United States so as to subject him to jurisdiction in the Courts of the United States. As described above, Naif organized fundraisers and made personal donations to SJRC for distribution to its constituent organizations, with knowledge that those constituent organizations were directing funds to Osama bin Laden and al Qaeda.  Moreover, Naif was the General Supervisor of the SJRC at the time that SJRC was funneling money to al Qaeda and providing a "cover" of legitimacy for al Qaeda operatives.  *See supra* pages 2 - 8.

In providing this support, Naif directed his conduct at the United States because it has been publicly known since the mid-1990s, if not well before, that Osama bin Laden and his Al Qaeda terrorist network had launched an international campaign of terror directed at the United States. For a complete discussion of the evidence demonstrating that the United States and its nationals were the primary avowed targets of al Qaeda, plaintiffs respectfully refer this Court to their memorandum of law submitted by the *Burnett* plaintiffs in opposition to the motion to dismiss filed by Hamad Al-Husaini, and to the Affirmation of Andrea Bierstein accompanying it, as well as to the exhibits annexed to the affirmation, and to memorandum of law and exhibits submitted in opposition to the Sultan Consolidated Motion, all of which are hereby incorporated.

As the Saudi Interior Minister and as a member of the Supreme Council charged with overseeing the work of Saudi-funded charities to ensure that their funds were not used to finance terrorism, Naif was well aware of bin Laden's avowed target and further was well aware that charitable donations were being used to finance al Qaeda.  Accordingly, in permitting the SJRC to continue to function as an al Qaeda front, in organizing fund-raisers for "charities" known to provide funding to al Qaeda, and in making personal donations to such "charities," Naif adopted and endorsed the program of al Qaeda for which he provided financing – a campaign of terror

directly specifically against the United States.   He cannot claim surprise at being held accountable in a U.S. court for this support.

Naif attempts to refute plaintiffs' jurisdictional theory by distinguishing the cases on which it rests, but his purported distinction fails.   Naif contends this case differs from those, including *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003), because, he argues, in cases like *Pugh*, the defendants personally took place in, or personally directed, the terrorist acts at issue.   *See* Naif Br. at 21.[15]   But Naif can point to no principled distinction between those who order or carry out acts of terrorism and those who finance them, with respect to the issue at hand, which is the extent to which a particular defendant can be said to have directed his conduct at the United States.   Surely if bin Laden had collected money by urging donors to "give money here to attack the United States," those who gave could readily be said to have directed their conduct at the U.S. and could expect to be haled into court here. Plaintiffs submit that bin Laden's public pronouncements of his intention to attack the United States, coupled with Naif's knowledge that the charities operating under the umbrella of the SJRC were conduits for al Qaeda, were the functional equivalents of such an appeal.   The jurisdictional result should be the same.[16]

---

[15]   Naif also argues that *Pugh* is distinguishable because the defendants were governments or agents of governments, sued under the FSIA exception for state-sponsored acts of terrorism.   *See* Naif Br. at 21.   But the defendants in *Pugh* were sued in both their official and their personal capacities and it was with respect to the claims against them in their personal capacities that the *Pugh* court found them to have directed their conduct at the United States.   *See* 290 F.Supp. 2d at 57-59.   Indeed, the court in *Pugh* specifically noted that that case differed from typical FSIA state-sponsored terrorism cases precisely because defendants had been sued in their individual capacities.   *Id.* at 58.

[16]   Naif may also be subject to personal jurisdictcion pursuant to a "conspiracy theory" of jurisdiction, whereby the U.S. contacts of Naif's co-conspirators may be attributed to him, *see*

## CONCLUSION

For the foregoing reasons, this Court should deny Naif bin Abdulaziz al-Saud's consolidated motion to dismiss for lack of jurisdiction in its entirety.

Dated: New York, NY
      July 30, 2004

Respectfully submitted,

/s/_____
Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
Ingrid Moll, Esq.
Justin Kaplan, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

James P. Kreindler, Esq.
Justin T. Green, Esq.
Andrew Maloney, Esq.
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, New York  10017-5590
Telephone:  (212) 687-8181

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

Stephen A. Cozen, Esq.
Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
Mark T. Mullen, Esq.
COZEN O'CONNOR

---

Plaintiffs' Consolidated Memorandum Of Law In Opposition To Prince Salman Bin Abdul Aziz Al-Saud's Motion To Dismiss, submitted on July 30, 2004.

1900 Market Street
Philadelphia, PA 19103
Tel.: (215) 665-2000
Fax: (215) 665-2013

Attorneys for Plaintiffs