IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACK
ON SEPTEMBER 11, 2001

CASE NO. 03 MD 1570 (RCC)

*This document relates to*:    Federal Insurance Co. v. al Qaida
                               Case No. 03-CV-6978

**REPLY IN SUPPORT OF AFRICAN MUSLIM AGENCY, GROVE CORPORATE, INC., HERITAGE EDUCATION TRUST, INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT, MAR-JAC INVESTMENTS, INC., MENA CORPORATION, RESTON INVESTMENTS, INC., SAFA TRUST, SANA-BELL, INC., STERLING CHARITABLE GIFT FUND, STERLING MANAGEMENT GROUP, INC., AND YORK FOUNDATION'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Plaintiffs, in their Opposition Brief,[1] still do not illuminate for the Court just how, when, where, or with whom African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation (collectively, the "Entities")[2] aided and abetted, conspired, or provided material support to defendant al Qaida and foreseeably caused the destruction of the World Trade Center on September 11, 2001.

Instead, Plaintiffs rely on "General Allegations Common to All Charity Defendants"; their history entitled "Origins of Al Qaida"; and their non-specific "Factual Background"

---

[1]   The Federal Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss Filed By Saar Network Entity Defendants African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation is referred to herein as "Opposition Brief."

[2]   Plaintiffs refer to these Entities as the "SAAR Network Entity Defendants"—a term not condoned by the Entities because it has no basis in fact, nor is it anywhere defined by Plaintiffs in their Opposition Brief or Complaint. This Court should strike all references to this phrase as these entities most properly should be referred to by their names, in their individual capacities.

portions of the First Amended Complaint ("Complaint" or "FAC") to demonstrate that they have stated a claim against *each* of these specific entities. These general allegations are insufficient to "show[] that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) ("Rule 8"). Plaintiffs cannot attempt to lump these Entities into either (a) their own fictional group of "malevolent" actors (Opp. Br. at 3), or (b) the broader "co-defendants" group, and in doing so comply with Rule 8's requirement that there be a "short and plain statement of the facts" against each of these Entities. *Id.*

To remedy this deficiency, Plaintiffs also improperly rely on facts not alleged in the Complaint (in clear contravention of the standard of review on a motion to dismiss). Neither attempt has any merit[3] because, *even with* the superfluous pleading, Plaintiffs cannot state what it is that each entity *did* (or agreed to do) that would connect it, individually, to any act of international terrorism. Such ghastly, baseless, fact-less charges hurled indiscriminately are so inherently destructive that they abuse the federal rules. Rule 8's liberal standards are intended as a shield against the abuses of ancient pleading rules, not as a sword to destroy the reputations and rights of these entities where there are no supporting allegations of fact.

**I.  Plaintiffs Cannot Define the Entities Into A Mythical "SAAR Network"**

Plaintiffs have adopted the same theory, advanced without facts in the *Burnett* and *Ashton* actions, that the Entities are part of a vast, "terrorist-financing" network in northern Virginia. And they refer to it by the same concocted name: the so-called "SAAR Network." Because for

---

[3] *See also* Memorandum of Law In Support of African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation's Motion to Strike Portions of Plaintiffs' Opposition Briefs, filed 8/2/04 (Dkt. No. 170 (Federal Insurance), 367 (MDL)).

months the Burnett and Ashton plaintiffs[4] have referred to the Entities as being part of a "SAAR Network," the Federal Plaintiffs now claim that the Entities collectively *are* the "SAAR Network" because "all but the defendants themselves" refer to the Entities by this name. (Opp. Br. at 3.)

This categorization is wholly contrived by the plaintiffs to suit their purposes in this litigation—to charge by definition; presumably, because this tautology is the only *possible* way to avoid dismissal of the Complaint. By referring to the Entities collectively, they hope to insinuate that an allegation against one is an allegation against all. But even so, *Plaintiffs do not even come close to alleging a claim*, by stating only generally what the "SAAR Network" did, not what any entity alleged to be a member of the "SAAR Network" did.[5] Plaintiffs' argument fails because to make an allegation against one that is attributable to all, Plaintiffs *must first establish the relationship* between the entities acting in collusion.

Plaintiffs argue that they are not required to present their evidence against each of the Entities (Opp. Br. at 6), and rely on the United States Court of Appeals for the District of Columbia Circuit's holding in *Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002), that one sentence, "I was turned down for a job because of my race," was sufficient to survive a 12(b)(6) motion.

But this sentence clearly alleges who the victim is; what happened; why; and the basis for liability. Here, in response to African Muslim Agency's motion, Plaintiffs rely on a section of

---

[4] *Burnett v. Al Baraka Investment Co.*, U.S. District Court for the Southern District of New York, Case No. 03-CV-9849 (RCC); *Ashton v. Al Qaeda Islamic Army*, U.S. District Court for the Southern District of New York, Case No. 02-CV-6977 (RCC).

3

the Complaint that only lists the entity as a member of the so-called "SAAR Network," but does not describe what happened, what African Muslim Agency did to cause what happened, or why that is the basis of any claim. This group that the African Muslim Agency is alleged to be a member of is a group of "charities, think tanks and for-profit businesses within the United States . . . [that] generate and surreptitiously transfer funds to terrorist organizations, including al-Qaida." (FAC at ¶ 222.) But neither the Complaint nor Opposition Brief states whether the entity or any of its principals generated funds to terrorist organizations. The same is true for Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation.

Plaintiffs apparently believe that it is not unconscionable to allege that reputable entities are involved in a conspiracy to finance al Qaida, or have aided and abetted terrorist organizations, in post-9/11 America, *despite that* they have no allegations of facts to support their reprehensible allegations. But the liberal opportunity for discovery made possible by "notice pleading" was not intended to permit a complainant to make vague yet sweeping allegations that earn them the right to later *fish* for evidence.

Plaintiffs' "stretch" that the Complaint be read "in its entirety" is unavailing, as well as based on false assumptions. Plaintiffs point the Entities to their "General Allegations Common to All Charity Defendants" section to search for facts related specifically to them, but they can

---

(footnote continued from previous page)

5   *See generally* FAC ¶¶ 222-232 ("*SAAR entities'* funds have been transferred . . ."; "*the SAAR Network has* . . . provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad") (emphasis added).

find none. (FAC at ¶¶ 79-83.) These allegations focus "in particular[ly]" on "Islamic charities under the control of the Kingdom of Saudi Arabia,"[6] which the so-called "SAAR Network" is not alleged to be. (FAC at ¶¶ 79, 222-232.)[7]

Each of the Entities is each mentioned in the Complaint *twice*; once in a laundry-list of the defendants alleged generally to be among the aiders and abetters, conspirators, and material supporters of defendant al Qaida and/or its affiliated FTOs, organizations, or persons (FAC ¶ 66); and second, in a list of alleged members of a wholly contrived "network" with no facts stated as to Plaintiffs' basis for its assertion that it is an organization, other than that many members of the "network" are headquartered at the same location (FAC ¶¶ 224, 227). These are wholly insufficient to state a claim and do not apprise the Entities of the claims against them.

## II. Plaintiffs' RICO Statement Does Not Assist Their RICO Claim

Neither the Opposition Brief nor Plaintiffs' belated RICO Statement[8] makes out a RICO claim against the Entities. The RICO Statement alleges that the Entities participated in an

---

[6] Three other "charity defendants" are not alleged to be agencies, instrumentalities, or organs of the Kingdom of Saudi Arabia, but two of these three organizations already have been designated by the government as terrorist organizations, and the third has admitted to be a successor of a designated entity, pursuant to the Complaint. *See* FAC at ¶ 218 (Global Relief Foundation: designated); ¶ 235 (Blessed Relief (Muwafaq) Foundation: designated); and ¶ 250 (Taibah International Aid Association: successor to Global Relief Foundation following its designation by the U.S. government in October 2002).

[7] All of the other "ostensible charitable organizations" that Plaintiffs have sued are each alleged to be "an agency, instrumentality and organ of the Kingdom of Saudi Arabia," . . . "control[led] and direct[ed]" by the Kingdom. *See* FAC at ¶ 85 (Benevolence International Foundation); ¶ 114 (Muslim World League); ¶ 131 (International Islamic Relief Organization); ¶ 151 (World Assembly of Muslim Youth); ¶ 168 (Al Haramain Islamic Foundation); ¶ 181 (Saudi High Commission); ¶ 191 (Saudi Red Crescent Society); ¶ 203 (Saudi Joint Relief Committee for Kosovo and Chechnya); and ¶ 208 (Rabita Trust).

[8] Plaintiffs did not file their RICO Statement Against the Entities until after the Entities filed the instant motion to dismiss. (Opp. Br. at 20.)

5

alleged racketeering enterprise, "Radical Muslim Terrorism," but because the alleged predicate acts do not constitute a "pattern" of racketeering activity consisting of two predicate acts, that are related, and that "amount to or pose a threat of continued criminal activity," it fails to support a claim." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

Section 1961(1)(A), which lists the predicate acts that constitute "racketeering activity," does *not* include "defrauding the US Government" (18 U.S.C. § 371 (RICO Stmt. at ¶ 5(a)); "filing false or materially false tax returns" (26 U.S.C. ¶ 7206(1), (2)) (*id.*); *or* "engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws" (26 U.S.C. § 7212(a)) (*id.*).

Further, the predicate acts of "money laundering" and "illegal transactions in monetary instruments" (*id.*) require specific allegations as to the transactions that caused such violations. Plaintiffs' RICO Statement does not indicate what any of the Entities did to cause such alleged violations, nor that any of the Entities used "proceeds" from a designated "specified unlawful activity . . . knowing that the property involved represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(c)(1), (4), (7). Plaintiffs also do not allege that the Entities "knowingly engaged in any monetary transaction in criminally derived property." 18 U.S.C. § 1957(a).

Plaintiffs mention only one of the Entities by name, the African Muslim Agency, and even then do not (and cannot) explain how this entity engaged in any predicate act that forms the basis of any continued criminal activity. (RICO Stmt. at ¶ 5(f).)

### III.    Plaintiffs' Conspiracy Theory for Personal Jurisdiction Also Fails On the Pleading

Relying on New York's long-arm statute, Plaintiffs state—without reference to the Complaint—that the Entities "were participants in a conspiracy that resulted in catastrophic

effects in this jurisdiction." (Opp. Br. at 7.) In addition, Plaintiffs point to "a modified due process standard for mass torts in which territorial contacts are replaced with state interests" for purposes of in personam jurisdiction. (*Id.* at 8.)[9]

For all the reasons articulated above—that Plaintiffs have not adequately pled a conspiracy or any of the statutory claims with adequate specificity—their reliance on "general allegations" in support of their claim that the court can exercise personal jurisdiction over these Entities, similarly, fails. *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) (nexus between New York contacts and illegal conduct must be demonstrated with "specific facts"); *In re Nazi Era Cases Against German Defendants Litig.*, Civil No. 02-3890 (WGB), 2004 WL 1246020, at *15 (D.N.J. May 20, 2004) ("a plaintiff must allege specific facts connecting the non-resident defendant to activity in New York *in furtherance of the conspiracy*") (emphasis added).

### A.   "Conspiracy Jurisdiction"

As the Court is well aware, it may exercise personal jurisdiction over a non-resident who "in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state . . . ." N.Y.C.P.L.R. § 302(a)(3). Plaintiffs argue that this section of New York's long-arm statute confers jurisdiction "where a plaintiff has presented a sufficient showing that a conspiracy exists" because personal jurisdiction may be "based on acts committed by [the defendant's] co-conspirators." Opp. Br. at 8, quoting *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998).

---

[9]   Plaintiffs do not address the Entities' contacts with the United States as a whole under either of the statutes that confer personal jurisdiction based upon their nationwide service of process provisions; therefore this argument should be considered conceded.

7

It is axiomatic, then, that jurisdiction may not be conferred under this concerted-action theory of liability where the Plaintiffs have not pled properly a conspiracy. *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93-94 (2d Cir. 1975) ("[T]he bland assertion of conspiracy . . . is insufficient to establish personal jurisdiction."); *In re Nazi Era Cases*, 2004 WL 1246020, at *15 ("A plaintiff may not rely solely upon a 'bland assertion' of conspiracy to establish personal jurisdiction over a non-resident defendant.")  Plaintiffs simply have stated no facts that would subject the Entities to conspiracy liability. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).

To establish conspiracy jurisdiction, a plaintiff must (1) make a *prima facie* showing of a conspiracy; (2) "allege *specific facts* warranting the inference that the defendant was a member of the conspiracy"; and (3) "show that the defendant's co-conspirator committed a tortious act in New York during and pursuant to the conspiracy." *Id.* (emphasis added); *see also Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593 (S.D.N.Y. 1998).[10]  Because Plaintiffs have not met this test, this Court should not exercise jurisdiction over the Entities.

In the alternative, the theory fails because the defendant or agent must (i) "regularly do[ ] or solicit[ ] business, . . . or derive[ ] substantial revenue from goods used or consumed or services rendered, in the state" or (ii) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international

---

[10] If the Court finds that the Plaintiffs have made a *prima facie* showing of conspiracy, they then must show the Entities' membership in the conspiracy by "establishing: (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control,' or 'at the request of or on behalf of' the out-of-state defendant." *In*

(footnote continued on next page)

commerce." N.Y.C.P.L.R. § 302(a)(3)(i)-(ii). There are absolutely no allegations that the Entities or any alleged co-conspirators derive substantial revenue from New York, or from international commerce, such that this Court should find that personal jurisdiction should be exercised under New York's long-arm statute.

### B. Due Process

Not only does the Court not have jurisdiction over the Entities under New York law, Plaintiffs' jurisdiction argument does not pass constitutional muster. Due process permits a court's exercise of personal jurisdiction over a non-resident defendant only if there exists sufficient "minimum contacts" between the defendant and the forum state such that they should reasonably anticipate being haled into court there. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Even if the facts demonstrated the necessary showing of "minimum contacts" in this case (which they do not), the Court would still have to find that the exercise of jurisdiction over the foreign Entities was reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112-14 (1987). Thus, Plaintiffs' reliance on *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998) and *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003) is misplaced, which Plaintiffs admit by acknowledging that these cases apply to foreign states, not American citizens. (Opp. Br. at 11 n.2.)

---

(footnote continued from previous page)
    *re Nazi Era Cases*, 2004 WL 1246020, at *17, citing *Simon*, 86 F. Supp. 2d at 120; *Chrysler,* 778 F. Supp. at 1269.

9

*Rein* and *Pugh* easily are distinguishable. Both involve actions brought under the Foreign Sovereign Immunities Act ("FSIA") and involve terrorist acts that occurred overseas, and both involve the foreign state of Libya—a then designated "state sponsor of terrorism." The *Rein* court exercised personal jurisdiction pursuant to the FSIA. *Rein*, 995 F. Supp. at 330. The *Pugh* court found that certain federal criminal statutes contemplated a United States court's jurisdiction *over a foreign national* for terrorist acts committed abroad, and thus civil courts should do the same. *Pugh*, 290 F. Supp. 2d at 59-60. In both, the courts exercised jurisdiction over foreign nationals and state sponsored acts of terrorism that occurred overseas—neither of which apply.

Nor should the Court condone the application of the "modified due process standard for mass torts" in which territorial contacts are replaced with state interests. (Opp. Br. at 12-13.) Presumably, because Plaintiffs are aware that the Court cannot sustain a finding of personal jurisdiction under traditional standards, they hope that the Court will lower the due process bar given the atrocity that occurred on September 11th. (*Id.*) The Court should refuse to do so, given that (a) the Entities are by no stretch of the imagination "major defendants" in this litigation (*Simon*, 86 F. Supp. 2d at 129); and (b) such horrific accusations mandate that the Court uphold traditional constitutional guarantees.

## CONCLUSION

For all the foregoing reasons, African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation respectfully request that the Court grant their Motion to Dismiss the First Amended Complaint with prejudice.

Respectfully submitted,

Dated: August 2, 2004    By: /s/ Nancy Luque
NANCY LUQUE (NL-1012)
DONNA M. SHEINBACH (DS-6247 )
**GRAY CARY WARE & FREIDENRICH LLP**
1625 Massachusetts Avenue NW, Suite 300
Washington, DC  20036-2247
Tel: 202-238-7764
Fax: 202-238-7701

*Attorneys for African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation (Admitted Pro Hac Vice)*

## CERTIFICATE OF SERVICE

      I hereby certify that on this 2nd day of August, 2004, I caused an electronic copy of the foregoing Reply in Support of African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation's Motion to Dismiss the First Amended Complaint to be served by the Court's electronic filing system upon all parties scheduled for electronic notice.

                                              /s/ Donna M. Sheinbach
                                              Donna M. Sheinbach (DS-6247)