**United States District Court**
**Southern District Of New York**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army,* 02 CV 6977 (RCC)
*Thomas Burnett, Sr.  v. Al Baraka Investment & Develop. Corp.,* 03 CV 9849 (RCC)
*Federal Insurance Co. v. al Qaida*, 03 CV 6978 (RCC)
*Barrera v. Al Qaeda Islamic Army,* 03-CV-7036 (RCC)
*Salvo v. Al Qaeda Islamic Army,* 03-CV-5071 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.,* 03-CV-9849 (RCC)

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF  DEFENDANT SAUDI HIGH COMMISSION

KREINDLER & KREINDLER LLP
100 Park Avenue
New York, NY  10017-5540
Phone:  (212) 687-8181

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Phone:  (215) 665-2000

MOTLEY RICE LLC
28 Bridgestone Boulevard
P.O. Box 1792
Mt. Pleasant, SC  29465
Phone:  (843) 216-9000

HANLY CONROY BIERSTEIN &
SHERIDAN, LLP
415 Madison Avenue
New York, NY  10017
Phone:  (212) 401-7600

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.   APPLICABLE LAW ............................................................................................ 4

   A.   The Burden of Proof  is on the Party Claiming Immunity.................................... 4

III.   ARGUMENT ....................................................................................................... 6

   A.   The SHC has Failed to Present a Prima Facie Case that it is a Foreign Sovereign ........... 6

      (1)   The SHC is not a Political Subdivision of the Kingdom of Saudi Arabia................. 7
      (2)   The SHC Has Failed to Present Sufficient Evidence to Establish That it
          is an Organ of the Kingdom of Saudi Arabia .......................................... 8

   B.   The SHC Has Waived Any Immunities Available to an Agency of a Foreign State ....... 11

   C.   The Tortious Act Exception Provides Jurisdiction Over the SHC .................................. 12

      (1)   The FSIA Does Not Impose a Higher Standard of Causation Than That
          Applicable to the Underlying Theory of Liability ...................................... 13
      (2)   Plaintiffs Have Adequately Pled Causation .......................................... 16
      (3)   Plaintiffs' Injuries Occurred in the United States .................................... 18
      (4)   The Sponsorship of Terrorism is not a "Discretionary Function" ........................... 21
      (5)   Sections 1605(a)(5) and 1605(a)(7) are not Mutually Exclusive............................. 21

   D.   This Court May Exercise Personal Jurisdiction Over the SHC ....................................... 22

      (1)   The SHC Directed its Conduct at the United States ................................... 24
      (2)   Plaintiffs Should Be Afforded An Opportunity to Conduct Discovery
          Relative to the SHC's Contacts with the United States .......................................... 25

IV.   CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
    902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990).......................................4

Birnbaum v. United States,
    588 F.2d 319 (2d Cir. 1978)..................................................................................14

Boim v. Quranic Literacy Institute,
    291 F.3d 1000 (7th Cir. 2002) ...............................................................................17

Bowers v. Transportes Naviores Ecuidorianos,
    719 F. Supp. 166 (S.D. N.Y. 1989).........................................................................7

Burnett v. Al Baraka Investment & Development Corp.,
    292 F. Supp. 2d 9 (D.D.C. 2003) ..........................................................................13

Cabiri v. Government of the Republic of Ghana,
    165 F.3d 193 (2d Cir. 1999).................................................................................11

Cabiri v. Ghana, 165 F.3d 193 (2d Cir. 1999) .....................................................19, 20

Calder v. Jones,
    465 U.S. 783 (1984)...........................................................................................22

Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.,
    727 F.2d 274 (2d Cir. 1984).................................................................................11

Cargill Int. S.A. v. M/T Pavel DyBenko,
    991 F.2d 1012 (2d Cir. 1993)................................................................................5

Chance v. Armstrong,
    143 F.3d 698 (2d Cir.1998)...................................................................................6

Conley v. Gibson,
    355 U.S. 41 (1957).............................................................................................6

Continental Ore Co. v. Union Carbide & Carbon Corp.,
    370 U.S. 690 (1962)...........................................................................................17

Cutco Industries, Inc. v. Naughton,
    806 F.2d 361 (2d Cir. 1986)................................................................................23

Daliberti v. Iraq,
    97 F. Supp. 2d 38 (D. D.C. 2000) ....................................................................23

Filetech S.A. v. France Telecom S.A.,
    157 F.3d 922, 932 (2d Cir. 1998) ....................................................................5

First City, Texas-Houston, N.A. v. Rafidian Bank,
    150 F.3d 172, 177 (2d Cir. 1998).....................................................................5

Filus v. Lot Polish Airlines,
907 F.2d 1328, 1332 (2d Cir. 1990)........................................................................5

Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998)...................................16, 17, 21

Gray v. Permanent Mission of the People's Republic of Congo to the United
    Nations,
    443 F. Supp. 816 aff'd, 580 F.2d 1044 (2d Cir. 1978)...............................................7

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ..................................................16

Hirsh v. State of Israel,
    962 F. Supp. 377 (S.D.N.Y.), aff'd, 133 F.3d 907 (2d Cir. 1997) ...........................20

Human Rights in China v. Bank of China,
    2003 U.S. Dist. LEXIS 16436 (S.D. N.Y. 2003) .....................................................5

Hyatt Corp. v. Stanton, 945 F. Supp. 675 (S.D. N.Y. 1996) ..........................................7

IUE AFL-CIO Pension Fund v. Herrmann,
    9 F.3d 1049 (2d Cir. 1993)..............................................................................23

Kelly v. Syria Shell Petroleum Development B.V.,
    213 F.3d 841 (5th Cir. 2000) ...........................................................................8

Kilburn v. Socialist Peoples Libyan Arab Jamahiriya,
    2004 WL. 1698198 (D.C. Circuit 2004).......................................................14, 15

Lee v. Bankers Trust Co.,
    166 F.3d 540 (2d Cir.1999).............................................................................6

Letelier v. Republic of Chile,
    488 F. Supp. 665 (D.DC. 1980).................................................................20, 22

Liu v. Republic of China,
    892 F.2d 1419 (9th Cir. 1989) ...................................................................20, 22

Lumbard v. Maglia,
    621 F. Supp. 1529 (S.D. N.Y. 1985)................................................................16

Olsen v. Government of Mexico,
    729 F.2d 641 (9th Cir. 1984) ...............................................................18, 19

PDK Laboratories v. Friedlander,
    103 F.3d 1105 (2d Cir. 1997)................................................................23

Patrickson v. Dole Food Co.,
    251 F.3d 795 (9th Cir. 2001) ...............................................................8

Pugh v. Socialist People's Libyan Arab Jamahiriya,
    290 F. Supp. 2d 54 (D. D.C. 2003).......................................................23

Rajaa al Mukaddam v. Permanent Mission,
    136 F. Supp. 2d 257 (S.D. N.Y. 2001)...........................................4, 5, 10

Rein v. Socialist People's Libyan Arab Jamahiriya,
    995 F. Supp. 325 (E.D. N.Y. 1998) ......................................................23

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
    235 F.3d 738 (2d Cir. 2000)............................................................5, 6, 10

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
    246 F. Supp. 2d 285 (S.D. N.Y. 2003)..................................................6

Robinson v. Government of Malaysia,
    269 F.3d 133 (2d Cir. 2001)......................................................4, 5, 13, 14, 15

Simmons v. Abruzzo,
    49 F.3d 83 (2d Cir.1995)......................................................................6

Simon v. Phillip Morris, Inc.,
    86 F. Supp. 2d 95 (E.D. N.Y 2000) ....................................................22

Stinnett v. Colorado Interstate Gas Co.,
    227 F.3d 247 (5th Cir. 2000) ...............................................................12

Swierkiewicz v. Sorema, 534 U.S. 506 (2002)..................................................5

Thomas Publishing Co. v. Industrial Quick Search, Inc.,
    237 F. Supp. 2d 489 (S.D. N.Y. 2002).................................................25

USX Corp. v. Adriatic Insurance Co.,
    345 F.3d 190 (3d Cir. 2003).............................................................8, 9

<u>Verlinden v. Central Bank of Nigeria</u>,
   461 U.S. 480 (1983).................................................................................15

<u>Woodford v. Community Action Agency of Greene County</u>,
   239 F.3d 517 (2d Cir. 2001)......................................................................6

## STATUTES AND RULES

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 <u>et seq</u>.............................................4

28 U.S.C. §1603(b) ...........................................................................................8

28 U.S.C. §1605 (a)(1).......................................................................................11

28 U.S.C. § 1605(a)(2) .................................................................................12, 13, 15

28 U.S.C. § 1605(a)(5) ...........................................................12, 13, 18, 20, 21, 22

28 U.S.C. § 1605(a)(7).............................................................13, 14, 15, 21, 22

28 U.S.C. § 1606.............................................................................................15

28 U.S.C. § 1653.............................................................................................23

Fed. R. Civ. P. 12(b)(1)....................................................................................4

Fed. R. Civ. P. 12(b)(6)....................................................................................6

## TREATIES, CHARTERS AND INTERNATIONAL MATERIALS

*Law on Humanitarian Activities and Humanitarian Organization
   of the Federation of Bosnia and Herzegovina,* Article 22 ........................................9

U.N. Charter, art. 2, para. 7............................................................................10

## MISCELLANEOUS

Matthew Levitt, *Tacking the Financing of Terrorism in Saudi Arabia,*
   Policywatch, March 11, 2002, ......................................................................2

*Saudis Reform Charities as Antiterror Measure,*
   CNN.com, June, 2004 ................................................................................3

*Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them (December 2, 2003)*,................................................................................................................3

*Terrorist Financing - Report of an Independent Task Force Sponsored by the Council on Foreign Relations*,............................................................................................3

## LEGISLATIVE HISTORY

House Report 94-1487 at 21, 1976 U.S.C.C.A.N. at 6620 (emphasis added)..............................13

## I.    INTRODUCTION

Plaintiffs have sued the Saudi High Commission for Relief to Bosnia and Herzegovina (SHC) based on its participation in, and aiding and abetting of, a global conspiracy to strike the United States through terrorist attacks, of which the September 11th attack was a natural, intended and foreseeable product.[1]

The SHC is ostensibly a charitable organization, headed by Defendant Prince Salman bin Abdulaziz al Saud.  Since its formation in 1993, the SHC has served as a major conduit for funneling financial and logistical support to al Qaida.[2]  Ashton ¶ 454; Burnett ¶ 404; Federal ¶ 182 & 188.  According to Bosnian officials, al Qaida members began entering Bosnia-Herzegovina as relief workers for the SHC, almost immediately after the organization established operations in the country.  Federal ¶ 183.  During the next ten years, the SHC channeled to al Qaida literally millions of dollars that had been donated to the SHC.  To this date, investigators have been unable to account for approximately $41,000,000 donated to the charity.  Ashton ¶ 456; Burnett ¶ 407; Federal ¶ 184.

In October 2001, NATO peacekeeping forces raided the SHC's headquarters in Sarajevo, as part of an ongoing investigation into the organization's ties to terrorism.  During the raid, investigators found computer hard drives of photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the USS Cole.  Investigators also discovered files on pesticides and crop dusters, information

---

[1] Plaintiffs have provided overviews of the scope, history and objectives of this global conspiracy in the following briefs previously filed with the Court:  The Federal Plaintiffs' Opposition to Prince Sultan's Motion to Dismiss at pp. 1-3; the Federal Plaintiffs' Opposition to Prince Turki's Motion to Dismiss at pp. 1-3; The Ashton and Burnett Plaintiffs' Joint Opposition to Prince Sultan's Motion to Dismiss and The Burnett Plaintiffs' Opposition to Hamad Al-Hussaini's Motion to Dismiss.  As the conduct which forms the basis of the Plaintiffs' claims against the SHC can only be fully understood within this broader context, Plaintiffs incorporate those descriptions by reference in lieu of restating them herein.

[2] Citations in the form "*Case Name* ¶ __" are citations to paragraphs in the most recent complaint in the case indicated (i.e. the *Ashton* Fourth Amended Complaint, the *Burnett* Third Amended Complaint, the *Federal* First Amended Complaint, and the *Salvo* First Amended Master Complaint).

about how to make fake State Department badges, and photographs and maps of Washington, on which prominent government buildings had been specifically marked.  Ashton ¶ 451; Burnett ¶ 397; Federal ¶ 186 & 458.

Following the raid, the Financial Police of the Federation of Bosnia-Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism related activities, stating:

> Members of the SFOR (stabilization forces) have on premises of the Saudi High Commission for relief to Boznia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization.

Ashton ¶ 452; Burnett ¶ 398; Federal ¶ 187 & 459.

During the month of the raid, officials in Bosnia also arrested several members of the al Qaida network, who were plotting an attack on the United States embassy in Sarajevo.  Burnett ¶ 394; See also Matthew Levitt, *Tackling the Financing of Terrorism in Saudi Arabia*, Policywatch, March 11, 2002, p.1, attached to the Affirmation of Sean P. Carter in Opposition to the Motion to Dismiss of the SHC (Carter Aff.), as Exhibit 1.  At least two of those men, including the group's leader Bensayah Belkacem, were employees of the SHC.  Belkacem has been identified as a top al Qaida lieutenant.  At the time of Belkacem's arrest, authorities discovered in his apartment fake passports and a mobile telephone listing for Abu Zubeida, al Qaida's then third-in-command.  Burnett ¶ 395.

The SHC's funneling of financial and logistical resources to al Qaida was well known to senior officials in the organization, including Prince Salman, for many years prior to the September 11th Attack.  In fact, an association called the "Mothers of Srebrenica and Podrinje" sent a letter to Prince Salman in September of 2000, in his capacity as head of the SHC,

complaining that the organization was not applying donated funds for humanitarian purposes. Ashton ¶ 454 & 455; Burnett ¶ 404 & 405; Federal ¶ 185 & 457.

The importance of Saudi "charities," such as the SHC, to al Qaida's phenomenal growth from a small group of radicals to a sophisticated global terrorist organization, cannot be overstated.  As the United Nations Security Council Committee Concerning al-Qaida and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities.  Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support.  These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.  Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaida.

See *Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them (December 2, 2003)*, p. 13, ¶ 34, Carter Aff., Exh. 2; See also *Terrorist Financing – Report of an Independent Task Force Sponsored by the Council on Foreign Relations*, pp. 7-8, Carter Aff., Exhibit 3.

Almost three years after the September 11th Attack, Saudi Arabia is finally bowing to international pressure and itself acknowledging the pervasiveness of its charities' involvement in the sponsorship of al Qaida.  For example, on June 2, 2004, Saudi Arabia announced that it intended to dissolve ***all*** of its international charities, apparently including the SHC,  as a "counter-terrorism" measure.  See *Saudis Reform Charities as Antiterror Measure*, CNN.com, June 2, 2004, Carter Aff., Exh. 4.

The SHC moves to dismiss the claims asserted against it.  As a first argument, the SHC, which expressly represented itself to be a non-governmental organization in order to obtain authorization to conduct activities in Bosnia-Herzegovina, now claims that it is a governmental

entity immune from suit under the provisions of the Foreign Sovereign Immunities Act, 28

U.S.C. §§ 1330, 1602 et seq. (FSIA), and therefore entitled to dismissal under Fed. R. Civ. P.

12(b)(1).  As an alternative grounds for dismissal, the SHC argues that this court lacks personal

jurisdiction over it.  Finally, the SHC urges this court to conclude that the allegations of the

various complaints fail to establish an adequate causal link between the SHC's sponsorship of al

Qaida and the September 11th Attack.  For the reasons set forth below, all of the arguments

proffered by the SHC are meritless.[3]  Accordingly, plaintiffs respectfully submit that the SHC's

motion to dismiss should be denied.

## II.    APPLICABLE LAW

### A.    The Burden of Proof  is on the Party Claiming Immunity

The applicable standards of review and parties' respective burdens of proof in a

jurisdictional challenge vary depending upon the procedural posture of the litigation and, at least

with respect to the FSIA, whether the defendant challenges the factual basis of the claim.

Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001); Ball v. Metallurgie Hoboken-

Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), cert. denied, 498 U.S. 854 (1990); Rajaa al

Mukaddam v. Permanent Mission, 136 F. Supp. 2d 257, 260 (S.D. N.Y. 2001).[4]  The Supreme

Court has not had occasion to comprehensively address the relevant standards of review and

burdens of proof applicable in analyzing an immunity defense at differing stages of an FSIA

action.  However, when read collectively and in light of the relevant pleading requirements of the

---

[3] In a footnote and without any discussion, the SHC also states that the "political question doctrine provides a basis" to dismiss the claims against the SHC.  To the extent the SHC is deemed to have formally raised the political question doctrine as a basis for dismissal, the plaintiffs respectfully refer the Court to, and incorporate herein by reference, the discussion contained in the Burnett plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of National Commercial Bank at pp. 27-37 in response.

[4] "While Ball involved a challenge to personal jurisdiction under Rule 12(b)(2), the holding applies to all jurisdictional testing motions, including challenges to subject matter jurisdiction under Rule 12(b)(1)." Rajaa al Mukaddam, 136 F.Supp.2d at 260 n. 11.

Federal Rules of Civil Procedure, the Second Circuit's decisions in FSIA cases provide a road map for resolving the immunity defenses in this case.

Consistent with Rule 8, a plaintiff in an FSIA case need only provide the defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  In responding to the complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA.  Cargill Int. S.A. v. M/T Pavel DyBenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes such a showing, the burden of production shifts to the plaintiff to come forward with specific factual allegations which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in the FSIA.  Robinson, 269 F.3d at 141-43; Human Rights in China v. Bank of China, 2003 U. S. Dist. LEXIS 16436, *4 (S.D. N.Y. 2003) ("plaintiff bears the burden of producing supporting *facts* showing the applicability of an FSIA exception once defendant makes a *prima facie* case for immunity) (emphasis supplied).  To the extent the defendant challenges the accuracy of those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery relative to that disputed factual contention.  Rajaa al Mukaddam, 136 F. Supp. 2d at 261-62; Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); First City, Texas-Houston, N.A. v. Rafidian Bank, 150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990).  Upon completion of discovery, the court should normally "afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction."[5]  Reiss v. Societe Centrale DuGroupe

---

[5] Consistent with these authorities, Plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the FSIA jurisdictional analysis.

Des Assurances Nationales, 235 F.3d 738, 748 (2d Cir. 2000).  In the Second Circuit, defendants must understand "that the ultimate burden of proof in a FSIA jurisdiction case ultimately lies with them."  Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 246 F. Supp.2d 285, 288 (S.D. N.Y. 2003).

The court should not grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless it "appears beyond doubt that plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." Conley v. Gibson, 355 U.S. 41, 45-6 (1957); Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir.1995).  The court must presume that the allegations in the complaints are true and give plaintiffs the benefit of every reasonable inference that may be drawn therefrom. Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir.1999).  Plaintiffs are not required to prove their claims at the pleading stage; indeed, "[t]he pleading of evidence should be avoided." Woodford v. Community Action Agency of Greene County, 239 F.3d 517, 526 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir.1998).

## III.   ARGUMENT

### A.   The SHC has Failed to Present a Prima Facie Case that it is a Foreign Sovereign

In its brief, the SHC asserts that it is either a political subdivision or organ of the Kingdom of Saudi Arabia, and therefore entitled to the protections of the FSIA.  For the reasons set forth below, plaintiffs respectfully submit that SHC has failed to meet its burden to establish that it is either a political subdivision or organ of the Kingdom of Saudi Arabia.[6]

---

[6] As the SHC notes in its brief, the *Federal* plaintiffs have alleged that the SHC is an "agency, instrumentality and organ" of the Kingdom of Saudi Arabia.  Significantly, the other plaintiffs have not alleged that the SHC is an agency or organ of the Kingdom.  The analysis set forth in this consolidated response therefore focuses, appropriately, on whether the SHC has carried its burden of proof relative to this issue.

> **(1)** **The SHC is not a Political Subdivision of the Kingdom of Saudi Arabia**

The evidence submitted by the SHC in its motion to dismiss does not support its contention that it is a political subdivision of the Kingdom of Saudi Arabia. As used in the FSIA, the terms "agency and instrumentality" and "political subdivision" are distinct and mutually exclusive of one another. Although the term "political subdivision" is not defined in the FSIA and the Supreme Court has not had occasion to offer an interpretation of that phrase, the courts of this district that have considered the issue have generally employed a "legal characteristics" test for determining whether an entity is a political subdivision of a foreign state. Under that test, "political subdivisions should be read to refer to all governmental units that cannot act and are not suable in their own name." Hyatt Corp. v. Stanton, 945 F. Supp. 675, 684 (S.D. N.Y. 1996); Bowers v. Transportes Naviores Ecuidorianos, 719 F. Supp. 166 (S.D. N.Y. 1989); Gray v. Permanent Mission of the People's Republic of Congo to the United Nations, 443 F. Supp. 816, 820, aff'd, 580 F.2d 1044 (2d Cir. 1978).

In the present case, the admissions made by the SHC in its own motion to dismiss confirm that it is not a "political subdivision" of the Kingdom of Saudi Arabia. In its motion to dismiss, the SHC asserts that "SHC is an identifiable legal entity with its own organizational chart…SHC is subject to suit in Saudi Arabia for non-discretionary acts…And SHC does 'contract' and 'hold property' in it own name…" See The SHC's Motion to Dismiss at p. 12. In view of these allegations, the SHC cannot be considered a political subdivision of the Kingdom of Saudi Arabia.

> **(2)** **The SHC Has Failed to Present Sufficient Evidence to Establish That it is an Organ of the Kingdom of Saudi Arabia**

As the SHC is not a political subdivision of Saudi Arabia, its entitlement to the protections of the FSIA necessarily depends on its ability to establish that it is an organ of the

7

Kingdom.[7]  The factors relevant to determining whether an entity is an "organ" of a foreign state

were set forth, most recently and comprehensively, in <u>USX Corp. v. Adriatic Ins. Co.</u>, 345 F.3d

190 (3d Cir. 2003).  In <u>USX</u>, the court synthesized and clarified previous rulings by the Ninth

Circuit, in <u>Patrickson v. Dole Food Co.</u>, 251 F.3d 795, 807-808 (9th Cir. 2001), and the Fifth

Circuit, in <u>Kelly v. Syria Shell Petroleum Dev. B.V.</u>, 213 F.3d 841, 846-847 (5th Cir. 2000).

According to the <u>USX</u> court:

> In making this assessment [whether an entity is an organ of a
> foreign state], factors employed by both the Courts of Appeals for
> the Ninth and Fifth Circuits are relevant, although no one is
> determinative: (1) the circumstances surrounding the entity's
> creation; (2) the purpose of its activities; (3) the degree of
> supervision by the government; (4) the level of government
> financial support; (5) the entity's employment policies, particularly
> regarding whether the foreign state requires the hiring of public
> employees and pays their salaries; and (6) the entity's obligations
> and privileges under the foreign state's laws.  To this list, we
> should add an additional factor: (7) the ownership structure of the
> entity. Under the organ prong, as opposed to the majority
> ownership prong of section 1603(b)(2), a foreign state might own
> only 10% of an entity; it might own directly 50% of the entity; or it
> might own even 100% of a holding company that owns 100% of
> the entity. On the other hand it is possible that a foreign state might
> not own any portion of any entity that nevertheless is its organ as
> section 1603(b)(2) does not require a foreign state to have any
> ownership interest in an entity for it to be its organ. Courts should
> consider how these different ownership structures might influence
> the degree to which an entity is performing a function "on behalf
> of the foreign government."

<u>USX</u>, 345 F.3d 190 at 209.

In its motion to dismiss, the SHC fails to present sufficient credible evidence to satisfy its

burden to establish that it is an organ of the Kingdom of Saudi Arabia, based on the relevant

factors cited above.  As an initial matter, the SHC's motion to dismiss offers no evidence

---

[7] Pursuant to §1603 of the FSIA, an entity which is a "separate legal person" may demonstrate that it is an agency of
a foreign by showing either (1) that the foreign state owns the majority of the entity's shares or other ownership
interest; or (2) that the entity is an organ of a foreign state.  28 U.S.C. §1603(b).  In its motion to dismiss, the SHC
advocates for agency status under the latter standard only.

regarding several of the relevant factors.  For example, the SHC provides no information regarding the organization's "ownership."[8]  Similarly, although the SHC summarily asserts that the SHC "evolved into the primary instrument of Saudi foreign policy toward Bosnia-Herzegovina," it does not state whether the SHC was required to fulfill or comply with any statutory or regulatory obligations in relation to its activities in Bosnia.  Further, the SHC does not offer any substantive analysis to show how application of the relevant factors supports its assertion that it is an organ of the Kingdom, choosing instead to base its argument on the definition of the word "organ" in the 1988 edition of Webster's New World Dictionary.  Because a careful examination of **all** of the factors cited by the USX Court is critical in determining whether an entity qualifies as an organ of a foreign sovereign, a complete analysis cannot be accomplished based on the limited record provided by the SHC in its motion to dismiss, and the SHC has consequently failed to meet its burden of proof on the issue.

In addition, the evidence the SHC has submitted in support of its claim that it is an official arm of the Saudi government directly contradicts representations the SHC made to the government of Bosnia-Herzegovina regarding its status, and is therefore fundamentally inconclusive.  The law of Bosnia-Herzegovina permits private **non-governmental** charities to register and operate within the country in accordance with the terms of the Law on Humanitarian Activities and Humanitarian Organizations of the Federation of Bosnia and Herzegovina ("Bosnian Act").  See Bosnian Act at Article 22, Carter Aff., Exh. 5.  In contrast, official charities of foreign governments and the United Nations must reach a special agreement with the government of Bosnia-Herzegovina in order to conduct operations within the country,

---

[8] In fact, although the SHC cites the USX decision in a footnote, the SHC references only six of the seven factors deemed relevant by that court, carefully avoiding any mention of the question of ownership.  In addition, the SHC quotes the "employment policies" factor partially,  excluding the court's statement that the critical aspect of an entity's employment policies is whether the "foreign state *requires* the hiring of public employees and pays their salaries."  USX 345 F.3d at 209.

presumably to guard against unwanted foreign influence in the nation's internal affairs.[9] <u>Id.</u>
Importantly, in its dealings with the government of Bosnia-Herzegovina, the SHC consistently
and repeatedly represented itself to be a non-governmental organization, and sought the benefits
and rights afforded such private organizations under the Bosnian Act.  <u>See</u> 2002 Bosnian
Ministry of Finance Audit of SHC at pp. 1-3, Carter Aff., Exh. 6.  The SHC's contention in the
present case that it is a governmental organization, and the evidence submitted in support
thereof, thus directly contradicts official representations the SHC made to the Bosnian
government under the requirements of Bosnian law.

The SHC makes no effort to reconcile these contradictory positions in its motion to
dismiss, and therefore has failed to present credible evidence sufficient to establish that it is an
agency of the Kingdom of Saudi Arabia.  On the most fundamental level, the SHC's consistent
representation that it was a non-governmental body, over a period of at least eleven (11) years,
renders it impossible to accept at face value the evidence submitted by the SHC in support of its
assertion that it is an agency.  Accordingly, the SHC cannot meet its burden of proof based on
the evidence it has submitted.  At the very least, the SHC's contradictory statements regarding its
status require that the parties be afforded an opportunity to conduct discovery relative to all of
the factors relevant to determining whether an entity is an organ of a foreign state, and to present
the evidence developed through that process at an evidentiary hearing to determine whether the
SHC qualifies as an organ of the Kingdom of Saudi Arabia within the meaning of the FSIA.
<u>Rajaa al Mukaddam</u>, 136 F. Supp. 2d at 261-62; <u>Reiss</u>, 235 F.3d at 748.

---

[9] It is a fundamental principle of international law that a nation may not,  through a pretext or otherwise, interfere in
the internal affairs of another sovereign nation.  <u>See</u> U.N. Charter, art. 2, para. 7.

**B.**     **The SHC Has Waived Any Immunities Available to an Agency of a
Foreign State**

Even assuming the SHC were able to present sufficient evidence to establish that it is an

agency of the Kingdom of Saudi Arabia, it has waived any protections of the FSIA.  Pursuant to

§1605 (a)(1) of the FSIA:

> (a)  a foreign state should not be immune from the jurisdiction of
> courts of the United States or of the states in any case –
>
> > (1) in which the foreign state has waived its
> > immunity either explicitly or by implication, not
> > withstanding any withdraw of the waiver which the
> > foreign state may purport to effect except in
> > accordance with the terms of the waiver…

28 U.S.C. §1605 (a)(1).  According to the Second Circuit, "the concept of implied waiver can be

read to apply to three different type of circumstances: (a) where a subjective intent to waive

immunity has been demonstrated; (b) where the foreign state has taken an act that objectively

can be interpreted as exhibiting an intent to waive immunity; or (c) where a foreign state has

taken acts that forfeit its right to immunity, irrespective of whether it has intended to do so."

Cabiri v. Government of the Republic of Ghana, 165 F.3d 193, 202 (2d Cir. 1999).  The Second

Circuit has further held that district courts have discretion in determining whether the conduct of

a party constitutes an implicit waiver of foreign sovereign immunity "in light of the

circumstances of a particular case."  Canadian Overseas Ores Ltd. v. Compania de Acero del

Pacifico S.A., 727 F.2d 274, 278 (2d Cir. 1984).

The SHC's systematic and repeated representations that it was a non-governmental

organization, in its dealings with the government of Bosnia-Herzegovina and international

community, satisfy all three of the potential standards for implied waiver set forth above.  In

seeking to conduct operations within Bosnia-Herzegovina, the SHC made a deliberate decision

to claim NGO status, and thereby avoid the special licensing and approval requirements

applicable to official charities.  In doing so, the SHC was necessarily abjuring any claim to

sovereign immunity.  In fact, given the disparate rights and obligations of private and official

charities under the law of Bosnia-Herzegovina, the legality of the SHC's operations within

Bosnia-Herzegovina depended on its waiver of any right to be treated as an official arm of a

foreign sovereign.[10]  As a result, the SHC has unmistakably demonstrated a subjective intent, and

engaged in conduct which objectively can be interpreted as demonstrating its intent, to waive any

right to be treated as a foreign sovereign.

### C.    The Tortious Act Exception Provides Jurisdiction Over the SHC

The tortious act exception to the FSIA would also provide a basis for exercising

jurisdiction over the SHC, in the event that the SHC were entitled to be treated as an agency of

the Kingdom of Saudi Arabia.[11]  The tortious act exception confers jurisdiction over a foreign

sovereign in any case:

> in which money damages are sought against a foreign state for
> personal injury or death, or damage to or loss of property,
> occurring in the United States and caused by the tortious act or
> omission of that foreign state or any official or employee of that
> foreign state  acting within the scope of his office or
> employment…

28 U.S.C. § 1605(a)(5).

The complaints seek monetary damages for personal injuries, wrongful deaths and

property damage resulting from the September 11th Attack, under a variety of common law and

statutory tort theories.  Thus, the claims in these cases fall squarely within the plain language of

the foregoing exception.

---

[10] In view of its representations to the government of Bosnia-Herzegovina, plaintiffs respectfully submit that the doctrine of "quasi-estoppel" precludes the SHC from invoking the protections of the FSIA.  The doctrine of quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken.  The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."  Stinnett v. Colorado Interstate Gas Co., 227 F.3d 247, 258 (5th Cir. 2000).

[11] For the reasons set forth in the *Federal* plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of Prince Turki, at pp. 20-22, incorporated herein by reference, the *Federal* plaintiffs submit that the SHC's laundering of funds on behalf fo al Qaida would subject the SHC to the jurisdiction of this Court under the "commercial activity" exception to the FSIA, 28 U.S.C. § 1605(a)(2), as well.

In an effort to avoid application of the tortious act exception, the SHC raises four arguments.  First, relying on the decision of Judge James Robertson in <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 292 F. Supp.2d 9 (D.D.C. 2003) (<u>Burnett II</u>), the SHC argues that the FSIA imposes a higher standard of causation than that of the underlying substantive theory of liability, and that the plaintiffs cannot meet this proposed elevated standard.  Second, the SHC argues, without any support in the language of the FSIA, that the "entire tort" must occur in the United States in order for the tortious act exception to apply.  Third, the SHC asserts that recognition of the plaintiffs' tort claims in the present case would somehow undermine Congress' intent in adopting the exception to immunity set forth in 28 U.S.C. § 1605(a)(7), which provides extra-territorial jurisdiction for certain categories of injury suffered outside of the United States.  Fourth, the SHC maintains that any participation by it in al Qaida's conspiracy to commit terrorist attacks within the United States constitutes a "discretionary function."  For the reasons set forth below, all of these arguments lack merit.

> **(1)     The FSIA Does Not Impose a Higher Standard of Causation Than That Applicable to the Underlying Theory of Liability**

The SHC's contention that the FSIA imposes a higher standard of causation than that applicable to the underlying theory of liability is inconsistent with controlling precedent in this Circuit, and recently has been rejected by the Court of Appeals for the District of Columbia Circuit as well.  In <u>Robinson v. Government of Malaysia</u>, 269 F.3d 133 (2d Cir. 2001), the Second Circuit considered the scope of the tortious act exception to the FSIA.  Quoting from the legislative history, the Court held that the purpose of the exception is to permit a plaintiff "to maintain an action against [a] foreign state *to the extent otherwise provided by law*." House Report 94-1487 at 21, 1976 U.S.C.C.A.N. at 6620 (emphasis added).  In keeping with that declared objective, the Second Circuit held that that the test for determining the applicability of the tortious act exception is whether the foreign sovereign's "acts were tortious under the law of

13

the State of New York . . . ."[12]  Robinson, 269 F.3d at 142, n.2  Thus, the substantive standards of the underlying theory of liability, and not some higher alternative standard, are used to determine the applicability of the tortious act exception in this Circuit.

The Court of Appeals for the D.C. Circuit embraced this same view of the FSIA in Kilburn v. Socialist Peoples Libyan Arab Jamahiriya, 2004 WL 1698198 (D.C. Circuit 2004), a case arising from the kidnapping and murder of an American citizen in Lebanon between November 1984 and April 1986.  The plaintiff, a family member of the victim, asserted claims against Libya, the Libyan Security Service, Iran and the Iranian Ministry of Information and Security, premising jurisdiction under the "state sponsor of terrorism" exception of the FSIA.  Id. at *1-2.  Libya moved to dismiss the claims, arguing that Congress' inclusion of the phrase "caused by" within the state sponsor of terrorism exception required the plaintiff to satisfy a more stringent standard of causation than that applicable to the underlying theories of liability. The D.C. Circuit squarely rejected Libya's causation argument, holding that the FSIA does not impose its own standard of causation, but rather imports the standard applicable to the underlying cause or causes of action.  In language that directly rejects the reasoning used by Judge Robertson in Burnett II, the D.C. Circuit held that "[a]ny concerns about reaching too far to charge foreign states with the attenuated impact of their financial activities are better addressed as questions of substantive law," and not jurisdiction under the FSIA.[13]  Id.  at 6.

Although the Kilburn court's  analysis focused on the state sponsor of terrorism exception of the FSIA, the court's reasoning is equally applicable to the tortious act exception. For instance, § 1605(a)(7) requires that plaintiffs' injuries be "caused by" defendants' conduct.

---

[12] The Second Circuit has held that the same test applies in determining the viability of claims against an official of the U.S. government under the Federal Tort Claims Act, a statute analogous to the FSIA.  See Birnbaum v. United States, 588 F.2d 319 (2d Cir. 1978) ("Purpose of the Act was to generally waive immunity … if torts of a private person would give rise to liability under State law.")

[13] In view of the Kilburn court's reasoning, the plaintiffs respectfully submit that Judge Robertson's decision in Burnett II has been effectively overruled.

28 U.S.C. § 1605(a)(7).  Finding that similar language elsewhere had been interpreted by the Supreme Court to require only "proximate cause," the court rejected defendants' argument that the FSIA contained any "unexpressed requirement" of a greater causal connection, holding that there was "no textual warrant" for the position.  Id. at *4.  Significantly, the causation language in the "tortious act" exception is identical to that of the "state sponsor of terrorism" exception – both speak only of deaths or injuries "caused by" "a tortious act" (in the case of § 1605(a)(2)) or "an act of torture, extrajudicial killing . . ." or similar acts (in the case of § 1605(a)(7)).  The D.C. Circuit's textual analysis thus is equally applicable to the "tortious act" exception as to the exception at issue in Kilburn.  Moreover, the D.C. Circuit noted that Libya's contention that the FSIA imposes a single, more restrictive standard of causation than the baseline standard of "proximate cause" applicable to the plaintiffs' claims "runs afoul of the FSIA's injunction that a non-immune 'foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.'" Id. at 6, citing 28 U.S.C. § 1606.  It was in this context that the D.C. Circuit reminded that the causation at issue was "jurisdictional causation" only,  Id. at *6 (emphasis in original), and that concerns about imposing liability where the causal chain is attenuated, or where there are multiple actors, are better addressed in the context of the underlying substantive law, not as matters of jurisdiction.  Id.  at *5-6.  This argument, too, is equally applicable to the "tortious act" exception.

Consistent with the Second Circuit's decision in Robinson and the D.C. Circuit's holding in Kilburn, the tortious act exception is properly construed to confer jurisdiction for all claims cognizable under the substantive standards governing liability.[14]

---

[14] This approach to determining the applicability of the FSIA is also necessary to provide clear and predictable standards to litigants in FSIA cases, one of Congress' paramount objectives in enacting the FSIA.  Verlinden v. Central Bank of Nigeria, 461 U.S. 480, 487-88 (1983).

### (2)      Plaintiffs Have Adequately Pled Causation

Under the applicable substantive standards, the SHC's extensive sponsorship of al Qaida ties it inextricably to the September 11th Attack, and provides a sufficient causal link to impose liability upon it for the plaintiffs' injuries.[15]  Plaintiffs allege that the SHC conspired with and/or knowingly aided and abetted al Qaida in carrying out the September 11th Attack by directly providing to al Qaida extensive financial and logistical support.  Neither the law of conspiracy nor the doctrine of aiding and abetting requires that plaintiffs plead a direct link between the SHC's conduct and the specific attack of September 11.  To the contrary, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, *regardless of the degree of their participation or culpability in the overall scheme*." Lumbard v. Maglia, 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985) (emphasis supplied). Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement."  Halberstam v. Welch, 705 F.2d 472,  477 (D.C. Cir. 1983) (emphasis supplied).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor.  Id.

In keeping with the foregoing principles, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing financiers and sponsors of the terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot.[16]  As the United States District Court for the District of Columbia observed in Flatow v. Islamic Republic of Iran, 999 F.

---

[15]  The SHC challenges the sufficiency of the causal link between its conduct and the plaintiffs injuries separately under the FSIA and Rule 12(b)(6).  This analysis is presented in response to both arguments.

[16]  These decisions are consistent with, and find additional support in, the express public policies of the Untied States.  As Attorney John Ashcroft has observed, the United States makes "no distinction between those who carry out terrorist attacks and those who finance organizations."  *Testimony of the Honorable John Ashcroft, Attorney General, United States Department of Justice, United States Committee on the Judiciary, March 4, 2003.*

Supp. 1 (D.D.C. 1998):  "[a] plaintiff need not establish that the material support and resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises…[s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient…." Id. at 18.  The Seventh Circuit adopted the same standard in Boim v. Quranic Literacy Inst., 291 F.3d 1000 (7th Cir. 2002), holding that plaintiffs who are victims of terrorism need show only that the defendant knew of the terrorist organization's illegal activities, desired to help those activities, and engaged in some affirmative act in support thereof. Id. at 1023.

Pursuant to these standards, the SHC's participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties it inextricably to the Attack.[17]  As the plaintiffs' injuries are indisputably the direct result of that Attack, the plaintiffs have properly and adequately alleged causation.  Accordingly, the SHC's causation-based arguments must be rejected.

The complaints also sufficiently allege that the Attack was a foreseeable product of the conspiracy in which the SHC knowingly participated, and of the SHC's aiding and abetting of al Qaida.  Indeed, the *Federal* Complaint unambiguously asserts that the Attack was a "direct, intended and foreseeable product" of that conspiracy.  FAC ¶ 72.  While it would be improper to test the sufficiency of the evidence in support of that allegation in the context of the present motion, it should be noted that al Qaida had unequivocally declared, through statements and actions, that the primary objective of its global conspiracy was to attack the United States and kill its citizens.  For example, in 1996 and 1998, al-Qaida issued *fatwas*, or religious decrees, authorizing attacks against the United States and its citizens.  In the 1998 *fatwa*, Osama bin

---

[17] The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking as it as a whole."  Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962).

Laden asserted that it was the duty of all Muslims to kill United States citizens – civilian or military – "in any country in which it is possible to do it…"  During the decade preceding the September 11th Attack, al Qaida followed through on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests.[18]

As the conduct of terrorist attacks against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is absurd to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as the SHC is alleged to have done.

### (3)     Plaintiffs' Injuries Occurred in the United States

The SHC further alleges that this Court should decline to apply the tortious act exception of the FSIA, because certain conduct in support of al Qaida's conspiracy to attack America occurred outside of the United States.  This argument fails to meet the plain language of the tortious act exception, which requires simply that the plaintiff suffer "personal injury or death, or damage to loss of property, occurring in the United States…" 28 U.S.C. § 1605(a)(5).  As the plaintiffs' claims undeniably arise from property damage, personal injury and wrongful deaths "occurring in the United States," those claims satisfy the unambiguous requirements of the statute.

The 9th Circuit's decision in Olsen v. Government of Mexico, 729 F.2d 641 (9th Cir. 1984) further undermines the SHC's position.  In Olsen, the plaintiffs brought claims against Mexico for the deaths of their parents, who were killed in a plane crash while being transferred

---

[18] Such attacks include:  the first World Trade Center bombing in 1993; the planned attacks against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993; the planned assassination of President Clinton in the Philippines; the planned bombing of 11 to 13 American jumbo jets over the Pacific in January 1995; the car bombing of the U.S. military mission in Riyadh, Saudi Arabia, in 1995; the truck bombing of the U.S. Housing area Khobar Towers in Dhahran, Saudi Arabia, 1996; the simultaneous bombings of the U.S. Embassies in Kenya and Tanzania in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide boat attack on the USS COLE in October of 2000.

by Mexico to the United States for incarceration.  Id. at 641.  Mexico moved to dismiss, arguing that the occurrence of contributing tortious acts or omissions outside of the United States barred application of the tortious act exception, and that Mexico was therefore immune.  Id. at 646.  The 9th Circuit rejected Mexico's argument, reasoning that Mexico's construction of the tortious act exception "would encourage foreign states to allege that some tortious conduct occurred outside the United States.  The foreign state would thus be able to establish immunity and diminish the rights of injured persons seeking recovery.   Such a result contradicts the purpose of the FSIA, which is to 'serve the interest of justice and….protect the rights of both foreign states and litigants in the United States Courts.'"  Id.

Consistent with the reasoning of the 9th Circuit in Olsen, the construction of the tortious act exception advocated by the SHC would undermine the purpose of the FSIA and should be rejected.  Indeed, as both the tort and the injuries giving rise to the plaintiffs' claims occurred within the United States, those claims are actionable under the unambiguous language of the tortious act exception.

The decisions cited by the SHC are not contrary.  While all of them note that the "tortious act" exception requires that the tort in question must occur in the United States, none of them construes the meaning of that requirement in circumstances even remotely similar to this one.  In Cabiri v. Ghana, 165 F.3d 193 (2d Cir. 1999), for example, plaintiffs Bawol and Efua Cabiri alleged that Bawol Cabiri was detained and tortured in Ghana and that the Ghanian government lied to his wife about his whereabouts.  The court held that Efua Cabiri's claim for intentional infliction of emotional distress fell outside the "tortious act" exception to the FSIA because, regardless of how it was styled, it was in essence a claim arising from a misrepresentation and thus explicitly excluded from the reach of the "tortious act" exception, which, by its terms, does not apply to claims "arising out of malicious prosecution, abuse of process, libel, slander,

misrepresentation, deceit, or interference with contractual rights . . . ." <u>Cabiri</u>, 165 F.3d at 200-201; see also 28 U.S.C. § 1605(a)(5)(B).  The <u>Cabiri</u> court thus had no occasion to consider whether any of the "tortious acts" in question occurred in the United States; it merely noted, in a footnote that is plainly dicta, that "this exception "covers only torts occurring within the territorial jurisdiction of the United States."  165 F.3d at 200 n.3.  The court expressed no opinion as to whether the facts of Cabiri would fall within this definition, but the fact that Mr. Cabiri was tortured in Ghana, while the victims of the September 11 attacks were murdered in the United States, would render any such analysis inapplicable in this case.

 <u>Hirsh v. State of Israel</u>, 962 F.Supp. 377 (S.D.N.Y.), aff'd, 133 F.3d 907 (2d Cir. 1997), also cited by the SHC, is similarly off-point.  In <u>Hirsh</u>, Holocaust survivors sought to recover reparation payments pursuant to terms of a treaty entered into by Germany and Israel. The court found that the only activity that had occurred in the United States was "the "signing and depositing of the treaty in U.N. headquarters in N.Y. as an international treaty or agreement" and that plaintiffs did not allege any tort arising from that signing.  Here, by contrast, the attack of September 11 took place in the United States and plaintiffs' claims arise from that attack.  In that circumstance, the <u>Hirsh</u> court's recitation of the rule that the tort in question must "take place within the territorial jurisdiction of the United States" in no way undermines plaintiffs' claims.

  **(4) The Sponsorship of Terrorism is not a "Discretionary Function"**

 The SHC also contends that its acts fall within the "discretionary function" exclusion of § 1605(a)(5)(A).  But courts have refused to recognize a foreign official's "discretion" to violate international law or the laws of their own country or to commit crimes against humanity.  <u>Liu v. Republic of China</u>, 892 F.2d 1419 (9th Cir. 1989); <u>Letelier v. Republic of Chile</u>, 488 F.Supp. 665 (D.DC. 1980).  Plaintiffs hereby incorporate by reference and respectfully refer the Court to their arguments on this point set forth in the their opposition to the Sultan Consolidated Motion; in the

Burnett plaintiffs' Memorandum of Law in Opposition To Motion Of Prince Sultan To Dismiss The Claims Against Him submitted in the D.C. District Court; the Sur-Reply Memorandum Of Law In Further Opposition To Motion Of Sultan Bin Abdulaziz Al-Saud To Dismiss The Claims Against Him, also submitted in the D.C. District Court; in the Federal plaintiffs' Memorandum of Law in Opposition to Prince Turki's Motion to Dismiss at pp. 18-20; and in the Federal plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of Prince Sultan, at pp. 9-13.

**(5)      Sections 1605(a)(5) and 1605(a)(7) are not Mutually Exclusive**

The SHC's argument that the "state sponsor of terrorism" exception provides the exclusive basis for obtaining jurisdiction in the present case is particularly disingenuous.

Congress created the exception set forth in §1605(a)(7) to create subject matter jurisdiction for claims arising from injuries sustained outside the United States.  For obvious reasons, the circumstances in which the courts of the United States may exercise such extra-territorial jurisdiction must be more limited than where the injury occurs here.  Thus, §1605(a)(7) is properly viewed as creating extra-territorial jurisdiction for certain specific types of torts, all of which fall within the broader umbrella of the tortious act exception where the resulting injury occurs in the United States.

This view of the interplay between the tortious act exception and §1605(a)(7) is supported by the case law.  As the District Court for the District of Columbia observed:

> As 28 U.S.C §1605(a)(5) already provides jurisdiction for state-sponsored terrorist acts in the United States, the state-sponsored terrorism exception would be redundant if it were held to apply only within the United States.

Flatow, 999 F. Supp. at 15.  Indeed, well before Congress adopted § 1605(a)(7), the courts consistently interpreted the tortious act exception to provide jurisdiction over foreign sovereigns for the types of conduct described in §1605(a)(7), where the resulting injury occurred in the United States.  For example, in Liu, the Court concluded that jurisdiction existed over Taiwan in

21

a case arising from the assassination of a Taiwanese expatriate living in California.  <u>Liu</u>, 892

F.2d at 1430-31.  Similarly, in <u>Letelier</u>, the court found that the tortious act exception provided

jurisdiction over Chile for the assassination of a former Chilean diplomat in Washington, D.C.

<u>Letelier</u>, 488 F. Supp. at 674.  On the most fundamental level, both of these cases involved

claims based on a foreign sovereign's participation in an "extra-judicial killing," one of the

specific categories of conduct for which Congress later provided extra-territorial jurisdiction

under §1605(a)(7).  In light of <u>Liu</u> and <u>Letelier</u>, it is beyond dispute that the tortious act

exception provides jurisdiction over a foreign state for all the categories of conduct described in

§ 1605(a)(7), provided that the resulting injury occurs in the United States, as is the case here.

### D.    This Court May Exercise Personal Jurisdiction Over the SHC

The SHC's assertion that the complaints fail to make out a *prima facie* showing of

personal jurisdiction, and therefore that the exercise of personal jurisdiction over it would violate

due process, is equally unconvincing.[19]  The Supreme Court repeatedly has held that the due

process clause of the Fourteenth Amendment permits personal jurisdiction so long as the

defendant has certain minimum contacts with the forum such that maintaining the suit there does

not offend traditional notions of fair play and substantial justice.  <u>Calder v. Jones</u>, 465 U.S. 783,

788 (1984).[20]  In an action involving the harm caused by an intentional tort, the plaintiff's

contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in

their absence."  <u>Id.</u>  Consistent with this principle, the courts have consistently held that due

process is not violated by the exercise of jurisdiction over those who deliberately target our

---

[19] Although the Second Circuit has held that foreign states are entitled to the protections of the due process clause, the Supreme Court has not yet addressed the issue.  Plaintiffs recognize that this Court is bound by Second Circuit precedent, but reserve their right to argue, on any potential appeal, that the SHC is not entitled to due process protections in the event that it is an agency or political subdivision of Saudi Arabia.

[20] To the extent the Court deems any claims to be subject to the FSIA, personal jurisdiction is satisfied by subject matter jurisdiction plus valid service.  Moreover, acts committed in a jurisdiction by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction.  <u>Simon v. Phillip Morris, Inc.</u>, 86 F. Supp.2d 95, 99 (E.D. N.Y 2000) (citation omitted).

citizens.  Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F.Supp.2d 54 (D. D.C. 2003);

Daliberti v. Iraq, 97 F. Supp. 2d 38, 54 (D. D.C. 2000); Rein v. Socialist People's Libyan Arab

Jamahiriya, 995 F. Supp. 325 (E.D. N.Y. 1998).

In making a *prima facie* case for personal jurisdiction under the foregoing standards,

plaintiffs are not limited to their pleadings.  Rather, that case may be established through

pleadings and affidavits.  See Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.

1986).  Moreover, plaintiffs are not required to know or to plead all possible jurisdictional

grounds from the outset of the case.  To the contrary, the relevant statutory scheme anticipates

and allows for liberal amendments as to jurisdiction. See 28 U.S.C. § 1653. That is particularly

true where the factual predicates are complex and the parties numerous, as herein. Moreover, in

evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings

and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor.

PDK Labs v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).  In addition, the Court "must read

the Complaint liberally, drawing all inferences in favor of the pleader." IUE AFL-CIO Pension

Fund v. Herrmann, 9 F.3d 1049, 1052 (2d Cir. 1993).

### (1)     The SHC Directed its Conduct at the United States

In the present case, the plaintiffs have satisfied their burden to make a *prima facie*

showing of personal jurisdiction over the SHC, pursuant to the applicable standards set forth

above.  As described above, the SHC has, for a period of many years, served as a major conduit

for channeling financial and logistical support to al Qaida.  The SHC has "employed" senior al

Qaida operatives, including al Qaida members directly involved in plots to attack the United

States.  In fact, the SHC's headquarters in Sarajevo were used as a base for planning and

coordinating terrorist operations.  Based on this and other evidence of the SHC's pervasive

sponsorship of al Qaida, the Financial Police for the Federation of Bosnian-Herzegovina's

Ministry of Finance have described the SHC as an al Qaida front.  These facts plainly establish that the SHC has, for a period of many years, directly supported al Qaida.

In knowingly sponsoring and directly participating in al Qaida's campaign to attack America, the SHC necessarily directed its conduct at the United States, as it has been publicly known, since at least the mid-1990's, that al Qaida was engaged in a global campaign of terror directed against the United States.  Thus, the exercise of jurisdiction over the SHC for claims arising from its sponsorship of al Qaida complies with due process.  For a complete discussion of the evidence demonstrating that the United States and its nationals were the primary avowed targets of al Qaida, plaintiffs respectfully refer this Court to their memorandum of law submitted by the Burnett  plaintiffs in opposition to the motion to dismiss filed by Hamad Al-Husaini, and to the Affirmation of Andrea Bierstein accompanying it, as well as to the exhibits annexed to the affirmation, and to memorandum of law and exhibits submitted in opposition to the Sultan Consolidated Motion, all of which are incorporated herein by reference.

> **(2)     Plaintiffs Should Be Afforded An Opportunity to Conduct Discovery Relative to the SHC's Contacts with the United States**

Plaintiffs anticipate that jurisdictional discovery relative to the SHC's fund-raising activities would reveal significant contacts between the SHC and the United States.  The research conducted to date suggests that the SHC may have solicited donations from within the United States through the Internet.  In particular, the Saudi Network Information Center, a non-profit entity operated by King Abdulazizz University for Science and Technology, maintains on its English language website links to the websites of numerous Saudi organizations.  That list includes a link to a now defunct website for the "High Commission for Relieving Bosnia and Hertsocnia," which the plaintiffs believe to be a website previously maintained by defendant SHC.  See List of Saudi Organizations from www.saudinic.net.sa/cat/org.sa.html, Carter Aff.,

Exh. 7.  Given the ease with which this website was identified through English language searches, it is reasonable to anticipate that discovery would reveal that the SHC did solicit donations from the United States via the Internet.  The use of the Internet by the SHC to solicit and facilitate fund-raising from within the United States would, in and of itself, establish sufficient minimum contacts to satisfy due process considerations.  Thomas Publishing Co. v. Industrial Quick Search, Inc., 237 F. Supp. 2d 489, 492-93 (S.D. N.Y. 2002).

**IV.    CONCLUSION**

For all of the foregoing reasons, plaintiffs respectfully submit that the Motion to Dismiss of the SHC should be denied in its entirety.