# EXHIBIT 2

United Nations

**S**/2003/1070



# Security Council

Distr.: General
2 December 2003

Original: English

**Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council**

In accordance with paragraph 13 of Security Council resolution 1455 (2003), I have the honour to transmit herewith the second report of the Monitoring Group established pursuant to Security Council resolution 1363 (2001).

I should be grateful if the attached report could be brought to the attention of the Council members and issued as a Security Council document as soon as possible.

(*Signed*) Heraldo **Muñoz**
Chairman
Security Council Committee established pursuant to
resolution 1267 (1999) concerning Al-Qaida and the
Taliban and associated individuals and entities

**Annex**

**Letter dated 3 November 2003 from the Chairman of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) addressed to the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities**

On behalf of the members of the Monitoring Group established pursuant to Security Council resolution 1363 (2001) and assigned, pursuant to resolution 1455 (2003), to monitor for a period of 12 months the implementation of the measures referred to in paragraph 8 of the latter resolution, I have the honour to enclose the second report in accordance with paragraph 13 of resolution 1455 (2003).

(*Signed*) Michael **Chandler**
Chairman
Monitoring Group pursuant to resolution 1390 (2002)

(*Signed*) Hasan **Abaza**
Expert member

(*Signed*) Victor **Comras**
Expert member

(*Signed*) Philippe **Graver**
Expert member

(*Signed*) Surendra **Shah**
Expert member

**Enclosure**

### Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban and individuals and entities associated with them

**Summary**

The Security Council, on 17 January 2003, acting under Chapter VII of the Charter of the United Nations, adopted resolution 1455 (2003), in which it decided to improve the implementation of measures imposed under its resolutions 1267 (1999), 1333 (2000) and 1390 (2002) against Osama bin Laden, Al-Qaida, the Taliban and individuals or entities associated with them. Those measures include a freeze of financial and economic assets, a travel ban, and an arms embargo. They are to be applied by all States against individuals and entities designated by the Al-Qaida and Taliban sanctions Committee.

A Monitoring Group of experts was reappointed in accordance with paragraph 8 of resolution 1455 (2003), and instructed to monitor and report on the implementation of the measures by States and to follow up on leads relating to any incomplete implementation. This is the second report of the Monitoring Group. It supplements information provided in the Group's previous report (S/2003/669 and Corr.1) and provides a more in-depth analysis of specific problems associated with the implementation. The report also contains an assessment of reports submitted by States pursuant to paragraph 6 of resolution 1455 (2003). Some 83 such reports have been submitted so far. The assessment is contained in appendix VI to this report.

Al-Qaida ideology has continued to spread, raising the spectre of further terrorist attacks and further threats to international peace and security. A synopsis of the terrorist attacks, allegedly linked to Al-Qaida network, carried out since the Group's last report is included in this report. More and more of these attacks are being perpetrated by suicide bombers. No region has been spared from such terrorist activities.

Iraq has become a fertile ground for Al-Qaida. It is readily accessible to Al-Qaida followers anxious to take up the battle against the coalition forces and other "Crusaders". The attack on the United Nations headquarters in Baghdad on 19 August 2003, followed a month later by one against the headquarters of the International Committee of the Red Cross, also in Baghdad, were yet further signs of the appalling lengths to which the terrorists are prepared to go in their indiscriminate war.

Progress is being made, worldwide, by law enforcement agencies, and military and security forces, in dealing with Al-Qaida and in hunting down and neutralizing its operatives and supporters. In South-East Asia, the arrest in Thailand of one of the principal leaders of the Jemaah Islamiyah, Nurjaman Riduan Isamuddin, also known as Hambali, and the death of Fathur al-Ghozi following a shoot-out with security forces in the southern Philippines highlight the ongoing successes in this global operation.

The Group has reiterated in each of its reports the importance the United Nations consolidated list plays in the implementation of the measures provided for in the resolutions. While the list has grown in numbers, it has not kept pace with the actions taken, or the increased intelligence and other information available, concerning Al-Qaida, the Taliban and associated individuals and entities. The current list contains a

total of 371 names of individuals and entities. This represents only a small subset of individuals and entities associated with Al-Qaida network. It reflects a continuing reluctance on the part of many States to provide such names to the Al-Qaida and Taliban sanctions Committee. In many cases States have preferred to communicate such information only through bilateral channels. The Group continues to believe that further action is needed to encourage all States to provide the Committee with the names of all the individuals and entities known by them to be associated with Al-Qaida network. More effort is also required to ensure that border control authorities in each State are provided with, and apply, the most recently updated version of the list.

Important progress has been made towards cutting off Al-Qaida financing. A large part of its funds have been located and frozen, and many of the key financial managers have been incarcerated. The international financial community is devoting significantly increased resources to this effort. Yet many Al-Qaida sources of funding have not been uncovered, and Al-Qaida continues to receive funds it needs from charities, deep-pocket donors, and business and criminal activities, including the drug trade. Extensive use is still being made of alternative remittance systems, and Al-Qaida has shifted much of its financial activity to areas in Africa, the Middle East and South-East Asia where the authorities lack the resources or the resolve to closely regulate such activity. The Counter-Terrorism Action Group sponsored by the Group of Eight is beginning to address this issue.

Controlling charities used, or abused, for purposes that support terrorism is proving extremely difficult. The close association of such charities with both religious and humanitarian relief purposes has made government regulation and oversight very sensitive. One important example of the use by Al-Qaida of charities and the difficulty of dealing therewith, touches directly on the activities of one of the largest Islamic charities, the International Islamic Relief Organization. Most of that organization's activities relate to religious, educational, social and humanitarian programmes, but it and some of its constituent organizations have also been used to assist in Al-Qaida financing. Concern has also surfaced regarding the activities of the Al-Haramain Islamic Foundation. The Somalia and Bosnia branches of Al-Haramain have already been designated for their Al-Qaida funding activities. Questions have now also arisen concerning the activities of other Al-Haramain branches.

Even when charities have been designated, it has proved difficult to shut them down. Al-Haramain offices continue to function in Somalia. Other designated charities, including the Global Relief Foundation, the Rabita Trust, Al-Rashid Trust and Lajnat al-Daawa al-Islamiya continue in operation. A number of the charities implicated in Al-Qaida funding are also engaged in business ventures to supplement their revenues. Little is yet known concerning those assets and activities.

The use of shell companies and offshore trusts to hide the identity of individuals or entities engaged in the financing of terrorism is also a difficult problem. Such arrangements serve to mask potential terrorist-financing activities, and make it difficult to locate and deal with terrorist-related financial assets other than bank accounts. The issue is complicated further by a reluctance on the part of States to freeze tangible assets such as business or property. The Group has looked closely at the activities of two designated individuals, Youssef Nada and Idris Nasreddin, in this respect, and concluded that shell companies, offshore trusts and other beneficial ownership arrangements have allowed them to circumvent the full application of the measures set out in the resolutions.

While great importance has been put on limiting the mobility of individuals linked to Al-Qaida, there have been no reports yet from any State that a designated individual has sought entry into or has been stopped from entering or transiting their country. Almost a third of the countries that have submitted the required "90-day" reports to the Committee have indicated that they have not yet incorporated all the names on the United Nations consolidated list in their "national stop lists". Only about a half of the States report that they regularly transmit updated lists to their border services. The continuing lack of identifiers has also been sited as a major obstacle to the inclusion of names in national stop lists.

The Group is also concerned that the whereabouts of many designated individuals remain unknown. Of the 272 designated individuals, only a few have been accounted for. This calls for more proactive measures by States to enforce the objectives of the travel ban.

The arms embargo is another area of concern. The Group continues to encounter serious difficulties in monitoring and reporting on the implementation of the embargo. Countries are reluctant to provide information concerning their seizures of illegal weapons and explosives believed destined for Al-Qaida, the Taliban and their associates.

During this reporting period the Group visited several countries in the Middle East. Many were aware that weapons were crossing their borders, but indicated that they had great difficulties in controlling such illegal traffic. Both Saudi Arabia and Yemen, for example, confirmed that weapons and explosives used in the recent terrorist attacks in Saudi Arabia had been smuggled across their 1,100-mile common border. Yemeni officials informed the Group that most of the illegal weapons entering the country were coming from Somalia. The Group is also concerned about reports indicating that weapons are being smuggled out of Iraq, including shoulder-fired missiles.

The international community must remain alert also to the increasing availability of man-portable air-defence systems to non-State actors. The Group considers it important that measures be initiated by the United Nations to harmonize the various controls necessary to ensure that such missiles cannot be acquired by Al-Qaida or its associates.

The scope of the Security Council resolutions and their incomplete implementation appear unable to stop Al-Qaida, the Taliban and their associates from obtaining whatever weapons and explosives they need, where and whenever they need them, to effect attacks, many of which have devastating results.

The risk of Al-Qaida members acquiring and using weapons of mass destruction also continues to grow. They have already taken the decision to use chemical and biological weapons in their forthcoming attacks. The only restraint they are facing is the technical complexity of operating them properly and effectively. Their possible use of a dirty bomb is also of great concern.

Following its intensive review of the implementation of the measures provided for in the resolutions, the Group has concluded that further steps are required to strengthen the measures and their application. **Without a tougher and more comprehensive resolution — a resolution which obligates States to take the mandated measures — the role played by the United Nations in this important battle risks becoming marginalized.**

The Group has addressed a number of these issues in this report and provides a list of recommendations beginning at paragraph 174.

## I.  Introduction

1.     After the submission of its first report (S/2003/669 and Corr.1) under resolution 1455 (2003), the Monitoring Group was requested by the Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities to concentrate on more specific aspects of the implementation, by States, of the measures called for under resolutions 1390 (2002) and improved by resolution 1455 (2003). In its previous reports the Group had identified a number of themes which demanded more attention. Among these were the abuse of certain charities or humanitarian foundations; the freezing of assets other than financial ones and the impact of not listing individuals known to have been trained by Al-Qaida or associated terrorist groups. These themes have been used as the basis for the case studies on which the Group has based the on-the-ground monitoring aspects of this report.

2.     An important aspect of resolution 1455 (2003) is the "90-day" reports called for from States and the analysis derived from the information provided to the Committee in those reports. In order to ensure that the reports could be thoroughly analysed without impeding the expert members of the Group in their primary monitoring role, the Group was augmented for this reporting period by three additional consultants. Their primary task has been an in-depth analysis of all the 90-day reports.

3.     Attached at appendix VI is their analysis and findings based on those reports submitted by this report. Aspects of their findings have also been incorporated in the relevant sections of this, the second, report of the Group requested under resolution 1455 (2003).

4.     In addition to discharging its mandated tasks the Group has, during the period covered by this report, participated in the plenary meeting of the Financial Action Task Force (FATF) in Stockholm and in the Joint United Nations Inter-regional Crime and Justice Research Institute/Europol initiative against the illegal movement of chemical, biological, radiological or nuclear weapons, in Turin, Italy. It has also briefed the Counter-Terrorism Working Group of the European Union (EU) on the work of the Committee and the Group, the EU External Relations Working Group of Counsellors (RELEX Group) on the practicalities of monitoring sanctions, and the Office of the United Nations Security Coordinator on the global threat posed by Al-Qaida.

## II.  Al-Qaida: a global network and an ideology

5.     In its last report the Group painted an image of Al-Qaida as more than just a loose network of like-minded Islamic extremist groups. Al-Qaida also has to be seen as an ideology, to which many young Muslims are being drawn. Subsequent events have confirmed this perspective, which must be viewed with great concern. A synopsis of the terrorist attacks, allegedly linked to Al-Qaida network, which have been carried out since the Group's last report is attached at appendix I.[a] More and more of these attacks are being perpetrated by suicide bombers. This is another disturbing trend.

---

[a] The synopsis is by no means exhaustive. It has been included in the report to emphasize how numerous and widespread are the reports of such activity, allegedly linked to elements of Al-Qaida network or other like-minded entities which appear to follow the same sort of extremist ideology as that espoused by Osama bin Laden. The synopsis has been compiled from a variety of sources, examples of which have been included in the appendix.

6.     As Al-Qaida has spread over past decades, from a movement which had its origins in the "holy war" against the Soviet occupation of Afghanistan into a global terrorist network, it has promoted a doctrine which provides for a battleground where aspiring Jihadis can undertake their misguided duty. After the Soviet Army left Afghanistan, members of the Mujahideen took their fight elsewhere, including to Bosnia and Herzegovina, Chechnya (Russian Federation) and parts of South-East Asia. Iraq, in the immediate aftermath of the overthrow of the Saddam Hussein regime, is seen also as providing just such an opportunity.

7.     Iraq is readily accessible to followers of Al-Qaida. In view of the presence of such large numbers of foreign and non-Muslim troops, it is proving to be an ideal "battleground" for followers of the Osama bin Laden-inspired "World Islamic Front for Jihad against the Jews and Crusaders".

8.     Initially, attacks against coalition forces in Iraq had the appearance of typical guerrilla-war tactics and were put down to Baath party loyalists and mafia-like criminal elements of the former Saddam Hussein regime. As the incidence and spread and ferocity of the attacks increased, so too did reports of "foreign fighters" becoming involved. There are reports of the resurgence, inside Iraq, of Ansar al-Islam, an Islamic extremist group, closely associated with Bin Laden's Al-Qaida network. The presence of other "foreign fighters" has been reported as the coalition forces have obtained better intelligence and made a number of key arrests, including 19 Al-Qaida suspects.[a]

9.     The attack on the headquarters of the United Nations Assistance Mission for Iraq in Baghdad on 19 August 2003 was yet another sign of the appalling lengths to which the terrorists are prepared to go in their indiscriminate war. A hitherto unknown group, calling itself the Abu Hafs al-Masri Brigades, associated with Al-Qaida, claimed responsibility for the attack, although this has not been officially confirmed. Other reports, however, have suggested that the attack may be attributable to groups supporting Saddam Hussein. Tragically an attack on a major United Nations facility should come as no surprise. Ayman al-Zawahiri, Osama bin Laden's deputy, personal physician and éminence grise, put the United Nations at the top of his list of the enemies of Islam in his book *Knights under the Prophet's Banner*.[b] Previous attempts to attack United Nations facilities elsewhere in the world had fortunately been foiled.

10.    Further confirmation of the "foreign elements" becoming involved in the Iraq situation came, apparently, on 27 September 2003 with the capture of an attempted suicide bomber of Syrian origin. He was just one of five attackers on that first day of the Holy Festival of Ramadan during which Baghdad saw a wave of suicide bomb attacks, culminating in 34 deaths and more than 200 persons injured. The fact that one of the targets was the headquarters (in Iraq) of the International Committee of the Red Cross (ICRC) emphasizes, yet again, the lengths to which the extremists are prepared to go. Even innocent Muslims are seen as expendable along with the designated enemies of Al-Qaida and its many associates.

11.    Coordinated, multiple attacks, involving suicide bombers, bear the hallmarks of the contemporary Al-Qaida network. It is important that the international community

---

[a] L. Paul Bremer III, United States Chief Administrator in Iraq, at a press conference at the Pentagon, Washington, D.C., on 26 September 2003.
[b] As published (in extracts) in *Al-Sharq al-Awsat* (London), 2 December 2001.

sees Al-Qaida network for what it is, no matter how defined — as a network, movement, loose affiliation and/or ideology. One should not seek to differentiate between its associated groups, elements and individual supporters. Too often the Group reads or hears that this or that individual or entity "… is not Al-Qaida"! To adopt this approach to the network or the ideology demonstrates a failure to recognize the true nature of the threat with which the international community has to deal.

12.   Elsewhere in the world law enforcement agencies and military and security forces, depending on the local situation, continue to hunt and neutralize individuals and entities associated with, or drawing their inspiration from, Osama bin Laden or similarly disposed preachers. In Afghanistan, in the regions bordering Pakistan, there has been a significant resurgence of the Taliban during the summer months, with numerous attacks against aid workers, innocent civilians, local security forces and troops of the coalition, resulting in more than 300 deaths (see appendix I). There are reports of foreign elements, from Chechnya, Uzbekistan and some Arab States, fighting alongside the Taliban, as well as elements of Gulbuddin Hekmatyar's Hezb-e Islami.

13.   In South-East Asia, the arrest in Thailand of one of the principal leaders of the Jemaah Islamiyah, Nurjaman Riduan Isamuddin, also known as Hambali, and the death of Fathur al-Ghozi following a shoot-out with security forces in the southern Philippines highlight the ongoing successes in this global operation. During the reporting period Indonesia has brought to justice some of those involved in the Bali nightclub bombings of October 2002. Abu Bakar Bashir was arraigned on charges of treason and being involved in a wave of bombings against 38 churches in 11 Indonesian cities on Christmas Day 2000, but in the end he was imprisoned for only four years. Despite Abu Bakar Bashir being the spiritual head of the Jemaah Islamiyah, the Indonesian authorities are clearly reluctant, even now, to have him designated on the list. It is the view of the Group that there is little point in designating entities on the list if the individuals responsible for the entities are not also designated at the same time.

14.   Other extremist groups in South-East Asia, connected with the Jemaah Islamiyah, continue to be active. The Moro Islamic Liberation Front continues to operate camps in the southern Philippines, in which recruits for the Abu Sayyaf group and the Jemaah Islamiyah are trained, for their ongoing attempts to form a break-away Islamic State. In Europe and elsewhere, new arrests of Al-Qaida members and their associates, in conjunction with the breaking-up of cells, have resulted in the fragmentation of the organization. But new cells form, highlighting the continuing existence of the network and its resilience. Al-Qaida, per se, through the spread of its ideology, has been able to decentralize its operations, relying on the many like-minded extremist groups around the world to continue fighting its global jihad.

## III.   The consolidated list

15.   The Group has reiterated in each of its reports the importance of the consolidated list, and its essential role in the implementation of the measures provided for in the resolutions directed against Osama bin Laden, Al-Qaida, the Taliban and associated individuals and entities. The initial list, published in November 2001, contained 90 names and 85 entities associated with Al-Qaida, and 152 names associated with the Taliban. The current list contains 129 names associated with Al-Qaida, and 143 names associated with the Taliban.

16.   In resolution 1455 (2003) the Security Council sought to strengthen the provisions of resolution 1390 (2002) by stressing further to all States the importance of submitting to the Committee the names and identifying information, to the extent possible, of and about members of Al-Qaida organization and the Taliban and other individuals, groups, undertakings and entities associated with them. Despite that appeal, many States have continued to show reluctance to providing such names to the Committee even as they take actions against such persons or entities, or provide information to other countries through limited bilateral channels.

17.   Although the list has grown in numbers, it has not kept pace with these actions, or the increased intelligence and other information available concerning Al-Qaida, the Taliban and those associated therewith. Only 272 individuals associated with Al-Qaida network have been designated on the list, despite the fact that some 4,000 individuals[a] have been arrested or detained on the basis of their links with Al-Qaida in 102 countries.[b] This lacuna continues to severely limit the application of the resolutions and their overall contribution to the war on terrorism. Appendix II to the present report provides a list of 45 individuals who have, since the Group's last report, been publicly identified as having been warranted, detained or arrested on suspicion of links to Al-Qaida network. None of these names has been proposed to the Committee for listing. The Group is pleased to note however that some individuals, named in similar appendices to its earlier reports, were subsequently submitted to the Committee for designation.

18.   The Group reiterates its previous recommendation that States become more proactive in proposing the names of persons known to have been recruited and trained for terrorist-related activities, and entities known to be associated with the network. The Group continues to believe that all persons who have been trained by Al-Qaida for terrorism-related purposes should be identified to the Committee and should be presumed to be Al-Qaida associates for the purposes of the list. The Group considers this an important adjunct to disrupting further the ability of the network to operate and of its members to move freely between countries.

19.   During the reporting period members of the Group visited a number of countries to determine what actions countries have taken with regard to the maintenance and application of the list. The Group wanted to learn what steps Governments were taking to inform the Committee of individuals and entities that should be added to the list, and to keep the Committee advised regarding their appropriate identification. The Group directed specific inquiries to Egypt, Jordan, Kuwait, Lebanon, Morocco, Pakistan, Saudi Arabia, the Syrian Arab Republic and Yemen. It also visited all of those countries except Pakistan and Saudi Arabia. All of the countries have reported the arrests of individuals allegedly belonging to the Taliban and Al-Qaida. The Group is concerned that, in most cases, the countries chose not to propose any of those individuals to the Committee. Saudi Arabia disclosed the name of one individual (Wa'el Hamza Julaidan, a Saudi national) and two entities (Al-Haramain Islamic Foundation Bosnia and Herzegovina and Al-Haramain Islamic Foundation Somalia), in conjunction with the United States of America.

---

[a] The Group is seeking the assistance of the United States Government to cross-check the names in appendix II and the United Nations list with this figure of about 4,000.

[b] Rohan Gunaratna, "The new Al-Qaeda: developments in the post-9/11 evolution of Al-Qaeda". Paper presented at the Conference on Bin Laden and Beyond, CIA headquarters, Langley, Virginia, United States of America, 2 September 2003.

20.   On 19 August 2003, the Group officially communicated its intention to visit the capitals of the above-mentioned countries by sending formal letters to their Permanent Representatives to the United Nations in New York. The Group did not receive any objections. The Syrian Arab Republic was the only country that communicated with the Group asking for a change of the date of the Group's visit to its capital. The request was then approved.

21.   The outcome of the planned visits can be summarized as follows:

     (a)   **Saudi Arabia**. The Group had originally visited Saudi Arabia in April 2003. A follow-up visit was planned for September 2003 but did not take place because the Permanent Mission of Saudi Arabia to the United Nations did not receive an approval from the capital.

     (b)   **Kuwait**. The Group met with government officials. The answer given to the Group in regard to the individuals detained (Kuwait arrested 8 individuals) was that none of those detained individuals had admitted to belonging to Al-Qaida and that Kuwait could not disclose their names without judicial findings of culpability. Some cases are still under investigation and, if it is proved that the individuals belong to Al-Qaida, their names will be submitted to the Committee. Following up, the Group asked about the whereabouts of several Kuwaiti nationals, members of Al-Qaida, who had attended training camps in Afghanistan and been repatriated to Kuwait. Officials of the Ministry of Foreign Affairs promised to look into that list of names and to update the Group as soon as possible. The list shows that the Wafa Humanitarian Organization has an address in Kuwait. The Kuwaiti officials denied however that it now has a presence there.

     (c)   **Yemen**. The Government of Yemen informed the Group of its inability to provide it with the names of the persons detained because none of them had admitted to belonging to Al-Qaida and because of the lack of judicial findings of culpability. The Group notes, however, the statement made by the Prime Minister of Yemen, Abdulqader Bajammal:

     "Moreover, the results of investigations and interrogation with those who are charged in the criminal terrorist acts that took place in the past period showed a direct relationship between extremist elements in some political parties and elements of Al-Qaida organization."[a]

Government officials were asked about the arrests related to the U.S.S. *Cole* incident. It has been reported that six of the individuals involved are at large, two were killed and two detained. The names of those detained have not been submitted to the Committee. The authorities promised the Group that those names will now be submitted to the Committee for inclusion in the list. The Group also asked about the whereabouts of several Yemeni nationals who had attended training camps in Afghanistan and were repatriated to Yemen. The authorities promised to look into this issue and provide an update to the Group as soon as possible.

     (d)   **Egypt**. The Group reminded Egyptian government officials that a letter had been sent to them by the United Nations Secretariat asking them to provide additional identifying information with regard to specific names already on the list.

---

[a] "Facts for the people: Terror in Yemen — where to?". Report of the Government of Yemen to the Council of Deputies on terrorist operations and the damages to Yemen. "26 September" Publications, Yemen, December 2002.

Egypt denied receiving any letter in this regard. The Group reiterated the request and provided the officials with the same list of names.

(e)  **Lebanon**. The Group received copies of the investigation files in regard to the bomb attack on a McDonald's restaurant in Beirut. These files are in Arabic and have been turned over for translation. The Group encouraged the Lebanese authorities to provide the names to the Committee in accordance with Committee guidelines.

(f)  **Jordan**. The Group met with officials of the Ministry of Finance, the Directorate of Public Police, the Central Bank and the Ministry of Transportation. Little new information was forthcoming, however. None of the questions raised by the Group was answered. The Group was, however, given a commitment by the acting Minister for Foreign Affairs that he would look into the situation and make further contact with the Group. To date no further contact has been made.

(g)  **Syrian Arab Republic**. The list now includes only one name associated with the Syrian Arab Republic, an individual of dual German/Syrian nationality. The Syrian officials who met with the Group promised to look into the situation and provide the Group with additional information and identifiers concerning that individual.

(h)  **Morocco**. The Group engaged Moroccan officials in discussions regarding the listing of individuals and entities and sought information concerning those responsible for the Casablanca bombings. The Group was informed that no names had been provided as the Government of Morocco had not yet officially established that any of those persons were linked to Al-Qaida. The Group advised the authorities to formally submit the names to the Committee as soon as any such link was found.

22.  The Group was generally surprised to observe that few, if any, officials, in most of the countries visited, were aware of the measures in resolution 1455 (2003) and its provisions regarding the submission of names, and the listing and delisting procedures associated with the list. Those countries that were aware of the requirements relied heavily on the exemption clause in the resolution, referring to the possibility of compromising investigations or enforcement actions. This appeared to the Group to be more in the nature of an excuse than an actual impediment to providing such names.

23.  Throughout the visits there appeared to be little or no knowledge regarding the work of the Committee or the Monitoring Group and the availability of information about the Committee and its United Nations web site. This included a lack of knowledge concerning the posting of the list. This has significantly impeded and delayed the application of updated lists. The Group also observed a serious lack of coordination between the Permanent Missions to the United Nations in New York and the capitals regarding the work of the Committee. Unfortunately this lack of coordination often jeopardizes the implementation of the relevant Security Council resolutions.

24.  Recommendations concerning the consolidated list are given in detail in paragraphs 175 to 177 below.

## IV.  Freezing of financial and economic assets

25.  In its last report to the Committee, the Group provided a comprehensive assessment of the steps that have been taken by States to carry out the measures

related to the freezing of financial and economic assets linked with Osama bin Laden, Al-Qaida, the Taliban and individuals and entities associated with them. It also provided a broad description of the resources and sources of funding that remain available to Al-Qaida and the Taliban, and the state of play in curtailing such resources and funding. On the basis of that assessment, the Committee asked the Group to supplement the information with a more in-depth analysis of the specific problems associated with the implementation of the measures.

26.   The Group recognizes that considerable progress has been made in combating the financing of terrorism as it relates to Al-Qaida, the Taliban and associated individuals and entities. An important part of their funds has been located and frozen, and many of their key financial managers have been arrested, killed or captured. Regulatory oversight and self-policing of the international banking community has improved markedly. The international community is devoting an ever-increasing amount of resources to combating the financing of terrorism.

27.   The picture painted by the 83 90-day reports that have been received so far indicates the seriousness with which most States are addressing the terrorist-financing issue. The vast majority of States have put in place new legal instruments to deal with terrorist financing and to better implement the asset freeze called for by the Security Council.[a] In most cases States have adopted specific legislation to freeze assets and otherwise deal with terrorist financing. In many cases this involves legislation to implement United Nations obligations. Several countries indicate that even without such specific legislation they are able to invoke, *ex lege*, other legislative enactments to deal with such matters.

28.   One potential shortcoming highlighted by the reports is the number of States that require judicial findings before being able to freeze assets.[b] This situation is more prevalent in civil law countries than in common law countries. While most of the countries have indicated that the judicial requirements have not impeded their capability to freeze assets, such procedures have entailed additional delays, which can reduce the effectiveness of freezing actions. The States which rely on administrative authority appear to be in a better position to take the necessary pre-emptive actions to capture and block assets.

29.   The number of reports submitted to date provides only a partial picture regarding the implementation of the measures set out in the resolutions. Only 21 of the 83 reporting countries indicated that they had frozen assets. The total amount affected by these freezing actions comes to approximately US$ 75 million (see appendix III). Pakistan, Saudi Arabia, Switzerland, Turkey and the United States alone account for about $70 million of that amount.[c] A significant part of the assets involved funds attributed to the Taliban, and they have subsequently been returned

---

[a] Seventy-two of the 83 countries reporting presented information regarding their legislative authority to carry out the measures in the resolution. Two countries indicated that they are in the process of putting such legislation in place, and four countries provided no indication as to their authority in this regard.

[b] Eleven of the reporting countries indicated that such judicial findings were a prerequisite for freezing assets.

[c] A recently published United States Treasury progress report indicates that 1,439 accounts, containing more than $136.7 million in assets, have been frozen worldwide and that countless millions in additional funds have been prevented from flowing to terrorists as a result of international actions to disrupt terrorist financing networks, deter donors, and secure the world financial system.

to the new Government of Afghanistan.[a] No States gave any indication of having frozen any tangible assets including businesses or property. Eleven of the reporting States, which had indicated the presence of Al-Qaida-related cells in their countries, provided no indication that any assets had been frozen.[b]

30.    The Group is concerned by the fact that only a very few States appear to have the authority to block assets other than bank accounts or other financial instruments. There is also little or no discussion in the reports regarding the authority of States to go beyond the designated entity or individual in order to reach and freeze assets "derived from property owned or controlled, directly or indirectly, by them or by persons acting on their behalf". Nor are there indications regarding the means by which States can "ensure that neither these nor any other funds, financial assets or economic resources are made available, directly or indirectly, for the benefit of such persons". States which rely only on money-laundering legislation are particularly limited in this regard. These are issues which will require further inquiry within the context of the country reviews conducted by the Counter-Terrorism Committee.

31.    The Group has concluded, from its research, review of reports, visits and discussions with government officials and experts that, despite the significant progress that has been made, some serious problems and systemic weaknesses remain. Many of Al-Qaida's sources of funding have not yet been uncovered or blocked. Al-Qaida continues to have access to funds through charities and deep-pocket donors, and from business and criminal activities, including the drug trade. Extensive use is being made of alternative remittance systems and cash couriers. Al-Qaida has shifted much of its financial activity to areas in Africa, the Middle East and South-East Asia where authorities lack the resources or the resolve to closely regulate such activity. There are also indications that a number of the entities and persons that have been designated on the list are still able to continue their funding activities, using trusts, front companies and other arrangements to veil their assets and activities (see paras. 67-82 below).

32.    The Group remains concerned that Al-Qaida, the Taliban, and those associated with the network are still able to obtain, solicit, collect, transfer and distribute considerable sums to support their ideological, logistical and operational activities.

33.    This section of the report will concentrate on some of the most problematic areas in the war on the financing of Al-Qaida network, including the use of charities, trusts and holding companies to mask Al-Qaida-related transactions and resources, the use of alternative remittance systems and insufficiently regulated banking facilities.

**Charities**

34.    From its inception Al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and

---

[a] See the 90-day report of the United States pursuant to resolution 1455 (2003).
[b] The reporting States are Algeria, Australia, Kuwait, Lebanon, India, the Islamic Republic of Iran, Israel, Jordan, the Russian Federation, Singapore and the Syrian Arab Republic. The Philippines also provided no indication whether any assets had been frozen, indicating that this was an issue that remained confidential in that country.

operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to Al-Qaida. The roots of these charity networks stem from the anti-Soviet jihad in Afghanistan during the late 1980s. During that time Al-Qaida could draw on the support of a number of State-assisted charities and other deep-pocket donors that supported the anti-Soviet cause.

35.   Today, Al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds. Activities range from collection boxes at mosques and Islamic centres[a] to direct fund-raising and solicitations, the merging of funds for both legitimate relief purposes and terrorism, the misuse or embezzlement of legitimate charitable funds, and the creation of front charities to channel funds from community collections or deep-pocket supporters. Al-Qaida has also benefited from, and relies heavily on, the activities of legitimate charities that support the propagation and teaching of more radical forms of Muslim fundamentalism.

36.   Controlling charities that are used, or abused, for purposes of supporting terrorism is proving extremely difficult. The close association of such charities with both religious and humanitarian relief purposes has made government regulation and oversight a very sensitive issue. Many of the charities that have been involved with Al-Qaida have also funded important humanitarian programmes in Afghanistan, Bosnia and Herzegovina, Chechnya (Russian Federation), Kosovo (Serbia and Montenegro), Pakistan, Somalia and the Sudan and in rural areas in South-East Asia.[b] In many countries, particularly in South-East Asia and the Middle East, there is a strong tradition that supports the independent operation of charities and the anonymity of their donors.

37.   The 90-day reports provide only a limited sketch of the problems associated with the use and abuse of charities, and the actions taken to deal with these problems. Before the events of 11 September 2001, few countries had sought to regulate charities or require them to report on their collection and disbursement activities. In most cases such regulations were limited to questions related to tax status. A number of countries are now beginning to take steps to deal with this difficult issue. The Governments of Kuwait and Saudi Arabia, for example, have both announced the establishment of new oversight authorities for charities in their countries.[c] The Philippines has asked for assistance from the Charities Commissioners for England and Wales of the United Kingdom. Brazil, Croatia, Cuba, Morocco and Paraguay have also indicated in their reports that new controls are in place to assure effective oversight of charities and non-governmental organizations.

---

[a] See *Arab News*, 17 September 2003, regarding restrictions now being put in place by the Government of Saudi Arabia concerning the use and regulation of collection boxes.

[b] The International Islamic Relief Organization web site, for example, lists its programmes as including "moral support and assistance in kind and in cash for poor and destitute Muslims", "comprehensive care for poor people, widows, old people and orphans", "sponsoring orphans and rendering health services, education, well drilling and teaching of the Holy Qur'an in Islamic countries", "providing relief for Muslims in Kosovo" etc.

[c] Kuwait indicated in its 90-day report that it has established a charity oversight committee chaired by the Minister of Social Affairs and Labour. It also requires prior government authorization for any bank transfers related to charities. For the measures Saudi Arabia is taking with regard to charity regulation, see "Initiatives and actions taken by the Kingdom of Saudi Arabia to combat terrorism", issued by the Government of Saudi Arabia in December 2002.

38.   Some 50 charities have reportedly been shut down in Gulf countries, and 40 more charities have come under official surveillance.[a] Saudi Arabia has announced that it has audited 245 domestic charities and frozen their external offices, shut down 12 charities and banned donation boxes at commercial stores and mosques.[b] However, the names of very few of these charities have so far been submitted to the Committee for designation.

39.   There continues to be a general reticence to act against charities, even those suspected of channelling funds to Al-Qaida, unless strong evidence is presented and judicial findings can be obtained. This higher standard of proof has inhibited the designation of charities and their inclusion in the list. Only some 17 charities or branches of charities have been designated so far by the Committee. They represent only the tip of the iceberg according to most experts in the field. Even when such charities have been listed there has been an even stronger reticence to go behind the charities, to reach to their directors, donors and fund-raisers.

40.   One important example of the use by Al-Qaida of charities and the difficulties in dealing with this issue touches directly on the activities of one of the largest Islamic umbrella charities, the International Islamic Relief Organization (IIRO) headquartered in Jeddah, Saudi Arabia. Most of that organization's activities, and the activities of its associated charities, relate to religious, educational, social and humanitarian programmes. But IIRO, and some of its constituent organizations, has also been used, knowingly or unknowingly, to assist in financing Al-Qaida. While IIRO has not been presented to the Committee for possible listing, the United States has asked Saudi Arabia to look closely into the organization's questionable activities. They have also offered to provide investigative assistance in this regard.

41.   The International Islamic Relief Organization has branch offices throughout the world, including 36 in Africa, 24 in Asia, 10 in Europe and 10 in Latin America, the Caribbean and North America. The bulk of its financial contributions come from private donations in Saudi Arabia. An endowment fund (Sanabil al-Khair) has been established to generate a stable income to finance its various activities. The charity also works in close association with the Muslim World League. Many prominent Middle East figures and financiers have associated themselves with this mainstream Islamic charity.

42.   Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to Al-Qaida, and responsible for the bombing in 1998 of the American Embassies in Dar es Salaam and Nairobi.[c] A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001.[d] After that date, Pakistan also identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan.[e]

---

[a]  These estimates were compiled by a noted terrorism expert, Amir Taheri; see Amir Taheri, "Terror's fall", *New York Post*, 12 May 2003.

[b]  See statement made by the Saudi spokesman, Adel al-Jubeir, on 18 May 2003 on *Fox News Sunday* and subsequently issued by the Royal Embassy of Saudi Arabia, Washington, D.C.

[c]  See *Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, docket Des-6-99, 2 November 1999.

[d]  The extracts from the text of this CIA report can be found on the Internet at http://www.centreforsecuritypolicy.org/cia96charities.pdf.

[e]  Associated Press, "Pakistan deporting 89 Arab aid workers", 6 October 2001.

43.   Allegations have surfaced in India and the Philippines that local IIRO officers and employees were directly implicated in Al-Qaida-related terrorist activities, including planned attacks against the American Consulates in Madras and Calcutta. The IIRO office in Zamboanga City, the Philippines, reportedly served during the early 1990s as the coordinating centre for secessionist Islamic activities, and as late as 1996 channelled money to the Abu Sayyaf group, another designated entity. That office was established and run by Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden.[a] More recently, IIRO, which operates in the United States as the Islamic Relief Organization, was tied to Soliman S. Biheiri and the Safa group of charities now under investigation in the United States for funding Al-Qaida-related activities.[b]

44.   The Safa investigation has also highlighted the problematic issue of the use and mingling of charitable funds with investment and business funds. In that investigation, information was uncovered indicating that funds were provided by IIRO to Sana-Bell, Inc., a United States corporation for investment and business purposes. Those funds were subsequently transferred through various channels to Al-Qaida operatives, and to an Al-Qaida financier, Yassin al-Qadi, a designated individual. A number of the charities that have been implicated in Al-Qaida funding, and that have been designated by the Committee, have also been engaged in business ventures to supplement their revenues.[c]

45.   Attention has also centred on the Al-Haramain Islamic Foundation. On 11 March 2002 the United States and Saudi Arabia jointly designated the Bosnia and Herzegovina and Somalia offices of Al-Haramain. A Saudi Arabia-based charity, Al-Haramain raises almost $30 million a year in donations. According to its web site, it has active branches in about 49 countries. It draws its support and funding from across the Middle East, and other Muslim centres. The Somalia and Bosnia branches had been directly implicated in Al-Qaida funding activities. Al-Haramain Somalia had funnelled money to Al-Ittihad al-Islami, a designated terrorist group, by disguising the funds as contributions for an orphanage project and for Islamic school and mosque construction. The Bosnia office was linked to Al-Jemaah al-Islamiyah al-Masriyah and to Osama bin Laden.

46.   Al-Haramain's offices in Indonesia have also been implicated in the funding of the Bali bombing. Omar al-Farouq, the Al-Qaida senior representative in South-East Asia, who was arrested in June 2002, told interrogators that Al-Haramain was the "principal source" of funding for the Indonesian Islamic group suspected of carrying out that attack.[d] Al-Haramain has also continued as a conduit for funding to the Jemaah Islamiyah, another designated entity. Many of the leaders of the Jemaah Islamiyah also reportedly continue as branch officers and members of Al-Haramain.[e] The Government of the Russian Federation has also complained to Saudi Arabia about funding provided by Al-Haramain to Chechen rebels.

_____

[a] See testimony of Matthew A. Levitt, United States Senate Judiciary Committee, Subcommittee on Terrorism, 10 September 2003. See also Zachary Abusa, "Tentacles of terror: Al Qaeda's Southeast Asian network", in *Contemporary Southeast Asia*, December 2002, pp. 427-465.

[b] See *United States of America v. Soliman Biheiri*, Declaration in support of pre-trial detention by David Kane, Special Agent, United States Bureau of Homeland Security, 14 August 2003.

[c] Ibid.

[d] See *Christian Science Monitor*, 18 December 2002.

[e] See testimony of Stephan Emerson before the United States Senate Committee on Government Affairs, 31 July 2003; see also Zachary Abusa, loc. cit.

47.   In May 2003, Saudi Arabia asked the Al-Haramain Islamic Foundation and all Saudi charities to suspend activities outside Saudi Arabia until a security clearance mechanism, to screen all personnel, could be implemented. This order applied to branches in Albania, Bosnia and Herzegovina, Croatia, Ethiopia, Kenya, Kosovo, Indonesia, Pakistan, Somalia and the United Republic of Tanzania.[a]

48.   Al-Haramain's General Manager, Sheikh Aqeel al-Aqeel, is now under investigation in Saudi Arabia, regarding indications that other branches of Al-Haramain may also have been engaged in such activities. Al-Haramain has also been closed by authorities in Kenya after having been linked to those responsible for the bombing in 1998 of the United States Embassy there. It has also been asked to close its doors in Albania, Croatia and Ethiopia. In response to enquiries from the Group the Permanent Mission of Albania to the United Nations wrote on 1 October 2003 that the Albanian Ministry of Finance had acted to freeze the bank accounts of the Al-Haramain Islamic Foundation. The Group has addressed similar enquiries to Croatia, Ethiopia, Indonesia, Kenya, Pakistan and the United Republic of Tanzania but has to date received no responses from any of those States.

49.   Despite the Saudi announcement, the status of many Al-Haramain branches, including those in Bangladesh, Egypt, Indonesia, Malaysia, Mauritania, Nigeria, the Sudan and Yemen, remains unclear. Al-Haramain is still active in a number of those countries, and has just opened a new Islamic school outside Jakarta.

50.   Even when charities and their managers have been designated, and their existing bank accounts have been frozen, it has proved difficult to shut them down completely. In many cases they continue to operate from the same premises, using third-party accounts and resources. The Al-Haramain offices in Somalia, for example, continue their operations, although their direct links with the Saudi home charity appear to have been broken. The Group has also learned that the Global Relief Foundation, a designated entity, continues to maintain offices in Brussels, despite the fact that its bank account of $4,000 has been frozen. Its current director is Nabil Sayadi. Sayadi and his spouse, Patricia Rosa Vinck, were included in the list in January 2003. The Global Relief Foundation is also known as Fondation Secours Mondial and had offices also in Albania, Bosnia and Herzegovina, France, Kosovo, Pakistan and Turkey. The status of some of these offices is unknown.

51.   The Rabita Trust was added to the list in October 2001. Its Saudi Chairman, Wa'el Hamza Julaidan (also spelled Jalaidan) was designated at the request of the United States and Saudi Arabia on 6 September 2002. There are nevertheless reports that Julaidan remains actively engaged in "charitable activities" and financial transactions. Julaidan currently lives in Saudi Arabia and is reportedly still working with the Saudi Joint Relief Committee for Kosovo and Chechnya, and serves as one of the directors of the Al-Haramain al-Masjid al-Aqsa Foundation in Bosnia and Herzegovina. The Rabita Trust retains its offices and other assets besides its frozen bank account. The Government of Pakistan is under local pressure to allow the Trust to move forward with its refugee repatriation activities.

52.   Al-Rashid Trust, another designated charity, also continues its operation in Pakistan under various names and partnerships, including its partnership with Al-Akhtar Trust. It has continued to be active in funding Al-Qaida-related activities as

---

[a] Information Office of the Royal Embassy of Saudi Arabia in Washington, D.C., *Saudi Arabia in Focus* (weekly newsletter), 26 May 2003.

S/2003/1070

well as other social and humanitarian projects. It was reportedly involved in a recent UNICEF effort to transport food to flood victims in the Badin region of Pakistan. The United States asked the Committee on 14 October 2003 to designate Al-Akhtar and add it to the list on the basis that "Al-Akhtar is carrying on the activities of the previously designated Al-Rashid Trust. The organization is also suspected of raising money for the new jihad in Iraq and is connected to an individual with ties to the kidnapping and murder of *Wall Street Journal* reporter Daniel Pearl".

53.    Another designated Kuwaiti charity, Lajnat al-Daawa al-Islamiyah also remains operational near Peshawar and Karachi, Pakistan. Its activities include five medical clinics, three Islamic schools and an orphanage, in different parts of Pakistan. Lajnat was involved recently in a housing programme near Asgharo, Pakistan, sponsored by UNHCR. The Government of Kuwait has informed the Group that it is approaching the Committee to determine if the organization might be delisted. The Special Representative to the Secretary-General for Afghanistan, Lakhdar Brahimi, has indicated that, given the important role that the charity has played in Afghan relief activities, further consideration should be taken in this regard.

54.    A number of the charities that have been implicated in Al-Qaida funding, and that have been designated by the Committee, have also been engaged in business ventures to supplement their revenues. Little is known about such business ventures, and none of those businesses, or their assets, have yet been frozen.

55.    The Government of the Philippines indicated in its report submitted pursuant to resolution 1455 (2003) that Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden, had established numerous organizations, corporations and charitable institutions which served as conduits for funds to the Abu Sayyaf group as well as other extremist organizations. Strong allegations have also surfaced recently in Australia to the effect that companies established in South-East Asia by Mohammed Jamal Khalifa continue to serve as front companies for Al-Qaida/ Jemaah Islamiyah. These include Khalifa Trading Industries, ET Dizon Travel, Pyramid Trading, Manpower Services and Daw al-Iman al-Shafee Inc. It is also believed that an Al-Qaida operative, Wali Khan Amin Shah, established the shell company, the Bermuda Trading Company, in Malaysia, and that Al-Qaida's chief representative in Malaysia, Ahmad Fauzi, also known as Abdul al-Hakim, established companies in that country such as Green Laboratory Medicine Sdn Bhd, In-Focus Technology Sdn Bhd, Secure Valley Sdn Bhd and Konsojaya Sdn Bhd, for the purpose of supporting the activities of Al-Qaida/Jemaah Islamiyah.[a]

56.    The status of these and other similar commercial undertakings is unclear. The Group believes that all charities should be required to report, and provide transparent information, concerning their involvement in or ownership of any such commercial undertakings. The recent arrest of Mahmoud Afif Abdeljalil and his colleague Taufek Refke in the Philippines is expected to throw more light on those companies and their possible contribution to Al-Qaida and Jemaah Islamiyah financing.

57.    Local charities have also played an important role in providing funding to Al-Qaida and other associated individuals and entities. This is particularly the case in South-East Asia, where new charities are sprouting up regularly. One recent

---

[a] See Commonwealth of Australia, Parliamentary Debates, House of Representatives, *Official Hansard*, No. 10, 2003 (Wednesday, 14 May 2003), Question No. 1645, Foreign Affairs: South-East Asia.

important source of Al-Qaida funding, for example, is a small Islamic charity, the Om al-Qura foundation, which has branches in Thailand and Cambodia as well as in Bosnia and Herzegovina and Chechnya (Russian Federation). The individuals running that charity are also reportedly involved in money-laundering activities using orphanages and nursery schools in Malaysia.[a] Charities are used throughout the region to provide funds to terrorist groups, including Jemaah Islamiyah. Hambali reportedly spent considerable effort in setting up such charities. Specific allegations have surfaced also regarding the activities of Kompak, a division of Dewan Dakwah Islam Indonesia, one of the country's most influential Islamic social organizations.

58.   The problem of charities also involves the problem of donors who use such charities to funnel money that supports Al-Qaida indoctrination, recruitment and logistical activities. It has proved particularly difficult to pierce the charity veil and uncover the deep-pocket donors, including the business entities that provide such funding. One important lead was provided by the so-called "golden chain" memorandum, found during raids on the offices of the Benevolence International Foundation in Sarajevo in March 2002. This subject continues to be under review by the Group. While a number of individuals are under suspicion or investigation, it has proved particularly difficult to establish that they were directly involved or knew that the funds they provided were being used for terrorism-related purposes. One key target is Adel Batterjee, a Saudi businessman who founded the Chicago-based Benevolence International Foundation; he is still unaccounted for, and has not yet been designated.

59.   Without severe penalties, those that finance Al-Qaida will continue to do so. The Group emphasizes, again, the importance that designation plays as a strong deterrent to others that may continue to provide funding to Al-Qaida.

60.   There are a number of steps that many established charities are taking to improve their self-regulation and transparency in support of new government oversight measures. These are spelled out in the best practices paper published by FATF, and in several recommendations developed by charitable associations themselves.

61.   Most experts recommend that special requirements should be imposed to ensure that, to the extent possible, charities route their transactions through established banking systems. In such cases the recipient organization should be required to maintain a bank account, and to transact business as much as possible through verifiable means such as cheques and electronic transfers.

62.   In cases where banking facilities are not available or are foreclosed by high fees, cash transfers may be necessary. In such cases, special efforts should be made to record and verify each such transaction. This should include the active participation of the donor charity to assure that the funds have been allocated in accordance with the conditions of the grant.

63.   Various charity associations have recommended to their membership that they be authorized to create their own databank concerning compliance by recipients. This would include both favourable and unfavourable information concerning recipient organizations. Such a database would serve as point of reference.

64.   Many charity managers recommend that an increased international cooperative effort should be undertaken to compile and publish this information in a usable

---

[a] See Zachary Abusa, "The forgotten front", *Wall Street Journal*, 3 October 2003.

format. It would then be the responsibility of public charities to check the lists and ensure that their grants are not being provided to blocked entities, and to document that this is being done. Charities should also use due diligence to ensure that their grants are not diverted to such blocked entities.

65.   The Security Council may wish to consider the adoption of steps to ensure that all United Nations bodies are apprised of each designation against an entity. All United Nations bodies should terminate any association with such entities.

66.   The Security Council may wish to consider establishing a databank on charities to which information, favourable and unfavourable, could be provided by government agencies or recognized and established international charities. Such a database could serve as a due diligence reference point for concerned charities.

**Business entities, shell companies and offshore trusts**

67.   The use of shell companies and offshore trusts to hide the identity of individuals or entities engaged in terrorist financing is another difficult problem to resolve. Such arrangements are often undertaken through the establishment of international business companies and trust arrangements that permit the establishment of companies in jurisdictions that have little or no interest in their regulation. In many offshore centres, the costs of setting up international business companies are minimal, and their activities are generally exempt from taxes and most regulatory inquiries. Such arrangements can serve to mask the true identity of beneficial owners, and the value, nature and location of their assets. This, in turn, creates opportunities for money-laundering and the financing of terrorist activities.

68.   Offshore business and financial centres have been established in many jurisdictions around the world. Several of those jurisdictions have begun to tighten up their regulation and oversight of such business activities. Others continue to attract offshore business enterprises by retaining a liberal "don't look" policy.[a] Those centres are now coming under increased pressure to provide greater oversight to activities conducted through such centres. There is also increased pressure to prohibit the establishment of shell banks that maintain no assets within the jurisdiction in which they are established. FATF and the World Bank have been at the forefront of this effort.

69.   Considerable progress has been made in closing shell banks, and bringing greater transparency and accountability to offshore companies and trusts. Nevertheless, many of the offshore business centres that have been deemed to be complying continue to pose serious obstacles in the war on terrorist financing. They still serve to mask potential terrorism-financing activities, and make it difficult to locate and deal with terrorist-related financial assets other than bank accounts.

70.   The Group has looked closely into this issue and has travelled extensively to discuss and investigate specific problems related to blocking the assets of designated individuals and entities. This in-depth inquiry involved Youssef Nada and Idris Nasreddin and business entities associated with them. The results of the inquiries uncovered serious problems relating to the identification and blocking of their

_____

[a] Several government officials expressed concerns to the Monitoring Group regarding those countries which continue in non-compliance with FATF standards. Concerns were also expressed regarding the use of offshore centres, such as Labuan in Malaysia, which have been used to cover the beneficial ownership of a number of business entities.

assets, especially assets other than bank accounts. Many of the problems stemmed from the use of offshore companies and trusts to mask their business holdings, as well as their continuing business transactions and dealings.

71.   Youssef Mustafa Nada was designated by the Committee on 9 November 2001 and Ahmed Idris Nasreddin was designated on 24 April 2002. Both, through their various commercial holdings, operated extensive financial networks that provided support to Al-Qaida-related activities. Their designation was accompanied by the listing of 14 entities owned or controlled by them. Nada and Nasreddin had worked closely together for many years as directors of Bank Al-Taqwa and Akida Bank. Both banks were shell banks lacking a physical presence and sharing the same address in the Bahamas, where they were licensed. They also owned or controlled a number of other business entities in cooperation with each other.

72.   Bank Al-Taqwa was established in 1988 with significant backing from the Muslim Brotherhood. It was a close affiliate of Al-Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization (Lugano). Nada also controlled Al-Taqwa Trade, Property and Industry Company Ltd. (Liechtenstein), Ba Taqwa for Commerce and Real Estate Company Ltd. (Liechtenstein) and Nada International Anstalt (Liechtenstein).

73.   Nasreddin's companies also included the Miga-Malaysian Swiss, Gulf and African Chamber (Lugano), Gulf Centre SRL (Milan, Italy), Nascoservice SRL (Milan), Nasco Business Residence Centre SAS (Milan), Nasreddin Company Nasco SAS (Istanbul and Milan), Nasreddin Foundation (Liechtenstein), Nascotex (Tangiers, Morocco) and Nasreddin International Group Ltd. Holding (Nassau, Bahamas, and Milan).

74.   There are a number of very close and complex interrelations between the Nada and Nasreddin networks (see appendix IV). Both Nada and Nasreddin served on the boards of each other's banks and companies and, in many cases, shared the same locations and employees. Both were actively engaged in financial transactions, import-export businesses, and real estate ventures. Both had close relations with the same investors in Iraq, Kuwait, Saudi Arabia, the United Arab Emirates and other Middle Eastern and north African countries. Both were tied in with several Islamic charities and business ventures, which had been linked to Al-Qaida financing, including the Milan Islamic Centre, a major Al-Qaida recruiting centre.

75.   For a long time Nada and Nasreddin resided and worked out of a small Italian enclave, Campione d'Italia, near Lugano, Switzerland. They operated their business ventures from offices in Campione d'Italia, Lugano and Milan. Many of their businesses were registered as offshore companies through local trusts in Liechtenstein. These arrangements were usually made through the auspices of so-called "gatekeepers", in most cases one or two law firms in Lugano, specializing in establishing offshore shell companies. At the time Liechtenstein imposed few requirements on such offshore shells, beyond their use of a local trust agent, in this case Asat Trust. There was no requirement to identify or profile the ownership, beneficial ownership or assets of the company being represented and registered locally. No record was kept of activities or transactions on behalf of the companies.[a]

---

[a] Liechtenstein authorities have informed the Group that they have adopted new measures that require the identification of beneficial ownership and a profile of the companies' activities and assets.

76.    The various holdings of the Nada and Nasreddin networks reportedly included — and may still include — business property and investments in a number of ventures in Europe, the Middle East, North Africa, and East and West Africa. There was also a tie-in to the Safa group of companies in the United States. Many of the assets were held in association with other individuals or entities.

77.    While actions have been taken by a number of countries to freeze Nada's and Nasdreddin's bank accounts, or accounts held in the name of one or more of their enterprises, nothing has been done with respect to any of their other physical or business assets. This included, inter alia, their residences and/or commercial property in Campione d'Italia, Lugano, and Milan.

78.    On 28 January 2003, Youssef Nada travelled from Campione d'Italia to Vaduz, in violation of the travel ban (see para. 101 below). While in Vaduz, he applied to the Company Registry Office to officially change the name of two of his companies that had been placed on the list: Al-Taqwa Trade, Property and Industry Company Ltd. and Ba Taqwa for Commerce and Real Estate Company Ltd. The former became Waldenberg SA,[a] and the latter Hocberg SA.[b] He also applied to put both companies in liquidation, and had himself appointed as liquidator. At the same time he applied for the release of frozen funds held in the form of a guarantee from the Lugano branch of BNP Paribas relating to tax litigation and attorney's fees concerning commercial property in Milan. The payments were to be made pursuant to the sale of those assets as part of the liquidation of Al-Taqwa (now renamed Waldenberg). The Government of Switzerland applied to the Committee for an exemption to release those funds under resolution 1452 (2002) to allow him to pay taxes and attorney's fees. The request is still pending before the Committee.

79.    The questions raised by the Group concerning this transaction led the Government of Liechtenstein to review the matter and to remove Youssef Nada as liquidator of Waldenberg and Hocberg. They have provisionally appointed another liquidator. As offshore companies Waldenberg and Hocberg maintained no records in Liechtenstein. Nor were they, at the time of registration, required to provide any information concerning their holdings and other assets. This has placed the provisional liquidator in the awkward position of having no information regarding the assets to be placed in liquidation that may belong to these companies. That knowledge apparently remains with Nada, Nasreddin and their attorneys.

80.    The Group was able to determine that both Nada and Nasreddin continue to have property interests in one or more hotels in Milan, and possibly other commercial property in Italy and Switzerland. Further enquiries by the Group in Switzerland and Italy failed to identify the additional properties. The Group was also unable to determine the present location of either Nada or Nasreddin. Apparently, local authorities had no knowledge of their current whereabouts. This can only make the task of regulating their business activities more difficult.

81.    The Nada and Nasreddin examples reflect continuing serious weaknesses regarding the control of business activities and assets other than bank accounts. They emphasize the difficulties faced in identifying beneficial ownership and

---

[a] Waldenberg SA was proposed for listing on 10 October 2003.

[b] Hocberg SA has not yet been proposed to the Committee for designation. The Group believes that it is the responsibility of each State to inform the Committee concerning any change of name or aliases of previously designated individuals or entities.

dealing with problems of shared assets. The additional lack of control over the international movement of such designated persons provides them the opportunity to continue to access and manipulate their business holdings, and otherwise circumvent the measures imposed by resolutions 1390 (2002) and 1455 (2003). The Group is concerned also that other designated individuals and entities may have the same success in getting around the measures imposed by those resolutions.

82.   A related problem is the lack of action by most countries to reach beyond bank accounts to the business activities or investments associated with the designated person or entities. In fact, few countries have frozen any assets other than bank accounts. Several countries have indicated that they lack the means or authority to reach beyond such accounts to other business or tangible assets. Many are loath to close down or take over the administration of business assets associated with designated persons or entities. There is also the additional problem of businesses and assets which are owned and administered jointly with non-designated persons. This may include family members.

83.   The Financial Action Task Force also decided, at its meeting held in Stockholm from 1 to 3 October 2003, to set forth in greater detail the obligations to freeze effectively terrorist-related assets, including assets other than bank accounts. It issued a new interpretative note regarding the property to be seized and the procedures to be used. It made it clear that the obligation to freeze funds and other assets, pursuant to various United Nations resolutions, included "those [assets] wholly or jointly owned or controlled, directly or indirectly, by designated persons". FATF has also recommended that all shell banks be closed and that improved transparency requirements be enacted by all countries, to ensure that adequate and timely information is provided concerning the beneficial ownership of all companies and trusts.

84.   On the basis of its findings the Group has set out a series of recommendations designed to address these problems. These are detailed in the recommendations section of this report (see para. 186 below).

**Alternative remittance systems and couriers**

85.   Al-Qaida and its associated groups place great reliance on the use of alternative remittance systems, such as hawala, to transfer money. They are often used to transfer money raised through charities, petty crime, the drug trade, or from deep-pocket donors. Al-Qaida also relies on couriers for the bulk movement of cash and other valuable commodities.

86.   Hawala is common in over 50 countries. Most systems operate out of rural areas, especially where people do not have access to a bank. They are also prevalent in areas where guest workers or refugees reside, and are used extensively to remit money home to their families. They are also used to cover illicit transactions. Hawala is found in most Muslim countries in the Middle East, the Indian subcontinent, South-East Asia and parts of Africa.

87.   Efforts are being made worldwide to bring alternative remittance systems under some kind of regulatory regime. Several countries have sought to outlaw hawala altogether.[a] Others are seeking to bring the systems under a variety of

_____

[a] Seven countries indicated in their 90-day reports that informal remittance systems, such as hawala, were illegal. They are France, India, the Islamic Republic of Iran, Malaysia, Portugal, Spain and Venezuela.

regulatory controls and reporting schemes.[a] Many countries, however, have not yet addressed this difficult issue.[b] In some countries this has included requirements that transparent records and bank accounts be maintained. Some have sought to limit the amounts that can be processed through hawala. Stiff penalties have been threatened against hawaladars who do not comply. This effort has had limited success, but has also driven many alternative remittance systems further underground, making such transactions more difficult to detect.

88.   While the effort to regulate or monitor such remittance systems must continue, the Group believes that greater efforts should also be directed at uncovering terrorist financing at its source. This will require increased intelligence resources, and more systematic sharing of intelligence information.

**Counter-Terrorism Action Group or getting at the weakest links**

89.   The international banking community has made considerable progress in tightening up its procedures and making it more difficult and risky for terrorists to use the banking community to store or transfer funds for terrorism. Most experts agree, however, that further efforts are still required to extend the measures to banks and financial institutions in many parts of the world that lack the resources, capability or political will to replicate such measures. This has made the next steps in the war on terrorist financing particularly difficult and challenging. As described in the Group's last report, Al-Qaida and other terrorist groups are adjusting to the new measures and have concentrated their activities in areas which still lack such effective controls. This includes, but is not limited to, the so-called list of failed or weak States. In fact, no terrorist assets at all have yet been located or frozen in a number of countries where Al-Qaida is well established and known to operate. It is imperative to expand control capabilities to such areas.

90.   Recognizing the urgent need to expand the fight against terrorism and the financing of terrorism, the leaders of the Group of Eight agreed at Evian, France, in June 2003 to establish a new Counter-Terrorism Action Group to focus on building political will to fight terrorism and to identify countries that need to expand and strengthen their efforts. The Group of Eight placed special emphasis on combating terrorist financing, tightening immigration and customs controls, halting illegal arms trafficking, and enhancing police and law enforcement capabilities. The Group of Eight statement stressed that:

> "It is essential for the G-8 to build stronger international will and to engage in outreach activities towards other countries in the area of counter-terrorism cooperation, and at the same time to provide capacity-building assistance to those countries with insufficient capacity to fight terrorism."

91.   Further efforts are also under way among the Asia-Pacific Economic Cooperation (APEC) countries to improve their ability to combat terrorism. APEC has established its own Counter-Terrorism Task Force and has agreed that it should join efforts with the Counter-Terrorism Action Group. They placed their own

---

[a] The 90-day reports indicate that Canada, Germany, the Netherlands, Paraguay, Qatar, the Republic of Korea, Singapore, Sweden, the Syrian Arab Republic, the United Kingdom and the United States have sought to control informal remittance systems through regulation and oversight.

[b] In their 90-day reports, Belarus, Bulgaria, Guatemala, Iceland, the Lao People's Democratic Republic and Lesotho indicated that they have no legal provisions to deal with hawala.

priorities on building the infrastructure necessary to secure ports, protect the movement of air travellers, fight cybercrime, strengthen energy security measures and prevent the financing of terrorism.

92.   Recommendations concerning the freezing of financial and economic assets are set out in detail in paragraphs 178 to 186 below.

## V.   Travel ban

93.   The Group is aware of the great importance that must be placed on limiting the mobility of individuals linked to Al-Qaida, the Taliban, and associated terrorist groups. It must report with concern, therefore, that, well over 32 months since the list was established, there have been no reports by States indicating that any of the 272 designated individuals have sought visas for, or attempted, entry into their countries, or been stopped or interned at points of entry.[a]

94.   The first line of defence in inhibiting the movement of designated individuals must be the incorporation by all States in their national "stop lists" of all persons included in the consolidated list. A workable national system also requires accurate and timely dissemination of those stop lists to all consular and border control authorities. To be most effective, such information should be available in the most usable formats — formats capable of electronic transmittal and data searching. The process would also be enhanced considerably by an expansion of machine readable travel documents, and the inclusion of "biometric identification information".

95.   The Group is encouraged by increasing evidence that border control authorities in Member States are now becoming more aware of the list and its importance. There remain, however, some serious deficiencies in this regard. Almost a third of the States have reported that they have not yet incorporated all the names on the list in their national stop lists. Only about half of the States reporting have indicated that they regularly transmit updated lists to their border services and incorporate such information in electronic formats. Some of the Member States, such as Croatia, the Islamic Republic of Iran and Paraguay, have requested financial and technical assistance to enhance their ability to implement all aspects of the travel ban.

96.   The lack of identifiers has been stated as a major obstacle to the inclusion of names in the national stop lists. Nevertheless, the information standard for listings should not be set so high as to bar the inclusion of identifiable individuals. The United Nations has significantly improved the format in which designated names are maintained and the overall quality of the information has been improved. The Group is aware, however, that a number of steps can still be taken to make the list more user-friendly.

97.   Designated individuals seek to avoid travelling with documents in their names as they appear on the list. The Group is concerned that the whereabouts of many of

---

[a] The United States has reported that Customs and Border Protection intercepted Youssef Mustafa Nada in Atlanta on 8 December 1999 and denied him entry to the United States. The subject was in possession of an Italian passport. But the subject was designated in the list only on 9 November 2001. The Netherlands has reported that Najamuddin Faraj Ahmad, also known as Mullah Krekar, leader of Ansar al-Islam, was denied entry to the Kingdom on 12 September 2002. However, Ansar al-Islam was designated on the list only on 24 February 2003 and the name of the subject individual has not, so far, appeared in the list.

the designated individuals remain unknown. Of the 272 designated individuals, only a few have been accounted for. There are reports that some have been arrested, detained, imprisoned or are dead, but quite a few are still at large, despite the warrants and alerts that have been issued. This situation calls for more proactive measures by States to enforce the objectives of the travel ban.

98.    The Group suggests that it would significantly strengthen the application of the travel ban measures if Member States were called upon by the Security Council to report regularly on the status or whereabouts of designated nationals and residents. This should include reports that the whereabouts of such nationals or residents are unknown. Changes of status, such as arrest, detention or release from detention, should also be reported. Provision should also be made for including such information in the list. This interaction would result in more information being available to the Committee and States concerning such designated persons. It would furnish a comprehensive and more practical document for border control authorities.

99.    The Group put forward the suggestion in its previous report (S/2003/669, para. 88) that the Security Council might wish to consider special designation for individuals subject to an arrest warrant, arrest or detention, or individuals against whom criminal charges have been brought. It should place a special obligation on all countries to arrest such individuals for prosecution or extradition to a country seeking to bring them to justice.

100.  Whenever possible, States should be obliged to inform designated individuals that their travel is to be restricted in accordance with the laws of that State. Thereafter, if an individual violates the travel ban sanctions, he/she should be subjected to legal action in the country in which he/she is present for violating the United Nations sanctions. After completion of the term of punishment he/she should be deported back to his/her country of origin, nationality or residence.

101.  In the course of the Group's inquiry into the status and activities of Youssef Mustafa Nada, it became clear that he continued to be able to move with relative ease between various countries. On 28 January 2003, Youssef Nada travelled from Campione d'Italia to Vaduz to apply to the Company Registry Office to officially change the name of two of his companies that had been placed on the list (see para. 78 above). This was a clear violation of the travel ban. The Group has obtained information which appears to indicate that he has been issued with new travel documents. This too would be a violation of the travel ban. When Youssef Nada visited Kuwait in 1997 he was in possession of an Italian passport, No. 487487, which was issued on 6 May 1997 and was valid until 15 May 2002. The subject was designated and included in the list on 9 November 2001.

102.  This matter is further complicated by the fact that Nada has, reportedly, dual Italian/Egyptian nationality. The Group has raised this issue with the Office of Legal Affairs of the United Nations Secretariat, which has suggested that this matter should be clarified by the Committee. It is the view of the Group that each designated individual should be considered to hold only one citizenship or nationality for the purpose of applying the travel ban.

103.  The members of the Group made a series of visits to border entry points at international airports in order to monitor the implementation of the travel ban. This included entry points in Egypt, Jordan, Kuwait, Lebanon, Morocco, the Syrian Arab

Republic, the United States of America and Yemen. The following observations resulted from those visits:

(a)   **United States of America**. The Group visited John F. Kennedy International Airport. The names, from the United Nations list, were found in the database of Customs and Border Protection. The officials of Customs and Border Protection mentioned, further, that legislation required all commercial air and sea carriers operating incoming and outgoing movements to electronically transmit to them APIS (advanced passenger information system) data on all passengers and crew members. Air carriers must electronically transmit their passenger data within 15 minutes of a flight's departure. The crew-member data must be submitted prior to the flight's departure. This practice has enhanced the ability of border control authorities to verify the names of passengers, against their database, before their arrival at the airport.

(b)   **Morocco**. During the visit to Casablanca International Airport, the members of the Group requested authorization to check names of individuals on the list on the computer terminals used to check passengers' identification at the airport, but the request was refused by the Border Police Service. The Border Police told the Group that the Ministry of Foreign Affairs had not informed them of the request. Nevertheless, they maintained that the entire list of United Nations-designated names was included in their system. This is also stated in the 90-day report of Morocco. The officials indicated also that they had begun a more thorough and detailed check of passengers coming from specific countries in the region. They refrained from providing the names of the countries subject to those measures.

(c)   **Kuwait**. The members of the Group had the opportunity to check the names in the computer terminals at the International Airport in Kuwait City. Some of the names on the Taliban and Al-Qaida lists were not to be found in that database. The Group asked the local authorities to provide it with the last update they had received of the list. The officer-in-charge replied that he was not aware of any update since the names on the list had been originally incorporated into their system.

(d)   **Yemen**. The Group learned during its field visit to the International Airport at Sana'a, that the Yemeni border control authority maintains two types of database at the border entry points — an "old system" and a "new system". All the names have been incorporated in the old system, but only names which had certain minimum identifiers appear in the new system. They are planning to switch over to the new system shortly. This means that the names without enough identifiers will not appear in the new system. Yemen has 15 entry points. The Government of Yemen also mentioned that it lacked sufficient skilled manpower to effectively operate the new database. They requested technical assistance.

(e)   **Egypt**. During the visit to the international airport at Cairo, all the names provided by the Group to the Border Service, for checking, were found to be included in their database. The Group also enquired about the receipt of new names and updated lists. The officials indicated that it was not possible to update the list in the database from the United Nations web page. The updated list had to come through higher authority. This often entailed delay.

(f)   **Lebanon**. During meetings with the Lebanese officials, the Group requested authorization to visit the international airport. The officials declined however to authorize such a visit. The Group was told that the inclusion of names in the national list required that warrants be issued against such individuals. It also

required the availability of sufficient identifiers such as at least three names, date and place of birth and nationality. Similarly, Lebanon indicated in its 90-day report that it included in its border control lists the names of the individuals against whom warrants had been issued by Interpol, and/or other individuals designated by the general secretariat of Arab Ministers of the Interior. Those entries contained full personal details and information concerning the crimes that had been committed. They also reported that other individuals, concerning whom no warrants had been issued or requests for arrest received from foreign judicial authorities, were not included in the local control lists. The Group does not believe that this conforms to the obligations placed upon States by resolution 1455 (2003).

(g)  **Jordan**. The Group had a meeting with concerned Jordanian officials. None of the officials with whom the Group met was able to answer the questions raised by the Group (see para. 21 (f)); nor were they able to authorize a visit by the group to the airport (international border entry point) to check the names of designated individuals in the computer database.

(h)  **Syrian Arab Republic**. The Syrian Arab Republic indicated in its 90-day report that the list had been incorporated in the "database of wanted and banned persons". The members of the Group who visited Damascus International Airport were unable to confirm this, however. The Group provided a series of names to the administering officers, who were unable to find any of them in their databases.

(i)  **Schengen Information System**. The States of the Schengen Area have indicated in their 90-day reports that they have adopted the practice of including the United Nations list in their national stop lists. However, it is not clear that those lists have the same utility as the Schengen list, which is meant to be a single set for controls at "external border points" of the Schengen space. The Group has addressed this issue in its previous reports and, in this regard, reiterates its previous recommendations.

104.  Recommendations concerning the travel ban are set out in detail in paragraphs 187 to 193 below.

# VI.  Arms embargo

105.  The assessment of the implementation of the arms embargo by States in accordance with resolution 1455 (2003) remains one of the hardest tasks assigned to the Group. As stated in its previous reports, the Group is heavily dependent on timely, accurate and detailed information from States. However, many States consider weapons and armaments issues to be directly linked to their national security interests. In many cases they have refused to disclose any information regarding these matters. This fact has been confirmed by the lack of substantive information in States' reports (see appendix VI).

106.  It has to be emphasized that, owing to the global dispersion of Al-Qaida network, the arms embargo, as has already been mentioned in previous reports of the Group, cannot be confined to a specific territory, or limited to only those individuals and entities designated on the United Nations consolidated list. It has to be applied, generally, to all Al-Qaida followers scattered all over the world. Otherwise, the resolution remains too limited in its scope to be effective. Preventing Al-Qaida, the Taliban and their associates from acquiring arms will require States to curb the flow of arms to all non-State actors and their associates all over the globe.

107. The Group continues to encounter serious difficulties in monitoring and reporting on the implementation of the arms embargo measures specified in the resolution. This is in large part due to the reluctance of countries to provide information to the Group on these issues through official channels, or to respond to requests from the Group for specific information related to reported or suspected violations of the arms embargo aimed at Al-Qaida, the Taliban and their associates.

108. The Group is aware that several countries have continued, during the reporting period, to seize large amounts of illegal weapons and explosives believed to be destined for Al-Qaida members, the Taliban and their associates. The Group is also aware of reports of possible violation and circumvention of the controls. Nevertheless, no country has sought to communicate this information to the Group, or otherwise report it to the Committee.

109. This was the case, for example when the Group sought to follow up on an initial visit, of 18 December 2002, to the Permanent Representative of Kenya to the United Nations. The Group asked for a special meeting with the Kenyan Mission to reiterate its request, and obtain additional specific information, including batch number, origin etc., regarding the missiles used in the Mombasa attack and for details of the explosives used in the suicide bomb attack on the hotel at nearby Kikambala.

110. To date, the Group has not received a response to those requests. As a result the Group was obliged to obtain the required information from indirect sources. This included information on some partial markings of the fired missiles. The Group is now seeking to cross-check this information with the help of the Permanent Mission of the Russian Federation.

111. In contrast, the Group notes with some puzzlement that various non-governmental organizations, think tanks and academic institutions dealing with arms transfer issues have been given access to such information on a regular basis. The Group has noted, for example, that United States and British forces did provide substantial useful information regarding small arms obtained by Al-Qaida to the Graduate Institute of International Studies at Geneva for its *Small Arms Survey 2003*. This information was included in a section of the *Survey* entitled "The small arms of Al-Qaida and Afghanistan". It included specific tabulations detailing the type and number of weapons seized by the coalition forces during their combat operations.[a]

112. The Group strongly regrets the lack of assistance and cooperation of the States, especially with regard to its work on the arms embargo issues.

113. During the reporting period, only Bulgaria and Saudi Arabia cooperated with the Group's experts on arms transfer matters. The Group welcomes the excellent cooperation of those two States and urges other States to act in a similar way.

114. Saudi Arabia, in response to a request from the Group, provided photographs of the remains of the Soviet-designed shoulder-fired missile found near the Prince Sultan Air Base, south of Riyadh, in late May 2002. The missile appears to belong to the same batch of missiles used in the Mombasa attack, which the Group is attempting to follow up.

---

[a] *Small Arms Survey 2003* (Oxford University Press, 2003), pp. 75 and 76.

115.  The missile used in Saudi Arabia was intended to shoot down a United States warplane during its take-off phase. For unknown reasons, the missile fortunately missed its target. This attempt has been attributed to Al-Qaida. A Sudanese suspect, handed over by the Government of the Sudan to the Saudi authorities, admitted firing a missile at a United States warplane taking off from the Prince Sultan Air Base.

116.  Bulgaria provided the Group with a tabulation of the small arms seized at its borders by its customs services from January 2002 to February 2003. The Bulgarian customs services reported finding more than 100 handguns of various types, five assault rifles, and around 4,000 rounds of ammunition of various kinds. An alarming aspect of the seizures is that some of the weapons found were fitted with silencers. This is specifically the type of weapon sought by criminals as well as terrorists.

117.  These seizures do not surprise the Group. There has always been a flow of illegal small arms in that part of Eastern Europe. European police services have long been aware that many of the weapons used by the organized crime groups in Europe come from the Balkans and Eastern European countries.

118.  This example is given to illustrate the ease with which terrorist groups such as Al-Qaida can acquire arms. For each reported seizure by customs and border services, how many other smuggled arms continue to move?

119.  This reality has led the Group to conclude that the implementation of the arms embargo, as defined by the Security Council resolutions, cannot be limited only to individuals and entities mentioned on the list. Incremental improvements can be expected only when the international community finds ways to drastically curb the flow of illegal small arms.

120.  Nonetheless, while the Group recognizes the importance of the resolution in providing a supplementary authority on which States can act to crack down on this activity, it also notes that none of the States in their reports provided any information on how the list is used by their competent authorities.

121.  Because of the dearth of information provided to the Group, the Group has had to rely greatly on its own travels and meetings with local government authorities and experts. It has also had to rely on open source information and reports to carry out this important mandate. This has severely limited the Group's ability to assess any particular violations of the arms embargo.

122.  During the reporting period the Group visited several countries in the Middle East. In each of the visits the Group sought to review the implementation of the arms embargo in the region. It focused mainly on conventional arms.

123.  Most of the countries visited recognized that they were encountering difficulties in monitoring their long borders, especially in areas of desert. This is due in large measure to a lack of human resources and technical means. They indicated an awareness that their borders were being crossed in both directions by smugglers, trafficking in all sorts of contraband, including weapons. It could easily be hypothesized that at least some of the smuggled weapons were reaching individuals or terrorist groups associated with Al-Qaida.

124.  Both the Saudi and Yemeni authorities confirmed that some of the weapons and explosives which had been used in the recent terrorist attacks in Saudi Arabia had been smuggled across their 1,100-mile common border. Prince Mohammad Ben Nasser, Governor of Jazan Province (Saudi Arabia), recently told the press that, on average, his forces were intercepting weapons being smuggled across the Yemeni

border on almost an hourly basis.[a] This situation led Saudi Arabia and Yemen to sign an agreement late in June 2003 to coordinate their border surveillance.

125.  Yemeni officials informed the Group that most of the illegal weapons entering the country were coming from Somalia. This statement surprised the Group since the United Nations Panel of Experts on Somalia, in its first report, issued in March, assessed that Yemen appeared to be a significant source for private weapons moving to the various opposing militias in Somalia.[b] Furthermore, in its follow-up on the shoulder-fired missiles used in the Mombasa attack against an Israeli airliner, the Group learned that there is a high probability that the missiles used in the Mombasa attack had been smuggled to Somalia from Yemen by sea, before travelling overland to Kenya.

126.  The Group is concerned that there is a continuing flow of smuggled weapons back and forth between Yemen and Somalia. This illicit trade moves in accordance with the needs of the time of the regional illegal arms market. The weapons smugglers are using both Somalia and Yemen as turntable countries for their regional business, which extends well into Africa and the Middle East. The Group is concerned that Somalia and Yemen are ideal places for Al-Qaida and its associates to obtain the weapons and explosives they need for terrorist activities and future planned attacks. The Group intends to discuss and corroborate this finding with the Panel of Experts on Somalia, and through further discussions with the competent authorities of the two countries.

127.  Furthermore, during its visit to Yemen, the Group was told by a reliable source that heat-seeker missiles, as well as rocket-propelled grenades and other types of light weapons and small arms usually sought by terrorist groups, are regularly sold in open weapons markets that are commonplace in different parts of the country. The Group has not yet been able to cross-check this information, which will definitely need follow-up action.

128.  Yemeni authorities also stressed that they were unable to secure their coastline, which appears to be used by smugglers to funnel weapons in and out of the country. The continuing lack of human and technical resources will make it difficult for Yemen to deal effectively with this issue. It will require international support and technical assistance in this regard.

129.  Similarly, the Syrian authorities told the Group that they had been unable to monitor completely their border with Iraq. They indicated that it was probable that persons believed to be carrying weapons were crossing the border.

130.  The Group also visited Lebanon. Despite the stringent laws and regulations Lebanon is seeking to implement, as stated in its report pursuant to resolution 1455 (2003), the governmental authorities admitted having only limited effectiveness in dealing with illegal dealings in arms conducted in the Palestinian refugee camps scattered throughout the country. Lebanon's security services are strictly monitoring the movements of suspicious individuals and entities in order to prevent them from carrying out any illegal operations such as the transportation and stockpiling of arms on behalf of terrorist individuals or groups. They are aware, however, that some militant Islamic groups settled in the country continue to receive foreign armaments.

---

[a] "Saudis seize smuggled weapons from Yemen every hour", *Jordan Times*, 22 August 2003.
[b] Report of the Panel of Experts on Somalia pursuant to resolution 1425 (2002) (S/2003/223).

131. Jordan is also having considerable difficulty in halting the traditional weapons trafficking on its borders despite increased efforts by its Government to curb it. The Jordanian authorities who met with the Group described their country as a "turntable or transiting point" for weapons-smuggling in the region. They pointed out that the weapons were coming from the Islamic Republic of Iran, Iraq, Lebanon and the Syrian Arab Republic. Furthermore, traffickers have been stationing and hiding weapons stockpiles inside the country. Weapons caches, dating back to the late 1970s, are still being found regularly in the country. According to the officials, the weapons are mainly of Chinese, Russian or East European origin.[a] Weapons made in Iraq are also regularly found. One cannot exclude the possibility that some of the weapons may be reaching Al-Qaida or its associates.

132. Recognizing that the region is already awash with illegal weapons, it is particularly disturbing to note reports that former Iraqi military dumps are adding significantly to the availability of such arms. Many of those arms have already been looted and dispersed around the country. They reportedly include some estimated 3,500 shoulder-fired missiles.[b] There is great concern that many of the weapons may have been smuggled out of the country and may have fallen into the hands of terrorist organizations.

133. It is clear that Al-Qaida and its associated groups are able to find a large part of the weapons supplies they are looking for in the Middle East region. This is underlined by the continuing movement of illicit arms across many of the borders in the region. It also shows that the weapons embargo as defined by resolution 1455 (2003) needs to be substantially revised in order to be realistic and much more effective. How are States able to report to the Committee the full implementation of the arms embargo if they are not able to halt the illicit movements of weapons across their borders?

134. The responsibility for these problems cannot be confined only to the States in that region. It has to be assumed at the international level. Combating weapons smuggling has definitely to be an active part of the fight against terrorism and must be done by helping and encouraging all States to adopt the measures incorporated in the Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All Its Aspects.

135. The Group notes that, besides the Programme of Action, States have at their disposal a full set of international instruments that could be used for the implementation of the arms embargo against Al-Qaida, the Taliban and their associates. Several States have already referred to them in their 90-day reports.

136. For the record, the instruments are the following:

Convention on the Physical Protection of Nuclear Material

Treaty on the Non-Proliferation of Nuclear Weapons

Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction

---

[a] In this context the Group understands "origin" to refer either to the original manufacture or design (for licence manufacture). This information does not imply that the weapons were supplied directly, or indirectly, by these countries to those who have acquired them.
[b] Raymond Bonner, "Guerrillas in Iraq tap unsecured arms caches, officials say", *New York Times*, 14 October 2003.

Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction

Convention on the Marking of Plastic Explosives for the Purpose of Detection

International Convention for the Suppression of Terrorist Bombings.

137. Although the Group, in its regular reports to the Committee, does not intend to be an echo chamber of the various media reports issued on the threatening aspects of terrorism, it nonetheless considers that it has to bring to the attention of States key issues regarding the implementation of the arms embargo according to resolution 1455 (2003).

138. One of those issues is the easy access terrorist groups have to man-portable air-defence systems. Indeed, it is estimated that 500,000 of those systems are currently in existence. According to *Jane's Intelligence Review*, 150,000 of them are in use around the world and another 350,000 have been stockpiled. Furthermore, more than 75 countries now have man-portable air-defence systems in their army inventories and around 30 non-State actors are believed to possess such systems.

139. Until now, fortunately, terrorists have only used man-portable air-defence systems, which are 20 to 30 years old. Because of their age, these missiles appear very cheap, even if their accuracy remains questionable. The current selling price on the illegal market is around $5,000 per unit. The main type of missile, which has been used in many conflict zones in Africa, Central America and South-East Asia, is the Soviet-designed SA-7 (Strela or, under its NATO designation, Grail). In addition, some Western-designed missiles such as the Stinger and the Blowpipe were used extensively in Afghanistan during the war against the Soviet occupation.

140. These missiles are easy to carry and to conceal because of their dimensions (for example, 1.40 m long, 70 mm in diameter and around 10 kg in weight). This kind of weapon is quite easy to hide inside a 20 ft (ISO) maritime container, indicating again the need for greater container and sea transport security. The dimensions of this problem are underlined by the fact that there are no less than 200 million container movements per year, and 48 million between the major international seaports.

141. The threat of seeing such missiles used by terrorist groups such as Al-Qaida and its associates remains very high and persistent. In November 2002, two surface-to-air missiles, fired by Al-Qaida-related terrorists at an Israeli airliner departing from Mombasa Airport, Kenya were, fortunately, near misses. At about the same time, three foreigners connected with Al-Qaida, trying to buy Stinger missiles, were arrested in Hong Kong, China. Nine months ago, the Government of the United Kingdom put Heathrow International Airport on high alert, and deployed over 400 troops, in order to prevent a feared Al-Qaida missile attack against civilian aircraft. More recently, the Federal Bureau of Investigation captured a British arms dealer of foreign origin as he was trying to smuggle and sell a Russian-designed SA-18 missile, a high-performance and sophisticated modern weapon, to alleged terrorists.

142. The Group believes that only international efforts such as the one carried out by the Wassenaar Arrangement in its elements for export controls of man-portable air-defence systems[a] can impede, if not prevent, terrorist groups from obtaining such weapon systems. At its Evian summit the Group of Eight endorsed this approach, calling for enhanced transport security and control of man-portable air-defence systems.

_____

[a] Thirty-three countries have already agreed to these controls.

143.  The Group welcomes the recent agreement reached among the Governments of Asia and the Pacific Rim to sharply restrict the use and transfer of man-portable air-defence systems that could be used by Al-Qaida and other terrorist groups to shoot down civilian aircraft.[a]

144.  Similarly, the Group salutes the effort made by defence ministers of some of the members of the Commonwealth of Independent States such as Armenia, Belarus, Kazakhstan, Kyrgyzstan, Moldova, the Russian Federation and Tajikistan, who met in Kazakhstan late in June, to agree on new measures[b] to reduce the proliferation of man-portable air-defence systems like the Strela and the Igla, which are used mainly by terrorist groups.

145.  The Group believes that it is crucial that all States producing and exporting man-portable air-defence systems[c] which are not yet bound by any international agreement on export controls of those systems take the appropriate measures, if none are already in place, for preventing such types of weapon systems from falling into the hands of Al-Qaida, the Taliban and their numerous associates.

146.  The Group believes that there is a need to harmonize, at the international level, the control measures over man-portable air-defence systems to better limit, if not cut off completely, the availability of such systems to terrorist organizations such as Al-Qaida network. Having so many different initiatives in this regard dilutes the effort. That is why the Group recommends, in addition to the agreements already reached, the adoption by the United Nations of measures addressing this specific matter. It is international security which is at stake.

147.  Concerning weapons of mass destruction, the Group, during the reporting period, participated in the working group set up by the United Nations Interregional Crime and Justice Research Institute and the European Police Office (Europol), which are conducting the project "Strengthening international cooperation to combat trafficking of weapons of mass destruction". The agencies participating in this group include the International Criminal Police Organization (Interpol), the World Customs Organization, the World Health Organization, the International Atomic Energy Agency and the Organization for the Prohibition of Chemical Weapons.

148.  The project is aimed at improving international cooperation between law enforcement agencies and reinforcing judicial cooperation. It is also meant to strengthen the regional role of the relevant international organizations, since such cooperation would facilitate a more effective curbing of the trafficking in weapons of mass destruction, especially when the trafficking is carried out by international criminal organizations and terrorist groups.

149.  Except for its above-mentioned participation in the working group meetings, the Group has no other specific information to communicate to the Committee on this issue. The Group will remain seized of this important issue, however. The Group expects to look closer into developing information regarding the recent discovery by the Philippines police of several canisters of unidentified chemicals and possible residues of a "tetanus-virus-carrying chemical" as well as a bio-terror manual in a raid against a

---

[a] See the Bangkok Declaration on Partnership for the Future, adopted on 21 October 2003 by the leaders of the APEC countries.

[b] No details of the new control measures have been disclosed yet.

[c] Including those countries developing, indigenously, their own man-portable air-defence systems and those countries already producing such systems under licence.

Jemaah Islamiyah hideout in the southern Philippines.[a] This information has to be connected with concern expressed by the ministers of the APEC forum that Al-Qaida might use operatives to poison food by way of committing deadly attacks.[b]

150.  Undoubtedly Al-Qaida is still considering the use of chemical or biological weapons to perpetrate its terrorist actions. When might this happen? Nobody really knows. It is just a matter of time before the terrorists believe they are ready. They have already taken the decision to use such chemical and biological weapons in their forthcoming attacks. The only restraint they are facing is the technical complexity of operating them properly and effectively.

151.  The Group believes that this is the main reason why Al-Qaida is still trying to develop new conventional explosive devices such as a bomb designed to evade scanning machines. Al-Qaida is also seeking to design new equipment to produce improvised explosives.[c] In the same pattern, Al-Qaida is adopting new suicide bombing tactics, similar to those used by other terrorist groups, which involve the use of explosive belts. Such explosive belts were found recently during raids on religious extremists in Saudi Arabia.[d]

152.  Regarding the current arms embargo, the Group strongly believes that it needs to be completely revamped before becoming a useful tool in the fight against Al-Qaida, the Taliban and their associates, since in its current shape it appears in many aspects totally ineffective.

153.  Trying to implement an arms embargo on a world scale could be seen as quite an unrealistic endeavour, especially when the embargo deals with individuals, most of whom are undercover. That is why the Group suggests that, besides a common framework, which is already more or less defined, a regional approach should be taken, defining realistic programmes of action that have to be put in place by the countries in a particular region.

154.  For instance, the problem Yemen is encountering with weapons could not be compared to the limited weapons-smuggling taking place in Switzerland and certainly not be tackled in the same way. Yemen on its own cannot resolve its problem without the full cooperation of the neighbouring countries and support from the international community.

155.  Thus, a shared programme of actions such as clearly identifying the sources providing the illicit weapons, the key actors in the smuggling process, and the usual smuggling routes could lead to measures to be taken at the regional level and their applications being regularly reported to the Security Council. This, undoubtedly, would have a far greater effect on Al-Qaida and its followers than some very broad international measures, which are a mere political statement rather than anything else.

156.  Recommendations concerning the arms embargo are given in detail in paragraphs 194 to 200 below.

[a]  Manny Mogato, "Police raid Jemaah hideout in south Philippines", Reuters, 20 October 2003.
[b]  Jane Macartney, Asian Diplomatic Correspondent, "Is poisoning the new terror tactic?", Reuters, 18 October 2003.
[c]  Adam Nathan, "Al-Qaeda 'invisible' bomb plan found", *The Sunday Times*, 26 October 2003.
[d]  Marie Colvin, "Suicide belts put Saudis on terror alert", *The Sunday Times*, 26 October 2003.

# VII.   Findings and conclusions

157.  The submission by States, as at 30 October 2003, of a total of 83 reports, six and half months after the requested submission date, is disappointing.

158.  Eighty-three States account for less than half of the membership of the United Nations! When considered against the fact some 4,000 members, supporters and associates of Al-Qaida have been arrested in no less than 102 countries, there is a serious question about the extent to which States are looking to the United Nations resolution in this regard.

159.  Of the 108 States that have not yet submitted a report, the Group has a particular interest in 25 of them, because of information that would suggest that Al-Qaida or their associates may, in some way or another, be active within their borders (see appendix V).

160.  The Group found that, in a number of countries it visited during the reporting period, few, if any, officials were aware of the measures called for in resolution 1455 (2003) and its provisions regarding the submission of names, and the listing and delisting procedures associated with the list.

161.  Many States that were aware of the listing requirements relied heavily on the exemption clause in paragraphs 4 and 5 of the resolution, referring to the possibility of compromising investigations or enforcement actions, as the reason for not listing individuals or entities. This appeared to the Group to be more in the nature of an excuse than an actual impediment to providing such names.

162.  Recent visits by the Group to certain States indicated that there appeared to be little, or no, knowledge regarding the work of the Committee or the Monitoring Group and the availability of information about the Committee and its United Nations web site. This included a lack of knowledge concerning the posting of the list. This has significantly impeded and delayed the application of updated lists.

163.  The Group also observed a serious lack of coordination between a number of the Permanent Missions to the United Nations in New York and the capitals regarding the work of the Committee and the Monitoring Group. Unfortunately this lack of coordination often jeopardizes the implementation of the relevant Security Council resolutions.

164.  The Group has concluded, from its research, review of reports, visits and discussions with government officials and experts that, despite the significant progress that has been made in the United Nations effort to combat Al-Qaida, the Taliban and their associates, some serious problems and systemic weaknesses remain with regard to the resolutions.

165.  Many of the sources of funding for Al-Qaida have not yet been uncovered or blocked. Al-Qaida continues to have access to sufficient funds to recruit, train and mount operations.

166.  Since 17 January 2002, when resolution 1390 (2002) was adopted, few if any assets of designated individuals or entities have reportedly been frozen, despite the increase in the numbers of both on the list.

167.  Those assets that have been frozen are limited to bank accounts. A serious problem exists, which appears to be widespread, namely, that States either lack the

authority or are unwilling to freeze or seize tangible assets such as businesses or property.

168. Although a number of entities, be they extremist groups, charities or businesses, have been designated on the list, only a very small number of the individuals responsible for leading or managing the operations of those entities have themselves been designated, leaving them free to set up new entities and/or continue with activities in breach of the resolution.

169. Charitable foundations continue to provide a conduit for funding the activities of Al-Qaida network and its many associates around the world.

170. To date there have been no reports submitted to the Committee of any designated individuals being stopped from entering or transiting as a result of their names being on the list, and no reports of arms being seized en route to any designated individuals or entities. Together with the fact that few additional assets have reportedly been frozen in connection with resolutions 1390 (2002) or 1455 (2003), this would clearly indicate that the resolutions in their present form are much less effective than was intended.

171. There is a reluctance on the part of many States to recognize the presence of Al-Qaida or elements of the network within their territory. There is also a reluctance to propose individuals and entities to the Committee to be listed. A lack of awareness of the resolutions and the obligation they impose further complicates the implementation of the measures. This contributes to the continuing resilience of Al-Qaida.

172. This being said, the Group has noted the many successes, around the world, of law enforcement agencies and security forces in the capture or killing of key individuals connected with Al-Qaida network and the foiling of possible attacks by elements of the network before they can be mounted. For the most part, however, these would appear to be the result of bilateral cooperation rather than the measures called for in the resolutions.

173. **The Group considers that, without a much tougher and more comprehensive resolution, in which the Security Council requests States to take the mandated measures and obliges them to cooperate fully with the Committee and its Monitoring Group, little or no progress will be achieved with regard to the sanctions regime imposed on Osama bin Laden, Al-Qaida, the Taliban and associated individuals and entities under the auspices of the Security Council.**

# VIII.  Recommendations

174. The following recommendations are based on the findings and conclusions of the Group and are intended to complement, not supersede or replace, but in some cases reinforce, the recommendations made in its four previous reports to the Committee under resolutions 1390 (2002) and 1455 (2003).

**Consolidated list**

175. States should be further encouraged to become proactive in proposing the names of individuals and entities known to be associated with Al-Qaida network, including persons who have been recruited and trained by Al-Qaida and its associated groups for terrorist purposes. The Group considers this an important

adjunct to further disrupting the ability of the network to operate and of its members to move freely between countries.

176. States should also be encouraged further to provide additional information concerning individuals and entities already included in the list. This information should include, inter alia, a description of their current location.

177. When proposals are made to designate entities associated with Al-Qaida network, they should be accompanied by requests to list the principal individuals involved with such entities, including all managers and directors implicated in the activities motivating the request for listing.

**Financial and economic asset freeze**

178. Language should be introduced into the resolutions to clarify the obligations on States to block assets other than bank accounts and other intangible financial assets. This should include direct reference to businesses or property owned or controlled by designated individuals and entities.

179. States should be encouraged further to ensure that adequate penalties are imposed for violations of any of the sanctions measures set out in the resolutions.

180. States should be encouraged further to adopt the Eight Special Recommendations on Terrorist Financing issued by FATF, and to adopt the measures recommended in its various "best practices" papers.

181. Special requirements should be imposed by States to ensure, to the extent possible, that charities route their transactions through established banking systems. In such cases the recipient organization should be required to maintain bank accounts, and to transact business as much as possible through verifiable means such as cheques and electronic transfers.

182. An increased international cooperative effort is necessary to compile and publish usable information concerning the conduct and reputation of charities, including information relating to questionable activities, such as links to terrorist financing.

183. The Security Council should consider measures requiring all States to take follow-up action to update and report at regular intervals to the Committee the status and activities of designated entities within their countries. This should include a description of the actions States are taking to ensure that such activities, if any, conform to the requirements of the measures in resolutions 1390 (2002) and 1455 (2003).

184. The Security Council may wish to consider the adoption of steps to ensure that all United Nations bodies are apprised of each designation against an entity. All United Nations bodies should terminate any association with such entities.

185. The Security Council may wish to consider establishing a data bank on charities to which information, favourable and unfavourable, could be provided by government agencies or recognized and established international charities. Such a database could serve as a due diligence reference point for concerned charities.

186. The Group believes that several proactive requirements or measures should be considered by the Security Council to stop the circumvention of the measures concerning the freezing of economic assets and resources currently in the resolutions. The measures should include:

(a)   Strengthening and clarifying asset freezing requirements to cover mingled assets, shared assets, and jointly owned assets which may continue to benefit, or are subject to manipulation by, designated individuals or entities;

(b)   Placing specific obligations on States to ensure that designated entities do not have access to offshore financial centres, and that their assets in such centres are frozen. This should include a required accounting of their assets and holdings in third countries;

(c)   Calling upon States to enact stiff penalties for the violation of laws and regulations relating to the implementation of the measures in the resolutions, including possible forfeiture of any economic resources made available to designated individuals or entities in violation of such laws;

(d)   Requiring States to identify and catalogue, wherever possible, all assets, tangible and intangible, wholly or jointly, directly or indirectly owned and controlled by a designated individual or entity that are subject to freezing under the resolutions;

(e)   Providing States with a mechanism by which they can enquire concerning the identity of assets that may be related to a designated individual or entity;

(f)   Prohibiting designated individuals from altering the status of assets subject to freezing under the resolutions. This should include a prohibition against altering business registrations, or changing business names, addresses or administering parties, without the consent of the Committee.

**Travel ban**

187. To render the list more effective, the Group recommends the extensive use by border control authorities of electronic means for sharing and searching data related to designated individuals.

188. Recognizing the importance of adequate identifiers, States should not set the standards for including names in national stop lists so high as to bar the inclusion of persons who might still be identified using the information available.

189. The Security Council may wish to call upon States to report regularly on the status or whereabouts of nationals or residents who are designated on the list. This should include any indication as to whether they have been arrested or detained, had warrants issued against them, or are deceased. States should also indicate the whereabouts of the individual, if known.

190. The information listed above should be available for distribution by the Committee and included, where possible, in the list.

191. Individuals with outstanding warrants of arrest who are stopped or detained at border entry points should be sent back to their country of origin or extradited to the country where the warrant was issued.

192. Government authorities in all countries should inform their nationals or their residents about their inclusion in the list and their obligation to strictly respect the ban on their travel. Any violation of the travel ban by the designated individual should be subject to tough penalties.

193. The Group recommends that the designated individuals should be considered as holding only one citizenship or nationality for the purpose of applying the travel ban.

**Arms embargo**

194. The arms embargo should not be limited only to the individuals and entities designated on the list but should be applied to all Al-Qaida followers and their associates.

195. Regional approaches to implementing the arms embargo should be encouraged.

196. Full cooperation should be given by all States to the Monitoring Group with respect to the discharge of its mandate regarding the implementation of the arms embargo.

197. Consideration should be given to expanding the mandate of the Monitoring Group to include some investigative powers and the authority to issue letters rogatory regarding its work.

198. All States should be encouraged to adopt, without delay, the measures incorporated in the Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All Its Aspects.

199. All States which have not yet ratified and/or implemented the following international instruments should be encouraged to do so as soon as possible. Those instruments include:

Convention on the Physical Protection of Nuclear Material

Treaty on the Non-Proliferation of Nuclear Weapons

Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction

Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction

Convention on the Marking of Plastic Explosives for the Purpose of Detection

International Convention for the Suppression of Terrorist Bombings.

200. The United Nations may wish to consider approving measures to harmonize the various controls necessary to ensure that man-portable air-defence systems do not fall into the hands of non-State actors and terrorist groups, particularly Al-Qaida or its associates or other elements of Al-Qaida network.

## Appendix I

### Chronology of incidents allegedly linked to Al-Qaida network since July 2003

This synopsis is by no means exhaustive. It has been included in the report to emphasize how numerous and widespread are the reports of incidents allegedly linked to elements of Al-Qaida network or other like-minded entities which appear to follow the same sort of extremist ideology as that espoused by Osama bin Laden. The Monitoring Group has noted that some of the claims have not yet been substantiated and that, in some cases, investigations are continuing.

The synopsis has been compiled from multiple sources, such as Afghan News Network, Agence France Presse, Associated Press, Canadian Press, Deutsche Presse-Agentur, Jang Group, Reuters News, *Al-Sharq al-Awsat*, *Arab News*, *The Asian Wall Street Journal*, *The Australian*, *Boston Globe*, *Boston Herald*, *Chicago Tribune*, *Dawn*, *Hindustan Times*, *The London Free Press*, *New York Times*, *SME*, *The Straits Times*, *USA Today*, *Washington Post*, ABC News, Al-Jazeera, Australian Broadcasting Corporation, BBC News, CBS News, CNN, Fox News, MSNBC News, Voice of America, to name many but not all.

**4 July 2003, Quetta, Pakistan**

Three terrorists, including two suicide bombers, carried out an attack on a Muslim Shiite mosque (Jama Masjid-o-Imambargah Kalaan Isna Ashri) in south-western Quetta. Two of the attackers blew themselves up with bombs attached to their bodies.

Persons killed: 52

**5 July 2003, Tushino, Russian Federation**

Two women strapped with explosives blew themselves up at a crowded outdoor rock festival at Tushino airfield in suburban Moscow, where the Russian band Crematorium was playing for an estimated 40,000 people. The attack came hours after the President of the Russian Federation signed an order for presidential elections to be held in Chechnya on 5 October 2003.

Persons killed: 16

**10 July 2003, Koronadal City, South Cotabato, Philippines**

Three persons were killed and 27 wounded as a result of an improvised bomb that exploded in the fish section of the public market in Koronadal City, the fourth such attack since February. While no group immediately claimed responsibility for the blast, the Government suspects involvement of the Moro Islamic Liberation Front and Abu Sayyaf.

Persons killed: 3

**22 July 2003, Orgun-e firebase, Paktika Province, Afghanistan**

Two rockets landed near Orgun-e firebase in south-eastern Paktika. There were no reports of casualties.

Persons killed: none

**22 July 2003, Ghecko firebase, Kandahar Province, Afghanistan**

The firebase came under rocket attack. There were no reports of casualties or damage.

Persons killed: none

**27 July 2003, Tsatsan-Yurt, Chechnya, Russian Federation**

A 20-year old female suicide bomber detonated explosives near the base of a security detail commanded by a son of the head of Chechnya's Moscow-backed administration, Ramzan Kadyrov. The female suicide bomber was killed and a female bystander slightly injured. Authorities began a search for another woman allegedly planning an attack on Kadyrov, who was not present at the base at the time.

Persons killed: 1

**29 July 2003, Naish, Kandahar Province, Afghanistan**

Armed with automatic weapons, suspected Taliban rebels ambushed government troops, killing three soldiers. They fled to a nearby mountain range.

Persons killed: 3

**29 July 2003, Spin Kotal, Kandahar Province, Afghanistan**

An Afghan working with a non-governmental organization was killed and his colleague was wounded after a group of about 30 Taliban guerrillas stopped their vehicles. The attack occurred near a site where a Salvadoran working for ICRC was killed in April.

Persons killed: 1

**1 August 2003, Mozdok, North Ossetia, Russian Federation**

Fifty people were killed and around 72 were injured when a suspected separatist Chechen rebel drove his truck loaded with ammonium nitrate explosive to the front door of a military hospital in Mozdok, where he detonated it. The four-storey hospital was completely destroyed by the explosion.

Persons killed: 50

**5 August 2003, Jakarta**

At least 13 people died and more than 149 were injured in a blast at the luxury Mariott Hotel in Jakarta. The lobby and the ground floor were both destroyed and windows were shattered as high as the 30th floor. The police, who identified the bomb ingredients as black powder, TNT and potassium chlorate, believe that the evidence suggests a link to the Jemaah Islamiyah.

Persons killed: 13

**5 August 2003, Maiwand District, Kandahar Province, Afghanistan**

Ten Afghan members of the non-governmental organization Coordination Humanitarian Assistance were attacked in their offices. When they refused to give

up the keys to their new vehicles, the armed men severely beat them and set three of their vehicles on fire.

Persons killed: none

**5 August 2003, Maiwand District, Kandahar Province, Afghanistan**

Five policemen were injured when their checkpoint in Maiwand District was attacked by fighters equipped with rocket-propelled grenades, heavy machine guns and grenades.

Persons killed: none

**6 August 2003, Kandahar Province, Afghanistan**

Four government soldiers were injured in an attack on a government post 70 km from Kandahar.

Persons killed: none

**7 August 2003, Deshu District, Helmand Province, Afghanistan**

Six Afghan soldiers and an Afghan driver for an American aid organization, Mercy Corps, who were conducting an agricultural survey in the region, were killed when about 40 suspected Taliban fighters drove up to the government offices in four vehicles and opened fire.

Persons killed: 7

**7 August 2003, Spin Buldak, Kandahar Province, Afghanistan**

Five Afghan government soldiers were killed and three were wounded when a rocket attacked their vehicles in the Mal Pul area.

Persons killed: 5

**7 August 2003, Chahar Bolak District, Balkh Province, Afghanistan**

A vehicle belonging to HALO Trust, the mine-clearance agency, was hit by a rocket in a village in the Chahar Bolak District of northern Balkh Province. The rocket, which hit the undercarriage of the vehicle, broke in half and did not explode.

Persons killed: none

**8 August 2003, Asadabad, Konar Province, Afghanistan**

Insurgents fired two rockets at a coalition base in Asadabad. There were no immediate reports of casualties or damage.

Persons killed: none

**8 August 2003, Baghdad**

A truck bomb killed 19 persons and wounded more than 50 at the Jordanian Embassy, as Iraqis waited near the entrance to apply for visas. According to reports, about 1,000 pounds of commercial-grade explosives were used in the attack. While the blast caused the collapse of the outer walls of the compound, there was no

significant damage to the embassy itself. The embassy had received a threat two days previously in the form of a letter tossed out of a passing car close to the embassy's entrance. The bombing came shortly after Jordan granted asylum to Saddam Hussein's daughters Raghd and Rana and their children.

Persons killed: 19

### 13 August 2003, Khowst Province, Afghanistan

Thirteen Taliban and Al-Qaida fighters and two Afghan border policemen were killed in an attack by insurgents on a base used by a border battalion in the Shinkai area. The insurgents, who used heavy guns, recoilless rifles, mortars and rocket-propelled grenades, conducted the attack in three phases. It is not known how many guerrillas participated in the attack but, according to Major Ghafar of the border police, the attack was led by Jalaluddin Haqqani, a top military commander and a former minister in the Taliban regime. Afghan border police seized a cache of Kalashnikov assault rifles, a telephone, radios and ammunition.

Persons killed: 15

### 13 August 2003, Lashkar Gah, Helmand Province, Afghanistan

A powerful explosion that ripped through a Toyota minibus in Nadh Ali District, around 15 km west of Lashkar Gah, killed 17 people, half of them children. The blast was caused by explosives inside the bus. No one claimed responsibility, and no arrests were made.

Persons killed: 17

### 13 August 2003, Kabul

Two students at Kabul Medical Institute were killed and one was injured when a bomb they were building exploded in a house belonging to one of the students. Police seized two old Volkswagen cars from the house in order to investigate whether the vehicles were to be used in car bomb attacks.

Persons killed: 2

### 13 August 2003, Andar District, Ghazni Province, Afghanistan

Two members of the Afghan Red Crescent Society were killed and three were injured when suspected guerrillas loyal to the former Taliban regime and the renegade Islamic warlord Gulbuddin Hekmatyar on motorcycles ambushed their convoy near the capital.

Persons killed: 2

### 14 August 2003, Khowst, Afghanistan

Three rockets landed on a suburb of the eastern town of Khowst. In addition, unidentified residential property was damaged when a bomb exploded in the area. No casualties were reported.

Persons killed: none

**16 August 2003, Zormat, Paktia Province, Afghanistan**

One 107-mm rocket landed in the vicinity of the coalition firebase at Zormat in Paktia Province. No casualties were reported.

Persons killed: none

**16 and 17 August 2003, Mazar-e Sharif, Afghanistan**

Two gunmen on motorcycles opened fire on a vehicle belonging to Save the Children, wounding both of the people in it before they were able to escape. The attack, which occurred in the Char Bolak area where a rocket was fired at a vehicle of a British-based demining agency, is being blamed on members of the resurgent Taliban movement.

Persons killed: none

**17 August 2003, Tarway, Paktika Province, Afghanistan**

An estimated 200 suspected members of the former Taliban regime attacked a police compound. After setting it ablaze, the attackers took four police officers hostage before fleeing across to Pakistan.

Persons killed: none

**18 August 2003, Lowgar Province, Afghanistan**

Ten policemen, including a provincial police chief, Abdul Khaliq, were killed by a rocket attack in an ambush on their convoy. The Taliban are being blamed for the attack.

Persons killed: 10

**18 August 2003, Barikot, Konar Province, Afghanistan**

An improvised bomb exploded near a patrolling coalition convoy in the border town of Barikot. According to reports, the bomb damaged a vehicle but did not cause any casualties.

Persons killed: none

**19 August 2003, Baghdad**

A truck bomb killed at least 22 persons and injured at least 100 at the United Nations headquarters in Baghdad. The bomb, consisting of 1,500-pound mix of aerial bombs and other munitions, was on the back of a Soviet-built Kamaz military flatbed truck. According to some reports, the main explosive used was C-4, also used in attacks on the U.S.S. *Cole*. Three groups, the Armed Vanguards of a Second Muhammad Army, Muhammad's Army and the Abu Hafs al-Masri Brigades, all claimed responsibility for the attack.

Persons killed: 22

### 19 August 2003, Asadabad, Konar Province, Afghanistan

Three rockets were fired at a coalition firebase at Asadabad. There were no reported casualties.

Persons killed: none

### 19 August 2003, Salar, Vardak Province, Afghanistan

Twenty-two Afghan nationals working for the locally run Mine Detection Centre were slightly injured after being beaten by armed men who ransacked their office.

Persons killed: none

### 20 August 2003, Sadiqabad town, Konar Province, Afghanistan

Two Afghans armed with Kalashnikovs shot Gul, a former Taliban military commander, in the north-eastern province of Konar. The attackers fled immediately. A local administration official, Mawaz Khan Afridi, explained that they have arrested five people to put pressure on the Afghan elders to hand over the two attackers.

Persons killed: 1

### 20 August 2003, Orgun, Paktika Province, Afghanistan

A United States special operations soldier died from his injuries during operations in the vicinity of Orgun in Paktika Province. Another United States soldier was injured by a bomb while on patrol in the same area. It is not clear whether the two incidents are linked.

Persons killed: 1

### 22 August 2003, Oruzgan Province, Afghanistan

Two Afghan soldiers and four Taliban fighters were killed in a clash in the central province of Oruzgan. Afghan soldiers captured nine Taliban and recovered important documents, assault rifles, shoulder-held rocket launchers and ammunition. The rest of the Taliban escaped to the south-east.

Persons killed: 6

### 22 August 2003, Dai Chupan District, Zabol Province, Afghanistan

Suspected Taliban fighters ambushed a truck full of Afghan government soldiers in the Dai Chupan District of Zabol. According to the provincial Governor Hafizullah Khan, five government soldiers and four Taliban were killed in a gun battle, while two Taliban were taken into custody. Contrary to the account of the Afghan Government, Mohammed Hanif, a Taliban spokesman, claimed that 12 Afghan soldiers were killed. He also indicated that the Taliban were able to seize 17 automatic rifles from a truck before leaving the scene.

Persons killed: at least 9

**29 August 2003, Najaf, Iraq**

A car bomb killed at least 91 people at a holy shrine in Najaf. Approximately 1,000 pounds of Soviet-era explosives were used in the bombing.

Persons killed: at least 91

**1 September 2003, Zabol Province, Afghanistan**

Four policemen died when their checkpoint, set up to guard reconstruction work on the Kabul-Kandahar highway performed by the Louis Berger Group Inc. (United States), came under fire at around 1 a.m.

Persons killed: 4

**1 September 2003, Zabol Province, Afghanistan**

Indian contractors working for the Louis Berger Group Inc. came under fire in a guesthouse where they were staying.

Persons killed: 3 dead or 3 injured (reports vary)

**2 September 2003, Muhammad Agha District, Lowgar Province, Afghanistan**

Moghul Khil school, built by villagers and teachers with the help of a Danish charity, in the Muhammad Agha District of Lowgar Province (40 miles south of Kabul) was set on fire. Leaflets stating that girls should not be allowed in the classroom were scattered around. Although no one was arrested, Afghan officials suspect the resurgent Taliban. According to reports, two other schools were set on fire last month in the same area.

**2 September 2003, Baghdad**

A car bomb killed one person at Iraqi police headquarters in Baghdad; 150 pounds of explosives were used in the attack.

Persons killed: 1

**6 September 2003, Shahwali, Kandahar Province, Afghanistan**

Five Afghan soldiers were killed and five injured when suspected Taliban ambushed their convoy in Kighai Gorge (Shahwali Kot District), about 15 miles north of Kandahar. According to Haji Granai, a military commander, 13 men with Taliban connections were being questioned.

Persons killed: 5

**6 September 2003, Gardiz, Afghanistan**

Three rockets landed near a United States-led coalition base near the town of Gardiz in Paktia Province. There were no reported casualties.

Persons killed: none

**7 September 2003, Kandahar Province, Afghanistan**

Four Afghan villagers were killed and one wounded when suspected Taliban ambushed their truck on a road between Spin Buldak and Shorawak.

Persons killed: 4

**8 September 2003, Moqur District, Ghazni Province, Afghanistan**

Four Afghan aid workers employed by the Danish Committee for Aid to Afghanistan Refugees were killed when their agency's car was ambushed.

Persons killed: 4

**9 September 2003, Arbil, Iraq**

A suicide bomber killed three persons at a United States intelligence base in Arbil. According to reports, 1,500 pounds of TNT were used.

Persons killed: 3

**11 and 12 September 2003, Kabul Province, Afghanistan**

Five rockets were fired at coalition targets in and around Kabul. First, three rockets were fired on the night of 11 September, one of them slamming into a shipping container in the main peacekeepers' compound in the east of the city. One Canadian civilian worker was injured by shrapnel from a small-calibre rocket. The second attack occurred about one km from a Canadian base in western Kabul, while the third was near the airport often used by the peacekeepers. The same airport was fired upon again on 12 September. Lastly, a 122-mm rocket was launched into the north of the city but did not explode.

Persons killed: none

**13 September 2003, Jani Khel, Paktika Province, Afghanistan**

More than 15 heavily armed attackers riding motorcycles raided a compound housing a police station and district offices. While police tried to counter the attack, they had to withdraw after running out of ammunition. The attack was being blamed on Taliban insurgents, their Al-Qaida allies and militiamen loyal to the renegade warlord Gulbuddin Hekmatyar.

Persons killed: none

**13 and 14 September 2003, Shkin, Paktika Province, Afghanistan**

Troops belonging to the United States Tenth Mountain Division came under small-arms fire, light machine gun fire and mortar during a patrol near their base in Shkin, in Paktika Province on the Pakistan border. No United States casualties were reported. The anti-coalition forces retreated towards the Pakistani border after the incident.

Persons killed: none

**15 September 2003, Magas, Ingushetia, Russian Federation**

At least three people died and 17 were injured when a truck loaded with explosives detonated near the building used as a headquarters of the Russian security service in

Ingushetia. It is not clear whether the truck was parked near the building or was driven to it by a suicide bomber. More than 100 people were working in the building at the time of the explosion. The explosion shattered glass, damaged cars and left a 3-m-wide crater near the building, which was completed in July 2003.

Persons killed: 3

### 16 September 2003, Moqur District, Ghazni Province, Afghanistan

A United States military convoy was bombed on the same road where four Afghan aid workers were attacked the previous week. The explosive device detonated about 10 m from the lead vehicle. There were no reported casualties or damage.

Persons killed: none

### 17 September 2003, Barikot, Konar Province, Afghanistan

Ten militants armed with AK-47 assault rifles and rocket-propelled grenades attacked United States-led coalition forces near a firebase in Barikot. The coalition forces called in air support and returned fire when the attackers fired at their guard post. There were no reported casualties.

Persons killed: none

### 19 September 2003, Bagram Air Base, Kabul Province, Afghanistan

A blast in a house near the entrance of the United States military Bagram Air Base north of Kabul killed three Afghan nationals and left 15 others trapped inside. The house stored ammunition.

Persons killed: 3

### 19 September 2003, Ghazni, Afghanistan

Four rockets were fired at a roadwork site along the Kabul-Kandahar highway near the town of Ghazni which houses workers and equipment of the private Turkish firm, Mensel JV. There were no reported casualties.

Persons killed: none

### 19 September 2003, Sangisar, Kandahar Province, Afghanistan

Sardar Mohammad, an Afghan police commander, was killed and two of his bodyguards were injured in a drive-by shooting. No one was arrested, but police are searching for the attackers.

Persons killed: 1

### 22 September 2003, Baghdad

A suicide bomber driving a grey 1995 Opel and wearing an explosive belt killed a 23-year old Iraqi policeman and injured at least 19 others, including United Nations workers. According to reports, the bomber was trying to get near a parking lot situated approximately 200 yards from the Canal Hotel, which housed the United Nations offices, when he was stopped by an Iraqi policeman.

Persons killed: 1

**24 September 2003, Shkin, Paktika Province, Afghanistan**

Suspected Taliban fighters fired eight rockets at a United States military base at Shkin. No casualties were reported.

Persons killed: none

**24 September 2003, Konar Province, Afghanistan**

Suspected Taliban fighters fired two rockets at a United States military base in north-eastern Konar. No casualties were reported.

Persons killed: none

**24 September 2003, Helmand Province, Afghanistan**

An aid worker belonging to an Afghan non-governmental organization, the Voluntary Association for the Rehabilitation of Afghanistan, was killed and a driver injured when suspected armed Taliban men attacked their vehicle.

Persons killed: 1

**27 September 2003, Shkin, Paktika Province, Afghanistan**

Unidentified individuals fired six rockets at the Shkin base, prompting coalition troops to respond with artillery fire. The attack did not cause any coalition casualties or damage.

Persons killed: none

**28 September 2003, Shkin, Paktika Province, Afghanistan**

Unidentified individuals fired two rockets at the Shkin coalition base. No coalition casualties or damage were reported.

Persons killed: none

**29 September 2003, Shkin, Paktika Province, Afghanistan**

A United States soldier was killed and two were wounded in a battle that left two suspected Taliban militants dead. The United States soldiers were involved in a combat manoeuvre against anti-coalition forces who were using small-arms fire.

Persons killed: 1

**1 October 2003, Dara-e-noor Nish, Kandahar Province, Afghanistan**

Ten government soldiers and two children were killed when up to 16 Taliban fighters attacked a pickup truck transporting government soldiers in the Nish area, about 45 miles north of Kandahar. One of the fighters was killed and another one wounded when the government soldiers returned fire. According to reports, one wounded Taliban fighter was captured in the area that night.

Persons killed: 1

**2 October 2003, Orgun, Paktika Province, Afghanistan**

Two people were beheaded when two fuel trucks supplying the United States-led coalition forces were ambushed by suspected Taliban insurgents. The remaining four individuals were kidnapped.

Persons killed: 2

**2 October 2003, Orgun, Paktika Province, Afghanistan**

Two Canadian peacekeepers were killed and three injured as a result of a landmine blast in Kabul.

Persons killed: 3

**9 October 2003, Baghdad**

A suicide bomber targeted a police station in Al-Sadr City, in the Shiite neighbourhood of Baghdad. Nine people were killed, including three policemen, five civilians and the suicide bomber, and 38 people were wounded.

Persons killed: 9

**10 October 2003, Kandahar, Afghanistan**

Forty Taliban and Hezb-e Islami prisoners, including Abdul Hadi, the brother of the former Taliban Defence Minister, Maulvi Obaidullah, escaped from a central jail overnight on Friday. According to reports, the escapees crawled through a tunnel, which had taken about a month to dig. The officials, who suspect that there might be a connection between the release of the former Taliban Foreign Minister, Mullah Wakil Ahmed Muttawakil, and the prison escape, said that they found a truck full of soil at the opening of the tunnel in a field nearby.

**11 October 2003, Kabul**

An American soldier was injured and an insurgent captured in a firefight that took place near a training centre for the Afghan army in the north-eastern part of Kabul. According to a statement from Bagram Air Base, three insurgents attacked United States troops who were observing a training exercise. One of the attackers was captured, after the three ran into a nearby building. The report did not state the status of the other two attackers.

Persons killed: none

**12 October 2003, Arghandab District, Zabol Province, Afghanistan**

Eight Afghani policemen were killed and two were wounded in an attack on a district office shortly before 2 a.m. on 12 October. Up to 100 Taliban guerrillas involved in the attack also burned down the district office and destroyed four vehicles.

Persons killed: 2

**12 October 2003, Baghdad**

A suicide attacker driving a white Toyota Corolla ran a security checkpoint and blew himself up in the parking lot of the Baghdad Hotel about 100 m from the

hotel's entrance, after he refused to stop to provide identification papers. Police officers shot at him to prevent him from reaching the hotel. Seven people were killed and 11 wounded, including a United States soldier, in the explosion that destroyed a car and a cement protective barrier and left a 2-ft-deep crater behind. Al-Qaida, declaring this operation No. 9, openly claimed responsibility for the attack.

Persons killed: 7

### 14 October 2003, Zabol Province, Afghanistan

Two Americans working on a road construction project were ambushed by suspected Taliban gunmen while travelling on a road to Ghazni Province. No injuries were reported.

Persons killed: none

### 14 October 2003, Baghdad

A suicide bomber blew himself up near the Turkish Embassy. The bomber was killed and six people were wounded as a result of the attack.

Persons killed: 1

### 17 October 2003, Farah Province, Afghanistan

According to State-run Kabul Television, seven people were killed and two were wounded when a group of armed men dressed in military uniforms ambushed their car on the main road between Kandahar and Herat, near Bakwa.

Persons killed: 7

### 17 October 2003, Paktia Province, Afghanistan

A group of 50 Taliban fighters briefly seized part of a road linking Khowst and Gardiz in Paktia Province. According to reports, they set up a picket, searched vehicles and punished drivers without beards in addition to confiscating and destroying music found in the vehicles.

Persons killed: none

### 17 October 2003, Konar Province, Afghanistan

Four people travelling from Pashat village to Asadabad were killed and five wounded when a bomb blew up their pickup truck. The truck's driver, his brother, the brother's son, and the daughter of another brother were among those killed.

Persons killed: 4

### 17 October 2003, Helmand Province, Afghanistan

A pickup truck carrying Afghan military intelligence agents hit a landmine south of Lashkar Gah. Two Afghan military intelligence officials were killed and three were injured as a result of the incident.

Persons killed: 2

**26 October 2003, Paktia Province, Afghanistan**

Two classrooms were destroyed by a blast at a Durnami school in Mando Zayi, about 18 km west of Khowst. Additional explosives were found during the search of the building. No injuries were reported.

Persons killed: none

**25 and 26 October 2003, Paktika Province, Afghanistan**

Two contract workers working for the CIA were killed in a gunfight by armour piercing rounds. Ten insurgents also died in the fighting.

Persons killed: 2

**26 October 2003, Baghdad**

Twenty-nine Katyusha missiles were remotely fired at Al-Rasheed Hotel, which houses the majority of the senior coalition staff, killing a United States soldier. Seventeen others were wounded. The missile-launching bay used in the attack was hidden behind a car carrying a portable generator; it contained 40 missiles but only 29 were fired. The missile-launching bay was placed in a zoo less than 100 m away from the hotel in a park called Al-Zaouraa. It has been noted that four rocket-propelled grenades were also used in the attack. It is believed that the attack had been planned for two months.

Persons killed: 1

**27 October 2003, Baghdad**

The headquarters building of the International Committee of the Red Cross in the neighbourhood of Karada was attacked by a bomb in a car which was disguised to look like a Red Cross or Red Crescent ambulance. The suicide bomber blew up the car at about 20 m from the building's entrance, as the guard prevented him from entering it. The explosion created a hole 20 m deep and close to 4 m across, and destroyed the front façade of the building. Twelve persons were killed and at least 22 were wounded as a result of the blast.

Persons killed: 12

**27 October 2003, Baghdad**

A suicide bomber, who pulled up his car to the least protected part of the compound, attacked Al-Shaab police station in northern Baghdad. While the 4-wheel drive vehicle was nearing the police station, and before it exploded, the police started shooting at it. Seven people were wounded.

Persons killed: none

**27 October 2003, Baghdad**

A suicide bomb exploded in north-eastern Baghdad close to a police station. Eight people were killed and many were wounded.

Persons killed: 8

**27 October 2003, Baghdad**

A suicide attacker dressed in police uniform driving a police car exploded the car in the courtyard of the Al-Baya'a police station in the southern district of Al-Doura. It has been reported that at least four people could have been killed as a result of the attack.

Persons killed: 0-4

**27 October 2003, Baghdad**

A suicide bomb exploded in Al-Khadra Street, close to a police station. An unknown number of people were killed and wounded.

**30 October 2003, Shah Joy District, Zabol Province, Afghanistan**

Suspected Taliban members kidnapped a Turkish engineer working on the reconstruction of the Kabul-Kandahar highway, Hassan Onal, and his Afghan driver on the highway linking the two cities. The driver was later released and sent to Ghazni Province with a letter demanding the release of six unidentified Taliban fighters.

**30 October 2003, Deh Rawood District, Oruzgan Province, Afghanistan**

A United States soldier died as a result of injuries received in a clash with 10 to 15 suspected Taliban fighters about 35 miles west of the Deh Rawood District.

Persons killed: 1

**30 October 2003, Zabol Province, Afghanistan**

Four government officials, including the brother of a district commissioner, were kidnapped and taken to mountains nearby. It is believed that the initial target was Mullah Mohammad Zafar, commissioner of the Khak Afghan District in southern Afghanistan.

Persons kidnapped: 4

## Appendix II

### Individuals, publicly identified, allegedly linked with Al-Qaida and the Taliban

| Number | Name |
| --- | --- |
| 1. | Abdeladim Akoudad |
| 2. | Abdul Azi Haji Thiming |
| 3. | Abu Bakr |
| 4. | Abu Saleh |
| 5. | Adil Charkaoui |
| 6. | Adnan alias Hasanat |
| 7. | Ahmad Sajuli bin Abdul Rahman |
| 8. | Ahmed Koshagi Kelani |
| 9. | Arifin Ali |
| 10. | Bambang Tetuko |
| 11. | Bandar ibn Abdul Rahman al-Ghamdi |
| 12. | Bilal Khazal |
| 13. | Esam Mohammed Khidr Ali |
| 14. | Gungun Rusman Gunawan |
| 15. | Hamid Razak/Hamid Razzaq |
| 16. | Hasam Alhusein |
| 17. | Ibrahim Obaidallah Al-Harbi |
| 18. | Iksan Miarso bin Warno Wibatso |
| 19. | Mahmood Afif Abdeljalil |
| 20. | Maisuri Haji Abdullah |
| 21. | Mayahi Haji Doloh |
| 22. | Moammar Kawama alias Ibn al-Shahid |
| 23. | Mohamed el Osmani |
| 24. | Mohamed Javed |
| 25. | Muchtar Daeng Lau |
| 26. | Muhaimin Yahya alias Siat |
| 27. | Muhammad Jalaludin Mading |
| 28. | Mullah Sharafuddin |
| 29. | Noor Islam |
| 30. | Osama Kasir |
| 31. | Payo Khan |
| 32. | Qalam |
| 33. | Sadik Merizak |
| 34. | Saifuddin |
| 35. | Samarn Wakaji |
| 36. | Sanae Al-Ghariss |
| 37. | Sulaiiman Dimansalang |
| 38. | Sumsul Bahri aka Farhan |
| 39. | Taufik Rifqi/Taufek Refke |
| 40. | Tayseer Alouni |
| 41. | Waemahadi Wae-dao |
| 42. | Wahid Koshagi Kelani |
| 43. | Willie Virgile Brigitte |
| 44. | Yaser Al-Sabeh |
| 45. | Zari Gul |

## Appendix III

### Assets frozen as reported by Member States

| Country | Number of assets frozen | Amount frozen | Amount in United States dollars[a] |
|---|---|---|---|
| Austria | 1 | $4 000.00 | 4 000.00 |
| Bahrain | not specified | not specified | - |
| Belgium | not specified | €4 568.1 | 5 316.35 |
| Canada | 17 | $340 000.00 | 340 000.00 |
| France | 3 | €30 198.22 | 35 144.70 |
| Germany | 10 | €4 935.75 | 5 744.23 |
| Italy | 64 | €435 000.00 | 506 253.00 |
| Japan | 351 | not specified | - |
| Liechtenstein | 2 | SwF 182 000.00 | 136 616.00 |
| Morocco | not specified | not specified | - |
| Netherlands | 1 | €2 763.21 | 3 215.82 |
| Norway | 1 | $1 000.00 | 1 000.00 |
| Pakistan | 22 | $10 655 680.40 | 10 655 680.40 |
| Portugal | 3 | €323.12 | 376.05 |
| Saudi Arabia | 41 | $5 679 400.00 | 5 679 400.00 |
| Spain | 8 | Ptas 29 593.00 | 207.00 |
| Sweden | not specified | SKr 1 200 000.00 | 153 986.00 |
| Switzerland | 82 | SwF 34 000 000.00 | 25 521 693.00 |
| Tunisia | 3 | not specified | - |
| Turkey | 1 | 2 000 000.00 | 2 000 000.00 |
| United Kingdom | - | £334 428.14 | 566 789.00 |
| United States of America | - | $29 900 000.00 | 29 900 000.00 |
| Yemen | 1 | YRls 5 900.00 | 35.74 |
| **Total amount frozen** | | | **75 003 068.79** |

[a] The total figure quoted is approximate. It is based on the rates of exchange applicable on 1 November 2003.

**Appendix IV**

### Nada and Nasreddin networks



**Appendix V**

### Member States that have not submitted a 90-day report pursuant to Security Council resolution 1455 (2003)

| Number | Country | Region | Subregion |
|---|---|---|---|
| 1. | Afghanistan[a] | Asia | South-Central Asia |
| 2. | Albania[a] | Europe | Southern Europe |
| 3. | Andorra | Europe | Southern Europe |
| 4. | Antigua and Barbuda | Latin America | Caribbean/Latin America |
| 5. | Armenia | Asia | Western Asia |
| 6. | Azerbaijan | Asia | Western Asia |
| 7. | Bangladesh[a] | Asia | South-Central Asia |
| 8. | Barbados | Latin America | Caribbean/Latin America |
| 9. | Belize | Latin America | Central America |
| 10. | Benin | Africa | Western Africa |
| 11. | Bhutan | Asia | South-Central Asia |
| 12. | Bolivia | Latin America | South America |
| 13. | Bosnia and Herzegovina[a] | Europe | Southern Europe |
| 14. | Botswana | Africa | Southern Africa |
| 15. | Brunei Darussalam[a] | Asia | South-eastern Asia |
| 16. | Burkina Faso | Africa | Western Africa |
| 17. | Burundi | Africa | Eastern Africa |
| 18. | Cambodia[a] | Asia | South-eastern Asia |
| 19. | Cameroon | Africa | Middle Africa |
| 20. | Cape Verde | Africa | Western Africa |
| 21. | Central African Republic | Africa | Middle Africa |
| 22. | Chad[a] | Africa | Middle Africa |
| 23. | Comoros[a] | Africa | Eastern Africa |
| 24. | Congo | Africa | Middle Africa |
| 25. | Costa Rica | Latin America | Central America |
| 26. | Côte d'Ivoire | Africa | Western Africa |
| 27. | Cyprus | Asia | Western Asia |
| 28. | Democratic People's Republic of Korea | Asia | Eastern Asia |
| 29. | Democratic Republic of the Congo | Africa | Middle Africa |
| 30. | Djibouti[a] | Africa | Eastern Africa |
| 31. | Dominica | Latin America | Caribbean/Latin America |
| 32. | Dominican Republic | Latin America | Caribbean/Latin America |
| 33. | Egypt[a] | Africa | Northern Africa |
| 34. | El Salvador | Latin America | Central America |
| 35. | Equatorial Guinea | Africa | Middle Africa |
| 36. | Eritrea | Africa | Eastern Africa |
| 37. | Estonia | Europe | Northern Europe |
| 38. | Ethiopia | Africa | Eastern Africa |
| 39. | Fiji | Oceania | Oceania/Melanesia |
| 40. | Gabon | Africa | Middle Africa |
| 41. | Gambia | Africa | Western Africa |

| Number | Country | Region | Subregion |
|---|---|---|---|
| 42. | Georgia[a] | Asia | Western Asia |
| 43. | Ghana | Africa | Western Africa |
| 44. | Grenada | Latin America | Caribbean/Latin America |
| 45. | Guinea-Bissau | Africa | Western Africa |
| 46. | Guyana | Latin America | South America |
| 47. | Haiti | Latin America | Caribbean/Latin America |
| 48. | Honduras | Latin America | Central America |
| 49. | Indonesia[a] | Asia | South-eastern Asia |
| 50. | Iraq | Asia | Western Asia |
| 51. | Ireland | Europe | Northern Europe |
| 52. | Jamaica | Latin America | Caribbean/Latin America |
| 53. | Kenya[a] | Africa | Eastern Africa |
| 54. | Kiribati | Oceania | Oceania/Micronesia |
| 55. | Kyrgyzstan[a] | Asia | South-Central Asia |
| 56. | Latvia | Europe | Northern Europe |
| 57. | Liberia | Africa | Western Africa |
| 58. | Libyan Arab Jamahiriya[a] | Africa | Northern Africa |
| 59. | Lithuania | Europe | Northern Europe |
| 60. | Luxembourg | Europe | Western Europe |
| 61. | Madagascar | Africa | Eastern Africa |
| 62. | Malawi | Africa | Eastern Africa |
| 63. | Maldives[a] | Asia | South-Central Asia |
| 64. | Mali[a] | Africa | Western Africa |
| 65. | Malta[a] | Europe | Southern Europe |
| 66. | Marshall Islands | Oceania | Oceania/Micronesia |
| 67. | Mauritania[a] | Africa | Western Africa |
| 68. | Micronesia | Oceania | Oceania/Micronesia |
| 69. | Mongolia | Asia | Eastern Asia |
| 70. | Mozambique | Africa | Eastern Africa |
| 71. | Myanmar | Asia | South-eastern Asia |
| 72. | Namibia | Africa | Southern Africa |
| 73. | Nauru | Oceania | Oceania/Micronesia |
| 74. | Nepal | Asia | South-Central Asia |
| 75. | Nicaragua | Latin America | Central America |
| 76. | Niger[a] | Africa | Western Africa |
| 77. | Nigeria[a] | Africa | Western Africa |
| 78. | Oman | Asia | Western Asia |
| 79. | Palau | Oceania | Oceania/Micronesia |
| 80. | Panama | Latin America | Central America |
| 81. | Papua New Guinea | Oceania | Oceania/Melanesia |
| 82. | Rwanda | Africa | Eastern Africa |
| 83. | Saint Kitts and Nevis | Latin America | Caribbean/Latin America |
| 84. | Santa Lucia | Latin America | Caribbean/Latin America |
| 85. | Saint Vincent and the Grenadines | Latin America | Caribbean/Latin America |
| 86. | Samoa | Oceania | Oceania/Polynesia |
| 87. | San Marino | Europe | Southern Europe |
| 88. | Sao Tome and Principe | Africa | Middle Africa |

S/2003/1070

| Number | Country | Region | Subregion |
|--------|---------|--------|-----------|
| 89. | Senegal | Africa | Western Africa |
| 90. | Seychelles | Africa | Eastern Africa |
| 91. | Sierra Leone | Africa | Western Africa |
| 92. | Solomon Islands | Oceania | Oceania/Melanesia |
| 93. | Somalia[a] | Africa | Eastern Africa |
| 94. | Sri Lanka | Asia | South-Central Asia |
| 95. | Sudan[a] | Africa | Northern Africa |
| 96. | Suriname | Latin America | South America |
| 97. | Swaziland | Africa | Southern Africa |
| 98. | Timor-Leste | Asia | South-eastern Asia |
| 99. | Togo | Africa | Western Africa |
| 100. | Trinidad and Tobago | Latin America | Caribbean/Latin America |
| 101. | Tuvalu | Oceania | Oceania/Polynesia |
| 102. | Uganda | Africa | Eastern Africa |
| 103. | United Republic of Tanzania[a] | Africa | Eastern Africa |
| 104. | Uruguay | Latin America | South America |
| 105. | Uzbekistan[a] | Asia | South-Central Asia |
| 106. | Vanuatu | Oceania | Oceania/Melanesia |
| 107. | Zambia | Africa | Eastern Africa |
| 108. | Zimbabwe | Africa | Eastern Africa |

[a] See paragraph 159 of the report.

**Appendix VI**

### Analysis of reports submitted by Member States

# Contents

*Page*

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

    General observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

Threat assessment by States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

    The fear of stigma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

    Engaging in dialogue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

The list: only as strong as its weakest link . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

    Technical hindrances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

    Other hindrances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

    Towards a more credible list . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

Financial and economic asset freeze . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

    Domestic legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

    Operational implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

    Freezing and unfreezing of assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72

    Informal remittance systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

    Charities and non-profit organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

    Precious commodities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

    Conclusions and outlook on the asset freeze . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

Travel ban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

    Effectiveness of the travel ban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

    Conclusions and outlook on the travel ban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

Arms embargo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

    Scope of the arms embargo: weapons of mass destruction and export controls . . . . . . . . .   77

    Enforcing the arms embargo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78

    Arms-brokering systems: a measure for the future . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

    Role of international conventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

    Conclusions and outlook on the arms embargo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

Future reporting requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

## Introduction

1.    In paragraph 6 of resolution 1455 (2003) the Security Council called upon all States to submit an updated report on all steps taken to implement the measures referred to in paragraph 1 of the resolution and all related investigations and enforcement actions, including a comprehensive summary of frozen assets of listed individuals and entities.

2.    The Security Council furthermore invited States to inform the Committee of the adoption of legislative enactments or administrative acts to enforce and strengthen the measures imposed against their nationals and other individuals or entities operating in their territory to prevent and punish violations of the sanctions regime against Al-Qaida and the Taliban.

3.    To assist States with the submission of their reports, the Committee issued a document entitled "Guidance for reports required of all States pursuant to paragraphs 6 and 12 of resolution 1455 (2003)" containing 26 questions, grouped as follows: Introduction, Consolidated list, Financial and economic asset freeze, Travel ban, Arms embargo, and Assistance and conclusion.

4.    As at 30 October 2003 a total of 83 reports had been submitted and reviewed. The methodology applied in the in-depth analysis of the reports had two levels, one measuring the scope of reporting and the other the degree of implementation of the sanctions against Al-Qaida and the Taliban. The analysis was based on the information as presented by States in their reports. Other reports such as those submitted pursuant to paragraph 6 of Security Council resolution 1390 (2002) and those submitted to the Counter-Terrorism Committee were also taken into account whenever required to gain a deeper understanding of the degree of implementation.

5.    The statistics relating to submitted reports are as follows:

   • 83 States submitted a report under resolution 1455 (2003)

   • 86 States submitted a report under resolution 1390 (2002)

   • 66 States submitted a report under both resolutions

   • 88 States have not submitted a report under either resolution

   • 20 States submitted a report only under resolution 1390 (2002)

   • 17 States submitted a report only under resolution 1455 (2003)

It must be stressed that 108 States did not submit a report under resolution 1455 (2003). As reflected in figure I, this corresponds to 57 per cent of all States. This analysis therefore does not project a picture of the total possible implementation.



**Figure I**

**Distribution of reporting and non-reporting States**

Reporting States 43%

Non-reporting States 57%

6.    Figures II and III illustrate the assessment of two aspects of the reports: the scope of reporting (extensiveness of information provided) and the scope of implementation of the measures. The four-point scale applied ranged from incomplete to complete. With regard to the reporting aspect, "complete reporting" entailed having provided all the information requested, whereas "incomplete reporting" applied to reports not covering the requested elements. As illustrated in figure II, the vast majority of reports had addressed most of the issues requested, thus providing either complete or extensive reporting.



**Figure II**
**Scope of reporting on measures taken by States**

7.    Concerning the assessment of the degree of implementation of the sanctions measures, it should be noted that the assessment took into account only the information provided by States in their reports. Thus "complete implementation" would entail that a report had provided information indicating that all three sanctions measures had been fully implemented. As illustrated in figure III, none of the reports submitted indicated the complete implementation of every aspect of the measures. However, almost half of reporting States provided information that indicated extensive implementation of the sanctions regime.



**Figure III**
**Scope of implementation of measures as reported by States**

**General observations**

8.    The majority of States followed the guidance in preparing their reports under resolution 1455 (2003). The depth of description and detail varied greatly and in general reports prepared according to the guidance tended to be more comprehensive and provided more substantive and comparable information than

reports submitted under resolution 1390 (2002). However, a number of replies submitted either did not address the issues in detail or were repetitive. This resulted in gaps and overlaps, thus limiting the possibility of assessing the implementation.

9.    Most of the States reported that they had encountered problems because of insufficient information on names of individuals and entities on the consolidated list. A number of ways to address some of the shortcomings were suggested.

10.    The sections of the reports that addressed the implementation of the financial and economic asset freeze tended to provide more information than the sections dealing with the travel ban and the arms embargo. Also noticeable was the fact that most of the legislation recently adopted or amended dealt specifically with financing of terrorist activities and money-laundering laws.

11.    The data provided by States concerning the travel ban highlighted the shortcomings of the list and the limitations States experienced in implementing this measure.

12.    The information provided concerning the arms embargo covered primarily conventional arms, thus indicating that the measures in place are not sufficient to control dual-use technology and other sensitive material that may be used for the development of weapons of mass destruction. In addition, the scant regulation on arms brokering proved to be an area where there is ample room for improvement.

13.    Some States expressed the need for technical assistance in implementing the sanctions measures against Al-Qaida and the Taliban and in a number of cases the specific areas where assistance was needed were highlighted.

## Threat assessment by States

14.    The introductory question of the guidance provided an open invitation to States to describe activities of Osama Bin Laden, Al-Qaida, the Taliban and their associates, and the threat they posed to their countries and the region, as well as likely trends, thus providing a unique opportunity to evaluate how those groups are perceived. In spite of this, the great majority of States chose a cautious approach, providing only brief responses with few details.

15.    A majority of reporting States responded to the question concerning the assessment of the Al-Qaida threat, but the replies varied greatly in level of detail. Almost half of the reporting States asserted that within their territory no activities of the designated individuals or entities had been detected. Moreover, most of the responses did not provide an assessment of the threat Al-Qaida posed to the country or the region, or of likely trends. The low number of responses fully acknowledging the domestic threat was in many cases coupled with a greater preparedness to point to an unspecified global threat that had to be addressed internationally. Many States reiterated their full and continued commitment to collaborating with the international community in combating Al-Qaida and the Taliban.

16.    A number of States indicated the expectation that the threat to their country was likely to increase in the future. The reasons provided varied from probable links of collaboration between Al-Qaida and other factions to the risk of their territory being used as a potential transit route for illegal trafficking as it relates to the financing of terrorism, and the degree of their involvement in counter-terrorism

efforts. Meanwhile, a number of States did not see a threat to their country, but foresaw possible attacks on foreign interests within their territory.

17.   Furthermore, a few States stressed the importance of also addressing the underlying causes, such as poverty and global development gaps, in the overall approach in the fight against terrorism.

18.   It should be noticed that some States tended to apply an all-inclusive definition of Al-Qaida, reporting on extremist and/or criminal groups within their territory, without providing detailed information on any association to Al-Qaida. This all-encompassing definition of Al-Qaida is significant as it may prove to have an impact on the ability of States to fully implement the sanctions regime.

**The fear of stigma**

19.   In his briefing to the Security Council on 29 July 2003 the Chairman of the Committee stated that recognition of the possible presence of Al-Qaida or those associated with the network within their territory appears to be a stigma to some States. By and large this was corroborated by the responses, which indicated a fear of stigmatization in acknowledging the threat that Al-Qaida may pose. One of the clearest indicators of this trend was the fact that almost a fifth of reporting States did not comment on or dismissed the threat, although in some of those countries there had been Al-Qaida-related activities, including dismantling of cells and uncovering of financial operations, as reflected in other parts of the reports.

20.   The fear of stigmatization was particularly apparent in the reports of some countries bordering Afghanistan. These either did not address the issue directly or asserted the non-existence of Al-Qaida and the Taliban within their territories. Nevertheless, other parts of the reports, especially in the cases of the Islamic Republic of Iran, Pakistan and Tajikistan, gave evidence of ongoing activities aimed at preventing and combating Al-Qaida and the Taliban, such as enhancement of border controls, ongoing investigations concerning alleged Al-Qaida operatives and arrests of suspected individuals.

21.   Taking into account the relevance of the region that Afghanistan and its neighbours constitute and the evidence of recent attacks and detentions linked to Al-Qaida and the Taliban, the vague recognition of the potential threat is worrisome. In spite of all measures taken to combat Al-Qaida, the Taliban and their associates in those countries it is unlikely that the threat they pose to the area is, as reported, close to non-existent. These examples confirm the fear of stigmatization, which, in the light of the considerable international focus on combating Al-Qaida, may lead some States to place greater emphasis on demonstrating effectiveness, or even downplaying their vulnerability, than addressing the complex matter through collective dialogue.

**Engaging in dialogue**

22.   Some reporting States showed a greater readiness to engage in a dialogue to address the threat posed by Al-Qaida and the Taliban by providing detailed assessments and descriptions of incidents of Al-Qaida activities, detentions and investigations.

23.   For instance, France reported on several operations having shown that "terrorist networks, both active and logistical, are still present in French territory". Those operations involved dismantling the support structure of operatives with ties to Al-Qaida and arrests of several individuals.

24.   In its report, Italy recognized the presence of radical groups linked to Al-Qaida inside its territory and provided an extensive description of various intelligence operations aimed at dismantling cells primarily engaged in providing logistical support such as procurement of counterfeit or false documents and the recruitment of volunteers for training camps.

25.   Another example was provided by the Philippines, which recognized the activities of Osama bin Laden, who has "apparently established numerous organizations, corporation and charitable institutions, some of which are under the control of his brother-in-law Mohammed Jamal Khalifa". Those entities are "… being utilized as conduits of funds for local extremists and their terrorist-related activities".

26.   A number of Central and South American States highlighted the vulnerability of certain areas and the risk of future Al-Qaida operations. For instance, both Argentina and Paraguay referred to the "triborder area", which was deemed vulnerable to financing of terrorism through profits from illegal trafficking. Colombia pointed to the possibility of a future link between the Revolutionary Armed Forces of Colombia (FARC) and Al-Qaida, owing to the mutual benefit in arms trading and financing of activities through drug trafficking. Guatemala deemed parts of its territory vulnerable to being used as a transit route for trafficking in drugs, arms or explosives or as basis for money-laundering. Some of these States stressed the need for assistance in dealing with some of the issues of concern.

27.   In describing the internal presence of Al-Qaida some States distinguished between the core "Al-Qaida organization/network/structure" and the peripheral "sympathizers/messengers/associates of Al-Qaida" mainly involved in financing, logistics and other supporting activities. The tendency, as in the cases of Canada, Colombia, the Netherlands and Spain, was to exclude the former possibility while acknowledging the latter option of a less structured presence of Al-Qaida "affiliates".

## The list: only as strong as its weakest link

28.   The list provides the foundation for the effective implementation of Security Council resolution 1455 (2003). It is one of the essential tools the international community has in the fight against Al-Qaida, the Taliban and their associates. Indeed, the value added to the implementation of the travel ban, asset freeze and arms embargo by an operational, user-friendly list is immeasurable.

29.   The various technical and political impediments highlighted in the reports received from States as well as the suggestions outlined below, some of which were provided by reporting States, will demonstrate that countries possessing enough political will can indeed contribute to strengthening this invaluable tool. It is therefore imperative that States and the Committee continuously strengthen the list in order to give the resolution a greater impact in this international challenge. As long as there are names on the list with insufficient identifiers and as long as the list is not fully implemented by all States, this foundation is in practical terms only "as strong as its weakest link".

### Technical hindrances

30.   A significant number of reporting States indicated that they had encountered or continued to experience problems with the names of individuals and entities on the

list. The predominant shortcoming of the list continues to be insufficient identifiers, which actually deters States from posting listed individuals on their watch lists. In some cases, this has resulted in making the processing of travellers cumbersome, in several errors by border control authorities and as in undermining the effectiveness of freezing funds by financial institutions. It should be noted that not a single State reported on using the list while implementing the arms embargo or on experiencing any technical difficulties in this regard.

31.   Indeed, States of various regions pointed out that, owing to incomplete information on designated individuals or entities, it is impossible to effectively search for or monitor their activities. The following sampling from the reports illustrates this obstacle in the actual implementation of the travel ban and freezing of assets. Liechtenstein reported that, when freezing assets, it is often not able to freeze the accounts of a given individual without having a date of birth. It further reported that some of the aliases listed give rise to confusion. Pakistan reported that in some cases detailed particulars are not given in the list, which leads to problems in identifying individuals. Portugal declared that lack of identifying data created problems: "In one case one name on the list corresponded to around 50 identical names in the database of a banking institution." Serbia and Montenegro stated, "The Security Agency lacks precise data for identifying individuals. In this regard a physical description is deemed helpful." South Africa noted that the difficulty with incomplete data hinders the positive identification of individuals.

32.   Other States informed the Committee that transliteration from Arabic to English was proving to be an additional obstacle. For example, Turkey observed that the listing of all designated individuals and entities is difficult when there are different spellings of the same name. Another facet of the spelling impediment is exemplified by the listing of an entity with reported activities in Lebanon. The group is officially designated with the spelling Asbat al-Ansar. The first word could be spelled with an initial U or E depending on the transliteration. Indeed, there are quite a few variations, but listing or incorporating an individual or entity's name into a State's watch list using spelling variations may result in a lack of detection while authorities are searching the list electronically or manually in their efforts to enforce the sanctions measures. To overcome these technical impediments, several States suggested that the list be provided in Arabic. This would enable States that use the Arabic alphabet to easily incorporate the data and to effectively search and monitor listed individuals and entities.

33.   Finally, several States reported that designated individuals on the list could not be placed on their national lists unless there was an international arrest warrant or a judicial charge against them.

**Other hindrances**

34.   The reports indicated that various obstacles may be discouraging States from submitting new names and additional identifiers to the Committee. Excluding the confidentiality of ongoing investigations, only 22 of 83 reporting States had identified designated individuals and entities or their associates within their territories. Even fewer reported having designated individuals and entities or potential designees as nationals of their countries. Of those that did report either identifying listed individuals and entities within their territories, or carrying out surveillance activities, arrests and sentencing of Al-Qaida members or their

associates, only a few indicated their intention to submit new names and additional identifiers to the Committee. Indeed, most States did not mention submitting names even though they had detected the presence of Al-Qaida in their territory. For instance, there are currently more than 20 designated individuals who are reportedly nationals or residents of Tunisia and yet its report did not fully address this matter.

35.   This obvious gap between the actual activities of States in combating Al-Qaida, the Taliban and their associates and what is reported of States' activities to the Committee has a contrary effect to that intended by the resolution, in that it reduces the list's effectiveness and will render it insignificant unless States proactively seek to update and report on their actions in their fight against Al-Qaida and its associates to the Committee. Logically, this should commence with the exchange of information between States and the submission of sufficient information on the names of individuals and entities that are known to them. As mentioned earlier, only a limited number of States reported that they had submitted names or were planning to submit names to the Committee.

36.   Indeed, it seems pertinent to refer to paragraph 4 of Security Council resolution 1455 (2003), in which the Council:

> "… stresses to all Member States the importance of submitting to the Committee the names and identifying information, to the extent possible, of and about members of the Al-Qaida organization and the Taliban and other individuals, groups, undertakings and entities associated with them so that the Committee can consider adding new names and details to its list, unless to do so would compromise investigations or enforcement actions".

Almost a third of reporting States offered some relevant information on ongoing investigations and enforcement actions. Several of them did not invoke the clause of confidentiality on ongoing investigations. They also did not provide additional information and updates on specific enforcement actions, particularly States bordering or neighbouring Afghanistan, such as the Islamic Republic of Iran, Pakistan, Saudi Arabia, Tajikistan, Turkmenistan and Uzbekistan. The provision of critical data on ongoing investigations and enforcement would assist in bridging the gap between the actual activities being undertaken by States and their current reporting on those activities to the Committee.

37.   In paragraph 7 of resolution 1455 (2003) the Security Council called upon all States, relevant United Nations bodies, and, as appropriate, other organizations and interested parties to cooperate fully with the Committee, including supplying such information as might be sought by the Committee pursuant to all pertinent resolutions and by providing all relevant information, to the extent possible, to facilitate proper identification of all listed individuals and entities.

38.   In order for the Committee to proactively assist and monitor the implementation of the measures, States must intensify their collaboration with the Committee and be more forthcoming with critical information. Again, it is necessary to point out that the identification and inclusion of key players, be they individuals or entities, is highly warranted for the effective implementation of the resolution.

39.   The majority of reporting States informed the Committee that listed individuals and entities had neither brought any lawsuits nor engaged in any legal proceedings against their authorities because of inclusion in the list. Only five States reported having lawsuits filed. These challenged the listing of individuals and

entities and requested either their delisting or the unfreezing of their assets. Switzerland reported that several individuals requested the removal of their names from the list and initiated the delisting procedure according to the Committee's guidelines. Sweden was the only Member State that reported the actual delisting of two individuals.

**Towards a more credible list**

40.   In reviewing the list, it is apparent from the findings set out above that there are names that do not have enough identifiers. This warrants some action on the part of States and the Committee. Names without sufficient identifiers are problematic. Listing a name used commonly without distinct details of an individual is ineffectual. The Committee should therefore consider and decide upon the procedures that could be adopted to resolve this matter. The Committee could also consider setting a time frame for States to submit additional information. If the information is not provided within the allotted time, the Committee may wish to discuss possible follow-up action.

41.   When listing individuals, a State submits to the Committee the names of individuals and entities with varying degrees of verifying information. This process could be further clarified and made more transparent by introducing the requirement to include minimum verification criteria as well as minimum identifying data. This could be achieved by having the submitting Member State engage in bilateral or multilateral discussions with the State or States (as in the delisting process) where the individual is a national or resident or where the entity or its management is legally based or is operating. Moreover, the Committee should amend its guidelines to outline specific minimum criteria for listing individuals and entities. It would also be useful if a standardized format for submission of names and details were adopted.

42.   The Committee initiated a dialogue with States during 2002 by sending letters requesting updates and additional information on listed individuals and only a few States responded and provided the much-needed additional information. Certainly, the Committee recently updated the Taliban section of the list when the Government of Afghanistan, in conjunction with the Monitoring Group and the Secretariat, collaborated to effect those changes. This positive action highlights the urgency of stepping up the exchange of information as well as cooperation and collaboration between States and the Committee. Much more remains to be done in this regard.

43.   The Committee, for its part, may wish to consider amending the criteria currently in use to further facilitate the use of the list. This should in practice provide the Committee with ample room to manoeuvre in amending and updating the list. To date, there still remain on the list names with insufficient identifiers as well as names of individuals who are reportedly dead.

## Financial and economic asset freeze

**Domestic legislation**

44.   States were asked to provide information regarding their domestic legislation to implement the asset freeze as required by resolutions 1390 (2002) and 1455 (2003).

45.   The vast majority of reporting States indicated that they had specific legal instruments to implement the freezing of assets linked to Al-Qaida or Taliban

financial networks as required by the resolutions aforementioned. Four States did not address the matter. They were Angola, the former Yugoslav Republic of Macedonia, Saudi Arabia and Ukraine.

46.   Other States reported that they did not have specific legislation, but were able to invoke, *ex lege*, other legislative enactments to freeze assets, such as anti-money-laundering laws and anti-terrorism acts. In other instances they can call upon the self-executing application of the Charter of the United Nations to fulfil the obligations under Security Council resolutions concerning the freezing of assets. For instance, Australia reported that it "has implemented the obligations to freeze the assets of listed individuals and entities through the Charter of the United Nations …. From the moment an individual or entity is listed by the Committee, an obligation to freeze the assets of that individual or entity under Australian law is automatically activated".

47.   Several States that lack specific legislation reported not having legal provision to criminalize the financing of terrorist acts. Colombia noted that financing of terrorist activities is currently not a criminal offence, but a proposal has been submitted for consideration to the competent authorities to remedy this. It also noted that if needed the authorities can apply other legislation in place to criminalize the financing of terrorism.

48.   Other States indicated that they were in the process of identifying areas where assistance would enable them to fully implement the financial freeze as stipulated in the sanctions against Al-Qaida and the Taliban. For instance, Guinea requested assistance in elaborating specific legislation to freeze assets linked to terrorism.

49.   The reports indicated mainly two procedures on which the freezing of assets were based, one administrative, the other judicial. The administrative process neither requires the prior notification nor the approval of the judicial authorities. Administrative orders to freeze assets can therefore be carried out expeditiously.

50.   Other States indicated that their legislation required a judicial order to freeze the assets of designated individuals and entities. The requirement for a judicial order is in most cases observed in those States whose legal systems are based on the provisions of civil law. Some States such as Chile and Spain reported that their authorities were considering the adoption of new measures to expedite the process of freezing assets belonging to designated individuals and entities.

51.   In some cases both procedures are applied, freezing assets through an administrative order while awaiting, within a fixed period of time, a judicial ratification to confirm the freezing order. The judicial authorities can either endorse or invalidate the decision taken by the administrative authorities. These procedures were reported to be in place in countries such as Cuba, the Philippines, Qatar and Switzerland.

52.   Moreover, a number of States reported that they had ratified or were about to ratify the International Convention for the Suppression of the Financing of Terrorism (1999). The ratification of the Convention paves the way for introducing new legislation and/or amending existing legislation. There is a clear link between States having ratified the Convention and the existence in those States of proper legal instruments to implement the assets freeze.

53.   The provisions of the Convention can be integrated within national legislation at two levels: either adjusting, prior to the ratification, the existing national legislation on fighting the financing of terrorism to the criteria set by the

Convention, or, after the deposit of the instrument of ratification, since the Convention is directly applicable as a national law, setting up the required legal instruments to ensure that its provisions are put into force. To date, of the 83 reporting States, 41 have ratified the Convention.

54.   Regarding the impediments to implementing the asset freeze, the Philippines reported that the impediments previously derived from the Philippine Bank Secrecy Law have been addressed by amendments to the law to enhance the power of the anti-money-laundering authorities.

## Operational implementation

55.   Most States provided information on the structure in place within their Governments to identify and investigate financial networks related to Osama bin Laden, Al-Qaida or the Taliban. The information submitted varied greatly. The majority of reporting States indicated the existence of some operational measures that addressed the issue but did not provide detailed information on how they function or how the measures were coordinated. The lack of information made it somewhat difficult to reach a concrete conclusion on the structures in place.

56.   Certain States did not report on their national structures or mechanisms to identify and investigate designated individuals and entities even though they indicated having legislation in place to freeze assets. This was the case for States such as Austria, Bahrain, Hungary, Israel, Slovenia, the Syrian Arab Republic and Tajikistan.

57.   For the most part the review of the reports indicated that States had taken practical steps to adopt policies to facilitate and strengthen the exchange of information with the authorities of other States. Few indicated that they had designated one agency or department to lead bilateral and multilateral efforts and actions required to locate and freeze assets. In some cases the reports made reference to the Forty Recommendations of the Financial Action Task Force (FATF) on anti-money-laundering measures and the Eight Special Recommendations on Terrorist Financing, to the Basel Core Principles for Effective Banking Supervision and the recommendations of the Egmont Group. Germany reported enacting into law the FATF Eight Special Recommendations on Terrorist Financing.

58.   Regarding the practical steps that banks and other financial institutions are required to take to locate funds linked to Al-Qaida and/or its associates, a majority of States reported having the necessary procedures in place. Generally, there are two types of authority to which financial institutions have to report: ad hoc or administrative authorities and judicial authorities.

59.   For instance, suspicious transactions reports are generally sent to the Central Bank or designated committees overseeing the freezing of assets. In other cases, suspicious transactions reports are sent to national ministries, including the Ministry of Finance, the Interior and Foreign Affairs. Generally, States have established a ceiling beyond which financial operations must be reported to the designated authorities. The amount is usually $10,000.

60.   As a general trend, little information was provided on the "due diligence" policy that financial institutions may apply in dealing with their customers. More detailed descriptions were presented regarding the "know your customer" criteria, which are applied by the financial institutions of the majority of reporting States.

61.   Moreover, some reporting States neither answered in a detailed way nor reported on the steps that banks and financial institutions have to take or the procedural instruments in place to investigate and identify assets of Al-Qaida and its associates.

**Freezing and unfreezing of assets**

62.   As reported, 26 States have frozen approximately $75 million. The amount of assets frozen was given in the national currencies of the States. To facilitate the evaluation the reported amounts were converted into United States dollars. Fifteen States reported freezing approximately $27 million under resolution 1390 (2002). The entities and individuals whose assets have been frozen are either listed on the United Nations list or included in other lists. However, while a significant number of individuals have been added to the list in the past year, the amount of frozen funds has not increased in tandem with expectations. It should be noted that the amounts reflect only the activities in the formal banking system.

63.   According to the information submitted, reporting States can be grouped as follows:

(a)   States that reported having frozen assets and provided comprehensive information regarding the amount, the type of assets and the name of the asset holder. For instance, Italy, Pakistan and Spain provided the names of the banks, the number of accounts and the names of the account holders. However, in the case of Spain some bank accounts seemed to have been inactive and had no funds.

(b)   States that reported having frozen assets but did not provide detailed information regarding the amounts frozen, the type and the holder of the assets. This was the case of Austria, Belgium, Canada, France, Germany, Japan, Liechtenstein, the Netherlands, Norway, Portugal, Saudi Arabia, Sweden, Switzerland, Tunisia, Turkey, the United Kingdom, the United States and Yemen.

(c)   States that reported having frozen assets without providing any additional information. This was the case in the reports of Bahrain, Morocco and the Philippines.

(d)   States that reported not having found any assets.

(e)   States, such as Bosnia and Herzegovina and Qatar, that have not submitted a report to the Committee but provided information on assets frozen to the Counter-Terrorism Committee, as well as States that in their report to the Committee did not clearly indicate whether they had frozen assets but had done so in their submission to the Counter-Terrorism Committee.

(f)   States that did not provide detailed information, making it unclear whether they had or had not identified funds.

64.   Several countries reported that they are aware of the presence of Al-Qaida members or associates in their territory, either as part of operating or sleeping cells or as an active recruiting force. According to the information provided in their reports, it was not clear, however, whether their authorities had found assets belonging to the individuals involved in those acts and/or had frozen them accordingly. This was the case for Algeria, Australia, the Islamic Republic of Iran, Israel, Jordan, Lebanon, the Philippines, the Russian Federation and Singapore.

65.   Under the provisions of resolutions 1390 (2002) and 1455 (2003), States are required to freeze "funds and other financial assets or economic resources" belonging to Al-Qaida members and associates. Only two reporting States, Italy and Pakistan, have frozen assets other than bank accounts.

66.   For the majority of States, it is unclear whether the freezing of assets limited to bank accounts is due to the non-existence of such assets or other factors.

67.   In the submitted information, the United States of America indicated that it had released $2.2 million for basic living expenses and reasonable fees of persons whose assets had been frozen pursuant to Executive Order 13224. Switzerland reported that it had released funds on several occasions prior to the entry into force of the procedure established by resolution 1452 (2002). A request for the release of funds has been transmitted by Switzerland to the Committee in accordance with the procedures set forth in that resolution. Japan, the Netherlands, the United Kingdom and the United States reported that funds had been released after the adoption of resolution 1388 (2002) and the Committee's decisions of 11 and 24 January 2002.

**Informal remittance systems**

68.   Notwithstanding some relevant exceptions, the great majority of States either did not provide detailed information or any information on the regulations and restrictions applicable to alternate and informal remittance systems.

69.   States that had submitted substantive information in this regard can be grouped as follows:

(a)   States where informal remittance systems are illegal, prohibited or unauthorized such as France, India, the Islamic Republic of Iran, Malaysia, Portugal, Spain and Venezuela.

(b)   States where such systems are subject to restrictions and where individuals and entities that provide this service render themselves liable to prosecution. This category includes Germany, the Republic of Korea, Singapore and the Netherlands.

(c)   States that reported having some restrictions or regulations on informal remittance systems, such as the obligation to report to the competent authorities or obtain from the Central Bank prior authorization to operate. This category includes Paraguay, Qatar and the Syrian Arab Republic.

(d)   States that reported on existing legislation to regulate and control informal remittance systems, such as Canada, Sweden, the United Kingdom and the United States.

(e)   States that reported not having legal provisions to regulate informal remittance systems, such as Belarus, Bulgaria, Guatemala, Iceland, the Lao People's Democratic Republic, Lesotho and the Russian Federation. It is to be pointed out that some of these States, including the Philippines and Viet Nam, are in the process of enacting legislation to address the issue.

**Charities and non-profit organizations**

70.   The vast majority of States provided no detailed information concerning their national legislations to regulate charities and non-profit organizations engaged in the collection and disbursement of funds for social or charitable purposes. Where

information was provided it covered mainly two areas: requirements for tax exemption and controls over fund-raising and collection of monies.

71.    Regarding tax exemption, in a number of cases non-profit associations are controlled only if they request exemption from corporate income tax. In other instances tax-exempt organizations must declare the amount of grants made, but are not required to list recipients.

72.    Concerning the controls that national authorities have over fund-raising and collection of monies by charities and other non-profit organizations, several States reported that their authorities are entrusted with oversight. In some cases, there are private sector self-regulating mechanisms. Others indicated that annual reviews of charities' accounts are conducted by approved auditors whenever the annual receipt or expenditure exceeds a certain amount of money. In addition, a few States reported applying a mixed control system, involving both public and private sector oversight.

**Precious commodities**

73.    Few reporting States touched upon the issue of national restrictions or regulations in place to control the commerce and movement of precious commodities such as gold, diamonds and other precious commodities as requested by the guidance. There are general and specific types of restriction to regulate precious commodities:

(a)    The most common instrument for regulating precious commodities is an obligation, set upon dealers, to register with the relevant authorities to obtain an authorization to trade and engage in operations involving such goods;

(b)    Regarding diamonds the general framework referred to is the Kimberly Process, which regulates international and national control;

(c)    Regarding gold, in many cases, the regulations in place deal with the amount of gold allowed to be taken in and out of the national territories by dealers, buyers and intermediaries.

**Conclusions and outlook on the asset freeze**

74.    A major conclusion that can be drawn from the information provided is that States have in general taken positive steps towards implementing the freeze on assets. Indeed, many Governments have exhibited their readiness to curb the financing of Al-Qaida activities. There are those that have yet to show the same preparedness, however. It is pertinent to note that an international effort is required to combat this threat.

75.    Even though the reporting on the financial measures is extensive, it is far from being comprehensive. There are two points of concern that should be addressed. The majority of States provided vague information on the mechanisms and the structures in place to identify and investigate individuals and entities, often overlapping data on this matter with information on the steps financial institutions and banks are required to take to locate suspicious funds. This could be addressed by formulating more targeted questions eliciting more accurate replies.

76.    Only two countries have frozen assets other than bank accounts. This could be addressed by requesting that States take a more proactive approach in locating assets other than bank accounts. In cases where the impediments for doing so refer to the

lack of a legal framework, States should be encouraged and assisted in setting up the necessary legal provisions. In this regard the promotion of greater collaboration within the realm of international financial regulatory institutions, such as FATF and the Egmont Group, would be valuable.

## Travel ban

77.    The effectiveness of the travel ban on Al-Qaida, the Taliban or their associates cannot be accurately gauged from the information provided in the reports. The majority of reporting States indicated that they had applied legal and/or administrative measures for implementing the travel ban against Al-Qaida, the Taliban and their associates. A significant number of States also noted that they had included the names of the designated individuals in their national watch lists. However, approximately a third of States have yet to incorporate the whole list or parts of it into their national watch lists. Again, the main reason cited for not listing some designated individuals was the absence of sufficient identifiers.

78.    Of the reporting States, the tendency towards incomplete incorporation of all designated individuals can be observed primarily through the analysis of reports from Schengen area countries. To date, those States have reported incorporating only listed individuals with enough or minimum identifiers to technically fit into the Schengen Information System. Some Schengen States reported that other designated individuals were added to their own national stop lists. One can thus conclude that there are names outstanding; that is, some designated individuals cannot be found on any of the Schengen States' lists. Lebanon, New Zealand, Romania, Singapore and the United States of America among others also reported that they had not incorporated in their national stop lists designated individuals about whom there was insufficient data.

79.    As pointed out earlier, the more identifying information and names submitted to the Committee by States, the higher the odds that these will be incorporated into their national lists. This then would lead to more viable screening procedures for suspicious individuals at the border entry and exit points. Without those, the current incomplete information on listed individuals will continue to hamper the actual identification process of individuals at border points.

### Effectiveness of the travel ban

80.    The minimal activity indicated by States in implementing the travel ban brings into question the efficacy of the measure in its current state. No State reported stopping any of the listed individuals at any of their border points or in transit through their territory. Only three countries, Belarus, Pakistan and the Philippines, reported barring individuals from entering their territory. It is unclear, however, whether those individuals are to be found on the list, as no further information was provided. The Netherlands reported barring an unlisted individual who heads a listed entity from entering their territory.

81.    Several States indicated that they had established new visa requirements and adopting stricter criteria to enforce the travel ban after 11 September 2001. Countries bordering Afghanistan mentioned implementing new visa regulations. The Islamic Republic of Iran, for instance, reported having decided to restore a visa requirement to better control entry into its territory and to prevent illegal transit.

Tajikistan reported strengthening measures to monitor the issuance of passage documents and to prevent falsification. However, visa-issuing authorities in all of the reporting States had not identified any visa applicant whose name appears on the list.

82. Furthermore, only half of the States reported that they both regularly transmitted the updated list to their border control authorities and had the capability to perform an electronic search. Little information was provided on the process of disseminating the list to the competent bodies and relevant agencies, including travel agencies, airline carriers and maritime authorities. Here it is worthwhile to note that several States requested financial and technical assistance in order to upgrade their border control facilities and enhance their capabilities. For instance, Croatia identified the need for border control equipment such as optical passport readers, devices for the detection of counterfeit passports, detectors of explosives and video surveillance. Paraguay noted that it would like to enhance its electronic capabilities in order to transmit relevant data throughout its territory.

**Conclusions and outlook on the travel ban**

83. The full implementation of the travel ban is intrinsically dependent on the quality and credibility of the list. It also requires that States strengthen their capabilities to enforce the travel ban by adopting stringent measures to control their borders, such as training their officials and upgrading their information technology capabilities.

84. Improving the list and increasing the technical capacity of States are thus two ways that may lead to more effective implementation of the travel ban. The former would resolve what many States reported, namely, not listing individuals with insufficient identifiers at their border entry and exit points. The latter would address the lack of capacity of some States in monitoring their borders.

85. It may also be useful to consider overhauling the travel ban to address some of the difficulties encountered by States while actually implementing the measure. Several of those difficulties, as mentioned in the Stockholm Process on the Implementation of Targeted Sanctions,[a] are the lack of clear procedures and legal requirements for States which find targeted actors attempting to enter their territories or present in their territories; the difficulty in clearly identifying individuals subject to travel bans owing to their legitimate holding of multiple nationalities or multiple passports; and the failure in the electronic dissemination of travel ban lists to all relevant States or officials within States because of the limitations of State capacity.

86. States should also consider taking the necessary measures to inform the designated individuals linked to them by virtue of nationality or residence that they have been placed on the list and are banned from travelling. This may help to provide a domestic basis for holding individuals who violate the travel ban accountable for their actions. Furthermore, States should report to the Committee on the status of those individuals.

## Arms embargo

87. The arms embargo is the least transparent of the measures in the sanctions regime against Al-Qaida, the Taliban and their associates and appears to be the

---

[a] Peter Wallensteen and others, eds., *Making Targeted Sanctions Effective: Guidelines for the Implementation of UN Policy Options* (Uppsala University, 2003).

hardest to implement. The possession, manufacturing and sale of arms are generally seen as matters of national security. The lack of substantive information in States' reports rendered it difficult to assess the effectiveness of this crucial measure.

88.   The global dispersion of Al-Qaida network has changed the scope of the arms embargo to the extent where it falls short and needs to be strengthened to prevent Al-Qaida, the Taliban and their associates from acquiring arms.

89.   Notably, in their responses covering the implementation of the arms embargo none of the States provided information on how the list is used by their competent authorities.

**Scope of the arms embargo: weapons of mass destruction and export controls**

90.   The arms embargo against Al-Qaida and the Taliban is aimed at "arms and related materiel of all types, including weapons and ammunition, military vehicles and equipment, paramilitary equipment, and spare parts, for the aforementioned, and technical advice, assistance, or training related to military activities" (resolution 1390 (2002), para. 2 (c)).

91.   The majority of responses from States covered mainly controls on conventional arms. A number of States addressed the issue of weapons of mass destruction, but expressed different interpretations of the required controls. Some referred to national safeguards on nuclear material and facilities while others simply stated that weapons of mass destruction were not produced within their territory. The responses did not fully acknowledge the relevance of control over dual-use products, which, although manufactured primarily for civilian use, might be used for military purposes, including the development of weapons of mass destruction. In addition, several States failed to cover measures to prevent the acquisition of conventional arms and weapons of mass destruction by Al-Qaida and its associates.

92.   The replies from States indicated that export controls on material related to weapons of mass destruction are unevenly implemented on a global level. This was observed primarily in reports from States that are not parties to the multilateral export control regimes. The current non-proliferation regimes are the Australia Group (non-proliferation of chemical and biological weapons); the Missile Technology Control Regime (non-proliferation of unmanned delivery systems for weapons of mass destruction); the Nuclear Suppliers Group (non-proliferation of nuclear weapons); and the Wassenaar Arrangement (non-proliferation of conventional weapons and dual-use goods).

93.   Approximately a third of reporting States provided information on export control measures concerning sensitive technology and dual-use items. Most of those States referred to their obligations under the existing export control regimes mentioned above and provided detailed information on the measures taken, such as the implementation of established guidelines for evaluating applications for export licences, requirements for end-user certificates, information-sharing, and revisions of lists of controlled goods and material.

94.   The diverse spectrum of replies concerning export controls does not allow for generalizations. A few examples may serve to illustrate the workings of current control measures:

  • Examples of the effectiveness of enforcement initiatives included descriptions of foiled attempts to smuggle weapons, ammunition and explosives, and the

denial of applications to export sensitive goods. Spain reported that it had refused a number of export licences for chemicals and equipment for fear of the intention to develop chemical and biological weapons. Another 35 application denials were based on fear of instability in the intended destination.

- Some States addressed measures to control the movement of goods by referring to their efforts to implement the Container Security Initiative.

- Others provided information on the use of post-shipment verification and physical inspection of exports in recipient destinations as an additional control measure supplementing end-user certificates. States that do not implement post-delivery verification regimes pointed to the risk of diversion of goods to banned individuals.

- A number of States indicated that they had benefited from expanding the collaboration among customs and intelligence officers in their respective regions.

- Some States, such as Argentina, Japan, the Republic of Korea and Sweden, referred to the implementation of a "catch-all clause". This additional mechanism would ensure that even goods not listed as products under export control would be "caught" and prevented from being exported in cases involving suspicious end-users and fear of diversion for the development of weapons of mass destruction.

- A few States described attempts at fine-tuning export controls by engaging the private sector in sharing the responsibility for preventing sensitive goods from being diverted.

95.   All in all, the descriptions provided by members of the export control regimes indicated the awareness-raising and regulating effect of multilateral collaboration. Considering the fact that illicit brokers often seek to take advantage of loopholes in countries with less stringent controls, or of the differing interpretations of the scope of controls among countries, there are legitimate reasons for raising the awareness of the relevance of such controls and harmonizing controls internationally so as to establish a common standard.

**Enforcing the arms embargo**

96.   The information submitted by States highlighted three different aspects of the enforcement of the arms embargo, namely, the legal measures to criminalize breaches of the arms embargo; various safeguards to prevent nationally produced weapons and ammunition from being diverted; and formulation of a normative framework to guide decisions regarding arms transfers.

97.   Approximately two thirds of reporting States indicated that they had general legislation in place to criminalize violations of the embargo. For the most part reference was made to existing legislative provisions criminalizing violations of United Nations embargoes. A few States indicated that penal provisions directed at particular individuals were deemed problematic from a constitutional point of view. In many cases the legislation referred to predated 11 September 2001.

98.   A significant proportion of States either failed to address the issue of criminalization of embargo violations or provided vague responses, rendering it impossible to assess whether measures were actually in place. A few States

indicated that they had no legislation in this regard, though some of them reported that new laws were being considered.

99.   A couple of reports illustrated that the existence of a legislative framework and measures to criminalize violations of the arms embargo did not necessarily preclude occurrences of illicit arms trading. In the final instance, laws are only as effective as their implementation and enforcement. Regrettably, only very few countries submitted details of the results of enforcement actions or examples of how the arms embargo was being implemented in practical terms.

100.  Apart from the sensitivity of the issue, part of the explanation for this absence of practical detail may be found in the changed scope of the measures required to implement the arms embargo against Al-Qaida and the Taliban: the challenge is no longer to prevent the acquisition of arms by certain individuals and groups within a confined territory but to prevent the flow of arms to non-State actors and their associates dispersed all over the globe.

101.  Concerning the safeguards to prevent weapons and ammunition produced nationally from being diverted, a significant number of States deemed the question irrelevant, as they do not produce weapons or ammunition. Some arms-producing States provided examples of safeguard mechanisms, including physical protection of arms stockpiles, licensing procedures combined with end-user certificates, and post-shipment checks of exports. As an additional measure against forged documents, some States introduced procedures for preventing the falsification of end-user certificates through verification of the authorization of the signatories.

102.  Finally, States in their reports drew a telling picture of the lack of a common international framework to guide decision-making regarding arms transfers. A couple of States indicated that they had established normative criteria for granting licences to export arms. One of the few examples of multilateral collaboration aimed at establishing a normative standard, referred to by Chile, was the International Code of Conduct on Arms Transfers, which asks Governments to uphold internationally recognized standards of democracy, human rights and peaceful international relations.

103.  Another example of multilateral collaboration is the European Union Code of Conduct for Arms Exports, to which several European Union Member States made reference. The European Union Code of Conduct stipulates that exports of arms should not be allowed if there is a clear risk that the arms may be used for aggression against another country, internal repression or violations of human rights in the recipient country, or if there is a risk of prolonging or aggravating armed conflicts. Other criteria relate to the arms purchasing country, including its attitude towards terrorism and its commitment to non-proliferation, United Nations embargoes and other international agreements. Although neither of these codes of conduct address the crucial role of arms brokering, or is legally binding, they function as a normative framework for more concrete measures to regulate arms transfers.

**Arms-brokering systems: a measure for the future**

104. States were requested to describe how their arms-brokering system, if any, could prevent Osama bin Laden, Al-Qaida, the Taliban and others from obtaining items under the arms embargo. Owing in part to the broad formulation of the question, and possibly also to the lack of a unified international approach in this

area, the replies differed significantly in level of detail and bore witness to the lack of uniform regulation on arms brokering.

105. The replies from the vast majority of reporting States reflected inconsistent interpretations of what constitutes the minimum requirements of an arms-brokering system:

- Most replies referred to a licensing mechanism requiring arms exporters to apply for an authorization to transfer arms. Little information was provided in general on the criteria for granting such a licence, however.

- Only very few reports included information on the existence of a national registry of authorized brokers. Some States reported that they held registers concerning arms possession within the country, but did not address the question of arms sales and transfers across borders.

- Notably, no States addressed the issue of how to control national brokers operating outside their territory. The lack of extraterritorial jurisdiction is known to be a loophole that illicit brokers take advantage of in circumventing international arms embargoes. Few countries have made attempts to close this gap, and in some instances the extraterritorial jurisdiction is limited to cases of breaches of the United Nations embargoes.

106. The lack of international regulation of brokering activities practically allows brokers to facilitate arms transfers to war zones or suspicious groups or individuals without violating any laws. This is further confirmed by open sources, which in some cases are able to identify those brokers operating at large.

107. The general absence of international regulation of arms brokering cannot be justified by a lack of adequate tools. As demonstrated in the reports, a set of tools already exists. This has been reaffirmed by the Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All its Aspects and by the recommendations of the Stockholm Process on the Implementation of Targeted Sanctions on how to improve arms embargoes. What is missing is that States apply those instruments, showing a unified political will to regulate arms brokering.

### Role of international conventions

108. States have confirmed in their reports the importance of international conventions related to the arms embargo. Several referred to the ratification of some of those conventions:

Convention on the Physical Protection of Nuclear Material

Treaty on the Non-Proliferation of Nuclear Weapons

Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction

Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction

Convention on the Marking of Plastic Explosives for the Purpose of Detection

International Convention for the Suppression of Terrorist Bombings.

109. International conventions provide a vital framework for capacity-building and implementation of legal measures at the national and international levels. A number of these conventions are still to be ratified by a number of States. As recently pointed out by the Secretary-General, 37 States have not signed the Chemical Weapons Convention. The International Convention for the Suppression of Terrorist Bombings is still to be adopted by a large number of States, some of which have been the victims of major incidents of terrorist bombings.

110. So far no international convention or other legally binding instrument has been concluded aimed at regulating brokering activities. Arms brokering has however been included in the recently introduced Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime. While the Protocol represents a step towards a more unified approach to arms brokering, it is still limited to encouraging States and putting forward proposals on what an arms-brokering system could include.

**Conclusions and outlook on the arms embargo**

111. Descriptions by States of the measures taken to prevent Al-Qaida, the Taliban and their associates from acquiring arms are more telling for the information they do not provide than the information they do provide. The lack of transparency, information-sharing and a common international approach regarding the arms embargo is confirmed by the absence of substantive information in the reports of States. This, however, sheds light on the areas where improvements to the arms embargo are highly warranted.

**Targeting and specification of focus**

112. In the light of recent developments, the arms embargo falls short as a measure to prevent the acquisition of arms and ammunition by Al-Qaida, the Taliban and their associates. The problem is twofold and requires the redefinition of the scope of the embargo at two levels.

113. First, the analysis of the reports revealed an inconsistency with regard to the interpretation of the scope of the arms embargo. Addressing this shortcoming would require a more specific and targeted formulation of the arms embargo to meet the new reality of terrorist warfare of Al-Qaida and the Taliban, including explicit mention of goods and material related to weapons of mass destruction.

114. Second, the fact that Al-Qaida and the Taliban now operate on a global scale, rather than within a confined territory, creates challenges of a magnitude that the arms embargo does not adequately meet. The only way to avoid the diversion of weapons and dangerous material to Al-Qaida is through dedicated collaboration at the regional and international levels. Therefore, the arms embargo cannot stand alone as an obligation upon each State, but has to be coupled to enhanced international collaboration. A multitude of relevant tools to this end have already been defined in the aforementioned Programme of Action. Moreover, joined efforts in the regulation of arms brokering would significantly strengthen the effectiveness of the arms embargo.

**Promotion of an international arms-brokering system**

115. States in their reports have clearly documented the lack of arms-brokering systems in spite of the availability of various tools.

116. The findings set out above, and reports of other expert panels and the Stockholm Process on the Implementation of Targeted Sanctions, point to the relevance of considering the international implementation of an effective arms-brokering system as an integral part of the arms embargo. This should entail the establishment of national registries of authorized brokers in all States and the introduction of licensing requirements for arms brokers. In addition, the existing legislative loopholes should be closed by introducing extraterritorial jurisdiction, where this is still not the case, to regulate national brokers wherever they are located.

117.  An additional measure to strengthen the regulation of arms brokering would be to establish a register ("black list") of individuals and entities engaged in illegal arms-related activities and ensure that those convicted cannot operate. This could be facilitated through enhanced collaboration and exchange of information among States and international agencies dealing with arms.

**Enhancement and expansion of export controls**

118.  Some reports bore witness to the benefit of information-sharing, development of best practices, and policy regulation within export control regimes. On the other hand, the reports indicated the disadvantages of limited membership, which precludes some States from obtaining relevant information, sharing knowledge and contributing to maintaining a common standard on export controls. Regional as well as global initiatives to enhance dialogue among States, relevant sanctions committees dealing with arms embargoes, and international export control regimes could facilitate the development of best practice guidelines on export controls.

**Global implementation of relevant international conventions**

119.  The ratification and implementation by all States of the requirements of international conventions related to arms is crucial. Two of them should be highlighted, as their ratification and implementation would significantly reduce the availability and use of explosives by Al-Qaida, the Taliban and their associates, namely, the Convention on the Marking of Plastic Explosives for the Purpose of Detection and the International Convention for the Suppression of Terrorist Bombings.

## Future reporting requirements

120.  The guidance prepared by the Committee assisted States in providing full and accurate information on the steps taken to implement the sanctions regime against Al-Qaida and the Taliban.

121.  In general, reports prepared according to the guidance provided more substantive and comparable information than reports submitted under resolution 1390 (2002).

122.  In describing the measures taken to implement the sanctions against Al-Qaida, the Taliban and their associates, States tended to report on legislation rather than practical steps taken. Furthermore, replies were in some instances repetitive. This resulted in gaps and overlaps, thus limiting the possibility of fully assessing the implementation of the measures. Moreover, a number of replies submitted either did not fully address or omitted the specific issue.

123. Even though the guidance contributed to more accurate reporting and greatly facilitated the analysis of reports, the formulation of questions targeting practical

implementation would have resulted in even more accurate and full reporting. In this regard the Committee may wish to consider refining the guidance.

124. Universal reporting requirements following the adoption of new Security Council resolutions imposing sanctions are necessary. However, in situations where the sanctions imposed remain in place for a long period of time, as in the case of the sanctions regime against Al-Qaida and the Taliban, universal reporting requirements alone may not be as effective. It was evident from the analysis of the reports that not all questions were relevant to all States. In such situations a more targeted approach to reporting may prove to be more fruitful.

125. As a result, the Committee may wish to consider adding more specific reporting requirements to the existing universal ones. Moreover, in order to address the gaps observed in reporting, the Committee may consider making it mandatory upon States to report.

———————