# EXHIBIT 4

Neutral Citation Number: [2004] EWHC 1735 (QB)
IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

HQ03X03141

Royal Courts of Justice
Strand
London WC2

Thursday, 1 July 2004

B E F O R E:

MR JUSTICE EADY

- - - - - - -

MAHFOUZ                                                  (CLAIMANT)

-v-

BRISARD & OTHERS                                         (DEFENDANT)

- - - - - - -

Tape transcription by
Smith Bernal Wordwave Limited
190 Fleet Street  London EC4A 2AG
Tel No: 020 7404 1400 Fax No: 020 7831 8838
(Official Court Reporters)

- - - - - - -

MR LAURENCE HARRIS (instructed by Messrs Kendall Freeman) appeared on behalf of the CLAIMANT
THE DEFENDANTS did not appear and were not represented

- - - - - - -

J U D G M E N T
(As Approved by the Court)

Crown copyright©

1. MR JUSTICE EADY: In this libel action Khalid Salim A Bin Mahfouz sues three defendants, Jean-Charles Brisard, JCB Consulting and JCB Consulting International SARL, over very serious allegations published, it would appear, on a number of websites. The defendants are abroad and have taken no part in these proceedings.

2. Judgment was in due course obtained by default. It is thus important to emphasise that there is nothing more that the claimant could have done in his attempt to vindicate his reputation in respect of these allegations. The defendants have had every opportunity to respond. It is also important to state that, although judgment has been obtained in default, the outcome of the proceedings is in no sense a formality; nor is the claimant's vindication any the less real.

3. The court is naturally conscious of the importance of freedom of speech and of the need to ensure so far as possible that its judicial processes are not abused by anyone who may seek to vindicate himself on a false basis and thus mislead the public. The allegations here are, as I have said, very serious. The claimant has always denied them and, when they have been made by others, apologies have been forthcoming. The defendants have been ready to assert that the claimant was involved in the funding of terrorism and of supporting Al-Qaeda in particular.

4. The claimant now proceeds, with the court's permission, to obtain remedies under sections 8 to 10 of the Defamation Act 1996. It follows that he is for that reason alone limiting his financial claim to £10,000. That might not be thought to represent the full gravity of the libel, but the claimant has made the concession purely because that is the ceiling imposed under the statutory regime. The concession is not intended to diminish the effect of the claimant's vindication or the seriousness with which he approaches these publications.

5. The material published consisted essentially of three items. The first item was a report entitled "Terrorism financing: routes and trends of Saudi terrorism financing." It was dated 19 December 2002 and it seems to have been submitted to the United Nations and has been described as "the UN Report". Within it the claimant is described as one of the main individual Saudi sponsors of Al-Qaeda.

6. Secondly, there are slides of a presentation apparently given by the first defendant at a Thomson Financial symposium on 13 June 2003. Unfortunately, the claimant knows very little about the circumstances in which that publication took place, where the symposium occurred or who was present. The slides suggest in no uncertain terms that the claimant constitutes an example of a wealthy businessman supporting Al-Qaeda.

7. The third item consists in the French transcript of an interview with M Brisard on RFI radio on 19 March 2003. The French transcript and the English translation have been placed before me in evidence. The first defendant suggested in that interview that the claimant supported terrorism by providing massive financial support to Al-Qaeda and Osama Bin Laden, who was wrongly described as the claimant's brother-in-law.

8. In accordance with the general though not universal practice, the evidence of the claimant has been put before me in the form of a witness statement for the purposes of this hearing. It is a very short witness statement. That is perhaps not surprising in view of the fact that the primary purpose of the claimant's evidence is to deny the truth of these very grave allegations and to explain also the impact of the publications upon himself and his feelings and those of his family, albeit strictly speaking the impact on his family is irrelevant, save insofar as it impacts indirectly upon the claimant.

9. For present purposes I need do no more than recite paragraphs 4 and 5 of the claimant's evidence:

> "It is difficult to assess the full extent of the damage that has been caused to my reputation in this jurisdiction by the publication of the defamatory words which are the subject matter of this libel action. However, the extremely serious nature of the allegations made by the Defendants have caused me (and my family) distress and, I believe, have damaged my reputation (and that of my family).
>
> "I do not have, nor have I ever had, any involvement or association with the sponsoring or support of the Al-Qaeda terrorist network and its leader Osama Bin Laden, nor have I ever knowingly financed terrorism of any description and I vehemently deny this. My family and I abhor and unequivocally condemn all acts of terrorism. Furthermore, Osama Bin Laden is not my brother-in-law: I am not married to any of Osama Bin Laden's sisters nor are any of my sisters married to Osama Bin Laden."

10. That evidence is short and to the point but is nonetheless effective for that. It follows from what I have already said that the evidence is unchallenged in these proceedings.

11. The background has been more fully covered in the evidence of Cherif Sedky, who is a lawyer and a United States citizen. It is right that I should refer to this background in a little detail. Mr Sedky explains that M Brisard is a self-styled "expert in the area of the financing of terrorism." He has been retained as an investigator by attorneys acting in a substantial action in the United States against a large number of defendants, including this claimant, brought on behalf of relatives of the victims of the attacks in the United States on 11 September 2001. The second defendant is a French company and the third defendant a Swiss company. Both of those defendants appear to be substantially owned and run by M Brisard.

12. Mr Sedky then goes on to describe briefly the effect of certain other litigation which in a real sense forms the background to the present claim. First of all, he deals with what has been described as "the Mail on Sunday action". On 27 October 2002 the Mail on Sunday published an article about the claimant, alleging that he was a funder and supporter of Osama Bin Laden and Al-Qaeda. The claimant issued libel proceedings against the author of that article, the editor and the publisher of the newspaper.

13. On 6 May of last year, before serving any defence, the Mail on Sunday issued an application for a stay of proceedings pending the outcome of a libel action brought by

the claimant and his son against the authors of a book called "Forbidden Truth". The authors of that book were none other than M Brisard and a gentleman called Guillaume Dasquié. Alternatively, the Mail on Sunday were seeking a stay until the outcome was known of a United States action.

14. The application was made on the basis that M Brisard was the primary source of the information which had appeared in the newspaper article, that he had compelling evidence to demonstrate the truth of the charges against the claimant and that, accordingly, proceedings against him should be litigated before the Mail on Sunday libel action was dealt with. The application by the Mail on Sunday was supported by evidence, including a witness statement from M Brisard dated 21 May 2003, which has been drawn to my attention.

15. The application was heard in open court and therefore reference was made without any inhibition to the content of M Brisard's witness statement. It has been described by Mr Harris as the high point of M Brisard's case and he considered it quite properly before me in some little detail. I need not refer to it at any length, but it proclaimed an intention, apparently, vigorously to defend any proceedings in respect of the book "Forbidden Truth" and to justify the truth of the allegation that this claimant knowingly supported terrorism.

16. There was also reference to key evidence, as it was described, gathered by M Brisard up to that point, about the claimant. He expressed an intention to put that evidence before the court in any claim in respect of the book. At that time Mr Sedky produced a lengthy witness statement of 9 June by way of rebuttal. So too did the claimant himself, in a witness statement dated 8 June of that year, and Mr Lawrence Smith. Those witness statements set out to rebut fully and comprehensively what was described as the key evidence.

17. No stay was granted by the court of the Mail on Sunday proceedings and, when its defence was eventually served on 1 August of last year, there was no attempt to plead justification. It is right to record that there was a defence based upon qualified privilege, relying upon the House of Lords decision in Reynolds v Times Newspapers. Not long thereafter the newspaper defendants in fact published an apology following a statement in open court which was read on 13 January of this year. It was expressly acknowledged that there was "no truth whatsoever" in the allegation that the claimant had supported or funded terrorist activities. The newspaper accepted that the claimant and his family abhor terrorism and they agreed to pay what were described as substantial damages and costs.

18. Next Mr Sedky turned to "the book action". Shortly after the publication of the Mail on Sunday article, it came to the attention of the claimant that the book had been published in the United States, (that is to say, the book known by the short title of "Forbidden Truth" by M Brisard and Guillaume Dasquié). It too made very serious allegations about the claimant and about his son, Abdul Rahman Bin Mahfouz, alleging that they supported Osama Bin Laden, Al-Qaeda and terrorism. Accordingly, libel proceedings were commenced in this jurisdiction against M Brisard and Guillaume Dasquie. That happened on 24 April 2003. There was no acknowledgement of the proceedings by M

Dasquie and default judgment was obtained, and an injunction, in respect of him. There was an order made by Treacy J on 22 August of last year.

19. M Brisard, however, did serve a defence in the book action on 4 August. Notably, however, he did not plead justification and there has been no attempt to amend to plead justification since, despite the intention expressed in the witness statement to which I have already referred. He did raise a defence based upon the proposition that he did not authorise publication of the book in this jurisdiction. The claimant accordingly served a reply on 17 December of last year and, pursuant to directions given by Master Foster on 2 April of this year, a window has been appointed for the trial of that action, on the issues as they stand at the moment, between 1 November of this year and 31 January next year.

20. Finally, Mr Sedky mentioned what he describes as "the Griffin/Pluto Press action". Proceedings were brought by the claimant and Nimir Petroleum against Pluto Press and an author called Michael Griffin in respect of a book which also alleged that the claimant had funded Bin Laden's and Al-Qaeda's terrorist activities. There was a statement in open court read on 15 March 2004. A comprehensive apology was proffered, and substantial damages were paid as part of the settlement by the defendants.

21. It is necessary now to say something more about what has been described as the UN Report, which forms an important part of the subject matter of these proceedings. As is made clear from the evidence of Mr Sedky, M Brisard has been the main disseminator of the defamatory and false accusations about the claimant. He prepared a report, to which I have already referred, and the report repeated the same allegation as was made in the book, albeit in abbreviated form. The claimant appears at the top of a list of persons described as the main financiers of Al-Qaeda.

22. The report has been published on various websites, including on the website of National Review Online. It has been claimed on a number of occasions by M Brisard that the report was prepared at the request of the United Nations, specifically by Sr Alfonso Valdivieso, who was in December 2002, for the time being, the President of the United Nations Security Council. Those claims by the first defendant would obviously tend to give status and authority to the report and to the allegations within it.

23. Such claims were made, for example, in the Los Angeles Times of 24 December 2002; a letter from the solicitors for the Mail on Sunday, Taylor Wessing, dated 2 May 2003; the witness statement prepared by M Brisard for the Mail on Sunday litigation of 21 May 2003, which was, incidentally, supported by a statement of truth; in M Brisard's own biography on his website in September 2003; and in an article in the New York Times of 28 September of last year. Copies of those claims have been exhibited before me in evidence.

24. Mr Sedky, representing the claimant's interests, records how he was extremely concerned to learn that a report might have been commissioned by the UN Security Council which listed the claimant as a sponsor of terrorism. Before taking any action, he decided that it was necessary to attempt to set the record straight with the United

Nations and also to establish the facts, in particular, whether the report had indeed been commissioned by the United Nations or any body within it, as the first defendant was claiming. Thus, Mr Sedky wrote on 5 February of last year to the then President of the UN Security Council, who was His Excellency Dr Gunther Pleuger. A copy of that letter has also been exhibited before me. Unfortunately, no reply was received.

25. The claimant's solicitors who represent him in these proceedings, Kendall Freeman, wrote on 28 February and on 10 April last year to National Review Online, making a request that the report should be removed from its website. Again, a copy has been exhibited before me. Later, in September of last year, it came to Mr Sedky's attention that the defendants had set up a website, www.jcbconsulting.com, on which the report was being published. It also contained other documents defamatory of the claimant, as I have already described. Proceedings were then commenced in respect of those publications. It remained, however, at that time still unclear as to whether or not the report did indeed have the authority of the UN behind it.

26. When proceedings were started there was an e-mail response from M Brisard dated 15 October 2003. That e-mail described the action as baseless and stated that M Brisard had "no intention at all to consider demands, requests or ultimatums emanating from [the claimant]." It was suggested by M Brisard that in relation to that report the claimant's representatives should contact the UN Counter-terrorism Committee. No further acknowledgement of the proceedings materialised and so it came about that judgment was entered in default.

27. Kendall Freeman investigated the position further. There was e-mail correspondence between them and one Tatiana Cotio, the Secretary of the United Nations Security Council Committee, which has been established pursuant to resolution 1267 of 1999, ("the Al-Qaeda Taliban Sanctions Committee"). She confirmed that the report was indeed not an official UN document. Later, Kendall Freeman received a letter of 12 March 2004 from Sr Valdivieso himself, who stated:

> "I personally never met with or spoke to M Brisard and it is completely false that I in my capacity as President of the Security Council or as President of the 1267 Committee or in any capacity within that Organisation had commissioned him [the first defendant] on a personal or official basis to write a Report on terrorism."

28. Sr Valdivieso also stated that M Brisard's conduct and attitude was "totally deceitful and marked by the intention to mislead." Those communications have been placed before me in evidence and I have been taken to them expressly this morning. It is to be noted that on 1 March of this year there was an article in Arab News which also confirmed Sr Valdivieso's denials.

29. It has now emerged that M Brisard contacted Sr Valdivieso in order to get him to confirm that he had commissioned the report "through an assistant". Sr Valdivieso, however, confirmed that this too was untrue and he had checked with the assistant in question, Mr Salazar, who also confirmed it to be untrue. That position has been

reaffirmed in writing by Sr Valdivieso. There is exhibited to Mr Sedky's witness statement a document dated 26 April of this year.

30. It is submitted therefore, not unreasonably, by Mr Sedky in his witness statement that M Brisard's assertions at various points that the report had been commissioned by the United Nations were made knowing that they were untrue. Of course, in the nature of things I have not heard anything further from M Brisard about this, since he has taken no part in the proceedings, but on the state of the evidence before me that submission of Mr Sedky's would appear to be true. I note also that one of those assertions was made in the course of a witness statement, with a statement of truth, prepared for proceedings in this jurisdiction. That is a matter naturally which the court must take seriously.

31. Mr Sedky goes on in the course of his witness statement to set out briefly the purposes behind these proceedings. He draws attention to the fact that the claimant and his family have significant connections with the United Kingdom. As a banker, the claimant has been well-known to the United Kingdom financial community. His reputation in this jurisdiction and that of his family are important to him. Significant negative publicity was having an adverse impact on the family's business interests in various jurisdictions, including this country. Various attempts have been made by the claimant to vindicate his reputation and to demonstrate the lack of any objective support for the falsehoods that M Brisard has sought to put about concerning him.

32. The key allegations, as they were described, put forward by M Brisard in the Mail on Sunday action, were shown to be nothing of the kind. The Mail on Sunday found itself unable to rely upon them and that is how the claim came to be settled with a full and unqualified apology and an acceptance that those allegations were actually untrue. Not only did M Brisard mislead the court in that witness statement but, despite his professed intention, he has not, as I have already made clear, sought to justify those serious allegations in the book proceedings.

33. I am invited to conclude, in the light of that evidence and not on any merely formal basis, that the allegations are untrue. As I said at the outset of this judgment, it is difficult to imagine in the circumstances what else the claimant or his representatives could have done to seek genuine vindication in respect of these allegations. In the nature of things, again, of course the claimant cannot know how many people have chosen to read the allegations put about by M Brisard. Nevertheless, there is concern that some individuals at least will have perceived the report as an official UN document and treated its contents seriously. Concern was expressed by Mr Sedky that a British government official or journalist might see the report and believe it to be an official United Nations report containing the claimant's name in and indeed at the top of a list of terrorist financiers.

34. Although it is not strictly relevant for proceedings in this jurisdiction, my attention has been drawn to the fact that very senior figures in the United States appear to have taken, at one time, the allegations in the report seriously. Two members of the US Senate Committee on Finance wrote a letter, which is before me in evidence, to Mr Richard Newcombe, Director of the Office of Foreign Assets Control of the United States Department of the Treasury, which was dated 22 December of last year. It contained

mis-statements about the claimant, apparently sourced from that report. Accordingly, the claimant's US attorneys wrote a letter to that Committee making the position clear on 16 January of this year.

35. Not surprisingly therefore the claimant still fears that the defamatory material, the subject matter of this action, will have been read widely within this jurisdiction and, quite possibly, taken seriously by those interested in such matters. He therefore seeks damages, limited, of course, artificially by the statutory cap, and also a declaration of falsity and an order for publication of an apology, in accordance with the provisions of sections 9 and 10 of the Defamation Act 1996, and the rules of court made subsequently pursuant to the provisions of section 10.

36. Of course, in this jurisdiction no court can force anyone to apologise. There is, however, a fallback procedure set out very carefully in the rules, which provide for the publication of a summary of the judgment in the event that a defendant is unwilling to negotiate the terms of an agreed apology. Provision has been made for that accordingly in the draft order placed before me.

37. In the light of the evidence before me and the submissions of Mr Harris, I propose to grant the relief sought, including damages of £10,000, being the maximum permitted under the statutory regime. I will also grant the other relief sought in the draft order placed before me, including a declaration of falsity and the other provisions.

38. Insofar as it may be necessary to do so I will now discuss those further with Mr Harris and any consequential matters that arise.