**United States District Court**
**Southern District Of New York**

| | |
|---|---|
| **In re Terrorist Attacks on September 11, 2001** | **03 MDL 1570 (RCC)**<br>**ECF Case** |

*This Document Relates to:*
<u>*Ashton v. Al Qaeda Islamic Army*</u>, *02-CV-6977 (RCC)*
<u>*Burnett v. Al Baraka Investment & Development Corp.*</u>, *03-CV-5738 (RCC)*
<u>*Federal Insurance Co. v. Al Qaida*</u>, *03-CV-6978 (RCC)*
<u>*Barrera v. Al Qaeda Islamic Army*</u>, *03-CV-7036 (RCC)*
<u>*Salvo v. Al Qaeda Islamic Army*</u>, *03-CV-5071 (RCC)*
<u>*Burnett v. Al Baraka Investment & Development Corp.*</u>, *03-CV-9849 (RCC)*

# REPLY IN SUPPORT OF
## HIS ROYAL HIGHNESS PRINCE SALMAN BIN ABDULAZIZ AL-SAUD'S
## MOTION TO DISMISS THE COMPLAINTS

William H. Jeffress, Jr. (admitted *pro hac vice*)
D.C. Bar No. 041152

Christopher R. Cooper (admitted *pro hac vice*)
D.C. Bar No. 453387

Jamie S. Kilberg (admitted *pro hac vice*)
D.C. Bar No. 480207

Sara E. Kropf (admitted *pro hac vice*)
D.C. Bar No. 481501

BAKER BOTTS, L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Phone:    (202) 639-7700
Fax:      (202) 639-7890

**TABLE OF CONTENTS**

Table of Contents ...................................................................................................................... i

Table of Authorities ...................................................................................................... ii,iii,iv

INTRODUCTION .................................................................................................................. 1

I.      The Accusation That Price Salman Heads A Global Terrorist Entity Is Demonstrably
        Inexcusable .............................................................................................................. 1

II.     Prince Salman Is Immune From Suit Under The FSIA ....................................................... 3

        A. The Plaintiffs Are Not Entitled To Discovery ............................................................ 4
        B. The SHC Is A Government Instrumentality Of Saudi Arabia ...................................... 5
        C. Prince Salman Acted Within The Scope Of His Duties .............................................. 6
        D. The Tortious Act Exception Does Not Apply to Prince Salman's Actions ................. 7
        E. The Commercial Activities Exception Does Not Apply ............................................. 7

III.    There Is No Personal Jurisdiction Over Prince Salman ..................................................... 8

        A. Plaintiffs Have Not Alleged Facts Demonstrating That Prince Salman Purposefully
           Directed His Actions At The United States ................................................................. 8
        B. Plaintiffs Cannot Rely On A Conspiracy Theory Of Personal Jurisdiction ............... 10
        C. Plaintiffs Are Not Entitled To Discovery On Personal Jurisdiction ......................... 11

IV.     The Plaintiffs Have Not Adequately Pleaded Causation ................................................ 12

V.      Conclusion ..................................................................................................................... 15

**TABLE OF AUTHORITIES**

**CASES**

*Andre Emmerich Gallery,*
  1997 WL 672009 ........................................................................................................11

*Andre Emmerich Gallery, Inc. v. Segre,*
  No. 96-Civ-889, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997)............................................11

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,*
  223 F.3d 1082 (9th Cir. 2000) ............................................................................................9

*Boim v. Quranic Literary Inst.,*
  291 F.3d 1000 (7th Cir. 2002) ...................................................................................13, 14

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985).............................................................................................................9

*Burnett v. Al Baraka Investment and Development Corp.,*
  292 F. Supp. 2d 9 (D.D.C. 2003)......................................................................................3, 9

*Calder v. Jones,*
  465 U.S. 783 (1984)..........................................................................................................8, 9

*Cali v. East Coast Aviation Servs., Ltd.,*
  178 F. Supp. 2d 276 (E.D.N.Y. 2001) ..............................................................................12

*Chrysler Capital Corp. v. Century Power Corp.,*
  778 F. Supp. 1260 (S.D.N.Y. 1991)...................................................................................11

*Daliberti v. Republic of Iraq,*
  97 F. Supp. 2d 38 (D.D.C. 2000) ......................................................................................10

*Dep't of Employment v. United States,*
  385 U.S. 355 (1966)..............................................................................................................6

*ESAB Group, Inc. v. Centricut, Inc.,*
  126 F.3d 617 (4th Cir. 1997) ..............................................................................................9

*Fickling v. Commonwealth of Australia,*
  775 F. Supp. 66 (E.D.N.Y. 1991) .......................................................................................7

*Filetech, S.A. v. France Telecom, S.A.,*
  157 F.3d 922 (2d Cir. 1998)................................................................................................4

*Filetech, S.A. v. France Telecom, S.A.,*
    304 F.3d 180 (2d Cir. 2002)................................................................................4

*Filus v. Lot Polish Airlines,*
    907 F.2d 1328 (2d Cir. 1990)............................................................................4

*First City v. Rafidain Bank,*
    150 F.3d 172 (2d Cir. 1998)..............................................................................4

*Grove Press, Inc. v. Angleton,*
    649 F.2d 121 (2d Cir. 1981)............................................................................11

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) .......................................................................13

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,*
    763 F.2d 55 (2d Cir. 1985)..............................................................................12

*Huang v. Sentinel Gov't Secs.,*
    657 F. Supp. 485 (S.D.N.Y. 1987) .................................................................10

*In re Magnetic Audiotape Antitrust Litig.,*
    334 F.3d 204 (2d Cir. 2003)..............................................................................9

*Jazini v. Nissan Motor Co., Ltd.,*
    148 F.3d 181 (2d Cir. 1998).......................................................................11, 12

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,*
    918 F.2d 1039 (2d Cir. 1990)..........................................................................12

*Lehigh Valley Indus., Inc. v. Birenbaum,*
    527 F.2d 87 (2d Cir. 1975)..............................................................................11

*Letelier v. Republic of Chile,*
    748 F.2d 790 (2d Cir. 1984)..............................................................................8

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,*
    184 F. Supp. 2d 277 (S.D.N.Y. 2001)..............................................................5

*Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.,*
    10 F. Supp. 2d 334 (S.D.N.Y. 1998)..............................................................11

*Medina v. Bauer,*
    No. 02-Civ-8837, 2004 WL 136636 (S.D.N.Y. Jan 27, 2004) ...........................3

*Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations,*
   136 F. Supp. 2d 257 (S.D.N.Y. 2001)......................................................4

*Phaneuf v. Republic of Indonesia,*
   106 F.3d 302 (9th Cir. 1997), <u>cert. denied</u> 535 U.S. 987 (2002) ......................7

*Pittman by Pittman v. Grayson,*
   149 F.3d 111 (2d Cir. 1998)..............................................................13

*Rein v. Socialist People's Libyan Arab Jamahiriya,*
   995 F. Supp. 325 (E.D.N.Y 1998) ......................................................10

*Rein v. Socialist People's Libyan Arab Jamahiriya,*
   162 F.3d 748 (2d Cir. 1998)..........................................................4, 11

*Robinson v. Government of Malaysia,*
   269 F.3d 133 (2d Cir. 2001)...........................................................2, 4

*SEC v. Unifund, SAL,*
   910 F.2d 1028 (2d Cir. 1990).............................................................10

*S&S Machinery Co. v. Masinexportimport,*
   706 F.2d 411 (2d Cir. 1983)...............................................................5

*Saudi Arabia v. Nelson,*
   507 U.S. 349 (1993)........................................................................8

*Time, Inc. v. Simpson,*
   No. 02-Civ-4917, 2003 WL 23018890 (S.D.N.Y. Dec. 22, 2003) ...................10

*Ungar v. Islamic Republic of Iraq,*
   211 F. Supp. 2d 91 (D.D.C. 2002) ....................................................13

## STATUTES

18 U.S.C. § 1956......................................................................8

28 U.S.C. § 1605(a)(7).............................................................7, 10

28 U.S.C. § 1605(a)(2)..................................................................8

## INTRODUCTION

The plaintiffs' opposition brief struggles to establish some basis for naming Prince Salman in this lawsuit, ranging from a false contention that he heads a "specially designated terrorist entity" to a strained argument that the Saudi High Commission (SHC) is not in fact an instrumentality of the Saudi government. These contentions are not only new, but are contradicted by positions taken expressly or implicitly in prior filings by one or more groups of plaintiffs. None is sufficient to allow the plaintiffs to proceed on any of their complaints.

I.   **The Accusation That Price Salman Heads A Global Terrorist Entity Is Demonstrably Inexcusable**

In their opposition, the plaintiffs state that Prince Salman "knew or should have known of the threat posed by Islamic charities" and their "extremist activities," and then offer four paragraphs of factual statements purportedly based upon newspaper articles or websites to support this conclusory allegation. Pl. Consolidated Mem. of Law in Opp. To Prince Salman bin Abdulaziz Al-Saud's Mot. To Dismiss ("Pl. Opp.") at 3-4. Astonishingly, *nearly every assertion in those paragraphs is demonstrably false.*

Plaintiffs correctly note that Prince Salman founded and serves as the chairman of a charitable society – the Al-Birr Society in Ar-Riyadh – which assists the needy in Riyadh. Plaintiffs then make the following allegations:

- The Al-Birr Society in Ar-Riyadh is "known in English" as the Benevolence International Foundation (BIF), a defendant in these proceedings

- The Al-Birr Society was designated by the Treasury Department as a Specially Designated Global Terrorist Entity in November 2002

- Prince Salman ordered the "closure" of the Al-Birr Society in 1994 for "supporting Islamic extremist activities" yet continues to serve as its chairman and "personally direct" it

1

None of these allegations is true. First, the Al-Birr Society is not BIF. As the plaintiffs themselves recognize, BIF's Arabic name is Al-Birr Al-Dawalia, not Al-Birr Society in Ar-Riyadh. Burnett Comp. ¶ 180, 228; Ashton Compl. ¶ 389. The only similarity between the names is the word "Al-Birr," which is a generic term, meaning "benevolence," "charity" or "godliness." Moreover, in thirteen pages of allegations against the BIF, the plaintiffs admit that BIF is headed by Adel Abdul Jalil Batterjee and directed by Enaam Arnaout, not Prince Salman. Burnett Compl. ¶ 180-228; 181; Ashton Compl. ¶ 388-89. Finally, unlike BIF – which the plaintiffs' exhibits describe as a U.S. organization incorporated in Illinois and having offices around the world – the Al-Birr Society is described by the plaintiffs' exhibits as a domestic organization with branches in Riyadh only. Pl. Opp., Exh. 8, 9.[1]

Second, the Al-Birr Society was not designated by the Treasury Department as a Specially Designated Global Terrorist Entity in November 2002. The plaintiffs' exhibits show that BIF was so designated. Pl. Opp., Exh. 9. As just shown, however, the BIF and the Al-Birr Society have nothing to do with each other.

Third, Prince Salman did not order the closure of the Al-Birr Society in 1994. Rather, as the plaintiffs' exhibit demonstrates, it is an existing charitable organization in Saudi Arabia. Pl. Opp., Exh. 8. Indeed, the media article cited by the plaintiffs, Pl. Opp., Exh. 11, does not name the Al-Birr Society as one of the organizations closed.

---

[1] The plaintiffs attach these and other exhibits containing new, unpleaded allegations and then complain that Prince Salman "improperly attached exhibits" to his motion to dismiss. Pl. Opp. at 5. As the Second Circuit has explained, however, a court *must* consider proffered extrinsic evidence in deciding a motion to dismiss on FSIA grounds "if resolution of a proffered factual issue may result in dismissal of the complaint for want of jurisdiction." Robinson v. Government of Malaysia, 269 F.3d 133, 141 n.6 (2d Cir. 2001). Further, given that plaintiffs have regularly attached hundreds of pages of exhibits to their opposition motions, they should not be heard to complain on this point.

The plaintiffs' careless allegations, the falsity of which is disclosed by their own exhibits and the allegations of their own complaints, are inexcusable. In truth, all plaintiffs have alleged is that Prince Salman (1) headed a Saudi government agency, the Saudi High Commission for Bosnia and Herzegovina, some of whose funds and/or personnel were allegedly diverted to support terrorists, and (2) made a single personal contribution to a well-established international Islamic relief organization, which has not been designated a terrorist entity, but which is alleged to have allowed funds to be diverted to terrorists. Neither allegation is sufficient to survive Prince Salman's motion to dismiss.[2]

## II.   Prince Salman Is Immune From Suit Under The FSIA

After first contending that this Court is required to permit discovery on FSIA issues, the plaintiffs offer four arguments in response to Prince Salman's assertion of immunity under the FSIA: (1) the SHC is not a government instrumentality; (2) Prince Salman acted outside the scope of his authority as head of the SHC; (3) the tortious act

---

[2] Contrary to the plaintiffs' assertion, Prince Salman does not contend that Judge Robertson's decision in Burnett v. Al Baraka Investment and Development Corp., 292 F. Supp. 2d 9 (D.D.C. 2003), must be applied under law of the case doctrine. Rather, he argues that it should be afforded substantial deference. Mem. In Support of His Royal Highness Prince Salman bin Abdulaziz Al-Saud's Motion to Dismiss the Complaints ("MTD"), at 9. This argument has been more fully explained in Prince Sultan's motion to dismiss certain complaints, filed March 19, 2004, at 10-13, and in Prince Sultan's Opposition to the Motion for Reconsideration, filed August 13, 2004. We will not repeat those arguments here.

Nor can plaintiffs complain that Prince Salman failed to consider the complaints as a whole or ignored the "remainder of the relevant contentions that tie him, directly and/or indirectly, to the terrorist acts alleged." Pl. Opp. at 4-5. Plaintiffs do not identify any specific "relevant contentions" that tie Prince Salman to the September 11th attacks, relying instead upon a "shotgun pleading" approach that has been expressly rejected by this Court. See Medina v. Bauer, No. 02-Civ-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan 27, 2004) ("By lumping all of the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong.").

exception applies and (4) the commercial activities exception applies because Prince Salman engaged in money laundering.[3]  None of these arguments has any merit.

### A.    The Plaintiffs Are Not Entitled To Discovery

The plaintiffs first argue that in this Circuit they "*must* be afforded an opportunity to complete discovery" as to any factual dispute necessary to resolve whether Prince Salman is immune and cite four cases in support of this contention.  Pl. Opp. at 7 (emphasis added).  Two of these cases do not even address discovery against an immune foreign state.[4]  The remaining two cases support the general rule in this Circuit that plaintiffs do not have an absolute right to discovery against a foreign sovereign to resolve a jurisdictional dispute.[5]

As the Second Circuit has held, "[s]overeign immunity is an immunity from trial and the attendant burdens of litigation[.]"  Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 756 (2d Cir. 1998) (quotation and citation omitted), aff'd in part 162 F.3d 748 (2d Cir. 1998).  When a complaint contains only "general allegations . . . absent an assertion of evidence of a factual predicate for such jurisdiction," the Second Circuit has suggested exposure even to discovery would be "at odds with the goal of the FSIA to enable a foreign government to obtain an early dismissal when the substance of the claim against it does not support jurisdiction."  Robinson, 269 F.3d at 146.

---

[3] The plaintiffs also argue that one of Prince Salman's alleged actions, a $400,000 donation to charitable organizations, is personal and not official and thus not covered by the FSIA, Pl. Opp. at 10.  While we do not concede that this donation was personal, rather than official, plaintiffs are correct that the FSIA would not apply to conduct in Prince Salman's personal capacity.  This Court, however, lacks personal jurisdiction over Prince Salman for such alleged conduct, which does not in any event state a claim for which relief may be granted.

[4] See First City v. Rafidain Bank, 150 F.3d 172 (2d Cir. 1998) (allowing discovery against sovereign who was not immune because an exception to the FSIA applied); Filetech, S.A. v. France Telecom, S.A., 157 F.3d 922 (2d Cir. 1998) (not discussing discovery); aff'd 304 F.3d 180 (2d Cir. 2002).

[5] See Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990) ("generally a plaintiff *may* be allowed *limited* discovery with respect to the jurisdictional issue") (emphasis added); Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations, 136 F. Supp. 2d 257 (S.D.N.Y. 2001) (allowing discovery on jurisdictional issue in order to permit fuller argument at summary judgment stage).

4

**B.      The SHC Is A Government Instrumentality Of Saudi Arabia**

The Federal Insurance plaintiffs conceded in their complaint that the Saudi High Commission (SHC) is an "agency, instrumentality and organ of the Kingdom of Saudi Arabia." Fed. Ins. Compl. ¶ 181.  But plaintiffs now argue that it is not a government instrumentality.  The sole support for this newly-found position is the allegation that the SHC registered in Bosnia under a Bosnian law requiring only "non-governmental" international charities to register.  Pl. Opp. at 10-11.

The sworn declaration attached to Prince Salman's motion to dismiss conclusively establishes that the Kingdom of Saudi Arabia recognizes the SHC as an agency or instrumentality of the government.  See Decl. of Saud Bin Mohammad Al-Roshood at ¶¶ 3, 20 (explaining that the SHC is a "primary instrument of Saudi foreign policy towards Bosnia-Herzegovina" and that "[a]ctions taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia.").  As this Court has held, it must give "great weight to any extrinsic submissions made by the foreign defendants regarding the scope of their official responsibilities."  Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001).  The plaintiffs offer no facts to counter these averments.

Plaintiffs' argument is frivolous.  First, the Second Circuit has explained that courts must look to the law of the foreign state – here, Saudi Arabia, not Bosnia – to determine whether an entity is a government instrumentality.  S&S Machinery Co. v. Masinexportimport, 706 F.2d 411, 414 (2d Cir. 1983) (holding that Romanian Bank for Foreign Trade was a government instrumentality because it was "specifically defined by Romanian law as a central state institution").

Second, plaintiffs' interpretation of Bosnian law is wrong. The attached declaration by Hadzimuratovic Hajrudin – outside Bosnian counsel to the SHC – makes clear that the Bosnian law cited by the plaintiffs, in requiring only "non-governmental" charities to register, means all charities that are not part of the government of Bosnia-Herzegovina.[6] See Decl. of Hadzimuratovic Hajrudin, Attachment 1, ¶ 4. Mr. Hajrudin attaches to his declaration a 1996 letter from the Bosnian ambassador in Riyadh which states that the SHC is a "government organization" and requests diplomatic status for the head of the SHC in Bosnia, which was granted. Id. ¶ 6 & Exh. C. Also attached to Mr. Hajrudin's affidavit is a Donation Agreement between the Kingdom of Saudi Arabia and Bosnia-Herzegovina specifying aid that Saudi Arabia would supply to the troubled nation. The Agreement states that Saudi Arabia is "represented by the Saudi High Commission" in the Agreement. Id. Exh. D, art. 1. There is simply no factual basis to dispute what the Federal Insurance plaintiffs have already admitted in their complaint: that the SHC is an agency and instrumentality of the Saudi government.

### C.   Prince Salman Acted Within The Scope Of His Duties

The declaration accompanying Prince Salman's motion to dismiss establishes that, as President of the SHC, he was duly authorized to administer the Saudi Arabian government's humanitarian aid activities in Bosnia. See Decl. of Mutlib Bin Abdullah Al-Nafissa, MTD, Exh. C, ¶ 9. Plaintiffs' contention that Prince Salman exceeded his authority is an impermissible end run around the immunity determination, aimed directly to the merits of the case. In any event, the only "evidence" offered by the plaintiffs to

---

[6] Other international charitable organizations, such as the American Red Cross have operated in Bosnia as well. See Description of work by American Red Cross in Bosnia and Herzegovina, included as Attachment 4. Of course, the Red Cross has been consistently held to be a government organization under relevant U.S. law. Dep't of Employment v. United States, 385 U.S. 355, 358 (1966).

support their argument – that Bosnian police allegedly found suspicious material in an office used by the SHC – is not attributed or linked in any way to Prince Salman and therefore fails to establish that he acted outside the scope of his authority as SHC's President. Phaneuf v. Republic of Indonesia, 106 F.3d 302, 306-07 (9th Cir. 1997) (analyzing individual ambassador's actions to determine whether they fell outside the scope of his authority), cert. denied 535 U.S. 987 (2002).

## D. The Tortious Act Exception Does Not Apply to Prince Salman's Actions

Prince Salman has established that he is presumptively immune from suit. Therefore, the burden shifts to the plaintiffs to present a *prima facie* case that an exception to immunity applies. Fickling v. Commonwealth of Australia, 775 F. Supp. 66, 69 (E.D.N.Y. 1991). Surprisingly, the plaintiffs do not even bother to counter Prince Salman's assertion that the tortious act exception does not apply. They offer no case law or explanation of the facts to dispute his contention that the discretionary function provision of this exception applies. They do not offer any extrinsic evidence to challenge the affidavit of Dr. Mutlib Bin Abdullah Al-Nafissa that "there are no specific regulations under Saudi Arabian law mandating how to disburse foreign and humanitarian aid to any particular cause or in any particular manner." MTD, Exh. C, ¶ 9. Finally, they do not challenge that this suit can only properly be brought under 28 U.S.C. § 1605(a)(7), the exception for terrorist states. The plaintiffs have failed to meet their burden under Fickling and therefore, Prince Salman's motion to dismiss should be granted.

## E. The Commercial Activities Exception Does Not Apply

The plaintiffs argue that Prince Salman's alleged conduct amounts to money laundering, and therefore that it falls under the commercial-activity exception to FSIA

immunity. See 28 U.S.C. § 1605(a)(2); Pl. Opp. at 14 n.14. The plaintiffs fail to identify

how Prince Salman's alleged conduct comes remotely close to the transactions proscribed

by 18 U.S.C. § 1956.[7] (Indeed, the plaintiffs fail even to cite the statute.) Moreover,

even if Prince Salman's conduct did fit the money laundering statute (which it does not),

this defeats plaintiffs' own claim. Under the Supreme Court's and Second Circuit's

*explicit* precedent, criminal activities are not commercial activities under the FSIA. See

Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1993); Letelier v. Republic of Chile, 748

F.2d 790, 797 (2d Cir. 1984).

## III.     There Is No Personal Jurisdiction Over Prince Salman

The plaintiffs offer two theories under which they claim this Court has personal

jurisdiction over Prince Salman: (1) Prince Salman purposefully directed his conduct to

further terrorist attacks against the United States; and (2) Prince Salman entered into a

"conspiracy" to commit terrorism against the United States. They also claim that they

need discovery against Prince Salman because it "will reveal substantial contacts between

Prince Salman and the U.S." Pl. Opp. at 21-22.

### A.     Plaintiffs Have Not Alleged Facts Demonstrating That Prince Salman Purposefully Directed His Actions At The United States

Plaintiffs do not claim that Prince Salman has any "minimum contacts" with the

Untied States sufficient to support personal jurisdiction as to him. Instead, they rely on

the "purposefully directed activities" test of Calder v. Jones, 465 U.S. 783 (1984), and

---

[7] Section 1956 makes it a crime to conduct a financial transaction with the proceeds of unlawful activity. 18 U.S.C. § 1956(a). The "transactions" at issue here would be Prince Salman's activities as SHC's president and his alleged personal contributions to charities. *Nowhere* do plaintiffs allege that the funds used by Prince Salman in connection with any of these alleged transactions were the "proceeds" of unlawful activity.

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985).[8]  The facts, however, fall far short of satisfying this test as it has been described by the Supreme Court and the Second Circuit.  Indeed, Judge Robertson rejected the same argument as to Prince Sultan, Burnett, 292 F. Supp. 2d at 22-23, and it should be rejected here as well.

In its most recent description of the Calder principle, the Second Circuit has said that "a court may exercise personal jurisdiction over a defendant consistent with due process when defendant is a *primary participant* in intentional wrongdoing – albeit extraterritorially – *expressly directed at the forum*."  In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (emphasis added) (reversing dismissal of complaint because there was evidence of "purposeful direction" where parent company in Korea attended meeting at which fixing of prices in the United States was discussed).

If the plaintiffs were to offer evidence that Prince Salman met with Al Qaeda leaders to plan attacks on Americans, even though the meeting occurred abroad, the "primary participant" and "expressly directed" requirements described in Magnetic Audiotape might be satisfied.  But the plaintiffs' theory does not come close to satisfying the Calder test.  Courts have emphasized that it is not enough to show that effects in the forum state from acts committed abroad were merely foreseeable.  See, e.g., Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1087 (9th Cir. 2000).  What is required is that the defendant's conduct was "intentionally targeted at and focused on" the forum state, ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997),

---

[8] The plaintiffs also make the rather astounding argument that it is reasonable to subject Prince Salman to personal jurisdiction because he is "alleged to have aided and abetted al Qaeda" and that reasonableness and policy considerations can replace minimum contacts as the touchstone for due process analysis.  Pl. Opp. at 17.  This is incorrect.  The Supreme Court has made it abundantly clear that the Constitution requires that before any lessened, reasonableness standard can apply, the court must find the defendant purposefully established minimum contacts in the forum.  Burger King, 471 U.S. at 474, 476.  Neither the Supreme Court – nor any other court – has ever held that because a defendant is accused of particularly bad acts, due process does not apply.

and that the defendant was "personally involved in the specific conduct that gave rise to the plaintiff's claim." Time, Inc. v. Simpson, No. 02-Civ-4917, 2003 WL 23018890, at *5 (S.D.N.Y. Dec. 22, 2003). Nothing of the sort is alleged here, much less supported by the evidence.[9]

The notion that one who donates to a charitable organization whose primary activity is humanitarian relief may be held liable for terrorists acts on the ground that the organization's funds were wrongfully diverted to terrorists would expand the "purposefully directed" doctrine beyond recognition and far beyond the holdings of the Supreme Court and the Second Circuit. See SEC v. Unifund, SAL, 910 F.2d 1028, 1033 (2d Cir. 1990) (explaining that "not every causal connection between action abroad and ultimate injury to American investors will suffice" for personal jurisdiction); Huang v. Sentinel Gov't Secs., 657 F. Supp. 485, 498 (S.D.N.Y. 1987) (noting that "with respect to effects in the forum caused by acts done elsewhere, 'the test for *in personam* jurisdiction is somewhat more demanding' than just 'some causal connection.'") (quoting Bersch v. Drexel Firestone, Inc., 519 F. 2d 974, 1000 (2d Cir. 1975)).

### B.    Plaintiffs Cannot Rely On A Conspiracy Theory Of Personal Jurisdiction

Plaintiffs' attempt to establish personal jurisdiction over Prince Salman based on his alleged membership in a conspiracy also must fail. They have offered nothing more

---

[9] The two district court cases cited by the plaintiffs, Pl. Opp. at 18-19, do not support their argument as to Prince Salman. The courts in Rein, supra, and Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38 (D.D.C. 2000), held that the defendants were subject to suit in this country under the FSIA's terrorism exception, § 1605(a)(7), and the discussion in the opinions relates to whether that exception can constitutionally be applied to governments and government officials. Section 1605(a)(7) is not, of course, applicable here because Saudi Arabia has not been designated a state sponsor of terrorism. Additionally, both cases are quite different from the plaintiffs' contention regarding Prince Salman, in that defendants were alleged to have personally and directly participated in the terrorist acts at issue. See Daliberti, 97 F. Supp. 2d at 41-42 (describing how Iraq's agents had arrested, tortured and held victim illegally); Rein, 995 F. Supp. at 327-328 (stating that plaintiffs alleged that "Libya and its agents were responsible for [Pan Am Flight 103]'s destruction and the resulting loss of life").

than a "bland assertion of conspiracy" which is insufficient to establish personal jurisdiction in this Circuit. Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93-95 (2d Cir. 1975). Indeed, they have entirely failed to allege the required conspiratorial agreement to which Prince Salman was a party. Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) (plaintiffs must make prima facie showing that conspiracy exists and that defendant was member of conspiracy).[10]  Finally, the Second Circuit requires a plaintiff asserting the conspiracy theory of personal jurisdiction to demonstrate that the in-forum actor acted "for the benefit of, with the knowledge and consent of, and under some control by the [out-of-forum] defendant." Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981). The Plaintiffs have not even attempted to allege that the 9/11 hijackers acted for the benefit of, with the knowledge and consent of, and under control by Prince Salman.[11]

## C.    Plaintiffs Are Not Entitled To Discovery On Personal Jurisdiction

Not only is Prince Salman a government official against whom discovery is strongly discouraged, Rein, 162 F.3d at 756, the plaintiffs have failed to make the "'*prima facie* showing' of jurisdiction" necessary to entitle them to jurisdictional discovery. Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (citation

---

[10] A plaintiff must allege a prima facie case of conspiracy by asserting facts demonstrating "(1) an agreement to enter into a conspiracy, (2) the non-domiciliary's participation in the conspiracy and acts in furtherance thereof, and (3) a connection between the non-domiciliary and the allegedly tortious acts committed in New York." See Andre Emmerich Gallery, Inc. v. Segre, No. 96-Civ-889, 1997 WL 672009, at *4-5 (S.D.N.Y. Oct. 29, 1997); Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc., 10 F. Supp. 2d 334 (S.D.N.Y. 1998).

[11] Further, the cases cited by the plaintiffs demonstrate that courts require more than a conclusory allegation of an agreement; rather, a plaintiff must allege specific facts that support the allegation that the defendant agreed to the conspiracy. See, e.g., Chrysler Capital, 778 F. Supp. at 1267 (plaintiffs alleged that defendants agreed to specific intent to withhold certain information until after sale and leaseback transaction had closed and that one defendant would "finesse" its documents to prevent disclosure of this intent); Andre Emmerich Gallery, 1997 WL 672009, at *5 (plaintiff alleged conspiratorial agreement by showing that two co-conspirators sent very similar correspondence that included similar misrepresentations as part of the conspiracy). In contrast, the plaintiffs have not alleged any facts that suggest that Prince Salman intentionally agreed to finance Al Qaeda. Therefore, this theory of jurisdiction should be rejected.

11

omitted). The plaintiffs have listed three "contacts" between Prince Salman and the United States on which they claim entitle them to further discovery. None of these alleged contacts is included in the complaints, and none is legally sufficient to confer personal jurisdiction.

They first suggest that Prince Salman owns stock in one American company and one company which owns an American company. Pl. Opp. at 22. Mere stock ownership however, is insufficient to confer personal jurisdiction. Cali v. East Coast Aviation Servs., Ltd., 178 F. Supp. 2d 276, 286 (E.D.N.Y. 2001). The plaintiffs also claim that Prince Salman made two official visits to the United States in the 1980s, obviously unrelated to the underlying facts of this case. Again, however, the law in this Circuit is clear that a few visits to the forum are insufficient to exercise personal jurisdiction over a defendant. See, e.g., Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1046 (2d Cir. 1990) (thirteen visits insufficient for personal jurisdiction); Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985) (fifty-four visits insufficient for personal jurisdiction). Finally, the plaintiffs suggest that jurisdiction is proper because Prince Salman's late son lived in the United States and Prince Salman allegedly agreed to "honor his son's obligations" to a plaintiff in a civil lawsuit. But Prince Salman's son's contacts with the United States cannot be used to confer personal jurisdiction over Prince Salman. These legally insufficient "contacts" do not come close to establishing a *prima facie* case of personal jurisdiction. Under Jazini, the plaintiffs are not entitled to discovery.

## IV. The Plaintiffs Have Not Adequately Pleaded Causation

Even the plaintiffs must concede that in order to establish liability for the 9/11 attacks, under any theory, they must at least demonstrate that Prince Salman "knowingly

12

and intentionally" provided material support to terrorist activities by Al Qaeda against the United States. The case law relied on by both sides is unambiguous on that requirement. See Boim v. Quranic Literary Inst., 291 F.3d 1000, 1021 (7th Cir. 2002) (liability under the ATA attaches to "aiders and abettors who *knowingly and intentionally* fund[] acts of terrorism"); Pittman by Pittman v. Grayson, 149 F.3d 111, 123 (2d Cir. 1998) (for both aiding and abetting and conspiracy liability "the defendant *must know* the wrongful nature of the primary actor's conduct"); Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) (aiding and abetting requires proof of "*knowing action that substantially aids*" tortious conduct); Ungar v. Islamic Republic of Iraq, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (civil liability for aiding and abetting terrorism requires that the defendant provide "*knowing and substantial assistance*") (emphasis added).

The plaintiffs' pleadings fail to meet the requirements of knowledge and intent. Disregarding the false and inexcusable accusation that Prince Salman heads a designated global terrorist organization (see, supra, at 1-3) the only facts alleged by the plaintiffs to support their allegation that Prince Salman aided and abetted the 9/11 attacks are: (1) he heads a government aid organization (the SHC) operating in Bosnia; (2) the SHC has been criticized for espousing "Wahabbism"; (3) the SHC employed a language translator suspected of having ties to Al Qaeda; (4) Bosnian police found suspicious material on a computer located in an office used by the SHC; (5) the SHC has been accused of spending its funds for (unspecified) purposes other than direct humanitarian relief, as reflected in a 2000 letter received by Prince Salman from a group called the "Mothers of Srebrenica;" and, finally, (6) Prince Salman made personal donations during

humanitarian relief campaigns sponsored by the IIRO and other well-established Islamic charities during or before 1999.

As we explained in our opening brief, these allegations, even if true, fall far short of establishing that Prince Salman "knowingly and intentionally" funded or otherwise supported terrorism by Al Qaeda. All of the cases relied on by the plaintiffs, including Boim, involve specific factual allegations establishing knowledge by the defendant of the primary actor's tortious conduct and a specific intent to further that conduct. Nothing of the sort is alleged here. The plaintiffs do not allege, for example, that Prince Salman knew or had any contact with the language translator suspected of being connected to Al Qaeda, or that he knew about or had any connection with the computer material allegedly found in one of the SHC's offices, or that the letter he received from the "Mothers of Srebrenica" made any connection between the SHC and Al Qaeda or terrorist financing generally. Nor do they offer any facts to suggest that he intended his alleged 1999 personal contributions to assist Al Qaeda, as opposed to their stated charitable purpose. If such vague allegations were deemed sufficient, virtually every government official (or CEO) would be potentially liable for torts committed by people having only the most tangential connection to their agency or company. That is not the law, nor should it be.[12]

---

[12] Consider the following hypothetical: It has been widely reported that numerous firearms purchased at a national retail chain have been used to commit crimes. The chain has also been criticized for being negligent in conducting background checks on purchasers of firearms. The chain's CEO, who happens to be a fundamentalist Christian and has personally contributed to a number of controversial but lawful evangelical groups, is well aware of the criticism. Assume that a domestic terrorist with a criminal record recruits a local employee of the chain to sell him a firearm without conducting a proper background check, and proceeds to use that weapon to conduct terrorist operations. There is absolutely nothing to link the CEO with either the accomplice employee, let alone the crime. Under the plaintiffs' theory, the CEO would be liable for providing material support to terrorists because (1) he was on notice that guns purchased at the chain had been used for criminal activity; (2) one of the chain's employees directly assisted the terrorists; and (3) one might infer the CEO's knowledge and support for the terrorist's aims of based on the political and evangelical causes that he supports. The law, however, provides otherwise: Without some identifiable link alleged between the CEO and the perpetrator or the crime, there can be no vicarious liability.

## V.    Conclusion

For all of the foregoing reasons, and for all of the reasons argued in Prince Salman's opening brief, the plaintiffs' complaints should be dismissed.

Dated: August 27, 2004                          Respectfully submitted,

                                                                 S/

William H. Jeffress, Jr. (admitted *pro hac vice*)
D.C. Bar No. 041152

Christopher R. Cooper (admitted *pro hac vice*)
D.C. Bar No. 453387

Jamie S. Kilberg (admitted *pro hac vice*)
D.C. Bar No. 480207

Sara E. Kropf (admitted *pro hac vice*)
D.C. Bar No. 481501

BAKER BOTTS, L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
Phone:    (202)639-7700
Fax:      (202)639-7890