# Exhibit 3

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re TERRORIST ATTACKS on SEPTEMBER 11, 2001 ) ) ) | 03 MDL 1570 (RCC) ECF Case |

*This document relates to:*

    *Federal Insurance Co. v. Al Qaida,* 03 CV 6978 (RCC)

    *Kathleen Ashton v. Al Qaeda Islamic Army,* 02 CV 6977 (RCC)


## <u>DECLARATION OF MICHAEL JOHN BRINDLE</u>

I, MICHAEL JOHN BRINDLE Q.C. of Fountain Court Chambers, Fountain Court, Temple, London EC4Y 9DH DECLARE under penalty of perjury under the laws of the United States of America that the following is true and correct:


**Introduction**

1.    I am a member of the Bar of England and Wales in independent practice. I was called to the Bar in 1975 and took silk in 1992. My CV is attached hereto as exhibit 1. I am experienced in company and commercial law.

2.    I have been asked by Patton Boggs LLP to provide a declaration explaining the applicable principles of English Law in relation to the following three issues:

    2.1.    The circumstances in which the corporate veil of a parent company can be pierced such as to make it liable for the acts of its subsidiary and the circumstances in which the corporate veil of a subsidiary company can be pierced such as to make it liable for the acts of a parent company;

    2.2.    Whether the shareholders of a dissolved company can be held liable in civil proceedings for any alleged pre-dissolution misconduct of that company;

2.3.    Whether a dissolved corporation can be sued.

3.    I have no connection with any of the parties to this action.  As with any English barrister in independent practice, I am self-employed.

**Summary of facts which are the basis on which this declaration is given**

4.    These proceedings involve claims by the plaintiffs that before 1999 the National Commercial Bank ("NCB") provided material support and resources to Osama bin Laden and al Qaeda in the form of ordinary banking services (such as cheque clearing and funds transfers) and through donations to Islamic charities that in turn allegedly provided funds to al Qaeda.  Relevant to the purposes of this declaration, the plaintiffs to the Ashton complaint also allege (at paragraph 563 of the Ashton complaint) that *"The NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise."*  I am instructed that although the Federal Insurance complaint identifies these SNCB companies as defendants, it does not make any allegations concerning their relationship with NCB and does not make any other individualised allegations against them.

5.    In relation to SNCB Corporate, I am instructed as follows.  SNCB Corporate Finance Ltd. ("SNCB Corporate") was established in November 1992, with its only business being to administer and collect outstanding loans issued by NCB's London branch after that branch closed. SNCB Corporate was incorporated and headquartered in England and had its principal place of business in London. SNCB Corporate was dissolved in November 2000.  Whilst it was operational, NCB owned all but one of SNCB Corporate's shares.

6.    SNCB Securities Ltd ("SNCB Securities") was incorporated and headquartered in England and had its principal place of business in London.  However, it ceased doing all business on 1 February 2003 and since that time has had no employees. When it was operational, SNCB's principal business was to provide investment advisory services to certain mutual funds distributed in the Kingdom of Saudi

Arabia, under contract with another affiliate of NCB incorporated under the laws of, and doing business in, the British Virgin Islands.  NCB owns all but one of SNCB Securities' shares.  However, I am instructed that SNCB Securities has always had its own policies and procedures, and maintained its books, records and accounts, separate from those of NCB.  Further, SNCB Securities did not require NCB's prior approval for its transactions and the members of SNCB Securities' board of directors are not members of NCB's board of directors.

**The requirements for piercing the corporate veil**

7.      The first issue which I am asked to consider is the circumstances in which the corporate veil of a parent company can be pierced such as to make it liable for the acts of its subsidiary and vice versa.

8.      The position under English law is that from the date of incorporation, the subscribers of the memorandum, together with such other persons as may from time to time become members of the company, are a body corporate by the name contained in the memorandum.[1]  That body corporate is a legal entity distinct from its shareholders.  This was established by the House of Lords in Salomon v Salomon [1897] AC 22 (HL), where it was held that however large the proportion of shares and debentures owned by one man, even if the other shares were held in trust for him, the company's acts were not his acts nor were its liabilities his liabilities.  This principle also applies to companies within a group, where the fundamental principle is that *"each company within a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities"*: see The Albazero [1977] AC 774 at 807 per Roskill LJ.

9.      However, there are certain limited circumstances in which the English courts applying English law will "pierce the corporate veil" and thus ignore or set aside the separate legal personality of a company.

---

[1] Companies Act 1985, s13(3).

10.     The leading authority on piercing the corporate veil under English law is <u>Adams v. Cape Industries</u> [1991] 1 Ch 433 (CA).  That case involved (amongst other things) the issue of whether a parent company was present within the jurisdiction of the U.S.A. by virtue of the presence of its subsidiaries.  The claimants alleged that the parent company was so present by virtue of one or more of three different arguments: first, that the companies in the group were to be treated as one for this purpose as they constituted a "single economic unit"; second, that the corporate veil should be pierced on the basis that it was a charade concealing the true facts; and third, that the subsidiaries were acting as agents of the parent and thus the parent was present through their agency.

11.     The Court of Appeal rejected the "single economic unit" argument and affirmed the distinct legal identity of subsidiary companies.  The Court (at p.536) rejected an argument to the effect that where legal technicalities would produce injustice in cases involving members of groups of companies those technicalities should not be allowed to prevail.  Rather, the Court stated that "*[o]ur law... recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.*"  However, the Court did recognise that in certain cases the wording of a particular statute or contract may justify the treatment of parent and subsidiary as one unit and the Court explained a number of cases on that basis.

12.     As to the claimants' second argument, the Court (at p.539) affirmed that the corporate veil could be pierced where "*special circumstances exist indicating that it is a mere façade concealing the true facts.*"  However, on reviewing the authorities the Court (at p.543) concluded that "*we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade....*"  The Court added that "*[w]e will not attempt a comprehensive definition of those principles.*"  Exceptional circumstances would be required involving some disguise of the truth to justify ignoring the separate legal personalities.

13.     As to the claimants' agency argument, the Court (at p.537) stated that "*there is no presumption of any such agency.  There is no presumption that the subsidiary is the parent company's alter ego...If a company chooses to arrange the affairs of its group in such a way that the business carried on in a particular foreign company is the business of the subsidiary and not its own, it is ... entitled to do so.*"  On the facts, the Court held that the relevant companies were not acting as agents for the parent.

14.     It is evident from Cape[2] that there are essentially two circumstances in which the Courts will pierce the corporate veil:

14.1.   First, if the construction of a statute or contract requires it;

14.2.   Second, if special circumstances exist indicating that it is a mere façade concealing the true facts.

15.     In addition, although simply an application of normal agency principles, it should be noted that where a subsidiary is found to be acting as an agent for the parent, it will have an effect similar to that achieved by piercing the corporate veil, in that the parent may be liable for the acts of the agent subsidiary insofar as those acts were within the agent subsidiary's actual or apparent authority.

16.     I consider each of these circumstances in more detail below.

*Construction of a statute or contract*

17.     There are certain statutory provisions, not relevant to the circumstances of this case, which in effect require the corporate veil to be pierced.  These include various statutory provisions relating to the law of taxation,[3] statutory provisions relating to competition law,[4] statutory provisions relating to the law of merger

---

[2] See also, Gore-Browne on Companies at para.1.5.2.
[3] See, for example, the Finance Act 1986, ss.75-77.
[4] See, for example, ICI v. Commercial Solvents [1974] ECR 223, referred to in Cape at pps.535-6.

control and statutory provisions relating to the provision of group accounts where companies are in the relationship of parent company and subsidiary.[5]

*Special circumstances indicating that the company is a mere façade concealing the true facts*

18.    As stated above, in Cape the court noted that the previous authorities only provided sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade, such as to permit the piercing of the corporate veil. However, in an attempt to discern what guidance is available, I review below the major decisions in which the courts have pierced the veil on the basis of the façade exception or have considered so piercing the veil on that basis.

19.    In Gilford v. Horne [1933] 1 Ch 935 (CA), the employment of the managing director of a company was terminated subject to a restrictive covenant against solicitation. Shortly afterwards, the former employee set up a company (of which he was neither a director or shareholder, but the court found that he in effect controlled) through which he carried on business contrary to the restrictive covenant. The Court held that the company was a mere cloak or sham for the purpose of enabling the former employee to commit breaches of his contract. The court therefore ordered an injunction against both the company and the former employee.

20.    In Merchandise v. British Transport [1962] 2 QB 173 (CA) a transport company which was unlikely to obtain a licence for its vehicles if it applied itself, caused the application to be made by its subsidiary, to which the vehicles were to be transferred. The court pierced the corporate veil, holding that the parent and company were to be treated as one for the purposes of the application. Although this case can simply be interpreted as one relating to the construction of the relevant statute[6], Dankwerts LJ stated (at p.206) the general principle (later

---

[5] See s.227 of the Companies Act 1985. More generally, see also the other cases referred to in Cape at pps.533-536.
[6] See, for example, p.207 thereof.

approved in Cape) that "*where the character of a company, or the nature of the persons who control it, is a relevant feature, the court will go behind the mere status of the company as a legal entity, and will consider who are the persons as shareholders or even as agents who direct and control the activities of a company which is incapable of doing anything without human assistance.*"

21.    In Jones v. Lipman [1962] 1 WLR 832, a vendor of land transferred that land prior to completion to a company acquired by him in order to avoid any order for specific performance.   Russell J. (at pps.836-7) pierced the corporate veil by ordering specific performance against both the company and the vendor, holding that the defendant company was a device or sham held before the vendor's face in an attempt to avoid recognition by the eye of equity.

22.    In Cape, the Court had to deal with a subsidiary which had been liquidated ("NAAC"), another of the parent companies' (albeit indirect) subsidiaries ("AMC") and another company ("CPC"), which was independently owned.   The Court of Appeal declined to pierce the corporate veil in relation to NAAC and CPC, but was prepared to do so in respect of AMC.   This did not avail the claimants since AMC did not carry on business and was not present in the USA. The Court provided the following three points of guidance as to the applicable principles:

22.1.    First, the court (at p.537) emphasised that it was not open to it to disregard the principle in Salomon merely because it was just to do so.

22.2.    Second, the court stated (at p.540) that whenever a device or sham or cloak is alleged in such cases, "*the motive of the alleged perpetrator must be legally relevant.*"

22.3.    Third, following on from that view, the court (at p.544) assumed for the purposes of the case that the court would lift the corporate veil where a defendant by the device of a corporate structure attempted to evade (i) limitations imposed on his conduct by law or (ii) such rights of relief as third parties already possess.   However, the court expressly rejected the

7

argument that the court is entitled to lift the veil where a party by the device of a corporate structure attempts to evade such rights of relief as third parties may in the future acquire.  The Court stated that:

> "*we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a corporate group merely because the corporate structure has been used to ensure that the legal liability (if any) in respect of particular future activities of the group (and correspondingly the risk of enforcement of that liability) will fall on another member of the group rather than the defendant company.  Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law.*"

23.    In <u>Re Polly Peck</u> [1996] 1 BCLC 428 a parent company set up a special purpose and wholly owned subsidiary to raise finance for the group by bond issues, the proceeds of which were on-loaned to the parent.  Once the subsidiary had issued the bonds, its involvement was minimal, with the payments under the bonds being made by the parent.  The liquidators of the subsidiary claimed in respect of the loans and it was argued in response (amongst other things) that the corporate veil should be pierced on the basis that the subsidiary merely acted as a façade for the parent.  Robert Walker J. stated that 'façade' was a "'*bad name' implying a value judgment of disapprobation*" and that 'façade' was "*perhaps most aptly used where one person (individual or corporate) uses a company either in an unconscionable attempt to evade existing obligations ... or to practice some other deception.*"  On the facts, he found that the use of the subsidiary as a single purpose financial vehicle did not involve such a façade.

24.    In <u>Re H</u> [1996] 2 All ER 391 (CA) three defendants charged with excise duty evasion offences had used two companies controlled by them for the fraudulent evasion of excise duty on a large scale.  In the circumstances, the Court of Appeal held that it was appropriate to pierce the corporate veil and to treat the companies' stock and motor vehicles as property held by the defendants.

25.   In The Tjaskemolen [1997] 2 Lloyd's Rep 465, prior to the arrest of a vessel of a group company and the issuing of a writ for breach of contract the relevant vessel was sold to another company in the same group. Mr Justice Clarke noted that the cases "*have not worked out what is meant by "piercing the corporate veil." It may not always mean the same thing.*" However, he held that where, such as in the case before him, an alleged transfer was a sham or façade, the Court will hold that the original owners retain the beneficial interest in the vessel.[7] He also highlighted the distinction between cases where the device of corporate structure is used to evade existing rights of third parties and cases where the device is used to evade rights that may in the future be acquired by third parties. Following Cape, he saw no problem with the latter, at least in the case of one ship companies. However, in relation to the former he said (at p.470) that:

"*the position is or may be different where a group arranges its affairs in such a way as to divest a company within the group of assets with the purpose and effect of ensuring that they will not be available to meet its existing liabilities, at any rate where the transfer is made to another member of the group at an undervalue. Depending on the facts, such an agreement is likely to be held to be a sham or façade....*"

26.   However, in the important case of Yukong Lines v. Rendsburg, The Rialto (No.2) [1998] 1 Lloyds Rep 322 charterers controlled and ultimately owned by Mr Yamvrias and his family repudiated a charterparty contract and then transferred monies into another company also controlled and ultimately owned by him and his family, so as to put the monies beyond the reach of the claimant. Mr Justice Toulson declined to go as far as to treat either Mr Yamvrias or the second company as a party to the charterparty, holding that neither the charterparty nor the transfer was a sham. Rather, he indicated the appropriate remedy was for the liquidator of the charterers to bring proceedings against Mr Yamvrias for breach of fiduciary duty. Further, the judge (at p.330) did not appear to regard either Jones v. Lipman or Gilford v Horne as involving the application of principles specific to company

---

[7] This case may be better regarded not as one involving a piercing of the corporate veil but rather as one in which the Court refuses to give effect to a sham transaction.

law.  Rather, he regarded both cases as explicable on the basis that the company acted with full knowledge of and/or assisted in the relevant breach of contract.

27.  In <u>Ord v Belhaven</u> [1998] 2 BCLC 447 (CA), following a recession in the property market, a group of companies restructured in such a way that most of the assets were transferred to the parent company.  Despite not being able to rely on any concept of fault or fraud and not being able to prove any sham or façade the claimants attempted to pierce the corporate veil.  The court emphasised the lack of any allegation of fault, fraud or sham and rejected the attempt to pierce the veil as being outside the scope of the applicable principle, stating that the companies had simply engaged in overt transactions in accordance with the liberties granted to them under the relevant legislation.

28.  In <u>Trustor v Smallbone</u> [2001] 3 All ER 987, the managing director of company A procured the improper payment by company A of monies to company B, which company he controlled.  Sir Andrew Morritt VC held that company B was a device or façade used as the vehicle for the receipt of money and in the circumstances it was appropriate to pierce the corporate veil and to recognise the receipt of the company as that of the managing director.

29.  It was argued in <u>Trustor</u> that the veil could be pierced in three situations: (1) where the company was a façade or sham, (2) where the company was involved in some impropriety or (3) where it was necessary to do so in the interests of justice and no unconnected third party was involved.  The court accepted (1) (at para.20), but rejected (2) (at para.22) and (3) (at para.21).  In relation to (2), the court stated that *"companies are often involved in improprieties ... But it would make undue inroads into the principle of <u>Salomon's</u> case if an impropriety not linked to the use of the company structure to avoid or conceal liability for that impropriety was enough."*

30.  Based on the above review of the relevant case law, the following principles may therefore be discerned in relation to the façade exception to the general principle in <u>Salomon's</u> case:

30.1.   The court may only pierce the veil where special circumstances exist indicating that it is a mere façade concealing the true facts: see Cape.

30.2.   In determining whether that test is satisfied, the motive of the alleged perpetrator is legally relevant: see Jones and Cape.

30.3.   In addition, establishing that the corporate veil is a mere façade appears to involve a person (legal or otherwise) directing or controlling the company which is said to be a façade and to entail treating that person and the façade company as one (see, for example, Merchandise Shipping.   See also, Gilford, Jones, Cape, Re H and Trustor).

30.4.   The court may not simply pierce the veil whenever it is in the interests of justice to do so: see Cape and Trustor.

30.5.   The court is not entitled to pierce the veil of a company which is the member of a corporate group merely because the corporate structure has been used to ensure that the legal liability in respect of particular future activities of the group will fall on another member of the group rather than that particular company: see Cape and The Tjaskemolen.

30.6.   However, the situation may be different where the corporate structure is used to effect a transfer of assets so as to avoid an existing liability: The Tjaskemolen. Cf the Rialto (No.2).

30.7.   Establishing that the corporate veil is a mere façade appears to entail some form of disapprobation, fault, fraud or impropriety: see Ord and Polly Peck. It is perhaps most aptly used where one person (individual or corporate) uses a company either in an unconscionable attempt to evade existing obligations or to practice some other deception: see Polly Peck.

30.8.   However, impropriety not linked to the use (and, pursuant to Cape, intention to use) the company structure to avoid or conceal liability for that impropriety is not sufficient to result in the veil being pierced: see Trustor.

*Agency*

31.  Whilst the application of agency principles does not involve piercing the corporate veil as such, it can have the effect of making the individual or company acting as principal for an agent company liable for acts carried out by the agent company within its actual or apparent authority.  For completeness, I therefore consider below the application of agency principles in the context of groups of companies.

32.  In <u>Smith Stone v. City of Birmingham</u> [1939] 4 All ER 116, company A acquired a partnership B, registered it as a subsidiary and carried on business through that subsidiary.  The premises of the subsidiary were compulsorily purchased, and the parent claimed compensation.  The defendant alleged that the proper claimants were the subsidiary B, who for various reasons would have had no claim.  Atkinson J. stated that it was *"well settled that the mere fact that a man holds all the shares in a company does not make...the company his agents for the carrying on of the business.  That proposition is just as true if the shareholder is itself a limited company."*

33.  He went on to state, however, that it was a question of fact in each case whether a company was acting as agent, and that the relevant test was whether the subsidiary was carrying on the business as the parent's business or as its own.  In this respect, he set out six relevant factors, which were as follows: first, whether the profits of the subsidiary were treated as the profits of the parent company; second, whether the person conducting the business was appointed by the parent company; third, whether the parent was the head and the brain of the trading venture; fourth, whether the parent governed the adventure, decided what should be done and what capital should be embarked on the venture; fifth whether the parent made the profits by its skill and direction; and sixth, whether the parent was in effectual and constant control.  On the facts, he held that every one of these questions had to be answered in favour of the claimant company A and that the subsidiary B therefore was acting as an agent.

34.     In re FG (Films) [1953] 1 WLR 483, the applicant English registered company
        wished to register their film as a British film.  In fact, the film was financed and
        essentially made by an American company whose president was the majority
        shareholder in the English company, with the English company being found to
        have had a negligible participation.  Valsey J. (at p.486) held that the English
        company was brought into existence solely for the purpose of enabling the film to
        be registered as British.  To the extent that the English company did have any
        involvement, he therefore found that it acted as agent for the American company.

35.     In Firestone v. Lewellin [1957] 1 WLR 464 (HL), the question was whether a
        parent traded through the agency of its subsidiary in the context of taxation.  Lord
        Morton (at p.469) emphasised that each case has to be determined on the facts.  On
        the facts, the court found that the course of dealings between the parent and
        subsidiary was that the subsidiary sold the goods on behalf of the parent to
        customers approved of by the parent, subject to terms imposed by the parent and to
        a requirement to account to the parent for the proceeds less the cost of the goods
        plus 5%.  In the circumstances, it was held that the subsidiary did act as an agent.

36.     However, the above cases must now be read in the light of the leading case of
        Cape, which makes clear that it will be difficult to establish an agency relationship
        in the context of a parent/subsidiary relationship.  In Cape the court accepted that it
        is of the very nature of a parent company-subsidiary relationship that a parent
        company is in a position to exercise overall control over the general policy of the
        subsidiary.  Nevertheless, it emphasised that there was no presumption of any
        agency in the parent/subsidiary context.  Rather, the agency had to be established
        on the facts.  In this respect, the court attached great importance to the question
        whether the subsidiary had general authority to bind (or had ever bound) the parent
        to any contractual obligation.[8]  However, the court regarded the test as being
        whether the subsidiary was carrying on its own business or the business of the
        parent.[9]

---

[8] See, for example, Cape at p.547.  At p.529 the Court approved a passage from Halsbury's Laws defining
agency as *"the relation[ship] which exists where one person has an authority or capacity to create legal
relations between a person occupying the position of principal and third parties."*

37.     On the facts in Cape, although the group ran a single integrated mining division and although the parent exercised a degree of overall supervision over the first subsidiary in question (NAAC), in particular by setting its maximum level of expenditure and its dividend and borrowing levels and by subjecting the subsidiary to the broad business policies of the parent, an agency relationship was not established.  The court relied (amongst other things) on the fact that NAAC had no general authority to bind Cape, on the fact that NAAC retained control of its day to day business and on the fact that the corporate forms applicable to NAAC as a separate legal entity were observed.

38.     Cape has been regarded as casting doubt on the decisiveness of the test expounded in Smith Stone.[10]  Further, the difficulty of now establishing an agency relationship in this context has been confirmed in two further cases since Cape.  In Polly Peck (supra), Mr Justice Walker rejected an agency argument as being inconsistent with the relevant contractual documents.   In rejecting the agency argument, he emphasised that "*neither agency nor nomineeship ... is to be inferred simply because a subsidiary company has a small paid-up capital and has a board of directors all or most of whom are also directors or senior executives of its holding company.*"

39.     In the Rialto, Mr Justice Toulson also rejected an agency argument.  He (at p.328) regarded Smith Stone simply as an example of a case decided on the basis of the wording of a particular statute.[11]   Further, he did not accept that the correct question was whether the company was carrying on business as its owner's business or as its own business (as was suggested in Cape).  Rather, (at p.328) he stated that "*the necessary requirement [was] to show that the relationship of agency was intended to be created. Ordinarily, the intention of someone who conducts trading activities through the vehicle of a one-man company will be quite the opposite.*"  Mr Justice Toulson emphasised (at p.327) that the relationship of principal and agent could only be established by consent.  He went on to approve an observation of Mr Justice Staughton in The Coral Rose [1991] 1 Lloyds Rep

---

[9] See Cape at p.545.
[10] See Gore-Browne at para.1.5.2.  Certainly, the Court in Cape did not apply the six factor test set out in Smith Stone.

563 that the creation or purchase of a subsidiary company with minimal liability, which will operate with the parent's funds and on the parent's directions but not expose the parent to liability was common and that to hold that it created an agency relationship between the subsidiary and the parent would be a revolutionary doctrine.

40.     In summary, it is evident from the above that although the application of agency principles may be used to impose liability on a parent company for the acts of the subsidiary, such a relationship must be determined on the facts and in the absence of an express agreement will be difficult to establish.  Of particular importance will be the question whether the subsidiary has general authority to bind the parent (or has a practice of being authorised to bind the parent) to any contractual obligation (see Cape) and whether there was ever any intention that the relationship of agency be created (see the Rialto).

*"Reverse" veil piercing*

41.     The English courts have not expressly recognised the concept of "reverse" veil piercing in contrast to "straight" veil piercing.  Indeed, as Mr Justice Clarke noted in The Tjaskemolen, the cases *"have not worked out what is meant by "piercing the corporate veil."  It may not always mean the same thing."*[12] Further, I have not found any case in which a subsidiary company has been found liable for the acts of a parent company as a result of veil piercing.

42.     If a statute or contract required it, or if the parent was found on the facts to have been acting as an agent of the subsidiary, the subsidiary might be liable for the acts of the parent, although this is likely to be a rare occurrence.  Where the façade exception applies, it generally has the effect of the court treating the relevant two entities as one (see paragraph 30.3 above).  Provided that the relevant requirements are satisfied, there is nothing to prohibit the façade exception applying so as to make the subsidiary liable for the acts of the parent.  However, the requirements of

---

[11] Firestone and In re FG can be regarded in the same way.
[12] To similar effect, in The Rialto at p.329 Mr Justice Toulson stated that *"the phrases "lifting the corporate veil" and "piercing the corporate veil" have been used in different situations…."*

the exception are likely to be much more difficult to satisfy in the context of "reverse" veil piercing than "straight" veil piercing. This is because in finding that a company was a mere façade, the courts rely on both the motive with which the company was formed or used and the control that the individual or company behind the veil has over the company (see paragraph 30 above). To the extent that it is sought to pierce the veil of a parent company to impose liability on a subsidiary rather than vice versa, establishing this motive or control is likely to be more difficult, as a subsidiary is much less likely to have the relevant degree of control over the parent.

*Summary on veil piercing*

43.    It is therefore evident that a subsidiary may be liable for the acts of its parent (and vice versa) if a general agency relationship exists (which will have to be established on the facts) or if a particular statute or contract requires it. Further, such liability may also arise if special circumstances exist indicating that the corporate veil is a mere façade concealing the true facts, although this may be more difficult to establish in the context of "reverse" rather than "straight" veil piercing. In determining whether the required circumstances exist to pierce the veil on the basis of a façade, the principles set out in paragraph 30 above will apply.

**Liability of shareholders of a dissolved company for pre-dissolution misconduct of that company**

44.    As stated in paragraph 8 above, the general principle in English law is that a company is a distinct legal entity from its shareholders and that the shareholders are not liable for the debts or liabilities of the company. Further, the shareholders' personal liability to the company or liquidator is, in a limited company such as SNCB Corporate, limited to the amount unpaid on shares registered in their name, or, if the company is limited by guarantee, to the amount of that guarantee.[13] Except to that extent, a shareholder is not in its capacity as a shareholder (unless

---

[13] See Gore-Browne on Companies at paras.1.3 and 2.5.

the corporate veil can be pierced) liable for any misconduct of a company in which it holds shares.[14]

45.    There is no principle or rule of English law which in any way modifies the above principles once a company has been dissolved. As a result, the above principles will apply equally to prevent liability for pre-dissolution misconduct being imposed on a shareholder as they would to prevent liability being imposed on a shareholder for misconduct of the company in circumstances where the company had not been subsequently dissolved.

## Suing a dissolved company

46.    Once a company is dissolved, it ceases to exist as a legal entity.[15] As a result, it can no longer be sued: see Gore-Browne on Companies at para.34.8.2. Any proceedings brought against a dissolved company are null[16] and any judgment obtained against a dissolved company is invalid.[17]

47.    In this case, SNCB Corporate was voluntarily wound up by its members, with the final account and return under s.94 of the Insolvency Act 1986 being dated 8 November 2000. Under s.201(2) of the Insolvency Act 1986, on the expiration of 3 months from the registration of the s.94 return the company is deemed to be dissolved. In this case, I am instructed that the Companies House stamp on the s.94 return shows that it was registered at Companies House on 9 November 2000, with the result that SNCB Corporate would be deemed to be dissolved on 9 February 2001.

48.    However, if a company is dissolved, a liquidator or person appearing to the court to be interested can apply pursuant to s.651(1) of the Companies Act 1985 for an order declaring the dissolution to have been void. Such applications are usually made for the purpose either of enabling a creditor to make a claim which he had

---

[14] A shareholder obviously will be liable in relation to misconduct of a company (irrespective of whether it has subsequently been dissolved) if the shareholder has itself acted in such a way as to commit an independent tort.
[15] See Halsbury's Laws Vol.7(3) at para.2691, Smith v. Mainwaring [1986] BCLC 342 (CA).
[16] See Morris v. Harris [1927] AC 252 at 259.

previously not made or to enable a liquidator to distribute an overlooked asset.[18] Pursuant to s.651(2), upon an order declaring the dissolution to have been void being made, such proceedings may be taken as might have been taken if the company had not been dissolved. However, it should be noted that an order of the court declaring the dissolution void does not render valid proceedings taken against the company after its dissolution and before the date of the order.[19] Rather, it simply allows fresh proceedings to be brought pursuant to s.651(2) (and subject to limitation).

49.     Further, subject to two exceptions set out in s.651(5), pursuant to s.651(4) an application under s.651 may not be made after the end of the period of two years from the date of dissolution of the company. The two exceptions in s.651(5) are where the purpose of the application is to bring proceedings (a) for damages in respect of personal injuries or (b) for damages under the Fatal Accidents Act 1976. When these exceptions apply, s.651(5) provides that the application shall be made at any time, but that no order shall be made on such an application if it appears to the court that the proceedings would fail by virtue of any enactment as to the time within which proceedings must be brought (i.e. by virtue of limitation). s.651(6) goes on to provide that nothing in s.651(5) shall affect the power of the court on making an order under s.651 to direct that the period between the dissolution of the company and the making of the order shall not count for the purposes of any such enactment. However, that power will not be exercised unless the court is satisfied that an application under s.33 of the Limitation Act 1980 would be bound to succeed.[20]

50.     Thus unless the action is one for personal injury (or under the Fatal Accidents Act 1976), as SNCB Corporate was dissolved on 9 February 2001, the time limit for making an application to declare the dissolution void would have expired in February 2003. If the action is one for personal injury (or one under the Fatal Accidents Act 1976), an application can still be made, subject to the position on limitation. With respect to limitation, the general rule for personal injury is that

---

[17] See <u>Salton v. New Beeston</u> [1900] 1 Ch 43.
[18] See <u>Stanhope Pension Trust v. Registrar of Companies</u> [1994] 1 BCLC 628 (CA).
[19] See <u>Morris v. Harris</u> [1927] AC 252 (HL).

the limitation period expires three years from the date on which the cause of action accrued.[21]  The cause of action in tort will accrue on the date the person suffered the relevant damage.

51.   Finally, it should be noted that even if a company's dissolution is rendered void under s.651, this will not upset any previous distributions made by the liquidator.[22] The resurrected company therefore may not have sufficient (or any) assets to satisfy any judgment obtained after the resurrection of the company.[23]  Indeed, the main purpose of the provision contained in s.651(5) is to allow a personal injuries claimant to take the procedural steps necessary to make an insurance recovery against the insurers of a dissolved company.[24]  Under English law, in certain circumstances,[25] an insolvent company's rights against its liability insurers are transferred to the third party claimant.  However, in order for those rights to accrue, the insurance policy will often require the liability to the third party to be ascertained by judgment, award or agreement, which will be impossible if the company has subsequently been dissolved.  S.651 allows the dissolution to be avoided for the purposes of entering judgment or reaching agreement and so enables a third party claimant to overcome this obstacle to asserting a claim against the relevant insurers.

**Conclusions**

52.   My conclusions are therefore as follows:

52.1.   The corporate veil may only be pierced such that a subsidiary may be liable for the acts of its parent (and vice versa) (a) if a particular statute or contract requires it or (b) if special circumstances exist indicating that the corporate veil is a mere façade concealing the true facts.

---

[20] See Smith v. White Knight Laundry [2002] 1 WLR 616 (CA).
[21] S.11 of the Limitation Act 1980.  This is subject to the discretion contained in s.33 of the Limitation Act 1980.
[22] See Gore-Browne at para.34.8.2, fn.5.
[23] If this is likely to be the case, it would be an argument against the application to render the dissolution void succeeding.
[24] See Palmer's Company Law Vol.3 at para.15-486.

52.2.   In determining whether the required circumstances exist to pierce the veil on the basis of a façade, the principles set out in paragraph 30 above will apply.

52.3.   It is likely to be more difficult to establish that the required circumstances exist to pierce the veil on the basis of a façade in the context of "reverse" rather than "straight" veil piercing: see paragraph 42 above.

52.4.   Although not an example of veil piercing, if a general agency relationship exists a parent may also be liable for the acts of its subsidiary or vice versa. However, there is no presumption of such a relationship in the parent/subsidiary context and an agency relationship would therefore have to be established on the facts, which is likely to be difficult (see Cape).

52.5.   The general principle in English law is that a company is a distinct legal entity from its shareholders and that the shareholders are not liable for the debts or liabilities of the company. This principle applies equally to protect shareholders from liabilities incurred by the company in circumstances where the company has subsequently been dissolved as it does where the company has not been subsequently dissolved.

52.6.   A dissolved company cannot be sued. Any proceedings brought against a dissolved company are null and any judgment obtained against a dissolved company is invalid. However, in certain limited circumstances it is possible pursuant to s.651 of the Companies Act 1985 to obtain an order declaring the dissolution to have been void, such that proceedings may then be brought against the company.

MICHAEL JOHN BRINDLE Q.C.

19 JULY 2004

---

[25] See the Third Parties (Rights Against Insurers) Act 1930, s.1.

MEMBERS



Terms/Disclaimer I About I Practice Areas I Members I Commercial Court Procedure I Publications I Pupillage I Contact I Links I News

## Michael Brindle QC



Work in the commercial/corporate sphere and in employment law. Emphasis on banking and financial services, company law, professional negligence in financial and commercial matters, insurance, arbitration and international trade. Experience in City-related matters, including litigation arising out of audits, take-overs and rights issues. Practice in chancery as well as commercial and common law courts.

**Queen's Counsel:** 1992

**Call:** 1975

**Date of Birth:** 1952

**Academic Qualifications**

Westminster School
New College, Oxford MA
Entrance Scholarship (Ella Stephens)
1972 First Class Hons Classics
1974 First Class Hons Jurisprudence
1976-82 Part-Time Lecturer at New College, Oxford - Jurisprudence

**Prizes and Scholarships**

New College Oxford
Entrance Scholarship (Ella Stephens)

**Appointments**

Recorder of the Crown Court, 2001
Deputy High Court Judge, 1999

**Notable cases**

*Morgan Crucible Co plc v Hill Samuel* (1991)
Professional negligence

*Caparo v Dickman* (1992)
Professional negligence

*Cape-Cure Myers v McCarthy* (1993)
Insurance policy construction Lloyd's market

*Re Bishopsgate Investment Management* (1993)
Constructive trust

*Deposit Protection Board v Dalia* (1993)
Depositor compensation

*Shah v Bank of England* (1994)
Banking regulation

*Cala Cristal v Al-Borno* (1994)
Mareva injunction - costs

*Mellstrom v Bank of England* (1995)
Banking regulation

*Football Association v Graham* (1995)
Sports Law

*Sunlife v Securities and Investment Board* (1995)
Judicial review - financial services

*Camdex v Bank of Zambia (1) & (2)* (1996)
Champerty and mareva injunctions involving a central bank

*Pointwest Litigation - BBL v Simmons & Simmons* (1996)
Solicitors' negligence and banking practice

*Credit Lyonnais v New Hampshire Insurance* (1996)
Insurance contract - Governing law

*British Gas v Eastern Electricity* (1996)
Commercial contract - consent to assignment

*Central Bank of Trinidad & Republic Bank Limited* (1996)
Bank regulation - Trinidad

*Camdex v Bank of Zambia (3)* (1997)
Garnishee orders and a central bank

*Re Mid-East Trading Limited* (1997)
Winding-up of foreign company

*BCCI v Price Waterhouse & Bank of England* (1997)
Interpretation of Banking Act 1987

*Nuova Safim Spa v The Sakura Bank Ltd* (1997)
Derivatives

*Bank Austria v Price Waterhouse* (1998)
Professional negligence

*KAFCO v Trans-ammonia* (1998)
Arbitration - restraint of trade

*Northern Rock v Archer* (1998)
Banking and sureties

*Morgan Grenfell v SACE* (1999)
Export credit insurance and Italian law

*Czarnikow-Rionda v Standard Bank* (1999)
Letters of Credit and fraud

*Barclays Bank v Boulter* (1999)
Banking and sureties

*Marks & Spencer v William Baird* (2000)
Certainty in contract and estoppel by convention

*State of Brunei v Jefri* (2000)
Apparent or actual bias of judge

*Barings v Coopers & Deloittes* (2001-2)
Auditors negligence

*Customs & Excise v Barclays Bank* (2003)
Freezing injunction and duty of care

*HSBC v Fortis* (2004)
Mutual Funds - Bahamas

**Publications**

(i) "Does Constructive knowledge make a constructive trustee?", Published in Australian Law Journal and Trust Law and Practice in 1987

(ii) "Money Laundering and the Criminal Justice Act 1988": International Tax Report May 1995 and Tolley's International Tax Planning (1996 and 2001)

(iii) "Confidence, Public Interest and the Lawyer" published in Legal Ethics and Professional Responsibility by Ross Cranston (1996)

(iv) "The Law of Bank Payments" with Raymond Cox QC: FT law and Tax (1996) (Third Edition 2004)

**Other relevant experience**

Chairman of Advisory Council of "Public Concern at Work".
Member of Financial Reporting Review Panel.
Chairman of Commercial Bar Association.
Special advisor to Trade & Industry Select Committee re "Export Licensing and BMARC".
Chairman of Bar Council Education and Training Committee.
Member of Financial Markets Law Committee.