# Exhibit 3

a

[COURT OF APPEAL]

b

ADAMS AND OTHERS v. CAPE INDUSTRIES PLC. AND ANOTHER

c

[1984 A. No. 2597]

d   1988 Feb. 15, 16, 17, 18, 19, 24, 25, 26, 29;                                    Scott J.
    March 1, 2, 3, 4, 7, 8, 9, 10, 11, 14, 15, 16,
e   17, 18, 21, 22, 23, 24, 25; April 11, 12, 13,
    14, 18, 19; June 17; July 26;

f   1989 April 5, 6, 7, 10, 11, 13, 14, 17, 18,            Slade, Mustill and Ralph Gibson L.JJ.
    20, 21, 24, 25, 27, 28; May 2, 3, 24; July 27

g
    Conflict of Laws - Foreign judgment - Jurisdiction to enforce - English companies mining asbestos
h     in South Africa - Marketing subsidiary of English parent company incorporated in Illinois -
      Subsidiary trading in asbestos but having no authority to bind English

© An extract from a JUSTIS database

companies in contract - Claim against English companies arising from sale of English companies' asbestos for use in Texas settled by consent judgment in Texas - Whether submission to Texas court's jurisdiction - Further claims - Whether English companies having presence within jurisdiction - Default judgment given in Texas court against English companies - Damages assessed without evidence relating to individual plaintiffs - Whether contrary to natural justice - Whether default judgment enforceable

Until 1979 the first defendant, Cape, an English company, presided over a group of subsidiary companies engaged in the mining in South Africa, and marketing, of asbestos. The marketing subsidiary in the United States of America was a wholly owned subsidiary, N.A.A.C., incorporated in Illinois in 1953. The marketing subsidiary worldwide was the second defendant, Capasco, a wholly owned English company. Asbestos from the South African mines was sold for use in an asbestos factory at Owentown, Texas. In 1974, some 462 plaintiffs, mainly employees or ex-employees at the Owentown factory, brought actions in the United States Federal District Court at Tyler, Texas, for damages for personal injuries allegedly suffered as a result of exposure to asbestos dust ("the Tyler 1 actions"). The defendants included Cape, Capasco, N.A.A.C., the South African mining subsidiary and other parties including the United States Government. Those actions were settled in September 1977 for U.S.$20m. of which Cape and its subsidiaries were to bear over $5m. Cape and Capasco had entered motions protesting the jurisdiction of the Tyler court and had filed defences as to the merits which, inter alia, repeated the jurisdiction protests. The settlement of the Tyler 1 actions was recorded by a consent order made on 5 May 1978.

Between April 1978 and November 1979, a further 206 plaintiffs instituted actions in the Tyler court against the same defendants ("the Tyler 2 actions"). Cape and Capasco took no part in the Tyler 2 actions maintaining that that court lacked jurisdiction over them. They were prepared to let default judgments be entered against them but to resist their enforcement in England. Cape decided to put N.A.A.C. into liquidation and, as from 31 January 1978, N.A.A.C. ceased to carry on business. Cape promoted the incorporation of a new Illinois corporation, C.P.C., and a Liechtenstein entity, A.M.C. The shares in C.P.C. were held by M., the chief executive of N.A.A.C., and those in A.M.C. were held by a nominee on trust for a Cape subsidiary, C.I.O.L. Arrangements were made for C.P.C. to carry out much the same marketing function for the sale of Cape asbestos in the United States as had previously been carried out by A.M.C. Those arrangements continued until 1979 when Cape sold its asbestos mining and marketing subsidiaries. In 1983, 133 plaintiffs in the Tyler 2 actions settled their actions against the main United States defendants, including N.A.A.C. but excluding the United States Government. Later all the 206 plaintiffs in the Tyler 2 actions agreed to settle their actions against the United States Government on terms that they would obtain default judgments against Cape and Capasco and that the United States Government would finance the steps to be taken to enforce those judgments against Cape and Capasco in England. The Tyler court fixed 12 September 1983 as the date for the hearing of the default judgment applications.

© An extract from a JUSTIS database

a

Under the United States Federal Rules, since Cape and Capasco were in default, the pleaded allegations against them were, save in relation to damage, taken to be admitted. But no judicial hearing took place. On 12 September the judge signed a default judgment for over U.S.$15äm. The awards made to individual

b

plaintiffs fell into a number of bands: 67 were awarded $37,000, 31 $60,000, 47 $85,000 and 61 $120,000. The judge directed that the total award should represent an average award of $75,000 per plaintiff but it was the plaintiffs' counsel who selected the level of the bands and who identified the plaintiffs to be placed in each band in order to produce the directed average award. All those plaintiffs, but one, sought to enforce the default judgment against Cape and Capasco by the present proceedings. They contended that

c

Cape and Capasco had submitted to the jurisdiction in the Tyler 1 actions, and that the submission to the jurisdiction in the Tyler 1 actions constituted a submission to the jurisdiction in the Tyler 2 actions or, alternatively, an agreement to submit to the jurisdiction in the Tyler 2 actions. Secondly, the plaintiffs contended that the Tyler court was entitled to take jurisdiction over Cape and Capasco by reason of their presence in Illinois when the Tyler 2 actions were commenced.

d

Scott J. dismissed the actions holding, inter alia, that the jurisdiction of a foreign court over defendants could be established either on a territorial basis by showing that the defendants were present within the territory of the foreign court or on a consensual basis by showing that the defendants had consented to the foreign court exercising jurisdiction over them; that Cape and Capasco by participating in the application in the Tyler 1 actions to the judge to make the consent order of 5 May 1978 submitted to the jurisdiction of

e

the Tyler court, but that the Tyler 1 actions and the Tyler 2 actions were distinct and separate actions so that submission to the jurisdiction in the Tyler 1 actions could not be regarded as a submission to the jurisdiction in the Tyler 2 actions; that an agreement to submit to the jurisdiction of a foreign court might be evidenced either by a term of an agreement binding in contract or by a unilateral representation of willingness to submit to the jurisdiction, but if such a representation was to be relied on, it should be clear

f

and unequivocal and have been acted on by the plaintiff and that Cape and Capasco had not contracted to submit nor made any representation of willingness to submit in the Tyler 2 actions; that, on the basis that the same principles applied to the question whether a corporation was present in the territory of a foreign court as applied to the question whether a corporation had a sufficient presence in England to enable service of a writ on the corporation to be effected by service on its agent in England, the presence of

g

N.A.A.C. and C.P.C. in Illinois and the business carried on from their respective offices in Illinois did not constitute the presence of Cape or Capasco in Illinois; and that the procedure adopted by the judge in the Tyler court in giving the default judgment of 12 September 1983 offended against English principles of natural justice, in that there had been no judicial assessment of the defendants' liability and the award of damages had been arbitrary, not based on evidence and not related to the individual entitlements of the

h

various plaintiffs.

On an appeal by the plaintiffs: -

© An extract from a JUSTIS database

Held, dismissing the appeal, (1) that an overseas trading corporation was likely to be treated by the English court as present within the jurisdiction of the courts of another country only where either such a corporation had established and maintained at its own expense in that other country a fixed place of business and had carried on from there its business for more than a minimal period of time through its servants or agents or through a representative; that in either of those two cases presence could only be established where the overseas corporation's business, whether together with the representative's own business or not, had been transacted at or from the fixed place and, in order to ascertain whether the representative had carried on the corporation's business or his own, it would be necessary to investigate his functions and his relationship with the overseas corporation (post, p. 530D–G).

Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag [1914] 1 K.B. 715, C.A.; Littauer Glove Corporation v. F. W. Millington (1920) Ltd. (1928) 44 T.L.R. 746 and Vogel v. R. and A. Kohnstamm Ltd. [1973] Q.B. 133 applied.

Quaere. Whether residence without presence will suffice (post, p. 518C–D).

(2) That, on the facts, C.P.C. was an independently owned company and by the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C. Cape wanted sales of asbestos from its subsidiaries to continue in the United States but intended, by any lawful means which it was entitled to do, to reduce the appearance of its, or its subsidiaries', involvement there and to reduce the risk of its being held liable for United States taxation or subject to the jurisdiction of the United States courts, and that, accordingly, since it was not a mere facade concealing the true facts it was not appropriate to pierce the corporate veil; that furthermore, since it was accepted that N.A.A.C. was incorporated so as to assist in marketing and to be a marketing agent of the Cape group in the United States and, since a substantial part of its business at all material times was, in every sense, its own business, it did not act as an agent of the Cape group; that, in any event, since N.A.A.C. had no general authority to enter into contracts binding Cape or Capasco and third parties no such transactions were ever entered into by N.A.A.C.; and that, accordingly, the defendants were not present in the United States of America through N.A.A.C., C.P.C. or A.M.C. (post, pp. 541F–H, 544A–C, 544H – 545B, G – 546A, 547A–D, 549C–D).

(3) That, as a matter of principle, the onus fell on the plaintiff, who sought to enforce a judgment of a foreign court, to demonstrate the competence of that court and that it was only the judgment of the competent foreign court recognised as such by English law which would bind the defendant; that, if the onus fell on the defendants to disprove the competence of the Tyler court to give judgment against them, they had discharged that onus because they had shown that they were not present in the United States (post, p. 550C–F).

(4) That the method by which the Tyler court came to a decision as to the amount of the default judgment was contrary to the requirements of substantial justice contained in English law (post, p. 568F).

(5) That the failure of the defendants to apply to set aside the default judgment did not preclude them from relying on

© An extract from a JUSTIS database

a

that breach of natural justice by way of defence to the present action to enforce that judgment, since the plaintiffs had failed to give prior notice to the defendants of the unusual course they were proposing to take, did not seek to dissuade the judge from adopting that method of assessment of damages and drew up and served a form of judgment which did not show the procedure adopted, and the effect on the defendants, although everything was done by the plaintiffs in good faith, was that they remained unaware of any basis for seeking relief from the Tyler court in respect of the defect in the judgment (post, p. 572B-E).

b

Pemberton v. Hughes [1899] 1 Ch. 781, C.A. and Jacobson v. Frachon (1928) 138 L.T. 386, C.A. applied.

Decision of Scott J., post, p. 441G, affirmed.

The following cases are referred to in the judgment of the Court of Appeal:

c Abouloff v. Oppenheimer ⬚ Co. (1882) 10 Q.B.D. 295, C.A.

Albazero, The [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R. 129, H.L.(E.)

Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.

Baroda (Maharanee of) v. Wildenstein [1972] 2 Q.B. 283; [1972] 2 W.L.R. 1077; [1972] 2 All E.R. 689, C.A.

d Boys v. Chaplin [1971] A.C. 356; [1969] 3 W.L.R. 322; [1969] 2 All E.R. 1085, H.L.(E.)

Bulova Watch Co. Inc. v. K. Hattori ⬚ Co. Ltd. (1981) 508 F. Supp. 1322.

Burnet v. Francis Industries Plc. [1987] 1 W.L.R. 802; [1987] 2 All E.R. 323, C.A.

Canada Enterprises Corporation Ltd. v. MacNab Distilleries Ltd. (Note) [1987] 1 W.L.R. 813, C.A.

Carrick v. Hancock (1895) 12 T.L.R. 59

Castrique v. Imrie (1870) L.R. 4 H.L. 414, H.L.(E.)

Colt Industries Inc. v. Sarlie [1966] 1 W.L.R. 440; [1966] 1 All E.R. 673, C.A.

e Crawley v. Isaacs (1867) 16 L.T. 529

D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [1976] 1 W.L.R. 852; [1976] 3 All E.R. 462, C.A.

Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell ⬚ Co. [1902] 1 K.B. 342, C.A.

Emanuel v. Symon [1908] 1 K.B. 302, C.A.

f Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins ⬚ Co. Ltd. [1927] A.C. 95, H.L.(E.)

Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64

Firestone Tyre and Rubber Co. Ltd. v. Lewellin (Inspector of Taxes) [1957] 1 W.L.R. 464; [1957] 1 All E.R. 561, H.L.(E.)

General Steam Navigation Co. v. Guillou (1843) 11 M. ⬚ W. 877

Godard v. Gray (1870) L.R. 6 Q.B. 139

g Grant v. Anderson ⬚ Co. [1892] 1 Q.B. 108, C.A.

Guaranty Trust Co. v. York (1945) 326 U.S. 99

Haggin v. Comptoir d'Escompte de Paris (1889) 23 Q.B.D. 519, C.A.

Holdsworth (Harold) ⬚ Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R. 352; [1955] 1 All E.R. 725, H.L.(Sc.)

Holstein, The [1936] 2 All E.R. 1660

h Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European Communities (Cases 6 and 7/73) [1974] E.C.R. 223, E.C.J.

© An extract from a JUSTIS database

a

Jabbour (F. ▒ K.) v. Custodian of Israeli Absentee Property [1954] 1 W.L.R. 139; [1954] 1 All
  E.R. 145
Jacobson v. Frachon (1928) 138 L.T. 386, C.A.
Jeannot v. Fuerst (1909) 100 L.T. 816
Jet Holdings Inc. v. Patel [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.
Jones v. Lipman [1962] 1 W.L.R. 832; [1962] 1 All E.R. 442

b

La Bourgogne [1899] P. 1; sub nom. Compagnie Gènèrale Transatlantique v. Thomas Law ▒ Co.
  [1899] A.C. 431, H.L.(E.)
Lalandia, The [1933] P. 56
Littauer Glove Corporation v. F. W. Millington (1920) Ltd. (1928) 44 T.L.R. 746
Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners [1969] 1 W.L.R. 1241; [1969]
  3 All E.R. 855, C.A.

c

Local Government Board v. Arlidge [1915] A.C. 120, H.L.(E.)
Merchandise Transport Ltd. v. British Transport Commission [1962] 2 Q.B. 173; [1961] 3 W.L.R.
  1358; [1961] 3 All E.R. 495, C.A.
Miller v. B.C. Turf Ltd. (1969) 8 D.L.R. (3d) 383
Mississippi Publishing Corporation v. Murphree (1946) 326 U.S. 438
Moore v. Mercator Enterprises Ltd. (1978) 90 D.L.R. (3d) 590
Newby v. Von Oppen ▒ The Colt's Patent Firearms Manufacturing Co. (1872) L.R. 7 Q.B. 293

d

Okura ▒ Co. Ltd. v. Forsbacka Jernverks Aktiebolag [1914] 1 K.B. 715, C.A.
Omni Capital International v. Rudolph Wolff ▒ Co. Ltd. (1987) 108 S. Ct. 404
Pemberton v. Hughes [1899] 1 Ch. 781, C.A.
Princesse Clementine, The [1897] P. 18
Revlon Inc. v. Cripps ▒ Lee Ltd. [1980] F.S.R. 85, C.A.
Reynolds v. Fenton (1846) 16 L.J. C.P. 15
Roberta, The (1937) 58 Ll. L.R. 159

e

Robinson v. Fenner [1913] 3 K.B. 835
Rousillon v. Rousillon (1880) 14 Ch.D. 351
Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesell- schaft [1911] 2 K.B.
  516, C.A.
Salomon v. A. Salomon ▒ Co. Ltd. [1897] A.C. 22, H.L.(E.)
Schibsby v. Westenholz (1870) L.R. 6 Q.B. 155

f

Scottish Co-operative Wholesale Society Ltd. v. Meyer [1959] A.C. 324; [1958] 3 W.L.R. 404;
  [1958] 3 All E.R. 56, H.L.(Sc.)
Sfeir ▒ Co. v. National Insurance Co. of New Zealand Ltd. [1964] 1 Lloyd's Rep. 330
Sirdar Gurdyal Singh v. Rajah of Faridkote [1894] A.C. 670, P.C.
South India Shipping Corporation Ltd. v. Export-Import Bank of Korea  [1985] 1 W.L.R. 585;
  [1985] 2 All E.R. 219, C.A.
Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco
  (1914) 111 L.T. 97, C.A.

g

Theodohos, The [1977] 2 Lloyd's Rep. 428
Vogel v. R. and A. Kohnstamm Ltd. [1973] Q.B. 133; [1971] 3 W.L.R. 537; [1971] 2 All E.R. 1428

Wallersteiner v. Moir [1974] 1 W.L.R. 991; [1974] 3 All E.R. 217, C.A.
Williams v. Jones (1845) 13 M. ▒ W. 628
Woolfson v. Strathclyde Regional Council, 1978 S.L.T. 159

h

World Harmony, The [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All E.R. 139
X Bank Ltd. v. G. (1985) 82 L.S.G. 2016, C.A.

© An extract from a JUSTIS database

a

The following additional cases were cited in argument in the Court of Appeal:

Badcock v. Cumberland Gap Park Co. [1893] 1 Ch. 362
Blohn v. Desser [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
Calvin's Case (1608) 7 Co. Rep. 1a
b Hercules v. Grand Trunk Pacific Railway Co. [1912] 1 K.B. 222
Joyce v. Director of Public Prosecution [1946] A.C. 347, H.L.(E.)
The following cases are referred to in the judgment of Scott J.:

Albazero, The [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R. 129, H.L.(E.)
Bank of Tokyo v. Karoon (Note) [1987] A.C. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.

c Blohn v. Desser [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
Boissière ▦ Co v. Brockner ▦ Co. (1889) 6 T.L.R. 85
Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und Motorfahrzeugbau Vorm.
Cudell ▦ Co. [1902] 1 K.B. 342, C.A.
Emanuel v. Symon [1908] 1 K.B. 302, C.A.
Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64
Firestone Tyre and Rubber Co. Ltd. v. Lewellin [1957] 1 W.L.R. 464; [1957] 1 All E.R. 561,
d    H.L.(E.)
Godard v. Gray (1870) L.R. 6 Q.B. 139, D.C.
Holstein, The [1936] 2 All E.R. 1660
Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the
European Communities (Cases 6 and 7/73) [1974] E.C.R. 223, E.C.J.
Jabbour (F. ▦ K.) v. Custodian of Israeli Absentee Property [1954] 1 W.L.R. 139; [1954] 1 All
E.R. 145
e Jacobson v. Frachon (1928) 138 L.T. 386, C.A.
La Bourgogne [1899] P. 1, C.A.
Lalandia, The [1933] P. 56
Littauer Glove Corporation v. F. W. Millington (1920) Ltd. (1928) 44 T.L.R. 746
Ochsenbein v. Papelier (1873) L.R. 8 Ch.App. 695
Okura ▦ Co. Ltd. v. Forsbacka Jernverks Aktiebolag [1914] 1 K.B. 715, C.A.
f Pemberton v. Hughes [1899] 1 Ch. 781, C.A.
Point Landing Inc. v. Omni Capital International Ltd. (1986) 795 F. 2d 415
Prima Paint Corporation v. Flood ▦ Conklin Manufacturing Co. (1967) 388 U.S. 395
Princesse Clementine, The [1897] P. 18
Rein v. Stein (1892) 66 L.T. 469, C.A.
Robinson v. Fenner [1913] 3 K.B. 835
Russell v. Smyth (1842) 9 M. ▦ W. 810
g S.A. Consortium General Textiles v. Sun and Sand Agencies Ltd. [1978] Q.B. 279; [1978] 2 W.L.R.
1; [1978] 2 All E.R. 339, Parker J. and C.A.
Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft [1911] 2 K.B. 516,
C.A.
Schibsby v. Westenholz (1870) L.R. 6 Q.B. 155
Sfeir ▦ Co. v. National Insurance Co. of New Zealand Ltd. [1964] 1 Lloyd's Rep. 330
Sirdar Gurdyal Singh v. The Rajah of Faridkote [1894] A.C. 670, P.C.
h South India Shipping Corporation Ltd. v. Export-Import Bank of Korea  [1985] 1 W.L.R. 585;
[1985] 2 All E.R. 219, C.A.

© An extract from a JUSTIS database

a

Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco (1914) 111 L.T. 97, C.A.

Vogel v. R. and A. Kohnstamm Ltd. [1973] Q.B. 133; [1971] 3 W.L.R. 537; [1971] 2 All E.R. 1428

Williams ▓ Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A. [1984] 1 W.L.R. 438; [1984] 1 All E.R. 760, H.L.(E.)

b

World Harmony, The [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All E.R. 139

The following additional cases were cited in argument before Scott J.:

Abouloff v. Oppenheimer ▓ Co. (1882) 10 Q.B.D. 295, C.A.

Actiesselskabet Dampskib Hercules" v. Grand Trunk Pacific Railway Co. [1912] 1 K.B. 222, C.A.

c   Attorney-General for Alberta v. Cook [1926] A.C. 444, P.C.

Bank of Australasia v. Nias (1851) 16 Q.B. 717

Béguelin Import Co. v. G. L. Import-Export S.A. (1972) 11 C.M.L.R. 81, E.C.J.

Bergerem v. Marsh (1921) 91 L.J.K.B. 80

Berliner Industriebank Aktiengesellschaft v. Jost [1971] 2 Q.B. 463; [1971] 3 W.L.R. 61; [1971] 2 All E.R. 1513, C.A.

Casdagli v. Casdagli [1919] A.C. 145, H.L.(E.)

d   Castrique v. Imrie (1870) L.R. 4 H.L. 414, H.L.(E.)

Crawley v. Isaacs (1867) 16 L.T. 529

Deverall v. Grant Advertising Inc. [1955] Ch. 111; [1954] 3 W.L.R. 688; [1954] 3 All E.R. 389, C.A.

Elefanten Schuh GmbH. v. Pierre Jacqmain [1981] E.C.R. 1671, E.C.J.

Europemballage Corporation and Continental Can Co. Inc. v. Commission of European Communities (1973) 12 C.M.L.R. 199, E.C.J.

e   Fender v. St. John-Mildmay [1938] A.C. 1; [1937] 3 All E.R. 402, H.L.(E.)

Ferguson v. Mahon (1839) 11 Ad. ▓ E. 179

Gatty (F.A.) and Gatty (P.V.) v. Attorney-General [1951] P. 444

Gray(orse. Formosa) v. Formosa [1963] P. 259; [1962] 3 W.L.R. 1246; [1962] 3 All E.R. 419, C.A.

Henderson v. Henderson (1844) 6 Q.B. 288

f   Houlditch v. Marquess of Donegal (1834) 2 Cl. ▓ Fin. 470

Imperial Chemical Industries Ltd. v. Commission of European Communities  (1972) 11 C.M.L.R. 557, E.C.J.

Jeannot v. Fuerst (1909) 25 T.L.R. 424

Jet Holdings Inc. v. Patel [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.

Local Government Board v. Arlidge [1915] A.C. 120, H.L.(E.)

Macalpine v. Macalpine [1958] P. 35; [1957] 3 W.L.R. 698; [1957] 3 All E.R. 134

g   Meyer, In re [1971] P. 298; [1971] 2 W.L.R. 401; [1971] 1 All E.R. 378

Newby v. Von Oppen and the Colt's Patent Firearms Manufacturing Co.  (1872) L.R. 7 Q.B. 293

Price v. Dewhurst (1837) 8 Sim. 279

Reg. v. Chief Registrar of Friendly Societies, Ex parte New Cross Building Society [1984] Q.B. 227; [1984] 2 W.L.R. 370; [1984] 2 All E.R. 27, C.A.

Rousillon v. Rousillon (1880) 14 Ch.D.351

Secretary of State for Foreign Affairs v. Charlesworth Pilling ▓ Co.  [1901] A.C. 373, P.C.

h   Smith, Stone and Knight Ltd. v. Birmingham Corporation [1939] 4 All E.R. 116

Syal v. Heyward [1948] 2 K.B. 443; [1948] 2 All E.R. 576, C.A.

© An extract from a JUSTIS database

**[1990]**
Ch.                                    **Adams v. Cape Industries Plc. (C.A.)**

a

Trottier v. Rajotte [1940] 1 D.L.R. 433
Vadala v. Lawes (1890) 25 Q.B.D. 310, C.A.
Vervaeke (formerly Messina) v. Smith [1983] 1 A.C. 145; [1982] 2 W.L.R. 855; [1982] 2 All E.R. 144, H.L.(E.)

b
Wahl v. Attorney-General (1932) 147 L.T. 382, H.L.(E.)
Weiss, Biheller and Brooks Ltd. v. Farmer [1923] 1 K.B. 226, C.A.

ACTION

By a writ and statement of claim dated 1 August 1984, the plaintiff, Jimmy Wayne Adams commenced an action against Cape Industries Plc. and its wholly owned subsidiary, Capasco Ltd.,
c seeking to enforce a default judgment which had been awarded to him in the United States of America. In the statement of claim it was alleged that (1) on 21 April 1978, the plaintiff commenced an action against the defendants in the United States District Court for the Eastern District of Texas, Tyler Division, in the State of Texas in the United States of America; (2) the court was duly constituted and held in accordance with the laws of the state and had jurisdiction in that behalf; (3) on 12 September 1983 the court gave judgment in favour of the plaintiff for damages and assessed the damages to which the plaintiff was entitled in the sum of U.S.$37,000 and ordered the
d defendants to pay the plaintiff forthwith the sum of $37,000 and interest at the rate of 9 per cent. per annum from that date until payment. Payment was claimed accordingly, it being certified that at the appropriate rate $37,000 amounted to £25,298.28.

The writ was one of 205 claims to enforce the default judgment of the Tyler court in consolidated actions by plaintiffs with similar claims in respect of personal injuries alleged to have been caused
e by asbestos dust. The defendants denied that the Tyler court had, for the purposes of English law, jurisdiction over them.

The facts are stated in the judgments of Scott J. and the Court of Appeal.

T. R. A. Morison Q.C. and Charles Falconer for the plaintiffs.
Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C., Adrian Brunner  and George Alliott for the
f defendants.

Cur. adv. vult.

17 June 1988. SCOTT J. read the following judgment. The judgment I am about to give is nearly but not quite my complete judgment. After reserving judgment on Tuesday 19 April my judicial
g duties required me to sit in the North of England until the end of May. A consequence has been that preparation of my judgment in this important case has been unavoidably delayed. Representations have been made to me on behalf of Cape Industries Plc. to the effect that if the result of the case remains uncertain beyond this week, serious financial damage may ensue to the company and to its shareholders. I need not elaborate on the nature of the fears but will say that they did not seem to me to be without substance.
h   I would think it unacceptable in principle that litigants or those connected with them should be brought to suffer financial loss by a

© An extract from a JUSTIS database

a

SLADE L.J.

### I Introduction

b   This is the judgment of the court, to which all its members have contributed, on an appeal by the plaintiffs in 205 consolidated actions. On 27 July 1988, Scott J. dismissed all their claims. The trial in the court below lasted some 35 days and the argument before this court extended over some 17 days. The case raises important points of law and some substantial issues of fact.

Having reserved judgment at the end of the argument on 3 May 1989, we subsequently came to the firm conclusion that the appeal must be dismissed and that in the particular circumstances of this c   case it was right that the parties should be informed of our decision at once, rather than having to wait for some more weeks before we were in a position to give the reasons for our decision. On 24 May we accordingly announced that the appeal would be dismissed and that we would give the reasons for our decision in writing at a later date, at which date the order dismissing the appeal would be drawn up. This we now do.

d   The plaintiffs in these proceedings are persons, or the personal representatives of persons, in whose favour awards of damages were made by the judgment, dated 12 September 1983, of Judge Steger, a
)   United States Federal District Court judge, in the District Court for the Eastern District of Texas, United States of America ("the Tyler court"). The judgment was a default judgment against Cape Industries Plc. ("Cape") and Capasco Ltd. ("Capasco"), companies registered in England and the sole defendants in all the actions before this court. They had taken no part in the proceedings in which e   the judgment was made. The judgment was for the specific sums payable to individual plaintiffs set out in an appendix to the judgment: $37,000 each for 67 plaintiffs; $60,000 each for 31 plaintiffs; $85,000 each for 47 plaintiffs and $120,000 each for 61 plaintiffs. The total of the individual awards was $15.654m. and the awards were directed to bear interest at 9 per cent. from judgment until payment.

f   The awards were made in respect of claims for damages for personal injuries and consequential loss allegedly suffered by each plaintiff as a result of exposure to asbestos fibres emitted from the premises of a primary asbestos insulation factory in Owentown, Smith County, Texas, which was operated from 1954 to 1962 by Unarco Industries Inc. ("Unarco") and from 1962 to 1972 by Pittsburg Corning Corporation ("P.C.C."). The basis of liability of Cape and Capasco was alleged to be negligent acts and omissions and breaches of implied and express warranties.

g   The relationship of Cape and Capasco to the emission of asbestos fibres from the Owentown factory was, in summary, that Cape owned the shares in subsidiary companies in South Africa which had mined the asbestos and in its subsidiary Capasco. Capasco was concerned in organising the sale of asbestos, mined in South Africa, throughout the world to those who wished to use it in various industrial processes. Between 1953 and 1978 when it was dissolved, another subsidiary of Cape, h   North American Asbestos Corporation ("N.A.A.C.") assisted in the marketing of asbestos of the Cape group in the United States of America. The plaintiffs' contention was that the defendants had been

© An extract from a JUSTIS database

a

responsible for the supply of asbestos fibres directly or indirectly to Unarco and P.C.C. without giving proper warning of the dangers thereof.

b

*Summary of the proceedings in the Tyler court*

Different sets of proceedings with reference to claims arising from the processing of asbestos in the Owentown factory had extended over many years. An account of what took place is unnecessary for a proper understanding of the course of the present proceedings. The first action was commenced in the Tyler court in January 1974 and was framed as a "class" action in which the plaintiffs sued "on c behalf of themselves and all others similarly situated." A second action was commenced in the same month. They were assigned to Judge Steger. Cape was one of the defendants. Capasco was added as a defendant in 1976. Egnep (Proprietary) Ltd. ("Egnep"), a wholly owned South African subsidiary of Cape, engaged in mining asbestos, was also a defendant. All filed motions to quash service on the ground of lack of jurisdiction.

d

By July 1974 it was apparent that hundreds of claimants, alleging injury caused by the amosite asbestos used in the Owentown plant, were intending to pursue claims. Judge Steger in December 1974 ruled that the actions should not proceed as class actions; that they should be conducted under the federal "Rules for Complex and Multi-District Litigation;" and that intervention in the proceedings should be allowed freely for those claimants who wished to join. In consequence a large number of claimants were added. In December 1974 a third action with reference to asbestos from e the Owentown plant was commenced in the Tyler court in which the only defendant was the United States of America. All these proceedings together have been known as the Tyler 1 proceedings. They were separate and distinct from the proceedings in which the plaintiffs, now before this court, obtained their judgment in September 1983.

f

The motions by Cape, Capasco and Egnep to dismiss the Tyler 1 proceedings as against them on the ground of lack of jurisdiction were dismissed by Judge Steger in August 1977. That dismissal was not final and it was open to the Cape companies to take the jurisdiction point at the trial of the action. They filed answers in which they pleaded to the merits of the claim while maintaining their objection to jurisdiction.

The number of claimants in the Tyler 1 proceedings had by mid 1977 risen to more than 400 and g was still increasing. Trial was set for 12 September 1977. The purpose of Judge Steger in fixing that date included that of causing the parties to consider settlement. On 12 September 1977 settlement discussions proceeded in which Judge Steger took part in a manner which would be unusual, if not impossible, in this country but which was effective and normal under the United States system of civil justice. By 28 September 1977 a settlement figure of $20m. was agreed for all the claimants h who then numbered 462. Upon agreement of the settlement figure it was ordered that as from 28 September 1977 no further intervention in any of the Tyler 1 actions would be permitted.

© An extract from a JUSTIS database

The sum of $20m. was provided by the defendants in agreed proportions: £5.2m. by N.A.A.C., Cape and Egnep; $1m. by Unarco (who had operated the Owentown plant from 1954 to 1962); $8.05m. by P.C.C. (who had operated the plant from 1962 to 1972) and its shareholders; and $5.75m. by the United States Government. The settlement was recorded and approved in a final

b judgment in the Tyler 1 actions dated 5 May 1978. The reference to shareholders in P.C.C. is to Pittsburgh P.G. Industries Inc. ("P.P.G.") and to Corning Glassworks Inc. who had been joined as defendants on the basis that each had taken such part in the management decisions regarding the use of asbestos as to be liable for injuries arising from that use.

Upon prohibition by the order of Judge Steger of further interventions in the Tyler 1 proceedings, new actions were commenced by claimants in what have been called the Tyler 2 proceedings. There

c were eight separate actions. They were assigned to Judge Steger. The first was commenced on 19 April 1978 and the last on 19 November 1979. There followed intervention by a very large number of claimants. Cape, Egnep and N.A.A.C. were defendants in all the actions. Capasco was a defendant in three only. P.C.C., P.P.G., Corning Glassworks Inc. and O.C.A.W., a trade union to which some claimants had belonged, were also defendants in all actions. The United States Government was a defendant in some actions and third party defendant in others.

d In December 1981 Judge Steger gave directions by which each claimant was required to provide
) specified information with reference to his claim "on personal knowledge and attested to under penalty of perjury." As a result of those directions, and of the response, or lack of response, thereto, a large number of claimants had their claims summarily dismissed "without prejudice." The number of plaintiffs left in the Tyler 2 actions was about 206. It is to be assumed that each of those remaining claimants had responded to the order of December 1981 by alleging some physical

e condition that was capable of having been caused by exposure to asbestos dust and of constituting an injury.

Cape, Capasco and Egnep took the decision to play no part in any of the Tyler 2 actions. They had initially regarded the Tyler 1 actions as having little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be imposed upon the Cape

f companies merely on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. They had had expectations of success on their jurisdiction objection. They had, however, succumbed to the pressure for settlement. They were unwilling to be left as the only defendants in a large and expensive jury trial. Having joined in the settlement of the Tyler 1 actions they decided, since they had no assets in the United States of America, to take no part in the Tyler 2 proceedings; to allow default judgments to be obtained against them; and to

g defend any actions brought in this country for enforcement of any such judgment on the ground that, under the law of this country, the Tyler court had no jurisdiction over Cape, Capasco or Egnep with reference to the claims of the claimants.

*The settlement against some defendants of the Tyler 2 proceedings*

h In circumstances which will be considered in more detail later in this judgment, the Tyler 2 proceedings were in February 1983 settled, as

© An extract from a JUSTIS database

a

against the effective defendants other than the Cape companies, for a sum of $1.33m. The figure of $1.33m. was based upon an average award of $10,000 for each of 133 plaintiffs represented in the settlement negotiations. The sum of $1.33m. was to be provided as to $900,000 by P.C.C., the firm which had operated the Owentown factory from 1962 to 1972, and by P.P.G., one of the

b corporations owning shares in P.C.C.; $130,000 by Corning Glassworks Inc., the other corporation holding shares in P.C.C.; $150,000 by O.C.A.W., and $250,000 by N.A.A.C. Such was the considered value of the claims, as it emerged from the settlement process between the judge and the parties, as against the parties which included those alleged to have had some direct concern in connection with the emission of asbestos particles at or from the Owentown factory. On payment of

c those sums the settling defendants were to be released from all claims by the 133 plaintiffs.

That settlement was complicated by a "device" devised by Mr. Bailey, who was the attorney negotiating the settlement on behalf of the claimants and which was intended, it was said, to give the claimants the chance of additional recovery against the United States. The form of this device, and the part which it was alleged to have played in the formulation of the terms of the default

d judgment against the Cape companies, was important to the allegations of fraud put forward against Mr. Bailey, which, as stated below, were rejected by Scott J. It is necessary to describe what happened to render intelligible some of the matters discussed later in this judgment. The device was described by Scott J., ante, p. 452C-F:

e "The device was this: the settlement figure would be expressed in the intended settlement agreement not as $1.33m. but instead as $6.65m., an average of $50,000 per plaintiff. The defendants would be obliged to pay only $1.33m. The balance of $5.32m. ($40,000 per plaintiff) would be payable only if and to the extent that the defendants' third party claims against the United States succeeded. The prosecution of those claims in the names of the defendants was to be the responsibility of the plaintiffs' counsel, no cost in respect thereof falling on any of the

f defendants. The $6.65m. was a figure proposed by Mr. Bailey. It was not a figure which mattered at all to the defendants since their obligation to pay was limited to the $1.33m. They did not bargain about the amount. They simply agreed to Mr. Bailey's proposal which would cost them nothing. Mr. Bailey told me that the figure was based upon what he thought might be awarded against the United States at the suit of the settling defendants. How it could have been supposed

g that the liability of the United States under the third party claims could exceed the $1.33m. that the settling defendants, the third party claimants, had agreed to pay the plaintiffs, defeats me."

On 2 February 1983 Judge Steger approved the settlement of the Tyler 2 proceedings as against the settling defendants, and that approval extended to the fairness and reasonableness of the

h settlement in the case of any minor claimants. The trial date for the outstanding Tyler 2 claims against the United States was fixed for 20 June 1983. Settlement was

© An extract from a JUSTIS database

Adams v. Cape Industries Plc. (C.A.)

a  discussed. An agreement of compromise dated 15 June 1983 was signed. The United States Government contributed nothing directly to the claimants but, in settlement of their claims against the United States, it was agreed that the United States would bear the costs of enforcement of default judgments against Cape, Capasco and Egnep in the United Kingdom or in South Africa. It is

b  in performance of that promise that these proceedings have been pursued in this country.

The default judgment in the Tyler court, upon which the present proceedings in this country are based, was, as stated above, signed on 12 September 1983. The nature of the process in which that judgment came to be signed will be examined in detail later in this judgment when the issue of natural justice is considered.

c  *The consolidated actions in this country*

There is no statutory provision for the registration in this country of the judgments of the federal or state courts of the United States of America. The plaintiffs, therefore, took proceedings in this country seeking to recover the amount of their judgments from Cape and Capasco. The writ in the

d  lead action of Mr. Jimmy Adams was issued on 1 August 1984 and claimed the amount of his separate award with interest. In law the claims of all the plaintiffs are based upon the principle of common law that, subject to certain qualifications, the judgment in personam of a foreign court of competent jurisdiction may be sued on in this country as creating a debt between the parties to it.

It would have been open to the plaintiffs in the first place to sue the defendants in this country rather than the United States of America, provided that they could have shown that the acts

e  complained of were actionable as a tort both under English law and the law of the place or places where they were committed: see Boys v. Chaplin [1971] A.C. 356. However, they chose to bring the proceedings in the United States of America and then to seek to enforce them in this country, where presumably the defendants are believed to have substantial assets.

*The issues at the trial before Scott J. and his decision*

f  The circumstances in which our courts will recognise a foreign court as competent to give a judgment in personam capable of enforcement in this country are stated thus in Dicey ░ Morris, The Conflict of Laws, 11th ed. (1987), vol. 1, pp. 436–437, rule 37:

g  "First Case - If the judgment debtor was, at the time the proceedings were instituted, resident (or, perhaps, present) in the foreign country.

"Second Case - If the judgment debtor was plaintiff in, or counterclaimed, in the proceedings in the foreign court.

"Third Case - If the judgment debtor, being a defendant in the foreign court, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.

h  "Fourth Case - If the judgment debtor, being a defendant in the original court, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to

© An extract from a JUSTIS database

a

submit to the jurisdiction of that court or of the courts of that country."

b
At the trial the plaintiffs relied on three separate grounds for enforcement of the judgment of the Tyler court in England, namely: (i) that the defendants had voluntarily appeared in the proceedings in the Tyler court; (ii) that the defendants had, before the proceedings commenced, agreed to submit to the jurisdiction of the Tyler court; (iii) that the defendants were resident in the United States of America at the time of the commencement of the plaintiffs' proceedings in the Tyler court. (A fourth pleaded ground, referred to as "comity or reciprocity," was not in the event relied on at the trial.)

c
Scott J. concluded that the Tyler court had been competent to give a judgment against Cape and Capasco on none of the three grounds relied on (Dicey ░ Morris' First, Third and Fourth Cases). The plaintiffs' claim, therefore, failed for this reason, if no other.

However, the judge proceeded to consider certain additional points raised by the defendants by way of defence. The first point arose in this way. According to the case made for the plaintiffs, the
d
presence (if any) of Cape and Capasco was in the State of Illinois where Cape's subsidiary, N.A.A.C. had its office in Chicago from 1953 to 1978 when it was wound up; and where in the same building from 1978 onwards Continental Products Corporation ("C.P.C."), also an Illinois corporation but not a subsidiary of Cape, carried out similar marketing functions in the United States of America for the sale of asbestos produced by Cape's South African subsidiaries. The plaintiffs did
e
not contend that Cape or Capasco had been present in Texas. In these circumstances, the defendants contended that under English law presence in Illinois did not suffice to give the Tyler court (a federal district court sitting in Texas) jurisdiction to hear a claim in tort against the defendants governed by the law of Texas. This argument, which we will call "the country issue," Scott J. rejected. He said, ante, p. 491F, that if he had felt able to conclude that Cape and Capasco were
f
present in Illinois when the Tyler 2 actions were commenced, he would have held that to be a sufficient basis in English law for the exercise by the Tyler court of jurisdiction over them.

The defendants further contended that, even if any grounds of jurisdiction in the Tyler court had existed, yet the judgment should not be enforced because (i) the judgment had been obtained by the fraud of Mr. Blake Bailey, the attorney who had represented some of the plaintiffs before Judge
g
Steger in the proceedings upon the making of the default judgment and who had drafted the terms in which the default judgment was finally expressed; and (ii) it would be contrary to the standards of natural justice required by our law, and contrary to the principles of public policy applied by our law, to enforce the judgment having regard to the circumstances in which, and the procedures by which, it came to be made. Scott J. considered these issues again on the assumption that, contrary to
h
his conclusion, the plaintiffs had made out a ground for jurisdiction in the Tyler court over Cape and Capasco. He acquitted Mr. Bailey of having had any intention

© An extract from a JUSTIS database

a

to deceive and of having deceived anyone with reference to the terms and form of the judgment. The allegations that the judgment had been obtained by fraud accordingly failed. However, the defendants succeeded before Scott J. on the natural justice point. The judge found that the judgment was not such that it could be enforced in the courts of this country. The primary ground of that

b finding was that the procedure adopted in this particular case by the judge of the Tyler court offended against the principles of substantial justice contained in our law.

Scott J. gave his judgment in two parts, which together covered 150 pages of transcript. On 17 June 1988 he announced that the claims of all the plaintiffs would be dismissed and he gave his reasons for rejecting each of the three grounds upon which the plaintiffs had claimed that their

c judgment in the Tyler court should be enforced in this country. He also stated in summary form his reasons for rejecting the allegations of fraud against Mr. Bailey and for upholding the contentions of Cape/Capasco on the natural justice issue. On 26 July 1988 he gave his full reasons with reference to the issues of fraud and natural justice. The plaintiffs have invited this court to take a different view on some parts of the facts in this case, and to apply principles of law which the judge

d considered to be inapplicable. Mr. Morison, however, began his submissions by rightly acknowledging the great care expended in, and the great accuracy and clarity of, the judgment of the judge, to which we also pay tribute.

The issues on this appeal

e
On this appeal the plaintiffs do not seek to challenge those parts of Scott J.'s judgment by which he rejected their submissions based on the alleged voluntary appearance by the defendants in the Tyler court proceedings or their alleged agreement to submit to the jurisdiction of that court. The defendants do not challenge his rejection of their allegation of fraud against Mr. Bailey. The

f plaintiffs do, however, seek to challenge those parts of his judgment by which (a) he rejected their submissions based on the alleged residence or presence of Cape and Capasco in the United States of America ("the presence issue"); (b) he accepted the defendants' submissions based on natural justice ("the natural justice issue").

As part of their answer to the plaintiffs' case on presence, the defendants have cross-appealed on what we have described as "the country issue."

g To sum up, the three issues which have been argued on this appeal are (a) the presence issue; (b) the country issue; and (c) the natural justice issue. A decision on any one of these issues in favour of the defendants would strictly render a decision on the other two issues unnecessary. However, we think it right to deal fully with all three issues, not only out of deference to the excellent arguments which have been presented to us on both sides, but also because these issues are important and we

h suppose that the case could proceed to a higher court. Furthermore, at least the first two of the three issues are closely connected with one another.

© An extract from a JUSTIS database

a

Adams v. Cape Industries Plc. (C.A.)

II The presence issue

[Their Lordships referred to the depositions placed before Scott J. at the hearing, listed the facts found by the judge relevant to the presence issue, and continued:]

b

*The plaintiffs' challenge to Scott J.'s finding of facts relevant to the "presence" issue*

The plaintiffs' challenge to the judgment of Scott J. on the "presence" issue is based not so much on the findings of primary fact which were made, but on his supposed failure to find all the material

c facts and to draw the correct inferences and conclusions which should have been drawn from such facts. In their amended notice of appeal (which we gave leave to amend at the hearing) the plaintiffs included a "Schedule of facts which ought to have been found." This schedule included 25 paragraphs. For convenience we will set out and deal with the issues of fact raised by this schedule in an appendix to this judgment, which in our view would not need to be reported.* We observe at

d this point that, having been taken through the evidence relating to such of these 25 paragraphs as are disputed, we think that the majority of them (though by no means all) are in broad terms borne out by the evidence. However, we do not think that those which are substantiated add very much to the strength of the plaintiffs' case on the presence issue or that they suffice to invalidate the ultimate conclusion of the judge on that issue.

On the basis of the findings of fact made by Scott J. and the further facts which they submit he

e ought to have found, the plaintiffs in their amended notice of appeal submit that he was wrong to conclude:

"(1) N.A.A.C.'s business was its own business and not the business of Cape or Capasco;

"(2) C.P.C. . . . was . . . an independently owned company and carried on its own business;

f "(3) As from 31 January 1978 N.A.A.C. ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets;

"(4) Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business."

Two important inferences of fact made by the judge (numbers (1) and (2)) and two important findings of primary fact (numbers (3) and (4)) are thus challenged on this appeal. We shall consider

g contention (4) in the section of this judgment dealing with the "single economic unit" argument and in the appendix. We shall consider the contention that C.P.C. was "not an independently owned company" in the section dealing with the "corporate veil argument." We shall consider contention (3) and the contentions that N.A.A.C.'s business was not "its own business" and that C.P.C.'s business was not "its own business" in the section dealing with what we will call the "agency" argument.

h

* Reporter's Note: The appendix has not been included in this report.

© An extract from a JUSTIS database

Case 1:03-md-01570-GBD-SN   Document 415-10   Filed 08/30/04   Page 19 of 26

a

Some leading authorities relevant to the presence issue

b

Provision has been made by statute for the enforcement in this country of the judgments of the courts of Commonwealth and foreign countries in a number of different circumstances: see in particular section 9 of the Administration of Justice Act 1920; section 4 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 and the Civil Jurisdiction and Judgments Act 1982. However, none of these statutory provisions applies in the present case. We are concerned solely with the common law: Dicey ≡ Morris, vol. 1, p. 436, "First Case."

c

So far as appears from the many cases cited to us, neither this court nor the House of Lords has ever been called on to consider the principles which should guide an English court in deciding whether or not a foreign court was competent to assume jurisdiction over a corporation (as opposed to an individual) on a territorial basis; and we have seen only two decisions of courts of first instance in which these principles fell to be considered. We will begin by mentioning some of the leading cases relating to judgments given against individuals.

d

Two points at least are clear. First, at common law in this country foreign judgments are enforced, if at all, not through considerations of comity but upon the basis of a principle explained thus by Parke B. in Williams v. Jones (1845) 13 M. ≡ W. 628, 633:

"where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced . . . " (Emphasis added.)

e

Blackburn J. stated and followed the same principle in delivering the judgment of himself and Mellor J. in Godard v. Gray (1870) L.R. 6 Q.B. 139, 147, and the judgment of the Court of Queen's Bench in Schibsby v. Westenholz (1870) L.R. 6 Q.B. 155, 159. In the latter case he said, at p. 159:

f

"It is unnecessary to repeat again what we have already said in Godard v. Gray. We think that, for the reasons there given, the true principle on which the judgments of foreign tribunals are enforced in England is that stated by Parke B. in Russell v. Smith (1842) 9 M. ≡ W. 810, 819, and again repeated by him in Williams v. Jones, 13 M. ≡ W. 629, 633, that the judgment of a court of competent jurisdiction over the defendant imposes a duty or obligation on the defendant to pay the sum for which judgment is given, which the courts in this country are bound to enforce; and consequently that anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

g

Secondly, however, in deciding whether the foreign court was one of competent jurisdiction, our courts will apply not the law of the foreign court itself but our own rules of private international law. As Lindley M.R. put it in Pemberton v. Hughes [1899] 1 Ch. 781, 791:

h

© An extract from a JUSTIS database

a

"There is no doubt that the courts of this country will not enforce the decisions of foreign courts which have no jurisdiction in the sense above explained - i.e., over the subject matter or over the persons brought before them . . .  But the jurisdiction which alone is important in these matters is the competence of the court in an international sense - i.e., its territorial competence over the

b   subject matter and over the defendant. Its competence or jurisdiction in any other sense is not regarded as material by the courts of this country."

Subsequent references in this section of this judgment to the competence of a foreign court are intended as references to its competence under our principles of private international law, which will

c  by no means necessarily coincide with the rules applied by the foreign court itself as governing its own jurisdiction. As the decision in Pemberton v. Hughes [1899] 1 Ch. 781 shows, our courts are generally not concerned with those rules.

Under the plaintiffs' case as pleaded, the obligation of the defendants to obey the judgment of the Tyler court is said to arise because "the defendants were resident in the United States of America at

d  the time the plaintiffs' proceedings were commenced in the Tyler court." The jurisdiction of the Tyler court is thus said to be founded on territorial factors.

Nearly 120 years ago in Schibsby v. Westenholz, L.R. 6 Q.B. 155, the "residence" of an individual in a foreign country at time of commencement of suit was recognised by the Court of Queen's Bench as conferring jurisdiction on the court of that country to give a judgment in personam against

e  him. In that case the court declined to enforce a judgment of a French tribunal obtained in default of appearance against defendants who at the time when the suit was brought in France were neither subjects of nor resident in France. On these facts the court decided, at p. 163, "there existed nothing in the present case imposing on the defendants any duty to obey the judgment of a French tribunal." However, it regarded certain points as clear on principle, at p. 161:

f
"If the defendants had been at the time of the judgment subjects of the country whose judgment is sought to be enforced against them, we think that its laws would have bound them. Again, if the defendants had been at the time when the suit was commenced resident in the country, so as to have the benefit of its laws protecting them, or, as it is sometimes expressed, owing temporary allegiance to that country, we think that its laws would have bound them."

g
In Rousillon v. Rousillon (1880) 14 Ch. D. 351, Fry J., after referring to Schibsby v. Westenholz and in enumerating the cases where the courts of this country regard the judgment of a foreign court as imposing on the defendant the duty to obey it, at p. 371, similarly referred to one such case as being "where he was resident in the foreign country when the action began."

h   In Emanuel v. Symon [1908] 1 K.B. 302, this court had to consider whether the fact of possessing property situate in Western Australia or

© An extract from a JUSTIS database

a

the fact of entering into a contract of partnership in that country was sufficient to give a Western Australian court jurisdiction (in the private international law sense) over a British subject not resident in Western Australia at the start of the action, who had neither appeared to the process nor expressly agreed to submit to the jurisdiction of that court. This question was answered in the negative.

b Buckley L.J. said, at p. 309:

> "In actions in personam there are five cases in which the courts of this country will enforce a foreign judgment: (1) Where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was resident in the foreign country when the action began; (3) where the defendant in the character of plaintiff has selected the forum in which he is
c afterwards sued; (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained. The question in the present case is whether there is yet another and a sixth case."

After referring to the principles established by, inter alia, Godard v. Gray, L.R. 6 Q.B. 139, and
d Schibsby v. Westenholz, L.R. 6 Q.B. 155, Buckley L.J. observed, at p. 310:

> "In other words, the courts of this country enforce foreign judgments because those judgments impose a duty or obligation which is recognised in this country and leads to judgment here also."

e In agreement with the rest of the court, he considered that the factors relied on by the plaintiff mentioned above did not suffice to impose a duty on the defendant to obey the Western Australian judgment which should be recognised in this country.

We pause to observe that Buckley L.J.'s second, third, fourth and fifth cases mentioned in his statement broadly correspond with Dicey ≡ Morris' respective four cases. It is doubtful whether the first case mentioned in his statement would still be held to give rise to jurisdiction: see Dicey ≡
f Morris, 11th ed., vol. 1, pp. 447-448, and the cases there cited. With this point we are not concerned.

Residence will much more often than not import physical presence. On the facts of the four cases last mentioned, any distinction between residence and presence would have been irrelevant. However, the brief statements of principle contained in the judgments left at least three questions unanswered. First, does the temporary presence of a defendant in a foreign country render the court of that
g country competent (in the private international law sense) to assume jurisdiction over him? Secondly, what is the relevant time for the purpose of ascertaining such competence? Thirdly, what is to be regarded as the "country" in the case of a political country, such as the United States of America comprising different states which have different rules of law and legal procedure?

We will have to revert to the third question in the section of this judgment dealing with the
h "country" issue; in the present section we will assume in favour of the plaintiffs that the United States of America,

© An extract from a JUSTIS database

a

rather than the state of Texas, is to be regarded as the relevant country. As to the first and second questions, we think that the most helpful guidance is to be obtained from the decision of the Privy Council in Sirdar Gurdyal Singh v. Rajah of Faridkote [1894] A.C. 670, the decision of Lord Russell of Killowen in Carrick v. Hancock (1895) 12 T.L.R. 59 and the decision of the House of

b Lords in Employers' Liability Assurance Corporation Ltd. v. Sedgwick Collins ░ Co. Ltd. [1927] A.C. 95.

In the Sirdar Gurdyal Singh case the Privy Council on an appeal from the Chief Court of the Punjab considered the question whether the courts of British India ought to have enforced against the defendant two judgments obtained against him ex parte in the native state of Faridkote, which

c for this purpose fell to be regarded as foreign judgments. The defendant had ceased to reside in the state before the actions were brought, and though he had received notice of the proceedings, he had never appeared in either of them or otherwise submitted to the jurisdiction of the Faridkote court. The Privy Council held the judgments to be a nullity under international law. Lord Selborne, delivering their opinion, said, at pp. 683–684:

d        "Under these circumstances there was, in their Lordships' opinion, nothing to take this case out of the general rule, that the plaintiff must sue in the court to which the defendant is subject at the time of suit ('Actor sequitur forum rei'); which is rightly stated by Sir Robert Phillimore (International Law, vol. 4, section 891) to 'lie at the root of all international, and of most domestic, jurisprudence on this matter.' All jurisdiction is properly territorial, and 'extra territorium

e        jus dicenti, impune non paretur.' Territorial jurisdiction attaches (with special exceptions) upon all persons either permanently or temporarily resident within the territory while they are within it; but it does not follow them after they have withdrawn from it, and when they are living in another independent country. . . . no territorial legislation can give jurisdiction which any foreign court ought to recognise against foreigners, who owe no allegiance or obedience to the power which so

f        legislates. In a personal action, to which none of these causes of jurisdiction apply, a decree pronounced in absentem by a foreign court, to the jurisdiction of which the defendant has not in any way submitted himself, is by international law an absolute nullity."

The Privy Council held, at p. 684, that the mere fact that the cause of action had arisen in one country did not operate to confer jurisdiction on the courts of that country over a defendant not

g otherwise subject to it.

In Carrick v. Hancock, 12 T.L.R. 59, the principle of territorial dominion was again referred to. In that case an action was brought upon a monetary judgment obtained in Sweden by an Englishman domiciled in Sweden against a defendant who resided and carried on business at Newcastle. The writ was served on the defendant during a short visit he was paying to Sweden and he duly appeared to

h answer it. Though he did not himself remain in Sweden, he was represented throughout the subsequent proceedings. He put in a defence and counterclaim and on

© An extract from a JUSTIS database

a

three separate occasions appealed to the Court of Appeal at Gota. It may be that in those circumstances, notwithstanding his protestations that he had "only appeared under pressure, duress and compulsion of law," the English court could properly have enforced the foreign judgment on the ground that the defendant had submitted to the jurisdiction of the Swedish court. However, Lord

b

Russell of Killowen did not decide the case in favour of the plaintiff on that ground. After reviewing the facts and arguments, he is reported as saying, at p. 60:

"that the jurisdiction of a court was based upon the principle of territorial dominion, and that all persons within any territorial dominion owe their allegiance to its sovereign power and obedience to all its laws and to the lawful jurisdiction of its courts. In his opinion that duty of allegiance

c

was correlative to the protection given by a state to any person within its territory. This relationship and its inherent rights depended upon the fact of the person being within its territory. It seemed to him that the question of the time the person was actually in the territory was wholly immaterial. This being so it was quite clear that under the facts of this case it was properly and lawfully initiated, and all its subsequent proceedings were lawful and valid, and that the Swedish courts had ample jurisdiction to enforce the plaintiff's claim against the defendant."

d

In the Employers' Liability case, Lord Parmoor said [1927] A.C. 95, 114-115:

"My Lords, in the case of actions in personam, in which a writ has been regularly served on foreigners or foreign corporations, when present in this country, and a judgment has been

e

obtained, it seems to be clear, as a general rule, that, under the obligations of that branch of international law, which governs the application of foreign judgments, other countries, whose governments have been recognised de jure and de facto by the government of this country, will accept the jurisdiction of the courts of this country, and regard their judgments as valid. In the case of such actions, it may also be stated negatively that, where a writ cannot be served on a defendant foreigner, or foreign corporation, when in this country, and no submission to

f

jurisdiction is proved, any consequent judgment has no validity in any other country, on the ground that the courts of this country have no jurisdiction under international law over the person of an absent foreign defendant. In other words, the right to serve a writ, in an action in personam, on a foreign defendant, only becomes effective, as a source of jurisdiction, to be recognised in other countries when, at the date of service, such defendant is within the territorial jurisdiction of the English courts."

g

Lord Parmoor was in terms referring to the recognition by foreign countries of judgments given by our courts, but he was speaking generally in terms of private international law and would presumably have regarded the same principles as applicable (mutatis mutandis) in a case where our courts were asked to enforce a foreign judgment.

h   From the three last mentioned authorities read together, the following principles can, in our judgment, be extracted. First, in determining the

© An extract from a JUSTIS database

a

jurisdiction of the foreign court in such cases, our court is directing its mind to the competence or otherwise of the foreign court "to summon the defendant before it and to decide such matters as it has decided:" see Pemberton v. Hughes [1899] 1 Ch. 781, 790, per Lindley M.R. Secondly, in the absence of any form of submission to the foreign court, such competence depends on the physical

b presence of the defendant in the country concerned at the time of suit. (We leave open the question whether residence without presence will suffice.) From the last sentence of the dictum of Lord Parmoor cited above, and from a dictum of Collins M.R. in Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell ▓ Co. [1902] 1 K.B. 342, 346, it would appear that the date of service of process rather than the date of issue of proceedings is to be treated as "the time of suit" for these purposes. But nothing turns on this point in the present case

c and we express no final view on it. Thirdly, we accept the submission of Sir Godfray Le Quesne (not accepted by Mr. Morison) that the temporary presence of a defendant in the foreign country will suffice provided at least that it is voluntary (i.e. not induced by compulsion, fraud or duress). Some further support for this submission is to be found in dicta of Parke B. in General Steam Navigation Co. v. Guillou (1843) 11 M. ▓ W. 877.

d   The decision in Carrick v. Hancock, 12 T.L.R. 59, has been the subject of criticism in Cheshire ▓ North's Private International Law, 11th ed. (1987), p. 342, and in Dicey ▓ Morris, 11th ed., vol. 1, where it is said, at pp. 439-440:

"It may be doubted, however, whether casual presence, as distinct from residence, is a desirable basis of jurisdiction if the parties are strangers and the cause of action arose outside the country

e concerned. For the court is not likely to be the forum conveniens, in the sense of the appropriate court most adequately equipped to deal with the facts or the law. Moreover, the English case referred to above is open to the comment that the jurisdiction of the foreign court might just as well have been based on the defendant's submission as on his presence."

f Our own courts regard the temporary presence of a foreigner in England at the time of service of process as justifying the assumption of jurisdiction over him: see Colt Industries Inc. v. Sarlie [1966] 1 W.L.R. 440 and H.R.H. Maharanee Seethadevi Gaekwar of Baroda v. Wildenstein [1972] 2 Q.B. 283. However, Cheshire ▓ North, 11th ed., comment, at p. 342:

"any analogy based on the jurisdiction of the English courts is not particularly convincing, since

g the rules on jurisdiction are operated in conjunction with a discretion to stay the proceedings, and the exercise of the discretion is likely to be an issue when jurisdiction is founded on mere presence."

We see the force of these points. They highlight the possible desirability of a further extension of

h reciprocal arrangements for the enforcement (or non-enforcement) of foreign judgments by convention.

© An extract from a JUSTIS database

a

Nevertheless, while the use of the particular phrase "temporary allegiance" may be a misleading one in this context, we would, on the basis of the authorities referred to above, regard the source of the territorial jurisdiction of the court of a foreign country to summon a defendant to appear before it as being his obligation for the time being to abide by its laws and accept the jurisdiction of its courts

b while present in its territory. So long as he remains physically present in that country, he has the benefit of its laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that

c country territorial jurisdiction over him under our rules of private international law.

In the forefront of his argument on this issue, Mr. Morison submitted that the essential feature of this country's rules relating to the enforcement of foreign judgments is "curial allegiance," which arises "where there is sufficient connection between the debtor and the rendering court at the date of suit so as to make it 'just' to enforce a judgment of that court." The relevance of residence or

d presence, in his submission, is that it provides the requisite connection. This, in our judgment, is not quite the correct way to look at the matter. While residence or presence will ex hypothesi give rise to a connection, it is the residence or presence, not the connection as such, which gives rise to the jurisdiction of the court. The question whether residence or presence existed at the time of suit is determined by our courts not by reference to concepts of justice or by the exercise of judicial

e discretion; it is a question of fact which has to be decided with the help of the guidance given by the authorities.

However, none of the authorities so far referred to was concerned with the question of enforcement of a foreign judgment against a corporate body. The residence or presence of a corporation is a difficult concept. A corporation is a legal person but it has no corporeal existence. It can own

f property. It can by its agents perform acts. It is clear that if an English corporation owns a place of business in a foreign state from which it carries on its business that English corporation is, under our law, present in that state for the purposes of in personam jurisdiction. Those clear circumstances, however, may be varied in many different ways. The corporation may not own the place of business but have only the use of it or part of it. It may, instead of carrying on its business by its own

g servants, cause its business to be done by an agent, or through an agent, in the foreign state. The question will then arise whether the commercial acts done are, for the purposes of our law, to be regarded as done within the jurisdiction of the foreign state (a) by the agent in the course of the agent's business or (b) by the corporation itself. Further, and this is of central importance in this case, if the English corporation causes to be formed under the law of the foreign state a separate but

h wholly owned corporation to carry out the business or commercial acts which it requires to be done, are those acts within the jurisdiction of the foreign state to be regarded, for the purposes of

© An extract from a JUSTIS database

a   enforcement of a judgment of the courts of that state, as the acts of the English corporation within that jurisdiction merely by reason that it owns all the shares of its foreign corporation; and, if not, what degree of power of control, or of exercise of control, and/or what other factors will suffice, in our law, to cause the English corporation to be held to be "present" within the jurisdiction of the

b  foreign state?

    The earliest case cited to us in which this court had to consider the concept of residence or presence of a corporation in the context of a claim to enforce a foreign judgment was Littauer Glove Corporation v. F. W. Millington (1920) Ltd. (1928) 44 T.L.R. 746. In that case the plaintiffs were manufacturers in the State of New York. The defendant company, which conducted the business of

c  clothiers' merchants, had its principal place of business in Manchester. It bought from manufacturers in various parts of the world and sold to wholesalers. On 17 March 1922 its managing director, Mr. Millington, arrived in New York on a business visit with a view to seeing samples and making purchases. He stayed in a New York hotel for four or five nights, where he did some business for his company. Thereafter he visited various other states where he also did business. On 1 April the plaintiffs took out a summons against the defendant company. On 3 April Mr. Millington returned to

d  New York. On that date, while he was in the sale office in New York of Union Mills Corporation, the defendant's principal United States suppliers, he was served with process in the action. He entered no appearance, took no steps in the proceedings and did not submit to the jurisdiction of the American court. On 4 April he sailed for England. The plaintiffs, having in due course obtained judgment against the defendant company in default of appearance in New York, sought to enforce

e  the judgment against it in England. The defendant contended that, under the rules of private international law, the New York court had no jurisdiction to make the order against it. Many authorities were cited to Salter J. From the report of the argument, it appears to have been common ground that the question turned on the "residence" or otherwise of the defendant company in the State of New York on 1 April 1922 when the proceedings were instituted. Salter J. identified the

f  question for his decision as being whether on 1 April 1922: "the defendant company were resident in the State of New York so as to have the benefit and be under the protection of the laws of that state." The plaintiffs' counsel had contended that it was not necessary for them to show that the defendant company was carrying on business at a fixed place. In his submission, it was resident in New York because it carried on business there: "the company is resident by its travellers and would be subject to process of the country in which they happened to be." Salter J. rejected this contention,

g  saying, at p. 747:

    "What was meant by saying that a business corporation was resident in a foreign jurisdiction for that purpose? That depended on whether, on the day in question, it was carrying on business in the foreign state so that it could fairly and properly be said to be then resident in that state. If the

h    defendant company were resident in the State of New York on 1 April 1922, where in that state were they resident? Mr. Le Quesne said that they were resident in Broadway,

© An extract from a JUSTIS database