a

New York, but there must be some place of residence on which one could put a finger. There was no suggestion that the name of the defendant company was in any way displayed at the address in Broadway, or that any letter paper of the company was used there, or that any business was done there except what the company did with firms in other parts of the United States. If the defendant company were resident in Broadway, it would follow that they were resident wherever Mr. Millington did business. He was, however, nothing more than a commercial traveller on that tour.

b

"If the company had 40 or 50 travellers ranging all over the world, was it to be said that the company were resident wherever the travellers put up at an hotel and took orders? He (his Lordship) did not rely on the expression 'fixed place,' but on what was the fair meaning of 'residence.' The inference which he drew from the cases cited was that there must be some carrying on of business at a definite and, to some reasonable extent, permanent place. There was no residence within the jurisdiction on the part of the defendant company, and the action on that point must fail."

c

d

Thus, the effect of Salter J.'s decision was that if a foreign judgment is to be enforced in this country against a corporation, it must be shown that at the relevant time (a) the corporation was carrying on business, and (b) it was doing so at a definite and "to some reasonable extent permanent place." This test is significantly different from that applicable in the case of judgments against individuals. Littauer does not bind this court, but we see no reason to doubt the correctness of this test so far as it goes. It seems to us consistent with authority and to represent a common sense approach to the question of "presence" in the case of a corporation. The difficulty may be to determine whether it can properly be said in any given case that the corporation is itself carrying on business in the country concerned.

e

The other, and most recent, leading case relating to the enforcement of foreign judgments against corporations is Vogel v. R. and A. Kohnstamm Ltd. [1973] Q.B. 133. There the defendants were a company registered in England. They sold leather skins to the plaintiffs through a Mr. Kornbluth who had an office in Tel Aviv. The defendants had no office of their own in Israel. All the material correspondence was conducted with them in England. The contract of sale was not made in Israel. The court in Israel gave judgment for the plaintiff on a claim for breach of contract and the plaintiff sought to enforce it in England. Ashworth J. dismissed the plaintiff's claim. In his judgment he described the functions of Mr. Kornbluth vis-à-vis the defendants, at p. 136A-B:

f

g

"Mr. Kornbluth's role was that of a person seeking customers who would buy the defendants' goods. For this purpose he was provided with samples for which he paid, and having found a potential customer he would act as a go-between between that person and the defendants. Correspondence would pass between the defendants and Mr. Kornbluth regarding a proposed order and Mr. Kornbluth would be in communication with the customer. If as a result a contract was made it would be made between the defendants and

h

© An extract from a JUSTIS database

a

the customer and at no time had Mr. Kornbluth any authority to make a contract on behalf of the defendants."

He said, at p. 136G:

b

"in order to succeed the plaintiff here has to persuade me either that the defendants were resident in Israel through Mr. Kornbluth as their agent or that they were carrying on business through him in such a way as to give rise to an implied agreement on their part to submit to the jurisdiction of Israeli courts."

With reference to the first of these two points, he observed, at p. 141:

c

"As has been said in many cases, residence is a question of fact and when one is dealing with human beings one can normally approach the matter on the footing that residence involves physical residence by the person in question. I keep open the possibility that even in regard to such a person he may be constructively resident in another country although his physical presence is elsewhere. But in the case of a corporation there is broadly speaking no question of physical residence. A corporation or company, if resident in another country, is resident there by way of agents."

d

He recognised that the Littauer case was distinguishable on the ground:

"the person through whom the defendant corporation was said to have residence in the United States was not a person with any fixed or reasonably permanent place . . ."

e

However, Ashworth J. pointed out, at p. 142, that the defendants in the case before him had no office of their own in Israel, and that "All the material correspondence was conducted with them in England and their connection with the State of Israel was limited . . . to their dealings through Mr. Kornbluth." He continued:

"In examining how far the presence of a representative or agent will, so to speak, impinge on the absent company so as to render that absent company subject to the relevant jurisdiction, I find help to be obtained from cases in which the converse situation has been considered: namely, where the English courts have been invited to allow process to issue to foreign companies on the footing that such foreign companies are 'here.'"

f

He expressed his ultimate conclusion, at p. 143:

g

". . . I have asked myself anxiously in this case whether in any real sense of the word the defendants can be said to have been there in Israel: and all that emerges from this case is that there was a man called Kornbluth who sought customers for them, transmitted correspondence to them and received it from them, had no authority whatever to bind the defendants in any shape or form. I have come to the conclusion really without any hesitation that the defendants were not resident in Israel at any material time."

h

On this appeal, in accordance with the approach of the courts in the Littauer and Vogel cases, it has been common ground that the Tyler

© An extract from a JUSTIS database

a

court was competent to exercise jurisdiction over Cape and Capasco, if at all, only if they could properly be said to be resident or present in the United States of America at the relevant time. (In view of their contentions on the "country" issue, the defendants do not accept that the Tyler court would have been competent, even if the latter condition had been fulfilled.) The words "resident" or

b "present" or equivalent phrases have been used interchangeably in argument, just as they have been used in the cases; we see no objection to this terminology if it is understood that in the case of a corporation the concept of "residence" or "presence" in any particular place must be no less of a legal fiction than the existence of the corporation itself. The argument has centred on the features which this concept embodies in the case of a corporation.

In considering these features, Salter J. in the Littauer case and Ashworth J. in the Vogel case

c clearly attached great weight to a long line of cases where the English court has considered whether it should allow process to issue to foreign companies as being amenable to its jurisdiction. We will call this line "the Okura line of cases," because a leading example is the decision of this court in Okura Co. Ltd. v. Forsbacka Jernverks Aktiebolag [1914] 1 K.B. 715.

The origin of this line requires some brief explanation. After it had been decided in Newby v. Von

d Oppen Colt's Patent Firearms Manufacturing Co. (1872) L.R. 7 Q.B. 293 that in appropriate circumstances a foreign corporation was capable of being sued in this country, our courts in a number of cases had to consider (a) whether on the facts the foreign corporate defendant was amenable to the jurisdiction of the English court, and if so (b) whether it had been properly served with the process. Most of these cases were concerned with the old Ord. 9, r. 8 of the Rules of the Supreme Court 1883, which provided:

e

"In the absence of any statutory provision regulating service of process, every writ of summons issued against a corporation aggregate may be served on the mayor or other head officer, or on the town clerk, clerk, treasurer or secretary of such corpora- tion . . ."

f     The rule contained no such expressions as "reside" or "carry on business." However, as Ackner L.J. pointed out in South India Shipping Corporation Ltd. v. Export-Import Bank of Korea [1985] 1 W.L.R. 585, 589:

"Those expressions were used as convenient tests, to ascertain whether the corporation had a sufficient 'presence' within the jurisdiction, since 'generally,' courts exercised jurisdiction only over

g persons who 'are within the territorial limits of their jurisdiction.' Apart from statute 'a court has no power to exercise jurisdiction over anyone beyond its limits,' per Cotton L.J. in In re Busfield (1886) 32 Ch.D. 123, 131, quoted by Lord Scarman in Bethlehem Steel Corporation v. Universal Gas (unreported), 17 July 1978, House of Lords."

h     Phrases referring to residence or presence within the jurisdiction, or equivalent phrases, have been used by way of shorthand reference to

© An extract from a JUSTIS database

a

the condition (or one of the conditions) which a foreign corporation has to satisfy if it is to be amenable to the jurisdiction of the English court. And indeed they have been used more or less interchangeably by the courts. One typical example is the phraseology used by the Earl of Halsbury L.C. in La Compagnie Générale Transatlantique v. Thomas Law ≣ Co., La Bourgogne [1899] A.C.

b 431, who said, at p. 433:

> "It appears to me that as a consequence of these facts the appellants are resident here in the only sense in which a corporation can be resident - to use the phrase which Mr. Joseph Walton has so constantly referred to, they are 'here;' and, if they are here, they may be served."

c    Perhaps the most helpful guidance in determining whether a foreign corporation is "here" so as to be amenable to the jurisdiction of our courts is the following passage from the judgment of Buckley L.J. in the Okura case [1914] 1 K.B. 715, 718-719:

> "The point to be considered is, do the facts show that this corporation is carrying on its business
d in this country? In determining that question, three matters have to be considered. First, the acts relied on as showing that the corporation is carrying on business in this country must have continued for a sufficiently substantial period of time. That is the case here. Next, it is essential that these acts should have been done at some fixed place of business. If the acts relied on in this case amount to a carrying on of a business, there is no doubt that those acts were done at a fixed place of business. The third essential, and one which it is always more difficult to satisfy, is that
e the corporation must be 'here' by a person who carries on business for the corporation in this country. It is not enough to show that the corporation has an agent here; he must be an agent who does the corporation's business for the corporation in this country. This involves the still more difficult question, what is meant exactly by the expression 'doing business?'"

f    It is clear that (special statutory provision apart) a minimum requirement which must be satisfied if a foreign trading corporation is to be amenable at common law to service within the jurisdiction is that it must carry on business at a place within the jurisdiction: see The Theodohos [1977] 2 Lloyd's Rep. 428, 430, per Brandon J.

     (All the authorities cited to us have been directed, and all the statements later in this judgment will be directed, to trading corporations. In the case of non-trading corporations, the same principles
g would presumably apply, with the substitution of references to the carrying on of the corporation's corporate activities for references to the carrying on of business.)

     The court will not find much difficulty in holding that a foreign corporation is present in this country if it has a fixed place of business of its own here (whether as owner, lessee or licensee) and for more than a minimal period of time has carried on its own business from such premises by its
h servants or agents. Typical example of such cases (which we will call "branch office cases") which have been cited to us are

© An extract from a JUSTIS database

a

(1) Newby v. Von Oppen ≋ Colt's Patent Firearms Manufacturing Co., L.R. 7 Q.B. 293; (2) Haggin v. Comptoir d'Escompte de Paris (1889) 23 Q.B.D. 519; (3) La Bourgogne [1899] P. 1; [1899] A.C. 431; (4) Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell ≋ Co. [1902] 1 K.B. 342.

b     However, the cases also show that it may be permissible to treat a foreign corporation as resident in this country so as to be amenable to the jurisdiction of our courts even if it has no fixed place of business here of its own, provided that an agent acting on its behalf carries on its business (as opposed to his own business) from some fixed place of business in this country. Typical examples of such cases are:

(1) Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft [1911] 2 K.B.
c 516 where the agent, Blasius, occupied and paid rent for offices in London, and in the words of Fletcher Moulton L.J., at p. 524:

> "He carries on business at a fixed place in London as sole agent for the defendants in the United Kingdom, though it is true that he is also agent for another firm. He has power to enter into contracts of sale for the defendants."

d

(2) Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco (1914) 111 L.T. 97, where Buckley L.J. began his judgment with the following statement of principle, at p. 98:

e
> "If contracts have been habitually made for a reasonably sub- stantial period of time at a fixed place of business within the juris- diction by a firm or a person there, without referring each time to the foreign corporation for instructions, and with the result that the foreign corporation has become bound to another party, then the foreign corporation for the present purpose carries on business at that place."

f     The ultimate problem in such cases may lie in determining whether the business carried on by the agent on behalf of the principal should properly be regarded on the one hand as his own business or on the other hand as the business of the foreign corporation. This must necessitate an investigation both of the activities of the agent and of the relationship between him and the corporation.

In a few of the Okura line of cases which have been cited to us, the court has had to consider the question whether a foreign corporation was carrying on business in this country in a context other
g than that of the old Ord. 9, r. 8, but nevertheless the like investigation was necessary. In Grant v. Anderson ≋ Co. [1892] 1 Q.B. 108 the context was the old Ord. 48A, r. 1, which provided that any two or more persons claiming or being liable as co-partners "and carrying on business within the jurisdiction" might sue or be owed in the name of the respective firms. The defendants, who were a Scottish firm of manufacturers carrying on business in Glasgow, employed an agent in London to
h obtain orders for them in London. He occupied an office in London, the rent of which he paid himself, and received a commission if, but only if, he got an order

© An extract from a JUSTIS database

a

which the firm accepted. In rejecting the contention that the firm carried on business in London, the Court of Appeal attached great weight to the fact that, in the words of Lord Esher M.R., at p. 116 "when he gets an order, he has no power himself to accept it." As he put it, at p. 117: "One might as well say that the defendants carry on business in any place through which their goods pass while being sent to their customers."

b

Sfeir ░ Co. v. National Insurance Co. of New Zealand Ltd. [1964] 1 Lloyd's Rep. 330 concerned a claim covered by section 9(2) of the Administration of Justice Act 1920, of which paragraph (b) precluded the registration of a judgment under the section if the judgment debtor

c

"being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court . . ."

The first question Mocatta J. had to determine (see, at p. 336) was whether the defendants at any material time carried on business in Ghana. If they did so, this could only have been through a Ghanaian company called Glyndova. He expressed his conclusion on this point, at p. 339:

d

"In my judgment, Mr. Mustill was right in submitting that the decision of the court at the end of the day after considering the guidance contained in the authorities and their application to the facts of a particular case is one of impression. The conclusion I have reached is that the limited authority possessed by Glyndova to bind the defendants by settlements of claims arising in Ghana under the defendants' policies issued elsewhere, even when coupled with the other matters relied upon which I have recited, did not amount to a carrying on of business by the defendants in Ghana. The business carried on in Ghana by Glyndova was their own and not that of the defendants."

e

f

At least in cases other than branch office cases it is obvious that the activities of the agent by whom the foreign corporation is said to be present in this country and the extent of the authority of that agent will be of particular importance in determining whether or not the corporation is amenable to our courts' jurisdiction. Counsel on both sides have referred us to numerous examples from the Okura line of cases in which a number of different aphorisms have been used to express the relevant test. Buckley L.J. (later Lord Wrenbury) "who made this subject particularly his own" (see The Lalandia [1933] P. 56, 62, per Langton J.) himself used a variety of expressions to state it on the facts of particular cases. In the Thames and Mersey case he stated it thus, 111 L.T. 97, 98-99:

g

"Does the agent in carrying on the foreign corporation's business make a contract for the foreign corporation, or does the agent, in carrying on the agent's own business, sell a contract with the foreign corporation? In the former case the corporation is and in the latter it is not carrying on business at that place."

h

© An extract from a JUSTIS database

a

**Adams v. Cape Industries Plc. (C.A.)**

In the Okura case itself, Buckley L.J. [1914] 1 K.B. 715, 721, summarised his reasons for concluding that the defendant corporation was not present in this country as follows:

b

"In my opinion the defendants are not 'here' by an alter ego who does business for them here, or who is competent to bind them in any way. They are not doing business here by a person but through a person."

At the trial of the present case a number of decisions from the Okura line of authorities were cited to Scott J. He said that counsel before him had treated the statements of principle to be found in the authorities as applicable equally to both classes of case. While expressing "a little unease" in this

c context, ante, p. 471F, he therefore assumed that the statements of principle applied equally to both classes of case.

Having made this assumption, he extracted the following propositions from the Okura line of cases:

d
(1) "The cases establish that jurisdiction on the territorial basis may be taken by an English court over a foreign company if the foreign company has business premises in England from which or at which its business is carried on:" ante, p. 468A.

(2) "There are, however, cases where residence or presence of a foreign company in England has been held established notwithstanding that the foreign company did not itself own or lease any business premises in England. A feature of these cases has been that the foreign company had

e a resident English agent who had authority to contract on behalf of and thereby to bind the principal. In those circumstances the presence or residence in England of the agent has been treated as the presence or residence of the foreign company, the principal:" ante, p. 468E-F.

(3) "trading in a country is insufficient, by the standards of English law, to entitle the courts of the country to take in personam jurisdiction over the trader: see the Littauer . . . case. . . . The trading must be reinforced by some residential feature, be it a branch office or a resident agent

f with power to contract:" ante, p. 476C.

These conclusions as to the law were of critical importance because the judge later found as facts, ante, p. 477E-F, that the 150, North Wacker Drive offices were N.A.A.C.'s offices and that N.A.A.C. had no authority to contract on behalf of Cape or Capasco or any other company in the Cape group. He also found as facts, ante, p. 482E "C.P.C., like N.A.A.C., had no authority to bind

g Egnep, Casap or any other of the Cape subsidiaries to any contract," and the offices at 150, North Wacker Drive were C.P.C.'s "own offices."

Mr. Morison did not challenge these particular findings of fact. However, he submitted that Scott J. erred in law in holding that, in cases other than branch office cases, "the trading must be reinforced by . . . a resident agent with power to contract." This conclusion, he pointed out, was based

h primarily on the judge's analysis of the Okura line of cases. However, this line of cases, in Mr. Morison's submission,

© An extract from a JUSTIS database

a

while of some relevance and interest, does not provide the correct yardstick to be applied in the present context. Contrary to the suggestion made by Ashworth J. in the Vogel case [1973] Q.B. 133, he said, those authorities do not represent the situation truly converse to the enforcement of a foreign judgment; the true converse would be a foreign court applying its own conflict rules, adjudicating on

b

the enforcement of an English judgment. Comity, as Blackburn J. pointed out in Schibsby v. Westenholz, L.R. 6 Q.B. 155, 159, is not the basis on which our courts enforce foreign judgments. Furthermore, the circumstances in which an English court will assume jurisdiction over a foreign corporation are closely bound up with our own rules of procedure which are derived largely from statute or statutory instrument and will be amended from time to time.

c

Pausing at this point, we would not go so far as to say that in every case one can determine whether a foreign court was competent at common law on territorial grounds to give a judgment against a corporation merely by ascertaining whether in like circumstances, and mutatis mutandis, our courts would have assumed jurisdiction over a foreign corporation. Nevertheless, enough has been said to demonstrate that in each case the same broad question falls to be answered by the court

d

under our own common law: "Was the corporation present in the relevant jurisdiction at the relevant time?" In our judgment, Scott J. was fully entitled to derive guidance from the Okura line of cases in deciding whether Cape and Capasco were resident in the United States of America at the relevant time.

Mr. Morison went on to submit that in any event the Okura line of cases does not establish a

e

universal rule that in cases where the foreign corporation has no fixed place of business of its own "the trading must be reinforced by . . . a resident agent with power to contract." There are, it is true, many dicta which suggest that the existence of power in the agent to bind his principal to contracts, without reference back to the principal, is an important indication that the principal himself is carrying on business by the agent. However, it has apparently never been held that this is an

f

essential feature of "presence" in cases where the corporation has no branch office in this country. Many of the reported cases were concerned with selling agencies, particularly in the shipping field, which were usually not exclusive to the principal concerned. It is therefore hardly surprising, Mr. Morison submitted, that the courts concentrated on the question of authority to contract, because the agency was in a real sense carrying on its own agency business. In the present case it is not alleged

g

that N.A.A.C. or C.P.C. had power to enter into sales contracts on behalf of Cape or Capasco. However, it is said, they were carrying out a recognised business activity for the exclusive benefit of Cape and Capasco, that is to say, the function of marketing agents. The question whether N.A.A.C. or C.P.C. were properly to be described as doing their own business or that of their principals was not to be determined by asking whether or not they had authority to contract, but by asking whether

h

they had authority to market and were carrying out this function. Mr. Morison invited us to follow the general approach adopted by the court in two Canadian

© An extract from a JUSTIS database

a

cases, Miller v. B. C. Turf Ltd. (1969) 8 D.L.R. (3d) 383 and Moore v. Mercator Enterprises Ltd. (1978) 90 D.L.R. (3d) 590.

b
We would agree with Mr. Morison that the existence of a power in the resident agent to bind the foreign corporation to contracts can be neither an exclusive nor conclusive test of the residence of the corporation itself. As he pointed out, there are many cases in which the corporation has been held not to be carrying on business at the agency notwithstanding the existence of authority of this kind: see for example The Princesse Clementine [1897] P. 18; The Lalandia [1933] P. 56 and The Holstein [1936] 2 All E.R. 1660. Conversely, we can conceive hypothetical cases in which it might be absurd to regard the test as conclusive. If in any given case all other factors indicate that the business carried on by the representative of a corporation in a particular country was clearly the business of the corporation (rather than that of its representative), it could make no difference that the corporation required him to take its instructions before he actually concluded contracts on its behalf; the existence of such a requirement would not by itself prevent the corporation from being present in the country concerned and thus from being amenable to the jurisdiction of its courts.

c

d
Nevertheless, it is a striking fact that with one possible exception (The World Harmony [1967] P. 341) in none of the many reported English decisions cited to us has it been held that a corporation has been resident in this country unless either (a) it has a fixed place of business of its own in this country from which it has carried on business through servants or agents, or (b) it has had a representative here who has had the power to bind it by contract and who has carried on business at or from a fixed place of business in this country.

e
We do not find this surprising as a matter of principle. Indubitably a corporation can carry on business in a foreign country by means of an agent. "It may be stated as a general proposition that whatever a person has power to do himself he may do by means of an agent:" Halsbury's Laws of England, 4th ed., vol. 1 (1973), p. 420, para. 703. However, though the terms "agency" and "agent" have in popular use a number of different meanings:

f
   "in law the word 'agency' is used to connote the relation[ship] which exists where one person has an authority or capacity to create legal relations between a person occupying the position of principal and third parties:" Halsbury's Laws of England, vol. 1, p. 418, para. 701.

g
Where the representative of an overseas corporation has general authority to create contractual relations between the corporation and third parties and exercises this authority, there may be little difficulty in applying the maxim "qui facit per alium facit per se." Where no such authority exists, there may be much greater difficulty. We were not persuaded by Mr. Morison's submission, based primarily on a dictum of Verchere J. in Miller v. B. C. Turf Ltd., 8 D.L.R. (3d) 383, 386, that the capacity (or possible capacity) of N.A.A.C. or C.P.C. to render Cape/Capasco vicariously liable for negligence (and thereby to create relations in tort between them and third parties) is of any weight in

h

© An extract from a JUSTIS database

a

deciding whether Cape/Capasco were present in the United States of America. The mere authority given by Cape/Capasco to N.A.A.C. or C.P.C. to convey a message to a third party could render Cape/Capasco potentially liable in tort to a third party if that message was carelessly transmitted. The existence of such potential liability would go no way towards establishing the presence of

b Cape/Capasco in the United States of America.

*General principles derived from the authorities relating to the "presence" issue*

In relation to trading corporations, we derive the three following propositions from consideration of

c the many authorities cited to us relating to the "presence" of an overseas corporation.

(1) The English courts will be likely to treat a trading corporation incorporated under the law of one country ("an overseas corporation") as present within the jurisdiction of the courts of another country only if either (i) it has established and maintained at its own expense (whether as owner or lessee) a fixed place of business of its own in the other country and for more than a minimal period

d of time has carried on its own business at or from such premises by its servants or agents (a "branch office" case), or (ii) a representative of the overseas corporation has for more than a minimal period of time been carrying on the overseas corporation's business in the other country at or from some fixed place of business.

(2) In either of these two cases presence can only be established if it can fairly be said that the

e overseas corporation's business (whether or not together with the representative's own business) has been transacted at or from the fixed place of business. In the first case, this condition is likely to present few problems. In the second, the question whether the representative has been carrying on the overseas corporation's business or has been doing no more than carry on his own business will necessitate an investigation of the functions which he has been performing and all aspects of the relationship between him and the overseas corporation.

f (3) In particular, but without prejudice to the generality of the foregoing, the following questions are likely to be relevant on such investigation: (a) whether or not the fixed place of business from which the representative operates was originally acquired for the purpose of enabling him to act on behalf of the overseas corporation; (b) whether the overseas corporation has directly reimbursed him for (i) the cost of his accommodation at the fixed place of business; (ii) the cost of his staff; (c)

g what other contributions, if any, the overseas corporation makes to the financing of the business carried on by the representative; (d) whether the representative is remunerated by reference to transactions, e.g. by commission, or by fixed regular payments or in some other way; (e) what degree of control the overseas corporation exercises over the running of the business conducted by the representative; (f) whether the representative reserves (i) part of his accommodation, (ii) part of

h his staff for conducting business related to the overseas corporation; (g) whether the representative displays the overseas

© An extract from a JUSTIS database

a

Adams v. Cape Industries Plc. (C.A.)

corporation's name at his premises or on his stationery, and if so, whether he does so in such a way as to indicate that he is a representative of the overseas corporation; (h) what business, if any, the representative transacts as principal exclusively on his own behalf; (i) whether the representative makes contracts with customers or other third parties in the name of the overseas corporation, or

b otherwise in such manner as to bind it; (j) if so, whether the representative requires specific authority in advance before binding the overseas corporation to contractual obligations.

This list of questions is not exhaustive, and the answer to none of them is necessarily conclusive. If the judge, ante, p. 476B-C, was intending to say that in any case, other than a branch office case, the presence of the overseas company can never be established unless the representative has authority to contract on behalf of and bind the principal, we would regard this proposition as too widely

c stated. We accept Mr. Morison's submission to this effect. Every case of this character is likely to involve "a nice examination of all the facts, and inferences must be drawn from a number of facts adjusted together and contrasted:" La Bourgogne [1899] P. 1, 18, per Collins L.J.

Nevertheless, we agree with the general principle stated thus by Pearson J. in F. ▓ K. Jabbour v. Custodian of Israeli Absentee Property [1954] 1 W.L.R. 139, 146:

d

"A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation is carrying on business at the agency is to ascertain whether the agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval . . ."

e

On the authorities, the presence or absence of such authority is clearly regarded as being of great importance one way or the other. A fortiori the fact that a representative, whether with or without prior approval, never makes contracts in the name of the overseas corporation or otherwise in such manner as to bind it must be a powerful factor pointing against the presence of the overseas

f corporation.

The plaintiffs' submissions on the "presence" issue

Ordinarily the three propositions set out above will fall to be applied in the same way whether or not the representative is an individual or itself a corporate body. However, the present case has the

g peculiar feature that one of the representatives in the United States of America, whose acts are relied on as the carrying on of business by Cape, was itself a subsidiary of Cape - a feature which has not been present in any of the directly relevant authorities cited to us. We will make some further observations on the legal relevance, if any, of this feature when we come to consider the second of Mr. Morison's main submissions on the presence issue.

h    These three main submissions were substantially as follows: (1) Cape and Capasco were present and carrying on business in the United States

© An extract from a JUSTIS database

a

of America, namely, marketing and selling the Cape group's asbestos, through N.A.A.C. until May 1978, and through C.P.C. (or Associated Mineral Corporation ("A.M.C."), a Liechtenstein corporation) until June 1979 from a place of business in Illinois because N.A.A.C. and C.P.C. were the agents of Cape. (We will call this "the agency argument"). (2) Cape/Capasco and N.A.A.C.

b
constituted a single commercial unit and for jurisdictional purposes, N.A.A.C.'s presence in Illinois therefore sufficed to constitute the presence of Cape/Capasco. Likewise, Cape/Capasco and C.P.C., which performed the same functions as those previously carried on by N.A.A.C., constituted a single economic unit, and C.P.C.'s presence in Illinois sufficed to constitute the presence of Cape/Capasco. (We will call this "the single economic unit argument"). (3) In relation to C.P.C./A.M.C., the corporate veil should be lifted so that C.P.C.'s and A.M.C.'s presence in the United States of

c
America should be treated as the presence of Cape/Capasco. (We will call this argument, which does not extend to N.A.A.C., "the corporate veil" argument.)

We find it convenient to deal with the second and third of these arguments before coming to the first.

#### The "single economic unit" argument

d

There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities:" The Albazero [1977] A.C. 774, 807, per Roskill L.J.

It is thus indisputable that each of Cape, Capasco, N.A.A.C. and C.P.C. were in law separate legal

e
entities. Mr. Morison did not go so far as to submit that the very fact of the parent-subsidiary relationship existing between Cape and N.A.A.C. rendered Cape or Capasco present in Illinois. Nevertheless, he submitted that the court will, in appropriate circumstances, ignore the distinction in law between members of a group of companies treating them as one, and that broadly speaking, it will do so whenever it considers that justice so demands. In support of this submission, he referred

f
us to a number of authorities.

In The Roberta (1937) 58 Ll.L.R. 159 agents, acting on behalf of the Dordtsche Co., had signed bills of lading. It was conceded at the trial that in so doing the agents had made Walford Lines Ltd., the parent company of Dordtsche Co., responsible for the bills of lading. Langton J., who described the concession as properly made, said, at p. 169:

g

"The Dordtsche Co. are a separate entity from Walford Lines Ltd., in name alone, and probably for the purposes of taxation. Walford Lines Ltd. own all the issued shares of the Dordtsche Co., and in fact supply two out of the three directors."

In Harold Holdsworth & Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R. 352 the question arose whether the respondent company, which had entered into a service agreement with Mr. Caddies

h
under which he was appointed managing director of the company, was entitled to require him to devote his whole time to duties in relation to subsidiaries of the

© An extract from a JUSTIS database

a

company. It was argued that the subsidiary companies were separate legal entities each under the control of its own board of directors, that in law the board of the appellant company could not assign any duties to anyone in relation to the management of the subsidiary companies, and that therefore the agreement could not be construed as entitling them to assign any such duties to Mr.

b Caddies. Lord Reid, in agreement with the majority, rejected this argument, saying, at p. 367:

> "My Lords, in my judgment this is too technical an argument. This is an agreement in re mercatoria and it must be construed in light of the facts and realities of the situation."

In Scottish Co-operative Wholesale Society Ltd. v. Meyer [1959] A.C. 324 the respondent based his

c complaint on section 210 of the Companies Act 1948, which provided:

> "(1) Any member of a company who complains that the affairs of the company are being conducted in a manner oppressive to some part of the members (including himself) . . . may make an application to the court by petition for an order under this section."

d The appellant society had formed a subsidiary company, of which the respondent was a member. It was submitted on behalf of the society that even if it had acted in an oppressive manner, yet it had not conducted the affairs of the company in an oppressive manner within the meaning of the section. The House of Lords unanimously rejected this submission. Lord Simonds said, at p. 342:

> "My Lords, it may be that the acts of the society of which complaint is made could not be

e regarded as conduct of the affairs of the company if the society and the company were bodies wholly independent of each other, competitors in the rayon market, and using against each other such methods of trade warfare as custom permitted. But this is to pursue a false analogy. It is not possible to separate the transactions of the society from those of the company. Every step taken by the latter was determined by the policy of the former."

f A little later, at p. 343, Lord Simonds expressly approved words which had been used by Lord President Cooper on the first hearing of the case:

> "In my view, the section warrants the court in looking at the business realities of a situation and does not confine them to a narrow legalistic view."

g In D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [1976] 1 W.L.R. 852 a group of three companies, "D.H.N.," "Bronze" and "Transport," all in voluntary liquidation at the relevant time, were seeking compensation under the Land Compensation Act 1961 following a compulsory purchase made by the respondent council. D.H.N. held all the shares in Bronze and Transport. The business of the group was owned by D.H.N. The land was owned by Bronze. The

h vehicles were owned by Transport. The Lands Tribunal held that D.H.N. were licensees of Bronze and had no claim to compensation for

© An extract from a JUSTIS database

a

disturbance beyond that which could be allowed under section 20 of the Compulsory Purchase Act 1965, which was negligible. This court allowed D.H.N.'s appeal on three separate grounds. We are concerned with only one of them, which Lord Denning M.R. explained, at p. 860:

b

"Third, lifting the corporate veil. A further very interesting point was raised by Mr. Dobry on company law. We all know that in many respects a group of companies are treated together for the purpose of general accounts, balance sheet, and profit and loss account. They are treated as one concern. Professor Gower in Modern Company Law, 3rd ed. (1969), p. 216 says: 'there is evidence of a general tendency to ignore the separate legal entities of various companies within a group, and to look instead at the economic entity of the whole group.' This is especially the case

c

when a parent company owns all the shares of the subsidiaries - so much so that it can control every movement of the subsidiaries. These subsidiaries are bound hand and foot to the parent company and must do just what the parent company says. A striking instance is the decision of the House of Lords in Harold Holdsworth ▦ Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R. 352. So here. This group is virtually the same as a partnership in which all the three companies

d

are partners. They should not be treated separately so as to be defeated on a technical point. They should not be deprived of the compensation which should justly be payable for disturbance. The three companies should, for present purposes, be treated as one, and the parent company D.H.N. should be treated as that one. So D.H.N. are entitled to claim compensation accordingly. It was not necessary for them to go through a conveyancing device to get it."

e

Goff L.J. said at p. 861:

"this is a case in which one is entitled to look at the realities of the situation and to pierce the corporate veil. I wish to safeguard myself by saying that so far as this ground is concerned, I am

f

relying on the facts of this particular case. I would not at this juncture accept that in every case where one has a group of companies one is entitled to pierce the veil, but in this case the two subsidiaries were both wholly owned; further, they had no separate business operations whatsoever; thirdly, in my judgment, the nature of the question involved is highly relevant, namely, whether the owners of this business have been disturbed in their possession and enjoyment of it."

g

In Revlon Inc. v. Cripps ▦ Lee Ltd. [1980] F.S.R. 85 the question (among many other questions) arose as to whether the goods in question were "connected in the course of trade with the proprietor . . . of the trade mark" within the meaning of section 4(3) of the Trade Marks Act 1938." The proprietor of the trade mark was Revlon Suisse S.A., a subsidiary of Revlon Inc. Buckley L.J., in

h

the course of deciding that the goods were connected in the course of trade with Revlon Suisse S.A., said, at p. 105:

© An extract from a JUSTIS database

a

"Since, however, all the relevant companies are wholly owned subsidiaries of Revlon, it is undoubted that the mark is, albeit remotely, an asset of Revlon and its exploitation is for the ultimate benefit of no one but Revlon. It therefore seems to me to be realistic and wholly justifiable to regard Suisse as holding the mark at the disposal of Revlon and for Revlon's benefit.

b
The mark is an asset of the Revlon group of companies regarded as a whole, which all belongs to Revlon. This view does not, in my opinion, constitute what is sometimes called 'piercing the corporate veil;' it recognises the legal and factual position resulting from the mutual relationship of the various companies."

c
Principally, in reliance on those authorities and the case next to be mentioned, Mr. Morison submitted that in deciding whether a company had rendered itself subject to the jurisdiction of a foreign court it is entirely reasonable to approach the question by reference to "commercial reality." The risk of litigation in a foreign court, in his submission, is part of the price which those who conduct extensive business activities within the territorial jurisdiction of that court properly have to pay. He invited us to follow the approach of Advocate General Warner in Istituto Chemioterapico

d
Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European Communities (Cases 6 and 7/73) [1974] E.C.R. 223 when considering whether a parent company and subsidiary were separate "undertakings" within the meaning of articles 85 and 86 of the E.E.C. Treaty. He said, at p. 263:

e
"One starts to my mind from this, that neither article 85 nor article 86 anywhere refers to 'persons.' In both articles the relevant prohibitions are directed to 'undertakings,' a much wider and looser concept. This indeed is what one would expect, because it would be inappropriate to apply rigidly in the sphere of competition law the doctrine referred to by English lawyers as that of Salomon v. A. Salomon ▩ Co. Ltd. [1897] A.C. 22 - i.e. the doctrine that every company is a

f
separate legal person that cannot be identified with its members. Basically that doctrine exists in order to preserve the principle of limited liability. It is concerned with the rights of creditors in the context of company law. It has been applied, with more or less happy results, in other spheres, such as those of conveyancing, of contracts and of liability for tort. But to export it blindly into branches of the law where it has little relevance, could, in my opinion, serve only to divorce the law from reality.

g
"Suppose my Lords, that C.S.C. had traded in Italy through a branch office. There could have been no doubt then that it was amenable to the jurisdiction of the Commission and of this court. Could it have made any difference if C.S.C. has chosen to trade in Italy through a wholly owned subsidiary? The difference would have been one only of legal form, not of reality. Why then should it make any difference that it chose to trade in Italy through a subsidiary that it controlled

h
by a 51 per cent. majority rather than by a 100 per cent. majority? What matters in this field, in my view, is control . . . "

© An extract from a JUSTIS database

a

Adams v. Cape Industries Plc. (C.A.)

Advocate General Warner said, at p. 264:

b

"(1) that there is a presumption that a subsidiary will act in accordance with the wishes of its parent because according to common experience subsidiaries generally do so act; (2) that, unless that presumption is rebutted, it is proper for the parent and the subsidiary to be treated, as a single undertaking for the purposes of articles 85 and 86 of the E.E.C. Treaty . . ."

We have some sympathy with Mr. Morison's submissions in this context. To the layman at least the distinction between the case where a company itself trades in a foreign country and the case c where it trades in a foreign country through a subsidiary, whose activities it has full power to control, may seem a slender one. Mr. Morison referred us to Bulova Watch Co. Inc. v. K. Hattori Co. Ltd. (1981) 508 F. Supp. 1322, where the United States District Court held that it had jurisdiction over a Japanese corporation which was expanding into a new market by setting up subsidiaries and dealing with competition, both on the theory that the corporation was "doing business" in New York and under the New York "long-arm statute." In the course of his judgment, d Weinstein C.J. said, at p. 1342: "these subsidiaries almost by definition are doing for their parent what their parent would otherwise have to do on its own." It is not surprising that in many cases such as Holdsworth [1955] 1 W.L.R. 352, Scottish Co-operative [1959] A.C. 324, Revlon [1980] F.S.R. 85 and Commercial Solvents [1974] E.C.R. 223, the wording of a particular statute or contract has been held to justify the treatment of parent and subsidiary as one unit, at least for some e purposes. The relevant parts of the judgments in the D.H.N. case [1976] 1 W.L.R. 852 must, we think, likewise be regarded as decisions on the relevant statutory provisions for compensation, even though these parts were somewhat broadly expressed, and the correctness of the decision was doubted by the House of Lords in Woolfson v. Strathclyde Regional Council, 1978 S.L.T. 159 in a passage which will be quoted below.

f

Mr. Morison described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As Sir Godfray submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the g creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.

In deciding whether a company is present in a foreign country by a subsidiary, which is itself present in that country, the court is entitled, indeed bound, to investigate the relationship between the h parent and the subsidiary. In particular, that relationship may be relevant in determining whether the subsidiary was acting as the parent's agent and, if so, on

© An extract from a JUSTIS database

a

what terms. In Firestone Tyre and Rubber Co. Ltd. v. Lewellin [1957] 1 W.L.R. 464 (which was referred to by Scott J.) the House of Lords upheld an assessment to tax on the footing that, on the facts, the business both of the parent and subsidiary were carried on by the subsidiary as agent for the parent. However, there is no presumption of any such agency. There is no presumption that the subsidiary is the parent company's alter ego. In the court below the judge, ante, p. 484B, refused an invitation to infer that there existed an agency agreement between Cape and N.A.A.C. comparable to that which had previously existed between Cape and Capasco and that refusal is not challenged on this appeal. If a company chooses to arrange the affairs of its group in such a way that the business carried on in a particular foreign country is the business of its subsidiary and not its own, it is, in our judgment, entitled to do so. Neither in this class of case nor in any other class of case is it open to this court to disregard the principle of Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22 merely because it considers it just so to do.

b

c

In support of the single commercial unit argument, Mr. Morison made a number of factual submissions to the following effect: the purpose of N.A.A.C.'s creation was that it might act as a medium through which goods of the Cape group might be sold. The purpose of the liquidation of N.A.A.C. was likewise to protect Cape. Any major policy decisions concerning N.A.A.C. were taken by Cape. Cape's control over N.A.A.C. did not depend on corporate form. It exercised the same degree of control both before and after the removal of the Cape directors from the N.A.A.C. board. The functions of N.A.A.C.'s directors were formal only. Dr. Gaze effectively controlled its activities. Cape represented N.A.A.C. to its customers as its office in the United States of America. In broad terms, it was submitted, Cape ran a single integrated mining division with little regard to corporate formalities as between members of the group in the way in which it carried on its business.

d

e

The plaintiffs further submitted in their notice of appeal that N.A.A.C. "did not deal and was not permitted to deal with Egnep or Casap, but had to go through Cape or Capasco." It seems clear that N.A.A.C., as principal, made direct purchases of raw asbestos from Egnep. On the balance of probabilities, we accept the plaintiffs' submission that it made similar direct purchases from Casap. In referring to the absence of dealing with Egnep or Casap, the plaintiffs were, we understand, intending to submit that as a matter of group policy, which Cape could and did enforce by its power of control over the boards of Egnep, Capasco and N.A.A.C., the transmission of information and orders to or from customers had to be effected and was effected by N.A.A.C. through Capasco. We accept that submission. We also accept that the matters referred to in this paragraph lend some broad support to the submission that Cape ran a single integrated mining division with little regard to corporate formalities as between members of the group. However, there has been no challenge to the judge's finding that the corporate forms applicable to N.A.A.C. as a separate legal entity were observed.

f

g

h

© An extract from a JUSTIS database

a

As to the plaintiffs' other factual submissions in this context we will deal with the purpose of N.A.A.C.'s creation and existence in considering the "agency" argument. As to the relationship between Cape and N.A.A.C., it is of the very nature of a parent company-subsidiary relationship that the parent company is in a position, if it wishes, to exercise overall control over the general policy

b of the subsidiary. The plaintiffs, however, submitted that Cape's control extended to the day-to-day running of N.A.A.C. They challenged the finding of fact made by Scott J. that "Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business." We explore further the facts relative to this finding and to the extent of Cape's control over N.A.A.C.'s activities in the appendix to this judgment. Our conclusion, shortly stated, is that the finding was justified by the evidence. A degree

c of overall supervision, and to some extent control, was exercised by Cape over N.A.A.C. as is common in the case of any parent-subsidiary relationship - to a large extent through Dr. Gaze. In particular, Cape would indicate to N.A.A.C. the maximum level of expenditure which it should incur and would supervise the level of expenses incurred by Mr. Morgan. Mr. Morgan knew that he had to defer in carrying out the business activities of N.A.A.C. to the policy requirements of Cape as the controlling shareholders of N.A.A.C. Within these policy limits, such as Cape's requirement that

d N.A.A.C.'s orders for asbestos for sale by N.A.A.C. in the United States of America be placed through Capasco on behalf of Egnep and Casap, the day-to-day running of N.A.A.C. was left to him. There is no challenge to the judge's findings that (a) the corporate financial control exercised by Cape over N.A.A.C. in respect of the level of dividends and the level of permitted borrowing was no more and no less than was to be expected in a group of companies such as the Cape group, ante,

e p. 474A–B; (b) the annual accounts of N.A.A.C. were drawn on the footing that N.A.A.C.'s business was its own business and there was nothing to suggest that the accounts were drawn on a false footing, ante, p. 484A–B.

In the light of the set up and operations of the Cape group and of the relationship between Cape/Capasco and N.A.A.C. we see the attraction of the approach adopted by Lord Denning M.R. in

f the D.H.N. case [1976] 1 W.L.R. 852, 860c, which Mr. Morison urged us to adopt: "This group is virtually the same as a partnership in which all the three companies are partners." In our judgment, however, we have no discretion to reject the distinction between the members of the group as a technical point. We agree with Scott J. that the observations of Robert Goff L.J. in Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45, 64, are apposite:

g  "[Counsel] suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot here be bridged."

h  As to C.P.C., in Mr. Morison's submission, the replacement of N.A.A.C. by C.P.C. was simply a substitute arrangement. The creation

© An extract from a JUSTIS database

a

of C.P.C. was affected and paid for by Cape so that it could perform the same functions on behalf of Cape as N.A.A.C. had previously performed. C.P.C., on behalf of A.M.C. (and thus Cape) made payment arrangements with third parties and received moneys for A.M.C. (Cape). While Mr. Morgan

b held all the shares in C.P.C. for his own benefit, the rights of pre-emption reserved to A.M.C. by the agency agreement of 5 June 1978 left him with little substantial financial interest in C.P.C.'s business, save for the office furniture and a right to an account which would be of little value; effectively, it was submitted, C.P.C.'s business was owned by A.M.C. (Cape).

Our reasons for rejecting the "single economic unit" argument in relation to N.A.A.C. apply a fortiori in relation to C.P.C., because C.P.C. was not Cape's subsidiary and its shares were held by Mr. Morgan for his own benefit. We give our reasons in the next section of this judgment for

c agreeing with the judge that C.P.C. was an independently owned company.

The "corporate veil" point

Quite apart from cases where statute or contract permits a broad interpretation to be given to references to members of a group of companies, there is one well-recognised exception to the rule

d prohibiting the piercing of "the corporate veil." Lord Keith of Kinkel referred to this principle in Woolfson v. Strathclyde Regional Council, 1978 S.L.T. 159 in the course of a speech with which Lord Wilberforce, Lord Fraser of Tullybelton and Lord Russell of Killowen agreed. With reference to the D.H.N. decision [1976] 1 W.L.R. 852, he said, at p.161:

e "I have some doubts whether in this respect the Court of Appeal properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts."

The only allegation of a façade in the plaintiffs' pleadings was that the formation and use of C.P.C. and A.M.C. in the

f

"alternative marketing arrangements of 1978 were a device or sham or cloak for grave impropriety on the part of Cape or Capasco, namely to ostensibly remove their assets from the United States of America to avoid liability for asbestos claims whilst at the same time continuing to trade in asbestos there."

g In their notice of appeal (paragraph 2(b)) the plaintiffs referred to their contention made at the trial that C.P.C. "was set up to replace N.A.A.C. in such a way as to disguise the defendants' continued involvement in the marketing of the group's asbestos in the United States of America."

Scott J. more or less accepted this contention. He found as a fact, ante, p. 478F:

h "the arrangements made regarding N.A.A.C., A.M.C. and C.P.C. were part of one composite arrangement designed to enable Cape asbestos to continue to be sold into the United States while

© An extract from a JUSTIS database

reducing, if not eliminating, the appearance of any involvement therein of Cape or its subsidiaries."

However, he went on to say, ante, p. 479B–C:

b

"But the question whether C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as Cape's presence, must, in my view, be answered by considering the nature of the arrangements that were implemented, not the motive behind them. The documentary evidence I have seen has made clear that the senior management of Cape, including Mr. Penna, were very anxious that Cape's connections with C.P.C. and with A.M.C. should not become publicly known. Some of the letters and memoranda have a somewhat conspiratorial flavour to them. But this too, although interesting to notice, is not, in my opinion, relevant to the main question."

c

If and so far as the judge intended to say that the motive behind the new arrangements was irrelevant as a matter of law, we would respectfully differ from him. In our judgment, as Mr. Morison submitted, whenever a device or sham or cloak is alleged in cases such as this, the motive of the alleged perpetrator must be legally relevant, and indeed this no doubt is the reason why the question of motive was examined extensively at the trial. The decision in Jones v. Lipman [1962] 1 W.L.R. 832 referred to below was one case where the proven motive of the individual defendant clearly had a significant effect on the decision of Russell J.

d

The judge's finding of fact quoted above as to the motives of Cape behind the new arrangements is accepted (no doubt welcomed) by the plaintiffs, so far as it goes. They submit, rightly in our judgment, that any such motives are relevant to the "corporate veil" point. They further submit that the judge (a) erred in concluding that C.P.C. was an "independently owned company;" and (b) failed to make a number of findings of fact which are relevant in the context of the "corporate veil" point.

e

Mr. Morison has taken us through the arrangements which led to the extinction of N.A.A.C. and the emergence of A.M.C. and C.P.C. with care and in considerable detail. The additional facts which the plaintiffs say the judge ought to have found, and which are set out in the appendix to this judgment, all relate to these arrangements. It is true that, as the judge said, some of the letters and memoranda have a "somewhat conspiratorial flavour to them." Since, contrary to the judge's view, we think motive is relevant in this context, we have thought it right to investigate these contentions in some detail in the appendix.

f

On analysis, much of the new material does little more than amply support the judge's finding quoted above as to the purpose of the composite arrangement. In this court Mr. Morison made it clear that the plaintiffs were not alleging any unlawful purpose or impropriety on the part of Cape in the sense of any intention to deceive or to do any unlawful act, either in Illinois or in this country. It was, however, asserted for the plaintiffs that A.M.C. and C.P.C. together constituted a façade which concealed the real activities of Cape. We understand that

g

h

© An extract from a JUSTIS database

a

to mean that the purpose of Cape was to conceal, so far as it lawfully could having regard to the requirements of the law in Illinois and this country, any connection of Cape with A.M.C. or C.P.C.

Before expressing our own views as to Cape's purpose, we will state our conclusions as to Mr.
b Morgan's position. It is, in our judgment, right to infer, substantially as submitted by Mr. Morison, that the assistance derived from the presence of Mr. Morgan in Illinois, undertaking the task through C.P.C. of marketing agent for the Cape subsidiaries in the United States, was regarded as being at least of great importance to the general purposes of the Cape group, and possibly essential for those purposes, because, if it was not so regarded, there is no apparent reason why Cape should assume
c the cost and such risk as might have arisen from setting up C.P.C. Sir Godfray, however, was in our view plainly right in submitting that the agreement of Mr. Morgan was required for the creation of the alternative marketing arrangements by means of a new independent Illinois company and that his agreement, when given, was real. Cape had obligations of a moral nature to Mr. Morgan and to the long serving staff of N.A.A.C. Cape also, for its own purposes, wanted Mr. Morgan and Mrs. Holtze
d to continue with the work previously done by them for N.A.A.C. If Mr. Morgan decided to take on the task of providing services to the subsidiaries of the Cape group through C.P.C., on the terms available to him as owner of the shares in C.P.C., Cape would get the benefit of his knowledge and experience as the person in charge of C.P.C. Nothing in the material to which our attention was drawn under these headings, however, causes us to doubt the correctness of Scott J.'s conclusion that
e the shares in C.P.C. belonged both at law and in equity to Mr. Morgan. It is clear that Cape intended C.P.C. to be in reality Mr. Morgan's company because that was part of their purpose. Such as it was, and dependent for almost all of its business on the Cape subsidiaries, C.P.C. was Mr. Morgan's company. We therefore reject the challenge to the judge's finding that C.P.C. was an independently owned company.

f    As to Cape's purpose in making the arrangements for the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C., we think that the extracts from the evidence set out in the appendix to this judgment (particularly under item (17)), sufficiently reveal both the substance of what the officers of Cape were doing and what they were trying to achieve. The allegation of impropriety was, in our view, rightly abandoned. The inference which we draw from all the evidence was that Cape's
g intention was to enable sales of asbestos from the South African subsidiaries to continue to be made in the United States while (a) reducing the appearance of any involvement therein of Cape or its subsidiaries, and (b) reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for United States taxation or subject to the jurisdiction of the United States courts, whether state or federal, and the risk of any default judgment by such a
h court being held to be enforceable in this country. Inference (a) was also made by the judge. Inference (b) is our own addition.

© An extract from a JUSTIS database

a

The question of law which we now have to consider is whether the arrangements regarding N.A.A.C., A.M.C. and C.P.C. made by Cape with the intentions which we have inferred constituted a façade such as to justify the lifting of the corporate veil so as that C.P.C.'s and A.M.C.'s presence in the United States of America should be treated as the presence of Cape/Capasco for this reason if no other.

b

In Merchandise Transport Ltd. v. British Transport Commission [1962] 2 Q.B. 173, 206-207, Danckwerts L.J. referred to certain authorities as showing:

"where the character of a company, or the nature of the persons who control it, is a relevant feature the court will go behind the mere status of the company as a legal entity, and will consider who are the persons as shareholders or even as agents who direct and control the activities of a company which is incapable of doing anything without human assistance."

c

The correctness of this statement has not been disputed, but it does not assist in determining whether "the character of a company or the nature of the persons who control it" will be relevant in the present case.

d

Rather greater assistance on this point is to be found in Jones v. Lipman [1962] 1 W.L.R. 832. In that case the first defendant had agreed to sell to the plaintiffs some land. Pending completion the first defendant sold and transferred the land to the defendant company. The evidence showed that this company was at all material times under the complete control of the first defendant. It also showed that the acquisition by him of the company and the transfer of the land to the company had been carried through solely for the purpose of defeating the plaintiff's right to specific performance: see at p. 836. Russell J. made an order for specific performance against both defendants. He held that specific performance cannot be resisted by a vendor who, by his absolute ownership and control of a limited company in which the property is vested, is in a position to cause the contract to be completed. As to the defendant company, he described it, at p. 836, as being

e

f

"the creature of the first defendant, a device and a sham, a mask which he holds before his face in an attempt to avoid recognition by the eye of equity."

Following Jones v. Lipman, we agree with Mr. Morison that, contrary to the judge's view, where a façade is alleged, the motive of the perpetrator may be highly material.

g

Other cases were cited to us in which the court, on interlocutory applications, has to a greater or lesser extent been prepared to look behind the corporate veil and have regard to the persons ultimately interested in a company under a group's company structure. For example, it did so in exercising its Mareva injunction in X Bank Ltd. v. G. (1985) 82 L.S.G. 2016 and in considering stays of execution in Canada Enterprises Corporation Ltd. v. MacNab Distillers Ltd. (Note) [1987] 1 W.L.R. 813 and Burnet v. Francis Industries Plc. [1987] 1 W.L.R. 802. The two last-mentioned decisions contain no statement of relevant principle and the report of X Bank Ltd. v. G. is so brief that we think it would not be safe to rely on it for present purposes.

h

© An extract from a JUSTIS database

a

We were referred to certain broad dicta of Lord Denning M.R. in Wallersteiner v. Moir [1974] 1 W.L.R. 991, 1013, and in Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners [1969] 1 W.L.R. 1241, 1254. In both these cases he expressed his willingness to pull aside the corporate veil, saying in the latter:

b

"I decline to treat the [subsidiary] as a separate and independent entity. . . . The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. The legislature has shown the way with group accounts and the rest. And the courts should follow suit. I think that we should look at the Fork Manufacturing Co. Ltd. and see

c

it as it really is - the wholly-owned subsidiary of Littlewoods. It is the creature, the puppet, of Littlewoods, in point of fact: and it should be so regarded in point of law."

However, in Wallersteiner v. Moir [1974] 1 W.L.R. 991 Buckley L.J., at p. 1027, and Scarman L.J., at p. 1032, expressly declined to tear away the corporate veil. In the Littlewoods case [1969] 1

d

W.L.R. 1241, 1255, Sachs L.J. expressly dissociated himself from the suggestion that the subsidiary was not a separate legal entity and Karminski L.J. refrained from associating himself with it. We therefore think that the plaintiffs can derive little support from those dicta of Lord Denning M.R.

From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve

e

a façade within the meaning of that word as used by the House of Lords in Woolfson, 1978 S.L.T. 159. We will not attempt a comprehensive definition of those principles.

Our conclusions are these. In our judgment, the interposition of A.M.C. between Cape and C.P.C. was clearly a façade in the relevant sense. Scott J., ante, p. 479E, said it seemed clear that A.M.C. was "no more than a corporate name" and that he would expect to find, if all the relevant documents were available, that "A.M.C. acted through employees or officers of either Casap or Egnep." He

f

rejected, ante, p. 482A, Mr. Morgan's evidence that he understood A.M.C. to be an independent South African trading company, and was satisfied that he knew very well that it was a "creature of Cape." "The seller in C.P.C.'s time was, nominally, A.M.C. but in reality still, I think, Egnep or Casap:" ante, p. 482E. In our judgment, however, the revelation of A.M.C. as the creature of Cape does not suffice to enable the plaintiffs to show the presence of Cape/Capasco in the United States

g

of America, since on the judge's undisputed findings, A.M.C. was not in reality carrying on any business in the United States of America.

The relationship between Cape/Capasco and C.P.C. is the crucial factor, since C.P.C. was undoubtedly carrying on business in the United States of America. We have already indicated our acceptance of the judge's findings that C.P.C. was a company independently owned by Mr. Morgan

h

and that the shares therein belonged to him in law and in equity. These findings by themselves make it very difficult to contend that the operation of C.P.C. involved a façade which entitles the court

© An extract from a JUSTIS database

a

to pierce the corporate veil between C.P.C. and Cape/Capasco and treat them all as one. Is the legal position altered by the facts that Cape's intention, in making the relevant arrangements (as we infer), was to enable sales of asbestos from the South African subsidiaries to be made while (a) reducing if not eliminating the appearance of any involvement therein of Cape or its subsidiaries, and (b)

b reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for United States taxation or subject to the jurisdiction of the United States courts and the risk of any default judgment by such a court being held to be enforceable in this country?

We think not. Mr. Morison submitted that the court will lift the corporate veil where a defendant

c by the device of a corporate structure attempts to evade (i) limitations imposed on his conduct by law; (ii) such rights of relief against him as third parties already possess; and (iii) such rights of relief as third parties may in the future acquire. Assuming that the first and second of these three conditions will suffice in law to justify such a course, neither of them apply in the present case. It is not suggested that the arrangements involved any actual or potential illegality or were intended to

d deprive anyone of their existing rights. Whether or not such a course deserves moral approval, there was nothing illegal as such in Cape arranging its affairs (whether by the use of subsidiaries or otherwise) so as to attract the minimum publicity to its involvement in the sale of Cape asbestos in

) the United States of America. As to condition (iii), we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a

e corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the group (and correspondingly the risk of enforcement of that liability) will fall on another member of the group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law. Mr. Morison urged on us that the purpose of the operation was in substance that Cape would have the practical benefit of the group's asbestos trade in the United

f States of America without the risks of tortious liability. This may be so. However, in our judgment, Cape was in law entitled to organise the group's affairs in that manner and (save in the case of A.M.C. to which special considerations apply) to expect that the court would apply the principle of Salomon v. A. Salomon ≡ Co. Ltd. [1897] A.C. 22 in the ordinary way.

The plaintiffs submitted (paragraph 7 of their notice of appeal) that the motive of the defendants in

g setting up the arrangements regarding N.A.A.C., A.M.C. and C.P.C. as revealed in the documentary evidence were "consistent only with an acceptance by Cape that they were present in the United States through N.A.A.C. and C.P.C." We think there is no substance in this point. These arrangements at most indicated an apprehension on the part of the defendants that they might be held to be so present and a desire that they should not be. They involved no admission or

h acceptance of such presence.

We reject the "corporate veil" argument.

© An extract from a JUSTIS database

a

The "agency argument" in relation to N.A.A.C.

We now proceed to consider the agency argument in relation to N.A.A.C. on the footing, which we consider to be the correct one, that N.A.A.C. must for all relevant purposes be regarded as a

b legal entity separate from Cape/Capasco. In an earlier section of this judgment we summarised three propositions which we derived from the authorities relating to the "presence" of an overseas corporation. There we stated that, save in a "branch office" case (which the instant case is not), the English court will be likely to treat an overseas trading corporation as present within the jurisdiction of the courts of another country only if a representative of the overseas corporation has for more

c than a minimal period of time been carrying on the overseas corporation's business in the other country at or from some fixed place of business. In the present case N.A.A.C., as representative of Cape/Capasco, unquestionably carried on business at a fixed place of business in the United States of America, 150, North Wacker Drive, for a substantial period of time. So no difficulty arises on that score. The crucial question is whether it can fairly be said that Cape's business has been transacted by N.A.A.C. at or from 150, North Wacker Drive. The judge's answer to it was that

d "N.A.A.C.'s business was its own business and not the business of Cape or Capasco:" ante, p. 477E-F. The plaintiffs challenge the correctness of this answer to the question.

This question, as we said earlier, will necessitate an investigation of the functions which N.A.A.C. performed and all aspects of the relationship between it and Cape.

The factual material which we have principally in mind in considering whether Cape's business was

e being transacted at or from 150, North Wacker Drive is to be found in the section of this judgment headed, "The facts on 'presence' as found by Scott J.," and in our observations in the appendix to this judgment. We summarise below what we consider the most material facts in context, having regard to the list of potentially relevant factors set out in an earlier section of our judgment.

We accept that the intention of Cape in procuring the incorporation of N.A.A.C. in the State of

f Illinois was that N.A.A.C. should assist in the marketing of asbestos in the United States of America upon sales by Egnep or Casap to purchasers in the United States of America and that it was to be the marketing agent of the Cape group in the United States of America. Nevertheless, in our judgment, it is indisputable that at very least a substantial part of the business carried on by N.A.A.C at all material times was in every sense its own business. In these contexts we draw attention in particular to the following facts.

g (1) Though we were referred to no evidence relating to the original acquisition by N.A.A.C. of its premises at 150, North Wacker Drive, we know that N.A.A.C. itself was the lessee of the premises and paid the rent for them. Furthermore, it owned the office furniture and employed there its own staff of four persons for whom it ran its own pension scheme.

(2) From time to time it conducted the following activities as principal on its own account: (a) it

h bought asbestos from United States government stocks or from Egnep or Casap and sold it to United States

© An extract from a JUSTIS database

Adams v. Cape Industries Plc. (C.A.)

a

customers, such purchases representing about 25 per cent. of N.A.A.C.'s business in terms of tonnage; (b) it imported asbestos goods from Japan and sold them to United States customers. (While we accept that the purchase by N.A.A.C. of asbestos goods was subordinate to its business with or for Cape's subsidiaries, we do not accept the plaintiffs' submission that such sales were

b trivial, having regard to the turnover of N.A.A.C.)

(3) For storing the asbestos which it has purchased from United States Government stocks or Egnep or Casap, N.A.A.C. rented in its own name and paid for warehousing facilities.

(4) N.A.A.C. earned profits and paid United States taxes thereon.

(5) N.A.A.C.'s creditors and debtors were its own (not those of Cape).

c
(6) The return to Cape as N.A.A.C.'s shareholder took the form of an annual dividend passed by a resolution of N.A.A.C.'s board of directors.

(7) In other respects also the corporate forms applicable to N.A.A.C. as a separate entity were observed.

In the face of these facts, now unchallenged, it is in our judgment clear beyond argument that N.A.A.C. was carrying on business of its own. The only question is whether, in performing the

d functions which it performed on behalf of Cape/Capasco, it was carrying on its own business or their business. What, then, were these functions? As we see the position from the findings of the judge and the evidence put before us, its functions were to assist in the marketing of asbestos in the United States of America upon sales by Egnep or Casap and generally to assist and encourage sales in the United States of America of asbestos of the Cape group. It acted as the channel of

e communication between Cape/Capasco and United States customers, such as P.C.C. It organised and arranged the performance of contracts between United States customers and Egnep. It had a co-ordinating role, particularly in arranging delivery. The United States customer would specify to N.A.A.C. from time to time the quantity of asbestos which it wished to purchase and the time when it desired delivery to be made. This information would be conveyed through N.A.A.C. to Casap and

f Egnep. Shipping arrangements and delivery dates would be arranged by Casap or Egnep and communicated to the United States customers via N.A.A.C. N.A.A.C. would receive documents and pass them on to the customers. It also received requests and complaints which it would normally pass on to Capasco. Generally it assisted in "nursing" the group's customers for asbestos and ensuring that they were satisfied. For its services N.A.A.C. was remunerated by way of a commission paid to it by Casap on sales effected by Egnep or Casap. There was no evidence that

g N.A.A.C. reserved any part of its office premises or any part of its staff exclusively for performing its agency functions.

Our further findings as to the functions which N.A.A.C. performed and as to its relationship between N.A.A.C. and Cape are to be found set out in the appendix. We bear in mind particularly the submissions contained in item (9) that (i) when corresponding with United States customers,

h Cape referred to N.A.A.C. as "our Chicago office" and N.A.A.C. referred to Cape and Capasco as "our London office;"

© An extract from a JUSTIS database

a

(ii) N.A.A.C. held itself out to a large United States customer as being part of the Cape selling organisation, and (iii) N.A.A.C. was treated by the major customer "as the channel between them and Cape and Capasco." However, in the appendix we give our reasons for concluding that the matters shown in the evidence considered under this heading do not by themselves show anything

b inconsistent with the findings of Scott J. as to N.A.A.C.'s role and functions.

There is no doubt that the services rendered by N.A.A.C. in acting as intermediary in respect of contracts between the United States customers and Egnep or Casap were active and important services which were of great assistance to Cape/Capasco in arranging the sales of their group's asbestos in the United States of America. Nevertheless, for all the closeness of the relationship

c between Cape/Capasco and N.A.A.C., strictly defined limits were imposed on the functions which N.A.A.C. were authorised to carry out or did carry out as their representative. First, N.A.A.C. had no general authority to bind Cape/Capasco to any contractual obligation. Secondly, as Mr. Morison expressly accepted, there is no evidence that N.A.A.C., whether with or without prior authority from Cape/Capasco, ever effected any transaction in such manner that Cape/Capasco thereby became subject to contractual obligations to any person. This significant factor renders the arguments in

d favour of "presence," at least in some respects, even less strong than they were in cases such as The Lalandia [1933] P. 56 and The Holstein [1936] 2 All E.R. 1660 where the argument failed. Having regard to the legal principles stated earlier in this judgment, and looking at the facts of the case overall, our conclusion is that the judge was right to hold that the business carried on by N.A.A.C. was exclusively its own business, not the business of Cape or Capasco, and that Cape and Capasco

e were not present within the United States of America, through N.A.A.C. at any material time. We see no sufficient grounds for disturbing this finding of fact.

Under this section of our judgment we should mention one further point. The plaintiffs challenged the judge's finding that as from 31 January 1978, N.A.A.C. ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating

f its assets. The object of the challenge was to refute the suggestion that Cape could not be regarded as present in the United States of America during the period between 31 January 1978 and N.A.A.C.'s formal dissolution on 19 May 1978. (They accepted that after 19 May Cape could not be said to be present in the United States of America, by or through N.A.A.C.) The plaintiffs regard this point as having potential legal relevance, since two of the eight actions which comprise Tyler 2 were begun before 18 May 1978. In the appendix we give our reasons for rejecting

g the challenge to the judge's finding of fact.

The agency argument in relation to C.P.C.

We now consider whether Cape/Capasco were present in the United States of America by or

h through C.P.C. In dealing with the "corporate veil" point we have stated our inferences as to Cape's purpose in making

© An extract from a JUSTIS database