a

the arrangements for the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C. Part of the very purpose of these arrangements was to enable sales of asbestos from the Cape group to continue to be made in the United States of America while creating a greater distance both in appearance and reality between Cape and the company (C.P.C.) which was intended to carry out the functions on its

b behalf in the United States of America which had previously been carried out by N.A.A.C. Having dealt with the "corporate veil" point, we agree with the following passage in Scott J.'s judgment, ante, p. 482D-F:

c

"I do not think, on analysis, that the plaintiffs' case is any stronger than their case regarding N.A.A.C. If anything, I think the case is weaker. N.A.A.C. was at least a wholly owned subsidiary. C.P.C., even if incorporated and launched with Cape money, was, on my reading of the facts, an independently owned company. Like N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the sale in the United States of Cape's asbestos. The seller of the asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think, Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind Egnep,

d Casap or any other of the Cape subsidiaries to any contract, C.P.C., like N.A.A.C., carried on its own business from its own offices at 150, North Wacker Drive. The provision by Cape of the $160,000 as a starting-up fund does not make the offices Cape's offices or the business Cape's business."

e   The interposition of A.M.C. in the new arrangements made in 1978 cannot one way or the other affect the question whether Cape/Capasco were present in the United States of America thereafter. For all relevant purposes, as we have already indicated, we are prepared to treat Cape and A.M.C. as one. The functions performed by C.P.C. and its relationship with Cape through A.M.C. are the relevant considerations for present purposes. Since Mr. Morgan held all the shares in C.P.C.

f beneficially, Cape had no control as a shareholder over the activities of C.P.C. similar to the control which it had exercised over N.A.A.C. Mr. Morison did not dispute the judge's finding that the terms of the agency agreement of 5 June 1978 were a reliable guide to the nature of the relationship between C.P.C. and A.M.C. and hence between C.P.C. and Cape. Under the terms of this agreement, C.P.C. were left free to sell materials and products other than asbestos fibre and to involve itself in other commercial activities. It is clear that it did so. While there is no evidence that it followed

g N.A.A.C. in buying raw asbestos from Egnep or Casap or the United States Government, it undoubtedly bought and sold manufactured textiles on its own behalf as principal.

   It is thus quite plain that at least a substantial part of C.P.C.'s business was in every sense its own business. As with N.A.A.C. the only question is whether, in performing the functions which it performed on behalf of Cape/Capasco, it was carrying on its own business or their business. As the

h terms of the agency agreement show, these functions were very similar to those which had been performed by N.A.A.C. The services rendered by C.P.C. to Cape/Capasco were similarly active and

© An extract from a JUSTIS database

a

important. Again, however, strictly defined limits were imposed on the functions which C.P.C. was authorised to carry out or did carry out as the representative of Cape/Capasco (through A.M.C.). C.P.C. had no authority to bind A.M.C. or Cape or Capasco to any contractual obligation. Again too, there is no evidence that C.P.C., whether with or without prior authority from any of those three

b companies, ever carried out any transaction in such manner as to subject any of them to contractual obligations to any person. In the light of the legal principles stated above and of the facts of the case looked at as a whole, we see no sufficient grounds for disturbing the judge's finding that the business carried on by C.P.C. was exclusively its own business and that Cape and Capasco were not present within the Unites States of America through C.P.C. (or A.M.C.) at any material time.

Under this heading, we refer to one further matter. The plaintiffs, on the evidence of Mr.

c Summerfield (that in August 1984 A.M.C.'s name was given as one of the occupants of the offices on the 12th floor at 150, North Wacker Drive), invited us to infer that A.M.C. had their plate up on those offices in 1978-79. Scott J. declined to draw any such inference. In our judgment, he was right to do so for the reasons given in the next section of this judgment dealing with burden of proof and under item (25) in the appendix.

d

The onus of proof

The plaintiffs submitted to Scott J. that the onus was on Cape to establish that it was not resident in the United States of America and that he should hold that the defendants had failed to discharge that onus. He rejected that argument, saying, ante, p. 483C-D:

e

"The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business in the United States. The plaintiffs' answer is to assert that the presence in the United States of N.A.A.C. and C.P.C. is to be treated as Cape's presence. But each of

f N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence of the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do."

Mr. Morison submitted that the judge misdirected himself as to the burden of proof. A foreign

g judgment, in his submission, prima facie gives rise to a legal obligation on the part of the defendant to obey the judgment and is thus prima facie enforceable in England. In support of this submission he invoked Dicey ☰ Morris, 11th ed., vol. 1, p. 465, where it is said:

h "the statement of claim in an action upon such a judgment need not specifically assert that the foreign court was competent in terms either of the relevant foreign law or of the English rules of conflict of laws, though it is usual to insert an allegation of this sort."

© An extract from a JUSTIS database

a

We agree that generally no specific assertion need be made that the foreign court was competent in terms of the foreign law, not because of any question of burden of proof, but because such assertion is irrelevant. As is stated in Dicey ▓ Morris, 11th ed., vol. 1, pp. 464-465, a foreign judgment cannot, in general, be impeached on the ground that the court which gave it was not competent to

b do so according to the law of the foreign country concerned.

However, as all the authorities show, it is only the judgment of a foreign court recognised as competent by English law which will give rise to an obligation on the part of the defendant to obey it. As a matter of principle it seems to us that in the first place the onus must fall on the plaintiff seeking to enforce the judgment of a foreign court to prove the competence (in this sense) of such

c court to assume jurisdiction over him. None of the authorities cited to us establish the contrary.

No doubt, in any case, the evidentiary burden may shift at the trial. However, we agree with the judge that the presence of A.M.C.'s name on a notice board at the office at 150, North Wacker Drive in 1984 did not give rise to any presumption that it had been there in 1979.

More generally we should state that if, contrary to our view, the onus fell on the defendants to

d disprove the competence of the Tyler court to give judgment against them, they have discharged that onus by showing that they were not "present" in any part of the United States of America, at the time of commencement of the various suits between April 1978 and November 1979.

This conclusion as to the presence issue means that this appeal must fail on this account if no other. However, for reasons already stated, and in case our conclusion on the "presence" issue is wrong, we think it right to proceed to consider the "country" issue and the "natural justice" issue.

e (As to the latter issue, there is no dispute that the onus of proof falls on the defendants.)

### III The country issue

f Thus far we have been considering the criteria for ascertaining whether a defendant was present in a particular place, and whether on the facts of this case the criteria were satisfied by Cape and Capasco. For this purpose, it was unnecessary to decide how to identify the place in the United States at which the defendant must have been present, when the action commenced, in order to make the judgment enforceable against him here, since if Cape and Capasco were not present in Chicago, they were not present anywhere else in the United States. If, however, the conclusion expressed in

g the preceding section of this judgment were to be incorrect, so that the companies were present in Chicago, Illinois, it would become necessary to decide whether that presence was sufficient to render enforceable in the United Kingdom the judgment given by the District Court in Tyler, Texas.

This question may conveniently be labelled the "country" issue, echoing the language of Schibsby v. Westenholz, L.R. 6 Q.B. 155, and several of the later cases. We should, however, observe that

h this terminology must be used with caution, lest it beg the very question under consideration, and lead the reader to assume that the political

© An extract from a JUSTIS database

a

entity provides the geographical test. This point was not in issue in any of the cases from which we have already quoted, and no assumption as to the relevant principle can be drawn from the language in which the courts chose to express their opinions on the question of "presence."

b [Their Lordships summarised the evidence concerning the organisation of the federal courts, their jurisdiction and the law which they enforced; referred to Mississippi Publishing Corporation v. Murphree (1946) 326 U.S. 438, Omni Capital International v. Rudolph Wolff Co. Ltd. (1987) 108 S. Ct. 404, Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64, Guaranty Trust Co. v. York (1945) 326 U.S. 99; and continued:]

c Against this background we may now trace the reasoning by which the judge arrived at his conclusion that, if Cape and Capasco had been present in Illinois when the Tyler 2 actions were commenced, this would have been a sufficient basis in English law for the exercise by the Tyler court of jurisdiction over them. He began, by citing a passage from Dicey Morris, 11th ed., vol. 1, pp. 26-27, which we may usefully repeat:

d "Meaning of 'country.' This word has from long usage become almost a term of art among English speaking writers on the conflict of laws, and it is vitally important to appreciate exactly what it means. It was defined by Dicey as 'the whole of a territory subject under one sovereign to one body of law.' He suggested that a better expression might be 'law district;' but this phrase has never found much favour with English speaking writers, who prefer the more familiar word 'country.' England, Scotland, . . . the Isle of Man, Jersey, Guernsey, Alderney, Sark, each British

e colony, each of the American and the Australian states and each of the Canadian provinces is a separate country in the sense of the conflict of laws, though not one of them is a state known to public international law. . . . A state may or may not coincide with a country in the sense of the conflict of laws. Unitary states like Sweden, the Netherlands and New Zealand, where the law is the same throughout the state, are 'countries' in this sense. But composite states like the United

f Kingdom, the United States, Australia and Canada are not."

The judge differed from this opinion. He did not accept that for some private international purposes the United States might not be a "country;" and he went on to develop an analysis of the position which would exist if the district court were sitting in a "federal question" matter such as an anti-trust damages suit. In the result, the judge concluded that the "court would be a United States

g court applying United States law;" that it would command the obedience of a resident anywhere in the United States; and that the sovereign from which the district court derived its jurisdiction was the United States. The judge continued this line by stating that, if Congress had chosen to establish a Federal District Court at Washington D.C. with in personam jurisdiction in respect of anti-trust cases, "the 'country' of the court would unarguably be the United States as a whole."

h Thus far, as the judge acknowledged, the discussion had been hypothetical, since the Tyler court was sitting in diversity not in a

© An extract from a JUSTIS database

a  federal question case. Nevertheless, the judge attached great weight to the rebuttal of what he saw as the main plank of the defendants' case, namely, that the United States could not be a "country" for private international law purposes. Having concluded that it could, he went on to consider and reject the argument which he attributed to the defendants, namely that the district court when sitting in
b  diversity was part of the system for the administration of justice in the state in which it sat.

The judge then stated his own view as to the basis on which the English court recognises the judgment of a foreign court, ante, p. 491A-B:

c  "the territorial basis of jurisdiction is dependent upon and cannot, in my opinion, be divorced from, the sovereignty of the 'country' that has established the court in question. It is, I think, recognition of the sovereignty of a foreign country that leads to the recognition of the entitlement of its courts to take jurisdiction over persons resident in its sovereign territory."

Founding on this principle, the judge concluded, ante, p. 491D-F:

d  "As a matter of principle, in my view, if a United States court exercises jurisdiction over a person resident in the United States, it is exercising powers inherent in the sovereignty which adheres to the United States. As a matter of principle, too, in my view, English law should recognise the legitimacy of that exercise of jurisdiction. It follows that I agree with Mr. Morison that the answer
e  to the question which I must answer does not lie in investigating the function discharged by the court but lies in investigating the source of authority of the court. Whatever the function of a federal district court in a diversity case, the source of its authority is to be found in the sovereign power which established it. For those reasons I conclude that the exercise of jurisdiction by a federal district court over a person resident in the United States is, by the standards of English
f  law, a legitimate and not an excessive exercise of jurisdiction."

Any attempt to weigh up the soundness of this or any other account of the rules governing the recognition of foreign judgments should, as it seems to us, begin with an exploration of the reasons why such judgments are recognised at all. Unfortunately, the cases give virtually no guidance on this essential question. Underlying it all must be some notion of comity, but this cannot be comity on an
g  individual nation-to-nation basis, for our courts have never thought it necessary to investigate what reciprocal rights of enforcement are conceded by the foreign country, or to limit their exercise of jurisdiction to that which they would recognise in others. The most one can say is that the duty of positive law first identified in Schibsby v. Westenholz, L.R. 6 Q.B. 155, must stem from an acknowledgement that the society of nations will work better if some foreign judgments are taken to
h  create rights which supersede the underlying cause of action, and which may be directly enforced in countries where the defendant or his assets are to be found.

© An extract from a JUSTIS database

a

But this tells one nothing of practical value about how to identify the foreign judgments which have this effect.

b   One possibility is to explain the principle in terms of allegiance. This idea, of which traces are found in the earliest cases, may have provided at least a moral underpinning for the concept that a foreigner who has chosen to establish himself within the territory of a sovereign owes to him, in exchange for an obligation to ensure the stranger's personal safety and well-being, a personal duty to pay the sovereign due respect, an obligation which involves an obligation to respect the sovereign's law as enforced by his courts. This concept may have served well enough in the case of an individual established in long-term residence, but the idea that the Dunlop Company, a foreign

c   company of manufacturers, present in the United Kingdom for a few days only through having set up a stall at an exhibition, thereby incurred a duty of fealty to the King-Emperor is surely fanciful.

Nor in our judgment can this concept be made to seem more persuasive by re-writing it in modern terminology. A foreigner who is physically present in a country does thereby acquire rights and duties expressed in terms of the local law, although not necessarily the same as those which apply to

d   the local citizens; but these are not rights and duties which in any sensible way can be described as arising reciprocally with the sovereign. The foreigner does not owe duties to the Queen, or to the United States of America. Rather, by making himself present he contracts-in to a network of obligations, created by the local law and by the local courts.

This is not to say that sovereignty is immaterial to the present problem, in the sense that an

e   identification of the source from which the local laws and the agencies which enforce them derive their powers must be part at least of the task of delineating the obligations, stemming from the judgments of those agencies, which a foreign court ought to regard as binding. Thus, we entirely accept the conclusion, flowing from the judge's premise, that if we had here been concerned with the enforcement of a judgment given by a state court in Texas, we should have been obliged to have

f   regard to the territory of Texas alone, so that if the judgment now in suit had been given (say) by a Texas Supreme Court sitting in Austin, it would not (on the hypothesis of Cape and Capasco's presence in Illinois) have been enforceable. For neither the states outside Texas, nor the federal organs established by or on the authority of the constitution, played any part in giving the State of Texas the right and power to establish its own courts of local jurisdiction. But the converse need not

g   be true. Merely to identify X as the ultimate law giver and creator of the agencies through which those laws are enforced, and then move on to the proposition that a judgment given anywhere in the territory governed by X against someone present anywhere else in those territories should be enforced by foreign courts, seems a large step. Even today, Scotland and England are not the same jurisdictions, and if one looks to the past, it is hard indeed to acknowledge that in Imperial times, all

h   persons present in one part of the Empire could properly be regarded as present everywhere else in the Empire, notwithstanding the immense variety of laws, courts and constitutional

© An extract from a JUSTIS database

a

systems which then prevailed, simply because as the ultimate source of power there was to be found a single sovereign.

Another aspect of this idea is to be found in the functional test propounded by the judge. We take this to invoke an inquiry as to the task which the Tyler court was performing - a local or a national

b task. We would not dissent from this approach, but we would venture to ask whether the judge was not approaching it solely in terms of constitutional theory. Because Congress could have created a single "Federal Court" of which every court and every judge was a manifestation, it is assumed that this is what has really happened, notwithstanding the cessation of a state contribution in the sphere of substantive law and personal amenability to service. On the evidence, we cannot accept that this

c hypothesis is made out, any more than it is possible to say that the Queen in Parliament has chosen, whatever powers may exist in reserve, actually to give England and Scotland a unified judicial system applying a unified law.

It is convenient to mention at this stage three suggested anomalies, relied upon as pointing to one answer rather than another. The first is that the need for the Tyler court in this case to have recourse

d to the Texan long-arm statute in order to entertain the suit demonstrates that the overseas defendants were not within the "country." We do not think that this helps. The use of the long-arm statute shows no more than we already know, namely, that the direct personal jurisdiction of a district court is not for American purposes recognised as extending beyond the boundaries of the state within which that particular court happens to sit. The same can be said of another apparent anomaly on

e which stress was laid, namely that, if the plaintiffs' submissions are correct, a judgment which would be unenforceable in some other state such as Illinois might nevertheless be effective to give recourse against the defendants' assets in England. We do not regard this as a surprising result, or one which points to any particular solution of the present problem, for if (contrary to the defendants' contentions) the whole of the United States is to be regarded as the territory within which the district court had jurisdiction, the infraction of what must on this view be regarded as an internal procedural

f rule is not something of which the English court should take account.

The third suggested anomaly is this. On the judge's own analysis, the jurisdiction of the Texas State Court, as recognised by the English court, would not extend beyond the Texan borders. Thus if the judge's view is right, the enforceability of the judgment in a case such as this would depend upon whether the action was removed by the defendants into the district court: and this

g notwithstanding that the courts would sit in the same place and apply the same law. This is certainly a striking result, but it must we believe follow from any tenable view of the law. As we understand the arguments, Sir Godfray would have been disposed to accept that if there were a single federal court of unitary jurisdiction, applying a single law, a defendant could be present anywhere in the United States and still have the judgment enforceable against him: and we should ourselves be of

h this opinion. All this shows, however, is that a person may be present in two different "countries" at the same time.

© An extract from a JUSTIS database

Adams v. Cape Industries Plc. (C.A.)

a

This is a good reason for discarding the word "country" as a useful test, and discarding with it the simple and attractive argument that the United States is a country, the Tyler court was a court of that country, the defendants were present in the United States, and hence they must necessarily have been within the jurisdiction of the country for the purpose of enforcement in England. Further than

b this, the argument does not run.

If these ideas are rejected as inconclusive, where should we look for the test? To our minds, the only way to find an answer is to consider why a person who goes abroad thereby incurs a duty to abide in England by a foreign judgment. The only reason that we can see is that by going to a foreign place he invests himself by tacit consent with the rights and obligations stemming from the

c local laws as administered by the local court: those laws including, of course, the local rules on the conflicts of laws.

Thus far we have experienced no great difficulty. What has raised very real problems is to apply the principle just suggested to the facts of the present case. It may be helpful to summarise the way in which the respective arguments might run.

d For the defendants, one might begin with the example of a foreigner who has set himself up in Scotland. Such a person could properly be regarded as having done so, and having been allowed to do so, on terms that his rights and duties were to be governed by the laws of Scotland. But not by English law, or by decisions of the English courts, even though the latter might without procedural impropriety purport to exercise a jurisdiction over him. Equally, an Englishman who has gone to live in France and engaged in transactions there, might find himself sued on those transactions in Texas.

e Any resulting judgment would be unenforceable here, not because the Texas court had broken its own rules, or indeed had broken any rules of international comity, but simply because the Englishman had done nothing to bring himself into a relationship with the court in Texas and the law which it administered.

Now if these examples are sound, they may be transformed into something nearer the present case.

f If the Englishman had established himself in Chicago, would he be treated as having put himself into a relationship with the State Court in Austin, Texas? Surely not, the defendants could argue. The fact that Chicago is in the United States does not make Texas any the less a foreign court for a resident in Illinois than if Chicago were in France; and the fact that the long arm of the Texas court does not have to reach out to another continent should not make any difference. This would be so, the defendants could argue, even if the laws of Illinois and Texas were identical in the minutest

g respect; and on the evidence before us it seems that this is not so.

Let us now make the one alteration necessary to bring the example home to the present case: namely by assuming the court in Texas to be a federal district court of the Tyler Division of the Eastern Division of the State of Texas. This is not a state court, but (so the defendants can argue) a local court in a real sense, administering local law. The juridical identity of the Tyler court might

h have been different if those invested with constitutional powers had chosen to exercise them differently, but

© An extract from a JUSTIS database

a

we must take the facts as they are. On these facts, the defendants can submit, there was no sufficient connection between the defendants, resident as for present purposes we assume they were in Chicago, and the federal court in Tyler, to justify the inference that by establishing their residence there they had consented to the administration of Texan laws as administered by the Tyler court.

b

For the plaintiffs, two preliminary points may be made. In the first place, the decision to join Cape as defendant in the proceedings in the Tyler court, as contrasted with the institution of separate proceedings against Cape in a federal court in Illinois, was no doubt influenced by the wish to rely upon the arguments about submission and consent, based upon Cape's participation in the Tyler 1 proceedings (which arguments were rejected by Scott J. and not renewed in this court). But the

c

joining of Cape in the proceedings in the Tyler court had, as we understand it, no other element of forum shopping about it: no advantage was gained, or present to be gained, as to the substantive law which would be applicable in proceedings in the Tyler court as compared with that applicable in a federal court sitting in Illinois. The joining of Cape in the Tyler court proceedings was, in short, a

d

normal and appropriate course of proceeding viewed solely from the point of view of United States law, whether federal or state law. If a default judgment obtained in such circumstances is not enforceable according to our law it is because the relevant rule of our law requires our courts thus to discriminate between a judgment given in default by a federal district court sitting in Illinois and a default judgment given by a federal district court sitting in Texas.

e

Secondly, it is true that the definition of facts, which justified the taking by the Tyler court of in personam jurisdiction over any person or corporation throughout the United States, which is said to constitute legitimate jurisdiction for the purposes of our private international law, would also justify the taking of jurisdiction over any person or corporation outside the territories of the United States, which, as is common ground, would not be regarded as a legitimate jurisdiction for our private

f

international law. Nevertheless, there seems no doubt that Congress has established a system of federal courts of which each one has jurisdiction, in the terms defined by the various long arm statutes of the forum states (where no specific federal statute provides otherwise) to exercise in personam jurisdiction over any person or corporation present in any state of the Union.

More detailed arguments available in support of the plaintiffs' proposition may be summarised.

g

(i) The concept of "contracting in" by presence means that, in the unitary state, the foreign resident is put in the same position, whether the visitor be an individual or a corporation, as any other person or corporation within that state so far as concerns obligations enforceable by in personam judgments (i.e. not including matters dependent upon domicile as opposed to mere presence).

(ii) Our law sets no standard with which the network of local law is required to comply other than

h

that of natural justice and public policy. Within those limits, the foreign law, substantive and procedural, may be

© An extract from a JUSTIS database

a

harsh, antiquated and unskilfully operated by the foreign court but the foreign resident must put up with the consequences.

b
(iii) Our law, faced with a federal system of two networks of local laws as administered by two sets of local courts, should, if it is to be consistent, favour that court which will leave the resident visitor in Illinois subject to the two local networks, both state and federal, to the same extent as any other resident of Illinois so far as concerns the validity of judgments rendered in the courts of either system, unless there is some clear reason to do otherwise.

c
(iv) The limitations of the federal judicial system as it has in fact been established, which cause the present system to fall short of a fully realised national judicial system, arise from the history and political principles which produced them. In other words, a national judicial system has been devised and established in terms in accordance with the political and social views of the peoples of the states which form the Union. The checks and limitations are available for the protection and convenience of the foreign resident as much as for the resident citizen.

d
(v) In particular, the decision that federal courts shall apply the law of the forum state does not necessarily alter the fact that the federal court, in so doing, is doing what it is commanded to do by federal law. Equally, the fact that choice of law rules are not the same in all of the states, does not necessarily alter the fact that the Supreme Court of Congress, as the effective authority under the Constitution, has directed or caused federal courts to continue to apply local choice of law rules as the law to be applied to cases in the national courts.

e
(vi) Finally, if in personam jurisdiction is given by United States law to federal courts to be exercised, within the circumstances stated, over any person or corporation present within the territories of the United States, the effectiveness of that jurisdiction for the purposes of our private international law, is not necessarily reduced by the fact that the jurisdiction is expressed in terms of and limited to the long arm jurisdiction statutes of the forum state. There is no reason to regard the in personam jurisdiction of the federal court of any federal state as necessarily impaired, or as relegated to a local status within one state of the Union, because the federal authorities have seen fit

f
so to express and limit that jurisdiction.

We have set out the facts and arguments on the country issue at some considerable length, notwithstanding that our conclusion on the presence issue is sufficient to dispose of the appeal, because they serve to illuminate a question of general importance which may well arise for decision in the future. In the event, as we have said, it is unnecessary to express a final decision on the country issue and in all the circumstances we think it better not to do so. All we should say is that

g
we all incline to favour, albeit with varying degrees of doubt, the view that if the plaintiffs had not failed at the first hurdle, they would on the country issue have been entitled to succeed.

IV The natural justice issue

h
The assumptions upon which we consider this defence are that our decision on the presence issue is wrong and that the assumed presence

© An extract from a JUSTIS database

a

of Cape/Capasco in Illinois at the commencement of the Tyler 2 proceedings rendered them subject to the jurisdiction of the Tyler court in those proceedings for the purpose of our law of enforcement of foreign judgments.

The conclusion of Scott J. on the issue of natural justice was expressed, ante, p. 500G-H:

b

"There was, in short, in my opinion, no judicial assessment of damages. In my judgment, the procedure adopted by Judge Steger offended against English principles of substantial justice. The defendants were entitled to a judicial assessment of their liability. They did not have one. The award of damages was arbitrary in amount, not based on evidence and not related to the individual entitlements of the plaintiffs. Many of the features of the procedure to which I have c drawn attention might, taken simply, have been insufficient to meet the yardstick of substantial injustice. Taken together, the criterion is, in my judgment, satisfied."

The facts relevant to the defence of breach of natural justice were stated in detail by Scott J. and no issue of primary fact has been raised by either side. [Their Lordships referred to the material facts concerning the procedure which led to the default judgment of 12 September 1983, substantially in the words of Scott J., and continued:]

d

The law applied by Scott J.

In the view of Scott J. the fundamental criterion for the success of a natural justice objection to e the enforcement of a foreign judgment was to be found in the judgment of Lindley M.R. in Pemberton v. Hughes [1899] 1 Ch. 781, 790, where he said:

"If a judgment is pronounced by a foreign court over persons within its jurisdiction and in a matter with which it is competent to deal, English courts never investigate the propriety of the proceedings in the foreign court, unless they offend against English views of substantial justice. f Where no substantial justice, according to English notions, is offended, all that English courts look to is the finality of the judgment and the jurisdiction of the court, in this sense and to this extent - namely, its competence to entertain the sort of case which it did deal with, and its competence to require the defendant to appear before it. If the court had jurisdiction in this sense and to this extent, the courts of this country never inquire whether the jurisdiction has been g properly or improperly exercised, provided always that no substantial injustice, according to English notions, has been committed."

Thus in the opinion of Scott J. if the natural justice objection were to succeed, the proceedings in the foreign court must "offend against English views of substantial justice:" ante, p. 497F-G. With reference to that broad criterion he considered the procedure which led to the default judgment of 12 h September 1983. The route which led him to his conclusion on this issue was very briefly as follows: (i) Cape/Capasco were in default and had forfeited any entitlement to a hearing save on

© An extract from a JUSTIS database

a

the issue of damages. There was no injustice in that. (ii) Cape/Capasco were given sufficient notice of the application for the default judgment but the application for relief of which notice was given was for a judicial assessment of damages at a judicial hearing. (iii) The effect of the notice given to Cape/Capasco could not be divorced from the context of the Federal Rules for default judgments.

b Having regard to that context a defendant in default in an action for unliquidated damages in the Tyler court was entitled to expect that his liability to the plaintiff would be assessed by the judge in the light of evidence which the judge had considered and which, in the judge's opinion, justified the award which was made: ante, p. 500A-B.

c (iv) "The requirements of substantial justice in a particular case cannot . . . be divorced from the legitimate expectation of both the plaintiff and the defendant in the context of the procedural rules applicable to the case:" ante, p. 500B

(v) Since there was no judicial assessment of the damages the proceedings offended our principles of substantial justice: ante, p. 500D.

d (vi) The fact that the default judgment might have been set aside on application to the judge, or an appeal, because of the breaches of local rules of procedure, did not as a matter of principle make the judgment enforceable notwithstanding the breach of natural justice: ante, p. 501C-E.

Principles not in issue on this appeal: some general observations

e In the context of the natural justice issue certain principles are common ground and appear to us to be indisputable. The first is that, upon proof of private international law jurisdiction in the Tyler court, Cape/Capasco would have come under an obligation to obey that judgment unless they should be able to impeach it on the ground of fraud, or breach of natural justice, or breach of the requirements of public policy. For the proof of these grounds of defence, all are to be judged in the

f courts of this country according to the law in force in England and Wales and to the principles of that law. Further, whether any alleged breach of natural justice based on procedural irregularity is such as to render the foreign judgment unenforceable, the courts of this country must have regard to fundamental principles of justice and not to the letter of the rules which, either in our system, or in the relevant foreign system, are designed to give effect to those principles.

The basis of the obligation, which our law would enforce against Cape/Capasco upon proof of

g jurisdiction in the Tyler court, is that, because Cape/Capasco were present within the territorial jurisdiction of that court at the date of service of the proceedings, the command contained in the document or process served upon them is regarded by our law as validly and effectively made. It would regard Cape/Capasco as obliged to make such answer as they could put forward against the claims of the plaintiffs, and to make it in the Tyler court. If they chose not to make any answer,

h they would not be permitted to dispute in our courts the judgment of the Tyler court upon the merits. Subject to the

© An extract from a JUSTIS database

a

defences of fraud, breach of natural justice, and public policy, Cape/Capasco would be liable upon the judgment.

It is clear that a corporate defendant, and those called upon to advise it, may thus be placed in great difficulty by the working of our rules of private international law. The directors of a defendant corporation may reasonably believe, upon competent advice, that the corporation was not, at the date of service of the proceedings present within the jurisdiction of the foreign court. If they are right, they can safely ignore the proceedings so far as concerns the assets of the corporation within the jurisdiction of our courts. If they are wrong - and the judgments of Scott J. and of this court show that the question may be of considerable complexity - they may be sued in this country upon a judgment which cannot be questioned as to the merits and substance of the decision upon which the judgment is based. In particular, with reference to the quantum of a judgment, whether for damages for tort or for breach of contract, the corporate defendant is placed in difficulty. Not infrequently plaintiffs, who are claiming damages, exaggerate their injuries and their losses. When the defendant does not appear, and no evidence is presented to answer the plaintiff's case, the court, which has the task of assessing damages, can normally do no more than consider the evidence put before it and base the assessment upon that evidence. In adversarial systems, the court cannot normally do more in investigation of the claims, or call for further evidence, and it is under no obligation to do so. In particular, according to our law, a defendant corporation which denies that it is subject to the jurisdiction of the foreign court, could not effectively continue to dispute that jurisdiction while taking part in the assessment of a damages claim because, if it did so take part, it would thereby normally submit to the jurisdiction of the foreign court and render itself liable to be sued in this country upon that judgment. In the result, if the corporation is to be able effectively to maintain its contention that it was not subject to the jurisdiction of the foreign court, it must leave the plaintiff there to present a wholly uncontested claim (as the defendants did in the present case). It will have no defence to an action upon the ensuing judgment, if it is held by the courts of this jurisdiction to have been in fact subject to the jurisdiction of the foreign court, unless it can rely upon fraud, breach of natural justice or public policy.

The plaintiff, too, in such a case may face the risk of an unjust result. The defendant may have no answer on the merits to the plaintiff's claim, and the judgment as entered in default may be in amount wholly in accordance with substantial justice. Yet if, through no personal fault of the plaintiff, the defendant can point to a sufficient breach of our principles of natural justice simply in the procedure by which the judgment was obtained, the plaintiff can recover nothing on the judgment. He may, if the procedure of the foreign court permits him to do so, start again at some point in the existing proceedings and continue in a way which avoids the procedural defect. If the wrong is actionable in this country, and the claim is not statute-barred here, he could sue here. What he cannot do is to enforce the foreign judgment here to the extent that it is unobjectionable and claim the assistance of our courts as

© An extract from a JUSTIS database

a

to the rest, unless, perhaps, some part of the judgment is clearly severable and unaffected by the defect in procedure. Thus, in these proceedings, upon the assumption that Cape/Capasco were present within the jurisdiction of the Tyler court, it would not be open to this court to enter judgment for the plaintiffs for damages to be assessed under the procedures of our court, although such an order

b would, if the plaintiffs cannot effectively start again in the Tyler court, get closer to substantial justice than dismissal of their claims. Nor was it suggested that this court could direct that judgment be entered for the plaintiffs on liability, with a direction that the plaintiffs be at liberty to apply to enter judgment for such amount as may hereafter be assessed by the Tyler court. These are partial or alternative remedies which could only be provided by the terms of a statute, presumably to be based

c upon a treaty or convention. The position therefore is that, if through the adoption of the procedure by which Judge Steger directed judgment to be entered for these 206 plaintiffs, there occurred a denial of the requirements of substantial justice, the plaintiffs would fail entirely although (as we assume for present purposes) Cape/Capasco were properly subject to the jurisdiction of the Tyler court. If, on the other hand, there was no such denial according to the established principles of our

d law, then Cape/Capasco (on the same assumption) would be held liable for the full amount of the judgment notwithstanding the forceful objections of Cape/Capasco to the manner in which the Tyler court left so much of the assessment of the plaintiffs' claims to counsel acting for those plaintiffs.

*The plaintiffs' submissions on natural justice*

e
Mr. Falconer's submissions for the plaintiffs may be summarised as follows.

1. The natural justice defence has been limited by authority binding upon this court to lack of notice and denial of proper opportunity to be heard: see Jacobson v. Frachon (1928) 138 L.T. 386. The underlying basis or reason for this limitation is that our law requires only that the judgment debtor be afforded by the foreign court a fair trial or the opportunity for a fair trial if the defendant

f chooses to take it. If the defendant is shown to have been deprived irremediably of a fair trial then the judgment is unenforceable here.

2. The defendant will be held to have been irremediably deprived of a fair trial by reason of defective procedure in two cases: (i) if the rules of procedure of the foreign court are themselves by our standards unfair, because, in that case, there can be no prospect of the foreign court correcting

g what has been done under its rules; and, (ii) if the rules of procedure of the foreign court are by our standards fair; and the defective procedure was caused by departure from those rules, but it is impossible or impracticable for the defect to have been corrected within the foreign system: e.g. because the defendant only learned of the judgment too late to advance an effective appeal or procedure for setting the judgment aside.

h 3. If the procedural defect was reasonably capable of remedy within the procedure of the foreign court, whether by application to set aside

a

the judgment, or by appeal, the defendant is not released from the obligation to obey the judgment by reason of the procedural defect because, being subject to the jurisdiction of the foreign court, he may properly be required to have resort to the remedies provided by the foreign system.

b
4. The basis and substance of those submissions for the plaintiffs were said to be in accordance with justice, with practicality and with the principles of our law in that (i) our law recognises that all courts make procedural mistakes: the fact that a mistake is made, for which the foreign court's procedure provides a remedy, should not release the defendant who chooses not to avail himself of the remedy; (ii) the argument is based upon the connection between the foreign court and the defendant created by the voluntary act of the defendant in being present within the foreign

c
jurisdiction, or by submission thereto, etc.; (iii) it is desirable that our courts should not be required to act as a court of error for the examination and assessment of procedural defects within the foreign system for which that system provides an effective remedy; (iv) the submissions provide a framework of reasonable certainty and clarity for the decision of pleas of breach of natural justice. By contrast, the "broad criterion" applied by the judge, is too wide and too uncertain a test.

d
5. The reliance placed by Scott J. on "legitimate expectation" was unjustified. There had been no actual expectation on the part of Cape/Capasco nor any reliance upon any expected form of procedure. Nothing to that effect had been pleaded or proved. This concept of legitimate expectation amounted, it was said, to no more than the assertion that a defendant is entitled to expect that, in the conduct of the proceedings in the foreign court, that court will correctly apply its own procedure

e
and that, if it does not, a sufficient breach of natural justice is demonstrated. (We will refer to the submissions summarised in this paragraph as "the legitimate expectation point.")

6. Upon the evidence and upon the findings of Scott J. the procedural rules applicable in the Tyler court were fair and just. The defendants could have applied to set aside the judgment on the grounds that the procedure for the assessment of damages was irregular under the relevant rules and such

f
application would have been allowed if made in due time. Further, an appeal to the Circuit Court was open to Cape/Capasco. Since they took no step to correct the procedural defect, and the consequences of it, they cannot rely upon it as a defence in these proceedings.

The defendants' submissions on natural justice

g
To these submissions Mr. Playford for Cape/Capasco replied by contending that Scott J. was right in his conclusion for the reasons which he gave. Further, if it should appear to this court that the defendants could not impeach the judgment on the ground of a procedural defect which was capable of remedy within the system of the federal courts, then it was said that the defendants did not know

h
in time of the procedural defects and could not reasonably be required or expected to have sought such remedy there.

© An extract from a JUSTIS database

a

The decision in Jacobson v. Frachon

A number of decisions were cited to us in the context of the natural justice issue. However, the most important of them was Jacobson v. Frachon, 138 L.T. 386, because it was said on behalf of
b the plaintiffs to establish legal principles which are binding on this court and render the natural justice defence unsustainable on the present facts by limiting that defence to lack of notice and denial of proper opportunity to be heard. Furthermore, it was common ground that this is the only case in which the Court of Appeal has considered points relevant to the questions raised in this case under the heading of the natural justice issue.
c     In Jacobson v. Frachon, this court applied rigorously the principle that our courts will not impeach the judgment of a foreign court having competent jurisdiction on its merits. However, the crucial passage in that case particularly relied upon by Mr. Falconer was a statement of Atkin L.J., who, after referring to the judgment of Lindley M.R. in Pemberton v. Hughes [1899] 1 Ch. 781, 790, said, at p. 392, that a judgment could be impeached "if the proceedings, the method by which the
d court comes to a final decision" are contrary to English views of substantial justice, and continued:

)     "The Master of the Rolls seems to prefer, and I can quite understand the use of the expression, 'contrary to the principles of natural justice;' the principles it is not always easy to define or to invite everybody to agree about, whereas with our own principles of justice we are familiar. Those
e     principles seem to me to involve this, first of all that the court being a court of competent jurisdiction, has given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an oportunity of substantially presenting his case before the court. Both those considerations appear to be essential if they are to be in accordance with natural justice." (Emphasis added.)

f     We have had the benefit of very careful and detailed analyses in argument of the judgments in Jacobson v. Frachon. We intend no disrespect to such arguments if we do not prolong an already very long judgment (in which we have already decided that the defendants succeed on the presence issue) by recapitulating these analyses. We will summarise our conclusions in relation to Jacobson v. Frachon, 138 L.T. 386, as follows.
g     (1) Atkin L.J. in his judgment was not attempting to make an exclusive or comprehensive statement of the circumstances in which our courts will treat the procedure adopted by a foreign court in reaching its decision as offending against the principles of natural justice.
     (2) Lord Hanworth M.R. was clearly of the view, at p. 390, which we share, that the requirements of due notice and proper opportunity to be heard will, in the majority of cases which can be
h expected to arise, sufficiently comprise the concept of natural justice in a procedural context, but he prudently qualified his statement by saying that they "almost, if not entirely" comprise it.

© An extract from a JUSTIS database

a

(3) We therefore reject the contention that the decision of this court in Jacobson v. Frachon restricted the defence of breach of procedural natural justice to the requirements of due notice and opportunity to put a case. Scott J. was entitled, in our view, to direct himself by reference to the test stated by Lindley M.R. in Pemberton v. Hughes [1899] 1 Ch. 781, 790, and to consider whether

b the procedural defect alleged by Cape was such as to constitute a breach of an English court's views of substantial justice. The point was not concluded against the defendants merely because they had been given proper notice of the application for default judgment and would, if they had attended, have been allowed full opportunity to put their case.

(4) However, this court in Jacobson v. Frachon, 138 L.T. 386, was not required to consider the

c relevance, if any, of any remedy which might have been available to Jacobson under the French legal system, whether by way of appeal or by application for the judgment to be set aside, if the hearing in the French court had itself constituted a breach of natural justice.

"No judicial assessment of damages"

d
The next question is whether, as Scott J. considered, the "method by which the Tyler court came to its final decision," to use Atkin L.J.'s words, was contrary to our views of substantial justice on the grounds that there had been no judicial assessment of damages.

We have found this to be a matter of difficulty. We have, although well aware of its limited

e nature, some general knowledge of the working of the system of civil justice in the federal courts of the United States; and we are aware that it is a system which has been developed by judges of great distinction and learning, and subjected to continuous and searching examination and comment both by the legal profession and by academic lawyers of similar distinction and learning. Scott J. expressed his view that the system of civil justice evidenced by the Federal Rules and explained by

f the witnesses was an unimpeachable system of justice within one of the great common law jurisdictions of the world and was plainly in accordance with the requirements of natural justice. We make the same respectful acknowledgement. But, as Scott J. pointed out, the defendants made no criticism of that system of justice. Their complaint was that, at the invitation of the plaintiffs' counsel, Judge Steger did not proceed in accordance with it.

We recognise, further, that the federal courts have been required to determine, and to develop

g methods for the effective control and management of, civil litigation in product liability cases in which large numbers of plaintiffs have made claims against numerous defendants arising out of similar classes of injury and having broadly similar consequences but with differing degrees of severity. We have had some experience in this country of such litigation but in smaller volume. Our own procedures have to an extent been modified to deal with the preparation and settlement of such

h cases but we have not, to the same extent, developed the techniques of a class action or the role of the judge in procuring settlements. We are aware that our present system

© An extract from a JUSTIS database

a

has been subjected to criticism in having failed, as it has been said, to respond sufficiently to the requirements of such litigation.

The circumstances of 206 plaintiffs making claims based upon a common cause of injury were, as it seems to us, directly relevant to the method of decision adopted by Judge Steger without objection

b by the plaintiffs' counsel. The purpose was, as we infer, to avoid the private costs and public expenditure of court time which would have been necessary if there had been either individual judicial assessments or judicial assessment by reference to groups based upon evidence directed to the individual cases. The method was adopted for proper purposes. We accept, as submitted by Mr. Falconer, that Judge Steger had knowledge and experience of Mr. Bailey and the other counsel and

c that Judge Steger must have reposed trust in those counsel to act properly in the matters left by the judge to them. Mr. Falconer submitted that there was nothing inherently objectionable, according to our standards of substantial justice, in a court leaving to the plaintiffs' lawyers the fixing of figures for individual plaintiffs after the court has indicated an average basis of award for all plaintiffs.

In reply to that contention Mr. Playford pointed out that the indication by Judge Steger of an

d average basis of award for all plaintiffs was based on nothing in the way of evidence as to the fair sums due for compensation for any of them. It may be that an average figure for settlement of such claims was known by the judge to be $75,000 but that provided no basis for a holding that the condition of these 206 plaintiffs was such as to justify a total award of $15.45m. or any other total award. If the judge had had before him, and had considered, evidence, perhaps from one expert, to

e the effect that, by reference to the listed apparent injuries suffered by the plaintiffs, they properly belonged in certain categories of gravity of injury; and if he had, by reference thereto, estimated a figure for general damages for each category; and, then, by reference to the numbers of plaintiffs in each category calculated a total award which would be fair to the defendants, we could see no valid objection, which the defendants could have put forward, if the judge had then left it to plaintiffs'

f counsel to allocate precise sums within the total award to individual plaintiffs. But we agree with Mr. Playford's submission that that was not what happened. The defect in the procedure adopted was, as Scott J. found, that the total award was not in any real sense based upon an objective assessment by the judge upon evidence as to the condition of these plaintiffs.

It seems to us that, in truth, Judge Steger was applying to the process of assessment of damages in

g default, when only the plaintiffs were represented before him, the process and technique appropriate to a settlement negotiated between both the plaintiffs and defendants with the intervention of the judge. If we understand the position properly, the only basis upon which Judge Steger, as the judge responsible for assessment of the damages, could assert, without knowledge of the evidence relating to the 206 plaintiffs, that $120,000 average, $24.72m. total, was too high a figure, and that $75,000

h average, $15.45m. total, was a proper figure, was that, if the defendants had been present and taking part, they would in probability have refused to settle for $24.72m.,

© An extract from a JUSTIS database

a

so as to avoid the risk of having to pay more after individual assessment, but would, in probability, have agreed to pay $15.45m. so as to avoid that risk. If that was the basis of his decision, there is nothing to show that he was in fact wrong upon the hypothesis upon which he acted and nothing to show that he was right; but, as Scott J. observed, ante, p. 56XXX, while damages calculated on an

b average per plaintiff basis may make very good sense for the purposes of a settlement, because defendants are not concerned with how the total will be divided up, a judicial award so calculated is the antithesis of an award based upon the individual entitlements of the respective plaintiffs.

Mr. Playford referred us to authority in order to demonstrate what he said should be regarded as the essential requirements of a court "acting judicially," and, in support of the proposition that it is

c part of the requirements of natural justice that the judgment of a foreign court, which is rendered for enforcement, be reached by that court "acting judicially." He referred in particular to Local Government Board v. Arlidge [1915] A.C. 120 and in particular to passages in the speech of Viscount Haldane L.C. at p. 132, of Lord Shaw of Dunfermline, at p. 138, of Lord Parmoor, at p. 142, and of Lord Moulton, at p. 150. That case was concerned with the validity of a closing order under section 17 of the Housing, Town Planning etc. Act 1909 and with the procedure on appeal to

d the Local Government Board. An example of the statements relied upon is that of Lord Parmoor, at p. 142:

"Whether the order of the Local Government Board is to be regarded as of an administrative or of a quasi-judicial character appears to me not to be of much importance, since, if the order is one

e which affects the rights and property of the respondent, the respondent is entitled to have the matter determined in a judicial spirit, in accordance with the principles of substantial justice."

In our view, no significant assistance is to be derived from this case, or other decisions upon the requirements of natural justice in administrative law cases, where the requirements of substantial

f fairness depend upon the subject matter and the context. It is sufficient, in our view, to derive the requirements of natural justice for the purposes of enforcement of a foreign judgment and the special defence thereto of breach of natural justice from the principles stated in Pemberton v. Hughes [1899] 1 Ch. 781 and relied upon by Scott J., namely: did the proceedings in this foreign court offend against our views of substantial justice?

The notion of substantial justice must be governed in a particular case by the nature of the

g proceedings under consideration. The purpose of an in personam monetary judgment is that the power of the state through the process of execution will take the defendant's assets in payment of the judgment. In cases of debt and in many cases of contract the amount due will have been fixed by the acts of the parties and in such cases a default judgment will not be defective for want of judicial assessment. When the claim is for unliquidated damages for a tortious wrong, such as personal

h injury, both our system and the federal system of the United States require, if there is no agreement between the

© An extract from a JUSTIS database

a

parties, judicial asessment. That means that the extent of the defendant's obligation is to be assessed objectively by the independent judge upon proof by the plaintiff of the relevant facts. Our notions of substantial justice include, in our judgment, the requirement that in such a case the amount of compensation should not be fixed subjectively by or on behalf of the plaintiff.

b    We do not find it necessary to decide whether, if the local rules provide for service by the plaintiff of notice of a specific sum claimed for damages, a default judgment may be entered for such a sum without proof of judicial assessment and without there being breach of any requirement of natural justice. Scott J. thought that there could be no objection to such procedure and we think that in most cases that would be right. The matter does not arise for decision in this case and we express

c    no concluded view. We would however not exclude the possibility of a defence being upheld if the facts justified the conclusion that, making due allowance for different levels of awards and of substantive law, the amount of the actual award was irrational.

Mr. Falconer relied upon Scott J.'s finding that there would be no breach of natural justice in proceedings for a default judgment for unliquidated damages if judgment were entered for the

d    specific sum claimed by the plaintiff. It was submitted that such a claim had in effect been made by the 205 plaintiffs in these proceedings because their pleading placed a limit upon the damages claimed in the sum of $100m. We see no force in that point. The maximum of $100m. would, as

)    we understand it, prevent the court from entering judgment for any larger sum but there is nothing to show that the limit was intended to mean, or would be understood by any person familiar with procedure in the federal courts as meaning, that the $100m. represented a sum which the plaintiffs

e    asserted to be the total of their estimated claims and for which the court would be empowered to give judgment without proof of the amount of injury and loss suffered.


The "legitimate expectation" point

f    At first sight there appeared to us to be some force in Mr. Falconer's criticism of the relevance of this concept in this case. It was accepted by Mr. Playford that reliance by the defendants had not been pleaded or proved with reference to any subjective expectation on their part that the assessment of damages on the application for the default judgment would proceed according to any particular method. We would also accept that the adoption of a particular method of assessment of damages by

g    the foreign court, would not per se amount to an effective defence, as a breach of natural justice under our law, merely because it was shown that, by reference to the procedural rules of the foreign court, the defendant might (on an objective basis) reasonably have expected that a different method would be used. So to hold would be to introduce, under the concept of reasonable expectation, a rule that breach by the foreign court of its own rules of procedure renders the foreign judgment

) h   unenforceable as offending our concepts of substantial justice. It is clear law that mere procedural irregularity, on the part of the foreign court and according to its own rules, is not such a ground of

© An extract from a JUSTIS database

a

defence. Pemberton v. Hughes [1899] 1 Ch. 781 itself was an example of mere procedural irregularity.

In our view, however, Scott J. did not so regard or use the point of reasonable expectation. He made reference to it in dealing with the question whether what had happened amounted to a breach

b of the requirements of substantial justice, and after reference to the fact that the rules of a court might, in his view, without offending those requirements, provide for the giving of notice of the plaintiffs' estimate of the recoverable damages and the entry of a default judgment for that amount in the absence of opposition on the part of the defendant. The question was to be decided, in the view of Scott J., by reference to the context in which the alleged procedural defect had occurred. He was,

c in our view, not in error in this regard. The fact was that the system of legal procedure in which Judge Steger had signed the default judgment had not contained any provision for converting an unliquidated damages claim to a potentially fixed sum for the entry of a default judgment. His reference to the fact that the defendant in a default action was entitled to expect that his liability to the plaintiff would be assessed by the judge on the evidence was not a reference to actual expectation on the part of these defendants but to the requirements of natural justice against the

d background of a system which contains no such provision.

We therefore conclude that the defendants have demonstrated, as Scott J. held, that the method by

) which Judge Steger came to a decision as to the amount of the default judgment was by itself contrary to the requirements of substantial justice contained in our law. If that fact is regarded as a sufficient and conclusive description of the proceedings of the Tyler court then, according to the

e judgment of Atkin L.J. in Jacobson v. Frachon, 138 L.T. 386, 390, that finding would serve to invalidate the judgment. But, as noted above, the Court of Appeal in Jacobson v. Frachon was not required to consider whether, as Mr. Falconer submits, an opportunity to correct such a defect, provided by the foreign system of procedure, may either cause such a defect to cease to be in our law an effective breach of natural justice or, if there is any difference, cause the defendant to be

f unable to rely upon it for purposes of impeaching the judgment.


Requirement of use of remedy in foreign court


Mr. Playford submitted that proof of this defect in the proceedings of the Tyler court is a conclusive defence for the defendants, and he submitted that it is just that it should be so. It is not

g exorbitant, he said, to require that a default judgment, designed and intended for enforcement in this country, should comply with so basic a principle as that the amount of a judgment for personal injuries be fixed in substance by the court upon the evidence and not in substance by the plaintiff. No authority establishes, he said, the requirement of use by a defendant of any local remedy.

We accept that no authority binding this court has been cited to us establishing the proposition for

h which Mr. Falconer has contended. It is at least clear that our law does not oblige a defendant who can show that a foreign judgment has been obtained by fraud to have used any

© An extract from a JUSTIS database

a  available remedy in the foreign court with reference to that fraud if he is successfully to impeach that judgment in our courts: see Abouloff v. Oppenheimer & Co. (1882) 10 Q.B.D. 295 and Jet Holdings Inc. v. Patel [1990] 1 Q.B. 335. The position may well be the same in cases where there has been a breach of natural justice of the two primary kinds considered by Atkin L.J. in Jacobson

b  v. Frachon, 138 L.T. 386, 392, namely, absence of notice of the proceedings or failure to afford the defendant an opportunity of substantially presenting his case.

In this judgment, however, we are dealing with a case where, although there was in our view a departure from the basic principles of natural justice in the assessment of the amount of a default judgment, nevertheless (a) the error which led to this departure was an honest error on the part of

c  all concerned; (b) the defendants had proper notice of the proceedings and could have presented their case on its merits if they had chosen to do so, but chose not to do so; (c) the procedural rules applicable in the Tyler court were themselves fair and just; (d) the defendants had the right to apply to set aside the judgment on the grounds that the procedure for the assessment of damages was irregular under the relevant rules and such application would presumably have been allowed if made

d  in due time.

Against this background, we are not persuaded that possession of and failure to exercise this right by the defendants can be disregarded as being wholly irrelevant in determining whether the proceedings in the Tyler court, which we think must be viewed as a whole, offend against English views of substantial justice, within the principles stated by Lindley M.R. in Pemberton v. Hughes [1899] 1 Ch. 781, 790, as the plaintiffs would submit.

e  It is well established that a defendant, shown to have been subject to the jurisdiction of a foreign court, cannot seek to persuade our court to examine the correctness of the judgment whether on the facts, or as to the application by the foreign court of its own law or, when relevant, of the law of this country. A foreign judgment is not impeachable merely because it is "manifestly wrong:"

f  Godard v. Gray, L.R. 6 Q.B. 139; Castrique v. Imrie (1870) L.R. 4 H.L. 414 and Robinson v. Fenner [1913] 3 K.B. 835, 842. In any such case it could be said that there has been a breach of natural justice, but it is not a type of breach which our courts will consider relevant. In effect, their attitude is that the only way in which the defendant can seek to correct an error of substance made by the foreign court is by using such means for correction of error as may be provided under the foreign system.

g  This being the position where there has been an error of substance, it would, in our judgment, be anomalous if our courts were obliged wholly to disregard the existence of a perfectly good remedy under a foreign system of procedure in considering whether the defective operation of that procedure has led to a breach of natural justice. And, indeed, from some of the cases on procedural defects, support can be derived from the proposition that, at least with reference to defects known to the

h  defendant before judgment, the defendant can be required to have made use of any remedy available in the foreign court: see, for example, Reynolds v. Fenton (1846) 16 L.J.C.P. 15 and Crawley v.

© An extract from a JUSTIS database

a

Isaacs (1867) 16 L.T. 529, see particularly at p. 531, where Bramwell B. said (obiter):

b
"If the proceedings be in accordance with the practice of the foreign court, but that practice is not in accordance with natural justice, this court will not allow itself to be concluded by them, but on the other hand, if the procedure be in accordance with natural justice, the foreign court itself will interfere to prevent the plaintiff taking advantage of the judgment irregularly and improperly obtained."

c
Mr. Falconer relied strongly not only on that passage but on dicta of Fry J. in Rousillon v. Rousillon, 14 Ch.D. 351, 370, and of Bray J. in Jeannot v. Fuerst (1909) 100 L.T. 816, 818.

Since the ultimate question is whether there has been proof of substantial injustice caused by the proceedings, it would, in our opinion, be unrealistic in fact and incorrect in principle to ignore entirely the possibility of the correction of error within the procedure of a foreign court which itself provides fair procedural rules and a fair opportunity for remedy. The court must, in our judgment,
d have regard to the availability of a remedy in deciding whether in the circumstances of any particular case substantial injustice has been proved. However, the relevance of the existence of the remedy and the weight to be attached to it must depend upon factors which include the nature of the
) procedural defect itself, the point in the proceedings at which it occurred and the knowledge and means of knowledge of the defendants of the defect and the reasonableness in the circumstances of
e requiring or expecting that they made use of the remedy in all the particular circumstances.

We return then to the circumstances of this case, of which the most relevant seem to us to be the following. First, the defendants who, for present purposes, we assume were subject to the jurisdiction of the Tyler court, were duly served with the proceedings; they chose to take no part in them; they were given notice of the application for the default judgment; they chose not to attend the hearing of
f that application; and they were thereafter served with the default judgment.

Secondly, on service of the judgment, the defendants knew the amount of the award to each plaintiff. It seems that they could have obtained access to the medical records as to each plaintiff referred to in the judgment, and advice as to the question whether, upon such material, the awards appeared excessive according to the law in the Tyler court.

Thirdly, by not attending the application for the default judgment, the defendants deprived
g themselves of information as to what occurred before the court. If they had attended before Judge Steger, the nature of the proceedings would have been largely apparent. The proceedings took place in public before the judge, and, at least so far as concerned the facts that there was no evidence received by the judge in court on the hearing and no arguments presented to the court, the defendants would have discovered those facts.

) h   Fourthly, it would have been open to them to apply for the judgment to be set aside if they had formed an intention to contest the amount of

© An extract from a JUSTIS database

a

Adams v. Cape Industries Plc. (C.A.)

the awards. It seems to us to be probable at least that, since the method of assessment adopted by Judge Steger was contrary to the Federal Rules, an application of this nature made promptly to the Tyler court would have succeeded.

b
Fifthly, however, the defendants, when the judgment was served upon them, could not and did not know the method by which damages had been assessed from anything stated in the judgment. The recitals in the judgment were, as Scott J. held, false and misleading: there had been no hearing at which damages had been assessed. The facts as to what happened in the Tyler court became known to the defendants at latest when evidence was given in the proceedings before Scott J. There was, as we understand it, no evidence from the defendants directed to the question when they first had

c
knowledge of the method adopted by Judge Steger for assessing damages. There is, however, nothing to indicate that they were aware of the method adopted at any time before the date when, after claims were made on them in this country on the basis of the default judgment, the circumstances in which the judgment was made were investigated for the purposes of these proceedings.

d
Conclusion on the natural justice issue

)
Giving full force to all these facts, we find it impossible to say that, because the defendants did not apply to set the default judgment aside, they could not rely upon the substantial injustice in the proceedings constituted by the failure of the court to assess the damages judicially upon the evidence. They did not wish to dispute the amount of the damages award by presenting a case to the

e
Tyler court. We cannot have regard, as an excuse available to them, to the reason why they chose not to appear, namely their unwillingness to submit to the jurisdiction of the Tyler court. However, it cannot, in our view, be required of them that they should have applied to the Tyler court to contest the amount of damages awarded when they were necessarily content to leave the amount of the damages to be assessed by the court. The only complaint which the defendants could thereafter make

f
would be as to procedural irregularity. As to that, as we have stated, they had at the time of service of the judgment no knowledge. The defendants were not told before the application for the default judgment that plaintiffs' counsel intended to invite Judge Steger to accept the view of plaintiffs' counsel as to the total value of the claim, based upon an average of $120,000 per plaintiff, and that the plaintiffs would accept in substitution for the assessment of the damages by the judge, such counter-proposal based upon an average sum per plaintiff as the judge might be minded to make,

g
from his general knowledge of the proceedings and of the settlement in the Tyler 2 proceedings to that date and from his knowledge of national average settlement figures in asbestosis cases.

The fact that information as to the procedural defect would probably have emerged if Cape had made an application to set the default judgment aside on other grounds, seems to us to be of no relevance. Cape are not to be treated as having information which they did not have because, if they

h
had made an application which they had no reason to make, they could have obtained that information.

© An extract from a JUSTIS database

Adams v. Cape Industries Plc. (C.A.)

a

A harsh but accurate summary of what happened is, in our judgment, that those acting for the plaintiffs failed to give prior notice to the defendants of the unusual course which they intended to pursue; they chose not to try to prevent Judge Steger from adopting that method of assessment; and they drew up and served a form of judgment which did not reveal what had taken place. That was

b all done in good faith. There was no dishonest purpose. But the effect upon the defendants was, in our view, that they had at no material time knowledge of any basis for seeking relief from the Tyler court in respect of the defect which Scott J. rightly held to have been demonstrated by them to have occurred in the proceedings in the Tyler court.

The only basis for attributing to the defendants constructive knowledge of the defect, upon which

c they could reasonably be required to have used any available remedy in the Tyler court, would be that a defendant who has been given notice of the proceedings will be fixed with knowledge of everything which he would have learned if he had attended those proceedings. That, in our judgment, is not an acceptable basis for considering proof of procedural injustice. Plaintiffs can, we think fairly be left to avoid such procedural errors as will prevent enforcement of a judgment in this

d country.

Accordingly, on the natural justice issue, although for somewhat different reasons, we would uphold the decision of Scott J.

V Conclusion

e

In the result, while we have some doubts as to whether the judge reached the right conclusion on the country issue, we are satisfied that he reached the right conclusions on the presence issue and the natural justice issue. He was accordingly right, in our judgment, to dismiss the plaintiffs' claims and this appeal likewise must be dismissed.

f Finally, we acknowledge our debt to all counsel on both sides for the great assistance which they have given us in this interesting but exceptionally difficult case.

Appeal dismissed with costs.
Leave to appeal refused.

g

24 October 1989. The Appeal Committee of the House of Lords (Lord Keith of Kinkel, Lord Griffiths and Lord Ackner) dismissed a petition by the plaintiffs for leave to appeal.

Solicitors: Nabarro Nathanson; Davies Arnold ☰ Cooper.

h

A. R.

© An extract from a JUSTIS database