# Exhibit 5

# GORE-BROWNE ON COMPANIES

## Supplement 48

This Supplement updates the following Chapters: 2 (The Memorandum of Association); 3 (The Ultra Vires Doctrine); 4 (The Articles of Association); 5 (Contracts Binding on the Company); 6 (Other Companies and Associations); 17 (Loan Capital); 19 (Debenture Holders' Remedies); 21 (Company Meetings and Resolutions); 23 (Accounts and Auditors); 25 (The Office of Director); 30 (Reconstruction and Amalgamation); 32 (Winding Up by the Court); and 35 (Offences and Civil Liabilities).

In addition, the following Chapters have been comprehensively updated and reissued in their entirety: 1 (The Company as a Legal Person); 22 (Annual Returns and Directors' Report); and 36 (Insolvency Practitioners).

Fully updated Tables and Indexes are included with this Supplement.

ISBN 0 85308 082 8

Instructions for the filing of this Supplement follow this card.

File this card at the front of Volume 1.



    (d) arrangements with creditors; and
    (e) procedures giving protection from creditors.
(2) preferred or preferential debts under the Bankruptcy (Scotland) Act 1985, the Insolvency Act 1986 or any other enactment;
(3) regulation of insolvency practitioners; and
(4) co-operation of insolvency courts.

Exceptions:

(1) in relation to business associations:[1]
    (a) the process of winding up, including the person having responsibility for the conduct of a winding up or any part of it, and his conduct of it or of that part;
    (b) the effect of winding up on diligence; and
    (c) avoidance and adjustment of prior transactions on winding up.
(2) floating charges and receivers, except in relation to preferential debts, regulation of insolvency practitioners and co-operation of insolvency courts.

### Head C3 (Competition)

Regulation of anti-competitive practices and agreements; abuse of dominant position; monopolies and mergers (excluding the legal profession).

### Head G3 (Auditors)

Regulation of the profession of auditor.

Under Head H1 employment and industrial relations are also 'reserved matters'.

The overall effect is to permit the Scottish Parliament, in relation to companies, to legislate for:

    (a) the supervision of the process of winding up of particular companies as distinct from the general law affecting winding up or insolvency practitioners;
    (b) the effect of winding up on diligence, preferences and other transactions of insolvent companies; and
    (c) floating charges and receivership.

In addition, the Scottish Parliament can legislate in relation to the law of property and securities over property in Scotland, which does not fall within any of the categories of 'reserved matters'.

    The Scotland Act 1998 also amends a number of statutes and subordinate legislation to take account of the delegation of powers to the Scottish Administration. The effect of the 1998 Act and subordinate legislation is noted at the appropriate point in this work.

## 1.3   The Consequences of Incorporation

Lindley LJ gave this definition of the old unincorporated joint stock company: 'I understand by a company – an unincorporated company – some association of members, the shares of which are transferable. As distinguished from a partnership, I know of nothing else except the transferability of shares.'[2] But with regard to an *incorporated* company there are other important distinctions:

---

1 Defined as noted under Head C2 above.
2 *R v Registrar of Joint Stock Companies, ex parte Johnson* [1891] 2 QB 598 at 610.

for example that, while in an ordinary partnership each partner is personally responsible for all the debts contracted by the firm, in an incorporated company the members have no individual liability to its creditors for debts owing by the company, and their personal liability is satisfied if they pay the calls properly made upon them by the company or its liquidator. These calls may be limited in amount or unlimited, depending on whether the company is limited or unlimited, but they are enforceable only by the company or its liquidator. The company, moreover, is a distinct legal personality,[1] can own and deal with property, sue[2] and be sued in its own name, and contract on its own behalf. The members are not personally entitled to the benefits or liable for the burdens arising thereby: their rights are confined to receiving from the company their share of the profits or, after a winding up, of the surplus assets, and their liabilities to paying the amounts due from them to the company. The creditors of a limited company accordingly know that they cannot, as in the case of an ordinary partnership, look to the whole property of the individual members to pay them, but are restricted to the property of the company, including such further amounts (if any) as the members are liable to pay in respect of shares held by them in the capital, and in the case of companies limited by guarantee the sums payable in accordance with the guarantee contained in the memorandum of association. As a matter of general principle, corporate personality will prevent shareholders and/or directors from being held liable in respect of company obligations.

### 1.3.1   The company as a 'person'

An incorporated company is a 'person' within the meaning of the Interpretation Act 1978, unless the contrary intention appears.[3]

It can be fined for contempt of court, although it cannot be attached.[4] Any judgment or order against a company wilfully disobeyed, may, by leave of the court or a judge, be enforced by:

1   Where a partnership of eight persons transferred their property to a company in exchange for shares in the same proportions as their interests in the partnership, this was held to be a sale to a distinct person 'We have two parties, one party consisting of several individuals, and the other party consisting of a corporation.' Per Lindley LJ in *John Foster & Sons v Commissioners of Inland Revenue* [1894] 1 QB 516 at 528. Cf *Dunedin United Friendly Societies Dispensary v Pharmacy Authority* [1999] 3 NZLR 233, HC (NZ) (friendly society incorporating as company). Even so, for many purposes the new body may be regarded as the 'continuation' of the former: *Willis v Association of Universities of the British Commonwealth* [1964] 2 WLR 946; *Jobnet Employment Services Inc v Copeman* (1999) 32 ACSR 554, SC (NSW). A company has only one legal personality, even though it may from a business point of view treat each separate division of its organisation as having a distinct identity: *Absa Bank Ltd v Blignault* 1996 (4) SA 100, PD (OFS).

2   A limited company can sue for trespass even without specific monetary loss, *Harold Megitt Ltd v Discount & Finance Ltd* (1938) 56 WN (NSW) 23, SC (NSW); for defamation that damages its business, *South Hetton Coal Co v North Eastern News Association* [1894] 1 QB 133; *D & L Caterers & Jackson v D'Anjou* [1945] KB 364; but not for general damage to its reputation or that of any individuals within it, *Australian Broadcasting Corpn v Comalco Ltd* (1986) 68 ALR 259, Fed CA; *Lewis v Daily Telegraph Ltd* [1964] AC 234; for malicious presentation of a winding up order, *Quartz Hill Consolidated Gold Mining Co v Eyre* (1883) 11 QBD 674; but not of course for assault or false imprisonment.

3   See Interpretation Act 1978, s 5 and Sch 1. This applies to Acts passed in or after 1889: ibid, Sch 2, para 4(1)(a). When a company authorises a director to act and appear from it in court, the company acts and appears by the director. The company is the litigant. The company so acting and appearing is not a litigant in person for the purposes of the Litigant in Person (Costs and Expenses) Act 1975: *Jonathan Alexander Ltd v Proctor* [1996] BCC 598. A company has been held not to be a 'person' within the meaning of s 133 of the Criminal Justice Act 1988 (compensation for miscarriage of justice): *R v Home Secretary ex parte Atlantic Commercial Ltd* [1997] BCC 692.

4   *R v JG Hammond & Co* [1914] 2 KB 866. As to the liability of a director for a contempt by his company, see *Biba Ltd v Stratford Investments* [1972] 3 WLR 390. Cf *Director General of Fair*
*(continued)*

(1) sequestration against the corporate property;
(2) sequestration against the personal property of any director or other officer; or
(3) order of committal against any director or other officer.[1]

A company may be summoned[2] and may be convicted of offences where the punishment is a fine.[3] A company may be 'a respectable and responsible person' within the meaning of those words in a licence to assign leasehold property.[4]

The Court of Appeal has held that a commercial company can make complaints (under the Broadcasting Act 1996) to the Broadcasting Standards Commission in respect of 'fairness' under s 111(1), and of 'unwarranted infringement of privacy' under s 110(1). This extends to secret filming on part of the company's premises to which the public had access.[5]

However, a company cannot be convicted under a section which inflicts only imprisonment as the penalty.[6] A company cannot be convicted of driving a lorry without a permit as this is a physical act which can be performed only by a natural person.[7] Also, a company cannot be subpoenaed to give evidence under oath.[8]

*(continued)*
*Trading v Buckland* [1990] 1 WLR 920. It can be required to give security for good behaviour: *Sheen v Geo Cornish Pty Ltd* (1978) 22 ALR 155, SC (NSW). It cannot commit perjury, although semble it might be liable for aiding or procuring the commission of perjury: *Smorgon v Federal Commr of Taxation* (1976) 13 ALR 481 at 487 to 488, HC (Aus). However, perjured evidence can be attributed to a company for the purpose of the fraud on the party rule: *Odyssey Re (London) Ltd v OIC Run-Off Ltd* (2000) 144 SJ LB 142, CA. In *Triplex Safety Glass Co Ltd v Lancegaye Safety Glass (1934) Ltd* [1939] 2 KB 395, CA and *Rio Tinto Zinc Corpn v Westinghouse Electric Corpn* [1978] AC 547, HL, it was held that a company can plead the privilege against self-incrimination. In Australia, the High Court has declined to follow these precedents, preferring the American view that this is a personal privilege protecting a 'purely human right': *Environmental Protection Authority v Caltex Refining Co Pty Ltd* (1993) 178 CLR 477, HC (Aus). In contrast, the Canadian cases support the English view: *Webster v Solloway Mills & Co* [1931] 1 CLR 831, AD (Alta), as does New Zealand authority: *NZ Apple & Pear Marketing Board v Master & Sons Ltd* [1986] 1 NZLR 191, CA (NZ).
1  CPR sc 45.5.4 and see *Benabo v William Jay & Partners* [1941] Ch 52; *Phonographic Performance v Amusement Caterers (Peckham) Ltd* [1964] Ch 195. This does not apply in Scotland.
2  *Evans & Co v London County Council* [1914] 3 KB 315; Magistrates' Courts Rules 1981, r 99(3).
3  *Pharmaceutical Society v London and Provincial Supply Association* (1880) 5 App Cas 857 at 869; *Chuter v Freeth & Pocock Ltd* [1911] 2 KB 832.
4  *Ideal Film Renting Co v Nielsen* [1921] 1 Ch 575; *Willmott v London Road Car Co* [1910] 2 Ch 525. See also *Re Greater London Property Ltd's Lease* [1959] 1 WLR 503. See further §1.4.1.
5  *R v Broadcasting Standards Commission, ex parte BBC* [2000] 3 All ER 989, per Lord Woolf. A complaint under Art 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms was not sustained.
6  *Hawke v E. Hulton & Co* [1909] 2 KB 93. The criminal liability of companies is discussed further at §1.7.1.
7  *Richmond on Thames London Borough Council v Pinn & Wheeler* (1989) 87 LGR 659, DC. It has been held that it is possible for a company to 'use' motor vehicles in a manner contrary to s 134 of the Road Traffic Act 1960. The justices wrongly dismissed an information on the ground that a limited company could not 'use' vehicles but only its employee driver: *Brown v Grange Tours Ltd* (1968) 112 SJ 1010, QBD. Contrast *Nelitz v Dyck* (2001) 52 OR (3d) 458, CA (Ont), where the Ontario Court of Appeal ruled that a company could be held liable for the tort of battery, directly and not merely vicariously, if it had retained a chiropractor to treat the plaintiff without properly securing her consent. A company can 'deal as a consumer' within the meaning of s 12(1) of the Unfair Contract Terms Act 1977: *R & B Customs Brokers Co Ltd v United Dominions Trust Ltd* [1988] 1 WLR 321, CA. It cannot be an employee, although it can contract to provide services: *Australian Mutual Provident Society v Chaplin* (1978) 18 ALR 385 at 392, PC. Nor can a company, unless authorised by statute, be appointed executor of a will: *In the Will of Docker* (1976) 12 ALR 521, SC (NT).
8  *Penn-Texas Corpn v Murat Anstalt* [1964] 1 QB 40, CA, although it could be required to attend and present documents under the Foreign Tribunals Evidence Act 1856, *Penn-Texas Corpn v Murat Anstalt (No 2)* [1964] 2 QB 647, CA.

*The Company as a Legal Person* [§1.4]

Since the Woolf reforms, the old rule that, as a company cannot appear in person, in all proceedings it must be represented by counsel or a solicitor,[1] has been relaxed. Statements of truth in claims, defences etc may now be signed by a senior employee and, with the court's approval, a duly authorised employee may represent the company in court.[2]

## 1.4   The Principle of Corporate Personality

The separate personality of a company[3] and its entity as distinct from its shareholders[4] was established by the House of Lords in *Salomon v Salomon & Co*[5] where it was held that however large the proportion of the shares and debentures owned by one man, even if the other shares were held in trust for him, the company's acts were not his acts nor were its liabilities his liabilities; nor is it otherwise if he has sole control of its affairs as governing director.[6]

The principle of the *Salomon*[7] case, that a company is a legal entity distinct from its members, is strictly applied by the courts whenever it is sought to attribute the rights or liabilities of a company to its shareholders, or regard the property of a company as belonging in law or equity to the shareholders.[8] Thus the fact that one shareholder controls all, or virtually all, the shares in a company is not a sufficient reason for ignoring the legal personality of the company.[9] Further, a company cannot be characterised as an agent of its shareholders unless there is clear evidence to show that the company was in fact acting as an agent in a particular transaction or series of transactions.[10] Likewise, the property of a company in no sense belongs to its members,[11] and it carries on its own business, not that of its members.[12] The company is not a trustee of its property for its shareholders even where the directors have been

1  *Tritonia Ltd v Equity and Law Life Assurance Soc* [1943] AC 548, HL; *Charles P Kinnel & Co v Harding Wace & Co* [1918] 1 KB 405, CA.
2  CPR 10 PD–004, 22 PD –003 and 39.6.
3  On the separate personality of a corporation sole, see *John Doe v Bennett* (2002) 218 DLR (4th) 276, CA (Newfoundland and Labrador), where liability of the corporation in tort was held to be direct and not vicarious. Compare *Re Indian Residential Schools* [2003] 3 WWR 521, QB (Alberta), in which several dioceses of the Anglican church were treated as distinct corporate bodies.
4  See *Re Noel Tedman Holdings Pty Ltd* [1967] Qd R 561, SC (Qld). The company remained in being despite the deaths in a road accident of a husband and wife who were its only shareholders and directors.
5  [1897] AC 22; see also *EBM Co v Dominion Bank* [1937] 3 All ER 555
6  *Inland Revenue Commissioners v Sansom* [1921] 2 KB 492; cf *Trevor Ivory Ltd v Anderson* [1992] 2 NZLR 517, CA (NZ) (person who was managing director and major shareholder of company running an advisory service held not personally liable for negligent advice); *Williams v Natural Life Health Foods* [1998] 1 WLR 830, HL.
7  [1897] AC 22; *Re Precco I (Pacific Coast) Ltd v Bon Street Developments Ltd* (1989) 60 DLR (4th) 30, CA (BC); *Chen v Butterfield* (1996) 7 NZCLC 261,087, HC (NZ). For an application of the *Salomon* principle, see *FJ Neale (Glasgow) Ltd v Vickery* 1974 SLT 88.
8  *Repatriation Commission v Harrison* (1997) 24 ASCR 711, Fed CA.
9  See, for example, *Tunstall v Steigmann* [1962] 2 QB 593, CA; *Lee v Lee's Air Farming Ltd* [1961] AC 12, PC; *Shipping Corpn of India Ltd v Evdomon Corpn* 1994 (1) SA 550, AD (S Afr); *Wilson v Wilson* 1999 SLT 249; *Tungstall v Steigmann* was not followed in *JR McKenzie Ltd v Gianoutsos & Booleris* [1957] NZLR 309, CA (NZ), where the company in question was a wholly owned subsidiary with the same directors as the parent company. See *Buchan v Secretary of State for Employment* [1997] BCC 145, EAT.
10  *Ebbw Vale UDC v South Wales Traffic Area Licensing Authority* [1951] 2 KB 366, CA; *Pegler v Craven* [1952] 2 QB 69, CA; *JH Raynor (Mincing Lane) Ltd v Department of Trade and Industry* [1988] 3 WLR 1033, CA; *Ewest (Aust) Catering & Services Pty Ltd v Independent Foods Pty Ltd* (2000) 35 ACSR 352; *Adams v Cape Industries plc* [1990] Ch 433, CA. See §1.4.1.
11  *Bank voor Handel en Scheepvaart NV v Slatford* [1953] 1 QB 248.
12  *Gramophone & Typewriter Co Ltd v Stanley* [1908] 2 KB 89; *Toronto Stock Exchange v Ontario (Regional Assessment Commissioner)* (1996) 136 DLR (4th) 362, CA (Ont) (non-profit company used by its members for trading not assessable for business tax)

continue with a voluntary liquidation under an independent liquidator who had their confidence.

There has been pressure to change the strict position taken in the UK. In Germany the 'law of integration'[1] imposes, in the appropriate conditions, the responsibility of the group for the obligations of subsidiaries and the EC Ninth Draft Directive proposed a reform in the company law of the other Member States on broadly the same lines. The Cork Committee[2] recommended the widest possible review of the different considerations, with a view to the introduction of reforming legislation.[3]

Although the Cork Committee's recommendations on some other matters were taken up (notably wrongful trading), this issue has languished. In the recent DTI review, it was proposed to leave UK law as it is, but perhaps allow an elective system where if a parent formally guarantees one or more subsidiaries, these subsidiaries would no longer have to produce separate accounts.[4] Even this limited change may not survive into any new legislation.

### 1.5.2    Lifting the veil in groups of companies

In its landmark decision in *Adams v Cape Industries plc*[5] the Court of Appeal took the opportunity to attempt to bring some order to the rather confused body of case-law relating to the question of lifting the veil where groups of companies are concerned. The case was concerned with the enforcement in an English court of judgments obtained in a USA court. One aspect[6] of the question of the exercise of foreign jurisdiction involved the alleged presence through various subsidiaries or associates[7] of Cape Industries in the USA. The respondent and its subsidiaries or associates operated a business mining asbestos in South Africa and selling this product in various parts of the world, including the USA. The judgments obtained in a Federal Court in Texas were concerned with the liability in tort for asbestos-related injuries. Counsel for the appellant raised three arguments as a basis for asserting that Cape Industries was 'present' in the USA. The Court of Appeal structured its new and more restrictive approach to lifting the veil around these three possible arguments.

#### (1)   *The single economic unit argument*

This concept of the group as a single economic entity found no support as an independent basis on which the corporate veil might be lifted. It could not justify any departure from the normal rule that 'each company in a group of companies . . . is a separate legal entity possessed of separate legal rights and liabilities'.[8] The considerable number of cases where the court has been prepared

1   See H Wurdinger, *German Company Law* (Oyez Publishing, 1975), Chap 2, pp 138 to 140. There is also a lesser degree of group liability where, though the conditions of 'integration' do not apply, there is nevertheless a 'control contract': ibid, pp 148 to 149.
2   Insolvency Law and Practice: Report of the Review Committee (1982 Cmnd 8558). See, as to the EC Ninth Draft Directive, ibid, para 1936.
3   See ibid, para 1952.
4   *Modern Company Law for a Competitive Economy, Completing the Structure*, Chapter 10.
5   [1990] Ch 433. A decision similar to *Adams* was reached independently on comparable facts in *Briggs v James Hardie Pty Ltd* (1989) 7 ACLC 841, CA (NSW).
6   The Court of Appeal also considered whether the defendants had consented to a foreign court exercising jurisdiction over them.
7   In the discussion below of the Court of Appeal's judgment, two of these subsidiaries are referred to (as in the judgment itself) as AMC and CPC.
8   [1990] Ch 433 at 532, citing Roskill LJ in *The Albazero* [1977] AC 774 at 807. Cf *The Maritime Trader* [1981] 2 Lloyd's Rep 153; *Bakri Bunker Trading Co Ltd v Owners of the 'Neptune'* [1986] HKLR 345, HC (HK); *The 'Skaw Prince'* [1994] 3 SLR 379, HC (Spore) (group trading through single-ship companies); *Dithaba Platinum (Pty) Ltd v Erconovaal Ltd* 1985 (4) SA 615, PD (T'vaal); *Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd* 1993 (2) SA 784, PD
                                                                                    *(continued)*

to ignore the distinction in law between a group of companies on the basis that 'justice so demands' or if 'the business realities' require it, were all explained by Slade LJ as turning 'on the wording of particular statutes or contracts'.[1] While this may be a very satisfactory explanation of some of these cases which explicitly turn on the liberal interpretation of an agreement *in re mercatoria*[2] or on the construction of the wording of a particular statutory provision,[3] it cannot satisfactorily explain all of them. It certainly gives a strained interpretation to *DHN Food Distributors Ltd v Tower Hamlets London Borough Council*.[4] However, given the doubts cast upon the Court of Appeal's decision in this case by the House of Lords in the Scottish case of *Woolfson v Strathclyde Regional Council*,[5] its authority must now be seriously questioned, particularly the approach taken by Lord Denning MR. The Court of Appeal in *Cape Industries* recognised that the rigid doctrine now espoused by the English courts differs markedly from that of the European Court of Justice,[6] where a group of companies may be treated as a single economic entity. However, failure so far to agree on the Draft Ninth Company Law Directive suggests this approach will not be extended.

## (2) *Piercing the corporate veil*

The Court of Appeal in *Cape Industries* accepted that there is 'one well-recognised exception to the rule prohibiting the piercing of the "corporate veil" '. This referred to Lord Keith's well-known observation in *Woolfson v Strathclyde Regional Council*[7] that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere facade concealing the true facts. Slade LJ in *Cape Industries*[8] cited *Jones Lipman*[9] as illustrating this principle.[10] As applied to the case itself, the 'facade' principle

*(continued)*

(Cape); *A-G v Equiticorp Industries Group Ltd* [1996] 1 NZLR 528, CA (NZ) (intra group contracts not a sham); *Revlon Inc v Cripps Lee Ltd* [1980] FSR 85 at 105. See [1990] Ch 433 at 534 to 535.

1  [1990] Ch 433 at 530; *Revlon Inc v Cripps Lee Ltd* [1980] FSR 85 at 105. See [1990] Ch 433 at 534 to 535.

2  Eg *Harold Holdsworth & Co (Wakerfield) Ltd v Caddies* [1955] 1 WLR 352 at 367; see [1990] Ch 433 at 537. See, for example, *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, CA (installation contract with holding company to install equipment at subsidiary; losses caused to other operating subsidiaries; a plaintiff holding company is entitled to recover its losses); cf *Firststeel Cold Rolled Products Ltd v Anaco Precision Pressings* (1994) *The Times*, November 21. It has been held that there is no legal principle that a holding company is unable to recover damages for loss in the value of its subsidiaries resulting directly from a duty owed to it, as distinct to a duty owed to the subsidiaries: *Barings plc (In Administration) v Coopers & Lybrand* [1997] BCC 498 at 505, CA. Legatt LJ applied *George Fischer's* case (above) and distinguished *Prudential Assurance v Newman Industries (No 2)* [1982] Ch 204, CA; see also *Ringway Roadmarking v Adbruf Ltd* [1998] 2 BCLC 625.

3  *Scottish Co-operative Wholesale Soc Ltd v Meyer* [1959] AC 324 at 342; see [1990] Ch 433 at 537; see also *Kalamazoo v Rice (David)* (unreported) 18 November 1994, CA.

4  [1976] 1 WLR 852 at 860 and 961; see [1990] Ch 433 at 533 to 534. The *DHN* case was disapproved of in *Pioneer Concrete Services Ltd v Yelnah Pty Ltd* (1986) 11 ACLR 108, at 116 to 121, SC (NSW), and *Bow Valley Husky (Bermuda) Ltd v Saint John Shipbuilding Ltd* (1994) 126 DLR (4th) 1, CA (Nfld), and distinguished in *Dennis Willcox Pty Ltd v Federal Commissioner of Taxation* (1988) 79 ALR 267, Fed CA.

5  1978 SLT 159; see [1990] Ch 433 at 536.

6  See the discussion of *Istituto Chemioterapico Italiano SpA v The Commission* [1974] ECR 233 in *Adams v Cape Industries* [1990] Ch 433 at 535; see further *Sar Schotte GmbH v Parfums Rothschild Sarl* [1992] BCL 239, *Ballast Nedam Groep NV v Belgium* [1994] 1 ECR 1289 and *Viho Europe BV v EC Commission* [1997] All ER (EC) 163.

7  1978 SLT 159 at 161.

8  [1990] Ch 433 at 542 to 543.

9  [1962] 1 WLR 832.

10  Slade LJ found little help in other authorities in terms of reasoned principle. Even the dicta of Lord Denning MR in *Wallersteiner v Moir* [1974] 1 WLR 991 at 1013 and in *Littlewoods Mail Order Stores Ltd v Inland Revenue Commissioners* [1969] 1 WLR 1241 at 1254 were not supported by other members of the Court of Appeal in those cases.

was applicable to AMC, which was not only a wholly owned subsidiary of Cape but had been used by Cape and its subsidiaries as a corporate name on their invoices.[1] This, however, did not help the appellants since the court found that AMC was not in fact carrying on business in the USA. Another company, CPC, was incorporated and carrying on business in the USA but was held not to be a facade. It was an independent corporation which was carrying on its own business in the USA and not that of Cape or its subsidiaries. In fact, its shares were wholly owned by its chief executive even though it had been set up at the behest of, and with funding from, Cape.[2]

At a more general level, the Court of Appeal observed that it is:[3]

'legitimate to use a corporate structure to ensure that legal liability (if any) in respect of particular future activity of the group . . . will fall on another member of the group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law.'

The Court of Appeal confirmed that the *motive* with which a subsidiary or associate was formed (or an existing one used) is crucial. Slade LJ stressed that the arrangements involving CPC were not shown to involve actual or potential illegality nor were they intended to deprive anyone of their existing rights.[4] No doubt future litigation will throw much needed light upon what is now this crucial, if limited, basis for lifting the corporate veil.[5] The importance of establishing a scheme of concealment to justify lifting the veil between parent and subsidiary has also been stressed in an Inner House decision of the Court of Session.[6]

### (3) *The agency argument*

The Court of Appeal in *Cape Industries* was careful to confine the possibility that a subsidiary or associate might be treated as the agent of its holding company to situations where such an inference was factually justified. It was made clear that in the absence of an express agreement[7] it will be difficult to establish such a relationship.[8] The fact that CPC acted as agent for Cape in particular transactions was not sufficient to establish that Cape was present in the USA through its agent.[9]

This restrictive approach is certainly in line with the House of Lords' original approach in *Salomon* and casts some doubt on the decisiveness of tests to imply an agency expounded in *Smith Stone and Knight v Birmingham Corp.*[10]

1  [1990] Ch 433 at 543
2  [1990] Ch 433 at 543 to 544
3  Ibid at 544; cf *Sharrment Pty Ltd v Official Trustee in Bankruptcy* (1988) 82 ALR 530, Fed CA (use of corporate structure to shield assets from bankruptcy).
4  [1990] Ch 433. Cf *Yue Tai Plywood & Timber Co Ltd v Far East Wagner Construction Ltd* [2001] 2 HKLRD 446, HC (Hong Kong) ('deliberate and obvious blurring of corporate personalities' of two companies, which had been run as one business).
5  See *Re H and Others (Restraint Order: Realisable Property)* [1996] BCLC 500 at 511, CA. This case concerned orders to restrain dealing in 'realisable property' under s 77 of the Criminal Justice Act 1988. This concerned defendants who had committed excise duty fraud. The Court of Appeal treated this as an appropriate case for lifting the veil. Applied in *Gencor ACA Ltd v Dalby* [2000] 2 BCLC 734 at 744.
6  *Watt's Trustee v SPS (Holdings) Ltd* 2000 SC 371.
7  See, for example, *Southern v Watson* [1940] 3 All ER 439, CA.
8  [1990] Ch 433 at 545 to 549; see also *Yukong Line Ltd v Rendsburg Investments Corp* [1998] 2 BCLC 485 at 493 to 496.
9  [1990] Ch 433 at 548 to 549. In *BG Preeco I (Pacific Coast) Ltd v Bon Street Developments Ltd* (1989) 60 DLR (4th) 30, CA (BC) the court rejected the American 'Deep Rock' doctrine (as expressed in *Taylor v Standard Gas & Electric Co* 306 US 307 (1938)) as being inconsistent with the *Salomon* principle.
10 [1939] 4 All ER 116, 37 LGR 665.

It would seem that the veil of incorporation will only be pierced or circumvented by the UK courts so as to treat the rights and liabilities of a company and its parent (or indeed any members) as one for any purpose in just three circumstances:[1]

(1) where the construction of a statute, contract or other document requires such an approach;[2]

(2) where the company is a mere facade for some fraud or improper purpose;[3]

(3) where the company is an authorised agent of its parent or other members.[4]

### 1.5.3   Liability for tort in groups

Although the Cape Industries approach is not popular with academics, it does have the practical advantage of clarity for practitioners and for regulators in any area (such as financial services) where solvency and liquidity are regulated.

However, there may be a further way of circumventing the veil of incorporation. In another asbestosis case involving jurisdiction, *Lubbe v Cape plc*,[5] the House of Lords has allowed an action to proceed against a parent company where the actual damage, if any, occurred as a result of the activities of various subsidiaries. The issue as formulated was:

'whether a parent company which is proved to exercise de facto control over the operations of a (foreign) subsidiary and which knows, through its directors, that these operations involve risks to the health of workers employed by the subsidiary and/or persons in the vicinity of its factory or other business premises, owes a duty of care to those workers and/or other persons in relation to the control which it exercises over and the advice which it gives to the subsidiary company?'[6]

Unless and until there is a substantive hearing on a similar case, it is not clear how much easier (if at all) it will be to prove sufficient control to give rise to this liability, compared to showing an agency relationship. However, the interlocutory hearings suggest that it would be easier. In the USA, the courts have been more prepared to hold parents liable for subsidiaries' torts than contractual breaches on the grounds that tort-victims are not volunteers.[7] Still it could be difficult to restrict this argument to parent/subsidiary situations and would render a controlling shareholder/director, like Mr Salomon,

1 An opinion shared by Paul L Davies, the current author of *Gower's Principles of Company Law*, 6th ed (Sweet & Maxwell, 1997) at 173.

2 Eg in the area of competition law: *ICI v EC Commission* [1972] CMLR 557; *Commercial Solvents Corpn v EC Commission* [1974] 1 CMLR 309; see also s 24 of the Companies Act 1985. This does not, however, extend to civil disclosure rules. For documents in fact in custody of subsidiaries: *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627.

3 *Jones v Lipman* [1962] 1 WLR 532; *Gilford Motor Co v Horne* [1933] Ch 935, CA; *Re Bugle Press* [1961] Ch 270; *Trustor AB v Smallbone* [2001] 1 WLR 1177; *International Credit Investment Co v Adham* [1998] BCC 134; although the extent of the freezing order in *Hayes (Valuation Officer) v Lloyd* (1985) 82 LSG 2016 was doubted in *Adams v Cape Industries plc* [1990] Ch 433.

4 Retrospectively interpreted in *Adams v Cape Industries plc* [1990] Ch 433; *Re Polly Peck International Plc (in administration) (No 3)* [1996] 1 BCLC 428; *Yukong Line Ltd of Korea v Rendsburg Investments Corp of Liberia (the Rialto) (No 2)* [1998] 1 WLR 294. However, agency was not required for the imposition of a freezing (*Mareva*) order in *Atlas Maritime Co SA v Avalon Maritime Ltd, The Coral Rose (No 1)* [1991] 4 All ER 769.

5 [2000] 4 All ER 268.

6 Ibid, at 271. Is this a vicarious liability (through the negligence of the parent's directors or other senior managers to whom the subsidiary reported) or a direct liability for corporate advice as in *Williams v Natural Health Foods Ltd* [1998] 1 WLR 830, HL?

7 For a detailed discussion of this area, see Phillip I Blumberg, 'The Multinational Challenge to Corporation Law' (OUP, 1993).

but these must be accompanied by a certified translation into English. This concession also applies to previously registered companies which alter their memorandum (by special resolution under s 2(2)) to place the situation of their registered office in Wales. Section 21(3) likewise allows companies registered with registered office in Wales (or changing to such under s 2(2)) to deliver any document, required by the Companies Act to be sent to the Registrar, in Welsh together with a certified English translation. Any amendments to the articles or memorandum must be in the same language as the memorandum and articles originally registered.[1] If that language is Welsh, such amendments must be accompanied by a 'certified translation'.

### 2.4.4   The objects of the company

This clause in the memorandum, and the whole ultra vires doctrine to which it gives rise, is dealt with separately in **Chapter 3**.

## 2.5   Liability of the Members

In the cases of companies limited by shares or by guarantee, with or without share capital, the fourth clause must simply state that 'The liability of the members is limited.' Those are the words contained in the forms given in regulations made under the 1985 Act,[2] and they should not be departed from. It is wrong to insert, as has been done, 'the liability of the *company* is limited.' Such a variation, if passed by the Registrar, might produce results disastrous to the members.

The most usual course is to frame the memorandum of association so as to limit the liability of each member or shareholder to the par value plus any premium on the shares held by him. The meaning of this is that at no time can he be called upon to pay, either for the purpose of carrying on the company's business or of satisfying the claims of its creditors, a larger sum than remains unpaid on the shares which at the time of the call, or within a year before the commencement of the winding up of the company, were registered in his name.[3] When he has paid a part, the balance only can be recovered from him. Should he transfer his shares before the full amount is called up, his unsatisfied liability passes to the person who acquires them; but a contingent liability still attaches to a former holder to the limited extent that, if the company should go into liquidation within one year from the time of his parting with his shares, he may be called upon to contribute towards the payment of any debts contracted before he ceased to be a member, in the event of the company being unable to meet its liabilities in full, and the person who has acquired his shares failing to pay the balance owing on them. No alteration of the memorandum or articles of association after a person becomes a member can bind him either to take up more shares than he held at the date when the alteration was made, or in any way increase his liability as at that date to contribute to the share capital of, or

---

1   See s 21(4). As to the meaning of 'certified translation', see s 21(5). See the Companies (Welsh Language Forms) (Amendment) Regulations 2000 (SI 2000/2413). These regulations prescribe a new Form 363s cym which corresponds to Form 363s prescribed by the Companies (Forms) (Amendment) Regulations 1999 (SI 1999/2356). The form is in Welsh as well as in English, and will be provided by the Registrar of Companies to any company with a memorandum stating that it is to be registered in Wales, as opposed to England and Wales, which notifies the Registrar that it wishes to receive this form instead of Form 363s.
2   See the Companies (Tables A to F) Regulations 1985, SI 1985/805, Tables B to D.
3   Insolvency Act 1986, s 74.

otherwise to pay money to, the company, unless he agrees in writing, either before or after the alteration is made, to be bound thereby[1] (s 16).

Under the provisions of ss 306 and 307 of the 1985 Act, the directors or managers may take upon themselves an unlimited liability, although the liability of the other members is limited, this being similar to the distinction between general and limited partners under the Limited Partnerships Act 1907. Almost no use, however, has been made of those provisions.

The second way of limiting the liability of members is by so framing the memorandum of association as to make each member guarantee a certain sum, which he can only be called upon to pay in the event of the company being wound up and which will remain the same whatever his pecuniary interest in the company may be. Associations of this kind are called 'companies limited by guarantee'. This form of company is discussed further in **Chapter 6**.

Two other aspects of limited liability will be examined in **Chapter 6**. The first is the power of the Department of Trade and Industry to release non-profit-making companies from the obligation of attaching the word 'limited' to the company's name.[2] The second is the procedure by which limited companies can register as unlimited companies, and vice versa.[3]

## 2.6   The Nominal Capital

In the case of companies limited by shares, s 2(5)(a) requires the memorandum to state the amount of the share capital with which the company proposes to be registered and the division of the share capital into shares of fixed amount.

In the case of a company registered as a public limited company, the share capital clause must state a minimum share capital complying with that required for a public company (ie £50,000): see Companies Act 1985, s 118.[4]

It is not necessary that the company's capital be denominated in sterling, except that, in the case of a public company, the minimum share capital requirement (ie £50,000) must be in English currency. In *Re Scandinavian Bank Group plc*[5] it was ruled that it was in order for the company to have a nominal capital consisting of a 'mixed basket' of currencies (sterling, US dollars, Swiss francs and Deutschmarks). It has been held in Australia that a company's nominal capital need not correspond with the lowest or any particular denomination of the currency.[6]

If in the case of a company having a share capital, there is a reference in business documents to the amount of the share capital, the reference must be to *paid-up share capital*: see further §2.2.8.

## 2.7   Optional Conditions in the Memorandum

Any matter which might be provided for in the articles of association can instead be inserted in the memorandum. This is not wholly unusual in regard

---

1  Companies Act 1985, s 16. The circumstances surrounding entry into membership may, however, show that the member has entered into an *additional* contractual relationship under which pecuniary obligations are incurred, and such a contract may contain an implied term permitting amendments of the articles which add to the members' liabilities: *Ding v Sylvania Waterways Ltd* (1999) 30 ACSR 301, SC (NSW) (company formed by riparian landowners: contribution by member towards maintenance of a common amenity).
2  Ibid, s 30. See §6.6.
3  Ibid, ss 49 to 52. See §6.8.
4  See §7.2.
5  [1988] Ch 87.
6  *Re Australian Pacific Technology Ltd* (1994) 13 ACSR 478, SC (Vic) (shares of 0.01c par value).

company's affairs is required, or that early dissolution is for any other reason inappropriate. On such application the Secretary of State may direct that the liquidation proceed in the ordinary way or, apparently,[1] defer the date of dissolution for such period as he thinks fit: s 203(3). His decision is subject to appeal to the court.[2] It appears that both the Secretary of State and the court may address wider issues (eg whether early dissolution is for any reason inappropriate in the public interest) than the official receiver, when he is considering whether or not to apply for early dissolution. There are similar provisions in Scotland under s 204 of the 1986 Act. The liquidator in a winding up by the court may apply for an order for early dissolution at any time after his appointment, on the ground that the realisable assets of the company are insufficient to cover the expenses of winding up. There are no specific rules of court and the application is made by way of note in the process. The court may order appropriate intimation and service (RCS 74.32 and 74.34; Sh CtR 30 and 32). A copy of the court order is to be forwarded by the liquidator to the Registrar within 14 days (r 4.77 of the Scottish Rules and Form 4.28 (Scot)). The court may entertain an application by any interested person for deferment of the date of dissolution, but otherwise dissolution takes place three months after the date of registration of the order. If an order deferring the date of dissolution is obtained, the person to whom it is granted must deliver a copy to the Registrar within seven days.

Dissolution may also take place under s 427(3)(d) of the Companies Act 1985 (see §30.11) and s 652(g) of that Act (see §34.29).

### 34.8.2   After dissolution

When a company is finally dissolved the court no longer has jurisdiction over it, for there is no company[3] and there are no officers or other agents to be served with notices or process on its behalf. The dissolution cannot be impeached on the basis of an allegation that in fact the affairs of the company had not been fully wound up, as required by ss 94 and 106, when the final meeting in a voluntary winding up was held.[4]

A company which has been dissolved in its jurisdiction of incorporation must be treated as dissolved everywhere and as having no existence.[5] A foreign company may, however, be the subject of winding-up proceedings notwithstanding the fact that it has been dissolved in its home jurisdiction.[6]

It was once said that a dissolution could be annulled 'on proper proceedings' being taken in a case of 'absolute fraud',[7] but this seems academic since by s 651

---

1   Section 203(3)(a) of the Insolvency Act 1986 provides for an order that the winding up should proceed 'as if no notice had been given under section 203(3)'. If no such notice is given the early dissolution procedure does not apply. How, in those circumstances, s 203(3)(b) can provide that the direction 'may include' a deferral of dissolution, when dissolution under the section has been excluded, is not clear. It is not, on the face of it, the intention of s 203(3)(b) merely to defer dissolution pending the outcome of a possible appeal.
2   Insolvency Act 1986, s 203(4). As to the duty to register directions and decisions on appeal, see s 203(5), (6), and as to the procedure on appeal, see rr 4.224 and 4.225 of the Rules.
3   *Re Westbourne Grove Drapery Co* (1879) 39 LT 30. An insurance company which sought to avoid liability because the company had failed to give notice of the event giving rise to the claim did not succeed, because a dissolved company was incapable of giving such a notice: *Home v Prudential Assurance Co Ltd* 1997 SLT (Sh Ct) 75.
4   *Re Pinto Silver Mining Co* (1878) 8 ChD 273, CA; *Re London and Caledonian Marine Insurance Co* (1879) 11 ChD 140, CA.
5   *United Service Insurance Co Ltd v Lang* (1935) 35 NSWLR 487, CA (NSW).
6   Insolvency Act 1986, s 225.
7   *Re London and Caledonian Marine Insurance Co* (above) at 144. What form the proceedings might take was not indicated, although James LJ referred to the possibility of an injunction to prevent completion of the winding up, and dissolution.

---

of the Companies Act 1985 the court may, within the appropriate period[1] after the date of dissolution[2] on the application of the liquidator[3] or any person who appears to the court to be interested, make an order on such terms as it thinks fit declaring the dissolution to have been void. Thereupon such proceedings may be taken as if the company had not been dissolved.[4] The description a 'person interested' means a person with a proprietary or pecuniary interest in resuscitating a company, such as an insurer who has indemnified the company and wishes to sue a third party in its name[5] or a third party with a personal injury claim against the company,[6] but not the solicitor to a proposed claimant.[7] An applicant claiming as a creditor has standing if he can show that he has more than a 'shadowy' claim.[8] The Secretary of State may be 'interested' in connection with his regulatory functions relating to companies.[9] A party with an interest which will be directly affected by an order under s 651 may also apply to be joined as a party to the proceedings.[10] Provided the proceedings in which the application is made were commenced within the time-limit, an order may be made even though the application is heard outside the time-limit.[11] The power will be exercised upon a reconstruction if the new company, after agreeing to satisfy the liabilities of the dissolved company, fails to honour its agreement after the dissolution.[12] The variety of parties who may have standing to make an application under s 651 indicates that a variety of purposes may be served by an order under the section. The paradigm, however, is an order

1  As prescribed by s 651(4) to (7), added by the Companies Act 1989, s 141(3) (and see also s 141(4), (5)). The general rule is that the application must be made within two years of dissolution. Where, however, the object is to bring a claim for damages for personal injuries or under the Fatal Accidents Act 1976 or the Damages (Scotland) Act 1976, there is no such restriction. Instead, the court is instructed to refuse an order if it appears that the claim would fail by reason of the statutory limitation rules applying to such actions. This requires the court to take into account not only the primary limitation period for such actions but also the power under s 33 of the Limitation Act 1980 to waive that period, and the court hearing the s 651 application will not hold that a claim 'would' fail if there is an arguable case for a s 33 order in favour of the plaintiff/applicant: *Re Workvale Ltd* [1992] 1 WLR 351, CA. The decision also reviews the situations in which it may be appropriate to make an order under s 651(6) in lieu of requiring the successful applicant to make a subsequent application for an order under s 33: ibid at 424 to 425 per Scott LJ. *Re Workvale* was followed in relation to the equivalent provisions of Scots law in *Scottish Lion Engineering Ltd v Benson* 2001 SLT 1037. See also *Smith v White Knight Laundry Ltd* [2001] 2 BCLC 206, CA which considered the circumstances where it would be appropriate to make a direction under s 651 that the period from the dissolution to the restoration should not count for limitation purposes.
2  Including dissolution under s 652 (see §34.8.5 and 34.8.8): *Re Belmont (M) & Co* [1951] 1 Ch 10.
3  'Liquidator' does not include a person 'appointed' after the company has been struck off the register under s 652 for failing to make returns: *Re Wood and Martin* [1971] 1 WLR 293.
4  As to the applicant's duty to register the order, see s 651(3).
5  *MH Smith (Plant Hire) Ltd v DL Mainwaring* [1986] BCLC 342 at 344. If the company has simply been dissolved, there is no cause of action to which such an indemnifier may claim a right of subrogation: ibid. The assignee of a cause of action against the company has standing: *Re Timothy's Pty Ltd* (1981) 6 ACLR 823, SC (NSW).
6  Ie a claim pending at the date of dissolution: *Re Philip Powis Ltd* [1998] 1 BCLC 440, CA. Here the court refused to dismiss the application simply because of its possible impact on the company's insurers who might, in any event, be able to intervene in the liquidation proceedings.
7  *Re Roehampton Swimming Pool* [1968] 1 WLR 1693.
8  *Re Wood and Martin* [1974] 1 WLR 293 at 247; *Re Mixhurst Ltd* [1993] BCC 748. The mere fact that a person is a former shareholder or director is similarly insufficient in itself to give him standing: *Re Waterbury Nominees Pty Ltd* (1986) 11 ACLR 348, SC (WA).
9  *Re Townreach Ltd* [1995] Ch 28.
10  *Stanhope Pension Trust Ltd v Registrar of Companies* [1994] BCLC 628, CA; *Re Jayham Ltd* [1995] 2 BCLC 455. For a review of the cases in this area, see the judgment of Norse LJ in *Blenheim Leisure (Restaurants) Ltd v Registrar of Companies* (1999) *The Times*, August 13.
11  *Re Scad* [1941] Ch 386.
12  *Re Spottiswoode, Dixon & Hunting* [1912] 1 Ch 410.

enabling the liquidator to realise an asset which was overlooked during the winding up, or a creditor to make a fresh claim.[1]

In England and Wales, notice of an application under s 651 of the Companies Act 1985 (which is normally made by motion) must be given to the Attorney-General through the Treasury Solicitor to ascertain whether the Crown makes any claim to the assets as bona vacantia.[2] Proof that he has no objection may be given in a simple case by exhibiting to the applicant's evidence a letter to that effect.[3] Moreover, where the company is still carrying on business, the Registrar of Companies should be joined as a party.[4]

An order under s 651 of the Companies Act 1985 declaring the dissolution of a company 'to have been void' means that all consequences flowing from such a dissolution are themselves annulled,[5] but the order will not validate any purported corporate activity of the company carried out prior to the order,[6] nor treat a limitation period as having been suspended during the dissolution.[7] Moreover, the court will not make an order simply to vest a legacy in the company which vested in an individual by reason of the dissolution.[8] Nor will an order revive a misfeasance summons which had been taken out prior to dissolution but which abated on dissolution.[9] A pending action ceases absolutely and for all time and cannot be revived on obtaining an order under s 651 declaring the dissolution void.[10]

If there is an effective dissolution which is not set aside by the court, claims by the company against other persons vest in the Crown.[11] If the right of action had been assigned before dissolution, however, whether by express assignment or by assignment of 'all the assets' of the company, the assignee will in some cases be able to enforce the claim by an action brought in his own name. An assignee may proceed in his own name only where he would have been able to sue in equity, without joining the assignor, before the Judicature Act 1873 (ie

---

1   *Stanhope Pension Trust Ltd v Registrar of Companies* [1994] 1 BCLC 628 at 632; *Re Oakleague Ltd* [1995] 2 BCLC 624. In the latter case, Robert Walker J decided that an asset can be said to have been 'overlooked' when the liquidator had been aware of its existence, but not that it had a realisable value. Once one of these primary purposes may on the evidence be served by restoration to the register, the question whether the applicant or any other party will in fact benefit is not the point; that can be determined only after restoration and, if the asset is a cause of action, by the appropriate forum.

2   *Practice Note* [1928] WN 218, [1931] WN 199; *Re Belmont (M) & Co* [1952] Ch 10. See *Re Henderson's (Nigel) Co* (1911) 105 LT 370.

3   *Re Belmont (M) & Co* (above).

4   *Re Test Holdings (Clifton)* [1970] 1 Ch 285.

5   *Re CW Dixon* [1947] Ch 251. This is subject to the overriding principle that previous distributions made by the liquidator will not be disturbed. Provided this principle is observed, however, a creditor may obtain an order enabling him to improve his position by asserting a specific proof for a debt when, at the time of the dissolution, he would have had only a contingent claim: *Stanhope Pension Trust Ltd v Registrar of Companies* [1994] BCLC 628, reversing on this point the decision reported at [1994] BCLC 166.

6   *Morris v Harris* [1927] AC 252, HL.

7   *Re Mixhurst* [1993] BCC 748; *602533 Ontario Inc v Shell Canada Ltd* (1998) 155 DLR (4th) 562, CA (Ont) (in contrast to the position under s 653, §34.29). In Mixhurst, Evans-Lombe J took the view of the decision in *Morris v Harris* [1927] AC 252 stated in the text. In *Re Townreach Ltd* [1995] Ch 28, Judge Paul Baker QC took the view that what was said in *Morris v Harris* was limited to 'bare' restoration orders, and did not inhibit the court's discretion in imposing terms when making an order. In particular, he held a voluntary winding up which had taken place since dissolution to be valid, rather than requiring it to take place again, delaying possible disqualification proceedings. It should be noted that the directors affected, whom the judge regarded as falling outside the normal range of 'third parties' with interests to be protected, had not appeared to object to restoration.

8   *Re Servers of the Blind League* [1960] 1 WLR 564.

9   *Re Lewis & Smart* [1954] 1 WLR 755. After dissolution, no proceedings can be taken against directors or officers for misfeasance: *Coxon v Gorst* [1891] 2 Ch 73.

10  *Foster Yates & Thom v HW Edgehill Equipment* (1978) 122 SJ 860, CA.

11  *Re Higginson & Dean* [1899] 1 Ch 352.

---

where there is a purely equitable debt) or when there is a statutory assignment under s 136 of the Law of Property Act 1925, ie an absolute assignment in writing, not purporting to be by way of charge only, 'of any debt or other legal chose in action' of which express notice in writing has been given to the debtor.[1] This will include the right to enforce contracts (eg for the supply of goods) and where the conditions set out above are satisfied the assignor need not be joined.[2] The words 'not purporting to be by way of charge only', do not exclude an assignment in a trust deed which is expressed to be absolute, even though there is a power of redemption, but will prevent a charge in debentures being sufficient to carry the right to sue under s 136.[3]

Since leasehold property is capable of becoming bona vacantia (see s 654 of the Companies Act 1985, §34.28) it remains alive despite dissolution of the lessee company, together with the liability of anyone guaranteeing its performance. It is therefore unnecessary when a company has agreed to assign a lease and been dissolved without doing so, to join the reversioner to an application of the kind mentioned below for a vesting order.[4] In England and Wales, where a company has agreed to sell an asset, received the price and thereby become trustee for the purchaser but has been dissolved before transferring the asset, a vesting order may be made without also obtaining an order appointing a new trustee of the property.[5] Such an order may be made under s 44 of the Trustee Act 1925 (land or any legal or equitable interest in land) or s 51 of that Act (stock[6] and choses in action). The dissolution of a company does not, ordinarily, bring a legal estate to an end,[7] but if it does, s 181 of the Law of Property Act 1925 empowers the court to create a corresponding estate and vest it in the person who would have been entitled to the determined estate if it had remained subsisting.

A creditor has a remedy in damages against the liquidator if, with knowledge of a debt, he has wilfully or negligently distributed or parted with the assets and caused the company's dissolution without providing for the debt.[8] A solicitor who continues to represent a company after its dissolution is liable to the opposing party for costs incurred as a result of his holding himself out to have authority to act for the company.[9]

### 34.8.3   Bona vacantia

Section 654 of the Companies Act 1985 provides that where a company is dissolved, all property and rights vested in or held on trust for the company immediately before its dissolution (including leasehold property but not

---

1  The notice may be given after the death of the assignor (*Walker v Bradford Old Bank* (1884) 12 QBD 511) and by analogy, it seems, after dissolution of an assignor company.

2  *Tolhurst v Associated Portland Cement Manufacturers* [1903] AC 414 at 420 to 424, HL. It seems that unliquidated damages for breach of contract may be recovered without joining the assignor if the contract would be specifically enforced (*Torkington v Magee* [1902] 2 KB 427, affirmed without referring to this point [1903] 1 KB 604) but not unliquidated damages for torts (*Dawson v Great Northern and City Railway* [1905] 1 KB 260).

3  *Hughes v Pump House Hotel Co* [1902] 2 KB 190; *Tancred v Delagoa Bay Rly* [1889] 23 QBD 239; *Comfort v Bettes* [1891] 1 QB 737; *Re Bell* [1896] 1 Ch 1.

4  As to disclaimer of a lease, see §34.3.9.

5  *Re C & H Crichton* (1921) [1932] WN 208; similarly where a company holds property on trust for its contributories.

6  For the definition of stock, see Trustee Act 1925, s 68(14). The Act refers expressly to a corporation which has been dissolved: see s 44(ii)(c) and s 51(ii)(c).

7  *Re Strathblaine Estates* [1948] Ch 228.

8  *Re London and Caledonian Marine Insurance Co* (1879) 11 ChD 140; *Pulsford v Devenish* [1903] 2 Ch 625; *Argyll's v Coxeter* (1913) 29 TLR 355; *Re Aidall* [1933] 1 Ch 323 at 327, CA; *James Smith & Sons (Norwood) v Goodman* [1936] 1 Ch 216, CA; *Re Armstrong Whitworth Securities Co* [1947] Ch 673, CA; *Lamey v Winram* 1987 SLT 635.

9  See previous footnote.

---