# Exhibit 7

a

[COURT OF APPEAL]

GILFORD MOTOR COMPANY, LIMITED v. HORNE.

b

[1932. G. 1418.]

1933 Feb. 28; March 1.

FARWELL J.

1933 April 27, 28.

LORD HANWORTH M.R., LAWRENCE and
ROMER L.JJ.

c

Restraint of Trade - Agreement between Company and Managing Director - Covenant not to solicit Customers or Persons "in the habit of dealing with the company" - Reasonableness of Restriction.

d

)

The plaintiff company bought the various parts of motor vehicles from manufacturers, assembled the parts on the company's premises and sold the products under the name of Gilford Motor Vehicles. They also sold separate parts which were handed over to the buyers for cash. By an agreement dated May 30, 1929, the defendant was appointed managing director of the plaintiff company for a term of six years from September 1, 1928. Clause 9 of the agreement provided that: "The managing director shall not at any time while he shall hold the office of a managing director or afterwards solicit, interfere with or endeavour to entice away from the company any person, firm or company who at any time during or at the date of the determination of the employment of the managing director were customers of or in the habit of dealing with the company." The employment of the defendant as managing director was determined in November, 1931, by an agreement between the parties under which the defendant was to receive a fixed sum payable in instalments. Shortly afterwards the defendant opened a business for the sale of spare parts of Gilford vehicles. In an action by the plaintiff company to enforce the covenant:-

e

f

Held (by Farwell J.), that persons buying spare parts from the plaintiff company, paying for them in cash and taking them away, would be included in the covenant; that the defendant, as managing director, would not come into contact with those customers and would not know them or their names and addresses and that, therefore, the covenant was too wide.

Held, by the Court of Appeal (reversing the decision of Farwell J.), that in the circumstances the covenant was not wider than was reasonably necessary for the protection of the plaintiff company's trade and was therefore enforceable by injunction.

g

WITNESS ACTION.

)

h

In this action the plaintiffs asked for an injunction to restrain the defendant E. B. Horne, either directly or indirectly by means of the defendant company (called J. M. Horne ▒ Co., Ld.) or otherwise, and to restrain the defendant company, from soliciting, interfering with or endeavouring to entice away from the plaintiffs any person, firm or company who at any time during or at the date of the determination of the employment of the defendant as managing director of the

© An extract from a JUSTIS database

**GILFORD MOTOR CO. v. HORNE. (C.A.)**

a

plaintiffs were customers of or in the habit of dealing with the plaintiffs, and to restrain the defendant Horne from directing or suggesting such solicitation, interference or endeavouring to entice

b away by the defendant company or any agent or servant thereof in breach of a covenant on the part of the defendant Horne contained in an agreement dated May 30, 1929, and made between the plaintiffs and Horne.

The facts are fully set out in the judgment of Farwell J.

c

Sir Herbert Cunliffe K.C. and W. E. Vernon for the plaintiffs. The covenant in clause 9 of the agreement is for the protection of the plaintiffs. It is not too wide considering that the plaintiffs'

d business is to supply Gilford motor vehicles and spare parts. The words, "or in the habit of dealing with the company," are mere surplusage and do not extend the scope of the restriction. The covenant is really one binding the defendant not to solicit the plaintiffs' customers, and should be enforced as such. In Konski v. Peet (1) it was held that the agreement there not to solicit customers could not be

e confined to persons who were customers during the employment, but extended to all persons who were customers at the date of the agreement or at any time after that date, and was therefore too wide. That case does not apply here.

Sir Walter Greaves-Lord K.C. and H. J. Astell Burt for the defendants. The covenant is too wide

f to be enforceable. The plaintiffs sell spare parts to strangers, who pay cash for and take the spare parts away with them. Any strangers who bought spare parts in this way several times would come within the meaning of persons "in the habit of dealing with the company." The defendant, as managing director, would not come into contact with customers of that class and would not know

g them, and might therefore quite innocently solicit their custom. That renders the prohibition unreasonable and makes the whole covenant bad. The tendency of the Courts is to be strict in their consideration of these restrictive covenants and to enforce only those which are formed for the

h

(1) [1915] 1 Ch. 530.

© An extract from a JUSTIS database

a

protection of employers and are not unreasonable or too wide: Attwood v. Lamont (1); Express Dairy Co. v. Jackson.(2)

b

FARWELL J.  The plaintiffs in this action are a limited company, Gilford Motor Company, Ld., and they seek an injunction against the first defendant, Edward Bert Horne, to restrain him from "soliciting, interfering with, or endeavouring to entice away from the plaintiffs any person, firm or

c  company who at any time during or at the date of the determination of the employment of the defendant Horne as managing director of the plaintiffs were customers of or in the habit of dealing with the plaintiffs"; and they seek against the defendant company, the second defendant, J. M. Horne

d  & Co., Ld., a similar injunction, the case against the defendant company being really put on the ground that the defendant company is merely the creature of the first defendant, and the first defendant is committing breaches of the covenant by the agency of the defendant company.

The facts which give rise to this dispute are these. The plaintiff company is a public company

e  which was incorporated in the year 1926, and its business is that of manufacturing a certain class of motor vehicle known as the Gilford motors. "Manufacturing" is not a very accurate term, because they only manufacture in the sense that they procure from other manufacturers the various necessary parts and then assemble those parts, so creating the motor in question. Some of the parts which are

f  thus bought by the plaintiff company are what are known as standard parts, but other parts are parts which are made to the direction of the plaintiff company, especially for their particular class of car. In addition to the manufacture and sale of the Gilford motors, they also give to their customers what

g  is known as service, which I understand means doing repairs to the motors which they sell, and in addition to that they sell spare parts. They have a catalogue which contains the various parts which they deal in, I think all of them parts which are required or used in the particular motor. The

h    (1) [1920] 3 K. B. 571.
     (2) (1929) 46 Times L. R. 147.

© An extract from a JUSTIS database

a

In my judgment this covenant does not fulfil either of those requirements and, accordingly, on these grounds the action fails and must be dismissed with costs.

b

P. J. B.

The plaintiffs appealed. The appeal was heard on April 27 and 28, 1933.

c

Sir Herbert Cunliffe K.C. and W. E. Vernon for the appellants. The appellants are entitled to an injunction to restrain the defendant from soliciting their customers. At the hearing before Farwell J. every point was decided in favour of the appellants except the question of the unreasonableness of the covenant obtained by the appellants against the defendant. Farwell J. was wrong in holding that a covenant against solicitation of customers must in order to be valid delimit the customers by reference to the employers' books or to a specific list of their names. Such a decision is contrary to many cases which have received judicial approval, including Trego v. Hunt. (1) The business in connection with which the covenant was enacted was started by the defendant and carried on by him in partnership until a private company was formed. In 1929 the company was turned into a public company, and it was a term made by two persons bringing in a large amount of new capital that the defendant on being employed as managing director of the company should enter into the covenant in question.

d

e

f

It is to be noted that the covenant against solicitation is limited to soliciting persons who were customers during the defendant's employment, and it is substantially identical the form with a covenant in the Encyclopaedia of Forms and Precedents (1907 ed.), vol. 13, p. 80. A list of customers was missing after the defendant ceased to be employed by the company, and the persons solicited were all contained in that list.

g

It has for many years been held reasonable to exact a covenant to prevent solicitation of customers by a servant

h

(1) [1896] A. C. 7.

© An extract from a JUSTIS database

a

after he has ceased to be employed provided that the covenant only relates to persons who were customers during the employment: Trego v. Hunt. (1)

[ROMER L.J. That was a case of vendor and purchaser.]

b
Cases relating to master and servant are to the same effect: Mills v. Dunham (2); Dubowski ▓ Sons v. Goldstein(3); and see Herbert Morris, Ld. v. Saxelby (4) and Mason v. Provident Clothing and Supply Co. (5)

Sir Walter Greaves-Lord K.C. and H. J. Astell Burt for the respondents. The test in this case is whether the covenant is proved to be reasonably necessary for the protection of the employers. That

c
can only be determined by a consideration of the nature of the employers' business and of the types of persons who would be included in the expression "any customer of or any person in the habit of dealing with" the plaintiff company.

In the case of a traveller or canvasser it is recognized in Mason's case (6) that the covenant against solicitation must be limited to customers in the district in which he worked. The proper limit in the

d
case of a multiple shop has never yet been determined, but in the case of a shop with many branches it would obviously be unreasonable that the manager of a South London branch should be prevented from soliciting customers of (say) Hertford. That is the basis of the decision in Dubowski ▓ Sons v. Goldstein. (3)

e
Here the defendant was general manager at High Wycombe and had nothing to do with the service depot in Holloway Road.

[ Sir Herbert Cunliffe K.C. The appellants deny this.]

In any case a covenant not to solicit customers cannot be reasonable unless the customers are personally identified.

f
[LORD HANWORTH M.R. referred to the notes to Mitchel v. Reynolds (7) in 1 Smith's L. C., 13th ed., pp. 475, 476.]

The present covenant is too wide in all its terms. The covenantor is entitled to know who are the persons he may

g
(1) [1896] A. C. 7.
(2) [1891] 1 Ch. 576.
(3) [1896] 1 Q. B. 478.
(4) [1916] 1 A. C. 688, 702.
(5) [1913] A. C. 724, 734.
h
(6) [1913] A. C. 724.
(7) (1711) P. Wms. 181.

© An extract from a JUSTIS database

a   not solicit. The covenant must not go further than is reasonably necessary for the protection of the employer and must not go so far as to prevent the covenantor from getting his living: Attwood v. Lamont. (1)

b   The respondent also takes the further point that the first agreement containing the covenant was superseded by the second agreement.

[They also referred to Express Dairy Co. v. Jackson (2); Smith v. Hancock (3); Baker v. Hedgecock(4); Hunt v. South-Eastern Ry. Co. (5); Patmore v. Colburn.(6)]

c   Sir Herbert Cunliffe K.C. was not called upon to reply.

LORD HANWORTH M.R.   In this case a business was carried on by the Gilford Motor Company, Ld., which had a registered office in Holloway Road, London, and they had a manufacturing place
d   in Green Lanes, at High Wycombe. The business that was carried on was this they sold motors which were assembled by them, but they were not in fact the actual manufacturers of the whole of the motors thus sold; it was rather that they assembled and then completed the motors that they sold, and were able to supply spare parts for these Gilford motor-cars. The defendant, Edward Bert Horne,
e   was a person who at that time, in May, 1929, was of primary importance in the business that was
)   carried on by the company, and on that date they made an agreement with him whereby he was appointed a managing director, with a right to hold that office for a term of six years from September 1, 1928; that is to say, the span for which he was engaged terminated on September 1,
f   1934. There were the usual clauses in that agreement. The managing director was to devote his whole time and attention and abilities during business hours to the company and the business of the company; he was entitled to certain holidays; he was entitled to a remuneration of 1250*l* a year and to a certain percentage on the profits,

g   (1) [1920] 3 K. B. 571.
(2) 46 Times L. R. 147.
(3) [1894] 2 Ch. 377.
(4) (1888) 39 Ch. D. 520.
h   (5) (1875) 45 L. J. (Q. B.) 87.
(6) (1834) 1 C. M. R. 65.

© An extract from a JUSTIS database

and during that time he was not to be, directly or indirectly, in any capacity except as a shareholder,
b interested in any business or company other than the Gilford Company. Then it was provided by clause 9 in terms as follows: "The managing director shall not at any time while he shall hold the office of a managing director or afterwards solicit, interfere with or endeavour to entice away from
c the company any person, firm or company who at any time during or at the date of the determination of the employment of the managing director were customers of or in the habit of dealing with the company and also will not at any time within five years from the determination of this agreement, either solely or jointly with or as agent for any other person, firm or company, be
d engaged, directly or indirectly, in any business similar to that of the company within a radius of three miles from any premises wherein the business of the company shall for the time being be carried on." Now it is the interpretation to be given to that clause 9, which has to be decided
e between the parties in this action, and it is the first part of that clause, of which I have read both limbs, which is in question. What happened was this. Difficulties arose between the company and Mr. Horne, and letters passed on November 17, 1931, that is approximately some three years before
f the termination of the span for which the managing director was employed. The letters that passed were to this effect, that Mr. Horne tendered his resignation as a director and joint managing director of the company "on terms as arranged with you to-day," and those terms are set out, that there is to be a total of 1500*l* paid to Mr. Horne by instalments of three several sums of 500*l*; and he
g concludes the letter: "I agree to accept in full discharge of all sums due to me by the company including compensation for cancellation of my joint managing director's agreement." The reply of the same date was an acknowledgment of the letter tendering the resignation and stating the Board had
h accepted the resignation, to operate "from to-day," and it is recorded in a minute of that same day that the Board resolved to accept

© An extract from a JUSTIS database

[1933]
Ch.

954

a

GILFORD MOTOR CO. v. HORNE. (C.A.)

Lord Hanworth
M.R.

the resignation as a director and joint managing director of the company on terms as arranged in

b accordance with the letter handed in and signed by Mr. E. B. Horne. After that resignation took effect Mr. E. B. Horne established a business and carried it on at his own home, 170 Hornsey Lane, Highgate, and the business he had was one carried on by "E. B. Horne," and there is no doubt that

c his business was one of supplying spare parts and service for all models of the Gilford vehicles. (I ought to have observed that in addition to the business then carried on by the Gilford Motor Company they carried on the business of service as well as the sale and supply of motors.) Having established himself, or attempted to establish himself, in that way as "E. B. Horne," he became

d anxious as to whether or not what he was doing - which I will refer to in a moment - was in accordance with, or not in contravention of, the agreement which he had entered into and to which I have referred, and so it was that on March 29, 1932, his solicitor wrote this letter to the Gilford

e Motor Company: "Dear Sirs, I am acting for Mr. E. B. Horne, the late joint managing director of your company, and I understand that he entered into certain agreements with your company as to service and for sale. As I am desirous of advising him upon the terms of these agreements, I shall

f be glad if you will be good enough to forward copies to me, and accept this letter as my undertaking to pay your reasonable charges for such copies. Yours faithfully, J. R. Cort Bathurst." The reply on March 30 was: "We are in receipt of your letter of yesterday's date, and in reply would inform you that Mr. E. B. Horne's copy of the original service agreement with this company was left

g with the writer for safe custody; therefore we have pleasure in enclosing it herewith." Thus the solicitor was on March 30 placed in possession of the agreement of which I have read some and indicated other portions of the terms. Following upon that reply of March 30, 1932, on April 8 a

h limited company under the title of "J. M. Horne" was incorporated. It was incorporated as a private company, and the paper which had been previously

© An extract from a JUSTIS database

a

"E. B. Horne" was altered by blacking out the initials of Mr. E. B. Horne, "E. B.," and inserting at

b the commencement "J. M." and adding "and Co. Limited." Now it so happens that "J. M." are the initials of the wife of Mr. Horne. That company is a private company, as I have already said; its primary objects are to carry on the business of factors' agents and distributors and vendors and buyers of accessories and spare parts of all classes of vehicles, and so on, and for charabancs,

c motor-cars, taxis, and so on. The registered office is at the private address of Mr. Horne, 170 Hornsey Lane; the directors are Jessie May Horne, the wife of Mr. E. B. Horne, and Mr. Albert Victor Howard, a person who had been, as I understand, originally in the employ of Gilford Motors,

d but who was at that time associated with Mr. E. B. Horne in the business which he carried on after November, 1931. The nominal capital was 500*l* divided into 500 shares of 1*l* each, and the allotments that were made on April 12 were, as to 101 shares, to Mrs. J. M. Horne, and 101 shares to Mr. A. V. Howard; the solicitor of the company was the writer of that letter of March 29 which I

e have already read.

Farwell J. heard the evidence about that company and had these documents before him. He says this: "The defendant company is a company which, on the evidence before me, is obviously carried

f on wholly by the defendant Horne. Mrs. Horne, one of the directors, is not, so far as any evidence I have had before me, taking any part in the business or the management of the business. The son, whose initials are 'J. M.,' is engaged in a subordinate position in that company, and the other director, Howard, is an employee of the company. As one of the witnesses said in the witness-box,

g in all dealings which he had had with the defendant company the 'boss' or the 'guvnor,' whichever term is the appropriate one, was the defendant Horne, and I have not any doubt on the evidence I have had before me that the defendant company was the channel through which the defendant Horne

h was carrying on his business. Of course, in law the defendant company is a separate entity from the defendant Horne, but I cannot help feeling quite convinced that at any rate one

© An extract from a JUSTIS database

GILFORD MOTOR CO. v. HORNE. (C.A.)

a

of the reasons for the creation of that company was the fear of Mr. Horne that he might commit
b breaches of the covenant in carrying on the business, as, for instance, in sending out circulars as he
was doing, and that he might possibly avoid that liability if he did it through the defendant
company. There is no doubt that the defendant company has sent out circulars to persons who were
c at the crucial time customers of the plaintiff company." Now I have recalled that portion of the
judgment of Farwell J., and I wish in clear terms to say that I agree with every word of it. I am
quite satisfied that this company was formed as a device, a stratagem, in order to mask the effective
carrying on of a business of Mr. E. B. Horne. The purpose of it was to try to enable him, under
d what is a cloak or a sham, to engage in business which, on consideration of the agreement which
had been sent to him just about seven days before the company was incorporated, was a business in
respect of which he had a fear that the plaintiffs might intervene and object.

e   Now this action is brought by the plaintiffs, the Gilford Motor Company, Ld., to enforce the terms
of clause 9 of the agreement of May 30, 1929, on the ground that the defendant Horne, and the
company, as his agent and under his direction, have committed breaches of the covenant which I
f have read. Admission has been made quite frankly and candidly in this Court, as it was made below,
that there have been circulars sent out to the customers of the Gilford Motor Company. The
statement is made in the evidence in these terms: "It is admitted now, I gather - although my learned
friend says it is small, that does not seem to me to matter, with respect - that persons were solicited
g by Mr. Horne, both before and after the formation of the company, who were customers of the
plaintiff company at the time he was in its service. That is right, is it not?" and Sir Walter
Greaves-Lord says: "That is right." So that the learned judge was on sure ground when he said there
h was a clear admission that these two defendants were soliciting the customers of Gilford Motors;
and, as Farwell J. puts it: "Admittedly the defendant Horne sent out circulars to various persons in

© An extract from a JUSTIS database

a

**GILFORD MOTOR CO. v. HORNE. (C.A.)**

which it was stated that the defendant was ready and in a position to supply spare parts for Gilford

b
vehicles; and in fact he did supply spare parts and at prices which were, I gather, considerably lower than those charged by the plaintiff company, so that in a sense he was what is known as undercutting the plaintiff company." In other words, there is no defence at all to the claim made in this action unless the conduct of the two defendants can be excused on one of two grounds: firstly,

c
that the covenant is unenforceable in law by reason of the width of its terms, or, secondly, that it has ceased to be operative by reason of the terms which were arranged between the company for the discharge or the release of the managing director from that position on November 17, 1931.

I, therefore, proceed now to consider those two points in order, and, first: Is the covenant

d
unenforceable as being bad in law? I accept the proposition that a covenant in restraint of trade is prima facie one which the law will not enforce, but to that broad proposition there have been many exceptions over a very long period of time, and the famous case of Mitchel v. Reynolds (1) has decided, by a judgment delivered by Lord Macclesfield, within what limits and terms the Court will

e
enforce such agreements. The old rule was undoubtedly that it must be partial in space or partial in time, but we have to bear in mind that the nature of these agreements has been expounded in the light of later considerations which have gradually arisen as there has been an evolution or

f
development of business transactions. As Rigby L.J. points out in Dubowski ▤ Sons v. Goldstein (2): "We have now gone far beyond what was supposed to be the law in the time of Tindal C.J. and Lord Denman C.J. I am not surprised that at that time they expressed the opinions they did. Lord Watson has pointed out in the case of Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co.

g
(3) that the opinion of the judges of this age as to matters of public policy may differ very much from that of judges

(1) 1 P. Wms. 181; 1 Sm. L. C., 13th ed., p. 462.

h
(2) [1896] 1 Q. B. 478, 484.
(3) [1894] A. C. 535.

© An extract from a JUSTIS database

[1933]
Ch.

958

GILFORD MOTOR CO. v. HORNE. (C.A.)

Lord Hanworth
M.R.

a

of a bygone age when the circumstances of the world were different. The only test of the validity of an agreement in restraint of trade now is whether or not such an agreement is reasonably necessary for the protection of the person with whom it is made," and, as pointed out on p. 475 of 1 Smith's Leading Cases, dealing with the Nordenfelt Co.'s case (1), which went to the House of Lords (2), the true view is "that any restraint, whether general or partial, is prima facie invalid, but may be good if the circumstances of the case show it to be reasonable." We have, therefore, to consider were the terms of this covenant in clause 9 reasonable? Let me just add one further passage from Mason v. Provident Clothing and Supply Co. (3) Lord Shaw, in dealing with a case where the activities of a canvasser were in question, says: "A very reasonable restriction of a canvasser in such circumstances as are here disclosed might no doubt have been that he should not canvass his old customers or in the limited locality of his former labour. This the law would naturally and properly enforce, and would look upon as a reasonable protection of the employer"; and in Dubowski's case (4) Lopes L.J. says(5): "This agreement, like all others, must be construed with regard to the surrounding circumstances. It has been objected to as being too wide in two respects: first, in respect of space; secondly, in respect of time," and he holds that the objection fails in respect of those persons who were customers of the late employers at the time when the employee was in their employ.

Now I turn to this agreement. What is its purpose? It is to protect the business, the profits which are to be earned by the company with the persons, firms or companies who at that time, the time of the employment of the defendant Horne, were customers of the company, and from whom, in the business they did with them, the company derived profit. I repudiate altogether the suggestion that you can, by reason of taking one or two words such as "the habit of dealing with the company," impute a meaning to this covenant that

(1) [1893] 1 Ch. 630.
(2) [1894] A. C. 535.
(3) [1913] A. C. 724, 741.
(4) [1896] 1 Q. B. 478.
(5) Ibid. 483.

© An extract from a JUSTIS database

[1933]
Ch.

GILFORD MOTOR CO. v. HORNE. (C.A.)

959

Lord Hanworth
M.R.

a

it deals with or covers the case of a person from whom the Gilford Motor Company buy and in
b respect of whose dealings there can be no profit at all arising to the Gilford Motor Company. It is
intended to deal with persons who are upon their books or with whom they deal and, in the course
of dealing, earn a profit.

c     Now objection is taken that these words are too wide, and Farwell J. has said that it may be that
by reason of the fact that the customers are not defined, or the persons who were in the habit of
dealing with the company are not particularized, a danger might accrue to this man from an innocent
sale to one of such persons, and he might have been imperilled during all time, long after his
d employment has ceased, by the nature of such transactions. I cannot agree that such is a fair test to
apply to the covenant. It appears to me that this covenant was, as in the many scores of cases in
which such covenants have been upheld in these Courts, necessary for the protection of the plaintiff
e company's business; it operated after the determination of the employment and in respect of persons
of whom the defendant himself would have the best knowledge, for he was the managing director of
the company, and what it means is that he is not to solicit, to interfere with or endeavour to entice
f away for his advantage, customers or persons who are in the habit of dealing with the company for
the company's advantage. Objection is taken that these words "customers of or in the habit of
dealing with the company" either have no meaning or are tautological. I do not agree with that. It
appears to me that a customer is a person who frequents a place of business for the purpose of
g making purchases, and those persons may be determined in a particular way by, for instance, having
their names recorded in the books of the company, or they may be upon a list, but there may be
other persons who are in the habit of dealing with the company but whose names have not yet been
h inscribed upon any register of customers, and I see no reason at all to object to the employment of
both those terms by reason of the fact that one or other of them

© An extract from a JUSTIS database

might have covered persons who are to be found in the alternative category. Now, if that be so, it
b appears to me that this is a covenant which was required for the purpose of reasonably protecting
the company's business. It does not go so far as to cover customers who become customers after the
managing director has left, and it was a covenant entered into by him with full knowledge of what
he was doing, and with full knowledge of who were the persons included in that phrase, and it is in
c respect of them that he is debarred from solicitation, interference or enticing away. The covenant is
definite in date; it is not uncertain, because you have the time at which you are to look for the
customers or persons in the habit of dealing, and you have got therefore a covenant which is
d reasonable in the sense of being necessary for the protection of the plaintiff company's business.

The defendant has, by his own admission, solicited persons who come within the ambit of the
covenant. What is the justification? It appears to me that this is an agreement which must be upheld
e by the Court, and the plaintiff company are entitled to the protection of the Court, and the injunction
must be granted. The question whether in any particular case some casual purchaser from the
defendant may cause the defendant to be in danger of further action by the Court is quite a different
f question. I do not quite understand the meaning of what is called a "casual customer." I think the
two words are mutually antagonistic: I think a "customer" is a person who, as I said, frequents the
shop; a casual purchaser seems to be a different person. But, however that may be, we have to say
that the plaintiffs are entitled in this action to have this covenant upheld, and an injunction is the
g proper mode of enforcing that as against these defendants.

The other ground of defence is that there has been an agreement whereby the defendant was
released from the restrictive covenant. It will be observed that as the matter went before the Court
h the defence relied upon an oral agreement to release him, and now suggestion is made that if you
look to the letters of November 17 there is a cancellation

© An extract from a JUSTIS database

**GILFORD MOTOR CO. v. HORNE. (C.A.)**

a

b of the agreement, and the cancellation means a release from clause 9. I do not so read the letters or the entry in the minute book. It appears to me that the defendant rightly stated that there was an oral agreement, and although some of the terms which have been agreed between the parties, particularly the one under which the defendant was to receive compensation, may have been recorded in the letters, in the absence of any specific term dealing with this protective clause 9, I agree with the

c learned judge and do not accept the view that there has been any release of the clause. Mr. Collier strenuously argued that, inasmuch as there was a new agreement, there was a release of this clause, but that, of course, will depend upon whether or not the new agreement covered the same area that

d the previous agreement had done. It appears to me that the purpose of the second agreement was to deal with the question of the shortening of the term of the employment, and the compensation to be paid in consequence of that shortening, and was not intended to deal with or release the defendant from the restrictive covenant.

e In these circumstances the appeal must be allowed, and for the reasons which I have already stated I think the injunction must go against the company. Sir Walter Greaves-Lord admitted that if the company were such as is indicated by Lindley L.J. in Smith v. Hancock (1), it would not be possible

f to object to the injunction going against the company. Lindley L.J. indicated the rule which ought to be followed by the Court: "If the evidence admitted of the conclusion that what was being done was a mere cloak or sham, and that in truth the business was being carried on by the wife and Kerr for the defendant, or by the defendant through his wife for Kerr, I certainly should not hesitate to draw

g that conclusion, and to grant the plaintiff relief accordingly." I do draw that conclusion; I do hold that the company was "a mere cloak or sham"; I do hold that it was a mere device for enabling Mr. E. B. Horne to continue to commit breaches of clause 9,

h

(1) [1894] 2 Ch. 377, 385.

© An extract from a JUSTIS database

a

and under those circumstances the injunction must go against both defendants, the appeal must be allowed with costs here and below, and the injunction will be in the terms asked in the prayer in the statement of claim.

b

LAWRENCE L.J.   The main question in this case is whether the provision against solicitation contained in the agreement of May 30, 1929, is too wide to be enforceable. The answer to that question depends upon whether, upon the particular facts of the present case, the covenant was reasonably necessary for the protection of the business carried on by the covenantees at the time when it was entered into. In order to determine that question, the Court must have regard, first, to the nature of the business; secondly, to the position of the covenantor; and, thirdly, to the scope of the covenant.

c

As to the nature of the business, the company carried on the business of suppliers of commercial motor vehicles (including charabancs) and of suppliers of service for such vehicles. In addition to those businesses, the company supplied spare parts for the motor vehicles. The head office of the company was situate in Holloway Road, London, where the company also had a service depot. The company's works were situate at High Wycombe, in Buckinghamshire. As to the position of the covenantor, he was appointed managing director, with the obligation of devoting his whole time and attention to the business of the company, his remuneration consisting of a substantial salary and a percentage of the profits earned by the company. He was, therefore, not in a subordinate position, but in a highly responsible and confidential position, being placed in actual charge of the business of the company.

d

e

f

g

As regards the scope of the covenant, it is plain that the covenant is limited to the non-solicitation of customers, or persons in the habit of dealing with the company, during or at the date of the determination of the covenantor's employment, and does not extend to prevent the covenantor from soliciting persons who might become

h

© An extract from a JUSTIS database

a

customers of the company after his employment had terminated.

b
  In these circumstances I am clearly of opinion that the company was entitled not to have its customers, by solicitation or any other means, enticed away by the covenantor after his employment had terminated. By such a covenant the company was legitimately endeavouring to protect what it had (namely, the chance of its customers continuing to resort to the company, or to its places of

c
business) and not to gain a special advantage which it could not otherwise secure.

  Farwell J. seems to have considered that the introduction of the words "or persons in the habit of dealing with the company" after the word "customers" rendered the covenant ambiguous. In my

d
opinion, there is no ambiguity in the covenant, and the covenantor has not ventured to go into the witness-box to say that he did not understand or was in any way embarrassed by the wording of the covenant. The expression "customers," in my judgment, is synonymous with the expression "persons

e
who are in the habit of dealing with the company." The two expressions, to my mind, mean practically the same thing, and the alternative expression introduced after the word "customers" was, in my opinion, inserted as a definition of the latter so as to make it plain that what was intended to

f
be guarded against by the covenant was any interference with or enticing away of those persons who were in the habit of dealing with the company during the covenantor's employment. I cannot myself think that there could have been any reasonable doubt in the minds of the parties to this covenant as

g
to the class of persons who were not to be solicited after the employment had terminated.

  The learned judge further held, and I think that this was the main ground of his decision, that the covenant is too wide, and unenforceable, because it does not specify which of the customers the

h
covenantor is not to solicit. The learned judge points out that the covenant is not limited to customers whose names were entered in the books of the

© An extract from a JUSTIS database

GILFORD MOTOR CO. v. HORNE. (C.A.)

company, or to customers mentioned in any list supplied by the company to the covenantor at the termination of the agreement, or to customers who were defined in some other manner. With the greatest respect for the opinion of the learned judge, I find myself quite unable to agree with this conclusion. In my judgment, having regard to the nature of the business and to the position of the covenantor, it was unnecessary further to define the persons who were not to be solicited by the covenantor beyond describing them as the "customers or persons in the habit of dealing with the company during his employment or at its termination." The learned judge seems to have considered that the covenant was too wide because it would include customers who might be in the habit of buying spare parts at the service depot and at the works, without their names being entered in the books of the company and without their becoming personally known to the covenantor. Apart from the question whether there is any evidence in the present case to show that there were any such customers, I am clearly of opinion that the fact that such customers were included in the covenant would not make the covenant too wide. The company, in my opinion, is entitled not to have that class of customers enticed away by solicitation any more than any other of its customers. The covenantor might inadvertently solicit one of that class of customers, but in such a case the Court would not grant an injunction against him or commit him for contempt for the breach of any injunction already granted if he could show that what he had done was done inadvertently, and would not be repeated. But where I think the learned judge has erred, is in making the possibility of such an innocent breach of the covenant a test of its validity. The position to which the covenantor was appointed was one in which he had the fullest opportunity of getting to know every customer of the company, and it seems to me that in these circumstances the restraint placed upon him was a reasonable restraint.

For the reasons stated, I am of opinion that the covenant was one which was reasonably required for the protection

© An extract from a JUSTIS database

a  of the company, and was neither ambiguous nor did it impose too wide a restraint on the covenantor.

b  There only remain two subordinate points to be considered. The first is whether the oral agreement arrived at in November, 1932, operated to put an end to the covenant. Upon that question I find myself in entire agreement with the Master of the Rolls and with Farwell J. The question depends upon what took place at the interview at which the oral agreement was arrived at. Apart from the

c  prima facie presumption that the company would not readily have agreed that their managing director who had, for a substantial time, been in control of their business should, on leaving, be permitted to solicit their customers, there is no evidence that at this interview it was agreed that the covenant in

d  question, which was to come into operation after the termination of the employment, should be abrogated.

   Secondly, as to the question whether the injunction ought to extend to restraining the defendant company from soliciting the plaintiff company's customers. I am of opinion that the evidence amply

e  justified the learned judge in drawing the inference that the company was a mere cloak or sham for the purpose of enabling the defendant to commit a breach of his covenant against solicitation. I need not recall the facts, but it seems to me that the evidence as to the formation of the company and as

f  to the position of its shareholders and directors leads to that inference. Of course, that inference might have been displaced by evidence adduced on the part of the defendants, but although the issue was plainly raised on the pleadings, no such evidence was forth-coming. In these circumstances, I agree with the finding by the learned judge that the defendant company was a mere channel used by

g  the defendant Horne for the purpose of enabling him, for his own benefit, to obtain the advantage of the customers of the plaintiff company, and that therefore the defendant company ought to be restrained as well as the defendant Horne.

h  I agree that this appeal ought to be allowed, with the consequences stated by the Master of the Rolls.

© An extract from a JUSTIS database

a

GILFORD MOTOR CO. v. HORNE. (C.A.)

ROMER L.J.   I have come to the same conclusion. The covenant with which we have to deal in the present case is obviously a covenant in restraint of trade. It is, therefore, prima facie,

b unenforceable. It can, however, be enforced, if it be shown that the covenant was reasonably necessary and not more extensive than was reasonably necessary for the protection of the covenantee. The particular covenant with which we have to deal is a covenant which is commonly referred to as

c a covenant against solicitation; that is to say, it is a covenant by an employee that he will not, after his employment shall have ceased, solicit orders from customers of his employers' business who were such at the time of the cessation of his employment or had been such during the existence of that

d employment. It is not, of course, every such covenant that is reasonably necessary for the protection of the employers. I can quite readily conceive cases in which such a covenant by an employee is in no way necessary for the protection of the employer. The question whether it be necessary or not

e depends upon the nature of the business carried on by the employer and the nature of the employment that is being given to the employee. It has, however, been frequently recognized in these Courts and is, in my opinion, established law, that where an employee is being offered

f employment which will probably result in his coming into direct contact with his employer's customers, or which will enable him to obtain knowledge of the names of his employer's customers, then the covenant against solicitation is reasonably necessary for the protection of the employer. In the present case the covenantor was employed as a managing director of the company, who are the

g covenantees, and it is perfectly obvious that at the date of his employment it was extremely probable, if not certain, that he would come into contact with the customers of his employers who were customers during the term of his employment. Now, in those circumstances, I should have

h thought that this covenant was enforceable. I will not read the covenant again, nor do I intend to comment upon the precise words in which that covenant is framed. It

© An extract from a JUSTIS database

a

is sufficient to say that in my opinion it restrains the covenantor from soliciting in the way of the business such as is carried on by the employers, persons who were customers of the employers
b during, or at the date of, the termination of the defendant's employment as managing director. I do not myself think that the words "or in the habit of dealing with the company" enlarge or diminish in any way the meaning of the word "customers."  But it was said, and the argument has found favour
c with Farwell J., that the covenant is unenforceable because the particular customers whom the defendant is precluded by the covenant from soliciting are not sufficiently defined in the covenant. Farwell J. said that if the plaintiffs in this case had been content to seek to restrain the defendant
d from canvassing the customers whose names appear in the books, such a covenant would be a reasonable one. But so to limit a covenant against solicitation would not be sufficient protection for the employers. There may be customers with whom the employee has come into contact, whose
e names he would know, whose names do not appear in the books, and in a case where the employee is a person, one of whose duties might be to see that the names of customers were inserted in the books, a covenant so restricted obviously would not be a proper or sufficient protection for the
f employers. Farwell J. also said that the covenant would be enforceable if the plaintiffs had been content to confine the customers to persons whose names were specified in a list of customers supplied to the defendant. It must be remembered, however, that the question whether the covenant is a valid one or not, that is to say, whether it is a reasonable covenant or not, is a question which
g has to be determined as at the date of the covenant being entered into. At that time, quite clearly, it would be impossible to supply the defendant with a list of persons who would become customers during the term of his employment. Further, the covenant as a matter of fact extends in the present
h case not only to the period after the defendant's employment has come to an end, but also to the period covered by the term of his employment. I do not

© An extract from a JUSTIS database

a

think it reasonable to suppose that the employers are from time to time, during the man's employment, to hand to him a list of the customers of the firm, so that he might know what

b customers he might and what customers he might not solicit during the term of his employment. Then Farwell J. referred to, as other cases in which the covenant might be enforceable, cases in which in some other way the meaning of the word "customers" was limited or defined. With great respect to the learned judge, I cannot myself think of any other way in which, consistently with the

c proper protection of the employers, the customers who are not to be solicited can be limited or defined other than by calling them "customers." There are numerous cases before the Courts where covenants against the solicitation of customers have been considered, and I know of no authority,

d and certainly our attention has not been called to any authority, where any such limitation upon the covenant as is suggested by Farwell J. has been held to be necessary. Of the cases to which we have been referred in which such covenants have been held to be good, there was no such limitation. In

e Mills v. Dunham (1), in which there was a very wide covenant, a covenant in the sense that it extended not only to soliciting but to transacting business with customers of the employer, no such words of limitation were to be found. The covenant was against transacting business with or soliciting orders from "any person or firm who, during the continuance of this agreement, shall be

f customers of the" employers. The case came before Chitty J. and afterwards before the Court of Appeal, and in neither Court was it suggested, either in argument or judgment, that any such limitation of the word "customers" was necessary in order that the covenant should be enforceable.

g Another case to which our attention was called was Dubowski, ▦ Sons v. Goldstein. (2) That was a case of a covenant entered into by an employee of a man carrying on a milk business, who was employed as a milk carrier, and the covenant was that he would not

h   (1) [1891] 1 Ch. 576.
      (2) [1896] 1 Q. B. 478.

© An extract from a JUSTIS database

a

"interfere with, or cause to be solicited or interfered with, any of the customers who shall at any time be served by or then belonging to the employer his successors or assigns in the said business."

b Again, it was never suggested that any such limitation was necessary in order that the covenant might be enforced, and, in my opinion, with the greatest deference to Farwell J., no such limitation is necessary. The limitation that is necessary, of course, is a limitation to persons who are customers

c during the employment of the covenantor. No such limitation as is suggested by Farwell J. is, in my opinion, necessary.

So far as regards the other two points upon which reliance was placed by the respondents, I do not

d wish to add anything. In my opinion Farwell J. was right in the conclusion to which he came as to the effect of the oral agreement come to between the parties in the month of November, 1931, and was right in coming to the conclusion, as I think he did conclude, that this defendant company was

e formed and was carrying on business merely as cloak or sham for the purpose of enabling the defendant Horne to commit the breach of the covenant that he entered into deliberately with the plaintiffs on the occasion of and as consideration for his employment as managing director. For this

f reason, in addition to the reasons given by my Lords, I agree that the appeal must be allowed, with the consequences which have been indicated by the Master of the Rolls.

Appeal allowed.

g

Solicitors for appellants: Cardew Smith ☰ Ross.
Solicitor for respondents: J. R. Cort Bathurst.

h

W. I. C.

© An extract from a JUSTIS database