# Exhibit 8

a

b

[COURT OF CRIMINAL APPEAL]

c

MERCHANDISE TRANSPORT LTD. v. BRITISH TRANSPORT COMMISSION AND OTHERS.

d

[1960 W. No. 46.]

e

1961 June 29, 30; July 3, 4, 5, 6, 7, 10, 28.                    Sellers, Devlin and Danckwerts L.JJ.

f

*Road Traffic - Licence - Goods vehicle - Application for "A" licence - "Switch" of "C" licence vehicles from private company to subsidiary - Desire to increase carrying capacity for return loads - Undertaking to carry only goods of parent company on outward*

g

——————————————————————

h

[Reported by D. M. GOODBODY, Esq., Barrister-at-Law.]

© An extract from a JUSTIS database

a

**MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)**

b

*journey - Whether "A" licence appropriate - Whether licensing authority entitled to look at substance - Relevance of relationship between parent and subsidiary company - Road Traffic Act, 1960 (8    9 Eliz. 2, c. 16), s. 174.*

*Road Traffic - Transport Tribunal - Appeal from - Jurisdiction of Court of Appeal - Jurisdiction of Transport Tribunal - Railway and Canal Traffic Act, 1888 (51    52 Vict. c. 25), s. 17.*

c

*Judicial Precedent - Transport Tribunal - Whether previous decisions binding - Traffic Cases.*

An appeal will lie to the Court of Appeal, except on a question of fact, from a decision of the Transport Tribunal, and on such an appeal the court may draw all such inferences as are not inconsistent with the facts expressly found by the tribunal as are necessary for determining the question of law. The court has the same powers as if the appeal were an appeal from a judgment of a superior court and the court may review the exercise of the tribunal's discretion if it is based on an error of law (post, p. 182).

d

Although it is desirable that a series of reasoned judgments disclosing the principles on which the Transport Tribunal proceeds should be built up, the tribunal has a discretion, and should not therefore regard itself as bound by its own previous decisions nor make rules so as to prevent itself or the licensing authority from examining each case on its merits (post, pp. 186, 192, 207).

e

The applicant company, which carried on the business of road haulage and was a wholly owned subsidiary of a company of furniture manufacturers, held certain "A" licences and for some time had been carrying some of the loads of the parent company. The parent company had its own "C" licence fleet, which it used to carry its own products. The applicants applied for a variation of their "A" licence so as to permit them to use, in addition to the vehicles authorised thereunder, 112 additional vehicles, all of which were subject to a "C" licence held by the parent company, and which it was proposed to transfer to the applicants with a further seven vehicles to be acquired later. One of the objects of the application was to enable the applicants to use the vehicles for the carriage of return loads and they undertook that, if the application were granted, they would only carry the goods of the parent company on outward journeys. The licensing authority dismissed the application on the ground that the desire of the parent company to employ the applicants to carry their goods was less than genuine and subsidiary to the desire of the parent and applicant companies to use "A" licensed vehicles in order substantially to increase the capacity they could offer for the carriage of return loads. On appeal, the Transport Tribunal granted the licence. On appeal by the objectors:-

f

g

*Held,* (1) that since it was the intention of Parliament that an "A" licence should be unfettered, the tribunal had no right to impose conditions under the guise of accepting undertakings (except under the special provisions relating to contract "A" licences),

h

© An extract from a JUSTIS database

### MERCHANDISE TRANSPORT LTD. v. BRITISH TRANSPORT COMMISSION. (C.A.)

a

whereas conditions might be attached to a "B" licence and that, in view of the undertakings, the appropriate licence, in the circumstances of the case, was a "B" licence. The applicants were not entitled to receive

b better treatment than the parent company would have received if they had retained the ownership of the vehicles and themselves applied for a licence (post, pp. 187, 190). The licensing authority was entitled to look at the substance of the matter - namely, that the parent and subsidiary, although separate legal persons, formed a single commercial unit.

(2) The tribunal were wrong in law in refusing to consider the relationship between parent and subsidiary

c company.

*Salomon v Salomon    Co.* [1897] A.C. 22; 13 T.L.R. 46, H.L. distinguished in the case of a discretionary jurisdiction.

(3) That an objector who appeals to the Transport Tribunal or to the Court of Appeal can contend that the application should not have been granted, and is not restricted to the statutory grounds upon which he

d might object (post, p. 200).

*British Transport Commission v. Bristow Ltd.* (1955) 30 Traff. Cas. 217 approved.

There was, therefore, an error of law in the decision of the tribunal and the appeal should be allowed.

*Per* Devlin L.J. The Transport Tribunal may substitute their discretion for that of the licensing authority, but when they sit as an appellate tribunal without hearing witnesses, they are not free to substitute their own

e findings of fact without good cause, and it they do so, they commit an error of law (post, p. 192).

APPEAL from the Transport Tribunal.

On February 5, 1960, the applicants. Merchandise Transport Ltd., who carried on business as road

f hauliers, applied to the licensing authority for the metropolitan area for a variation of their "A" licence so as to permit them to use, in addition to certain other vehicles - (a) 112 Luton furniture vans and seven articulated vehicles consisting of tractors and trailers, and (b) seven Luton furniture vans to be acquired later. The applicants were a wholly owned subsidiary company of Harris Lebus Ltd., a large firm of furniture manufacturers of Tottenham, Middlesex, and Reading. The applicants' place of

g business was near the factory of the parent company at Tottenham and they had, for a considerable time, been carrying some of the loads of Harris Lebus Ltd. The applicants were formed in 1955 shortly after the denationalisation of the road haulage industry, and in 1957 and 1958 acquired all the shares in two other transport companies, C. E. Dormer (Leyton) Ltd. and C. E. Dormer (Islington)

h Ltd., respectively. The effect of that was to increase their haulage fleet and to assist in the transport of the goods of Harris Lebus Ltd. At the date of the application all the vehicles, the subject

© An extract from a JUSTIS database

**MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)**

a

b  of the application - other than the seven Luton vans to be acquired - were subject to a "C" licence held by Harris Lebus Ltd. and were in regular operation. It was the applicants' case that Harris Lebus Ltd. no longer wished to carry their own loads which in future would be carried by the applicants, and one of the objects of the application for an "A" licence was to enable them to use their vehicles for the carriage of return loads and thus to achieve more economical operation.

c  The application was opposed by the British Transport Commission and 62 other objectors, who contended, inter alia, that if the application was granted, there would be vehicles in excess of requirements.

d  At the public inquiry before the licensing authority, the applicants stated that they were prepared to give an undertaking that in the event of the application being granted only the goods of Harris Lebus Ltd. would be carried on outward journeys on those vehicles. On June 17, 1960, the licensing authority dismissed the application, giving as his reasons: (a) that the desire of Harris Lebus Ltd. to employ the applicants was less than genuine and was subordinate to the desire of Harris Lebus Ltd. and its subsidiaries to use "A" licensed vehicles to carry return loads, thereby increasing their capacity

e  in certain cases. (b) That there was already a surplus of vehicles available to carry return loads. (c) That the objectors had satisfied him that there was likely to be abstraction of their traffic and this would lead to an excess of requirements. (d) That it would not be in the public interest to grant the application.

f  The applicants appealed to the Transport Tribunal, who, in January, 1961, reversed the finding of the licensing authority, giving in June, 1961, as their reasons for doing so: (1) the fact that the applicants were a subsidiary of Harris Lebus Ltd. was irrelevant; (2) that if Harris Lebus Ltd. wished to change its business interests and seek the services of a haulier, they were entitled to do so; (3) the

g  objectors' case that the granting of the proposed application would create transport facilities in excess of requirements had not been made out, and (4) that the needs of Harris Lebus Ltd. could not be met under section 180 of the Road Traffic Act, 1960.

h  The tribunal, in setting aside the decision, ordered that Harris Lebus Ltd. should produce to the licensing authority an undertaking in writing to surrender all "C" licences then held by them, and not to apply for all "C'" licence during the currency of the

© An extract from a JUSTIS database

a

**MERCHANDISE TRANSPORT LTD. v. BRITISH TRANSPORT COMMISSION. (C.A.)**

licence to be granted to the applicants, and the case was remitted to the licensing authority to decide matters of quantum.

b    The British Transport Commission and the other objectors appealed, the appeal being brought under section 17 of the Railway and Canal Traffic Act, 1888.

*E. S. Fay Q.C.* and *D. L. M. McDonnell* for the British Transport Commission, Guest Carriers (Hackney) Ltd., and 61 other objectors. The jurisdiction of the court to hear the appeal is found in
c    section 17 of the Railway and Canal Traffic Act, 1888, which does not permit an appeal on a question of fact but allows this court to draw all such inferences of fact as are not inconsistent with the facts expressly found: see Railways Act, 1921, s. 26, and Transport Act, 1947, Sch. X, para. 5.

There are three classes of licence. viz., "A" (public carriers), "C" (private carriers) and "B" (a hybrid
d    called a limited carriers' licence). "C" licences are obtainable as of right, the grant of "A" or "B" licences being in the discretion of the licensing authority. The Transport Tribunal were wrong in that (a) they wrongly exercised their discretion on the material before them, (b) they regarded themselves as bound by their previous decisions, and (c) they erred in law in failing to exercise their discretion
e    judicially. Discretion is a matter neither of fact nor of law. It is the intellectual process of forming an opinion as to the wisdom of a particular course of action, and the person exercising it must keep the process within reasonable bounds. By section 174 (1) the licensing authority has full power in his discretion to grant or refuse an "A" or a "B" licence, but subsection (4) prescribes the matters to which he must have regard in exercising his discretion. As to the review of the exercise of a
f    discretionary power, see *Evans v. Bartlam,*[1] *Dick v. Piller*[2] and *Inland Revenue Commissioners v. Ross and Coulter.*[3]  Although the Transport Tribunal has power to make such order as it thinks fit, it should pay great attention to the views of the licensing authority: *Stepney Borough Council v. Joffe.*[4]

In considering the functions of the licensing authority, the Salter Report shows the historical
g    background. In *Archbolds (Freightage) Ltd. v. S. Spanglett Ltd.*[5] Pearce L.J. said that

1 [1937] A.C. 473; 53 T.L.R. 689; [1937] 2 All E.R. 646, H.L.
2 [1943] K.B. 497; 59 T.L.R. 276; [1943] 1 All E.R. 627, C.A.
3 [1948] 1 All E.R. 616, H.L.
h    4 [1949] 1 K.B. 599; 65 T.L.R. 176; [1949] 1 All E.R. 256, D.C.
5 [1961] 1 Q.B. 374, 386; [1961] 2 W.L.R. 170; [1961] 1 All E.R. 417, C.A.

© An extract from a JUSTIS database

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

the object of the Road and Rail Traffic Act, 1933 (which introduced the licensing system), was to control those who provided transport with a view to promoting its efficiency. One of the objects of
b the licensing system was to protect the professional haulier against uneconomic competition. Any surplus of licensed vehicles would lead to such competition.

Since the appellate jurisdiction was transferred to the Transport Tribunal by the Transport Act, 1947, they have overruled some of the decisions of the old Appeal Tribunal. Each case must, however, be decided on its merits unfettered by previous decisions: *Reg. v. Flintshire County Council.*[6] Section 9
c of the Transport Act, 1953, altered the relevant weight to be given to certain considerations. The interests of those wanting transport were given greater weight than the interests of those providing transport. The former includes the interests of all persons who want transport and not merely those of the applicants' customers. What has been read into *Allison's Transport (Contractors) Ltd. v. British*
d *Transport Commission*[7] is that if a customer decides not to have his goods carried under "C" licence or contract "A" licence, and induces some haulier to apply for a licence to continue his work, the licensing authority ought to grant the latter a licence. This decision was right in its context but it has wrongly been treated as laying down a rule. What has been read into the decision is that if a customer does change his business method and induces a subsidiary company or another haulier to apply for an
e "A" licence, then such licence ought to be granted. See also *Reed Ltd. v. British Transport Commission.*[8]

The case for the applicants was twofold, namely, we operate under "C" licence arrangements and want our subsidiary to have an "A" licence (i) for simplification and (ii) to carry return loads. The
f first could be done in one or other of two ways, namely, by a "B" licence or an application under section 180 of the Road Traffic Act, 1960. As to (ii), weight must be given to the economic implications. The tribunal disregarded the principle that protection should be given to existing hauliers against uneconomic competition in respect of return loads. The tribunal shut their eyes and excluded the only important part of the case, and this must amount to misdirection.
g The evidence called by the objectors showed that they could carry all the traffic offered. The applicants did not call a particle

6 [1957] 1 Q.B. 350; [1957] 2 W.L.R. 90; [1957] 1 All L.R. 112, C.A.
h 7 (1955) 30 Traff.Cas. 238.
8 (1937) 31 Traff.Cas. 50.

© An extract from a JUSTIS database

of evidence about return loads. The appellants' general submission is that the statutory objection was made out. The Transport Tribunal have neglected the larger picture and have also neglected their
b important function of regulating transport as a whole. The real issue in the case, namely, the carriage of return loads, was swept aside by the tribunal. The question whether the statutory objection was made out is a mixed question of law and fact and is therefore appealable: see *Glassbrook Brothers Ltd. v. Leyson.*[9]  Whether in any case the facilities are in excess of requirements is an inference which the court has to draw from the primary facts; the inference has to be fitted into the wording of the
c Act: see *Edwards (Inspector of Taxes) v. Bairstow,*[10] *per* Lord Radcliffe.

The proper course in this case would have been to apply for a "B" licence, and this would have met everybody's view. The application was to carry anything for anyone from anywhere to London: *British Transport Commission v. Francis (N.)      Co. Ltd.*[11]
d    The switch from a "C" licence to an "A" licence was something special and should have been so treated. It affords an easy entry to the haulage field which should have been realised and watched as such. When this is coupled with the relationship of a holding and a subsidiary company it raises the question whether there ought to be a change from carriage by public hauliers to carriage in vehicles operated by manufacturers. The return traffic was the outward traffic of other carriers. The tribunal
e said "if you prove need to carry the parent company's goods we will not require evidence as to return loads."

[SELLERS L.J. They have the "C" licensee's security and are free to cut across the work of public carriers.]
f
Section 9 (4) of the Transport Act, 1953 (now re-enacted in section 178 (1) (*d*) of the Road Traffic Act, 1960), is the statutory provision which has led to the practice of the giving of undertakings by applicants for "A" licences.

*M. L. Lyell Q.C.* and *C. R. Beddington,* for the respondents. On the true construction of section 17 appeal lies on a matter of law only: *Inland Revenue Commissioners v. Ross and Coulter,*[12] *per* Lord
g Thankerton.

The rights of objectors before the licensing authority and the

9 [1933] 2 K.B. 91.
10 [1956] A.C. 14, 36; [1955] 3 W.L.R. 410; [1955] 3 All E.R. 48, H.L.
h 11 (1956) 31 Traff.Cas. 19.
12 [1948] 1 All E.R. 616, 629.

© An extract from a JUSTIS database

a          MERCHANDISE TRANSPORT LTD. v. BRITISH
                  TRANSPORT COMMISSION. (C.A.)

Transport Tribunal are very circumscribed. The Road Traffic Act, 1960, s. 173 (1) (*b*), shows the
extent of objectors' rights. All an objector is entitled to is to be heard in support of his objection, and
b   if rejected to appeal to the Transport Tribunal. The tribunal exercises a fresh discretion but on the
same basis: see sections 174 (1) (*b*), 175 and 176. Section 174 (4) gives guidance as to the tests by
which the discretion is to be exercised. The licensing authority has to decide whether the grant of the
licence applied for is in the interests of the public generally, and, if not, would some modified grant
be beneficial to those interests. This is a matter of discretion in the sense that when all the facts are
c   considered more than one view may be held in applying a reasonable judgment to them. It is a matter
of degree and substantially one of fact. It is not akin to "reasonable cause," but is much more akin to
the type of question that was dealt with in *Blunt v. Blunt*.[13] This is an appeal from a specialised
tribunal with wide general knowledge of the industry which it is set up to control. What the tribunal
d   has to consider is much wider than the issues joined between the parties. The appellants contend that
because of the relationship between the parent company and the applicants either the parent must not
be considered as a person "requiring facilities for transport" or it must be taken into account to a
lesser extent than if it were a stranger, but it is submitted that the two are entitled to be considered as
entirely separate entities see *Salomon v. Salomon      Co. Ltd.*[14]
e     [DANCKWERTS L.J. Are you not entitled to have regard to practical reality when exercising a
discretion?]
The crucial fact is that they are not in law the same persons.
The tribunal have found that no excess of facilities was proved and that no harm will be done to the
objectors. Unless that finding is one which no reasonable person could make on the totality of the
f   evidence it must stand.
[DEVLIN L.J. Some of the language of the judgment is unnecessarily deprecatory of the licensing
authority, and the tribunal says that some of his findings should be corrected and when they correct
them they do so clumsily.]
g     See also *Daimler Co. Ltd. v. Continental Tyre and Rubber Co. (G.B.) Ltd.*[15]
*Beddington* following. It was never suggested to the licensing authority that determination of the
application was concluded by

     13 [1943] A.C. 517, 526.
h    14 [1897] A.C. 22; 13 T.L.R. 46. H.L.
     15 [1916] 2 A.C. 307; 32 T.L.R. 624. H.L.

© An extract from a JUSTIS database

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

previous decisions of the Transport Tribunal. These decisions relate to what evidence is to be considered.

b
It must be accepted that if application had been made for; a "B" licence to carry the goods of Harris Lebus Ltd., the applicants would have had to give evidence of need. It is a rare thing to apply for a "B" licence to carry return loads. Merchandise Transport Ltd. had an established business as "A" licensed hauliers and it was wrong to consider them as a pure adjunct of Harris Lebus Ltd. In *Great Western Railway Co. v. West Midland Licensing Authority*[16] the House of Lords took the view that an

c
"A" or a "B" licence could be unrestricted by conditions. It is, however, normal not to authorise a "B" licensee to carry anything other than the traffic as to which evidence has been placed before the licensing authority. As a matter of practice a condition allowing carriage of return loads would not be granted without evidence of need. It has been the practice to treat evidence from a single customer as justifying the grant of an "A" licence: *Bulwark Transport Ltd. v. Morris*.[17]

d
*Fay Q.C.* in reply. At the outset the applicants stated that their intention was to carry goods "mainly for Harris Lebus Ltd. outwards," but in the course of the case they were driven to give an undertaking to confine their outward traffic to that of Harris Lebus Ltd. This is within the realm of conditions, but the licensing authority could not have imposed a condition upon an "A" licence. Where an application is in reality one for the carriage of return loads, then the need for such carriage should be proved.

e
The reason why it was not the practice in the past to require evidence of need for the carriage of return loads was the old practice that an "A" or a "B" licence would not be granted to serve the needs of a single customer only. At that time there could not have been a "switch" from "C" licence or contract "A" licence to "A" licence. This doctrine was reversed in *Bulwark Transport Ltd. v. Morris*,[18]

f
and the new order of things led to cases where return loads are the sole consideration. *Daimler Co. Ltd. v. Continental Tyre and Rubber Co. (G.B.) Ltd.*[19] is applicable and is relied on. *Unit Construction Co. Ltd. v. Bullock*[20] is a further authority for looking at the reality of the matter and applies a fortiori to the exercise of a discretion.

g
*Cur. adv. vult.*

16 [1936] A.C. 128.
17 (1951) 30 Traff.Cas. 77.
18 Ibid.
h
19 [1916] 2 A.C. 307.
20 [1960] A.C. 351. C. A.

© An extract from a JUSTIS database

July 28. The following judgments were read.

b    SELLERS L.J.  This is the first appeal from the Transport Tribunal, in its appellate jurisdiction (or, in its goods vehicle licensing jurisdiction), to this court, and quite properly the argument has travelled over a wide area, covering matters incidental to, as well as those more directly involved in, the appeal.

c    Mr. Fay, for the appellants, commenced his submissions by a consideration of the extent of this court's jurisdiction. It is to be found in section 17 of the Railway and Canal Traffic Act, 1888, which permits no appeal upon a question of fact but expressly empowers this court to draw all such inferences as are not inconsistent with the facts expressly found, and are necessary for determining the

d    question of law, and this court is given such powers for that purpose as if the appeal were an appeal from a judgment of a superior court. This court may make any order which the commissioners (now the Transport Tribunal) could have made, and its decision is final except where there has been a difference of opinion between any two appellate courts. It was conceded by Mr. Lyell, on behalf of

e    the respondents, that that section governs this appeal, and it becomes unnecessary to set out the tortuous statutory route which the section has taken.

The cases which have been cited have been in relation to earlier relevant statutes, in particular the Road and Rail Traffic Act, 1933, the Transport Acts, 1947 and 1953, and much of the argument has been in relation thereto. But the Road Traffic Act, 1960, consolidated, with corrections and

f    improvements, the relevant enactments, and it will be more convenient and, perhaps, now more helpful to make reference only to the provisions of this Act which came into operation, as far as material here, on September 1, 1960. The hearing before the licensing authority was in May, 1960, and before the Transport Tribunal, on appeal, in November, 1960.

g    Part IV of the Act of 1960 deals with the regulation of carriage of goods by road. By section 164 a "carrier's licence" is required by a person who uses a goods vehicle for the carriage of goods (a) for hire or reward or (b) for or in connection with any trade or business carried on by him, with some exceptions not here material. The classes of carriers' licences and acts authorised thereby are set out in

h    section 166 in three classes: "A" public carrier's licences; "B" limited carrier's licences: "C" private carrier's licences; and section 168 stipulates conditions

© An extract from a JUSTIS database

which apply or may be applied in the circumstances stated, some of which call for consideration in the present case.

b   It is difficult to summarise the differences in the classes without, being as exhaustive as the sections of the Act. The public carrier's licence conveys by its name the nature of the trade to which it refers, and apart from contract "A" licences under special provisions in section 174, it refers to the general carriage of goods for the public within the locality and according to the nature of the goods

c contemplated. The "A" licence only permits the carriage of goods of others and not carriage for or in connection with any other business carried on by the holder of the licence, except goods carried incidentally to his haulage business. The "B" licence may be used for two alternative purposes, either private carriage or for hire and reward subject to conditions. The "C" licence does not permit the

d holder to use his vehicle for any but his own goods unless specially authorised in an emergency, and an application for a "C" licence cannot be refused by the licensing authority if there is no objection to the character and conduct of the applicant: section 174 (3).

The private carrier therefore cannot make inroads on the traffic which is to be carried under "A"

e licences for it permits of no return loads not owned by the holder, and no question of competition arises. Under a "B" licence competition may arise but, as I read the Act, it is subject to control and gives rise to the main issue in this case.

Section 174 (1) gives full power in his discretion to the licensing authority to grant or refuse an application for a licence, subject to the Act and to a right of appeal to the Transport Tribunal by a

f person aggrieved: section 175 (1) and (2).

Before considering the procedure governing the granting of carriers' licences it is convenient to turn to the facts which brought Merchandise Transport to require and apply for additional "A" licences. Harris Lebus Ltd. are large manufacturers of furniture, with premises at Tottenham for the

g manufacture of cabinet furniture, and at Reading for upholstered furniture. I read from the detailed findings of the licensing authority: "3: From 1928 until 1949 Harris Lebus Ltd. used public hauliers, but after nationalisation they found the services of British Road Services not altogether satisfactory and went in for 'C' hiring, supplying the drivers themselves. They continued to use British Road

h Services to some extent but as business expanded they started to build up their 'C' licensed fleet. After denationalisation they formed Merchandise Transport Ltd. in

© An extract from a JUSTIS database

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

a

1955 as a separate road haulage company to tender for British Road Services' units and they were granted 13 special 'A' licences for 19 vehicles and three trailers, which were later converted to ordinary 'A' licences. Merchandise Transport are a wholly owned subsidiary of Harris Lebus and many of the directors are common to the two companies. 98 shares are held by Harris Lebus Ltd. and two by Mr. A. Lebus. In 1957 Merchandise Transport acquired C. E. Dormer (Leyton) Ltd. and in 1958 C. E. Dormer (Islington) Ltd. 98 shares of each company are held by Merchandise Transport and two by Mr. Chidwick, Secretary of Harris Lebus Ltd. These acquisitions brought Merchandise Transport 38 additional vehicles on 'A' licence and two on 'B' licence. The two Dormer companies have now no customers of their own as their fleets have been amalgamated with the Merchandise Transport fleet. Mr. Forrest, the Transport Manager of Merchandise Transport, estimates that of the total carryings of the combined fleet 61 per cent. is for Harris Lebus and that $95\frac{1}{2}$ per cent. of the 39 per cent. carried for other customers represents return loads. Thus to all intents and purposes the three haulage companies work entirely for Harris Lebus on outward journeys. The 'A' licensed vehicles are said to be used mainly on long haul work, the local work being done mainly by Harris Lebus vehicles on 'C' licence and 'C' hiring. The vehicles of all four companies are said to be garaged at one place.

4: The principal object of the applications is stated to be to form a single integrated fleet of 'A' licensed vehicles primarily to serve the extensive transport needs of Harris Lebus Ltd. It is claimed that there would then be simplification of record keeping, ability to interchange drivers and general economy on overheads. It is not denied that there would be a considerably increased opportunity to carry return loads and that there might be a certain amount of abstraction from existing hauliers."

The application by the respondents, dated February 5, 1960, to the Metropolitan Licensing Authority was for a variation of an "A" licence so as to permit them to use in addition to the vehicles then authorised thereunder (a) 112 Luton (furniture) vans and seven articulated units (tractors and trailers), and (b) seven Luton vans "to be acquired." At the date of the application all the vehicles (other than the seven vans "to be acquired") were the subject of a "C" licence held by Harris Lebus Ltd. and were in regular operation. In these circumstances what was

© An extract from a JUSTIS database

sought to be achieved was not inappropriately referred to as a "switch" from the manufacturers to their subsidiary and controlled company, the respondents. It was a "switch" on a considerable scale.

b    The licensing authority refused the application and his conclusion and findings are stated in his decision of June 17, 1960, as follows: "As in deciding this application I have to have regard to the public interest, I do not think it would be right to ignore the obvious implications of a grant. It may

c   be that there are not many large 'C' licensed operators who by the simple device of establishing a transport subsidiary would be able profitably to switch to 'A' licence activities. But obviously there are some and there is substance in the fears of some objectors that if the application is granted it will be the precursor of others. In the 1933 Act, Parliament decided that it would be in the public interest

d  that public hauliers should be protected against the inroads of private hauliers with spare capacity, unless those private hauliers could establish a case for a limited 'B' licence. The grant of the application in this case would nullify the clear intention of Parliament and would thus be contrary to the public interest. On this part of the principal application therefore my findings are as follows:

e   (1) The desire of Harris Lebus Ltd. to employ Merchandise Transport Ltd. to carry their goods is less than genuine and is subordinate to the desire of Harris Lebus Ltd. and its subsidiaries to use 'A' licensed vehicles in order substantially to increase the capacity they can offer for the carriage of return

f  loads. (2) It is not necessary in view of findings 3, 4 and 5 to determine the quantum of the grant. (3) In a limited number of cases the objectors satisfied me that a surplus of vehicles already existed which could carry the return loads sought to be carried by the applicants. (4) All the objectors satisfied me that if the application was granted there would be a likelihood of abstraction of their

g  traffic and this again would lead to facilities being in excess of requirements. (5) It would not be in the public interest that this part of the application should be granted."

  By its judgment the Transport Tribunal set aside this decision and remitted the appeal to the licensing authority for him to determine the number and unladen weight to be authorised with this

h  direction: "that upon the appellants" ("the appellants" being Merchandise Transport, the respondents before us) "procuring and producing to the licensing authority an undertaking

© An extract from a JUSTIS database

in writing by Harris Lebus Ltd. (a) to surrender all such 'C' licences as are now held by them and (b)
b  not to apply for any 'C' licence during the currency of the licence to be granted to the appellants
under this order the licensing authority do vary the appellants' said 'A' licence by authorising the use
thereunder of such vehicles as may be required to carry the traffic now carried by Harris Lebus Ltd.
under the 'C' licences to be surrendered by them."

Both decisions rely on previous judgments of the Transport Tribunal or its predecessors, and it was
c  submitted to us that the Transport Tribunal, whilst properly making decisions for the guidance of
those concerned with this branch of the law, tended to apply too rigidly and authoritatively their
pronouncements without due regard to the discretion which each application involves and to the
changing and developing circumstances in which the Act, as distinct from the decisions, calls for
d  interpretation and application.

In my view it is desirable and no doubt inevitable that a body of guiding authority should be built
up as the various circumstances call for adjudication, but viewing this matter for the first time and
recognising that the whole field has not been traversed, the criticism does not seem wholly unjustified.
e  Where discretion lies it should not be hidebound by authority.

I turn now to the sections of the Act of 1960 dealing with procedure. Section 171 provides that an
application for an "A" or a "B" licence shall be made to the licensing authority for the area in which
the applicant's operating centre is situated, and section 172 requires the applicant to furnish specified
f  information on a prescribed form of the motor-vehicles proposed to be used.

The objectors, who objected in large numbers, were empowered to object under section 173 of the
Act, and it is important to observe these provisions which I extract from subsections (3), (4), (5) and
(6) and from section 174 (4). Section 173 provides: "(3) It shall be the duty of the licensing authority
g  ... to take into consideration any relevant objection to the application which may be made by a person
who is already providing facilities, whether by means of road transport or any other kind of transport,
for the carriage of goods for hire or reward in the district, or between the places, which the applicant
intends to serve: ... (4) In this section, 'relevant objection' means an objection on any of the following
h  grounds, that is to say, - (a) that suitable transport facilities in the district, or between the places,
which the applicant intends to serve are or, if the application were

© An extract from a JUSTIS database

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

granted, would be, either generally or in respect of any particular type of vehicles, in excess of requirements; ... (5) The onus of proof of the existence of the grounds on which a relevant objection

b is made shall lie on the objector. (6) In considering, for the purposes of an objection on grounds such as are referred to in paragraph (*a*) of subsection (4) of this section, whether existing transport facilities are to be treated as suitable, the licensing authority shall have regard to the relative efficiency, reliability and adequacy of the existing facilities at the date of the application and the facilities which

c the applicant will provide if his application is granted, and to all other relevant considerations, including, to such extent as may in all the circumstances appear proper, the charges made and to be made in respect of those facilities respectively."

Section 174 provides: "(4) The licensing authority, in exercising his discretion under this section,
d shall have regard to the interests of the public generally, including primarily those of persons requiring facilities for transport, and secondarily those of persons providing facilities for transport ... and, in the case of an application for a 'B' licence, also to the extent to which the applicant intends that the vehicles proposed to be used under the licence shall be used for the carriage of goods for hire or

e reward."

The objectors are concerned not with the applicants' outward traffic from London, for that is dealt with by an undertaking which I shall have to consider later, but with the right which an "A" licence would give the applicants to collect, without control or limitation, return loads to the probable

f detriment of the objectors, who are public carriers who have already provided facilities, which they say are ample and which would be excessive if the applicants are allowed to intervene by taking return loads and depriving the objectors, to whatever extent to which they do so, of what would be their outward traffic. It appears that where there are free and unfettered "A" licences, that is, where

g the traders are in fact public carriers, there is a give and take in the matter and in the past carriers have not been concerned to resist the competition for return loads. Here it is said the position is very different and has not arisen before. Indeed, Mr. Fay, who is one of the seasoned practitioners in this branch of the law, wont so far as to say at the outset of his argument that if the decision stands it

h will alter the whole character of the road transport industry.

It is this broad question which calls for consideration. I

© An extract from a JUSTIS database

[1962]
2 Q.B.

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

188

Sellers L.J.

a

attach importance to what took place at the hearing before the licensing authority. Harris Lebus Ltd.
b undertook that they would not apply for additional vehicles or "C" licence or "C" hiring allowance,
but, more important in my view, the subsidiary company, the applicants, gave an undertaking that, if
the application for additional vehicles on "A" licence was granted, these vehicles on outward journeys
would be used for the carriage of Harris Lebus Ltd.'s goods only. "This means," said the licensing
authority, "that on outward journeys these vehicles would do no more than they now do under the 'C'
c licence and 'C' hiring allowance."

This undertaking, in my opinion, altered the whole nature of the application. With such a restriction
on outward journeys it would scarcely fit the description of public carrier, and the licence to carry for
others with such a restriction on outward traffic would create, in effect, an "A" licence subject to a
d condition. Such an undertaking would be enforceable, it is true, not by penalty, as would a condition,
but at the discretion of the authorities by a termination of the licence.

It does not seem to be surprising that an application of this character gave rise to doubts in the
mind of the licensing authority, and he dismissed the application on the ground that the desire of
e Harris Lebus Ltd. to employ the applicants to carry their goods was less than genuine and was
subordinate to the desire of Harris Lebus Ltd. and its subsidiaries to use "A" licensed vehicles in
order substantially to increase the capacity they could offer for the carriage of return loads.

With respect to the Transport Tribunal, who showed little sympathy with that conclusion, I feel that
f there is much force in what the licensing authority said. It was, I think, unnecessary to use the word
"genuine" at all, even though it did appear in an earlier judgment of the tribunal, but the suspicion
which the finding expressed seems to me justified.

The evidence of the objectors stood alone and unchallenged with regard to facilities for return loads,
g and on that evidence the licensing authority held that in limited localities an ample supply or even a
surplus of vehicles already existed and a surplus would arise if they were increased. The applicants
boldly called no evidence on return loads and relied on authority to permit evidence of need for
outward traffic, in this case guaranteed in effect, as sufficient to justify an "A" licence without further
h proof, particularly without consideration for return traffic.

I am not concerned in this appeal to decide whether it is

© An extract from a JUSTIS database

necessary in the ordinary application for an "A" licence to trade as a public carrier, in any real sense, for the licensing authority to inquire into the effect on return load facilities already existing. Strictly,

b the Act does seem so to require, but if an outward demand were clearly proved the facility would have to be granted and it may be objectors would not be forthcoming.

It is here, I think, that the undertaking which was given calls for consideration, and as the matter has been left by the Transport Tribunal the applicants have acquired a right to trade which fulfils the

c circumstances of a "B" licence but not that of an "A" licence. Under section 166 a "B" licence entitles the holder thereof to use the authorised vehicles as he thinks fit from time to time, either (a) for the carriage of his goods or (b) subject to conditions, for the carriage of goods for hire or reward.

These are clear alternatives and I find no restriction on the use of a "B" licence in the words "from

d time to time," which permits of the alternative use. Section 168 (2) provides that a licensing authority may attach to a "B" licence the conditions (b) that certain classes or descriptions of goods only shall be carried and (c) that goods shall be so carried only for specified purposes. That is, in effect, what has been done here under the guise of an "A" licence. The Act contemplates an "A" licence as

e unfettered and gives the authority no right to impose conditions (except under the special provisions of section 174 (2), which deals with what have been called contract "A" licences).

On the face of it, therefore, it would seem to me that the Transport Tribunal, faced with the applicants' undertaking with regard to outward traffic, should either have dismissed the appeal or, at

f their discretion, have offered a "B" licence with the conditions attached and, if this had been accepted, sent the case back to the licensing authority to say what restrictions, if any, should be placed on the applicants' rights to pick up return loads. So far as the objectors are concerned the return loads are the ting of the matter.

g The ideal for economy of transport would, I suppose, be that every outward vehicle should return as near as possible to its headquarters with a full load. On the other hand, from a short view of the public interest it might be said that the more vehicles available and over the widest areas the better, whether they were fully laden or not. But in this regulation of traffic by licences there is clearly an

h element of monopoly, and an endeavour to build up and retain a stable system of goods transport by road. Section 173 (3), (4) (a) and (6), which I have

© An extract from a JUSTIS database

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

already read, impose the duty on the licensing authority to consider the relevant objections and in the case of a "B" licence application and, therefore, in this case, which, as I see it, is completely
b   analogous, there is a duty to consider the return facilities.

The 119 vehicles will travel as trade requires to all parts of the British Isles bringing vehicles at some time or another to nearly all localities with empty space for return loads. No doubt there will be concentration on the bigger industrial centres and further concentration at some points as the returning
c   vehicles advance upon the main routes to London and become available, with fair frequency, to collect traffic at given points on their way home.

It was argued that a hundred or more vehicles would make no appreciable difference having regard to the large number of vehicles operating on the roads all over the country, and that their outward
d   journeys would be so widespread. I should have thought the concentration was one of the matters which ought to be considered. One vehicle a month might go to, say, Sunderland, but 20 a week might, let us suppose, go to Leeds and the odd vehicle to Sunderland, or Newcastle or Scotland might return through Leeds and swell the number of returning vehicles week by week to the possible
e   detriment of those public carriers already serving the needs of Leeds. I cannot see why such a situation does not call for inquiry and decision under the Act. Under a "B" licence granted to the applicants certain centres might be excluded from the right to pick up return loads. It would be a matter for exercising discretion on a judicial assessment of the facilities and the interest of the public.
f   In *Barratt     Co. Ltd. v. L.M.S. and L.N.E.R. and G.W.R. Cos.*[1] it was held by the Road and Rail Traffic Appeal Tribunal (which the Transport Tribunal supplanted) that the carrying of return loads for hire and reward is not generally in the public interest and the applicant for a "B" licence there showed no case for exceptional treatment.
g   I would allow the appeal on the ground that the appropriate licence which the Act provides on the facts of this case is a "B" licence, and that under the Act an "A" licence is not available, and the only application before the authority was for an "A" licence. If a "B" licence were to be sought then I am of
h

1 (1936) 24 Traff.Cas. 127.

© An extract from a JUSTIS database

opinion that full consideration should be given to the objectors concern over return loads.

I would allow the appeal equally with my brethren, whose judgments I have read, on the ground of b the relationship of the main company with its subsidiary company, the applicants, and for the reasons given in my Lords' judgments.

In an administrative matter of this kind, where licences have to be obtained and granted for the efficient provision and regulation of road transport, and where discretion has to be exercised on the c information available, I think that the authority is justified in looking at the substance of the matter and where effective control lies. If it is just that public carriers should be protected against the unfettered competition of private carriers with spare capacity, as the Act seems to indicate, then this should not be evaded by an artificial "switch" but should be established as fair and reasonable under d an application for a "B" licence.

I am in agreement with the decision in *British Transport Commission v. Bristow,*[2] relied on by the appellants. The appeal before us is not restricted to that part of the Transport Tribunal's decision which held that their objections as to excess of facilities was not made out.

e The error in the decision appealed from, in my opinion, is an error of law, and no question arises of interfering with the discretion of the Transport Tribunal. The Transport Tribunal, as a reviewing body of the various orders of the licensing authorities throughout the country, is an expert body responsible for the proper administration of the Act, and I would be reluctant to interfere with any matter of f discretion, although there is power to do so in exceptional circumstances. The tribunal has for so long given the final judgment in these matters, and it is with deference that I differ from them, but I am of the opinion that the decision of the licensing authority was right and should be restored.

g DEVLIN L.J.   In this case we have to consider the machinery whereby road licences are granted to goods vehicles. Most of it was originally enacted by the Road and Rail Traffic Act, 1933. That statute, subject to some amending legislation, was the statute in force at the time when these proceedings began. All of this has now been re-enacted in the Road Traffic Act, 1960; and as we are h told that it would be more convenient to refer to

2 (1955) 30 Traff.Cas. 217.

© An extract from a JUSTIS database

the provisions of that Act, I shall do so. The appeal is from the decision of the Transport Tribunal, a
body which is authorised by section 175 (1) to hear appeals from persons who are aggrieved by the
b decision of the licensing authority.

It is unnecessary to set out the complicated route by which appeals from the decisions of the
Transport Tribunal come to this court. It is agreed that they are governed by section 17 of the
Railway and Canal Traffic Act, 1888. We may not entertain any appeal upon a question of fact,
c although we have a certain power to draw inferences of fact. Subject to this, we may make any order
which the tribunal could have made.

The grant or refusal of a road licence is essentially a matter of discretion. The application is made in
the first instance to the licensing authority of the appropriate district, and he has "full power in his
d discretion" to grant or refuse it: section 174 (1). On an appeal from him the tribunal has power "to
make such order as it thinks fit": section 175 (3). The question has therefore arisen as to how far on
this appeal we are bound by the exercise of the discretion of the tribunal. It is agreed that it is to the
tribunal that we have to look in this respect and not to the licensing authority; they may substitute
their discretion for that of the licensing authority. But they are not, in my opinion, when they sit, as
e they usually do, as an appellate tribunal without hearing the witnesses, free to substitute their own
findings of fact without good cause for those findings of the licensing authority which are based on
and derive their force from his observation of the witnesses; if they did that, they would commit an
error of law, for that is a limitation inherent in the nature of appellate work. Apart from this, the
f question is to what extent we can interfere with the discretion exercised by the tribunal. On the one
side it is agreed that we should not interfere unless we discover some error of principle, such as may
cause an appellate court to differ from the decision of a judge in chambers. It is conceded on the
other side that if there lies at the root of the exercise of the discretion any error of law, we are
g entitled to correct it and, if necessary, to exercise our own discretion, making such order as the
tribunal itself could have made. I need not explore the territory that lies between these limits since, in
my opinion, this case falls outside them. I am satisfied in this case that the tribunal has fallen into an
error of law.

h    The other question on discretion is whether the tribunal can fetter - and, if so, whether it has
fettered - the exercise of the

© An extract from a JUSTIS database

a

discretion by the licensing authorities and by itself. It is said by Mr. Fay that the tribunal has constructed a rigid system of rules embodied in reported cases which licensing authorities are required

b to follow as binding precedents. He submits that that is wrong. In my opinion a series of reasoned judgments such as the tribunal gives is bound to disclose the general principles upon which it proceeds. I think that that is not only inevitable but also desirable. It makes for uniformity of treatment and it is helpful to the industry and to its advisers to know in a general way how particular

c classes of applications are likely to be treated. But the tribunal may not, in my opinion, make rules which prevent or excuse either itself or the licensing authorities from examining each case on its merits. That is a power which the High Court has assumed. If the High Court has made a rule for the proper administration of justice generally - as, for example, that there should be no communication of

d any sort between a party and a juror - the court will enforce the rule without inquiring whether the breach of it in a particular case has actually caused any injustice. There is no warranty for an inferior court making rules of that sort; and, in my opinion, it would not be open to a tribunal charged by statute with a duty to decide each case as a matter of discretion, to inhibit itself from going fully into

e the facts. I respectfully adopt what Jenkins L.J. said on a similar point in *Reg. v. Flintshire County Council County Licensing (Stage Plays) Committee, Ex parte Barrett*[3]: a tribunal must not pursue consistency at the expense of the merits of individual cases. If the discretion is to be narrowed, that must be done by statute; the tribunal has no power to give its decisions the force of statute.

f   It is necessary now to say something about the framework of the relevant sections of the Act. Section 166 divides licensees into three classes - "A," "B" and "C": public, limited and private. The fundamental distinction is between the public and the private carrier. The private carrier is a man who uses his vehicle for delivering his own goods; and unless he has misbehaved himself in some way, he

g is entitled to his licence as of right: section 174 (3). Such a vehicle will normally be empty on the return journey and it would therefore pay the private carrier to solicit a load back at a very cheap rate. If he were allowed to do this, there would be unfair or uneconomic competition with the public carrier or "A" licensee whose function is to carry goods

h

   3 [1957] 1 Q.B 350, 367, 368; [1957] 2 W.L.R. 90; [1957] 1 All E.R. 112, C.A.

© An extract from a JUSTIS database

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

a

generally for hire or reward. It is plainly the policy of the Act to prevent this. The "C" licensee or private carrier is forbidden, except when authorised in an emergency, to carry goods for hire or reward: sections 166 (4) and 168 (3). The Act also provides for the possibility that a public carrier or "A" licensee may have as well a different business in which he delivers his own goods and forbids such a carrier from using his "A" licence vehicles for carrying such goods: section 168 (1).

b

In between these two main categories, the Act provides for what have come to be regarded as three other categories Although there is only one other class mentioned in the Act, the "B" licence, this licence has come to be used for two rather distinct purposes; and there is also a modification of the "A" licence, which, although it has no official name, is known as the contract "A" licence. It is convenient to deal with that first. Although in form it is a modification of the "A" licence, in substance it is a variant of private carriage. Instead of carrying his own goods, a trader may find a carrier who is prepared under contract to set aside vehicles exclusively for the trader's goods. Such a carrier may obtain a licence in the same way as a "C" licence as of right, but he is then subject to the essential disability of the "C" licensee, namely, that he may not carry any other person's goods in that vehicle: section 174 (2).

c

d

e

The next category to be considered is that of the public carrier who is prepared to submit to some restriction. The "A" licence in theory gives the carrier power to travel all over the country and to carry what goods he wants. The only condition which can be imposed on him is that which I have already noticed, namely, that if he carries on another business, he may not transport the goods of that other business. In the limited or "B" licence conditions can be imposed: section 168 (1). The carrier may be limited to a specified district, to travel between specified places, to certain classes or descriptions of goods, or to the carriage of goods only for specified persons. A public carrier who wanted only a limited licence of this sort should apply for a "B" licence. But it appears that there are public carriers who, while not wishing to bind themselves stringently, are prepared to submit to what in effect are restrictions of a more general character. In his application an applicant must state "the facilities for the transport of goods intended to be provided by the applicant": section 172 (2) (a). The wider the facilities for which he asks, for example, in the area to be covered or in the classes of goods to be carried, the less likely he is to get his

f

g

h

© An extract from a JUSTIS database

licence. So he is not likely to ask for more than he hopes to get. This statement is not binding upon
him as a condition would be. If he goes outside the facilities for which he has asked, he does not, as
b in the case of a "B" licensee who breaks a condition, commit a criminal offence. But section 178 (1)
(*d*) provides that if for the purposes of an application the applicant has made a statement of intention
or expectation which has not been fulfilled, the licensing authority may revoke, suspend or curtail his
licence. No doubt, therefore, the penalty for departure from the statement of intention by an "A"
c licensee is practically as effective as that for the breach of a condition by a "B" licensee. But the
revocation of the licence is discretionary and I presume that the departure from the intention would
have to be more than trivial; the procedure is useful in the sort of case where the restraint which is
acceptable to the carrier does not lend itself easily to the formulation of a rigid condition. I have
d observed that a word such as "mainly" often qualifies a statement of intention, so that the question
would be whether the carrier poached outside the area mentioned in his application, or made a regular
trade in classes of goods which he had not included in it.

　　Finally, in the third category there is the private carrier who wants to be relieved to some extent of
e his disability from carrying other people's goods. He, too, can apply for a "B" licence, and that is why
I have said that that one class seems to include two categories. Under a "B" licence he can not only
) carry goods of his own but he can also carry other people's goods for hire or reward subject to
conditions. These may include, in addition to those I have already mentioned, any condition imposed
f "in the public interest and with a view to preventing uneconomic competition": section 168 (2) (*d*).
That is the protection given to the "A" carrier who would otherwise start from a position of economic
disadvantage in that he would have to compete with the surplus capacity of the private trader.

　　In this case the nominal applicant for an ordinary "A" licence is Merchandise Transport Ltd. Their
g application was refused by the licensing authority and granted by the tribunal. This company is a
wholly owned subsidiary of Harris Lebus Ltd., who are manufacturers of furniture on a very big scale
and therefore have to have at their disposal a fleet of furniture vans for delivering their goods.
Merchandise Transport Ltd., together with two subsidiaries of their own, handles or wishes to handle
h all this transport. The application in this case is in respect of a number of vehicles known as Luton
vans which have hitherto

© An extract from a JUSTIS database

been used by Harris Lebus Ltd. for delivery of their furniture on "C" licence; it is proposed that they should be transferred to Merchandise Transport Ltd. and used by that company on "A" licence for the
b transport of "mainly new furniture, any distance, and on return, goods suitable for carriage in Luton vans." It is said that the object of this transfer is to simplify record-keeping and administration. Two witnesses who are officers of both companies, spoke about this and were examined and cross-examined on the point; and the licensing authority who heard them came to the conclusion "that
c the driving motive behind all these applications is not the customer's wish to change his business method, but the desire of the organisation of which the customer is the head to carry return loads in all their vehicles." I do not think that the tribunal anywhere rejects this finding; as one made by the licensing authority who heard and saw the witnesses, I think that it should be accepted. It is not
d suggested that Merchandise Transport Ltd. was formed simply for the purpose of getting round the Act. But the situation that will result is that by a "simple device," as the licensing authority rightly describes it, the Harris Lebus Group will be put in the position of a manufacturer who can carry his own goods to their destination and pick up return loads where he can get them without having to
e submit to the conditions which on the grant of a "B" licence would probably be imposed to protect public carriers.

An "A" licence is not granted as a matter of course and it is open to existing "A" licensees to object on certain grounds, principally that the grant of it would increase capacity above requirements. The British Transport Commission, for whom Mr. Fay appears, heads the list of objectors who gave
f evidence at the hearing. In the course of the hearing, and I suppose in order to meet some of the objections, the applicants gave an undertaking that they would not on outward journeys seek to carry any traffic other than Harris Lebus's goods. Effect was given to this by means of "a statement of intention" within section 178 (1) (d). In my opinion this was not correct. It is a precise limitation,
g capable of exact enforcement, and should be made the subject of a condition and of a limited licence in accordance with the design of the Act. I do not say that the line between a statement of intention and a condition must always be drawn too meticulously. But if it is completely blurred, if as in this case a restriction on trade of a sort for which a "B" licence was clearly designed is imposed on an
h "A" licence by way of a statement of intention, injustice may result. All existing "A" licensees and "B"

© An extract from a JUSTIS database

a

licensees may oppose an application for a "B" licence, but only an "A" licensee may oppose an
application for an "A" licence: section 173 (3). If the distinction between a condition and a statement
b of intention is not observed and application is made for an "A" licence in cases where a "B" licence
is for this reason the appropriate one, what is in effect a "B" licence will be granted without existing
"B" licensees having had an opportunity to be heard. This ground is, in my judgment, sufficient to
c justify the refusal of the "A" licence in this case. But although it was taken by Mr. Fay before us, it
does not appear to have been pressed below, and I shall therefore proceed to consider the essential
matter in issue, on which the licensing authority took one view and the tribunal the other.

Before doing so it will be convenient to see just what advantage the Harris Lebus Group gains by
d applying for an "A" rather than for a "B" licence. They have consented to carry Harris Lebus's goods
only in their outward journeys. Since the main object of the enterprise is to deliver Harris Lebus's
furniture, the concession does not involve much sacrifice, though I dare say they would have liked to
have kept their hands entirely free. What they insist on retaining is their freedom to pick up return
e loads; if they had not wanted that, they could have got a contract "A" licence as of right.

They do not, however, they told us, wish to cut rates on return loads. It may be asked, therefore,
why they are not willing in accordance with the commercial realities of what they are doing to apply
f for a "B" licence enabling them to carry their own goods on the outward journey and other traders'
goods on the return. The answer lies in the different conditions which are laid down either by the Act
or have been followed as a matter of practice in relation to the burden of proof and which distinguish
the application for the "A" licence from that for the "B" licence. As I have said, on an application for
g an "A" licence existing "A" licensees can object on the ground (I shall give the exact phraseology
later on) that their existing capacity is already sufficient and that the grant of any additional services
would be in excess of requirements. When such an objection is taken, as in this case, the onus of
proof is on the objector: section 173 (5).

h   But when an application is made by a "C" licensee to switch to a "B" licence so that he can carry
return loads, the practice is to put the onus of proof the other way round. In *Barratt     Co.*

© An extract from a JUSTIS database

[1962]
2 Q.B.

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

198

Devlin L.J.

*Ltd. v. L.M.S. and L.N.E.R. and G.W.R. Cos.*[4] the Road and Rail Traffic Appeal Tribunal said[5] that a facility to take return loads should be granted to a "B" licensee only in exceptional circumstances, and

b this principle seems thereafter to have been followed. As a general rule, that appears to me to be in accordance with the intent of the Act and in particular with the intent that is manifest in section 168 (2) (*d*) that "B" licences should not be used for the purpose of uneconomic competition. Prima facie, it is uneconomic competition if a public carrier is forced to cut his rates so as to compete with private

c carriers who can afford to take cut rates (the licensing authority has no power to impose conditions with respect to rates) on his return loads.

Now, on the facts of this case the onus of proof appears to be all-important. If the application were confined to a specified area, it might be easy enough on investigation of the facts to prove either that there was or was not already sufficient capacity. Since the application is to carry loads all over the

d country, it is extremely difficult to give any satisfactory proof of needs one way or the other. Both Mr. Fay and Mr. Beddington, in the useful argument with which he followed Mr. Lyell for the applicants, accepted this. By asking for "A" licences rather than "B" licences the Harris Lebus Group thus put themselves in a position of great advantage.

e I turn now to the main question. The licensing authority, as I have said, regarded the arrangements made by the Harris Lebus Group as "a simple device" to evade the intent of the Act, which he concisely describes in paragraph 22 of his judgment as follows: "Parliament decided that it would be in the public interest that public hauliers should be protected against the inroads of private hauliers

f with spare capacity, unless those private hauliers could establish a case for a limited 'B' licence."

No doubt a man may so arrange his affairs as not to bring them within the purview of a statute. Certainly Merchandise Transport Ltd. is as a legal person quite distinct from Harris Lebus Ltd. If the duty imposed upon the licensing authority was to grant Merchandise Transport a licence, provided certain conditions were satisfied, he could not withhold it because he properly regarded Merchandise

g Transport as the alter ego of a person who would not himself be qualified. But the grant of an "A" or a "B" licence is discretionary and not mandatory. Is it a proper exercise of the discretion to refuse a licence to someone

h   4 24 Traff.Cas. 127.
    5 Ibid. 134.

© An extract from a JUSTIS database

Case 1:03-md-01570-GBD-SN   Document 415-17   Filed 08/30/04   Page 28 of 39

who is seeking, either for himself or for a group of which he is a member, an advantage which, though it may be within the letter of the law, is contrary to the spirit of the Act?

b   This is a broad and simple way of approaching the point. The licensing authority and the Transport Tribunal have approached it by a narrower route. They have not considered the exercise of the discretion at large but have related it to the specific matters to which under section 174 (4) and section 173 (3) and (4) the licensing authority must have regard or take into consideration. Section

c   174, which, as I have already noted, gives the licensing authority "full power in his discretion" either to grant or refuse the application, requires by subsection (4) that he "shall have regard to the interests of the public generally, including primarily those of persons requiring facilities for transport, and secondarily those of persons providing facilities for transport." Were Harris Lebus Ltd. "persons

d   requiring facilities for transport"? Had Harris Lebus Ltd. a "genuine desire" (a phrase taken from the report of an earlier decision of the tribunal) to give up its "C" licences and change over to public transport? This was all investigated in the evidence, and there is certainly something bizarre about evidence from witnesses who as officers of both companies spoke of the needs of the parent and the

e   willingness of the child to help. It is as if a man explained that his right hand felt that it was time to give up work but fortunately his left hand was able to take over. If section 174 (4) imposed conditions precedent to the grant of a licence, it would no doubt be necessary to consider carefully whether the literal requirements of the subsection were fulfilled. Since it is only a matter to which the

f   licensing authority in the broad exercise of his discretion must have regard, it seems to me to be unnecessary to take up time determining whether the letter of the Act has been fulfilled.

   The other material matter which the licensing authority was required by section 173 (3) "to take into consideration" is whether "suitable transport facilities in the district, or between the places, which the

g   applicant intends to serve are or, if the application were granted, would be, either generally or in respect of any particular types of vehicles, in excess of requirements": section 173 (4) (*a*). The British Transport Commission contended that facilities would be in excess of requirements, and this is the ground of their objection to which I have already referred. Evidence was called on this point. The

h   licensing authority found that the objection was made out and the Transport Tribunal found that it was not. We have been invited to

© An extract from a JUSTIS database

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

Devlin L.J.

a

set aside the tribunal's finding and I dare say that we have power to do so. The finding that there
would be no excess of requirements within the meaning of the Act was based upon an evaluation of
b the evidence; it was an inference from the facts proved, and I think that we have power to interfere
with it. We should, however, be very reluctant to do so, for it is an inference drawn by a tribunal
which is specially experienced in matters of which we have no special knowledge. As I think that the
appeal should be allowed whether the objection is sustainable or not, I need express no concluded
c view on this point.

The way is now almost clear to consider the central point of how, in the end, the discretion should
be exercised, but there is still one further matter which I must get out of the way. Mr. Lyell pressed
upon us the argument that the only locus standi which the British Transport Commission had in this
d case was that of an objector. They could therefore appeal to us only against so much of the tribunal's
decision as affected their objection, that is, that part of the decision which decided that the objection
had not been made out. If we upheld the tribunal's decision on this point, as he submitted we ought
to, the whole appeal must fail; and, as I understood the argument, the subject-matter of the appeal
e being confined to the objection, we had no power under section 17 of the Act of 1888 to review the
exercise of the discretion by the tribunal in allowing the application. An argument on the same lines
as this was advanced to the tribunal in *British Transport Commission v. Bristow*.[6] The wording of the
Act on this point is undoubtedly difficult, but, for the reasons given by the tribunal in the case I have
f cited, I think the argument fails.

I now come to the central point in the case which the licensing authority decided in paragraph 22 of
his judgment. I have already quoted a sentence from that paragraph, but I think it is best that I should
set it out in full: "As in deciding this application I have to have regard to the public interest, I do not
think it would be right to ignore the obvious implications of a grant. It may be that there are not
g many large 'C'-licensed operators who by the simple device of establishing a transport subsidiary
would be able profitably to switch to 'A' licence activities. But obviously there are some and there is
substance in the fears of some objectors that it the application is granted it will be the precursor of
others. In the 1933 Act, Parliament decided that it would be in the public interest that public hauliers

h

6 30 Traff.Cas. 217.

© An extract from a JUSTIS database

should be protected against the inroads of private hauliers with spare capacity, unless those private hauliers could establish a case for a limited 'B' licence. The grant of the application in this case would
b   nullify the clear intention of Parliament and would thus be contrary to the public interest."

It will be seen from this extract that the licensing authority justifies his decision as being in the public interest. He has in mind the words from section 174 (4), which I have quoted, that in exercising his discretion he is to "have regard to the interests of the public generally." I am not sure
c   that the phrase when used in section 174 (4) was intended to have quite such a wide meaning. But I think it to be quite immaterial. It is not necessary to justify every exercise of the discretion by reference to something to which the licensing authority is required to have regard; it would have been quite sufficient if he had said that he had exercised his discretion in a way which in his view best
d   fulfilled the objects of the Act and was in accordance with its general design.

The licensing authority's reasoning which I have quoted was dealt with by the tribunal in paragraph 8 of its judgment in the following terms: "We are by no means certain that we understand this passage. It is sufficient however for us to say that we rejected this contention four years ago in Reed[7]
e   and that we see no reason to qualify what was said in that case at pages 54 and 55."

I agree with Danckwerts L.J., whose judgment I have had the advantage of reading, that there is nothing obscure in the reasoning of the licensing authority on this point or on any other in his decision.

f   The argument which the tribunal had earlier accepted in Reed's case[8] was repeated before us by Mr. Lyell. It is based upon Salomon v. Salomon Co.[9] and upon the undoubted legal proposition that a company is a legal entity distinct from its shareholders. The reasoning of the licensing authority is said to conflict with this proposition. I cannot see that it does. If he had refused a licence to Merchandise Transport on the ground that it had no legal existence apart from Harris Lebus Ltd. and
g   that the latter ought to have applied themselves, that would be wrong. Or if, for example, Merchandise Transport Ltd. had contracted with Harris Lebus Ltd. to carry all their goods and

7 Reed Ltd. v. British Transport Commission (1957) 31 Traff.Cas. 50.
h   8 31 Traff.Cas. 50.
9 [1897] A.C. 22; 13 T.L.R. 46, H.L.

© An extract from a JUSTIS database

a

had applied for a contract "A" licence, the licensing authority would be bound to grant it; he could not refuse it on the ground that in reality Merchandise Transport was only the transport department of

b Harris Lebus Ltd. If there could be any doubt About that, section 180 would settle the point. That section provides that when a holding company applies for a licence it can signify to the licensing authority its desire that goods vehicles belonging to its subsidiaries shall be treated as if they belonged to itself. The main object of this provision is no doubt to ensure that one company in a group does

c not break the law if under a "C" licence it carries the goods of another group company. But the section shows that it must be the choice of the applicant and not the act of the licensing authority that pierces the corporate fiction.

But the fact that two persons are separate in law does not mean that one may not be under the

d control of the other to such an extent that together they constitute one commercial unit. It may be a case of parent and subsidiary; or it may be a case in which one man, though nominally independent, is in truth the instrument of another; or it may be a case in which a man has simply put his vehicles in the name of his wife. Whenever a licensing authority is satisfied that that sort of relationship exists,

e and that the dominant party is using it to obtain contrary to the intent of the Act an advantage which he would not otherwise get, he is entitled, if not bound, to exercise his discretion so as to ensure that the scheme of the Act is complied with in the spirit as well as in the letter. This does not mean that Merchandise Transport Ltd. is not entitled to a licence at all. It means that it is not to be given better treatment than Harris Lebus Ltd. would have had if they had retained the ownership of their vehicles

f and applied themselves. Merchandise Transport Ltd. should be given a licence, if it applies for one, subject to whatever conditions would be imposed upon Harris Lebus Ltd. if they were the applicant. It is common ground that some conditions would have been imposed, and that means that the application should have been for a "B" licence and not for an "A" licence.

g   The judgment of the tribunal is wrong in law because they wrongly describe the decision of the licensing authority as "giving the go-by in this way to a fundamental legal doctrine" (I take these words from the passage in *Reed's* case,[10] which they incorporate into their judgment in the present case), and on that

h

10 31 Traff.Cas. 50.

© An extract from a JUSTIS database

a

erroneous interpretation of it dismiss his reasoning as fallacious. That leaves it open to us to exercise
our discretion, and I think we should do it in the way the licensing authority did and adopt his
b reasoning and dismiss the application.

Theoretically, this leaves over the question whether if, in a future case of such an application by a
subsidiary company, a licensing authority or the tribunal exercise their discretion upon a correct view
of the law but nevertheless permit the use of the device, it would be a wrong exercise of it. I prefer
c to leave the matter in this way because I have not added to a long judgment by exploring the full
extent to which we are entitled to interfere with the exercise of the discretion below; I have based my
conclusion upon the presence of an error of law. It is most unlikely that any tribunal would exercise
its discretion so as to sanction a way of getting round the Act; I do not believe that the tribunal in
d this case would have done so had it not thought it was legally compelled. If such a case ever arises, I
am certainly not saying that it would be beyond our power to declare that the exercise of the
discretion was unlawful in that it ignored the intent and purpose of the Act and was unjudicial.

e      DANCKWERTS L.J.  The subject-matter of this appeal is an application by Merchandise Transport
Ltd. for a variation of an "A" licence for vehicles under the Road Traffic Act, 1960, so as to permit
them to use an additional 119 vehicles, consisting of 112 Luton vans and seven articulated units
(tractors and trailers) and a further seven Luton vans "to be acquired." Luton vans are a form of van
f with an extension over the driver's cab, which are commonly used for the carriage of furniture. The
applicants are a wholly owned subsidiary of Harris Lebus Ltd., who manufacture furniture at
Tottenham and at Woodley near Reading, and at the date of the application the whole of the 119 vans
were licensed by Harris Lebus Ltd. and were used by that company for the carriage of their furniture
g to various places in Great Britain under a "C" licence (which authorised them to use the vans for the
carriage of their own goods only). An "A" licence is a public carrier's licence which authorises a
carrier to carry the goods of other persons. At the date of the application the applicants held "A"
licences for 19 vehicles and three trailers, and through two wholly owned subsidiaries (C. E. Dormer
h (Leyton) Ltd. and C. E. Dormer (Islington) Ltd.) controlled another 38 "A" licensed vehicles and all
57 of these vehicles were fully occupied.

© An extract from a JUSTIS database

[1962]
2 Q.B.

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

204
Danckwerts L.J.

a

Of the total quantity of furniture distributed by Harris Lebus Ltd. by road 61.2 per cent. was carried in vehicles the subject of the "C" licences held by them, and these (not being authorised to carry the goods of other persons) returned empty. About 23 per cent. of the furniture was carried in the vehicles of the applicants and their subsidiaries, and the balance was carried by other hauliers employed by Harris Lebus Ltd. Harris Lebus Ltd. were the instigators of the application and the reasons given for the application were (1) the facilities previously carried out partly by Harris Lebus Ltd.'s own vehicles and those of the applicants and other hauliers would be simplified, (2) costs of managing the vehicles would be reduced by some thousands of pounds a year, and (3) the ability of all the vehicles to carry return loads would be financially advantageous to Harris Lebus Ltd.

b

c

The application was opposed by British Road Services, British Railways and 62 other transport undertakings, who lodged objections. Twenty-seven supported their objections by evidence, seeking to establish that if the application was granted suitable transport facilities in the districts or between the places which the applicants intended to serve would be in excess of requirements within the meaning of section 173 (4) (a) of the Road Traffic Act, 1960 (which replaces section 11 (2) of the Act of 1933).

d

e

During the course of the inquiry before the licensing authority, an undertaking was given by one, Forrest (who was a director of the applicants and also the transport manager of Harris Lebus Ltd.) on behalf of the applicants that if the application was granted, the use of the vehicles the subject thereof would on their outward journeys be confined to the carriage of the products of Harris Lebus Ltd. Mr. Forrest and Chidwick (who was the secretary and a director of Harris Lebus Ltd.) gave evidence on behalf of the applicants.

f

The licensing authority refused the application, but the applicants appealed to the Transport Tribunal, and the tribunal set aside the decision of the licensing authority, and directed that upon the applicants procuring and producing to the licensing authority an undertaking in writing by Harris Lebus Ltd. (a) to surrender all such "C" licences as were held by them, and (b) not to apply for any "C" licence during the currency of the licence to be granted to the applicants, the licensing authority should vary the applicants' "A" licence by authorising the use thereunder of such vehicles as might be required to carry the traffic previously carried by Harris Lebus Ltd. under the

g

h

© An extract from a JUSTIS database

"C" licence to be surrendered by them; for this purpose the tribunal remitted the matter to the licensing authority for him to determine the number and unladen weights of the vehicles to be
b  authorised by the said licence.

The Transport Tribunal is the successor of the Railway Rates Tribunal established by legislation many years ago.

The limited jurisdiction of the Court of Appeal under the provisions of section 17 of the Railway and Canal Traffic Act, 1888, has already been referred to in the judgments which have been
c  delivered. But, though an appeal may not lie from an inferior court on a question of fact, nonetheless, as has been explained in the much quoted speeches of Lord Simonds and Lord Radcliffe in *Edwards v. Bairstow*,[11] and we were duly reminded, a Court of Appeal is entitled to interfere with the decision of the inferior court, if it has been based on a view of the facts which could not reasonably be
d  entertained. On the other hand, as was pointed out by Lord Goddard C.J. in *Stepney Borough Council v. Joffe*,[12] the court must be satisfied that the judgment appealed from is wrong, and is not entitled to interfere merely because it is not satisfied that the judgment was right.

But the exercise of the lower court's discretion may be vitiated if it has failed to consider relevant factors, or has based the exercise of its discretion on matters which ought not to have been taken into
e  consideration.

I need not go through the statutory provisions which deal with the licensing of road vehicles as they have been dealt with very fully in the judgments which have already been delivered.

The way in which the licensing authority treated this application, in my view, showed both practical
f  approach and good sense He accepted the proposition that Harris Lebus Ltd., who were put forward as the customer dealing with the applicants as their intended hauliers, were entitled to concern themselves with efficient transport arrangements for the delivery of furniture which it was suggested would be more easily administered and more economical if the application were granted. The secondary reason, which, I think, the licensing authority correctly described as the collective desire of
g  Harris Lebus Ltd. and the three subsidiaries (four limited companies appearing with one voice) is undoubtedly to make the best and most profitable use of the combined fleet by obtaining the opportunity to carry return loads

h    11 [1956] A.C. 14; [1955] 3 W.L.R. 410; [1955] 3 All E.R. 48, H.L.
     12 [1949] 1 K.B. 599, 602-603; 65 T.L.R. 176; [1949] 1 All E.R. 256, D.C.

© An extract from a JUSTIS database

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

in all their vehicles. When the licensing authority expressed the view that the customer's desire was less than genuine, it seems quite clear to me that his meaning was (as, indeed, he went on to say) that

b the driving motive behind the application was not the customer's wish to change his business methods, but the desire of the organisation of which the customer is the head to carry return loads on all their vehicles. The tribunal treated this point somewhat roughly. They say in their judgment: "the mistake in the authority's reasoning is fairly obvious. He was confusing the object sought with the motive for seeking it. Harris Lebus Ltd.'s object was to make money. It is a mere misuse of language to regard

c Harris Lebus Ltd. as torn between two desires one genuine the other 'less than genuine.'" This comment seems to me to miss the point completely. What the authority had in mind and was questioning as legitimate was an approach which put in the forefront a desire to simplify the administration of the delivery of furniture when the overriding motive was to make more money by

d obtaining return loads for vehicles, which might by their competition reduce the profits of established hauliers.

Furthermore, the question arises, whether in the circumstances Harris Lebus Ltd. ought to be treated as no more than genuine customers of the applicants, "persons requiring facilities for transport" who

e are given priority in the all-important provisions of section 174 (4) of the Road Traffic Act, 1960. Ought they not to be treated rather as persons "providing facilities for transport" who are relegated to secondary consideration under the provisions of that subsection? Mr. Lyell relied strongly on the technical (and irrefutable) legal distinction between a company formed under the Companies Acts and

f the persons who hold its shares, as shown by *Salomon v. Salomon    Co.,*[13] a company case, in which sphere of the law technicality is no doubt of the essence. But *Daimler Co. Ltd. v. Continental Tyre and Rubber Co. (G.B.) Ltd.*[14] (a trading with the enemy case) and *Unit Construction Co. Ltd. v. Buller*[15] (an income tax case on the residence of a company), and other cases, show that where the character of a company, or the nature of the persons who control it, is a relevant feature the court will

g go behind the mere status of the company as a legal entity, and will consider who are the persons as shareholders or even as agents who direct and control the activities of

13 [1897] A.C. 22.

h 14 [1916] 2 A.C. 307; 32 T.L.R. 624, H.L.
15 [1960] A.C. 351; [1959] 3 W.L.R. 1022; [1959] 3 All E.R. 831. H.L.

© An extract from a JUSTIS database

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

Danckwerts L.J.

a

company which is incapable of doing anything without human assistance.

b This is plainly what the authority had in mind when he explained his doubts about precedents which might be created if a licence were to be granted in the circumstances of the present case. It appears to me that if a manufacturer, who holds a "C" licence for vehicles for the carriage of his goods, has only to form a subsidiary company in order to secure an "A" licence for the latter company to carry the holding company's goods and enter into competition with public hauliers, the whole scheme of the Act might thus be evaded.

c The tribunal, who stated that they were by no means certain that they understood this passage in the authority's decision (though to me it seems entirely lucid), dealt with it shortly by saying that they had rejected this contention four years ago in *Reed's* case,[16] and that they saw no reason to modify what is said in that case.[17] In my view, the tribunal were entirely wrong to adopt that position. It seems to me

d that the authority was right in the conclusion which he reached that it is contrary to the intention of the Acts that a manufacturer owning vehicles, which have been carrying his goods under "C" licences, should be able, by merely forming a subsidiary company and transferring his vehicles to that company, which he is able to control and direct by virtue of his ownership of the shares in the company and the nomination of the directors, to claim and obtain an "A" licence for the same vehicles so as to

e compete with genuine and independent public carriers. In substance the applicants are really Harris Lebus Ltd., holders of a "C" licence, who are seeking to obtain an "A" licence for return loads. It is plainly against the policy of the Act that "C" licence holders should compete with public carriers holding "A" licences. This factor (which the tribunal rejected) is, in my opinion, a sufficient reason

f for setting aside the decision of the tribunal.

There are, however, other points with which it is advisable to deal. One feature of this jurisdiction, which the tribunal's reference to *Reed's* case[18] brings into notice, is that, over the years since the tribunal's predecessor was founded, a system of case law has been built up in law reports which are

g now in the 31st volume. It is no doubt an advantage to traders and those who advise them to have records of this kind to show how applications are likely to be dealt with. No doubt also it is right that

h 16 31 Traff.Cas. 50.
17 Ibid. 54, 55.
18 31 Traff.Cas. 50.

© An extract from a JUSTIS database

the tribunal should have regard to a consistent practice in dealing with applications for licences. But in the exercise of a discretionary power of this kind, an applicant is entitled to have his application

b considered on its merits and in the circumstances of his particular case. If the tribunal makes a practice of relying on previous decisions in respect of other applications that have come before the tribunal, there is, in my opinion, danger that the discretion of the tribunal may not be applied in an unfettered and proper manner having regard to the merits of the particular case, and, of course, having

c regard to the principles which are regarded as being incorporated in the provisions of the Act.

A few observations must be made on the position of the objectors. The admissible objections or "relevant objections," as they are termed in section 173 of the Act, are strictly limited by the terms of that section, and, since the amendments which were introduced by the Act of 1953, the onus of

d proving the objections is placed upon the objectors (now by section 173 (5)). In the present case there were a large number of objectors, whose opposition was plainly stimulated by the apprehension which they felt in regard to their businesses by reason of competition of the applicants in carrying return loads and is easily understandable. Under section 173 (3) the duty of the licensing authority is "to

e take into consideration any relevant objection to the application which may be made by a person who is already providing facilities, whether by means of road transport or any other kind of transport, for

) the carriage of goods for hire or reward in the district, or between the places, which the applicant intends to serve."

f    Section 173 (6) directs the licensing authority, in considering, for the purposes of an objection on grounds such as are referred to in paragraph (*a*) of subsection (4) of the section, whether existing transport facilities are to be treated as suitable, to have regard to the relevant efficiency, reliability and adequacy of the existing facilities at the date of the application and the facilities which the applicant

g will provide if his application is granted, and to all other relevant considerations, including to such extent as may in all the circumstances appear proper, the charges made and to be made in respect of these facilities respectively.

Under paragraph (*a*) of subsection (4) a relevant objection may be "that suitable transport facilities in

h the district, or between the places, which the applicant intends to serve are or, if the application were granted, would be, either generally or

© An extract from a JUSTIS database

[1962]
2 Q.B.                                                                              209

MERCHANDISE TRANSPORT LTD. v. BRITISH         Danckwerts L.J.
TRANSPORT COMMISSION. (C.A.)

a

in respect of any particular type of vehicles, in excess of requirements." Other passages in this Act
and the earlier Acts also indicate that one of the objects of the legislation was the prevention of
b  uneconomic competition between carriers, which it was presumably thought would be against the
interests of the public as well as those of the carriers, who would not be able to maintain services
unless they could obtain a fair return for their efforts.

The licensing authority was satisfied in a limited number of cases that a surplus of vehicles already
c  existed, and, as to all the objectors, that if the application were granted there would be a likelihood of
abstraction of their traffic and that this again would lead to facilities being in excess of requirements.

The tribunal rejected this conclusion. They remarked that only 27 out of 64 objectors had
"persevered to the point of supporting their opposition by evidence." This seems to me to be rather an
d  unfair criticism, as where objectors are making common cause it cannot be incumbent on each and
every one of the objectors to produce evidence, which might largely be duplication of evidence given
on behalf of other objectors. The comment of the tribunal that the authority, having come to the
conclusion that the objectors had proved the grounds of their objection, concluded that the application
e  must necessarily fail, seems to me not to be a correct reproduction of the process adopted by the
authority. The tribunal say: "We do not however think that the evidence came near to proving what
)  the objectors set out to prove. All that was proved in our view was what in truth hardly needed proof,
namely, that if the application were granted there would every now and then at unpredictable intervals
f  be available at a number of places more vans than if the application were not granted, and that on
these occasions persons who would otherwise have perforce employed the services of one of the
objectors might prefer to sample the services of the stranger." This seems to me to do less than justice
to the evidence on behalf of the objectors. Evidence in regard to a future situation not yet an
g  established fact, that is the competition of the applicants' vehicles in respect of return loads, must
necessarily be speculative, and, indeed, must be partly a matter of opinion expressed by those with
some ability to estimate the probable result. The effect of the new facilities must be a matter of
degree.

h   It may be that this is a question of fact, upon which no appeal lies to this court. But I am bound to
say that I think that the

© An extract from a JUSTIS database

a

MERCHANDISE TRANSPORT LTD. v. BRITISH
TRANSPORT COMMISSION. (C.A.)

b  conclusion of the authority is more realistic, though it may not be possible to say that the conclusion of the tribunal is one which could not reasonably be reached.

c  However that may be, in my opinion the tribunal have erred in not taking into consideration relevant matters which they ought to have taken into consideration, and their decision should be set aside, with

d  the result that the decision of the licensing authority should be restored, so that the application is refused.

e

f  *Appeal in Merchandise Transport Ltd. v. British Transport Commission and Others allowed with costs.*

g

h  Solicitors: *M. H. B. Gilmour; Mawby, Barrie   Letts.*

© An extract from a JUSTIS database