# Exhibit 12

Case 1:03-md-01570-GBD-SN   Document 415-21   Filed 08/30/04   Page 2 of 12

**[1997] Vol. 2**   **LLOYD'S LAW REPORTS**   **465**

---

QUEEN'S BENCH DIVISION
(ADMIRALTY COURT)

July 30 and Aug. 1, 1996

---

THE "TJASKEMOLEN"
(Now named "VISVLIET")

Before Mr. Justice CLARKE

**Admiralty practice - Arrest of vessel - Security - Ownership of vessel - Application to discharge or reduce amount of security- Whether affidavit stated nature of claim- Defendants alleged vessel sold at time writ of summons issued - Whether transaction a sham or façade - Whether amount of security should be reduced.**

Bayland Navigation Inc. (Bayland) were part of a group of companies known as the Fondel Group and were formed for the sole purpose of owning the vessel*Tjaskemolen* which was bought by the group in February, 1996.

By a charter-party dated Mar. 6, 1996 Bayland let the vessel to the plaintiffs Profer A.G. for the carriage of 30,000 tonnes of steel scrap (5 per cent. more or less in owners option) from Rotterdam to Korea. Notice of readiness was to be given at the loadport and by cll. 17 and 49 the vessel was to be "considered gearless for this trade". Further the charter provided by cl. 58 that:

On completion of drydock Owners warrant that all appropriate certificates of seaworthiness will be in order and Charterers have the right to counter-verify same.

On Mar. 15 a notice of readiness was tendered. The classification certificates were not on board on that day and the plaintiffs alleged that that was a breach of cl. 58, they were unable to load as a result of that breach and they suffered loss because they were unable to perform a contract for the sale of steel to Dongkuk International Inc. (Dongkuk) as originally agreed.

On Mar. 20 the plaintiffs arrested the vessel in Rotterdam. On Mar. 26, Dongkuk sent a fax to Profer purporting to cancel the contract of sale because Profer had cancelled the charter. Bayland re-offered the vessel to Profer on Mar. 29 but that offer was rejected on the ground that Dongkuk had cancelled the contract of sale as a result of Baylands breach of the charter-party.

On Apr. 15 the Court in Rotterdam ordered the release of the vessel after a summary hearing on the merits.

The plaintiffs appointed Mr. Christopher Moss as their arbitrator on Apr. 22 and on Apr. 23 the defendants appointed Mr. Hamsher as their arbitrator.

On June 13, 1996 the plaintiffs issued the writ and the vessel was arrested. The purpose of the arrest was to provide security for their claim in the arbitration. Security was subsequently provided in order to procure the release of the vessel.

The defendants applied to discharge or reduce the amount of security provided on the grounds that (1) the

affidavit in support of the application to lead to a warrant for arrest did not comply with the requirements of R.S.C., O. 75, r. 5 (9)(a)(i) in that it failed to state the nature of the claim and/or (2) Bayland were not the owners of the vessel at the time of the issue of the writ of summons in that the vessel had been sold to Golden International Navigation S.A. another company in the group, pursuant to a memorandum of agreement (MOA) on an amended Norwegian Saleform 1987 dated Apr. 15, 1996, which was subsequently ratified and that both beneficial and legal title had passed to Golden before June 13, 1996.

The plaintiffs submitted that the alleged sale agreement was a sham and not apt to pass the beneficial ownership of the vessel to the alleged buyers and that in any event neither the legal nor the beneficial ownership passed to the buyers until the vessel was deleted from the Register of Ships in Panama on June 14 which was after the issue of the writ.

-*Held*, by Q.B. (Adm. Ct.) (CLARKE, J.), that (1) the purposes of O. 75, r. 5(9) were to enable the Court to assess whether on the facts of the particular case it had in rem jurisdiction under the Supreme Court Act, 1981 and to enable the defendant or prospective defendant or other persons interested in the vessel to identify the basis on which and the claim in respect of which the property had been arrested (*see* p. 467, col. 2; p. 468, col. 1);

(2) the affidavit stated that the claim was for breach of an identified charter-party; the affidavit did comply with the rule; it identified the charter-party and a charter-party was a contract relating to the use or hire of a ship within the meaning of s. 20(2) (*h*) of the Supreme Court Act, 1981; the affidavit said that the claim was for damages for breach of that charter and that it was unsatisfied; that was a sufficient statement of the nature of the claim for the purposes of this particular action; and having regard to the recent history of the matter, the defendants could not have been in any doubt as to what the nature of the claim was; the first ground on which the application was made failed*(see* p. 468, col. 1);

(3) where an alleged transfer of a vessel was a sham or façade the Court would hold that the original owners retained the beneficial ownership in the vessel (*see* p. 469, col. 2);

(4) it was clear from the statement of Mr. Breekweg that the express purpose of the arrangement was to ensure that Profer could not arrest the vessel, and it was reasonably to be inferred that a further purpose and certainly the effect of it was to ensure that she would not be available for the enforcement of any arbitration award (*see* p. 472, col. 2);

(5) the facts showed that the MOA was a sham or façade; it was not a genuine commercial transaction and it was intended by those who controlled both Bayland and other companies in the group including Golden that there should be a transfer from the ownership of Bayland so that the vessel could not be arrested or executed upon by Profer and so that she could be traded in the name of another company within the group; it was never intended that Golden should pay a full price to Baylands*(see* p. 474, col. 1);

(6) the whole arrangement was a sham designed to avoid the arrest of Baylands vessel and probably the

[1997] Vol. 2                          LLOYD'S LAW REPORTS                                    466
Q.B. (Adm. Ct.)                            The "Tjaskemolen"                              CLARKE, J.

execution of an arbitration award; the alleged agreement to sell the vessel to Golden was a sham or façade which did not have the effect of divesting Bayland of the beneficial ownership of the vessel; the application to set aside the security on ground 2 failed (*see* p. 474, cols. 1 and 2);

(7) as to whether the amount of security should be reduced, it was common ground that the plaintiffs were entitled to security in the amount of their reasonably arguable best case in respect of damages, interests and costs; the plaintiffs had a sufficiently arguable case that Dongkuk accepted *Tjaskemolen* on a gearless basis and the plaintiffs had an arguable case in respect of freight deferential (*see* p. 474, col. 2; p. 475, col. 1);

(8) on the evidence at present available the plaintiffs had an arguable case that the allegations of the defendant that the plaintiffs had failed to mitigate their loss by failing to accept Bayland's re-offer in March or to attempt to charter the vessel in April, would fail; the application for reduction of the security failed (*see* p. 475, col. 2).

---

The following cases were referred to in the judgment:

Adams v. Cape Industries Plc., (C.A.) [1990] 1 Ch. 433;

*Aventicum*, The [1978] 1 Lloyd's Rep. 184;

Company, In re a (C.A.) [1985] 1 B.C.C. 99;

Creasey v. Breechwood Motors Ltd., [1992] B.C.C. 638;

*Evpo Agnic*, The (C.A.) [1988] 2 Lloyd's Rep. 411; [1988] 1 W.L.R. 1090;

*I Congreso del Partido*, The [1977] 1 Lloyd's Rep. 536; [1978] Q.B. 500;

*Lloyd Pacifico*, The [1995] 1 Lloyd's Rep. 54;

*Maritime Trader*, The [1981] 2 Lloyd's Rep. 153;

*Moschanthy*, The [1971] 1 Lloyd's Rep. 37;

*Saudi Prince*, The [1982] 2 Lloyd's Rep. 255;

Woolfson v. Strathclyde Regional Council, 1978 S.L.T. 159.

---

This was an application by the defendants the owners of the vessel *Tjaskemolen* now named *Visvliet* to discharge or reduce the amount of security provided to procure the release of the vessel from arrest by the plaintiffs Profer A.G., the owners of a cargo of steel scrap which was to be shipped from Rotterdam to Korea.

Mr. David Matthews (instructed by Messrs. Hill Taylor Dickinson) for the plaintiffs; Mr. James Turner (instructed by Messrs. Lawrence Graham) for the defendants.

The further facts are stated in the judgment of Mr. Justice Clarke.

## JUDGMENT

**Mr. Justice CLARKE:**

This is an application by the defendant to discharge or reduce the amount of security provided to procure the release of the vessel *Visvliet* (previously called the *Tjaskemolen*) from arrest in this action. The vessel was arrested on June 20, 1996. The defendants have issued an amended notice of motion seeking that relief on a number of grounds. The present application to discharge the security is, however, limited to the grounds set out in pars. 1 and 2 of the amended notice of motion, namely:

(1) The affidavit of Anthony James Goldsmith sworn herein in support of the application to lead to a warrant for arrest did not comply with the requirements of RSC Order 75 rule 5(9)(a)(i), in that it failed to state the nature of the claim; and/or

(2) The said Defendant vessel is not and was not at the time of the issue of the Writ of Summons herein owned by or chartered by demise to the person who would be liable for the claim brought by the Plaintiffs on an action in personam and the Plaintiffs' claim is therefore outwith section 21(4) of the Supreme Court Act 1981; . . .

It is important to note that I am not at present concerned with the grounds set out in pars. (3), (5) and (6) of the amended notice of motion. Those paragraphs include pars. (3) and (5) as follows:

(3) The said Defendant vessel was previously arrested in the Netherlands on or about 20 March 1996, but was released from arrest by the Rotterdam Court on or about 15 April 1996 upon the application of her then owners. In the premises the Plaintiffs must satisfy the Court that there is good cause for maintaining the arrest herein. Without prejudice to the burden of proof, which is upon the Plaintiffs, the Defendants will say that there is no good cause for maintaining the said arrest and/or that the Rotterdam Court has already resolved that there is no good cause for maintaining an arrest, which decision is binding upon the Plaintiffs; . . .

(5) The arrest of the vessel in Liverpool was vexatious and an abuse of the process of the Court.

I need not, I think, set out pars. (4) or (6) of the grounds at present.

The plaintiffs initially wanted the whole application to be dealt with at one time. But it was agreed that it would not be possible to do so immediately because of the time available. In these circumstances the defendants sought an order that they be permitted to proceed on grounds (1) and (2). I acceded to that application.

Case 1:03-md-01570-GBD-SN   Document 415-21   Filed 08/30/04   Page 4 of 12

**[1997] Vol. 2**
**Q.B. (Adm. Ct.)**

**LLOYD'S LAW REPORTS**
**The "Tjaskemolen"**

**467**
**CLARKE, J.**

The plaintiffs' claim arises out of a charter-party between themselves ("Profer") as charterers and Bayland Navigation Inc. ("Bayland") as owners, dated Mar. 6, 1996. The charter-party was for a voyage from Rotterdam to Korea laden with 30,000 tonnes of steel scrap (5 per cent. more or less in owners' option). Notice of readiness was to be given at the loadport. By cl. 17 the vessel's class was described as "NKK" and by cll. 17 and 49 she was to be "considered gearless for this trade." Clause 58 provided as follows:

On completion of drydock, Owners warrant that all appropriate certificates of seaworthiness will be in order and Charterers have the right to counter-verify same.

A notice of readiness was tendered on Mar. 15. The classification certificates were not, however, on board on that day. The plaintiffs say that that was a breach of cl. 58 of the charter-party. By cl. 7 of the charter-party the plaintiffs had an option to cancel if the vessel was not ready to load on or before Mar. 17. It is not clear to me whether they purported to exercise their contractual right to cancel or purported to accept the alleged breach by the defendants as a repudiatory breach of the charter-party. In any event they say that they were unable to load the vessel as a result of the defendants' alleged breach of cl. 58 of the charter-party. They say that as a result they have suffered loss because they were unable to perform a contract for the sale of steel to Don Dongkuk International Inc. ("Dongkuk") as originally agreed.

The defendants say, inter alia, that cl. 58 was not concerned with certificates of class, that all documents covered by cl. 58 were on board and that there was no breach of the charter-party. They further say that the plaintiffs' case is unfounded because they could not have delivered steel to Dongkuk in the vessel because the sale contract provided for the vessel to be fitted with cranes and that the plaintiffs were seeking an excuse not to perform the charter-party. Moreover, they chose two grounds upon which to rely, namely not only reliance upon cl. 58 but also a wholly false allegation that the vessel only had five and not the warranted six holds, which the plaintiffs have now abandoned. In response, the plaintiffs say that Dongkuk agreed on Mar. 4, 1996 to accept the vessel on a gearless basis. The defendants say in their turn that the document which apparently evidences that agreement is (as Mr. Turner puts it in his skeleton argument) dubious, by which he presumably means false.

On Mar. 20 the plaintiffs arrested the vessel in Rotterdam. On Mar. 26 Dongkuk sent a fax to Profer purporting to cancel the contract of sale because Profer had cancelled the charter-party. On

Mar. 29 Bayland re-offered the vessel to Profer but that offer was rejected on the ground that Dongkuk had cancelled the contract of sale as a result of Bayland's breach of the charter-party.

On Apr. 15 the Court in Rotterdam ordered the release of the vessel after a summary hearing on the merits. It rejected the plaintiffs' claim on the merits and was sceptical about their motives. It is to be observed in this context that the document apparently dated Mar. 4 signed by Dongkuk (to which I have referred) was not put before the Court, so that the Court, not unnaturally, took the view that the arguments advanced by the plaintiffs were not sound, but were advanced (as the Court put it) "pour besoin de la cause".

On Apr. 22 the plaintiffs appointed Mr. Christopher Moss as their arbitrator in connection with their claim for damages for breach of the charter-party, which contains a London arbitration clause, and on the next day the defendants appointed Mr. Mark Hamsher as their arbitrator. On the same day the contract between the plaintiffs and Dongkuk was resurrected.

On June 13, 1996 the plaintiffs issued the writ in this action and on June 20, 1996 the vessel was arrested. The purpose of the arrest was to provide security for their claim in the arbitration. Security was subsequently provided in order to procure the release of the vessel. The defendants now say that the security should be released on the ground that the vessel should not have been arrested. I turn to the first ground of their application:

(1) *Order 75, r. 5(9)*

By O. 75, r. 5(9) the affidavit to lead the warrant must state:

(a) in every case (i) the nature of the claim . . .

Paragraph 2 of Mr. Goldsmith's first affidavit said this:

The plaintiffs' claim is for damages for breach of contract in respect of all claims arising out of or in connection with a charterparty dated 6th March 1996, London, concluded between the Defendants as Owner of "TJASKEMOLEN" and the Plaintiffs as Charterers of the said vessel, and for interest pursuant to Section 35A of the Supreme Court Act 1981 and/or under the inherent jurisdiction of the Admiralty Court. The claims arise in connection with the ship "TJASKEMOLEN". . . .

Mr. Turner submits that that affidavit does not comply with the rule. He submits that the purposes of the rule are: (i) to enable the Court to assess whether, on the facts of the particular case, it has in rem jurisdiction under the Supreme Court Act,

[1997] Vol. 2                          LLOYD'S LAW REPORTS                                    468
Q.B. (Adm. Ct.)                        The "Tjaskemolen"                              CLARKE, J.

1981; and (ii) to enable the defendant or prospective defendant, or other persons interested in the vessel, to identify the basis upon which and the claim in respect of which the property has been arrested.

That second purpose is taken from something I said in *The Lloyd Pacifico*, [1995] 1 Lloyd's Rep. 54 at p. 62. I accept the submission that those are the purposes of the requirements set out in the rule. However, it appears to me that how much detail is required in the affidavit will depend upon the facts of the particular case. In *The Lloyd Pacifico* I was not considering whether the affidavit sufficiently described the nature of the claim.

In the instant case Mr. Goldsmith said that the claim was for damages for breach of an identified charter-party. While on the borderline, in my judgment the affidavit did comply with the rule. It identified the charter-party. There is no doubt that a charter-party is a contract relating to the use or hire of a ship within the meaning of s. 20(2)(*h*) of the Supreme Court Act, 1981. The affidavit said that the claim was for damages for breach of that charter-party and that it was unsatisfied. That was, I think, just a sufficient statement of the nature of the claim for the purposes of this particular action. Having regard to the recent history of the matter, the defendants cannot have been in any doubt as to what the nature of the claim was. In these circumstances, the first ground upon which the application is made fails.

(2) *Ownership*

Section 21(4) of the Supreme Court Act, 1981 provides, inter alia, as follows:

(4) In the case of any such claim as is mentioned in section 20(2)(e) to (r), where -

(*a*) the claim arises in connection with a ship; and (*b*) the person who would be liable on the claim in an action in personam ("the relevant person") was, when the cause of action arose the owner or charterer of, or in possession or in control of the ship, an action in rem may (whether or not the claim gives rise to a maritime lien on that ship) be brought in the High Court against - (i) that ship, if at the time when the action is brought the relevant person is either the beneficial owner of that ship as respects all the shares in it . . . .

Bayland were both the persons who would be liable on the claim in an action in personam and the owners (that is the legal owners) of the vessel when the cause of action arose. That is common ground. It is equally common ground that, in order to satisfy the provisions of s. 21(4)(*b*)(i) of the Supreme Court Act, 1981, the plaintiffs must prove that,

when the writ was issued, Bayland were the beneficial owners of the vessel.

It follows that the question is whether Bayland were the beneficial owners of the *Visvliet* on June 13, 1996. The plaintiffs say that they were, whereas the defendants say that they were not. The defendants say that the vessel was sold to Golden International Navigation S.A. pursuant to a memorandum of agreement (an "MOA") on an amended Norwegian Saleform, 1987, dated May 15, 1996, which was subsequently ratified and that both legal and beneficial title have passed to the buyers (namely Golden International Navigation S.A.) before June 13, 1996.

I have described Golden International S.A. as "the defendants" for convenience because an acknowledgment of service has, as I understand it, been entered on their behalf and they make this application. I do so, however, without prejudice to the question whether they were at any material time the owners of the vessel.

The plaintiffs take two points. The first is that the alleged agreement was a sham and not apt to pass the beneficial ownership of the vessel to the alleged buyers. The second is that, in any event, neither the legal nor the beneficial ownership passed to the buyers until the vessel was deleted from the Register of Ships in Panama on June 14, which was after the issue of the writ.

The second of those two submissions raises potentially important questions as to the passing of property under the Norwegian Saleform where the MOA is governed by English law but the vessel is registered elsewhere. I shall, however, consider, first, the nature of the agreement.

*The nature of the agreement*

The plaintiffs say that the purpose of the alleged agreement was to avoid Bayland's liability to the plaintiffs and that it was not a bona fide arm's length transaction for valuable consideration, but a simple device to avoid providing security to the plaintiffs for their claim and probably also to avoid having to satisfy any arbitration award which might be made.

Mr. Matthews submits that in these circumstances the Court should pierce the corporate veil, in the sense that it should hold that, whatever other effects the transaction may have, it does not have the effect of divesting Bayland of the beneficial ownership of the vessel.

*Relevant legal principles*

Mr. Matthews relies upon a number of cases, both in the general law and in the context of s. 21(4) of the 1981 Act, which he says support the proposition that the Court will disregard the alleged sale (at

**[1997] Vol. 2**
**Q.B. (Adm. Ct.)**

**LLOYD'S LAW REPORTS**
**The "Tjaskemolen"**

**469**

**CLARKE, J.**

least for these purposes) where it is a sham or a facade.

The Court has considered this problem in a number of cases of arrest of vessels under s. 21(4) of the 1981 Act and its predecessor, s. 3(4) of the Administration of Justice Act, 1956.

The first case is *The Aventicum*, [1978] 1 Lloyd's Rep. 184 which is, I think, sufficiently referred to for present purposes in *The Maritime Trader*, [1981] 2 Lloyd's Rep. 153, where Mr. Justice Sheen said this, at p. 157:

From that starting point there is no way in which it can be said that *Maritime Trader* was "beneficially owned as respects all the shares therein" by MTO, unless the corporate veil can be lifted. I would not hesitate to lift that veil if the evidence suggested that it obscured from view a mask of fraud rather than the true face of the corporation. . .
. .

My attention was drawn to the judgment of Mr. Justice Slynn in *The Aventicum*, [1978] 1 Lloyd's Rep. 184 in which it was held that:

. . .s. 3(4) of the Act intended that the Court should not be limited to a consideration of who was the person having legal ownership of the shares in the vessel. The Court in all cases can and in some cases should look behind the registered owner to determine the true beneficial ownership.

I do not dissent from that view. In that case there was much to be investigated in order to see whether each change of ownership was genuine or a sham.

Circumstances may justify the lifting of the corporate veil or more than one veil, if that is necessary to reveal the truth. But I also agree with Mr. Justice Slynn that the onus is upon the plaintiffs to show that the person against whom it is sought to invoke the Admiralty jurisdiction by arresting his ship is the person who beneficially owns all the shares in that ship and that he is the person who is liable in an action in personam.

The evidence upon which I have to decide that matter does not raise even a prima facie case that the ship *Maritime Trader* was purchased by MTS in 1976 in order that it would not be available as security for a judgment against MTO.

Mr. Justice Sheen returned to the same theme in *The Saudi Prince*, [1982] 2 Lloyd's Rep. 255 at p. 260. Finally in *The Evpo Agnic*, [1988] 2 Lloyd's Rep. 411 at p. 415, col. 2; [1988] 1 W.L.R. 1090 at p. 1097E Sir John Donaldson, M.R. said:

. . .The purpose of s. 21(4) is to give rights of arrest in respect of "the particular ship", ships in the ownership of the owners of "the particular ship", and those who have been spirited into

different legal, i.e. registered, ownership, the owners of "the particular ship" retaining beneficial ownership of the shares in that ship. This was the situation in *The Saudi Prince*, [1982] 2 Lloyd's Rep. 255 and was alleged to be the situation in *The Aventicum*, [1978] 1 Lloyd's Rep. 184.

None of those cases was on all fours with this on the facts, but, in my judgment, they support the proposition that, where an alleged transfer of a vessel is in the relevant sense a sham or façade, the Court will hold that the original owners retain the beneficial ownership in the vessel.

That approach is consistent with a number of authorities which have considered the circumstances in which it may be appropriate, as it is sometimes put, to pierce the corporate veil. The leading cases are *Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159 and *Adams v. Cape Industries Plc.*, [1990] 1 Ch. 433. In *Woolfson* the House of Lords stressed that:

. . .the relevant principle is that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere facade concealing the true facts.

In *Adams v. Cape Industries Plc.*, the Court of Appeal carried out a detailed analysis of the relevant principles. It referred to many of the authorities and, at p. 543D-E Lord Justice Slade, said this:

From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a facade within the meaning of that word, as used by the House of Lords in *Woolfson* [1978] S.L.T. 159. We will not attempt a comprehensive definition of those principles.

At p. 544 he said this:

. . .Mr. Morison submitted that the court will lift the corporate veil where a defendant by the device of a corporate structure attempts to evade (i) limitations imposed on his conduct by law; (ii) such rights of relief against him as third parties already possess; and (iii) such rights of relief as third parties may in the future acquire. Assuming that the first and second of these three conditions will suffice in law to justify such a course, neither of them apply in the present case . . .

As to condition (iii), we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the group

| [1997] Vol. 2 | LLOYD'S LAW REPORTS | 470 |
|---|---|---|
| Q.B. (Adm. Ct.) | The "Tjaskemolen" | CLARKE, J. |

(and correspondingly the risk of enforcement of that liability) will fall on another member of the group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law.

It is to be observed that that last statement related to Mr. Morison's condition (iii) which related to such rights of relief as third parties may in the future require. It appears that the Court of Appeal is prepared to assume the contrary in cases within Mr. Morison's condition (ii).

Mr. Matthews submits that there is an important distinction between categories (ii) and (iii). I accept that submission. Thus it is common for shipowning groups to arrange their affairs by forming one ship companies. There is no reason in law why they should not do so without any risk of the arrangements being held to be a sham. It was expressly so held in *The Evpo Agnic*, where Sir John Donaldson said this, at p. 415, col. 1; p. 1096, in an earlier passage than that cited above:

The plaintiffs' real case is that Mr. Evengalos Pothitos, who describes himself as a Greek shipowner, or his company Pothitos Shipping Co. S.A., is the real owner of both ships and indeed of all the ships in the Pothitos fleet. This involves the proposition that the registrations are shams. I am as realistic as most Judges who have served in the Commercial Court, but I really do not see the commercial advantage of creation of sham registered ownerships. Mr. Pothitos no doubt has a legitimate interest in running these ships, including the two with which we are concerned, as a fleet, but he can do this by running a series of genuine one-shipowning companies as a group. He does not need a structure involving a holding company and subsidiaries, and still less sham companies. As governing shareholder in each shipowning company he can cause them to use their individual assets to the mutual advantage of the members of the group and of Mr. Pothitos.

In my judgment the position is or may be different where a group arranges its affairs in such a way as to divest a company within the group of its assets with the purpose and effect of ensuring that they will not be available to meet its existing liabilities, at any rate where the transfer is made to another member of the group at an undervalue. Depending upon the facts, such an agreement is likely to be held to be a sham or façade, as those expressions are used in the cases.

Before turning to the facts, I should refer to two other cases. The first is *In re a Company*, [1985] 1 B.C.C. 99. The decision in that case appears to support the proposition that a Court is entitled to

pierce the corporate veil if it is necessary to achieve justice. However, although it is a decision of the Court of Appeal, I do not think that the principle can be correctly so stated in the light of the decisions in *Woolfson* and *Adams v. Cape Industries* to which I have referred. Moreover, Mr. Matthews does not support such a wide proposition. The second case is the decision of Mr. Richard Southwell, Q.C. in *Creasey v. Breechwood Motors Ltd.*, [1992] B.C.C. 638, which in my judgment is of some assistance. The facts were briefly that the plaintiff C worked for a company called Welwyn. Another company called Motors carried on a similar business. Both companies were owned and controlled by the same shareholders, F. and S. C issued a writ claiming damages for wrongful dismissal against Welwyn. Welwyn ceased trading and the next day Motors took over its business. It paid Welwyn's creditors but made no allowance for C's claim. It was held that Motors should be treated as liable for Welwyn's liability to C. In the course of his judgment the Judge said this with regard to the conduct of the shareholders F. and S.:

Nothing I have seen in the evidence could justify their conduct in deliberately shifting Welwyn's assets and business into Motors in total disregard of their duties as directors and shareholders, not least their duties created by Parliament as a protection for all creditors of a company.

Welwyn was not put into liquidation. As a subsisting company it was entitled to retain its business and assets, so that they might be available to pay a dividend, however small, to such of Welwyn's creditors as Motors decided not to pay.

Mr. Ford and Mr. Seaman decided instead to remove the business and assets of Welwyn to Motors, and, realising that the business could not be carried on satisfactorily unless Welwyn's trade creditors were paid, paid all their then actual creditors, but left Mr. Creasey facing a defendant without assets. They did so in the full knowledge of Mr. Creasey's claim.

On the state of evidence before me the inference could readily be drawn that one of the reasons why Mr. Ford and Mr. Seaman acted in the way they did was in order to ensure that Mr. Creasey if he succeeded in his claim would not be able to recover anything. But I consider that it would be wrong to draw so strongly adverse an inference at this stage on only the affidavit evidence.

In all the circumstances, however, this is a case in which the court would be justified in lifting the veil and treating Motors as liable for this remaining liability of Welwyn.

[1997] Vol. 2                    LLOYD'S LAW REPORTS                        471
Q.B. (Adm. Ct.)                      The "Tjaskemolen"                      CLARKE, J.

That case is thus an example of piercing the veil where assets are deliberately transferred from A to B in the knowledge that to do so will defeat a creditor's claim or potential claim, even if that is not proved to be the purpose of doing so. The Judge in that case would have regarded the case as even stronger if the purpose of the transaction was to defeat the creditor's claim. I agree with the reasoning in *Creasey*.

The cases have not worked out what is meant by "piercing the corporate veil". It may not always mean the same thing. But in the present context the cases seem to me to show that, where the alleged transfer is a sham or a façade, it will not have the effect of transferring the beneficial ownership of the transferor in the vessel concerned. What, if any, effect the alleged transfer of the legal title may have in the absence of an order under s. 423 of the Insolvency Act, 1986 or its equivalent elsewhere, can be considered when it arises. It may be that, if the legal title is transferred, the transferee would hold the vessel as trustee for the transferor so that the beneficial interest in the same sense described in *The I Congreso del Partido*, [1977] 1 Lloyd's Rep. 536; [1978] Q.B. 500 is retained by the transferor. However, it is not necessary to consider this point further in the instant case.

I turn to the facts in order to consider whether the transaction here was a sham or façade in the sense described in the cases.

*The facts*

It is important to state at the outset the assumptions upon which this part of the argument is based. There are two principal assumptions. The first is that the plaintiffs have an arguable case on the facts. I do not understand the defendants to say on this application at present that the plaintiffs do not have an arguable case that they were in breach of the charter-party and that the plaintiffs have suffered loss as a result. Indeed the basis of the defendants' application to reduce the amount of the security is that the plaintiffs' reasonably arguable best case is for a sum lower than the amount of security so far provided. It is not that the plaintiffs have no reasonably arguable case at all.

The second assumption is that the plaintiffs have an arguable case that they have good cause to arrest the vessel in England within the meaning of art. 3(3) of the Arrest Convention of 1952 notwithstanding the arrest and subsequent release of the vessel in Holland. As already stated, whether there was in fact good cause is raised by ground 3 of the amended notice of motion and, together with the other grounds, will be determined at a future hearing.

It follows that I cannot determine today whether there was good cause and, as I think was properly

conceded by Mr. Turner, for present purposes I must assume that there was good cause notwithstanding the decision of the Court in Rotterdam. Nothing which I say today is in any way intended to prejudge the questions which will arise in the future. It may well be that the defendants are entitled to have the vessel released because the plaintiffs should not be permitted to arrest the same vessel twice in two jurisdictions in respect of the same claim.

The assumption for present purposes that that is not so is, however, of some significance on these applications because I must assume that Bayland are potentially liable to the plaintiffs and that the plaintiffs were arguably entitled to arrest the vessel. It was that arrest that Bayland sought to avoid by entering or purporting to enter into an agreement for the sale of the vessel. That agreement has a number of curious features but the background to it and the reason for it can be seen from the statements of Mr. Breekweg and Mr. Janssen. It is, shortly, as follows. Bayland are part of a group of companies known as the Fondel Group. In February, 1996 the group bought two vessels of which *Tjaskemolen* was one. Bayland is a Panamanian company which was formed for the sole purpose of owning the vessel. Another company was formed to own the other vessel. There is no possible ground for criticism of that. Although described as a group, the Fondel Group is a small organization within which much of the communication is oral and in which the chief executive of practically all the companies is Mr. W. C. Van 't Wout, who, as Mr. Breekweg puts it, "makes all decisions".

Mr. Breekweg was directly concerned both with work which had been done on the vessel and with her chartering. After the vessel was released, repair work was done in Flushing Roads while it was decided what to do. Bayland's P. & I. club had instructed a Dutch lawyer, Mr. Van Leeuwen. Mr. Breekweg says that "they", by which I think he really means the group, considered with Mr. Van Leeuwen whether they could safely charter the vessel to third parties free of the risk of arrest by Profer. They did not do so pending the expiry of the time for appealing against the decision of the Court in Rotterdam. They themselves arrested a Profer cargo to secure their claims for damages for wrongful arrest. They were concerned about the risk of arrest by Profer. In pars. 10 and 11 of his statement, Mr. Breekweg, inter alia, says this:

10. . . .Against this background, Mr. Van Leeuwen (who initially had advised against a change of ownership, among other reasons because there were still outstanding debts of Bayland Navigation Inc.) now told us that it was probably unavoidable, if the vessel was to operate in a normal way and if a mortgage was to put

Case 1:03-md-01570-GBD-SN    Document 415-21    Filed 08/30/04    Page 9 of 12

[1997] Vol. 2          **LLOYD'S LAW REPORTS**          472
Q.B. (Adm. Ct.)          The "Tjaskemolen"          CLARKE, J.

in place, to put the vessel in a different ownership. It must be kept in mind that there were no problems whatsoever relating to this vessel, other than the behaviour of Profer who seemed not to be able to accept the Rotterdam decision which they had failed to appeal. In other words: by this time the crew were paid, all the suppliers were paid, the shipyard had been paid and there were no remaining outstanding debts on the vessel whatsoever. Bayland Navigation Inc. had, indeed, no creditors at all, apart from an alleged creditor (Profer) which we regarded as a bad faith creditor for reasons extensively argued in the Rotterdam Court. In these circumstances, and bearing in mind that we now had a possible opportunity to fix the vessel for a voyage from Liverpool to Karachi, we decided that we could not run the risk of having the vessel arrested after conclusion of a new charter and that therefore we would sell her to an affiliated company. This decision was taken after I had discussed the position with Mr. Van 't Wout. For the moment, it was decided she should be registered in Belize but eventually we might even wish to bring her under the Dutch flag in view of recent legislation in the Netherlands which might make it attractive to do so. We would however need some time to study this and discuss it with our bankers and in the mean time, we wanted to earn some money with the vessel as soon as the cranes were ready. All of this happened in the first half of May 1996. The new name for the vessel was to be "Visvliet". The fixture negotiations which led to the charter for the voyage from Liverpool to Karachi eventually being concluded between 24th (fixture recap) and 30th (charter-party) May 1996 were initially conducted for the vessel with its old name, Tjaskemolen, but after the delivery the vessel is shown in the brokers telexes as "Visvliet ex-Tjaskemolen".

11. Once the decision to sell the vessel to an affiliated company had been taken, we of course had to take the necessary steps to put this into effect. The first step was to make certain that there were no creditors of Bayland Navigation Inc. This was simply dealt with by paying (or making appropriate arrangements with) all creditors of Bayland Navigation Inc. I can now confirm that there are no such creditors left.

It is to be noted that Bayland or, more accurately, the group decided to pay all creditors except Profer, which they regarded as "a bad faith creditor". It appears that they would not have regarded the transfer to a new company as proper if other creditors were prejudiced. In par. 14 of his statement Mr. Breekweg, inter alia, says this:

> We believed and still believe, that the actions described above were justified and appropriate in

the circumstances, and made economical sense. It was important for us to see to it that no "real" creditors of Bayland (or of the vessel as a whole) would be the victim of the change of ownership. That aim was achieved.

It appears to have been recognized that, if "real" creditors were not paid, they would be the victims of the change of ownership. The difficulty with this distinction, that is between "real" creditors on the one hand and Profer on the other, on the facts of this case is that, as already explained, Profer must be assumed for present purposes to have a bona fide arguable claim. It is clear from Mr. Breekweg's statement that the express purpose of the arrangement was to ensure that Profer could not arrest the vessel, and it is reasonably to be inferred that a further purpose and certainly the effect of it was to ensure that she will not be available for the enforcement of any arbitration award. Bayland have no other assets apart from any rights which they might have against the company to whom the vessel was transferred.

In order to see what if any rights those are, I turn to the MOA. As already stated, it is dated May 15, 1996. The buyers are described as Golden International Navigation. The MOA is stated to be signed for the owners by Benelux Shipping Surveyors B.V., and for the buyers by Sateda B.V. (in each case) as agents only. In fact no entity called Golden International Navigation existed when the MOA was signed. The defendants Golden International Navigation S.A. were not incorporated until either May 23 or perhaps May 27. Both Benelux Shipping Surveyors B.V. and Sateda B.V. are part of a group controlled by Benelux Holdings Ltd.; so is Sateda Ship Management B.V. According to Mr. Janssens, who is a director of Benelux Holdings Ltd., the group assisted the Fondel Group with Benelux Shipping Surveying B.V., concentrating on an advisory function, and Sateda Ship Management B.V. concentrating on management. He says that the MOA was signed by himself in his capacity as a director of "Sateda", presumably of Sateda B.V., and by "Ms. A. Janssens (on behalf of Benelux as agents for Bayland)."

It is not absolutely clear how authority was imparted to Sateda B.V. to sign a contract on behalf of a non-existent entity but it seems reasonably apparent that someone within the Fondel Group simply gave instructions that the MOA be signed without worrying much or at all about the legal niceties. The MOA provides, inter alia, as follows:

1. **Price:** US$ 2,700,000

2. **Deposit**

As a security for the correct fulfilment of this contract, the Buyers shall pay a deposit of 10%

**[1997] Vol. 2**
**Q.B. (Adm. Ct.)**

**LLOYD'S LAW REPORTS**
**The "Tjaskemolen"**

**473**

**CLARKE, J.**

- ten per cent - of the Purchase Money within 5 banking days from the date of this agreement. This amount shall be deposited with a promissory note, dated May 31, 1996 US$ 270,000, - at Sellers office and held by them.

### 3. Payment

The said Purchase money shall be paid free of bank charges to Owners, (in a manner as described in clause 16 of this Memorandum of Agreement) on delivery of the vessel, but not later than three banking days after the vessel is ready for delivery and written or telex notice thereof has been given to the Buyers by the Sellers. . . .

### 5. Place and time of delivery

The vessel shall be delivered and taken over at/in Scheveningen Roads.

**Expected time of delivery:** May 20, 1996

**Date of cancelling** (see clause 14): May 27, 1996 . . .

### 8 Documentation

In exchange for payment of the Purchase Money the Sellers shall furnish the Buyers with legal Bill of Sale of the said vessel free from all encumbrances and maritime liens or any other debts whatsoever, duly notarially attested and legalised by the Panamanian Notary together with a certificate stating that the vessel is free from registered encumbrances. On delivery of the vessel the Sellers shall provide for the deletion of the vessel from the Registry of Vessels and deliver a certificate of deletion to the Buyers. The deposit shall be placed at the disposal of the Sellers as well as the balance of the Purchase Money, which shall be paid as agreed together with payment for items mentioned in clause 7 above. . . .

### 9 Encumbrances

The Sellers warrant that the vessel, at the time of delivery, is free from all encumbrances and maritime liens or any other debts whatsoever. Should any claims which have been incurred prior to the time of delivery be made against the vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims. . . .

### 16

The purchase price will be paid in Promissory Notes in 30 equal payments at US$100,000 each.

It is, I think, common ground that the contract is governed by English law.

As Mr. Matthews has pointed out in argument, the MOA has some very curious features. Ordinarily an agreement of this kind provides for a deposit, followed subsequently by delivery of the

vessel and, inter alia, of a bill of sale against payment of the price. Here the expected date of delivery was to be May 20, with a cancelling date of May 27, whereas the deposit was to be paid by a promissory note dated May 31, 1996. By cl. 16 payment was to be made by promissory notes in 30 equal payments of U.S.$100,000 each. The clause is silent as to when the promissory notes were to be payable. Moreover, that would suggest a total price of U.S.$3 m., although by cl. 1 the price was expressed to be U.S.$2.7 m., and by cl. 2 a promissory note of U.S.$270,000 was to have been deposited already. There is no provision as to when the promissory notes were to be provided, let alone paid.

In the event, delivery of the vessel at 15 30 on May 22, is said to be evidenced by a document signed by Benelux Shipping Surveyors B.V. for the sellers "as agents only" and for the buyers by "Sateda Shipmanagement B.V. as agents only." The buyers are stated to be Golden International Navigation Inc., although, as I understand it, no such company ever existed, and Golden International Navigation S.A. did not yet exist, although it was contemplated that it should. The vessel no doubt remained manned by the same master and crew throughout. There is also in existence a document dated May 22, 1996, apparently signed on behalf of Sateda Management B.V. and Golden International Inc. pursuant to which the former was to manage the vessel from May 23, 1996.

The only promissory note which has so far come into existence is dated May 31. It was originally drafted as having been signed by Golden International S.A. but the word "Navigation" was at some stage added in manuscript, perhaps before it was signed. It is in the sum of U.S.$270,000 and is expressed to be payable "at sight after 30th August 1996". I can see nothing in the MOA which justifies the date of Aug. 30, 1996 or any other date.

No other promissory notes have come into existence as apparently contemplated by cl. 16 of the MOA.

Mr. Breckweg says in his statement:

. . .it was decided that Golden International was to pay for the vessel in instalments, using the earning capacity of the vessel, which was now in a good condition for trading (including operational cranes). It was therefore agreed that both the downpayment and the subsequent instalments would be made at a later date, out of the freights to be earned by Golden International. To this effect promissory notes were to be drawn up although it was also still to be envisaged that Golden International would pay the purchase price through a loan to be concluded under

Case 1:03-md-01570-GBD-SN    Document 415-21    Filed 08/30/04    Page 11 of 12

**[1997] Vol. 2**                          **LLOYD'S LAW REPORTS**                                    **474**
**Q.B. (Adm. Ct.)**                          **The "Tjaskemolen"**                                **CLARKE, J.**

security of a mortgage on the vessel. This depended on discussions with our bankers, lawyers, auditors and tax advisors. . . .

. . .However, there seems to have been some misunderstanding between the various people involved as to whether the company was to have the suffix "Inc." or rather "S.A.". Lock Janssens, at one stage, clearly was under the impression that it was to be "Inc." and he had a stamp made for the company in that name, and drew up several contracts. Such a misunderstanding is regrettable but of no great importance: we have not tried to deceive anyone in this respect and we will of course comply with all commitments entered into by the company, whether under the name "Inc." or under the name "S.A."

Subsequently, Golden International Navigation S.A. procured the provisional registration of the vessel in their name in Belize on May 23, a bill of sale was executed in their favour on June 4, and a deletion certificate evidencing deletion from the Panamanian Register was subsequently issued on June 14, after the issue of the writ in this action.

In my judgment, the facts recounted above show that the MOA was a sham or façade, as those expressions are used in the authorities. It was not a genuine commercial transaction. It was intended by those who control both Bayland and other companies in the group, including now Golden International Navigation S.A., that there should be a transfer from the ownership of Bayland so that the vessel could not be arrested or executed upon by Profer and so that she could be traded in the name of another company within the group. But, as it seems to me, it was never intended that Golden International Navigation S.A. should pay a full price to Bayland. Thus, there are no clear provisions which govern what, if anything, is to be paid when. Moreover, no promissory notes have been issued, save for one which was dated after delivery of the vessel under the MOA had already taken place, albeit to a non-existent company. In my judgment, the whole arrangement was a sham designed to avoid the arrest of Bayland's vessel, and probably the execution of an arbitration award. In short, this is an example of a case in which, in the words of Sir John Donaldson M.R. in *The Evpo Agnic*, the vessel has been spirited into different ownership.

I can understand the frustration of Bayland and the group of which it is a part at what they regard as improper behaviour by Profer. But those are matters for consideration in the future. In my judgment, for the reasons which I have tried to give, the alleged agreement to sell the vessel to Golden International Navigation S.A. was a sham or façade which, whatever other effect it might or might not have

had, did not have the effect of divesting Bayland of the beneficial ownership of the vessel. It follows that the application to set aside the security on ground 2 in the amended notice of motion fails. In these circumstances, it is not necessary to consider any of the other interesting questions which were argued under this head.

*Amount of security*

I turn to the question whether the amount of security should be reduced. The amount of security demanded and provided was, I think, U.S.$680,000. The principles are not in dispute. It is common ground that the plaintiffs are in principle entitled to security in the amount of their reasonably arguable best case in respect of damages, interest and costs: *The Moschanthy*, [1971] 1 Lloyd's Rep. 37.

As already stated, the defendants do not say that the plaintiffs have no reasonably arguable case. They say that the amount of security should be reduced on two grounds, which I shall consider under the heading of gears and mitigation.

1. *Gears*

The plaintiffs' claim for damages includes a claim for the extra cost of freight in the sum of U.S.$359,866.21 incurred by them as a result of the carriage of the cargo of steel in *Frotavega* instead of *Tjaskemolen*. The defendants say that the plaintiffs have no arguable case that they have suffered loss by reason of any breach of the charter-party by the defendants in this regard. *Frotavega* is equipped with cranes or derricks. *Tjaskemolen* was expressed to be "considered gearless for this trade", as already stated. The defendants say that, in these circumstances, while *Frotavega* was able to perform the contract between the plaintiffs and Dongkuk, *Tjaskemolen* was not, because that contract provided that the vessel chartered to carry the cargo must be -

. . .equipped with cranes or derricks of minimum lifting capacity of 10 tonnes.

It is thus said that the plaintiffs have no arguable case under this head.

In response the plaintiffs say, as I have already indicated, that the contract of sale was amended by an agreement dated Mar. 4, signed by Don Chu on behalf of Dongkuk. If that document is, or is arguably, genuine, the plaintiffs have an arguable case under this head.

Mr. Turner's submissions are summarized thus in his skeleton argument:

The sale contract between Profer and Dongkuk required the vessel carrying the cargo to be gearless. Although the plaintiff has now produced evidence that this requirement was

[1997] Vol. 2
Q.B. (Adm. Ct.)
LLOYD'S LAW REPORTS
The "Tjaskemolen"
475
CLARKE, J.

waived, the key document is highly dubious for the following reasons:

(i) It is apparently dated 4th March 1996 and yet was not produced in time for it to be considered by the Dutch Court prior to its judgment of 15 April 1996.

(ii) This quite important alteration in the terms of the sale contract went unmentioned in all the various addenda, which repeatedly stipulated that "all other terms and conditions remain unchanged and in full effect".

(iii) The typeface used in the document's header (date etc.) is of a quite different type and quality to that used in its body.

Those are all points which can be put to the arbitrators who will consider the plaintiffs' claim on its merits. But they are not, in my judgment, sufficient to enable the Court to say that the plaintiffs have no arguable case under this head. I have reached the conclusion that the plaintiffs have an arguable case that Dongkuk accepted *Tjaskemolen* on a gearless basis on Mar. 4, so that the plaintiffs have an arguable case in respect of the freight differential.

### 2. *Mitigation*

Mr. Turner submits that the plaintiffs' failure to accept the offer made by Bayland in March or to attempt to charter the vessel in April remains

without any, or any convincing, explanation. This is highly surprising, it is submitted, in view of the extremely high freight differential alleged.

Mr. Matthews' submissions in response are summarized in his skeleton argument as follows:

1. The re-offer was made on 29th March 1996;

2. At that time, the contract between the plaintiffs and Dongkuk had been cancelled, leaving the plaintiffs exposed to a claim for damages;

3. The contract was not resurrected until 23rd April 1996;

4. This was explained to the owners on 2nd April 1996.

Mr. Turner would no doubt submit in reply that it is striking that the plaintiffs were able to resurrect the contract with Dongkuk subsequently, and that if they had acted reasonably they could no doubt have done so earlier, so that in any event they ought to have accepted the defendants' offer. The arbitrators may well accept these submissions, but that is essentially a matter for them. The onus of proving a failure to take reasonable steps to mitigate is upon the defendants. On the evidence at present available, the plaintiffs have an arguable case that the allegations of failure to mitigate will fail.

In these circumstances, the application for a reduction of the security fails.