# Exhibit 13

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 322 |

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

July 21, 22, 23, 24, 28; Sept. 23, 1997

---

YUKONG LINES LTD OF KOREA

v.

RENDSBURG INVESTMENTS CORPORATION AND OTHERS

(THE "RIALTO") (No. 2)

Before Mr. Justice TOULSON

**Charter-party (Time) - Agency - Undisclosed principal - Charter-party entered into - Whether third defendants alter ego of charterers - Whether third defendant acted as undisclosed principal of charterers - Whether third defendant could be treated as party to charter-party.**

By a charter-party dated July 8, 1995 on the New York Produce Exchange form (as amended) the plaintiffs (Yukong) as disponent owners chartered the vessel *Rialto* to the first defendants Rendsburg for a period of three years plus or minus two months at Rendsburg's option at a daily rate of hire of U.S.$14,000. For the charterers the document was signed by the third defendant Mr. Yamvrias as director of a broking company Marcan Shipping (London) Ltd. (Marcan) described as acting on behalf of Rendsburg.

On Jan. 8, 1996 Yukong gave notice to Rendsburg of expected delivery of the vessel on about Feb. 9, 1996. On Jan. 23, 1996 Mr. Yamvrias sent a fax on Marcan paper to Yukong informing them that the charterers for reasons beyond their control were unable to perform the charter-party.

Yukong issued proceedings against Rendsburg on Feb. 2, 1996 and on the same day obtained a *Mareva* order which required disclosure of information regarding Rendsburg's shareholders, directors and relationship with Marcan.

In his affidavits Mr. Yamvrias disclosed that the shares in Marcan were held by his wife and himself as directors and by the second defendant (Ladidi) the beneficial ownership of which was held on trust for "family interests"; that the shares in Rendsburg were bearer shares all of which were held to his order as beneficial owner; that U.S.$244,965.60 was transferred from Rendsburg's account to Ladidi and the account was closed soon afterwards by a further transfer to Ladidi of U.S.$648.99.

In the light of these disclosures Yukong amended its claim to join Ladidi and Mr. Yamvrias alleging that either or both acted as undisclosed principal(s) of Rendsburg in respect of the charter-party or were to be treated as parties to the charter-party. Yukong claimed that at all relevant times Mr. Yamvrias directed and controlled Rendsburg and Ladidi for the benefit of himself so that he was the companies' alter ego and that he transferred Rendsburg's assets to Ladidi on the repudiation of the charter-party in order to put them

beyond the reach of Yukong. Yukong also alleged that the defendants had conspired to injure Yukong by siphoning funds from Rendsburg's account at the time of the repudiation of the charter.

-*Held*, by Q.B. (Com. Ct.) (TOULSON, J.), that (1) from the contemporaneous evidence and from Mr. Yamvrias' past admissions which he had not attempted to explain, it would be concluded that at all relevant times Mr. Yamvrias exercised control over Rendsburg and Ladidi and that the ultimate beneficial interest in both companies belonged to him, his wife and possibly his family; he was the alter ego of both companies; there was no satisfactory evidence that the purposes of the transfer of the money was to meet Rendsburg's ordinary business expenses or to pay other creditors; there was no satisfactory evidence that Rendsburg had other creditors apart from Yukong; and the purpose of the transfer was to put Rendsburg's assets beyond the reach of Yukong in the probable litigation (*see* p. 327, col. 1);

(2) Mr. Yamvrias signed the charter-party expressly in his capacity as a director of Marcan acting as brokers for the charterer named in the contract, Rendsburg; that was inconsistent with an intention that Mr. Yamvrias, not Rendsburg, should be the principal; there was no evidence to suggest that the document was a "sham", meaning that it did not reflect Mr. Yamvrias true intention; and the argument that Mr. Yamvrias entered into the charter as undisclosed principal of Rendsburg would be rejected (*see* p. 328, col. 2);

(3) the transfer of funds by Rendsburg to Ladidi on the repudiation of the charter-party for the purpose of putting them beyond the reach of Yukong did not entitle the Court to treat Mr. Yamvrias retrospectively as a party to the charter and therefore liable in damages for Rendsburg's repudiation of it (*see* p. 330, col. 2; p. 331, cols. 1 and 2; p. 332, col. 1);

-*Gilford Motor Co. Ltd. v. Horne*, [1933] Ch. 935, *Jones v. Lipman*, [1962] 1 W.L.R. 832, *Creasey v. Breachwood Motors Ltd.*, [1993] B.C.L.C. 480 and *The Tjaskmolen*, [1997] 2 Lloyd's Rep. 465, distinguished.

(4) where a director or person having the management of an insolvent company acted in breach of his duty to the company by causing assets of the company to be transferred in disregard of the interests of its creditors under English law he was answerable through the scheme which Parliament had provided; he did not owe a direct fiduciary duty towards an individual creditor nor was the individual creditor entitled to sue for breach of the fiduciary duty owed by the director to the company (*see* p. 333, col. 1);

(5) in an unlawful act of conspiracy the unlawful act must be actionable at the suit of the plaintiff (*see* p. 334, col. 2);

-*Generale Bank Nederland N.V. v. Export Credits Guarantee Department*, [1998] 1 Lloyd's Rep. 19 applied.

(6) at the time of the wrongful repudiation of the charter there was no available market in which Yukong could have entered into a replacement three year charter at a daily rate of not less than U.S.$13,000; Yukong acted reasonably in the circumstances in which it found

Case 1:03-md-01570-GBD-SN   Document 415-22   Filed 08/30/04   Page 3 of 16

itself and if it were entitled to damages against Mr. Yamvrias for breach of the charter the Court would have found in its favour on the disputed quantum issue (*see* p. 334, col. 2);

(7) Yukong was not entitled to the forms of relief claimed against Mr. Yamvrias (*see* p. 334, col. 2).

---

The following cases were referred to in the judgment:

Adams v. Cape Industries Plc., (C.A.) [1990] Ch. 433;
Company, Re A [1985] B.C.L.C. 333;
Creasey v. Breachwood Motors Ltd., [1993] B.C.L.C. 480;
*Coral Rose*, The (C.A.) [1991] 1 Lloyd's Rep. 563;
DHN Food Distributors Ltd. v. Tower Hamlets London Borough Council, [1976] 1 W.L.R. 852;
Garnac Grain Co. Inc. v. H.M.F. Faure & Fairclough Ltd., (H.L.) [1967] 1 Lloyd's Rep. 495; [1968] A.C. 1130;
Generale Bank Nederland N.V. v. Export Credits Guarantee Department, (C.A.) [1998] 1 Lloyd's Rep. 19;
Gilford Motor Co. Ltd. v. Horne, (C.A.) [1933] Ch. 935;
Jones v. Lipman, [1962] 1 W.L.R. 832;
Kinsella v. Russell Kinsella Pty. Ltd., [1986] 4 A.C.L.C. 215;
Lonrho Plc. v. Fayed, (H.L.) [1992] 1 A.C. 448;
Lonrho Plc. v. Shell Petroleum Co. Ltd., (H.L.) [1982] A.C. 173;
Marrinan v. Vibart, [1963] 1 Q.B. 528;
Salomon v. A. Salomon and Co. Ltd., (H.L.) [1897] A.C. 22; (C.A.) [1895] 2 Ch. 345;
Smith Stone and Knight Ltd. v. Birmingham Corporation, [1939] 4 All E.R. 116;
Snook v. London and West Riding Investments Ltd., (C.A.) [1967] 2 Q.B. 786;
*Tjaskmolen*, The [1997] 2 Lloyd's Rep. 465;
West Mercia Safetywear Ltd. v. Dodd, [1988] 4 B.C.C. 30;
Woolfson v. Strathclyde Regional Council, 1978 S.L.T. 159;
Yukong Lines Ltd. v. Rendsburg Investment Corporation, [1996] 2 Lloyd's Rep. 604.

---

This was an action by the plaintiffs Yukong Lines Ltd. claiming damages against the defendants Rendsburg Investment Corporation, Ladidi Investment Corporation of Liberia and Dimitrios Nicholas Yamvrias for wrongful repudiation of the charter-party entered into between the plaintiffs and Rendsburg and alleging that Ladidi and/or Mr. Yamvrias acted at all material times as the undisclosed principals of Rendsburg in relation to the charter or were to be treated in law as parties to the contract, alternatively that Rendsburg, Ladidi and Mr. Yamvrias conspired together to injure Yukong by siphoning funds from Rendsburg's account at the time of the repudiation of the charter.

Mr. Peter Gross, Q.C. and Mr. David Joseph (instructed by Messrs. Ince & Co.) for the plaintiffs; Mr. Adrian Hamilton, Q.C. and Mr. David Allen (instructed by Messrs. Hewett & Co.) for Mr. Yamvrias.

The further facts are stated in the judgment of Mr. Justice Toulson.

Judgment was reserved.

Tuesday Sept. 23, 1997

---

### JUDGMENT

**Mr. Justice TOULSON:**

*The parties*

The plaintiff ("Yukong") is a substantial Korean shipping company. The only defendant represented at this trial has been the third defendant, Mr. Yamvrias. The first defendant ("Rendsburg") and the second defendant ("Ladidi") are Liberian companies. Rendsburg no longer has a solicitor on the record and Ladidi has never acknowledged service. Yukong wishes to defer any decision in relation to any relief claimed against Rendsburg and Ladidi until after it has considered this judgment. The fourth defendant, whose proper name is VAL Finance Investments Inc. ("VAL") and the fifth defendant, Den Norske Bank A/S ("DNB"), were joined in the action for purposes connected with certain *Mareva* orders, but no substantive relief is now claimed against either of them.

*The action*

The action began as a straightforward claim by Yukong against Rendsburg for damages for wrongful repudiation of a charter-party dated July 8, 1995 ("the charter-party"). According to the terms of the charter-party, made on the New York Produce Exchange form (as amended), Yukong as disponent owners chartered the vessel *Rialto* to Rendsburg for a period of three years, plus or minus two months at Rendsburg's option, at a daily rate of hire of

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 324 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

U.S.$14,000. For the charterers the document was signed by Mr. Yamvrias as director of a broking company, Marcan Shipping (London) Ltd. ("Marcan"), described as acting on behalf of Rendsburg by a telex authority dated Aug. 29, 1995. (Nobody appears to have queried the date of the telex, which supposedly postdated the charter-party, and the evidence called on behalf of Mr. Yamvrias was that no such telex authority existed.)

On Jan. 8, 1996 Yukong gave notice to Rendsburg of expected delivery of the vessel in accordance with the terms of the charter-party on about Feb. 9, 1996. On Jan. 23, 1996 Mr. Yamvrias sent a fax on Marcan paper to Yukong's brokers informing them that the charterers for reasons beyond their control were unable to perform the charter-party. The market had fallen since the contract was made, and the repudiation followed an unsuccessful request by Mr. Yamvrias for a reduction in the charter rate.

Yukong issued proceedings against Rendsburg on Feb. 2, 1996, and on the same day obtained a *Mareva* order, which required disclosure of information regarding Rendsburg's shareholders, directors, and relationship with Marcan.

In response to the order, Mr. Yamvrias swore an affidavit dated Feb. 15, 1996. In it he said that he was a director of Marcan, the only other director being his wife. He and his wife also held shares in Marcan (15,750 and 1750 respectively). The remaining shares (70,000) were held by Ladidi, the beneficial ownership of which was held on trust for "family interests." He explained that Marcan carried on business as shipbrokers from offices in the Baltic Exchange and provided services to a variety of owners and charterers around the world, including Rendsburg. He believed that Rendsburg was incorporated in Liberia and its last known directors were Tatiana Nagovsky and Quentin Bogousslavsky, who had addresses in Geneva.

A letter dated Feb. 16, 1996 from solicitors for Marcan to Yukong's solicitors added:

> Our clients have no telephone or fax numbers for the directors of Rendsburg in Geneva. Instructions from Rendsburg were received by incoming telephone calls from Captain Vatistas, who was responsible for the company's operations.

So at this stage Mr. Yamvrias appeared to be denying that he had any connection with Rendsburg, except that Rendsburg was a client of Marcan.

However, in a second affidavit, sworn on Feb. 22, 1996, Mr. Yamvrias stated that the shares in Rendsburg were bearer shares, all of which were held to his order as beneficial owner. He also disclosed that the last directors, Miss Nagovsky and Mr. Bogousslavsky, had resigned on his instructions given at the end of January, 1996, and he confirmed that the "family interests" for which the beneficial ownership of Ladidi was held on trust were his family interests.

In a third affidavit, sworn on Apr. 22, 1996, Mr. Yamvrias stated that since swearing his second affidavit he had learned that new directors of Rendsburg had been appointed on the day before he swore his second affidavit. He said that after receipt of the *Mareva* order dated Feb. 2, 1996 he had given instructions to a Greek lawyer, Mr. Ioannis Zacharias, that new directors of Rendsburg should be appointed, but he was unaware of the fact of their appointment until Mr. Zacharias informed him of it on Mar. 4, 1996. The new directors appointed were Mr. Zacharias, Mrs. Catherine Stamatopoulos and Mrs. Sissy Bakas.

Mr. Yamvrias' third affidavit and exhibits also disclosed that on the day of repudiation of the charter-party (Jan. 23, 1996), the sum of U.S.$244,965.60 was transferred from Rendsburg's account at DNB (headed c/o Marcan) to Ladidi, and the account was closed soon afterwards by a further transfer to Ladidi of U.S.$648.99. Mr. Yamvrias said in his affidavit that of the funds so transferred U.S.$50,000 was paid to a Mrs. Baltas in repayment of a loan, although there were no documents to show this. He did not say what happened to the balance. Study of Ladidi's bank statements shows that the U.S.$244,965.60 transferred to it on Jan. 23, 1996 was disbursed over the next three weeks in various ways, concluding with a transfer on Feb. 4, 1996 of U.S.$164,799 on Mr. Yamvrias' instructions to VAL.

In the light of these disclosures and other matters, on June 6, 1996 Yukong amended its claim to join Ladidi and Mr. Yamvrias, alleging that either or both of them acted at all material times as the undisclosed principal(s) of Rendsburg in respect of the charter-party or were to be treated in law as parties to the charter-party. Further or alternatively, Yukong alleged that Rendsburg, Ladidi and Mr. Yamvrias conspired together to injure Yukong by siphoning funds from Rendsburg's account at the time of the repudiation of the charter-party.

On July 1, 1996 Mr. Justice Moore-Bick, held on the trial of a preliminary issue that Rendsburg was in repudiatory breach of the charter-party, by reason of Marcan's fax dated Jan. 23, 1996, and that Yukong had not subsequently affirmed the contract. His judgment is reported at [1996] 2 Lloyd's Rep. 604.

Yukong's claim against Mr. Yamvrias raises disputed questions of fact and law. Factually, Yukong claims that at all relevant times Mr. Yamvrias directed and controlled Rendsburg and Ladidi

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 325 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

for the benefit of himself (jointly, it may be, with his wife and family), so that he was, in the odd but familiar phrase, the companies' "alter ego"; and that he transferred Rendsburg's assets to Ladidi on the repudiation of the charter-party in order to put them beyond the reach of Yukong. It is necessary to deal first with those issues.

*The ownership of Rendsburg and Ladidi*

After Mr. Yamvrias was made a party to the action, he began to go back on the statements in his previous affidavits about the ownership of Rendsburg and Ladidi.

On June 17, 1996 solicitors acting on Mr. Yamvrias' instructions wrote to Yukong's solicitors stating that they had been in touch with the Ladidi trustees in Switzerland, a firm called Attendus Treuhandgesellschaft ("Attendus"), from whom they now understood that the information previously given by Mr. Yamvrias about the beneficial ownership of Ladidi being held on trust for his family interests was "simply wrong".

In his sixth affidavit, sworn on Aug. 9, 1996, Mr. Yamvrias confirmed that he had been mistaken in his belief at the time of swearing his earlier affidavits that Ladidi was owned on trust for his family interests. He also stated that he was unaware who beneficially owned Ladidi. He did not attempt to explain how the mistake arose, and it remains unexplained.

Some bank statements relating to Ladidi had by this time been disclosed by DNB. Mr. Yamvrias said in his sixth affidavit that the statements had been disclosed by the bank in error, and that he neither had given instructions to the bank to disclose them nor had authority to do so. However, it is clear from the documents disclosed by the bank that Mr. Yamvrias had operational control over Ladidi's account at the time of swearing his earlier affidavits, for the transfer of U.S.$164,799 from Ladidi to VAL was carried out on the instructions of Mr. Yamvrias by a fax dated Feb. 13, 1996, in which he directed the bank to transfer the balance of Ladidi's account to the National Bank of Greece in Rotterdam for the account of VAL. So Mr. Yamvrias not only believed at that time that he was the beneficial owner of Ladidi, but apparently acted accordingly.

In his seventh affidavit, sworn on Sept. 13, 1996, Mr. Yamvrias gave a reason for the transfer of U.S.$244,965 from Rendsburg to Ladidi on Jan. 23, 1996, the date of repudiation of the charter-party. He explained that he was instructed to close Rendsburg's account by Mr. Zacharias, who also suggested for the sake of convenience that Mr. Yamvrias should transfer the money into Ladidi's account, over which Mr. Yamvrias had control, instead of opening a new account. He added that any purpose for the transfer beyond that was within Mr. Zacharias' knowledge and not his own.

This explanation implied that Mr. Yamvrias was not the beneficial owner of Rendsburg, but that he was acting under instructions from Mr. Zacharias, in contrast with his second and third affidavits, according to which Mr. Yamvrias was the beneficial owner of Rendsburg and Mr. Zacharias had acted on Mr. Yamvrias' instructions. By implication, therefore, Mr. Yamvrias had been wrong in his previous statements about the ownership of Rendsburg as well as Ladidi, but no explanation was given for this additional turnabout.

On Mar. 14, 1997 an order was made in the usual way for exchange of signed statements of factual witnesses. Statements were duly exchanged, including one from Mr. Yamvrias. However, I was told at the start of the trial that a decision whether to call him as a witness would not be made until the close of Yukong's case. His case on the facts was to be that he was not the effective owner of either Rendsburg or Ladidi.

Not surprisingly, Mr. Gross, Q.C. in his opening made strong comment about how unsatisfactory it would be if Mr. Yamvrias were not to give evidence and effectively challenged him to do so. The challenge was not accepted. Why Mr. Yamvrias elected not to give evidence can only be a matter of inference. A large number of questions cried out to be answered by him. The inference I draw is that either he was unwilling to perjure himself in the witness box and believed that if he were to tell the truth it would be detrimental to his cause, or else he did not believe that his case would withstand his being cross-examined on it.

Mr. Yamvrias did adduce other evidence for the purpose of contradicting his sworn admissions concerning his control of Rendsburg and Ladidi. With one important exception, this evidence took the form of statements admitted under the Civil Evidence Act from people living overseas.

Statements in relation to Ladidi were provided by Mr. Ranger, a solicitor employed by Attendus, and by a Mr. Borhan Kabalawi. Mr. Ranger exhibited to his statement a document which he said was the only form of Ladidi trust deed. This described itself as "trust deed of the Aland settlement trust" made with effect from June 1, 1995. Mr. Ranger also confirmed that neither Mr. Yamvrias nor any member of his family was, or had at any time been, a member of the class of potential beneficiaries under the trust. The trust deed is a curious document for various reasons. The original beneficiaries were the British Red Cross Society (Isle of Man Branch) and British Heart Foundation Appeal (Isle of Man), but a supplemental deed added as beneficiaries with

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 326 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

effect from June 2, 1995 Mr. Kabalawi, his spouse for the time being and their issue.

Mr. Kabalawi's statement is more notable for what it does not say than for what it does. He says that he, his wife and family are the beneficiaries of the trust. He is aged 45, lives in Athens and has known Mr. Yamvrias for 10 years. His statement contains no further information. In particular, it contains nothing more about his relationship with Mr. Yamvrias, nothing about the circumstances in which Mr. Yamvrias came to be in control of Ladidi's bank account, and nothing which might help to explain how Mr. Yamvrias came to believe that the trust was for the benefit of Mr. Yamvrias' family.

Oral evidence was given by Mr. Zacharias, a member of the Athens Bar since 1969 and formerly a legal adviser to the National Bank of Greece and to the Greek Embassy and Consulate in London. The effect of his evidence was, in summary, that in 1993 Mr. Yamvrias and a Mr. Cacouris contacted him regarding a proposed Nigerian project to buy oil and sell it in Ghana. They were looking for investors in the project and approached Mr. Zacharias as an intermediary. He introduced some investors, and Mr. Yamvrias offered them Rendsburg, then a dormant company in Mr. Yamvrias' ownership, as a vehicle for the project. The investors came from a Gulf state and needed for political reasons to keep their identity concealed. From that time Mr. Yamvrias had no beneficial interest in Rendsburg. He opened its bank account in London with DNB for the ultimate benefit of the investors, who communicated with Mr. Yamvrias through Mr. Zacharias. Unfortunately the Nigerian project was a failure. Mr. Zacharias accordingly suggested to Mr. Yamvrias that he should find some other project in order to produce a return for the investors. In 1995, after discussion with Rendsburg's owners, Mr. Zacharias agreed that this should take the form of ship chartering, with Marcan acting as brokers for Rendsburg. So it was that Rendsburg, through Marcan, came to charter *Rialto*. There was also another venture involving another vessel, *Eastern Queen*. Unfortunately, the market fell. There was no way in which Rendsburg's shareholders were prepared to invest further funds, and so, when Yukong refused to renegotiate the rate, Marcan was forced to report that Rendsburg could not proceed.

The explanation for the resignation of Rendsburg's former directors in early 1996, and their replacement by Mr. Zacharias, Mrs. Stamatopoulos and Mrs. Bakas, was that it was no longer considered to be worthwhile paying the annual fee charged by the former directors.

Mr. Zacharias said that he had no first hand knowledge of the owners of Ladidi, but he understood it to belong to another Arab family. Use of Ladidi's account for Rendsburg's business was a form of accommodation between one Arab family and another.

Mr. Zacharias' witness statement identified the shareholders of Rendsburg as the family of a lady said to reside at an address with a P.O. box number at Ashralfa Mountain, Amman. This led to investigations being made on Yukong's behalf by a lawyer in Amman, who elicited the information that the local postal service had no knowledge of the lady in question at that address.

In response, an affidavit was sworn by a lady of the relevant name at the British Embassy in Athens. In her affidavit she stated that she was the owner of the shares in Rendsburg, and that she had been living and working in Greece since May 18, 1997. She also exhibited her passport, showing her date of entry. Prior to her arrival in Greece, she stated that the address named in Mr. Zacharias' statement was the address at which he corresponded with her.

When questioned about correspondence with Rendsburg's shareholders, Mr. Zacharias said that the only correspondence which he ever had with them was of an innocuous nature and that all instructions were received orally either by telephone or at meetings.

The absence of contemporaneous documentary evidence to support Mr. Yamvrias' case, however it may be sought to be explained, is a significant feature, especially when set against documents which do exist showing that Mr. Yamvrias was exercising practical control over Rendsburg's and Ladidi's bank accounts, and against Mr. Yamvrias' unexplained past admissions about the ownership of the companies. If Rendsburg and Ladidi were at all relevant times owned by two different Arab families, unconnected with Mr. Yamvrias, why did he say on affidavit that he was the beneficial owner of Rendsburg and that Ladidi was held on trust for his family? His silence about those points (beyond the bare statement that he was mistaken about the ownership of Ladidi) is deafening.

Moreover, where it was possible for Mr. Zacharias to be questioned about documents, his answers were in a number of respects unsatisfactory. For example, he was unable to give satisfactory answers to questions about the timing of, and reasons for, resolutions of Rendsburg's stockholders and directors purportedly passed at meetings chaired by Mr. Zacharias on Feb. 21 and 22, 1996 (drafts of which were sent to Mr. Zacharias by London solicitors on Mar. 7, 1996), or about instructions purportedly given by Rendsburg to

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 327 |
|---|---|---|
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

Marcan in January, 1996 to attempt to renegotiate the charter-party.

Without having heard Mr. Yamvrias, I am unable to form a firm view about how much Mr. Zacharias knew of what was going on between Rendsburg, Ladidi and Marcan, but I am unable to accept Mr. Zacharias' evidence that at the relevant time Mr. Yamvrias was acting on his instructions. From the contemporaneous evidence and from Mr. Yamvrias' past admissions, which he has not attempted to explain, I conclude that at all relevant times Mr. Yamvrias exercised control over Rendsburg and Ladidi, and that the ultimate beneficial interest in both companies belonged to him with his wife and possibly his family. He was, in short, the alter ego of both companies.

It would be stretching credulity to suppose that the transfer of funds from Rendsburg to Ladidi on the same day as the charter-party was repudiated was a pure coincidence. There is no satisfactory evidence that the purpose of the transfer of the money was to meet Rendsburg's ordinary business expenses or to pay other creditors. Indeed, there is no satisfactory evidence that Rendsburg had other creditors apart from Yukong.

I conclude that the purpose of the transfer was to put Rendsburg's assets beyond the reach of Yukong in the probable event of litigation. Mr. Yamvrias subsequently put up a cover story, which has failed. Such conduct was disreputable, but is unhappily not uncommon. Mr. Gross submitted that the law would be open to reproach if Yukong were left without a remedy. I agree, but the question what remedy is available has to be considered in accordance with principle.

*Agency*

The first remedy claimed is that Mr. Yamvrias should be held liable to Yukong for damages for breach of the charter-party on the basis, firstly, that he acted as Rendsburg's undisclosed principal, or secondly, that his improper conduct brings the case within the circumstances in which the Court may look behind Rendsburg's corporate personality so as to treat Mr. Yamvrias as if he were a party to the contract.

There is an important distinction between these two approaches, which must not be blurred. According to the first approach, Mr. Yamvrias was in truth the party who contracted with Yukong, albeit that his agent, Rendsburg, was described as the charterer in the contract. According to the second approach, Mr. Yamvrias was not originally a party to the contract, but is to be treated as if he were by reason of his subsequent improper conduct. I emphasize "subsequent", because it is not suggested that when the charter-party was entered into in the name of Rendsburg, there was any fraudulent or improper purpose on the part of Mr. Yamvrias.

The starting point for considering the question of agency is the decision of the House of Lords in *Salomon v. A. Salomon and Co. Ltd.*, [1897] A.C. 22, where it was held that a limited company has a legal existence independent of its members and is not the agent of its members. In rejecting the argument that the relationship between Mr. Salomon and the company was that of principal and agent, Lord Halsbury, L.C. said at p. 31:

> Either the limited company was a legal entity or it was not. If it was, the business belonged to it and not to Mr Salomon. If it was not, there was no person and no thing to be agent at all; and it is impossible to say at the same time that there is a company and there is not.

That is not to say that a company may not act as agent for another company or for an individual, just as an individual may act as agent for another individual or for a company. Whether such a relationship exists in a given case has to be determined in accordance with the principle stated by Lord Pearson in *Garnac Grain Co. Inc. v. H.M.F. Faure & Fairclough Ltd.*, [1967] 1 Lloyd's Rep. 495 at p. 508, col. 2; [1968] A.C. 1130 at p. 1137:

> The relationship of principal and agent can only be established by the consent of the principal and the agent. They will be held to have consented if they have agreed to what amounts in law to such a relationship, even if they do not recognise it themselves and even if they have professed to disclaim it, as in *ex parte Delhasse*. But the consent must have been given by each of them, either expressly or by implication from their words and conduct.

That principle applies as much in the case of one-man companies or wholly owned subsidiaries as in any other case. It was applied by the Court of Appeal in relation to a one-ship company and its ultimate beneficial owner in *The Coral Rose*, [1991] 1 Lloyd's Rep. 563, where Lord Justice Staughton, observed at p. 571:

> The creation or purchase of a subsidiary company with minimal liability, which will operate with the parent's funds and on the parent's directions but not expose the parent to liability, may not seem to some the most honest way of trading. But it is extremely common in the international shipping industry, and perhaps elsewhere. To hold that it creates an agency relationship between the subsidiary and the parent would be revolutionary doctrine.

In the present case Mr. Gross submitted that the proper test was that posed by Mr. Justice Atkinson, in *Smith Stone and Knight Ltd. v. Birmingham*

Case 1:03-md-01570-GBD-SN   Document 415-22   Filed 08/30/04   Page 8 of 16

*Corporation*, [1939] 4 All E.R. 116 at p. 121. The case concerned a claim for compensation on compulsory purchase of land by the defendant council. The land previously belonged to the plaintiff company, but was let by it to a wholly owned subsidiary on a yearly tenancy. By virtue of s. 121 of the Lands Clauses Consolidation Act, 1845, an occupier with no greater interest than a tenancy not exceeding one year had no statutory right of compensation. The issue was whether the parent company had a right of compensation. Mr. Justice Atkinson, said that it was a question of fact -

> . . .whether the subsidiary was carrying on the business as the company's business or as its own.

In addressing that question he asked himself a number of subsidiary questions including who was really carrying on the business, whether the persons conducting the business were appointed by the parent, whether the company was the head and the brain of the trading venture, whether the parent company governed the venture, and so on.

In *Adams v. Cape Industries Plc.*, [1990] Ch. 433 at p. 536 the Court of Appeal observed that the wording of a particular statute or contract has sometimes been held to justify the treatment of parent and subsidiary as one unit for some purposes, and gave as an example the compensation case of *DHN Food Distributors Ltd. v. Tower Hamlets London Borough Council*, [1976] 1 W.L.R. 852, while commenting that parts of the judgments in that case were somewhat broadly expressed. It seems to me that the same observations apply to the decision in *Smith Stone and Knight Ltd. v. Birmingham Corporation*.

I do not accept Mr. Gross' submission that as a matter of general approach the Court should ask whether the company was carrying on business as its owner's business or its own business, using as guidance the sub-questions posed by Mr. Justice Atkinson, and should determine the question of agency accordingly. On that approach, *Salomon's* case would surely have been decided differently, as the judgments of the Court of Appeal in that case illustrate. Consider, for example, the following passage from the judgment of Lord Justice Kay, at [1895] 2 Ch. 345:

> The question - as was put to counsel during the argument - is, Whose was this business in fact after the formation of the company? There really was no attempt to deny that it was the business of Salomon. The pretended sale to the company was an utter fiction. The company had no funds or property whatever except what it took under this alleged sale and £7 payable on the subscription shares. It borrowed no money. The £10,000 debentures were issued in part of the nominal price. The only security for them was the value of the assets of this business. The company paid nothing to Salomon for the purchase. They had nothing to pay with. There was no pretence of a bargain between the company and Salomon as vendor. There was no independent director to protect the company in the transaction. In truth, there was no purchase and sale at all. The business remained Salomon's. He carried it on in the name of the company.

The fundamentally different approach taken by the House of Lords is summarized in the passage already cited from the speech of Lord Halsbury. If the company was a legal entity independent of its members, it followed that the business belonged to it and not to Mr. Salomon. It was nothing to the point that it acted on the direction of Mr. Salomon and for his benefit. Something quite different would need to be established in order to show that the company, in law an entity independent of its owner, was acting in some respect as agent for its owner, the necessary requirement being to show that the relationship of agency was intended to be created. Ordinarily, the intention of someone who conducts trading activities through the vehicle of a one-man company will be quite the opposite.

In support of the agency argument Mr. Gross relied in particular on the bank statements of Rendsburg and Ladidi to say that, although Rendsburg had its own banking facilities, Mr. Yamvrias appeared to conduct the accounts of either company as it suited him. Mr. Gross relied also on the absence of any dividend payments. He submitted that there was a complete lack of credible evidence to show that they were in fact run as separate entities.

Taking those points at their highest, the fact remains that Mr. Yamvrias signed the charter-party expressly in his capacity as a director of Marcan, acting as brokers for the charterer named in the contract, Rendsburg. That is inconsistent with an intention that Mr. Yamvrias, not Rendsburg, should be the principal. Further, there is no evidence to suggest that the document was a "sham", meaning that it did not reflect Mr. Yamvrias' true intention. On the contrary, it would have been surprising, to say the least, if he had wanted personally to charter *Rialto* for a three year term. I therefore reject the argument that Mr. Yamvrias entered into the charter-party as undisclosed principal of Rendsburg.

*Lifting or piercing the corporate veil*

There was some discussion whether Yukong's alternative basis for treating Mr. Yamvrias as a party to the charter-party was properly to be regarded as an attempt to "lift the corporate veil" or to "pierce the corporate veil." In a sense, it may not

matter what language is used as long as the principle is clear; but there lies the rub. For metaphor can be used to illustrate a principle; it may also be used as a substitute for analysis and may therefore obscure reasoning, as Lord Justice Staughton observed in *The Coral Rose*, [1991] 1 Lloyd's Rep. 563 at p. 571. Since the phrases "lifting the corporate veil" and "piercing the corporate veil" have been used in different situations, some of which are not relevant to the present case, it is important to approach the issue in this case in its proper context.

It has long been recognized that the *Salomon* principle can cause hardship, although those dealing with one-man companies may, and commonly do, seek to protect themselves by requiring a personal guarantee. Some authorities have suggested that the Court will use its powers to pierce the corporate veil whenever it thinks it necessary to achieve justice (see *Re A Company*, [1985] B.C.L.C. 333 at pp. 337-338), but such a broad approach was disapproved by the Court of Appeal in *Adams v. Cape Industries Plc.*, [1990] Ch. 433 at p. 536, where it was held that:

> ...save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v. A Salomon and Co Limited* [1897] A.C. 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.

It is a moot academic question whether the apparent departures from the *Salomon* principle referred to in that passage are in truth exceptions to the principle or merely cases where the *Salomon* principle does not affect the result. In his Hamlyn lecture on *Salomon's* case delivered on Nov. 7, 1996 (Sweet & Maxwell, 1997), Lord Cooke said (at p. 13):

> In the main the concept that a duly incorporated limited liability company, if not a real thing, is at least not to be identified with its shareholders has been faithfully followed by British and other Commonwealth courts ever since Salomon's case. But there has been some gnawing away at the edges of doctrine, a process commonly described as piercing or lifting the corporate veil. I believe that there is only one broad class of cases where this is truly consistent with the Salomon reasoning. They are all cases where, under enactments such as those against fraudulent or wrongful trading, or on the permissible interpretation of an enactment or contract,

or for the purposes of common law or equitable principles against fraud or oppression or relating to agency, it is necessary to look at what has happened in fact rather in form.

Lord Cooke went on to suggest that in such cases the difference between the company and its shareholders remains absolute, but the consequences of that principle become unimportant in fact, because the statute, contract, or doctrine in question is wide enough to embrace the company and its shareholders.

Here there is no question concerning the interpretation of a statute or contract, and I have dealt with the issue of agency. The key question is whether there is some other principle of the law which enables Mr. Yamvrias to be treated as if he were a party to the contract by reason of his conduct in siphoning money from Rendsburg's account into Ladidi's account in order to prevent that money being available to meet Yukong's claims.

Before considering that issue further, it is necessary to refer to the doctrine also relied upon by Yukong that the Courts will pierce the corporate veil where the corporate structure is merely a device, façade or sham. That was part of the reasoning of the Court of Appeal in *Salomon's* case, which led to Lord Halsbury's riposte at [1897] A.C. 22 at p. 33:

> My Lords, the learned judges appear to me not to have been absolutely certain in their own minds whether to treat the company as a real thing or not. If it was a real thing; if it had a legal existence, and if consequently the law attributed to it certain rights and liabilities in its constitution as a company, it appears to me to follow as a consequence, that it is impossible to deny the validity of the transactions into which it has entered.

However, it has been recognized in subsequent cases, including the decision of the House of Lords in *Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159 at p. 161 that it is appropriate to pierce the corporate veil where special circumstances exist indicating that it is a mere façade concealing the true facts.

Certain authorities in this area were considered by the Court of Appeal in *Adams v. Cape Industries Plc.*, where the Court concluded at [1990] Ch. 433 at p. 543, that the authorities left rather sparse guidance as to the principles which should guide the Court in determining whether or not the arrangements of a corporate group involve a façade.

Lord Justice Diplock, considered the legal concept involved in describing a transaction as a "sham" in *Snook v. London and West Riding Investments Ltd.*, [1967] 2 Q.B. 786 at p. 802:

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 330 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

As regards the contention of the plaintiff that the transactions between himself, Auto Finance and the defendants were a "sham", it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. But one thing, I think, is clear in legal principle, morality and the authorities (see *Yorkshire Railway Wagon Co v. Maclure* (1882) 21 Ch. D. 309 and *Stoneleigh Finance Limited v. Phillips* [1965] 2 Q.B. 537), that for acts or documents to be a "sham", with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating.

The word "sham" has perhaps not always been used in that clear sense. In *Gilford Motor Co. Ltd. v. Horne*, [1933] Ch. 935 the plaintiff company employed Mr. Horne as its managing director under a contract containing a post-contract non-solicitation clause. At the end of his contract, Mr. Horne set up a company, J. M. Horne and Co. Ltd., to carry on a competing business. An injunction was granted against Mr. Horne and the company. In the Court of Appeal Lord Hanworth, M.R. said, at pp. 961-962, that the company was a mere cloak or sham, a mere device for enabling Mr. Horne to breach his contract, and that accordingly an injunction should be issued against both defendants.

It was plainly necessary to determine whether, on the proper construction of the contract, the acts of the company put Mr. Horne in breach of his obligations. In order to give commercial efficacy to the relevant clause, consistent with the way in which it would have been understood by reasonable businessmen, it was necessary to construe it as wide enough to encompass the activities of a company set up for the sole purpose of attempting to defeat the contractual restrictions which Mr. Horne had accepted. If an injunction lay against Mr. Horne, it was proper that an injunction should lie also against the company which was knowingly assisting him. The granting of an injunction against the company was necessary because the company was (as Lord Hanworth affirmed at p. 955) a separate entity from Mr. Horne.

That case was followed in *Jones v. Lipman*, [1962] 1 W.L.R. 832, where a vendor of land attempted to avoid being compelled to convey the land to the purchaser by forming a limited company and conveying the land to the company. Mr. Justice Russell, citing *Gilford Motor Co. Ltd. v. Horne*, ordered specific performance against both the vendor and the company. Lord Cooke in his Hamlyn lecture, at p. 17, made the following comment about the decision:

> Since the company was in the vendor's control, there was no difficulty in granting a decree of specific performance against him. Describing the company as a creation of the vendor, a device, sham and mask, the judge also decreed specific performance directly against it. Those epithets, however, do not appear to have been needed to justify the remedy. No particular difficulty should arise in holding that a company or any other purchaser acquiring property with actual notice that the transaction is a fraud on a prior purchaser takes subject to the latter's equity. In truth the very granting of the remedy against the company brings out that it was not a sham.

Whether the "sham" doctrine in this branch of the law applies in the strict sense identified by Lord Justice Diplock in *Snook's* case, or whether it applies in some more extended sense which has so far eluded precise definition, the charter-party cannot in my judgment be said to have been a sham. The arrangement which it recorded was that which Mr. Yamvrias intended, and the charter-party was not entered into with a view to defeating any pre-existing contractual obligation.

So I return to the question whether there is a doctrine which entitles Yukong to say that Mr. Yamvrias should be treated as if he were a party to the charter-party because of his subsequent conduct in causing Rendsburg to pay moneys to Ladidi with a view to preventing such moneys from being available to meet Yukong's claim.

If there is such a doctrine, there is no particular reason why it should be confined to cases involving limited companies. It not infrequently happens, for example, that a married man who owes substantial legal liabilities may transfer assets to his wife in order to shelter them from his creditor or creditors.

The present case differs from *Jones v. Lipman* and *Gilford Motor Co. v. Horne*, where equitable relief was granted against the company being used to perpetrate a continuing breach of contract by its controller, of which the company had full knowledge. If either Mr. Horne's wife or Mr. Lipman's wife (assuming their existence) had agreed to act in a similar role to that of company, no doubt similar equitable relief would have been granted against the lady concerned. *Salomon's* case would have been irrelevant. In the same way, the fact that the company had separate legal personality was no bar

Case 1:03-md-01570-GBD-SN   Document 415-22   Filed 08/30/04   Page 11 of 16

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 331 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

to the Court granting relief against it as well as the contract breaker. That is quite different from awarding damages against it for some antecedent breach of duty by the contracting party (for example, some breach by Mr. Horne of his employment contract prior to its termination or some misrepresentation by Mr. Lipman in answers to enquiries before contract) on the basis that the company was to be put in the shoes of the contract breaker. Mr. Gross submitted that this was the logical result of such cases and was sound in principle. I do not agree. I do not see why in logic or in principle the company should have been liable for damages in such a situation, any more than Mrs. Lipman, if the land had been conveyed to her, should thereby have become liable for any and every breach by Mr. Lipman of his contract with Mr. Jones. I do not therefore regard those cases as establishing a principle enabling Mr. Yamvrias to be treated as the charterer and so liable to Yukong for damages for wrongful repudiation of the charter-party.

Mr. Gross also relied on *Creasey v. Breachwood Motors Ltd.*, [1993] B.C.L.C. 480 and *The Tjaskemolen*, [1997] 2 Lloyd's Rep. 465 in support of the proposition that when it can be established that assets have been deliberately transferred out of a company by its alter ego to his own use in order to defeat potential claims against the company, the Court may pierce the corporate veil and treat him as liable for the liabilities of the company.

In *Creasey's* case the plaintiff worked as general manager for a company known as Welwyn. The shareholders and directors of the company F. and S. Welwyn carried on a garage business in Welwyn Garden City. F. and S. were also the shareholders and directors of another company, Motors, which carried on similar business elsewhere. Mr. Creasey was summarily dismissed by Welwyn and brought an action against it for damages for wrongful dismissal. While the action was pending F. and S. informally transferred Welwyn's business to Motors, and Welwyn ceased trading. Motors paid all Welwyn's liabilities, except in relation to the plaintiff. The plaintiff's action proceeded, but Welwyn took no further part in defending it and its defence was struck out for failure to give particulars. Judgment was entered for the plaintiff for damages to be assessed. Subsequently Welwyn was stuck off the register and dissolved. The plaintiff then applied for an order that Motors be substituted for Welwyn as defendant under the Court's inherent jurisdiction and under O. 15, r. 7(2) (which applies where the interest or liability of a party is assigned or transmitted to or devolves upon some other person). The master made the order sought and his decision was upheld on appeal by Mr. Richard Southwell, Q.C., sitting as a Deputy High Court Judge.

The Judge held, at pp. 492-493, that since the transfer of assets from Welwyn to Motors would otherwise enable the Breachwood group owned by F. and S. to evade responsibility for the contingent liability to the plaintiff for breach of his contract of employment, the Court was justified in lifting the veil and treating Motors as liable for the remaining liability of Welwyn. In reaching that conclusion he said that the most important factor in the case was that F. and S., and through them Motors, deliberately ignored the separate corporate personalities of Welwyn and Motors, and that there was no justification for their conduct in deliberately shifting Welwyn's assets and business into Motors in disregard of their duties as directors and shareholders, not least the duties created by Parliament as a protection to all creditors of a company. Instead of Welwyn being put into liquidation in an orderly fashion, its assets were transferred to Motors informally in such a way as to leave the plaintiff facing a defendant without assets. The Judge said that it would be wrong to conclude on the affidavit evidence before him that F. and S. intended to defeat the plaintiff's claim, but he held, at p. 496, that Welwyn's liability to the plaintiff devolved onto Motors on the transfer of the business. Accordingly, it was not necessary for Welwyn to be restored to the register.

It seems to me, with respect, that under the relevant order and on the facts, the same result might possibly have been arrived at on the basis that there was a genuine intention on the part of F. and S. that the entirety of Welwyn's business (assets and liabilities) should be taken over by Motors, and that the plaintiff assented to this so far as concerned him by making his application under the order. But that does not seem to have been the way in which the matter was argued, although the fact that there was an entire transfer of the business clearly weighed heavily with the Judge.

Mr. Hamilton, Q.C. attacked the Judge's reasoning. I do not think it necessary to express a view on that, because it seems to me that the present case is clearly different. Here there was no such purported transfer of undertaking. Yukong's claim is for damages for breach of the charter-party amounting to U.S.$2,716,000. The amount transferred from Rendsburg to Ladidi was U.S.$245,000. It would seem strange that, without there being any purported general transfer of rights and liabilities under the charter-party, the payment of U.S.$245,000 by Rendsburg to Ladidi at the time of its repudiation should lead to the conclusion that Mr. Yamvrias should retrospectively be treated as having been a party to the charter-party, with a consequent liability according to Yukong of U.S.$2,716,000.

Mr. Gross submitted that this point went only to the measure of relief and, by an amendment made

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 332 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

at the trial, Yukong claimed in the alternative that Mr. Yamvrias should be treated as party to the charter-party to the extent of being held liable for the sums transferred from Rendsburg's account. But as Mr. Gross rightly submitted in argument, if Mr. Yamvrias is to be treated in law as a party to the charter-party entered into by Rendsburg, there is no logical basis for restricting the damages recoverable by Yukong from Mr. Yamvrias for its breach.

In *The Tjaskmolen*, [1997] 2 Lloyd's Rep. 465 the defendant company applied to discharge or reduce the amount of security provided to procure the release of a vessel from arrest on the ground that at the time of the issue of the writ the defendant was not the beneficial owner of the vessel, having previously sold it to another company within the same group. The plaintiff contended that the supposed sale was not a bona fide transaction for valuable consideration. Mr. Justice Clarke accepted that submission. He found in particular, at p. 474, col. 1, that it was never intended that the supposed buyer should pay a full price to the supposed seller, and he concluded that the alleged agreement was a sham or façade which did not have the effect of divesting the defendant of beneficial ownership of the vessel. Referring to *Creasey*, the Judge said at p. 471, col. 1:

> That case is thus an example of piercing the veil where assets are deliberately transferred from A to B in the knowledge that to do so will defeat a creditor's claim or potential claim, even if that has not proved to be the purpose of doing so. The Judge in that case would have regarded the case as even stronger if the purpose of the transaction was to defeat the creditor's claim. I agree with the reasoning in *Creasey*.
>
> The cases have not worked out what is meant by "piercing the veil". It may not always mean the same thing. But in the present context the cases seem to me to show that, where the alleged transfer is a sham or a façade, it will not have the effect of transferring the beneficial ownership of the transferor in the vessel concerned.

The present case is again different. It is one thing to hold a purported transfer to be ineffective, and another to hold the would-be transferee liable to the plaintiff in damages for the antecedent wrongs of the would-be transferor.

I am not persuaded on the authorities or as a matter of principle that the transfer of funds by Rendsburg to Ladidi on the repudiation of the charter-party, for the purpose of putting them beyond the reach of Yukong, entitles the Court to treat Mr. Yamvrias retrospectively as a party to the charter-party and therefore liable in damages for Rendsburg's repudiation of it.

*Conspiracy*

Yukong's claim for conspiracy relates to the transfer of U.S.$245,000 from Rendsburg's account. Its case is that it was injured by an unlawful combination of Rendsburg, Ladidi and Mr. Yamvrias. It alleges both that the predominant purpose of the conspiracy was to injure it without just cause, and that the conspiracy involved unlawful means, namely breach of Mr. Yamvrias' fiduciary duty to Rendsburg. Yukong therefore relies on both forms of conspiracy recognized by the House of Lords in *Lonrho Plc. v. Fayed*, [1992] 1 A.C. 448.

As to an unlawful purpose conspiracy, it seems to me that the predominant purpose of Mr. Yamvrias was to forward his own interest by sheltering or using Rendsburg's assets for his own benefit.

As to an unlawful means conspiracy, Mr. Yamvrias undoubtedly owed a fiduciary duty to Rendsburg. Although he was not formally a director, he was a "shadow director" and controlled the company's activities. To remove the funds in Rendsburg's bank account when it had a probable liability to Yukong far in excess of its assets involved a clear breach of that fiduciary duty: *West Mercia Safetywear Ltd. v. Dodd*, [1988] 4 B.C.C. 30. No argument was advanced that the position is different in Liberian law from English law, and indeed an agreed expert's report stated that in Liberian law a person who assumes to act in the position of a director of a corporation has a fiduciary duty towards it.

The critical questions are whether Mr. Yamvrias' breach of duty was actionable at the suit of Yukong and, if not, whether the unlawful act relied upon for the purpose of conspiracy requires to be actionable at the suit of the plaintiff.

In *West Mercia Safetywear Ltd. v. Dodd* Lord Justice Dillon, cited with approval, at p. 33, the following statement of principle by Street, C.J. in *Kinsella v. Russell Kinsella Pty. Ltd.*, [1986] 4 A.C.L.C. 215 at p. 221:

> In a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of directors arise. If, as general body they authorise or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude. They become *prospectively entitled, through the mechanism of liquidation,* to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, *through the medium of the company,* are under the management of the directors pending

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 333 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

either liquidation, return to solvency, or imposition of some alternative administration. [Emphasis added.]

Lord Justice Dillon continued:

Prima facie the relief to be granted when money of the company has been misapplied by a director for his own ends is an order that he repay that money with interest, as in *Re Washington Diamond Mining Co.* The section in question, however, section 333 of the Companies Act 1948, provides that the court may order the delinquent director to repay or restore the money, with interest at such rate as the court thinks fit, or to contribute such sum to the assets of the company by way of compensation in respect of the misapplication as the court thinks fit. The court has a discretion over the matter of relief, and it is permissible for the delinquent director to submit that the wind should be tempered, because for instance, full repayment would produce a windfall to third parties, or, alternatively, because it would involve money going round in a circle or passing through the hands of someone else whose position is equally tainted.

The relevant provisions are now contained in s. 212 of the Insolvency Act, 1986.

Where a director, or person having the management, of an insolvent company acts in breach of his duty to the company by causing assets of the company to be transferred in disregard of the interests of its creditor or creditors, under English law he is answerable through the scheme which Parliament has provided. In my judgment he does not owe a direct fiduciary duty towards an individual creditor, nor is an individual creditor entitled to sue for breach of the fiduciary duty owed by the director to the company.

There remains the question whether, in an unlawful act conspiracy, the unlawful act relied upon must be actionable at the suit of the plaintiff.

In *Generale Bank Nederland N.V. v. Export Credits Guarantee Department*, [1998] 1 Lloyd's Rep. 19 Lord Justice Stuart-Smith took it that the law does so require, citing Clarke and Lindsell on Torts, 17th ed., pars. 23-80, *Marrinan v. Vibart*, [1963] 1 Q.B. 528, and *Lonrho Plc. v. Shell Petroleum Co. Ltd.*, [1982] A.C. 173 at p. 186 per Lord Diplock. The passage was strictly obiter and proceeded on a concession, but it is nevertheless of persuasive authority.

In *Lonrho v. Shell* there were assumed unlawful acts (breaches of a sanctions order made under the Southern Rhodesia Act, 1965), and the first issue which arose for decision by the House of Lords was whether an action might lie at the suit of the plaintiff for damage caused to it by such criminal acts. It was held that it would not.

The next question was whether an action might nevertheless lie for conspiracy. The answer was only if injury to the plaintiff, and not the self-interest of the defendants, was the predominant purpose of the agreement in execution of which the damage-causing acts were done.

Lord Diplock posed the question at p. 188:

Why should an act which causes economic loss to A but is not actionable at his suit if done by B alone become actionable because B did it pursuant to an agreement between B and C?

He did not find a satisfactory answer to that question from the authorities, but concluded that the civil tort of conspiracy to injure the plaintiff's commercial interests, where that was the predominant purpose of the agreement, was too well-established to be discarded, however anomalous it might seem. However, the House of Lords was against extending the tort beyond its established boundaries. In considering what its established boundaries were, Lord Diplock observed at p. 189:

My Lords, in none of the judgments in decided cases in civil action for damages for conspiracy does it appear that the mind of the author of the judgment was directed to a case where the damage-causing acts, although neither done for the purpose of injuring the plaintiff nor actionable *at his suit* if they had been done by one person alone, were nevertheless a contravention of some penal law. (Emphasis added.)

It seems to me inherent in Lord Diplock's approach that unless the act which caused economic loss to A would be actionable at his suit if done by B alone, it could only become actionable if done pursuant to an agreement between B and C where the dominant purpose of that agreement was to injure A.

Mr. Gross submitted that this was not the law. He submitted that an act causing economic loss to A, which, if done by B alone, would not be actionable at the suit of A but would be actionable at the suit of X, became actionable at the suit of A if done pursuant to an agreement between B and C (whether or not injury to A was the dominant purpose of that agreement). In other words, although Mr. Yamvrias' breach of fiduciary duty towards Rendsburg would, if committed alone, not have been actionable by Yukong (but only by Rendsburg), it became actionable by Yukong because Mr. Yamvrias acted in concert with Ladidi, without the necessity to establish a predominant intention to injure.

That seems to me inconsistent with Lord Diplock's reasoning, and I cannot see in principle why it should make any difference to Yukong's right of action whether or not Mr. Yamvrias' act, if done by

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 334 |
|---|---|---|
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

him alone, would have been actionable at the suit of somebody else.

Mr. Gross relied in support of his submission on *Lonrho Plc. v. Fayed*, [1992] 1 A.C. 448. In that case the plaintiffs advanced various causes of action against the defendants, including the tort of interference with business by unlawful means and the tort of conspiracy. The defendants applied to strike out all the claims. In relation to the claim in conspiracy, they argued that it could not be sustained in the absence of a plea of predominant intention to injure. The House of Lords rejected that argument, holding that it was based on a mistaken interpretation of Lord Diplock's speech in *Lonrho v. Shell*. A predominant intention to injure was not required to be proved in an unlawful means conspiracy, and Lord Diplock had not suggested otherwise.

It is important to note that in that case the wrongful acts which were alleged to form the basis of the conspiracy were also alleged to give rise to the action for wrongful interference with business, and were therefore allegedly actionable at the plaintiff's suit whether committed in combination or not.

This point is relevant to the way in which the case was decided. For, after citing certain passages from Lord Diplock's speech in *Lonrho v. Shell*, and rejecting the submission that Lord Diplock had intended to lay down a rule of law that the tort of conspiracy to injure required proof in every case not merely of an intention to injure the plaintiff but also that injury to the plaintiff was the predominant purpose of the conspiracy, Lord Bridge said at pp. 468-469:

> It follows from this conclusion that Lonrho's acceptance that the pleaded intention on the part of the appellants to cause injury to Lonrho was not the predominant purpose of their alleged unlawful action is not necessarily fatal to the pleaded cause of action in conspiracy and therefore affords no separate ground for striking out that part of the pleading. If the appellants fail to establish that Lonrho's primary pleading asserting the tort of interference with business by unlawful means should be struck out, they are in no stronger position in relation to the pleaded cause of action in conspiracy. It is not, I think, necessary for present purposes to consider whether the pleaded conspiracy adds anything of substance or raises any significantly different issues from those on which the rest of the pleading depends. At this interlocutory stage it is sufficient to say that the two pleaded causes of action must stand or fall together. Either both should be struck out or both should go to trial.

The House of Lords was not addressing a situation in which a plaintiff was seeking to advance a case of conspiracy based on an act not actionable at the plaintiff's suit if done by one defendant alone, and I do not consider that the decision assists Yukong.

I conclude that the law on this point is, as stated by Lord Justice Stuart-Smith, in *Generale Bank Nederland N.V. v. Export Credits Guarantee Department*, that in an unlawful act of conspiracy the unlawful act relied upon must be actionable at the suit of the plaintiff.

*Damages*

There was an issue on quantum. Put shortly, the question was whether, at the time of the wrongful repudiation of the charter-party, there was an available market in which Yukong could have entered into a replacement three year charter-party at a daily rate of not less than U.S.$13,000. Having heard expert evidence on both sides, I am not satisfied that there was. A three year charter-party would have been a rarity, particularly in the state of the market which caused Rendsburg to repudiate its contract with Yukong. I am not persuaded that a three year charter-party would have been available at the price suggested by the expert called on behalf of Mr. Yamvrias (for which there was a singular absence of contemporary evidence) or at a price which would have been considered commercially reasonable. Yukong acted reasonably in the circumstances in which it found itself, and if it were entitled to damages against Mr. Yamvrias for breach of the charter-party, I would have found in its favour on the disputed quantum issue.

*Conclusion*

It follows from the reasons which I have given that in my conclusion Yukong is not entitled to the forms of relief claimed against Mr. Yamvrias. I said earlier in this judgment that I agreed with Mr. Gross' comment that the law would be open to reproach if it provided no remedy where there was sharp practice by Mr. Yamvrias in moving funds from Rendsburg's account for the purpose of putting them beyond Yukong's reach. On my findings of fact and the evidence which I have heard, Mr. Yamvrias would have no answer to proceedings by a liquidator of Rendsburg for breach of fiduciary duty, if the funds which he moved from Rendsburg's account have been effectively put beyond the company's reach.

Mr. Hamilton suggested in his submissions that it was also open to a creditor in Yukong's position to protect itself by applying for *Mareva* relief, provided that he acted in time. This suggestion would be somewhat rich in circumstances where Mr. Yamvrias set about transferring the funds on the same day as the repudiation of the charter-party, if it is to be taken that he did so effectively. But since Mr. Yamvrias had effective control over Rendsburg, he would presumably have been in a position on

| [1998] Vol. 1 | LLOYD'S LAW REPORTS | 335 |
| Q.B. (Com. Ct.) | The "Rialto" | TOULSON, J. |

behalf of the company to get back from himself that which he had caused to be paid for his benefit. It might in an appropriate case be within the scope of the Court's *Mareva* jurisdiction to require a company, and its only effective officer, to do just that; but that has not been the subject of argument.

**Mr. Justice TOULSON** delivered the following judgment on Oct. 1, 1997: In the last paragraph of my judgment I referred to the possibility of an order being made under the Court's *Mareva* jurisdiction requiring Rendsburg to recover the U.S.$245,000 paid over by it to Ladidi in order to put those funds beyond the Court's reach, and an order against Mr. Yamvrias compelling him to cause the company to do so. Not altogether surprisingly, Yukong now applies for such an order.

The form of relief sought by its summons is that the *Mareva* order dated Feb. 2, 1996 made by Mr. Justice Colman be varied so that Rendsburg, by Mr. Yamvrias, do restore to Rendsburg at a specially designated bank account by a specified date the sum of U.S.$245,614.29, or alternatively U.S.$164,799, removed from Rendsburg's bank account in London in January, 1996. It will be recalled from the judgment that the difference between those two sums was this: the U.S.$245,000 was the amount paid out of Rendsburg's account on the repudiation of the charter-party. That money went into Ladidi's account. The U.S.$164,000 was paid out of Ladidi's account after a *Mareva* order had been made.

I will state my starting point in blunt terms. Rendsburg and its controller, Mr. Yamvrias, carried out an exercise to try to make itself judgment-proof. I think that it is right that the Court should do all that lies legitimately within its power to see that the exercise does not work. If there is a choice of routes to that end, in principle that route should be preferred which would involve the least merry-go-round. But in the desire to achieve the speediest and least costly solution, I must be careful not to exceed the Court's powers or to act unfairly.

The Court's powers derive from s. 37 of the Supreme Court Act, 1981, under which the Court may grant an injunction or appoint a receiver in all cases in which it appears to the Court to be just and convenient to do so.

The jurisdiction of the Court in *Mareva* matters is wide, as appears from various authorities to which I have been referred, in particular *Derby & Co. Ltd. v. Weldon (No. 6)*, [1990] 1 W.L.R. 1139 (see especially Lord Justice Dillon's observations at p. 1151), *T.S.B. Private Bank International S.A. v. Chabra and Another*, [1992] 1 W.L.R. 231 and *Mercantile Group (Europe) A.G. v. Aiyela and Others*, [1994] Q.B. 366.

It is logical and just that if a Court has jurisdiction to prohibit a party from acting in a way intended to make itself judgment-proof, so the Court should be able to order that party to undo measures taken with that object. Obviously, the exercise of that power calls for caution. For one thing, other parties may be affected. Furthermore, remembering that the sanction for breach of a mandatory order is punishment for contempt, the Court should not make a mandatory order where a party is not able to carry it out, although, of course, that does not mean that the Court is obliged to accept a party's assertion of inability to comply with an order. The Courts are often met by parties saying that they cannot do things which, when they have to do them, they do.

When an order is made against a company which is a party to an action, the Court also has jurisdiction to make an order against an officer of a company, if that is necessary in order to secure compliance with the order by the company. In the present case, therefore, I am satisfied that I have the jurisdiction to make the order sought, and indeed, Mr. Hamilton, Q.C. has not submitted otherwise. His argument is that the course proposed would be inappropriate for a number of reasons. He submits that the proper course would be that the existing *Mareva* order against Mr. Yamvrias should be discharged and an inquiry directed as to loss suffered by Mr. Yamvrias if, on consideration of advice, Mr. Yamvrias decides to make such an application. The plaintiff, Yukong, would then be free to sign judgment against Rendsburg and set about enforcing its judgment in the usual way, including applying in the Companies Court to have the company wound up. The liquidator would then be able to pursue the company's rights against Mr. Yamvrias. That is certainly a possible route. It is also likely to be the slowest, and possibly the least effective, route available.

Mr. Hamilton advances a number of objections to the route proposed by Mr. Gross, Q.C. Firstly, he submits that the application is premature, because Yukong has not yet signed judgment against Rendsburg and would prefer not to do so pending a decision whether or not to appeal against my dismissal of its claim against Mr. Yamvrias. There is some difference of understanding between the parties represented today whether Rendsburg was notified of the recent trial. I do not think that this is crucial, because it is not in dispute that Yukong could sign judgment immediately against Rendsburg for damages to be assessed and that the damages must on any view exceed U.S.$245,000. Mr. Hamilton's point was that, while Yukong is making up its mind whether to sign judgment against Rendsburg, it should not obtain this order. Yukong is, of course, entirely free to appeal against

the dismissal of its claim against Mr. Yamvrias, but, he submits, the only basis of the relief claimed in this summons is that Rendsburg is liable to Yukong, and has divested itself of funds in order to defeat enforcement of that liability. He submits that it would therefore be inappropriate to make an order for immediate repayment of the funds paid away, if Yukong intends to let the action against Rendsburg remain on ice for the next year or more while it pursues a possible claim against Mr. Yamvrias.

In my view, there is much force in that, but I do not agree that the summons should on that count be dismissed as premature. I think that the correct answer is to require an undertaking by Yukong that it will sign judgment against Rendsburg within 48 hours after compliance with the order, that is, after payment of the money directed. I put it in that way because I can see possible unfairness to Yukong if it were forced to sign a judgment against Rendsburg as a pre-condition of an order which was then breached.

It is next said that Yukong has not been properly served with notice of this application, which should not be made ex parte. The reason for the matter being listed today is that I gave judgment a week ago today and will be on circuit from tomorrow. Bearing in mind my findings about Mr. Yamvrias' control of Rendsburg, I have to say that I do not see a great deal of merit in this point, but in any event, it would be open to Rendsburg to apply to set aside on an inter partes hearing an order which it is agreed would as against Rendsburg be an ex parte order. It follows also that Mr. Yamvrias should have liberty to apply to set aside such an order during the same period as that course remains open to Rendsburg.

Mr. Hamilton next argued that Yukong has failed to serve evidence, as it ought, to demonstrate that Mr. Yamvrias has the means to comply with such an order. Had that been done, Mr. Yamvrias would have had the opportunity to reply. The matter should therefore be stood over for evidence to be served. There is, in Mr. Hamilton's submission, no need for these matters to be rushed. It is understandable that Yukong should have wanted this matter to be disposed of by the trial Judge while still available shortly after conclusion of the trial. It would, of course, be wrong to make an order, breach of which would be contempt, if in truth Mr. Yamvrias is not able to comply with it. That may not be a matter purely of his personal means in the narrowest sense. Parties in the Commercial Court not infrequently include some who are able to depose to a complete absence of personal means, and yet somehow are able to control a flow of money when required. Mr. Yamvrias has been able to be represented throughout the trial by solicitors and leading and junior Counsel. Mr. Gross submits that there is no reason to suppose

that Mr. Yamvrias could not see to it that the funds in question are returned to Rendsburg. Mr. Yamvrias lives in this country. He has not sought to put before the Court any evidence of means on this occasion, although admittedly time has been short. I think it is just that he should have a further opportunity to do so, but this does not mean that no order should today be made.

Mr. Hamilton further submitted that any order should be limited to the sum of U.S.$164,000 moved out of Ladidi after the *Mareva* order had been made. If this were a contempt application, it would have to be limited to that sum, but since it is an application to reverse payments made in order to render Rendsburg judgment-proof, I do not see why the order should be limited to the lesser sum.

I will listen to any further arguments as to the precise form of wording, but I propose, subject to Yukong giving the undertaking to which I referred, to make an order that Rendsburg, by Mr. Yamvrias, cause the sum of U.S.$245,614 to be paid into an account to be specified within 28 days unless within that period Rendsburg or Mr. Yamvrias apply to vary or set aside this order. I will hear Counsel about the appropriate means of service of this order on Rendsburg.

Mr. Hamilton has referred to this as a swift remedy. I do not regard that as a fault. On the contrary, if money has been paid out in order to defeat in advance an anticipated order of the Court, it seems to me salutary that a swift remedy should be available against the party concerned and anyone knowingly instrumental in causing that to be done.

Finally, there is the matter of the *Mareva* order against Mr. Yamvrias and his possible application for an inquiry as to damages against Yukong. As to the injunction itself, I have not heard argument about this, but as presently advised, it seems to me that if a Court had known the full facts now known at the time the original order was made, a *Mareva* order would have been made against Mr. Yamvrias in the sum of U.S.$245,000 as relief ancillary to Yukong's claim against Rendsburg, and that accordingly such an order should remain in force until repayment of that sum into the designated account or further order.

As to any possible application by Mr. Yamvrias for damages, either on the basis that, contrary to the view just expressed, no *Mareva* order should have been made against him, or on the basis that he has suffered a loss through the amount specified in the order being too great, it seems to me that Mr. Yamvrias should be put on time for making such application as he may be advised, and that that period should be 28 days.