# Exhibit 14

# Ord and another v Belhaven Pubs Ltd

COURT OF APPEAL, CIVIL DIVISION
HOBHOUSE AND BROOKE LJJ AND SIR JOHN BALCOMBE
12, 13 FEBRUARY 1998

*Action – Change of party – Substitution of parent company for subsidiary as defendant – Restructuring of company because of property losses – Plaintiffs bringing action against subsidiary from which they had leased public house – Subsidiary's assets transferred at book value to other companies in group as part of normal restructuring – Whether plaintiffs entitled to substitute parent company as defendant – RSC Ord 15, r 7(2).*

In 1991 the plaintiffs issued a writ against the defendant company, the legal owners of a public house, claiming, inter alia, damages for misrepresentation and breach of warranty arising out of the purchase of a 20 year lease of the public house by the plaintiffs from the defendant company. The amount of damages claimed was put at £387,750. The defendant counterclaimed for unpaid rent which the plaintiffs had refused to pay. The defendant company was a subsidiary and part of a group of companies which dealt with properties, especially hotels and public houses and in 1992, as the result of a severe recession in the property market, the group was restructured in such a way that the hotels in the defendant's name were transferred to the parent company. Thereafter the defendant effectively ceased trading although it continued to be the legal owner of the public house leased to the plaintiffs who, in 1997, applied under RSC Ord 15, r 7(2) for leave to substitute as defendants in the action the parent company and another subsidiary which had taken over the defendant's trading operations as part of the corporate restructuring, on the grounds that the defendant had become a mere shell with insufficient assets to pay any damages that might be awarded to the plaintiffs. The deputy judge ordered that the parent company be substituted as the defendant to the action. The defendant appealed to the Court of Appeal.

**Held** – The appeal would be allowed for the following reasons:
(1) Although the discretion potential conferred on the court under RSC Ord 15, r 7(2) to order the substitution of a party in order to ensure that all matters in dispute were effectually and completely determined and adjudicated upon was very wide and could be exercised both before and after judgment, the rule for substituting a defendant was merely a consequential provision for dealing with a situation which had already arisen, such as devolution or succession, and an application under the rule could only be made as a consequence of an event which had already occurred. The rule did not give rise to a right to create a situation which could then be relied on by the plaintiff or other party as grounds for substitution, especially if the effect of the proposed substitution was to assert a new cause of action against the new substituted party. The plaintiffs, having dealt with the defendant company, wished by their application to substitute the company's

shareholders as defendants in order to assert a liability of the shareholders which was properly characterised as a new cause of action when the company itself was and remained the proper party to be sued and was and remained liable if the plaintiffs were successful. In those circumstances it was not appropriate to make an order for substitution under RSC Ord 15, r 7(2).

(2) In the absence of any impropriety, sham or concealment in the restructuring of the group it would be wrong to lift the corporate veil in order to make the shareholders of the defendant company liable instead of the company itself. The restructuring was a normal attempt to rationalise the group's operating structure in the light of the collapse in the property market in 1992 after the plaintiffs' writ had been issued and had not been undertaken in order to evade any liability towards the plaintiffs. Nor was it appropriate to treat the group as a single economic unit by disregarding the separate and distinct legal entities involved as the restructuring was not a mere façade concealing the true facts. *Creasy v Breachwood Motors Ltd* [1993] BCLC 480 disapproved.

Cases referred to in judgment
*Adams v Cape Industries plc* [1990] BCLC 479, [1991] 1 All ER 929, [1990] Ch 433, CA.
*Bank of Tokyo Ltd v Karoon* [1986] 3 All ER 468, [1987] 1 AC 45, CA.
*Choko Star, The* [1996] 1 All ER 114, [1996] 1 WLR 774.
*Creasey v Breachwood Motors Ltd* [1993] BCLC 480.
*DHN Ltd v Tower Hamlets LBC* [1976] 3 All ER 462, [1976] 1 WLR 852.
*Mercer Alloys Corp v Rolls Royce Ltd* [1972] 1 All ER 211, [1971] 1 WLR 1520, CA.
*Salomon v A Salomon & Co Ltd* [1897] AC 22, HL.
*Wallersteiner v Moir* [1974] 3 All ER 217, [1974] 1 WLR 991, CA.
*Woolfson v Strathclyde Regional Council* [1978] SLT 159, HL.
*Yorkshire Regional Health Authority v Fairclough Building Ltd* [1996] 1 All ER 519, [1996] 1 WLR 210, CA.

Appeal
The defendants, Belhaven Pubs Ltd, appealed against the decision of Judge Alton sitting as a deputy judge of the High Court on 25 July 1997 whereby on the hearing of a summons issued by the plaintiffs, Mr and Mrs Ord, the deputy judge ordered that the plaintiffs be granted leave to substitute Ascot Holdings plc as the defendant in action brought by the plaintiffs against Belhaven Pubs Ltd claiming damages for misrepresentation and breach of warranty. The facts are set out in the judgment of the court.

*John Brisby QC* and *Barry Stancombe* (instructed by *Belmont Hodgson*) for the defendants.
*Michael Ashe QC* and *Richard Wilson* (instructed by *Wilson Browne*, Northampton) for the plaintiffs.

**HOBHOUSE LJ.** The writ in this action was issued on 12 April 1991. It made a claim by Mr and Mrs Ord (the plaintiffs) against a company called Belhaven Pubs Ltd (the defendants). The defendants were, and it appears still are, the legal owners of a public house in Stanford called the Fox Inn. In 1989 the defendants were advertising a 20 year lease of the inn. Mr and Mrs Ord

responded to that advertisement and negotiations followed. The outcome was that they purchased the lease for approximately £31,000 on 10 May 1989. Thereafter they invested a sum of money and effort in making a going concern of running the pub.

However, they say that they found that what they had been told about the turnover and profitability of the pub was not correct. They say that there were serious misrepresentations made to them during the course of the negotiations, and indeed they even say that some of those representations were made fraudulently. They say that there were breaches of warranty. Therefore they claimed in a writ a number of remedies which included a claim for rescission of the contract to acquire the lease; they also claimed damages in tort and in contract. Those damages seem to have grown over the subsequent period and most recently they have been put (including both matters of income, capital account and accumulated interest) at £387,570, a substantial sum. The question of rescission is no longer in the forefront because they have and continue in possession of the public house.

They declined to pay rent. There was a counterclaim in the action by the defendants (who are their landlords) against the plaintiffs for a sum of rent, exclusive of interest, which is put at £82,271. Of course with interest it will be a considerably larger sum.

The action did not progress as rapidly as one would have hoped. There were certain difficulties on the plaintiff's side and an original trial date of November 1996 had, we are told, to be vacated because the court did not have time to hear the action at that time. Events were then overtaken by the issue of a summons on 28 February 1997 by the plaintiffs. It appears that it was simply addressed to the defendant and asked that the plaintiffs be granted leave to substitute Ascot Estates Ltd and/or Ascot Holdings plc for the present defendant. Alternatively they asked for security for costs of the counterclaim.

These matters seem to have arisen from their appreciation that the defendants no longer had substantial assets. The two companies that were referred to ('Holdings' and 'Estates' respectively) were, firstly the parent company of the defendants and another wholly owned subsidiary of the parent company, Holdings. Therefore, the substance of the application was for leave to substitute either a company which was in the same ownership as, or a company which was the shareholder of, the defendant company.

That summons came on for hearing before Judge Alton sitting as a deputy judge of the High Court. In August 1997 she ordered that the holding company be substituted for the defendant as a defendant to the claim. She contemplated that the defendant would still remain the counterclaiming party. She left it to the plaintiffs to make consequential amendments to the pleadings and the record. She delivered a reasoned judgment; she also gave leave to appeal to this court.

Pursuant to that leave the defendant has appealed against that order. It is probable that in fact the effective party appealing is the holding company rather than the defendant. Nothing arises on that. We have now to consider whether the judge's order was correct. It must be borne in mind that there is a new trial date fixed for 19 March 1998, and it is important that it should be settled who are the parties to this action.

The application was made under RSC Ord 15, r 7(2). Order 15 is a rule which deals with change of parties by reason of death, etc. As appears from the notes to *The Supreme Court Practice 1997*, its general content is to deal with formal changes in the constitution of parties as, typically, succession of a party by another entity.

Paragraph (2) reads:

'Where at any stage of the proceedings in any cause or matter the interest or liability of any party is assigned or transmitted to or devolves upon some other person, the Court may, if it thinks it necessary in order to ensure that all matters in dispute in the cause or matter may be effectually and completely determined and adjudicated upon, order that other person to be made a party to the cause or matter and the proceedings to be carried on as if he had been substituted for the first mentioned party.'

The discretion potential given by that rule within its terms is a wide one. It has been exercised both before and after a judgment. One example of it is the case of *Mercer Alloys Corp v Rolls Royce Ltd* [1972] 1 All ER 211, [1971] 1 WLR 1520 where, under a foreign legal system (the law of California) a company (the original party) had beome merged with its parent company and therefore an order was made that the parent company should be substituted for the subsidiary and the judgment should be enforceable against the parent company accordingly.

That is an example of an application of the law of succession and merger under a foreign legal system. There are other examples to be found in the books.

The peculiarity of this case is that the plaintiffs here do not rely upon any such principle. They acknowledge that the defendants were the right party to be sued originally. They appear to accept that they are still a party that they can sue now. Their complaint is that, if they carry on with this action against the defendants and they are successful in obtaining judgment (which of course has yet to be decided) then they will have difficulty in enforcing that judgment against the defendant. Therefore, they are saying they want to have the shareholder as the defendant so that they can have recourse to the assets, not of the company they have sued, but of that company's shareholder.

The events which they rely upon are not events which are germane to the time at which their cause of action arose and the time at which they dealt with the defendant company (they do not even relate to the time at which they issued the writ) -- they relate to matters which occurred later, namely in 1992 and 1995. What happened then was that the companies which are in the same group as the defendant and the defendant themselves, suffered serious losses through the collapse of the property market. The business of all the companies was in the property market. They apparently dealt in properties; they also ran hotels where the company asset was the hotels; and they ran public houses, where likewise the asset was these public houses. With the collapse in the property market, of course complete reassessment of the value of the assets of the companies had to be made and their ability to trade profitably was seriously affected.

One of the affidavits which the plaintiffs placed before the judge in support of their application was an affidavit sworn by Derek Arthur Parry, who was a member of the Institute of Chartered Accountants in England and Wales and in practice as an accountant. He referred to what had happened in the various years between 1992 and 1995. He had access to the accounts of the relevant companies which had been lodged or made available by the defendants' solicitors, and he was able to speak to the revaluations which had taken place as a result of the collapse in property values to which I have already referred. Thus he refers in his affidavit to the fact that in 1991 or 1992 there was a write-down in the value of the properties owned by the defendant of £9.9m and of those owned by Estates of £108.4m. Similarly in March, further substantial revaluation and write-downs were considered to be necessary, and these for the defendants were £7.8m and for Estates of £1.7m. These, of course, radically altered the balance sheets of these various companies, and the balance sheets indeed of the parent company.

Remedial action was required and elements of restructuring within the group occurred. Mr Parry says:

> 'With effect from 1 April 1992, as part of what appears to be a normal attempt to rationalise the group's operating structure, all of the group's UK hotel operations were transferred to [the defendants] and the public house estate operation was transferred to [Estates]. Consequently, there were substantial transfers of public house properties from [the defendants] to [Estates] and considerable transfers of hotel properties from [Estates] to [the defendants].'

He went on to observe that the accounts indicate that the respective interests were transferred between the companies at net book value. He also refers to what happened in 1995 when the hotels which were then owned by the defendants were transferred at book value to the company's parent company (Holdings) and thereafter the defendants ceased to trade. In fact, the consideration that was paid by the parent company to the defendants was very considerably in excess of the book value of the assets that were transferred. The balance sheet of the defendants had, from the time of the revaluations, shown a substantial deficit, and the effect of what was done in 1995 was not only to transfer an appropriate sum to the defendants to represent the value of the properties that were transferred by the defendants to its parent company, but also was sufficient to eliminate the negative balance on the defendants' balance sheet.

He comments (and I quote from para 20 of his affidavit):

> 'It appears that the transfers of the pubs and hotels between the different group companies were just a normal restructuring or refocusing of activities within the group in a way which groups do tend to do from time to time. I do not believe in itself that there was anything untoward with these arrangements. Certainly whatever happened to The Fox was as part of some larger exercise and was not something specific to that one pub. There is no indication that the directors were trying to be devious.'

He then added a sentence which was treated by the judge as being significant:

> 'There is however every indication that the group treated its subsidiary companies as though they were divisions of one large company rather than as individual legal entities.'

That basic information was also used in one of the other supporting affidavits, an affidavit sworn by Mr Brown, who was the solicitor acting for the plaintiff, to develop submissions. It must be recognised that in part what Mr Brown said was wrong. He did advance a case of transfer of liabilities which it is now recognised is not sustainable and was abandoned as I will shortly mention before the judge. He also made submissions (and I quote from para 16 of affidavit):

> 'The Defendant company . . . is simply a shell devoid of assets and not trading. [Of course he is there talking about the time when he wrote this affidavit.] Any judgment obtained against that company would be worthless to the Plaintiffs. Within the Ascot Group of companies, there have been various transfers of assets which have had the consequence of enabling the Ascot Group of companies to evade responsibility for the contingent liabilities to the Plaintiffs for misrepresentation and/or breach of warranty. It is submitted that [Estates] acquired the liabilities as well as the assets of the Defendant company and that the Plaintiffs should be able to pursue their remedies in law against [Estates]. Furthermore, it is clear that the companies in the Ascot Holding Group have acted as a single entity in transferring assets between various companies and that the court will be justified in lifting the corporate veil and treating Ascot Estates Limited and/or Ascot Holdings PLC as liable for the outstanding contingent liability to the Plaintiffs.
> 17. I ask the Honourable Court to grant an order pursuant to Order 15 Rule 7 and/or its inherent jurisdiction and should permit the Plaintiffs to substitute Ascot Estates Limited and Ascot Holdings PLC for the present Defendant . . .'

It can be commented again that in that paragraph he was relying upon the submission that Estates had acquired liabilities as well as assets, and that, as I say, was not a matter which can be sustained nor was it pursued. Likewise there was no evidence to support the statement by him that there was a transfer of assets which had had the consequence of enabling the Ascot group of companies to evade responsibility for contingent liabilities to the plaintiffs for misrepresentation and/or breach of warranty. That is a statement which Mr Brown should not in my judgment have made. The accounts which he exhibited to his affidavit did not support that conclusion, nor did the affidavit of Mr Parry.

The defendant company was in financial difficulties. None of the things that were done in 1992 and 1995 in any way exacerbated those difficulties; in fact, they relieved those difficulties; they did not adversely affect the balance sheet of the defendant company in any way that prejudiced the plaintiffs, nor, which could be said to amount to an attempt to evade responsibility for the contingent liabilities to the plaintiff. That case in that

respect simply was not made out and that is apparent from the accounts and from the affidavit of Mr Parry.

It is true that the accounts show that the defendant company was in financial difficulties. They do show that, following the revaluation of the properties, instead of having a surplus of assets over liabilities, the position had been reversed. It may be that, whilst they continued to trade they might have generated sufficient profits to enable them to pay sums to the plaintiffs as well as to the other persons to whom they owed money, but that would have been simply a trading decision. It would not have been as a result of any of the restructuring within the group to which the defendant company belonged.

The judge's reasoning is, in my judgment, not wholly consistent. I will do my best to give a fair explanation of it. At the outset of her judgment she said:

> 'The alternative arguments based upon assumption of the defendant's liabilities to the plaintiffs by another group company and the plaintiffs' application for security for costs are not pursued.'

She went through the facts. She referred to the financial difficulties in which the defendant company and the other companies found themselves. She accepted that it was right to proceed to deal with the application on the basis that the accounts were correct. She also said in her reasons:

> 'For the purposes of this application I shall assume that the transfers of the pubs and hotels between the different group companies were, at the time, treated as part of their normal re-structuring without there being any devious intent formed by any of those involved. I accept Mr Parry's evidence, however, that such organisation was effected without any regard as to where profits or losses arose or fell. Movements of both assets and liabilities were seemingly effected by the directors without consideration as to whether a particular transaction was or was not in the interests of the particular subsidiary or, more specifically, its creditors. The boundaries between the companies were not simply blurred but disregarded altogether.'

She then said:

> 'The question arises whether in these circumstances it is right or just to lift the corporate veil so as to permit substitution of Holdings or Estates for the defendant in this case.'

She pointed out that there was no presumption in favour of lifting the corporate veil, which may be regarded as an understatement. She then set out the real issue between the parties: whether, before the veil can be lifted, the court must be satisfied that a defendant acted pursuant to some improper or fraudulent motive creating or utilising a corporate façade as a sham or device to achieve something which it could not otherwise lawfully do.

She referred to *Creasey v Breachwood Motors Ltd* [1993] BCLC 480, a decision of Mr Richard Southwell QC sitting as a deputy judge of the High Court, which was very similar to the case with which she was concerned and in which he had made an order for substitution.

She then developed her view of the facts by saying:

> 'In this case there was not, as in *Creasey*, a blatant asset stripping of one subsidiary in favour of another for no consideration whatsoever. The transfers were, at least, accompanied by paper adjustments to the group's inter-company balances. It would plainly be wrong as a general rule, when considering applications of this nature, for a court to inquire too closely as to the precise adequacy of the consideration for any particular transfer where there is no evidence or no sufficient evidence of improper motive.'

In my judgment she was right to say that. There was no evidence that any assets had been transferred at undervalues, nor was there any evidence of improper motive, a position which Mr Ashe (who was appearing for the plaintiffs on this appeal) has confirmed. Later in her reasons she said:

> 'I accordingly conclude on the evidence before me that the directors of the defendant in 1993 and again in 1995 deliberately ignored the separate corporate identity, acted solely in the interests of the group and at the behest of Holdings in so doing and thus deliberately and totally disregarded their duties to creditors in general and the plaintiffs in particular. I accordingly conclude that the court would be justified in lifting the veil and treating Holdings, who appear to be the controlling mind for both these subsidiaries, as liable for this contingent debt.'

Before commenting on that paragraph, I will continue with her reasoning. She then added three further reasons. The first was that although the transactions were part of a normal group restructuring—

> 'it would seem to me to be unjust to permit the defendant and/or those who control it to take advantage of it to avoid a contingent liability which (assuming the claim is proved) the defendant company would appear to have been capable of meeting but for the 1993 and 1995 transfers. To permit such a potential windfall as a consequence of taking of action by the group for the purposes of its own commercial interests would in my view be unjust.'

Her second initial reason was that the counterclaim was not to be taken into account; and the third reason was that she had regard to the fact that the plaintiffs were legally aided and that, if some complicated enforcement procedures were to be adopted, as, for example, when proceeding under the Insolvency Act 1986 (the 1986 Act) against a shareholder company in order to recoup or recover some of the assets which it was said had been transferred away, then that would be an expensive and tortuous route. To require the plaintiffs to follow it would be expensive and unfair.

She finally dealt with the question of which company should be substituted, whether it should be Holdings or Estates. It should be borne in mind that Estates was the company to which the public house interests had been transferred. She said:

'... the evidence in this case established that the day-to-day controller of the business is Holdings itself in whose interest the group restructuring was undoubtedly carried out. Given the manipulation from time to time of the business within the group and my decision that in effect Holdings has been operating those group businesses as if they were simply divisions of itself rather than separate corporate entities it would seem logical that Holdings should equally be treated as the appropriate corporate entity for substitution and I will so order.'

Her reasoning is open to criticism and has been criticised on behalf of the appellants on two grounds. The first is that it misapplies the rule under which the order purported to have been made; and secondly that the factual basis of the judgment is not correct and that, in any event, this is not a case for lifting the corporate veil, as she put it.

With regard to the rule, the rule does not help the plaintiffs in the present case. It is merely a consequential provision to deal with a situation which has already arisen, such as devolution or succession. Applying under the rule must be a consequence of something that has already occurred. It does not give rise to a right to create a situation which can then be relied upon by the plaintiff or other party. This character of the rule was clearly stated by Mance J in *The Choko Star* [1996] 1 All ER 114, [1996] 1 WLR 774, which was referred to with approval in *Yorkshire Regional Health Authority v Fairclough Building Ltd* [1996] 1 All ER 519, [1996] 1 WLR 210. It suffices for me to quote a passage from the judgment of Evans LJ in *Yorkshire Regional Health Authority v Fairclough Building Ltd* [1996] 1 All ER 519 at 528–529, [1996] 1 WLR 210 at 221 where he said:

'When a litigant dies, or becomes bankrupt, the litigation does not cease, unless the cause of action is personal to him. It may be carried on by his personal representatives, or his trustee in bankruptcy, in their own names. There is, not surprisingly, provision in the Rules of the Supreme Court for the change in the identity of the party to be duly made: RSC Ord 15, r 7. A corporate plaintiff does not die, but it may cease to exist. A particular example is when the corporation, which is a creature of statute, is terminated by statute and its rights and liabilities are transferred to some other person. When that occurs, the new person may become a party to pending proceedings in place of the old. Although the identity of the party changes, the nature of the claim does not. It is, in legal terms, the same cause of action as it was before. There is no question of a new claim or cause of action being asserted, even though in the particular circumstances the claim is being made by a different person. Because it is the same cause of action, there is no scope for a limitation defence. The defendant cannot say that the time for bringing proceedings has expired when the new claimant replaces the old, because the essential point is that no new claim is being put forward.'

That is not, of course, what is being sought to be achieved by the plaintiffs in the present case. They are seeking to impose a liability upon the shareholders of a company when they dealt with the company itself. There is a liability of the company. The company was the proper party to be sued and

Case 1:03-md-01570-GBD-SN   Document 415-23   Filed 08/30/04   Page 11 of 13

456        Butterworths Company Law Cases        [1998] 2 BCLC

remains liable to them, if they make out their case on the merits. What they wish to do now is to assert a liability of the shareholders. That is a liability which can only be properly characterised as a new cause of action. The only way in which it can be described as not a new cause of action is if it is recognised and established that it was wrong to sue the original defendant, but that is not this case. The original defendant was the right defendant; it is not suggested that it was the wrong defendant in 1991; it is suggested that the first time at which it might be appropriate to consider substitution was after 1992. That is a situation which just does not marry up to the scheme of the rule or of the contentions which are being advanced on behalf of the plaintiffs.

The plaintiffs are unable to establish that they are not making and seeking to present a new cause of action against the new party. If that is what they are in truth doing then, of course, they should apply to join the new party and to deliver an amended pleading making claims against that new party. If they do that then they run into Limitation Act questions which may or may not prove insuperable. The course that they have adopted under the rule is not the appropriate course.

The second aspect is the factual aspect and the lifting of the corporate veil. As will be appreciated from what I have already said, the judge in the latter part of her judgment does not have proper regard to the evidence, or indeed what she has accepted in the earlier parts. She uses the words 'deliberately ignore the separate corporate identity', carrying with it an inference that something improper has been done. Nothing improper was done by the group or the companies in the group or their directors.

Similarly, she suggest that there were breaches of duty because she said they deliberately and totally disregarded their duties to the creditors. That is not the position on the evidence and is not something which she was entitled to say on the evidence.

Indeed, before us Mr Ashe has frankly accepted that he does not put his case in that way. He says no impropriety is alleged. He does not allege that there was any breach of the provisions of the 1986 Act, nor that there was any conduct on the part of the directors (or any other person) in 1992 or 1995 which would give rise to remedies under the Companies Act 1985 or under the 1986 Act. Therefore, he is not able to rely upon any concept of fault or indeed of fraud in support of his contention that the corporate veil should be pierced. It will be appreciated that this immediately puts the facts of this case into a completely different category from cases such as *Wallersteiner v Moir* [1974] 3 All ER 217, [1974] 1 WLR 991. Furthermore, he is not able to make out any case that at any stage the company was a mere façade, or that it concealed the true facts, nor that there was any sham. All the transactions that took place were overt transactions. They were conducted in accordance with the liberties that are conferred upon corporate entities by the Companies Act 1985 and they do not conceal anything from anybody. The companies were operating at material times as trading companies and they were not being interposed as shams or for some ulterior motive.

Therefore, the judge's factual basis was wrong, but she also seems to have relied to some extent on what can be described as a concept of corporate benefit, or a concept of the economic unit. Indeed, in support of this part of

his argument Mr Ashe referred to *Woolfson v Strathclyde Regional Council* [1978] SLT 159 and *DHN Ltd v Tower Hamlets LBC* [1976] 3 All ER 462, [1976] 1 WLR 852. These were both compensation cases which involved questions of valuation of interest which raised much broader criteria than those which are concerned with establishing legal liability of one corporate entity or another for alleged torts or breaches of contract.

But in any event, the matter was reviewed again by the Court of Appeal in the case of *Adams v Cape Industries plc* [1990] BCLC 479, [1990] Ch 433. This case arose in a rather different context of the status of foreign judgments and jurisdiction over companies where a subsidiary in the group was trading in a particular country, and the extent to which its activity of trading could be attributed to other companies in the group.

In the course of its judgment, the Court of Appeal considered both what is described as the single economic unit argument of groups of companies and the stripping or piercing the corporate veil. They discussed the authorities and they clearly recognised that the concepts were extremely limited indeed. For example in relation to the idea of economic unit, they quoted with approval Robert Goff LJ in *Bank of Tokyo Ltd v Karoon* [1986] 3 All ER 468 at 486, [1987] 1 AC 45 at 64 where he said:

> 'Counsel suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot here be bridged.'

The approach of the judge in the present case was simply to look to the economic unit, to disregard the distinction between the legal entities that were involved and then to say: since the company cannot pay, the shareholders who are the people financially interested should be made to pay instead. That of course is radically at odds with the whole concept of corporate personality and limited liability and the decision of the House of Lord in *Salomon v A Salomon & Co Ltd* [1897] AC 22.

On the question of lifting the corporate veil, the Court of Appeal in *Adams v Cape Industries plc* [1990] BCLC 479 at 519–520, [1990] Ch 433 at 544 expressed themselves similarly, but it is clear that they were of the view that there must be some impropriety before the corporate veil can be pierced. It is not necessary to examine the extent or the limitations of that principle because, in the present case no impropriety is alleged. For example, they quoted what was said by Lord Keith in *Woolfson* concerning the *DHN* decision. I have some doubts whether in this respect the Court of Appeal properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist, indicating that it is a mere façade concealing the true facts.

The plaintiffs in the present case cannot bring themselves within any such principle. There is no façade that was adopted at any stage; there was no concealment of the true facts.

We pressed Mr Ashe during the course of his submissions as to whether he was making any such suggestion. He was unable to give a satisfactory reply. This was obviously inevitable because there was no basis for suggesting that

there was any such façade. It was just the ordinary trading of a group of companies under circumstances where, as was said in *Adams v Cape Industries plc* [1990] BCLC 479 at 520, [1990] Ch 433 at 544, the company is in law entitled to organise the group's affairs in the manner that it does, and to expect that the court should apply the principles of *Salomon v A Salomon & Co Ltd* in the ordinary way. Therefore, the basis of the judge's reasoning and the attempt to support it cannot be sustained.

That leaves only the case of *Creasey v Breachwood Motors Ltd* [1993] BCLC 480, the decision of Mr Southwell QC. There may have been elements in that case of asset stripping. I do not so read the report of his judgment. But he appears to have followed a very similar train of thought to that which was followed by the judge in the present case. I do not consider it would be useful to analyse his reasoning in view of the comments that I have made about the reasoning of the judge in the present case. But it seems to me to be inescapable that the case of *Creasey v Breachwood Motors Ltd* as it appears to the court cannot be sustained. It represents a wrong adoption of the principle of piercing the corporate veil and a misuse of the power granted by the rules to substitute one party for the other following death or succession. Therefore, in my judgment the case of *Creasey v Breachwood Motors Ltd* should no longer be treated as authoritative.

It also follows from what I have said that I consider that the appeal should be allowed and the judge's order should be set aside. This case should proceed as a case against the original defendant, and the plaintiffs should make out their case against the original defendant and obtain such judgment as they are entitled to against them.

**BROOKE LJ.** I agree.

**SIR JOHN BALCOMBE.** I agree. I would merely add this. If there had been any substance in the allegations that there had been some impropriety in the handling of the group restructuring, insolvency law (and in particular I have in mind s 423 of the Insolvency Act 1986) makes adequate provision for dealing with that eventuality.

*Appeal allowed. Leave to appeal to the House of Lords refused.*

Celia Fox   Barrister.