# Exhibit 15

ard and I say nothing

lraft the speech which
offmann. I agree with
niss the appeal.

lraft the speech of my
and for the reasons he

Celia Fox Barrister.

# Trustor AB v Smallbone and others (No 2)

CHANCERY DIVISION
SIR ANDREW MORRITT V-C
28 FEBRUARY, 1, 16 MARCH 2001

*Company – Corporate personality – Lifting corporate veil – Restitution – Knowing receipt – Circumstances in which company's receipt to be treated as individual's receipt.*

The first defendant, S, was the managing director of the claimant company. In 1997 almost £39m were paid out of one of the claimant's accounts on the signatures of S and one other director, without reference to the claimant or its other directors. Of those funds, some £20m were received by the second defendant, I Ltd, which paid part of that sum (£426,439) to S. In proceedings for recovery of the misappropriated funds, the claimant obtained summary judgment against I Ltd in the sum received by it. On I Ltd's appeal, the judge also heard an application by the claimant for summary judgment against S. In the course of his judgment, the judge concluded that I Ltd was controlled by S, that the payments from the claimant's account to I Ltd had been effected by S or on his instruction, that I Ltd was simply a vehicle used by S for receiving money from the claimant, that the payments to I Ltd were unauthorised and that they involved an inexcusable breach by S of his duty as the claimant's managing director. The judge dismissed I Ltd's appeal, and gave summary judgment against S for £426,439, ie the sum that he had received from the claimant via I Ltd. In subsequently dismissing the defendants' appeals, the Court of Appeal expressed the view that S's liability was not limited to the judgment against him, but extended to a joint and several liability for the larger amount for which I Ltd had been found liable, ie some £20m. The court did not, however, extend the judgment against S to the larger amount because his counsel had lacked adequate opportunity to deal with some of its conclusions. Accordingly, the claimant brought a fresh application for summary judgment, contending that the receipt by I Ltd was to be treated as S's receipt and that he should be ordered to repay all of the claimant's money received by I Ltd on the basis of knowing receipt. The court was therefore required to determine the circumstances in which it could pierce the corporate veil and treat a company's receipt as that of an individual.

**Held** – The court was entitled to pierce the corporate veil and recognise the receipt of a company as that of the individual in control of it if the company had been used as a device or facade to conceal the true facts, thereby avoiding or concealing any liability of that individual. It was, however, insufficient that the company had been involved in some impropriety, not linked to the use of the company structure to avoid or conceal that liability. Nor could the court pierce the corporate veil merely on the grounds that it was necessary to do so in the interests of justice and no unconnected third party was involved. In the instant case, S was bound by the findings of fact made by the judge and the Court of Appeal. On those findings, the court was entitled to recognise the receipt of the claimant's money by I Ltd as the receipt by S too. I Ltd was a device or facade in that it was used as the vehicle for the receipt of the claimant's money. Its use was improper as it was the means by which S had committed unauthorised and inexcusable breaches of his duty as a director of the claimant. S had no real

prospect of successfully defending that part of the claim, and accordingly the claimant's application would be granted (see [21]–[25], [27], below).

*Adams v Cape Industries plc* [1991] 1 All ER 929 and *Ord v Belhaven Pubs Ltd* [1998] BCC 607 applied.

Dictum of Cumming-Bruce LJ in *Re a Company* [1985] BCLC 333 at 337–338 not followed.

**Notes**
For piercing the corporate veil, see 7(1) *Halsbury's Laws* (4th edn reissue) para 93.

**Cases referred to in judgment**
*Adams v Cape Industries plc* [1991] 1 All ER 929, [1990] Ch 433, [1990] 2 WLR 657, Ch D and CA.
*Barnes v Addy* (1874) LR 9 Ch App 244.
*Barney, Re, Barney v Barney* [1892] 2 Ch 265.
*Company, Re a* [1985] BCLC 333, CA.
*Cowan de Groot Properties Ltd v Eagle Trust plc* [1992] 4 All ER 700.
*El Ajou v Dollar Land Holdings plc* [1993] 3 All ER 717; *rvsd* [1994] 2 All ER 685, CA.
*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734.
*Gilford Motor Co Ltd v Horne* [1933] Ch 925, [1933] All ER Rep 109, CA.
*H (restraint order: realisable property), Re* [1996] 2 All ER 391, CA.
*Jones v Lipman* [1962] 1 All ER 442, [1962] 1 WLR 832.
*Mubarak v Mubarak* (2000) Times, 30 November, CA.
*Ord v Belhaven Pubs Ltd* [1998] BCC 607, CA.
*Salomon v A Salomon & Co Ltd* [1897] AC 22, [1895–9] All ER Rep 33, HL.
*Westpac Banking Corp v Savin* [1985] 2 NZLR 41, NZ CA.
*Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90.
*Yukong Line Ltd of Korea v Rendsburg Investments Corp of Liberia, The Rialto (No 2)* [1998] 4 All ER 82, [1998] 1 WLR 294.

**Case also cited or referred to in skeleton argument**
*Creasey v Breachwood Motors Ltd* [1993] BCLC 480.

**Application for summary judgment**
By application notice dated 12 September 2000, the claimant, Trustor AB, applied under CPR 24 for summary judgment against the first defendant, Lindsay James Trevor Smallbone, in the same amount as the liability of the second defendant, Introcom (International) Ltd, under a judgment of the Court of Appeal (Scott V-C, Buxton LJ and Gage J) on 9 May 2000. That judgment had been given on an appeal from the decision of Rimer J on 25 June 1999 in which he had (i) dismissed an appeal by Introcom from the order of Master Bowman on 13 October 1998 giving summary judgment against it, and (ii) gave summary judgment against Mr Smallbone in the sum of £426,439. Master Bowman had given judgment against Introcom for SKr 166·7m, £404,100 and Fmk 75·5m, a sum equivalent to approximately £20m. Rimer J had varied Master Bowman's order in respect of the quantum of the judgment against Introcom, but the master's order was restored by the Court of Appeal which also expressed the view that Mr Smallbone's liability was joint and several with that of Introcom. The facts are set out in the judgment.

n, and accordingly the
7], below).
*Belhaven Pubs Ltd* [1998]

CLC 333 at 337–338 not

th edn reissue) para 93.

433, [1990] 2 WLR 657,

ER 700.
1994] 2 All ER 685, CA.

Rep 109, CA.
1, CA.

ER Rep 33, HL.

*iberia, The Rialto (No 2)*

nt, Trustor AB, applied
fendant, Lindsay James
f the second defendant,
urt of Appeal (Scott V-C,
had been given on an
999 in which he had
of Master Bowman on
and (ii) gave summary
ter Bowman had
,1 and Fmk 75·5m, a
aried Master Bowman's
inst Introcom, but the
also expressed the view
that of Introcom. The

*Stephen Smith QC* (instructed by *Allen & Overy*) for Trustor.
Mr Smallbone appeared in person.

*Cur adv vult*

16 March 2001. The following judgment was delivered.

SIR ANDREW MORRITT V-C.

[1] On 25 June 1999 Rimer J gave summary judgment under RSC Ord 14 for the claimant Trustor AB against the first defendant, Mr Smallbone, for £426,439 and interest. At the same time he dismissed an appeal of the second defendant, Introcom (International) Ltd (Introcom), from the order of Master Bowman giving summary judgment under the same rule in favour of Trustor for SKr 166·7m, £404,100 and Fmk 75·5m. On 9 May 2000, on appeal from the orders of Rimer J, the Court of Appeal indicated that, in their view, Mr Smallbone's liability was not limited to the amount of the judgment against him but extended to a joint and several liability for the much larger amount for which Introcom had been found to be liable. They did not then extend the judgment against Mr Smallbone to the larger amount because counsel for Mr Smallbone had not had adequate opportunity to deal with some of the conclusions of the Court of Appeal. This application was made by Trustor on 12 September 2000 seeking judgment for the additional relief the Court of Appeal had suggested.

[2] Trustor is a company incorporated in Sweden. Formerly it held major investments in the steel, engineering and automotive parts industries. On about 23 May 1997 Lord Moyne acquired voting control of Trustor. On 13 June 1997 Lord Moyne, Mr Smallbone and others were appointed to the board of Trustor. At a directors meeting held on the same day Mr Smallbone was appointed to be the managing director and it was resolved that Trustor's bank accounts might be operated on the signature of any two directors.

[3] Without having obtained the approval of the board, on 18 June 1997 Lord Moyne and Mr Smallbone opened an account for Trustor with Barclays Bank plc, Cheapside and procured the transfer to the credit of that account of moneys of Trustor amounting to SKr 779m. The only signatories to that account were Lord Moyne and Mr Smallbone. Between mid-June and early November 1997 SKr 486m (£38·88m) was paid out of that account on the signatures of Lord Moyne and Mr Smallbone without reference to Trustor or its other directors. The recipients included Mr Smallbone (£33,334·34) and Introcom (SKr 166·7m, £404,100 and Fmk 75·5m). Of the sums received by Introcom SKr 43,335 and £327,509 were applied for the benefit of Mr Smallbone in payments to his wife and Cove Investments Ltd, a company incorporated in the Turks and Caicos Islands and controlled by Mr Smallbone.

[4] Trustor was wound up by the court in Stockholm on 23 December 1997. The writ in this action was issued by Trustor on 17 March 1998. The statement of claim, which has been amended twice, sets out the relevant facts. In paras 16–22 it alleges that SKr 486m of Trustor's money was misappropriated in the manner and in the amounts I have summarised. In paras 23–27 Trustor sets out its allegations of knowledge and complicity. In the case of Mr Smallbone it is alleged that all transfers from the account of Trustor with Barclays were made on the instructions of Mr Smallbone. In addition it is alleged that Mr Smallbone was the controlling mind of Introcom and knew of and gave instructions for all transfers to or from Introcom. In paras 31–35 Trustor alleges that the various transfers constituted a

breach of duty. In the case of Mr Smallbone it is alleged that he acted fraudulently and dishonestly and in breach of duty as a director of Trustor. Paragraphs 36–39 contain allegations concerning claims to trace at law and for money had and received, paras 40–42 relate to a claim for damages for conspiracy and para 43 seeks equitable compensation. For present purposes the relevant claims are for knowing receipt (paras 44–46) and knowing assistance (paras 47–49).

[5] The first application of Trustor was for summary judgment against Introcom. It was pursued in respect of all the causes of action relied on in the statement of claim. This application came before Master Bowman. It was successful in respect of the claims for money had and received and knowing receipt. It was unsuccessful in respect of the claims for knowing assistance and conspiracy. By an order made on 13 October 1998 Master Bowman ordered Introcom to pay to Trustor SKr 166·7m, £404,100 and Fmk 75·5m.

[6] Introcom appealed. Its appeal was heard by Rimer J in conjunction with the application for summary judgment against Mr Smallbone issued by Trustor on 28 August 1998. The hearing took seven days. Rimer J gave judgment on 25 June 1999. In summary he dismissed the appeal of Introcom and gave judgment against Mr Smallbone for (1) £426,439 and interest for knowing receipt, (2) damages and equitable compensation to be assessed for breach of duty and (3) payment of £1m by way of interim payment on account of his liability for damages or compensation.

[7] Rimer J made a number of findings to which I should refer. First, he found that Introcom was controlled by a Liechtenstein trust called the Lindsay Smallbone Trust of which Mr Smallbone is a beneficiary. He considered that the directors of Introcom were nominees acting on the instructions of Mr Smallbone so that Introcom could be regarded as Mr Smallbone's company and his knowledge could be treated as Introcom's knowledge. Second, he found that the payments into and out of the Trustor account at Barclays, Cheapside and the account of Introcom at the same bank and branch were made by Mr Smallbone or on his instructions without the authority of Trustor. Third, he concluded that Introcom was simply a vehicle Mr Smallbone used for receiving money from Trustor and that the payments to Introcom 'were unauthorised and involved an inexcusable breach of his duty as managing director of Trustor'. Fourth, he rejected a submission of Mr Smallbone to the effect that the payments to Introcom were justified by an agreement dated 8 August 1997. Fifth, in the light of those conclusions he found that 'the payments to Introcom were unauthorised and improper ones, being payments to Mr Smallbone's own company which was then going to and did devote itself to further unauthorised and improper dissipations of the money'. Sixth, in relation to the claim against Introcom based on knowing assistance Rimer J considered that Mr Smallbone did act dishonestly 'for there was no sensible explanation for the payment of a single penny to Introcom or for the onward payments which Introcom made and Mr Smallbone could not have believed that he was entitled to make them'. However as there was some doubt whether English law applied to that claim and as that cause of action added nothing to the claims against Introcom Rimer J refused to grant summary judgment in respect of the knowing assistance claim.

[8] With regard to the summons against Mr Smallbone Rimer J considered there was no defence to the claim by Trustor to recovery of that part of its money which Mr Smallbone paid to himself and retained. With regard to the claim for knowing assistance Rimer J considered that it was artificial to regard Mr Smallbone as having

Case 1:03-md-01570-GBD-SN Document 415-24 Filed 08/30/04 Page 6 of 11

at he acted fraudulently stor. Paragraphs 36–39 id for money had and piracy and para 43 seeks claims are for knowing

ary judgment against action relied on in the ster Bowman. It was ed and knowing receipt. sistance and conspiracy. dered Introcom to pay

r J in conjunction with oone issued by Trustor er J gave judgment on of Introcom and gave est for knowing receipt, r breach of duty and (3) unt of his liability for

ld r r. First, he found t ndsay Smallbone lered that the directors f Mr Smallbone so that ny and his knowledge und that the payments ide and the account of Mr Smallbone or on his oncluded that Introcom oney from Trustor and nvolved an inexcusable Fourth, he rejected a ents to Introcom were , in the light of those were unauthorised and n company which was horised and improper against Introcom based one did act dishonestly t of a single penny to nade and Mr Smallbone em' However as there in d as that cause of imer J refused to grant claim.

Rimer J considered there part of its money which o the claim for knowing Mr Smallbone as having

dishonestly assisted Lord Moyne in the breach of Lord Moyne's duties rather than being in breach of his own.

[9] Both Trustor, Mr Smallbone and Introcom appealed with the permission of the judge or of the Court of Appeal. In his judgment Scott V-C, with whom Buxton LJ and Gage J agreed, recorded (paras 21 and 22) that it had not been disputed that the circumstances in which £38·88m left Trustor's Barclays, Cheapside account constituted an unlawful misappropriation of Trustor's money and a breach of duty by Mr Smallbone so that Mr Smallbone and Introcom were accountable for the sums of Trustor's money they had respectively received. The issues on the appeal were whether by virtue of other recoveries their liabilities would be reduced to nothing. Each of those contentions was rejected. In paras 57 and 58 Scott V-C pointed out that Trustor had two types of claim against Mr Smallbone, namely, compensation for breach of duty and claims based on what happened to its money, more specifically the misappropriation arising from the payment out from the Trustor account with Barclays, Cheapside. In his summary of the result of the appeal Scott V-C upheld the order of Rimer J regarding the liability of Mr Smallbone for the sum of £426,439 received by him from the money of Trustor paid to Introcom.

**[10]** Scott V-C then considered the order for an interim payment of £1m. He posed the question whether it was clear that Trustor would establish a liability on the part of Mr Smallbone for compensation of at least that amount. He thought that it might be premature to reach that conclusion and continued:

> '97. There is, however, a further point to consider. Introcom is liable, as constructive trustee, to account for and repay to Trustor the Trustor moneys that were paid to it. Hence the order for repayment to Trustor of the SKr 166·7m, the £404,000 and the Fmk 70·45m (the whole totalling some £20m in value). In respect of £426,439, the Trustor money received by Mr Smallbone from Introcom, Mr Smallbone, as well as Introcom is accountable. But what of the balance? Introcom was the creature of Mr Smallbone. He owned and controlled Introcom. The payments out by Introcom of Trustor money were payments made with the knowing assistance of Mr Smallbone. Rimer J, on several occasions in his judgment, characterised Mr Smallbone's participation in the steps taken to extract Trustor's money and pay it out to various recipients without the authority of Trustor's board as being dishonest ... Mr Hollington's [counsel for Mr Smallbone] skeleton argument ... protested that these findings of dishonesty were unnecessary and should not have been made. He did not, however, before us persist in that contention. It would follow, it seems to me, from the judge's finding of dishonesty on Mr Smallbone's part in respect of the payments out made by Introcom of Trustor's money, that Mr Smallbone would be liable jointly and severally with Introcom for the repayment of that money with interest thereon. Mr Smallbone's joint and several liability would not be confined to the part that he personally received.
>
> 98. In my judgment, the judge's order for an interim payment by Mr Smallbone of £1m was not justified as an interim payment on account of damages or compensation for loss caused by breach of duty as a director. The amount of that loss is still too uncertain. But Mr Smallbone is, in my view, clearly liable, jointly and severally with Introcom, for the whole of the sums for which Introcom is accountable. It may be, therefore, that para 4 of the judge's order could be left undisturbed save for the deletion of the words

"by way of interim payment" and the substitution of the words "on account of the sums to be paid by Introcom". To do so, however, would be to change the basis on which the judge ordered Mr Smallbone to pay the £1m. Since no respondent's notice on this point has been served and since Mr Hollington has had no opportunity on Mr Smallbone's behalf to argue against the conclusions expressed in para 97, it would not, I think, be right at this stage of the litigation to allow the order for the interim payment to stand.'

The result was that the order against Mr Smallbone for payment of £1m was set aside but otherwise the order of Rimer J stood save that the liability of Mr Smallbone for £426,439 was declared to be joint and several with Introcom.

[11] The judgment of the Court of Appeal was provided to counsel in draft in advance of the proposed date for handing it down, then fixed for 12 April 2000. On 11 April 2000 counsel for Mr Smallbone wrote to Scott V-C with comments on, amongst others, para 97. Counsel pointed out that it had been common ground in the Court of Appeal that the findings of dishonesty made by Rimer J against Mr Smallbone were academic. For this reason he had not pursued them in oral argument particularly when invited to do so late on the last day of the hearing. He emphasised that in the statement of claim and the argument before Rimer J the only basis on which Trustor had sought to make Mr Smallbone jointly and severally liable with Introcom for the money paid to Introcom was conspiracy to defraud and knowing assistance. He pointed out that Mr Smallbone had succeeded on these issues and that Trustor had not appealed. He submitted:

> 'It is not open to the Court of Appeal to revisit this finding without further argument … nor to make a finding of joint and several liability on the part of Mr Smallbone on some other basis.'

No alteration to the draft judgment was made before it was handed down on 9 May 2000; the Court of Appeal indicated that Trustor would have to make a further application for summary judgment on which Mr Smallbone would be able to raise any contrary arguments he chose. Mr Smallbone's petition for leave to appeal was dismissed by the House of Lords on 18 December 2000.

[12] The application now before me seeks a further order against Mr Smallbone pursuant to CPR 24.2 or CPR 25. The order sought is for payment by Mr Smallbone to Trustor (after giving credit for net recoveries received from Mr Smallbone or Introcom) of SKr 166·7m, £404,100 and Fmk 75·5m with interest thereon at the rate of 8% from 1 November 1997 until payment, such liability to be joint and several with Introcom. Trustor accepts that it cannot obtain summary judgment for damages or compensation for breach of duty for all the reasons given by Rimer J and the Court of Appeal. Thus the claim for summary judgment is necessarily advanced on a restitutionary basis only. Two such bases were raised in the statement of claim, namely knowing receipt and knowing assistance.

[13] Paragraph 21 of the witness statement of Mr Wilkes made in support of the application led Mr Smallbone to believe that the application was pursued on the basis of knowing assistance. He protested that the apparent findings of dishonesty made against him by Rimer J were unnecessary to the orders of either Rimer J or the Court of Appeal and could not justify the grant of summary judgment against him. However, the oral argument of counsel for Trustor made it clear that Trustor's contention was that the receipt by Introcom was, in the circumstances, to be treated as the receipt by Mr Smallbone too. He submitted that as there could be no question but that Mr Smallbone had the requisite

knowledge he should be ordered to repay all the money of Trustor received by Introcom on the basis of knowing receipt.

[14] Counsel for Trustor submitted that the circumstances were such as to warrant the court 'piercing the corporate veil' and recognising the receipt by Introcom as the receipt by Mr Smallbone. He suggested that the authorities justified such a course in three, potentially overlapping, categories, namely (1) where the company was shown to be a facade or sham with no unconnected third party involved, (2) where the company was involved in some impropriety and (3) where it is necessary to do so in the interests of justice and no unconnected third party is involved. I was referred to *Gilford Motor Co Ltd v Horne* [1933] Ch 925, [1933] All ER Rep 109, *Jones v Lipman* [1962] 1 All ER 442, [1962] 1 WLR 832, *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90, *Re a Company* [1985] BCLC 333, *Adams v Cape Industries plc* [1991] 1 All ER 929, [1990] Ch 433, *Yukong Line Ltd of Korea v Rendsburg Investments Corp of Liberia, The Rialto (No 2)* [1998] 4 All ER 82, [1998] 1 WLR 294, *Ord v Belhaven Pubs Ltd* [1998] BCC 607 and *Mubarak v Mubarak* (2000) Times, 30 November.

[15] Counsel suggested that the facts, as found by Rimer J, brought this case within each of the three categories. He pointed out that Introcom, a company incorporated in Gibraltar, has only nominee directors and is controlled by a Liechtenstein Anstalt of which Mr Smallbone is a beneficiary. He relied on the findings of Rimer J that Introcom acted on the instructions of Mr Smallbone, that Mr Smallbone was its directing mind and will and that Introcom had no independent business, third-party directors, creditors or shareholders.

[16] Mr Smallbone, who appeared in person, told me that there was a sensible justification for the payment of Trustor's money to Introcom. He explained that Introcom had been formed in connection with an earlier scheme, having no connection with Trustor, as a vehicle for his remuneration. He contended that Introcom was not a sham, device or facade but a genuine company having its own separate existence. He submitted that the fact that Introcom was controlled by him was well known to the other directors of Trustor. He contended that there was no finding or evidence of impropriety sufficient to justify the order sought by Trustor.

[17] It appears to me that the argument for Trustor raises a point of some general importance. In cases of knowing receipt attention is usually focused on the extent of the knowledge required and whether the recipient of the trust property had it. In this case there is no doubt that Mr Smallbone had the requisite knowledge because the liability of Introcom, upheld by the Court of Appeal, depended on the imputation of the knowledge of Mr Smallbone to Introcom. The issue is whether the court is entitled to regard the receipt by Introcom as the receipt by Mr Smallbone.

[18] Liability arising from the knowing receipt of trust property stems from the speech of Lord Selborne LC in *Barnes v Addy* (1874) LR 9 Ch App 244 at 251–252 that—

> 'strangers are not to be made constructive trustees merely because they act as agents of trustees in transactions within their legal powers ... unless those agents receive and become chargeable with some of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees.'

In *White & Tudor's Leading Cases in Equity* (9th edn, 1928) vol 2, p 595 in relation to that passage from the speech of Lord Selborne LC the editors say on the authority

of the judgment of Kekewich J in *Re Barney, Barney v Barney* [1892] 2 Ch 265 at 273 that there is no liability 'unless he has the trust property vested in him, or so far under his control that he can require it should be vested in him'.

**[19]** The only modern work of which I am aware which deals with the problems of receipt in any detail is *Lewin on Trusts* (17th edn, 2000) pp 1348–1350 (paras 42-32–42-34). The editors suggest that there is a sufficient receipt if, in accordance with the normal rules of tracing in equity, the trust property can be identified in the hands of the defendant. They point out that receipt by a subsidiary company will not count as a receipt by the parent if the subsidiary is acting in its own right, not as agent or nominee, at any rate in the absence of a want of probity or dishonesty. These propositions are supported by the authorities to which the editors refer, namely *Cowan de Groot Properties Ltd v Eagle Trust plc* [1992] 4 All ER 700 at 762 and *El Ajou v Dollar Land Holdings plc* [1993] 3 All ER 717 at 738. It is also necessary that the receipt by the defendant should be for his own benefit or in his own right in the sense of setting up a title of his own to the property so received (see *Westpac Banking Corp v Savin* [1985] 2 NZLR 41 at 69).

**[20]** I should also refer to some of the cases relied on by counsel for Trustor. In *Gilford Motor Co Ltd v Horne* [1933] Ch 925, [1933] All ER Rep 109 an individual bound by a non-solicitation covenant after the termination of his employment set up in business through a limited company. The individual was held to be in breach of covenant, notwithstanding the interposition of the company, because the company was formed as the device, stratagem or mask to 'the effective carrying on of a business of' the individual (see [1933] Ch 925 at 956, 965, 969, [1933] All ER Rep 109 at 114, 119, 121). In each of the passages to which I have referred it was made plain that the conclusion was one of fact. In *Jones v Lipman* [1962] 1 All ER 442, [1962] 1 WLR 832 an individual had contracted to sell land. Wishing to avoid his liability he transferred the land to a company he had acquired for the purpose. A decree of specific performance was made against both the individual and the company on two grounds. The first was that the individual had sufficient control of the company to compel it to perform the contract. The second, following the principle applied in the *Gilford Motor* case, was that the company was the creature of the first defendant, 'a device and a sham, a mask which he holds before his face in an attempt to avoid recognition in the eye of equity' (see [1962] 1 All ER 442 at 444, [1962] 1 WLR 832 at 836). In *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90 at 96 Lord Keith of Kinkel pointed out that it was appropriate to pierce the corporate veil 'only where special circumstances exist indicating that [the company] is a mere facade concealing the true facts'. This principle was applied by the Court of Appeal in *Adams v Cape Industries plc* [1991] 1 All ER 929 at 1024, [1990] Ch 433 at 542. *Adams*'s case was followed by the Court of Appeal in *Re H (restraint order: realisable property)* [1996] 2 All ER 391 which was applied by Rimer J in *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734. These authorities plainly establish the first proposition of counsel for Trustor I referred to in [14] above.

**[21]** The third proposition is said to be derived from the decision of this court in *Re a Company* [1985] BCLC 333. In that case a complicated structure of foreign companies and trusts was used to place the individual's assets beyond the reach of his creditors. Cumming-Bruce LJ described (at 336) the structure as a facade but (at 337–338) expressed the principle to be that the court will use its powers to pierce the corporate veil if it is necessary to achieve justice irrespective of the legal efficacy of the corporate structure under consideration. The latter statement is

not consistent with the views of the Court of Appeal in *Adams*'s case [1991] 1 All ER 929 at 1019, [1990] Ch 433 at 536 where Slade LJ said:

> '[Counsel for Adams] described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As [counsel for Cape] submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v A Salomon & Co Ltd* [1897] AC 22, [1895–9] All ER Rep 33 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.'

In *Ord v Belhaven Pubs Ltd* [1998] BCC 607 at 614–615 Hobhouse LJ expressed similar reservations. It does not appear from the reports that in either of those cases the court was referred to *Re a Company* [1985] BCLC 333. In those circumstances I consider that I should follow the later decisions of the Court of Appeal in *Adams*'s case and *Ord*'s case and decline to apply so broad a proposition as that for which counsel for Trustor contends in the third principle referred to in [14] above.

[22] The second proposition also appears to me to be too widely stated unless used in conjunction with the first. Companies are often involved in improprieties. Indeed there was some suggestion to that effect in *Salomon v A Salomon & Co Ltd* [1897] AC 22, [1895–9] All ER Rep 33. But it would make undue inroads into the principle of *Saloman*'s case if an impropriety not linked to the use of the company structure to avoid or conceal liability for that impropriety was enough.

[23] In my judgment the court is entitled to 'pierce the corporate veil' and recognise the receipt of the company as that of the individual(s) in control of it if the company was used as a device or facade to conceal the true facts thereby avoiding or concealing any liability of those individual(s). On the facts of this case it is unnecessary to decide whether the dictum of Kekewich J in *Re Barney, Barney v Barney* [1892] 2 Ch 265 at 273 referred to in [18] above, is applicable where the recipient is a wholly-owned corporate body. The dictum suggests that complete control of the actual recipient may be enough. But this was not said in relation to a limited company and predates the decision of the House of Lords in *Saloman*'s case.

[24] Mr Smallbone is bound by the findings made by Rimer J and the Court of Appeal in relation to the issues before them. Thus it is established that Introcom was and is controlled by Mr Smallbone, the payments from the Trustor account with Barclays, Cheapside to the account of Introcom at Barclays, Cheapside were effected by Mr Smallbone or on his instructions and, in the words of Rimer J, 'Introcom was simply a vehicle Mr Smallbone used for receiving money from Trustor.' Rimer J also concluded that the payments to Introcom were unauthorised and involved an inexcusable breach by Mr Smallbone of his duty as managing director of Trustor 'being payments to Mr Smallbone's own company which was then going to and did devote itself to further unauthorised and improper dissipations of the money'.

[25] In my view these conclusions are such as to entitle the court to recognise the receipt of the money of Trustor by Introcom as the receipt by Mr Smallbone

too. Introcom was a device or facade in that it was used as the vehicle for the receipt of the money of Trustor. Its use was improper as it was the means by which Mr Smallbone committed unauthorised and inexcusable breaches of his duty as a director of Trustor. Mr Smallbone has no real prospect of successfully defending this part of the claim because he is bound by the findings of Rimer J to which I have referred.

[26] I have reached this conclusion from a consideration of the facts as found by Rimer J and the principles to be derived from the cases independently from the passage in paras 97 and 98 of the judgment of Scott V-C which I have quoted earlier. I have been concerned whether that passage was referring to a liability based on knowing receipt or knowing assistance. Liability for the former would be consistent with the Court of Appeal's conclusions regarding the liability of Introcom but liability for the latter would not. Paragraph 97 seems to be dealing with the payments out of the Introcom account and so understood refers prima facie to knowing assistance. But para 98 recognises joint and several liability for 'the whole of the sums for which Introcom is accountable'. The judgment of the Court of Appeal recognised liability on Introcom for knowing receipt but not at that stage for knowing assistance. Accordingly my conclusion is consistent with the decision of the Court of Appeal whether or not I was bound by that decision to reach the same conclusion.

[27] For all these reasons I make an order under CPR 24.2 for payment by Mr Smallbone of the sums set out in and on the terms of the draft order accompanying the application notice.

*Order accordingly.*

Celia Fox     Barrister.