# Exhibit 16

The question for me is whether the plaintiffs can satisfy me that the obvious signs of subsidence or settlement which were discovered during the currency of the policy showed that settlement or subsidence occurred during that period or whether or not they were signs of long standing settlement or subsidence, occurring long before the period of the policy, but which only became apparent when the process of demolition of No. 24 and the repair of the party wall was undertaken.

I feel that this evidence is such as to leave me entirely unconvinced by the plaintiffs that there was any subsidence within the period of the policy.

Counsel for the plaintiffs, has argued that some subsidence must have occurred between the date of the first dangerous structure notice and the second dangerous structure notice, because, said he, the surveyor to the London County Council would not have served a second notice unless that was so; but in view of the evidence I see no reason to draw this inference. It may be and, indeed, it was the fact that evidence of subsidence was discovered in that interval, but I am not satisfied that that evidence was evidence of fresh subsidence and that it was not evidence of longstanding subsidence and settlement. I am not satisfied that there was any subsidence within the period of the currency of the policy. Nor am I satisfied that, even if there were any slight subsidence, that subsidence was the proximate cause of the loss of the building.

*Judgment for the defendant with costs.*

Solicitors: *Nicholson, Freeland & Shepherd* (for the plaintiffs); *Hair & Co.* (for the defendant).

[*Reported by* Charles Shelley, Esq., *Barrister-at-Law.*]

---

## SMITH, STONE AND KNIGHT, LTD. *v.* LORD MAYOR, ALDERMEN AND CITIZENS OF THE CITY OF BIRMINGHAM.

[King's Bench Division (Atkinson, J.), **October 4, 5, 19, 1939.**]

*Compulsory Purchase—Acquisition of premises on which business of subsidiary company carried on—Right of parent company to claim compensation for disturbance and removal—Lands Clauses Consolidation Act,* 1845 (*c.* 18), *s.* 121.

A company acquired a partnership concern and, having registered it as a company, continued to carry on the acquired business as a subsidiary company. The parent company held all the shares except five which its directors held in their respective names in trust for the company. The profits of the new company were treated as profits of the parent company, which appointed the persons who conducted the business and were in effectual and constant control. The defendant corporation compulsorily acquired the premises upon which the business of the subsidiary company was carried on, and the parent company claimed compensation in respect of removal and disturbance, but the respondents contended that the proper claimants were the subsidiary company, that being a separate legal entity:—

Held: possession by a separate legal entity was not conclusive on the question of the right to claim, and as the subsidiary company

satisfy me that the
e discovered during
subsidence occurred
gns of long standing
period of the policy,
ss of demolition of
ken.
ntirely unconvinced
in the period of the

ıbsidence must have
ıcture notice and the
the surveyor to the
second notice unless
reason to draw this
ct that evidence of
ıot satisfied that that
it was not evidence
ı not satisfied that
rrency of the policy.
ght subsidence, that
ıe ding.

plaintiffs); *Hair &*

, *Barrister-at-Law.*]

LORD MAYOR,
CITY OF

, 5, 19, 1939.]

*ich business of sub-*
*to claim compensation*
*ısolidation Act,* 1845

ıd, having registered
quired business as a
all the shares except
ames in trust for the
re treated as profits
ns who conducted the
tro The defendant
on ch the business
rent company claimed
, but the respondents
subsidiary company,

was not conclusive
subsidiary company



was not operating on its own behalf but on behalf of the parent company, the parent company was the party to claim compensation.

[EDITORIAL NOTE. The question in this case is whether a subsidiary company has such an interest in the property upon which its business is conducted that it is entitled to receive compensation upon compulsory purchase. It would seem that in the ordinary case, there is no such right to compensation, but the question is one of fact in each case, depending upon the arrangements made between the parent and the subsidiary company.

As to Persons entitled to Compensation, see HALSBURY, Hailsham Edn., Vol. 6, pp. 39-41, para. 36; and for Cases, see DIGEST, Vol. 11, pp. 123, 124, Nos. 148-155.]

Cases referred to:

(1) *Salomon* v. *Salomon & Co., Salomon & Co.* v. *Salomon*, [1897] A.C. 22; 9 Digest 34, *11*; 66 L.J.Ch. 35; 75 L.T. 426; *revsg. S.C. sub nom. Broderip* v. *Salomon*, [1895] 2 Ch. 323.

(2) *Gramophone & Typewriter, Ltd.* v. *Stanley*, [1908] 2 K.B. 89; 9 Digest 35, *14*; 77 L.J.K.B. 834; 99 L.T. 39; 5 Tax Cas. 358.

(3) *Inland Revenue Comrs.* v. *Sansom*, [1921] 2 K.B. 492; 28 Digest 101, *612*; 90 L.J.K.B. 627; 125 L.T. 37; 8 Tax Cas. 20.

(4) *San Paulo (Brazilian) Ry. Co.* v. *Carter*, [1896] A.C. 31; 28 Digest 27, *142*; 65 L.J.Q.B. 161; 73 L.T. 538; 3 Tax Cas. 407.

(5) *Apthorpe* v. *Peter Schoenhofen Brewing Co., Ltd.* (1899), 80 L.T. 395; 28 Digest 29, *150*; 4 Tax Cas. 41.

(6) *Jones (Frank) Brewing Co.* v. *Apthorpe* (1898), 4 Tax Cas. 6; 28 Digest 26, *138*.

(7) *St. Louis Breweries, Ltd.* v. *Apthorpe* (1898), 79 L.T. 551; 28 Digest 29, *149*; 4 Tax Cas. 111.

Motion to set aside an award on the ground of technical misconduct of the arbitrator. By consent the judge decided the matter upon which the consultative opinion had been unsuccessfully sought.

The facts are fully set out in the judgment.

*G. Russell Vick, K.C.*, and *Arthur Ward* for the applicants (claimants).

*A. S. Comyns Carr, K.C.*, and *F. G. Bonnella* for the respondents.

Atkinson, J.: This is a motion by a firm of Smith, Stone & Knight, Ltd., whom I shall call the company, to set aside an interim award on somewhat unusual grounds. The company was the owner of a factory and a number of small houses in Moland St., Birmingham. They were paper manufacturers and carried on their business on some premises other than those in Moland St. The corporation of Birmingham desired to purchase under their compulsory powers this factory, land and cottages in Moland St., in order to build a technical college, and on Feb. 16, 1935, they served on the company a notice to treat. On Feb. 20 the company lodged a claim, and described themselves as of "84, Colmore Row, Birmingham, paper makers, waste paper merchants and dealers." They described the property, and under heading 7, where they had to specify the names of occupiers and various details, they said:

Factory and offices let to Birmingham Waste Co., Ltd., as yearly tenants at £90 a year.

Then they gave particulars of their claim, the value of the land and premises, compensation for removal £3,000, and disturbance—the disturbance was partly the estimated additional cost of cartage of material to and from the new factory to which they would have to go—and ended with these words:

> The claim under paragraph (B) [the second part of the claim for removal and disturbance] is by the Birmingham Waste Co., Ltd., which is a subsidiary of Smith, Stone & Knight, Ltd.

On Apr. 29, 1937, an amended claim was put in, and under the first particular they added to their original description:

> and which business embodies their subsidiary company, the Birmingham Waste Co., Ltd.

Under heading 7, they said:

> Factory and offices nominally let to the Birmingham Waste Co., Ltd., which said company is a subsidiary company of Smith, Stone & Knight, Ltd., carrying on this business for and on behalf of Smith, Stone & Knight, Ltd., which said company owns the whole of the capital and takes the whole of the profits of the said subsidiary company. The subsidiary company occupies the said premises and carries on its trade as a separate department of and as agents for Smith, Stone & Knight, Ltd. The said rent was and is arranged as an inter-departmental charge and is merely a book-keeping entry.

They added to that final note, or, at any rate, in its final form it read:

> These two items of damage will accrue to Smith, Stone & Knight, Ltd., who are the principals of the Birmingham Waste Co., Ltd. The said loss will fall upon Smith, Stone & Knight, Ltd.

The parties were unable to come to terms and finally the matter was referred to arbitration. A preliminary point was at once raised, which was whether, as a matter of law, the company could claim compensation for disturbance of the business which was carried on on these premises, or whether, in law, that claim must be made by the Waste company itself. In the latter event, the corporation would escape paying compensation altogether, by virtue of Lands Clauses Consolidation Act, 1845, s. 121. That section enables purchasers to get rid of occupiers with no greater interest than a tenancy not exceeding one year, because they can give them notice and thereby terminate their tenancy, and escape paying anything to them.

The question has been put during the hearing in various ways. Was the loss which was incurred by the business which was being carried on on the premises the direct loss of the claimants, or was it, as the corporation say, a loss which they suffered merely in their capacity of shareholders in the Waste company? Again, to whom did the business in truth belong? Again, was the Waste company merely the agent of the claimants for the carrying on of the business? Were the claimants in fact carrying on the business, albeit in the name of the Waste company? All these questions were discussed during the argument.

The facts were these, and I do not think there was any dispute about them, except, possibly, as to one of them. Before Jan., 1913, the com-

ue of the land and d disturbance—the of cartage of material ld have to go—and

claim for removal and s a subsidiary of Smith,

and under the first

he Birmingham Waste

Waste Co., Ltd., which Knight, Ltd., carrying night, Ltd., which said of the profits of the said the said premises and nts for Smith, Stone & er-departmental charge

s final form it read :

it, Ltd., who are ss will fall upon

ally the matter was t once raised, which l claim compensation n on these premises, the Waste company escape paying com- Consolidation Act, get rid of occupiers ng one year, because their tenancy, and

various ways. Was was being carried on r was it, as the cor- eir capacity of share- did the business in e agent of the e claimants in he Waste company ? ent.

s any dispute about Jan., 1913, the com-



pany had been carrying on their business as manufacturers. In Jan., 1913, a business was being carried on on these premises by the Waste company (which was then not a limited company, but a partnership) and the business which was being carried on was that of dealers in waste. In that month the claimants bought from the Waste company the premises and the business as a going concern, and there is no question about it that this business became vested in and became the property of the claimants. They altered and enlarged the factory and carried on the business. On Mar. 13, the claimants caused this new company, the Birmingham Waste Co., Ltd., to be registered. It was a company with a subscribed capital of £502, the claimants holding 497 shares. They found all the money, and they had 497 shares registered in their own name, the other five being registered one in the name of each of the five directors. There were five directors of the Waste company and they were all directors of the claimants, and they all executed a declaration of trust for the share which they held, stating they held them in trust for the claimants. At no time did the board get any remuneration from the Waste company. The new company purported to carry on the Waste business in this sense, that their name was placed upon the premises, and on the note-paper, invoices, etc. It was an apparent carrying on by the Waste company. I think that these two facts are of the greatest importance. There was no agreement of any kind made between the two companies, and the business was never assigned to the Waste company. There was no suggestion that anything was done to transfer the beneficial ownership of it to the Waste company. A manager was appointed, doubtless by the company, but there was no staff. The books and accounts were all kept by the claimants; the Waste company had no books at all and the manager, it is found, knew nothing at all about what was in the books, and had no access to them. There is no doubt that the claimants had complete control of the operations of the Waste company. Then other businesses were bought by the claimants, but they were not assigned to the Waste company; the Waste company just carried them on. There was no tenancy agreement of any sort with the company; they were just there in name. No rent was paid. Apart from the name, it was really as if the manager was managing a department of the company. Six months after the incorporation there was a report to the shareholders that the business was under the supervision and control of the claimants and that the profits would be credited to that company in the books, as is very often done with departments. A proportion of the overheads was debited to the Waste company and this rent, which has been referred to in the first claim of £90, was a book entry, debiting the company with that sum. There was a question as to why the company was ever formed. The functions of buying and sorting waste are different from the function of manufacturing paper, and, according to the evidence which is part of the case before me, it was thought better to have these different functions performed in a

different name. The arbitrator has said in his case and in his affidavit that the reason was that the carrying on of this business would be something outside the powers of the company. He is obviously wrong about that, because the memorandum is wide enough to cover such a business, and is just as wide as that of the Waste company. It is quite clear that there was no evidence to support what he said, and I cannot think that I am bound by a finding which is shown to be wrong by the material which the arbitrator himself brings before the court.

At the end of each year the accounts were made up by the company, and if the accounts showed a profit, the claimants allocated the profit to the different mills belonging to the company, exhausting the paper profit in that way and making the profit part of the company's own profit, because allocating this profit to their different departments or different mills would have the effect of increasing their own profit by a precisely similar sum. The Waste company never declared a dividend; they never thought of such a thing, and their profit was in fact treated as the claimants' profit.

Those being the facts, the corporation rest their contention on *Salomon's* case (1), and their argument is that the Waste company was a distinct legal entity. It was in occupation of the premises, the business was being carried on in its name and the claimants' only interest in law was that of holders of the shares. It is well settled that the mere fact that a man holds all the shares in a company does not make the business carried on by that company his business, nor does it make the company his agents for the carrying on of the business. That proposition is just as true if the shareholder is itself a limited company. It is also well settled that there may be such an arrangement between the shareholders and a company as will constitute the company the shareholders' agent for the purpose of carrying on the business and make the business the business of the shareholders. In *Gramophone & Typewriter, Ltd.* v. *Stanley* (2) Cozens-Hardy, M.R., said, at pp. 95, 96:

> The fact that an individual by himself or his nominees holds practically all the shares in a company may give him the control of the company in the sense that it may enable him by exercising his voting powers to turn out the directors and to enforce his own views as to policy, but it does not in any way diminish the rights or powers of the directors, or make the property or assets of the company his, as distinct from the corporation's. Nor does it make any difference if he acquires not practically the whole, but absolutely the whole, of the shares. The business of the company does not thereby become his business. He is still entitled to receive dividends on his shares, but no more. I do not doubt that a person in that position may cause such an arrangement to be entered into between himself and the company as will suffice to constitute the company his agent for the purpose of carrying on the business, and thereupon the business will become, for all taxing purposes, his business. Whether this consequence follows is in each case a matter of fact. In the present case I am unable to discover anything in addition to the holding of the shares which in any way supports this conclusion.

Then Fletcher Moulton, L.J., said the same thing on pp. 100 and 101. Then in *Inland Revenue Comrs.* v. *Sansom* (3) Lord Sterndale said, at p. 503:

> There may, as has been said by Lord Cozens-Hardy, M.R., be a position such

and in his affidavit
ness would be some-
viously wrong about
ver such a business,
It is quite clear that
I cannot think that
ong by the material

up by the company,
allocated the profit
chausting the paper
the company's own
ent departments or
heir own profit by a
eclared a dividend;
was in fact treated

tention on *Salomon's*
pany was a distinct
e business was being
est in law was that
ie e fact that a
the ousiness carried
e the company his
roposition is just as
It is also well settled
shareholders and a
olders' agent for the
usiness the business
. *Ltd.* v. *Stanley* (2)

olds practically all the
ny in the sense that it
it the directors and to
ay diminish the rights
of the company his, as
fference if he acquires
shares. The business
still entitled to receive
person in that position
mself and the company
pose of carrying on the
taxing purposes, his
matter of fact. In the
ne ' ing of the shares

on pp. 100 and 101.
STERNDALE said, at

., be a position such



that although there is a legal entity within the principle of *Salomon* v. *Salomon & Co.* (1), that legal entity may be acting as the agent of an individual and may really be doing his business and not its own at all. Apart from the technical question of agency it is difficult to see how that could be, but it is conceivable. Therefore the mere fact that the case is one which falls within *Salomon* v. *Salomon & Co.* (1) is not of itself conclusive.

It seems therefore to be a question of fact in each case, and those cases indicate that the question is whether the subsidiary was carrying on the business as the company's business or as its own. I have looked at a number of cases—they are all revenue cases—to see what the courts regarded as of importance for determining that question. There is *San Paulo Brazilian Ry. Co.* v. *Carter* (4), *Apthorpe* v. *Peter Schoenhofen Brewery Co., Ltd.* (5), p. 41; *Frank Jones Brewing Co.* v. *Apthorpe* (6), *St. Louis Breweries* v. *Apthorpe* (7), and I find six points which were deemed relevant for the determination of the question: Who was really carrying on the business? In all the cases, the question was whether the company, an English company here, could be taxed in respect of all the profits made by some other company, a subsidiary company, being carried on elsewhere. The first point was: Were the profits treated as the profits of the company?—when I say "the company" I mean the parent company—secondly, were the persons conducting the business appointed by the parent company? Thirdly was the company the head and the brain of the trading venture? Fourthly, did the company govern the adventure, decide what should be done and what capital should be embarked on the venture? Fifthly, did the company make the profits by its skill and direction? Sixthly, was the company in effectual and constant control? Now if the judgments in those cases are analysed, it will be found that all those matters were deemed relevant for consideration in determining the main question, and it seems to me that every one of those questions must be answered in favour of the claimants. Indeed, if ever one company can be said to be the agent or employee, or tool or simulacrum of another, I think the Waste company was in this case a legal entity, because that is all it was. There was nothing to prevent the claimants at any moment saying: "We will carry on this business in our own name." They had but to paint out the Waste company's name on the premises, change their business paper and form, and the thing would have been done. I am satisfied that the business belonged to the claimants; they were, in my view, the real occupiers of the premises. If either physically or technically the Waste company was in occupation, it was for the purposes of the service it was rendering to the claimants, such occupation was necessary for that service, and I think that those facts would make that occupation in law the occupation of the claimants. An analogous position would be where servants occupy cottages or rooms for the purposes of their business, and it is well settled that if they have to occupy those premises for the purposes of the business, their occupation is the occupation of their principal. I have no doubt the business was the company's business

and was being carried on under their direction, and I answer the question in favour of the claimants.

*Award set aside with costs of this motion.*

Solicitors: *Nash, Field & Co.*, agents for *Reynolds & Co.*, Birmingham (for the applicants); *Sharpe, Pritchard & Co.*, agents for *Sir Frank Wiltshire*, Town Clerk, Birmingham (for the respondents).

[*Reported by* W. J. Alderman, Esq., *Barrister-at-Law.*]

---

## R. v. GEORGE ALBERT GILLINGHAM.

[Court of Criminal Appeal (Lord Hewart, L.C.J., Charles and Humphreys, JJ.), **October 10, 1939.**]

*Criminal Law—Evidence—Admissibility—Indecent postcards found in possession of prisoner charged with gross indecency.*

In a case of gross indecency postcards found in the possession of the accused may be admitted in evidence as things which a man intending to commit such an offence might well have about him, and might use as an adjunct to assist him in the commission of the offence. They are not admissible merely to show that he had a dirty mind.

**[EDITORIAL NOTE.** Evidence of articles found in possession of the accused is generally admissible, but it is essential that there shall be a *nexus* between the article found and the offence charged.

As to Evidence of Character, see HALSBURY, Hailsham Edn., Vol. 9, p. 188, para. 270; and for Cases, see DIGEST, Vol. 14, pp. 401-403, Nos. 4216-4233.]

Case referred to:

(1) *R.* v. *Twiss*, [1918] 2 K.B. 853; 14 Digest 403, *4232*; 88 L.J.K.B. 20; 119 L.T. 680; 13 Cr. App. Rep. 177.

Appeal from a conviction at Poole Quarter Sessions on the ground of misdirection, and wrongful admission of evidence. The facts are fully stated in the judgment.

*J. T. Molony* for the appellant.

*W. M. Walker* for the Crown.

Charles, J. [delivering the judgment of the court]: In this case, George Albert Gillingham was, together with a man named Victor Farr, convicted at the Poole Quarter Sessions of attempted buggery and gross indecency, and he was sentenced to 6 months' imprisonment with hard labour, and he now appeals by leave of the court against his conviction.

The circumstances of the case are such that I need not deal with them in detail. They were found guilty of the charges alleged against them, and the charges carried their own description without my further describing what these offences were.

Evidence was admitted of postcards, depicting dirty sexual acts, which were found on Gillingham and which it is said would show that