# Exhibit 18

[PROBATE, ETC., DIVISION.]

1957
Feb. 19.

\* PRACTICE DIRECTION (ATTORNEY ADMINISTRATOR).

*Probate — Administration — Attorney administrator — Further grant — Inspection of power of attorney.*

Where an attorney administrator seeks a concurrent grant in another estate in his capacity of personal representative, this further grant will not be issued without inspection of the power of attorney. A power in general terms appointing the attorney for all purposes will be accepted as establishing his right to apply for the further grant; but if the power is a limited one confined to obtaining the first grant, a further power extending the attorney's duties to obtaining the further grant will be required.

B. LONG,
*Senior Registrar.*

February 19, 1957.

---

[HOUSE OF LORDS.]

H. L. (E.)† \* FIRESTONE TYRE AND RUBBER CO. LTD.   APPELLANT;

1956
Dec. 13, 17, 18.
1957
Feb. 14.

AND

LEWELLIN (INSPECTOR OF TAXES)   .   .   RESPONDENT.

*Revenue — Income tax — Non-resident — Trade within United Kingdom — Contracts made in United Kingdom for sale of goods manufactured there — United Kingdom company assessed as agent of foreign company — Whether authorized regular agent of foreign company carrying on trade or business within the United Kingdom — Income Tax Act, 1918 (8 & 9 Geo. 5, c. 40), Sch. D, para. 1 (a) (iii); All Schedules Rules, rr. 5, 10.*

A company registered in the United Kingdom (hereafter called "Brentford") was assessed to income tax on the profits of its business of branded tyre manufacturers within the United Kingdom. In addition it was assessed to income tax on the profits of the trade of marketing the branded tyres carried on with customers on the continent of Europe. This additional assessment was made on the footing that Brentford was itself carrying on that trade or, alternatively, that a foreign non-resident company (hereafter called "Akron") which owned all the shares in Brentford was (*a*) itself carrying on the trade within the United Kingdom of selling the tyres outside the United Kingdom, or (*b*) was carrying on that trade through the agency of Brentford.

Akron had made agreements relating to the sale of its products with distributors on the continent of Europe, giving them lists of

---

† *Present:* LORD MORTON OF HENRYTON, LORD RADCLIFFE, LORD TUCKER and LORD COHEN.

Case 1:03-md-01570-GBD-SN   Document 415-27   Filed 08/30/04   Page 3 of 10

the suppliers from whom they might order the goods. Brentford was an authorized supplier. By agreements between Akron and Brentford the latter was authorized to fulfil orders received from distributors. A subsequent agreement made between Akron and Brentford ostensibly altered this, Brentford agreeing to fulfil all orders obtained by Akron in Europe or elsewhere, as and when requested by Akron, to forward the goods ordered to the purchaser and to give such instructions as to payment as were requested by Akron. In practice, however, Brentford continued to fulfil orders received direct from the authorized distributors, normally without further intervention by Akron. Delivery of the goods was f.a.s. and payment was in each case effected in the United Kingdom. Brentford retained out of the payments received the cost price plus 5 per cent. and remitted the balance to Akron (or, when that became impossible, owing to wartime currency restrictions, it credited the sums held on behalf of Akron to a separate account in its books). Akron was supplied with details of each order effected:—

*Held*, that the trade of selling tyres to persons outside the United Kingdom was carried on within the United Kingdom and was exercised by Akron through Brentford as its agent. Accordingly, tax was chargeable in respect of that trade under Schedule D, para. 1 (a) (iii), to the Income Tax Act, 1918, and Brentford was Akron's regular agent in whose name it was properly assessed to tax on profits of that trade under rules 5 and 10 of the All Schedules Rules.

An order and its acceptance alone constituted the effective contract under which a distributor could call on Brentford to deliver tyres. Accordingly, Brentford was selling under contracts made in the United Kingdom tyres manufactured by it in the United Kingdom and deliverable in the United Kingdom to purchasers thereof against payment in the United Kingdom of the purchase price. Further, the course of dealings between Akron and Brentford was to set up standing arrangements whereby Brentford agreed to hold goods of its own at the disposal of Akron and to sell them on Akron's behalf to customers approved by Akron and subject to terms imposed by Akron and to account to Akron for the proceeds of the sales.

Decision of the Court of Appeal [1956] 1 W.L.R. 352; [1956] 1 All E.R. 693 affirmed.

H. L. (E.)

1956-1957

FIRESTONE
TYRE AND
RUBBER CO.
LTD.
v.
LEWELLIN
(INSPECTOR
OF TAXES).

APPEAL from the Court of Appeal (Lord Evershed M.R., Jenkins and Birkett L.JJ.).

This was an appeal from an order of the Court of Appeal dated February 13, 1956, dismissing an appeal from an order of the High Court (Harman J.) dated October 20, 1955. The appellant was Firestone Tyre and Rubber Co. Ltd. (hereafter called "Brentford"), carrying on the business of tyre and rubber manufacturers at Great West Road, Brentford, in Middlesex. By the order of the High Court an appeal by Brentford on a case stated by the Commissioners for the Special Purposes of the Income Tax Acts was dismissed and their determination was affirmed. The matter arose on assessments to income tax made on Brentford under Schedule D to the Income Tax Act, 1918, for the five years 1940-1941 to 1944-1945 inclusive as agents for a non-resident company, Firestone Tire and Rubber Co. of Akron, Ohio, in the United States of America (hereafter called "Akron").

The questions for the determination of the Special Commissioners were set out in the case stated as follows: "(a) whether

466		THE WEEKLY LAW REPORTS		March 8, 1957

H. L. (E.)
1956–1957

Firestone
Tyre and
Rubber Co.
Ltd.
*v.*
Lewellin
(Inspector
of Taxes).

"Brentford itself was carrying on a trade on its own behalf of "selling tyres to persons outside the United Kingdom; and, if not, "(*b*) whether Akron was exercising within the United Kingdom "a trade of selling tyres to persons outside the United Kingdom; "and, if so, (*c*) whether that trade was carried on by Akron "through the agency of Brentford." They answered (*a*) in the negative and (*b*) and (*c*) in the affirmative. The Crown did not challenge the answer to (*a*).

Paragraph 5 of the case stated was as follows: "Firestone "tyres which had been manufactured by Brentford were exported "to customers outside the United Kingdom by agreement with "Akron in accordance with the following arrangements. They "were exported only to persons approved by Akron as 'dis-"'tributors' of Firestone tyres, who were required to sign an "agreement with Akron. A copy of an agreement made between "a Swedish corporation" (Aktiebolaget A. Wiklunds Maskin & Velocipedfabrik, carrying on business (inter alia) as a distributor of tyres at Stockholm, Sweden, and hereafter referred to as "Sweden") "and Akron . . . is attached to and forms part of "this case. Under this agreement dated May 20, 1935, Akron "granted to the Swedish distributor the exclusive right to sell "Firestone tyres and accessories in Sweden and the latter under-"took to buy, sell and distribute such Firestone branded products "exclusively; to keep on hand reasonable stocks of these products; "and to use its best efforts to sell these products in Sweden but "not elsewhere . . . Akron undertook to make deliveries f.a.s. "vessel . . ."

Paragraph 7 of the case stated set out that, following negotiations between Akron and Brentford, "an agreement was drawn "up on February 8, 1936, regulating the fulfilment by Brentford "on behalf of Akron of orders obtained in Europe and elsewhere "by Akron."

Paragraph 16 (*d*) set out the following finding of the Special Commissioners: ". . . It seems to us that the effect of the "agreement of February 8, 1936, and the course of the dealings "between Akron and Brentford was to set up standing arrange-"ments whereby Brentford agreed to hold goods of its own at "the disposal of Akron and to sell the same on Akron's behalf to "customers approved of by Akron; and, further, to account to "Akron for the proceeds of the sales less the cost of the goods "sold plus 5 per cent."

The facts summarized in the headnote are fully set out in the report below.[1]

*George Honeyman* Q.C. and *David Wilson* for the appellant company.

*Sir Frank Soskice* Q.C. and *Sir Reginald Hills* for the Crown.

---

[1] [1956] 1 W.L.R. 352, 353–358; [1956] 1 All E.R. 693.

The following authorities, besides those referred to in their Lordships' opinions, were cited in argument: *Sulley* v. *Attorney-General*[2]; *The Moorcock*[3]; *Cassaboglou* v. *Gibb*[4]; *Maclaine & Co.* v. *Eccott*[5]; *Great Northern Railway Co.* v. *Witham*[6]; *Household Fire and Carriage Accident Insurance Co. Ltd.* v. *Grant*[7]; *Gramophone and Typewriter Ltd.* v. *Stanley*[8]; *Grainger & Son* v. *Gough*[9]; *W. H. Muller & Co. (London) Ltd.* v. *Lethem* and *Neilson, Anderson & Co.* v. *Collins*[10]; *Scales* v. *Atalanta Steamship Co. of Copenhagen*[11]; *Absalom* v. *Talbot*,[12] and *Hughes* v. *Bank of New Zealand Ltd.*[13]

H. L. (E.)
1956–1957

FIRESTONE
TYRE AND
RUBBER CO.
LTD.
v.
LEWELLIN
(INSPECTOR
OF TAXES).

Their Lordships took time for consideration.

Feb. 14, 1957. LORD MORTON OF HENRYTON. My Lords, in this case I agree with the conclusions successively reached by the Special Commissioners, Harman J. and the Court of Appeal, and I can state my reasons very briefly.

Three companies were concerned in the transactions giving rise to this appeal. They are: (1) the Firestone Tyre and Rubber Co. Ltd., which carries on the business of tyre and rubber manufacturers at Great West Road, Brentford, Middlesex; (2) the Firestone Tire and Rubber Co. of Akron, Ohio, in the United States of America; (3) a company named Aktiebolaget A. Wiklunds Maskin & Velocipedfabrik, carrying on business (inter alia) as a distributor of tyres at Stockholm, Sweden. These three companies have been referred to in the courts below as "Brentford," "Akron" and "Sweden," and I shall adopt the same convenient course.

The events giving rise to this appeal are fully set out in the case stated and are summarized in the judgment of the Master of the Rolls. I gratefully accept his summary and shall not repeat it. The questions for determination before the Special Commissioners were: "(a) whether Brentford itself was carrying "on a trade on its own behalf of selling tyres to persons outside "the United Kingdom; and, if not, (b) whether Akron was exer-"cising within the United Kingdom a trade of selling tyres to "persons outside the United Kingdom, and, if so, (c) whether "that trade was carried on by Akron through the agency of "Brentford." The Special Commissioners answered question (a) in the negative and the Crown has not sought to contest this decision, so your Lordships are only concerned with questions (b) and (c).

---

[2] (1860) 5 H. & N. 711.
[3] (1889) 14 P.D. 64; 5 T.L.R. 316.
[4] (1883) 11 Q.B.D. 797.
[5] [1926] A.C. 424; 42 T.L.R. 416.
[6] (1873) L.R. 9 C.P. 16.
[7] (1879) 4 Ex.D. 216.
[8] [1908] 2 K.B. 89; 24 T.L.R. 480.
[9] [1896] A.C. 325; 12 T.L.R. 364.
[10] [1928] A.C. 34; 44 T.L.R. 53.
[11] (1925) 134 L.T. 411; 41 T.L.R. 591.
[12] [1944] A.C. 204; 60 T.L.R. 434; [1944] 1 All E.R. 642.
[13] [1938] A.C. 366; 54 T.L.R. 542; [1938] 1 All E.R. 778.

H. L. (E.)
1956–1957

Firestone
Tyre and
Rubber Co.
Ltd.
v.
Lewellin
(Inspector
of Taxes).

Lord Morton
of Henryton.

The relevant provisions of the Income Tax Act, 1918, are as follows:—

The Income Tax Act, 1918, Sch. D, para. (1), provides: "Tax "under this Schedule shall be charged in respect of—(a) The "annual profits or gains arising or accruing— ... (iii) to any per-"son, whether a British subject or not, although not resident in "the United Kingdom, ... from any trade, profession, employ-"ment, or vocation exercised within the United Kingdom; ...."

General Rule 5 provides: "A person not resident in the "United Kingdom, whether a British subject or not, shall be "assessable and chargeable in the name of ... any factor, agent, "receiver, branch, or manager, whether such factor, agent, "receiver, branch, or manager has the receipt of the profits or "gains or not, in like manner and to the like amount as such "non-resident person would be assessed and charged if he were "resident in the United Kingdom and in the actual receipt of "such profits or gains."

General Rule 10 provides: "Nothing in these rules shall "render a non-resident person chargeable in the name of a broker "or general commission agent, or in the name of an agent not "being an authorised person carrying on the regular agency of "the non-resident person or a person chargeable as if he were an "agent in pursuance of these rules, in respect of profits or gains "arising from sales or transactions carried out through such a "broker or agent."

It is clear that if Akron was carrying on the trade in question through the agency of Brentford, the agency was a "regular" one within the meaning of General Rule 10, and counsel for the appellant did not seek to rely upon that rule.

The first stage in considering questions (b) and (c) is to determine whether the trade in selling tyres to persons outside the United Kingdom, with which this appeal is concerned, was exercised within the United Kingdom. My Lords, I cannot doubt that it was so exercised, in view of the facts as to the course of dealing set out in the case stated and in particular in paragraphs 6 to 12 inclusive.

Jenkins L.J. states the result of this course of dealing, in language which I entirely accept, as follows [1]: "An order placed "by a distributor direct with Brentford as one of the listed manu-"facturers of Firestone tyres could at most only create a contract "between the distributor and Akron to the effect that the distri-"butor would purchase, and Akron would cause the manufacturer "to sell to the distributor, the tyres ordered on the terms and "conditions of the distributor agreement. There was no privity "of contract between distributor and manufacturer quoad the "distributor agreement, and it is, I think, quite impossible to "hold that the mere placing of an order with any one of the listed "manufacturers would, without more, oblige that manufacturer

[1] [1956] 1 W.L.R. 352, 371–372; [1956] 1 All E.R. 693.

H. L. (E.)
1956-1957

FIRESTONE TYRE AND RUBBER CO. LTD.
v.
LEWELLIN (INSPECTOR OF TAXES).

Lord Morton of Henryton.

"to deliver the tyres ordered. As between the distributor and "the listed manufacturer the matter must have been one of offer "and acceptance, that is to say, an order placed by the distributor "with the manufacturer and accepted by the latter. The order "and its acceptance would alone constitute the effective contract "under which the distributor could call upon the manufacturer "to deliver the tyres ordered, and would be bound on his own "part to take and pay for them. Such contracts in the case of "Brentford would be made in England as the place of acceptance. "On applying this view of the contractual position to the facts "found, it appears that during the material period Brentford "was selling to distributors abroad, under contracts made in the "United Kingdom, tyres manufactured by Brentford in the United "Kingdom, and deliverable in the United Kingdom to the pur- "chasers thereof against payment in the United Kingdom of the "contract price; and, furthermore, was in fact effecting delivery of "and receiving payment for such tyres in the United Kingdom."

The next stage is to consider whether there was evidence to justify the Special Commissioners in finding that during the relevant years Akron was exercising the trade in question through Brentford as its agent.

My Lords, in my view this question must be answered in the affirmative. Having regard to the course of dealing pursued by the parties there were only two views open for consideration by the Special Commissioners. One was that Brentford was exercising the trade on its own behalf; the other was that Akron was exercising the trade through Brentford as its agent. The Special Commissioners rejected the first view and accepted the second and, in my opinion, they were right. It is true that the goods sold belonged to Brentford and not to Akron, but this fact does not show conclusively that Brentford was selling the goods on its own behalf and not as agent: see *Weiss, Biheller & Brooks Ltd. v. Farmer*.[2] Each case has to be determined having regard to all the facts, and the other facts in the present case were strongly in favour of the view expressed by the Special Commissioners. I agree with their summary of the position, as set out in paragraph 16 (d) of the case stated: "It seems to us that the effect of the "agreement of February 8, 1936, and the course of the dealings "between Akron and Brentford was to set up standing arrange- "ments whereby Brentford agreed to hold goods of its own at "the disposal of Akron and to sell the same on Akron's behalf to "customers approved of by Akron and subject to terms imposed "by Akron; and, further, to account to Akron for the proceeds "of the sales less the cost of the goods sold plus 5 per cent."

In his helpful argument for the appellant Mr. Honeyman rightly referred your Lordships to a number of other cases, but the view that I take makes it unnecessary to refer to any of them. I can see no good reason for disturbing the determination of the Special Commissioners, and I would dismiss the appeal with costs.

[2] [1923] 1 K.B. 226; 39 T.L.R. 118.

470 THE WEEKLY LAW REPORTS MARCH 8, 1957

H. L. (E.)
1956-1957

FIRESTONE
TYRE AND
RUBBER Co.
LTD.
*v.*
LEWELLIN
(INSPECTOR
OF TAXES).

LORD RADCLIFFE. My Lords, I agree that the appeal ought to be dismissed. I believe that all your Lordships are of the same opinion. Since the assessments in question cover the revenue years 1940-1941 to 1944-1945, it is perhaps time that the litigation with regard to them should come to an end. It will be some consolation to the appellants, when the tax is paid, to know that none of the four courts by whom their case has been heard has differed from the others in the decision given, nor has there been a dissentient voice here or in the Court of Appeal: and this despite a full and careful presentation on the appellants' behalf of all the arguments that might lead to a contrary result.

In my view, what needs to be said has already been said in the other courts and in the speech of my noble and learned friend on the Woolsack. I propose to say, therefore, only in the briefest way where it is that I think that the appellants' argument breaks down.

The question before the Special Commissioners was whether the American company, styled Akron in the case stated, was exercising a trade within the United Kingdom. I omit for the moment the subsidiary question whether, if so, the English company styled Brentford was its regular agent for the purpose of assessment.

The question whether a trade has been exercised within the United Kingdom is a question of fact in this sense, that, although the law must rule whether any given set of facts can amount to such an exercise or cannot but amount to such an exercise, it is for the Special Commissioners, within those limits, to decide in the particular case before them whether a trade has or has not been so exercised. That done, there remains only the question whether they made any error of law in the decision that they came to. I do not myself take the view that this distinction is of any special importance in the present case, since the weight of the appellants' argument rested in any event on a legal proposition, the proposition that, where the trade sought to be assessed was what was called a " pure " merchanting business, the place at or in which the goods merchanted were " sold " determined in law the site of the exercise of the merchanting trade itself. The second step in the argument was that the sales the profits of which were now being assessed were made outside the United Kingdom because the master agreement between Akron and its Swedish distributor, out of which arose the orders given to Brentford by the latter, was not itself made within the United Kingdom or, alternatively, because those orders, originating in Sweden, brought about American/Swedish sales despite the not unimportant part allotted to Brentford in the course of dealing.

My Lords, no one can doubt that in considering what are the legal requirements of the phrase " trade . . . exercised within the " United Kingdom " courts of law have ruled that the place where sales or contracts of sale are made is of great importance when it is a merchanting business that is in question. They have not

H. L. (E.)
1956-1957

FIRESTONE TYRE AND RUBBER Co. LTD.
v.
LEWELLIN (INSPECTOR OF TAXES).

Lord Radcliffe.

gone so far as to seek to substitute this test (which under the conditions of international business and modern facilities of communication is capable of proving a somewhat ingenuous one) for the statutory duty to inquire whether a trade is or is not exercised within the kingdom. I should be doing an injustice to the arguments of the counsel for the appellants if I said that he submitted that they had. But he rightly reminded us that more than once the place where the contract is made has been spoken of as the " crucial " test or, again, as the " most vital " element.

Speaking for myself I do not find great assistance in the use of a descriptive adjective such as " crucial " in this connexion. It cannot be intended to mean that the place of contract is itself conclusive. That would be to rewrite the words of the taxing Act, and could only be justified if there was nothing more in trading than the act of sale itself. There is, of course, much more. But, if " crucial " does not mean as much as this, it cannot mean more than that the law requires that great importance should be attached to the circumstance of the place of sale. It follows then that the place of sale will not be the determining factor if there are other circumstances present that outweigh its importance or unless there are no other circumstances that can. Since the courts have not attempted to lay down what those other circumstances are or may be, singly or in combination, and it would be, I believe, neither right nor possible to try to do so, I think it true to say that, within wide limits which determine what is a permissible conclusion, the question whether a trade is exercised within the United Kingdom remains, as it began, a question of fact for the Special Commissioners. In my opinion, therefore, Harman J. in the High Court and the Master of the Rolls in the Court of Appeal were well founded in laying stress on the observation of Atkin L.J. in *F. L. Smidth & Co.* v. *Greenwood*[3]: " The contracts in this case were made abroad. But I am not " prepared to hold that this test is decisive. I can imagine cases " where the contract of resale is made abroad, and yet the " manufacture of the goods, some negotiation of the terms, and " complete execution of the contract take place here under such " circumstances that the trade was in truth exercised here. I " think that the question is, where do the operations take place " from which the profits in substance arise? "

Now, in the present case the sales from which trading arose were the dealings by virtue of which Brentford disposed of Firestone tyres to the Swedish distributor in response to the orders received from the latter. It is, I think, the major fallacy of the appellants' argument that it seeks to determine the locality of this trading by the locality which the law would attribute to the master agreement between Akron and that distributor. In my opinion the master agreement has very little, if any, significance for this purpose. It was important, of course, for other purposes.

---

[3] [1921] 3 K.B. 583, 593; 37 T.L.R. 949 (C.A.); *Greenwood* v. *F. L. Smidth & Co.* [1922] 1 A.C. 417; 38 T.L.R. 421 (H.L.)

Case 1:03-md-01570-GBD-SN   Document 415-27   Filed 08/30/04   Page 10 of 10

H. L. (E.)
1956-1957
―――
FIRESTONE
TYRE AND
RUBBER CO.
LTD.
v.
LEWELLIN
(INSPECTOR
OF TAXES).
―――
Lord Radcliffe.
―――

It was one of the basic treaties upon which the international organization of Akron was built up. It settled many particulars of the terms of trade upon which would take place the dealings of those who were to come within the operational range of that organization. But it did not itself constitute the contracts of sale the locality of which was to be so important in deciding whether Akron was carrying on any trade inside the United Kingdom. The sales to look at for that purpose were the dealings which took place in the course of trade between Brentford and the Swedish distributor: and those dealings consisted of invitations to trade received by Brentford in England, the manufacture or appropriation of stock in England in response to those invitations, the delivery of the stock free alongside vessel in England in discharge of the order, and the receipt of the payment in a bank in England. Those operations constituted the exercising of a trade in England. The Special Commissioners thought that it was Akron's trade, not Brentford's: and I do not see why we should disagree with them.

I think that the trading situation is accurately described by the Special Commissioners in paragraph 16 (d) of the case stated: "It seems to us that the effect of the agreement of February 8, "1936, and the course of the dealings between Akron and Brent- "ford was to set up standing arrangements whereby Brentford "agreed to hold goods of its own at the disposal of Akron and "to sell the same on Akron's behalf to customers approved of "by Akron and subject to terms imposed by Akron; and, further, "to account to Akron for the proceeds of the sales less the cost "of the goods sold plus 5 per cent."

There is nothing in law that prevents such a finding being made. It is a very natural description of the course of trading that was pursued. But, if so, the Special Commissioners were fully entitled to their conclusion that Akron was trading in the United Kingdom during the years of assessment and that Brentford had constituted themselves their regular agents for the purpose of this trade. The latter point seems to me to be involved almost of necessity in the reading of the facts which I have set out above.

I would dismiss the appeal.

LORD TUCKER. My Lords, I agree that the appeal should be dismissed for the reasons which have been stated by my noble and learned friends.

LORD COHEN. My Lords, I agree that the appeal should be dismissed, and cannot usefully add any further reasons of my own.

*Appeal dismissed.*

Solicitors: *Lovell, White & King;* Solicitor of Inland Revenue.

F. C.