**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In Re TERRORIST ATTACKS on | ) | 03 MDL 1570 (RCC) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| | ) | |

*This document relates to:*
    *Federal Insurance Co. v. Al Qaida,* 03 CV 6978 (RCC)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF THE NATIONAL COMMERCIAL BANK

Dated: August 30, 2004
         Washington, D.C.

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB-4112)
Ugo Colella (admitted *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:     202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*

**Table of Contents**

Argument ..................................................................................................................................1

    I.     NCB is Immune from Suit under the Foreign Sovereign Immunities Act ...................2

           A.    Instrumentality Status ........................................................................................2

           B.    The FSIA's Exceptions ......................................................................................4

    II.    This Court Lacks Personal Jurisdiction Over NCB .................................................12

    III.   Plaintiffs Fail to State Any Claims Against NCB ...................................................14

           A.    Causation..........................................................................................................14

           B.    Standing ...........................................................................................................15

           C.    RICO ................................................................................................................17

           D.    Aiding and Abetting/Conspiracy ....................................................................20

           E.    Negligence.......................................................................................................21

           F.    Additional Claim-Specific Grounds ...............................................................21

Conclusion .............................................................................................................................22

## Table of Authorities

## Cases

*A.O. Fox Memorial Hospital v. American Tobacco Co.,*
302 A.D.2d 413, 754 N.Y.S.2d 368 (2d Dep't 2003) .................................................16

*Allstate Insurance Co. v. Mazzola,*
175 F.3d 255 (2d Cir. 1999) ..............................................................................15

*Alvarez-Machain v. United States,*
124 S. Ct. 2739 (2004).......................................................................................11

*Antares Aircraft v. Nigeria,*
999 F.2d 33 (2d Cir. 1993),
*cert. denied,* 510 U.S. 1071 (1994) .....................................................................7

*Arkwright-Boston Manufactuers Mutual Ins. Co. v. City of New York,*
762 F.2d 205 (2d Cir. 1985) ..............................................................................16

*Baker v. Hanvit Bank,*
--- F.3d ---, 2004 WL 1764228 (2d Cir. Aug. 6, 2004) ......................................4

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.,*
344 F.3d 211 (2d Cir. 2003) ........................................................................ 15, 16

*Bunge Corp. v. London & Overseas Insurance Co.,*
394 F.2d 496 (2d Cir.),
*cert. denied,* 393 U.S. 952 (1968) ................................................................ 16, 17

*Burnett v. Al Baraka,*
274 F. Supp. 2d 86 (D.D.C. 2003) .............................................................2, 7, 17, 21

*Burnett v. Al Baraka,*
292 F. Supp. 2d 9 (D.D.C. 2003) ..............................................................2, 6, 10, 14

*Calder v. Jones,*
465 U.S. 783 (1984) ..........................................................................................14

*Casalino v. Ente Ferrovie Dello Stato,*
779 F. Supp. 338 (S.D.N.Y. 1991) ......................................................................8

*Compagnie Noga v. The Russian Federation,*
361 F.3d 676 (2d Cir. 2004) ...........................................................................3, 4

*DePace v. Flaherty,*
183 F. Supp. 2d 633 (S.D.N.Y. 2002) ..............................................................15

*Diorinou v. Mezitis*,
　　237 F.3d 133 (2d Cir. 2001) .................................................................5

*Dole Food Co. v. Patrickson*,
　　123 S. Ct. 1655 (2003) .......................................................................3

*Eastern States Health & Welfare Fund v. Philip Morris, Inc.*,
　　188 Misc. 2d 638, 729 N.Y.S. 2d 240 (N.Y. Sup. Ct. 2000) ......................16

*Exchange Nat'l Bank of Chicago v. Empresa Minera Del Centro Del Peru S.A.*,
　　595 F. Supp. 502 (S.D.N.Y. 1984) .........................................................8

*FDIC v. State of New York*,
　　718 F. Supp. 191 (S.D.N.Y. 1990),
　　*aff'd*, 928 F.2d 56 (2d Cir. 1991) ..........................................................4

*Gabay v. Mostazafan Foundation of Iran*,
　　151 F.R.D. 250 (S.D.N.Y. 1993) ...........................................................8

*General Electric Capital Corp. v. Grossman*,
　　991 F.2d 1376 (8th Cir. 1993) ..............................................................8

*Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C.*,
　　288 F. Supp. 2d 482 (S.D.N.Y. 2003) ...................................................15

*Gmurzynska v. Hutton*,
　　257 F. Supp. 2d 621 (S.D.N.Y. 2003),
　　*aff'd*, 355 F.3d 206 (2d Cir. 2004) .......................................................21

*Goldfine v. Sichenzia*,
　　118 F. Supp. 2d 392 (S.D.N.Y. 2000).....................................................19

*Grossman v. Citrus Assoc. of the New York Cotton Exchange, Inc.*,
　　706 F. Supp. 221 (S.D.N.Y. 1989) ........................................................20

*Grove Press, Inc. v. Angleton*,
　　649 F.2d 121 (2d Cir. 1981) ................................................................14

*Harris v. VAO Intourist, Moscow*,
　　481 F. Supp. 1056 (E.D.N.Y. 1979) ........................................................8

*In re Air Crash Disaster at Cove Neck, Long Island, New York on January 25, 1990*,
　　885 F. Supp. 434 (E.D.N.Y. 1995) .......................................................16

*In re Joint Eastern & Southern Dist. Asbestos Litig.*,
　　78 F.3d 764 (2d Cir. 1996) ............................................................16, 17

*In re Ski Train Fire in Kaprun, Austria on November 11, 2000,*
No. 01-1428, 2003 WL 22909153 (S.D.N.Y. Dec. 9, 2003) ....................................... 13

*Katzman v. Victoria's Secret Catalogue,*
167 F.R.D. 649 (S.D.N.Y. 1996),
*aff'd,* 113 F.3d 1229 (2d Cir. 1997) (unpublished) ....................................... 20

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
376 F.3d 1123 [2004 WL 1698198] (D.C. Cir. 2004) ....................................... 10, 11

*Kolbeck v. LIT America, Inc.,*
939 F. Supp. 240 (S.D.N.Y. 1996),
*aff'd,* 152 F.3d 918 (2d Cir. 1998) (unpublished) ....................................... 20

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,*
26 F. Supp. 2d 593 (S.D.N.Y. 1998) ....................................... 14

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,*
191 F.3d 229 (2d Cir. 1999)
*cert. denied,* 528 U.S. 1080 (2000) ....................................... 17

*Lapudula & Vilani, Inc. v. United States,*
563 F. Supp. 782 (S.D.N.Y. 1983) ....................................... 4

*Leutwyler v. Office of Her Majesty,*
184 F. Supp. 2d 277 (S.D.N.Y. 2001) ....................................... 3

*Lewis v. Rosenfeld,*
138 F. Supp. 2d 466 (S.D.N.Y. 2001) ....................................... 20

*Magnus Electronics, Inc. v. La Republic Argentina,*
830 F.2d 1396 (7th Cir. 1987) ....................................... 8

*Misek-Falkoff v. International Business Machines Corp.,*
162 A.D.2d 211 (1st Dep't 1990) ....................................... 22

*O'Connell Machinery v. M.V. "Americana",*
734 F.2d 115 (2d Cir.)
*cert. denied,* 469 U.S. 1086 (1984) ....................................... 3, 4

*O'Melveny & Myers v. FDIC,*
512 U.S. 79 (1994) ....................................... 4

*Odyssey Re (London) Ltd. v. Stirling Cook Brown Holdings Ltd.,*
85 F. Supp. 2d 282 (S.D.N.Y. 2000),
*aff'd,* 2 Fed. Appx. 109 (2d Cir. 2001) ....................................... 20

*Oei v. Citibank, N.A.,*
    957 F. Supp. 492 (S.D.N.Y. 1997) ...................................................20

*Papasan v. Allain,*
    478 U.S. 265 (1986) ...........................................................................15

*Republic of Argentina v. Weltover,*
    504 U.S. 607 (1992) .............................................................................9

*Republic of Austria v. Altmann,*
    124 S. Ct. 2240 (2004) ........................................................................3

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ...........................................................................19

*Rocap v. Indiek,*
    539 F.2d 174 (D.C. Cir. 1976) ............................................................4

*Saudi Arabia v. Nelson,*
    507 U.S. at 357 ...................................................................................7

*Schmidt v. Fleet Bank,*
    16 F. Supp. 2d 340 (S.D.N.Y. 1998) ..........................................19, 20

*Travelers Indemnity Co. of Illinois v. 28 East 70th Street Construction Co., Inc.,*
    296 F. Supp. 2d 476 (S.D.N.Y. 2003) ...............................................15

*United States Fire Ins. Co. v. United Limousine Service, Inc.,*
    303 F. Supp. 2d 432 (S.D.N.Y. 2004).................................................17

*Virtual Countries, Inc. v. Republic of South Africa,*
    300 F.3d 230 (2d Cir. 2002) ..................................................2, 4, 9, 10

*Winkelmann v. Excelsior Ins. Co.,*
    626 N.Y.S.2d 994, 650 N.E.2d 841 (N.Y. 1995).................................15

*Zappia v. Abu Dhabi,*
    215 F.3d 247 (2d Cir. 2000) .............................................................3, 4

## Federal Statutes

18 U.S.C.

    § 1952.................................................................................................18

    § 1952 (a) & (b) ................................................................................18

    § 1956 ...............................................................................................18

§ 1957 ............................................................................................................................18

§ 1961(1) .......................................................................................................................18

§ 1962(a).............................................................................................................13, 14, 17

§ 1962(c) & (d) ...............................................................................................14, 17, 19, 20

§ 1964(c) ........................................................................................................................17

§ 2331 ............................................................................................................................13

§ 2333 ............................................................................................................................14

§ 2336(a) ........................................................................................................................21

§ 2337(2) ........................................................................................................................21

28 U.S.C.

§ 1350 ............................................................................................................................14

§ 1603(b)(1) .....................................................................................................................2

§ 1603(b)(2) ..................................................................................................................2, 4

§ 1603(b)(3) .....................................................................................................................2

§ 1605(a)(2) .............................................................................................................. 6, 7, 8

§ 1605(a)(5) ............................................................................................................. 10, 11

§ 1605(a)(7) ......................................................................................................5, 6, 10, 11

**Federal Rules of Civil Procedure**

Rule 8 ...........................................................................................................................21

**State Statutes**

N.Y. CPLR

§ 215(3) .........................................................................................................................22

§ 301 ............................................................................................................................13

§ 302 ............................................................................................................................13

**Executive Branch Statements**

Condaleeza Rice, National Security Advisor, Statement Before the
National Commission on Terrorist Attacks Upon the United States, 9th Public Hearing
(Apr. 8, 2004) ...................................................................................................................12

**Congressional Record**

H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., reprinted in, 1976 U.S.C.C.A.N. 6604 ..........................8

**Miscellaneous**

*Korean Banking Reform Following the Asian Financial Crisis*, available at
http://www.Columbia.edu/cu/business/apec/publications/kataoka.pdf................................4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| | ) | |
| In Re TERRORIST ATTACKS on | ) | 03 MDL 1570 (RCC) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| | ) | |

---

*This document relates to:*
   *Federal Insurance Co. v. Al Qaida,* 03 CV 6978 (RCC)

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
### OF THE NATIONAL COMMERCIAL BANK

The *Federal Insurance* First Amended Complaint ("1AC") makes allegations against The National Commercial Bank ("NCB") that are indistinguishable from those in *Burnett* and *Ashton*, with three exceptions. First, Plaintiffs are not victims of the 9/11 attacks, but rather are insurance companies alleging a subrogation right to recoup payments they allegedly made to their insureds. Second, unlike in *Burnett* and *Ashton*, Plaintiffs assert a civil RICO claim against NCB on the fanciful theory that NCB conspired to be part of a so-called "Radical Muslim Terrorism" enterprise. Third, the *Federal Insurance* Plaintiffs confine themselves to a subset of the *Burnett* and *Ashton* allegations, and seek to hold NCB liable for the September 11th attacks based only on banking services that NCB allegedly provided to its customers in Saudi Arabia.

Apart from these three modest differences, the *Federal Insurance* allegations are the same as those that NCB has shown to be deficient in its pending motions to dismiss in *Burnett* and *Ashton*. Moreover, the three new twists offered in the *Federal Insurance* complaint do not save it from dismissal. As previously shown in NCB's *Burnett* and *Ashton* motions—and as the *Federal Insurance* Plaintiffs expressly concede—NCB is an "instrumentality" of the Kingdom of Saudi Arabia, a sovereign foreign state. NCB is immune from suit under the Foreign Sovereign Immunities Act ("FSIA") because Plaintiffs' attenuated theories of liability do not satisfy any FSIA exceptions to

immunity.  Nor can the Plaintiffs establish personal jurisdiction over NCB or the required causal connection between NCB's alleged conduct and the September 11th attacks.[1]

## I.  NCB is Immune from Suit under the Foreign Sovereign Immunities Act.

### A.  Instrumentality Status

The FSIA provides the "sole basis" for exercising subject matter jurisdiction over instrumentalities of a foreign state.  *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236 (2d Cir. 2002).  Plaintiffs expressly concede that, from 1999 forward, NCB has been an "instrumentality" of the Kingdom of Saudi Arabia, 1AC, ¶¶ 286, 287, and the indisputable facts confirm Plaintiffs' concession.[2]  *See* 28 U.S.C. § 1603(b)(1)-(3) (defining agency or instrumentality).  NCB is a separate legal person from the Saudi government (*id.*, § 1603(b)(1)), and is neither a citizen of a State of the United States nor created under the laws of any third country.  *Id.*, § 1603(b)(3); *see also Burnett* Op. Mem., at 35; *Ashton* Op. Mem., at 2-3.

Also, a majority of NCB's shares is owned by "a foreign state or political subdivision thereof," the third and final requirement for FSIA instrumentality status.  28 U.S.C. § 1603(b)(2).  As of the filing date of the *Federal Insurance* complaint naming NCB as a defendant,[3] the Public

---

[1]     NCB adopts the argument by Prince Sultan that Judge Robertson's rulings in *Burnett* are entitled to substantial deference in these MDL-consolidated actions.  *See* MDL Dkt. #48, at 10-13; *Burnett v. Al Baraka*, 274 F. Supp. 2d 86 (D.D.C. 2003) ("*Burnett I*"); *Burnett v. Al Baraka*, 292 F. Supp. 2d 9 (D.D.C. 2003) ("*Burnett II*").

[2]     *See* Aff. of Mitchell R. Berger ("Berger Aff.") (attached hereto), Exh. 4 (Affidavit of Abdallah Bin Hamad Al-Wohaibi); Exh.  5 (Declaration of Jorge Juco); Exh. 6 (Supp. Affidavit of Abdallah Bin Hamad Al-Wohaibi); Exh. 7 (Declaration of Nizar Bin Obaid Madani).  NCB also incorporates by reference:  Mem. of Law in Support of Mot. to Dismiss of Defendant The National Commercial Bank, Oct. 14, 2003, Dkt. (DC) #359 ("*Burnett* Op. Mem."), at 35; Reply Mem. of The National Commercial Bank in Support of its Mot. to Dismiss, MDL Dkt. #45 ("*Burnett* Reply Mem."), at 2-3; Mem. of Law in Support of Mot. to Dismiss of Defendant The National Commercial Bank, MDL Dkt. #46 ("*Ashton* Op. Mem."), at 2-10; Reply Mem. of The National Commercial Bank in Support of its Mot. to Dismiss, MDL Dkt. #170 ("*Ashton* Reply Mem."), at 1-3.

[3]     Plaintiffs acknowledge that an entity's FSIA status is determined as of the time a lawsuit is filed—here, September 10, 2003.  *See* Fed. Ins. Dkt. #1; MDL Dkt. #305 (Opp. to HRH Prince

Investment Fund ("PIF") owned a majority of NCB's outstanding shares. *Burnett* Op. Mem., at 35; *Ashton* Op. Mem., at 2-3. The PIF—as established by affidavits from Saudi Arabia's Ministry of Finance—is a department or bureau of the Ministry of Finance with "no separate legal status" from the Ministry itself. *See* Berger Aff., Exh. 4, ¶¶ 2, 4 & Exh. 6, ¶¶ 3, 4, 6. In turn, the Ministry of Finance is not a separate legal person from the Saudi Government. *Id.*, Exh. 6, ¶ 11. These Affidavits are entitled to "great weight" in determining the PIF's status under Saudi law. *See Leutwyler v. Office of Her Majesty*, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001).

With no separate legal status from the Ministry, the PIF is "an integral part" of Saudi Arabia's "government and political structure" and therefore must be viewed, for FSIA purposes, either as the Saudi Government itself or as a "political subdivision" thereof. *See Compagnie Noga v. The Russian Federation*, 361 F.3d 676, 687-88 & n.12 (2d Cir. 2004) (adopting a "core functions" test, which holds that entities "so closely bound up with the structure of the state . . . must in all cases be considered as the 'foreign state' itself"; "any government of reasonable complexity must act through men organized into offices and departments"; noting cases holding that government ministries are political subdivisions); *O'Connell Machinery v. M.V. "Americana"*, 734 F.2d 115, 116 (2d Cir.) (entity analogous to the PIF deemed a political subdivision), *cert. denied*, 469 U.S. 1086 (1984); *Zappia v. Abu Dhabi*, 215 F.3d 247, 249, 250 (2d Cir. 2000) (Abu Dhabi Commercial Bank, a majority of whose shares were owned by the Abu Dhabi Investment Authority, was an "instrumentality" of the Emirate of Abu Dhabi).[4] Accordingly, NCB is an instrumentality of the Saudi Government, a conclusion confirmed by the Saudi Ministry of Foreign Affairs. *See* Berger Aff., Exh. 7, ¶¶ 2, 4 ("It

---

Turki), at 7; *Republic of Austria v. Altmann*, 124 S. Ct. 2240, 2252, 2253 (2004); *Dole Food Co. v. Patrickson*, 123 S. Ct. 1655, 1662, 1663 (2003).

[4]     *Burnett* Op. Mem., at 35; *Burnett* Reply Mem., at 2-3; *Ashton* Op. Mem., at 2-10; *Ashton* Reply Mem., at 1-3.

is the position of the Ministry of Foreign Affairs that NCB is a government instrumentality of the Kingdom of Saudi Arabia.").[5]

### B.    The FSIA's Exceptions

As an instrumentality of the Saudi Government, NCB is immune from suit unless one of the FSIA's "limited" exceptions applies.  *See Virtual Countries*, 300 F.3d at 241.  The allegations against NCB in the 1AC are not materially different from those made by the *Burnett* and *Ashton* plaintiffs.  Plaintiffs allegations fall into three categories:[6]

(1)    **BCCI**:  NCB purportedly played a role in the BCCI affair.  1AC, ¶¶ 288-89; RICO Statement (Berger Aff., Exh. 8), Exh. A.

(2)    **Financial Conduit**:  NCB customers—which include individuals (*id.*, ¶ 295) and charities (*id.*, ¶¶ 290-94)—allegedly "transfer[red]" funds to al Qaeda, thus making NCB a "channel" to al Qaeda and purportedly "one of al Qaida's preferred banks" (*id.*, ¶¶ 290, 292, 293; RICO Statement, Exh. A; *see also* 1AC, ¶¶ 66, 72-74, 254-58).  NCB's former CEO, Khalid bin Mahfouz, purportedly knew that "accounts maintained by [NCB] . . . were being used to channel funds to al Qaida."  *Id.*, ¶ 293.

---

[5]     *Baker v. Hanvit Bank*, --- F.3d ---, 2004 WL 1764228 (2d Cir. Aug. 6, 2004), is not to the contrary.  Without dispute from the parties, the Second Circuit there held that the bank's majority-owner—the Korean Deposit Insurance Corporation ("KDIC")—was a "special legal entity" separate from the Korean central government, which should therefore be viewed as an "organ" of the Korean government for FSIA purposes.  *Id.* at *1, *3, *5.  That conclusion is not surprising because the KDIC "was modeled on the U.S. FDIC."  *See Korean Banking Reform Following the Asian Financial Crisis*, http://www.Columbia.edu/cu/business/apec/publications/kataoka.pdf,  n.31.  Under U.S. law, the FDIC is likewise treated as a special purpose quasi-governmental entity.  *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) (the "FDIC is not the United States"); *Rocap v. Indiek*, 539 F.2d 174, 178 (D.C. Cir. 1976); *Lapudula & Vilani, Inc. v. United States*, 563 F. Supp. 782, 784 (S.D.N.Y. 1983) (FDIC a "separate legal entity" from the U.S. government); *accord FDIC v. State of New York*, 718 F. Supp. 191, 195 (S.D.N.Y. 1990) (same), *aff'd*, 928 F.2d 56 (2d Cir. 1991).  By contrast, here, the PIF is not some quasi-governmental "organ" of the Kingdom of Saudi Arabia, but instead is an integral part of the Saudi central government.  *See* Berger Aff., Exh. 6, ¶¶ 6, 11.  *Baker* thus does not displace the Second Circuit's decisions in *Compagnie Noga*, *O'Connell*, and *Zappia* (none of which was cited in *Baker*), under which the PIF must be viewed as an inseparable part of the Saudi central government or, alternatively, as a "political subdivision" thereof.  As *Baker* recognizes, under 28 U.S.C. § 1603(b)(2), entities like NCB that are majority-owned either by a foreign state's central government or by a "political subdivision" are entitled to "instrumentality" status under the FSIA.  *Baker*, 2004 WL 1764228, at *5.

[6]     All of these alleged acts were taken in Saudi Arabia, where NCB is incorporated and operates.  *See* 1AC, ¶¶ 285, 286, 287; Berger Aff., Exh. 5, ¶¶ 3, 6, 9.

NCB allegedly "managed the budget" of the Saudi Joint Relief Committee.  *Id.*, ¶ 290; RICO Statement, Exh. A.[7]

(3)  **Facilitating Charity Fundraising**:  NCB allegedly "facilitates al Qaida's fundraising efforts" by "advertis[ing]" its charity customers' accounts.  *Id.*, ¶ 291; RICO Statement, Exh. A.[8]

Plaintiffs cannot in good faith maintain these allegations.  An English court already has entered a judgment that declared as "false" the same allegations that Mr. bin Mahfouz and NCB supported Osama bin Laden or al Qaeda.  In an Order memorializing a libel judgment in favor of Mr. bin Mahfouz and against the *Burnett* plaintiffs' lead investigator, Jean-Charles Brisard (and his two companies), the English court found that:

> [T]he statements made by the Defendants [*i.e.*, Brisard and his companies] in the publications which are the subject matter of this action are defamatory of [Mr. bin Mahfouz] and <u>false</u>, namely that: . . . [Mr. Bin Mahfouz] knowingly supported and assisted in terrorism . . . as Chairman of the National Commercial Bank, by diverting or being responsible for the diversion of millions of dollars to terrorist organizations, in particular to al-Qaida which was led by Osama bin Laden.

July 1, 2004 Order (emphasis added) (Berger Aff., Exh. 9).  "American courts will normally accord <u>considerable deference</u> to foreign adjudications as a matter of comity."  *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001) (emphasis added).  Even putting the English court judgment aside, Plaintiffs' allegations do not fit within any of the FSIA's exceptions.

**The State-Sponsor of Terrorism Exception.**  As in *Burnett* and *Ashton*, Plaintiffs' claims must be governed by the state-sponsor of terrorism exception (28 U.S.C. § 1605(a)(7)) because the

---

[7]      The Saudi Minister of Justice has confirmed that the Saudi Joint Relief Committee is an "agency of the Kingdom of Saudi Arabia" that "operates in accordance with the laws and regulations of the Kingdom.  Berger Aff., Exh. 11.  The Minister of Justice likewise confirmed that many of the charities for which NCB allegedly provided banking services were established and authorized to operate under the laws and regulations of Saudi Arabia.  *See* Berger Aff., Exh. 10 (Muslim World League, World Assembly of Muslim Youth, Al-Haramain Islamic Foundation, and the International Islamic Relief Organization); *compare* 1AC, ¶ 290.

[8]      Although neither the *Burnett* nor *Ashton* plaintiffs alleged in their respective complaints that NCB was involved in fundraising for its charity customers, those plaintiffs did make such claims in their opposition briefs.  *See* Dkt. (DC) #435 (*Burnett* Opp.), at 49-50; *Ashton* Dkt. #127 (*Ashton* Opp.), at 17.

gravamen of the allegations is that NCB provided material support and resources to al Qaeda, which in turn committed an act of "international terrorism" (*i.e.*, the September 11th attacks).  *See* 1AC, ¶¶ 66, 72-74, 254-58, 287-96; *Burnett II*, 292 F. Supp. 2d at 20 n.5; *Burnett* Op. Mem., at 16-17, 36-37; *Ashton* Op. Mem., at 12.  Indeed, the complaint invokes § 1605(a)(7) as a basis for jurisdiction over those same claims when asserted against other defendants that are designated state sponsors of terrorism.  1AC, ¶¶ 55-62, 68 (Iran, Iraq, Syria, and their instrumentalities).  However, § 1605(a)(7) does not waive NCB's FSIA immunity because the Secretary of State has not designated the Kingdom of Saudi Arabia as a state sponsor of terrorism.  *Compare* 1AC, ¶ 63; *Burnett* Op. Mem., at 16-17, 36-37; *Ashton* Op. Mem., at 12.

With exception (a)(7) foreclosed, Plaintiffs cannot do a U-turn to rely on another exception. *Burnett II*, 292 F. Supp. 2d at 20 n.5.  Even if they could, however, the other FSIA exceptions that Plaintiffs invoke do not apply.

**The Commercial Activity Exception.**  Plaintiffs contend that the commercial activity exception (28 U.S.C. § 1605(a)(2)) applies to the sovereign defendants that allegedly provided material support and resources to al Qaeda.  *See* MDL Dkt. #312, at 18-21 (Opp. to HRH Prince Sultan); MDL Dkt. #305, at 20-22 (Opp. to HRH Prince Turki).  The commercial activity exception states:

(a)     A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \* \* \* \* \*

(2)     in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).  Plaintiffs have argued that either the second or third of these three scenarios

applies.  *See* MDL Dkt. #312, at 18-21 (Opp. to HRH Prince Sultan); MDL Dkt. #305, at 20-22

(Opp. to HRH Prince Turki).  Neither scenario can be supported.

First, none of Plaintiffs' claims against NCB is "based upon" commercial activities.  The

Supreme Court has held that the phrase "based upon" in exception (a)(2) "is read most naturally to

mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of

the case."  *Saudi Arabia v. Nelson*, 507 U.S. at 357.  In addition, the Second Circuit follows the

"legally significant acts" test for § 1605(a)(2), which provides that acts that are unrelated to the

liability of the foreign sovereign are irrelevant in determining whether § 1605(a)(2) applies.  *See*

*Ashton* Op. Mem., at 13; *Antares Aircraft v. Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993), *cert. denied*, 510 U.S.

1071 (1994).

The alleged "legally significant" acts of NCB consist of providing banking services to its

customers, and letting its charity customers advertise their claim that they have accounts with NCB.

These acts cannot be "legally significant" because, as a matter of law, a bank cannot be held liable

for its customers' allegedly wrongful use of banking services.  *See Burnett I*, 274 F. Supp. 2d at 109

("Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for

injuries done with money that passes through its hands in the form of deposits, withdrawals, check

clearing services, or any other routine banking service."); *Ashton* Op. Mem., at 13; MDL Dkt. #379

(Arab Bank Reply Mem.), at 3-4 (citing cases).[9]  Regardless, if, as Plaintiffs contend, NCB was not

providing its customers ordinary banking services, but rather conspiring to commit mass murder and

arson (*see* RICO Statement, Exh. A), then the commercial activity exception could not apply because

---

[9]        Likewise, Plaintiffs' allegations regarding NCB's alleged role in BCCI are entirely unrelated
to Osama bin Laden, al Qaeda, or the September 11th attacks and therefore do not bring Plaintiffs'
claims within the commercial activity exception.  *See Ashton* Op. Mem., at 13 n.13.

those acts are criminal, and therefore not "commercial" as a matter of law.  *Burnett* Op. Mem., at 41-42 & n.32.

Second, Plaintiffs do not allege that NCB committed any act within the United States.  As the legislative history of exception (a)(2) makes clear, clause two of that exception "looks to <u>conduct of the foreign state in the United States</u> which relates either to a regular course of commercial conduct elsewhere or to a particular commercial transaction concluded or carried out in part elsewhere."  H.R. Rep. 94-1487, 94th Cong., 2d Sess., *reprinted in*, 1976 U.S.C.C.A.N. 6604, 6617 (emphasis added).[10]  The September 11th attacks are the "act[s]" that Plaintiffs contend trigger clause two of this exception.  *See* MDL Dkt. #312 (Opp. to HRH Prince Sultan), at 18; MDL Dkt. #305 (Opp. to HRH Prince Turki), at 21.  But Plaintiffs do not, and cannot, allege that NCB committed those attacks.  Nor can Plaintiffs use an insupportable theory of "concerted liability" to impute the actions of the hijackers to NCB.  *See* Dkt. # 305 (Pls' Opp. to Prince Turki), at 21; Dkt. # 312 (Pls' Opp. to Prince Sultan), at 18.[11]

---

[10]    *Accord Casalino v. Ente Ferrovie Dello Stato*, 779 F. Supp. 338, 341 (S.D.N.Y. 1991) (holding that the second clause of the commercial activity exception did not strip the foreign instrumentality of its immunity where all of its actions took place outside the United States); *Harris v. VAO Intourist, Moscow*, 481 F. Supp. 1056, 1061 (E.D.N.Y. 1979) (clause two of the commercial activity exception did not apply where none of the alleged conduct <u>of the foreign instrumentality</u> occurred in the United States); *Exchange Nat'l Bank of Chicago v. Empresa Minera Del Centro Del Peru S.A.*, 595 F. Supp. 502 at 504 (S.D.N.Y. 1984).

[11]    *See General Electric Capital Corp. v. Grossman*, 991 F.2d 1376, 1384 (8th Cir. 1993) (holding that the second clause of the commercial activity exception did not strip the foreign instrumentality of its immunity where all its actions took place outside the United States, despite Plaintiffs' allegation that the foreign instrumentality conspired with other parties in the United States); *Magnus Electronics, Inc. v. La Republic Argentina*, 830 F.2d 1396, 1401 (7th Cir. 1987) (explaining that plaintiff's bare allegations of agency, alter ego and conspiracy were "mere verbiage made solely for the purpose of obtaining jurisdiction" and, as such, did not advance plaintiff's argument for imputing conduct under the commercial activities exception); *Gabay v. Mostazafan Foundation of Iran*, 151 F.R.D. 250, 254-55 (S.D.N.Y. 1993) ("When a plaintiff grounds the "commercial activity" exception on an alter ego theory, courts have quite naturally required the alleged alter ego to be <u>directly involved in the wrong done to plaintiff</u>; only thus can there be the required nexus between the commercial activity of the entity and the basis of the lawsuit." (emphasis added)).

Third, clause three of this exception does not waive NCB's immunity because Plaintiffs cannot establish that NCB's alleged activities had the statutorily required "direct effect in the United States." *See Burnett* Op. Mem., at 42-49; *Ashton* Op. Mem., at 12-16.  To meet this requirement, the September 11th attacks had to be the "immediate consequence" of NCB's alleged actions—and they were not.  *See Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992); *Virtual Countries*, 300 F.3d at 236.  Foreseeability is not enough.  *Virtual Countries*, 300 F.3d at 238 n.6; *compare* 1AC, ¶¶ 72, 297.

In the *Federal Insurance* complaint, NCB's alleged connection to the September 11th attacks is even <u>more</u> attenuated than in the insufficient *Burnett* and *Ashton* complaints.  *Compare Burnett* Op. Mem., at 42-49; *Ashton* Op. Mem., at 12-16.  Plaintiffs allege "a larger conspiracy among the defendants to commit acts of international terrorism against the United States" (1AC, ¶¶ 600-01, 615-16, 621, 624-25, 628, 631, 638, 640-42) by providing "global" (1AC, ¶ 100) resources and support to al Qaeda, "a sophisticated global terrorist network" (1AC, ¶¶ 398, 408) that "grew to several thousand members, associates, and supporters, with operational and logistical cells in every corner of the globe."  1AC, ¶ 77; *see also id.* at ¶ 254 (describing al Qaeda as a "global criminal enterprise").  Plaintiffs contend that the September 11th attacks allegedly could not have occurred without the material sponsorship and logistical support of <u>several hundred</u> affiliated "FTOs, associations, organizations, or persons."  *See* 1AC, ¶¶ 65-66, 72-74, 78, 83, 258, 409, 643.  All of this purportedly led to, or otherwise made possible, the September 11th plot, which was:

(1)        coordinated and supported in Afghanistan (1AC, ¶¶ 78, 134, 159) and Dubai (1AC, ¶¶ 344, 345);

(2)        supported by al Qaeda cells in Spain (1AC, ¶¶ 359, 387-94, 449, 470), Germany (1AC, ¶¶ 391-92, 421-22) and Kenya (1AC, ¶¶ 103, 122, 139, 175);

(3)        funded by a "Spanish network of businesses [that] provided income streams for al Qaida cells in Europe and the Middle East, including the German al Qaida cell which planned and carried out the September 11th attack." 1AC, ¶ 391; and

(4)        indirectly assisted by numerous co-conspirator individuals, organizations and governments located in Sudan (1AC, ¶¶ 78, 93-94,. 378-79, 509-16), the Philippines

(1AC, ¶¶ 136), Bosnia/Chechnya (1AC, ¶¶ 100-03, 120, 143, 176, 184-86, 203-07, 240-44), Pakistan (1AC, ¶¶ 154-55, 162, 174), Iran (1AC, ¶¶ 525-35), Iraq (1AC, ¶¶ 450, 520-22, 536-40), and Syria (1AC, ¶¶ 517-524), among others.

Thus, this case involves many more actors, overseas acts, and intervening elements than were present in *Virtual Countries, Inc.,* 300 F.3d 230, where the Second Circuit rejected a claim of "direct effect" because there were only two intervening elements. *Id.* at 237 (holding that the press release did not have a "direct effect" in the United States because it fell at the end of a long chain of causation and [was] mediated by numerous activities by third parties"); *Burnett* Op. Mem., at 48-49; *Ashton* Op. Mem., at 14-15.

**The Non-Commercial Tort Exception.**  The FSIA's non-commercial tort exception (28 U.S.C. § 1605(a)(5)) does not apply here for the same reasons that it does not apply in *Burnett* and *Ashton. See Burnett* MTD, at 50-54; *Burnett* Reply Mem., at 4-5; *Ashton* MTD, at 15-19; *Ashton* Reply Mem., at 3-4.  A bank that is an alleged "channel" through which its customers allegedly make transfers to al Qaeda, or which "facilitates" its charity customers' fundraising, does not engage in tortious conduct. *See supra* at 7; *Burnett* Op. Mem., at 50-51; *Burnett* Reply Mem., at 4; *Ashton* Op. Mem., at 15; *Ashton* Reply Mem., at 3.  But even if such conduct were tortious, it would fail to satisfy (a)(5)'s "caused by" requirement.  Plaintiffs' theory  is nothing more than the same alleged causal chain that Judge Robertson previously rejected as too attenuated—namely, that defendants allegedly funded those who, in turn, funded terrorists. *Burnett II*, 292 F. Supp. 2d at 19-20; *see supra* at 9.

The D.C. Circuit's decision in *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 [2004 WL 1698198] (D.C. Cir. 2004), is consistent with Judge Robertson's conclusion. *Kilburn* confirms that the phrase "caused by" in the state-sponsor of terrorism exception is to be construed and applied as a principle of underlined federal law, holding that § 1605(a)(7) "is solely a jurisdictional provision." *Id.* at *6.  Because "caused by" in exception (a)(7) establishes what the D.C. Circuit called a standard of "*jurisdictional* causation" (original emphasis), "state tort law . . . is not inextricably

linked with . . . the proper scope of jurisdictional causation under § 1605(a)(7)." *Id.* at *11. In addition, "jurisdictional causation" under (a)(7) "means only what tort law has traditionally called 'proximate cause.'" *Id.* at *4 (internal quotations and citation omitted). Having held that "caused by" in § 1605(a)(7) equates with proximate cause, the *Kilburn* court concluded that "there is no doubt that the plaintiff's allegations satisfy the proximate cause standard." *Id.* at *6. Specifically, plaintiffs alleged that the Libyan government—through its agent that it "supported, "funded," and "directed"—purchased, tortured, and murdered a U.S. citizen. *Id.* at *1, *6, *8. However, the *Burnett*, *Ashton*, and *Federal Insurance* plaintiffs do not allege any facts suggesting any such link between NCB and the September 11th attacks.

Thus, *Kilburn* does not contradict, or otherwise undermine, Judge Robertson's conclusion that the attenuated funding-the-funders of terrorism theory—proffered by Plaintiffs here—fails to satisfy the non-commercial tort exception's causation requirement, even assuming that "caused by" in the non-commercial tort exception means proximate cause. *E.g.*, *Alvarez-Machain v. United States*, 124 S. Ct. 2739, 2750 (2004) ("Proximate cause is causation substantial enough and close enough to the harm . . . ."). The *Burnett*, *Ashton*, and *Federal Insurance* plaintiffs recognize that their allegations fall short of the proximate cause standard. *See* MDL Dkt. #312 (Opp. to HRH Prince Sultan), at 15-18 (relying on theory that "concerted action liability" satisfies (a)(5)'s causation requirement, plaintiffs assert that there is no need to establish "direct involvement" in the September 11th plot); MDL Dkt. #397 (Opp. to Saudi High Commission), at 14-18 (same); *Ashton* Dkt. #127, at 11 (no discussion of proximate cause); Dkt. #435 (*Burnett* Opp.), at 25, 60 (arguing that "caused by" in (a)(5) equates with the causation standard in the Anti-Terrorism Act ("ATA") and that the ATA's causation standard is "in conflict" with the proximate cause standard).

Finally, because Plaintiffs do not allege that NCB committed <u>any</u> acts within the United States, exception (a)(5) does not apply because the "entire tort" could not have been committed

11

here.  *See Burnett* Op. Mem., at 51-54; *Burnett* Reply Mem., at 4; *Ashton* Op. Mem., at 17-18; *Ashton*

Reply Mem., at 4.  Finally, Plaintiffs do not allege that NCB's agents or employees were acting

within the scope of their agency or employment when they engaged in the conduct alleged in the

1AC.  *See Burnett* Op. Mem., at 52 n.43; *Burnett* Reply Mem., at 4; *Ashton* Op. Mem., at 18 n.17;

*Ashton* Reply Mem., at 4 n.11.

Because the state-sponsor of terrorism, commercial activity, or non-commercial tort

exceptions do not apply, NCB has FSIA immunity.  Accordingly, this Court lacks subject matter

jurisdiction over Plaintiffs' claims against NCB, and those claims should be dismissed.[12]

## II.    This Court Lacks Personal Jurisdiction Over NCB.

As in *Ashton* and *Burnett,* Plaintiffs here have not met their burden of alleging a *prima facie*

case of personal jurisdiction over NCB,[13] either under a nationwide service of process theory or

---

[12]    Alternatively, plaintiffs' claims are not justiciable under the political question, act of state, and international comity doctrines. *See Burnett* Op. Mem., at 3-32; *Burnett* Reply Mem., at 5-6; *Ashton* Op. Mem., at 19-21; the Declaration and Supplementary Declaration of Ambassador Charles ("Chas.") W. Freeman (Berger Aff., Exhs. 1-2); the Letter from William J. Burns to the Hon. Jim Kolbe (*id.*, Exh. 3); and the Declaration of Nizar Bin Obaid Madani, the Saudi Assistant Minister of Foreign Affairs of the Kingdom of Saudi Arabia (*id.*, Exh. 7).  Statements made by U.S. Government officials since then only further confirm the point.  *E.g.*, 9th Public Hearing, National Commission on Terrorist Attacks Upon the United States (Apr. 8, 2004) (statement of Condaleeza Rice, National Security Advisor)("As to some of the questions concerning the Saudis: I think that we have had, really, very good cooperation with Saudi Arabia since 9/11, and since the May 12th attacks on Riyadh even greater cooperation, because Saudi Arabia is I think fully enlisted in the war on terrorism.").  This Court already has rejected the plaintiffs' invitation to wade into how the Executive Branch is waging the war on terrorism.  Plaintiffs sought to compel the Executive Branch to disclose the names of persons alleged to be in U.S. custody.  MDL Dkt. ##54, 55.  The Executive Branch objected, explaining that identifying such persons could have "grave consequences for the Government's efforts to combat terrorism."  MDL Dkt. #70, at 2.  The Executive Branch reasoned that "the responsibility for regulating access to sensitive national security information is committed to the Executive Branch, not to the courts."  MDL Dkt. #115, at 3.  This Court agreed with the Executive Branch.  MDL Dkt. #231 (Mem. Opn. & Order), at 4 ("This Court defers to the judgment of the executive branch with respect to issues of national security, and agrees . . . in upholding the Government's determination to not reveal the names of detainees in connection with September 11 and the war on terror.").  It is highly likely that the parties' inevitable requests for access to similar kinds of information will meet the same Executive Branch objections, thus raising potentially insurmountable proof problems.  *Burnett* Op. Mem., at 24-26.

under New York law.[14]   Nor have Plaintiffs alleged any facts suggesting that NCB has the constitutionally required "minimum contacts" with the United States.[15]

**Nationwide Service of Process and New York Law.**   Plaintiffs have alleged claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.* (1AC, Count X) and RICO, 18 U.S.C. § 1962(a) *et seq.* (1AC, Count VIII), both of which provide for nationwide service of process. However, Plaintiffs fail to state a claim under either the ATA or RICO.   *See infra* Part III.   Absent a cognizable claim under these statutes, Plaintiffs only remaining basis for personal jurisdiction is New York law.   *See* N.Y. CPLR §§ 301, 302.   However, New York law does not support jurisdiction, regardless of whether Plaintiffs' theory is general jurisdiction or specific jurisdiction.   *See Ashton* Op. Mem., at 22-23.

**Minimum Contacts.**   NCB does not have the constitutionally required "minimum contacts" with the United States.   Plaintiffs allege no facts suggesting that NCB was, or is, "doing business" in the United States.[16]   *See Burnett* Op. Mem., at 59-64; *Burnett* Reply Mem., at 6-8; *Ashton* Op. Mem., at 24; Berger Aff., Exh. 5, ¶¶ 2-15.   Nor have Plaintiffs alleged any facts suggesting that NCB "purposefully directed" or "expressly aimed" its allegedly tortious conduct at the United

---

[13]   Personal jurisdiction is determined as of September 10, 2003, the date on which Plaintiffs filed their original complaint against NCB.   *See* Fed. Ins. Dkt. # 1; *Burnett* Op. Mem., at 56.

[14]   NCB incorporates by reference: *Burnett* Op. Mem., at 55-57, 59-64; *Burnett* Reply Mem., at 6-8; *Ashton* Op. Mem., at 21-24; and, the Declaration of Jorge Juco (Berger Aff., Exh. 5).   Because Plaintiffs' Complaint was filed in this Court, New York's law of personal jurisdiction applies here.   *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, No. 01-1428, 2003 WL 22909153, at *2 (S.D.N.Y. Dec. 9, 2003) (noting that in a MDL proceeding, the court applies the law of the state where the action was originally filed in determining whether a defendant is subject to jurisdiction under the state's long-arm statute).

[15]   The "minimum contacts" requirement applies to instrumentalities of a foreign state (like NCB), as Plaintiffs have conceded.   *Burnett* Reply Mem., at 6-7; MDL Dkt. #397 (Opp. to Saudi High Commission), at 22 n.19 ("[T]he Second Circuit has held that foreign states are entitled to the protections of the due process clause . . . .").

[16]   Plaintiffs allegation that NCB allegedly facilitated fundraising by its charity customers (1AC, ¶ 291) does not establish the required minimum contacts because Plaintiffs have not alleged that the supposed "facilitat[ion]" of "fundraising" occurred in the United States.

States, as required by the *Calder v. Jones*, 465 U.S. 783, 789 (1984) theory of specific jurisdiction.  *See Burnett II*, 292 F. Supp. 2d at 22-23; *Burnett* Reply Mem., at 6-8; *Ashton* Op. Mem., at 24; *Ashton* Reply Mem., at 6.[17]

## III.   Plaintiffs Fail to State Any Claims Against NCB.

Plaintiffs allege twelve causes of action against NCB: trespass (1AC, Count I); wrongful death based on intentional murder (1AC, Count II); survival damages based on intentional murder (1AC, Count III); assault and battery (1AC, Count IV); intentional and/or negligent infliction of emotional distress (1AC, Count V); violation of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 (1AC, Count VI); conspiracy (1AC, Count VII); civil RICO violations, 18 U.S.C. § 1962(a), (c) & (d) (1AC, Count VIII; RICO Statement, ¶ 1); aiding and abetting (1AC, Count IX); violations of the ATA, 18 U.S.C. § 2333 (1AC, Count X); negligence (1AC, Count XI) and punitive damages (1AC, Count XII).  All of these claims against NCB fail as a matter of law.[18]

### A.   Causation

Proximate cause is an essential element of each one of Plaintiffs' federal and common law claims and requires Plaintiffs to demonstrate that NCB's alleged conduct was the cause-in-fact of the

---

[17]    Plaintiffs cannot meet their burden of establishing a *prima facie* case of personal jurisdiction with the conclusory allegation that NCB allegedly participated in a "larger conspiracy among defendants to commit acts of international terrorism against the United States."  *See* 1AC, ¶¶ 66, 72, 73, 600-01, 615-16, 621, 624-25, 628, 631, 638, 640-42; *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981) (noting that bare or conclusory allegations of conspiracy that do not connect the defendant with the forum will not state a cause of action for conspiracy).  To establish personal jurisdiction based on a conspiracy theory, Plaintiffs must demonstrate that:  (1) the out-of-state co-conspirator had an awareness of the effects of the activity of others in the forum; (2) the in-state co-conspirator's activity was for the benefit of the out-of-state conspirators; and (3) the in-state co-conspirators acted at the behest of or on behalf of, or under the control of the out-of-state conspirators.  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.* 26 F. Supp. 2d 593, 602 (S.D.N.Y. 1998).  Plaintiffs have alleged no facts, nor could they, that:  NCB knew that the September 11th attacks were going to occur; the hijackers' actions were for the benefit of NCB; or, that the hijackers were acting on behalf, or under the control, of NCB.  *Ashton* Op. Mem., at 23 n.23; *Ashton* Reply Mem., at 6-7.

[18]     NCB incorporates by reference:  *Burnett* Op. Mem., at 65-77; *Burnett* Reply Mem., at 9-10; *Ashton* Op. Mem., at 24-25; and, *Ashton* Reply Mem., at 8-10.

September 11th attacks. *See Burnett* Op. Mem., at 68-75 & n.58; *Burnett* Reply Mem., at 9-10; *Ashton* Op. Mem., at 24-25; *Ashton* Reply Mem., at 8-10. Plaintiffs do not allege any facts that meet this requirement. *See supra* at 9-10. Plaintiffs instead rely on legal conclusions masquerading as factual allegations. 1AC, ¶¶ 74, 78, 83, 258, 409, 643 (asserting that the September 11th attacks would not have occurred absent co-defendants material support), ¶¶ 297 (alleging that the September 11th attacks were the "direct . . . product of defendant's alleged "participation in al Qaida's jihadist campaign). Conclusory allegations are insufficient. *Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C.*, 288 F. Supp. 2d 482, 484-85 (S.D.N.Y. 2003) ("courts need not credit conclusory allegations, or legal conclusions without factual allegations" (relying on *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *DePace v. Flaherty*, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002) ("[a] plaintiff must offer more than conclusory allegations to defeat a motion to dismiss.").

**B.    Standing**

Under New York law—which Plaintiffs contend "applies" to a "vast majority" of their claims[19]—Plaintiffs may pursue recovery on a subrogation theory. *Travelers Indemnity Co. of Illinois v. 28 East 70th Street Construction Co., Inc.*, 296 F. Supp. 2d 476, 478 n.1 (S.D.N.Y. 2003) (citing *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.*, 344 F.3d 211, 218 (2d Cir. 2003)). However, as subrogees, Plaintiffs "'stand in the shoes' of their insured[s]." *Allstate Insurance Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999) (citing *Winkelmann v. Excelsior Ins. Co.*, 626 N.Y.S.2d 994, 650 N.E.2d 841, 843 (N.Y. 1995)). "As a general matter, a subrogation claim by an insurer 'depends upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the insured.'" *Blue Cross*, 344 F.3d at 218 (quoting *Allstate Ins. Co.*, 175 F.3d at 260 (internal quotations omitted)). There

---

[19]    *See, e.g.*, MDL Dkt. #305 (Opp. to HRH Prince Turki), at 5 n.5; MDL Dkt. #312 (Opp. to HRH Prince Sultan), at 5 n.4; MDL Dkt. #316 (Opp. to Arab Bank), at 8 n.3; MDL Dkt. #318 (Opp. to HRH Prince Mohamed), at 8 n.2; MDL Dkt. #292 (Opp. to Mar-Jac Poultry), at 8 n.4.

are numerous defenses to, and legal defects in, the claims asserted on behalf of the insureds that apply equally to the subrogated insurance companies.  *See infra* Part III.A, C-F.

In addition, Plaintiffs' subrogation rights are subject to at least three other limitations.  <u>First</u>, the subrogation right attaches only when payment is made.[20]  <u>Second</u>, to the extent that Plaintiffs' claims overlap with those brought by their insureds in any of the other consolidated actions, Plaintiffs and their insureds cannot recover the same damages.[21]  <u>Third</u>, a subrogee must "identify its subrogors and those subrogors' claims so that defendants would have the opportunity to assert defenses against those claims."[22]  Here, Plaintiffs have asserted subrogation rights to "future" payments to their insureds.  *See* 1AC, ¶¶ 541-78, 580, 582, 584, 586, 588, 590, 592, 594, 596. Plaintiffs do not have standing to assert such claims.  *See In re Joint Eastern & Southern Dist. Asbestos*

---

[20]     *See In re Joint Eastern & Southern Dist. Asbestos Litig.*, 78 F.3d 764, 779-80 (2d Cir. 1996) ("[T]he insurer's right of subrogation comes into existence only when the insurer pays the claim of the insured."); *Bunge Corp. v. London & Overseas Insurance Co.*, 394 F.2d 496, 497 (2d Cir.) ("An insurer who has not paid its insured's claim has no right in claims which the insured has against third parties."), *cert. denied*, 393 U.S. 952 (1968).

[21]     *See Arkwright-Boston Manufacturers Mutual Ins. Co. v. City of New York*, 762 F.2d 205, 209 (2d Cir. 1985) (noting that insurer could initiate suit to recover for payments made to cover business losses while the insured pursued a separate suit to recover for deductible paid); *In re Air Crash Disaster at Cove Neck, Long Island, New York on January 25, 1990*, 885 F. Supp. 434, 442 (E.D.N.Y. 1995) (fact that insurance company was subrogated to the insured's right to sue did not preclude insured's right to sue for uninsured losses).

[22]     *Blue Cross*, 344 F.3d at 217-18 (reversing judgment on subrogation claim because subrogee "never identified the actual number of subrogors, much less provided individualized information about the claims to which [the putative subrogee] was subrogated"); *A.O. Fox Memorial Hospital v. American Tobacco Co.*, 302 A.D.2d 413, 414, 754 N.Y.S.2d 368 (2d Dep't 2003) (subrogation claim dismissed where "plaintiffs failed to identify the individual patients and their particular injuries and specify facts which, if proven, would establish liability); *Eastern States Health & Welfare Fund v. Philip Morris, Inc.*, 188 Misc. 2d 638, 652, 729 N.Y.S. 2d 240 (N.Y. Sup. Ct. 2000) (subrogation claim dismissed where plaintiffs "neglected to identify the participants and beneficiaries to whose claims they are subrogated" and "omitted facts which, if proven, would establish liability on Defendants' part.").

*Litig.*, 78 F.3d at 779-80; *Bunge Corp.*, 394 F.2d at 497.  Plaintiff Valiant likewise lacks standing as a subrogee because it has made no payments at all to its insureds.  1AC, ¶ 558.[23]

## C.   RICO

Plaintiffs fail to state a civil RICO claim under § 1962(c) or (d).[24]  Certain Plaintiffs lack standing to assert a RICO claim.  RICO's civil liability provision confers standing on "[a]ny person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  A number of Plaintiffs paid workers' compensation claims on behalf of employers whose employees were "injured or killed" in the September 11th attacks.  1AC, ¶¶ 578, 580, 582, 584, 586, 588, 590, 592, 594, 596.  However, RICO does not provide standing to sue for personal injuries.  *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 241 (2d Cir. 1999), *cert. denied*, 528 U.S. 1080 (2000); *see also Burnett I*, 274 F. Supp. 2d at 101-02 ("The overwhelming weight of authority . . . holds that the 'business or property' language of Section 1964(c) does not encompass personal injuries.").

The remaining Plaintiffs fare no better.  <u>First</u>, Plaintiffs fail to allege that NCB committed two or more predicate acts, an essential element of any RICO claim.  *United States Fire Ins. Co. v. United Limousine Service, Inc.*, 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004).  In their RICO Statement as to NCB, Plaintiffs identify eight alleged predicate acts:  conspiracy to commit murder; conspiracy to

---

[23]     It is unclear whether the second and third limitations on Plaintiffs' standing as subrogees apply in the circumstances here.  Plaintiffs do not identify by name their insureds or the details of their insureds' tort claims in the body of the 1AC, but they do incorporate by reference Exhibits A-UU, which purportedly "identif[y]" the insureds.  *See* 1AC, ¶¶ 541-97 & nn.1-50.  According to Plaintiffs, those Exhibits have been filed under seal and are currently unavailable to any of the defendants in these consolidated actions.  *See* Fed. Ins. Dkt. #1 (Orig. Compl.), at 80 ("All Exhibits appended to Plaintiffs' complaint are filed under seal pursuant to the order issued by the Honorable Robert Patterson, Jr. [SDNY] dated September 9, 2003.").  As a result, the Court and the defendants are unable to determine whether any of the insureds are litigating similar claims in any of the consolidated actions.  NCB reserves the right to assert additional challenges to Plaintiffs' standing pending review of the Exhibits referenced in the 1AC.

[24]     In the 1AC, Plaintiffs assert claims under § 1962(a), but in their RICO Statement they allege claims under subsections (c) and (d).  *Compare* 1AC (Count VIII) *with* RICO Statement, ¶ 1.

commit arson; violation of the Travel Act; illegal transactions in monetary instruments; money laundering; defrauding the U.S. Government; filing false tax returns; and engaging in a corrupt endeavor to impede the administration of the internal revenue laws.  RICO Statement, ¶ 5(a).  Three of these—defrauding the U.S. Government, filing false tax returns, impeding or impairing the administration of Internal Revenue Code—are not RICO predicate acts.  *See* 18 U.S.C. § 1961(1) (listing predicate acts).[25]  Plaintiffs then fail to allege sufficient facts suggesting that NCB committed any one of the remaining five predicate acts:

- Plaintiffs allege no <u>facts</u> that support the notion that NCB conspired with any person or entity to commit murder or arson.

- The Travel Act (18 U.S.C. § 1952) prohibits a person or entity from "travel[ing] in interstate or foreign commerce or us[ing] the mail or any facility in interstate or foreign commerce" with the intent to engage in a statutorily defined "unlawful activity."   18 U.S.C. § 1952(a).   Such activities include operating a "business enterprise involving gambling, liquor on which the Federal excise tax has not been paid[;] narcotics or controlled substances . . .[;] or prostitution offenses . . .[;] extortion, bribery, or arson . . .[;] or any act which is indictable under . . . section 1956 or 1957 of this title . . . ."  18 U.S.C. § 1952(a), (b).  With the exception of the money laundering provisions (18 U.S.C. §§ 1956, 1957), NCB is not alleged to have engaged in any of the "unlawful activity" proscribed in the Travel Act.   And, Plaintiffs have not alleged sufficient facts to support the money laundering allegation.  Money laundering occurs when a defendant obtains property illegally and then uses that illegal property in a subsequent transaction.   18 U.S.C. §§ 1956 and 1957.  There are no allegations that NCB received any illegal property from anyone at any time, or that NCB purportedly used illegal property in any subsequent transaction.

---

[25]     In any event, there are no allegations in the 1AC that come anywhere near suggesting that NCB engaged in these acts.  Nor could Plaintiffs make such allegations in good faith, given that NCB does not engage in transactions with the U.S. Government or file U.S. tax returns.  *See* Berger Aff., Exh. 5, ¶¶ 3-9, 11, 13-14.

Second, liability under § 1962(c) "requires a showing that *each* defendant employed by or associated with the enterprise 'conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs." *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 402 (S.D.N.Y. 2000). Plaintiffs allege no facts that meet this essential element. The Supreme Court has held that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis added; internal quotations omitted); *accord Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998). Nowhere in the 1AC or the RICO Statement do Plaintiffs allege that NCB in any way participated in the "operation" or "management" of the purported "Radical Muslim Terrorism" enterprise. Plaintiffs instead allege that "al Qaida had its own membership roster and a structure of 'committees' to guide and oversee" the activities of the enterprise. RICO Statement, ¶ 8. Plaintiffs do not allege, because they cannot, that NCB was part of an alleged al Qaeda "committee" or "membership roster" that "guide[d]" or "overs[aw]" the so-called "Radical Muslim Terrorism" enterprise. Nor does the 1AC suggest that NCB "operated" or "managed" the alleged enterprise's goals of "(i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Arab regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Isreal." RICO Statement, ¶ 6(b).

Third, because Plaintiffs have not alleged facts sufficient to state a claim under § 1962(c), their conspiracy claim under § 1962(d) also must be dismissed. Section 1962(d) prohibits any conspiracy to commit a RICO violation. This Court has made clear "that there can be no RICO conspiracy without a substantive RICO violation." *Schmidt*, 16 F. Supp. 2d at 353; *Goldfine*, 118 F. Supp. 2d at 406 ("A RICO conspiracy claim must fail . . . if the substantive claims themselves are

deficient."). Thus, Plaintiffs' "failure to adequately plead facts that would satisfy the . . . requirements of . . . Section 1962(c) dooms any claim [they] might assert arising under 1962(d)." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) (unpublished).[26]

### D.    Aiding and Abetting/Conspiracy

To state a claim for aiding and abetting, Plaintiffs must establish, *inter alia*, that NCB provided "substantial assistance" to "the achievement of the primary violation." *Oei v. Citibank, N.A.*, 957 F. Supp. 492, 520 (S.D.N.Y. 1997). Plaintiffs have not alleged that NCB provided <u>any</u> assistance to the September 11th hijackers, or to any other person or entity, for the purpose of "achiev[ing]" the September 11th attacks. *See Burnett* Op. Mem., at 68-69; *Burnett* Reply Mem., at 10; *Ashton* Op. Mem., at 24; *Ashton* Reply Mem., at 10. In any event, Plaintiffs have not alleged any facts suggesting that NCB had <u>actual knowledge</u> of the September 11th attacks, another essential element of an aiding and abetting claim. *See, e.g., Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (requiring actual knowledge to state a claim for aiding and abetting), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (unpublished). Nor have Plaintiffs stated a viable conspiracy claim because they do not allege that NCB entered into any "corrupt agreement" with any other person or entity. *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 479 (S.D.N.Y. 2001); *Grossman v. Citrus Assoc. of the New York Cotton Exchange, Inc.*, 706 F. Supp. 221, 233 (S.D.N.Y. 1989) (dismissing a conspiracy where plaintiff failed to make "any allegation of an agreement between the defendants, an essential element of

---

[26]    Alternatively, Plaintiffs' § 1962(d) claim fails because Plaintiffs do not adequately plead a conspiracy. *See infra* Part III.D; *Odyssey Re (London) Ltd. v. Stirling Cook Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 301 (S.D.N.Y. 2000) (stating that to state a Section 1962(d) claim, a plaintiff must allege "as to each alleged co-conspirator:  (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same."), *aff'd*, 2 Fed. Appx. 109 (2d Cir. 2001); *Schmidt*, 16 F. Supp. 2d at 354 ("Bare and conclusory allegations are insufficient to withstand a motion to dismiss and a plaintiff must plead facts sufficient to show that each defendant knowingly agreed to participate in the conspiracy.").

conspiracy"); *see also Burnett* Op. Mem., at 69-70; *Burnett* Reply Mem., at 10; *Ashton* Op. Mem., at 24; *Ashton* Reply Mem., at 10.  Plaintiffs' repeated pairing of NCB with the words "conspired" and "conspiracy"[27] does not provide the missing detail.  *See Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 631 (S.D.N.Y. 2003) ("While the pleading standard under Rule 8 is a liberal one, [the] mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the Rule's pleading requirements."), *aff'd*, 355 F.3d 206 (2d Cir. 2004).

### E.      Negligence

Plaintiffs have failed to allege facts that would give rise to a duty owed by NCB to Plaintiffs, an essential element of any negligence claim.  *See Burnett I*, 274 F. Supp. 2d at 108; *Burnett* Op. Mem., at 76.  To the extent Plaintiffs rely upon a theory of negligence *per se*, that too fails because Plaintiffs cannot identify any laws or regulations the violation of which would support a finding of negligence *per se.  See Burnett I*, 274 F. Supp. 2d at 109 ("Plaintiff's failure to identify those laws and regulations dooms this argument."); *Burnett* Op. Mem., at 76; *Burnett* Reply Mem., at 10 n.15.

### F.      Additional Claim-Specific Grounds

ATA:  As an instrumentality of the Saudi Government, NCB is immune from ATA liability. *See* 18 U.S.C. § 2337(2); *Burnett* Opp. Mem., at 76; *Burnett* Reply Mem., at 10 n.14; *Ashton* Op. Mem., at 25 n.26.  Moreover, the ATA's act of war exception bars Plaintiffs' claim.  *See* 18 U.S.C. § 2336(a); MDL Dkt. #302 (Jameel Mot.), at 10-14.

TVPA:  If the Court did not treat NCB as a Saudi Government instrumentality, then Plaintiffs' TVPA claim would have to fail because that statute requires state action.  *See Burnett* Op. Mem., at 76; *Burnett* Reply Mem., at 10 n.14; *Ashton* Op. Mem., at 25 n.26.

Assault and Battery and Intentional Infliction of Emotional Distress:  Plaintiffs' complaint was filed more than one year after the September 11th attacks, and therefore their causes of action

---

[27]      *See* 1AC, ¶¶ 66, 72, 73, 600, 601, 615, 616, 621, 624, 625, 626, 628, 638, 640, 641, 642, 645.

for assault and battery and intentional infliction of emotional distress are barred by New York's one-year statute of limitations. *See* CPLR § 215(3) (assault and battery); *Misek-Falkoff v. International Business Machines Corp.*, 162 A.D.2d 211, 211 (1st Dep't 1990) (IIED).

Punitive Damages:  Punitive damages are a form of relief, and not an independent cause of action. *Burnett* Op. Mem., at 76; *Burnett* Reply Mem., at 10 n.14; *Ashton* Op. Mem., at 25 n.26.

### Conclusion

For the foregoing reasons, NCB's motion to dismiss should be granted, and Plaintiffs' claims should be dismissed with prejudice.


Dated:  August 30, 2004
      Washington, D.C.

/s/ Ronald S. Liebman

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB-4112)
Ugo Colella (admitted *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*