# Exhibit 1

DECLARATION OF AMBASSADOR CHAS. W. FREEMAN, JR.

My name is Charles Wellman Freeman, Jr., usually known, and confirmed by the United States Senate for various positions in the Executive Branch, as Chas. W. Freeman, Jr.

I have been asked by the attorneys for His Royal Highness Prince Sultan bin Abdulaziz Al-Saud, Second Deputy President of the Council of Ministers, Minister of Defense and Aviation, and Inspector General of the Kingdom of Saudi Arabia, and the attorneys for The National Commercial Bank (NCB) of Jeddah, Saudi Arabia, to provide my expert opinion on certain issues arising from lawsuits in which their clients are named as defendants. The lawsuits in question are Burnett, et al. vs. Al Baraka Investment, et al., Civil Action No. 02-01616 (D.D.C.) and Ashton, et al., v. Al Qaeda, et al., Civil Action No. 02-6977 (S.D.N.Y.). The issues I have been asked to address are the implications and probable consequences for the United States and its ability to conduct relations with Saudi Arabia and the international community at large, should the United States' courts decide to adjudicate the allegations against them and other Saudi government defendants in these law suits.

## I.    Qualifications

My qualifications to address these questions include nearly thirty years as a professional diplomat and defense official, during the course of which I served our country in India, China, Southeast Asia, and the Middle East as well as in senior foreign policy positions in Washington, and represented our government in negotiations on over a hundred countries on six continents. My last official positions were Ambassador to the

Kingdom of Saudi Arabia (1989-1992, a period that included the 1990-1991 war to liberate Kuwait) and Assistant Secretary of Defense for International Security Affairs (1993-1994).

Since my voluntary retirement from the diplomatic service at the end of 1994, I have been invited and have agreed to serve as chairman of Projects International (a twenty-five-year-old firm that serves private sector clients seeking to globalize their business operations), as President of the Middle East Policy Council, Co-Chair of the United States-China Policy Foundation, Vice Chair of the Atlantic Council of the United States, as a Trustee of the Institute for Defense Analyses, and as a member of the boards of the American Academy of Diplomacy, the Association for Diplomatic Studies and Training, and the Washington World Affairs Council, among other positions. I am the author of two oft-reprinted books on statecraft and diplomacy (*The Diplomat's Dictionary* and *Arts of Power*), the editor of the current entry for *Diplomacy* in the Encyclopedia Britannica, and a frequent lecturer on general as well as contemporary issues of foreign affairs.[1]

## II.   **Summary**

In summary, in my opinion, adjudication of these cases would require the courts to disregard or reexamine and possibly substitute their own rulings for the considered judgments of the Executive Branch on a wide range of sensitive national security, diplomatic, and international political, economic, and intelligence issues, while severely undermining the basis for continued effective international cooperation against terrorism. These cases invite the Judicial Branch to act for the United States in condemning the

---

[1] A detailed *curriculum vita* appears in *Who's Who in the World* as well as *Who's Who in America*.

domestic and international policies of Saudi Arabia's government and demand that the courts pass negative judgments on the intricacies of the Kingdom's compact of governance, religious practices, and social system.

Quite aside from the denigration of Executive Branch discretion to conduct United States foreign relations implied in such a course, apparent disregard by the United States judiciary for Saudi Arabia's sovereignty and disrespect for its religious traditions would gravely complicate prospects for its continued cooperation – and the cooperation of other Arab and Muslim states – with the United States on many issues of mutual concern, not just those connected with international terrorism. Adjudication of these cases by the United States' courts would adversely affect a broad range of American national interests and could gravely complicate the ability of the Executive Branch to advance those interests through either diplomacy or the use of force. Beyond this, a finding by the United States' courts that the allegations in these cases are justiciable would risk retaliatory limitation by Saudi Arabian and other foreign courts of their regard for United States' sovereignty and withdrawal of the respect for our judicial decisions traditionally dictated by the comity of nations.

III.     **Details**

1.     **United States Interests in the Conduct of Relations with the Kingdom of Saudi Arabia**

Few relationships so clearly embody the complexities inherent in foreign policy as that between the United States of America and the Kingdom of Saudi Arabia. Very important national interests have been and are at stake in this relationship, which the United States went to war to defend as recently as 1990-91. In brief, these interests currently center on:

▶ Terrorism. Al Qaeda's attacks on the United States have been motivated by its recognition that success in its principal objectives (overthrowing the Saudi monarchy, replacing it with a new caliphate, and using the Islamic holy places as a pulpit from which to unite the Muslim world in long-term war against the West) depends on ending American friendship and support for the Kingdom of Saudi Arabia. Al Qaeda has, most unfortunately, registered major progress toward this end. In the aftermath of its criminal atrocities on September 11, 2001, public opinion in both the United States and Saudi Arabia has turned strongly against the other and, amongst policymakers in each capital, the merits of continuing close relations with the other have become controversial. (Given the terrible suffering of the plaintiffs in this case at the hands of Al Qaeda, it is ironic that a court decision for the plaintiffs would directly serve Al Qaeda's aims and those of other Islamic extremists. It would aid and abet those within the Kingdom, including not a few in the ruling Al-Saud, who argue that their country should now end its longstanding cooperation with the United States and distance itself from both America and our national security and foreign policy objectives.) At the same time, the emergence of Al Qaeda as a common enemy of both Saudi Arabia and the United States has underscored to senior officials in the governments of both countries the importance of greatly enhanced policy coordination and cooperation in intelligence and law enforcement in order to crush Al Qaeda and other terrorist threats to both.

▶ Partnership. Saudi Arabia's wealth, regional prestige, and centrality to Islam have made it an essential partner of the United States in the search for a just and lasting peace between Israelis and their Arab neighbors. The generous support provided by individual Saudi Arabians to Palestinian Arabs suffering under Israeli occupation has

given the Kingdom unexampled moral and practical influence among them. For Israel to find peace with Palestinians and other Arab neighbors – a major foreign policy objective of the United States – US-brokered Saudi Arabian cooperation will be essential, not just to avoid overthrowing the peace but to buttress its perpetuation.

▶ Islam. For the fifth of the human race that is Muslim, the holy places in Saudi Arabia, where Islam began, are the focus of religious faith and moral inspiration. Saudi Arabia's status as the homeland of Islam gives it unique influence over the moral outlook of 1.25 billion human beings, including their judgments about the United States. Saudi Arabian attitudes toward the United States and our policies therefore have global, not just regional resonance. The United States has an interest in avoiding, if at all possible, the hostility of the world's Muslims and in establishing cordial and cooperative relations with them.

▶ Transit and Basing. Saudi Arabia bestrides the major routes between Asia and Europe. There are no convenient alternatives. Thousands of ships and tens of thousands of civilian and military aircraft transit the Kingdom each year. Keeping these lines of communication in friendly hands and open to Americans remains an important national interest. Similarly, on numerous occasions, as demonstrated most recently with respect to Afghanistan and Iraq, the United States has a vital interest in access to Saudi Arabian bases and military facilities, either for the direct staging of military operations or for their command, control, and logistical support. Alternative basing arrangements in neighboring countries on the Arabian Peninsula are almost certainly unsustainable without Saudi acquiescence. Continued access to bases and facilities in and around Saudi Arabia remains important to the national security interests of the United States.

▶ Oil. Saudi Arabia has by far the largest petroleum reserves in the world. It has long been one of the world's three largest producers of oil and related products. It will have an increasingly crucial part in global energy production and trade in coming decades. Even more important, the Kingdom is unique among oil producers in maintaining excess production capacity so that it can respond to fluctuations in demand by shifting levels of production at will. To the extent it can regulate global energy markets to the benefit or detriment of consumers, Saudi Arabia plays a uniquely important role in determining the health and welfare of the American and world economies. The United States has an important interest in Saudi Arabia exercising its power in ways favorable to us.

▶ Trade and Finance. Saudi Arabia is not only the largest supplier of oil to the American market, it has long accounted for over 50% of all United States exports of goods and services to the West Asian-North African region. By the end of the last century, Saudi private investors had invested as much as $800 billion in the United States, making them significant players in our domestic financial and real estate markets. The Kingdom has historically provided substantial, sometimes decisive, financial support for US foreign policy in the region and beyond it. Much beyond access to oil is at stake for the United States economy in our relations with the Kingdom and its commercial elite.

2.      **Management of Saudi-American Relations and the Pursuit of Al Qaeda**

The political complexity of the interests engaged in our relations with Saudi Arabia in the circumstances since 9/11, as well as the issues of terrorism on which those interests bear, challenges America's sense of priorities, political acumen, and diplomatic

skills.  The preservation and advancement of our interests demands all of the qualities the founding fathers saw as unique to the Executive Branch: "accurate and comprehensive knowledge of foreign politics; a steady and systematic adherence to the same views; a nice and uniform sensibility to national character; decision, secrecy, and dispatch."[2]

In order to adjudicate the claims in these lawsuits, the courts would have to make judgments on matters closely connected to religious doctrine and practice that will concern and may draw reactions from Muslims throughout the world, especially those who profess forms of strict Unitarian (often termed Wahhabi) Islam similar to the officially sanctioned faith of Saudi Arabia.  The subjects proposed for adjudication include (a) the religious legitimacy and degree of inspiration to terrorism of the dominant sect of Islam in Saudi Arabia in distinction to Islam as a whole, (b) the role of Zakat (religiously obligatory almsgiving) and religious charities in Islam and in Saudi Islam in particular, (c) whether proselytizing by some sects of Islam (such as that dominant in Saudi Arabia) constitutes an inherent incitement to terrorism, and (d) the relationship of religious education in various Muslim countries, including but not limited to Saudi Arabia, to the inculcation of attitudes conducive to terrorism.  The courts would also have to evaluate Saudi Arabian policies and the adequacy of the efforts by Saudi Arabian intelligence and law enforcement agencies to control religious charities and prevent use of their funds by terrorist organizations.  The reaching of actionable judgments on such matters is the daily stuff of politics and foreign policy.  It is foreign to the normal work of courts.  The issues in question involve subjective judgments and differences of political opinion that courts everywhere have always considered best left to other branches and organs of government.

---

[2] *Federalist Papers*, number 75.

In any event, in this instance, the Executive Branch has neither considered nor declared Saudi Arabia to be a state sponsor of terrorism.  Far from embracing the plaintiff's theories of Saudi facilitative accountability and complicity in Al Qaeda's criminal assaults on the United States, the Executive Branch has repeatedly declared its basic satisfaction with the cooperation it is receiving from the government of Saudi Arabia against Al Qaeda and other terrorist organizations.  It is not clear from the pleadings whether the plaintiffs asked the Executive Branch to press their claims against the government of Saudi Arabia or the numerous institutions and individuals in the Kingdom they have named as defendants in these pleadings.  Executive espousal of claims judged by the Secretary of State to have legal merit is the normal international practice for pursuing such matters against foreign governments, rulers, and establishments.  No such espousal has taken place in this instance.  No interest in it has been manifested.

Meanwhile, however, the Executive has been anything but inactive.  It has taken military action directly against Al Qaeda and its hosts in Afghanistan.  American diplomacy has built a global coalition against Al Qaeda and similar terrorist organizations – a coalition that prominently includes the Kingdom of Saudi Arabia.  The Executive's efforts have in fact resulted in steady expansion of the scope and pace of Saudi-American cooperation against the criminal perpetrators of 9/11, their fellow travelers, and their support network.

Tactful American diplomacy has catalyzed concomitant reforms in domestic Saudi policies and practices to harmonize them with our own.  Saudi and American law enforcement agencies have reached new accommodations, consistent with respect for

each other's forensic requirements, judicial traditions, and national sovereignties, that have enabled them to work together in ways they could not in the past. In the aggregate, these and related measures (including the establishment of a Department of Homeland Security under new legislative authorities) constitute a comprehensive policy, composed through consultations between the Executive and Legislative Branches, for dealing with the terrorism of 9/11 and its aftermath.

### 3.    The Costs of Executive-Judicial Inconsistency

The present lawsuits propose to insert the civil judicial power into the midst of the delicately balanced machinery of this complex policy. The Judicial Branch is asked to substitute its own judgments for those of the Executive Branch about whether Saudi Arabia – including its religious establishment, government ministries and ministers, members of its ruling family, and instrumentalities of its government – is a sponsor of terrorism. The Judicial Branch is asked to make judgments about the role of government, the actions of government officials and instrumentalities, and governmental functions of royal family members in a sovereign foreign state and society whose compact of governance is vastly different from our own.

The Saudi Arabian compact of governance has traditionally laid two essential duties on the ruler and his family: (1) to assist in the formation and proclamation of consensus and policies that reflect it; and (2) to support and give money to -- rather than to tax or take money from -- citizens, especially those in need. (There are no taxes on Saudi Arabian individuals or corporations other than the religious obligation of charitable giving through Zakat.) The Kingdom of Saudi Arabia is thus a polity in which charity is uniquely integral to both official governmental and individual religious duty. It is a

society in which individual members of the royal family have a responsibility, as the Kingdom's rulers, to respond to the needs of the destitute or deprived in their own name but on behalf of the state. It is a political culture in which the more exalted the rank of a member of the royal family, the greater the expectation that he will draw on the resources of the state for charitable acts that redistribute the Kingdom's wealth to the benefit of the less fortunate.

Executive Branch judgments about how to treat charitable acts by Saudi Arabian officials and government instrumentalities must weigh and balance them against both this cultural background and the state and content of bilateral diplomatic dialogue and negotiation with the Kingdom of Saudi Arabia at any given moment. What criteria of judgment should the courts, should they choose to do so, apply to serve the objectives of American public policy in such an alien and shifting scene? The interests of the United States dictate that issues like those posed in these lawsuits and their political, economic, military, and cultural implications be considered in light of the complexities of other issues that Saudi or other foreign government negotiators might seek to link to them, and not dealt with in isolation from the broader and constantly changing diplomatic context within which they have arisen. Are the courts equipped to take effective judicial cognizance of the shifting dynamics of diplomacy and bilateral negotiation between various Executive Branch agencies and their Saudi counterparts? If the courts choose to adjudicate the issues posed by plaintiffs in these lawsuits, how can they avoid acting crosswise with the Executive Branch as it attempts to conduct the defense and foreign relations of the American people?

Clearly, the Executive Branch cannot credibly proclaim Saudi Arabia a friend and partner in the struggle against terrorism while the Judicial Branch simultaneously declares its government, senior ministers, and instrumentalities to be a menace, aiding and abetting the enemies of the American people. Nor can the Executive Branch hope effectively to elicit the cooperation of Saudi Arabia, still less enhance it, while the Judicial Branch simultaneously seeks to subject the very officials and institutions whose cooperation the Executive is courting to onerous civil penalties on the very matters the Executive Branch is actively addressing with them. These lawsuits are a direct challenge to the authority of the Executive to conduct the foreign relations of the United States.

Should the Judicial Branch contradict the Executive by declaring Saudi Arabia – writ large – to be against rather than for the United States in the "war on terrorism" proclaimed by the President and seek, as the plaintiffs ask, on the basis of this judgment, to subject Saudi Arabia and its establishment to the civil judicial power of the United States, the Kingdom would certainly be deeply insulted. More to the point, it would acquire powerful disincentives to further cooperation with the United States not just on terrorism but on many other issues on which we have sought and heretofore received Saudi assistance, pending an end to judicial intervention.

Were these lawsuits to proceed, the questions of justiciability they pose would become the central issues in bargaining between the United States and Saudi Arabia, as well as of negotiation with other interested nations – of which there would be many. In the meantime, those within the Kingdom arguing for the suspension of cooperation with the United States on some or all aspects of global and regional counter-terrorist strategy would gain important ground; Saudi Arabia's rulers would come under sharply escalating

domestic political pressure to retaliate actively against other American interests of great concern to the United States, including many unrelated to terrorism. The consequences for a wide range of American interests – for example, sales of goods and services to the Royal Saudi government, base rights in countries bordering the Kingdom, the security of our forces in Iraq, financial flows to Palestinians under Israeli occupation, the continued use of the dollar as the unit of account for the oil and other commodity trade – could be substantial. So, too, could the opportunity costs in terms of diminished prospects for Saudi cooperation on these and other issues, for example, should the President's diplomatic initiatives on peace between Israelis and Palestinians or Israelis and Syrians bear fruit.

4.     **The Consequences for Comity and Executive Branch Credibility Abroad**

The issues at stake go well beyond terrorism and, as the listing of American interests in relations with Saudi Arabia above attests, well beyond the state of bilateral relations between the United States and Saudi Arabia. There is a wide range of political, economic, and military issues beyond those connected with terrorism with respect to which suspension of Saudi cooperation or retaliation against the United States could have grave consequences for our interests. Moreover, there are alarming implications for American foreign relations more broadly and for the Executive Branch's ability to conduct them, should the Judicial Branch establish a precedent of justiciability in these cases.

There is, first, the question of the precedent that could be set both for courts here and abroad. What is there to stop similar lawsuits against other countries, judged by the Executive Branch to be friendly, but alleged by plaintiffs to have adopted policies that

harmed them or to have failed to adopt policies to prevent such harm? Given the multiple

origins and international connections of American citizens and legal residents of the

United States, one does not need much imagination to foresee a slew of politically

tendentious lawsuits in the United States against China, Israel, Myanmar, or Russia and

their officials – just to name a few obvious examples – for alleged state terrorism, war

crimes or other tortious behavior.

Some foreign courts might decide, in these circumstances, to suspend normal

considerations of comity and decline to give effect to American judicial decisions they

considered to contravene the principles of international sovereignty and the law of

nations. But what is to stop still others from attempting, on a reciprocal basis, to subject

the United States, members of our Cabinet, Legislative Branch, agencies of our

government, banks, charities and prominent donors to them, to parallel jurisdiction?

Given the frequency with which the United States conducts military operations in foreign

countries – sometimes, as in the case of Iraq, on legal grounds that are widely disputed

abroad – one might expect numerous foreign civil suits against the US Government and

its senior officials to the considerable embarrassment and inconvenience of both our

civilian and military leaders and their ability to travel internationally. One might also

foresee suits here and abroad against American banks and donors to religious figures and

charities involved in funding – again, just for example – controversial separatist causes

like those of the Irish Republican Army and its Sikh, Sudanese, and Uighur counterparts,

or the actions of the current president of Liberia (a recipient of church donations who is

under international indictment for war crimes).

Finally, but in many respects most importantly for the United States, there is the issue of potential damage to the credibility of the Executive and its capacity effectively to conduct the business of the United States with other nations. How could other countries have any confidence in the President's characterization and conduct of United States' relations with them when his judgments and policies might at any time be second-guessed and contradicted by the US courts? Saudi Arabia would not be alone in withholding cooperation from the United States in these circumstances. No other country could feel secure against judicial intervention in its diplomatic relations with the United States. The ripple effects could be very wide.

5.     **Conclusion**

There are many reasons that courts have traditionally refrained from adjudication of cases of the kind presented by these lawsuits. The matters they raise are not only highly political; they are part of both a larger pattern of national interests and policies that challenge the analytical and leadership skills of the President and his administration. These are not episodes or cases and controversies to be settled in isolation but components of a flow of trends and events that can only be effectively addressed by strategy and over time. Issues like those presented by these plaintiffs are the traditional stuff of statecraft and diplomacy, not the civil judicial power. Under all but the most exceptional of circumstances, it is statecraft by the Executive Branch, not informed deliberation by the judiciary, to which they should look for redress.

In the end, we live in a world in which the boundaries of sovereignty are, in practice, established either by self-restrained respect for the autonomous diversity of other nations or by armed coercion or conflict. In such a world, courts here in the United

States and abroad have rightly preferred self-restraint and the promotion of reciprocal tolerance and respect for the rule of law to the risk of international confrontation or legal disorder or anarchy.  Recognizing that disrespect for sovereignty is a *casus belli* and that respect for judicial decisions by foreign governments and judiciaries is a matter of comity born of reciprocity rather than of right, courts here and abroad have generally refrained from questioning the compacts of governance, policies, practices, or religious values of foreign states and societies.  They have therefore judged it to be both wise and expedient to defer to other branches of government in respect of issues like those presented in these lawsuits.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 7, 2003.

Chas. W. Freeman, Jr.