# Exhibit 2

SUPPLEMENTARY DECLARATION BY AMBASSADOR FREEMAN

My name is Charles Wellman Freeman, Jr., usually known, and confirmed by the United States Senate for various positions in the Executive Branch, as Chas. W. Freeman, Jr.

On August 7, 2003, at the request of the attorneys for His Royal Highness Prince Sultan bin Abdulaziz Al-Saud, Second Deputy President of the Council of Ministers, Minister of Defense and Aviation, and Inspector General of the Kingdom of Saudi Arabia, and the attorneys for The National Commercial Bank (NCB) of Jeddah, Saudi Arabia, I provided my expert opinion on certain issues arising from two lawsuits in which their clients are named as defendants.

Prince Sultan's lawyers filed my declaration in the United States District Court for the District of Columbia on August 8, 2003, as part of their reply to earlier pleadings by the plaintiffs in Burnett, et al. vs. Al Baraka Investment, et al., Civil Action No. 02-01616 (D.D.C.). On September 2, 2003, the plaintiffs filed a Sur-Reply Memorandum of Law with three accompanying Declarations from Mr. William F. Wechsler, Mr. W. Michael Reisman, and the Honorable Jeane J. Kirkpatrick. I have read these documents attentively. I submit this Supplementary Declaration at the request of the attorneys for NCB.

Plaintiffs' lawyers and their three declarants seem to me to have evaded rather than addressed most of the substance of my August 7 declaration. But I consider that it may be helpful to the court to provide supplementary comments on the few substantive points of rebuttal that plaintiffs' attorneys and their declarants offered. In doing so, I will

also briefly address the questions they have raised about the objectivity, extent, and timeliness of my expertise on these and related issues.

The issues that require supplementary comment fall within what I continue to see as the three central issues of this and its companion cases in New York[1]: (1) Who decides for the United States what the foreign policy interests of all Americans are and whether those interests are aided or impaired by lawsuits like these actions? (2) Who decides for the United States whether a foreign state, like Saudi Arabia, including its government, government officials and instrumentalities, and ruling family, is or is not a sponsor of terrorism? And (3) should the courts step in, when the Executive Branch has declined to do so, to impose punitive sanctions on a foreign state, including its government, government officials and instrumentalities, and ruling family, on behalf of private parties?

## I. Summary

Contrary to plaintiffs' arguments, the concept of state sovereignty is *not* outmoded. The United States is itself in the midst of a vigorous international campaign to preclude assertions of jurisdiction over it, its officials, and its instrumentalities by foreign courts. Our country has rejected the jurisdiction of foreign tribunals expressly to avoid the impairment of our foreign policy and damage to our national security and other interests. Recent US disputes with allies and friends on issues of justiciability are remarkably similar to those in these cases and serve to underscore the dangers of courts attempting to make decisions about how best to conduct the nation's foreign relations or to influence the domestic policies of foreign states. The Executive, through the Department of State, is the branch of government with responsibility for making these

---

[1] E.g., Ashton et al. v. Al Qaeda, Civil Action No. 02-6977 (S.D.N.Y.).

decisions. There is no reason the court should not seek to ascertain the Executive's opinion with respect to these cases.

Saudi Arabia has not issued any threats, direct or implied, against the United States or Americans. Nevertheless, this case seeks a judgment for $1 trillion against officials and instrumentalities of the Government of Saudi Arabia. $1 trillion is an amount over four times the Kingdom's gross domestic product (GDP). It is difficult to imagine that Saudi Arabia would accept such a judgment with equanimity, as plaintiffs suggest. It would not be out of the question for the Kingdom to react adversely, as one might expect the United States to do if subjected to comparable injury by a foreign court. Expert opinion might differ in predicting this reaction, but actually determining what Saudi Arabia would or would not likely do in response to a finding for plaintiffs, or what the implications of this could be for the Executive's ability to manage US-Saudi relations, is a task best performed by the Executive, not in the courts.

The Executive, not the courts, is charged by law to determine whether a foreign state is a sponsor of terrorism. The Executive has made no such determination in the case of Saudi Arabia. Plaintiffs are asking the courts to do so instead. Even if this were legally proper, it would be unwise. The courts should not become a venue for former government officials to reopen policy debates they lost while in government. Nor should the courts become a vehicle for the imposition of punitive sanctions and pressures on foreign countries when the Executive has decided on other means of accomplishing US objectives internationally. This would make the courts into a mechanism for the privatization of foreign policy and a forum for the pursuit of private vendettas against foreign states.

## II. Details

### 1. Who determines the foreign policy interests of the United States?

I agree, of course, with Mr. Wechsler that courts generally "should be wary of becoming involved in cases with a substantial potential for impairing foreign policy,[2]" even as I disagree with him about the potential of this case to produce such impairment. But the root question remains whether it is the Executive or the Judicial Branch that has responsibility for determining whether these cases impair US foreign policy interests. Mr. Wechsler appears to agree that the Executive Branch, through the Department of State, has such responsibility.[3]

There is ample reason for this assignment of responsibility to the Executive both under our Constitution and those of foreign states. Judicial assertions of jurisdiction over the officials and instrumentalities of foreign states can have severe, if completely unintended, effects on national security and foreign policy interests. This is why our government has adamantly opposed the extension of jurisdiction to the United States and Americans by the newly created International Criminal Court. It is why recent efforts by foreign courts to assert jurisdiction over American officials have drawn such a strong US response.

A case in point. This summer saw a major confrontation between the United States and Belgium, where the North Atlantic Treaty Organization (NATO) is headquartered, on this very issue. In March 2003, responding to suits filed in the Belgian courts against various senior US officials, including the President, the Vice President, and past and present combat commanders in the Middle East, the American Ambassador at

---

[2] Declaration of William F. Wechsler, August 25, 2003, p. 9
[3] Ibid.

Brussels warned the Government of Belgium that the willingness of its courts to entertain such suits would "result in Belgium's becoming a venue for political vendettas, harming innocent government, military and business leaders" as well as Belgian interests.[4] (The Government of Israel had already reacted to an earlier decision by the Belgian Supreme Court purporting to subject Prime Minister Ariel Sharon to Belgian jurisdiction by recalling the Israeli ambassador to Brussels.[5]) In June, Secretary of Defense Rumsfeld felt obliged to underscore in a major policy address that "we must take care to not damage the core principle that undergirds the international system – the principle of state sovereignty" and subsequently to warn that there would be consequences "if Belgium appears not to respect the sovereignty of other nations."[6]

Under the pressure of escalating threats from the United States, the Government of Belgium finally decided to withdraw legal authority for such suits.[7] The interest that states have in defending their sovereignty is manifestly not as "outdated" a concept nor is national sovereignty as "routinely 'disrespected'" as Mr. Wechsler would have us believe.[8] In this and the related cases, plaintiffs' attorneys urge the United States courts to emulate the now abandoned practices of the Belgian courts to which the United States Government and other governments so strongly objected.

---

[4] State Department Briefing, March 19, 2003. Defendants in the Belgian suits that were the subject of controversy included President George H. W. Bush, Vice President Dick Cheney, Secretary of State Colin Powell, General Norman Schwartzkopf , President  George W. Bush, Secretary Donald F. Rumsfeld, and General Tommy Franks.

[5] BBC World News, February 13, 2003 (http://news.bbc.uk/2/hi/middle_east/2756709.stm)

[6] Speech by Secretary of Defense Donald H. Rumsfeld, Garmisch, Germany, June 11, 2003. The following day, in Brussels, according to an Armed Forces Press Service report, Secretary Rumsfeld said that the United States "will have to seriously consider whether we can allow uniformed and civilian officials to come to . . . Brussels," adding that "until this matter is resolved we will have to oppose any further spending for construction of the new NATO headquarters in Brussels."
(http://www.defenselink.mil/news/Jun2003/n06112003_200306113.html and
http://www.defenselink.mil/news/Jun2003/n06122003_200306125.html)

[7] See the July 31, 2003 report and commentary in the New Republic, "Belgian Waffle"
(http://www.nationalreview.com/nr_comment/nr_comment073103.asp)

[8] Declaration of William F. Wechsler, August 25, 2003, p. 8

Plaintiffs' attorneys and declarants cannot dismiss the impact of these cases on US-Saudi relations by characterizing them as claims merely against "Saudi-based individuals and institutions."[9] That's not who they're after. Elsewhere, in fact, plaintiffs' attorneys have clearly stated that their target in these lawsuits is "the Saudi government," which they define as "highly placed members of the royal family, … leading banks," and current and former members of the Saudi Cabinet.[10]

The US Government has repeatedly declined to label Saudi Arabia as a state sponsor of terrorism, and that determination applies equally to officers and instrumentalities of the Saudi Government like Prince Sultan and NCB. Through these lawsuits, plaintiffs' attorneys seek a contrary declaration from the US courts. My conviction that this would set a precedent with severe consequences for the Executive's ability to conduct US foreign relations is what prompted me to express the views I did in my original declaration.

Plaintiffs' lawyers echo Mr. Wechsler in deriding the notion that the government of Saudi Arabia might be "insulted" by a judgment against it in this case. Saudi Arabian readers might indeed take offense at the tone of the plaintiffs' attorneys' pleadings,[11]

---

[9] Declaration of William F. Wechsler, August 25, 2003, p. 8

[10] Allan Gerson and Ron Motley, Op-Ed in the New York Times, December 30, 2002. The full paragraph is: "The Saudi government refuses to cooperate with the families of the victims of Sept. 11. In the suit we are involved in, highly placed members of the royal family are named as defendants, as are leading banks, the interior minister, the former ministers of health and Islamic affairs and, most important, Prince Turki Al-Faisal, the former intelligence minister." Mr. Gerson is separately quoted as telling one of the plaintiffs in this case that "it is enormously expensive and difficult going after a foreign government – difficult, difficult…. On the other hand, it can be enormously satisfying." The National Law Journal, November 15, 2002.

[11] See, for example, the snide "surmises" at pp. 7 - 8 of Plaintiffs' Sur-Reply Memorandum of Law in Further Opposition to Motion of Sultan bin Abdulaziz Al-Saud to Dismiss the Claims against Him that "the Kingdom is 'insulted' by the rule of law" and "it may be hard for Prince Sultan and his government to appreciate the independent judiciary and the rule of law." These "surmises" are then inadvertently contradicted by the statement of a foreign policy adviser to Crown Prince Abdullah bin Abdulaziz Al-Saud (at the foot of page 8). The adviser expresses respect for the judicial process.

which parallel their frequent public denigration of the Kingdom and its officials.[12]  But

that is not the issue.  This lawsuit asks Saudi Arabia for damages of $1 trillion, an amount

that is over four times the Kingdom's Gross Domestic Product (GDP) in a year of high

oil prices.  Were a foreign court to levy proportional damages against the United States,

the amount of the judgment would come to nearly $50 trillion.  I suspect that the United

States Government and the American people might well find such a judgment sufficiently

"insulting" to justify retaliation against the country whose courts had rendered it.  I do not

think that anything short of the defeat of the United States in war could persuade us to

permit such a judgment to be executed.

      Saudi Arabia has not, of course, issued any threats against the United States, still

less threatened war or any other adverse consequence to Americans, though plaintiffs'

lawyers attempt to extrapolate such threats from the opinions I expressed in my original

declaration.  In this regard, inasmuch as plaintiffs' attorneys and Mr. Reisman[13] have

made much of the phrase, I note that what constitutes a *casus belli*[14] remains a political

judgment that those who are offended, not those who offend them, make.  Nor, for better

or ill, is this an issue decided on legal criteria.  If it ever was, the United Nations Charter

---

[12] See, for example, The Charleston Post and Courier, which noted on June 24, 2003 that "Mr. Motley ... boasts that when he is finished with the former director of Saudi intelligence [Prince Turki Al-Faisal], 'he'll have a new name: Prince Cooked Goose.'" (http://charleston.net/stories/062403/edi_24edit1.shtml)

[13] Declaration of W. Michael Reisman, August 26, 2003, paragraph 4. Mr. Reisman's dismissal of the possibility of a sharp Saudi Arabian reaction to an adverse judgment in this case apparently reflects his lack of awareness of the US-Belgian and Israeli-Belgian contretemps over judicial assertions of jurisdiction with respect to government officers and instrumentalities. The Belgians believed that their courts were entertaining "lawful actions," authorized by their Legislative Branch and fulfilling policies of international law that their parliament regarded as important. This did not prevent the United States and other states from being deeply offended by the willingness of the Belgian courts to entertain lawsuits similar to this one. Although the United States was able to resolve its dispute with Belgium by diplomatic means, it took months of escalating threats to accomplish this.

[14] "Casus belli" is defined by the American Heritage Dictionary, 4th ed., as "an act or event that provokes or is used to justify war."

is not now the only authority on this, despite what Ambassador Kirkpatrick asserts.[15]
Otherwise, how could one justify the United States invasion and occupation of Iraq?
That conflict did not spring from a violation of the United Nations Charter.  Nor did the
Security Council endorse it, as the Charter would appear to require.

Mr. Wechsler, for his part, dismisses the impact of a judgment against Saudi
Arabia in this and other lawsuits and opines that "any likely negative ramifications of …
private litigation [like this] will be manageable in the context of evolving U.S.-Saudi
diplomatic relations."[16]  It is not clear to me on what basis he reaches this hopeful
judgment.  What is clear is that, with the rise of al Qaeda as a threat to both the United
States and Saudi Arabia, the importance of cooperation between the two nations and the
need for strengthened bonds between their two governments is greater than ever before.
The Executive has recognized this and acted accordingly.[17]  This conclusion is not an
assertion of American "dependence" on Saudi Arabia or an expression of undue
deference to the Kingdom's rulers; it is acknowledgment of the reality of mutual reliance,
coupled with recognition that mutual respect for sovereignty is the only reliable basis for
international cooperation.

On page 6 of his affidavit, Mr. Wechsler quotes the report on terrorist financing
he helped a task force of the Council on Foreign Relations (CFR) prepare and publish.
Apparently, he is citing himself as an authority for his own views.[18]  If so, he is citing
very controversial "authority."

---

[15] Declaration of Jeane J. Kirkpatrick, August 26, 2003, paragraph 7.
[16] Declaration of William F. Wechsler, August 25, 2003, p. 8
[17] See my original Declaration, p. 4 & p. 8.
[18] Declaration of William F. Wechsler, August 25, 2003, p. 1.

The Council asked me to participate in this particular task force, as I have in others though I have never joined the Council. I declined to take part when it became apparent that the task force's purpose vis-à-vis Saudi Arabia was polemical rather than analytical. As far as I know, the Council's in-house experts on the Middle East did not contribute to the report. I am aware of a number of persons with highly regarded expertise on the Kingdom who decided not to participate after hearing that most of the task force's findings and recommendations had been drafted before it convened. As an admirer of the Council's work on many issues, it pains me to say that this report, sound as it may be with respect to the vulnerabilities created by domestic US banking practices, has no credibility at all with respect to Saudi Arabia except among those with little or no direct experience and expertise in the Kingdom. It certainly does not represent the views of the Executive Branch with respect to Saudi Arabia. Those views are on the record and contradict the CFR report.

At this point, since I am, as plaintiffs' attorneys have pointed out, the salaried president of the Middle East Policy Council (MEPC), I feel obliged to say a word or two about MEPC. As president of MEPC, I travel frequently to the region, including to Saudi Arabia, to discuss contemporary policy issues with government and private sector leaders there. This helps MEPC to carry on its activities, which are directed at educating Americans about the complexities of US-Middle Eastern relations and Arab culture and Islam and at enriching public debate on contemporary policy issues affecting US interests in the Middle East. MEPC conducts panel discussions on Capitol Hill, publishes a quarterly journal ("Middle East Policy") that is the most often cited in its field, and maintains a syllabus and nationwide training program for high school teachers who teach

courses about Arab civilization and Islam.  All of MEPC's activities are open to the
public or on the public record.  MEPC does not take policy positions, lobby, do public
relations, or provide business facilitative services here or abroad for anyone –
governmental, corporate, or individual.

Plaintiffs' attorneys imply that my position as president of MEPC somehow
disqualifies me as an expert on Saudi Arabia and international relations for two reasons:
(1) purported financial dependency on MEPC and hence on Saudi Arabian donors to it;
and (2) friendship with Saudi Arabia and its ruling family.  But I accepted the presidency
of MEPC from my predecessor in office, Senator George McGovern, as a civic duty *pro
bono publico*.  My salary from MEPC is a tiny fraction of my income; I serve as president
because I believe in the importance of MEPC's educational mission, not because I need
its money.  In my nearly six years as president of MEPC, not once has a donor to it asked
me to perform any personal service.  Nor do other officers of MEPC or the organization
itself perform such services for donors.

I am bemused by plaintiffs' attorneys' apparent belief that one can have true
expertise only if one deplores the people, culture and society that are the subject of the
expertise.[19]  Of course, I have many Saudi friends.  My friendships with Saudi Arabians
were built "in the foxhole," while representing my country's interests in the Kingdom
under wartime conditions that were deeply stressful for both Saudis and Americans.  In
any event, as plaintiffs' attorneys have reminded me,[20] my alleged deference and
diffidence toward Saudi Arabia's royal family did not inhibit me from raising awkward

---

[19] Plaintiffs' Sur-Reply Memorandum of Law in Further Opposition to Motion of Sultan bin Abdulaziz Al-
Saud to Dismiss the Claims against Him, p. 9
[20] Ibid.

and unpleasant matters involving the royal family directly with Prince Sultan bin
Abdulaziz Al-Saud.

As a result of my familiarity with the region and its current political economy, I
am frequently invited to participate in efforts by the intelligence community to predict
Saudi reactions to regional developments as well as shifts in US policy toward the
Kingdom and the region. From time to time, I do the same on other topics related to the
Middle East and other regions of the globe. I am acutely aware that statesmen must
routinely act on the basis of inadequate information about the present and plausible
conjecture about the future. To predict is often little more, to quote Vladimir Nabokov,
than "to expand enormously the specious present." We will not know whether Mr.
Wechsler is correct in his optimistic judgments about how the Saudis would react to
adjudication of these cases until events take their course and the future becomes the
present.

In any event, as Mr. Wechsler, at least, appears to accept, the Executive Branch,
through the Department of State, is the branch of government charged with making
assessments and predictions on the questions on which we disagree.[21] The argument over
what the Saudi Arabian government may or may not do if this lawsuit proceeds is too
speculative to resolve in a court of law. The Executive Branch must make the key
judgments with respect to "the likely impact of this suit on U.S. foreign policy."[22]

In this regard, I confess, I am mystified by the logic of the footnote at page 11 of
the plaintiffs' attorneys' Sur-Reply.[23] Why should the court *not* "seek the views of the

---

[21] Declaration of William F. Wechsler, August 25, 2003, p. 9
[22] Ibid.
[23] Plaintiffs' Sur-Reply Memorandum of Law in Further Opposition to Motion of Sultan bin Abdulaziz Al-Saud to Dismiss the Claims against Him, p. 11, footnote 10

United States" with respect to the issues in this litigation, even if not "required" to do so? Since, as Mr. Wechsler notes, neither he nor I (nor the attorneys for the parties) can speak for the Executive Branch on the issues before the courts, would it not be helpful to have the benefit of the Executive's views? If so, why not ask the Executive Branch for its views? The worst that might happen is that the Department of State's Legal Advisor might, given the highly charged atmosphere surrounding this case, lack the political courage to respond.

In fact, my recollection, based on numerous discussions with successive Legal Advisors and their staffs at the Department of State over the course of a nearly thirty year diplomatic career, was that the Department will not, as a rule, volunteer the views of the United States in civil suits by private plaintiffs unless asked to do so by the courts concerned. If asked, it treats the question of whether to respond as one of Executive Branch discretion in relation to an equal Branch of government. (I understand the reasons for this policy but have never agreed with it.) The Executive Branch thus respects the autonomy of the Judiciary to such an extent that it will not be drawn into civil lawsuits except when the courts have made it clear they require Executive views to do their job. It is up to the courts to ask. That would seem to me to be the right thing to do here.

## 2. Who decides which foreign states are sponsors of terrorism?

It is apparent from Mr. Reisman's terse declaration that he is under the erroneous impression that the Executive Branch has designated Saudi Arabia as a state sponsor of terrorism, thereby allowing the victims of terrorism "to hold" it "and other sponsors of

terrorism accountable, as defined by law."[24]  Given the highly charged political
environment in which these cases have been filed, Mr. Reisman may be forgiven this
mistake.  Far from such a designation having occurred, of course, the Executive Branch
continues to praise both Saudi cooperation in the global war against terrorism and the
steady improvements in that cooperation.

Both Ambassador Kirkpatrick and Mr. Wechsler advance the view that these
lawsuits should be seen as opening another front in the war on terrorism, and as a source
of leverage for inducing the Saudi Arabian government to shift its domestic policies in
the directions they believe appropriate.[25]  But decisions about how to wage the war on
terrorism and how to influence the domestic policies of foreign sovereigns are for the
Executive Branch, not the courts, to make.  At root, both Mr. Wechsler and Ambassador
Kirkpatrick seem to see these lawsuits as a means by which to impose foreign policies on
the United States that the Executive has declined to adopt.[26]

Mr. Wechsler argues that Saudi Arabia has failed to take adequate action against
the terrorist infrastructure on its own soil.[27]  It appears that he is arguing that our
government should act to designate Saudi Arabia as a state sponsor of terrorism, if only

---

[24] Declaration of W. Michael Reisman, August 26, 2003, paragraph 3.
[25] Declaration of Jeane J. Kirkpatrick, August 26, paragraphs 8 – 9 & Declaration of William F. Wechsler,
August 25, 2003, pp. 3-4, 6, 8, 9.
[26] The argument that the Executive should take a different approach than it has to the management of
relations with Saudi Arabia is the essence of the Gerson-Motley Op-Ed in the December 30, 2002 New
York Times.  That article says: "the United States should push the issue.  Unfortunately, for many years our
officials, worried about keeping reasonably priced oil flowing and using Saudi Arabia as a possible staging
area in the event of war with Iraq, have been soft on the kingdom."  Elsewhere, another member of
plaintiffs' legal team, Jean-Charles Brisard, boasts that the lawsuit "can do … something the US
government cannot, because it conflicts with major strategic interests."
(http://www.inq7.net/wnw/2002/aug/17/wnw_4-1.htm)  Perhaps the Executive has been wrong to be
cautious in tending to the strategic interests of the United States.  Perhaps we shouldn't worry about
whether the global and American economies have access to reasonably priced oil or whether our troops in
Iraq can be supported logistically and instead take the risks inherent in facilitating lawsuits against the
Kingdom.  But, where the Executive hesitates, should the courts rush in?
[27] Declaration of William F. Wechsler, August 25, 2003, p. 8.

through errors of omission or nonfeasance rather than errors of commission and malfeasance. He argues that the courts should evaluate the "adequacy"[28] – by reference to what standard is not clear – of Saudi Arabia's domestic and foreign policy responses to terrorism. Regardless, US Government policy, both when Mr. Wechsler was in government and now, is that Saudi Arabia is not a state sponsor of terrorism but rather both a victim of terrorism and a valuable ally against it. It is the role of the Executive, not the courts, to make such determinations and, when they have been made, to draw the necessary inferences, form a policy, and implement it.

Ambassador Kirkpatrick seizes on statements by the President that "those who are not with us are against us." Of course, however, the same President has repeatedly stated that Saudi Arabia is fully "with us" in the war on terror. The President's statements thus provide no support for a judicial determination that Saudi Arabia is an enemy in the war on terror.

These lawsuits are directed at officials and instrumentalities of the Kingdom of Saudi Arabia like Prince Sultan bin Abdulaziz and The National Commercial Bank. Suits charging wrongdoing by the officers and instrumentalities of foreign states are charging wrongdoing by the state itself. The rule of law is, ultimately, the only effective antidote to terrorism. Internationally, the rule of law is based on recognition of the sovereignty of foreign states; transnational cooperation in law enforcement is based on comity that respects such sovereignty. This is dangerous territory for the Judicial Branch to invade, particularly when the Executive Branch has not invited such action and the interests at stake are as great as they are in US relations with Saudi Arabia.

---

[28] Declaration of William F. Wechsler, August 25, 2003, p.4

**3. Should the courts facilitate the imposition of sanctions by individuals when other Branches of Government have not agreed to do so?**

On page 8 of his declaration, Mr. Wechsler marshals his policy case for a different US approach to Saudi Arabia. He argues, specifically, that additional pressure should have been and ought to be put on Saudi policymakers. Presumably, Mr. Wechsler put his arguments for sanctions and other punitive policies against Saudi Arabia before the councils of government when he was a political appointee in the Clinton Administration. One senses his frustration that he did not persuade the government to adopt the policies he favored.

Mr. Wechsler suggests that "U.S.-Saudi relations will come to resemble more closely normal U.S. bilateral relations with other large, important regional powers with which the U.S. has a complex pattern of bilateral relations and where domestic issues are always 'on the table,' often to the consternation of the other party."[29] He cites US-China relations as an example. It is a good example of such evolution, and one with which I am personally familiar.[30]

But, far from establishing a case for freelance revision of US relations with Saudi Arabia through private plaintiff lawsuits against Saudi officials or government instrumentalities, the evolution of US-China relations demonstrates the complexities of statecraft and diplomacy that make an approach through the courts unworkable. Bringing US-China relations to their present stage (which still falls short of satisfactory in terms of

---

[29] Declaration of William F. Wechsler, August 25, 2003, p. 7.

[30] I was the principal American interpreter during President Nixon's path-breaking 1972 visit to Beijing, a member of the advance party to establish the U.S. Liaison Office there in 1973, Country Director for China at the U.S. Department of State 1979-81, and Deputy Chief of Mission cum Chargé d'affaires ad interim at Beijing 1981-84. In 1993, as Assistant Secretary of Defense I restored US military dialog with the Chinese People's Liberation Army. In recent years, I have visited China frequently on business.

many US interests) has involved repeated meetings at the summit, several military

confrontations, much travel back and forth by the Secretary of State and his Chinese

counterpart, the establishment of several inter-ministerial joint commissions, fifteen years

of difficult negotiations to bring China into the World Trade Organization, diplomatic

pressure and dialog through international organizations and transnational arms control

arrangements, exchanges of intelligence, coordination with allies, campaigns of public

diplomacy, and other political, economic, and military maneuvers too numerous and

varied to mention here. Seeking comparable evolution in US-Saudi Arabian relations

may be desirable, as Mr. Wechsler believes; it will require an equally deft hand at the

diplomatic helm to bring it about.

Mr. Wechsler is clearly a man of his convictions about Saudi Arabia. Having left

government as a new Administration entered office, he again made his case for punitive

sanctions and other pressure, this time through the Council on Foreign Relations. Since

that effort also did not persuade the government, he now suggests that "civil lawsuits in

the United States, if deemed appropriate under U.S. civil law, against Saudi-based

individuals and institutions could help apply" appropriate "pressure" on the Kingdom to

do what he thinks it should.[31]

Mr. Wechsler is in effect arguing that, the Executive Branch having failed to

accept his political judgments and to adopt them as United States policy, the courts

should now do so. In other words, since the Executive has declined to impose the

punitive sanctions and other forms of pressure on Saudi Arabia that Mr. Wechsler and

plaintiffs' attorneys regard as necessary and appropriate, the courts should facilitate the

---

[31] Declaration of William F. Wechsler, August 25, 2003, p. 8.

imposition of such punitive measures and pressures through lawsuits by private individuals.

I share Mr. Wechsler's frustration with the inadequacies of the government's response to the threat of terrorism then and now, if not his appreciation of what those inadequacies consist of. My experience as a wartime ambassador in the Middle East led me to take a leading role, as a Hart-Rudman Commission study group member, in stressing the danger of a catastrophic terrorist attack on the United States and urging the establishment of a department of homeland security and other measures to counter it. Before the full implications of 9/11 sunk in, the Bush Administration gave no greater heed to the Commission's warnings and recommendations[32] than the Clinton Administration apparently gave to Mr. Wechsler. But, as someone with years of first-hand experience of Saudi Arabia, I do not share Mr. Wechsler's judgments about Saudi Arabia's responses to the terrorist threat, either then or now. And as someone with nearly three decades of experience in high-level diplomacy and foreign policy, I do not agree with his view that privatization of policy through the courts is the appropriate remedy for ineffectual policy formulation by the Executive.

To do what Mr. Wechsler and plaintiffs' attorneys suggest would, in fact, transform the role of the judiciary in relation to foreign policy; and not to the benefit of the United States. The courts would become a forum for the resolution of arguments about the appropriateness of different policies toward foreign countries and a vehicle for

---

[32] See the reports of the U.S. Commission on National Security/21st Century, "New World Coming," September 15,1999; "Seeking a National Security Strategy," April 15, 2000; "Road Map for National Security," February 15, 2001. The Commission's work is summarized, in part on the basis of my remarks on its behalf to the annual conference of Diplomatic and Consular Officers, Retired (DACOR) on October 6, 2000 in "Adapting to the New National Security Environment," United States Institute of Peace (http://www.usip.org/pubs/specialreports/sr001201.html).

the privatization of sanctions and other policy instruments.  The use of such policy instruments against foreign nations to achieve national objectives has, up to now, been a matter of Executive discretion, often acknowledged and commonly empowered by explicit legislative authority.  The Judicial Branch has traditionally declined to participate in this policy process.  To accept a contrary agenda risks creating in the United States the judicial "venue for political vendettas," and harm to "innocent government, military and business leaders" abroad that the US Ambassador to Belgium warned his hosts they were in danger of allowing their courts to become.

### III. Conclusion

This declaration is a supplement to my declaration of August 7, 2003.  Although lengthier than I would have liked, this supplement is not a substitute for the more comprehensive statement of views that my original declaration contained.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 23, 2003.



Chas. W. Freeman, Jr.