**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to the Kingdom of Saudi Arabia** |

*This document relates to:*   Federal Insurance Co. v. al Qaida
                              03 CV 06978 (RCC)

**RICO STATEMENT**
**APPLICABLE TO THE KINGDOM OF SAUDI ARABIA**

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 for defendant the Kingdom of Saudi Arabia.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2. The name of the defendants to whom this RICO statement pertains is the Kingdom of Saudi Arabia (the "Kingdom"). The Kingdom is a "person" within the meaning of the statute, *i.e.*, it is an "individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). The Kingdom is an "entity," in that it is "an organization (such as a business or a governmental unit) that has a legal identity apart from its members." European Community v. RJR Nabisco, Inc., 150 F. Supp. 2d 456, 487 (E.D. N.Y. 2001) (*quoting* **Blacks Legal Dictionary** (7th ed. 1999)). The term "entity" also encompasses the subdefinition "public entity" which is a "government or one of its political subdivisions." Id. (*quoting* **Blacks Legal Dictionary** (7th ed. 1999)). Therefore, a foreign government, including the Kingdom, is a "person" under RICO.

   The alleged misconduct and basis for liability is set forth in the Amended Complaint, which is incorporated herein by reference, and in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| financial institution fraud | 18 U.S.C. § 1344 |
| relating to unlawful procurement of citizenship or naturalization papers | 18 U.S.C. § 1425 |
| relating to the unlawful reproduction of naturalization or citizenship papers | 18 U.S.C. § 1426 |
| relating to the sale of naturalization or citizenship papers | 18 U.S.C. § 1427 |
| obstruction of justice | 18 U.S.C. § 1503 |
| obstruction of a criminal investigation | 18 U.S.C. § 1510 |
| obstruction of state or local law enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| fraud or misuse of visa permits or other documents | 18 U.S.C. § 1546 |

| | |
|---|---|
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| defrauding the US Government | 18 U.S.C. § 371 |
| filing false or materially false tax returns | 26 U.S.C. § 7206(1), (2) |
| engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| mid-1990s to 9/11/2001 | the Kingdom, and/or its Agents | Throughout this period, the Kingdom, and/or certain so-called charities funded and controlled by the Kingdom, including but not limited to Muslim World League, the International Islamic Relief Organization, the World Assembly of Muslim Youth, Al Haramain Islamic Foundation, the Saudi High Commission for Aid to Bosnia and Herzegovina, the Rabita Trust, the Saudi Red Crescent, Saudi Joint Relief Committee, and the Benevolence International Foundation, certain individuals including but not limited to His Royal Highness Prince Abdullah Al Faisal bin Abdulaziz Al Saud, His Royal Highness Prince Bandar bin Sultan bin Abdulaziz al Saud, His Royal Highness Prince Naif bin Abdulaziz Al Saud, His Royal Highness Prince Salman bin Abdul Aziz Al Saud, His Royal Highness Prince Sultan bin Abdulaziz Al Saud, His Royal Highness Prince Turki Al Faisal Al Saud, certain commercial entities, including but not limited to National Commercial Bank and Saudi American Bank, and other actors who served as agents of the Kingdom (these so-called charities, individuals, commercial |

3

| | | |
|---|---|---|
| | | entities and other actors are hereinafter sometimes referred to collectively as the "Agents"), conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| late 1990s to 9/11/2001 | the Kingdom and/or its Agents | The Kingdom and/or its Agents undertook certain actions constituting racketeering as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which they were participating, Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Kingdom and/or its Agents. |
| mid-1990s to 9/11/2001 | the Kingdom, directly and/or through its Agents | The Kingdom, directly and/or through its Agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| mid-1990s to 9/11/2001 | the Kingdom, directly and/or through its Agents | In violation of 18 U.S.C. § 1956, on multiple occasions the Kingdom, directly or through its Agents conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the Kingdom and/or its Agents |
| mid-1990s to 9/11/2001 | the Kingdom, directly and/or through its Agents | In violation of 18 U.S.C. § 1957, on multiple occasions the Kingdom, directly or through its Agents, conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| mid-1990s | the Kingdom, directly and/or | In violation of 18 U.S.C. § 371, the |

| to 9/11/2001 | through its Agents | Kingdom, through its Agents, conspired to and did defraud the United States Government of taxes legally due by the Agents |
| --- | --- | --- |
| mid-1990s to 9/11/2001 | the Kingdom, directly and/or through its Agents | In violation of 26 U.S.C. § 7206(1), (2), the Kingdom, through its Agents, conspired to and did file false or materially false tax returns |
| mid-1990s to 9/11/2001 | the Kingdom, directly and/or through its Agents | In violation of 26 U.S.C. § 7212(a), the Kingdom, through its Agents, conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. The Agents consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed the Kingdom, through its Agents, to surreptiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a)   The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical,

5

conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Kingdom and its Agents fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

(c)   no.

(d)   The Kingdom and its Agents are associated with the Enterprise.

(e)   The Kingdom and its Agents are a member of the Enterprise, and are separate and distinct from the Enterprise.

(f)   The Kingdom and its Agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.   The pattern of racketeering activity conducted by the Agents is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8.   The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Kingdom's Agents funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.   The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.  The Enterprise, and the racketeering activities conducted by the Agents, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.  Not applicable.

12.  Not applicable.

13.  Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

6

14. The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Kingdom and its Agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of so-called charities. The money raised from these various sources (the "Funds"), including the Kingdom and its Agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of the Kingdom and its Agents of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient to enable planning for this catastrophic harm, and to establish an intelligence system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds also enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives"), and provided planning and direction to the Operatives. Among other things, the Funds enabled the Enterprise to operate terrorist training camps in Afghanistan, where some Operatives were trained in conventional warfare but where the best and most zealous Operatives received advanced terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All Operatives, including trainees and other personnel, were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these Operatives the nineteen perpetrators of the Attack were selected. None of this would have been possible without the Funds supplied by participants and conspirators like the Kingdom and its Agents. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Kingdom and it Agents. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Kingdom and its Agents. The Kingdom and/or its Agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. The Kingdom and/or its Agents also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

7

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| | | |
|---|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Kingdom | The Kingdom itself participated in the Enterprise by fraudulently issuing identification documents to various Operatives; through various acts of mail fraud, wire fraud, and financial institution fraud; by assisting Operatives with the procurement of false citizenship or naturalization papers; by obstructing justice, criminal investigations, and local law enforcement efforts with respect to the activities of the Operatives; and by fraudulently providing or assisting in the procurement of visa permits and other documents necessary to the Enterprise's nefarious intent. | 1962(c) 1962(d) |
| The Kingdom, through its Agent National Commercial Bank ("NCB") | The Kingdom's Agent NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, the Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise. | 1962(c) 1962(d) |

9

| | | |
|---|---|---|
| | NCB knowingly facilitates al Qaida's fundraising by advertising the existence and numerical designations of the accounts it maintains for al Qaida's cooperating charities throughout the Muslim world, so that al Qaida supporters can deposit funds directly into those accounts for the benefit of al Qaida and its cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to al Qaida through the International Islamic Relief Organization, and also transferred significant funding to al Qaida through Blessed Relief Foundation accounts it maintained. | |
| The Kingdom, through its Agent the Saudi American Bank | The Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including al Qaida. The Saudi American Bank is a financial institution headquartered in Riyadh, Saudi Arabia. The Saudi American Bank was established by royal decree in 1980. The Saudi American Bank financed many of the projects undertaken by Osama bin Laden and al Qaida in the Sudan during the years that the al Qaida leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport. Defendants Saudi Bin Laden Group and Mohamed Bin Laden Organization provided technical assistance on these projects. Further, from 1996 through 2001, the Saudi American Bank funneled money to and/or from the Spanish al Qaida cell. | 1962(c)<br><br>1962(d) |
| The Kingdom, through its Agent the Saudi High Commission | The Saudi High Commission has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated Foreign Terrorist Organizationss. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities. The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly | 1962(c)<br><br>1962(d) |

10

| | | |
|---|---|---|
| | implicated in al Qaida operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania. Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to al Qaida operations in Bosnia alone. The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas. Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | |
| The Kingdom, through its Agent the Muslim World League (the "MWL") | The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the IIRO, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and the Rabita Trust. The MWL has long operated as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs. The MWL has provided substantial material support and resources to al Qaida through its subsidiary bodies, including the IIRO, the World Association of Muslim Youth, the Rabita Trust, and Benevolence International Foundation. | 1962(c) 1962(d) |
| The Kingdom, through its Agent International Islamic Relief Organization (the "IIRO") | The IIRO is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL provides "humanitarian assistance" through the arms of the IIRO. In reality, the IIRO is one of the charities operating within al Qaida's support infrastructure, and the IIRO has long operated as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. According to the recently declassified 1996 CIA report regarding the | 1962(c) 1962(d) |

11

| | | |
|---|---|---|
| | involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which al Qaida planned, approved and coordinated the Attack, and at which some or all of the September 11 hijackers received indoctrination and training. Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir. | |
| The Kingdom, through its Agent the Rabita Trust | The Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. The Rabita Trust was designated by President Bush as an organization that provided logistical and financial support to al Qaida. The Rabita Trust was led by defendant Wa-el Hamza Julaidan, a founder of al Qaida. The Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad, knowing that such support would result in an attack like the one that occurred on September 11, 2001. | 1962(c) 1962(d) |
| The Kingdom, through its Agent the Benevolence International Foundation (the "BIF") | As more fully set forth in the Amended Complaint at paragraphs 84 - 112, which averments are incorporated herein by reference, BIF is an ostensible charity, with offices located throughout the world, and is a subsidiary body of the Muslim World League.<br><br>BIF has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations, with the full knowledge of and intent that its support give rise to an attack on the United States like that which occurred on September 11th, 2001. Indeed, BIF has been designated as a supporter and associate of terrorists by the U.S. government, pursuant to Executive Order 13224, based on its material support and sponsorship of, or affiliation with, defendant al | 1962(c) 1962(d) |

| | | |
|---|---|---|
| | Qaida and/or affiliated foreign terrorist organizations, associations, organizations or persons.<br><br>Enaam Arnaout, BIF's chief executive officer and a member of the Board of Directors, pled guilty to racketeering conspiracy, in violation of Section 1962(d); conspiracy to provide material support to persons, organizations and groups engaged in violent activities, in violation of 18 U.S.C. § 371; conspiracy to launder proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.<br><br>BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor al Qaida's activities.<br><br>BIF used the U.S. financial system extensively to launder money for al Qaida and support its terrorist operations throughout the world. Further, BIF substantially understated the amount of funds it received in its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source. | |
| The Kingdom, through its Agent the World Assembly of Muslim Youth ("WAMY") | WAMY is a subsidiary body of the MWL, with more than sixty offices throughout the world. WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. Among other things, WAMY has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world. | 1962(c)<br>1962(d) |
| The Kingdom, through its | The SRC has long acted as a fully integrated | 1962(c) |

| | | |
|---|---|---|
| Agent, the Saudi Red Crescent (the "SRC") | component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. | 1962(d) |
| The Kingdom, through its Agent, the al Haramain Foundation ("al Haramain") | Al Haramain has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. Indeed, as a result of AHF's pervasive sponsorship of al Qaida, the United States has designated every al Haramain branch office, including the headquarters in Saudi Arabia, a Foreign Terrorist Organization pursuant to Executive Order 13224. After consistently denying for many years Al Haramain's involvement in sponsoring terrorism, the Kingdom finally acknowledged reality, and bowed to international pressure and dissolved the organization on June 2, 2004.<br><br>Prior to its dissolution, Al Haramain was one of the principle Islamic non-governmental organizations that provided support for the al Qaida network and promoted its militant Islamic doctrine worldwide. Also prior to its dissolution, Al Haramain raised almost $30 million a year in donations and had an annual budget of $80 million. According to its web site, it had active branches in about fifty countries. Al Haramain provided funding to terrorist organizations designated by the United States, including but not limited to Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah, and also permitted those organizations to use Al Haramain as a front for fundraising and operational activities. | 1962(c)<br><br>1962(d) |
| The Kingdom, through its Agent His Royal Highness Prince Abdullah Al Faisal bin Abdulaziz Al Saud ("Prince Abdullah") | Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror. Further, Prince Abdullah engaged in transactions with | 1962(c)<br><br>1962(d) |

14

| | | |
|---|---|---|
| | Mushayt for Trading establishment, the funding mechanism for the Spanish al Qaida cell.  Still further, Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing al Qaida's activities in Europe, served for many years as Prince Abdullah's accountant.  During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdullah and Zouaydi maintained a business partnership.  Thus, through his official and personal acts, Prince Abdullah has provided critical financial and logistical support to al Qaida for a period of many years, knowing and intending that this support would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent His Royal Highness Prince Bandar bin Sultan bin Abdulaziz al Saud ("Prince Bandar") | In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds and of his personal wealth to charities operating within al Qaida's infrastructure, thereby providing critical financial and logistical support to al Qaida for a period of many years, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(c)<br><br>1962(d) |
| The Kingdom, through its Agent His Royal Highness Prince Naif bin Abdulaziz Al Saud ("Prince Naif") | In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia.  Under Prince Naif's direction, the Saudi Joint Relief Commission diverted $74 million to al Qaida members and loyalists.  Through the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain al Qaida's presence and operations in Afghanistan.  Further, Prince Naif has used his position as Minister of the Interior to protect al Qaida's support infrastructure.  Remarkably, Prince Naif publicly denied al Qaida's responsibility for the Attack.  Further, Prince | 1962(c)<br><br>1962(d)<br>1962(c)<br><br>1962(d) |

15

| | | |
|---|---|---|
| | Naif has also made large personal contributions to Saudi-based charities for the purpose of supporting terrorism, with the knowledge and intent the contributions he made would be used to fund al Qaida's global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to al Qaida for a period of many years, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent His Royal Highness Prince Salman bin Abdul Aziz Al Saud ("Prince Salman") | In his capacity as founder of the Saudi High Commission, Prince Salman has long provided material support and resources to al Qaida, has donated substantial funds to several other charities that operate within al Qaida's infrastructure, and has been instrumental in raising funds for these charities from third parties. Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, these charities would be used to fund al Qaida's global operations and acts of international terrorism. Prince Salman thus has provided critical financial and logistical support to al Qaida for a period of many years, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(c)<br><br>1962(d) |
| The Kingdom, through its Agent His Royal Highness Prince Sultan bin Abdulaziz Al Saud ("Prince Sultan) | In his capacity as the Chairman of the Supreme Council for Islamic Affairs, established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia, Prince Sultan has known, for a period of many years, that Saudi-based charities were providing material support and resources to al Qaida. Rather than intervening to stem the flow of money and support from the charities to al Qaida, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing | 1962(c)<br><br>1962(d)<br>1962(c)<br><br>1962(d) |

16

| | | |
|---|---|---|
| | sponsorship of al Qaida by those charities. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of al Qaida's global operations  Prince Sultan knew and intended that the contributions he made to these charities would be used to fund al Qaida's global operations and acts of international terrorism, but has nonetheless provided critical financial and logistical support to al Qaida for a period of many years, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent His Royal Highness Prince Turki Al Faisal Al Saud ("Prince Turki") | During Prince Turki's tenure as head of Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time, al Qaida and the Taliban maintained a symbiotic and mutually supportive relationship. Prince Turki knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would materially benefit al Qaida, by virtue of the close relationship and near identity between the two organizations. Additionally, Prince Turki made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations, and coordinated the sponsorship of al Qaida by several wealthy members of Saudi society, knowing that all such contributions would be used to fund al Qaida's global operations and acts of international terrorism, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(c)<br><br>1962(d) |