IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: TERRORIST ATTACKS ON ) <br> SEPTEMBER 11, 2001 ) <br> _____) | 03-MDL-1570(RCC) <br> ECF Case |

This document relates to:

*Ashton* v. *Al Qaida Islamic Army*, No. 02-CV-6977 (RCC)
*Barrera* v. *Al Qaeda Islamic Army*, No. 03-CV-7036 (RCC)
*Burnett* v. *Al Baraka Inv. & Dev. Corp.*, No. 03-CV-5738 (RCC)
*Burnett* v. *Al Baraka Inv. & Dev. Corp.*, No. 03-CV-9849 (RCC)
*Federal Insurance Co.* v. *Al Qaida*, No. 03-CV-6978 (RCC)
*Salvo* v. *Al Qaeda Islamic Army*, No. 03-CV-5071 (RCC)

# REPLY IN SUPPORT OF DEFENDANT SAUDI HIGH COMMISSION'S MOTION TO DISMISS

LAWRENCE S. ROBBINS (LR 8917)
ROY T. ENGLERT, JR.
ALAN E. UNTEREINER
MAX HUFFMAN
*Robbins, Russell, Englert, Orseck & Untereiner LLP*
1801 K Street, N.W., Suite 411
Washington, D.C.  20006
Tel:   (202) 775-4500
Fax:   (202) 775-4510

*Attorneys for Defendant Saudi High Commission*

September 7, 2004

## INTRODUCTION

Plaintiffs' opposition brief is a loose amalgam of facts they have never alleged, claims they cannot support, and legal assertions that find no actual grounding in the case law. Disavowing one of their own complaints, plaintiffs now say that the Saudi High Commission (SHC) is not an arm of the Saudi government after all. In any event, plaintiffs continue, SHC waived its governmental status by proclaiming itself to be a non-governmental entity when it sought to perform its charitable works in Bosnia – a conclusion plaintiffs purport to derive from an unverified translation of Bosnian law they found somewhere in cyberspace (but which, in fact, reflects a misunderstanding of Bosnian law). And, if their faux-Bosnian law fails to persuade, plaintiffs also invoke the non-commercial exception to the FSIA, which they say applies largely because SHC funds allegedly ended up in the hands of persons who somehow assisted a vast worldwide terrorist organization, eventually linked to the horrors of 9/11. In the process, plaintiffs roll out facts nowhere contained in the complaints – such as the outright falsehood that somebody named Belkacem was at one time employed by SHC. Br. in Opp. 2; see also *id*. at 23.

The reality remains unchanged that plaintiffs have alleged nothing, in *any* of the six complaints that are the subjects of this motion to dismiss (or, indeed, in their brief), that defeats SHC's showing of its entitlement to immunity from suit under the FSIA, that supports haling SHC into court in New York to defend these lawsuits, or that meets plaintiffs' burden of pleading causation. Each of the complaints against SHC should be dismissed in its entirety, with prejudice.

## ARGUMENT

**I.    Plaintiffs Say Nothing to Overcome SHC's Governmental Status, and Make No Allegations Supporting the Application of an Exception to FSIA Immunity**

A. As we showed in our opening brief, the Federal Insurance plaintiffs were entirely correct when they alleged, point blank, that SHC "is an agency, instrumentality and organ of the Kingdom

of Saudi Arabia" (KSA). *Fed. Ins.* Compl. ¶ 181. Relegating that concession to a footnote (Br. in Opp. 6 n.6), plaintiffs now insist that SHC is not an agency of KSA after all. But plaintiffs nowhere address the dispositive evidence we presented on just that point. Dr. Al-Nafissa rendered an opinion on SHC's legal status under KSA law. He did so in terms that could not be clearer: "The Saudi High Commission is an arm of the Saudi Arabian government. Actions taken by the Saudi High Commission properly are viewed as actions of the government of Saudi Arabia." *Al-Nafissa Decl.* ¶ 3. There is no better source for this evidence. Dr. Al-Nafissa is a member of the Council of Ministers of KSA, with the duties of "reviewing all business of a legal nature submitted to the Council of Ministers, including treaties, other international agreements, and draft laws and regulations." *Id.* ¶ 1. And his declaration was made with the authorization of King Fahad. *Id.* ¶ 2.

Plaintiffs ignore the binding authority that renders this evidence dispositive. Courts give "great weight" to submissions by foreign defendants regarding the scope of their official responsibilities. *Leutwyler* v. *Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001). This Court must consider factual submissions, including affidavits, submitted for the purpose of demonstrating a defendant's sovereign status. *Robinson* v. *Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001). In *O'Connell Machinery Co.* v. *M.V. "Americana"*, 734 F.2d 115, 116 (2d Cir. 1984), an affidavit closely comparable to the declaration of Dr. Al-Nafissa was submitted regarding the ownership of the defendant corporation. The affidavit alone was sufficient to establish the defendant's status as an instrumentality of the Italian government. *Ibid.* So, too, here.

If a sovereign nation, like KSA, decides to assert that an entity is part of its government, U.S. courts are ill equipped to second-guess that determination. Likely for this reason, plaintiffs point to no case, and we have uncovered none, in which an assertion by a sovereign government that the defendant has governmental status has *not* been held sufficient to establish governmental status.

Short of a contrary allegation of fact on this question – which plaintiffs do not make – nothing plaintiffs can say or do can defeat the declaration by Dr. Al-Nafissa. See *O'Connell Machinery Co.*, 734 F.2d at 116 (plaintiff's failure to provide contrary evidence justified reliance on the uncontested affidavit presented by the defendant). Instead, plaintiffs fall back on two arguments, neither of which provides any basis to question the showing of SHC's governmental status.[1]

1. Plaintiffs point to seven factors related to sovereign status that the Third Circuit listed in *USX Corp.* v. *Adriatic Ins. Co.*, 345 F.3d 190 (2003).[2] They fail to note, however, that the Al-Nafissa and Al-Roshood declarations directly address six of the *USX* factors, and the seventh factor – which asks about ownership – is irrelevant to a non-corporate governmental entity like SHC. First, "[t]he circumstances surrounding [SHC's] creation" (*USX Corp.*, 345 F.3d at 209) show that it "was formed in 1993 by Decision No. 17419 of the President of the Council of Ministers of Saudi Arabia," King Fahad. *Al-Roshood Decl.* ¶ 6; see also *Al-Nafissa Decl.* ¶ 4. Second, "the purpose of [SHC's] activities" (*USX Corp.*, 345 F.3d at 209) is clearly governmental. SHC "was formed for the purpose of providing charitable funds for relief efforts in Bosnia-Herzegovina," and became "the primary instrument of Saudi foreign policy toward Bosnia-Herzegovina," giving monies "in the character of

---

[1] Plaintiffs also contend (Br. in Opp. 7) that SHC cannot be a "political subdivision" of KSA if it is an "agency" of KSA, but that merits little attention. We argued that SHC is a political subdivision in the *alternative* – not that SHC is *both* an agency *and* a political subdivision. Mem. 13. Of course, if the Court holds that the declarations of Dr. Al-Nafissa and Mr. Al-Roshood demonstrate that SHC is an agency, the Court need not reach the question whether SHC exercises essentially sovereign powers that make it inseparable from KSA. See *Transaero* v. *La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994). But "whether SHC is a political subdivision or an agency of KSA does not affect the jurisdictional analysis." Mem. 13.

[2] In *Filler* v. *Hanvitt Bank*, 378 F.3d 213, 217 (2d Cir. 2004), this Circuit applied factors similar to those in *USX Corp.*, and reached a result that would equally show that SHC is an 'organ' of the Saudi Government, and thus an 'agency or instrumentality' under Section 1603(b)(2):

> [T]he [Korean Deposit Insurance Corp.] is an organ of a foreign state because the KDIC was formed by statute * * * and presidential decree, it performs functions traditionally performed by the government * * *, has its directors * * * appointed by the Ministry of Finance and Economy; its president appointed by the President of the Republic of Korea; and many of its operations overseen by the Ministry of Finance and Economy.

3

foreign aid." *Al-Roshood Decl.* ¶¶ 6, 20-21.  Third, SHC is under a high "degree of supervision by the government."  *USX Corp.*, 345 F.3d at 209.  SHC is "headed by His Royal Highness Prince Salman bin Abdulaziz Al Saud, who is the Governor of the Riyadh Province and a member of the Saudi Royal Family."  *Al-Roshood Decl.* ¶ 7; see also *Al-Nafissa Decl.* ¶ 6.  Even plaintiffs acknowledge that KSA "stringently controls" SHC.  *Fed. Ins.* Compl. ¶ 181.

The fourth factor, "the level of government financial support" (*USX Corp.*, 345 F.3d at 209), also confirms SHC's governmental status.  "The largest source of funding for the Saudi High Commission is the treasury of the Kingdom of Saudi Arabia, which has provided approximately 30% of the total funds used and distributed * * *."  *Al-Roshood Decl.* ¶ 24.  According to plaintiffs themselves, KSA provides "virtually all of [SHC's] funding."  *Fed. Ins.* Compl. ¶ 181.  Number five, SHC's "employment policies" (*USX Corp.*, 345 F.3d at 209), demonstrate its governmental status. SHC "is staffed with other civil servant employees" of KSA, many of whom "are detailed from other government ministries," and "are paid by their respective ministries and administrative organs."  *Al-Roshood Decl.* ¶ 10.[3]  Finally, SHC's "obligations and privileges" (*USX Corp.*, 345 F.3d at 209) under KSA law demonstrate its governmental nature.  Its actions "necessarily are in keeping with the foreign and domestic governmental policies" of KSA.  *Al-Nafissa Decl.* ¶ 3.  SHC has "the sole authority to collect and distribute charitable funds in Bosnia-Herzegovina."  *Al-Roshood Decl.* ¶ 5.

Of course, we do not offer evidence relating to SHC's "ownership," a factor that relates only to corporate entities.  "*Either* the entity can be an organ of a foreign state, *or* the entity can have a majority of its shares or other ownership interest owned by a foreign state or a political subdivision

---

[3]  Plaintiffs suggest (Br. in Opp. 9 n.8) that it is our burden to show that KSA law *requires* SHC to hire public employees.  While that might be a nice fact for a purported government entity that does not satisfy any other of the *USX Corp.* factors, in the case of SHC, which satisfies *every index* of governmental status, it is hardly necessary that we show a legal requirement, rather than a consistent practice, of hiring public employees.

4

thereof." *EIE Guam Corp.* v. *Long Term Credit Bank of Japan*, 322 F.3d 635, 639 (9th Cir. 2003) (internal quotation omitted) (emphases in original). See also *USX Corp.*, 345 F.3d at 209 (ownership interest not required for organ status). Non-corporate governmental entities routinely are held immune, without ink being spilled over the question of "ownership." See, *e.g.*, *Transaero, Inc.* v. *La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) (military); *El-Fadl* v. *Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996) (individual).

2.  Plaintiffs next argue that their interpretation of an unverified translation of a purported Bosnian law that they located somewhere on the Internet provides insight into SHC's status under the law of KSA. Because SHC registered in Bosnia as a foreign humanitarian organization, and because plaintiffs' Internet search has persuaded them that Bosnian law therefore treats SHC as non-governmental, plaintiffs contend that SHC is not an agency of KSA. Br. in Opp. 9-12. This contention is flawed at every turn. For one thing, SHC's governmental status in KSA cannot possibly depend on the interpretation of *Bosnian* law. Rather, the Court should dispose of plaintiffs' argument by following the rule that the law of the foreign state in question – in this case, KSA – determines whether an entity is governmental. See *EIE Guam Corp.*, 322 F.3d at 640 (Japanese law); *S&S Mach. Co.* v. *Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983) (Romanian law).

In any event, plaintiffs have misapprehended even the law they cite. Article 22 of the Bosnian Law on Humanitarian Activities and Humanitarian Organizations precludes "Foreign Humanitarian Organizations" only from being part of the *Bosnian* government. Declaration of Hadzimuratovic Hajrudin (Exhibit A to the Decl. of Max Huffman) (*Hajrudin Decl.*) ¶ 4. The law says nothing about any governmental status that a humanitarian organization might have in a foreign country. *Ibid.* In fact, the Bosnian government always has considered SHC to be a part of the government of KSA. *Hajrudin Decl.* ¶ 6 & Exhs. C & D.

5

Properly understood, Bosnian law equally disposes of plaintiffs' waiver and estoppel arguments (Br. in Opp. 11-12 & n.10). By registering as a foreign humanitarian organization in Bosnia, SHC did nothing inconsistent with its governmental status in KSA. Those arguments fail for other reasons as well. FSIA's waiver provision, 28 U.S.C. § 1605(a)(1), does not apply to statements made in a third country that are unrelated to the proceedings in which immunity is asserted. Implicit waiver under the FSIA is a question of the conduct of the governmental entity related to the proceedings in question. See *Coleman* v. *Alcolac, Inc.*, 888 F. Supp. 1388, 1403 (S.D. Tex. 1995) ("the implicit waiver clause of 1605(a)(1) has been very narrowly construed" and applies primarily when the foreign sovereign has agreed to arbitration or adjudication under some third country's laws, or has failed to raise the FSIA defense in a responsive pleading). And estoppel requires allegations of prejudicial reliance by plaintiffs, which they have not made here. See 8/27/04 Salman Rep. 8 (Dkt. No. 411).

B. As they must, plaintiffs acknowledge that, once SHC has demonstrated its governmental status, it is *their* burden to produce *facts* supporting an exception to immunity. Br. in Opp. 5. Plaintiffs also acknowledge, as again they must, that their entitlement to discovery depends on their having fulfilled their burden to allege specific facts. *Ibid*. But plaintiffs have not produced any jurisdictional facts implicating any of the exceptions to immunity. As a result, *there are **no disputed facts*** relating to SHC's entitlement to immunity under the FSIA. Plaintiffs' contention that they are entitled to discovery on this issue (*Id.* at 5 & n.5) is entirely baseless.

Plaintiffs rely almost exclusively on the non-commercial tort exception to FSIA immunity.[4]

---

[4] Plaintiffs relegate to a footnote their argument that SHC engaged in "commercial activity," which might provide an exception to FSIA immunity. Br. in Opp. 12 n.11. Notably, plaintiffs concede by silence that SHC's humanitarian and foreign aid is not activity "'in the manner of a private player within [the market].'" Mem. 17 (quoting *Republic of Argentina* v. *Weltover*, 504 U.S. 607, 614 (1992)). Instead, plaintiffs apparently believe that "laundering of funds" on behalf of al Qaeda is commercial activity (Br. in Opp. 12 n.11) – although they provide

6

They take issue (Br. in Opp. 13-15) with the view that *Burnett II*, 202 F. Supp. 2d 9, required a heightened pleading standard for causation. But, as our arguments make clear, we by no means depend on a heightened standard of causation to avoid the application of the non-commercial tort exception; plaintiffs have failed to plead causation adequately under even the standards espoused by their primary authorities.[5] See Mem. 19-20, 24-25. As we pointed out, and nothing in plaintiffs' brief contradicts it, there are no facts alleged, in any complaint, giving rise to the inference that SHC funds were used to prepare for or to perpetrate the September 11 attacks, or even that SHC funds were used to prepare for or to perpetrate *any* terrorist attack. *Id.* at 20, 24-25. And plaintiffs make no effort to disavow the statement of their lead counsel acknowledging this limitation to their allegations. See *id.* at 20 (quoting 6/24/03 *Burnett I* Hearing Tr. 77-78). Plaintiffs' allegations certainly would not satisfy *Boim* v. *Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002), on which they place primary reliance. Mem. 24-25. Plaintiffs' chain of causation – so attenuated as to make even Mrs. Palsgraf blush – cannot succeed under any view of the law.

    Plaintiffs fall back on a vague conspiracy theory. Br. in Opp. 16. But plaintiffs have not alleged, and cannot allege, any agreement to injure the United States to which SHC was a party. See *Halberstam* v. *Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). Plaintiffs' aiding and abetting argument fails for the same reason: They have not alleged, and cannot allege, that SHC provided "substantial assistance" to anybody who participated in the September 11 attacks. *Ibid.*

---

no facts supporting any claims of money laundering, and fail even to provide the elements of a claim of money laundering. Plaintiffs also ignore the unequivocal rules in this and other Circuits that criminal activity cannot be commercial activity, and that the activity alleged must have a "'direct effect in the United States.'" Mem. 18-19 (quoting 28 U.S.C. § 1605(a)(2)). Even if there were allegations of money laundering (which there are not), the allegations fall far short of satisfying the commercial activity exception to FSIA immunity.

[5]    Moreover, plaintiffs' characterization of *Kilburn* v. *Socialist Peoples Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004), as overruling *Burnett II*, 292 F. Supp. 2d 9 (Br. in Opp. 14-15), is flat wrong. See 8/13/04 Turki/Sultan Letter.

The non-commercial tort exception is inapplicable for other reasons also. Plaintiffs cannot overcome our showing that all of the conduct attributed to SHC was highly discretionary.[6] Mem. 20-22. "Decisions regarding causes to support and recipients for Saudi High Commission funds are within the discretion of the Executive Committee, the Supreme Commission, and Prince Salman bin Abdulaziz." *Al-Nafissa Decl.* ¶ 9. And, when SHC was directed to provide aid in Somalia and Egypt, "discretion as to how and where to disburse funds in these countries was left to Prince Salman bin Abdulaziz and the Executive Committee and the Supreme Commission." *Ibid.*

Plaintiffs' citation of *Liu* v. *Republic of China*, 892 F.2d 1419 (9th Cir. 1989), is unavailing. In that case, the plaintiffs demonstrated that the alleged conduct was prohibited by the law of the Republic of China. 892 F.2d at 1431. In this case, plaintiffs have made no attempt even to state KSA law, much less to demonstrate how SHC violated it. Plaintiffs are left with only their mantra that there is no discretion to commit crimes against humanity. Br. in Opp. 20. Whether or not that accurately states the law,[7] plaintiffs do not allege, and cannot allege, that SHC committed any such crimes. Plaintiffs allege *at best* careless misuse of funds that ultimately supported terrorist causes. But SHC's distribution of humanitarian funds has been demonstrated to be discretionary under the law of KSA. Mem. 21-22. The limited nature of plaintiffs' allegations also renders ineffective their citation of *Letelier* v. *Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980). That court held that there

---

[6] Plaintiffs do not distinguish *Macharia* v. *United States*, 334 F.3d 61 (D.C. Cir. 2003), a case in which the United States' exercise of discretion was alleged to have resulted in death at the hands of terrorists. As here, the plaintiffs argued that the terrorist attack was foreseeable and avoidable. Nonetheless, the discretionary function exception to FTCA liability required dismissal. *Id.* at 65-67; see Mem. 20-21.

[7] Plaintiffs state this as if it is an obvious proposition, but that is far from clear. Because discretion is a question of the law of the foreign sovereign (see *Liu* v. *Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989)), not of U.S. law or some vague "international law," an agency or political subdivision of KSA has discretion bounded by KSA law. For example, the sovereign immunity of KSA was upheld by the Supreme Court against allegations of kidnaping and torture of an American citizen, because "a foreign state's exercise of the power of its police has long been understood * * * to be peculiarly sovereign in nature." *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 361 (1994). In any event, there is no allegation that SHC committed crimes against humanity.

8

was no discretion "to order or to aid in an assassination" (*id.* at 673) – conduct that falls far beyond even the most creative interpretation of the allegations against SHC.

Finally, in this Circuit, both the act and the injury must occur in the United States, and plaintiffs do not allege that here. Plaintiffs contend that the Second Circuit had no reason to state this rule in *Cabiri* v. *Gov't of Republic of Ghana*, 165 F.3d 193, 200 n.3 (2d Cir. 1999) (Br. in Opp. 19-20), but that cannot undermine the binding nature of that authority. And plaintiffs' argument that the rule is not textually based (Br. in Opp. 18), ignores the fact that *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989), on which *Cabiri* relied, *did* ground its "entire tort" holding in a textual analysis of the FSIA. Mem. 22 (citing *Amerada Hess*, 488 U.S. at 441).[8]

## II. Plaintiffs Say Nothing to Warrant the Assertion of Jurisdiction over SHC, and Cannot Support Their Baseless Request for Jurisdictional Discovery

Nothing plaintiffs say relating to personal jurisdiction alters the fact that plaintiffs have failed to allege (a) *any* contacts between SHC and the United States, and (b) *anything* that SHC has done that "targets" the United States. Plaintiffs' new allegation about SHC employing some senior al Qaeda member (Br. in Opp. 23) was not raised in the complaints and cannot be considered here. And, even if true (which it is not), this new allegation is irrelevant. Jurisdiction over SHC cannot be based only on possible jurisdiction over someone who may once have worked there.

Plaintiffs *argue* that SHC "directed its conduct at the United States" (Br. in Opp. 23), but none of the complaints *alleges* that. They allege only that SHC money may have supported al Qaeda

---

[8]     Plaintiffs argue (Br. in Opp. 21-22) that we are "particularly disingenuous" in pointing out that their claims are exactly what the state-sponsor-of-terror exception, Section 1605(a)(7), was designed to encompass. But plaintiffs do not address the perverse result of applying Section 1605(a)(5) to suits against U.S. allies like KSA, while applying Section 1605(a)(7), with its greater protections for defendants, to suits against designated terrorist states. Mem. 15-16 n.8. Also, plaintiffs make no effort to deal with Judge Robertson's view that Congress's failure to include "the provision of material support or resources" in the definition of a non-commercial tort under Section 1605(a)(5) creates a "powerful presumption" that Congress did not mean that exception to encompass supporting terrorism. *Burnett II*, 292 F. Supp. 2d at 20 n.5. See also 8/27/04 Naif Rep. 12-14 (Dkt. No. 401).

9

– not that the money supported attacks on the United States, not that the money supported the September 11 attacks, and most certainly not that SHC intended its money to support any such conduct.

Finally, plaintiffs seek the right to jurisdictional discovery, although they have alleged *no contacts*, **whatsoever**, with the United States. Their sole support for this request? A reference to a non-existent Internet website, based on which plaintiffs argue that, if SHC had an Internet website, and used it to solicit donations in the United States, that might subject SHC to personal jurisdiction here. Br. in Opp. 24-25. There is no basis for this extraordinary leap. Because plaintiffs have not alleged any contacts with the United States, they may not take jurisdictional discovery.

### III. Plaintiffs' Arguments Regarding Causation Do Not Cure Their Deficient Allegations

Plaintiffs have cited no case, and we have found none, in which the attenuated causal link they allege here – that SHC monies were carelessly spent and some of them made it into the hands of those who support terrorism – is sufficient to confer liability. The law is clear, and every case cited in the papers reiterates it, that liability for supporting terrorists can be imposed only if the support is linked to the specific terrorist act in question, and provided when the specific terrorist act was foreseeable. Mem. 24-25. For the reasons described above (at p. 7), plaintiffs' reliance on conspiracy and aiding-and-abetting theories are likewise ineffective.

### CONCLUSION

This Court should dismiss plaintiffs' claims in their entirety, with prejudice.

September 7, 2004                                                   Respectfully submitted,


                                                   ___/S/ [Lawrence S. Robbins/mh]_____
                                                   LAWRENCE S. ROBBINS (LR 8917)
                                                   [additional counsel and addresses listed on front cover]

10

## CERTIFICATE OF SERVICE

I certify that, pursuant to this Court's Case Management Order Number 2, on September 7, 2004, I caused this Reply in Support of Defendant Saudi High Commission's Motion to Dismiss, together with the Declaration of Max Huffman and Exhibits in Support thereof, to be served on all counsel electronically through the Court's ECF system.

\_\_\_\_/S/ [Max Huffman]_____
Max Huffman