UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |
|---|---|

*This document relates to:*    Federal Insurance Co. v. al Qaida
                               03 CV 06978 (RCC)


**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO THE MOTION
TO DISMISS FILED BY DEFENDANT RABITA TRUST**


COZEN O'CONNOR
The Atrium – Third Floor
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1

II. FACTS ...........................................................................................................................3

III. APPLICABLE LAW .....................................................................................................5

    A.    Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's *Prima Facie* Showing of Personal Jurisdiction May be Established Solely by Legally Sufficient Allegations of Jurisdiction. .........................................5

IV. ARGUMENT ..................................................................................................................7

    A.    This Court Has Personal Jurisdiction Over Rabita Trust Under New York's Long Arm Statute. ...................................................................7

    B.    This Court's Exercise of Jurisdiction Over Defendant Rabita Trust Does Not Violate Due Process. ........................................................................8
        1)    This Court Can Constitutionally Exercise Specific Jurisdiction. .................................................................................8
        2)    Defendant Rabita Trust is Also Constitutionally Subject to Jurisdiction Pursuant to the Modified Due Process Standard For Mass Torts. .........................................................................10

V. CONCLUSION ...........................................................................................................11

## TABLE OF AUTHORITIES

Page

### CASES

*Alexander v. Fritzen*,
    503 N.E.2d 102 (N.Y. 1986)..................................................................................7

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990).............................. 5-6

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000, 1024 (7th Cir. 2002) ............................................................ 10-11

*Calder v. Jones*,
    465 U.S. 781 (1984)..............................................................................................8

*Chrysler Capital Corp. v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991)......................................................................7

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
    187 F.3d 229 (2d Cir. 1999)............................................................................. 7-8

*In re DES Cases*,
    79 F. Supp. 552 (E.D.N.Y. 1992) .......................................................................10

*DiStefano v. Carozzi North America, Inc.*,
    286 F.3d 81 (2d Cir. 2001)....................................................................................6

*Durante Brothers & Sons, Inc. v. Flushing National Bank*,
    755 F.2d 239 (2d Cir. 1985)..................................................................................7

*Hogan v. Wal-Mart Stores, Inc.*,
    167 F.3d 781 (2d Cir. 1999)..................................................................................5

*Klaxon Co. v. Stentor Electric Manufacturing Co.*,
    313 U.S. 487 (1941)..............................................................................................5

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998)....................................................................7

*In re Magnetic Audiotape Antitrust Litigation*,
    334 F.3d 204 (2d Cir. 2003)..................................................................................6

*Pittman v. Grayson*,
    149 F.3d 111 (2d Cir. 1998)..........................................................................................7

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
    290 F. Supp. 2d 55 (D.D.C. 2003) ............................................................................ 9-10

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
    995 F. Supp. 325 (E.D. N.Y. 1998), 162 F.3d 748 (2d Cir. 1998), *cert. denied*,
    527 U.S. 1003 (1999)................................................................................................. 8-9

*Simon v. Philip Morris, Inc.*,
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) ...........................................................................7, 10

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*,
    241 F.3d 135 (2d Cir. 2001)..........................................................................................8

## MISCELLANEOUS

*Second Report of the Monitoring Group Established Pursuant to Resolution 1363
(2001), on Sanctions Against Al Qaida, the Taliban and Individuals and Entities
Associated With Them (December 2, 2003)*...................................................................... 2-3

Fed. R. Civ. P. 12(b)(2)........................................................................................................6

Fed. R. Civ. P. 56................................................................................................................6

N.Y.C.P.L.R. §302(a)(2).......................................................................................................7

I.      **INTRODUCTION**

Plaintiffs have sued Defendant, Rabita Trust, based on its participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and foreseeable product. Rabita Trust has moved to dismiss the Federal Plaintiffs' claims before any discovery, contending that it lacks the necessary minimum contacts with the United States to trigger personal jurisdiction because it does not do charitable work here, receive donations from this country, and the Federal Plaintiffs failed to adequately plead that it purposefully directed any tortious activity here or conspired with anyone to do so. The thirteen paragraphs in the Complaint specifically addressing Defendant Rabita Trust, which this Court must accept as true, establish the legal nexus of Rabita Trust's contacts to the United States for this Court properly to exercise its jurisdiction. For the reasons set forth below, Defendant Rabita Trust's motion should be denied in all respects.

Ongoing investigations around the World are slowly revealing the unprecedented scope and sophistication of the global conspiracy. According to published reports, al Qaida maintained and operated at least twelve training camps in Afghanistan before the United States' military action forced the organization to disperse. As many as 20,000 dedicated *jihadists*, including all nineteen of the September 11 hijackers, received indoctrination and training at those camps between 1996 and September 11, 2001. By September 11, al Qaida drew from the resources of a vast network of terrorist cells in more than 100 countries. That network's strength was reinforced by al Qaida's strategic alliances with other like minded terrorist organizations. To this day, the depth and breadth of the organization's infrastructure enable it to mount attacks throughout the World, even though international efforts have resulted in the capture of more than 3,000 al Qaida members in over 100 countries since September 11.

Post 9/11 investigations have confirmed that al Qaida relied heavily on its global infrastructure to plan, support and coordinate the September 11th Attack, and that it would have been impossible for al Qaida to carry out an attack on that scale within the United States without that infrastructure. According to the *Report of the Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, plans for the Attack were carefully vetted through al Qaida's most senior leadership over a period of six (6) years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaida's financial supporters. The individual participants in the Attack were chosen from an enormous pool of potential candidates, who were recruited, trained and indoctrinated using funds provided by the organization's supporters. Each of the hijackers received training at one or more of al Qaida's well funded training camps in Afghanistan. Until the last minute, details of the plot were revised through a global communication network, the existence of which also was made possible by the financial sponsorship of al Qaida's supporters. In these ways, and others too numerous and complex to detail herein, the success of the September 11th Attack depended critically on the sophistication and extensiveness of the organization's global resources.

By all accounts, the infrastructure that made the September 11th Attack possible was built over a period of many years, using the financial and logistical support of a vast network of charities, banks and wealthy donors.[1] As the United Nations Security Counsel Committee Concerning al Qaida and the Taliban succinctly explained:

> From its inception, al Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al Qaida with the very useful international channel for soliciting, collecting, transferring and distributing the funds it

---

[1] The estimated costs of building and sustaining that infrastructure are staggering. David Aufhasuer, the former General Counsel of the Treasury Department, estimated that al Qaida needed $35 million to support its infrastructure on an annual basis prior to September 11.

>   needs for indoctrination, recruitment, training, and logistical and operational support.  These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.  Al Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al Qaida.

*Second Report of the Monitoring Group Established Pursuant to Resolution 1363 (2001), on Sanctions Against Al Qaida, the Taliban and Individuals and Entities Associated With Them (December 2, 2003)* at ¶ 34.

Government officials and experts also agree that charities established and funded by the Kingdom of Saudi Arabia, and wealthy Saudi supporters, played a singularly important role in al Qaida's development and pursuit of its perverse ambitions.  Indeed, David Aufhauser has described Saudi Arabia as the "epicenter" of al Qaida's financing.  Almost three years after the September 11th Attack, Saudi Arabia is finally bowing to international pressure and itself acknowledging the pervasiveness of its charities' involvement in the sponsorship of al Qaida.  In fact, on June 2, 2004, Saudi Arabia announced that it intended to dissolve **all** of its international charities as a "counter-terrorism" measure.

The Federal Plaintiffs' claims against Rabita Trust arise from its participation in the conspiracy outlined in general above.  The allegations against Rabita Trust are set forth in detail in the Federal Plaintiffs' 646-paragraph, 182-page FAC.  In addition to a number of general allegations that apply, the specific allegations relating to Rabita Trust are contained at Paragraphs 113, 121, 127, 195 and 208-16.

## II.    FACTS

All of the following facts must be taken as true from the Federal Plaintiffs' Complaint. Defendant Rabita Trust is a subsidiary body of the Muslim World League, with its headquarters in Lahore, Pakistan and offices throughout the world.  It is an agency,

instrumentality, and organ of the Kingdom of Saudi Arabia and the Kingdom controls and directs its operations, appoints and terminates its personnel, provides Rabita Trust with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls Rabita Trust's operations.  FAC¶208.  Defendant Rabita Trust has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provides material support and resources to al Qaida and affiliated foreign terrorist organizations.  FAC¶210.

Rabita Trust's direct participation in al Qaida's operations dates to the establishment of Osama bin Laden's terrorist movement, as confirmed by the internal al Qaida document recovered from the computer files of the Benevolence International Foundation wherein Osama bin Laden suggests Defendant Rabita Trust's involvement in a committee to collect and distribute funds to al Qaida.  FAC¶211.  Rabita Trust's material sponsorship of al Qaida has been facilitated by the direct participation of senior al Qaida officials in the management and operation of Rabita Trust.  A founding member of al Qaida, Wael Hanza Julaidan, was the head of Rabita Trust for several years before September 11, 2001.

Defendant Rabita Trust also shared officers and directors with several other charities operating within al Qaida's infrastructure, including MWL and the SAAR Network of charities and businesses.  Abdullah Omar Naseef served as a chairman of Rabita Trust and as a Secretary General of the MWL.  Naseef is also an officer of Makkahl-Mukarramah, Inc., a Virginia based charity operating within the SAAR Network.  The Vice Chairman of the Board of Trustees of Rabita Trust, Abdullah al-Obaid, also served as an officer of the MWL and an organization within the SAAR Network.  Al-Obaid also serves as a senior executive of al-Watania Poultry in Saudia Arabia, one of the many businesses owned by Suleiman Abdel Aziz

al-Rajhi, the founder of the SAAR Network, member of the board of directors of IIRO, CEO of al-Rajhi Banking and Investment, and a defendant herein. FAC¶213.

Given the pervasive and ongoing involvement in al Qaida's operations, and the direct participation of senior al Qaida officials in its management, the United States Government designated Rabita Trust as a Specially Designated Global Terrorist on October 12, 2001 pursuant to an Executive Order 13224. FAC¶214. As such, Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global *jihad*. FAC¶215. The September 11th Attack was a direct, intended, and foreseeable product of Rabita Trust's participation in al Qaida's *jihadist* campaign. FAC¶216.

### III. APPLICABLE LAW

The law that this Court must apply depends upon the issue being decided. Federal law and the Federal Rules of Civil Procedure control all Constitutional and federal question issues, both substantive and procedural. For plaintiffs' common law claims, the Court must apply the substantive law of New York, the forum state, including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). The Federal Rules of Civil Procedure control all procedural issues, even on the common law claims. *Hogan v. Wal-Mart Stores, Inc.*, 167 F.3d 781, 783 (2d Cir. 1999).

### A. Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's *Prima Facie* Showing of Personal Jurisdiction May be Established Solely by Legally Sufficient Allegations of Jurisdiction.

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal jurisdiction varies depending upon the procedural posture of the litigation.

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation

> omitted] legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted]. At that point, the *prima facie* showing must be factually supported.

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990). The Second Circuit has observed that a plaintiff's averment of jurisdictional facts will normally be met in one of three ways when in dispute: (1) by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency; (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction; or (3) by request for an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits. *Id.* at 197. Where, as here, "the defendant is content to challenge only the sufficiency of the plaintiff's factual allegations, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Id.*[2] In order to meet its prima facie showing, the Federal Plaintiffs need only allege facts that connect the defendant with the applicable forum, here, the United States. The plaintiff's averments of jurisdictional facts must be taken as true. *Id*; *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003). The Court also construes the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor. *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).

---

[2] Defendant Rabita Trust relies on Rule 12(b)(2) in its Memorandum of Law in Support of Defendant Rabita Trust's Motion to Dismiss First Amended Complaint (Rabita Trust's Memorandum of Law) but has attached an affidavit in support of its motion. The Federal Plaintiffs have therefore also referred to evidence outside the Complaint in response. Nevertheless, this Court is not obligated to consider the defendant's motion as a Rule 56 motion because the Federal Plaintiffs have not had an opportunity to conduct discovery and Defendant Rabita Trust is not asserting that there are undisputed facts demonstrating the absence of jurisdiction.

## IV. ARGUMENT

### A. This Court Has Personal Jurisdiction Over Rabita Trust Under New York's Long Arm Statute.

This Court has jurisdiction over the Federal Plaintiffs' claims pursuant to New York's long arm statute. That statute provides, in part, that "the court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent commits a tortious act within the state." N.Y.C.P.L.R. §302(a)(2). "It is well settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. §302(a)(2)." *Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 99 (E.D.N.Y. 2000) (citation omitted); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991). "Both state and federal courts have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998).

New York law does not recognize the substantive tort of civil conspiracy. *Durante Bros. & Sons, Inc. v. Flushing Nat. Bank*, 755 F.2d 239, 251 (2d Cir. 1985). Rather, allegations of a conspiracy connect the actions of separate defendants with an otherwise actionable tort. *Alexander v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986). Both conspiracy and aiding and abetting create concerted-action liability in New York. *Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998). Conspiracy requires an agreement to commit a tortious act while aiding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer. *Id.* at 122-23. For the reasons set forth above, the conduct of Rabita Trust constitutes both forms of concerted-action liability under New York law as set forth in the allegations of the Complaint and, as such, connects it with the subject transaction, charges Rabita

Trust with the acts and declarations of its co-conspirators, and exposes it to joint and several liability. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 240 (2d Cir. 1999). This Court therefore has personal jurisdiction over Rabita Trust pursuant to New York's long arm statute and the well-recognized conspiracy jurisdiction theory under New York law.

> **B.  This Court's Exercise of Jurisdiction Over Defendant Rabita Trust Does Not Violate Due Process.**

### 1)   This Court Can Constitutionally Exercise Specific Jurisdiction.

The Supreme Court repeatedly has held that the due process clause of the Fourteenth Amendment permits personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice. *Calder v. Jones*, 465 U.S. 781, 788 (1984). Where, as here, the claim arises out of, or relates to, a defendant's contact with the forum, i.e., the attack in New York, the plaintiff need only prove specific jurisdiction. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135, 152 (2d Cir. 2001) (citation omitted).

When considering specific jurisdiction, the court properly focuses on the relationship among the defendant, the forum and the litigation in judging minimum contacts. *Calder*, 465 U.S. at 788. In an action involving the harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence." The Federal Plaintiffs have alleged that Defendant Rabita Trust was engaged in a conspiracy to attack and wage war against the United States, its nationals, interests, and allies. FAC ¶73. The actions of the conspirators were expressly aimed at the United States such that, under the circumstances, they must reasonably anticipate being haled into court here.

Two recent cases involving the hijacking of airplanes outside the United States, but with some United States citizens as passengers, provide support for exercising personal

jurisdiction here.  *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D. N.Y. 1998), *aff'd in part*, 162 F.3d 748 (2d Cir. 1998), *cert. denied*, 527 U.S. 1003 (1999), involved the in-flight bombing and destruction of Pan Am Flight 103 with the loss of 189 United States citizens over Lockerbie, Scotland.  Judge Platt, in the Eastern District of New York, reasoned that the destruction of the airplane, 189 deaths, and significant security concerns for the country and its aviation industry arguably "has had extensive impacts" on the United States.  *Id.* at 330.

> Any foreign state would know that the United States has substantial interest in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, including civil actions in United States courts.

*Id.*  The September 11th Attack indisputably had impacts in and on the United States like few events in its history.

In *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 55 (D.D.C. 2003), Libya challenged the personal jurisdiction of a federal court in the District of Columbia in a suit involving the 1989 mid-air explosion of a French airline in Africa that killed seven United States citizens.  The plaintiffs in *Pugh* alleged that the defendants "conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight." *Id.* at 59.  The court noted that the United States had a well known, worldwide interest in preventing and punishing terrorism.  Congress had enacted several criminal statutes dealing with such cases starting at least five years before the bombing.  These criminal statutes contemplated jurisdiction in the United States over foreign nationals for activities abroad regardless of other contacts with the United States.

> It logically follows that if a federal court may constitutional exercise criminal jurisdiction over such individuals, the

> Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

*Id.* That same logic applies here.

In sum, this Court's exercise of specific personal jurisdiction does not violate Rabita Trust's due process rights.

### 2) Defendant Rabita Trust is Also Constitutionally Subject to Jurisdiction Pursuant to the Modified Due Process Standard For Mass Torts.

Defendant Rabita Trust is also subject to personal jurisdiction pursuant to the "modified due process standard for mass torts" adopted on several occasions by courts in the Eastern District of New York in both tobacco and DES cases. *Simon*, 86 F. Supp. 2d at 129-37; *In re DES Cases*, 79 F. Supp. 552, 574-77 (E.D.N.Y. 1992). "New York's interest in this dispute is intense, and the burden on [defendant] is minimal compared to the difficulty of the plaintiffs litigating in [Saudi Arabia]." *Simon*, 86 F. Supp. 2d at 137.

The courts of the United States in general, and New York in particular, have an undeniable and overwhelming appreciable interest in the World Trade Center litigation. *Id.* at 131 (citation omitted). Since New York has an appreciable state interest because this litigation raises serious issues that would affect or have a probable impact on the vindication of policies expressed in the laws of New York, the assertion of jurisdiction is *prima facie* constitutional. *Id.* Thus, the assertion of jurisdiction is considered constitutional unless, given the actual circumstances of the case, the defendant is unable to amount a defense in the forum state without suffering a relatively substantial hardship. *Id.* Defendant Rabita Trust can make no such showing here.

**V.      CONCLUSION**

Defendant Rabita Trust "repeatedly confuse[s] what must be alleged with what must be proved. The plaintiffs need not set out in detail all of the facts upon which they base their claim. They need only give [Rabita Trust] fair notice of what their claim is and the grounds upon which it rests. [citation omitted]. This, they have done." *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1024 (7th Cir. 2002). For all of the foregoing reasons, the Federal Plaintiffs respectfully submit that the Motion to Dismiss of Defendant Rabita Trust should be denied in its entirety.

Respectfully submitted,

COZEN O'CONNOR

By:      _____/s/_____
STEPHEN A. COZEN (SAC 1625)
ELLIOTT R. FELDMAN (ERF 8111)
SEAN P. CARTER (SPC 0636)
MARK T. MULLEN (MTM 2384)
The Atrium – Third Floor
1900 Market Street
Philadelphia, PA  19103
Attorneys for Plaintiffs

Phila1\2140258\1 117430.000