**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
03 CV 06978 (RCC)
*Vigilant Insurance Co. v. Saudi Arabia*
03 CV 08591 (RCC)

**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE**
**MOTION TO DISMISS OF THE KINGDOM OF SAUDI ARABIA**

COZEN O'CONNOR

1900 Market Street
Philadelphia, PA 19103
215-665-2000/telephone
215-665-2013/fax

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  APPLICABLE LAW ....................................................................................... 6

    A.   The Burden of Proof  is on the Party Claiming Immunity...................................... 6

III. ARGUMENT

    A.   The Kingdom is Legally Responsible for the Actions of al Qaida's Charity
        Fronts ........................................................................................................ 7

    B.   The Kingdom Rigidly Controls the Charities ........................................................ 9

    (1)   The Circumstances Surrounding the Establishment of the Charities.................... 10

    (2)   The Purpose of the Charities' Activities ................................................................ 10

    (3)   The Kingdom Extensively Supervises the Activities of the Charities................. 12

    (4)   The Saudi Government is the Principal Source of Funding for the Charities ...... 15

    (5)   The Charities' Employment Policies .................................................................... 16

    (6)   The Charities' Obligations and Privileges Under Saudi Laws ........................... 16

    (7)   The Ownership Structure of the Charities ............................................................ 17

    C.   Equitable Principles Also Require That the Kingdom Answer for the Actions of
        its Charities ............................................................................................................ 18

    D.   This Court Possesses Subject Matter Jurisdiction Relative to the Claims Arising
        From the Misconduct of the Saudi Charities and Officials.................................. 20

    (1)   The Money Laundering Services Provided by the Charities to al Qaida Constitute
        Commercial Activity Actionable Under 1605(a)(2) of the FSIA ........................ 21

    (2)   The Charities, and Consequently the Kingdom, Have Waived the Protections of
        the FSIA ................................................................................................................ 24

IV.  CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

Page

Alejandre v. The Republic of Cuba,
    42 F. Supp. 2d 1317 (S.D. Fl. 1999) .......................................................................20

Cargill Int. S.A. v. M/T Pavel DyBenko,
    991 F.2d 1012 (2d Cir. 1993) ...................................................................................6

Compagnie Noga D'Importation et D'Exportation v. The Russian Federation,
    361 F.3d 676 (2d Cir. 2004) .................................................................................8, 9

Filus v. Lot Polish Airlines,
    907 F.2d 1328 (2d Cir. 1990) ..................................................................................7

First City, Texas-Houston, N.A. v. Rafidian Bank,
    150 F.3d 172 (2d Cir. 1998) ....................................................................................7

First National City Bank v. Banco Para el Comercio Exterior de Cuba,
    462 U.S. 611 (1983) ...........................................................................................8, 19

Foremost-McKesson, Inc. v. Islamic Republic of Iran,
    905 F.2d 438 (D.C. Cir. 1990) ................................................................................8

Kingdom 5-KR-41, Ltd. v. Star Cruises P.L.C., 2003 LEXIS 1766 (S.D.N.Y.
    2003) .......................................................................................................................20

McKesson Corp. v. Islamic Republic of Iran,
    52 F.3d 346 (D.C. Cir. 1995) ................................................................................11

People of God Community v. Commissioner,
    75 T.C. 127 (T.C. 1980) ........................................................................................17

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
    235 F.3d 738 (2d Cir. 2000) ....................................................................................7

Robinson v. Malaysia,
    269 F.3d 133 (2d Cir. 2001) ....................................................................................7

Saudi Arabia v. Nelson,
    507 U.S. 349, 123 L. Ed. 2d 47 (1993) ..................................................................7

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002) ................................................................................................6

**Page**

Transamerica Leasing, Inc. v. La Republica de Venezuela,
200 F.3d 843 (D.C. Cir. 2000) ..................................................................................8

Trinity Broadcasting of FLA., Inc., v. FCC,
341 U.S. App. D.C. 191 (D.C. Car. 2000) ...............................................................17

USX Corp. v. Adriatic Insurance Co.,
345 F.3d 190 (3d Cir. 2003) ......................................................................................9

United Cancer Council v. Commissioner,
165 F.3d 1173 (7th Cir. 1999) .................................................................................17

## STATUTES, RULES AND LEGISLATIVE HISTORY

26 U.S.C.S. §501(c)(3) ...............................................................................................17

28 U.S.C. § 1605(a)(1) ................................................................................................24

28 U.S.C. §1605(a)(2) .................................................................................................22

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 et seq ..........................6

Fed. R. Civ. P. 8 ..........................................................................................................6

H.R. Rep. No. 1487, 94th Cong., 2d Sess. *reprinted in* 1976 U.S. Code Cong. &
Ad. News 6604, 6617 ................................................................................................25

## OTHER MATERIALS

*Second Report of the Monitoring Group on Al-Qaida, (December 2, 2003)*, pp.
13-14 ...........................................................................................................................3

*Terrorist Financing - Report of an Independent Task Force of the Council on
Foreign Relations,* pp. 7-8 .........................................................................................3

*Final Report of the National Commission on Terrorist Attacks Upon the United States*
(July 2004) ..................................................................................................................3

*Monograph on Terrorist Financing of the Staff of the National Commission on
Terrorist Attacks Upon the United States A*ugust 2004) ..........................................3, 4

**Page**

*International Religious Freedom Report 2004*, United States Department of State, Bureau of Democracy, Human Rights and Labor, September 15, 2004......................11

Stephen Emerson and Jonathan Levin, *Terrorism Financing:  Saudi Arabia, Terrorist Financing and the War on Terror, Written Testimony Before the Senate Committee on Governmental Affairs*, July 31, 2003 ..............................................................10, 11

Senator Bob Graham, *Intelligence Matters – the CIA, the FBI, Saudi Arabia, and the Failure of America's War on Terror*, Random House (2004) ..................................... 5

Dr. Dore Gold, *Hatred's Kingdom – How Saudi Arabia Supports the New Global Terrorism*, Regenry Publishing (2003) ....................................................................... 11

*Feds:  Saudi Charity Funds Terror*, CBS News.Com , September 9, 2004 .....................18

*Former Treasury Official Praises Saudi Action Against Terrorist Financing*, www.usembassy.it, January 23, 2004 .........................................................................10

*Saudis Reform Charities as Anti-Terror Measure*, CNN.Com, June 2, 2004 ..............4, 18

*U.S. Eyes Money Trails of Saudi-Backed Charities*, WashingtonPost.Com, August 19, 2004.................................................................................................................................12

Reasons for Order of Justice B. Cullen, Minister of Citizenship and Immigration v. Mahmoud Jaballah, Federal Court of Canada, DES-6-99 ...........................................14

## I.      INTRODUCTION

The Federal Plaintiffs have sued the Kingdom of Saudi Arabia (the "Kingdom" or "Saudi Arabia") for injuries resulting from the September 11, 2001 terrorist attack upon the United States (the "September 11th Attack").  As detailed in the Federal Plaintiffs' First Amended Complaint ("FAC" or "Complaint"), the claims against the Kingdom arise predominantly from misconduct of ostensible charities under the Kingdom's control, and of government officials who used their authority to support al Qaida's global *jihad*.  Through the critical support they provided to al Qaida, those charities and officials actively participated in a global conspiracy to conduct terrorist attacks against the United States, of which the September 11th Attack was a natural, intended and foreseeable product.  FAC ¶¶ 72-74.  Through the present action, the Federal Plaintiffs seek to hold the Kingdom legally responsible for the conspiratorial conduct of the Saudi charities and officials.

In describing the Saudi charities' integral role in the conspiracy which led to the September 11th Attack, the FAC sets forth the following detailed factual allegations:

> Ostensible charitable organizations, and in particular, Islamic charities under the control of the Kingdom of Saudi Arabia, have played a singularly important role in al Qaida's development and pursuit of its perverse ambitions. These "charities" have served as the primary vehicle for raising, laundering and distributing funds on behalf of al Qaida from its inception. In addition, these charities have provided arms, false travel documentation, physical assets and logistical support to al Qaida. In many cases, senior members of the al Qaida movement have served as senior representatives of the charities, and used their employment status with the charities to shield their direct involvement in planning, coordinating, organizing, funding and conducting acts of international terrorism. Facilities of the charities, including the branch offices, have served as safe houses for al Qaida operatives, and bases for planning and launching operations. These charities are fully integrated components of al Qaida's organizational structure, and are actively involved at every level of al Qaida's operations, from recruitment and training of new members, to the planning and conduct of terrorist attacks.

FAC ¶ 79.

> As further described herein, the Kingdom of Saudi Arabia has
> established, funded, managed, maintained, directed and controlled
> many of the ostensible charities and banks that operate within al
> Qaida's support infrastructure. These agencies and
> instrumentalities of the Kingdom of Saudi Arabia have served as
> the primary vehicle for raising, laundering and distributing funds
> on behalf of al Qaida, since the organization's inception. The vast
> majority of these funds have been provided by the Kingdom of
> Saudi Arabia and members of the Saudi Royal Family. In addition,
> purported charities, operating as arms of the Kingdom, have
> provided arms, false travel documentation, physical assets and
> logistical support to al Qaida. In many cases, the Kingdom of
> Saudi Arabia has appointed senior members of the al Qaida
> movement to high ranking positions within the charities it
> controlled, thereby providing a cover for their terrorist activity and
> facilitating the provision of material support and resources to al
> Qaida. Al Qaida has planned and coordinated terrorist attacks from
> branch offices of the charities, including branches which operated
> from within Saudi embassies throughout the world.

FAC ¶ 399.

Investigations conducted since the September 11th Attack have affirmed the Federal

Plaintiffs' factual allegations regarding the support provided to al Qaida by the Saudi charities.[1]

As the United Nations Security Council Committee Concerning al-Qaida and the Taliban

succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and
> donations from its sympathizers to finance its activities.  Charities
> provide al-Qaida with the very useful international channel for
> soliciting, collecting, transferring and distributing the funds it
> needs for indoctrination, recruitment, training, and logistical and
> operational support.  These funds are often merged with and
> hidden among funds used for other legitimate humanitarian or
> social programmes.  Al-Qaida supporters and financiers have also
> established front charity networks whose main purpose is to raise
> and deliver funds to al-Qaida.

---

[1] The estimated costs of building and sustaining al Qaida's global infrastructure are staggering.  David Aufhasuer,
the former General Counsel of the Treasury Department, estimated that al Qaida needed $35 million to support its
infrastructure on an annual basis prior to September 11.

*Second Report of the Monitoring Group on Al-Qaida, (December 2, 2003)*, pp. 13-14, attached to the Affirmation of Sean P. Carter in Opposition to the Motion to Dismiss of the Kingdom (Carter Aff.), as Exhibit 1.

An Independent Task Force sponsored by the Council on Foreign Relations reached the same conclusion after a detailed investigation into al Qaida's finances, which benefited from information and assistance provided by the Central Intelligence Agency.  According to the Task Force:

> [T]he most important source of al Qaeda's money is its continuing fund-raising efforts.  Al Qaeda's financial background was built from the foundation of charities, non-governmental organizations, mosques, websites, fund raisers, intermediaries, facilitators, and banks and other financial institutions that helped finance the Mujahideen Regime though the 1980s.  This network extended to all corners of the Muslim world.  It included everyone from wealthy Persian Gulf Arabs, who could be solicited directly to give huge sums themselves, to the masses, who would make regular charitable donations as part of their religious obligations, the *zakat*.
>
> [I]t is worth stating clearly and unambiguously what official U.S. government spokespersons have not.  For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaeda; and for years, Saudi officials have turned a blind eye to this problem.

*Terrorist Financing - Report of an Independent Task Force of the Council on Foreign Relations*, pp. 7-8, Carter Aff., Exh. 2.

The recent report of the National Commission on Terrorist Attacks Upon the United States (9/11 Commission), and subsequent Staff Monograph, further supports the Federal Plaintiffs' assertion that charities under the control of the Kingdom funneled massive financial and logistical support to al Qaida.  In particular, the Commission found that there was a "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaida."  9/11 Commission Report, p. 171.  The Commission's Staff expanded on that finding in

a subsequent Monograph on Al Qaida's financing, explaining that "al Qaida was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities and the use of well-placed financial facilitators who gathered money from both witting and unwitting donors, primarily in the Gulf region."  9/11 Commission Staff Monograph on Terrorist Financing, p. 4.  The Staff Monograph further states that "The intelligence community identified [Saudi Arabia] as the primary source of money for al Qaida both before and after the September 11th attacks. Fund-raisers and facilitators throughout Saudi Arabia and the Gulf raised money for al Qaida from witting and unwitting donors and diverted funds from Islamic charities and mosques."  Id. at p. 8.

Almost three years after the September 11th Attack, Saudi Arabia is finally bowing to international pressure and itself acknowledging the pervasiveness of its charities' involvement in the sponsorship of al Qaida.  In fact, on June 2, 2004, Saudi Arabia announced that it intended to dissolve **all** of its international charities as a "counter-terrorism" measure.  See *Saudis Reform Charities as Antiterror Measure*, CNN.com, June 2, 2004, Carter Aff., Exh. 3.

The FAC also asserts that several members of the ruling Saudi Royal Family provided support to al Qaida in their capacities as officials of the Kingdom.  Specifically, the FAC alleges that Prince Sultan Bin Abduldaziz Al Saud, Prince Salman Bin Abduldaziz Al Saud, Prince Naif Bin Abduldaziz Al Saud and Prince Turki Al Faisal Al Saud used their positions within the Saudi government to channel financial and logistical support to al Qaida.  FAC ¶¶ 426-464.  The support provided by Princes Sultan, Naif and Turki flowed largely, although not exclusively, through the Supreme Council of Islamic Affairs, a government body in which all three defendants held positions in the years prior to the September 11th Attack.  As officials of the Supreme Council of Islamic Affairs, Princes Sultan, Naif and Turki determined which Saudi charities would receive government and private funds collected within Saudi Arabia, and the

projects to which those funds would be applied.  The Federal Plaintiffs allege that the Princes used this authority to channel financial and logistical support to al Qaida through the charities operating within its infrastructure.  The claims against Prince Salman are based largely on his role as founder and head of the Saudi High Commission for Relief to Bosnia and Herzegovena. The FAC alleges that Prince Salman "fully intended that the [SHC] would serve as a vehicle for funding and supporting Islamic militants in Bosnia, including elements of the al Qaida movement."  FAC ¶ 456.

In addition to the claims based on the conduct of the members of the Saudi Royal family outlined above, the FAC asserts that several less senior officials of the Saudi government provided direct support to the September 11th planners and hijackers.  In particular, the FAC alleges that Omar Al Bayoumi, a Saudi intelligence officer, and Fahad Al Thumairy, a Saudi diplomat who was stripped of his diplomatic visa and later barred from the United States based on suspected ties to terrorism, provided direct assistance to two of the September 11th hijackers. FAC ¶¶ 411-420.  Although several defendants have disputed the Federal Plaintiffs' contention that al Bayoumi worked for the Saudi intelligence service in filings with this Court, Senator Bob Graham, a member for many years of the Senate Intelligence Committee and a co-chair of the Joint Congressional Inquiry into the September 11th Attacks Upon the United States, has consistently asserted that intelligence materials he has reviewed establish that Al Bayoumi was a Saudi national "serving his nation as a spy."  *Intelligence Matters – The CIA, the FBI, Saudi Arabia, and the Failure of America's War on Terror*, Senator Bob Graham, at p.11.  The FAC also asserts that Muhammed Fakihi, the head of the Islamic Affairs Department of the Saudi Embassy in Berlin, provided material support to members of the Hamburg al Qaida cell that planned and coordinated the September 11th Attack.  FAC ¶ 421.

The Kingdom now moves to dismiss the claims asserted against it in the FAC, arguing that it is immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 et seq. (FSIA).  The Kingdom's Motion fails in several respects.  Most notably, the Kingdom fails to recognize that it is legally responsible for the sponsorship provided to al Qaida by several of al Qaida's charity fronts, as well as for the actions of Saudi officials who provided financial and logistical support to al Qaida in the course and performance of their official duties. Because the claims based on the conduct of the charities and Saudi officials fall squarely within the exceptions to immunity set forth in sections 1601, 1602 and/or 1605 of the FSIA, this Court may properly exercise jurisdiction over the Kingdom for the Federal Plaintiffs' claims.  Further, even if the Kingdom were not responsible for the actions of al Qaida's charity fronts, its pervasive sponsorship of those organizations, in the face of its express knowledge of their integration into al Qaida's global infrastructure, destroys any immunity afforded the Kingdom under the FSIA.  Accordingly, and for the reasons set forth below, the Kingdom's Motion to Dismiss should be denied.[2]

## II.    APPLICABLE LAW

### A.    The Burden of Proof  is on the Party Claiming Immunity

Consistent with Fed. R. Civ. P. 8, a plaintiff in an FSIA case need only provide the defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  In responding to the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA.  Cargill Int. S.A. v. M/T Pavel DyBenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes such a

---

[2] By agreement of the parties, the Kingdom's Motion to Dismiss, and Federal Plaintiffs' Opposition thereto, will also be deemed applicable to Vigilant Insurance v. Kingdom of Saudi Arabia, 03 CV 08591 (RCC).

showing, the burden of production shifts to the plaintiff to come forward with specific factual allegations *or* evidence which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in the FSIA. Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001). In deciding a motion to dismiss based on the FSIA prior to discovery, the court must accept as true the factual allegations and any evidence proffered by the plaintiff in support of jurisdiction. Saudi Arabia v. Nelson, 507 U.S. 349, 351, 123 L.Ed.2d 47 (1993) ("Because this case comes to us on a motion to dismiss the complaint, we assume we have truthful factual allegations before us, though many of those allegations are subject to dispute.") (internal citations omitted). To the extent the defendant challenges the accuracy of those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery relative to that disputed factual contention. First City, Texas-Houston, N.A. v. Rafidian Bank, 150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990). Upon completion of discovery, the Court should normally "afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction."[3] Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 235 F.3d 738, 748 (2d Cir. 2000).

## III.   ARGUMENT

### A.   The Kingdom is Legally Responsible for the Actions of al Qaida's Charity Fronts

The FAC alleges that the following ostensible charities are agencies, instrumentalities, arms or organs[4] of the Kingdom: The Muslim World League (MWL), International Islamic

---

[3] Consistent with these authorities, the Federal Plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the FSIA jurisdictional analysis, and to present evidence at a hearing on the question of FSIA jurisdiction.

[4] An agency is an entity in which a foreign state holds a majority ownership interest. Organ status is defined by the foreign state's control over the organization, rather than by ownership. A political subdivision is an entity whose

Relief Organization (IIRO), World Assembly of Muslim Youth (WAMY), al Haramain Islamic

Foundation (al Haramain), Saudi High Commission for Relief to Bosnia and Herzegovina

(SHC), Saudi Joint Relief Committee (SJRC), Rabita Trust, Saudi Red Crescent and

Benevolence International Foundation (BIF).  The FAC further details the Kingdom's extensive

control over those charities, as well as the pervasive involvement of each in the sponsorship of al

Qaida's global *jihad*.[5]  Consistent with the legal principles set forth below, Saudi Arabia is

legally responsible for the misconduct of each of these alleged charities, regardless of whether

they are deemed agencies, organs or political subdivisions of the Kingdom.

Because political subdivisions of a foreign state are so closely intertwined with the

central government, the actions of political subdivisions are necessarily attributable to the state

itself.  See Compagnie Noga D'Importation et D'Exportation v. The Russian Federation, 361

F.3d 676, 688 (2d Cir. 2004) ("[N]o meaningful distinction can be drawn between a sovereign

and one of its political organs").  Similarly, although agencies of a foreign state are presumed to

be independent of the state, the Supreme Court has recognized that this presumption of juridical

independence must be disregarded: (1) where "internationally recognized equitable principles

mandate attribution to avoid injustice;" or (2) where "the corporate entity is so extensively

controlled by its owner that a relationship of principal and agent is created."  First National City

Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611 (1983) (hereinafter "Bancec").[6]

Moreover, insofar as organ status under the FSIA is defined by a foreign state's control over the

---

purpose is deeply intertwined with the operation of the central government.  As used in the FAC, the term "arm" is
synonymous with the term "political subdivision."

[5]  The allegations specific to these defendants are set forth on pp. 42-76 of the FAC.  The Federal Plaintiffs
incorporate those allegations herein by reference.

[6]  Although Bancec addressed the circumstances in which an agency or instrumentality could be held responsible for
the actions of the State, courts have uniformly held that the Bancec exceptions may be invoked to hold a foreign
sovereign liable for the acts of an agency or instrumentality.  See Foremost-McKesson, Inc. v. Islamic Republic of
Iran, 905 F.2d  438, 446-47 (D.C. Cir. 1990); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d
843, 848 (D.C. Cir. 2000).

entity in question, the actions of an organ are, like those of a political subdivision, *per se* attributable to the state. Compagnie Noga, 361 F.3d at 688.[7]

**B.    The Kingdom Rigidly Controls the Charities**

There exists no rigid formula for determining whether the degree of control exercised by a foreign state vitiates the presumption of juridical independence. See Transamerica Leasing, 200 F.3d at 849 ("The question defies 'mechanical formulae,' for the inquiry is inherently fact-specific.") However, because organ status under the FSIA depends upon the degree of control exercised by the foreign state over the entity in question, the factors deemed relevant to the organ analysis provide a logical framework for analyzing whether a foreign state's domination of an entity defeats the presumption of independence, even where the entity in question is an agency within the meaning of the FSIA. The factors relevant to determining whether an entity is an "organ" of a foreign state were set forth, most recently and comprehensively, in USX Corp. v. Adriatic Ins. Co., 345 F.3d 190 (3d Cir. 2003). According to the USX Court:

> In making this assessment [whether an entity is an organ of a foreign state], factors employed by both the Courts of Appeals for the Ninth and Fifth Circuits are relevant, although no one is determinative: (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; and (6) the entity's obligations and privileges under the foreign state's laws. To this list, we should add an additional factor: (7) the ownership structure of the entity.

USX, 345 F.3d 190 at 209.

---

[7] In its Motion to Dismiss, the SHC asserts that it is a political subdivision of the Kingdom. Thus, the SHC has represented to this Court that its actions are attributable to the Kingdom itself. Certain of the other charities may constitute political subdivisions as well. The Federal Plaintiffs request leave to conduct discovery as to that question. For purposes of the present analysis, the Federal Plaintiffs focus on the issue of control, as the evidence of the Kingdom's control over the charities establishes its vicarious liability for the actions of the charities, regardless of whether they are characterized as agencies, organs or political subdivisions.

The Federal Plaintiffs have presented specific factual allegations, and assembled substantial evidence even before discovery, detailing the Kingdom's extensive control over the subject charities.  When analyzed under the seven factors enunciated by the USX Court for determining organ status, these factual allegations and evidentiary materials satisfy the Federal Plaintiffs' burden of production relative to the issue of the Kingdom's control over the charities, and, at a minimum, move this matter to discovery and an evidentiary hearing.

### (1)   The Circumstances Surrounding the Establishment of the Charities

The circumstances surrounding the creation of the relevant charities are consistent with the assertion that those entities are, in fact, organs of the Kingdom.  The MWL, SHC, and SJRC were all founded by the government itself, pursuant to a Royal Decree or Decision of the Council of Ministers.  WAMY, IIRO, Rabita Trust and BIF are subsidiaries of MWL, established by the Kingdom, or by MWL with the Kingdom's approval.  Former General Counsel of the Treasury Department David Aufhauser has testified that Al-Haramain was "established by the Saudi Royal Family." *Former Treasury Official Praises Saudi Action Against Terrorist Financing*, January 23, 2004, Carter Aff., Exh. 4.  Thus, the available evidence suggests that the Saudi government itself established each of the relevant charities.

### (2)   The Purpose of the Charities' Activities

Knowledgeable experts and government officials have repeatedly asserted that the subject charities were established to further the interests of the Kingdom, and in particular to promote Saudi Arabia's image throughout the Islamic World.  For example, in written testimony submitted to the Senate Committee on Governmental Affairs on July 31, 2003, Steven Emerson and Jonathan Levin of the Investigative Project stated that the MWL "has functioned as the quasi-official religious missionary and propaganda arm of the Saudi Kingdom." *Terrorism Financing: Saudi Arabia, Terrorist Financing and the War on Terror*, Written Testimony of

Steven Emerson and Jonathan Levin Before the Senate Committee on Governmental Affairs, July 31, 2003, Carter Aff., Exh. 5.  Dr. Dore Gold, the former Israeli ambassador to the United Nations, has explained that the government of Saudi Arabia founded the MWL and other Saudi charities as a vehicle for spreading Wahhabism, an extreme version of Islam which is the official state religion of the Kingdom and has been cited as the source of al Qaida's virulent philosophy. *See Hatred's Kingdom*, Dr. Dore Gold, p. 119; see also *International Religious Freedom Report 2004*, United States Department of State ("The [Saudi] Government enforces a strictly conservative version of Sunni Islam.  Muslims who do not adhere to the officially sanctioned Salafi (commonly called "Wahhabi") tradition can face severe repercussions at the hands of the Mutawwa'in (religious police)"), Carter Aff., Exh. 6.

Representations made by Saudi officials and their counsel in these proceedings further support the conclusion that the subject charities were established to further the interests of the Saudi government.  In an affidavit submitted in support of the SHC's motion to dismiss, Saud Bin Mohammad Al-Roshood, the Director of the Executive Office of the SHC, describes the SHC as an instrument for advancing Saudi foreign policy in Bosnia-Herzegovina.  *See* Al-Roshood Affidavit, ¶¶ 5, 9, Carter Aff., Exh. 7.  Thus, the SHC argues that its activities "properly are viewed as acts of [the Kingdom of Saudi Arabia]."  Motion to Dismiss of SHC at P. 4.  During the September 14, 2004 oral argument on the motions to dismiss of Princes Sultan and Turki, counsel for Prince Sultan represented that the Supreme Council for Islamic Affairs uses the charities as instruments for advancing Saudi policy outside the Kingdom.[8]  Transcript of September 14, 2004 Oral Argument at p.8.

---

[8] The role of the charities in implementing the policies of the Saudi government is, in and of itself, grounds for disregarding the presumption of juridical independence.  As the D.C. Circuit has observed, "when a state controlled corporation implements state policies, its separate corporate existence does not shield the state from liability." McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 352 (D.C. Cir. 1995).

### (3)     The Kingdom Extensively Supervises the Activities of the Charities

The information assembled thus far also reveals that the activities of the charities are extensively supervised by the government of Saudi Arabia.  On the macro level, the Kingdom exercises supervisory control over the charities principally through the Supreme Council for Islamic Affairs.  King Fahd established the Supreme Council of Islamic Affairs in 1994 to centralize, supervise and review aid requests from Islamic groups.[9]  FAC ¶ 427; See also Declaration of Abdulaziz H. Al Fahad, at ¶¶ 8-11, Carter Aff., Exh. 8.  Thus, the Supreme Council determines which charities receive funding, as well as the causes to which private and public funds are applied by those charities.  As a consequence of its role in reviewing aid requests and determining the funding of the relevant charities, the Supreme Council of Islamic Affairs necessarily defines the policies and objectives of the charities, and thereby exercises critical supervisory authority over those organizations.

On a more direct level, the Kingdom oversees the operations of the charities through the Ministry of Islamic Affairs, Endowments, Da'Wa and Guidance.  The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world.  As the export of Wahhabism is also a principal goal of each of the relevant Saudi charities, there exists a complete identity between the objectives of the Ministry of Islamic Affairs and the mission of each of the charities.[10]  This commonality of purpose is no coincidence.  Indeed, King Fahd created the Ministry of Islamic Affairs specifically to oversee the operations of the Saudi charities.  See *U.S. Eyes Money Trails of Saudi-Backed Charities*,

---

[9]  The Kingdom contemporaneously issued a Royal Decree banning the collection of money in Saudi Arabia for charitable causes without official permission.

[10]  The organizational structure of the MWL itself illustrates the identity between the interests of the Ministry of Islamic Affairs and the charities.  According to official documents of the MWL, the Deputy Secretary-General of the MWL is responsible for overseeing Da'wa activity and Islamic education.  The organizational structure of the MWL also includes a Da'wa Affairs Manager, who is responsible for managing Da'wa activity and directing Muslims, in charge of supplying Da'wa needs in coordination with other relevant administrative branches, following the activity of preachers and Imams and training preachers.

WashingtonPost.com, August 19, 2004, Carter Aff., Exh. 9.  Thus, the "Islamic Organizations Guide" on al-islam.com, a prominent Islamic magazine, explicitly states that the MWL and IIRO work "under the supervision of the Ministry of Islamic Affairs."  See Islamic Organizations Guide from al-Islam.com, Carter Aff., Exh. 10.  Similarly, in filings submitted to the Court in these proceedings, al Haramain officials have represented that the organization "operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."  See Affidavit of Khalid bin Obaid Azzahri, at ¶ 3, Carter Aff., Exh. 11.

Representatives of the Islamic Affairs divisions of the Saudi embassies facilitate the Ministry's oversight of the charities, by supervising the regional activities and operations of those organizations.  In many cases, the charities operate from the offices of the Islamic Affairs divisions of the Saudi embassies throughout the world, subject to the direction of embassy personnel.  FAC ¶¶ 85, 114, 131, 151, 168, 181, 191, 208.  In this regard, Arafat Al-Asahi, the Director of the IIRO's Canadian office, testified as follows during Canadian court proceedings:

> Let me tell you one little thing.  Whenever the Saudi embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us.

Given the rigid control exercised over the MWL and IIRO by the Saudi government, through its embassies, Al-Asahi further testified as follows:

> Let me tell you one thing.  The Muslim World League, which is the mother of IIRO, is a fully government funded organization.  In other words, I work for the government of Saudi Arabia.  I am an employee of that government.  Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the government of Saudi Arabia.  Keep that in mind, please…I am paid by my organization which is funded by the [Saudi] government…the [IIRO] office, like any other office in the world, here or in the Muslim World League, have to abide by the policy of the government of Saudi Arabia.  If anybody deviates from that, he would be fired;  he would not work at all with IIRO or with the Muslim World League.

See November 2, 1999 Reasons for Order of Justice B. Cullen, p. 81 Carter Aff., Exh. 12.

Al-Asahi's comments regarding Saudi Arabia's direct supervision over the activities of the MWL and IIRO mirror those of Sheik Aqeel Al Aqeel, the former Director of Al-Haramain Islamic Foundation.[11]   Interviewed in the *Washington Post*, Al-Aqeel explained "we work under the supervision of the Saudi government."   See Affidavit of Special Agent Colleen Anderson in Support of Search Warrant, ¶ 27, Carter Aff., Exh. 13.

Additional evidence reveals that the government not only supervises the activities of the charities, but frequently directs the charities to perform specific functions, and to carry out specific acts on behalf of the Kingdom.  For example, a report published on the Saudi Information Resource website on January 6, 2002 indicated that al Haramain sent aid to Afghan refugees "under direct supervision of the Saudi Committee for Relieving Afghans, which is headed by Prince Naif bin Abdul Aziz, the Minister of Interior."  On February 22, 2003, the Saudi Arabian Information Resource reported that the SJRC had resumed its aid program "in accordance with the directives of Prince Naif bin Abdul Aziz…"

The Kingdom's extensive supervision and control of the charities' activities is further manifested by the presence of high-ranking governmental officials on the boards of those charities.  For instance, the head of the Ministry of Islamic Affairs, Saleh Bin Abdul Aziz Al Sheikh, serves as the Chairman of both the WAMY and Al-Haramain.  Prince Salman Bin Abdul Aziz founded and chairs the SHC.  The activities of the SJRC are directly supervised by Prince Naif Bin Abdul Aziz, in his capacity as Minister of Interior.  The MWL's Secretary General,

---

[11] The Saudi government removed Aqeel from his position in al Haramain under pressure from the international community.  On June 2, 2004, the United States government designated Aqeel under Executive Order 13224 as a sponsor of terrorism, based on evidence of links "to al Qaeda."  In addition, the U.S. government has formally designated all offices of al Haramain, including the Saudi headquarters, as terrorist sponsors based on their sponsorship of al Qaida.  The Kingdom joined in the most recent designations of al Haramain, including that of Aqeel al Aqeel, thereby admitting the organization's pervasive sponsorship of al Qaida.  Copies of press releases issued by agencies of the U.S. government in relation to those designations are collectively included as Exhibit 14 to the Affidavit of Sean P. Carter, filed contemporaneously herewith.

Abdullah Al-Turki, served as the Kingdom's Minister of Islamic Affairs for six years before being appointed, by King Fahd, to his position in the MWL. Sheikh Nasir bin Abd al Rahman al-Saeed, a member of Saudi Arabia's Shura Council,[12] also serves as a supervisor of the Sarajevo regional office of the SHC. Sheikh Salah bin Hamid, also a member of the Shura Council, serves as a member of the IIRO's Sharia Committee and Supreme World Council. The head of the Saudi Red Crescent Supreme Authority is the Saudi Health Minister. Former General Abd al-Kader bin ab al-Khai bin Kamal, who is currently a member of the Shura Council, served as a member of the Saudi Red Crescent Board of Management, while he was also a senior official in Saudi Arabia's General Intelligence Service.

### (4) The Saudi Government is the Principal Source of Funding for the Charities

Each of the relevant charities relies extensively, and in some cases almost exclusively, on the Saudi government to fund its global operations. In March 1997, Abdul Al-Obaid, then Secretary General of the MWL, stated that the Saudi government had provided more than $1.33 billion in financial aid to MWL since the organization's establishment. In an interview which appeared in the Saudi newspaper *Achat* on November 11, 2000, MWL director Turki explained that the Saudi government holds "an important and fundamental role in supporting the League, providing over 90 percent of its budget." In view of that fact, Arafat Al-Asahi's sworn statement that the MWL and IIRO are "fully funded" by the Saudi government is hardly surprising. Al-Haramain similarly relies on the Saudi government for virtually all of its funding. In this regard, Aqeel Al-Aqeel stated that over 95 percent of Al-Haramain's funding comes directly from the Kingdom. In filings with this court, the SHC has similarly represented that the government of Saudi Arabia is the principal source of its finances. See Roshood Aff., ¶24, Carter Aff., Exh. 7.

---

[12] The Shura Council, formally the Majlis al Shura, is a consultative body established to provide advice to the King on issues of importance to the Kingdom. See Consultative Council: Introduction from Saudinf.com, Carter Aff., Exh. 15.

**(5)      The Charities' Employment Policies**

The available information concerning the employment policies of the relevant charities also supports the Federal Plaintiffs' assertion that the charities are organs of the Kingdom of Saudi Arabia.  As discussed previously, officials of the Saudi government occupy senior positions within all of the relevant charities.  In fact, the Minister of Islamic Affairs appoints all members of the Board of Directors and officers of al Haramain.  Azzahri Affidavit, ¶3, Carter Aff., Exh. 11.  In addition, the Saudi government frequently appoints civil servants to serve as employees of the charities, both within Saudi Arabia and abroad.  In this regard, the SHC has represented to this Court that "the SHC is staffed primarily with civil servants on detail from other ministries of  [the Kingdom]."  SHC Motion to Dismiss at p. 4.  During the Canadian immigration proceedings in which Arafat al Asahi testified on his behalf, Mamoud Jaballah testified that he was paid directly by the Saudi embassy while an employee of the IIRO.  See November 2, 1999 Reasons for Order of Justice B. Cullen, pp. 14-16, Carter Aff., Exh. 12.  Al Asahi's testimony, previously cited, indicates that he also viewed himself to be an employee of the government of Saudi Arabia, working for the MWL and IIRO.  Id. at 81.  Thus, the evidence collected to date indicates that the employees of the charities view themselves to be employees of the Kingdom itself, and are frequently compensated directly by the Kingdom.

**(6)      The Charities' Obligations and Privileges Under Saudi Laws**

The available information also indicates that the charities enjoy substantial benefits, and are subject to certain obligations, under the laws of the Kingdom.  As an initial matter, these defendants were entitled to solicit funds for charitable purposes from within the Kingdom.  In view of the 1994 ban against collection of funds for charitable purposes absent official permission, these charities necessarily enjoyed privileged status under Saudi law.  Moreover, these charities received funds directly from the government to support their operations.  This funding included not only public funds from the government, but also private funds collected by

the Kingdom from the citizenry of Saudi Arabia in accordance with the obligation of *zakat*.  In addition, members of the Royal Family and government ministries frequently held fund raising campaigns on behalf of these charities, thereby promoting them both within and outside of Saudi Arabia.  Thus, there can be little dispute that the charities enjoy privileged status under Saudi law.  Further, as discussed previously, the charities were obligated to carry out operations at the direction of the Kingdom, and consequently were subject to unique obligations under Saudi law.

### (7)     The Ownership Structure of the Charities

The final factor deemed relevant in evaluating organ status by the USX Court – the ownership structure of the entity – is difficult to apply to non-profit organizations such as the relevant charities.  As the D.C. Circuit has remarked, ownership is "a concept having no meaning with respect to non-profit entities."  Trinity Broadcasting of FLA., Inc., v. FCC, 341 U.S. App. D.C. 191 (D.C. Car. 2000).  Although courts have not had occasion to consider the concept of a charitable organization's ownership in an FSIA case, a number of federal courts have addressed that concept in tax matters.  Pursuant to 26 U.S.C.S. §501(c)(3), non-profit organizations are eligible to receive federal tax exemptions if "no part of the [entity's] net earnings…inures to the benefit of any private shareholder or individual."  As non-profit entities generally do not issue stock, a charitable organization's entitlement to tax exempt status frequently hinges on the question of what "individuals" should be considered shareholder equivalents.  In United Cancer Council v. Commissioner, 165 F.3d 1173, 1176 (7th Cir. 1999), the 7th Circuit held that "the term 'any private shareholder or individual'… has been interpreted to mean an insider of the charity… the test is functional.  It looks to the reality of control rather than to the insider's place in a formal table of organization."  Similarly, in People of God Community v. Commissioner, 75 T.C. 127, 133 (T.C. 1980), the federal tax court explained that "§501(c)(3) denies exempt status to an organization whose founders or controlling members have a personal stake in that

organization's receipts."  Thus, the federal courts have found that the founders and controlling members of a charity are properly considered to have an "ownership interest" in the organization.

For the reasons set forth previously, the Kingdom is both the founder and controlling member of all of the relevant charities.  As such, to the extent that any entity can be considered to hold an ownership interest in the charities, it is the Kingdom itself.

As the foregoing analysis demonstrates, the factual allegations of the FAC and related evidence support the Federal Plaintiffs' contention that the Kingdom exercises rigid control over the subject charities.  As a result, the Federal Plaintiffs have met their burden of production on the issue of the Kingdom's control over the charities.

C.      **Equitable Principles Also Require That the Kingdom Answer for the Actions of its Charities**

On June 2, 2004, the Kingdom announced that it was dissolving its international charities as a counter-terrorism measure.[13]  *Saudis Reform Charities as Antiterror Measure*, CNN.com, June 2, 2004, Carter Aff., Exh. 3.  Although the Kingdom has yet to publicly specify which charities are subject to the dissolution order,[14] it made clear that all offices of al Haramain would be closed.  See *Feds: Saudi Charity Funds Terror, CBSNews.com*, September 9, 2004, Carter Aff., Exh. 16.  The Kingdom further announced that all assets of the dissolved charities were being seized by the Kingdom, and re-allocated to a newly formed governmental agency, which is to assume responsibility for the operations of the dissolved charities.  Id.  Consistent with that announcement, all assets of al Haramain have been seized by the Kingdom.  Id.   In other words,

---

[13] The fact that the Kingdom possessed the authority and power to dissolve the charities, including offices outside of the Kingdom, further demonstrates the Kingdom's complete domination of the charities.

[14] The Federal Plaintiffs respectfully submit that the analysis of the equity exception would benefit, and may be impossible to fully conduct in the absence of, additional information concerning the scope of the Kingdom's actions in relation to the dissolution of its international charities.  Therefore, the Federal Plaintiffs request the opportunity to conduct discovery to determine the identity of any charities which have or will be dissolved, the disposition of the assets of any such organizations, and related issues.

the Kingdom has dissolved and assumed control of all of the assets of at least one primary

defendant in this action, while these proceedings were ongoing.

In accordance with recognized equitable principles, the Kingdom must be held to account

for the actions of any charities it has dissolved, or whose assets it has seized.  On this point, the

Supreme Court's decision in Bancec is instructive.  In Bancec, Citibank sought to set off the

value of assets seized by the Cuban government against amounts owed by Citibank under a letter

of credit issued to a Cuban bank established as a separate juridical entity.  Bancec, 462 U.S. at

614-617.  Cuba sought to evade the set off, based on the presumption of juridical independence.

Citing well established principles of equity, the Court found that the presumption of

independence should be disregarded where necessary to prevent "fraud or malfeasance, to

protect a third person such as creditor or purchaser, or to prevent the evasion of legal

requirements or obligations."  Id. at 630.  Thus, the Court declined to "adhere blindly to the

corporate form where doing so would cause … an injustice."  Id. at 632.  Applying the foregoing

principles to the facts before it, the Court concluded that Cuba could not escape liability for the

seizure of Citibank's assets, reasoning as follows:

> Having dissolved Bancec and transferred its assets to entities that
> may be held liable on Citibank's counter-claim, Cuba cannot
> escape liability for acts in violation of international law simply by
> retransferring the assets to separate juridical entities.  To hold
> otherwise would permit governments to avoid the requirements of
> international law simply by creating juridical entities whenever the
> need arises.

Id. at 633.

In the present case, the equitable principles announced in Bancec require that the

Kingdom be held accountable for the actions of al Haramain and any other charities dissolved by

the Kingdom.  As was the case in Bancec, Saudi Arabia has dissolved entities that are alleged to

owe a substantial debt to plaintiffs, and transferred all of the assets of those defendants to a

newly established government agency.[15]  Thus, the failure to hold the Kingdom responsible for the actions of the charities would work a fraud and injustice, by depriving plaintiffs of any meaningful opportunity to obtain a recovery from a primary wrongdoer.  Such a result would encourage foreign states to dissolve and assume the assets of agencies and instrumentalities that were subject to substantial debts to American citizens, and thereby deprive aggrieved Americans of any legitimate vehicle for obtaining a recovery.  Such an outcome is directly inconsistent with the primary purpose of the FSIA, which is to provide American citizens with a forum to obtain redress from foreign states and their agencies.

### D.    This Court Possesses Subject Matter Jurisdiction Relative to the Claims Arising From the Misconduct of the Saudi Charities and Officials

By virtue of the Kingdom's extensive control over the charities, as well as its dissolution and seizure of the assets of at least certain of the charities, the actions of the charities are attributable to the Kingdom, regardless of whether the charities are characterized as political subdivisions, agencies or organs of the Kingdom.  Moreover, the Kingdom also is legally responsible for any actions of its officials, acting within their official capacities.  Indeed, the Kingdom does not dispute this point, acknowledging that the FSIA imposes *respondeat superior* liability upon foreign states for the actions of their officials.  See Saudi Arabia's Motion to Dismiss at p. 11; see also Alejandre v. The Republic of Cuba, 42 F. Supp. 2d 1317, 1322 (S.D. Fl. 1999) ("since a foreign state would be liable for the tortious acts of its officials, employees and agents under the theory of *respondeat superior*, the victim of a terrorist attack may seek monetary damages from the foreign state itself, and/or from an agency or instrumentality thereof").

---

[15] By virtue of its actions, the Kingdom is also liable as a successor in interest to the dissolved charities.  See Kingdom 5-KR-41, Ltd. v. Star Cruises P.L.C., 2003 LEXIS 1766 (S.D.N.Y. 2003).

Because the actions of Saudi Arabia's charities and officials are attributable to the Kingdom, this Court may exercise jurisdiction over the Kingdom provided that the claims predicated on the conduct of the charities and officials fall within one of the exceptions to immunity set forth in the FSIA.  At this point in the litigation, the parties have extensively briefed the applicability of the tortious act and commercial activity exceptions of the FSIA. Rather than burdening the Court with a restatement of those same arguments herein, the Federal Plaintiffs incorporate by reference the discussion of the applicability of the tortious act exception to the misconduct of the charities set forth in Plaintiff's Consolidated Opposition to the Motion to Dismiss of the Saudi High Commission at pp. 12-22, and the discussion of the applicability of the tortious act and commercial activity exceptions to the misconduct of Saudi officials acting in their official capacity set forth in the Federal Plaintiffs' Opposition to the Motion to Dismiss of Prince Turki al Faisal Bin Abduldaziz Al Saud at pp. 8-20.  For the reasons set forth in those Briefs, the Federal Plaintiffs respectfully submit the claims based on the misconduct of the Saudi charities and officials fall squarely within the tortious act or commercial activity exceptions of the FSIA, and that this Court consequently possesses subject matter jurisdiction over the Kingdom for the claims set forth in the FAC.[16]

> **(1)  The Money Laundering Services Provided by the Charities to al Qaida Constitute Commercial Activity Actionable Under 1605(a)(2) of the FSIA**

Although the Federal Plaintiffs have previously briefed the applicability of the commercial activity exception relative to the claims arising from the conduct of officials of the Saudi government, they have not had the opportunity to fully analyze that exception in the

---

[16] Indeed, for the reasons set forth in those briefs, the Kingdom's pervasive sponsorship of the charities, despite its express awareness of their integration into al Qaida's infrastructure, destroys any immunity afforded the Kingdom under the FSIA, even if the acts of the charities were not attributable to the Kingdom.

context of the conduct of the Saudi charities.  As this Court is aware, the commercial activity

exception withdraws a foreign state's immunity in any case:

> in which the action is based… upon an act performed in the United
> States in connection with commercial activity of the foreign state
> elsewhere; or upon an act upon the territory of the United States in
> connection with the commercial activity of the foreign state
> elsewhere and that act causes a direct effect on the United States.

28 U.S.C. §1605(a)(2).

In previous filings with this Court, the Federal Plaintiffs have argued that the laundering

of funds on behalf of al Qaida constitutes commercial activity under Second Circuit law, and that

claims based on such conduct consequently are actionable under the commercial activity

exception of the FSIA.  The investigations into the nature of the support provided to al Qaida by

the Saudi charities confirm that those defendants did provide money laundering services to al

Qaida.  As an initial matter, although the laundering of terrorist funds does differ from traditional

notions of money laundering, in that the objective is to take legitimately derived funds and apply

them to illicit causes, the methodologies used to launder funds for terrorism and more traditional

criminal activity are common.  As a result, the U.S. government has consistently treated the

laundering of funds in support of terrorism as a form of money laundering, and addresses the

problem within the rubric of the National Money Laundering Strategy.

Furthermore, governmental reports and intelligence analyses have consistently confirmed

that the Saudi charities served as al Qaida's principal vehicle for obfuscating the source and

destination of its funds.  According to the United National Security Council Monitoring

Committee on al Qaida and the Taliban, the charities provided "al Qaida with the very useful

international channels for soliciting, collecting, transferring and distributing the funds it needs

for indoctrination, recruitment and logistical and operational support."  The Independent Task

Force of the Council of Foreign Relations similarly explained that "al Qaida also uses its

network of businesses and charities as covers to move its funds.  It is believed to employ traditional over-invoicing schemes to transfer value from one location to another without attracting the attention of authorities."  These activities are quintessential forms of money laundering.

Statements of government officials and counter-terrorism experts also establish that there exists a direct relationship between the extensive money laundering services provided by the charities and the September 11th Attack.  According to the 9/11 Commission, al Qaida required nearly $30 million dollars on an annual basis to sustain its global infrastructure.  The vast majority of that funding flowed through the charities.  The 9/11 Commission further concluded that al Qaida relied heavily on its global infrastructure to plan, support and coordinate the September 11th Attack, and that it would have been impossible for al Qaida to carry out an attack on that scale within the United States without that infrastructure.  In this regard, the 9/11 Commission noted that al Qaida could not have successfully mounted the September 11th Attack without:  (1) leaders able to evaluate, approve, and supervise the planning and direction of the operation; (2) communication sufficient to enable planning and direction of the operatives and those who would be helping them; (3) a personnel system that could recruit candidates, vet them, indoctrinate them, and give them necessary training; (4) an intelligence effort to gather required information and perform assessments of enemy strengths and weaknesses; (5) the ability to move people; and (6) the ability to raise and move the necessary money.  9/11 Commission Report, pp. 172-173.

In recognition of the extensive infrastructure needed to carry out an attack on the scale of September 11th, and the cost of maintaining such a global apparatus, Stuart A. Levey, the Under-Secretary for Terrorism and Financial Intelligence of the U.S. Department of the Treasury, recently testified that:

> [T]he cost of financing terrorist activity cannot be measured by the
> cost of a primitive destructive act.  The maintenance of those
> terrorist networks like al Qaeda, which threaten international
> security is expensive – even if a particular attack does not cost
> much to carry out.  As the 9/11 Commission explained, groups like
> al Qaida must spend money for many purposes – to recruit, train,
> travel, plan operations, and bribe corrupt officials for example.  If
> we can eliminate or even reduce their sources and conduits of
> money, we can degrade their ability to do all of these things, and
> thus can make them less dangerous.

Consistent with Levey's statement, Treasury Secretary Snow recently asserted that "our ability to combat terrorist financing is linked with our ability to combat money laundering."

The official statements of US government officials, and indeed the very policies guiding the financial war on terrorism, thus support the Federal Plaintiffs' argument that the Saudi charities provided extensive money laundering services to al Qaida, and that there exists a direct relationship between those money laundering services and the Federal Plaintiffs' injuries. Simply stated, absent massive funding, al Qaida could not have achieved its abhorrent objectives on September 11th.  Because the vast majority of those funds derived from the commercial activities of the Saudi charities in laundering funds on behalf of al Qaida, the commercial activity exception applies to the claims against the charities.[17]

### (2)    The Charities, and Consequently the Kingdom, Have Waived the Protections of the FSIA

Through their own actions, including their conduct in this litigation, the relevant charities have waived any protections of the FSIA.  Pursuant to Section 1605(a)(1) of the FSIA, a foreign state is not immune in any case "in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).  Significantly, courts have consistently held that an implied waiver arises when a foreign state files a responsive pleading in an action

---

[17] The FAC also asserts that banks under the control of the Kingdom, such as the National Commercial Bank, materially sponsored al Qaida.  The analysis of the commercial activity exception presented herein, and the discussion of the tortious act exception set forth in the Federal Plaintiffs' Opposition to Prince Turki's Motion to Dimiss, applies equally to those claims.  Further, in view of the allegations relating to the Kingdom's control over those banks, the conduct of the banks is also attributable to the Kingdom.

without raising the defense of sovereign immunity.  See H.R. Rep. No. 1487, 94th Cong., 2d

Sess. *reprinted in* 1976 U.S. Code Cong. & Ad. News 6604, 6617.

In these consolidated actions, MWL, IIRO, Al-Haramain, and Rabita Trust have all filed

responsive pleadings in which they have chosen not to raise the FSIA as a defense to the claims

asserted against them.  While certain of these responsive pleadings were filed in actions other

than Federal, those cases arise from the same incident and assert claims based on the same

general conduct underlying the Federal Plaintiffs' claims, and in fact have been consolidated at

the request of the defendants.  By virtue of their decision not to raise the FSIA as a defense to the

claims asserted against them, these defendants, and consequently the Kingdom, have waived any

immunity which may have been afforded them relative to the claims set forth in the FAC.

IV.   **CONCLUSION**

For all of the foregoing reasons, the Federal Plaintiffs respectfully submit that the

Kingdom's Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

COZEN O'CONNOR

By:   _____/s/_____
      STEPHEN A. COZEN (SC 1625)
      ELLIOTT R. FELDMAN (EF 8111)
      SEAN P. CARTER (SC 0636)
      MARK T. MULLEN (MM 2384)