ALBUTHE and SEDA, dated 4th of Thul Hijjah, 1420.[5] Both agreements state in part that SEDA was turning all monies over to ALBUTHE for the "Brothers and Sisters in Chechnya" and that Abu Yunus was relieved of all responsibilities for the money.

35. The two agreements are slightly different. One states ALBUTHE received $188,465 and contains, in addition to the signatures of SEDA and ALBUTHE, the signatures of two unidentified witnesses. The second agreement, however, states ALBUTHE received $186,644.70, lists a second handwritten date of March 11, 2000, and contains the notation "I deposit the amanet [6] in Alharamain head office for Chechenya Refugees", and appears to have been signed a second time by ALBUTHE.

36. U.S. Immigration and Customs Enforcement records show that on March 12, 2000 ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 38, as documented on immigration form I-94 number 35584030208. An inspector for Customs and Border Protection determined that on March 12, 2000, Saudi Arabian flight 38 flew from New York, New York to Riyadh, Saudi Arabia, connecting to Dhahran.

**CMIR REQUIREMENTS:**

37. From my training and experience, I know that Currency and Monetary Instrument Reports (CMIR's) are used by government agencies, including the IRS, to track currency and other monetary instruments coming into and leaving the U.S. Based on the training and experience of ICE Special Agent Robert Priddy and his conversations with other experienced ICE Special Agents, I also understand the following regarding the laws

---

[5] The 4th of Thul Hijiah, 1420 is from the Islamic Calendar, which translated means approximately the 11th of March, 2000.
[6] I have learned from an FBI translator that the word "amanet" in Arabic translates to the

Affidavit in Support of Search Warrant - Page 15

relating to CMIRs:

38. CMIR reporting requirements are imposed by U.S. Treasury regulations promulgated at Title 31 C.F.R. §103.23, pursuant to Title 31 U.S. C. §5316. In summary, the requirements mandate that any person physically transporting currency or certain monetary instruments, **including traveler's checks in any form**, in an aggregate amount exceeding $10,000 at any one time, into or out of the United States, must file a CMIR with United States Customs and Border Protection. A review of a CMIR shows that it requires the person filling out the report to provide, in part, information pertaining to the person's identity, information about the exportation or importation of funds, information about the person's business on whose behalf importation or exportation was conducted, information about the type and amount of currency and/or monetary instruments, and the signature of the person completing the report.

39. Title 31 U.S.C. §5324 provides in most pertinent part:

(c) International monetary instrument transactions. No person shall, for the purpose of evading the reporting requirements of section 5316— (1) fail to file a report required by section 5316, or cause or attempt to cause a person to fail to file such report;…

(d) Criminal penalty.— (1) In general.--- Whoever violates this section shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both. (2) Enhanced penalty for aggravated cases.— Whoever violates this section while violating

Affidavit in Support of Search Warrant - Page 16

another law of the United States or as part of a pattern of illegal activity involving more than $100,000 in a 12 month period shall be fined twice the amount provided in subsection (b) (3) or (c) (3) (as the case may be) of section 3571 of title 18, United States Code, imprisoned for not more than 10 years, or both.

40. The elements of a CMIR violation charged under Title 31 U.S.C. § 5324 most pertinent to this case are:

(a) The violator transported, shipped, or mailed-or attempted to transport, ship, or mail-currency or other reportable monetary instruments into or out of the United States, or the violator received in the United States currency or other reportable monetary instruments transported, shipped, or mailed from abroad;

(b) The value of the currency or other reportable monetary instruments involved in the violation exceeded $10,000 U.S. in an aggregate amount at any one time; and

(c) The violator acted for the purpose of evading the requirements by failing to file a report, or causing another to fail to file a report, when required to do so.

41. As stated above, U.S. Immigration and Customs Enforcement records show ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 38 on March 12, 2000. Officials at ICE informed me that no CMIRs were found related to this departure, nor did ALBUTHE ever file a CMIR reporting that he took

Affidavit in Support of Search Warrant - Page 17

the $130,000 in traveler's checks out of the country.

42. Immigration Forms 94 obtained by U.S. Immigration and Customs Enforcement show between October 1997 and April 2001, ALBUTHE crossed the United States border at least thirteen times. During this time period, ALBUTHE filed nine (9) CMIRs, showing he transported a total of $777,845 into the United States. From the nine CMIRs filed by ALBUTHE, seven of them were filed based on ALBUTHE'S transportation of traveler's checks. The filing of nine CMIRs by ALBUTHE, unrelated to the financial transactions detailed earlier in this affidavit, shows that he knew he was required to file the CMIR form while transporting currency or monetary instruments, including traveler's checks, into the United States.

43. A CMIR clearly states on its face that it is required to be filled out by anyone departing or entering the United States, or a person shipping, mailing, or receiving currency or monetary instruments. In addition, the general instructions to the form state that persons who must file the form are each person who physically transports, mails, or ships, or causes to be physically transported, mailed, or shipped currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time from the United States to any place outside the United States or into the United States from any place outside the United States.

44. I have reason to believe that ALBUTHE speaks, reads, and/or writes English and therefore was aware of the requirement to report funds exceeding $10,000 while departing the U.S. In addition to filling out CMIRs on nine prior occasions, the investigation has shown that ALBUTHE appears to have written, "I deposit the amanet in Alharamain head office for Chechenya Refugees", on an agreement between him and

Affidavit in Support of Search Warrant - Page 18

SEDA and then signed the agreement. A document containing e-mails that was provided by AHIF, Inc., pursuant to a grand jury subpoena also indicates that ALBUTHE reads English. The e-mails were conducted between SEDA and other individuals in English and ALBUTHE appears to have received a carbon copy (Cc:) of these e-mails.

45. I have attempted to learn the disposition of the $130,000 in traveler's checks and the $21,000 cashier's check obtained by ALBUTHE from AHIF, Inc. funds. An analysis of the American Express Travelers checks indicates ALBUTHE cashed the traveler's checks on approximately March 25, 2000 at Al Rajhi Banking and Investment in the Kingdom of Saudi Arabia.

46. An analysis of the $21,000 cashier's check ALBUTHE received from SEDA shows the check was deposited into an Al Rajhi Banking and Investment account in the Kingdom of Saudi Arabia. A date for the deposit could not be established due to illegible bank stamps found on the back of the check, however Arabic markings on the check indicate that the cashier's check was deposited in what appears to be a personal account for ALBUTHE at Al Rajhi Banking and Investment.

47. In summary, I believe there is probable cause to believe that ALBUTHE knowingly failed to file a CMIR when he departed the U.S. on March 12, 2000 with the one hundred thirty (130) $1,000 American Express Traveler's checks. I believe that because SEDA assisted ALBUTHE with the purchase of the traveler's checks, and that the agreements pertaining to the turning over of these funds to ALBUTHE appear to have emanated from AHIF, Inc. in Ashland, Oregon, it is likely additional evidence of the CMIR violation may be located at 3800 S. Highway 99, where I believe AHIF, Inc. has conducted most of its business affairs. Further, since it appears that SEDA and ALBUTHE have

Affidavit in Support of Search Warrant - Page 19

attempted to conceal the movement of funds to Chechnya, as more fully described below, there may other similar transactions conducted which we have not yet detected. Therefore, I request authorization to search for evidence of all financial transactions conducted between October 1997 and February 2003 which involved cash, traveler's checks, cashier's checks or money orders, and the individuals or entities set forth in attachment B, for indications of additional CMIR violations.

**VIOLATION OF TITLE 26 U.S.C 7206(1)**

48. The second violation to be established in this affidavit is the willful filing of a false tax return by SEDA with the IRS for the year 2000. Support for this violation is as follows.

49. IRS records show that SEDA filed a 2000 Form 990, *Return of Organization Exempt From Income Tax,* in October of 2001 on behalf of AHIF, Inc. AHIF, Inc.'s accountant, Thomas J. Wilcox, Certified Public Accountant (CPA), stated that he prepared AHIF, Inc.'s 2000 Form 990 in his office in Medford, Oregon. Accountant Wilcox also told me that the return bared his signature and the signature of SEDA and that SEDA signed the form in his accounting office before the returns were filed with the IRS via certified mail.

**FILING REQUIREMENTS:**

50. From my experience and from consulting with experienced exempt organization specialists within the IRS, I know that, under the Internal Revenue Code, tax-exempt public charities are required to file annual information returns with the IRS on Form 990, *Return of Organization Exempt From Income Tax,* if their gross receipts during the year exceed $100,000.

51. Similar to for-profit entities, tax exempt entities are subject to audit by the

Affidavit in Support of Search Warrant - Page 20

IRS. If upon review of the organization's Form 990 and backup documentation, the IRS determines the organization is not operating consistently with its tax-exempt purpose, then the IRS may revoke the tax exemption, or impose excise taxes based on the nature and severity of the violation. Once an organization loses tax-exempt status, its total revenues are subject to federal income taxation, based upon its business form (i.e. corporation, partnership, or sole proprietorship).

52. From my experience, I know that under Title 26 U.S.C. § 7206(1), any person who willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

53. The elements of Title 26 U.S.C. § 7206(1) are:

    (a) The taxpayer made and subscribed a return, statement, or other document;

    (b) The return, statement, or other document contained a written declaration that it was made under the penalties of perjury;

    (c) The taxpayer did not believe the return, statement or other document to be true and correct as to every material matter; and

    (d) Willfulness.

Affidavit in Support of Search Warrant - Page 21

54. In AHIF, Inc.'s 2000 Form 990, I believe SEDA attempted to disguise the true disposition of the $150,000 that AHIF, Inc. received from Mahmoud El-Fiki in February of 2000, as described above, in order to prevent law enforcement and/or the IRS from scrutinizing the transaction. SEDA disguised the true disposition of the funds received from El-Fiki by causing the omission of AHIF, Inc.'s receipt of some of the funds and mischaracterizing the utilization of the remaining funds, as explained in detail below.

55. Accountant Wilcox said he first met SEDA in December of 1999 and from his first meeting with SEDA, SEDA told him that he thought the AHIF, Inc. and/or himself would be scrutinized by the U.S. government. Accountant Wilcox said SEDA believed his phones had been tapped for over ten years because the U.S. government thinks all Muslims are Bin Laden followers, but SEDA said this is far from the truth. Therefore, SEDA told Accountant Wilcox that the books had to be right and clean, because if they are not, AHIF, Inc. will be audited.

56. Accountant Wilcox said the original records and backup documentation for AHIF, Inc. are maintained at the organization's facility at 3800 S. Highway 99 in Ashland. Accountant Wilcox estimated that he has been to AHIF, Inc.'s Ashland facility about four times and the last time he was there was on January 13, 2003, prior to SEDA's departure from the U.S. Accountant Wilcox recalled the Ashland facility contained a downstairs office with two computers, filing cabinets, and banker boxes full of records. Accountant Wilcox told me that AHIF, Inc. used a software accounting program called Quickbooks for the organization's financial transactions and this program was contained in a computer located against the far wall in the downstairs office at 3800 S. Highway 99 in Ashland. Accountant Wilcox said he trained two women named "Laleh" and "Sumer" at

Affidavit in Support of Search Warrant - Page 22

3800 S. Highway 99 in Ashland on how to use the Quickbooks software program.

57. Accountant Wilcox said these two women categorized and input the income and expense items into the AHIF Inc.'s Quickbooks program, while SEDA oversaw them, and they called Wilcox if they had any questions. Accountant Wilcox stated that SEDA told him several times to make sure these women knew the program and to ensure the records were clean. I have attempted to interview Laleh and Sumer by asking them on June 23, 2003 to telephone me to arrange an appointment. Neither of the two women ever contacted me, and I have reason to believe they no longer reside or work at 3800 S. Highway 99, Ashland, Oregon. I have been unable to contact them since June 2003.

58. Accountant Wilcox said he prepared AHIF, Inc.'s returns using information provided by SEDA, which included AHIF, Inc.'s bank statements, bank reconciliation statements, and summaries from their Quickbooks accounting program. Accountant Wilcox said that with a Quickbook's disk, it is possible for him to get a full detailed income and expense printout for each year. However, he said the transaction details for 1999 and 2000 are no longer available for review because SEDA told him that AHIF, Inc.'s computer crashed in October of 2001.

59. In an interview with Accountant Wilcox, I showed him several documents pertaining to the apparent disposition of the $150,000 AHIF, Inc. received from El-Fiki in February of 2000, as described in this affidavit. These records included bank documents pertaining to the purchase of the $130,000 in traveler's checks by ALBUTHE, bank documents pertaining to the purchase of the $21,000 cashier's check by SEDA, copies of the two agreements provided by AHIF, Inc. between ALBUTHE and SEDA stating monies were being turned over to ALBUTHE for the Brothers and Sisters in Chechnya, and a copy

Affidavit in Support of Search Warrant - Page 23

of the check provided by AHIF, Inc. with the notation, "Donations for Chichania Refugees". After reviewing this documentation, Accountant Wilcox said SEDA did not provide him any records indicating these funds were being sent to Chechnya. He said if he had known about the disposition of the funds in Chechnya, he would have prepared the 2000 Form 990 differently.

60. Accountant Wilcox stated the information he received from SEDA pertaining to the disposition by AHIF, Inc. of the $131,300 showed the funds were used to purchase the Springfield, Missouri prayer house, described earlier in this affidavit. I have reviewed AHIF, Inc.'s Quickbooks Springfield, Missouri building schedule, which was provided to Accountant Wilcox for preparation of the organization's 2000 Form 990. The schedule shows SEDA, or one of his associates, improperly listed the $131,300 disbursement to ALBUTHE as funds used to purchase the Springfield prayer house, showing a total purchase price of $461,541.74.

61. I have obtained the closing records from the purchase of the Springfield, Missouri prayer house and I reviewed those records with Accountant Wilcox. The closing documents show that AHIF, Inc. purchased the property for $378,291.74, not for the $461,541.74 SEDA reported to AHIF, Inc.'s accountant. Thus, SEDA or his associates appear to have deceived AHIF, Inc.'s accountant by providing the accountant with information which overstated the purchase price of the Springfield, Missouri property by over $80,000. In addition, Accountant Wilcox stated that based on conversations he had with SEDA, it was his understanding that the $21,000 issued to ALBUTHE were funds going back to the original contributor. I have reviewed AHIF, Inc. Quickbook's detail schedule for reimbursed expenses provided to Accountant Wilcox for the preparation of

Affidavit in Support of Search Warrant - Page 24

the organization's 2000 Form 990. The detail schedule for reimbursed expenses shows SEDA, or someone assisting him and AHIF, incorrectly listed the $21,000 as a reimbursed expense, rather than as funds being distributed to Chechnya.

62.   After reviewing the aforementioned documents with Accountant Wilcox, he stated the contribution income on AHIF, Inc.'s 2000 Form 990 appears to be understated due to the $21,000 that was disbursed to ALBUTHE and backed out of contribution income. In addition, Accountant Wilcox stated that grants and allocations on AHIF, Inc.'s 2000 Form 990 appears to be understated by over $150,000, due to the disbursement of the funds to ALBUTHE for apparent distribution in Chechnya. Lastly, Accountant Wilcox stated that the cost basis in the Springfield, Missouri prayer house may be overstated due to the fact that the $131,300 disbursed to ALBUTHE for distribution in Chechnya should not have been added to the cost basis of the asset.

63.   In summary, I believe there is probable cause to believe that the 2000 Form 990 filed by SEDA on behalf of AHIF, Inc. is materially false. Based on various documents described above and information provided by AHIF, Inc.'s accountant, I believe that the following line items on AHIF, Inc.'s 2000 Form 990 are materially false:

    a)    Line 1a is false, in that AHIF, Inc.'s contribution income is understated by at least $21,000;

    b)    Line 22 is false, in that grants and allocations are understated by at least $150,000;

    c)    Line 57a is false, in that the organizations basis in land, buildings, and equipment is overstated by the incorrect addition of the $131,300, which appears to have been

Affidavit in Support of Search Warrant - Page 25

disbursed to ALBUTHE for distribution in Chechnya.

64.  Based on the evidence described above, I believe SEDA deliberately attempted to mislead the IRS about the true disposition of the funds received from El-Fiki and given to ALBUTHE. SEDA attempted to disguise the disposition of these funds by causing AHIF, Inc.'s accountant to omit $21,000 from the organization's contribution income, thus allowing the distribution of these funds to ALBUTHE without having to account for the funds on the Form 990. In addition, SEDA mischaracterized the disposition of the $131,300 to ALBUTHE by falsely claiming that the funds were used to purchase the Springfield, Missouri prayer house.

65.  I have consulted with IRS tax exempt experts regarding the false reporting of the disposition of funds by a tax exempt charitable organization, in the manner shown above. A tax exempt expert has informed me that if a tax exempt charitable organization's Form 990 was false in this regard, then AHIF, Inc.'s tax exempt status may be questioned and/or revoked. If AHIF, Inc.'s status was revoked, AHIF, Inc. would be responsible for paying U.S. taxes and would more likely be scrutinized by the IRS, including IRS Criminal Investigation and other law enforcement agencies.

**LIKELIHOOD OF RECORDS BEING FOUND AT LOCATION**

66.  The investigation has established SEDA left the U.S. for Saudi Arabia in February of 2003. SEDA told an FBI special agent that he planned on returning to the U.S. on March 11, 2003 or March 12, 2003. Flight records retrieved and analyzed by agents involved in the investigation show SEDA has not returned to the U.S. Currently, there does not appear to be any business or religious activities at 3800 S. Highway 99. The front gate has often been padlocked since SEDA's departure. I know that Pete

Affidavit in Support of Search Warrant - Page 26

SEDA's son, Jonah Seda, left the United States in December 2003, but has recently returned and appears to be residing at 3800 S. Highway 99, Ashland, Oregon. Property records reflect that AHIF, Inc. still owns the property. Information received from Pacific Power indicates that the utilities at 3800 S. Highway 99, Ashland, Oregon are still in the name of Al-Haramain and that the last payment was received on January 21, 2004.

67. Although SEDA presently remains abroad, I have reviewed evidence that shows AHIF, Inc. is still operating in Oregon. First, according to a representative of The Mail Stop, a private mail service in Ashland, Oregon, AHIF, Inc. is still actively using its private mail box and the organization's mail is being retrieved regularly by, among others, Jonah Seda. This representative also stated that Pete SEDA, by way of e-mail, renewed AHIF's private mail box at the Mail Stop for another six months on Februuary 6, 2004. Secondly, AHIF, Inc.'s bank records show that, even though SEDA left the U.S. in February of 2003, the organization is still conducting limited, but continuous bank activity. Bank records show deposits and disbursements from AHIF, Inc.'s main account in Ashland, Oregon continued until June 2003, which indicates AHIF, Inc. was active after SEDA left the U.S. Third, according to Unicom, an internet service provider, Unicom provided internet service to 3800 S. Highway 99, Ashland, Oregon until February 10, 2004, at which time service was canceled. Fourth, according to a representative of Qwest, as of February 10, 2004, there were four active telephone numbers associated with Pete SEDA at 3800 S. Highway 99, Ashland, Oregon.

68. An attorney representing AHIF, Inc. in Oregon has provided me with a great deal of records in response to a Grand Jury subpoena issued to the organization, and has invited the IRS to review additional records. However, I believe there may be additional

Affidavit in Support of Search Warrant - Page 27

items at 3800 S. Highway 99, Ashland, Oregon which neither SEDA nor anyone else at AHIF, Inc. in Ashland, Oregon have disclosed to investigators or to AHIF, Inc.'s attorney.

69. Specifically, AHIF, Inc.'s accountant could not provide investigators with transaction details from the organization's Quickbooks program for the 1999 and 2000 tax years. The accountant stated that he did not have these transaction details because SEDA told him they were no longer available for review because AHIF, Inc.'s computer crashed in October of 2001. If SEDA has attempted to disguise financial transactions in a manner described in this affidavit, then I believe there may not have been a computer crash and there may still be computer and paper records relevant to this investigation at the location. In addition, based on the e-mails described earlier in this affidavit, there appears to be e-mails referred to involving Mahmoud El-Fiki, Pete SEDA and Soliman ALBUTHE which I have not been provided.

70. FBI Special Agent Dave Carroll advised me that during the course of an interview of Pete SEDA on September 15, 2001, he was provided a tour of the upper floor of 3800 S. Highway 99, Ashland, Oregon. He advised me that during this tour, SEDA brought him to a room located above the garage which contained a computer and numerous pamphlets and boxes, as well as a back storage area containing religious reading materials.

71. Therefore, I believe there may still be records relating to the false Form 990 and the CMIR violation still at 3800 S. Highway 99 in Ashland, Oregon. These records may consist of the following financial records and computer data.

**FINANCIAL RECORDS:**

72. From my experience and from consulting with other experienced IRS-CI

Affidavit in Support of Search Warrant - Page 28

special agents, I know that individuals normally maintain records of their financial activity, such as receipts for expenditures made with cash and checks, bank records, and other financial documents, in their personal residences and in their businesses. Persons engaged in tax and/or money laundering violations frequently retain records of their transactions for long periods of time within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

73. As a criminal investigator with the IRS, I know that to adequately investigate the accuracy of a tax return, especially a business tax return, it is necessary to examine most of the business' records for that year, including all financial documentation concerning income, expenses, asset purchases, communications with tax preparers and other officers.

74. Persons engaged in tax and/or money laundering violations often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but

Affidavit in Support of Search Warrant - Page 29

have significance and relevance when considered in light of other evidence.

75. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer expert.

**COMPUTER DATA:**

76. Based upon information related to me by IRS-CI Special Agent Richard Smith, and others involved in the forensic examination of computers, I know computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

77. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

78. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted, or password-protected data. Computer

Affidavit in Support of Search Warrant - Page 30

hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

79. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10'x12'x10' room to the ceiling.

80. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.

81. In addition, computer users can conceal data within another seemingly

Affidavit in Support of Search Warrant - Page 31

unrelated innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

## CONCLUSION

Based on the foregoing, I have probable cause to believe that Soliman ALBUTHE, with the assistance of Pete SEDA has evaded reporting requirements, in violation of Title 31 U.S.C. §5324 and that Pete SEDA has committed the crime of subscribing to a false return in violation of Title 26 U.S.C. §7206(1). I believe ALBUTHE and SEDA committed these crimes while attempting to disguise the true disposition of funds, that if reported correctly, would have caused the IRS and law enforcement to scrutinize their activities and may have jeopardized the organizations tax exempt status.

Therefore, I request that the court authorize a warrant to search 3800 S. Highway 99 in Ashland, Oregon, detailed in Attachment A, for the evidence listed in Attachment B and to seize the same. I request authority to seize all records set forth in Attachment B and to physically seize all computers and related equipment for analysis.

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

Affidavit in Support of Search Warrant - Page 32