# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*  Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)

**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE
MOTION TO DISMISS FILED BY PRINCE ABDULLAH AL FAISAL BIN
ABDULAZIZ AL SAUD, MOHAMMED BIN ABDULRAHMAN AL ARIEFY, AND
ALFAISALIAH GROUP (A/K/A FAISAL GROUP HOLDING CO.)**

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Telephone:     (215) 665-2000
Facsimile:     (215) 665-2013

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................1

II.   ALLEGATIONS AGAINST PRINCE ABDULLAH AL FAISAL BIN
      ABDULAZIZ AL SAUD, MOHAMMED BIN ABDULRAHMAN AL
      ARIEFY, AND ALFAISALIAH GROUP (A/K/A FAISAL GROUP
      HOLDING CO.) ..................................................................................................3

      A.   Allegations Against Prince Abdullah Al Faisal Bin Abdulaziz Al Saud......................4

      B.   Allegations Against Mohammed Bin Abdulrahman Al Ariefy .................................5

      C.   Allegations Against Alfaisaliah Group (a/k/a Faisal Group Holding Co.)...................5

III.  APPLICABLE LAW .............................................................................................5

      A.   Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's Prima Facie
           Showing of Personal Jurisdiction May be Established Solely by Legally
           Sufficient Allegations of Jurisdiction ...............................................................6

      B.   Under Rule 12(b)(6), The Federal Plaintiffs' Complaint Need Only Give
           the  Defendant Fair Notice of Their Claims and the Grounds Upon Which
           They  Rest .................................................................................................7

IV.   ARGUMENT ........................................................................................................8

      A.   The Federal Plaintiffs Have Fulfilled Their Obligations Under the Federal
           Notice Pleading Requirements........................................................................8

      B.   This Court Has Personal Jurisdiction Over the AFG Defendants Under
           New York's Long Arm Statute ......................................................................9

      C.   This Court's Exercise of Jurisdiction Over the AFG Defendants Does Not
           Violate Due Process...................................................................................11

           1.   This Court Can Constitutionally Exercise Specific Jurisdiction............................11

           2.   The AFG Defendants are Also Constitutionally Subject to Jurisdiction
                Pursuant to the Modified Due Process Standard For Mass Torts ........................13

      D.   The Federal Plaintiffs Have Adequately Pled Causation............................................13

      E.   The Complaint States a Claim Against The AFG Defendants Under RICO...............17

F.     The Complaint States a Claim Against The AFG Defendants Under the
       Torture Victim Protection Act ................................................................................20

G.     The Federal Plaintiffs Have Adequately Alleged State Common Law
       Claims ........................................................................................................................21

V.   CONCLUSION ..................................................................................................................24

# TABLE OF AUTHORITIES

Page

## CASES

Alexander v. Fritzen,
        503 N.E.2d 102 (N.Y. 1986) ...................................................................10

Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters,
        459 U.S. 519 (1983) ...............................................................................19

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
        902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990) .................6

Bastein v. Sotto,
        749 N.Y.S.2d 538 (N.Y. App. Div. 2002) ......................................22

Boim v. Quranic Literacy Institute,
        291 F.3d 1000 (7th Cir. 2002) .........................................................15

Calder v. Jones,
        465 U.S. 781 (1984) ...........................................................................11

Chance v. Armstrong,
        143 F.3d 698 (2d Cir. 1998) .............................................................7

Chrysler Capital Corp. v. Century Power Corp.,
        778 F. Supp. 1260 (S.D.N.Y. 1991) ...............................................10

Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,
        187 F.3d 229 (2d Cir. 1999) .............................................................10

Conley v. Gibson,
        355 U.S. 41 (1957) .........................................................................7, 8

Continental Ore Co. v. Union Carbide & Carbon Corp.,
        370 U.S. 690 (1962) ...........................................................................14

Davis v. Barrett Day Securities, Inc.,
        1995 U.S. Dist. LEXIS 15434 (M.D.N.C. 1995) ............................11

DiStefano v. Carozzi North America, Inc.,
        286 F.3d 81 (2d Cir. 2001) ................................................................7

Durante Brothers & Sons, Inc. v. Flushing National Bank,
        755 F.2d 239 (2d Cir. 1985) .............................................................10

Flatow v. Islamic Republic of Iran,
    999 F. Supp. 1 (D.D.C. 1998).........................................................................14, 23

Geisler v. Petrocelli,
    616 F.2d 636 (2d Cir. 1980)....................................................................................7

Goff v. Clark,
    755 N.Y.S.2d 493 (N.Y.App. Div. 2003) .........................................................22

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) ..........................................................................14, 22

Holmes v. Security Investor Prot. Corp.,
    503 U.S. 258 (1992)...........................................................................................18, 19

In re DES Cases,
79 F. Supp. 552 (E.D.N.Y. 1992) ...........................................................................13

In re Initial Public Offering Sec. Litigation,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................................8

Kilburn v. Socialist People's Libyan Arab Jamahiriya,
    376 F.3d 1123 (D.C. Cir. 2004) .........................................................................15, 17

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998).....................................................................10

Leatherman v. Tarrant County,
    507 U.S. 163 (1993)................................................................................................8

Lerner v. Fleet Bank, N.A.,
    318 F.3d 113 (2d Cir. 2003)...............................................................................18, 19

Lumbard v. Maglia, Inc.,
    621 F. Supp. 1529 (S.D. N.Y. 1985).....................................................................14

In re Magnetic Audiotape  Antitrust Litigation,
    334 F.3d 204 (2d Cir. 2003)...........................................................................6, 7, 11

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996)......................................................................................9

National Asbestos Workers Medical Fund v. Philip Morris, Inc.,
    74 F. Supp. 2d 221 (E.D.N.Y. 1999) ...............................................................18, 19

Pittman v. Grayson,
       149 F.3d 111 (2d Cir. 1998)............................................................................10

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
       244 F. Supp. 2d 289 (S.D. N.Y. 2003)..............................................................20

Pugh v. Socialist People's Libyan Arab Jamahiriya,
       290 F. Supp. 2d 55 (D.D.C. 2003) ...................................................................12

Rein v. Socialist People's Libyan Arab Jamahiriya,
       995 F. Supp. 325 (E.D.N.Y. 1998) , *aff'd in part*, 162 F.3d 748 (2d Cir. 1998),
       *cert. denied*, 527 U.S. 1003 (1999) .........................................................11, 12

Salinas v. United States,
       522 U.S. 52 (1997)...........................................................................................19

Simmons v. Abruzzo,
       49 F.3d 83 (2d Cir. 1995) ..................................................................................7

Simon v. Philip Morris, Inc.,
       86 F. Supp. 2d 95 (E.D.N.Y. 2000) ............................................................10, 13

Swierkiewicz v. Sorema N.A.,
       534 U.S. 506 (2002)........................................................................................7, 8

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.,
       241 F.3d 135 (2d Cir. 2001)..............................................................................11

United States v. Louie,
       625 F. Supp. 1327 (S.D. N.Y. 1985)..................................................................18

United States v. Turkette,
       452 U.S. 576 (1981).........................................................................................17

Von Bulow v. Von Bulow,
       634 F. Supp. 1284 (S.D.N.Y. 1986)...................................................................19

Woodford v. Comm. Action Agency,
       239 F.3d 517 (2d Cir. 2001)...............................................................................7

Wynder v. McMahon,
       360 F.3d 73 (2d Cir. 2004)...............................................................................7, 8

# RULES AND STATUTES

18 U.S.C. § 1962(a) ...................................................................................................17

18 U.S.C. § 1962(c) ...................................................................................................18

18 U.S.C. § 1962(d) ...................................................................................................19

28 U.S.C. § 1350 ........................................................................................................20

Fed. R. Civ. P. 8(a) ..............................................................................................7, 8, 9

Fed. R. Civ. P. 12(b)(2) ...............................................................................................6

Fed. R. Civ. P. 12(b)(6) ...............................................................................................7

N.Y.C.P.L.R. §302(a)(2) ............................................................................................10

N.Y. Est. Powers & Trusts Law § 11-3.2 ...................................................................23

Restatement (Second) of Torts § 302 .........................................................................22

I.      **INTRODUCTION**

Plaintiffs have sued Defendants Prince Abdullah Al Faisal Bin Abdulaziz Al Saud,

Mohammed Bin Abdulrahman Al Ariefy, and Alfaisaliah Group (a/k/a Faisal Group Holding

Co.) [hereinafter referred to collectively as "the AFG Defendants"], based on their participation

in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al

Qaida, of which the September 11th Attack was a natural, intended and foreseeable product.

The AFG Defendants have moved to dismiss the Federal Plaintiffs' claims before any discovery,

contending that they lack the necessary minimum contacts with the United States to trigger

personal jurisdiction, and that the Federal Plaintiffs failed to adequately plead that they

purposefully directed any tortious activity here or conspired with anyone to do so.  The

paragraphs in the First Amended Complaint ("FAC" or "Complaint"), specifically addressing the

AFG Defendants, which this Court must accept as true, establish the legal nexus of the

AFG Defendants' contacts to the United States for this Court properly to exercise its jurisdiction.

For the reasons set forth below, the AFG Defendants' motion should be denied in all respects.

Ongoing investigations around the World are slowly revealing the unprecedented scope

and sophistication of the global conspiracy which led to the September 11th Attack.  According

to published reports, al Qaida maintained and operated at least twelve training camps in

Afghanistan before the United States' military action forced the organization to disperse.  As

many as 20,000 dedicated *jihadists*, including all nineteen of the September 11 hijackers,

received indoctrination and training at those camps between 1996 and September 11, 2001.  By

September 11, al Qaida drew from the resources of a vast network of terrorist cells in more than

100 countries.  That network's strength was reinforced by al Qaida's strategic alliances with

other like minded terrorist organizations.  To this day, the depth and breadth of the

organization's infrastructure enable it to mount attacks throughout the World, even though

international efforts have resulted in the capture of more than 3,000 al Qaida members in over 100 countries since September 11.

Post 9/11 investigations have confirmed that al Qaida relied heavily on its global infrastructure to plan, support and coordinate the September 11th Attack, and that it would have been impossible for al Qaida to carry out an attack on that scale within the United States without that infrastructure.  According to the *Report of the Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, plans for the Attack were carefully vetted through al Qaida's most senior leadership over a period of six (6) years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaida's financial supporters.  The individual participants in the Attack were chosen from an enormous pool of potential candidates, who were recruited, trained and indoctrinated using funds provided by the organization's supporters.  Each of the hijackers received training at one or more of al Qaida's well funded training camps in Afghanistan.  Until the last minute, details of the plot were revised through a global communication network, the existence of which also was made possible by the financial sponsorship of al Qaida's supporters.  In these ways, and others too numerous and complex to detail herein, the success of the September 11th Attack depended critically on the sophistication and extensiveness of the organization's global resources.

By all accounts, the infrastructure that made the September 11th Attack possible was built over a period of many years, using the financial and logistical support of a vast network of charities, banks and wealthy donors.[1]  As the United Nations Security Counsel Committee Concerning al Qaida and the Taliban succinctly explained:

> From its inception, al Qaida has relied heavily on charities and donations from its sympathizers to finance its activities.  Charities provide al Qaida with the very useful international channel for

---

[1]    The estimated costs of building and sustaining that infrastructure are staggering.  David Aufhasuer, the former General Counsel of the Treasury Department, estimated that al Qaida needed $35 million to support its infrastructure on an annual basis prior to September 11.

soliciting, collecting, transferring and distributing the funds it
needs for indoctrination, recruitment, training, and logistical and
operational support.  These funds are often merged with and
hidden among funds used for other legitimate humanitarian or
social programmes.  Al Qaida supporters and financiers have also
established front charity networks whose main purpose is to raise
and deliver funds to al Qaida.

*Second Report of the Monitoring Group Established Pursuant to Resolution 1363 (2001), on*

*Sanctions Against Al Qaida, the Taliban and Individuals and Entities Associated With Them*

*(December 2, 2003)* at ¶ 34.

Government officials and experts also agree that charities established and funded by the

Kingdom of Saudi Arabia, and wealthy Saudi supporters, played a singularly important role in al

Qaida's development and pursuit of its perverse ambitions.  Indeed, David Aufhauser has

described Saudi Arabia as the "epicenter" of al Qaida's financing.  Almost three years after the

September 11th Attack, Saudi Arabia is finally bowing to international pressure and itself

acknowledging the pervasiveness of its charities' involvement in the sponsorship of al Qaida.  In

fact, on June 2, 2004, Saudi Arabia announced that it intended to dissolve **all** of its international

charities as a "counter-terrorism" measure.

## II. ALLEGATIONS AGAINST PRINCE ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD, MOHAMMED BIN ABDULRAHMAN AL ARIEFY, AND ALFAISALIAH GROUP (A/K/A FAISAL GROUP HOLDING CO.)

The FAC alleges that the AFG Defendants were among the sponsors of terrorism whose

participation in al Qaida's global conspiracy led to the Attack and its devastating consequences.

FAC ¶¶ 465-471.  Specifically, as the following discussions will demonstrate, the FAC alleges

that the AFG Defendants aided and abetted, conspired with, and provided material support and

resources to al Qaida and affiliated foreign terrorist organizations, associations, organizations

and persons.

A.    **Allegations Against Prince Abdullah Al Faisal Bin Abdulaziz Al Saud**

For a period of many years, Prince Abdullah al Faisal Bin Abdulaziz Al Saud[2] ("Prince Abdullah") has provided critical financial and logistical support to al Qaida.  Particularly, Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaida's global operations, including International Islamic Relief Organization, Muslim World League, World Assembly of Muslim Youth, Benevolence International Foundation, the Saudi High Commission, the Saudi Joint Relief Committee, and al Haramain Islamic Foundation, among others.  In doing so, Prince Abdullah knew and intended that contributions to these charities and to Sanabel al-Kheer would be used to fund al Qaida's global operations and acts of international terrorism.

Prince Abdullah's significant business interests have also provided material and financial support to al Qaida for some time.  For example, Prince Abdullah maintains a controlling stake in al Faisal Group Holding Co., and its predecessor-in-interest, al Faisaliah Group.[3] Investigations conducted by the Federal Bureau of Investigation ("FBI") have produced evidence that suggests a direct link between Prince Abdullah's business interests and the September 11th hijacker, Hani Saleh Hanjour.  According to FBI records, Hanjour maintained a registered address in Taif, Saudi Arabia, under the name of al Faisaliah.  This same address, the FBI contends, corresponds with the branch office of al Faisaliah Group in Taif.

Furthermore, there is substantial evidence that Prince Abdullah provided support to al Qaida as a result of a close business partnership with Muhammed Galeb Klaje Zouaydi. Zouaydi, who served as Prince Abdullah's accountant for many years, founded a network of

---

[2]       On page 2 of the Memorandum of Law submitted by the AFG Defendants in Support of Their Motion to Dismiss the First Amended Complaint [hereinafter referred to as "Defendants' Brief"], Prince Abdullah notes that the Federal Plaintiffs incorrectly refer to him as Crown Prince Abdullah Bin Abdulaziz Al Saud, "the de-facto head of the Kingdom of Saudi Arabia." The Federal Plaintiffs recognize that the moving defendant is not the Crown Prince, and consequently withdraw those allegations. Certainly, had counsel for Prince Abdullah contacted the Federal Plaintiffs prior to filing their motion to dismiss, this error could have been clarified by stipulation among the parties.

[3]       Prince Abdullah is a 97.5% owner of the Alfaisaliah Group.  See Defendants' Brief, p. 2..

companies which served as a vehicle for economically supporting the al Qaida Spanish cell and
its activities in Europe.  One of those companies included Mushayt for Trading Establishment, a
Saudi-based company which Prince Abdullah entered into a number of transactions with during
the time it was laundering money for the Spanish al Qaida cell.  Zouaydi was arrested and
convicted in Spain for financing al Qaida's operations in Europe.

### B.    Allegations Against Mohammed Bin Abdulrahman Al Ariefy

Mohammed Bin Abdulrahman Al Ariefy ("Al Ariefy") is a Saudi businessman with
similar ties to al Qaida.  Al Ariefy is a minority owner, and president, of al Faisal Group Holding
Co., and its predecessor-in-interest, al Faisaliah Group.[4]  As stated above, investigations
conducted by the Federal Bureau of Investigation ("FBI") have produced evidence that suggests
a direct link between Al Ariefy's business interests in al Faisaliah Group and the September 11th
hijacker, Hani Saleh Hanjour.

### C.    Allegations Against Alfaisaliah Group (a/k/a Faisal Group Holding Co.)

Al Faisal Group Holding Co., and its predecessor-in-interest, al Faisaliah Group, is a
large Saudi commercial enterprise with more then 3,000 employees and headquartered in
Riyadh, with branches throughout Saudi Arabia.[5]  Al Faisal Group is owned by both Prince
Abdullah and Al Ariefy and has been linked by the FBI to the September 11th hijacker Hani
Saleh Hanjour, as discussed above.

## III.   APPLICABLE LAW

The AFG Defendants make two broad arguments in favor of dismissal of the claims
asserted against them in the FAC:  (1) that this Court lacks personal jurisdiction over all of the
AFG Defendants; and (2) that the Federal Plaintiffs have failed to state any claim entitling them
to relief against any of the AFG Defendants.  For the reasons set forth below, the Federal

---

[4]    Al Ariefy is a 2.5% owner of the Alfaisaliah Group.  See Defendants' Brief, p.2.

[5]    See Defendants' Brief, p. 2.

Plaintiffs respectfully request that the joint Motion to Dismiss filed by the AFG Defendants be

denied in all respects, with prejudice.

**A.      Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's *Prima Facie* Showing of Personal Jurisdiction May be Established Solely by Legally Sufficient Allegations of Jurisdiction**

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal

jurisdiction varies depending upon the procedural posture of the litigation.

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.  After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted].  At that point, the *prima facie* showing must be factually supported.

Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S.

854 (1990).  The Second Circuit has observed that a plaintiff's averment of jurisdictional facts

will normally be met in one of three ways when in dispute:  (1) by a Rule 12(b)(2) motion, which

assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges

their sufficiency; (2) by a Rule 56 motion, which asserts that there are undisputed facts

demonstrating the absence of jurisdiction; or (3) by request for an adjudication of disputed

jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the

merits.  Id. at 197.  Where, as here, "the defendant is content to challenge only the sufficiency of

the plaintiff's factual allegations, in effect demurring by filing a Rule 12(b)(2) motion, the

plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing

of jurisdiction."  Id.  In order to meet its prima facie showing, the Federal Plaintiffs need only

allege facts that connect the defendant with the applicable forum, here, the United States.  The

plaintiff's averments of jurisdictional facts must be taken as true.  Id.; In re  Magnetic Audiotape

6

<u>Antitrust Litigation</u>, 334 F.3d 204, 206 (2d Cir. 2003).  The Court also construes the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor.  <u>DiStefano v. Carozzi North America, Inc.</u>, 286 F.3d 81 (2d Cir. 2001).

> **B.      Under Rule 12(b)(6), The Federal Plaintiffs' Complaint Need Only Give the Defendant Fair Notice of Their Claims and the Grounds Upon Which They Rest**

The AFG Defendants alternatively move to dismiss the Federal Plaintiffs' claims pursuant to Rule 12(b)(6) if the Court concludes that it has personal jurisdiction.  Such a motion must be denied unless " it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Wynder v. McMahon</u>, 360 F.3d 73, 78 n. 8. (2d Cir. 2004); <u>Simmons v. Abruzzo</u>, 49 F.3d 83, 87 (2d Cir. 1995).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  <u>Geisler v. Petrocelli</u>, 616 F.2d 636, 639 (2d Cir. 1980).  The Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of plaintiffs. <u>Wynder</u>, 360 F.3d at 77.  Plaintiffs are not required to prove their case at the pleading stage; indeed, the pleading of evidence should be avoided.  <u>Woodford v. Comm. Action Agency</u>, 239 F.3d 517 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion is "not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  <u>Chance v. Armstrong</u>, 143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  Under <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 512-13 (2002), Rule 8 pleadings are extremely permissive.  A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief," and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests." 534 U.S. at 512 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41 (1957));

<u>Wynder</u>, 360 F.3d at 77.

## IV.   <u>ARGUMENT</u>

### A.   **The Federal Plaintiffs Have Fulfilled Their Obligations Under the Federal Notice Pleading Requirements**

Rule 8 of the Federal Rules of Civil Procedure provides in relevant part:

> **Claims for relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks . . .

Fed. R. Civ. P. 8(a).  Rule 8 provides the "notice pleading" requirement for federal

courts.  The Rule imposes a lenient obligation on the pleader, requiring only that the pleader

provide its opponent with fair notice of its claim and the grounds upon which that claim rests.

<u>See</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512 (2002).  In the absence of averments of

fraud or mistake, which must be pled with particularity pursuant to Rule 9(b), a federal court is

prohibited from imposing more demanding requirements than those prescribed by Rule 8(a).

<u>See</u>, <u>e.g.</u>, <u>Leatherman v. Tarrant County</u>, 507 U.S. 163, 168-69 (1993).  "Such simplified 'notice

pleading' is made possible by the liberal opportunity for discovery and the other pretrial

procedures established by the Rules to disclose more precisely the basis of both claim and

defense and to define more narrowly the disputed facts and issues." <u>In re Initial Pub. Offering</u>

<u>Sec. Litig.</u>, 241 F. Supp. 2d 281, 322 (S.D.N.Y. 2003) (<em>quoting</em> <u>Conley v. Gibson</u>, 355 U.S.

41,48 (1957)).  Consequently, "[a]s the Supreme Court recognized in <u>Swierkiewicz</u>, one clearly

written sentence can satisfy Rule 8(a)(2)." <u>Id.</u> at 323.

The AFG Defendants' Motion is rife with accusations that the Federal Plaintiffs have not pled sufficient facts to establish either personal jurisdiction or valid claims against them. However, the AFG Defendants are mistaken and misunderstand the meaning and intent behind Rule 8(a). The Federal Plaintiffs have provided the AFG Defendants with the requisite notice in alleging that they knowingly aided, abetted and conspired to fund the activities of terrorists, including al Qaida, and that a terrorist attack on American soil was a direct, intended and foreseeable product of a larger conspiracy to commit acts of international terrorism against the United States, its nationals and allies. (FAC ¶¶ 66, 73.).

To expect or require the Federal Plaintiffs to set forth every wrongful act of the AFG Defendants is as unreasonable as it is unnecessary at this stage in the proceedings. It simply is not required in notice pleading. See Fed. R. Civ. P. 8, 12. Having stated a claim against the AFG Defendants, the Federal Plaintiffs are entitled to conduct discovery before they should be called upon to present their evidence. Indeed, as to the AFG Defendants' jurisdictional challenge, only a *prima facie* showing of jurisdiction is required at the pleading stage. See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 576 (2d Cir. 1996). A plaintiff is entitled to jurisdictional discovery and an evidentiary hearing before having to demonstrate jurisdiction by a preponderance of the evidence. Id. Under the Federal Rules and relevant case law, it is inappropriate and untimely for the AFG Defendants to challenge the substance of the Federal Plaintiffs' good faith allegations which have effectively put them on notice of the claims and jurisdictional bases against them. For this reason, the AFG Defendants' Motion to Dismiss should be denied in its entirety.

### B.   This Court Has Personal Jurisdiction Over the AFG Defendants Under New York's Long Arm Statute

This Court has jurisdiction over the Federal Plaintiffs' claims pursuant to New York's long arm statute. That statute provides, in part, that "the court may exercise personal jurisdiction

over any non-domiciliary…who in person or through an agent commits a tortious act within the state." N.Y.C.P.L.R. §302(a)(2). "It is well settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. §302(a)(2)." Simon v. Philip Morris, Inc., 86 F. Supp.2d 95, 99 (E.D.N.Y. 2000) (citation omitted); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991). "Both state and federal courts have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp.2d 593, 601 (S.D.N.Y. 1998).

New York law does not recognize the substantive tort of civil conspiracy. Durante Bros. & Sons, Inc. v. Flushing Nat. Bank, 755 F.2d 239, 251 (2d Cir. 1985). Rather, allegations of a conspiracy connect the actions of separate defendants with an otherwise actionable tort. Alexander v. Fritzen, 503 N.E.2d 102, 103 (N.Y. 1986). Both conspiracy and aiding and abetting create concerted-action liability in New York. Pittman v. Grayson, 149 F.3d 111, 122 (2d Cir. 1998). Conspiracy requires an agreement to commit a tortious act while aiding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer. Id. at 122-23. For the reasons set forth above, the conduct of the AFG Defendants constitutes both forms of concerted-action liability under New York law as set forth in the allegations of the Complaint and, as such, connects it with the subject transaction, charges the AFG Defendants with the acts and declarations of its co-conspirators, and exposes it to joint and several liability. Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 240 (2d Cir. 1999). This Court therefore has personal jurisdiction over the AFG Defendants pursuant to New York's long arm statute and the well-recognized conspiracy jurisdiction theory under New York law.

**C.    This Court's Exercise of Jurisdiction Over the AFG Defendants Does Not Violate Due Process**

**1.    This Court Can Constitutionally Exercise Specific Jurisdiction**

The Supreme Court repeatedly has held that the due process clause of the Fourteenth Amendment permits personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  Calder v. Jones, 465 U.S. 781, 788 (1984).  Where, as here, the claim arises out of, or relates to, a defendant's contact with the forum, i.e., the attack in New York, the plaintiff need only prove specific jurisdiction.  U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd., 241 F.3d 135, 152 (2d Cir. 2001) (citation omitted).

When considering specific jurisdiction, the court properly focuses on the relationship among the defendant, the forum and the litigation in judging minimum contacts.  Calder, 465 U.S. at 788.  In an action involving the harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence."  The Federal Plaintiffs have alleged that the AFG Defendants were engaged in a conspiracy to attack and wage war against the United States, its nationals, interests, and allies.  FAC ¶ 73.[6]  The actions of the conspirators were expressly aimed at the United States such that, under the circumstances, they must reasonably anticipate being haled into court here.

Two recent cases involving the hijacking of airplanes outside the United States, but with some United States citizens as passengers, provide support for exercising personal jurisdiction here.  Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D.N.Y. 1998), aff'd in part, 162 F.3d 748 (2d Cir. 1998), cert. denied, 527 U.S. 1003 (1999), involved the in-flight bombing and destruction of Pan Am Flight 103 with the loss of 189 United States

---

[6]    The Federal Plaintiffs' allegations of conspiracy are, in and of themselves, sufficient to satisfy due process at this stage of the litigation.  In Re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003); see also Davis v. Barrett Day Securities, Inc., 1995 U.S. Dist. LEXIS 15434, *11-12 (M.D.N.C. 1995).

citizens over Lockerbie, Scotland.  Judge Platt, in the Eastern District of New York, reasoned

that the destruction of the airplane, 189 deaths, and significant security concerns for the country

and its aviation industry arguably "has had extensive impacts" on the United States.  Id. at 330.

> Any foreign state would know that the United States has
> substantial interest in protecting its flag carriers and its
> nationals from terrorist activities and should reasonably expect that if these
> interests were harmed, it would be subject to a variety of potential
> responses, including civil actions in United States courts.

Id.  The September 11th Attack indisputably had impacts in and on the United States like few

events in its history.

In Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F. Supp.2d 55 (D.D.C. 2003),

Libya challenged the personal jurisdiction of a federal court in the District of Columbia in a suit

involving the 1989 mid-air explosion of a French airline in Africa that killed seven United States

citizens.  The plaintiffs in Pugh alleged that the defendants "conspired to sabotage and succeeded

in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting

passengers while in flight."  Id. at 59.  The court noted that the United States had a well known,

worldwide interest in preventing and punishing terrorism.  Congress had enacted several criminal

statutes dealing with such cases starting at least five years before the bombing.  These criminal

statutes contemplated jurisdiction in the United States over foreign nationals for activities abroad

regardless of other contacts with the United States.

> It logically follows that if a federal court may constitutionally
> exercise criminal jurisdiction over such individuals, the
> Constitution should be no bar to those same federal courts, in a
> civil action for damages, exercising civil *in personam* jurisdiction
> over those same individuals for the same acts.

Id.  That same logic applies here.

In sum, this Court's exercise of specific personal jurisdiction does not violate the

AFG Defendants' due process rights.

2.      **The AFG Defendants are Also Constitutionally Subject to Jurisdiction Pursuant to the Modified Due Process Standard For Mass Torts**

The AFG Defendants are also subject to personal jurisdiction pursuant to the "modified due process standard for mass torts" adopted on several occasions by courts in the Eastern District of New York in both tobacco and DES cases.  <u>Simon</u>, 86 F. Supp. 2d at 129-37; <u>In re DES Cases</u>, 79 F. Supp. 552, 574-77 (E.D.N.Y. 1992).  "New York's interest in this dispute is intense, and the burden on [defendant] is minimal compared to the difficulty of the plaintiffs' litigating in [Saudi Arabia]."  <u>Simon</u>, 86 F. Supp.2d at 137.

The courts of the United States in general, and New York in particular, have an undeniable and overwhelming appreciable interest in the World Trade Center litigation.  <u>Id.</u> at 131 (citation omitted).  Since New York has an appreciable state interest because this litigation raises serious issues that would affect or have a probable impact on the vindication of policies expressed in the laws of New York, the assertion of jurisdiction is *prima facie* constitutional.  <u>Id.</u> Thus, the assertion of jurisdiction is considered constitutional unless, given the actual circumstances of the case, the defendant is unable to amount a defense in the forum state without suffering a relatively substantial hardship.  <u>Id.</u>  The AFG Defendants can make no such showing here.

D.      <u>The Federal Plaintiffs Have Adequately Pled Causation</u>

The AFG Defendants further challenge the Federal Plaintiffs' causes of action based solely on the argument that the Federal Plaintiffs failed to plead that the AFG Defendants' actions have a proximate causal link to the Attack.  In making this argument, the AFG Defendants fundamentally misapprehend the elements of the Federal Plaintiffs' aiding and abetting and conspiracy theories, and ignore the allegations of the Complaint.  Under New York law, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or

culpability in the overall scheme." <u>Lumbard v. Maglia, Inc.,</u> 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985).

Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement." <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983) (emphasis added). Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor. <u>Id.</u> Pursuant to these standards, the AFG Defendants' participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties them inextricably to the Attack.[7] As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the Federal Plaintiffs have properly and adequately alleged causation. Accordingly, the AFG Defendants' causation-based arguments must be rejected.

In keeping with the foregoing principles, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing financiers and sponsors of the terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot. As the United States District Court for the District of Columbia observed in <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1 (D.D.C. 1998): "[a] plaintiff need not establish that the material support and resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises…[s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient…." <u>Id.</u> at 18. The Seventh Circuit adopted the same standard

---

[7]    The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking as it as a whole." <u>Continental Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690 (1962).

in <u>Boim v. Quranic Literacy Inst.</u>, 291 F.3d 1000 (7th Cir. 2002), holding that plaintiffs who are

victims of terrorism need show only that the defendant knew of the terrorist organization's illegal

activities, desired to help those activities, and engaged in some affirmative act in support thereof.

<u>Id.</u> at 1023.  More recently, the D.C. Circuit explicitly held that application of the "but for"

standard of causation is manifestly improper in cases arising from the provision of material

support to a terrorist organization.  <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 376

F.3d 1123, 1130 (D.C. Cir. 2004).  In support of its decision, the D.C. Circuit insightfully

reasoned as follows:

> [T]he more likely situation is not Libya's hypothetical, involving
> one direct and one general state sponsor, but rather the case in
> which multiple foreign states claim to be providing only "general
> support."  Such a case, in which application of a "but for" standard
> to joint tortfeasors could absolve them all, is precisely the one for
> which courts generally regard "but for" causation as inappropriate.

<u>Id.</u>  Pursuant to these standards, the AFG Defendants' participation in al Qaida's conspiracy to

commit terrorist attacks against the United States, and aiding and abetting of that terrorist

organization, ties them inextricably to the Attack.  As the plaintiffs' injuries are indisputably the

direct result of that Attack, the plaintiffs have properly and adequately alleged causation.

Accordingly, the AFG Defendants' causation-based arguments must be rejected.

While unnecessary to establish liability over the AFG Defendants given the asserted

aiding and abetting and conspiracy theories, it should be noted that the Complaint does

specifically allege that the Attack would not have been possible absent the sponsorship and

support provided by the AFG Defendants and the other defendants. According to the Complaint,

"[a]bsent the material, support and resources provided by the co-defendants, both directly and

indirectly, al Qaida would not have possessed the financial resources, physical assets,

membership base, technological knowledge, communication skills, and global reach required to

conceive, plan and execute the September 11th attack."  FAC ¶ 74.  The AFG Defendants

conveniently ignore these and similar allegations of the Complaint in their Motion to Dismiss. For purposes of the present motion, however, the allegations of the Complaint must be accepted as true.

The Complaint also sufficiently alleges that the Attack was a foreseeable product of the conspiracy in which the AFG Defendants knowingly participated, and of the AFG Defendants' aiding and abetting of al Qaida. Indeed, the Complaint unambiguously asserts that the Attack was a "direct, intended and foreseeable product" of that conspiracy. FAC ¶ 72. While it at this stage it is not necessary for the Federal Plaintiffs to provide evidence of its allegations, it should be noted that al Qaida had unequivocally declared, through statements and actions, that the primary objective of its global conspiracy was to attack the United States and kill its citizens. For example, in 1996 and 1998, al Qaida issued *fatwas*, or religious decrees, authorizing attacks against the United States and its citizens. In the 1998 *fatwa*, issued under the banner "The World Islamic Front For Jihad Against Jews And Crusaders," Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens, civilian or military, "in any country in which it is possible to do it… ."

During the years before the September 11 Attack, al Qaida followed through on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests, including: the first World Trade Center bombing in 1993; the planned attacks against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993; the planned assassination of Pope John Paul II in the Philippines, including the Americans in his entourage; the planned assassination of President Clinton in the Philippines; the planned bombing of eleven to thirteen American airliners over the Pacific in January 1995; the car bombing of the U.S. military mission in Rihadh, Saudi Arabia in 1995; the truck bombing of the U.S. Housing area Khobar Towers in Dhahran, Saudi Arabia in 1996; the simultaneous

bombings of the U.S. Embassies in Kenya and Tanzania in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide attack on the USS Cole in October of 2000.

As the conduct of terrorist acts against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is inconceivable to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as the AFG Defendants are alleged to have done.[8]

### E.    The Complaint States a Claim Against The AFG Defendants Under RICO

According to the AFG Defendants, in the Complaint the Federal Plaintiffs have failed to allege a sustainable violation of Section 1962(a) against them.  See Defendants' Brief at 22.  The Federal Plaintiffs bring their claims against the AFG Defendants pursuant to Sections 1962(c) and 1962(d).  The Enterprise, Radical Muslim Terrorism, is comprised of the defendants named in the Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact with complex goals that consist of far more than the desire to perpetrate the acts of racketeering outlined herein.  Rather, Radical Muslim Terrorism utilizes acts of racketeering, including acts of money laundering and other improprieties conducted by the AFG Defendants, to further its overall common purposes of:  (a) spreading a particularly virulent brand of radical Islam; (b) eliminating Western influences in Islamic countries; and (c) punishing the United States for its perceived support of Israel, all by sponsoring, supporting and funding acts of terror in the United States.  Id.  Thus, the Federal Plaintiffs have sufficiently pled the existence of an enterprise:  "a group of persons associated together for a common purpose of engaging in a course of conduct" or "an ongoing organization, formal or informal."  United States v. Turkette, 452 U.S. 576, 583 n.5 (1981).

---

[8]    Not surprisingly, the AFG Defendants deny and challenge the allegations in the FAC.  Consistent with the precedents of the Second Circuit, the Federal Plaintiffs request the opportunity to conduct discovery if the Court, for some reason, does not assume the truth of all of the allegations in the FAC.

Further, the Federal Plaintiffs also have sufficiently pled the AFG Defendants'

participation in that enterprise.  Pursuant to Sections 1962(c), "a proper RICO allegation does not

require that each member agree with the actions taken by other members of the enterprise but

only that they intended to 'participate in the enterprise.'"  United States v. Louie, 625 F. Supp.

1327, 1333 (S.D. N.Y. 1985).  In the Complaint, the Federal Plaintiffs allege that the AFG

Defendants aided and abetted, conspired with, and provided material support and resources to al

Qaida and/or affiliated FTOs, associations, organizations or persons.  Plaintiffs further allege that

the AFG Defendants have acted as a fully integrated component of al Qaida's logistical and

financial support infrastructure, having provided material support and resources to al Qaida and

affiliated FTOs.

Moreover, the Federal Plaintiffs need not plead or prove that a predicate act furthered the

purpose for which the organization was founded, but only that it was related to the enterprise.

Louie, 625 F. Supp. at 1333.  Thus, the question for the jury is not only the actions taken by the

AFG Defendants (in this case, money laundering and other crimes), but the motivation or intent

underlying the AFG Defendants' criminal activity and the acts' relationship to the enterprise (in

this case, terrorism, which the plaintiffs allege the AFG Defendants intended to support through

money laundering).  Id.

The Federal Plaintiffs also have adequately alleged proximate cause under RICO.  This

requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate

cause of the injury alleged.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003) (citing

Holmes v. Security Investor Prot. Corp., 503 U.S. 258, 268 (1992)).  Because "[t]he legal

concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry,"

dismissal at the pleadings stage of a RICO claim is likely imprudent.  National Asbestos Workers

Medical Fund v. Philip Morris, Inc., 74 F. Supp. 2d 221, 225 (E.D.N.Y. 1999).  This Court's

decision "should be guided by a flexible, case-by-case approach." Id. (citing Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 536-37 (1983) and Holmes, 503 U.S. at 272 n.20.  Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static:  as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures."  Id.  Further, failure to explain the alleged injury in detail is not fatal.  Von Bulow v. Von Bulow, 634 F. Supp. 1284, 1309 (S.D.N.Y. 1986).  Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6).  Id.  The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts."  Id. (citations omitted).

Here, the Federal Plaintiffs allege that they were directly injured in their business and property by the AFG Defendants' participation in Radical Muslim Terrorism, and specifically in furthering al Qaida's goal of committing acts of terrorism against the United States, by providing al Qaida with "the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74.

The Federal Plaintiffs' damages – injuries, the loss of life and property damage that resulted from the AFG Defendants' actions – are not derivative of damage to a third party. Rather, the Federal Plaintiffs' insureds and assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," i.e., terrorism. Lerner, 318 F.3d at 124.  Thus, the Federal Plaintiffs have standing to bring claims under RICO.

A conspiracy of this nature is not a simple linear being, but is instead a complex, multi-dimensional web of relationships and intrigue.  The Supreme Court recently addressed the scope of RICO's conspiracy provision, 18 U.S.C. § 1962(d), in Salinas v. United States, 522 U.S. 52

(1997).  That holding establishes that the RICO statute is flexible enough to embrace the

complexity of the conspiracy alleged here, and the Federal Plaintiffs' allegations are sufficient, at

this stage, to meet their burden.

For all these reasons, therefore, the AFG Defendants' motion to dismiss Count VIII

should be denied.

**F.    The Complaint States a Claim Against The AFG Defendants Under the Torture Victim Protection Act**

Plaintiffs have alleged facts sufficient to state a cause of action under the Torture Victim

Protection Act ("TVPA"), 28 U.S.C. § 1350.  The Complaint describes in detail how the Islamic

charitable system has been utilized to finance and otherwise support illegal al Qaida activities.

FAC ¶¶ 75-252.  Moreover, the allegations specific to the AFG Defendants state clearly that the

AFG Defendants provided critical financial and logistical support to al Qaida for a period of

many years.  FAC ¶¶ 465-471.  Given the Complaint's allegations regarding how the AFG

Defendants financed and supported terrorism, it can, at the very least, be reasonably inferred for

Rule 12(b)(6) purposes that the AFG Defendants were materially involved in aiding and abetting

and/or conspiring with other defendants and with al Qaida in a manner intended to enable and

proximately cause acts of violence and international terrorism, including the Attack.  Such

conduct clearly violates the law of nations or, alternatively, otherwise constitutes actionable

conduct under the TVPA.

Moreover, to sufficiently allege a TVPA cause of action against the AFG Defendants, the

Federal Plaintiffs need not allege that the AFG Defendants were directly involved in the Attack

itself.  Rather, it is sufficient for the Federal Plaintiffs to allege, as they have, that the AFG

Defendants conspired with or aided and abetted other defendants in a violation of the law of

nations.  Indeed, federal courts have recognized that TVPA liability can be based on

conspiratorial relationships or theories of aiding and abetting.  Presbyterian Church of Sudan v.

20

Talisman Energy, Inc., 244 F. Supp. 2d 289, 320 (S.D. N.Y. 2003).  Here, the Complaint alleges a violation of the law of nations, *i.e.*, the Attack.  Such conduct is actionable under the TVPA. The Complaint alleges that the AFG Defendants facilitated, fostered, financed, or otherwise supported terrorists who committed the Attack.  The Complaint further alleges the AFG Defendants acted in collusion with other defendants, thereby entering into an illegal relationship with al Qaida.  Moreover, the Complaint alleges the Attack could not have been carried out in the absence of financing and logistical support to al Qaida through that relationship.  FAC ¶ 74.

Unquestionably, such allegations satisfactorily set forth the Federal Plaintiffs' claim that the AFG Defendants conspired with others to facilitate the terrorist activities of al Qaida, aided and abetted, and that those activities resulted in the attack of September 11th.   Pursuant to Rules 8 and 12, the Federal Plaintiffs have sufficiently alleged their claim - that the AFG Defendants sponsored international terrorism.  The Complaint alleges a vast network of overlapping entities, charities, corporations, banks, state sponsors, and individuals who financed and promoted terrorism and also concealed the involvement of many of the important participants.  Based on the extraordinary circumstances surrounding the events of September 11, 2001 and the complex web of individuals and entities who conspired to commit acts of international terrorism against the United States, it is implausible and unnecessary in notice pleading to require more.  The Complaint when read as a whole sufficiently asserts a claim against the AFG Defendants under the TVPA.

G.    **The Federal Plaintiffs Have Adequately Alleged State Common Law Claims**

The AFG Defendants further challenge the Federal Plaintiffs' claims under New York common law for assault and battery, negligence, negligent infliction of emotional distress,

survival, and punitive damages.[9]  However, these claims have been sufficiently alleged in the

Complaint.

To sustain a claim for assault under New York law, there must be physical contact

placing an individual in imminent apprehension of harmful contact.  Bastein v. Sotto, 749

N.Y.S.2d 538, 539 (N.Y. App. Div. 2002).  A battery, under New York law, consists of an

intentional, offensive, wrongful bodily contact.  Goff v. Clark, 755 N.Y.S.2d. 493, 495

(N.Y.App. Div. 2003).  It is beyond dispute that the Attack involved both physical contact

placing individuals in imminent apprehension of harmful contact and also intentional offensive,

wrongful bodily contact.  As is alleged in the Complaint, the AFG Defendants *knowingly*

provided material support to the terrorists who carried out the Attack.  It is well established that

the knowing provision of material support for tortious acts gives rise to liability for the resulting

harm.  See Halberstam v. Welch, 705 F.2d 472, 483-84 (D.C. Cir. 1983).  Thus, the Federal

Plaintiffs have sufficiently alleged the AFG Defendants' liability under a theory of assault and

battery for the injuries to persons resulting from the Attack.

The AFG Defendants also contend that they cannot be liable under theories of negligence

or negligent infliction of emotional distress because the Federal Plaintiffs do not allege or

identify a duty on the part of the AFG Defendants where they did not knowingly provide funds

to al Qaida.  As is alleged in the Complaint, the AFG Defendants *knowingly* provided material

support and resources to the terrorists who carried out the Attack.  The idea that an individual has

no duty to avoid committing acts of murder or intentional destruction of another's property is

almost incomprehensible.  As a general principle of tort law, every individual has a duty to

exercise reasonable care to avoid physical harm to others' person and property.  See

---

[9]        Given the number of lawsuits filed as a result of the September 11th Attack, and the consequent possibility that the
Federal Insurance case could be transferred to a jurisdiction other than New York, the FAC sets forth the survival, conspiracy,
aiding and abetting, and punitive damages in separate counts.  To the extent that these counts are not recognized as separate or
independent theories under New York or federal common law, these counts should be liberally construed to modify and/or
supplement other counts of the FAC.

**Restatement (Second) of Torts** § 302.  Without a doubt, the AFG Defendants had a duty to refrain from financing killings and destruction of property.  There can be no question that the violations of law described in the Federal Plaintiffs' Complaint state a claim sounding in both negligence and negligent infliction of emotional distress.

Furthermore, New York recognizes survival actions "for injury to person or property . . . despite death of person in whose favor or against whom cause of action existed."  See **N.Y. Est. Powers & Trusts Law** § 11-3.2.  As is alleged in the Complaint, the AFG Defendants knowingly provided material support to the terrorists who carried out the Attack.  As is noted above, it is well established that the knowing provision of material support for tortious acts gives rise to liability for the resulting harm.  The Federal Plaintiffs thus have sufficiently alleged the elements of a survival claim for the injuries to persons and property resulting from the Attack.

The AFG Defendants also claim that the Federal Plaintiffs are not entitled to punitive damages.  Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998). If the Federal Plaintiffs prove their allegations that the AFG Defendants knowingly financed and provided material support to al Qaida giving its purpose to commit terrorist acts against innocent persons in the United States, the AFG Defendants' conduct is sufficiently egregious and outrageous to warrant the imposition of punitive damages.

## V.      **CONCLUSION**

For the reasons stated above, the Federal Plaintiffs respectfully request that the joint

Motion to Dismiss filed by Prince Abdullah Al Faisal Bin Abdulaziz Al Saud, Mohammed Bin

Abdulrahman Al Ariefy, and Alfaisaliah Group (a/k/a Faisal Group Holding Co.) be denied in all

respects, with prejudice.


Respectfully submitted,

COZEN O'CONNOR


By:        _____/s/_____
           STEPHEN A. COZEN, ESQUIRE
           ELLIOTT R. FELDMAN, ESQUIRE
           SEAN P. CARTER, ESQUIRE
           MARK T. MULLEN, ESQUIRE
           1900 Market Street
           Philadelphia, PA  19103
           Telephone:    (215) 665-2000
           Facsimile:     (215) 665-2013

           *Attorneys for the Federal Plaintiffs*


Dated:  October 4, 2004

24