UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Burnett v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.*, 03 CV 5738 (RCC)

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD AND ALFAISALIAH GROUP

October 4, 2004

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................3

I.     THE ALFAISALIAH DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES ........................................................................................3

     A.     Defendants Who Purposefully Direct Their Conduct At the United States Are Subject to Jurisdiciton Here .......................................................3

     B.     The Alfaisaliah Defendants Are Also Subject to Jurisdiction in This Court Because They Conspired With al Qaeda to Attack the United States ........................................................................................9

II.     THE COMPLAINT STATES CLAIMS AGAINST THE ALFAISALIAH DEFENDANTS ........12

     A.     The Complaint Adequately Pleads the Causal Connection Between the Alfaisaliah Defendants and the Injuries and Deaths that Occurred on September 11, 2001................................................................13

     B.     Plaintiffs' RICO Claims Should Not Be Dismissed .................................17

CONCLUSION...............................................................................................................18

# TABLE OF AUTHORITIES

*Page*

**Cases**

*All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215 (S.D.N.Y. 1992) ............................ 9

*Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) ........................ 10

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987) ................. 5

*Ball v. Metallurgie Hoboken-Overpelt*, S.A., 902 F.2d 194 (2d Cir. 1990) ................................. 3

*Boim v. Quranic Literary Institute*, 291 F.3d 1000 (7th Cir. 2002) ...................................... passim

*Branum v. Clark*, 927 F.2d 698 (2d Cir. 1991) ............................................................. 12

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985). ....................................................... 5, 6

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961). .............. 5

*Calder v. Jones*, 465 U.S. 783 (1984) ......................................................................... 6

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ..... 9, 10, 11

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................... 12

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000) ................................................... 6, 8, 9

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) ................................. 18

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802 (S.D.N.Y. 1991) ..................... 11

*DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001) ......................................... 3

*Dixon v. Mack*, 507 F. Supp. 345 (S.D.N.Y. 1980) ....................................................... 10

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ............................................. 5

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ....................................................... 12

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................... 14, 15

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ..................................... 14, 16

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987) ........................................ 17

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ............................... 3

*International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724 (7th Cir. 1999) .... 12

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .......................................................... 5

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993).......................................... 3

*Jackson Nat'l Life Ins. Com. v. Merrill Lynch & Co.*, 32 F.3d 697 (2d Cir. 1994)...................... 12

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988).......................................... 5

*PDK Labs v. Friedlander,* 103 F.3d 1105 (2d Cir. 1997)................................................................ 3

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) ........ 6, 7, 8

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) .................................................................... 6, 8

*Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95 (E.D.N.Y. 2000).................................................. 10

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002).................................................................... 12

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135 (2d Cir. 2001)............ 4

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ......................................... 5, 10

**Statutes & Rules**

18 U.S.C. § 2331 ............................................................................................................................ 14

18 U.S.C. § 2333 ...................................................................................................................... passim

18 U.S.C. § 2339A .................................................................................................................. 15, 17

18 U.S.C. § 2339B .............................................................................................................. 15, 16, 17

18 U.S.C. § 2339C .................................................................................................................. 15, 17

28 U.S.C. § 1330 .............................................................................................................................. 3

Fed.R.Civ.P. 12 ...................................................................................................................... 12, 13

Fed.R.Civ.P. 8............................................................................................................................ 12, 13

**Legislative History**

S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 .................................... 1, 13, 16

# INTRODUCTION

In this action, plaintiffs, victims and survivors of the September 11 terrorist attacks, seek to hold accountable those who financed and sponsored the terrorist network that perpetrated those attacks. As demonstrated in plaintiff's 400-page Third Amended Complaint (sometimes referred to as the "3AC" or the "Complaint"), there is now a vast (and growing) body of evidence that a network of banks, corporations, wealthy individuals, and so-called "charities" has aided, abetted, funded, and provided material support to al Qaeda and Osama bin Laden. Without this support, the al Qaeda terrorists could not have planned and carried out their attacks. As one court has eloquently put it: "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002). If you take away those resources, you cut off the life-blood of terrorist violence. But, as the *Boim* court recognized: "The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Id*. To this end, Congress enacted the Anti-Terrorism Act, 18 U.S.C. § 2333, to "interrupt, or at least imperil, the flow of money" to terrorists through the "imposition of liability *at any point along the causal chain* of terrorism." S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372, *22. (Emphasis added.) That is what plaintiffs in this lawsuit seek to do.

Defendant Abdullah Al Faisal bin Abdulaziz Al Saud ("Abduallah Al Faisal" or "Abdullah") is a member of the Saudi royal family and a brother of defendants Turki Al Faisal bin Abdulaziz Al Saud and Mohammed Al Faisal bin Abdulaziz Al Saud.  3AC ¶ 367.  Abdullah Al Faisal is the main shareholder of defendant Alfaisaliah Group, a commercial conglomerate

with business relationships around the world. *Id.* at ¶ 369-71.  (Together, Abdullah Al Faisal and Alfaisaliah Group are referred to in this brief as the "Alfaisaliah Defendants.")

As alleged in the Complaint, the Alfaisaliah Defendants' significant business interests have provided material and financial support to al Qaeda.  Investigations conducted by the Federal Bureau of Investigation ("FBI") have produced evidence that suggests a direct link between Alfaisaliah Group and one of the September 11th hijackers, Hani Saleh Hanjour. According to FBI records, Hanjour maintained a registered address in Taif, Saudi Arabia, under the name of al Faisaliah. This same address, the FBI contends, corresponds with the branch office of Alfaisaliah Group in Taif.  3AC ¶¶ 372-73.  Furthermore, there is evidence that Abdullah Al Faisal provided support to al Qaeda as a result of a close business partnership with Muhammed Galeb Klaje Zouaydi. Zouaydi, who served as Abdullah's accountant for many years, founded a network of companies which served as a vehicle for economically supporting the al Qaeda Spanish cell and its activities in Europe. One of those companies included Mushayt for Trading Establishment, a Saudi-based company which Abdullah entered into a number of transactions with during the time it was laundering money for the Spanish al Qaeda cell. Zouaydi was arrested and convicted in Spain for financing al Qaeda's operations in Europe. *See* 3AC ¶¶ 374-378.

The Alfaisaliah Defendants claim that these allegations are insufficient, but they have mistaken plaintiffs' pleading obligations for the requirements of proof.  At this stage of the case, to put defendants on notice as to the nature of the claims against them, plaintiffs need allege no more than that these defendants knowingly aided and abetted the September 11 hijackers.  There is no doubt that the Complaint accomplishes this – indeed, it is precisely because the Complaint has so plainly notified defendants of the claims against them that have reacted so indignantly at

being accused of assisting the terrorists who carried out the September 11 attacks.  That defendants may be offended at the charges, however, in no way demonstrates that plaintiffs' allegations are too generalized or too vague to meet the "notice pleading" requirements of the Federal Rules of Civil Procedure.  Plaintiffs adequately state claims against these defendants and have adequately alleged a *prima facie* case for personal jurisdiction. The motion to dismiss should be denied in its entirety.

## ARGUMENT

## I.   THE ALFAISALIAH DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES[1]

### A.   Defendants Who Purposefully Direct Their Conduct At the United States Are Subject to Jurisdiciton Here

The Alfaisaliah Defendants contend that the allegations of the Complaint are insufficient to make a *prima facie* case for personal jurisdiction. Plaintiffs' *prina facie* case for jurisdiction may be established solely by allegations; additional evidence need not be provided. *Ball v. Metallurgie Hoboken-Overpelt*, S.A., 902 F.2d 194, 197 (2d Cir. 1990). Moreover, in evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003); *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997).  The Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993); *accord DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).

---

[1] Defendants concede that the relevant inquiry concerns their contacts with the United States as a whole.  *See* Def. Mem. at 5 n.5.

3

Here, plaintiffs have satisfied their burden to make a *prima facie* showing that jurisdiction exists.

As alleged in the Third Amended Complaint (the "3AC" or the "Complaint"), Abdullah is "engaged in the aiding and abetting or material sponsorship of Osama bin Laden, al Qaeda, and international terrorism . . . ."  3AC ¶ 342.  Moreover, Abdullah "is implicated in . . . financial transactions of material support to al Qaeda," through his employment of Muhammed Galeb Klaje Zouaydi, as an accountant.  *Id.* at ¶¶ 374-78.   In addition, one of the September 11 hijackers, Hani Saleh Hanjour, gave defendant Alfaisaliah Group's address as his own.  *Id.* at ¶¶ 372-73.   It is reasonable to infer that Hanjour could not have expected to receive any correspondence sent to him at that address unless Alfaisaliah itself was aware that he was using its post office box and knew how to forward material on to him.  These allegations are sufficient to subject the Alfaisaliah Defendants to jurisdiction in the United States because, in providing support to al Qaeda, which had announced its intentions to attack the United States, they purposefully directed their conduct here.[2]

The standard for determining whether a defendant has sufficient contacts with the forum is not a rigid one, nor can it be applied without reference to the nature of the underlying claims against the defendant.  As the Supreme Court has explained, "'[d]ue process,' unlike some legal

---

[2]   Defendants devote several pages of their memorandum of law to the argument that their contacts with the United States are not "systematic and continuous" and thus they are not subject to so-called "general jurisdiction" here.   Plaintiffs do not assert that the contacts of these defendants with the United States are sufficient to establish "general jurisdiction"; rather, plaintiffs rely on defendants' purposeful direction of their conduct at the United States in connection with their support of al Qaeda, and their conspiracy with al Qaeda, to establish specific, *in personam* jurisdiction for claims that arise out of that support and conspiracy.  *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135, 152 (2d Cir. 2001) (where claim arises out of, or relates to, a defendant's contact with the forum, plaintiff need only prove specific jurisdiction.).

rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961). It is for this reason that the Supreme Court has rejected a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an approach whereby each case could be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The issue is whether the defendant should "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there"); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987).

More recently, the Supreme Court has stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985). The D.C. Circuit, too, has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").

If ever a case called for recognition of the policy considerations that determine what process is due, it is this one. The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the cold-blooded manner in which U.S. residents were attacked for no reason other than that they were here, on United States soil. The policies of "fair play"

5

and "substantial justice" cannot be applied without recognition of the deliberate murderous attacks on the United States that gave rise to plaintiffs' claims.

In *Burger King*, the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472 (citations omitted).  Physical presence is *not* a requirement.  *Id.* at 475.

In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum.  *Calder v. Jones*, 465 U.S. 783, 789 (1984).  Thus, the *Calder* Court concluded:  "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."  465 U.S. at 790.

Three recent cases involving jurisdiction over those who participate in terrorist attacks on Americans demonstrate the appropriateness of jurisdiction here. *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003); *Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998).  These cases make clear that where terrorists target Americans, they should reasonably foresee being haled into court in the United States, such that due process is not violated by the assertion of jurisdiction over them.  The record before this Court demonstrates that bin Laden and al Qaeda not only targeted the United States from the early 1990's on, but also announced, publicly and repeatedly, that they were doing so.  In this context, the Alfaisaliah Defendants' support of al Qaeda

amounted to purposeful direction of their conduct at the United States sufficient to satisfy the "minimum contacts" test.

In *Pugh*, the D.C. district court analyzed the minimum contacts of certain Libyans accused of conspiring in the terrorist downing of a French commercial aircraft en route from Brazzaville, Congo to Paris, with an intermediate stop in Chad.  The passengers, all of whom were killed, were from 17 different countries; seven passengers were Americans and the action was brought by their survivors.  The individual defendants were accused of conspiring (in their individual capacity, and not merely as members of the Libyan government) to sabotage the plane.  Applying the *World-Wide Volkswagen* test that requires the court to look at whether the defendant "should reasonably anticipate being haled into court" in the United States, the court in *Pugh* held:

> Taking the factual allegations of the complaint as true for present purposes, the individual defendants in the instant action conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight. As the plane they chose to destroy was on an international flight and expected to stop in several nations before reaching its final destination, the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die. Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d at 59.  In language especially relevant to this case, the *Pugh* court continued:

> The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. Congress has not been indifferent to providing judicial sanctions for terrorist acts committed abroad. Beginning at least five years before the UTA Flight 772 bombing, a succession of federal statutes had evinced an intent to assure the criminal prosecution of foreign individuals who committed terrorist acts overseas against U.S. persons or property. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that

individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

*Id.*  Accordingly, the court held:

[I]n light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being "haled into court" in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any "traditional notions of fair play and substantial justice."

*Id.* at 60-61.  Thus, in *Pugh*, the defendants were found to have purposefully directed their conduct at the United States sufficiently to subject them to jurisdiction in an American court even though the plane they attacked was a French carrier and the flight was not scheduled to, and did not, take off or land in the United States.

Similarly, in *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998), the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction.   Like the attack in *Pugh*, the attack at issue in *Rein* did not take place in the United States, but rather over Scotland.  Nonetheless, the court found that the targeting of an American-flagged carrier provided a sufficient nexus for the assertion of jurisdiction.  *See also Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns). In all three cases, *Rein*, *Pugh*, and

8

*Daliberti*, the attacks on Americans took place abroad.  In none were the defendants alleged to have taken any steps in the United States in furtherance of the plots.  Yet in all three cases, the court found that defendants had sufficiently targeted Americans and had sufficient notice that United States law and United States courts would subject them to liability so that the assertion of personal jurisdiction was constitutional.  Here, by contrast, the entire September 11 attack was focused specifically on, and took place in, the United States.  Moreover, the perpetrators of the attacks had announced their intention to attack the United States at the time the Alfaisaliah Defendants provided material support to their terrorist projects.  *See, e.g.,* 3AC at pp. 212-17 & ¶ 493.  Under *Calder*, *Rein*, *Pugh,* and *Daliberti*, no more is required to satisfy the "minimum contacts" test and subject the Alfaisaliah Defendants to jurisdiction in the United States.

**B.     The Alfaisaliah Defendants Are Also Subject to Jurisdiction in This Court Because They Conspired With al Qaeda to Attack the United States**

The Alfaisaliah Defendants are also subject to jurisdiction here because, as alleged in the Complaint, they conspired with al Qaeda to attack the United States. Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum. *See All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over Australian defendants via conspiracy theory by imputing forum acts of co-conspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory). To assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the state to the out-of-state conspirator." *All State Life Ins. Co.*, 782 F. Supp. at 221 n.6. And by imputing forum acts of their co-conspirators to non-resident

defendants, this Court has repeatedly found that such non-resident defendants have minimum contacts with the forum to satisfy Due Process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the suit, supplies the necessary minimum contacts. . . ."); *Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfying Due Process). Consistent with the logic of *Calder, Pugh*, *Rein*, and *Daliberti*, the conspiracy jurisdiction cases from this Court explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court there." *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 WL 672009, *6 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)); *see also Chrysler Capital Corp.*, 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Thus, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their coconspirators satisfies Due Process.

Defendants recognize the existence of conspiracy jurisdiction, but claim that plaintiffs have not sufficiently pleaded that they conspired with al Qaeda. But plaintiffs have satisfied all the requirements for conspiracy jurisdiction; they have "(1) establish[ed] a prima facie case of conspiracy; (2) allege[d] specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate[d] the commission of a tortious act in [the forum] during, and pursuant to, the conspiracy. *See Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 120 (E.D.N.Y. 2000). The *prima facie* showing of conspiracy requires allegations of the primary tort

10

(in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *Id.*; *see also Chrysler Capital*, 778 F.Supp. at 1267. Fairly read, the Third Amended Complaint alleges an agreement among Osama bin Laden and numerous others to recruit and train terrorists to attack the United States. The Complaint further alleges that the Alfaisaliah Defendants aided and abetted and provided material support to this conspiracy. 3AC ¶¶ 342, 372-3, 374-78.

Plaintiffs also sufficiently allege that facts warranting the inference that these defendants were members of the conspiracy. Here, plaintiffs allege that Abdullah provided material support to al Qaeda, ¶ 342.  They also allege that one of Abduallah's accountant's was defendant Muhammed Galeb Kalaje Zouaydi ("Zouaydi"), who was convicted in Spain for financing al Qaeda operations in Europe. *Id.* at ¶ 374.  Zouaydi set up Spanish companies established during the time he was staying in Saudi Arabia and working for Prince Abdullah al Faisal, between 1996 and 2000. Zouaydi laundered Saudi money through Spain to an al Qaeda cell in Germany. *Id.*  Zouaydi's role as Abdullah's accountant at the same time that he was actively moving money for al Qaeda supports the inference that Abduallah, like Zouaydi, was a member of the al Qaeda conspiracy.  Similarly, the confidence of one of the hijackers that he could use Alfaisaliah Group's post office box as his own, *see* 3AC ¶ 372-73, supports the inference that Alfaisaliah Group was a member of the conspiracy with the hijackers.  *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (for civil conspiracy, tacit, as opposed to explicit, understanding is sufficient to show agreement; court may infer agreement).

## II.    THE COMPLAINT STATES CLAIMS AGAINST THE ALFAISALIAH DEFENDANTS

The Alfaisaliah Defendants also seek dismissal under Fed.R.Civ.P. 12(b)(6) because, they contend, plaintiffs fail to state a claim against them.  A 12(b)(6) motion to dismiss must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of plaintiffs' allegations.  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). In evaluating whether plaintiffs could ultimately prevail, the Court must take the facts alleged in the Complaint as true and draw all reasonable inferences in favor of plaintiffs. *Jackson Nat'l Life Ins. Com. v. Merrill Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir. 1994). Rule 12(b)(6) is read with Rule 8(a)(2), which requires only that the Complaint give a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). That "short and plain statement" required by Rule 8(a) "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,'" *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley*, 355 U.S. at 47); *see also International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 733 (7th Cir. 1999) ("The only function the pleadings must serve is to give notice of the claim; the development of legal theories and the correlation of facts to theory come later in the process.").

The Alfaisaliah Defendants' assertion that plaintiffs have not pled sufficient facts to establish valid claims against them misconstrues the meaning and intent behind Rule 8(a). Plaintiffs have provided the Alfaisaliah Defendants with the requisite notice in alleging that they knowingly aided, abetted and conspired to fund the activities of terrorists, including al Qaeda.

To expect or require plaintiffs to set forth every wrongful act of these defendants is as unreasonable as it is unnecessary at this stage in the proceedings. It simply is not required in notice pleading. *See* Fed.R.Civ.P. 8, 12. Having stated a claim against the Alfaisaliah Defendants, plaintiffs are entitled to conduct discovery before they are called upon to present their evidence. Under the Federal Rules and relevant case law, it is inappropriate and untimely for the Alfaisaliah Defendants to challenge the substance of plaintiffs' good faith allegations when those allegations have effectively put them on notice of the claims against them.

Here, the Complaint states claims against the Alfaisaliah Defendants under the Anti-Terrorism Act, the Alien Tort Claims Act, the RICO statute, and under the common law.

### A. The Complaint Adequately Pleads the Causal Connection Between the Alfaisaliah Defendants and the Injuries and Deaths that Occurred on September 11, 2001

Defendants claim that plaintiffs have failed to plead a sufficient causal connection between their actions and the September 11 terrorist attacks to sustain a claim under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, or any other cause of action. In making this argument, defendants completely ignore Congress's express direction that the ATA is intended to "impos[] liability *at any point along the causal chain* of terrorism." S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 *22. (Emphasis added.) Consistent with this instruction, it is sufficient that plaintiffs plead, as they have, that these defendants knowingly provided material support to al Qaeda and/or aided and abetted al Qaeda in its terrorist agenda. Moreover, the law is clear that the assistance provided by the Alfaisaliah Defendants need not have been used directly in the September 11 attacks. Under the ATA, defendants are liable if they provided any material support to al Qaeda with knowledge of its terrorist agenda or if they aided and abetted al Qaeda or Osama bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literary Institute*, 291 F.3d 1000 (7th Cir. 2002); *Humanitarian Law Project v. Reno*,

205 F.3d 1130, 1136 (9th Cir. 2000); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). As Stuart A. Levey, Under-Secretary for Terrorism and Financial Intelligence at the U.S. Treasury Department, recently explained to Congress:

> Terrorists require money to train, travel, communicate, indoctrinate, procure weapons, carry out attacks, and conceal themselves. Starving them of money debilitates every aspect of their operations and, ultimately, their ability to survive.

Testimony of Stuart A. Levey before the Senate Committee on Banking and Urban Affairs (September 29, 2004), available at http://www.treasury.gov/press/releases/js1965.htm. Moreover, Under-Secretary Levey continued, "the terrorists' budgets are not measured by the cost of a primitive destructive act. The real operating costs of terrorists inhere in maintaining and perpetuating their networks, and these costs are considerable. As we choke off the terrorists' money flow, we degrade their capabilities and render them less dangerous." *Id.* It is against the background of the legislative history of the ATA and the realities of terrorist financing described most recently by Under-Secretary Levey (but with equal eloquence in the *Boim* decision and elsewhere) that the causal scope of the ATA (and the common law doctrines of aiding and abetting and conspiracy) must be understood.

The Anti-Terrorism Act permits a private cause of action for injuries resulting from international terrorism.[3] There can be no doubt that the acts of September 11 were acts of "international terrorism" within the meaning of § 2333 and the Alfaisaliah Defendants do not contend otherwise.

---

[3] The statute provides, in relevant part: "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.". 18 U.S.C. § 2333. The term "international terrorism" is defined to include "activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State . . . ." 18 U.S.C. § 2331(1).

In *Boim*, the court recognized two theories of causation under which a civil suit may be sustained under § 2333.  First, the court concluded, a plaintiff may recover under § 2333 if the defendants violated the criminal provisions of the ATA. *See Boim*, 291 F.3d at 1012-14. The relevant criminal provisions, set forth at 18 U.S.C. §§ 2339A, 2339B, and 2339C, impose liability on those who provide "material support" to acts of terrorism or to designated terrorist organizations.[4] Provision of material support gives rise to civil liability under § 2333 so long as the support was provided knowingly and intentionally. *Boim*, 291 F.3d at 1015.

The second theory of causation endorsed by the Seventh Circuit permits recovery under § 2333 where the defendants have aided and abetted an act of international terrorism. *Boim*, 291 F.3d at 1021.[5] With regard to this prong, it is not necessary for plaintiffs to allege that the Alfaisaliah Defendants knew specifically about the September 11 attacks. Rather, it is enough that, when it provided financial support to bin Laden and al Qaeda, it knew that al Qaeda was preparing to engage in some kind of terrorist activity. *See Halberstam*, 705 F.2d at 489.

Here, the Third Amended Complaint alleges that Abduallah al Faisal and the Alfaisaliah Group provided "material support" to al Qaeda in violation of 18 U.S.C. § 2339B and that they aided and abetted al Qaeda in its terrorist enterprise. *See* 3AC ¶¶ 342, 372-73, 376; *see also* 3AC at p. 217 ("Defendants knew or reasonably should have known they were providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent people.").  Under *Boim*, these allegations state claims against the Alfaisaliah Defendants for violations of the Anti-Terrorism Act.

---

[4] The phrase "material support" refers not to the amount of support, but to its nature – "the type of aid provided rather than whether it is substantial or considerable." *See Boim*, 291 F.3d at 1015.

[5] Plaintiffs respectfully refer the Court to the more detailed discussions of the causation requirements of the ATA in their memoranda of law submitted in opposition to motions to

The Alfaisaliah Defendants also claim that plaintiffs must allege that they provided their support directly to the terrorists who carried out the September 11 attacks, see Def. Mem. at 16-23, but that is not the law. Rather, as previously noted, Congress expressly stated its intention that the ATA be used to "interrupt, or at least imperil, the flow of money" to terrorists through the "imposition of liability *at any point along the causal chain* of terrorism." S. Rep. No. 342, 1992 WL 187372, *22 (emphasis added). Thus, it is sufficient that defendants knowingly provided material support to those who instigated and planned the September 11 attacks. Nor is it necessary for plaintiffs to show that specific dollars that these defendants provided were used in the September 11 attacks. As the Ninth Circuit held in *Humanitarian Law Project*, 205 F.3d at 1136, the knowing provision of "material support" to a designated terrorist entity violates § 2339B regardless of whether the donor intended to support the terrorist activities of the group and regardless of whether the particular dollars provided to the organization can be traced to the resulting acts of terrorism. The court explained:

> [A]ll material support given to such organizations aids their unlawful goals. Indeed, as the government points out, terrorist organizations do not maintain open books. Therefore, when someone makes a donation to them, there is no way to tell how the donation is used. Further . . . even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive. More fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.

*Id.* (emphasis supplied). Far from requiring direct participation in a particular terrorist act, then, § 2339B does not even require support for, or agreement with, the violent portion of a terrorist group's agenda; rather, the statute recognizes that even the provision of "humanitarian" support

---

dismiss filed in Burnett claims by the Saudi Binladin Group, the Khalid bin Mafouz, and the National Commercial Bank.

to such a group inevitably redounds to the benefit of the group's terrorist purposes.[6] Thus, under § 2339B, anyone who knowingly contributes to the terrorist "factory" is responsible for all of the terrorist acts that come out of that "factory."[7] Plaintiffs allege that the Alfaisaliah Defendants helped to support the factory by providing material support. They need not allege that these defendants purchased the specific "weapons" for the September 11 attacks when it provided the financing that allowed bin Laden to train terrorists and to set up a vast terrorist infrastructure which in turn enabled multiple acts of international terrorism, including those attacks.

### B.     Plaintiffs' RICO Claims Should Not Be Dismissed

The Alfaisaliah Defendants contend that plaintiffs have failed to state claims under RICO and lack standing to assert their RICO claims in any event because, they assert, plaintiffs do not allege an injury to business or property. Def. Br. at 23. Plaintiffs recognize that in *Burnett v. Al Baraka Investment & Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) ("*Burnett I*"), the D.C. court adopted this argument and held that plaintiffs lack standing to pursue their RICO claims. Plaintiffs respectfully disagree and note that this Court is not bound by the ruling of the D.C. court. *See In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987)

---

[6]   That direct participation is not a requirement is further made clear in § 2339C, which makes it a crime knowingly to provide funds for terrorist acts and further provides that "[f]or an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act." 18 U.S.C. § 2339C(a)(3).

Nor is it relevant that § 2339C was added after the events of September 11. In *Boim*, the court noted that much of the defendants' alleged conduct occurred prior to the passage of §§ 2339A and 2339B. The court rejected defendants' argument that these sections could not be used to set the standard for liability under § 2333. It held: "We are using sections 2339A and 2339B not as independent sources of liability under section 2333, but to amplify what Congress meant by 'international terrorism.'" 291 F.3d at 1016. In the same way, § 2339C amplifies Congress's purpose in enacting § 2333; use of this provision as a guide to interpreting § 2333, which was enacted in 1992, does not impose retroactive liability.

[7]   As noted above, the Seventh Circuit in *Boim* held that § 2333 incorporates the standards of § 2339B because it would make no sense to conclude "that Congress imposed criminal liability .

("transferee district court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect"); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996). Plaintiffs hereby incorporate by reference the argument regarding RICO standing set forth in their opposition to the motions filed by Al Rajhi Bank, Al Haramain, and Dr. Khudeira.[8]

## CONCLUSION

For the foregoing reasons, this Court should deny Abdullah al Faisal al Saud and Alfaisaliah Group's motion to dismiss for lack of jurisdiction in its entirety.

Dated: New York, NY          Respectfully submitted,
      October 4, 2004

                               /s/_____
                               Ronald L. Motley, Esq.
                               Jodi Westbrook Flowers, Esq.
                               Donald A. Migliori, Esq.
                               Michael Elsner, Esq. (ME-8337)
                               Ingrid Moll, Esq.
                               Justin Kaplan, Esq.
                               MOTLEY RICE LLC
                               28 Bridgeside Boulevard
                               P.O. Box 1792
                               Mount Pleasant, South Carolina 29465

---

. . on those who financed terrorism, but did not intend to impose civil liability on those same persons. . . ." 291 F.3d at 1014.

[8]   The Alfaisaliah Defendants also have moved to dismiss plaintiffs' claim under the Torture Victim Protection Act ("TVPA"), codified at 28 U.S.C. § 1350, note. Plaintiffs do not currently intend to pursue this claim against these defendants. Plaintiffs reserve the right, however, to re-plead this claim against the Alfaisaliah Defendants should additional information become available in discovery demonstrating that they acted "under actual or apparent authority, or color of law, of any foreign nation" in connection with its support of al Qaeda. The Alfaisaliah Defendants also seek dismissal of plaintiffs' claim for punitive damages on the ground that, under New York law, punitive damages are a remedy, not a cause of action. See Def. Br. at 24. Defendants present no argument that plaintiffs are not entitled to recover punitive damages in this lawsuit. Since it is clear that punitive damages are available in connection with the claims that plaintiffs assert, and because the question of what law governs plaintiffs' claims remains open, this Court should not dismiss plaintiffs' claim for punitive damages because of this technicality of New York law.

Telephone:  (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq.
Amy Ficklin DeBrota, Esq.
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, Indiana 46240
Telephone:  (317) 848-7939

Harry Huge, Esq.
HARRY HUGE LAW FIRM, LLP
Market Square North
1401 Ninth Street, N.W., Suite 450
Washington, D.C. 20004
(202) 824-6046

Allan Gerson, Esq.
Attorney At Law
2131 S Street NW
Washington, DC 20008
Tel:  (202) 234-9717

Attorneys for Plaintiffs