**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | x |  |
| In Re TERRORIST ATTACKS on | x | 03 MDL 1570 (RCC) |
| SEPTEMBER 11, 2001 | x | ECF Case |
|  | x |  |

*This document relates to:*
    *Thomas Burnett v. Al Baraka Inv. & Dev. Corp.*, 03 CV 9849 (RCC)
    *Kathleen Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (RCC)

<br>

**RESPONSE OF THE NATIONAL COMMERCIAL BANK TO**
**THE SUPPLEMENTAL AFFIDAVITS OF DAVID K. DRAPER AND JOHN FAWCETT**

<br>

Dated:  October 7, 2004
        Washington, D.C.

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB-4112)
Ugo Colella (admitted *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:     202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*

# Table of Contents

I.      Plaintiffs' Post-Argument Supplemental Affidavits Improperly Raise a New Issue ................2

II.     The Majority-Ownership Challenge Contradicts Binding Allegations ........................................3

III.    Hearsay Skimmed from the Internet is Inadmissible ..............................................................5

IV.     The Internet Provides Unreliable and Inconsistent Information  ...............................................5

V.      Plaintiffs Invite Inconsistent Pretrial Rulings  ......................................................................6

VI.     Under Controlling Saudi Law, the PIF Increased its NCB Shareholdings to 69.3%
        as of November 17, 2001 ..................................................................................................7

VII.    Even Under U.S. Law, the PIF Acquired Majority-Ownership not later than
        November 17, 2001 ........................................................................................................10

Conclusion ........................................................................................................................12

i

## Table of Authorities

### Cases

*Admerasia, Inc. v. United States Postal Serv.,*
    No. 00-9784, 2004 WL 895552 (S.D.N.Y. Apr. 27, 2004) ........................................3

*Andrews v. Troy Bank & Trust Co.,*
    529 So. 2d 987 (Ala. 1988) ...................................................................................11

*Bankers Trust Co. v. Rhoades,*
    111 B.R. 54 (S.D.N.Y. 1990) ................................................................................10

*Barakat v. South Fork Oil & Gas Co.,*
    631 F. Supp. 45 (D. Utah 1985) ...........................................................................11

*Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,*
    923 F.2d 957 (2d Cir. 1991) ....................................................................................8

*Brink's Ltd. v. South African Airways,*
    93 F.3d 1022 (2d Cir. 1996),
    *cert. denied,* 519 U.S. 1116 (1997) .......................................................................8

*Carmody v. ProNav Ship Management, Inc.,*
    --- F.R.D. ---, 2004 WL 1837783 (S.D.N.Y. Aug. 17, 2004) .........................................3

*Credit Lyonnais v. Getty Square Assoc.,*
    876 F. Supp. 517 (S.D.N.Y. 1995) ....................................................................7, 8

*Crow v. Newspaper Dealer Supply,*
    603 F. Supp. 847 (E.D. Mo. 1985)........................................................................11

*Degulis v. LXR Biotechnology,*
    928 F. Supp. 1301 (S.D.N.Y. 1996) .......................................................................6

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003) ................................................................................... 1, 2, 7

*Equitable Trust Co. v. Gallagher,*
    67 A. 2d 50 (Del. Ch. 1949),
    *aff'd,* 77 A. 2d 548 (Del. Supr. 1950) ................................................................10

*Estate of Bridges v. Mosebrook,*
    662 S.W. 2d 116 (Tex. Ct. App. 1983) .................................................................11

*Gardiner Stone Hunter v. Iberia Lines,*
    896 F. Supp. 125 (S.D.N.Y. 1995) ....................................................................7, 8

*G-I Holdings, Inc. v. Baron & Budd,*
No. 01-0216, 2004 WL 1277870 (S.D.N.Y. June 10, 2004) .................................3

*Guidi v. Inter-Continental Hotels Corp.,*
No. 95-9006, 2003 WL 1907901 (S.D.N.Y. Apr. 16, 2003) .........................................9

*Harris v. Polskie Linie Lotnicze,*
820 F. 2d 1000 (9th Cir. 1987) .......................................................................8

*Holmes v. Gaynor,*
313 F. Supp. 2d 345 (S.D.N.Y. 2004)..............................................................5

*In re Comark,*
124 B.R. 806 (Bkrtcy. C.D. Cal. 1991),
*aff'd,* 145 B.R. 47 (9th Cir. 1992) ...................................................................11

*In re Initial Public Offering Securities Litig.,*
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................4

*In re Ski Train Fire in Kaprun, Austria,*
198 F. Supp. 2d 420 (S.D.N.Y. 2002) .............................................................8

*In re Stewart Becker, Ltd. v. Horowitz,*
94 Misc. 2d 766 N.Y.S. 2d 571 (Sup. Ct. 1978) .............................................11

*Int'l Ins. Co. v. Caja Nacional de Ahorro Y Seguro,*
293 F. 3d 392 (7th Cir. 2002) ........................................................................7

*Jones v. Hirschfeld,*
No. 01-7585, 2003 WL 21415323 (S.D.N.Y. June 19, 2003)............................5

*Kallop v. McAllister,*
678 A.2d 526 (Del. Sup. Ct. 1996) ...........................................................10, 11

*Katz v. Prete,*
459 A. 2d 81 (R.I. 1983) ...............................................................................11

*Leutwyler v. Office of Her Majesty Queen Rania,*
184 F. Supp. 2d 277 (S.D.N.Y. 2001) ............................................................9

*Linton v. Airbus Industrie,*
794 F. Supp. 650 (S.D. Tex. 1992) .................................................................7

*O'Connell Mach. Co. v. M.V. Americana,*
566 F. Supp. 1381 (S.D.N.Y. 1983),
*aff'd,* 734 F.2d 115 (2d Cir.),
*cert. denied,* 469 U.S. 1086 (1984) .................................................................9

*Official Comm. of Unsecured Creditors v. Coopers & Lybrand,*
      322 F. 3d 147 (2d Cir. 2003) ...........................................................................................4

*Republic of Austria v. Altmann*,
      124 S. Ct. 2240 (2004)....................................................................................................1

*Saylor v. Bastedo,*
      82 F.R.D. 440 (S.D.N.Y. 1979),
      *aff'd in part and rev'd in part on other grounds*, 623 F.2d 230 (2d Cir. 1980) ....................8

*Smith v. Koehler,*
      632 N.E. 2d 914 (Ohio. Ct. App. 1992)........................................................................10

*Soo Line R.R Co., v. St. Louis S.W. Ry. Co.,*
      125 F.3d 481 (7th Cir. 1997) ..........................................................................................5

*Tanner v. Robinson,*
      411 So.2d 240 (Fla. Ct. App. 1982) ..............................................................................11

*Tri-State Rubber v. Central States Pension Fund,*
      677 F. Supp. 516 (E.D. Mich. 1987) ......................................................................10, 11

## Federal Statutes

28 U.S.C.

      § 1407 ...........................................................................................................................6

      § 1603(b)(2) ...................................................................................................................1

## Uniform Commercial Code

Section

      § 8-102(a)(14) ..............................................................................................................11

      § 8-104(a)(1) ................................................................................................................11

      § 8-301(a)(2) ................................................................................................................11

## New York Uniform Commercial Code

Section

      § 8-102(a)(14) ..............................................................................................................11

§ 8-104(a)(1) ..................................................................................................................11

§ 8-301(a)(2) ..................................................................................................................11

**Treatises**

Restatement (Second) of Conflict of Laws § 188.......................................................................8

8 Williston on Contracts § 953 (3d ed. 1964) .......................................................................10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | x | |
| In Re TERRORIST ATTACKS on | x | 03 MDL 1570 (RCC) |
| SEPTEMBER 11, 2001 | x | ECF Case |
| | x | |

*This document relates to:*
  *Thomas Burnett v. Al Baraka Inv. & Dev. Corp.*, 03 CV 9849 (RCC)
  *Kathleen Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (RCC)

**RESPONSE OF THE NATIONAL COMMERCIAL BANK TO**
**THE SUPPLEMENTAL AFFIDAVITS OF DAVID K. DRAPER AND JOHN FAWCETT**

Pursuant to leave granted by the Court (MDL Dkt. #463), defendant The National

Commercial Bank ("NCB") submits this response to the *Burnett* and *Ashton* plaintiffs' belated and

erroneous assertion, based on two "supplemental affidavit[s],"[1] that NCB did not satisfy the

"majority-ownership" test for "instrumentality" status under the Foreign Sovereign Immunities Act

("FSIA") until "the end of 2002." Draper Aff., ¶ 8. To qualify as a foreign government

"instrumentality" under the FSIA, a corporation like NCB *inter alia* must have "a majority of [its]

shares or other ownership interest…owned by a foreign state or political subdivision thereof." 28

U.S.C. § 1603(b)(2). The FSIA "instrumentality" test is applied as of the date on which a lawsuit—

or, here, the dates on which <u>each</u> of these <u>lawsuits</u>—was filed. *Republic of Austria v. Altmann*, 124 S.

Ct. 2240, 2252-53 (2004); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477-80 (2003).

This response and the accompanying affidavits demonstrate that:

- It was improper for the *Burnett* and *Ashton* plaintiffs to challenge NCB's majority-ownership status for the first time in sur-reply submissions made after full briefing and oral argument on NCB's FSIA defense.

---

[1]    *See* Supplemental Affidavit [David K. Draper] in Further Opposition to National
Commercial Bank's Motion to Dismiss, MDL Dkt. #451, filed Sept. 21, 2004 ("Draper Aff.");
Supplemental Affidavit of John Fawcett in Support of Ashton Plaintiffs' Opposition to National
Commercial Bank's Motion to Dismiss, MDL Dkt. #455, filed Sept. 23, 2004 ("Supp. Fawcett
Aff.").

- The belated challenge to NCB's majority-ownership status impermissibly contradicts the *Ashton* plaintiffs' own allegations, by which they are bound.

- Plaintiffs rely on inadmissible hearsay skimmed from the Internet. Moreover, a search of the Internet yields a variety of wildly inaccurate and inconsistent statements about the timing and extent of Saudi government acquisition of NCB's majority-ownership.

- Plaintiffs have opened a Pandora's Box of potential inconsistency across the twelve "September 11" lawsuits in which NCB is named as a defendant.

  - Only three of these twelve lawsuits were filed before the "end of 2002," the date by which the *Burnett* and *Ashton* plaintiffs contend the Saudi government Public Investment Fund acquired majority-ownership of NCB.

  - Even if the *Burnett* and *Ashton* plaintiffs were correct about that "end of 2002" date—and they are not—NCB still would be entitled to FSIA "instrumentality" status and immunity in the nine lawsuits filed after that date.

  - Such a crazy-quilt outcome would defeat the goal of consistent pretrial rulings in MDL-consolidated cases, and would inconsistently apply the "protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns" that the FSIA was designed to provide. *Patrickson*, 538 U.S. at 479.

- As a matter of governing Saudi law, under the transaction documents, the Saudi Public Investment Fund ("PIF") acquired majority-ownership of NCB on behalf of the Saudi Ministry of Finance not later than November 17, 2001, before any of the September 11 lawsuits was filed.

- Even if U.S. law applied, the Saudi government acquired majority-ownership of NCB not later than November 17, 2001.

## I.    Plaintiffs' Post-Argument Supplemental Affidavits Improperly Raise a New Issue.

Without authorization, the *Burnett* and *Ashton* plaintiffs filed their "supplemental affidavit[s]" after the Court had heard argument on, and took under advisement, NCB's motion to dismiss based on FSIA immunity. Worse, those supplemental affidavits attempted <u>for the first time</u> to challenge the timing of NCB's government majority-ownership—a challenge that plaintiffs had not previously made in their opposition briefs or at oral argument. *See* Draper Aff., ¶ 8; Supp. Fawcett Aff., ¶ 4. This Court has made clear that "[a] party may not raise an argument for the first time on reply."

*Admerasia, Inc. v. United States Postal Serv.*, No. 00-9784, 2004 WL 895552, at *4 n.5 (S.D.N.Y. Apr. 27, 2004) (Casey, J.); *accord Carmody v. ProNav Ship Management, Inc.*, --- F.R.D. ---, 2004 WL 1837783, at *22 (S.D.N.Y. Aug. 17, 2004) (and cases cited therein). It is all the more improper to raise a new ground in opposition to a motion only after it has been fully briefed, argued, and submitted for decision—particularly given that the materials cited in plaintiffs' "supplemental" submissions were available before plaintiffs filed their opposition briefs. *See, e.g., G-I Holdings, Inc. v. Baron & Budd*, No. 01-0216, 2004 WL 1277870, at *3 (S.D.N.Y. June 10, 2004) (request to supplement record was "particularly inappropriate…because the information…[plaintiff] seeks to submit was available before the motion for leave to amend was filed").

## II.    The Majority-Ownership Challenge Contradicts Binding Allegations.

NCB supported its FSIA defense in both *Burnett* and *Ashton* with affidavits of the chief legal officer of the Saudi Ministry of Finance, which stated: "The Public Investment Fund ('PIF') of Saudi Arabia is an administrative department of the Ministry of Finance …[that] owns on behalf of the Ministry of Finance 69.3% of the common stock shares of the National Bank" [*i.e.*, NCB]. *Burnett* Mot. (Dkt. (DC) #359), Exh. 4, ¶ 2; *Ashton* Mot. (MDL Dkt. #46), Berger Aff., Exh. 4, ¶ 2. In response to NCB's motions to dismiss, neither the *Burnett* nor *Ashton* plaintiffs argued that the PIF acquired NCB's majority-ownership too late to make NCB an "instrumentality" under the FSIA. Plaintiffs' decision not to challenge the date of NCB's government majority-ownership was consistent with the position the plaintiffs had taken from the outset of these cases.

For example, the *Ashton* plaintiffs' original complaint alleged that the Saudi government had acquired majority ownership of NCB well before any of these lawsuits were filed. Specifically: "The BIN MAHFOUZ family controlled the NATIONAL COMMERCIAL BANK in Saudi Arabia, <u>until 1999 when the Saudi Government bought the majority of its ownership</u>." *Ashton* Dkt. #1, ¶ 150 (emphasis added). The *Ashton* plaintiffs repeatedly amended their complaint without changing

that allegation.  And, the *Ashton* plaintiffs were not alone in making such an allegation.  For example, the *Federal Insurance* plaintiffs allege: "Since 1999, the Kingdom of Saudi Arabia has owned a controlling interest in [NCB], and operated the bank as an agency, instrumentality and organ of the Kingdom."  *Federal Insurance* 1ˢᵗ Am. Complt. ¶ 287 (MDL Dkt. #104); *see also Salvo*, 03-5071, Complt. ¶ 369 (MDL Dkt. #1) (same).

Against that consistent set of allegations, the *Burnett* and *Ashton* plaintiffs instead chose to oppose FSIA immunity by arguing that the PIF—which holds NCB's majority shares—does not qualify as a "foreign state or political subdivision thereof" as required for NCB to have FSIA "instrumentality" status.  The parties have debated that point at length in their briefs and at oral argument, and we will not repeat those arguments here.  However, we note that, to support their argument that the PIF is not a core part of the Saudi government, the *Ashton* plaintiffs sought leave on May 14, 2004, to amend their complaint to allege that the "Public Investment Fund," rather than the "Saudi Government," owned a majority of NCB's shares.  *See Ashton* Dkt. ##137-138, at 1-2 (emphasis added)).  Importantly, the *Ashton* plaintiffs did not seek to change their allegation that majority ownership was acquired in 1999.  *Id.* at 2.  To the contrary, in their motion for leave to amend, the *Ashton* plaintiffs stated as follows: "Plaintiffs contend that the PIF's 1999 purchase of NCB's shares does not confer sovereign immunity to NCB" and "[t]he parties agree that the PIF owns a majority of NCB's shares . . . ." *Id.* (emphasis added)).  The *Ashton* plaintiffs are bound by these statements.  As another judge of this Court has held:  "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *See, e.g., In re Initial Public Offering Securities Litig.*, 241 F. Supp. 2d 281, 324 (S.D.N.Y. 2003) (internal quotations and citation omitted); *see also Official Comm. of Unsecured Creditors v. Coopers & Lybrand*, 322 F.3d 147, 167 (2d Cir. 2003) ("'[J]udicial efficiency demands that a party not be allowed to

controvert what it has already unequivocally told a court by the most formal and considered means possible.'") (quoting *Soo Line R.R. Co., v. St. Louis S.W. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997)).

## III.   Hearsay Skimmed from the Internet is Inadmissible.

Plaintiffs' two "supplemental affidavits' simply offer the affiants' opinion—based on materials pulled from the Internet—that the PIF did not acquire majority-ownership of NCB until "the end of 2002" after the *Burnett* and *Ashton* lawsuits were filed.  *See* Draper Aff., ¶ 8; Supp. Fawcett Aff., ¶ 4.  Websites and articles found on the Internet, however, are not competent evidence about when the PIF on behalf of the Ministry of Finance acquired majority ownership of NCB.  *See Jones v. Hirschfeld*, No. 01-7585, 2003 WL 21415323, at *4 n.12 (S.D.N.Y. June 19, 2003) (website descriptions of settlement agreement are inadmissible hearsay); *see also Holmes v. Gaynor*, 313 F. Supp. 2d 345, 358 n.1 (S.D.N.Y. 2004) ("The newspaper article . . . is hearsay and inadmissible for proving the truth of the matters asserted therein.").

## IV.   The Internet Provides Unreliable and Inconsistent Information.

Even if the Court considered Internet sources, it would have a hard time choosing which of the many contradictory Internet versions of the "truth" to accept.  For example, a search of the Internet yields the following array of inconsistent statements—only some of which the plaintiffs cite—about the timing and extent of Saudi government ownership of NCB:

- The PIF purchased a "50 percent stake in NCB" in "1991."  Supp. Fawcett Aff., ¶ 1 & Exh. 3.

- The PIF purchased a 50% interest in NCB in "1999."  Supp. Fawcett Aff., ¶ 1 & Exh. 1; Draper Aff., Exh. 3.

- The PIF acquired "60 percent" of NCB's stock in "1998."  *See* http://www.menafn.com/qn_print.asp?StoryID=5182&subl=true.

- As of April 2002, "NCB [wa]s 70% owned by the . . . PIF."  (*See* Stephen Timwell, *Saudi Banks Buck International Trend*, THE BANKER, Apr. 2, 2002, http://www.thebanker.com/news/fullstory.php/aid/208/Saudi_banks_buck_international.)

- The "Saudi government" owns "80%" of NCB.  *See* Supp. Fawcett Aff., ¶ 3 & Exh. 3.

- The "Saudi government" owns "more than 95 percent of the bank."  Supp. Fawcett Aff., ¶ 3 & Exh. 4.
- An "anonym[ous]" source for one of the Internet reports "refused to disclose details of the [PIF] purchase <u>or say when it was finalized</u>."  Supp. Fawcett Aff., ¶ 3 & Exh. 4 (emphasis added).

These Internet reports, however, do make one statement consistently—namely, that the "Saudi government" owns a majority of NCB's shares.  Of course, such statements contradict the plaintiffs' position that the PIF is not a core part of the Saudi government.  Surely, however, the plaintiffs cannot pick only the parts of the Internet reports that they like.

## V.    Plaintiffs Invite Inconsistent Pretrial Rulings.

There are currently twelve "September 11" lawsuits, only three of which were filed before the "end of 2002" majority-ownership acquisition date that the *Burnett* and *Ashton* plaintiffs derive from the Internet.  *See* Table A (attached hereto).  Because FSIA "instrumentality" status is measured as of the date on which a lawsuit is filed (*see supra* at 1), NCB still would meet the "majority ownership" test in nine of these twelve lawsuits, even if the *Burnett* and *Ashton* plaintiffs were correct about an "end of 2002" acquisition date (although they are not).  Thus, the *Burnett* and *Ashton* plaintiffs invite inconsistent pre-trial rulings on NCB's "instrumentality" status, contrary to the important MDL-consolidation goal of achieving consistency in pre-trial rulings and proceedings.  *See* 28 U.S.C. § 1407; *Degulis v. LXR Biotechnology*, 928 F. Supp. 1301, 1309 (S.D.N.Y. 1996).  The ruling that the *Burnett* and *Ashton* plaintiffs request—that the PIF acquired NCB's majority ownership only after those two lawsuits were filed—would not streamline or otherwise promote consistency in these MDL proceedings.  Rather, in the nine lawsuits that were filed in 2003 and 2004, the Court still would have to resolve the question of whether the PIF meets the FSIA test for being either "a foreign state or a political subdivision thereof."  Of course, that issue is the one that

the *Burnett* and *Ashton* plaintiffs originally raised, and on which the Court received briefing and oral argument.

Moreover, the hodgepodge of rulings that these plaintiffs invite on NCB's instrumentality status would send a confusing message to Saudi Arabia.  As the Supreme Court noted in *Patrickson*, "[f]oreign sovereign immunity [is meant] … to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns."  538 U.S. at 479.  Comity surely would be poorly served if a Saudi government instrumentality were treated as such in nine of these twelve lawsuits, but not in the other three.

Ultimately, however, if the Court considers it necessary to resolve the ownership-timing question, then the answer cannot be found by "surfing" the World Wide Web as plaintiffs propose.  Rather, the answer must be found in the transaction documents.  As we show next, those documents confirm that the PIF acquired the majority of NCB's shares on behalf of the Ministry of Finance not later than November 17, 2001.

## VI.    Under Controlling Saudi Law, the PIF Increased its NCB Shareholdings to 69.3% as of November 17, 2001.

The PIF acquired the majority of NCB's shares through two sets of transactions, one in 1999 and the other in 2001.  The first—which plaintiffs do not dispute—occurred in 1999, when the PIF acquired 50% of NCB's shares and thereafter sold 10% of those shares to another Saudi government entity.[2]  *See* Supp. Fawcett Aff., ¶ 3; Draper Aff., ¶¶ 2, 4, 7-9.  The second set of

---

[2]     Several decisions suggest that 50% ownership of NCB, held collectively by two Saudi government entities, alone would suffice to establish Saudi government majority-ownership of NCB as of 1999, as the *Ashton*, *Federal Insurance* and other plaintiffs have alleged.  *E.g., Int'l Ins. Co. v. Caja Nacional de Ahorro Y Seguro*, 293 F.3d 392, 399 (7th Cir. 2002) (evidence did not show that "at least 50%" of instrumentality was owned by Argentina); *Gardiner Stone Hunter v. Iberia Lines*, 896 F. Supp. 125, 131 (S.D.N.Y. 1995) (quoting with approval, *Linton v. Airbus Industrie*, 794 F. Supp. 650, 652 (S.D. Tex. 1992), which held "under [FSIA] section 1603, an entity 50% or more of whose shares are owned by a foreign state is itself a foreign state" (emphasis added)).  Decisions of this Court have approved the "pooling" of ownership interests held by entities of the same foreign government, *e.g., Credit Lyonnais v. Getty Square Assoc.*, 876 F. Supp. 517, 520 (S.D.N.Y. 1995), but not

transactions occurred in November 2001 and is described in affidavits by the chief legal officer of

the Saudi Ministry of Finance, and an expert on Saudi law.[3]   The transactional documents and the

affidavits confirm that, under controlling Saudi law,[4] "from 17 November 2001 to the present, the

the PIF on behalf of the Ministry of Finance has owned 69.3% of the National Bank [NCB]."  2d

Supp. Al-Wohaibi Aff., ¶ 6; *accord* Fahad Dec., ¶ 4.  In summary:

- The PIF (represented by the Minister of Finance) increased its 1999 stake in NCB by purchasing another 17,577,000 NCB shares through six identically-worded Sale Agreements dated and executed on 17 November 2001.  2d Supp. Al-Wohaibi Aff., ¶ 4; Fahad Dec., ¶¶ 4-5 & Exh. A.

---

entities of <u>different</u> foreign governments.  *Gardiner Stone*, 896 F. Supp. at 130; *see also In re Ski Train Fire in Kaprun, Austria*, 198 F. Supp. 2d 420, 426 (S.D.N.Y. 2002) (disagreeing with *Credit Lyonnais* where shares in the majority-ownership "pool" were held indirectly by a government).  The Court, however, need not reach the question whether the 1999 transaction satisfied the "majority" and ownership-pooling tests because it is clear that, without pooling, the PIF on behalf of the Finance Ministry increased its NCB shareholdings to 69.3% as of November 17, 2001.

[3]     *See* Second Supplemental Affidavit of Abdullah Bin Hamad Al-Wohaibi ("2d Supp. Al-Wohaibi Aff.") and Declaration of Abdulaziz Al-Fahad ("Fahad Dec.") (attached as Exhibits 1 and 2, respectively, to the accompanying Affidavit of Mitchell R. Berger).

[4]     **Choice of Law:**  The purchase of NCB's shares was negotiated and performed in Saudi Arabia, and the contracting parties were domiciled and located in Saudi Arabia.  Saudi Arabia was the "center of gravity" for the 2001 PIF transaction, and Saudi law therefore applies.  *See, e.g., Barkanic v. General Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 959-60 (2d Cir. 1991) (applying the forum state's choice-of-law rules to issues arising in an FSIA case); *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030-31 (2d Cir. 1996) (applying New York [the forum state] choice-of-law rules to contract issues in the context of an FSIA case and concluding that foreign law applied because the "center of gravity" of the contract, including the place of contract and place of performance, was outside the U.S.), *cert. denied*, 519 U.S. 1116 (1997); *see also Saylor v. Bastedo*, 82 F.R.D. 440, 442 n.2 (S.D.N.Y. 1979) (noting that law of state in which corporation issuing the stock was incorporated would govern on any issues regarding proof of ownership of stock), *aff'd in part and rev'd in part on other grounds*, 623 F.2d 230 (2d Cir. 1980).  Even if the Court applied a federal common law choice-of-law rule, the result would be the same because that rule also looks to the "center of gravity" of the transaction.  *See Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987) (applying federal common law choice-of-law rule in FSIA case and noting that the RESTATEMENT (SECOND) OF CONFLICT OF LAWS is the appropriate source of federal common law choice-of-law principles); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971) (applying five factors to determine what forum has the most "significant relationship" to the contractual issue, which include: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties).

8

- All of the 2001 Sale Agreements stated that the parties "have agreed" that the shares were "sold" to the PIF on behalf of the Ministry of Finance.  2d Supp. Al-Wohaibi Aff., ¶ 4; Fahad Dec., ¶ 7.

- The Agreements recited a fixed and definite purchase price and number of shares sold.  *Id.*

- Under Saudi law, "[t]he execution of the Sale Agreement with those specific terms makes it binding and gives it immediate effect."  Fahad Dec., ¶ 7.

- The sale was binding and effective as of November 17, 2001 notwithstanding a Sale Agreement provision that the sale "shall be effective" upon payment of the purchase price (which occurred on December 28, 2002.  Under Saudi law, that provision is invalid because it did not specify a date by which payment must be made, which improperly "would introduce an element of uncertainty" in the transaction.  Fahad Dec., ¶ 8; 2d Supp. Al-Wohaibi Aff., ¶ 7.

- Even when contracts specify a date for payment of the purchase price, under Saudi law "once the price is paid, the effectiveness of the contract is recognized to be the date on which the agreement was executed, with all rights and liabilities as of that date accruing to the purchaser."  Fahad Dec., ¶ 9; 2d Supp. Al-Wohaibi Aff., ¶ 7.

- "Accordingly, it is the position of the Ministry of Finance (including the Public Investment Fund) that, under Saudi law, the PIF and the seller-shareholders intended to and did transfer ownership of the 17,577,000 National Bank shares to the PIF on behalf of the Ministry as of 17 November 2001."  2d Supp. Al-Wohaibi Aff., ¶ 6.

The affidavit of the Ministry of Finance as to its ownership of NCB is entitled to "great weight" in the Court's determination of NCB's instrumentality status.  *O'Connell Mach. Co. v. M.V. Americana*, 566 F. Supp. 1381, 1384 (S.D.N.Y. 1983) (giving "great weight" to Italian Embassy affidavit concerning government ownership of "Italian Line," and government instrumentality), *aff'd*, 734 F.2d 115 (2d Cir.), *cert. denied*, 469 U.S. 1086 (1984); *accord Leutwyler v. Office of Her Majesty Queen Rania*, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001).  Questions of Saudi law concerning the effective date of ownership also are properly addressed by these affidavits.  *Guidi v. Inter-Continental Hotels Corp.*, No. 95-9006, 2003 WL 1907901, at *16 (S.D.N.Y. Apr. 16, 2003).

**VII.   Even Under U.S. Law, the PIF Acquired Majority-Ownership not later than November 17, 2001.**

In the unlikely event that U.S., rather than Saudi, law governed this transaction, the result would be the same.  In addition to signing the Sale Agreements, the sellers wrote letters dated 17 November 2001 to the Chairman of the Board of NCB, which referenced and enclosed a copy of the Sale Agreement and which enclosed certificates for, or relinquished the sellers' claim to, the shares sold.  2d Supp. Al-Wohaibi Aff., ¶¶ 5-6.  We understand that those letters and the share certificates were delivered to a Saudi lawyer, who held them until December 25, 2002.  Under the U.S. common law doctrine of "constructive delivery":

> [T]he purchaser of shares, absent any agreement to the contrary, is generally entitled to . . . all the privileges of a shareholder, except voting power, <u>from the time he makes the purchase contract, whether or not he has made payment, has taken legal title, or has been registered on the corporate records as a shareholder.</u>

8 WILLISTON ON CONTRACTS § 953, at 321 (3d ed. 1964) (emphasis added).  Viewed as a "constructive delivery," the 2001 Sale Agreements transferred ownership of the seller's 17,577,000 NCB shares to the PIF when the parties executed those Agreements on November 17, 2001— stating that the shares had been "sold"—even though payment occurred later.[5]  Equally, the fact that

---

[5]      *Accord Bankers Trust Co. v. Rhoades*, 111 B.R. 54, 56 (S.D.N.Y. 1990) (holding that a transfer of ownership of corporate shares occurred at the time a purchase agreement was executed regardless of whether or not the purchaser subsequently breached the agreement by failing to pay the required consideration); *Kallop v. McAllister,* 678 A.2d 526, 531-32 (Del. Sup. Ct. 1996) (finding that "receipt of the Letter Agreement constituted a valid constructive delivery of the one share of stock" (emphasis added)); *Smith v. Koehler*, 632 N.E.2d 914, 916 (Ohio. Ct. App. 1992) (holding that, in the absence of physical delivery of a stock certificate, "there may still be a beneficial, or equitable, change of ownership prior to the delivery of the certificated security, where the buyer and seller are contractually bound" (emphasis added)); *Tri-State Rubber v. Central States Pension Fund*, 677 F. Supp. 516, 519 (E.D. Mich. 1987) (holding that "a stock assignment agreement is valid at the time of its making … and neither a failure to transfer certificates of ownership nor a corporation's failure to record a transfer in its books invalidates a stock assignment" (emphasis added)); *Equitable Trust Co. v. Gallagher,* 67 A.2d 50, 54 (Del. Ch. 1949) (holding that an agreement "purporting to assign and transfer shares of corporate stock" may, in itself, complete delivery), *aff'd*, 77 A.2d 548 (Del. Super. 1950).

registration occurred later does not postpone either the constructive delivery of those shares, or the effective date of the transfer of ownership.[6]

Alternatively, under the Uniform Commercial Code, ownership of shares is transferred upon actual delivery to the purchaser or to someone designated by the purchaser "other than a securities intermediary."[7]  UCC §§ 8-104(a)(1), 8-301(a)(2); *see, e.g.*, N.Y.U.C.C. §§ 8-104(a)(1), 8-301(a)(2).  The Court need not reach the UCC issue, however, both because the transaction is governed by Saudi law and because, even if U.S. law applied, ownership of the 17,577,000 shares would have transferred to the PIF on November 17, 2001 under the doctrine of constructive delivery.[8]

---

[6]     *See In re Comark*, 124 B.R. 806, 813 (Bkrtcy. C.D. Cal. 1991) (holding that the transfer of securities can be accomplished without reregistering or physically transferring them), *aff'd*, 145 B.R. 47 (9th Cir. 1992); *Tri-State Rubber*, 677 F. Supp. at 519 (finding a valid transfer of stock even though the corporation "fail[ed] to record a transfer on its books"); *Estate of Bridges v. Mosebrook*, 662 S.W.2d 116, 121 (Tex. Ct. App. 1983) ("Actual delivery is not always necessary; rather, where the circumstances make actual delivery impractical, delivery may be symbolical or constructive. . . . The controlling issue is not who had possession of the certificates, but who had actual ownership of the stock, as evidenced by all the circumstances."); *Katz v. Prete*, 459 A.2d 81, 84 (R.I. 1983) (intent of the parties, rather than corporate formalities, establish stock ownership, "which may be inferred from the acts and conduct of a party").

[7]     A "securities intermediary" is either "a clearing corporation" or "a person, including a bank or a broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  UCC § 8-102(a)(14); *see, e.g.*, N.Y.U.C.C. § 8-102(a)(14).  An escrow agent designated by the purchaser is not a securities intermediary.  *See Barakat v. South Fork Oil & Gas Co.*, 631 F. Supp. 45, 47 (D. Utah 1985).

[8]     "Article 8 of the UCC . . . did not displace common law constructive delivery."  *Kallop,* 678 A.2d at 530; *see also Andrews v. Troy Bank & Trust Co.*, 529 So. 2d 987, 992 (Ala. 1988); *Crow v. Newspaper Dealer Supply,* 603 F. Supp. 847, 851 (E.D. Mo. 1985) (construing Missouri UCC); *Tanner v. Robinson,* 411 So. 2d 240, 241-42 (Fla. Ct. App. 1982); *In Re Stewart Becker, Ltd. v. Horowitz,* 94 Misc. 2d 766, 405 N.Y.S. 2d 571, 574 (Sup. Ct. 1978).

**Conclusion**

For the foregoing reasons, NCB respectfully submits that, as a matter of law and undisputed fact, the PIF on behalf of the Ministry of Finance acquired majority ownership of NCB not later than November 17, 2001.

Dated:  October 7, 2004                         Respectfully submitted,
        Washington, D.C.

                                       /s/ Ronald S. Liebman
                                       Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB-4112)
Ugo Colella (admitted *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:     202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*

12

**TABLE A**

| Case | Date Filed |
|---|---|
| *Ashton* | September 4, 2002 |
| *Burnett* | August 15, 2002 |
| *Tremsky* | September 11, 2002 |
| *Salvo* | July 8, 2003 |
| *Federal Insurance* | September 10, 2003 |
| *Barrera* | September 10, 2003 |
| *O'Neill* | March 10, 2004 |
| *New York Marine* | August 6, 2004 |
| *Continental Casualty Co.* | September 1, 2004 |
| *Cantor Fitzgerald* | September 2, 2004 |
| *Euro Brokers* | September 10, 2004 |
| *World Trade Center Properties* | September 10, 2004 |