# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                          x
IN RE: TERRORIST ATTACKS        x     03 MDL 1570 (RCC)
ON SEPTEMBER 11, 2001           x
------------------------------------------------------x

*This document relates to:*

*Thomas Burnett, Sr. v. Al Baraka Investment & Develop. Cop.* 03 CV 9849 (RCC)
*Ashton v. Al Qaeda, et al.*, 02 CV 6977 (RCC)

## DECLARATION OF ABDULAZIZ H. AL FAHAD

I, Abdulaziz H. Al Fahad, declare as follows:

This declaration is given at the request of United States counsel for The National Commercial Bank, to address certain issues of Saudi law that are relevant to assertions made in two affidavits submitted by the plaintiffs: (1) "Supplemental Affidavit [David. K. Draper] in Further Opposition to National Commercial Bank's Motion to Dismiss" dated September 21, 2004 (the "Draper Affidavit"); and (2) "Supplemental Affidavit of John Fawcett in Support of Ashton Plaintiffs' Opposition to National Commercial Bank's Motion to Dismiss" dated September 23, 2004 (the "Supplemental Fawcett Affidavit"). I have previously submitted declarations in this action, including one dated April 6, 2003 in support of the motion to dismiss filed by His Royal Highness Prince Sultan bin Abdulaziz Al-Saud. I am being compensated for my work in this matter.

2.  I am a lawyer admitted to practice in the Kingdom of Saudi Arabia. I was born and raised in Saudi Arabia, and received an undergraduate, graduate and legal education in the United States. I received a B.A. degree in economics from

Michigan State University in 1979, an M.A. in International Relations from the Johns Hopkins School of Advanced International Studies in 1980, and a J.D. degree from Yale Law School in 1984. During 1984-1985, I was a Post-Doctoral Fellow at Harvard's Center for Middle Eastern Studies and a Research Fellow at Harvard Law School.

     3.     Currently I am the principal of the Law Office of Abdulaziz H. Fahad in Riyadh, in affiliation with the United States law firm Akin, Gump, Strauss Hauer & Feld. I am a member of the Academic Committee, Legal Experts Commission, Council of Ministers (which is charged with translating official government documents); was a member of the Advisory Commission of the Supreme Economic Council (1999-2003); and a member of the International Trade Committee of the Council of Saudi Chambers of Commerce and Industry. I have occasionally taught and written on Middle Eastern law, politics and economics, and most recently, "From Exclusivism to Accommodation: Doctrinal and Legal Evolution of Wahhabism," 79 N.Y.U. L. Rev. 485 (2004). I am also a licensed Arabic to English translator, holding License No. 138 issued by the Ministry of Commerce of the Kingdom of Saudi Arabia.

     4.     I have been asked to review the various agreements, written in Arabic and governed by Saudi law, by which majority ownership of The National Commercial Bank ("NCB") was acquired by The Public Investment Fund ("PIF") on behalf of the Saudi Ministry of Finance to determine when such majority ownership became effective as a matter of Saudi law. In summary, as explained in more detail below, it is my conclusion that, pursuant to Sale Agreements dated 2 Ramadan 1422H, corresponding to 17 November, 2001G, PIF on behalf of the Ministry of Finance, acquired, with binding effect as of that date, an additional 17,577,000 shares

of NCB, bringing the total holdings of the PIF on behalf of the Ministry of Finance to 69.3% of NCB's issued and outstanding common stock as of November 17, 2001.

5    The sale of the additional 17,577,000 shares was effected through six separate but identical sales agreements (the "Sale Agreement") with differences only in the identity of the sellers and the number of shares sold. (Attached as Exhibit A hereto is a copy of the six Sale Agreements executed on 17 November 2001 in their original Arabic, together with my translation of those documents into English, which certify to be a true and accurate translation.)

6.    On 17 November 2001, simultaneously with execution of the 2001 Sale Agreements, the sellers wrote letters (the "November 2001 letters") to the Chairman of the Board of NCB, which referred to and enclosed a copy of the 2001 Sale Agreements. The November 2001 letters also enclosed, or expressly relinquished the seller's claim to, NCB share certificates equal to the number of shares sold to the Fund. The November 2001 letters further stated: "This is so that you may take the steps necessary with respect to this sale agreement and its recording in the Bank's shareholder register and to provide me with a copy of your letter to the Public Investment Fund, confirming the delivery of the shares thereto, for our record keeping." The November 2001 letters delivered or relinquished the full total of the 17,577,000 NCB shares "sold" to the PIF on behalf of the Ministry in the 2001 transactions. (Attached as Exhibit B hereto is a copy of the six letters dated 17 November 2001 in their original Arabic, together with my translation of those documents into English, which I certify to be a true and accurate translation.)

7.    The Sale Agreement clearly states that the shares were "sold" and the price was definite as well as the number of shares sold. The execution of the Sale Agreement with those specific terms makes it binding and gives it immediate effect.

8.	Article 5 purports to offer qualifications as to the effectiveness of the Sale Agreement by stipulating that the sale "shall become effective" upon the purchaser's payment of the price. This qualification is invalid under Saudi law since it lacks any time limit, which would introduce an element of uncertainty. The sale price was paid on December 28, 2002, as demonstrated by the date upon which the stock certificate was transferred to PIF.

9.	Even assuming the validity of the Article 5 qualification, upon payment of the price, it is the established Saudi law that, once the price is paid, the effectiveness of the contract is recognized to be the date on which the agreement was executed, with all rights and liabilities as of that date accruing to the purchaser.

10.	These are the rules according to the standard legal texts authored by the most prominent Hanbali jurists, Hanbalism being the official school of Islamic jurisprudence in Saudi Arabia. For example, the jurist Mansur al-Buhuti in his <u>Kashshaf al-Qina'</u>, clearly states that if "[two contracting parties] stipulate a condition and do not specify its duration" then "the stipulation is void." [Beirut: 'Alam al-Kutub, n.d., vol. 3, p.203]. The same author, in his other standard reference, <u>Sharh Muntaha al-Iradat</u>, states that "ownership of a sold item is transferred to a purchaser and of a price to a seller by virtue of the contract whether the [two contracting parties] stipulate a condition for one or both of them." [Beirut: Alam al-kutub, 1996, vol. 2, p.39.]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 4, 2004.

*[signature]*

Abdulaziz H. Al Fahad

4