UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001      MDL No. 1570

-------------------------------------------------------------x

Thomas Burnett, Sr., *et al.*                      03 CV 9849 (RCC)

Plaintiffs

- against -

Al Baraka Investment & Development Corp., *et al.*

Defendants.

-------------------------------------------------------------x

**AFFIDAVIT OF EVAN F. KOHLMANN**

Evan F. Kohlmann declares under penalty of perjury:

1. I am a consultant offering expert research and analysis services to media, governmental, and non-governmental clients on issues relating to Al-Qaida and International Terrorism.  In the past, I have testified in federal court as a government expert witness on terrorism and Internet-research matters.  I am author of the book, Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network, cited by the final report of the bi-partisan Congressional 9/11 Commission (issued in July 2004) as a recommended source of information on "Bin Ladin's involvement in the Bosnian conflicts."  I submit this affidavit to provide the Court with an explanation of the documents seized in Bosnia including the "Golden Chain".[1]

---

[1]      Please find attached as **Exhibit 1** a copy of my curriculum vitae.

2. For over seven years, I have tracked and analyzed al-Qaida. During that time, I have lectured and given frequent briefings on transnational terrorist threats to academic, law enforcement, and intelligence bodies, including the United States Department of Justice, Federal Bureau of Investigation, National Security Council, and the Department of Homeland Security.

3. I have served as an approved expert witness on behalf of federal prosecutors in various terrorism cases, including most recently before Judge Leonie, Brinkema in <u>United States v. Masoud Khan</u> (United States District Court for the Eastern District of Virginia).

4. I hold a B.S.F.S. in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown) and a J.D. From the University of Pennsylvania Law School. AT the School of Foreign Service at Georgetown, I worked as a research assistant to Dr. Mamoun Fandy, a widely-known Egyptian political scientist and Middle East expert.

5. In April 2001, I authored an acclaimed honors thesis at Georgetown University titled "The Legacy of the Arab-Afghans: A Case Study." The work analyzed the roots of Al-Qaida and how it has managed to infiltrate various countries in the Middle East, North Africa, and Central Asia. Also, in 2001 I was certified by the Center for Muslim-Christian Understanding at Georgetown University in Islamic studies.

6. In April 1988, Abdullah Azzam and Usama Bin Laden announced the founding of al Qaeda. Azzam published the nascent organization's main policy platform in Peshawar's Al-Jihad Magazine reasoning that every revolutionary ideology needs a rugged, elite cadre to protect it, inspire it, and lead it to ultimate victory. According to

Azzam, the war in Afghanistan emblemized a divine "trial by fire" of the vanguard; it was a test of their true commitment to establish Islam at any cost.  Only by continued armed struggle would the unified strength of the Muslims be brought to bear on their supposed enemies.  In concluding, Azzam issued what he referred to as "the final call":  "We shall continue the Jihad no matter how long the way is until the last breath and the last beating of the pulse or we see the Islamic state established."[2]  One of Azzam's top lieutenants, Tamim Al-Adnani, declared to a rapt audience in that U.S. later that year, "the best thing is [to] continue Jihad.  Nothing but Jihad...  Even after liberation of Afghanistan, even after the Islamic government, [the mujahideen] will not stop.  They will go up to the Muslim countries of Russia, Islamic republics.  They will go down to Palestine, to [Jerusalem]."  Moreover, Al-Adnani offered this chilling addendum:  "[if] Anybody stops in their way, Oh my God!  Smash them!  Any ruler, [if] he will not let us go, we will go by force!  Jihad!"[3]

7. The elite group of initial Al-Qaida members was comprised of a diverse mix of predominantly Saudis, Egyptians, Syrians, and Yemenis.  Among the men who grew very close to Bin Laden at this time was Jamal al-Fadl (a.k.a. Abu Bakr al-Sudani), originally from northeast Africa, who arrived in Afghanistan via Saudi Arabia.  Al-Fadl was the graduate of at least four different emerging Al-Qaida combat training camps along the Pakistani-Afghan border -- Khalid bin al-Walid, Jihad Wal, Al-Farooq, and Abu Bark al-Siddiz -- studying everything from urban warfare and explosives to how to shoot down helicopters and airplanes with shoulder-fired rocket projectiles.  During testimony given at the federal trial of U.S. v. Usama Bin Laden et

[2] Azzam, Dr. Abdallah. "*Al-Qa'ida*." *Al-Jihad*.  No. 41; April 1988.  *Page 46.*
[3] Emerson, Steven.  *Jihad in America*.  SAE Productions (for PBS); Washington, DC.  Originally aired November 21, 1994.  Running time:  1 hour.

al., Al-Fadl recalled discussions with Bin Laden concerning the purpose of this training:

> "[Bin Laden was] thinking about making [a new] group ... to be ready for another step because in Afghanistan everything is over ... [He said] we have to make Khalifa ... Khalifa mean we need one Muslim leader for the whole Muslim in the war... He say also we want to change the Arab government because there's no Muslim government in the war, so we have to make [a] Muslim government.[4]

4. Jamal Ahmed Mohamed Al-Fadl was one of the first to swear allegiance to Usama Bin Laden when Al Qaeda was formed in Afghanistan in 1988.  Al-Fadl moved to Sudan in 1991 when Al Qaeda relocated its headquarters to this country.  He became a financial aide for several front companies formed by Usama Bin Laden in Sudan, regularly meeting Usama Bin Laden and high ranking members of the terrorist organization and providing a large scale of financial services to the Al Qaeda members.

5. Acting on behalf of Usama Bin Laden was an influential extremist Saudi religious benefactor named Shaykh Adel Batterjee.  As an enthusiastic supporter of the jihad in Afghanistan, Batterjee established Lajnat Al-Birr Al-Islamiyya (a.k.a. Lajnat al-Birr al-Dawaliyya, Benevolence International Foundation) in 1987 in Pakistan and Saudi Arabia.  From its inception, Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the foreign mujahideen in Afghanistan.  An internal BIF document confirms that "its purpose 'from the first day' was to provide support to *jihad* and *mujahideen* and which indicated that BIF moved

---

[4] U.S. v. Usama Bin Laden et al. February 6, 2001.  Page 189-190.

to the Sudan because of its relationship with 'the base,' the English translation for *Al Qaeda*."[5]

6.  One of the documents seized in the Bosnian office of BIF is a handwritten memo on BIF letterhead stationery providing a detailed expense report for months in 1990. Among the transactions described are wage payments made for the months April to June, 1990; 70,000 paid to the Yemeni camp by Adel Batterjee; a 100,000 payment to "the Jihad Department;" and 500 paid to "Usama's ...(illegible). account."[6]  This payment was made by BIF to Osama Bin Laden's Jihad Department two years after the formation of Al-Qaeda and after the withdrawal of the Soviets from Afghanistan.

7.      In approximately 1993, in conversations with former senior Al-Qaida lieutenant Jamal Al-Fadl, Usama Bin Laden identified three Muslim charities as the primary sources of Al-Qaida financial and fundraising activity, including BIF. "In or about 1993, Bin Laden advised *Al Qaeda* member Jamal Ahmed Al Fadl that *Al Qaeda* was using several charities to fund its operations oversees, specifically naming *al* Birr, which translates in English to 'Benevolence.'"[7]  Like the other charities Bin Laden named, BIF served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping "to move funds to areas where al

---

[5] "Government's Bill of Particulars." <u>United States of America v. Enaam M. Arnaout</u> United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. February 3, 2003, pp. 2-3. **Attached hereto as Exhibit 2.**
[6] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." <u>United States of America v. Enaam M. Arnaout</u> United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Exhibit 98.* (Parenthesis indicates a translator's notation). **Attached hereto as Exhibit 3.**
[7] "Government's Response to Defendant's Position Paper as to Sentencing Factors." <u>United States of America v. Enaam M. Arnaout</u> United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. June 12, 2003, p.31. **Attached hereto as Exhibit 4.**

Qaeda was carrying out operations."[8] According to a U.S. Justice Department brief on the subject:

> "[Al-Fadl] understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy."

8. Standing orders were left by Bin Laden to keep all transactions involving the charitable groups in cash only; by this method, these NGOs were manipulated as a secret laundry to make Al-Qaida's financial network virtually invisible. The charities would then create false documentation for the benefit of unwary donors, purportedly showing that the money had actually been spent on orphans or starving refugees. In fact, according to some former employees of these organizations, upwards of 50% of their total funding was secretly diverted directly to Al-Qaida and Usama Bin Laden.[9]

9. The Jeddah-based charitable group BIF went to great lengths to protect the reputation of its prestigious donors. In 1993, Shaykh Batterjee publicly stepped down as head of BIF in exchange for a more behind-the-scenes role. Several years afterwards, the individual who took over Benevolence from Batterjee, Enaam Arnaout, instructed his staff to disavow any knowledge of the "founders": "[t]ell him that all we know about them is that they are Saudi Business men and that they left the organization in May 93. Do not[sic] disclose any other information."[10]

---

[8] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. Pages 28-29. **Attached hereto as Exhibit 5.**

[9] Dugger, Celia W. "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say." The New York Times January 21, 1999. *Page 4.*

[10] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Pages 28-29.* **Attached hereto as Exhibit 5.**

10.     Nevertheless, in approximately 1993, when the manager of BIF's main office in the Sudan traveled to Saudi Arabia to meet with local donors, he was arrested and held for several weeks by Saudi authorities while being subjected to repeated interrogation by Saudi intelligence regarding the now apparent relationship between BIF and Usama Bin Laden. According to Jamal Ahmed Al-Fadl, Al-Qaida Treasurer Madani Al-Tayyib worried that the arrest could only mean that the Saudi regime had uncovered documents and records linking BIF directly to Usama Bin Laden. When the Sudanese administrator was finally freed and able to return to Khartoum, Bin Laden hastily convened a meeting to determine whether he had divulged any sensitive information regarding Al-Qaida's relationship with BIF. Yet, in the end, Bin Laden worried needlessly; though the Saudis had indeed uncovered evidence of a BIF-Al-Qaida connection, no apparent steps were taken to close this source of funding or support. Several months later, Al-Tayyib indicated to Al-Fadl that "the problem had been fixed" and no more was spoken of the incident.[11]

11.     During interviews with federal prosecutors and FBI agents, former Al-Qaida lieutenant Jamal al-Fadl has detailed meetings held at this time of high-ranking Al-Qaida officials in the Balkans chaired by Abu Abdel Aziz "Barbaros" (a senior Al-Qaida fighter from Afghanistan) and attended by, among others, Enaam Arnaout and Bin Laden's cousin Abu Zubair al-Madani.[12] During those meetings, Abu Abdel Aziz talked about his directives from Usama Bin Laden and indicated that Al-Qaida was seeking to use the regional jihad in Bosnia as "a base for operations... against al

---

[11] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 26.* **Attached hereto as Exhibit 5.**
[12] Shaykh Abu Abdel Aziz is identified in these documents by his alias Abdulrahman Al-Dosari.

Qaeda's true enemy, the United States."[13]  Not long afterward, Abu Hajer al-Iraqi
(Mamdouh Mahmud Salim, one of the original founders of Al-Qaida in Afghanistan)
confirmed to al-Fadl in private discussions that Abu Abdel Aziz had spoken the truth,
and Usama Bin Laden's interest in Bosnia was largely as a staging area from which to
strike at America.[14] Consequently, Enaam Arnaout personally arranged for Al-Qaida
material resources to be diverted from Afghanistan into central Bosnia, including nine
elite instructors from the *Al-Sadda* terrorist training camp.[15]

12.      In order to assist in these far-flung BIF regional operations, Enaam Arnaout had
recruited several local Bosnian fundamentalists, including former Bosnian intelligence
officer Munib Zahiragic.  Zahiragic was placed in charge of a cache of extremely
sensitive internal Al-Qaida historical documents that were deemed too important to
accidentally fall into enemy hands in the tumultuous Sudan or Afghanistan. The
documents, some stored on CD-ROM and computer hard drives, revealed the detailed
early history of Al-Qaida in Afghanistan through the eyes of Usama Bin Laden and his
henchmen.

13.      The evidence also laid the basic groundwork for the vast financing and
recruitment network lurking behind Al-Qaida. Various documents within the cache
appear to have been authored anywhere from approximately 1987 to 1992— when
Arnaout (under orders from Bin Laden and Abu Abdel Aziz "Barbaros") had carried

---

[13] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02CR 892. January 31, 2003. *Page 24-25*. **Attached hereto as Exhibit 5.**
[14] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 24-25*. **Attached hereto as Exhibit 5.**
[15] Government's Response to Defendant's Position Paper as to Sentencing Factors." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois Eastern Division. Case #: 02 CR 892. *Page 38*. **Attached hereto as Exhibit 4.**

out the key shift in military training operations from Afghanistan to Bosnia and the

Sudan. Following the end of the Bosnian war in 1995, Zahiragic deliberately

concealed these materials in a family member's empty car garage in central Bosnia.

14.     By 1996, the Bosnian-Sudanese Al-Qaida network established by Usama Bin

Laden was already starting to crumble. Former top Al-Qaida lieutenant and BIF

officer in the Sudan Jamal al-Fadl turned himself in to the U.S. government and

volunteered to be an inside informant after a dispute with Bin Laden over embezzled

Al-Qaida finances. Within five years, al-Fadl would testify as the U.S. Justice

Department's star witness at the federal trial of Usama Bin Laden in the Southern

District of New York. On November 6, 1997, Enaam Arnaout wrote a letter to a BIF

employee suddenly instructing him to "conceal Batterjee's involvement in BIF": "For

the person in Saudi Arabia give him the three names of the Founders. You will find it

in the old bylaws (The names along with Adil B.). Tell him that all we know about

them is that they are Saudi Business men and that they left the organization in May 93.

Do not (sic) disclose any other information."[16]

15.     Finally, in the aftermath of the September 11 terrorist attacks, the U.S.

government froze the corporate assets of BIF and commenced legal action against one

of its principle directors and founders, Illinois-resident Enaam Arnaout. During

February 2002, Arnaout worriedly contacted his brother "Dr. Hisham" to discuss how

"they" had taken the former director of BIF's office in Bosnia "in a special plane...

[t]o Cuba." Arnaout, convinced of his own inevitable fate, explained to Hisham how

he would attempt to shoulder the blame and exonerate BIF's Saudi founders. He

---

[16] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 29*. **Attached hereto as Exhibit 5.**

somberly reflected, "It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how."[17]

16.      Acting on the request of American intelligence and law enforcement, Bosnian security forces duly raided BIF's offices in Sarajevo in March 2002 and detained its manager, Munib Zahiragic. Zahiragic turned over nearly 100 top-secret documents about suspected fundamentalist terrorists operating in Bosnia, including transcripts of communications between BIF management and senior commanders of Al-Qaida based in Afghanistan.[18] This cache of documents describing the formation of Al-Qaida are discussed in the complaint filed by Burnett plaintiffs at paragraph 219.

17.      In March of 2002, the Supreme Court of the Federation of Bosnia and Herzegovina, issued an order to search and seize certain documents and items as evidence supporting claims of conspiracy to commit terrorist acts [hereinafter referred to as "Seized Evidence". A general description of the seized items can be found in a Special Report filed with the Federation of Bosnia and Herzegovina on April 11, 2002.[19] The Federal Ministry of Internal Affairs in Bosnia and Herzegovina subsequently informed the Supreme Court of Bosnia and Herzegovina that it released the Seized Evidence seized to representatives of the United States Embassy in Sarajevo for use in the investigation of BIF and Enaam Arnaout.[20]

18.      On November 14, 2002, the U.S. District Court for the District of Columbia issued Letters Rogatory to the Supreme Court of the Federation of Bosnia and

---

[17] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 74.* **Attached hereto as Exhibit 5.**
[18] Whitmore, Brian. "Bosnian Charities Tied to Terror." The Boston Globe. July 2, 2002. Page 1.
[19] *See,* **Exhibit 6**.
[20] *See,* **Exhibit 7**.

Herzegovina, requesting international cooperation and the production of the Seized

Evidence.   On February 25, 2003 and March 6, 2003, the Supreme Court of Bosnia

and Herzegovina issued two orders demanding that the Seized Evidence turned over to

the United States Embassy be given to the Burnett Plaintiffs for use in this case.[21]

Burnett Plaintiffs contacted the Assistant U.S. attorney for the Northern District of

Illinois and requested production of the Seized Evidence as described in the Letters

Rogatory to Bosnia and Herzegovina and in the orders of the Bosnian Supreme Court.

On March 10, 2003, The U.S. Attorney's Office sent a partial set of the Seized

Evidence in Bosnia.  Specifically the U.S. Attorney sent exhibits 5-103 of the 247

exhibits to the Arnaout Proffer.  The Assistant U.S. Attorney noted in the transmission

"that while no U.S. court order requires us to produce these materials to you, we

believe that their production is consistent with the intent of the courts in Washington,

DC and in Bosnia-Herzegovina."[22]

19.    This cache of documents describes and historically annotates the formation and

the development of Al-Qaida.  The documents do not purport to describe the war in

Afghanistan except to the extent that it sets the framework for Bin Laden's vision of

global jihad.  For this reason the earliest documents within the collection are dated

1987.   The bulk of the documents, however, are dated after the formation of Al-Qaida

in 1988.

20.    The documents include a collection of hand-written meeting minutes.  On August

11, 1988, the notes describe "a discussion regarding the establishment of a new

military group ... Qaida (the base)."  The meeting concludes with an estimate that

---

[21] See, **Exhibit 8.**
[22] See, **Exhibit 9.**

"within six months of Al Qaida (the base), 314 brothers will be trained and ready."[23]

Shortly thereafter in a subsequent meeting an advisory council was established. Bin

Laden stated that "Al Qaida is basically an organized Islamic faction. Its goal will be

to lift the word of God to make His religion victorious." The council also established

a set of requirements to enter Al Qaida and a pledge or an oath that each member was

required to declare. The meeting concluded by stating that the "work of Al Qaida

commenced on September 10, 1988..."[24] Shortly thereafter the committee established

a listing of action items for the new Al Qaida movement. The notes state that:

> "2. The camps remain as they are.
> 6. Holding a mass-media event to collect in-kind and financial donations.
> 7. Clarifying a Mujahideen's situation to the world in keeping the spirit of jihad alive.
> 10. Forming a committee to receive donations and maintain an account and the spending
> - the Crescent (most likely, the Saudi Red Crescent),
> - the Rabita (the Muslim World League),
> - Sheikh Abdallah,
> - the Relief Agency (Hayaat Al-Ighata),
> - Abu Mazin.
> 17. Discussing the present situation with the Al-Jamaa Al Islamiyya (the Islamic Group), and the possibility of cooperation (Abu El-Jood).
> 23. A printed declaration which will explain the following:
>> a. The East's and West's agreement to prevent the establishment of an Islamic nation and thorn;
>> b. The only solution is the continuation of the armed jihad ...
> 28. Keeping alive the jihadist's spirit among Muslims in general, and the Arabs in particular, by opening bases for their jihad along with maintaining contact lines with them. The Sudan is recommended."

21.     The collection also includes a series of letters and other pieces of correspondence

which were signed and dated by Osama Bin Laden either using his own name or one

---

[23] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02CR 892. January 31, 2003. *Exhibit 20.* **Attached hereto as Exhibit 10.**
[24] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02CR 892. January 31, 2003. *Exhibit 21.* **Attached hereto as Exhibit 11.**

of his various aliases or signed by others on his behalf.[25]  These letters at times request the acquisition of funds or the distribution of funds.

22.     The cache of documents includes memoranda and meeting notes written on the letterhead of various Islamic charities including the Muslim World League, the International Islamic Relief Organization and Al Birr (the predecessor to Benevolence International Foundation).  One of the documents states that one "must pursue finding an umbrella which you can stay under, other than the Crescent (most likely, the Saudi Red Crescent) because I expect that Abu Al-Hasan will be replaced, because he is known by them especially after Abu Mazin left the arena, and I prefer the name of the League (most likely, Muslin World League) ..."[26]  One of the documents seized in the Bosnian office of BIF is a handwritten memo on BIF letterhead stationery  providing a detailed expense report for months in 1990.  Among the transactions described as wage payments made for the months April to June, 1990; 70,000 paid to the Yemeni camp by Adel Batterjee; a 100,000 payment to "the Jihad Department;" and 500 paid to "Usama's ... (illegible) account."[27]

23.     In the same cache of documents among the materials which describe the historical formation of Al Qaida is found a document which has been described by Jamal Ahmed Al Fadl as the "Golden Chain".  According to briefs filed by the U.S. Attorney's Office in Chicago:

---

[25] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Exhibit 8, 9, 11, 13-17, 29.*  **Attached hereto as Exhibit 12.**

[26] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Exhibit 9-A.*  **Attached hereto as Exhibit 13.**

[27] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Exhibit 98.*  **Attached hereto as Exhibit 3.**

"BIF had in its Sarajevo office a computer file labeled 'Tareekh Osama,' or 'Osama's History.' The file contains scanned images of documents which chronicles Usama Bin Laden's activities in Afghanistan which led to the formation of al Qaeda and even includes later reports of the danger Bin Laden poses to the U.S. BIF possessed in the file a handwritten draft list of the people referred to within al Qaeda as the 'Golden Chain,' wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: 'And spend for God's cause.' The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. 'Usama' appears after seven of the listings, including the listing 'Bin Laden Brothers.' 'Baterji', LBI's and BIF's founder, appears after six of the listings. Only three other persons are listed in the parentheses."[28]

24.    Jamal Al Fadl was prepared to provide testimony in the case of <u>United States of America v. Enaam M. Arnaout</u>, United States District Court, Northern District of Illinois, Eastern Division, Case #:  02CR 892, concerning Exhibit 5 of the Government's Proffer.  According to Al Fadl, the list of predominantly Saudi Muslim businessmen known as the "Golden Chain" were ardent supporters of Usama Bin Laden who regularly provided him and his associates with funding for transportation, communications equipment, weapons, and ammunition.

25.    Exhibit 105 from the Government's Proffer is the transcript of a videotape featuring Enaam Arnaout and Specially Designated Global Terrorist (SDGT) Gulbuddin Hekmatyar, who according to the U.S. State Department has "supported terrorist acts carried out by al-Qaida and the Taliban."  During the video, "Arnaout, Hekmatyar and others assemble a satellite telephone provided" to Arnaout through the financial resources of a prominent member of the "Golden Chain."

26.    Jamal Al Fadl's potential testimony regarding these exhibits buttresses the conclusion that the Golden Chain list is a list of donors to the Al Qaida network and

---

[28] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." <u>United States of America v. Enaam M. Arnaout.</u> United States District Court Northern District of Illinois, Eastern Division. Case #: 02CR 892. January 31, 2003. *Pages 33-34.* **Attached hereto as Exhibit 5.**

not merely a list of individuals who provided financial support to Usama Bin Laden during the first Afghan war.

27.     According to the final report of the bi-partisan Congressional 9/11 Commission released in July 2004:

> "Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'"[29]

28.     Though it is not possible to say with certainty the precise years that these two documents were first penned, their content and context suggest anywhere from approximately the founding of Al-Qaida in April 1988 to the sudden transfer of BIF operations from Afghanistan to Bosnia and the Sudan in 1992-1993. Regardless of the date of the document, Al Fadl's statements concerning the contributions of the members on the Golden Chain extend into the early to mid 1990s long after the conclusion of the war in Afghanistan and the formation of Al Qaida. Moreover, corroborating evidence taken from media reports and financial records suggest that at least some of the wealthy donors first advertised on the "Golden Chain" list (such as Shaykh Adel Batterjee) continued to indirectly fund Al-Qaida military operations through fraudulent Islamic charities like BIF until at least the year 2000.

29.     I have also had the opportunity to review a transcript of the hearing on Tuesday, October 12, 2004, wherein counsel for Golden Chain member Mr. Al Husaini stated that the documents cited in the Proffer filed in the Arnaout case were rejected by the

---

[29] The 9/11 Commission Final Report. *Page 55.*

United States District Court, Northern District of Illinois, Eastern Division.[30]  To the

contrary, in the government's response to defendant Arnaout position paper as to

sentencing factors, the government states that:

> As defendant **now acknowledges**, defendant became well-acquainted with Usama
> Bin Laden and *al Qaeda* in the 1980s, having spent significant time in bin Laden's
> *al Masada* camp in Afghanistan and then living in Bin Laden's house.  In 1997,
> defendant arranged to preserve in electronic form historical documents
> concerning Usama Bin Laden and *al Qaeda* as well as other persons and groups.
> These items, which have been discussed in detail in the government's *Santiago*
> *Proffer* and other filings, include the August 1988 minutes of the founding of *al*
> *Qaeda* and handwritten notes taken by defendant himself in October 1988 of a
> *shura* ("consultation") council meeting at Bin Laden's house involving Bin Laden
> and others that occurred two months after *al Qaeda* had been formed.[31]

The minutes of the founding of Al Qaeda were found in Bosnia and in the possession

of the defendant, Enaam Arnaout in Illinois.[32]

30.     The Proffer documents were authenticated by Enaam Arnaout's admission.

Moreover, they were specifically used to determine an appropriate sentence for the

former head of the Benevolence International Foundation, Enaam Arnaout.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 18, 2004.

---

[30]  Hearing transcript, <u>Ashton, et al. v. Egyptian Islamic Jihad, et al.</u>, Case No. 03 MD 1570 (RCC) page 29,
line 17 through page 30, line 1.  **Attached hereto as Exhibit 14.**

[31]  "Government's Response to Defendant's Position Paper as to Sentencing Factors."  <u>United</u>
<u>States of America v. Enaam M. Arnaout</u> United States District Court Northern District of Illinois, Eastern
Division. Case #: 02 CR 892. June 12, 2003, pp.30-31 (Emphasis in Bold Added, Emphasis in Italics in
Original).  **Attached hereto as Exhibit 4.**

[32]  "Government's Bill of Particulars."  <u>United States of America v. Enaam M. Arnaout</u> United States
District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. February 3, 2003, p. 7.
**Attached hereto as Exhibit 2.**

Evan Kohlmann

SWORN to before me, this _18_

Day of _October_ , 2004.

NOTARY PUBLIC
My Commission Expires:

Leslie P. Kim
Notary Public, District of Columbia
My Commission Expires 8-31-___

17