# Exhibit 14

```
     4acWterC
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   KATHLEEN ASHTON, et al.,
 3
 4                  Plaintiffs,
 4
 5            v.                        03 MD 1570 (RCC)
 5
 6   EGYPTIAN ISLAMIC JIHAD, et
 6   al.,
 7
 7                  Defendants.
 8
 8   ------------------------------x
 9                                 New York, N.Y.
 9                                 October 12, 2004
10                                 10:00 a.m.
10
11   Before:
11
12                     HON. RICHARD CONWAY CASEY,
12
13                                      District Judge
13
14                          APPEARANCES
14
15   KREINDLER & KREINDLER
15        Attorneys for Ashton Plaintiffs
16   BY:  JAMES P. KREINDLER
16        JUSTIN T. GREEN
17        VINCE PARRETT
18   MOTLEY RICE, LLP
18        Attorneys for Burnett Plaintiffs
19   BY:  RONALD L. MOTLEY
19        DONALD A. MIGLIORI
20        JODI WESTBROOK FLOWERS
20        JUSTIN KAPLAN
21        -and-
21   ALLAN GERSON
22
22   HANLY CONROY BIERSTEIN & SHERIDAN, LLP
23        Attorneys for Burnett Plaintiffs
23   BY:  PAUL J. HANLY, JR.
24        ANDREA BIERSTEIN
25
25   DICKSTEIN SHAPIRO MORIN & OSHINSKY
```

```
     4acWterC
 1        Attorneys for Cantor Fitzgerald and Port Authority
 1   Plaintiffs
 2   BY:  JONATHAN M. GOODMAN
 2        STACEY SAIONTZ
 3
 3   BRODER & REITER
 4        Attorneys for Schneider Plaintiffs
 4   BY:  JONATHAN C. REITER
 5
 5   J.D. O'BRIEN & ASSOCIATES
 6        Attorneys for Tremsky Plaintiffs
 6   BY:  DAVID O'BRIEN
 7
 7   COZEN O'CONNOR
 8        Attorneys for Federal Plaintiffs
 8   BY:  ELLIOT R. FELDMAN
 9        SEAN P. CARTER
 9
10   RICH HAILEY
10        Attorney for Havlish Plaintiffs
11
11   JOSHUA M. AMBUSH
12        Attorney for O'Neil Plaintiffs
12
13   SPEISER, KRAUSE, NOLAN & GRANITO
13        Attorneys for Plaintiffs' Steering Committee
14   BY:  KENNETH P. NOLAN
14
15   JONES DAY
15        Attorneys for Defendants Bin Laden
16   BY:  JAMES E. GAUCH
16        E. MICHAEL BRADLEY
17        STEPHEN J. BROGAN
17        MELISSA D. STEAR
18
18   WILLIAMS & CONNOLLY
19        Attorneys for Defendant Abdul Rahman Bin Kahlid Bin
19        Mahfouz
20   BY:  PETER J. KAHN
20        THOMAS C. VILES
21        JOHN L. CUDDIHY
21
22   WHITE & CASE
22        Attorneys for Defendant Al Rajhi
23        Banking & Investment Corp.
23   BY:  CHRISTOPHER M. CURRAN
24        NICOLE E. ERB
24
25   McDERMOTT, WILL & EMERY
25        Attorneys for Defendant Jameel
```

```
       4acWterC
   1   BY:   THOMAS P. STEINDLER
   1
   2   JOSHUA L. DRATEL, P.C.
   2         Attorneys for Defendant Al-Hussayen
   3   BY:   MARSHALL A. MINTZ
   3
   4
   5
   6
   7
   8
   9
  10
  11
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
```

```
      4acWterC
 1    PATTON BOGGS
 1         Attorneys for Defendant National Commercial Bank
 2    BY:  RONALD S. LIEBMAN
 3         MITCHELL BERGER
 4    KELLOGG, HUBER, HANSEN, TODD & EVANS
 4         Attorneys for Defendant Al-Faisal
 5    BY:  MICHAEL J. GUZMAN
 5
 6    KING & SPALDING
 6         Attorneys for Defendant Arab Bank, PLC
 7    BY:  RICHARD T. MAROONEY, JR.
 7
 8    WILMER CUTLER PICKERING HALE and DORR, LLP
 8         Attorneys for Defendant Mohamed Al-Faisal Al-Saud
 9    BY:  LOUIS R. COHEN
 9         DAVID P. DONOVAN
10
10    SHEARMAN & STERLING
11         Attorneys for Defendant Saudi American Bank
11    BY:  BRIAN H. POLOVOY
12         HENRY WEISBURG
12         DAN SEGAL
13
13    BAKER BOTTS
14         Attorneys for Defendant Abdulaziz al Saud
14    BY:  CASEY COOPER
15         WILLIAM H. JEFFRESS
15         JAMIE S. KILBERG
16
16    GRAY CARY WARE & FREIDENRICH
17         Attorneys for Defendants African Muslim Agency, Heritage
17         Education Trust, International Institute of Islamic
18         Thought, Mar-Jac Investments, Inc., Reston Investments,
18         Inc. Safa Trust, York Foundation, Taha Al-Alwani, Muhammad
19         Ashraf, M. Omar Ashraf, M. Yaqub Mirza, Iqbal Unus, Jamal
19         Barzinji, Sterling Management Group, Sterling Charitable
20         Gift Fund, Inc., Mena Corporation, Grove Corporate, Inc.
20         and Sana-Bell, Inc.
21    BY:  NANCY LUQUE
21         JAY HANSON
22
23
24
25
```

```
                                                       5
     4acWterC
 1   BERNABEI & KATZ
 1       Attorneys for Defendants Dr. Abdullah M. Al-Turki, Dr.
 2       Abdulla Naseef, Dr. Abdullah Al-Obaid, Dr. Abdul Rahman Al
 2       Swailem, Sheik Saleh Al-Hussayen, Sheik Shahir Batterjee,
 3       Mushayt for Trading Company, Mohammed Al Sayed Mushayt,
 3       Sheik Hamad Al-Husaini, Saudi Arabian Red Crescent
 4       Society, Sheik Salman Al-Oadah, Sheik Safer Al-Hawali, Al
 4       Haramain Islamic Foundation, Inc. Soliman H.S. Al-Buthi,
 5       Soliman J. Khuderia, Talal M. Badkook, Dr. Adnan Basha and
 5       Perouz Seda Ghaty
 6   BY:  LYNNE BERANBEI
 6        ALAN R. KABAT
 7
 7   GILLEN PARKER & WITHERS
 8       Attorneys for Defendant Zahir H. Kazmi
 8   BY:  WILMER PARKER
 9
 9   MARTIN F. McMAHON & ASSOCIATES
10       Attorneys for Defendants Saleh Abdullah Kamei, Al Baraka
10       Investment & Development Corp., International Islamic
11       Relief Organization, Rabita Trust, Dallah Al Baraka Group,
11       LLC, Makkah Mukarrahman Charity Trust and Wael Jalaidan
12   STEPHANIE W. FELL
12
13   BRYAN CAVE, LLP
13       Attorneys for Defendant Prince Naif bin Abdulazia Al-Saud
14   BY:  JAMES M. COLE
14   CHADBOURNE & PARKE, LLP
15       Attorneys for Defendant Yousef Jameel
15   BY:  JEFFREY I. WASSERMAN
16
16   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
17       Attorneys for Defendants HRH Prince Abdullah Al Faisal Bin
17       Abdulaziz Al Saud, Alfaisaliah Group, Faisal Group Holding
18       Co. and Mohammed Bin Abdulrahman Al Ariefy
18   BY:  DARIA M. CIAPUTA
19
19   STEPTOE & JOHNSON, LLP
20       Attorneys for Defendant Mohammad Bin Abdullah Aljomaih
20   BY:  CHRISTOPHER T. LUTZ
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

6

4acWterC

```
 1              (Case called)
 2              (In open court)
 3              THE COURT:  Good morning, please be seated.
 4              THE DEPUTY CLERK:  Your Honor, now before the Court
 5    this morning, In re Terrorist Attacks on September 11, 2001.
 6              THE COURT:  All right.  Now this morning, the two
 7    counsel, I believe, have been designated by the defendants to
 8    carry the ball on the main argument.  Is that correct?
 9              MR. COOPER:  Casey Cooper, on behalf of Saudi Arabia's
10    defense minister.  That is correct, your Honor.  I've been
11    tasked with being lead-off this morning.
12              Mr. Cohen, on behalf of Prince Mohamad al-Faisal
13    al-Saud, will follow to discuss the plaintiffs' theory of
14    conspiracy jurisdiction and the specific allegations of
15    jurisdiction against his client.  And thereafter, I believe,
16    five separate defense counsel will address the specific
17    jurisdictional allegations against their respective clients.
18              THE COURT:  All right.  Now, I take it you've worked
19    it out, there will be an hour and a half on each side, and I've
20    directed my law clerk to inform you, either stage setters or
21    introductory arguments, we'll stick to that time limit.  We'll
22    see how it goes.  We'll allow some time.  I think, if you stick
23    to your time limits, we're going to try and ask Mr. Brantley to
24    keep you to that, then we'll allow a half hour for rebuttal.
25              Mr. Cooper.
```

7

4acWterC
```
 1              MR. COOPER:  Very well, your Honor.  I will try my
 2    best to adhere.
 3              THE COURT:  Lead off.  You're at the plate.
 4              MR. COOPER:  Your Honor, I'd like to address three
 5    points this morning:
 6              First, plaintiff's failure to state or to allege any
 7    traditional minimum contacts between Prince Sultan and the
 8    United States that would give rise to general jurisdiction in
 9    this Court.  Second, plaintiffs' alternative theory of personal
10    jurisdiction, which is, under the Burger King and Calder v.
11    Jones cases in the Supreme Court, that he and scores of other
12    defendants somehow intentionally targeted the United States
13    with terrorism.  And, third, I would like to briefly discuss
14    jurisdictional discovery.
15              THE COURT:  Mr. Cooper, get a little closer to the
16    microphone.
17              MR. COOPER:  Your Honor, the plaintiffs have alleged
18    that Prince Sultan aided and abetted the 9/11 attacks by making
19    charitable contributions to four Islamic charities which are,
20    none of which are designated as foreign terrorist organizations
21    by the United States either then or now.  Before Judge
22    Robertson in the Burnett action, we submitted evidence in the
23    form of declarations and business records, demonstrating that
24    those charitable contributions were made to two charities, the
25    International Islamic Relief Organization and the World
```

8
4acWterC
1   Assembly for Muslim Youth, and that those donations were made
2   by Prince Sultan in his official capacity.  They were grants of
3   government funds issued from government bank accounts.
4              Plaintiffs raised a factual challenge to our
5   submission alleging that those two contributions were in fact
6   personal.  Judge Robertson declined to resolve that factual
7   dispute and instead ruled in the alternative, as the Court
8   knows.  He ruled that if those contributions were official,
9   Prince Sultan's actions were clearly covered by sovereign
10  immunity.  If, on the other hand, they were personal, the Court
11  lacked personal jurisdiction over his actions.
12             The two grounds for Judge Robertson's rulings on
13  personal jurisdiction were, one, no minimum contacts were
14  alleged, or virtually no minimum contacts were alleged; and,
15  two, the plaintiffs, in Judge Robertson's words, stopped well
16  short of alleging that Prince Sultan expressly aimed his
17  activities towards the forum.
18             Your Honor, the law of the facts remains the same.  We
19  would urge your Honor to adopt Judge Robertson's reasoning and
20  his findings.
21             Let me speak briefly, your Honor, on minimum contacts,
22  which, of course, is the starting point on any analysis of
23  personal jurisdiction.  I would be brief because the plaintiffs
24  have alleged virtually none.  The only allegation of
25  traditional minimum contacts found in any of the complaints is
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4acWterC

1    that Prince Sultan is the chairman of Saudi Air Lines, which
2    does business in the United States.  We do not dispute that
3    allegation.  In fact, he's the ex officio chairman.  But be
4    that as it may, that allegation is clearly not sufficient to
5    establish jurisdiction over him or to entitle the plaintiffs to
6    discovery as to any other traditional contacts that may or may
7    not exist.
8            The plaintiffs really make a different argument here.
9    They rely on the Burger King case in the Supreme Court and
10   Calder v. Jones to argue that Prince Sultan and scores of other
11   defendants expressly aimed his conduct towards the United
12   States.  Now, that is the core issue of this discussion, your
13   Honor.  What does it mean to expressly aim or to intentionally
14   target one's conduct towards the forum?  Without belaboring the
15   facts of Burger King and Calder and recent cases in the Second
16   Circuit and the Southern District, interpreting them, namely,
17   In re Magnetic Audiotape and the Time, Inc. v. Simpson cases
18   which are cited in our briefs, those cases say four things
19   regarding what it means to expressly aim one's conduct at the
20   forum.
21           The defendant must be a primary participant in the
22   wrongdoing that gave rise to the plaintiffs' actions.  Exact
23   language for Calder.  He or she must be personally intimately
24   involved in that wrongdoing.  Its own conduct as opposed to the
25   conduct of third parties must be intentionally targeted towards

4acWterC
1     the forum.  And, finally, foreseeability of causing injury in
2     the forum is insufficient to satisfy the test for jurisdiction
3     under those cases.
4             Your Honor, none of those requirements are met here.
5     And let me be more specific.  I suspect that Mr. Motley and
6     Mr. Carter will stand up today and recount for the Court all of
7     the so-called evidence that they have put into the record in an
8     effort to establish personal jurisdiction over Prince Sultan
9     and many other defendants.  They will claim that various
10    charities, regardless of whether Prince Sultan actually donated
11    to them or not, diverted money to Al Qaeda.  They will claim
12    that Prince Sultan was in a position to know about these
13    diversions of funds.  And they will argue that everyone knew
14    that Al Qaeda was targeting the United States.
15            Your Honor, we have serious quarrels with the
16    plaintiffs' evidence.  Mr. Jeffress noted some of those
17    disagreements last month.  Others are noted in our briefs, but
18    even if every stitch of the plaintiffs' evidence with respect
19    to Prince Sultan is true, that doesn't get him to personal
20    jurisdiction because none of that evidence shows when in 1987,
21    14 years prior to the September 11 attacks, Prince Sultan first
22    authorized a government grant to the IIRO that he meant to
23    attack the United States, that he meant to cause harm to
24    American citizens.  And that is what Calder, Burger King,
25    Magnetic Audiotape and Time, Inc. v. Simpson stand for.  In

11

4acWterC

1  fact, the record is exactly the opposite.  It shows no
2  animosity on behalf of Prince Sultan towards the United States,
3  let alone that he meant America any harm.
4          Prince Sultan is in his 80s.  He has served as
5  minister of defense for the Kingdom of Saudi Arabia for over 40
6  years.  He has spent his entire career devoted to strengthening
7  U.S.-Saudi relations and building a strategic relationship
8  that's among America's strongest in the entire Middle East.
9          And, your Honor, for those efforts, what did that get
10 him?  It got him named in Osama Bin Laden's 1996 fatwa, singled
11 out as a traitor who implemented the policy of America in order
12 to bleed financial and human resources of the nation.  This is
13 a man whose government stripped Osama Bin Laden of his
14 citizenship in 1994, some four years before Al Qaeda was
15 designated as a terrorist organization in the United States.
16 They froze his assets and tried to extradite him.  And, of
17 course, the 9/11 Commission found that neither the Kingdom of
18 Saudi Arabia nor any of its officials funded Al Qaeda.
19         In sum, none of the plaintiffs' so-called evidence
20 establishes that Prince Sultan, through his actions, meant to
21 attack the United States.  And when the rubber hits the road,
22 your Honor, that's exactly what they need to allege and come
23 forward with evidence to show under Burger King and Calder.
24         Let me take one moment to address a line of cases that
25 the plaintiffs rely on as somewhat of an alternative to Burger
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

4acWterC

1   King and Calder to establish jurisdiction; namely, a number of
2   cases where courts have exercised personal jurisdiction over
3   states, designated state sponsors of terrorism, cases against
4   Iran, against Libya, against Iraq, alleging direct sponsorship
5   of specific terrorist activities.
6           Those cases are inapposite here.  Personal
7   jurisdiction was conferred in those cases by operation of that
8   specific exception, which, of course, is not at issue here
9   because Saudi Arabia has not been designated a terrorist
10  sponsor.  Judge Robertson rejected that argument in Burnett and
11  recently in a 2001 case from the District of Rhode Island which
12  the plaintiffs do not cite in their papers, if I'm not
13  mistaken, Ungar v. Palestinian Authority case.  The Court
14  specifically distinguished this line of cases that the
15  plaintiffs are relying on here, in a case brought under the
16  same statute that's at issue here, 18 U.S.C. Section 2333.  The
17  Court there held that minimum contacts analysis applies and
18  dismissed complaints filed by Yasser Arafat and other senior
19  Palestinian officials based on lack of jurisdiction.
20          Finally, your Honor, jurisdictional discovery, the key
21  case in the Second Circuit is the Jazini case, which stands for
22  the simple proposition that the plaintiffs need to make out a
23  prima facie case of personal jurisdiction in order to be
24  entitled to discovery.  What does that mean?  It means specific
25  factual allegations which, if true, are legally sufficient to

13

4acWterC

1   establish jurisdiction, not conclusions, not restatements of
2   the law.
3          They have not met that standard.  They haven't alleged
4   minimum contacts.  They've not alleged any personal
5   participation, primary involvement, in the 9/11 attacks or any
6   attacks against America.  And that's exactly what they have to
7   do.  They've had two years to do it, they've failed to do it,
8   and they're not entitled to discovery.
9          Your Honor, unless there are any questions, I will
10  leave it at that and turn the mic over to Mr. Cohen.
11          THE COURT:  All right.
12          MR. COHEN:  Your Honor, I'm Louis Cohen for Prince
13  Mohamad al-Faisal al-Saud.
14          Prince Mohamad is a member of the royal family of
15  Saudi Arabia but not a government official.  In his case as
16  well, plaintiffs have failed to assert a prima facie case of
17  jurisdiction, either as general jurisdiction or a specific
18  jurisdiction based on actions outside the United States
19  expressly aimed at the United States or on the theory of
20  conspiracy.
21          In light of Mr. Cooper's argument, I'm going to focus
22  on the conspiracy issue, but I want to make a couple of remarks
23  about requirements that tortious actions outside the United
24  States be expressly aimed at the forum.
25          In Prince Mohamad's case, the plaintiffs do not allege

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

4acWterC
1   that he transferred any money or property to any person or
2   organization.  He is not accused even of making charitable
3   contributions.  On the contrary, the Federal Insurance
4   plaintiffs complaint originally contained allegations that he
5   had made contributions to four charities.  I think it is four,
6   but when we pointed out to them that there was no factual basis
7   for that assertion, they did the right thing and agreed to
8   delete those allegations from their complaint, and your Honor
9   has a stipulation to that effect.
10          The only concrete allegation against Prince Mohamad is
11  that he was chairman of Faisal Islamic Bank in Sudan at which,
12  according to an Al Qaeda operative named Jamal Al Fadl, who
13  testified at the trial of the 1998 East Africa embassy bombers,
14  "We got account," end of quotation, end of relevant testimony.
15          Plaintiffs do not allege anything further about that
16  single three-word line of testimony.  In particular, they do
17  not allege any facts suggesting that Prince Mohamad knew of the
18  existence of the account, let alone that he knew anything about
19  any use to which the account was put.
20          I'm not going to repeat Mr. Cooper's argument, but it
21  is clear that this doesn't meet the standard for tortious
22  conduct expressly aimed at the United States.  For a Saudi to
23  serve as chairman of a bank in Sudan is neither tortious nor
24  expressly aimed at the United States.  There is no allegation
25  that Prince Mohamad intended or directed that the mysterious
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

15

4acWterC

1  account be used against the United States.
2           More generally, as Judge Robertson ruled, banks, and a
3  fortiori their chairman, are not subject to jurisdiction in
4  foreign countries based on the actions of their depositors.
5  Indeed, if the rules were otherwise, if serving as a bank
6  chairman were enough to subject an individual to jurisdiction
7  in any place where a deposit might possibly later have been
8  misused, all kinds of mischief would follow.
9           Just as an example, the American chairman of Suntrust
10 Bank, where the 9/11 terrorist leader Mohammad Atta was
11 photographed withdrawing money would be personally subject to
12 suit in Indonesia, in Spain, in Egypt, in Israel, and, indeed,
13 in Saudi Arabia because they are all places where Al Qaeda has
14 threatened to kill people and where it has in fact killed
15 people.
16          Turning to conspiracy, plaintiffs argue that Prince
17 Mohamad and other defendants are subject to jurisdiction in New
18 York because all defendants were members of a conspiracy with
19 Al Qaeda, making the 9/11 terrorists their agent.  But the
20 Second Circuit has said repeatedly, I'm quoting from the Lehigh
21 Valley case, that "the bland assertion of conspiracy is
22 insufficient to establish personal jurisdiction over a foreign
23 defendant; that, on the contrary, plaintiff must not only make
24 a prima facie showing of a conspiracy, but must allege specific
25 facts showing that the particular defendant was a member of the

16

4acWterC

1    conspiracy."
2          Now, one way to satisfy that requirement, of course,
3    is to allege, if there are reasonable grounds for doing so,
4    that the particular defendant was a party to an agreement
5    constituting a conspiracy to injure Americans.  But in the case
6    of Prince Mohamad and of many other defendants who are here and
7    can speak for themselves, there is no allegation that he
8    reached an agreement with anybody about anything.  The
9    plaintiffs use the word "conspiracy" dozens of times, but they
10   never plead any facts showing that Prince Mohamad conspired
11   with anyone in particular about any objective or activity.
12         Plaintiff can also show indirectly that a foreign
13   defendant was a member of a conspiracy, but to do so, he must
14   show three things.  And here, I'm citing, among many cases, the
15   Second Circuit's decision in Grove Press:  "Plaintiff must show
16   that the in-state actor acted, one, for the benefit of the
17   out-of-state defendant; two, with the knowledge and consent of
18   the foreign defendant; and, three, under some control by a
19   foreign defendant."  And again, none of those requirements is
20   met here.
21         There is, and this is most important, no allegation
22   that Prince Mohamad benefitted in any way, financially or
23   otherwise, from the terrorist activities.
24         As a member of the Saudi Royal Family and a banker, he
25   benefits from a stable world.  He has never said or done

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

4acWterC

1    anything that expressed hostility toward the United States or
2    toward Americans.  The plaintiffs haven't pointed to anything
3    he has ever said that suggests that 9/11 was for him anything
4    other than the horror that he promptly said it was shortly
5    after 9/11 and long before any of these complaints were filed.
6            With respect to the Second Circuit's second
7    requirement, that the nonresident defendant have knowledge of
8    and that he consent to the tortious acts in the forum, again,
9    there's no such allegation in Prince Mohamad's case.  There's
10   not the slightest suggestion that he knew anything about 9/11
11   or any other violent activity.  The only fact alleged is the
12   account, and there is no allegation of what effects the account
13   had in New York or anywhere else, and no allegation that Prince
14   Mohamad had any knowledge of or consented to any such effects.
15           Finally, there's not the slightest suggestion that the
16   9/11 conspirators were acting in any way at Prince Mohamad's
17   direction or control or at his request or on his behalf.
18   Nothing in the complaint connects him in any way with the
19   events, the horrendous, terrible events that injured the
20   plaintiffs.
21           In sum, Al Qaeda was and is undoubtedly a conspiracy,
22   but it's not enough for the plaintiffs to allege that
23   conspiracy and then simply assert over and over that dozens of
24   other people were members of that conspiracy.  The plaintiff
25   must allege specific facts connecting the nonresident defendant

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

18

4acWterC
1   to activity in New York in furtherance of the conspiracy.  I'm
2   quoting from the "Nazi-Era Cases" at 320 F.Supp.2d 222.
3   Plaintiffs have utterly failed to allege any connection with
4   respect to Prince Mohamad.  They say over and over, a little
5   bit in the complaint and a lot in the briefs, that he aided Al
6   Qaeda, that he supported Al Qaeda, that he conspired with Al
7   Qaeda, but they do not allege any instance of any such aid or
8   support.
9           If I can turn for a minute to discovery, plaintiffs
10  aren't entitled to jurisdictional discovery because, as
11  Mr. Cooper said, the Jazini case quite clearly requires that
12  they first state a prima facie case for jurisdiction, that they
13  first are able responsibly to allege facts that, if proved,
14  would be sufficient to establish jurisdiction.  Vague and
15  generalized allegations are insufficient to make out a prima
16  facie showing of jurisdiction over an out-of-state defendant.
17          Here, discovery against Prince Mohamad would be a
18  license to fish.  Prince Mohamad's chairmanship of a bank that
19  allegedly had an account in 1996, which is when Osama Bin Laden
20  questionably left Sudan, that was associated with an Al Qaeda
21  member falls miles short of suggesting that Prince Mohamad
22  personally expressed, expressly aimed any evil at the United
23  States.  A bank chairman cannot be personally subject to
24  discovery anywhere in the world whenever a plaintiff alleges
25  that a bad person had a deposit in his bank.  Or lots of
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

19

4acWterC

1   American bank chairmen would be subject to suit all over the
2   place.  The issue is no different for Prince Mohamad.
3          Plaintiffs' repeated but wholly conclusory allegation
4   that Prince Mohamad assisted Al Qaeda or conspired with Al
5   Qaeda does not entitle them to disrupt his life to see whether
6   they can find out whether or not there was any good factual
7   basis in the first place for their deeply offensive claims.
8          Your Honor, Judge Robertson said -- I think these were
9   wise words.  He said in the Burnett case when it was before
10  him, "It is difficult to imagine uglier or more serious charges
11  than those the plaintiffs have leveled at these defendants.
12  The use of the privileged medium of a lawsuit to publicly label
13  someone an accomplice of terrorists can cause incalculable
14  reputational damage.  Fairness requires extra careful scrutiny
15  of plaintiffs' allegations as to any particular defendant."
16         Prince Mohamad and each of the other defendants who
17  are before you today ask for that careful scrutiny before they
18  are kept in this case.
19         Thank you, your Honor.
20         MR. LUTZ:  Good morning, your Honor.  My name is
21  Christopher Lutz.  I represent the estate of Mohammad Abdulla
22  Aljomaih.
23         My goal is to focus on the pleadings and facts
24  relating to Mr. Aljomaih as related to the law explained to you
25  by Mr. Cooper and Mr. Cohen.  In Calder, the U.S. Supreme Court

4acWterC
```
 1   said that in a multidefendant case, jurisdictional facts had to
 2   be examined on a defendant-by-defendant basis, that a general,
 3   overall description of facts, jurisdictional facts not keyed to
 4   particular defendants was insufficient.
 5            And so, what is the specific situation then for my
 6   client, the late Mr. Aljomaih?  So far, you've heard from
 7   counsel for banks and counsel for princes.  Mr. Aljomaih was
 8   simply a private citizen, a successful Saudi businessman.  He
 9   first became involved in this litigation when his name appeared
10   on a list filed in the Burnett case in May of 2003.  There are
11   no allegations in the third amended complaint in Burnett as to
12   him, and there were no allegations as to him when he was added
13   to Burnett.  He was added in a way that was slapdash in many
14   ways, terrible service problems.  He was served by publication,
15   though there was no authority for that.  The wrong name was put
16   on the service list.  But all we had at that time was the
17   addition of his name to the case, the bare edition of his name
18   to the case.
19            At the time he was added, Mr. Aljomaih was 88 years
20   old.  He was in declining health and has since died, sadly, in
21   late April of this year.  We filed a suggestion of death a
22   month ago.  We provided plaintiffs' counsel with his death
23   certificate, but they continue to pursue him and his name and
24   his reputation.
25            At the time he was added, as I say, he was simply a
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC
1    highly respected Saudi businessman.  He had never ever been
2    associated in the public press or in any reports or anything
3    else with terrorism or Al Qaeda or any of it.  He lived all his
4    life in Saudi Arabia.  The last 60 years of his life he lived
5    in Riyadh, and that residence is an important point I want to
6    come back with.
7            He founded businesses in the late 1930s that became
8    the means of marketing American goods in Saudi Arabia.  His
9    businesses became the biggest distributors of General Motors
10   cars and Coca-Cola, and in general, if you think about it, it
11   is an odd line for someone accused of wanting to damage the
12   United States.  He never had any personal significant
13   connection with the United States.  He never lived here.  He
14   last made a business trip to the United States 40 years ago.
15   From 1993 to 1999, he made a few brief visits for treatment of
16   a heart condition and cancer.  But since 1999, he had never
17   been in this country.  He owned no real estate here, he owned
18   no home.  He had no bank accounts.  He did no business in this
19   country personally.  In short, there was nothing connecting Mr.
20   Aljomaih to the United States of America.
21           Given all of that, and given the defects in service
22   that I've mentioned, we filed our motion to dismiss in October
23   of 2003, before Judge Robertson.  We pointed out all the things
24   that I've mentioned, and it seemed clear that there was no
25   general jurisdiction, no specific jurisdiction, no reason at

22

4acWterC

```
 1    all to hold Mr. Aljomaih in this case.
 2              With those facts before them, with that motion before
 3    them, the plaintiffs had a burden.  They had thus up to that
 4    point offered no allegations at all for Mr. Aljomaih.  Their
 5    burden at that point was to offer, as other counsel have told
 6    you, specific and not conclusory facts or allegations, excuse
 7    me, establishing a prima facie case of jurisdiction.
 8              Now, I want to pause for a minute on the requirement
 9    of specific allegations.  In all the jurisdiction motions that
10    have been filed, when plaintiffs are challenged on the
11    specificity of their allegations, there is a familiar pattern.
12    They very briefly, very briefly deal with the individual
13    defendant making the motion, and then they launch off into what
14    has become a set piece, a long, detailed history of Al Qaeda.
15              Mr. Motley has given what he sometimes calls his
16    terror factory speech two or three times in these litigations.
17    That's all detailed, and it's all specific.  But in this case,
18    in the case of this motion, it has nothing whatever to do with
19    Mr. Aljomaih.  These long descriptions in the papers, the long
20    descriptions in presentations to the Court are beside the point
21    for Mr. Aljomaih unless they deal with Mr. Aljomaih
22    specifically, and have specific allegations as to him.
23              What did they actually do as to Mr. Aljomaih in their
24    opposition to our motion to dismiss?  One thing they did is the
25    same thing that Mr. Cohen said happened for Prince Mohamad.
```

23

4acWterC

1   There were endless conclusory statements that Mr. Aljomaih
2   supported Al Qaeda, supported terrorism, but purely conclusory.
3   No indication of what he had done, what steps he had taken, how
4   he had done that.  All conclusory, all insufficient, and all
5   offensive and wrong.
6           What is there specific to Mr. Aljomaih and what the
7   plaintiffs have filed?  Do they attach papers indicating that
8   he's been identified as a supporter of terrorism?  No, they
9   don't.  They do four things.  They attach pictures from
10  Aljomaih company Web sites.  They make the claim that a
11  company, not Mr. Aljomaih, but an Aljomaih company made a
12  charitable donation to an unspecified charity.  They say he is
13  a wealthy, successful businessman, and they refer to something
14  that I want to come back to, that they call the Golden Chain.
15          Now, demonstrating that Mr. Aljomaih was a successful
16  businessman or that his companies provided good customer
17  service, which is what the attachments to the Web pages show,
18  doesn't get close to providing the specific allegations
19  necessary to indicate that there's personal jurisdiction over
20  him.  None of it changes his lack of connection to the United
21  States.  None of it demonstrates that he intentionally targeted
22  people in this country.  Nothing.  There's simply nothing.
23          But they do speak of this document that they call the
24  Golden Chain, and I suspect that Mr. Motley or other
25  plaintiffs' counsel may describe this at some length, and so

24

4acWterC

1    I'd like to devote the remainder of my remarks to that, and I
2    think counsel that follow me will do that as well.
3           In the opposition, the plaintiffs say that Mr. Aljomaih
4    appears, his name appears on this document that they call the
5    Golden Chain.  They say it is a list of Al Qaeda donors.  At
6    one point, they say it is an honor roll of Al Qaeda donors.
7           Now, the question is:  Is that enough to establish the
8    specific, not really an allegation, but is it enough to show
9    that there is personal jurisdiction over Mr. Aljomaih?  A quick
10   examination of the document shows that that can't possibly be
11   the case.  There's nothing in the document itself to indicate
12   that it is what the plaintiffs say it is.  And even if it were,
13   there's no good reason to think that anyone listed on that
14   document is Mohammad Aljomaih.
15          First, let me describe to you what the Golden Chain
16   is.
17          You may remember in the September arguments that, I
18   think, Ms. Bierstein held up and talked about a document that
19   she said had come from Bosnia, that had been seized by the
20   Bosnian police.  The Golden Chain so-called is another one of
21   these Bosnian documents, the plaintiffs claim.  It is a single
22   sheet of paper.  It is handwritten in Arabic.  It is unsigned,
23   and it is undated.  There's no way to tell from the document
24   who wrote it or when it was written, and the plaintiffs haven't
25   suggested either.

25

4acWterC

```
 1              It consists and this, a translation is provided of
 2   pertinent parts of it in our reply brief.  It consists of very
 3   little.  There is some language that I understand to be a verse
 4   from the Koran about charity, and then there is a list of
 5   names.  That's the entirety of the document.  It doesn't call
 6   itself a Golden Chain.  It doesn't say the people listed are
 7   donors.  It doesn't mention donations.  That's it.
 8              So, by itself, just by itself, given Mr. Aljomaih's
 9   complete lack of contact with the United States, the failure of
10   the plaintiffs to say anything about what he specifically did
11   to support this conspiracy that they attack, even on its face,
12   the Golden Chain is not enough to hold him in this case.
13              But there's even another reason to say that it's not
14   enough.  In fact, even if the document were what the plaintiffs
15   claim, it points in the other direction.  In other words, it
16   points not at Mr. Aljomaih, this Mr. Aljomaih, but elsewhere.
17   It does not contain the words Mohammad Abdullah Aljomaih.
18   There is one word, Aljomaih.  It doesn't say which Aljomaih.
19   It doesn't have a first name or middle name, and that name
20   Aljomaih is paired with the word Jiddah.
21              Now, Jiddah is a city in Saudi Arabia on the Red
22   Coast.  You may remember that I said earlier, Mr. Aljomaih had
23   lived for 60 years in Riyadh.  Riyadh is hundreds of miles away
24   from Jiddah.  He never lived in Jiddah.  So even if this
25   document is what the plaintiffs say it is, and even if it has
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

4acWterC

 1   some significance, it is identifying an Aljomaih that is not
 2   the man that I represent.
 3           That's all the plaintiffs have.  No connection to the
 4   United States, a single handwritten document that seems to
 5   point to another person.  There is no reason to keep Mohammad
 6   Aljomaih in this case.  There is no allegation, no showing of
 7   deliberate targeting or purposeful direction of his actions
 8   towards the United States, your Honor.  His motion to dismiss
 9   for lack of personal jurisdiction should be dismissed.
10           Thank you very much.
11           THE COURT:  Thank you, sir.
12           MS. BERNABEI:  Good morning, your Honor.  Lynne
13   Bernabei, representing Mr. Al-Husaini, a defendant who has also
14   filed a motion to dismiss on the grounds of personal
15   jurisdiction.
16           Like Mr. Aljomaih, his name was added to the complaint
17   with no allegations alleged against him.  The same service
18   problems adhere in his case as in the case of Mr. Aljomaih.
19   But what I'd like to talk about today is what is undisputed,
20   that there is no grounds for a specific jurisdiction against
21   Mr. Al-Husaini.
22           It is undisputed that Mr. Al-Husaini has absolutely no
23   contacts with this country.  He's an elderly businessman in
24   Saudi Arabia.  He's never visited this country, never travelled
25   here, owns no property here, no bank accounts, conducts no
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
     4acWterC
 1   business here, and his companies in Saudi Arabia conduct no
 2   business with American companies.
 3          It is also undisputed that the only basis on which
 4   plaintiffs have asserted personal jurisdiction over him is on a
 5   theory that Mr. Al-Husaini purposefully directed his activities
 6   towards the United States by providing financial support to Al
 7   Qaeda.
 8          Now, if the Court looks at the supposed evidence the
 9   plaintiffs have brought forward, there is in fact only two
10   pieces of what they call evidence.  The first is a Wall Street
11   Journal article, in which Mr. Al-Husaini is mentioned as being
12   a director of a foundation which sponsors seminars and schools
13   in the Netherlands and that some of the 9/11 hijackers attended
14   some of those seminars.
15          Plaintiffs claim, we believe misleadingly, in a
16   distorted fashion in their brief, that what this article says
17   is that Mr. Al-Husaini's companies are principal supporters of
18   the Al Waqf Foundation, a Dutch entity that played a major role
19   in the recruitment of terrorists including six of the September
20   11 hijackers.  As we point out in our brief and we cite to that
21   article, it does not say that.  What the article says is that
22   Mr. Al-Husaini is on the board of a foundation which funds
23   schools and seminars and which Dutch investigators believed
24   that some of the 9/11 hijackers attended some of those
25   seminars.
```

4acWterC

```
 1              It also says that these seminars may create a milieu
 2    sympathetic to Islam.  This is a far cry from saying
 3    Mr. Al-Husaini is recruiting terrorists, is contributing to
 4    terrorists or himself has recruited the 9/11 hijackers, which
 5    is what the plaintiffs in this case suggest.
 6              The plaintiffs also claim that this article, which is
 7    attached to their pleadings, they also claim that Spanish
 8    investigators believed that the Al-Husaini family transferred
 9    money to Mr. Zouaydi, an alleged terrorist who Spanish
10    authorities now have in custody.  In fact, the article doesn't
11    state that either.  What the article says is that Mr.
12    Al-Husaini, Al-Husaini's companies had financial transactions
13    with Zouaydi, but there is nothing alleged or claimed in the
14    article that this was at a time or in any way in connection
15    with Mr. Zouaydi's alleged terrorist actions.
16              The second piece of supposed evidence that the
17    plaintiffs present of Mr. Al-Husaini's connection to this vast
18    conspiracy is that his name appears on the handwritten document
19    recovered in 2003 by the Bosnian police in Sarajevo, with what
20    we believe they call misleadingly the Golden Chain.
21              Without repeating what Mr. Lutz has said, this Court
22    should recognize that the Golden Chain document, according to
23    the plaintiffs' counsel's chief investigator, Jean Claude
24    Brisard, he has stated that this document was created in 1988.
25    This date is critical because, at most, this document in 1988
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

4acWterC

```
1   would indicate persons on the list are donors or potential
2   donors to the mujaheddin in Afghanistan or Osama bin Laden in
3   Afghanistan.
4            In 1988, the United States Government was supporting
5   Al Qaeda and the mujaheddin to get the Soviets out of that
6   area.  In fact, as we show in Exhibit 6 to our reply, President
7   Reagan made five speeches between 1987 and 1988 showing U.S.
8   open support for the mujaheddin.  In fact, it was not until the
9   mid-1990s when Bin Laden and the Al Qaeda began targeting the
10  United States.  The Wall Street Journal, upon which the
11  plaintiffs heavily rely, itself has stated after a series of
12  libel suits were brought against it that this list, the
13  supposed Golden Chain, is not evidence that any of the persons
14  on that list provided any support to Bin Laden or Al Qaeda
15  after 1988 or at any time when Al Qaeda was targeting the
16  United States.
17           It is also very important for this Court to know that
18  two British Courts and one district court in the United States
19  have already rejected this document as evidence of
20  participation of individual Saudis in terrorist actions and in
21  particular in the 9/11 atrocities.  These two British courts in
22  libel actions brought against the Wall Street Journal in one
23  case and Mr. Brisard in another case have said clearly that a
24  handwritten document does not indicate anything about these
25  persons being potential donors to Al Qaeda or the atrocities
```

4acWterC

1   that took place in New York City.
2           Now, plaintiffs also make much of the fact that this
3   document was included in a government proffer to the Court in
4   the Northern District of Illinois in the Arnaout prosecution.
5   Mr. Arnaout was connected with the Benevolence International
6   Foundation.  What they failed to tell the Court is that Judge
7   Conlon of the Northern District of Illinois rejected that
8   proffer and said the document was not, could not be admitted or
9   used in that prosecution because it constituted impermissible
10  hearsay evidence of any terrorist conspiracy.  Its author was
11  unknown, the government did not provide its date, and
12  therefore, the judge in that case said that it could not be
13  used, did not fit within the coconspirator exception.
14          Therefore, we believe that this Court, just as those
15  two courts rejected any evidentiary value to this as showing
16  any involvement of any, certainly of any individual Saudi
17  citizen to any of the terrorist acts of Al Qaeda, that it
18  should also reject this unwritten, undated, handwritten
19  document as indicating anything of the sort.
20          Therefore, we believe that if your Honor looks at the
21  specific evidence the plaintiffs have brought forward to link
22  our client, Mr. Al-Husaini, to the events of 9/11, you will
23  find there's absolutely no fact showing that Mr. Al-Husaini had
24  any involvement with the activities of terrorists or Al Qaeda,
25  and that even if you credit Golden Chain with some evidentiary

31
4acWterC

1   value, it was, by the plaintiffs' own admission, it was created
2   at a time before Al Qaeda was formed and years before Al Qaeda
3   targeted the United States.
4           Therefore, there's no basis for saying Mr. Al-Husaini
5   directed any actions toward the United States as is required
6   under the Burger King and Calder analysis.
7           Thank you.
8           THE COURT:  Thank you, ma'am.
9           MR. LIEBMAN:  May it please the Court, Ron Liebman for
10  National Commercial Bank.
11          Your Honor, I'm going to limit my remarks to points
12  that relate individually to National Commercial Bank.  With the
13  Court's permission, I'd like to adopt the arguments made by Mr.
14  Cohen and Mr. Cooper on behalf of their clients as those points
15  apply as well to National Commercial Bank.
16          I'd like to address two things.  First, specific
17  jurisdiction as it relates to NCB and then, briefly, general
18  jurisdiction.
19          With respect to specific jurisdiction, your Honor, the
20  plaintiffs concede that they're not trying to allege or prove
21  that National Commercial Bank participated in planning or
22  carrying out of the September 11 attacks or even that the
23  assistance the plaintiffs allege NCB provided was used
24  specifically to assist in those attacks.  Instead, the
25  plaintiffs speculate that NCB may have participated in some

32
4acWterC
 1    unspecified way, in fund-raising activities that the Muslim
 2    World League and another defendant in this case supposedly
 3    conducted in the U.S.
 4              This speculation is based essentially upon some
 5    advertisements that were run by charities in a magazine.  The
 6    advertisements seeking charitable donations appeared, according
 7    to the plaintiffs, in a magazine called the Muslim World League
 8    Journal.  The charities who were seeking funds were called the
 9    Islamic Solidarity Fund, and Kahir Fund.  The magazine, the
10    plaintiffs contend, was available in the United States, and I
11    think it was.  And that the advertisements listed the numbers
12    of bank accounts that the Muslim World League claimed to have
13    at two Saudi banks, Al Rajhi Bank and National Commercial Bank.
14    And that's it.
15              There is no allegation, no facts in support of
16    National Commercial Bank having done anything with respect to
17    these advertisements.  There's no allegation that the
18    advertisements were placed by the bank.  Indeed, they were
19    placed by the charities.  The only assertion is that the
20    charities, in seeking funds from contributors in the
21    advertisements, advised the funds, rather, the contributors,
22    that they claimed to have bank accounts at two banks in Saudi
23    Arabia, as I said, Al Rajhi Bank, and National Commercial Bank.
24              Those facts, your Honor, don't show that NCB did
25    anything from which a legal claim could arise.  The facts don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

33

4acWterC

1   show that NCB as opposed to the Muslim World League did
2   anything in or aimed anything at the United States.
3          Your Honor, let me next turn to general jurisdiction,
4   as it relates to NCB.  That's the concept of doing business in
5   the United States.  The Burnett plaintiffs don't argue that NCB
6   is doing business in the U.S.  In fact, neither do the Ashton
7   plaintiffs, but the Ashton plaintiffs ask for jurisdictional
8   discovery to explore what, in essence, are two outdated
9   connections between National Commercial Bank or its affiliates
10  with the U.S.  Those outdated connections are not enough to
11  show that NCB is doing business in the U.S.  That test, the
12  doing business test, requires proof that NCB had substantial
13  continuous and systematic contacts with the U.S.  And the test
14  looks to contacts, if any, between NCB and the U.S. as of the
15  date of the complaints in this case require
16         The Burnett complaint was filed on August 15, 2002,
17  and the Ashton complaint was filed on September 4, 2002.
18  National Commercial Bank has submitted affidavits in support of
19  its motion, which are uncontradicted, demonstrating that NCB
20  did not have substantial continuous or systematic contact with
21  the U.S. as of those relevant dates.
22         Now, when parties submit affidavits addressing
23  jurisdictional contacts, the Court is to look beyond the
24  allegations of the complaint and assess the facts.  Here are
25  the facts about NCB as established and contained in those

4acWterC

1    affidavits:  NCB is a Saudi bank.  Its headquarters, branches,
2    and principal place of business are all in Saudi Arabia.  It's
3    regulated by the Saudi Arabian Monetary Agency, which is the
4    Central Bank of Saudi Arabia.  NCB is not registered or
5    licensed to do business in the U.S.  It's not regulated by any
6    agency of the U.S. Government.  NCB does not have a branch in
7    the United States and has not had one since its New York City
8    branch was closed in 1992.
9            Now, with those basic facts, and there are other facts
10   in these affidavits, your Honor, that negate jurisdiction -- I
11   won't go through them one by one; I'll simply rely on the
12   papers.  But with that basic background, here are the two
13   outdated U.S. contacts that the Ashton plaintiffs rely on to
14   argue for jurisdictional discovery over whether or not NCB is
15   doing business in the U.S.
16           First, NCB used to have second tier subsidiary that
17   had an office in New York.  It was a subsidiary of an English
18   company whose parent was NCB.  That subsidiary was dissolved in
19   February of 2001, and the New York office space was surrendered
20   to the landlord in January of 2001, and the surrender document
21   is a part of this record, submitted by us.
22           Two, NCB was a party in two U.S. lawsuits back in the
23   1990s.  Now, those lawsuits ended by 1998.  Even if those
24   lawsuits were still pending today, and they're not, that, under
25   the law, in and of itself is insufficient to establish either

4acWterC

```
 1   personal jurisdiction or a right to discovery.  But, in any
 2   event, your Honor, as I say, those lawsuits ended by 1998.  In
 3   other words, both of these U.S. contacts were long gone before
 4   the relevant benchmark dates of August and September of 2002,
 5   when the Burnett and Ashton complaints were filed.  And for
 6   that reason, your Honor, there is neither specific jurisdiction
 7   nor an entitlement to discovery over general jurisdiction, nor
 8   general jurisdiction over NCB.
 9             Thank you, your Honor.
10             THE COURT:  Thank you, Mr. Liebman.
11             MR. KAHN:  Peter Kahn of Williams & Connolly, on
12   behalf of defendant Abdulrahman Bin Mahfouz.
13             I will not repeat the arguments of my colleagues and
14   would simply adopt them to the extent that they affect my
15   client directly.
16             I would like to focus solely on the issue which has
17   not been addressed as to whether a corporate position alone is
18   sufficient to establish personal jurisdiction over an
19   individual.  Our client, Abdulrahman Bin Mahfouz, is mentioned
20   only three times in the entire 406-page third amended
21   complaint.  The sum and substance of the allegations against
22   him, total sum and substance, is that he held corporate
23   positions with three entities.  One, a Channel Islands
24   charitable organization known as Muwafaq, or Blessed Relief,
25   and second, a Saudi petroleum corporation, Nimir, that already
```

36

4acWterC
1   has been voluntarily dismissed from this case by the
2   plaintiffs.  And third, a Saudi commercial bank that you just
3   heard about, National Commercial Bank, or NCB.
4           Now, nowhere in the complaint do plaintiffs allege any
5   specific conduct as opposed to status by Mr. Bin Mahfouz.
6   Nowhere do they allege that he participated in, ratified, or
7   even knew of these entities' alleged wrongful conduct.  In
8   order to establish personal jurisdiction over him, plaintiffs
9   must allege sufficient facts in the complaint that make a prima
10  facie case of linking him personally, not the entity, but him
11  personally to the forum.  And this, they have not done.
12          As if to underscore the point, your Honor, the
13  plaintiffs' opposition brief, once we raised this, contains a
14  laundry list of more than 140 paragraphs they cite in the
15  complaint that supposedly show that Mr. Bin Mahfouz's
16  involvement was with a scheme to fund Al Qaeda.  Yet, if you
17  look at each one of the paragraphs that they cite in their
18  opposition at page 6, not one mentions him by name.  So, as
19  I've said, plaintiffs rely entirely on his alleged status as an
20  officer, director or trustee of these three entities that I
21  mentioned.
22          This is insufficient for two reasons, your Honor.
23  First, these alleged positions themselves do not, as a matter
24  of law, create jurisdiction over him personally.  And,
25  secondly, these three entities have no relevant presence in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC

1    United States.
2           First, your Honor, on the first point, the case law is
3    clear, and we cite it at page 8 of our opening brief, personal
4    jurisdiction over the employees or officers of a corporation in
5    their individual capacities must be based on their personal
6    contacts with the forum and not their acts on contacts carried
7    out solely in a corporate capacity.  Plaintiffs have made no
8    showing of any personal contacts, none, by Mr. Bin Mahfouz with
9    the United States.
10          Now, in an attempt to correct this deficiency,
11   plaintiffs, for the first time, in their opposition brief,
12   allege at page 7 that he was a stockholder in two publicly
13   traded American companies.  I would suggest that that no more
14   established personal jurisdiction than their previous
15   allegations that merely holding a corporate position in a
16   foreign company that arguably does business in the United
17   States somehow establishes personal jurisdiction.  It does not.
18   And here, the foreign entities were not even doing any business
19   in the United States at any relevant time.
20          Let's take each one of those three entities that I
21   mentioned.  First, Blessed Relief or Muwafaq was a charitable
22   organization that plaintiffs allege had a post office box in
23   the United States.  But they specifically acknowledge in their
24   complaint at paragraph 334 that Mr. Bin Mahfouz was not an
25   incorporator of the United States branch.

4acWterC

1        Now, the records of the Delaware secretary of state's
2   office which we have attached to our moving papers show that
3   since 1992, when the charity first appeared, no fees were paid,
4   and the Delaware secretary of state declared the entity to be
5   void two years later in 1994.  Even if it ever had come into
6   existence, no fees were paid from day 1.  The records that are
7   before the Court show no involvement by Mr. Bin Mahfouz.  And
8   furthermore, and contrary to plaintiffs' unsubstantiated
9   allegations, Blessed Relief, and I underscore this, your Honor,
10  is not on any United States list of specially designated global
11  terrorist entities.  We've provided the Court with the link to
12  the U.S. Treasury Department Web site which lays that out
13  clearly as part of the public record.
14       The second entity, your Honor, Nimir Petroleum, Mr.
15  Bin Mahfouz is variously alleged to have been the chair, CEO,
16  or shareholder and board member.  Now, in a vain effort to
17  create the appearance that the Court has jurisdiction over
18  Nimir, plaintiffs allege that the company owns a subsidiary,
19  Nimir Petroleum U.S.A., located in Dallas, Texas, but like the
20  same assertion with regard to Blessed Relief that it had a
21  branch in the U.S., this allegation is also a red herring.
22       We have attached to our moving papers, your Honor, a
23  certification from the Texas secretary of state that
24  demonstrates that Nimir Petroleum's U.S. existence was
25  forfeited and made null and void as of February 1996.  It was

39

4acWterC

1   similarly declared void by the Delaware secretary of state on
2   March 1, 2000.
3           Most importantly, however, as I said at the outset of
4   my argument, plaintiffs have already voluntarily dismissed this
5   entity, their claimed allegations against it in this case.
6   Nimir is no longer in this case.
7           Finally, plaintiff alleges that Abdulrahman Bin
8   Mahfouz is a shareholder and a member of the board and vice
9   chairman of the executive management committee, or was, I
10  should say, of National Commercial Bank, which you just heard
11  about from Mr. Liebman.  As with all entities here, plaintiffs
12  allege the bank operated as financial conduit or funnel for Al
13  Qaeda.  But here again, nowhere is it alleged that Mr. Bin
14  Mahfouz played any part in, ratified, or even knew of the
15  bank's alleged role as a conduit.
16          In an attempt to tie NCB to the United States,
17  plaintiffs allege that the bank was implicated in the allegedly
18  fraudulent schemes and practices of BCCI, between 1986 and
19  1990.  Well, your Honor, our client was a teenager at that
20  time.
21          In sum, personal jurisdiction depends on the
22  defendant's personal contacts with the forum state at the time
23  the lawsuit was filed, not sometime in the remote past.  Bare
24  allegations of nebulous involvement in intentional torts within
25  this jurisdiction such as those made against Mr. Bin Mahfouz
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4acWterC

1    are simply not enough.  Plaintiffs make no claim that Mr. Bin
2    Mahfouz personally has ever had any relevant contact with the
3    United States.  He is not alleged to have participated in,
4    ratified, or even known of the alleged wrongful conduct.
5    Merely holding a corporate position in a foreign company does
6    not create personal jurisdiction even if the company does
7    business in the United States, according to what we believe is
8    the plaintiffs' wrongful allegations.  There is simply no
9    personal jurisdiction over Mr. Bin Mahfouz.  Whether the Court
10   has jurisdiction over the corporate entities is not the issue.
11           Thank you, your Honor.
12           THE COURT:  Thank you.
13           MR. GAUCH:  May it please the Court, James Gauch on
14   behalf of the Saudi Bin Laden group and Bakr, Omar and Tariq
15   Bin Laden.
16           I'm mindful that we're into the second hour of
17   argument, and, under the Court's ground rules, I will not
18   address the two primary arguments, whether the SBG defendants
19   purposefully directed their conduct into the United States
20   under Calder and Burger King -- you heard from Mr. Cooper on
21   that -- and whether there is conspiracy jurisdiction, which Mr.
22   Cohen addressed.
23           I would like to address simply the point of general
24   jurisdiction and, specifically, plaintiffs' claim that they're
25   entitled to jurisdictional discovery in an effort to establish

4acWterC

1   general jurisdiction over SBG or the individual Bin Laden SBG
2   defendants.  Plaintiffs state this argument as a fall-back but
3   stop well short in their briefs of actually arguing that they
4   have identified sufficient contacts to make a case that general
5   jurisdiction exists.
6         Both in Ashton and Burnett, they express a subjective
7   belief that the jurisdictional discovery would reveal
8   substantial contacts, and their jumping-off point for that
9   argument is an article that appeared in the New Yorker two
10   months after the 9/11 attacks.  As we've explained in the
11   briefs, the particular contacts they point to are plainly
12   inadequate to establish a prima facie case of jurisdiction,
13   which, as you've heard earlier this morning, under the Jazini
14   case, the Second Circuit clearly requires in order to obtain
15   jurisdictional discovery.  And there's no dispute in this case
16   as to what a prima facie case of personal jurisdiction would
17   constitute, which plaintiffs themselves quote language out of
18   Bellepointe v. Freeport-McMoran that a prima facie case
19   consists of facts, which, if true, are sufficient in themselves
20   to establish jurisdiction.
21         We've gone through in our briefs the particular
22   contacts that the plaintiffs have pointed to in their briefs,
23   as well as the one contact that they actually allege in their
24   complaint.  I won't belabor the point by going through those
25   individually, but I will make several broader points.  One is

42

4acWterC

1    that there is absolutely no assertion anywhere in the complaint
2    or in any of the briefs that the individuals that I represent,
3    Bakr, Omar and Tariq Bin Laden, had any relevant contacts with
4    the United States.
5              As to SBG, we've explained that the numerous contacts
6    that they cite are either remote in time -- they cite donations
7    to Harvard University more than ten years ago.  Many of the
8    contacts that they cite have nothing to do with SBG but in fact
9    concern personal holdings of other Bin Laden family members
10   that are not in the case.
11             They also raise the issue of passive investments which
12   are clearly irrelevant as a matter of law, and they point to an
13   address that SBG used to have in Rockville, Maryland, has
14   asserted to have had.  They tried to create a factual dispute
15   as to the status of that office, whether it was a subsidiary of
16   SBG or in fact an office of SBG itself, but they acknowledge
17   that the office was closed.  But as Mr. Liebman said, the
18   relevant time period is when the complaint was filed, and that
19   contact is irrelevant.
20             In conclusion, I would like to make the point, respond
21   to plaintiffs' likely argument that, without discovery, they
22   cannot establish a prima facie case of jurisdiction, it would
23   be unfair to put them to that burden.  That argument has
24   already been clearly rejected in the Jazini case.  The Second
25   Circuit acknowledged that it is difficult and may be extremely

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC

 1   difficult to establish jurisdiction over foreign corporations,
 2   but that is simply the nature of the process.  They explained
 3   that the rules governing the establishment of jurisdiction over
 4   foreign corporations is clear and settled, and it is just as
 5   clear that the plaintiffs are not entitled to jurisdictional
 6   discovery.
 7           Thank you.
 8           THE COURT:  Thank you, sir.
 9           MR. COOPER:  Your Honor, Mr. Cooper, on behalf of
10   Prince Sultan.  I believe that that concludes the defendants'
11   presentations this morning.
12           THE COURT:  All righty.  We'll take a five-minute
13   recess.
14           (Recess)
15           THE COURT:  Please be seated.  All right.  Mr. Motley,
16   will you be leading off?
17           MR. MOTLEY:  May it please the Court.  Ron Motley from
18   Charleston, South Carolina.
19           Your Honor, in this MDL consolidated proceeding, we
20   believe it's appropriate in this jurisdictional motion that
21   your Honor resort to pleadings and all of them, the 12(e)s that
22   have been filed, the affidavits we filed, the letters rogatory
23   that were issued by Judge Robertson in the Burnett case, which
24   yielded documents which are placed in the record by that
25   vehicle, and also, I believe the RICO statements should bear on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

44

4acWterC

1    these matters.

2           Now, your Honor, with the Court's permission, I will
3    be addressing the factual basis for two issues before your
4    Honor, and that is the targeting of the United States by these
5    defendants as it bears on the issue of jurisdiction, and the
6    conspiracy and conspiratorial conduct of these defendants and
7    their coconspirators, as it bears upon jurisdiction.  Mr. John
8    Carter will be addressing your Honor on the Supreme Court and
9    Second Circuit and other decisions which bear on directed at
10    the United States, targeting the United States and conspiracy
11    jurisdiction.

12           We will not be addressing general doing business
13    jurisdiction, as we thought that we had agreed that the primary
14    focus would be on the other two, the direction at the United
15    States.

16           I would like to start, your Honor, that the burden
17    here is not that of summary judgment, it's a prima facie
18    showing.  I've heard these defendants, and according to them,
19    nobody in this courtroom has done anything, nobody ought to be
20    here, not even people whose names are Bin Laden.  That then
21    takes me, your Honor, to September 11.

22           On the morning of September 11, your Honor, New
23    Yorkers going to business were interrupted by the sound of jets
24    roaring overhead at very high rates of speed and the horrific
25    sounds of these jets ramming into the World Trade Center, not

4acWterC

1  very far from here.  Your Honor, everything I'm about to say is
2  in the record before your Honor, and if the defendants think it
3  is not, and if they bring it to my attention, I would like to
4  have the opportunity, your Honor, to respond in writing as to
5  where it could be found.
6          Initially, your Honor, Al Qaeda was not formed when
7  Ms. Bernabei claims it was formed.  It was formed and
8  publicized in April of 1988, in a magazine, an Arabic magazine
9  called Jihad.  It was a proclamation by Dr. Azzam.  He was a
10  mentor to Osama Bin Laden.  Your Honor, the defendants in their
11  papers speak at length regarding due process.  As I hope we
12  will demonstrate to you, the jurisprudence in the Second
13  Circuit that has arisen out of the activities of Al Qaeda is
14  informative in regard to how much process is due defendants who
15  target the United States or participate in the targeting of the
16  United States or participate as coconspirators.
17          Your Honor, it goes without saying that September 11
18  was not planned in August of 2001.  The first hijacking of a
19  jetliner with the intended consequence of crashing it in a
20  suicide fashion into a public landmark occurred in December
21  1994 by affiliates of Al Qaeda when Air France was hijacked,
22  refuelled in Marseilles with the intention being stated that
23  they intended to crash it into the Eiffel Tower.  The demands
24  of the hijackers were that a man be released from prison in New
25  York City.  This man is known as Sheik Rahman.

46

4acWterC

1      Sheik Rahman, your Honor, if you might recall, was
2  tried and convicted in this very courthouse or in a Southern
3  District courthouse, I'm not sure how old this courthouse is,
4  in the mid-1990s.  There were a string of Al Qaeda operatives
5  who were tried and convicted in this courthouse in the 1990s,
6  including a man who participated in the destruction or
7  attempted destruction of the World Trade Center in 1993, and
8  who actually participated in the planning of what later became
9  the September 11 hijackings.  This was in 1995, it was called
10  Plan Bojinka.
11      Your Honor, this man, Ramzi Yousef, was convicted in
12  this courthouse in the 1990s of not hijacking a United States
13  aircraft, of not murdering a United States citizen, but of
14  plotting to hijack a Philippines airlines, placing a bomb on
15  that plane, which exploded, killing a Japanese citizen.
16  Because of the nature of terrorism and the laws that had been
17  enacted by our country to prosecute and bring to civil justice
18  perpetrators of terrorism, the court held that the United
19  States District Court had extraterritorial right to try
20  Mr. Yousef in a criminal court of law for this conduct which
21  occurred in the Philippines and did not involve United States
22  aircraft or United States citizens.
23      Your Honor, President Bush memorably told the nation
24  in his first address to us after September 11, he said, among
25  other things, "If you fund a terrorist, you are a terrorist."

4acWterC

1   Why did Al Qaeda target the United States?  And when
2 did they target the United States, and how was this known?
3   It's very important to the inquiry here today, your
4 Honor, Sheik Rahman, whose name I just mentioned, while sitting
5 in a jail in New York, issued a fatwa, or religious edict, from
6 his jail cell, in the United States, in 1998.  How do we know
7 this?  In this very courthouse, in June of 2001, an Al Qaeda
8 operative named Ahmed Ressam, under oath, in this courthouse,
9 in June of 2001, told the jury that he, as an Al Qaeda
10 operative trained in Afghanistan, at a Bin Laden run camp, saw
11 and received copies of Sheik Rahman's edict, fatwa, issued from
12 his jail in New York.  And here's what Sheik Rahman said about
13 targeting the United States:
14   "All Muslims everywhere" -- this is in the record,
15 your Honor, of the trial to which I referred in June 2001 --
16 "cut the transportation of their countries, tear it down,
17 destroy their economy, burn their companies, eliminate their
18 interests, sink their ships, shoot down their planes, kill them
19 on the sea, in the air, on the land, kill them when you find
20 them.  Take them and encircle them."
21   Now, your Honor, pretty much everything he just said
22 happened on September 11, right here in New York City and at
23 the Pentagon and in an open field in Shanksville, Pennsylvania.
24 Your Honor, in May of 2001, a defendant in this case whose
25 motion is not ripe for today, who we claim is a coconspirator,

48

4acWterC
1    a person named Sami Al-Hussein, placed on his Web site in May
2    2001 the following edict or fatwa from yet another Saudi
3    cleric, to this effect, these words:
4              "The holy warrior must kill himself if he knows that
5    this will lead to killing a great number of the enemies.  This
6    can be accomplished with the modern means of bringing down an
7    airplane on an important location that will cause the enemy
8    great losses."
9              That is four months before 9/11.  Is that targeting
10   the United States?  Is that direct?  Is that specific?  I say
11   it is, your Honor.
12             Your Honor, in October of 2001, the Congress convened
13   an inquiry of how September 11 occurred, and among the
14   witnesses, and this is in the record, your Honor, is the
15   testimony of the former head of FBI counterterrorism task
16   force, Mr. Buck Revell, and he traced, your Honor, he traced,
17   your Honor, the history of Al Qaeda's targeting of the United
18   States.  He listed, under oath in that testimony, 13 pre-9/11
19   attacks or attempted attacks on United States interests.  He
20   testified that the United States was a principal target of the
21   terrorist campaign of Al Qaeda.  He referred to a speech he
22   made in 1999 that was published to the same effect.  Mr. Revell
23   said, If 13 attacks on the United States interests is not a
24   campaign against the United States, then he said I've never
25   seen one.

4acWterC

 1          Your Honor, in this case, as the D.C. Circuit Court
 2    held in July of this year, it is not the specific bad act that
 3    we're looking at; it's the funding of the bad actor.  In this
 4    case, Al Qaeda.  Al Qaeda targeted the United States.  It was
 5    well known to these defendants.  It's well pled in our
 6    allegations, and it implicates the direct targeting of the
 7    United States jurisdiction over these defendants.
 8          How else do we know that Al Qaeda targeted the United
 9    States, your Honor?  Well, he gave an interview on CNN which
10    was telecast worldwide in 1997.  He says, I declared Jihad or
11    war against the United States because I, this government, is
12    unjust, criminal and tyrannical.  The American people are not
13    exonerated from responsibility because they voted for their
14    corrupt government.  In other words, we're targeting U.S.
15    voters.
16          In 1996, Mr. Bin laden issued his first fatwa, calling
17    upon Muslims to attack and kill Americans wherever they found
18    them.  In 1998, he declared war, his words, on the United
19    States and its citizens, the taxpayers of the United States.
20    Both of these fatwas, your Honor, were translated.  They were
21    made in Arabic.  They appeared in Arabic publications, the
22    largest publication in the Muslim world.
23          In 1998, your Honor, Mr. Bin laden was indicted by the
24    Southern District of New York U.S. Attorney.  He held a press
25    conference, your Honor, outside of his office, in 1998 when he

50

4acWterC
1   announced the indictment of Mr. Bin laden.  In the indictment
2   on Mr. Bin laden, the grand jury, in the indictment, traces the
3   history of the creation of Al Qaeda.  Traces why Al Qaeda
4   targeted the United States.  Describes their loyalty and the
5   inspiration given to them by Sheik Rahman.  Paired together Al
6   Qaeda with Egyptian terrorist groups refers specifically to the
7   fatwas that I mentioned.
8           The indictment, your Honor, concludes that Al Qaeda
9   targeted the United States national defense efforts in 1991.
10  And paragraph F, your Honor, of that indictment of Mr. Bin
11  Laden refers specifically to Bin Laden's practice of using
12  religious, Islamic religious charities to raise and distribute
13  money for his terror campaign.
14          Your Honor, there's one thing that's not in the
15  record, and the reason it's not in the record is because it
16  didn't occur until September the 29th of, less than a month
17  ago.  And I would respectfully, it's testimony of the
18  undersecretary of the United States Treasury to a congressional
19  committee, and I would ask for leave of Court for your Honor to
20  take judicial notice of this.  I have copies for the
21  defendants, but I think it's highly relevant to the issues
22  before your Honor today.  Because it's not a contemporaneous
23  statement alone, it's a review of things that occurred
24  historically, because the Department of the Treasury, as your
25  Honor knows, was empowered with the designation of terrorist
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

51

4acWterC
```
 1  organizations and foreign terrorist organizations.  And with
 2  your Honor's permission, I would ask for permission to be
 3  allowed to refer to this and to place it in the record, since
 4  it just occurred three weeks ago.
 5          THE COURT:  Who wants to take the lead for the
 6  defendants on this?  It's highly unusual, but if it happened
 7  three weeks ago, why didn't you send it to your counsel on the
 8  other side and either get their consent or their opposition?
 9  It is highly unusual, Mr. Motley.
10          MR. MOTLEY:  Then I'll move on, your Honor.
11          THE COURT:  I wouldn't do it, if I were you.  But I
12  anticipate if you did, there's going to be some opposition.
13          Am I correct?  Mr. Cohen?
14          MR. COHEN:  Yes.
15          THE COURT:  You led off for the defendants today.  I
16  take it there would be some opposition, is that correct?
17          MR. COHEN:  Yes, I think so, your Honor.  We'd
18  certainly like a chance to consider it.
19          THE COURT:  Mr. Motley, I think if you wish to add it
20  subsequently, at least, you know, show it to your opponents and
21  then we'll consider it.
22          MR. MOTLEY:  I'll move on, your Honor.  Thank you.
23          THE COURT:  I think that's wise of you.
24          MR. MOTLEY:  Yes, sir.
25          Your Honor, I would now like to turn to the 9/11
```

52

4acWterC
1    Commission report which was cited by the defendants.
2            As I argued to your Honor the last time, the 9/11
3    Commission report is not binding on your Honor, but I think it
4    can inform your Honor with respect to its investigative
5    findings.  And in this regard, I think it's important to
6    understand, your Honor, that the 9/11 Commission has pointed
7    out that while the specific acts in question, the atrocities of
8    September 11, were relatively inexpensive, costing somewhere
9    between four and $500,000, the infrastructure of Al Qaeda,
10   which existed from 1988 until and after September 11, cost
11   upwards of $30 million per year.  And, your Honor, it's the
12   infrastructure of Al Qaeda today, their cost of doing business,
13   which is relevant to our inquiry here, not just the cost of the
14   specific attack on 9/11.
15           As I stated, it came into existence in '88.  They
16   attacked the United States 13 times prior to 9/11, or attempted
17   to attack the United States, and so this 9/11 plot did not
18   occur overnight.
19           Judge, as you may have noticed, I usually defer to my
20   more learned colleagues on matters of law, but, with your
21   Honor's permission, I'm going to cite to your Honor a case from
22   1807 of the United States Supreme Court involving the treason
23   of Aaron Burr and certain of his accomplices.  Mr. Chief
24   Justice John Marshall wrote, "If war be actually levied, all
25   those who perform any part, however minute, or however remote

4acWterC

```
 1   from the incident and who are actually engaged in the general
 2   conspiracy, are traitors."
 3            In this courthouse, your Honor, a jury convicted
 4   members of Al Qaeda of acts of sedition, a conspiracy, a
 5   seditious conspiracy against the United States, a conspiracy to
 6   attack the infrastructure of the New York area in the
 7   mid-1990s.  This is the case of the United States v. Rahman,
 8   the Sheik Rahman, your Honor, which was decided by the Second
 9   Circuit in August of 1999.
10            I will not bore your Honor with citations from the
11   Second Circuit's unanimous opinion, except that I would point
12   out specific to the issue of targeting the United States, that
13   in 1993, in Brooklyn, New York, Sheik Rahman conducted a
14   seminar on jihad against the United States, within shouting
15   distance of this courthouse, in Brooklyn, in 1993.  And he
16   called upon the attendees at this meeting to target the United
17   States and its allies.  The Second Circuit did find, your
18   Honor, that Al Qaeda, in 1999, in its published opinion, was
19   guilty of a conspiracy to levy war upon the United States.
20            The government introduced evidence of notebooks,
21   terror cookbooks, if you will, that were found in possession of
22   the defendants in the New York City area when searches were
23   conducted in 1993.  Your Honor, in April of last year, another
24   Al Qaeda operative, Ramzi Yousef, was convicted and his
25   conviction was upheld by the Second Circuit unanimously.
```