**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*    Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)


**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE MOTION TO DISMISS FILED BY**
**SAUDI AMERICAN BANK**


COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................................1

II.  ALLEGATIONS AGAINST SAUDI AMERICAN BANK AND OSAMA
BIN LADEN'S RELOCATION TO SUDAN IN 1991......................................................1

    A.  Allegations Against Saudi American Bank ...............................................................2

    B.  Bin Laden Was a Known Terrorist When He Moved to Sudan in 1991,
and the Defendant Either Knew or Should Have Known It Was
Supporting al Qaida When It Financed bin Laden's Construction
Projects in Sudan ...................................................................................................3

        1.  Al Qaida's Origins ..........................................................................................4

        2.  Bin Laden was a celebrity in the Muslim world and seen as a hero
of the *jihad* in Afghanistan when he returned to Saudi Arabia in
1989 ................................................................................................................5

        3.  Bin Laden relocated al Qaida's leadership structure to Sudan with
the permission of the Sudanese government .....................................................6

    C.  Documents from the CIA, the State Department, the Congressional
Research Service, and the 9/11 Commission's Final Report All Indicate
that bin Laden's Construction Projects in Sudan Were Performed for
the Sudanese Government in Exchange for Refuge for al Qaida's
Leadership Structure and Permission to Set Up Training Facilities in
Sudan ....................................................................................................................9

        1.  The 1996 CIA Assessment of bin Laden indicates a *quid pro quo*
between bin Laden and the Sudanese government...........................................10

        2.  The State Department's Report *Patterns of Global Terrorism:
1995* also reveals a *quid pro quo* between bin Laden and Sudan...................11

        3.  The Congressional Research Service's 2002 Report is another
document illustrating the agreement between bin Laden and
Sudan ...........................................................................................................12

        4.  The 9/11 Commission's Final Report supports the statements from
the CIA, the State Department, and the Congressional Research
Service ..........................................................................................................13

i

III.     ARGUMENT ...................................................................................................14

     A.    Applicable Standards on a Motion to Dismiss.........................................15

           1.    Fed. R. Civ. P. 12(b)(6).................................................................15

           2.    Fed. R. Civ. P. 8(a)(2)...................................................................16

     B.    The Federal Plaintiffs Have Adhered to Rule 8's Liberal Pleading
         Standard .................................................................................................16

     C.    The ATSSSA Does Not Preclude the Federal Statutory Claims in the
         FAC ........................................................................................................20

           1.    Canons of statutory construction ..................................................20

           2.    Sections 405(c)(3) (B)(i) & 408(c) show that § 408(b)(1) does not
              preclude other federal statutory claims against terrorists and co-
              conspirators..................................................................................21

           3.    The ATSSSA and the federal statutory claims in the FAC are
              capable of coexistence and each must be given effect ...................22

     D.    The Federal Plaintiffs Have Sufficiently Alleged Claims under the
         ATA, RICO, and New York State Common Law ....................................23

IV.    CONCLUSION.............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*America Tobacco Co. v. Patterson,*
    456 U.S. 63 (1982)........................................................................22

*Auburn Housing Authority v. Martinez,*
    277 F.3d 138 (2d Cir. 2002)........................................................21

*Bingham v. Meachum,*
    77 F.3d 626 (2d Cir. 1996)..........................................................15

*Canada Life Assur. Co. v. Converium Ruckversicherung (Deutschland) AG,*
    335 F.3d 52 (2d Cir. 2003)..........................................................22

*Chance v. Armstrong,*
    143 F.3d 698 (2d Cir. 1998)........................................................15

*Conley v. Gibson,*
    355 U.S. 41 (1957)..............................................................15-16

*Consumer Prod. Safety Commission v. Gte Sylvania,*
    447 U.S. 102 (1980)....................................................................20

*Elliott Associates, L.P. v. Banco de la Nacion,*
    194 F.3d 363 (2d Cir. 1999)........................................................22

*Geisler v. Petrocelli,*
    616 F.2d 636 (2d Cir. 1980)........................................................15

*Hudson News Co. v. Federal Insurance Co.,*
    258 F. Supp. 2d 382 (D.N.J. 2003) ............................................23

*In re Initial Public Offering Sec. Litigation,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................16

*Int'l Fine Art & Antique Dealers Show Ltd. v. ASU Int'l, Inc.,*
    No. 02-CV-534 (DLC), 2002 U.S. Dist. LEXIS 10878
    (S.D.N.Y. June 19, 2002)............................................................22

*Leatherman v. Tarrant County,*
    507 U.S. 163 (1993)....................................................................16

*Morton v. Mancari,*
    417 U.S. 535 (1974)...................................................................................22-23

*In re Phillip Servs. Corp. Secs. Litig.,*
    No. 98-CIV-0835 (MBM), 2004 U.S. Dist. LEXIS 9261
    (S.D.N.Y. May 24, 2004)...............................................................................15

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997)...................................................................................20-21

*Simmons v. Abruzzo,*
    49 F.3d 83 (2d Cir. 1995) ...............................................................................15

*Sparrow v. United Airlines, Inc.,*
    216 F.3d 1111 (D.C. Cir. 2002).......................................................................16

*Swierkiewicz v. Sorema,*
    534 U.S. 506 (2002)................................................................................. 16-19

*Tom Lange Co. v. Kornblum & Co.,*
    81 F.3d 280 (2d Cir. 1996)..............................................................................20

*United States Nat'l Bank v. Indep. Ins. Agents of Am., Inc.,*
    508 U.S. 439 (1993)........................................................................................21

*United States v. Sforza,*
    326 F.3d 107 (2d Cir. 2003)............................................................................23

*In re Venture Mortgage Fund, L.P.,*
    282 F.3d 185 (2d Cir. 2002)............................................................................21

*Woodford v. Community Action Agency,*
    239 F.3d 517 (2d Cir. 2001)............................................................................15

*In re World Trade Ctr. Disaster Site Litig.,*
    270 F. Supp. 2d 357 (S.D.N.Y. June 20, 2003) .........................................21-22

*Wynder v. McMahon,*
    360 F.3d 73 (2d Cir. 2004)...................................................................15, 16, 18

*Yilmaz v. McElroy,*
    No. 00-CV-7542 (RCC), 2001 U.S. Dist. LEXIS 20839
    (S.D.N.Y. Dec. 17, 2001) ...............................................................................15

*Yoder v. Orthomolecular Nutritionist Institute, Inc.,*
    751 F.2d 555 (2d Cir. 1985)............................................................................15

## STATUTES, RULES, AND LEGISLATIVE MATERIALS

RICO, 18 U.S.C. § 1961 *et seq* ........................................................................14

The Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq* ...........................................14

147 Cong. Rec. S9589-9606 (Sept. 21, 2001) ...................................................21

147 Cong. Rec. H5884-5917 (Sept. 21, 2001)...................................................21

Fed. R. Civ. P. 8(a)(2)................................................................................... 16-19

Fed. R. Civ. P. 12(b)(6).................................................................................. 15-16

Torture Victim Protection ACT, Pub. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C. § 1350 note) ..................................................................................................14

Pub. L. No. 107-134, 115 Stat. 2435 (2002).....................................................20

The Air Transportation Safety and System Stabilization Act ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230-242 (Sept. 22, 2001) (reprinted, as amended, at 49 U.S.C. § 40101 note) ......................................................................................... 14, 20-23

Pub. L. No. 107-71, 115 Stat. 631 (2001)..........................................................20

## OTHER MATERIALS

*FRONTLINE Report, Hunting Bin Laden, Osama Bin Laden: A Chronology of His Political Life* (PBS television & PBS online, published April 1999 & updated Sept. 2001)   ................................................................................................................5

Central Intelligence Agency Assessment, Usama Bin Laden: Islamic Extremist Financier (August 1996) ............................................................................... 10-11

Congressional Research Service, Terrorism: Near Eastern Groups and State Sponsors 2002 (updated February 13, 2002)....................................................... 6, 12-13

THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATED, FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES (1st ed.,  W.W. Norton & Co. 2004).................................... 5, 6, 13-14

Press Release, U.S. Attorney for the Southern District of New York, Announcement of Indictment of Usama Bin Laden and Muhammad Atef (November 4, 1998)...........................7

Unclassified Version of Director of Central Intelligence George C. Tenet's
Testimony before the Joint Inquiry into Terrorist Attacks against the Untied States,
(June 18, 2002) .......................................................................................................... 6-7

U.S. Department of State, Patterns of Global Terrorism: 1993, Overview of State-
Sponsored Terrorism (April 1994)................................................................................7

U.S. Department of State, Patterns of Global Terrorism: 1995, Overview of State-
Sponsored Terrorism (April 1996)........................................................................ 11-12

U.S. Department of State, Patterns of Global Terrorism: 1997, Overview of State-
Sponsored Terrorism, at 1 (April 1998)........................................................................4

Defense Department Fact Sheet on Usama Bin Ladin: Saudi Advocates Destruction
of United States (August 20, 1998)........................................................................4, 6, 8

U.S. Senate Select Committee on Intelligence & U.S. House Permanent Select
Committee on Intelligence, Joint Inquiry into Intelligence Community Activities
before and after the Terrorist Attacks of September 11, 2001, S. Rep. No. 107-351 &
H. Rep. No. 107-792, at 194 (December 2002). ......................................................7, 8

Written Testimony of Jean-Charles Brisard, International Expert on Terrorism
Financing and Lead Investigator 911 Lawsuit, before the Committee on Banking,
Housing, and Urban Affairs, U.S. Senate, at 13 (October 22, 2003)............................24

I.      **INTRODUCTION**

The Federal Plaintiffs have sued Saudi American Bank ("SAB") based on its participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and foreseeable product.  FAC ¶ 72, 375, 600, 625, 632, & 640.  Throughout SAB's entire Memorandum of Law in Support of its Motion to Dismiss, SAB claims that the Federal Plaintiffs have not adequately alleged that SAB provided support to al Qaida's terrorist network.  SAB Br. at 4, 12-14, 18-25.[1]  SAB fails to recognize that the First Amended Complaint ("FAC") alleges that SAB financed many of the construction projects undertaken by Osama bin Laden and al Qaida in Sudan during the years that al Qaida's leadership structure operated from within that country, including the construction of major roads and the Port of Sudan airport.  FAC ¶ 367.  When bin Laden moved to Sudan from Saudi Arabia in 1991, it was generally known that he was a terrorist, and he had a *quid pro quo* with the Sudanese government under which he received refuge for al Qaida's leadership structure in exchange for the performance of construction projects.  FAC ¶¶ 321 & 510.  Based on those facts, the Federal Plaintiffs contend that it is not credible for SAB, the second largest bank in Saudi Arabia, to suggest that it was unaware that it was providing critical financial and logistical support to al Qaida's global terrorist network when it financed bin Laden's construction projects in Sudan.  FAC ¶¶ 368 & 374.

II.     **ALLEGATIONS AGAINST SAUDI AMERICAN BANK AND OSAMA BIN LADEN'S RELOCATION TO SUDAN IN 1991**

The Federal Plaintiffs will demonstrate that SAB either knew or should have known that by financing bin Laden's construction projects in Sudan, it was actually paying for al Qaida to operate from with Sudan's borders.[2]  The Federal Plaintiffs will make this point by first

---

[1]     "SAB Br. at page #." refers to SAB's Memorandum of Law in support of its Motion to Dismiss.

[2]     As support for this, the Federal Plaintiffs have cited to intelligence documents from the U.S. Government and other outside sources, which have been attached to this brief as exhibits.  While the Federal Plaintiffs' position is that there should be no need to refer to such outside sources because the allegations in the FAC should be

explaining the allegations against SAB in the FAC.  Second, the Federal Plaintiffs will explain

that it was publicly known that bin Laden was building a global terrorist network when he

relocated to Sudan from Saudi Arabia in 1991.  Lastly, and most importantly, the Federal

Plaintiffs will show that the allegations against SAB in the FAC are supported by statements

from the Central Intelligence Agency ("CIA"), the U.S. State Department, the Congressional

Research Service ("CRS"), and the 9/11 Commission, all of which explain bin Laden's

relationship to the National Islamic Front ("NIF") regime in Sudan.

### A.    Allegations Against Saudi American Bank

SAB is a financial institution headquartered in Riyadh, Saudi Arabia.[3]  FAC ¶ 365.  SAB

was established by royal decree in 1980, and it operates as an agency and instrumentality of the

Kingdom of Saudi Arabia.  FAC ¶ 365.  SAB has long provided financial services and other

forms of material support to several terrorist organizations, including al Qaida.  FAC ¶ 366.  In

regard to al Qaida, SAB financed many of the projects that were undertaken by Osama bin Laden

and al Qaida in Sudan during the years that bin Laden and al Qaida's leadership structure

operated from within Sudan.[4]  FAC ¶ 367.

---

accepted as true at this stage in the proceedings, the Federal Plaintiffs find the inclusion of these sources to be appropriate in light of SAB's assertion that the Federal Plaintiffs have no foundation for the allegations against it in the FAC.

[3]       The Federal Plaintiffs' previous briefings in this case have explained the general allegations in the FAC against al Qaida's partners in the International Banking System.  See Memorandum of Law in Opposition to the Motion to Dismiss Filed by Saleh Abdullah Kamel and Al Baraka Investment and Development Corporation at 1-2 (filed on 09/28/04).  Rather than repeat the discussion of those allegations here, the Federal Plaintiffs take this opportunity to argue that it is not credible for SAB, a major Saudi corporation and an important player in the International Banking System, to suggest that it was not aware that it was funding al Qaida's global terrorist network in the years that it financed Osama bin Laden's construction projects in Sudan.

[4]       Furthermore, SAB has also maintained accounts for many of the ostensible charities that operate within al Qaida's infrastructure, including Muslim World League ("MWL"), World Assembly of Muslim Youth ("WAMY"), International Islamic Relief Organization ("IIRO") and al Haramain, among others.  FAC ¶ 369.  In cooperation with the charities operating within al Qaida's infrastructure, SAB provides a mechanism to allow al Qaida supporters to deposit funds directly into accounts it maintains.  FAC ¶ 370.  Through this mechanism, SAB facilitates al Qaida's fundraising efforts.  FAC ¶ 370.  The accounts maintained by SAB on behalf of charities operating within al Qaida's infrastructure, and in particular, accounts it maintained for IIRO, WAMY and al Haramain, have been used to transfer funds to al Qaida cells throughout the World.  FAC ¶ 371.  SAB has long known that accounts it maintained for many ostensible charities were being used to solicit and transfer funds to al Qaida.  FAC ¶ 372.  Despite that knowledge, SAB has continued to maintain those accounts.  FAC ¶ 372.  In doing so, SAB knowingly provided financial services and other forms of material support to al Qaida.  FAC ¶ 372.

From 1991 to 1996, the Republic of Sudan openly harbored Osama bin laden and many top al Qaida lieutenants.  FAC ¶ 510.  During those years, the Sudanese government permitted bin Laden to establish al Qaida training camps, to set up front companies to move assets and generate revenues, and to use Sudan's state sovereignty to shield al Qaida's operations.  FAC ¶ 510.  When bin Laden first relocated to Sudan in 1991, he invested heavily in businesses and infrastructure projects in Sudan, in order to strengthen al Qaida's collaborative relationship with the ruling National Islamic Front ("NIF") regime.  FAC ¶ 321.  SAB provided the financing for the construction projects that bin Laden performed for the Sudanese government during the years that Sudan harbored bin Laden and al Qaida's lieutenants.[5]  FAC ¶¶ 510 & 367.  By financing theses projects, SAB knowingly provided material support and resources to al Qaida.  FAC ¶¶ 368.  Therefore, SAB has, for many years, provided critical financial and logistical support to al Qaida, and the September 11th Attack was a direct, intended and foreseeable product of SAB's participation in al Qaida's *jihadist* campaign.  FAC  ¶¶ 374 & 375.

### B.   Bin Laden Was a Known Terrorist When He Moved to Sudan in 1991, and the Defendant Either Knew or Should Have Known It Was Supporting al Qaida When It Financed bin Laden's Construction Projects in Sudan

When Osama bin Laden relocated to Sudan in 1991, SAB unquestionably knew that bin Laden was a terrorist and that it was supporting al Qaida by financing bin Laden's construction projects.  On this point, a brief discussion of al Qaida's origins, bin Laden's departure from Saudi Arabia in 1991, and the nature of the relationship between bin Laden and the NIF regime in Sudan, in which SAB played a major role by providing financing to bin Laden for construction projects in Sudan, is illuminating.

---

SAB also serves as the Saudi Arabia correspondent for many other banks within al Qaida's infrastructure, including Al Shamal Bank.  FAC ¶ 373.  SAB challenges ¶ 373, asserting that there is nothing "illegal or improper about a bank having international correspondent banking relationships."  SAB Br. at 7 n.1.  As support, SAB relies on a statement from JP Morgan's website.  *Id.*  The Federal Plaintiffs contend that when a bank uses its relationships with other banks to further the goals of a terrorist organization, such conduct is illegal and improper.

[5]     The Saudi Binladin Group and the Mohamed Binladen Organization also provided technical assistance on these projects.  FAC ¶ 367.

1.     __Al Qaida's Origins__

Al Qaida has its origins in the *jihad* – holy war – against the Soviet occupation of Afghanistan.  FAC ¶ 75.  During the 1980s, mujihadeen fighters – persons waging *jihad* – from throughout the Muslim world arrived in Afghanistan to fight the Soviets and defend Afghani Muslims.  FAC ¶ 75.  From the early stages of the conflict, Osama bin Laden provided financial, organizational, and engineering aid to the mujihadeen in Afghanistan.  FAC ¶ 75.  Together with Abdullah Azzam, bin Laden founded an organization known as the Makhtab al Khidmat ("The Office of Services"), to facilitate the provision of financial and logistical support to the mujihadeen.  FAC ¶ 75.  Throughout the conflict with the Soviets, the Makhtab al Khidmat worked closely with a number of purported charities and relief organizations to provide travel documents, funds, transportation, training, facilities, arms, physical assets and other logistical support to the mujihadeen.[6]  FAC ¶ 76.  In collaboration with one another, these ostensible charities and relief organizations established a vast financial and logistical infrastructure to support the mujihadeen opposition to the Soviets.  FAC ¶ 76.

Shortly before the Soviets withdrew from Afghanistan in 1989, bin Laden became determined to spread the *jihadist* movement to regions outside of Afghanistan, and to wage war with the U.S., which he believed to be the true enemy of Islam.  FAC ¶ 77.  In furtherance of that objective, bin Laden established al Qaida ("the Base").  *See* U.S. Department of State, Patterns of Global Terrorism: 1997, Overview of State-Sponsored Terrorism, at 1 (April 1998), attached to the Affirmation of Sean P. Carter in Opposition to the Motion to Dismiss of SAB (Carter Aff.), as Exhibit 1, *also available at* http://www.usemb.se/terror/rpt1997/sponsored.html; *see also* Defense Department Fact Sheet on Usama Bin Ladin: Saudi Advocates Destruction of United States (hereinafter "Defense Dep't Fact Sheet on Bin Ladin 1998") (August 20, 1998), Carter

---

[6]     These charities and relief organizations included MLW, IIRO, Benevolence International Foundation ("BIF") a/k/a Lajnat al-Birr al-Islamiyya, and the Saudi Red Crescent ("SCR"), among others.  FAC ¶ 76.

Aff. Exhibit 2, *also available at* http://usembassy-australia.state.gov/hyper/WF980820/

epf404.htm.  Using the system developed to support the mujihadeen fighters in Afghanistan as a

model, al Qaida relied, from its inception, on a complex infrastructure of ostensible charities,

relief organizations, banks, financial institutions, wealthy sponsors, mosques, and for-profit

enterprises to fuel its phenomenal development and global expansion.  FAC ¶78.  This

international support infrastructure sustained al Qaida when it moved to Sudan in 1991, and

when it was forced to relocate back to Afghanistan in 1996.  FAC ¶ 78.

> **2.    Bin Laden was a celebrity in the Muslim world and seen as a hero of
> the *jihad* in Afghanistan when he returned to Saudi Arabia in 1989**

At the conclusion of the Afghan war against the Soviets in 1989, Osama bin Laden

returned to Saudi Arabia as "a hero" of the *jihad* against the Soviets.  *FRONTLINE Report,*

*Hunting Bin Laden*, at *Osama Bin Laden: A Chronology of His Political Life* (hereinafter

"*FRONTLINE Report")* at ¶ 8 (PBS television & PBS online, published April 1999 & updated

Sept. 2001), Carter Aff. Exhibit 3, *also available at* http://www.pbs.org/ wgbh/pages/frontline/

shows/binladen/etc/cron.html.[7]  According to the 9/11 Commission's Final Report, bin Laden's

"efforts in Afghanistan had earned him celebrity and respect" in the Muslim world.[8]  THE

NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATED, FINAL REPORT OF

THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES ("9/11

COMMISSION REPORT") at 57 (1st ed.,  W.W. Norton & Co. 2004), *also available at*

http://www.gpoaccess.gov/911/ (hereinafter "9/11 COMMISSION REPORT").

After returning to Saudi Arabia, Osama bin Laden went to work for the Saudi Binladen

Group, which was his family's construction company.  FAC ¶ 383.  Between 1989 and 1991,

---

[7]       The *Hunting Bin Laden* report by the PBS show FRONTLINE has a companion website that offers
information from the report and the investigation that was conducted by a team of New York Times reporters and
FRONTLINE correspondent Lowell Bergman.  The Federal Plaintiffs cite to the companion website in this brief.

[8]       The 9/11 Commission's Final Report also states that from 1992-1996, "Bin Ladin was well-known and a
senior figure among Islamic extremists, especially those in Egypt, the Arabian Peninsula, and the Afghanistan-
Pakistan border region."  9/11 COMMISSION REPORT at 59.

while he was working for the Saudi Binladen Group, bin Laden continued to develop al Qaida's infrastructure.  FAC ¶ 383.  According to the Defense Department, when bin Laden returned to work for his family's construction business, "he continued his organization to support opposition movements in Saudi Arabia and Yemen."  Defense Dep't Fact Sheet on Bin Ladin 1998.

In August 1990, while Osama bin Laden was working for the Saudi Binladen Group, Iraq invaded Kuwait.  9/11 COMMISSION REPORT at 57; FAC ¶ 383.  "After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin . . . began to publicly denounce the arrangement."  9/11 COMMISSION REPORT at 57.  According to the Congressional Research Service ("CRS"), bin Laden's "radical Islamic contacts and protests against the presence of U.S. troops in Saudi Arabia to combat Iraq's invasion of Kuwait caused him to run afoul of Saudi authorities."  Congressional Research Service, Terrorism: Near Eastern Groups and State Sponsors 2002 (hereinafter "CRS Report 2002"), at CRS-16 (updated February 13, 2002), Carter Aff. Exhibit 4, *also available at* http://www.lib.uiowa.edu/govpubs/guides/terrorism.html.  As a result, Saudi authorities expelled him in 1991.  Defense Dep't Fach Sheet on Bin Ladin 1998; *see also* 9/11 COMMISSION REPORT at 57.  After his expulsion, "Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined businesses and terrorist enterprises."  9/11 COMMISSION REPORT at 57.

### 3.   Bin Laden relocated al Qaida's leadership structure to Sudan with the permission of the Sudanese government

In 1991, bin Laden relocated al Qaida's leadership structure and principle training camps to Sudan, under the protection of the ruling NIF regime.  FAC ¶ 93 & 321.[9]  George J. Tenet, the former Director of Central Intelligence, has explained that the U.S. intelligence community "first locked onto Bin Laden in the period from 1991 to 1996 when he was in Sudan."  Unclassified

---

[9]   The allegations contained in ¶ 321 are based on a 2002 Congressional Research Service Report ("CRS"). This report is discussed in more detail in Section II., C., *infra*.

Version of Director of Central Intelligence George C. Tenet's Testimony before the Joint Inquiry

into Terrorist Attacks against the Untied States, at 1 (June 18, 2002), Carter Aff. Exhibit 5, *also*

*available at* http://www.cia.gov/cia/public_affairs/speeches/2002/dci_testimony_06182002.html.

According to Mr. Tenet, "[d]uring those years, [bin Laden] was principally a financier of

terrorist attacks . . . ." *Id.*

When Bin Laden relocated to Sudan in 1991, he had the approval of the NIF's leader,

Hasan al-Turabi.[10]  FAC ¶ 321.  Al Qaida remained in Sudan for a period of five (5) years,

during which it worked closely with the NIF, the Sudanese Intelligence Service, and the Popular

Defense Force.[11]  FAC ¶ 93 & 321.  Moreover, "[d]uring his time in Sudan, Bin Ladin built a

network of international Islamic extremists . . . ."  U.S. Senate Select Committee on Intelligence

& U.S. House Permanent Select Committee on Intelligence, Joint Inquiry into Intelligence

Community Activities before and after the Terrorist Attacks of September 11, 2001 (hereinafter

"Joint Inquiry"), S. REP. NO. 107-351 & H. REP. NO. 107-792, at 194 (December 2002), *also*

*available at* http://www.gpoaccess.gov/serialset/creports/911.html.  In August 1993, Sudan was

added to the State Department's List of State Sponsors of Terrorism.  *See* U.S. Department of

State, Patterns of Global Terrorism: 1993, State-Sponsored Terrorism Overview, at 1 (April

1994), Carter Aff. Exhibit 7, *also available at* http://www.fas.org/irp/threat/terror_93/

---

[10]     The U.S. Attorney for the Southern District of New York's press release concerning the indictment of
Osama bin Laden for the August 7, 1998, bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam,
Tanzania, also states that "BIN LADEN and al Qaeda forged alliances with the National Islamic Front in the Sudan .
. . with the goal of working together against their perceived common enemies in the West, particularly the United
States."  Press Release, U.S. Attorney for the Southern District of New York, Announcement of Indictment of
Usama Bin Laden and Muhammad Atef (November 4, 1998), Carter Aff. Exhibit 6, *also available at*
http://fas.org/irp/news/1998/11/98110602_nlt.html.
[11]     Furthermore, when the al Qaida leadership structure relocated to Sudan in 1991, BIF, an ostensible charity
and an agency, instrumentality and organ of the Kingdom of Saudi Arabia that provided material support and
resources to al Qaida, immediately opened an office in Sudan to support al Qaida in its new location.  FAC ¶¶ 84,
85, 86 & 94.  BIF's sponsorship of al Qaida in Sudan mirrored how it had worked with al Qaida in Afghanistan prior
to 1991.  FAC ¶ 94.

statespon.html.  By that time, "al-Qa'ida was financing at least three terrorist training camps in

northern Sudan."  Joint Inquiry at 194.

While in Sudan, bin Laden invested heavily in businesses and infrastructure projects in

order to strengthen al Qaida's relationship with the ruling NIF regime.  FAC ¶ 321.  In concert

with NIF leaders, bin Laden built a network of businesses that included Al Shamal Islamic Bank,

an import-export firm, a currency trading firm, and firms that exported agricultural products.

FAC ¶ 321 & 378.  More importantly, bin Laden's business ventures in Sudan also included al-

Hijrah for Construction and Development, a construction enterprise which performed several

significant infrastructure projects on behalf of the ruling NIF regime.  FAC ¶ 378.  Among the

projects that the al-Hijrah Construction firm performed for the Sudanese government were the

construction of the Tahaddi Road linking Khartoum with the Port of Sudan, and the construction

of a modern international airport near the Port of Sudan.  FAC ¶ 379.  Defendant SAB financed

these construction projects.  FAC ¶ 367.  Bin Laden's al-Hijrah Construction firm also received

significant support for its projects in Sudan from Saudi Binladen Group, which is owned to this

day by members of the bin Laden family.  FAC ¶ 321 & 380.  Additionally, the business bin

Laden conducted in Sudan enabled him to offer safe haven and employment in Sudan to al Qaida

members, which in turn promoted their involvement in radical Islamic movements in their

countries of origin as well as anti-U.S. terrorism.  FAC ¶ 321.

In May 1996, bin Laden was expelled from Sudan.[12]  Defense Dep't Fact Sheet on Bin

Ladin 1998.  This was done "largely in response to U.S. insistence and to the threat of UN

---

[12]       By 1996, when Osama bin Laden finally left Sudan, the plans for the September 11th Attack were already in
the works.  In August 1996, bin Laden issued the first *fatwa* declaring *jihad* against the U.S.  Joint Inquiry at 129.
Former Director of Central Intelligence George Tenet testified before the Joint Inquiry that, after September 11,
2001, the CIA learned that "in 1996, Bin Ladin's second-in-command, Muhammad Atif, drew up a study on the
feasibility of hijacking U.S. planes and destroying them in flight," and that Khalid Shaykh Muhammad proposed
that the World trade Center "be targeted by small aircraft packed with explosives."  *Id.* at 130.  Furthermore, the
attack on the World Trade Center in 1993 and a plot to blow up bridges, tunnels, and landmarks in New York, which
the FBI discovered in 1993, all indicate that al Qaida was in the process of planning the September 11th Attack.  *Id.*
at 128.  Therefore, the intelligence information discussed by the Joint Inquiry illustrates that although al Qaid's

sanctions following Sudan's alleged complicity in the attempted assassination of Egyptian President Hosni Mubarak in Ethiopia in 1995." *Id.* Approximately one month after leaving Sudan, bin Laden "took refuge in Afghanistan." *Id.*

      **C.**     **Documents from the CIA, the State Department, the Congressional Research Service, and the 9/11 Commission's Final Report All Indicate that bin Laden's Construction Projects in Sudan Were Performed for the Sudanese Government in Exchange for Refuge for al Qaida's Leadership Structure and Permission to Set Up Training Facilities in Sudan**

The Federal Plaintiffs' allegations against SAB in the FAC are supported by documents from the Central Intelligence Agency ("CIA"), the U.S. State Department, the Congressional Research Service ("CRS"), and the 9/11 Commission's Final Report. All of these sources indicate that a *quid pro quo* existed between Osama bin Laden and the Sudanese government, pursuant to which bin Laden agreed to provide construction projects in exchange for permission from the Sudanese government to relocate al Qaida's leadership to Sudan. SAB asserts throughout its brief that the Federal Plaintiffs have failed to assert allegations which show that SAB provided support to al Qaida's global campaign of terrorism against the U.S. The Federal Plaintiffs response is that SAB should be held accountable, because the construction projects that the SAB financed were essentially al Qaida's payment to Sudan for safe harbor. The financing for the construction projects in Sudan is a form of support which enabled al Qaida to cultivate its goal of terrorist acts against the U.S. while it resided in Sudan. The Federal Plaintiffs contend that the best way to illustrate that bin Laden had a *quid pro quo* with the Sudanese government, which was in essence financed by SAB, is to allow these four sources to speak for themselves.

---

major Attack against the U.S. occurred in 2001, al Qaida's preparation and training for it began in the early 1990s. For a in depth discussion of al Qaida's terrorist activities leading up to the September 11th Attack, the Federal Plaintiffs refer the Court to the 9/11 Commission's Final Report. *See* 9/11 COMMISSION REPORT at 59-61.

1.    **The 1996 CIA Assessment of bin Laden indicates a *quid pro quo* between bin Laden and the Sudanese government**

The National Security Archive has made available a 1996 CIA Assessment of Osama bin Laden, which was formerly classified.  Central Intelligence Agency Assessment, Usama Bin Laden: Islamic Extremist Financier (hereinafter "CIA Assessment") (August 1996), Carter Aff. Exhibit 8, *also available at* http://www.gwu.edu/~nsarchiv/ NSAEBB/NSAEBB55/ciaubl.pdf. This CIA document explains that Sudan afforded bin Laden and al Qaida refuge in exchange for various construction projects:

> Bin Ladin relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hassan al-Turabi.  In a 1994 interview, Bin Ladin claimed to have surveyed business and agricultural investment opportunities in Sudan as early as 1983.  He embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum.  Bin Ladin also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf:
>
> •   Bin Ladin's company Al-Hijrah for Construction and Development, Ltd built the tahaddi (challenge) road linking Khartoum with Port Sudan, as well as a modern international airport near Port Sudan.
>
>     . . . .
>
> Bin Ladin's workforce grew to include militant Afghan war veterans seeking to avoid a return to their own countries, where many stood accused of subversive and terrorist activities.  In May 1993, for example, Bin Ladin financed the travel of 300 to 480 Afghan war veterans to Sudan after Islamabad launched a crackdown against extremists lingering in Pakistan.  In addition to safehaven in Sudan, Bin Ladin has provided financial support to militants actively opposed to moderate Islamic governments and the West:
>
>     . . . .
>
> •   By January 1994, Bin Ladin had begun financing at least three terrorist training camps in northern Sudan—camp residents included Egyptian, Algerian, Tunisian, and Palestinian extremists—in cooperation with the NIF.  Bin Ladin's Al-Hijrah for Construction and Development works directly with Sudanese military officials to transport and provision terrorist training in such camps.
>
>     . . . .

10

CIA Assessment at 1-2.

As this CIA assessment demonstrates, Osama bin Laden had a "symbiotic" relationship with the Sudanese government, in which he agreed to perform construction projects in exchange for the permission to relocate al Qaida to Sudan.  *Id.*  In addition, this assessment also illustrates that bin Laden set up training camps in Sudan, which he was able to supply through a working relationship between the NIF and his construction firm al-Hijrah.  Id.  Therefore, the Federal Plaintiffs assert that it is not credible for SAB, a major financial institution in the Middle East, to contend that it was unaware that it was financing al Qaida's operations when it financed bin Laden's construction projects in Sudan.

### 2.	The State Department's Report *Patterns of Global Terrorism: 1995* also reveals a *quid pro quo* between bin Laden and Sudan

In the State Department's Report *Patterns of Global Terrorism: 1995*, the State Department explained that "Sudan continues to harbor Usama Bin Laden, a major financier of terrorism," and that "Khartoum is a major transit point and base for a number of terrorist groups."  U.S. Department of State, Patterns of Global Terrorism: 1995, Overview of State-Sponsored Terrorism (hereinafter "Patterns of Global Terrorism: 1995"), at 1 (April 1996), Carter Aff. Exhibit 9, *also available at* http://www.usemb.se/terror/rpt1995/sponsor.html.  More importantly, the State Department's Report indicated that the Sudanese government "condoned" Osama bin Laden's terrorist activities.  *Id.*  The Report explained in pertinent part:

> Sudan continued to serve as a refuge, nexus, and training hub in 1995 for a number if international terrorist organizations, primarily of Middle Eastern origin.  The Sudanese Government, which is dominated by the National Islamic Front (NIF), also condoned many of the activities of . . . the Khartoum-based Usama Bin Ladin, a private financier of terrorism.  Khartoum permitted the funneling of assistance to terrorist and radical Islamist groups operating in and transiting Sudan.
>
> . . . .
>
> Khartoum also permitted Usama Bin Ladin, a denaturalized Saudi citizen with mujahedin contacts, to use Sudan as a shelter for

11

his radical Muslim followers and to finance and train militant groups.  Bin Ladin, who lives in Khartoum and owns numerous business enterprises in Sudan, has been linked to numerous terrorist organizations.  He directs funding and other logistic support through his companies to a number of extremist causes.

. . . .

Sudan's support to terrorist organizations has included paramilitary training, indoctrination, money, travel documentation, safe passage, and refuge in Sudan.  Most of the organizations present in Sudan maintain offices or other types of representation. They use Sudan as a base to organize some of their operations and to support compatriots elsewhere.  . . . .

Patterns of Global Terrorism: 1995 at 3-4.

Like the 1996 CIA Assessment, the State Department's Report *Patterns of Global Terrorism: 1995* demonstrates that bin Laden had a *quid pro quo* with the Sudanese government. Given bin Laden's renown in the Muslim world during this time period, it is not credible for SAB to assert that it was unaware that by financing construction projects in Sudan, it was effectively funding al Qaida's terrorist network.  SAB either knew or should have known that it was essentially financing al Qaida's payment to the Sudanese government.

### 3. The Congressional Research Service's 2002 Report is another document illustrating the agreement between bin Laden and Sudan

The Congressional Research Service's ("CRS") 200 Report, "Terrorism: Near Eastern Groups and State Sponsors 2002," is another document that illustrates the agreement between bin Laden and the Sudanese government.[13]  *See* CRS Report 2002 at CRS-16.[14]  The relevant portion of that Report, which contains information that is similar to the 1996 CIA Assessment, provides the following description:

In 1991, bin Laden relocated to Sudan with the approval of Sudan's National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, he built a network of businesses, including an Islamic Bank (Al Shamal), an import-

---

[13]     The CRS is a legislative branch agency within the Library of Congress, which works exclusively and directly for Members of Congress, their Committees, and staff on a confidential, nonpartisan basis. *See* Congressional research Service, *CRS Employment Opportunities: About CRS* (Sept. 20, 2004), *available at* http://www.loc.gov/crsinfo/whatscrs.html.  Essentially, the CRS is the public policy research arm of Congress. *Id.*

[14]     This report was also discussed in the FAC at ¶ 321.

> export firm, and firms that exported agricultural products. An
> engineer by training, bin Laden also used his family connections in
> the construction business to help Sudan build roads and airport
> facilities. The businesses in Sudan, some of which may still be
> operating, enabled him to offer safe haven and employment in
> Sudan to al-Qaeda members, promoting their involvement in
> radical Islamic movements in their countries of origin (especially
> Egypt) as well as anti-U.S. terrorism. . . . .

CRS Report 2002 at CRS-16. Thus, the CRS Report provides further support for the Federal

Plaintiffs' assertion that SAB either knew or should have known that by financing bin Laden's

construction projects in Sudan, it was, in essence, making a payment to the Sudanese

government for allowing bin Laden to relocate al Qaida to Sudan.

**4.     The 9/11 Commission's Final Report supports the statements from the
CIA, the State Department, and the Congressional Research Service**

The Final Report from the 9/11 Commission also provides insight into the *quid pro quo*

between Osama bin Laden and the NIF's leader Hasan al-Turabi. The 9/11 Commission's Final

Report states in pertinent part:

> By the fall of 1989, Bin Ladin had sufficient stature among
> Islamic extremists that a Sudanese political leader, Hassan al-
> Turabi, urged him to transplant his whole organization to Sudan.
> Turabi headed the National Islamic Front in a coalition that had
> recently seized power in Khartoum. Bin Ladin agreed to help
> Turabi in an ongoing war against African Christian separatists in
> southern Sudan and also to do some road rebuilding. Turabi in
> return would let Bin Ladin use Sudan as a base for worldwide
> business operations and for preparations for jihad.[15] While agents
> of Bin Ladin began to buy property in Sudan in 1990, Bin Ladin
> himself moved from Afghanistan back to Saudi Arabia.
>
> . . . .
>
> Bin Laden moved to Sudan in 1991 and set up a large and
> complex set of intertwined business and terrorist enterprises. In
> time, the former would encompass numerous companies and a
> global network of bank accounts and nongovernmental institutions.
> Fulfilling his bargain with Turabi, Bin Ladin used his construction
> company to build a new highway from Khartoum to Port Sudan on
> the Red Sea coast. . . . .

9/11 COMMISSION REPORT at 57-58.

---

[15]     As support for this statement, the 9/11 Commission relied on "Intelligence Report, Terrorism: Historical
Background of the Islamic Army and bin Laden's Move from Afghanistan to Sudan, November 26, 1996." 9/11
COMMISSION REPORT at 467 n.31

The above statement from the 9/11 Commission is analogous to the previous statements that the Federal Plaintiffs have brought to this Court's attention.   Together, all of the statements that have been set forth in this brief demonstrate that it is not credible for SAB to suggest that providing financing for bin Laden's construction projects in Sudan does not equate to providing material support to al Qaida.  As an initial matter, Bin Laden was a known terrorist in 1991, and his highly publicized move to Sudan was meant to further al Qaida's global campaign of terrorism.  Moreover, if the excerpts from the various documents presented in this brief show anything at all, they demonstrate that al Qaida's presence in Sudan was conditioned on bin Laden performing certain construction projects.  Therefore, the Federal Plaintiffs contend that when SAB willingly financed bin Laden's construction projects in Sudan, it knew that it was financing al Qaida.  That is, SAB was helping al Qaida to prepare for its acts of terrorism against the U.S., which culminated in the Septmeber 11th Attack.  Such a conclusion is not a leap of faith; it is the logical extension of the realities surrounding bin Laden's presence in Sudan from 1991 to 1996.

## III.   **ARGUMENT**

Defendant SAB makes three broad arguments in favor of dismissal of the Federal Plaintiffs' FAC: (1) that the Federal Plaintiffs have failed to comply with Fed. R. Civ. 8(a), (2) that § 408(b)(1) of the Air Transportation Safety and System Stabilization Act ("ATSSSA") precludes the Federal Plaintiffs' federal statutory claims, and (3) that the Federal Plaintiffs have failed to state claims under the Anti-Terrorism Act[16] ("ATA"), the Racketeer Influenced and Corrupt Organizations Act[17] ("RICO"), the Torture Victim Protection Act[18] ("TVPA"), and New York common law.  SAB Br. at & 3-8, 9-10, & 10-25.  After further review, the Federal Plaintiffs find that the TVPA is not a viable cause of action against SAB.  Nevertheless, SAB's remaining arguments fail.

---

[16]     *See* 18 U.S.C. § 2331 *et seq.*
[17]     *See* 18 U.S.C. § 1961 *et seq.*
[18]     *See*  Pub. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C. § 1350 note).

### A.    Applicable Standards on a Motion to Dismiss.

#### 1.    Fed. R. Civ. P. 12(b)(6)

In ruling on Motion to Dismiss brought pursuant to Rule 12(b)(6), for failure to state a claim, the motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995). Moreover, "[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole." *In re Phillip Servs. Corp. Secs. Litig.*, No. 98-CIV-0835 (MBM), 2004 U.S. Dist Lexis 9261, at * 32 (S.D.N.Y. May 24, 2004) (quoting *Yoder v. Orthomolecular Nutritionist Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) (citation omitted)). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the FAC, but "merely to assess the legal feasibility" of the FAC. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (citing *Conley*, 355 U.S. at 45). In evaluating whether the Federal Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the FAC and draw all reasonable inferences in favor of the Federal Plaintiffs. *See Yilmaz v. McElroy*, No. 00-CV-7542 (RCC), 2001 U.S. Dist. LEXIS 20839, at * 6 (S.D.N.Y. Dec. 17, 2001). The Federal Plaintiffs "are not required to prove [their] case at the pleading stage; indeed, the pleading of evidence should be avoided." *Woodford v. Cmty. Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001) (internal quotation marks and citations omitted). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (quoting *Bingham v. Meachum*, 77 F.3d 626 (2d Cir. 1996) (citation omitted)).

2.        <u>Fed. R. Civ. P. 8(a)(2)</u>

A Rule 12(b)(6) motion is analyzed in the context of the requirements of FED. R. CIV. P.

8(a)(2), which is extremely permissive.  *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002).

Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of

the claim showing that the pleader is entitled to relief," and that such a statement shall simply

"give the respondent fair notice of what the petitioner's claims are and the grounds upon which

they rest." *Id*. (quoting *Conley*, 355 U.S. at 47); *see also Wynder*, 360 F.3d at 77.  Furthermore,

in the absence of averments of fraud or mistake, which must be pled with particularity pursuant

to Rule 9(b), a federal court is prohibited from imposing more demanding requirements than

those prescribed under Rule 8(a).  *See Leatherman v. Tarrant County*, 507 U.S. 163, 168-69

(1993).  As a judge in this District recently explained, "[s]uch simplified 'notice pleading' is

made possible by the liberal opportunity for discovery and the other pretrial procedures

established by the Rules to disclose more precisely the basis of both claim and defense and to

define more narrowly the disputed facts and issues*." In re Initial Pub. Offering Sec. Litig.*, 241

F. Supp. 2d 281, 322 (S.D.N.Y. 2003) (quoting *Conley*, 355 U.S. at 48).  Thus, "[a]s the

Supreme Court recognized in *Swierkiewicz*, one clearly written sentence can satisfy Rule

8(a)(2)."[19] *Id.* at 323.

B.        <u>The Federal Plaintiffs Have Adhered to Rule 8's Liberal Pleading Standard</u>

SAB essentially makes seven arguments to support its claim that the Federal Plaintiffs

have failed to meet Rule 8.  This Court should find each of the Defendant's arguments to be

unpersuasive, because the allegations in the FAC meet Rule 8's liberal pleading standard.  *See*

*Swierkiewicz*, 534 U.S. at 512-13.  To the extent that this Court finds the Federal Plaintiffs'

allegations to be insufficient, the Federal Plaintiffs should be granted leave to amend.

---

[19]        By way of illustration, one Court of Appeals recently held that the allegation, "I was turned down for a job because of my race," when included in a complaint, would be sufficient to survive a Rule 12(b)(6) motion.  *Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002).

Additionally, the Federal Plaintiffs contend that the previous discussions in this brief regarding the allegations against SAB and the documents that support those allegations show that the Federal Plaintiffs have met Rule 8's liberal pleading standard.  See Part II., A.-C., *supra.*

SAB first argues that fairness requires "extra-careful scrutiny" of the Federal Plaintiffs' allegations, so that both the Court and SAB will know the nature of the Plaintiffs' claims and the grounds upon which they rest.  SAB Br. at 6 & 3.  In regard to this argument, SAB also states that the FAC fails to put SAB on notice of the Federal Plaintiffs' claims and the grounds upon which they rest.  SAB Br. at 7-8.  This argument fails, because the Federal Plaintiffs have adhered to the liberal pleading standards allowed by Rule 8.  *See Swierkiewicz*, 534 U.S. at 512-13.  The FAC meets the requirements of Rule 8, because the allegations in the FAC put SAB on notice of the Federal Plaintiffs' claims and adequately set forth the grounds upon which those claims rest.  See Part II., A., *supra.*

With the above discussion in mind, SAB's argument that the Federal Plaintiffs' allegations are insufficient simply because they are similar to those in *Burnett* and *Ashton* fails as well.  SAB Br. at 3-5.  This Court should not view the allegations in the FAC to be insufficient simply because they are similar to allegations put forth in *Burnett* and *Ashton*.

Next, SAB challenges ¶¶ 367 & 368 in the FAC, asserting that the Federal Plaintiffs have used a "liberal pen" and that "it is fanciful to even hint that *Al Qaida* – as opposed to the Saudi Binladin Group – constructed the airport and highways in Sudan."  SAB Br. at 4-5.  As the lengthy discussion provided in Part II of this brief demonstrates, there was a *quid pro quo* between Osama bin Laden and the Sudanese government.  See Part II., B. & C., *supra*. Therefore, SAB's attempt to circumnavigate the fact that bin Laden performed the construction projects in Sudan in exchange for refuge for al Qaida's leadership is unpersuasive.

17

SAB's fourth argument is that the allegations in the FAC are legal conclusions couched as facts.  SAB Br. at 3 & 6-7.  The Federal Plaintiffs assert that the allegations in the FAC are fair statements that give SAB notice of the Federal Plaintiffs' claims and the grounds upon which they are based.  *See Wynder*, 360 F.3d at 77.  Rule 8 allows liberal pleading, *see Swierkiewicz*, 534 U.S. at 512-513, and the allegations against SAB in the FAC meet that standard.  See Part II., A., *supra*.

As a fifth argument, SAB asserts that it cannot be held liable for the acts of its customers.  SAB Br. at 7.  The Federal Plaintiffs are not seeking to hold SAB liable foe the acts of others; the Federal Plaintiffs are seeking to hold SAB liable for, among other things, financing al Qaida's construction projects in Sudan.  The FAC alleges that SAB is liable for providing material support and financing to al Qaida's global terrorist network while it was headquartered in Sudan.  See Part II., A., *supra*.  The financing that SAB provided for construction projects in Sudan essentially paid for al Qaida's shelter in Sudan.  See Part II., B. & C., *supra*.

SAB also takes issue with ¶¶ 374 & 375 in the FAC, asserting that the Federal Plaintiff's have "simply copied and pasted their allegations concerning Arab Bank PLC into the [SAB] section." [20]  See SAB Br. at 6.  First off, the Federal Plaintiffs recognize that ¶¶ 374 & 375 contain typing errors, in that they refer to "Arab Bank" and not "Saudi American Bank."  These paragraphs are found under the SAB section of the FAC, and they are meant to refer to SAB.  *See* FAC ¶ 374-375.  SAB, however, attempts to use these typing errors as a basis for asserting that the Federal Plaintiffs have "[made] up specific facts about a defendant or cut[] and past[ed] allegations against one defendant so that they appear to apply to another defendant."  SAB Br. at 6.  In SAB's eagerness to seize upon these typing errors, SAB has failed to recognize that ¶¶ 374 & 375 are indicative of the "form" closing allegations that the Federal Plaintiffs used at the end

---

[20]     Paragraphs 374 & 375 allege that SAB provided critical financial and logistical support to al Qaida, and that the September 11th Attach was a direct, intended and foreseeable product of SAB's participation in al Qaida's *jihadist* campaign.

of each section for each banking entity listed in the FAC.  The Federal Plaintiffs used such form

closing allegations because the various defendants named in the FAC were all part of a common

plan, *i.e.*, a conspiracy that was spearheaded by al Qaida, and the Federal Plaintiffs sought to

maintain consistency in the FAC.  Those allegations that precede the typical "form" closing

allegations serve to distinguish one defendant from another, another point which Defendant SAB

fails to recognize.  Furthermore, the Defendant's argument here shows that had the Federal

Plaintiffs used different closing paragraphs for each banking entity, SAB would have taken issue

with the fact that the closing allegations in its section of the FAC were not phrased in the same

way as those for other defendants.

Finally, SAB argues that "[l]umping defendants together without distinguishing the

factual allegations against each" does not satisfy Rule 8(a).  SAB Br. at 8.  This Court should

find SAB's argument to be unpersuasive.  First, the Federal Plaintiffs point out that the general

allegations in the FAC are necessary in order to define the parameters of the conspiracy that took

place to bring about the September 11th Attack.  Second, although there are general allegations

addressing al Qaida's partners in the International Banking System, the FAC also sets forth

specific allegations against SAB.  See FAC ¶¶ 365-375.

At this stage of the litigation, the Defendants are entitled to "a short and plain statement

of the facts" supporting the Federal Plaintiffs' claims.  *Swierkiewicz*, 534 U.S. at 512-13.   They

have been provided with this in the FAC.  The FAC sufficiently supports multiple claims, in that

it alleges (1) that SAB knowingly provided material support and resources to al Qaida, (2) that al

Qaida would not have possessed the financial resources, physical assets, membership base,

technological knowledge, communication skills, and global reach required to conceive, plan and

execute the Attack absent the support provided by SAB and the other defendants, and (3) that

SAB knowingly participated in the conspiracy with the intent to advance the commission of

terrorist attacks against the United States, of which the Attack was a natural, intended and foreseeable consequence.  FAC ¶¶ 72-74 & 368.

### C.    The ATSSSA Does Not Preclude the Federal Statutory Claims in the FAC

SAB argues that the Federal Plaintiffs "cannot . . . assert claims under *Federal* statutes other than" § 408(b)(1) of the Air Transportation Safety and System Stabilization Act,[21] Pub. L. No. 107-42, 115 Stat. 230-242 (Sept. 22, 2001) (reprinted, as amended, at 49 U.S.C. § 40101 note) (hereinafter "ATSSSA").  SAB Br. at 9-10.  As support for this argument, SAB relies on § 408(b)(1)'s statement that "this cause of action shall be the exclusive remedy for damages arising out of the hijacking and subsequent crashes of such flights."[22]  For the following reasons, the Federal Plaintiffs assert that § 408(b)(1) of the ATSSSA does not preclude the federal statutory claims set forth in the FAC.

#### 1.    Canons of statutory construction

Generally, "the staring point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. Gte Sylvania*, 447 U.S. 102, 108 (1980); *see also, e.g., Tom Lange Co. v. Kornblum & Co.*, 81 F.3d 280, 285 (2d Cir. 1996).  "[The] inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent."

---

[21]    The ATSSSA was enacted by Congress eleven days after the September 11th Attack "to preserve the continued viability of the United States air transportation system," Pub. L. No. 107-42, 115 Stat. 230, 230, and "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist related aircraft crashes of September 11, 2001."  ATSSSA at § 403.  The ATSSSA was later amended on November 19, 2001, *see* Pub. L. No. 107-71, 115 Stat. 631 (2001), and on January 23, 2002, *see* Pub. L. No. 107-134, 115 Stat. 2435 (2002). The ATSSSA is organized into six titles: (1) Title I, Airline Stabilization; (2) Title II, Domestic Insurance and Reimbursement of Insurance Costs; (3) Title III, Tax Provisions; (4) Title IV, Victim Compensation; (5) Title V, Air Transportation Safety; and (6) Title VI, Separability.  Section 408(b)(1) is found in Title IV of the ATSSSA, which established the Victim's Compensation Fund ("VCF").  *See* ATSSSA at §§ 404-407.

[22]    Section 408(b)(1) of the ATSSSA provides:
> (1) Availability of action.  There shall exist a Federal cause of action for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001.  Notwithstanding section 40120(c) of title 49, United States Code, this cause of action shall be the exclusive remedy for damages arising out of the hijacking and subsequent crashes of such flights.

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (internal quotation marks and citations omitted); *see also, e.g., In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir. 2002). Furthermore, "in expounding a statute, [a court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (citation omitted and emphasis added); *see also In re World Trade Ctr. Disaster Site Litig.*, 270 F. Supp. 2d 357, 368 (S.D.N.Y. June 20, 2003). Where the statutory language is ambiguous, a court may also look at the statute's legislative history to determine the intent of Congress.[23]  *See, e.g., Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 143-44 (2d Cir. 2002).

### 2. Sections 405(c)(3) (B)(i) & 408(c) show that § 408(b)(1) does not preclude other federal statutory claims against terrorists and co-conspirators

SAB has misinterpreted § 408(b)(1), which is located in Title IV of the ATSSSA, because §§ 405(c)(3) (B)(i) & 408(c) illustrate that § 408(b)(1) applies only to claims against air carriers, domestic security firms and persons with property interests in the World Trade Center.[24] One court in this jurisdiction has recently explained that §§ 408(c)(3) (B)(i) & 408(c) of the ATSSSA state that claimants must waive their right to file a civil action (or to be a party to an action) in any federal or state court if they wish to partake in the Victim's Compensation Fund

---

[23]     This tenet of statutory construction is not particularly relevant for the ATSSSA, because neither the House nor the Senate provided a report. There were, however, floor statements from various Senators and Representatives. *See* 147 CONG. REC. S9589-9606 (Sept. 21, 2001) & 147 CONG. REC. H5884-5917 (Sept. 21, 2001).

[24]     Section 408(c)(3) (B)(i) states:

> (i) In general.  Upon submission of a claim under this title, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001.  The preceding sentence does not apply to a civil action to recover collateral source obligations, or to a civil action against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act.

Section 408(c) states in pertinent part:

> (c) Exclusion.  Nothing in this section shall in any way limit any liability of any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act.  . . . .

("VCF"), except for suits to recover collateral source obligations and "suits against the hijackers and their co-terrorists." *In re World Trade Ctr.*, 270 F. Supp. 2d at 362 (citing §§ 408(c)(3) (B)(i) & 408(c) of the ATSSSA).  In that case, the court explained, "Congress . . . intended that Title IV [of the ATSSSA] . . . would limit the aggregate exposure of the non-terrorist defendants, especially the airlines [sic] defendants, to maintain their viability and solvency." *Id.* at 371. What is more, another case in the Southern District of New York has stated that "Section 408 . . . addresses the overall exposure of businesses connected to the four airplanes that were crashed on September 11 and of those persons with a property interest in the World Trade Center as of September 11." *Int'l Fine Art & Antique Dealers Show Ltd. v. ASU Int'l, Inc.*, No. 02-CV-534 (DLC), 2002 U.S. Dist. LEXIS 10878, at * 12-13 (S.D.N.Y. June 19, 2002); *see also Canada Life Assur. Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52, 55 (2d Cir. 2003) ("Title IV's general purpose is to protect the airline industry and other potentially liable entities from financially fatal liabilities while ensuring that those injured or killed in the terrorist attacks receive adequate compensation.").

Thus, the case law in this jurisdiction indicates that § 408(b)(1) applies only to the liability of air carriers and persons with a property interest in the World Trade Center.  And if § 408 applies only to the overall liability of the air carriers and persons with property interests, then § 408 of the ATSSSA does not preclude federal statutory or state common law claims against the terrorists and co-conspirators who brought about the September 11th Attack.

### 3.   The ATSSSA and the federal statutory claims in the FAC are capable of coexistence and each must be given effect

The Supreme Court has cautioned numerous times that a statute "should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."  *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982); *see also, e.g., Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 371 (2d Cir. 1999).  Additionally, "when two statutes are capable of co-existence, it is

the duty of the courts, absent a clearly expressed congressional intent to the contrary, to regard each as effective."  *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *see also, e.g., United States v. Sforza*, 326 F.3d 107, 111 (2d Cir. 2003).  If this court construes § 408(b)(1) of the ATSSSA narrowly, in that § 408(b)(1) does not encompass claims against the terrorists and co-conspirators that brought about September 11th, there will be no conflict with the federal statutory claims in the FAC.  *See Hudson News Co. v. Fed. Ins. Co.*, 258 F. Supp. 2d 382, 387-88 (D.N.J. 2003) ("[m]ost, if not all courts addressing the jurisdictional effect of the [ATSSSA] have narrowly construed the scope of § 408(b)(1) and (3)" (citations omitted)).

### D.   The Federal Plaintiffs Have Sufficiently Alleged Claims under the ATA, RICO, and New York State Common Law

As alternatives to its ATSSSA argument, SAB also claims that the Federal Plaintiffs have failed to state a claim against it under the ATA, RICO, and New York common law.  SAB Br. at 12, 14, & 18.  Because the Federal Plaintiffs have thoroughly addressed SAB's ATA argument in previous briefs that have been filed with this Court, the Federal Plaintiffs refer this Court to the discussions provided in those previous briefs.[25]  The Federal Plaintiffs also refer this Court to previous briefs that address SAB's argument that the Federal Plaintiffs have failed to state a claim under New York common law.[26]

The Federal Plaintiffs also refer this Court to previous briefs that address RICO arguments analogous to those put forth by SAB.[27]  However, the Federal Plaintiffs wish to

---

[25]   The Federal Plaintiffs refer this Court to its Memorandum of Law in Opposition to the Motion to Dismiss file by Mar-Jac Poultry, Inc., in which the Federal Plaintiffs extensively briefed the issue of a failure to state a claim under ATA.  See Opposition to Mar-Jac Poultry at pages 8-13 (filed on 07/09/04).  The Federal Plaintiffs also refer this Court to its Memorandum of Law in Opposition to the Motion to Dismiss filed by Saleh Abdullah Kamel and Al Baraka Investment and Development Corporation.  See Opposition to Kamel and Al Abaraka at 17-23 (filed on 09/28/04).

[26]   The Federal Plaintiffs refer this Court to its Memorandum of Law in Opposition to the Motion to Dismiss file by Prince Abdullah Al Faisal bin Abdulaziz al Saud, Mohammed Bin Abdulrahman al Ariefy, and ALFAISAL GROUP (a/k/a FAISAL GROUP HOLDING CO.).  See Opposition to Prince Abdullah at 21-24 (filed on 10/04/04).  The Federal Plaintiffs also refer this Court to its Memorandum of Law in Opposition to the Motion to Dismiss filed by Arab Bank PLC.  See Opposition to Arab Bank at 18-21 (filed on 07/19/04)

[27]   See Opposition to Prince Abdullah at 17-20 (filed on 10/04/04); see also Opposition to Arab Bank at 13-17 (filed on 07/19/04)

specifically point out that under ¶ 14 of Case Management Order No. 2, the RICO Statement is

considered to be an amendment to the FAC.  In addition, the allegation in the RICO statement

for SAB regarding the Spanish al Qaida cell was based on the written testimony of Jean Charles

Brisard, an international expert on terrorist financing, before the U.S. Senate Committee on

Banking, Housing and Urban Affairs.  *See* Written Testimony of Jean-Charles Brisard,

International Expert on Terrorism Financing and Lead Investigator 911 Lawsuit, before the

Committee on Banking, Housing, and Urban Affairs, U.S. Senate, at 13 (October 22, 2003)

(stating that SAB was one of the banks of the Kingdom "which funneled money to or from the

Spanish Al-Qaida cell from 1996 until 2001"), *available at* http://banking.senate.gov/

index.cfm?Fuseaction=Hearings.Detail&HearingID=71.  Therefore, SAB's argument that any

mention of the Spanish al Qaida cell in the RICO Statement for SAB must have been "cut and

pasted from [the] allegations against Arab Bank" is without merit.

**IV.** **CONCLUSION**

For the reasons stated above, the Federal Plaintiffs respectfully request that the Motion to

Dismiss filed by Saudi American Bank be denied in all respects, with prejudice.


Respectfully submitted,

COZEN O'CONNOR


By:    _____/s/_____
          STEPHEN A. COZEN, ESQUIRE
          ELLIOTT R. FELDMAN, ESQUIRE
          SEAN P. CARTER, ESQUIRE
          MARK T. MULLEN, ESQUIRE
          1900 Market Street
          Philadelphia, PA  19103
          Tel.:  (215) 665-2000
          Fax:  (215) 665-2013

          *Attorneys for the Federal Plaintiffs*