Order Code RL31119

# CRS Report for Congress

_Received through the CRS Web_

# Terrorism: Near Eastern Groups and State Sponsors, 2002

**Updated February 13, 2002**

Kenneth Katzman
Specialist in Middle Eastern Affairs
Foreign Affairs, Defense, and Trade Division

# Terrorism: Near Eastern Groups and State Sponsors, 2002

## Summary

The Al Qaeda terrorist network founded by Osama bin Laden is believed to pose a continuing, although diminished, threat to the United States at home and to U.S. interests and allies abroad following the network's defeat in its base in Afghanistan. As stated in taped appearances by its leaders since the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, the goal of Al Qaeda is to destroy high profile U.S. targets in order to end what Al Qaeda claims is U.S. suppression of Islamic societies.   In these appearances, bin Laden virtually claimed responsibility for the September 11 attacks.  Throughout its history, Al Qaeda has sought to oust pro-U.S. regimes in the Middle East and gain removal of U.S. troops from the region.

Before September 11, signs pointed to a decline in state sponsorship of terrorism.  Since the attacks, some countries that are designated by the United States as state sponsors of terrorism, including Iran and Sudan, have cooperated to an extent with the U.S.-led war against Al Qaeda and its Taliban protectors in Afghanistan.  In spite of its cooperation against the Taliban and Al Qaeda, Iran is still considered a major sponsor of radical Islamic groups that conduct terrorism against Israel.

The Arab-Israeli peace process is a longstanding major U.S. foreign policy interest, and the Administration and Congress are concerned about any terrorist groups or state sponsors that oppose the process.  Possibly because of a breakdown in the Palestinian-Israeli peace process in September 2000, Palestinian organizations such as Hamas, as well as older groups such as the Popular Front for the Liberation of Palestine that have been inactive for years, have stepped up operations against Israelis.   Following several major terrorist attacks against Israelis since December 2001, the United States has strongly criticized Palestinian Authority President Yasir Arafat for failing to exert sufficient efforts to constrain these and other groups.  Some analysts assert that Israel's actions against the Palestinians have been provocative and have contributed to increased Palestinian support for violence against Israel.

U.S. differences with other governments on the strategies for countering terrorism in the Near East have to some extent narrowed since September 11.  The United States, in the past, differed with its  allies, particularly on how to deal with state sponsors of terrorism; most allied governments believe that engaging these countries diplomatically might sometimes be more effective than trying to isolate or punish them.  The United States has generally been more inclined than its European allies to employ sanctions and military action to compel state sponsors and groups to abandon terrorism.  Post-September 11 developments seem to have validated the importance of both diplomacy and, in certain circumstances, more forceful responses in dealing with terrorism.  Differences with allies have begun to reemerge as the Bush Administration expands its "war on terrorism," indicating it will seek to prevent the emergence of threats by regimes – some of which also have ties to terrorist groups – that are developing weapons of mass destruction (WMD).

# Contents

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Radical Islamic Groups  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    Hizballah (Party of God)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        Hizballah's History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        Hizballah's Outside  Connections  . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        Specially Designated Terrorists (SDTs)  . . . . . . . . . . . . . . . . . . . . .  6
        Blocked Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    Hamas and Palestinian Islamic Jihad (PIJ)  . . . . . . . . . . . . . . . . . . . . .  7
        History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
        Blocked Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        SDTs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
    The Islamic Group and Al-Jihad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        Connections to Al Qaeda and the 1993 Bombing of the
          World Trade Center  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
        SDTs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
    Al-Qaeda (Osama bin Laden Network)  . . . . . . . . . . . . . . . . . . . . . . . .  10
        Al Qaeda's Global Reach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
        History of Terrorist Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
        SDTs/Executive Orders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
        Al Qaeda Financing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
    The Armed Islamic Group(GIA)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
    Harakat ul-Mujahidin/Lashkar e-Tayyiba/Jaish e-Mohammad/ Other
        Islamist Groups in Pakistan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
        Other Islamist Groups in Pakistan . . . . . . . . . . . . . . . . . . . . . . . . . .  18
    Islamic Movement of Uzbekistan (IMU)  . . . . . . . . . . . . . . . . . . . . . .  19
    Abu Sayyaf Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
    Islamic Army of Aden  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Radical Jewish Groups: Kach and Kahane Chai  . . . . . . . . . . . . . . . . . . .  21
        Blocked Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Left-wing and Nationalist Groups  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
    Palestine Liberation Organization (PLO)  . . . . . . . . . . . . . . . . . . . . . . .  22
    Popular Front for the Liberation of Palestine — General Command
        (PFLP-GC)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
        SDTs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
    Popular Front for the Liberation of Palestine (PFLP)  . . . . . . . . . . . . . .  24
        SDTs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
    Democratic Front for the Liberation of Palestine (DFLP) . . . . . . . . . . . .  25
    Palestine Liberation Front (PLF)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
        SDTs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
    Abu Nidal Organization (ANO) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
        SDTs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Other Non-Islamist Organizations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Kurdistan Workers' Party (PKK) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Revolutionary People's Liberation Party/Front (DHKP/C) . . . . . . . . . . . 28
The People's Mojahedin Organization of Iran (PMOI) . . . . . . . . . . . . . . 28

Middle Eastern Terrorism List Countries   . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Iran . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Syria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Libya . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Pan Am 103 Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Other Terrorism Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Sudan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Iraq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Countering Near Eastern Terrorism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Military Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Unilateral Economic Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Terrorism List Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
"Non-Cooperating List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Multilateral Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Counter-Terrorism Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Terrorism Fundraising Cooperation  . . . . . . . . . . . . . . . . . . . . . . . . . 41
Selective Engagement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Legal Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
The Domestic Front . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## List of Tables

Table 1.  Near Eastern Foreign Terrorist Organizations (FTOs) . . . . . . . . . . . . .  3
Table 2.  Blocked Assets of Middle East Terrorism List States  . . . . . . . . . . . . 36

# Terrorism: Near Eastern Groups and State Sponsors, 2002

## Introduction[1]

This report updates the version issued on September 10, 2001, just prior to the September 11 attacks on the World Trade Center and the Pentagon that killed about 3,000 persons. It is an analysis of Near Eastern terrorist groups and countries on the U.S. "terrorism list," a list of countries that the Secretary of Commerce and Secretary of State have determined provide repeated support for international terrorism.[2]  This report adopts the same definition of terrorism as that used by the State Department in its annual reports – the definition contained in Title 22 U.S.C. Section 2656f(d). According to this section, "terrorism" means "premeditated politically-motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents, usually intended to influence an audience."

Five out of the seven states currently on the terrorism list are located in the Near East region — Iran, Iraq, Syria, Libya, and Sudan. (The other two are Cuba and North Korea, which will not be covered in this report). The composition of the list has not changed since Sudan was added in 1993. The groups analyzed in this report include, but are not limited to, those designated as "Foreign Terrorist Organizations" (FTOs), pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 (P.L. 104-132). The last section of the report discusses significant themes in U.S. unilateral and multilateral efforts to combat terrorism in or from the region. The State Department's annual report on international terrorism, entitled *Patterns of Global Terrorism: 2000*[3]  is a significant source for this report; other sources include press reports and conversations with U.S. counter-terrorism officials, experts, investigative journalists, and foreign diplomats.

Although the September 11 attacks have placed Near Eastern terrorist groups at the center of U.S. anti-terrorism policy, Near Eastern terrorist groups and their state sponsors have been a focus of U.S. counter-terrorism policies for several decades. Since the 1970s, many of the most high-profile acts of terrorism against American citizens and targets have been conducted by these groups, sometimes with the encouragement or at the instigation of their state sponsors. However, no single terrorist attack – either in or outside the Near East region – compares in scale to the September 11 attacks on the World Trade Center and Pentagon, which killed a total

---

[1] This report was prepared with the assistance of Patricia Niehoff.

[2]  The determinations are made in accordance with Section 6(j) of the Export Administration Act of 1979 50 U.S.C. 2405(j).

[3] State Department Publication 10822, released April 2001.

CRS-2

of over 3,000 persons.   Senior U.S. officials have attributed this attack to the Al Qaeda network, whose leaders enjoyed sanctuary in Afghanistan from 1996 until their defeat at the hands of the U.S. military and its Afghan partners in late 2001.

According to *Patterns of Global Terrorism: 2000* (available on the U.S. Department of State's web site at [http://www.state.gov/s/ct/rls/pgtrpt/2000/]; hereafter cited as **Patterns 2000**), worldwide terrorism-related casualties increased to 405 in 2000 from 233 in 1999, but the number of attacks increased only slightly, from 392 in 1999 to 423 in 2000.  Of these 2000 totals, only 16 of the 423 attacks and 19 of the 405 casualties occurred in the Middle East, although Patterns 2000 covered only three months of the Palestinian uprising that began in late September 2000.   Since 2001 began, there have been dozens of terrorism-related Israeli casualties resulting from Palestinian suicide bomb attacks, some of them in retaliation for Israeli actions against suspected Palestinian militants.  Thirty-one of attacks and 12 of the deaths during 2000 occurred in Eurasia (Central Asia, the Caucasus, and Russia).

The terrorist groups analyzed often differ in their motivations, objectives, ideologies, and levels of activity.  The Islamist groups remain generally the most active, stating as their main objective the overthrow of secular, pro-Western governments, the derailment of the Arab-Israeli peace process, the expulsion of U.S. forces from the region, or the end of what they consider unjust occupation of Muslim lands.  Some groups, such as the Kurdistan Workers' Party (PKK), fight for cultural and political rights or the formation of separate ethnically-based states.  **Table 1** below shows the 20 Near Eastern groups currently designated by the State Department as FTOs.  The designations were mostly made when the FTO list was inaugurated in October 1997 and revised in October 1999 and October 2001.  A group can be added to the list at any time; Al-Qaeda (the bin Laden network) was added on August 21, 1998, the Islamic Movement of Uzbekistan was designated on September 25, 2000, and two Pakistani groups – Lashkar e-Tayyiba and Jaish e-Mohammad – were added to the FTO list on December 26, 2001.

Under the Anti-Terrorism and Effective Death Penalty Act, the designation of a group as an FTO blocks its assets in the United States and makes it a criminal offense for U.S. persons to provide it with material support or resources, such as financial contributions.  Executive Order 12947 of January 23, 1995, also bars U.S. dealings (contributions to or financial transactions) with any individuals named as "Specially Designated Terrorists (SDTs)."  On November 2, 2001, the Secretary of State also subjected all FTOs to the increased financial restrictions that had been applied to Al Qaeda-related entities under Executive Order 13224 (September 23, 2001).  Under this new executive order, the United States can close down U.S. branches of foreign banks that do not comply with U.S. requests to end dealings with the FTOs.  An SDT, according to the executive order, is a person found to pose a significant risk of disrupting the Middle East peace process, or to have materially supported acts of violence toward that end.

CRS-3

## Table 1.  Near Eastern Foreign Terrorist Organizations (FTOs)

| Group | Description | Terrorist Activity Level |
|---|---|---|
| Abu Nidal Organization | Palestinian, nationalist | Low |
| Abu Sayyaf Group | Filipino, Islamist | Moderate |
| Armed Islamic Group | Algerian, Islamist | Moderate |
| Hamas | Palestinian, Islamist | Very High |
| Harakat ul-Mujahidin/Lashkar e-Tayyiba/Jaish e-Mohammad | Kashmir, Islamist | Very High |
| Hizballah | Lebanese, Shiite Islamist | High |
| Islamic Group | Egyptian, Islamist | Moderate |
| Islamic Movement of Uzbekistan | Uzbek, Islamist | Moderate |
| Al-Jihad | Egyptian, Islamist | Moderate |
| Kach and Kahane Chai | Jewish extremist | Low |
| Kurdistan Workers' Party | Kurdish, anti-Turkey | Low |
| Palestinian Islamic Jihad | Palestinian, Islamist | Very High |
| Palestine Liberation Front | Palestinian, nationalist | Low |
| Popular Front for the Liberation of Palestine | Palestinian, Marxist | Low |
| Popular Front for the Liberation of Palestine - General Command | Palestinian, nationalist | Moderate |
| People's Mojahedin Organization of Iran | Iranian, left-wing anti-regime | Very Low |
| Al-Qaeda  (Bin Laden Network) | Multinational Islamist, Afghanistan-based | Extremely High |
| Revolutionary People's Liberation Party/Front | Turkish, left-wing anti-government | Low |

In contrast to Patterns 2000, this report analyzes the following:

- The Palestine Liberation Organization (PLO), which has not been the subject of a separate section in Patterns since Patterns 1995, is analyzed in this report because of the debate over whether PLO leader Yasir Arafat is taking sufficient steps to prevent terrorism by other groups in areas under the control of the Palestinian Authority. Since late 2000, there has been discussion about the degree to which certain PLO factions are involved in violence against Israel and whether they should be named as FTOs.

- When the FTO list was reviewed and re-issued in October 1999, the Democratic Front for the Liberation of Palestine (DFLP) was dropped, largely because it has reconciled with Arafat. The group's past involvement in terrorism, and the recent revival of its operations against Israel, are discussed in this report.

- This report contains a section on the Abu Sayyaf Group operating in the Philippines, as well as analysis of several Pakistani Islamist groups that are fighting Indian control of part of Kashmir Province. These groups are discussed in this report, even though they operate outside the Near East region, because of their alleged connections to the bin Laden network and the Taliban of Afghanistan.

- In accordance with the October 2001 redesignation of the FTO list, the two Jewish extremist groups Kach and Kahane Chai will be treated as one group.

# Radical Islamic Groups

Since the 1979 Islamic revolution in Iran, and particularly since the seizure of the U.S. Embassy in Tehran in November of that year, radical Islam has attracted widespread press attention as the driving ideology of the most active Middle Eastern terrorist groups and state sponsors. Of the 20 FTOs listed above, 12 are Islamic organizations.

## Hizballah (Party of God)[4]

Lebanon-based Hizballah appears to be groping for direction following Israel's May 2000 withdrawal from Lebanon. Having accomplished its main goal of ousting Israel from southern Lebanon, some in the organization want it to focus exclusively on political and social work, primarily through participation in parliament (it holds 8 out of 128 total seats) and through its charity and reconstruction works with Lebanon's Shiite community. Some want Hizballah to accept ministerial positions in Lebanon's cabinet, a step that Hizballah has thus far not taken. Hardliners in Hizballah want it to battle Israeli forces over the border, particularly in the disputed

---

[4]For other names under which Hizballah or the other groups discussed in this paper operate, see U.S. Department of the Treasury, Office of Foreign Assets Control. "Terrorism: What You Need to Know About U.S. Sanctions."

Shib'a farms area.[5]  Other hardliners in the organization believe that the Israeli withdrawal validated its guerrilla strategy and appear to be helping Palestinian groups apply similar tactics against Israeli forces in the West Bank and Gaza Strip.

Although initially encouraged by Hizballah's relative restraint following the Israeli withdrawal, Israel and the United States remain wary of Hizballah.  Hizballah's 15 year military campaign against Israeli and Israeli surrogate forces in southern Lebanon – activity that is not technically considered terrorism by the U.S. State Department – often included rocket attacks on Israeli civilians.  Even though the United Nations has certified that Israel's withdrawal is complete, Hizballah has asserted that Israel still occupies some Lebanese territory (the Shib'a farms) and, on that basis, has conducted several military attacks on Israel since the withdrawal.  In October 2000, Hizballah captured three Israeli soldiers in the Shib'a farms area and kidnaped an Israeli noncombatant whom it had lured to Lebanon.  Israel announced in early November 2001 that the three soldiers are believed dead.

Hizballah has continued to conduct surveillance of the U.S. Embassy in Lebanon and its personnel, according to recent Patterns reports, but no major terrorist attacks have been attributed to it since 1994.  However, according to numerous press reports and Hizballah leaders' own statements, the organization is providing advice and logistical support to Islamist Palestinian groups fighting against Israel in the latest Palestinian uprising, which began in September 2000.  In January 2001, Israel accused Hizballah of serving as an intermediary in the shipment of 50 tons of weaponry from Iran that was seized by Israel and, according to the United States and Israel, was bound for the Palestinian Authority.  The PA is precluded from fielding the weapons contained in the shipment under its Oslo interim accords with Israel.   If true, this suggests that Hizballah is trying to broaden its assistance to non-Islamist Palestinian elements.  In late August 2001, Jordanian officials discovered a cache of rockets at a Hizballah-owned location in Jordan, igniting fears that Hizballah might fire rockets on Israel from there or might provide the weapons to Palestinian militants there or in the West Bank.[6]  Jordan's King Abdullah was said to have raised his concern about growing Hizballah activity in Jordan with President Bush in February 2002.

**Hizballah's History.**  Founded in 1982 by Lebanese Shiite clerics inspired by the Islamic revolutionary ideology of Iran's Ayatollah Khomeini, Hizballah's original goal was to establish an Islamic republic in Lebanon.  During the 1980s, Hizballah was a principal sponsor of anti-Western, and particularly anti-U.S., terrorism.  It is known or suspected to have been involved in suicide truck bombings of the U.S. Embassy (April 1983), the U.S. Marine barracks (October 1983, killing 220 Marine, 18 Navy and 3 Army personnel), and the U.S. Embassy annex (September 1984), all in Beirut.  It also hijacked TWA Flight 847 in 1985, killing a Navy diver, Robert Stethem, who was on board, and its factions were responsible for the detention of most, if not all, U.S. and Western hostages held in Lebanon during the 1980s and early 1990s.  Eighteen Americans were held hostage in Lebanon during that period, three of whom were killed.

---

[5]For a further discussion of this dispute, see CRS Report RL31078, *The Shib'a Farms Dispute and Its Implications*.  August 7, 2001, by Alfred Prados.

[6]Slavin, Barbara.  Rockets Found in Jordan Worry U.S.  *USA Today*, August 31, 2001.

In the early 1990s, Hizballah also demonstrated an ability to conduct terrorism far from the Middle East.  In May 1999, Argentina's Supreme Court, after an official investigation, formally blamed Hizballah for the March 17, 1992 bombing of Israel's embassy in Buenos Aires and issued an arrest warrant for Hizballah terrorist leader Imad Mughniyah.  Hizballah did not claim responsibility for the attack outright, but it released a surveillance tape of the embassy, implying responsibility.  In May 1998, FBI Director Louis Freeh told Argentina the FBI believes that Hizballah, working with Iranian diplomats, was also responsible for the July 18, 1994 bombing of the Argentine-Jewish Mutual Association (AMIA) building in Buenos Aires that left 86 dead.[7]  In July 1999, Argentine investigators brought charges against 20 suspected Argentine collaborators in the AMIA bombings, and the trial began in late September 2001.

**Hizballah's Outside Connections.**  Hizballah maintains connections with similar groups in the Persian Gulf.  Saudi and Bahraini investigations of anti-regime unrest have revealed the existence of local chapters of Hizballah composed of Shiite Muslims, many of whom have studied in Iran's theological seminaries and received terrorist training there and in Lebanon.  Saudi and U.S. officials believe that Saudi Shiite Muslims, possibly with connections to Lebanese Hizballah, were responsible for the June 25, 1996 bombing of the Khobar Towers housing complex for U.S. military personnel, near Dhahran, Saudi Arabia.  The United States reaffirmed this allegation in the June 2001 U.S. indictments of 14 Khobar suspects.  According to Patterns 1998, in November 1998 Bahraini authorities uncovered an alleged bomb plot that they blamed on persons linked to Bahraini and Lebanese Hizballah.

Patterns 1999 reiterates that Hizballah receives "substantial" amounts of financial assistance, weapons, and political and organizational support from both Syria and Iran, although it does not mention specific figures.  Then Secretary of State Christopher said on May 21, 1996 that Iran gave Hizballah about $100 million per year, a figure that U.S. officials have not since deviated from.  A reported 150 of Iran's Revolutionary Guards remain in Lebanon to coordinate Iran's aid to Hizballah.  Syria permits Iran to supply weapons to Hizballah through the international airport in Damascus, although a recent Turkish shutdown of the air corridor connecting Iran and Syria has made Iranian deliveries more difficult.

**Specially Designated Terrorists (SDTs).**[8]  Hizballah members named as SDTs include:  (1) Secretary General Hasan Nasrallah, who is about 44 and has led Hizballah since 1993; (2) Shaykh Muhammad Hussein Fadlallah, the 64-year-old senior Shiite cleric and leading spiritual figure of Hizballah; (3) Subhi Tufayli, the 54 year old former Hizballah Secretary General who leads a radical breakaway faction of Hizballah; and (4) Imad Mughniyah, the 39 year old Hizballah intelligence officer and alleged holder of some Western hostages in the 1980s.  He was also implicated in the TWA 847 hijacking.  Mughniyah, as well as several alleged perpetrators of the June 1996 attack on the U.S. housing complex of Khobar Towers in Saudi Arabia, was included on a list of 39 entities and persons issued October 12, 2001 under

---

[7]FBI Ties Iran to Argentine Bombing in '94.  *Washington Post*, August 8, 1998.

[8]The list of SDTs is contained in the Office of Foreign Assets Control factsheet "Terrorism: What You Need to Know About U.S. Sanctions."

Executive Order 13224 (September 23, 2001). The order subjects listed entities to financial restrictions.

**Blocked Assets.** According to the Treasury Department's "Terrorist Assets Report" for 2000, the Bureau of Alcohol, Tobacco and Firearms has seized $283,000 in assets belonging to 18 persons arrested in North Carolina in July 2000 on suspicion of smuggling goods to generate funds for Hizballah.

## Hamas and Palestinian Islamic Jihad (PIJ)

Prior to the September 2000 outbreak of the Palestinian uprising, it appeared that the bulk of the leadership of the Sunni Muslim Palestinian group Hamas (Islamic Resistance Movement) was accommodating Yasir Arafat's leadership of the Palestinian Authority (PA). Hamas leaders also appeared resigned to an eventual final peace agreement between Israel and the PA, although they continued to criticize Arafat as too eager to compromise with Israel. Since the uprising began, Hamas and its smaller ally, Palestinian Islamic Jihad (PIJ), have escalated terrorist attacks against Israelis. Hamas claimed responsibility for the June 1, 2001 suicide bombing of the "Dolphinarium" discotheque in Tel Aviv, which killed 21, and for an August 9, 2001 suicide bombing at a pizza restaurant in Jerusalem that killed 18, including one American. It also claimed responsibility for the December 1 - 2, 2001 suicide bombings in Jerusalem and Haifa that killed about 25 persons, in addition to the three bombers. PIJ has conducted several recent suicide bombings, many of which killed only the bomber(s). Many experts believe that the renewed terrorist activity is at least partly attributable to a breakdown in security cooperation between Israel and the Palestinian Authority – cooperation that was widely credited with keeping terrorist attacks to a minimum in the preceding few years. The renewed terrorist threat has led Israel to adopt a policy – criticized by the United States and many other countries – of assassinating Hamas and PIJ activists to preempt their suspected attacks.

Hamas continues to receive funding from businesses it runs in Palestinian controlled areas, from Iran (about 10% of its budget), from wealthy private benefactors in the Persian Gulf monarchies, and Palestinian expatriates, according to Patterns 2000. The Patterns report adds that the group conducts fundraising and propaganda activities in Western Europe and North America. Many individual donors appear to believe their contributions go to charitable activities for poor Palestinians served by Hamas' social services network, and are not being used for terrorism. PIJ is politically closer to Iran than is Hamas, and apparently derives most of its funding from state sponsors, especially Iran. PIJ receives some logistical support from Syria, according to Patterns 2000.

**History.** Hamas was formed by Muslim Brotherhood activists during the early stages of the earlier Palestinian uprising (intifada) in 1987. Its spiritual leader, Shaykh Ahmad Yassin, who is paralyzed, was released from prison by Israel in October 1997. He seems to serve as a bridge between Hamas' two main components — the extremists who orchestrate terrorist attacks (primarily through a clandestine wing, the Izz ad-Din al-Qassam Brigades), and the more moderate elements affiliated with Hamas' social services, charity, and educational institutions. PIJ was, in part, inspired by the Iranian revolution of 1979 even though PIJ is a Sunni Muslim, not a Shiite Muslim organization. PIJ remains almost purely a guerrilla organization, with

no overt component. It is led by Ramadan Abdullah Shallah, a Gaza-born, 43 year old academic who previously was an adjunct professor at the University of South Florida. He was chosen leader in 1995 after his predecessor, Fathi al-Shiqaqi was assassinated, allegedly by Israeli agents. Recent Patterns reports characterize Hamas' strength as "an unknown number of hardcore members [and] tens of thousands of supporters and sympathizers," and PIJ's strength as "unknown."

Hamas and PIJ generally have not targeted the United States or Americans directly, although Americans have died in attacks by these groups, along with Israelis and often the bombers themselves. Five out of the 65 killed in a series of four Hamas/PIJ bombings in Israel during February - March 1996 were American citizens. These bombings had the apparent effect of shifting public opinion toward the conservative Likud Party leader Benjamin Netanyahu in Israeli national elections on May 29, 1996, possibly proving decisive in his election victory as Prime Minister over then Labor Party leader Shimon Peres. Neither group conducted major attacks in the run-up to the May 1999 Israeli elections, although they did carry out attacks in an attempt to derail the negotiation and implementation of the October 23, 1998 Israeli-Palestinian Wye River Memorandum. In total, the two groups have conducted about 80 suicide bombings or attempted suicide bombings, killing more than 450 Israelis, since the signing of the Israeli-PLO Declaration of Principles in 1993.[9]

**Blocked Assets.** The United States has blocked the assets of some alleged Hamas/PIJ leaders, using the authority of President Clinton's January 23, 1995 executive order on Middle East terrorism. As of the end of 2000, a total of about $17,000 in PIJ assets in the United States were blocked, consisting of a bank account belonging to PIJ leader Shallah.[10] On December 4, 2001, three financial entities believed linked to Hamas were designated for increased financial restrictions under Executive Order 13224. The three are the Holy Land Foundation for Relief and Development, Beit al-Mal Holdings, and Al Aqsa Islamic Bank.

**SDTs.** Several Hamas and PIJ activists have been named as SDTs. They include: (1) Hamas founder Shaykh Ahmad Yassin; (2) PIJ leader Ramadan Abdullah Shallah; (3) PIJ ideologist Abd al-Aziz Awda; (4) Hamas political leader Musa Abu Marzuq; and (5) alleged U.S. fundraiser for Hamas, Mohammad Salah.

# The Islamic Group and Al-Jihad

Egyptian security authorities continue to gain the upper hand in their battle against the opposition Islamic Group and its ally, Al-Jihad,[11] groups that, over the past several decades, periodically have gone underground and then resurfaced. This effort could be enhanced by the U.S. defeat of Al Qaeda in Afghanistan, because

---

[9]Pipes, Daniel and Steven Emerson. Rolling Back the Forces of Terror. *Wall Street Journal*, August 13, 2001.

[10]These figures are contained in the 2000 Annual Report to Congress on Assets in the United States Belonging to Terrorist Countries or International Terrorist Organizations. Office of Foreign Assets Control, U.S. Department of Treasury. January 2001.

[11]A faction of the Jihad operates under the name "Vanguards of Conquest."

militants from the two groups constitute a large and politically significant faction of Al Qaeda. There have been no large scale terrorist attacks by these groups since the Islamic Group's November 17, 1997 attack on tourists near Luxor, and no attacks inside Egypt at all since August 1998. The gunmen in the Luxor attack killed 58 tourists and wounded 26 others, and then committed suicide or were killed by Egyptian security forces. Even before September 11, these Egyptian groups sensed that they were on the defensive and that terrorism had made them unpopular. In late 1997 leaders of both groups, including their common spiritual leader, the 64 year old blind cleric Shaykh Umar Abd al-Rahman, declared a ceasefire with the Egyptian government. Muhammad Hamza, who is in operational control of the Islamic Group in Egypt while Abd al-Rahman remains incarcerated in the United States, has abided by the truce.

**Connections to Al Qaeda and the 1993 Bombing of the World Trade Center.** With the decline of the groups' activities within Egypt and the incarceration of Abd al-Rahman for plots related to the February 1993 bombing of the World Trade Center, factions of the groups that are in exile have gravitated to the Al Qaeda network. Several SDTs from the Islamic Group and Al-Jihad became members of bin Laden's inner circle as his top lieutenants, including Ayman al-Zawahiri, and Abu Hafs Masri (Mohammad Atef). According to U.S. military officials, Atef was killed by a U.S. air strike during the U.S. war on the Taliban and Al Qaeda. These Egyptian militants oppose any truce with the Egyptian government and also seek, in concert with bin Laden, to attack U.S. interests directly.

Shaykh Umar Abd al-Rahman was not convicted specifically for the February 1993 bombing of the World Trade Center in New York, but he was convicted for related unsuccessful plots in the New York area. Those convicted in the Trade Center bombing were allegedly associated with him. There has been much speculation about the relationship, if any, between Abd al-Rahman and bin Laden at the time of the 1993 Trade Center bombing. Both recruited fighters for the Afghan conflict against the Soviet Union through organizations in the United States and elsewhere, particularly one called the Maktab al-Khidamat (Services Office), also known as Al Kifah.[12] The two also had close connections to the Islamic government of Sudan, although Abd al-Rahman left Sudan in 1990, before bin Laden relocated there in 1991. Abd al-Rahman's two sons reportedly have been associated with Al Qaeda in Afghanistan since 1989; one was reported killed and one reported captured during the U.S.-led war on Al Qaeda. The alleged mastermind of the 1993 Trade Center bombing, Ramzi Ahmad Yousef, reportedly was an Al Qaeda member.[13] (See section on Al Qaeda, below). Although their recruiting activity in Afghanistan has raised questions as to whether the United States gave bin Laden or Abd al-Rahman assistance during the Afghan war, the Central Intelligence Agency has told CRS that it found no evidence that the Agency provided any direct assistance to either of them. The U.S. assistance program for the anti-Soviet groups in Afghanistan focused

---

[12] Maktab al-Khidamat/Al Kifah were designated for increased financial restrictions under Executive Order 13224, September 23, 2001.

[13] U.S. Sees Links in Brooklyn To World Terrorist Network. *New York Times*, October 22, 1998.

primarily on indigenous Afghan mujahedin and not Arab volunteers such as those sponsored by bin Laden or Abd al-Rahman.

**History.** The Islamic Group and Al-Jihad formed in the early 1970s as offshoots of the Muslim Brotherhood, which opted to work within the political system after being crushed by former President Gamal Abd al-Nasser. Both seek to replace Egypt's pro-Western, secular government with an Islamic state. Al-Jihad was responsible for the assassination of President Anwar Sadat in October 1981. The Islamic Group has been responsible for several attacks on high-ranking Egyptian officials, including the killing of the People's Assembly Speaker in October 1990 and the wounding of the Minister of Information in April 1993. The Islamic Group also has a nonviolent arm which recruits and builds support openly in poor neighborhoods in Cairo, Alexandria and throughout southern Egypt, and runs social service programs. Al-Jihad has operated only clandestinely, focusing almost exclusively on assassinations.

**SDTs.** The following Egyptian Islamist figures have been named as SDTs or as subject to enhanced financial restrictions under Executive Order 13224: (1) Shaykh Umar Abd al-Rahman, who was acquitted in 1984 of inciting Egyptian President Anwar Sadat's assassination, is in a medical detention facility in Missouri following his October 1995 conviction for planning terrorist conspiracies in the New York area; (2) Ayman al-Zawahiri, about 51, who is a top lieutenant of bin Laden (see below) and was convicted in Egypt for the Sadat assassination;[14] (3) Mohammad Atef, who, as noted above, was apparently killed in the U.S.-led war on Al Qaeda; (4) Rifa'i Taha Musa, about 48, who was arrested in Syria and extradited to Egypt in October 2001; (5) Abbud al-Zumar, leader of the remnants of the original Jihad who is serving a 40 year sentence in Egypt; (6) Talat Qasim, about 44, a propaganda leader of the Islamic Group; and (7) Muhammad Shawqi Islambouli, about 46, the brother of the lead gunman in the Sadat assassination. Islambouli, a military leader of the Islamic Group, also is believed to be associated with bin Laden in Afghanistan.

## Al-Qaeda (Osama bin Laden Network)

Founded in 1988, Al-Qaeda (Arabic for "the base"), the network of Osama bin Laden, has evolved from a regional threat to U.S. troops in the Persian Gulf to a global threat to U.S. citizens and national security interests. The September 11, 2001 suicide hijacking attacks, allegedly by Al Qaeda, on the World Trade Center and Pentagon were considered a threat to U.S. national security and led to a U.S. military campaign against Al Qaeda in its primary sanctuary in Afghanistan, and against Al Qaeda's protector, the Islamic fundamentalist Taliban regime. By December 2001, the war had resulted in the ouster of the Taliban from power and the death or capture of thousands of Al Qaeda fighters and operatives in Afghanistan. Bin Laden's fate, and that of his top cohort, Egyptian Islamic Jihad leader Ayman al-Zawahiri, are unknown. Pakistan's leader, President Pervez Musharraf, has said he believes bin Laden most likely has died, but others, particularly U.S. officials, say there is no evidence bin Laden or al-Zawahiri have died.

---

[14] Egypt's Most Wanted. *The Estimate*, December 19, 1997. P.8.

CRS-11

Most experts believe that, whether bin Laden does or does not survive the war, the effort has seriously disrupted Al Qaeda's ability to plan major new acts of terrorism. At least one of bin Laden's top lieutenants, Mohammad Atef, was reportedly killed in the war. Another senior recruiter, Ibn al-Shaykh al-Libi, is in U.S. custody. Zawahiri's family has been killed in the war, according to a death announcement in an Egyptian newspaper. Others say that much of the Al Qaeda network is based outside Afghanistan and its members still pose a substantial threat to U.S. and other targets in the United States and abroad. The fate of other top operatives, including Abu Zubaydah and Safl al-Adl (Mohammad Makawi), is unknown, and some believe that they or any number of other senior Al Qaeda operatives are capable of reconstituting the group even if bin Laden and Zawahiri have not survived.

Those who believe Al Qaeda can last beyond its defeat in Afghanistan note that, in building this network, bin Laden assembled a broad coalition of disparate radical Islamic groups of varying nationalities to work toward common goals – the expulsion of non-Muslim control or influence from Muslim-inhabited lands. The network's ideology, laid out in several pronouncements by bin Laden and his allies, has led Al Qaeda to sponsor Islamic fighters or terrorists against Serb forces in Bosnia; against Soviet forces in Afghanistan and now Russian forces in Chechnya; against Indian control over part of Kashmir; against secular or pro-Western governments in Egypt, Algeria, Saudi Arabia, and Uzbekistan; and against U.S. troops and citizens in the Persian Gulf, Somalia, Yemen, Jordan, and the U.S. mainland itself. Some experts believe this ideology is widely held and can outlive bin Laden or Al Qaeda's formal existence as an organization.

The backbone of Al Qaeda, according to many experts, is the ideological and personal bond among the Arab volunteers who were recruited by bin Laden for the fight against the Soviet occupation of Afghanistan (1979-1989). Reflecting its initial low level of early activity, al-Qaeda was not discussed in U.S. government reports until Patterns 1993. That report, which did not mention a formal group name, said that several thousand non-Afghan Muslims fought in the war against the Soviets and the Afghan Communist government during 1979 to 1992,[15] and that many of these fighters had subsequently become engaged in Islamic opposition activity and terrorism.

**Al Qaeda's Global Reach.** U.S. officials say that Al Qaeda may have a presence in up to 60 countries or locations worldwide. The presence varies widely in scope – from Afghanistan, where Al Qaeda's leadership was welcomed by the Taliban, to Western and Latin American countries in which Al Qaeda operatives are unwelcome but might be active unbeknownst to the government of that country. In some cases, such as Sudan and Yemen, governments are aware of an Al Qaeda presence but might be unwilling or ill-equipped to take action to expel Al Qaeda. In other cases, Al Qaeda activists are linked to opposition movements, such as those in the Persian Gulf countries (Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, and the United Arab Emirates).

---

[15]*Patterns of Global Terrorism: 1993.* Released April 1994. p.4.

CRS-12

In other cases, the Al-Qaeda presence is a function of the activities of its subordinate or affiliate groups, including: Egypt's Islamic Group and Al-Jihad; Algeria's Armed Islamic Group and Salafist Group for Call and Combat, which have been active not only in Algeria but in past acts of terrorism against former colonial power France; the Abu Sayyaf Organization in the Philippines; Harakat ul-Mujahidin (Movement of Islamic Fighters) in Pakistan; the Islamic Movement of Uzbekistan; the Islamic Army of Aden (Yemen); the Asbat al-Ansar (Partisan's Group) in Lebanon; Al Ittihad Islamiya (Islamic Union) in Somalia; and the Libyan Islamic Fighting Group, an opposition movement to Libya's government.[16]  Although there are few evident links to Hamas, bin Laden was a follower of Dr. Abdullah al-Azzam, a Palestinian of Jordanian origin who was influential in the founding of both Hamas and al-Qaeda and who was assassinated in 1989.  In addition to Afghanistan, Al Qaeda or its affiliates has participated in recent or ongoing wars or insurgencies, such as in Bosnia, Kosovo, Chechnya, and Kashmir.  Some Uighur activists in Muslim areas of western China are said to be affiliated with Al Qaeda.[17]

In still other cases, Al Qaeda's affiliate groups are active in countries near their main areas of operation.  For example, the Islamic Movement of Uzbekistan has transited Tajikistan and Kyrgyzstan in an effort to operate against the government of Uzbekistan. Chechen guerrillas allegedly linked to Al Qaeda have reportedly transited Azerbaijan, and there may be ties between Al Qaeda and an Azeri Islamist opposition group called Hizb e-Tahrir (Liberation Party).  In east Asia, Abu Sayyaf and other Islamic activists are said to be operating in Indonesia, and Malaysia, and an alleged Al Qaeda plot against the U.S. embassy in Singapore was reportedly uncovered in January 2002.  The Singapore plotters are alleged to be members of an organization called Jemaah Islamiah (Islamic Group), which was created in Malaysia in the mid 1990s and also has a presence in Indonesia and the Philippines.[18]  Regarding Indonesia, there is speculation that a group called Laskar Jihad, founded in early 2000 and which advocates anti-Christian violence, is associated with Al Qaeda.[19]  Al Qaeda has also been present in some countries in the course of planning or committing acts of terrorism, such as several countries in east Africa, including Kenya, Tanzania, Eritrea, Ethiopia, Somalia, and Uganda.[20]  A major Al Qaeda terrorist plot was foiled in Jordan in December 1999 (see below), suggesting that there has been Al Qaeda activity there; a segment of that plot, which also was foiled, was attempted by an Al Qaeda cell in Canada.

---

[16]With the exception of the Islamic Group in Egypt, all the organizations mentioned above were listed by Executive Order 13224 as subject to U.S. and international financial restrictions.

[17]Pan, Philip.  China Links Bin Laden to Separatists.  *Washington Post*, January 22, 2002.

[18]Chandrasekaran, Rajiv.  Al Qaeda's Southeast Asian Reach.  *Washington Post*, February 3, 2002.

[19]Bonner, Raymond and Jane Perlez.  Al Qaeda Seeks Niche in Indonesia, Officials Fear. *New York Times*, January 23, 2002.

[20]For further information on Al Qaeda activities in Africa, see CRS Report RL31247.  Africa and the War on Terrorism, January 17, 2002, by Ted Dagne.

CRS-13

The September 11 attacks demonstrated that Al Qaeda cells can exist even in countries, such as the United States, where Al Qaeda is clearly considered hostile by the government and the population. These countries are working together to uncover and arrest Al Qaeda cells that might remain. Previous investigations of Al Qaeda plots, as well as of the September 11 attacks, have turned up Al Qaeda cells in virtually every country in western Europe, as well as a few countries in eastern Europe, including Poland. Some alleged Al Qaeda activists are reported to have transited a few countries in South America, and those countries are working with U.S. intelligence and law enforcement authorities against Al Qaeda.[21]

**History of Terrorist Activities.** Bin Laden's network has been connected to a number of acts of terrorism prior to the September 11 attacks. Bin Laden himself has been indicted by a U.S. court for involvement in several of them.

- Bin Laden has claimed responsibility for the December 1992 attempted bombings against 100 U.S. servicemen in Yemen — there to support U.N. relief operations in Somalia (Operation Restore Hope). No one was killed.

- In press interviews, bin Laden has openly boasted that he provided weapons to anti-U.S. militias in Somalia during Operation Restore Hope and that his loyalists fought against U.S. forces there. In a street battle in Mogadishu in October 1993, 18 U.S. special operations forces were killed in a battle with militiamen allegedly supplied and assisted by Al Qaeda. Al Qaeda's involvement with the Somali militias appears to have strengthened bin Laden's view that terrorism and low-technology combat could succeed in causing the United States to withdraw from military involvement abroad.

- The four Saudi nationals who confessed to the November 13, 1995 bombing of a U.S. military training facility in Riyadh, Saudi Arabia, admitted on Saudi television to being inspired by bin Laden and other Islamic radicals. Three of the four who confessed to the bombing were veterans of conflicts in Afghanistan, Bosnia, and Chechnya.

- According to Patterns 1997, members of bin Laden's organization might have aided the Islamic Group assassination attempt against Egyptian President Mubarak in Ethiopia in June 1995.

- There is no direct evidence that bin Laden was involved in the February 1993 bombing of the World Trade Center. However, Patterns 1999 says that bin Laden's network was responsible for plots in Asia believed orchestrated by Ramzi Ahmad Yusuf, who was captured in Pakistan, brought to the United States, and convicted in November 1997 of masterminding the Trade Center bombing. The plots in Asia, all of which failed, were: to assassinate the Pope during his late 1994 visit to the Philippines and President Clinton during his visit there in early 1995; to bomb the U.S. and Israeli embassies in Manila in late 1994; and to bomb U.S. trans-Pacific flights.

---

[21]For further information, see CRS Report RS21049, *Latin America: Terrorism Issues and Implications for the United States*. October 12, 2001, by Mark Sullivan.

- The August 7, 1998 U.S. embassy bombings in Kenya and Tanzania, which killed 224 persons, including 12 American citizens, occurred just after a six month period in which bin Laden had issued repeated and open threats, including a February 1998 pronouncement calling for the killing of U.S. civilians and servicemen worldwide. On August 20, 1998, the United States launched cruise missiles on bin Laden's training camps in eastern Afghanistan, based on U.S. evidence of his network's involvement in the bombings. The United States also struck a pharmaceutical plant in Sudan that the Administration alleged was linked to bin Laden and was producing chemical weapons agents. U.S. officials add that the bombings were intended to disrupt planning for a new attack. For their alleged role in the bombings, 17 alleged members of al-Qaeda have been indicted by a U.S. court, including bin Laden. Four of the six in U.S. custody have been tried and convicted; three others were arrested and have been convicted in Britain.

- In December 1999, U.S. and Jordanian law enforcement authorities uncovered and thwarted two alleged plots – one in the United States and one in Jordan – to attack U.S. citizens celebrating the new millennium. The United States plot, allegedly to bomb Los Angeles international airport, was orchestrated by a pro-bin Laden cell of Algerian Armed Islamic Group members coming from Canada. In June 2000, Jordan tried 28 persons who allegedly were planning to attack tourists during millennium festivities in that country, but 15 of those charged are still at large. Also in June 2000, Lebanon placed 29 alleged followers of bin Laden – who belong to an organization called Asbat al-Ansar (see above) – on trial for planning terrorist attacks in Jordan. The presence of bin Laden cells in Jordan and Lebanon – coupled with Israeli arrests of alleged bin Laden operatives in the West Bank and Gaza Strip – suggests that Al-Qaeda might plan acts of terrorism in connection with the Palestinian uprising. Some press reports in February 2002 indicate that some Al Qaeda activists who fled Afghanistan after the start of the U.S. war effort have gone to Lebanon. If the reports are true, the fleeing Al Qaeda members might be benefitting from the Asbat al-Ansar network there.

- Patterns 2000 says that "supporters" of bin Laden are suspected in the October 12, 2000 bombing of the destroyer U.S.S. Cole in the harbor of the port of Aden, Yemen. The blast, which severely damaged the ship, killed 17 and injured 39 Navy personnel.

- Although most governments have agreed with the United States that the evidence of Al Qaeda's responsibility for September 11 is clear and compelling, there is little agreement on responsibility for the spate of anthrax mailings in the United States that followed the September 11 events. Five people died in these mailings, which temporarily closed several congressional buildings and post offices. No one has been arrested for the mailings. U.S. officials say it appears, based on tests, that the source of the anthrax was domestic, such as a military research laboratory, but a connection to Al Qaeda has not been ruled out.

**SDTs/Executive Orders.** President Clinton's August 20, 1998 Executive Order 13099 amended an earlier January 23, 1995 Executive Order (12947) by

naming al-Qaeda as an FTO.  The effect of the order was to ban U.S. financial transactions with bin Laden's organization and to allow U.S. law enforcement to freeze any bin Laden assets in the United States that could be identified.  The order also named bin Laden as an SDT, along with Rifai Taha Musa, of the Egyptian Islamic Group (see that section above) and Mohammad Atef.  Atef and Zawahiri (see above) were indicted along with bin Laden on November 4, 1998 for the Kenya/Tanzania bombings.[22]

**Al Qaeda Financing.**  Financially, Al Qaeda drew initially on the personal fortune of bin Laden, variously estimated at anywhere from $50 million to $300 million.  The organization, according to most press reports,  later became relatively self-sustaining, relying on funding from many other sources, including contributions, Islamic charities and lending institutions, such as Al Barakat,  and some legitimate businesses, such as a chain of honey shops and bakeries in the Middle East.  Executive Order 13224 of September 23, 2001, greatly expanded the number of Al Qaeda related entities under financial restrictions, and increased the scope of the restrictions to include penalties against foreign financial entities that conduct transactions with the named entities.   Many of the entities named are individual leaders of Al Qaeda, including those mentioned in this section.[23]  The Deputy Treasury Secretary said on January 22, 2002 that about $80 million in Al Qaeda assets had been uncovered and seized worldwide since Executive Order 13224 was issued.  In addition, about $221 million in assets of the Taliban movement were blocked under Executive Order 13129, issued in July 1999 on the grounds that the Taliban continued to harbor bin Laden.  However, in January 2002 the United States released those funds to the new Afghan interim administration.

---

[22]Loeb, Vernon.  As U.S. Targets Bin Laden, 2 Top Aides Also Draw Scrutiny.  *Washington Post*, July 3, 2000.

[23]A complete listing of the entities covered under Executive Order 13224 can be found at the website of the Office of Foreign Assets Control of the Dept. of the Treasury.  *Terrorism: What You Need to Know About the U.S. Embargo* [http://www.treas.gov/ofac/].

CRS-16

## Osama bin Laden

Osama bin Laden, born July 30, 1957 the seventeenth of twenty sons of a (now deceased) Saudi construction magnate of Yemeni origin, gained prominence during the Afghan war against the Soviet Union. Bin Laden's father died in 1968 when the aircraft he was piloting crashed. Bin Laden studied civil engineering in his family's home city of Jeddah, Saudi Arabia, before going to Afghanistan following the Soviet invasion of that country in December 1979. In 1989, after the Afghan war ended, he returned to Saudi Arabia to work in his family's business, the Bin Laden Construction group. However, his radical Islamic contacts and protests against the presence of U.S. troops in Saudi Arabia to combat Iraq's invasion of Kuwait caused him to run afoul of Saudi authorities.

In 1991, bin Laden relocated to Sudan with the approval of Sudan's National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, he built a network of businesses, including an Islamic bank (Al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help Sudan build roads and airport facilities. The businesses in Sudan, some of which may still be operating, enabled him to offer safe haven and employment in Sudan to al-Qaeda members, promoting their involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-U.S. terrorism. He reportedly has some business interests in Yemen as well and is believed to have investments in European and Asian firms. Bin Laden has said publicly that, while he was in Sudan, there were a few assassination attempts against him.

During his time in Sudan, bin Laden also sponsored a London-based group, the Advisory and Reform Committee, that distributed literature against the Saudi regime. As a result of bin Laden's opposition activities, Saudi Arabia revoked his citizenship in 1994 and his family disavowed him, although his Syrian-born mother and some of his brothers reportedly maintained contact with him. He has no formal role in the operations of the Bin Laden Construction group, which continues to receive contracts from the Saudi government and from other Arab countries. In May 1996, following strong U.S. and Egyptian pressure, Sudan expelled him, and he returned to Afghanistan, under protection of the Taliban movement. Some reports say Sudan offered to extradite him to Saudi Arabia but that Saudi Arabia refused the offer.

On June 7, 1999, bin Laden was placed on the FBI's "Ten Most Wanted List," and a $25 million reward is offered for information leading to his capture. He is believed to suffer from kidney ailments and the last known video of him, made in early December 2001, showed him to be weakened and possibly injured or ailing. He has several children, including a few sons photographed in Afghanistan by various Middle Eastern media outlets.

## The Armed Islamic Group(GIA)

The Armed Islamic Group (GIA, after its initials in French) is experiencing pressure in Algeria similar to that faced by Egyptian Islamist groups in Egypt. According to Patterns 2000, a GIA splinter group, the Salafi Group for Call and Combat, is now the more active armed group inside Algeria, although it is considered somewhat less violent in its tactics than is the GIA. Both the GIA and the Salafi Group were subjected to increased financial restrictions under Executive Order 13224, suggesting the U.S. government considers both groups linked to Al Qaeda. Some GIA members, including Ahmad Ressam, were allegedly involved in a thwarted December 1999 plot to detonate a bomb in the United States,[24] a plot widely attributed to Al Qaeda by U.S. law enforcement authorities. As noted above, it now appears that the target of the plot was Los Angeles international airport.

The GIA is highly fragmented,[25] in part because it does not have an authoritative religious or political figure who can hold its various factions together and arbitrate disputes. Founded by Algerian Islamists who fought in Afghanistan, the GIA formed as a breakaway faction of the then legal Islamic Salvation Front (FIS) political party in 1992, after the regime canceled the second round of parliamentary elections on fears of an FIS victory. According to Patterns 2000, the GIA has killed over 100 expatriates in Algeria (mostly Europeans) since 1992, but, in a possible indication of regime counter-terrorism success, no foreigners have been killed in Algeria since 1997. Over the past six years, the GIA has conducted a campaign of civilian massacres, sometimes wiping out entire villages in their areas of operations, in an effort to intimidate rival groups and to demonstrate that the government lacks control over the country. The GIA conducted its most lethal terrorist attack on December 31, 1997, when it killed 400 Algerian civilians in a town 150 miles southwest of Algiers, according to Patterns 1997. It should be noted that there are allegations that elements of the regime's security forces and other opposition groups have also conducted civilian massacres.

Over the years, several of the GIA's leaders have been killed battling Algerian security forces. In February 2002, Algerian authorities announced that the GIA's latest leader, Antar Zouabri, was killed in a gun battle with government forces.

Among its acts outside Algeria, the GIA hijacked an Air France flight to Algiers in December 1994, and the group is suspected of bombing the Paris subway system on December 3, 1996, killing four. Patterns 2000 repeats previous descriptions of the GIA's strength as probably between several hundred to several thousand. The organization receives financial and logistical aid from Algerian expatriates, many of whom reside in Western Europe and in Canada.

---

[24]Evidence Is Seen Linking Bin Laden to Algerian Group. *New York Times*, January 27, 2000; Burns, John and Craig Pyes. Radical Islamic Network May Have Come to U.S. New York Times, December 31, 1999.

[25]For more information, see CRS Report 98-219. *Algeria: Developments and Dilemmas*, by Carol Migdalovitz, updated August 18, 1998.

## Harakat ul-Mujahidin/Lashkar e-Tayyiba/Jaish e-Mohammad/ Other Islamist Groups in Pakistan

Three Islamic militant organizations based in Pakistan have been named as foreign terrorist organizations. These groups, as well as others discussed below, seek the end of Indian control of Muslim-inhabited parts of the divided region of Kashmir. They are Harakat ul-Mujahidin (Movement of Islamic Fighters), Lashkar e-Tayyiba (Army of the Righteous), and Jaish e-Mohammad (Army of Mohammad). The latter two were designated as foreign terrorist organizations on December 26, 2001, following a December 13, 2001 attack by Pakistani Islamic militants on India's parliament building. The three groups are also designated for financial restrictions under Executive Order 13224.

The largest and most well known of the Pakistani Islamic extremist movements is Harakat ul-Mujahidin (HUM). It is composed of militant Islamist Pakistanis and Kashmiris, as well as Arab veterans of the Afghan war against the Soviet Union who view the Kashmir struggle as a "jihad" (Islamic struggle). The HUM was included in the original October 1997 FTO designations when its name was Harakat al-Ansar. It subsequently changed its name to Harakat ul-Mujahidin, possibly in an attempt to avoid the U.S. sanctions that accompanied its designation as an FTO. Under its new name, the group was redesignated as an FTO in October 1999. An offshoot of the HUM kidnapped and reportedly later killed five Western tourists in Kashmir in 1995. The HUM is believed responsible for the December 1999 hijacking of an Indian airliner because the hijackers demanded the release of an HUM leader, Masood Azhar, in exchange for the release of the jet and its passengers (one of whom was killed by the hijackers).

The group is allied with or part of the Al Qaeda coalition, but it has been focused primarily on expelling Indian troops from Kashmir and does not appear to be part of Al Qaeda's broader struggle against the United States. Then leader of the HUM, Fazlur Rehman Khalil, signed bin Laden's February 1998 pronouncement calling for terrorist attacks on American troops and civilians, although the HUM has not tended to target Americans. According to Patterns 1999, some HUM fighters were killed in the August 20, 1998 U.S. retaliatory strikes on bin Laden's training camps in Afghanistan. Khalil stepped down in February 2000 as leader of the HUM in favor of his second-in-command, Faruq Kashmiri. Kashmiri is not viewed as closely linked to bin Laden as is Khalil, and the move suggested that the HUM was seeking to distance itself from Al Qaeda. Khalil remained as Secretary General of the organization, but he is said to be in hiding since October 2001, fearing arrest by Pakistan after its decision to cooperate with the U.S. war on the Taliban.

**Other Islamist Groups in Pakistan.** The HUM fights alongside other Pakistani Islamist groups that have not been named as FTOs. They include the following:

- Jaish-e-Mohammed (JEM, Army of Mohammed). This is a more radical splinter group of the HUM formed by Masood Azhar (see above) in February 2000. The group, which attracted a large percentage (up to 75%) of HUM fighters who defected to it when it was formed, is politically aligned with Al

Qaeda, the Taliban, and the pro-Taliban Islamic Scholars Society (Jamiat-i Ulema-i Islam) party of Pakistan.  It probably receives some funds from Al Qaeda, according to Patterns 2000.  On December 25, 2001, Pakistan detained Masood Azhar, a partial response to Indian demands on Pakistan to curb Kashmir-related terrorism following the December 13 attack on India's parliament building.

- Lashkar-e-Tayyiba (Army of the Righteous) is described by Patterns 2000 as "one of the three largest and best trained groups fighting in Kashmir against India."  Led by Professor Hafiz Mohammed Saeed and operating through a missionary organization known  as the MDI  (Center for Islamic Call and Guidance), its fighters are Pakistanis from religious schools throughout Pakistan, as well as Arab volunteers for the Kashmir "jihad."  Pakistan detained Saeed in late December 2001 following the attack on India's parliament building.

- A few other Kashmir-related groups are mentioned in press reports or in Patterns 2000, but they are not analyzed separately in the report or discussed in depth.  One is the Harakat-ul Jihad Islami (Islamic Jihad Movement), many of whose fighters defected to the Jaish-e-Mohammed when it was formed. Another group, Lashkar-e-Jhangvi, has called for attacks on the United States and declared itself an ally of bin Laden.  The Hizb-ul Mujahedin (Mujahedin Party) is an older, more established, and somewhat more moderate group with few apparent links to bin Laden or to Arab volunteers for the Kashmir struggle.

## Islamic Movement of Uzbekistan (IMU)

The Islamic Movement of Uzbekistan (IMU) was named as an FTO on September 25, 2000 after kidnaping four U.S. citizens who were mountain climbing in Kyrgyzstan in August 2000.  The IMU's primary objective is to replace the secular, authoritarian government of Uzbekistan's President Islam Karimov with an Islamic regime, and it is believed responsible for setting off five bombs in Tashkent, Uzbekistan on February 16, 1999.  One of the bombs exploded in a government building just minutes before Karimov was to attend a meeting there.  The government of Uzbekistan blamed the plot on two IMU leaders, Tahir Yuldashev and Juma Namangani, both of whom reportedly enjoyed safe haven in Taliban-controlled Afghanistan.[26]  Anti-Taliban forces in Afghanistan say Namangani was killed in the U.S. war against the Taliban while commanding Al Qaeda fighters around the city of Mazar e-Sharif in November 2001.  Yuldashev's fate is unknown.  The government of Uzbekistan is hopeful that the IMU's activities will be significantly reduced by the successful U.S. war effort in Afghanistan.  Press reports have indicated that Al Qaeda contributed funds to the IMU,[27] although Patterns 2000 says only that the IMU receives "support from other Islamic extremist movements in Central Asia."

---

[26]Kyrgyz Lawmaker to Extend Stay in Kabul to Push Talks.  *Reuters*, September 29, 1999.

[27]Kinzer, Stephen.  Islamic Militants With Japanese Hostages Hold Kyrgyz at Bay. *New York Times*, October 18, 1999.

Among IMU insurgency operations, in August 1999, Namangani led about 800 IMU guerrillas in an unsuccessful attempt to establish a base in Kyrgyzstan from which to launch cross-border attacks into Uzbekistan. In the course of their operations, the IMU guerrillas kidnaped four Japanese geologists and eight Kyrgyz soldiers. In early August 2000, about 100 guerrillas presumably linked to the IMU seized several villages just inside Uzbekistan, on the Uzbekistan-Tajikistan border. At the same time, a related group of guerrillas battled security forces in neighboring Kyrgyzstan.

## Abu Sayyaf Group

The Abu Sayyaf Group, which is a designated FTO, is an Islamic separatist organization operating in the southern Philippines, founded in 1991. Although it is not known to operate in the Near East region, Abu Sayyaf is discussed in this report because of its alleged financial and political ties to Al Qaeda. The group is led by Khadafi Janjalani, brother of its founder, Abdujarak Janjanlani, who was killed in a battle with the Filipino military in 1998. It now raises funds for operations and recruitment by kidnaping foreign hostages. Press reports assess its numeric strength at about 2,000, some of whom have trained in Afghanistan. As of now, it is holding about 12 hostages, including two American citizens, in the southern Philippines. It has also expanded its kidnapings into Malaysia and is suspected of shipping weapons to Muslim extremists in Indonesia who are fighting against Christians there.[28]

The United States fears that some Al Qaeda fighters who fled the recent fighting in Afghanistan might try to congregate in the Philippines, possibly in territory controlled by the Abu Sayyaf Group. U.S. officials have announced that approximately 600 U.S. military officers are now in the Philippines advising the Filipino military on how to combat the Abu Sayyaf Group.

## Islamic Army of Aden

The Islamic Army of Aden, also called the Aden-Abyan Islamic Army, is a Yemen-based radical Islamic organization. It has not been designated by the State Department as an FTO, although it is designated for financial restrictions under Executive Order 13224. Patterns 2000 did not analyze the group as a distinct entity, although the report did mention it in its discussion of terrorism in Yemen. Little is known about the group, but it advocates the imposition of Islamic law in Yemen and the lifting of international sanctions against Iraq, and opposes the use of Yemeni ports and bases by U.S. or other Western countries. Some of the group's members are suspected of having links to bin Laden, and the group was one of three to claim responsibility for the bombing of the U.S.S. Cole on October 12, 2000.

The group first achieved notoriety in December 1998, when it kidnaped sixteen tourists, including two Americans. Three British and one Australian tourist were killed in the course of a rescue attempt by Yemeni security forces; the rest were saved. The group's leader at the time, Zein al-Abidine al-Midhar (Abu Hassan),

---

[28]Malaysia Probes Abu Sayyaf Link in Gun Racket - Reports. *Dow Jones Newswire*, August 21, 2001.

admitted to the kidnaping and was executed by the Yemeni government in October 1999. No new leader has been publicly identified.

Even before September 11, Yemen's President Ali Abdullah al-Salih had publicly vowed to eradicate terrorism from Yemen and there is no evidence that the government, as a matter of policy, supported radical Islamist groups or alleged Al Qaeda sympathizers living in Yemen. However, there are areas of Yemen under tenuous government control and experts believe that the Yemeni government has, to some extent, tolerated the presence of Islamic extremists in Yemen. Some government workers are believed to have personal ties to individual Islamists there. Yemen interrogated many people and made a number of arrests in the Cole attack, but some U.S. law enforcement officials have been unsatisfied with its cooperation in that investigation. In mid-December 2001, Yemen government forces attacked tribes in central Yemen believed to be harboring associates of bin Laden, although the attack was unsuccessful and led to U.S. requests to provide Yemen with military advisory assistance.

The former South Yemen (People's Democratic Republic of Yemen, PDRY) was on the U.S. terrorism list during 1979-1990 for supporting left-wing Arab terrorist groups, but was removed from the list when South Yemen merged with the more conservative North Yemen in 1990 to form the Republic of Yemen.

## Radical Jewish Groups: Kach and Kahane Chai

Some radical Jewish groups are as opposed to the Arab-Israeli peace process as are radical Islamic groups. The Jewish groups, which derive their support primarily from Jewish settlers in the occupied territories, have been willing to engage in terrorism to try to derail the process. The incidents involving these Jewish groups have declined in recent years, although settlers possibly linked to them have attacked Palestinians throughout the latest Palestinian uprising that began in September 2000. In the October 2001 reissuing of the foreign terrorist organization list, the State Dept. combined Kach and Kahane Chai into a single designation, suggesting that the two have either merged or are so closely associated as to be indistinguishable.

Kach was founded by Rabbi Meir Kahane, who was assassinated in the United States in 1990.[29] Kahane Chai (Kahane Lives) was founded by Kahane's son, Binyamin, following his father's assassination. Binyamin Kahane and his wife were killed on December 31, 2000 by a Palestinian group calling itself the "Martyr's of Al-Aqsa." The two Jewish movements seek to expel all Arabs from Israel and expand Israel's boundaries to include the occupied territories and parts of Jordan. They also want strict implementation of Jewish law in Israel. To try to accomplish these goals, the two groups have organized protests against the Israeli government, and threatened Palestinians in Hebron and elsewhere in the West Bank.

---

[29]El Sayyid Nosair, a radical Islamist associated with Shaykh Abd al-Rahman and others involved in the World Trade Center bombing, was convicted of weapons possession for the attack on Kahane, but not the murder itself.

On March 13, 1994, the Israeli Cabinet declared both to be terrorist organizations under a 1948 Terrorism Law.  The declaration came after the groups publicly stated their support for a February 25, 1994 attack on a Hebron mosque by a radical Jewish settler, Baruch Goldstein, who was a Kach affiliate and an immigrant from the United States.  The attack killed 29 worshipers and wounded about 150.  Patterns 2000 says that the numerical strength of Kach and Kahane Chai is unknown and repeats previous assertions that both receive support from sympathizers in the United States and Europe.  Prime Minister Yitzhak Rabin was killed by Israeli extremist Yigal Amir in November 1995, shortly after signing the Oslo II interim agreement with the Palestinians.  Neither Amir nor his two accomplices were known to be formal members of Kach or Kahane Chai, although Amir appears to espouse ideologies similar to those of the two groups.

**Blocked Assets.**  According to the Terrorist Assets Report for 2000, about $200 belonging to Kahane Chai has been blocked since 1995.

# Left-wing and Nationalist Groups

Some Middle Eastern terrorist groups are guided by Arab nationalism or left-wing ideologies rather than Islamic fundamentalism.  During the 1980s and 1990s, with the collapse of the Soviet Union and the loss of much of their backing from state sponsors, the left-wing and nationalist groups became progressively less active and were largely eclipsed by militant Islamic groups.  However, some of the left-wing nationalist groups have reactivated their terrorist and commando operations since the latest Palestinian uprising began in September 2000.

## Palestine Liberation Organization (PLO)

The PLO formally renounced the use of terrorism in 1988, and it reaffirmed that commitment as part of its September 1993 mutual recognition agreement with Israel.  The PLO has not been named an FTO by the State Department and  Patterns 1995 was the last Patterns report to contain a formal section analyzing the PLO.  The PLO is analyzed in this CRS report because of the debate in Congress and among observers over whether the PLO, as the power behind the Palestinian Authority (PA), is taking sufficient steps to prevent Hamas, PIJ, and others from conducting terrorist attacks against Israelis.  This debate has intensified since the Palestinian uprising began in September 2000 – the uprising has been accompanied by a significant increase in the frequency of Hamas and PIJ terrorist attacks.  Some observers maintain there is evidence that Hamas and PIJ are increasingly cooperating with militant elements linked to the PLO in conducting acts of violence against Israel.

The Bush Administration has become more critical of the PA following Hamas suicide attacks in Jerusalem and Haifa on December 1-2, 2001 that killed 26 persons.  The U.S. criticism escalated following Israel's seizure in early January 2002 of a ship carrying 50 tons of Iranian arms bound for the PA and possibly Hamas, according to press reports.  The weapons aboard the ship, including long range mortars and plastic explosives – all of which are banned under Palestinian interim agreements with Israel – suggested that PA elements might be planning terrorist attacks against Israel, trying

to build a conventional military option, or attempting to build a capability to combat reprisal attacks on PA facilities.

Patterns 2000 generally credited the PA with working with Israel to disrupt Hamas and PIJ attacks against Israel in the first half of 2000, but the report noted Israel's dissatisfaction with PA anti-terrorism cooperation after the uprising began. An Administration report to Congress on PLO compliance with its commitments (covering December 15, 2000 - June 15, 2001) alleges that factions of the PLO have encouraged or participated in violence against Israel. The factions mentioned include a wing of the Fatah movement called the "Tanzim" (Organization) and a PLO security apparatus called Force 17. On the basis of these allegations, some Members of Congress maintain that Fatah, the Tanzim, Force 17, and a related armed faction that has been conducting attacks on Israel – the Al Aqsa Martyr's Brigade – should be designated as FTOs.

Although some Israelis no longer view Arafat as a partner for peace, others note than many Palestinians have looked to Arafat and the PLO for leadership for more than three decades and that there is no viable alternative to him. Yasir Arafat, who was born August 1, 1929, used the backing of his Fatah guerrilla organization to become chairman of the PLO in 1969. After the PLO and other Palestinian guerrillas were forced out of Jordan in 1970 and 1971, cross border attacks on Israel became more difficult, and some constituent groups under the PLO umbrella resorted to international terrorism. In the wake of the 1973 Arab-Israeli war, international efforts to promote Arab-Israeli peace caused Arafat to limit terrorist attacks largely to targets within Israel, Lebanon, and the occupied territories.

## Popular Front for the Liberation of Palestine — General Command (PFLP-GC)

Ahmad Jibril, a former captain in the Syrian army, formed the PFLP-GC in October 1968 as a breakaway faction of the Popular Front for the Liberation of Palestine (PFLP, see below), which he considered too willing to compromise with Israel. He also believed that a conventional military arm was needed to complement terrorist operations, and the group operates a small tank force at its bases in Lebanon, according to observers. Jibril's several hundred guerrillas fought against Israeli forces alongside Hizballah during Israel's occupation of a strip of southern Lebanon, which ended in May 2000. Recent Patterns reports have not attributed any significant terrorist attacks to the PFLP-GC in the past few years. In May 2001, Jibril claimed responsibility for shipping a boatload of weapons to the Palestinians in the occupied territories, although the shipment was intercepted by Israel's navy.

Probably because of Jibril's service in the Syrian military, Syria has always been the chief backer of the PFLP-GC, giving it logistical and military support. In the late 1980s, the PFLP-GC also built a close relationship with Iran, and it receives Iranian financial assistance. Although only Libyan agents have been tried or convicted for the December 21, 1988 bombing of Pan Am 103, there have been persistent reports that Iran approached the PFLP-GC to bomb a U.S. passenger jet in retaliation for the July 3, 1988 U.S. Navy's downing of an Iranian passenger airplane (Iran Air flight 655). According to some theories, the PFLP-GC first pursued such the operation and

abandoned it or, according to other versions, handed off the operation to Libya in what became a successful effort to bomb the flight.[30]  Patterns 2000 drops assertions in previous  Patterns reports that Libya, formerly a major financier of the group, retains ties to the PFLP-GC.

**SDTs.**  Jibril, who is about 64, and his deputy, Talal Muhammad Naji (about 70), have been named as SDTs.

## Popular Front for the Liberation of Palestine (PFLP)

After several years of relative inactivity, the PFLP appears to be reviving its attack operations against Israel, particularly following Israel's August 27, 2001 killing of its leader, Abu Ali Mustafa.  Israel killed Mustafa with a missile strike on his West Bank office.  Mustafa had replaced his longtime mentor, ailing PFLP founder George Habash, as PFLP Secretary-General in July 2000.  (In October 1999, in the wake of the PFLP's reconciliation talks with Arafat, Israel had allowed Mustafa to return to Palestinian-controlled territory from exile.)  Partly because Mustafa's office was located in a building inhabited by civilians, the United States strongly criticized the Israeli killing of Mustafa – and Israel's policy of targeted killings – as an excessive use of force and unhelpful to efforts to quiet the ongoing violence.  In October 2001, the PFLP retaliated for Mustafa by assassinating Israeli tourism minister Rehavam Zeevi.  Mustafa's successor, Ahmad Saadat, was arrested in mid-January 2002 by PA authorities as part of Arafat's most recent crackdown on Palestinian terrorism.

The PFLP was founded in December 1967,  following the Arab defeat in the Six Day War with Israel in June of that year, by Marxist-Leninist ideologue and medical doctor George Habash, a Christian.  The PFLP was active in international terrorism during the late 1960s and the 1970s; on September 6, 1970, PFLP guerrillas simultaneously hijacked three airliners and, after evacuating the passengers, blew up the aircraft.  The PFLP opposed the Palestinians' decision to join the Madrid peace process and suspended its participation in the PLO after the September 1993 Israel-PLO Declaration of Principles.  In August 1999, in apparent recognition of Arafat's growing control over Palestinian territory, the PFLP held reconciliation talks with him.  Arafat reportedly invited the PFLP to send a delegate to the U.S.-brokered summit talks with Israel at Camp David in July 2000, but the PFLP refused.  Its terrorist wing had been almost completely inactive in the four years prior to the latest Palestinian uprising, but since then has conducted five car bombings and a few other attacks on Israelis, according to Israeli officials.  Patterns 2000 repeats previous estimates of the PFLP's strength as about 800, and says that the group receives logistical assistance and safehaven from Syria.  The PFLP is headquartered in Damascus and it reportedly has training facilities in Syrian-controlled areas of Lebanon.

**SDTs.**  George Habash, who is about 76 years old, is named as an SDT.  He suffered a stroke in 1992.

---

[30]Closing In on the Pan Am Bombers. *U.S. News and World Report*, May 22, 1989.  p.23.

## Democratic Front for the Liberation of Palestine (DFLP)[31]

As have other non-Islamist Palestinian groups, the DFLP has revived some of its operations since the Palestinian uprising began in September 2000. Since then, the group has claimed responsibility for a few attacks on Israeli military patrols and settlers in the occupied territories, and has openly encouraged the Palestinian uprising. Two commandos from the group attacked a heavily fortified Israeli military position in the Gaza Strip on August 25, 2001, and killed three Israeli soldiers; the two guerrillas were killed in the exchange of fire. Recent Patterns reports estimate the total strength (for all major factions) of the DFLP is about 500. The DFLP may still receive some financial assistance from Syria, where it has its headquarters.

The DFLP formed in 1969 as an offshoot of the PFLP. The DFLP's most noted terrorist attack was the May 1974 takeover of a school in Maalot, in northern Israel, in which 27 schoolchildren were killed and 134 people wounded. It thereafter confined itself largely to small-scale border raids into Israel and infrequent attacks on Israeli soldiers, officials, and civilians in Israel and the occupied territories. The DFLP, still led by its 67-year-old founder Nayif Hawatmeh, abandoned its call for the destruction of Israel in the 1980s. It sought stringent conditions for Palestinian participation in the October 1991 Madrid peace conference and publicly opposed the September 1993 Israel-PLO mutual recognition accords and subsequent interim agreements reached between Israel and the Palestinians. The DFLP began reconciling with Arafat in August 1999 and stated that it might recognize Israel if there were a permanent Israeli-Palestinian peace. In response to the DFLP's apparent moderation, the State Department removed the group from the list of FTOs when that list was revised in October 1999. Also that month, Israel permitted Hawatmeh to relocate to the Palestinian-controlled areas, although he apparently has not moved there permanently. Patterns 1999 was the first Patterns report to exclude the group from its analysis of terrorist organizations. In July 2000, the DFLP was part of the Palestinian delegation to the U.S.-brokered Israeli-Palestinian final status summit negotiations at Camp David.

## Palestine Liberation Front (PLF)

The PLF, founded in 1976 as a splinter faction of the PFLP-GC, has been considered dormant for at least the past five years. However, in late November 2001, Israel said it had uncovered a 15-member Iraq-trained PLF cell, which was allegedly responsible for the July 2001 killing of an Israeli youth and a separate bombing that injured five. The group's last major attack was a failed raid on the Israeli resort town of Eilat in May 1992. The leader of the most prominent PLF faction, Abu Abbas (real name, Muhammad Zaydun), has always enjoyed close personal ties to Arafat. Abbas at first opposed Arafat's decision to seek peace with Israel, but, since the mid-1990s, he has accommodated to that decision. In April 1996, Abu Abbas voted to amend the PLO Charter to eliminate clauses calling for Israel's destruction. In April 1998, Israel allowed Abu Abbas to relocate to the Gaza Strip from Iraq, where he had settled after his expulsion from Damascus in 1985.

---

[31]The DFLP has splintered into factions, but the one headed by Nayif Hawatmeh dominates the organization and is the one discussed in this paper.

During its most active period, the PLF conducted several high-profile attacks. Its most well-known operation was the October 1985 hijacking of the Italian cruise ship Achille Lauro, in which the group murdered disabled U.S. citizen Leon Klinghoffer and held the other passengers hostage for two days. Abu Abbas and his team surrendered to Egyptian forces in exchange for a promise of safe passage. They were apprehended at a NATO airbase in Italy after U.S. aircraft forced down the Egyptian airliner flying them to safehaven. Abu Abbas, who was not on board the Achille Lauro during the hijacking, was released by the Italian government but later sentenced in absentia. A warrant for his arrest is outstanding in Italy but the Justice Department dropped a U.S. warrant in 1996 for lack of evidence. The four other hijackers were convicted and sentenced in Italy.[32] (On April 30, 1996, the Senate voted 99-0 on a resolution (S.Res. 253) seeking Abu Abbas' detention and extradition to the United States.) On May 30, 1990, the PLF unsuccessfully attempted a seaborne landing, from Libya, on a Tel Aviv beach. Arafat refused to condemn the raid and, as a consequence, the United States broke off its dialogue with the PLO, which had begun in 1988. The dialogue resumed in September 1993, following the mutual Israeli-PLO recognition agreement.

**SDTs.** Abu Abbas, who was born in 1948, has been named an SDT. He underwent guerrilla training in the Soviet Union.[33]

## Abu Nidal Organization (ANO)

The international terrorist threat posed by the Abu Nidal Organization has receded because of Abu Nidal's reported health problems (leukemia and a heart condition), internal splits, friction with state sponsors, and clashes with Arafat loyalists. It still has a few hundred members and a presence in Palestinian refugee camps in Lebanon, in addition to its reported headquarters in Iraq, but it has not attacked Western targets since the late 1980s. During the 1970s and 1980s, the ANO carried out over 90 terrorist attacks in 20 countries, killing about 300 people. One of its most well-known operations was a December 27, 1985 attack at airports in Rome and Vienna, in which 18 died and 111 were injured. One month earlier, ANO members hijacked Egypt Air 648, resulting in the deaths of 60 people. On September 6, 1986, ANO gunmen killed 22 at a synagogue (Neve Shalom) in Istanbul. The group is suspected of assassinating top Arafat aides in Tunis in 1991 and a Jordanian diplomat in Lebanon in January 1994.

Also known as the Fatah Revolutionary Council, the ANO was created in 1974 when Abu Nidal (real name, Sabri al-Banna), then Arafat's representative in Iraq, broke with the PLO over Arafat's willingness to compromise with Israel. U.S. engagement with Iraq in the early stages of the 1980-88 Iran-Iraq war contributed to Iraq's expulsion of Abu Nidal to Syria in November 1983, but Syria expelled the group four years later to reduce scrutiny on the country as a sponsor of terrorism. Abu Nidal left his next home, Libya, in April 1998, after a schism between pro and

---

[32]Of the four, one is still in jail, two were paroled in 1991, and one, Yusuf al-Mulqi, escaped in 1996 while on prison leave.

[33]Holmes, Paul. Achille Lauro Mastermind Looks Back at 50. Reuters, June 24, 1998.

anti-Arafat members of Abu Nidal's group.  He relocated to Cairo, where he stayed until December 1998, when more infighting caused his presence in Egypt to become public, and therefore a foreign policy problem for Egypt.  He has been in Iraq since, but there is no hard evidence that Abu Nidal is reviving his international terrorist network on his own or on Baghdad's behalf. [34]

**SDTs.**  Abu Nidal, who was born in 1937 in Jaffa (part of what is now Israel), is the only ANO member named an SDT.  He faces no legal charges in the United States, according to an ABC News report of August 25, 1998, but he is wanted in Britain and Italy.  His aide, Nimer Halima, was arrested in Austria in January 2000.

# Other Non-Islamist Organizations

Three groups designated as FTOs primarily are attempting to influence the domestic political structures or the foreign policies of their countries of origin.  Two of them operate against the government of Turkey and the other against the government of Iran.

## Kurdistan Workers' Party (PKK)[35]

The PKK appears to be in transition from a guerrilla and terrorist organization to a political movement.  It was founded in 1974 by political science student Abdullah Ocalan, who is now about 53 years old, with the goal of establishing a Marxist Kurdish state in southeastern Turkey, where there is a predominantly Kurdish population.  It claims to have changed its goals somewhat to focus on greater cultural and political rights within Turkey.  The PKK  generally targeted government forces and civilians in eastern Turkey, but it has operated elsewhere in the country and attacked Turkish diplomatic and commercial facilities in several Western European cities in 1993 and 1995.  The United States sides with Turkey in viewing the PKK as a terrorist organization, but wants to see a peaceful resolution of the conflict, and encourages Turkey to provide greater cultural and linguistic rights to the Kurds.

The PKK's transition accelerated in October 1998 when Turkish military and diplomatic pressure forced Syria to expel PKK leader Ocalan and the PKK.  Ocalan, who is about 52, sought refuge in several countries, but Turkey, acting on information reportedly provided by the United States, captured him as he was leaving Greece's embassy in Kenya in early 1999.  He was tried and, on June 29, 1999, sentenced to death for treason and the murder of about 30,000 Turks since 1984.   The implementation of the sentence has been suspended pending appeals to the European Court of Human Rights.  In August 1999, he called on his supporters to cease armed operations against the Turkish government, a decision affirmed at a PKK congress in

---

[34]Ibid.

[35]For more information on the PKK, see CRS Report 94-267, *Turkey's Kurdish Imbroglio and U.S. Policy*, by Carol Migdalovitz,, Mar.  18, 1994.  The PKK is distinct from Iranian and Iraqi Kurdish organizations that the State Department does not consider terrorist and which, in the case of Iraqi Kurds, benefit from U.S. support.

January 2000.  PKK violence against the Turkish government has since subsided, but not ended, and many of the PKK's estimated 5,000 fighters remain encamped and active across the border in Iran and Kurdish-controlled northern Iraq and have conducted a few minor terrorist attacks since.

## Revolutionary People's Liberation Party/Front (DHKP/C)

The DHKP/C is becoming more active after a long period of virtual dormancy. This Marxist organization, still commonly referred to by its former name, Dev Sol, was formed in 1978 to oppose Turkey's pro-Western tilt and its membership in the North Atlantic Treaty Organization (NATO).  Since the late 1980s, the DHKP/C (which corresponds to its acronym in Turkish) has concentrated attacks on Turkish military and security officials, but it has since 1990 attacked foreign interests, according to Patterns 2000.  The group assassinated two U.S. military contractors in Turkey to protest the Gulf War against Iraq and it rocketed the U.S. consulate in Istanbul in 1992.  An attempt by the group to fire an anti-tank weapon at the consulate in June 1999 was thwarted by Turkish authorities.  Also foiled was a planned attack by the group in August 2000 on Incirlik air base, which hosts U.S. aircraft patrolling a "no fly zone" over northern Iraq.  The group attacked an Istanbul police station, killing one police officer, in January 2001.

## The People's Mojahedin Organization of Iran (PMOI)

The People's Mojahedin Organization of Iran (PMOI), the dominant organization within a broader National Council of Resistance (NCR), has left-wing roots but it is not composed of an ethnic minority.  It was formed in the 1960's as an opponent of the Shah's authoritarian rule and was part of the broad movement that overthrew the Shah.  In 1981, the PMOI turned against the Islamic revolutionary regime of Ayatollah Khomeini when Iran's clerics violently excluded the PMOI and other groups from major roles in the new government, but the PMOI rebellion was suppressed and some of its leaders fled Iran to continue their political activities in exile.  The group claims that it has abandoned what some experts describe as a left-wing past and that it is committed to free markets and democracy.  However, the State Department noted in a 1994 congressionally-mandated report that there is no record of an internal debate over the change in ideology, and there is reason to doubt the organization's sincerity.  The group publicly supports the Arab-Israeli peace process and the rights of Iran's minorities.

The State Department's longstanding mistrust of the group is based not only on the group's past activities, but on its killing of several U.S. military officers and civilians during the struggle against the Shah, its alleged support for the takeover of the U.S. Embassy in Tehran in 1979, its authoritarian internal structure, and its use of Iraq as base for its several thousand member military wing.  The State Department named the PMOI an FTO in October 1997 on the grounds that it kills civilians in the course of its anti-regime operations inside Iran.  In one of its most high-profile attacks, the group claimed responsibility for the April 10, 1999 assassination in Tehran of a senior Iranian military officer.  However, the group does not appear to purposely target civilians.  In the October 1999 revision of the FTO list, the State Department, partly in response to an Iranian government request, named the NCR as

an alias of the PMOI, meaning that FTO-related sanctions now apply to the NCR as well.  The NCR's offices in the United States have not been closed by U.S. law enforcement authorities, because its U.S. chapter was not included in the FTO designation.  Seven persons were arrested in California in March 2001 for allegedly soliciting donations for the group, which, if proved, would be a violation of FTO sanctions regulations.  Other supporters of the group often operate under the names of local Iranian expatriate organizations.  In 1998, a majority of the House signed a letter questioning the State Department's designation of the group as an FTO, and some Members state that the group merits U.S. support as an alternative to the current regime in Tehran.  Some Members and outside experts believe that the PMOI was designated as an FTO as a gesture of goodwill to Iran after the election of Mohammad Khatemi in 1997.[36]

The PMOI is led by Masud and Maryam Rajavi.  Masud leads the PMOI's military forces based in Iraq and he is President of the NCR.  His wife Maryam, who is now with him in Iraq after leaving France in 1997, is the organization's choice to become interim president of Iran if it were to take power.  Mozagan Parsaii is the organization's Secretary General.

# Middle Eastern Terrorism List Countries

U.S. officials maintain that they have made a number of gains in their efforts to reduce state sponsorship of terrorism.  Five Middle Eastern countries are on the terrorism list — Iraq, Iran, Syria, Sudan, and Libya.[37]  In the case of Libya, Sudan, and, to a lesser extent, Iraq, U.S. and international pressure, coupled with internal developments in some of these states, have reduced their support for international terrorism long before September 11.  Of the Middle Eastern countries on the list, Sudan appears to be the closest to achieving removal.  The State Department openly acknowledges working with Sudan to help it meet the remaining requirements for removing it from the list, and has praised its cooperation against Al Qaeda after September 11.  In the case of Iran and Syria, however, U.S. efforts have had little success in curbing the support of these governments for terrorist groups.

Under Section 6(j) of the Export Administration Act, removal from the list requires 45 day advance notification to the House International Relations Committee, the Senate Foreign Relations Committee, and the Senate and House Banking Committees, that the country has ceased support for international terrorism and pledges to continue doing so.  Also under that provision, a major change of government in the listed country can serve as grounds for immediate removal from the list.

---

[36]Kempster, Norman.  US Designates 30 Groups as Terrorists.  *Los Angeles Times*, October 9, 1997.

[37]Along with Cuba and North Korea, these countries have been designated by the Secretary of State, under Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) as having repeatedly provided state support for international terrorism.

**Iran**[38]

Iran's sponsorship of terrorist groups appears to be setting back the prospects for reconciliation between the United States and Iran. U.S.-Iran relations were improving prior to September 11 and subsequently in the course of tacit cooperation in the war against the Taliban. However, in January 2002, the United States and Israel alleged that Iran sold a large shipment of arms to the Palestinian Authority. Israel seized the ship before its cargo was offloaded. The episode expanded U.S. concerns about Iran's sponsorship of terrorism by indicating a link between Iran and Palestinian groups who are not Islamic in nature and with which Tehran has previously had few links. In his January 29, 2002 State of the Union message, President Bush was highly critical of Iran, calling it a part of an "axis of evil" with Iraq and North Korea.

Patterns 2000, as has been the case for the past 6 years, again characterized Iran as "the most active" state sponsor of international terrorism. However, the report, as did Patterns 1999, attributes Iran's terrorism support to specific institutions – the Revolutionary Guard and the Ministry of Intelligence and Security – rather than the Iranian government as a whole. These institutions are controlled by Supreme Leader Ali Khamene'i, who espouses hardline positions on most foreign and domestic policies. This characterization suggests that the State Department believes President Mohammad Khatemi and his allies genuinely wish to overcome Iran's reputation as a "terrorist state" in order to further ease Iran's isolation. Indicating that Khatemi is attempting not to differ with Khamene'i, Patterns 2000 cites statements by Khatemi as well as by hardline leaders calling for the destruction of Israel. In an apparent positive signal to Iran, Patterns 2000, for the third year in a row, cites PMOI attacks on Iranian officials as justification for Iran's claim that it is a victim of terrorism.

Although no major international terrorist attacks have been linked to Iran since Khatemi took office in August 1997, the United States has not publicly noted any diminution of Iranian material support for terrorist groups opposed to the Arab-Israeli peace process, such as those groups discussed earlier in this paper. Patterns 2000 notes that Iran has encouraged Hizballah and Palestinian terrorist groups to escalate attacks on Israel in the context of the Palestinian uprising. Iran also has been accused by regional governments of sponsoring assassinations of anti-Shiite Muslim clerics in Tajikistan and Pakistan, and of supporting Shiite Muslim Islamic opposition movements in the Persian Gulf states and Iraq. On the other hand, U.S. officials acknowledge that Iran has improved relations with its Gulf neighbors dramatically in recent years, and that its support for Gulf opposition movements has diminished sharply. Iran also has largely ceased attacks on dissidents abroad that were so prominent during the tenures of Khatemi's predecessors.

In handing down indictments of 14 people in June 2001, the Department of Justice stated its belief that Iran was involved in the June 1996 Khobar Towers bombing in Saudi Arabia, which killed 19 U.S. airmen. No Iranians were among those indicted, but the indictments detail the role of Iranian security personnel in

---

[38]For further information, see CRS Issue Brief IB93033, *Iran: Current Developments and U.S. Policy*. Updated regularly, by Kenneth Katzman.

inspiring and supervising the plot, which was carried out by members of Saudi Hizballah.  Eleven of the 14 are in custody in Saudi Arabia, and Saudi Arabia says they will be tried there and not extradited to the United States.[39]  Many experts believe that the Saudi and U.S. governments have sought to avoid firmly pressing the Khobar case against Iran – legally or diplomatically – in order not to undermine Khatemi (who was elected after the bombing) or reduce the chance to improved relations with Iran.

## Syria[40]

Syria has expressed public support for the U.S. war on terrorism and has emphasized that Syria itself  has long combated Islamic movements in Syria.  At the same time, Syria is attempting to deflect U.S. and international scrutiny of its role as host to terrorist groups.  Syria's position is that the movements it hosts are legitimate resistance movements against Israeli occupation.  On that basis, Syria refuses to expel the groups in Syria and areas of Lebanon that Syria controls.

Even before September 11, Patterns 2000 was  more critical of Syria than was Patterns 1999, which came close to promising that Syria would be removed from the terrorism list if it signed a peace agreement with Israel.  This appeared to signal that U.S. hopes had receded that President Bashar al-Assad would be more flexible on foreign policy than his father, the late Hafez al- Assad, who Bashar succeeded in June 2000 upon his death.  Far from praising Syria for restraining terrorist groups as was the case in some past Patterns report, Patterns 2000 says that Syria allowed Hamas to open a new office in Damascus in March 2000.  The report adds that Syria did not act to stop Hizballah or Palestinian terrorist groups, operating in Syria or areas under Syrian control or influence, from launching ant-Israel attacks.  Syria continues to allow Iran to resupply Hizballah through the Damascus airport, and has allowed visiting Iranian officials to meet with anti-peace process terrorist organizations based in Syria.  It also publicly opposed suggestions that Hizballah be disarmed by U.N. peacekeepers after the militia seized positions in southern Lebanon vacated by Israel during its May 2000 withdrawal.

Syria also provides sanctuary to the PFLP-GC and other non-Islamist Palestinian groups.  There are no indications that Al Qaeda members are welcome in Syria.  A group active in Lebanon, Asbat al-Ansar (Partisans' Group) is believed linked to Al Qaeda and was named to the list of entities covered under Executive Order 13224 restrictions.  Syria exercises substantial influence over Lebanon, but Lebanon arrested several Asbat members in 1999-2000 and there is no information to suggest that the group operates with Syrian or Lebanese government approval.

Patterns 2000 does state that Syria is generally upholding its pledge to Turkey not to support the PKK.  Some believe that Syria's position on the PKK is the result of  Syria's fear of Turkey's potential threat to use armed force against Syria, and not

---

[39]MacFarquhar, Neil.  Saudis Say They, Not U.S., Will Try 11 in '96 Bombing. *New York Times*, July 2, 2001.

[40]For further information, see CRS Issue Brief IB92075, *Syria: U.S. Relations and Bilateral Issues*.  Updated regularly, by Alfred Prados.

a unilateral Syrian desire to sever relations with the PKK. An alternate interpretation is that Syria wants to sustain the recent improvement in its bilateral relationship with Turkey. Also, Patterns 2000 states that Syria appears to have maintained its long-standing ban on attacks launched from Syrian territory or against Western targets.

Despite its position on the terrorism list, the United States maintains relatively normal relations with Syria. The two countries exchange ambassadors and most forms of non-military U.S. trade with and U.S. investment in Syria are permitted, subject to various licensing restrictions.

## Libya[41]

The Pan Am 103 bombing issue has been at the center of U.S. policy toward Libya for more than a decade, and will likely prevent any major rapprochement as long as Muammar Qadhafi remains in power. However, some press reports citing unnamed Administration officials indicate that the Bush Administration might consider easing sanctions, perhaps including removing Libya from the terrorism list outright, if outstanding Pan Am 103 issues are resolved.[42] After an article to this effect appeared in January 2002, Bush Administration officials sought to downplay the possibility that Libya would be removed from the list anytime soon.

Most experts believe Libya has reduced its involvement with terrorist groups, at least for now. In 1998, prior to the handover, Libya had expelled Abu Nidal, it was reducing its contacts with other radical Palestinian organizations, and it expressed support for Yasir Arafat. In an effort to reward Libya's positive steps, in 1999 a U.S. official began meeting with a Libyan diplomat for the first time since 1981, and the U.S. trade ban was modified to permit exports of food and medicine. On the other hand, reflecting the difficulties of assessing Libya's intentions, Patterns 2000 stated that it is unclear whether Libya's distancing itself from its "terrorist past" signifies a true change in policy.

**Pan Am 103 Issues.** The Pan Am attack, on December 21, 1988, killed 259 people aboard plus 11 on the ground. Three U.N. Security Council resolutions — 731 (January 21, 1992); 748 (March 31, 1992); and 883 (November 11, 1993) — called on Libya to turn over the two Libyan intelligence agents (Abd al-Basit Ali al-Megrahi and Al Amin Khalifah Fhimah) suspected in the bombing, and to help resolve the related case of the 1989 bombing of French airline UTA's Flight 772. The U.N. resolutions prohibited air travel to or from Libya and all arms transfers to that country (Resolution 748); and froze Libyan assets and prohibited the sale to Libya of petroleum-related equipment (Resolution 883). In accordance with U.N. Security Council Resolution 1192 (August 27, 1998), the sanctions were suspended, but not terminated, immediately upon the April 5, 1999 handover of the two to the Netherlands. There, their trial under Scottish law began on May 3, 2000 and ended on January 31, 2001 with the conviction of al-Megrahi and the acquittal of Fhimah.

---

[41]For further information on Libya and its involvement in terrorism, see CRS Issue Brief IB93109, *Libya*, by Clyde Mark, (updated regularly).

[42]Slavin, Barbara. U.S. May Take Libya Off Terror Sponsor List. *USA Today*, January 23, 2002.

Megrahi began the appeal process in January 2002. In March 2000, a group of U.S. security officials visited Libya briefly to assess whether to lift the U.S. restriction on the use of U.S. passports for travel to Libya. The restriction has not been lifted.

The January 31, 2001 conviction of al-Megrahi brought some closure to the Pan Am case but also reinforced the perception among the Pan Am victims' families and others that Libyan leader Muammar Qadhafi had, at the very least, foreknowledge of the bombing. Immediately upon the conviction, President Bush stated that the United States would maintain unilateral sanctions on Libya and oppose permanently lifting U.N. sanctions until Libya: (1) accepts responsibility for the act; (2) compensates the families of the victims; (3) renounces support for terrorism; and (4) discloses all it knows about the plot. In January 2002, some persons involved in pursuing a compensation agreement with Libya expressed optimism about a settlement.[43]

**Other Terrorism Issues.** There is no evidence that Libya has supported Al Qaeda, and it appears to view Al Qaeda as more of a threat than a potential ally. A Libyan opposition group, the Libyan Islamic Fighting Group, is linked to Al Qaeda and was designated for financial restrictions under Executive Order 13224. The group allegedly tried to assassinate Qadhafi in 1996, and Libya has provided the United States some information on the group subsequent to the September 11 attacks. In the early 1990s, the Libyan government indicted bin Laden for allegedly supporting the Libyan Islamic Fighting Group.

Libya has tried to appear cooperative in resolving other past acts of terrorism. In March 1999, a French court convicted six Libyans, in absentia, for the 1989 bombing of a French airliner, UTA Flight 772, over Niger. One of them is Libyan leader Muammar Qadhafi's brother-in-law, intelligence agent Muhammad Sanusi. Although it never acknowledged responsibility or turned over the indicted suspects, in July 1999 Libya compensated the families of the 171 victims of the bombing, who included seven U.S. citizens. In July 1999, Britain restored diplomatic relations with Libya after it agreed to cooperate with the investigation of the 1984 fatal shooting of a British policewoman, Yvonne Fletcher, outside Libya's embassy in London. It is alleged that a Libyan diplomat shot her while firing on Libyan dissidents demonstrating outside the embassy.

In what some construe as part of the effort to improve its international image, Libya also has tried to mediate an end to conflicts between Eritrea and Ethiopia, and within Sudan and the Democratic Republic of the Congo. However, some believe Libya is trying to extend its influence in Africa rather than broker peace, and some in Congress and the Administration assert that Libya continues to arm rebel groups in Africa, such as the Revolutionary United Front in Sierra Leone.[44] In March 2000, a group of U.S. security officials visited Libya briefly to assess whether to lift the U.S. restriction on the use of U.S. passports for travel to Libya. The restriction has not been lifted.

---

[43]Slavin, Barbara. U.S. May Take Libya Off Terror Sponsor List.

[44]Libya Must Fulfill All Requirements to Have Sanctions Lifted. USIS Washington File, July 22, 1999.

## Sudan[45]

Sudan appears closest of any of the Near Eastern countries on the terrorism list to being removed, despite congressional and outside criticism over its prosecution of the war against Christian and other rebels in its south. Prior to the September 11 attacks, the State Department said it was engaged in discussions with Sudan with the objective of getting Sudan "completely out of the terrorism business and off the terrorism list."[46] The Administration has praised Sudan's cooperation with the U.S. investigation of Al Qaeda and the September 11 plot. In recognition of this cooperation, the Administration did not block a U.N. Security Council vote on September 28, 2001 to lift U.N. sanctions on Sudan.

In recent years, Sudan has signaled a willingness to assuage international concerns about its support for terrorism. In August 1994, Sudan turned over the terrorist Carlos (Ilyich Ramirez Sanchez) to France. In December 1999, Sudan's President Umar Hassan al-Bashir, a military leader, politically sidelined Sudan's leading Islamist figure, Hassan al-Turabi. In February 2001, Turabi was arrested, and has remained under house arrest since May 2001. Turabi was one of the primary proponents of Sudan's ties to region-wide Islamic movements, including Al Qaeda, the Abu Nidal Organization, Hamas, PIJ, Egypt's Islamic Group and Al Jihad, Hizballah, and Islamist rebel movements in East Africa – the ties that prompted the United States to place Sudan on the terrorism list in August 1993. According to Patterns 2000, by the end of 2000 Sudan had signed all 12 international conventions on combating terrorism.

One issue that apparently has been resolved is Sudan's compliance with three Security Council resolutions adopted in 1996: 1044 of January 31; 1054, of April 26; and 1070 of August 16. The resolutions demanded that Sudan extradite the three Islamic Group suspects in the June 1995 assassination attempt against President Mubarak in Ethiopia, restricted the number of Sudanese diplomats abroad, and authorized a suspension of international flights by Sudanese aircraft, although the last measure was never put into effect. According to the *Washington Post* of August 21, 2001, the Bush Administration has concluded that Sudan has ended its support for the terrorists involved in the bomb plot.

The United States has tried to promote further progress on terrorism by slowly increasing engagement with Sudan. The United States removed its embassy staff from Khartoum in February 1996, although diplomatic relations were not broken. U.S. diplomats posted to Sudan have since worked out of the U.S. Embassy in Kenya, but have made consular visits to the embassy in Khartoum. Beginning in mid-2000, U.S. counter-terrorism experts have visited Sudan to discuss U.S. terrorism concerns and monitor Sudan's behavior on the issue. A U.S. envoy for Sudan, former Senator John Danforth, was appointed on September 6, 2001.

---

[45]For further information see CRS Issue Brief IB98043, *Sudan: Humanitarian Crisis, Peace Talks, Terrorism, and U.S. Policy*. Updated regularly, by Theodros S. Dagne.

[46]Patterns 2000, p. 31.

There is lingering resentment among some Sudanese against the United States because of the August 20, 1998 cruise missile strike on the al-Shifa pharmaceutical plant in Khartoum, conducted in conjunction with the strike on bin Laden's bases in Afghanistan.  The United States destroyed the plant on the grounds that it was allegedly contributing to chemical weapons manufacture for bin Laden.  Although the Clinton Administration asserted that the al-Shifa strike was justified, several outside critics maintained that the plant was a genuine pharmaceutical factory with no connection to bin Laden or to the production of chemical weapons.  The plant owner's  $24 million in U.S.-based assets were unfrozen by the Administration in 1999, a move widely interpreted as a tacit U.S. admission that the strike was in error.

## Iraq[47]

U.S.-Iraq differences over Iraq's regional ambitions and its record of compliance with post-Gulf  war ceasefire requirements will probably keep Iraq on the terrorism list as long as Saddam Husayn remains in power.  Some U.S. officials want to expand the "war on terror" to Iraq despite a lack of hard evidence of Iraqi involvement in the September 11 attacks.  President Bush, in his January 29,2002 State of the Union message, suggested Iraq was part of an "axis of evil" along with North Korea and Iran, a statement that some took as an indication that the United States would eventually take action against Iraq.  Even those U.S. officials who oppose extending the war to Iraq assess Iraq's record of compliance with its postwar obligations as poor, and its human rights record as abysmal.  However, international pressure on Iraq on these broader issues appears to have constrained Iraq's ability to use terrorism.

Patterns 2000, as have the past few Patterns reports, notes that  Iraq continues to plan and sponsor international terrorism, although Iraq's activities are directed mostly against anti-regime opposition, those Iraq holds responsible for its past defeats, or bodies that represent or implement international sanctions against Iraq.  These trends apparently accord with recent Central Intelligence Agency judgments of Iraq's terrorism policy, according to a *New York Times* report of February 6, 2002.  That press report added that the CIA has no evidence Iraq has planned anti-U.S. terrorism since it organized a failed assassination plot against former President George H.W. Bush during his April 1993 visit to Kuwait, which triggered a U.S. retaliatory missile strike on Iraqi intelligence headquarters.  The *Times* report also said that the CIA is "convinced" Iraq has not provided chemical or biological weapons to Al Qaeda or other terrorist groups.

Among recent developments, in October 1998, Iraqi agents allegedly planned to attack the Prague-based Radio Free Iraq service of Radio Free Europe/Radio Liberty, although no attack occurred.  Czech officials say an Iraqi intelligence officer in Prague met with September 11 lead hijacker Muhammad Atta in early 2001, reportedly to discuss an attack on the radio facility.  Some observers believe the meeting suggests an Iraqi role in the September 11 attacks.  Iraq, which historically has had close ties to Yasir Arafat, has given some  support to anti-peace process Palestinian groups, and

---

[47]For further information, see CRS Issue Brief IB92117, *Iraqi Compliance With Ceasefire Agreements*.  Updated regularly, by Kenneth Katzman.

hosts the Abu Nidal Organization, Abu Abbas' Palestine Liberation Front, and other minor groups.  As a lever in its relations with Iran, Iraq continues to host and provide some older surplus weaponry to the PMOI's army, the National Liberation Army (NLA), which has bases  near the border with Iran.  However, Iraq apparently has reduced support for the group as Iraq's  relations with Tehran have improved over the past two years.

### Table 2.  Blocked Assets of Middle East Terrorism List States
(As of End 2000)

| Country | Assets in U.S. |
|---|---|
| IRAN<br>(added to terrorism list<br>January 19, 1984) | $23.2 million, consisting of blocked diplomatic property and related accounts. (A reported additional $400 million in assets remain in a Defense Dept. account pending resolution of U.S.-Iran military sales cases)[48] |
| IRAQ<br>(on list at inception, December 29, 1979. Removed March 1982, restored to list September 13, 1990) | $2.356 billion, primarily blocked bank deposits.  Includes $596 million blocked in U.S. banks' foreign branches, and $173 million in Iraqi assets loaned to a U.N. escrow account. |
| SYRIA<br>(on list since inception) | No blocked assets. |
| SUDAN<br>(added August 12, 1993) | $33.3 million in blocked bank deposits. |
| LIBYA<br>(on list since inception) | $1.073 billion, primarily blocked bank deposits. |

**Principal Source:** 2000 Annual Report to Congress on Assets in the United States Belonging to Terrorist Countries or International Terrorist Organizations.  Office of Foreign Assets Control, Department of the Treasury.  January 2001.

# Countering Near Eastern Terrorism

Prior to September 11, there was little agreement on a strategy for countering the terrorism threats discussed above.  The apparent success of the U.S. military campaign against the Taliban and Al Qaeda in Afghanistan apparently has prompted wider acceptance of the utility of military force than was the case previously. Observers tend to agree that the continued success against Al Qaeda and other terrorist groups will depend on sustained bilateral, multilateral, or international cooperation with U.S. efforts.

---

[48]Pincus, Walter.  Bill Would Use Frozen Assets to Compensate Terrorism Victims. *Washington Post*, July 30, 2000.

Not all options focus on pressuring states or groups; some experts believe that diplomatic engagement with some state sponsors and U.S. efforts to address terrorists' grievances could be more effective over the long term. The United States has claimed some successes for its policy of pressuring state sponsors, but there are signs that the United States is now incorporating a greater degree of engagement into its policy framework. At the same time, the United States has not dropped the longstanding stated U.S. policy of refusing to make concessions to terrorists or of pursuing terrorism cases, politically or legally, as long as is needed to obtain a resolution.

An exhaustive discussion of U.S. efforts to counter terrorism emanating from the region is beyond the scope of this paper, but the following sections highlight key themes in U.S. efforts to reduce this threat.[49]

## Military Force

The success of the U.S. military against the Taliban movement of Afghanistan that had protected the Al Qaeda organization has, according to many experts, validated the utility of military force against terrorism. Some believe that many governments are now moving against Al Qaeda cells and other terrorist groups present in their countries, fearing that U.S. military force might be used against regimes that tolerate the presence of terrorist groups. Advocates of broad application of military force believe that military action against Al Qaeda in Afghanistan has severely disrupted that organization's ability to plan new acts of terrorism. Skeptics of further military action maintain that conditions in Afghanistan are unique and that the anti-terrorism campaign in Afghanistan cannot easily be replicated elsewhere. U.S. officials say that the continued campaign against Al Qaeda might unfold differently elsewhere, including the use of U.S. military advisers to help governments destroy Al Qaeda sanctuaries in other countries.

U.S. military attacks were conducted in retaliation for terrorist acts sponsored by Libya and Iraq, as well as those allegedly sponsored by Al Qaeda. On April 15, 1986, the United States sent about 100 U.S. aircraft to bomb military installations in Libya. The attack was in retaliation for the April 2, 1986 bombing of a Berlin nightclub in which 2 U.S. military personnel were killed, and in which Libya was implicated. On June 26, 1993, the United States fired cruise missiles at the headquarters in Baghdad of the Iraqi Intelligence Service, which allegedly sponsored a failed assassination plot against former President George Bush during his April 14-16, 1993 visit to Kuwait. (Other U.S. retaliation against Iraq since 1991 has been triggered by Iraqi violations of ceasefire terms not related to terrorism.) The August 20, 1998 cruise missile strikes against the bin Laden network in Afghanistan represented a U.S. strike against a group, not a state sponsor. The related strike on a pharmaceutical plant in Sudan could have been intended as a signal to Sudan to sever any remaining ties to bin Laden.

---

[49] Further discussion of these issues is provided by CRS Issue Brief IB95112. *Terrorism, the Future, and U.S. Foreign Policy.* Updated regularly, by Raphael Perl.

The effectiveness of other U.S. military action against terrorist groups or state sponsors is difficult to judge. Libya did not immediately try to retaliate after the 1986 U.S. strike, but many believe that it did eventually strike back by orchestrating the Pan Am 103 bombing. Since the 1993 U.S. strike, Iraq has avoided terrorist attacks against high profile U.S. targets, but it has continued to challenge the United States on numerous issues related to its August 1990 invasion of Kuwait. The 1998 airstrikes against Al Qaeda did not prompt the Taliban leadership to extradite or expel bin Laden from Afghanistan, nor did the strikes deter bin Laden's network from engaging in further terrorist activities, including September 11.

## Unilateral Economic Sanctions

The United States has been willing to apply economic sanctions unilaterally, particularly against state sponsors of terrorism, in an effort to pressure those states to expel terrorist groups they host. Analysts doubt that unilateral U.S. economic sanctions, by themselves, can force major changes in the behavior of state sponsors of terrorism. Major U.S. allies did not join the U.S. trade ban imposed on Iran in May 1995 and the move did not, in itself, measurably alter Iran's support for terrorist groups. On the other hand, virtually all Middle Eastern terrorism list states have publicly protested their inclusion on the list and other U.S. sanctions, suggesting that these sanctions are having an effect politically and/or economically. U.S. officials assert that U.S. sanctions, even if unilateral, have made some terrorism state sponsors "think twice" about promoting terrorism.

To demonstrate that improvements in behavior can be rewarded, in April 1999 the Clinton Administration announced that it would permit, on a case-by-case basis, commercial sales of U.S. food and medical products to Libya, Sudan, and Iran. The move relaxed the bans on U.S. trade with the three countries. As noted previously, all three have recently shown some signs of wanting to improve their international images.

**Terrorism List Sanctions.** Under a number of different laws,[50] the placement of a country on the terrorism list triggers a wide range of U.S. economic sanctions, including:

- a ban on direct U.S. foreign aid, including Export-Import Bank guarantees.

- a ban on sales of items on the U.S. Munitions Control List.

- a requirement that the United States vote against lending to that country by international institutions.

---

[50]The list of sanctions are under the following authorities: Section 6(j) of the Export Administration Act, as amended [P.L. 96-72; 50 U.S.C. app. 2405 (j)]; Section 40 of the Arms Export Control Act, as amended [P.L. 90-629; 22 U.S.C. 2780]; and Section 620A of the Foreign Assistance Act of 1961, as amended [P.L. 87-195; 22 U.S.C. 2371]; and Section 1621 of the International Financial Institutions Act [22 U.S.C. 262c].

- strict licensing requirements for sales to that country, which generally prohibit exports of items that can have military applications, such as advanced sensing, computation, or transportation equipment.

A U.S. trade ban has been imposed on every Middle Eastern terrorism list state, except Syria, under separate executive orders. Placement on the terrorism list **does not** automatically trigger a total ban on U.S. trade with or investment by the United States. In addition, foreign aid appropriations bills since the late 1980s have barred direct and indirect assistance to terrorism list and other selected countries, and mandated cuts in U.S. contributions to international programs that work in those countries. As shown in **Table 2** above, the United States also tries to maintain some leverage over terrorism list states and groups by blocking some of their assets in the United States.

Some U.S. sanctions are "secondary sanctions," imposing penalties on countries that help or arm terrorism list countries. Sections 325 and 326 of the Anti-Terrorism and Effective Death Penalty Act (P.L. 104-132) amended the Foreign Assistance Act by requiring the President to withhold U.S. foreign assistance to any government that provides assistance or lethal military aid to any terrorism list country. In April 1999, three Russian entities were sanctioned under this provision for providing anti-tank weaponry to Syria; sanctions on the Russian government were waived.

**"Non-Cooperating List."** The 1996 Anti-Terrorism act also gave the Administration another option besides placing a country on the terrorism list. Section 303 of that Act created a new list of states that are deemed "not cooperating with U.S. anti-terrorism efforts," and provided that states on that list be barred from sales of U.S. Munitions List items. Under that provision, and every year since 1997, Afghanistan – along with the seven terrorism list countries – has been designated as not cooperating. No U.S. allies have been designated as "not cooperating," although the provision was enacted following an April 1995 incident in which Saudi Arabia did not attempt to detain Hizballah terrorist Imad Mughniyah when a plane on which he was believed to be a passenger was scheduled to land in Saudi Arabia.[51] Possibly in an attempt to avoid similar incidents, on June 21, 1995, President Clinton signed Presidential Decision Directive 39 (PDD-39), enabling U.S. law enforcement authorities to capture suspected terrorists by force from foreign countries that refuse to cooperate in their extradition.[52]

The Clinton Administration rejected several outside recommendations – most recently those issued in June 2000 by the congressionally-mandated National Commission on Terrorism – to place Afghanistan on the terrorism list. The Clinton Administration said that placing Afghanistan on the list would imply that the United States recognizes the Taliban movement as the legitimate government of Afghanistan, a position later adopted by the Bush Administration. However, President Clinton, on July 4, 1999, issued Executive Order 13129, imposing sanctions on the Taliban that are similar to those imposed on terrorism list countries and on foreign terrorist organizations. The order imposed a ban on U.S. trade with areas of Afghanistan

---

[51]Hizballah Denies Mughniyah on Board Plane. FBIS-NES-95-079. Apr. 25, 1995. p.44.

[52]Policy on Terror Suspects Overseas. *Washington Post*, February 5, 1997.

CRS-40

under Taliban control, froze Taliban assets in the United States, and prohibited contributions to Taliban by U.S. persons. The Clinton Administration justified the move by citing the Taliban's continued harboring of bin Laden.

Also in its June 2000 report, the National Commission on Terrorism recommended naming Greece and Pakistan as not fully cooperating with U.S. anti-terrorism efforts. The Clinton Administration rejected those recommendations as well. In Patterns 2000, the State Department implied that Pakistan and Lebanon were potential candidates for the terrorism list, or possibly the "not cooperating" list, for supporting or tolerating operations by terrorist groups.[53] On the other hand, Patterns 2000 did credit both Pakistan and Lebanon with anti-terrorism cooperation in selected cases. In the aftermath of the September 11 attacks and Pakistan's decision to align itself with the U.S. war effort, the United States has praised Pakistan's cooperation, lifted U.S. sanctions, and begun a new foreign assistance program for that country.

## Multilateral Sanctions

In concert with U.S. unilateral actions, the United States has sought to enlist its friends, allies, and other countries to employ multilateral sanctions against Middle Eastern terrorism. As noted above, the United States led efforts to impose international sanctions on Libya and Sudan for their support of terrorism, and both those states sought to distance themselves from terrorist groups. This suggests that the perception of isolation caused by the U.N. sanctions was a factor in the terrorism policy decisions of these countries. In 1998 and 1999, the United States and Russia jointly worked successfully to persuade the United Nations Security Council to adopt sanctions on the Taliban because of its refusal to extradite bin Laden. U.N. Security Council Resolution 1267, adopted October 15, 1999, banned flights outside Afghanistan by its national airline, Ariana, and directed U.N. member states to freeze Taliban assets. The United States and Russia teamed up again to push another resolution (U.N. Security Council Resolution 1333, adopted December 19, 2000) that, among other measures, imposed an international arms embargo on the Taliban only, not on opposition factions.[54] These measures began to be implemented just prior to the September 11 attacks, but did not cause the Taliban to waiver in its refusal to hand over bin Laden.

## Counter-Terrorism Cooperation

Successive administrations have identified counter-terrorism cooperation with friendly countries as a key element of U.S. policy. In one important regional example, the United States has sought to contain Hizballah by providing military and law enforcement assistance to the government of Lebanon. In the past few years, the United States has sold Lebanon non-lethal defense articles such as armored personnel carriers. In 1994, on a one-time basis, the United States provided non-lethal aid,

---

[53]Patterns 2000, p. 32.

[54]Miller, Judith. Russians Join U.S. To Seek New Sanctions on Taliban. *New York Times*, August 4, 2000.

including excess trucks and equipment, to Palestinian Authority security forces in an effort to strengthen them against Hamas and PIJ.

Prior to September 11, the United States had been expanding a counter-terrorism dialogue with Russia and the Central Asian states against Islamic militant groups linked to Al Qaeda. All of these countries subsequently aligned themselves, openly or tacitly, with the U.S. war against the Taliban and Al Qaeda. Every year since 1999, the State Department hosted a multilateral conference of senior counter-terrorism officials from the Middle East, Central Asia, and Asia, focusing on combating the terrorism threat from Afghanistan. These conferences and meetings have often resulted in agreements to exchange information, to conduct joint efforts to counter terrorist fundraising, and to develop improved export controls on explosives and conventions against nuclear terrorism.[55] For the past few years, the United States has been providing some detection equipment and a few million dollars in financial assistance to the Central Asian states to help them prevent the smuggling of nuclear and other material to terrorist groups such as Al Qaeda. The measure yielded some results in April 2000, when Uzbek border authorities used this equipment to detect and seize ten containers with radioactive material bound for Pakistan.[56]

The United States has worked with the European Union (EU) to exert influence on Iran to end its sponsorship of terrorism. In exchange for relaxing enforcement of U.S. sanctions under the Iran-Libya Sanctions Act (P.L. 104-172) , which would have sanctioned EU firms that invest in Iran's energy industry, in mid 1998 the United States extracted a pledge from the EU to increase cooperation with the United States against Iranian terrorism. In May 1998, the EU countries agreed on a "code of conduct" to curb arms sales to states, such as Iran, that might use the arms to support terrorism. However, the code is not legally binding on the EU member governments.[57]

**Terrorism Fundraising Cooperation.** In January 2000, the United States signed a new International Convention for the Suppression of Terrorist Financing, which creates an international legal framework to investigate those involved in terrorist financing. Since September 11, the United States has made cooperation against terrorism fundraising a major priority in its dealings with other countries, particularly Middle Eastern countries where much of the fundraising for Al Qaeda is conducted.

## Selective Engagement

As noted in the discussions of terrorism list countries, the Administration has shown increasing willingness to engage state sponsors, once these countries have demonstrated some willingness to curb support for terrorism. U.S. officials justify engagement with the argument that doing so creates incentives for terrorism list

---

[55]Patterns 1998. p. V.

[56]Bryen, Stephen. "The New Islamic Bomb." *Washington Times*, April 10, 2000.

[57]"Plan Still Lets Rogue States Buy Arms." *Associated Press*, May 26, 1998.

CRS-42

countries to continue to reduce their support for international terrorism.  On the other hand, critics believe that terrorism list countries are likely to view a U.S. policy of engagement as a sign that supporting terrorism will not adversely affect relations with the United States.

Of the Middle Eastern terrorism list countries, the United States engages in bilateral dialogue with all except Iran and Iraq.  The United States has called for a dialogue with Iran, but Iran has thus far refused on the grounds that the United States has not dismantled what Iran calls "hostile" policies toward that country – a formulation widely interpreted to refer to U.S. sanctions.  Iraq has asked for direct talks with the United States, but the United States has rejected the suggestion on the grounds that Iraq is too far from compliance with Gulf war-related requirements to make official talks useful.

## Legal Action

Legal action against terrorist groups and state sponsors had become an increasingly large component of U.S. counter-terrorism strategy, although the September 11 attacks and U.S. military response has, to some extent, diminished support among observers for this option.  In the case of the bombing of Pan Am 103, the Bush Administration chose international legal action – a trial of the two Libyan suspects – over military retaliation.  A similar choice has apparently been made in the Khobar Towers bombing case, although that legal effort consists of U.S. indictments of suspects and not a U.N.-centered legal effort.  The United States is planning to try some Al Qaeda fighters captured in Afghanistan, although the U.S. strategy has been primarily to defeat Al Qaeda militarily rather than treat the September 11 attacks primarily as a criminal case.

Congress has attempted to give victims of international terrorism a legal option against state sponsors.  The Anti-Terrorism and Effective Death Penalty Act of 1996 (Section 221) created an exception to the Foreign Sovereign Immunity for Certain Cases (28 U.S.C., Section 1605), allowing victims of terrorism to sue terrorism list countries for acts of terrorism by them or groups they support.  Since this provision was enacted, a number of cases have been brought in U.S. courts, and several multimillion dollar awards have been made to former hostages and the families of victims of groups proven in court to have been sponsored by Iran.  In 2000, the Clinton Administration accepted compromise legislation to use general revenues to pay compensatory damage awards to these successful claimants, with the stipulation that the President try to recoup expended funds from Iran as part of an overall reconciliation in relations and settlement of assets disputes.  The provision, called the "Justice for Victims of Terrorism Act," was incorporated into the Victims of Trafficking and Violence Protection Act of 2000 (P.L. 106-386).  The Clinton and Bush Administrations have opposed directly tapping frozen Iranian assets in the United States – such as selling Iran's former embassy in Washington – on the grounds that doing so could violate diplomatic sovereignty or provoke attacks on U.S. property or citizens abroad.

## The Domestic Front

The September 11 attacks have exposed the vulnerability of the United States homeland to Middle Eastern-inspired terrorism as no other previous event. The October-November 2002 anthrax mailings also exposed U.S. vulnerabilities, although it is not known whether these incidents were related to September 11, other Middle Eastern-related terrorism, or activity by groups in the United States not connected to the Middle East. The September 11 attacks have sparked stepped up law enforcement investigation into the activities of Islamic networks in the United States and alleged fundraising in the United States for Middle East terrorism.

Some observers allege that Middle Eastern terrorist groups, including Al Qaeda, have extensive political networks in the United States, working from seemingly innocent religious and research institutions and investment companies.[58] PIJ leader Shallah, before being tapped to lead PIJ, taught at the University of South Florida in the early 1990s and ran an affiliated Islamic studies institute called the World and Islam Studies Enterprise (WISE). Some observers believe that extraordinary security measures are needed to ferret out Al Qaeda cells in the United States.

Others have challenged this view, saying that most American Muslims oppose the use of violence, and donate money to organizations that they believe use the funds solely for humanitarian purposes. Some post-September 11 U.S. domestic counter-terrorism efforts, particularly those dealing with immigration and investigative powers, have drawn substantial criticism from U.S. civil liberties groups, which have expressed concern about excessive intrusions by law enforcement authorities. Some Arab-American and American Muslim organizations have long complained that U.S. residents and citizens of Arab descent are unfairly branded as suspected terrorists, and that this sentiment increased dramatically after September 11. As part of their criticism, these organizations point to erroneous initial accusations by some terrorism experts that Islamic extremists perpetrated the Oklahoma City bombing in April 1995.

---

[58]Emerson, Steven. Islamic Terror: From Midwest to Mideast. *Wall Street Journal*, August 28, 1995.