# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*    Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)

### THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS FILED BY NATIONAL COMMERCIAL BANK

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Telephone:    (215) 665-2000
Facsimile:    (215) 665-2013

**Table of Contents**

**Page**

1.  INTRODUCTION ..................................................................................................1

2.  APPLICABLE LAW ...........................................................................................5

    A.  The Burden of Proof is on the Party Claiming Liability.........................................5

    B.  Prior to Discovery on a Rule 12(b)(2)
        Motion, a Plaintiff's *Prima Facie* Showing
        of Personal Jurisdiction May be Established
        Solely by Legally Sufficient Allegations of Jurisdiction .........................................6

    C.  Under Rule 12(b)(6), The Federal Plaintiffs'
        Complaint Need Only Give the Defendant Fair
        Notice of Their Claims and the Grounds Upon Which They Rest .........................7

3.  ARGUMENT .......................................................................................................8

    A.  The Federal Plaintiffs Have Fulfilled Their
        Obligations Under the Federal Notice Pleading Requirements .............................8

    B.  NCB Liability Under the Foreign Sovereign Immunities Act ...............................10

    C.  This Court Has Personal Jurisdiction Over
        NCB Under New York's Long Arm Statute.........................................................10

    D.  This Court's Exercise of Jurisdiction Over
        NCB Does Not Violate Due Process ...................................................................11

        1.  This Court Can Constitutionally Exercise
            Specific Jurisdiction.......................................................................................11

        2.  NCB is Also Constitutionally Subject to
            Jurisdiction Pursuant to the Modified Due
            Process Standard For Mass Torts....................................................................13

    E.  The Federal Plaintiffs Have Adequately Pled Causation......................................14

    F.  Subrogation is Appropriate Because Payments
        Have Been Made and the Federal Plaintiffs
        Have Identified the Subrogors in the Sealed Exhibits ..........................................18

    G.  As Subrogees, The Federal Plaintiffs Have
        Standing Under RICO, And They Have
        Sufficiently Pled A Claim Against NCB ..............................................................19

H.    The Federal Plaintiffs Have Sufficiently Pled Claims
      Against NCB for Conspiracy and Aiding and Abetting .......................................19

I.    The Complaint States a Claim Against NCB Under Negligence .........................21

J.    The Complaint States a Claim Against
      NCB Under the Anti-Terrorism and
      Effective Death Penalty Act...............................................................................22

K.    Assault and Battery, Intentional Infliction
      of Emotional Distress and Punitive Damages......................................................23

4.    CONCLUSION..............................................................................................................24

# TABLE OF AUTHORITIES

## CASES

Alexander v. Fritzen,
    503 N.E.2d 102 (N.Y. 1986) ............................................................11

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
    902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990) ...........................6, 7

Blue Cross & Blue Shield of N.J., Inc. v. Phillip Morris USA, Inc.,
    344 F.3d 211 (2d Cir. 2003) ............................................................18

Boim v. Quranic Literacy Institute,
    291 F.3d 1000 (7th Cir. 2002) ..........................................................15

Calder v. Jones,
    465 U.S. 781 (1984) .................................................................11, 12

Cargill Int. S.A. v. M/T Pavel DyBenko,
    991 F.2d 1012 (2d Cir. 1993) ............................................................5

Chance v. Armstrong,
    143 F.3d 698 (2d Cir. 1998) .............................................................8

Chrysler Capital Corp. v. Century Power Corp.,
    778 F. Supp. 1260 (S.D.N.Y. 1991) ...................................................10

Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,
    187 F.3d 229 (2d Cir. 1999) ............................................................11

Conley v. Gibson,
    355 U.S. 41 (1957) ................................................................7, 8, 9

Continental Ore Co. v. Union Carbide & Carbon Corp.,
    370 U.S. 690 (1962) ..................................................................15

In re DES Cases,
    79 F. Supp. 552 (E.D.N.Y. 1992) .....................................................13

Davis v. Barrett Day Securities, Inc.,
    1995 U.S. Dist. LEXIS 15434 (M.D.N.C. 1995) ........................................12

DiStefano v. Carozzi North America, Inc.,
    286 F.3d 81 (2d Cir. 2001) ..............................................................7

Durante Brothers & Sons, Inc. v. Flushing National Bank,
    755 F.2d 239 (2d Cir. 1985)................................................................11

Filus v. Lot Polish Airlines,
    907 F.2d 1328 (2d Cir. 1990)..............................................................6

First City, Texas-Houston, N.A. v. Rafidian Bank,
    150 F.3d 172 (2d Cir. 1998)................................................................6

Flatow v. Islamic Republic of Iran,
    999 F. Supp. 1 (D.D.C. 1998)........................................................15, 24

Geisler v. Petrocelli,
    616 F.2d 636 (2d Cir. 1980)................................................................7

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) ..............................................14, 15, 20

In re Initial Public Offering Sec. Litigation,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................9

Johnson v. Nyack Hospital,
    86 F.3d 8 (2d Cir. 1996)....................................................................23

Jones v. R.R. Donnelly & Sons Co.,
    124 S. Ct. 1836 (2004)......................................................................23

Kilburn v. Socialist People's Libyan Arab Jamahiriya,
    376 F.3d 1123 (D.C. Cir. 2004) ....................................................15, 16

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998)..................................................11

Leatherman v. Tarrant County,
    507 U.S. 163 (1993)............................................................................8

Louisiana Land & Exploration Co. v. Unocal Corp.,
    863 F. Supp. 306 (E.D. La. 1994)......................................................23

Lumbard v. Maglia, Inc.,
    621 F. Supp. 1529 (S.D. N.Y. 1985)..................................................14

In re Magnetic Audiotape Antitrust Litigation,
    334 F.3d 204 (2d Cir. 2003)...........................................................7, 12

Merrill Lynch Futures, Inc. v. Kelly,
    585 F. Supp. 1245 (S.D. N.Y. 1984)..................................................20

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996)..........................................................9

Pittman v. Grayson,
    149 F.3d 111 (2d Cir. 1998)........................................................11

Pugh v. Socialist People's Libyan Arab Jamahiriya,
    290 F. Supp. 2d 55 (D.D.C. 2003)..................................................13

Rein v. Socialist People's Libyan Arab Jamahiriya,
    995 F. Supp. 325 (E.D.N.Y. 1998) .............................................12, 13

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
    235 F.3d 738 (2d Cir. 2000)........................................................6

Rich-Taubman Associate v. Stamford Restaurant Operating Co., Inc.,
    587 F. Supp. 875 (S.D. N.Y. 1984)................................................20

Robinson v. Malaysia,
    269 F.3d 133 (2d Cir. 2001).........................................................5

Saudi Arabia v. Nelson,
    507 U.S. 349 (1993)................................................................5

Simmons v. Abruzzo,
    49 F.3d 83 (2d Cir. 1995) ...........................................................7

Simon v. Philip Morris, Inc.,
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) .......................................10, 13, 14

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002).............................................................5, 8, 9

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.,
    241 F.3d 135 (2d Cir. 2001)........................................................12

United States of America v. Enaam Arnaout,
    No. 02-CR-892 (N.D. Ill. filed Jan. 6, 2003).........................................4

Wahad v. FBI,
    813 F. Supp. 224 (S.D. N.Y. 1993)................................................20

<u>Winkelmann v. Excelsior Insurance Co.</u>,
 85 N.Y.2d 577 (N.Y. 1995) ......................................................................18

<u>Woodford v. Committee Action Agency</u>,
 239 F.3d 517 (2d Cir. 2001)......................................................................7

<u>Wynder v. McMahon</u>,
 360 F.3d 73 (2d Cir. 2004) ....................................................................7, 8

## RULES AND STATUTES

18 U.S.C. § 2331(4) ......................................................................................22

18 U.S.C. § 2333 ..........................................................................................22

18 U.S.C. § 2336(a) ......................................................................................22

18 U.S.C. § 2339A ........................................................................................1

18 U.S.C. § 2339B ........................................................................................1

Fed. R. Civ. P. 8 ....................................................................................5, 8, 9

Fed. R. Civ. P. 12(b)(2) ..........................................................................6, 7

Fed. R. Civ. P. 12(b)(6) ..........................................................................7, 8

Restatement (Second) of Torts § 302......................................................21

## MISCELLANEOUS

*Al Qaeda and the Global Reach of Terrorism,*  Hearing before the Committee on International Relations, House of Representatives, October 3, 2001, prepared statement of Vincent Cannistraro, former Chief of Counter-Terrorism Operations, Central Intelligence Agency ......................................................................................................1

Description of the Office of Terrorism Analysis of the Director of Central Intelligence Counterterrorism Center ..........................................................................................2

*An Assessment of Current Efforts to Combat Terrorism Financing*, Hearing before the Senate Committee on Governmental Affairs, June 15, 2004, Statement of Lee S. Wolosky.........3

November 29, 2001 Letter of Treasury Department General Counsel David Aufhauser to Swiss Substitut du Procureur General Claude Nicati ....................................................3

Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements................................................................................................................4

1.    **INTRODUCTION**

The Federal Plaintiffs have sued National Commercial Bank ("NCB") based on its

participation in a global conspiracy to conduct terrorist attacks against the United States,

spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and

foreseeable product.  First Amended Complaint (FAC) ¶ 72, 296-97.  While the FAC must be

read as a whole in order to fully understand the Federal Plaintiffs' claims against NCB, the

principal allegations against NCB are set forth in paragraphs 253-258 and 285-297.

Senior officials of the U.S. Government have confirmed the core factual allegations

underlying the Federal Plaintiffs' claims against NCB.  For example, during testimony before the

House Committee on International Relations on October 3, 2001, Vincent Cannistraro, the

former chief of counter-terrorism operations for the Central Intelligence Agency, asserted that

NCB had knowingly provided financial services[1] to al Qaida.  According to Cannistraro:

> There is little doubt that a financial conduit to Bin Laden was
> handled through the National Commercial Bank, until the Saudi
> Government finally arrested a number of persons and closed down
> the channel.  It was evident that several wealthy Saudis were
> funneling contributions to bin Laden through this mechanism.

*Al Qaeda and the Global Reach of Terrorism,*  Hearing before the Committee on International
Relations, House of Representatives, October 3, 2001, prepared statement of Vincent
Cannistraro, former Chief of Counter-Terrorism Operations, Central Intelligence Agency,
attached to the Affirmation of Sean P. Carter (Carter Aff.) as Exhibit 1, at p. 20.

In confirming that Saudi authorities arrested NCB employees as a result of the bank's

role in financing al Qaeda, Cannistraro's comments make clear that NCB was not a passive

conduit of financing to al Qaeda, but rather that it provided financial services and other forms of

support to the terrorist organization *knowingly* and *intentionally*.

---

[1]       Pursuant to the Anti-Terrorism and Effective Death Penalty Act (ATA), it is a crime to provide material support or
resources to, or to conceal or disguise the source, location, source or ownership of material support or resources on behalf of, a
terrorist organization.  18 U.S.C. ¶ 2339A.  In recognition of the fact that terrorist organizations like al Qaida require money
laundering services and access to the international banking system, the ATA defines the term "material support and resources" to
include "financial services."  18 U.S.C. ¶ 2339B.

Notably, as director of the Central Intelligence Agency's Counter-Terrorism Center during the period in question, Cannistraro was directly charged with ultimate responsibility for:

- Tracking terrorists and the activities of states that sponsor them, and assessing terrorists' vulnerability by analyzing their ideology and goals, capabilities, associates and locations.

- Analyzing world-wide terrorist threat information and patterns to provide warnings aimed at preventing terrorist attacks.

- Monitoring world-wide terrorism trends and patterns, including emerging and non-traditional terrorist groups, evolving terrorist threats or operational methods, and possible collusion between terrorist groups.

- Identifying, disrupting, and preventing international financial transactions that support terrorist networks and operations.

See Description of the Office of Terrorism Analysis of the Director of Central Intelligence Counterterrorism Center, available at http://www.cia.gov/cia/di/organizationt_ota_page.html, Carter Aff. Exh. 2. Given his responsibilities as director of the Central Intelligence Agency's Counter-Terrorism Center, and the unique intelligence he received in that capacity, Cannistraro's statements regarding NCB's material support and sponsorship of al Qaeda are significant at this early stage in the litigation. Indeed, the fact that Mr. Cannistraro singled out NCB during testimony just three weeks after the September 11th Attack underscores the importance of NCB's role in the conspiracy, spearheaded by al Qaida, to attack America.

In addition to serving as a conduit for contributions to al Qaida from its wealthy financiers, the bank itself provided substantial funding to bin Laden's terrorist organization. For instance, investigations have revealed that NCB channeled $74,000,000 to the International Islamic Relief Organization and $3,000,000 to the Muwafaq Foundation, an ostensible charity established by Khalid bin Mahfouz and Yassin al Qadi. On October 12, 2001, the United States government designated Yassin al Qadi as a terrorist supporter. In conjunction with the designation, the Treasury Department asserted that the Muwafaq Foundation "is an al Qaeda

front that receives funding from wealthy Saudi businessmen.  Saudi businessmen have been

transferring millions of dollars to bin Laden through Mawafaq."  See *An Assessment of Current*

*Efforts to Combat Terrorism Financing*, Hearing before the Senate Committee on Governmental

Affairs, June 15, 2004, Statement of Lee S. Wolosky, Carter Aff. Exh. 3.

In a November 29, 2001 letter to Swiss officials, then general counsel of the Treasury

Department David Aufhauser further described the Muwafaq Foundation's direct and pervasive

participation in terrorist activities throughout the World.  According to that letter:

> The pattern of activity displayed by Mr. Qadi, and his foundation
> and businesses, is typical of the financial support network of al
> Qa'ida and other terrorist organizations.  Working in troubled areas
> such as Bosnia, Somalia, Sudan, and various refugee camps, the
> putative "relief" organizations provide cover for individuals
> engaged in recruiting, organizing and training terrorist cells.  Their
> provision of humanitarian aid and educational services is done in
> concert with the terrorists to win the hearts and minds of the local
> people to whatever causes the terrorists dispout.  When a region
> becomes more settled, such as Bosnia or Albania today, seemingly
> legitimate businesses replace charitable foundations as cover for
> continuing terrorist organizational activity.  Mr. Qadi's actions and
> those of his Mawafaq Foundation, and businesses fit this pattern
> and give rise to a reasonable basis to believe that they have
> facilitated terrorist activities.

November 29, 2001 Letter of Treasury Department General Counsel David Aufhauser to Swiss

Substitut du Procureur General Claude Nicati, Carter Aff. Exh. 4, at pp. 3-4.

It is unreasonable to suggest that NCB was unaware of the true nature of the Muwafaq

Foundation's activities when it contributed $3,000,000 to that organization.  In particular, Khalid

bin Mahfouz, the co-founder of the Muwafaq Foundation, held a controlling interest in NCB and

served as an officer of the bank for many years.[2]  Between 1996 and 1999, Khalid bin Mahfouz

---

[2]       In 1992, Khalid bin Mahfouz was indicted for fraud in New York for his role in the Bank of Credit and Commerce
International (BCCI) Scandal.  Bin Mahfouz was the director of BCCI, a huge financial conglomerate convicted of money
laundering, bribery, support of terrorism, arms trafficking, and many other crimes.
http://www.fas.org/irp/congress/1992_rpt/bcci/07later.htm  The fraud charges against bin Mahfouz were dropped after he agreed
to pay $225 million dollars.
        In addition,  Khalid bin Mahfouz is identified on the "Golden Chain" as one of al Qaida's principal financiers.  The
Golden Chain has been the subject of significant discussion during oral arguments, and a brief discussion of the circumstances

served as the bank's president and chief executive officer.  FAC ¶ 286.  Khalid bin Mahfouz's

son, Abdul Rahman bin Mahfouz, served as one of the Muwafaq Foundation's directors and as a

member of NCB's board of directors.  FAC ¶ 497.  As NCB and Muwafaq were controlled by

many of the same people during the relevant period, the Federal Plaintiffs' submit that NCB

necessarily knew, or it is reasonable to infer that it did, that the funds it contributed to Muwafaq

would be channeled to al Qaida.  FAC ¶ 293.

In addition to its money laundering on behalf of al Qaida and direct funding of Muwafaq

and IIRO, NCB has also long maintained accounts for numerous charities operating within al

Qaida's infrastructure, including IIRO, Muwafaq and the Saudi Joint Relief Committee.  FAC ¶

292.  At all times material hereto, NCB knew that those accounts were being used to solicit and

transfer funds to al Qaida.  FAC ¶ 293.

Through the conduct described above, NCB knowingly and intentionally aided and

abetted al Qaida, and actively participated in al Qaida's global conspiracy to attack the United

States.

---

which have led US authorities to conclude that it is an authentic listing of al Qaida's principal financiers is therefore warranted. As has been previously described to the Court, the "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaeda.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement.  See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. filed Jan. 6, 2003) Carter Aff. Exh. 5, at p. 30.  The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.  See Final Report of the 9/11 Commission, Note 21 to Chapter 2.

The Federal plaintiffs recognize that the current record may be insufficient to establish the authenticity or admissibility of the Golden Chain at trial.  However, discovery is likely to supplement the record relative to this document.  For instance, plaintiffs have sued and intend to depose Enaam Arnaout , an associate of Osama bin Laden currently incarcerated in the United States whom the plaintiffs believe possesses personal knowledge of the Golden Chain document.  For this reason, and in view of the well settled standards governing the review and consideration of a motion to dismiss, the authenticity or admissibility of the document is not controlling at this stage of the proceeding.  Plaintiffs clearly have a good faith basis for the factual allegations relating to the Golden Chain, and those allegations must be accepted as true in connection with the consideration of the pending motions to dismiss.

2.    **APPLICABLE LAW**

Defendant NCB makes three broad arguments in favor of dismissal of the claims asserted against it in the FAC:  (1) that NCB is immune from suit under the Foreign Sovereign Immunities Act; (2) that this Court lacks personal jurisdiction over NCB; and (3) that the Federal Plaintiffs have failed to state any claim entitling them to relief against NCB.  For the reasons set forth below, the Federal Plaintiffs respectfully request that the Motion to Dismiss filed by NCB be denied in all respects, with prejudice**.**

A.    **The Burden of Proof is on the Party Claiming Liability**

Consistent with Fed. R. Civ. P. 8, a plaintiff in an FSIA case need only provide the defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  In responding to the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA.  Cargill Int. S.A. v. M/T Pavel DyBenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes such a showing, the burden of production shifts to the plaintiff to come forward with specific factual allegations *or* evidence which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in the FSIA.  Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001).  In deciding a motion to dismiss based on the FSIA prior to discovery, the court must accept as true the factual allegations and any evidence proffered by the plaintiff in support of jurisdiction.  Saudi Arabia v. Nelson, 507 U.S. 349, 351, 123 L.Ed.2d 47 (1993) ("Because this case comes to us on a motion to dismiss the complaint, we assume we have truthful factual allegations before us, though many of those allegations are subject to dispute.") (internal citations omitted).  To the extent the defendant challenges the accuracy of those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to

determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an

opportunity to complete discovery relative to that disputed factual contention.  First City, Texas-

Houston, N.A. v. Rafidian Bank, 150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines,

907 F.2d 1328, 1332 (2d Cir. 1990).  Upon completion of discovery, the Court should normally

"afford the parties the opportunity to present evidentiary material at a hearing on the question of

FSIA jurisdiction."[3]  Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 235 F.3d

738, 748 (2d Cir. 2000).

> **B.**  **Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's *Prima Facie* Showing of Personal Jurisdiction May be Established Solely by Legally Sufficient Allegations of Jurisdiction**

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal

jurisdiction varies depending upon the procedural posture of the litigation.

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.  After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted].  At that point, the *prima facie* showing must be factually supported.

Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S.

854 (1990).  The Second Circuit has observed that a plaintiff's averment of jurisdictional facts

will normally be met in one of three ways when in dispute:  (1) by a Rule 12(b)(2) motion, which

assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges

their sufficiency; (2) by a Rule 56 motion, which asserts that there are undisputed facts

demonstrating the absence of jurisdiction; or (3) by request for an adjudication of disputed

---

[3]        Consistent with these authorities, the Federal Plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the FSIA jurisdictional analysis, and to present evidence at a hearing on the question of FSIA jurisdiction.

jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits.  Id. at 197.  Where, as here, "the defendant is content to challenge only the sufficiency of the plaintiff's factual allegations, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction."  Id.  In order to meet its prima facie showing, the Federal Plaintiffs need only allege facts that connect the defendant with the applicable forum, here, the United States.  The plaintiff's averments of jurisdictional facts must be taken as true.  Id.; In re  Magnetic Audiotape Antitrust Litigation, 334 F.3d 204, 206 (2d Cir. 2003).  The Court also construes the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor.  DiStefano v. Carozzi North America, Inc., 286 F.3d 81 (2d Cir. 2001).

### C.  Under Rule 12(b)(6), The Federal Plaintiffs' Complaint Need Only Give the Defendant Fair Notice of Their Claims and the Grounds Upon Which They Rest

NCB alternatively moves to dismiss the Federal Plaintiffs' claims pursuant to Rule 12(b)(6).  Such a motion must be denied unless " it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n. 8. (2d Cir. 2004); Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).  The Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of plaintiffs.  Wynder, 360 F.3d at 77.  Plaintiffs are not required to prove their case at the pleading stage; indeed, the pleading of evidence should be avoided.  Woodford v. Comm. Action Agency, 239 F.3d 517 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion is "not whether a

plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Under Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002), Rule 8 pleadings are extremely permissive. A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief," and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 534 U.S. at 512 (quoting Conley v. Gibson, 355 U.S. 41 (1957)); Wynder, 360 F.3d at 77.

3. **ARGUMENT**

    A. **The Federal Plaintiffs Have Fulfilled Their Obligations Under the Federal Notice Pleading Requirements**

Rule 8 of the Federal Rules of Civil Procedure provides in relevant part:

> **Claims for relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks . . .

Fed. R. Civ. P. 8(a). Rule 8 provides the "notice pleading" requirement for federal courts. The Rule imposes a lenient obligation on the pleader, requiring only that the pleader provide its opponent with fair notice of its claim and the grounds upon which that claim rests. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). In the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Rule 9(b), a federal court is prohibited from imposing more demanding requirements than those prescribed by Rule 8(a). See, e.g., Leatherman v. Tarrant County, 507 U.S. 163, 168-69 (1993). "Such simplified 'notice

pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 322 (S.D.N.Y. 2003) (*quoting* Conley v. Gibson, 355 U.S. 41, 48 (1957)). Consequently, "[a]s the Supreme Court recognized in Swierkiewicz, one clearly written sentence can satisfy Rule 8(a)(2)." Id. at 323.

Defendant NCB's Motion is rife with accusations that the Federal Plaintiffs have not pled sufficient facts to establish either personal jurisdiction or valid claims against it. However, NCB is mistaken and misunderstands the meaning and intent behind Rule 8(a). The Federal Plaintiffs have provided NCB with the requisite notice in alleging that they knowingly aided, abetted and conspired to fund the activities of terrorists, including al Qaida, and that a terrorist attack on American soil was a direct, intended and foreseeable product of a larger conspiracy to commit acts of international terrorism against the United States, its nationals and allies. (FAC ¶¶ 66, 73.).

To expect or require the Federal Plaintiffs to set forth every wrongful act of NCB is as unreasonable as it is unnecessary at this stage in the proceedings. It simply is not required in notice pleading. See Fed. R. Civ. P. 8, 12. Having stated a claim against NCB, the Federal Plaintiffs are entitled to conduct discovery before they should be called upon to present their evidence. Indeed, as to NCB's personal jurisdictional challenge, only a *prima facie* showing of jurisdiction is required at the pleading stage. See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 576 (2d Cir. 1996). A plaintiff is entitled to jurisdictional discovery and an evidentiary hearing before having to demonstrate jurisdiction by a preponderance of the evidence. Id. Under the Federal Rules and relevant case law, it is inappropriate and untimely for NCB to challenge the substance of the Federal Plaintiffs' good faith allegations which have

effectively put them on notice of the claims and jurisdictional bases against them.  For this reason, NCB's Motion to Dismiss should be denied in its entirety.

### B.    NCB Liability Under the Foreign Sovereign Immunities Act

At this point in the litigation, the parties have extensively briefed the applicability of the tortious act and commercial activity exceptions of the FSIA.  Rather than burdening the Court with a restatement of those same arguments herein, the Federal Plaintiffs incorporate by reference the discussion of the applicability of the tortious act and commercial activity exceptions set forth in the Federal Plaintiffs' Opposition to the Motion to Dismiss of Prince Turki al Faisal Bin Abduldaziz Al Saud at pp. 8-20, Federal Plaintiffs' Opposition to the Motion to Dismiss of Prince Sultan Bin Abdulaziz Al Saud at pp. 8-21, and Federal Plaintiffs' Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia at pp. 20-25.  For the reasons set forth in those Briefs, the Federal Plaintiffs respectfully submit the claims based on the misconduct of NCB fall squarely within the tortious act or commercial activity exceptions of the FSIA, and that this Court consequently possesses subject matter jurisdiction over NCB for the claims set forth in the FAC.

### C.    This Court Has Personal Jurisdiction Over NCB Under New York's Long Arm Statute

This Court has jurisdiction over the Federal Plaintiffs' claims pursuant to New York's long arm statute.  That statute provides, in part, that "the court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent commits a tortious act within the state."  N.Y.C.P.L.R. §302(a)(2).  "It is well settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. §302(a)(2)."  Simon v. Philip Morris, Inc., 86 F. Supp.2d 95, 99 (E.D.N.Y. 2000) (citation omitted); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).  "Both state and federal courts have found that

where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp.2d 593, 601 (S.D.N.Y. 1998).

New York law does not recognize the substantive tort of civil conspiracy. Durante Bros. & Sons, Inc. v. Flushing Nat. Bank, 755 F.2d 239, 251 (2d Cir. 1985). Rather, allegations of a conspiracy connect the actions of separate defendants with an otherwise actionable tort. Alexander v. Fritzen, 503 N.E.2d 102, 103 (N.Y. 1986). Both conspiracy and aiding and abetting create concerted-action liability in New York. Pittman v. Grayson, 149 F.3d 111, 122 (2d Cir. 1998). Conspiracy requires an agreement to commit a tortious act while aiding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer. Id. at 122-23. For the reasons set forth above, the conduct of NCB constitutes both forms of concerted-action liability under New York law as set forth in the allegations of the Complaint and, as such, connects it with the subject transaction, charges NCB with the acts and declarations of its co-conspirators, and exposes it to joint and several liability. Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 240 (2d Cir. 1999). This Court therefore has personal jurisdiction over NCB pursuant to New York's long arm statute and the well-recognized conspiracy jurisdiction theory under New York law.

## D.   This Court's Exercise of Jurisdiction Over NCB Does Not Violate Due Process

### 1.   This Court Can Constitutionally Exercise Specific Jurisdiction

The Supreme Court repeatedly has held that the due process clauses of the Fifth and Fourteenth Amendments permit personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice. Calder v. Jones, 465 U.S. 781, 788 (1984). Where, as here, the claim arises out of, or relates to, a defendant's contact with the forum, i.e., the attack

in New York, the plaintiff need only prove specific jurisdiction.  U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd., 241 F.3d 135, 152 (2d Cir. 2001) (citation omitted).

When considering specific jurisdiction, the court properly focuses on the relationship among the defendant, the forum and the litigation in judging minimum contacts.  Calder, 465 U.S. at 788.  In an action involving the harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence."  The Federal Plaintiffs have alleged that NCB was engaged in a conspiracy to attack and wage war against the United States, its nationals, interests, and allies.  FAC ¶ 73.[4]  The actions of the conspirators were expressly aimed at the United States such that, under the circumstances, they must reasonably anticipate being haled into court here.

Two recent cases involving the hijacking of airplanes outside the United States, but with some United States citizens as passengers, provide support for exercising personal jurisdiction here.  Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D.N.Y. 1998), aff'd in part, 162 F.3d 748 (2d Cir. 1998), cert. denied, 527 U.S. 1003 (1999), involved the in-flight bombing and destruction of Pan Am Flight 103 with the loss of 189 United States citizens over Lockerbie, Scotland.  Judge Platt, in the Eastern District of New York, reasoned that the destruction of the airplane, 189 deaths, and significant security concerns for the country and its aviation industry arguably "has had extensive impacts" on the United States.  Id. at 330.

> Any foreign state would know that the United States has substantial interest in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, including civil actions in United States courts.

Id.  The September 11th Attack indisputably had impacts in and on the United States like few events in its history.

---

[4]    The Federal Plaintiffs' allegations of conspiracy are, in and of themselves, sufficient to satisfy due process at this stage of the litigation.  In Re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003); see also Davis v. Barrett Day Securities, Inc., 1995 U.S. Dist. LEXIS 15434, *11-12 (M.D.N.C. 1995).

In <u>Pugh v. Socialist People's Libyan Arab Jamahiriya</u>, 290 F. Supp.2d 55 (D.D.C. 2003), Libya challenged the personal jurisdiction of a federal court in the District of Columbia in a suit involving the 1989 mid-air explosion of a French airline in Africa that killed seven United States citizens.  The plaintiffs in <u>Pugh</u> alleged that the defendants "conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight."  <u>Id.</u> at 59.  The court noted that the United States had a well known, worldwide interest in preventing and punishing terrorism.  Congress had enacted several criminal statutes dealing with such cases starting at least five years before the bombing.  These criminal statutes contemplated jurisdiction in the United States over foreign nationals for activities abroad regardless of other contacts with the United States.

> It logically follows that if a federal court may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

<u>Id.</u>  That same logic applies here.

In sum, this Court's exercise of specific personal jurisdiction does not violate NCB's due process rights.

## 2. NCB is Also Constitutionally Subject to Jurisdiction Pursuant to the Modified Due Process Standard For Mass Torts

NCB is also subject to personal jurisdiction pursuant to the "modified due process standard for mass torts" adopted on several occasions by courts in the Eastern District of New York in both tobacco and DES cases.  <u>Simon</u>, 86 F. Supp. 2d at 129-37; <u>In re DES Cases</u>, 79 F. Supp. 552, 574-77 (E.D.N.Y. 1992).  "New York's interest in this dispute is intense, and the burden on [defendant] is minimal compared to the difficulty of the plaintiffs' litigating in [Saudi Arabia]."  <u>Simon</u>, 86 F. Supp.2d at 137.

The courts of the United States in general, and New York in particular, have an undeniable and overwhelming appreciable interest in the World Trade Center litigation.  Id. at 131 (citation omitted).  Since New York has an appreciable state interest because this litigation raises serious issues that would affect or have a probable impact on the vindication of policies expressed in the laws of New York, the assertion of jurisdiction is *prima facie* constitutional.  Id.  Thus, the assertion of jurisdiction is considered constitutional unless, given the actual circumstances of the case, the defendant is unable to amount a defense in the forum state without suffering a relatively substantial hardship.  Id.  NCB can make no such showing here.

### E.        The Federal Plaintiffs Have Adequately Pled Causation

NCB further challenges the Federal Plaintiffs' causes of action based on the argument that the Federal Plaintiffs failed to plead that NCB's actions have a proximate causal link to the Attack.  In making this argument, NCB fundamentally misapprehends the elements of the Federal Plaintiffs' aiding and abetting and conspiracy theories, and ignores the allegations of the Complaint.  Under New York law, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme." Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985).

Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement." Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983) (emphasis added).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor.  Id.  Pursuant to these standards, NCB's participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that

terrorist organization, ties them inextricably to the Attack.[5]  As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the Federal Plaintiffs have properly and adequately alleged causation.  Accordingly, NCB's causation-based arguments must be rejected.

In keeping with the foregoing principles, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing financiers and sponsors of the terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot.  As the United States District Court for the District of Columbia observed in Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998):  "[a] plaintiff need not establish that the material support and resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises…[s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient…."  Id. at 18.  The Seventh Circuit adopted the same standard in Boim v. Quranic Literacy Inst., 291 F.3d 1000 (7th Cir. 2002), holding that plaintiffs who are victims of terrorism need show only that the defendant knew of the terrorist organization's illegal activities, desired to help those activities, and engaged in some affirmative act in support thereof. Id. at 1023.  More recently, the D.C. Circuit explicitly held that application of the "but for" standard of causation is manifestly improper in cases arising from the provision of material support to a terrorist organization.  Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1130 (D.C. Cir. 2004).  In support of its decision, the D.C. Circuit insightfully reasoned as follows:

> [T]he more likely situation is not Libya's hypothetical, involving one direct and one general state sponsor, but rather the case in which multiple foreign states claim to be providing only "general

---

[5] The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking as it as a whole."  Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962).

> support."  Such a case, in which application of a "but for" standard
> to joint tortfeasors could absolve them all, is precisely the one for
> which courts generally regard "but for" causation as inappropriate.

Id.  Pursuant to these standards, NCB's participation in al Qaida's conspiracy to commit terrorist

attacks against the United States, and aiding and abetting of that terrorist organization, ties them

inextricably to the Attack.  As the plaintiffs' injuries are indisputably the direct result of that

Attack, the plaintiffs have properly and adequately alleged causation.  Accordingly, NCB's

causation-based arguments must be rejected.

While unnecessary to establish liability over NCB given the asserted aiding and abetting

and conspiracy theories, it should be noted that the Complaint does specifically allege that the

Attack would not have been possible absent the sponsorship and support provided by NCB and

the other defendants.  According to the Complaint, "[a]bsent the material, support and resources

provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed

the financial resources, physical assets, membership base, technological knowledge,

communication skills, and global reach required to conceive, plan and execute the September

11th attack."  FAC ¶ 74.  NCB conveniently ignores these and similar allegations of the

Complaint in their Motion to Dismiss.  For purposes of the present motion, however, the

allegations of the Complaint must be accepted as true.

The Complaint also sufficiently alleges that the Attack was a foreseeable product of the

conspiracy in which NCB knowingly participated, and of NCB's aiding and abetting of al Qaida.

Indeed, the Complaint unambiguously asserts that the Attack was a "direct, intended and

foreseeable product" of that conspiracy.  FAC ¶ 72.  While at this stage it is not necessary for the

Federal Plaintiffs to provide evidence of its allegations, it should be noted that al Qaida had

unequivocally declared, through statements and actions, that the primary objective of its global

conspiracy was to attack the United States and kill its citizens.  For example, in 1996 and 1998,

al Qaida issued *fatwas*, or religious decrees, authorizing attacks against the United States and its

citizens.  In the 1998 *fatwa*, issued under the banner "The World Islamic Front For Jihad Against Jews And Crusaders," Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens, civilian or military, "in any country in which it is possible to do it… ."

During the years before the September 11 Attack, al Qaida followed through on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests, including:  the first World Trade Center bombing in 1993; the planned attacks against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993; the planned assassination of Pope John Paul II in the Philippines, including the Americans in his entourage; the planned assassination of President Clinton in the Philippines; the planned bombing of eleven to thirteen American airliners over the Pacific in January 1995; the car bombing of the U.S. military mission in Rihadh, Saudi Arabia in 1995; the truck bombing of the U.S. Housing area Khobar Towers in Dhahran, Saudi Arabia in 1996; the simultaneous bombings of the U.S. Embassies in Kenya and Tanzania in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide attack on the USS Cole in October of 2000.

As the conduct of terrorist acts against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is inconceivable to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as NCB is alleged to have done.[6]

---

[6]        Not surprisingly, NCB denies and challenges the allegations in the FAC.  Consistent with the precedents of the Second Circuit, the Federal Plaintiffs request the opportunity to conduct discovery if the Court, for some reason, does not assume the truth of all of the allegations in the FAC.

F.     **Subrogation is Appropriate Because Payments Have Been Made and the Federal Plaintiffs Have Identified the Subrogors in the Sealed Exhibits**

NCB sets forth three reasons why the Federal Plaintiffs lack standing to bring a subrogation action.[7]  First, NCB argues that the Federal Plaintiffs' right to subrogation "attaches only when payment is made."  NCB Brief at 16.  This argument is unpersuasive, because the FAC alleges that payments have been made.[8]  See FAC ¶¶ 541-597.  Second, NCB asserts that the "Plaintiffs and their insureds cannot recover the same damages."  NCB Brief at 16.  This issue is not an issue that is properly addressed through a motion to dismiss.  Further, the Federal Plaintiffs are not seeking to recover any of the subrogors' uninsured losses, except to the extent that any of the uninsured losses have been assigned to the Federal Plaintiffs.[9]  NCB's final argument is that it cannot assert defenses because the Federal Plaintiffs have failed to identify the subrogors and their claims.[10]  NCB Brief at 16.  This argument not properly addressed through a motion to dismiss.  More importantly, the Federal Plaintiffs have identified each subrogor, the payments made, and the policy numbers for each claim in the sealed Exhibits, which this Court

---

[7]        NCB fails to distinguish between property damage subrogation claims and workers' compensation subrogation claims. As a result, the Federal Plaintiffs do not make that distinction in this brief.

[8]        While NCB is correct in stating that an insurer's right of subrogation attaches upon a payment of an insured's loss, *see,e.g., Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577, 581 (N.Y. 1995), NCB ignores the fact that payments have been made in this case.  See FAC ¶¶ 541-597.  NCB also states that "Plaintiffs have asserted subrogation rights to 'future' payments."  NCB Brief at 16.  This statement does not affect the Federal Plaintiffs' right of subrogation.  The right of subrogation has already vested and the Federal Plaintiffs will only be able to collect what has been paid out prior to trial.
           In regard to plaintiff Valiant, NCB asserts that "Valiant likewise lacks standing as a subrogee because it has made no payments at all to its insureds."  NCB Brief at 17.  Although the First Amended Complaint states that "plaintiff Valiant anticipates that it may make payments to the insureds," Exhibit B in the RICO Statement for the SAAR Network Executives, which was filed on July 16, 2004, states that Valiant has in fact paid out $3,500.  See MDL Dkt. # 306, Exhibit B, p. 11.  According to Case Management Order No. 2, the RICO Statements are considered to be amendments to the FAC.  See MDL Dkt. # 247 at ¶ 14.  Therefore, NCB's assertion that Valiant lacks standing is unpersuasive.

[9]        If the subrogors were seeking to recover the same damages as the Federal Plaintiffs, such action would be inconsistent with one of the primary purposes of subrogation, which is "to prevent the insured from recovering twice for one harm, as it might if it could recover from both the insurer and from a third person who caused the harm."  *Winkelmann*, 85 N.Y.2d at 581 (citation omitted).  At some point in the future, there may have to be an accounting to determine whether there is any overlap between the subrogors' claims for uninsured losses, if any, and claims being asserted by the Federal Plaintiffs.  The possibility of such accounting, however, does not destroy the Federal Plaintiffs' right to subrogation.

[10]       As support for this argument, NCB relies on *Blue Cross & Blue Shield of N.J., Inc. v. Phillip Morris USA, Inc.*, 344 F.3d 211, 217-218 (2d Cir. 2003), in which the Second Circuit held that allowing a subrogation action to proceed was "improper" because the subrogee "*never identified* the actual number of subrogors or their names, much less provided any individualized information about the claims to which [the subrogee] alleged it was subrogated."  (emphasis added).  The Second Circuit's holding in *Blue Cross* is inapplicable to the Federal Plaintiffs' case, because the Federal Plaintiffs have provided the names of the subrogors and their respective claims in the sealed Exhibits.  See FAC ¶¶ 541-597 & nn.1-50.

has approved.[11]  See MDL Dkt. #s 426 & 434.; FAC ¶¶ 541-597 & nn.1-50.  The fact that the

Exhibits are sealed does not render the identifications ineffective, and neither NCB nor any other

defendant has inquired about viewing the information in the sealed Exhibits.  For these reasons,

this Court should find NCB's standing arguments to be unpersuasive.  To the extent that this

Court does not agree with the Federal Plaintiffs, the Federal Plaintiffs should be granted leave to

amend the FAC.[12]

> **G.     As Subrogees, The Federal Plaintiffs Have Standing Under RICO, And They Have Sufficiently Pled A Claim Against NCB**

Defendant NCB makes a two-pronged argument in opposition to the Federal Plaintiffs'

RICO claim:  (1) that the Federal Plaintiffs have failed to state a RICO claim under § 1962(c) or

(d); and (2) that the Federal Plaintiffs lack standing to bring a claim under RICO.  See Def's Br.

at 17-20.  At this point in the litigation, the Federal Plaintiffs have extensively addressed and

briefed RICO arguments analogous to those put forth by NCB.  Rather than burdening the Court

with a restatement of those same arguments herein, the Federal Plaintiffs incorporate those

arguments by reference.[13]

> **H.     The Federal Plaintiffs Have Sufficiently Pled Claims Against NCB for Conspiracy and Aiding and Abetting**

Defendant NCB further argues that the Federal Plaintiffs have failed to state a claim for

aiding and abetting and conspiracy.  The elements necessary to establish liability for a

defendant's participation in a conspiracy to commit a tort are:  (1) an agreement between two or

more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an

injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4)

---

[11]     Despite its argument that the Federal Plaintiffs have not identified the subrogors and their claims, NCB recognizes the existence of the sealed Exhibits in a footnote at the end of its section on subrogation.  NCB Brief at 17, n.23.  This recognition by NCB defeats its argument that the Federal Plaintiffs have not supplied the information it is seeking, because it has not sought the information in the Exhibits.

[12]     Even if the Federal Plaintiffs had completely failed to identify the subrogors and their claims, a dismissal for lack of standing would not be appropriate.

[13]     See Opposition to Mar-Jac Poultry, Inc. at 14-20 (filed on 07/09/04).

which overt act was done pursuant to and in furtherance of the overall scheme.  Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983).[14]

Civil liability for aiding and abetting will be imposed where:  (1) the party whom the defendant aids or abets performs a wrongful act that causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides substantial assistance to the wrongdoer.  Id. at 477.

When read as a whole, the Federal Plaintiffs' Complaint plainly and adequately states claims against NCB pursuant to aiding and abetting and conspiracy theories.  At the threshold, the Complaint alleges that NCB has "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons."  FAC ¶ 66.  Further, the Complaint alleges that the Attack "was a direct, intended and foreseeable product of a larger conspiracy among the defendants, to commit acts of international terrorism against the United States, its nationals and allies."  FAC ¶ 72.  Describing the conspiracy, the Complaint states that it "included the provision of material support and resources to defendant al Qaida and affiliated foreign states, FTOs, persons, organizations, commercial entities and other parties."  FAC ¶ 73.  The Complaint also sets forth the consequences of NCB's participation, in that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74.  Thus, the Complaint describes, in reasonable detail, the specific role of

---

[14]    Although New York law likely controls the vast majority of the Federal Plaintiffs' claims, Halberstam long has been regarded as the leading case on concerted action liability, and the New York courts have repeatedly relied on Halberstam in analyzing conspiracy and aiding and abetting claims.  See Wahad v. FBI, 813 F. Supp. 224, 233 (S.D. N.Y. 1993); Rich-Taubman Assoc. v. Stamford Rest. Operating Co., Inc., 587 F. Supp. 875, 879 n.5 (S.D. N.Y. 1984); Merrill Lynch  Futures, Inc. v. Kelly, 585 F. Supp. 1245, 1254 (S.D. N.Y. 1984).

NCB in al Qaida's conspiracy to commit terrorist attacks against the United States.  See also

FAC ¶¶ 285-297.

Read collectively, the forgoing allegations of the First Amended Complaint

unambiguously allege that NCB knowingly and intentionally aided and abetted and conspired

with al Qaida, in furtherance of the terrorist organization's calculated campaign to commit

terrorist attacks against the United States, and that the Attack was a direct, intended and

foreseeable product of that larger conspiracy.  These allegations satisfy the liberal pleading

requirements necessary to state a claim to conspiracy and aiding and abetting theories of tort

liability.

### I.  The Complaint States a Claim Against NCB Under Negligence

NCB also contends that it cannot be liable under a theory of negligence because the

Federal Plaintiffs do not allege or identify a duty owed by NCB to the Plaintiffs.  As is alleged in

the Complaint, NCB *knowingly* provided material support and resources to the terrorists who

carried out the Attack.  The idea that an individual has no duty to avoid committing acts of

murder or intentional destruction of another's property is almost incomprehensible.  As a general

principle of tort law, every individual has a duty to exercise reasonable care to avoid physical

harm to others' person and property.  See **Restatement (Second) of Torts** § 302.  Without a

doubt, NCB had a duty to recognize that its funds were being used to finance killings and

destruction of property.  There can be no question that the violations of law described in the

Federal Plaintiffs' Complaint state a claim sounding in both negligence and gross negligence.[15]

---

[15]    Without question, the knowing provision of financial services to a terrorist organization, and failure to implement and
procedures to prevent money laundering in support of terrorism, is inconsistent with the laws and relevant standards of numerous
countries in which NCB operated, either directly or through correspondent banking relationships.  See The Forty
Recommendations of the Financial Action Task Force on Money Laundering (1996), http://www.fatf-gafi.org/40Recs-
1996_en.htm.  Given the widely recognized obligation of banking institutions to engage in good faith efforts to prevent the
financing of terrorism, NCB unquestionably owed a duty of care to plaintiffs.

J.      **The Complaint States a Claim Against NCB Under the Anti-Terrorism and Effective Death Penalty Act**

Defendant NCB further argues that it is immune from liability under the Anti-Terrorism and Effective Death Penalty Act ("ATA") because: (1) it is an instrumentality of the Saudi government; and (2) the ATA's act of war exception bars Federal Plaintiffs' claims. The parties have extensively briefed and argued the question of NCB's entitlement to the protections of the FSIA. See MDL Docket #435, *Burnett Opposition*, pp. 10-16. The Federal Plaintiffs take no position on that question herein. However, to the extent that this Court determines that NCB is not an agency or instrumentality of the Kingdom of Saudi Arabia, NCB's arguments relative to the protections afforded under the FSIA necessarily fail.

Secondly, NCB's argument that the ATA's act of war exception bars the Federal Plaintiffs' claims is misplaced. Section 2336(a) provides that "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." Section 2331(4) defines "act of war" as "any act occurring in the course of -- (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." Although NCB fails to assert which subdivision of Section 2331(4) is applicable to the instant case, the September 11th Attack clearly was not a declared war or an armed conflict between two or more nations. Moreover, it is difficult to imagine that any reasonable person could conclude that the September 11th Attack was an armed conflict between military forces. To suggest that the innocent individuals who were killed or injured in the Attack constituted a "military force" is nonsense. Simply put, the September 11th Attack was a *terrorist* act which falls squarely within the scope of the ATA. See MDL Docket #505, *Burnett Opposition*, pp. 16-19.[16]

---

[16]     Defendant NCB also challenges the Federal Plaintiffs' claim under the Torture Victim Protection Act ("TVPA"). After further review, the Federal Plaintiffs find that the TVPA is not a viable cause of action against NCB.

### K.   The Complaint States Valid Claims For Assault and Battery, Intentional Infliction of Emotional Distress and Punitive Damages

Defendant NCB challenges the Federal Plaintiffs' claims under New York common law for assault and battery, intentional infliction of emotional distress, and punitive damages.[17]

First, NCB claims that the Federal Plaintiffs' causes of actions for assault and battery and intentional infliction of emotional distress are barred by New York's one-year statute of limitations.  Pursuant to relevant federal statutes, Federal Plaintiffs may simultaneously pursue claims under state common law and federal common law.  As to the federal common law claims, state statutes of limitations are inapplicable.  See Jones v. R.R. Donnelly & Sons Co., 124 S. Ct. 1836 (2004).  See also Louisiana Land & Exploration Co. v. Unocal Corp., 863 F. Supp. 306, 309 (E.D. La. 1994) (holding that suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even when brought by private parties).  Moreover, all of Federal Plaintiffs' claims arise from NCB's participation in the conspiracy to conduct terrorist attacks against the United States; a conspiracy designed to hide the participants from disclosure to the outside world.  As a result, the statute of limitations was tolled until the Federal Plaintiffs reasonably should have become aware of NCB's involvement within the conspiracy.  Once NCB's involvement was discovered, the Federal Plaintiffs brought this claim against NCB.  Given this fact, equitable principles require that the statute of limitations be tolled.  See Johnson v. Nyack Hospital, 86 F.3d 8, 12 (2d Cir. 1996) (holding that "[e]quitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").

NCB also claims that the Federal Plaintiffs are not entitled to punitive damages.  Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and

---

[17]   Given the number of lawsuits filed as a result of the September 11th Attack, and the consequent possibility that the Federal Insurance case could be transferred to a jurisdiction other than New York, the FAC sets forth several claims in separate counts, including punitive damages.  To the extent that these counts are not recognized as separate or independent theories under New York or federal common law, these counts should be liberally construed to modify and/or supplement other counts of the FAC.

others like him from similar conduct in the future." <u>Flatow v. Islamic Republic of Iran</u>, 999 F.

Supp. 1, 32 (D.D.C. 1998).  If the Federal Plaintiffs prove their allegations that NCB knowingly

financed and provided material support to al Qaida giving its purpose to commit terrorist acts

against innocent persons in the United States, NCB's conduct is sufficiently egregious and

outrageous to warrant the imposition of punitive damages.

**4.**      **CONCLUSION**

        For the reasons stated above, the Federal Plaintiffs respectfully request that the Motion to

Dismiss filed by National Commercial Bank be denied in all respects, with prejudice.

                                    Respectfully submitted,

                                    COZEN O'CONNOR


                                    By:   _____/s/_____
                                          STEPHEN A. COZEN, ESQUIRE
                                          ELLIOTT R. FELDMAN, ESQUIRE
                                          SEAN P. CARTER, ESQUIRE
                                          MARK T. MULLEN, ESQUIRE
                                          1900 Market Street
                                          Philadelphia, PA  19103
                                          Telephone:    (215) 665-2000
                                          Facsimile:    (215) 665-2013

                                    *Attorneys for the Federal Plaintiffs*

Dated:  October 29, 2004


PHILA1\2161525\1 117430.000

                                    - 24 -