# AL-QAEDA AND THE GLOBAL REACH OF TERRORISM

# HEARING

BEFORE THE

## COMMITTEE ON
## INTERNATIONAL RELATIONS
## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

————

OCTOBER 3, 2001

————

## Serial No. 107–50

————

Printed for the use of the Committee on International Relations



Available via the World Wide Web: http://www.house.gov/international_relations

———

U.S. GOVERNMENT PRINTING OFFICE

75–562PDF                    WASHINGTON : 2001

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON INTERNATIONAL RELATIONS

HENRY J. HYDE, Illinois, *Chairman*

BENJAMIN A. GILMAN, New York
JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
CHRISTOPHER H. SMITH, New Jersey
DAN BURTON, Indiana
ELTON GALLEGLY, California
ILEANA ROS-LEHTINEN, Florida
CASS BALLENGER, North Carolina
DANA ROHRABACHER, California
EDWARD R. ROYCE, California
PETER T. KING, New York
STEVE CHABOT, Ohio
AMO HOUGHTON, New York
JOHN M. McHUGH, New York
RICHARD BURR, North Carolina
JOHN COOKSEY, Louisiana
THOMAS G. TANCREDO, Colorado
RON PAUL, Texas
NICK SMITH, Michigan
JOSEPH R. PITTS, Pennsylvania
DARRELL E. ISSA, California
ERIC CANTOR, Virginia
JEFF FLAKE, Arizona
BRIAN D. KERNS, Indiana
JO ANN DAVIS, Virginia

TOM LANTOS, California
HOWARD L. BERMAN, California
GARY L. ACKERMAN, New York
ENI F.H. FALEOMAVAEGA, American
    Samoa
DONALD M. PAYNE, New Jersey
ROBERT MENENDEZ, New Jersey
CYNTHIA A. McKINNEY, Georgia
SHERROD BROWN, Ohio
EARL F. HILLIARD, Alabama
BRAD SHERMAN, California
ROBERT WEXLER, Florida
JIM DAVIS, Florida
ELIOT L. ENGEL, New York
WILLIAM D. DELAHUNT, Massachusetts
GREGORY W. MEEKS, New York
BARBARA LEE, California
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
EARL BLUMENAUER, Oregon
SHELLEY BERKLEY, Nevada
GRACE NAPOLITANO, California
ADAM B. SCHIFF, California
DIANE E. WATSON, California

THOMAS E. MOONEY, SR., *Staff Director/General Counsel*
ROBERT R. KING, *Democratic Staff Director*
JOHN MACKEY, *Investigative Counsel*
LIBERTY DUNN, *Staff Associate*

# C O N T E N T S

————

Page

### WITNESSES

Vincent Cannistraro, Former Chief of Counterterrorism Operations, Central
    Intelligence Agency ...................................................................................................... 16
Charles Santos, Former Special Assistant to The Undersecretary for Political
    Military Affairs, United Nations ................................................................................ 20
Oliver "Buck" Revell, Former Associate Director in Charge of Investigative
    and Counter-Intelligence Operations, Federal Bureau of Investigation ......... 25

### LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

The Honorable Henry J. Hyde, a Representative in Congress from the State
    of Illinois, and Chairman, Committee on International Relations: Prepared
    statement ........................................................................................................................ 3
The Honorable Tom Lantos, a Representative in Congress from the State
    of California: Material submitted for the record ...................................................... 6
The Honorable Diane E. Watson, a Representative in Congress from the
    State of California: Prepared statement ................................................................... 13
Vincent Cannistraro: Prepared statement ..................................................................... 18
Charles Santos: Prepared statement ............................................................................... 23
Oliver "Buck" Revell: Prepared statement .................................................................... 27
The Honorable Gregory W. Meeks, a Representative in Congress from the
    State of New York: Prepared statement ................................................................... 56
The Honorable Robert Menendez, a Representative in Congress from the
    State of New Jersey: Prepared statement ................................................................ 66

### APPENDIX

The Honorable Edward R. Royce, a Representative in Congress from the
    State of California: Prepared statement ................................................................... 69
The Honorable Joseph R. Pitts, a Representative in Congress from the State
    of Pennsylvania: Prepared statement ....................................................................... 69
The Honorable Darrell E. Issa, a Representative in Congress from the State
    of California: Prepared statement ............................................................................. 70

(III)

# AL-QAEDA AND THE GLOBAL REACH OF TERRORISM

————

## WEDNESDAY, OCTOBER 3, 2001

House of Representatives,
Committee on International Relations,
*Washington, DC.*

The Committee met, pursuant to call, at 10:15 a.m. In Room 2172, Rayburn House Office Building, Hon. Henry J. Hyde (Chairman of the Committee) presiding.

Chairman HYDE. The Committee will come to order.

With the September 11 attacks on the United States, the once-distant prospect of terrorism has become an inescapable reality for all Americans. The impact of this assault is greater than the tally of physical destruction, greater even than the tragic loss of life. The images forced into our lives are permanent ones. The realization that human beings are capable of performing such deeds forces us to accept that evil still exists among us, especially in our modern era when many had hoped it might be abolished altogether.

We understand that the challenge before us is a deeply entrenched one, that we face more than a simple emergency. Many have said that we are at the beginning of a new era, one in which our daily lives and routines will be altered significantly.

But what does this mean? Are we now to live in permanent fear in our own country and adopt a defensive crouch as part of our national character? Do we remake our country and communities into fortresses? Must we sacrifice our entire foreign policy agenda in order to address this suddenly urgent problem?

Clearly, such responses are unacceptable to a free people. Even more, they are unnecessary. Without doubt, we are faced with a malevolent and implacable enemy, but we should not let its sudden emergence or its embrace of horror distort our deliberations. We must remember that we have overcome far more powerful enemies in the past, from Nazi Germany and Imperial Japan to the Soviet Union. Thus, it seems to me this latest challenge is well within our capacity to overcome, but only if we are fully committed to the struggle that lies ahead.

As President Bush has correctly stated, terrorism is not a problem that will be solved easily or quickly. We cannot eliminate this threat overnight because it didn't arise overnight. It has taken root in many places, growing steadily as our attention was focused elsewhere, drawing strength from a bottomless reservoir of hatred. Given the nature of the threat, we should not expect quick victories or even a final victory. I have no doubt we will eliminate Osama

2

bin Laden and the al-Qaeda network, but we should not make the mistake of believing that our battle will then be won.

Let us begin by accepting there is no single enemy to be defeated, no one network to be eliminated. Al-Qaeda is but our most prominent opponent, but its outlook is shared by many others who are equally committed to our destruction. If we believe that our safety can be secured by destroying any one organization or any single person, we will only ensure that we will remain unsafe and unprepared once again. For we know now that we have permanent, mortal enemies who will seize upon our vulnerabilities to bloody us, to murder our citizens, to commit horror for the purpose of forcing horror upon us.

There can be no dispute that we were unprepared for the assault upon us. In retrospect, the warning signs may seem obvious, but there is no person or organization we can saddle with the blame. We as a Nation did not heed them.

We are now moving to correct our failings and to prepare ourselves for the task ahead. Our hopes and prayers are with our men and women in uniform on whose strength and dedication to duty the safety of our country rests, but we cannot place this burden entirely on their shoulders. If we are to be successful, our enemy must be engaged in many areas far from any battlefield, and our efforts must draw upon the energies and resources of the entire country. Our strategy, plans, and actions must be comprehensive, deliberate and formulated for the long-term. We must be prepared not only to protect ourselves from new assaults, not only to intercept and frustrate them, but to eliminate new threats at their source. This must be a permanent campaign, similar to the ancient one humanity has waged against disease and its never-ending assault upon our defenses.

The optimism that is so integral a part the American outlook often leads some to assume an image of the world that is at odds with reality, one that is peaceful and welcoming without effort. I hope that illusion is now gone. In its place should be a new recognition that peace and security exists for us only because we have created them. We have wrested them from an often hostile world, and they will continue only so long as we are prepared to defend them. The world will be safe for us only if we are prepared to make it safe.

America has always triumphed over her enemies, and I have no doubt we will do so again. But to do so, we must cast aside any illusions of an easy victory. We must take up our responsibilities and commit ourselves to fully and completely prosecuting the conflict ahead.

We did not seek this conflict, and we cannot run from it. We have no choice but to take it up and to prevail. We have more at stake than even our own safety and that of our children and grandchildren. For this is a battle for our future and the future of our country.

I would now like to recognize Mr. Lantos for an opening statement. Because of time constraints, I would ask that other Members place their opening statements in the record, except Mr. Gilman who has a statement and anybody who else has a statement.

[The prepared statement of Mr. Hyde follows:]

3

Prepared Statement of the Honorable Henry J. Hyde, a Representative in Congress from the State of Illinois, and Chairman, Committee on International Relations

With the September 11 attacks on the United States, the once-distant prospect of terrorism has become an inescapable reality for all Americans. The impact of this assault is greater than the tally of physical destruction, greater even than the tragic loss of life. The images forced into our lives are permanent ones. The realization that human beings are capable of performing such deeds forces us to accept that evil still exists among us, especially in our modern era when many had hoped it might be abolished altogether.

We understand that the challenge before us is a deeply entrenched one, that we face more than a simple emergency. Many have said that we are at the beginning of a new era, one in which our daily lives and routines may be altered significantly.

But what does this mean? Are we now to live in permanent fear in our own country and adopt a defensive crouch as part of our national character? Do we remake our country and our communities into fortresses? Must we sacrifice our entire foreign policy agenda in order to address this suddenly urgent problem?

Clearly, such responses are unacceptable to a free people. Even more, they are unnecessary. Without doubt, we are faced with a malevolent and implacable enemy, but we should not let its sudden emergence or its embrace of horror distort our deliberations. We must remember that we have overcome far more powerful enemies in the past, from Nazi Germany and Imperial Japan to the Soviet Union. Thus, it seems to me that this latest challenge is well within our capacity to overcome, but only if we are fully committed to the struggle that lies before us.

As President Bush has correctly stated, terrorism is not a problem that will be solved easily or quickly. We cannot eliminate this threat overnight because it did not arise overnight. It has taken root in many places, growing steadily as our attention was focused elsewhere, drawing strength from a bottomless reservoir of hatred. Given the nature of the threat, we should not expect quick victories or even a final victory. I have no doubt that we will eliminate Osama bin Laden and the al-Qaeda network, but we should not make the mistake of believing that our battle would then be won.

Let us begin by accepting that there is no single enemy to be defeated, no one network to be eliminated. Al-Qaeda is but our most prominent opponent, but its outlook is shared by many others who are equally committed to our destruction. If we believe that our safety can be secured by destroying any one organization or any single person, we will only ensure that we will remain unsafe and unprepared once again. For we now know that we have permanent, mortal enemies who will seize upon our vulnerabilities to bloody us, to murder our citizens, to commit horror for the purpose of forcing horror upon us.

There can be no dispute that we were unprepared for the assault upon us. In retrospect, the warning signs may seem obvious, but there is no person or organization we can saddle with the blame. We as a nation did not heed them.

We are now moving to correct our failings and to prepare ourselves for the task ahead. Our hopes and prayers are with our men and women in uniform on whose strength and dedication to duty the safety of our country rests, but we cannot place this burden entirely on their shoulders. If we are to be successful, our enemy must be engaged in many areas far from any battlefield, and our efforts must draw upon the energies and resources of our entire country. Our strategy, plans, and actions must be comprehensive, deliberate, and formulated for the long-term. We must be prepared not only to protect ourselves from new assaults, not only to intercept and frustrate them, but to eliminate new threats at their source. This must be a permanent campaign, similar to the ancient one humanity has waged against disease and its neverending assault on our defenses.

The optimism that is so integral a part of the American outlook often leads some to assume an image of the world that is at odds with reality, one that is peaceful and welcoming without effort. I hope that illusion is now gone. In its place should be a new recognition that peace and security exist for us only because we have created them. We have wrested them from an often hostile world, and they will continue only so long as we are prepared to defend them. The world will be safe for us only if we are prepared to make it safe.

America has always triumphed over her enemies. I have no doubt that we will do so again. But to do so, we must cast aside any illusions of an easy victory, we must take up our responsibilities, and commit ourselves to fully and completely prosecuting the conflict ahead.

We did not seek this conflict, and we cannot run from it. We have no choice but to take it up and to prevail. We have more at stake than even our own safety and

4

that of our children and grandchildren. For this is a battle for our future and for the future of our country.

I would now like to recognize Mr. Lantos for an opening statement. [Because of time constraints, I would ask that other members place their opening statements in the record]. And then we will turn to our witnesses and what I expect will be their very enlightening testimony.

Ms. McKINNEY. I have a statement, Mr. Chairman.

Chairman HYDE. Of course. We will hear all statements.

Mr. LANTOS. Thank you, Mr. Chairman.

Let me first identify myself with your excellent opening statement. In the last 3 weeks, bipartisanship has permeated this city. Let the record show that on the House International Relations Committee bipartisanship was the order of the day since the very first day of this congressional session, and it will continue to be.

Mr. Chairman, I want to thank you for holding this hearing. Winning the war on terrorism requires that we in Congress devote our full and undivided attention to this daunting endeavor. To this end, I believe that our Committee must play a key role and I urge you to follow this hearing up with a series of others devoted to this topic.

Mr. Chairman, the war on terrorism will be nasty, brutish and anything but short. It has already involved some 6,000 American casualties, and it will involve many more. It attacks our strength, our intelligence, our patience and our commitment. But, in the end, I have no doubt that the American people are prepared to bear the costs of this campaign; and I am supremely confident that the United States, joined by our true friends, will prevail.

I declare, Mr. Chairman, that we must wage the war against terrorism in a sequential fashion. First, we must find and destroy the terrorists that perpetrated September 11; and, in this regard, I urge the Administration not only to target Osama bin Laden and his al-Qaeda organization but the Taliban as well. The Taliban has chosen to be on the side of the terrorists, and they have chosen to share their fate.

At the same time, Mr. Chairman, we must recognize that defeating all terrorist organizations of global reach is an indispensable component of the struggle. As the President said in his address to our joint session 2 weeks ago, and I quote,

"Our war on terror begins with al-Qaeda, but it does not end there. It will not end until every terrorist group of global reach has been found, stopped and defeated."

In this connection, Mr. Chairman, I would like to place in the record from *The Washington Post* this morning an excellent article by Jim Hoagland on terrorism. This article, among others, points out the risk of building what appear like coalitions.

Let me quote:

"The first risk of building a broad strategic coalition is that the construction becomes an end in itself, that photos of parades of foreign ministers shaking hands and expressing sympathy get defined as success and overtake effective action as the ultimate goal."

He goes on to say that,

5

"American policy will now drift into incoherence if it continues to aim at assembling the broadest possible coalition and co-operating seriously with regimes that are broken beyond repair. With us or against us, the American President warned the world 2 weeks ago. Others will believe those words only if Mr. Bush shows he meant them."

In this connection, Mr. Chairman, I would like to place in the record a letter to Secretary Powell by our former Speaker Newt Gingrich.

Newt Gingrich calls on Mr. Powell and the President to include both Hamas and Hezbollah in the list of international terrorist organizations, since, I quote, "both groups publicly embrace and exalt suicide bombers who kill innocent civilians and are symbols of terrorist violence."

Now a great deal has been made of the fact that during the Second World War we made common cause with Stalin against Hitler. We did that, Mr. Chairman, but not as long as Stalin was in cooperation with Hitler. And I think it is extremely important that organizations which have engaged in terrorist activities must cease and desist all of these activities before they can be considered as part of an effort to engage in this global struggle.

The Congress and the American people are prepared to trust the President with extraordinary powers during these extraordinary times. I urge the Administration to remain true to the principles it has set forth in the President's address to our joint session and not falter in this fight. We cannot compromise our principles. We cannot pretend that we do not see terrorist organizations for what they are. We must not sweep the ugly truth under the rug. There are no good terrorists and bad terrorists. There are terrorist organizations and in a sequential fashion they must and will all be defeated.

Thank you, Mr. Chairman.

Chairman HYDE. Mr. Gilman.

Mr. GILMAN. Thank you, Mr. Chairman. And I want to thank the Chairman for conducting this hearing in a timely manner and for your very erudite statement at the opening of the hearing.

The panel that has been assembled here cannot be more distinguished and more——

Chairman HYDE. Excuse me, Mr. Gilman.

Without objection, the article by Mr. Hoagland and the letter referred to by Mr. Lantos will be made a part of the record.

Mr. LANTOS. Thank you.

[The information referred to follows:]

6

Copyright 2001 The Washington Post
The Washington Post

**October** 03, 2001, Wednesday, Final Edition

**SECTION:** EDITORIAL; Pg. A31

**LENGTH:** 785 words

**HEADLINE:** An Ally's Terrorism

**BYLINE:** Jim **Hoagland**

**BODY:**

Improvised in the horror and shock of the Sept. 11 terror attacks on America, the Bush administration's initial diplomatic strategy bought valuable time and space for the more serious and sustained response to come. So let us praise that strategy and prepare to bury it as soon as its limited utility is exhausted.

Napoleon warned that nothing lasts as long as the temporary. The first risk of building a broad strategic coalition is that the construction becomes an end in itself -- that photos of parades of foreign ministers shaking hands and expressing sympathy get defined as success and overtake effective action as the ultimate goal. That is a temptation President Bush and Secretary of State Colin Powell should resist without great trouble. Less obvious but equally dangerous are the future risks involved in reaching out too broadly now -- the long-term peril of recruiting and rewarding nations that do not share U.S. values and interests. Some countries sign up primarily to stall and limit U.S. action, not to facilitate it.

There's the rub of the coalition Bush and Powell have assembled in all necessary haste. They have recruited to fight terrorism regimes that practice or tolerate terrorism as a matter of policy. The inclusion of such states at the center of the coalition undermines the sweeping and noble war aims enunciated by Bush, who has promised not to divide terrorists into bad and good camps.

The difficulties of keeping that promise -- and the huge stakes this still-developing

7

campaign has for South Asia -- were blasted home Monday by a car bomb and guerrilla assault that wrecked the state assembly in Srinagar in Indian-administered Kashmir. At least 38 persons were killed in a gruesome attack on a building that, for Kashmir inhabitants, matches the Pentagon and the World Trade Center in symbolic value.

You would think the radical Islamic guerrillas who claimed responsibility for Monday's attack -- the Pakistani-based Jaish-e-Muhammed group -- might deserve to be at least called terrorists. India implored the United States to put the group on its terrorist list for earlier outrages. But Washington declined out of fear that such action would undermine the regime of Gen. Pervez Musharraf and complicate U.S. diplomatic goals.

This is diplomacy without vision and without the roots needed for a long, difficult struggle against terrorism. It is delusional to think that the United States can reform the Musharraf regime or elements in the Taliban regime in neighboring Afghanistan into responsible partners to fight terrorism.

This is the lure of the quick fix. Previous administrations pursued it in building up Saddam Hussein to protect the Arab world against Iran, in counting on the Iraqi army to take care of Saddam in the wake of the Gulf War, in betting that Mikhail Gorbachev's reform communism could keep the Soviet Union together and in dozens of other instances of short-termism.

Washington knows full well that Pakistan actively supports Jaish-e-Muhammed and other guerrilla organizations that see terror as the only effective tool they have against India. Members of these groups freely tell Western journalists that they have trained in camps in Afghanistan run by Pakistani intelligence services and then been deployed into Kashmir. These terrorists are creatures of Musharraf and the Taliban and soulmates of Osama bin Laden.

Theoretically it should be possible to set them against each other. But Musharraf sees the Taliban's opponents in the Northern Alliance as agents of India working for his mortal foes. Survival for him means seeming to go along with U.S. goals while making sure they do not actually get carried out. As a bonus, stroking Musharraf so openly makes the stronger relationship Washington should be creating with India more difficult.

American cooperation with Stalin in World War II is frequently cited as an example of the necessity of dealing with the devil in times of crisis. But the United States did not make the Soviet Union a strategic ally while Stalin was still cooperating with Hitler. There has yet to be a serious tangible act by Pakistan to break its alliance with terror and earn the kind of trust the administration has ostensibly extended.

Short-term goals of initial positioning, both military and political, have largely been met. American policy will now drift into incoherence if it continues to aim at assembling the broadest possible coalition and cooperating seriously with regimes that are broken beyond repair.

8

September 25, 2001



Department of State
2201 C St NW
Washington, DC 20520

Dear Mr. Secretary:

I strongly approve of the steps taken last night to freeze the funds of various terrorist groups. This is a powerful step to cut them off from financial support.

However, it was very disturbing to note the absence of Hamas and Hesbollah from the list. These are two of the best-known international terrorist organizations in the world, receiving money from international sources. Both groups publicly embrace and exalt suicide bombers who kill innocent civilians and are symbols of terrorist violence.

The President, in his magnificent speech to the Congress, made clear that America is engaged against terrorism and not merely seeking revenge for the September 11 attack. He made it clear this is a moral cause and that countries could chose to be on our side or the side of terrorism.

Excluding these terrorist organizations weakens last night's action and undermines the moral cause that the President has outlined so strongly.

Both Hamas and Hesbollah have recently repeated their commitment to suicide bombing and to terrorism. To ignore them will be to weaken the moral basis of our efforts. Furthermore, it will signal to much of the world that the United States abandons it friends to appease some of its enemies. Finally it will embolden both groups to return to the use of terror against Israel which will further enflame the region.

Please reconsider and add these two groups to the list immediately for both the moral and the

9

Mr. GILMAN. This panel that we have assembled cannot be more distinguished and more expert in their appropriate areas. Of course, there is no way to turn the clock back at this time. We can rebuild buildings, but the nearly 6,000 who lost their lives in the September 11 attacks cannot be brought back to life. Their families cannot be put back together. In my congressional district, I have 98 families who have lost close members of their family, creating a devastating impact upon them.

The September 11 barbaric attacks demonstrate clearly that terrorism is not just a part of modern life. It is just not a cost of doing business for the world's only remaining superpower. It cannot be just factored into our foreign policy as just another problem. Terrorism is indeed a threat to our Nation's security and to the security of nations throughout the world.

September 11 and other attacks similar to it affect our way of life, our economy, our perceptions of safety, our collective national psyche and our whole national fabric. Certainly we should have been able to have seen this attack coming. With all the resources that our Government has, looking at Osama bin Laden and his terrorist network, especially since the August, 1998, bombings of our two embassies in Africa, the former bombing in the World Trade Center, it is almost beyond belief how this plot could have been missed.

Clearly, some in the Government believe that bin Laden was in a box, unable to communicate with his followers in over 60 countries. Those assertions were sadly mistaken, and on September 11 that was demonstrated. At some point, we will need to consider why anyone in our Government ever believed those assertions.

Of course, we cannot turn the clock back, but we can ourselves work to make certain that nothing of this nature ever happens again. I welcome the comments of our witnesses of what can and should be done to this threat. It is hoped that at this hearing they can bring some clarity to what should be the objectives of our U.S. response to the September 11 attacks.

I ask our panelists to consider some of the following questions:

Should our objective be narrow, to decapitate the bin Laden network leadership network in Afghanistan, while avoiding being punitive toward the Afghan people? Or should the objective be broader, to take down the Taliban regime itself as a signal to other state sponsors that they will lose their regimes if they harbor such groups as bin Laden's? And would that signal be appropriately understood or is the Taliban regime so weak that the lesson will not be absorbed by other regimes such as Iran?

Is one name contingent on the other? Can we get bin Laden and his top lieutenants without first changing the regime in Afghanistan? Alternatively, is there some combination of U.S. military or covert action that might compel the Taliban to hand over bin Laden?

Perhaps an even broader question is whether the dismantling of bin Laden's top echelons will result in the kind of response we are seeking. Does the answer not lie in better law enforcement cooperation among the 60 or so countries where these networks operate? Will going to the source in Afghanistan eliminate the threat for the network? And then what other states are harboring al-Qaeda?

10

Let me also say something about rewarding terror. Especially where democratic governments and our friends are under pressure, we cannot take any actions or begin to contemplate any actions which would give the impression of rewarding terror or encouraging others to reward terror. If someone must make peace with the terrorists, if they can trust the change in someone else's heart, that must be for them to decide, not for us.

So let me be explicit.

Chairman HYDE. The gentleman's time has expired.

Mr. GILMAN. I am about to close. With your indulgence, Mr. Chairman, just 30 seconds.

As to Mr. Arafat, who used violence against innocents, terror to advance his political goals, only the Government of Israel, which is politically responsible in a democratic way to the potential victims of terror, can decide if he is worthy of trust.

Accordingly, we face a set of difficult issues as we try to determine how to respond to the September 11 disasters, and we look forward to the assessments by our witnesses.

Thank you, Mr. Chairman.

Chairman HYDE. Mr. Ackerman?

Mr. ACKERMAN. Mr. Chairman, I will pass, unless provoked.

Chairman HYDE. Please don't provoke Mr. Ackerman.

Mr. Royce?

Mr. ROYCE. I will pass.

Chairman HYDE. God love you, Mr. Royce.

Ms. McKinney from Georgia.

Ms. MCKINNEY. Thank you, Mr. Chairman. I would ask if I could have Mr. Ackerman's and Mr. Royce's time.

Mr. ROYCE. Reclaiming my time, Mr. Chairman. I am afraid I have been provoked.

Chairman HYDE. The gentlelady is recognized for 5 minutes.

Ms. MCKINNEY. Thank you, Mr. Chairman.

I would like to congratulate you for having this important hearing on the global reach of terrorism.

I also would like to take this opportunity to make a recommendation that we have another hearing on a topic that I feel is vitally important. That is the issue of domestic terrorism. Domestic terrorism is probably a more widespread worldwide phenomenon than international terrorism. But because international terrorism has had a direct impact on U.S. interests, it is the primary focus of intelligence and defense agencies.

As we all learned to our horror on September 11th, no nation is immune from the manifestations of hatred and rage that comes from other parts of the world. But what about the terror that originates from sources that are purely domestic in nature? In the last decade or so, we have seen a rise in anti-U.S. Government sentiments, anti-Government from the standpoint of militia groups, the Aryan Nation, white supremists, skinheads, the KKK. In the Oklahoma City bombing in which 169 died, the two who were responsible for the crime, Timothy McVeigh and Terry Nichols, were both affiliated with right-wing militia movements.

In 1996, a pipe bomb exploded at Centennial Olympic Park in Atlanta, Georgia, killing two people and injuring more than 100 others. The FBI said that the pipe bomb looked homemade, with nails

and screws attached. They suspected domestic terrorists. Even after a $500,000 reward was offered, there still has been no breakthrough in the Atlanta Olympic bombing case.

Violent protests in the form of arson, fire bombing and vandalism against abortion clinics started in the early 1970s in the United States. Recent cases involving the assassination and attempted murder of abortion providers in both the U.S. and Canada have shown that perpetrators may be sheltered by a network of sympathizers.

What about the victimization of gays and lesbians based upon their sexual orientation, which includes harassment, vandalism, robbery, assault, rape and even murder? Shouldn't this be considered terrorism as well?

Well, according to Title 22 of the U.S. Code, it is considered terrorism. That statute contains the following definitions: The term terrorism means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents usually intended to influence an audience. The term terrorist group means any group practicing or that has significant subgroups that practice international terrorism.

The U.S. Government has employed this definition since 1983. COINTELPRO was the FBI's secret program and arguably would fall under Article 22 of this definition of terrorism.

The FBI and other Federal agencies set out to eliminate political opposition inside the United States. When traditional modes of repression, exposure, blatant harassment and prosecution for political crimes failed to counter the growing insurgency and even helped to fuel it, the Bureau of Investigation took the law into its own hands and secretly used fraud and force to sabotage constitutionally protected political activity.

It is our patriotic duty to continue to examine our own history and search for improvements in our policies even in this difficult time. We will win the battle against terrorism all the more quickly for doing so and establish development of justice with a global reach.

I have offered a bill to allow victims of the September 11 attacks to seek compensation through U.S. courts from whatever nations may have sponsored these attacks. Victims and their families already have the right to seek restitution from nations on the State Department's countries of concern list, namely Cuba, Iraq, Iran, Syria, North Korea, Libya and Sudan. However, if a terrorist activity is sponsored by a state that is not on this list, as appears to be the case with regard to September 11, the victims have no opportunity to seek compensation through U.S. courts. H.R. 2947 would correct that by permitting U.S. citizens to seek justice from any country that propagates or sponsors terrorist activity.

We cannot selectively use the term terrorism nor can we or should we protect nations that harm or support terrorism. Tragically, experience has shown us that American citizens are in great danger in many parts of the world. The current list of seven nations as state sponsors of terrorism is proving inadequate and needs to be expanded to include the right for U.S. citizens to seek redress against any and all nations that harm them.

Chairman HYDE. The gentlelady's time has expired.

12

Ms. McKINNEY. Thank you, Mr. Chairman.

We need to study terrorism and understand it and eliminate it from the face of the earth.

Chairman HYDE. The gentleman from New Jersey, Mr. Smith.

Mr. SMITH OF NEW JERSEY. I, too, will put my statement in the record [no statement submitted for the record]; and I hope other Members—there are at least an hour's worth of opening statements still remaining. We have three very distinguished witnesses that I am looking forward to hearing from, and I would hope that other Members would take your admonition in the beginning and put their statements into the record.

Chairman HYDE. The Chair thanks Mr. Smith.

Mr. Sherman of California.

Mr. SHERMAN. Thank you, Mr. Chairman. I will be brief.

There are 6 billion people on this planet and a few will want to kill Americans because, as the *National Review* states, we are resented for our power, envied for our wealth and hated for our liberty. Since we cannot control all 6 billion people, we must instead focus on a foreign policy that puts the responsibility on the roughly 200 governments on this planet that we can hold responsible.

Homeland security is important. But just as no hockey goalie can stop every shot, if we had a perfect homeland security system but we still allowed terrorist groups to organize these attacks, some of those attacks would be successful. It is also not enough to go after just the terrorist groups, because new terrorist groups can spring up.

As I mentioned, there are 6 billion people on the planet and a tiny percentage hate us. Therefore, we must go after the Taliban not only because of justice—they have been coconspirators in the death of 7,000 Americans—but also to set example for other regimes.

Finally, Mr. Chairman, we cannot and dare not change our foreign policy, because to placate Mr. bin Laden and his gang is impossible. They want nothing less than to turn the entire world into a giant Afghanistan. To placate them is dishonorable. Because when Pearl Harbor was attacked, we sought not peace but victory. And, in this case, we have faced three times as many American casualties.

But finally, Mr. Chairman, if we change our policy in this instance, we simply whet the appetite of those who want to change the policies of the world's only superpower toward Kosovo or Sri Lanka, Taiwan or Sumatra. The list goes on and on. If it ever becomes known that by killing Americans one can change the policy of the world's only superpower, then this is just the beginning.

I look forward to this Committee working toward an effective way of setting an example with the Taliban regime. Thank you.

Chairman HYDE. Ms. Ros-Lehtinen of Florida.

Ms. ROS-LEHTINEN. Thank you very much, Mr. Chairman.

It has been repeatedly said that the United States lost our innocence on Tuesday, September 11. The sense of security and stability that stemmed from being the Cold War victor and global superpower was destroyed in less than an hour—the span of time between the attack on the first tower of the World Trade Center and that on the second tower and then later the Pentagon.

13

In this brief moment in history, the United States and the American people realize that anything and everything is possible. We now fully understand that terrorists have no boundaries and no sense of remorse. Terrorists place no value on human life. As the September 11 attacks taught us, no country or no target is immune from this cancer.

To terrorists, any means is justifiable. Suddenly, the warnings and analysis by experts on the potential use of chemical and biological weapons and potential for nuclear terrorism were no longer viewed as abstract arguments or action film plots. Suddenly, nuclear-related terrorism became a vivid and very real threat.

The Subcommittee which I chair will be holding a hearing at 1 o'clock today in this same room on nuclear terrorism and on the International Atomic Energy Agency. We will work to ensure that the physical protection of nuclear materials and countering the illicit trafficking in these radioactive elements is underscored.

Secretary of Energy Spencer Abraham said we know that our security and that of nations around the world largely depends upon what this agency does to prevent the proliferation and misuse of nuclear materials. We cannot assume that tomorrow's terrorists' acts will mirror those we have just experienced, and that is why the work of the International Atomic Energy Agency is so pivotal.

How real or imminent is the threat of nuclear-related terrorism? We will be discussing these topics today, and I hope that some of the audience will be with us later on today at 1 o'clock.

I thank the Chair.

Chairman HYDE. I thank the gentlelady.

Mr. Jim Davis of Florida.

Mr. DAVIS. I pass.

Chairman HYDE. Thank you, Mr. Davis.

Mr. Schiff of California.

Mr. SCHIFF. Mr. Chairman, in the interest of getting to our witnesses, I will pass as well.

Chairman HYDE. Thank you, Mr. Schiff.

Mr. Meeks of New York. Not here.

Mr. Berman of California.

Mr. BERMAN. Pass.

Chairman HYDE. Ms. Watson.

Ms. WATSON. Mr. Chairman, I would like to submit my statement for the record. I pass.

Chairman HYDE. The Chair thanks you. Without objection, it shall be received.

[The prepared statement of Ms. Watson follows:]

PREPARED STATEMENT OF THE HONORABLE DIANE E. WATSON, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA

Mr. Chairman, I want to thank you and the Ranking Minority Member, Mr. Lantos, for holding this important and timely hearing. The events of September 11 have forever demonstrated that our homeland is not invulnerable to attack from the outside. More direct attacks on American citizens on American soil are, sadly, likely in the future. We now must prepare ourselves to deal with this reality.

In the face of this new threat, our nation does not have a comprehensive, integrated plan and government structures in place to respond effectively to homeland terrorist attacks. The President has recommended the creation of a cabinet level Office of Homeland Security. The effectiveness of this new office will be predicated on the power and authority that the Congress and President vest in it. Perhaps most

14

critical to the success or failure of a comprehensive homeland security policy is our willingness to engage in an honest reexamination of the role and effectiveness of our government structures and military doctrine in the post Cold War world.

It is therefore my hope that this hearing, besides providing us with important information on Al Qaeda and international terrorism, will commence the public dialog on how our nation can best begin to reallocate its resources to meet the new challenges.

Chairman HYDE. Mr. Tancredo is not here.

Mr. Kerns is not here.

Mr. Burton of Indiana.

Mr. BURTON. Mr. Burton passes, Mr. Chairman.

Chairman HYDE. Thank you, Mr. Burton.

Mr. Nick Smith of Michigan.

Mr. SMITH OF MICHIGAN. Mr. Chairman, just very briefly. I and 10 other Members of a congressional delegation just returned from a trip to Moscow, Russia and to Turkey and Rome, to meet with the former King Shah.

One issue that concerns me is that one of the chief sources of terrorism is the radical religious schools in Pakistan and in Afghanistan that often take on orphans and young boys to indoctrinate and, if you will, brainwash over several years. So I hope we can get the comments from the witnesses today on that issue.

Certainly, the CIA and other intelligence agencies seem to have adopted an excessively defensive attitude toward terrorist activity, and I hope we learn today what is being done to improve our operations and focus more on disrupting terrorist activities in addition to simply attempting to defend our country.

I hope that you will relate to where we go from here on the Church Commission and the CIA's evident decision not to get information from those individuals that have or might conduct human rights.

Thank you, Mr. Chairman.

Chairman HYDE. Thank you, Mr. Smith.

The gentleman from Indiana, Mr. Kerns.

Mr. KERNS. Thank you, Mr. Chairman; and thank you for calling this important hearing. I am looking forward to hearing from our panelists and the important information.

Also, I would like to say I was one of those travelling to Turkey, Italy and to Russia recently. We learned very valuable information, meeting with the King of Afghanistan and the leaders of the United Front and actually going over a map of some of the things where the United States can be helpful.

I am also happy to report we are not in this fight against terrorism alone, and we also recognize it is going to take our friends and help from many.

But, with that, Mr. Chairman, I look forward to hearing from our witnesses; and thank you again for calling this hearing.

Chairman HYDE. Thank the gentleman.

Mr. Cooksey, you have been passed over. Do you want an opening statement?

Mr. COOKSEY. No, Mr. Chairman.

Chairman HYDE. Mr. Rohrabacher.

Mr. ROHRABACHER. Thank you, Mr. Chairman. I will try to be brief.

15

America has witnessed a ruthless slaughter of our fellow citizens, and we need—and I say we—we in Congress and this Committee—need to hold those who are responsible for this slaughter accountable. And of course bin Laden is responsible. Of course, the Taliban have their fingerprints all over this crime. But we also need to make sure that we hold accountable those people in our State Department and our intelligence agencies who did not do their job in providing policies and providing information that were necessary for the protection of our citizens.

We cannot just sit back and blame the terrorists for being terrorists but not hold accountable those people in our Government who were incompetent in fulfilling their responsibilities. They, too, must share the burden of blame for this horrible atrocity that has been committed against honest American citizens who were just going about their lives.

Now I understand that some of the people, who I believe had advocated incompetent policies over these last 5 years in relationship to the Taliban, are suggesting that we have a policy that in some way might leave the Taliban in power. Well, I would hope that our President has more common sense than this. Because some of these very same folks were the ones who suggested to his father that we keep Saddam Hussein alive and that he would crumble on his own after we left that last conflict in Iraq so many years ago. Well, of course, we know what their advice is worth when it came to Saddam Hussein. If we leave the Taliban in power now, it will be a horrible signal to any government around this world that may or may not choose to give aid or to harbor terrorists in the future.

This is a very serious issue. The Taliban must go. Bin Laden must die. We are saying this not because we seek revenge but because we want to deter people in the future, terrorists and governments, from doing things that will result in the slaughter of innocent people, especially Americans.

So today I am looking forward to hearing the testimony. I know two of the witnesses very well. Vince and I worked in the White House together when he was deeply involved in the Afghan issue—and Vince, I remember going to your office on many occasions talking about this. And Mr. Santos and I have worked in recent years very often.

I want to thank you for holding this hearing. We do have some very expert witnesses today. But let us not heed the advice of people who in some way have to bear some responsibility, whose incompetence caused this slaughter in the first place, who are suggesting now that we hold back and that we in some way don't finish this job in the first stage. The first stage of fighting terrorism, if we are going to have the rest of the stage successful, is bin Laden dead and the Taliban out.

Chairman HYDE. Mr. Delahunt.

Mr. DELAHUNT. Mr. Chairman, I would like to yield some of my 5 minutes to one of the witnesses. I don't know if that is appropriate.

Chairman HYDE. It certainly is. We thank the gentleman.

That will conclude the statements, and I appreciate the cooperation of the Committee. I would like to welcome our panel of distinguished witnesses.

16

Mr. Vincent Cannistraro is a former Chief of Operations and Analysis at the CIA's Counterterrorism Center from October 1988 to November 1990. Prior to this, he worked at the Department of Defense where he was Special Assistant for Intelligence in the Office of the Secretary of Defense; and from November 1984 to January 1987, he was Director of Intelligence Programs at the National Security Council under President Reagan. Mr. Cannistraro is also a consultant on intelligence and international security affairs for ABC World News with Peter Jennings.

Charles Santos was a special assistant to Diego Cordovez, United Nations Under Secretary General for Special Political Military Affairs in the late 1980s, who negotiated the Soviet withdrawal from Afghanistan. He was responsible for Afghan internal political issues dealing with the different Afghan factions, and in the mid-1990s he helped to establish the United Nations Special Mission to Afghanistan and was its first Political Advisor and Deputy to its head. He is currently a partner at SBS Associates, LLC, an energy consulting and marketing firm in New York.

Mr. Oliver Revell is the Founder and President of Revell Group International, a global business and security consulting firm based in Dallas County, Texas. On November 16, 1964, Mr. Revell was appointed a Special Agent of the FBI. In January 1975, he was promoted to Assistant Special Agent in Charge of the Chicago Division and later served as Acting Special Agent in Charge. In June 1980, he was promoted to Assistant Director and placed in charge of the Criminal Investigative Division, making him responsible for the criminal investigative and counter-terrorism programs and operations of the FBI. He served as the Director's deputy in charge of the FBI's Criminal Investigative, Counter-Terrorism and Counter-Intelligence programs. He has been interviewed or served as a commentator on numerous national television and commentary programs.

We are very honored to have you three appear before the Committee today. If we could request gently a 5-minute summary of your statement, we promise to insert your statement in full in the record, and that will leave time for some questions.

So we will begin with you, Mr. Cannistraro.

## STATEMENT OF VINCENT CANNISTRARO, FORMER CHIEF OF COUNTERTERRORISM OPERATIONS, CENTRAL INTELLIGENCE AGENCY

Mr. CANNISTRARO. Thank you, Mr. Chairman.

It is very difficult for Americans to understand the nature of extremist organizations with the religious orientation such as al-Qaeda, but we have to understand and comprehend it if we are to confront the threat itself.

Religious fundamentalists are domestic as well as international. An analogy might be Christian Identity, a white supremist group that has carried out killings and assassinations in the United States. Unless we know what drives these religious extremists, who are willing to kill themselves in the performance of their violent acts, we will see other days like September 11, perhaps with even greater casualties.

17

It is worth studying the evolution of the al-Qaeda group. Bin Laden, who opposes the American influence in the Middle East, was outraged by the Persian Gulf War which saw American and other western troops stationed in Saudi Arabia, his home country. He considers that country, ruled by the al-Sau'd family, as the guardian of the Islamic holy places. King Abd'al aziz al-Sau'd, who founded the kingdom, had the support of the Wahabis, a fundamentalist Islamic sect that prevails in Saudi Arabia itself. The monarchy drives its authority from the Wahabis. In return, the monarchy guarantees the sanctity of the holy places.

In bin Laden's view, the Saudi monarchy betrayed that sacred pact by allowing Christian and Jewish soldiers to be stationed on the soil of this country during the Gulf War. Bin Laden opposed the monarchy in 1991 and was expelled from the country by Saudi intelligence. He then moved to the Sudan where he began organized training camps for Islamic activists from almost every major Islamic country.

The mission was to train these fighters and to send them back to their native lands to fight and promote insurgency against the secular Arab regimes and replace them with religious governments based on Sharia, Islamic law. The targets were countries such as Egypt and Algeria and Muslim dominated provinces such as Chechnya and Dagestan in Russia, and in Bosnia and Kosovo. Even movements in Libya against Khadafi were promoted by Islamic activists trained in bin Laden's camps in the Sudan.

We have to understand what bin Laden is trying to do. He believes in the restoration of an Ottoman Empire, but this time based opon Islam. An "Islamic Caliphate" to be re-established under the leadership of the Taliban leader Mullah Omar. Osama sees the United States and its world influence as the principal obstacle to achieving his vision.

In 1996, he moved lock, stock and barrel to Afghanistan after pressure by the Governments of Saudi Arabia, the United States and Egypt. He aligned himself with the Taliban, a group of religious students who were trained in Pakistani schools. They were then sent back into Afghanistan by the Pakistani government's military intelligence service, Interservices Directorate (ISI), in order to promote ethnic Pashtun control over Afghanistan, which had been suffering tribal conflict among various groups, particularly Tajik and Uzbek.

The Pashtuns—we say Pathuns in common American usage—designates about a dozen separate tribes on both sides of the Afghan-Pakistani border. The Taliban, as we know, is almost medieval in its concept of governance. Rulers from the Taliban have mismanaged the country and promoted starvation and human rights abuses against their own population. Pakistan has allowed bin Laden really to exist in Afghanistan by contributing to the defense of some of his training camps, which are used as schools to train Kashmiri terrorists who then go back into Kashmir and fight that war there.

They don't have clean hands here. The Northern Alliance, of course, which had up until a few weeks ago 7 percent of the territory, is dominated by ethnic Tajik and Uzbek, which the Pakistanis, of course, opposed. About 3 weeks ago, the leader of the

18

Northern Alliance, Ahmad Shah Massud, was assassinated by bin Laden's operatives. He did it for Mullah Omar.

The bonds between Mullah Omar and Osama bin Laden are bonds of blood. Bin Laden has offered "bayat," an Arabic word meaning an offering of submission to his will and his leadership. Bin Laden recently declared Taliban-ruled Afghanistan as the "new Mecca" and Mullah Omar as the new caliph. Bin Laden's fighters are intertwined with the Taliban, and any effort to remove bin Laden from Afghanistan by necessity means the removal of Mullah Omar in the inner core of the Taliban leadership.

What is al-Qaeda? Al-Qaeda means the "base," or the "foundation." Bin Laden doesn't talk about all of his networks around the world as al-Qaeda. He uses that to refer to his inner circle.

Mr. Chairman, I see I have gone over my 5 minutes, so I will sum up very quickly.

For the past 4 years, bin Laden has fought, with the Taliban military, against the Northern Alliance. He lost his own son in fighting against the Northern Alliance. So it is clear that, without the Taliban, bin Laden could not exist. Removing him means removing the Taliban.

I will conclude here, Mr. Chairman, because I will go on for a couple of hours if you let me.

Chairman HYDE. Well, perhaps during the questioning these other points will come out.

[The prepared statement of Mr. Cannistraro follows:]

PREPARED STATEMENT OF VINCENT CANNISTRARO, FORMER CHIEF OF COUNTERTERRORISM OPERATIONS, CENTRAL INTELLIGENCE AGENCY

I am pleased to appear before this committee to provide my views on al-Qaeda, its structure and its objectives. It is important to note that Americans have a difficult time in understanding extremist organizations with a religious orientation like al-Qaeda. It is essential that the agencies of our government involved in law enforcement and intelligence become intimately familiar with the culture of religious zealots whether of foreign or domestic origin. We must understand the nature of the threat before we can successfully confront it. In America, we also have fundamentalists such as Christian Identity, and other religious extremists who kill or maim in the name of God. Comprehending the danger and the mind-set of these groups is a first step to deterring the violence executed by the Osama Bin Laden's of the world. Unless we know what drives these religious extremists, who are willing to kill themselves in the performance of their violent acts, we will see days like September 11, 2001, repeated, perhaps with even greater casualties.

It is worth studying the evolution of the al-Qaeda group. Bin Laden, who opposes the American influence in the Middle East, was outraged by the 1990 Persian Gulf War which saw American and other western troops stationed in Saudi Arabia. Bin Laden considers the country, ruled by the Al-Sau'd family, as the guardian of the Islamic holy places. King Abd'al aziz al-Sau'd, who founded the monarchy, had the support of the Wahabis, the fundamentalist Islamic sect. The al-Sau'd monarchy derives its authority from the Wahabis, who allied with Abd'al aziz, in creating modern Saudi Arabia. In return, the monarchy serves to guarantee the sanctity of Mecca and Medina, the site and magnetic pole for pilgrimages by the world's Muslims. In Bin Laden's view, the Saudi monarchy betrayed that sacred pact by allowing Christian and Jewish soldiers to be stationed on the soil of this Islamic country which had been entrusted with a special protectorate mission for the holy places. Bin Laden's opposition to the monarch resulted in his expulsion from the Kingdom. Shortly after, Bin Laden used his personal fortune and continuing contributions from wealthy Islamic businessmen in Saudi and the Gulf to organize training camps in the Sudan for Islamic activists from every major Islamic country. These contributions, plus revenues from Islamic Charity fronts, such as the International Islamic Relief Organization, headed by Bin Laden's brother-in-law, as well as numerous other charitable fronts, continue to fuel his group today

19

The international cadres that comprise many of the networks associated with al-Qaeda, were trained by so-called "Arab-Afghans" with fighting experience from the Soviet-Afghan war, although many of these "mujahedin" did not reach Afghanistan until after the Soviet withdrawal in 1989. The main mission for Bin Laden was to disperse trained fighters to their native lands to fight against the secular Arab regimes and replace them with religious governments based on the Sharia-Islamic rather than civil law. The targets were secular Muslim countries such as Egypt and Algeria, and Muslim dominated provinces such as Chechnya and Dagestan in Russia and in Bosnia and Kosovo. Anti-government movements were also promoted in Libya and Tunisia as well. Indeed, Bin Laden's vision is to re-establish the "Islamic Caliphate" across every Muslim country, a religious restoration of the old Ottoman Empire, this time under the leadership of the Taliban leader, Mullah Omar. Usama sees the United States and its world influence as the principal obstacle to achieving his vision.

Bin Laden relocated his operations to Afghanistan following pressure on the Sudan exerted by Saudi Arabia and the U.S. The Taliban, a group of religious students from Pakistani schools, were successful in establishing control over Afghanistan with the active military support of Pakistan's military intelligence service, the Inter Services Directorate (ISI). Pakistan's concern was to promote ethnic Pashtun control over the country, which was being run by Afghans hostile to Pashtun rule and Pakistani influence. The Pashtuns, or Pathans in common western usage, designates several dozen separate tribes on both sides of the Afghan/Pakistani border. The Taliban, lacking a secular education, is almost medieval in its concept of governance. The Taliban rulers have mismanaged the country, but have been amenable to Pakistani political influence although not totally subservient to it. Pakistan has also used its position and support to the Taliban to establish within Afghanistan a series of training camps for Kashmiri terrorists. ISI personnel are present, in mufti, to conduct the training. This arrangement allowed Pakistan "plausible denial" that it is promoting insurgency in Kashmir. Pakistan also provisioned the Taliban with weapons to fight the "Northern Alliance" which contests Taliban control over the country and had until recently about 7% of Afghan territory, mostly north of Kabul and in the Panshir. The Northern Alliance, while including some Pashtuns, has been commanded by Ahmad Shah Massud, an ethnic Tajik. About three weeks ago, Massud was assassinated by suicide bombers identified as part of Bin Laden's group.

The bonds between Mullah Omar, and Usama Bin Laden, are bonds of blood and Bin Laden has offered "bayat" to Mullah Omar, an offering of submission to his will and his leadership. Bin Laden recently declared Taliban-ruled Afghanistan as the "new Mecca" and Mullah Omar as the new caliph. It is therefore all but impossible for Mullah Omar to turn over Bin Laden to the U.S. for prosecution as the U.S. has demanded. The Taliban and Bin Laden's estimated 4,000 to 5,000 fighters are intertwined with the Taliban military and Mullah Omar considers Bin Laden as his right hand.

What is Al-Qaeda? The Arabic word means the "Base," or "foundation." Bin Laden does not refer to his international network as al-Qaeda. This word refers to his companion in arms at his headquarters in Southern Afghanistan. In his camps perhaps 10,000 Bangladeshi, Pakistani, Tunisian, Moroccan, Algerian, Egyptian and ethnic Chechens, Dagestanis, Kosovars and dozens of other nationalities have been trained. Some of them are provided specialized intelligence training, some schooled in the arts of making improvised explosive devices, and others given instruction in the production and use of chemical weapons. Those not chosen for specialized tasks are given combat training and either sent back to their native countries to foment insurgency against their secular regimes or enlisted in his combat brigade that fights alongside the Taliban against the Northern opposition. For the past four years, Bin Laden's men have fought with the Taliban against Massud, and have suffered the losses of at least seven hundred to a thousand men in the fighting, including one of Bin Laden's own sons about seven months ago.

It is important to distinguish between the so-called "loose networks" of affiliated groups, and the tightly controlled inner circle of al-Qaeda that conceives and implements their strategic operations. The bombing of the USS Cole, for example, was a tightly controlled al-Qaeda operation that had some local support, drawn from the Islamic Army of Aden, a radical Islamic group in the Yemen set up by Bin Laden's brother-in-law and funded by Usama. The operation was apparently directed by Muhammad Atef, an Egyptian who serves as Bin Laden's Chief of Operations. It was Atef's daughter who married one of Bin Laden's sons last May, a marriage that also symbolized the merger of the Egyptian Islamic Jihad into al-Qaeda, and a new name for the inner circle: "Jidad al-Qaeda."

20

The Ahmad Ressam case, was an example of the use of affiliated groups by al-Qaeda to promote violence against America. This was the "millennium" plot frustrated when Ressam panicked at the Canadian/US border while transporting materials for five bombs. Ressam, a member of an Algerian terrorist faction funded and supported by Bin Laden, was trained at an al-Qaeda camp in Afghanistan and given $12,000 seed money. He was told to raise the rest of the monies needed through criminal activity in Canada, organize his cell, and choose targets in America to destroy. Ressam planned to plant bombs at Los Angeles International Airport, to kill as many people as possible. At the same time, a more centrally controlled and sensitive al-Qaeda operation was being implemented in the port of Aden, against the USS Sullivans, the sister ship of the Cole. The explosives laden boat sank in the harbor while being piloted by the two would-be suicide bombers. They swam back to shore, and went to ground, certain that their abortive operation would be discovered. It was not. About 8 months later, the same operation, using more sophisticated and lighter explosives, was carried out against the Cole. The devastating results are well known.

How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways. For example, orders may be given to liquidate a stock portfolio in New York, and have those funds deposited in a Gulf, African or Hong Kong bank controlled by a Bin Laden associate. Other channels exist for the flow of monies to Bin Laden, through financial entities in the UAE and Qatar. Cash, carried to intermediaries, is also a source of funding. There are some female members of Bin Laden's own family who have been sending cash from Saudi Arabia to his "front" accounts in the Gulf.

I will stop my remarks here, and I am prepared to address any questions you may have.

Chairman HYDE. Mr. Santos.

## STATEMENT OF CHARLES SANTOS, FORMER SPECIAL ASSISTANT TO THE UNDERSECRETARY FOR POLITICAL MILITARY AFFAIRS, UNITED NATIONS

Mr. SANTOS. Thank you, Mr. Chairman.

The Taliban leadership has refused to turn over bin Laden, citing their obligation, supposedly under tribal norms, to provide hospitality. Make no mistake, their relationship has nothing to do with hospitality. Mullah Omar and his Taliban provide sanctuary to bin Laden because he has helped the Taliban as much or even more than they have helped him. Both are part of the same extremist reality: dogmatically committed to a wider, Islamic struggle to expel western and secular influences which they view as corrupt, replacing it with their vision of a purified Islamic control over the Muslim world. In this sense, they are not so much looking to the past but using it to create a future—one particularly intolerant, narrow-minded and alarming. They are also both united in a willingness to pursue these ends by all means necessary.

Early on, Mullah Omar publicly demonstrated his closeness to bin Laden. One significant occasion occurred in March 1997 during the Eid prayers after the Haj, when Omar pulled bin Laden from a large crowd in Kandahar, announcing in front of them that bin Laden was a friend, a brother and a great holy warrior. The two then led prayers for the tens of thousands gathered in an open field.

21

For Omar, the Saudi exile was a powerful symbol of Islamic struggle and defiance, built on their common triumph over Soviet occupation. Mullah Omar's rise to power came as the Taliban successfully identified themselves not in fractious political terms but in extremist, ethnic and religious terms. Their vision fused ethnic Pashtun hegemony with Sunni fundamentalism. The Taliban were able to promote themselves as Afghanistan's true rulers among the Pashtuns with an historic and divine mandate. They effectively consolidated power by masking their political intentions and minimizing talk of power or their political ambitions.

Bin Laden and his extremist links thus not only provided political legitimacy to his Taliban allies, but also important resources in a contest that was otherwise waged with meager means. These resources were not simply monetary. Communications, training, technical expertise and crucial recruits were also provided in those campaigns reaching beyond the traditional Pashtun lands now into areas dominated by the other Afghan ethnic minorities. This is a crucial point—the extremist international networks fed an ethnic war machine to further their own purposes.

As the Taliban consolidated their control with these resources, their movement began to expunge the more traditionalist elements, leaving Mullah Omar and his more radical allies in the Taliban unchallenged. At the same time, links to extremist Sunni fundamentalists in Pakistan and the Gulf deepened and expanded, which in turn provided yet more recruits and resources. International Islamicists, including crucial Pakistani support, in turn came to champion the Taliban as the true representative of a pure Islamic State built upon Islam's victory over the Communist infidels. The Taliban thus have become an integral and important part of Sunni fundamentalist mythology and its international networks, connecting them well beyond Afghanistan to Islamicists all over the world. Afghanistan became not only a place where extremists from around the world could meet safely, share ideas, develop strategies, and receive training—a physical base of terror—it also became a symbol to extremists of the possibilities of their mission.

Throughout, the Taliban have continued to receive support from the Government of Pakistan, whose policies have led to a growing wave of extremism as well. It is important to note that the growing Islamic extremism in Pakistani society is not only the result of corruption, growing poverty, disconnected elite and a government policy that has actively encouraged Islamicist ideology as a means of holding together a diverse society. That policy is now out of control, producing a stronger, more virulent anti-western view and a much less reliable Pakistan.

Pakistani support of the Taliban also allowed them to strengthen their control and expand their influence into the Pashtun areas of Afghanistan. It enabled Pakistan to relocate its training camps for Kashmiri separatists to Afghanistan. Those camps benefitted from the extremist networks in Afghanistan and provided Pakistan with plausible deniability. Moreover, Pakistani extremist groups have functioned as umbrella organizations for other international terror groups that sought shelter in Afghanistan.

We should be clear: The Taliban see the West through their ethno-nationalist and fundamentalist eyes as being both corrupt

22

and potentially hostile to their campaign to impose their extremist vision, precisely as bin Laden and his ideological allies see America as an obstacle to a "pure" Islamic region, untainted by westernization. Bin Laden is neither a guest nor a foreigner in Afghanistan. He is one of them ideologically, politically, and pragmatically.

Nonetheless, bin Laden's alliance with the Taliban has significant vulnerabilities. He has taken sides in a civil war which is ethnic much more than it is religious. The Taliban are Pashtuns, a group that represents less than 40 percent of Afghanistan's population. They are still the largest minority in a country of minorities—including the Shi'a Hazara, Uzbeks, Turkmens and Tajiks, to name the largest of the nine or so ethnic groups that live within the borders of Afghanistan.

The ugly truth is that the Pakistani supported Taliban-Bin Laden extremist alliance is built on religious, cultural and ethnic domination in Afghanistan. Bin Laden and his extremist network are vulnerable in the same way that the Taliban are vulnerable— their brutal actions have completely antagonized those that live in the North and Central parts of the country, and beyond as well.

There are capable leaders currently on the ground in Afghanistan such as General Rashid Dostum, an ethnic Uzbek leader with significant forces in northern Afghanistan; Karim Khalili, leader of the Hazara of Central Afghanistan; Ismael Khan, an ethnic Tajik leader and a former governor of western Afghanistan; Commander Fahim, the man who replaced Massud, an ethnic Tajik leading forces in Panshir and in northeast Afghanistan. All are fighting to protect their people and rid their areas of Taliban and extremist supporters.

In the end, Osama bin Laden must depend on the Taliban's ability to maintain dominance over the other ethnic communities in Afghanistan. If Pashtun chauvinism buckles, bin Laden and his extremist networks and, most importantly, the symbol of a true and pure Islamic state that serves as an ideological as well as a physical base for extremism and terror, will collapse.

To ensure that Afghanistan will no longer be a base of terror requires not only eliminating the Taliban, but crucially eliminating the idea of ethnic dominance and religious extremism in that country. This can only happen if a system of government emerges that is democratic and provides protection and rights to all the country's ethnic communities, allowing the links of goodwill to be rebuilt among the various people.

I believe that the alliance between the north and the former King can assist in this regard, but we should make no mistake: This will not come from any one individual. It will require a change in thinking of many Pashtuns and a decentralized political system of government—a federal system or confederation—that accurately reflects the political aspirations of the diverse communities of Afghanistan.

To summarize, there are five important points to keep in mind. The extremism of the Taliban and bin Laden may be religious, but in Afghanistan it is built on ethnic domination. Break the ethnic domination and you break the Taliban, bin Laden and his extremists. Give full support to all the elements in the Northern Alliance in their struggle. Focus political efforts mainly on building a new

23

political structure, not short-term power-sharing agreements. This was the failure of the U.N. in the past. The new political structure must be decentralized and modeled on a federal or confederated system.

Thank you, Mr. Chairman.

Chairman HYDE. Thank you, Mr. Santos.

[The prepared statement of Mr. Santos follows:]

PREPARED STATEMENT OF CHARLES SANTOS, FORMER SPECIAL ASSISTANT TO THE
UNDERSECRETARY FOR POLITICAL MILITARY AFFAIRS, UNITED NATIONS

The Taliban leadership has refused to turn over Bin Ladin, citing their obligations, supposedly under tribal norms, to provide hospitality. But their relationship has nothing to do with hospitality. Mullah Omar and his Taliban provide sanctuary to Bin Ladin because he has helped the Taliban as much—or even more—than they have helped him. Both are part of the same *extremist* reality: dogmatically committed to a wider, Islamic struggle to expel western and secular influences which they view as corrupt, replacing it with their vision of purified Islamic control over the Muslim world. In this sense they are not so much looking to the past but using it to create a future—one particularly intolerant, narrow-minded and alarming. They are also both united by a willingness to pursue these ends by all means necessary.

This was not always the case. When I was the Political Advisor to the United Nations Special Mission to Afghanistan, I was the first member of the Mission to meet the Taliban Council in January 1995, two months after they emerged in Kandahar. The Taliban, as a new movement, was weak and thus inclined to allow certain less extremist, elements within its ruling Council. At that time, Bin Ladin was nowhere to be found in Taliban areas. Instead he had established a base in Eastern Afghanistan not far from Jalalabad. He started living there more permanently in the summer of 1995 under the protection of Islamicist Jihadi commanders who were opposing the Taliban.

During this period, Bin Ladin's low profile and relatively constrained situation were due to civil strife, particularly in Kabul. However, when the Taliban took control of Jalalabad and Kabul in September 1996, instead of expelling Bin Ladin, a logical conclusion given his relationship with their enemies, he was immediately moved south to Kandahar for his safety.

Bin Ladin, his family and some followers lived in Kandahar for several months in a building across from the Taliban foreign ministry offices. He clearly was given the full support and protection of the Taliban, and traveled freely around the city in an easily recognized caravan of approximately eight Toyota Hiluxes and Landcruisers. My residence was located near a complex of houses in central Kandahar, which, he was building for himself. In fact, he next moved to Kandahar Airport where he lived for more than a year. He gave the newly constructed complex in Kandahar to Mullah Omar and his Taliban leadership.

Mullah Omar publicly demonstrated his closeness to Bin Ladin on several occasions. One important occasion occurred in March 1997 during the Eid prayers after the Haj, when Omar pulled Bin Ladin from the large crowd, announcing in front of them that Bin Ladin was a friend, a brother and great holy warrior. The two then led the prayers for the tens of thousands gathered in an open field.

Why did he show such support for Bin Ladin? For Omar, the Saudi exile is first and foremost a powerful symbol of Islamic struggle and defiance, built on their common triumph over Soviet occupation. As the various mujahideen political parties were contesting Kabul, the Taliban rose to power by successfully identifying themselves not in fractious political terms, but in extremist national and religious terms. Their vision fused ethnic Pashtun hegemony with Sunni fundamentalism. The Taliban were able to promote themselves as Afghanistan's true rulers among the Pashtuns with an historic and divine mandate. They effectively consolidated power by masking their political intentions and minimizing talk of power of their political ambitions.

Bin Ladin and extremist links thus not only provided political legitimacy to his Taliban allies, but also important resources in a contest which was otherwise waged with meager means. These resources were not simply monetary: communications, training, technical expertise and crucial recruits were also provided in those campaigns reaching beyond the traditional Pashtun lands, now into areas dominated by the other Afghan ethnic minorities—*This is a crucial point, the extremist international networks fed an ethnic war machine to further their own purposes.*

24

As the Taliban consolidated their control with these resources, their movement began to expunge the more traditionalist elements, leaving Mullah Omar and his more radical allies in the Taliban unchallenged. At the same time, links to extremist Sunni fundamentalists in Pakistan and the Gulf deepened and expanded, which in turn provided yet more recruits and resources. International Islamicists, including crucial Pakistani support, in turn came to champion the Taliban as the true representative of a pure Islamic State built upon Islam's victory over the Communist infidels. The Taliban thus have become an integral and important part of Sunni fundamentalist mythology and its international networks, connecting them well beyond Afghanistan to Islamicists in Pakistan, the Gulf, Kashmir, Chechnya and Central Asia. Afghanistan became not only a place where extremists from around the world could meet safely, share ideas, develop strategies, and receive training—a physical base of terror—it also became a symbol to extremists of the possibilities of their mission.

Throughout, the Taliban have continued to receive support from the Government of Pakistan, whose policies have led to a growing wave of "extremism" within Pakistan as well. What was Pakistan's interest in Taliban domination of its neighbor? Often it is mentioned that Pakistan sought strategic depth as a counterweight to India as well as reconnecting Pakistan to transit routes and energy resources in Central Asia. I believe that these are valid reasons but not sufficient in explaining Pakistan's actions, which have isolated the country significantly. Most important is the growing Islamic extremism in Pakistan society, resulting from a combination of corruption, growing poverty, a disconnected elite and a government which has actively encouraged Islamicists as a means of holding together a diverse society. That policy is now out of control, producing a stronger more virulent anti-western view and a much less reliable Pakistan.

Pakistani support of the Taliban also allowed them to strengthen their control and expand their influence into the Pashtun areas of Afghanistan, which presented a historic reversal in their favor. It enabled Pakistan to relocate its training camps for Kashmiri separatists to Afghanistan, benefiting from extremist networks in Afghanistan and providing Pakistan with plausible deniability. Pakistani extremist groups have functioned as umbrella organizations for other international terror groups that sought shelter in Afghanistan.

We should be clear: The Taliban see the West through their ethno-nationalist and fundamentalist eyes as being both corrupt and potentially hostile to their campaign to impose their extremist vision, precisely as Bin Ladin and his ideological allies see America as an obstacle to a "pure" Islamic region, untainted by westernization. Bin Ladin is neither a guest nor a foreigner in Afghanistan: he is one of them, ideologically, politically, and pragmatically.

The Taliban war machine has also benefited significantly from the trade in opium, levying a thirty percent tax and providing security for the illicit shipments.

Nonetheless, Bin Ladin's alliance with the Taliban has significant vulnerabilities: he has taken sides in a civil war in Afghanistan which is ethnic more than it is religious. The Taliban are for all intents and purposes Pashtun, a group that represents less than 40 percent of Afghanistan's population. They are still the largest minority in a country of minorities—including the Shi'a Hazara, Uzbeks, Turkmens and Tajiks, to name the largest of the nine or so ethnic groups that live within the borders of Afghanistan.

The ugly truth is that the Pakistani supported Taliban-Bin Ladin extremist alliance is built on religious, cultural and ethnic domination in Afghanistan. Bin Ladin and his extremist network are vulnerable in the same way the Taliban are vulnerable—their brutal actions have completely antagonized those that live in the North and Central part of the country, and beyond as well.

There are capable leaders currently on the ground such as General Rashid Dostum, an ethnic Uzbek leader with significant forces in Northern Afghanistan; Karim Khalili, leader of the Hazara of Central Afghanitsan; Ismael Khan, an ethnic Tajik leader and former Governor of Western Afghanistan; and Commander Fahim, an ethnic Tajik, leading forces in the Panshir Valley and Northeast Afghanistan. All are fighting to protect their people and rid their areas of the Taliban and their extremist supporters.

In the end, Osama Bin Ladin must depend on the Taliban's ability to maintain dominance over the other ethnic communities of Afghanistan. If Pashtun chauvinism however buckles, Bin Ladin and his extremist network, and most importantly, the symbol of a true and pure Islamic State that serves as an ideological as well as physical base for extremism and terror, will collapse.

To ensure that Afghanistan will no longer be a base of terror requires not only eliminating the Taliban, but crucially eliminating the idea of ethnic dominance and religious extremism. This can only happen if a system of government emerges that

25

is democratic and provides protection and rights to all the country's ethnic communities, allowing the links of goodwill to be rebuilt among the various peoples. I believe the Alliance between the North and the former king can assist in this regard, but we should make no mistake: this will not come from any one individual. It will require a change in the thinking of many Pashtuns and a decentralized political system of government—a federal system or confederation—that accurately reflects the political aspirations of the diverse communities of Afghanistan.

Chairman HYDE. Mr. Revell.

## STATEMENT OF OLIVER "BUCK" REVELL, FORMER ASSOCIATE DIRECTOR IN CHARGE OF INVESTIGATIVE AND COUNTER-INTELLIGENCE OPERATIONS, FEDERAL BUREAU OF INVESTIGATION

Mr. REVELL. I thank you and the Members of the Committee for holding these hearings. It is an extremely important responsibility that you bear; and I know that you and your colleagues want to provide the very best support that you can to our President and those in our Government, including the military, intelligence, diplomatic and law enforcement agencies that must face this challenge. I will try and provide you with my honest and forthright assessment and opinions based on some 40 years now that I have been involved in this arena.

The terrible events of September 11 shall ever remain in our collective memories. I, like so many Americans, lost friends in those attacks. I wish I could tell you that they could not have been anticipated and that we are unlikely to face such devastation again. I cannot. It is very clear that we have been the targets of a sustained campaign of terrorism since at least 1979. The fall of the Shah of Iran and the establishment of a fundamentalist Islamic state in Iran under the Ayatollah Khomeini and the invasion of Afghanistan by the Soviet Union, both in 1979, were the direct predicates in my mind to the tragedy that we suffered on September 11.

In Iran, the Islamic extremists found that they could take and hold Americans hostage without serious repercussions. Out of that experience, the Iranian-backed Hezbollah in Lebanon and Syria bombed our embassies in Beirut twice, Kuwait once, as well as killing over 200 Marines in a suicide bomb attack. The Hezbollah took Americans hostage and highjacked our airliners and yet we seemed impotent to respond.

Before we even knew of Osama bin Laden, Imad Mugniyah of the Hezbollah was the leading terrorist against America. He was directly responsible for the attacks against our personnel and facilities in Lebanon, and yet he and his organization have never been punished for their crimes against our Nation. This example was not lost on the founders of al-Qaeda, primarily members of the Afghan mujahidin from Arab countries. Osama bin Laden and his associates experienced firsthand that guerilla warfare and terrorist tactics could defeat a superpower. He learned from Mugniyah that America was not likely to fight back.

Since the attack on Americans Special Forces on a humanitarian mission in Somalia in 1992, bin Laden and his associates have carried out a steady and increasingly deadly campaign against America and Americans. The following are publicly known events that have occurred in his campaign beginning with Somalia in 1992; the first World Trade Center bombing in 1993; the planned attacks

26

against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993 that was thwarted; the planned assassination of Pope John Paul in the Philippines, including the Americans and his entourage; the planned assassination of President Clinton in the Philippines; the planned bombing of 11 to 13 American jumbo jets over the Pacific in January 1995; the car bombing of the U.S. military mission in Riyadh, Saudi Arabia, in 1995; truck bombing of the U.S. housing area Khobar Towers in Dhahran, Saudi Arabia, 1996; the truck bombing of the U.S. Embassy in Kenya in 1998; and the simultaneous bombing of the U.S. Embassy in Tanzania; the plot to bomb the Los Angeles International Airport, Y2K, coming out of Canada and another apparent attempt coming out of eastern Canada in the New England area; the plot to attack a U.S. Naval ship in Yemen in January of 2000; the actual suicide boat attack on the USS Cole in Yemen in October of 2000.

If that is not a campaign, I have never seen or heard of one. It has been consistent and has been increasingly violent.

By September 11, we should have known that we were the principal targets of a terrorist campaign unlike any that we had ever faced, and yet we totally failed to recognize the impending disaster that stalked our Nation. Some of us in the counterterrorist business have tried to warn over the years that we were in danger and the danger was increasing, but we generally have been thought to be alarmists. For the purpose of lessons learned, I am going to cite just briefly some remarks I made at a conference on terrorism sponsored by the U.S. Justice Department in 1999.

I pointed out that the rather abrupt end to the Cold War had been expected to bring about a substantial improvement in international cooperation and a concordant change in the manner in which governments dealt with transnational issues such as terrorism and organized crime. However, the expected improvements in overall safety and security of U.S. citizens and interests have not materialized except at the strategic level.

I went on to point out that terrorism remains a constant and viable threat to American interests on a global basis, even though the sources of the threat may be evolving into heretofore unknown and/or undetected elements and organizations.

The threat is changing and increasing due to the following factors:

The philosophy, motivation, objectives and modus operandi of terrorist groups, both domestic and international, has changed.

The new terrorist groups are not concerned with and in many instances are trying to inflict mass casualties. I have to admit, Mr. Chairman, I never thought it would be 7,000 simultaneously.

Terrorist groups now have ready access to massive data bases concerning the entire United States infrastructure, including key personnel, facilities and networks, including, of course, our air transportation network.

Aided by state sponsors or international organized crime groups, terrorists can now obtain weapons of mass destruction.

The Internet now allows even small or regional terrorist groups to have a worldwide C3I—Command, Control, Communication and Intelligence—system and propaganda dissemination capabilities.

27

Domestic anti-government reactionary extremists have proliferated and now pose a significant threat to the Federal Government and law enforcement at all levels.

Militia organizations have targeted the Federal Government for hostile actions and could target any element of our society that is deemed to be their adversary, and Islamic extremism has spread to the point where it now has a global infrastructure, including a substantial network in the United States.

I will cut my statement off there, but I will simply state that, in addition to the terrorist organizations—and certainly the al-Qaeda is a network that has many terrorist associations—we also have seen indications of significant drug trafficking and organized crime involvement with terrorist organizations; and, in fact, there have been some substantial reports that a great deal of the money and proceeds for al-Qaeda has come from heroin trafficking from Afghanistan and their support of other types of criminal activities, including supporting their operatives by various fraudulent schemes both in Europe and in the United States.

Mr. Chairman, we have to take these very serious events, this tragedy that faced us on September 11, we have to learn the lessons because we will again be attacked and they will change their tactics next time, so we can't just prepare for the last event.

Thank you.

[The prepared statement of Mr. Revell follows:]

PREPARED STATEMENT OF OLIVER "BUCK" REVELL, FORMER ASSOCIATE DIRECTOR IN CHARGE OF INVESTIGATIVE AND COUNTER-INTELLIGENCE OPERATIONS, FEDERAL BUREAU OF INVESTIGATION

Chairman Hyde, I thank you and members of your Committee for the opportunity to testify during these hearings. Yours is an extremely important responsibility and I know that you and your colleagues want to provide the very best support that you can to our President and those in our Government, military, intelligence, diplomatic and law enforcement that must face this challenge. I will try and provide you with my honest and forthright assessment and opinions based upon the forty years that I have now been involved in this arena.

The terrible events of September 11, 2001 shall ever remain in our collective memories. I like so many other Americans lost friends in the attacks. I wish that I could tell you that the attacks could not have been anticipated and that we are unlikely to face such devastation again. I cannot. For it is very clear that we have been the targets of a sustained campaign of terrorism since 1979. The fall of the Shah of Iran and the establishment of a fundamentalist Islamic State in Iran under the Ayatollah Khomeini, and the invasion of Afghanistan by the Soviet Union in 1979 were the predicates of the tragedy that we suffered on September 11th. In Iran the Islamic extremists found that they could take and hold Americans hostage without serious repercussions. Out of that experience the Iranian back Hezbollah bombed our Embassies in Beirut twice and Kuwait once, as well as killing over two hundred Marines in a suicide truck bombing. The Hezbollah took American's hostage and hijacked our airliners and yet we seemed impotent to respond. Before we even knew of Osama bin Laden, Imad Mugniyah of the Hezbollah was the leading terrorist against America. He was directly responsible for the attacks against our personnel and facilities in Lebanon and yet he and his organization have never been punished for their crimes against our nation.

This example was not lost on the founders of al Qaida, primarily members of the Afghan mujahidin from Arab countries. Osama bin Laden and his associates' experienced first hand that guerilla warfare and terrorist tactics could defeat a "Super Power". He learned from Mugniyah that America was not likely to fight back.

Since the attack on the American Special Forces on a humanitarian mission in Somalia in 1992 bin Laden and his associates have carried out a steady and increasingly deadly campaign against America and Americans. The following are but the publicly known events:

1. Somalia 1992

28

2. World Trade Center, New York, 1993
3. Planned attacks against multiple targets in New York in July 1993
4. Planned assassination of Pope John Paul in the Philippines 1994 (Americans were in the Pope's entourage)
5. Planned assassination of President Clinton in the Philippines 1995
6. Planned bombings of 11–13 American Airliners over Pacific Ocean 1995
7. Car bombing of U.S. military mission in Riyadh, Saudi Arabia 1995
8. Truck bombing of U.S. Air Force housing area Khubar Towers, Dhahran, Saudi Arabia 1996
9. Truck Bombing U.S. Embassy, Kenya 1998
10. Truck Bombing U.S. Embassy, Tanzania 1998
11. Plot to bomb Los Angeles International Airport, Y2K, New Year 2000
12. Plot to bomb East Coast target, Y2K, New Year, 2000
13. Plot to attack U.S. Naval Ship in Yemen, January 2000
14. Suicide boat attack on USS Cole, Yemen October 2000

By September 11th we certainly should have known that we were the principal targets of a terrorist campaign unlike any we had ever faced. And yet we totally failed to recognize the impending disaster that stalked our nation. Some of us in the Counter-terrorist business tried to warn of the danger, but we were generally thought of as alarmists. For the purpose of lessons learned I am citing the concerns I, among others, expressed about our lack of preparedness for the struggle we now face as a war.

In a speech to a conference held by the National Institute of Justice in May of 1999 on "Terrorism & Technology: Threat and Challenge in the 21st Century" I pointed out my concerns for our lack of readiness to deal with the growing threat of terrorism. Some of these remarks are set forth below.

"The rather abrupt end to the Cold War was expected to bring about a substantial improvement in international cooperation, and a concordant change in the manner in which governments dealt with transnational issues such as terrorism and organized crime. However, the expected improvements in overall safety and security of U.S. citizens and interests have not materialized except at the strategic level.

Terrorism remains a constant and viable threat to American interests on a global basis even though the sources of the threat may be evolving into heretofore unknown or undetected elements/organizations.

The threat is changing and increasing due to the following factors:

1.) The philosophy, motivation, objectives and modus operandi of terrorists groups both domestic and international has changed.
2.) The new terrorist groups are not concerned with and in many instances are trying to inflict mass causalities.
3.) Terrorist groups now have ready access to massive databases concerning the entire United States infrastructure including key personnel, facilities, and networks.
4.) Aided by state sponsors or international organized crime groups, terrorist can obtain weapons of mass destruction.
5.) The Internet now allows even small or regional terrorist groups to have a worldwide C3I (Command, Control, Communication and Intelligence) system, and propaganda dissemination capability.
6.) Domestic anti-government reactionary extremists have proliferated, and now pose a significant threat to the Federal Government and to law enforcement at all levels. Militia organizations have targeted the Federal Government for hostile actions, and could target any element of our society that is deemed to be their adversary.
7.) Islamic extremism has spread to the point where it now has a global infrastructure, including a substantial network in the United States.

Terrorism has been a tough political, analytical and operational target for years. Nonetheless, twenty years ago, analysts could agree on several "tenets of terrorism." First, terrorists were viewed as falling into one of three categories: those that were politically motivated, and used violence as a means to achieve legitimacy, such as the IRA or PLO, or; those that used violence as a means of uprising, or finally; those that were state-sponsored whose violence was manipulated by foreign powers to achieve political leverage. Second, terrorists were generally thought to calculate

29

thresholds of pain and tolerance, so that their cause was not irrevocably compromised by their actions.

While U.S. officials worried about terrorists "graduating" to the use of weapons of mass destruction, especially nuclear, we believed that most terrorist groups thought mass casualties were counterproductive. This was because mass casualties seemed to de-legitimize the terrorists' cause, would certainly generate strong governmental responses, and erode terrorist group cohesion. In essence, we thought a certain logic and morality line existed beyond which terrorist dared not go.

The different types of terrorist groups had a wide range of motives. The extreme left's motivation for violence has been significantly diminished by the disenchantment with communism on a global scale. These groups find that their message is out-of-fashion, and they can no longer mobilize the public to their causes. This loss of motivation is a major reason for the recent downward trend in international terrorist incidents, as documented in the State Department's report, "Patterns in Global Terrorism." The threat level of all leftist groups globally, once rated high, is now considered moderate. Of the twenty-two known groups, three have denounced violence altogether. Indeed, high collateral casualties are inconsistent with the fundamental message of leftist terrorists who profess their goal to be the betterment of the masses.

State-sponsored terror has seen a notable decline in the last several years for three primary reasons. First, the Middle East peace process has given previously violent groups and states a motive to refrain from terrorism in order to gain leverage and bargaining power at the table. Second, post Cold-War geopolitical realities have brought about many new agreements and growing cooperation among nations in countering terrorism. One of the largest sponsors of terrorism in the past—the former communist East European countries—are now aggressively supporting counter-terrorism initiatives.

However, several state sponsors remain who continue to fund, motivate, support, and train terrorists. Iran is by far the most active of these state sponsors, with the greatest long-term commitment and worldwide reach. Iraq remains of concern, but has a more limited transnational capability. However, attacks within Iraq's own backyard, such as the attempted assassination of former President George Bush in 1993 during his Kuwaiti trip, and the assassinations of dissidents in Jordan, are more likely to threaten the peace and stability of the region. Syria is a more pragmatic sponsor, by providing supplies in transit, but has refrained more recently from terrorism in order to enhance its negotiating position in the peace talks. Its loss of USSR patronage has meant a decline in financial and logistical support, but it nevertheless allows some rejectionists to maintain headquarters in Syria. Hezbollah still receives supplies through the Damascus airport and operates openly in parts of Syria and Syrian controlled territory. The newest sponsor on the list is Sudan, which was added in 1993 because of its provision of safe haven and training for a variety of terrorist groups. Sudan has hosted Osama Bin Laden's facilities. Libya, a notorious state sponsor, has also refrained lately from terrorism in order to obtain some sanctions relief. It continues, however, to target dissidents, fund extremist Palestinians, and provide safe haven for Abu Nidal, all while attempting to avoid accountability for the PanAm 103 bombing. The recent surrender of the PanAm 103 suspects came only after crippling sanctions by the United Nations. For state-sponsored terrorism, the value of deterrence retains credibility, and America should not relinquish this capability.

Radical Islamic groups are now the most active in terms of the rate of incidents. Many of these groups are considered separatists, and desire a seat at the recognition and negotiation table. Others, considered extreme Islamic zealots, operate as loosely affiliated groups, as in the World Trade Center and East African bombings. For these groups deterrence has less effect. And in fact many have stated that they wanted to maximize casualties to punish the United States, which they have demonized as the Great Satan.

Ethnic separatist terrorism, as old as mankind, can be temporarily sidetracked by a few contemporary geopolitical developments, but generally, it is impervious to such developments because its root-cause is invariable long-lived. Most of these groups seek world recognition and endorsement; to date, they have not resorted to the use of weapons of mass destruction.

The "New" Terrorist, the argument has been made that while traditional terrorism—in terms of motivations—is still a large segment of the terrorist population, there is a new breed of terrorist for which the old paradigms either do not apply at all or have limited application. These groups—cults, religious extremists, anarchists, or serial killers—must be regarded as serious threats, and perhaps the most serious of the terrorist groups operating today. These "new" terrorists are driven by a different set of motivations: they seek an immediate reward for their act, and

30

their motivations and objectives may range from rage, revenge, hatred, mass murder, extortion, or embarrassment, or any combination of these. They may desire mass casualties, or at least not care about how many people are killed in their attacks. As such, they do not make traditional calculations of thresholds of pain or tolerance within a society. These groups tend to be loosely affiliated both internationally and domestically, and may have no ties at all to state sponsorship. They change affiliations and identities as needed, and are extremely difficult to detect. Where traditional groups want publicity to further their cause, many "new" terrorists do not desire attribution; this is particularly true of the religious extremists, God knows, and will reward. Religious extremism is growing in numbers, and is not limited to the Islamic faith. While the "new" terrorist may have a variety of motivations, some single issue groups, such as, extremists in the animal rights, environmental, and anti-abortion movements, may also pose a significant threat, and can not be overlooked. Additionally, the new millennium is an important apocalyptic milestone for many religious or extremist cults. Many terrorist groups, both traditional and "new," have privatized their practices through a few standard business techniques (fund-raising, use of technology, etc.)

Also new today is the proliferation of knowledge and technology among many criminal, terrorist, and narcotics groups. Many of these groups are building skills in state-of-the-art communications, and weaponry. They are achieving new global links and support from one another in cooperative ways. While inflicting mass casualties have never been prohibitive, the barriers to their use seem to be falling.

Twenty years ago, intelligence specialists viewed proliferation of Weapons of Mass Destruction primarily through the lens of nation states seeking the ultimate weapon. Chemical and biological weaponry was only a minuscule afterthought of the whole nuclear problem.

One of the outcomes of the globalization of economies and technologies, the phenomenon that President Bush termed the "New World Order" is the relatively new linking and intermingling of disparate crime and narcotics organizations with terrorists. Analysts have been dismayed to find that even the most notorious crime groups with global reach, such as the Italian Mafia, the Russian Mafias, the Nigerian criminal enterprises, the Chinese triads, the Colombian and Mexican cartels, and the Japanese Yakuza, are developing new working relationships. They are developing cooperative arrangements, and networking with one another and with insurgent and terrorist organizations to take advantage of one another's strengths and to make inroads into previously denied regions.

This has allowed terrorists a new means to raise money as well as provide them with a marketplace to purchase sophisticated weaponry and other high tech equipment. This cooperation, for example, has long been seen among Colombian drug lords and Italian crime groups in exploiting the West European drug market, but now is seen in New York City and in Eastern Europe with drug and financial crime networks linking Russian and Italian groups.

As organized crime groups become increasingly international in the scope of their activities, they are also less constrained by national boundaries. The new lowering of political and economic barriers allows them to establish new operational bases in commercial and banking centers around the globe. The willingness and capability of these groups to move into new areas and cooperate with local groups is unprecedented, magnifying the threats to stability and even governability.

All of these transnational groups are becoming more professional criminals, both in their business and financial practices and in the application of technology. Many of them use state-of-the-art communications security that is better than some nation's security forces can crack.

*The Challenge of Cyber-terrorism:*

While a number of excellent studies—both classified and unclassified—have been produced on the information warfare threat, popular journalism has also produced a great deal of hyperbole on this subject. That the National Information Infrastructure is vulnerable to an Information Warfare attack is unarguable. A recent National Intelligence Estimate verified this threat. The challenge comes in providing context and a proper appreciation of the nature of the vulnerabilities and the extent of the threat.

Traditionally, the information warfare threat has been associated with the telecommunications infrastructure and the ability to communicate. This remains a primary area of concern. But the government is also growing more and more dependent upon the commercial power, transportation, energy, and finance communities, and these communities are also vulnerable to attack. All of these major national infrastructures share a common dependency on computer driven management and control systems. With the passage of time, technical and economic imperatives have

31

driven these infrastructures to more and more dependence on networked computer driven systems. Indeed, the complexity of the software involved in the "system-of-systems" that drive some of the major infrastructures is a significant concern.

By virtue of this increasing dependence on networked computer driven systems, all of these infrastructures possess some degree of vulnerability to infowar attack. The question is how vulnerable?

Some of the critical infrastructures (e.g., the Public Switched Telephone Network—PSTN) have been the subject of hacker attacks for years. A number of the major companies operating networks that comprise the PSTN have very robust programs to defeat toll fraud and ensure network continuity. Others have placed less emphasis on this problem and, while a structure exists to facilitate cooperation among the various companies, the level and quality of the cooperation is mixed. The continued globalization of the economy, information, and technology will provide significant new opportunities for those seeking to terrorize or intimidate. This is because the interdependencies created by such networking provide a broader base for greater destruction, especially in the areas of infowar. Concurrently, these very trends may also provide new and better means of tracking, capturing, preventing or deterring these same criminal elements. However, our own growing dependency on computer-driven systems in government, within industry, and throughout the Nation's infrastructures of oil and gas, finance, communications, power, and transportation undoubtedly increases our vulnerability. The President's Commission on Infrastructure Protection has vigorously studied the vulnerabilities of our infrastructure, however it remains to be seen if our society can effectively organize itself to protect these key assets of our nation. (The denial of service attacks launched against several major Internet sites in February of 2000 graphically demonstrates this growing threat to our National security and well being ).

Whatever tools terrorists select, the fact of increasing cooperation between crime, narcotics and terrorist groups will provide terrorists with new, more creative ways to raise money and a marketplace to shop for weaponry and high tech equipment.

Weapons of mass destruction are not the only highly destructive tools that terrorists may use. As the government becomes more and more dependent upon commercial-off-the-shelf information technologies, products, and networks, it will become more vulnerable to the infowar threat. This vulnerability will not be limited to potential IW attack on the operation of support infrastructures, but also will include potential "time bomb" attack via pre-programmed imbedded software in operating systems, much, of which software is written abroad.

In addition to foreign nations placing more emphasis on developing infowar capabilities, there is growing evidence that drug cartels and other transnational groups—to include some terrorist groups—have recognized the potential for infowar and are developing capabilities. In fact, some groups, like the FARC, ELN, Provisional IRA, and the Sendero Luminoso, already target information infrastructures today for the purposes of collecting intelligence, targeting data, and monitoring of law enforcement and other government activities. In time, with the increasing availability of infowar attack information on the Internet and in other public media, transnational groups will establish some modicum of capability in this arena.

It is the American character to believe we can solve all problems with our ingenuity and hard work. But even if the United States intelligence and law enforcement communities were given the means to correct these gaps, there still would remain a significant portion of terrorist planning, preparation, operations and attacks that will be unpredictable. Just as better defenses have turned some terrorists away from harder targets, the amorphous nature of the "new" terrorism, combined with the uncertainty inherent in predictive analysis of chaotic behaviors, means that some events will remain unforeseen.

We as a nation may not be able to prevent all acts of terrorism given the nature of our democratic society. However, the new vehemence of terrorist groups and their access to both high technology and weapons of mass destruction make it imperative that we do our utmost to prevent terrorist acts and prepare for the dire consequences if we fail."

Not long after I retired from Federal service I was asked to participate in a conference on Terrorism, hosted by the Ethics and Public Policy Center in Washington. On October 11, 1996 I made a presentation to the conference entitled, "Counter-terrorism and Democratic Values: An American Practitioners Experience" This presentation outlined some of the many difficulties that we have in balancing our need for security and our desire to maintain our Constitutional protections. I have edited the remarks for brevity but believe that what I said has relevance to our current situation.

"In 1980, I became an Assistant Director of the Federal Bureau of Investigation and was placed in charge of the Criminal Investigative Division of the FBI, which

32

had responsibility for all criminal investigative programs, including Terrorism. At that time, the U.S. was suffering approximately 100–120 terrorist incidents per year. People think the World Trade Center and Oklahoma City, were the first acts of terrorism in the U.S., however, we have a very short collective memory. During this period when we were still attempting to deal with violence associated with Black power, the uproar in the civil rights movement, the anti-war movement, and so forth. We still had a very active level of terrorism by many groups in the U.S. There were a number of Puerto Rican organizations that were carrying out the most acts of terrorism. We also had the remnants of the Weather Underground that was still very active in committing acts of terrorism, including murder, assassination and bombings. We had groups that were committing terrorist acts right here in Washington—placing a bomb in the Capitol building and at the Naval base in the Potomac Basin. We had groups that were targeting the infrastructure of the U.S., carrying out bombings against power stations and communication centers. And we also had groups that were aiming at the military structure, recruit centers, depots, and so forth in the United States. In the FBI we were trying to cope with the after-math of one of the frequent purges that goes on in our Government.

There had been no consensus in our Nation in the 60s and 70s on how to deal with major national issues, particularly the Vietnam War and anti-war movement, and to some degree the more radical elements of the civil rights movement, and therefore the Executive branch of our Government had taken certain actions, and those actions had not been by consensus. They had been essentially Presidential decisions. Some of these governmental actions included tactics that today would be considered illegal—at the time were not illegal, but were very unwise. The FBI and military intelligence as well as the CIA, engaged in activities, which sought to determine who was behind certain movements, causes and groups that carried out violent acts. Improper activities by these agencies included wiretaps and surreptitious entries into locations seeking intelligence. In most of the world today, including Britain, France, and Germany, these types of activities are still authorized by executive order of their government. In the U.S. they are not. In my view they should not be. But at the time they were.

In the mid-70s, our Nation had gone through Watergate and the turmoil that brought to our political system, and coming out of the Watergate milieu was a series of Congressional hearings called the Church and Pike Committee hearings. In these hearings the intelligence components of the U.S. Government were highly criticized for their activities during this period of time. Particularly, their spying upon elements in our society that were considered radical, but not necessarily a threat to our existence as a Nation. Of course, they never became that. So, there was no consensus in our body-politic as to the degree and extent to which the domestic law enforcement and intelligence services could and should be utilized to determine the root causes, the structure organization, membership and participants in groups, that in fact, descended into the use of systemic violence.

The Church and Pike hearings resulted in a great deal of criticism, it was primarily directed at the CIA, but the FBI got its share, including for a very misconstrued and ill-considered program called COINTELPRO. COINTELPRO was the adoption of counterintelligence methods used against a foreign power for use against domestic groups. In COINTELPRO the FBI used extralegal tactics to determine who was behind certain movements and what they were involved in and so forth. As a result, the Bureau was quite traumatized and not certain of its proper role and the legal use of executive authority in the pursuit of terrorism, although it was not even called that at the time. Terrorism was still considered a domestic security issue. Terrorism was not *en vogue* as a description for a program that the government would use, today "terrorism" or "anti-terrorism."

In the late 1970s, the FBI practically shut down its entire domestic security operation. It was dealing with specific criminal acts after the fact and had virtually no collection, analysis, or utilization of intelligence prior to the commission of any sort of violent action by a politically motivated organization. In 1980, several of these incidents had climbed to the point where we simply believed that we had to become pro-active again, but to do so very carefully and under a set of guidelines which we had participated in designing called the Attorney General Guidelines. These guidelines were intended not only to tell us the limitations of our authority, but also to sanction those actions that we did take, and to make sure that people understood that this was a legitimate exercise of the legal authority of the President, the Attorney General, and those charged with carrying out their responsibilities. So under the Attorney General Guidelines, we began to build a more pro-active program during the early 80s. In 1982, I recommended and Director Bill Webster, who had been appointed Director of FBI in 1978, agreed to designate Terrorism as a national pri-

ority of the FBI, thereby joining counterintelligence, organized crime and white-collar crime as the principal national priorities of the FBI.

In 1982, we incurred 51 terrorist incidents, 7 people being killed and 26 being injured. There were still a number of very active groups. From 1982 until 1988, we were able to reduce terrorism in the U.S. down to the point where we were incurring only 5 to 10 incidents a year, and only three or four groups were actually still functioning. We had been able, through the use of the law, through the use of prosecution, through the use of the legal procedures, to preempt and neutralize organizations both domestic and foreign that were operating and committing acts of terrorism in the U.S.

In the late 1970s and early 1980s, in addition to domestic groups operating in the United States, we had groups that had their cause, and their base overseas. We had Sikh terrorism, Armenian terrorism, Croatian terrorism; we had terrorism from virtually every continent, but with some of their violent acts being perpetrated in the U.S. There were groups carrying out attacks against the Soviet Union, Turkey, and India, all functioning and operating in the U.S. It was a precursor to what we have today.

But because of the renewed vigor of the Counter-Terrorism program and the emphasis we had given it, we were able to prevent 56 terrorist incidents that if they had occurred, would have resulted in massive loss of life in the U.S., including assassination of foreign leaders while they visited the U.S.

Other incidents similar to PanAm 103 were prevented because of our ability to collect and utilize information under the Attorney General Guidelines.

Of course, this was also the time President Reagan's policy in Central America had become very controversial. We had another situation develop that again set back the development of a totally effective counter-terrorism program. That was a case or series of cases called CISPES—the Committee in Solidarity with the People of El Salvador was the organization. In 1982 or 1983, intelligence had been received from the CIA that this entity in the U.S. was actually a front organization for the terrorist apparatus in El Salvador and was largely funded by Cuba and the Sandinista regime in Nicaragua. The FBI developed an informant who was Salvadoran and there was a substantial amount of information coming in that indicated that CISPES was formed to support of the revolutionary element in El Salvador, which directly supported the terrorist organizations in El Salvador, particularly the "Farabundo Marti National Liberation Front" (FMLN). Information was also received that indicated CISPES was using the U.S. for fundraising, arming and even recruiting people to go to El Salvador—all in violation of U.S. law, and was otherwise engaged in activities that were illegal in the U.S. An investigation began within the Terrorism Section, utilizing FBI field offices in several locations—Dallas, New Orleans, and so forth. This case was one of several hundred pending cases in the Terrorism Section at the time. It never reached the level of the Assistant Director in charge of Criminal Investigations, which I was when the case began, or later the Executive Assistant Director for Investigations, which I was at the time that the difficulties developed. The reason it didn't is because no extraordinary investigative techniques were used—there were no wiretaps, there were no undercover operations, the information was gathered from attending public meetings, from physical surveillance, from the use of informants, all of which were authorized under the Attorney General Guidelines. But, because of the heightened political dichotomy and the disagreement between the President and the Congress, we had a Democratic Congress and a Republican President (this became a focal point for a clash of philosophies, and particularly strategies in dealing with Central America), it became very much a *cause celebe*.

While not denying that there had been mistakes made in the investigation and some violations of our own regulations, the charges against the FBI were that: 1) it was involved in a political investigation; 2) that it was using illegal tactics; and 3) it was violating the Constitutional rights of those involved in this movement. In fact the investigations by the FBI, by the Justice Department, and by the Senate Intelligence Committee, found that none of those allegations were true. There was no political involvement whatsoever on the part of the Reagan Administration—they were not even cognizant that we were involved in this investigation when it was opened. The investigation had been reviewed by the Justice Department's Office of Intelligence Policy and Oversight early on and had been sanctioned as a legitimate investigation. There had been no violation of anyone's Constitutional rights. No one had been prohibited from attending meetings, from speaking their piece or from carrying out their activities, from engaging in all of the protected activities. No one had been impeded, obstructed, or in any way intimidated into not engaging in those activities. Nor had any FBI agent committed any violation of law other than the case

34

agent who was involved in a financial fraud in dealing with informant payments. But that had nothing to do with the members of the CISPES organization.

Then *The New York Times* and *The Washington Post* said, "The FBI admits that it was engaged in illegal actives as they did during COINTELPRO," which was nonsense. I testified before the Senate Intelligence Committee although I had not been personally involved in the CISPES investigation; it had never risen to my level for approval. But in looking at case, I felt there was substantial justification for at least part of the investigation and I was extremely worried that we would suffer again what we had gone through in the late 70s and early 80s. In that the Senate inquiry would jeopardize careers of people who were honestly trying to do their very best to prevent acts of terrorism in the U.S., and who had no ulterior motive except to defend their Country. Unfortunately, that's exactly what happened. In 1988 again we almost went down to ground zero in carrying out our counter-terrorism responsibilities. And that's what led us, in my view, to what happened at the 1993 World Trade Center bombing. Before the World Trade Center, there was an assassination in New York of an individual who was known to most of you, Rabbi Meir Kahane. Rabbi Kahane was himself an extremist. He created an organization—the Jew Defense League (JDL)—, which also engaged in acts of terrorism in the U.S. He engendered a group in Israel that ultimately, I think, committed acts of terrorism, or at least facilitated acts of terrorism, including by an American Jewish doctor who had moved to Israel—Dr. Goldstein. And some of his more active followers fled from the U.S. while under investigation for assassinating a Palestinian-American in Los Angeles and were essentially given sanctuary in Israel—which was one of the difficulties that we had at the time. The New York City Police Department carried out the investigation of the assassination of Meir Kahane with the FBI looking over their shoulder to see if there was anything of interest for the Bureau. I was in charge of Bureau operations at the time and I never received any information that the assassin of Meir Kahane was connected with any sort of organization that might have a terrorist agenda.

As it turns out later, as we see after the World Trade Center, there was substantial information available that if it had been properly translated, processed, authenticated and analyzed, would have led to a direct association between the assassin of Meir Kahane and the group that conspired and eventually did bomb the World Trade Center, and was conspiring to carry out a number of other heinous acts of terrorism. A proper analysis of the Kahane assassination was not conducted. By-and-large the reason it didn't get done was because of the political climate and the fact that FBI agents were loathe to undertake anything that had any appearance of being involved in the political process. That includes religious activity, free speech, etc., that are obviously protected under our Constitution. It had become very difficult to assess how to deal with those issues.

When I left Washington in May 1991, we were feeling pretty good. The Cold War had ended, we believed our side had won, Communism in the U.S. and the affiliated organizations were largely defunct. Communism as a global movement was essentially discredited. Terrorism was held in check in the U.S. and was descending on an international scale, at least the international acts of terrorism, although terrorism still was very evident in certain countries—Algeria, Israel, India, Northern Ireland, etc. But as far as the U.S., we were becoming less and less a victim. We had defeated Saddam Hussein in an unprecedented alliance and in doing so had countered his threat of global terrorism without any serious losses.

All in all we had done a good job in dealing with the threat of terrorism in spite of a lot problems along the way. Of course, the Iran-Contra controversy arose and there were new allegations that we had again been manipulated and used by the Reagan Administration, which were also untrue. But it took a while to sort this out. However by 1991, I felt very good about leaving Washington, finishing my career in Texas and moving on into another life after government.

Then in 1993 the World Trade Center bombing occurred. Although I was in Texas at the time, we started seeing a nexus between certain people in Texas, particularly in the Dallas/Richardson area, and those directly involved in the World Trade Center. This heightened my interest as to what was really involved. Was this the act of a very small group that was independent and now defunct because of the investigation? Or did it really indicate a much larger and perhaps more global conspiracy?

Unfortunately, perhaps the most informative trial, or series of trials, in the history of the United States, as it relates to the issue of international terrorism, was overshadowed. During the entire course of the New York trials for the WTC bombing, some of the most important testimony, some of the most important revelations about an international movement, which had targeted the U.S. for vicious acts of terrorism on a global basis, was almost totally ignored. The Terrorism trial of the

35

Century was totally overshadowed by a tragic soap opera (The O.J. Simpson trial) from Los Angles. It would have been very instructive to academia, to the media, to our Congress, to have paid attention to what was going on in that trial. The trial revealed a global conspiracy not necessarily of a huge magnitude, but with a very sophisticated capability. One of the individuals who escaped the initial arrests, Ramzi Yousef, went on to plan a whole series of additional acts of terrorism, including the simultaneous bombings of between 11 and 13 U.S. airliners flying from Asia to the U.S., which was planned to occur in January 1995. They had already developed the technology, they had tested it, it had in fact worked—it killed a Japanese citizen aboard a Philippine airliner, they had tested it in a theater, it had worked, they had developed the techniques to put explosive devices on board aircraft, and were fully engaged in the plot to carry out these simultaneous bombings of the U.S. air fleet.

Growing out of the investigation into the World Trade Center, the Bureau through the Joint Terrorism Task Force detected a continuing conspiracy, that had not even slowed down because of the arrests, to carry out bombings on July 4, 1993, of the Lincoln and Holland tunnels, the George Washington bridge, the UN building, and the Federal building housing the FBI. This group also planned a number of political assassinations, including the president of Egypt and a senator from New York. If they had been successful these attacks would have cost several thousand lives. The conspirators were already present in the U.S. and were actively utilizing the protections of our Constitution to aid and facilitate their ability to operate and conspire to carry out these terrorist acts. We also saw certain potentially connected activities overseas, the bombing of the Israeli embassy in Buenos Aires, followed up by a terrible bombing of the Jewish Community Center in Buenos Aires, an attempted bombing in Bangkok, and a bombing in London, by an organization that was functioning and operating that neither the U.S. government nor Allied governments had come to grips with as of yet.

We started to get a handle on this group. The investigations were and are being conducted under the Foreign Counterintelligence Guidelines, which gives somewhat more latitude than the domestic guidelines do, and through the help of some people like Yigal Carmon and Steve Emerson, the Bureau started to understand and appreciate that it was dealing with a much wider conspiracy than just those involved in the World Trade Center bombing.

However, the bombing of the Federal Building in Oklahoma City on April 19, 1995, again demonstrated that our government was not properly prepared to address the specter of domestic Terrorism. The FBI was ill prepared to deal with this phenomenon because it was not investigating the growth of the anti-government militias and similar organizations at the time. Oklahoma City occurred on Wednesday. On Sunday morning I was asked to appear on Face the Nation, immediately prior to my appearance was Leon Panetta, the President's Chief of Staff. Mr. Panetta comes on and says, "Not to worry. The FBI knows all about these organizations and it has things in hand." I'm the next person and my comment is, "It isn't so". "The FBI does not have it in hand, the FBI has not been investigating these organizations, the FBI is not even aware of the totality of the militia movement." In fact, if it hadn't been for the Anti-Defamation League and the Southern Poverty Law Center, I don't think many people in the U.S., including the FBI, would have known much about the militia movement at all. The reason is because under the Attorney General Guidelines as interpreted at the time—and still—the FBI did not believe nor did the Justice Department believe that the FBI had the authority to collect information on groups that openly espouse the use of force and violence unless and until there is a criminal predicate. In other words, that there has been an action taken that would be an indication of a criminal offense in progress, or had that already occurred. The espousal of violence, the collections of arms, as long as the arms were not illegal, and organizing to commit violence, these things would not necessarily have predicated an investigation, and in fact with the militias they had not. We were faced with a situation in that not only did we have evidence of a growing militant, extremist element from overseas based on a misinterpretation of Islam, but we also had within our own country a growing network of groups and individuals who misperceived the entire rationale for our Constitutional form of government and blamed the government for all of the ills that they and our society were subject to. So, we had these twin concerns, one totally domestic, one primarily international, both coming to bear upon the safety and the security of the people of the United States.

No government can totally protect all the people, all the locations, all the activities in their nation, no matter how high the level of security at any given time, if a person or group is prepared to carry out a terrorist act no matter the risks involved and whatever the consequences might be. In the United States today, we're

36

faced with a dilemma, we do not as a people trust our government entirely to protect us from acts of terrorism, particularly if they are motivated by political or religious beliefs, and at the same time, we expect our government to protect us from terrorism and political violence. We have not reached a level of comfort with what authority we should grant to the counter-terrorism agencies and entities of our government with that responsibility. But at the same time we expect them to be effective. And we've had a very strange coalition develop over the last two to three years in our Congress where elements of the left and the elements of the right have coalesced and come together to oppose a President of the Democratic Party and the leadership of the Republican Party in Congress, in putting together anti-terrorism legislation that has been supported through three Administrations. Which would withstand Constitutional scrutiny, most elements of which have already been ruled on by the Supreme Court in other forms, such as the roving wiretap issue, which has already been adjudicated in organized crime and drug cases as being Constitutional.

There is no consensus in our society as to how far we will allow the counter-terrorism forces to proceed. Under the guidelines as they are today, the FBI is in the very unusual position of being perhaps the only people in our society who cannot take official cognizance of what people say, of what people do, of what people pronounce and promulgate that they will do until they do it. A professor, an institute, a newsman, can collect this information, can analyze it, collate it, can make pronouncements on it, can issue statements of concern, can say the government ought to be doing something or ought not to be doing something, but the FBI cannot. It is prohibited under the current guidelines and a provision of the Privacy Act, from collecting public information even from groups who directly espouse the use of violence to accomplish their objectives. We have already seen a terrorist organization, which was in actuality both a political movement and a religious cult, called the Aum Shinrikyo in Japan, turn to the use of a very dangerous gas—Sarin—developed by the Nazi regime before World War II, with the potential loss of life in its use of thousands. A dozen Japanese citizens were killed and thousands were injured, but that was fortunate. They hadn't really perfected their delivery system as yet, but they intended to kill thousands of people of people. The Aum specifically targeted the Japanese National Police in these attacks and tried to assassinate the Commissioner General of the Police. Their ultimate goal was to bring down the Government of Japan.

We've seen chemical weapons used by outlaw regimes; we've seen the capability of use of chemical weapons obtained by terrorist organizations. In the United States we have people that support and are involved in the militia movement, collect biologicals, including anthrax, which is probably one of the most lethal diseases that could ever be released, and yet it is easily obtainable. We have botulism that can be cultured and proliferated by obtaining a small amount of the toxin. We've already seen terrorist organizations and state sponsors of terrorism utilize these types of weapons of mass destruction, and we have a continuing, growing proliferation of nuclear materials coming out of the former Soviet Union that may not lead to the development of a nuclear device but could certainly lead to contamination through spreading nuclear materials by the use of a conventional explosive device.

As the threat escalates, and we've already seen terrorists utilize weapons of mass destruction, we as a society have not yet as even determined how we're going to utilize and authorize our counter-terrorist forces to prevent acts of terrorism. In a discussion with Senator Specter, during the CISPES inquiry, I asked him, "Senator, do you want us to wait until there's blood on the streets to act? Or are you going to authorize us to act on information that any reasonable person would assume to be true?" And he said, "In a democratic society, you may have to wait until there's blood on the street." If that's one person, maybe society can accept it. If 50,000 people are killed in the World Trade Center bombing, which was the intent of the terrorists, will we as a society accept that? 168 people were killed in Oklahoma City and it traumatized our society. What would the death of 50,000 have done? What would the blowing up of 12 or 13 PanAm 103s do to our society? What would be the reaction of our Congress? Do you think they would stop with the FBI being able to collect public information? Or would we see internments, would we see mass expulsions, would we see the *writ of habeas corpus suspended*? Would we see Draconian measures? I'm concerned that our society would overreact.

As a person that has dealt with enforcing the law for thirty years, that concerns me greatly. In the United Kingdom, from which our legal system was developed, they have suspended the right of trial by jury, they've suspended the *writ of habeas corpus*, they've allowed investigative detention without charge, they've engaged in wiretaps and electronic surveillance without court order, and this is in a society that is civil and democratic and certainly is one that we look to as one of the founding

37

nations of democracy. The British, the French, the Germans, all use extralegal means to combat terrorists. We do not, we should not, and we don't have to. But we have to reach a reasonable balance to allow those elements of our society charged with preventing terrorism an opportunity to carry out their duties and do their jobs.

Right now the balance is not there.

I wish that I could tell you it is my belief that we won't have additional World Trade Centers, PanAm 103s, and Oklahoma Citys—I have no such expectation. There have been some improvements, but they are not what they should be to put us in a position to have a reasonable chance to prevent the kind of events and terrible incidents that I've described. As the potential use of even more devastating weapons increases, we have not increased our capabilities.

Do I think that we ought to impose Draconian measures on our society to prevent terrorism? Absolutely not, that would allow the terrorists to win. But we must find a reasonable balance. We can find a reasonable balance under the Constitution. There's no question that we can. We need the political will and we need public attention for more than 24 hours. In our society, that is very difficult to achieve. But this is a battle we must win to protect our nation from the scourge of terrorism."

Chairman Hyde I am certain that you and your Committee will determine that we need better tools to deal with the problems that increase our vulnerabilities. I only ask that we learn from our past mistakes and oversights. I sincerely believe that we must restructure our Intelligence and Federal law enforcement agencies if we are to come to grips with this most elusive and insidious enemy. Our Nation must be able to protect itself from those who come here to attack our citizens and attempt to destroy our Country and our way of life.

Thank you,

Chairman HYDE. Mr. Revell, I understand that you have a video that you want to play.

Mr. REVELL. Yes, sir. In 1994, when I retired from the FBI, I was approached by an investigative reporter by the name of Steve Emerson who was working on an issue that was of concern to him and that he had in fact brought to my attention while I was still in the FBI and we were investigating the first World Trade Center bombing and that was the existence in the United States of certain groups and organizations that were in support of terrorist organizations overseas, particularly Hamas, Hezbollah and the Palestinian Islamic jihad.

I reviewed his material. I looked at the documentation and the video. I saw the translations and I, along with Ambassador Bremer and some others, reacted to what we saw. This documentary, which was produced by Public Broadcasting, was actually broadcast I believe in 1995 and it is called Jihad in America.

Chairman HYDE. Well, I understand it takes about 13 minutes.

Mr. REVELL. Well, the entire video is 60 minutes, but I think the excerpt has been edited to 13 minutes.

Chairman HYDE. Our Committee staff has reviewed an earlier version of this tape. Like the producers, narrators and several former U.S. officials that are featured on the tape, we do not believe Islam or the overwhelming vast majority of Muslims in the U.S. support the use of violence and hatred as portrayed in this video. I want to make that clear.

Mr. REVELL. I think if you saw the entire video you will see that that statement is made over and over again. I made it personally, and Ambassador Bremer made it, and the narrator made it. There is no indication of belief on our part that the 6 million Muslims in the United States are uniformly in favor of terrorism or violence, but there are within this community, just like there are within the Christian community the Christian Identity movement and other radical elements that have used our very protections, our civil

38

rights, our constitutional guarantees to protect their ability to support and function in support of terrorist organizations overseas. That was the issue.

Chairman HYDE. Very well. That is fine. Can we play the video?

Mr. ROHRABACHER. Mr. Chairman, for the record, I think this is very ill-advised, after thousands of our people have been slaughtered, to play something about domestic Muslims in our country that may make them look like they are part of a terrorist network. We have to get the truth out, but this may not be the moment to play this at a congressional hearing. I have never seen this tape, but if it is dealing with what is going on in our mosques and to our fellow citizens, this may not be a good moment to be doing this.

Ms. McKINNEY. Mr. Chairman, I would also like to lend some words in support of my colleague Dana. I have not seen it either. If the Chairman himself felt he had to provide some characterization that this in no way suggests that all Muslims in America are terrorists, then maybe this information is something we should view before it is just put out there for the entire country on these television cameras that are here to see.

Mr. SMITH OF NEW JERSEY. Mr. Chairman.

Chairman HYDE. Mr. Smith.

Mr. SMITH OF NEW JERSEY. Mr. Chairman, I have watched the entire video. It has been sent to every one of our offices. I have watched it not once but twice. As Mr. Revell pointed out, it has made it very clear that these are people coming in under the guise of doing humanitarian work in New Jersey and Kansas and elsewhere who are openly and actively talking about killing, using the sword, and I think it is very appropriate and—since it has been drawn down to a concise fashion—for this Committee to see it.

I have watched it twice, and I would admonish every Member to watch it. Because the threat is very real, and most of these people come into this country using all of our openness to our own disadvantage, and we need to be much more aware of what is going on.

Mr. ROHRABACHER. Would the gentleman yield for a question?

You have seen this video several times in its entirety, you said. Are you sure that the editing that has been done provides the safeguards that we are talking about so this wouldn't lead to attacks on——

Mr. SMITH OF NEW JERSEY. Throughout that video that point is made, that the overwhelming majority of Muslim belief decries the use of violence. These are extremists, and it is in their own words, and we need to hear it from their own words.

Ms. McKINNEY. Would the gentleman yield, please?

I would like to ask if the 13-minute edited version has this language about not blaming all Muslim Americans or suspecting all Muslim Americans. Is that included in the 13-minute clip?

Mr. REVELL. The video never blames Muslim Americans or makes that leap that Muslims are——

Ms. McKINNEY. The question is, even you say that all Muslim Americans should not be characterized as believers in terrorism and violence.

Mr. REVELL. What do you mean by "even I say?" I have spent 40 years protecting Muslim Americans.

39

Ms. MCKINNEY. I am just quoting what you said. I wrote it down here. So the question I have is, does the 13-minute clip have that kind of language in it as well?

Mr. ACKERMAN. Mr. Chairman.

Chairman HYDE. Yes, Mr. Ackerman.

Mr. ACKERMAN. I confess to having sent this to Members' offices quite some time ago—435 copies. It is replete with continuous disclaimers. And if anybody would like, maybe the Chair could lead us all at once in saying that nobody blames Muslim American——

Mr. ROHRABACHER. Does the 13-minute version we are going to see have those disclaimers——

Mr. ACKERMAN. I don't think there is any 13-minute section that doesn't say it.

Ms. MCKINNEY. Maybe it has a 15-minute clip that at least has a 2-minute clip saying——

Chairman HYDE. Would the gentlelady yield?

Ms. MCKINNEY. Yes, I will, Mr. Chairman.

Chairman HYDE. The Chair will make a decision. This is part of Mr. Revell's testimony. I don't believe in censoring the testimony of a witness or forbidding something because it might offend somebody's sensibilities. I think the point has been made again and again that this is not to demonstrate a tendency on the part of the majority of Muslims in our country to violence or to terrorism. With that, the Chair will direct the staff to show the video.

[Video shown.]

Chairman HYDE. We will now entertain questions. Mr. Lantos.

Mr. LANTOS. Thank you, Mr. Chairman.

I want to commend all three of our very able witnesses. With everything else having become globalized, we ought not to be surprised that terrorism has become globalized as well. I would like each of you to comment on the extent to which Hamas and Hezbollah, typically associated with the Middle East, are connected or related to or associated with or cooperating with al-Qaeda and this network in Afghanistan. Mr. Cannistraro.

Mr. CANNISTRARO. Congressman Lantos, in this investigation, both from the law enforcement point of view and intelligence point of view, there have been no indications that Hamas is connected or Hezbollah is connected. Al-Qaeda has the resources, the zealotry, and the willingness of its followers to commit suicide to conduct this operation. What we saw in that film is alarming, but it has nothing to do with al-Qaeda.

Abdullah Azam, who is shown in that film, was assassinated by bin Laden. There was a disagreement between them about the objectives—about how to carry out the objectives. Bin Laden wanted to carry it around the world and he wanted to focus on the establishment of an Islamic crusade in the Muslim world and Azam did not. So when we look at what happened on September 11, we have to be very careful to avoid connecting groups that may not be connected to it.

People talked about Iraqi involvement. Certainly Iraq operates on the principle of the enemy of my enemy is my friend, but there are no Iraqi assets used in this operation.

Iran has wished us harm in the past, and they conducted the operation at El Khobar in Saudi Arabia in 1996, killing several of our

40

young service people, but they were not involved with this operation.

We have to focus on the immediate objective, which is the nerve center in Afghanistan and its connections around the world. The problem is, if we lose this focus, we will not be able to root out this evil—and that has to be our immediate focus. Whether or not we want to make a reckoning with Iraq at some future point, that decision should be made down the road. In the immediate aftermath of September 11, we have to concentrate on rooting out the Taliban and bin Laden.

Mr. LANTOS. So you agree with my initial comments that we should view this war against terrorism as a sequential war and the focus for the immediate future needs to be on Afghanistan and on this group?

Mr. CANNISTRARO. I do, sir. I think there is no question that we should go after, as the President said, terrorists with a global reach. I think we have to attend to the immediate business at hand.

Mr. LANTOS. Mr. Santos.

Mr. SANTOS. I also agree with his testimony, and I would also mention that Afghanistan is a symbol. It is part of a myth of Sunni extremism right now, and that is a particularly important reason why that needs to be the first place that we would go after. The Taliban and bin Laden have been building that symbolism and that mythology, and I think it is time to take that back.

Mr. LANTOS. Mr. Revell.

Mr. REVELL. I don't know of any information that would indicate that either Hamas or Hezbollah was directly involved. However, the Hezbollah has been named in the indictment for the east African bombings as being involved in those bombings; and there has been substantial intelligence of at least cooperation with al-Qaeda by Hezbollah and Hamas. Certainly I don't think the extent to which other terrorist organizations were involved in this organization and supported it is known yet, and I think we need to remain focused. Certainly I think the evidence is that al-Qaeda led this and was the principal entity responsible, but we should not ignore the possible participation of other groups. They have participated and supported terrorist actions in the past.

Mr. LANTOS. Assuming that bin Laden and al-Qaeda are destroyed, what is the danger of repeating the mistake at the end of the Persian Gulf War where we left Saddam Hussein in power, in this case leaving other international terrorist organizations in power? Is it your view that once this task is completed we have to move on and destroy other international terrorist networks? Mr. Cannistraro.

Mr. CANNISTRARO. I believe that, as the President said, we should go after every terrorist group that targets Americans. If they carry out terrorist operations against Americans, I think we have the responsibility to our fellow citizens to go after the source and deter future acts of terrorism. We are talking about human life here, so I don't think there is any question that we should go after those groups that target Americans.

Mr. LANTOS. Is the record clear that Hezbollah has killed Americans?

41

Mr. CANNISTRARO. The record is very clear that the Hezbollah carried out operations against the United States, that the infamous Imad Mugniyah has carried out operations against the United States. It may have trained the people who actually did the bombing of Al Khobar at the behest of the Iranian government.

Mugniyah has become an instrument of Iranian intelligence. We haven't seen his hand or footprint here, and I wouldn't expect to, given the pattern of the suicide bombers themselves and the methodologies that they employ. It doesn't have Mognea's footprint on it. We know that the resources can be traced back to al-Qaeda from the personnel, the majority of whom were Saudis, to the money and the command and control apparatus. That all goes back to Afghanistan.

Mr. LANTOS. Mr. Santos.

Mr. SANTOS. I don't feel like I am able to comment particularly on Hamas or Hezbollah, but I will say this in terms of what you have to do in Afghanistan. I think it is not just a question of eliminating the Taliban. That is a prerequisite. But one needs to deal with the other dimension of extremism that has fused together with these Sunni extremists—that is a hypernationalist notion that we have seen in other places like Serbia that has to somehow be addressed. So extremism is extreme ethnic notions and extreme religious notions that are often different sides of the same coin, and I think that needs to be understood in terms of approaching these problems.

Mr. LANTOS. Mr. Revell.

Mr. REVELL. If we were able to completely eradicate the bin Laden network, we would still face terrorism. We faced it before. It existed, particularly the radical teachings of some of the extremists. As I indicated, the Ayatollah Khomeini was the first one who really started this, and his movement is Shia. The radical Sunni elements have now taken the vanguard. I am not a religious expert, but I have seen for the first time in my knowledge the cooperation of various extremist elements that are both Shia and Sunni and common objectives which have been very unique.

Certainly Hezbollah continues to be a threat to the United States. It has shown its ability to operate oversees in Southeast Asia, in South America. It has an infrastructure in the United States.

Hamas has a tremendous support structure. It has not carried out any terrorist operations in the United States, but it has a tremendous apparatus here for fund raising, for support of other types of activities. Hamas also has a unique footprint in Israel in that it does carry out humanitarian activities, giving it a rationale for fund-raising in the United States, much like NORAID and the IRA did in the United States early on when we did not have the ability to go after those type of activities.

So the short—the long answer, Mr. Lantos, is even if we are 100 percent successful in going after Osama bin Laden, even if the Taliban falls, we still will have perhaps an invigorated group of people against us of like-minded people who believe that the United States is the great Satan.

Mr. LANTOS. Thank you.

Mr. SMITH OF NEW JERSEY. [Presiding.] Mr. Gilman.

Mr. GILMAN. Mr. Revell, I want to commend you for bringing the film here. I think it is very important for our Committee to learn more about the network within our own Nation. What more should we be doing to address the radical jihad movement in our own country?

Mr. REVELL. Mr. Gilman, that is probably the most difficult issue that any of us in law enforcement and Congress and the courts face. Because, as I pointed out in the film, it is our very protections that afford these individuals to come to the United States and sometimes have domestic support but are largely an overseas apparatus and they operate here under our constitutional protections.

We cannot give up our constitutional rights, and I would never make that suggestion. We do have to be somewhat smarter in how we control our borders, who we let in, our visa process, our clearance process and more alert to those who would come in to abuse our hospitality and the atmosphere of our civil rights that exist in this society. I don't mean we should shut down our border, but we have to be more astute in how we clear people and what we allow them to do once they are here.

Mr. GILMAN. What about the network of people that we have already identified? What can we do about them?

Mr. REVELL. The President has taken action to freeze assets. We can look at the tax free 501(c)(3) status of many of these groups that are supposedly formed for educational and humanitarian purposes but whose purpose has proven to be or at least been alleged to be for direct support of terrorist organizations.

I think it should be clear that there is a right of people that are of the Muslim faith, people that come from the Middle East, to raise funds to support humanitarian purposes. That should be clear. But we also should have a mechanism to ensure that that is what those funds are being used for.

Mr. GILMAN. Thank you, Mr. Revell.

Mr. Santos, today's *Washington Post* notes the Taliban's penetration of the Pakistani intelligence service (ISI). Could you give us more details of Pakistan's involvement with the Taliban and how reliable is Pakistan as an ally in our war against terrorism?

Mr. SANTOS. Pakistan has been a sponsor and backer of the Taliban since the very beginning, which goes back to the Bhutto government, in fact. It has been a consistent policy of Pakistan. I think one of the reasons they did this was dealing with their own campaign in Kashmir, and so it allowed them to shift their training facilities into Afghanistan. Those facilities were able to benefit from the very networks being developed by the Taliban.

So I would say that Pakistan's involvement is significant. Many of the ethnic connections are within the Pakistani army and many of them are Pakistani Pashtuns. So you have links by family and clan that cross over the border. So you would expect that within the Pakistan military there would be significant connections from family to business with the Taliban and ultimately with bin Laden's network. So I think in terms of reliability one just needs to keep that in mind, and I think the issue of Pakistan being a dependable ally may be a bit more problematic than it was 10 years ago.

43

Mr. GILMAN. Mr. Cannistraro, would you like to comment on Pakistan?

Mr. CANNISTRARO. No. I would just like to support what Charlie said.

I think it is correct that the ISI, which has increasingly become controlled by fundamentalist leaders over the years, has promoted not only the Taliban but training in bin Laden's camps, which leaves them with complicit hands. We are relying on them for information about locating bin Laden and at the same time they have been in some way a supporter of him.

It is clear that President Musharraf of Pakistan has finally made the calculation that the Taliban has to go and that he is willing to support an alliance comprised of other Pashtun leaders. He is supporting the political process in Rome, for example, the one that ex-King Zahir Shah is trying to organize. So I think they have made a decision here to support us. I think they have decided to change horses.

But, nevertheless, there is a legacy here, and it will continue in the future because of their promotion of terrorism in Kashmir, and that makes them at all times an uncertain ally.

Mr. GILMAN. Thank you.

Mr. Santos, the U.N. states, and I quote,

> "Funds raised from the production and trading of opium and heroin are used by the Taliban to buy arms and other war material and to finance the training of terrorists and support the operations of these extremists in the neighboring countries and beyond."

Shouldn't we be doing more with UNDCP and our own DEA to take the drug profits away from the Taliban and Osama bin Laden—profits that finance the terrorism?

Mr. SANTOS. Absolutely. In fact, initially the Taliban was just collecting a 30 percent tax on the opium, but by 1997 they were transporting it. They were buying it from the refining facilities and then selling it—so they made additional money on all that, and that was used to basically keep their war machine going. It basically financed their efforts to take the northern part of Afghanistan initially in 1997 and then back again in 1998. It is not a far stretch, since bin Laden and his people—as well as other extremists—were involved in those military efforts to create a link. This has gone on pretty significantly overseas as well.

Mr. GILMAN. One last question. Let me ask the entire panel. How can we improve the ability to try to penetrate the close-knit terrorist groups like al-Qaeda, where many of them fought together and know each other personally from fighting in Afghanistan? How do we penetrate groups of that nature?

Mr. CANNISTRARO. We need better intelligence. Intelligence is our first line of defense, and I think in this case it has failed us. We should do a retrospective. Why did it fail us? What do we need to do? What has the Central Intelligence Agency done or failed to do?

We have had a task force on bin Laden both at the FBI and at the CIA, yet neither service had any inkling that this was going to happen on September 11. We need a refocus and definition, which means we have to recruit people who by definition have

44

blood on their hands because they are terrorists. We have to get agents within the group. That means recruiting people already within al-Qaeda, or other people in the area who are likely to be recruited by al-Qaeda but who are responsible to us.

To do that, we are going to have to get our hands dirty. We have not been willing to do that. We have had a wave of political correctness that has affected our intelligence agencies over the last 10 years, sometimes for understandable reasons. I mean, there were human rights abusers on the payroll. So when Congress points this out and is critical, bureaucracy's reaction is to pull its horns in—to withdraw and to just do the safe thing and become risk averse. Well, that might be all right in Central America. It is not all right with terrorist groups. We have to take risks because they are the only way, taking risks, to prevent the taking of human life.

Mr. GILMAN. Thank you, Mr. Cannistraro. We hear that more and more these days.

Mr. Revell.

Mr. REVELL. Yes, sir. I want to go back to the point you made about the opium smuggling. If I am not mistaken, the United States provided something like $47 million to the Taliban for an eradication program. You talk about naivete. I think we need to re-examine that process.

Certainly Vince is correct. Our human intelligence needs to be vastly improved. You cannot determine a terrorist organization's activities by technical means.

We have been—I could never understand why it was all right domestically for the FBI to recruit members of the Mafia, La Cosa Nostra, known killers who were the only ones that could penetrate La Cosa Nostra and give us that information, but the CIA could not use individuals of this type.

Now that doesn't mean that you in any way support or facilitate or accept those kinds of actions on their part; and, if they do, then you have to take action. But you cannot get some—a choir boy inside of these organizations. You have got to understand that the only people that can give you information on these kind of groups and structures are the people that will be acceptable to them, and we have to accept that as part of the responsibility we have in collecting intelligence.

Mr. GILMAN. Thank you, Mr. Chairman.

Mr. SMITH OF NEW JERSEY. Thank you.

Mr. Ackerman.

Mr. ACKERMAN. Thank you, Mr. Chairman. I thank the panel.

I would like to address a point that is conspicuous by its absence in the testimony of all three of our distinguished panelists today. I think a lot of us have heard from some constituents some misguided notions and we have also heard the same on some of the call-in radio shows that tie this in with America's relationship to Israel and our policy in regard to the Middle East, an area to which none of you refer in your testimony. As a matter of fact, I think it is only Mr. Revell who even uses the word Israel one time in all of his testimony, as I have read all three prepared statements; and it is not mentioned with regard to this particular issue.

It has been my contention and response to these who say, well, America should reevaluate its policies in the Middle East because

45

we are favoring one side or the wrong side, some say, and if this keeps up the conclusion to which they would lead us would be just to cut our relationship with Israel off and take a different perspective and change our view as was referred to as a mistake by one of our colleagues here in an opening statement.

From my vantage point, and I would like you to respond to this, they are not mad at us because we support Israel. They are mad at Israel because Israel represents the bulkhead of freedom and democracy that they see us as representing as the big Satan, represents that as a bulkhead within their immediate part of the world under certainly insufficient yet Islamic control from their point of view. And that while some of the other leaders in the area, whether it is Saddam Hussein or Arafat or whoever compared to bin Laden, that these individuals are a bunch of Mini Me's that have a very limited agenda, which is to kill all the Jews and get rid of Israel. Bin Laden seems to have a much larger perspective and that is to attack all of western values, and any change in respect to Israel would not really affect their view of us.

How would you respond to that?

Mr. CANNISTRARO. Mr. Ackerman, it is clear that bin Laden would do what he is doing regardless of what happened in Israel or the occupied territories. It is not the number one item on his agenda. He wants to overthrow the monarchy in Saudi Arabia, which is a U.S. ally. He wants to overthrow the government in Egypt. He wants to replace these regimes with a religious regime, a theological regime. So he started his campaign against us way back in 1992. It wasn't the chief objective. He wanted to drive the U.S. presence out of the Middle East. He wanted to drive it out of the Gulf. He wanted to drive it out of Saudi Arabia.

Now, certainly he adds fuel to his zealotry by focusing on what is happening in Israel, but that is not what drives him.

Mr. ACKERMAN. Thank you.

Mr. Santos.

Mr. SANTOS. Yes, I would agree, and I would just add that this is about Osama bin Laden and the Taliban in fact are about a purified notion of Islamic control over the so-called corrupted Muslim world. What they are seeking to do is throw out any American or western influence and push it out. So in that context, if Israel is even a base of western values, then of course that is part of it. The real threat I think is the United States, because it is the sole superpower and the leader of the free world.

Mr. ACKERMAN. Thank you.

Mr. Revell, I thank you very much for editing that down and bringing it to the Committee.

I do want to point out that Mr. Emerson is in the audience with us, and we thank him.

Mr. REVELL. He actually brought it.

Mr. ACKERMAN. We thank him for the public service he has done in putting this together.

In your statements and in your testimony you have been fairly critical of the FBI in several aspects. I want to ask you specifically, toward the end of your written statement you referred to tying in the assassination of Meir Kahane, the militant, some would say racist, American Israeli rabbi who was assassinated by a terrorist

46

in New York, and you tie that in with the bombing of the World Trade Center in 1991 and are critical of the FBI in not tying them together. And indeed I could tell you a lot more of that but not in an open hearing. And you say that that is because the FBI lacked the—loathed to undertake—I am quoting you, anything that had the appearance of being involved in the political process. The FBI was absolutely dead wrong then in saying that the people that were involved in the assassination were acting on their own, et cetera. You think——

Mr. REVELL. It is critical of myself.

Mr. ACKERMAN. Yes, I know; and I think that is courageous of you to historically note that at this time. But is that still the FBI's viewpoint?

Mr. REVELL. No, I don't think so. The difficulty—we were coming off in that period of time one of these periods of criticism for us being overactive in so-called political issues. So throughout the field the agents felt I am not going to get involved in this kind of thing unless I just have to. So in the Kahane assassination, the FBI didn't have primary jurisdiction. It was a local homicide, but the Bureau was looking over the shoulders of the NYPD to see if in fact there was any radical involvement. They missed and I missed, because I was in charge of FBI operations at the time, and it never came to my attention that there was this connection that ultimately led to the same group that was involved in the first World Trade Center bombing in 1993.

Mr. ACKERMAN. I am trying to understand this from an operational point of view. At the time of Kahane's assassination, I will assure you that it was pointed out to the agents at the time who were doing the investigation that indeed the person who was the assassin, who was apprehended on the scene, had an involvement with certain people who indeed now appear on this video who have a connection with that shooting range in Connecticut that also appeared on the video. And the FBI's assertion at the time was that this assassin acted completely on his own and had nothing to do with any other group. Subsequently, of course, he was convicted of the World Trade Center bombing in 1991.

Mr. REVELL. That was totally——

Mr. ACKERMAN. How would they conclude that after 3 days that this assassin was not connected when other very amateurish investigators—and I am not referring to Mr. Emerson at all here, I am referring to others—were able to come up and point this out to these agents who completely denied this as a possibility?

Mr. REVELL. Congressman, I don't know. If I was still there, I would have found out. I left after the Gulf War and went to Texas and wasn't there when the first World Trade Center bombing occurred, but it was clear to me, even from Texas, that we had missed it, missed it badly. And I did not know why that had occurred and it certainly had to be something that was reexamined as the way that the Bureau was processing information that related to the radical elements. Whether they be Jewish radicals or Islamic radicals or Christian radicals, it doesn't make any difference. If they espouse and contribute and directly support violence, they certainly should have been subject to serious scrutiny from the Bureau.

Mr. ACKERMAN. I appreciate the Chair's indulgence, and I would like to speak with you separately, privately.

Mr. REVELL. Yes, sir.

Mr. ACKERMAN. Thank you.

Mr. SMITH OF NEW JERSEY. Thank you.

First of all, and again I encourage all Members and really the American public to view that excellent journalistic piece by Steve Emerson. It lays out in their own words what many of these characters have planned, perhaps have even carried out, and it raises some questions.

I, as a Member of Congress now for 21 years, have been a very staunch advocate of refugees. When I chaired the Human Rights Subcommittee, especially because of the work that Committee does on refugee protection, we were able to enhance many of our refugee programs. We tried with some success to increase the amount of money for refugees over and above what the Clinton Administration had asked for.

So I say that as a backdrop, and I am joined by Members of both sides of the aisle on this who believe passionately in refugees.

All the more reason why, when we see an organization like al-Qaeda—and I would ask you to comment on that if you would—that apparently uses as a front a legitimate humanitarian concern while simultaneously acting as a cover for the bringing in of terrorists or those involved in terrorist activities. It is like taking a Red Cross truck and using it as a car bomb. All of the defenses are down. People are more likely to give it safe passageway. A 501(c)(3) organization which is doing ostensibly humanitarian work and may even do some but meanwhile has another agenda seems to me to be the most despicable act of all, to use it for anti-humanitarian work.

I would like you to comment on that individual organization. What was done with some of those individuals who made that kind of hate speech? Did that trigger any kind of investigation? Did they break any laws when they talked about making widows and orphans and using the sword and AK–47s and the like in order to kill people? That takes hate speech, it seems to me, to new dimensions.

Mr. REVELL. They have not been prosecuted for it. It is a difficult dilemma in our society. There has long been the principle that you can't cry fire in a theatre, but we haven't quite defined that when it comes to political rhetoric espousing a religious or political cause.

Many of them have since been banned from entering the United States. Hopefully, we have somewhat more control. These were not necessarily refugees. These were people coming in and out of the United States, and some of them probably could have been prosecuted on false documentations and passport violations. We did not have the best enforcement effort at this time through INS and certainly not the State Department's visa process. All of them have to be corrected.

Certainly we are a Nation of refugees. We continue to allow refugees. We have seen refugee status used to import entire organized crime elements in our society. It doesn't mean we should stop allowing refugees, but we certainly have to be smarter about it and

48

realize that not everybody who comes here believes in American values and is not a threat to us.

Mr. SMITH OF NEW JERSEY. Can you or any other panelist tell us where does free speech end and the commission of a crime begin? Did those individuals on that tape commit a crime?

Mr. REVELL. That is a judicial question. In my view, it becomes a matter of at least investigation when they specifically directly advocate violence and do so not in a general term but in a specific term. I think at that point they become at least a legitimate target for investigation.

Mr. SMITH OF NEW JERSEY. Let me just ask with regards to jihad networks. Since the production of that video, have the number of jihad networks increased, or stayed the same in America?

Mr. REVELL. Mr. Smith, I do not know. I have not been focused on this. You will have to ask other experts, including Mr. Emerson who in his investigative project has investigated this. But my focus has been the security of American business internationally, and I haven't followed this locally.

Mr. SMITH OF NEW JERSEY. Mr. Santos, you in your testimony—and Mr. Gilman did make some mention of this. You talked about the use of opium as a means of garnering revenues in order to spread their terrorist activities. Now that the world has been mobilized, and hopefully it will be on a sustainable basis, is it likely that opium revenues will be choked off?

Mr. SANTOS. I think one of the problems that the Taliban has had recently has been a massive drought in Afghanistan the past year or two. That has made real serious inroads in their ability to produce the kind of opium they would like. Also, they flooded the market to such an extent that I think they depressed prices. So they basically pulled back and stored what they had, waiting for the price to go back up. So they still have I think significant stores of opium, but they haven't been able to utilize it as effectively as they were in 1997 and 1998.

Mr. SMITH OF NEW JERSEY. Let me just ask Mr. Santos one question again. How does one measure the performance of the Government of Pakistan in the fight against terrorism? Is it by the capture of bin Laden, or are there some other measurement gauges that we might use to say whether or not they are acting in a truly responsible way?

Mr. SANTOS. I think it goes all the way to Taliban and are they really willing to sever the links that they have established, significant links; and if they are not, then I think you set the stage for others to utilize Afghanistan as a base of terror. So I think the test really is how far they really are willing to go to sever those links.

Mr. SMITH OF NEW JERSEY. Let me just finally say again—and Mr. Gejdenson, our former Ranking Member, and I and others, Ms. McKinney worked on legislation. And I went back and re-read the record from when we heard from the Administration. After the two bombings in Africa, Admiral Crowell convened a commission that looked into what would be needed to strengthen our diplomatic security, to follow up on Admiral Inman's ideas on how to strengthen and fortify without isolating our embassies missions abroad. And for the first year $1.4 billion was his recommendation each year for 10 years.

49

For the first year everybody was gangbusters, let us do it.

Second year, up came the recommendation from the Administration, there was no new security money, which we in Congress did reverse. And it was done in a bipartisan way, I am happy to say. Clinton did finally sign our bill, the Embassy Security Act, which went under a number of names, but that was one of the titles we had given it.

But there was a sense of everybody was gung ho for a year and then it slacked off precipitously and put, I believe, our people at risk. Is it your belief that the fight against terrorism will be sustainable? Have we really learned our lesson?

My time is running out. I do want to say Steve Emerson deserves whatever the highest prize, Pulitzer, whatever it may be, for investigative journalism. He asked some of the most pointed questions and got back very feeble responses from people during the course of those interviews. I encourage every Member of the House and Senate and hopefully every American who can get access to it to view that. It is the most concise and succinct and troubling bit of journalism that I have ever seen.

Mr. SANTOS. In terms of the American foreign policy establishment, I think there are two points here that I noted when I was traveling through Afghanistan. One was I was the only American there. There were some people involved with humanitarian operations, but there was a very little cross-border travel on the part of various diplomats, and it seemed to me there was a tendency to depend a lot on Pakistan and that possibly was due to the relationship that evolved during the jihad. But it seems to me the United States has to have its own links and connections and sources of information.

And the interesting thing is, as an American walking and going through Afghanistan, everybody wanted to talk to me. They always thought an American, this person might be able to convey their ideas or their concerns. So I think there is a natural desire and interest on the part of many of these people, particularly in Afghanistan, to have those kinds of links. We have tended to use intermediaries, and maybe we need to take a few more risks in terms of establishing those direct contacts in dangerous places.

Mr. SMITH OF NEW JERSEY. Ms. McKinney.

Ms. MCKINNEY. Thank you, Mr. Chairman. I just have two questions, I think.

The first question pertains to an article published by the Heritage Foundation and basically it says—I will read it. It says,

"When the United States helped the Afghan resistance defeat the Soviet army in a brutal guerrilla war, it scored one of its biggest Cold War victories. However, shortly after Soviet troops withdrew from Afghanistan in 1989, the United States withdrew from active involvement in Afghan affairs. As a result, Washington squandered the residual influence that it had acquired through its $3 billion aid program for the Afghan resistance in the 1980s. One former U.S. official intimately involved in Afghanistan policy lamented Afghanistan has gone from one of Washington's greatest foreign policy triumphs to one of its most profound failures."

50

The question I have there is, how can we turn this around in Afghanistan and in other places where this might be the case?

My second question pertains to intelligence failures.

We had two trials that gave us information about the financial and operational network of the bin Laden organization, the trials from the first World Trade Center bombing and the second trial from the U.S. Embassy bombings.

There also have been some newspaper reports. The *Los Angeles Times* reported on September 20 that Mossad had warned FBI and CIA officials that a major terrorist force of some 200 individuals was entering the U.S. and planning a major assault on the United States.

Secondly, a newspaper from the Murdoch group reported on Monday, September 17, 2001, that a man in the Cayman Islands wrote to U.S. authorities on August 29 and warned them that he had just overheard three Afghan men in a bar talking about impending attacks on U.S. targets.

It is also reported that a week later an Iranian in Hamburg, Germany, contacted the police and warned them of an impending terrorist attack against the United States using highjacked planes. Apparently his warning specifically mentioned the World Trade Center.

This same newspaper also reports of FBI agents tracking some of the alleged terrorists at their flight schools in the U.S. Also, there were reports that the CIA was told, as long as 2 years ago, that a suspicious group of Middle Eastern men were gathering in Florida.

The first question is, how can we turn around the situation in Afghanistan and other places where we might have foreign policy failures? And the second question is, how can we explain this abhorrent lack of intelligence failure when there were these leads that have reportedly come in? Mr. Cannistraro first.

Mr. CANNISTRARO. Yes, Congresswoman. I would like to take the second one first.

The alleged Israeli warning is nonexistent. The CIA made an unusual public declaration that there was no such report. In the aftermath of a great disaster, there are always these reports come up saying someone knew this, someone knew that. In every case that was investigated after September 11, they were proved to be untrue. So there was no warning. There was no warning at all. There was not a warning that was ignored.

Were there signs? Yes, of course, there were signs. We knew that Ramzi Yousef, as Buck mentioned, had planned to attack at least 11 aircraft out of the Far East. We knew that Ramzi Yousef also was the author of the first World Trade Center attack. We know that one of his subordinates was asked to pilot a plane into CIA headquarters. So there is a pattern there.

Should we have known or should we have had a better analytical grasp of the risks? Certainly. I couldn't agree with you more. But there was no specific warning. Those stories are not true.

Secondly, on Afghanistan, I agree that that was an amazing American policy failure. The previous Administrations—the Carter and Reagan Administrations—had as their objectives to bloody the Soviets and then drive them out of Afghanistan. There was a presi-

51

dential security decision made that our goal was to drive the Soviets out of Afghanistan. We were successful.

But then we turned and left the field. We left even though we had a moral obligation caused by our involvement to begin with. We had an obligation to assist the Mujahedin, to stay the course and to help reconstruct that country which had been bombed into the Stone Age by the Soviets. We didn't. And we left the field.

What happened was a return to the tribal rivalry, infighting and ethnic hatreds that had been evident in that country for hundreds of years. And we left it to the Pakistani government, which as we know, was responsible for the creation of the Taliban. So certainly we had a great policy success, and then we had a great policy failure. I agree.

This time, to avoid that, we have to be a lot smarter on how we act. I don't think we can choose a new government for Afghanistan, but we can certainly promote a federation. We can certainly promote a process which includes every tribe and every minority in that country.

Charlie mentioned the Shi'a Hazaras. Yet the Tajiks, the Uzbeks and, yes, the Pashtuns are the majority compared to the other groups. But we have to have a representative government. We have to promote a process, but the Afghans have to do it themselves. We can't pick and choose. We are not very good at that.

Mr. SANTOS. I would fully agree on the Afghan question.

I would add that one of the failures of U.N. efforts which I have been intimately involved with over the years has been a focus on power sharing—with a more immediate focus on trying to come up with a transitional government and with very little attention paid to the very structure of the Afghan state, which is part of the problem. Afghanistan historically, the only way it has been able to survive is in a more decentralized way. But there has always been an extremist element within the largest of the minority groups, the Pashtun, to impose a powerful central authority that would control all the other areas where these ethnic minorities are. And I think that idea is a failed idea and what we should try to do is promote and encourage a federated or confederated system where ethnic rights are protected, where people feel that their culture will not be smashed in the way the Taliban has smashed it.

One of the things that the Taliban did was destroy these Buddhist statutes, and people were arguing that this was somehow related to some notion of Islamic sense of idolatry. The Taliban knew what they were doing. They were smashing the Buddhist statutes because they were identified with a community. That community was the Hazaras population who lived in the central part of the country. And we ignored what happened. This kind of extremism has been at play.

So to do it right, I think, is to focus not on individuals but to focus in the longer term on creating a truly representative democratic and multi-ethnic Afghanistan. Immediately we would have to get rid of the Taliban. That is essential. The Taliban are an obstacle to Afghanistan on all kinds of levels, not only in the way that we have been talking about in terms of terrorism, but also the way they have been terrorizing the people of Afghanistan, particularly these ethnic minorities.

52

So I would suggest also to immediately help those fighting——

Ms. MCKINNEY. And women, too. They have been terrorizing women, too.

Mr. SANTOS. On the intelligence failure, I mean, all I can say is what I saw. And I just saw so few American officials going to Afghanistan and so much dependence on other countries for information. I can imagine that these countries have their own interests and they pursue them. And if we don't understand that and we don't have our own lines of not only intelligence—it is not just in terms of the intelligence agencies but diplomats and others involved in this, then of course we are going to have a distorted view.

Mr. SMITH OF NEW JERSEY. Chair recognizes Mr. Royce.

Mr. ROYCE. Thank you, Mr. Chairman.

I would like to go right to a point that is before us in Congress. Why did the FBI and the CIA not have access to information that they needed? And to do that—I think the best way to do it, Mr. Revell, is to quote from some of the comments in your report.

In relation to the Oklahoma City bombing, you say, I don't think many people in the United States, including the FBI, would have known much about the militia movement at all. The reason is because that, under the Attorney General's guidelines as interpreted at that time and still today, the FBI nor the Justice Department did not believe that the FBI had the authority to collect information on groups that openly espouse the use of force and violence unless and until there is a criminal predicate.

You go on to say, the espousal of violence, the collection of arms, organizing to commit violence—these things would not necessarily have predicated an investigation and in fact, with the militias, they had not.

Then, as Former Deputy Director of Investigation of the FBI, you make some observations. You say, we have had a very strange coalition develop over the last 2 or 3 years in our Congress. Elements of the left and elements of the right have coalesced and come together to oppose a President of the Democratic party and the leadership of the Republican party in Congress in putting together anti-terrorism legislation that has been supported through three Administrations.

You go on to say, legislation which would withstand constitutional scrutiny, most elements of which have already been ruled on by the Supreme Court in other forms, such as roving wiretaps—which have already been adjudicated in organized crime—and drug cases as being constitutional.

You know, while the silent majority are not paying attention, forces on the left and forces on the right in Congress—admittedly they are very well-intentioned—but every day they are working to water down the bill the Attorney General has put before the Congress. They are working to water down what the FBI has asked for, removing things that the CIA has asked for. I think we need to contemplate that as Members of Congress.

I think we need to think about the fact that, as you said in your testimony, under the guidelines as they are today, the FBI is in the very unusual position of being perhaps the only organization that cannot take official cognizance of what people say, of what people do, of what people pronounce and promulgate until they do it. The

53

FBI is prohibited under the current guidelines and a provision of the Privacy Act from collecting public information even from groups who directly espouse the use of violence to accomplish their objective.

And to take the point home, you quoted a discussion with a Senator some years ago where you said,

> "Senator, do you want us to wait until there is blood on the streets to act or are you going to authorize us to act on information that any reasonable person would assume to be true?"

And he said,

> "In a democratic society, you may have to wait until there is blood on the streets."

Well, there is blood on the streets. And, as you concluded in your remarks, we have to reach a reasonable balance to allow those elements of our society charged with preventing terrorism an opportunity to carry out their duties and do their jobs. Right now, the balance is not there.

Well, we have a bill before us that is being watered down as we speak. I just wanted to ask you if you would give us your thoughts on what some of the tools are that we need? I also ask some of the other members on the panel as well.

Mr. REVELL. Mr. Royce, I made those comments, which were later printed in a book in 1996. I think they are even more true and relevant today. Now the Attorney General guidelines had nothing to do with the failure to detect the tragic events of September 11. If any information had come to the attention of the FBI, it would have been under the foreign intelligence guidelines and they give more latitude. If this had been carried out by a domestic group, then, of course, the guidelines would have been a problem.

I helped write the guidelines. I believe in the guidelines. I think they are very important because it tells agents what they can do and under what circumstances. But in putting together and in conjunction with the Privacy Act, the Privacy Act says you cannot maintain a file unless you have an investigation. The guidelines say you cannot have an investigation unless you have a criminal predicate. Well, if that criminal predicate is the blowing up of a Federal building, that is a very high price to pay; and I think it is reasonable to believe that if the Bureau had somewhat broader authority to pay attention to what is being said publicly and openly by groups espousing violence, that there is at least a chance the Oklahoma City bombing could have been prevented.

Now as far as the circumstance involving September 11, there, I think, we are talking about a matter of better analysis of information we might have had—and I don't know—Vince is probably correct. There have probably been a thousand reports since the fact and maybe two bits of information that can now be tied it. It is like having a 100-piece puzzle and you have two bits and you don't know what the picture is.

Well, the coming to the United States of Saudi Arabian nationals to take flight training is not an ominous act. They are an ally of the United States. Saudi Arabians coming here to take flight training probably has occurred hundreds of times. We recognize it by

54

giving student visas for vocational purposes as well. So, you know, in hindsight, we may go back and say that should have been an indication.

Mr. ROYCE. Let us say this. If we had been able to match that up with the fact that some of them had been accused of terrorism, then you could have put it together. I am a little chagrined when the Attorney General of the United States asks for certain tools that we have such a rush to judgment. Some are trying to water down the very provisions that our authorities are asking for in order to allow us to put together the analysis that would allow us to apprehend those involved in terrorism.

Mr. REVELL. As I indicated, it has been somewhat—as a citizen sitting out in Texas looking at the situation, I have been somewhat aghast at the fact that tools that we can use against organized crime and drug traffickers, we cannot use against terrorists, and that makes no sense to me whatsoever. The constitutionality of those tools has already been established, and certainly terrorism poses an imminent danger to us as much as drugs and organized crime.

Mr. ROYCE. I hope Members will all read your report here. But it is very, very helpful. Thank you.

Mr. SMITH OF NEW JERSEY. Mr. Payne?

Mr. PAYNE. Thank you very much.

I appreciate your testimony, and I just have a question regarding the new allies in this war on global terrorism, this global coalition. I heard, as it occurred several days ago, that the Government of Sudan is now going to be cooperating and that we are very happy that they said they are going to give us information.

As you know, bin Laden lived between Sudan and Somalia from 1991 to 1996. The bombing of the two African embassies in Tanzania and Kenya were done by themselves and people being trained in both Sudan and Somalia. The Khartoum government still has continuing aerial raids where they are bombing the people of the south. They have got a new bomb that has nails in it because the people are barefooted and then the nails are spread all over the ground so these people cannot walk or, when they walk, it is just very painful and infections come in and they become very ill.

The Sudan government is still allowing abductions by bandits who then take women and children and sell them back and forth. They condone slavery.

The Sudan government still is not allowing adequate food into the Nuba Mountains where there is starvation in large numbers.

The Governor of Sudan still says—whether you are Christian or atheist—that you must adhere to Sharia government, Sharia laws, their law of Islam. The Sudan government has kept terrorists there for all along.

All of a sudden—and these things are still going on—we now say that, one, we have taken off sanctions on travel of Sudan and Sudanese government officials. We have legislation which is going to require that anyone doing oil exploration in Sudan could not enter the capital markets in our country—that there would be sanctions against them. For the first time, we had the Sudanese government starting to shake a little bit because the oil companies were saying that they may have to pull out. Of course, the Sudanese are using

55

the oil money to buy more planes that are more accurate so that they can shoot down food planes that are coming in unauthorized.

Now we say that they are all right, and we are going to allow them to continue to do all these things. There was a meeting last week with the Government of Sudan with the SPLA, the Southern Liberation Movement, and they just bothered not to come because they are now our allies and our friends supposedly.

Do you actually believe that the Sudanese government is going to turn over all of its top information on bin Laden when he lived there for 5 or 6 years? Do you think it is as naive as our giving money for crop rotation to the Taliban to stop growing opium?

Maybe all three of you might be able to answer.

Mr. REVELL. I am not an expert on the Sudan. But I think it does indicate a somewhat naive position on our part to think overnight that they have changed from a state—we have them listed as a state that sponsors terrorism and that they have automatically changed over. I think we ought to be very circumspect in dealing with a regime that has been as ruthless and has been as supportive as it has of terrorist activities, not just Osama bin Laden but other groups as well.

Mr. SANTOS. I would agree with those comments.

Mr. CANNISTRARO. I don't think we ought to overlook any of those abuses that you cited, Congressman.

I would point out, though, under the Sudanese sanctions regime there are exceptions made for the import of certain foodstuffs from Sudan, including gum arabic. And that was done at the request of certain lobbies in the United States—mainly the confectioneries, because Sudan is the producer of gum arabic. So we have made tactical concessions in the past.

There is no excuse for any of the behavior that you cited by the Sudanese government. There is, however, a reason for the State Department to try and engage the Sudanese government to correct those abuses using the leverage of our pressure on them as a state sponsor of terrorism and list it as such to try and get them to correct those procedures.

They are very eager to get out from under U.S. scrutiny. Clearly, that is why they have enlisted themselves in the so-called war on terrorism. And they do have some information. Bin Laden does have a root in the Sudan. He has a network of companies. He has agricultural products that he has invested in, possibly including the gum arabic that we allow to be imported into the United States. So I think a process of forceful engagement is better than just completely ignoring the Sudan, because we do have an opportunity, through this crisis, to condition their behavior and behavior which is abhorrent to us.

Mr. PAYNE. I agree. The gum arabic was something that our Committee put restrictions on, also. But the White House overrode our sanctions. I moved the motion myself, and it was written into law. But it was overturned in the White House and the gum arabic——

And, like I said, the whole question of this horrific, unbelievable government still exists. There are close to 2 million people dead in the Sudan. I really don't think, you know, that there will be very much changes made there. I think they have had opportunities be-

56

fore. But I hope that we don't get back into the situation we were in during the Cold War where anybody that gives us a hand we say they are okay.

So we have got the former Zaire—which is the Congo now— where Mabuto reigned for 30 years and robbed the country of everything it had as we continued to give them World Bank money and as we continued to support them. Now we have seven countries fighting in the Congo over 30 years later. The fighting has been going on for 2 or 3 years with several million people dead—as a result of our saying, as long as Mabuto helped us, the rest doesn't matter.

I think we have to certainly wipe out terrorism and so forth. However, if we are going to go to bed with the devil, we are going to put ourselves in the same boat as those people who are doing the terrorist bombing and so forth.

I would like, Mr. Chairman, for Mr. Meeks, to ask unanimous consent to have his remarks entered into the record.

Mr. SMITH OF NEW JERSEY. Without objection, so ordered.

[The prepared statement of Mr. Meeks follows:]

PREPARED STATEMENT OF THE HONORABLE GREGORY W. MEEKS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW YORK

I want to thank Chairman Hyde and Ranking Member Lantos for their strong leadership and clear bipartisan efforts in calling today's hearing.

As we learned on September 11th, when it comes acts of terrorism we are not Republicans and Democrats we are all just Americans. I would dare say that September 11th also demonstrated that for us to wage a global war against terrorism and win it, we can not be Americans against terrorism, we must be human beings against terrorism.

If we want the world the feel our pain and sense of loss as many have demonstrated, then then we in this country can not afford to believe that can we isolate ourselves from the world, ignore our responsibilities in the world and not expect that sooner or later we will also be affected.

Let me say first and foremost I want to fight and win the war against terrorism, not just today or tomorrow, but in a manner which is sustainable over time. This means I want our government to fight this war the right way.

I believe that fighting terrorism the right way requires a multi-faceted approach. It involves law enforcement, security, defense and diplomacy on national, regional and global levels.

I've called for our government to not only think about how we wage the war, but to also think about how we engage those societies after the conflict. We must have a strategy, the political will and a demonstrated level of commitment to ensure that societies are not left in conditions of poverty, degradation, and humiliation which makes it easy for authoritarian governments, dictators, and future terrorists to flourish.

Fighting terrorism the right way in the future requires that we have learned lessons from previous policy actions and approaches to waging a war which have clearly blown back against us.

It is my belief that for America to win the battle in ways which won't lay the seeds to losing the war, there are two errors we can not repeat.

1. We cannot continue to conceptualize our short term strategic and security interests in the region, in ways which exclude, minimize or disregard the legitimate long term strategic and security interests of the societies in the region;

2. We cannot continue to pursue our foreign policy interests in the region with approaches and means which contradict the values, principles and morals which the American people expect their government to stand for.

This latter lesson is of critical importance for a number of reasons.

A. There have been calls for changes in certain types of actions and procedures by our intelligence and security forces as justifiable responses to September 11th.

Yes, we must be careful and clear to address areas which the events of September 11th revealed where our security and intelligence agencies face challenges or have deficiencies.

57

However, I am concerned by those who would suggest that our security and intelligence agencies have been overly hindered or burdened by civil liberty protections and rights to privacy and hence such rights and protections must be weakened.

B. There have also been calls for removing restrictions on our security and intelligence related agencies on being able to work with individuals and groups involved in human rights violations. Some have even suggested that relaxing the prohibition on government sanctioned assassinations should be adopted to fight terrorism.

While no one denies that extreme measures to respond to extreme actions should be explored, state sanctioned assassinations, restrictions on civil liberties, use of force to extract confessions, and arrests and detentions without charge have not been proven as solutions to solve the problem. Israel uses such measures and terrorism still exists. Great Britain used such measures in Ireland without much success.

While I don't seek to judge others, I also have a sense of caution about such measures based on our own long history of domestic and international actions, both of a covert and overt nature which not only crossed the legal lines, codes of conduct and international norms, but which often flew in the face of the principles, morals, values and rights which the American people expect their government to uphold.

I'm sure that my colleagues would agree that if our approaches to waging a war on terrorism involves getting involved in foreign civil wars, providing covert military assistance to non-state rebels, forming alliances with organizations that engage in drug trafficking, and formally supporting governments with known human rights violations all in the name of defending Americans, then we had better be sure that the American people are informed and support such actions. If we become like our enemy in fighting terrorism, then our enemy has won!

In the case of Afghanistan, I am concerned that as a means of fighting the Al Qaeda network and those who harbor them the Taliban, we would seek alliances with other groups which may be equally intolerant, undemocratic, and hated by many people in Afghanistan.

In addition, there are reports that some of the groups which make up the Northern Alliance forces fighting against the Taliban have been actively involved in the production of opium and international heroin trafficking in Northern Afghanistan.

I've also read reports that earlier this year, in the May 22nd *Los Angeles Times*, the Bush Administration provided $43 million in assistance to the Taliban government to support their efforts to eradicate opium production and encourage farmers to grow food crops as opposed to poppies in Afghanistan.

Where do we draw the line? Are we going to tell the American people that attacking Al Qaeda in the war against terrorism, requires working with drug dealers that I thought we were attacking as part of our war against drugs?

In a sense, it is my strong hope that we would learn from our policy actions in how we fought the cold war in Afghanistan, and apply such lessons in how we fight the war on terrorism in Afghanistan.

Some argue that our policy of providing or coordination with the help of China, Britain, Saudi Arabia and Pakistan the provision several billion in weapons to the Mujahadeen (including the Taliban) including US made Stinger surface to air missiles, is now blowing back in our face today.

Other arguments are dis-engagement from Afghanistan after the Russians were defeated, because we are not in the nation building business, is partially to blame for the conditions which materialized to cause the civil war and the Taliban government.

Regardless which side you side you take, lets make sure that our previous policy approaches which are a factor in what Afghanistan is today, a shattered society, with a failed state, and millions of internally displaced and external refugees.

As we look forward, it behooves us to contemplate the ramifications of our approach to waging war against Al Qaeda, other international terrorist networks and states which support those networks. We can't simply adopt a highly militarized approach to a highly militarized society like Afghanistan which is in the midst of a political civil war.

I urge my colleagues to ensure that we give the same level of support for the international law enforcement, diplomatic, financial security and socioeconomic development components of this war, given to the military.

Given the complexity of the war on terrorism, the humanitarian situation brewing in Afghanistan, and the implications for regional stability vis a vis, India, Pakistan and the central Asian nations of the former Soviet Union, let us ensure that all of our policy actions reflect careful, deliberate and prudent approaches.

I want to win this war and there is little doubt in my mind that we will win it. But I also want to win it in a way that is sustainable over time. Hence as with all wars, how we win the peace is just as important. None of us want to win this

58

war, in a way which creates new problems and sows the seeds for events like September 11th to revisit America's shores again one day.

Mr. SMITH OF NEW JERSEY. The gentlelady—the Chairwoman of the International Operations and Human Rights Subcommittee, the gentlelady from Florida.

Ms. ROS-LEHTINEN. Thank you, Mr. Chairman.

As I had announced, the Subcommittee which I chair will be holding a hearing after our's on nuclear-related terrorism. I would like to ask you a question about that and also about the recent arrest of a senior analyst for the Defense Intelligence Agency related to Cuba and what connection there could be related to terrorism worldwide.

A study conducted by the U.S. Department of State noted that as many as 130 terrorist groups worldwide have expressed an interest in obtaining nuclear capabilities, among them, of course, Osama bin Laden. And earlier this year it was reported that the CIA had identified 12 terrorist groups that had attempted to actually buy enriched uranium and plutonium in order to make a nuclear bomb, groups including Chechnyan separatists, Palestinian extremists and Islamic militants, such as Osama bin Laden. Further, information coming out of the trial of New York of bin Laden and others for the U.S. Embassy bombings also reveals bin Laden's interest in securing such nuclear materials.

In your expert opinions, what is the time frame for the terrorist groups to employ any nuclear-related terrorism against the U.S.? And what form would you predict that it would take? Would you agree with some that the threat would come from a combination of nuclear materials and conventional weapons and could orphan sources be used for nuclear-related terrorism? And orphan sources are those used in nonweapons military applications, such as medical, industrial and research.

And an additional question, it was reported in the front page of *The Washington Post* on September 28, just a few weeks ago, that Ana Belen Montes, the most senior defense intelligence for matters pertaining to Cuba, was arrested for spying for the Castro regime and its intelligence sources. In this *Washington Post* article, U.S. Government sources are quoted as saying that the investigation ended because Cuban intelligence could pass along information provided by this DIA spy to other countries. And Government sources stated that the Castro regime has been noted to share information with Libya, Iran and others and other regimes who might be sympathetic to Osama bin Laden.

We know that Montes had access to the most sensitive U.S. military and security information. How much and what type of intelligence could have been compromised by this DIA analyst spying for Cuba? And how much intelligence could have been provided by the Castro regime to those states which have support for attacks such as the ones on September 11?

Mr. CANNISTRARO. Congresswoman, let me take the first part of that and defer to Buck for the second part of it, because it really is counterintelligence methods to which he is better schooled than I am.

There is no question that there is an alarm about the use of chemicals and biologicals as a possible terrorist weapon. What we

59

saw on September 11 was neither. However, we saw almost 7,000 deaths. That means that terrorists will tend to use conventional methods because they are easier to use. If they can inflict mass casualties, they will choose to do that.

Now if they can acquire uranium 235, for example, which we know bin Laden has attempted to acquire, is he trying to make a bomb or is he really trying to make a dirty conventional bomb? In other words, to add uranium 235 to a conventional explosive would, when it is detonated, disseminate the radiation from that uranium over a wide area, thereby contaminating that area and making it unusable and unlivable for untold numbers of years. That seems to me more likely as an immediate threat.

Terrorists will tend to use the conventionals. We spend a lot of money worrying about biologicals and about nuclear weapons and nuclear weapons in a suitcase that can be put on a ship, et cetera. Those tend to be more like Hollywood scenarios. Not that they wouldn't do it if they could. They would. But why invest in that kind of skill level and that kind of money that you need to develop that weapon when you can use conventional explosives to inflict mass casualties?

So I see it as a threat, but I don't see it as the immediate threat. I see it as something for us to be concerned and worried about.

In terms of chemical weapons, we know that a person in custody was interested in acquiring crop dusters. Perhaps it was to be used to spray chlorine gas, which is deadly. Now that could have been an instrument to inflict a lot of casualties. How many we don't know, because wind currents play such a large part—there is a lot of chance in the dissemination of a gas, as we saw during World War I. It is better utilized in an enclosed area rather than an aerial spray. Inserted in a building that uses recirculating air, it can be quite deadly. Sprayed over a mountain top in West Virginia, perhaps it will have no effect whatsoever on humans.

I defer to Buck for the other part of that.

Mr. REVELL. The first World Trade Center bombing, the participants actually contemplated and tried to find radiological materials to spike the bomb so that the scene of the devastation would be contaminated and rescue operations and even a return to any type of use would be very difficult. They could not obtain the quantity and quality of radiological materials in the time frame they were concerned with, but that certainly was one of their plans.

As Vincent said, Osama bin Laden has been in contact with various sources, including Russian Mafia groups, in an attempt to obtain radiological materials, perhaps even tactical nuclear weapons. There appears to be—and this was a question much better answered by people in active service—no indication they have been able to do that yet. But if they kill and intend to kill 6 or 7,000 people and intend to kill 50 or 60,000 people, there is no reason why they wouldn't deploy and utilize tactical nuclear weapons if they could obtain them. And unfortunately there were many, many at the time of the demise of the Soviet Union that were in less than secure circumstances that we still have to be concerned about.

Again, they can, with just using conventional explosives and conventional methods, can wreak havoc on our society. They can de-

60

stroy our infrastructure. You don't need to use chemical, biological or nuclear weapons to do tremendous damage to our society.

Another element of this is the potential of cyberterrorism, which can, again, once we are so connected system-wise, that that offers tremendous potential. There are many, many ways to create tremendous mischief worldwide and damage to our society without turning to the weapons of mass destruction.

However, we have seen the Aum Shinrikyo in Japan were in fact experimenting with all three forms of weapons of mass destruction. That is a precedent that others have looked at. We cannot ignore that.

The Center for Strategic and International Studies has done an excellent study on the potential use of or potential access to nuclear materials by organized crime and terrorist groups. I participated in that study, and I would refer that study to you. I think it is a very sound study on that issue.

On the issue of the Cuban intelligence, Cuba, for many, many years has just beat us up something fierce on their intelligence operations. We had a number of Cuban double agents who were actually triple agents and had been working against us while we thought they were working for us. Our counterintelligence program, both within the Agency and the Bureau, failed to detect them.

Of course, there is a very large Cuban population in south Florida, 99.9 percent of which are loyal to the United States but, within that, there is that $\frac{1}{10}$ of 1 percent that are still in favor of supporting Castro. And that provides access to a lot of information.

Any intelligence analyst in a position of authority or access in the DIA, CIA, the National Security Agency and the FBI can do tremendous harm to our national security by providing access to highly classified information. We have certainly seen that in every agency over the past 10 years.

So I will have to wait and see what the public reports are as far as the amount of damage done, but I would expect it to be substantial. And indeed Cuba does provide a great deal of intelligence to third world countries that are also supportive of Cuba.

Ms. ROS-LEHTINEN. Thank you very much.

Mr. SMITH OF NEW JERSEY. Gentlelady from California.

Ms. LEE. Thank you very much, Mr. Chairman.

Thank you for your candid testimony today. Let me ask you a couple of questions.

First, given the number of terrorist organizations and cells in several countries, including the United States, what type of military actions do any of you see as appropriate to accomplish the goal of stamping out terrorism?

Secondly, let me just ask you, following up on the gentlelady's question with regard to chemical weapons and nuclear weapons and access by terrorist organizations, do you think or do you believe that our intelligence community is up to snuff on the status of that?

Also, I would like to hear what your assessment is in terms of the links to Abu Sayyaf in the Philippines and how those links to Osama bin Laden relate to Saudi Arabia.

61

Mr. REVELL. The military operations are not going to be appropriate under all circumstances, even to go after al-Qaeda and Osama bin Laden. There are places, for instance, in the United States, Canada, Germany, France, where there are elements that are very much in support where you would not use military operations. You would use law enforcement cooperation, as we have seen with the trials that have already occurred.

There are five ways to deal with terrorism, and they are not mutually exclusive. You have diplomatic initiatives, economic sanctions, covert operations, military operations and law enforcement activities. In this battle we are going to need to use them all, and we are going to use them in coordination and concert. But some activities are going to apply in certain areas and others at other locations.

We certainly wouldn't send the military in, you know, to an allied country where there may be a support apparatus. On the other hand, we may send a covert operation into an area where we don't want there to be public acknowledgment of our activities and even the government there may look the other way while we go in and carry out a covert operation.

Military operation should be in those areas where we do not have access otherwise, and that is the only way in which we can reach the terrorists. So I think that that is important, to remember that we have multiple ways to deal with terrorism and need to use all of them.

Abu Sayyaf was directly involved with Ramzi Yousef. It is a Muslim extremist organization. It has attacked Americans and killed Americans. Even though it doesn't have a global reach, it has access to the global network and should be one of the organizations on our target list that needs to be dealt with.

Mr. CANNISTRARO. I would just add to what Buck said about Abu Sayyaf. That group was funded by the brother-in-law of Osama bin Laden, a man named Mohammad Khalifa. He also helped set up the Islamic Army of Aydin in the mid 1990s in Yemen, and that was a group that supported the attack by bin Laden's organization against the USS Cole. But Abu Sayyaf's group has kind of degenerated into a bunch of criminals and thugs. They do a lot of beheading and kidnapping for ransom but kind of lost their objective, direction sometime in the late 1990s. I don't think that they have a lot of support from bin Laden, at least financial support, at the present time.

In the use of the military, clearly we are not going to be using the military in any conventional sense. If the primary objective is to get bin Laden and the nerve center in Afghanistan, then we are going to have to use unconventional warfare. We are going to have to use special forces. We are going to have to use covert action. We are going to have to try and peel away the support that the Taliban has in Afghanistan because they are the protector of bin Laden. And that means peeling away some of the tribal leaders in provinces such as is in Paktia and Vardak.

I think that process is already under way. I think there is probably already some success there. You need to be able to limit any kind of a direct military confrontation because it is going to be bloody and there will be a lot of casualties.

62

Ms. LEE. Do you foresee any time when actual bombing would be necessary as a military strategy in any of these countries?

Mr. CANNISTRARO. I think if some of the actions under way right now are not successful, there will have to be bombing of the air-fields, particularly of the Taliban air-force. They have been able to put together several aircraft left over from the Soviet war and the old Kabul regime and may be able to put 30 MiGs up in the air at any given time. And they have helicopters for troop carrying. Those would have to be destroyed before any action takes place to avoid the Taliban being able to use that against U.S., British and whatever forces may be in Afghanistan.

But bombing of civilian areas, Kandahar and Kabul, would be worthless. All you are going to do is kill a lot of civilians. There is nothing there to bomb. There is nothing of an infrastructure that supports terrorism that you can destroy with cruise missiles. You may want to bomb the terrorist training camps themselves. But, again, there is not a lot of infrastructure to destroy.

The only significant bombing—and I am not running the war, that is for sure—would be the mountain redoubts where bin Laden is believed to be holed up with some support apparatus. Once he can be located, perhaps that is a fit target for limited bombing but certainly not of urban areas or cities.

Mr. SMITH OF NEW JERSEY. Chair recognizes the gentleman from Michigan, Mr. Smith.

Mr. SMITH OF MICHIGAN. Thank you, Mr. Smith.

Seems to be one target might be the opium warehouses. We talked a little bit of drugs and opium and other drugs doing a lot of the financing for the Taliban and certainly a lot of the other terrorist organizations. This morning's news column has a report from the U.S. Drug Enforcement Agency that the amount of opium flood-ing out of the Taliban warehouses in Afghanistan has increased 400 percent since the September 11 bombing. It seems like, for sev-eral reasons, because of the damage that it causes and because of the fact that it is one of the main financing tools of the Taliban and some of these terrorist organizations, why hasn't action been taken thus far to destroy the centers of production and warehouses of these drugs?

Mr. SANTOS. I mean, I think that there had been a policy before the events of the 11th of September, at least at some level, to look at potentially engaging the Taliban. And as other witnesses here have said, that was, you know, kind of farfetched, but, nonetheless, maybe that is what was going on, a hope that they could convince the Taliban to stop production.

But I completely agree that at this stage—and this should have been done long before, but the Taliban have been using drugs to fund their war machine.

Mr. SMITH OF MICHIGAN. Well, at this stage, obviously, they are probably doing it for a couple of reasons. One is to bring in more money now to better protect themselves in some way, and the other is to disburse those drugs out of those centrally located warehouses so it becomes more impossible to destroy those drugs. It seems like it is a mistake not to have gone farther.

Let me follow up with a second question. Does the Administra-tion—are they preparing a plan to eradicate opium production in

63

Afghanistan, assuming that the Taliban and bin Laden are going to be overcome?

Mr. SANTOS. You would hope so. What I would say is that the first step is to get rid of the Taliban. They are the ones who control the drug trade in the beginning, and they increased—as they consolidated their power, they massively increased drug production. So a number of the northern groups were much less involved. More of the fertile fields are in the south, in Helmand and in Pashtun areas, in Jalalabad or outside of Jalalabad, in Nangarhar Province.

But I would say the first step to doing that would be supporting the Northern Alliance.

Mr. SMITH OF MICHIGAN. I think the first step probably would have been—as I understand it from CNN and other television reports, they have been stockpiling huge quantities of opium, trying to make sure the demand would be high enough to make their greatest profit on that opium. And now it seems to me we can conclude—at least on Monday morning quarterbacks—that that was a mistake. Some of those opium warehouses have a tremendous volume of opium that is now disbursed and probably going to be much more difficult——

Mr. SANTOS. They are going to have a problem to disburse that if they are engaged in battles with Northern Alliance forces. They are using their military equipment, their transport equipment, to move some of that stuff. So if they are now in a situation where they have to defend themselves against these kinds of attacks as well as potential hits against those warehouses——

Mr. SMITH OF MICHIGAN. Since September 11, the Taliban have increased the dispersion by 400 percent, and that is significant. And 400 percent times the 3½ weeks since then wherever we are— do they have other sources of export revenue besides drugs?

Mr. SANTOS. I think they are benefitting from bin Laden's network. So they are getting money from bin Laden and also getting money from Pakistani authorities as well as money they were getting in the transport trade. So goods would come into Afghanistan and then be smuggled across to Pakistan. So they were able to make money that way as well. Since the border has been shut down, that should constrain that somewhat, but they still have access to——

Mr. SMITH OF MICHIGAN. Can I ask about what seems to be a very difficult solution to a difficult problem? That is, as I understand it, most of the terrorists are orphans, young boys, that have been taken in and put in these strict religious schools—indoctrination if you will, brainwashing, if you will. So it is just not an instanteous—here is a guy that looks like a good terrorist. It is over-the-years indoctrination of these young boys that are abused— sometimes sexually abused—so that their only goal is to kill themselves or die in such a way that they think Allah approves in order to have a good eternity.

If that is the case—and to the extent that it is not the case and I am not right, tell me—but what do we do with all of these thousands of young terrorists that now have been schooled over the years with that kind of philosophy?

Mr. SANTOS. That is a very big problem. These madrasas have been built over the last 10 to 15 years. This is one of the things

64

that were an outgrowth of the jihad period. They have been funded, and often people are funding these maybe not knowing completely what they are being used for. There are thousands of them in Pakistan and in Afghanistan, and this is a training area.

I think the way that you would approach this, though, is, once again, you have got to break the Taliban and their ability to maintain these facilities and——

Mr. SMITH OF MICHIGAN. Is it correct that most of the facilities are in Pakistan and Afghanistan but mostly funded by the Saudis?

Mr. SANTOS. I think there has been a fair amount of funding coming from Gulf countries, including Saudi Arabia. Absolutely. But you found an increase in the number of these madrasas in Afghanistan. You are right. Originally, they were multiplying very, very fast in Pakistan—still are. But as the consolidation of power occurred under the Taliban, the Taliban was inviting that money to come in and help establish those same types of schools.

Mr. SMITH OF MICHIGAN. An interesting answer to a question that was asked to some—when we met with the exiled King Shah in Rome—was how much would terrorism be reduced if bin Laden was captured or killed? Their estimate was 4 to 5 percent. Would that be consistent with your evaluation?

Mr. SANTOS. I mean, if you are talking about just bin Laden and not the Taliban and the other networks that are really part of that—I mean, it is all interrelated. They are not separate things. I mean, if you were just to take out bin Laden, I am sure that would have some effect. But you have got to root out all of those people. There are thousands of these extremists in Afghanistan right now and have close links with the Taliban. So I think you would have much more of an effect if you were able to do that.

Mr. SMITH OF MICHIGAN. I think the Chairman is going to say my time has expired.

Since the Church Commission, the CIA has been discouraged under executive order from getting information on these nasty kind of individuals. Should we change that?

Mr. CANNISTRARO. I just want to add one thing to what your question was addressing about the source of the people. Certainly a lot of them do come from the madrasas, and that is a failure of education in Pakistan, because these are almost religious educations, and there are very few secular subjects that are taught in these madrasas. The Minister of Education—the Taliban, for example, doesn't have a high school education. So that is kind of representative of the mindset of those people.

But in terms of the terrorism being—terrorists being drawn from poor families—and that certainly was the paradigm we saw for a long time—but it has changed now. We saw that a number of the Saudis who were suicide bombers, for example, on September 11, don't come from that kind of environment. They come from elites—not all of them but many of them did. They come from privileged families. They don't necessarily come from poor, desperate families. So that speaks of something else. We have to understand what motivates people like that. What kind of religious orientation is it that they can grow up with the idea that they can go to paradise by killing people?

65

So that is something for the intelligence community to address and to understand, and that is one of the major failures, both in our law enforcement and in our intelligence agencies. We don't understand the nature of this kind of terrorism.

We have to do a better job. We need linguists, obviously. We need area specialists, obviously. We need them both in law enforcement and at the intelligence agencies as well. But we need a better focus on understanding what the nature of this threat is if we are to have any success of defeating it.

If you kill bin Laden—even if you kill Ayman Al-Zawahiri, his number two, terrorism and al-Qaeda will not disappear. There is a whole network that does depend on the nerve center for its motivation, for its leadership, but it won't disappear just by the eradication of the people in Afghanistan. That has to be addressed.

Mr. SMITH OF MICHIGAN. I would like to offer my thanks for the witnesses and for their knowledge and testimony.

Mr. SMITH OF NEW JERSEY. Thank you, Mr. Smith. If you have additional questions——

Mr. SMITH OF MICHIGAN. My other question, of course, is the intelligence agencies seem to have adopted sort of a defensive attitude toward terrorism. What is being done so we can protect and add to the security on sort of a defensive way? But it seems to me that there has got to be a little more aggressiveness in terms of being on the offense. And I think I have heard you sort of suggest that, but it is easy for us politically to lean toward the defensive side with Tom Ridge and the defensive effort. But if we are not going to have a good defense without a good offense, how do we improve——

Mr. REVELL. The only offense that we have had have been the ones I have talked about, political, economic. We haven't used covert operations, and we haven't used the military. So we have had limitations. Certain places you cannot reach with law enforcement. I mean, you have lawless areas and areas where there will not be cooperation. So law enforcement actions are not going to work. It is difficult to mount an assault until you have the tools to carry out an assault. And certainly in the limited areas where you could not go in with a law enforcement operation and you had no political or economic clout, then covert operations probably primarily and military operations lastly would be the only way to reach; and we haven't been willing to do that.

I talked earlier in my testimony about the Hezbollah and the campaign they have carried out against the United States since 1982, and we never scratched them. We know where they are, we know where they have been and their camps and locations, and we have never done anything to them. So it doesn't take a stretch of the imagination for them to believe that we are probably not going to do that in the future.

Mr. SMITH OF MICHIGAN. What do you suggest for changes, more legislative authority or legislative action?

Mr. CANNISTRARO. I think I hinted at this earlier on. I mean, our intelligence agencies have been become risk averse. They have become bureaucracies. They are responding to the threat as bureaucracies do. They answer the mail, and they are very efficient, but

66

they don't take proactive measures, and they don't go after the nature of the problem with all of the resources at hand.

Covert action certainly is part of it, and all the tools in our arsenal are part of it. But unless we know how to apply those tools, we are not going to have the right effect.

We need supporting legislation. I think that is true. I think we have to have a focus on anti-terrorism that recognizes that international terrorism has transparent borders. We have artificial distinctions between where we collect our intelligence and how law enforcement is perceived.

Buck referred to the problems of law enforcement not being able to get at the sources of some of these things because they are beyond the reach of law enforcement. In many cases, they are beyond the reach of intelligence resources as well.

But when we prosecuted the people for the East African bombing, we did a good job. We prosecuted those, and they have been sentenced, and then we declared a great victory. But it was no victory. What we did was put in jail and put away secondary players, soldiers, not the generals. The generals remain beyond our reach in Afghanistan and some other places.

So we need to have a new definition of what terrorism policy should be. We need to have a more articulate policy, and hopefully we will under the spur of these events of September 11.

Mr. REVELL. We have to have the political will, Mr. Smith. We have never had it, and we have to have it. And the only way is to go forth and do it with our allies if possible.

Mr. SMITH OF MICHIGAN. Mr. Chairman, through you to the witnesses would it be possible or would you consider just each of you making a list of three or four or five areas where you think you should have more legislative action or support in some way or the laws should be changed in some way? Would you consider, Mr. Chairman, with your permission, if they would submit that to the Committee?

The SMITH OF NEW JERSEY. That is an excellent idea. And if you could get that to us hopefully in a timely fashion.

Mr. REVELL. I hope you know that none of us speak for the Government.

Mr. CANNISTRARO. If we did, we would have been fired today.

Mr. SMITH OF NEW JERSEY. We do appreciate your candor.

Thank you, Mr. Smith, for your questions. Your expertise and professionalism is certainly highly apparent and will help this Committee and, by extension, the Congress and the American people to further combat terrorism.

I do have one final one question. But before I do that, without objection, a statement by Mr. Menendez will be made a part of the record.

[The prepared statement of Mr. Menendez follows:]

PREPARED STATEMENT OF THE HONORABLE ROBERT MENENDEZ, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY

September 11th changed America forever. Not one American in this great land will again view security as it was before September 11th. Not one American *can* view security as it was before September 11th. This truly is a new world order.

As a Member of this distinguished Committee, and as the chair of the House Democratic Task Force on Homeland Security, I want to lay out principles that I

67

believe are vitally important as we undertake what may be the most important work of our generation.

First and foremost, we must protect our people. Our children, our brothers and sisters, mothers and fathers; grandmothers and grandfathers; friends and neighbors.

Second, we must protect our homeland. We must use every single tool available to us in this great democracy, and in this great institution—the House of the people—to secure our physical infrastructure: electric power grids, nuclear plants, food and water supply, information and communications systems.

Third, while leaving nothing out, we must preserve our Constitution because it is the precious foundation of all those privileges of freedom that we hold so dearly in our hearts.

Next, allow me to address the situation at hand.

Perhaps the greatest challenge before us is that the nature of the threat does not allow for much margin of error. Adequate preparedness and response to biological and chemical attacks, for example, is not something we can get wrong. It will require highly effective and unprecedented cooperation and coordination among federal, state and local authorities. The announcement by the President of a new cabinet-level Homeland Security chief acknowledges the seriousness of the threat. This challenge is fundamentally different than, say, ensuring that we do not repeat the errors of last year's presidential election.

As America and her coalition partners take the first concrete steps to confront the terrorists of the al Qaeda network, let us consider that the world has entered a new national security paradigm: the international fight against terror represents a new but different kind of Cold War. We face new strategic choices on multiple fronts to address challenges of unprecedented urgency, complexity and risk.

Like the Cold War, the new struggle has many fronts, many layers and is a long-term undertaking. We will have to fight hundreds of battles large and small, overt and covert, in a war that will take decades and a united international coalition to win. Conventional armed forces and conventional warfare will be either supplemented or *supplanted* by new unconventional combat methods that target terrorist groups and networks such as al Qaeda, and will be assisted by intelligence and law enforcement agencies that bring unique assets to the new battlefield.

We have to tread very carefully—and discreetly—as a nation and as coalition partners. Sooner or later, we will strike at the forces of terror. After that first strike, we can expect coalition support may slip a bit and become more difficult to maintain. Just maintaining support for sanctions on Iraq has been very difficult.

If we want to target terrorist groups within other nations, we will not have an easy time in obtaining the support in particular of Islamic nations. Thus, we must be mindful that poverty, powerlessness and hopelessness throughout the Islamic Middle East and South Asia only aggravates the problem and supplies the youth lost to extremist organizations such as al Qaeda.

As with the Cold War, broadening economic development, expanding democracy and increasing educational opportunities will be critical to securing victory. We and our coalition partners may well have to rethink our approach toward international operations. An annual US Foreign Operations budget that is equivalent to the aviation bailout bill of $15 billion may not be adequate.

But if assistance efforts are to succeed, they will have to be linked to economic, financial, democratic and justice-sector reforms throughout the Islamic world. Even as we seek their support in a coalition against terror, our Islamic friends will have to undertake domestic reforms if we are to really arrive at workable solutions in the international struggle against terror.

It is important to point out that in addition to pure evil, the root of the problem that we must address here is not our policy toward Israel. The root of the problem is the utter desolation and despair of millions in the Islamic world that enables a megalomaniac like Usama bin Laden to lure disillusioned and alienated youth in the Islamic world to their deaths through unspeakable evil deeds while he lives on.

Autocratic regimes, in most cases corrupt and repressive, run most Islamic nations today. Many of them are now willing to work with us against the terrorists. In turn, we will have to work with them to develop viable economic opportunities, political freedoms and hope for their people.

Like the Cold War, this is a battle of ideas. To win, the international coalition against terror will have to use effectively the tools of information and public diplomacy and deny the terrorists success in their use of those same tools. Despite our anger, we must avoid engaging in inflammatory rhetoric that would validate the desire of the terrorists to frame this as a struggle between religious and secular forces—Islam versus the West, in this case.

In conclusion, in times of tragedy, America pulls together and America gets stronger. We have some serious and difficult challenges ahead. But we defeated the

68

forces of evil in World War II. We turned economic crisis into economic opportunities and beat the Great Depression. We can and will defeat these forces, too.

Mr. SMITH OF NEW JERSEY. The extensiveness and the worldwide reach of al-Qaeda is impressive. How does bin Laden communicate now? Is it by cell phone, courier, e-mail? How is he getting the message out to his fellow terrorists?

Mr. REVELL. There was a very unfortunate circumstance not long ago where we had been able or our intelligence community had been able to track and trace a satellite phone that was being used. And our news media felt they had to disclose that, and of course that source immediately dried up. Now almost all of their communications are by personal dead-drop and traditional intelligence means, which makes it very difficult to intercept.

Now some of the players—you still get some telephone calls and some e-mails, but the core is really much more circumspect now than they were in the past because of the knowledge that we are looking and listening and very possibly will intercept their communications.

Mr. CANNISTRARO. They have become very sophisticated. They understood that we were using technical means and they didn't get off the air as a result of that, but they used those means to use this information to mislead us. Before September 11, all eyes in the U.S. were on the foreign threat that bin Laden was going to attack embassies, bases in the Far East, Middle East, Southeast Asia. We had no inkling he was coming here. He has been able to use deception to his advantage.

Another way he communicates is by courier. He does use e-mail, but his field generals, not him himself.

Mr. SMITH OF NEW JERSEY. Let me just again thank you—there will be some additional questions sent—if you could respond for the record, we would appreciate it.

I just want to make note that immediately following—it should have been under way right now in this room, which is why we do have to conclude—Chairman Ros-Lehtinen will be holding a hearing, a very important follow-up to this hearing, the role of the International Atomic Energy Agency, IAEA, in safeguarding against nuclear terrorism. Representatives from State, Energy and the Nuclear Regulatory Commission will be testifying. So the full court effort to get every bit of information as to how to go from here is under way, and we hope the Congress can be responsive and the Administration, to try to mitigate this threat.

We thank you for your testimony. It was very, very educational and again will help us do a better job. And please stay in touch.

[Whereupon, at 1:20 p.m., the Committee was adjourned.]

# APPENDIX

————————

## Material Submitted for the Hearing Record

Prepared Statement of the Honorable Edward R. Royce, a Representative in Congress from the State of California

Thank you Mr. Chairman.

As we will hear today, we're facing a threat that is new to the American people: networks of sophisticated terrorists who are willing to die for their despicable cause, and terrorists who are seeking, if they don't already have, weapons of mass destruction. In fighting this terrorism, we as a nation have little room for error.

The American people want their government to respond to this crisis. The American people are now focused on what is the prime responsibility of the federal government: the defense of the nation. The work of this Committee, always important, will be ever more important.

President Bush is undertaking a very complex war against terrorism. So far, so good, but this undertaking has really only begun. The American people need to take the President's words seriously: this will be a long campaign.

We also need to act at home. The real world has hit us in the face. The peoples' representatives in Washington can't be prisoner to ideologies which would deny our law enforcement agencies the tools they will need to combat this new style of terrorism at home. That is the debate the House will soon have.

Unfortunately, we're seeing an upsurge of hate crimes associated with the terrorist attack. I've had some in my District. Those Americans who would be an unwitting tool of the terrorists seeking to destroy American freedom must be deterred, and apprehended if they act.

————————

Prepared Statement of the Honorable Joseph R. Pitts, a Representative in Congress from the State of Pennsylvania

Thank you, Mr. Chairman, for convening this important hearing and gathering these experienced professionals to inform us regarding the Al Qaeda and equip us to combat the global reach of terrorism. While the topic of this morning's hearing has been on the Unites States' agenda for some time, the September 11th attacks have transformed the campaign against bin Laden and his network of followers into a moral imperative.

I want to begin by saying that, as we examine this enemy we are confronting, it is important to realize that a war against terrorism will be one unlike any we have fought before. This is not a war that can be contained by borders. It is not one in which success can be measured in battles won or territory conquered.

It is also important to recognize that our enemy is made up of individuals motivated by extreme ideology wrapped ion religious garb. And ideological resolve has proven to be stronger than any political campaign or quest for power. This ideology does not square with Islam's recognition of transcendence, but tries to create a heaven—though a very twisted one—on earth, here and now. In the last century, we confronted and defeated Marxist and Fascist attempts to recreate reality after their totalitarian visions. And we will succeed again against international terrorism.

We need to realize today that we are combating not only bin Laden but his ability to awaken a religious passion and deep determination in his followers. This makes the challenge of combating international terrorism even more difficult. We are not merely fighting a move for power or territory. We are up against an organization with deep-seeded, though misguided and distorted, beliefs that are motivating their actions—the lunatic fringe that uses outlaw tactics.

(69)

70

The United States is equipped with military might that has been a vital asset in defending and protecting ourselves and our allies in many battles. But this war is one unlike any battle fought before. As long as we lack an understanding of the Al-Qaeda and other terrorist groups, we are empty handed in our fight against the horror and injustice of terrorism.

It is essential that we be proactive about learning as much as we can about our enemy. We need to learn about the financial means used by the organizations so that we may deprive them of their resources and their ability to remain functional. We need to become educated about previous attacks by these organizations and look for a pattern to their campaign of destruction.

President Bush has already started gathering a coalition of allies in this war on terrorism. It is essential that we gather cooperation of our foreign allies in combating these terrorist organizations on many fronts. I have been thankful for the many calls from Muslim friends in Muslim countries that are offering their condolences and commitment to help. We must help these allies realize that the help we need is much more than military and technical assistance. We need them to join with us in identifying and freezing assets. We need their support in combating the drug trafficking that has sometimes financed these organizations. It will also include working diplomatically to isolate the Taliban and demand they hand over bin Laden. We need them to help us gain access to information regarding these terrorist enemies and their methods.

We are gathered for this hearing today to learn additional information about the enemy. As we proceed into this war it is essential that we remember who that enemy is. The enemy is not the innocent civilians of Afghanistan. It is essential that we respond to these terrorists and those that harbor them, offering sanctuary with precise and deliberate retribution. We will make it clear that America is a land of hope and freedom that does not tolerate evil and the destruction of innocents. We must be careful, however to respond in a way that targets the enemy and makes every attempt to avoid harming the innocent people of Afghanistan that have already suffered for years under the tyrannical rule of the Taliban. While ferocious response is necessary, it is vital that we make it a priority to protect as many innocent lives as possible. To properly target our enemy we must make every effort to become educated on their ways, their methods, and their resources.

It is only through education about this network of bin Laden's that we will gain the ability to combat it. So, thank you distinguished guests for coming to inform us today. And thank you, Chairman, for convening a hearing on this matter.

---

PREPARED STATEMENT OF THE HONORABLE DARRELL E. ISSA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA

I thank the Chairman for yielding and for calling this hearing on such a crucial issue facing our nation.

Future generations will undoubtedly view the attacks on September 11, 2001 as the most horrific act of terrorism on American soil and as a time when our people bore the burden of freedom in the most demanding way. However, they will also view this as the age that saw true courage and answered the noble call to fight global terrorism. If we do what is right and seek to leave the world a safer and more peaceful place, it will be remembered as the beginning of the end of extremist groups who twist their faith into an outlet for hatred. It will be thought of as the time when a global coalition, made up of western, eastern, Christian, and Islamic countries came together to thwart global terrorists, who pervert truth and promulgate their evil around the world.

The struggle may be long, but we will be victorious because the enemy is clear. Our enemies are those who will not come to the table to negotiate their grievances. They are those who take a direct route to violence in order to achieve their vague and unattainable goals, rather than to world bodies for mediation. They are those who hate freedom and will never conceive the notion of peace. They are the members of the al Qaeda network, whose global reach wreaks havoc around the world. With the al Qaeda, there are no negotiations because they have already chosen their path—and their goal of death, destruction, and terror is clear.

We cannot lose hope for those conflicts around the world that do have momentum for peace. We must thoughtfully engage those peoples who have come to the negotiating table and hold hope for a final resolution through continued negotiations. I agree with the President who recently recognized that there is a framework for a negotiated peace in the Middle East. Both Palestinian and Israeli leaders are struggling to exit the circle of violence that has consumed them for decades. Both parties should be encouraged and aided in their efforts to return to the negotiating table.

71

I urge my colleagues not to give up on this region because, as the President has rightfully stated, the process is available for peace.

Again, I thank the Chairman for calling this important hearing and I look forward to the testimony of our witnesses.

○