## WITNESS TESTIMONY

**Statement of Lee S. Wolosky**
**Senate Committee on Governmental Affairs**
**"An Assessment of Current Efforts to Combat Terrorism Financing"**
**June, 15 2004**

Madame Chairman, Senator Lieberman and Distinguished Members of the Committee:

Thank you for your dedicated leadership on these issues. This Committee's sustained attention to terrorist financing issues is critically important to our nation.

We are honored to report to you today on the second report of the Independent Task Force Relations on Terrorist Financing sponsored by the Council on Foreign. I have served as co-Director of this bipartisan initiative since its inception in the summer of 2002.

Our report is the result of the hard work of a number of dedicated individuals of both political parties who seek to further vital national interests. I wish to thank our Chairman, Maurice Greenberg, for his unwavering support of the Task Force and his broader leadership in assuring continued attention to, and scholarship on, issues at the intersection of global finance and national security. Our Vice-Chairman, Mallory Factor, undertook important efforts to advance the mission of the Task Force. My co-Director and co-author, William F. Wechsler, brought not only a wealth of talent and energy but the wealth of experience that comes from being the first senior U.S. official to focus seriously on these issues, beginning in 1998.

I am also grateful to Council President Richard Haass. This Task Force would not have succeeded without his support and assistance.

Finally, it is my honor to testify beside David Aufhauser, who served our country with dedication and distinction. Many of the positive developments in this area since 9/11 are the direct fruits of his vision and leadership.

I will discuss the background of our second report and its findings. Mallory will then discuss the report's recommendations. Since the report, along with its various appendices, is almost 300 pages in length, we will only be able to highlight core points. We ask that the full report and its appendices be placed into the record, and we look forward to a fuller discussion of various aspects of the report in response to your

Case 1:03-md-01570-GBD-SN   Document 516-4   Filed 11/01/04   Page 2 of 6

questions.

In our first report, released in October 2002, we concluded: "It is worth stating clearly and unambiguously what official U.S. government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda; and for years, Saudi officials have turned a blind eye to this problem." We recommended the encouragement of the Saudi regime to strengthen significantly its efforts to combat terrorist financing. In this regard, we noted a recent historical record of inattention, denial, and half measures. And we urged the U.S. Government to confront directly the lack of political will in Saudi Arabia and elsewhere through the institution of a declaratory policy that would permit or compel U.S. officials to speak more frankly about the nature of the problem.

The reaction to the release of the Task Force's initial report was reflective of then-prevailing mindsets. The Saudi Arabian Foreign Minister, Prince Saud al-Faisal, told CNN that the report was "long on accusation and short on documented proof." The Saudi ambassador to the United States, Prince Bandar bin Sultan, said the Task Force report was based on "false and inconclusive information" and "clearly out of touch with current activities." He also maintained that "Saudi Arabia has put into place the tools, resources, laws, and regulations to combat terrorism and terrorist financing" and promised to "prosecute the guilty to the fullest extent of the law." The U.S. Treasury Department's spokesperson called the report "seriously flawed."

During 2002 and into the first few months of 2003, U.S. officials quietly engaged their Saudi counterparts on a sustained basis in Washington and Riyadh—at increasingly high levels, with more intelligence they were prepared to share, and with more aggressive demands. Results were mixed.  Less transparent methods of curtailing terrorist financing were also stepped up, with significant successes.

The status quo changed on May 12, 2003, when al-Qaeda bombed housing compounds in Riyadh used by U.S. and other foreign residents, prompting more comprehensive Saudi action against terrorism.  Public statements and actions by both the United States and Saudi Arabia since May 2003 have evidenced in many respects a more urgent approach to terrorist financing, one that is broadly consistent with our initial report's conclusions, findings, and recommendations.

For example, Saudi Arabia has announced a profusion of new laws, regulations, and institutions regarding money laundering, charitable oversight, and the supervision of the formal and informal financial services sector. Significantly, the government also took steps to remove donation boxes from mosques and shopping malls. And, for the first time, Saudi Arabia has subjected aspects of its anti–money laundering regime to international scrutiny.

While Saudi officials were previously unwilling to acknowledge or address the role government-sanctioned religious messages play in supporting militant Islamic groups, following the May terrorist attacks Saudi officials began to take steps to address the mindset that foments and justifies acts of terrorism.

Most critically, for the first time, the Saudi government decided to use force to hunt—and kill—members of domestic al-Qaeda cells, including, in one case, a financier named Yousif Salih Fahad Al-Ayeeri (aka "Swift Sword"). Actions on this scale were not in evidence prior to the 2003 bombings.

Saudi Arabia has markedly increased its tactical law enforcement and intelligence cooperation with the United States and the Bush administration acted quickly to take advantage of newfound political will in Saudi Arabia to renew and reinvigorate its own efforts to combat terrorist financing.

The Bush administration also moved toward a more declaratory policy.  On June 26, 2003, for example, at the annual U.S.-EU Summit, President Bush took the important step of publicly urging European leaders to criminalize all fundraising by Hamas.  That same day, David Aufhauser testified before Congress that "in many ways, [Saudi Arabia] is the epicenter" of the financing of al-Qaeda and other terrorist movements.

The pace of joint U.S.-Saudi designations quickened, specifically in respect to efforts to close problematic overseas branches of the sprawling, Saudi-based Al Haramain Islamic Foundation, which Saudi officials estimate was, at its height, raising between forty and fifty million dollars per year.

As our report was going to press, the government of Saudi Arabia announced the dissolution of Al Haramain and other charitable entities and the creation of a nongovernmental organization to coordinate private Saudi charitable giving abroad.

As a result of the foregoing activities, al-Qaeda's current and prospective ability to raise and move funds with impunity has been significantly diminished. These efforts have likely made a real impact on al-Qaeda's financial picture, and it is undoubtedly a weaker organization as a result.

Indeed, in many respects, the views expressed in the Task Force's first report are now widely held, at home and abroad. But although much work has been done, much work remains.

I will now describe a number of our core findings.

Although Saudi Arabia has made significant improvements in its legal and regulatory regime, it has not fully implemented its new laws and regulations, and because of that, opportunities for the witting or unwitting financing of terrorism persist.

Indicia of implementation and enforcement are generally unavailable. We are concerned that the unavailability of such indicia may negatively impact the deterrent effect presumably intended by these measures.

As our report was going to press, for example, we were unable to find evidence to suggest that the announced High Commission of Oversight of Charities was fully operational. Moreover, its composition, authority, mandate, and charter remain unclear, as do important metrics of its likely effectiveness, such as staffing levels, budget, and personnel training. The mandate and authority of the High Commission of Oversight of Charities is also unclear relative to that of the Saudi National Entity for Charitable Work Abroad, which was first announced in February 2004. As Juan Zarate told Congress earlier this spring, "the Kingdom must move forward to clarify and empower an oversight authority that will administer effective control over the [charity] sector and ensure compliance with obligations under the new regulatory measures." More recently, on June 2, 2004, Zarate called the establishment of the Saudi National Entity for Charitable Work Abroad a "major step forward" and noted, "we're looking forward to seeing the implementation of that."

At least one other key body, Saudi Arabia's Financial Intelligence Unit (FIU), is also not yet fully functional. FIU's are intended to collect and analyze suspicious financial data. Reliable, accessible metrics are lacking with respect to many of the other newly announced legal, regulatory, and institutional reforms. Critical data necessary to assess the implementation, enforcement, and effectiveness of many of these announced reforms are generally nonexistent or not publicly available. We find this troubling given the importance of these issues to the national security interests of the United States and other countries (including Saudi Arabia) that remain targets of al-Qaeda and similar terrorist organizations.

Additionally, we have found no evidence that Saudi Arabia has taken public punitive actions against any individual for financing terror. As a result, Saudi Arabia has yet to demand personal accountability in its efforts to combat terrorist financing and, more broadly and fundamentally, to de-legitimize these activities. The lack of transparent and compelling evidence of implementation is particularly troublesome in the criminal law enforcement context. Despite the flurry of laws and regulations, we believe that there have been no publicly announced arrests, trials, or incarcerations in Saudi Arabia in response to the financing of terrorism—despite the fact that such arrests and other punitive steps have reportedly taken place.

Against its poor historical enforcement record, any Saudi actions against financiers of terror are welcome. But actions taken in the shadows may have little consistent or systemic impact on ingrained social or cultural practices that directly or indirectly threaten the security of the United States.

Put simply, our Task Force found that people and organizations need to be publicly punished, including for past involvement in terrorist financing activities.

Not only have there been no publicly announced arrests in Saudi Arabia related to terrorist financing, but key financiers remain free or go unpunished. For example, Yasin al-Qadi, a Specially Designated Global Terrorist, appears to live freely in Saudi Arabia. According to

the Treasury Department, "He heads the Saudi-based Muwafaq Foundation. Muwafaq is an al-Qaeda front that receives funding from wealthy Saudi businessmen. Blessed Relief is the English translation. Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief." Wa'el Julaidan, who was jointly designated on September 6, 2002, by the governments of the United States and Saudi Arabia as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," also appears to live freely in Saudi Arabia. According to the Treasury Department, "The United States has credible information that Wa'el Hamza Julaidan is an associate of Usama bin Laden and several of bin Laden's close lieutenants. Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida." The same is true for Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of the Al Haramain Islamic Foundation (AHF). According to the Treasury Department, "As AHF's founder and leader, Al-Aqil controlled AHF and was responsible for all AHF activities, including its support for terrorism…. Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al-Qa'ida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS, and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities."

We find it regrettable and unacceptable that *since September 11, 2001, we know of not a single Saudi donor of funds to terrorist groups who has been publicly punished*—despite Ambassador Bandar's assertion, in response to the issuance of our first report, that Saudi Arabia would "prosecute the guilty to the fullest extent of the law."

Finally, Saudi Arabia continues to export radical extremism. A battle of ideas undergirds the global war on terrorism. Militant groups such as al-Qaeda are fueled by uncompromising fundamentalist interpretations of Islam that espouse violence and that millions of Muslims join Christians and Jews in rejecting.

As a core tenet of its foreign policy, Saudi Arabia funds the global propagation of Wahabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike. We are concerned that this massive spending is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States. Through the support for *madrassas*, mosques, cultural centers, hospitals, and other institutions, and the training and export of radical clerics to populate these outposts, Saudi Arabia has spent what could amount to hundreds of millions of dollars around the world financing extremism. Such Saudi financing is contributing significantly to the radicalization of millions of Muslims in places ranging from Pakistan to Indonesia to Nigeria to the United States. Foreign funding of extremist *madrassas* in Pakistan alone, for example, is estimated in the tens of millions, much of it historically from Saudi Arabia.

Saudi Arabia has begun to crack down on *domestic* extremism, most dramatically through education reform and the banishment or "re-education" of scores of radical Wahabi clerics. But our Task Force found that there is less evidence of effective action to curb the ongoing *export* of extremism.

Although the United States is not and should not be at war with any religion or any religious sect, we found that U.S. policy should affirmatively seek to drain the ideological

breeding grounds of Islamic extremism, financially and otherwise.  To do so, we will need more demonstrable cooperation from Saudi Arabia, which so far as not been sufficiently forthcoming.

We have made a number of other findings that I hope we can discuss.  In the interest of time, Mallory will now address the report's recommendations, after which time I would be happy to answer any questions.

Printable Version

| About the Committee | Hearings | Legislation & Nominations | Press | Issues | Subcommittees | Committee Documents | Related Links |

Committee on Governmental Affairs
340 Dirksen Senate Office Building
Washington, D.C. 20510