UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to Perouz Seda Ghaty and**<br>**Al Haramain Islamic Foundation** |

*This document relates to:*   Federal Insurance Co. v. al Qaida
                              03 CV 06978 (RCC)


**RICO STATEMENT**
**APPLICABLE TO**
**PEROUZ SEDA GHATY a/k/a "PETE SEDA" AND**
**AL HARAMAIN ISLAMIC FOUNDATION**

       Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendants Perouz Seda Ghaty a/k/a "Pete Seda" and Al Haramain Islamic Foundation.

       Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.    The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).


2.    The names of the defendants to whom this RICO statement pertains is Perouz Seda Ghaty a/k/a "Pete Seda" and Al Haramain Islamic Foundation. The alleged misconduct and basis for liability is set forth in Exhibit "A".


3.    Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| financial institution fraud | 18 U.S.C. § 1344 |
| relating to unlawful procurement of citizenship or naturalization papers | 18 U.S.C. § 1425 |
| relating to the unlawful reproduction of naturalization or citizenship papers | 18 U.S.C. § 1426 |
| relating to the sale of naturalization or citizenship papers | 18 U.S.C. § 1427 |
| obstruction of justice | 18 U.S.C. § 1503 |
| obstruction of a criminal investigation | 18 U.S.C. § 1510 |
| obstruction of state or local law enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| fraud or misuse of visa permits or other documents | 18 U.S.C. § 1546 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |

| | |
|---|---|
| defrauding the US Government | 18 U.S.C. § 371 |
| filing false or materially false tax returns | 26 U.S.C. § 7206(1), (2) |
| engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| mid-1990s to 9/11/2001 | Perouz Seda Ghaty aka "Pete Seda" ("Seda") and Al Haramain Islamic Foundation ("AHIF") | Seda and AHIF conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| late 1990s to 9/11/2001 | Seda and AHIF | Seda and AHIF undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which they were participating, Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| mid-1990s to 9/11/2001 | Seda and AHIF | Seda and AHIF agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a) The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Perouz Seda Ghaty and Al Haramain Islamic Foundation fit neatly into this framework by providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

(c) no.

(d) Perouz Seda Ghaty and Al Haramain Islamic Foundation are associated with the Enterprise.

(e) Perouz Seda Ghaty and Al Haramain Islamic Foundation members of the Enterprise, and are separate and distinct from the Enterprise.

4

    (f)    Perouz Seda Ghaty and Al Haramain Islamic Foundation intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Perouz Seda Ghaty and Al Haramain Islamic Foundation is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Perouz Seda Ghaty and Al Haramain Islamic Foundation furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Perouz Seda Ghaty and Al Haramain Islamic Foundation, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Perouz Seda Ghaty and Al Haramain Islamic Foundation, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities.

    The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

      The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Perouz Seda Ghaty and Al Haramain Islamic Foundation. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Perouz Seda Ghaty and Al Haramain Islamic Foundation. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Perouz Seda Ghaty and Al Haramain Islamic Foundation. Perouz Seda Ghaty and Al Haramain Islamic Foundation, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Perouz Seda Ghaty and Al Haramain Islamic Foundation also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | | |
|---|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

6

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Perouz Seda Ghaty aka "Pete Seda" ("Seda") and Al Haramain Islamic Foundation ("AHIF") | Seda and AHIF have long provided financial services and other forms of material support to terrorist organizations, including al Qaida. Indeed, AHIF has long acted as a fully integrated component of al Qaida's worldwide logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations.<br><br>AHIF has offices all over the world from which it coordinates its support for the Enterprise, Radical Muslim Terrorism, and an interlocking management by which it effectuates that support. For example, Aqeel Abdulaziz Al-Aqil, a Saudi, is Secretary General of the Saudi AHIF located in Riyadh and president of the Oregon AHIF. Mansour Al-Kadi, a Saudi, is deputy director general of the Saudi AHIF, "head" of AHIF's Africa Committee, and vice president of the Oregon AHIF. (Seda is the secretary of the Oregon AHIF.)<br><br>AHIF has advertised its connection to al Qaida. AHIF's website used to have a direct link to the al Qaida site about the Chechnyian operations (qoqaz.com). The website is part of the al Qaida propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others).<br><br>Numerous branches of AHIF, including Afghanistan, Albania, Bangladesh, Bosnia, Ethiopia, Herzegovina, Indonesia, Kenya, the | 1962(c)<br>1962(d) |

|  | Netherlands, Tanzania and Pakistan, have been designated as sponsors and supporter of al Qaida and affiliated FTOs.

When viewed as a single entity, AHIF is one of the principal Islamic organizations providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under the leadership of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of AHIF and an al Qaida supporter, AHIF, numerous AHIF field offices and AHIF representatives operating throughout Africa, Asia, Europe and North America provided financial and material support to the al Qaida network.

Also under Aqeel Abdulaziz Al-Aqil's leadership, AHIF implemented its tasks through its offices and representatives, which span more than fifty countries around the world. AHIF maintained nine general committees and several other "active committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

In Southeast Asia, AHIF served as a primary source of al Qaida funding.

In Africa, AHIF was heavily involved in plotting terrorist attacks against Americans, including but not limited to the suicide bomber attacks against the U.S. Embassies in Nairobi and Dar es Salaam in which 224 people were killed.

AHIF's Pakistan office provided funding and logistical support for the acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank weapons to |  |

|  | al Qaida and al Qaida affiliated militants.<br><br>In Europe, AHIF sponsored al Qaida activity through the al Nur Mosque which served as a meeting place, recruitment center and base of operations for al Qaida within Germany. At the direction of the Kingdom of Saudi Arabia, AHIF contributed in excess of $1 million dollars to the Mosque, funding the purchase of the land for the Mosque as well as its construction.<br><br>AHIF also sponsored al Qaida operations in Chechnya and Kosovo through its participation in the Saudi Joint Relief Committee (the "SJRC"). The SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with the SJRC bureaus.<br><br>In the United States, AHIF's Ashland, Oregon office, of which Seda was the secretary, committed violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act which funneling money to al Qaida.<br><br>Seda and AHIF thereby have, for a period of many years, provided critical financial and logistical support to al Qaida to support that terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Seda and AHIF's participation in al Qaida's jihadist campaign. |  |