**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*      Federal Insurance Co. v. al Qaida
                                 03 CV 06978 (RCC)

**THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE MOTION TO DISMISS FILED BY**
**TARIK HAMDI**

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

# <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION ................................................................................................ 1

II.  ALLEGATIONS AGAINST TARIK HAMDI ...................................................... 1

III.  ARGUMENT ....................................................................................................... 3

    A.  Applicable Standards on a Motion to Dismiss.............................................. 4

        1.  Fed. R. Civ. P. 12(b)(6)....................................................................... 4

        2.  Fed. R. Civ. P. 8(a)(2)......................................................................... 5

    B.  Hamdi Improperly Attempts to Submit Evidence Contradicting the Federal
       Plaintiffs' Allegations .................................................................................. 6

    C.  The Federal Plaintiffs' Allegations Are Fair Statements that Give Hamdi
       Notice of the Federal Plaintiffs' Claims ...................................................... 6

    D.  The Federal Plaintiffs Have Adequately Alleged Claims Under the Anti-
       Terrorism and Effective Death Penalty Act................................................. 7

        1.  The Federal Plaintiffs Have Adequately Alleged Claims Under the
           ATA Pursuant to General Tort Principles............................................ 7

        2.  Federal Plaintiffs Have Adequately Alleged Claims Under the ATA
           Based Upon Hamdi's Criminal Violations ........................................ 12

        3.  The Federal Plaintiffs Have Adequately Pled Causation.................... 13

    E.  The Federal Plaintiffs Have Sufficiently Pled a RICO Claim Against Hamdi.............. 15

        1.  The Federal Plaintiffs May Pursue a RICO Claim ................................. 16

        2.  The Federal Plaintiffs Have Sufficiently Pled Violations of Sections
           1962(c) and 1962(d)......................................................................... 18

    F.  The Federal Plaintiffs Have Sufficiently Pled Claims Against Hamdi for
       Conspiracy and Aiding and Abetting.......................................................... 20

    G.  The Federal Plaintiffs Have Adequately Alleged State Common Law
       Claims ....................................................................................................... 21

        1.  The Federal Plaintiffs Have Adequately Alleged Intentional Infliction
           of Emotional Distress....................................................................... 21

         2.  The Federal Plaintiffs Have Adequately Alleged Wrongful Death ......... 21

        3.  The Federal Plaintiffs Have Adequately Alleged Survival.................... 22

        4.  The Federal Plaintiffs Have Adequately Alleged Punitive Damages..... 23

IV.  CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

*Abrahams v. Young & Rebicam, Inc.*,
    79 F.3d 234 (2d Cir. 1996)....................................................................................18

*American Tobacco Co. v. United States*,
    147 F.2d 93 (6th Cir. 1944) ...............................................................................14

*Associated Gen. Contractors of Cal., Inc. v. California State Council of
Carpenters*, 459 U.S. 519 (1983)..........................................................................19

*Bingham v. Meachum*,
    77 F.3d 626 (2d Cir. 1996)....................................................................................5

*Boim v. Quranic Literacy Institute* ("*Boim I*"),
    291 F.3d 1000 (7th Cir. 2002) ..................................................................7-10, 13

*Boim v. Quranic Literacy Institute* ("*Boim II*"),
    No. 00-C-2905, 2004 WL 2554446 (N.D. Ill. Nov. 10, 2004) ..........................8-10, 13

*Boim v. Quranic Literacy Institute* ("*Boim II*")
    No. 00-C-2905, 2004 U.S. Dist. LEXIS 22745 (N.D. Ill. Nov. 10, 2004) ....................8

*Brewer v. Brewer*,
    34 Fed. Appx. 28 (2d Cir. 2002) ............................................................................21

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir. 1998)....................................................................................5

*Condit v. Dunne*,
    317 F. Supp. 2d 344 (S.D.N.Y. 2004)........................................................................6

*Conley v. Gibson*,
    355 U.S. 41 (1957)....................................................................................4, 5, 6

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)..............................................................................................14

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998) ................................................................................23

*Foman v. Davis*,
  371 U.S. 178 (1962)..................................................................................7

*Geisler v. Petrocelli*,
  616 F.2d 636 (2d Cir. 1980).................................................................4, 6

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ....................................................8, 14, 22

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984)................................................................................11

*Hoffman-LaRoche, Inc. v. Greenberg*,
  447 F.2d 872 (7th Cir. 1971) ...............................................................9

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992)........................................................................17, 19

*Howell v. New York Post Co., Inc.*,
  612 N.E.2d 699 (N.Y. 1993).................................................................21

*In re Initial Public Offering Sec. Litig.*,
  241 F. Supp. 2d  281 (S.D.N.Y. 2003)..................................................5-6

*LaMarca v. United States*,
  31 F. Supp. 2d 110 (E.D.N.Y. 1998) ................................................21-22

*Leatherman v. Tarrant County*,
  507 U.S. 163 (1993)...........................................................................5, 6

*Lerner v. Fleet Bank, N.A.*,
  318 F.3d 113 (2d Cir. 2003)............................................................19, 20

*Lumbard v. Maglia, Inc.*,
  621 F. Supp.  1529 (S.D.N.Y. 1985).................................................13-14

*Merrill Lynch Futures, Inc. v. Kelly*,
  585 F. Supp. 1245 (S.D.N.Y. 1984).......................................................8

*National Asbestos Workers Med. Fund v. Philip Morris, Inc.*,
  74 F. Supp. 2d 221 (E.D.N.Y. 1999) ..............................................16-18, 19

*In re Phillip Servs. Corp. Secs. Litig.*,
  No. 98-CIV-0835 (MBM), 2004 U.S. Dist. LEXIS 9261 (S.D.N.Y. May 24,
  2004) ...................................................................................................4

*Rachman Bag Co. v. Liberty Mut. Ins. Co.,*
    46 F.3d 230 (2d Cir. 1995)..................................................................................7

*Ramos v. Patrician Equities Corp.,*
    No. 89-CIV-5370 (TPG), 1993 U.S. Dist. LEXIS 2979 (S.D.N.Y. March 3,
    1993) ......................................................................................................................16

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)................................................................................................17

*Rich-Taubman Associate v. Stamford Restaurant Operating Co., Inc.,*
    587 F. Supp. 875 (S.D.N.Y. 1984).........................................................................8

*Salinas v. United States,*
    522 U.S. 52 (1997)..................................................................................................20

*Simmons v. Abruzzo,*
    49 F.3d 83 (2d Cir. 1995) .......................................................................................4

*Sparrow v. United Airlines, Inc.,*
    216 F.3d 1111 (D.C. Cir. 2002) .............................................................................6

*Swierkiewicz v. Sorema,*
    534 U.S. 506 (2002)..............................................................................................5, 6

*United States v. Louie,*
    625 F. Supp. 1327 (S.D.N.Y. 1985)..................................................................18, 19

*United States v. Turkette,*
    452 U.S. 576 (1981)................................................................................................18

*Valdan Sportswear v. Montgomery Ward & Co.,*
    591 F. Supp. 1188 (S.D.N.Y. 1984).......................................................................22

*Von Bulow v. Von Bulow,*
    634 F. Supp. 1284 (S.D.N.Y. 1986).................................................................19-20

*Wahad v. FBI,*
    813 F. Supp. 224 (S.D.N.Y. 1993)..........................................................................8

*Whyte v. Contemporary Guidance Servs.,*
    No. 03-C 2004 U.S. Dist. LEXIS 12447 (S.D.N.Y. July 2, 2004) ..........................7

*Woodford v. Community Action Agency,*
    239 F.3d 517 (2d Cir. 2001)....................................................................................5

*Wynder v. McMahon*,
  360 F.3d 73 (2d Cir. 2004).................................................................4, 5, 6

*Yilmaz v. McElroy*,
  No. 00-CV-7542 (RCC), 2001 U.S. Dist. LEXIS 20839 (S.D.N.Y. Dec. 17,
  2001) ...............................................................................................4-5

*Yoder v. Orthomolecular Nutritionist Institute, Inc.*,
  751 F.2d 555 (2d Cir. 1985)..................................................................4

## STATUTES, RULES, AND OTHER MATERIALS

18 U.S.C. § 2331, *et seq*...................................................... 4, 7-8, 13

18 U.S.C. § 2339A ....................................................................13

19 U.S.C. § 2339B ....................................................................13

18 U.S.C. § 1961, *et seq*..............................................................4, 15

18 U.S.C. § 1962(c) ............................................................... 15-18

18 U.S.C. § 1962(d) ......................................................... 15-16, 18, 20

FED. R. CIV. P. 8.....................................................................5-6

FED. R. CIV. P. 12(b)(6) ............................................................4-5, 19

FED. R. CIV. P. 15(a) ..................................................................7

N.Y. EST. POWERS & TRUSTS LAW § 11-3.2 (2004) ......................................22

RESTATEMENT (SECOND) OF TORTS § 876(b) cmt. d.......................................22

U.S. Senate Select Committee on Intelligence & U.S. House Permanent Select
Committee on Intelligence, Joint Inquiry into Intelligence Community Activities
before and after the Terrorist Attacks of September 11, 2001 (hereinafter "Joint
Inquiry"), S. REP. NO. 107-351 & H. REP. NO. 107-792, at 129 (December 2002),............1

*The Role of Charities and NGOs in the Financing of Terrorist Activities:  Hearing Before
the Senate Subcommittee on International Trade and Finance of the Committee on
Banking, Housing, and Urban Affairs*, S. HRG. 107-988, at 45 (August 1, 2002) (prepared
Statement of Matthew A. Levitt, Senior Fellow in Terrorism Studies, the Washington
Institute for Near East Policy)........................................................ 1,2

## I.     INTRODUCTION

The Federal Plaintiffs have sued Tarik Hamdi ("Hamdi") based on his participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and foreseeable product.[1]  FAC ¶¶ 66, 72, 600, 625, 632, & 640; RICO at ¶ 5(b), ¶ 6(b) & (f), ¶14, & Exhibit A.[2]

## II.    ALLEGATIONS AGAINST TARIK HAMDI

In May 1998, well after Osama bin Laden had declared war against the United States,[3] Defendant Hamdi delivered a satellite telephone and battery pack to bin Laden in Afghanistan.[4]

---

[1]     Defendant Hamdi's Memorandum of Law in support of his Motion to Dismiss the Federal Plaintiffs' First Amended Complaint ("FAC") is, for all intents and purposes, identical to the Memorandum of Law that he filed in the *Burnett* action.  Although Hamdi has made minor changes, the Memorandum still focuses on the allegations of the Burnett Plaintiffs' Third Amended Complaint ("TAC"), not the Federal Plaintiffs' FAC.  Because Hamdi has failed to address the allegations of the FAC in any meaningful sense, the Federal Plaintiffs respectfully submit that his Motion to Dismiss should be summarily denied.  Nevertheless, the Federal Plaintiffs have endeavored to interpret Defendant Hamdi's arguments and made a good faith effort to be as responsive as possible to Hamdi's Memorandum.

[2]     "FAC" refers to the Federal Plaintiffs' First Amended Complaint.  "TAC" refers to the Burnett Plaintiffs' Third Amended Complaint.  "RICO" refers to the RICO Statement applicable to Tarik Hamdi, which was filed on July 30, 2004.  Under ¶14 of Case Management Order No. 2, "[a]ny such RICO statement shall be deemed an amendment to the Federal Insurance plaintiffs' . . . Amended Complaint, by incorporation by reference."

[3]     In August 1996, bin Laden issued the first *fatwa* (religious decree) declaring *jihad* (holy war) against the United States.  U.S. Senate Select Committee on Intelligence & U.S. House Permanent Select Committee on Intelligence, Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 (hereinafter "Joint Inquiry"), S. REP. NO. 107-351 & H. REP. NO. 107-792, at 129 (December 2002), *also available at* http://www.gpoaccess.gov/serialset/creports/911.html.  In February 1998, al Qaida issued a second *fatwa* under the banner "the World Islamic Front for Jihad Against Jews and Crusaders," saying that it was the duty of all Muslims to kill United States citizens – civilian or military – and their allies everywhere.  FAC ¶ 42.  Just a few months later, al Qaida acted on that threat, bombing the U.S. embassies in Kenya and Tanzania, leaving 258 people dead and more than 5,000 injured.  Furthermore, the Attack on the World Trade Center in 1993 and a plot to blow up bridges, tunnels, and landmarks in New York, which the FBI discovered in 1993, both indicate that al Qaida was in the process of planning the September 11th Attack at that time.  Joint Inquiry at 130.

[4]     In the government's closing statement in the embassy bombings trial, Assistant United States Attorney Kenneth Karas explained that the battery pack for the satellite phone went from being "shipp[ed] . . . to Tariq Hamdi, to Tariq Hamdi going to Pakistan, and then Afghanistan, where he delivers the battery pack for the phone." TAC ¶ 581.  Moreover, according to Matthew A. Levitt, a senior fellow in Terrorism Studies at the Washington Institute for Near East Policy, "Tarik Hamdi, an IIIT employee, personally provided bin Laden with the battery for the satellite phone prosecutors at the New York trial of the East Africa Embassy bombers described as 'the phone Bin Laden and others will use to carry out their war against the United States.' "  *The Role of Charities and NGOs in the Financing of Terrorist Activities:  Hearing Before the Senate Subcommittee on International Trade and Finance of the Committee on Banking, Housing, and Urban Affairs*, S. HRG. 107-988, at 45 (August 1, 2002) (prepared Statement of Matthew A. Levitt, Senior Fellow in Terrorism Studies, the Washington Institute for Near East Policy) (hereinafter "Levitt Statement") (footnote and citation omitted), *also available at* http://banking.senate.gov/-_files/107988.pdf.

RICO at Exhibit A; TAC ¶ 581.  Using the satellite phone and battery pack supplied by Hamdi, bin Laden conferred with al Qaida members across the globe and ordered the bombing of the two United States embassies in East Africa.  RICO at Exhibit A; TAC ¶¶ 245 & 581.  In 1998, Hamdi, a resident of Herndon, Virginia, traveled to Afghanistan with an ABC news team in order to coordinate an interview with bin Laden, which was the apparent cover for his involvement in delivering the satellite phone and battery pack.  RICO at Exhibit A; TAC ¶ 581. Thus, by facilitating the delivery of the satellite phone and battery pack used by bin Laden to coordinate al Qaida's global *jihad* against the United States, Hamdi participated in and conspired to commit murder and arson, all in furtherance of the Enterprise's common goals and ultimate plan of launching an Attack on the United States.  RICO at Exhibit A.

Hamdi is also a material sponsor, co-conspirator and aider and abettor of the International Institute of Islamic Thought ("IIIT"), which is one of the SAAR Network entities.[5]  TAC ¶¶ 267 & 583; FAC ¶¶ 146 & 224.  Hamdi was employed by IIIT, which is located at 555 Gross Street, Herdon, Virginia.  TAC ¶¶ 583; FAC ¶¶ 146 & 224; Levitt Statement at 45.  That address is the central location for the SAAR Network entities.  *Id.*  During the time that Hamdi worked for IIIT, IIIT aided and abetted, conspired with, and provided material support and resources to defendant al Qaida and/or affiliated FTOs, associations, organizations or persons.[6]  FAC ¶¶ 66 & 224; TAC ¶ 267.  Thus, as an employee of IIIT, Hamdi aided and abetted the SAAR Network entities in conspiring to and supporting terrorism, evading tax obligations, and obfuscating the

---

[5]     Beginning in the 1980s, several prominent and wealthy sponsors of al Qaida's global *jihad* began establishing a network of interrelated ostensible charities, think tanks, and for-profit businesses within the United States, commonly referred to as the "SAAR Network," to generate and surreptitiously transfer funds to terrorist organizations, including al Qaida.  FAC ¶ 222.  By September 11, 2001, more than one hundred (100) ostensible charities and for-profit businesses functioned under the umbrella of the SAAR Network, including International Institute of Islamic Thought, which employed Defendant Hamdi.  FAC ¶ 222; TAC ¶ 583.  The entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.  FAC ¶ 226.

[6]     As the RICO Statement alleges, Defendant Hamdi raised funds for and provided funding and material support to the members of the conspiracy that brought about the Attack.  RICO at ¶ 6(b).

roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the September 11th Attack.  RICO at ¶ 5(b).

In addition to aiding and abetting and conspiring with the SAAR Network entities, Hamdi associated himself with the Committee for the Defense of Legitimate Rights ("CDLR") and the Advice and Reformation Committee ("ARC").[7]  TAC ¶ 561.  In the Radical Arabic publication, *Al-Zaytuna*, an advertisement for CDLR listed in the contact information a telephone number that is registered in Hamdi's name.  TAC ¶ 580.  In regard to ARC, Hamdi wrote a note to Khalid al-Fawwaz calling him "Brother Khalid," which indicates a more than professional relationship with one of ARC's key leaders.  TAC ¶¶ 561 & 581.  Khalid al-Fawwaz was head of bin Laden's ARC organization in London and one of the masterminds of the 1998 United States Embassy bombings, for which he was indicted by the United States government.  TAC ¶¶ 232, 261, & 564.

As the above discussion illustrates, Hamdi acted for and/or associated himself with the organizations discussed above as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, Radical Muslim Terrorism,[8] planned to and would commit an act of deadly aggression against the United States in the near future using the resources and support that he supplied from the late 1990's to September 11th.  RICO at ¶ 5(b).

## III.  ARGUMENT

Defendant Hamdi makes five arguments in favor of dismissal:  (1) that the Federal Plaintiffs have failed to allege a sufficient factual basis to support any of the claims set forth in

---

[7]      Both CDLR and ARC have aided and abetted, conspired with, and provided material support and resources to defendant al Qaida and/or affiliated FTOs, associations, organizations or persons.  FAC ¶ 66.  Both organizations seek to overthrow the Saudi government to replace the regime with an even stricter brand of Islam.  TAC ¶ 561. These two organizations have disseminated bin Laden's propaganda throughout their existence and served to further the violent goals of radicals and terrorists against the United States.  TAC ¶ 562.
[8]      "Radical Muslim Terrorism" or the "Enterprise" is a conspiracy comprised of the defendants named in the FAC, and a collection of persons, organizations, businesses, and nations associated in fact.  RICO at ¶ 6(a).

the FAC, (2) that the Federal Plaintiffs have failed to state claim under the Anti-Terrorism Act ("ATA"),[9] (3) that the Federal Plaintiffs have failed to state a claim under the Racketeer Influence and Corrupt Organizations Act ("RICO"),[10] (4) that the Federal Plaintiffs have failed to state claims for conspiracy and aiding and abetting, and (5) that the Federal Plaintiffs have failed to state claims under New York common law.  Defendant's motion must be denied, because the Federal Plaintiffs have alleged a sufficient factual basis to support the claims in the FAC. Furthermore, the Federal Plaintiffs have sufficiently pled causes of action under the ATA, RICO, conspiracy, aiding and abetting, and New York common law.

A.     **Applicable Standards on a Motion to Dismiss.**

1.     **Fed. R. Civ. P. 12(b)(6)**

In ruling on Motion to Dismiss brought pursuant to Rule 12(b)(6), for failure to state a claim, the motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995).  Moreover, "[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole."  *In re Phillip Servs. Corp. Secs. Litig.*, No. 98-CIV-0835 (MBM), 2004 U.S. Dist Lexis 9261, at * 32 (S.D.N.Y. May 24, 2004) (quoting *Yoder v. Orthomolecular Nutritionist Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) (citation omitted)).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the FAC, but "merely to assess the legal feasibility" of the FAC.  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (citing *Conley*, 355 U.S. at 45).  In evaluating whether the Federal Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the FAC and draw all reasonable inferences in favor of the Federal Plaintiffs.  *See*

---

[9]     *See* 18 U.S.C. § 2331 *et. seq.*
[10]    *See* 18 U.S.C. § 1961 *et. seq.*

*Yilmaz v. McElroy*, No. 00-CV-7542 (RCC), 2001 U.S. Dist. LEXIS 20839, at * 6 (S.D.N.Y.

Dec. 17, 2001).  The Federal Plaintiffs "are not required to prove [their] case at the pleading

stage; indeed, the pleading of evidence should be avoided." *Woodford v. Cmty. Action Agency*,

239 F.3d 517, 526 (2d Cir. 2001) (internal quotation marks and citations omitted).  The issue on

a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the

claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d

698, 701 (2d Cir. 1998) (quoting *Bingham v. Meachum*, 77 F.3d 626 (2d Cir. 1996) (citation

omitted)).

### 2.      Fed. R. Civ. P. 8(a)(2)

A Rule 12(b)(6) motion is analyzed in the context of the requirements of FED. R. CIV. P.

8(a)(2), which is extremely permissive.  *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002).

Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of

the claim showing that the pleader is entitled to relief," and that such a statement shall simply

"give the respondent fair notice of what the petitioner's claims are and the grounds upon which

they rest." *Id*. (quoting *Conley*, 355 U.S. at 47); *see also Wynder*, 360 F.3d at 77.  Furthermore,

in the absence of averments of fraud or mistake, which must be pled with particularity pursuant

to Rule 9(b), a federal court is prohibited from imposing more demanding requirements than

those prescribed under Rule 8(a).  *Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993).

As a judge in this District recently explained, "[s]uch simplified 'notice pleading' is made

possible by the liberal opportunity for discovery and the other pretrial procedures established by

the Rules to disclose more precisely the basis of both claim and defense and to define more

narrowly the disputed facts and issues*." In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d

281, 322 (S.D.N.Y. 2003) (quoting *Conley*, 355 U.S. at 48).  Thus, "[a]s the Supreme Court

recognized in *Swierkiewicz*, one clearly written sentence can satisfy Rule 8(a)(2)."[11]  *Id.* at 323.

### B.   Hamdi Improperly Attempts to Submit Evidence Contradicting the Federal Plaintiffs' Allegations

Hamdi's Motion to Dismiss is fatally flawed because he improperly attempts to submit

unattested evidence contradicting the allegations put forth by the Federal Plaintiffs.  Hamdi Br. at

1-3.  The Federal Plaintiffs assert that such evidentiary submissions are improper in a Motion to

Dismiss, because the Court must take as true the factual allegations made by the Federal

Plaintiffs.[12]  *See Leatherman*, 507 U.S. at 164; *Swierkiwicz*, 534 U.S. at 508 n.1.   Moreover, the

Court's job in evaluating Hamdi's Motion to Dismiss is to assess the legal feasibility of the FAC,

not weigh the evidence.  *See Geisler*, 616 F.2d at 639.

### C.   The Federal Plaintiffs' Allegations Are Fair Statements that Give Hamdi Notice of the Federal Plaintiffs' Claims

Hamdi argues that the Court cannot "accept legal conclusions cast in the form of factual

allegations."  Hamdi Br. at 3.  The allegations in the FAC and the RICO Statement are not legal

conclusions "cast in the form of factual allegations," as Hamdi asserts; they are fair statements

that given him notice of the Federal Plaintiffs' claims and the grounds upon which they are

based.  *See Wynder*, 360 F.3d at 77.  Furthermore, the allegations set forth in the FAC and the

RICO Statement are sufficient to state a claim under the liberal pleading standard allowed by

FED. R. CIV. P. 8(a).  *See Swierkiewicz*, 534 U.S. at 512-13.  To the extent that the Court finds

---

[11]     By way of illustration, one Court of Appeals recently held that the allegation, "I was turned down for a job because of my race," when included in a complaint, would be sufficient to survive a Rule 12(b)(6) motion.  *Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002).

[12]     Ordinarily, "[w]hen a party submits additional evidence to the Court beyond that which it may consider on a motion to dismiss, the Court must convert the motion to dismiss into a motion for summary judgment [under Rule 56] or *exclude the extraneous documents from consideration*."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 356 (S.D.N.Y. 2004) (emphasis added and citations omitted).   Because Hamdi has provided no foundation for the facts that he has proffered, those facts should be stricken under any characterization of the motion.  Nevertheless, should the Court decide to treat Hamdi's motion as a Motion for Summary Judgment, the Federal Plaintiffs request that the Court wait until the close of discovery before ruling on Hamdi's motion.

that the Federal Plaintiffs' allegations are insufficient to make out the various claims, the Federal

Plaintiffs should be granted leave to amend.  *See* Fed. R. Civ. P. 15(a) ("leave shall be freely

given when justice so requires"); *see also Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d

230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally

be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with

the spirit of the Federal Rules.' " (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Whyte v.*

*Contemporary Guidance Servs.*, No. 03-CV-5544 (GBD), 2004 U.S. Dist. LEXIS 12447, at *13-

14 (S.D.N.Y. July 2, 2004) (mem.) (explaining that "leave to amend should be freely given when

justice dictates" (citations omitted)).

### D. The Federal Plaintiffs Have Adequately Alleged Claims Under the Anti-Terrorism and Effective Death Penalty Act

Contrary to Hamidi's assertions, the Federal Plaintiffs have adequately stated a claim

against Hamdi under the ATA, 18 U.S.C. § 2331, *et seq.*[13]  See Hamdi Br. at 8-9.  A plaintiff

may assert a valid claim under the ATA under either of two alternative approaches:  (1) pursuant

to general tort principles, including concerted action theories of liability; or (2) by demonstrating

that the defendant violated the ATA's criminal standards, and that the defendant's violation was

a substantial factor in bringing about plaintiff's injuries.  *Boim v. Quranic Literacy Inst.*, 291

F.3d 1000, 1015 & 1020 (7th Cir. 2002) ("*Boim I*").  The Federal Plaintiffs have done both.

### 1. The Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant to General Tort Principles

In *Boim I*, the Court of Appeals for the Seventh Circuit held that the legislative history of

the ATA evinces a clear intent by Congress to codify general common law tort principles, and to

impose civil liability for acts of international terrorism to the full reaches of traditional tort law.

---

[13]     Hamdi appears to focus on allegations that he funded al Qaida's global terrorist network.  Hamdi's Br. at 8-9.  The Federal Plaintiffs, however, have not solely alleged that Hamdi funded al Qaida; the Federal Plaintiffs have also alleged that Hamdi delivered crucial communications equipment, *i.e.*, a satellite phone and battery pack, to bin Laden in Afghanistan.  RICO at Exhibit A.

*Boim I*, 291 F.3d at 1010.  Accordingly, the *Boim I* court specifically embraced the use of concerted action theories of liability, such as aiding and abetting and conspiracy, to establish liability over a defendant under the ATA.  *Id*. at 1020.

The elements necessary to establish liability for a defendant's participation in a conspiracy to commit a tort are:  (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the overall scheme.  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).[14]  Civil liability for aiding and abetting will be imposed where:  (1) the party whom the defendant aids or abets performs a wrongful act that causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides substantial assistance to the wrongdoer.  *Id*. at 477.

In its recent decision in *Boim v. Quranic Literary Inst.,* No. 00-C-2905, 2004 WL 2554446 (N.D. Ill. Nov. 10, 2004) (mem.) ("*Boim II*"),[15] the United States District Court for the Northern District of Illinois engaged in a thorough and insightful analysis of these standards of concerted action liability in the context of an action arising from a terrorist attack.  In *Boim II*, the parents of an American citizen assassinated in Israel by Hamas sought to hold several entities, including purported charities, liable for their son's death under the Anti-Terrorism Act and concerted action theories.  In support of their claims, the plaintiffs alleged that the defendants knowingly provided material support and resources to Hamas.

---

[14]     Although New York law likely controls the vast majority of the Federal Plaintiffs' claims, *Halberstam* long has been regarded as the leading case on concerted action liability, and the New York courts have repeatedly relied on *Halberstam* in analyzing conspiracy and aiding and abetting claims.  *See Wahad v. FBI*, 813 F. Supp. 224, 233 (S.D.N.Y. 1993); *Rich-Taubman Assoc. v. Stamford Rest. Operating Co., Inc.*, 587 F. Supp. 875, 879 n.5 (S.D.N.Y. 1984); *Merrill Lynch Futures, Inc. v. Kelly*, 585 F. Supp. 1245, 1254 (S.D.N.Y. 1984).

[15]     This decision is also available on LEXIS.  *See Boim v. Quranic Literacy Inst.*, No. 00-C-2905, 2004 U.S. Dist. LEXIS 22745 (N.D. Ill. Nov. 10, 2004) (mem.).

Consistent with the principles announced in *Boim I*, the court defined at the outset plaintiffs' burden in establishing defendants' liability. The court noted that "[t]o prove that the defendants provided material support to Hamas in violation of § 2333, the Boims would have to show that they knew about Hamas' illegal activity, that they desired to help those activities succeed, and that they engaged in some act of helping." 2004 WL 2554446 at *7. With respect to establishing that defendants conspired to provide material support to Hamas, the court held:

> The Boims need not show that the defendants knew about the
> attack that killed David Boim, or that they committed any specific
> acts in furtherance of that attack; rather, the Boims need only show
> that the defendants were involved in an agreement to accomplish
> an unlawful act and that the attack that killed David Boim was a
> reasonably foreseeable consequence of the conspiracy.

*Boim II*, 2004 WL 2554446 at *7 (citation omitted). Moreover, the court explained that "the Boims [would not be] required to provide direct evidence of an agreement between the parties; 'circumstantial evidence may provide adequate proof of conspiracy.' " *Id.* (quoting *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971)). The *Boim II* court thus made clear that defendants who knowingly and intentionally provide *any* assistance to terrorist groups may be held liable for all of the terrorist acts the group commits.

The court in *Boim II* also considered, and rejected, another argument made by many of the defendants in this proceeding – that defendants cannot be liable for material support they provided years before the attack in question took place. In *Boim II,* defendant Mohammed Salah argued that he was entitled to summary judgment because plaintiffs had not demonstrated that he provided any support after 1993, while David Boim was not killed until 1996. The *Boim II* court rejected this argument and, indeed, found it to be of "no moment" that Salah was actually in prison in Israel when David Boim was murdered. *Id.* at *36. The court reiterated:

> The Seventh Circuit did not say that, to impose liability under §
> 2333, the Boims have to link Mr. Salah or any of the other
> defendants specifically to the attack that killed David Boim; rather,

9

> the court held that, to impose liability for aiding and abetting – that is, providing material support to – a terrorist organization, the Boims need only show that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping.

*Id.* (citing *Boim I*, 291 F.3d at 1028).  Because there was no factual dispute about any of those elements, the court granted summary judgment to plaintiffs even though none of Salah's "act[s] of helping" took place after 1993.  Moreover, the court noted, under principles of civil conspiracy, Salah could be liable for acts committed in furtherance of the conspiracy even if the acts were committed after he had ceased to be an active participant. *Id.*

  *Boim II* is also significant in that the court imposed liability for assistance provided to Hamas indirectly, through intermediaries.  Although one defendant, a purported "charity" called the Holy Land Foundation for Relief and Development ("HLF"), was found to have provided material support directly to Hamas, others, such as the Islamic Association for Palestine ("IAP") and the American Muslim Society ("AMS"), were found to have provided support to HLF, with knowledge that the support would flow through to Hamas.  The district court held that "[a]lthough these fundraising and financing activities relate to HLF, and not Hamas, taken in the context of the findings made . . . about HLF's established link to Hamas, *this is strong evidence that IAP was supporting Hamas . . . .*"  *Boim II*, 2004 WL 2554446 at *23 (emphasis added).[16]

  Finally, the evidence described in the *Boim II* decision demonstrates that transactions that appear on their face to be innocuous – including a stipend paid to one defendant purportedly for his voluntary assistance in a project to translate the Quran, *see* 2004 WL 2554446 at *40-42, and a "loan" made purportedly to enable a charity to purchase real estate, *see id.* at *43-44 – may,

---

[16]  Defendants before this Court have similarly argued that support they provided to al Qaeda through intermediaries such as "charities" cannot subject them to liability. The *Boim II* decision makes clear, however, that if the purported "charities" had established links to al Qaida, the Court may infer that those who supported the "charities" were supporting al Qaida.

with further discovery, be revealed to be sham transactions by which material support to terrorism is concealed.[17]

When read together, the FAC and the RICO Statement plainly and adequately state claims against Hamdi under the ATA,[18] pursuant to aiding and abetting and conspiracy theories. At the threshold, the FAC alleges that Hamdi has "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons." FAC ¶ 66. Further, the FAC alleges that the Attack "was a direct, intended and foreseeable product of a larger conspiracy among the defendants, to commit acts of international terrorism against the United States, its nationals and allies." FAC ¶ 72. Describing the conspiracy, the FAC states that it "included the provision of material support and resources to defendant al Qaida and affiliated foreign states, FTOs, persons, organizations, commercial entities and other parties." FAC ¶ 73. The FAC also sets forth the consequences of Hamdi's participation, in that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, *communication skills*, and global reach required to conceive, plan and execute the September 11th Attack." FAC ¶ 74 (emphasis added).

The RICO Statement applicable to Hamdi explains that from the mid-1990s to the date of the Attack, Hamdi conspired to support terrorism and to obfuscate the roles of the various

---

[17]    It should be noted that the district court's decision in *Boim II* is a summary judgment ruling, with a fully developed factual record. In connection with the motions to dismiss filed by the various defendants in this MDL proceeding, plaintiffs cannot, of course, be held to the same evidentiary standard that plaintiffs in *Boim II* were able to meet. Nor do plaintiffs contend that they are entitled to judgment at this time. But *Boim II* demonstrates the factual scenarios that, when fully developed after discovery, may give rise to liability under the ATA. Only if there can be *no* such factual scenarios that could be proved consistent with the allegation of plaintiffs' complaints in these cases may plaintiffs be denied the opportunity to take discovery and prove their case. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

[18]    The RICO Statement is considered to be an amendment to the FAC under paragraph 14 of Case Management Order No. 2. See note 2, *supra.*

participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack.  RICO at ¶ 5(b).  Hamdi also aided and abetted the SAAR Network entities in conspiring to and supporting terrorism, evading tax obligations, and obfuscating the roles of the various participants and conspirators in Radical Muslim Terrorism.  RICO at ¶ 5(b).  Hamdi undertook these actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support that he supplied.  RICO at ¶ 5(b).

Read collectively, the forgoing allegations from the FAC and the RICO Statement unambiguously allege that Hamdi knowingly and intentionally aided and abetted and conspired with al Qaida, in furtherance of the terrorist organization's calculated campaign to commit terrorist attacks against the United States, and that the Attack was a direct, intended and foreseeable product of that larger conspiracy.  Moreover, the FAC and the RICO Statement describe, in reasonable detail, the role that Hamdi played in al Qaida's conspiracy to commit terrorist attacks against the United States.  Thus, the Federal Plaintiffs have satisfied the liberal pleading requirements necessary to state a claim under the ATA pursuant to conspiracy and aiding and abetting theories of tort liability.

### 2.  Federal Plaintiffs Have Adequately Alleged Claims Under the ATA Based Upon Hamdi's Criminal Violations

The Federal Plaintiffs have also adequately pled claims against Hamdi under the ATA based upon Hamdi's violations of the ATA's criminal standards.  Specifically, the Federal Plaintiffs have alleged that Hamdi delivered a satellite telephone and battery pack, *i.e.*, communications equipment, to bin Laden, which were essential for communicating with al Qaida's followers across the globe and ordering attacks against the Untied States.  See Part II, *supra.*  Hamdi's act of providing communications equipment clearly violates the ATA's criminal

standards.  Section 2339A(a) makes it unlawful to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" numerous criminal statutes.  Section 2339B prohibits the knowing provision of "material support or resources to a foreign terrorist organization."  In regard to both sections, the definition of "material support or resources" includes providing "communications equipment" and "physical assets," such as the satellite phone and battery pack Hamdi provided to Osama bin Laden.  18 U.S.C. § 2339A(b).  The term "material," as used in these sections, "relates to the type of aid provided rather than whether it is substantial or considerable."  *Boim I*, 291 F.3d at 1015.  Furthermore, Hamdi's argument that "even if he gave money that eventually made it to Al Qaeda, those few alleged transactions were not material support as required by the ATA," Hamdi Br. at 8, is unpersuasive.  *See Boim II*, 2004 WL 2554446 at *23.  Section 2339A(b) clearly states that "currency or monetary instruments or financial securities" are forms of "material support or resources."  Therefore, the Federal Plaintiffs have stated a cause of action against Hamdi pursuant to the criminal provisions of the ATA.

### 3.    The Federal Plaintiffs Have Adequately Pled Causation

Hamdi further argues that the Federal Plaintiffs have not adequately pleaded a "direct link" between his illicit conduct, if any, and the Attack, sufficient to sustain claims under theories of aiding and abetting and conspiracy.  Hamdi Br. at 15.  In making this argument, Hamdi fundamentally misapprehends the elements of the Federal Plaintiffs' aiding and abetting and conspiracy theories, and ignores the allegations in the FAC and the RICO Statement.

Under New York law, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme."  *Lumbard v. Maglia, Inc.*, 621 F. Supp.

1529, 1536 (S.D.N.Y. 1985).  Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement."  *Halberstam*, 705 F.2d at 477 (emphasis added).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor.  *Id.*  Pursuant to these standards, Hamdi's participation in al Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties him inextricably to the Attack.[19]  As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the Federal Plaintiffs have properly and adequately alleged causation.  Accordingly, Hamdi's causation-based arguments must be rejected.

While unnecessary to establish liability over Hamdi given the asserted concerted action theories, it should be noted that the FAC does specifically allege that the Attack would not have been possible absent the sponsorship and support provided by Hamdi and the other defendants. According to the FAC, "[a]bsent the material, support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th attack." FAC ¶ 74.  Hamdi conveniently ignores this and similar allegations of the FAC in its Motion to Dismiss.  For purposes of the present motion, however, the Federal Plaintiffs' allegations must be accepted as true.

---

[19]      The United States Supreme Court has held that in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  '. . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.' "  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (quoting *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir. 1944) (citation omitted)).

Moreover, the FAC also adequately alleges that the Attack was a foreseeable product of the conspiracy in which Hamdi knowingly participated, and of Hamdi's aiding and abetting of al Qaida. Indeed, the FAC unambiguously asserts that the Attack was a "direct, intended and foreseeable product" of that conspiracy. FAC ¶ 72. While it would be improper to test the sufficiency of the evidence in support of that allegation in the context of the present Motion to Dismiss, it should be noted that al Qaida had unequivocally proclaimed its ambition to attack the United States, and had in fact done so, on numerous occasions over a period of several years prior to the Attack.[20]

As the conduct of terrorist attacks against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's stated objective, it is absurd to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as Hamdi is alleged to have done.

**E.**  **The Federal Plaintiffs Have Sufficiently Pled a RICO Claim Against Hamdi**

Defendant puts forth two main reasons why the Federal Plaintiffs have failed to plead a violation of RICO: (1) "the plaintiffs cannot recover under 1964 (c) for the loss of their loved ones," and (2) the Federal Plaintiffs fail to "show a violation of 18 U.S.C. 1962 (a)-(d)."[21] Hamdi Br. at 10, 11-14. The Federal Plaintiffs contend that they can recover under RICO, and that they have sufficiently pled violations of §§ 1962(c) & (d). The following discussions address each of Hamdi's arguments in turn.

---

[20]   See note 3, *supra*.
[21]   Hamdi also argues, "If there is damage as required under 1964 (c) then Fed. R. Civ. Proc. 9 (b) requires that it be pled with particularity." Hamdi Br. at 10-11. The Federal Plaintiffs respond to this statement by pointing out that the damages have been explained in the sealed exhibits. See MDL Dkt. #s 426 & 434; FAC ¶¶ 541-597 nn.1-50. In addition, the FAC also explains that the damages being sought are for property damage, business interruption losses, workers' compensation benefit payments and other specified damages. FAC at p.181.

1.        **The Federal Plaintiffs May Pursue a RICO Claim**

As a result of the Attack, the Federal Plaintiffs have paid out several billion dollars to their insureds for property damage, business interruption losses, and other related economic losses and specified damages.  Therefore, as subrogees of the property insureds, the Federal Plaintiffs may pursue a RICO claim for these types of loss.

Defendant Hamdi argues, however, that the Federal Plaintiffs cannot recover under RICO "for the loss of their loved ones" because recovery is limited to loss of business or property. Hamdi Br. at 10.  As the Federal Plaintiffs have previously pointed out, Defendant Hamdi's Memorandum addresses the allegations and claims contained in the Burnett Plaintiffs' TAC, not the Federal Plaintiffs allegations.  See note 1, *supra*.  As a result, it is difficult to sort out the claims to which Hamdi's RICO argument applies.  Based on that fact alone, the Court should reject Hamdi's argument.  Nevertheless, the Federal Plaintiffs do take this opportunity to explain that they may pursue a RICO claim for workers' compensation benefit payments.[22]

As insurers who paid workers' compensation benefits to those injured and the beneficiaries of those killed, the Insurers are bringing this action to recover the money that they lost as a result of Defendant Hamdi's violation of Sections 1962(c) and 1962(d).  "The equitable doctrine of subrogation allows insurers . . . to bring their own claims for the recovery of the economic damages incurred as a result of tortious injury to their insureds."  *National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 228 (E.D.N.Y. 1999). Subrogation functions as a form of assignment, and RICO claims are assignable.  *Id.* (citations omitted).  Indeed, a number of courts agree that a subrogee can assert a RICO claim.  *Id.* (citing *Ramos v. Patrician Equities Corp.*, No. 89-CIV-5370 (TPG), 1993 U.S. Dist. LEXIS 2979 (S.D.N.Y. March 3, 1993) (mem.)).  Further, the Supreme Court has assumed, for purposes of

---

[22]        The Federal Plaintiffs are also seeking recovery for assigned personal injury and wrongful death claims beyond the workers' compensation claims.  After further review, the Federal Plaintiffs recognize that the RICO claim is not a viable cause of action for the assigned personal injury and wrongful death claims.

argument, that it was proper for a plaintiff to assert a subrogated RICO claim.  *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 271 (1992)).

*National Asbestos Workers* is instructive here.  In that case, the defendant tobacco companies suggested that the plaintiff health insurer could not state a subrogated RICO claim because the subrogee insurer plaintiffs "stand in the shoes" of their subrogors and "the subrogors themselves have no RICO claims for the economic injuries associated with the treatment of smoking related illnesses."  74 F. Supp. 2d at 229.  Judge Weinstein found the tobacco companies' analysis unpersuasive.   According to Judge Weinstein,

> [t]he recovery of pecuniary losses associated with physical injuries directly caused by racketeering conduct is consistent with the language of the RICO statute.  Such claims, furthermore, would materially advance the statute's legislative purposes of deterring racketeering, in all its forms, and of remedying, as full as practicable, the economic consequences of racketeering.  Finally, the recovery of these pecuniary losses is consistent with the expansive scope of RICO's civil remedy provisions as consistently interpreted by the Supreme Court.

*Id.*  Moreover, "the most natural reading of the language in RICO supports the conclusion that pecuniary losses resulting from racketeering personal injuries should be compensable under the statute, because the statute confers standing on "any person injured in his business or property by reason of [racketeering acts defined in the statute]."[23]  *Id.* (citing 18 U.S.C. § 1964(c)).

The physical nature of the workers' compensation claimants' underlying claims does not affect this analysis.  Indeed, "analysis of the statute's legislative history confirms that RICO was intended to deter the use of physical violence by racketeers and to remedy the economic consequences of those physical injuries resulting from racketeering violence."  *National Asbestos Workers*, 74 F. Supp. 2d at 230.  Thus, as the victims of intentional violence, the Insurers'

---

[23]     Furthermore, the Supreme Court has recognized, albeit in another context, that money is a form of property.  *National Asbestos Workers*, 74 F. Supp. 2d at 229 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979)).  Therefore, according to Judge Weinstein, "[v]ictims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase 'business property,' recover their pecuniary losses."  *Id.*

insureds were "in the category the statute meant to protect" and the harm that befell them was "the 'mischief' the statute sought to avoid." *Abrahams v. Young & Rebicam, Inc.*, 79 F.3d 234, 237 (2d Cir.), *cert. denied*, 519 U.S. 816 (1996).

> ###        2.        The Federal Plaintiffs Have Sufficiently Pled Violations of Sections 1962(c) and 1962(d)

According to the RICO Statement, the Federal Plaintiffs bring their claims against Hamdi pursuant to Sections 1962(c) and 1962(d).  The Enterprise, Radical Muslim Terrorism, is comprised of the defendants named in the FAC, and is a collection of persons, organizations, businesses, and nations associated in fact with complex goals that consist of far more than the desire to perpetrate the acts of racketeering outlined herein.  RICO at ¶ 5.  Radical Muslim Terrorism utilizes acts of racketeering to further its overall common purposes of:  (a) spreading a particularly virulent brand of radical Islam; (b) eliminating Western influences in Islamic countries; and (c) punishing the United States for its perceived support of Israel, all by sponsoring, supporting and funding acts of terror in the United States.  RICO at ¶ 5.  Thus, the Federal Plaintiffs have sufficiently pled the existence of an enterprise:  "a group of persons associated together for a common purpose of engaging in a course of conduct" or "an ongoing organization, formal or informal."  *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981).

Further, the Federal Plaintiffs also have sufficiently pled Hamdi's participation in that enterprise.  Pursuant to Section 1962(c), "a proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.' "  *United States v. Louie*, 625 F. Supp. 1327, 1333 (S.D.N.Y. 1985).  In the FAC, the Federal Plaintiffs allege that Hamdi has aided and abetted, conspired with, and provided material support and resources to al Qaida and/or affiliated FTOs, associations, organizations or persons.  FAC ¶ 66.  Furthermore, the RICO Statement specifically alleges that Hamdi aided and abetted the SAAR Network entities in conspiring to and supporting

18

terrorism, evading tax obligations, and obfuscating the roles of the various participants and conspirator in Radical Muslim Terrorism, which conspiracy culminated in the Attack.  RICO at ¶ 5(b).

Moreover, the Federal Plaintiffs need not plead or prove that a predicate act furthered the purpose for which the organization was founded, but only that it was related to the enterprise. *Louie*, 625 F. Supp. at 1333.  Thus, the question for the jury is not only the actions taken by Hamdi (in this case, delivering communications equipment and working with organizations that supported al Qaida's goals), but the motivation or intent underlying Hamdi's criminal activity and the acts' relationship to the enterprise (in this case, terrorism, which the plaintiffs allege Hamdi intended to support through his actions).  *Id.*

The Federal Plaintiffs also have adequately alleged proximate cause under RICO.  This requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged.  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (citing *Holmes*, 503 U.S. at 268).  Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is likely imprudent.  *National Asbestos Workers*, 74 F. Supp. 2d at 225. This Court's decision "should be guided by a flexible, case-by-case approach."  *Id.* (citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983) *and Holmes*, 503 U.S. at 272 n.20).  Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static:  as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures."  *Id.*  Further, a failure to explain the alleged injury in detail is not fatal.  *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D.N.Y. 1986).  Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6).  *Id.*  The FAC need only

"allege[] compensable injury flowing from the commission of the predicate acts." *Id.* (citations omitted).

Here, the Federal Plaintiffs allege that they were directly injured by Hamdi's participation in Radical Muslim Terrorism.  Hamdi furthered al Qaida's goal of committing acts of terrorism against the United States by providing al Qaida with "the financial resources, physical assets, membership base, technological knowledge, *communication skills*, and global reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74 (emphasis added).  The Federal Plaintiffs' damages – injuries, the loss of life and property damage that resulted from Hamdi's actions -- are not derivative of damage to a third party.  Rather, the Federal Plaintiffs' insureds and assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism.  *Lerner*, 318 F.3d at 124.  Thus, the Federal Plaintiffs have standing to bring claims under RICO.

A conspiracy of this nature is not a simple linear being, but is instead a complex, multi-dimensional web of relationships and intrigue.  The Supreme Court recently addressed the scope of RICO's conspiracy provision, 18 U.S.C. § 1962(d), in *Salinas v. United States*, 522 U.S. 52 (1997).  That holding establishes that the RICO statute is flexible enough to embrace the complexity of the conspiracy alleged here, and the Federal Plaintiffs' allegations are sufficient, at this stage, to meet their burden.

### F.   The Federal Plaintiffs Have Sufficiently Pled Claims Against Hamdi for Conspiracy and Aiding and Abetting

Hamdi alleges that the Federal Plaintiffs have failed to plead facts or circumstances to establish his participation in a civil conspiracy or to establish a claim for aiding and abetting.  Hamdi br. at 14-15.  For the reasons stated in relation to the discussion of the Federal Plaintiffs' ATA claims, the Federal Plaintiffs respectfully submit that the FAC and the RICO Statement

20

adequately allege claims under both theories of concerted action liability.  See Part III., D., *supra*.

### G.      The Federal Plaintiffs Have Adequately Alleged State Common Law Claims

Hamdi challenges the Federal Plaintiffs' common law claims for intentional infliction of emotional distress, wrongful death, survival, and punitive damages.[24]  The Federal Plaintiffs contend that those claims have been sufficiently alleged in the FAC.[25]

#### 1.      The Federal Plaintiffs Have Adequately Alleged Intentional Infliction of Emotional Distress

To state a claim under New York law for intentional infliction of emotional distress, the Federal Plaintiffs must allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress."  *Brewer v. Brewer*, 34 Fed. Appx. 28, 30 (2d Cir. 2002) (citing *Howell v. New York Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993)).  Hamdi asserts that the FAC does not allege that he intentionally engaged in extreme, intentional, or recklessly outrageous conduct that caused severe emotional distress.  Hamdi Br. at 9-10.  No person can reasonably contend that the Attack was not outrageous, extreme and intentional.  Therefore, under notice pleading, the Federal Plaintiffs have stated a claim for intentional infliction of emotional distress.

#### 2.      The Federal Plaintiffs Have Adequately Alleged Wrongful Death

Under New York law, a personal representative of a decedent may maintain a wrongful death action provided that the defendant "would have been liable to the decedent by reason of

---

[24]      Hamdi also challenges the Federal Plaintiffs' common law claims for negligence and negligent infliction of emotional distress.  Given the intentional nature of Defendant Hamdi's wrongdoing, the Federal Plaintiffs deem it unnecessary to pursue negligence theories against him and therefore withdraw those claims.

[25]      Due to the number of lawsuits filed as result of the September 11th Attack, and the consequent possibility that the *Federal Insurance* case could be transferred to a jurisdiction other than New York, the FAC sets forth several claims in separate accounts, including punitive damages.  To the extent that these counts are not recognized as separate or independent theories under New York or federal common law, these counts should be liberally construed to modify and/or supplement other counts of the FAC.

such wrongful conduct if death had not ensued." *LaMarca v. United States*, 31 F. Supp. 2d 110, 124 (E.D.N.Y. 1998) (mem.) (citing N.Y. EST. POWERS & TRUSTS LAW § 5-4.1).  As is alleged in the FAC and the RICO Statement, Hamdi is liable to such decedents because he provided material support and resources to the terrorists who deliberately caused their death.  FAC ¶ 66; RICO at ¶ 5(b) & Exhibit A.  It is well established that the knowing provision of material support for homicide gives rise to liability for the resulting death.  *See Halberstam*, 705 F.2d at 483-83 (reviewing case law from a number of jurisdictions, citing the Restatement (Second) of Torts § 876(b) cmt. d, and concluding that five factors should be taken into consideration when determining whether the defendant offered enough assistance for liability: the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; his relation to the tortuous actor; and the defendant's state of mind).  Furthermore, New York generally recognizes that those who aid and abet tortious conduct are jointly and severally liable with other participants, regardless of the degree of their participation or culpability in the overall scheme.  *Valdan Sportswear v. Montgomery Ward & Co.*, 591 F. Supp. 1188, 1191 (S.D.N.Y. 1984).  The Federal Plaintiffs have therefore sufficiently alleged a cause of action for wrongful death.

### 3.    The Federal Plaintiffs Have Adequately Alleged Survival

In general, New York recognizes survival actions "for injury to person or property . . . despite the death of person in whose favor or against whom cause of action existed."  N.Y. EST. POWERS & TRUSTS LAW § 11-3.2 (2004).  As is noted in above in the discussion of the wrongful death cause of action, it is well established that the knowing provision of material support for tortious acts gives rise to liability for the resulting harm.  The FAC alleges that Hamdi knowingly provided material support and resources to defendant al Qaida and/or affiliated FTOs, associations, organizations or persons.  FAC ¶ 66.  In addition, the RICO Statement alleges that

Hamdi provided essential communications equipment to bin Laden, and that he knowingly aided and abetted the SAAR Network entities in conspiring to and supporting terrorism, evading tax obligations, and obfuscating the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack.  RICO at ¶ 5(b) & Exhibit A. Therefore, the Federal Plaintiffs have sufficiently alleged the elements of a survival claim for the injuries to persons and property resulting from the Attack.

  **4.  The Federal Plaintiffs Have Adequately Alleged Punitive Damages**

  Hamdi also claims that the Federal Plaintiffs are not entitled to punitive damages.  Hamdi Br. at 16.  Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998).  If the Federal Plaintiffs prove their allegations that Hamdi knowingly provided material support to al Qaida given its purpose to commit terrorist acts against innocent persons in the United States, Hamdi's conduct is sufficiently egregious and outrageous to warrant the imposition of punitive damages.

**IV.  CONCLUSION**

  For the reasons stated above, the Federal Plaintiffs respectfully request that the Motion to Dismiss filed by Hamdi be denied in all respects, with prejudice.

      Respectfully submitted,

      COZEN O'CONNOR

      By:     /s/      
        STEPHEN A. COZEN, ESQUIRE
        ELLIOTT R. FELDMAN, ESQUIRE
        SEAN P. CARTER, ESQUIRE
        MARK T. MULLEN, ESQUIRE
        1900 Market Street
        Philadelphia, PA  19103
        Tel.:  (215) 665-2000
        Fax:  (215) 665-2013
        *Attorneys for Plaintiffs*

Phila1\2181705\1 117430.000