UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT Applicable to Al Haramain (Oregon & Missouri), Al Haramain Foundation, Al Haramain Foundation (Bosnia), Al Haramain Foundation (Indonesia), Al Haramain Foundation (Pakistan), Al Haramain Foundation (Somalia), Al Haramain Foundation (Tanzania), Al Haramain Foundation, Inc., Al Haramain Islamic Foundation, Al Haramain Islamic Foundation, Inc., Al Haramayn Foundation (Kenya), and Vazir** |

*This document relates to :*   Cantor Fitzgerald et al. v. Akida Bank Private Ltd., et al.
04 CV 07065 (RCC)

## RICO STATEMENT APPLICABLE TO
## AL HARAMAIN (OREGON & MISSOURI), AL HARAMAIN FOUNDATION, AL HARAMAIN FOUNDATION (BOSNIA), AL HARAMAIN FOUNDATION (INDONESIA), AL HARAMAIN FOUNDATION (PAKISTAN), AL HARAMAIN FOUNDATION (SOMALIA), AL HARAMAIN FOUNDATION (TANZANIA), AL HARAMAIN FOUNDATION, INC., AL HARAMAIN ISLAMIC FOUNDATION, AL HARAMAIN ISLAMIC FOUNDATION, INC., AL HARAMAYN FOUNDATION (KENYA), AND VAZIR

Based on information currently available, plaintiffs submit this RICO Statement with respect to its claims against defendants Al Haramain (Oregon & Missouri), Al Haramain Foundation, Al Haramain Foundation (Bosnia), Al Haramain Foundation (Indonesia), Al Haramain Foundation (Pakistan), Al Haramain Foundation (Somalia), Al Haramain Foundation (Tanzania), Al Haramain Foundation, Inc., Al Haramain Islamic Foundation, Al Haramain Islamic Foundation, Inc., Al Haramayn Foundation (Kenya), and Vazir (collectively, the "Al Haramain Defendants"). Given the complicated nature of the wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO Statement as information is learned and verified through discovery and otherwise.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(c).

2. This RICO Statement pertains to defendants Al Haramain (Oregon & Missouri), Al Haramain Foundation, Al Haramain Foundation (Bosnia), Al Haramain Foundation (Indonesia), Al Haramain Foundation (Pakistan), Al Haramain Foundation (Somalia), Al Haramain

Foundation (Tanzania), Al Haramain Foundation, Inc., Al Haramain Islamic Foundation, Al Haramain Islamic Foundation, Inc., Al Haramayn Foundation (Kenya), and Vazir.

The Al Haramain Defendants conducted or participated, directly or indirectly, in the affairs of the RICO enterprise defendant Al Qaeda (sometimes referred to herein as the "Enterprise") through a pattern of racketeering activity that, among other things, has facilitated, materially supported and substantially assisted Al Qaeda's purposes. The Al Haramain Defendants' misconduct includes materially supporting Al Qaeda (*e.g.*, providing "access to bank accounts" and serving as "cover" to Al Qaeda members who were able to travel undetected "under the guise of working for" these humanitarian organizations), knowingly and intentionally employing Al Qaeda operatives, laundering money for Al Qaeda, raising and distributing financial assistance to Al Qaeda (often under false pretense), providing Al Qaeda with safe houses and false documentation, and/or facilitating weapons and military equipment purchases and transfers for Al Qaeda. Additionally, the Al Haramain Defendants knowingly and intentionally collected, diverted and transferred *Zakat* funds to Al Qaeda and otherwise lent material support to Al Qaeda. The Al Haramain Defendants knowingly and intentionally lent material support to Al Qaeda through, *inter alia*, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings. The Al Haramain Defendants' knowing and intentional conduct enabled Al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

The basis of the Al Haramain Defendants' liability is 18 U.S.C. § 1962(c).

3. All known wrongdoers are named as defendants in this action. Plaintiffs separately will file RICO Statements with respect to the misconduct of these other defendants. Given the complicated nature of the wrongdoing that led to the September 11th attack, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO Statement as information is learned through discovery and otherwise.

4. The alleged victims are Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald, L.P., Cantor Index Limited, CO2e.com, LLC, eSpeed Government Securities, Inc., eSpeed, Inc., eSpeed Securities, Inc., TradeSpark, L.P. (collectively, the "Cantor Plaintiffs"); and the Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC (collectively, the "Port Authority Plaintiffs"). The Cantor Plaintiffs and Port Authority Plaintiffs were injured by damage to their physical property and property interests, as well as business interruption losses and lost profits.

The injuries suffered by the Cantor Plaintiffs resulting from the September 11th attack include damage to their physical property located at and near the World Trade Center premises, including their business offices located in One World Trade Center, and other and related property interests, damage to their ability to conduct their business and promote and pursue business opportunities, and lost profits and opportunities.

The injuries suffered by the Port Authority Plaintiffs resulting from the September 11th attack include damage to their business offices and other physical property located at and near

the World Trade Center premises, including One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center, Seven World Trade Center and the PATH stations, trains and property at or near the World Trade Center complex. The Port Authority Plaintiffs also suffered injuries through damage to their ability to conduct their business, to promote and pursue business opportunities, to pursue business profits, and by lost profits and opportunities at One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center, Seven World Trade Center, John F. Kennedy International Airport, LaGuardia Airport and Newark Airport, the Lincoln Tunnel, the Holland Tunnel, the George Washington Bridge, the Goethals Bridge, the Outerbridge Crossing, the Bayonne Bridge, the Port Authority Bus Terminal, the George Washington Bridge Bus Station, and several of its PATH train stations.

5. (a)   List Of Predicate Acts And Specific Statutes Violated

| | |
|---|---|
| Providing material support of terrorism | 18 U.S.C. §2332b(g)(5)(B) <br> 18 U.S.C. §2339A <br> 18 U.S.C. §2339B <br> 18 U.S.C. §2339C |
| Money laundering | 18 U.S.C. §1956 |
| Mail Fraud | 18 U.S.C. §1341 |
| Wire Fraud | 18 U.S.C. §1343 |
| Travel Act | 18 U.S.C. §1952 |

(b)   Dates Of, The Participants In, And A Description Of The Facts Surrounding The Predicate Acts

Al Haramain Islamic Foundation, Inc. is a Saudi based charity. Prior to its recent dissolution, Al Haramain Islamic Foundation, Inc. operated under the auspices of the Kingdom of Saudi Arabia, which financed, controlled and directed its offices and branches located all around the world, including branches located in the United States. Al Haramain Islamic Foundation, Inc. Al Haramain Foundation, and Al Haramain Islamic Foundation, are all part of the same foundation and are otherwise substantively interconnected. For instance, on and before September 11, 2001, the President and Vice-President of Al-Haramain's United States organization also served as the Secretary general and Deputy General, respectively, of the Al Haramain headquarters located in Riyadh, Saudi Arabia. The Al Haramain entities are also financed, controlled and directed through a centralized command and financial structure and every Al Haramain branch office was controlled and directed by the "home" office in Saudi Arabia. At all times relevant to the Amended Complaint and this RICO Statement, the Al Haramain Defendants were funded, authorized, supervised, directed and/or controlled by the Kingdom of Saudi Arabia and several of its Princes.

The Al Haramain Defendants hold themselves out at as a charity with humanitarian goals, and have raised, solicited and distributed funds under the pretense that the funds would be used

for legal and humanitarian purposes. Yet the Al Haramain Defendants have knowingly and intentionally lent material support to the Al Qaeda Enterprise through, *inter alia*, the use of interstate and international faxes, telephones, wire transfers and transmission, and mailings.

From the mid 1990's through September 11, 2001, the Al Haramain Defendants, which receive the bulk of their donations from Saudi Arabia and the Middle East, laundered money for Al Qaeda.

In June of 2004, the United States designated as a terrorist organization five branches of the Al Haramain Defendants located in Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands, and submitted these entities to the United Nations 267 Committee for listing by the United Nations as terrorists tied to Al Qaeda. In February, 2004, the United States government blocked the assets of the Al Haramain Defendant's United States branches (Ashland, Oregon and Springfield, Missouri, respectively) because their "charitable contributions" were siphoned off to support Al Qaeda's terrorist activities. In September, 2004, the United States government designated as a terrorist organization the United States office of Al Haramain Islamic Foundation. In January, 2004, the United States State Department designated as a terrorist organization and blocked the assets of Al Haramain Defendants' branch offices in Indonesia, Kenya, Tanzania and Pakistan on the ground that the Al Haramain Defendants are tied to Al Qaeda and Osama Bin Laden. These branches provided financial, material and logistical support to Al Qaeda including: (a) transferring funds for Al Qaeda; (b) agreeing to finance Al Qaeda terrorist operations (including the bombing of the U.S. embassy in Nairobi, Kenya); and (c) obtaining weapons for Al Qaeda.

The Al Haramain Defendants' branch offices in Bosnia and Somalia were designated and their assets blocked in March, 2002. In freezing these assets, the United States Treasury Department confirmed that these branch offices were "clearly linked to terrorist financing". The Al Haramain Defendants' Bosnian branch continued to operate as a successor entity, Defendant Vazir, and was later added to the United Nation 1267 Sanctions Committee terrorism list for its association with Al Qaeda and the former Taliban regime. According to Al Qaeda operative, Umar Faruq, Al Haramain Defendants "[were] the funding mechanism of all [Al Qaeda] operations in Indonesia" and the Al Haramain Defendants office funding those terrorist operations "was working under the control of a representative of Usama bin Laden."

From the mid 1990's through September 11, 2001, the Al Haramain Defendants conducted or participated, directly or indirectly, in the affairs of the RICO enterprise defendant Al Qaeda (sometimes referred to herein as the "Enterprise") through a pattern of racketeering activity that, among other things, has facilitated, materially supported and substantially assisted Al Qaeda's purposes. Al Haramain Defendants' misconduct includes materially supporting Al Qaeda (i.e., providing "access to bank accounts" and serving as "cover" to Al Qaeda members who were able to travel undetected "under the guise of working for" these humanitarian organizations), knowingly and intentionally employing Al Qaeda operatives, laundering money for Al Qaeda, raising and distributing financial assistance to Al Qaeda (often under false pretense), providing Al Qaeda with safe houses and false documentation, and/or facilitating weapons and military equipment purchases and transfers for Al Qaeda.

Additionally, the Al Haramain Defendants knowingly and intentionally collected, diverted and transferred *Zakat* funds to Al Qaeda and otherwise lent material support to Al Qaeda. The Al Haramain Defendants knowingly and intentionally lent material support to Al

Qaeda through, *inter alia*, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings. The Al Haramain Defendants' knowing and intentional conduct enabled Al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

(c) Plaintiffs' RICO claims are based in part on the predicate offenses of wire fraud and mail fraud. From the mid-1990's through September 11, 2001, the Al Haramain Defendants utilized interstate and international faxes, telephones, wire transfers and transmissions, and the United States and international mails to facilitate, provide financial and material support and provide substantial assistance to Al Qaeda. The financial support and assistance provided to Al Qaeda by the Al Haramain Defendants assisted the business and financial transactions in which Al Qaeda engaged to further its operations and purposes. Al Qaeda relied upon Al Haramain, among others, to generate material support to continue its terrorist operations and to conceal the nature and extent of financial assistance provided to Al Qaeda. These activities assisted Al Qaeda's ability to plan over a number of years, orchestrate, and ultimately carry out the September 11th attack that injured plaintiffs. The creation and maintenance of a financial network is essential to Al Qaeda.

Further, given the complicated nature of the Al Haramain Defendants and others wrongdoing that led to the events of September 11, 2001, additional information relating to the circumstances constituting NCB's wire and mail fraud activities likely will be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO Statement as information is learned through discovery and otherwise.

(d) No.

(e) No.

(f) The predicate acts conducted by the Al Haramain Defendants form a pattern of racketeering in that they are repeated and continuous, including funneling of money to Osama bin Laden and Al Qaeda in the mid to late-1990s. From the mid-1990's through September 11, 2001, the Al Haramain Defendants consistently, evenly constantly, laundered money, provided material support for terrorism, committed wire fraud and mail fraud and engaged in monetary transactions improperly derived from unlawful activity.

(g) The predicate acts relate to each other (horizontal relatedness) as a part of a common plan because each act of money laundering, wire and mail fraud and providing material support of terrorism allowed the Al Haramain Defendants to provide financial and other assistance to Al Qaeda, which assistance culminated in the September 11 attack.

6. (a) The enterprise is comprised of defendant Al Qaeda, defendant Osama bin Laden, defendant Ayman al-Zawahiri, and other unknown members.

(b) The Enterprise was formed in or about 1988 by Osama bin Laden with the help of other Muslim *mujahideen* who traveled to Afghanistan in the 1980s to wage jihad against Soviet occupation forces. Al Qaeda financed and directed the activities of Islamic militants worldwide. Osama bin Laden heads Al Qaeda. Underneath Osama bin Laden is Ayman al-Zawahiri, an Egyptian national.

Al Qaeda's stated purpose is the overthrow of secular non-Muslim governments through violent, terrorist means in favor of radical Islamic theocracies governed by *Shari'a* (Islamic law). As a matter of organizational doctrine, Al Qaeda views western-style democratic societies and their institutions, particularly the United States, as enemies of Islam. As stated in Osama bin Laden's 1998 *fatwah*, Al Qaeda's commonly held purpose is to "kill the Americans and their allies-civilians and military" and to "plunder their money wherever and whenever they find it." For years, Al Qaeda and its members (both individuals and affiliated terrorist organizations operating under the Al Qaeda organizational umbrella) repeatedly acted upon this shared anti-American, anti-democratic purpose, the September 11th attack being the most dramatic in a series of terrorist operations against American interests.

Al Qaeda is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. Its internal organizational structure allows it to build relationships with other terrorist organizations while maintaining and promoting its own goals and terrorist operations around the world. Al Qaeda is run by a council that "discusse[s] and approve[s] major undertakings, including terrorist operations." It also uses a treasurer and operation and planning chiefs to design and plan terrorist attacks. Al Qaeda operations are conducted around the world through the efforts of individual members and affiliated groups. Al Qaeda members swear an oath of loyalty to Al Qaeda's aims and mission. These members carry out the terrorist directive received from their superiors.

Al Qaeda is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

At the time of the September 11th attack, Al Qaeda's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. Al Qaeda relies upon a global network of banks and financial institutions, including NCB, and illegal activity (including narcotics trafficking) to generate material support to continue its terrorist operations.

(c)     The Al Haramain Defendants do not appear to be employees, officers or directors of the Enterprise.

(d)     Al Haramain Defendants associated themselves with the Enterprise.

(e)     The Al Haramain Defendants consist of entities that are separate and distinct from the Enterprise, Al Qaeda. The Al Haramain Defendants associated themselves with the Enterprise by: (1) providing financial and material support and substantial assistance to Al Qaeda; and/or (2) employing Al Qaeda members.

(f)     Not applicable.

7.      As stated, Al Qaeda is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. The Al Haramain Defendants holds themselves out as a charities with humanitarian goals. The pattern of racketeering activity conducted by the Al

Haramain Defendants is separate from the existence of Al Qaeda, but was a necessary component of the September 11th attack.

8. Al Qaeda conducts terrorism around the world. The Al Haramain Defendants conducted the racketeering activity through its charity operations, by raising, soliciting and distributing funds under the pretense that the funds would be used for legal and humanitarian purposes. The racketeering activity conducted by the Al Haramain Defendants substantially assists and materially supports Al Qaeda' terrorist activity. The usual and daily activities of Al Qaeda include planning and executing acts of terrorism against the United States and its citizens, all of which are funded and/or materially supported by the racketeering activities described herein.

9. Al Qaeda benefits by having the funds available to commit its terrorism goals as described above in 6(b).

10. Al Qaeda's commonly held purpose is to "kill the Americans and their allies-civilians and military" and to "plunder their money wherever and whenever they find it." The Enterprise's activities in support of terrorism affect interstate commerce as illustrated by the September 11th attack, which damaged the United States economy when four commercial airliners were hijacked and crashed into the World Trade Center, a vital center of interstate and foreign commerce.

11. Not applicable.

12. Not applicable.

13. (a) Defendants Osama bin Laden, Ayman al-Zawahiri, NCB, among others whose identities are unknown are employed or associated with Al Qaeda.

    (b) The same entity is not both the liable "person" and the "enterprise" under 1962(c). Al Qaeda is the RICO enterprise. The Al Haramain Defendants are a separate person within the meaning of RICO.

14. Not applicable.

15. The injuries suffered by the Cantor Plaintiffs resulting from the September 11th attack include damage to their physical property located at and near the World Trade Center premises, including their business offices located in One World Trade Center, and other and related property interests, damage to their ability to conduct their business and promote and pursue business opportunities, and lost profits and opportunities.

    The injuries suffered by the Port Authority Plaintiffs resulting from the September 11th attack include damage to their business offices and other physical property located at and near the World Trade Center premises, including One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center, Seven World Trade Center and the PATH stations, trains and property at or near the World Trade Center complex. The Port Authority Plaintiffs also suffered injuries through damage to their ability to conduct their business, to promote and pursue business opportunities, to pursue business profits, and by lost profits and opportunities at One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center, Seven World Trade Center, John F. Kennedy International Airport,

LaGuardia Airport and Newark Airport, the Lincoln Tunnel, the Holland Tunnel, the George Washington Bridge, the Goethals Bridge, the Outerbridge Crossing, the Bayonne Bridge, the Port Authority Bus Terminal, the George Washington Bridge Bus Station, and several of its PATH train stations.

16. Al Haramain Defendants' uninterrupted financial and material support of terrorism, mail fraud, wire fraud, money laundering, and substantial assistance, as described herein and in the Amended Complaint, enabled the Enterprise to plan, orchestrate, and carry out the September 11th attack that injured the Cantor and Port Authority Plaintiffs. Therefore, the conduct of Al Haramain Defendants proximately resulted in the September 11th attack. The Cantor Plaintiffs and Port Authority Plaintiffs suffered injury to their property by reason of the above conduct of the Al Haramain Defendants.

17. The Al Haramain Defendants are jointly and severally liable for all damages sustained by each plaintiff in an amount in excess of $200,000,000 in damages for plaintiffs' injuries to their property and business, including damage to physical property as well as business interruption and lost profits.

18. <u>Federal Causes of Action</u>

| **Count Two** | Anti-Terrorism Act,<br>18 U.S.C. §2331, 2333<br>18 U.S.C §2333<br>18 U.S.C. §2339A<br>18 U.S.C. §2339B<br>18 U.S.C. §2339C |
|---|---|
| **Count Four** | Civil Rico,<br>18 U.S.C. §1962 |
| **Count Nine** | Violations of International Law, *see* 28 U.S.C.§1331 |

19. <u>Pendant State Claims</u>

| **Count One** | Trespass |
|---|---|

| Count Ten | Conspiracy |
| --- | --- |
| Count Eleven | Aiding and Abetting |
| Count Twelve | Punitive Damages |
| Count Thirteen | Contribution and Indemnity |

20. Not applicable

Dated: December 17, 2004                    Respectfully submitted,

By: /s/ Jonathan M. Goodman
Jonathan M. Goodman (JG 3031)

Kenneth L. Adams
Stacey A. Saiontz
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 835-1400

Attorneys for Plaintiffs

DOCSNY.131776.1