# Exhibit C
# (part 2)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

| | |
|---|---|
| Kathleen Ashton, *et al.*<br>- against –<br>Al Qaida Islamic Army, *et al.* | 03 CV 6977 (RCC) |
| Ernesto Barrera, *et al.*<br>- against –<br>Al Qaeda Islamic Army, *et al.* | 03 CV 7036 (RCC) |
| Thomas Burnett, Sr., *et al.*<br>- against –<br>Al Baraka Investment & Development Corp., *et al.*, | 03 CV 5738 (RCC) |
| Gladys H. Salvo, *et al.*<br>- against –<br>Al Qaeda Islamic Army, *et al.* | 03 CV 5071 (RCC) |
| Walter Tremsky, *et al.*<br>- against –<br>Osama bin Laden, *et al.* | 03 CV 7300(RCC) |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO SULTAN BIN ABDULAZIZ AL-SAUD'S MOTION TO DISMISS CERTAIN CONSOLIDATED COMPLAINTS**

May 14, 2004

[D]

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTS ............................................................................................................................... 2

    Al Qaeda's Public Targeting of the United States .............................................................. 3

    Warnings to Sultan and the Saudi Government About Charities as Terrorist Fronts .......... 5

    The Charities That Supported Terrorism ......................................................................... 8

    Sultan's Donations to the Charities That Supported Terrorism ....................................... 11

ARGUMENT ....................................................................................................................... 12

    I.    THIS COURT HAS JURISDICTION OVER THE CLAIMS AGAINST SULTAN
           IN HIS OFFICIAL CAPACITY ................................................................... 12

           A.    Plaintiffs' Injuries Were "Caused by" Sultan's Alleged Conduct Within
                  the Meaning of the "Tortious Act" Exception to the FSIA ....................... 13

           B.    The "Discretionary Function" Clause Does Not Immunize Sultan From the
                  Claims Alleged in These Lawsuits ............................................................ 18

           C.    Section 1605(a)(7) Does Not Preclude Application of the "Tortious Act"
                  Exception ................................................................................................ 20

    II.    SULTAN'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
           SHOULD BE DENIED ............................................................................ 22

CONCLUSION ...................................................................................................................... 24

TABLE OF AUTHORITIES

*Page*

**Cases**

*Antares Aircraft L.P. v. Federal Republic of Nigeria*, 948 F.2d 90 (2d Cir. 1991), *vac'd on other grounds*, 505 U.S. 1215 (1992)...................................................................................... 2

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ................................... 1, 16, 17

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ........................................................ 22

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003) ... 13, 14, 15

*Calder v. Jones*, 465 U.S. 783 (1984) .................................................................... 23

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000) ...................................................... 23

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996) .................................. 14

*Filartiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980) ..................................................... 19

*Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) ................................................ 24

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ................................. 16, 17, 21

*Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983) ............................................. 15, 16, 17, 19

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ........................................ 18

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987)...................................... 14

*In re Sept. 11 Litig.*, 280 F.Supp.2d 279 (S.D.N.Y. 2003) ................................................ 17

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1996)........................................................... 19

*Lamarca v. United States*, 31 F.Supp.2d 110 (E.D.N.Y. 1998).............................................. 17

*Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980)...................................... 18, 19, 21

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) ........................................ 18, 19, 21

*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987).................. 14

*Marine Midland Bank NA v. Miller*, 664 F.2d 899 (2d Cir. 1981) ........................................ 24

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)......................................................... 13

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 n.13 (1978).....................................24

*Price v. Socialist People's Libyan Arab Jamahiriaya*, 294 F.3d 82 (D.C. Cir. 2002) .................21

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,  290 F.Supp.2d 54 (D.D.C. 2003) .............23

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part,* 162 F.3d 748 (2d Cir. 1998) ........................................................23

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)...........................................14

*Second Amendment Found. v. United States Conference of Mayors*,
    274 F.3d 521 (D.C. Cir. 2001) .....................................................................................24

*Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217 (S.D.N.Y. May 7, 2003) ........ 16, 17

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996).....................................................17

*Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) ...........................24

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2003) .......................12

**Statutes**

28 U.S.C. § 1330......................................................................................................................12

28 U.S.C. § 1604......................................................................................................................12

28 U.S.C. § 1605(a) ...........................................................................................................passim

**Rules**

F.R.C.P. 12................................................................................................................................. 2

F.R.C.P. 54................................................................................................................................14

**Other Authorities**

5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE,
    § 1351, at 253-59 (2d ed. 1990).................................................................................24

H.R. Rep. No. 94-1487, at 21, 1976 U.S.C.C.A.N. at 6620 ......................................................14

House Report No. 103-702 (August 16, 1994) ..........................................................................22

## INTRODUCTION

In these consolidated actions,[1] plaintiffs, victims and survivors of the September 11 terrorist attacks, seek to hold accountable those who financed and sponsored the terrorist network that perpetrated those attacks. As alleged in the various complaints in these actions, there is now a vast (and growing) body of evidence that a network of banks, corporations, wealthy individuals, and so-called "charities" aided, abetted, funded, and provided material support to Al Qaeda and Osama bin Laden. Without this support, the Al Qaeda terrorists could not have planned and carried out their attacks. As one court has eloquently put it: "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002). If you take away those resources, you cut off the life-blood of terrorist violence. But, as the *Boim* court recognized: "The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Id.* That is what plaintiffs in this lawsuit seek to do.

Defendant Sultan bin Abdulaziz al-Saud ("Sultan") is alleged to have knowingly financed and assisted Al Qaeda in its self-declared war against the United States and its citizens and residents. He asks this Court to dismiss the allegations against him on the ground that, as an official in the government of Saudi Arabia, he cannot be held answerable in a U.S. court. Sultan also claims that he has insufficient contact with the United States to be held accountable in his personal capacity. But Sultan's knowing support of terrorist groups committed to atrocious acts

---

[1] Sultan has filed his motion to dismiss in five actions: *Ashton v. Al Qaida Islamic Army*, 02-CV-6977; *Barrera v. Al Qaeda Islamic Army*, 03-CV-7036; *Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-5738 ("*Burnett* SDNY"); *Salvo v. Al Qaeda Islamic Army*, 03-CV-5071; *Tremsky v. Osama bin Laden*, 02-CV-7300. Plaintiffs in all five actions respond to that motion in this memorandum of law.

of mass murder falls outside the permissible scope of any official discretion.  Moreover, Al Qaeda's deliberate targeting of the United States and the evidence supporting the inference that Sultan was aware of that, coupled with Sultan's financial support for al Qaeda, provides sufficient contact with the United States and with New York to subject Sultan to jurisdiction in this Court.  Accordingly, Sultan's motion to dismiss for lack of jurisdiction should be denied.

FACTS[2]

Prince Sultan bin Abdul Aziz Al Saud, a brother of King Fahd and one of some 30,000 members of the Saudi royal family, is the Saudi Arabian Minister of Defense and Aviation. More significantly for this action, he is also Chairman of the Supreme Council for Islamic Affairs (the "Supreme Council").  *See* Embassy of the Kingdom of Saudi Arabia in the United States Web site: http://www.saudiembassy.net/gov_profile/bio_sultan.html, attached to the Affirmation of Andrea Bierstein In Opposition To Sultan Bin Adbulaziz Al-Saud's Motion To Dismiss Certain Consolidated Complaints ("Bierstein Aff.") as Exhibit 1. Since 1994, Sultan has provided more than six million dollars in personal and Saudi government funds to charities that raised money for, and diverted funds, equipment and personnel to, Osama bin Laden and Al Qaeda. While many of those who gave money to Islamic charities may have been ignorant of the ultimate destination of their donations, Sultan was not.  Not only was he the man charged by the Saudi government with preventing charitable donations from going to terrorists, but beginning in the mid-1990s, he served on a joint intelligence committee with the United States whose purpose was to share information regarding terrorist financing activities.  In addition, as early as 1994, he

---

[2]  Because Sultan has brought his motion to dismiss under F.R.C.P. 12 (b)(1) and 12(b)(2), alleging that this Court lacks subject matter and personal jurisdiction, this Court may consider evidence beyond the allegations of the complaints at issue.  *See Antares Aircraft L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991 (court may resolve disputed factual issues pertaining to subject matter jurisdiction by reference to evidence outside the pleadings; ), *vac'd on other grounds*, 505 U.S. 1215 (1992).

participated in meetings at which French and American officials explicitly warned him about the terrorist financing activities of the Islamic charities he personally supported throughout the 1990s. Despite this knowledge, Sultan personally provided millions of dollars to these very organizations that he knew to be diverting funds to Al Qaeda. It is crucial to point out that Sultan continued to support these Islamic "charities" *after* he knew that these entities were supporting Al Qaeda and *after* Al Qaeda had unequivocally declared its intention to attack the United States and had carried out a series of attacks against the United States.

`Al Qaeda's Public Targeting of the United States`

It has been publicly known since the mid-1990s, if not well before, that Osama bin Laden and his Al Qaeda terrorist network had launched an international campaign of terror directed at the United States. In July 1996, bin Laden told the British newspaper, *The Independent*, that al Qaeda terrorists had "hit their main enemy, which is the Americans." *See* Youssef M. Ibrahim, "Saudi Exile Warns More Attacks Are Planned," New York *Times*, July 11, 1996, Bierstein Aff., Exhibit 2. That same summer, the Committee for the Defense of Legitimate Rights (CDLR), a Saudi Islamist dissident movement affiliated with bin Laden, released Osama bin Laden's "Declaration of War" on the internet. In the statement, bin Laden declared: "My Muslim Brothers of The World: Your brothers in Palestine and in the land of the two Holy Places are calling upon your help and asking you to take part in fighting against the enemy *-your enemy and their enemy- the Americans* and the Israelis." (Emphasis added.) *See* Osama bin Laden, *'Declaration of War Against the Americans Occupying the Land of the Two Holy Places,'* August 1996, Bierstein Aff., Exhibit 3.

The following year, bin Laden told Peter Arnett, correspondent for CNN, "We declared *jihad against the US government . . . ."* Asked about whether American civilians also were targeted, bin Laden said: "As for what you asked regarding *the American people,* they *are not*

*exonerated from responsibility,* because they chose this government and voted for it."(Emphasis added.) *See* Osama bin Laden Interview with Peter Arnett, *CNN*, March, 1997, Bierstein Aff., Exhibit 4.

In 1998, bin Laden made even more explicit his declaration of war against the United States and all Americans, wherever they happen to be. He issued a *fatwa* in which he stated: "We—with God's help—call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to *kill the Americans* and plunder their money wherever and whenever they find it." (Emphasis added.) *See* Jihad Against Jews and Crusaders, *World Islamic Front Statement,* 23 February 1998, Bierstein Aff., Exhibit 5. Osama bin Laden and other Middle Eastern terrorist leaders in attendance at the meeting agreed that "the ruling to *kill the Americans* and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it." *Id.* (Emphasis added.) That same year, the al Qaeda spiritual leader, Shaykh Omar Abdel Rahman, who led the 1993 World Trade Center bombing plot, issued his own *fatwa* which called on all Muslims to kill American infidels:

> Oh, Muslims everywhere! Cut the transportation of their countries, tear it apart, destroy their economy, burn their companies, eliminate their interests, sink their ships, shoot down their planes, kill them on the sea, air, or land. Kill them when you find them, take them and encircle them, paralyze their every post. Kill those infidels . . . .

"Dr. Omar AbdurRahman's Latest Statement," Supporters of Shariah website archive, Nov./Dec. 1998, Bierstein Aff., Exhibit 6.

These *fatwas* proved to be more than just empty, albeit virulent, threats. Throughout the 1990's, Osama bin Laden and al Qaeda carried out a series of attacks on the United States that removed any doubt about the seriousness of their intentions or the identity of their target. These attacks included the 1993 World Trade Center bombing, the 1998 bombing of two U.S.

embassies in East Africa, and the 2000 attack on the *USS Cole*.   Other unsuccessful plots included the plan to blow up the Lincoln and Holland tunnels in New York City and "Plan Bojinka," a harrowing scheme developed in the Philippines to simultaneously blow up as many as a dozen American commercial air flights over the Pacific Ocean.   The plan was foiled in 1995, but there was no doubt that the terrorist threat was real and that it was directed against America.

**Warnings to Sultan and the Saudi Government About Charities as Terrorist Fronts**

The source of the financing for Osama bin Laden's activities became clear almost as soon as the leader of al Qaeda began carrying out terrorist attacks against the United States in the early 1990s.   Saudi Arabia had financed Islamic resistance fighters in Afghanistan.   With the fall of the Soviet Union, Saudi money previously sent by wealthy Saudi businessmen and members of the royal family to *mujahideen* in Afghanistan, was diverted to anti-American terrorist activities coordinated by bin Laden and other Islamic extremists.   *See* Tom Carter, "Bin Laden's Terrorism career began fighting Soviet Union," Washington *Times*, September 13, 2001, Bierstein Aff., Exhibit 7; Jonathan Wells, "Saudi Elite linked to OBL financial empire," Boston *Herald,* October 14, 2001, Bierstein Aff., Exhibit 8.

The diversion of money from charities to terrorist groups was well known and publicized in the mid-1990's.   *See* Jeff Gerth and Judith Miller, "Funds for Terrorists Traced to Persian Gulf Businessmen," New York *Times,* Aug. 14, 1996, Bierstein Aff., Exhibit 9 [hereinafter "Funds for Terrorists"]; Steve Coll and Steve LeVine, "Global Network Provides Money," *Washington Post,* August 3, 1993, Bierstein Aff., Exhibit 10 [hereinafter "Global Network Provides Money"].   As early as 1991, King Fahd of Saudi Arabia urged wealthy Saudis to "be more careful in their charitable donations."   *See* Exhibit 9, "Funds for Terrorists."

In 1993, in response to the first bombing of the World Trade Center, the Saudi government issued a ban on private charitable contributions sent overseas without the approval of the Saudi government. *See* Exhibit 10, "Global Network Provides Money"; *see also* Exhibit 9, "Funds for Terrorists." In 1994, the Saudi Supreme Council of Islamic Affairs, with Sultan as its chair, was established to monitor and approve Islamic charitable giving within Saudi Arabia and abroad. *See* Jean-Charles Brisard, "Terrorism Financing," Report prepared for the President of the Security Council United Nations, December 19, 2002, at p. 17, Bierstein Aff., Exhibit 11; *see also* Exhibit 9, "Funds for Terrorists." The purpose of this ban on donations abroad was to prevent Saudi charitable donations from being used to support terrorism. *See* Exhibit 10, "Global Network Provides Money"; Exhibit 9, "Funds for Terrorists." Thus, Sultan was charged with the task of preventing the diversion of Saudi charitable donations to terrorists.

He was not left to figure out on his own how the money was being diverted. Between 1994 and September 11, 2001, Sultan and/or his government received at least three official warnings from the United States and France regarding the used of charitable donations to Islamic charities as conduits for supporting terrorism. In November, 1994, Charles Pasqua, then the French Interior Minister, made an official visit to Saudi Arabia where he met with Sultan and other officials of the Saudi government. As Mr. Pasqua describes in an affidavit for *Burnett* plaintiffs:

> In the course of the meetings with my Saudi counterparts, I raised the question of financial aid furnished by Saudi charitable organizations enjoying state support, in particular the World Islamic League [Muslim World League], to Islamist movements or terrorist groups. I specifically warned my counterparts about this situation and officially requested that they put an end to it . . . .

*See* Affidavit of Charles Pasqua, December 15, 2003, Bierstein Aff., Exhibit 12. In June, 1999, the Saudi government received a similar visit from a U.S. delegation, sent specifically to warn

6

the Saudis about the ways in which significant funds were being raised in their country to finance al Qaeda's terrorist attacks. *See* Daniel Benjamin & Steven Simon, *The Age of Sacred Terror* (Random House Trade Paperback 2003) ["*Age of Sacred Terror*"] at 286-288, excerpt attached as Exhibit 13 to the Bierstein Aff. In October, 1999, Sultan visited the United States for follow-up discussions with senior American officials on defense and terrorist financing issues. Just days before Sultan visited the White House, *USA Today* reported that "[more than a year after the U.S. embassy bombings in East Africa, prominent businessmen in Saudi Arabia continue to transfer tens of millions of dollars to banks accounts linked to indicted terrorist Osama bin Laden." The article explained that money was "deposited into the accounts of Islamic charities, including Islamic Relief and Blessed Relief, which serve as fronts for bin Laden." The article noted that "Secretary of State Madeleine Albright is expected to raise the issue with Prince Sultan . . . during his visit to Washington next week." *See* "Saudi Money Aiding bin Laden; Businessmen Are Financing Front Groups," *USA Today*, Oct. 29, 1999, Bierstein Aff., Exhibit 14; *see also* "FBI List Boosted Donations to bin Laden," *USA Today*, Nov. 4, 1999, Bierstein Aff., Exhibit 15.

Sultan also got information about terrorist financing directly from U.S. intelligence. Beginning in 1997, he participated in a joint initiative with the United States to share intelligence information on terrorist financing and al Qaeda. *See* Turki al-Faisal, "Allied Against Terrorism," *Washington Post*, Sept. 17, 2002, Bierstein Aff., Exhibit 16. Thus, in the mid-to-late 1990s, during the period when al Qaeda was planning major attacks against the United States, Sultan personally received U.S. intelligence information about Osama bin Laden's use of money from Islamic charities and front companies to finance his sprawling terrorist network.

Through his discussions and briefings with U.S. and other foreign government officials during this period, Sultan knew or should have known that the Islamic charities to which he personally donated millions of dollars—The Muslim World League, the International Islamic Relief Organization ("IIRO"), Al-Haramain International Islamic Foundation, the World Assembly of Muslim Youth ("WAMY"), and the Saudi Joint Relief Committee ("SJRC") -- all were major financial conduits for bin Laden and al Qaeda. *Burnett* 1AC ¶ 359.

## The Charities That Supported Terrorism

Through his meetings with U.S. and French officials, and through his intelligence-sharing with the United States, Sultan was told about particular charities that were providing financing to al Qaeda. Among the most notorious sponsors of bin Laden and terrorism about Islamic charities were the Muslim World League ("MWL"), Al-Haramain, the World Assembly for Muslim Youth ("WAMY), the International Islamic Relief Organization ("IIRO"), and the Saudi Joint Relief Committee (SJRC). The funding provided by these and other charities was critical to al Qaeda. The Independent Task Force Sponsored by the Council on Foreign Relations concluded in its 2002 Report on Terrorism Financing that "the most important source of al Qaeda's money is its continuing fundraising efforts." *See Burnett* 1AC at p. 204. Moreover, the report found that individuals and charities in Saudi Arabia have been "the most important source of funds for al Qaeda." *Id.* at 205.

MWL is a Saudi government-funded charity. The organization reportedly worked directly with bin Laden; its offices around the world served in the early days of al Qaeda to attract and train "holy warriors." *Ashton* 4AC at ¶¶ 304; *Burnett* 1AC ¶¶ 236, 255. The Rabita Trust, a Pakistan-based branch of MWL, has been designated by the U.S. Treasury Department as a "Specially Designated Global Terrorist Entity."

8

Al-Haramain has been designated as a terrorist entity by the United States Treasury Department. *Ashton* 4AC at ¶¶ 467, 471; *Burnett* 1AC ¶ 150. As alleged in the Complaint, Al-Haramain played a major role in funding terrorism through its Bosnian office, which served as a crucial financial hub of Osama bin Laden's international financial and logistical support network. *Ashton* 4AC ¶¶ 472, 473, 474, 475, 476, 480, 481; *Burnett* 1AC ¶¶ 158, 159, 160, 161, 164, 169. In addition to providing funding to al Qaeda, Al-Haramain employees helped coordinate the 1998 bombings of two U.S. embassies in Africa, *see Ashton* 4AC ¶ 479 ; *Burnett* 1AC ¶¶ 167-168. The charity's involvement in the embassy bombings was reported in the press as early as October, 1998. More recently, Al-Haramain helped plan the 2002 bombing of a nightclub in Bali, Indonesia *see Ashton* 4AC ¶¶ 487, 488, 489, 490; *Burnett* 1AC ¶ 175.

WAMY has been implicated as the distributor of terrorist training manuals, including those found in the possession of the 1993 World Trade Center bombing conspirators. *Burnett* 1AC ¶¶ 231-232. WAMY was identified by the FBI as a "suspected terrorist organization" as early as 1996. *Ashton* ¶ 272.

IIRO, a subsidiary of MWL, has been central to the financing of terrorist training activity around the globe for many years. Its office in the Philippines was headed by Osama bin Laden's brother-in-law, Mohammed Jamal Khalifa. *See, e.g.,* Exhibit 9, "Funds for Terrorists." IIRO was involved in financing the 1993 World Trade Center bombing and the 1998 African embassy bombings, as well as the unsuccessful plots to destroy the Lincoln Tunnel and the Brooklyn Bridge, to assassinate former President Bill Clinton and Pope John Paul II, and to blow up twelve American airplanes over the Pacific. *Ashton* 4AC at ¶ 310; *Burnett* 1AC ¶ 234. In 1996, Western intelligence sources indicated that IIRO was a major clearinghouse for millions of dollars in Saudi financial aid to extremists. (Indeed, the organization admitted giving money to

Hamas, which was, even then, on the State Department's terrorist list.  *See* "Funds for
Terrorists," Exhibit 9.)  In 1998, Kenyan authorities shut down IIRO's Kenya office after it was
linked to the bombing of the U.S. embassy in Nairobi.  *See* 4AC ¶ 318; AC ¶ 242; *see also*
Statement of Jonathan Winer to the Senate Committee on Governmental Affairs, July 31, 2003,
Bierstein Aff., Exhibit 17.   In 2000, Philippine intelligence reported that the IIRO served as a
pipeline for terrorist funding.  *See* Christine Herrera, "Bin Laden Funds Abu Sayyaf Through
Muslim Relief Group," *Philippine Daily Inquirer*, Aug. 9, 2000, Bierstein Dec, Exhibit 18.  In
testimony before the House Committee on International Relations on October 3, 2001, former
CIA Chief of Counter-Terrorism Operations Vince Cannistraro singled out IIRO as an ongoing
source of funding for Al Qaeda and bin Laden.  *See* "Al Qaeda and the Global Reach of
Terrorism," Hearing before the Committee on International Relations of the House of
Representatives, October 3, 2001, at p. 18, Bierstein Aff., Exhibit 19.

    In May 2000, the United Nations Mission in Kosovo (UNMIK) raided a house rented by
the Saudi Joint Relief Committee (SJRC) in Pristina, Kosovo in response to reports of a possible
terrorist attack on the U.S. office in the province.   UN and US officials stated that the
organization was acting as a cover for several al Qaeda operatives, including Adel Muhammad
Sadi Bin Kazem and former SJRC director Wael Hamza Jalaidan.  Julaidan previously served as
Secretary General of Rabita Trust (a specially-designated global terrorist entity) in Pakistan and
was a co-founder of al Qaeda.  An intelligence document reviewed by the *BBC* stated that
Jalaidan helped bin Laden "move money and men to and from the Balkans."  *See* Nick Wood,
"U.S. fears terrorist attack in Kosovo," *BBC News*, April 3, 2000, Bierstein Aff., Exhibit 20.

    As demonstrated above, the involvement of these particular charities in financing bin
Laden and his terrorist agenda was hardly a secret.  And yet, throughout the mid- and late

1990's, Sultan made repeated, substantial contributions to the very charities that had been identified as conduits for terrorist financing.

## Sultan's Donations to the Charities That Supported Terrorism

As alleged in the complaints, Sultan provided funding to IIRO, Al-Haramain, MWL, and WAMY. 4AC ¶¶ 266-272; AC ¶¶ 359-362. Public announcements concerning these donations, at least some of which were made personally, demonstrate the substantial size of the contributions that Sultan made to these organizations. Thus, in 1996, *The Muslim World*, an English-language weekly newspaper put out by MWL, reported that Sultan donated SR1,000,000 to the IIRO in two installments. The paper reported that the contributions were part of Sultan's annual pledge of SR1,000,000 to the IIRO. IIRO secretary-general Fareed Qurashi thanked Sultan for his "continuous support to the organization." *See The Muslim World*, January 22, 1996, Bierstein Dec, Exhibit 21 at p.2; *id.* July 1, 1996, Bierstein Aff., Exhibit 22. Sultan continued these sizable annual donations from at least 1997-1999. And in July 1999, Sultan donated SR5 million to the Saudi Joint Relief Committee of Kosovar Refugees. *See The Muslim World*, July 26, 1999, Bierstein Aff., Exhibit 23.[3]

In summation, al Qaeda repeatedly and publicly announced that it was directing its terrorist activities against the United States and carried out several such attacks against U.S. targets. Sultan was charged with ensuring that Saudi charitable contributions were not diverted to al Qaeda to support such attacks. Sultan was provided information by Western governments about which charities were in fact providing support for al Qaeda and its terrorist campaign against the United States; he participated on a joint intelligence committee with the United States; and he had available to him vast amounts of information, especially in the late 1990's,

---

[3] In 2000, Sultan also donated SR10 million as part of a telethon to raise money for the "heroes of the al-Quds Intifada" in the Palestinian territories. *See The Muslim World*, October 20, 2000, Bierstein Aff., Exhibit 24.

which demonstrated that MWL, IIRO, Al-Haramain, WAMY, and SJRC were among the primary financiers of al Qaeda.   Rather than preventing such charities from raising money and sending it overseas where it could be used by al Qaeda, Sultan donated millions of dollars to the very groups identified as charity "fronts" funneling money to bin Laden for his campaign of international terrorism.

Plaintiffs now seek to hold Sultan accountable for his support of al Qaeda front groups which carried out the September 11 attacks against the United States of America.

ARGUMENT

## I.   THIS COURT HAS JURISDICTION OVER THE CLAIMS AGAINST SULTAN IN HIS OFFICIAL CAPACITY

The Foreign Sovereign Immunities Act ("FSIA") confers subject matter and personal jurisdiction on the district courts for claims against foreign states and their agencies or instrumentalities unless the sovereign (or agency or instrumentality) has immunity for that claim. 28 U.S.C. § 1330.  Sultan contends that, to the extent that he is alleged to have acted in his official capacity, the FSIA provides him with immunity and thus, he argues, the claims in these lawsuits fall outside the jurisdiction provided by § 1330[4]  While it is true that the FSIA does, generally speaking, provide immunity from suit for foreign officials acting in their official capacity, *see* 28 U.S.C. § 1604, the cloak of immunity provided by the FSIA is not absolute. Congress has carved out seven exceptions to immunity, specifically providing that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" that falls within one of the seven enumerated categories.  28 U.S.C. § 1605(a)  Although plaintiffs have "the burden of going forward with evidence showing that . . . immunity should

---

[4] Sultan apparently recognizes and concedes that, to the extent that the acted in his personal capacity, the FSIA provides him with no immunity. *See* Sultan Br. at 21.  For this reason, it is important to emphasize that plaintiffs in

12

not be granted . . . the ultimate burden of persuasion remains with the alleged foreign sovereign"

to show that the claimed exception does not apply and that immunity should be granted. *Virtual*

*Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2003).

In these cases, the claims against Sultan fall within one of the FSIA exceptions, the so-

called "tortious act" exception, which lifts immunity for any case:

> in which money damages are sought against a foreign state for personal injury or
> death or damage to or loss of property, occurring in the United States and caused
> by the tortious act or omission of that foreign state or of any official or employee
> of that foreign state while acting within the scope of his office or employment . . .

28 U.S.C. § 1605(a)(5).  Because plaintiffs' claims arise from deaths and injuries incurred in the

September 11 terrorist attacks, they are seeking money damages for personal injury and/or death

in the United States based on tortious conduct.  Their claims fall squarely within this exception.

Sultan makes three arguments why the "tortious act" exception should not be applied

here, but as demonstrated below, none is correct.

A.    **Plaintiffs' Injuries Were "Caused by" Sultan's
      Alleged Conduct Within the Meaning of the "Tortious
      Act" Exception to the FSIA**

Sultan argues that the "tortious act" exception does not apply because, Sultan says, the

deaths and injuries on September 11 were not "caused" by his actions.  In making this argument,

Sultan relies on the November 14, 2003 ruling of the D.C. court in the *Burnett* D.C. action.

*Burnett v. Al Baraka Investment & Development Corp.*, 292 F.Supp.2d 9 (D.D.C. 2003).  Sultan

urges this Court to adopt that ruling, although he concedes that this Court is not bound to do so

and that the ruling is not even the "law of the case," itself a discretionary doctrine.  *See* Sultan

Br. at 11.  In the context of these actions, however, this Court owes no greater deference to Judge

Robertson's ruling than it owes to any other decision of the D.C. district court.  Such decisions of

---

these cases do contend that Sultan acted, at least in part, in his personal capacity when he gave money to support al

a coordinate district court in another circuit *may* (but need not) be followed if they are persuasive and if they are in accordance with Second Circuit law, which is controlling in this consolidated proceeding. *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993)  Judge Robertson's decision is neither persuasive nor in accordance with Second Circuit law and, accordingly, should not be followed.[5]

This Court should not follow the ruling in *Burnett***Error! Bookmark not defined.** because that ruling is based on an improperly narrow view of the "tortious act" exception.  In *Burnett*, the court held that the standard of causation under the "tortious act" exception is more stringent than the standard of causation applicable to the underlying tort.  292 F.Supp.2d at 19-20.  There was no basis for this approach.  Rather, as the Second Circuit has held, the substantive state or federal rule that governs plaintiffs' cause of action is used to resolve the threshold question of the court's jurisdiction under the FSIA.  *Robinson v. Government of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001)  In reaching this conclusion, the Second Circuit relied on the legislative history of the "tortious act" exception, which specifically states that the purpose of the "tortious act" exception is to permit a plaintiff "to maintain an action against [a] foreign state *to the extent otherwise provided by law*." H.R. Rep. No. 94-1487, at 21, 1976 U.S.C.C.A.N. at 6620 (emphasis added). For that reason, the Second Circuit in *Robinson* held that a plaintiff is required to meet the same standard to fall within the "tortious act" exception as would be required to prevail on the merits.

Qaeda.

[5]  Even in the *Burnett* D.C. action itself, this Court is not bound by the ruling of the D.C. court.  *See* F.R.C.P. 54 (b) (orders adjudicating claims against fewer than all defendants open to revision at any time before final judgment); *In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987) (following § 1407 transfer, district court has power and obligation "to modify or rescind any orders in effect in the transferred case which it concludes are incorrect"); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996) (re-considering ruling of district court in Texas after transfer).  Accordingly, this Court need not follow the D.C. court in order to achieve uniformity in all the cases in this consolidated proceeding, as such uniformity can be achieved in any event by modification of the D.C. court ruling in *Burnett* itself, should this Court reach a different conclusion here than was reached there.

269 F.3d at 143.[6]  Applying the *Robinson* standard, plaintiffs sufficiently demonstrate that

Sultan's tortious conduct caused their injuries, for purposes of the FSIA, to the extent that they

demonstrate the element of causation for their underlying common law claims.  Because the D.C.

court erroneously held, in *Burnett*, that plaintiffs were required to plead a tighter causal

connection under the FSIA than would be required to maintain their claims, *see* 292 F.Supp.2d at

19-20, that decision should not be followed here.[7]

With respect to their underlying claims, plaintiffs allege that Sultan proximately caused

the deaths and injuries in the September 11 attacks because he knowingly aided and abetted al

Qaeda in carrying them out by providing financial support to known al Qaeda fronts.  The

doctrine of aiding and abetting does not require that plaintiffs plead a direct link between

Sultan's conduct and the specific attacks of September 11.  In *Halberstam v. Welch*, 705 F.2d

472, 477 (D.C.Cir. 1983), the court explained the three requisites for holding a defendant liable

for aiding and abetting:  "(1) the party whom the defendant aids must perform a wrongful act that

causes an injury; (2) the defendant must be generally aware of his role as part of an overall

illegal or tortious activity at the time that he provides the assistance; (3) the defendant must

---

[6]  The D.C. district court relied, for its contrary conclusion, on *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987), but that case (which is not binding on this Court) never addressed whether the standard to be applied to the elements of the "tortious act" exception was different from the standard applicable to the underlying tort.  Rather, in *MacArthur Area Citizens*, the court simply stated, in the context of a zoning dispute, that the "tortious act" exception should be construed narrowly.  Unlike *MacArthur Area Citizens*, however, the *Robinson* specifically addresses the issue raised in *Burnett* and makes clear that the court in D.C. erred in finding that the element of "causation" is different under the "tortious act" exception than it is under the underlying substantive law.  In this respect, Sultan is simply wrong when he argues that there has been no change in the applicable law – the law *has* changed, because it is now Second Circuit, rather than D.C. Circuit, precedent that is controlling.

[7]  Sultan attempts to salvage *Burnett* by re-casting it as requiring a higher degree of *evidentiary proof* at the pleading stage, rather than as requiring a different legal standard of causation, but the language of the opinion does not support Sultan's creative re-interpretation.  Judge Robertson did not dismiss plaintiffs' claims for lack of sufficient evidentiary proof of their theory of the causal connection between Sultan's support of various al Qaeda fund-raising channels, but rather – and erroneously – he rejected plaintiffs' theory of causation, even as he acknowledged that the same theory of causation could suffice for the underlying claims.  292 F.Supp.2d at 19-20.  Moreover, if *Burnett* had been based on the amount of evidence that plaintiffs submitted to support their allegations, it would be wholly inapplicable here, where plaintiffs have submitted additional evidence not before the D.C. court.

knowingly and substantially assist the principal violation." In applying these elements to the facts before it, the *Halberstam* court held that the defendant Hamilton could be liable for aiding and abetting her co-defendant Welch in the murder of the plaintiff's husband during the course of a burglary. Hamilton was not present at the burglary and claimed not to have known that Welch was a burglar at all. Finding that Hamilton had assisted Welch for years in disposing of large quantities of jewelry and precious metals, the Court held:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night--whether as a fence, burglar, or armed robber made no difference--because *violence and killing is a foreseeable risk in any of these enterprises.*

*Halberstam*, 705 F.2d at 489 (emphasis added). Thus, the Court reasoned, Hamilton was liable not only for the burglaries – whether she knew about them or not – but also for the murder that Welch committed during the course of one of them. *Id.*[8]

In *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998), the court applied the same standard used in *Halberstam*, holding: "[A] plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises .. Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient . . . ." 999 F. Supp. at 18. More recently, and more pertinent to the facts of this case, in *Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217, 232 (S.D.N.Y. 2003), the court granted a default judgment to plaintiffs against

---

[8] It is important to emphasize that in *Halberstam,* the court found that Hamilton "knew" that Welch was involved in personal property crimes – and thus could be held liable for the murder that Welch committed during one of his burglaries – without any direct evidence of that knowledge. 705 F.2d at 486-87. As noted above, Hamilton denied knowing that Welch was engaged in criminal activities. But the court was able to infer that Hamilton must have known because she carefully logged all of Welch's sales of jewelry and precious metals but had no records of any purchases, because of the extravagant lifestyle that she enjoyed as a result of Welch's crimes, and because of Welch's mysterious evening absences over the course of their relationship. The court applied common sense to determine that a person in Hamilton's position must have known that Welch was committing crimes and the D.C. Circuit upheld liability based on that inferred knowledge. 705 F.2d at 486-87.

16

Iraq for injuries arising out of the September 11 attacks after plaintiffs provided "a sufficient basis for a reasonable jury to draw inferences which could lead to the conclusion that Iraq provided material support to al Qaeda and that it did so with knowledge and intent to further al Qaeda's criminal acts." *See also Boim*, 291 F.3d at 1023 (plaintiffs need show only that defendants knew of the terrorist organization's illegal activities, that they desired to help those activities, and they engaged in some act of helping the illegal activities).

Under *Boim, Halberstam, Flatow*, and *Smith* plaintiffs need not allege nor prove that Sultan participated in the planning or carrying out of the September 11 attacks or even that the assistance he provided was used specifically to assist in those attacks. *See Boim,* 291 F.3d 1000; *Halberstam*, 705 F.2d 472; *Smith*, 262 F.Supp.2d 217; *Flatow*, 999 F.Supp. 1. Substituting the situation of this case into the framework of *Halberstam*, and using that court's own language, it is not necessary that Sultan knew specifically that al Qaeda was going to commit the atrocities of September 11. Rather, it is enough that, when he provided assistance to al Qaeda, he knew that al Qaeda was involved in terrorist activity, because the attacks of September 11 were a foreseeable risk of that terrorist activity. *See Halberstam*, 705 F.2d at 489.[9]

Sultan disputes however that he can be deemed to have provided assistance to al Qaeda when he donated money to charities like Al Haramain, IIRO, and WAMY. That Sultan provided his assistance to Al Qaeda through an intermediary does not break the causal connection because the evidence that plaintiffs have amassed, *see, supra,* pp. 1-11 and Exhibits 1-24, shows that Sultan *knew* that funds donated to IIRO, Al Haramain, and WAMY were being diverted to al Qaeda and its terrorist agenda. That knowledge made it entirely foreseeable that terrorist

---

[9] The result is the same under general tort principles of causation. *See, e.g., Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1996); *In re Sept. 11 Litig.*, 280 F.Supp.2d 279, 309 (S.D.N.Y. 2003); *Lamarca v. United States*, 31 F.Supp.2d 110, 127 (E.D.N.Y. 1998). *See also* Plaintiffs' Memorandum of Law in Opposition to Prince Mohammed al-Faisal al-Saud's Motion to Dismiss.

donations to those organizations would be used to fund terrorist attacks, including the attacks of September 11, 2001.[10] Nor is it necessary that the precise dollars (or riyals) that Sultan donated were the ones that were funneled to al Qaeda. The money was fungible and every dollar that IIRO received was one more it could send to bin Laden, regardless of which bill or coin it actually sent. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) (because money is fungible, any contribution to a terrorist organization gives rise to criminal responsibility, regardless of whether the support given is intended for, or flows directly to, the group's terrorist activities).

**B.    The "Discretionary Function" Clause Does Not Immunize Sultan From the Claims Alleged in These Lawsuits**

Sultan also contends that his acts fall within the "discretionary function" exclusion of § 1605(a)(5)(A). But courts have refused to recognize a foreign official's "discretion" to violate international law or commit crimes against humanity. *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989); *Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.DC. 1980). In rejecting a claim of sovereign immunity in connection with an assassination carried out in Washington, D.C. at the direction of the Chilean government, the court in *Letelier* explained:

> Whatever policy options may exist for a foreign country, it has no "discretion" to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law. Accordingly there would be no "discretion" within the meaning of section 1605(a)(5)(A) to order or to aid in an assassination and were it to be demonstrated that a foreign state has undertaken any such act in this country, that foreign state could not be accorded sovereign immunity under subsection (A) for any tort claims resulting from its conduct.

---

[10]  That terrorist attacks, including those of September 11, *are* a foreseeable risk of terrorist activity is nearly a tautology that requires little elaboration, especially in light of the D.C. Circuit's ruling in *Halberstam* that "violence and killing is a foreseeable risk" of criminal enterprises involving property crimes. *Halberstam*, 705 F.2d at 489.

488 F.Supp. at 673 (citations omitted). *Accord Liu*, 892 F.2d at 1431 (director of Taiwanese Defense Intelligence Bureau had no discretion to carry out assassination in United States and government was not immune from suit under "tortious act" exception).

Sultan claims that this Court should not follow *Letelier* and *Liu* because the Second Circuit has not adopted them. But the Second Circuit has not rejected them either – it simply has not the occasion to consider the applicability of the "discretionary function" exception in the context this kind of violation of international law. Moreover, the Second Circuit has, in other contexts, taken a strong stand to open U.S. courts to claims involving egregious violations of international law. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1996) (entertaining, under the Alien Tort Claims Act, claims against Bosnian Serb leader Radovan Karadzic for war crimes and other gross violations of international law); *Filartiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980) (permitting suit against Inspector General of Police in Asuncion, Paraguay who allegedly tortured plaintiffs son in Paraguay). Reading the Second Circuit's Alien Tort Claims Act jurisprudence, there is simply no reason to believe that the Second Circuit would take a different view of the egregious violations of international law at issue in *Letelier*, and *Liu*, and in this case, than did the D.C. District Court and the Ninth Circuit in finding that the "discretionary function" clause of § 1605(a)(5) does not protect foreign officials who commit such acts.

Sultan also claims that even if *Letelier* and *Liu* are applicable in the Second Circuit, they do not apply here because, he contends, his conduct "does not remotely approach the conduct found outside the discretionary function exclusion in *Letelier* and *Liu*." Sultan Br. at 19 n.13. Plaintiffs disagree. The defendants in *Letelier* and *Liu* carried out targeted assassinations against particular persons; Sultan is alleged to have assisted al Qaeda in its mission to murder large numbers of Americans indiscriminately for no reason other than they were Americans or were

19

present in the United States. Surely foreign officials do not acquire discretion to support murder on American soil by killing *more*, rather than fewer, people.

C.   Section 1605(a)(7) Does Not Preclude Application of the "Tortious Act" Exception

Sultan claims that the existence of the "state-sponsored terrorism" exception to the FSIA, 28 U.S.C. § 1605(a)(7) (which all parties agree is inapplicable to the claims against this defendant), precludes reliance on any other FSIA exception. *See* Sultan Br. at 20-21.    This argument is nonsense.  Nothing in the language or history of § 1605(a)(7) precludes the Court from hearing a claim against a foreign sovereign for an act of terrorism under any of the other exceptions to the FSIA set forth in other paragraphs of § 1605, so long as the requirements of that other exception are met.  Indeed, in those instances where Congress intended to preclude overlapping interpretations of the various exceptions, it specifically said so.  Thus, the "tortious act" exception can only be used in cases "not otherwise encompassed in paragraph (2)"; similarly, the "state-sponsored terrorism" terrorism exception only applies to cases "not otherwise covered by paragraph (2).  28 U.S.C. §§ 1605(a)(5), (a)(7).  If Congress had intended to limit the applicability of § 1605(a)(5) to cases that did not involve terrorism, it would have said so.

Nor does plaintiffs' reliance on the "tortious act" exception represent some kind of "end-run" around the limitations of § 1605(a)(7) or the policies that underlie them.  Each of the exceptions to sovereign immunity in § 1605 provides a separate and independent basis of jurisdiction over a foreign sovereign.  Use of the "tortious act" exception here in no way undermines the policies of the "state sponsored terrorism" exception because the two exceptions address entirely different circumstances. Section 1605(a)(5) provides jurisdiction over all non-commercial torts, including acts of terrorism, that take place in the United States, while

§ 1605(a)(7) provides jurisdiction for acts that take place abroad, but is limited to acts of terrorism committed by designated state sponsors of terrorism.

This was the precise holding of the court in *Flatow,* 999 F.Supp. 1.  There, the court considered the extraterritorial application of § 1605(a)(7) to determine whether the then-recently enacted state-sponsored terrorism exception extended to acts of terrorism that occurred outside the United States.  Citing *Letelier* and *Liu,* the court reasoned:  "As 28 U.S.C. § 1605(a)(5) already provides jurisdiction over state-sponsored terrorist acts in the United States, the state sponsored terrorism exception would be redundant if it were held to apply only within the United States." *Flatow,* 999 F.Supp. at 15 (emphasis added; citations omitted).  *See also Price v. Socialist People's Libyan Arab Jamahiriaya,* 294 F.3d 82, 88 (D.C. Cir. 2002) ("Under the original FSIA, therefore, terrorism, torture, and hostage taking *committed abroad* were immunized forms of state activity.") (emphasis added).

Because the terrorism exception in § 1605(a)(7) sweeps so much more broadly than does the "tortious act" exception, encompassing conduct that takes place entirely outside the United States, it is understandable that Congress limited the circumstances in which this exception applies to suits involving terrorist acts and designated state sponsors of terrorism.  But there is no reason similarly to limit the liability of a foreign sovereign when the bomb explodes in the United States, rather than overseas, and nothing in the FSIA suggests that any such limitation was intended. Moreover, the considerations of foreign relations and diplomatic policy that may be implicated when Americans are injured in terrorist conflicts abroad have much less place, if any, in the context of terrorist attacks at home.  The structure of the FSIA recognizes this distinction by lifting the immunity of a foreign sovereign more freely when Americans are injured at home than when they are injured abroad. *Compare* 28 U.S.C. § 1605(a)(5), 28 U.S.C.

21

§ 1605(a)(7).  Indeed, it is notable that, in striking the balance of lifting immunity for acts that take place entirely outside the United States, but only for states that have been designated as sponsors of terrorism, Congress did not at the same time limit the existing "tortious act" exception, even though it clearly understood that that exception would apply to acts of terrorism committed in the U.S.  *See* House Report No. 103-702 (August 16, 1994) at *4.

Indeed, plaintiffs cannot help but note that Sultan's interpretation of the FSIA leads to a fundamental absurdity whereby a foreign sovereign may be sued if one of its employees accidentally runs down a pedestrian in the District of Columbia with his car, but has immunity if that employee blows up the pedestrian in a deliberate act of violence instead.  The FSIA does not countenance such absurdities.   Rather, it presents a coherent scheme in which injuries negligently or deliberately inflicted in the United States are actionable under § 1605(a)(5), while injuries inflicted abroad are actionable only in the more limited circumstances set forth in § 1605(a)(7).

## II.  SULTAN'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION SHOULD BE DENIED

Recognizing that the FSIA confers no immunity for actions in his personal capacity, Sultan argues that he cannot be subjected to the jurisdiction of this Court in connection with his personal donations to al Qaeda front charities because, he contends, he lacks sufficient contact with the forum to meet the constitutional requirements for the assertion of jurisdiction. Sultan is wrong.

A defendant is subject to jurisdiction in the United States if he "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted).  Physical presence is *not* a requirement.  *Id.* at 475.  Where a defendant's intentional,

and allegedly tortious, actions were expressly aimed at the forum, the "due process" requirement of minimum contacts is satisfied. *See Calder v. Jones*, 465 U.S. 783, 789 (1984).[11]

Three recent cases involving terrorism against Americans apply this test and hold that due process is not violated when those who deliberately target Americans are made to answer in American courts of law. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998); *Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000 (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns).

Here, Sultan deliberately targeted Americans because, at the time he contributed money to organizations that he knew were diverting funds to al Qaeda, he also knew that the primary targets of al Qaeda's terrorist agenda were the United States and Americans. As noted above, bin Laden had declared as much, over and over again. *See, supra*, at pp. 3-5.[12] Moreover, Sultan had been tasked precisely with preventing this from occurring and yet he gave millions of dollars to precisely those organizations identified to him as financial sponsors of terrorism against the United States. Under *Calder, Pugh, Rein,* and *Daliberti,* no more is required to subject Sultan to

---

[11]   Rather than repeat the arguments set forth at length in Plaintiffs' Memorandum of Law in opposition to the motion to dismiss filed by the National Commercial Bank ("Plaintiffs' NCB Brief"), which was previously submitted in this action, and in Plaintiffs' Memorandum of Law In Support of Their Prima Facie Showing of Personal Jurisdiction and In Opposition to Defendants' Challenges to Personal Jurisdiction ("Jurisdiction Brief") being filed in connection with various motions to dismiss in the consolidated actions, plaintiffs hereby incorporate by reference the arguments set forth therein and respectfully refer the Court to those briefs.

[12]   Additional evidence that bin Laden and al Qaeda were targeting Americans and were known to be doing so is attached to Plaintiffs' Omnibus Personal Jurisdiction Brief, which is hereby incorporated by reference and to which plaintiffs respectfully refer the Court.

personal jurisdiction in the United States. *See also* Plaintiffs' NCB Brief at Point III-B; Jurisdiction Brief.[13]

CONCLUSION

For the foregoing reasons, this Court should deny Sultan bin Abdulaziz al-Saud's consolidated motion to dismiss for lack of jurisdiction in its entirety.

Dated: New York, NY         Respectfully submitted,
       May 14, 2004

                            /s/
                            Ronald L. Motley, Esq. (RM-2730)
                            Jodi Westbrook Flowers, Esq.
                            Donald A. Migliori, Esq.
                            Michael Elsner, Esq. (ME-8337)
                            MOTLEY RICE LLC
                            28 Bridgeside Boulevard
                            P.O. Box 1792
                            Mount Pleasant, South Carolina 29465
                            Telephone: (843) 216-9000

                            James P. Kreindler, Esq.
                            Justin T. Green, Esq.
                            Andrew Maloney, Esq.
                            Vincent Parrett, Esq.
                            KREINDLER & KREINDLER LLP
                            100 Park Avenue
                            New York, New York 10017-5590
                            Telephone: (212) 687-8181

---

[13] In any event, plaintiffs should be permitted to take jurisdictional discovery concerning . . . that give rise to plaintiffs' claims in this action. A plaintiff faced with a motion to dismiss for lack of personal jurisdiction "is entitled to reasonable discovery." *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues"); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) ("generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue"); *Marine Midland Bank NA v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (court may decide challenge to personal jurisdiction "on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion"); *Strategem Devel. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) (where plaintiff had not made *prima facie* showing of jurisdiction, but had made "a sufficient start toward establishing personal jurisdiction" court order jurisdictional discovery). Moreover, "[a] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery. 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990)

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone: (212) 401-7600

Harry Huge, Esq. (D.C. Bar #55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
1401 Ninth Street, N.W., Suite 450
Washington, D.C. 20004
Telephone: (202) 824-6046

Allan Gerson, Esq. (DC Bar #327494)
Attorney At Law
4221 Lenore Lane
Washington, DC 20008
Telephone: (202) 966-8557

Ken Nolan, Esq.
Frank Granito, III, Esq.
SPEISER KRAUSE NOLAN & GRANITO
140 East 45th Street, 34th Floor
New York, NY 10017
Telephone: (212) 661-0011

Michel Baumeister, Esq.
Thea Capone, Esq.
BAUMEISTER & SAMUELS, P.C.
One Exchange Place, 15th Floor
New York, NY 10006-3008
Telephone: (212) 363-1200

Thomas E. Mellon, Jr., Esq.
MELLON WEBSTER & SHELLEY
87 North Broad Street
Doylestown, PA 18901
Telephone: (215) 348-7700

Richard D. Hailey, Esq.
RAMEY & HAILEY
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone: (317) 848-3249

J.D. Lee
LEE, LEE, & LEE
422 S. Gay Street
Knoxville, TN 37902
Telephone: (865) 544-0101

Attorneys for Plaintiffs in the Personal Injury and Death
Cases

26