# Exhibit D

**ALFONSO VALDIVIESO**
Abogado

Bogotá, D.C., March 12, 04

KENDALL FREEMAN
Solicitors

According to your request through Mr. José Gabriel Fernandez-Cardona I want to state some facts related to Jean-Charles Brisard and his strategy to use the United Nations and my name in order to promote documents or information on terrorism that supposedly he elaborated.

From September 15, 1998 to January 14, 2003 I was the Permanent Representative of Colombia at the United Nations and in that capacity I was President of the Security Council in July 2001 and December 2002, I was also President of the 1267 Committee of the Council dealing with terrorism during the period 2001-2002 and at the same time I was Vice chairman of the Counter Terrorism Committee established by the Security Council after the September 11th events. I have now retired from government service and devoted to legal practice.

Actually, I personally never met with or spoke to Mr. Brisard and it is completely false that I in my capacity as President of the Security Council or as President of the 1267 Committee or in any capacity within that Organization had commissioned him on a personal or official basis to write a Report on terrorism. He had no role whatsoever with the United Nations Security Council during the period in which I occupied the Presidency.

Let me refer to some of Mr. Brisard's moves directed- I assume - to the manipulation that he was trying to make. Some time in 2002 my assistant in the 1267 Committee of the Security Council, that I chaired, was approached by a person named Damien Peres, who mentioned the name of Mr. Brisard in connection with a lawsuit that he handled on behalf of the families affected by the September 11th tragedy. Mr. Peres volunteered to provide information on the financing of terrorism and around June 2002, an individual identified as Jean-Charles Brisard came to New York and gave my assistant a Report which supposedly had been submitted to the US Congress.

**ALFONSO VALDIVIESO**
Abogado

In December 2002, when I was chairing the Security Council, another report reached our office in New York. Immediately after there were media reports about a Report attributed to Brisard and "commissioned" by the Security Council or by the President of the Council. In a very emphatic way we explained to several journalists that no such commission had been issued and that such version was simply false.

As I have been saying in different statements, Mr. Brisard's conduct and attitude is totally deceitful and marked by the intention to mislead. It shows the kind of person that he is in that he uses the name of others – in this case UN and I – to try to validate and promote reports that probably don't have a significant value. Mr. Brisard's Report was unsolicited and I do not believe his Report was taken seriously by anyone at the UN, nor do I believe any step or action was taken by the UN with it, except the need to explain to journalists that it has not been commissioned by us as I have explained in the previous paragraph.

I am ready to provide any additional comment or information concerning this matter.

Cordially,

ALFONSO VALDIVIESO

# Exhibit E

HQ03X03141

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

MR JUSTICE EADY

B E T W E E N:



KHALID SALIM A BIN MAHFOUZ

Claimant

and

(1) JEAN-CHARLES BRISARD

(2) JCB CONSULTING

(3) JCB CONSULTING INTERNATIONAL SARL

Defendants

---

**ORDER**

---

**PURSUANT** to paragraph 4 of the Order of Mr Justice Eady dated 30 January 2004 by which he ordered that there be an assessment of the damages to be paid by the Defendants to the Claimant

**AND PURSUANT** to paragraph 1 of the Order of Mr Justice Eady dated 21 April 2004 by which he ordered that the Claimant do serve on the Defendants an application for summary disposal

**AND UPON THE APPLICATION** of the Claimant dated 30 April 2004 for the said assessment of damages to be dealt with by way of Summary Disposal pursuant to sections 8 to 10 of the Defamation Act 1996

**AND UPON READING** the witness statements of Cherif Sedky dated 29 April 2004 and Khalid Salim A bin Mahfouz dated 28 April 2004

**AND UPON HEARING** the Solicitor for the Claimant

**IT IS ORDERED THAT**

PCL2/1155054/2

1.  The Defendants do pay the Claimant the sum of £10,000 by way of damages, such payment to be made within 28 days of the date of this Order;

2.  The Court hereby declares that pursuant to section 9(1)(a) of the Defamation Act 1996, the statements made by the Defendants in the publications which are the subject matter of this action are defamatory of the Claimant and false, namely that:

    2.1  the Claimant was one of the main individual Saudi sponsors of the terrorist network al-Qaida

    2.2  the Claimant knowingly supported and assisted in terrorism:

        2.2.1  as a banker, by playing a leading role in the provision of financial support to the al-Qaida terrorist network over a ten year period, totalling between $300 million and $500 million and providing an annual income of around $50 million;

        2.2.2  as Chairman of the National Commercial Bank, by diverting or being responsible for the diversion of millions of dollars to terrorist organisations, in particular to al-Qaida which was led by Osama bin Laden

    2.3  the Claimant is the brother-in-law of Osama bin Laden.

3.  There be publication by the Defendants of a suitable correction and apology in accordance with the following provisions:

    3.1  the parties are to agree a suitable correction and apology within 21 days of the date of this Order.  The parties should by that date also reach agreement about the content, time, manner, form and place of the publication of the correction and apology by the Defendants, and the Defendants will publish the correction and apology in accordance with that agreement;

    3.2  In default of agreement being reached between the parties in accordance with paragraph 3.1 above, the Claimant is to prepare a summary of the judgment (the **Summary**) given by the Court and serve it upon the Defendants within 24 days of the date of this Order;

    3.3  The Summary is to be agreed between the parties within 14 days of service of the Summary by the Claimant upon the Defendants. If it is agreed, then the Defendants will publish the Summary in a manner, form, place and at a time agreed between the parties;

    3.4  In default of agreement being reached between the parties in accordance with paragraph 3.3 above, the parties are to file within 3 days of service of the Summary with the clerk to Mr Justice Eady and serve upon each other a copy

of the Summary and the revisions they wish to make to it, and apply to the Court for the Court to settle the Summary. The Court will then settle the final version of the Summary;

3.5    Once the Court has settled the final version of the Summary, the Court shall make an order as to the manner, form and place of publication by the Defendants.

4.    Paragraph 2 of the Order of Mr Justice Eady dated 30 January 2004 shall continue in full force and effect.

5.    The costs of and occasioned by the Claimant's application dated 30 April 2004, and the costs of and occasioned by the hearing on 21 April 2004 be paid by the Defendants to the Claimant, such costs to be the subject of detailed assessment if they cannot be agreed.

6.    The Defendants do make an interim payment to the Claimant of £30,000 in respect of the costs of this action ordered to be paid by them pursuant to paragraph 5 of the Order of Mr Justice Eady dated 30 January 2004, and in respect of paragraph 5 of this Order, such payment to be made within 28 days of the date of this Order.

7.    In default of payment by the Defendants of the amounts ordered to be paid to the Claimant pursuant to paragraphs 1 and 6 of this Order within the time therein specified for payment, the Claimant may enforce this Order without further notice to the Defendants or further Order from the Court.

8.    Each Defendant is jointly and severally liable for the payments ordered at paragraphs 1 and 6 of this Order and the Claimant may enforce this Order and any subsequent Order for any additional payment found due to the Claimant after the assessment of costs, against each and any of the Defendants, save that the Claimant may not recover more than the total amount ordered to be paid to him.

Dated 1 July 2004

HQ03X03141

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

MR JUSTICE EADY

B E T W E E N:

KHALID SALIM A BIN MAHFOUZ

Claimant

and

(1) JEAN-CHARLES BRISARD

(2) JCB CONSULTING

(3) JCB CONSULTING INTERNATIONAL SARL

Defendants

_____

**ORDER**

_____

Kendall Freeman
43 Fetter Lane
London
EC4A 1JU

Neutral Citation Number: [2004] EWHC 1735 (QB)

HQ03X03141

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

Royal Courts of Justice
Strand
London WC2

Thursday, 1 July 2004

B E F O R E:

MR JUSTICE EADY

- - - - - - -

MAHFOUZ

(CLAIMANT)

-v-

BRISARD & OTHERS

(DEFENDANT)

- - - - - - -

Tape transcription by
Smith Bernal Wordwave Limited
190 Fleet Street  London EC4A 2AG
Tel No: 020 7404 1400 Fax No: 020 7831 8838
(Official Court Reporters)

- - - - - - -

MR LAURENCE HARRIS (instructed by Messrs Kendall Freeman) appeared on behalf of
the CLAIMANT
THE DEFENDANTS did not appear and were not represented

- - - - - - -

J U D G M E N T
(As Approved by the Court)

Crown copyright©

1.   MR JUSTICE EADY:  In this libel action Khalid Salim A Bin Mahfouz sues three defendants, Jean-Charles Brisard, JCB Consulting and JCB Consulting International SARL, over very serious allegations published, it would appear, on a number of websites.  The defendants are abroad and have taken no part in these proceedings.

2.   Judgment was in due course obtained by default.  It is thus important to emphasise that there is nothing more that the claimant could have done in his attempt to vindicate his reputation in respect of these allegations.  The defendants have had every opportunity to respond.  It is also important to state that, although judgment has been obtained in default, the outcome of the proceedings is in no sense a formality; nor is the claimant's vindication any the less real.

3.   The court is naturally conscious of the importance of freedom of speech and of the need to ensure so far as possible that its judicial processes are not abused by anyone who may seek to vindicate himself on a false basis and thus mislead the public.  The allegations here are, as I have said, very serious.  The claimant has always denied them and, when they have been made by others, apologies have been forthcoming.  The defendants have been ready to assert that the claimant was involved in the funding of terrorism and of supporting Al-Qaeda in particular.

4.   The claimant now proceeds, with the court's permission, to obtain remedies under sections 8 to 10 of the Defamation Act 1996.  It follows that he is for that reason alone limiting his financial claim to £10,000.  That might not be thought to represent the full gravity of the libel, but the claimant has made the concession purely because that is the ceiling imposed under the statutory regime.  The concession is not intended to diminish the effect of the claimant's vindication or the seriousness with which he approaches these publications.

5.   The material published consisted essentially of three items.  The first item was a report entitled "Terrorism financing: routes and trends of Saudi terrorism financing."  It was dated 19 December 2002 and it seems to have been submitted to the United Nations and has been described as "the UN Report".  Within it the claimant is described as one of the main individual Saudi sponsors of Al-Qaeda.

6.   Secondly, there are slides of a presentation apparently given by the first defendant at a Thomson Financial symposium on 13 June 2003.  Unfortunately, the claimant knows very little about the circumstances in which that publication took place, where the symposium occurred or who was present.  The slides suggest in no uncertain terms that the claimant constitutes an example of a wealthy businessman supporting Al-Qaeda.

7.   The third item consists in the French transcript of an interview with M Brisard on RFI radio on 19 March 2003.  The French transcript and the English translation have been placed before me in evidence.  The first defendant suggested in that interview that the claimant supported terrorism by providing massive financial support to Al-Qaeda and Osama Bin Laden, who was wrongly described as the claimant's brother-in-law.

8.   In accordance with the general though not universal practice, the evidence of the claimant has been put before me in the form of a witness statement for the purposes of this hearing. It is a very short witness statement. That is perhaps not surprising in view of the fact that the primary purpose of the claimant's evidence is to deny the truth of these very grave allegations and to explain also the impact of the publications upon himself and his feelings and those of his family, albeit strictly speaking the impact on his family is irrelevant, save insofar as it impacts indirectly upon the claimant.

9.   For present purposes I need do no more than recite paragraphs 4 and 5 of the claimant's evidence:

> "It is difficult to assess the full extent of the damage that has been caused to my reputation in this jurisdiction by the publication of the defamatory words which are the subject matter of this libel action. However, the extremely serious nature of the allegations made by the Defendants have caused me (and my family) distress and, I believe, have damaged my reputation (and that of my family).

> "I do not have, nor have I ever had, any involvement or association with the sponsoring or support of the Al-Qaeda terrorist network and its leader Osama Bin Laden, nor have I ever knowingly financed terrorism of any description and I vehemently deny this. My family and I abhor and unequivocally condemn all acts of terrorism. Furthermore, Osama Bin Laden is not my brother-in-law: I am not married to any of Osama Bin Laden's sisters nor are any of my sisters married to Osama Bin Laden."

10.   That evidence is short and to the point but is nonetheless effective for that. It follows from what I have already said that the evidence is unchallenged in these proceedings.

11.   The background has been more fully covered in the evidence of Cherif Sedky, who is a lawyer and a United States citizen. It is right that I should refer to this background in a little detail. Mr Sedky explains that M Brisard is a self-styled "expert in the area of the financing of terrorism." He has been retained as an investigator by attorneys acting in a substantial action in the United States against a large number of defendants, including this claimant, brought on behalf of relatives of the victims of the attacks in the United States on 11 September 2001. The second defendant is a French company and the third defendant a Swiss company. Both of those defendants appear to be substantially owned and run by M Brisard.

12.   Mr Sedky then goes on to describe briefly the effect of certain other litigation which in a real sense forms the background to the present claim. First of all, he deals with what has been described as "the Mail on Sunday action". On 27 October 2002 the Mail on Sunday published an article about the claimant, alleging that he was a funder and supporter of Osama Bin Laden and Al-Qaeda. The claimant issued libel proceedings against the author of that article, the editor and the publisher of the newspaper.

13.   On 6 May of last year, before serving any defence, the Mail on Sunday issued an application for a stay of proceedings pending the outcome of a libel action brought by

the claimant and his son against the authors of a book called "Forbidden Truth". The authors of that book were none other than M Brisard and a gentleman called Guillaume Dasquié. Alternatively, the Mail on Sunday were seeking a stay until the outcome was known of a United States action.

14.   The application was made on the basis that M Brisard was the primary source of the information which had appeared in the newspaper article, that he had compelling evidence to demonstrate the truth of the charges against the claimant and that, accordingly, proceedings against him should be litigated before the Mail on Sunday libel action was dealt with. The application by the Mail on Sunday was supported by evidence, including a witness statement from M Brisard dated 21 May 2003, which has been drawn to my attention.

15.   The application was heard in open court and therefore reference was made without any inhibition to the content of M Brisard's witness statement. It has been described by Mr Harris as the high point of M Brisard's case and he considered it quite properly before me in some little detail. I need not refer to it at any length, but it proclaimed an intention, apparently, vigorously to defend any proceedings in respect of the book "Forbidden Truth" and to justify the truth of the allegation that this claimant knowingly supported terrorism.

16.   There was also reference to key evidence, as it was described, gathered by M Brisard up to that point, about the claimant. He expressed an intention to put that evidence before the court in any claim in respect of the book. At that time Mr Sedky produced a lengthy witness statement of 9 June by way of rebuttal. So too did the claimant himself, in a witness statement dated 8 June of that year, and Mr Lawrence Smith. Those witness statements set out to rebut fully and comprehensively what was described as the key evidence.

17.   No stay was granted by the court of the Mail on Sunday proceedings and, when its defence was eventually served on 1 August of last year, there was no attempt to plead justification. It is right to record that there was a defence based upon qualified privilege, relying upon the House of Lords decision in Reynolds v Times Newspapers. Not long thereafter the newspaper defendants in fact published an apology following a statement in open court which was read on 13 January of this year. It was expressly acknowledged that there was "no truth whatsoever" in the allegation that the claimant had supported or funded terrorist activities. The newspaper accepted that the claimant and his family abhor terrorism and they agreed to pay what were described as substantial damages and costs.

18.   Next Mr Sedky turned to "the book action". Shortly after the publication of the Mail on Sunday article, it came to the attention of the claimant that the book had been published in the United States, (that is to say, the book known by the short title of "Forbidden Truth" by M Brisard and Guillaume Dasquié). It too made very serious allegations about the claimant and about his son, Abdul Rahman Bin Mahfouz, alleging that they supported Osama Bin Laden, Al-Qaeda and terrorism. Accordingly, libel proceedings were commenced in this jurisdiction against M Brisard and Guillaume Dasquie. That happened on 24 April 2003. There was no acknowledgement of the proceedings by M

Dasquie and default judgment was obtained, and an injunction, in respect of him. There was an order made by Treacy J on 22 August of last year.

19.  M Brisard, however, did serve a defence in the book action on 4 August. Notably, however, he did not plead justification and there has been no attempt to amend to plead justification since, despite the intention expressed in the witness statement to which I have already referred. He did raise a defence based upon the proposition that he did not authorise publication of the book in this jurisdiction. The claimant accordingly served a reply on 17 December of last year and, pursuant to directions given by Master Foster on 2 April of this year, a window has been appointed for the trial of that action, on the issues as they stand at the moment, between 1 November of this year and 31 January next year.

20.  Finally, Mr Sedky mentioned what he describes as "the Griffin/Pluto Press action". Proceedings were brought by the claimant and Nimir Petroleum against Pluto Press and an author called Michael Griffin in respect of a book which also alleged that the claimant had funded Bin Laden's and Al-Qaeda's terrorist activities. There was a statement in open court read on 15 March 2004. A comprehensive apology was proffered, and substantial damages were paid as part of the settlement by the defendants.

21.  It is necessary now to say something more about what has been described as the UN Report, which forms an important part of the subject matter of these proceedings. As is made clear from the evidence of Mr Sedky, M Brisard has been the main disseminator of the defamatory and false accusations about the claimant. He prepared a report, to which I have already referred, and the report repeated the same allegation as was made in the book, albeit in abbreviated form. The claimant appears at the top of a list of persons described as the main financiers of Al-Qaeda.

22.  The report has been published on various websites, including on the website of National Review Online. It has been claimed on a number of occasions by M Brisard that the report was prepared at the request of the United Nations, specifically by Sr Alfonso Valdivieso, who was in December 2002, for the time being, the President of the United Nations Security Council. Those claims by the first defendant would obviously tend to give status and authority to the report and to the allegations within it.

23.  Such claims were made, for example, in the Los Angeles Times of 24 December 2002; a letter from the solicitors for the Mail on Sunday, Taylor Wessing, dated 2 May 2003; the witness statement prepared by M Brisard for the Mail on Sunday litigation of 21 May 2003, which was, incidentally, supported by a statement of truth; in M Brisard's own biography on his website in September 2003; and in an article in the New York Times of 28 September of last year. Copies of those claims have been exhibited before me in evidence.

24.  Mr Sedky, representing the claimant's interests, records how he was extremely concerned to learn that a report might have been commissioned by the UN Security Council which listed the claimant as a sponsor of terrorism. Before taking any action, he decided that it was necessary to attempt to set the record straight with the United

Nations and also to establish the facts, in particular, whether the report had indeed been commissioned by the United Nations or any body within it, as the first defendant was claiming. Thus, Mr Sedky wrote on 5 February of last year to the then President of the UN Security Council, who was His Excellency Dr Gunther Pleuger. A copy of that letter has also been exhibited before me. Unfortunately, no reply was received.

25. The claimant's solicitors who represent him in these proceedings, Kendall Freeman, wrote on 28 February and on 10 April last year to National Review Online, making a request that the report should be removed from its website. Again, a copy has been exhibited before me. Later, in September of last year, it came to Mr Sedky's attention that the defendants had set up a website, www.jcbconsulting.com, on which the report was being published. It also contained other documents defamatory of the claimant, as I have already described. Proceedings were then commenced in respect of those publications. It remained, however, at that time still unclear as to whether or not the report did indeed have the authority of the UN behind it.

26. When proceedings were started there was an e-mail response from M Brisard dated 15 October 2003. That e-mail described the action as baseless and stated that M Brisard had "no intention at all to consider demands, requests or ultimatums emanating from [the claimant]." It was suggested by M Brisard that in relation to that report the claimant's representatives should contact the UN Counter-terrorism Committee. No further acknowledgement of the proceedings materialised and so it came about that judgment was entered in default.

27. Kendall Freeman investigated the position further. There was e-mail correspondence between them and one Tatiana Cotio, the Secretary of the United Nations Security Council Committee, which has been established pursuant to resolution 1267 of 1999, ("the Al-Qaeda Taliban Sanctions Committee"). She confirmed that the report was indeed not an official UN document. Later, Kendall Freeman received a letter of 12 March 2004 from Sr Valdivieso himself, who stated:

> "I personally never met with or spoke to M Brisard and it is completely false that I in my capacity as President of the Security Council or as President of the 1267 Committee or in any capacity within that Organisation had commissioned him [the first defendant] on a personal or official basis to write a Report on terrorism."

28. Sr Valdivieso also stated that M Brisard's conduct and attitude was "totally deceitful and marked by the intention to mislead." Those communications have been placed before me in evidence and I have been taken to them expressly this morning. It is to be noted that on 1 March of this year there was an article in Arab News which also confirmed Sr Valdivieso's denials.

29. It has now emerged that M Brisard contacted Sr Valdivieso in order to get him to confirm that he had commissioned the report "through an assistant". Sr Valdivieso, however, confirmed that this too was untrue and he had checked with the assistant in question, Mr Salazar, who also confirmed it to be untrue. That position has been

reaffirmed in writing by Sr Valdivieso.   There is exhibited to Mr Sedky's witness statement a document dated 26 April of this year.

30.   It is submitted therefore, not unreasonably, by Mr Sedky in his witness statement that M Brisard's assertions at various points that the report had been commissioned by the United Nations were made knowing that they were untrue.   Of course, in the nature of things I have not heard anything further from M Brisard about this, since he has taken no part in the proceedings, but on the state of the evidence before me that submission of Mr Sedky's would appear to be true.   I note also that one of those assertions was made in the course of a witness statement, with a statement of truth, prepared for proceedings in this jurisdiction.   That is a matter naturally which the court must take seriously.

31.   Mr Sedky goes on in the course of his witness statement to set out briefly the purposes behind these proceedings.   He draws attention to the fact that the claimant and his family have significant connections with the United Kingdom.   As a banker, the claimant has been well-known to the United Kingdom financial community.   His reputation in this jurisdiction and that of his family are important to him.   Significant negative publicity was having an adverse impact on the family's business interests in various jurisdictions, including this country.   Various attempts have been made by the claimant to vindicate his reputation and to demonstrate the lack of any objective support for the falsehoods that M Brisard has sought to put about concerning him.

32.   The key allegations, as they were described, put forward by M Brisard in the Mail on Sunday action, were shown to be nothing of the kind.   The Mail on Sunday found itself unable to rely upon them and that is how the claim came to be settled with a full and unqualified apology and an acceptance that those allegations were actually untrue.   Not only did M Brisard mislead the court in that witness statement but, despite his professed intention, he has not, as I have already made clear, sought to justify those serious allegations in the book proceedings.

33.   I am invited to conclude, in the light of that evidence and not on any merely formal basis, that the allegations are untrue.   As I said at the outset of this judgment, it is difficult to imagine in the circumstances what else the claimant or his representatives could have done to seek genuine vindication in respect of these allegations.   In the nature of things, again, of course the claimant cannot know how many people have chosen to read the allegations put about by M Brisard.   Nevertheless, there is concern that some individuals at least will have perceived the report as an official UN document and treated its contents seriously.   Concern was expressed by Mr Sedky that a British government official or journalist might see the report and believe it to be an official United Nations report containing the claimant's name in and indeed at the top of a list of terrorist financiers.

34.   Although it is not strictly relevant for proceedings in this jurisdiction, my attention has been drawn to the fact that very senior figures in the United States appear to have taken, at one time, the allegations in the report seriously.   Two members of the US Senate Committee on Finance wrote a letter, which is before me in evidence, to Mr Richard Newcombe, Director of the Office of Foreign Assets Control of the United States Department of the Treasury, which was dated 22 December of last year.   It contained

mis-statements about the claimant, apparently sourced from that report. Accordingly, the claimant's US attorneys wrote a letter to that Committee making the position clear on 16 January of this year.

35. Not surprisingly therefore the claimant still fears that the defamatory material, the subject matter of this action, will have been read widely within this jurisdiction and, quite possibly, taken seriously by those interested in such matters. He therefore seeks damages, limited, of course, artificially by the statutory cap, and also a declaration of falsity and an order for publication of an apology, in accordance with the provisions of sections 9 and 10 of the Defamation Act 1996, and the rules of court made subsequently pursuant to the provisions of section 10.

36. Of course, in this jurisdiction no court can force anyone to apologise. There is, however, a fallback procedure set out very carefully in the rules, which provide for the publication of a summary of the judgment in the event that a defendant is unwilling to negotiate the terms of an agreed apology. Provision has been made for that accordingly in the draft order placed before me.

37. In the light of the evidence before me and the submissions of Mr Harris, I propose to grant the relief sought, including damages of £10,000, being the maximum permitted under the statutory regime. I will also grant the other relief sought in the draft order placed before me, including a declaration of falsity and the other provisions.

38. Insofar as it may be necessary to do so I will now discuss those further with Mr Harris and any consequential matters that arise.

# Exhibit F

Federal Criminal Court

_____

BK_S 094/04

**Judgment of 16 September 2004**
**Appeals Chamber**

_____

Composition            Federal criminal judges Hochstrasser (presiding), Ott and
                       Ponti,
                       Clerk of the court Husson Albertoni

_____

Parties                **Yassin Abdullah Kadi**, Wali al-Ahad St., Al Farsi Center,
                       Jeddah (Saudi Arabia),

                                                                      plaintiff

                       represented by Messrs Marc Bonnant, Carlo Lombardini and
                       Maurice Turrettini, of Bonnant, Warluzel & Associates, 12 rue
                       de Saint-Victor, PO Box 473, 1211 Geneva 12, Switzerland

                       versus

                       **Office of the Attorney General of Switzerland**,
                       Taubenstrasse 16, 3003 Berne, Switzerland

_____

Subject                Complaint against the acts of the Attorney General (art.
                       105bis para. 2 Federal Code of Criminal Procedure
                       (hereinafter PPF)

- 2 -

**Facts:**

A.  Subsequent to the events of 11 September 2001 (attacks in New York and Washington), the Office of the Attorney General of Switzerland (hereinafter OAGS) opened a judicial police investigation against unknown on 15 September 2001. On 25 October 2001, the investigation was widened to Yassin Abdullah Kadi, a Saudi national residing in Jeddah (Saudi Arabia); he is suspected of having financed, as president of the Muwafaq Foundation, the Al-Qaeda terrorist organisation run by Osama Bin Laden. The accusations formulated against Yassin Kadi relate mainly to the transfers of funds in the amount of 1.25 million USD effected in Switzerland in 1998 in favour of a certain Wael Jeleidan, suspected of being one of the chief financiers of the aforementioned terrorist group (see BK act. 1.12, appendix 10 of the complaint).

B.  Yassin Kadi's name features on the Bush II list (list drawn up by the American authorities aimed at blocking the property and prohibiting the transfer of funds belonging to persons suspected of having links with terrorist organisations such as Al-Qaeda) and in appendix 2 (natural and legal persons subject to financial sanctions) of the order of 2 October 2000 of the Swiss Federal Council instituting measures against persons and entities linked to Osama Bin Laden, to the Al-Qaeda group or to the Taliban (RS 946.203). Yassin Kadi is furthermore named as a defendant – alongside innumerable other natural and legal persons, as well as various Middle Eastern States or governmental authorities – within the context of a class action lawsuit opened in the United States by the families of the victims of 11 September 2001, instituted on 15 August 2002 and known as the "Burnett Lawsuit", aimed at indemnifying the victims' families in an amount in excess of 1 trillion USD.

C.  Between late October and early December 2001, subsequent to various denunciations from the Swiss Money Laundering Reporting Office (MROS), 27 bank accounts controlled by Yassin Kadi were frozen by the OAGS in Geneva and in Zurich.

- 3 -

D.  Yassin Kadi was heard by a representative of the OAGS on 1st July 2003, at the time of a hearing organised at the premises of the Swiss Embassy in Riyadh (Saudi Arabia).  On this occasion, he provided detailed explanations as to the transactions effected in 1998 in favour of Wael Jeleidan: according to the accused, the payments in question were donations of a philanthropic nature – and, hence, wholly legitimate – intended for the construction of accommodation buildings for university students in Yemen.  The documentation relating to these donations (documentary evidence of the construction, bank statements, etc.) was sent to the OAGS on 25 August 2003.

Subsequently (in December 2003), the OAGS sent the counsel for the accused a list of over two hundred written questions, to which the accused replied by letter dated 12 March 2004.

E.  On 27 May 2004, Yassin Kadi asked the OAGS for clarifications as to the role played in the preliminary investigation by Jean-Charles Brisard, a French investigative journalist commissioned by an American law firm to participate in the "Burnett Lawsuit".  The accused complained notably of the fact that Jean-Charles Brisard had been able to obtain a copy of a confidential document sent by the American authorities to the OAGS in November 2001, even though the criminal proceedings were still at the (secret) stage of the preliminary investigation.

In a letter dated 1st June 2004, the OAGS denied any violation of the rules of criminal proceedings, specifying that it had assigned to Jean-Charles Brisard – by virtue of his vast knowledge of the world related to Islamic terrorism – a simple mandate of "analysing" the file, with the aim of ascertaining the ins and outs of such a complex case.

F.  In a request dated 11 June 2004, Yassin Kadi sought that a series of measures be taken by the OAGS, including the immediate revocation of Jean-Charles Brisard's "expert mandate", the removal from the file of all documents, reports and notes compiled by him, and the return by him of the entire set of documents he had received.  In parallel, deeming that he was unable to form an opinion on the accusations made against him without knowledge of the incriminating documents, the accused, once again, sought full access to the file.

- 4 -

G.  On 1st July 2004, the OAGS responded to the different requests formulated by the accused. It firstly accepted to give him access to the file, proposing to arrange an appointment in late August in order to have the time to re-order and paginate the documents. Moreover, it refused to revoke the mandate assigned to Jean-Charles Brisard, deeming that it was entitled to assign an "analysis mandate" to a third party in order to gain a better understanding of a complex case and to enable it, as leading the enquiries of the judicial police, to direct its investigation efforts.

H.  On 7 July 2004, Yassin Kadi referred a complaint against the "decision" of 1st July 2004 to the Appeals Chamber of the Federal Criminal Court. He appeals for the annulment of this decision and for the immediate revocation of Jean-Charles Brisard's mandate, the return by him of the entire set of documents he has received or of which he could have obtained a copy. He also seeks that Jean-Charles Brisard provide a solemn written undertaking, under the threat of article 292 Swiss Penal Code, not to retain any copy of the returned documents and that he give an exhaustive account of the usage that he has made of the procedural documents that he has obtained. He further requests full and immediate access to the file so as to ascertain the nature of the acts in which Jean-Charles Brisard has been involved, in order, as appropriate, to seek their annulment and the right to obtain a copy of the notes compiled by the OAGS subsequent to its meetings with him, subject to legal fees and costs.

For grounds, the accused essentially contested the fact that the OAGS did call upon a third party with no specific capacity or role to clarify its knowledge of a file. He also argued Jean-Charles Brisard's partiality – commissioned to carry out research by the law firm representing the victims in the "Burnett Lawsuit" – and therefore the fact that he could not validly be appointed as an expert. Lastly, he noted that if Jean-Charles Brisard were nevertheless to be recognised as an expert, he would then have violated the duty of official secrecy incumbent upon him by having communicated a document to the American civil authorities that was submitted to him by the OAGS.

I.  In its response of 13 August 2004, the OAGS doubts the admissibility of the complaint. In its estimation, at the stage of the judicial police investigations, the use of experts by the OAGS does not constitute an appointment of "judicial experts" within the meaning of articles 91 and subsequent PPF and is not therefore disputable. Stating moreover that Jean-Charles Brisard's mandate in the American civil

- 5 -

proceedings could effectively imply that he is directly interested in the case, it asserts that it is renouncing the mandate assigned to him.   It thereby considers that the complaint is rendered moot.

In his reply of 30 August 2004, Yassin Kadi upholds his complaint, which the OAGS, in its rejoinder of 6 September 2004, persists in considering as having been rendered moot.


**The Appeals Chambers considers in law:**

1.   In the example of the former Prosecution Chamber of the Federal Court, dissolved as of 31 March 2004, the Appeals Chamber examines as a matter of course the admissibility of the complaints referred to it (ATF 122 IV 188 consid. 1 p.190 and judgments cited); in particular, it is not bound by the designation of the act or by the authority designated as competent in the act.

1.1 The acts and omissions of the attorney general can be the subject of a complaint before the Appeals Chamber pursuant to art. 214 to 219 PPF (art. 105bis para. 2 PPF and 28 para. 1 let. a LTPF).   The timeframe for lodging the complaint is five days from when the plaintiff was notified of this act (217 PPF).   Dated 1st July 2004, the contested "decision" was notified to the plaintiff's representatives by letter signed for and received on 2 July 2004.   Posted on 7 July, the complaint was thus formed within the legal timeframe of five days.

1.2 In this particular case, it is in the first instance a matter of determining whether and on what grounds the decision of 1st July 2004 of the Attorney General, who – in substance – denies the accused full and immediate access to the file and refuses to revoke the mandate assigned to the "terrorism expert" Jean-Charles Brisard within the context of the present proceedings, constitutes an "act" that may be subject to a complaint within the sense of art. 105bis para. 2 PPF.

In the judgment ATF 120 IV 342, the Appeals Chamber of the Federal Court, which was called to rule on the refusal of the OAGS to allow a counsel for the defence to consult the entire file and to attend the examination of the accused, had declared the complaint inadmissible insofar as, according to art. 105bis PPF in force at the time, only the coercive measures of the OAGS and the corresponding acts could be the

- 6 -

subject of an appeal.  In the new version of it, in effect since 1st January 2002, art. 105bis PPF has widened the field of acts that are subject to appeal.  Art. 105bis para. 2 PPF effectively provides that "the acts and omissions of the attorney general may be subject to a complaint before the Appeals Chamber pursuant to art. 214 to 219".  As stressed by BANZIGER/LEIMGRUBER, "para. 2 corresponds to the new notion which subjects the activity of the Office of the Attorney General of Switzerland to full judicial review..." (BANZIGER/LEIMGRUBER, The new undertaking of Switzerland in criminal prosecutions, Berne 2001, n. 258 ad art. 105bis PPF).  This content has been taken up in art. 28 para. 1 let. a LTPF.  The term used in the French version of the PPF is however ambiguous, the word "*opération*" implying an "act or series of material or intellectual acts assuming reflection and combination of means to produce a particular result" (translated from Le Petit Robert dictionary, 1993 edition).  As for the German term "*Amtshandlung*", this can be used to express a single act.  In the French version of their text, op. cit., n. 258 ad art. 105bis PPF, BANZIGER/LEIMGRUBER moreover translate the word "*Amtshandlung*" by "act" and again specify "all acts and omissions (...) of the Office of the General Attorney of Switzerland may form the subject of a complaint before the Prosecution Chamber (in the future undoubtedly before the Appeals Chamber of the Federal Criminal Court)".  In a very recent judgment (due to be published officially), the Federal Court, deciding on a complaint contesting the attendance of a federal examining magistrate at a press conference, specified that "act" within the sense of art. 214 PPF must specifically be taken to mean the acts related to the proceedings, which are likely to alter the legal position of the parties (see judgment 8G.145/2003 of 9 March 2004, consid. 2).  This is manifestly the case in point and moreover the Deputy Attorney General himself considered that his decision constituted an operation (or act) within the meaning of art. 105bis PPF since he opened the way for the accused to lodge a complaint (see p. 4 and 5 of the decision at issue).  Therefore the decision of 1st July 2004 is indeed an act that can form the subject of a complaint before the Appeals Chamber.

2.  In a first appeal, the plaintiff contested the merits of the mandate granted to Jean-Charles Brisard by the OAGS, requested its revocation and claimed the return of all documents of which Jean-Charles Brisard could have obtained copies.

- 7 -

In its reply of 13 August 2004, the OAGS stated that it was renouncing the analysis mandate that it had assigned to Jean-Charles Brisard. It also specified that he would consequently be required to return the entire set of documents he had received or of which he could have obtained copies and to provide a solemn undertaking that he had retained no copies of the returned documents.

The admissibility of the complaint is subject to the requirement for current and practical interest in the annulment of the decision at issue, and respectively to the examination of the grievances raised. The interest in lodging an appeal must still exist at the time when the authority decides the case, as the authority rules on concrete not theoretical issues. It lacks interest in particular when the act of the authority has been carried out or has been rendered moot (judgment 1P.340/2000 of 8 August 2000 consid. 2 and judgment cited).

In this particular case, given that the OAGS has renounced the contested mandate, the plaintiff has achieved what he was seeking through his complaint, regarding not only the involvement of Jean-Charles Brisard within the context of the preliminary investigation, but also the fate of the documents that he had obtained. The solemn undertaking that the OAGS will order him to provide should suffice, without it proving necessary to accompany these injunctions with the threat of prosecution as provided for under article 292 CP. Consequently, the accused no longer has a current interest in having these issues settled by the appeal authority. Its conclusions in this respect must therefore be considered as having been rendered moot.

3. It therefore remains to examine the issue of full and immediate access to the file such as requested by the plaintiff.

3.1 Previously in its letter of 1st July 2004, the OAGS specified that it considers that access to the file in the said phase of the judicial police enquiry is vital in order that each party can usefully exercise their rights. It consequently invited the plaintiff to make an appointment in late August to allow him access to the said file, made up of some 70 binders. In its entries of 13 August 2004, it repeated its availability to make the file available to the accused. There is nothing therefore preventing the plaintiff from being able to consult the case file. Given that the OAGS proposed to him to arrange an appointment in late August so that he may consult the file, there is

- 8 -

moreover cause for surprise that in his reply of 30 August 2004, the accused once again reiterates his request in this respect.

3.2 Clearly, in the contested letter of 1st July 2004, the Deputy Attorney General refused the plaintiff any access to the notes that he had taken subsequent to his meetings with Jean-Charles Brisard.  However, since then, the respondent authority has renounced the analysis mandate that it had assigned to Jean-Charles Brisard.  In this respect, it should no longer be able to cite any document whatsoever relating to it. There is no option but to observe that neither in its reply, nor in its rejoinder does the OAGS persist in its will to restrict the consultation of this case file by the accused. Thus, nothing stands in the way of Yassin Kadi being able, within the context of consulting the file, to have sight of the relevant notes.  The Federal Court has had opportunity of specifying that the right to consult the file, arising out of art. 29 para. 2 Cst (and formerly of art. 4 Cst), is in theory satisfied notably when the interested party has had the possibility to take notes (ATF 126 I 7 consid. 2b; 122 I 109 consid. 2b; JT 1991 IV 114 consid. 5).  The accused may therefore obtain copies of the documents in question; consequently, the requests that he has formulated in this respect are also moot.

4.

4.1 Under the terms of article 72 PCF (in reference to articles 245 PPF and 40 OJ), when a case is rendered moot, or the parties cease to have legal interest in it, the court shall, after hearing the cases stated by the parties but without other proceedings, declare the case closed and shall rule on the costs of the case by a decision justified in broad lines, taking into consideration the state of affairs as existing prior to the act that ended the dispute.  Within this context, there is no cause to examine in detail the usual outcome of the case; it is appropriate to simply carry out a summary appraisal of the file.  The decision as to costs does not equate to a material judgment and must not, under the circumstances, prejudge a delicate legal issue.  If the probable outcome of the proceedings, in the concrete case, cannot be established without closer examination, it is appropriate to apply by analogy the criteria applicable in civil proceedings.  Consequently, costs will be borne in the first instance by the party who instigated the moot proceedings or who gave rise the grounds which led these proceedings to be rendered moot (judgment 2A.573/2003 of 30 July 2004 consid. 2.7; ATF 118 Ia 488, consid. 4a).

4.2 In this case, the proceedings were rendered moot by virtue of the fact that, subsequent to the complaint, the OAGS renounced the contested mandate that it had assigned to Jean-Charles Brisard.  The OAGS must therefore be considered in this particular case as being the party who has succumbed.  As an authority, costs cannot be charged to the OAGS (art. 156 para. 2 OJ); on the other hand, it is incumbent upon the OAGS to bear the costs incurred by the plaintiff.  In the absence of a corresponding written account, the authority deciding the case shall fix costs according to its own assessment (art. 3 para. 3 of the regulation on costs and fees allocated before the Federal Criminal Court of 11 February 2004, effective as of 1st April 2004, RS 173.711.31).  Considering the nature of the case and the activity engaged in by the counsel for the defence within the context of the proceedings inherent to the complaint, costs in the amount of 2,000.00 Francs, inclusive of VAT, would seem justified.  Lastly, there is cause to return to the plaintiff the 5,000.00 Francs advance of fees paid by him.

**On these grounds, the Appeals Chamber rules:**

1.  Insofar as the complaint is admissible, it is rendered moot and the case is struck out.
2.  No costs assessed.
3.  A cost award of 2,000.00 Francs, payable by the Office of the Attorney General of Switzerland, is allocated to the plaintiff.
4.  The advance of fees of 5,000.00 Frances paid by the plaintiff is returned to him.


Bellinzona, 21 September 2004

In the name of the Appeals Chamber
of the Federal Criminal Court

Presiding Judge:                    Clerk of the Court:




**Distribution**

-   Messrs Marc Bonnant, Carlo Lombardini and Maurice Turrettini, of Bonnant, Warluzel and Associates, 12 rue de Saint-Victor, PO Box 473, 1211 Geneva 12, Switzerland.

-   Office of the Attorney General of Switzerland, Taubenstrasse 16, 3003 Berne, Switzerland.


Indication of remedies at law
This judgment is not subject to appeal.

© *24 Heures*; 12/3/2004; page 8

**An extraordinary Vaudois prosecutor**

**The Federal Council assigned to Cantonal Judge François Jomini the investigation of the Swiss Federal prosecutor accused of violating official secrecy.**

JUSTICE. A few months before his retirement, Judge François **Jomini** from the Canton of Vaud was appointed special prosecutor by the Federal Council. This judge, who directed the important structure of judicial reform in the Canton of Vaud, will have the delicate mission of investigating a fellow judge who is suspected of having violated official secrecy within the context of his investigations of financing the Al-Qaida network.

Claude Nicati, Deputy Attorney General of the Swiss Federal Office of the Attorney General, is being challenged for having used a private expert in an investigation of Saudi businessman Yassin Kadi, who was suspected of financially supporting the terrorist movement of Bin Laden. This expert, who is no other than the French national Jean-Charles Brisard, the author of the highly contested book, *La vérité interdite* [The Forbidden Truth] at the same time was appointed as a private detective on behalf of attorneys of the families of victims of the September 11, 2001 attack, in proceedings against this same Saudi investor, among others.

According to [the Swiss newspaper] *Sonntags Blick*, Kadi's attorneys, pursuant to a Swiss Federal Attorney General investigation that has been ongoing since 2001, discovered by chance that Brisard was appointed to both of these positions, because of a pre-discovery phase document found in the United States. Claude Nicati, who initially refused to revoke the appointment, explained that he called upon Brisard in order to better understand the context of Islamic terrorism. It was not until the attorneys for the Saudi businessman complained to the Bellinzone Criminal Court that the judge admitted that there may be a certain conflict between the two appointments of his expert.

This outside agent had access to secret files brought on a deluge of criticism. The Federal Council finally decided to initiate an investigation. For François **Jomini**, Chief Justice of the Civil Court of the Canton of Vaud and Chairman of the Federal Expropriation Commission, this is his first federal criminal assignment. "The fact that a judge is being investigated doesn't change anything. I have a job to do," the Vaudois judge said yesterday.

In the wake of the mistakes attributed to the Federal Attorney General's Office, yesterday, Alain Berset, a *Conseil d'État* judge from Fribourg, announced that he was preparing a Parliamentary initiative for increased oversight of the Swiss Federal Attorney General's Office. He also would like the Attorney General to be elected by the Parliament, as is the case in certain Cantonal Courts, and no longer appointed by the Federal Council, which is how the position is currently filled. "We know that there is the feeling of the end of an era between Attorney General Valentin Roschacher, appointed by Ruth Metzler, and his Minister, Federal justice Christoph Blocher. It is necessary to ensure the impartiality of judges, who must be elected transparently and not in some alcove of a department," according to the Socialist.

**Madeleine Schürch**



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK            )
                             )
                             )          ss
COUNTY OF NEW YORK           )


### CERTIFICATION


This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from French into English of the article "An Extraordinary Vaudois

Prosecutor" from *24 Heures*, written by Madeleine Schürch, dated December 3, 2004.


Ezechiel Copic
Project Manager
Geotext Translations, Inc.


Sworn to and subscribed before me

this 15ᵗʰ day of December, 20 04.


Robert A. Adler Jr.
Notary Public, State of New York
No.01AD6097048
Qualified in Kings County
Commission Expires August 18, 2007

New York
259 West 30th Street, 17th Floor, New York, NY 10001
tel 212.631.7432  fax 212.631.7407  www.geotext.com
e-mail translations@geotext.com

San Francisco
220 Montgomery Street, 3rd Floor, San Francisco, CA 94104
tel 415.576.9500  fax 415.520.0525  www.geotext.com
e-mail sanfrancisco@geotext.com

© **24 Heures**; 03.12.2004; page 8

## Un procureur extraordinaire vaudois

**Le Conseil fédéral a confié au juge cantonal François Jomini l'enquête sur le procureur de la Confédération qui aurait violé le secret de fonction.**

JUSTICE A quelques mois de sa retraite, le juge cantonal vaudois François **Jomini** a été nommé procureur extraordinaire par le Conseil fédéral. Celui qui a piloté l'important chantier de la réforme de la justice vaudoise aura la délicate mission d'enquêter sur un collègue magistrat, soupçonné d'avoir violé le secret de fonction dans le cadre de ses investigations sur le financement du réseau Al-Qaïda.

On reproche en effet à Claude Nicati, procureur général suppléant du Ministère public de la Confédération (MPC), d'avoir eu recours à un expert privé dans le cadre d'une enquête sur l'homme d'affaires saoudien Yassin Kadi, soupçonné de soutenir financièrement le mouvement terroriste de Ben Laden. Or, cet expert, qui n'est autre que le Français Jean-Charles Brisard, auteur du livre très constesté La vérité interdite, assumait en même temps un mandat de détective privé pour le compte des avocats des familles des victimes de l'attentat du 11 septembre 2001, en procédure entre autres contre ce même financier saoudien.

Selon le Sonntags Blick, les avocats de ce dernier, sous enquête du MPC depuis 2001, auraient découvert par hasard que Brisard détenait ces deux mandats, grâce à un document d'instruction découvert aux Etats-Unis. Claude Nicati, qui s' est refusé dans un premier temps à rompre le mandat, a expliqué qu' il avait fait appel à Brisard pour mieux comprendre le contexte du terrorisme islamiste. Ce n'est que lorsque les avocats du Saoudien ont porté plainte auprès du Tribunal pénal de Bellinzone, que le magistrat a admis qu' il pouvait exister une certaine incompatibilité entre les deux mandats de son expert.

Le fait que ce mandataire externe ait eu accès à des dossiers secrets a provoqué une tempête de critiques. Le Conseil fédéral a finalement décidé d'ouvrir une enquête. Pour François **Jomini**, président de la Cour civile du Tribunal cantonal vaudois et président de la Commission fédérale d'expropriation, il s' agit du premier mandat confié en matière pénale fédérale. « Qu' il s' agisse d'instruire contre un magistrat ne change rien. J'ai un mandat à remplir », a confié hier le juge vaudois.

Dans la foulée des maladresses reprochées au MPC, le conseiller aux Etats fribourgeois Alain Berset a annoncé hier qu' il préparait une initiative parlementaire réclamant un renforcement de la surveillance exercée sur le Ministère public de la Confédération. Il souhaite également que le procureur général soit élu par le Parlement, comme cela se pratique pour certaines Cours cantonales, et qu' il ne soit plus nommé par le Conseil fédéral, comme c'est le cas actuellement. « On sait qu' il y a une ambiance de fin de règne entre le procureur général Valentin Roschacher, nommé par Ruth Metzler, et son ministre, le conseiller fédéral Christoph Blocher. Il faut garantir l'indépendance des magistrats, qui doivent être élus dans la transparence et non pas dans l'alcôve d'un département », estime le socialiste.

**Madeleine Schürch**

*Le Temps,* September 25, 2004

Copyright 2004 Le Temps SA
All rights reserved

*Le Temps*

September 25, 2004

**TOPIC:** Switzerland

**LENGTH:** 950 words

**TITLE:** Dangerous liaisons of federal prosecutor Claude **Nicati** with the "expert" Jean-Charles **Brisard**;
JUSTICE. In his investigation, Claude **Nicati** appointed Jean-Charles **Brisard,** author of *La Vérité interdite* ["The Forbidden Truth"], as an expert. The judge finally had to revoke this appointment. Pressured by the attorneys of the Saudi national, Yassin Kadi, Claude **Nicati** acknowledged that this collaboration posed a problem for justice to be served.

**TEXT-ARTICLE:**

It is difficult to be both a private investigator and an official agent at the same time. With the burden of wearing both of these hats, Jean-Charles **Brisard,** author of *La Vérité interdite* ["The Forbidden Truth"], a book about the nebulous Al-Qaida, will no longer cooperate with the Swiss Deputy Attorney General, Claude **Nicati,** in one of the criminal investigations initiated in Switzerland following the September 11 attacks. Pressured by the Geneva-based attorneys of the Saudi national, Yassin Kadi, who was charged with financing terrorism, the judge had to retreat. For legal reasons related to guaranteeing a fair trial, he finally agreed to revoke the appointment of Jean-Charles **Brisard** in this case - a case which the Attorney General publicly announced, in June, would be transferred to the examining judge "in the coming weeks," but which has not yet occurred.

A French national based in Lausanne, Jean-Charles **Brisard** assumed the duties of private investigator on behalf of the families of the victims of the 2001 attacks in the United States in a U.S. civil suit filed against Yassin Kadi, among some other 180 persons. This double duty was problematic, Claude **Nicati** himself later acknowledged. It was not until the defense attorneys of the Saudi national, Attorneys Marc Bonnant, Carlo Lombardini and Maurice Turrettini, reported the facts to the Federal criminal court of Bellinzone that Claude **Nicati** reviewed his position. Jean-Charles **Brisard** will no longer play a role in the case and the report that he submitted in August may not be used. Neither Claude **Nicati** nor Jean-Charles **Brisard** wants to indicate whether Brisard was appointed in other current or future investigations.

The presence in the criminal case of an adversary of their client as an official agent was deemed "monstrous" by the three defense attorneys of the Saudi national. They learned by chance that Jean-Charles **Brisard** was asked to participate in the investigation. Since the case was still secret and their client, despite his demands, was not allowed access, the attorneys were actually warned that Jean-Charles Brisard submitted a piece of evidence from the case in the U.S. trial. Described as taking back an "expert" in correspondence from the Federal Attorney General – who, in legal terminology, must have absolute impartiality with regard to the case in question– the attorneys argued that Jean-Charles **Brisard** is not the proper person to fill this position, thereby placing the credibility of this expert in serious doubt.

Initially, these strong protests were unsuccessful. On May 27, 2004, Claude **Nicati** refused to revoke the appointment. He noted that although it was true that Jean-Charles **Brisard** was not a "party to the proceedings," he likewise was not appointed as an "analyst" and his mission was to "deliver a report with justification, as quickly as possible". But, the attorneys asked, a report about what, and for what purpose? "It was like: **Brisard,** tell me about terrorism," Attorney Bonnant joked today. According to Claude **Nicati,** it was a kind of "who's who" of people appearing in the investigation.

*Le Temps,* September 25, 2004

Jean-Charles **Brisard** submitted his conclusions in August. And it was not until August 13, when he took a position on the appeal filed on July 7 with the Bellinzone federal judges, that Claude **Nicati** admitted that his actions may be questionable. "We noted that there are certain circumstances related to his appointment as advisor in the U.S. civil suit that may subjectively compromise the impartiality of Mr. Jean-Charles **Brisard.** [...] Sensitive to the importance of the case [...], it seems judicious for us to revoke the appointment of Mr. Jean-Charles **Brisard.**" Consequently, he "will be asked to return all of the exhibits received or of which he was able to obtain a copy." He will also be ordered "to wear under oath that he has not retained any copy of the returned documents." The Federal Criminal Court then considered that the appeal had no grounds, but not without assigning the court costs to the Attorney General. The defense attorneys of the accused may also, according to the ruling, consult the notes that the prosecutor took during discussions with Jean-Charles **Brisard.**

For **Brisard**, these pitfalls are to be chalked up to "artificial debates" regarding the investigation. As for Claude **Nicati,** he basically indicated that he simply chose to revoke the appointment. "I don't believe that it was a mistake to appoint Mr. **Brisard.** I knew about the role he played in the U.S. case. Legally, there was no obstacle, since he was appointed as an analyst and not an expert, so the rules for impartiality of "experts" in the strict sense of the word are not entirely applicable. His court-ordered recusal thus was no longer applicable. After examining the remarks made by the attorneys of the accused in the context of writings exchanged during the appeal proceedings, we again examined the legal situation and withdrew the analyst appointment of Mr. **Brisard.** It was with my authorization that he forwarded a document addressed to the U.S. federal civil court judge. In view of the nature of the document [this document contained no formal proof, according to the Attorney General, and was in fact obtained from the U.S. government], forwarding this document did not violate any rules. I would have done it myself without any major complications."



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK     )
                       )    ss
                       )
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the article "Dangerous Liaisons of Federal Prosecutor Claude Nicati with the 'Expert' Jean-Charles Brisard" from *Le Temps*, dated September 25, 2004.

Ezechiel Copic
Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this _15th_ day of _December_, 20 _04_ .

Robert A. Adler Jr.
Notary Public, State of New York
No.01AD6097048
Qualified in Kings County
Commission Expires August 18, 2007

New York
259 West 30th Street, 17th Floor, New York, NY 10001
tel 212.631.7432  fax 212.631.7407  www.geotext.com
e-mail translations@geotext.com

San Francisco
220 Montgomery Street, 3rd Floor, San Francisco, CA 94104
tel 415.576.9500  fax 415.520.0525  www.geotext.com
e-mail sanfrancisco@geotext.com

Le Temps 25 septembre 2004

Copyright 2004 Le Temps SA
All rights reserved

Le Temps

**25** septembre 2004

**RUBRIQUE:** suisse

**LONGUEUR:** 950 mots

**TITRE:** Les liaisons dangereuses du procureur fédéral Claude **Nicati** avec
«l'expert» Jean-Charles **Brisard;**
JUSTICE. Claude **Nicati** avait confié un mandat dans une enquête à Jean-
Charles **Brisard,** auteur de «La Vérité interdite». Le magistrat a finalement
dû y renoncer. Sous la pression des avocats du Saoudien Yassin Kadi, Claude
**Nicati** a reconnu que cette collaboration posait un problème de
fonctionnement de la justice.

**TEXTE-ARTICLE:**

Difficile d'être à la fois un enquêteur privé et un mandataire officiel.
Porteur de cette encombrante double casquette, Jean-Charles **Brisard,** auteur
du livre La Vérité interdite consacré à la nébuleuse d'Al-Qaida, ne
collaborera plus avec le procureur général suppléant de la Confédération,
Claude **Nicati,** dans l'une des enquêtes pénales ouvertes en Suisse après les
attentats du 11 septembre. Sous la pression des avocats genevois du
Saoudien Yassin Kadi, prévenu de financement du terrorisme, le magistrat a
dû faire machine arrière. Pour des raisons juridiques liées à la garantie
d'un procès équitable, il a finalement accepté de révoquer le mandat qu'il
avait confié à Jean-Charles **Brisard** dans ce dossier. Un dossier dont le
Ministère public annonçait publiquement, en juin, la transmission au juge
d'instruction «dans les semaines à venir», mais qui ne l'est toujours pas à
ce jour.

Ressortissant français basé à Lausanne, Jean-Charles **Brisard** assume des
fonctions d'enquêteur privé pour le compte des familles des victimes des
attentats de 2001 aux Etats-Unis dans une procédure civile américaine
visant, parmi quelque 180 autres personnes, Yassin Kadi. Cette double
fonction était problématique, comme l'a reconnu après coup Claude **Nicati**
lui-même. Ce n'est pourtant que lorsque les défenseurs du Saoudien, Mes
Marc Bonnant, Carlo Lombardini et Maurice Turrettini, ont dénoncé les faits
au Tribunal pénal fédéral de Bellinzone que Claude **Nicati** a revu sa
position. Jean-Charles **Brisard** ne jouera plus de rôle dans le dossier et le
rapport qu'il avait remis, en août, ne pourra pas être utilisé. Ni Claude
**Nicati** ni Jean-Charles **Brisard** ne veulent toutefois préciser si ce dernier
avait reçu un mandat dans d'autres enquêtes ouvertes actuellement ou à
venir.

La présence dans le dossier pénal d'un adversaire de leur client à titre
de mandataire officiel a été jugée «monstrueuse» par les trois défenseurs
du Saoudien. C'est fortuitement qu'ils ont appris que Jean-Charles **Brisard**
était amené à intervenir dans l'enquête. Alors que le dossier était encore
secret et que leur client, malgré ses demandes, n'avait pas été autorisé à
y accéder, les avocats ont en effet été avertis qu'une pièce en provenant
avait été versée dans la procédure américaine par Jean-Charles **Brisard.**
Qualifié même à une reprise «d'expert» dans la correspondance du Ministère
public fédéral - avec ce que cela suppose, dans la terminologie juridique,
d'indépendance absolue à l'égard de l'affaire en cause - Jean-Charles
**Brisard** ne saurait être la personne adéquate pour remplir ce rôle, ont
argumenté les avocats, mettant par ailleurs très fortement en doute la
crédibilité de ce spécialiste.

Le Temps 25 septembre 2004

Dans un premier temps, ces vives protestations n'ont servi à rien. Le 27 mai dernier, Claude **Nicati** se refusait à révoquer le mandat. Il relevait que, s'il était exact que Jean-Charles **Brisard** n'était pas «partie à la procédure», il ne s'en était pas moins vu confier un «mandat d'analyse» et qu'il avait pour mission de «livrer, à bref délai, un rapport circonstancié». Mais un rapport sur quoi et à quel titre? ont questionné les avocats. «C'était un peu: **Brisard**, raconte-moi le terrorisme», ironise aujourd'hui Me Bonnant. Selon Claude **Nicati**, il s'agissait d'une sorte de «who is who» des personnes apparaissant dans l'enquête.

Jean-Charles **Brisard** dépose ses conclusions en août. Et c'est seulement le 13 août, lorsqu'il prend position sur le recours adressé le 7 juillet aux magistrats fédéraux de Bellinzone, que Claude **Nicati** admet que sa démarche pouvait être discutable. «Nous constatons qu'il y a certaines circonstances liées à son mandat de conseil dans la procédure civile américaine qui pourraient subjectivement mettre en doute l'impartialité de M. Jean-Charles **Brisard**. [...] Sensible à l'importance d'un tel dossier [...], il nous paraît judicieux de renoncer au mandat confié à M. Jean-Charles **Brisard**.» En conséquence, ce dernier «sera prié de restituer l'intégralité des pièces reçues ou dont il aurait pu obtenir copie.» Il lui sera également ordonné «de produire un engagement solennel de ne conserver aucune copie des documents restitués» dès lors. Le Tribunal pénal fédéral a dès lors considéré que le recours était devenu sans objet, non sans mettre les frais à la charge du Ministère public. Les défenseurs du prévenu pourront également, selon le jugement, consulter les notes que le procureur a prises lors de ses entretiens avec Jean-Charles **Brisard**.

Pour ce dernier, ces écueils sont à mettre sur le compte de «polémiques artificielles» entretenues autour de l'enquête. Quant à Claude **Nicati**, il relève en substance que c'est à bien plaire qu'il a révoqué le mandat de l'intéressé. «Je ne considère pas que c'était une erreur de désigner M. **Brisard**. Je connaissais le rôle qu'il assumait dans la procédure américaine. Juridiquement, aucun obstacle ne s'opposait toutefois à ce qu'un mandat d'analyse et non d'expertise lui soit confié, les règles sur l'indépendance des «experts» au sens strict du mot ne s'appliquant pas intégralement ici. Sa récusation d'office ne s'imposait donc pas non plus. Après examen des remarques faites par les avocats de l'inculpé, dans le cadre des échanges d'écriture en procédure de recours, nous avons procédé à un nouvel examen de la situation juridique et retiré le mandat d'analyse confié à M. **Brisard**. C'est avec mon autorisation qu'il a transmis une pièce destinée au juge fédéral civil américain. Vu la nature du document [cette pièce ne contenait aucune preuve formelle, selon le Ministère public, et provenait de l'administration américaine elle-même], cette transmission ne violait aucune règle. J'aurais d'ailleurs pu le faire moi-même sans grande complication.»