# Exhibit I
# (part 2)

the Government.  (Schmidt Declaration at p. 24.)  He also implies
that the Government's reference in earlier bail proceedings to
this incident was a combination of bad faith and desperation
because an Arizona state investigator did not see el Hage's name
in the investigative file.  As set forth below, el Hage provided
misleading information concerning this incident -- and only after
the topic was raised with him by the Government.

56.  El Hage's name first arose in relation to the
Khalifa homicide based upon a terrorism investigation being
conducted by federal authorities in New York.  Source information
developed in the New York investigation indicated that an
identified person

[REDACTED]

was dispatched by the late Mustafa Shalabi to
travel from New York to Tucson, Arizona, to surveil Rashad
Khalifa for the purpose of later killing him. The source
information further indicated that[REDACTED] stayed with el Hage
(known by one of his aliases "Abu Abdallah"), who was known to be
married to an American woman.  Based upon this lead, the
Government questioned el Hage about the incident in the grand
jury in 1997.

57.  When questioned, el Hage admitted that a person
from New York made contact with him and visited el Hage at his
home, telling el Hage "he came to see Rashad Khalifa and
investigate the things he heard about Rashad Khalifa." See
Exhibit 18 at 77.  El Hage further admitted that sometime after

37

that visit, el Hage learned that Rashad Khalifa was killed and thought "it was a good thing." Id. at 85. However, notwithstanding el Hage's claim to be a "respected and uncontroversial member of the Muslim community" (Schmidt Declaration at p. 24), el Hage only advised law enforcement of what he knew about the surveillance of Khalifa when he was questioned specifically with regard to that murder in the September 1997 grand jury. See Exhibit 18 at 73.

58. Moreover, el Hage perjured himself in his testimony concerning [REDACTED] El Hage claimed that he did not know the person's name who visited him (nor did he ask), nor the identity of the person who had sent him and given el Hage's name as a point of contact. Id. at 73-90. Yet, el Hage described [REDACTED]consistent with his true appearance: an Egyptian male with black hair and glasses. When shown a photograph of [REDACTED] el Hage stated that [REDACTED] was not the person who visited him, though he could not describe how the two differed:

A: No, that is not him. I remember the face of that guy very well.

Q: How does that guy's face differ from the guy in Grand Jury Exhibit No. 9?

A: I don't know. But it is very close. This guy is the same thing, white with long beard and I think he is Egyptian. He looks like Egyptian, but I am not sure if this is him or not. If I see the picture of that person, I am sure I can recognize him.

Q: Do you know if Grand Jury Exhibit 9 is or is not the person that came to your home?

A: No, it is not.

Q: Can you tell us any differences between the person that came to your house and Grand Jury Exhibit 9?

A: I think that one was bigger, wider.

Q: The guy who came to your house was bigger and wider?

A: Yes.

Q: The guy who came to your house, did you ever hear whether or not he later ever worked for Usama Bin Laden?

A: No. I never seen him after that or heard anything about him.

Id. at 87-88. El Hage further testified under oath that he only met el Sayyid Nosair (later convicted of the murder of Rabbi Meir Kahane) one time at a particular office in Brooklyn, New York.16/

[REDACTED]

59. The Government does not allege -- and has not alleged -- that el Hage (or even, for that matter, [REDACTED] participated in the actual murder of Khalifa.18/ What is

_____

16/It bears note that a search of Nosair's work locker at 100 Centre Street (following Nosair's November 5, 1990, murder of Rabbi Meir Kahane) recovered a pamphlet discussing the January 1990 murder of Rashad Khalifa. (The pamphlet was entitled "Who killed this believer?"; a copy of the cover is annexed as Exhibit 25.)

[REDACTED]

18/ El Hage makes much of the fact that other persons have been charged in connection with the Khalifa homicide. As the Government understands it, the Colorado charges arising out of the search of the Fuqra compound concerned a conspiracy to kill Khalifa, not the actual murder. Whether the surveillance effort by

important is that el Hage thought so little of hearing a priest
at his house who came from New York to surveil a radical Islamic
imam -- who was then later killed -- to even report such
information to authorities.  Still worse, El Hage then lied about
the circumstances under oath, falsely denying his association
with [REDACTED]and the extent of his association with Nosair.
Moreover, these facts also indicate that the people who knew el
Hage knew that he could be trusted to host someone to surveil a
potential murder victim and not worry about el Hage betraying
their confidence.  It demonstrates that el Hage does not merely
associate with violent terrorists -- he can be counted on to
protect them when and as necessary.

Purchasing Weapons for A Terrorist Cell in New York

60.  During this same grand jury testimony, El Hage did
not "volunteer" information to the Government concerning the
weapons purchases of Mahmud Abouhalima, as el Hage now asserts.
Rather, source information developed by the New York
investigation indicated that Mahmud Abouhalima had obtained
weapons for use in New York from "Abu Abdallah" in Texas.
Abouhalima and other men in the New York city area were then
involved in military training activities and were covertly
involved in domestic terrorist activity (including several
conspiracies to murder and attempted murders and bombings which

---

[REDACTED] was related to the murder conspiracy by the Fuqra sect
(which, upon information and belief, is headquartered in Pakistan)
or the actual murder (for which no one has been charged to the
Government's knowledge) remains unclear.

took place in the New York city area from 1988 to 1990.19/).
Abouhalima was convicted for his role in the February 26, 1993,
bombing of the World Trade Center. Notwithstanding the notoriety
of Abouhalima's 1993 arrest and 1994 trial, el Hage -- a U.S.
citizen -- did not come forward to provide information to
American authorities about Abouhalima's weapons purchases until
he was asked specific questions in interviews by the FBI and
before the grand jury in September 1997.  (Indeed, in response to
questions, el Hage first indicated that he met Abouhalima three
times and "[w]e never had any special discussion together."
(Exhibit 18 at 37.). Only after being warned that he needed to
give full and complete answers (Id. at p. 38), el Hage admitted
to the grand jury that he purchased the weapons but claimed that
he never delivered the weapons.20/  Instead, he testified that he
sold them -- but could not remember to whom he purportedly sold
the weapons.

## The al Bunyan al Mahrsous Connection

61.  By his own account, el Hage spent substantial time
in Pakistan and Afghanistan.  In support of his bail application,

---

19/ These activities included the attempted murder of Mikhail
Gorbachev in New York in December 1988 (which was frustrated by a
grenade which failed to explode), several surveillances of Rabbi
Meir Kahane in 1988 and 1989, a failed effort to murder President
Mubarak of Egypt during a visit to the Waldorf Astoria hotel in
1989, and the planting of pipebombs at: (i) a gay bar in Greenwich
Village on April 28, 1990; (ii) the Sheraton Hotel (where then Vice
President Dan Quayle was speaking) on May 20, 1990; and (iii) the
Hilton Hotel (where then UN Ambassador Jeanne Kirkpatrick was
speaking) on May 23, 1990.

20/ To be clear, the Government does not credit el Hage's
assertion that the weapons were not delivered to New York.

41

el Hage raises his association with the magazine *al Bunyan al Mahrsous* as an effort to legitimize his employment and associations during that time.   In fact, *al Bunyan al Mahrsous* has served repeatedly as a cover for the movement of terrorists. By way of example, Ahmad Ajaj and Ramzi Ahmed Yousef (both convicted of the World Trade Center bombing) entered the United States in September 1992 with, among other things, bomb manuals and *al Bunyan al Mahrsous* identification cards.  Moreover, Wali Khan, a/k/a "Asmarai" (convicted of his participation with Yousef in a conspiracy in the Philippines to bomb 12 American flag airliners roughly simultaneously in early January 1995) was also found at the time of his arrest to be in possession of an *al Bunyan al Mahrsous* identification card -- identifying him as an investigative reporter. (El Hage has admitted knowing Wali Khan, a/k/a "Asmarai.")

The 1991 Mustafa Shalabi Murder

62.   El Hage was also questioned in the 1997 grand jury concerning his knowledge of the murder of Mustafa Shalabi, which happened in Brooklyn, New York, in or about late February or early March 1991.**21**/ (Shalabi was the person mentioned above who purportedly dispatched [REDACTED] to Arizona to surveil Rashad Khalifa.)   El Hage admitted that he had arrived in New York to

---

**21**/ Shalabi was reported missing on or about February 26, 1991, and his body was found in his apartment in the first week of March 1991, riddled with bullets and knife wounds. [REDACTED]

assume temporary care of Shalabi's Alkifah Refugee Center on the day that Shalabi was murdered  While the Government does not contend -- and has never contended -- that el Hage physically murdered Shalabi (or even necessarily participated in a conspiracy to murder Shalabi), this fact is relevant, taken in context, to show el Hage often meets with some of the world's most dangerous terrorists, in the immediate vicinity of a remarkable number of violent acts and plots, yet makes the highly dubious claim of a blissful ignorance as to all that happens around him.

## The Courtroom Incident

63.   In June 1999, at a pretrial conference where el Hage demanded that a letter blaming the Government for the August 1998 bombings be read aloud, el Hage bolted from the jury box. According to a Deputy United States Marshal who witnessed the event, el Hage and co-defendant al 'Owhali made eye contact before el Hage bolted from the jury box and al 'Owhali thereafter interfered with a Deputy United States Marshal who sought to pursue el Hage from behind.  El Hage takes the galling tack of citing his egregious misconduct as a reason for relaxing the restrictions imposed on him. El Hage's blatant breach of courtroom security graphically demonstrates both his dangerousness and risk of flight.  The fact that he is completely unable to offer a cogent, exculpatory reason for his unlawful behavior does not prove that he should be rewarded with a lessening of security restrictions.  Indeed, to even suggest so

43

blinks cold reality and mocks the seriousness of the incident.

64.   It is at best ironic that in the face of the documents produced in discovery to date -- including the report that establishes el Hage's critical role in militarizing the Kenyan cell of al Qaeda which would later bomb an embassy -- and the record of el Hage's perjurious grand jury testimony, el Hage would contend that the Government lacks respect for the judicial process:

> Essentially, the government's argument for detention of Mr. El-Hage, as well as its entire case against him, is that mere association with co-defendant Usama Bin Laden and/or Muslim organizations in Africa is the equivalent of criminal intent and participation in a criminal conspiracy ...  The claim that mere association with co-defendant Usama Bin Laden and/or Muslim organizations in Africa is the equivalent of criminal intent and participation in a criminal conspiracy is, however, improper since it constitutes "guilt by association," a fallacy that constitutes an anathema to our system of criminal jurisprudence.

Schmidt Declaration at p. 3. (Emphasis added)

II.  Overview of el Hage's Risk of Flight

65.   This Court earlier found that "the Government has presented an overwhelming case for detention based on danger to the community and risk of flight"  (See Exhibit 2 at 29.)(emphasis added).  That finding was plainly correct.  First, el Hage has every reason to flee: he faces a strong case for which the likely punishment will be life imprisonment without parole if convicted of the conspiracy charges and a likely guidelines range of imprisonment of 30 years to life imprisonment if convicted of the perjury charges but acquitted of the

conspiracy charges. Second, el Hage has the wherewithal to flee. He is a member of an organization with ready access to false passports and he was heavily involved in a passport forgery operation in his home in Kenya. Moreover, el Hage has extensive international travel experience and has failed to appear for his only earlier arrest on trivial charges.

Reason to Flee: Strength of Case

66. The strength of the Government's case against el Hage is a compelling reason for el Hage to wish to flee. El Hage is charged with two categories of charges: conspiracy charges (Counts 1 through 6) and perjury/false statement charges (Counts 245 through 267). The various conspiracy counts arise out of the same factual allegations contained in Count One, which charges a conspiracy to kill United States nationals. The proof of the conspiracy charges will consist in large part of indisputable documentary evidence -- such as some of the computer reports discussed above -- as well as cooperating witnesses, including at least one cooperating witness ("CS-1") who is familiar with el Hage's activities on behalf of Bin Laden and al Qaeda.

The Strength of the Perjury/False Statements Charges

67. El Hage is also charged with 19 counts of perjury (Counts 245 through 264) and 3 counts of false statements (Counts 265 through 267). Counts 245 through 251 charge el Hage's perjury before the grand jury in 1997 concerning the following topics:

    -- claiming an almost complete lack of contact with Usama

45

Bin Laden since 1994 (Count 245);

-- claiming an almost complete lack of contact with
Muhammed Atef, a/k/a "Abu Hafs," a/k/a "Taysir," since 1994
(Count 246);

-- claiming not to recognize a photograph of Ali Mohamed or
know any Bin Laden contact in California (Count 247);

-- claiming not to recognize a photograph [REDACTED]
(Count 248);

-- claiming to have first met Khalid al Fawwaz in London in
1995 (Count 249);

-- claiming not to know that Abu Ubaidah al Banshiri was in
Kenya and had drowned in 1996 (Count 250); and

-- claiming not to know that al Qaeda had targeted the
United States until hearing about the same on CNN (Count 251).

        68.  Counts 252 through 264 charge el Hage's perjury
before the grand jury in 1998 concerning the following topics:

-- claiming an almost complete lack of contact with Usama
Bin Laden since 1994 (Count 252);

-- claiming not to know "Taysir" (Count 253);

-- claiming not to recognize photographs of Ali Mohamed or
his name (Count 254);

-- claiming not to know any Bin Laden contacts living in
the United States (Count 255);

-- claiming not to know Ihab Ali, a/k/a "Nawawi" (Count
256);

-- claiming not to recognize a document el Hage wrote to

46

Ihab Ali, a/k/a "Nawawi" (Count 257);

-- claiming not to know Mohamed Odeh or to recognize his picture (Count 258);

-- claiming not to recognize a document el Hage wrote using the alias "Norman," or otherwise to know that name (Count 259);

-- claiming not to know that Abu Ubaidah al Banshiri, a/k/a "Jallal," was in Kenya and had drowned in 1996 (Count 260);

-- claiming not to recognize Bin Laden's alias "the hajj" (Count 261);

-- claiming not to recognize two different documents el Hage wrote to Ihab Ali, a/k/a "Abu Suliman" (Counts 262 and 263); and

-- claiming not to know "Taysir." (Count 264)

69.   Counts 265 through 267 charges el Hage with false statements to FBI agents concerning his knowledge of Abu Ubaidah's whereabouts (Counts 265 and 266) and his claimed lack of knowledge of Mohamed Sadeek Odeh (Count 267).

70.   The perjury/false statements counts can be substantially proven by the documentary evidence outlined above. By way of example, the documents show that el Hage wrote letters to (and received letters from) persons he claimed not to know and that the substance of the letters concern communications with a variety of al Qaeda members with whom he denies contact.

The Statutory Penalties Faced

71.   El Hage faces a penalty of life imprisonment on each of Counts One through Five, ten (10) years' imprisonment on Count Six, as well as five years' imprisonment on each of the 18

47

counts of perjury and 3 counts of false statements for which he will be tried.23/

The Guidelines Penalties if el Hage is Convicted

72.   If convicted of any one of the five counts charging him with various conspiracies to murder, bomb or maim (Counts One through Five), el Hage faces a guidelines range of life imprisonment: the base offense level for conspiracy to commit murder is level 28 but becomes 43 where "the offense resulted in ... death." (see Guidelines Section 2A1.5).   At least an additional 21 levels would appear appropriate for various adjustments: 3 levels because victims (American nationals in the embassy buildings) were selected on the basis of national origin (see Guidelines Section 3A1.1); 3 levels because the victims included government officers or employees (see Guidelines Section 3A1.2); 12 levels because the offense is a felony that involved, and was intended to promote, a federal crime of terrorism (see Guidelines Section 3A1.4); and 3 points for el Hage's managerial role in al Qaeda (see Guidelines Section 3B1.1).   At the same time, el Hage's criminal history category would be Category VI because the offense is a felony that involved, and was intended to promote, a federal crime of terrorism (see Guidelines Section 3A1.4).   Thus, el Hage's adjusted offense level would be level 54 at Category VI.   A level 43 at Category I calls for a guidelines

_____

23/ The number of perjury counts will change from 19 to 18 in the next superseding Indictment because Counts 253 and 264 will be merged.

range of life imprisonment.  El Hage's offense level would exceed
that by 11 offense levels and 5 criminal history categories.
Moreover, el Hage's offense level would be at this high level
even if only one person, a Government official, was killed in the
August 1998 bombings whereas in fact 223 people were killed.
Thus, in assessing whether to appear for trial, el Hage would
have to fairly assume the strong possibility of life imprisonment
without parole if convicted of any of the first five conspiracy
charges.

     73.  As to the perjury and false statements counts, el
Hage would likely face a guidelines imprisonment range of thirty
(30) years' imprisonment to life if convicted of the
perjury/false statements charges.  Guidelines Section 2J1.2(c)
provides that the Guideline Section 2X3.1 (Accessory After the
Fact guideline) applies where the offense involves obstructing
the investigation or prosecution of a criminal offense, which was
clearly the case here.  Guideline Section 2X3.1 in turn provides
that the offense level for the accessory shall be 6 levels lower
than the offense level for the underlying offense (here murder),
but in no event more than 30.  Thus, because the offense level
for murder is 43, the relevant base offense level for an
accessory after the fact to murder is level 30.  At least an
additional 12 levels would appear appropriate because the offense
is a felony that involved, and was intended to promote, a federal
crime of terrorism (see Guidelines Section 3A1.4).  Thus, el
Hage's adjusted offense level would be level 42.  Again, because

the offense is a felony that involved, and was intended to promote a federal crime of terrorism (see Guidelines Section 3A1.4), el Hage's criminal history category would be Category VI. Thus, el Hage's adjusted offense level would be level 42 at Category VI, which provides a guidelines range of imprisonment of thirty (30) years' imprisonment to life.  Again, el Hage's range of imprisonment would be at this high level even if only one person, a Government official, was killed in the August 1998 bombings whose investigation he obstructed -- rather than 223 persons. El Hage's possible sentence of imprisonment would be capped by the cumulative statutory maxima for the number of perjury/false statements convictions.  That cap could be as high as 105 years if el Hage were convicted of all 18 perjury and all 3 false statement counts on which he will be tried.  Thus, in assessing whether to appear for trial, el Hage would have to also assume that he faced between 30 and 105 years' imprisonment without the possibility of parole even if convicted of the bulk of the perjury charges and acquitted of the five conspiracy charges.  Accordingly, el Hage has every incentive to flee, not appear for trial and seek to rejoin his coconspirators overseas.

Ability to Flee: El Hage's Connection to Passports

74.  Al Qaeda is an organization that has had ready access to false travel documents for many years.  CS-1 has advised that al Qaeda members have operated a very professional counterfeiting operation and, at times, have received blank passports from certain governments, including the Sudan.  Wadih

50

el Hage's computer has actually been found to contain

[REDACTED]                    a very professionally counterfeited

Kenyan travel stamp.23/   Moreover, correspondence recovered from

the el Hage files indicates that el Hage and his deputy Harun

(fugitive Fazul Abdullah Mohamed) were providing false passports

to "mujahideen" in the Caucasus, while other documents indicate

they did the same for al Qaeda fighters in Somalia.

75.  An October 23, 1996, letter addressed to Harun

from "Drdaa (Ashraf)" from "Monte Carlo" asked Harun to change

"the picture of the office only ...the name of the office ...

change the plastic of the office's certificate or repair it ...

place the golden design the Yemeni or the Turkish" (1B93/7X-37;

copy annexed as Exhibit 27)

76.  A letter dated December 21, 1996, responds:

> Dear Mr. Dorda ... We had sent to you few weeks ago a
> package by DHL and did not receive confirmation as to its
> arrival. <u>It contained three booklets for various travel
> agencies</u> ... Saad called a few days ago and he is alright.
> All others in his location are doing all right and send you
> their greetings.  Communication with them is difficult but
> they are doing all right in their studies and will graduate
> soon ... H.W. Alkeiti Monte Carlo.

(emphasis added)(1B93/7X-28; copy annexed as Exhibit 28).

Forensic analysis has revealed that two fingerprints of Wadih el

Hage were recovered on the letter dated December 21, 1996, which

---

23/ The Government is in the process of printing out several
items                              on the el Hage computer
seized in Kenya, including the Kenyan travel stamp.  We will
forward a copy of such exhibit to the Court and counsel as quickly
as we can print out a hard copy from el Hage's computer.  This item
will be Exhibit 26.

purported to be from "H W Alkejra in Monte Carlo." Moreover, an analysis of el Hage's telephone records in Kenya reveals that his home telephone called a particular telephone number in Baku, Azerbaijan, in close proximity to the two dates on the letters in question: telephone number 12989965 was dialed on October 22 (as well as October 25) and on December 21, 1996 (when it was the only number called that day). Upon information and belief, the people receiving these passports were in contact with the Bin Laden network. For example, billing records for the satellite telephone used by Bin Laden indicate that Bin Laden's telephone also called that same number in Azerbaijan on December 5, 1996. In short, el Hage's fingerprints were on a letter that, in code, spoke of false passports and at the same time he was in telephone contact with individuals who were in contact with Bin Laden.

El Hage's Links to Passports for the Military Cell in Somalia

77.   El Hage also possessed passport sized photographs in his files which included pictures of many of the al Qaeda members who participated in al Qaeda activity in Somalia as well as "Abu Khaled al Masry," one of the top military commanders in Egyptian Islamic Jihad -- the group which worked in unison with Bin Laden's al Qaeda to declare war on the American population and to execute the Embassy bombings. 24/ "Abu Khaled al Masry" is

---

24/ Some idea of the importance of these photographs is the fact that they were contained in an envelope marked: "To be hand delivered to the Director General or his substitute." (Bin Laden is known by the alias "the Director" among others.) (1B93-6G; copy annexed as Exhibit 29).

wanted in Egypt in connection with the 1981 assassination of Egyptian President Anwar Sadat -- but obtained a passport under the false name "Musa al Gamal" through the auspices of Ali Mohamed in California in March 1993.

78.   When in the grand jury in 1998, Wadih el Hage was asked why he had the passport sized photographs and provided the dubious answer that only one photograph belonged to him and the person depicted *thought* el Hage could get passports simply because he traveled a lot but in fact he had no such ability. *See* Exhibit 24 at p. 48.25/

79.   Thus, el Hage's claim in his brief that "Mr. El-Hage does not possess any phony personal travel documents" (Brief at p. 15) conveniently overlooks the facts that his files contained passport photos of al Qaeda members and a leading figure in Egyptian Islamic Jihad, his computer contained a counterfeit travel stamp   [REDACTED]        and he also possessed an Egyptian and a Yemeni passport for other persons.26/ Moreover, Odeh -- a participant in al Qaeda activities in Somalia -- admitted post-arrest that el Hage had provided him with an identity card when he arrived in Kenya.

_____

25/ It bears note that el Hage wrote an associate in Germany in June 1997 to offer that he was "ready for any help he needs in traveling or any other thing". *See* 1B93/2-11; copy annexed as Exhibit 30.

26/ See the Egyptian Passport (with photo) for Mohamed Mou'awwad Mohamed Shehata and a Yemeni Passport for "Ahmed Dirhim Snayei al Shalif." (1B93 Items 6B and 6D; copies annexed as Exhibit 31.)

Past International Travel

80. El Hage makes the preposterous claim that he is
not a risk of flight because, among other claims, "it is almost
unthinkable that any other nation would allow him refuge within
its borders and risk the resultant wrath of the United States."
Schmidt Affirmation at p. 29. Yet, to this day, there are eight
indicted fugitives in this case -- ranging from Usama Bin Laden,
who is widely reported to be living in Afghanistan, to lower
level members of the Kenyan and Tanzanian cells. In any event,
fugitives flee and remain at large in the ordinary course because
they obtain false documents and thus do not apprise their "host"
country that in fact they are a wanted terrorist. El Hage also
claims that he has "always traveled and lived with his wife and
(now seven) children." (Schmidt Affirmation at p. 30.) El Hage
has traveled to the Sudan and Kenya and back to the United States
with his children; the documentary and other evidence suggests
that he has also traveled to Tanzania, Zaire, Pakistan,
Afghanistan, Somalia, Russia, England, Italy, Belgium, Ethiopia,
the Czech Republic and Slovakia, among other places. Thus, el
Hage has the proven ability, wherewithal and willingness to
travel and could do so without his family if necessary.

El Hage's Past History: The Bad Check Charge

81. El Hage has encountered the American court system
three times in his life before his arrest in this case: once when
he was arrested for passing bad checks (for which he failed to
appear for several years); and twice by appearing before grand

juries and perjuring himself.    If he could not be trusted to
show up as required for a bad check case, and has otherwise shown
nothing but contempt for the sanctity of the judicial system, he
can hardly be expected to appear where he is charged with being
an integral part of one of the most lethal conspiracies every
entered into against the United States and faces the very
substantial prospect of life imprisonment without parole.

Electronic Monitoring Will Not Eliminate Either Risk of Danger or Flight

    82.   Electronic monitoring and/or electronic bracelets
will not suffice to eliminate the risk of flight or danger to the
community.   First, electronic bracelets do not prevent flight as
they still allow an absconder a substantial head start in flight
before it can be verified that he has absconded.

    83.   I have had the unfortunate experience of having a
defendant released on bail subject to electronic monitoring
abscond prior to trial.   See United States v. John Gambino, et
al., 88 Cr. 919 (PKL).   I was subsequently advised by a Pre-trial
Services Officer (Evans Kavallines) that when a defendant is
subject to electronic bracelet monitoring, that defendant is
outfitted with a device usually placed around the ankle which
transmits an encoded signal by radio frequency to a receiver
located in his home.   The receiver in turn transmits a signal by
telephone to a computer at a central monitoring office at a
private facility.    If the company fails to receive the signal,
the company will usually attempt to make their own verification
as to whether the failure to receive a signal is due to the

55

defendant leaving the designated area or due to a technical malfunction. (This is necessary as there are too many false alarms caused by, among other things, defendants straying to remote areas of their homes, or because of a battery failure or a malfunction in the telephone line, including a busy signal.) However, the company does not have the ability to verify voices if a person answers the telephone and indicates that he is the defendant. The private company next contacts a Pre-trial Services Officer. The Pre-trial Services Officer then attempts to contact the defendant at home. If the defendant answers the telephone and circumstances indicate that there is an equipment malfunction, then the officer must travel to the home of the defendant to effect repairs or make a replacement. Obviously, if the defendant does not respond to the telephone call or if the telephone reveals a busy signal, the officer must report to the defendant's home to see if he is there. The Pre-trial Services Officer often has a fair distance to travel and these contacts may occur on a weekend or a holiday. It should be noted that most of these alerts are in fact false alarms.[27] Whenever the defendant is determined not to be home, law enforcement agents are contacted so that they may seek an arrest warrant from the

---

[27] In fact, in the case of <u>United States</u> v. <u>Gambino</u>, <u>supra</u>, the defendants were allowed so many "blackout periods" (to attend meetings with attorneys, religious services, etc.) that Pre-Trial Services (with the consent of the Government and the Court) eventually ceased use of the electronic bracelets as to one of the defendants who absconded (John Gambino) because of the extensive blackout periods, false alarms and other difficulties posed by the bracelets.

appropriate judicial authority and begin to look for the individual.  It is fair to say that a defendant outfitted with an electronic bracelet who decides to flee will usually obtain a sufficient headstart to have reached an airport  -- or at the very least left the area surrounding his home -- before law enforcement agents can begin the search for that defendant. Thus, electronic monitoring does not prevent flight: it merely provides notice some time after the flight has already taken place.28/

       84.  Nor does electronic monitoring of conversations prevent dangerous messages from being passed where el Hage is well versed and experienced in passing coded messages and would be communicating with members of an organization who are trained in various codes. Moreover, absent extraordinary measures -- including regular strip searches of el Hage's wife, children and any visitors -- messages could be passed by secreting them on persons entering and leaving the home or writing them in codes similar to the ones el Hage used in Kenya which would not alert even the careful reader to their true meaning.  Still worse, it would be impossible to prevent el Hage from passing messages by whispering to family members or visitors.

------------------------------

    28/ I would also note that the electronic bracelets are tamper-resistant but not tamper-proof.  I was advised by Pre-Trial Service Officer Kavallines that by way of a variety of methods which should not be publicly disclosed, some defendants have managed to abscond while leaving the bracelet behind -- and thus the private agency monitoring the bracelets will still receive the electronic signal meant to indicate that the defendant is home. The defendant's absence will then only be noted when he is apprehended for some other reason or when he fails to appear in Court.

III.  Modification of el Hage's Prison Conditions Is Inappropriate

      35.  In addition to seeking home confinement or bail, el Hage seeks the alternative relief of rescission of the SAM's, transfer to general population or sundry other relief concerning his conditions of confinement.  Since the time of the filing of el Hage's motion, the Government and the Warden have agreed to try a significant modification of el Hage's conditions of confinement: a test period whereby el Hage will be housed with a roommate (co-defendant Salim).  As is set forth below, any further modification of el Hage's prison conditions would be entirely inappropriate as the conditions of confinement now in place are both necessary and reasonably related to the legitimate penological interest of maintaining the safety of the prison and the public.

      86.  El Hage complains about four aspects of his conditions of confinement in particular: (i) solitary confinement and perceived lack of sunlight; (ii) restrictions on his telephone privileges; (iii) restrictions on his social visits; and (iv) general conditions such as being subject to strip searches and limits on his commissary privileges.

The Solitary Confinement Issue

      87.  El Hage's moving papers complained at numerous points of his "solitary confinement."  El Hage refers to "solitary confinement" dozens of times in the Schmidt Declaration and accompanying Memorandum of Law.  Dr. Grassian's writings (submitted as Exhibits to the Schmidt Affirmation) refer

repeatedly to solitary confinement.

88.    The Government offered el Hage a solution to his solitary confinement -- a designated cellmate.   That offer was initially declined.   A second modification was proposed: el Hage was allowed socialization with co-defendant Salim during his five weekly one-hour recreation periods.   See Letter of Assistant United States Attorney Patrick J. Fitzgerald, dated December 22, 1999; copy to be annexed as Exhibit 32.   El Hage initially accepted the second offer through counsel.   At a subsequent date, defendants el Hage and Salim opted instead to share a cell.   See Letter of Sam Schmidt, Esq., dated December 28, 1999; copy annexed as Exhibit 33.   At this point, no further modifications are appropriate.

89.    The Government's tailored flexibility in addressing the issue of the possible effect of solitary confinement should not be construed to indicate any lesser concern on the Government's part about the security issues that can be caused by interaction between defendants.   Indeed, in November 1998, this Court found the restrictions then in place -- which included solitary confinement -- justified:

> [T]he sole remaining item, the ability of the defendants to interact with each other and other inmates at the MCC[:]
> Again, it need not be argued that the human desire for contact with other persons is very great, and the deprivation of that contact is severe and interferes with what would otherwise be normal activity.   I don't want to wax eloquent -- even if I were capable of doing so -- about the fact that prison life is not an ideal and that there are

59

activities which defendants who are incarcerated are
compelled to forego.
        I am satisfied that the procedures which have been
proposed by the government in response to defendants'
objections, modified as I have indicated, are consistent
with prison conditions and satisfies due process and the
criteria set forth by the Supreme Court and the Second
Circuit as measures which are reasonably based on security
concerns and needs of the institution, not arbitrarily or
capriciously or for the purposes of punishment or
harassment.

See Exhibit 3 at p. 8.

The case supporting this Court's earlier findings has only gotten

stronger.  First, el Hage has demonstrated rather concretely an

ability to act in blatant violation of security rules.  Second,

there have been security breaches by inmates in the MCC with the

SAMs in place that prove that even tight restrictions are not

foolproof.  If the Court has any doubt that there remain serious

concerns about the harm that may flow from communications between

detainees and the outside world -- even when SAMs are in place --

the Government is prepared to describe some of the security

breaches in a sealed *ex parte* filing.  Public filing of such

information would educate detainees and the public as to

weaknesses in prison security.

The Claims Regarding Lack of Sunlight

        90.  The Government is frankly baffled by el Hage's

claim regarding sunlight deprivation.  El Hage is housed on 10

South, the second highest floor in the M.C.C. which thus has

greater access to sunlight than lower floors.  El Hage is rotated

between cells so that he spends part of his time in the cells

with the most light and the other part in the cells with less
light and more room.  Inmates on other units and other floors
also rotate between various cells with varying degrees of light.
Moreover, as detailed in the accompanying Declaration of Warden
Dennis Hasty, the cells at issue have windows at least twice as
large as other cells in the MCC:

> each cell in 10 Annex has an oversized window (from 8'
> x 2'7" to 10' x 2'7") as opposed to the size of windows the
> rest of the inmates in administrative detention and general
> population have (approximately 2' x 4').   At times, el-
> Hage's cell is almost equivalent to two cells used for other
> inmates, both in general population and administrative
> detention.   As far as bars on the windows are concerned,
> every single window in this institution is covered with
> steel bars, for security reasons, including all the
> administrative offices and my office as well.

## The SAM Limits on Telephonic Contact Are Appropriate

91.  El Hage complains of the restrictions of his
telephone privileges which provide him three (3) telephone calls
per month on a regularly scheduled basis with a status report to
the Court (with copies to counsel) advising whether the calls
were successfully placed.  It needs to be kept in mind that, by
order of the Court, el Hage is allowed three times as many
telephone calls as Bureau of Prisons policy requires for other
inmates in administrative detention status.  As the Court noted
on November 17, 1998:

> ... I adhere to the view I expressed yesterday and take
> up the suggestion made by government counsel that these
> defendants be allowed three calls a month rather than one
> per month.  This treats them in a more favorable fashion
> than the other population at the facility.  It is intended
> not to put them in a favored position, but is intended to be
> a reasonable offset for the fact that they are deprived of

61

contact with other inmates and outdoor exercise..
See Exhibit 3 at 5.

The fact that the calls are monitored live is only marginally more intrusive than all other inmates' calls which are recorded and subject to monitoring without notice. This extra scrutiny is warranted because al Qaeda members such as el Hage are exposed to remarkably sophisticated training which helps to illuminate some of the coded conversations and documents described above.  By way of example, as set forth in the Indictment and discovery to date, the treasure trove of documents seized from a search of the house of Ali Mohamed in 1998, included the following items, among others:

> -- documents concerning codes;
> -- coded correspondence;
> -- documents concerning how best to lie to investigators;
> -- documents concerning techniques of surveilling various targets, including military, diplomatic and government targets;
> -- documents concerning the planning of terrorist operations and the structuring of a terrorist group into different cells;
> -- documents concerning how intelligence agencies operate; and
> -- documents regarding assassination techniques.

92.  The SAM restrictions on communications are particularly appropriate where as here the relevant facts show that el Hage is a person whose role within the terrorist organization was to pose in essence as "front man" who used the cover of purported commercial businesses in the Sudan and elsewhere and of a purported charity in Kenya to carry on the work of a terrorist organization, disseminating new policies from

al Qaeda leadership and coded messages.  While a defendant who is proficient in the art of killing may constitute the epitome of physical "dangerousness," a person like el Hage who can pass off communications and orders to terrorist associates in a manner that outwardly appears legitimate is more dangerous to the outside world when confined -- but allowed access to a telephone --- than a trained assassin.

93.  El Hage would like the Court to believe that the Government's citation to security concerns "is in most cases clearly arbitrary and without purpose."  (Brief at 33-34).  To the contrary, past history has shown that, absent such restrictions, persons with terrorist training have been able to use telephones at the M.C.C. to transmit dangerous messages to the outside world.  The public record of the trial of the World Trade Center bombing revealed that Ahmad Ajaj - while incarcerated in the M.C.C. and elsewhere following a trip from Pakistan -- made telephone calls seeking to aid the persons involved in the then ongoing World Trade Center bombing plot.  Ajaj, using a third-party "social contact" was patched through to the principal organizer of the World Trade Center bombing, Ramzi Yousef. During these patch-through calls, the participants spoke in Arabic and used coded references.  Ajaj attempted to arrange for Yousef to pick up Ajaj's bomb-making manuals. Although the calls were subject to monitoring and recording, it was not possible to decipher the true import of these conversations.  Two months after one of these conversations, the World Trade Center was

bombed, six people were killed and more than a thousand were
injured. Indeed, a jury later found Ajaj culpable for the
bombing notwithstanding his imprisonment for most of the six (6)
months preceding the bombing.29/ While we do not seek to blame el
Hage for the conduct of other associated persons, we have to
recognize that experience has taught us that the ordinary prison
rules are simply not adequate when attempting to prevent persons
with the same experience with terrorist organizations as el Hage
from passing messages. Certainly, these regulations are
"reasonably related" to prison security and public safety.

> 94. As the Court observed in November 1998:

> The government is attempting to do a very difficult
> thing. The government is attempting to protect against
> communication by the defendants to any one other than
> authorized persons of any message. That is a very hard
> thing to do. If some of the precautions seem a little
> excessive, I think it is because the objective is to
> accomplish something that is very difficult to accomplish.
> And it is not paranoia on the government's part; it is a
> realization, based on past experience, that there is a risk
> that persons who have engaged in conduct which the
> defendants have been accused of engaging in have
> communicated to their cohorts messages which have been
> detrimental to the security and wellbeing of the country.

Exhibit 3 at 10.


[ REDACTED ]

---

29/Similarly, evidence at the trial of United States v. Omar
Abdel Rahman, et al. 93 Cr. 181 (MBM) showed that el Sayyid Nosair,
during his imprisonment in a high-security segregated housing unit
at Attica, used "social visits" to help facilitate the bombing of
the World Trade Center and otherwise plotted a campaign of terror
directed against New York City landmarks, Jewish leaders in the New
York area and the judge who presided over his state homicide trial.

[   REDACTED   ]

(Emphasis added.)

The Restrictions on Visitors

96.   For the same reasons that it is necessary to make sure that el Hage does not pass any illicit or dangerous messages by telephone, it is necessary to ensure that he does not pass messages during visits.  The only social visitor the Government has opposed to date for el Hage has been his imam from Arlington, Texas, Moataz al Hallak.  El Hage assails the Government's opposition to his contact with al Hallak, mocking the Government's assertion at a bail proceeding that: (i) there was coded correspondence "'having to do with the imam from Arlington, Texas, Moataz al Hallak'"; and (ii) the Government's contention that al Hallak "'allegedly served as a contact between members of the Bin Laden organization.'" (Schmidt Affirmation at p. 25.)  El Hage boldly proclaims that:

[   REDACTED   ]

> Like the government's other allegations with respect to
> Mr. El Hage's associations, the argument with respect to
> Moataz al Hallak ... is simply specious and based upon
> communications that were not at all criminal, but which
> were, instead, exclusively commercial in nature.

Id.

El Hage further contends in his papers that:

> Upon information and belief ... al Hallak and Ibrahim –
> as well as the congregation at the mosque in Arlington as a
> whole – remain intimidated by the government's unfounded
> suspicions with respect to that particular (and completely
> innocent) transaction.  This is one of the reasons
> underlying Mr. El Hage's request for permission to telephone
> al Hallak.

Id. at 27, fn. 9.

That el Hage mischaracterizes al Hallak and his role is

demonstrated by a letter that el Hage refers to in his memorandum

of law in an obscure footnote.  There, el Hage makes brief

reference to one "letter that is neither written by nor addressed

to Mr. El-Hage in which the writer informs the reader that he did

not know where Mr. El-Hage resided in Texas, but that al Hallak

might know."  Id. at 27, fn. 8.  The letter adverted to is the

coded letter described more fully in paragraphs 46 and 47 whereby

Ihab Ali wrote Ali Mohamed to advise that el Hage had visited Bin

Laden in Pakistan but had then been interviewed by the FBI ("Food

and Beverage Industry") and provided Ali with the number of al

Hallak to contact el Hage.  Indeed, this is precisely one of the

66

coded letters the Government referred to at the bail hearing.31/
It demonstrates that al Hallak was a contact point for el Hage's
co-conspirators.

97.  As borne out in documents seized in Kenya, Hallak
provided cover for el Hage's business activities.  The seized
documents indicate that el Hage sought to establish a company
with an overseas associate in Germany which would be named "Anhar
Trading" and el Hage explicitly stated that they would do
business in this name and not mention the Sudan.  (See Item
1B117/7*-242; copy annexed as Exhibit 35).  Business cards
recovered in Kenya show that el Hage used al Hallak's address in
Texas as a mailing address for the Anhar Trading company.
(1BAUG97/EN3-3; copy annexed as Exhibit 36).

98.  Moreover, while el Hage was in the Sudan from 1992-
1994, Hallak was involved in obtaining "business equipment" in
the United States for shipment to the Sudan.  Writings in el
Hage's various notebooks include references to obtaining lock-
picking sets from the United States - through the assistance of
his imam, Moataz al Hallak.  One el Hage notebook reflects
entries below Arabic writing which says "Contact Moataz so that

---

31/   Another document contains the cryptic reference: "Mutaz:
A person who has the same name as Riyadh al Salha's friend will
contact you and give you the number of his account." (1B93/7B-16;
copy annexed as Exhibit 37)(Emphasis added.) The author (el Hage)
goes out of his way to refer to the contact in a way that cannot be
identified by an outsider.

he brings these things":

> 1992 spring US Cavalry
> swival action combat knife
> Lockpicking simplified
> Master profession Lockpicking set
> Mohamed M Al Hallak
> [al Hallak's credit card]"

(1B117/7*-111; copy annexed as Exhibit 38).

99. In addition, the imam al Hallak played a role in facilitating the purchase of a jet plane for Bin Laden after Bin Laden relocated to the Sudan. El Hage admitted in an October 1997 interview his own role in obtaining an airplane from the United States for Bin Laden. Moreover, an entry in el Hage's notebook indicates:

> Mutaz has a buyer for the airplane. He pays in cash, he wants complete information on the airplane. Tell Mamdouh Salim to send him a fax with information about the airplane.

I note that this entry is followed by the annotation [ REDACTED ] a telephone number associated with al Hallak. (1B93/7B-15; copy annexed as Exhibit 39.)

Overall Prison Conditions

100. El Hage asserts that his prison conditions are the "21st Century equivalent" of being "chained, shackled and thrown into a *dungeon*." (Brief at p. 29) (emphasis in original) This is a gross overstatement. The overall conditions on 10 South are described far more accurately in Warden Hasty's Declaration:

> 10 Annex ... permits for more advantageous conditions for the inmates housed there. For instance, the cells are much larger than the cells in which all other administrative detention inmates and inmates housed in general population are housed. The cells in the Annex are 47% to 90% larger than all the other administrative detention cells and those

in general population as well (two of the cells in the Annex
are 47% larger , two are 70% larger and two are 90% larger).
Additionally, all the cells in the Annex have private
showers, oversized windows (from 8' x 2'7" to 10' x 2'7")
compared to windows in all other administrative detention
and general population cells (approximately 2' x 4') ...
Specifically, the conditions that El-Hage is housed in are
as follows:
        a.) <u>unit and cell conditions</u>: the quarters used are
well-ventilated, well-lit by both electrical and natural
light, as each cell in 10 Annex has an oversized window . .

        Unlike almost all other inmates in administrative
detention, El-Hage's cell equipped with a shower, in
addition to standard toilet facilities.  He may shower and
shave as often as he likes.  The shower is constructed in
such a way that the water does not spray out of his cell and
onto his bed.

        101.  Indeed, this Court previously made findings on

the record on November 17, 1998, following a tour of the "10

South" wing of the MCC where el Hage (and co-defendants) are

housed.  The Court noted that:

        I am satisfied that the conditions in 10 South are not
    worse than conditions at 9 South and, indeed, are in many
    aspects more comfortable to the inmates.  The cells in 10
    South are considerably larger than the cells in 9 South and
    each cell has a window.  There is one shower for all of the
    inmates in 9 South; in 10 South, each inmate has his own
    shower.
        So I think that a claim of discrimination against these
    defendants by placing them in 10 South rather than 9 South
    simply cannot stand an inspection such as the one that I
    just completed.

<u>See</u> Exhibit 3 at p. 3-4.

<u>Khalid al Fawwaz' Conditions of Confinement in Another Country Do
Not Bind the Bureau of Prisons</u>

        102. While it is always an inappropriate and dangerous

practice to compare the circumstances of one inmate with another,

it is particularly so in the case of Khaled al-Fawwaz, whose

conditions of confinement are obviously within the province of

69

British, not American, officials.  However, it should be pointed
out that al Fawwaz has only been given access to that part of the
discovery that British authorities have provided him and which
was contained in his extradition package -- none of which
includes the category of materials in this case determined to be
"particularly sensitive" discovery, and Fawwaz has certainly not
been provided with any classified discovery.

There is No Need for a Bill of Particulars

103. A bill of particulars for el Hage is entirely
unnecessary in light of the extensive discovery to date and the
thorough exposition of the theory of the Government's case in the
267 count, 135 page indictment and filings to date, including the
instant submission. The Government is not required to assemble an
order of proof for defense counsel to indicate each and every
document that proves each contention.  The overwhelming majority
of the essential documents that support the Government's primary
case were produced early on in discovery, specifically described
in the detailed indictment and many are discussed in detail in
this affidavit.  Under the governing law and circumstances of
this case, it is respectfully submitted that no more is required.

The Need to File These Papers in Redacted Form

104. Given the confidential nature of the continuing
investigation, I request that this affidavit and all papers
submitted herewith be maintained under seal until this Court
orders otherwise, while an appropriately redacted version of
these papers will be publicly filed with the Court.  A copy of

70

the proposed redacted filing will be provided to Court and counsel on or before Wednesday, January 5, 2001.  In addition, a copy of this sealed filing will be furnished to el Hage by delivery to the MCC.

105. If the Court deems it appropriate or necessary to complete the record, the Government is prepared to submit a separate affidavit setting forth certain classified information supporting the Government's position concerning el Hage's dangerousness, risk of flight and the strength of the Government's case, a copy of which affidavit would be made available for review by el Hage's cleared counsel but not el Hage.

Dated: New York, New York
       December 30, 1999

PATRICK J. FITZGERALD