UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to World Assembly of Muslim Youth** |

*This document relates to:*     Federal Insurance Co. v. al Qaida
                                03 CV 06978 (RCC)


**RICO STATEMENT**
**APPLICABLE TO**
**WORLD ASSEMBLY OF MUSLIM YOUTH**

        Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant World Assembly of Muslim Youth.

        Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.    The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.    The names of the defendant to whom this RICO statement pertains is World Assembly of Muslim Youth. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.    Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | World Assembly of Muslim Youth (the "WAMY") | WAMY conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | WAMY | WAMY undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | WAMY | WAMY agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple |

| | | acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. WAMY and other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a)     The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)     The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. World Assembly of Muslim Youth fit neatly into this framework by raising funds for, providing funding and

money laundering services to, and otherwise providing material support to al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

    (c)    no.

    (d)    World Assembly of Muslim Youth is associated with the Enterprise.

    (e)    World Assembly of Muslim Youth is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f)    World Assembly of Muslim Youth intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by World Assembly of Muslim Youth is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by World Assembly of Muslim Youth furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by World Assembly of Muslim Youth, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and ostensible charities, including World Assembly of Muslim Youth, who laundered funds and raised money from witting and unwitting donors. Al Qaida also relied heavily on certain imams

at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in Sudan, Afghanistan and other parts of the World, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like World Assembly of Muslim Youth. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including World Assembly of Muslim Youth. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by World Assembly of Muslim Youth. World Assembly of Muslim Youth, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. World Assembly of Muslim Youth also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20. not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| World Assembly of Muslim Youth ("WAMY") | WAMY has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.<br><br>Founded in 1973, WAMY, which has its headquarters in Riyadh, officially bills itself as an organization which "aims to assist young Muslims around the world in leading fulfilled lives through Islam."<br><br>In fact, along with Al Haramain Islamic Foundation, Benevolence International Foundation, the International Islamic Relief Organization, the Rabita Trust, and the Muslim World League, WAMY is one of the principal players in the charity-based funding and sponsorship of al Qaida.<br><br>WAMY is under the umbrella of the Muslim World League (the "MWL"), from which it receives substantial support and assistance. WAMY is an organization that sponsors a number of other Islamic charities, commonly referred to as bodies or members of the League, including, in addition to WAMY, the International Islamic Relief Organization, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and Rabita Trust, among others.<br><br>WAMY is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs WAMY's operations, appoints and terminates WAMY's personnel, provides WAMY with virtually all | 1962(c)<br>1962(d) |

| | of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls WAMY's operations. In many countries, WAMY conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division. Further, WAMY receives much of its funding from members of the Saudi Royal Family, including Prince Sultan and Prince Naif.<br><br>The relationship between WAMY and the Kingdom was perhaps best described by Dr Abdul Wahab Noorwali, Assistant Secretary General of WAMY, who said that "Saudi Arabia's support has been enormous since the establishment of WAMY in 1973. The Kingdom provides us with a supportive environment that allows us to work openly within the society to collect funds and spread activities. It also provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." Abdullah Naseef, Vice Chairman of the Majlis as-Shura of the Saudi Arabian Government, Vice Chairman of WAMY and former Secretary-General of the Muslim World League, explained "Praise is due to Allah SWT and then to the kings of Saudi Arabia who supported this pioneering organization and other non-governmental bodies such as the Muslim World League in Makkah in 1962 and the World Assembly of Muslim Youth in Riyadh in 1973."<br><br>WAMY also operates under the aegis of the Saudi Joint Relief Committee, along with a number of other Islamic charities. WAMY further sponsored al Qaida through its participation in the SJRC.<br><br>WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs. | |

|  | Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Khasmiri terrorists.<br><br>According to Indian officials, Nazir Qureshi, an Assistant Secretary General of WAMY, has supplied money and other assets to Khasmiri terrorist groups associated with al Qaida.<br><br>Mohammed Ayyub Thukar, President of the World Khasmir Freedom Movement and a principal financier of the al Qaida affiliated Hizbul Mujihadeen, served as a WAMY official during exile in Saudi Arabia.<br><br>WAMY has provided military training to prospective jihadists, and members of the organization have fought under Gulbadin Hekmatyar's Hizb e Islami in Afghanistan.<br><br>On February 19, 2003, the United States government designated Hekmatyar pursuant to Executive Order 13224, based on his affiliation with al Qaida.<br><br>WAMY also has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world. When he was arrested in 1992, Ahmed Ajaj, who was subsequently convicted for his role in the 1993 World Trade Center bombing, had in his possession an al Qaida Manual entitled "*Military Lessons In The Jihad Against The Tyrants*" which detailed how to establish and maintain clandestine operational cells. The manual was distributed to Ajaj by WAMY. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.<br><br>In 1992, Abdullah bin Laden, Osama bin Laden's nephew, established a WAMY office within the United States, in Falls Church, Virginia. At least through 1998, Abdullah bin Laden served as the president of WAMY's |  |

|  | U.S. operations. WAMY's U.S. office was affiliated with the SAAR Network of businesses and charities created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. WAMY's U.S. operations were raided by federal authorities in conjunction with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated FTOs.<br><br>WAMY also has provided financial support to the U.S. based Council on American Islamic Relations (CAIR), a purported civil rights organization which received its initial seed money from the Holy Land Foundation for Relief and Development. On December 4, 2001, the Treasury Department listed Holy Land Foundation for Relief and Development as a specially designed terrorist pursuant to Executive Order 13224.<br><br>WAMY has also supported al Qaida affiliated extremists through its participation in the Islamic Coordination Council, an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan. Other members of the ICC included the IIRO, Saudi Red Crescent and Qatar Charitable Society. Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujhadeen elements which joined Osama bin Laden's al Qaida.<br><br>WAMY is closely affiliated with defendant Benevolent International Foundation ("BIF"). In fact, WAMY and BIF shared a common address in Peshawar, Pakistan, and frequently shared common officers and directors. As outlined in further detail in the Amended Complaint, BIF long has provided material support and resources to al Qaida. |  |