UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to**<br>**Abdul Rahman Khaled Bin Mahfouz** |

*This document relates to:*     Federal Insurance Co. v. al Qaida
                                 03 CV 06978 (RCC)


**RICO STATEMENT
APPLICABLE TO
<u>ABDUL RAHMAN KHALED BIN MAHFOUZ</u>**

   Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Abdul Rahman Khaled Bin Mahfouz.

   Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.  The names of the defendant to whom this RICO statement pertains is Abdul Rahman Khaled Bin Mahfouz. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Abdul Rahman Khaled Bin Mahfouz ("Bin Mahfouz") | Bin Mahfouz conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Bin Mahfouz | Bin Mahfouz undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Bin Mahfouz | Bin Mahfouz agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, |

2

| | | |
|---|---|---|
| | | multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a) The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Abdul Rahman Khaled Bin Mahfouz fit neatly into this framework by raising funds for, providing

funding and money laundering services to, and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

    (c)    no.

    (d)    Abdul Rahman Khaled Bin Mahfouz is associated with the Enterprise.

    (e)    Abdul Rahman Khaled Bin Mahfouz is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f)    Abdul Rahman Khaled Bin Mahfouz intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Abdul Rahman Khaled Bin Mahfouz is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Abdul Rahman Khaled Bin Mahfouz furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Abdul Rahman Khaled Bin Mahfouz, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators, including Abdul Rahman Khaled Bin Mahfouz, who laundered funds through Islamic so-called charities, such as the Blessed Relief Foundation, and corporations and raised money from

4

witting and unwitting donors. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities, including Abdul Rahman bin Mahfouz.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Abdul Rahman Khaled Bin Mahfouz. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Abdul Rahman Khaled Bin Mahfouz. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Abdul Rahman Khaled Bin Mahfouz. Abdul Rahman Khaled Bin Mahfouz, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Abdul Rahman Khaled Bin Mahfouz also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | | |
|---|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Abdul Rahman Khaled Bin Mahfouz ("Bin Mahfouz") | Abdul Rahman Khaled Bin Mahfouz has provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.<br><br>For a period of many years, bin Mahfouz served as an officer and director of the Blessed Relief Foundation, an ostensible charity also known as the Muwafaq Foundation. Blessed Relief was founded and endowed jointly by Yassin al Kadi and Khalid bin Mahfouz, Abdul Rahman bin Mahfouz's father. At the time they established the Blessed Relief Foundation, Yassin al Kadi and Khalid bin Mahfouz intended for it to serve as a vehicle for funding and otherwise supporting terrorist organizations, including al Qaida.<br><br>On October 12, 2001, the United States government designated Yasin al-Qadi and the Blessed Relief Foundation under Executive Order 13224, based on their longstanding and integral role in advancing the al-Qaida movement. In a November 29, 2001 letter to Swiss authorities requesting that the Swiss government block al Kadi's assets, a copy of which is attached hereto and incorporated herein by reference, Treasury Department General Counsel David Aufhauser summarized the Blessed Relief Foundation's pervasive sponsorship of al Qaida as follows:<br><br>  The leader of the terrorist organization :Al Gama'at Al Islamiya, Talad Fuad Kassem, has said that the Muwafaq | 1962(c)<br>1962(d) |

|  | | Foundation provided logistical and financial support for a mujahadin battalion in Bosnia. The foundation also operated in. Sudan, Somalia and Pakistan, among other places.<br><br>A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al-Qa'ida and the Al Faran terrorist group responsible for the kidnapping of Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United States for his role in the first World Trade Center attack. Following the arrest of Ramzi Yusif in 1995, the Pakistani police reportedly raided Muwafaq's offices and held its local director in custody for several months. The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.<br><br>The Muwafaq Foundation also employed or served as cover for Islamic extremists connected with the military activities of Makhtab Al-Khidamat (MK), | |
|---|---|---|---|

|  | which has been partially financed by the Muwafaq Foundation. The Muwafaq Foundation supplied identity cards and employment as cover for some Arabs to allow them, to obtain visas to remain in Pakistan. The founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor. Following the dissolution of MK in early June 2001 and its absorption into Al Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq also merged with Al-Qa'ida.<br><br>Mr. Kadi has asserted in various press interviews that the Muwafaq Foundation ceased operations at a range of different times in 1995, 1996 or 1997. However, the United Nations reported that Muwafaq was active in Sudan as late as 1997. Moreover, far from ceasing operations, the U.N. report stated that the "Muwafaq Foundation plans to continue to expand its humanitarian activities in the coming year...." U.N. Department of Humanitarian. Affairs, Consolidated Inter-Agency, Appeal for Sudan January-December 1997 (Feb. 18, 1997)(emphasis added).<br><br>From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate.[9] Ayadi Chaliq fought in Afghanistan in the 1980s and is known to be |  |
|---|---|---|

|  | associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF. As of February 1999, Mr. Chafiq was running Mr. Kadi's European network and serving as the president of Depositna Banka in Sarajevo, Bosnia, which was owned by Mr. Kadi.  Mr. Chafiq may have participated in planning an attack on a U.S. facility in Saudi Arabia. Mr. Chafiq left his residence in London in a hurry after the September 11 attacks, and had reportedly been in the United States in the months preceding the attack<br><br>The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qa'ida and other terrorist organizations. Working in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and training terrorist cells.  Their provision of humanitarian aid and educational services is done in concert with the terrorist to win the hearts and minds of the local people to whatever causes the terrorists espouse. When a region becomes more settled, such as Bosnia or Albania today, seemingly legitimate businesses replace charitable |  |

|  | foundations as cover for continuing terrorist organizational activity.  Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.<br><br>In his capacity as an officer and director of the Blessed Relief Foundation, bin Mahfouz knowingly and actively participated in that organization's continuous efforts to advance al Qaida's terrorist ambitions, and used his position within the organization to ensure that it served as an effective mechanism for raising and laundering funds for, and providing other forms of material support to, al Qaida.  By virtue of his active role in the Blessed Relief Foundation's wrongdoing, bin Mahfouz is personally responsible for the resulting harm. |  |
|---|---|---|