**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to the**<br>**Saudi Arabian Red Crescent Society *and***<br>**Abdul Rahman al Swailem** |

*This document relates to:*          Federal Insurance Co. v. al Qaida
                                     03 CV 06978 (RCC)


**RICO STATEMENT**
**APPLICABLE TO THE**
**SAUDI ARABIAN RED CRESCENT SOCIETY *and***
**ABDUL RAHMAN AL SWAILEM**


        Based on information currently available, and pursuant to the Case Management
Order dated June 15, 2004, plaintiffs submit this RICO statement for defendants Saudi Arabian
Red Crescent Society and Abdul Rahman Al Swailem.

        Given the vastly complicated nature of the conspiracy and other wrongdoing that
led to the events of September 11, 2001, much information is presently unavailable to plaintiffs,
absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as
information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).


2.      The names of the defendants to whom this RICO statement pertains are the Saudi
        Arabian Red Crescent Society and Abdul Rahman Al Swailem.  The alleged misconduct
        and basis for liability is set forth in Exhibit "A".


3.      Not applicable.  All known wrongdoers are named as defendants in this action. Given the
        vastly complicated nature of the conspiracy and other wrongdoing that led to the events
        of September 11, 2001, however, much information is unavailable to plaintiffs, and the
        identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore

reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.     The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.     (a)  list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support for terrorism | 18 U.S.C. § 2332, § 2339 (A) – (C) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Saudi Arabian Red Crescent Society (the "Saudi Arabian Red Crescent") and Abdul Rahman Al Swailem ("Al Swailem") | The Saudi Arabian Red Crescent and Al Swailem conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Saudi Arabian Red Crescent and Al Swailem | Saudi Arabian Red Crescent and Al Swailem undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which they were participating, Radical Muslim Terrorism, planned to and would commit an |

| | | |
|---|---|---|
| | | act of deadly aggression against the United States in the near future, using the resources and support they supplied. |
| early 1990s to 9/11/2001 | Saudi Arabian Red Crescent and Al Swailem | The Saudi Arabian Red Crescent and Al Swailem agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

  (c)  not applicable

  (d)  No.

  (e)  No.

  (f)  The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Saudi Arabian Red Crescent, Al Swailem and other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism.

  (g)  The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

  (a)  The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

  (b)  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel,

and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Saudi Arabian Red Crescent and Al Swailem fit neatly into this framework by raising funds for providing funding to, and otherwise providing material support for al Qaida and the members of the Enterprise who engaged in the Attack.

    (c)      no.

    (d)      The Saudi Arabian Red Crescent and Al Swailem are associated with the Enterprise.

    (e)      The Saudi Arabian Red Crescent and Al Swailem are members of the Enterprise, and are separate and distinct from the Enterprise.

    (f)      The Saudi Arabian Red Crescent and Al Swailem intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.     The pattern of racketeering activity conducted by the Saudi Arabian Red Crescent and Al Swailem is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8.     The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Saudi Arabian Red Crescent and Al Swailem furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.     The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.    The Enterprise, and the racketeering activities conducted by the Saudi Arabian Red Crescent and Al Swailem, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.    Not applicable.

12.    Not applicable.

13.    Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14.    The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Saudi Arabian Red Crescent, who laundered funds and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities. In addition, al Qaida members cited the ostensible employment with charities including Saudi Red Crescent to conceal their terrorist activities and to gain entry into important conflict areas.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the financial services and funds supplied by participants and conspirators like the Saudi Arabian Red Crescent and Al Swailem. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Saudi Arabian Red Crescent and Al Swailem. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Saudi Arabian Red Crescent and Al Swailem. The Saudi Arabian Red Crescent and Al Swailem, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. The Saudi Arabian Red Crescent and Al Swailem also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.    As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.    Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.     Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.     pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20.     not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Saudi Arabian Red Crescent Society and Abdul Rahman Al Swailem | The Saudi Arabian Red Crescent Society (the "Saudi Arabian Red Crescent") is a Saudi Arabia-based ostensible charity, which conducts operations throughout the world. Abdul Rahman Al Swailem ("Al Swailem") is the president of the Saudi Arabian Red Crescent, and chairman of the Saudi Joint Committee for Relief of Kosovo and Chechnya (SJRC).  In his capacities as president of the Saudi Red Crescent and chairman of the SJRC, Al Swailem actively and directly participated in both organizations' sponsorship of al Qaida , and used his authority to facilitate and conceal the support provided by those organizations to al Qaida.<br><br>The Saudi Arabian Red Crescent and Al Swailem have, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.<br><br>The Saudi Arabian Red Crescent is an agency, instrumentality and organ of the Kingdom of Saudi Arabia (the "Kingdom").  The Kingdom controls and directs the Saudi Arabian Red Crescent's operations, appoints and terminates Saudi Arabian Red Crescent personnel, provides the Saudi Arabian Red Crescent with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the Saudi Arabian Red Crescent's operation.  In many countries, the Saudi Arabian Red Crescent conducts operations from the local Saudi embassy, under the supervision of the | 1962(c)<br><br>1962(d) |

embassy's Islamic Affairs Division.

The Saudi Arabian Red Crescent and Al Swailem have provided important support to al Qaida, including maintaining passport for al Qaida operatives so they can avoid searches. Indeed, the Saudi Arabian Red Crescent is referred to as an "umbrella" by al Qaida operatives, and Abdullah Azzam, Osama bin Laden's spiritual advisor, wrote that "at the forefront" of the Islamic charities that provided "financial support" to jihad is the Saudi Arabian Red Crescent.

The Saudi Arabian Red Crescent is one of the organizations comprising the Saudi Joint Relief Committee (the "SJRC"), a body established by the Kingdom to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya. The other purported charities compromising the SJRC include the International Islamic Relief Organization (the "IIRO"), World Assembly of Muslim Youth, al Haramain Foundation, Islamic Endowments and Makk Establishment, among others.

In Kosovo the SJRC served as a cover for several al Qaida operatives, including Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC. Between 1998 and 2000, the Kingdom, through the SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with the SJRC bureaus. Throughout this time, the SJRC, of which the Saudi Arabian Red Crescent was a part, was under the supervision and control of Saudi Interior Minister Prince Naif bin Abdul Aziz.

In 2001, in Bosnia, two administrators for the Saudi Arabian Red Crescent, Boumediene Lakhdar and Nechle Mohammed, were arrested for plotting terrorist attacks against

the U.S. and British Embassies in Sarajevo.

The Saudi Arabian Red Crescent is also a participant in the Islamic Coordination Council (the "ICC"), an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan.  Other members of the ICC included the IIRO and the Qatar Charitable Society.  Throughout the 1980s the Saudi Arabian Red Crescent provided extensive financial and logistical support to the mujihadeen in Afghanistan.  During this time, the Saudi Arabian Red Crescent was populated and run by Islamic militants who would become the future founders of al Qaida.  Indeed, Wa'el Julaidan served as an officer of the Saudi Arabian Red Crescent for many years, and continued to fill that role following the establishment of al Qaida.  Ayman-Zawahiri, al Qaida's second in command, joined the Saudi Arabian Red Crescent in 1985.  In 1995, he presented himself as a representative of the Saudi Arabian Red Crescent and raised $500,000 in the San Francisco area.

Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujhadeen elements which joined Osama bin Laden's al Qaida, and the Saudi Arabian Red Crescent redirected its efforts towards the fulfillment of the objectives of the newly established al Qaida movement.  The Saudi Arabian Red Crescent's integral role in the growth and development of the nascent al Qaida movement has been confirmed by documents seized in Bosnia and Herzegovina, during the searches of the Benevolent International Foundation's offices.  During those searches, investigators recovered a list of orders from Osama bin Laden regarding the management of Islamic charities.  On point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaida, and suggests the participation of the Saudi Arabian Red Crescent, among

others.  During that same search, investigators found a letter on Saudi Arabian Red Crescent stationary to Abu Rida, another founding member of al Qaida, requesting that "weapons be inventoried."  At the bottom of the letter is a note from Osama bin Laden to Wa'el Julaidan stating that al Qaida has an extreme need for weapons.

Moreover, Saudi Arabian Red Crescent employees have repeatedly been implicated in al Qaida attacks and plots.  In 1996, two Sudanese members of the Saudi Arabian Red Crescent were arrested in connection with the 1995 Egyptian Embassy bombing in Pakistan.  In October 2001, Pakistan deported several dozen representatives of the Saudi Arabian Red Crescent, after confirming their affiliation with al Qaida.

In addition, other of al Qaida's charity fronts have used the Saudi Red Crescent as a vehicle for conducting operations in regions were those charities had been banned from operating based on their affiliation with al Qaida.  For examples, when Russian authorities refused to permit several Saudi charities to provide aid in Chechnya, the Saudi government channeled the operations of those charities through the Saudi Red Crescent.