UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to Sherif Sedky** |

*This document relates to:*      Federal Insurance Co. v. al Qaida
                                 03 CV 06978 (RCC)


**RICO STATEMENT**
**APPLICABLE TO SHERIF SEDKY**

       Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Sherif Sedky, a/k/a Cherif Sedky (hereinafter "Sherif Sedky").

       Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.      The names of the defendant to whom this RICO statement pertains is Sherif Sedky. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.      The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support for terrorism | 18 U.S.C. § 2332, § 2339 (A) – (C) |

(b) <u>dates of, the participants in, and a description of the facts surrounding the predicate acts</u>

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Sherif Sedky | Throughout this period, Sherif Sedky conspired to and did support terrorism, evade tax obligations, and obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Sherif Sedky | In violation of 18 U.S.C. § 1952, on multiple occasions Sherif Sedky conspired to and did traffic in interstate and/or foreign commerce, and/or used the mail and/or facilities in interstate or foreign commerce with intent to distribute the proceeds of their money laundering activities which are indictable under 18 U.S.C. § 1956 and/or 1957. |
| early 1990s to 9/11/2001 | Sherif Sedky | In violation of 18 U.S.C. § 1956, on multiple occasions Sherif Sedky conspired to and did conduct financial transactions knowing that the property involved in those financial |

| | | |
|---|---|---|
| | | transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations controlled by Sherif Sedky |
| early 1990s to 9/11/2001 | Sherif Sedky | In violation of 18 U.S.C. § 1957, on multiple occasions Sherif Sedky conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| early 1990s to 9/11/2001 | Sherif Sedky | In violation of 18 U.S.C. § 371, Sherif Sedky conspired to and did defraud the United States Government of taxes legally due |
| mid-1990s to 9/11/2001 | Sherif Sedky | In violation of 26 U.S.C. § 7206(1), (2), Sherif Sedky conspired to and did file false or materially false tax returns |
| early 1990s to 9/11/2001 | Sherif Sedky | In violation of 26 U.S.C. § 7212(a), Sherif Sedky conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws |
| early 1990s to 9/11/2001 | Sherif Sedky | Sherif Sedky undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise he was underwriting, Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources supplied by Sherif Sedky |
| early 1990s to 9/11/2001 | Sherif Sedky | Sherif Sedky agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, tax evasion, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Sherif Sedky and other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism. For example, in one such transaction, in 1998, SAAR Network Entity Mar-Jac Poultry, Inc. "donated" $1.1 million, which represented 99% of the company's profits for that year, to SAAR Network Entity African Muslim Agency, a purported charity, which then transferred all but $35,000 of the money to another SAAR Network Entity, York International, a shell company located in the Isle of Man, which is famed for its bank secrecy laws. At the time of these transfers, Sherif Sedky served as an officer and/or director of all three SAAR Network Entities. In other words, Sherif Sedky directed Mar Jac's profits through a series of other entities he also controlled, until those funds ultimately reached a shell company in the Isle of Man, where they could no longer be tracked by federal authorities. These transactions bear all of the hallmarks of money laundering in support of terrorism. Such money laundering, the filing of false tax returns, and tax evasion were all in furtherance of a conspiracy to commit murder and arson which culminated in the Attack.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a)   The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel,

and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sherif Sedky fit neatly into this framework by raising funds for providing funding to, and otherwise providing material support for al Qaida and the members of the Enterprise who engaged in the Attack.

    (c)    no.

    (d)    Sherif Sedky is associated with the Enterprise.

    (e)    Sherif Sedky is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f)    Sherif Sedky intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Sherif Sedky is separate from the existence of Radical Muslim Terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sherif Sedky furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sherif Sedky, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

5

14. The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Sherif Sedky, who laundered funds and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities. In addition, al Qaida members cited the ostensible employment with charities to conceal their terrorist activities and to gain entry into important conflict areas.

    The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the financial services and funds supplied by participants and conspirators like Sherif Sedky. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Sherif Sedky. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sherif Sedky. Sherif Sedky, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Sherif Sedky also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

6

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.  pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20.  not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Sherif Sedky | In his capacity as secretary, trustee and director of the SAAR Network, Sherif Sedky conspired to and did generate and surreptitiously transfer funds to terrorist organizations, including al Qaida. As Sherif Sedky knew, the entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. | 1962(c) 1962(d) |
| Sherif Sedky | In his capacity as secretary, trustee and director of the SAAR Network, Sherif Sedky committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America. | 1962(c) 1962(d) |
| Sherif Sedky | In his capacity as advisor to the Bin Mahfouz family: Khalid Bin Mahfouz is a wealthy Saudi national and is identified on the "Golden Chain" as one of al Qaida's principal individual financiers. For many years, bin Mahfouz owned a controlling interest in National Commercial Bank ("NCB"), and served as President and CEO of that institution. While under Bin Mahfouz's control, and with Sherif Sedky's assistance, NCB provided extensive financial services and | 1962(c) 1962(d) |

|  | other forms of material support to al Qaida. Bin Mahfouz, with Sherif Sedky's assistance, also endowed the Blessed Relief Foundation, established to serve as a vehicle for funding and otherwise supporting terrorist organizations, including al Qaida, and designated as a Foreign Terrorist Organization under Executive Order 13224 based on its extensive involvement in al Qaida's global operations.  Bin Mahfouz, again with Sherif Sedky's assistance, is also intimately associated with the International Development Foundation, another charity operating within al Qaida's support infrastructure.  Sherif Sedky thus participates and conspires in al Qaida's operations with full knowledge that his funds would be used to support al Qaida's operations and terrorist attacks, which culminated in the Attack. |  |
|---|---|---|

A.