**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*     Federal Insurance Co. v. al Qaida
03 CV 06978 (RCC)

## THE FEDERAL PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO THE MOTION TO DISMISS FILED BY
## ABDULRAHMAN ALAMOUDI

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ALLEGATIONS AGAINST ALAMOUDI .................................................... 1

III.  ARGUMENT ...................................................................................................... 9

   A.  Applicable Standards on a Motion to Dismiss.......................................... 10

       1.  Fed. R. Civ. P. 12(b)(6).................................................................... 10

       2.  Fed. R. Civ. P. 8(a)(2) ..................................................................... 11

   B.  Alamoudi Improperly Attempts to Submit Evidence ............................... 12

   C.  Plaintiffs' Allegations Are Fair Statements that Give Alamoudi Notice of
       the Plaintiffs' Claims ................................................................................ 12

   D.  Plaintiffs Have Adequately Alleged Claims Under the ATA ..................... 13

       1.  Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant  to
           General Tort Principles ................................................................... 14

       2.  Plaintiffs Have Adequately Alleged Claims Under the ATA Based
           Upon Alamoudi's Criminal Violations.............................................. 17

       3.  Plaintiffs Have Adequately Pled Causation ..................................... 18

   E.  Plaintiffs Have Sufficiently Pled a RICO Claim ...................................... 19

       1.  Plaintiffs May Pursue a RICO Claim................................................ 20

       2.  Plaintiffs Have Sufficiently Pled Violations of §§ 1962(c) & (d) ........... 22

   F.  Plaintiffs Have Sufficiently Pled Conspiracy and Aiding and Abetting........ 24

   G.  Plaintiffs Have Adequately Alleged State Common Law Claims ............... 24

IV.  CONCLUSION.................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abrahams v. Young & Rebicam, Inc.*,
   79 F.3d 234 (2d Cir. 1996)..............................................................................21

*Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*,
   459 U.S. 519 (1983)........................................................................................23

*Boim v. Quranic Literacy Institute* ("*Boim I*"),
   291 F.3d 1000 (7th Cir. 2002) .......................................................... 13-17, 18

*Boim v. Quranic Literacy Institute* ("*Boim II*"),
   No. 00-C-2905, 2004 U.S. Dist. LEXIS 22745 (N.D. Ill. Nov. 10, 2004) ........... 15-17, 18

*Boim v. Quranic Literary Institute* ("*Boim II*"),
   No. 00-C-2905, 2004 WL. 2554446 (N.D. Ill. Nov. 10, 2004) .......................................15

*Chance v. Armstrong*,
   143 F.3d 698 (2d Cir. 1998)..............................................................................11

*Condit v. Dunne*,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004).................................................................12

*Conley v. Gibson*,
   355 U.S. 41 (1957).....................................................................................10, 11

*Foman v. Davis*,
   371 U.S. 178 .................................................................................................13

*Geisler v. Petrocelli*,
   616 F.2d 636 (2d Cir. 1980)......................................................... 10-11, 12

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983)....................................................................14, 19

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984)..........................................................................................15

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992)........................................................................................23

*In re Initial Public Offering Sec. Litigation*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003).................................................................12

*Leatherman v. Tarrant County*,
    507 U.S. 163 (1993)............................................................................................11, 12

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003).............................................................................23, 24

*Lumbard v. Maglia, Inc.*,
    621 F. Supp.  1529 (S.D.N.Y. 1985)............................................................... 18-19

*Merrill Lynch Futures, Inc. v. Kelly*,
    585 F. Supp. 1245 (S.D.N.Y. 1984)......................................................................14

*National Asbestos Workers Medical Fund v. Philip Morris, Inc.*,
    74 F. Supp. 2d 221 (E.D.N.Y. 1999) ........................................................ 20-21, 23

*Pelman v. McDonald's Corp.*,
    No. 03-9010, 2005 U.S. App. LEXIS 1229 (2d Cir. January 25, 2005).......... 10, 11-12, 13

*In re Phillip Servs. Corp. Secs. Litig.*,
    No. 98-CIV-0835 (MBM), 2004 U.S. Dist. LEXIS 9261
    (S.D.N.Y. May 24, 2004)........................................................................................10

*Rachman Bag Co. v. Liberty Mutual Insurance Co.*,
    46 F.3d 230 (2d Cir. 1995)....................................................................................13

*Ramos v. Patrician Equities Corp.*,
    No. 89-CIV-5370 (TPG), 1993 U.S. Dist. LEXIS 2979
    (S.D.N.Y. March 3, 1993)......................................................................................20

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)...............................................................................................21

*Rich-Taubman Associate v. Stamford Restaurant Operating Co., Inc.*,
    587 F. Supp. 875 (S.D.N.Y. 1984)........................................................................14

*Salinas v. United States*,
    522 U.S. 52 (1997).................................................................................................24

*Simmons v. Abruzzo*,
    49 F.3d 83 (2d Cir. 1995) ......................................................................................10

*Swierkiewicz v. Sorema*,
    534 U.S. 506 (2002)........................................................................ 10, 11-12, 13

*United States v. Cuervelo*,
    726 F. Supp. 103 (S.D.N.Y. 1989).................................................................. 14-15

*United States v. Louie*,
    625 F. Supp. 1327 (S.D.N.Y. 1985)............................................................22-23

*United States v. Nusraty*,
    867 F.2d 759 (2d Cir. 1989)....................................................................14

*United States v. Samaria*,
    239 F.3d 228 (2d Cir. 2001)................................................................ 14-15

*United States v. Turkette*,
    452 U.S. 576 (1981).................................................................................22

*United States v. Young*,
    745 F.2d 733 (2d Cir. 1984)....................................................................14

*Von Bulow v. Von Bulow*,
    634 F. Supp. 1284 (S.D.N.Y. 1986)........................................................23

*Wahad v. FBI*,
    813 F. Supp. 224 (S.D.N.Y. 1993)..........................................................14

*Whyte v. Contemporary Guidance Servs.*,
    No. 03-C 2004 U.S. Dist. LEXIS 12447 (S.D.N.Y. July 2, 2004) ............................13, 18

*Woodford v. Community Action Agency*,
    239 F.3d 517 (2d Cir. 2001)....................................................................11

*Wynder v. McMahon*,
    360 F.3d 73 (2d Cir. 2004)................................................................ 10-11, 13

*Yilmaz v. McElroy*,
    No. 00-CV-7542 (RCC), 2001 U.S. Dist. LEXIS 20839
    (S.D.N.Y. Dec. 17, 2001) ........................................................................11

*Yoder v. Orthomolecular Nutritionist Institute, Inc.*,
    751 F.2d 555 (2d Cir. 1985)....................................................................10

## STATUTES AND RULES

18 U.S.C. § 1961 ..........................................................................................9

18 U.S.C. § 1962 .................................................................................... 19-24

18 U.S.C. § 2331 .................................................................................... 9, 13

18 U.S.C. § 2339A ............................................................................................18

18 U.S.C. § 2339B ............................................................................................18

Fed. R. Civ. P. 8 ...................................................................................... 11-12, 13

Fed. R. Civ. P. 12(b)(6).............................................................................. 10-11

## OTHER MATERIALS

Fact Sheet on Executive Order 13224, U.S. Department of State, Office of the
    Coordinator for Counterterrorism (December 20, 2002) .....................................7

Brett Gentrup, Special Agent, U.S. Immigration and Customs Enforcement, "Affidavit in
    Support of Criminal Complaint," *United States v. Alamoudi* (E.D. Va.)
    (September 30, 2003) ................................................................................3, 4, 5, 6

Brett Gentrup, Special Agent, U.S. Immigration and Customs Enforcement,
    "Supplemental Declaration in Support of Detention," *United States v. Alamoudi*
    (E.D. Va.), (October 22, 2003) ....................................................................1, 3, 4, 5, 6

*Progress Since 9/11: The Effectiveness of U.S. Anti-Terrorist Financing Efforts:
    Hearings Before the Subcomm. on Oversight and Investigations of the House
    Comm. on Financial Services* (March 11, 2003) (prepared testimony of Matthew
    Epstein with Evan Kohlman, Senior Terrorism Analysts, The Investigative
    Project)........................................................................................................2, 3

*U.S. Senate Select Committee on Intelligence & U.S. House Permanent Select Committee
    on Intelligence, Joint Inquiry into Intelligence Community Activities before and
    after the Terrorist Attacks of September 11, 2001*, S. Rep. No. 107-351 & H. Rep.
    No. 107-792 (December 2002), *available at*
    http://www.gpoaccess.gov/serialset/creports/911.html. .................................. 1-2

Press Release, U.S. Department of Justice, *Abdurahman Alamoudi Sentenced to Jail in
    Terrorism Financing Case* (October 15, 2004) ............................................5, 6

*Terrorism Financing: Origination, Organization, and Prevention: Hearings Before the
    U.S. Senate Committee on Governmental Affairs*, S. Hrg. 108-245 (July 31,
    2003) (testimony of R. Richard Newcomb, Director, Office of Foreign Assets
    Control, U.S. Department of the Treasury)................................................... 8-9

*The Financing of Terror Organizations: Hearings Before the Senate Comm. on Banking,
    Housing, and Urban Affairs* (October 22, 2003) (prepared testimony of Matthew
    A. Levitt, Senior Fellow, The Washington Institute for Near East Policy,
    "UNTANGLING THE TERROR WEB: The Need for a Strategic Understanding

of the Crossover Between International Terrorist Groups to Successfully
Prosecute the War on Terror")......................................................................... 5-6

## I.      INTRODUCTION

The Federal Plaintiffs have sued Abdulrahman Alamoudi ("Alamoudi") based on his participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaida, of which the September 11th Attack was a natural, intended and foreseeable product.[1]  FAC ¶¶ 66, 72, 245-247, 295 & 490; RICO at Exhibit A.[2]

## II.     ALLEGATIONS AGAINST ALAMOUDI

Alamoudi is the Vice President of Taibah International Aid Association's ("Taibah") U.S. branch.  FAC ¶ 245;  Brett Gentrup, Special Agent, U.S. Immigration and Customs Enforcement, "Supplemental Declaration in Support of Detention," *United States v. Alamoudi* (E.D. Va.), at 13-14 (October 22, 2003) (hereinafter "Gentrup Supp."), attached to the Affirmation of Sean P. Carter in Opposition to the Motion to Dismiss of Alamoudi (hereinafter "Cater Affirm.") as Exhibit 1.  Taibah has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.[3]  FAC ¶¶ 239 & 66.  Taibah has been directly implicated in the 1998 United States Embassy bombings in Kenya and Tanzania.[4] FAC ¶ 244.  Moreover, Taibah has

---

[1]       Defendant Alamoudi's Memorandum of Law in support of his Motion to Dismiss the Federal Plaintiffs' First Amended Complaint ("FAC") is, for all intents and purposes, identical to the Memorandum of Law that he filed in the *Burnett* action.  As a result, the Federal Plaintiffs have endeavored to interpret Defendant Alamoudi's arguments and have made a good faith effort to be as responsive as possible to Alamoudi's Memorandum.

[2]       "FAC" refers to the Federal Plaintiffs' First Amended Complaint.  "RICO" refers to the RICO Statement applicable to Alamoudi, which was filed on August 2, 2004.  Under ¶14 of Case Management Order No. 2, "[a]ny such RICO statement shall be deemed an amendment to the Federal Insurance plaintiffs' . . . Amended Complaint, by incorporation by reference."

[3]       Taibah is a non-profit organization headquartered in Falls Church, VA, which has offices in Sarajevo, Bosnia, Tirana, Albania, and Moscow.  Gentrup Supp. at p.13-14; FAC ¶ 238.  Taibah was founded in 1991 by Abdullah A. bin Laden, who is Osama bin Laden's nephew.  Gentrup Supp. at p.13; FAC ¶ 238.  Abdullah bin Laden was a director of Taibah and had signature authority over the Taibah bank account.  Gentrup Supp. at 13.

[4]       In August 1996, bin Laden issued the first *fatwa* (religious decree) declaring *jihad* (holy war) against the United States.  U.S. Senate Select Committee on Intelligence & U.S. House Permanent Select Committee on Intelligence, Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 (hereinafter "Joint Inquiry"), S. REP. NO. 107-351 & H. REP. NO. 107-792, at 129 (December 2002), *also available at* http://www.gpoaccess.gov/serialset/creports/911.html.  In February 1998, al Qaida issued a second *fatwa* under the banner "the World Islamic Front for Jihad Against Jews and Crusaders," saying that it was the duty of all Muslims to kill United States citizens – civilian or military – and their allies everywhere.  FAC ¶ 42.  Just a few months later, al Qaida acted on that threat, bombing the U.S. embassies in Kenya and Tanzania, leaving

been particularly active in furthering al Qaida's efforts to establish a base of operations in Bosnia.[5]  FAC ¶ 240; *see also Progress Since 9/11: The Effectiveness of U.S. Anti-Terrorist Financing Efforts: Hearings Before the Subcomm. on Oversight and Investigations of the House Comm. on Financial Services*, at 13 (March 11, 2003) (prepared testimony of Matthew Epstein with Evan Kohlman, Senior Terrorism Analysts, The Investigative Project) (hereinafter "Epstein Test."), Carter Affirm. Exhibit 2.  Within Bosnia, Taibah worked closely with the Global Relief Foundation ("GRF")[6] and the Saudi High Commission ("SHC"),[7] from which it received a vast majority of its funding.  FAC ¶ 243.

---

258 people dead and more than 5,000 injured.  Furthermore, the Attack on the World Trade Center in 1993 and a plot to blow up bridges, tunnels, and landmarks in New York, which the FBI discovered in 1993, both indicate that al Qaida was in the process of planning the September 11th Attack at that time.  Joint Inquiry at 130.

[5]     Mustafa al-Kadar, one of the five al Qaida members arrested in 2001 for plotting to attack the U.S. Embassy in Bosnia, gained entry into Bosnia and Bosnian citizenship rights based on his employment with Taibah.  FAC ¶ 240.  Based on substantial evidence of pervasive involvement in al Qaida's activities within Bosnia, police raided Taibah's office on December 13, 2001.  FAC ¶ 241.  The raid and subsequent investigation of Taibah's financial records confirmed that Taibah diverted donated funds to al Qaida and al Qaida affiliated militants in Bosnia.  FAC ¶ 241.  The investigation further confirmed that Taibah facilitated entry of al Qaida members into Bosnia by falsely claiming that those terrorists would be serving as employees for the organization in the region.  FAC ¶ 242; Epstein Test. at 13.  Bosnian officials concluded that "large cash sums were withdrawn by [Taibah] management . . . which were never accounted for," indicating "a wide scope for possible illegal spending."  Epstein Test. at 13. (quoting Glenn R. Simpson, "Report Links Charity To an al Qaeda Front." *The Wall Street Journal*. September 20, 2002).

[6]     GRF is an ostensible charity that was organized under the laws of Illinois in 1992, and it has long acted as fully integrated component of al Qaida's logistical and financial support infrastructure and provided material support and resources to al Qaida and affiliated FTOs.  FAC ¶¶ 217 & 218.  On December 14, 2001, Bosnian Federation Police searched the offices of GRF.  FAC ¶ 249.  The search confirmed GRF's sponsorship of al Qaida's activities in Bosnia and elsewhere.  FAC ¶ 249.  Accordingly, Bosnian officials shut down GRF's operations in that country.  FAC ¶249.  Taibah assumed representation of GRF's interests after the Bosnian government closed GRF's offices in Bosnia.  FAC ¶ 250.  On October 18, 2002, the U.S. government designated GRF under the authority of Executive Order 13224.  FAC ¶ 218.  In the press release issued in conjunction with the designation of GRF, the Treasury Department stated that GRF's "officers and directors have connections to, and have provided support for and assistance to, Usama Bin Laden (UBL), al Qaida, and other known terrorist groups."  FAC ¶ 219.  The Treasury Department also noted that "GRF has provided financial and other assistance to, and received funding from, individuals associated with al Qaida."  FAC ¶ 219.  In addition, the Treasury Department outlined several other connections to al Qaida.  See FAC ¶ 219.

[7]     SHC is a Saudi Arabia-based charity that is an agency, instrumentality and organ of the Kingdom of Saudi Arabia.  FAC ¶¶ 180-181.  SHC has long acted as full integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.  FAC ¶ 182.  According to Bosnian officials, al Qaida mujihadeen fighters began entering Bosnia-Herzegovina in 1992, frequently disguised as workers for the SHC.  FAC ¶ 183.  For the next ten years, SHC funneled millions of dollars to al Qaida operations in Bosnia.  FAC ¶184.  To this date, investigators have been unable to account for approximately $41 million donated to this charity.  FAC ¶ 184.  In October 2001, the U.S. government raided the Sarajevo offices of the SHC.  FAC ¶ 186.  During that raid, investigators found computer hard drives with photographs of the World Trade Center before and after the collapse, as well as photographs of the U.S. Embassies in Kenya and Tanzania and the U.S.S. Cole.  FAC ¶ 186.  Investigators also found files on pesticides and crop

As an officer of Taibah, Alamoudi is intimately affiliated with several organizations within the SAAR network.[8]  FAC ¶ 245.  According to Alamoudi's resume, he served as Executive Assistant to the President of SAAR Foundation between 1985 and 1990.  FAC ¶ 245; Brett Gentrup, Special Agent, U.S. Immigration and Customs Enforcement, "Affidavit in Support of Criminal Complaint," *United States v. Alamoudi* (E.D. Va.), at 9 (September 30, 2003) (hereinafter "Gentrup Aff."), Carter Affirm. Exhibit 3.  Alamoudi also served as President of the Hajj Foundation, and he is a director and Secretary of the Success Foundation ("Success").[9]  FAC ¶ 245; Gentrup Aff. at 10; Gentrup Supp. at 4.  Success is one of many organizations related to IIRO,[10] which works through Success.  Epstein Test. at 15.  Indeed, there is a "closely shared" leadership between IIRO and Success and they "are in reality one and the same."  Epstein Test. at 15 & 16.  According to federal officials, Alamoudi used his control of Taibah, Success, and Happy Hearts Trust ("HHT") to funnel money to al Qaida through various al Qaida funds, including the designated terrorist organizations GRF and The Foundation for Human Rights and Humanitarian Relief, which supported al Qaida operatives associated with the millennium bombing plot.  FAC ¶¶ 243 & 247.

---

dusters, information on how to make fake state department badges, and photographs and maps of Washington, marking prominent government buildings.  FAC ¶ 186.  Following the raid, the Financial Police of the Federation of Bosnia-Herzegovina Ministry of Finance described SHC as a front for radical and terrorism-related activities.  FAC ¶ 187.

[8]  Beginning in the 1980s, several prominent and wealthy sponsors of al Qaida's global *jihad* began establishing a network of interrelated ostensible charities, think tanks, and for-profit businesses within the United States, commonly referred to as the "SAAR Network," to generate and surreptitiously transfer funds to terrorist organizations, including al Qaida.  FAC ¶ 222.  By September 11, 2001, more than one hundred (100) ostensible charities and for-profit businesses functioned under the umbrella of the SAAR Network, including the U.S. branches of the Muslim World League ("MWL"), the International Islamic Relief Organization ("IIRO"), and the Success Foundation.  FAC ¶ 222.  Many of the organizations operating within the SAAR Network are related by common management and parent/subsidiary relationships.  FAC ¶ 225.  The entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.  FAC ¶ 226.

[9]  Success is located at 3606B Forest Drive, Alexandria, VA.  Epstein Test. at 15.  A document entitled "Cooperation Agreement between Success Foundation and Taibah Charitable Foundation" states that "Taibah Foundation will act as an agent for Success Foundation in executing its external projects."  Gentrup Supp. at 14.

[10]  The FAC sets forth detailed allegations regarding IIRO's pervasive sponsorship of al Qaida.  FAC ¶¶ 130-149; see also FAC ¶¶ 113-129.  Given the relationship between Success and IIRO, those allegations are directly relevant to the claims asserted against Alamoudi.

In 1990, Alamoudi founded the American Muslim Council ("AMC").  FAC ¶ 490;
Gentrup Aff. at 9.  Alamoudi has served as a member of the board of directors of AMC and as its
Executive Director for the past several years.  Gentrup Aff. at 9-10.  Alamoudi is also President
of the American Muslim Foundation ("AMF").[11] Gentrup Supp. at 4; Gentrup Aff. at 9.

Defendant Alamoudi has also openly supported terrorist organizations such as Hamas and
Hezbollah, both of which cooperate with al Qaida.  See FAC ¶¶ 50 & 53.  On October 28, 2000,
Defendant Alamoudi openly declared his support for those terrorist organizations at a rally in
Washington, D.C.:

> I have been labeled by the media in New York to be a supporter of
> Hamas.  Anybody support this Hamas here?  Anybody's [sic] is a
> supporter of Hamas here?  Anybody's [sic] is a supporter of
> Hamas here?  Here that Bill Clinton, we are all supporters of
> Hamas!  Allah akbar [God is greater].  I wish to add here I am also
> a supporter of Hezbollah!  Anybody supports Hezbollah here?
> Anybody supports Hezbollah here? . . .  I want to send a message .
> . .  My Brothers, this is the message that we have to carry to
> everybody.  It's an occupation, and Hamas is fighting to end an
> occupation.  It's a legal fight.  Allah akbar!  Allah akbar!

Gentrup Aff. at 10.  Alamoudi's involvement with and support of terrorist organizations is
further shown by his participation in a Conference in Beirut in January 2001 alongside leaders of
al Qaida, Hamas, Hezbollah, and Islamic Jihad.  Gentrup Aff. at 11 (referring to an article in
*Jerusalem Post* dated June 22, 2001).

On August 16, 2003, officials of Britain's Metropolitan Police Service (New Scotland
Yard), National Terrorist Financial Investigations Unit (Special Branch) detained Alamoudi at
Heathrow Airport when he attempted to travel from London, England, to Damascus, Syria.  FAC
¶ 246; Gentrup Aff. at 12.  As a result of a search of Alamoudi's belongings, Customs officers
discovered and seized approximately $340,000 in 34 bundles of sequentially numbered $100

---

[11]     The address on the corporate records for AMF is 1212 New York Avenue, N.W. Suite 525, Washington,
D.C., which is the same building where AMC is located.  In addition, records for AMF are also located at 3606B
Forest Drive, Alexandria, VA, which is the location of Success.  Gentrup Supp. at 4; Gentrup Aff. at 9.  Happy
Hearts Trust ("HHT") also uses the address 3606 Forest Drive, Alexandria, VA as its mailing address.  Gentrup
Supp. at 4.  HHT is under the "same umbrella" as Success and AMF.  Gentrup Supp. at 4.

bills,[12] two U.S. passports and one Yemeni passport.[13]  FAC ¶ 246; Gentrup Aff. at 12 & 17.

Alamoudi explained that he intended to eventually deposit the money in banks located in Saudi

Arabia, from which he would then feed it back into accounts in the U.S. in smaller sums.[14]

Gentrup Aff. at 14.  Alamoudi later explained to U.S. authorities how, from November 1995 to

September 2003, he devised a scheme to obtain money from Libya and other sources overseas

for transmission into the U.S. without attracting the attention of U.S. federal immigration,

customs and law enforcement officials.  Press Release, U.S. Department of Justice, *Abdurahman*

*Alamoudi Sentenced to Jail in Terrorism Financing Case* (October 15, 2004) (hereinafter "DOJ

Press Release"), Cater Affirm. Exhibit 4.  He admitted to participating in a comprehensive

scheme to conceal prohibited financial transactions related to Libya, his travel to Libya, and

financial transactions designed to evade currency reporting requirements.  DOJ Press Release.

One government official has stated that "in addition to dealing with Libya, [Alamoudi] has a

more direct connection with terrorist organizations designated by the United States government."

*The Financing of Terror Organizations: Hearings Before the Senate Comm. on Banking,*

*Housing, and Urban Affairs*, at 11 (October 22, 2003) (prepared testimony of Matthew A. Levitt,

Senior Fellow, The Washington Institute for Near East Policy, "UNTANGLING THE TERROR

WEB: The Need for a Strategic Understanding of the Crossover Between International Terrorist

---

[12]      U.S. officials allege that the $340,000 seized may have been destined for Syrian-based terrorist groups.
Levitt Test. at 10-11.

[13]      One of the items seized by the Special Branch when Alamoudi was detained on August 16, 2003 was his
Palm Pilot.  Gentrup Supp. at 19.  A printout of all of the contact information in that device shows that Alamoudi
had contacts with Specially Designated Global Terrorists ("SDGTs").  Gentrup Supp. at 19-20.

[14]      The report from the Special Branch states that Alamoudi explained that he had negotiated funding on his
last visit to Libya, and that it was arranged for him to receive a sizeable cash donation during his stay at the London
Metropole Hotel, Edgware Road, London between August 11, 2003 and August 16, 2003.  Gentrup Aff. at 13.  A
small Samsonite style briefcase, which contained the $340,000 seized by the Special Branch, was then delivered to
Alamoudi's room.  Gentrup Aff. at 13.  Alamoudi told the officers of the Special Branch that he transferred the
money to his own luggage.  Gentrup Aff. at 13.  During a subsequent interview with officers of the Special Branch,
Alamoudi conceded that he had been involved in other similar cash transactions involving amounts from $10,000 to
$20,000.  Gentrup Aff. at 14.

Groups to Successfully Prosecute the War on Terror") (hereinafter "Levitt Test.") (citation omitted), Carter Affirm. Exhibit 5.

Federal officials arrested Alamoudi shortly after he arrived at Washington Dulles International Airport on September 28, 2003.[15]  FAC ¶ 247; Gentrup Aff. at 24.  On July 30, 2004, Alamoudi pleaded guilty to three federal offenses: (1) one count of violating the International Emergency Economic Powers Act (IEEPA), which imposes terrorism-related sanctions prohibiting unlicensed travel to and commerce with Libya; (2) one count of false statements made in his application for naturalization; and (3) tax offenses involving a long-term scheme to conceal from the IRS his financial transactions with Libya and his foreign bank accounts and to omit material from the tax returns filed by his charities.[16]  DOJ Press Release.  Alamoudi was sentenced to twenty-three (23) years in jail for these charges which were related to his activities in the U.S. and abroad with nations and organizations that have ties to terrorism.  DOJ Press Release.  As part of his plea agreement, Alamoudi agreed that he should be sentenced under the terrorism provision of the federal sentencing guidelines, and he agreed to forfeit all proceeds from his illegal dealings with Libya, which total at least $910,000, including the $340,000 seized from him in the United Kingdom.  DOJ Press Release.  According to Attorney General John Ashcroft, Alamoudi is "a terrorist facilitator . . . and we have reason to expect that through his cooperation, we will obtain intelligence that will assist us in our ongoing efforts to advance these critical investigations."  DOJ Press Release.

---

[15]     In an eighteen count indictment filed shortly after his arrest, federal authorities charged Alamoudi with engaging in prohibited financial transactions with the Libyan government, misuse of a passport, procuring naturalization by fraudulent means, and failure to report foreign bank accounts.  FAC ¶ 247

[16]     Through accounts with the National Commercial Bank, wealthy relatives of Defendant Alamoudi, residing in Saudi Arabia, have transferred large sums of money to Alamoudi to support terrorist operations.  FAC ¶ 295. From 1996 through 2002, Alamoudi received approximately $2,168,948 into his personal bank accounts that he did not report on tax returns, which shows that he had access to a substantial amount of cash.  Gentrup Supp. at 20.  He received over $550,000 from his brothers between 1997 and 2002.  Gentrup Supp. at 23-24.

As the above discussion illustrates, Alamoudi aided and abetted, conspired with, and provided material support and resources to al Qaida and affiliated FTOs.  FAC ¶ 66.  Plaintiffs anticipate that Alamoudi will argue that he has not been designated pursuant to Executive Order 13224, and that the Court should therefore infer that he is not a supporter of al Qaida or any other terrorist organization.[17]  In point of fact, the U.S. government's decision not to formally designate Alamoudi under Executive Order 13224 is by no means an indication of innocence.  In this regard, a brief discussion of the history of the Executive Order 13224 designation program, and the process through which the government determines whether designation is the appropriate tool for addressing the terrorist activities of an individual or entity, is warranted.  Executive Order 13224 designation is but one of many tools available to the U.S. government in the war against terrorism.  Other tools employed by the government to fight terrorism include law enforcement, intelligence, diplomacy, and military action.  In certain circumstances, designation is not the preferred tool.  For instance, as it did with Alamoudi, the government may choose to use criminal investigations to attack an individual's terrorist activities.  For obvious reasons, such investigations would be compromised if the government were to publicly designate the individual or organization being targeted through such a criminal investigation.  Moreover, the designation process is a long one, encompassing a lengthy policy coordinating process between the State Department, Treasury Department and Attorney General's Office..[18]

---

[17]     In general terms, the Order provides a means by which to disrupt the financial support network for terrorists and terrorist organizations by authorizing the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism.  Fact Sheet on Executive Order 13224, U.S. Department of State, Office of the Coordinator for Counterterrorism, at 1 (December 20, 2002) (hereinafter "Dep't State Fact Sheet"), Carter Affirm. Exhibit 6.  In addition, because of the pervasiveness and expansiveness of the financial foundations of foreign terrorists, the Order authorizes the U.S. government to block the assets of individuals and entities that provide support, services, or assistance to or otherwise associate with terrorists and terrorist organizations designated under the Order, as well as their subsidiaries, front organizations, agents, and associates.  *Id.*

[18]     "The Executive Order authorizes both the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, or the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate individuals and entities pursuant to the specified criteria described above."  Dep't State Fact Sheet at 2.

During a hearing before the U.S. Senate Committee on Governmental Affairs on July 31, 2003, Senator Arlen Specter and R. Richard Newcomb, Director, Office of Foreign Assets Control ("OFAC"), U.S. Department of the Treasury, discussed the policy coordinating process at length:

> SENATOR SPECTER:  I want to focus very sharply on the rejections on the recommendations which involve Saudi sources. Precisely, what has happened on that?
>
> MR. NEWCOMB:  Well, the designation, as we indicated in our discussions, is not the only possible action.  There is also law enforcement, intelligence, diplomatic, and military—
>
> SENATOR SPECTER:  Well, let's focus on economic sanctions, which is my question, before we go into other possible actions.  I want to know about the recommendations on economic sanctions as to Saudis which have been turned down.
>
> MR. NEWCOMB:  Senator Specter, we have made numerous recommendations, including relating to Saudi Arabia and other terrorist support organizations and groups.  This goes through a Policy Coordinating, PCC process, where all the equities of the government come to the table, including—
>
> SENATOR SPECTER:  Well, my question focuses on recommendations which you have made for sanctions as to Saudi organizations which have been rejected.
>
> MR. NEWCOMB:  Well, first let me say it is not—it is the policy not to comment on internal policy deliberations within the government.  I can tell you these issues have been discussed with all the key players at the table, and when there is another possible action that can be taken, we have achieved our goal by teeing issues up.
>
> . . . .
>
> SENATOR SPECTER:  How about the [IIRO]?  Were there recommendations for sanctions there whish were rejected by higher officials in the Treasury Department?
>
> MS. NEWCOMB:  This is an issue we looked at, and, again, your question related to policy deliberations within the administration which I can not comment on.  I can tell you we did look at that organization.
>
> SENATOR SPECTER:  I am not interested in your policy deliberations.  What I am interested in is yoru conclusions.  Were there economic sanctions taken against the [IIRO]?
>
> MR. NEWCOMB:  To date, there have not been as of this date.
>
> SENATOR SPECTER:  Do you think there should be?

> MR. NEWCOMB:  It is something that we would look at very carefully along with the others participating in the policy process.
>
> SENATOR SPECTER:  Well, when you look at it very carefully, how long have you been looking at it up until now?
>
> MR. NEWCOMB:  Certainly since immediately in the aftermath of September 11.
>
> SENATOR SPECTER:  Well, that is almost 2 years.  How long will it take you to come to a conclusion?
>
> MR. NEWCOMB:  We can recommend and we can designate, but there is a policy process which takes into account all the variety of—
>
> . . . .
>
> MR. NEWCOMB:  I can say that there have been some charities and other organizations that we have considered, we have had at the table, and that have been deferred for other actions which I would deem as appropriate.

*Terrorism Financing: Origination, Organization, and Prevention: Hearings Before the U.S. Senate Committee on Governmental Affairs*, S. HRG. 108-245, at 11-12 (July 31, 2003) (testimony of R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury), Carter Affirm. Exhibit 7.  As the foregoing excerpts make clear, designation is but one of many tools used by the U.S. government in the war on terrorism and, even where designation is the chosen method of fighting terrorism, the policy process can delay designation for two (2) years, if not longer.

## III.   **ARGUMENT**

Defendant Alamoudi makes five arguments in favor of dismissal:  (1) that the Federal Plaintiffs have failed to allege a sufficient factual basis to support any of the claims set forth in the FAC, (2) that the Federal Plaintiffs have failed to state claim under the Anti-Terrorism Act ("ATA"),[19] (3) that the Federal Plaintiffs have failed to state a claim under the Racketeer Influence and Corrupt Organizations Act ("RICO"),[20] (4) that the Federal Plaintiffs have failed to state claims for conspiracy and aiding and abetting, and (5) that the Federal Plaintiffs have failed

---

[19]     *See* 18 U.S.C. § 2331 *et. seq.*
[20]     *See* 18 U.S.C. § 1961 *et. seq.*

to state claims under New York common law.[21]  Defendant's motion must be denied, because the Federal Plaintiffs have alleged a sufficient factual basis to support the claims in the FAC. Furthermore, the Federal Plaintiffs have sufficiently pled causes of action under the ATA, RICO, conspiracy, aiding and abetting, and New York common law.

To the extent that the Court finds that the Federal Plaintiffs' FAC does not provide a sufficient factual basis or fails to adequately allege any of the various claims put forth, the Federal Plaintiffs respectfully request leave to amend.  *See Pelman v. McDonald's Corp.*, No. 03-9010, 2005 U.S. App. LEXIS 1229, at *9 n.5 (2d Cir. January 25, 2005) (noting that where a court finds allegations to be "vague and conclusory . . . the cure for such deficiencies, in a claim not required to be pled with particularity, is a motion for a more definite statement under Rule 12(e), Fed. R. Civ. P., rather than dismissal" (citing *Swierkiewicz*, 534 U.S. at 514-15)).

A.       **Applicable Standards on a Motion to Dismiss.**

1.       **Fed. R. Civ. P. 12(b)(6)**

A Motion to Dismiss brought pursuant to Rule 12(b)(6) must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995).  Moreover, "[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole."  *In re Phillip Servs. Corp. Secs. Litig.*, No. 98-CIV-0835 (MBM), 2004 U.S. Dist Lexis 9261, at * 32 (S.D.N.Y. May 24, 2004) (quoting *Yoder v. Orthomolecular Nutritionist Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) (citation omitted)).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the FAC, but "merely to assess the legal

---

[21]       Alamoudi's Motion to Dismiss states that the Court should dismiss the FAC for lack of subject matter jurisdiction, for lack of personal jurisdiction, and for failure to state a claim upon which relief can be granted. However, in his Memorandum of Law in Support of his Motion to Dismiss, Alamoudi, addresses only failure to state a claim under Rule 12(b)(6). See Alamoudi Br. at 4.  Therefore, the Federal Plaintiffs's Memorandum in Oppisition to Alamoudi's Motion to Dismiss focuses only on failure to state a claim.

feasibility" of the FAC.  *Geisler  v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (citing *Conley*, 355 U.S. at 45).  In evaluating whether the Federal Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the FAC and draw all reasonable inferences in favor of the Federal Plaintiffs.  *See Yilmaz v. McElroy*, No. 00-CV-7542 (RCC), 2001 U.S. Dist. LEXIS 20839, at * 6 (S.D.N.Y. Dec. 17, 2001).  The Federal Plaintiffs "are not required to prove [their] case at the pleading stage; indeed, the pleading of evidence should be avoided."  *Woodford v. Cmty. Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001) (internal quotation marks and citations omitted).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (citation omitted).

### 2.   Fed. R. Civ. P. 8(a)(2)

A Rule 12(b)(6) motion is analyzed in the context of the requirements of FED. R. CIV. P. 8(a)(2), which is extremely permissive.  *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief," and that such a statement shall simply "give the respondent fair notice of what the petitioner's claims are and the grounds upon which they rest."  *Id.* (quoting *Conley*, 355 U.S. at 47); *see also Wynder*, 360 F.3d at 77.  In the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Rule 9(b), a federal court is prohibited from imposing more demanding requirements than those prescribed under Rule 8(a).  *Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Swierkiewicz*, 534 U.S. at 513.  "A requirement of greater specificity for particular claims is a result that 'must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.' "  *Swierkiewicz*, 534 U.S. at 515 (quoting *Leatherman*, 507 U.S. at 168). Furthermore, "[i]f a pleading fails to specify the allegations in a manner that provides sufficient

notice, a defendant can move for a more definite statement under Rule 12(e) before responding."
*Id.* at 514; *see also Pelman*, 2005 U.S. App. LEXIS 1229, at *9 n.5 ("the cure for such deficiencies, in a claim not required to be pled with particularity, is a motion for a more definite statement under Rule 12(e) . . . rather than dismissal").  As a judge in this District recently explained, "[s]uch simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues*." In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 322 (S.D.N.Y. 2003) (quoting *Conley*, 355 U.S. at 48).  Thus, "[a]s the Supreme Court recognized in *Swierkiewicz*, one clearly written sentence can satisfy Rule 8(a)(2)."  *Id.* at 323.

### B.   Alamoudi Improperly Attempts to Submit Evidence

Alamoudi's Motion to Dismiss is fatally flawed because he improperly attempts to submit unattested evidence contradicting the allegations put forth by the Federal Plaintiffs. Alamoudi Br. at 2, 6, 9, 10, 11, 15, & 17-19.  Such evidentiary submissions are fundamentally improper in a Motion to Dismiss.[22]  *See Leatherman*, 507 U.S. at 164; *Swierkiwicz*, 534 U.S. at 508 n.1.  Moreover, the Court's job in evaluating Alamoudi's Motion to Dismiss is to assess the legal feasibility of the FAC, not weigh the evidence.  *See Geisler*, 616 F.2d at 639.

### C.   Plaintiffs' Allegations Are Fair Statements that Give Alamoudi Notice of the Plaintiffs' Claims

Alamoudi argues that the Court cannot "accept legal conclusions cast in the form of factual allegations."  Alamoudi Br. at 4.  The allegations in the FAC and the RICO Statement are

---

[22]      Ordinarily, "[w]hen a party submits additional evidence to the Court beyond that which it may consider on a motion to dismiss, the Court must convert the motion to dismiss into a motion for summary judgment [under Rule 56] or *exclude the extraneous documents from consideration*."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 356 (S.D.N.Y. 2004) (emphasis added and citations omitted).   Because Alamoudi has provided no foundation for the facts that he has proffered, those facts should be stricken under any characterization of the motion.   Nevertheless, should the Court decide to treat Alamoudi's motion as a Motion for Summary Judgment, the Federal Plaintiffs request that the Court wait until the close of discovery before ruling on Alamoudi's motion.

not legal conclusions "cast in the form of factual allegations," as Alamoudi asserts; they are fair statements that given him notice of the Plaintiffs' claims and the grounds upon which they are based.  *See Wynder*, 360 F.3d at 77.  Further, the allegations in the FAC and the RICO Statement are sufficient to state a claim under the liberal pleading standard allowed by FED. R. CIV. P. 8(a).  *See Swierkiewicz*, 534 U.S. at 512-13.  To the extent that the Court finds that the Plaintiffs' allegations are insufficient to make out the various claims, the Plaintiffs should be granted leave to amend.  Rule 15(a) provides that "leave shall be freely given when justice so requires."  *See also Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.' " (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Whyte v. Contemporary Guidance Servs.*, No. 03-CV-5544 (GBD), 2004 U.S. Dist. LEXIS 12447, at *13-14 (S.D.N.Y. July 2, 2004) (mem.) (explaining that "leave to amend should be freely given when justice dictates" (citations omitted)).  In addition, "the cure for . . . deficiencies, in a claim not required to be pled with particularity, is a motion for a more definite statement under Rule 12(e) . . . rather than dismissal."  *Pelman*, 2005 U.S. App. LEXIS 1229, at *9 n.5; *see also Swierkiewicz*, 534 U.S. at 514 ("[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding").

### D.     Plaintiffs Have Adequately Alleged Claims Under the ATA

Contrary to Alamoudi's assertions, Plaintiffs have adequately stated a claim against Alamoudi under the ATA, 18 U.S.C. § 2331, *et seq*.  See Alamoudi Br. at 9-10.  A plaintiff may assert a valid claim under the ATA under either of two alternative approaches:  (1) pursuant to general tort principles, including concerted action theories of liability; or (2) by demonstrating that the defendant violated the ATA's criminal standards, and that the defendant's violation was

13

a substantial factor in bringing about plaintiff's injuries.  *Boim v. Quranic Literacy Inst.*, 291

F.3d 1000, 1015 & 1020 (7th Cir. 2002) ("*Boim I*").  The Federal Plaintiffs have done both.

### 1.    Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant to General Tort Principles

In *Boim I*, the Court of Appeals for the Seventh Circuit held that the legislative history of

the ATA evinces a clear intent by Congress to codify general common law tort principles, and to

impose civil liability for acts of international terrorism to the full reaches of traditional tort law.

*Boim I*, 291 F.3d at 1010.  Accordingly, the *Boim I* court specifically embraced the use of

concerted action theories of liability, such as aiding and abetting and conspiracy, to establish

liability over a defendant under the ATA.  *Id.* at 1020.  Civil liability for aiding and abetting will

be imposed where:  (1) the party whom the defendant aids or abets performs a wrongful act that

causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or

tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides

substantial assistance to the wrongdoer.  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir.

1983).[23]  The elements necessary to establish liability for a defendant's participation in a

conspiracy to commit a tort are:  (1) an agreement between two or more persons; (2) to

participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an

unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was

done pursuant to and in furtherance of the overall scheme.  *Id.*[24]

---

[23]        Although New York law likely controls the vast majority of the Federal Plaintiffs' claims, *Halberstam* long
has been regarded as the leading case on concerted action liability, and the New York courts have repeatedly relied
on *Halberstam* in analyzing conspiracy and aiding and abetting claims.  *See Wahad v. FBI*, 813 F. Supp. 224, 233
(S.D.N.Y. 1993); *Rich-Taubman Assoc. v. Stamford Rest. Operating Co., Inc.*, 587 F. Supp. 875, 879 n.5 (S.D.N.Y.
1984); *Merrill Lynch  Futures, Inc. v. Kelly*, 585 F. Supp. 1245, 1254 (S.D.N.Y. 1984).

[24]        "Conspiracy is by nature a clandestine offense."  *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir.
1989) (quoting *Developments in the Law – Criminal Conspiracy*, 72 HARV. L. REV. 920, 933 (1959)); *see also*
*United States v. Cuervelo*, 726 F. Supp. 103, 104-05 (S.D.N.Y. 1989) (same).  In the context of criminal
proceedings, the Second Circuit has expressly noted that  "[a] conspiracy by its very nature is a secretive operation,
and because intent and knowledge are subjective facts, the existence of and participation in a conspiracy with the
requisite criminal intent may be established . . . through circumstantial evidence."  *United States v. Young*, 745 F.2d
733, 762 (2d Cir. 1984) (alterations in original) (internal quotation marks and citations omitted), *cert. denied*, 470
U.S. 1084 (1985).  Moreover, "once a conspiracy is shown to exist, the evidence sufficient to link another defendant

In *Boim v. Quranic Literary Inst.,* No. 00-C-2905, 2004 WL 2554446 (N.D. Ill. Nov. 10, 2004) (mem.) ("*Boim II*"),[25] the United States District Court for the Northern District of Illinois engaged in a thorough and insightful analysis of the standards for imposing liability under the ATA pursuant to concerted actions theories.[26]  In *Boim II*, the parents of an American citizen assassinated in Israel by Hamas sought to hold several entities, including purported charities, liable for their son's death under the Anti-Terrorism Act and concerted action theories.  In support of their claims, the plaintiffs alleged that the defendants knowingly provided material support and resources to Hamas.

Consistent with the principles announced in *Boim I*, the court defined at the outset plaintiffs' burden in establishing defendants' liability.  The court noted that "[t]o prove that the defendants provided material support to Hamas in violation of § 2333, the Boims would have to show that they knew about Hamas' illegal activity, that they desired to help those activities succeed, and that they engaged in some act of helping." 2004 WL 2554446 at *7. With respect to establishing that defendants conspired to provide material support to Hamas, the court held:

> The Boims need not show that the defendants knew about the attack that killed David Boim, or that they committed any specific acts in furtherance of that attack; rather, the Boims need only show that the defendants were involved in an agreement to accomplish an unlawful act and that the attack that killed David Boim was a reasonably foreseeable consequence of the conspiracy.

---

to it need not be overwhelming." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (citation omitted); *see also, e.g., Cuervelo*, 726 F. Supp. at 105 (same).  Given the low standard of *proof* for a criminal conspiracy conviction, it would be improper to impose an elevated pleading standard for civil conspiracy.

[25]   This decision is also available on LEXIS.  *See Boim v. Quranic Literacy Inst.*, No. 00-C-2905, 2004 U.S. Dist. LEXIS 22745 (N.D. Ill. Nov. 10, 2004) (mem.).

[26]   It should be noted that the district court's decision in *Boim II* is a summary judgment ruling, with a fully developed factual record.  In this respect, *Boim II* illustrates the factual scenarios that, when fully developed after discovery, may give rise to liability under the ATA.  Only if there can be *no* such factual scenarios that could be proved consistent with the allegations in the Federal Plaintiffs' FAC may the Federal Plaintiffs be denied the opportunity to take discovery and prove their case. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).  Upon information and belief, the U.S. Treasury Department possesses evidentiary files relating to Alamoudi's sponsorship of al Qaida.  The Federal Plaintiffs submitted a Freedom of Information Act ("FOIA") request for those files over a year ago, but have received no response from the government.  The Court should be aware that the Federal Plaintiffs are continuing their efforts to obtain the information that the government has in its possession.

*Boim II*, 2004 WL 2554446 at *7 (citation omitted).  Moreover, the court explained that "the Boims [would not be] required to provide direct evidence of an agreement between the parties; 'circumstantial evidence may provide adequate proof of conspiracy.' "  *Id.* (quoting *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971)).  The *Boim II* court thus made clear that defendants who knowingly and intentionally provide *any* assistance to terrorist groups may be held liable for all of the terrorist acts the group commits.

The court in *Boim II* also considered, and rejected, another argument made by many of the defendants in this proceeding – that defendants cannot be liable for material support they provided years before the attack in question took place.  In *Boim II,* defendant Mohammed Salah argued that he was entitled to summary judgment because plaintiffs had not demonstrated that he provided any support after 1993, while David Boim was not killed until 1996. The *Boim II* court rejected this argument and, indeed, found it to be of "no moment" that Salah was actually in prison in Israel when David Boim was murdered.  *Id.* at *36.  The court reiterated:

> The Seventh Circuit did not say that, to impose liability under §
> 2333, the Boims have to link Mr. Salah or any of the other
> defendants specifically to the attack that killed David Boim; rather,
> the court held that, to impose liability for aiding and abetting – that
> is, providing material support to – a terrorist organization, the
> Boims need only show that the defendants knew of Hamas' illegal
> activities, that they desired to help those activities succeed, and
> that they engaged in some act of helping.

*Id.* (citing *Boim I*, 291 F.3d at 1028).  Because there was no factual dispute about any of those elements, the court granted summary judgment to plaintiffs even though none of Salah's "act[s] of helping" took place after 1993.  Moreover, the court noted, under principles of civil conspiracy, Salah could be liable for acts committed in furtherance of the conspiracy even if the acts were committed after he had ceased to be an active participant. *Id.*

*Boim II* is also significant in that the court imposed liability for assistance provided to Hamas indirectly, through intermediaries.  Although one defendant, a purported "charity" called

the Holy Land Foundation for Relief and Development ("HLF"), was found to have provided material support directly to Hamas, others, such as the Islamic Association for Palestine ("IAP") and the American Muslim Society ("AMS"), were found to have provided support to HLF, with knowledge that the support would flow through to Hamas.  The district court held that "[a]lthough these fundraising and financing activities relate to HLF, and not Hamas, taken in the context of the findings made . . . about HLF's established link to Hamas, *this is strong evidence that IAP was supporting Hamas . . . .*"  *Boim II*, 2004 WL 2554446 at *23 (emphasis added).[27]

Finally, the evidence described in the *Boim II* decision demonstrates that transactions that appear on their face to be innocuous – including a stipend paid to one defendant purportedly for his voluntary assistance in a project to translate the Quran, *see* 2004 WL 2554446 at *40-42, and a "loan" made purportedly to enable a charity to purchase real estate, *see id.* at *43-44 – may, with further discovery, be revealed to be sham transactions by which material support to terrorism is concealed.

Consistent with the principles announced in *Boim I*  and *Boim II*, the Federal Plaintiffs have stated valid claims against Alamoudi under the ATA.  The FAC alleges that Alamoudi served as a financial facilitator for al Qaida, see Part II., *supra*.

### 2.    Plaintiffs Have Adequately Alleged Claims Under the ATA Based Upon Alamoudi's Criminal Violations

The Federal Plaintiffs have also adequately pled claims against Alamoudi under the ATA based upon Alamoudi's violations of the ATA's criminal standards.  For example, the Federal Plaintiffs have alleged that Alamoudi is intimately associated with the SAAR Network, and that he used his control of Taibah, Success, and HHT to funnel money to al Qaida through various al Qaida funds, including the designated terrorist organizations GRF and The Foundation for

---

[27]      Defendants before this Court have similarly argued that support they provided to al Qaeda through intermediaries such as "charities" cannot subject them to liability. The *Boim II* decision makes clear, however, that if the purported "charities" had established links to al Qaida, the Court may infer that those who supported the "charities" were supporting al Qaida.

Human Rights and Humanitarian Relief.  See Part II, *supra*.  Section 2339A(a) makes it unlawful to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" numerous criminal statutes.  Section 2339B prohibits the knowing provision of "material support or resources to a foreign terrorist organization."  In regard to both sections, the definition of "material support or resources" includes providing "currency or monetary instruments or financial securities" or "financial services."  18 U.S.C. § 2339A(b).  The term "material," as used in these sections, "relates to the type of aid provided rather than whether it is substantial or considerable."  *Boim I*, 291 F.3d at 1015.  Furthermore, Alamoudi's argument that "even if [he] gave money that eventually made it to Al Qaeda, those few alleged transactions were not material support as required by the ATA," Alamoudi Br. at 8, is unpersuasive.  *See Boim II*, 2004 WL 2554446 at *23.  Section 2339A(b) clearly states that "currency or monetary instruments or financial securities" and "financial services" are forms of "material support or resources."  Therefore, the Federal Plaintiffs have stated a cause of action against Alamoudi pursuant to the criminal provisions of the ATA.

### 3.   Plaintiffs Have Adequately Pled Causation

Alamoudi further argues that Plaintiffs have not adequately pleaded a "direct link" between his illicit conduct, if any, and the Attack, sufficient to sustain claims under theories of aiding and abetting and conspiracy.  Alamoudi Br. at 17.  In making this argument, Alamoudi fundamentally misapprehends the elements of the Federal Plaintiffs' aiding and abetting and conspiracy theories, and ignores the allegations in the FAC and the RICO Statement.

Under New York law, "those who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme."  *Lumbard v. Maglia, Inc.*, 621 F. Supp.

1529, 1536 (S.D.N.Y. 1985).  Consistent with this rule, the causation analysis in a civil

conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful

overt act performed by *one of the parties* to the agreement."  *Halberstam*, 705 F.2d at 477

(emphasis added).  Similarly, a plaintiff need only allege that the defendant provided substantial

assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting

of the principal tortfeasor.  *Id.*  Pursuant to these standards, Alamoudi's participation in al

Qaida's conspiracy to commit terrorist attacks against the United States, and aiding and abetting

of that terrorist organization, ties him inextricably to the Attack..  The conduct of terrorist attacks

against the United States and its citizens was, for many years prior to September 11th, al Qaida's

stated objective,[28] and it is absurd to suggest that the Attack was unforeseeable to any party who

knowingly provided material support and resources to al Qaida, as Alamoudi is alleged to have

done.  As the Federal Plaintiffs' injuries are indisputably the direct result of that Attack, the

Federal Plaintiffs have properly and adequately alleged causation.  See Part II., *supra*.

Accordingly, Alamoudi's causation-based arguments must be rejected.

E. **Plaintiffs Have Sufficiently Pled a RICO Claim**

Defendant puts forth two main reasons why the Federal Plaintiffs have failed to plead a

violation of RICO:  (1) "the plaintiffs cannot recover under 1964 (c) for the loss of their loved

ones," and (2) the Federal Plaintiffs fail to "show *a* violation of 18 U.S.C. 1962 (a)-(d)."[29]

Alamoudi Br. at 12 & 12-14 (emphasis in original).  The Federal Plaintiffs contend that they can

recover under RICO, and that they have sufficiently pled violations of §§ 1962(c) & (d).  The

following discussions address each of Alamoudi's arguments in turn.

---

[28]    See note 4, *supra*.

[29]    Alamoudi also argues, "If there is damage as required under 1964 (c) then Fed. R. Civ. Proc. 9 (b) requires
that it be pled with particularity."  Alamoudi Br. at 12.  The Federal Plaintiffs respond to this statement by pointing
out that the damages have been explained in the sealed exhibits.  See MDL Dkt. #s 426 & 434; FAC ¶¶ 541-597
nn.1-50.  In addition, the FAC also explains that the damages being sought are for property damage, business
interruption losses, workers' compensation benefit payments and other specified damages.  FAC at p.181.

1.        **Plaintiffs May Pursue a RICO Claim**

As a result of the Attack, the Federal Plaintiffs have paid out several billion dollars to their insureds for property damage, business interruption losses, and other related economic losses and specified damages.  Therefore, as subrogees of the property insureds, the Federal Plaintiffs may pursue a RICO claim for these types of loss.

Defendant Alamoudi argues, however, that the Federal Plaintiffs cannot recover under RICO "for the loss of their loved ones" because recovery is limited to loss of business or property.  Alamoudi Br. at 12.  The Federal Plaintiffs take this opportunity to explain that they may pursue a RICO claim for workers' compensation benefit payments.[30]  As insurers who paid workers' compensation benefits to those injured and the beneficiaries of those killed, the Insurers are bringing this action to recover the money that they lost as a result of Defendant Alamoudi's violation of Sections 1962(c) and 1962(d).  "The equitable doctrine of subrogation allows insurers . . . to bring their own claims for the recovery of the economic damages incurred as a result of tortious injury to their insureds."  *National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 228 (E.D.N.Y. 1999).  Subrogation functions as a form of assignment, and RICO claims are assignable.  *Id.* (citations omitted).  Indeed, a number of courts agree that a subrogee can assert a RICO claim.  *Id.* (citing *Ramos v. Patrician Equities Corp.*, No. 89-CIV-5370 (TPG), 1993 U.S. Dist. LEXIS 2979 (S.D.N.Y. March 3, 1993) (mem.)).  Further, the Supreme Court has assumed, for purposes of argument, that it was proper for a plaintiff to assert a subrogated RICO claim.  *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 271 (1992)).

*National Asbestos Workers* is instructive here.  In that case, the defendant tobacco companies suggested that the plaintiff health insurer could not state a subrogated RICO claim

---

[30]        The Federal Plaintiffs are also seeking recovery for assigned personal injury and wrongful death claims beyond the workers' compensation claims.  After further review, the Federal Plaintiffs recognize that the RICO claim is not a viable cause of action for the assigned personal injury and wrongful death claims.

because the subrogee insurer plaintiffs "stand in the shoes" of their subrogors and "the subrogors themselves have no RICO claims for the economic injuries associated with the treatment of smoking related illnesses." 74 F. Supp. 2d at 229. Judge Weinstein found the tobacco companies' analysis unpersuasive. According to Judge Weinstein,

> The recovery of pecuniary losses associated with physical injuries directly caused by racketeering conduct is consistent with the language of the RICO statute. Such claims, furthermore, would materially advance the statute's legislative purposes of deterring racketeering, in all its forms, and of remedying, as fully as practicable, the economic consequences of racketeering. Finally, the recovery of these pecuniary losses is consistent with the expansive scope of RICO's civil remedy provisions as consistently interpreted by the Supreme Court.

*Id.* Moreover, "the most natural reading of the language in RICO supports the conclusion that pecuniary losses resulting from racketeering personal injuries should be compensable under the statute, because the statute confers standing on "any person injured in his business or property by reason of [racketeering acts defined in the statute]."[31] *Id.* (citing 18 U.S.C. § 1964(c)).

The physical nature of the workers' compensation claimants' underlying claims does not affect this analysis. Indeed, "analysis of the statute's legislative history confirms that RICO was intended to deter the use of physical violence by racketeers and to remedy the economic consequences of those physical injuries resulting from racketeering violence." *National Asbestos Workers*, 74 F. Supp. 2d at 230. Thus, as the victims of intentional violence, the Insurers' insureds were "in the category the statute meant to protect" and the harm that befell them was "the 'mischief' the statute sought to avoid." *Abrahams v. Young & Rebicam, Inc.*, 79 F.3d 234, 237 (2d Cir.), *cert. denied*, 519 U.S. 816 (1996).

---

[31]     Furthermore, the Supreme Court has recognized, albeit in another context, that money is a form of property. *National Asbestos Workers*, 74 F. Supp. 2d at 229 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979)). Therefore, according to Judge Weinstein, "[v]ictims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase 'business property,' recover their pecuniary losses." *Id.*

**2.** **Plaintiffs Have Sufficiently Pled Violations of §§ 1962(c) & (d)**

Plaintiffs bring their claims against Alamoudi pursuant to Sections 1962(c) and 1962(d).

RICO at ¶ 18.  The RICO Statement explains that the Enterprise, Radical Muslim Terrorism, is

comprised of the defendants named in the FAC, and is a collection of persons, organizations,

businesses, and nations associated in fact with complex goals that consist of far more than the

desire to perpetrate acts of racketeering.  RICO at ¶ 6.  Radical Muslim Terrorism utilizes acts of

racketeering to further its overall common purposes of:  (a) spreading a particularly virulent

brand of radical Islam; (b) eliminating Western influences in Islamic countries; and (c) punishing

the United States for its perceived support of Israel.  RICO at ¶ 6.  Thus, the Federal Plaintiffs

have sufficiently pled the existence of an enterprise:  "a group of persons associated together for

a common purpose of engaging in a course of conduct" or "an ongoing organization, formal or

informal."  *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981).

Further, the Federal Plaintiffs also have sufficiently pled Alamoudi's participation in that

enterprise.  Pursuant to Section 1962(c), "a proper RICO allegation does not require that each

member agree with the actions taken by other members of the enterprise but only that they

intended to 'participate in the enterprise.' "  *United States v. Louie*, 625 F. Supp. 1327, 1333

(S.D.N.Y. 1985).  In the FAC, the Federal Plaintiffs allege that Alamoudi has aided and abetted,

conspired with, and provided material support and resources to al Qaida and/or affiliated FTOs,

associations, organizations or persons.  FAC ¶ 66.  Furthermore, the RICO Statement specifically

alleges that Alamoudi used his control of Taibah, Success, and HHT to funnel money to al Qaida

through various al Qaida funds, including the designated terrorist organizations GRF and The

Foundation for Human Rights and Humanitarian Relief, which supported al Qaida operatives

associated with the millennium bombing plot.  RICO at Exhibit A.

Moreover, the Federal Plaintiffs need not plead or prove that a predicate act furthered the

purpose for which the organization was founded, but only that it was related to the enterprise.

*Louie*, 625 F. Supp. at 1333.  Thus, the question for the jury is not only the actions taken by Alamoudi (in this case, funneling money to al Qaida and affiliated FTOs from organizations that he had control over), but the motivation or intent underlying Alamoudi's criminal activity and the acts' relationship to the enterprise (in this case, terrorism, which the plaintiffs allege Alamoudi intended to support through his actions).  *Id.*

Plaintiffs have also adequately alleged proximate cause under RICO.  This requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged.  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (citing *Holmes*, 503 U.S. at 268).  Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is likely imprudent.  *National Asbestos Workers*, 74 F. Supp. 2d at 225.  This Court's decision "should be guided by a flexible, case-by-case approach."  *Id.* (citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983) *and Holmes*, 503 U.S. at 272 n.20).  Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static:  as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures."  *Id.*  Further, a failure to explain the alleged injury in detail is not fatal.  *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D.N.Y. 1986).  Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6).  *Id.*  The FAC need only "allege[] compensable injury flowing from the commission of the predicate acts."  *Id.* (citations omitted).

Here, the Federal Plaintiffs allege that they were directly injured by Alamoudi's participation in Radical Muslim Terrorism.  Alamoudi furthered al Qaida's goal of committing acts of terrorism against the United States by providing al Qaida with "the financial resources, physical assets, membership base, technological knowledge, communication skills, and global

reach required to conceive, plan and execute the September 11th Attack."  FAC ¶ 74.  The

Federal Plaintiffs' damages – injuries, loss of life and property damage that resulted from

Alamoudi's actions -- are not derivative of damage to a third party.  Rather, the Federal

Plaintiffs' insureds and assignees were the "reasonably foreseeable victims of a RICO violation"

and the "intended victims of the racketeering enterprise," *i.e.*, terrorism.  *Lerner*, 318 F.3d at

124.  Thus, the Federal Plaintiffs have standing to bring claims under RICO.

A conspiracy of this nature is not a simple linear being, but is instead a complex, multi-

dimensional web of relationships and intrigue.  The Supreme Court recently addressed the scope

of RICO's conspiracy provision, 18 U.S.C. § 1962(d), in *Salinas v. United States*, 522 U.S. 52,

64-66 (1997).  That holding establishes that the RICO statute is flexible enough to embrace the

complexity of the conspiracy alleged here, and the Federal Plaintiffs' allegations are sufficient, at

this stage, to meet their burden.

### F.      Plaintiffs Have Sufficiently Pled Conspiracy and Aiding and Abetting

Alamoudi alleges that the Federal Plaintiffs have failed to plead facts or circumstances to

establish his participation in a civil conspiracy or to establish a claim for aiding and abetting.

Alamoudi br. at 14-15.  For the reasons stated in relation to the discussion of the ATA claims,

the Federal Plaintiffs respectfully submit that the FAC and the RICO Statement adequately

allege claims under both theories of concerted action liability.  See Part III., D., *supra*.

### G.      Plaintiffs Have Adequately Alleged State Common Law Claims

Alamoudi challenges the Federal Plaintiffs' common law claims for intentional infliction

of emotional distress, wrongful death, survival, and punitive damages.[32]  The Federal Plaintiffs

contend that those claims have been sufficiently alleged in the FAC.[33]  At this point in the

---

[32]     Alamoudi also challenges the Federal Plaintiffs' common law claims for negligence and negligent infliction
of emotional distress.  Given the intentional nature of Defendant Alamoudi's wrongdoing, the Federal Plaintiffs
deem it unnecessary to pursue negligence theories against him and therefore withdraw those claims.

[33]     Due to the number of lawsuits filed as result of the September 11th Attack, and the consequent possibility
that the *Federal Insurance* case could be transferred to a jurisdiction other than New York, the FAC sets forth

litigation, the Federal Plaintiffs have extensively briefed common law arguments analogous to those put forth by Alamoudi.  Specifically, Alamoudi's common law arguments are, for intents and purposes, identical to those put forth by Defendant Tarik Hamdi.  See  Alamoudi br. at 4-8, 10-12, & 18; Defendant Tarik Hamdi's Memorandum of Law in Support of his Motion to Dismiss the FAC at 3-6, 9-10, & 16 (MDL Refence No. 497) (filed 10/14/04).  Therefore, rather than burdening the Court with a restatement of the discussion in the Federal Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendant Tarik Hamdi, the Federal Plaintiffs incorporate that discussion by reference.  See Federal Plaintiffs' Opposition to Defendant Tarik Hamdi at 21-23 (MDL Reference No. 575) (filed 12/14/04).

## IV.    **CONCLUSION**

For the reasons stated above, the Federal Plaintiffs respectfully request that the Motion to Dismiss filed by Abdulrahman Alamoudi be denied in all respects, with prejudice.

Respectfully submitted,

COZEN O'CONNOR

By:    _____/s/_____
STEPHEN A. COZEN, ESQUIRE
ELLIOTT R. FELDMAN, ESQUIRE
SEAN P. CARTER, ESQUIRE
MARK T. MULLEN, ESQUIRE
1900 Market Street
Philadelphia, PA  19103
Tel.:  (215) 665-2000
Fax:   (215) 665-2013

*Attorneys for Plaintiffs*

---

several claims in separate accounts, including punitive damages.  To the extent that these counts are not recognized as separate or independent theories under New York or federal common law, these counts should be liberally construed to modify and/or supplement other counts of the FAC.