*#2*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

SEP **2 9** 2003

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 03-1009-M |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Abdurahman Muhammad Alamoudi | ) |  |
| a/k/a  Abdulrahman Alamoudi | ) |  |
| Abdul Rahman Al-Amoudi | ) |  |
| Abdulrahman Mohamed Omar Alamoudi | ) |  |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Brett Gentrup being first duly sworn, hereby depose and state as follows:

I.      PROFESSIONAL EXPERIENCE OF AFFIANT

1.      I am a Special Agent of the U.S. Immigration and Customs Enforcement  (ICE) currently

assigned to the Office of the Special Agent in Charge, Washington, DC (SAC/DC) and have

been employed as a Special Agent with ICE and the United States Customs Service for

approximately two years.  I have conducted and participated in a complex international money

laundering investigation, that involved complex sequences of domestic and international

transfers of money, between individuals and organizations, which involve "front companies" and

"phantom organizations".   These layered transactions are designed to both disguise the true

origin and end-destination of the funds and render it exceedingly difficult and confusing for any

prospective investigation by law enforcement authorities.

2.      Before joining ICE, I obtained a Bachelor of Accountancy and a Bachelor of Criminal

1



Justice from New Mexico State University. I worked as an auditor with KPMG LLP for three years, where he participated in financial statement audits of Fortune 500 companies and analyzed complex financial transactions.

II.     THE INVESTIGATION

3.     The following information is based on my personal knowledge and information I have received from fellow law enforcement officers. The instant investigation is being conducted by agents of the Federal Bureau of Investigation, Washington Field Office, and ICE, and is staffed by Special Agent Todd Price, the FBI case agent, and myself, as co-case agent. Since January 2002, I, along with other agents of ICE, the FBI, and the Internal Revenue Service-Criminal Investigation (IRS-CI) have been conducting an investigation into the activities of the "Safa Group." Agents of the ICE, FBI, and IRS-CI conducted a search warrant at this business location on March 20, 2002, in connection with the Safa Group investigation.

4.     I submit this affidavit in support of a criminal complaint for violation of: Title 50, United States Code, Section 1705(b), Executive Order 12543, and 31 C.F.R. 550.207 and 550.209(violations of the International Economic Emergency Powers Act and the Libyan Sanctions Regulations).

III.    STATUTORY AND REGULATORY FRAMEWORK

      A.     International Economic Emergency Powers Act (IEEPA), Executive Orders and the Libyan Sanctions Regulations

5.     At the time relevant to this Affidavit, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., empowered the President during a declared national emergency, inter alia, to:

(A) investigate, regulate or prohibit (i) any transactions in foreign exchange; (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or national thereof, (iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.

6.      A willful violation of an order, regulation or license issued under the authority of IEEPA is punishable as a felony pursuant to Title 50, United States Code, Section 1705(b).

7.      On January 7, 1986, in the wake of terrorist bombings at airports in Rome, Italy, and Vienna, Austria, President Reagan declared a national emergency and invoked his powers under the IEEPA, to issue Executive Orders 12543 and 12544 and impose wide-ranging and comprehensive economic sanctions against Libya.  The effect of the sanctions is to halt virtually all economic intercourse with Libya, see Ex. Ord. 12543, 51 Fed. Reg. 875 (Jan. 7, 1986), and to "block" all Libyan property in the United States, see Ex. Ord. 12544, 51 Fed. Reg. 1235 (Jan. 8, 1986).

8.      To implement Executive Orders 12543 and 12544, the United States Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"), promulgated the Libyan Sanctions Regulations, which are detailed at Title 31, Code of Federal Regulations, Part 550. Executive Order 12543 and the Libyan Sanctions Regulations, among other things: (a) prohibited the exportation of goods and services to Libya; (b) prohibited transactions involving property in

3

which the Government of Libya has an interest; (c) prohibited transactions relating to travel to

Libya or to activities within Libya; and (d) prohibited transactions which have the purpose or

effect of evading the prohibitions in the regulations.

9.      In the course of this investigation I have received a formal determination from the

Department of Treasury, Office of Foreign Assets Control (OFAC) addressing the applicability

of the Libyan Sanctions Regulations to the facts set forth in this Affidavit. In that letter, entitled

OFAC Determination on Libyan Transactions (DCC02PR03DC0013)/Abdurahman Alamoudi,

dated September 17, 2003, (Determination Letter), OFAC explained that the Libyan Sanction

Regulations (LSR) set forth at Title 31, Code of Federal Regulations, Part 550 prohibit virtually

all commercial transactions with the Government of Libya by U.S. persons unless they have been

authorized by a license issued from OFAC.

10.     Title 31, Code of Federal Regulations, Section 550.207 prohibits transactions relating to

travel to Libya or to activities within Libya and states:

> Except as authorized, no U.S. person may engage in any transaction relating to
> travel by any U.S. citizen or permanent resident alien to Libya, or to activities by
> any U.S. citizen or permanent resident alien within Libya . . . .

11.     The OFAC publication "Libya: What You need to Know About the US Embargo; An

Overview of the Libyan Sanctions Regulations" (Overview), available on the Treasury

Department's website, explains the prohibition on travel transactions in these terms:

> All travel-related transactions are prohibited for U.S. citizens or residents with
> regard to Libya, except for . . . travel by close family members of Libyan
> nationals when the U.S. citizen or resident has registered with Treasury's Office
> of Foreign Assets Control or with the Embassy of Belgium in Tripoli . . . .

Thus, although travel to Libya is not itself illegal under the LSRs, no U.S. person may spend

4

money to travel to, from, or within Libya, unless the exception applies.

12.     Title 31, Code of Federal Regulations, Section 550.209 prohibits dealing in property in

which the Government of Libya has an interest (known as "blocked property"). It states:

> Except as authorized . . . no property or interests in property of the Government of
> Libya that are in the United States[,] that hereafter come within the United
> States[,] or that are or hearafter [sic] come within the possession or control of U.S.
> persons, . . . . may be transferred, paid, exported, withdrawn or otherwise dealt in.

13.     The Overview explains the comprehensive ban on dealing in blocked property in these

terms:

> On January 8, 1986 the President blocked all government of Libya assets in the
> United States or in the possession or control of U.S. persons anywhere in the
> world. This action prohibits all transfers of Libyan government assets without a
> specific license from the Office of Foreign Assets Control. All *contracts*, loans
> and *financial dealings* with Libya are prohibited.

14.     The Determination Letter reinforces the point, stating that the LSRs prohibit the receipt

or any other dealing by a U.S. person[1] in funds or other property in which the Government of

Libya has an interest.

15.     Title 31, Code of Federal Regulations, Section 550.422 states that "the prohibitions

under Section 550.209 apply to services performed by U.S. persons, wherever located, on behalf

of the Government of Libya; or with respect to the property interests of the Government of

Libya."

16.     The LSRs define Government of Libya, at Title 31, Code of Federal Regulations 550.304,

to include the "state and the Government of Libya, as well as . . . any agency or instrumentality

thereof, . . . and any partnership, association, corporation, or *other organization owned or*

_____

[1]As a naturalized American citizen, Alamoudi is a "U.S. Person."

5

*controlled* directly or indirectly" by the state and the Government of Libya or its agencies or instrumentalities.

17.    The LSRs define property and interest in property to include money, checks, and drafts.

18.    According to Title 31, Code of Federal Regulations, Section 550.313, transfer means "any actual or purported act or transaction, whether or not evidenced by writing, and whether or not done or performed within the United States, the purpose, intent or effect of which is to create, surrender, release, transfer, or alter, directly or indirectly, any right, power remedy, privilege or interest with respect to any property . . . ."   According to the Determination Letter, the unlicensed transfer of blocked property to a U.S. Person does not terminate the interest of the Government of Libya.  Thus, any dealing in the property after its transfer to a U.S. person is a further violation of the LSRs.

19.    As used in the LSRs, the term U.S. Person includes a United States citizen.

20.    The comprehensive prohibition on dealing in blocked property applies to banking institutions in the United States or their foreign branches.  Section 550.212 of the LSRs require banking institutions which receive blocked property to deposit such funds in interest bearing accounts.  Any holder of blocked property is required to register with OFAC.

21.    Title 31, Code of Federal Regulations, Section 208 prohibits any transaction for the purpose of, or which has the effect of , evading or avoiding any of the restrictions in the LSRs.

    B.  Financial Transactions With State Sponsor of Terrorism

22.    Title 18, United States Code, Section 2332d prohibits financial transactions between any United States person and any of the seven state sponsors of terrorism.  It provides:

    Except as provided in regulations issued by the Secretary of the Treasury, in

6

consultation with the Secretary of State, whoever, being a United States person, knowing or having reasonable cause to know that a country is designated under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405) as a country supporting international terrorism, engages in a financial transaction with the government of that country, shall be fined under this title, imprisoned for not more than 10 years, or both.

23.    The term "financial transaction" means . . . a transaction which in any way or degree

affects interstate or foreign commerce (i) involving the movement of funds by wire or other

means or (ii) involving one or more monetary instruments . . . . which includes coin or currency

of the United States or personal checks, bank checks and money orders.

24.    The term "United States person" includes any United States citizen or national and

juridical person organized under the laws of the United States.

25.    Libya has been designated a state sponsor of terrorism under Section 6(j) of the Export

Administration Act of 1979 since December 29, 1979.  As reported at 58 Federal Register 52523,

that designation was reaffirmed by then Secretary of State Warren Christopher on August 23,

1993.

26.    I understand that the regulations adopted by the Secretary of Treasury to implement

Section 2332d, are the same regulations which administer OFAC's Libyan Sanctions Program.

Under 31 CFR Sections, 596.503 and 596.504, the LSRs create a safe harbor under 18 U.S.C.

2332d for a U.S. person who engages in a financial transaction with the Government of Libya.

However, unless the financial transaction complies with the licensing or authorization

requirements of the LSRs, or is not required to be licensed or authorized under the LSRs, the

financial transaction is prohibited under Section 2332d.

C.    Willful Misuse of a Passport

7

27.     Title 18, United States Code, Section 1544 prohibits willful misuse of a passport.

It provides:

> Whoever, willfully and knowingly uses or attempts to use any passport in
> violation of the conditions or restrictions therein contained, or of the rules
> prescribed pursuant to the laws regulating the issuance of passports.

28.     Since December 11, 1981 the State Department has restricted the use of

U.S Passports for use to travel to Libya. The annual renewal of this restriction is

discussed at 67 Federal Register 71228-02:

> On December 11, 1981, pursuant to the authority of 22 U.S.C. 211a and
> Executive Order 11295 (31 FR 10603), and in accordance with 22 CFR 51.73 (a)
> (3), all United States passports were declared invalid for travel to, in, or through
> Libya unless specifically validated for such travel. This restriction has been
> renewed yearly because of the unsettled relations between the United States and
> the Government of Libya and the possibility of hostile acts against Americans in
> Libya.

IV.     FACTS

   A.     Alamoudi's Background

29.     According to his United States Passport application, Alamoudi is a native of Eritrea,

Ethiopia, where he was born in March 19, 1952. Alamoudi first arrived in this country in 1979

and was naturalized as a U.S. citizen on May 23, 1996. According to the website,

IslamOnline.net, which published a "Guest CV" for Abdurahman Alamoudi, dated August 19,

2003, Alamoudi is the founder of the American Muslim Council (AMC), and the American

Muslim Foundation (AMF) and is currently the President of AMF. The Guest CV states that

Alamoudi has served as a member of the board of directors of AMC and as its Executive Director

for the past several years. Alamoudi's resume states that from 1985-1990, he was executive

Assistant to the President of the SAAR Foundation.

30.      I have reviewed summaries of the articles of incorporation, public records databases and

the IRS Forms 990 (Return of Organization Exempt From Income Tax) for AMF, AMC, and the

Success Foundation.   These documents confirm a group of companies with interlocking officers

and directors.  Alamoudi and Mohamed Omeish are President and Vice-President, respectively of

AMF and two of the three members of the board of directors.   The 2001 Form 990 for AMF,

filed August 16, 2002, shows that even though the address on the corporate records is 1212 New

York Avenue, N.W. Suite 525, Washington, D.C., the records for AMF are kept at 3606 Forest

Drive, Alexandria, Virginia.  That same Form 990 shows that AMF is related to AMC by virtue

of interlocking directors or officers.  According to the Articles of Incorporation for AMC, dated

July 5, 1990, Alamoudi was the initial director of AMC.  From 1996-2000 his name appeared as

a director and/or officer of AMC.

31.      Although Alamoudi is not named on the corporate records for AMC beyond 2000, I have

probable cause, beyond what is set forth on the "Guest CV," to believe that Alamoudi remained

in a leadership capacity with AMC.  When he was interviewed in London by Officers of Special

Branch, as detailed hereafter, he stated his intention to merge AMC and another entity (American

Muslim Alliance) and form the Muslim American Congress.

32.      Omeish and Alamoudi are President and Secretary, respectively of Success Foundation

and are two of the three members of the board of directors.

33.      Alamoudi is the President of the Hajj Foundation and Omeish is the Secretary.  They are

two of the nine directors.

34.      I have examined bank accounts in the name of each of these entities and in the name of

9

Alamoudi. The accounts in the name of each of the entities is at a bank located in the United

States with branch offices in Northern Virginia. The mailing address for the statements for AMF

is 3606 B Forest Drive, Falls Church, Virginia.

35.    I have reviewed the transcript of a video tape of Alamoudi speaking at an rally in

Lafayette Park, Washington, D.C., on October 28, 2000. In this rally, Alamoudi the audience as

follows:

> I have been labeled by the media in New York to be a supporter of Hamas.
> Anybody support this Hamas here? Anybody's [sic] is a supporter of Hamas here?
> Anybody's [sic] is a supporter of Hamas here? Hear that Bill Clinton, we are all
> supporters of Hamas! Allah akbar [God is greater]. I wish to add here I am also a
> supporter of Hezbollah! Anybody supports Hezbollah here? Anybody supports
> Hezbollah here? . . . I want to send a message. . . My brothers, this is the message
> that we have to carry to everybody. It's an occupation, and Hamas is fighting to
> end an occupation. It's a legal fight. Allah akbar! Allah akbar!

36.    In addition I have reviewed the Statement of Steven Emerson to the National

Commission on Terrorist Attacks Upon the United States July 9, 2003 available on the National

Commission's website at www.9-11commission.gov. In that Statement Mr. Emerson quoted

Alamoudi at the Islamic Association of Palestine's 1996 Annual Convention in Illinois:

> I think our attitude toward America should change…we have a chance, in
> America, to be the moral leadership of America. The problem is when? It will
> happen, it will happen (unclear word) Allah, I have no doubt in my mind, that
> Muslims sooner or later will be the moral leadership of America. It depends on
> me and you, either we do it  now or we do it after a hundred years, but this
> country will become a Muslim country. And I (think) if we are outside this
> country we can say oh, Allah destroy America, but once we are here, our mission
> in this country is to change it.   When will you talk to the President to free Brother
> Musa Marzook?
>
> * * *
>
> When will you talk to the President to free Sheikh Omar Abdul Rahman?
> Brothers, it's an investment, we all are in this together, unless you help us with it,
> we cannot do it.

According to Mr. Emerson's statement, Musa [Abu] Marzook is a Hamas leader deported from the United States in 1997; Sheik Omar Abdul Rahman is serving a life sentence in prison for his role in the 1995 plot to bring down airliners and blow up New York City landmarks.

37.     I have reviewed a report of an interview with Alamoudi in the US based English language newspaper Al Zaitohnah, dated June 2, 2000. Alamoudi stated: "[AMC's] position with regard to the peace process is well-known. We are the ones who went to the White House and defended what is called Hamas."

38.     According to a Jerusalem Post article, dated June 22, 2001, Alamoudi participated in a Beirut Conference in January 2001 alongside leaders of Hamas, Hezbollah, Islamic Jihad, and al-Qaeda. A communique issued by the conference called for a boycott on American and Israeli products, stating: "America today is a second Israel."

B.      Alamoudi's Detention and Questioning at Heathrow Airport

39.     The investigation has revealed that on August 11, 2003, Alamoudi and his family traveled to London, England. I have reviewed a report summarizing the detention and questioning of Alamoudi by officers of Metropolitan Police Service (New Scotland Yard), Special Branch, National Terrorist Financial Investigations Unit (Special Branch). The report indicates that on August 16, 2003, Alamoudi attempted to travel from London, England, to Damascus, Syria, when United Kingdom Customs officers conducted a search of Alamoudi and his belongings at London Heathrow Airport. As a result of the examination, the Customs Officials discovered and seized approximately $340,000 USD. The currency consisted of 34 bundles of sequentially numbered $100 bills.

40.     Alamoudi was interviewed by officers of the Special Branch. He stated that he is the

11

President of the AMF and that financing the organization's work is a constant struggle. He

further stated that in order to alleviate the problem, he approached the Libyan Ambassador to the

United Nations in 1997, whom he named as Abuzed O. Dorda. At a subsequent meeting

between the two, the frozen Libyan assets in the United States were discussed. According to the

report of the Special Branch investigation, Alamoudi stated to interviewing officers that the

Libyan Ambassador suggested he (Alamoudi) could receive an unspecified share of any assets he

may succeed in releasing. According to the report, Alamoudi then had a series of meetings with

White House officials who informed him that Libyan assets were frozen as a result of the

downing of Pan Am Flight 103 over Lockerbie, Scotland. Alamoudi said that at a further

meeting with the Libyan Ambassador it was suggested to Alamoudi that, in order to mitigate the

funding problem, he contact the Tripoli-based Libyan Islamic Call Society.

41.     During the interview, Special Branch asked Alamoudi to justify why, as an American

citizen, he was willing to negotiate with a country linked to terrorist attacks and subject to

American Government embargo. Alamoudi explained that as the Libyan regime had by then

renounced terrorism, he felt obliged to 'bridge the gulf' between his adopted country and an

Islamic State.

42.     Alamoudi remarked that he has traveled to Tripoli on at least ten occasions, usually to

negotiate with the President of the "Islamic Call Center" [sic].

43.     Alamoudi stated that on his last visit to Libya, he finally negotiated funding for his

organization through the Islamic Call Society. It was arranged for him to receive a sizeable cash

donation during his stay at the London Metropole Hotel, Edgware Road, London between

August 11, 2003, and August 16, 2003. Alamoudi told Special Branch officers that on the

12

morning of Wednesday, August 13, 2003, he received a telephone call to his room from someone who spoke Arabic with a Libyan accent, informing him he had "something" for him. The individual arrived at Alamoudi's room and handed him a small "Samsonite" style briefcase. Alamoudi said there was no conversation and the visitor abruptly left Alamoudi's room. Upon opening the case he discovered $340,000 of United States currency. Alamoudi told officers that he then transferred the money to his own luggage and left the other case in the hotel room.

44.     According to the report, Alamoudi's justification for the cash transaction is that the American authorities have stringent measures to reduce the amounts of cash entering and leaving the United States. He believed it was illegal to be in possession of any amount exceeding $10,000. He stated it was solely for this reason that he involved himself in this surreptitious transaction. Alamoudi was adamant that this was the only such transaction in which he has been involved. Alamoudi told officers that he intended eventually to deposit the money in banks located in Saudi Arabia, from where he would feed it back in smaller sums into accounts in the United States.

45.     The next day, August 17, 2003, Alamoudi agreed to meet again with Special Branch Officers. During this second interview, the report states that he conceded  he had been involved in other similar cash transactions involving amounts in the range of $10,000 to $20,000.

       C.  Evidence of Alamoudi's Libyan Contacts and Transactions

            1.     The Libyan Permanent Mission to the United Nations

46.     I have reviewed the website for the Libyan Permanent Mission to the United Nations at www.libya-un.org. It identifies His Excellency Abuzed Omar Dorda as the Ambassador, or Permanent Representative, of Libya to the United Nations. According to the website, Mr. Dorda

held that position beginning in 1996. According to the State Department, as of September 17, 2003, Dorda has been replaced as head of the Libyan Permanent Mission to the U.N.

> 2.     The World Islamic Call Society

47.     I believe that the Islamic Call Society (WICS) is an agency of, or controlled by, the Government of Libya. According to the International Religious Freedom Report 2002, released by the Bureau of Democracy, Human Rights and Labor within the U.S. Department of State, the World Islamic Call Society "was established by Libyan leader Colonel Mu'ammar Al-Qadhafi. It is the outlet for state approved religion, as well as a tool for exporting the revolution abroad." The website for WICS confirms that it was established by Qadhafi, and it is funded by "allocations from its first founder, the Revolutionary, from the Jihad Fund." The references to the first founder and the Revolutionary are unmistakably references to Qadhafi.

48.     According to the Library of Congress Country Study for Libya, accessible through the Department of State's, Bureau of Near Eastern Affairs, Country Information, (circa 1987)

> The [Libyan] government took a leading role in supporting Islamic institutions and in worldwide proselytizing on behalf of Islam. The Jihad Fund, supported by a payroll tax, was established in 1970 to aid the Palestinians in their struggle with Israel. The Islamic Call Society (Ad Dawah) was organized with government support to propagate Islam abroad, particularly throughout Africa, and to provide funds to Muslims everywhere.

49.     According to the article "Islam in the Jamahiriya," at www.qadhafi.org, the pro-Qadhafi website of the International Supporters of Muammar Qadhafi "the Jihad fund was established in 1970 by a special payroll tax to provide assistance to the Palestinian struggle against Israel, the country which Libya considers to be a threat to the integrity of Islam." According to the article the work of the WICS is centered on the spread of Islam throughout Africa and providing of

14

funds for Muslims wherever they may be. . . . This is the first time in the contemporary period that a Muslim State has taken special care of Muslims the world over." The article claims the Jihad Fund was established in the spirit of achieving this goal.

50.     According to the State Department's Patterns of Global Terrorism 1991, Qadhafi has exploited the WICS's philanthropic reputation to advance his terrorist agenda. Similarly, the Washington Post, in an article dated May 5, 1985, quoted a State Department official as stating that the Islamic Call Society had "been used as a front group for terrorists."

51.     According to the website of the World Islamic Call Society, www.islamic-call.org, it was founded in 1972. In addition, the 'Final Communique, Resolutions and Recommendations of the 6th General Congress of the World Islamic Call Society," ("Final Communique"), states that "Ghadafi founded the Society when he called for the convening of the 1st General Congress for Islamic Call only one year after the triumph of the 1st September Revolution." The September revolution is a reference to the 1969 coup which brought Qadhafi to power.

52.     The WICS is based in Tripoli, Libya. The current head of the WICS, its Secretary-General, is Mohammad Ahmed Al-Sharif, aka Muhammad Ahmed Al-Sherif. I have reviewed information which indicates that the WICS Secretary General has acted as the Libyan representative in State visits. For example, an article in the Moscow News, dated January 15, 1992, described a state visit to Tajikstan by a delegation from the Libyan Jamahiriya. According to the article, the head of the delegation, WICS Secretary General Mohamed Ahmed Al-Sharif, is "the third man in Libya's state heirarchy."

53.     In the case Farrakhan v. Reagan, which is reported at 669 F. Supp. 506 (D.D.C. 1987), the opinion described the WICS (without further elaboration) as "an agency of the Libyan

15

government." Id. at 507.

54.     I have reviewed the "Final Communique" which relates to a WICS conference held September 18-21, 2000, in Jakarta, Indonesia. This document is published on the website of the WICS. A copy of the Final Communique was contained on the computers seized on March 20, 2002 from the offices at 3606B Forest Drive, Alexandria, VA. According to the "Final Communique" the Congress adopted the proposed composition of the World Islamic Call Council, which included "Dr. Abdul Rahman Al Amoudi/USA." The World Islamic Call Council is charged with the duty of implementing the programs adopted at the WICS Conference. I have reviewed a Confirmation of Participation Form for that conference which was contained among documents seized from the offices of Success Foundation in March 2002. The Confirmation of Participation Form lists Abdurahman Alamoudi's United States Passport Number, e-mail address, date and place of birth, and home address. On this basis I believe that Abdurahman Alamoudi became a member of the World Islamic Call Council in 2000.

55.     During the course of the examination conducted by UK Officers, Alamoudi was found to be in possession of two United States passports and one Republic of Yemen passport. I have reviewed copies of the passports and a subsequent translation of the Arabic characters was conducted by Khalil M. Ismail, who is currently an Officer with the Bureau of Customs and Border Protection (CBP), and has been employed by the United States Customs Service since July 3, 2000. Mr. Ismail is fluent in Arabic and has been used consistently in this capacity since September 12, 2001.

56.     The translation of the entries in United States passport number 015505662 identified two Libyan visas that were issued for Alamoudi in Canada. Visa number 0176361 was issued in

16

Canada on August 8, 2001. Visa number 0176440 was issued in Canada on February 1, 2002.

57.     The translation of the Republic of Yemen passport number 00679586, which was issued
in Washington, D.C. on August 15, 2001 and is valid for a period of five years, identified several
entry and exit stamps related to Alamoudi's visits to Libya. The stamps indicate Alamoudi has
been traveling to and from Libya regularly since May 2002 through July 2003 with the length of
stay averaging approximately five days. Specific travels are identified further in the following
paragraphs of this affidavit.

58.     Analyses conducted on Alamoudi's American Express Personal Card Statements
identified purchases of plane tickets in the passenger name of Alamoudi for travel from Zurich,
Switzerland, to Tripoli, Libya. The charges were recorded on January 23, 2000, and August 14,
2001, and both were billed to Abdurahman Alamoudi at 3311 Garland Drive, Falls Church,
Virginia.

59.     On March 20, 2003, pursuant to court order, the government installed a Dialed Number
Recorder (DNR) and Caller ID equipment on (703) 578-4022, a residential hard-line subscribed
to by Abdurahman Alamoudi, and located at 3311 Garland Drive, Falls Church, Virginia. On
July 5, 2003, there was one call made from (703) 578-4022 to (917) 375-5189, which is
subscribed to by the Libyan Mission to the United Nations, Financial Attaché Office, New York,
New York. Subsequent searches of Alamoudi's Palm Pilot, which was seized from the premises
of 3606 Forest Drive, Suite B, Falls Church, Virginia on March 20, 2002, indicated (917) 375-
5189 was the cell phone of Abuzaid Omar Dorda, then Libyan Ambassador to the United
Nations.

60.     In addition, Alamoudi's Palm Pilot contained a number under the heading "Libya," (the

17

same category where Dorda's cell phone number appears) which appears to be another number in Libya in the name of M A Alsharif. I believe that this is the telephone number for Wics Secretary General Mohamed Ahmed Al-Sharif.

61.     On May 2, 2003, there were five calls made from (703) 578-4022 to 011-218-21-4449075. Subsequent searches of Alamoudi's Palm Pilot shows this is the number of the Al-Mahari Hotel, Tripoli, Libya. A review of the Republic of Yemen passport number 00679586 identified a Libyan entry stamp dated May 1, 2003, and a Libyan exit stamp dated May 6, 2003.

62.     A review of documents inspected as part of a border search of Alamoudi and his personal effects on or about March 19, 2003, disclosed a letter in Arabic on the letterhead of American Muslim Foundation, bearing the return address of 3606 Forest Drive, Alexandria, Virginia. The letter is in Arabic. The letter was translated by Marlene Burke, an ICE Analyst who is fluent in Arabic. The letter is from Alamoudi, as President of AMF, to Mohamed Ahmed Al-Sharif, the Secretary General of the International Islamic Dawa Association, which is the same as the World Islamic Call Society.

63.     The letter recites that "we" were able to buy a building in May 2002 to be a permanent quarters for the AMC, the AMF and the Hajj Foundation. The purchase price was $2.5 million dollars and the value of the real estate in March 2003 was described as $3.5 million. According to the letter, the building was acquired by three loans two of which, from Islamic Development Bank and SEDCO (Saudi Economic Development Co.) were interest-free. The third loan was interest free for six months. The letter solicited Al-Sharif to assist in paying the loan which would bear interest or taking an equity stake in the realty.

64.     A review of the seized computer evidence from 3606 Forest Drive, Suite B, Falls

Church, Virginia, revealed correspondence from Alamoudi to His Excellency Mohamed Al-Julaidy, Director of Finance, Libyan Mission to the United Nations. The letter is dated August 25, 2001, and was typed in Arabic. ICE Analyst Marlene Burke conducted the translation of the document and I have reviewed the translation. Alamoudi states in his letter that he enclosed copies of travel receipts of his latest trip to Tripoli. Alamoudi further states that he used the monies the Libyan Mission provided to him ($3700) to purchase air fare from Washington to Zurich for his last trip to Libya. Alamoudi requests that the addressee allocate the amount of $5,000 for his next trip to London to meet with his Excellency the Ambassador, Mr. Abu Zaid Dorda, and Alamoudi will furnish the receipts upon his return. The total amount of reimbursement Alamoudi is seeking is $7,000.

65.     I have also reviewed a translation of another document obtained from the computer evidence seized from 3606 Forest Drive, Suite B, Falls Church, Virginia, in which Alamoudi writes to His Excellency Ambassador Abu Zaid Omar Dorda, Permanent Representative of the Libyan Mission to the United Nations. In the letter, Alamoudi thanks the Ambassador for his continuous support and assistance, advice, and guidance. Alamoudi also refers to an upcoming meeting with the Iranian President, Mohamed Khatemi, in New York. Alamoudi further requests the Ambassador's assistance in arranging meetings with other leaders and ministers of foreign affairs from Pakistan, Libya, Sudan, and Iraq, or others who are deemed important in the realm of decision making in the Arab and Islamic world.

E.     Absence of Licenses and Authorizations

66.     The Determination Letter indicates that there are no license applications for Alamoudi, AMC, AMF, Success Foundation and Hajj Foundation.

67.     On September 24, 2003, I spoke with Sharon Palmer-Royston, Senior Attorney Advisor,

Office of Consular Affairs, Passport Service, Passport Policy and Legal Assistance, at the United

States Department of State, to determine whether Alamoudi had satisfied any of the validation or

registration requirements that relate to travel to Libya by a United States citizen.  As is set forth

in detail below, at the time of this records check, Alamoudi was in Libya and had been there

since September 19, 2003.

68.     According to the Consular Information Sheet for Libya, published on the Department of

State's website, since December 11, 1981, U.S. Passports have not been valid for travel to Libya

without a special validation from the State Department.   The validation would only be granted if

the U.S. passport holder falls into one of the categories eligible for the special validation. If

eligible for travel to Libya under one of those categories, a person may obtain a validation for use

of his U.S. passport by applying to the Office of Passport and Policy Services.

69.     Ms. Palmer-Royston's office is responsible for issuing the special validation for U.S.

passport holders traveling to Libya.  She indicated that if the special validation is approved, the

approval would be indicated by a separate stamp in the passport.  Ms. Palmer-Royston checked

the appropriate indices and told us that Abdurahman Alamoudi had never sought nor had been

granted a special validation.   I have reviewed Alamoudi's United States passport numbers

015505662 and 015921393 there is no stamp or other indication of State Department approval of

his travel Libya on these passports.  In fact, the visas recorded in passport no. 015505662 were

issued by the Libyan Embassy in Canada.

70.     The Consular Information Sheet for Libya, and the Overview of the LSRs, state that there

is a separate registration requirement for travel to Libya, which registration requirement can be

met by registering with OFAC or with the U.S. interests section of the Belgian Embassy in Tripoli, Libya. Compliance with this registration requirement, by a person who fits one of the exceptions to the LSRs travel restrictions, would authorize any expenditure incurred in connection with that travel. The Determination Letter indicates that Alamoudi never registered with OFAC for travel to Libya for any of the trips he made there.

71.    Ms. Palmer-Royston explained that the Department of State has a liaison procedure in effect with the Embassy of Belgium to address situations where a U.S. citizen relies upon registration with the U.S. Interests Section of the Belgian Embassy to satisfy the registration requirement LSRs. She stated that any such registration with the Belgian Embassy does not satisfy the special validation requirement for U.S. passport holders. It only satisfies the registration requirement under the LSRs. She further stated that under the liaison procedure, the Belgian Embassy would notify the State Department that a U.S. person had attempted to register for Libyan travel. Thus, in the normal course of things, no registration for travel with the U.S. Interests Section of the Belgian Embassy in Tripoli, would take place without the State Department being aware of it. If the registration had been completed without the State Department being notified, there would still be an indication in the individual's passport (another stamp) that this procedure had been completed.

72.    Ms. Palmer-Royston's records check indicated that the State Department had no record that Alamoudi attempted to register with the U.S. Interests Section of the Belgian Embassy in Tripoli. A check of the passports Alamoudi used to travel to Libya show that there are no indications that he registered his travel with the Belgian Embassy. Thus, even if Alamoudi otherwise qualified for an exception to Libya travel restriction, he violated the LSRs by failing to

register.

E. Documents Showing Financial Transactions with the Libyan Permanent Mission

73.     A review of the subpoenaed bank records for the AMF identified financial transactions

between AMF, a U.S. Person within the meaning of the LSRs, and the Libyan Mission to the

United Nations.  Bank records show a $5,000 wire transfer from an account held by the Libyan

Mission to the United Nations to the AMF's Citibank FSB Account No. 66531829.  On

American Muslim Foundation's 1999 Form 990, at Part I, line 1d (Schedule of Contributors)

Alamoudi listed a $5,000 contribution from the Libyan Mission to the United Nations.  This may

be the funds represented by the December 3, 1999, wire transfer.

74.     Additionally, a check dated November 14, 2000, from the account of the Libyan Mission

to the United Nations was written to the order of the AMF for $2,000 and deposited in that same

AMF Citibank account.

75.     These amounts from the Libyan Permanent Mission to the U.N are in addition to the

amounts mentioned in the translation of the August 25, 2001 letter, in which Alamoudi discussed

payments totaling $7,000.  According to that letter, Alamoudi had received $3700 from the

Libyan Mission, sought reimbursement of $2000 of travel expenses, and requested that $5,000 be

allocated by the Libyan Mission for his next trip to London, and discussed arrangements for the

delivery of the total due of $7,000.

F.      Alamoudi was Aware of the Restrictions on Travel and the Libyan Sanctions

76.     I have reviewed evidence seized in the search of the offices of Success Foundation

conducted March 20, 2002. On the computer network server for the Success Foundation offices,

agents found a document dated March 16, 2001, entitled "US Policy toward Libya: Concerns,

Interests and Options," which states that it appeared in "Middle East Institute Policy Brief." The article, a speech delivered at a conference on US-Libyan Relations After Lockerbie, addresses the sanctions and travel restrictions in place between the United States and Libya. While the speech contends that it is time the United States revised or abandoned the sanctions and restrictions, it makes clear that the sanctions and restrictions exist.

77.     The speech addresses the US unilateral sanctions on Libya. The speech states that there are "legal prohibitions associated with the Iran Libya Sanctions Act . . . and the terrorism list." The speaker went on to state that "[i]nfluential members of Congress are likely to be hostile to revisions of the US Executive Orders [on which the LSRs are based] . . . .The speaker concluded that "there are incremental ways in which the US government could liberalize some of the executive order for the benefit of US companies without ending the broader context of sanctions."

78.     The speech also addresses "Travel of US passport holders to Libya" and opines that "removal of restrictions on US citizens seemed to me to be long overdue." The speaker stated, "The US passport restriction was not justified last year" from a personal security standpoint.

79.     In addition, in the normal course of planning an overseas trip, Alamoudi would have either consulted the Consular Information Sheet for Libya or made inquiry of the State Department's Office of Passport Services. On this basis, I believe Alamoudi was aware of the restrictions on the use of his US passport.

V.     ALAMOUDI'S ARRIVAL AT DULLES AIRPORT

80.     On September 28, 2003, Alamoudi returned to the United States on British Airways Flight 217 from London Heathrow Airport to Dulles International Airport within the Eastern

23

District of Virginia. When he arrived in the United States he completed a Customs Declaration Form (Form 6059-B). Completion of this form is required of all persons entering the United States.

81.     Question 8 on the Form 6059-B requires the traveler to list "Countries visited on this trip prior to U.S. arrival." Based on my training and experience, I know that this question in used by the agency to determine the scope of the interview and search during any secondary examination conducted by CBP Officers.

82.     Alamoudi stated that he had visited England and Saudi Arabia. In fact, Alamoudi had visited Libya during this trip between September 19 and 25, 2003. CBP Officers found Alamoudi was in possession of a passport issued by the Republic of Yemen, which contained an entry stamp for Libya dated September 19, 2003, and an exit stamp for Libya dated September 25, 2003. After departing Libya, he entered London on September 25, 2003, presenting his United States Passport (no. 016921393) to the Immigration Officer at Heathrow Airport, thus concealing the fact that he had been to Libya from United Kingdom officials.

83.     Alamoudi's U.S. Passport No. 015921393, the passport which does not show any Libyan travel, shows that he entered the United Kingdom on August 11, 2003. Records of United States Immigration and Customs Enforcement, specifically the Treasury Enforcement Computer System, Passenger Activity Report, indicate that Alamoudi has been out of the United States since that date, i.e., Alamoudi has not returned to the United States between August 11, 2003 and September 28, 2003. The Yemeni Passport Alamoudi used during this trip revealed the following countries, other than England and Saudi Arabia, Alamoudi visited and which he failed to disclose:

24

a.      Lebanon from August 29 to September 2, 2003

b.      Syria from September 2 to September 8, 2003[2]

c.      Yemen from September 8 to September 13, 2003

d.      Syria from September 15 to September 16, 2003[3]

e.      Egypt from September 16 to September 18, 2003

f.      Libya from September 19 to September 25, 2003

84.     Alamoudi was questioned on September 28, 2003, by Senior CBP Officer Wesley

Hartman. During that questioning, Alamoudi was twice asked what countries he had visited on

this trip. Both times he responded that he only visited England and Saudi Arabia. After the CBP

Officer began to review his three passports, they again asked what countries he had visited on

this trip. Alamoudi stated that he had also visited Lebanon, Syria, and Yemen during this trip.

He concealed the fact that, after visiting those countries, he had also visited Libya and Eqypt.

85.     Alamoudi was also in possession of United States Passport No. 015505662, which

reflected he had used the passport for two trips to Libya. The passport contains an entry stamp

into Libya on August 14, 2001, and an exit stamp for August 23, 2001. It also contains an entry

stamp for Libya on February 7, 2002, and an exit stamp for February 12, 2002.

86.     On or about March 19, 2003, Alamoudi returned to the United States from overseas into

Dulles International Airport. At that time he completed a Customs Declaration Form. In

----

[2]The stamped exit date is illegible; however, on this same date, there is an entry stamp for
Yemen.

[3]The stamped exit date is illegible; however, on this same date, there is an entry stamp for
Egypt.

25

response to Question 8 on that form, he stated that he had only visited Switzerland and Britain. I have reviewed Alamoudi's Yemeni Passport and found, with the aid of an interpreter, that it contains an entry stamp to Libya dated March 13, 2003 and an exit stamp which is dated March 18 on an adjacent page. The year of that exit stamp is only partially legible. I believe, however, that Alamoudi was returning from Libya because, in his personal effects he had contact information for Libyans Mr. Dorda, Mr. Al-Sharif and a Libyan Hotel, along with the letter to al-Sharif discussed earlier.

VI.     THE VIOLATIONS

87.     Based on the facts set forth above, I respectfully submit that there is probable cause to believe that Alamoudi willfully violated Title 50, United States Code, Section 1705(b), Executive Orders 12543 and 12544 and Title 31, CFR Section 550.207 when, as a U.S. person, within the meaning of the LSRs, and without license or authorization:

   a.     he paid for his travel expenses to Libya on or about August 14, 2001, to wit, round trip air fare on Swiss Air from Zurich to Tripoli in the amount of $2014.28;

   b.     he paid for his travel expenses to Libya on or about January 23, 2000, to wit, round trip air fare on Swiss Air from Zurich to Tripoli in the amount of $1,877.70

88.     Further, Alamoudi willfully violated Title 50, United States Code, Section 1705(b), Executive Orders 12543 and 12544 and Title 31, CFR Section 550.209, and Title 18, United States Code, Section 2332d, when, as a U.S. person, within the meaning of the LSRs, and without license or authorization:

   a.     he transferred, caused to be transferred and otherwise dealt in, funds from the Libyan Permanent Mission to the United Nations, an instrumentality of the

government of Libya, to wit, a wire transfer in the amount of $5,000, wired into an account in the name of AMF, received on or about December 3, 1999;

b.      he transferred, deposited, caused to be deposited, and otherwise dealt in, funds from the Libyan Permanent Mission to the United Nations, an instrumentality of the government of Libya, to wit, a check in the amount of $2,000, dated November 14, 2000, deposited into an account in the name of AMF;

c.      he received, transferred and otherwise dealt in, funds from the Libyan Permanent Mission to the United Nations, an instrumentality of the government of Libya, to wit $3700 received in connection with a trip to Libya between August 14, 2001, and August 23, 2001, which represented the approximate cost of air fare for the first leg of that trip from Dulles International Airport to Zurich.

FURTHER AFFIANT SAYETH NOT.


BRETT GENTRUP
Special Agent
   U.S. Immigration and
   Customs Enforcement

Subscribed to and sworn before me this 21 day of September 2003.


United States Magistrate Judge