UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to Ahmad Totonji and Mohammed Jaghlit** |

*This document relates to:*     Federal Insurance Co. v. al Qaida
                                03 CV 06978 (RCC)


RICO STATEMENT
APPLICABLE TO AHMAD TOTONJI AND MOHAMMED JAGHLIT

        Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Ahmad Totonji and Mohammed Jaghlit.

        Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.    The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.    The names of the defendants to whom this RICO statement pertains are Ahmad Totonji and Mohammed Jaghlit.. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.    Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support for terrorism | 18 U.S.C. § 2332, § 2339 (A) – (C) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | Throughout this period, Ahmad Totonji and Mohammed Jaghlit conspired to and did support terrorism, evade tax obligations, and obfuscate the roles of the various participants and conspirators in The al Qaida Movement to perpetrate radical Muslim terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | In violation of 18 U.S.C. § 1952, on multiple occasions Ahmad Totonji and Mohammed Jaghlit conspired to and did traffic in interstate and/or foreign commerce, and/or used the mail and/or facilities in interstate or foreign commerce with intent to distribute the proceeds of their money laundering activities which are indictable under 18 |

2

| | | |
|---|---|---|
| | | U.S.C. § 1956 and/or 1957. |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | In violation of 18 U.S.C. § 1956, on multiple occasions Ahmad Totonji and Mohammed Jaghlit conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations controlled by Ahmad Totonji and Mohammed Jaghlit. |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | In violation of 18 U.S.C. § 1957, on multiple occasions Ahmad Totonji and Mohammed Jaghlit conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | In violation of 18 U.S.C. § 371, Ahmad Totonji and Mohammed Jaghlit conspired to and did defraud the United States Government of taxes legally due |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | In violation of 26 U.S.C. § 7206(1), (2), Ahmad Totonji and Mohammed Jaghlit conspired to and did file false or materially false tax returns |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | In violation of 26 U.S.C. § 7212(a), Ahmad Totonji and Mohammed Jaghlit conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | Ahmad Totonji and Mohammed Jaghlit undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise he was underwriting, The al Qaida Movement to perpetrate radical Muslim terrorism, planned to and would commit an act of deadly aggression against the United States in the |

| | | |
|---|---|---|
| | | near future, using the resources supplied by Ahmad Totonji and Mohammed Jaghlit. |
| early 1990s to 9/11/2001 | Ahmad Totonji and Mohammed Jaghlit | Ahmad Totonji and Mohammed Jaghlit agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, tax evasion, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Ahmad Totonji, Mohammed Jaghlit and other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of The al Qaida Movement to perpetrate radical Muslim terrorism . For example, in one such transaction, in 2000, SAAR Network Entity Safa Trust, of which Totonji and Jaghlit served as officers, "donated" $400,000 to another SAAR Network Entity, the York Foundation (located in the same building as Safa Trust), which in turn sent $400,000 to a related entity called York International Trust, a shell company located in the Isle of Man, which is famed for its bank secrecy laws. As a further example of layering involving a charitable contribution and loan, in 1996 Safa contributed $8.6 million to the Heritage Education Trust, controlled by Jaghlit. according to the Safa Trust 990. In that same year Heritage loaned $5.5 million to Mar-Jac Holdings, Safa's majority owned subsidiary. In the following year, Heritage transferred $4.1 million to Safa, reporting that this was a return of the 1996 contribution. As there was no reason Safa could not have made the loan directly to Mar-Jac Holdings, its subsidiary, it is apparent that the route the funds traveled, from Safa to Heritage to Mar-Jac, with a portion being returned to Safa, was designed to disguise the true nature of the transaction and the ultimate disposition of these funds. Indeed, between 1996 and 2000, approximately $26 million was funneled from the SAAR network of charities (including the International Institute for Islamic Thought, which Totonji controlled, and the Heritage Education Trust, which Jaghlit controlled) to the York International Trust and Humana Charitable Trust, both Isle of Man entities controlled both other members of the enterprise all working from the same location in Herndon, Virginia. In other words, Ahmad Totonji and Mohammed Jaghlit directed funds through a series of other entities over which they had influence until those funds ultimately reached a shell company in the Isle of Man, where they could no longer be tracked by federal authorities. These transactions bear all of the

4

      hallmarks of money laundering in support of terrorism. Such money laundering, the filing of false tax returns, and tax evasion were all in furtherance of a conspiracy to commit murder and arson which culminated in the Attack.

    (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

    (a)    The enterprise (the "Enterprise" or "The al Qaida Movement to perpetrate radical Muslim terrorism ") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

    (b)    The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida Movement to perpetrate radical Muslim terrorism  does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Ahmad Totonji and Mohammed Jaghlit fit neatly into this framework by raising funds for, providing funding to, and otherwise providing material support for al Qaida and the members of the Enterprise who engaged in the Attack.

    (c)    no.

    (d)    Ahmad Totonji and Mohammed Jaghlit are associated with the Enterprise.

    (e)    Ahmad Totonji and Mohammed Jaghlit are members of the Enterprise, and are separate and distinct from the Enterprise.

    (f)    Ahmad Totonji and Mohammed Jaghlit intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Ahmad Totonji and Mohammed Jaghlit is separate from the existence of The al Qaida Movement to perpetrate radical Muslim terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Ahmad Totonji and Mohammed Jaghlit furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Ahmad Totonji and Mohammed Jaghlit, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida Movement to perpetrate radical Muslim terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind the al Qaida Movement to perpetrate radical Muslim terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Ahmad Totonji and Mohammed Jaghlit, who laundered funds and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities. In addition, al Qaida members cited the ostensible employment with charities to conceal their terrorist activities and to gain entry into important conflict areas.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan, and various other regions, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of the Sudan, Afghanistan, Bosnia-Herzegovina, Kosovo and Chechnya. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the financial services and funds supplied by participants and conspirators like Ahmad Totonji and Mohammed Jaghlit. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Ahmad Totonji and Mohammed Jaghlit. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Ahmad Totonji and Mohammed Jaghlit. Ahmad Totonji and Mohammed Jaghlit with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Ahmad Totonji and Mohammed Jaghlit also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| | | |
|---|---|---|
| | VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| | VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| | X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| I | Trespass |
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent |

|  | Infliction of Emotional Distress |
|---|---|
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.  not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Ahmad Totonji | In his capacity as a director of the International Institute for Islamic Thought and the Safa Trust, Ahmad Totonji conspired to and did generate and surreptitiously transfer funds to terrorist organizations, including al Qaida.  As Ahmad Totonji knew, the entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. | 1962(c) 1962(d) |
| Mohammed Jaghlit | In his capacity as a director of the Heritage Education Trust and the SAAR Foundation, Mohammed Jaghlit conspired to and did generate and surreptitiously transfer funds to terrorist organizations, including al Qaida.  As Ahmad Totonji knew, the entities operating within the SAAR Network have long acted as fully integrated components of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. | 1962(c) 1962(d) |
| Ahmad Totonji | In his capacity as a director of the International Institute for Islamic Thought and the Safa Trust, Ahmad Totonji committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the | 1962(c) 1962(d) |

|  | Enterprise's common goals and ultimate plan of launching an attack on America. |  |
|---|---|---|
| Mohammed Jaghlit | In his capacity as a director of the Heritage Education Trust and the SAAR Foundation, Mohammed Jaghlit committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America. | 1962(c)<br><br>1962(d) |

A.