**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to Taha Jaber Al-Alwani,**<br>**Muhammed Ashraf, M. Omar Ashraf,**<br>**Yaqub M. Mirza, Iqbal Yunus, Ahmed**<br>**Totonji, and Mohammed Jaghlit** |

*This document relates to:*   *World Trade Center Properties, L.L.C., et al. vs. Al Baraka*
*Investment and Development Corporation, et al.*
04 CV 07280 (RCC)

**RICO STATEMENT**
**APPLICABLE TO TAHA JABER AL-ALWANI, MUHAMMED ASHRAF,**
**M. OMAR ASHRAF, YAQUB M. MIRZA, IQBAL YUNUS,**
**AHMED TOTONJI, AND MOHAMMED JAGHLIT**

   Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 and the stipulations dated December 27, 2004 for defendants:

      • Taha Jaber Al-Alwani

      • Muhammad Ashraf

      • M. Omar Ashraf

      • Yaqub M. Mirza

      • Iqbal Yunus

      • Ahmed Totonji

      • Mohammed Jaghlit

These defendants are hereinafter sometimes collectively referred to as the "SAAR Network" executives. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.   The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.      The name of each defendant to whom this RICO statement pertains, the alleged misconduct and the basis of liability for each such defendant is indicated on the chart attached hereto as Exhibit "A".

3.      Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the enterprise and conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.      The damages sustained for which each defendant is liable include, the total destruction of One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center and related subgrade spaces and Seven World Trade Center; lost rental income, business interruption and other related losses; property damage to other of plaintiffs' properties; environmental and remediation expenses; potential liability, indemnification, contribution and other payments to third parties for alleged bodily injury, wrongful death, property damage and other claimed injuries; and related costs, professional and other fees, and expenses.

5.      (a) list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| defrauding the US Government | 18 U.S.C. § 371 |
| filing false or materially false tax returns | 26 U.S.C. § 7206(1), (2) |
| engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| mid-1990s to 9/11/2001 | all SAAR Network executives | Throughout this period, the SAAR Network executives conspired to and did support terrorism, evade tax obligations, and obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, which conspiracy culminated in the Attacks of September 11, 2001; |
| mid-1990s to 9/11/2001 | all SAAR Network executives | In violation of 18 U.S.C. § 1952, on multiple occasions the SAAR Network executives conspired to and did travel in interstate and/or foreign commerce, and/or used the mail and/or facilities in interstate or foreign commerce with intent to distribute the proceeds of their money laundering activities which are indictable under 18 U.S.C. § 1956 and/or 1957; |
| mid-1990s to 9/11/2001 | all SAAR Network executives | In violation of 18 U.S.C. § 1956, on multiple occasions the SAAR Network executives conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the SAAR Network executives and/or the SAAR Network entities; |
| mid-1990s to 9/11/2001 | all SAAR Network executives | In violation of 18 U.S.C. § 1957, on multiple occasions the SAAR Network executives conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000; |

| mid-1990s to 9/11/2001 | all SAAR Network executives | In violation of 18 U.S.C. § 371, the SAAR Network executives conspired to and did defraud the United States Government of taxes legally due; |
|---|---|---|
| mid-1990s to 9/11/2001 | all SAAR Network executives | In violation of 26 U.S.C. § 7206(1), (2), the SAAR Network executives conspired to and did file false or materially false tax returns; |
| mid-1990s to 9/11/2001 | all SAAR Network executives | In violation of 26 U.S.C. § 7212(a), the SAAR Network executives conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws; |
| late 1990s to 9/11/2001 | all SAAR Network executives | the SAAR Network executives undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise they were underwriting, Radical Muslim Terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources supplied by the SAAR Network executives; |
| mid-1990s to 9/11/2001 | all SAAR Network executives | the SAAR Network executives agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, i.e., multiple acts of money laundering, tax evasion, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) See 4(f) below.

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the SAAR Network executives' regular way of doing business. The SAAR Network was set up to transfer illicit funds and hide the nature of the enterprise in doing so. The SAAR Network executives consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration

of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism. For example, in one such transaction, in 1998, SAAR Network entity Mar-Jac Poultry, Inc. "donated" $1.1 million, which represented 99% of the company's profits for that year, to SAAR Network entity African Muslim Agency, a purported charity, which then transferred all but $35,000 of the money to another SAAR Network entity, York International, a shell company located in the Isle of Man, which is famed for its bank secrecy laws. At the time of these transfers, SAAR executive Defendant Yaqub M. Mirza served as an officer and/or director of all three SAAR Network entities. In other words, Mirza directed Mar Jac's profits through a series of other entities he also controlled, until those funds ultimately reached a shell company in the Isle of Man, where they could no longer be tracked by federal authorities. Also, in 2000, SAAR Network Entity Safa Trust, of which Totonji and Jaghlit served as officers, "donated" $400,000 to another SAAR Network Entity, the York Foundation (located in the same building as Safa Trust), which in turn sent $400,000 to a related entity called York International Trust, a shell company located in the Isle of Man, which is famed for its bank secrecy laws. As a further example of layering involving a charitable contribution and loan, in 1996 Safa contributed $8.6 million to the Heritage Education Trust, controlled by Jaghlit, according to the Safa Trust 990. In that same year Heritage loaned $5.5 million to Mar-Jac Holdings, Safa's majority owned subsidiary. In the following year, Heritage transferred $4.1 million to Safa, reporting that this was a return of the 1996 contribution. As there was no reason Safa could not have made the loan directly to Mar-Jack Holdings, its subsidiary, it is apparent that the route the funds traveled, from Safa to Heritage to Mar-Jac, with a portion being returned to Safa, was designed to disguise the true nature of the transaction and the ultimate disposition of these funds. Indeed, between 1996 and 2000, approximately $26 million was funneled from the SAAR network of charities (including the International Institute for Islamic Thought, which Totonji controlled, and the Heritage Education Trust, which Jaghlit controlled) to the York International Trust and Humana Charitable Trust, both Isle of Man entities controlled both other members of the enterprise all working from the same location in Herndon, Virginia. In other words, the SAAR entities and executives directed funds through a series of other entities over which they had influence until those funds ultimately reached a shell company in the Isle of Man, where they could no longer be tracked by federal authorities. The SAAR entities and executives engaged in acts of mail and wire fraud in soliciting funding for purportedly charitable purposes. These transactions bear all of the hallmarks of money laundering in support of terrorism. Such money laundering, the filing of false tax returns, and tax evasion were all in furtherance of a conspiracy to commit murder and arson which culminated in the September 11, 2001 Attacks.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed the SAAR Network executives to surreptiously provide funds to terrorist organizations, including al Qaeda, which conspiracy culminated in the September 11, 2001 Attacks.

6.

    (a) The enterprise (the "Enterprise" or "Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact and purpose.

    (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaeda." Al Qaeda was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Arab regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature, its flexible, even nimble operations, and thus its success. Therefore, although al Qaeda had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The SAAR Network executives fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the September 11, 2001 Attacks by engaging in a course of conduct that included money laundering and tax evasion.

    (c) No.

    (d) All of the SAAR Network executives are associated with the Enterprise.

    (e) The SAAR Network executives are members of the Enterprise, and are separate and distinct from the Enterprise.

    (f) The SAAR Network executives are perpetrators of the racketeering activity, and intended to further the September 11, 2001 Attacks and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the September 11, 2001 Attacks.

7.    The pattern of racketeering activity conducted by the SAAR Network executives is separate from the existence of al Qaeda and Radical Muslim Terrorism, but was a necessary component to the  September 11, 2001 Attacks.

8.    The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the SAAR Network executives funds that international terrorist and criminal activity,

which culminated in the September 11, 2001 Attacks. The usual and daily activities of the Enterprise includes recruitment, indoctrination, financing, material support and the provision and operation of al Qaeda training camps, all of which activities are funded or sponsored by the racketeering activities described herein.

9.     The Enterprise benefits by spreading its radical and illegitimate ideology, by suppressing other forms of Islam, and through the gratification of destroying all perceived enemies.

10.    The Enterprise, and the racketeering activities conducted by the SAAR Network executives, relies heavily on the American interstate system of commerce for banking, financing, supplies, communications, and virtually all essential commercial functions, and in that manner affects interstate commerce.  Additionally, the September 11, 2001 Attacks adversely affected interstate commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the September 11, 2001 Attacks "severely damaged the U.S. economy").

11.    Not applicable.

12.    Not applicable.

13.    Radical Muslim Terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin and his al Qaeda network; the constituent members and associates of the Enterprise, including the SAAR Network executives, employ other of the defendants, including the SAAR Network executives.

14.    The history of the conspiracy behind Radical Muslim Terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being fostered by the Republic of the Sudan until May 1996, al Qaeda established itself in Afghanistan, and relied on well-placed financial facilitators, including but not limited to the SAAR Network executives, and laundered funds from Islamic charities and financial institutions, including the so-called charities and corporations among the SAAR Network entities and other co-defendants herein.  The financial facilitators, including the SAAR Network executives, raised money from witting and unwitting donors. (The 'witting' are named herein.)  They also relied heavily on certain imams at mosques who were willing to divert the zakat, the mandatory charitable contributions required of Muslims.  Al Qaeda also collected money from employees of corrupted charities, including, upon information and belief, at least some of the SAAR Network executives.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan in preparation for the September 11, 2001 Attacks. None of this would have been possible without the funds and sponsorship supplied by participants and conspirators including the SAAR Network executives. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the SAAR Network executives. In order to identify individuals willing, able and trained to carry out the September 11, 2001 Attacks, al Qaeda needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the SAAR Network executives. Each SAAR Network executive, with knowledge and intent, agreed to the overall objectives of the enterprise or conspiracy, and each agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Each SAAR Network executive also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the intended targets, plaintiffs have been severely harmed in their business and property through the losses that they have suffered or will suffer.

16. Plaintiffs' damages -- the loss of business and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. The plaintiffs were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," i.e., international terrorism, the culmination of which was the September 11, 2001 Attacks.

17. The damages sustained for which each defendant is liable include, the total destruction of One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center and related subgrade spaces and Seven World Trade Center; lost rental income, business interruption and other related losses; property damage to other of plaintiffs' properties; environmental and remediation expenses; potential liability, indemnification, contribution and other payments to third parties for alleged bodily injury, wrongful death, property damage and other claimed injuries; and related costs, professional and other fees, and expenses, in excess of $12 billion.

18.

| I | Anti-Terrorism Act, 18 U.S.C. § 2333 |
|---|---|
| II | RICO, 18 U.S.C. § 1962(a) |
| III | RICO, 18 U.S.C. § 1962(c) |
| IV | RICO, 18 U.S.C. § 1962(d) |
| IX | Violation of International Law |

19.  pendent common law claims:

| V | Trespass |
|---|---|
| VI | Intentional and/or Willful Destruction of Property |
| VII | Conspiracy |
| VIII | Aiding and Abetting |
| | Punitive Damages |

20.  Not applicable.