UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT<br>applicable to Al Rajhi Banking &<br>Investment Corporation** |

*This document relates to:*   Federal Insurance Co. v. al Qaida
                             03 CV 06978 (RCC)


**AMENDED RICO STATEMENT
APPLICABLE TO
<u>AL RAJHI BANKING & INVESTMENT CORPORATION</u>**

   Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Al Rajhi Banking & Investment Corporation.

   Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.   The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.   The names of the defendant to whom this RICO statement pertains is Al Rajhi Banking & Investment Corporation. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.   Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Al Rajhi Banking & Investment Corporation ("Al Rajhi Bank") | Al Rajhi Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida Movement to perpetrate radical Muslim terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Al Rajhi Bank | Al Rajhi Bank used its banking and financial operations to knowingly and intentionally provide financial services to al Qaida and its members, as well as organizations which it knew were providing support to the Enterprise. |
| early 1990s to 9/11/2001 | Al Rajhi Bank | Al Rajhi Bank undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the |

2

|  |  | al Qaida Movement to perpetrate radical Muslim terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| --- | --- | --- |
| early 1990s to 9/11/2001 | Al Rajhi Bank | Al Rajhi Bank agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, even constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscated their support of the al Qaida Movement to perpetrate radical Muslim terrorism.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a)   The enterprise (the "Enterprise" or "the al Qaida Movement to perpetrate radical Muslim terrorism") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power

3

repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida Movement to perpetrate radical Muslim terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Al Rajhi Banking & Investment Corporation fit neatly into this framework by providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

 (c) no.

 (d) Al Rajhi Banking & Investment Corporation is associated with the Enterprise.

 (e) Al Rajhi Banking & Investment Corporation is a member of the Enterprise, and is separate and distinct from the Enterprise.

 (f) Al Rajhi Banking & Investment Corporation intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Al Rajhi Banking & Investment Corporation is separate from the existence of the al Qaida Movement to perpetrate radical Muslim terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Rajhi Banking & Investment Corporation furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by having funds available to meet its goals of spreading its ideology, suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Al Rajhi Banking & Investment Corporation, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida Movement to perpetrate radical Muslim terrorism "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind the al Qaida Movement to perpetrate radical Muslim terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Al Rajhi Banking & Investment Corporation, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities.

    The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Al Rajhi Banking & Investment Corporation. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Al Rajhi Banking & Investment Corporation. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al Rajhi Banking & Investment Corporation. Al Rajhi Banking & Investment Corporation, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Al Rajhi Banking & Investment Corporation also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

5

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | | |
|---|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.  pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.  not applicable

7

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Al Rajhi Banking & Investment Corporation | Al Rajhi Banking & Investment Corporation has long provided financial services and other forms of material support to terrorist organizations, including al Qaida.<br><br>Al Rajhi Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charitable organization defendants that operate within al Qaida's infrastructure, including but not limited to the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").<br><br>In cooperation with these charitable organizations, Al Rajhi Bank advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for these charitable organizations, thereby providing a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi Bank facilitated al Qaida's fundraising efforts.<br><br>The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for al Haramain and the IIRO, have been used to transfer funds to al Qaida cells throughout the world. | 1962(c)<br>1962(d) |

|  | In addition, as part of its own *zakat* obligation to donate 2.5% of its current assets and other items to charity, Al Rajhi has directly funded several of al Qaida's charity fronts, via *zakat* and *haram* contributions, including MWL, WAMY, IIRO, Al Haramain and the Saudi Joint Relief Committee. In order to ensure that such contributions, and those of its depositors and account holders satisfied with Islamic obligations, Al Rajhi was required to determine the ultimate recipients of its money were within one of the categories prescribed in the Koran for recipients of *zakat*. As a result of this obligation to inquire, plus the fact that many of the charities maintained accounts at its banks and therefore records of checks and wire transfers were readily accessible, Al Rajhi knew that a primary intent and purpose of these charities was to use this money towards the furtherance of the Enterprise and support its international terrorist activity.<br><br>Moreover, as a result of its obligation to inquire and ready access to information about the charities in question, Al Rajhi Bank knew or had to know that the funds it collected on behalf of these charities and the funds that it managed from these charities were likely to be used by the Enterprise for terrorist activities against the United States.<br><br>Such knowledge is also evident based on its decision to continue to contribute to and maintain accounts these charities even after various public disclosures of the involvement of each with international terrorism well prior to September 11, 2001, such as the banning of Al Haramain from Kenya in September 1998 because of its involvement with the bombing of American embassies in Kenya and Tanzania; WAMY's disclosed involvement with the 1993 World Trade Center bombing; the MWL's ties to a 1995 assassination attempt on Egyptian President Mubarak and the 1998 embassy bombings; IIRO's publicly discussed involvement with terrorist attacks |  |

9

and plots in Bosnia, the Philippines, Croatia, Kenya, India, Macedonia, Jordan, India and the 1993 World Trade Center bombing; the SJRC's publicly discussed involvement with terrorist attacks in Albania, Kosovo, Egypt, Tanzania and Kenya; and public links between the BIF and terrorist activities in Chechnya, the Sudan, Bosnia and the Philippines, as well as the arrest of its Sudan manager in Saudi Arabia in 1993 under suspicion of ties to al Qaida.

Al Rajhi Bank has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaida, and that the funds it contributed directly to the charities were being funneled to al Qaida. In fact, individual defendant Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of these charitable organizations, including the MWL and the IIRO. Through his involvement in the affairs of these charitable organizations, Suleiman Abdul Aziz Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaida's operations, and consequently that the accounts maintained by Al Rajhi Bank on behalf of those charitable organizations were being used to channel funds to al Qaida.

Such knowledge and coordination is further demonstrated by disclosure that a member of al Rajhi's Sharia Committee, which is responsible for approving the bank's donations to charities, has simultaneously served as an official of at least two of the relevant Saudi charities. Sheik Abdallah bin Abd-al Rahman al Basam simultaneously served as chairman of the Sharia Supervisory Committee in the IIRO, and as a member of the Sharia Committee of the al Rajhi Bank. He was also a member of the Holy Qura Committee of the Muslim World League. As an official of the IIRO, al Basam certainly would have received

|  | notification of the involvement of the IIRO in Philippine al Qaida plots and the African embassy bombings. As such, it is indisputable that officials of al Rajhi Bank were specifically aware that the bank's *zakat* contributions were being funneled to terrorist fronts.<br><br>Nevertheless, Al Rajhi Bank has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaida, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks like the Enterprise through anti-terrorist and money laundering safeguards and "know your customer" regulations.<br><br>Moreover, Al Rajhi Bank has laundered money for al Qaida, knowingly and intentionally provided financial services to al Qaida including the maintenance of bank accounts, and facilitated its purchase of weapons and military equipment. Al Rajhi Bank knowingly provided banking services for September 11th hijacker Abdulaziz al-Omari.<br><br>Al Rajhi Bank thereby has, for a period of many years, provided critical financial and logistical support to al Qaida to support that terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida's jihadist campaign. |  |