UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────────────
                                    )
In Re TERRORIST ATTACKS on          )    03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                  )    ECF Case
                                    )
───────────────────────────────────────

*This document relates to:*
    *Burnett v. Al Baraka Inv. & Dev. Corp.*, 03 CV 9849 (RCC)
    *Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (RCC)

## REPLY MEMORANDUM OF THE NATIONAL COMMERCIAL BANK IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

An exceptional degree of clairvoyance would be required to satisfy Plaintiffs' version of the standards for reconsideration. *See Ashton* Opp. at 2-4; *Burnett* Opp. at 1-3, 6-7.[1] Plaintiffs seem to believe that NCB should have anticipated all along that the Court would grant Rule 12(b)(6) dismissals to several other "Banking Defendants"[2] on grounds that are equally applicable to NCB. *Id.*; *Burnett* 3AC, at p. 230. Only under that fanciful hypothesis would it have been logical for NCB to argue, from the outset, that the Court could invoke the "foreordained outcome" principle to grant NCB's Rule 12(b)(6) motion before resolving NCB's two jurisdictional defenses. *Center for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 191-95 (2d Cir. 2002) ("*Bush*").

Of course, NCB could not have foreseen any aspect of the Court's January 18, 2005 Opinion and Order. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005). It was only after the Court's Rule 12(b)(6) dismissal of several other Banking Defendants that the *Bush* "foreordained outcome" principle became relevant. Equally, it was only after the Court's January 18 decision to allow jurisdictional discovery on <u>both</u> the FSIA <u>and</u> personal jurisdiction

---

[1]     "*Ashton* Opp." refers to Memorandum of Law in Opposition to Defendant National Commercial Bank's Motion for Reconsideration (MDL Dkt. #686, filed Feb. 18, 2005). "*Burnett* Opp." refers to *Burnett* Plaintiffs' Memorandum of Law in Opposition to National Commercial Bank's Motion for Reconsideration (MDL Dkt. #687, filed Feb. 21, 2005).

[2]     *See Burnett*, Third Amended Complaint ("3AC"), at p. 230 (allegations against "The Banking Defendants").

defenses that the sequencing of such jurisdictional discovery became germane. Thus, both aspects of NCB's Motion for Reconsideration were properly raised after the Court's Opinion.

**I.    The *Bush* "Foreordained Outcome" Principle Authorizes the Court to Dismiss NCB under Rule 12(b)(6) at this Time.**

Under the *Bush* rule, the Court can suspend resolution of thorny jurisdictional questions and dismiss on Rule 12(b)(6) grounds "where the outcome on the merits has been 'foreordained' by another case such that 'the jurisdictional question could have no effect on the outcome.'" *Bush*, 304 F.3d at 194; Recon. Mem. at 2-3.[3] If, as NCB contends, the Court's Rule 12(b)(6) dismissal of several other Banking Defendants "foreordains" a Rule 12(b)(6) dismissal of NCB as well, then there can be no question that NCB's Motion for Reconsideration satisfies Local Civil Rule 6.3.[4] *See Seippel v. Jenkens &Gilchrist, P.C.*, No. 03-6942, 2004 WL 2403911, at *1-*2 (S.D.N.Y. Oct. 26, 2004).

In *Seippel*, Judge Scheindlin granted a motion for reconsideration under Local Civil Rule 6.3 when the defendant pointed out that Judge Scheindlin's initial ruling in the case "doomed" the resumption of the litigation in another forum as Judge Scheindlin originally had allowed. 2004 WL 2403911, at *2. On reconsideration, Judge Scheindlin concluded that it would be a "useless exercise" to allow the plaintiff to resume the litigation in another forum because, under *res judicata* principles, the successor court would have to reach the same conclusion that she did. NCB respectfully submits that the *Bush* principle equally allows this Court to conclude that its Rule 12(b)(6) dismissal of several other Banking Defendants "doom[s]" Plaintiffs' claims against NCB, and makes it a "useless exercise" to allow the claim against NCB to survive, regardless of the outcome of NCB's jurisdictional defenses.

---

[3]    "Recon. Mem." refers to the Memorandum of Law in Support of The National Commercial Bank's Motion for Reconsideration (MDL Dkt. #648, filed Feb. 1, 2005).

[4]    The *Ashton* Plaintiffs' contention that reconsideration is improper because no final, appealable "judgment" has been entered is frivolous. *Ashton* Opp. at 3. Local Rule 6.3 allows the Court to reconsider "order[s] <u>determining a motion</u>" <u>or</u> "order[s] resulting in a judgment." (Emphasis added.) NCB's motion plainly seeks reconsideration of an "order determining a motion."

2

Contrary to Plaintiffs' assertion, the *Bush* principle does not turn on whether this Court already has decided the merits of Plaintiffs' precise allegations against NCB, or on whether this is a "close case" or one that presents a "genuine controversy." *Ashton* Opp. at 4 n.3; *Burnett* Opp. at 5. Rather, as *Bush* itself makes clear, a plaintiff cannot avoid the *Bush* principle simply by asserting that there are factual distinctions between its claims and the claims dismissed in a prior "controlling" decision. *Bush*, 304 F.3d at 190-91, 193. Like Plaintiffs here (*Burnett* Opp. at 5 *and Ashton* Opp. at 2 n.2), the *Bush* plaintiffs argued that the Second Circuit's prior controlling decision was "distinguish[able]" because their factual allegations were different. *Id.* at 190-91 & n.3. The Second Circuit rejected that contention on the ground that the plaintiffs' allegations were "far too similar" to those in the prior "controlling" case to support a "distinction as a factual matter." *Id.* at 191; *see also id.* at 190 n.3 (plaintiffs made "minor alterations" to allegations that were previously rejected); *id.* at 193 (prior case "analyzed essentially the same factual allegations").

*Bush* plainly permits the Court to decide NCB's Rule 12(b)(6) motion now if three requirements are met:

(1) this Court (the "same court") has decided a legal question

(2) that is "controlling" and

(3) that "foreordains" dismissal of plaintiffs' claims against NCB on the merits.

*Bush*, 304 F.3d at 191-95. Plaintiffs effectively concede that *Bush* so holds. *See Burnett* Opp. at 6 (stating that the "foreordained outcome" principle applies "if the prior resolution of a *legal* issue that was *identical* . . . control[s] the result in the subsequent case" (original emphasis)).

The first two *Bush* requirements are met here because Plaintiffs do not dispute that the Court's Rule 12(b)(6) dismissal of several other Banking Defendants is law of the case and thus is a "controlling" decision. Recon. Mem., at 2. Moreover, that dismissal decided a legal question because, axiomatically, a Rule 12(b)(6) dismissal is a "ruling of law" that "address[es] . . . the legal

3

sufficiency of the complaint." *Chen v. Trustees of Columbia Univ.*, No. 00-7532, 2001 WL 815521, at *1 (S.D.N.Y. July 18, 2001) (Casey, J.); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (Rule 12(b)(6) dismissal is a "ruling of law"), *cert. denied*, 519 U.S. 808 (1996); *accord De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir.) ("A [Rule 12(b)(6)] motion to dismiss is designed to test the <u>legal sufficiency of the complaint</u>, and thus does not require the Court to examine the evidence at issue." (emphasis added)), *cert. denied*, 519 U.S. 1007 (1996).

That leaves only the question of whether Plaintiffs' allegations against NCB are so "similar" to the legally insufficient allegations against the other Banking Defendants that a Rule 12(b)(6) dismissal of NCB is "foreordained." *Bush*, 304 F.3d at 193-95. We respectfully suggest that the allegations against NCB are "far too similar"—in the words of the *Bush* ruling, 304 F.3d at 191—to the legally insufficient allegations against the now-dismissed Banking Defendants to warrant a different Rule 12(b)(6) outcome as to NCB. Recon. Mem., at 4.[5]

Putting aside Plaintiffs' rhetoric, there is simply no basis to conclude that the allegations against NCB are "different" or "unique." *Burnett* Opp. at 5; *Ashton* Opp. at 2 n.2. Indeed, the Plaintiffs themselves make clear that their claims against <u>all</u> of "The Banking Defendants" (*Burnett*, 3AC at p. 230) proceed from a common core of allegations about "The Islamic Banking System and its Role in International Terrorism" that are found in paragraphs 40-46 of the *Burnett* Third Amended Complaint. An examination of the specific allegations against "The Banking Defendants" only reinforces that conclusion.

<u>First</u>, NCB's alleged "connection" to the Bank of Credit and Commerce International ("BCCI") is just as irrelevant to the September 11 attacks as were the "connections" that both Al

---

[5] Plaintiffs make their customary conclusory assertion that the record is "replete" with unspecified "documentation" supporting their allegations against NCB (*Ashton* Opp. at 2 n.2) but fail to point to any such documentation or support. Indeed, the Court noted that Plaintiffs' allegations against NCB are "largely conclusory." *In re Terrorist Attacks*, 349 F. Supp. 2d at 836.

Rajhi Bank and Arab Bank allegedly had to Hamas. *Compare Burnett* Opp. at 5 *with In re Terrorist Attacks*, 349 F. Supp. 2d at 833, 835. Plaintiffs' failure to allege any link between Hamas and the September 11th attacks doomed their claims against Al Rajhi Bank and Arab Bank. 349 F. Supp. 2d at 833 (Al Rajhi Bank: "Plaintiffs have not alleged any relationship between Hamas and al Qaeda or the terrorist attacks of September 11"); *id.* at 835 ("While claiming Arab Bank has ties with known Hamas fronts, the <u>Federal</u> complaint does not contain any allegation of a connection between Hamas and Osama bin Laden, al Qaeda, or the September 11 attacks."). The supposed connection between NCB and BCCI likewise is legally insufficient because Plaintiffs do not allege that BCCI had any connection to Osama bin Laden, al Qaeda, or the September 11th attacks, as their own complaints confirm. *See Burnett* 3AC, ¶ 92 (BCCI allegedly was "implicated" for purportedly "handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization"); *Ashton* 4AC, ¶ 567 (same).

<u>Second</u>, Plaintiffs' claim that NCB acted as a "channel of funding for Osama bin Laden" or for "transfer[s] . . . to organizations that funded al Qaeda" (*Burnett* Opp. at 5; *Ashton* Opp. at 2 n.2) is essentially a pattern allegation that also was made against all of the other Banking Defendants—and found legally insufficient by this Court. As the Court recognized: "All the banking Defendants are alleged to have 'provided essential support to the al Qaeda organization … [and allegedly] have acted as instruments of terror, in raising, facilitating and transferring money to terrorist organizations.'" *In re Terrorist Attacks*, 349 F. Supp. 2d at 831 (quoting *Burnett* 3AC, ¶ 46). The Court held that those allegations were insufficient to support any theory of liability for the September 11th attacks because: "This Court, like Judge Robertson before it, has found no basis for a bank's liability for injuries funded by money passing through it on routine banking business." *Id.* at 833 (Al Rajhi;); *accord id.* at 834 (Saudi American Bank: "As the Court has stated before, there can be no bank liability for injuries caused by money routinely passing through the bank."); *id.* at 835 (Arab Bank: "Providing

5

routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability."). As to all of the Banking Defendants—both NCB and the now-dismissed banks—the Plaintiffs make only general, conclusory and legally insufficient assertions that the banks knowingly facilitated a transfer of funds by their customers to terrorist individuals or organizations. *Id.* at 833 (Al Rajhi), 834 (Saudi American Bank), 835 (Arab Bank).[6]

Third, the alleged "role of the bin Mahfouz family in NCB" and BCCI, and the purported arrest of Khalid bin Mahfouz (*Burnett* Opp. at 5; *Ashton* Opp. at 2 n.2), are legally insufficient to allege wrongdoing on the part of NCB. Plaintiffs made similar and extensive allegations against the Al Rajhi family that the Court found legally insufficient to state a claim against the Al Rajhi Bank because "there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business." *In re Terrorist Attacks*, 349 F. Supp. 2d at 833; *accord id.* at 836 ("An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business."); *compare id.* at 832 (the *Burnett* plaintiffs alleged that "al Rajhi family members are allegedly closely associated with wealthy donors to Osama bin Laden," including a family member on the "Golden Chain"); *Burnett* 12(e) Stmnt., ¶¶ 17, 68-70, 79-85; *Burnett* 3AC, ¶¶ 84, 86; *Ashton* 4AC, ¶¶ 559, 561. Plaintiffs likewise have failed to allege any facts that could be legally sufficient to impute the alleged conduct of Mr. bin Mahfouz to NCB.

In sum, Plaintiffs' allegations against NCB raise only immaterial variations of the same "legal issue" that the Court already has decided, *i.e.*, that the provision of routine banking services cannot

---

[6] *Compare, e.g., Burnett* 12(e) Stmnt., ¶ 39 ("Al Rajhi knew or had to know . . . that certain of its depositors, and in particular, the defendant charities herein, were material supporters of terrorism and terrorist activities.") *and Burnett* 3AC, ¶ 138 ("Arab Bank PLC has materially supported, aided, abetted and financed al Qaeda.") *and Burnett* 3AC, ¶ 146 ("Saudi American Bank . . . directly provid[ed] material support and assistance to Osama bin Lad[e]n.") *and Ashton* 4AC, ¶ 608 (same) *with Ashton* 4AC, ¶ 570 (NCB "knew or should have known they were materially supporting, aiding and abetting Al Qaeda, Osama bin Laden, and international terrorism") *and Burnett* 3AC, ¶ 95 (same).

render the Banking Defendants liable for the September 11th attacks. *Bush* allows the Court to apply that holding to NCB at this time, without resolving NCB's jurisdictional defenses.

## II. Alternatively, Personal Jurisdiction Discovery Should Proceed First Because The Court May Decide Personal Jurisdiction Before FSIA Subject Matter Jurisdiction.

The Court ordered that jurisdictional discovery on FSIA issues proceed "first," before discovery on the personal jurisdiction due process issue of NCB's contacts with the United States. *In re Terrorist Attacks*, 349 F. Supp. 2d at 836. Reconsideration of that discovery sequence is appropriate because NCB has pointed to "'controlling decisions'" that "'might reasonably be expected to alter the conclusion reached by the court.'" *Burnett* Opp. at 2 (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (upholding the district court's reconsideration of its denial of a motion to dismiss where the defendant "introduc[ed] . . . additional relevant case law" in its motion for reconsideration)); *accord Ashton* Opp. at 2 (same). In sum, because the Court may— and, indeed, should in these circumstances—decide personal jurisdiction before the FSIA issue, the sequence of discovery should be rearranged if NCB is not dismissed under Rule 12(b)(6).

Contrary to Plaintiffs' assertion (*Ashton* Opp. at 4-5; *Burnett* Opp. at 3-6), as a matter of law generally, "there is no unyielding jurisdictional hierarchy" that requires federal courts to decide subject matter jurisdiction before personal jurisdiction. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999). Indeed, "[i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits." *Id.* at 585. Thus, as the Supreme Court has explained, when the "district court has before it a straightforward personal jurisdiction issue" and a "difficult and novel question" of subject matter jurisdiction, "the court does not abuse its discretion by turning directly to personal jurisdiction." *Id.* at 588.

Moreover, the Second Circuit has held that it is "acceptable" for a district court to defer deciding the question of FSIA jurisdiction to reach—and to dismiss a lawsuit based on—the alternative defense of *forum non conveniens*. *In re Arbitration Between Monegasque de Reassurances*, 311 F.3d

488, 497-98 (2d Cir. 2002). In *Monegasque*, an arbitration enforcement action against Ukraine, the Second Circuit held that, regardless of whether subject matter jurisdiction rested on the FSIA or on the New York Convention, "neither we nor the district court are barred from passing over the question of jurisdiction and going directly to the *forum non conveniens* issue raised by Ukraine." *Id.* at 498. Importantly, in reaching that conclusion, the Second Circuit "agree[d]" with the D.C. Circuit decision in *In re Papandreou*, 139 F.3d 247, 255-56 (D.C. Cir. 1998), that issues of personal jurisdiction as well as *forum non conveniens* could be decided before issues of FSIA jurisdiction. *Id.*[7]

Further, the D.C. Circuit decision in *Papandreou* invoked principles of comity to hold that personal jurisdiction should be resolved first, before FSIA jurisdiction, when it may provide a "swifter route" to dismissal and thereby avoid imposing discovery burdens on core ministries of a sovereign foreign government. *In re Papandreou*, 139 F.3d at 254, cited in Recon. Mem., at 5. The FSIA "jurisdictional discovery" involving NCB—"to explore PIF's [the Public Investment Fund's] function, organizational structure, and place within the Kingdom of Saudi Arabia," *In re Terrorist Attacks*, 349 F. Supp. 2d at 792—inevitably would intrude on the Saudi Ministry of Finance of which the PIF is an administrative unit, *id.* at 789. By contrast, jurisdictional discovery as to "NCB's contacts with the United States" and whether those contacts "satisfy due process requirements," *id.* at 820, is quite unlikely to involve the Ministry of Finance.

Indeed, precisely because of that clear separation between (i) FSIA jurisdictional discovery as to the PIF and (ii) personal jurisdiction discovery as to NCB's U.S.-contacts, there is no force to Plaintiffs' argument (*Burnett* Opp. at 8) that *Reiss v. Societe Centrale*, 235 F.3d 738 (2d Cir. 2000)

---

[7] Additionally, in *Monegasque*, the Second Circuit held that the rule of "jurisdiction first"—to which the *Bush* case, in any event, provides an exception—did not apply there because the only subject matter jurisdiction questions arose under statutes—the FSIA and the New York Convention—not the Constitution. *Id.* at 497, citing *Bush* and *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 816 n.11 (2d Cir. 2000). The Second Circuit held that courts can postpone resolving questions of subject matter jurisdiction unless "the potential lack of jurisdiction is a constitutional question." *Id.* Thus, here, even if the Court found the *Bush* exception inapplicable, it could postpone resolution of the purely statutory issue of FSIA jurisdiction to reach the question of personal jurisdiction.

8

requires the Court to resolve the FSIA issue first.  Plaintiffs' threshold problem, of course, is that they urge a reading of *Reiss* that would put it squarely in conflict with the subsequent decision in *In re Arbitration Between Monegasque de Reassurances*, which allowed Second Circuit courts to postpone the FSIA jurisdiction question to reach other jurisdictional defenses.  But there also are more specific reasons why *Reiss* simply does not help the Plaintiffs.

*Reiss* involved a situation—diametrically opposed to the one here—where the factual issues underlying both FSIA and personal jurisdiction were "inextricably intertwined."  *Reiss*, 235 F.3d at 748.  In *Reiss*, it was "undisputed" that the defendants were foreign government instrumentalities. *Id.* at 746.  The FSIA question, instead, was whether the foreign government instrumentalities had engaged in "commercial activity" in the United States—a factual question that mirrored the personal jurisdiction question of whether the instrumentalities were continuously engaged in business in New York.  *Id.* at 747.  *Reiss* held only that, when FSIA and personal jurisdiction issues rest on the same core of facts, sovereign immunity should be resolved first.  *Id.* at 747-48.  By contrast here, the factual issues on which the Court has directed FSIA discovery (*i.e.*, PIF structure and function issues) have nothing to do with the factual issues on which the Court has directed personal jurisdiction discovery (*i.e.*, NCB's U.S. contacts).  Moreover, *Reiss* makes clear that "constitutional due process considerations" of personal jurisdiction still must be addressed even if FSIA subject matter jurisdiction is found to exist.  *Id.* at 746.  Consequently, if there is no personal jurisdiction over NCB because it has insufficient U.S. contacts to satisfy due process, then the question of FSIA subject matter jurisdiction becomes moot.  Recon. Mem., at 5 n.3.

**Conclusion**

For the foregoing reasons, and those stated in NCB's opening memorandum of law, NCB respectfully requests that its motion for reconsideration be granted.

Dated: March 7, 2005  
      Washington, D.C.

/s/ Ronald S. Liebman  
Ronald S. Liebman (admitted *pro hac vice*)  
Mitchell R. Berger (MB-4112)  
Ugo Colella (admitted *pro hac vice*)  
PATTON BOGGS LLP  
2550 M Street, N.W.  
Washington, D.C. 20037  
Phone: (202) 457-6000  
Fax:     (202) 457-6315

*Attorneys for Defendant*  
*The National Commercial Bank*