UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to Mohammed Al Faisal Al Saud** |

*This document relates to:*   Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
04 CV 01923 (RCC)

## RICO STATEMENT
## APPLICABLE TO MOHAMMED AL FAISAL AL SAUD

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules, for defendant Mohammed Al Faisal al Saud.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

1.    The unlawful conduct is in violation of 18 U.S.C. § 1962(b), (c) and/or (d).

2.    The name of the defendant to whom this RICO statement pertains is Mohammed Al Faisal Al Saud ("Prince Mohammed"). The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.    Not applicable. All known wrongdoers are named as defendants in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4.    The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any

individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. (a) List of predicate acts and specific statutes violated:

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15; NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15; NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States | 18 U.S.C. § 371 |

| Government | |
|---|---|
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |

(b) <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| mid-1990s to 9/11/2001 | Prince Mohammed | Throughout this period, Prince Mohammed conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Late 1990s to 9/11/2001 | Prince Mohammed | Prince Mohammed undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was |

|  |  |  |
|---|---|---|
|  |  | participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Prince Mohammed. |
| Mid-1990s to 9/11/2001 | Prince Mohammed | Prince Mohammed agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) Not applicable.

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically Prince Mohammed, to surreptitiously provide funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or International Islamic Front for the Jihad Against the Jews and Crusaders, which conspiracy culminated in the Attack.

6.
  a. The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)) and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

  *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

  *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

  b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Prince Mohammed fit neatly into this framework by raising funds for and

  providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

  The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

  On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Prince Mohammed and illegal activity to generate material support to continue its terrorist operations.

 c. No.

 d. Prince Mohammed is associated with the Enterprise.

 e. Prince Mohammed is a member of the Enterprise, and is separate and distinct from the Enterprise.

 f. Prince Mohammed intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Prince Mohammed is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Prince Mohammed funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Prince Mohammed, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and

in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center- and as such, affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13.

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Second Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

14. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Prince Mohammed, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Prince Mohammed, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Prince Mohammed, of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Prince Mohammed. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Prince Mohammed. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Prince Mohammed. Prince Mohammed, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Prince Mohammed also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, business, and livelihood.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.  The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| | |
|---|---|
| **Count One** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Two** | Alien Tort Claims Act 28 U.S.C. §1350 |
| **Count Nine** | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*. |
| **Count Ten** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Twelve** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| | |
|---|---|
| **Count Three** | Wrongful Death |
| **Count Four** | Survival |
| **Count Five** | Negligent and Intentional Infliction or |

|  | Emotional Distress |
| --- | --- |
| **Count Six** | Conspiracy |
| **Count Seven** | Aiding and Abetting |
| **Count Eight** | Negligence |
| **Count Eleven** | Punitive Damages |

20. Not applicable

Date: March 10, 2005

        LAW OFFICES OF JERRY S. GOLDMAN
        & ASSOCIATES, P.C.

        BY:_____
           GINA M. MAC NEILL, ESQUIRE
           (GM 0581)

        BY: _____/s/_____
           JERRY S. GOLDMAN, ESQUIRE
           (JG 8445)

           Attorneys for the Plaintiffs
           111 Broadway, 13th Floor
           New York, N.Y. 10006
           212.242.2232

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Prince Mohammed | Mohammed al Faisal al Saud ("Prince Mohammed") is the son of the late King Faisal and the cousin of King Fahd.  Prince Mohammed is brother to Prince Turki al Faisal who headed the Saudi Secret Service.  Prince Mohammed is part of the royal family and a well known business man in the Islamic Business World. **Connection to DMI :** Prince Mohammed is a founder of Dar al Maal al Islami.   For almost twenty years, Dar al Maal al Islami Trust and Dar al Maal Administrative Services, SA (collectively {"DMI") were operated under the chairmanship of Prince Mohammed. DMI has an investment banking arm known as the Islamic Investment Company of the Gulf ("IICG"), which is based in Bahrain. IICG is a wholly-owned subsidiary of DMI.  Faisal Islamic Bank is a subsidiary of IICG.  Both DMI and Faisal Islamic Bank are major shareholders in Al Shamal Bank.   A director of the Al Shamal Bank is Haydar Bin Laden, the half brother of Osama Bin Laden. Haydar Bin Laden is also on the Board of Directors for DMI.  **The United Nations has acknowledged that DMI funds terrorist activities.**  DMI has been directly linked to holding funds for Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through several of its subsidiary banks, including Al Shamal Bank.  Based upon information and belief, Al Shamal Bank reportedly held upwards | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

|  | of $50 million of investments of Osama Bin Laden, according to state department and United Nations documents.

DMI has also been linked to Al Taqwa Bank. The United States and the United Nations sanctioned Al Taqwa for funding al-Qaida and other terrorist activities.

DMI is viewed in the Muslim world as one of the primary vehicles for Saudi financing of the International Islamic Fundamentalist Movement. During the 2001 trial, relating to the 1998 United States embassy bombings in Kenya and Tanzania, Faisal Islamic Bank, which is a subsidiary of DMI, was implicated as holding bank accounts for operatives of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

DMI adheres to the *Zakat* system of donating 2.5% of a company's annual income to Islamic leaders and institutions. DMI's *Zakat* accounts have been used to support Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

As chairman of DMI, Prince Mohammed oversaw the funding and had knowledge of the distribution of funds through DMI to the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**Connection to Faisal Islamic Bank:**

Prince Mohammed is the major shareholder of Faisal Islamic Bank ("FIB"). He serves as the Chairman of the board of directors. As Chairman of FIB, Prince Mohammed "implements the decisions of the board, administers all activities [of the bank]and is directly responsible for all these activities before the Board," as stated on the website of the Faisal Islamic Bank of Egypt website. |  |

FIB was founded in 1970 by Yousef M. Nada ("Nada"). Nada is a member of the Egyptian Muslim Brotherhood and the Jamaa al-Islamiya, which is directly allied with al Qaida. When he came to Saudi Arabia, he became friendly with the Royal Family, though his membership in the Muslim Brotherhood, opened a construction company, and thereafter, founded the FIB. Nada has been implicated as a supporter of the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and has been connected to the Al Taqwa Bank, as their president, in supporting Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

FIB is a subsidiary of Islamic Investment Company of the Gulf. Islamic Investment Company of the Gulf is a subsidiary of DMI.

FIB was one of the main founders of the al Shamal Islamic Bank, the bank which Osama Bin Laden helped to establish in 1991 by providing capital in the amount of $50 million. At this time, it is believed that FIB remains a major shareholder of al Shamal Bank. Al Shamal Bank regularly provided financial and account services to al Qaida operatives – six of whom held bank accounts at Al Shamal. Osama Bin Laden paid al Qaida members from Al Shamal accounts. Moreover, money from these Al Shamal accounts was deposited, housed and transferred to other al Qaida members to buy military equipment, including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

FIB was also implicated during the 2001 United States trial relating to the 1998 embassy bombings in Africa. A former finance manager for al Qaida in Khartoum, Jamal al-Fadl, testified that FIB held bank accounts for al Qaida operatives by stating:

> Q: "Where were the accounts [of the al
>
>   Qaida] held? In what countries?
>
> A: …we got account in Bank Faisal

Islami.

Q: Is that also in Khartoum?

A: Yes."

The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by FIB.

The events of 9/11 were a direct and intended and foreseeable result of FIB's participation. FIB controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States, and did nothing to stop them.

As chairman of FIB, Prince Mohammed oversaw the funding and had knowledge of the distribution of funds through FIB to the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**Connection to al Shamal Bank:**

Prince Mohammed is also Chairman of Al Shamal Bank. As stated prior, Al Shamal Bank was funded by Osama bin Laden in the amount of $50 million to assist the founding of the bank. Prince Mohammed joined bin Laden in founding the Al Shamal Bank in Sudan, according to a report prepared for the French intelligence service.

Al Shamal Bank regularly provided financial and account services to al Qaida operatives – six of whom held bank accounts at Al Shamal. Osama Bin Laden paid al Qaida members from Al Shamal accounts. Moreover, money from these Al Shamal accounts was deposited, housed and transferred to other al Qaida members to buy

|  | military equipment, including an airplane which was delivered to Osama Bin Laden to be used to transport missiles. |  |
|---|---|---|
|  | A director of the Al Shamal Bank is Haydar Bin Laden, the half brother of Osama Bin Laden. Haydar Bin Laden is also on the Board of Directors for DMI. |  |
|  | As chairman of Al Shamal, Prince Mohammed oversaw the business activities and had knowledge of the distribution of funds through Al Shamal to the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. |  |
|  | **Connection to Mohammed Galed Kalaje Zouaydi:** |  |
|  | Based upon information and belief, Prince Mohammed had close relations with Mohammed Galed Kalaje Zouaydi ("Zouaydi"). It has been reported that Prince Mohammed used Zouaydi as an accountant. |  |
|  | Zouaydi, of Syrian origin, is considered to be a "big financier" behind the European terrorist networks of al Qaida, and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. He was arrested in Spain in April 2002. Allegedly, Zouaydi was at the center of a money laundering ring that funded al Qaida, and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, in Europe. He set up private companies where he received donations in Saudi Arabia from 1996 to 2001. These funds were distributed to the al Qaida, and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, members in Europe. |  |
|  | Zouaydi had direct contact with the hijackers of Hamburg. He is a member of the Syrian Muslim Brotherhood whose other members in Hamburg were tied into the Hamburg terrorists, particularly Mohammed Atta. |  |

|  | Prior to September 11, 2001 Prince Mohammed was on notice that al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders: (a) was soliciting and raising funds in and from Saudi Arabia through purportedly legitimate businesses and financial entities; and (b) intended to use the material support and substantial assistance it acquired to kill Americans and attack American interests around the world.  Despite the known and foreseeable risks posed to the United States citizens and property by al Qaida  and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Mohammed acted with the knowledge and intent that the flow of funds through and use of DMI, FIB, and al Shamal Bank would continue unabated.  To that end, Prince Mohammed conducted and/or participated, directly or indirectly, in the affairs of the RICO Enterprises FIB and/or DMI and/or Al Shamal Bank and/or al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders through a pattern of racketeering activity that among other things, facilitated, materially supported and substantially assisted al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>Prince Mohammed has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Prince Mohammed continued to permit, make available, assist, and maintain those accounts.<br><br>As the foregoing demonstrates, Prince Mohammed thereby knowingly has, for a period of many years, provided critical financial and |  |

|  | logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Prince Mohammed's participation in al Qaida's jihadist campaign. |  |

**CERTIFICATE OF SERVICE**

I hereby certify that the attached RICO statement Applicable to Arab Bank was served on all counsel of record by way of electronic filing in the Southern District of New York on March 10, 2005.

Dated: March 10, 2005

                                        BY:_____
                                              GINA M. MAC NEILL, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Mohammed al Faisal al Saud - RICO statement - v1.doc