**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*     *Federal Insurance Co., et al v. al Qaida, et al.*
03 CV 06978 (RCC)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**THE MOTION TO DISMISS OF THE SAUDI JOINT RELIEF**
**COMMITTEE FOR KOSOVO AND CHECHNYA**

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ............................................................................................... 1

II.  FACTUAL BACKGROUND ............................................................................. 2

III.  APPLICABLE LAW ........................................................................................ 7

   A.  The Burden of Proof in a Jurisdictional Challenge is on the Party Claiming Immunity  ............................................................................................................ 7

   B.  Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's *Prima Facie* Showing of Personal Jurisdiction May be Established Solely by Legally Sufficient Allegations of Jurisdiction ......................................................................................... 8

IV.  ARGUMENT ................................................................................................... 9

   A.  The Federal Plaintiffs' Claims Against the SJRC Fall Squarely Within the Tortious Act Exception ................................................................................................ 9

      1.  Section 1605(a)(5) and 1605(a)(7) Are Not Mutually Exclusive ................................. 11

      2.  The Plaintiffs Have Adequately Pleaded Causation Under The Tortious Act Exception ................................................................................................ 11

      3.  The SJRC's Direct Sponsorship of Al Qaida is not a Discretionary Function ............ 14

      4.  Plaintiffs' Injuries Occurred in the United States ........................................................ 17

   B.  The Commercial Activity Exception Confers Jurisdiction Over the SJRC ..................... 18

   C.  The Exercise of Jurisdiction Over the SJRC does not Violate Due Process ................... 22

      1.  The SJRC Directed its Conduct at the United States .................................................... 23

      2.  This U.S. Contacts of Saudi Arabia and the SJRC's Constituent Charities are Attributable to the SJRC ................................................................................................ 23

V.  CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

**Page**

Ball v. Metallurgie Hoboken Overpelt, S.A.,
    902 F.2d 194 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990).......................8, 9

Berkovitz v. United States,
    468, U.S. 531, 536 (1988)............................................................................14

Boim v. Quranic Literacy Institute,
    291 F.3d 1000 (7th Cir. 2002) .......................................................12, 13, 14

Burger King v. Rudzewicz,
    471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)............................22

Burnett v. Al Baraka Invest. & Development Corp.,
    274 F. Supp. 2d 86 (D.D.C. 2003) ..............................................................12

Calder v. Jones,
    465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 806 (1984)............................22

Cargill Int. S.A. v. M/T Pavel DyBenko,
    991 F.2d 1012 (2d Cir. 1993)........................................................................7

Daliberti v. Iraq,
    97 F. Supp. 2d 38 (D. D.C. 2000)................................................................22

Davis v. Barrett Day Securities, Inc.,
    1995 U.S. Dist. LEXIS 15434 (M.D.N.C. 1995).........................................23

DiStefano v. Carozzi North America, Inc.,
    286 F.3d 81 (2d Cir. 2001)...........................................................................12

Filus v. Lot Polish Airlines,
    907 F.2d 1328 (2d Cir. 1990)........................................................................7

First City, Texas-Houston, N.A. v. Rafidian Bank,
    150 F.3d 172 (2d Cir. 1998)..........................................................................7

Glickman v. United States,
    626 F. Supp. 171 (S.D. N.Y. 1985)........................................................15, 17

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) .......................................................12, 13, 14

**Page**

Jacobs v. Verlag,
 160 F. Supp. 2d 722 (S.D. N.Y. 2001)......................................................24

Letelier v. Republic of Chile,
 488 F. Supp. 665 (D.D.C. 1980) .................................................15, 17

Letelier v. Republic of Chile,
 748 F.2d 790 (2d Cir. 1984).......................................................19, 20

Liu v. Republic of China,
 892 F.2d 1419 (9th Cir. 1989) ...................................................15, 17

Lombard v. Maglia, Inc.,
 621 F. Supp. 1529 (S.D.N.Y. 1985)....................................................12

In re Magnetic Audiotape Antitrust Litigation,
 334 F.3d 204 (2d Cir. 2003)..........................................................9, 23

Merrill Lynch Futures, Inc. v. Kelly,
 585 F. Supp. 1245 (S.D.N.Y. 1984)....................................................12

Olsen v. Government of Mexico,
 729 F.2d 641 (9th Cir. 1984) ......................................................17, 18

Palmieri v. Estefan,
 793 F. Supp. 1182 (S.D. N.Y. 1992)..................................................24

Pelman v. McDonald's,
 396 F.3d 508 (2nd Cir. 2005)..........................................................14

Phelps v. Kapnolas,
 308 F.3d 180 (2d Cir. 2002)............................................................14

Pugh v. Socialist People's Libyan Arab Jamahiriya,
 290 F. Supp. 2d 54 (D. D.C. 2003) ..................................................22

Rein v. Socialist People's Libyan Arab Jamahiriya,
 995 F. Supp. 325 (E.D. N.Y. 1998) ..................................................22

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,
 235 F.3d 738 (2d Cir. 2000).............................................................8

Republic of Argentina v. Weltover, Inc.,
 504 U.S. 607, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992)...........................18

**Page**

Rich-Taubamn Associate v. Stamford Restaurant Operating Co., Inc.,
587 F. Supp. 875 (S.D.N.Y. 1984)..........................................................................12

Robinson v. Malaysia,
269 F.3d 133 (2d Cir. 2001).............................................................................7, 10

Saraceno v. S.C. Johnson & Son, Inc.,
83 F.R.D. 65 (S.D. N.Y. 1979) ...............................................................................24

Saudi Arabia v. Nelson,
507 U.S. 349, 123 L. Ed. 2d 47 (1993)..............................................7, 8, 19, 20, 21

Southway v. Central Bank of Nigeria,
198 F.3d 1210 (10th Cir. 1999) ...............................................................................22

Swierkiewicz v. Sorema,
534 U.S. 506 (2002)....................................................................................................7

In re Terrorist Attacks on September 11, 2001,
349 F. Supp. 2d 765 (S.D. N.Y. 2005)............................................9, 10, 11, 12, 16, 23

Titu-Serban Ionesco v. EF Hutton and Co. S.A.,
434 F. Supp. 80 (S.D.N.Y. 1977).............................................................................24

United States v. Goodwin,
141 F.3d 394 (2d Cir. 1997)..............................................................................19, 20

Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,
751 F.2d 117 (2d Cir. 1984)..............................................................................23, 24

Wahad v. FBI,
813 F. Supp. 224 (S.D.N.Y. 1993)............................................................................12

## STATUTES, RULES AND LEGISLATIVE HISTORY

28 U.S.C. § 1605(a)(2).............................................................................................18

28 U.S.C. § 1605(a)(5).........................................................................................9, 11

Fed. R. Civ. P. 8.........................................................................................................7

# OTHER MATERIALS

**Page**

Steven Schwartz, *Islamic Fundamentalism in the Balkans*, Partisan Reivew ................2, 3

*Saudi Publications on Hate Ideology Fill American Mosques*, Center for
Religious Freedom ...........................................................................................................3

Alex Alexiev, *Wahhabism: State Sponsored Extemism Worldwide*, Written
Testimony Before the Senate Committee on the Judiciary, June 26, 2003 .......................3

Nick Wood, *US Fears Terrorist Attack in Kosovo*, BBC News, April 3, 2000 .................4

Treasury Department Press Release Regarding the Designation of Wa'el Julaidan .......4, 5

November 29, 2001 Letter of Treasury Department General Counsel David
Aughauser to Swiss Substitut du Procureur General Claude Nicati ...................................5

*Second Report of the Monitoring Group on Al-Qaida*, December 2, 2003 .......................6

*Final Report of the National Commission on Terrorist Attacks Upon the
United States* (July 2004) .................................................................................................6

*Monograph on Terrorist Financing of the Staff of the National Commission on
Terrorist Attacks Upon the United States* (August 2004)...................................................6

*Saudis Reform Charities as Antiterror Measure*, CCN.com, June 2, 2004 ......................6

Fawaz Mohammad, *Riyadh to Close Charities Ovesees*, IslamOnline.net,
March 29, 2004 ................................................................................................................7

Alfred Prados and Christopher Blanchard, *Saudi Arabia: Terrorist Financing Issues,*
Congressional Research Service, December 8, 2004......................................................16

United States of America v. Al Haramain Islamic Foundation, 05-CR-_____,
United States District Court of the District of Oregon .....................................................25

## I.   INTRODUCTION

The Federal Plaintiffs have sued the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), based on its direct and extensive financial and logistical sponsorship of the al Qaida terrorist organization.  Through its calculated and deliberate support for al Qaida, the Federal Plaintiffs allege that the SJRC knowingly participated in that terrorist organization's well publicized conspiracy to conduct terrorist attacks against the United States, of which the September 11th Attack was a natural, intended and foreseeable product.[1]  The SJRC has moved to dismiss the claims asserted against it, arguing that this Court lacks both subject matter and personal jurisdiction to adjudicate those claims.

While the Federal Plaintiffs acknowledge for purposes of the present Motion that the SJRC is an organ of the Kingdom of Saudi Arabia, the limited protections of the Foreign Sovereign Immunities Act (FSIA) do not extend to the claims asserted against the SJRC in the present action.  As set forth in the Federal Plaintiffs' First Amended Complaint (FAC) and RICO Statement,[2]  the SJRC provided ***direct*** financial and logistical support to al Qaida, for several years leading up the September 11th Attack.  FAC ¶¶ 203-207; RICO Statement at pp.7-8.  As the September 11th Attack was a foreseeable product of the conspiracy in which the SJRC knowingly and actively participated, the SJRC's misconduct falls squarely within the tortious act and commercial activity exceptions of the FSIA, destroying any immunity which would otherwise be afforded to it as an agency, instrumentality or organ of the Kingdom of Saudi Arabia.  Furthermore, the SJRC's sponsorship of al Qaida in no way involved a discretionary function, as the SJRC's support of al Qaida's operations did not involve any valid exercise of choice or judgment relating to a policy of the Saudi government, and because its conduct

---

[1] The Federal Plaintiffs have provided detailed descriptions of the scope, history and objectives of this global conspiracy in their Amended Complaint, as well as their opposition to Prince Sultan's Motion to Dismiss.  As the conduct which forms the basis of the plaintiffs' claims against the SJRC can only be fully understood within this broader context, plaintiffs incorporate those descriptions by reference in lieu of restating them herein.

[2] Pursuant to Case Management Order #2, the RICO Statement is deemed an amendment to the FAC.

violated international law and the laws of all relevant nation states.  Therefore, the SJRC is not immune from the subject matter jurisdiction of this Court in the present action.  In addition, this Court possesses personal jurisdiction over the SJRC, under both specific and general theories of personal jurisdiction.  Accordingly, and for the reasons set forth with greater particularity below, the SJRC's Motion to Dismiss should be denied in its entirety.

## II.    FACTUAL BACKGROUND

The Kingdom of Saudi Arabia established the SJRC in 1999, and endowed it with responsibility for coordinating and carrying out the operations of five constituent charities in Kosovo and Chechnya:  al Haramain Islamic Foundation; the International Islamic Relief Organization (IIRO); World Assembly of Muslim Youth (WAMY); Muslim World League (MWL); and Saudi Red Crescent.  RICO Statement at p. 7.  Subsequent to the establishment of the SJRC, those constituent charities continued to solicit funds to support activities in Kosovo and Chechnya throughout the World, including from the United States.   In addition, at least certain of the constituent charities maintained an operational presence in the Balkans subsequent to the SJRC's establishment.  However, the SJRC assumed principal responsibility for distributing funds and carrying out operations on behalf of the constituent charities.

While the SJRC implies that it was established solely to provide charitable and humanitarian assistance to refugees in Kosovo and Chechnya, an objective review of the SJRC's activities reveals that the organization was primarily dedicated to exporting Wahhabism, a fundamentalist interpretation of Islam that has been repeatedly tied to terrorism.  In fact, according to the SJRC's own records, nearly half of the organization's 1999 budget was spent to sponsor three hundred eighty-eight (388) religious "propagators," dedicated to converting Kosovars to Wahhabi fundamentalism.  See Steven Schwartz, *Islamic Fundamentalism in the*

*Balkans*, Partisan Review, attached to the Affirmation of Sean P. Carter (Carter Aff.) as Exhibit 1, at p.2.

Counter terrorism experts and government officials have consistently identified Wahhabism as the source of al Qaida's virulent philosophy.  According to R. James Woolsey, the director of Central Intelligence from 1993 through 1995, "Wahhabi and Islamic extremism today is the soil in which al Qaida and sister terrorist organizations are growing."  See *Saudi Publications on Hate Ideology Fill American Mosques*, Center for Religious Freedom, Carter Aff. Exh. 2, at p. 9.[3]  During testimony before the Senate Subcommittee on the Judiciary, Alex Alexiev, a distinguished fellow with the Center for Security Policy, similarly testified that "[t]he Jihadist ideology par excellence is, by and large, also the worldview of radical Islam and it is not at all an exaggeration to argue that Wahhabism has become the prototype ideology of all extremists and terrorist groups…."  Alex Alexiev, *Wahhabism:  State Sponsored Extremism Worldwide*, Written Testimony Before the Senate Committee on the Judiciary, June 26, 2003, Carter Aff. Exh. 3, at p. 3.

Given the SJRC's role in propagating Wahhabi ideology, it is hardly surprising that the organization became a magnet for al Qaida members and sympathizers in the Balkan region.  After gaining entry into the region with the assistance of the SJRC and its constituent charities, these al Qaida members and sympathizers channeled charitable contributions through the SJRC to the al Qaida network, facilitated the transfer of physical assets to al Qaida members fighting alongside local Muslim rebels, and actively recruited and trained new al Qaida members from the local Muslim population.  RICO Statement at p. 7.  Between its formation in 1999 and 2001,

---

[3] This report presents excerpts from publications disseminated by Saudi agencies and charities affiliated with the Kingdom which illustrate the extremist, intolerant and violent ideas which typify Wahhabi ideology, and have been embraced by terrorists to justify their actions.  These ideas, which the authors of the report describe as embodying a "totalitarian ideology of hatred that can incite to violence," are fundamentally inimical to the concept of "charity," at least as that term is understood in this country.

the SJRC channeled more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.  FAC ¶ 204; RICO Statement at p. 7.

SJRC employees, including high ranking officers of the organization, were directly and intimately involved in al Qaida's illicit activities.  In fact, the SJRC offices in Pristina, Kosovo, served as cover for senior al Qaida operatives Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC.  FAC ¶ 205; RICO Statement at p. 7; see Nick Wood, *US Fears Terrorist Attack in Kosovo*, BBC News, April 3, 2000, Carter Aff. Exh. 4, at p.2.  In a 1999 interview with *al Jazeera* regarding the formative years of the al Qaida organization, Osama bin Laden himself attested to Julaidan's important role in the organization, stating "[w]e were all in one boat, as is known to you, including our brother Wa'el Julaidan."  Treasury Department Press Release Regarding the Designation of Wa'el Julaidan, Carter Aff. Exh. 5.  More than a year before the September 11th Attack, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the SJRC.  In that document, the U.S. government asserted that SJRC officials Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.  *US Fears Terrorist Attack in Kosovo*, Carter Aff. Exh. 4, at p.2.

On September 6, 2002, the United States government designated Wa'el  Julaidan pursuant to Executive Order 13224.  The Treasury Department Press Release issued in conjunction with the designation set forth the following basis for the action:

> The United States' has credible information that Wa'el Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants.  **Julaidan has directed organizations that have provided financial and logistical support to al Qaida.**  Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

4

Treasury Department Press Release Regarding the Designation of Wa'el Julaidan, Carter Aff.

Exh. 5 (emphasis added).

In addition to the logistical and financial support of al Qaida, members of the SJRC staff

actively participated in the development and planning of terrorist attacks against American

interests.  In April of 2000, NATO forces raided SJRC offices in Kosovo, based on intelligence

gathered by U.S. officials which indicated that employees of the ostensible charity were planning

a terrorist attack on U.S. and NATO headquarters in Pristina.  RICO Statement at p. 8; *US Fears*

*Terrorist Attack in Kosovo*, Carter Aff. Exh. 4, at p.1.  In a separate incident, British soldiers

blew up a suspect car belonging to an employee of the ostensible charity.  *US Fears Terrorist*

*Attack in Kosovo*, Carter Aff. Exh. 4, at p.1.  U.S. officials strenuously defended the actions,

asserting that members of the SJRC were associated with Osama bin Laden and were involved in

sponsoring al Qaida in the region.  Id.

The SJRC's pattern of activity in Kosovo and Chechnya is typical of al Qaida's charity

fronts.  As Treasury Department General Counsel David Aufhauser explained in a November 29,

2001 letter to Swiss officials:

> Working in troubled areas such as Bosnia, Somalia, Sudan and
> various refugee camps, the putative "relief" organizations provide
> cover for individuals engaged in recruiting, organizing, and
> training terrorist cells.  Their provision of humanitarian aid and
> educational services is done in concert with the terrorists to win the
> hearts and minds of the local people to whatever causes the
> terrorists espouse.

November 29, 2001 Letter of Treasury Department General Counsel David Aufhauser to Swiss

Substitut du Procureur General Claude Nicati, Carter Aff. Exh. 6, at pp. 3-4.

The importance of the support provided by ostensible charities such as the SJRC to the

success of the al Qaida movement cannot be overstated.  As the United Nations Security Council

Committee Concerning al-Qaida and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and
> donations from its sympathizers to finance its activities.  Charities
> provide al-Qaida with the very useful international channel for
> soliciting, collecting, transferring and distributing the funds it
> needs for indoctrination, recruitment, training, and logistical and
> operational support.  These funds are often merged with and
> hidden among funds used for other legitimate humanitarian or
> social programmes.  Al-Qaida supporters and financiers have also
> established front charity networks whose main purpose is to raise
> and deliver funds to al-Qaida.

*Second Report of the Monitoring Group on Al-Qaida*, December 2, 2003, Carter Aff. Exh. 7, at

pp. 13-14.

The National Commission on Terrorist Attacks Upon the United States further found that

there was a "likelihood that charities with significant Saudi government sponsorship diverted

funds to al Qaida."  9/11 Commission Report, p. 171.  The Commission's Staff expanded on that

finding in a subsequent Monograph on Al Qaida's financing, explaining that "al Qaida was

funded, to the tune of approximately $30 million per year, by diversions of money from Islamic

charities and the use of well-placed financial facilitators who gathered money from both witting

and unwitting donors, primarily in the Gulf region."  9/11 Commission Staff Monograph on

Terrorist Financing, p. 4.  The Staff Monograph further states that "The intelligence community

identified [Saudi Arabia] as the primary source of money for al Qaida both before and after the

September 11th attacks.  Fund-raisers and facilitators throughout Saudi Arabia and the Gulf

raised money for al Qaida from witting and unwitting donors and diverted funds from Islamic

charities and mosques."  Id. at p. 8.

On June 2, 2004, Saudi Arabia announced that it intended to dissolve several of its

international charities as a "counter-terrorism" measure.  See *Saudis Reform Charities as*

*Antiterror Measure*, CNN.com, June 2, 2004, Carter Aff. Exh. 8.  Notably, the SJRC is one of

the charities the Kingdom intends to disband in connection with that counter-terrorism initiative.

Fawaz Mohammad, *Riyadh to Close Charities Oversees*, IslamOnline.net, March 29, 2004,

Carter Aff. Exh. 9, at p. 1.

## III.   APPLICABLE LAW

### A.   The Burden of Proof in a Jurisdictional Challenge is on the Party Claiming Immunity

Consistent with Fed. R. Civ. P. 8, a plaintiff in an FSIA case need only provide the

defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to

relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests." Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  In responding to

the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a

foreign sovereign, entitled to the protections of the FSIA.  Cargill Int. S.A. v. M/T Pavel

DyBenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes such a

showing, the burden of production shifts to the plaintiff to come forward with allegations **or**

evidence which, if proven, would bring the plaintiff's claims within one of the exceptions to

immunity set forth in the FSIA.  Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001).  In

deciding a motion to dismiss based on the FSIA prior to discovery, the court must accept as true

the factual allegations and any evidence proffered by the plaintiff in support of jurisdiction.

Saudi Arabia v. Nelson, 507 U.S. 349, 351, 123 L.Ed.2d 47 (1993) ("Because this case comes to

us on a motion to dismiss the complaint, we assume we have truthful factual allegations before

us, though many of those allegations are subject to dispute.") (internal citations omitted).  To the

extent the defendant challenges the accuracy of those factual allegations, and the court

determines that the resolution of any fact in dispute is necessary to determine the availability of

jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery

relative to that disputed factual contention.  First City, Texas-Houston, N.A. v. Rafidian Bank,

150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir.

1990).  Upon completion of discovery, the Court should normally "afford the parties the

opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction."[4]

Reiss v. Societe Centrale DuGroupe Des Assurances Nationales, 235 F.3d 738, 748 (2d Cir.

2000).  The district court should not, under any circumstances, seek to resolve disputed issues of

fact based on an evaluation of the perceived strength or credibility of the allegations or evidence

offered by the parties in support of their respective positions prior to discovery.  Nelson, 507

U.S. at 351.

> **B.**    **Prior to Discovery on a Rule 12(b)(2) Motion, a Plaintiff's *Prima Facie* Showing of Personal Jurisdiction May be Established Solely by Legally Sufficient Allegations of Jurisdiction**

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal

jurisdiction varies depending upon the procedural posture of the litigation.

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.  After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted].  At that point, the *prima facie* showing must be factually supported.

Ball v. Metallurgie Hoboken Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S.

854 (1990).  The Second Circuit has observed that a plaintiff's averment of jurisdictional facts

will normally be met in one of three ways when in dispute:  (1) by a Rule 12(b)(2) motion, which

assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges

their sufficiency; (2) by a Rule 56 motion, which asserts that there are undisputed facts

demonstrating the absence of jurisdiction; or (3) by request for an adjudication of disputed

---

[4] Consistent with these authorities, the Federal Plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the FSIA jurisdictional analysis, and to present evidence at a hearing on the question of FSIA jurisdiction.

jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits.  Id. at 197.  Where, as here, "the defendant is content to challenge only the sufficiency of the plaintiff's factual allegations, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction."  Id.  In order to meet its prima facie showing, the Federal Plaintiffs need only allege facts that connect the defendant with the applicable forum, here, the United States.  The plaintiff's averments of jurisdictional facts must be taken as true.  Id.;  In re  Magnetic Audiotape Antitrust Litigation, 334 F.3d 204, 206 (2d Cir. 2003).  The Court also construes the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor.  DiStefano v. Carozzi North America, Inc., 286 F.3d 81 (2d Cir. 2001).

## IV.   ARGUMENT

### A.   The Federal Plaintiffs' Claims Against the SJRC Fall Squarely Within the Tortious Act Exception

This Court possesses subject matter jurisdiction over the claims asserted against the SJRC in the present case under the tortious act exception to the FSIA.  The tortious act exception confers jurisdiction over a foreign sovereign in any case:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or any official or employee of that foreign state  acting within the scope of his office or employment…

28 U.S.C. § 1605(a)(5).

As this Court recognized in its recent Opinion, the test used to determine whether a defendant's conduct falls within the tortious act exception of the FSIA in the 2nd Circuit is "whether the defendant's alleged acts were tortious under the laws of New York, and if so, whether the defendant's acts were discretionary."  In re Terrorist Attacks on September 11, 2001,

9

349 F. Supp. 2d 765, 794 (S.D. N.Y. 2005).  Further, New York law has long recognized tort

claims based in conspiracy and aiding and abetting theories.  Id. at 797.  Thus, where a plaintiff's

complaint adequately alleges that a defendant aided and abetted or conspired in a tort which

causes injury in New York, and the underlying misconduct does not involve the exercise of a

valid discretionary governmental function, the court possesses subject matter jurisdiction over

the claim under the tortious act exception to the FSIA.  Robinson, 269 F.3d at 142.

The FAC seeks to impose liability on the SJRC for personal injuries, wrongful deaths and

property damage resulting from the September 11th Attack, based on the SJRC's knowing

participation in al Qaida's conspiracy to attack America, and material aiding and abetting of bin

Laden's terror network.  The FAC further alleges that the September 11th Attack was a direct,

intended and foreseeable product of the conspiracy in which the SJRC knowingly participated.

Thus, the Federal Plaintiffs' claims in this case fall squarely within the tortious act exception

under the standards enunciated above.

The SJRC raises four arguments against application of the tortious act exception in the

present case.  First, the SJRC asserts that claims premised on the material sponsorship of a

terrorist organization are actionable solely under §1605(a)(7) of the FSIA, and consequently that

the tortious act exception cannot be invoked to obtain jurisdiction in the present case.  Second,

the SJRC asserts that the FSIA imposes a more stringent causation requirement than that

governing the underlying tort, and that the plaintiffs cannot sustain causation against the SJRC

under the allegations of the FAC.  Third, the SJRC urges this Court to find that the SJRC's direct

sponsorship of al Qaida constitutes a discretionary function.  Finally, although both the terrorist

attack and resulting injury for which plaintiffs seek compensation occurred in the United States,

the SJRC argues that every act which contributed to the attack and injury must have taken place

in the United States in order for the tortious act exception to apply.  For the reasons set forth

below, all of these arguments lack merit.

### 1.      Section 1605(a)(5) and 1605(a)(7) Are Not Mutually Exclusive

In its recent decision, this Court embraced the arguments previously advanced by

plaintiffs in opposition to the Motions to Dismiss of Prince Sultan bin Abdul Aziz al Saud and

Prince Turki al Faisal al Saud, and found that §1605(a)(5) and §1605(a)(7) are not mutually

exclusive.  In support of that finding, the Court reasoned as follows:

> [W]hen [Congress] drafted the state sponsor of terror exception it
> did not include mutually exclusive language that would preclude
> the application of the tortious act exception here.  It did include
> such language with respect to the commercial activity exception…
> particularly in a case such as this where interest of sovereignty,
> comity, international relations, and separation of powers are
> implicated, the Court must be vigilant to exercise discipline to
> apply the law only as it is written.  While there are certain
> obstacles to (a) (5)'s application…the court will not rule as a
> matter of law that subsections (a)(7) and (a)(5) are mutually
> exclusive.

In re Terrorist Attacks, 349 F. Supp. 2d at 796.

As the SJRC's exclusivity argument is factually and legally identical to the

argument raised by Prince Sultan and Prince Turki, the Court's January 18, 2005 Opinion and

Order disposes of the SJRC's exclusivity argument.[5]

### 2.      The Plaintiffs Have Adequately Pleaded Causation Under The
### Tortious Act Exception

This Court already found that jurisdictional causation under the FSIA is satisfied by

pleading "proximate causation."  In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d

765, 797 n. 26 (S.D. N.Y. 2005).  Citing Judge Robertson's earlier decision in Burnett v. Al

---

[5] The Federal Plaintiffs' presented detailed arguments in opposition to the exclusivity argument in their
Memorandum of Law in Opposition to the Motion to Dismiss of Prince Sultan at pp.13-14.  As the Court has
already decided this issue in their favor, the Federal Plaintiffs will not restate those arguments herein.  However, for
purposes of preserving the record, the Federal Plaintiiffs' incorporate by reference the relevant discussion from their
Opposition to Prince Sultan's Motion to Dismiss.

Baraka Invest. & Dev. Corp., 274 F. Supp. 2d 86 (D.D.C. 2003) ("Burnett I"), the Court further held that "[a]ny terrorist attack, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda…"  In re Terrorists Attacks, 349 F. Supp. 2d at 797 (quoting Burnett I, 274 F. Supp. 2d at 105).  Thus, the Court implicitly found that victims of terrorist acts may sustain tort claims against foreign sovereigns who sponsored the responsible terrorist organization, directly or indirectly, pursuant to the standards announced in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983)  or Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1023 (7th Cir. 2002) ("Boim II").  See  In re Terrorists Attacks, 349 F. Supp. 2d at 800.

Under Halberstam, a plaintiff must plead the following elements to sustain a claim for civil conspiracy: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the overall scheme.  Halberstam, 705 F.2d at 477.[6]  The Halberstam court described the elements of aiding and abetting as: "(1) the party whom the defendant aids must perform a wrongful act that causes injury; (2) the defendant must be generally aware of his role as part of an overall illegal and tortious activity at the time he provides the assistance; (3) the defendant must knowingly and substantially assist in the principal violation." Id.[7]   Under Boim II, a defendant may be held liable where that defendant: (1) knows that a party to whom he is

---

[6] Although New York law likely controls the vast majority of the Federal Plaintiffs claims, Halberstam long has been regarded as the leading case and concerted action liability, and the New York courts have repeatedly relied on Halberstam in analyzing conspiracy and aiding and abetting claims.  See Wahad v. FBI, 813 F. Supp. 224, 233 (S.D.N.Y. 1993); Rich-Taubamn Assoc. v. Stamford Rest. Operating Co., Inc., 587 F. Supp. 875, 879 N.5 (S.D.N.Y. 1984); Merrill Lynch Futures, Inc. v. Kelly, 585 F. Supp. 1245, 1254 (S.D.N.Y. 1984).

[7]  Significantly, "those who aid or abed or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, *regardless of the degree of their participation or culpability in the overall scheme.*"  Lombard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985) (emphasis applied).  Thus, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement."  Halberstam, 705 F. 2d at 477 (emphasis applied).  Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor.

providing support or assistance is engaged in illegal activities; (2) desires to help those activities succeed; and (3) engages in some act of helping the illegal activities.  Boim II, 291 F.3d at 1023.[8]

The specific allegations of the FAC and RICO statement, as supplemented by the additional evidence submitted in support of this Opposition, satisfy the standards of both Halberstam and Boim II, and thereby confer jurisdiction under the tortious act exception. Among other things, the Federal Plaintiffs allege that the SJRC contributed **direct** financial and logistical support to al Qaida.  The SJRC's channeling of support to al Qaida was facilitated by high ranking al Qaida members, including Wa'el Julaidan and Adel Muhammad Sadi bin Kazam, who served as directors of the SJRC.  Given the fact that al Qaida members were personally involved in directing the SJRC's activities and sponsorship of al Qaida, it is clear that there existed an agreement between the SJRC and al Qaida to conspire with one another in furtherance of al Qaida's perverse agenda.  Furthermore, al Qaida was a well known terrorist organization at the time the SJRC supported the organization, which had publicly and repeatedly targeted the United States.  In short, the FAC and RICO statement allege that the SJRC was directly and intimately involved in advancing the agenda of a known terrorist organization that had publicly declared its intention to conduct terrorist attacks against the United States.  These allegations clearly satisfy both Halberstam and Boim II.

In its Motion to Dismiss, the SJRC seeks to analogize its sponsorship of al Qaida to the conduct underlying plaintiffs' claims against Princes Sultan and Turki, and thereby distance itself from al Qaida.  To this end, the SJRC inaccurately argues that plaintiffs' claims are premised on the SJRC's "support for charities which in turn supported yet other entities that ultimately funded or provided material resources to the terrorists who perpetrated the September

---

[8] While Boim II involved claims under the Antiterrorism Act (ATA), it is properly read as setting forth the standards for establishing liability over sponsors of terrorism under common law concerted action theories.  Indeed, in enacting the ATA, Congress sought to extend liability over terrorist sponsors to the furthest reaches of the common law.  Boim II, 291 F.3d at 1011.

11th attacks…"  However, whereas Princes Sultan and Turki are alleged to have channeled support to al Qaida through intermediary organizations, the Federal Plaintiffs claims against the SJRC are premised on its **_direct_** sponsorship of al Qaida.  Thus, the concerns which led the Court to conclude that the allegations of the FAC were insufficient to establish that the Princes were sufficiently close to the terrorists' illegal activity to satisfy Halberstam, or that they knew their charitable contributions were being channeled to al Qaida so as to satisfy Boim II, are not present here.[9]  Regardless, to the extent the Court finds the allegations against the SJRC in any way deficient on this point, the appropriate remedy is to require the Federal Plaintiffs to file a more definite statement pursuant to Rule 12(e), and not to dismiss the action.  Pelman v. McDonald's, 396 F.3d 508, 512 n. 5 (2nd Cir. 2005); see also Phelps v. Kapnolas, 308 F.3d 180 (2d Cir. 2002) (holding that knowledge, intent and other conditions of the mind of a person may be averred generally).

### 3.    The SJRC's Direct Sponsorship of Al Qaida is not a Discretionary Function

The SJRC also incorrectly argues that its direct sponsorship of al Qaida constitutes a "discretionary function" under the FSIA.

When determining whether a foreign agency's conduct falls within the discretionary function exception, a court must decide whether the agency's actions involved an element of choice or judgment based in considerations of public policy.  See Berkovitz v. United States, 468, U.S. 531, 536 (1988) (construing the Federal Tort Claims Act).  In conducting that analysis, the Court must focus on "the nature of the conduct" and consider "whether the action is a matter of choice for the acting employee."  Id. at 536.  However, the exception does not extend to all acts which involve some exercise of choice or judgment relating to social, economic or political

---

[9] Understandably, the Federal Plaintiffs maintain that the FAC adequately states claims against Princes Sultan and Turki under the applicable standards.

policy – the element of judgment exercised must be the kind that the discretionary function

exception was designed to shield.  Thus, the exception does not apply to illegal, malevolent or

extraordinary conduct of Government officials.  Glickman v. United States, 626 F. Supp. 171,

175 (S.D. N.Y. 1985) .  Similarly, foreign sovereigns may not invoke the exception for conduct

that contravenes international law or that violates the fundamental precepts of humanity.  Liu v.

Republic of China, 892 F.2d 1419 (9th Cir. 1989); Letelier v. Republic of Chile, 488 F. Supp.

665 (D.D.C. 1980)

     In the present case, the SJRC's direct sponsorship of al Qaida cannot possibly fall within

the scope of the discretionary function exception, under any potentially applicable analytical

framework.  As an initial matter, application of the discretionary function exception requires, at a

minimum, that the conduct at issue involves some valid exercise of choice or judgment in

furtherance of the government's public policy.  The SJRC is specifically alleged to have directly

contributed funding and other forms of support to al Qaida, and to have employed senior al

Qaida members in order to allow those terrorists to use the organization as a vehicle for

facilitating the movement of men and money into Kosovo and Chechnya on behalf of Osama bin

Laden.  No plausible argument can be made that the SJRC's direct provision of support to al

Qaida involved public policy considerations, especially in view of the Kingdom of Saudi

Arabia's consistent denial that it ever pursued a policy which involved supporting al Qaida.

     Even assuming that the conduct underlying the Federal Plaintiffs' claims against the

SJRC involved some exercise of judgment relating to governmental policy, the discretionary

function exception would not apply, as the conduct at issue violated international law as well as

the laws of all relevant nation states.  Without question, the SJRC's material sponsorship of al

Qaida violates the criminal laws of the United States, including the provisions of the Anti-

terrorism and Effective Death Penalty Act, enacted more than five years before the September

11th Attack, as well as RICO and any number of other relevant criminal statutes.  On this point, the Federal Plaintiffs note that this Court has expressly held that money laundering in support of terrorism, one of the activities underlying the claims against the SJRC, is a criminal activity under U.S. law.  See  In re Terrorists Attacks, 349 F. Supp. 2d at 793 (holding that money laundering is a criminal activity and therefore cannot be commercial activity under the FSIA).

Pronouncements by Saudi officials make clear that the SJRC's direct sponsorship of al Qaida violates the laws of the Kingdom as well.  Specifically, in defending their refusal to adopt explicit regulations criminalizing the provision of material support to terrorist organizations in the wake of the September 11 Attack, Saudi officials argued that the wider body of Islamic *sharia* underlying the Saudi legal system already criminalized such conduct.  See Alfred Prados and Christopher Blanchard, *Saudi Arabia*:  *Terrorist Financing Issues*, Congressional Research Service, December 8, 2004, Carter Aff. Exh. 10, at pp. 20-21 n. 90.

The unequivocal pronouncements of the United Nations make clear that the conduct underlying the Federal Plaintiffs' claims against the SJRC violates international law as well. Pursuant to Resolution 51-210, adopted by the General Assembly on January 16, 1997:

> The States' members of the United Nations solemnly reaffirm their unequivocal condemnation of all acts, methods and practices of terrorism as criminal and unjustifiable, whether and by whomsoever committed…;
>
> They declare that knowingly financing, planning and inciting terrorist attacks are also contrary to the purposes and principles of the United Nations …

G.A. Res. 51-210, U.N. GAOR, 51st Sess., Annex 1 at 6 (1997).  In the same Resolution, the member states of the United Nations specifically called "upon all states to take steps to prevent and counteract, through appropriate domestic measures, the financing of terrorists and terrorist organizations, *whether such financing is direct or indirect through organizations which also*

16

*have or claim to have charitable, social or cultural goals or which are also engaged in unlawful activities*…" <u>Id</u>., Art. I, ¶6.

As the sponsorship, financing and aiding and abetting of terrorism violate international law and the laws of all relevant nation states, the conduct underlying the Federal Plaintiffs' claims against the SJRC cannot be deemed "discretionary" within the meaning of the FSIA. <u>Glickman</u>, 626 F. Supp. at 175; <u>Liu</u>, 892 F.2d at 1431; <u>Letelier</u>, 488 F. Supp. at 673.

### 4.      Plaintiffs' Injuries Occurred in the United States

The SJRC further alleges that this Court should decline to apply the tortious act exception of the FSIA, because certain conduct in support of al Qaida's conspiracy to attack America occurred outside of the United States.  Once again, the SJRC's argument fails to meet the plain language of the tortious act exception, which requires simply that the plaintiff suffer "personal injury or death, or damage to loss of property, occurring in the United States…" 28 U.S.C. § 1605(a)(5).  As the Federal Plaintiffs' claims undeniably arise from property damage, personal injury and wrongful deaths "occurring in the United States," those claims satisfy the unambiguous requirements of the statute.

The 9th Circuit's decision in <u>Olsen v. Government of Mexico</u>, 729 F.2d 641 (9th Cir. 1984) further undermines the SJRC's position.  In <u>Olsen</u>, the plaintiffs brought claims against Mexico for the deaths of their parents, who were killed in a plane crash while being transferred by Mexico to the United States for incarceration.  <u>Id</u>. at 641.  Mexico moved to dismiss, arguing that the occurrence of contributing tortious acts or omissions outside of the United States barred application of the tortious act exception, and that Mexico was therefore immune.  <u>Id</u>. at 646.  The 9th Circuit rejected Mexico's argument, reasoning that Mexico's construction of the tortious act exception "would encourage foreign states to allege that some tortious conduct occurred outside the United States.  The foreign state would thus be able to establish immunity and diminish the

17

rights of injured persons seeking recovery.   Such a result contradicts the purpose of the FSIA, which is to 'serve the interest of justice and….protect the rights of both foreign states and litigants in the United States Courts.'"  Id.

Consistent with the reasoning of the 9th Circuit in Olsen, the construction of the tortious act exception advocated by the SJRC would undermine the purpose of the FSIA and should be rejected.  As both the tort and the injuries giving rise to the Federal Plaintiffs' claims occurred within the United States, those claims are actionable under the unambiguous language of the tortious act exception.

**B.**      **The Commercial Activity Exception Confers Jurisdiction Over the SJRC**

The SJRC further argues that the commercial activity exception to the FSIA may not be invoked in relation to the claims asserted against it, reasoning that the "charitable and humanitarian aid provided through the SJRC" cannot be deemed a commercial activity.  For the reasons set forth below, this argument fails in several respects.

The second and third clauses of the commercial activity exception to immunity provide that:

> A foreign state shall not be immune … in any case … in which the action is based … upon an act performed in the United States in connection with a commercial activity of a foreign state elsewhere; or upon an act outside the territory of the United States in connection with the commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The Supreme Court first interpreted the meaning of the term "commercial activity" as used in the FSIA in Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992).  Drawing on the legislative history of the FSIA, the Supreme Court held that a foreign government engages in commercial activity within the meaning of the FSIA when it acts, not as a regulator of a market, but in the manner of a private player within it.  Id. at 614.

Although the Supreme Court has not had occasion to consider the question, the Second Circuit has explicitly held that money laundering is a quintessential economic activity in which private actors engage:

> Money laundering is a quintessential economic activity.  Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity.

United States v. Goodwin, 141 F.3d 394, 399 (2d Cir. 1997).

In the present case, the Federal Plaintiffs' claims against the SJRC fall within the definition of "commercial activity" as outlined above.  In particular, the Federal Plaintiffs allege that the SJRC served as a front for concealing the source and destination of funds on behalf of al Qaida.  There can be no question that such conduct constitutes money laundering.  Importantly, government officials and counter-terrorism experts have consistently declared that there exists a direct relationship between the extensive money laundering services provided by charities such as the SJRC and the September 11th Attack.[10]   Accordingly, the commercial activity exception provides this Court with subject matter jurisdiction over the claims based on the SJRC's money laundering in support of al Qaida.

Although the SJRC did not raise the argument in its Motion to Dismiss, the Federal Plaintiffs anticipate that SJRC will seize on this Court's recent Opinion, and argue that criminal conduct can never be commercial activity within the meaning of the FSIA.  In support of that proposition, this Court cited to the Second Circuit's decision in Letelier v. Republic of Chile, 748 F.2d 790, 797-98 (2d Cir. 1984) and the Supreme Court's decision in Nelson, 507 U.S. at 360-62 (1993).  Plaintiffs respectfully submit that neither of those cases support the broad proposition for which they were cited by this Court, and that the Supreme Court in fact implicitly rejected

---

[10] The Federal Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia contains a detailed discussion of these points at pp. 21-24.  The Federal Plaintiffs incorporate that discussion, as well as the Exhibits submitted in support thereof, by reference in lieu of restating it herein.

any categorical distinction between criminal conduct and commercial activity in <u>Nelson</u>.  On these points, a brief discussion of the reasoning of those cases is warranted.

In <u>Letelier</u>, the Second Circuit considered whether a politically motivated kidnapping and assassination could be considered "commercial activity" under the FSIA.  <u>Letelier</u>, 748 F.2d at 795-96.  The Court concluded that such conduct could not be considered commercial activity, "because a private person cannot lawfully engage in that activity.  A private person cannot lawfully engage in murder any more than he could in kidnapping or criminal assault."  <u>Id.</u> at 797.

Although the Second Circuit did reference the unlawful character of the defendants' conduct in declining to apply the commercial activity exception in <u>Letelier</u>, the Federal Plaintiffs respectfully submit that <u>Letelier</u> is not properly read as holding that criminal conduct can never be commercial.  Rather, the Second Circuit merely found that the type of criminal conduct underlying the plaintiff's claim in that case – a politically motivated assassination – could not be commercial activity because it fell so far outside the realm of conduct through which private actors participate in the marketplace.  In other words, private actors simply do not engage in commerce by killing people.  However, as the Second Circuit subsequently recognized in <u>Goodwin</u>, private actors do engage in money laundering activities in connection with economic and commercial enterprises, even though such conduct is criminal.  <u>Goodwin</u>, 141 F.3d at 399.  Thus, <u>Letelier</u> does not foreclose the possibility that certain criminal conduct could be deemed commercial activity within the meaning of the FSIA.

Even assuming that the Second Circuit did intend to draw a bright line distinction between criminal conduct and commercial activity in <u>Letelier</u>, the Supreme Court implicitly rejected such a categorical distinction in <u>Nelson</u>.  In that case, an American plaintiff hired in the United States to work in a Saudi hospital claimed that he had been wrongly imprisoned and tortured by Saudi police in retaliation for his "whistle blowing" regarding certain hospital

practices.  Nelson, 507 U.S. at 349.  The plaintiff argued that his claims against Saudi Arabia

arising from his imprisonment and torture fell within the "commercial activity" exception to the

FSIA.  Id.  As the claims arose from false imprisonment and torture - activities which are clearly

criminal in nature – the Supreme Court easily could have disposed with the plaintiff's arguments

by adopting a bright line distinction between criminal actions and commercial activity.

However, the Supreme Court chose not to pursue this most obvious line of analysis.  Instead, the

Court carefully reviewed the nature of the underlying conduct, and determined that it involved

the exercise of police and penal powers.  Id. at 349-50.  Because such powers are reserved to

sovereigns and are not activities in which private actors can engage, either lawfully or

unlawfully, the Court concluded that the claims did not fall within the commercial activity

exception.  Id.  By declining to employ a categorical approach in analyzing the availability of

jurisdiction under the commercial activity exception in Nelson, the Federal Plaintiffs submit that

the Supreme Court implicitly rejected a bright line distinction between criminal and commercial

activity.

Indeed, the only Court to have considered this precise issue since the Supreme Court's

decision in Nelson found that conduct which is criminal in nature can fall within the commercial

activity exception to the FSIA.  In Southway v. Central Bank of Nigeria, 198 F.3d 1210 (10th

Cir. 1999), the Tenth Circuit considered claims against agencies of the Nigerian government

arising from an alleged scheme to defraud the plaintiffs.  In holding that the conduct underlying

the plaintiffs' claims was commercial, the court reasoned that "simply because the activities of a

foreign state are illegal or nefarious does not mean that those activities can never be commercial

in nature or connected with a commercial activity."[11] Id. at 1217.

---

[11] If criminal conduct can never be commercial within the meaning of the FSIA, a foreign state which intentionally
defrauds a U.S. citizen through a commercial venture would enjoy complete immunity for its conduct.  In contrast, a
foreign state which inadvertently breaches a contract with a U.S. citizen would be liable for injuries resulting from
its breach in a U.S. court.  Such a construction of the FSIA's commercial activity exception would lead to absurd
results, and encourage foreign states to engage in fraud.

In view of the foregoing, the Federal Plaintiffs respectfully submit that the criminal character of the SJRC's conduct does not preclude application of the commercial activity exception.

### C.     The Exercise of Jurisdiction Over the SJRC does not Violate Due Process [12]

The SJRC also challenges this Court's authority to exercise personal jurisdiction over it. In particular, while the SJRC acknowledges that the FSIA provides a valid statutory basis for personal jurisdiction, it asserts that the exercise of such jurisdiction would violate due process.

The Supreme Court has consistently held that the due process clauses of the Fifth and Fourteenth Amendments permit personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  Calder v. Jones, 465 U.S. 783, 788, 104 S. Ct. 1482, 79 L. Ed. 2d 806 (1984).  Under these standards, due process considerations are satisfied so long as the defendant has "fair warning" that he may be haled into court in the forum to respond for his actions.  Burger King v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).  In an action involving harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence." Calder, 465 U.S. at 788.  Consistent with this principle, the courts have found that due process is not violated by the exercise of jurisdiction over those who deliberately target our citizens.  Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F.Supp.2d 54 (D. D.C. 2003); Daliberti v. Iraq, 97 F. Supp. 2d 38, 54 (D. D.C. 2000); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D. N.Y. 1998).

---

[12] The Federal Plaintiffs incorporate by reference the arguments presented by plaintiffs on this issue during the October 12, 2004 hearing before the Court.

### 1. The SJRC Directed its Conduct at the United States

In the present case, the Federal Plaintiffs have satisfied their burden to make a *prima facie* showing of personal jurisdiction over the SJRC, pursuant to the applicable standards set forth above. As described above, the SJRC has, for a period of many years, directly channeled financial and logistical support to al Qaida. The SJRC has "employed" senior al Qaida operatives, including al Qaida members directly involved in plots to attack the United States. In fact, the SJRC's headquarters in Pristina were used as a base for planning and coordinating terrorist operations. These facts plainly establish that the SJRC has, for a period of many years, directly supported al Qaida.

In knowingly sponsoring and directly participating in al Qaida's campaign to attack America, the SJRC necessarily directed its conduct at the United States, as it has been publicly known, since at least the mid-1990's, that al Qaida was engaged in a global campaign of terror directed against the United States. In re Terrorists Attacks, 349 F. Supp. 2d at 813 ("This Court's record…contains many examples of Osama bin Laden's and al Qaeda's public targeting of the United States"). Thus, the exercise of jurisdiction over the SJRC for claims arising from its sponsorship of al Qaida complies with due process.[13]

### 2. This U.S. Contacts of Saudi Arabia and the SJRC's Constituent Charities are Attributable to the SJRC

This Court also may exercise personal jurisdiction over the SJRC under general jurisdiction standards, as the U.S. contacts of the Kingdom of Saudi Arabia and the SJRC's constituent charities are attributable to the SJRC for jurisdictional purposes. Under Second Circuit law, the contacts of a department or agency within the jurisdiction are attributable to its parent and vice versa. *See* Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120-22 (2d Cir. 1984). While most of the cases addressing the issue involve the

---

[13] The Federal Plaintiffs' allegations of conspiracy are, in and of themselves, sufficient to satisfy due process at this stage of the litigation. In Re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003); see also Davis v. Barrett Day Securities, Inc., 1995 U.S. Dist. LEXIS 15434, *11-12 (M.D.N.C. 1995).

exercise of jurisdiction over the foreign parent of a domestic subsidiary, it makes no difference for the analysis whether the foreign entity is the subsidiary of the entity with New York contacts or its parent. See, e.g., Palmieri v. Estefan, 793 F. Supp. 1182, 1187 n. 9 (S.D. N.Y. 1992); Saraceno v. S.C. Johnson & Son, Inc., 83 F.R.D. 65, 67 n. 5 (S.D. N.Y. 1979).

Four criteria are relevant in determining whether attribution for jurisdictional purposes is appropriate, the primary one being whether the subsidiary shares common ownership with the parent.  Other factors to be considered are whether the subsidiary functions as a "mere department" of the parent; whether it is financially dependent upon the parent; and the extent to which the parent entity interferes in personnel decisions and otherwise demonstrates a failure to obey corporate formalities and extent of control.  See Volkswagenwerkt, 751 F.2d at 120-22; Jacobs v. Verlag, 160 F. Supp. 2d. 722, 734 (S.D. N.Y. 2001).  If the subsidiary forms an "integral part[ ] of [a] united endeavor," the contacts of the domestic entity are attributable to the foreign.  Titu-Serban Ionesco v. EF Hutton and Co. S.A., 434 F Supp 80, 82 (S.D. N.Y. 1977)).

In the present case, the Kingdom's contacts with the United States are attributable to the SJRC under the foregoing standards.  In its own Motion to Dismiss, the SJRC acknowledges that it was created by the Saudi government, relies extensively on the Kingdom for its funding, is staffed primarily with Saudi civil servants seconded to work for the SJRC, and is actively supervised by Prince Naif.  In addition, the management of the SJRC includes numerous high-ranking officials of the Kingdom.  Given the Kingdom's extensive control over the SJRC, the Kingdom's contacts with the United States are attributable to the SJRC for purposes of determining jurisdiction.  As the Kingdom has pervasive and continuing contacts with the U.S., the exercise of jurisdiction over the SJRC comports with due process.[14]

---

[14] At a minimum, the Federal Plaintiffs are entitled to discovery regarding  the Kingdom's control over the SJRC.

The U.S. contacts of the SJRC's constituent charities also are attributable to the SJRC for due process purposes.  Although the SJRC claims that it did not engage in fundraising activities in the United States, SJRC constituent charities IIRO, MWL, WAMY and al Haramain all maintained offices in America during the years preceding the September 11th Attack, and engaged in fundraising activities here.  FAC ¶¶ 146, 160, 177 & 224.  As those organizations were actively involved in ostensible relief efforts in Kosovo and Chechnya, it is reasonable to infer that certain of the funds raised by those constituent charities were dedicated to operations in Kosovo and Chechnya, under the direction of the SJRC.  In fact, a federal indictment alleges that the U.S. branch and Saudi headquarters of al Haramain engaged in a scheme in 2000 to divert donations made for "Chechen refugees" to al Qaida *mujihadeen* fighters in Chechnya.  See United States v. Al Haramain Islamic Foundation, 05-CR-___, United States District Court for the District of Oregon, Carter Aff. Exh. 11.  At a minimum, the indictment establishes that at least some of the constituent charities of the SJRC, which maintained U.S. offices, engaged in active fundraising efforts on behalf of the SJRC's operations in Chechnya.  As the SJRC was established to direct and supervise all efforts of the constituent charities relative to Chechnya and Kosovo, the contacts of the constituent charities are attributable to the SJRC and serve to satisfy due process considerations.

V.     **CONCLUSION**

For all of the foregoing reasons, the Motion to Dismiss of the SJRC should be denied.

Respectfully submitted,

COZEN O'CONNOR

By: _____
STEPHEN A. COZEN (SC 1625)
ELLIOTT R. FELDMAN (EF 8111)
SEAN P. CARTER (SC 0636)

25