UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to Sami Omar Al-Hussayen** |

*This document relates to:*       Federal Insurance Co. v. al Qaida
                                  03 CV 06978 (RCC)


**RICO STATEMENT**
**APPLICABLE TO SAMI OMAR AL-HUSSAYEN**

       Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Sami Omar Al-Hussayen.[1]

       Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.    The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.    The name of the defendant to whom this RICO statement pertains is Sami Omar Al-Hussayen.  The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.    Not applicable.  All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

---

[1]    Plaintiffs herein incorporate and attach as Exhibit "C" to this Statement, the More Definite Statement as to Sami Omar Al-Hussayen previously filed by the <u>Burnett</u> plaintiffs in this consolidated action, which lays out in greater detail the factual allegations in question here.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| false statement to the United States | 18 U.S.C. §§ 1001(a)(2) and 3238 |
| visa fraud | 18 U.S.C. §§ 1546(a), 3237 and 3238 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support for terrorism | 18 U.S.C. § 2332, § 2339 (A) – (C) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Sami Omar Al-Hussayen | Throughout this period, Sami Omar Al-Hussayen conspired to and did support terrorism, evade tax obligations, and obfuscate the roles of the various participants and conspirators in the al Qaida Movement to perpetrate radical Muslim terrorism, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Sami Omar Al-Hussayen | In violation of 18 U.S.C. § 1952, on multiple occasions Sami Omar Al-Hussayen conspired to and did traffic in interstate and/or foreign commerce, and/or used the mail and/or facilities in interstate or foreign |

2

| | | |
|---|---|---|
| | | commerce with intent to distribute the proceeds of their money laundering activities which are indictable under 18 U.S.C. § 1956 and/or 1957. |
| early 1990s to 9/11/2001 | Sami Omar Al-Hussayen | In violation of 18 U.S.C. § 2333, Sami Omar Al-Hussayen provided material support to the Enterprise with knowledge of its terrorist agenda, aiding and abetting it in its course of terrorist conduct. |
| early 1990s to 9/11/2001 | Sami Omar Al-Hussayen | In violation of 26 U.S.C. § 7212(a), Sami Omar Al-Hussayen conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws |
| early 1990s to 9/11/2001 | Sami Omar Al-Hussayen | Sami Omar Al-Hussayen undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise he was underwriting, the al Qaida Movement to perpetrate radical Muslim terrorism, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources supplied by Sami Omar Al-Hussayen. |
| early 1990s to 9/11/2001 | Sami Omar Al-Hussayen | Sami Omar Al-Hussayen agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, tax evasion, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Sami Omar Al-Hussayen and other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as

3

      part of their scheme to conduit money to terrorists, and yet obfuscate their support of the al Qaida Movement to perpetrate radical Muslim terrorism. From his central position in the Islamic Assembly of North America (IANA), he spread the violent message of the Enterprise through a series of linked websites he controlled which all promoted the Enterprise's mission through graphic videos and threatening texts, even going so far as to spreading advocacy of the use of airplanes onto important locations against "the enemy". At the same time, he because a distribution hub for over $3,000,000 in funds aimed to supporting terrorism, maintaining multiple bank accounts and distributing money for groups in support of jihad around the globe. These transactions bear all of the hallmarks of money laundering in support of terrorism. Such money laundering, the filing of false tax returns, and tax evasion were all in furtherance of a conspiracy to commit murder and arson which culminated in the Attack.

    (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

    (a)    The enterprise (the "Enterprise" or "The al Qaida Movement to perpetrate radical Muslim terrorism ") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

    (b)    The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida Movement to perpetrate radical Muslim terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sami Omar Al-Hussayen fit neatly into this framework by raising funds for, providing funding to, and otherwise providing material support for al Qaida and the members of the Enterprise who engaged in the Attack.

4

    (c)    no.

    (d)    Sami Omar Al-Hussayen is associated with the Enterprise.

    (e)    Sami Omar Al-Hussayen is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f)    Sami Omar Al-Hussayen intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Sami Omar Al-Hussayen is separate from the existence of The al Qaida Movement to perpetrate radical Muslim terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sami Omar Al-Hussayen furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sami Omar Al-Hussayen, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida Movement to perpetrate radical Muslim terrorism  "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind the al Qaida Movement to perpetrate radical Muslim terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed facilitators, including Sami Omar Al-Hussayen, who laundered funds and corporations and raised money from witting and unwitting donors while spreading the message of violent *jihad*.  They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.  Al Qaida also collected

money from employees of corrupted charities. In addition, al Qaida members cited the ostensible employment with charities to conceal their terrorist activities and to gain entry into important conflict areas.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan, and various other regions, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of the Sudan, Afghanistan, Bosnia-Herzegovina, Kosovo and Chechnya. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the financial services and funds supplied by participants and conspirators like Sami Omar Al-Hussayen. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Sami Omar Al-Hussayen. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sami Omar Al-Hussayen. Sami Omar Al-Hussayen with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Sami Omar Al-Hussayen also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

6

18.

| | | |
|---|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.  pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.  not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Sami Omar Al-Hussayen | Sami Omar Al-Hussayen, a citizen of Saudi Arabia, was admitted into the United States on an F-1 Student Visa for the purpose of pursuing his PhD. in computer science at the University of Idaho. On these applications, he failed to disclose that he would be providing business services and funding for numerous terrorist-affiliated charities and organizations.<br><br>From at least October 2, 1998 until February 13, 2003 Al-Hussayen provided expert computer services, advice, assistance and support to terrorist-related organizations and individuals, in the form of web-site registration, management, administration and maintenance.<br><br>Sami Al-Hussayen actively participated in the creation and design of these websites which entailed determining the inclusion and placement of various articles and images. Sami Al-Hussayen assisted the Islamic Assembly of North America (IANA) and numerous other groups in the maintenance of their sites.<br><br>Al-Hussayen was the formal registered agent for IANA in Idaho, as well as for a number of other internet websites associated with or belonging to the organization.  For each website, Al-Hussayen was responsible to the content provided to visitors.<br><br>This content included the recruiting and mobilization of supporters to play a more active role in support of terrorist activities or causes, the direct promotion of violent *jihad* | 1962(c)<br>1962(d) |

and directly support for Osama bin Ladin and al Qaida.

He performed this service by disseminating fatwas, articles, images and other materials with the intention of recruiting supporters, sympathizers and members and to raise money for terrorist groups like al Qaida. He promoted fatwas by Sheik Alman Al-Ouda, Sheik Safar Al-Hawaly, the spiritual leaders of al Qaida, providing material support to the Enterprise by creating websites by which violent *jihad* against the United States could be espoused.

On May 15, 2001, three and one-half months before the September 11th attacks, Al-Hussayen posted an article written by Sheik Ouda called "Suicide Operations" was posted on one of the affiliated websites for which he was responsible. The article advocated killing a great number of "enemies" through the suicidal takeover of an airplane and crashing it into an "important location" – ""The mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies. In the new era, this can be accomplished with the modern means of bombing or bringing down an airplane on an important location that will cause the enemy great losses."

Al Hussayen collected and forwarded jihadist audiotape messages from Osama bin Laden to fellow terrorist operatives with instructions to its recipients to send the messages out to as many people as possible. Thus, Al- Hussayen directly promoted and distributed messages from Osama bin Laden, as well as the suicide operations and the ideology espoused by Sheik Ouda.

Al-Hussayen has also downloaded and distributed a speech given by Osama bin Laden with instructions that the speech be widely distributed. Consistent with this ideological support of Al Qaida, Al Hussayen

created, registered and maintained numerous websites and Internet chat rooms which promote radical and violent jihad for the purpose of recruitment and raising funds to perpetuate the Al Qaida jihad.

From November 1999 through February 13, 2003 Al-Hussayen was functioning as an IANA officer and employee. Al-Hussayen was actively involved in IANA's business transactions and fundraising activities, and helped direct money towards a number of so-called "charities" which were in fact part of the Enterprise.

IANA was the only American Muslim organization to be individually promoted on the website of Azzam Publications, widely considered to be the premier English-language mouthpiece of al Qaida.

In addition to the messages and articles previously described, Al-Hussayen also maintained several disturbing images on his computer for use on these websites. Among the thousands of images were:

- Several pictures of the World Trade Center Towers including a computer generated image of where the airplanes struck the towers, and images of the towers before and after they collapsed;
- An aerial photograph of the Pentagon;
- Photographs of other Al Qaida terrorist targets including the Golden Gate Bridge and the Capitol Building in Washington, DC;
- Numerous photographs of Osama bin Laden including an image of Osama bin Laden facing off with President Bush. (There is a target superimposed on President Bush's head with the center of his head in the cross hairs of the target).
- Photographs of Zacarias Moussaoui, the suspected 20th hijacker who has been indicted in Virginia and Richard Reid, the Al Qaida operative convicted of attempting to explode a trans-Atlantic flight from Paris to Miami with explosives inserted in his shoes; and
- Photograph of a Taliban soldier firing a rocket

10

|  | propelled grenade. |  |
|---|---|---|
|  | Sami Al-Hussayen also provided material support to Al Qaida and other terrorist groups through the collection of donations. From August 1994 until at least February 2003, Sami Al-Hussayen maintained at least six different bank accounts in the United States. From at least 1997, Al-Hussayen used some of these accounts to receive donations and large sums of money. He transferred these sums to the IANA and other organizations and individuals. Sami Al Hussayen also made disbursements to individuals in Cairo, Egypt; Montreal, Canada; Riyadh, Saudi Arabia; Amman, Jordon; and Islamabad, Pakistan.<br><br>Mr. Al-Hussayen played an active role in determining where the IANA would send its contributions and how the business should operate in support of *jihad* and the Enterprise, including support for such organizations as "Help The Needy", whose website he also maintained, which illegally passed funds to Iraq in contravention of multiple executive orders |  |

.111