# EXHIBIT "C"

# PART 1 OF 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON<br>SEPTEMBER 11, 2001 | Civil Action No.<br>03 MDL 1570 (RCC) |

-----------------------------------------------------------x

This document relates to:

>   *Thomas E. Burnett, Sr., et al. vs. Al Baraka*
>   *Investment and Development Corp., et al.*
>   03 CV 9849 (RCC); 03 CV 5738 (RCC)

## PLAINTIFFS' RESPONSE TO DEFENDANT SAMI OMAR AL-HUSSAYEN'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR A MORE DEFINITE STATEMENT

Counsel for the *Burnett* Plaintiffs hereby provide a more definite statement as to Defendant Sami Omar Al-Hussayen[1]. This statement, annexed hereto as Exhibit 1, is hereby incorporated into the *Burnett* Complaints.

Dated:  May 14, 2004                    Respectfully submitted,

                                         /S/ Michael Elsner
                                        Michael E. Elsner, Esq. (NY & VA-ME8337)
                                        Ronald L. Motley, Esq. (SC-4123)
                                        Jodi Westbrook Flowers, Esq. (SC-66300)
                                        Donald A. Migliori, Esq. (RI-4936; MA-567562;
                                            MN-0245951)
                                        William H. Narwold, Esq. (NY-WN1713)
                                        Ingrid L. Moll, Esq. (CT-21866)
                                        Robert T. Haefele, Esq. (NJ-58293; PA-57937)

---

1  Defendant Sami Omar al-Hussayen, in his pleading, appears to attempt to use his Declaration in Support of a Motion for Definite Statement under Rule 12(e) to propound a set of contention interrogatories.  Any such effort is both procedurally improper at this stage of the litigation pursuant Case Management Order No. 1 and Federal Rules 12 and 33, as well as substantively improper under the relevant case law.  *See* CMO #1, 3/3/04; Fed. R. Civ. Pr. 12, 33; Fed.*In Re Convergent Technologies*, 108 F.R.D. 328 (N.D. Cal. 1985).

Justin B. Kaplan, Esq. (TN-022145)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Jayne Conroy, Esq. (NY-JC8611)
Paul J. Hanly, Jr., Esq. (NY-PH5486)
Andrea Bierstein, Esq. (NY-AB4618)
HANLY CONROY BIERSTEIN
    & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq. (IN - 4941-49)
Amy Ficklin DeBrota, Esq. (IN - 17294-49)
RILEY, DUDLEY LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone:  (317) 848-7939

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Jack Cordray, Esq. (SC-1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761

Attorneys for Plaintiffs

# EXHIBIT 1

**More Definite Statement as to Sami Omar Al-Hussayen**

1.      Plaintiffs hereby incorporate all other allegations contained in the Third Amended Complaint, Burnett, et al. v. Al Baraka Investment and Development Corp., et al., 03 MD 1570 (RCC); 02 CV 6977 (RCC) and incorporate all other responses to Defendants' motions for more definite statements pursuant to Fed. R. Civ. P. Rule 12 (e).

2.      Sami Al-Hussayen is a citizen of Saudi Arabia.  Between roughly August 7, 1994 and September 23, 1998 Mr. Al-Hussayen studied at Ball State University in Muncie, Indiana and Southern Methodist University in Dallas, Texas where he obtained a Master's Degree.[1]

3.      In January of 1999, Sami Al-Hussayen was admitted to the Computer Science PhD. program at the University of Idaho.[2]  The defendant began his studies at the University of Idaho in the Spring Semester, 1999.[3]  On or about August 11, 1999, Sami Al-Hussayen was readmitted into the United States on an F-1 student visa for the purpose of pursuing his PhD. degree.  Sami Al-Hussayen never disclosed in any of his visa applications that he was providing World Wide Web-based services and funding for numerous charities and associations.[4]

4.      From at least October 2, 1998 until February 13, 2003 Sami Al-Hussayen provided expert computer services, advice, assistance and support to organizations and individuals, in the form of web-site registration, management, administration and

---

[1]      Indictment, U.S. v. Sami Omar Al-Hussayen, ¶ 2, Cr. No. 03-048 NEJL (DC ID) (February 13, 2003).  A copy of the indictment is attached as Exhibit A.
[2]      Id. at ¶ 4.
[3]      Id.
[4]      Id. at ¶ 7.

2

maintenance.[5]  Sami Al-Hussayen actively participated in the creation and design of these

websites which entailed determining the inclusion and placement of various articles and

images.  Sami Al-Hussayen assisted the Islamic Assembly of North America (IANA) and

numerous other groups in the maintenance of their sites.

  5. The IANA was incorporated in Colorado in 1993 as a non-profit charitable

organization designed to spread the word of Islam.[6]  The IANA spreads the message of

Islam through its website, internet magazines, radio services, toll-free telephone lines and

website bulletin boards where patrons may post messages on the World Wide Web.[7]

The IANA also organizes Islamic conferences in the United States.  IANA maintains an

office in Ann Arbor, Michigan.[8]

  6. Sami Al-Hussayen was the formal registered agent for the IANA in Idaho.

In addition, Sami Al-Hussayen was the registrant or administrative contact for a number

of internet websites which either belonged to or were associated with the IANA.  Al-

Hussayen was the sole registrant of the following websites:

> www.alasr.ws
> www.alasr.net
> www.almawred.com
> www.heejrah.com
> www.cybermsa.org
> www.liveislam.net[9]

  7. Sami Al-Hussayen was also listed as the administrative contact for the

website {www.almanar.net}.  Al-Hussayen was the head of the Supervisory Committee

and the Technical Committee for IANA and {www.ianaradionet.com}.[10]  The website

---

5 *Id.* at ¶ 15.
6 *Id.* at ¶ 16.
7 *Id.*
8 *Id.*
9 *Id.* at ¶ 19.
10 *Id.*

{www.islamway.com} was registered to IANA, with direct links to Al-Hussayen's websites {www.alasr.ws} and {www.cybersma.org}.[11]  In fact, the President of IANA, Muhammad Al-Ahmari, e-mailed Sami Al Hussayen stating that "what matters to me is what we agreed upon, which is **your total supervision of all of the Assembly's sites.**[12] Sami Al Hussayen was also registered as the administrative contact for {www.alhawali.com} and {www.alhawali.org}.[13]  Islam al-Maurabit, the administrator for {www.iana.org} sent an e-mail to Sami Al-Hussayen stating that:

> With Allah's support, I suggest that no one is to have the authority to add or delete any banners, except for one person from the office, which shall be you…
>
> Anyway, Abu Al-Muhanned (a/k/a Sami Al-Hussayen), you have been the site manager for a very long time now and I know how busy you are but I want to stress the importance of defined authorities and responsibilities.[14]

8.        The internet, websites and chat rooms are an important medium through which Islamic fundamentalism is spread, donations are collected and Muslims are recruited to join violent jihad.  "Today, almost all active terrorist organizations maintain websites, and many maintain more than one website and use several different languages."[15]

9.        "The Internet is in many ways an ideal arena for activity by terrorist organizations.  Most notably it offers: easy access; little or no regulation, censorship, or other forms of governmental control; potentially huge audiences spread throughout the world; anonymity of communication; fast flow of information; inexpensive development

---

[11]    *Id.*
[12]    U.S. Government Exhibit, F49A, <u>U.S. v. Sami Omar Al Hussayen</u>. (Emphasis added).
[13]    *Id.*
[14]    U.S. Government Exhibit F101A, <u>U.S. v. Sami Omar Al Hussayen</u>.
[15]    Gabriel Weimann, "www.terror.net How Modern Terrorism Uses the Internet," Special Report of the United States Institute of Peace, Report No. 116, p. 3 (March 2004), the article may be located at www.usip.org.

and maintenance of web presence; a multimedia environment (the ability to combine text,
graphics, audio, video and to allow users to download films, songs, books, posters, and so
forth); and the ability to shape coverage in the traditional mass media, which increasingly
use the internet as a source for stories."[16]

   10.  In their use of the internet, "terrorists commonly employ three rhetorical
structures, all used to justify their reliance on violence.  The first one is the claim that the
terrorists have no other choice other than to turn to violence."[17]  "While the sites avoid
mentioning how terrorists victimize others, the forceful actions of the governments and
regimes that combat terrorists are heavily emphasized and characterized with terms such
as 'slaughter,' 'murder' and 'genocide.'"[18]  The second method employed by terrorists is to
demonize or delegitimize the enemy.[19]  "The members of the movement or organization
are presented as freedom fighters, forced against their will to use violence because a
ruthless enemy is crushing the rights and dignity of their people or group."[20]  "Terrorist
rhetoric tries to shift the responsibility for violence from the terrorist to the adversary,
which is accused of displaying brutality, inhumanity, and immorality."[21]  The third
rhetorical device is to use language of nonviolence in an attempt to counter the terrorists'
violent image.[22]  An example of this demonization is given in an interview by an
individual working for the website {www.aljihad.com}:

> We have tried and we have succeeded to show to the world that the
> democracy and liberty in America is only for the good of the white
> man. We have won this war against America, now, all the World
> knows that all the concepts and principles, the Americans talk about,

---

[16]  *Id.*
[17]  *Id.* at 6.
[18]  *Id.*
[19]  *Id.*
[20]  *Id.*
[21]  *Id.*
[22]  *Id.*

are just lies, with our website which costs us about 70 dollars, we were capable of destroying all those lies. The Americans have destroyed our Website five times, where is the freedom they are talking about? Why they should do that? Why they are fighting a small Website like ours? This explains that the American civilization reaches its end, they can not lie more, in addition, the blessed September 11, put the American administration in a series of troubles, it's their end now.

11.     "The Internet is emerging as a cheap and powerful delivery system, capable of great disruptive power over long distances. It offers minimal risk to any individual or group wishing to illustrate the strength of its argument with direct confrontation against companies or governments."[23] Jimmy Gurulé, Under Secretary of the Treasury for Enforcement, U.S. Department of the Treasury, testified before the U.S. Senate Judiciary Committee that terrorist groups exploit the Internet to recruit supporters and to raise terrorist funds.[24]

12.     "Al Qaeda has always depended heavily on donations, and its global fundraising network is built upon a foundation of charities, nongovernmental organizations, and other financial institutions that use websites and Internet-based chat rooms and forums."[25]  Frequently, the websites offer specific bank account numbers of the site to which donations may be wired.  "The U.S. government has also frozen the assets of three seemingly legitimate charities that use the internet to raise money--the Benevolence International Foundation (BIF), the Global Relief Foundation, and the Al Haramain Foundation--because of evidence that those charities have funneled money to

---

[23]     http://www.computerweekly.com/Article117405.htm
[24]     Testimony of Jimmy Gurulé, Under Secretary for Enforcement, U.S. Department of the Treasury, before the U.S. Senate Judiciary Committee (PO-3635).  November 20, 2002; *see also*, {http://usinfo.state.gov/topical/pol/terror/02112001.htm}.
[25]     *Id.* at 7.

Al Qaeda." Each of these charities are associated with and have direct relationships with Sami Al-Hussayen or the websites he maintains for IANA.[26]

13.     In addition to soliciting donations, websites are also used "to recruit and mobilize supporters to play a more active role in support of terrorist activities or causes."[27] Terrorist organizations capture information about users who browse their websites. Those who appear to be most interested are sent e-mails with religious decrees and Anti-American propaganda.

14.     Mohamad bin Ahmad Assalim, a member of Al Qaeda wrote an article entitled "39 Ways to participate in Jihad and Serve the Mujahideen." He called for the publication of news about the mujahideen fighting jihad. "The publication and circulation of Mujahideen news should not be underestimated. So, as a Muslim, one should participate in these actions because it is a duty that has to be carried out." "You have to publish any information or materials to promote Jihad and to praise the Mujahideen." "You may also put this document in the Internet so that your brothers can have access to it."

15.     He specifically mentions websites in item 34:

> Websites: This is a vital area for support and exchange of information on Jihad and the Mujahideen. Some of the topics could be discussed through the internet among a limited group of Muslims:
>
> > Promoting Jihad
> > Ways to Defend the Mujahideen
> > Guidance
> > Jihad Literature

16.     Similarly, Jandal Al-Azdi declared in <u>Destroying America</u>, a media war.

---

[26]     *Id.* at 8.
[27]     *Id.*

> The Islamic jihadist websites should be a spider network that participates more in this conflict.  These websites have to be developed and have to become more advanced, in fact, more websites are needed, their number should multiply like ants.  Our war starts by the media, we have to win this war in order to be able to continue the conflict and fight."

17.     "Terrorists use the Internet not only to learn how to build bombs but also to plan and coordinate specific attacks.  Al Qaeda operatives relied heavily on the Internet in planning and coordinating the September 11 attacks."[28]

18.     Defendant Sami Al-Hussayen is committed to the principles of violent jihad.  He actively supports and promotes this ideology by registering and maintaining websites.  Sami Al-Hussayen established, developed and maintained websites for individuals and groups which promote violent jihad and directly support Al Qaeda.  He performed this service and disseminated fatwas, articles, images and other materials with the intention of recruiting supporters, sympathizers and members and to raise money for terrorist groups like Al Qaeda.

*Sheiks Al-Hawali and Ouda*

19.     Sheiks Safar Al-Hawali and Salman Al-Ouda are the spiritual leaders of the Al Qaeda movement.[29]  In September 1990, during the initial U.S.-Iraq conflict, Sheikh Al-Hawali released a tape which established a vision for Osama bin Laden's war against the United States and the West:

> We have asked the help of our real enemies in defending us.  The point is that we need an internal change.  The first war should be against the infidels inside and then we will be strong enough to face our external

---

[28]     Institute of Peace Special Report, at 10.

[29]     Testimony of Michael Gneckow, U.S. v. Sami Omar Al-Hussayen, Detention Hearing, p. 22, lines 10-14.  Attached as Exhibit B.

enemy.  Brothers, you have a duty to perform.  The war will be long.  The confrontation is coming.[30]

20.    After the 1995 bombing of the U.S. National Guard Khobar Towers facility in Saudi Arabia, a fax was sent to CNN in Atlanta claiming responsibility for the attack.  The terrorists stated that the attack was in retaliation for the imprisonment of Sheik Al-Hawali and Sheik Al-Ouda.

21.    In 1996, when Osama bin Laden issued his fatwa or declaration entitled, Declaration of War against the Americans Occupying the Land of the Two Holy Places" Osama bin Laden specifically called for the release of these two Saudi sheiks from imprisonment in Saudi Arabia.

> By orders from the USA they also arrested a large number of scholars, Da'ees and young people - in the land of the two Holy Places- among them the prominent **Sheikh Salman Al-Oud'a and Sheikh Safar Al-Hawali** and their brothers; (We bemoan this and can only say: "No power and power acquiring except through Allah")...The imprisoned Sheikh **Safar Al-Hawali**, may Allah hasten his release...[31]

22.    Immediately after the 1998 attacks against the United States embassies in Africa, Osama bin Laden issued statements supporting the bombings and stating that attacks against the United States will continue until certain demands are met.  One of these demands called for "Releasing Islamic preachers and youths detained inside prisons in the United States, Israel, and Saudi Arabia, foremost of whom are Sheik Omar Abdel Rahman, **Sheik Alman Al-Ouda**, **Sheik Safar Al-Hawaly** and their brothers."

---

[30]    "Saudi Missteps Helped Bin Laden Gain Power," <u>Washington Post</u>, October 15, 2001.
[31]    Originally published in <u>Al Quds Al Arabi</u> (emphasis added).

23.    These Saudi sheiks were outspoken in their proclamations of jihad, terrorism and violence against the West.[32]  In fact, they have promoted suicide operations as a legitimate means of jihad.[33]  Copies of Sheik Al-Ouda's sermons promoting violent jihad were found in one of Osama bin Laden's residences in Afghanistan.[34]

24.    In an October 19, 2001 open letter to President George W. Bush, Sheikh Al Hawali wrote: "In the midst of this continuous confusion and frustration, the events of the 11[th] of September occurred.  I will not conceal from you that a tremendous wave of joy…was felt by the Muslim in the street."[35]

25.    The sheiks used websites to spread their violent message of jihad against the United States and non-Muslims.  Sami Al-Hussayan assisted in their promotional efforts by creating a medium for them to express their ideology.  Sami Al-Hussayen provided material support to the Al Qaeda network by creating websites by which violent jihad against the United States could be espoused.  In furtherance of Al Qaeda's goals, he purposefully and knowingly posted militant articles and messages written by these Saudi sheiks--the spiritual leaders of Al Qaeda.

26.    A member of Mohammed Atta's September 11 hijacker cell in Hamburg, Germany made several calls to Sheik Al Hawali and Sheik Ouda.  The sheiks provided ideological justifications and support for suicide attacks.  It has also been recently revealed that the United States National Security Agency intercepted phone conversations between the September 11th hijackers and sheiks from Saudi Arabia.  Although the

---

[32]    *Id.* at p. 23, lines 7-15.
[33]    *Id.* at p. 23, lines 16-20.
[34]    *Id.* at p. 26, lines 7-16
[35]    Saudi cleric Safar bin-Abd-al-Rahman al-Hawali, "Open Letter from Saudi Cleric to President Bush," <u>Al Quds Al Arabi</u>, October 19, 2001

identity of the sheiks that the hijackers contacted has not been revealed at this time, it seems likely that they may have tried to contact these same Saudi Sheiks.

27.     Sheik Al Hawali's websites {www.alhawali.org} and (www.alhawali.com} were registered by Sami Al-Hussayan.  Sheik Ouda publishes his articles and fatwas on the website {www.islamtoday.net}. IslamToday was registered by the Specially Designated Global Terrorist Al Haramain Islamic charity on behalf of these two Saudi sheiks.  Sami al-Hussayen administered the site {www.islamtoday.net}.[36]

28.     On May 15, 2001, three and one-half months before the September 11th attacks, an article written by Sheik Ouda called "Suicide Operations" was posted on the website {www.alasr.ws}.  Sami Al-Hussayen was the sole registrant for this website. Sheik Ouda wrote:

> The second part of the rule is that the Mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies, and that he will not be able to kill them without killing himself first, or demolishing a center vital to the enemy or its military force, and so on.  This is not possible except by involving the human element in the operation.  In this new era, this can be accomplished with the modern means of bombing **or bringing down an airplane** on an important location that will cause the enemy great losses.[37]

29.     Sami Al-Hussayen  paid invoices for the website domain name {www.alasr.net}.  The defendant's computer also contained images of the materials posted on the "alasr" site.  FTP logs show that Al-Hussayen uploaded these files from his computer to the website {www.alasr.ws}.  In fact, Sami Al-Hussayen conducted this upload to the "alasr" site on the same date the fatwa was written.

---

[36]     Superseding Indictment, U.S. v. Sami Omar Al-Hussayen, para. 23, CR-03-0048-C-ELJ (DC Idaho) (January 9, 2004).  Attached as Exhibit C.
[37]     Indictment at para. 20. (Emphasis added).

30.     Sami Al-Hussayen promoted these suicide operations and the ideology espoused by Sheik Ouda.  Mr. Al-Hussayen e-mailed a poem to his brother entitled "A Martyr Under Twenty."  The introduction to this poem was written by Sheik Ouda.   The poem praises violent jihad through suicide operations.

31.     As a telling precursor to the defense currently asserted by Sami Al-Hussayen in his criminal trial in Idaho, he stated that in the email that "if ever questioned about posting the messages of suicide attacks by Sheik Al-Hawali, 'I will simply deny knowledge of the content of the message and claim that I merely host the servers.'"

*Al-Multaqa*

32.     Al-Hussayen also maintained and posted information on the website {www.al-multaqa}.  The website presented an online version of the Arabic magazine *Al-Mutaqa*.  The magazine contained Sami Al-Hussayen's contact phone numbers.  The magazine also displayed news about the Chechen mujahideen and advised visitors to join the Yahoo!QoqazGroup for news about jihad in Chechnya.   In one such article, among many found on the website and also on Sami Al Hussayen's personal computer is an article entitled "The True Meaning of Shaheed."  The article states that to die as a shaheed [martyr] is the ultimate honor.

33.     The magazine is hyper linked to the "alasr" websites and {www.ianaradio.net}maintained by Al-Hussayen.  The site is also linked to the website {www.qoqaz.com} which has been used frequently by Al Qaeda to promote jihad in Chechnya.  The "alasr" site is also linked to {www.palestine-info.org}, a site considered by numerous experts to be the official website of Hamas.  Hamas and Al Qaeda are designated as global terrorist groups.

34.     Al-Multaqa also included links for subscribing to the internet bulletin board that later became Yahoo!QoqazGroup, which was maintained by Sami Al-Hussayen.  In a telephone call with Verizon, Al-Hussayen requested the activation of the telephone number of Al Multaqa – 208 892 9197.  He gave his own home phone number and address as a point of contact.

35.     Sami Al-Hussayen received an e-mail thanking him for posting messages while the {www.qoqaz.com} website was not functioning.  The Qoqaz website is the premier website promoting jihad in Chechnya.  The website includes images of Ibn-ul-Khattab, the Al Qaeda leader of jihad in Chechnya.  These images were found saved on Sami Al-Hussayen's computer.

36.     As described above, Al-Hussayen also monitored and participated in the Yahoo!QoqazGroup chat room.  Participants in this chat room promoted violence and jihad.  The invitation to join the chat room was posted on the Al-Multaqa website and announced the "Establishment of a network to support and disseminate news of the Caucasus [Qoqaz]."  The purpose of the chat room was described the following way:

> So that those who cannot physically engage in holy war may support the Chechen issue and holy war by the pen and tongue, an electronic network [listserve] has been established.  Please use this [listserve] for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers.... We ask everyone to help the Chechen holy warriors with your support, your money, and your selves. This is a duty upon us, and we must not be negligent.

37.     The first posting that Sami Al-Hussayen issued on the Qoqaz group chat room called for "A Cry and Call" to fight "idolators with your money, your selves, your tongues and your prayers."  His postings also included a statement that the problem with contemporary Islam is that Muslims have given up jihad and are not practicing it enough.

In addition, he posted "Virtues of Jihad" which glorified those who die in battle while performing jihad. He said that these martyrs have a special place in heaven close to Allah.

38.     Al Hussayen received jihadist messages on the Yahoo!QoqazGroup chat room which included an audiotape from Osama bin Laden. Sami downloaded and transferred these audio messages by e-mail to fellow terrorist operatives with instructions to its recipients to send the messages out to as many people as possible. Thus, Sami Al-Hussayen directly promoted and distributed messages from Osama bin Laden.

*Islamic Assembly of North America*

39.     Sami Al-Hussayen controlled IANA's websites. Al-Hussayen described himself in an e-mail as the Webmaster for IANA. IANA's sites include {www.islamway.com}, {www.iana.org} and {www.ianaradio.net}. Al-Hussayen maintained a complete back-up of these websites on his computer. Al-Hussayen knowingly and intentionally selected materials for the websites.

40.     On June 19, 2001, IANA's website {www.islamway.com} published an article by al-Hawali that was republished on his website, {www.islamtoday.net}. On November 4, 2001, an article was posted on the site which:

> justified and advocated suicide bombings if certain conditions were met, namely: (1) that the purpose is to assist Allah's religion; (2) that 'the attacker is almost certain that his act will have some benefit, either by inflicting the enemy with casualties or injuries, by encouraging the Muslims to fight the enemy, or by weakening the enemy's resolve by showing them what a single man is capable of...[;] (3) that the act is against 'unbelievers who have declared war against the Muslims...[;] (4) that 'the act is in their countries or in countries under their rule, where Muslims need to resists

them and expel them…[;] and (5) 'to be approved by the parents of the attacker…'[38]

41.     On August 16, 2001, IANA's website {www.islamway.com} published a propaganda statement that encouraged individuals to join arms in jihad against the West. Appropriately entitled "An Invitation to Jihad," the publication stated that "[t]he mujahid brothers will accept you with open arms and within a period of two weeks you will be given commando training and will be sent to the frontline."[39]

42.     Just two days before the attacks, on September 9, 2001, an individual posted a statement on IANA's website {www.islamway.com} that he was leaving Afghanistan "on duty" and that "Jihad is the only means to eradicate all evil on a personal and general level[;]" that "[t]he only answer is to ignite and trigger an all out war, a worldwide Jihad; and that "[w]e will do our best to ignite this war, may Allah protect us."

43.     In addition, an officer of IANA's Canada branch ran a mosque that harbored an al-Qaeda operative. Bahaa Elbatal is a director of the Islamic Assembly of North America in Canada.[40]   Elbatal is also the Secretary of the mosque in Montreal where Ould Slahi found refuge and led prayers.[41] Slahi is a senior al-Qaeda operative that provided assistance to both the 1998 Embassy Bombing attacks and the failed Millennium bomb plot on the United States.

44.     From November 1999 through February 13, 2003 Al-Hussayen was functioning as an IANA officer and employee.[42]   Al-Hussayen was actively involved in

---

[38]     Michael E. McLennan, FBI Special Agent. Application and Affidavit for Search Warrant, Case Number: CR 03-048, United States District Court for the District of Idaho. February 21, 2003. p16.

[39]     Application and Affidavit for Search Warrant, p13.

[40]     Islamic Assembly of North America in Canada. List of Directors. Canada Corporations Directorate. March 31, 2000.

[41]     David Johnston, "Terror Suspect is Rearrested in Africa at U.S. Request," *New York Times,* January 29, 2000.

[42]     Superseding Indictment, at paragraph 6.

IANA's business transactions and fundraising activities.[43]  He also assisted in the coordination of an IANA conference.

45.     A number of IANA conferences were sponsored by the Global Relief Foundation (GRF) which is a Specially Designated Global Terrorist and co-defendant in this action.  GRF also participated in the IANA conferences and sent money to IANA to offset the conferences' costs.[44]

46.     These conferences were also sponsored and/or financed, in part, by the Benevolence International Foundation which is also a Specially Designated Global Terrorist and co-defendant in this action.[45]

*Images Found on Sami Al Hussayen's Computer*

47.     In addition to the messages and articles previously described, Sami Al Hussayen also maintained several disturbing images on his computer for use on these websites.  Such images included:

> Several pictures of the World Trade Center Towers including a computer generated image of where the airplanes struck the towers, and images of the towers before and after they collapsed;
>
> An aerial photograph of the Pentagon;
>
> A picture of a United Airlines airplane;
>
> A photograph of a U.S. Navy Aircraft Carrier;
>
> Photographs of other Al Qaeda terrorist targets including the Golden Gate Bridge and the Capitol Building in Washington, DC;
>
> Numerous photographs of Osama bin Laden including an image of Osama bin Laden facing off with President George Bush.  There is a target

---

[43]     *Id.*

[44]     Testimony of Michael Gneckow, U.S. v. Sami Omar Al-Hussayen, Detention Hearing, at 104, lines 9 - 20.

[45]     *Id.* at 100, lines 15-20.

superimposed on President Bush's head with the center of his head in the cross hairs of the target. A copy of this photograph is included below;



Numerous photographs of Sheik Salman Ouda;

Photograph of Sudaman Abu Ghaith who is an Al Qaeda spokesman;

A poster of Chechnya with a symbol for the website Qoqaz.com and images of armed mujahideen soldiers;

Photographs of Zacarias Moussaoui, the suspected 20th hijacker who has been indicted in Virginia and Richard Reid, the Al Qaeda operative convicted of attempting to explode a trans-Atlantic flight from Paris to Miami with explosives inserted in his shoes;

Photograph of a Taliban soldier firing a rocket propelled grenade.[46]

These are merely a sample of the thousands of images contained on his computer.

*Financial Support*

48.     Sami Al-Hussayen also provided material support to Al Qaeda and other terrorist groups through the collection of donations. From August of 1994 until at least February 2003, Sami Al-Hussayen maintained at least six different bank accounts in the United States.[47] From at least 1997, Sami used some of these accounts to receive donations and large sums of money. He transferred these sums to the IANA and other

---

[46]      *See,* Testimony and Exhibits of Michael Gneckow, <u>U.S. v. Sami Omar Al-Hussayen</u>, Detention Hearing,   Attached as Exhibit B.
[47]      Indictment, at paragraph 22.

organizations and individuals.[48]  Sami Al Hussayen also made disbursements to

individuals in Cairo, Egypt; Montreal, Canada; Riyadh, Saudi Arabia; Amman, Jordon;

and Islamabad, Pakistan.[49]

      49.    Monies transferred from Al-Hussayen were used to fund salaries of IANA

officers, and to permit patrons to travel to IANA conventions.  Mr. Al-Hussayen played

an active role in determining where the IANA would send its contributions and how the

business should operate.  The IANA received and distributed over three million dollars

($3,000,000.00).  These funds were also used to support jihad and the Al Qaeda network.

      50.    Sami Al-Hussayen used the Yahoo!QoqazGroup to directly request

financial contributions to support those engaged in jihad.  In a response to statements that

the Russians won the Chechen conflict, Al-Hussayen posted a message to the jihadist

email group on February 9, 2000, "We request the Muslims to increase their *Duas* to

Allah and to increase their moral and financial support to the mujahideen."

      51.    In September, 1998, Sami Al-Hussayen received two checks totaling one

hundred thousand dollars ($100,000.00) from his uncle, Saleh Al-Hussayen.  Sami Al-

Hussayen forwarded this money directly to the IANA.[50]  This same uncle's travel was

sponsored by the IANA.  He traveled to the United States on an IANA fundraising

mission to the United States in the weeks leading up to the September 11th terrorist

attacks.  Saleh al-Hussayen is a senior Saudi cleric and the director of the Two Holy

Mosques.  In August 2001, he arrived in New York City and was given a tour of the city,

---

[48]   *Id.*

[49]   *Id.* at paragraph 24.

[50]   Testimony of Michael Gneckow, <u>U.S. v. Sami Omar Al-Hussayen</u>, Detention Hearing, at 77, lines
2-20, Attached as Exhibit B.

including the vicinity of the World Trade Center Towers.[51]  He then traveled to Chicago,

Detroit and Canada meeting with IANA officials and with officials from other charities.[52]

52.     There is an indication that Sami Al-Hussayen met with his uncle in

Michigan, because he received a cash disbursement in Ann Arbor around the same time

that his uncle Saleh was in Ann Arbor.[53]  On September 6, 2001, Sami's uncle Saleh

arrived in Herndon, Virginia.  Two or three days before the September 11th attacks,

Saleh Al-Hussayen switched from his original hotel to a hotel a few miles away, the

Marriott Residence Inn in Herndon.[54]  The Marriott Residence Inn in Herndon was the

same hotel where at least three of the American Airlines Flight 77 hijackers stayed the

night before September 11th.  The following morning these men hijacked Flight 77 and

crashed the airliner into the Pentagon.[55]

53.     When interviewed by the FBI, Saleh Al-Hussayen feigned a heart attack to

avoid interrogation.[56]  The doctor attending to Saleh Al-Hussayen claimed that he could

not find anything wrong with him.[57]

*Indictment*

54.     Sami Al Hussayen was indicted on January 9, 2004 for providing material

support and resources to terrorists.  The indictment states that:

> Sami Omar Al-Hussayen did knowingly conspire, combine,
> confederate, and agree with persons known and unknown to the
> Grand Jury, to provide material support and resources, and to
> conceal and disguise the nature, location, source and ownership of
> material support and resources, intending that they were to be used
> in preparation for and in carrying out a violation of Title 18, United

---

[51]   *Id.* at p. 81, lines 3-17.
[52]   *Id.*
[53]   *Id.* at 81, lines 18-24.
[54]   *Id.* at 82, lines 9-20.
[55]   *Id.* at 83, lines 1-6.
[56]   *Id.* at  89, lines 1-7.
[57]   *Id.* at  89, lines 8-13.

States Code, Section 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country), in violation of Title 18, United States Code, Section 2339A and Section 371.[58]

55.     The grand jury found that "the purpose of the conspiracy was to create and maintain websites and other internet media, which were intended in part to recruit personnel and raise funds for violent jihad…."[59] The Grand Jury also determined that Sami Al Hussayen, on the {www.al-multaqa.com} website, invited "those who cannot physically engage in holy war" to join an internet e-mail group "for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers," and urged all readers "to help the Chechen holy warriors with [their] support, [their] money, and [their] selves." As described above, members of this internet e-mail group posted inquiries and information relating to violent jihad.[60]

56.     Through these websites, Sami Al-Hussayen published and  broadcast a wide variety of speeches, lectures and articles justifying and glorifying violent jihad.[61] He also called upon Muslims to personally participate in violent jihad, or alternatively to provide financial assistance to such groups.[62]

57.     The Defendant also "published graphic videos depicting mujahideen and other subjects relating to violent jihad with the intent to inspire viewers to engage in violent jihad or to provide financial assistance to those who did so.  Individuals in the United states who viewed these videos were inspired, at least in part, by the videos to travel overseas to train for and engage in violent jihad and related terrorist offenses."[63]

---

[58] Superseding Indictment of Sami Omar Al-Hussayen, p. 14.
[59] Id.
[60] Id., at p. 15.
[61] Id.
[62] Id.
[63] Id., at p. 16.

58.     Sami Al-Hussayen ideologically supports global jihad believing that, irrespective of location, Muslims should support fellow Muslims who are engaging in violent jihad against non-Muslim regimes including the United States of America.  Sami Al-Hussayen has directly provided material support to groups that sponsor and carry out international terrorist activities, including suicide operations.

59.     Sami Al-Hussayen has materially supported the Al Qaeda network which carried out the September 11, 2001 attacks upon the United States by promoting and distributing articles and fatwas issued by the spiritual leaders of Al Qaeda Sheiks Ouda and Al-Hawali.  Sami Al-Hussayen has also downloaded and distributed a speech given by Osama bin Laden with instructions that the speech be widely distributed.  Consistent with this ideological support of Al Qaeda, Sami Al Hussayen has created, registered and maintained numerous websites and Internet chat rooms which promote radical and violent jihad for the purpose of recruitment and raising funds to perpetuate the Al Qaeda jihad.

EXHIBIT A

PROVIDED BY
**FindLaw**
WWW.FINDLAW.COM

1   THOMAS E. MOSS
    UNITED STATES ATTORNEY
2   KIM R. LINDQUIST
    ASSISTANT UNITED STATES ATTORNEY
3   TERRY L. DERDEN
    FIRST ASSISTANT UNITED STATES ATTORNEY
4       and CRIMINAL CHIEF
    DISTRICT OF IDAHO
5   WELLS FARGO BUILDING
    877 WEST MAIN STREET, SUITE 201
6   BOISE, IDAHO  83702
    TELEPHONE: (208) 334-1211
7   MAILING ADDRESS:
      BOX 32
8     BOISE, IDAHO  83707

9

10

11              UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

12

13   UNITED STATES OF AMERICA,        )   Cr. No. CR-03 048-N.EJL
                                      )
14              Plaintiff,            )   I N D I C T M E N T
                                      )
15   vs.                             )   (Vio. 18 U.S.C. 1546(a); 1001(a)(1) and
                                      )    (2), 3237 and 3238)
16   SAMI OMAR AL-HUSSAYEN,          )
                                      )
17              Defendant.            )

18

19

20   THE GRAND JURY CHARGES:

21

22   At all times pertinent to this Indictment:

23

24   VISA FRAUD AND FALSE STATEMENT

25       The Student Visas

26           Background

27   1.   In order for a foreign student to study in the United States on an F-1 student visa

28

                                        1

1   the student must declare and promise under oath to United States authorities that the student

2   seeks a presence in the United States solely for the purpose of pursuing the student's

3   course of studies. In relation thereto, the foreign student must truthfully and fully declare his

4   associations with organizations to the appropriate United States Government authorities in

5   order for those authorities to evaluate any such association and related activities in relation to

6   the interests of the United States.

7        2.    **SAMI OMAR AL-HUSSAYEN** was a citizen of Saudi Arabia. Between about

8   August 7, 1994 and September 23, 1998, AL-HUSSAYEN studied in the United States as a

9   foreign student. He studied at Ball State University in Muncie, Indiana, where he obtained a

10  Masters of Science degree in computer science; and at Southern Methodist University in

11  Dallas, Texas.

12       3.    On or about September 23, 1998, AL-HUSSAYEN applied to the University of

13  Idaho at Moscow, Idaho, by submitting an International Application Form requesting that he

14  be admitted to the Computer Science PhD program for the Spring 1999 Semester.

15       4.    In or about January, 1999, AL-HUSSAYEN was admitted to the Computer

16  Science PhD program at the University of Idaho, with an emphasis on computer security and

17  intrusion techniques. University of Idaho records indicated that he began his studies the

18  Spring 1999 Semester. At the time he published his permanent address as ███████████

19  ███████Moscow, Idaho.

20       **The year 1999 transactions**

21       5.    On or about May 17, 1999, United States Immigration and Nationalization (INS)

22  Form I-20 was issued by the University of Idaho, allowing AL-HUSSAYEN to study in the

23  Computer Science PhD program beginning no later than August 24, 1999, and ending no later

24  than December 17, 2004.

25

26

27

28

2

6.    On or about July 17, 1999, while outside the United States, AL-HUSSAYEN signed the Student Certification of the INS Form I-20 at section #11, which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and **solely for the purpose of pursuing a full course of study at [the University of Idaho].** I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

AL-HUSSAYEN falsely made said certification, knowing of his internet and business activities alleged hereafter. On or about July 20, 1999, the United States Government issued an F-1 student visa to AL-HUSSAYEN at Riyadh, Saudi Arabia. The visa was valid for twenty-four months, or until July 20, 2001. (See Counts One and Two hereafter.)

7.    On or about August 11, 1999, AL-HUSSAYEN was admitted by the United States Government into the United States at John F. Kennedy International Airport in New York City, New York, as an F-1 student. AL-HUSSAYEN was admitted into the United States by the United States Government pursuant to the July 20, 1999 visa and in direct reliance upon AL-HUSSAYEN's certification on the INS Form I-20 dated July 17, 1999. (See Count Three hereafter.)

**The year 2000 transactions**

8.    On or about July 7, 2000, a second INS Form I-20 was issued by the University of Idaho and designated "for Continued attendance at this school" and in order "to add dependant." On or about this same day and in Moscow, Idaho, AL-HUSSAYEN signed the Student Certification of said INS Form I-20 at section #11 and which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and **solely for the purpose of pursuing a full course of study at [the University of Idaho].** I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

AL-HUSSAYEN falsely made said certification, knowing of his internet and business activities alleged hereafter. (See Counts Four and Five hereafter.) On or about July 9, 2000,

3

1   AL-HUSSAYEN departed from the United States at the John F. Kennedy International

2   Airport in New York City, New York.

3       9.   On or about August 25, 2000, AL-HUSSAYEN was admitted into the United

4   States by the United States Government at Washington, D.C., as an F-1 student. AL-

5   HUSSAYEN was admitted into the United States by the United States Government pursuant

6   to the student visa dated July 20, 1999 as previously referenced and in reliance upon AL-

7   HUSSAYEN's certification on the INS Form I-20 dated July 7, 2000. (See Count Six

8   hereafter.)

9            **The year 2002 transactions**

10      10.   On or about January 10, 2002, AL-HUSSAYEN departed the United States at

11   the John F. Kennedy International Airport in New York City, New York. On or about January

12   13, 2002, AL-HUSSAYEN signed and submitted to the United States embassy a DOS Form

13   DS-156 for the purpose of obtaining another F-1 student visa. Section 36 of the form reads in

14   pertinent part:

15         I certify that I have read and understand all the questions set forth in this application
          and the answers I have furnished on this form are true and correct to the best of my

16       knowledge and belief. I understand that any false or misleading statement may result
          in the permanent refusal of a visa or denial of entry into the United States. I

17       understand that possession of a visa does not automatically entitle the bearer to enter
          the United States of America upon arrival at a port of entry if he or she is found

18       inadmissable.

19   At section nineteen of the Form DS-156, AL-HUSSAYEN stated that the purpose of his entry

20   into the United States was to "study;" and, at section twenty-six, that he would do so at the

21   University of Idaho. At section 20 he stated his permanent address in the United States to be

22   ███████████ Moscow, Idaho, 83843. As part of his application for the F-1 student

23   visa, AL-HUSSAYEN relied upon and/or submitted the INS Form I-20 dated July 7, 2000, as

24   previously referenced.

25      11.   On or about January 14, 2002, the DOS Form DS-156 was formally stamped as

26   received by the United States Government at the United States Embassy in Riyadh, Kingdom

27   of Saudi Arabia. However, the application was refused because the birth date of AL-

28

1  HUSSAYEN on the visa application and the July 7, 2000 INS Form I-20 did not match the

2  birth date on his passport.

3      12.   On or about January 14, 2002, and in conjunction with the same F-1 student visa

4  application, AL-HUSSAYEN submitted a DOS Form DS-157 Supplemental Non-immigrant

5  Visa Application to the United States Government at the United States Embassy in Riyadh,

6  Kingdom of Saudi Arabia, which DOS Form DS-157 was attached to the original DOS Form

7  DS-156 submitted on January 14, 2002.  Section 13 of the DOS Form DS-157 required the

8  applicant to "[l]ist all Professional, Social, Charitable Organizations to Which You Belong

9  (Belonged) or Contribute (Contributed) or with Which You Work (Have Worked)."  AL-

10  HUSSAYEN listed "ACM & IEEE."  ("ACM" stands for the Association for Computive

11  Machinery, and "IEEE" stands for the Institute of Electrical and Electronic Engineers.)  AL-

12  HUSSAYEN listed no other affiliations. AL-HUSSAYEN falsely and intentionally did not

13  list the Islamic Assembly of North America (hereafter the IANA) and other entities.  (See

14  Counts Seven and Eight hereafter.)

15      13.   On or about March 19, 2002, the University of Idaho provided an INS Form I-20

16  for AL-HUSSAYEN "for Continued attendance at this school" and to "correct birth-date."

17  On or about April 6, 2002, AL-HUSSAYEN signed the Student Certification of the INS Form

18  I-20 at section eleven, which stated in pertinent part:

19      I have read and agreed to comply with the terms and conditions of my admission. . . .
        I certify that all information provided on this form refers specifically to me and is true
20      and correct to the best of my knowledge.  I certify that I seek to enter or remain in the
        United States temporarily, and solely for the purpose of pursuing a full course of
21      study at [the University of Idaho].  I also authorize the named school to release any
        information from my records which is needed. [Emphasis added.]
22

23  AL-HUSSAYEN falsely made the certification, knowing of his internet and business

24  activities alleged hereafter.  On or about the same day of April 6, 2002, AL-HUSSAYEN

25  formally submitted the INS Form I-20 dated April 6, 2002, to the United States Government

26  at the United States Embassy in Riyadh, Kingdom of Saudi Arabia, and the United States

27  Government issued AL-HUSSAYEN an F-1 student visa in direct reliance upon AL-

28

                                          5

HUSSAYEN's certifications on the DOS Form DS-156 dated January 14, 2002, and attached DOS Form DS-157, together with the INS Form I-20 dated April 6, 2002. (See Counts Nine and Ten hereafter.)

14.     On or about May 9, 2002, AL-HUSSAYEN was admitted by the United States Government into the United States at the John F. Kennedy International Airport in New York City, New York, as an F-1 student by virtue of the F-1 student visa issued April 6, 2002, and in direct reliance upon AL-HUSSAYEN'S certifications on the DOS Form DS-156 dated January 14, 2002, and attached DOS Form DS-157, together with the INS Form I-20 dated April 6, 2002. During the admission at the John F. Kennedy International Airport, AL-HUSSAYEN was inspected by INS and Customs officials. During the inspections, the INS Form I-20 dated April 6, 2002, was photocopied by the Customs officials, with the Customs officials retaining the copy and the original being returned to AL-HUSSAYEN. (See Count Eleven hereafter.)

### The Web-site Activities

15.     From at least October 2, 1998, until the date of this Indictment, AL-HUSSAYEN engaged in computer web-site activities that exceeded his course of study at the University of Idaho. These activities included expert computer services, advice, assistance and support to organizations and individuals, including the IANA, in the form of web-site registration, management, administration and maintenance. A number of those web-sites accommodated materials that both advocated violence against the United States.

16.     The IANA was incorporated in 1993 in Colorado as a non-profit, charitable organization. It maintained offices in Ann Arbor, Michigan. Its official mission statement was that of *Da'wa*: the proselytizing and spreading the word of Islam. The IANA did this, in part, by providing a number of media outlets as vehicles for advocating Islam, such as internet web-sites with "bulletin boards," internet magazines, toll-free telephone lines, and audio ("radio.net") services. The IANA solicited and received donations of monies both from within the United States and without. The IANA also hosted regular Islamic

6

conferences in the United States, with participation by individuals affiliated with other charitable organizations also located within the United States.

17.   AL-HUSSAYEN was the formal registered agent for the IANA in Idaho (since May 11, 2001) and a business associate of the IANA in its purpose of *Da'wa* (proselytizing), which included the web-site dissemination of radical Islamic ideology the purpose of which was indoctrination, recruitment of members, and the instigation of acts of violence and terrorism.

18.   AL-HUSSAYEN was either the registrant or the administrative contact for a number of internet web-sites which either belonged to or were linked to the IANA.  A number of said IANA-related web-sites were registered to AL-HUSSAYEN directly, to the IANA or to Dar Al-Asr, a Saudi Arabian company that provided web hostings on the internet.  AL-HUSSAYEN registered web-sites on behalf of Dar Al-Asr, identifying himself as the administrative point of contact for Dar Al-Asr and giving his Moscow, Idaho street address and University of Idaho e-mail address for reference.

19.   Of the afore-referenced web-sites, AL-HUSSAYEN was the sole registrant of web-sites www.alasr.ws (created September 11, 2000), www.cybermsa.org (created March 15, 2001) and www.liveislam.net (created July 8, 2002).  Web-sites www.alasr.net (created August 15, 1999), www.almawred.com (created November 1, 1999) and www.heejrah.com (February 22, 2000) were registered to Dar Al-Asr, with AL-HUSSAYEN as the administrative contact person.  Web-site www.almanar.net (created October 2, 1998) was registered to Al-Manar Al-Jadeed Magazine, with AL-HUSSAYEN as the administrative contact person.  Iananet.org (created August 11, 1995) was registered to IANA and designed and maintained by the web-site entity Dar Al-Asr.  Ianaradionet.com (created May 25, 1999) was registered to IANA, with AL-HUSSAYEN as the head of its supervisory committee and member of its technical committee.  Islamway.com (created August 18, 1998) was registered to IANA, with direct links to AL-HUSSAYEN's web-sites, including www.alasr.ws and www.cybersma.org.  The registration of web-sites www.alhawali.org and www.alhawali.com

7

1   (both created November 18, 2000) referenced Al-Asr and AL-HUSSAYEN, with AL-

2   HUSSAYEN as the administrative contact for www.alhawali.com. These two web-sites

3   corresponded to a radical sheikh referenced in paragraph 21 hereafter. Web-site

4   www.islamtoday.net (created March 17, 2000) was related to a radical sheikh also referenced

5   in paragraph 21 hereafter and posted articles to some of the Dar Al-Asr and AL-HUSSAYEN

6   web-sites.

7       20.   One of the afore-referenced web-sites registered by AL-HUSSAYEN was

8   www.alasr.ws. On September 11, 2000, AL-HUSSAYEN registered the www.alasr.ws web-

9   site. In about June of 2001, an article entitled "Provision of Suicide Operations" was

10   published on the internet magazine of the website www.alasr.ws. The article was written by

11   a radical Saudi sheikh. A portion of the article read as follows:

12       The second part is the rule that the *Mujahid* (warrior) must kill himself if he knows

13       that this will lead to killing a great number of the enemies, and that he will not be able

14       to kill them without killing himself first, or demolishing a center vital to the enemy or

         its military force, and so on. This is not possible except by involving the human

15       element in the operation. In this new era, this can be accomplished with the modern

         means of bombing or **bringing down an airplane on an important location that will**

16       cause the enemy great losses. [Emphasis added.]

17       21.   Www.alasr.ws and other web-sites registered or linked to, or technically advised

18   by AL-HUSSAYEN, including www.islamway.com (previously mentioned), also posted

19   other violent *jihad* (holy war)-related messages by other radical sheikhs, including those

     referenced in preceding paragraph 19.

20   **Financial and Business Activities**

21       22.   From on or about August 17, 1994, until the date of this Indictment, AL-

22   HUSSAYEN, at various times, maintained at least six United States bank accounts in Indiana,

23   Texas, Idaho and Michigan. From at least January 23, 1997, until the date of this Indictment,

24   AL-HUSSAYEN used said bank accounts to receive large sums of monies from within and

25   without the United States, and to transfer and cause to be transferred large sums of monies to

26   the IANA and other organizations and individuals.

27

28                                            8

23. From at least January 23, 1997, until the date of this Indictment, AL-HUSSAYEN received into and disbursed out of his bank accounts approximately $300,000.00 in excess of the university study-related funds he received during the same period of time, such as the monthly stipend he was given by the Saudi Arabian Government, and the living expenses that corresponded thereto. These excess funds included $49,992.00 paid to AL-HUSSAYEN on September 10, 1998, and $49,985.00 paid to him on September 25, 1998.

24. From at least November 16, 1999, to the date of this Indictment, AL-HUSSAYEN made disbursements of the excess funds referenced in the preceding paragraph to the IANA and to the IANA's officers, including a leading official of the IANA. A portion of these funds was used to pay operating expenses of the IANA, including salaries of IANA employees. Furthermore, in 1999, 2000 and 2001 wire transfers were made from AL-HUSSAYEN to individuals in Cairo, Egypt; Montreal, Canada; Riyadh, Kingdom of Saudi Arabia; Amman, Jordan; and Islamabad, Pakistan. AL-HUSSAYEN also made disbursements to other organizations and individuals associated therewith during the time referenced in this paragraph.

25. From at least November 16, 1999, to the date of this Indictment, AL-HUSSAYEN maintained frequent business contact with the leading IANA official referenced above. Not only did AL-HUSSAYEN disburse money directly to the official in the form of wire transfers and personal checks, their relationship also included the maintenance of a checking account in a Michigan bank in AL-HUSSAYEN's name alone, but with the official's home address and the official's apparently exclusive use of the account. Among the deposits into the account was a $4,000.00 wire transfer from AL-HUSSAYEN, 311 Sweet Avenue, Apt 6, Moscow, Idaho, to AL-HUSSAYEN, 219 Fieldcrest Street, Ann Arbor, Michigan. In addition, numerous telephone calls between AL-HUSSAYEN and the official were made during the time referenced in this paragraph.

9

26.    From at least March of 1995 until about February of 2002, the IANA received into its bank accounts approximately three million dollars ($3,000,000.00), including the funds received from AL-HUSSAYEN as referenced above, and disbursed approximately the same amount.  The deposits included a three hundred thousand dollar ($300,000.00) transfer from a Swiss bank account on or about May 14, 1998.

27.    From about December of 1994 to about July of 2002, AL-HUSSAYEN traveled and otherwise funded travel for other individuals, including travel related to the IANA, through AL-HUSSAYEN's bank accounts and to locations in numerous states, as well as foreign countries.

28.    From at least January 1, 1997, until on or about August 28, 2002, telephones corresponding to AL-HUSSAYEN had contact with telephones subscribed to individuals or entities in numerous states, as well as foreign countries.   Subscribers corresponding to or associated with some of the numbers included the IANA and the source of the $49,992.00 and $49,985.00 transfers previously referenced paragraph 23.

## THE VIOLATIONS

In material reliance upon the information contained in the INS I-20 forms and the DOS Forms DS-156 and DS-157 as heretofore referenced, the United States Government issued AL-HUSSAYEN F-1 student visas and allowed him to enter and remain in the United States. However, AL-HUSSAYEN entered into and remained in the United States for purposes other than that of solely pursuing his studies, including, but not limited to, material support of the IANA and others by means of his web-site and business activities, and knowingly and wilfully made false statements and omissions to the authorities of the United States in relation thereto. By not truthfully stating and revealing the nature and extent of his activities and affiliations in the United States, AL-HUSSAYEN thereby deprived the authorities of the United States of the knowledge thereof and the opportunity to evaluate and address the same within the context of the laws of the United States, resulting in felony violations by the Defendant, SAMI OMAR AL-HUSSAYEN, consisting of Counts One through Eleven.

10

COUNT ONE
## FALSE STATEMENT TO THE UNITED STATES
(Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See previous paragraphs 5 and 6.)


COUNT TWO
## VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, until the date of this Indictment, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration

11

laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238. (See previous paragraphs 5 and 6.)

### COUNT THREE
### VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3237)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about August 11, 1999, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States, (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and claim, in that SAMI OMAR AL-HUSSAYEN, in entering into the United States, presented to United States Government authorities a student visa procured by means of a false statement and claim and other document containing such false statement and claim; in violation of Title 18, United States Code, Sections 1546(a) and 3237. (See previous paragraphs 5 through 7.)

12

**COUNT FOUR**
**FALSE STATEMENT TO THE UNITED STATES**
(Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 7, 2000, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See previous paragraph 8.)

**COUNT FIVE**
**VISA FRAUD**
(Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 7, 2000, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the

13

1  United States and (2) knowingly presented such application and other document required by

2  the immigration laws and regulations of the United States which contained a materially false

3  statement, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student

4  visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby

5  knowingly and willfully representing to United States Government authorities that he sought

6  to enter into the United States for the sole purpose of pursuing a full course of study at the

7  University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was

8  and would be engaged in activities other than his course of study at the University of Idaho,

9  including, but not limited to, his involvement with the Islamic Assembly of North America;

10  in violation of Title 18, United States Code, Sections 1546(a) and 3238.  (See previous

11  paragraph 8.)

12

13
COUNT SIX
VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3237)

14

15  The previous numbered paragraphs one through twenty-eight are hereby re-alleged as

16  though set forth in full herein.

17  On or about August 25, 2000, within and as the same pertains to the District of Idaho,

18  SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and

19  subscribed as true to the United States a false statement with respect to a material fact in an

20  application and other document required by the immigration laws and regulations of the

21  United States, (2) knowingly presented such application and other document required by the

22  immigration laws and regulations of the United States which contained a materially false

23  statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and

24  claim, in that SAMI OMAR AL-HUSSAYEN, in entering into the United States, presented

25  to United States Government authorities a student visa procured by means of a false statement

26  and claim and other document containing such false statement and claim; in violation of Title

27  18, United States Code, Sections 1546(a) and 3237.  (See previous paragraphs 8 and 9.)

28

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT SEVEN
## FALSE STATEMENT TO THE UNITED STATES
### (Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about January 14, 2002, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted Department of State (DOS) form DS-156 and form DS-157, thereby knowingly and wilfully failing and refusing to inform United States Government authorities of his involvement with the Islamic Assembly of North America and other entities; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See previous paragraphs 10 through 12.)

## COUNT EIGHT
## VISA FRAUD
### (Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about January 14, 2002, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student

15

1  visa, signed and submitted Department of State (DOS) form DS-156 and form DS-157,

2  thereby knowingly and wilfully failing and refusing to inform United States Government

3  authorities of his involvement with the Islamic Assembly of North America and other entities;

4  in violation of Title 18, United States Code, Sections 1546(a) and 3238.  (See previous

5  paragraphs 10 through 12.)

6

7                              COUNT NINE
8              FALSE STATEMENT TO THE UNITED STATES
                 (Violation 18 U.S.C. 1001(a)(2) and 3238)
9      The previous numbered paragraphs one through twenty-eight are hereby re-alleged as

10  though set forth in full herein.

11     On or about April 6, 2002, within and as the same pertains to the District of Idaho,

12  SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the

13  Executive Branch of the United States Government, knowingly and wilfully made a

14  materially false, fictitious and fraudulent statement and representation to authorities of the

15  United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in

16  the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a

17  student visa, signed and submitted an Immigration and Naturalization (INS) form I-20,

18  thereby knowingly and wilfully representing to United States Government authorities that he

19  sought to enter into the United States for the sole purpose of pursuing a full course of study at

20  the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been,

21  was and would be engaged in activities other than his course of study at the University of

22  Idaho, including, but not limited to, his involvement with the Islamic Assembly of North

23  America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.  (See

24  previous paragraphs 10 through 13.)

25

26

27

28
                                       16

1
2

COUNT TEN
VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3238)

3       The previous numbered paragraphs one through twenty-eight are hereby re-alleged as
4  though set forth in full herein.

5       On or about April 6, 2002, within and as the same pertains to the District of Idaho,
6  SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and
7  subscribed as true to the United States a false statement with respect to a material fact in an
8  application and other document required by the immigration laws and regulations of the
9  United States and (2) knowingly presented such application and other document required by
10 the immigration laws and regulations of the United States which contained a materially false
11 statement, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student
12 visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby
13 knowingly and willfully representing to United States Government authorities that he sought
14 to enter into the United States for the sole purpose of pursuing a full course of study at the
15 University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was
16 and would be engaged in activities other than his course of study at the University of Idaho,
17 including, but not limited to, his involvement with the Islamic Assembly of North America;
18 in violation of Title 18, United States Code, Sections 1546(a) and 3238.  (See previous
19 paragraphs 10 through 13.)

20
21
22

COUNT ELEVEN
VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3237)

23      The previous numbered paragraphs one through twenty-eight are hereby re-alleged as
24 though set forth in full herein.

25      On or about May 9, 2002, within and as the same pertains to the District of Idaho,
26 SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and
27 subscribed as true to the United States a false statement with respect to a material fact in an

28

17

1 application and other document required by the immigration laws and regulations of the

2 United States, (2) knowingly presented such application and other document required by the

3 immigration laws and regulations of the United States which contained a materially false

4 statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and

5 claim, in that SAMI OMAR AL-HUSSAYEN, in entering into the United States, presented

6 to United States Government authorities a student visa procured by means of a false statement

7 and claim and other document containing such false statement and claim; in violation of Title

8 18, United States Code, Sections 1546(a) and 3237.  (See previous paragraphs 10 through 14.)

9

10 Dated this ___13th___ day of ~~January~~ February, 2003.

11

12                                             A TRUE BILL

13

14

15                                             FOREPERSON

16

17

18 THOMAS E. MOSS
   UNITED STATES ATTORNEY

19

20

   KIM R. LINDQUIST
21 Assistant United States Attorney

22

23

   TERRY L. DERDEN
24 First Assistant United States Attorney
   Chief, Criminal Section

25

26

27

28                          18