# EXHIBIT "C"

# PART 2 OF 6

EXHIBIT B

1

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION

```
UNITED STATES,                .    Case No. CR03-48-N
                              .
        Plaintiff,            .
                              .    Boise, Idaho
        vs.                   .    March 11, 2003
                              .    10:15 a.m.
SAMI OMAR AL-HUSSAYEN,        .
                              .  (Testimony of Michael Gneckow)
        Defendant.            .
                              .
. . . . . . . . . . . . . . . .
```

VOLUME I OF II
DETENTION HEARING
BEFORE THE HONORABLE MIKEL H. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

```
APPEARANCES:
For the Plaintiff:           MR. KIM R. LINDQUIST
                             MR. TERRY DERDEN
                             MS. STEPHANIE PELL
                             United States Attorney's Office
                             877 West Main Street, Suite 201
                             Boise, Idaho  83702

For the Defendant:           MR. DAVID Z. NEVIN
                             MR. SCOTT MCKAY
                             Nevin, Herzfeld, Benjamin & McKay
                             P.O. Box 2772
                             Boise, Idaho  83701


COURT RECORDER:              TRANSCRIPTION BY:

Verlene Nelson              CANYON TRANSCRIPTION
U.S. District Court        P.O. Box 387
                           Caldwell, Idaho  83606
```

Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

2

Exhibit B.txt

I N D E X

GOVERNMENT WITNESS:                          PAGE    LINE

        GNECKOW, Michael James
Direct Examination by Mr. Lindquist            3      11
Cross-Examination by Mr. Nevin               134      14


E X H I B I T S

GOVERNMENT EXHIBITS:                         PAGE    LINE

GX 3 - List of Web Sites
     Admitted                                 37       6

GX 4 - Synopsis of Events
     Admitted                                122      18

GX 5 through 15 - Photographs
     Admitted                                 50       7

GX 14 - Photograph
     Withdrawn                                52       7

GX 16 through 94 - Photographs
     and Graphic Images
     Admitted                                 65      15

DEFENDANT'S EXHIBITS:

DX A, B, C - Articles of
     "Seattle PI"
     Admitted                                 --      --

DX E - Letter of Muslim
     Student Association
     Admitted                                185      15

3

```
                           Exhibit B.txt
 1                    (Proceedings in progress.)
 2              MR. LINDQUIST:  And with that, Your Honor, we would
 3    have Michael Gneckow testify.
 4              COURT:  Come forward and be sworn.
 5                   (MICHAEL JAMES GNECKOW is sworn.)
 6              CLERK: State your full name and spell your last name.
 7              WITNESS:  Full name is Michael James Gneckow.  The
 8    last name is spelled G-n-e-c-k-o-w.
 9              COURT:  You may proceed.
10              MR. LINDQUIST:  Thank you.
11                             DIRECT EXAMINATION
12    QUESTIONS BY MR. LINDQUIST:
13    Q.  You are a special agent with the FBI; is that correct?
14    A.  That is correct, sir.
15    Q.  And have been for how many years?
16    A.  For almost seven years, sir.
17    Q.  And your present duty station is where?
18    A.  The Coeur d'Alene, Idaho Resident Agency.
19    Q.  Can you give us an idea of just generally and briefly what
20    your present responsibilities are there?
21    A.  As special agent in the Coeur d'Alene RA, I'm also assigned
22    to the Inland Northwest Joint Terrorism Task Force.  My
23    responsibility is to investigate crimes that deal with both
24    domestic and international terrorism as well as other felony
25    crimes under Title 18.
```

```
 1    Q.  We'll chat here in a moment about the international
 2    terrorism aspect of your responsibilities but first, prior to
```

Exhibit B.txt

3  becoming an FBI agent, were you a police officer?

4  A.  No, sir, but I was in federal law enforcement for

5  approximately ten years.

6  Q.  How so?

7  A.  I was a special agent with the Naval Criminal Investigative

8  Service and was assigned to various offices around the world.

9  Q.  Can you give us an idea of what you did in that capacity?

10  A.  As a special agent with the Naval Criminal Investigative

11  Service, it was my responsibility to investigate felony crimes

12  as they relate to Department of Navy personnel.

13  Q.  Did that also have to do with international terrorism at

14  times?

15  A.  Yes, sir, it did.  A large portion of what the Naval

16  Criminal Investigative Service does is deal with force

17  protection issues overseas, investigation of counter-

18  intelligence and international terrorism matters.

19  Q.  With that background, let's talk a bit about international

20  terrorism.  Of course the charges in this case relate to visa

21  fraud and false statements; is that correct?

22  A.  That is correct.

23  Q.  But your understanding is those charges are made within the

24  context of international terrorism; is that right?

25          MR. NEVIN:  I object to misleading.

                                                              5

1          COURT:  I'll overrule the objection at this point for

2  foundation purposes.

3          WITNESS:  The question again, please?

                        Page 4

Exhibit B.txt

4   BY MR. LINDQUIST:

5   Q.  Those charges are made within the context of international

6   terrorism; is that correct?

7   A.  That is correct, sir.

8   Q.  Can you give us an idea just the concept of international

9   terrorism?  What does it mean from your perspective given what

10  you've told us about your duties?

11  A.  Well, international terrorism and terrorism in general is

12  generally used as a political tool used by organizations or

13  individuals in order to pursue or foster their own political

14  agenda.

15  Q.  Is this -- I'm sorry.

16  A.  I'm sorry.  Using terror as a political weapon.

17  Q.  And does that terror necessarily include violence?

18  A.  Yes, sir.  Well, not necessarily includes violence but most

19  times it does.

20  Q.  Are you familiar with the term "stateless nation" with

21  regard to terrorism?

22  A.  Yes, sir, I am.

23  Q.  What does that mean?

24          MR. NEVIN:  Judge, I'll object to the relevance of

25  this.

□

6

1          COURT:  Response?

2          MR. LINDQUIST:  The relevance is the -- as I've stated

3   and as Agent Gneckow has testified is that these charges were

4   made within the context of international terrorism.  We're

5   laying the foundation for that and it is particularly pertinent

Page 5

Exhibit B.txt

6    for this Court's determination of whether or not the defendant

7    should be released pending trial.

8           COURT:  I'll overrule the objection.

9           WITNESS:  A stateless nation is a term that is

10   frequently used with international terrorism organizations.

11   The reason for that is because, most frequently, terrorist

12   organizations are not bound within the context of a regular

13   country or nation as we know it.  Rather international

14   terrorist organizations is generally made up from individuals

15   from various nations, from various countries and nationalities.

16   Therefore, the term "stateless nation" is in reference to a

17   group or rather organization that makes up the terrorist

18   organization itself.

19   BY MR. LINDQUIST:

20   Q.  Does international terrorism as you've described it have a

21   philosophical basis?

22   A.  Yes, it does.

23   Q.  Generally speaking, what is that philosophical basis as it

24   exists currently?

25   A.  Well, philosophically, I suppose the international

                                                                    7

1    terrorism attempts to pursue through its own means pushing its

2    political or philosophical agenda where frequently you have a

3    clash of cultures and philosophies will frequently clash as

4    well and many times terrorism or terrorist acts are in

5    furtherance of a certain philosophy.

6    Q.  And in this particular case, does that have anything to do

                                  Page 6

Exhibit B.txt

7   with the religion of Islam?

8   A.  Yes, it does.

9   Q.  How so?

10  A.  When we talk about the religion of Islam in the context of

11  international terrorism, it's important to note that we're not

12  talking about anything other than a very strict minority; a

13  minority of extremists that use the religion of Islam as a

14  rationale for their terrorist activities.

15  Q.  And does that radical Islam have any particular perception

16  of the west, particularly the United States?

17  A.  Yes, it does.

18  Q.  What is that?

19  A.  Radical Islam, that espoused by the extremist factions of

20  Islam, view the United States and the west in general as a

21  threat to their own culture.  Any presence of the west,

22  particularly in the form of military troops, military presence

23  is perceived as being against the extremist tenets of Islam.

24  Q.  As a nation, albeit without geographical boundaries,

25  stateless if you will, is there nonetheless a need for members

8

1   or a reality of having members of that issue (inaudible)?

2   A.  Yes, absolutely.

3   Q.  And is there also an aspect -- a financial aspect to it?

4   A.  Yes, most definitely.

5   Q.  How so?

6   A.  As with any organization, any country, any nation, it has

7   to have finances.  It has to have infrastructure in order to

8   operate.

Exhibit B.txt

9   Q.  Okay.  Are there organizational needs?

10  A.  Yes.

11  Q.  How so?

12  A.  Well, it's necessary for there to be at least a hierarchy.

13  There needs to be members.  There needs to be infrastructure.

14  There needs to be leadership.  So just like with a regular

15  country itself, there has to have -- there has to be a certain

16  hierarchy, communications, logistics.  Just a regular

17  infrastructure of any sort of organization.

18  Q.  Does recruitment of constituents or members play a role in

19  that phenomenon?

20  A.  Most importantly.  As a stateless nation with no actual

21  borders, with no actual civilian population to recruit from,

22  recruitment -- the recruitment tool or the recruitment methods

23  used are extremely important because this organization has to

24  draw new members from a variety of different nationalities,

25  from a variety of different areas.  So recruitment is most

9

1   definitely an important aspect of that.

2   Q.  Is education and indoctrination an aspect of that

3   recruitment?

4   A.  Yes.

5   Q.  How so?

6   A.  It's important in the recruitment phase for an organization

7   for that organization or that stateless nation to educate

8   prospective recruits.  Generally young -- young men, young

9   persons to educate them as to the ideals of the movement and

Page 8

Exhibit B.txt

10   then once they're educated, then to further indoctrinate those

11   prospective recruits.

12   Q.  Is organization of those recruits also a factor?

13   A.  Yes, it is.

14   Q.  Motivation of them?

15   A.  Yes, most definitely.

16   Q.  And as far as any particular activities, instruction and

17   direction, is that also part of that phenomenon that you're

18   addressing?

19   A.  Yes.

20   Q.  Generally speaking, do computers play a role in what you've

21   just been talking about?

22   A.  Computers play an amazingly important role.  In today's --

23   in today's day and age with technology the way that it is,

24   communication is just so vastly important.  The world --

25   computers and the internet specifically have allowed the world

10

1   to essentially be shrunken down to much smaller than it ever

2   was and the internet allows everyone, including terrorist

3   organizations, to be able to communicate to the widest audience

4   possible.

5   Q.  So generally speaking, it is therefore a mechanism of

6   recruitment and indoctrination; is that correct?

7   A.  Yes, it is.

8   Q.  And motivation and direction as far as activities

9   associated with that indoctrination?

10   A.  Yes, sir.

11   Q.  Talking about that infrastructure associated with

Page 9

Exhibit B.txt

12  international terrorism, does that relate to the infrastructure

13  of the United States in any way?

14  A.  It does.  I believe that the infrastructure of the United

15  States provides a great forum for organizations to come to our

16  country, to take advantage of our rules, our civil liberties

17  and to be able to recruit completely unimpeded.  Many of the

18  countries that members of terrorist organizations belong to are

19  often times oppressive and being able to get out and exercise

20  sessions where lectures can be shared, sometimes very violent

21  lectures would not be tolerated in many other countries.  Our

22  country does allow that to take place.

23  Q.  That international terrorist infrastructure then utilizes

24  the U.S. infrastructure; is that right?

25  A.  Yes, it does.

11

1  Q.  Is there a money aspect of that?

2  A.  Most definitely.

3  Q.  How so?

4  A.  The United States is a very affluent country and most

5  citizens in the United States want to provide donations.  They

6  want to support worthy causes.  It's a terrific forum for

7  organizations to come to the United States, solicit donations

8  that are ostensibly portrayed as being for good causes when in

9  many cases, that's not the case.

10  Q.  Well, let's talk about that.  Do these particular entities

11  have a generic name?

12  A.  Probably the most common form that these entities take is

Exhibit B.txt

13   in the form of charitable organizations.

14   Q.  By -- what do you mean by a charitable organization within

15   the context of what you're testifying to?

16   A.  Well, charitable organizations are nonprofit organizations

17   that purport to solicit funds, solicit donations and then in

18   turn provide some sort of service to the community at large, to

19   the world at large, whether that be in the form of feeding the

20   hungry, sheltering the homeless or providing any sort of

21   support, whether that be religious, cultural and so forth.

22   Q.  From the standpoint of international terrorism, however,

23   are those charitable organizations based upon your experience

24   sometimes used otherwise?

25   A.  Yes.

12

1    Q.  How?

2    A.  What we have discovered through lengthy investigations is

3    that in many cases, these charitable organizations do provide a

4    service worldwide.  They do clothe and feed and shelter but

5    we've also found that portions of the money that the donors

6    intend for the purposes that I've just stated are actually

7    siphoned off to more diabolical sort of ends.

8    Q.  That relates to international terrorism directly; is that

9    correct?

10   A.  That is correct.

11   Q.  And you will be testifying to us today about several of

12   those organizations within the context of this case; is that

13   right?

14   A.  Yes, sir.

Page 11

Exhibit B.txt

15  Q.  Universities.  Do universities factor into the utilization
16  by international terrorism of the U.S. infrastructure?
17  A.  That is correct.
18  Q.  Based upon your experience generally speaking, how is that
19  so?
20  A.  Universities are -- there's a couple of ways that
21  universities are actually utilized.  One is that in my
22  discussions with fellow agents from the INS, the Immigration
23  and Naturalization Service, I've learned that perhaps the most
24  easy way to gain access and protracted stays in the United
25  States is through the receipt of student visas -- F-1 student

13

1  visas.
2       Universities are also a wonderful environment, based
3  on the academics that are shared there, for foreign nationals,
4  including those tied to terrorism, to come and learn from some
5  of our best instructors, some of our best professors some
6  highly technological sort of fields and many of those
7  potentially can be used against us.
8  Q.  You've already mentioned computer technology generally with
9  regard to international terrorism.  Does that also factor
10 specifically into international terrorism's utilization of the
11 American infrastructure?
12 A.  Most definitely.
13 Q.  How is that?
14 A.  And this goes back to our discussion a few moments ago
15 about the computers and the use of the internet by

Page 12

Exhibit B.txt

16 organizations including terrorist organizations.  The computer
17 is not only a vehicle for massive communication but it's also
18 potentially a weapon.  And terrorist organizations recognize
19 that and are -- it's an important facet of their education to
20 be able to learn computer expertise, to maintain web sites, to
21 be able to maintain this infrastructure of communication world
22 wide.
23 Q.  And this particular case, as you will testify to, addresses
24 some of those issues specifically, universities, charitable
25 organizations and computer technology within the context of

14

1 terrorism; is that right?
2 A.  Yes, sir.
3 Q.  Let's talk about a particular aspect of international
4 terrorism.  Are you familiar with the term Al Quaida?
5 A.  Yes, sir, I am.
6 Q.  What does Al Quaida refer to?
7 A.  Al Quaida is a well known international terrorist
8 organization who's -- they're -- the person they look to for
9 leadership is embodied in the form of Usama Bin Laden.  It was
10 something that was created more or less in 1988 as a result
11 of -- in the aftermath let's say of the Russian invasion of
12 Afghanistan.
13 Q.  And so Usama Bin Laden played a particular role in its
14 creation; is that correct?
15 A.  Yes, he did.  He and others.
16 Q.  And others; is that right?
17 A.  That is correct.

Page 13

Exhibit B.txt

18  Q.  In addition to some that you will be testifying about in

19  this particular case, in particular two radical Saudi sheikhs;

20  is that correct?

21  A.  That's correct, sir.

22  Q.  And their names are?

23  A.  Their names are Salman Al-Ouda and Safar Al-Hawali.

24  Q.  Can you give us an idea of in recent history some violent

25  events associated with Al Quaida, conducted by Al Quaida if you

15

1  will?

2  A.  Yes, sir.

3       MR. NEVIN:  I object to the relevance.  We're not

4  going to hear that Sami has had contact with Mr. Usama Bin

5  Laden or that he supports his beliefs or any of it.  It's

6  surely to sensationalize the situation.  It's not relevant to

7  this detention hearing.

8       COURT:  Response?

9       MR. LINDQUIST:  Counsel errs.  There will be testimony

10  that the defendant has direct contact with individuals directly

11  associated with Mr. Bin Laden and does espouse and support Mr.

12  Bin Laden's beliefs and activities.  There will be evidence of

13  that.

14       COURT:  All right.  I'll overrule the objection at

15  this time. (Inaudible) I'm assuming all this information now is

16  general background information in the broadest context.  It

17  will be up to the Government through the presentation of their

18  evidence today to show a connection between the broad

Exhibit B.txt

19    principles or things going on and tie into whether or not this

20    defendant either is a danger to the community or constitutes a

21    risk of flight.  There will have to be that tie made, that

22    evidence presented.

23        MR. LINDQUIST:  Very well.

24        COURT:  With that caveat, I'll overrule the objection.

25        MR. LINDQUIST:  Thank you.


 

16


1    BY MR. LINDQUIST:

2    Q.  Let's just mention briefly some of the incidents associated

3    with Al Quaida.

4    A.  The most recent incidence -- and please keep in mind there

5    are many incidents.  In August of 1998, Al Quaida was

6    responsible and claimed responsibility for the bombings of the

7    U.S. embassies in Kenya and Tanzania. In October of 2000, the

8    USS Cole was attacked by a small boat laden with explosives.

9    Again, Al Quaida took responsibility for that attack and of

10   course most recently as most people remember, there were the

11   attacks of September 11, 2001 on the World Trade Center and the

12   Pentagon.

13   Q.  What is Jihad in relation to what you're testifying to now?

14   A.  Well, the Jihad that I am going to refer to and it takes

15   many forms is armed Jihad and that is violence against those

16   who are enemies of Islam.

17   Q.  And does that relate to Al Quaida?

18   A.  Yes, it does.

19   Q.  How just briefly?

20   A.  Al Quaida promotes, supports -- supports in the form of

Page 15

Exhibit B.txt

21  training, logistical support, et cetera, armed Jihad against

22  those who it perceives as being enemies of Islam.

23  Q.  Agent Gneckow, you've talked about the infrastructure of

24  international terrorism, Mr. Bin Laden as a leadership

25  component of that.  With regard to the search warrant affidavit

☐

17

1  I mentioned earlier, you heard me mention that, correct?

2  A.  Yes, I did.

3  Q.  Are you familiar with that search warrant affidavit?

4  A.  Yes, I am.

5  Q.  How are you familiar with it?

6  A.  I was principally responsible for preparing the affidavit

7  although I was not the affiant on it.

8  Q.  And for logistical reasons, you were not the affiant

9  presented directly to the Court but you in effect were the --

10  one of the sources or the authors of that, correct?

11          MR. NEVIN:  Objection.  Misleading.

12          COURT:  I'll overrule the objection for foundation.

13          WITNESS:  That is correct.

14  BY MR. LINDQUIST:

15  Q.  And in that search warrant affidavit, specifically at

16  paragraph 9, you reference statements attributable to Usama Bin

17  Laden as it relates to this Jihad -- the instigation of

18  violence, the international terrorism as it relates to the

19  United States and utilization of its infrastructure; is that

20  correct?

21  A.  That is correct.

Page 16

Exhibit B.txt

22  Q.  And as an aspect of that, there's a component in there that

23  is -- that relates to (inaudible); is that right?

24  A.  Yes.

25  Q.  Explain that very briefly as background for this particular

18

1  statement associated with him.

2  A.  Martyrdom is something that's extremely important.  Suicide

3  operations, for example, are not something that he's done

4  lately.  There are conditions that must be met prior to

5  conducting such an operation and if those conditions are met,

6  then the individual who conducts the suicide operation can

7  achieve martyrdom.  Martyrdom is essentially a better life -- a

8  better life after death.

9  Q.  The quotation attributable to Mr. Bin Laden in paragraph 9

10 of the search warrant affidavit is referred to as his

11 declaration of war; is that correct?

12 A.  That is correct.

13 Q.  And it was found on a web site; is that right?

14     MR. NEVIN:  Object to it as leading.

15     COURT:  I'll overrule the objection for foundation.

16     WITNESS:  Yes.  The affidavit states that it was found

17 on a web site.

18 BY MR. LINDQUIST:

19 Q.  And the quotation attributable to him is recited in full in

20 that paragraph that the Court has; is that right?

21 A.  I'm sorry.  The question again?

22 Q.  That quote that's attributable to him is stated in full in

23 that particular paragraph; is that correct?

Page 17

Exhibit B.txt

24  A.  Actually, I think this is just a portion.

25  Q.  Or a segment of it; is that right?

19

1   A.  A segment, yes.

2   Q.  But it is a full quote of a segment of that declaration of

3   war; is that right?

4   A.  That's correct.

5   Q.  Just synopsize for us, if you will, what it is that Bin

6   Laden is proclaiming here in this declaration of war by means

7   of this web site without taking the time to read it because the

8   Court has the text.  Just synopsize it for purposes of your

9   testimony.

10  A.  Well, essentially, the text is -- is urging on operations

11  by the youths because it states that our youths believe in

12  paradise after death.  This is a component of martyrdom.  He

13  says in here -- it says in here that they will receive a

14  reward.  They will go to heaven, forgiveness for all of

15  their -- all their sins for lack of a better term.

16  Q.  So this is that motivation associated with terrorism?

17         MR. NEVIN:  Object to it as leading.

18         COURT:  Yes.  I'll sustain the objection.  So the

19  record it clear, while I understand that the web sites will be

20  an issue in this hearing, this one is not connected with this

21  defendant; is that correct?

22         MR. LINDQUIST:  Not directly, that is correct.

23         COURT:  All right.

24  BY MR. LINDQUIST:

Exhibit B.txt
25   Q.   Paragraph 10 refers to another web site publication, does

20

1    it not?

2    A.   Yes, it does.

3    Q.   And in that particular publication that's quoted there, one

4    term -- a particular term is used by Bin Laden in relation to

5    terrorism; is that right?

6    A.   That is correct.

7    Q.   What's that term?

8    A.   The term there is instigate and I think that's a very

9    important term used on this --

10   Q.   Why is that important in this context?

11   A.   When we talk about terrorism in a general sense, it's not

12   just one or two individuals out there but rather it is -- it is

13   a large infrastructure; the stateless nation we referred to

14   before.  And an important component of that is the instigation

15   to commit acts.  The instigation to just act by itself which is

16   a component along with the recruitment, the indoctrination, the

17   education and as you proceed down this path, you eventually get

18   to the point where you're instigated to take action.

19   Q.   Paragraph 11 refers to a quote from a "Time" magazine

20   interview with Bin Laden; is that correct?

21   A.   That is correct.

22   Q.   Is also refers to instigation, does it not?

23   A.   Yes, it does.

24   Q.   Just read that bolded portion of that that refers to

25   instigation as it's found down in the affidavit.

Page 19

Exhibit B.txt

⬜

21

```
 1   A.  Well, the bolded portion reads, "If instigation for Jihad
 2   against the Jews and the Americans is considered to be a crime,
 3   then let history be a witness that I am a criminal.  Our job is
 4   to instigate and by the grace of God, we did that and certain
 5   people responded to this instigation."
 6   Q.  Paragraph 12 references what?
 7   A.  Paragraph 12 is the claim of responsibility by Usama Bin
 8   Laden following the September 11 attacks.
 9   Q.  Okay.  And does it bear some relationship to his
10   declaration of war and its reference to motivating youths to
11   perform these acts?
12   A.  Yes, it does.  That seems to be a constant thing in this is
13   the motivation of the youths, those that are being targeted for
14   recruitment.
15   Q.  There is a particular term in that first paragraph that is
16   significant, is it not, with regards to these activities --
17   these violent activities?
18   A.  And you're referring to the term "operations"?
19   Q.  Yes.  Why is that significant?
20   A.  Consistently through much of the literature that we read,
21   much of the investigative efforts that we take, the term
22   "operations" is a consistent -- is a consistent term when we're
23   dealing with violent Jihad.
24   Q.  Is there a connection between -- you've already referenced
25   that there is a connection between Bin Laden and the two
```

Exhibit B.txt

1   radical sheikhs that you've mentioned, Al-Ouda and Al-Hawali;
2   is that correct?
3   A.  That's correct.
4   Q.  Generally speaking, what is that association or what is
5   that connection?
6   A.  Sheikh Al-Hawali and Sheikh Al-Ouda, they were termed in
7   the early 1990's as two of the awakening sheikhs.  They took a
8   very radical stance against the Saudi government, a radical
9   stance against western interests inside Arabia and against the
10  west and the United States in general.  Many of the tenets that
11  they have espoused are the same tenets espoused by Usama Bin
12  Laden and in fact, Usama Bin Laden in many of his publications
13  or interviews makes clear reference to Al-Hawali and Al-Ouda as
14  spiritual leaders of the movement.
15  Q.  As a matter of fact, in Bin Laden's declaration of war,
16  does he not reference both of these two men?
17  A.  Yes, he does.
18  Q.  In what context?
19  A.  At the time of the declaration of war which occurred in
20  August of 1996, both Al-Hawali and Al-Ouda were imprisoned in
21  Saudi Arabia by the Saudi government for the radical preachings
22  against the Saudi government.  Usama Bin Laden frequently took
23  it upon himself to make references to the two sheikhs, Al-Ouda
24  and Al-Hawali demanding their release, making statements about
25  how wrongfully they were imprisoned, things of that nature.

Exhibit B.txt

1   Q.   Is there public source information that indicates that Bin
2   Laden's turning towards violence more prolifically had
3   something to do with Al-Ouda and Al-Hawali?
4   A.   Yes.  There are some academics out there who believe that
5   as a result of the imprisonment of Al-Ouda and Al-Hawali, Usama
6   Bin Laden took a more violent turn.
7   Q.   Historically, have these two radical sheikhs, Al-Hawali and
8   Al-Ouda been outspoken in their proclamations of Jihad,
9   terrorism and violence against the west, particularly the
10  United States?
11  A.   Yes.  In fact, one of the sheikhs even made Jihad -- his
12  violent Jihad statements prior to the Gulf War, circa 1990.
13  Q.   And that was directed directly towards the United States;
14  is that correct?
15  A.   The United States and the west.
16  Q.   And the west.  Do these radical sheikhs talk about
17  martyrdom and suicide operations in conjunction with the
18  message that they proclaim?
19  A.   Frequently.  Many of their statements are very similar in
20  nature to the ones we referred to from Usama Bin Laden.
21  Q.   Do these two sheikhs also utilize web sites in conjunction
22  with their publications and proclamations?
23  A.   Most definitely.
24  Q.   Generally speaking, how so?
25  A.   Both of the sheikhs and others as well utilize the

24

Exhibit B.txt

1  internet, utilize various web sites to preach their form of

2  radical Islam to the widest audience possible.

3  Q.  Now, you mentioned a moment ago that Bin Laden made some

4  statements regarding the release of these two individuals from

5  imprisonment; is that correct?

6  A.  That is correct.

7  Q.  Would you explain that, their imprisonment and how that

8  relates to that statement?

9  A.  There were -- immediately prior and I think this is the

10  answer to your question.  Immediately prior to the embassy

11  bombings in 1998, there were some -- there were three letters

12  that were --

13  Q.  We'll go to that here in just a moment.

14  A.  Okay.

15  Q.  What I'm -- what I'm referring to is the arrest and release

16  of -- these two sheikhs were ultimately arrested; is that

17  correct?

18  A.  Oh, that is correct, yes.

19  Q.  By what authority, what country?

20  A.  They were arrested in 1994 by the Saudi Arabian government.

21  Q.  There are some particular dates associated with that event?

22  A.  Yes, there are.

23  Q.  Tell us about those dates and the significance of them.

24  A.  On September 11, 1994, Sheikh Al-Ouda and possibly Sheikh

25  Al-Hawali -- but definitely Sheikh Al-Ouda was called before

25

1  the Saudi ministry of the interior and was ordered to no longer

2  preach his -- or to no longer continue preaching against the

Page 23

Exhibit B.txt

3   Saudi ruling government.  Al-Ouda refused -- refused to sign a
4   declaration that was provided to him by the ministry and was
5   subsequently arrested as was Al-Hawali.
6   Q.  Approximately how long were the two imprisoned; do you
7   know?
8   A.  I believe they were released in 1999.
9   Q.  You were going to mention something about the embassy
10  bombings that related to these two men; is that correct?
11  A.  That is correct.
12  Q.  What about that?  Tell us about that.
13  A.  Immediately prior to the embassy bombings in 1998, there
14  were three letters that were faxed to three different media
15  outlets in Europe claiming responsibility for the bombings.  In
16  two of the letters, there were specific conditions that were
17  laid out as to how the violence would stop.  One of the
18  conditions -- and it was -- essentially the same condition in
19  each of these two letters called for the release of Sheikh
20  Al-Hawali, Sheikh Al-Ouda and the (inaudible) sheikh imprisoned
21  in the United States for the 1993 World Trade Center bombings.
22  Q.  Was there a similar demand made in conjunction with another
23  bombing in Saudi Arabia?
24  A.  Yes.
25  Q.  Tell us about that bombing briefly and the circumstances

26

1   associated with it.
2   A.  In 1995, there was a bombing of a National Guard armory --
3   or a National Guard facility in Saudi Arabia.  There was a fax

Exhibit B.txt

4   to CNN claiming responsibility for that particular attack and

5   in that attack, it claimed that this act was in retaliation for

6   the imprisonment of Al-Hawali and Al-Ouda.

7   Q.   Another event that I would like you to address regarding a

8   house or a facility associated with Al Quaida, a search of that

9   and things found that related to the Sheikh Al-Ouda.

10  A.   Post 9/11 during a search of a former Bin Laden house in

11  Afghanistan, there were tapes of Sheikh Al-Ouda that were found

12  in the house.

13  Q.   And the tapes dealt with what generally speaking?

14  A.   They were generally motivational speeches, talking about

15  Jihad, talking about -- basically motivational sort of

16  speeches.  Lectures.

17  Q.   All right.  And finally in that regard, you mention that

18  these two sheikhs utilized web sites; is that correct?

19  A.   That is correct.

20  Q.   Are you familiar with a particular interview of Sheikh

21  Al-Ouda by a New York Times correspondent where web sites were

22  specifically discussed?

23  A.   Yes, I am aware of that.

24  Q.   And prior to discussing a web site, give us an idea of the

25  tenor of that interview and what it was that Al-Ouda was

                                                                    27

1   expressing with regard to suicide attacks.

2   A.   Essentially what Al-Ouda was saying during this interview

3   with the New York Times was that suicide operations are

4   acceptable under certain conditions.  The conditions were

5   things to the effect of -- that you're at war, that the attack

                          Page 25

Exhibit B.txt

6    takes place against the enemy, that innocents are not targeted,

7    things like that.  There were a series of conditions that had

8    to be met before a suicide operation was acceptable.

9    Q.  Was there a discussion of the justification of suicide

10   operations philosophically?

11   A.  Yes.

12   Q.  Generally speaking, what was the philosophical

13   justification?

14   A.  Well, the justification to Al-Ouda was suicide operations

15   are fine because this is war.

16   Q.  In particular, internet web site was referenced by Sheikh

17   Al-Ouda in that interview; is that correct?

18   A.  That is correct.

19   Q.  And that web site is what?

20   A.  That web site is Islam Today.

21   Q.  And does that particular web site bear on your

22   investigation of the defendant in this particular case,

23   generally speaking?

24   A.  Yes, it does.

25   Q.  And how so generally speaking does it bear on the

28

1    defendant?

2    A.  Our investigation has looked into numerous web sites that

3    the defendant has been involved in, one of which is Islam

4    Today.

5    Q.  Let's talk about the defendant from a prospective of your

6    investigation and this information is also contained in the

Page 26

Exhibit B.txt

7    affidavit as you know.  The defendant began his studies here in

8    the United States, at least as far as your investigation is

9    concerned, where?

10   A.  He actually began working on his master's degree at Ball

11   State University in Muncie, Indiana on or about August, 1994.

12   Q.  And from there, his studies took him where?

13   A.  He received his master's degree at Ball State.  Returned to

14   Saudi Arabia and a couple years later came back to the United

15   States as a J-1 -- on a J-1 visa which he's got a student visa,

16   an F-1 student visa.  A J-1 visa is an exchange visitor as I

17   understand it from my INS counterparts.  And at that time, he

18   was at Southern Methodist University and was providing -- was

19   acting as a visiting professor I believe, something to that

20   effect.

21   Q.  And that's spelled out in paragraph 16 of that affidavit;

22   is that correct?

23   A.  That is correct.

24   Q.  Ultimately, the defendant ended up at the University of

25   Idaho, correct?


                                                                29


1    A.  That is correct.

2    Q.  How did that come about?

3    A.  The defendant made application to the University of Idaho

4    for acceptance into the Ph.D. program for computer science.

5    Q.  And ultimately began studying there; is that right?

6    A.  That's correct.  In the spring semester of '99 if I

7    remember right.

8    Q.  And information that corresponds to that is found in

                              Page 27

Exhibit B.txt

9    paragraph 17; is that right?

10   A.  That is correct.

11   Q.  Let's talk about the University of Idaho computer program.

12   Have you looked into that as part of your investigation at

13   least to a certain extent?

14   A.  Yes, sir, I have.

15   Q.  First of all, what was the focus of the defendant's

16   doctoral dissertation?

17   A.  The focus is on computer security, intrusion defense

18   methodology, things of that nature.

19   Q.  Generally speaking, what did -- what does the University of

20   Idaho program have to offer as far as advanced computer

21   studies?

22   A.  The University of Idaho was designated by the National

23   Security Agency in 1998 or 1999 as a center for excellence with

24   regard to their computer science program.  They have at least

25   one extremely competent person on their faculty who is renowned

30

1    throughout government circles as being a forefront of computer

2    security, instrusion detection techniques and so on.  And as a

3    result of the University of Idaho's designation as a center for

4    excellence, they were able to apply for and receive grants from

5    the federal government to be part of the federal government's

6    cybercorps program.

7    Q.  And what's the significance of that as far as projects or

8    activities involved in at the University of Idaho?

9    A.  As both a center for excellence and as having cybercorps

Exhibit B.txt

10    program at the university, it enabled the university to work on

11    sensitive sometimes classified projects on behalf of the

12    federal government.

13    Q.  Did your investigation reveal that there were limitations

14    necessarily associated with that?

15    A.  Yes.  The program at the University of Idaho as I

16    understand it has both the CSDS program which is the center

17    for -- I probably don't have the exact name.  But it works

18    alongside with the cybercorps program in essentially teaching

19    students both sets of programs the same methodology with regard

20    to computer security, instrusion detection, et cetera.  The

21    cybercorps portion of the program is a scholarship program that

22    only U.S. citizens can access.  But essentially, they're taught

23    the same thing with the exception of some very sensitive

24    programs.

25    Q.  So as a foreign student, the defendant would not have been

⬜

31

1    able to participate in the cybercorps programs; is that

2    correct?

3    A.  That's not quite correct.  He could not participate in the

4    cybercorps program as far as being a scholarship student and he

5    would not necessarily be able to participate on sensitive

6    programs.  However, other programs with lesser sensitivities

7    could potentially have been accessed by the defendant.

8    Q.  And otherwise was the full breadth and depth of the

9    University of Idaho program available to him?

10    A.  More or less with the exception of the sensitive programs.

11    Q.  And as far as access to those American students that did

Exhibit B.txt

12    participate in those programs -- those sensitive programs,

13    there was nothing to prevent his association with them; is that

14    correct?

15    A.   No.  And in fact my understanding is that they all worked

16    alongside one another anyway.

17    Q.   Did your investigation allow you to become somewhat

18    familiar with the University of Idaho computer network?

19    A.   Yes, it did.

20    Q.   How does that relate to the computer program that Mr.

21    Al-Hussayen participated in?

22    A.   I'm not quite sure I understand.

23    Q.   Does the computer network have something to do with his

24    studies there?

25    A.   Yes.



⬚                                                                    32



1     Q.   How?

2     A.   Although my understanding is that much of his project work

3     was not necessarily tied to the network as a computer science

4     Ph.D. candidate, the network was something I'm sure that he

5     would have access on a routine basis.

6     Q.   Tell us about that network just generally.  An advanced

7     network?

8     A.   Very advanced.

9     Q.   What else can you tell us about it just generally to give

10    us some idea?

11    A.   The University of Idaho network is a very fast, very

12    sophisticated, very powerful network.  It is -- for lack of a

Page 30

Exhibit B.txt

13  better term, it's a back bone of much of the activity that
14  occurs in that area.
15  Q.  And as far as its activity with other networks, what did
16  your investigation reveal?
17  A.  It's directly connected to many of the other very large
18  universities in the northwest.
19  Q.  We'll come back and revisit that area in a moment but in
20  the meantime, let me ask you some questions about another
21  aspect of the affidavit and we're referring specifically to
22  paragraph 29 as a reference for those that have a copy and the
23  defendant's outside activities, if you will, with regard to web
24  site work.  Are you with me?
25  A.  Yes, I am.

33

1   Q.  Can you just give us an idea generally speaking did your
2   investigation show that the defendant -- whether or not the
3   defendant was involved in activities outside of his studies at
4   the University of Idaho that had to do with web sites?
5   A.  Yes.
6   Q.  Generally speaking, what did you find?
7   A.  What we found and we continue to find are extensive ties,
8   extensive links either through as a technical advisor, as the
9   maintainer, as the creator of numerous web sites.
10  Q.  And web sites associated with any particular entities or
11  individuals?
12  A.  Yes.
13  Q.  For example?
14  A.  We have discovered web sites -- multiple web sites that are

Page 31

Exhibit B.txt

15  tied to a charitable organization located in the Detroit,

16  Michigan area.

17  Q.  What is that organization?  What's the name of it?

18  A.  That organization is the Islamic Assembly of North America.

19  Q.  And its acronym is IANA customarily; is that correct?

20  A.  That is correct.

21  Q.  And generally speaking, what did your investigation reveal

22  as far as his web site activities in relation to that charity?

23  A.  Various web sites that we've looked at have the defendant's

24  stamp on them, whether it's in -- whether it was a web site he

25  created, whether it's a web site that he appears on the


[]

34


1   technical advisory committee for, whether -- whether he is a

2   technical advisor.  Numerous web sites to that fashion.

3   Q.  Have you been able to identify all of the web sites that

4   bear his stamp if you will in your opinion?

5   A.  I seriously doubt we've identified all of them.

6   Q.  But you have identified some; is that correct?

7   A.  Yes.

8   Q.  And we'll get to those more in just a moment.  But first of

9   all, let's talk about the Islamic Assembly of North America.

10  Can you tell us a little bit about that and this roughly

11  corresponds to paragraph 30 of the affidavit?

12  A.  Yes.  My understanding is that the Islamic Assembly of

13  North America or IANA was incorporated in 1993 in Colorado.  It

14  is a nonprofit organization and it -- its purported existence,

15  its purported function is that of the spread of Islam or Da'wa.

Exhibit B.txt

16  They use -- they make extensive use of web sites to communicate

17  their messages around the globe.  They solicit donations.  They

18  receive quite a bit of money and another aspect of their

19  function is they generally have an annual conference in which

20  guest speakers are invited, members of other charitable

21  organizations attend and it's generally considered to be a big

22  deal.

23  Q.  Based upon your investigation, can you give us an idea

24  roughly when the investigation shows that the defendant began

25  having these ties with the Islamic Assembly of North America?

                                                              35

1   A.  We have ties based on web site activity that begins right

2   about 1998.  Circa '98 I believe.  And we have other ties to

3   him in other areas, financial, in other ways as well.

4   Q.  At some point in time, did you discover a formal

5   demonstration of his tie to the IANA?

6   A.  As a matter of fact, I did.  We were able to access Idaho

7   Department of State records and discovered that Mr. Al-Hussayen

8   is the registered agent for the IANA in Idaho.

9   Q.  And what was the date associated with that initial

10  registration that you found?

11  A.  That was May 11, 2001.

12  Q.  And has your investigation shown activities attributable to

13  the defendant that seem to be consistent with that agency?

14  A.  Yes.

15  Q.  You've mentioned the web sites that bear the defendant's

16  stamp, if you will, and associated with the IANA.

17          MR. LINDQUIST:  Your Honor, I would like the witness

                        Page 33

Exhibit B.txt

18 to reference Exhibit 3.  Counsel has a copy.  Your Honor, you
19 should have a copy there and I believe the agent also has a
20 copy of that.
21       COURT:  Any objections to referencing this exhibit for
22 illustrative purposes?
23       MR. NEVIN:  Not to referencing it, no, sir.
24       COURT:  All right.  You may proceed with Exhibit 3.
25 BY MR. LINDQUIST:

36

1 Q.  Take a look at that Exhibit 3.  Tell us what that is.
2 A.  Exhibit 3 is a list of various web sites that we have
3 identified to date that are linked in one fashion or another to
4 the defendant.
5 Q.  And it consists of three columns; is that correct?
6 A.  That is correct.
7 Q.  The first column is the internet web site name, correct?
8 A.  Yes.
9 Q.  What's the second column?
10 A.  The second column is the actual date that the web site was
11 created or registered.
12 Q.  Okay.  And the third column?
13 A.  The third column is just a quick reference to who the web
14 site is registered to and what sort of ties they have to Mr.
15 Al-Hussayen.
16 Q.  So it's a shorthand for those ties; is that correct?
17 A.  That is correct.
18 Q.  And a more -- a fuller statement of that is contained in an

Page 34

Exhibit B.txt

19  affidavit paragraph 33 further referenced by the Court; is that
20  correct?  Double check.
21  A.  Yes.
22  Q.  All right.  Let's talk about some of the things you found
23  in conjunction with some of these web sites.
24      MR. LINDQUIST:  First of all, Your Honor, I would
25  offer for purposes of this hearing that Exhibit 3.

37

1       COURT:  All right.  It will be admitted for
2   illustrative purposes of the witness's testimony.  It's
3   referred to also in paragraph 33 (inaudible) as near as I can
4   tell (inaudible).
5       MR. LINDQUIST:  Thank you.
6           (Government Exhibit No. 3 admitted.)
7   BY MR. LINDQUIST:
8   Q.  Agent Gneckow, take a look at web site no. 9 that's listed
9   there.  Do you see that?
10  A.  Yes, I do.
11  Q.  What is that web site?
12  A.  That web site is Al-Asr.ws.
13  Q.  And Al-Asr, what's the significance of that from the
14  standpoint of the defendant's involvement with these web sites?
15  A.  The significance of that particular web site is that the
16  defendant, Mr. Al-Hussayen, is the sole registrant of that web
17  site.
18  Q.  All right.  And Al-Asr, does that refer to a particular
19  entity?
20  A.  Yeah.  There is a Saudi Arabian company named Dar Al-Asr
                    Page 35

Exhibit B.txt

21   and the Al-Asr web sites -- it's my understanding that the
22   Al-Asr web sites are the official web sites for that company.
23   Q.   And your investigation showed that the defendant was
24   directly linked to those web sites at Dar Al-Asr -- within the
25   context of those web sites; is that correct?

38

1            MR. NEVIN:  I'm going to object to the question, Your
2    Honor, as being leading and I don't understand what he means
3    either with respect to (inaudible).
4            COURT:  Why don't you rephrase the question.
5            MR. LINDQUIST:  Maybe a clarification but the rules of
6    evidence don't apply.
7            COURT:  That's correct.  I have to be able to
8    understand the question that's being posed and understand the
9    answer so --
10           MR. LINDQUIST:  Okay.  So you did not understand the
11   question, Your Honor?
12           COURT:  No.
13   BY MR. LINDQUIST:
14   Q.   Agent Gneckow, does Dar Al-Asr have something to do with
15   the defendant's involvement with these web sites?
16   A.   Yes.
17   Q.   What is that?
18   A.   When you -- when you access Dar Al-Asr records even over
19   the internet, Mr. Al-Hussayen's address and frequently his
20   name, telephone number, e-mail address are all associated with
21   web sites that belong to Dar Al-Asr.

Page 36

Exhibit B.txt

22  Q.  What address do you see most commonly as far as the

23  defendant is concerned?

24  A.  The address that we generally see is 311 West Sweet Avenue,

25  Apartment 6, Moscow, Idaho, 83843.



⬚

39


1   Q.  With regard to that web site, Al-Asr.ws, do you know when

2   that web site was created?

3   A.  Yes.  That was web site was created on September 11, 2000.

4   Q.  By whom specifically?

5   A.  It was created by Mr. Al-Hussayen.

6   Q.  Okay.  And sometime after September 11 of 2000 but before

7   September 11 of 2001, did a particular publication occur or

8   appear on that web site that related to September 11, 2001?

9   A.  That's correct.

10  Q.  Can you -- and that publication at least in part is

11  portrayed in paragraph 20 -- excuse me.  In paragraph 34 of the

12  affidavit; is that correct?

13  A.  That is correct.

14  Q.  Would you read that for us, please?

15  A.  The entire paragraph or --

16  Q.  Just read the quoted portion beginning with the second

17  part.

18  A.  The second part is the rule --

19  Q.  Let me interrupt you just to make sure we're clear.  This

20  is what appeared on the web site created by the defendant; is

21  that correct?

22  A.  That's correct.

23  Q.  And this was -- approximately when did it appear in

Page 37

Exhibit B.txt

24    relation to September 11, 2001?

25    A.   It occurred either May or June of 2001.   So approximately

⬚

                                                              40

1     four or five months prior to the September 11 attacks.

2     Q.   All right.   Go ahead and read that.

3               MR. NEVIN:   Judge, may I inquire in aid of objection?

4               COURT:   Yes.

5               MR. NEVIN:   When you use the term "create," you don't

6     mean that Mr. Al-Hussayen wrote this language that you're about

7     to read, do you?

8               WITNESS:   Do I answer that?

9               MR. NEVIN:   It was addressed to you.

10              COURT:   Yes.

11              WITNESS:   No, I did not say that he wrote it.

12              MR. NEVIN:   When you use the term "create" referring

13    to the web site itself?

14              WITNESS:   That's correct.

15              MR. NEVIN:   And it's your testimony that he created

16    this web site?

17              WITNESS:   He is listed as the sole registrant for the

18    web site.

19              MR. NEVIN:   Is that the same as creation of the web

20    site?

21              WITNESS:   It can mean the same.

22              MR. NEVIN:   But it doesn't necessarily?

23              MR. LINDQUIST:   Your Honor, I believe this is

24    cross-examination and not aid of --

Exhibit B.txt
25          COURT:  I'll allow counsel to (inaudible).

41

1          MR. NEVIN:  And you don't know whether that's the case
2   in this situation.
3          WITNESS:  I don't believe I know that at this point,
4   no.
5          MR. NEVIN:  But in any event, this wasn't written by
6   Mr. Al-Hussayen?
7          WITNESS:  No.  As a matter of fact, this article was
8   written by another radical Saudi sheikh by the name of Homed
9   Ali (phonetic).
10          MR. NEVIN:  What do you mean by another?
11          MR. LINDQUIST:  Your Honor, now we're into
12   cross-examination.  We're beyond what he needs in the scope of
13   direct.
14          COURT:  I'll allow this last question and then --
15          MR. NEVIN:  What do you mean by another?
16          WITNESS:  In addition to Salman Al-Ouda and Safar
17   Al-Hawali.
18          MR. NEVIN:  That's all I have.
19          COURT:  All right.
20   BY MR. LINDQUIST:
21   Q.  Read that to us, will you?
22   A.  "The second part is the rule that the (inaudible) which
23   means holy warrior must kill himself if he knows that this will
24   lead to killing a great number of the enemies.  And that he
25   will not be able to kill them without killing himself first or

Page 39

Exhibit B.txt

42

1   demolishing a center vital to the enemy or its military force

2   and so on.  This is not possible except by involving the human

3   element in the operation.  In this new era, this can be

4   accomplished with the modern means of bombing or bringing down

5   an airplane on an important location that will cause the enemy

6   great losses."

7   Q.  Let's talk about the chronology associated with this

8   publication, the creation of the web site and other events.

9   You've already testified to Bin Laden's declaration of war; is

10  that correct?

11  A.  That's correct.

12  Q.  And that occurred approximately when?

13  A.  I believe that was August 25, 1996.

14  Q.  And you've testified to the web site registration by the

15  defendant of Al-Asr.ws in which this appears; is that right?

16  A.  That is correct.

17  Q.  And the publication itself in May or June of 2001; is that

18  correct?

19  A.  That is correct.

20  Q.  In conjunction with the events of September 11, did your

21  investigation reveal anything about the defendant's activities

22  in the Moscow area in relation to a bank?

23  A.  Yes, it did.

24  Q.  Tell us about that.

25  A.  More specific question?