# EXHIBIT "C"

# PART 3 OF 6

Exhibit B.txt

43

```
1   Q.   In specific regard to the date September 11 of 2001, did
2   your investigation identify some activities of the defendant
3   with regard to a banking institution?
4   A.   Yes.
5   Q.   Tell us about that.
6   A.   It's my understanding based on our investigation that the
7   defendant last set foot inside the main branch of the U.S. Bank
8   in Moscow, Idaho on September 4, 2001.
9   Q.   What's the significance of September 4 from the standpoint
10  of September 11 given your experience and this investigation
11  specifically?
12  A.   Activity involving various individuals that are currently
13  under investigation seem to almost halt as of September 4,
14  September 5 time frame.
15  Q.   What happened on September 11 as far as he was concerned
16  and the bank?
17  A.   On September 11, 2002, a year after the terrorist attacks,
18  the defendant was first seen since -- over a year later
19  entering the bank and making a cash deposit.
20  Q.   So you have the November -- the September 11, 2001 events
21  and then a year later, he next appears in the bank following
22  the September 4, 2001 appearance; is that correct?
23  A.   Right.  On the anniversary.
24  Q.   And then you also mention the Bin Laden declaration of
25  acceptance of responsibility for those events.
```

44

Exhibit B.txt

1          COURT:  Before we leave that area, is it your

2    testimony that the defendant was seen at the main bank on

3    September 4, 2001?

4          WITNESS:  Yes.

5          COURT:  You may proceed.

6    BY MR. LINDQUIST:

7    Q.  In conjunction with the arrest of the defendant and as part

8    of this search warrant affidavit, search warrants were

9    executed; is that correct?

10   A.  That is correct.

11   Q.  And just generally speaking, tell us how those search

12   warrants were obtained.

13   A.  The search warrants were obtained by applying for the

14   search warrants preparing an affidavit and presenting those in

15   front of a U.S. magistrate.  The search warrants were obtained

16   and then were subsequently executed.

17   Q.  And executed on what day?

18   A.  They were executed on February 26, 2003.

19   Q.  Where were the search warrants executed?

20   A.  There were four separate locations.  One was the

21   defendant's home at 311 West Sweet, Apartment 6, Moscow, Idaho.

22   A second search warrant was executed for the defendant's

23   vehicle, a 1992 Pontiac Bonneville.  A third one was served at

24   an apartment on D Street, 504 and one-half D Street which is on

25   the corner of Van Buren and D in Moscow, Idaho and the fourth

45

Page 42

Exhibit B.txt

1   and final warrant was served at the engineering isotope lab on

2   the University of Idaho campus where the defendant's work

3   station was located.

4   Q.  When you say work station, did that include a computer?

5   A.  Yes, it did.

6   Q.  Was a search done of the contents of that computer?

7   A.  A cursory examination only.

8   Q.  Okay.  And can you tell us just briefly how that search of

9   the computer was conducted, how it was done?

10   A.  The computer was transported to our Pocatello information

11   technology center where some intelligence analysts in

12   conjunction with our computer analysis response team conducted

13   a cursory examination of various files on that computer.

14   Q.  Okay.  Can you give us an idea generally speaking how much

15   material was identified on that computer?  First of all, the

16   size of the hard drive.

17   A.  The hard drive was an 80 gigabyte hard drive which to put

18   in comparison, that computer at that location at the University

19   of Idaho would normally have been only a 3 or 4 gigabyte hard

20   drive.

21   Q.  What did you find as far as the amount of material

22   contained on that large hard drive?

23   A.  In the cursory examination which probably was only 29,000

24   files resulted in the identification of numerous photographs --

25   photo images.

⬜

46

1   Q.  Can you give us an idea, recognizing that it has been a

2   cursory review, of the number of photographic images that were

Page 43

Exhibit B.txt

3   recovered from the hard drive or that are on that hard drive?

4   A.  Thousands.  Thousands of photographs.

5   Q.  Were some retrieved for purposes of this case, for purposes

6   of this hearing?

7   A.  Yes, some were retrieved.

8   Q.  Take a look, if you will, at Exhibits 5 through 15 that you

9   have there in front of you.  Do you see those?

10  A.  Yes, I do.

11  Q.  Are those photographs taken from the hard drive that you've

12  just referenced?

13  A.  Yes.

14  Q.  The defendant's hard drive there in the isotope lab; is

15  that correct?

16  A.  That is correct.

17  Q.  And these are just a few of thousands of other pictures

18  that are on that hard drive; is that right?

19  A.  Yes.

20  Q.  Can you give us an idea generally speaking of what

21  collectively these -- this group of photographs depict?

22  A.  Exhibit 5 through --

23  Q.  5 through 15.  Go ahead and just pull those out.

24  A.  Exhibits 5 through 14 are all photographic or artistic

25  renditions of the attacks on the World Trade Center or

47

1   photographs of the World Trade Center in New York.

2   Q.  And 15?

3   A.  The 15th is an aerial view of the Pentagon building in

Page 44

```
                          Exhibit B.txt
 4   Washington D.C.
 5              MR. LINDQUIST:  Your Honor, I offer these for purposes
 6   of this hearing.
 7              COURT:  Any objection to Exhibits 5 through 15?
 8              MR. NEVIN:  Can I have a moment, Your Honor?
 9              COURT:  All right.
10              MR. NEVIN:  May I inquire in aid of an objection, Your
11   Honor?
12              COURT:  All right.  It will be solely for foundation,
13   how they were obtained, et cetera.
14              MR. NEVIN:  Yes.
15              COURT:  All right.
16              MR. NEVIN:  Yes.
17                            EXAMINATION
18   QUESTIONS BY MR. NEVIN:
19   Q.  Did you personally seize the computer?
20   A.  No, sir, I did not.
21   Q.  Have you been told where it was seized from?
22   A.  Yes.
23   Q.  And it was seized from an office area?
24   A.  Yes, sir.  It was seized from the engineering isotope lab.
25   Q.  And this is an office area that's utilized by -- only by
```

48

```
 1   Mr. Al-Hussayen?  Is that your testimony?
 2   A.  No.  It's my understanding that he shares that office with
 3   another person.
 4   Q.  And do you know the history of this computer?  Do you know
 5   who it's been used by, how it arrived at that location, who put
```
Page 45

Exhibit B.txt

6   those images on the computer, matters of that sort?

7   A.  No, sir.  Those items are still under investigation.

8   Q.  Isn't there a way that you can look at a computer and tell

9   who's accessed the particular files on the computer and when

10  they were last accessed?

11          MR. LINDQUIST:  Your Honor, this is really

12  cross-examination.

13          WITNESS:  Sir, I'm not a technical expert.

14          COURT:  I'll allow counsel to finish.

15          WITNESS:  Sir, I'm not a technical expert in that

16  manner.

17  BY MR. NEVIN:

18  Q.  Go ahead.  Sorry.

19  A.  The answer is I'm not a technical expert when it comes to

20  computer analysis.

21  Q.  You know that to be the case though.  You can determine

22  when files have been accessed.

23  A.  Sir, I refer those questions to the technical guys.

24  Q.  You can't tell us as you sit here on the witness stand that

25  Mr. Al-Hussayen has ever looked at these images, can you?

⬚

49

1   A.  Sir, that computer was seized from his work station area

2   and I do know that he accessed that computer.

3   Q.  That's not my question.

4           MR. LINDQUIST:  Now we're in cross-examination, Your

5   Honor.

6           MR. NEVIN:  I think this is foundational to whether

Page 46

Exhibit B.txt

7   these come into evidence.

8        MR. LINDQUIST:  No, it isn't.  This is

9   cross-examination.

10       COURT:  I'll allow him to finish up this short line of

11  inquiry and then you can state an objection to the evidentiary

12  introduction if you have one.

13  BY MR. NEVIN:

14  Q.  Then my question was you can't testify as you sit on the

15  witness stand today that Mr. Al-Hussayen ever looked at these

16  images, can you?

17       MR. LINDQUIST:  And I'll object to the relevancy of

18  that.

19       COURT:  Do you have an objection to the (inaudible)?

20       MR. NEVIN:  Yeah, I object that they've not been

21  adequately tied to Mr. Hussayen to be admitted into evidence.

22       COURT:  I'll overrule the objection.  Counsel, I plan

23  on going till noon today if that works with everyone before we

24  take that break.  Is that agreeable?

25       MR. NEVIN:  Yes, sir.  Would we start up again at

                                                            50

1   1:00 -- 1:30?

2        COURT:  At 1:00.

3        MR. NEVIN:  At 1:00.

4        COURT:  Yes.  All right.  You may proceed.  Exhibits 5

5   through 15 will be admitted.

6        MR. LINDQUIST:  Thank you.

7         (Government's Exhibit Nos. 5 through 15 admitted.)

8                   CONTINUED DIRECT EXAMINATION
                         Page 47

Exhibit B.txt

9   QUESTIONS BY MR. LINDQUIST:

10   Q.  Very quickly and briefly, what does Exhibit 5 depict?

11   A.  Bear with me for one second.

12   Q.  Do you have them there?

13   A.  I'm sure I have it here somewhere.  Here we go.  Exhibit 5

14   is what appears to be a photograph of the World Trade Center

15   after it had collapsed.

16   Q.  Exhibit 6?

17   A.  Exhibit 6 is what appears to be a computer generated image

18   of the World Trade Center depicting where the first and second

19   impacts of the aircraft hit the towers.

20   Q.  Exhibit 7?

21   A.  Exhibit 7 is a photograph of the World Trade Center sky

22   line prior to the attack -- well, at some time prior to the

23   attack.

24   Q.  Exhibit 8?

25   A.  Exhibit 8 appears to be a dual image of the second aircraft

51

1   before -- immediately before and right after it crashed into

2   the towers.

3   Q.  Exhibit 9?

4   A.  Exhibit 9 are two photographs.  A larger photograph of the

5   World Trade Center undamaged and then an inserted photograph of

6   the trade centers on fire.

7   Q.  Exhibit 10?

8   A.  Exhibit 10 again appears to be a computer generated image

9   of the World Trade Centers showing in stages how the aircraft

Page 48

Exhibit B.txt

10   impacted into the towers.

11   Q.  Exhibit 11?

12   A.  Exhibit 11 is a photograph -- what appears to be a

13   photograph of the World Trade Centers after they had collapsed

14   and rescue personnel were on the scene.

15   Q.  12?

16   A.  Exhibit 12 is a photograph of the World Trade Centers taken

17   from below.  It shows that both towers are on fire.

18   Q.  13?

19   A.  13 is another image of the trade centers from a distance

20   with the Empire State Building in front of it that show the

21   towers on fire.

22   Q.  14?

23   A.  14 appears to me to be the same --

24   Q.  As a previous one, doesn't it?

25   A.  As a previous one.

52

1   Q.  No. 8?

2   A.  Yes.  That's the same as Exhibit 8.

3           MR. LINDQUIST:  Given that, Your Honor, I would move

4   to withdraw No. 14 because it's already depicted in -- by

5   Exhibit 8.

6           COURT:  All right.  It will be withdrawn.

7               (Government Exhibit No. 14 withdrawn.)

8   BY MR. LINDQUIST:

9   Q.  And then 15?

10   A.  And 15 is an aerial photograph of the Pentagon building.

11   Q.  Is your testimony that these are the only photographs

Page 49

Exhibit B.txt

12  depicting the World Trade Center in conjunction with the events
13  of 9/11 on that computer?
14  A.  By no means whatsoever.
15  Q.  Why do you say that?
16  A.  The cursory examination of the photographic images on that
17  computer revealed thousands and thousands of photographs.  I
18  can't even begin to guess how many were of the World Trade
19  Center.
20  Q.  Let's continue talking about the defendant's web site
21  activities.  Specifically, did your investigation show any
22  connection between the defendant and the sheikhs that you've
23  mentioned, Al-Ouda and Al-Hawali?
24  A.  Yes.
25  Q.  Tell us what those connections are.

☐

53

1  A.  Well, the investigation has revealed numerous connections
2  between the defendant and Sheikh Al-Ouda and Sheikh Al-Hawali.
3  Q.  Let's just talk web sites for right now.
4  A.  As far as web sites are concerned, the defendant has been
5  involved in the maintenance, technical advisement for web --
6  multiple web sites for both Sheikh Al-Ouda and Sheikh
7  Al-Hawali.
8  Q.  Take a look at Exhibit No. 3 which is that list of web
9  sites associated with the defendant.  Do you have that?
10  A.  Yes, I do.
11  Q.  Can you point out the number of the web site that is
12  directly attributable to one of those sheikhs or those two

Page 50

Exhibit B.txt

13   sheikhs?

14   A.  Islam Today for example is --

15   Q.  Number --

16   A.  Is no. 8.

17   Q.  Okay.

18   A.  Islam Today is Sheikh Al-Ouda's web site.  He publishes a

19   lot of his lectures, articles on that web site and I believe

20   even on the web page itself, there is reference to the fact

21   that that is Sheikh Al-Ouda's web site.

22   Q.  And that's the web site that he referenced in the interview

23   with the New York Times reporter, correct?

24   A.  That's correct.

25   Q.  What other web sites do we see here associated with either

54

1   of those two gentlemen?

2   A.  Well, clearly web sites nos. 10 and 11 are associated with

3   Sheikh Al-Hawali.  Those web sites are Al-Hawali.org and

4   Al-Hawali.com.

5   Q.  Okay.  Now, did your investigation identify some particular

6   publications associated with those web sites or other web sites

7   linked to the defendant and the IANA publications of these two

8   radical sheikhs?

9   A.  Yes.

10   Q.  Let me call your attention to one in particular.  And this

11   is cross referenced if you will with affidavit paragraph 36.

12   Are you with me?

13   A.  All right.

14   Q.  That affidavit paragraph 36 references some publications

Page 51

Exhibit B.txt

15   that appeared on one of these web sites; is that correct?

16   A.   Yes, it does.

17   Q.   Okay.  Which web site is that?

18   A.   That is web site Al-Asr.ws.

19   Q.   And give us an idea what that publication or publications

20   consisted of.

21   A.   That publication -- Al-Asr.ws is an internet magazine or

22   one of the functions is I suppose as an internet magazine and

23   on the date depicted there in the affidavit of May 15, 2001,

24   there were at least three articles that specifically spoke to

25   the issue of suicide operations.

55

1    Q.   Who were the authors of those articles?

2    A.   The authors were Sheikh Homed Ali (phonetic).

3    Q.   And where have we heard him before -- of him?

4    A.   He is the sheikh that wrote the article that had the

5    verbiage in it about bringing down an airplane.

6    Q.   Okay.

7    A.   There was also an article entitled "Suicide Operations"

8    which was written by Sheikh Salman Al-Ouda and --

9    Q.   And in essence, the content of that with regard to suicide

10   operations, what?

11   A.   In that particular article, Sheikh Al-Ouda stated that

12   death is better than a humiliating life and it gave

13   justifications and conditions on suicide operations.

14   Q.   Go to paragraph 37.  Does that reflect another publication

15   associated with Sheikh Al-Ouda?

Page 52

Exhibit B.txt

16   A.  Yes, it does.

17   Q.  And what -- what web site are we talking about here?

18   A.  That web site is Islam Way.com.

19   Q.  And that is associated with the Islamic Assembly of North

20   America; is that correct?

21   A.  Yes, sir.

22   Q.  And what was the orientation of that publication?

23   A.  I'm not sure I understand.

24   Q.  What did the publication say?  What was its --

25   A.  It again was a publication or an article that justified

56

1    suicide bombings.

2    Q.  Paragraph 38 talks about an event associated with a

3    Canadian web site at the time; is that correct?

4    A.  That's my understanding.

5    Q.  Tell us about that.  What happened here?

6    A.  As is stated in the affidavit, on August 16, 2001, three

7    full weeks prior to the September 11 attacks, there was a

8    posting on the Islam Way.com web site that was titled "An

9    Invitation to Jihad" and in that particular posting, there was

10   an invitation as I said in the title for -- or a recruitment

11   pitch essentially to come and fight with the Mujahideen.  Come

12   and train and then eventually fight with --

13   Q.  Did that result in a complaint by a particular entity?

14   A.  Yes, it did.

15   Q.  Tell us about that.

16   A.  There was a Jewish entity in Canada that became aware of

17   that particular posting, brought that to the attention of the

Exhibit B.txt

18  Royal Canadian Mounted Police who initiated an investigation.
19  Q.  Did that also result in some press, some articles in the
20  newspaper?
21  A.  Yes, it did.
22  Q.  Does that paragraph in the affidavit reflect at least a
23  snippet of one of those articles and the perception of what was
24  appearing on that web site?
25  A.  Yes, it does.

57

1   Q.  Would you read that snippet for us if you would on the
2   bottom of page 13?  And that appeared in what newspaper?  Do
3   you recall?
4   A.  I don't recall.
5   Q.  Okay.
6   A.  Sorry.
7   Q.  But a Canadian newspaper; is that correct?
8   A.  That is correct.
9   Q.  All right.  Read that sentence to us, would you?
10  A.  It states, "Terrorist organizations have been making
11  increasing use of the internet to further their violent
12  agendas.  They use computers to communicate, spread propaganda,
13  fund raise and organize operations.  Canada may be becoming a
14  base for such cyber terrorism because of the technological
15  advancement."
16  Q.  Did that newspaper article have anything to do with your
17  investigation of the defendant meaning was it generated as a
18  result of your investigation of the defendant or was it

Page 54

Exhibit B.txt

19  completely independent?

20  A.  No.  It was completely independent.

21  Q.  This is just something that you came across as part of your

22  investigation; is that right?

23  A.  That's correct.

24  Q.  Let's talk about another publication associated with the

25  defendant's web sites.  Take a look at paragraph 39.  Are you

58

1   with me?

2   A.  Yes, I am.

3   Q.  That is another publication on what web site?

4   A.  That is again on Islam Way.com.

5   Q.  And what is the gist of that particular publication?

6   A.  This again appears to be a posting on Islam Way.com where

7   the writer of the posting advised -- excuse me, that he was

8   leaving Afghanistan in an on-duty status and further stated

9   that Jihad is the only means to eradicate all evil on a

10  personal and general level.  And that the only answer is to

11  ignite and trigger an all out war, a worldwide Jihad, and that

12  we will do our best to ignite this war.  May Allah protect us.

13  Q.  Affidavit paragraph 40 references yet another publication

14  associated with these web sites; is that correct?

15  A.  That is correct.

16  Q.  And this -- the web site in this particular case is what?

17  A.  This web site is Islam Today.net.

18  Q.  Now again, remind us.  That web site is tied to what

19  particular individual?

20  A.  It's my understanding that that belongs to Sheikh Al-Ouda.

Page 55

Exhibit B.txt

21  Q.  And this publication though is not by Sheikh Al-Ouda,

22  correct?

23  A.  No, it's not.

24  Q.  Is it by whom?

25  A.  It is by Sheikh Safar Al-Hawali.

59

1   Q.  And the date of that publication?

2   A.  September 4, 2002.

3   Q.  Title of the article that was published?

4   A.  The title of the article is "Appeal to Help Our Palestinian

5   Brothers."

6   Q.  Can you give us an idea of the content of that publication,

7   its philosophical orientation, what it was saying?

8   A.  It was essentially calling for support of Jihad in the

9   Palestinian situation.  There is verbiage in the publication

10  that states developing the methods and means of Jihad such as

11  targeting settlements, surprise attacks on military bases,

12  manufacturing and improving weapons and similar careful and

13  wise choices in deep penetration and martyrdom operations,

14  et cetera, et cetera.

15  Q.  These then were publications, indications of direct contact

16  between the defendant and these two radical sheikhs by means of

17  those publications on the web sites; is that right?

18          MR. NEVIN:  I'll object to that as a leading question.

19          COURT:  I'll sustain the objection.

20  BY MR. LINDQUIST:

21  Q.  There were other connections -- your investigation revealed

Page 56

Exhibit B.txt

22  other connections, did they not, or revealed other things as

23  far as connections between the defendant and these two sheikhs;

24  is that right?

25  A.  That's correct.

⬚

60

1  Q.  Did the investigation participate in what is referred to

2  statutorily as the Foreign Intelligence Surveillance Act?

3  A.  Yes, it did.

4  Q.  Just generally speaking, what is that?

5  A.  The Foreign Intelligence Surveillance Act is a mechanism by

6  which the United States Government after going through a long

7  process of applying for -- to have this act operational by

8  which we can have a court-ordered surveillance or court-ordered

9  wire tap with regard to circumstances dealing with national

10  security matters.

11  Q.  All right.  How is that different from what in the federal

12  system we commonly refer to as a Title 3 wire tap or court-

13  ordered authorization?  How is it different?

14  A.  It's different in the sense that we go before an entirely

15  different court.  For example, instead of going before a

16  criminal magistrate to obtain a search warrant, you actually go

17  before the Foreign Intelligence Surveillance Court.

18  Q.  What I'm really getting to is on the Title 3, we're talking

19  about a typical criminal investigation within the federal

20  system; is that correct?

21  A.  That's correct.

22  Q.  As the Foreign Intelligence Surveillance Act deals with

23  national security and investigations that are directly prompted

Page 57

Exhibit B.txt

24  by national security; is that correct?

25  A.  That's correct.

61

1   Q.  And as a result of those court authorized interceptions, a

2   criminal investigation can gain access to learn what has been

3   intercepted and learned as a result of those investigations; is

4   that right?

5   A.  That's correct.

6   Q.  What type of interceptions were involved -- or did you

7   receive information from?  Are we talking phone calls, computer

8   e-mails?  Is that what we're talking about?

9   A.  Primarily.

10  Q.  Okay.  So that's what we're talking about as far as these

11  interceptions are concerned; is that right?

12  A.  That's correct.

13  Q.  Did some of those court authorized interceptions reveal

14  activities by the defendant?

15  A.  Yes, they did.

16  Q.  And in what capacity?  Telephone and e-mail?

17  A.  That's correct.

18  Q.  All right.  Did those interceptions reveal anything as far

19  as the relationship between the defendant and Sheikh Al-Ouda?

20  A.  Yes.

21  Q.  What did they reveal generally speaking?

22  A.  They revealed -- they revealed one thing, that the

23  defendant has an extreme amount of respect for Sheikh Al-Ouda.

24  He has operated in the capacity of assisting with setting up

Exhibit B.txt

25    web sites that Sheikh Al-Ouda can use as a vehicle to preach

                                                                    62

1    his message to -- as I've stated before, to the widest audience
2    possible.
3    Q.  Did they reveal the direct contact between the defendant
4    and that sheikh?
5    A.  Yes, they do.
6    Q.  And those associated with the sheikh?
7    A.  Yes, they do.
8    Q.  Did those interceptions also reveal anything similar with
9    regard to Sheikh Al-Hawali?
10   A.  Yes, very similar.
11   Q.  What?
12   A.  Again, the interceptions show a very close link between the
13   defendant and Sheikh Al-Hawali, the setting up of web sites,
14   the providing of vehicles for extended communication,
15   telephonic contact with intermediaries of Sheikh Al-Hawali.
16   Q.  And all within the context of web site work; is that
17   correct?
18   A.  I believe so.
19   Q.  In the course of those interceptions, do you remember any
20   characterization by Sheikh Al-Ouda or those associated with him
21   of the defendant as far as the defendant's role in this web
22   site work?
23   A.  Yes.  I seem to recall there being one intercepted
24   communication in which --
25              MR. NEVIN:  I'll object to that without further

                              Page 59

Exhibit B.txt

63

```
1   foundation as to who made the statement and time, place,
2   matters of that sort.
3            COURT:  You may proceed a little bit with foundation.
4   BY MR. LINDQUIST:
5   Q.  Tell us approximately when this interception took place and
6   the defendant was involved; is that correct?
7   A.  The defendant was involved.  The party on the other end was
8   Sheikh Al-Ouda and he deferred to the defendant as being the
9   manager or -- I don't recall the exact verbiage but essentially
10  the manager of the web site and he deferred decisions with
11  regard to the web site to him.
12  Q.  And would follow his, meaning the defendant's direction; is
13  that correct?
14  A.  Yes.
15  Q.  You mentioned that the search warrants were executed in
16  conjunction with the arrest of the defendant.  Did those search
17  warrants show anything or result in any evidence that
18  corroborated the tie between the defendant and Sheikh Al-Ouda
19  and Sheikh Al-Hawali?
20  A.  Yes, they did.
21  Q.  Tell us about that.
22  A.  During one of the executed search warrants, an address,
23  phone book was discovered and in that phone book in Arabic were
24  written the telephone numbers for both Sheikh Al-Ouda and
25  Sheikh Al-Hawali.
```

Exhibit B.txt

64

1    Q.  Was that finding consistent with your investigation
2    otherwise that you testified to?
3    A.  Yes.
4    Q.  You've already testified to photographs that were found on
5    the defendant's computer, seized at the isotope lab.  There
6    were other photos that were seized from that in your cursory
7    review; is that correct?
8    A.  Yes.
9    Q.  Take a look at Exhibits 16 through 94.  Do you have those
10   up there?
11   A.  I do.
12   Q.  And all of those exhibits depict photographs; is that
13   correct?
14   A.  I am pretty sure they are all photographs.  No, I take that
15   back.  I know that there are some that are graphic images of
16   maps for example but not many.
17   Q.  But they were all taken from the computer that you
18   testified to; is that right?
19   A.  That's correct.
20   Q.  Categorically, what do all of these photographs have in
21   common from the standpoint of what you've been testifying to
22   today?  What's their significance?  What's their pertinence
23   here?  Why are we showing them to the judge?
24   A.  I think their significance is clear.
25   Q.  What is it?

65

Exhibit B.txt

1   A.  Almost without exception, these photographs show Jihad --
2   what we could consider to be Jihadist sort of things.  Many
3   photographs of Usama Bin Laden.  Many photographs of Chechnyan
4   Mujahideen.  Photographs of dead disemboweled bodies.
5   Photographs of what appear to be captured Russian soldiers.
6   Q.  International terrorism related event; is that correct?
7   A.  Exactly.
8          MR. LINDQUIST:  I offer these exhibits into evidence,
9   please, for purposes of this hearing.
10          COURT:  Any objection?
11          MR. NEVIN:  The same objection I expressed with
12   respect to the other photographs.
13          COURT:  All right.  That's been noted and overruled.
14   We'll admit Exhibits 16 through 94.
15             (Government Exhibit Nos. 16 through 94 admitted.)
16          COURT:  You may proceed.
17          MR. LINDQUIST:  Thank you.
18   BY MR. LINDQUIST:
19   Q.  Let's just go through some of these.  There are quite a
20   number but there again, in that regard, this is just a small
21   percentage of what your cursory review found; is that right?
22   A.  Just the tip of the iceberg in my opinion.
23   Q.  Take a look at Exhibit 17.  Who's that?
24   A.  That appears to be a photograph of Sudaman Abu Gathe
25   (phonetic) who is known as -- he is an Al Quaida or was an Al

⌷

66

Page 62

```
                    Exhibit B.txt
 1  Quaida spokesman.
 2  Q.  Okay.  Exhibit 18?
 3  A.  That's a photograph of a Taliban soldier with an RPG -- a
 4  rocket propelled grenade.
 5  Q.  Exhibit 20?
 6  A.  That's a photograph of Usama Bin Laden superimposed on some
 7  Arabic text that we have not translated yet.
 8  Q.  Exhibit 21?
 9  A.  Photograph of Usama Bin Laden.
10  Q.  And 23?
11  A.  Usama Bin Laden.
12  Q.  24?
13  A.  Usama Bin Laden.
14  Q.  25?
15  A.  Usama Bin Laden.
16  Q.  26?
17  A.  That appears to be a photograph of Hisballah (phonetic)
18  rebels with rocket propelled grenades on the shoulders and a
19  firearm of some sort.
20  Q.  29?
21  A.  That is a photograph of the American flag being burned.
22  Q.  What's the significance of 30?
23  A.  30 --
24  Q.  Specifically.
25  A.  Specifically?  Well, it is a photograph almost in the form
```

                                                                67

```
 1  of a poster it appears that shows Usama Bin Laden facing off
 2  with President George Bush and there is a target superimposed
                    Page 63
```

Exhibit B.txt

3   on the president's head with the center of his head directly in
4   the center of the cross hairs of the target.
5   Q.  And it has a reference to a web site; is that correct?
6   A.  Yes, it does.
7   Q.  No. 31.
8   A.  Usama Bin Laden and others.
9   Q.  Who's depicted in 33 to your knowledge?
10  A.  You know, I'm not certain.  That's a photograph of an
11  individual that we have yet to identify.
12  Q.  34, what does that show?
13  A.  That is a photograph of Washington, D.C.
14  Q.  The capital building, correct?
15  A.  Yes, it is.
16  Q.  35, what's the significance of that specifically?
17  A.  35 is a poster and the shape of the blob in the middle of
18  the poster appears to be Chechnya.  Inside the blob are
19  soldiers who appear to be Mujahideen and the poster itself
20  makes reference to a very radical web site, Cocaus.com
21  (phonetic) which is linked to many of the IANA, Islamic
22  Assembly of North America, sites and the defendant received
23  e-mail from Cocaus.
24  Q.  36?
25  A.  Taliban soldiers with RPG's.

68

1   Q.  39?
2   A.  Although I'm not positive, this appears to be a photograph
3   of the inside of the Moscow music hall where the chemical

Page 64

Exhibit B.txt

```
 4   agents were introduced to essentially put an end to the
 5   takeover of that -- that theater by Mujahideen rebels.
 6   Q.  You're going to reference that here in a moment in another
 7   capacity, correct?
 8   A.  Yes, sir.
 9   Q.  41?
10   A.  That is a photograph of Sheikh Al-Ouda.
11   Q.  42?
12   A.  That is Eden Catab (phonetic), a Chechnyan rebel leader.
13   Q.  You mentioned some Russian soldiers.  Exhibit 44.
14   A.  This is a photograph of what appears to be a Russian
15   soldier, Petrov Demetri Alexandrovich, almost as if he has --
16   he's got his name superimposed in front of him.  Although we
17   don't know what it is, we suspect he may have been taken
18   prisoner.
19   Q.  Similarly 45; is that correct?
20   A.  Yes.
21   Q.  And I'm skipping over some that depict violent deaths; is
22   that right?
23   A.  That is --
24   Q.  Corpses and so forth?
25   A.  That is correct.
```

                                                                    69

```
 1   Q.  Exhibit 49?
 2   A.  Exhibit 49 is a map that appears to be pulled from MS NBC.
 3   Q.  A map of what?
 4   A.  The map is of the State of California and there are four
 5   specific locations that are designated on the map, each of
```

Page 65

Exhibit B.txt

```
 6   which appears to be a bridge:  The Golden Gate Bridge in San
 7   Francisco, the Bay Bridge in San Francisco, the Coronado Bridge
 8   between San Diego and Coronado and the Vincent-Thomas Bridge
 9   that spans the main channel of L.A. harbor.
10   Q.  50?
11   A.  Is a photograph of the Golden Gate Bridge.
12   Q.  52?
13   A.  52 is a photograph of detainees being flown in U.S.
14   military aircraft to Guantanamo Bay.
15   Q.  54?
16   A.  Our initial analysis of this photograph indicates that this
17   is a suicide note with a superimposed arrow pointing to the
18   detonation switch.
19   Q.  58?
20   A.  Usama Bin Laden.
21   Q.  59?
22   A.  This appears to be soldiers including what appears to be a
23   wounded soldier in the Cashmere region.
24   Q.  What's 60?  Who's depicted in 60?
25   A.  That's Sheikh Al-Ouda.
```

                                                                    70

```
 1   Q.  61, what's the significance of that building?
 2   A.  That's the FBI headquarters building in Washington, D.C.
 3   Q.  62, who's that?
 4   A.  Sheikh Al-Ouda.
 5   Q.  63, more fighters; is that correct?
 6   A.  Actually Taliban fighters.
```
                              Page 66

Exhibit B.txt

7   Q.   Taliban fighters?  64, what's that?

8   A.   That is a United Airlines passenger jet.

9   Q.   On the ground or flying?

10  A.   Flying.

11  Q.   65?

12  A.   Is a U.S. Navy aircraft carrier.

13  Q.   66, who's that?

14  A.   That's Sheikh Al-Ouda.

15  Q.   67, what's the significance of that building?

16  A.   That's a photograph of a building in Israel where a Jewish

17  wedding was being held and it was bombed.

18  Q.   72, who is that?

19  A.   I'm not sure.  Sorry.

20  Q.   Okay.  What do we see there?  We see --

21  A.   We see what appears to be a scholarly looking elderly man

22  with -- in a vehicle with an automatic weapon at his side.

23  Q.   Going back to Exhibit 64, the United Airlines plane flying,

24  is this the only -- is this the only one of this nature that

25  was found in your cursory review of airplanes?

71

1   A.   I don't think so.  I'm not sure.

2   Q.   Fair enough.  73, what does that depict?

3   A.   That is the Knesset Building, the Israeli parliament

4   building.

5   Q.   75, do you know what that depicts?

6   A.   That appears to be a nuclear reactor in North Korea.

7   Q.   The individuals in 76, what's the significance of that

8   photo; do you know?

Page 67

Exhibit B.txt

 9    A.  Those folks -- those three individuals in that one
10    photograph are the victims of the Gibla Baptist Hospital
11    murders.
12    Q.  And does that relate to No. 77 that follows?
13    A.  It does.
14    Q.  What does that show?
15    A.  That's a photograph of the Gibla Baptist Hospital in the
16    Yemen -- Gibla, Yemen.
17    Q.  Does that have something to do with international
18    terrorism?
19    A.  It does.  On December 30, 2002, a terrorist gunman -- at
20    least one entered the hospital and murdered some of the -- at
21    least one doctor and some medical personnel inside the
22    hospital, wounded several others.
23    Q.  And 78, what does that show?
24    A.  That is a photograph of the British ship HMS South Hampton
25    as it's traveling through the Suez Canal.

0

                                                                    72

 1    Q.  79, who is that?
 2    A.  That is Zacharias Musowi (phonetic).
 3    Q.  Who's he?
 4    A.  He is currently at trial for terrorist charges related to
 5    September 11.
 6    Q.  No. 80, who is that?
 7    A.  That is Richard Reed --
 8    Q.  Who is he?
 9    A.  He is the infamous shoe bomber that tried to ignite his
                              Page 68

Exhibit B.txt

10   shoes in the transatlantic flight.

11   Q.   No. 83, who is that; do you know?

12   A.   That is Daniel Pearl, the assassinated or murdered

13   journalist.

14   Q.   And he was murdered where?

15   A.   Pakistan I think.

16   Q.   Pakistan? 84, what does that depict?

17   A.   That is a photograph of President George Bush superimposed

18   on other photographs that show U.S. military troops and Usama

19   Bin Laden.   The title of this file is "War, Al Quaida."

20   Q.   No. 90?

21   A.   That's Sheikh Al-Ouda.

22   Q.   No. 93?  I think No. 93 and 94 are two versions of the same

23   picture, are they not?

24   A.   Yes, they are.

25   Q.   What do they depict?

73

1    A.   Well, the title of this file is "Air Marshals" and the

2    photograph shows what appears to be a training exercise where a

3    masked attacker is behind another individual and what appears

4    to be slitting his throat.

5    Q.   The review of that computer is ongoing; is that correct?

6    A.   Yes.

7    Q.   And these particular photographs became available to you

8    only as recently as when?

9    A.   Late last night.

10   Q.   We've been talking about the defendant's web site --

11   outside web site activities and how that relates to terrorism;

Page 69

Exhibit B.txt

12   is that correct?

13   A.  That's correct.

14   Q.  Now I want to ask you some questions about his outside

15   business activities in the same connection.  We're looking at

16   page 14 for cross reference purposes of the affidavit.

17   Specifically as far as my first question, it's affidavit

18   paragraph 41.  Generally speaking, what did your investigation

19   find as far as the outside business activities of the

20   defendant?

21   A.  The financial aspects of the investigation have revealed

22   extensive amounts of money passing in and out of the

23   defendant's accounts.  We've identified at least six different

24   bank accounts in the United States and significant moneys

25   passing through them.

74

1   Q.  Prior to the execution of the search warrants that you've

2   mentioned, how many bank accounts have you identified

3   associated with the defendant?

4   A.  I want to say there were six -- are you talking about other

5   than his own accounts?

6   Q.  No, I'm just talking about accounts known to you prior to

7   his arrest and the execution of the search warrants.

8   A.  His accounts, six.

9   Q.  As a result of the execution of the search warrants, have

10   you become aware of potentially any other bank accounts

11   associated with --

12   A.  It appears that we've identified other accounts, yes.

Exhibit B.txt

13   Q.   And the investigation is ongoing with regard to them; is

14   that correct?

15   A.   That's correct.

16   Q.   Paragraph 42.  These business relationships, these

17   financial relationships that your investigation revealed were

18   connected with what entity primarily?

19   A.   They were primarily connected with the Islamic Assembly of

20   North America.

21   Q.   And were there connections -- financial connections,

22   business connections with other individuals and other entities

23   besides the Islamic Assembly of North America?

24   A.   Yes.

25   Q.   Did that include Sheikh Al-Ouda or that you would

75

1    characterize as business?

2    A.   Yes.

3    Q.   Sheikh Al-Hawali?

4    A.   To the extent that they deal with the web sites, yes.

5    Q.   Fair enough.  As far as the IANA, the Islamic Assembly of

6    North America, what -- describe for us, if you would, the

7    business relationship that your investigation found as far as

8    the defendant was concerned.

9    A.   We've cited tens of thousands if not hundreds of thousands

10   of dollars that have passed from the defendant to the Islamic

11   Assembly of North America in the form of checks, wire transfers

12   and other means.

13   Q.   Have colleagues of yours done assessments of the financial

14   information that you have obtained?

Page 71

Exhibit B.txt

15  A.  Yes.
16  Q.  Does that assessment include the funds going into the
17  defendant's accounts and what funds were going out of the
18  accounts?
19  A.  Yes.
20  Q.  Can you give us an idea generally speaking of the nature of
21  the funds generally speaking going into his personal accounts,
22  going in?
23  A.  The defendant routinely receives large sums of money that
24  come from overseas sources.  Generally from Saudi Arabia.  They
25  pass into his account and subsequently pass out of his

76

1  account --
2  Q.  Before going to where they go out of the account, let's
3  just talk about the funds coming in.  Did you identify any
4  funds coming into his accounts that you could attribute
5  directly to his studies and living?
6  A.  Yes.
7  Q.  Tell us about that.
8  A.  As a foreign student from Saudi Arabia in the United
9  States, Mr. Al-Hussayen is essentially on a scholarship of
10  sorts from the Saudi government.  He receives a monthly stipend
11  that ranges in amounts but it's generally about $2,700 a month
12  more or less.
13  Q.  Were you able in your analysis -- your financial analysis
14  to segregate the study/living related expenses coming into the
15  account and where they went and the nonstudy/living related

Page 72

Exhibit B.txt

16  expenses or the moneys that came into his account and where
17  they went?
18  A.  Yes.
19  Q.  Were they clearly segregated?
20  A.  It appears that there was a definite split.
21  Q.  Did that financial analysis show that the defendant was
22  functioning as a financial conduit of large sums of money?
23  A.  Yes.
24  Q.  Can you give us an idea of some of the sources of that
25  nonstudy/nonliving expense money that the financial records

77

1   show went into his accounts?
2   A.  Well, for example, we identified two wire transfers in 1998
3   that came from a family member of Mr. Al-Hussayen.
4   Q.  Who's that?
5   A.  That would be Saleh Al-Hussayen.
6   Q.  And as far as the investigation is concerned, what do you
7   deem that relationship to be, that individual to the defendant?
8   A.  It appears that Saleh Al-Hussayen is the defendant's uncle.
9   Those two wire transfers totaled approximately $100,000.
10  Q.  And approximately when did those transfers occur?
11  A.  They occurred in 1998 and I can be more specific if I refer
12  to the affidavit.  In September 10 and September 25 of 1998 and
13  were broken into two wire transfers each approximately $50,000.
14  Q.  Did your financial analysis maintain or insure the
15  integrity of those funds being maintained as they passed
16  through the defendant's bank account and out?
17  A.  Yes.

Page 73

Exhibit B.txt

18   Q.  Where did they go?  Where did they go out and into?

19   A.  Almost to the penny, that hundred thousand dollars went to

20   IANA.

21   Q.  Was there a period of time that the defendant held those

22   funds in his bank account before they went out to the IANA?

23   A.  Yes.

24   Q.  Approximately how long was that?

25   A.  It was approximately six to nine months that that money sat

78

1   in the defendant's account.

2   Q.  By the way, has your investigation revealed whether or not

3   these accounts generated interest?

4   A.  Yes.

5   Q.  What has your investigation shown?

6   A.  They do not generate interest.

7   Q.  And have you come to understand why that is?

8   A.  Yes.  Upon request of many of the foreign students, they

9   will not accept interest payments into their accounts.

10   Q.  As a religious matter; is that correct?

11   A.  That is correct.

12   Q.  So the hundred thousand sat there for that period of time

13   not collecting interest; is that right?

14   A.  That's correct.

15   Q.  And then went where?

16   A.  It went piecemeal to IANA over a period of time.

17   Q.  Did the financial analysis of that flow of the hundred

18   thousand dollars from the uncle through the defendant's bank

Exhibit B.txt

19   accounts to the IANA correlate with any other receipt of a

20   large sum of money by the IANA?

21   A.  Yes.

22   Q.  And this is I believe also depicted or referenced in

23   affidavit paragraph 45; is that correct?  No, excuse me.  I'm

24   wrong.  Not 45.  42.

25   A.  No, I don't think it's there.

                                                                    79

1    Q.  Okay.  You know what I'm referring to?

2    A.  I know what you're referring to.

3    Q.  I'll find the paragraph here in a moment.

4    A.  There was a -- paragraph 48.

5    Q.  48, thank you.

6    A.  In May of 1998, there was a $300,000 wire transfer to IANA

7    from a Swiss bank account.  It was only when that $300,000 was

8    exhausted by IANA that payments of the defendant's $100,000

9    began to be disbursed to IANA.

10   Q.  Showing the correlation of activity of operations; is that

11   correct?

12   A.  Yes.  As the payments were made, in many cases on the same

13   day that say $14,000 wire transfer was sent to IANA, payments

14   were made to officers from that IANA bank account essentially

15   in the form of salary.

16   Q.  Has your investigation revealed how these moneys -- these

17   moneys that are sent from the defendant's bank accounts to the

18   IANA are characterized by the IANA?

19   A.  Yes.  The investigation has revealed that the IANA books

20   refer to them as loans.

                          Page 75

Exhibit B.txt

21   Q.  Loans?

22   A.  Right.

23   Q.  Is there anything in the investigation that would suggest

24   to you that these are legitimate loans?

25   A.  No.

80

1   Q.  Your investigation suggests that --

2           MR. NEVIN:  Object.  This is leading.

3           COURT:  All right.  I'll sustain the objection.

4           MR. LINDQUIST:  I didn't even get it out, Your Honor.

5           COURT:  You appear to be heading in a leading

6   direction.

7           MR. LINDQUIST:  Well, I'm going to surprise you

8   because it wasn't headed that way.

9   BY MR. LINDQUIST:

10   Q.  And what did your investigation suggest as far as the

11   nature of the funds that were being funneled through his

12   account?

13   A.  They appear to be payments that were -- that the defendant

14   was receiving from overseas or sometimes in the form of local

15   solicitation that was being sent to the IANA for use by the

16   IANA exclusively.

17   Q.  And concealed in loan designation?

18   A.  That's what it appears at this stage.

19   Q.  An affidavit paragraph 43, the uncle is mentioned a bit

20   more; is that correct?

21   A.  That is correct.

Page 76

Exhibit B.txt
22  Q.  Did your investigation show additional contact between this

23  uncle -- and when I say additional, additional to the hundred

24  thousand dollars funds that flowed through the defendant's

25  account, additional contact with the United States by that

81

1   uncle?

2   A.  I'm not sure I understand the question.

3   Q.  Did your investigation reveal that the uncle was here at

4   any particular time in the United States?

5   A.  Yes, it did.

6   Q.  What did your investigation reveal as far as when he was

7   here?

8   A.  It appeared that the uncle arrived in the United States on

9   or about August 20 of 2001.  He was met in New York or

10  Washington, D.C., I'm not exactly sure but he was met on the

11  east coast by some members of a Moslim (inaudible) in New York.

12  He was given a tour of the area, given a tour of downtown New

13  York -- of downtown Manhattan including the vicinity of the

14  World Trade Centers.  He subsequently traveled to the Midwest

15  to Chicago, to Detroit, even into Canada and it appears that he

16  met with numerous officials of both the IANA and other

17  charitable organizations.

18  Q.  Was there anything in your investigation that indicated

19  that the defendant joined him at some point in time on this

20  trip?

21  A.  There are indications that they did join and that is based

22  on our review of financial analysis of the defendant's accounts

23  which show money disbursed in Ann Arbor, Michigan area from his

Page 77

Exhibit B.txt

24   account at the same time that the uncle was in Ann Arbor.

25   Q.  Where did the trip take the uncle and by the way, was the

82

1    uncle alone according to the information that you received as

2    far as this trip was concerned?

3    A.  No, the uncle was accompanied by his spouse, Fadine

4    Peterson (phonetic).

5    Q.  And where did the trip take them after the Detroit area?

6    A.  I may have the sequence incorrect but they did travel to

7    Chicago and to Canada, returned to Michigan and then traveled

8    back to Virginia.

9    Q.  And approximately when was it that they arrived back in

10   Virginia?

11   A.  I believe it was on or about September 6, 2001.

12   Q.  And do you know where they initially stayed when they

13   returned to the Virginia area and what part of the Virginia

14   area was that?

15   A.  It was the Herndon, Virginia area more or less.

16   Q.  Do you recall where they went initially there in the

17   Herndon, Virginia area?

18   A.  They stayed at one hotel for a couple of nights.  I can't

19   recall the hotel but then after one or two nights, changed the

20   hotel to the Marriott Residence Inn in Herndon.

21   Q.  And you recall what day that was that they went into the

22   Marriott Residence in Herndon?

23   A.  I'm not positive.

24   Q.  Approximately how long prior to September 11?

Exhibit B.txt
25   A.   Just two or three days prior.

83

1   Q.   What's the significance of the Marriott Residence in
2   Herndon as far as this investigation is concerned?
3   A.   That particular hotel is significant because our
4   investigation nationwide has revealed that at least three of
5   the hijackers of Flight 77 stayed at that hotel on September
6   10.
7   Q.   And the three hijackers have been linked to which of the
8   flights of the September 11 events?
9          MR. NEVIN:  Object to it as asked and answered.
10          COURT:  I'll allow him to answer (inaudible) response.
11          WITNESS:  The Flight 77 was the flight that eventually
12   crashed into the Pentagon.
13   BY MR. LINDQUIST:
14   Q.   After September 11, did an FBI investigation involve the
15   uncle and his wife?
16          COURT:  This might be a good time to stop before you
17   go into another area.  We'll go ahead and recess for one hour
18   and reconvene at 1:00.  The court's in recess.
19          CLERK: All rise.
20            (A recess was taken.)
21          CLERK:  All rise.  The Court is back in session.
22          COURT:  Good afternoon.  You may be seated.  You may
23   proceed where you left off.  The witness will return to the
24   stand.  I'll remind you you are still under oath.
25          MR. NEVIN:  Judge, could I interrupt just to -- for a

Page 79

Exhibit B.txt

84

1   moment?  I anticipate the need to present evidence to the Court

2   by a teleconference.

3          COURT:  I was advised of that by the clerk.  I will

4   break a little before 2:00 and (inaudible) set up --

5          MR. NEVIN:  That will be fine.

6          COURT:  (Inaudible.)

7          MR. NEVIN:  Thank you.

8          COURT:  You may proceed.

9   BY MR. LINDQUIST:

10  Q.  Agent Gneckow, before the lunch break, you provided

11  testimony about the computer images and if you recall, I

12  skipped over several as far as asking for your specific

13  comments and over the lunch break, you advised me that there

14  were several that you felt would be particularly pertinent as

15  far as their relevance; is that correct?

16  A.  That's correct.

17  Q.  If you'd take Exhibits 86, 87 and 91.  Do you find those?

18  86, 87 and 91.

19  A.  I've got them.

20  Q.  What does the image on 86 portray and its significance?

21  A.  What's interesting about the image on Exhibit 86 is that

22  the file name is "Dirty Bomb."  The photograph depicts or the

23  image depicts two or three individuals that are wearing

24  hazardous material protective gear including gas masks and the

25  like.