# EXHIBIT "C"

# PART 4 OF 6

Q. Turn to 87. What's the significance of that image?
A. That image is what appears to be a map of Kenya and there is emblazoned with a red star or --
Q. Asterisk-type --
A. Asterisk type mark where the city of Mumbasa, Kenya is located. That corresponds to the location of the city of Mumbasa. Again, what's interesting to me about this particular file is that the file name is "Recruits" for one thing and that that is the location of a terrorist attack.
Q. On the U.S. embassy there?
A. Yes, sir.
Q. And 91?
A. 91 appears to be an image of Amed Braheen (phonetic) who was arrested by the Spanish (inaudible) due to his connections to the September 11 terrorist attacks. The Spanish investigation in conjunction with ours indicates that there are strong ties between Braheen and Sheikh Al-Ouda.
Q. Also during the noon hour, I believe you received some information concerning the source of these images as far as the computers; is that correct?
A. That's correct.
Q. And we need to correct your testimony as far as where these images came from; is that right?
A. That is correct.
Q. Where did these images, Exhibits 5 through 94, come from as

far as the computers related to the search warrants that you've previously referenced?
A. Well, originally it was my understanding that they came solely from the computer at the engineering isotope lab. However, I was told that that is not correct. In fact, some of the images come from the defendant's personal computer taken from his home. And may I also clarify something? The images themselves were taken -- were taken from a mirror image of those hard drives so as not to taint the actual real hard drives.
Q. All right. A couple of other matters of clarification of your previous testimony. You talked about Islamic Assembly of North America and its offices in the Detroit area; is that correct?
A. That is correct.
Q. More specifically, where are the offices of the Islamic Assembly of North America?
A. Well, specifically, the offices are located I believe in Ypsilanti, Michigan which is a suburb of Ann Arbor.
Q. You also provided testimony about the web site event in Canada associated with Islam Way.com and the complaint by the Jewish entity regarding the recruitment publication there. Do you recall that?
A. Yes, I do.
Q. Can you tell us what the investigation revealed as far as

what happened to the web site Islam Way.com as it existed in Canada after that complaint and the investigation by the RCMP?

A. It's my understanding based on information received from the RCMP that when that newspaper article was published, within a day or two, the web site itself Islam Way.com relocated from Canada to Ann Arbor, Michigan.

Q. In your testimony, you refer to certain financial transactions between the defendant and the Islamic Assembly of North America, transactions that were characterized as loans. Do you remember that?

A. That's correct.

Q. Over the noon hour, you referenced to me specifically a check that you recall being identified as part of the financial investigation that had to do with the IANA and a loan; is that right?

A. That is correct.

Q. Tell us about that.

A. The financial investigation showed that there was a check from an IANA bank account back to the defendant and there was a notation in the memo line that indicated -- and I'm not exactly sure of the verbiage but it indicated that it may have been a repayment of a loan. The significance of that was when the endorsement on the back of the check was reviewed, it was indeed signed by the defendant. However, it was signed back over to an IANA official.

88

Q. When we broke, you were recounting the trip of the defendant's uncle and his wife to the United States around the

time of September 11, 2001; is that correct?
A. That is correct.
Q. I want to clarify one aspect of your testimony with regard to the Marriott Residence in Herndon. What did the investigation reveal as far as where the uncle and his wife were staying on the day prior -- or the evening prior to September 11, that is September 10?
A. Well, on the evening of September 10, the uncle and his wife were staying at the Marriott Residence Inn. On that same evening, our investigation has revealed that three of the hijackers also stayed in the same hotel.
Q. Do you have any idea of how many hotels there are in the Herndon, Virginia area?
A. I couldn't give you a specific number. I would venture there are several.
Q. Following September 11, did the FBI make contact with the uncle and his wife?
A. Yes.
Q. Approximately how long after September 11?
A. My understanding is that he and his wife were interviewed on or about September 17.
Q. And where did that interview take place? Do you know?
A. The interview took place at the hotel.

89

Q. And can you tell us what happened at that interview?
A. My understanding after speaking with the agent who conducted the interview was that during the course of the

interview, the uncle exhibited signs of physical distress and actually fainted to the ground during the course of the interview. He was subsequently brought to a local hospital and examined by a physician there.

Q. And did the investigation reveal whether or not anything wrong was found with the uncle?

A. No. In fact, the agent who conducted the interview spoke directly with the attending physician who told the agent that he could find nothing wrong with the patient and the opinion of the agent, she felt the attack was fained.

Q. The agent felt the attack was fained?

A. Meaning the seizure.

Q. Okay. That was the agent though that was of that perception?

A. Yes.

Q. All right. As a result of that seizure -- that fained seizure according to the perception of the agent, what was the result of the interview of the uncle?

A. It was effectively terminated.

Q. And was his wife interviewed?

A. Yes. While the uncle was being attended at the hospital, the interview continued with the spouse, Fadine Peterson

90

(phonetic).

Q. And generally speaking, the content of that interview did include the trip that you have been referencing?

A. Yes, it did.

Q. To the United States?

A. Yes, it did.
Q. Subsequent to that interview of the uncle and his wife by the FBI agents, was there yet another interview by the FBI later?
A. Yes.
Q. How much later?
A. Within the next day or so.
Q. By the same agents or different agents?
A. Different agents. He was -- the uncle was recontacted based on the circumstances of the incomplete interview. However, no additional information was obtained from the uncle.
Q. And following that interview, where did the uncle and the wife go?
A. They returned to -- my understanding is they returned to Saudi Arabia on or about September 19 I would say.
Q. Had any procedural mechanism been imposed by the Bureau to try and prevent their leaving?
A. There was telephonic contact between the agent who conducted the first interview based on that agent's opinion that the uncle should not be allowed to leave until additional



follow-up could occur specifically with regard to questions dealing with the events of September 11. However, her recommendation for whatever reason did not -- was not complied with.
Q. So they left without further contact; is that correct?
A. That is correct.

Q. Let's reference affidavit paragraph 44 in relation to the business relationship between the defendant and the Islamic Assembly of North America. Based upon your investigation, your personal involvement in this investigation, your knowledge of it, how would you characterize its business relationship with the Islamic Assembly of North America, his role if you will?

A. Well, it was a very close role. Based on the information we have obtained through our financial investigation, through intercepted communications, it's clear that the defendant had if not a central -- if not a leading role, then certainly a central role in the operation of that organization.

Q. In what capacities?

A. The capacities were multi-faceted. For example, his technical expertise was extremely valuable to IANA in the registration of web sites, the technical advisement to those running web sites. He was involved in much of the decision making process with regard to money flow, obtaining donations for the charity.

Q. Personnel decisions?

92

A. Yes.

Q. He played a key role in that as well?

A. Yes, he did.

Q. Would it be fair to say that for all intents and purposes, he was a senior officer of that organization?

A. I would say if not on paper, he was a de facto senior executive.

Q. Did that relationship -- that business relationship with

the Islamic Assembly of North America include one with its at least paper leader at the time?

A. Yes.

Q. And who was that leader at the time, the head of the Islamic Assembly of North America?

A. The then president was an individual by the name of Mohammed Al-Hamari.

Q. What did your investigation reveal as far as the nature of the relationship between the defendant and Mr. Al-Hamari?

A. The relationship was extremely close. Hundreds of telephone calls between the two, e-mail contact, financial dealings, face to face contact. What you might typically see in a corporation with the executive officers.

Q. Is Mr. Al-Hamari presently the subject of a government investigation?

A. Yes, he's currently under investigation.

Q. As an aspect of the defendant's business relationship with

93

the IANA, did that include disbursement of funds to individuals?

A. Yes, it did.

Q. And we're talking about affidavit paragraph 44 for reference, are we not?

A. Yes, sir.

Q. Can you give us an idea of some of the locations where money was sent as influenced or done by the defendant?

A. Not including wire transfers or money sent within the

United States, there were numerous wire transfers sent around the world to Cairo, Egypt; Montreal, Canada; Riyadh, Saudi Arabia; Aman, Jordan and Islamabad, Pakistan.

Q. Did your investigation reveal any transfer or transfers associated with an Amal Saltan?

A. Yes, sir, they did.

Q. Who's Amal Saltan?

A. Amal Saltan is currently actively involved in the Al-Manar internet magazine. He writes for the magazine, has some controlling interest in the magazine although the Al-Manar magazine which is internet site no. 3 on our web site chart on Exhibit 3 is also affiliated with the subject. He is the administrative contact for that magazine. But historically, Amal Saltan is of interest to us for this investigation because the defendant has sent him approximately $15,200 over the past two or three years in the form of wire transfers. Amal Saltan



is a former member of the Egyptian Islamic Jihad, the EIJ which is designated by the United States Government as a foreign terrorist organization.

Q. What's the significance of the designation as a foreign terrorist organization? What does that mean?

A. If for example an individual in the United States were to send money to or have significant contact financially or otherwise with an organization that is a foreign terrorist organization or with members of an FTO, that person would be in violation of U.S. law.

Q. And that designation is coming pursuant to a particular law

or procedure?
A. There is a process that is done at the highest levels of government where various organizations and individuals or information pertaining to those individuals or organizations are reviewed and a determination is made through executive order that these individuals and/or organizations would be designated as foreign terrorist organizations. I'd like to add that currently, Amal Saltan, it appears that he is espousing the fact that he is no longer a member of the EIJ although that is something that is still currently under investigation.
Q. Referring back to Mr. Al-Hamari, the defendant's business relationship -- relationship with him involved a particular bank account that the investigation revealed.
A. Yes, it did.

95

Q. Tell us about that bank account.
A. There is a bank account under the name of the defendant that is in Ann Arbor, Michigan yet the address on the bank account is that of Mohammed Al-Hamari in Ann Arbor, Michigan. In fact, the sole -- the only signatures on that account on the checks are from Mr. Al-Hamari. However, it is the defendant Mr. Al-Hussayen who is listed as the sole signatory on the account.
Q. Paragraph 49 of the affidavit refers to the travel activities of the defendant as revealed by his financial records primarily; is that correct?
A. That is correct.

Q. Can you give us an idea of the number of -- before I ask you that question, as revealed by the financial records showing either his own travel or travel of others that he helped fund; is that correct?
A. That is correct.
Q. Can you give us an idea of the number of states involved domestically as far as his travel is concerned?
A. As far as an exact number, I'm not certain. However, there is extensive travel on the west coast, southern United States, the Midwest, the east coast, extensive travel. In addition, there is travel funded for other individuals including travel as remote as Brazil.
Q. Did your investigation show that that travel was consistent

96

with the defendant as a very active officer of the Islamic Assembly of North America?
A. It seemed to go hand in hand with that particularly in the context of raising donations for the charity.
Q. Affidavit paragraph 50 refers to phone toll information gleaned by the investigation, correct?
A. Yes.
Q. What are phone tolls just briefly?
A. Phone tolls are a record kept of telephone calls that are made that are generally charged to a particular telephone number. Long distance calls, cellular telephone calls, things of that nature.
Q. Can you give us an idea of the breadth of the telephone activity revealed by these phone tolls investigation?

A. The extent of phone activity is tremendous. Just with contact with Mohammed Al-Hamari and the IANA for example, there are hundreds of telephone calls. And in addition to that, much of the telephone activity is not trackable by us at this point because for the past few years, the defendant has been using prepaid calling cards in order to make his long distance calls.
Q. How do prepaid calling cards prevent the generation of the information that the investigation would otherwise seek?
A. It's not impossible but it is extremely difficult to track the phone activity on prepaid calling cards.
Q. Affidavit paragraph 45 talks about another purported



charitable organization with whom the defendant had contacts; is that correct?
A. That is correct.
Q. What is that organization?
A. That organization is called Help the Needy.
Q. Tell us about Help the Needy. What has that historically consisted of?
A. Well, Help the Needy is an Iraqi relief organization that is located in Syracuse, New York. The Help the Needy or HTN as it's referred to was a spin off organization out of the IANA. In fact its leader, its president, Rafael Defere (phonetic), is the self proclaimed vice president of IANA.
Q. Are you aware as part of your participation in this case as to whether or not Help the Needy has been investigated by the federal authorities of the United States?

A. Yes, it has been.
Q. Do you have knowledge of what those -- that investigation consists of?
A. Yes. The investigation primarily focused on tax violations and violations of the U.S. embargo on Iraq.
Q. Can you tell us the state of that prosecution presently?
A. Yes. Rafael Defere and several other officials of Help the Needy have been indicted by a federal grand jury in New York. Their offices have been searched. Rafael Defere is currently in custody after being arrested on February 26 with a couple



other officers of Help the Needy.
Q. Did that -- did those events have anything to do with the arrest and search warrant events of this case?
A. Yes, they did.
Q. What?
A. Because of the close association between our defendant, Mr. Al-Hussayen, and Rafael Defere and the close associations between the IANA and Help the Needy, when the Syracuse FBI chose to conduct those searches and affect their arrest in Syracuse, our arrests and our -- our arrest rather and our search warrants here were coordinated in such a fashion that they were conducted at the same time.
Q. Has the investigation revealed a tripart type relationship among the defendant, Mr. Defere and Mr. Al-Hamari?
A. Definitely.
Q. What is the nature of that relationship according to the criminal investigation that you've done?

A. We have obtained information through a variety of different means that the defendant, Mr. Al-Hussayen, Rafael Defere, the president of Help the Needy, and Mohammed Al-Hamari, the then president of the IANA, have had extensive conversations, have met face to face on numerous occasions and have generally discussed the future of IANA, have discussed setting up boards of trustees, typical executive officer type of meetings.

Q. You mentioned that Mr. Defere was arrested and detained; is

99

that correct?

A. That is correct.

Q. Now, these two other individuals were subject of -- at least one other individual was subject of an arrest warrant in that coordinated case, correct?

A. That is correct.

Q. That person's name is what?

A. It's Iman (phonetic) Jarwan.

Q. And do you know if that individual has been detained?

A. It is my understanding that he is detained.

Q. In addition to the charges that you've mentioned otherwise as to Mr. Defere, are there any other charges relating to Mr. Jarwan in conjunction with this detention hearing?

A. I believe so although I'm unaware of the exact specifics.

Q. Do you know -- can I jog your memory? Does that involve visa fraud charges?

A. As a matter of fact, it does. Thank you.

Q. Affidavit -- excuse me. One more series of questions as

far as Help the Needy is concerned. Did your investigation show any direct financial transactions between defendant and Help the Needy?

A. Yes.

Q. In what form did those transactions occur; how were they reflected?

A. It's my understanding that those were in the form of



personal checks to Help the Needy.

Q. Do you recall a particular check or checks that had notations that are pertinent to what we're dealing with here?

A. Yes.

Q. Tell us about that.

A. On at least one, maybe more of the checks, there were notations and I believe they were in Arabic on the memo line that stated that the money sent to Help the Needy was for Iraq.

Q. Affidavit paragraph 46 references yet another charity; is that correct?

A. That is correct.

Q. And the name of that charity?

A. The name of that charity is Benevolence International Foundation.

Q. What did the investigation reveal as far as the connection between Benevolence International Foundation and this case?

A. Primarily the financial aspects of the investigation showed that Benevolence International Foundation has sent money to the IANA and in general terms, that money has been sent to assistant sponsoring conferences and the like.

Q. Has Benevolence International been subject of an investigation?
A. Yes, it has.
Q. Do you have knowledge of what the status of that investigation is presently?



A. Yes. It's my understanding that the leader of Benevolence International, a gentleman by the name of Arno (phonetic) has pled guilty to numerous charges and he is currently awaiting sentencing.
Q. Let me ask you this: To your knowledge, what was his role or relationship with BIF or Benevolence International foundation?
A. When he was in a leadership role of Benevolence International and he was specifically involved in providing material support to the Mujahideen in Chechnya.
Q. So those federal charges related to the operation by him of Benevolence International as a racketeering enterprise in providing material support to Bin Laden and Al Quaida?
A. Yes.
Q. Now, you indicated that he pled guilty. Do you recall what he pled guilty to? Let me see if I can refresh your recollection.
A. Thank you.
Q. Did he plead guilty to illegally averting charitable contributions to Mujahideen in Bosnia and Chechnya?
A. Yes, he did.

Q. But otherwise denied supporting Al Quaida and Bin Laden; is that correct?

A. That is correct.

Q. However, do you know what the position of the U.S.



attorney's office in Chicago is as far as the proof that they intend to introduce at his sentencing regarding the connection with Al Quaida and Bin Laden?

A. Yes. Their position is that they will be introducing information at sentencing that will clearly show that link.

Q. You mentioned with regard to -- I'm not sure I recall in regard to what but as far as the executive order that designates -- oh, it was with regard to the Egyptian Islamic Jihad, the executive order whereby an entity or organization can be designated a terrorist organization; is that correct?

A. That is correct.

Q. Do you know if -- is there a similar designation as far as an organization that doesn't designate as a terrorist organization but a terrorist support?

A. Yes. As a matter of fact, executive order 13224 gives the United States Treasury the authority to designate organizations and individuals as supporting terrorism.

Q. And was Benevolence International so designated by that executive order?

A. It was and as a result, their assets were frozen.

Q. Frozen by what entity?

A. Frozen by the United States Treasury.

Q. There is an acronym of OFAC.

A. Yes, it is.
Q. What does OFAC stand for?



A. That is the Office of Foreign Asset Control.
Q. Is that the entity that's responsible for making that -- for doing that freezing of assets?
A. Yes, sir, it is.
Q. There is yet another charity to which the defendant and the IANA have been connected by the investigation; is that right?
A. That's correct.
Q. And what is that charity?
A. That would be the Global Relief Foundation.
Q. And where is the Global Relief Foundation based?
A. Like Benevolence International, it is also based in the Chicago area.
Q. What did your investigation reveal as far as the connections among Global Relief Foundation, the Islamic Assembly of North America and the defendant?
A. Are you asking about financial?
Q. Financial, yes.
A. Well, we -- our financial aspects of the investigation have revealed that there have been checks -- personal checks written by the defendant to Global Relief and on the memo line of those checks, there is I believe again in Arabic a notation that the money is to go to Chechnya.
Q. Is that consistent with your knowledge of such transactions as they might be associated with the investigation of

international terrorism in general?



A. Yes.
Q. How so?
A. Investigations around the country that come across information such as this, personal checks with notations on the memo line, seem to indicate that the people that are sending the money have a specific purpose for that check. In this case, it's our belief that those checks were written specifically to go to the Mujahideen in Chechnya.
Q. Did your investigation reveal a connection between Global Relief Foundation and the Islamic Assembly of North America?
A. Yes, there is a connection.
Q. And generally speaking, what was -- what is that or has been that connection?
A. Well, the connection between Global Relief and the Islamic Assembly is like I had mentioned earlier where the IANA sponsors these annual conferences and invites charitable organizations from around the country to participate. Global Relief is one of those organizations and it's my understanding that Global Relief may also have sent money to the IANA to help pay -- offset the costs of these conferences.
Q. Does the name Al-Multayce mean anything to you?
A. Yes, it does.
Q. What's Al-Multayce?
A. Well, Al-Multayce is a meeting place.
Q. Where?

A. The specific reference to Al-Multayce as far as our investigation is concerned, it corresponds to one of the search locations that we executed our search warrants for on February 26. That is the apartment that I mentioned earlier that's located at 504 and a half D Street in Moscow, Idaho. Al-Multayce is a relatively small apartment, sparsely furnished -- or not furnished at all actually and inside that apartment is a place where many individuals would go and meet on a regular basis, primarily on Saturday evenings, to discuss information in private that was not necessarily to be discussed at the Islamic center in Moscow.

Q. Did that include the defendant, that group?

A. Yes, it did.

Q. Does Al-Multayce have anything to do with Al-Marreti?

A. Yes, it does.

Q. What's Al-Marreti?

A. Al-Marreti is a web site. It's also a bank account controlled by Mohammed Al-Hamari.

Q. Mohammed Al-Hamari again the historical leader --

A. The then president of IANA. Colocated at the Al-Multayce apartment on D Street was a computer that was attached to a credit card machine and from that computer, on-line sales for IANA were conducted and payments were received.

Q. And what was the connection with Al-Hamari as far as the control and maintenance of that account?

A. Although still under investigation, there is a bank account in the Detroit area under the name of Al-Marreti which is the same name as the web site that shows Mohammed Al-Hamari, the then president of IANA, as probably the sole signatory but at least one of the signatories on that account.

Q. Let's shift gears a little bit, Agent Gneckow. You've indicated that the investigation included a court authorized interception of certain communications by the defendant and including his wife; is that correct?

A. That is correct.

Q. In preparation for this hearing and the investigation otherwise, did you identify certain interceptions that might be of value as far as the court's determination in this particular case?

A. Yes, I did.

Q. Let's talk about a few of those, shall we? How do they reflect the number of interceptions that have been realized to your knowledge?

A. There are -- there are so many interceptions. These are just a tiny sample of what we have.

Q. Do you recall any interceptions in which the FBI is mentioned?

A. Yes, I recall at least two.

Q. Okay. Let me refer you to one I believe September 12 of 2002. Do you know which one I'm talking about?

A. I do.
Q. And the defendant was one of the -- this was a telephone intercept; is that correct?
A. Yes, it was.
Q. The defendant was one of the participants talking; is that right?
A. That is correct.
Q. And what was discussed between the defendant and the party that he was talking to as far as the FBI? What was the nature of this discussion?
A. Well, generally it was a business discussion that dealt with establishing as a venue for business something in the State of Texas. It was the defendant's response that he didn't feel that was a good idea because there's one company in particular that is having difficulty with the FBI in that state.
Q. You're referring to another call of November 25 of 2002. The defendant was a participant in this telephone call that was intercepted; is that right?
A. Yes.
Q. And they were talking about his studies at the University of Idaho; is that correct?
A. That is correct.
Q. Tell us what the --
COURT: The date of that again?

WITNESS: November 25, 2002.

BY MR. LINDQUIST:

Q. They discussed extensions; is that correct?

A. That is correct.

Q. Tell us about that.

A. Well, in this particular telephone call, it dealt with the defendant's attempts to get additional -- an additional extension or stipend from the Saudi government to allow him to stay longer to complete his studies. In the course of the conversation, the defendant made the statement that he was not prepared to have the FBI knock on his door.

Q. I'll refer you to a telephone call intercepted on October 24, 2002. The defendant's wife was talking with a friend; is that correct?

A. That is correct.

Q. I believe they discussed something that you referenced earlier with regard to the exhibits, the images from the computers; is that right?

A. That's correct.

Q. What was the nature of this discussion?

A. This discussion centered around the Mujahideen takeover of the Moscow music hall in Moscow, Russia. The content of the conversation was that it was the participants in the conversation's opinion that it was good to go from a defensive posture to an offensive posture with regard to (inaudible)

109

activity.

Q. Did the interception reveal any -- any expression by the

defendant's wife as far as her attitude toward America?

A. Yes. In that telephone call, she said that she hates America.

Q. Let me refer you to an intercepted call of November 19 of 2002 involving discussion between the defendant and someone else and discussing the arrest of a person in Palestine. Do you know what I'm referring to?

A. Yes.

Q. What was the gist of that conversation as far as what was happening in Palestine?

A. Essentially the conversation dealing with this particular arrest was something -- one of the individuals wanted to have posted or published on one of the web sites associated with the defendant, Mr. Al-Hussayen. However, it was Mr. Al-Hussayen who told the caller -- or the callee that he did not want to have any information published until they got additional details relative to the arrest.

Q. Let me refer you to an intercepted call of October 29, 2002 between the defendant and another person where they were talking about conferences.

MR. NEVIN: What was the date again?

MR. LINDQUIST: I'm sorry. October 29 of 2002.

BY MR. LINDQUIST:

110

Q. With regard to conferences. Do you know which one I'm talking about?

A. Yes.

Q. And earlier in your testimony, you referred to one of the publications, the web site publications, the term "operations"; is that correct?
A. That's correct.
Q. Is that term used here?
A. Yes, it was.
Q. Tell us about that.
A. In this particular phone call, the discussion of operations in the sense of suicide operations was discussed and the fact that this is a topic that always causes debate at the conferences. The significance of this particular call we believe is as a result of the Saudi mufti condemning suicide operations after --
Q. The Saudi --
A. M-U-F-T-I.
Q. What's that?
A. That is a religious political leader of the Saudi Arabian -- of Saudi. Following the attacks of -- the terrorist attacks of September 11, he issued a Fatwa condemning the suicide operations.
Q. Fatwa, what's that?
A. A Fatwa is a religious ruling typically issued by a sheikh

111

or someone in very high standing with the Islamic society.
Q. Please refer to a call of November 28 of 2002 involving the defendant that also used this term I believe a second operation; is that correct?
A. That is correct.

Q. Please tell us about that call.
A. In this particular conversation, Sami -- excuse me, Mr. Al-Hussayen and a friend of his discussed suicide operations in Palestine. They discussed the fact that there were many deaths and Mr. Al-Hussayen thank his friend for that information and said it was very powerful.
Q. I'd like to refer you to a call of December 4, 2002. That was intercepted but did not necessarily involve the defendant; is that correct?
A. Right. This was an e-mail communication that was sent to a group address so there were numerous recipients on this particular communication although the defendant was one of the people in the group address.
Q. And what was the nature of the item that was intercepted?
A. The item that was intercepted appears to be a communique from the Al Quaida political office extolling the virtues and successes of a Jihadist and suicide operations targeting the west.
Q. This specifically references, does it not, the bombings in Kenya?

112

A. Yes, it does. I believe it also references the attack on the USS Cole if I'm not mistaken.
Q. It references those two bombings -- the bombings of the two embassies; is that right?
A. That's correct.
Q. The World Trade Center?

A. Yes.

Q. The Pentagon; is that correct?

A. Yes.

Q. And the Pennsylvania -- or the plane that crashed in Pennsylvania as part of the 9/11 events; is that correct?

A. Yes, there was references to that as well.

Q. And I mean this is -- it's fairly extensive but essentially, what this proclaimed -- what does it teach you or instructing as far as these particular events of the past are related to the future?

A. It's clearly in my opinion a motivational document. This is the good stuff that we've done and let's continue doing it.

Q. Are you familiar as a result of your experience in this investigation with what is referred to as the Al Quaida political office?

A. I am somewhat familiar with it but not very -- in a detailed fashion.

Q. Are you experienced enough with it to say that this would be part of that infrastructure that you were talking about at

113

the beginning of your testimony associated with international terrorism?

A. Certainly. As part of any organization, something like a periodic newsletter or motivational document would be part and parcel of that.

Q. I'd like to refer you to a telephone call of January 19 of 2003 that was intercepted. That addressed involved Mr. Al-Hussayen and another individual as they talk about two of

Mr. -- of Sheikh Al-Ouda's lectures; is that right?
A. That is correct.
Q. Tell us what was said between the two gentlemen in this interception.
A. During this particular telephone call, Mr. Al-Hussayen discussed with the other individual the fact that there were two Sheikh Al-Ouda lectures, one of which had not been endorsed or supported by the Saudi government. During the course of the conversation, Mr. Al-Hussayen stated that he felt that both articles could be published and if they fell under any scrutiny, they meaning the operators of the web site, they would simply say that they are a service provider only and it won't happen again.
Q. Refer to a call of January 21 of 2003, just two days later involving the defendant and another Al-Ouda lecture; is that right?
A. I'm sorry. I think that is a Al-Hawali lecture.

114

Q. Is that Al-Hawali? Okay. Excuse me. What lecture are we referring to?
A. What date are we talking about?
Q. January 21 of 2003.
A. Right. I'm very sure that is a Al-Hawali lecture.
Q. Sorry. Okay. And what was the title -- first of all, how does it relate to this telephone call that was intercepted?
A. The telephone call itself was a discussion in which the defendant, Mr. Al-Hussayen, was talking about this article that

was going to come out, the article -- the title of the article being the anti Fatwah and the new tarters (phonetic).

Q. What is anti Fatwah? What does that mean?

A. Anti Fatwah is a violent movement to oust in this particular case the Jews.

Q. And did the investigation ultimately identify that article which was intercepted in this telephone conversation?

A. Yes, we did identify it.

Q. And can you tell us about the content of that article, what it contained? What did it say? First of all, where did you find it? Was it on the web site somewhere?

A. It was on the web site and in fact it was found on Sheikh Al-Ouda's web site, Islam Today.

Q. And that's on our chart, correct?

A. That is on our chart, yes.

Q. All right. What was the content of this publication? What did it say?



A. Well, the content of the publication spoke of the anti Fatwah and how important it was for the true believes to support it in any deed possible, whether by paying money, by writing articles, by actually supporting it through violence. But that the anti Fatwah was something that was forbidden to stop and the anti Fatwah itself encompassed several different fronts many of which -- or all of which are listed in this particular article. Among them are suicide operations, attacks on settlements, firing mortars, blowing up tanks, developing explosives, killing in hand to hand combat, attacks on bases,

strong intelligence pursuing important Jewish personalities, bribing the enemies. There were also references in the article to the United States calling the United States itself the new tarters (phonetic).

There's verbiage in here that states the only thing that will make America retract from war -- and I believe this is a reference to the possible war with Iraq. The only thing that will make America retract from war or any murderous project it has in the region is for Israel to be struck and hit causing it more and pain and suffering in such a fashion that there will be no solution but to stop the American aggression.

Q. Okay. Let me refer you to an e-mail that was intercepted on April 15 of 2002. Do you know which one I'm referring to?

A. Yes, I do.



Q. And it referred to Jihad, did it not?

A. Yes, it did.

Q. And weapons?

A. Yes, it did.

Q. In what way?

A. This particular message was forwarded to Mr. Al-Hussayen from another student at the University of Idaho essentially soliciting donations and funding for Hamasse which is a foreign terrorist organization. The message in short lays out the cost for bullets, assault rifles, explosives, et cetera and calls for support for the Muslim brothers that are fighting in Palestine.

Q. Another e-mail that was associated with Mr. Al-Hussayen was intercepted on April 16 of 2002; is that correct?
A. That is correct.
Q. This one dealing -- this one being an article in favor of suicide bombings; is that correct?
A. That is correct.
Q. And in sum, what did this article proclaim as far as suicide bombings were concerned?
A. I have to apologize. I do not have that article with me.
Q. But you can tell us that it was an article extolling the propriety of suicide bombings; is that right?
A. Yes, it was.
Q. An intercepted e-mail of November 12, 2002 regarding the

117

reservation of a web site. Are you familiar with that?
A. Yes, I am.
Q. What was the nature of that e-mail?
A. This e-mail communication dealt with a specific request to have the defendant, Mr. Al-Hussayen, set up a web site for an article by one of the sheikhs. We believe it is Sheikh Al-Ouda. The speech was going to deal with the Iraqi situation vis-a-vis the United States and in fact a name for that web site was recommended to Mr. Al-Hussayen.
Q. Were you able to locate that talk for which the web site was reserved, the Iraq talk?
A. Yes.
Q. And can you give us an idea of what the content or the orientation of that talk was for purposes of this hearing?

What did it say?
A. Well, the lecture or the article itself was actually unsigned so it is difficult for us to --
Q. We don't know who the author is.
A. We don't know who the author is. We believe it was Sheikh Al-Ouda based on the e-mail communication that occurred prior to that. Before I talk about the article, I think it's important to note that the web site name that was requested of Mr. Al-Hussayen is the web site name that he registered for this particular article although it was linked to a second web site. The web site in particular that the article exist -- or



was located on was Sawtna, S-a-w-t-n-a I believe, and it was linked to another web site called Nation Voice all registered by Mr. Al-Hussayen.

The speech itself was very similar to much of the verbiage we have seen so far and that is it dealt with showing -- or arguing that the United States was completely wrong in an inference to go against Iraq and that those -- any efforts in that regard would be dealt with.
Q. Is there any reference in the talk to charity associations and organizations?
A. I believe there were. However, I don't have that information in front of me.

MR. LINDQUIST: Your Honor, we're a little bit before the hour you indicated that you wanted to break.

COURT: It's about five till. We'll go ahead and

recess. We'll take a presentation of evidence out of order at this time. We'll take a recess.

CLERK: All rise.

(A recess was taken. The testimony of Ab Dul Rakman Al-Hussayen was taken. Direct Examination of Michael Gneckow was continued.)

COURT: We'll go ahead and then continue with the Government's evidence.

MR. NEVIN: Your Honor, thank you for accommodating that out of order (inaudible).



COURT: You're quite welcome. You may proceed.

MR. LINDQUIST: Thank you.

BY MR. LINDQUIST:

Q. Agent Gneckow, we were talking about some specific interceptions that the investigation revealed. I'd like to refer you to the one of January 17 of 2003 that involved a martyrdom poem. Do you know what I'm talking about?

A. Yes, sir, I do.

Q. That was an e-mail interception; is that correct?

A. That is correct.

Q. And tell us about that, how that was intercepted on the defendant's e-mail.

A. This was an e-mail communication that came from Islam Today I believe. The communication, it was --

Q. Islam Today so that we remember is the web site associated with Sheikh Al-Ouda?

A. Yes, Sheikh Salman Al-Ouda, that's correct. This was a

short poem, the title of which was "A Martyr under 20" and if you like, I can --

Q. Do you have the gist of that poem there?

A. Actually I do.

Q. Go ahead.

A. The poem goes as follows:

MR. NEVIN: Judge, let me object to this without additional testimony about the context. It can't be told from



the testimony thusfar whether this was something that Mr. Al-Hussayen received under circumstances, whether (inaudible). I think that foundation (inaudible).

MR. LINDQUIST: That's cross-examination. The link to the defendant has been established as far as the interception of his e-mail. It's dealing with martyrdom and the other testimony that the agent has provided. It's very relevant.

COURT: I'll overrule the objection.

BY MR. NEVIN:

Q. Go ahead.

A. The poem as translated states, "I kiss your young heart. I kiss the toes upon your feet that are going to their death. I kiss a beautiful head and beautiful eyes. I kiss your heart where religion and your strong faith live. I kiss your heart which was certain that life that has fettered me and the poor pretentious others was nothing but a passing trip. I kiss your picture and your name and your wound, your wound that embarrasses shallow people like me. God is generous and you

are the martyr."

Q. I'd like to you reference another interception I believe. A telephone call the day before the defendant's arrest. He was arrested on what day?

A. Mr. Al-Hussayen was arrested on February 26, 2003.

Q. So this would be on the 25th; is that correct?

A. That is correct.



Q. And this call was between the defendant and whom?

A. Between the defendant and one of his brothers.

Q. Do you know which brother that was?

A. Yes. It was Khalid (phonetic).

Q. One of the brothers mentioned by Abdul Rakman, the brother that just testified; is that correct?

A. That's correct. I believe he is the brother residing in Calgary.

Q. And can you tell us what this call was about?

A. There was a number of items discussed during the conversation. Towards the end of the conversation, the brother asks Mr. Al-Hussayen where he would recommend that he send money. Mr. Al-Hussayen tells his brother to send money to Help the Needy since according to Mr. Al-Hussayen it was above suspicion unlike some other organizations that are under monitoring. The brother asked if the money was going to Iraq. Mr. Al-Hussayen said yes and that it was a good choice.

Q. I'll also refer you to telephone call that was intercepted on November 16 of 2002 involving the defendant and another individual. Do you recall that?

A. Yes, I do.
Q. And what was the gist of that conversation within the context of your testimony here today?
A. In that conversation, Mr. Al-Hussayen stated that they, meaning the United States, have to live in terror in order to



rationalize their actions.
Q. If you would, do you have exhibit -- do you have Exhibit 4 there in front of you?
A. Yes, I do.
Q. And that exhibit is a synopsis, if you will, of the events associated with the false statement and visa fraud charges of the indictment; is that correct?
A. Yes, sir, that is.
Q. And they correspond to essentially affidavit paragraphs 15 and 19 through 28; is that right?
A. That's correct.
MR. LINDQUIST: Your Honor, I offer that for the benefit of the Court in simply assessing that aspect of the affidavit.
COURT: Any objections to the summary?
MR. NEVIN: No, sir.
COURT: All right.
(Government's Exhibit No. 4 admitted.)
BY MR. LINDQUIST:
Q. Agent Gneckow, you mentioned previously in your testimony that your investigation revealed much of the defendant's

doctoral dissertation pursuit at the University of Idaho; is that correct?

A. That's correct.

Q. Did that investigation reveal that he was struggling in



that doctoral pursuit?

A. It certainly indicated that, yes.

Q. In what way?

A. It appears that Mr. Al-Hussayen, the defendant, has required at least three extensions of his stay in the United States. Interviews of University of Idaho personnel seem to indicate that he is about a year and a half behind schedule on his studies and in fact some official or an official at the university expressed frustration in his lack of progress in pursuit of his doctoral (inaudible).

Q. And who was that official?

A. That official would be Dr. Debra Frinke.

Q. We'll go to that here in just a moment but before we go there, may I infer from your testimony that the defendant is now functioning under the fourth extension to your knowledge?

A. The details of the extension are unclear to me. The extension was not something that was extended to Mr. Al-Hussayen in the form of additional stipend payments from the Saudi government.

Q. What has your investigation revealed as far as the status of the stipend payments?

A. It's my understanding that the stipend payments from the Saudi government have ceased and in fact Mr. Al-Hussayen is

supporting his continued stay in the United States out of his own pocket or with assistance from others other than the Saudi



government.
Q. And do you know whether or not a deadline has been established or did the investigation reveal that as far as that extension -- fundless extension if you will and when the doctoral must be had?
A. It appears on the limited information that I have in my possession that sometime in May appears to be the end of the extension.
Q. Does that correspond to essentially the semester that we're in as far as the University of Idaho is concerned?
A. Essentially, yes.
Q. You mentioned Dr. Frinke what has been her relationship with the defendant?
A. For a time, Dr. Frinke was the defendant's advisor for his doctoral dissertation.
Q. Is she now?
A. She no longer is now.
Q. Why not?
A. There were a series of events that ultimately led to the defendant switching advisors. Dr. Frinke stated that although Mr. Al-Hussayen -- although she considered Mr. Al-Hussayen to be very bright, she was puzzled and frustrated by his lack of progress in pursuing the degree.
Q. Did she say anything about him being preoccupied or

otherwise distracted?



A. In fact, she did. She said it appeared that he was preoccupied. She said something was going on. She couldn't put her finger on it but she felt that something needed to be done, a change of some sort was in order, some action needed to be taken. That was preceded by Mr. Al-Hussayen switching advisors on his own.

Q. Did she say anything that had to do with her coming close to taking some action -- negative action toward him because of his lack of progress?

A. She indicated that because of his lack of progressing, because something she couldn't immediately identify, something that dealt with his preoccupation perhaps with other items, she was being forced quickly into the position of perhaps having to take some action which ultimately could have been her reassigning him to another advisor herself but certainly she was facing a crossroads.

Q. Your understanding is from interviews of her that the defendant took steps to change advisors in light of that?

A. Yes.

Q. Who is the defendant's advisor now to your knowledge?

A. That would be a Mr. Dickinson at the University of Idaho.

Q. Has he also been interviewed as part of this investigation?

A. Yes, he has.

Q. And can you tell us how he characterized Mr. Al-Hussayen as far as how the defendant compares with his other students?

A. Well, I believe that based on the interview, Mr. Dickinson is fond of Mr. Al-Hussayen. He feels he's bright but in comparing him with past students he's had as advisees, he said Mr. Al-Hussayen would not be in the star or spectacular category of previous students.

Q. In your testimony, you've indicated that the defendant had his office in the isotope lab there at the University of Idaho, correct?

A. That is correct.

Q. Did your investigation indicate that that has always been the case or not?

A. No. As a matter of fact, he has not always had his lab at the -- or his work station at the isotope lab. In fact, our investigation revealed that no one knew that he had moved his lab or his work station to that lab. No one in authority, that is neither Dr. Frinke, Dr. Dickinson nor people responsible for oversight of the lab itself.

Q. And it was there at the isotope lab where he had his work station that the computer with the large hard drive was identified; is that correct?

A. That's correct.

Q. Did you have occasion to talk to Dr. Frinke about the computer security situation there at the University of Idaho, the network?

A. I did.