# EXHIBIT "C"

# PART 5 OF 6

Exhibit B.txt

127

1   Q.  Generally speaking, how did she characterize the
2   vulnerability of that network to you?
3   A.  She said that unfortunately because of the academic setting
4   of the university and simple funding issues that the University
5   of Idaho's network was very vulnerable to cyber probing, cyber
6   attack.
7   Q.  Did you discuss with her as part of the interview her
8   position with regard to the program that the advanced students
9   have available to them and how that relates to computer
10  security versus hacking?
11  A.  Yes, we did have an opportunity to discuss that with her.
12  Q.  And essentially, what was her position with regard to that
13  program -- the significance of that program and the concepts of
14  security and hacking?
15  A.  Well, Dr. Frinke as I mentioned earlier in my testimony is
16  considered preeminent within circles of the government with
17  regard to computer security, intrusion defense, things of that
18  nature.  Because of her knowledge in that area, she takes her
19  job very seriously when it comes to instructing new students
20  that are part of these programs.  She told me that she makes it
21  a point upon her initial contact with new students to make sure
22  that they understand to not use the knowledge that they're
23  learning in the program to go out and conduct hacking because
24  certainly someone who knows how to defend a computer system
25  will also know the weaknesses and how to exploit it.

128

Page 121

Exhibit B.txt

1          She says she takes great pains in even using the FBI
2     as an example to say that if you go out -- addressing the
3     students, if you go out and do any hacking, the FBI will
4     investigate.
5     Q.  You might have said this and I didn't catch it.  If I
6     didn't, I apologize.  Did she characterize these advanced
7     students as sophisticated hackers on the right side of the law?
8     Does that ring a bell?
9     A.  Actually, no.  In our discussions during the interview
10    process, those were -- those were things that we threw back and
11    forth in discussion.  But clearly, it was apparent during the
12    course of the interview that there has to be an ethical line
13    that students with that kind of knowledge have to walk and not
14    cross.  And I believe that she takes a very serious look at
15    that and impresses that upon her students.
16    Q.   I have a newspaper article here with an article attributed
17    to the Associated Press that indicates a quote of Dr. Frinke
18    it says, quote, "The technology that protects the system is the
19    same technology that can bring a system down," closed quote.
20    Assuming she made that statement, is that consistent with what
21    she told you in her interview?
22    A.   I think it's very consistent.  Dr. Frinke even stated that
23    with a cursory look at a student in the CSDS program at the
24    University of Idaho, you might think of that person -- you
25    might believe that person is a hacker because the tools that

⬚

129

Page 122

Exhibit B.txt

1  they use in order to learn their profession to do their
2  research are the same tools that a hacker would use.
3  Q.  I also have an article that came off of a web site that is
4  attributed to I believe the Lewiston Tribune also quoting Dr.
5  Frinke.  It says, "The average computer owner, Frinke said, can
6  help guard against everything from identity theft to terrorism
7  by routinely adapting or using more complicated passwords.
8  Those who have constant on-line service should also invest in
9  the latest firewall components to help insure against entry."
10  Is that comment, assuming she made it, consistent with her
11  interview by the FBI?
12  A.  Absolutely.  I think she is very aware of the potential
13  vulnerabilities of computer systems and that is consistent with
14  what we learned from our interview with her.
15  Q.  Did your investigation include chatting with security
16  officials at the University of Idaho with regard to that
17  network?
18  A.  Yes, it did.
19  Q.  Anyone in particular?
20  A.  Yes.  The IT security director, for lack of a better term,
21  Tony Opheim (phonetic) was interviewed.  I myself did not
22  conduct that interview but I am privy to the information
23  obtained.
24  Q.  And did that interview include -- did it address entries
25  into the network that Dr. Frinke perhaps is referring to here

130

1  in this article and the security danger associated with that?
2  A.  Yes.

Page 123

Exhibit B.txt

3   Q.  Generally speaking, what is your understanding of what this

4   fellow said as far as entries into the network and the

5   difficulties that that can cause?

6   A.  I think Mr. Opheim is very comfortable with the level of

7   security he has for the network based on the limited budget

8   that he has.  However, he is also very concerned about the

9   vulnerabilities of the network and in the discussions that our

10  investigators have had with him, one of his biggest concerns is

11  of probing or intrusion from within versus from without.  For

12  example, if someone were to have access to the network and in

13  such a fashion, they essentially bypass some of the stronger

14  security layers, get inside the layers of the onion if you will

15  and are able to probe the system, probe the network which as

16  you recall from my earlier testimony is a very advanced, very

17  fast, very sophisticated network.

18  Q.  And connected with other networks; is that right?

19  A.  Yes, it is.

20  Q.  Did your investigation include analysis by computer experts

21  with regard to the large hard drive computer in the isotope

22  lab?

23  A.  Yes.

24  Q.  Did that analysis render a result or an opinion as to the

25  nature of that computer with that large hard drive from the

131

1   standpoint of being a server?

2   A.  Yes, it did.

3   Q.  What's your understanding of that analysis?

Page 124

Exhibit B.txt

4    A.   My understanding from the analysis or the security scan

5    that was run on that particular computer is that it is or was a

6    file server.  The concern by the information technology

7    security personnel at the University of Idaho is independent

8    file service created on a network essentially create a back

9    door for entry into the network.

10   Q.   An open portal; is that correct?

11   A.   Yes.

12   Q.   With the security officer, did you discuss whether or not

13   this type of phenomenon, a server in fact resulting in an open

14   portal in a left-handed way, how that relates to the security

15   policy of the University of Idaho?

16   A.   Yes.  He said that -- I'm sorry.

17   Q.   Go ahead.  What was said?

18   A.   Periodic scans are always made of the computer systems at

19   the university looking for violations of university policy.  An

20   independent file server is a violation of policy and it would

21   be immediately shut down and the persons responsible for either

22   the creation or use of that file server would then be

23   answerable to the dean of the university and perhaps have their

24   network privileges removed.

25   Q.   Did the technical analysis indicate that the defendant's

⬜

132

1    computer as a server had in effect had that effect of opening

2    that portal?

3    A.   Yes.  An independent scan of that particular server was run

4    and there were indications that IP addresses from outside the

5    network had perhaps probed the network.  What he was not able

Page 125

Exhibit B.txt

6   to tell us was the extent, whether it was just a probing issue,

7   whether it was a false positive, whether someone actually

8   entered the network and was inside downloading or probing for

9   security weaknesses within.  The scan could not tell us any of

10  that but what it did tell us was that there were at least two

11  IP addresses, possibly three, that appear to have paned or

12  probed at a minimum the system.

13  Q.  Did one of those IP addresses correspond to a web site that

14  we've discussed here today?

15  A.  Yes, it did.

16  Q.  And what is that web site?

17  A.  That web site is Islam Way.com.

18  Q.  And that is associated with the Islamic Assembly of North

19  America; is that correct?

20  A.  Yes, it is.

21  Q.  Shifting gears slightly, did your post-arrest interviews

22  reveal anything as far as people opining about the defendant's

23  radical orientation changing after September 11?

24  A.  Yes.

25  Q.  What did those interviews reveal?

133

1   A.  There was at least one interview that I'm aware of where a

2   fellow student, an associate, stated that prior to September

3   11 --

4           MR. NEVIN:  I'll object to it without further

5   foundation with respect to who made the statement.

6           COURT:  Response?

Page 126

Exhibit B.txt
7         MR. LINDQUIST:  That's fine.

8    BY MR. LINDQUIST:

9    Q.  Who made the statement?

10   A.  During the interview, a fellow student, Sala Al-Korida

11   (phonetic), statements were made that prior to September 11,

12   the group to which Mr. Al-Hussayen belongs was very radical but

13   that they toned down their rhetoric for lack of a better word

14   after September 11.

15   Q.  To your knowledge, Agent Gneckow, does the United States

16   have an extradition treaty with Saudi Arabia?

17   A.  To my knowledge, there is no extradition treaty.

18   Q.  And to your knowledge at the present time, independently of

19   this prosecution and this detention hearing mechanism, does the

20   Immigration and Naturalization Service or what was formally

21   before Homeland Security the Immigration and Naturalization

22   Service have a detainer lodged against the defendant at the

23   present time for those independent administrative proceedings?

24   A.  It is my understanding that there is a detainer.

25   Q.  And is your understanding that those charges are similar to

                                                          134

1    the charges in this indictment and also reflect the orientation

2    of this investigation?

3    A.  Yes, sir.

4         MR. LINDQUIST:  Your Honor, thank you.  Those are the

5    questions that I have of Agent Gneckow.

6         COURT:  (Inaudible.)

7         MR. NEVIN:  Is this a time we can take a brief recess,

8    Your Honor?
                        Page 127

Exhibit B.txt

```
 9          COURT:  All right.  We'll be in recess for 15 minutes
10   until 3:30.
11          CLERK: All rise.
12            (A recess was taken.)
13          COURT:  You may be seated.  You may proceed.
14                    CROSS-EXAMINATION
15   QUESTIONS BY MR. NEVIN:
16   Q.  Let's start with the last point you testified about first,
17   this business of talking to Deb Frinke. Did I understand you to
18   say that Dr. Frinke was not aware that Sami was occupying a new
19   work station at the isotope lab?
20   A.  That's correct.
21   Q.  And he had moved to that location fairly recently, isn't
22   that true?
23   A.  I'm not positive of the date he moved.
24   Q.  You haven't checked that out in the course of your
25   investigation?
```

```
 1   A.  Those sorts of things are under investigation right now.
 2   Unfortunately, nobody knew when he moved into the isotope lab.
 3   Q.  No one knew?
 4   A.  No one at the university that we've interviewed to this
 5   date.
 6   Q.  Yeah.  But it's not true that no one knew, is it?
 7   A.  Oh, I'm sure you're correct.  There are some people that
 8   know when he moved over there.  But as far as our investigation
 9   is concerned, we have yet to interview someone who knows when
```

Exhibit B.txt

10   he moved there.

11   Q.  Yeah, your investigation is incomplete in that respect but

12   we're talking about an office that is a physical location at

13   the university, right?  I mean it's visible to the naked eye,

14   correct?

15   A.  That is correct, sir.

16   Q.  Anybody who wanted to go there could see that Sami was

17   occupying that space, right?

18   A.  That's not correct, sir.  That office space is locked much

19   of the time.

20   Q.  The time -- this is the computer, is it not, that all of

21   these pictures that you found was located on, right?

22   A.  No, sir.  Some of the photographs came from that computer.

23   Some came from Mr. Al-Hussayen's home computer.

24   Q.  Right.  And the bulk of them came from the computer at the

25   isotope lab; isn't that true?

136

1    A.  Sir, I'm not sure what the percentage is.

2    Q.  Did you determine when those pictures had been placed on

3    the hard drive of that computer?

4    A.  As you recall from my previous testimony, sir, it was just

5    a cursory review.  Complete analysis of the computer has yet to

6    be conducted.

7    Q.  Well, isn't it true that those pictures -- that many of

8    those pictures were probably placed on that computer before

9    Sami ever started using it?

10   A.  Sir, as I stated, I --

11   Q.  You don't know.

Page 129

Exhibit B.txt

12  A.  That part of the investigation, that analysis has yet to be

13  conducted.

14  Q.  Isn't it true that Sami has only started using the computer

15  in that location for something like the last six months or so?

16  A.  As I mentioned earlier, sir, we're still looking into the

17  exact date that he moved in there.

18  Q.  Well, yes, sir, but you testified -- your testimony

19  indicated that these photographs -- I mean you came here and

20  testified that these photographs are connected to Sami

21  Al-Hussayen and you indicate that -- the implication is that

22  he's downloaded them and preserved them for the purposes of

23  having them on his computer because they -- they're consistent

24  with his beliefs.  I mean that was the tenor of your testimony,

25  wasn't it?

137

1   A.  Sir, I never stated that he downloaded any of those images.

2   Q.  Well, why were you -- why was it raised then?

3   A.  Because in the normal course of an investigation that deals

4   with computer activity, typical analysis of computers includes

5   retrieving documentary evidence, photographic images, things of

6   the like.

7   Q.  So you had time to print them out and attach the file name

8   to them but you didn't have time to determine when they were

9   downloaded?

10  A.  Sir, the computer at the isotope lab as an example is an 80

11  gigabyte computer.  To put things in perspective, that is

12  thousands, perhaps millions of documents.  The search was

Exhibit B.txt

13  conducted just on the 26th and this was just a cursory review
14  of what was on the computer.
15  Q.  Sir, if you had time to print these images, you had time to
16  tell us when they were downloaded, didn't you?
17  A.  No, sir.
18  Q.  Okay.
19  A.  No, sir.
20  Q.  Okay.  Now, you know, don't you that when I log onto the
21  New York Times.com, for example, that happens to be my home
22  page that the images that are on New York Times.com are
23  downloaded to my computer and they stay there on my computer
24  until I go and I delete them.  Don't you know that to be true?
25  A.  Sir, I don't have an internet computer at home so I don't

138

1  necessarily know that.
2  Q.  You're conducting this investigation and you don't know
3  that?
4  A.  Sir, I rely on my --
5       MR. LINDQUIST:  This is just argumentative.
6       COURT:  I'll sustain the objection.
7       MR. NEVIN:  Well, Your Honor, the witness --
8       COURT:  Proceed by questions, Counsel.
9  BY MR. NEVIN:
10  Q.  Well, sir, you then aren't aware of how pictures end up on
11  a computer?  Is that your testimony?
12  A.  My testimony, sir, is that I rely on the technical experts
13  to tell me that.
14  Q.  And so the answer would be you don't know how they get

Page 131

Exhibit B.txt

15   there, you personally?

16   A.   I'm sorry.  Was that a question?

17   Q.   Yes.

18   A.   I personally rely on the technical experts to provide me

19   information relative to the computer analysis aspects of our

20   investigation.

21   Q.   So if I told you that when a person logs onto a news

22   organization's web site and the photographs are downloaded onto

23   a person's computer, if I told you that they stay there until

24   you go and delete them, you wouldn't be able to disagree to

25   that?

139

1    A.   I would have to refer to the experts.

2    Q.   Did you say that was an 80 gigabyte hard drive?

3    A.   That is my understanding.

4    Q.   That will hold a lot of photographs, won't it?

5    A.   That's what I've been told, yes.

6    Q.   And photographs will keep flowing onto it until it fills

7    up, right?

8    A.   I would have to defer to the experts on that, sir.

9    Q.   And it is the filling up of a computer with photographs

10   that would typically cause its performance to slow down and it

11   would alert a person to the fact that it was filling up that

12   something needed to be done about that; isn't that true?

13   A.   Again, sir, I would have to defer to the experts on that.

14   Q.   You testified that this is unusually large, this 80

15   gigabyte hard drive.  That a 3 or 4 gigabyte hard drive would

Page 132

Exhibit B.txt

16  be more a typical kind of (inaudible).

17  A.  That's what I've been told.

18  Q.  Isn't it true that a 3 to 4 gigabyte hard drive won't even

19  run the operating systems that are used at the University of

20  Idaho?

21  A.  Again, sir, I'd have to defer to the experts on that.

22  Q.  Did I understand you to say that Dr. Frinke told you that

23  she, Dr. Frinke, made it clear to all of her students that if

24  they did any hacking, the FBI would in some way be made aware

25  of it and would investigate it?

140

1  A.  Yes.  Dr. Frinke made statements to us that indicated that

2  she was cognizant of the potential security concerns and made

3  every effort to allow her students to understand that security

4  on these systems is paramount as far as her teachings are

5  concerned.

6  Q.  So anybody who was using the computer -- anybody who would

7  have been in her program would be -- would have some awareness,

8  some capacity to be aware of the level of sophistication that

9  the FBI has in gathering up these kinds of communications?

10  A.  I don't know that that's necessarily what she said to me,

11  sir.  I believe that she said that she used the FBI as an

12  example of an entity that would potentially investigate in the

13  event there was hacking.

14  Q.  She didn't tell you that Sami had ever been involved in

15  hacking, did she?

16  A.  She did not.

17  Q.  And she didn't tell you that the system at the University

Page 133

Exhibit B.txt

18  of Idaho was ever compromised in any way, did she?

19  A.  She did not say that it had ever been compromised but she

20  did express grave concerns about its vulnerable status.

21  Q.  She told you that Mr. Al-Hussayen had changed advisors on

22  his own?

23  A.  That is what she said, yes.

24  Q.  Did she tell you that she had had an illness, I believe

25  breast cancer, that prohibited her from being at the university

141

1   for something on the order of a year?

2   A.  We were aware of that, yes.

3   Q.  You were aware of that before you testified here?  You were

4   aware of that earlier today when you testified?

5   A.  Was I aware of the fact that Dr. Frinke had suffered from

6   an illness?

7   Q.  Yes.

8   A.  Yes.

9   Q.  Isn't that the reason that Sami Al-Hussayen changed

10  advisors because she was really no longer accessible to him?

11  A.  I have not had the opportunity to ask Mr. Al-Hussayen why

12  he changed advisors.

13  Q.  You had the opportunity to ask Dr. Frinke that, didn't you?

14  Didn't she tell you that?

15  A.  Dr. Frinke said that he changed advisors on her own --

16  excuse me, on his own rather than putting her in the position

17  of having to take action herself but that the break-up was

18  amicable.

Page 134

Exhibit B.txt

19  Q.  Do you think it's unusual for a person to get extensions on

20  the completion of their doctoral work?

21  A.  I don't know, sir.  I don't know if it's unusual or not.

22  Q.  Well, your testimony implied that it was unusual.

23  A.  I certainly think that three extensions sounds unusual.

24  Q.  Okay.  Have you made inquiry about that to see whether

25  doctoral students typically get extensions, whether that's

142

1  unusual or not?

2  A.  Not specifically, sir.

3  Q.  You referred to a statement that you had overheard or that

4  someone in your investigation had overheard that Sami

5  Al-Hussayen had been involved in and a statement was made to

6  the effect that in the United States, they have to live in

7  terror in order to rationalize their actions?  Do you remember

8  that?

9  A.  Yes, I do remember that.

10  Q.  What was the date of that?

11  A.  I would have to refer to my notes.

12  Q.  Feel free to do that.

13          WITNESS:  Your Honor, may I?

14          COURT:  Yes.

15  BY MR. NEVIN:

16  Q.  Are you ready to --

17  A.  Yes, sir, I am.

18  Q.  Go ahead.

19  A.  The date as reflected in my notes is November 16, 2002.

20  Q.  And was that an e-mail?

Exhibit B.txt

21   A.  I don't recall specifically whether it was e-mail or
22   telephonic intercept.
23   Q.  Mr. Gneckow, what did it refer to?  Can you give it some
24   context?
25   A.  I unfortunately don't have the document in front of me.

143

1   Q.  Aren't you aware that a lot of people around this country
2   feel that one of the justifications for going to war in Iraq
3   which many people disagree with is a degree in a sense of
4   people being terrified and therefore to urge us on to go to war
5   in Iraq?
6   A.  I'm sorry, sir.  I didn't understand your question.
7   Q.  Well, have you been following the debate about whether we
8   should go to war in Iraq over the last few months?
9   A.  Yes, sir, I have.
10   Q.  Aren't you aware that there are a lot of people who believe
11   that argument for going to war in Iraq is based on trying to
12   make people in the United States feel that they live in terror
13   or that they should be fearful and that therefore it's
14   necessary to go to war in Iraq to eradicate terrorism?
15   A.  That may be the argument that some people are placing, yes.
16   Q.  Is that what Mr. Al-Hussayen was referring to in the
17   conversation?
18   A.  Sir, as I mentioned before --
19   Q.  You don't know.
20   A.   -- I don't have content here in front of me.
21   Q.  Now, you also testified that on the day before he was

Page 136

Exhibit B.txt

22   arrested, Sami spoke to his brother Halid?

23   A.   Khalid.  That's spelled K-h-a-l-i-d.

24   Q.   And you think it's pronounced Khalid?

25   A.   That's how I pronounce it, sir.

144

1    Q.   And is it correct that the brother -- that Khalid asked

2    Sami, "where should I send money?"  And Sami said to Help the

3    Needy?

4    A.   Yes.

5    Q.   Because that was above suspicion?

6    A.   That's exactly right, sir.

7    Q.   And that he understood the money was going to Iraq?

8    A.   Sami's brother actually asked him if the money was going to

9    Iraq and Sami said that yes, it was.

10   Q.   Don't you know that there have been embargos in place

11   against Iraq for a number of years?

12   A.   Yes, sir, I am aware that there is an embargo.

13   Q.   And aren't you aware that that's created tremendous

14   hardship among common people in Iraq?

15   A.   Sir, that may be so but the embargo is law.

16   Q.   And the embargo has caused there to be medical hardship,

17   nutritional hardship, matters of that sort?  You're aware of

18   that, aren't you?

19   A.   Sir, I've not done any research into the conditions in

20   Iraq.

21   Q.   Isn't it reasonable for people to want to try to provide

22   some relief to people under those circumstances?  Isn't that in

23   fact kind of a noble purpose?

Page 137

Exhibit B.txt

24    A.  Sir, you recall from my previous testimony, I said the

25    United States is an area in which because of its affluent

145

1    nature and because the American people are so giving that this

2    is an area where donations to charities of worthy causes are

3    something that are common place for us and that's why it's a

4    place that terrorist organizations like to operate out of.

5    Q.  On January 17 of 2003, you stated that there was a

6    martyrdom poem and you read from the poem.

7    A.  I did.

8    Q.  And you indicated that the e-mail was from Islam Today.

9    Who at Islam Today was it from?

10   A.  It's interesting you bring that up because I spoke with Mr.

11   Lindquist and we were going to correct the fact that it came

12   from Islam Way versus Islam Today.

13   Q.  There's a difference, isn't there?

14   A.  Yes, there is a difference.

15   Q.  All right.  And with respect to Islam Way, where did

16   that -- who did that e-mail come from?

17   A.  My recollection of the document is that it came from Islam

18   Way itself; not from a specific individual.

19   Q.  So it was a publication of Islam Way.com?

20   A.  I don't know that to be certain.  The Islam Way.com e-mail

21   address is what sent that to Mr. Al-Hussayen.  I don't know

22   necessarily that it was a publication so much as perhaps it was

23   just an e-mail that included that.

24   Q.  Was it sent to anyone besides Mr. Al-Hussayen?

Page 138

Exhibit B.txt
25   A.  I'm not certain.


                                                            146


     1   Q.  Isn't it correct that Islam Way has mailing lists of

     2   thousands of people to whom communications are sent?

     3   A.  Sir, I don't know that for a fact.

     4   Q.  Maybe as many as 90,000?

     5   A.  Sir, I don't know that.

     6   Q.  Are you -- did you look to see what Sami's GPA was at the

     7   University of Idaho?

     8   A.  Yes, sir, I looked at it on a number of occasions.

     9   Q.  It's a 3.88, isn't it?

    10   A.  My recollection that the last one is a 3.88, yes.

    11   Q.  Isn't it true that he went all the way through his doctoral

    12   program at the University of Idaho and got one B, all the rest

    13   A's in his courses?

    14   A.  My recollection of his studies indicate that yes, he did

    15   get good grades.

    16   Q.  And yet your testimony (inaudible) that he was struggling?

    17   A.  As you recall, my testimony stated that in the interview

    18   with Dr. Frinke, she believed that he was struggling based on

    19   his lack of progress in the pursuit of his doctoral

    20   dissertation which is not necessarily the same thing as

    21   attending class and receiving grades.

    22   Q.  Did you mention that on April the 15th, Sami had received a

    23   message from another student soliciting money for Hamasse?

    24   A.  I'll have to double check the date.  If you'll bear with me

    25   for a moment.

                            Page 139

Exhibit B.txt

147

1   Q.  Sure.

2   A.  Your question again, please?

3   Q.  April 15 of 2002, a message to Sami requesting soliciting

4   money for Hamasse?

5   A.  On April 15, 2002, Mr. Al-Hussayen did receive an e-mail

6   message from another student at the University of Idaho.  The

7   content of that message was essentially a solicitation of funds

8   for Hamasse.  In that particular e-mail, there was information

9   that suggested the cost of bullets per bullet of automatic

10  weapons, explosives, et cetera.

11  Q.  And you didn't tell us what Mr. Al-Hussayen's response was.

12  A.  I did not tell you what his response is, you're correct.

13  Q.  What was it?

14  A.  Sir, I don't have his response in front of me.

15  Q.  So if I sent you an e-mail describing donations to Hamasse

16  in an unsolicited e-mail, would that make you guilty of

17  something?

18  A.  Sir, I didn't say that someone who receives an e-mail like

19  that is necessarily guilty.  However, individuals who routinely

20  receive e-mail messages that talk about Jihad, that talk about

21  terrorist activity, that is something of concern to me.

22          MR. NEVIN:  Your Honor, I have three exhibits that I

23  would ask to be marked.

24          COURT:  All right.  The bailiff will hand them to be

25  marked.  Marked as Defendant's Exhibits A, B and C.  Copies are

Page 140

Exhibit B.txt

148

1   provided to (inaudible).

2           MR. NEVIN:  Yeah.

3           MR. LINDQUIST:  They have?

4           MR. NEVIN:  Yeah.

5           WITNESS:  Thank you.

6   BY MR. NEVIN:

7   Q.  I'll ask if you have Defendant's Exhibits A, B and C in

8   front of you?

9   A.  Yes, sir.

10  Q.  And do you recognize those, sir?

11  A.  I recognize Exhibit A as a photocopy of what appears to be

12  an article from the Seattle Post (inaudible).  Exhibit B is

13  what appears to be another article also from the Seattle PI and

14  Exhibit C is again what appears to be another article from the

15  Seattle PI.

16  Q.  And the date of those articles?

17  A.  The date of the article for Exhibit A is -- appears to be

18  August 2, 2002.

19          MR. LINDQUIST:  Your Honor, I'm going to object.  May

20  I ask a question in aid of that objection?

21          COURT:  All right.

22          MR. LINDQUIST:  Agent Gneckow, have you seen any of

23  these three exhibits before looking at them right now?

24          WITNESS:  No.

25          MR. LINDQUIST:  Foundation hasn't been laid to allow

149

Exhibit B.txt

1   this witness to be addressing these exhibits.

2          COURT:  Response.

3          MR. NEVIN:  Well, Your Honor, I'll state by way of

4   proffer that these are articles which appeared in the Seattle

5   Post Intelligence August the 2nd, 2002, some six months

6   before -- more than six months before Sami was arrested and

7   they refer to Sami and there will be additional testimony about

8   these matters.  And they indicate that members of the Muslim

9   community in the Palouse were made crystal clear aware that the

10  FBI was conducting an investigation of allegations of money

11  being funded to improper -- funneled to improper organizations;

12  that this information became available, as I say, six months

13  before Sami's arrest and I think it's important because as we

14  know, Sami made no attempt to flee the country despite the fact

15  that these articles were published.

16         COURT:  Well, as I stated at the outset, the formal

17  rules of evidence do not apply in a detention hearing.  We're

18  just going to proceed by proffer or otherwise.  To the extent

19  the objection is based more upon the rules of evidence than the

20  matter that should be considered by the Court, I'll overrule

21  the objection to the extent that the witness may have knowledge

22  of what's contained in the articles or whatever the

23  (inaudible).

24  BY MR. NEVIN:

25  Q.  And you've never seen these before?

150

Page 142

Exhibit B.txt

1   A.  No, I don't believe I have.

2   Q.  Are you aware of this -- these articles being written?

3   A.  I seem to recall that there was information that part of

4   our investigation had been leaked to the media.  However, I try

5   to make it a habit not to concern myself with the actual

6   written stories that come out.

7   Q.  You're saying it was not a concern to you that your -- some

8   of the aspects of your investigation may have been leaked to

9   the media?

10  A.  No, that's not what I said.  I said the content of the

11  stories themselves are of little concern to me.  The fact that

12  it was leaked to the media was of concern to me.

13  Q.  And the reason that it would be of concern to you is

14  because it might reveal to the people that you were

15  investigating the fact that you were investigating them and

16  then in response to that, they might try to flee or take other

17  actions?

18  A.  Yeah.  Among the other actions they would take could

19  potentially be the destruction of valuable evidence as well.

20  Q.  Right. And possibly trying to flee the jurisdiction to

21  avoid being around when you arrested them.  That's a

22  possibility as well.

23  A.  It is a remote possibility, yes.

24  Q.  Well, do you have information that Mr. Al-Hussayen has

25  destroyed evidence?

151

1   A.  It would be very difficult to determine if say hard

2   documentary evidence in the form of paper had been destroyed

Page 143

Exhibit B.txt

3   and things were shredded or burned or put away other places.

4   It would be difficult to know that.

5   Q.  Sure.  But as difficult as it would be, you do sometimes

6   find that kind of thing out and you don't have any evidence of

7   that having occurred in this situation?

8   A.  Sir, Moscow, Idaho is about two hours south of our office.

9   The logistics of being able to keep an eye on the physical

10  comings and goings of people down there are quite difficult.

11  If someone were to leave the house and destroy evidence, it's

12  very possible we would never know.

13  Q.  And again, you don't have evidence that there's been any

14  destruction of evidence?

15  A.  The investigation --

16          MR. LINDQUIST:  That's been asked and answered, Your

17  Honor.

18          MR. NEVIN:  No, actually it hasn't been answered, Your

19  Honor.

20          MR. LINDQUIST:  It has been answered by this witness.

21          COURT:  Well, just a moment.  Let the Court rule on

22  the matter.  Can you respond to that question directly yes or

23  no?

24          WITNESS:  The investigation has yet to determine

25  whether evidence has been destroyed.  However, as we stated

 

152

1   throughout my testimony, the investigation is ongoing.

2   BY MR. NEVIN:

3   Q.  And you have acquired mountains of evidence, would that be

Page 144

Exhibit B.txt

4   fair to say?  Is that true?

5   A.  A lot of evidence, yes.

6   Q.  You testified about a check that Sami wrote to the Global

7   Relief Foundation, did you not?

8   A.  Actually I believe I said it was a check or checks written

9   to Global Relief, yes.

10  Q.  And those would have written on Sami Al-Hussayen's bank

11  account?

12  A.  I believe that is the case, yes.

13  Q.  Which bank account uses his name, right?

14  A.  I'm sorry.  Your question?

15  Q.  The bank account uses his name.

16  A.  Which bank account uses his name?  Is that what you're

17  asking?

18  Q.  No.  The bank account that -- from which the checks to the

19  Global Relief Fund were written were written on a bank account

20  that has Sami Al-Hussayen's name attached to it, right?

21  A.  That is correct, yes.

22  Q.  And the checks have his name as well printed right on them,

23  don't they?

24  A.  Yes, I believe so.

25  Q.  Not any effort to hide the fact that that -- that that

153

1   check was being written to that organization, right?

2   A.  Well, not necessarily unless you take into the account the

3   fact that the memo line is written in Arabic versus in English.

4   Q.  Yes.  And do you have anybody in your organization who

5   speaks Arabic, sir?

Page 145

Exhibit B.txt

 6   A.  As a matter of fact, we do have a number of language
 7   specialists who speak Arabic but there are none assigned to the
 8   Coeur d'Alene office nor to the Boise office and that's where
 9   the lion's share of the evidence regarding the financial
10   aspects of the investigation are conducted.
11   Q.  The testimony that you provided about the Al-Multayce, the
12   apartment at 504 and a half D Street, do you remember that?
13   A.  Yes.
14   Q.  You indicated that there were private discussions which
15   were undertaken which were not to be discussed in public.
16   A.  I don't believe that's what I said, sir.
17   Q.  What did you say about that?
18        MR. LINDQUIST:  About what, Your Honor?  There was a
19   large number of questions directed toward that.
20        COURT:  They're referring to the apartment and what
21   occurred there.
22   BY MR. NEVIN:
23   Q.  Was their testimony not that it was a place to hold private
24   discussions?
25   A.  I believe that my testimony did shadow -- or did share

154

 1   information such as that and that's based primarily on
 2   investigative experience.  Generally around the country, these
 3   sorts of investigations clearly indicate that there are
 4   separate secluded meeting places by which many groups that are
 5   currently under investigation can meet privately to discuss
 6   private things.  These meetings typically took place on

Page 146

Exhibit B.txt

```
 7   Saturday evenings in Moscow on the other side of town from the
 8   Islamic center.  Not everyone from the Islamic center was
 9   invited to these meetings.  Therefore, it appears that these
10   meetings were for more private discussions.
11   Q.  Sir, that was a social club, wasn't it?
12   A.  Sir, I've never been asked to attend.  I would not know.
13   Q.  Well, aren't there foosball tables -- isn't there a
14   foosball table there?
15   A.  Sir, I've never been inside the Al-Multayce apartment.
16   Q.  Well, but the FBI has been inside there.  Didn't they serve
17   a search warrant there?
18   A.  That is correct.
19   Q.  Well, you've not been told that there was a foosball table
20   and a pingpong table there?
21   A.  Sir, no one told me that there is a foosball table inside
22   the apartment and until someone tells me such, I won't know.
23   Q.  In any event, you don't have -- in all of your
24   interceptions and all the rest, you don't have any indication
25   that any kind of secret conversations took place at that
```

155

```
 1   location, do you?
 2         MR. LINDQUIST:  Your Honor, could we approach a side
 3   bar, please?
 4         COURT:  All right.
 5             (A side bar discussion was had.)
 6   BY MR. NEVIN:
 7   Q.  Mr. Gneckow, you also described payments -- some checks
 8   that had been written by Sami to -- that had been intended to
```

Page 147

Exhibit B.txt

 9   go to Chechnya.  And that those -- those were checks which were
10   directed to the Global Relief Foundation; is that correct?
11   A.  That is correct.
12   Q.  And again, those checks were written on Sami's own bank
13   account, checks that had his name printed on them, correct?
14   A.  I'm not sure without the checks in front of me but I would
15   imagine that is the case.
16   Q.  Do other people write checks to the Global Relief
17   Foundation?
18   A.  Yes.  It's my understanding that the Global Relief
19   Foundation receives many checks.
20   Q.  Thousands of checks from people all over; isn't that true?
21   A.  I don't know what the number is, sir.
22   Q.  Did you indicate that the Global Relief Foundation has been
23   declared to be a terrorist organization?
24   A.  Sir, I believe my testimony stated that pursuant to
25   executive order 13224, it has been designated by the U.S.

                                     156

 1   treasury department as a terrorist support organization under
 2   the guidelines of OFAC, the Office of Foreign Asset Control.
 3   Q.  Is the same true of Help the Needy?
 4   A.  No, sir.  I do not believe that Help the Needy has been
 5   designated under OFAC.
 6   Q.  Is it true that Help the Needy has been indicted as an
 7   organization?
 8   A.  I'm not absolutely positive that the organization itself
 9   has been indicted.

                              Page 148

Exhibit B.txt

10  Q.  The organization IANA, Islamic Assembly of North America,

11  has not been designated as a terrorist organization, has it?

12  A.  Not at this time, it hasn't.

13  Q.  And not at any time in the past, has it?

14  A.  No, sir.

15  Q.  Not at any time when Sami Al-Hussayen was dealing with it,

16  right?

17  A.  Well, at this time, we have a bunch of evidence as a result

18  of search warrants at IANA that are in the process of being

19  reviewed.  At the conclusion of that review, we'll see what

20  happens.

21  Q.  Yes.  And my question was that at no time during the time

22  that Sami Al-Hussayen was dealing with IANA was it ever

23  declared to be a terrorist organization?

24  A.  And his dealings with them continue to date; is that

25  correct?

157

1  Q.  Today?  They continue today?

2  A.  To date I said.

3  Q.  Is that your testimony, that he continues to deal with them

4  today?

5  A.  Sir, obviously he can't be dealing with them today.

6  Q.  Right.  So let me ask the question again.  Isn't it true

7  that at no time when Sami Al-Hussayen has ever dealt with IANA

8  has it been declared to be a terrorist organization?

9  A.  Not by OFAC, no, sir.

10  Q.  By someone else?

11  A.  Currently investigations clearly point to the fact that

Page 149

Exhibit B.txt

12    they're considered to be a support for terrorism.

13    Q.  So in other words, you're thinking about declaring them to

14    be a terrorist organization?

15    A.  Sir, that's not my call.

16    Q.  And isn't it true that at all times that Sami has dealt

17    with IANA that it has been a 501(c)(3) corporation?

18    A.  I'm not certain whether the entire time it has been but I

19    believe that is true.

20    Q.  The government has never acted to take away its tax exempt

21    status?

22    A.  Not yet.

23    Q.  It hasn't happened in the past.  Not at any time when Sami

24    was dealing with them was it -- was that status taken away?

25    A.  No, sir, not yet.

                                                              158

1    Q.  Isn't it true that their assets were frozen at a time after

2    September the 11th but then the freeze was lifted shortly

3    afterwards?

4    A.  Yes, sir.  I'm vaguely aware of that incident, yes.

5    Q.  IANA has not been indicted, has it?

6    A.  No, sir.

7    Q.  Has any person who is presently a principal of IANA been

8    indicted?

9    A.  I'm not exactly certain of the answer of that, sir.  I know

10    that we have individuals who may still be in active status with

11    IANA that are currently under arrest or under indictment.  The

12    current status of those individuals I'm not certain of right

Exhibit B.txt

13   now.

14   Q.  You've referred to IANA from time to time as a charity and

15   IANA has a legitimate purpose even in your view; isn't that

16   true?

17   A.  It's a purported charitable organization, yes.

18   Q.  Well, it conducts seminars and conventions and operates

19   summer programs up in Canada.  You're aware of that, aren't

20   you?

21   A.  I'm not aware of summer programs in Canada, no, sir.

22   Q.  You're aware that undertaking those activities costs money,

23   aren't you?

24   A.  Of course.

25   Q.  You're also aware that they maintain an 800 number called

159

1    Fatwah. Do you know what that is?

2    A.  Yes, sir, I'm aware of the hot line.

3    Q.  And that's a number that people can call to get questions

4    answered about Islamic law and Islamic religious issues?

5    A.  I have never spoken to anyone who has called that line,

6    sir.

7    Q.  You've not made an effort to determine whether that's a

8    legitimate operation or enterprise?

9    A.  Sir, based on the number and various activities including

10   the volume of web sites, the Fatwah line is one of the areas

11   that we have not paid very close attention to other than

12   financial flows back and forth between individuals involved in

13   that.

14   Q.  Well, you know that it costs money to run the Fatwah line,

Page 151

Exhibit B.txt

15    don't you?

16    A.  I don't know that, sir.

17    Q.  Then you know as well that IANA runs something called the

18    radio net.

19    A.  Yes, I'm aware that they run a web site called radio net.

20    Q.  And you're aware that there was an effort at one time to

21    start a radio station at IANA, aren't you?

22    A.  I'm not necessarily aware of that, no.

23    Q.  Do you know that it costs money to operate the IANA radio

24    net?

25    A.  I would imagine it probably does cost money, sir.


160


1    Q.  Now, you mentioned a quarterly magazine that IANA

2    publishes, Al-Manar Al-Jaheed.  You're familiar with that,

3    aren't you?

4    A.  Yes, I am.

5    Q.  And in fact you testified about money being sent to Amal

6    Saltan, did you not?

7    A.  I did.

8    Q.  Isn't it true that Amal Saltan has been responsible for

9    publication of Al-Manar Al-Jaheed?

10    A.  My understanding is that Amal Saltan is actively involved

11    in that effort, yes.

12    Q.  Yeah.  And you said that Sami had sent Mr. Saltan some

13    $15,200 over a period of time, correct?

14    A.  That does not include money sent directly from IANA to

15    Saltan.

Exhibit B.txt

16   Q.  I was just asking you about money that Sami sent.  That was

17   your testimony, wasn't it?

18   A.  It is although Sami being an officer -- de facto officer at

19   least of the IANA, moneys flowing from the IANA to Amal Saltan

20   I believe are pertinent.

21   Q.  How often were moneys received from -- how often did Sami

22   send money to Amal Saltan?

23   A.  I'm not specifically sure of the number of times but the

24   amount is $15,200.

25   Q.  Is it correct that it costs money to publish the magazine

                                                              161

1   Al-Manar Al-Jaheed?

2   A.  Sir, I haven't looked at the books.

3   Q.  You haven't.  You haven't looked at IANA's books?

4   A.  They've been seized as part of a search warrant and I have

5   not reviewed that as yet.

6   Q.  Isn't it true that the magazine Al-Manar Al-Jaheed is

7   received by American universities?

8   A.  Sir, I don't know that.

9   Q.  Isn't it true that IANA publishes books?

10   A.  I do believe that they publish books, yes.

11   Q.  And you can get on Amazon.com right now and find four or

12   five titles that IANA has published, can't you?

13   A.  Sir, do you recall from my testimony I don't have an

14   internet computer.

15   Q.  Are you aware that IANA provides scholarships to students?

16   A.  I'm not aware of that, sir.

17   Q.  Are you aware that IANA has a library program for prison
                        Page 153

Exhibit B.txt

18  inmates?

19  A.  Yes, I'm aware of that.

20  Q.  Are you aware that the government reimburses IANA for their

21  expenses associated with that project?

22  A.  Sir, if I may, during my testimony previously, I said that

23  these various charitable organizations around the country do

24  charitable work but portions of the work are not necessarily

25  sent to good causes and in fact in many cases, portions of the

162

1   money are siphoned off for diabolical causes.  So to say to me

2   that IANA is involved in charitable work simply restates what I

3   testified to previously.

4           MR. NEVIN:  Your Honor, I ask that the answer be

5   stricken as nonresponsive.

6           COURT:  It is nonresponsive.  Please just try your

7   best to answer the questions asked by counsel.

8           WITNESS:  Yes, Your Honor.

9   BY MR. NEVIN:

10  Q.  The question was are you aware that they have a public

11  library project?

12  A.  I'm not aware of that, sir.

13  Q.  Well, have you analyzed what IANA has done with the money

14  that you say it received from Sami Al-Hussayen?

15  A.  We have done some analysis in that, yes.

16  Q.  Is it your testimony that it was used for operation of

17  IANA?

18  A.  I believe it is used for operation of IANA, yes.

Page 154

Exhibit B.txt

19   Q.  And for these legitimate purposes, among others, that I

20   have just articulated?

21   A.  What the money has done after it's paid out as salary out

22   to the employees, I'm not aware of that.

23   Q.  Do you know how many people give money to IANA?

24   A.  No, sir, I don't.

25   Q.  Do you know what organizations give money to IANA?

163

1   A.  I know some.

2   Q.  Is it your intent -- is it your belief that all of the

3   organizations and all of the people who provide money to IANA

4   has committed crimes?

5   A.  Sir, my previous testimony, I said that many people send

6   money -- the reason many of these organizations exist in the

7   United States is because people donate money to these

8   organizations believing that the end result is going to be the

9   charitable -- the charitable services that the organization

10   purports.  So certainly people will send money to charitable

11   organization including IANA not knowing where the money's going

12   but assuming it goes to the charitable cause that they're told.

13   Q.  How long has your investigation of IANA been ongoing?

14   A.  That's kind of difficult to say.  The investigation of the

15   defendant Mr. Al-Hussayen was initiated shortly after the event

16   of September 11, 2001.  As part of the investigation of Mr.

17   Al-Hussayen, IANA was identified and subsequently was

18   investigated.

19   Q.  So you don't know when the investigation of IANA began?

20   A.  Sir, if I could reference some of the case files, I could

Page 155

Exhibit B.txt

21   tell you exactly the date but I don't have the case files in
22   front of me.
23   Q.  Are they available to you readily today?
24   A.  No, sir.
25   Q.  Despite all of the investigation that you've done, however,

                                                                164

1   you still are not -- you still have not caused IANA to be
2   indicted, correct?
3   A.  Sir, IANA is not under indictment at this time.
4   Q.  So to a person from the outside looking in at IANA, during
5   all of the periods of time that we've been talking about, '98,
6   '99, the year 2000, the year 2001, the year 2002, IANA looks
7   for all intents and purposes like a legitimate organization
8   from the outside, doesn't it?
9   A.  Oh, not necessarily, sir.
10         MR. LINDQUIST:  I'll object to the form of the
11   question from the perspective of whom?  From the perspective of
12   a law enforcement officer investigating international terrorism
13   or what?
14         COURT:  The witness was starting to answer the
15   question in any event.  I'll let the -- are you standing on
16   your objection?
17         MR. LINDQUIST:  Yes.
18         COURT:  I will sustain the objection and the question
19   can be rephrased.
20         MR. NEVIN:  All right.
21   BY MR. NEVIN:
                        Page 156

Exhibit B.txt
22   Q.  From the point of view of a person -- not from the point of
23   view of a law enforcement person.  Let's start from the point
24   of a view of an ordinary person.  IANA has all the appearances
25   of a legitimate organization, does it not?

                                                                    165

1    A.  Sir, that's a difficult question for me to answer.  I've
2    been in federal law enforcement for 17 years.  To ask me to
3    tell you what a reasonable nonlaw enforcement person would
4    think is -- that's a difficult question for me to answer.
5    Q.  You offered testimony about Sami's Uncle Saleh.  Do you
6    recall that testimony?
7    A.  Yes, I do.
8    Q.  What is Saleh's background?  Have you determined that?
9    A.  I believe that he is currently a minister in the Saudi
10   government and his post is Mecca at this time.
11   Q.  Right.  The Islamic holy city?
12   A.  Yes.
13   Q.  And you don't advocate or contend that he advocates
14   terrorism, do you?
15   A.  Sir, not having had the opportunity to interview him, I
16   can't really answer that question.
17   Q.  You're not aware of him ever having written or spoken in
18   favor of terrorism, are you?
19   A.  I have no information at my disposal to analyze regarding
20   that.
21   Q.  And so you simply don't have any evidence to suggest that,
22   do you, and nor does the FBI?
23           MR. LINDQUIST:  To suggest what, Your Honor?
                      Page 157

Exhibit B.txt

24          MR. NEVIN:  That he's involved in terrorism.
25          WITNESS:  Sir, based on the events that resulted in

                                                              166

1    his interview and subsequent interview, I don't necessarily
2    have information that suggests that he isn't something --
3    someone that we need to talk to about terrorism.
4    BY MR. NEVIN:
5    Q.  Was it your testimony that he was seen together with the
6    terrorists who were at that hotel?
7    A.  No, sir, that was not my testimony.
8    Q.  He wasn't seen with them at all, was he?
9    A.  Sir, I have no information based on the investigation that
10   he was observed in the company of the hijackers.
11   Q.  You don't have any evidence that he knows the hijackers, do
12   you?
13   A.  Sir, I have no evidence to suggest that he doesn't know the
14   hijackers.
15   Q.  And Mr. Gneckow, if he were truly aware of what the
16   hijackers were about to do and supported it or had been
17   involved in it in some way, the last place he would be with
18   them is at the hotel with them the day before the hijacking
19   occurs.  Doesn't that make sense to you?
20   A.  Sir, you're asking me to speculate into the mind of a
21   person I've never met.
22   Q.  Well, the last place that anybody with advanced knowledge
23   of September 11 would be would be there at that hotel with the
24   hijackers unless they were one of the hijackers.  I mean
                                Page 158

Exhibit B.txt
25   doesn't that make sense to you?


167


1          MR. LINDQUIST:  Your Honor, that's a nice argument but
2    we should leave that for closing argument.  I'd be happy to
3    address it.
4          COURT:  All right.  I'll sustain the objection.
5    BY MR. NEVIN:
6    Q.  Well, isn't it more likely in your view, sir, that it's
7    just a coincidence?
8          MR. LINDQUIST:  And again that's just argument.  If
9    counsel wants to make that argument in closing, I'd be happy to
10   respond.
11         COURT:  All right.  I'll sustain the objection.
12   BY MR. NEVIN:
13   Q.  So how old is Saleh?
14   A.  I'm not exactly sure but I believe his date of birth was in
15   1931.
16   Q.  So he's a man in his 70's.
17   A.  If that date of birth is correct, yes.
18   Q.  And was it your testimony that a number of people were
19   questioning him?
20   A.  I believe my testimony was that he was interviewed once on
21   September 17 by a couple of FBI agents and then perhaps a day
22   later.  I'm not sure of the date.
23   Q.  Was it hostile questioning?
24   A.  My understanding, sir, is that when questions were asked
25   relative to the event of September 11, that precipitated a

Page 159

Exhibit B.txt

168

1    seizure.
2    Q.  So you have a 70-year-old Saudi man who's within days of
3    September 11 is being interviewed by FBI agents and your
4    testimony is that an attack that he had was fained?
5    A.  Sir, the testimony that I provided was based on the
6    information received from the interviewing agent who was
7    perhaps in the best position to make an assessment after also
8    speaking with the attending physician at the hospital.
9    Q.  Mr. Gneckow, isn't it true that all of the money that you
10   claim that Sami forwarded to IANA was forwarded from his own
11   personal bank accounts?
12   A.  Sir, based on the volumes of the accounts involved in this,
13   I wouldn't be comfortable in saying that all of the money has
14   come from his personal accounts.
15   Q.  Well, the vast majority of it?
16   A.  Again, sir, there's continued investigation that needs to
17   be conducted.  For example, a search warrant conducted at Mr.
18   Al-Hussayen's house discovered the existence of a bank account
19   that belongs to another individual who has since left the
20   United States that Mr. Al-Hussayen apparently is using as well.
21   Q.  Well, sir, you don't know of any money that Sami
22   Al-Hussayen sent to IANA that did not come out of his personal
23   bank accounts, do you?
24   A.  That's not necessarily true.
25   Q.  What money do you know of that Sami sent to IANA that did

Page 160