# EXHIBIT "C"

# PART 6 OF 6

Exhibit B.txt

169

1    not come out of his personal bank accounts?

2    A.  Sir, during the solicitation of donations for these

3    charitable organizations, in particular for IANA, and based on

4    the review of Mr. Al-Hussayen's bank account and the bank

5    accounts of other associates in Moscow, Idaho, there are a lot

6    of cash transactions that occur.  And it's difficult for me to

7    say where those cash transactions come from.  They could come

8    from Mr. Al-Hussayen's account.  It could come from others'

9    accounts.

10          MR. NEVIN:  Well, Your Honor, I ask that be stricken

11   as nonresponsive to the question I asked.

12          MR. LINDQUIST:  It was very responsive.

13          COURT:  Well, I will not strike the testimony.  He was

14   responding to whether he has information that the money came

15   all out of the personal checking accounts.  He responded that

16   apparently there was some cash transactions (inaudible) respond

17   to that.

18   BY MR. NEVIN:

19   Q.  Your testimony is that there was cash transactions between

20   IANA and Mr. Al-Hussayen?

21   A.  No, sir.  My testimony is that based on the fact that there

22   are these cash transactions that exist out there, the

23   difficulty in tracking that makes it very hard for us to

24   determine whether moneys came from other places other than Mr.

25   Al-Hussayen's account that he personally delivered to IANA.

170

Exhibit B.txt

1    Those are things that require further investigation.
2    Q.  Right.  But at this point, you just don't know of any such
3    transfers, do you?
4    A.  Yes, sir.  But I also don't know that they don't exist.
5    Q.  The bank accounts list -- the bank accounts in Moscow and
6    in Pullman list Sami's correct home address, don't they?
7    A.  I believe the ones in Moscow and Pullman do list his
8    address in Moscow.
9    Q.  And those accounts, according to your testimony, were used
10   to send money to IANA.  Isn't that correct?
11   A.  That is correct.
12   Q.  And the way the banking system works is that checks are
13   photocopied or microfilmed and retained and anybody who wrote a
14   check to IANA on their own bank account would not be able to
15   conceal the fact that they had done so.  Isn't that true?
16   A.  That is assuming of course that the information on the
17   accounts is correct.  For example, my earlier testimony
18   indicated that there is a bank account under Mr. Al-Hussayen's
19   name in Michigan that is solely used by Mohammed Al-Hamari, the
20   president of IANA.
21   Q.  And what was it used for?
22   A.  Sir, I don't know.  But all of the checks written off of
23   that account bear Mr. Al-Hamari's signature.
24   Q.  Well, I understand and with respect to that account, you
25   know that all of those -- all of the money in that account was

171

Page 162

Exhibit B.txt

1    used for day to day expenditures of Mr. Al-Hamari, don't you?

2    A.  Sir, I don't know that for a fact.

3    Q.  You indicated that Mr. Al-Hussayen was a registered agent

4    for IANA in the State of Idaho.

5    A.  That is correct.

6    Q.  And he registered under his own name, right?

7    A.  Yes.

8    Q.  He didn't go in and offer an alias or a phony name or

9    anything, right?

10   A.  Not to my knowledge.

11   Q.  That's not a particularly effective way to hide your

12   connection with an organization, is it, to list your own name

13   as the registered agent?

14   A.  Yes.  But there are other ways in which he hid his

15   association with IANA.

16   Q.  Well, certainly if a person thought he were making

17   contributions to a terrorist organization, he wouldn't list

18   himself as the registered agent with the organization.  That

19   wouldn't be very smart, would it?

20   A.  Again, sir, I have not had the opportunity to interview Mr.

21   Al-Hussayen and ask him questions such as that.

22        COURT:  All right.  We're going to take a short

23   recess.  I have to address a case that I have set for trial in

24   Pocatello.  I've got to confer with counsel on that.  So we'll

25   recess for about 10 or 15 minutes.

172

1        CLERK: All rise.

2             (A recess was taken. The testimony of John
                 Page 163

Exhibit B.txt

3    Dickinson was taken and the proceedings were

4    recessed at 5:39 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



173


    I, court-approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled matter.

Page 164

Exhibit B.txt

Signature of Approved Transcriber        Date


    Tamara A. Weber

Typed or Printed Name

**EXHIBIT C**

1  THOMAS E. MOSS
   UNITED STATES ATTORNEY
2
   KIM R. LINDQUIST
3  ASSISTANT UNITED STATES ATTORNEY

4  TERRY L. DERDEN
   FIRST ASSISTANT UNITED STATES ATTORNEY
5         and CRIMINAL CHIEF

6  DISTRICT OF IDAHO

7  DAVID B. DEITCH
   TRIAL ATTORNEY, UNITED STATES DEPARTMENT OF JUSTICE
8
   WELLS FARGO BUILDING
9  877 WEST MAIN STREET, SUITE 201
   BOISE, IDAHO 83702
10 TELEPHONE: (208) 334-1211
   **MAILING ADDRESS:**
11    **BOX 32**
      **BOISE, IDAHO 83707**
12

13

14

15        UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

16 UNITED STATES OF AMERICA,            )   Cr. No.  **CR 0 3 - 0 0 4 8 - C - EJL**
                                        )
17        Plaintiff,                    )   SUPERSEDING INDICTMENT
                                        )
18 vs.                                  )   (Vio. 18 U.S.C. 371 , 956, 2339A,
                                        )      1546(a), 1001(a)(2), 3237, 3238
19 SAMI OMAR AL-HUSSAYEN,               )
                                        )
20        Defendant.                    )
                                        )
21 _____  )

22 THE GRAND JURY CHARGES:

23

24 At all times pertinent to this Superseding Indictment:

25

26

27

28                                      1

378

## INTRODUCTION

1.       This Superseding Indictment charges defendant **SAMI OMAR AL-HUSSAYEN** with various criminal offenses arising from his work on behalf of the Islamic Assembly of North America (hereafter the "IANA"), the Al-Haramain Islamic Foundation (hereafter "Al-Haramain") , Dar Al-Asr and other entities through which he provided material support and resources to terrorists.  As described in further detail in this Superseding Indictment, **AL-HUSSAYEN** provided, among other things, computer advice and assistance, communications facilities, and financial instruments and services that assisted in the creation and maintenance of internet websites and other internet media intended to recruit and to raise funds for violent jihad, particularly in Palestine and Chechnya.  **AL-HUSSAYEN's** conduct in furtherance of this conspiracy violated federal law barring material support of terrorists, and the false statements and omissions he made during the process of obtaining student non-immigrant visas to enter the United States also constituted violations of federal law.

2.       As used in this Superseding Indictment, "jihad" is an Arabic word meaning "holy war."  In this context, it refers to the taking of actions against persons or governments that are deemed to be enemies of a fundamentalist version of Islam.  Historically, violent jihad has included armed conflicts and other violence in numerous areas of the world, including Afghanistan, Chechnya, Israel, the Philippines and Indonesia.  The armed conflicts in these geographic areas and elsewhere have involved murder, maiming, kidnaping, and the destruction of property.

3.       In addition to and in conjunction with dates otherwise specifically indicated herein, reference in this Superseding Indictment to "at all times pertinent to this Superseding Indictment" shall mean at least between September 13, 1994 and on or about February 26, 2003.

## DEFENDANT

4.       Defendant **SAMI OMAR AL-HUSSAYEN** is a citizen of Saudi Arabia.  Between about August 7, 1994 and February, 2003, **AL-HUSSAYEN** studied in the United States as a foreign student. He studied at Ball State University in Muncie, Indiana, where he obtained a Masters of Science degree in computer science and at Southern Methodist University in Dallas, Texas.  Thereafter, AL-HUSSAYEN

2

1  studied at the University of Idaho in the Ph.D. program in computer science.

2  **DEFENDANT'S RELATIONSHIP WITH IANA AND AL-HARAMAIN**

3  **The Islamic Assembly of North America (IANA)**

4       5.    At all times pertinent to this Superseding Indictment, the IANA purported to be a non-

5  profit charity organized pursuant to the laws of the United States. Between at least January 1, 1999 and

6  the date of this Superseding Indictment, the IANA maintained offices in Ann Arbor, Michigan. The

7  IANA provided a number of internet websites and other internet-related outlets for disseminating

8  information regarding Islam, as well as for soliciting and receiving donations of monies both from within

9  the United States and without. As detailed below, IANA-sponsored websites included a variety of

10  materials intended to recruit and to raise funds for violent jihad. The IANA also hosted regular

11  conferences in the United States, with participation by individuals affiliated with other purported

12  charitable organizations located within the United States as well.

13       6.    During the period between on or about November 16, 1999, to February 13, 2003, **AL-**

14  **HUSSAYEN** functioned as an employee and official of the IANA and, together with the president of the

15  IANA, engaged in significant decision-making and business transactions related to IANA's business,

16  particularly with respect to the creation, maintenance and content of websites and the associated

17  fundraising for IANA. Since May 11, 2001, **AL-HUSSAYEN** has been the registered agent for the

18  IANA in Idaho. **AL-HUSSAYEN** was involved in the planning of at least one of the IANA conferences

19  described above, and attended and participated in more than one such conference.

20       7.    During **AL-HUSSAYEN's** period of study, the government of his native country paid for

21  his tuition and provided to him and his family a stipend for living expenses. Beginning on or about

22  August 17, 1994, **AL-HUSSAYEN**, at various times, maintained at least six United States bank accounts

23  in Indiana, Texas, Idaho and Michigan. From at least January 23, 1997, until the date of this Superseding

24  Indictment, **AL-HUSSAYEN** received into and disbursed out of his bank accounts more than

25  $300,000.00 in excess of the study-related funds he received during the same period of time.

26       8.    Beginning on or about November 16, 1999, **AL-HUSSAYEN** made disbursements of the

27

28                                          3

1  excess funds referenced in the preceding paragraph to the IANA, to the IANA's officers (including its
2  president), and for other operating expenses of the IANA, such as the salaries of its employees. From
3  about December of 1994 to about July of 2002, **AL-HUSSAYEN** traveled and otherwise funded travel
4  for other individuals, including travel related to the IANA, through **AL-HUSSAYEN's** bank accounts
5  and to locations in numerous states, as well as foreign countries.

6      9.    Between on or about November 16, 1999, to February 13, 2003, **AL-HUSSAYEN's** IANA-
7  related business activities included frequent contact with the president of the IANA, including numerous
8  telephone conversations and e-mails, as well as face-to-face meetings. **AL-HUSSAYEN** disbursed
9  money directly to said president of the IANA in the form of wire transfers and personal checks, and **AL-**
10  **HUSSAYEN** also maintained a checking account in a Michigan bank in **AL-HUSSAYEN's** name alone,
11  but with the president's home address.

12  **The Al-Haramain Islamic Foundation**
13      10.    At all times pertinent to this superseding indictment, Al-Haramain was a purported charity
14  centered in Saudi Arabia. It developed a world-wide network of offices and representatives in a number
15  of countries, including Saudi Arabia, the United States (Ashland, Oregon), Chechnya, Bosnia, Somalia
16  and Kenya. Its stated mission included the dissemination of fundamentalist Islamic doctrines, including
17  by means of the Internet. On or about March 11, 2002, pursuant to Executive Order 13224, the United
18  States Government designated the Bosnia and Somalia branches of Al-Haramain as Specially Designated
19  Global Terrorists.

20      11.    From at least on or about November 10, 2001, until February 13, 2003, **AL-HUSSAYEN**
21  was a representative of Al-Haramain in that he provided assistance in that organization's internet-related
22  business and activities. **AL-HUSSAYEN's** Al-Haramain activities included contact with Al-Haramain
23  officials. In addition, on one or more occasions, **AL-HUSSAYEN** signed contracts on behalf of Al-
24  Haramain, and, in doing so, represented that he was legally authorized to do so.

25
26
27
28            4

**DEFENDANT'S WEBSITE WORK**

12.    From at least October 2, 1998, until February 13, 2003, **AL-HUSSAYEN** engaged in extensive computer website support activities beyond his course of study at the University of Idaho. These activities included expert computer services, advice, assistance and support to and for organizations and individuals, including the IANA, a Saudi information technology company known as Dar Al-Asr and two Saudi sheikhs. **AL-HUSSAYEN's** activities included website creation, registration, management, administration and maintenance. A number of these websites accommodated and contained materials intended to recruit and to raise funds for violent jihad.

**The IANA Websites**

13.    At all times pertinent to this Superseding Indictment, through the efforts of **AL-HUSSAYEN** and others known and unknown to the grand jury, the IANA maintained and/or controlled a number of websites. These websites included the following:

a.    www.al-multaqa.com, a website that included the online publication of "Al-Multaqa," an Arabic language magazine of which **AL-HUSSAYEN** was a member of the Board of Editors, and which was created April 5, 1999, and registered to "Al-Multaqa" at a Moscow, Idaho address used by **AL-HUSSAYEN** and others.

b.    www.islamway.com, a website created August 18, 1998 and registered to the IANA. **AL-HUSSAYEN** was the director, administrator, and advisor to other webmasters of the website, in creating, maintaining and controlling the site's format and content.

c.    www.alasr.ws, an internet magazine created September 11, 2000, with **AL-HUSSAYEN** as the sole registrant, editor of the magazine and administrator of the website.

d.    www.iananet.org, a website created August 1, 1995, registered to the IANA, and subsequently designed and maintained by Dar Al-Asr.

e.    www.almanar.net, a website created October 2, 1998, and registered to Al-Manar Al-Jadeed Magazine, with **AL-HUSSAYEN** as the administrative contact person.

f.    www.ianaradionet.com, essentially an Internet radio station, which was created

5

1  May 25, 1999 and registered to the IANA, with **AL-HUSSAYEN** as the head of its supervisory

2  committee and member of its technical committee.

3          g.     www.almawred.com, an Islam-related shopping website associated with the IANA,

4  which was created November 1, 1999 and registered to Dar Al-Asr, with **AL-HUSSAYEN** as the

5  administrative contact person.

6          h.     www.liveislam.net, a website created July 8, 2002 which, though never active,

7  listed **AL-HUSSAYEN** as the sole registrant and designated administrator.

8          i.     www.liveislam.com, a speech broadcast-facilitating Website, which was created

9  June 12, 2000, with **AL-HUSSAYEN** as a key administrator and providing technical support.

10       14.     These websites were intended to assist in recruiting and in raising funds for violent jihad.

11  To that end, one or more of the websites contained explicit calls for violent jihad against non-Muslims

12  and for financial support for those who went to fight jihad.  These websites urged visitors that their

13  religious duty was to participate in violent jihad or to make financial contributions to support violent

14  jihad, and at least one such page provided a link to a website for such donations.

15  **The Internet E-Mail Group**

16       15.     Beginning in early 2000, visitors to www.islamway.com and to the Arabic language

17  website described in the preceding paragraph (as well as other websites such as www.al-multaqa.com)

18  who wished to see so-called "news" concerning jihad were directed to sign up for an internet e-mail

19  group maintained and moderated by **AL-HUSSAYEN** and others.   An internet e-mail group is an

20  internet facility that permits members to post e-mails, files (such as documents, images, and audio or

21  video files), as well as links to internet websites, to which other members then have access.  This

22  particular internet e-mail group, which grew to more than 2400 members, was intended to permit

23  members to post inquiries and information relating to violent jihad, and thereby provided a

24  communications platform for individuals who wished to engage in violent jihad.  **AL-HUSSAYEN's**

25  status as a moderator of the internet e-mail group gave him various privileges with respect to the

26  acceptance, retention and deletion of messages posted to the group.

27

28                                              6

16.     The invitation to join the internet e-mail group included a "Cry and Call" to Muslims that exhorted them to "fight the idolater with your money, your selves, your tongues and your prayers." The first posting on the internet e-mail group (on February 2, 2000) was an identical "Cry and Call" posted by **AL-HUSSAYEN**, one of numerous postings that he made to the internet e-mail group.

17.     Posts to the internet e-mail group included a July 14, 2001, posting that purported to be from a mujahid (warrior) departing from Bosnia, and extolled the virtues of violent jihad. Other members who responded with further posts to the internet e-mail group stated that they too had fought violent jihad.

18.     Another example of posts to the internet e-mail group is a February 25, 2000, post responding to a specific request for information on how one could train for violent jihad. In the post, a member of the internet e-mail group gave detailed instructions on how to travel and train at a particular terrorist training camp outside of the United States.

19.     Another example is a February 25, 2003, posting to the internet e-mail group that contained an "urgent appeal" to Muslims serving in the American military. The posting called upon such individuals to provide information about valuable targets for attacks, particularly in the Middle East. The long list of requested targets included American military bases, the logistical support (including drinking water) for such bases, the residences of civilian workers supporting the bases, storage facilities for weaponry and ammunition, facilities of American oil companies, and the routes followed by oil tankers. The posting specifically urged an attack upon a specifically identified high-ranking American military official.

20.     The internet e-mail group also served as a platform for **AL-HUSSAYEN's** direct fundraising appeals. In February, 2000 (shortly after the creation of the internet e-mail group), **AL-HUSSAYEN** sent a message to all members of the internet e-mail group urging them to donate money to support those who were participating in violent jihad in order to provide "them with weapons and physical strength to carry on with the war against those who kill them." This message was thereafter sent at the beginning of each month as a "monthly reminder" to donate money in support of violent jihad.

7

**The Dar Al-Asr Websites**

21.    At all times pertinent to this Superseding Indictment, Dar Al-Asr was an information technology company in Saudi Arabia.  From at least August of 1999, **AL-HUSSAYEN** was a representative and official of Dar Al-Asr in the United States.  Dar Al-Asr's principal website was www.alasr.net, which was created on August 15, 1999 and registered to Dar Al-Asr in **AL-HUSSAYEN's** name and at his Moscow, Idaho, address.  The website www.hccjrah.com was created February 22, 2000 and was registered to Dar Al-Asr, with **AL-HUSSAYEN** as the administrative contact person.  The website www.alsunnah.com was created August 10, 2000, and registered, with **AL-HUSSAYEN** paying the invoice.  As previously referenced, Dar Al-Asr was affiliated with a number of IANA Websites, including www.alasr.ws, www.almanar.nct, www.al-multaqa.com, www.iananct.org and www.ianaradionet.com.

**The Websites of the Sheikhs**

22.    During the period of time pertinent to this Superseding Indictment, **AL-HUSSAYEN** had personal contact with two sheikhs known to the Grand Jury, in that he performed internet-related business and activities on their behalf, including the publication of fatwas – that is, religious decrees – justifying violent jihad .

23.    **AL-HUSSAYEN** registered the websites www.alhawali.org and www.alhawali.com for one of these sheikhs.  Both websites were created November 18, 2000 and in their registration referenced both Dar Al-Asr and **AL-HUSSAYEN**, with **AL-HUSSAYEN** as the administrative contact for www.alhawali.com.  The website www.islamtoday.net, created March 17, 2000 and registered to an official of the Al-Haramain Foundation, was the website for and on behalf of the other of these two sheikhs and was administered at least in part by **AL-HUSSAYEN**.  It was also linked to some of the other websites described above.

**Defendant's Control Over The Websites**

24.    **AL-HUSSAYEN** exercised significant control over the IANA websites and others.  In e-mails to **AL-HUSSAYEN** and others, IANA and Al-Haramain officials expressly recognized

8

1  **AL-HUSSAYEN's** expertise, and deferred to him on decisions as to the content and management of the
2  websites.

3        25.    In his capacity as Dar Al-Asr agent, **AL-HUSSAYEN** had financial and operational
4  responsibility for www.alasr.net and www.alasr.ws, as well as financial responsibility for a number of
5  other website domains owned by and/or affiliated with Dar Al-Asr, including www.alhawali.com,
6  www.alhawali.org, www.adssite.net, www.almandhoor.com, www.al-duaij.net, and www.alyaqaza.com.

7        26.    As a result of **AL-HUSSAYEN's** control over, and extensive involvement with, these
8  websites and other internet media, **AL-HUSSAYEN** not only knew that the communications platform he
9  created would be used to support and justify violent activities, but he also specifically intended that the
10  expert advice and assistance, communication facilities, financial instruments and services, and other
11  material support he provided would be used to recruit and to raise funds for violent jihad.  As such,
12  **AL-HUSSAYEN** knew and intended that the material support and resources that he provided were to be
13  used in preparation for, and to commit, violations of federal law involving murder, maiming, kidnaping,
14  and the destruction of property.  **AL-HUSSAYEN** also sought to conceal and disguise the nature,
15  location, source and ownership of the material support and resources that he provided.

16                              **THE STUDENT VISAS**

17        27.    In order for a foreign student to study in the United States on an F-1 student
18  visa, the student must declare and promise under oath to United States authorities that the
19  student seeks a presence in the United States solely for the purpose of pursuing the student's
20  course of studies.  The foreign student must truthfully and fully declare his associations with
21  organizations to the appropriate United States Government authorities in order for those
22  authorities to evaluate any such association and related activities in relation to the interests of
23  the United States.

24        28.    On or about September 23, 1998, **AL-HUSSAYEN** applied to the University of
25  Idaho at Moscow, Idaho, by submitting an International Application Form requesting that he
26  be admitted to the Computer Science Ph.D. program for the Spring 1999 Semester.

27

28                                     9

29.     In or about January, 1999, **AL-HUSSAYEN** was admitted to the Computer Science PhD program at the University of Idaho, with an emphasis on computer security and intrusion techniques.  University of Idaho records indicated that he began his studies during the Spring 1999 Semester.  At the time, the defendant published his permanent address as 311 Sweet Ave., Apt. #6, Moscow, Idaho.

**The year 1999 transactions**

30.     On or about May 17, 1999, United States Immigration and Nationalization (INS) Form I-20 was issued by the University of Idaho, allowing **AL-HUSSAYEN** to study in the Computer Science Ph.D. program beginning no later than August 24, 1999, and ending no later than December 17, 2004.

31.     On or about July 17, 1999, while outside the United States, **AL-HUSSAYEN** signed the Student Certification of the INS Form I-20 at section #11, which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . .  I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge.  I certify that I seek to enter or remain in the United States temporarily, **and solely for the purpose of pursuing a full course of study at [the University of Idaho].**  I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

**AL-HUSSAYEN** falsely made said certification, despite his extensive internet and business activities described above.  On or about July 20, 1999, the United States Government issued an F-1 student visa to **AL-HUSSAYEN** at Riyadh, Saudi Arabia.  The visa was valid for twenty-four months, or until July 20, 2001.

32.     On or about August 11, 1999, **AL-HUSSAYEN** was admitted by the United States Government into the United States at John F. Kennedy International Airport in New York City, New York, as an F-1 student.  **AL-HUSSAYEN** was admitted into the United States by the United States Government pursuant to the July 20, 1999 visa and in direct reliance upon **AL-HUSSAYEN's** certification on the INS Form I-20 dated July 17, 1999.

**The year 2000 transactions**

10

33.    On or about July 7, 2000, a second INS Form I-20 was issued by the University of Idaho and designated "for Continued attendance at this school" and in order "to add dependant." On or about this same day and in Moscow, Idaho, **AL-HUSSAYEN** signed the Student Certification of said INS Form I-20 at section #11 and which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, **and solely for the purpose of pursuing a full course of study at [the University of Idaho].** I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

**AL-HUSSAYEN** falsely made said certification, despite his extensive internet and business activities described above. On or about July 9, 2000, **AL-HUSSAYEN** departed from the United States at the John F. Kennedy International Airport in New York City, New York.

34.    On or about August 25, 2000, **AL-HUSSAYEN** was admitted into the United States by the United States Government at Washington, DC, as an F-1 student. **AL-HUSSAYEN** was admitted into the United States by the United States Government pursuant to the student visa dated July 20, 1999 as previously referenced and in reliance upon **AL-HUSSAYEN's** certification on the INS Form I-20 dated July 7, 2000.

**The year 2002 transactions**

35.    On or about January 10, 2002, **AL-HUSSAYEN** departed the United States at the John F. Kennedy International Airport in New York City, New York. On or about January 13, 2002, **AL-HUSSAYEN** signed and submitted to the United States embassy a DOS Form DS-156 for the purpose of obtaining another F-1 student visa. Section 36 of the form reads in pertinent part:

> I certify that I have read and understand all the questions set forth in this application and the answers I have furnished on this form are true and correct to the best of my knowledge and belief. I understand that any false or misleading statement may result in the permanent refusal of a visa or denial of entry into the United States. I understand that possession of a visa does not automatically entitle the bearer to enter the United States of America upon arrival at a port of entry if he or she is found inadmissable.

At section nineteen of the Form DS-156, **AL-HUSSAYEN** stated that the purpose of his entry

11

into the United States was to "study;" and, at section twenty-six, that he would do so at the University of Idaho. At section 20, he stated his permanent address in the United States to be 311 Sweet Ave. #6, Moscow, Idaho, 83843. As part of his application for the F-1 student visa, **AL-HUSSAYEN** relied upon and/or submitted the INS Form I-20 dated July 7, 2000, as previously referenced.

36.     On or about January 14, 2002, the DOS Form DS-156 was formally stamped as received by the United States Government at the United States Embassy in Riyadh, Kingdom of Saudi Arabia. However, the application was refused because the birth date of **AL-HUSSAYEN** on the visa application and the July 7, 2000 INS Form I-20 did not match the birth date on his passport.

37.     On or about January 14, 2002, and in conjunction with the same F-1 student visa application, **AL-HUSSAYEN** submitted a DOS Form DS-157 Supplemental Non-immigrant Visa Application to the United States Government at the United States Embassy in Riyadh, Kingdom of Saudi Arabia, which DOS Form DS-157 was attached to the original DOS Form DS-156 submitted on January 14, 2002. Section 13 of the DOS Form DS-157 required the applicant to "[l]ist all Professional, Social, and Charitable Organizations to Which You Belong (Belonged) or Contribute (Contributed) or with Which You Work (Have Worked)." **AL-HUSSAYEN** listed "ACM & IEEE." ("ACM" stands for the Association for Computive Machinery, and "IEEE" stands for the Institute of Electrical and Electronic Engineers.) **AL-HUSSAYEN** listed no other affiliations, particularly of any charitable organizations. **AL-HUSSAYEN** falsely and intentionally did not list the IANA, Al-Haramain or other entities.

38.     On or about March 19, 2002, the University of Idaho provided an INS Form I-20 for **AL-HUSSAYEN** "for Continued attendance at this school" and to "correct birth-date." On or about April 6, 2002, **AL-HUSSAYEN** signed the Student Certification of the INS Form I-20 at section eleven, which stated in pertinent part:

1

2   I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, **and solely for the purpose of pursuing a full course of study at [the University of Idaho]**. I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

3

4

5   AL-HUSSAYEN falsely made the certification, despite his extensive internet and business

6   activities described above. On or about the same day of April 6, 2002, **AL-HUSSAYEN**

7   formally submitted the INS Form I-20 dated April 6, 2002, to the United States Government

8   at the United States Embassy in Riyadh, Kingdom of Saudi Arabia, and the United States

9   Government issued **AL-HUSSAYEN** an F-1 student visa in direct reliance upon **AL-**

10  **HUSSAYEN's** certifications on the DOS Form DS-156 dated January 14, 2002, and attached

11  DOS Form DS-157, together with the INS Form I-20 dated April 6, 2002.

12       39.    On or about May 9, 2002, **AL-HUSSAYEN** was admitted by the United States

13  Government into the United States at the John F. Kennedy International Airport in New York

14  City, New York, as an F-1 student by virtue of the F-1 student visa issued April 6, 2002, and

15  in direct reliance upon **AL-HUSSAYEN'S** certifications on the DOS Form DS-156 dated

16  January 14, 2002, and attached DOS Form DS-157, together with the INS Form I-20 dated

17  April 6, 2002. During the admission at the John F. Kennedy International Airport, **AL-**

18  **HUSSAYEN** was inspected by INS and Customs officials. During the inspections, the INS

19  Form I-20 dated April 6, 2002, was photocopied by the Customs officials, with the Customs

20  officials retaining the copy and the original being returned to **AL-HUSSAYEN**.

21

22                          **COUNT ONE**
            **CONSPIRACY TO PROVIDE MATERIAL SUPPORT**
23                **OR RESOURCES TO TERRORISTS**
                 **(Violation 18 U.S.C. 371 and 2339A)**
24

25       The facts set forth in the previously numbered paragraphs 1 through 39 are hereby re-

26  alleged as though set forth in full herein.

27

28                              13

1    Beginning at a time uncertain, but no later than September 13, 1994, until on or about

2   February 26, 2003, within and as the same pertains to the District of Idaho, **SAMI OMAR**

3   **AL-HUSSAYEN** did knowingly conspire, combine, confederate, and agree with persons

4   known and unknown to the Grand Jury, to provide material support and resources, and to

5   conceal and disguise the nature, location, source and ownership of material support and

6   resources, intending that they were to be used in preparation for and in carrying out a violation

7   of Title 18, United States Code, Section 956 (conspiracy to kill, kidnap, maim, or injure

8   persons or damage property in a foreign country), in violation of Title 18, United States Code,

9   Section 2339A and Section 371.

10   **The Purpose of the Conspiracy**

11   The purpose of the conspiracy was to create and maintain websites and other internet

12   media, which were intended in part to recruit personnel and raise funds for violent jihad in

13   such places as Chechnya and Israel.

14   **The Manner and Means of the Conspiracy**

15   From on or about September 13, 1994, until on or about October 26, 2001, the

16   material support and resources that were the manner and means of the conspiracy included

17   currency, financial services, communications equipment, and personnel.  From on or about

18   October 26, 2001, until on or about February 26, 2003, the material support and resources that

19   were the manner and means of the conspiracy included currency, monetary instruments,

20   financial services, expert advice and assistance, communications equipment, and personnel.

21   At times relevant to the conspiracy, **AL-HUSSAYEN** provided these material support

22   and resources at the request of certain persons located in the United States and abroad,

23   knowing that the persons to whom he provided the material support and resources were

24   attempting to fund and facilitate overseas violence, and intending to assist in these efforts.

25   **Overt Acts in Furtherance of the Conspiracy**

26   Defendant **AL-HUSSAYEN**, together with co-conspirators known and unknown to

27

28                                              14

1  the Grand Jury, committed overt acts as part of and in furtherance of the conspiracy, including

2  the following:

3     a.     On or about January 29, 2000, on the www.al-multaqa.com website, defendant,

4  together with co-conspirators known and unknown to the Grand Jury, invited "those who

5  cannot physically engage in holy war" to join an internet e-mail group "for all news,

6  discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior

7  brothers," and urged all readers "to help the Chechen holy warriors with [their] support, [their]

8  money, and [their] selves."  As described above, members of this internet e-mail group posted

9  inquiries and information relating to violent jihad.  The internet e-mail group thus provided a

10  communications platform for individuals who wished to engage in violent jihad.

11     b.     On or about May 15, 2001, on the www.alasr.ws website, defendant, together

12  with co-conspirators known and unknown to the Grand Jury, published several fatwas (that is,

13  religious decrees) justifying and encouraging violent jihad, including suicide attacks.

14     c.     Defendant, together with co-conspirators known and unknown to the Grand

15  Jury, published or broadcasted a wide variety of speeches, lectures and articles justifying and

16  glorifying violent jihad.  Thus, for example, the following articles were transmitted to the

17  internet service provider that hosted the www.al-multaqa.com website: "The World's Bravest

18  People" (extolling the Chechen mujahideen (warriors) and asking Allah to destroy the Russian

19  army and make their wives into widows), "Jihad in the Qur'an and the Sunnah", "The True

20  Meaning of Shaheed" (stating that to die as a shaheed (martyr) is the ultimate honor), "The

21  Objectives and Aims of Jihad"; and "The Religious and Moral Doctrine on Jihad."   These

22  same articles were also found on defendant's home computer in a subdirectory named

23  "almultaqa"

24     d.     Defendant, together with co-conspirators known and unknown to the Grand

25  Jury, called upon Muslims to participate personally in violent jihad, or, alternatively, to

26  provide financial assistance to such groups.  For example, from in or about October, 2000, to

27

28                                            15

1   in or about September, 2002, the www.islamway.com website included a specific solicitation

2   of donations to the Islamic Resistance Movement, also known as HAMAS, and provided a

3   link for that purpose to a website that it characterized as the official mouthpiece of HAMAS.

4   As a result of HAMAS's participation in violent jihad in Israel, HAMAS has been designated

5   by the United States Department of State since 1997 as a foreign terrorist organization,

6   pursuant to Section 219 of the Immigration and Nationality Act.  On April 15, 2002, Al-

7   Hussayen received an e-mail in which the sender forwarded a solicitation for donations to

8   Hamas.  The original e-mail purported to be from "the battalion of the martyr Ezeldeen Al-

9   Qassam" of "the military wing for the Islamic Resistance Movement," and stressed the need

10   for money in order to arm fighters against the "Zionists occupiers."  **AL-HUSSAYEN** thus

11   knew and intended that the donations he solicited on behalf of HAMAS would be used in

12   preparation for, and in committing, violent jihad.

13        e.    Defendant, together with co-conspirators known and unknown to the Grand

14   Jury, published graphic videos depicting mujahideen and other subjects relating to violent

15   jihad with the intent to inspire viewers to engage in violent jihad or to provide financial

16   assistance to those who did so.  Individuals in the United States who viewed these videos was

17   inspired at least in part by the videos to travel overseas to train for and engage in violent jihad

18   and related terrorist offenses.

19        f.    **AL-HUSSAYEN** sent numerous messages to the internet e-mail group.  For

20   example, on February 20, 2000, **AL-HUSSAYEN** sent a post to the internet e-mail group

21   forwarding materials titled "Virtues of Jihad" that glorified those who die in battle while

22   performing violent jihad.  The post explained that such people have their own place in heaven

23   close to Allah, and that the problem with Islam today is that Muslims have given up on violent

24   jihad and are not practicing it enough.

25        g.    Defendant, together with co-conspirators known and unknown to the Grand

26   Jury, sought to conceal their participation in the broadcast of an inflammatory lecture (by one

27

28                           16

of the sheikhs described above) in which the sheikh urged listeners to participate in violent jihad in Israel. In particular, on or about January 19, 2003, **AL-HUSSAYEN** discussed with another individual a plan to deny to authorities, if questioned, that they knew the nature of the materials that they were broadcasting, and the way in which they could structure the broadcast to permit them to make that denial.

**COUNT TWO**
**FALSE STATEMENT TO THE UNITED STATES**
**(Violation 18 U.S.C. 1001(a)(2) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

17

**COUNT THREE**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238.

**COUNT FOUR**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3237)**

The previous numbered paragraphs 1 through 39, are hereby re-alleged as though set forth in full herein.

On or about August 11, 1999, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an

18

1   application and other document required by the immigration laws and regulations of the

2   United States, (2) knowingly presented such application and other document required by the

3   immigration laws and regulations of the United States which contained a materially false

4   statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and

5   claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented

6   to United States Government authorities a student visa procured by means of a false statement

7   and claim and other document containing such false statement and claim; in violation of Title

8   18, United States Code, Sections 1546(a) and 3237.

9

10                        **COUNT FIVE**
                **FALSE STATEMENT TO THE UNITED STATES**
11                 **(Violation 18 U.S.C. 1001(a)(2) and 3238)**

12        The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set

13   forth in full herein.

14        On or about July 7, 2000, within and as the same pertains to the District of Idaho,

15   **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the

16   Executive Branch of the United States Government, knowingly and willfully made a

17   materially false, fictitious and fraudulent statement and representation to authorities of the

18   United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in

19   the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a

20   student visa, signed and submitted an Immigration and Naturalization (INS) form I-20,

21   thereby knowingly and willfully representing to United States Government authorities that he

22   sought to enter into the United States for the sole purpose of pursuing a full course of study at

23   the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been,

24   was and would be engaged in activities other than his course of study at the University of

25   Idaho, including, but not limited to, his involvement with the Islamic Assembly of North

26   America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

27

28                                      19

**COUNT SIX**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about July 7, 2000, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238.

**COUNT SEVEN**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3237)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about August 25, 2000, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an

20

application and other document required by the immigration laws and regulations of the
United States, (2) knowingly presented such application and other document required by the
immigration laws and regulations of the United States which contained a materially false
statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and
claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented
to United States Government authorities a student visa procured by means of a false statement
and claim and other document containing such false statement and claim; in violation of Title
18, United States Code, Sections 1546(a) and 3237.

## COUNT EIGHT
### FALSE STATEMENT TO THE UNITED STATES
### (Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set
forth in full herein.

On or about January 14, 2002, within and as the same pertains to the District of Idaho,
**SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the
Executive Branch of the United States Government, knowingly and willfully made a
materially false, fictitious and fraudulent statement and representation to authorities of the
United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in
the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a
student visa, signed and submitted Department of State (DOS) form DS-156 and form DS-
157, thereby knowingly and wilfully failing and refusing to inform United States Government
authorities of his involvement with the Islamic Assembly of North America and other entities;
in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

**COUNT NINE**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about January 14, 2002, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted Department of State (DOS) form DS-156 and form DS-157, thereby knowingly and wilfully failing and refusing to inform United States Government authorities of his involvement with the Islamic Assembly of North America and other entities; in violation of Title 18, United States Code, Sections 1546(a) and 3238.

**COUNT TEN**
**FALSE STATEMENT TO THE UNITED STATES**
**(Violation 18 U.S.C. 1001(a)(2) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about April 6, 2002, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a

22

student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

## COUNT ELEVEN
### VISA FRAUD
**(Violation 18 U.S.C. 1546(a) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about April 6, 2002, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238.

23

## COUNT TWELVE
## VISA FRAUD
## (Violation 18 U.S.C. 1546(a) and 3237)

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about May 9, 2002, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States, (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented to United States Government authorities a student visa procured by means of a false statement and claim and other document containing such false statement and claim; in violation of Title 18, United States Code, Sections 1546(a) and 3237.

Dated this ___8th___ day of January, 2004.

A TRUE BILL

_Kristine J. Crawford_
FOREPERSON

THOMAS E. MOSS
UNITED STATES ATTORNEY

_Kim R. Lindquist_
KIM R. LINDQUIST
Assistant United States Attorney

_Terry L. Derden_
TERRY L. DERDEN
First Assistant United States Attorney
Chief, Criminal Section

_David B. Deitch_
DAVID B. DEITCH
Trial Attorney

24