UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) ECF Case<br><br>**RICO STATEMENT Applicable to Saudi American Bank a/k/a Samba** |

*This document relates to:*   Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
04 CV 01923 (RCC)

### RICO STATEMENT APPLICABLE TO
### SAUDI AMERICAN BANK A/K/A SAMBA

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules, for defendant Saudi American Bank a/k/a Samba.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(b), (c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains is Saudi American Bank a/k/a Samba ("SAB"). The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001*, (03-MDL-1570 (RCC)), others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. (a) List of predicate acts and specific statutes violated:

| | |
|---|---|
| Conspiracy to commit murder | NY Penal Law § 105.15; NY Penal Law § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15; NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |

2

| | |
|---|---|
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) <br> 18 U.S.C. § 2339A <br> 18 U.S.C. § 2339B <br> 18 U.S.C. § 2339C |

(b) <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| mid-1990s to 9/11/2001 | SAB | SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. <br><br> Throughout this period, SAB conspired to support terrorism |

3

|  |  | and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
|---|---|---|
| Late 1990s to 9/11/2001 | SAB | SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>SAB undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by SAB. |
| Mid-1990s to 9/11/2001 | SAB | SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation |

|  |  | of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. <br><br> SAB agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) Not applicable.

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically SAB, to surreptitiously provide funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or International Islamic Front for the Jihad Against the Jews and Crusaders, which conspiracy culminated in the Attack.

6.
    a. The Enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-

5

1922 (RCC)), *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)) and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the Enterprise ("al Qaida") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the Enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. SAB fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety

      of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

      On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including SAB, and illegal activity to generate material support to continue its terrorist operations.

  c. No.

  d. SAB is associated with the Enterprise.

  e. SAB is a member of the Enterprise, and is separate and distinct from the Enterprise.

  f. SAB intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by SAB is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by SAB funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by SAB, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore,

activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center- and as such, affected commerce.  See <u>Rasul v. Bush,</u> 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.    Not applicable.

12.    Not applicable.

13.

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.  SAB is associated with the Enterprise.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Second Amended Complaint, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the Enterprise and that which makes up the Enterprise.

14.    The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including SAB, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including SAB, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of SAB, of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.

>The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.
>
>The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.
>
>The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like SAB. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including SAB. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by SAB. SAB, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. SAB also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, business, and livelihood.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.  The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| **Count One** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| **Count Two** | Alien Tort Claims Act 28 U.S.C. §1350 |
| **Count Nine** | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*. |
| **Count Ten** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Twelve** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| **Count Three** | Wrongful Death |
|---|---|
| **Count Four** | Survival |
| **Count Five** | Negligent and Intentional Infliction or Emotional Distress |

10

| Count Six | Conspiracy |
|---|---|
| **Count Seven** | Aiding and Abetting |
| **Count Eight** | Negligence |
| **Count Eleven** | Punitive Damages |

20. Not applicable

Date: April 22, 2005

        LAW OFFICES OF JERRY S. GOLDMAN
        & ASSOCIATES, P.C.


BY:_____
        GINA M. MAC NEILL, ESQUIRE
        (GM 0581)


BY: ___/s/_____
        JERRY S. GOLDMAN, ESQUIRE
        (JG 8445)

        Attorneys for the Plaintiffs
        111 Broadway, 13th Floor
        New York, N.Y. 10006
        212.242.2232

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| SAB | SAB has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>SAB is a financial institution headquartered in Riyadh, Saudi Arabia, with offices in New York. The Saudi American Bank was established by royal decree in 1980.<br><br>SAB is the main banker of the Arab Cement Company which is owned by the Al Rajhi Group and the Saudi Bin Ladin Group, two groups which have had ties to supporting Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Arab Cement Company is managed by such Saudis as Khalid bin Salim Bin Mahfouz and Mohammed Bin Laden.<br><br>Additionally, Khalid bin Salim bin Mahfouz maintained a bank account at SAB.  This fact was realized when the United States Treasury Department sent a team of investigators to Saudi Arabia to track down prominent individuals allegedly associated with terrorist funding. Around September, 2003, SAB closed the | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

account and returned his money. It has been widely reported that Khalid bin Salim bin Mahfouz, a codefendant herein, provided material support to Osama bin Laden and Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by providing millions of dollars to them. Specifically, Khalid bin Salim bin Mahfouz, as the Chief Operating Officer of the Bank of Credit and Commerce International (BCCI), was implicated in supporting terrorism and fraud. Also, in Spain, he provided money through his bank. The National Commercial Bank ("NCB") to Al Qaida operators. He is also the brother-in-law of Osama Bin Laden. He has been known to set up various charities organizations around the world since 1991, which have been linked to the Al Qaida and involved in the financing of Osama Bin Laden.

The Saudi American Bank is the official correspondent of the Al Baraka Bank[1] of Lebanon, which is based in Beirut and chaired by Saleh Abdullah Kamel.[2] Saleh Abdullah Kamel was one of the three founding members of Al Shamal Islamic Bank. The Saudi American Bank has maintained a partnership with the Al Baraka financial system since its inception.

The Saudi American Bank serves as the bank for the Dallah al Baraka Group, LLC ("Dallah Al Baraka") which is chaired by Saleh Abdullah Kamel. Dallah Al Baraka is a diversified conglomerate based in Jeddah, Saudi Arabia. It is involved in various industries, services and financial activities. The group includes twenty-three (23) banks located mostly in Arab and Islamic countries, in addition to several investment and financial companies. Dallah Al Baraka's financial arm if Al Baraka, as a wholly owned subsidiary. Saudi American Bank undertook financial transactions through the United States sanctioned Al Taqwa Bank.

SAB is the Riyadh correspondent to Faisal Islaimc Bank.[3] Faisal Islamic Bank is managed

by Mohammed Al Faisal Al Saud. Faisal Islamic Bank, along with Mohamed Al Faisal Al Saud, has facilitated Al Qaida terrorist operations.

SAB is also the main correspondent in Riyadh for a branch of Al Shamal Bank, a branch of Dar al Mal al Islamic Trust[4] is Nassau, which have been involved in the financing and support of the AL Qaida.

In 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia to collect donations to the "heroes of the Al Quds Uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including defendants World Assembly of Muslim Youth ("WAMY"), International Islamic Relief Organization ("IIRO") and Al Haramain Foundation.[5]

For over twenty (20) years, Citigroup has had a 20 percent stake in SAB. It has run the operation under a management contract since 1980. "Forbes" reports the United States bank used SAB to nurture its ties with the Saudi elite and that the relationship runs deep and sometimes loose. Prince Alwaleed bin Alsud, a Saudi prince, is purportedly the fourth-richest man in the world and he owns approximately $9.4 billion in Citigroup stock and a 7% interest in SAB. There are other Saudi royal family members who have significant holdings in both banks.

As has been recently reported, much money which was received by Arab Bank was transferred through SAB.

In 2000, the Saudi government issued an edict requiring all banks operating in the Kingdom to have charitable accounts to handle donations to the "martyrs" in the Palestinian uprising. Money from the funds, known as Account 98, was paid to the beneficiaries of suicide bombers and to the Hamas to help with the recruitment. SAB was a major conduit for this money. The Saudis refused to cooperate when Citigroup expressed concerns

14

|  | about the cash going to terrorist groups.<br><br>Some of the Saudi checks to the terrorists were routed through Saudi American Bank.<br><br>SAB financed many of the projects undertaken by Osama Bin Laden and the Al Qaida in Sudan during the years that the Al Qaida leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport. SAB was the main banker of the Saudi Bin Laden Group and the Mohamed Bin Laden Organization which provided technical assistance on these projects.<br><br>As the foregoing demonstrates, SAB thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of SAB's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. |  |

## **CERTIFICATE OF SERVICE**

I hereby certify that the attached RICO statement Applicable to Saudi American Bank was served on all counsel of record by way of electronic filing in the Southern District of New York on April 22, 2005.


Dated: April 22, 2005


BY:_____
GINA M. MAC NEILL, ESQUIRE

---

[1] Specific misconduct regarding Al Baraka Investment & Development Corp. ("Al Baraka"), a co-defendant herein, will be provided via RICO Statement Applicable to Al Baraka. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its RICO statement Applicable to Al Baraka, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), to be filed.

[2] Specific misconduct regarding Saleh Abdullah Kamel, , a co-defendant herein, will be provided via RICO Statement Applicable to Saleh Abdullah Kamel. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its RICO statement Applicable to Saleh Abdullah Kamel, relating to *Estate of John P. O'Nell, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), to be filed.

[3] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statement Applicable to Faisal Islamic Bank, , a co-defendant herein, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), filed on or about February 10, 2005.

[4] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statement Applicable to Dar al Maal Al Islami Trust, , a co-defendant herein,

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Saudi American Bank - Final.doc

relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), filed on or about January 14, 2005.

[5] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statement Applicable to World Association of Muslim Youth (WAMY), , a co-defendant herein,  within its RICO statement applicable to International Islamic Relief Organization (IIRO), , a co-defendant herein,  and within its RICO statement applicable to Al Haramain, , a co-defendant herein, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), filed previously at the United States District Court of the Southern District of the United States., as part of the instant multi-district litigation.