UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to Dubai Islamic Bank** |

*This document relates to:*   Federal Insurance Co. v. al Qaida
                              03 CV 06978 (RCC)


**RICO STATEMENT**
**APPLICABLE TO DUBAI ISLAMIC BANK**

        Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Dubai Islamic Bank.

        Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.   The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).


2.   The names of the defendant to whom this RICO statement pertains is Dubai Islamic Bank.  The alleged misconduct and basis for liability is set forth in Exhibit "A".


3.   Not applicable.  All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.   The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Bank Secrecy Act | 18 U.S.C. § 1960 |

(b) <u>dates of, the participants in, and a description of the facts surrounding the predicate acts</u>

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Dubai Islamic Bank | Dubai Islamic Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Dubai Islamic Bank | Dubai Islamic Bank used its banking and financial operations to knowingly and intentionally provide financial services to al Qaida and its members, as well as organizations which it knew were providing support to the Enterprise. |
| early 1990s to 9/11/2001 | Dubai Islamic Bank | Dubai Islamic Bank undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit an act of deadly aggression against the United States |

2

| | | |
|---|---|---|
| | | in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Dubai Islamic Bank | Dubai Islamic Bank agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

   (c) not applicable

   (d) No.

   (e) No.

   (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, even constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscated their support of the al Qaida movement.

   (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

   (a)   The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

   (b)   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its

3

own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Dubai Islamic Bank fit neatly into this framework by providing financial services and other forms of material support for the members of the Enterprise who engaged in the Attack.

    (c)    no.

    (d)    Dubai Islamic Bank is associated with the Enterprise.

    (e)    Dubai Islamic Bank is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f)    Dubai Islamic Bank intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Dubai Islamic Bank is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Dubai Islamic Bank furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by having funds available to meet its goals of spreading its ideology, suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Dubai Islamic Bank, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, the al Qaida movement hasand relied on well-placed financial facilitators,

4

including Dubai Islamic Bank, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.  Al Qaida also collected money from employees of corrupted charities.

The funds thus raised were used to, among other things, operate terrorist training camps in Sudan and Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Sudan, Afghanistan and other countries where al Qaida conducted operations.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the material support provided by participants and conspirators like Dubai Islamic Bank.  Dubai Islamic Bank, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  Dubai Islamic Bank also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| | | |
|---|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.   pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.   not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Dubai Islamic Bank | Dubai Islamic Bank has knowingly and repeatedly lent material support to the Enterprise, including the knowing and intentional provision of financial and banking services to several known al Qaida operatives.  So pervasive and apparent was the Bank's money laundering on behalf of the Enterprise that in 1999, American officials visited Dubai to demand that the government take steps to end its lax supervision of the Bank.  According to a July 8, 1999 State Department press conference, Bank involvement with terrorist money laundering was the key concern.<br><br>That same day, the New York Times reported that the CIA had obtained evidence that bid Ladin had been allowed to funnel money through the Dubai Islamic Bank, and a subsequent NATO analysis confirmed that al Qaida had used Dubai Islamic Bank to fund the bombings of the American embassies in Tanzania and Kenya.<br><br>Shortly after the 9/11 Attack, the Central Bank of the UAE froze the accounts of various persons and organizations suspected of ties with the Enterprise, including Dubai Islamic Bank, mirroring the regulatory alert issued by Luxembourg authorities announcing the Bank's ties to Osama bin Ladin.<br><br>Dubai Islamic Bank was directly involved in the 9/11 attacks. Mustafa Ahmed al-Hisawai (Sheikh Saeed), bin Ladin's chief financial officer, lived in the Emirates from June 2001 | 1962(c)<br>1962(d) |

until September 11, 2001, when he fled for Karachi, Pakistan. U.S. authorities have identified at least $500,000 that flowed from his accounts to the 19 hijackers, including hundreds of thousands of dollars in money transfers from Dubai Islamic Bank to two of the hijackers since at least June 2000, to pay for their flight training and expenses. These transactions were carried out in violation of international standards adopted to prevent money laundering, including the 40 Recommendations on Money Laundering adopted in 1990 by the international Financial Action Task Force, of which the UAE is a member.

Dubai Islamic Bank has been a key shareholder in other banks well-known for their involvement in laundering money on behalf of the Enterprise, including the Bank of Credit and Commerce International (BCCI), Tadamon Islamic Bank and Baraka Islamic Bank, an affiliate of Al Baraka Bank.

Despite all these warnings, Dubai Islamic Bank continued to maintain those accounts and Bank knowingly provided financial services and other forms of material support to al Qaida, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks like the Enterprise through anti-terrorist and money laundering safeguards and "know your customer" regulations.

Dubai Islamic Bank has laundered money for al Qaida, knowingly and intentionally provided financial services to al Qaida including the maintenance of bank accounts, and directly facilitated the training of the September 11 hijackers.

Dubai Islamic Bank thereby has, for a period of many years, provided critical financial and logistical support to al Qaida to support

|  | that terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Dubai Islamic Bank's participation in al Qaida's jihadist campaign. |  |
|---|---|---|