## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) ) ) | No. 03 MDL 1570 (RCC) ECF Case |

_____

This document relates to:

> ASHTON, *et al.* v. AL QAEDA ISLAMIC ARMY, *et al.*, Case No. 02-CV-6977;
> BURNETT, *et al.* v. AL BARAKA INVESTMENT & DEVELOPMENT CORP., *et al.*, Case No. 03-CV-5738;
> CONTINENTAL CASUALTY CO., *et al.* v. AL QAEDA ISLAMIC ARMY, *et al.*, Case No. 04-CV-05970;
> EURO BROKERS, INC., *et al.* v. AL BARAKA INVESTMENT AND DEVELOPMENT CORP., *et al.*, Case No. 04-CV-07279;
> FEDERAL INSURANCE CO., *et al.* v. AL QAIDA, *et al.*, Case No. 03-CV-6978;
> NEW YORK MARINE AND GENERAL INSURANCE CO. v. AL QAIDA, *et al.*, Case No. 04-CV-6105;
> SALVO, *et al.* v. AL QAEDA ISLAMIC ARMY, *et al.*, Case No. 03-CV-5071;
> TREMSKY, *et al.* v. OSAMA BIN LADEN, *et al.*, Case No. 02-CV-7300; and
> WORLD TRADE CENTER PROPERTIES LLC, *et al.* v. AL BARAKA INVESTMENT AND DEVELOPMENT CORP., *et al.*, Case No. 04-CV-07280.

## MEMORANDUM OF LAW IN SUPPORT OF
## SOLIMAN H.S. AL-BUTHE's
## CONSOLIDATED MOTION TO DISMISS

Lynne Bernabei, Esquire  (LB2489)
Alan R. Kabat, Esquire  (AK7194)
Bernabei & Katz, PLLC
1773 T Street, N.W.
Washington, D.C. 20009-7139
(202) 745-1942

Attorneys for Defendant
 Soliman H.S. Al-Buthe

DATED:  May 9, 2005

# TABLE OF CONTENTS

I.      Introduction ................................................................................................. 1

II.     Procedural History ..................................................................................... 1

III.    Factual Background .................................................................................... 2

IV.     Summary of Legal Argument .................................................................. 11

V.      Plaintiffs Fail to Plead Sufficient Facts Showing That Mr. Al-Buthe's Acts
        Proximately Caused Plaintiffs' Injuries ................................................. 13

VI.     Plaintiffs' Allegations are Insufficient to Plead Tort Claims Against Mr. Al-Buthe
        ..................................................................................................................... 17

VII.    The Plaintiffs in Some Cases Lack Standing to Maintain Their RICO Claims
        Because Their Injuries are Personal Injuries, Not Injuries to Business or Property ... 20

VIII.   Plaintiffs' Allegations are Insufficient to Establish a Cause of Action Against Mr.
        Al-Buthe for Plaintiffs' RICO Claims ........................................................ 20

IX.     Plaintiffs' Allegations are Insufficient to Make out Negligence Claims Against
        Mr. Al-Buthe Because He Owed No Duty of Care to Plaintiffs ................................. 22

X.      Plaintiffs' Punitive Damage Claims Fail as a Matter of Law Because No
        Independent Cause of Action Exists ............................................................ 24

XI.     Plaintiffs' Conspiracy Damage Claims Fail as a Matter of Law Because No
        Independent Cause of Action Exists ............................................................ 24

XII.    This Court Lacks Personal Jurisdiction over Mr. Al-Buthe, Pursuant to Rule
        4(k)(1)(D),  Fed. R. Civ. P. or the New York Long-Arm Statute .............................. 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases:**

Ahmed v. National Bank of Pakistan,
    572 F. Supp. 550 (S.D.N.Y. 1983) ...................................................................... 24

Appalachian Enterprises, Inc. v. ePayment Solutions Ltd.,
    No. 01 CV 11502 (GBD), 2004 WL 2813121 (S.D.N.Y. Dec. 8, 2004) ............ 15

Arndt v. UBS AG,
    342 F. Supp. 2d 132 (E.D.N.Y. 2004) ................................................................ 17

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,
    171 F.3d 779 (2d Cir. 1999) ............................................................................... 25

Bigio v. Coca-Cola Co.,
    239 F.3d 440 (2d Cir. 2001) ............................................................................... 17

Boim v. Quranic Literacy Inst.,
    291 F.3d 1000 (7th Cir. 2002) ....................................................................... 16, 18

Burnett v. Al Baraka Invest. & Devel. Corp.,
    274 F. Supp. 2d 86 (D.D.C. 2003) ................................................................ 20, 23

Christiansen v. National Sav. & Trust Co.,
    683 F.2d 520 (D.C. Cir. 1982) ........................................................................... 23

Chrysler Capital Corp. v. Century Power Corp.,
    778 F. Supp. 1260 (S.D.N.Y. 1991) .................................................................. 24

Conley v. Gibson,
    355 U.S. 41 (1957) ............................................................................................. 12

De Jesus v. Sears, Roebuck & Co.,
    87 F.3d 65 (2d Cir. 1996) .................................................................................. 12

Dineen v. Stramka,
    228 F. Supp. 2d 447 (S.D.N.Y. 2002) ............................................................... 19

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994) ................................................................................ 14

Grove Press, Inc. v. Angleton,
        649 F.2d 121 (2d Cir. 1981) ............................................................................... 24

*In re*: Terrorist Attacks on Sept. 11, 2001,
        349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........................................................... *passim*

Jerry Kubecka, Inc. v. Avellino,
        898 F. Supp. 963 (E.D.N.Y. 1995) ................................................................... 20

Kajtazi v. Kajtazi,
        488 F. Supp. 15 (E.D.N.Y. 1978) ...................................................................... 24

King v. Crossland Savings Bank,
        111 F.3d 251 (2d Cir. 1997) ............................................................................... 23

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,
        191 F.3d 229 (2d Cir. 1999) ............................................................................... 20

Lesavoy v. Lane,
        304 F. Supp. 2d 520 (S.D.N.Y. 2004) .............................................................. 21

Liberman v. Worden,
        701 N.Y.S.2d 419 (App. Div. 2000) .................................................................. 14

Mayes v. UVI Holdings, Inc.,
        723 N.Y.S. 2d 151 (App. Div. 2001) ................................................................. 24

McCarthy v. Olin Corp.,
        119 F.3d 148 (2d Cir. 1997) ............................................................................... 23

McCoy v. Goord,
        255 F. Supp. 2d 233 (S.D.N.Y. 2003) .............................................................. 12

McGrath v. United Hosp.,
        562 N.Y.S.2d 193 (App. Div. 1990) .................................................................. 23

Mende v. Milestone Tech., Inc.,
        269 F. Supp. 2d 246 (S.D.N.Y. 2003) .............................................................. 25

Meroni v. Holy Spirit Ass'n for the Unification of World Christianity,
        506 N.Y.S.2d 174 (App. Div. 1986) .................................................................. 19

NAACP v. AcuSport, Inc.,
        271 F. Supp. 2d 435 (E.D.N.Y. 2003) .............................................................. 23

iii

Ouaknine v. MacFarlane,
        897 F.2d 75 (2d Cir. 1990) .................................................................. 21

Palsgraf v. Long Island R.R. Co.,
        248 N.Y. 339, 342 (1928) ................................................................... 23

Pittman v. Grayson,
        149 F.3d 111 (2d Cir. 1998) ............................................................... 14

Smith v. County of Erie,
        743 N.Y.S.2d 649 (App. Div. 2002) ................................................... 24

Smith v. Islamic Emirate of Afghanistan,
        262 F. Supp. 2d 217 (S.D.N.Y. 2003) ................................................ 18

Smith v. Local 819 I.B.T. Pension Plan,
        291 F.3d 236 (2d Cir. 2002) ............................................................... 12

Stern v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses and Missionaries,
        381 F. Supp. 1003 (D.D.C. 1974) ....................................................... 23

Talmor v. Talmor,
        712 N.Y.S.2d 833 (Sup. Ct. 2000) ...................................................... 19

Ungar v. Islamic Republic of Iran,
        211 F. Supp. 2d 91 (D.D.C. 2002) ...................................................... 16

United States v. Ruiz,
        115 F.3d 1492 (1st Cir. 1997) ............................................................. 19

von Bulow v. von Bulow,
        634 F. Supp. 1284 (S.D.N.Y. 1986) ................................................... 20


**Statutes and Rules:**

Alien Tort Claims Act, 28 U.S.C. § 1350 ....................................................... 17

Anti-Terrorism Act, 18 U.S.C. § 2331, et seq. .............................................. 18

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, et seq. .......... 2, 20-22

        18 U.S.C. § 1962(a) ............................................................................... 2, 21

iv

18 U.S.C. § 1962(c) ........................................................................... 2, 21-22

18 U.S.C. § 1962(d) ........................................................................... 2, 22

18 U.S.C. § 1964(c) ........................................................................... 20

Torture Victim Protection Act, 28 U.S.C. § 1350 note ................................... 1-2, 17

Federal Rules of Civil Procedure:

Rule 4(k)(1)(D) ........................................................................... 13, 24-25

Rule 12(b) ........................................................................... 1

Rule 12(b)(2) ........................................................................... 1, 24-25

Rule 12(b)(6) ........................................................................... 1, 12

N.Y. C.P.L.R. § 215(3) (McKinney 2003) ....................................................... 17

N.Y. C.P.L.R. § 302(a)(1)-(4) (McKinney 2001) ............................................... 13, 25

N.Y. E.P.T.L. § 5-4.1(1) (McKinney 1999 & Supp. 2005) ........................................ 18

N.Y. E.P.T.L. § 11-3.3 (McKinney 2001) ....................................................... 18-19

**Other Materials:**

Zbigniew Brzezinski, The Choice: Global Domination or Global Leadership (2004) ... 5-6

Peter Finn, "Chechen Activist Groups Feel Pressure From Russia," Washington Post, May 8, 2005, at A22 ........................................................................... 10

National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing (Aug. 21, 2004) ........................................................ 10

Restatement (Second) of Torts, § 9 cmt. b (1965) ........................................... 16

Secretary of State Madeleine K. Albright, Briefing (Dec. 17, 1999) ........................... 5

Secretary of State Madeleine K. Albright, Remarks (Dec. 21, 1999) ........................... 5

## I.     INTRODUCTION.

Soliman H.S. Al-Buthe, a Saudi citizen, was named as a defendant in four of the personal injury complaints, and in five of the property damage and insurance complaints before this Court on nothing more than a bare allegation that he was one of several "co-conspirators, aiders and abettors" with a Saudi charity, the al-Haramain Islamic Foundation, and that charity's overseas affiliates.  Mr. Al-Buthe respectfully moves, pursuant to Rule 12(b), Fed. R. Civ. P., for dismissal based on (1) failure to state a claim and (2) lack of personal jurisdiction.  As set forth below, this Court must find, pursuant to Rule 12(b)(6), Fed. R. Civ. P., that plaintiffs have failed to state a claim against Mr. Al-Buthe, primarily because plaintiffs have failed to plead sufficient facts showing that his acts proximately caused their injuries.  This Court must further find, pursuant to Rule 12(b)(2), Fed. R. Civ. P., that it lacks personal jurisdiction over Mr. Al-Buthe, a non-resident who lacks sufficient contacts with this forum.

## II.     PROCEDURAL HISTORY.

There are nineteen lawsuits pending before this Court, with an aggregate total of about 835 named defendants and 191 counts, spanning over 2,455 pages (not counting the captions) and over 7,283 numbered paragraphs.  See Exhibit 1 (attached hereto).  Mr. Al-Buthe seeks to dismiss four of the personal injury complaints: *Ashton*, *Burnett*, *Salvo*, and *Tremsky*.[1]  Mr. Al-Buthe is also moving to dismiss the two property damage complaints (*Euro Brokers* and *WTC Properties*), and the three insurance company subrogation complaints (*Continental Casualty*, *Federal Insurance*, and *N.Y. Marine*) in which he is named as a defendant.

This Court recently held that the plaintiffs could not state claims under the Torture

---

[1] Mr. Al-Buthe is moving against the *Burnett* complaint originally filed in this Court, No. 03-CV-5738, which is similar to the *Burnett* complaint filed in the District of Columbia, but with changes in the listing of parties.

Victim Protection Act against defendants who did not act under color of law.  *In re*: Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 828 (S.D.N.Y. 2005).  This Court further held that the plaintiffs could not state Civil RICO claims under 18 U.S.C. § 1962(a), (c), and (d), against those defendants who were not "central figures in the underlying schemes" or whose income was not alleged to have injured plaintiffs.  Id. at 827-28.  This Court held that the assault and battery and intentional infliction of emotional distress claims had to be dismissed with respect to plaintiffs whose complaints were filed more than one year after September 11, 2001, which includes the *Burnett*, *Federal Insurance*, and *Salvo* complaints herein.  Id. at 829.  This Court also held that the negligence and negligent infliction of emotional distress claims could not be stated against defendants who owed no duty to plaintiffs.  Id. at 830-31.

### III.   FACTUAL BACKGROUND.

The allegations in the complaints regarding Mr. Al-Buthe are clearly insufficient.  In fact, these complaints lump Mr. Al-Buthe together with many other defendants, without even specifying exactly what he is alleged to have done.  Mr. Al-Buthe is mentioned only once in the text of the six of the complaints, and even then, this mention is nothing more than the conclusory statement, made without any factual support, that he was one of several "co-conspirators, aiders and abettors" of the al-Haramain Foundation (Saudi Arabia) ("al-Haramain (SA)").  *Ashton* Third Am. Compl. ¶ 469; *Burnett* Am. Compl. ¶ 157; *Continental Casualty* Am. Compl. ¶ 496; *Salvo* Am. Compl. ¶ 495; *Tremsky* Am. Compl. ¶ 83; *WTC Properties* Compl. ¶ 294.  Two of the insurance subrogation plaintiffs do nothing other than include Mr. Al-Buthe in a laundry list of a hundred or more defendants who allegedly "have aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs,

associations, organizations, or persons," without any further specificity.  *Federal Insurance* Am. Compl. ¶ 66; *NY Marine* Am. Compl. ¶ 45.  The *Euro Brokers* plaintiffs did not allege any facts against Mr. Al-Buthe, but merely listed him in the caption.

Based on plaintiffs' subsequent filings with respect to another defendant, the Al Haramain Islamic Foundation, Inc. (USA) ("AHIF"), which is a separately incorporated entity in Oregon,[2] it now appears that the plaintiffs seek to impose liability on Mr. Al-Buthe based on two developments that plaintiffs allege reflect his alleged support for al Qaeda.  Plaintiffs aver that Mr. Al-Buthe was designated on September 9, 2004 "as a supportor [sic] of terrorism,"and that "Federal authorities are currently prosecuting AHIF and AHIF officers Perouz Sedaghaty and Soliman al-Buthe for their role in the scheme to divert charitable donations to al Qaeda fighters in Chechnya."  <u>See</u> Plaintiffs' Opp. (AHIF), at 16, 17 (Apr. 8, 2005) (Docket No. 809).  As a threshold matter, the plaintiffs have fundamentally misrepresented to this Court the nature of the pending prosecution.  Even if this Court were to consider these new allegations, it must find that the underlying conduct fails to provide any basis for their claims against Mr. Al-Buthe.[3]

First, plaintiffs fail to inform this Court that Mr. Al-Buthe is <u>not</u> being prosecuted for his role "in the scheme to divert charitable donations to al Qaeda fighters in Chechnya."  In fact, Mr. Al-Buthe was indicted for allegedly failing to report a charitable donation that was transported overseas, and for allegedly participating in a scheme that misstated the costs associated with the purchase of property in Missouri.  *See* No. CR-05-600008-HO, Indictment (D. Or. Feb. 17,

---

[2] AHIF was incorporated under Oregon law as a charity in 1999, and is a separate corporate entity from al-Haramain (SA).  <u>See</u> AHIF Motion to Dismiss (Feb. 7, 2005), at 2 & Ex. 2-3 (Docket No. 654).

[3] If plaintiffs now desire to add allegations about Mr. Al-Buthe, they will need leave to amend their complaints, which will render this motion to dismiss moot.  Mr. Al-Buthe will then have the opportunity to move to dismiss the amended complaints.

2005).[4]  Mr. Al-Buthe was not indicted with any charge of knowingly supporting terrorism, let alone "al Qaeda fighters in Chechnya," as plaintiffs claim.

Second, the designation is being challenged as not being based on legally sufficient evidence.  Moreover, the facts underlying the transaction that the government is using as a basis for the designation and prosecution of Mr. Al-Buthe do not support any allegation that AHIF, or Mr. Al-Buthe, were engaged in knowing support of "al Qaeda fighters in Chechnya," or any other knowing support of terrorism.  The questioned transaction, as AHIF has previously informed the government, through the Office of Foreign Assets Control, was intended solely for humanitarian purposes, as part of a joint Saudi-Russian humanitarian relief project, approved through a memorandum of understanding by the Russian government in Chechnya, to provide humanitarian aid to the refugees in Chechnya, and not to fighters.  Further, this donation was made at a time when the U.S. government itself was criticizing the Russian military actions in Chechnya and encouraging humanitarian support to Chechen refugees.

In late 1990s, in the aftermath of the dissolution of the Soviet Union, several provinces on the southern border of Russia sought greater political freedom or independence from the communist government remaining in Russia, much as had Armenia, Estonia, Latvia, Lithuania, and the other former states of the Soviet Union.  The Russian government, however, reacted harshly to these efforts through escalated military actions in Chechnya, Georgia, and several other provinces in the Caucasus region.  In December 1999, after a meeting of the G-8 Foreign Ministers in Berlin – a meeting that included the Russian Foreign Minister Igor Ivanov – U.S. Secretary of State Madeleine Albright publicly criticized the Russian government for its

---

[4] Mr. Al-Buthe is charged with tax and customs reporting violations, 31 U.S.C. §§ 5316(a)(1)(a) and 5322 and 31 C.F.R. §§ 103.11 and 103.23, and with a generic conspiracy to defraud the government, 18 U.S.C. § 371.

unwarranted military intervention in Chechnya, called for an immediate ceasefire, and

encouraged humanitarian support to the refugees in Chechnya:

> First of all, let me say clearly the issue of Chechnya and the fighting in Grozny did occupy some time this morning . . . [it was] made clear to all of us that there continued to be a great need for humanitarian assistance, better coordination, the ability of humanitarian assistance to get in there and the need for further political dialogue.  I think it is very important for us to do everything we can to aid the humanitarian effort . . . .

> What has been evident at this meeting, frankly, is that the Russians through their actions [in Chechnya] are self-isolating from the rest of the international community. . . .

> . . . there is no legitimate military solution to the Chechen conflict . . . and that there needs to be the greatest care taken for the civilians who are caught in a terrible humanitarian debacle. . . .

> Yes, we are demanding an immediate and long-term ceasefire [in Chechnya].

See Secretary of State Madeleine K. Albright, Briefing (Dec. 17, 1999) (attached hereto as

Exhibit 2).  Several days later, Secretary Albright unambiguously reiterated the U.S.

government's criticism of the Russians for their actions in Chechnya:

> And now today, in Chechnya, we see a variation on the same tragic theme.  And we are saying to the Russians, not only are the excesses of what you are doing wrong; your strategy is fundamentally misguided and will not work.  Killing the innocent does not defeat terror; it feeds terror.  You are making new enemies when what you need are friends.

See Secretary of State Madeleine K. Albright, Remarks (Dec. 21, 1999) (attached hereto as

Exhibit 3).  Secretary Albright's conclusions were recently confirmed by Zbigniew Brzezinski,

the former U.S. National Security Advisor, who described this conflict as "Russia's gradual

genocide of the Chechen people," which was one of several "tragic conflicts [such] as the

Russian war in Chechnya," which he recognized as one of two "bloody wars Russia brutally

waged against the independence-seeking Chechnya . . . [which] did enormous damage to

Russia's moral standing."  See Zbigniew Brzezinski, The Choice: Global Domination or Global Leadership, at 79, 82, and 99 (2004) (excerpts attached hereto as Exhibit 4).

Thus, encouraged by this U.S. government position, AHIF participated in humanitarian efforts in Chechnya, as part of a framework established and authorized at the highest levels of the Saudi and Russian governments.  In the fall of 1999, Dr. Abdulrahman Al Swailem, who was then the Deputy Minister of Health in the Saudi government and the President of the Saudi Arabian Red Crescent Society, part of the International Committee of the Red Cross, met with the Russian Ambassador to Saudi Arabia about the ongoing war in Chechnya and its impact on the Muslim community.  The Saudi Red Crescent and other charities were then working with the Saudi Joint Relief Committee on Kosovo and Chechnya ("SJRC") to provide humanitarian aid to the refugees in Chechnya.  On November 9, 1999, Crown Prince Abdullah bin Abdulaziz Al-Saud, the de facto ruler of Saudi Arabia, by memorandum to Prince Naif (Saudi Minister of Interior and the General Advisor to the SJRC), reported that the Russian Ambassador had authorized Saudi humanitarian aid in Chechnya, and the Crown Prince authorized the SJRC to go forward with this relief project.  See Letter from HRH Prince Abdullah to HRH Prince Naif (Nov. 9, 1999) (attached and incorporated herein as Exhibit 5); see also Declaration of Dr. Abdulrahman Al-Swailem (Jan. 10, 2005), at ¶ 6 (excerpts attached hereto as Exhibit 6).

Several weeks later, Prince Turki bin Fahd bin Jilawi Al-Saud, chair of the SJRC's Chechnya Committee, sent a letter setting forth guidelines for raising and accounting for the donations to be collected for Kosovo and Chechnya.  See Letter from Prince Turki bin Fahd to al-Haramain (SA) (Nov. 30, 1999) (attached hereto as Exhibit 7).

In December 1999, at around the time that U.S. Secretary of State Albright met with her

6

Russian counterpart, and criticized the Russian government for its military acts in Chechnya, the

Russian Ministry for Civil Defense Affairs and the SJRC signed a Memorandum of

Understanding ("MOU") for providing humanitarian aid to the refugees in Chechnya.  <u>See</u>

Memorandum of Understanding (Dec. 8, 1999) (attached and incorporated hereto as Exhibit 8).[5]

The Russian Ministry agreed to provide logistical support and facilities for transporting the

humanitarian aid to the refugees, and the SJRC agreed to coordinate its work with the Russian

Ministry.  Pursuant to this MOU, the SJRC and its constituent charities, including al-Haramain

(SA), started gathering donations for Chechnya, and providing them to the SJRC.  The SJRC

itself set up an office in Vladikavkaz, northern Chechnya, which was staffed by Saudi

government employees, and the Saudi government provided logistical and financial support for

the SJRC's relief efforts in Chechnya through early 2004.  <u>See</u> Al-Swailem Dec. (Ex. 6), at ¶¶ 9-

12.  In October 2000, the Russian Ministry of Justice registered the Saudi Arabian Red Crescent

Society, part of the SJRC's Chechen project, as a foreign entity accredited to operate in Russia to

distribute humanitarian aid in Chechnya.  <u>See</u> Matusevitch Dec. (Ex. 8), at ¶ 11 & Att. B.

     In February 2000, shortly after the Saudi and Russian governments authorized the

SJRC's Chechen relief project, Dr. Al-Fiki made a charitable donation of $150,000 to AHIF for

Chechen humanitarian aid.  AHIF, instead of attempting to set up its own relief project, decided

to use this donation, along with several smaller donations, to participate in the SJRC's project,

which was already underway.  In order to transport the funds to the SJRC, since overseas wiring

of these funds was not possible, Mr. Al-Buthe agreed to accept responsibility for transferring the

---

[5] Translations of the Russian documents were provided by Vladimir Matusevitch, a former intellectual who
defected to the U.S. from the Soviet Union, and devoted 25 years of his professional career to researching and
reporting on Russian governmental issues for Radio Liberty.  <u>See</u> Declaration of Vladimir Matusevitch (Aug. 23,
2004), at ¶¶ 2-10 (attached hereto as Exhibit 8).

Chechen donations from AHIF to Saudi Arabia in March 2000.  Messrs. Sedaghaty and Al-Buthe went to the local branch of the Bank of America in the small town where AHIF operated and where AHIF maintained its bank accounts, to obtain the requisite travelers' checks. Although the Bank of America recommended that they take a cashier's check, they opted to take travelers' checks, believing that travelers' checks could be cleared faster by overseas banks.  As it happened, the bank did not have sufficient travelers' checks, so they took $130,000 in American Express travelers' checks, and $21,000 in a cashier's check.  Upon Mr. Al-Buthe's arrival in Riyadh, Saudi Arabia, he deposited the cashier's check and travelers' checks in the Al Rajhi Banking and Investment Corporation, in order to have the funds converted into Saudi Rials.  See Al Rajhi receipt for cashier's check; Al Rajhi receipt for travelers' checks (attached hereto as Exhibits 9-10).  After the checks had cleared, Mr. Al-Buthe made two payments to al-Haramain (SA):  on March 12, 2000, for 224,000 Saudi Rials, and on March 28, 2000, for 479,514 Saudi Rials, for the balance, and covering several other miscellaneous donations.  See Receipt (March 14, 2000); Receipt (March 28, 2000) (attached hereto as Exhibits 11-12).  These receipts were issued pursuant to the SJRC's guidelines for accounting for donations to the Chechen relief efforts.  These transactions are confirmed by a declaration from the Financial and Administrative Manager of al-Haramain (SA).  See Declaration of Khalid bin Obaid Azzahri (May 3, 2004) (attached hereto as Exhibit 13).  Beyond that point, AHIF and Mr. Al-Buthe had no further control over, or direct knowledge about, the use of these funds.

Thus, at every stage of the questioned transaction over which AHIF and Mr. Al-Buthe had control or knowledge, the transaction was properly documented pursuant to the foregoing chain of custody, and was made pursuant to a relief project that was authorized at the highest

levels of the Saudi and Russian governments.  At every step, AHIF and Mr. Al-Buthe ensured

that the money collected for Chechnya relief would be transferred to a Saudi government entity,

the SJRC, that itself ensured that the funds went to Chechen refugees, all with the approval and

assistance of the Russian government.  Moreover, AHIF's participation in this relief effort was

encouraged by the U.S. government's foreign policy, as articulated by Secretary of State

Albright, which condemned the Russian military actions in Chechnya, and called upon the world

to support humanitarian aid to the refugees in Chechnya.

      Moreover, subsequent developments confirm the legitimacy of these humanitarian relief

efforts in Chechnya.  Indeed, even the government-controlled media in Russia, which supported

the Russian military operations in Chechnya, recognized the humanitarian projects in Chechnya

that were supported by the Saudi government through the SJRC.  The attached declaration by

Vladimir Matusevitch, a former intellectual who defected to the U.S. from the Soviet Union and

devoted his professional career at Radio Liberty (an arm of the U.S. government) to analyzing

and reporting on developments in that country, and in Russia following the breakup of the Soviet

Union, discusses the Russian actions in Chechnya and how it was portrayed in the government-

controlled newspapers.  See Declaration of Vladimir Matusevitch (Sept. 7, 2004), at ¶¶ 3-12

(attached hereto as Exhibit 14).  While the Russian government and the government-controlled

media has claimed that the Chechnya "war" was a war against international terrorism (also

contrary to the U.S. government position as expressed by Secretary Albright), a wide range of

Russian newspapers, from 2000 through 2004, favorably reported on the Saudi humanitarian

efforts in Chechnya.  Id. at ¶¶ 14-16.  For example, in February 2000, the Moscow newspapers

reported on the discussions in 2000 between the SJRC and the Russian Ministry for Civil

Defense regarding the humanitarian efforts to provide relief to the Chechen refugees.  Id. at ¶ 14

& Ex. A.  Three years later, a monthly news magazine published an article by a prominent

member of the Russian Council of Federation (the upper chamber of the Russian Parliament),

which recognized the "very significant aid" provided by Saudi Arabia to the "displaced people of

Chechnya."  Id. at ¶ 15 & Ex. B.  More recently, in January 2004, at least three Moscow

newspapers reported on the official visit by the then-head of administration for Chechnya to

Saudi Arabia, which reflected Saudi support for the official government of Chechnya, and not

for the opposition movement, which Russia alleges is an illegal separatist movement.  Id. at ¶ 16

& Ex. C.  Thus, even the government-controlled media in Russia recognized the legitimate

humanitarian aid in Chechnya, of which AHIF's support was a properly documented component.

The U.S. government, through the National Endowment for Democracy, continues its financial

support of human rights groups in Chechnya.  See Peter Finn, "Chechen Activist Groups Feel

Pressure From Russia," Washington Post, May 8, 2005, at A22 (attached hereto as Exhibit 15).

Also, in August 2004, the 9/11 Commission released its Staff Report which summarized

the U.S. government's knowledge of alleged illegal activities as follows:

> On February 19, 2004, federal law enforcement took action against both the al
> Haramain branch in Ashland, Oregon, and the imam of the HIF mosque in
> Springfield, Missouri.  The FBI and the IRS conducted searches of the Ashland
> offices of HIF as part of an investigation into alleged money laundering and
> income tax and currency reporting violations.  Treasury took the additional step
> of freezing, during the pendency of an investigation, the accounts of the branch in
> Oregon and the mosque in Missouri.

See National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist

Financing, at 127 (Aug. 21, 2004) (excerpts attached hereto as Exhibit 16).  The description of

the investigation is consistent with the subsequent indictment for income tax and currency

reporting violations, as the indictment did not include money laundering charges.  Nowhere is there any indication in this report, or in the official report of the 9/11 Commission itself, available online at http://www.9-11commission.gov/, that AHIF itself is involved in terrorist activities or knowingly funded terrorist activities, certainly none in relationship to the 9/11 attacks carried out by Al Qaeda.

## IV.  SUMMARY OF LEGAL ARGUMENT.

Plaintiffs have failed to allege any specific conduct by Mr. Al-Buthe, let alone wrongful conduct related to the 9/11 attacks.  Nor have plaintiffs pled any facts that would establish that Mr. Al-Buthe's conduct proximately caused their injuries, or made out the specific requirements of their claims.

Since many of the legal issues have been fully briefed in the motions to dismiss filed by AHIF and Perouz Sedaghaty, Mr. Al-Buthe will cite to their briefs to avoid duplicative briefing.

The various claims brought against Mr. Al-Buthe overlap in large part because several have copied the allegations, claims, and defendants verbatim from earlier-filed complaints. Some or all of the plaintiffs brought the following claims:  statutory tort claims under the Anti-Terrorism Act (*Ashton, Burnett, Federal Insurance, NY Marine, Salvo, Tremsky,* and *WTC Properties*); the Torture Victim Protection Act (*Ashton, Burnett, Federal Insurance, Salvo,* and *Tremsky*); the Alien Tort Claims Act (*Burnett* and *Tremsky*); and Civil RICO (*Burnett, Continental Casualty, Euro Brokers, Federal Insurance, Tremsky, NY Marine*, and *WTC Properties*).  Some plaintiffs brought state common-law tort claims for wrongful death (*Ashton, Burnett, Federal Insurance,* and *Salvo*), survival (*Ashton, Burnett, Federal Insurance, Salvo*, and *Tremsky*), assault and battery (*Ashton, Federal Insurance*, and *Salvo*), conspiracy and aiding and

abetting (*Burnett, Federal Insurance, NY Marine, Tremsky*, and *WTC Properties*), and for

property destruction and damage (*Ashton, Continental Casualty, Euro Brokers, Federal

Insurance, NY Marine*, and *WTC Properties*).  Several plaintiffs brought negligence claims

(*Burnett, Federal Insurance, NY Marine*, and *Tremsky*) as well as negligent and intentional

infliction of emotional distress claims (*Burnett, Federal Insurance*, and *Tremsky*).  All plaintiffs,

except for *Continental Casualty*, brought separate claims for punitive damages.  The *Tremsky*

plaintiffs brought a common-law nuisance claim.[6]

The court must dismiss a complaint, under Rule 12(b)(6), for failure to state a claim,

where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The Second

Circuit has upheld the dismissal of a complaint that "consists of conclusory allegations

unsupported by factual assertions [that] fails even the liberal standard of Rule 12(b)(6)."  De

Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996).[7]

As set forth below, plaintiffs have failed to state a cause of action as to their intentional

tort claims, since they have not pled facts to support an allegation that Mr. Al-Buthe's actions

were a "but for" cause of plaintiffs' injuries, or that he was involved in any of those torts.  See

Part V, *infra*.  The personal injury plaintiffs, as well as the insurance subrogation plaintiffs who

seek recovery for workers compensation payments, lack standing to bring their RICO claims,

---

[6] All four personal injury complaints also allege claims pursuant to Foreign Sovereign Immunities Act's state sponsor of terrorism provision, which does not apply to Mr. Al-Buthe.

[7] Accord Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss"); McCoy v. Goord, 255 F. Supp. 2d 233, 258 (S.D.N.Y. 2003) ("It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.").

because their injuries are only personal injuries, not injuries to business or property, and

plaintiffs have failed to plead any facts to support any inference required to state their RICO

claims.  See Parts VI-VII, *infra*.  Plaintiffs' negligence, negligent infliction of emotional distress,

and nuisance claims fail to state a cause of action as a matter of law, because Mr. Al-Buthe owed

no duty to plaintiffs.  See Part VIII, *infra*.  Plaintiffs' claims for conspiracy and punitive

damages fail to state a cause of action, since neither is recognized as an independent claim under

New York law.  See Parts IX-X, *infra*.  Finally this Court lacks personal jurisdiction over Mr.

Al-Buthe, a non-resident defendant, under either Rule 4(k)(1)(D), Fed. R. Civ. P., or the New

York long-arm statute, N.Y. C.P.L.R. § 302(a).  See Part XI, *infra*.

## V.     PLAINTIFFS FAIL TO PLEAD SUFFICIENT FACTS SHOWING THAT MR. AL-BUTHE'S ACTS PROXIMATELY CAUSED PLAINTIFFS' INJURIES.

This Court must find that the plaintiffs have failed to satisfy the threshold requirement for

their intentional tort claims:  they have not pled sufficient facts showing that Mr. Al-Buthe's acts

proximately caused plaintiffs' injuries.  Plaintiffs have merely alleged in a conclusory manner

that all defendants provided support to al Qaeda, which led to the September 11 attacks.

However, plaintiffs have not pled any facts showing that Mr. Al-Buthe's acts, whatever they

were alleged to be, proximately caused their injuries.  Even plaintiffs' most recent allegations

regarding AHIF's participation in a humanitarian relief project that was approved by the Saudi

and Russian governments fails to support any allegation that Mr. Al-Buthe's participation in that

project meant that he knowingly supported terrorism, or engaged in terrorism.

Under Second Circuit precedent, proximate causation means that only those defendants

whose acts "were a substantial factor in the sequence of responsible causation, and whose injury

13

was reasonably foreseeable or anticipated as a natural consequence" can be held liable for

intentional torts.  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994).

In this litigation, the plaintiffs rely entirely on theories of concerted liability, *i.e.*, aiding and

abetting, and conspiracy, to support their allegations of proximate causation.  *In re* Sept. 11, 349

F. Supp. 2d at 826.  In order to impose tort liability on Mr. Al-Buthe through a concerted liability

theory, plaintiffs must show that he "must know the wrongful nature of the primary actor's

conduct" and that he acted "in pursuance of a common plan or design to commit a tortious act,

actively take part in it, or further it by cooperation or request, or who lend aid or encouragement

to the wrongdoer."  Id. (quoting Pittman v. Grayson, 149 F.3d 111, 122-23 (2d Cir. 1998));

accord Liberman v. Worden, 701 N.Y.S.2d 419, 420 (App. Div. 2000) (upholding dismissal of

aiding and abetting claims "in the absence of any allegation that defendants had actual or

constructive knowledge of the misconduct and substantially assisted therein").

        Here, however, six of the complaints have stated nothing more than a conclusory and

unsupported allegation that Mr. Al-Buthe was one of several "co-conspirators, aiders and

abettors" of al-Haramain (SA).  *Ashton* Third Am. Compl. ¶ 469; *Burnett* Am. Compl. ¶ 157;

*Continental Casualty* Am. Compl. ¶ 496; *Salvo* Am. Compl. ¶ 495; *Tremsky* Am. Compl. ¶ 83;

*WTC Properties* Compl. ¶ 294.  Two of the insurance subrogation plaintiffs merely lump Mr.

Al-Buthe with a hundred or more defendants who allegedly "have aided and abetted, conspired

with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs,

associations, organizations, or persons."  *Federal Insurance* Am. Compl. ¶ 66; *NY Marine* Am.

Compl. ¶ 45.  The *Euro Brokers* plaintiffs list Mr. Al-Buthe in the caption, but do not mention

him in the text of the complaint.

14

This is insufficient to meet the standards set forth by the Second Circuit in <u>Pittman</u>, and this Court's prior ruling.  Hence, the absence of specific allegations regarding Mr. Al-Buthe himself requires this Court to find that plaintiffs cannot use concerted liability theories as a basis for their tort claims against him.  Nor can plaintiffs simply "lump" Mr. Al-Buthe with a laundry list of other defendants in an attempt to plead allegations in a collective manner.  <u>See, e.g.</u>, <u>Appalachian Enterprises, Inc. v. ePayment Solutions Ltd.</u>, No. 01 CV 11502 (GBD), 2004 WL 2813121, at *9 (S.D.N.Y. Dec. 8, 2004) ("The complaint lumps together all of the defendants in each claim without providing any factual allegations to distinguish their conduct, and accordingly dismissal of the complaint in its entirety is warranted.").

Instead, plaintiffs' allegations are almost entirely about the activities of al-Haramain (SA) and several of its other affiliates.  Regardless of the veracity of these allegations, plaintiffs have not pled any facts to support an inference that Mr. Al-Buthe (1) intentionally provided assistance to al-Haramain (SA) or to any al Qaeda entity, knowing that the recipient engaged in terrorist activities; or (2) had authority or control over the activities of al-Haramain (SA) or any al Qaeda entity, knowing it engaged in terrorist activities; or (3) knew that the recipients of his assistance would engage in terrorism.  This stands in stark contrast to the more specific allegations that plaintiffs did make about several other defendants, and which this Court found to be sufficient as to one defendant alleged to have had specific ties with known al Qaeda entities and individuals.  <u>In re</u> Sept. 11, 349 F. Supp. 2d at 825, 837.  Moreover, plaintiffs have not informed this Court that al-Haramain (SA) was never designated as a terrorist group by the U.S. government, which certainly would have happened if there were evidence to do so.  Hence, any attempt to plead Mr. Al-Buthe's liability by linking him to alleged acts of al-Haramain (SA) proves nothing.

The Seventh Circuit recognized, in the context of Anti-Terrorism Act claims, that making donations to an alleged terrorist group, <u>without</u> "knowledge of and intent to further the payee's violent criminal acts," could not sustain a tort claim.  <u>Boim v. Quranic Literacy Inst.</u>, 291 F.3d 1000, 1012 (7th Cir. 2002); <u>accord</u> <u>Ungar v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (even though "plaintiffs have established that Iran provided extensive support to Hamas, . . . their proof does not link that support to the Ungar murders specifically"); <u>see also</u> <u>Restatement (Second) of Torts</u>, § 9 cmt. b (1965) ("In order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must be a substantial factor in bringing about the harm.").

Even if AHIF's funds are alleged to have gone to Chechen rebels, as plaintiffs now claim, the U.S. government did not designate these groups as terrorists in March 2000.  Furthermore, plaintiffs have not pled that there is any connection between the Chechen rebels and the 9/11 attacks carried out by Al Qaeda.  Therefore, plaintiffs have not pled any facts to support their claim that Mr. Al-Buthe's alleged participation in funding of Chechen rebels supported the Al Qaeda attacks on September 11, 2001.

This Court should find that since plaintiffs have not stated a cause of action that Mr. Al-Buthe's acts directly and intentionally injured plaintiffs, they are precluded from recover against him under any direct tort theory, <u>i.e.</u>, Torture Victim Protection Act; Anti-Terrorism Act; Alien Tort Claims Act; wrongful death; survival; assault and battery; property destruction; and intentional infliction of emotional distress.  Therefore, this Court should dismiss those counts against Mr. Al-Buthe.

## VI.   PLAINTIFFS' ALLEGATIONS ARE INSUFFICIENT TO PLEAD TORT CLAIMS AGAINST MR. AL-BUTHE.

(1)     This Court must dismiss the plaintiffs' claims under the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA"),[8] because plaintiffs have not alleged that Mr. Al-Buthe was acting under color of law as required to impose liability on individuals.  *In re* Sept. 11, 349 F. Supp. 2d at 828 (citing Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004)).

(2)     This Court must dismiss the plaintiffs' assault and battery claim (*Federal Insurance* Count 4 and *Salvo* Count 3) and the plaintiffs' intentional infliction of emotional distress claims (*Burnett* Count 8 and *Federal Insurance* Count 5) because the statute of limitations for these claims, one year, ran by the time these suits were filed.  N.Y. C.P.L.R. § 215(3) (McKinney 2003); *In re* Sept. 11, 349 F. Supp. 2d at 829.  The *Salvo* complaint was filed on July 8, 2003, the *Burnett* (New York) complaint on August 1, 2003, and the *Federal Insurance* complaint on September 10, 2003, all more than one year after September 11, 2001. Since several complaints in this litigation were filed within the one-year period, including one by the *Burnett* plaintiffs' counsel, the only reason these complaints were not timely filed is plaintiffs' counsels' inaction, not an alleged lack of knowledge of the underlying facts.

(3)     This Court must dismiss the plaintiffs' tort claims under the Alien Tort Claims Act, 28 U.S.C. § 1350,[9] because liability can only be imposed if (1) the defendant is a state actor or acting under color of state law, or (2) the defendant engaged in "certain forms of conduct" such as "hijacking of aircraft" or "certain acts of terrorism."  Bigio v. Coca-Cola Co., 239 F.3d 440, 447-48 (2d Cir. 2001).  Mr. Al-Buthe is not a state actor, and plaintiffs have not pled that he

---

[8] *Ashton* Count 5; *Burnett* Count 2; *Federal Insurance* Count 6; *Salvo* Count 5; and *Tremsky* Count 2.

[9] *Burnett* Count 4; *Tremsky* Count 3.

was acting under color of state law.  Nor have plaintiffs pled facts to state a claim that he engaged in, or knowingly supported, the requisite misconduct, i.e., hijacking or terrorism.

(4)     This Court must dismiss the plaintiffs' tort claims under the Anti-Terrorism Act, 18 U.S.C. § 2331, et seq.,[10] because plaintiffs have failed to plead any facts to support an inference that Mr. Al-Buthe engaged in any act of international terrorism proscribed by 18 U.S.C. § 2331(1), or to support an inference that he provided any donations, training, or personnel to any terrorist group which caused plaintiffs' injuries, or contributed to any terrorist group whose recipients were known to him and which caused plaintiffs' injuries, as required to impose liability under the ATA.  Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 227 n.12 (S.D.N.Y. 2003) (plaintiff "must show knowledge of and an intent to further the criminal acts and proximate cause"); see also Boim, 291 F.3d at 1012 (plaintiff must show "knowledge of and intent to further the payee's violent criminal acts").  As set forth in Part III, supra, plaintiffs' allegations relating to the Chechen humanitarian relief project fail to support any allegation other than that Mr. Al-Buthe participated in a legitimate, authorized charitable effort.  Thus, plaintiffs' allegations fail to support their ATA claims against Mr. Al-Buthe.

(5)     This Court must dismiss the plaintiffs' common law tort claims for wrongful death and survival,[11] because plaintiffs have not pled any facts to support an allegation that Mr. Al-Buthe "caused the decedent's death," or that he committed a tort against the decedent prior to death.  N.Y. E.P.T.L. § 5-4.1(1) (McKinney 1999 & Supp. 2005) (wrongful death claim), § 11-

---

[10] Ashton Count 4; Burnett Count 3; Federal Insurance Count 10; NY Marine Count 5; Salvo Count 4; Tremsky Count 9; and WTC Properties Count 1.

[11] Wrongful death:  Ashton Count 1; Burnett Count 5; Federal Insurance Count 2; and Salvo Count 1. Survival:  Ashton Count 2; Burnett Count 7; Federal Insurance Count 3; Salvo Count 2; and Tremsky Count 5.

3.3 (McKinney 2001) (survival claim).[12] Nor have plaintiffs pled any facts to support the allegation that Mr. Al-Buthe "supported, aided and abetted, or conspired with the September 11 terrorists." <u>In re</u> Sept. 11, 349 F. Supp. 2d at 829.

(6) This Court must dismiss the plaintiffs' common law intentional infliction of emotional distress, assault and battery, and property destruction tort claims,[13] because plaintiffs have not pled any facts, let alone sufficient facts, to support an allegation that Mr. Al-Buthe's acts caused plaintiffs' injuries, as required for these torts. <u>See</u> Sedaghaty Mot. at 11-12 (Feb. 7, 2005) (Docket No. 655) (collecting cases). Nor can the plaintiffs rely on a conspiracy or aiding and abetting theory to support their property damage claim, since plaintiffs have not pled facts sufficient to show that Mr. Al-Buthe associated himself with, and participated in, the conspiracy resulting in the property damage, let alone that the property damage was a foreseeable act done in furtherance of any of Mr. Al-Buthe's unstated actions in pursuit of some vague conspiracy. <u>United States v. Ruiz</u>, 115 F.3d 1492, 1499 (1st Cir. 1997). Finally, plaintiffs' "bare legal conclusions are not sufficient" to state an intentional infliction of emotional distress claim. <u>Talmor v. Talmor</u>, 712 N.Y.S.2d 833, 837 (Sup. Ct. 2000). Thus, this Court should dismiss the plaintiffs' assault and battery, intentional infliction of emotional distress, and property damage

---

[12] <u>See</u> <u>also</u> <u>Dineen v. Stramka</u>, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) ("Plaintiff's wrongful death claim must also be dismissed because he has failed to allege a sufficient causal or proximate nexus between any action by the defendant and the death of Dineen."); <u>Meroni v. Holy Spirit Ass'n for the Unification of World Christianity</u>, 506 N.Y.S.2d 174, 179 (App. Div. 1986) ("both wrongful death and survival actions require that the defendant have committed some underlying wrong against the decedent").

[13] Intentional infliction of emotional distress: *Burnett* Count 8; *Federal Insurance* Count 5; *Tremsky* Count 6. Assault and battery: *Ashton* Count 3; *Federal Insurance* Count 4; *Salvo* Count 3. Property destruction: *Ashton* Count 8; *Continental Casualty* Count 1; *Euro Brokers* Counts 1-2, 6, 8; *Federal Insurance* Count 1; *NY Marine* Count 1; *WTC Properties* Counts 5-6, 9. Only two of the *Ashton* plaintiffs have standing to bring a property destruction claim, <u>i.e.</u>, Mayore Estates LLC and 80 Lafayette Associates, LLC. These plaintiffs originally filed their own lawsuit, No. 02 CV 7214, which was consolidated with *Ashton*.

claims, for failure to state a claim.

**VII.   THE PLAINTIFFS IN SOME CASES LACK STANDING TO MAINTAIN THEIR RICO CLAIMS BECAUSE THEIR INJURIES ARE PERSONAL INJURIES, NOT INJURIES TO BUSINESS OR PROPERTY.**

This Court must dismiss the RICO claims brought by the *Burnett* and *Tremsky* personal injury plaintiffs, as well as by the *Federal Insurance* subrogation plaintiffs who seek recovery for the insurance payments that they made on behalf of injured or deceased individuals, because those plaintiffs lack standing as their injuries are personal injuries (or derived directly from personal injuries).

Personal injury plaintiffs, including those seeking recovery based on insurance or medical payments – which covers many of the individual payments made by the *Federal Insurance* plaintiffs – lack standing to bring RICO claims, which are limited by statute to "[a]ny person injured in his business or property."  18 U.S.C. § 1964(c).  Under clear Second Circuit precedent, personal injury plaintiffs cannot seek recovery under the RICO statute.  <u>Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.</u>, 191 F.3d 229, 241 (2d Cir. 1999) ("the RICO statute requires an injury to 'business or property'"); <u>see also</u> <u>Burnett v. Al Baraka Invest. & Devel. Corp.</u>, 274 F. Supp. 2d 86 at 101-02 (D.D.C. 2003) (dismissing plaintiffs' RICO claims for lack of standing); <u>Jerry Kubecka, Inc. v. Avellino</u>, 898 F. Supp. 963, 969 (E.D.N.Y. 1995) (holding that "personal representatives of the decedents are not entitled to sue under § 1964(c)"); <u>von Bulow v. von Bulow</u>, 634 F. Supp. 1284, 1309 (S.D.N.Y. 1986) ("It is clear that personal injury is not actionable under RICO.").  The arguments recently made by plaintiffs with respect to their standing to assert RICO claims against other defendants are unavailing.  <u>See</u> AHIF Reply Br. (*O'Neill*), at 3-6 (May 9, 2005) (Docket No. 890) (collecting cases).

20

**VIII.   PLAINTIFFS' ALLEGATIONS ARE INSUFFICIENT TO ESTABLISH A
CAUSE OF ACTION AGAINST MR. AL-BUTHE FOR PLAINTIFFS'
RICO CLAIMS.**

Even if this Court were to consider the merits of the plaintiffs' RICO claims as to those
plaintiffs who lack standing, it must still find that all the plaintiffs who seek to bring RICO
claims against Mr. Al-Buthe have failed to state a RICO claim under Section 1962(a), (c), or (d).

As a threshold issue, none of the plaintiffs has filed a RICO Statement, as required by
Case Management Order No. 2, ¶ 14 (June 15, 2004).  The RICO Statements that some plaintiffs
filed regarding AHIF and/or Mr. Sedaghaty impermissibly lumped together allegations about all
of the so-called "Al Haramain" defendants, without identifying with specificity what Mr.
Al-Buthe himself is alleged to have done that knowingly and proximately caused plaintiffs'
injuries.  Indeed, much of the text in these statements is copied verbatim from that used against
other, completely unrelated defendants, such as banks or members of the Saudi royal family.
These statements fail to set forth sufficient facts to plead the plaintiffs' allegations against Mr.
Al-Buthe himself.  See Lesavoy v. Lane, 304 F. Supp. 2d 520, 532 (S.D.N.Y. 2004) (elements of
a RICO claim "cannot be incorporated loosely from a previous narration, but must be tightly
particularized and connected in a complaint").

Plaintiffs cannot state a Section 1962(a) claim because they have not alleged any "injury
arising from the defendant's investment of the racketeering income to recover under Section
1962(a)," other than an impermissible generic and conclusory assertion as to all defendants.  In
re Sept. 11, 349 F. Supp. 2d at 827 (quoting Ouaknine v. MacFarlane, 897 F.2d 75, 83 (2d Cir.
1990)) (holding that the *Federal Insurance* plaintiffs have not stated a Section 1962(a) claim).

Plaintiffs cannot state a Section 1962(c) claim because they have pled any facts, let alone

sufficient facts, showing that Mr. Al-Buthe had the requisite level of directing the operation and

management of the "Al Qaeda enterprise."  As this Court previously held, merely alleging

participation or assistance is insufficient absent pleading facts showing that an individual

defendant engaged in "active management or operation" to state a Section 1962(c) claim.  Id. at

827-28 (holding that the *Federal Insurance* plaintiffs have not stated a Section 1962(c) claim).

Finally, plaintiffs cannot state a Section 1962(d) claim against Mr. Al-Buthe, since the

plaintiffs have done nothing to show that each individual defendant conspired with the other

defendants to engage in an enterprise, or that Mr. Al-Buthe was a "central figure in the

underlying schemes."  Id. (holding that the *Federal Insurance* plaintiffs have not stated a Section

1962(d) claim).  Merely alleging that Mr. Al-Buthe was a "co-conspirator, aider and abettor" of

al-Haramain (SA) is insufficient, since plaintiffs do not "allege some factual basis for a finding

of a conscious agreement among the defendants" as required to state a Section 1962(c) RICO

claim.  Id. at 827.

Therefore, this Court must dismiss plaintiffs' RICO claims against Mr. Al-Buthe under

Sections 1962(a), (c), and (d), because plaintiffs failed to allege any injury arising from his

investment of the enterprise's income; that Mr. Al-Buthe engaged in an enterprise, or conspired

with others to do so; or that Mr. Al-Buthe was actively managed and operated the alleged

enterprise, or was a central figure in the alleged scheme, as required to maintain RICO claims.

**IX.     PLAINTIFFS' ALLEGATIONS ARE INSUFFICIENT TO MAKE OUT
          NEGLIGENCE CLAIMS AGAINST MR. AL-BUTHE BECAUSE HE
          OWED NO DUTY OF CARE TO PLAINTIFFS.**

This Court must dismiss plaintiffs' negligence, negligent infliction of emotional distress,

and nuisance claims against Mr. Al-Buthe because he owed no duty of care to the plaintiffs.[14]  It

is black letter law that a defendant must owe a duty to plaintiffs in order to state a negligence

claim.  King v. Crossland Savings Bank, 111 F.3d 251, 259 (2d Cir. 1997); Palsgraf v. Long

Island R.R. Co., 248 N.Y. 339, 342 (1928); In re Sept. 11, 349 F. Supp. 2d at 830.  Charitable

organizations, and their officers and employees, owe no duty to the general public.[15]

        The personal injury plaintiffs have alleged nothing more than conclusory allegations that

"all Defendants were under a general duty" or "breached duties of care owed to the Plaintiffs."

See Burnett Am. Compl. ¶ 666; Tremsky Am. Compl. ¶ 235.  However there is no general duty

to "control the conduct of third persons to prevent them from causing injury to others."

McCarthy v. Olin Corp., 119 F.3d 148, 156-57 (2d Cir. 1997).[16]  The Federal Insurance and NY

Marine plaintiffs' negligence claims do not even bother to plead that any defendant owed a duty

of care to plaintiffs.  Thus, this Court should dismiss plaintiffs' negligence, negligent infliction

of emotional distress, and nuisance claims against Mr. Al-Buthe.

---

[14] Four complaints brought negligence and negligent infliction of emotional distress claims against Mr. Al-Buthe.  Burnett, Counts 6 and 8; Federal Insurance, Counts 5 and 11; NY Marine, Count 6 (negligence only); Tremsky, Counts 4 and 6.  The Tremsky plaintiffs also raised a vague "nuisance" claim (Count 15), which sounds in negligence, since it alleges that all defendants "were under a general duty."  However, they cannot satisfy the requirements of a nuisance claim which requires a showing that Mr. Al-Buthe owed "a duty of care to the public or to a substantial number of persons."  NAACP v. AcuSport, Inc., 271 F. Supp. 2d 435, 490 (E.D.N.Y. 2003).

[15] See McGrath v. United Hosp., 562 N.Y.S.2d 193, 194 (App. Div. 1990) (charity owed no duty to plaintiffs); Christiansen v. National Sav. & Trust Co., 683 F.2d 520, 529 (D.C. Cir. 1982); Burnett, 274 F. Supp. 2d at 108-09 (dismissing negligence claims against AHIF).

[16] The Tremsky plaintiffs also incorrectly alleged that the "charity Defendants were under heightened duties as fiduciaries of ... charities, as public servants endowed with the public trust." Tremsky Am. Compl. ¶ 235.  This allegation is legally insufficient, since the only fiduciary duty owed in a charitable context is that of the directors of a charity to the charity itself.  Christiansen, 683 F.2d at 528-29; Stern v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses and Missionaries, 381 F. Supp. 1003, 1013 (D.D.C. 1974).

**X.   PLAINTIFFS' PUNITIVE DAMAGE CLAIMS FAIL AS A MATTER OF LAW BECAUSE NO INDEPENDENT CAUSE OF ACTION EXISTS.**

This Court must dismiss the plaintiffs' punitive damages counts, brought against Mr. Al-Buthe by all plaintiffs except for *Continental Casualty*, because no independent cause of action exists under New York law for this claim.  It is settled law that punitive damages are merely a form of relief, not an independent tort cause of action.[17]

**XI.   PLAINTIFFS' CONSPIRACY CLAIMS FAIL AS A MATTER OF LAW BECAUSE NO INDEPENDENT CAUSE OF ACTION EXISTS.**

This Court must dismiss the plaintiffs' conspiracy counts, listed in several cases, see *Burnett*, Count 9, *Federal Insurance* Count 7, *NY Marine*, Count 2, *Tremsky*, Count 7, and *WTC Properties*, Count 7, because no independent cause of action exists under New York law for this claim.  It is settled law that conspiracy is merely a method for establishing a nexus between defendants and the tortious conduct, or for establishing personal jurisdiction, but is not an independent tort cause of action under New York law.[18]  Furthermore, the plaintiffs' "allegation of conspiracy is merely duplicative of the other claims and accordingly [should be] dismissed." Ahmed v. National Bank of Pakistan, 572 F. Supp. 550, 555 (S.D.N.Y. 1983).

**XII.   THIS COURT LACKS PERSONAL JURISDICTION OVER MR. AL-BUTHE, PURSUANT TO RULE 4(k)(1)(D), FED. R. CIV. P. OR THE NEW YORK LONG-ARM STATUTE.**

This Court must dismiss plaintiffs' complaints against Mr. Al-Buthe, pursuant to Rule

---

[17] See Smith v. County of Erie, 743 N.Y.S.2d 649, 651 (App. Div. 2002) ("the court properly dismissed the cause of action for punitive damages"); Mayes v. UVI Holdings, Inc., 723 N.Y.S. 2d 151, 157 (App. Div. 2001) ("there is no independent cause of action for punitive damages").

[18] See Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981) ("Under New York law, conspiracy, per se, is not a tort."); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991) ("The charge of conspiracy is merely the string which serves to connect defendants to the actionable wrong and the overt acts which caused injury."); Kajtazi v. Kajtazi, 488 F. Supp. 15, 21 (E.D.N.Y. 1978) ("a civil conspiracy to commit an actionable wrong is not a cause of action").

12(b)(2), Fed. R. Civ. P., for lack of personal jurisdiction.  The burden is on plaintiffs to establish that personal jurisdiction exists over each defendant by making a prima facie showing of facts sufficient to support a finding of personal jurisdiction.  Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999).  Conclusory assertions or "argumentative inferences" cannot be the basis for personal jurisdiction.  *In re* Sept. 11, 349 F. Supp. 2d at 804; Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).

As previously briefed, neither the catch-all provision of Rule 4(k)(1)(D), Fed. R. Civ. P., which allows the exercise of personal jurisdiction over a non-resident defendant "when authorized by a statute of the United States," nor the New York long-arm statute, N.Y. C.P.L.R. § 302(a) (McKinney 2001), allow this Court to exercise personal jurisdiction over Mr. Al-Buthe, a resident of Saudi Arabia whose only connection with the United States was his involvement with AHIF in Oregon.  See Sedaghaty Mot., at 17-21 (Feb. 7, 2005) (Docket No. 655) (collecting cases).  Moreover, even if this Court were to apply the statutory jurisdictional provisions, it must still find that the constitutional requirements of due process are not satisfied.  Id. at 21-22; see also *In re* Sept. 11, 349 F. Supp. 2d at 810-11.

## CONCLUSION

For the foregoing reasons, defendant Soliman H.S. Al-Buthe respectfully requests that this Court grant his Motion to Dismiss for failure to state a claim upon which relief can be granted and for lack of personal jurisdiction.

Respectfully submitted,


/s/ Lynne Bernabei

_____
Lynne Bernabei, Esquire  (LB2489)
Alan R. Kabat, Esquire  (AK7194)
Bernabei & Katz, PLLC
1773 T Street, N.W.
Washington, D.C. 20009-7139
(202) 745-1942

Attorneys for Defendant
 Soliman H.S. Al-Buthe

Dated:  May 9, 2005

26

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2005, I caused the foregoing to be served electronically on counsel of record by the Court's Electronic Case Filing (ECF) System, pursuant to ¶ 9(a) of Case Management Order No. 2 (June 16, 2004).


/s/ Alan R. Kabat
_____
Alan R. Kabat