**Exhibit 1**

Al-Buthe Motion to Dismiss
(May 9, 2005)

No. 03 MDL 1570 (RCC)

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
                                              )
```
*IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001        )        No. 03 MDL 1570 (RCC)
```
                                              )        ECF Case
                                              )
```

This document relates to:  All actions

## DECLARATION OF ALAN R. KABAT
## REGARDING THE COMPLAINTS
## CONSOLIDATED UNDER NO. 03 MDL 1570 (RCC)

I am an attorney licensed to practice in the District of Columbia and am admitted *pro hac vice* in this matter. I am with the law firm of Bernabei & Katz PLLC, counsel to defendant Soliman H.S. Al-Buthe. I submit this declaration to summarize the relevant statistics of the complaints consolidated under, or referred to, No. 03 MDL 1570 (RCC).

1.       I have reviewed the nineteen complaints that have been consolidated with, or referred to, No. 03 MDL 1570 (RCC). For each complaint, I have calculated the following statistics as of May 6, 2005:  (a) the number of defendants; (b) the number of defendants who were voluntarily dismissed by plaintiffs; (c) the number of defendants who were dismissed by this Court's January 18, 2005 opinion, *In re*: Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), by this Court's Order of Dismissal (May 5, 2005) (Docket No. 883), and by Judge Robertson's opinion in Burnett v. Al Baraka Invest. & Devel. Corp., 292 F. Supp. 2d 13 (D.D.C. 2003); (d) the number of defendants who were added back to the complaint after having initially been voluntarily dismissed by the plaintiffs; and (e) the size of the complaint, *i.e.*, the number of pages (without the caption), the number of paragraphs, and the number of counts.

2.      In determining the total number of defendants for each complaint, I did not include multiple listings of the same individual defendant, or "a/k/a" listings.  In determining the total number of defendants for all the proceedings in No. 03 MDL 1570, I attempted to reconcile inconsistent spellings of the names of single individual defendants across the complaints.  In reviewing the complaints, it was readily apparent that most if not all the complaints with numerous defendants, including *Ashton*, *Burnett*, *Federal Insurance*, *Salvo*, and *Tremsky*, erroneously listed the same person's name several times, as purported separate defendants, sometimes even on the same page.  Also, given that several of these complaints were copied from earlier-filed complaints prepared by different counsel, misspellings in one complaint were copied into other complaints.

3.      To summarize, in the nineteen operative complaints, I have identified a total of 835 named defendants, and an additional 6,775 anonymous ("John Doe") defendants.  The nineteen complaints span a total of 2,455 pages (not counting the captions listing the parties), and 7,283 numbered paragraphs (with some complaints, including *Burnett*, having additional introductory paragraphs that are not numbered), and a total of 191 counts.

4.      Ashton, *et al.* v. Al Qaeda Islamic Army, *et al.*, Case No. 02-CV-6977.  The Third Amended Complaint (Sept. 5, 2003) lists 440 defendants.  Subsequent to the filing of the Third Amended Complaint, the *Ashton* plaintiffs voluntarily dismissed 258 of the 440 defendants.  See MDL Docket Nos. 230, 562, 549, 550, 562, and 563.  The Third Amended Complaint includes six defendants who were first named in an earlier complaint, subsequently dropped from an intervening complaint, and then added back.  This Court, in its January 18, 2005 opinion, dismissed six defendants from *Ashton*.  The *Ashton* plaintiffs subsequently voluntarily

2

dismissed an additional nine defendants. See MDL Docket No. 706. This Court, in its May 5, 2005 Order of Dismissal, dismissed one additional defendant. The Third Amended Complaint consists of 213 pages (not counting the caption), 625 numbered paragraphs, and eight counts.

5.      Burnett, et al. v. Al Baraka Investment & Development Corp., et al., Case No. 03-CV-9848. The Third Amended Complaint (Nov. 22, 2002) lists 189 defendants, and the *Burnett* plaintiffs subsequently added 114 defendants, for a total of 303 named defendants, and an additional 5,000 anonymous defendants. Subsequent to the filing of the Third Amended Complaint, the *Burnett* plaintiffs voluntarily dismissed twenty-five of the 303 defendants. See MDL Docket Nos. 20, 186, 210, 286, 432, and 602; D.D.C. Docket Nos. 77, 78, 139, 213, 245, 261, 367, 432, and 438. However, the *Burnett* plaintiffs then added back twelve defendants whom they had previously dismissed. Compare Notice of Voluntary Dismissal (Feb. 21, 2003) (D.D.C. Docket No. 77) with Notice of Addition/Removal of Parties (Jan. 3, 2005) (MDL Docket No. 602). This Court, in its January 18, 2005 opinion, dismissed thirteen defendants from *Burnett*, including two dismissed by Judge Robertson and for whom the plaintiffs sought reconsideration. The *Burnett* plaintiffs subsequently voluntarily dismissed an additional two defendants. See MDL Docket Nos. 813 and 814. This Court, in its May 5, 2005 Order of Dismissal, dismissed one additional defendant. The Third Amended Complaint consists of 203 pages (not counting the caption), 723 numbered paragraphs (not counting over twenty pages of introductory text for which the paragraphs are not numbered), and fifteen counts.

6.      Burnett, et al. v. Al Baraka Investment & Development Corp., et al., Case No. 03-CV-5738. The First Amended Complaint (Sept. 3, 2003) lists 361 defendants, and an additional 5,000 anonymous defendants, and was stated to be identical with the complaint filed in

the U.S. District Court for the District of Columbia, other than in listing more defendants.
Subsequent to the filing of the First Amended Complaint, the *Burnett* plaintiffs voluntarily
dismissed six of the 361 defendants. See MDL Docket Nos. 186, 210, and 286. This Court in its
January 18, 2005 opinion, dismissed two defendants from *Burnett* (the other eleven defendants
who were dismissed from *Burnett*, No. 03-CV-9848, had not moved against the second *Burnett*
action). The *Burnett* plaintiffs subsequently voluntarily dismissed an additional two defendants.
See MDL Docket Nos. 813 and 814. This Court, in its May 5, 2005 Order of Dismissal,
dismissed one additional defendant. The First Amended Complaint consists of 194 pages (not
counting the caption), 723 numbered paragraphs (not counting over twenty pages of introductory
text for which the paragraphs are not numbered), and fifteen counts.

7.     Cantor Fitzgerald Associates, LP, *et al.* v. Akida Investment Co., Ltd., *et al.*, Case
No. 04-CV-7065. The First Amended Complaint (Dec. 7, 2004) lists eighty-nine defendants, and
an additional 10 anonymous defendants. This Court, in its May 5, 2005 Order of Dismissal,
dismissed five defendants. The First Amended Complaint consists of sixty pages (not counting
the caption), 242 numbered paragraphs, and thirteen counts.

8.     Continental Casualty Co., *et al.* v. Al Qaeda Islamic Army, *et al.*, Case No. 04-
CV-05970. The First Amended Complaint (Dec. 7, 2004) lists 431 defendants. Subsequent to
the filing of the First Amended Complaint, the *Continental Casualty* plaintiffs voluntarily
dismissed six of the 431 defendants. See MDL Docket Nos. 622 and 652. Subsequent to this
Court's January 18, 2005 opinion, the *Continental Casualty* plaintiffs voluntarily dismissed an
additional nine defendants. See MDL Docket Nos. 658, 688, 691, 692, and 828. This Court, in
its May 5, 2005 Order of Dismissal, dismissed an additional four defendants. The First Amended

4

Complaint consists of 181 pages (not counting the caption), 617 numbered paragraphs, and three counts.

9.      Euro Brokers, Inc., *et al.* v. Al Baraka Investment and Development Corp., *et al.*, Case No. 04-CV-07279. The Complaint (Sept. 10, 2004) lists 201 defendants. Subsequent to this Court's January 18, 2005 opinion, the *Euro Brokers* plaintiffs voluntarily dismissed two defendants. See MDL Docket Nos. 813 and 814. This Court, in its May 5, 2005 Order of Dismissal, dismissed an additional four defendants. The Complaint consists of forty-three pages (not counting the caption), 192 numbered paragraphs, and nine counts.

10.      Federal Insurance Co., *et al.* v. Al Qaida, *et al.*, Case No. 03-CV-6978. The First Amended Complaint (Mar. 10, 2004) lists 581 defendants. Subsequent to the filing of the First Amended Complaint, the *Federal Insurance* plaintiffs voluntarily dismissed seventy-nine of the 581 defendants. See MDL Docket Nos. 22, 188, 288, 496, 538, 562, 549, 552, 562, 566, 567, 568, 569, and 573. This Court, in its January 18, 2005 opinion, dismissed five defendants from *Federal Insurance*. The *Federal Insurance* plaintiffs subsequently voluntarily dismissed an additional three defendants. See MDL Docket Nos. 708, 820, and 830. This Court, in its May 5, 2005 Order of Dismissal, dismissed one additional defendant. The First Amended Complaint consists of 165 pages (not counting the caption), 646 numbered paragraphs, and twelve counts.

11.      Havlish, *et al.* v. Bin Laden, *et al.*, Case No. 03-CV-09848. The Class Action Complaint (Feb. 12, 2002) listed forty-four defendants. The Amended Class Action Complaint (Sept. 5, 2003) lists twenty defendants, and an additional 500 anonymous defendants, with the remaining twenty-four defendants from the original complaint dropped. The Amended Class

Action Complaint consists of 124 pages (not counting the caption), 367 numbered paragraphs, and ten counts.

12.     Morrison v. Kingdom of Saudi Arabia, *et al.*, Case No. 04-CV-7210.  The Class Action Complaint (Sept. 10, 2004) lists eight defendants.  This Court, in its May 5, 2005 Order of Dismissal, dismissed one defendant.  The Complaint consists of ten pages (not counting the caption), thirty-two numbered paragraphs, and one count.

13.     New York Marine and General Insurance Co. v. Al Qaida, *et al.*, Case No. 04-CV-6105.  The First Amended Complaint (Dec. 23, 2004) lists 561 defendants.  Subsequent to this Court's January 18, 2005 opinion, the *New York Marine* plaintiffs voluntarily dismissed three defendants.  See MDL Docket No. 825 and 874.  This Court, in its May 5, 2005 Order of Dismissal, dismissed an additional four defendants.  The First Amended Complaint consists of twenty-five pages (not counting the caption), eighty-three numbered paragraphs, and seven counts.

14.     Estate of O'Neill, *et al.* v. Republic of Iraq, *et al.*, Case No. 04-CV-1076.  The Second Amended Complaint (Dec. 29, 2004) lists 111 defendants, and an additional 67 anonymous defendants.  The Second Amended Complaint consists of eighty-two pages (not counting the caption), 258 numbered paragraphs, and ten counts.

15.     Estate of O'Neill, *et al.* v. Kingdom of Saudi Arabia, *et al.*, Case No. 04-CV-1922.  The Class Action Complaint (Mar. 10, 2004) lists twenty-five defendants, and an additional 99 anonymous defendants.  This Court, in its May 5, 2005 Order of Dismissal, dismissed one defendant.  The Class Action Complaint consists of forty-four pages (not counting the caption), 184 numbered paragraphs, and thirteen counts.

16.     Estate of O'Neill, *et al.* v. Al Baraka Investment and Development Corp., *et al.*, Case No. 04-CV-1923.  The Second Amended Class Action Complaint (Dec. 30, 2004) lists 139 defendants, and an additional 99 anonymous defendants.  Subsequent to this Court's January 18, 2005 opinion, the *O'Neill* plaintiffs voluntarily dismissed one defendant.  See MDL Docket No. 822.  This Court, in its May 5, 2005 Order of Dismissal, dismissed an additional two defendants.  The Second Amended Class Action Complaint consists of fifty pages (not counting the caption), 188 numbered paragraphs, and twelve counts.

17.     Pacific Employers Ins. Co., *et al.* v. Kingdom of Saudi Arabia, *et al.*, Case No. 04-CV-7216.  The Complaint (Sept. 10, 2004) lists two defendants.  This Court, in its May 5, 2005 Order of Dismissal, dismissed one defendant.  The Complaint consists of thirty-two pages (not counting the caption), ninety-five numbered paragraphs, and eleven counts.

18.     Salvo, *et al.* v. Al Qaeda Islamic Army, *et al.*, Case No. 03-CV-5071.  The First Amended Complaint (Sept. 4, 2003) lists 376 defendants.  This Court, in its January 18, 2005 opinion, dismissed two defendants from *Salvo*.  Subsequent to this Court's January 18, 2005 Opinion and Order, the *Salvo* plaintiffs voluntarily dismissed 184 of the 376 defendants.  See MDL Docket No. 633.  This Court, in its May 5, 2005 Order of Dismissal, dismissed an additional two defendants.  The First Amended Complaint consists of 225 pages (not counting the caption), 620 numbered paragraphs, and seven counts.

19.     Tremsky, *et al.* v. Osama Bin Laden, *et al.*, Case No. 02-CV-7300.  The First Amended Complaint (Aug. 22, 2003) lists ninety-eight defendants.  This Court, in its January 18, 2005 opinion, dismissed two defendants from *Tremsky*.  This Court, in its May 5, 2005 Order of

7

Dismissal, dismissed an additional two defendants. The First Amended Complaint consists of seventy-four pages (not counting the caption), 285 numbered paragraphs, and fifteen counts.

20.     *Vadhan v. Riggs Nat'l. Corp., et al.*, Case No. 04-CV-7281. The Amended Class Action Complaint (Mar. 24, 2005) lists two defendants. The Amended Class Action Complaint consists of 399 pages (not counting the caption), 145 numbered paragraphs (not counting the listing of parties), and ten counts.

21.     *Vigilant Ins. Co., et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 03-CV-8591. The Complaint (Oct. 28, 2003) lists two defendants. This Court, in its January 18, 2005 opinion, dismissed one defendant from *Vigilant Insurance*. The Complaint consists of seventeen pages (not counting the caption), sixty-six numbered paragraphs, and eleven counts.

22.     *World Trade Center Properties LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07280. The Complaint (Sept. 10, 2004) lists 201 defendants. Subsequent to this Court's January 18, 2005 opinion, the *World Trade Center Properties* plaintiffs voluntarily dismissed two defendants. See MDL Docket Nos. 813 and 814. This Court, in its May 5, 2005 Order of Dismissal, dismissed an additional four defendants. The Complaint consists of 314 pages (not counting the caption), 1192 numbered paragraphs, and nine counts.

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on May 8, 2005.

*Alan R. Kabat*
_____
ALAN R. KABAT

8

**Exhibit 2**

Al-Buthe Motion to Dismiss
(May 9, 2005)

No. 03 MDL 1570 (RCC)

Case 1:03-md-01570-GBD-SN   Document 893-2   Filed 05/09/05   Page 11 of 25



The State Department web site below is a permanent electro
information released prior to January 20, 2001.  Please see v
material released since President George W. Bush took offic
This site is not updated so external links may no longer func
us with any questions about finding information.

NOTE: External links to other Internet sites should not be c
endorsement of the views contained therein.



**Secretary of State Madeleine K. Albright**
Press Briefing Following G-8 Foreign Ministers Meeting, Landtag
Berlin, Germany, December 17, 1999
As released by the Office of the Spokesman
U.S. Department of State

**SECRETARY ALBRIGHT:** Good afternoon, I think you have heard a great deal
from my colleagues and Foreign Minister Fischer was able to give you a full account
of the meetings that took place here. As you know I did not arrive until this morning
and so I just want to briefly tell you that the parts of the discussion that I participated
in obviously involved Chechnya and I listened to the report from Foreign Minister
Vollebaek about his trip to the region, discussion about Kosovo.

Then in terms of picking up on some of the discussions on conflict prevention, I
specifically focused on our interest in limiting the spread of small arms, on the
importance of developing a more robust and quickly acting civilian police, on the
problems associated with the illegitimate trade of diamonds, in terms of perpetuating
or creating the possibility for conflicts, general problems to do with terrorism and
organized crime.

I also briefed my colleagues, in a general way, on the Middle East peace talks as
President Clinton and I conducted them in Washington, between the Syrians and
Israelis in the last couple of days. So that is what we have done in the last few hours
and I'd be very pleased to answer your questions.

**QUESTION:** There has been a lot of talk about conflict prevention by Foreign
Minister Fischer before you came in. We have reports of some serious fighting in
Grozny. I was wondering if you would have any more to say than you said before
about your position as regards international funding to Russia in this context?

**SECRETARY ALBRIGHT:** First of all, let me say clearly the issue of Chechnya
and the fighting in Grozny did occupy some time this morning and I think that the
vividness with which Foreign Minister Vollebaeck described the situation, made
clear to all of us that there continued to be a great need for humanitarian assistance,
better coordination, the ability of humanitarian assistance to get in there and the
need for further political dialogue.

Case 1:03-md-01570-GBD-SN   Document 893-2   Filed 05/09/05   Page 12 of 25

I think that it is very important for us to do everything we can to aid the humanitarian effort and I think that generally we, the international community and the United States also, have had an impact in terms of the humanitarian situation, pushing in order to have borders open, corridors created. I think, frankly, we have had a marginal affect on the political aspect of this conflict. I think there has been a recognition by the Russians of the importance for political dialogue and some contacts between the government in Moscow and various representatives of the rebel groups and President Maskhadov, and obviously some recognition of the fact that the OSCE mission had an appropriate role and might in fact have a longer-term role there. I think we have had no impact militarily, however, and that has been of concern, I think, to everyone.

What has been evident at this meeting, frankly, is that the Russians through their actions are self-isolating from the rest of the international community. That was clear today. And that to a great extent their lack of ability to face squarely what is going on and extending the time for when there might be a solution, that they are losing credibility and international standing. As we look at policy options I think the important point here is to try to keep explaining to the Russians what they could and should be doing and at the same time making sure that, in the case of the United States, that we continue to pursue our national interest, which is to have a functioning relationship with Russia. I think we have to keep remembering that that is very much a part of our short, medium and long-term goal.

**QUESTION:** You said it was important to impress upon the Russians the need for a political solution. If beyond the Duma elections there is no progress and they continue with their offensive against the Chechen rebels, would you see a point when it would be necessary to consider sanctions or other punitive measures in order to reinforce the message that you are sending today?

**SECRETARY ALBRIGHT:** I don't think it is useful to speculate on specific measures such as that. All I am saying, and I think it is very important for people to understand this, is that this kind of action that the Russians are taking is isolating them -- as I said was evident in today's meeting. Where in the past I think there have been G-8 meetings where we were all trying to solve something together, at this one there was a different mood because after Knut Vollebaek's report, the Russians were trying to explain -- I believe not sufficiently -- their actions.

I do think though that there is no question that continued action like this does have a serious affect even on our bilateral relationship, but at the same time, I would like to make very clear, as I just did, is that it is in our national interest to maintain a relationship with Russia. It is a very important country with which we have a lot of business and that we have worked very hard to bring closer to all of us in the last years.

**QUESTION:** (in French) Excuse me, I do not speak English very well.

**SECRETARY ALBRIGHT:** (In French) I speak French.

**QUESTION:** (In French) Thank you. After 500 years torture is a tradition in Turkey. How much longer will this be possible? After 500 years we expect of

Turkey -- and Turkey calls itself Europe or American -- can torture in Turkey be stopped or not? After 28 years Nelson Mandela is no longer a terrorist. The question is President Nelson Mandela is not a terrorist. Mr. Ocalan and after 28 years is not a terrorist, the president of Turkey or Kurdistan. Thank you.

**SECRETARY ALBRIGHT:** (In French) I am not entirely sure I understood your question, but I have to say that the definition of a terrorist is someone who commits actions against civilians who have not done anything -- against innocent people. I know there is a difficulty -- there are people for whom someone is a freedom fighter and for others he is described as a terrorist-- but for me it is not difficult if someone takes the lives of innocent people and what is happening now is that there is a lot of terrorism in the world where there are people who have no respect for the lives of innocent people. Because I have not entirely understood what you said, I hope that this answer will be sufficient for you.

**QUESTION:** During the first Chechen war the West did succeed in getting President Yeltsin to stop bombing the citizens of Grozny. That hasn't happened this time. I wanted to ask you why you thought that was true? Why is Russia more self-isolating this time? Is it the example, misused however it may be, of Kosovo? Is it the coming elections or do you think the Russian military is less under the control of Russian politicians?

**SECRETARY ALBRIGHT:** Well, first of all, it is very hard for me to give you a definitive or even speculative answer on this. I do not accept the similarity between this and Kosovo. What happened that Milosevic did was to have government-directed ethnic cleansing on a large scale and a wholly different approach to how this was being carried out. So I don't accept that analogy.

I believe that from listening to Foreign Minister Ivanov, is that they basically see this as a threat to the territorial integrity and existence of the Russian Federation and that for them it is an important goal to be able to rid themselves of terrorists. That is their explanation. I think because they feel that they were not able to accomplish that earlier, they now can.

That does not mean that it is an explanation that the United States accepts or that the other members of the G-8 accepted this morning. There is definitely the feeling among the rest of us, that while there may be legitimate problems with terrorists that there is no legitimate military solution to the Chechen conflict and that the only way to accomplish what the Russians legitimately want -- which is to keep their territorial integrity -- is through a political dialogue with those representatives of the rebel groups that can engage in such a dialogue, and that there needs to be the greatest care taken for the civilians who are caught in a terrible humanitarian debacle.

**QUESTION:** In that respect, Mr. Fischer stated that many of the G-8, I'm quoting him now, "are demanding an immediate ceasefire." Do you support that demand?

SECRETARY ALBRIGHT : Yes, we are demanding an immediate and long-term ceasefire. We are not looking for some short-term ceasefire that just would allow people to leave -- though we believe people ought to be allowed to leave -- but there

needs to be a long-term ceasefire and a political dialogue. Yes, we did agree.

The other thing that we did all agree on and were concerned about, was the spill-over on the rest of the region from the kind of fighting that is going on in Chechnya and [there was] discussion about the affect it might have on the neighboring countries, very great concern about that.

**QUESTION:** Beyond intense jawboning that we've heard in the last few days and weeks, isn't there anything that the West can do that would perhaps make the Russians hurt a little bit? There is some talk about perhaps withholding EXIM Bank funds and other loans of that sort.

**SECRETARY ALBRIGHT:** We are all very concerned, obviously, about the fact that this continues and that is why we have been proposing a ceasefire and the protection of the civilians and the importance of a political dialogue. There were not specific discussions about taking any other actions beyond what the Chairman of the G-8 stated. I think what is important here is that we are all united in making clear to the Russians that this is unacceptable. It is creating for them a situation where they are being systematically excluded from the kinds of international dialogue that we have had with them for the last ten years. Whereas for the last ten years we have been trying to bring them into things that [now] they are isolating themselves and all of a sudden being outside and that this will have an effect. I think there are number of actions that can be taken, but at this stage what we believe is important is to keep making the case to them that there should be a long-term ceasefire, that the civilians need to be protected and that the only way to reach an appropriate end is through a political dialogue.

**QUESTION:** I understand you have been seeing members of the Serbian Opposition today. Can you say anything about that meeting?

**SECRETARY ALBRIGHT:** I will be seeing them later. I have met them before. We all met in Istanbul and one of the things we established, there which we will be doing this afternoon, is to have a U.S.-EU-Yugoslav Opposition dialogue in order to try to strengthen the possibilities of democracy actually at some stage coming to Serbia. We have all made very clear that our fight has not been with the Serb people. The problems are with Milosevic, an indicted war criminal. And that there are forces, within Serbia, democratic forces that should be allowed to come to power through free elections. That is the purpose of the discussion is to really hear from them, what they are doing and to be supportive in terms of the desire of those of us who were part of the Kosovo war to help assure the victory and really make sure that the people of the Balkans and especially of the former Yugoslavia -- have an ability to live freely and choose people of their own choice.

Thank you very much.

[End of Document]

Secretary's Home Page | State Department Home Page

**Exhibit 3**

Al-Buthe Motion to Dismiss
(May 9, 2005)

No. 03 MDL 1570 (RCC)



The State Department web site below is a permanent electro
information released prior to January 20, 2001.  Please see v
material released since President George W. Bush took offic
This site is not updated so external links may no longer func
us with any questions about finding information.

NOTE: External links to other Internet sites should not be c
endorsement of the views contained therein.



**Secretary of State Madeleine K. Albright**
**Remarks at Iftaar Dinner with leaders of the American Muslim**
**Community**
**December 21, 1999, Washington, D.C.**
**As released by the Office of the Spokesman**
**U.S. Department of State**

[As Prepared for Delivery]

Colleagues and honored guests, welcome. I am delighted you could come. I want to
thank Assistant Secretary Harold Koh, Ambassador Bob Seiple and their staffs for
all their work in arranging this event.

And let me echo Harold's earlier apology for the short notice. We don't usually
invite people to events here at the State Department with only three days warning.
But hopefully, in this case, the scrambling of schedules will be to good purpose,
freeing time for the resumption of Middle East talks and leading perhaps to real
progress towards peace.

In the meantime, quite a number of events on my schedule were cancelled. But there
was no way I was going to cancel this dinner, which I have long wanted to do.
Ramadan is a very special time, and I deeply appreciate your willingness to spend an
evening here. I hope you are enjoying it as much as I.

This is the second Iftaar I have had the honor to host. Last year, we had Chairman
Arafat and his delegation.

This year, we considered issuing invitations to appropriate members of the
diplomatic corps. But I felt it would be even more valuable and fitting to invite
leading members of America's Islamic community--that is, you. After all, U.S.
foreign policy is conducted in your name. And like other citizens, you may not agree
with everything we do, but you should at least feel a connection to it, and know that
your views are being heard.

I suspect that for many American Muslims, this is not something you simply take for
granted.

You may be familiar with Professor Huntington's article of six years ago, predicting a clash of civilizations in which the Muslim world and the West would be adversaries. That is an unacceptable prospect for all of us, including Muslims who live in the West.

The article contained many false assumptions, but it did serve as a warning that people of good faith from every faith must work together.

In so doing, we draw strength from the knowledge that no single nationality or culture has a monopoly on wisdom or good values. And we derive confidence from the conviction that human rights are universal, and that people everywhere share a common interest in peace, development and justice.

This sense of common interest was illustrated just this past month in the UN General Assembly, when it approved a Resolution sponsored by the Islamic Republic of Iran, and cosponsored by the United States of America.

In direct contrast to the Huntington article, that Resolution calls for a Dialogue of Civilizations. Its purpose is to underscore the importance--even as we celebrate and respect cultural differences--of working together to solve mutual problems.

If there were any doubt about that need, and the corresponding need to oppose intolerance, it should have been erased by the tragic history of this decade.

A few years ago, I traveled through the countryside in Bosnia. The war was still raging, and I remember seeing church after church still standing, and every mosque burned to the ground. I remember going to a farm in Croatia where hundreds of innocent people had been killed, their bodies dumped in a mass grave, not because of anything they had done, but simply for who they were.

I remember meeting the widows of Srbrenica, and of Rwanda, and of Kosovo, and being overcome with sadness and anger. I am supposed to be a powerful person; but there was nothing these women truly wanted that I had the power to give; and nothing I had the power to give that could replace what they had lost.

And now today, in Chechnya, we see a variation on the same tragic theme. And we are saying to the Russians, not only are the excesses of what you are doing wrong; your strategy is fundamentally misguided and will not work. Killing the innocent does not defeat terror; it feeds terror. You are making new enemies when what you need are friends.

One of the great challenges in the world right now and for decades to come will be that of resolving the inherent tension between the homogenizing effects of globalization, and the abiding differences of culture and faith that help to define and guide us in our journeys through life.

As a multi-ethnic democracy, America has long wrestled with the problems created by this tension. And the lessons we have learned--albeit still imperfectly--have been a rich source of our success.

Our nation was founded by those seeking religious freedom It has grown stronger with every advance in civil rights. Its future depends on our ability to understand that the American identity is not the property of any particular race, ethnicity or religion. And those who have a problem with that will just have to get over it.

We also need to move beyond stereotypes.

Before I was nominated to be Secretary of State, I remember reading that I should be disqualified because I was a woman and therefore would not be able to work with Arab or Islamic leaders. That presumption was an insult to Muslims and to women, and it betrayed an appalling degree of ignorance.

But there was ignorance, too--and bigotry--in the violence directed by some against Muslims in the immediate aftermath of the bombing in Oklahoma City; and in the conclusions some jumped to, without waiting for the investigation, after the tragic crash of Egypt Air.

There are a billion and a half Muslims in the world. They are of many nationalities and live in virtually every corner of every continent. How can anyone apply a stereotype to a quarter of the globe's people? Yet we know it happens every day in the press, in public discussions, and even among those who consider themselves knowledgeable and fair-minded.

That is why I hope in the coming year to make a concerted effort to build on this dinner tonight. I want to be sure that the legitimate concerns of Muslim Americans are taken into account when shaping the programs, activities and reports of this Department.

And I want to encourage our younger citizens to consider a career in the U.S. Foreign Service.

I came to my job determined to do all I could to improve the State Department's record on diversity and equal opportunity.

I have had strong support from our administrative people and from the Director General of the Foreign Service. We are recruiting hard, but women and minorities-- including Muslims--remain under-represented. We want and need to do better. I ask your help in urging young people in your communities to think seriously about becoming part of America's foreign policy team.

I ask this out of selfishness, because the future of the State Department depends on attracting smart young people. But it may also be the right choice for many Muslims, not because of their religion, but because they are dedicated and want to make a difference.

There can be great satisfaction in trying to forge a peace agreement, or prevent a humanitarian disaster, or speak up for a political prisoner, or try to improve respect for human rights. Our diplomats do these and a hundred other things to help make the world a little safer and better.

In closing, I want to thank you again for coming.

I have seen some of you before. I look forward to seeing all of you again. Together, I hope we will build a strong and durable bridge between the State Department and the American Muslim community.

I hope, as well, that with God's help, in this country and overseas, we will succeed in sowing knowledge where there is now ignorance; trust where there is now suspicion; well-being where there is now hardship; and peace where there is now conflict. That, in a nutshell, is the wish I wanted to share with each of you this evening.

Thank you again for being here, and I hope you all have a very blessed and fulfilling Ramadan.

[End of Document]

Secretary's Home Page | State Department Home Page

**Exhibit 4**

Al-Buthe Motion to Dismiss
(May 9, 2005)

No. 03 MDL 1570 (RCC)

# THE CHOICE:

## GLOBAL DOMINATION OR GLOBAL LEADERSHIP

## ZBIGNIEW BRZEZINSKI



A Member of the Perseus Books Group
New York

ZBIGNIEW BRZEZINSKI

If nations are to forsake the acquisition of nuclear weapons, they must have alternative sources of security: either a binding alliance with a nuclear-armed ally or a credible international guarantee. A region-wide agreement banning nuclear weapons—on the model of the convention adopted some years ago by South American states—would be the preferable outcome. But in the absence of regional consensus, the only effective alternative is for the United States, or perhaps the permanent members of the UN Security Council, to provide a guarantee of protection against nuclear attack to any state in the region that abjures nuclear weapons.

The effort to stabilize the Global Balkans will last several decades. At best, progress will be incremental, inconsistent, and vulnerable to major reversals. It will be sustained only if the two most successful sectors of the globe—the politically mobilized America and the economically unifying Europe—treat it increasingly as a shared responsibility in the face of a common security threat.

## NOTES

1    The illustrative data below speak for themselves:

*The world's most widespread social deprivation.* As much as 85 percent of South Asia's populace live on less than $2 per day. In parts of Eurasia paralyzed by regional or domestic strife—North Korea, Afghanistan, Iraq, the Occupied Territories—poverty can be even more extreme. Early in 2002, unemployment had reached more than 38 percent in the West Bank and more than 46 percent in the Gaza Strip; in Chechnya, it surpasses 90 percent.

*The world's most concentrated demographic congestion.* No matter how the demographic data are spun, their trends are daunting. The collective population of four countries alone in this stretch of Eurasia—India, Pakistan, China, and Bangladesh, respectively—will increase by 1.05 billion people by 2050. Measuring population growth over that same period as a percentage, six of the top nine countries growing most rapidly—including the top three—form a solid block from Palestine through the Persian Gulf.

*The world's potentially most explosive ethnic time bombs,* including the partition of about 25 million Kurds by Turkey, Iraq, Iran, and Syria; the domination of more than 4.5 million Arab Palestinians by 5 million Jewish Israelis; the separation of some 15–25 million Azerbaijani Turks in Iran from Azerbaijan; the corralling of at least 8

78

THE CHOICE

million Kashmiris by India and Pakistan; and Russia's gradual genocide of the Chechen nation, to mention only a few.

*The world's most intense religious violence.* Bloodthirsty retribution between Muslims and Hindus in Gujarat, India, and between Christians and Muslims in Indonesia; violent rancor between Jews and Muslims in the Middle East, and perhaps also between Iraq's Shiite Muslim majority and its Sunni minority—all reflect the pervasiveness and visceral intensity of religious antagonisms across Eurasia.

*Some of the world's politically most despotic regimes.* In the 2001–2002 edition of Freedom House's *Freedom in the World,* of the ten countries rated worst for political rights and civil liberties, seven of them fall between the Suez Canal and the China Sea. Fifty-nine percent of the countries in that swathe of Eurasia are classified as "Not Free." Of the remainder, 28 percent are rated "Partly Free"; only 13 percent are considered "Free."

2    The reference to "Global Balkans" is meant to draw attention to the geopolitical similarity between the traditional European Balkans of the nineteenth and twentieth centuries and the unstable region that currently extends from approximately the Suez Canal to Xinjiang and from the Russo-Kazakh border to southern Afghanistan, almost like a triangle on the map. In the case of both areas, internal instability has served as a magnet for external major power intervention and rivalry. (For fuller discussion, see Brzezinski, *The Grand Chessboard,* chap. 5.)

3    The near panic set loose in Washington, DC, by the "sniper" shootings perpetrated by two criminals in the fall of 2002—including the widespread speculation at the time that it may have been a terrorist undertaking—is symptomatic of the degree to which fear of the unknown combined with mass-media hype can produce a state of mind that unintentionally helps to accomplish what the terrorists actually intend.

4    For a sober appraisal of al-Qaeda's capabilities, see Paul J. Smith, "Transnational Terrorism and the al Qaeda Model: Confronting New Realities," *Parameters* (U.S. Army War College Quarterly) 32, no. 2 (Summer 2002), 33–46. Al-Qaeda's transnational appeal, as reflected in its captured archives, is vividly summarized in a report published in *The New York Times,* March 17, 2002. In their article, "A Nation Challenged; Qaeda's Grocery Lists And Manuals of Killing," David Rohde and C. J. Chivers note that "From the mid-1990's on, recruits came to Afghanistan from more than 20 countries, as varied as Iraq and Malaysia, Somalia and Britain. The young men arrived in Afghanistan under the auspices of several different militant groups, each of which ran training camps. But once there, they received strikingly similar courses of religious indoctrination and military training. ...Diverse Muslim groups joined Mr. bin Laden's global jihad. Sometimes, they also came seeking help in pressing their own causes back home."

79

ZBIGNIEW BRZEZINSKI

*Monitor*, March 21, 2002; see also the analysis of the speech's import by Hooman Peimani, "Turkey Hints at Shifting Alliance," *The Asia Times*, June 19, 2002).

11   Demographics play a role as well: The fact that somewhat more than 5 million Jewish Israelis dominate the somewhat less than 5 million Arab Palestinians (of whom about 1.2 million are Israeli citizens) and that the latter are increasing much more rapidly intensifies Israeli insecurity and Arab resentments.

12   See endnote 7.

13   The Seville Declaration was much more explicit in formulating the specific parameters of a peace agreement between Israel and Palestine—notably on such matters as the sharing of Jerusalem, the 1967 frontiers, and the right of the Palestinians to chose their own leaders, including Arafat—than the corresponding U.S. formulations at the time, which made concrete demands of the Palestinian side while not addressing the more contentious immediate issues.

14   In January 2000, President Suleyman Demirel of Turkey proposed a "Caucasus Stability Pact," based on the successful experience of the "Stability Pact for South Eastern Europe" founded in June 1999. The latter—with strong U.S. and EU backing and under their security umbrella—was subsequently able to raise substantial amounts of money to promote the recovery of the Balkans. A similar initiative for the Caucasian region, involving its three newly independent states as well as the United States, the EU, Russia, and Turkey (at some point also Iran) could become an important vehicle for multilateral efforts to stabilize the volatile Caucasian region, to help resolve its various ethnic conflicts, and to facilitate a peaceful solution to such tragic conflicts as the Russian war in Chechnya.

15   In general, professional military establishments have a preference for nuclear weapons with reliable means for their delivery over either chemical weapons, which are less efficient, or bacteriological weapons, which are less controllable. Since it is easier to detect the production and deployment of nuclear weapons and to monitor the likely range of their delivery systems, and since any use of them can be traced to their source, the strategy of deterrence may continue to provide some reassurance of stability even in the face of regional nuclear proliferation. That cannot be said with regard to bacteriological weapons, which are likely to become the WMD of choice for terrorist groups whose targeting is less discriminating than that of the military. In the more immediate future, therefore, the more complex issue of bacteriological weapons will deserve special international attention.

16   It is noteworthy that Israel does not exclude the eventual possibility of a WMD-free zone (WMDFZ) in the Middle East. "In 1991, Israel and the Arab

82

Azerbaijan), as well as a host of small ethnic enclaves in the still Russian-dominated Northern Caucasus. The region is not only beset by intense internal ethnic and religious hostilities, it has also been the traditional focus of power rivalries among Russia, Turkey, and Iran. In the post-Soviet setting, these long-standing conflicts have been compounded by vigorous competition over the division of the energy resources of the Caspian Sea. Moreover, it is probably only a question of time before the very large Azeri population of northwestern Iran begins to seek reunification with its newly independent and potentially more prosperous homeland, thereby injecting more fuel into the region's wildfires.

None of the three traditional rivals for regional preeminence—Russia, Turkey, and Iran—now has the power to impose its unilateral will on the area as a whole. Even a combination of two against one—say, Russia and Iran against Turkey—would be insufficient, as in the background lurk both the United States (through NATO, of which Turkey is a key member) and the European Union (to which Turkey aspires). Yet without some active external involvement, the internal social, political, ethnic, and religious conflicts of the Caucasus will not only continue to fester but are likely to erupt into periodic violence, as they have already done several times since 1990.

That increasingly self-evident reality may even induce Russia to conclude, albeit reluctantly, that its interests would be best served by some form of collaboration with the Euroatlantic community to promote a more stable, eventually cooperative and prosperous, Caucasian region. The two bloody wars Russia brutally waged against the independence-seeking Chechnya in the decade following the disintegration of its historic empire not only did enormous damage to Russia's moral standing but demonstrated the physical limits of its capacity to wage an imperial war in the post-imperial age.

In the 1990s, NATO assumed a new role by imposing stability on the turbulent and violent Balkans. By the early years of the subsequent decade, it was becoming evident that some sort of a new Stability Pact for the Caucasus—modeled on the Stability Pact for the