EXHIBIT "A"

RICO STATEMENT

QUESTION #2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| DMI Administrative Services S.A. and Daar Al-Maal Al-Islami Trust | Dar Al Maal Al Islami is the predecessor-in-interest to the Daar Al-Maal Al-Islami Trust (or "DMI Trust") and DMI Administrative Services S.A., (or "DMI S.A."). DMI S.A. is located in Geneva, Switzerland. The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions." These continents include North America, Europe, Africa and Asia. DMI S.A. provides assistance to the Board of Supervisors of the DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology." Therefore, it is incumbent on DMI S.A. to manage and audit DMI Trust's subsidiary and associate entities. DMI Trust owns 100% of DMI S.A. DMI S.A. is both a wholly owned subsidiary and an agent of the DMI Trust. DMI S.A. and DMI Trust are referred to collectively herein as "DMI." The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "Islamic House of Money").<br><br>DMI Trust is an Islamic Financial Institution founded in 1981. "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship." Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies. Asset management, however, is the Group's core business activity. "The Trust's policy is determined by its fifteen-member Board of Supervisors. To ensure strict conformity with Islamic principles, all DMI operations are reviewed and approved by its Religious Board. The Trust's administrator, DMI Administrative Services S.A., located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries." DMI S.A. is a wholly owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions, and policies of the DMI Trust. DMI S.A. acts as one of DMI Trust's | 1962(a)<br>1962(c)<br>1962(d) |

operational arms.

DMI was founded for the purpose of pursuing a financial jihad in the modern era.  DMI was designed "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."  DMI is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."  "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim.  The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."

While it may be argued that the above DMI spokesman was only advancing a legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam); however, the spokesman refers to his brothers in banking as Mujahideen.  Mujahid (singular of mujahideen) is the title given to a warrior engaged in violent jihad.

In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirms DMI's commitment to financial jihad: "May Allah bless your Jihad and all your efforts.  May He aid you and affirm your faith."

Although the DMI Trust website lists their contact information as DMI SA in Switzerland, and they operate globally, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

DMI sought and seeks depositors from the general public throughout the world.  It also sought and seeks capital from its shareholders.  DMI makes its money from investing its depositor's money and from investing its own and others' capital.  DMI, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

In its quest to seek world wide participation, DMI advertised in the United States. A full page advertisement was published in the Wall Street Journal in 1981 announcing the "Foundation of Dar Al Maal Al Islami With a Capital of 1000 Million Dollars." In its 'Covenant and Call to Ummat Al Islam,' DMI executed a declaration that included the following statement:

> The Founders observe with dismay the pernicious temptation afforded to Muslims by the all pervasive influence of the Riba-dominated financial structure established in Ummat Al-Islam in imitation of institutions alien to it, and the Founders will join in a Holy Struggle for the sake of Allah, exalted be his Name, to eliminate Riba from Ummat Al-Islam since Riba as defined by the Glorious Sharia is banned by Allah.

By advertising in a major United States publication with nationwide circulation and soliciting business from American consumers in support of a "holy struggle" in the slightly veiled language of jihad, DMI illustrates that it has purposefully directed its materially support for Islamic extremist activities at the United States for more than two decades.

On November 27, 1984, Faisal Islamic Bank (Egypt), Faisal Islamic Bank (Sudan) and Dar Al-Maal Al-Islami (DMI) ran an ad in the *New York Times* stating that they would be unable to attend a Conference on Islamic Banking and Finance at the Westbury Hotel, New York on December 12, 1984 "due to conflict with DMI's Annual General Meeting in Istanbul. It is therefore evident that the Conference will not have the necessary expertise to represent practices in Islamic Banking."

When DMI was established in mid-1981, bank officials told the *Wall Street Journal* that it would be active in:

> Islamic investment, Islamic solidarity, and Islamic banking activities…" in Moslem nations and **in the U.S.** and Europe. It added that "Islamic banks capitalized by an organization of the standing of DMI will

have a greater capacity to attract deposits
from the public and governments."  DMI
said it is fixing its capitalization at $1 billion
because it "will compete with well-
established and well-capitalized" Western
financial institutions."

In addition, DMI has published various advertisements in
the U.S. magazines and journals distributed by various
Saudi-based charities.  In one such advertisement in the
Journal of the Muslim World League, there is a picture of
the DMI building in Switzerland with a notation which
reads "the group benefits from an extensive network with a
strong foothold with the major international Islamic
centers.  Its subsidiaries -- banks, insurance and investment
companies -- are rooted regionally to respond more rapidly
and effectively to client needs.  The synergetic relationship
between the subsidiaries gives DMI the leading edge."

DMI also has significant business operations in the United
States.  DMI's wholly-owned subsidiary, Crescent
International Ltd. is a Bermuda registered company owned
by Greenlight SA of Switzerland.  Both entities are DMI
Trust subsidiaries.  A 2003 SEC 'Registration Statement'
for shareholders of Acclaim Entertainment Inc., states:

Mel Craw, Manager of DMI Trust, has
voting and dispositive control over securities
held by Crescent International, Ltd.

DMI Trust's 2001 Annual Report states that Greenlight
(Switzerland) S.A. and Crescent International Ltd are 100
percent DMI Trust-owned "principal subsidiaries."

DMI, Crescent International, Ltd., and Greenlight SA have
overlapping business managers and addresses.   In
Crescent International Ltd.'s SEC filings, Crescent
International, Greenlight (Switzerland) SA, and DMI SA
Services use the same business address in Geneva
Switzerland:

*Crescent International Ltd. January 2, 1999
SEC Filing*
Melvyn Craw
Crescent International Limited
c/o Greenlight (Switzerland) SA

84, Av Louis-Casai, P.O. Box 42
1216 Geneva, Cointrin, Switzerland

*Crescent International Ltd. February 10,*
*2004 SEC Filing*
c/o Greenlight (Switzerland) SA
84 AVE LOUIS CASAI, 1216
COINTRIN/GENEVA Switzerland

DMI Trust uses the same business address as DMI
Administrative Services S.A., Greenlight (Switzerland)
SA, and Crescent International, Ltd.:

*www.dmitrust.com has the following under*
*contact information:*

Daar Al-Maal Al-Islami Trust
Contact:
c/o DMI Administrative Services S.A.
84, Avenue Louis-Casai, P.O. Box 161
1216 Cointrin-Geneva Switzerland

The 1999 SEC report lists a U.S. contact for Crescent
International/DMI as:

COPY TO:
Sara P. Hanks, Esq.
Rogerts & Wells
200 Park Avenue
New York, NY  10166 Tel:  212-878-8000

In June 2003, Crescent International Ltd. owned 1.2%, or
1.4 million shares of Acclaim Entertainment Inc. prior to
Acclaim's stock offering.  An April 1, 2004 stock sale
Prospectus for Sun Healthcare Group, Inc., lists Crescent
International Ltd. as owner of 35,000 shares of Sun
Healthcare Group being offered for sale on the NASDAQ
exchange. The report states:

Mel Craw and Maxi Brezzi, in their capacity
as managers of Green Light (Switzerland)
SA, the investment adviser to Crescent
International Ltd., have voting control and
investment discretion over the shares owned
by Crescent International Ltd. Messrs. Craw
and Brezzi disclaim beneficial ownership of

such shares.

Since 2000, International FiberCom, Inc., (IFC) a Phoenix-based telecommunications service provider has borrowed at least $14 million from Crescent International.  Crescent owns more than 2 million FiberCore shares.  On June 22, 2001, IFC announced:

> The completion of the private placement of $10 million in Series D Convertible Preferred Stock to Crescent International Ltd., an investment company managed by GreenLight (Switzerland) SA, and warrants exercisable to purchase 509, 554 shares of common stock at a price of $5.89 for a five year term…Crescent also agreed to purchase up to $10 million of common stock of the company in increments of between $200,000 and $2.5 million at the discretion of the company during the 18-month commitment period.

In June 2002, Dauphin Technology announced that 6.6 million shares of common stock: "may be acquired by Crescent International Ltd."  In September 2001, Dauphin entered into a $10 million securities purchase agreement that "allows Dauphin to sell Crescent Crescent up to $7.5 mission in stock until September 27, 2003."

As of October 2001, DMI Trust had invested at least $200 million in the International Development Bank Infrastructure Fund L.P.  DMI committed "$100 million for equity and an additional $100 million for complementary finance facility purposes."  The fund commenced operations "seeks to work with governments, international project sponsors and local companies in investing in infrastructure projects in Islamic Development Bank member countries."

The fund was launched and is "managed" by Washington, DC-based Emerging Markets Partnership (EMP).  The private equity firm expects to raise $1 billion for the initiative. It is believed to be the first private investment vehicle for private-sector infrastructure projects in the Islamic world.  EMP set up offices for the fund in Bahrain to "handle fund-raising efforts."

In addition, DMI became a 35% partner in Boston Capital, a Massachusetts based real estate financing firm with "holdings in 48 states and the U.S. Virgin Islands."

The CEO of DMI stated in an interview with the Gulf Daily news that the DMI group has "substantially increased" its investments in the United States after September 11, 2001.

DMI has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts.  Moreover, DMI has purposefully availed itself of the jurisdiction of the United States because it has directed its activities at the United States.  DMI has financially and materially supported al Qaeda, Wael Jelaidan, Yassin Al Kadi and other al Qaeda members that call for holy war or jihad against the United States.  Moreover, DMI's supervising board members and religious board members have publicly called for jihad against the United States.

DMI's misconduct includes laundering money for al Qaeda, knowingly and intentionally providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. Also, DMI's *Zakat* accounts have been used to support al Qaeda.  In addition, DMI has transferred money for Al Haramain, a purported charitable and relief organization. Both the United States and the Kingdom of Saudi Arabia have designated as al Qaeda terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for the financial, material and logistical support they provided to al Qaeda.  DMI S.A. has handled the accounts of Specially Designated Global Terrorists Yassin Al Kadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaeda goals.

DMI Trust is a major shareholder in Al Shamal Bank, which Osama Bin Laden helped to establish in 1991 by providing capital of $50 million.  Additionally, Faisal Islamic Bank (Sudan), another major shareholder of Al Shamal Bank is a subsidiary of defendant Islamic Investment Company of the Gulf (Bahrain) EC, which is in

turn a wholly-owned subsidiary of DMI Trust.  Moreover, another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan).  Al Shamal Bank regularly provided financial and account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank.  Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts.  Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

Islamic Investment Company of the gulf is based in Bahrain.  It recently merged with Faisal Islamic Bank, and the new entity is called Al-Shamil Islamic Bank.  Al-Shamil Islamic Bank is a subsidiary of DMI Trust.  One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

DMI is a primary vehicle for Saudi financing of the international Islamic fundamentalist movement.  For example, Faisal Islamic Bank was implicated during the 2001 U.S. trial on the 1998 embassy bombings in Africa as holding bank accounts for al Qaeda operatives.

Functioning on an Islamic method, DMI adheres to the Zakat system.  After the transaction is made, the funds earmarked as Zakat disappear and are off the books.  Later, under no financial regulation, the money may be used to fund radical Islamic groups.  Islamic banking institutions operate by participating in investments, sharing profits on projects, and earning fees for services performed.

Al Qaeda raises money from a variety of individuals, charities and businesses, including banks and financial institutions.  Once raised, finances are transferred through banks and financial institutions, through individual accounts and accounts maintained by charities and other businesses.  Money is also transferred through alternative remittance systems such as hawala, travelers' checks and

directly by transporting and delivering cash.  The simplest, safest and most efficient mechanism to transfer money, however, "is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy.  For years, al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy."

Al Qaeda has infiltrated and abused the Islamic financial system, a typically legitimate form of investment and finance that abides by Sharia, or Islamic law, which prohibits the earning or payment of interest.  "Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious domestic considerations.  Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement.  Moreover, al Qaeda and other terrorist groups that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system."

A number of businesses and financial institutions which provide material support to al Qaeda do so through a complex web of inter-related corporations, charities, and financial service companies.  These entities purposefully create subsidiaries with inter-locking directors and business ventures, in part, to conceal the distribution of funds for terrorist purposes.  Such institutions maintain several associations, joint ventures and subsidiary banks which are used to finance and facilitate Osama bin Laden and the al Qaeda network.

The United Nations Security Council has created a committee to actively address the issue of the use of shell companies and offshore trusts as shields to obscure the identities of those groups or persons active in the financing of terrorism.  In a December 2003 report, the Council declared that "such arrangements serve to mask potential terrorist-financing activities, and make it difficult to locate

and deal with terrorist-related financial assets...." The Group of Eight (G8) Counter-Terrorism Action Group has "concluded that shell companies, offshore trusts and other beneficial ownership arrangements have allowed [businesses and individuals] to circumvent the full application of the measures set out in the [UN Security Council's anti-terrorism] resolutions."

Al Qaeda and other terrorist groups, in partnership with banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world by perverting and taking advantage of every Muslim's religious duty - - payment of Zakat.

One of the so-called "five pillars" of Islam is Zakat, or almsgiving. The Quran requires every Muslim, both as individuals and corporations, to give Zakat for specific charitable purposes as identified in the Quran. The standard rate for Zakat is 2.5% of current assets and other items of income.

Each year, every able Muslim citizen and company is obligated to donate 2.5% of his or its assets, in money or kind, to the poor and indigent as specified in the Quran. This legal and religious duty is generally satisfied by yearly donations to charities. Many of these charities have financed and continue to finance international terrorism under the cover of supporting Islamic schools, mosques, or orphanages.

It is estimated that hundreds of Saudi-based charitable organizations distribute as much as four billion U.S. dollars ($4,000,000,000.00) each year. Zakat funds are often provided in cash to prominent, trusted community leaders, or to institutions such as banks, which then commingle and disperse donated monies to persons or charities that they deem worthy. These practices have allowed unscrupulous front groups or charities to fund violent, extremist Islamic groups, including al Qaeda. Al Qaeda and its mentors, sponsors, and facilitators are responsible for the horrific acts of terror which occurred on September 11, 2001.

Islamic businesses and financial organizations are major donors to Islamic charities as a result both of their own

corporate Zakat obligations as well as their guidance and involvement in the distribution of the Zakat payments of their individual investors.  Most Islamic financial institutions maintain a Zakat Department.  This department selects the recipients for the business' own Zakat donations and is charged with ensuring that the Zakat is in fact distributed to worthy and appropriate recipients so that the donation satisfies the business' religious obligation as set forth in the Quran and under Sharia law.  As a result, Islamic religious charities have tremendous influence and power in the Middle East and throughout the world.

Islamic financial institutions, through their Zakat Departments, also typically provide services to individual investors to assist them in selecting recipients for their Zakat funds and also to facilitate the actual donations. Investors make use of these services and do so in reliance on the financial institution to ensure that the donation is made to worthy recipients so that the donation complies with Sharia law and satisfies the investor's Zakat obligation.  DMI engages in the Zakat services described above.

Islamic financial institutions that adhere to Sharia principles must also calculate the percentage of unlawful or unacceptable income that is collected but is considered unacceptable according to Sharia principles.  This income is referred to as "Haraam," or forbidden.  Examples of Haraam income include, among other things, any interest that is earned as a result of an account holder's credit balance and any income derived by a corporation from impure activities such as gambling or the sale of liquor. The donation of Haraam income that must be given away cannot count as a virtuous or charitable act.  As such, it cannot fulfill a Muslim's Zakat obligation.  Donations of Haraam income, then, are made in addition to the donations made to satisfy the Zakat requirement.

In addition to the actual monetary donations to charities, Islamic businesses like DMI also provide a broad range of facilities, material support, and services to charities and individuals and in some cases directly to al Qaeda through their various subsidiaries and investments.  These activities include assistance in the actual distribution of both individual and corporate Haraam and Zakat obligations.

As partners, the financial institution and its associates, co-conspirators or agents have a close and collaborative relationship that requires that the bank be aware of the project or business involved in the transactions, the source of its funding, and its goals, successes and failures.  In other words, the Islamic financial institution's relationship to its investment "customer" is akin to the relationship between Western business partners, and completely unlike the more arms-length Western banking relationship between customers and banks.

Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from both Zakat and Haraam donations made by and/or passed through Islamic businesses on behalf of themselves and/or their investors, and they rely on financial institutions, including DMI and its subsidiaries, to facilitate the illicit transfer of funds.

Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate through the Zakat system to his terrorist organization.  In December 1998, during an interview with ABC News, Osama bin Laden said "Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God."

On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including al Qaeda, as international terrorist entities.  Osama bin Laden and his sponsors and followers were known to openly promote hatred and violence against innocents long before this time.  On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other assistance in support of terrorism.  The list of these "Specially Designated Global Terrorists" or terrorist organizations ("SDGT") included Osama bin Laden and al Qaeda.

In full recognition of Islamic principles, Osama bin Laden

and his al Qaeda organization, in partnership with several Saudi and Gulf Islamic banks, founded banking institutes in the Republic of Sudan that provided funding and support for international terrorist operations and organizations and Osama Bin Laden.

Consistent with this founding principle of invoking and organizing a financial jihad, DMI Trust appointed a supervising board of directors who embrace an ideology of violence.  Hassan Abdallah Al Turabi served as one of the initial Supervising Board members of DMI Trust.   Hassan Abdallah Al Turabi was the Secretary General of the Muslim Brotherhood in the Sudan in the early 1960's, and in 1986 he founded the National Islamic Front in the Sudan.  Al Turabi promotes violent jihad as a means to achieve an Islamic state.  In 1989, Al Turabi seized power in Sudan by coup and an Islamic state was created.  Al Turabi encouraged radical Islamic terrorist groups such as al Qaeda to immigrate to Sudan.

In 1991, Osama bin Laden moved to the Sudan where he was welcomed by Al Turabi and the National Islamic Front.  In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival.  Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war.  Turabi provided these camps and the al Qaeda network with military and logistical support through the government of Sudan.

In 1991 the U.S. State Department reported that:

> Terrorist and militant Muslim groups have increased their presence in Sudan.  The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations....  The National Islamic Front, under the leadership of Hassan Al Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

Turabi also provided these groups with business and investment opportunities and in some cases political positions within the Sudanese government. Even before arriving in the Sudan, bin Laden began to invest in the region. He quickly developed a number of joint ventures with prominent National Islamic Front leaders such as Al Turabi. The United States State Department created a fact sheet on Osama Bin Laden which described his activities as follows:

> Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front leader Hassan Al Turabi.... He embarked on several business ventures in Sudan 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

One of these business ventures was the creation of an Islamic bank in the Sudan called Al Shamal Islamic Bank. "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank." DMI conducted its financial support of jihad by also investing in the Al Shamal bank through the Faisal Islamic Bank of Sudan and the Tadamon Islamic Bank.

In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces; and providing for martyrs' families.

The ISSF jihad fund's largest public or private contributors were Prince Mohammed Al Faisal Al Saud's Faisal Islamic Bank, which gave 7 million Sudanese Pounds, along with Faisal Islamic Bank subsidiaries Shamal Islamic Bank, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

In June of 1991, during the period in which Osama bin Laden was transferring his center of operations to the Sudan, there were 26 Faisal Islamic Bank branches, 13 Tadamon Islamic Bank branches, and two Al Shamal Islamic Bank branches operating in the Sudan.

Another personal friend of Hassan Al Turabi is Sheik Omar Abdel Rahman (a/k/a the "Blind Sheik"), who was convicted for the 1993 bombing of the World Trade Center. The Blind Sheik provided religious inspiration to Hassan Al Turabi and Osama bin Laden, issuing a notorious fatwa permitting Afghan-Arab mujahideen to assassinate Muslims who violated the Sharia and authorizing the killing of President Sadat of Egypt and tourists in Muslim lands. The Blind Sheik was also given refuge in Sudan by Hassan Al Turabi.

The government of Sudan and the Blind Sheik assisted Osama bin Laden and his al Qaeda network in the 1993 bombing of the World Trade Center. Sudan sent two intelligence agents to New York who posed as officials of the Sudan UN Mission to the United States. These agents attempted to assist the bombing co-conspirators to leave the country after the attack. One of the agents, Siddiq Ali, served as a bodyguard for Turabi when he visited the United States. Ali was arrested for attempting to blow up New York City landmarks, along with the Blind Sheik and five other Sudanese recruits and members of bin Laden's al Qaeda network.

On November 3, 1997, President Bill Clinton imposed a trade embargo against Sudan and a total asset freeze against the Government of Sudan. This was done after learning that the Government of Sudan's policies and actions such as support for international terrorism, efforts to destabilize neighboring governments, and the prevalence

of human rights violations constituted an unusual and extraordinary threat to national security and foreign policy of the USA.

Turabi endorsed DMI's mission of worldwide jihad through his activities in the Sudan.  In 1991, Turabi organized the Popular Arab and Islamic Congress (*Al-Mutamar al-Arabi al'Shabi al-Islami*, PAIC).  The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991.  "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Co-Defendant Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

Khalifa provided material support to Ramzi Youssef, convicted of the World Trade Center bombing in 1993, who was preparing to assassinate Pope John Paul II during a trip to the Philippines in 1995.  Youssef was also planning Bojinka -- a plot to simultaneously explode twelve US flagship airplanes over the Pacific Ocean.

"There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation.  He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs.  Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad.  During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups.  At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without *jihad* … the Islamic era will prevail, where truth

defeats falsehood and all Moslems live in a united Islamic Nation."

In October 1994 Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum.  Dr. Ayman al-Zawahiri, al Qaeda's second in command, was in attendance.  At the conference Turabi accused the West of trying to wipe out Muslim independence.  Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the 'Great Satan.'"

Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans.  "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught....To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

In selecting Turabi, DMI Trust chose as one of its Supervising Board members an Islamic scholar who provided refuge, business opportunities, ideological support and logistical support to Osama bin Laden and the al Qaeda network.  Turabi promoted and encouraged international Islamic movements to engage in jihad -- the principle espoused by the DMI Trust. Founding DMI board members and spiritual advisors Hassan Al Turabi and Youssef al-Karadawi belong to the Muslim Brotherhood. Considered to be the first Islamic fundamentalist jihadi organization, the Muslim Brotherhood was the model for numerous militant groups, including al Qaeda.  The Brotherhood's homepage states the group's basic credo:

> Allah is our objective.
> The messenger is our leader.
> Quran is our law.
> Jihad is our way.
> Dying in the way of Allah is our highest
> hope.

During the first meeting of the PAIC, Al-Turabi led the

attendees with chants "Down with the USA."  In October 1994, Hassan al-Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum.  At the conference Turabi accused the West of trying to wipe out Muslim independence.  Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the "Great Satan."  Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques" which calls for jihad against Americans.

DMI Trust and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.  An associated company of the DMI Trust is the Faisal Islamic Bank of the Sudan.  The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust.

In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated: "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened.  DMI has actively participated in their investment operations and other activities.  During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983.  Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and a friend of Hassan Al Turabi.  In 1983 Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

Islamic banks operate on the principles of Sharia, a set of rules and laws that guide economic, social, political, and cultural aspects of the daily lives of Muslims.  Sharia originates from both the rules dictated by the Quran and its teachings and from the sayings (also called "hadith") of the Prophet Muhammad.

Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking.  The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981.

Prince Mohammed Al Faisal also served as the Chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaeda, and other extremist groups.

Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed Al Faisal and Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to establish an Islamic State. Together they encouraged Osama bin Laden to travel to Sudan and to develop his al Qaeda terrorist network to train soldiers for jihad.

Former al Qaeda financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum had held bank accounts for al Qaeda operatives during bin Laden's years of operation in Sudan:

> Q.    Where were the accounts [of al Qaeda] held? In what countries?
> A.    (…) we got account in Bank Faisl Islami [Faisal Islamic Bank].
> Q.    Is that also in Khartoum?
> A.    Yes.

The Faisal Islamic Bank of the Sudan was a founding member of the Al Shamal Islamic Bank in Sudan and one of the bank's principal shareholders.

The other co-founders of the bank included the government

of the Northern State of Sudan, which was under the
control of former DMI Trust Supervisory Board member
Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah
Kamel and Al Baraka for Investment and Development.
Main shareholders included the following co-defendants:
the predecessor of the Benevolence International
Foundation, Al Baraka for Investment and Development,
and Sheik Saleh Abdullah Kamel.

The Faisal Islamic Bank of Sudan is a subsidiary of the
Islamic Investment Company of the Gulf (Bahrain) which
is a wholly-owned subsidiary of the DMI Trust.  The
Islamic Investment Company of the Gulf (Bahrain) is also
chaired by Mohammed Al Faisal Al Saud, as is DMI Trust
and the Faisal Islamic Bank of Sudan.

The Faisal Islamic Bank of Sudan is also a shareholder of
the Tadamon Islamic Bank which was a founding
shareholder of the Al Shamal Islamic Bank.  The Tadamon
Islamic Bank was formed in the Sudan on November 28,
1981.  The Islamic Investment Company of the Gulf
(Bahrain), which was a wholly-owned subsidiary of the
DMI Trust, was a main shareholder of the Tadamon
Islamic Bank.

A spokesman and shareholder for Al Shamal Islamic Bank
issued a statement in 1998 promoting jihad as envisioned
by the DMI Trust, urging "all those who are able to carry a
gun to join the [military training] camps....  Jihad has now
become an obligation that comes before any other duty."

The Al Shamal Islamic Bank was capitalized by Osama bin
Laden in the amount of fifty million U.S. dollars
($50,000,000.00).  "[Osama bin Laden] in concert with
National Islamic Front leaders, built a network of
businesses, including an Islamic Bank Al Shamal."  Osama
bin Laden continued to use this bank to finance his terrorist
training activities in Sudan and to support his world wide
terrorist network.

Jamal Ahmed Al-Fadl, a former financial officer for
Osama bin Laden, testified in the 1998 Africa Embassy
bombings trial that Osama bin Laden and at least six al
Qaeda operatives held accounts in their own names at the
Al Shamal Islamic Bank.  Osama bin Laden also financed
the al Qaeda network in part through the Al Shamal Bank:

When you worked for Osama bin Laden in
the Sudan, how much were you paid?
$1,200 a month.
For how long did you work for him [Osama
bin Laden]?
Almost two years.
What Banks did he keep his money at?
Bank Al Shamar.
In responding "Bank Al Shamar," Al-Fadl
was referring to Al Shamal Islamic Bank.

Jamal Al-Fadl also testified that he transferred one hundred
thousand U.S. dollars ($100,000.00) on Osama bin Laden's
behalf to an al Qaeda representative in Jordan.  In the same
trial, another former al Qaeda operative stated that the Al
Shamal Islamic Bank was used for operational purposes.
The witness was wired two hundred fifty thousand U.S.
dollars ($250,000.00) *via* the Bank of New York for the
purchase of stinger missiles and an airplane which he
delivered to Osama bin Laden.

The General Manager of Al Shamal Islamic Bank
acknowledged in a September 2001 press release that
Osama bin Laden had two accounts in the bank.  The
accounts were opened on March 30, 1992 for the company
Al-Hijrah for Construction and Development Ltd.
According to the U.S. State Department, the company
worked directly with Sudanese military officials to
transport soldiers and materials to terrorist training camps
in the Sudan.  A third account was opened in 1993 under
the name of Osama bin Laden's holding company Wadi Al
Aqiq, a company registered in Saudi Arabia.  This
company, according to the U.S. State Department, was
founded by prominent National Islamic Front members and
exercises a monopoly over major agricultural exports from
the Sudan.

Senator Carl Levin, Chairman of the Senate Armed
Services Committee on Investigation of the Governmental
Affairs Committee stated that Al Shamal Islamic Bank
operations continue and that there is evidence that Osama
bin Laden "remains the leading shareholder of the bank"
through trustees and may still use the bank's facilities.

The Chairman of the Al Shamal Islamic Bank was Adel
Baterjee, a wealthy Saudi Arabian businessman and

founder of the Benevolence International Foundation.
Adel Baterjee is a close associate of Osama bin Laden; so
close, in fact, that he was selected by bin Laden to collect
funds on behalf of the al Qaeda network.  In 1993, the
government of Saudi Arabia closed the predecessor to the
Benevolence International Foundation for its ties to
terrorism.  The assets of the Benevolence International
Foundation have been frozen by the United States
Department of Treasury on suspicion that the charity was
secretly funding al Qaeda.  Adel Batterjee is a United
States specially designated global terrorist.

The Faisal Islamic Bank of Sudan is also a shareholder of
the Tadamon Islamic Bank, which was a founding
shareholder of the Al Shamal Islamic Bank.  Jamal Al-Fadl
testified in the criminal trial concerning the 1998 Embassy
bombings that the Tadamon Islamic Bank was used by
members of al Qaeda to fund the terrorist attacks and to
generally support the network.

The Islamic Investment Company of the Gulf (Bahrain)
which is a wholly-owned subsidiary of the DMI Trust was
a main shareholder of the Tadamon Islamic Bank.

Designated terrorist and Co-Defendant Youssef Nada co-
founded Faisal Islamic Bank of Egypt with former DMI
Trust chairman Prince Mohammed Al Faisal Al Saud.
Youssef  Nada is the director of Al Taqwa Bank (a
Specially Designated Global Terrorist entity) and a
member of the Egyptian Muslim Brotherhood and Gama'a
al-Islamiya, which is directly allied with al Qaeda through
Dr. Ayman al-Zawahiri.  In 1970 Nada moved to Saudi
Arabia and established contact with members of the Saudi
Royal family, and in 1977 he and Mohammed Al Faisal Al
Saud established the Faisal Islamic Bank in Egypt.

 Faisal Islamic Bank of Egypt was heavily involved in the
Bank of Credit and Commerce International (BCCI)
banking fraud scandal of the 1970s and 1980s.  Established
in the 1970s as a front to launder heroin money in Pakistan,
the "Bank of Crooks and Criminals" (as referred to by the
CIA) rapidly spread to become a vast fraudulent empire.
BCCI head Khalid bin Mahfouz was indicted in the United
States on July 1, 1992 on criminal fraud charges and
ultimately paid two hundred twenty-five million U.S.
dollars ($225,000,000.00) in a settlement with U.S.

prosecutors.  The 1992 Senate Investigative Report on BCCI detailed the bank's role in supporting terrorism *via* massive diversions of laundered money.  Faisal Islamic Bank of Egypt moved approximately five hundred fifteen million five hundred thousand U.S. dollars ($515,500,000.00) of its deposits into overseas BCCI accounts.  A "major creditor of BCCI," Faisal Islamic Bank of Egypt was the main source of unrecorded deposits used by BCCI to conceal losses.

DMI Trust board members continue to participate in the regulation of Faisal Islamic Bank of Egypt.  In addition to Prince Mohammed Al Faisal Al Saud, fellow DMI Trust board members Ibrahim bin Khalifa Al Khalifa and Omar Abdel Rahman Azzam, a cousin to Egyptian al Qaeda leader Ayman al-Zawahiri, sit on the board of Faisal Islamic Bank Egypt.

One of DMI's Trust subsidiary institutions is Geneva-based Faisal Finance S.A.  DMI Trust and its subsidiary Shamil Bank own the majority of Faisal Finance S.A. capital.  Yassin al-Qadi, who has been indicated as a top financial sponsor of HAMAS, was designated on October 12, 2001 as a terrorist by the United States government under the criteria established in Executive Order 13224 for his financial support of al Qaeda.  Yassin al-Qadi heads the Muwafaq Foundation.  An SDGT entity, Muwafaq was created by Qadi and Khalid bin Mahfouz as an al Qaeda front company, and has been used to transfer millions of dollars to bin Laden.  In 1995, bin Laden himself described Muwafaq as a central element to his financial network.

DMI Trust and its affiliates operate under Islamic principles of finance, paying no interest on investments, and performing financial transactions in line with Sharia, a set of rules and laws that guide economic, social, political, and cultural aspects of the daily lives of Muslims.

To ensure that the Trust and its subsidiaries, affiliates and investments comply with Sharia principles, DMI has always maintained a religious board.  At the conclusion of each year, the Religious Board or Sharia Board reviews all of DMI's investments and banking operations and issues an opinion letter determining whether the DMI's operations and investments were conducted in accordance with Islamic law.  Throughout the year, the Religious Board

issues recommendations to DMI management and staff.

One important recommendation from the Religious Board is the amount of Zakat which should be distributed and the manner in which those funds should be disbursed. Each year the Religious Board has advised that over two million two hundred thousand U.S. dollars ($2,200,000.00) should be designated from the DMI for Zakat appropriation. Subsumed within this amount is also the Zakat distributed on behalf of DMI's equity participants.

The Religious Board plays a crucial role in determining the amount, manner and purposes for which Zakat is distributed. One previous member of the Religious Board of DMI Trust was Youssef al-Karadawi. Karadawi is the spiritual leader of the Muslim Brotherhood who promotes the DMI philosophy of jihad. On May 12, 2001, Karadawi stated that:

> The suicide mission is the loftiest form of jihad. We are talking about a heroic act of sacrifice and sanctification. The person who redeems his soul for Allah, sacrifices himself as a sacrifice for his religion and people, and fights the enemies of Allah, with new weapons that fate awarded to the downtrodden, in order to fight with these means against the tyranny of the arrogant.

Youssef al-Karadawi was also a shareholder of Bank Al Taqwa in the Bahamas, which has been identified by the United States government as a financial supporter of al Qaeda. At the time of the Bank's designation President George Bush declared that:

> Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world. Al Taqwa raises funds for Al Qaeda.

Karadawi has been barred from entering the US since November 1999 for his alleged support of terrorism and affiliations with al-Qaeda associates. He teaches at Qatar University in Doha, and serves as Chairman of Qatar Bank's Sharia board.

In another interview in Palestine Times, Karadawi stated:

> The foreign military presence in the Arab
> world is in fact a new imperialist invasion.
>
> The Islamic resistance in Lebanon and
> Palestine represents the glorious face of the
> Muslim Umma and serves as an example to
> that effect. As for the martyrs, I have issued
> a religious edict blessing the martyrdom
> operations in which a given Muslim fighter
> turns himself or herself into a human bomb
> that casts terror in the hearts of the enemy.
>
> These heroes are carrying out the duty of
> Jihad on behalf of the entire Umma.
>
> Jihad and Resistance is our fate and destiny;
> it is a duty upon us.

Karadawi has also endorsed the killing of American
military personnel stationed in the Middle East.  In an al-
Quds Press Agency interview Karadawi stated: "Those
killed fighting the American forces are martyrs given their
good intentions since they consider these invading troops
an enemy within their territories but without their will."

Fatwas issued by Youssef al-Karadawi have long appeared
on numerous Islamic websites with broad readerships.
One such site is www.islam-online.net.  Though based in
Qatar, the site considers itself to be "global" and
"multilingual," with content appearing in both Arabic and
English and boasting a "global presentation" to reach out to
"all people, Muslim and non-Muslim, without regard to
geographic boundaries, religion, language, background,
culture or gender."  Karadawi heads up the Sharia advisory
created by the website's owners to ensure the site's content
remains in accordance with Islamic standards.

On this webpage, Karadawi has referred to "the marvelous
fighting carried out by our brothers in Chechnya" as "one
of the best kinds of Jihad in the Cause of Allah:"

> There is a scholarly consensus (Ijma`) that
> whoever fights in defense of his religion,

land and household, and is killed in that
fighting, is considered a Martyr (Shahid).
...we are sure that Allah the Almighty will
help [the Chechen fighters] put their enemy
to rout, grant them victory and help them
gain supremacy in their lands.  ...The recent
days augurs (sic) victory for Chechnya, and
the Promise of Allah will for sure come true
soon.

Other fatwas authored by Karadawi urging jihad can be
seen on www.islam-online.net.  In one, he encourages
Muslims to wage jihad on all non-Muslims, declaring:

Disbelievers are all alike.  Capitalists,
Communists, Westerners, Easterners, People
of the Book [Christians and Jews] and
pagans are by no means different from one
other. They should all be fiercely fought if
they attempt to occupy any part of the
Muslim land.

Waging war on the unbelievers, Karadawi states in his
fatwas, is an ideology that must be embraced by all
Muslims, and must be supported by their financial means.
"Declaring Jihad to save our land is an Islamic obligation,"
he states; it is "incumbent on all Muslims to take part in
Jihad."  Karadawi endorses the use of the Zakat payments
to support jihad efforts:

If war is waged anywhere to achieve [the
liberation of Muslims from] the tyranny of
disbelievers, it is undoubtedly a case of
Jihad for the sake of Allah. It thus needs to
be financed from the money of Zakah....

Prince Mohammed Al Faisal Al Saud, former Chairman of
DMI Trust and Faisal Islamic Bank of Sudan, stated: "We
make money when our borrowers make money.  If they
don't we don't collect anything."  He said there was well
over twelve billion U.S. dollars ($12,000,000,000.00) kept
in cash in Saudi hands "because these religious people do
not believe that they should put them in banks that collect
or give interest."  He said he hoped his Islamic banks
would attract these funds, and said that over the brief

period they had been in business—one year—they were already doing so.

Prince Mohammed Al Faisal and DMI Trust sought the investment and distribution business of the Saudi religious elite that collect millions of dollars for the purpose of promoting Islam and funding religious works.  These religious leaders also promote the same jihadist ideals as espoused by DMI.  DMI supports radical and violent jihad by facilitating the transfer of funds from the religious Saudi elite to jihad groups, including al Qaeda.

One cause that DMI S.A. has supported is the Islamic Center of Geneva.  Established in Geneva in 1961 by the son-in-law of Hassan al-Banna, founder of the Egyptian Muslim Brotherhood and of co-defendant Muslim World League, the Islamic Center has received financial support from DMI S.A.  The Center has also received financial support from Bank Al Taqwa, designated a terrorist entity by the United States government.  Al Taqwa is headed by Specially Designated Global Terrorists Youssef Nada and Ahmed Idris Nasreddin.  Youssef Al-Karadawi, a former member of the Religious Board of DMI Trust, also was a shareholder of Bank Al-Taqwa.  On January 4, 2002, the Deputy General Counsel of the United States Department of the Treasury wrote to prosecutors in Switzerland stating that:

> [b]ased on information available to the United States Government, we have a reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist-related organizations....Bank Al Taqwa was founded in the Bahamas and is a close affiliate of Al Taqwa Management Organization....The Malta and Lugano, Switzerland branch offices of Al Taqwa Management Organization receive money that 'pours in' from Kuwait and the United Arab Emirates for Usama bin Laden....As of late September 2001, bin Laden and his Al Qa'ida organization received financial assistance from Youssef M. Nada and Ali bin Mussalim.  Nada has a controlling

interest in, and is chairman of, Bank Al
Taqwa, and Mussalim is involved in Bank
Al Taqwa operations.  Since the 1980s,
following the pullout of the Soviet army
from Afghanistan, Mussalim, assisted by
Nada, has been providing indirect
investment services for Al Qa'ida, investing
funds for bin Laden, and making cash
deliveries on request to the Al Qa'ida
organization.

The Islamic Center of Geneva provided a support network
for al Qaeda's terrorist activities.  In 1991, the son of the
Islamic Center's founder organized a conference at which
Ayman al-Zawahiri and the "Blind Sheik" Omar Abdel
Rahman, indicted for his role in the 1993 World Trade
Center bombing, were present.  As further evidence of the
Islamic Center of Geneva's association with al Qaeda,
Islamic convert Albert Huber (a board member at Youssef
Nada's company) acknowledged that he used his
connections to the Center to meet with members of Osama
bin Laden's al Qaeda network in Lebanon.

DMI Trust satisfies its Zakat obligations by directly
funding the al Qaeda network and by financially
supporting charities and other groups which it knows
support al Qaeda.  DMI Administrative Services has
directly funded an al Qaeda operative whom the United
States Treasury has specially designated as a Global
Terrorist.  In addition, Islamic financial institutions
identify and calculate Haraam income for their depositors
or investors. Islamic financial institutions typically
maintain a department to oversee and distribute Haraam
income for themselves as well as for their individual
investors to ensure that both the donation amount and its
subsequent distribution comply with Sharia law.  As a
result of those obligations and services, Islamic financial
institutions were and are directly involved in the selection
of beneficiaries and the donation of billions of their own
and their depositors' dollars to charities that sponsor
terrorism.

In addition, DMI Trust and its affiliates and subsidiaries
have their own Haraam obligation that must be calculated
and subsequently donated to charity.  Rather than provide
charity directly to the needy, DMI Trust and its affiliates

satisfied, and continue to satisfy, their Haraam obligations by donating to charities of their own choosing. The charities, in theory, are to disburse the money to the needy. DMI Trust knows, however, that these charities have used these funds to support the al Qaeda network.

Through its Religious Board, DMI Trust assists individual investors who, like DMI Trust, wish to satisfy their Zakat and Haraam obligations by donating to charitable organizations, rather than by direct contribution to the needy. DMI Trust selects, or participates in the selection of, the charities that will receive and distribute the Zakat and Haraam payments of both DMI itself and the DMI investors who make use of this service.

The charities selected by DMI Trust or its agents materially supported, aided and abetted al Qaeda, international terrorists and their activities. These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

DMI Trust's subsidiaries Faisal Islamic Bank and the Islamic Investment Company of the Gulf (now Shamil Bank) actively participated in the collection of funds for "charitable" front jihad organizations. Co-defendant the International Islamic Relief Organization (IIRO), an Islamic charity which has long diverted legitimate funds to support terrorism, solicited donations through full-page advertisements run in leading Islamic journals. These advertisements, which called for Zakat donations to assist the needy in Chechnya, Bosnia, and other such areas, often provided account numbers to facilitate the contribution of funds. In many of these advertisements, which ran throughout the 1990s to the present in such publications as the English-language Muslim World League Journal (an Islamic periodical distributed widely throughout the United States), account numbers appeared for Faisal Islamic Bank and the Islamic Investment Company of the Gulf.

Al Qaeda is known to recruit operatives, raise funds, and operate training and weapons manufacturing plants in Chechnya and Bosnia. While some of these funds raised via the advertisements may have been used for legitimate charitable purposes, portions of these funds were diverted to al Qaeda terrorist operations in these regions.

In order to ensure that its Zakat and Haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI Trust is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat.   As a result, DMI Trust knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

For instance, as early as 1992, DMI, its affiliates, agents or predecessors in interest knew or had to know that Osama Bin Laden and al Qaeda were directly collaborating with the International Islamic Relief Organization as part of the Bin Laden Organization's recruitment and training efforts which were crucial to the expansion of al Qaeda. In late 1992, a major Egyptian daily, *Rose Al Yusuf*,  reported that the IIRO and Bin Laden Organization in Egypt recruited and sponsored more than 700 Arab operatives to travel to Afghanistan to train as jihadist terrorists. It was also widely reported in the international media that the Cairo office of the IIRO was managed by the Bin Laden family and Mohamad Showki Al Istanbul, who was sentenced to death in Egypt for his Islamic extremist activities. The IIRO was shut down by Egyptian authorities later in 1993 or early 1994 as a result of the charity's links to Osama Bin Laden.

With operations in Egypt, DMI knew or had to know that the Muslim World League office in Cairo was also managed by Osama Bin Laden.  Along with the IIRO Cairo offices, the MWL served as a direct recruitment and transit facility for jihadists on their way to Afghanistan. As a May 1993 *Rose Al Yusuf* article describes:

> Working with Palestinian Islamist Shaykh Abdallah Azzam, Bin-Ladin set up the 'Jihad and Relief' guesthouse in Peshawar to receive volunteers who would arrive after a short stop in the al-Ansar guesthouse in Jeddah.  The route of this process passed through the unlicensed Cairo office of the Islamic World League [MWL], directed by Dr. Abdallah Umar Nasif.

DMI knew or had to know that the Muslim World League was directly funding and materially supporting al Qaeda. Plaintiffs' Third Amended Complaint describes the pre-September 11th testimony of a high level al Qaeda operative, Mohammed Bayazid, who described how Osama Bin Laden's brother-in-law, convicted terrorist and IIRO employee, Jamal Khalifa, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda to recruit, train and equip al Qaeda terrorists.

DMI knew or had to know that al Qaeda was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States. DMI also knew or had to know that al Qaeda was and is the manager and recipient of millions of dollars from charities which DMI supported financially. As such, DMI aided, abetted, acted in concert with and/or materially supported al Qaeda terrorists and international terrorist activities.

Despite the actual and/or implied knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of Zakat and Haraam contributions on their own behalf and on behalf of their investors, depositors and account holders. Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

As a result of its obligation to inquire and its access to information about its investors and depositors, DMI knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and account holders, to certain charities, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.