UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001          03 MDL 1570 (RCC)

-------------------------------------------------------------------x

THIS DOCUMENT RELATES TO:

    *World Trade Center Properties LLC, et al. v.*
    *Al Baraka Invest. & Devel. Corp., et al.,* 04-CV-07280.

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SAMI OMAR AL-HUSSAYEN'S MOTION TO DISMISS WITH SUPPORTING POINTS AND AUTHORITIES

May 20, 2005

## TABLE OF CONTENTS

I.     INTRODUCTION...................................................................................................1

II.    ARGUMENT .......................................................................................................5

    A.   THE COMPLAINT MEETS THE PLEADING REQUIREMENTS OF THE
        FEDERAL RULES OF CIVIL PROCEDURE .................................................5

        1.   The Motion to Dismiss Standard Under Fed. R. Civ. P. 12 ..................5

    B.   THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANT AL-
        HUSSAYEN..................................................................................................4

        1.   Sami Al-Hussayen Has Sufficient Contacts With the U.S. to Satisfy the
            "Minimum Contacts" Test...................................................................4

        2.   The Requirements for Jurisdiction Under the New York Long-Arm
            Statute Are Satisfied...........................................................................6

    C.   DEFENDANT AL-HUSSAYEN IS ALSO SUBJECT TO JURISDICTION IN THIS
        COURT BECAUSE HE CONSPIRED WITH AL QAEDA TO ATTACK THE
        UNITED STATES .........................................................................................10

    D.   PLAINTIFFS HAVE PROPERLY ALLEGED CONSPIRACY AND
        AIDING/ABETTING AGAINST DEFENDANT .............................................11

    E.   PLAINTIFFS PROPERLY SERVED AL-HUSSAYEN IN ACCORDANCE WITH
        CMO2..........................................................................................................10

        1.   Plaintiffs' Service of Process on Al-Hussayen Via Publication Was
            Effective and Consistent With Due Process Requirements..................11

    F.   THE COMPLAINT STATES CLAIMS AGAINST THE DEFENDANT AND SHOULD NOT
        BE DISMISSED............................................................................................14

        1.   The Plaintiffs Have Adequately Alleged Causation.............................14

        2.   Defendant Al-Hussayen's Alleged Activities Are Not Protected by the
            First Amendment...............................................................................17

        3.   Defendants "Freedom of Speech" Arguments Also Fail.....................20

        4.   There is No Statutory Immunity for the Assistance that Mr. Al-
            Hussayen Provided to al-Qaeda..........................................................22

        5.   Plaintiffs State a Valid Claim Against Al-Hussayen Under the Anti-
            Terrorism Act....................................................................................24

IV.    CONCLUSION ....................................................................................................28

# TABLE OF AUTHORITIES

*Page*

## CASES

*All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215 (S.D.N.Y. 1992)............................9

*Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997)..........................9

*Bennett v. Schmidt*, 153 F.3d 516, 519 (7th. Cir. 1998)..................................................................4

*Boim v. Quranic Literary Institute*, 291 F.3d 1000 (7th Cir. 2002)........................................ passim

*Burnett v. Al Baraka,* 274 F.Supp.2d 86 (D.D.C. 2003)...........................................................4, 25

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991)........7, 9, 10

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301 (S.D.N.Y. 1996)...................................25

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802 (S.D.N.Y. 1991)......................11

*Dixon v. Mack*, 507 F. Supp. 345 (S.D.N.Y. 1980) ......................................................................9

*Estate of Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76 (D.R.I. 2001)............................6, 7

*H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) ......................................................3

*Halberstam  v. Welch,* 705 F.2d 472 (D.C. Cir. 1983) ....................................................10, 15, 16

*Harris v. Ladner*, 127 F.3d 1121 (D.C. Cir. 1997) ......................................................................3

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) .................................... passim

*In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868 (2d Cir. 1987)........................................25

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................................4

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ........................................3

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S.
   163, 164 (1993)........................................................................................................................3

*NOW v. Scheidler*, 510 U.S. 249 (1994) ......................................................................................3

*Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987)......................................................5

*Republic of Argentina v. Weltover*, 504 U.S. 607 (1992) ........................................................4, 6

*S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292 (11th Cir. 2000)..................................................4

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ......................................................................................3

*Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95 (E.D.N.Y. 2000)................................................6, 9

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir.
   1981) .....................................................................................................................................5, 6

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 16 F.Supp.2d 326 (S.D.N.Y.
   1998), *modified on other grounds,* 182 F.R.D. 97 (S.D.N.Y. 1998), *aff'd on other
   grounds,* 241 F.3d 135 (2d Cir. 2001) ......................................................................................4

*United Elec., Radio & Mach. v. 163 Pleasant St. Corp.*, 960 F.2d 1080 (1st Cir. 1992)................5

*Wiggins v. Hitchens*, 853 F. Supp. 505 (D.D.C. 1994)....................................................................3

**UNITED STATES CODE**

18 U.S.C. § 2331...........................................................................................................................15, 24

18 U.S.C. § 2333................................................................................................................... passim

18 U.S.C. § 2339A........................................................................................................................15, 17

18 U.S.C. § 2339B ................................................................................................................ 15, 16, 17

18 U.S.C. § 2339C .............................................................................................................................15

28 U.S.C. § 1653..................................................................................................................................4

**PUBLIC LAWS**

S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 ........................................14, 16

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12 ..........................................................................................................................2, 3

## I.       INTRODUCTION

In this action, plaintiffs seek to hold accountable those who financed, sponsored and otherwise materially supported the terrorist network that perpetrated the September 11, 2001, attacks. Defendant Sami Omar Al-Hussayen ("Al-Hussayen" or "Defendant") is a Saudi citizen who lived, studied and worked in the United States from about 1994 until recently.  Al-Hussayen served as a website consultant, designer and administrator for a number of Al Qaeda charity fronts including the defendant Islamic Assembly of North America ("IANA"), an organization in the United States which has been linked to a number of individuals and organizations that materially supported international terrorism.

As set forth in substantial detail in the Complaint, Al-Hussayen is committed to the principles of violent jihad.  *See especially* Complaint at ¶ 969.  From 1999 until 2003, Al-Hussayen served as an employee and official of IANA.  He served as the group's registered agent in Idaho; he was actively engaged in the business transactions and fundraising activities of IANA; and he assisted in the coordination of IANA's Islamic conferences, many of which were co-sponsored and financed by Specially Designated Global Terrorist organizations (and Defendants) Global Relief Foundation and the Benevolence International Foundation.  *See* Complaint at ¶¶ 957, 569-570. Plaintiffs have alleged, "Al Qaeda has always depended heavily on donations, and its global fundraising network is built upon a foundation of charities, nongovernmental organizations, and other financial institutions that use websites and Internet-based chat rooms and forums." Complaint at ¶ 963. Al-Hussayen is one of the facilitators of that money flow.  He maintained bank accounts in the United States which he used to receive donations and large sums of money for Al Qaeda affiliated charities and other organizations and individuals. Complaint at ¶ 993.

In addition to that material support, Al-Hussayen designed, created, and maintained a number of IANA websites. Complaint at ¶¶ 957, 958, 990. Under his express control, IANA's websites consistently espoused a radical fundamentalist interpretation of Islam and advocated violent jihad against the United States.  Al-Hussayen disseminated fatwas, articles, images and other materials with the intention of recruiting supporters, sympathizers and members to raise money for terrorist groups including Al Qaeda.  Complaint at ¶ 969.

Although Defendant couches his arguments in terms of Rule 12(b)(2) and 12(b)(6), in fact, his motion is addressed to the merits of the case against him.  But the merits of plaintiffs' claims cannot be resolved at this juncture.  A motion to dismiss is designed to test the legal sufficiency of the allegations, not to determine the ultimate issues of fact that underlie the pleadings.  While the Defendant might prefer to move the Court for an immediate ruling on the substantive underpinnings of Plaintiffs' allegations, the Defendant confuses "what must be alleged with what must be proved." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1025 (7th Cir. 2002).  Plaintiffs respectfully submit that whether or not the Defendant materially supported, aided and abetted, and/or conspired with al Qaeda or Osama bin Laden as alleged is an issue for the trier of fact and is not appropriate for a motion to dismiss.  Clearly, significant differences as to the material facts at issue exist between the parties.  Moreover, and more to the point, there is no basis for dismissal pursuant to Fed. R. Civ. P. 12.  This Motion is without basis in law or fact and should be denied.

## II.    ARGUMENT

### A.    THE COMPLAINT MEETS THE PLEADING REQUIREMENTS OF THE FEDERAL RULES OF CIVIL PROCEDURE

#### 1.    The Motion to Dismiss Standard Under Fed. R. Civ. P. 12

Rule 12(b)(6) motions are highly disfavored.  *Conley v. Gibson*, 355 U.S. at 41, 45-46

(1957).  To prevail on a Rule 12(b)(6) motion, a defendant must show beyond doubt that the Plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief.  *Id.*; a*ccord, Harris v. Ladner*, 127 F.3d 1121 (D.C. Cir. 1997); *Wiggins v. Hitchens*, 853 F. Supp. 505 (D.D.C. 1994) ("Dismissal is only appropriate if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief."); and *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989) (a court may not dismiss a complaint unless "it is clear that *no* relief could be granted under *any* set of facts that *could* be proved consistent with the allegations" (emphasis added)).  There has been no such showing here.  As the Supreme Court observed:

> When a federal court reviews the sufficiency of a complaint, its task is necessarily a limited one.  The issue is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

> *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Moreover, the complaint itself must be liberally construed in the plaintiff's favor and the Court is to grant plaintiffs the benefit of all inferences that can be derived from the facts alleged. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (internal citations omitted).  Plaintiffs' allegations must be accepted as true on a motion to dismiss.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993).  Indeed, "at the pleading stage, general factual . . . allegations embrace those specific facts that are necessary to support the claim."  *NOW v. Scheidler*, 510 U.S. 249, 256 (1994).[1]

Defendant would attempt to hold Plaintiffs to a higher standard in this case.

---

[1] Allowing defendants to use Rule 12(b)(6), rather than summary judgment under Rule 56, to challenge cases could create potential conflict with Rule 8.  *Krieger*, 211 F.3d at 136.  The rationale behind this position is simple – litigants are entitled to discovery before being put to their proof, and treating the allegations of the complaint as a statement of the party's proof defeats the function of Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998). Furthermore, Rule 12 explicitly clarifies that if, on a Rule 12(b)(6) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(b).  The material attached to Defendants Motion should be disregarded.

In *Burnett I*, Judge Robertson noted that "*No heightened standard of pleading will be applied in this case . . .*" *Burnett I*, 274 F.Supp.2d at 103-104, emphasis added.  Plaintiffs' pleadings withstand scrutiny.  The Court in *Burnett I* also concluded:  "The 3AC's allegations provide support for an inference of a causal link between [Defendant's] funding and the attacks of September 11." *Id. at 105.*  "There is no heightened pleading requirement for civil conspiracy, nor is civil conspiracy exempt from the operation of Rule 8(a)." *Id.* at 110 (citations omitted).

Moreover, plaintiffs are not required to know or to plead all possible jurisdictional grounds from the outset of the case, to the contrary, the relevant statutory scheme anticipates and allows for liberal amendments as to jurisdiction.  *See* 28 U.S.C. § 1653.  That is particularly true where the factual predicates are complex and the parties numerous, as herein.  Moreover, the conduct and injuries at issue are clearly in the United States' national interest.  Finding personal jurisdiction is seldom a problem when the ultimate wrongful act occurred in the United States. *See, e.g., Argentina v. Weltover Inc.,* 504 U.S. 607, 619 (1992).  Occurrence of the injury alone might also be sufficient, depending on the specific provision of the statute being invoked.  *See, S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000) ("direct effects" and "minimum contacts" are "inextricably intertwined").  Both this Court and the Second Circuit have indicated that all doubtful questions regarding personal jurisdiction should be resolved in favor of the Plaintiff. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 16 F.Supp.2d 326, 332-33 (S.D.N.Y. 1998), *modified on other grounds,* 182 F.R.D. 97 (S.D.N.Y. 1998), *aff'd on other grounds,* 241 F.3d 135 (2d Cir. 2001).

**B.    THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANT AL-HUSSAYEN**

**1.    Sami Al-Hussayen Has Sufficient Contacts With the U.S. to Satisfy the "Minimum Contacts" Test**

With respect to the due process prong of *International Shoe*, Al-Hussayen claims that

Plaintiffs cannot satisfy the N.Y. long-arm statute.  *See* Motion at 2.  Al-Hussayen applies the wrong standard, however.  Where a cause of action is based upon a federal statute that provides for nationwide service of process, the familiar "minimum contacts" is measured in terms of a defendant's contacts with the United States, rather than with the particular forum state.  *See, e.g., Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. at 102 n.54; *United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148 (1982); *see also* Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1067.1, at 82 (2d ed. Supp. 1995).  In *Estate of Ungar v. The Palestinian Authority*, 153 F. Supp. 2d 76 (D.R.I. 2001), for example, the Court considered the personal jurisdiction reach of the ATA in a case brought against several institutional and individual defendants relating to the death of a husband and wife in Israel.  With respect to the foreign institutional defendants, the Court concluded that it could exercise personal jurisdiction over them because they had "contacts with the United States sufficient to confer general personal jurisdiction."  *Id.* at 95.  Those contacts included a Washington, D.C. office, fundraising activities and a public relations campaign in the U.S., as well as several bank accounts in New York.  *Id.* at 88-89.  Defendant herein has far more extensive contacts.

Nowhere in his motion to dismiss does the Defendant assert that he has no contacts with the United States as a whole.  In fact, as the plaintiffs have alleged, Al-Hussayen lived in the United States and conducted business in the United States from 1994 until his recent deportation.  His due process argument boils down to the bald assertion that there is no allegation that he "purposely availed himself of the privilege of conducting activities within the forum…nor is there any allegation that he 'should reasonably anticipate being haled into court there'." (internal citations omitted).  Defendant Hussayen's personal and business activities over the course of the

last decade in the United States and the conduct described in detail in the Complaint ¶¶ 511-618, 953-1010 are sufficient to demonstrate that the Defendant has "purposefully availed itself of the privilege of conducting activities within the United States."  *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148 (1982); *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992).   Such contacts provide adequate support for the exercise of jurisdiction consistent with the Due Process Clause of the Fifth Amendment.  *See Estate of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88-89, 91 (D.R.I. 2001) (personal jurisdiction properly exercised over Palestinian Authority and Palestine Liberation Organization).  In sum, these contacts are more than sufficient to confer personal jurisdiction over the Defendant Al-Hussayen.

## 2. The Requirements for Jurisdiction Under the New York Long-Arm Statute Are Satisfied

This Court has jurisdiction over the Federal Plaintiffs' claims pursuant to New York's long arm statute.  That statute provides, in part, that "the court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent commits a tortious act within the state." N.Y.C.P.L.R. §302(a)(2).   "It is well settled that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. §302(a)(2)." *Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 99 (E.D.N.Y. 2000) (citation omitted); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991). "Both state and federal courts have found that where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his co-conspirators." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp.2d 593, 601 (S.D.N.Y. 1998). New York law does not recognize the substantive tort of civil conspiracy. *Durante Bros. &*

*Sons, Inc. v. Flushing Nat. Bank*, 755 F.2d 239, 251 (2d Cir. 1985). Rather, allegations of a conspiracy connect the actions of separate defendants with an otherwise actionable tort. *Alexander v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986). Both conspiracy and aiding and abetting create concerted-action liability in New York. *Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998). Conspiracy requires an agreement to commit a tortious act while aiding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer. Id. at 122-23.

In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984). Thus, the *Calder* Court concluded: "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Id.* at 790. For the reasons set forth above, the conduct of al-Hussayen constitutes both forms of concerted-action liability under New York law as set forth in the allegations of the Complaint and, as such, connects it with the subject transaction, charges al-Hussayen with the acts and declarations of its co-conspirators, and exposes it to joint and several liability. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 240 (2d Cir. 1999). This Court therefore has personal jurisdiction over al-Hussayen pursuant to New York's long arm statute and the well-recognized conspiracy jurisdiction theory under New York law.

### C. DEFENDANT AL-HUSSAYEN IS ALSO SUBJECT TO JURISDICTION IN THIS COURT BECAUSE HE CONSPIRED WITH AL QAEDA TO ATTACK THE UNITED STATES

The court can also exercise jurisdiction over Defendant under the theory of conspiracy-based jurisdiction. The Defendant Al-Hussayen is subject to the Court's jurisdiction not only because he resided and conducted business here for a decade, but because plaintiffs have alleged

that he conspired with al Qaeda to attack the United States. Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum. *See All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over Australian defendants via conspiracy theory by imputing forum acts of co-conspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory). To assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the state to the out-of-state conspirator." *All State Life Ins. Co.*, 782 F. Supp. at 221 n.6.[2]

### D. PLAINTIFFS HAVE PROPERLY ALLEGED CONSPIRACY AND AIDING/ABETTING AGAINST DEFENDANT

Defendant Al-Hussayen also asserts that plaintiffs have failed to make a prima facie showing of a conspiracy. *See* Motion at 9-10. Making this argument ignores the lengthy and detailed allegations contained in the Complaint. Defendant's claim that plaintiffs have not sufficiently pled that Defendant conspired with al-Qaeda is absurd. Plaintiffs have satisfied all the requirements for pleading conspiracy to warrant conspiracy jurisdiction; they have "(1)

---

[2] By imputing forum acts of their co-conspirators to non-resident defendants, this Court has repeatedly found that non-resident defendants have minimum contacts with the forum to satisfy Due Process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the suit, supplies the necessary minimum contacts. . . ."); *Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfying Due Process). The conspiracy jurisdiction cases from this Court explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court there." *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 WL 672009, *6 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)); *see also Chrysler Capital Corp.*, 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Thus, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their coconspirators satisfies Due Process. In that Defendant was not a "non-resident" until recently, these cases are instructive, but not necessary for a finding of jurisdiction.

establish[ed] a prima facie case of conspiracy; (2) allege[d] specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate[d] the commission of a tortious act in [the forum] during, and pursuant to, the conspiracy." *See Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000). The *prima facie* showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *Id.*; *see also Chrysler Capital*, 778 F.Supp. at 1267. Fairly read, the Complaint clearly alleges an agreement among Osama bin Laden and numerous others to finance, recruit and train terrorists to attack the United States.  Plaintiffs go to great lengths to allege with specificity how Al-Hussayen aided and abetted and provided material support to these acts.

Plaintiffs allege that between 1999 and 2001, Al-Hussayen made wire transfers to individuals in Egypt, Canada, Saudi Arabia, Jordan and Pakistan.  Complaint at ¶ 999. Sometime before 2001, he sent $15,000 directly to a member of the Egyptian Islamic Jihad, a designated Foreign Terrorist Organization which merged with al-Qaeda in the 1990's. Complaint at ¶ 573-574.  Al-Hussayen served as head of IANA's supervisory committee.  IANA was a known al-Qaeda charity front.  He maintained at least six bank accounts in the United States into which he deposited hundreds of thousands of dollars of donations he received from overseas.  Complaint at ¶ 999, 519.  When IANA needed funds, Al-Hussayen transferred those funds directly to IANA knowing that IANA was supporting al-Qaeda.  Complaint at ¶ 519-520. In fact, he played an active role in determining to whom IANA would send its contributions and how the business should operate.  Complaint at ¶ 1000.  In addition, Al-Hussayen created, controlled, and was the sole registrant for IANA's many websites.  Complaint at ¶ 957, 990.  He

knowingly and intentionally selected materials for the websites and exercised a great deal of control over the editorial content of those sites. Complaint at ¶ 990. Under his express control, those websites consistently espoused a radical fundamentalist interpretation of Islam and advocated violent jihad against the United States. He used those websites as tools for raising funds and recruiting fighters, calling on Muslims everywhere to participate in jihad and provide financial assistance to groups like al-Qaeda. Complaint at ¶ 1007.

When read alongside the other general allegations of conspiracy and aiding and abetting which are contained in the Complaint, see e.g. ¶¶ 1, 7, 35, 824, 1130 and 650, these specific allegations are more than enough to satisfy the requirements for having alleged defendant's aiding and abetting and/or participation in the conspiracy. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (for civil conspiracy, tacit, as opposed to explicit, understanding is sufficient to show agreement; court may infer agreement).

Plaintiffs have alleged a sufficient *prima facie* showing of personal jurisdiction over defendant Al-Hussayen, and they have sufficiently alleged his participation in the al-Qaeda conspiracy. Therefore, Defendant's motion to dismiss for lack of personal jurisdiction and failure to state a claim of conspiracy or aiding/abetting must fail. In *Halberstam*, the court noted: "A conspirator may be liable for an injury even if he or she did not plan or know about the particular overt act that caused the injury so long as the purpose of the act was to advance the overall object of the conspiracy." *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). Defendant's supported motion to dismiss for lack of personal jurisdiction should be summarily denied.

### E.     PLAINTIFFS PROPERLY SERVED AL-HUSSAYEN IN ACCORDANCE WITH CMO2

Al Hussayen alleges that the notices published in the *USA Today, International Herald*

*Tribune, and Al-Quds Al-Arabi* did not meet constitutional requirements. This argument raised

by al Hussayen relative to service of the Complaint upon him does not warrant dismissal of the

Complaint.

### 1.   Plaintiffs' Service of Process on Al-Hussayen Via Publication Was Effective and Consistent with Due Process Requirements

Al Hussayen argues that the Plaintiffs' chosen method to attempt service by publication

was not reasonably calculated to advise him of this lawsuit. It is difficult to argue credibly that

one has not received notice of a lawsuit when one has retained counsel, appeared, and filed a

motion to dismiss. Nevertheless, al Hussayen argues that notice of the lawsuit in the *USA Today*,

*International Herald Tribune*, and the *Al-Quds Al-Arabi* newspapers was constitutionally

insufficient. Al Hussayen further asserts that the *Al-Quds Al-Arabi*, which is published in

Arabic, is not distributed in Saudi Arabia and therefore failed to provide notice of the instant

lawsuit.

The Second Circuit stated the following in *S.E.C. v. Tome,* 833 F.2d 1086, 1089 (2d Cir.

1987):

> To submit a party to the jurisdiction of a court, due process has long been held to require the giving of notice in such a manner that there can be little doubt that the party has actual notice of the claims in order to appear and defend.

> Justice Jackson further stated:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 314 (1950). The question before this

Court therefore is whether publication in the *USA Today*, *International Herald Tribune*, and the

*Al-Quds Al-Arabi* newspapers was "reasonably calculated" to notify al Hussayen of the suit

against him so as to satisfy due process. Al Hussayen's appearance in this case sufficiently

demonstrates that service by publication was adequate and thus consistent with due process requirements.

The Second Circuit stated in *Tome*: "The 'reasonably calculated' analysis need not be relied on exclusively in this case because we are not dealing with the question of the adequacy of constructive notice." *Tome,* 833 F.2d at 1089. At a minimum, in this instance there is constructive notice because al Hussayen has appeared to defend this action. As the United States Supreme Court stated in *Grannis v. Ordean,* 234 U.S. 385, 394 (1914), "the fundamental requisite of due process of law is the opportunity to be heard." The record in this matter establishes that service by publication was adequate, that al Hussayen received notice of the suit, understood that he should hire counsel, and understood his rights because he instructed said counsel to file a motion to dismiss. This manifests the adequacy of the notice by publication.

By its September 15, 2004 Order, this Court agreed that publication in these periodicals was appropriate.[3]  It is significant to point out that Al-Hussayen was represented by counsel in the consolidated action (03 MDL 1570) at the time of the Order permitting publication and was arguably notified that the Plaintiffs intended to serve him in this manner. Actual publication did not begin until December 22, 2004. During that three month period, multiple defendants (both foreign and domestic) who were identified on the publication list came forward to accept service and negotiate briefing schedules. Counsel for al Hussayen could have similarly contacted the Plaintiffs to discuss an agreement to accept service on behalf of their client but failed to do so. *See Ehrenfeld v. Bin Mahfouz*, 2005 U.S. Dist. LEXIS 4741 (S.D.N.Y. March 23, 2005) (holding

---

[3] Indeed, this Court recognized that publication of the notice in the the *Al-Quds Al-Arabi* was reasonably calculated to apprise defendants of the lawsuit. The *Al-Quds Al-Arabi* is published in London and is circulated in Europe, the Middle East, North Africa, and North America. The newspaper has specifically been chosen in the past by terrorists for the granting of interviews, has published several fatwas by Osama bin Laden, and has similarly received statements from al Qaida. Moreover, this Court is in agreement with other courts that the *Al-Quds Al-Arabi* is an appropriate place to publish the notice of suit. *See Mwami, et al. v. Osama Bin Laden, et al.*, Case No. 99-0126 (D.D.C. Aug. 2, 1999); *Havlish v. Osama Bin Laden, et al.*, Case No. 02-0305 (D.D.C.) (J.R.); *Burnett v. Al Baraka Investment & Development Corp., et al.*, Case No. 02-1616 (D.D.C. (J.R.).

that service on a foreign defendant's U.S. attorney would successfully provide the defendant with notice of the lawsuit). Notice by publication is designed to impart information about a lawsuit. However, there is nothing that requires the target to gain the information directly from reading the notice himself, as opposed to someone else advising him of the notice. Without question, the notice in this case accomplished the goal of informing al Hussayen of the instant action.

Al Hussayen also argues that the Plaintiffs failed to comply with the Court's Order requiring publication of the various complaints on (www.september11terrorlitigation.com), contending that publication was ineffective because the website was not functioning until near or after the conclusion of the four-week publication period. This argument is both factually inaccurate and legally erroneous. The legal notices were published in the *USA Today* and *Al-Quds Al-Arabi* on December 23, 2004, December 30, 2004, January 6, 2005, and January 13, 2005. Publication similarly occurred in the *International Herald Tribune* on December 22, 2004, December 27, 2004, January 5, 2005, and January 10, 2005. The website was functioning on December 21, 2004 with several complaints available to the webpage's visitors. Additional complaints were added to the website on December 23, 2004. The website was thus active throughout the entire publication period. Any delay in having each of the complaints posted on the website as of the first date of publication was only minimal (24 hours) and cannot constitute a failure to provide notice of the lawsuits.

Al Hussayen's further contention that service upon him by publication could only be effected through a newspaper widely distributed within Saudi Arabia is particularly unreasonable and disingenuous. Saudi Arabia is an absolute monarchy, governed by Islamic law (*Sharia*). The Basic Law (which sets out the system of government, rights of the citizens and powers of the State) provides "that the media's role is to educate the masses and boost national unity *and that it*

*can be banned if it gives rise to mischief and discord, compromises the security of the State and its public image, or offends man's dignity and rights*." Consistent with this view of the media's role in Saudi society, the government actively restricts freedom of speech and of the press, and routinely imprisons and otherwise sanctions members of the media who engage in conduct deemed inimical to the interests of the State. Given the Saudi regime's absolute dominance of the media and the draconian sanctions it has imposed upon members of the press, it is absolutely unreasonable to suggest that any Saudi periodical would have agreed to publish notice of this suit, which names the Saudi government and prominent members of the Saudi Monarchy as defendants. In fact, the *Federal* Plaintiffs made several attempts to contact the Saudi newspaper Al Hayat, which is owned by Prince Khalid Bin Sultan Bin Abdul Aziz Al Saud, to discuss publication of the notice. Those calls were never returned.

The record in this matter clearly establishes that the Plaintiffs' service of process on al Hussayen via publication was effective and consistent with due process requirements.

### F. THE COMPLAINT STATES CLAIMS AGAINST THE DEFENDANT AND SHOULD NOT BE DISMISSED

#### 1. The Plaintiffs Have Adequately Alleged Causation[4]

Defendant claims that plaintiffs have failed to plead a sufficient causal connection between his actions and the September 11 terrorist attacks to sustain a claim under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, or any other cause of action. In making this argument, Al-Hussayen completely ignores Congress's express direction that the ATA is intended to "impos[] liability *at any point along the causal chain* of terrorism." S. Rep. No. 342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 *22. (Emphasis added.) Consistent with this

---

[4] At the outset, defendant alleges that the Plaintiffs' allegations are mere legal conclusions and opinions which are either unsupported or contradicted by the underlying documents. See Motion at 6. The Complaint laid out in detail in more than 192 paragraphs the allegations against Defendant Al-Hussayen including detail about his activities as well as his connections to IANA and IANA's agenda. Given the detail in which plaintiffs have pled their allegations against Al-Hussayen, it is absurd that Defendant now claims as he does that the allegations consist of mere legal conclusions or opinions. *See* Motion at 7-9. The allegations are in fact detailed factual allegations.

instruction, it is sufficient that plaintiffs plead, as they have, that this defendant knowingly provided material support to al Qaeda and/or aided and abetted al Qaeda in its terrorist agenda. Moreover, the law is clear that the assistance provided by Al-Hussayen need not have been used directly in the actual September 11 attacks. Under the ATA, defendants are liable if they provided any material support to al Qaeda with knowledge of its terrorist agenda or if they aided and abetted al Qaeda or Osama bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literary Institute*, 291 F.3d 1000 (7th Cir. 2002); *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).

The ATA permits a private cause of action for injuries resulting from international terrorism.[5] There can be no doubt that the acts of September 11 were acts of "international terrorism" within the meaning of § 2333, despite the fact that Al-Hussayen contends otherwise. *See* Motion at 6.  In *Boim*, the court recognized two theories under which a civil suit may be sustained under § 2333.  First, the court concluded, a plaintiff may recover under § 2333 if the defendants violated the criminal provisions of the ATA. *See Boim*, 291 F.3d at 1012-14. The relevant criminal provisions, set forth at 18 U.S.C. §§ 2339A, 2339B, and 2339C, impose liability on those who provide "material support" to acts of terrorism or to designated terrorist organizations.[6] Provision of material support gives rise to civil liability under § 2333 so long as the support was provided knowingly and intentionally. *Boim*, 291 F.3d at 1015.

The second theory endorsed by the Seventh Circuit permits recovery under § 2333 where the defendants have aided and abetted and/or conspired to commit acts of international terrorism.

---

[5] The statute provides, in relevant part: "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.". 18 U.S.C. § 2333. The term "international terrorism" is defined to include "activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State . . . ." 18 U.S.C. § 2331(1).

[6] The phrase "material support" refers not to the amount of support, but to its nature – "the type of aid provided rather than whether it is substantial or considerable." See *Boim*, 291 F.3d at 1015.

*Boim*, 291 F. Supp. 3d at 1021.[7] With regard to this prong, it is not necessary for plaintiffs to allege that Al-Hussayen knew specifically about the September 11 attacks. Rather, it is enough that, when he provided financial support to bin Laden and al Qaeda, he knew that al Qaeda was preparing to engage in some kind of terrorist activity. *See Halberstam*, 705 F.2d at 489.

Here, the Complaint alleges Al-Hussayen provided "material support" to al Qaeda in violation of 18 U.S.C. § 2339B and that he aided and abetted al Qaeda in its terrorist enterprise. *See* Complaint at ¶¶ 511-618, 953-1010; s*ee* also ¶¶ 1, 7, 35, 824, 1130, 1131; *see also* Complaint at 1122 ("Defendants knew or reasonably should have known they were providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent people."); Complaint at ¶¶ 511-618, 953-1010. Under *Boim*, these allegations state claims against Al-Hussayen for violations of the Anti-Terrorism Act.

Al-Hussayen also appears to claim that plaintiffs must allege that they provided their support directly to the terrorists who carried out the September 11 attacks, but that is not the law. Motion at 7-9.  Rather, as previously noted, Congress expressly stated its intention that the ATA be used to "interrupt, or at least imperil, the flow of money" to terrorists through the "imposition of liability at any point along the causal chain of terrorism." S. Rep. No. 342, 1992 WL 187372, *22 (emphasis added). Thus, it is sufficient that defendants knowingly provided material support to those who instigated and planned the September 11 attacks. It is not necessary for plaintiffs to show that specific support that the defendant provided was given to Mohammed Atta.  As the Ninth Circuit held in *Humanitarian Law Project*, 205 F.3d at 1136, the knowing provision of "material support" to a designated terrorist entity violates § 2339B regardless of whether the

_____

[7] Plaintiffs respectfully refer the Court to the more detailed discussions of the causation requirements of the ATA in their memoranda of law submitted in opposition to motions to dismiss filed in *Burnett* claims by the Saudi Binladin Group, the Khalid bin Mafouz, and the National Commercial Bank.

donor intended to support the terrorist activities of the group and regardless of whether the particular dollars provided to the organization can be traced to the resulting acts of terrorism.

Far from requiring direct participation in a particular terrorist act, then, § 2339B does not even require support for, or agreement with, the violent portion of a terrorist group's agenda; rather, the statute recognizes that even the provision of material support to such a group inevitably redounds to the benefit of the group's terrorist purposes.[8] Thus, under § 2339B, anyone who knowingly contributes to the terror "factory" is responsible for all of the terrorist acts that come out of that "factory."[9] Plaintiffs allege that Al-Hussayen helped to support the factory by providing material support. The plaintiffs need not allege that defendant purchased the specific "weapons" for the September 11 attacks.  The defendant provided material support that allowed bin Laden to recruit and train terrorists and to set up a vast terrorist infrastructure which in turn enabled multiple acts of international terrorism, including the 9/11 attacks.

> **2.    Defendant Al-Hussayen's Alleged Activities are Not Protected by the First Amendment.**

Given the fundamental nature of the right to freely associate, governmental "action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (citation omitted) (1963).  Yet, it is likewise clear that "[n]either the right to associate nor the right to participate in political activities is absolute." *CSC v. Letter Carriers*, 413 U.S. 548, 567 (1973).  "Even a 'significant interference' with

---

[8]  That direct participation is not a requirement is further made clear in § 2339C, which makes it a crime knowingly to provide funds for terrorist acts and further provides that "[f]or an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act." 18 U.S.C. § 2339C(a)(3).  Nor is it relevant that § 2339C was added after the events of September 11. In *Boim*, the court noted that much of the defendants' alleged conduct occurred prior to the passage of §§ 2339A and 2339B. The court rejected defendants' argument that these sections could not be used to set the standard for liability under § 2333. It held: "We are using sections 2339A and 2339B not as independent sources of liability under section 2333, but to amplify what Congress meant by 'international terrorism.'" 291 F.3d at 1016. In the same way, § 2339C amplifies Congress's purpose in enacting § 2333; use of this provision as a guide to interpreting § 2333, which was enacted in 1992, does not impose retroactive liability.

[9]  As noted above, the Seventh Circuit in *Boim* held that § 2333 incorporates the standards of § 2339B because it would make no sense to conclude "that Congress imposed criminal liability . . . on those who financed terrorism, but did not intend to impose civil liability on those same persons. . . ." 291 F.3d at 1014.

protected rights of political association may be sustained if the state demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. 24-25 (citations omitted). When examining a potential infringement of the right to freedom of association, the Supreme Court focuses on the legislation's primary purpose to determine whether there is a constitutionally sufficient justification for limitations of associational freedoms. *Id*. at 26.

An instructive ATA case on this point is *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000). The plaintiffs in *Humanitarian Law Project* wanted to provide monetary support to entities that were designated as foreign terrorist organizations by the U.S. Secretary of State pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA incorporates much of the definitions and language used in ATA. Plaintiffs claimed that their material aid would be directed to only non-violent humanitarian and political activities of these organizations.

Plaintiffs argued that being prohibited from giving support to these entities infringed upon their associational rights under the First Amendment. Plaintiffs relied heavily on the case of *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). Plaintiffs characterized the AEDPA as imposing "guilt by association," which they argued was unconstitutional under *Claiborne Hardware*. In *Claiborne Hardware*, the Supreme Court reversed a state tort judgment against the National Association for the Advancement of Colored People and members of that organization who had participated in a seven (7) year boycott of white merchants. The Supreme Court found that liability had been unconstitutionally imposed "by reason of association alone." *Id*. The rule enunciated in *Claiborne Hardware* states:

> [f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual had a specific intent to further those illegal aims.

*Id.*

Here, the Islamic Assembly of North America ("IANA"), has openly and unrepentantly advertised its own illegal aims.  IANA Board Chairman Mohammed Al-Ahmari expanded on exactly what this purpose translates to:

> "As long as Muslims are without fatal, far-reaching, striking power, we will stay under the protection of the super powers because we surrendered ourselves to them… We threw away 'And make ready against them all you can of power [including steeds of war to terrorize the enemies of Allah]' behind our backs, we ousted 'Verily!  Shooting is the Power', and 'He who learned shooting and forgot it, is not one of us.'  The physical power and weapons became great prohibitions in the world of the super powers' reservations!  And it will continue to be so until the Ummah wakes up and removes the veil of shame from its face… We at IANA are guarding one of the Islamic fronts that we believe to be important in the revival of the anesthetized Islamic body."

Complaint at ¶ 501.

Immediately following the September 11, 2001 suicide hijackings, Al-Ahmari's name and Michigan address appeared on a U.S. federal watch list of alleged terrorists and terrorist supporters with possible links to the September 11 attacks.  Complaint at ¶ 559.  At least three IANA national conferences in the mid-1990s explicitly featured senior Saudi Al-Qaida member Abu Abdel Aziz "Barbaros" recruiting new volunteers for Arab-Afghan mujahideen groups active in Bosnia, Kashmir, the Philippines, and Afghanistan.

It is true that the *Humanitarian Law Project* court ruled that "[t]he statute [AEDPA] does not prohibit being a member . . . or vigorously promoting and supporting the political goals of the group.  Plaintiffs are even free to praise the groups for using terrorism as a means of achieving their ends."  These "political" activities—while perhaps repugnant to the average observer—would still be protected by the broad reach of the First Amendment.  Nonetheless, the Ninth Circuit refused to extend First Amendment protection any farther than to pure speech cases, holding that AEDPA does fairly prohibit "the act of giving material support . . . there is no

constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives." *Humanitarian Law Project* at 1133. The Ninth Circuit flatly rejected plaintiffs' argument that the First Amendment required that the government demonstrate that a donor had a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds. *Id.* at 1134.

The plaintiffs have alleged that Al-Hussayen provided material financing support to terrorist groups and their international affiliate organizations. Though Al-Hussayen portrays himself as merely a service employee of IANA, in fact, "from at least November 16, 1999, to [February 2003], Al-Hussayen made disbursements [of $300,000]… to the IANA and to the IANA's officers, including a leading official of the IANA. A portion of these funds was used to pay operating expenses of the IANA, including salaries of IANA employees." Complaint at ¶ 520. Al-Hussayen was for all intensive purposes bankrolling IANA's illicit goals, including the specific activities of the previously referenced IANA Board Chairman and terrorist suspect Mohammed Al-Ahmari. During this period, Sami Omar Al-Hussayen was also doing work on behalf of the defendant Al-Haramain Islamic Foundation, a global charity that has been named as a Specially Designated Global Terrorist (SDGT) and has had its assets frozen. *See* Complaint at ¶ 581-597.

### 3. Defendants "Freedom of Speech" Arguments Also Fail

Defendant claims that he is immune from liability for his conduct because his activities are speech somehow protected by the First Amendment. Motion at 11-13. The *Humanitarian Law Project* plaintiffs also made a First Amendment argument that material support to terrorist organizations was a form of political speech or advocacy, citing *Buckley v. Valeo*, 424 U.S. 1 (1976). In *Buckley*, the Supreme Court stated that limits on monetary contributions are not

comparable to restrictions on conduct previously deemed free speech, such as draft card burning. *Id*. at 16018.  (citing 391 U.S. 367 (1968).

The *Humanitarian Law Project* plaintiffs argued that these organizations also engage in a form of political advocacy, therefore, donating money to them is political expression, requiring the court to exercise strict scrutiny of this activity.  The *Ninth Circuit* rejected this argument and instead applied an intermediate scrutiny standard because the material support restriction is not aimed at interfering with the expressive component of the conduct, but rather, in stopping aid to terrorist groups.  *Id*. at 1135 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)).  Intermediate scrutiny applies where a regulation serves purposes unrelated to the content of expression. *Humanitarian Law Project*, 205 F.3d at 1135.

Under the intermediate scrutiny standard, the court must ask four (4) questions:

(1) Is the regulation within the power of the government?
(2) Does it promote an important or substantial government interest?
(3) Is that interest unrelated to suppressing free expression?
*(4)* Is the incidental restriction on First Amendment freedoms no greater than necessary?

*Id*.  In applying the intermediate scrutiny standard and in the context of terrorism, the *Humanitarian Law Project* court answered each question in the affirmative.[10]

The *Boim* court also rejected the First Amendment challenge to the ATA.  The Seventh Circuit concluded:

There is no constitutional right to provide weapons and explosives to terrorist, nor is there any right to provide their resources with which the terrorists can purchase weapons and explosives.

*Id*. at 1026 (citing *Humanitarian Law Project* at 1133).

---

[10]   First, the federal government clearly has the power to enact laws restricting certain conduct and courts have upheld such regulations over a variety of constitutional challenges.  Second, the government has a legitimate interest in preventing the spread of international terrorism, and that interest is substantial.  Third, this interest is unrelated to suppressing free expression because it restricts the actions of those who wish to give material support to international terrorism, not the expression of those who advocate or share their ideals.  Fourth, the court allowed Congress wide latitude in selecting the means and use of its fact finding resources to properly enact this statute, and thus the court could not conclude that AEDPA is not sufficiently tailored.  *Id*. at 1135-1136.

The defendants in *Boim* also argued that giving money to foreign organizations was a form of protected political advocacy. The *Boim* court, consistent with *Humanitarian Law Project*, rejected the defendants' position. The *Boim* court applied the same intermediate scrutiny test and concluded:

> Congress carefully limited its prohibition on funding as narrowly as possible in order to achieve the government's interest in preventing terrorism. We note that Congress did not attach liability for simply joining a terrorist organization or zealously espousing its views. By prohibiting funding alone, Congress employed means closely drawn to avoid unnecessary abridgement of associational freedoms. The *Boim* court concluded the ATA does not run afoul of the First Amendment.

*Id.* at 1027.[11]

### 4. There is No Statutory Immunity for the Assistance that Mr. Al-Hussayen Provided to al Qaeda.

The statute cited by Al-Hussayen as specifically barring the claims against him is entirely inapplicable here. Motion at 16-17, citing 47 U.S.C. § 230. Al-Hussayen attempts to categorize himself as merely a "provider" of an interactive computer service, who therefore is immune from civil liability in tort for material disseminated which is created by other people. *See Blumenthal v. Drudge*, 992 F.Supp. 44, 49. In fact, however, one of the very cases to which the defendant Al-Hussayen cites as supporting his argument succinctly states the case for why his activities are not protected. The court in *Blatzel v. Smith* explained that: "If information is provided to those individuals in a capacity unrelated to their function as a provider or user of interactive computer services, then there is no reason to protect them with the special statutory immunity." 333 F.3d 1018, 1033 (9th Cir. 2003). The court goes on to explain that when an individual "who happens to operate a website" receives mail from another individual, the website operator cannot

---

[11]   Defendant Hussayen makes a third argument apparently in an effort to paint this lawsuit as a general attack against Islam rather than what it really is – a lawsuit against the material supporters of the terrible acts of 9/11. He points out that "the free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires," See Hussayen Memorandum at 14. For the record, the plaintiffs wholeheartedly agree with principles of freedom of religion, but fail to see how providing material support to terrorism by collecting and distributing funds to so-called charities which are in actuality merely fronts for Al Qaeda and utilizing the medium of the internet in order to raise money and incite violence against the United States – both of which the plaintiffs have alleged – can be said to have been "undertaken for religious purposes."

necessarily be said "to have been 'provided' the information in his capacity as a website service." *Id.* Immunity does not apply unless the information is provided to persons in their roles as website providers; that is not what is at issue here.

The information Defendant controlled was not information provided to him as a website provider for the purposes of being posted on a website. As the plaintiffs have alleged Al-Hussayen exercised significant control over the IANA websites and others. *See* Complaint at ¶ 511-518. In e-mails to Al-Hussayen and others, IANA and Al-Haramain officials expressly recognized Al-Hussayen's expertise, and deferred to him on decisions as to the content and management of the websites. Complaint at ¶ 957-958, 589. Al-Hussayen was not merely the webmaster for the IANA sites. He knowingly and intentionally selected materials for the websites and exercised a great deal of control over the editorial content of the sites. In fact, as plaintiffs have alleged, in an email to Sami Al-Hussayen, Muhammad al-Ahmari, the President of IANA, emphasized Al-Hussayen's "total supervision of all of Assembly's sites." Complaint at ¶ 958. Under his express control, IANA's websites consistently espoused a radical fundamentalist interpretation of Islam and advocated violent jihad against the United States. The plaintiffs have alleged that the pages Defendant posted to the IANA website show obvious signs that he personally created the pages, was aware of the content, and supported the mission of the content: to provide material support to radical Islamic terrorist groups and incite violence against the United States as is alleged.

Defendant Al-Hussayen mischaracterizes plaintiffs' allegations as attempting to impose civil liability upon him for the publication of information "despite the fact that Mr. Al-Hussayen was the mere user or provider of the interactive computer service upon which it was published." (emphasis added) *See* Motion at 17. Al-Hussayen's substantial financial and personal connections to IANA and its board of directors confirm that his role in the organization went far

beyond being a "mere user or provider of the interactive computer service."  As far as the websites in question, the proper party immunized in this case as a "mere user or provider" would be OLM LLC, of Trumbull, Connecticut—the Internet service provider that Al-Hussayen hired on behalf of Al-Haramain and IANA in order to host their respective websites.  As a generic business hosting provider, unless OLM LLC would have specific reason to know that their electronic resources were being used to support an SDGT, they remain blameless and outside legal liability.  Mr. Al-Hussayen was solely a private client of OLM LLC; he was not in any capacity an employee or representative of the web hosting company this statute was designed to protect.  He does not share in the limited legal immunity they may enjoy.

### 5.  Plaintiffs State a Valid Claim Against Al-Hussayen Under the Anti-Terrorism Act[12]

Defendant Al-Hussayen amazingly, and without a sense of the irony of his position continues to argue that the ATA only applies to international terrorism, and the events of September 11, 2001, were not international terrorism.  Defendant, in an exercise in unabashed linguistics de-constructionism, attempts to rewrite the definition of "international terrorism" that Congress provided in 18 U.S.C. § 2331 (1).  In order to make this argument, however, defendant must ignore the actual language of the statute, which makes clear that events such as September 11th fall within the ambit of international terrorism.

In relevant part, the statute defines international terrorism as: "activities that…occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished…"  18 U.S.C. 2331(1)(C).  In *Burnett I* the court noted that "the September 11th attacks began with the hijacking of four airplanes, and

---

[12] Defendant Al-Hussayen also has moved to dismiss plaintiffs' claim under the Torture Victim Protection Act ("TVPA"), codified at 28 U.S.C. § 1350, note. Plaintiffs do not currently intend to pursue this claim against this defendant. Plaintiffs reserve the right, however, to re-plead this claim against Al-Hussayen should additional information become available in discovery demonstrating that he acted "under actual or apparent authority, or color of law, of any foreign nation" in connection with its support of al Qaeda.  The plaintiffs do not contest Defendant's assertion that Al-Hussayen is not a foreign sovereign and that the FSIA does not apply to him.

aircraft hijacking is generally recognized as a violation of international law of the type that gives rise to individual liability." *Burnett I*, 274 F.Supp.2d at 100. Second, the September 11th hijackers did not begin the preparations for the attacks in the United States on September 10th. Third, the plaintiffs ask why the United Nations would have sought a unanimous resolution condemning the attacks of September 11th if the acts were not acts of "international terrorism." Finally, this argument ignores not only common sense but the complaint which in its totality alleges that all defendants were part of a global network of terrorism which recognizes no boundaries. The attacks of September 11th clearly constitute acts of international terrorism.[13] Defendant Al-Hussayen's attempt to exculpate himself by word play must be rejected.

## III.   CONCLUSION

For the reasons stated herein, the Defendant's Motion to Dismiss is without basis and should be denied.

New York, New York                     Respectfully submitted,

Dated:  May 20, 2005

/S/

Ronald L. Motley, Esq. (SC-4123)
Jodi Westbrook Flowers, Esq. (SC-66300)
Donald A. Migliori, Esq. (RI-4936; MA-567562;
   MN-0245951)
Michael E. Elsner, Esq. (NY & VA-ME8337)
Ingrid L. Moll, Esq. (CT-21866 & NY-IM3949)

---

[13]   Defendant Al-Hussayen contends that plaintiffs have failed to state claims under RICO and lack standing to assert their RICO claims in any event because, they assert, plaintiffs do not allege an injury to business or property. Motion at 24. Plaintiffs recognize that in *Burnett v. Al Baraka Investment & Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) ("*Burnett I*"), the D.C. court adopted this argument and held that plaintiffs lack standing to pursue their RICO claims. Plaintiffs respectfully disagree and note that this Court is not bound by the ruling of the D.C. court. *See In re Grand Jury Proceedings (Kluger)*, 827 F.2d 868, 871 n.3 (2d Cir. 1987) ("transferee district court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect"); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1308-1309 (S.D.N.Y. 1996). Plaintiffs hereby incorporate by reference the argument regarding RICO standing set forth in their opposition to the Motions filed by Al Haramain Islamic Foundation.

Robert T. Haefele, Esq. (NJ-58293; PA-57937)
Elizabeth Smith, Esq.
Justin B. Kaplan, Esq. (TN-022145)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Jayne Conroy, Esq. (NY-JC8611)
Paul J. Hanly, Jr., Esq. (NY-PH5486)
Andrea Bierstein, Esq. (NY-AB4618)
HANLY CONROY BIERSTEIN
    & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq. (IN - 4941-49)
Amy Ficklin DeBrota, Esq. (IN - 17294-49)
RILEY DEBROTA LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone:  (317) 848-7939

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Jack Cordray, Esq. (SC-1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761

Attorneys for Plaintiffs

29