# EXHIBIT "B"

# RICO STATEMENT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                    Civil Action No.
SEPTEMBER 11, 2001                            03 MDL 1570 (RCC)

-----------------------------------------------------------x

**This document relates to:**

> ***Thomas E. Burnett, Sr., et al. vs. Al Baraka***
> ***Investment and Development Corp., et al.***
> **03 CV 9849 (RCC); 03 CV 5738 (RCC)**


**PLAINTIFFS' RESPONSE TO DEFENDANT SAMI OMAR AL-HUSSAYEN'S**
**DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR A MORE**
**DEFINITE STATEMENT**

Counsel for the *Burnett* Plaintiffs hereby provide a more definite statement as to Defendant Sami Omar Al-Hussayen[1]. This statement, annexed hereto as Exhibit 1, is hereby incorporated into the *Burnett* Complaints.

Dated: May 14, 2004                    Respectfully submitted,


 /S/ Michael Elsner
Michael E. Elsner, Esq. (NY & VA-ME8337)
Ronald L. Motley, Esq. (SC-4123)
Jodi Westbrook Flowers, Esq. (SC-66300)
Donald A. Migliori, Esq. (RI-4936; MA-567562;
   MN-0245951)
William H. Narwold, Esq. (NY-WN1713)
Ingrid L. Moll, Esq. (CT-21866)
Robert T. Haefele, Esq. (NJ-58293; PA-57937)

---

1  Defendant Sami Omar al-Hussayen, in his pleading, appears to attempt to use his Declaration in Support of a Motion for Definite Statement under Rule 12(e) to propound a set of contention interrogatories.   Any such effort is both procedurally improper at this stage of the litigation pursuant Case Management Order No. 1 and Federal Rules 12 and 33, as well as substantively improper under the relevant case law.  *See* CMO #1, 3/3/04; Fed. R. Civ. Pr. 12, 33; Fed.*In Re Convergent Technologies*, 108 F.R.D. 328 (N.D. Cal. 1985).

Justin B. Kaplan, Esq. (TN-022145)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Jayne Conroy, Esq. (NY-JC8611)
Paul J. Hanly, Jr., Esq. (NY-PH5486)
Andrea Bierstein, Esq. (NY-AB4618)
HANLY CONROY BIERSTEIN
    & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

William N. Riley, Esq. (IN - 4941-49)
Amy Ficklin DeBrota, Esq. (IN - 17294-49)
RILEY, DUDLEY LLP
3815 River Crossing Parkway, Suite 340
Indianapolis, IN 46240
Telephone:  (317) 848-7939

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Jack Cordray, Esq. (SC-1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761

Attorneys for Plaintiffs

# EXHIBIT 1

## More Definite Statement as to Sami Omar Al-Hussayen

1.      Plaintiffs hereby incorporate all other allegations contained in the Third

Amended Complaint, Burnett, et al. v. Al Baraka Investment and Development Corp., et

al., 03 MD 1570 (RCC); 02 CV 6977 (RCC) and incorporate all other responses to

Defendants' motions for more definite statements pursuant to Fed. R. Civ. P. Rule 12 (e).

2.      Sami Al-Hussayen is a citizen of Saudi Arabia.  Between roughly August

7, 1994 and September 23, 1998 Mr. Al-Hussayen studied at Ball State University in

Muncie, Indiana and Southern Methodist University in Dallas, Texas where he obtained a

Master's Degree.[1]

3.      In January of 1999, Sami Al-Hussayen was admitted to the Computer

Science PhD. program at the University of Idaho.[2]  The defendant began his studies at the

University of Idaho in the Spring Semester, 1999.[3]  On or about August 11, 1999, Sami

Al-Hussayen was readmitted into the United States on an F-1 student visa for the purpose

of pursuing his PhD. degree.  Sami Al-Hussayen never disclosed in any of his visa

applications that he was providing World Wide Web-based services and funding for

numerous charities and associations.[4]

4.      From at least October 2, 1998 until February 13, 2003 Sami Al-Hussayen

provided expert computer services, advice, assistance and support to organizations and

individuals, in the form of web-site registration, management, administration and

---

[1]      Indictment, U.S. v. Sami Omar Al-Hussayen, ¶ 2, Cr. No. 03-048 NEJL (DC ID) (February 13, 2003).  A copy of the indictment is attached as Exhibit A.
[2]      Id. at ¶ 4.
[3]      Id.
[4]      Id. at ¶ 7.

maintenance.[5]  Sami Al-Hussayen actively participated in the creation and design of these websites which entailed determining the inclusion and placement of various articles and images.  Sami Al-Hussayen assisted the Islamic Assembly of North America (IANA) and numerous other groups in the maintenance of their sites.

5.     The IANA was incorporated in Colorado in 1993 as a non-profit charitable organization designed to spread the word of Islam.[6]  The IANA spreads the message of Islam through its website, internet magazines, radio services, toll-free telephone lines and website bulletin boards where patrons may post messages on the World Wide Web.[7] The IANA also organizes Islamic conferences in the United States.  IANA maintains an office in Ann Arbor, Michigan.[8]

6.     Sami Al-Hussayen was the formal registered agent for the IANA in Idaho. In addition, Sami Al-Hussayen was the registrant or administrative contact for a number of internet websites which either belonged to or were associated with the IANA.  Al-Hussayen was the sole registrant of the following websites:

> www.alasr.ws
> www.alasr.net
> www.almawred.com
> www.heejrah.com
> www.cybermsa.org
> www.liveislam.net[9]

7.     Sami Al-Hussayen was also listed as the administrative contact for the website {www.almanar.net}.  Al-Hussayen was the head of the Supervisory Committee and the Technical Committee for IANA and {www.ianaradionet.com}.[10]  The website

---

[5]     *Id.* at ¶ 15.
[6]     *Id.* at ¶ 16.
[7]     *Id.*
[8]     *Id.*
[9]     *Id.* at ¶ 19.
[10]    *Id.*

{www.islamway.com} was registered to IANA, with direct links to Al-Hussayen's websites {www.alasr.ws} and {www.cybersma.org}.[11]  In fact, the President of IANA, Muhammad Al-Ahmari, e-mailed Sami Al Hussayen stating that "what matters to me is what we agreed upon, which is **your total supervision of all of the Assembly's sites**.[12] Sami Al Hussayen was also registered as the administrative contact for {www.alhawali.com} and {www.alhawali.org}.[13]  Islam al-Maurabit, the administrator for {www.iana.org} sent an e-mail to Sami Al-Hussayen stating that:

> With Allah's support, I suggest that no one is to have the authority to add or delete any banners, except for one person from the office, which shall be you…
>
> Anyway, Abu Al-Muhanned (a/k/a Sami Al-Hussayen), you have been the site manager for a very long time now and I know how busy you are but I want to stress the importance of defined authorities and responsibilities.[14]

8.       The internet, websites and chat rooms are an important medium through which Islamic fundamentalism is spread, donations are collected and Muslims are recruited to join violent jihad.  "Today, almost all active terrorist organizations maintain websites, and many maintain more than one website and use several different languages."[15]

9.       "The Internet is in many ways an ideal arena for activity by terrorist organizations.  Most notably it offers: easy access; little or no regulation, censorship, or other forms of governmental control; potentially huge audiences spread throughout the world; anonymity of communication; fast flow of information; inexpensive development

---

[11]     *Id.*
[12]     U.S. Government Exhibit, F49A, <u>U.S. v. Sami Omar Al Hussayen</u>. (Emphasis added).
[13]     *Id.*
[14]     U.S. Government Exhibit F101A, <u>U.S. v. Sami Omar Al Hussayen</u>.
[15]     Gabriel Weimann, "www.terror.net How Modern Terrorism Uses the Internet," Special Report of the United States Institute of Peace, Report No. 116, p. 3 (March 2004), the article may be located at www.usip.org.

and maintenance of web presence; a multimedia environment (the ability to combine text, graphics, audio, video and to allow users to download films, songs, books, posters, and so forth); and the ability to shape coverage in the traditional mass media, which increasingly use the internet as a source for stories."[16]

10.     In their use of the internet, "terrorists commonly employ three rhetorical structures, all used to justify their reliance on violence.  The first one is the claim that the terrorists have no other choice other than to turn to violence."[17]  "While the sites avoid mentioning how terrorists victimize others, the forceful actions of the governments and regimes that combat terrorists are heavily emphasized and characterized with terms such as 'slaughter,' 'murder' and 'genocide.'"[18]  The second method employed by terrorists is to demonize or delegitimize the enemy.[19]  "The members of the movement or organization are presented as freedom fighters, forced against their will to use violence because a ruthless enemy is crushing the rights and dignity of their people or group."[20]  "Terrorist rhetoric tries to shift the responsibility for violence from the terrorist to the adversary, which is accused of displaying brutality, inhumanity, and immorality."[21]  The third rhetorical device is to use language of nonviolence in an attempt to counter the terrorists' violent image.[22]  An example of this demonization is given in an interview by an individual working for the website {www.aljihad.com}:

> We have tried and we have succeeded to show to the world that the democracy and liberty in America is only for the good of the white man. We have won this war against America, now, all the World knows that all the concepts and principles, the Americans talk about,

---

[16]     *Id.*
[17]     *Id.* at 6.
[18]     *Id.*
[19]     *Id.*
[20]     *Id.*
[21]     *Id.*
[22]     *Id.*

are just lies, with our website which costs us about 70 dollars, we were capable of destroying   all those lies. The Americans have destroyed our Website five times, where is the freedom they are talking about? Why they should do that?  Why they are fighting a small Website like ours?   This explains that the American civilization reaches its end, they can not lie more, in addition, the blessed September 11, put the American administration in a series of troubles, it's their end now.

11.     "The Internet is emerging as a cheap and powerful delivery system, capable of great disruptive power over long distances. It offers minimal risk to any individual or group wishing to illustrate the strength of its argument with direct confrontation against companies or governments."[23] Jimmy Gurulé, Under Secretary of the Treasury for Enforcement, U.S. Department of the Treasury, testified before the U.S. Senate Judiciary Committee that terrorist groups exploit the Internet to recruit supporters and to raise terrorist funds.[24]

12.     "Al Qaeda has always depended heavily on donations, and its global fundraising network is built upon a foundation of charities, nongovernmental organizations, and other financial institutions that use websites and Internet-based chat rooms and forums."[25]  Frequently, the websites offer specific bank account numbers of the site to which donations may be wired.  "The U.S. government has also frozen the assets of three seemingly legitimate charities that use the internet to raise money--the Benevolence International Foundation (BIF), the Global Relief Foundation, and the Al Haramain Foundation--because of evidence that those charities have funneled money to

---

[23]     http://www.computerweekly.com/Article117405.htm
[24]     Testimony of Jimmy Gurulé, Under Secretary for Enforcement, U.S. Department of the Treasury, before the U.S. Senate Judiciary Committee (PO-3635).  November 20, 2002; *see also,* {http://usinfo.state.gov/topical/pol/terror/02112001.htm}.
[25]     *Id.* at 7.

6

Al Qaeda."  Each of these charities are associated with and have direct relationships with Sami Al-Hussayen or the websites he maintains for IANA.[26]

13.     In addition to soliciting donations, websites are also used "to recruit and mobilize supporters to play a more active role in support of terrorist activities or causes."[27]  Terrorist organizations capture information about users who browse their websites.  Those who appear to be most interested are sent e-mails with religious decrees and Anti-American propaganda.

14.     Mohamad bin Ahmad Assalim, a member of Al Qaeda wrote an article entitled "39 Ways to participate in Jihad and Serve the Mujahideen."  He called for the publication of news about the mujahideen fighting jihad.  "The publication and circulation of Mujahideen news should not be underestimated.  So, as a Muslim, one should participate in these actions because it is a duty that has to be carried out."  "You have to publish any information or materials to promote Jihad and to praise the Mujahideen."  "You may also put this document in the Internet so that your brothers can have access to it."

15.     He specifically mentions websites in item 34:

> Websites: This is a vital area for support and exchange of information on Jihad and the Mujahideen.  Some of the topics could be discussed through the internet among a limited group of Muslims:
>
> > Promoting Jihad
> > Ways to Defend the Mujahideen
> > Guidance
> > Jihad Literature

16.     Similarly, Jandal Al-Azdi declared in <u>Destroying America</u>, a media war.

---

26      *Id.* at 8.
27      *Id.*

> The Islamic jihadist websites should be a spider network that participates more in this conflict. These websites have to be developed and have to become more advanced, in fact, more websites are needed, their number should multiply like ants. Our war starts by the media, we have to win this war in order to be able to continue the conflict and fight."

17.     "Terrorists use the Internet not only to learn how to build bombs but also to plan and coordinate specific attacks. Al Qaeda operatives relied heavily on the Internet in planning and coordinating the September 11 attacks."[28]

18.     Defendant Sami Al-Hussayen is committed to the principles of violent jihad. He actively supports and promotes this ideology by registering and maintaining websites. Sami Al-Hussayen established, developed and maintained websites for individuals and groups which promote violent jihad and directly support Al Qaeda. He performed this service and disseminated fatwas, articles, images and other materials with the intention of recruiting supporters, sympathizers and members and to raise money for terrorist groups like Al Qaeda.

*Sheiks Al-Hawali and Ouda*

19.     Sheiks Safar Al-Hawali and Salman Al-Ouda are the spiritual leaders of the Al Qaeda movement.[29] In September 1990, during the initial U.S.-Iraq conflict, Sheikh Al-Hawali released a tape which established a vision for Osama bin Laden's war against the United States and the West:

> We have asked the help of our real enemies in defending us. The point is that we need an internal change. The first war should be against the infidels inside and then we will be strong enough to face our external

---

[28]     Institute of Peace Special Report, at 10.
[29]     Testimony of Michael Gneckow, U.S. v. Sami Omar Al-Hussayen, Detention Hearing, p. 22, lines 10-14. Attached as Exhibit B.

8

enemy.  Brothers, you have a duty to perform.  The war will be long.  The confrontation is coming.[30]

20.    After the 1995 bombing of the U.S. National Guard Khobar Towers facility in Saudi Arabia, a fax was sent to CNN in Atlanta claiming responsibility for the attack.  The terrorists stated that the attack was in retaliation for the imprisonment of Sheik Al-Hawali and Sheik Al-Ouda.

21.    In 1996, when Osama bin Laden issued his fatwa or declaration entitled, Declaration of War against the Americans Occupying the Land of the Two Holy Places" Osama bin Laden specifically called for the release of these two Saudi sheiks from imprisonment in Saudi Arabia.

> By orders from the USA they also arrested a large number of scholars, Da'ees and young people - in the land of the two Holy Places- among them the prominent **Sheikh Salman Al-Oud'a and Sheikh Safar Al-Hawali** and their brothers; (We bemoan this and can only say: "No power and power acquiring except through Allah")...The imprisoned Sheikh **Safar Al-Hawali**, may Allah hasten his release...[31]

22.    Immediately after the 1998 attacks against the United States embassies in Africa, Osama bin Laden issued statements supporting the bombings and stating that attacks against the United States will continue until certain demands are met.  One of these demands called for "Releasing Islamic preachers and youths detained inside prisons in the United States, Israel, and Saudi Arabia, foremost of whom are Sheik Omar Abdel Rahman, **Sheik Alman Al-Ouda**, **Sheik Safar Al-Hawaly** and their brothers."

---

[30]    "Saudi Missteps Helped Bin Laden Gain Power," Washington Post, October 15, 2001.
[31]    Originally published in Al Quds Al Arabi (emphasis added).

23. These Saudi sheiks were outspoken in their proclamations of jihad, terrorism and violence against the West.[32]  In fact, they have promoted suicide operations as a legitimate means of jihad.[33]  Copies of Sheik Al-Ouda's sermons promoting violent jihad were found in one of Osama bin Laden's residences in Afghanistan.[34]

24. In an October 19, 2001 open letter to President George W. Bush, Sheikh Al Hawali wrote: "In the midst of this continuous confusion and frustration, the events of the 11th of September occurred.  I will not conceal from you that a tremendous wave of joy…was felt by the Muslim in the street."[35]

25. The sheiks used websites to spread their violent message of jihad against the United States and non-Muslims.  Sami Al-Hussayan assisted in their promotional efforts by creating a medium for them to express their ideology.  Sami Al-Hussayen provided material support to the Al Qaeda network by creating websites by which violent jihad against the United States could be espoused.  In furtherance of Al Qaeda's goals, he purposefully and knowingly posted militant articles and messages written by these Saudi sheiks--the spiritual leaders of Al Qaeda.

26. A member of Mohammed Atta's September 11 hijacker cell in Hamburg, Germany made several calls to Sheik Al Hawali and Sheik Ouda.  The sheiks provided ideological justifications and support for suicide attacks.  It has also been recently revealed that the United States National Security Agency intercepted phone conversations between the September 11th hijackers and sheiks from Saudi Arabia.  Although the

---

[32]     *Id.* at p. 23, lines 7-15.
[33]     *Id.* at p. 23, lines 16-20.
[34]     *Id.* at p. 26, lines 7-16
[35]     Saudi cleric Safar bin-Abd-al-Rahman al-Hawali, "Open Letter from Saudi Cleric to President Bush," <u>Al Quds Al Arabi</u>, October 19, 2001

identity of the sheiks that the hijackers contacted has not been revealed at this time, it seems likely that they may have tried to contact these same Saudi Sheiks.

27.     Sheik Al Hawali's websites {www.alhawali.org} and (www.alhawali.com} were registered by Sami Al-Hussayan.  Sheik Ouda publishes his articles and fatwas on the website {www.islamtoday.net}. IslamToday was registered by the Specially Designated Global Terrorist Al Haramain Islamic charity on behalf of these two Saudi sheiks.  Sami al-Hussayen administered the site {www.islamtoday.net}.[36]

28.     On May 15, 2001, three and one-half months before the September 11th attacks, an article written by Sheik Ouda called "Suicide Operations" was posted on the website {www.alasr.ws}.  Sami Al-Hussayen was the sole registrant for this website. Sheik Ouda wrote:

> The second part of the rule is that the Mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies, and that he will not be able to kill them without killing himself first, or demolishing a center vital to the enemy or its military force, and so on.  This is not possible except by involving the human element in the operation.  In this new era, this can be accomplished with the modern means of bombing **or bringing down an airplane** on an important location that will cause the enemy great losses.[37]

29.     Sami Al-Hussayen  paid invoices for the website domain name {www.alasr.net}.  The defendant's computer also contained images of the materials posted on the "alasr" site.  FTP logs show that Al-Hussayen uploaded these files from his computer to the website {www.alasr.ws}.  In fact, Sami Al-Hussayen conducted this upload to the "alasr" site on the same date the fatwa was written.

---

[36]     Superseding Indictment, U.S. v. Sami Omar Al-Hussayen, para. 23, CR-03-0048-C-ELJ (DC Idaho) (January 9, 2004).  Attached as Exhibit C.
[37]     Indictment at para. 20. (Emphasis added).

30.     Sami Al-Hussayen promoted these suicide operations and the ideology espoused by Sheik Ouda.  Mr. Al-Hussayen e-mailed a poem to his brother entitled "A Martyr Under Twenty."  The introduction to this poem was written by Sheik Ouda.   The poem praises violent jihad through suicide operations.

31.     As a telling precursor to the defense currently asserted by Sami Al-Hussayen in his criminal trial in Idaho, he stated that in the email that "if ever questioned about posting the messages of suicide attacks by Sheik Al-Hawali, 'I will simply deny knowledge of the content of the message and claim that I merely host the servers.'"

*Al-Multaqa*

32.     Al-Hussayen also maintained and posted information on the website {www.al-multaqa}.  The website presented an online version of the Arabic magazine *Al-Mutaqa.*  The magazine contained Sami Al-Hussayen's contact phone numbers.  The magazine also displayed news about the Chechen mujahideen and advised visitors to join the Yahoo!QoqazGroup for news about jihad in Chechnya.   In one such article, among many found on the website and also on Sami Al Hussayen's personal computer is an article entitled "The True Meaning of Shaheed."  The article states that to die as a shaheed [martyr] is the ultimate honor.

33.     The magazine is hyper linked to the "alasr" websites and {www.ianaradio.net}maintained by Al-Hussayen.  The site is also linked to the website {www.qoqaz.com} which has been used frequently by Al Qaeda to promote jihad in Chechnya.  The "alasr" site is also linked to {www.palestine-info.org}, a site considered by numerous experts to be the official website of Hamas.  Hamas and Al Qaeda are designated as global terrorist groups.

34.     Al-Multaqa also included links for subscribing to the internet bulletin board that later became Yahoo!QoqazGroup, which was maintained by Sami Al-Hussayen.  In a telephone call with Verizon, Al-Hussayen requested the activation of the telephone number of Al Multaqa – 208 892 9197.  He gave his own home phone number and address as a point of contact.

35.     Sami Al-Hussayen received an e-mail thanking him for posting messages while the {www.qoqaz.com} website was not functioning.  The Qoqaz website is the premier website promoting jihad in Chechnya.  The website includes images of Ibn-ul-Khattab, the Al Qaeda leader of jihad in Chechnya.  These images were found saved on Sami Al-Hussayen's computer.

36.     As described above, Al-Hussayen also monitored and participated in the Yahoo!QoqazGroup chat room.  Participants in this chat room promoted violence and jihad.  The invitation to join the chat room was posted on the Al-Multaqa website and announced the "Establishment of a network to support and disseminate news of the Caucasus [Qoqaz]."  The purpose of the chat room was described the following way:

> So that those who cannot physically engage in holy war may support the Chechen issue and holy war by the pen and tongue, an electronic network [listserve] has been established.  Please use this [listserve] for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers.... We ask everyone to help the Chechen holy warriors with your support, your money, and your selves. This is a duty upon us, and we must not be negligent.

37.     The first posting that Sami Al-Hussayen issued on the Qoqaz group chat room called for "A Cry and Call" to fight "idolators with your money, your selves, your tongues and your prayers."  His postings also included a statement that the problem with contemporary Islam is that Muslims have given up jihad and are not practicing it enough.

In addition, he posted "Virtues of Jihad" which glorified those who die in battle while performing jihad.  He said that these martyrs have a special place in heaven close to Allah.

38.     Al Hussayen received jihadist messages on the Yahoo!QoqazGroup chat room which included an audiotape from Osama bin Laden.  Sami downloaded and transferred these audio messages by e-mail to fellow terrorist operatives with instructions to its recipients to send the messages out to as many people as possible.  Thus, Sami Al-Hussayen directly promoted and distributed messages from Osama bin Laden.

*Islamic Assembly of North America*

39.     Sami Al-Hussayen controlled IANA's websites.  Al-Hussayen described himself in an e-mail as the Webmaster for IANA.  IANA's sites include {www.islamway.com}, {www.iana.org} and {www.ianaradio.net}.  Al-Hussayen maintained a complete back-up of these websites on his computer.  Al-Hussayen knowingly and intentionally selected materials for the websites.

40.     On June 19, 2001, IANA's website {www.islamway.com} published an article by al-Hawali that was republished on his website, {www.islamtoday.net}.  On November 4, 2001, an article was posted on the site which:

> justified and advocated suicide bombings if certain conditions were met, namely: (1) that the purpose is to assist Allah's religion; (2) that 'the attacker is almost certain that his act will have some benefit, either by inflicting the enemy with casualties or injuries, by encouraging the Muslims to fight the enemy, or by weakening the enemy's resolve by showing them what a single man is capable of…[;] (3) that the act is against 'unbelievers who have declared war against the Muslims…[;] (4) that 'the act is in their countries or in countries under their rule, where Muslims need to resists

them and expel them…[;] and (5) 'to be approved by the parents of the attacker…'[38]

41.    On August 16, 2001, IANA's website {www.islamway.com} published a propaganda statement that encouraged individuals to join arms in jihad against the West. Appropriately entitled "An Invitation to Jihad," the publication stated that "[t]he mujahid brothers will accept you with open arms and within a period of two weeks you will be given commando training and will be sent to the frontline."[39]

42.    Just two days before the attacks, on September 9, 2001, an individual posted a statement on IANA's website {www.islamway.com} that he was leaving Afghanistan "on duty" and that "Jihad is the only means to eradicate all evil on a personal and general level[;]" that "[t]he only answer is to ignite and trigger an all out war, a worldwide Jihad; and that "[w]e will do our best to ignite this war, may Allah protect us."

43.    In addition, an officer of IANA's Canada branch ran a mosque that harbored an al-Qaeda operative. Bahaa Elbatal is a director of the Islamic Assembly of North America in Canada.[40]   Elbatal is also the Secretary of the mosque in Montreal where Ould Slahi found refuge and led prayers.[41] Slahi is a senior al-Qaeda operative that provided assistance to both the 1998 Embassy Bombing attacks and the failed Millennium bomb plot on the United States.

44.    From November 1999 through February 13, 2003 Al-Hussayen was functioning as an IANA officer and employee.[42]  Al-Hussayen was actively involved in

---

[38]    Michael E. McLennan, FBI Special Agent. Application and Affidavit for Search Warrant, Case Number: CR 03-048, United States District Court for the District of Idaho. February 21, 2003. p16.

[39]    Application and Affidavit for Search Warrant, p13.

[40]    Islamic Assembly of North America in Canada. List of Directors. Canada Corporations Directorate. March 31, 2000.

[41]    David Johnston, "Terror Suspect is Rearrested in Africa at U.S. Request," *New York Times,* January 29, 2000.

[42]    Superseding Indictment, at paragraph 6.

IANA's business transactions and fundraising activities.[43]  He also assisted in the coordination of an IANA conference.

45.     A number of IANA conferences were sponsored by the Global Relief Foundation (GRF) which is a Specially Designated Global Terrorist and co-defendant in this action.  GRF also participated in the IANA conferences and sent money to IANA to offset the conferences' costs.[44]

46.     These conferences were also sponsored and/or financed, in part, by the Benevolence International Foundation which is also a Specially Designated Global Terrorist and co-defendant in this action.[45]

*Images Found on Sami Al Hussayen's Computer*

47.     In addition to the messages and articles previously described, Sami Al Hussayen also maintained several disturbing images on his computer for use on these websites.  Such images included:

> Several pictures of the World Trade Center Towers including a computer generated image of where the airplanes struck the towers, and images of the towers before and after they collapsed;
>
> An aerial photograph of the Pentagon;
>
> A picture of a United Airlines airplane;
>
> A photograph of a U.S. Navy Aircraft Carrier;
>
> Photographs of other Al Qaeda terrorist targets including the Golden Gate Bridge and the Capitol Building in Washington, DC;
>
> Numerous photographs of Osama bin Laden including an image of Osama bin Laden facing off with President George Bush.  There is a target

---

[43]     *Id.*

[44]     Testimony of Michael Gneckow, U.S. v. Sami Omar Al-Hussayen, Detention Hearing, at 104, lines 9 - 20.

[45]     *Id.* at 100, lines 15-20.

superimposed on President Bush's head with the center of his head in the cross hairs of the target.  A copy of this photograph is included below;



Numerous photographs of Sheik Salman Ouda;

Photograph of Sudaman Abu Ghaith who is an Al Qaeda spokesman;

A poster of Chechnya with a symbol for the website Qoqaz.com and images of armed mujahideen soldiers;

Photographs of Zacarias Moussaoui, the suspected 20th hijacker who has been indicted in Virginia and Richard Reid, the Al Qaeda operative convicted of attempting to explode a trans-Atlantic flight from Paris to Miami with explosives inserted in his shoes;

Photograph of a Taliban soldier firing a rocket propelled grenade.[46]

These are merely a sample of the thousands of images contained on his computer.

*Financial Support*

48.      Sami Al-Hussayen also provided material support to Al Qaeda and other terrorist groups through the collection of donations.  From August of 1994 until at least February of 2003, Sami Al-Hussayen maintained at least six different bank accounts in the United States.[47]  From at least 1997, Sami used some of these accounts to receive donations and large sums of money. He transferred these sums to the IANA and other

---

[46]      *See*, Testimony and Exhibits of Michael Gneckow, U.S. v. Sami Omar Al-Hussayen, Detention Hearing,   Attached as Exhibit B.

[47]      Indictment, at paragraph 22.

organizations and individuals.[48] Sami Al Hussayen also made disbursements to individuals in Cairo, Egypt; Montreal, Canada; Riyadh, Saudi Arabia; Amman, Jordon; and Islamabad, Pakistan.[49]

49. Monies transferred from Al-Hussayen were used to fund salaries of IANA officers, and to permit patrons to travel to IANA conventions. Mr. Al-Hussayen played an active role in determining where the IANA would send its contributions and how the business should operate. The IANA received and distributed over three million dollars ($3,000,000.00). These funds were also used to support jihad and the Al Qaeda network.

50. Sami Al-Hussayen used the Yahoo!QoqazGroup to directly request financial contributions to support those engaged in jihad. In a response to statements that the Russians won the Chechen conflict, Al-Hussayen posted a message to the jihadist email group on February 9, 2000, "We request the Muslims to increase their *Duas* to Allah and to increase their moral and financial support to the mujahideen."

51. In September, 1998, Sami Al-Hussayen received two checks totaling one hundred thousand dollars ($100,000.00) from his uncle, Saleh Al-Hussayen. Sami Al-Hussayen forwarded this money directly to the IANA.[50] This same uncle's travel was sponsored by the IANA. He traveled to the United States on an IANA fundraising mission to the United States in the weeks leading up to the September 11th terrorist attacks. Saleh al-Hussayen is a senior Saudi cleric and the director of the Two Holy Mosques. In August 2001, he arrived in New York City and was given a tour of the city,

---

[48]    *Id.*
[49]    *Id.* at paragraph 24.
[50]    Testimony of Michael Gneckow, <u>U.S. v. Sami Omar Al-Hussayen</u>, Detention Hearing, at 77, lines 2-20, Attached as Exhibit B.

including the vicinity of the World Trade Center Towers.[51]  He then traveled to Chicago,

Detroit and Canada meeting with IANA officials and with officials from other charities.[52]

52.     There is an indication that Sami Al-Hussayen met with his uncle in

Michigan, because he received a cash disbursement in Ann Arbor around the same time

that his uncle Saleh was in Ann Arbor.[53]  On September 6, 2001, Sami's uncle Saleh

arrived in Herndon, Virginia.  Two or three days before the September 11th attacks,

Saleh Al-Hussayen switched from his original hotel to a hotel a few miles away, the

Marriott Residence Inn in Herndon.[54]  The Marriott Residence Inn in Herndon was the

same hotel where at least three of the American Airlines Flight 77 hijackers stayed the

night before September 11th.  The following morning these men hijacked Flight 77 and

crashed the airliner into the Pentagon.[55]

53.     When interviewed by the FBI, Saleh Al-Hussayen feigned a heart attack to

avoid interrogation.[56]  The doctor attending to Saleh Al-Hussayen claimed that he could

not find anything wrong with him.[57]

*Indictment*

54.     Sami Al Hussayen was indicted on January 9, 2004 for providing material

support and resources to terrorists.  The indictment states that:

> Sami Omar Al-Hussayen did knowingly conspire, combine,
> confederate, and agree with persons known and unknown to the
> Grand Jury, to provide material support and resources, and to
> conceal and disguise the nature, location, source and ownership of
> material support and resources, intending that they were to be used
> in preparation for and in carrying out a violation of Title 18, United

---

[51]     *Id.* at p. 81, lines 3-17.
[52]     *Id.*
[53]     *Id.* at 81, lines 18-24.
[54]     *Id.* at 82, lines 9-20.
[55]     *Id.*  at 83, lines 1-6.
[56]     *Id.* at  89, lines 1-7.
[57]     *Id.* at  89, lines 8-13.

States Code, Section 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country), in violation of Title 18, United States Code, Section 2339A and Section 371.[58]

55.     The grand jury found that "the purpose of the conspiracy was to create and maintain websites and other internet media, which were intended in part to recruit personnel and raise funds for violent jihad…."[59]  The Grand Jury also determined that Sami Al Hussayen, on the {www.al-multaqa.com} website, invited "those who cannot physically engage in holy war" to join an internet e-mail group "for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers," and urged all readers "to help the Chechen holy warriors with [their] support, [their] money, and [their] selves."  As described above, members of this internet e-mail group posted inquiries and information relating to violent jihad.[60]

56.     Through these websites, Sami Al-Hussayen published and  broadcast a wide variety of speeches, lectures and articles justifying and glorifying violent jihad.[61] He also called upon Muslims to personally participate in violent jihad, or alternatively to provide financial assistance to such groups.[62]

57.     The Defendant also "published graphic videos depicting mujahideen and other subjects relating to violent jihad with the intent to inspire viewers to engage in violent jihad or to provide financial assistance to those who did so.  Individuals in the United states who viewed these videos were inspired, at least in part, by the videos to travel overseas to train for and engage in violent jihad and related terrorist offenses."[63]

---

[58] Superseding Indictment of Sami Omar Al-Hussayen, p. 14.
[59] *Id.*
[60] *Id.*, at p. 15.
[61] *Id.*
[62] *Id.*
[63] *Id.*, at p. 16.

58.     Sami Al-Hussayen ideologically supports global jihad believing that, irrespective of location, Muslims should support fellow Muslims who are engaging in violent jihad against non-Muslim regimes including the United States of America.  Sami Al-Hussayen has directly provided material support to groups that sponsor and carry out international terrorist activities, including suicide operations.

59.     Sami Al-Hussayen has materially supported the Al Qaeda network which carried out the September 11, 2001 attacks upon the United States by promoting and distributing articles and fatwas issued by the spiritual leaders of Al Qaeda Sheiks Ouda and Al-Hawali.  Sami Al-Hussayen has also downloaded and distributed a speech given by Osama bin Laden with instructions that the speech be widely distributed.  Consistent with this ideological support of Al Qaeda, Sami Al Hussayen has created, registered and maintained numerous websites and Internet chat rooms which promote radical and violent jihad for the purpose of recruitment and raising funds to perpetuate the Al Qaeda jihad.

PROVIDED BY
FindLaw
WWW.FINDLAW.COM

1  THOMAS E. MOSS
   UNITED STATES ATTORNEY
2  KIM R. LINDQUIST
   ASSISTANT UNITED STATES ATTORNEY
3  TERRY L. DERDEN
   FIRST ASSISTANT UNITED STATES ATTORNEY
4       and CRIMINAL CHIEF
   DISTRICT OF IDAHO
5  WELLS FARGO BUILDING
   877 WEST MAIN STREET, SUITE 201
6  BOISE, IDAHO  83702
   TELEPHONE:  (208) 334-1211
7  MAILING ADDRESS:
      BOX 32
8  BOISE, IDAHO  83707

9

10

11

                    UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO
12

13  UNITED STATES OF AMERICA,            )   Cr. No. CR-03  048-NEJL
                                          )
14           Plaintiff,                   )   INDICTMENT
                                          )
15  vs.                                   )   (Vio. 18 U.S.C. 1546(a); 1001(a)(1) and
                                          )        (2), 3237 and 3238)
16  SAMI OMAR AL-HUSSAYEN,                )
                                          )
17           Defendant.                   )

18

19  THE GRAND JURY CHARGES:

20

21  At all times pertinent to this Indictment:

22

23  VISA FRAUD AND FALSE STATEMENT

24       The Student Visas

25           Background

26      1.   In order for a foreign student to study in the United States on an F-1 student visa

27

28                                            1

1  the student must declare and promise under oath to United States authorities that the student
2  seeks a presence in the United States solely for the purpose of pursuing the student's
3  course of studies. In relation thereto, the foreign student must truthfully and fully declare his
4  associations with organizations to the appropriate United States Government authorities in
5  order for those authorities to evaluate any such association and related activities in relation to
6  the interests of the United States.

7       2.    SAMI OMAR AL-HUSSAYEN was a citizen of Saudi Arabia. Between about
8  August 7, 1994 and September 23, 1998, AL-HUSSAYEN studied in the United States as a
9  foreign student. He studied at Ball State University in Muncie, Indiana, where he obtained a
10 Masters of Science degree in computer science; and at Southern Methodist University in
11 Dallas, Texas.

12      3.    On or about September 23, 1998, AL-HUSSAYEN applied to the University of
13 Idaho at Moscow, Idaho, by submitting an International Application Form requesting that he
14 be admitted to the Computer Science PhD program for the Spring 1999 Semester.

15      4.    In or about January, 1999, AL-HUSSAYEN was admitted to the Computer
16 Science PhD program at the University of Idaho, with an emphasis on computer security and
17 intrusion techniques. University of Idaho records indicated that he began his studies the
18 Spring 1999 Semester. At the time he published his permanent address as ▮▮▮▮▮▮▮
19 ▮▮▮▮Moscow, Idaho.

20              The year 1999 transactions

21      5.    On or about May 17, 1999, United States Immigration and Nationalization (INS)
22 Form I-20 was issued by the University of Idaho, allowing AL-HUSSAYEN to study in the
23 Computer Science PhD program beginning no later than August 24, 1999, and ending no later
24 than December 17, 2004.

25

26

27

28                        2

6.  On or about July 17, 1999, while outside the United States, AL-HUSSAYEN signed the Student Certification of the INS Form I-20 at section #11, which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and <u>solely for the purpose of pursuing a full course of study at [the University of Idaho]</u>. I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

AL-HUSSAYEN falsely made said certification, knowing of his internet and business activities alleged hereafter. On or about July 20, 1999, the United States Government issued an F-1 student visa to AL-HUSSAYEN at Riyadh, Saudi Arabia. The visa was valid for twenty-four months, or until July 20, 2001. (See Counts One and Two hereafter.)

7.  On or about August 11, 1999, AL-HUSSAYEN was admitted by the United States Government into the United States at John F. Kennedy International Airport in New York City, New York, as an F-1 student. AL-HUSSAYEN was admitted into the United States by the United States Government pursuant to the July 20, 1999 visa and in direct reliance upon AL-HUSSAYEN's certification on the INS Form I-20 dated July 17, 1999. (See Count Three hereafter.)

### The year 2000 transactions

8.  On or about July 7, 2000, a second INS Form I-20 was issued by the University of Idaho and designated "for Continued attendance at this school" and in order "to add dependant." On or about this same day and in Moscow, Idaho, AL-HUSSAYEN signed the Student Certification of said INS Form I-20 at section #11 and which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and <u>solely for the purpose of pursuing a full course of study at [the University of Idaho]</u>. I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

AL-HUSSAYEN falsely made said certification, knowing of his internet and business activities alleged hereafter. (See Counts Four and Five hereafter.) On or about July 9, 2000,

3

1  AL-HUSSAYEN departed from the United States at the John F. Kennedy International

2  Airport in New York City, New York.

3       9.   On or about August 25, 2000, AL-HUSSAYEN was admitted into the United

4  States by the United States Government at Washington, D.C., as an F-1 student. AL-

5  HUSSAYEN was admitted into the United States by the United States Government pursuant

6  to the student visa dated July 20, 1999 as previously referenced and in reliance upon AL-

7  HUSSAYEN's certification on the INS Form I-20 dated July 7, 2000. (See Count Six

8  hereafter.)

9             The year 2002 transactions

10      10.  On or about January 10, 2002, AL-HUSSAYEN departed the United States at

11  the John F. Kennedy International Airport in New York City, New York. On or about January

12  13, 2002, AL-HUSSAYEN signed and submitted to the United States embassy a DOS Form

13  DS-156 for the purpose of obtaining another F-1 student visa. Section 36 of the form reads in

14  pertinent part:

15      I certify that I have read and understand all the questions set forth in this application
16      and the answers I have furnished on this form are true and correct to the best of my
        knowledge and belief. I understand that any false or misleading statement may result
17      in the permanent refusal of a visa or denial of entry into the United States. I
        understand that possession of a visa does not automatically entitle the bearer to enter
18      the United States of America upon arrival at a port of entry if he or she is found
        inadmissable.

19  At section nineteen of the Form DS-156, AL-HUSSAYEN stated that the purpose of his entry

20  into the United States was to "study;" and, at section twenty-six, that he would do so at the

21  University of Idaho. At section 20 he stated his permanent address in the United States to be

22  ███████████ Moscow, Idaho, 83843. As part of his application for the F-1 student

23  visa, AL-HUSSAYEN relied upon and/or submitted the INS Form I-20 dated July 7, 2000, as

24  previously referenced.

25      11.  On or about January 14, 2002, the DOS Form DS-156 was formally stamped as

26  received by the United States Government at the United States Embassy in Riyadh, Kingdom

27  of Saudi Arabia. However, the application was refused because the birth date of AL-

28                         4

1  HUSSAYEN on the visa application and the July 7, 2000 INS Form I-20 did not match the

2  birth date on his passport.

3      12.   On or about January 14, 2002, and in conjunction with the same F-1 student visa

4  application, AL-HUSSAYEN submitted a DOS Form DS-157 Supplemental Non-immigrant

5  Visa Application to the United States Government at the United States Embassy in Riyadh,

6  Kingdom of Saudi Arabia, which DOS Form DS-157 was attached to the original DOS Form

7  DS-156 submitted on January 14, 2002.  Section 13 of the DOS Form DS-157 required the

8  applicant to "[l]ist all Professional, Social, Charitable Organizations to Which You Belong

9  (Belonged) or Contribute (Contributed) or with Which You Work (Have Worked)."  AL-

10 HUSSAYEN listed "ACM & IEEE."  ("ACM" stands for the Association for Computive

11 Machinery, and "IEEE" stands for the Institute of Electrical and Electronic Engineers.)  AL-

12 HUSSAYEN listed no other affiliations. AL-HUSSAYEN falsely and intentionally did not

13 list the Islamic Assembly of North America (hereafter the IANA) and other entities.  (See

14 Counts Seven and Eight hereafter.)

15      13.   On or about March 19, 2002, the University of Idaho provided an INS Form I-20

16 for AL-HUSSAYEN "for Continued attendance at this school" and to "correct birth-date."

17 On or about April 6, 2002, AL-HUSSAYEN signed the Student Certification of the INS Form

18 I-20 at section eleven, which stated in pertinent part:

19     I have read and agreed to comply with the terms and conditions of my admission. . . .
        I certify that all information provided on this form refers specifically to me and is true
20     and correct to the best of my knowledge.  I certify that I seek to enter or remain in the
        United States temporarily, and solely for the purpose of pursuing a full course of
21     study at [the University of Idaho].  I also authorize the named school to release any
        information from my records which is needed. [Emphasis added.]
22

23 AL-HUSSAYEN falsely made the certification, knowing of his internet and business

24 activities alleged hereafter.  On or about the same day of April 6, 2002, AL-HUSSAYEN

25 formally submitted the INS Form I-20 dated April 6, 2002, to the United States Government

26 at the United States Embassy in Riyadh, Kingdom of Saudi Arabia, and the United States

27 Government issued AL-HUSSAYEN an F-1 student visa in direct reliance upon AL-

28                                          5

1  HUSSAYEN's certifications on the DOS Form DS-156 dated January 14, 2002, and attached
2  DOS Form DS-157, together with the INS Form I-20 dated April 6, 2002. (See Counts Nine
3  and Ten hereafter.)

4      14.   On or about May 9, 2002, AL-HUSSAYEN was admitted by the United States
5  Government into the United States at the John F. Kennedy International Airport in New York
6  City, New York, as an F-1 student by virtue of the F-1 student visa issued April 6, 2002, and
7  in direct reliance upon AL-HUSSAYEN'S certifications on the DOS Form DS-156 dated
8  January 14, 2002, and attached DOS Form DS-157, together with the INS Form I-20 dated
9  April 6, 2002. During the admission at the John F. Kennedy International Airport, AL-
10  HUSSAYEN was inspected by INS and Customs officials. During the inspections, the INS
11  Form I-20 dated April 6, 2002, was photocopied by the Customs officials, with the Customs
12  officials retaining the copy and the original being returned to AL-HUSSAYEN. (See Count
13  Eleven hereafter.)

14      **The Web-site Activities**

15      15.   From at least October 2, 1998, until the date of this Indictment, AL-
16  HUSSAYEN engaged in computer web-site activities that exceeded his course of study at the
17  University of Idaho. These activities included expert computer services, advice, assistance
18  and support to organizations and individuals, including the IANA, in the form of web-site
19  registration, management, administration and maintenance. A number of those web-sites
20  accommodated materials that both advocated violence against the United States.

21      16.   The IANA was incorporated in 1993 in Colorado as a non-profit, charitable
22  organization. It maintained offices in Ann Arbor, Michigan. Its official mission statement
23  was that of *Da'wa*: the proselytizing and spreading the word of Islam. The IANA did this, in
24  part, by providing a number of media outlets as vehicles for advocating Islam, such as internet
25  web-sites with "bulletin boards," internet magazines, toll-free telephone lines, and audio
26  ("radio.net") services. The IANA solicited and received donations of monies both from
27  within the United States and without. The IANA also hosted regular Islamic

28                    6

1 conferences in the United States, with participation by individuals affiliated with other
2 charitable organizations also located within the United States.

3     17.   AL-HUSSAYEN was the formal registered agent for the IANA in Idaho (since
4 May 11, 2001) and a business associate of the IANA in its purpose of *Da'wa* (proselytizing),
5 which included the web-site dissemination of radical Islamic ideology the purpose of which
6 was indoctrination, recruitment of members, and the instigation of acts of violence and
7 terrorism.

8     18.   AL-HUSSAYEN was either the registrant or the administrative contact for a
9 number of internet web-sites which either belonged to or were linked to the IANA. A number
10 of said IANA-related web-sites were registered to AL-HUSSAYEN directly, to the IANA or
11 to Dar Al-Asr, a Saudi Arabian company that provided web hostings on the internet. AL-
12 HUSSAYEN registered web-sites on behalf of Dar Al-Asr, identifying himself as the
13 administrative point of contact for Dar Al-Asr and giving his Moscow, Idaho street address
14 and University of Idaho e-mail address for reference.

15     19.   Of the afore-referenced web-sites, AL-HUSSAYEN was the sole registrant of
16 web-sites www.alasr.ws (created September 11, 2000), www.cybermsa.org (created March
17 15, 2001) and www.liveislam.net (created July 8, 2002). Web-sites www.alasr.net (created
18 August 15, 1999), www.almawred.com (created November 1, 1999) and www.heejrah.com
19 (February 22, 2000) were registered to Dar Al-Asr, with AL-HUSSAYEN as the
20 administrative contact person. Web-site www.almanar.net (created October 2, 1998) was
21 registered to Al-Manar Al-Jadeed Magazine, with AL-HUSSAYEN as the administrative
22 contact person. Iananet.org (created August 11, 1995) was registered to IANA and designed
23 and maintained by the web-site entity Dar Al-Asr. Ianaradionet.com (created May 25, 1999)
24 was registered to IANA, with AL-HUSSAYEN as the head of its supervisory committee and
25 member of its technical committee. Islamway.com (created August 18, 1998) was registered
26 to IANA, with direct links to AL-HUSSAYEN's web-sites, including www.alasr.ws and
27 www.cybersma.org. The registration of web-sites www.alhawali.org and www.alhawali.com

28                          7

1  (both created November 18, 2000) referenced Al-Asr and AL-HUSSAYEN, with AL-
2  HUSSAYEN as the administrative contact for www.alhawali.com. These two web-sites
3  corresponded to a radical sheikh referenced in paragraph 21 hereafter. Web-site
4  www.islamtoday.net (created March 17, 2000) was related to a radical sheikh also referenced
5  in paragraph 21 hereafter and posted articles to some of the Dar Al-Asr and AL-HUSSAYEN
6  web-sites.

7       20.    One of the afore-referenced web-sites registered by AL-HUSSAYEN was
8  www.alasr.ws. On September 11, 2000, AL-HUSSAYEN registered the www.alasr.ws web-
9  site. In about June of 2001, an article entitled "Provision of Suicide Operations" was
10 published on the internet magazine of the website www.alasr.ws. The article was written by
11 a radical Saudi sheikh. A portion of the article read as follows:

12

13      The second part is the rule that the *Mujahid* (warrior) must kill himself if he knows
        that this will lead to killing a great number of the enemies, and that he will not be able
14      to kill them without killing himself first, or demolishing a center vital to the enemy or
        its military force, and so on. This is not possible except by involving the human
15      element in the operation. In this new era, this can be accomplished with the modern
        means of bombing or bringing down an airplane on an important location that will
        cause the enemy great losses. [Emphasis added.]

16

17      21.    Www.alasr.ws and other web-sites registered or linked to, or technically advised
18 by AL-HUSSAYEN, including www.islamway.com (previously mentioned), also posted
19 other violent *jihad* (holy war)-related messages by other radical sheikhs, including those
   referenced in preceding paragraph 19.

20

   **Financial and Business Activities**

21

22      22.    From on or about August 17, 1994, until the date of this Indictment, AL-
23 HUSSAYEN, at various times, maintained at least six United States bank accounts in Indiana,
24 Texas, Idaho and Michigan. From at least January 23, 1997, until the date of this Indictment,
25 AL-HUSSAYEN used said bank accounts to receive large sums of monies from within and
26 without the United States, and to transfer and cause to be transferred large sums of monies to
   the IANA and other organizations and individuals.

27

28

                                      8

23. From at least January 23, 1997, until the date of this Indictment, AL-HUSSAYEN received into and disbursed out of his bank accounts approximately $300,000.00 in excess of the university study-related funds he received during the same period of time, such as the monthly stipend he was given by the Saudi Arabian Government, and the living expenses that corresponded thereto. These excess funds included $49,992.00 paid to AL-HUSSAYEN on September 10, 1998, and $49,985.00 paid to him on September 25, 1998.

24. From at least November 16, 1999, to the date of this Indictment, AL-HUSSAYEN made disbursements of the excess funds referenced in the preceding paragraph to the IANA and to the IANA's officers, including a leading official of the IANA. A portion of these funds was used to pay operating expenses of the IANA, including salaries of IANA employees. Furthermore, in 1999, 2000 and 2001 wire transfers were made from AL-HUSSAYEN to individuals in Cairo, Egypt; Montreal, Canada; Riyadh, Kingdom of Saudi Arabia; Amman, Jordan; and Islamabad, Pakistan. AL-HUSSAYEN also made disbursements to other organizations and individuals associated therewith during the time referenced in this paragraph.

25. From at least November 16, 1999, to the date of this Indictment, AL-HUSSAYEN maintained frequent business contact with the leading IANA official referenced above. Not only did AL-HUSSAYEN disburse money directly to the official in the form of wire transfers and personal checks, their relationship also included the maintenance of a checking account in a Michigan bank in AL-HUSSAYEN's name alone, but with the official's home address and the official's apparently exclusive use of the account. Among the deposits into the account was a $4,000.00 wire transfer from AL-HUSSAYEN, 311 Sweet Avenue, Apt 6, Moscow, Idaho, to AL-HUSSAYEN, 219 Fieldcrest Street, Ann Arbor, Michigan. In addition, numerous telephone calls between AL-HUSSAYEN and the official were made during the time referenced in this paragraph.

9

26.   From at least March of 1995 until about February of 2002, the IANA received into its bank accounts approximately three million dollars ($3,000,000.00), including the funds received from AL-HUSSAYEN as referenced above, and disbursed approximately the same amount. The deposits included a three hundred thousand dollar ($300,000.00) transfer from a Swiss bank account on or about May 14, 1998.

27.   From about December of 1994 to about July of 2002, AL-HUSSAYEN traveled and otherwise funded travel for other individuals, including travel related to the IANA, through AL-HUSSAYEN's bank accounts and to locations in numerous states, as well as foreign countries.

28.   From at least January 1, 1997, until on or about August 28, 2002, telephones corresponding to AL-HUSSAYEN had contact with telephones subscribed to individuals or entities in numerous states, as well as foreign countries.  Subscribers corresponding to or associated with some of the numbers included the IANA and the source of the $49,992.00 and $49,985.00 transfers previously referenced paragraph 23.

**THE VIOLATIONS**

In material reliance upon the information contained in the INS I-20 forms and the DOS Forms DS- 156 and DS-157 as heretofore referenced, the United States Government issued AL-HUSSAYEN F-1 student visas and allowed him to enter and remain in the United States. However, AL-HUSSAYEN entered into and remained in the United States for purposes other than that of solely pursuing his studies, including, but not limited to, material support of the IANA and others by means of his web-site and business activities, and knowingly and wilfully made false statements and omissions to the authorities of the United States in relation thereto. By not truthfully stating and revealing the nature and extent of his activities and affiliations in the United States, AL-HUSSAYEN thereby deprived the authorities of the United States of the knowledge thereof and the opportunity to evaluate and address the same within the context of the laws of the United States, resulting in felony violations by the Defendant, SAMI OMAR AL-HUSSAYEN, consisting of Counts One through Eleven.

10

## COUNT ONE
## FALSE STATEMENT TO THE UNITED STATES
### (Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See previous paragraphs 5 and 6.)

## COUNT TWO
## VISA FRAUD
### (Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, until the date of this Indictment, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration

11

1  laws and regulations of the United States and (2) knowingly presented such application and
2  other document required by the immigration laws and regulations of the United States which
3  contained a materially false statement, in that SAMI OMAR AL-HUSSAYEN, in applying
4  for and receiving a student visa, signed and submitted an Immigration and Naturalization
5  (INS) form I-20, thereby knowingly and willfully representing to United States Government
6  authorities that he sought to enter into the United States for the sole purpose of pursuing a full
7  course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN
8  knowingly had been, was and would be engaged in activities other than his course of study at
9  the University of Idaho, including, but not limited to, his involvement with the Islamic
10  Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a)
11  and 3238. (See previous paragraphs 5 and 6.)

12
13  ### COUNT THREE
### VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3237)

14
15  The previous numbered paragraphs one through twenty-eight are hereby re-alleged as
though set forth in full herein.

16
17  On or about August 11, 1999, within and as the same pertains to the District of Idaho,
SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and
18  subscribed as true to the United States a false statement with respect to a material fact in an
19  application and other document required by the immigration laws and regulations of the
20  United States, (2) knowingly presented such application and other document required by the
21  immigration laws and regulations of the United States which contained a materially false
22  statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and
23  claim, in that SAMI OMAR AL-HUSSAYEN, in entering into the United States, presented
24  to United States Government authorities a student visa procured by means of a false statement
25  and claim and other document containing such false statement and claim; in violation of Title
26  18, United States Code, Sections 1546(a) and 3237. (See previous paragraphs 5 through 7.)
27
28  12

## COUNT FOUR
## FALSE STATEMENT TO THE UNITED STATES
### (Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 7, 2000, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See previous paragraph 8.)

## COUNT FIVE
## VISA FRAUD
### (Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about July 7, ~~1999~~ within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the

13

1  United States and (2) knowingly presented such application and other document required by
2  the immigration laws and regulations of the United States which contained a materially false
3  statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student
4  visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby
5  knowingly and willfully representing to United States Government authorities that he sought
6  to enter into the United States for the sole purpose of pursuing a full course of study at the
7  University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was
8  and would be engaged in activities other than his course of study at the University of Idaho,
9  including, but not limited to, his involvement with the Islamic Assembly of North America;
10 in violation of Title 18, United States Code, Sections 1546(a) and 3238. (See previous
11 paragraph 8.)

12

13                          **COUNT SIX**
                           **VISA FRAUD**
14                  (Violation 18 U.S.C. 1546(a) and 3237)

15      The previous numbered paragraphs one through twenty-eight are hereby re-alleged as
    though set forth in full herein.
16

17      On or about August 25, 2000, within and as the same pertains to the District of Idaho,
18  **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and
19  subscribed as true to the United States a false statement with respect to a material fact in an
20  application and other document required by the immigration laws and regulations of the
21  United States, (2) knowingly presented such application and other document required by the
22  immigration laws and regulations of the United States which contained a materially false
23  statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and
24  claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented
25  to United States Government authorities a student visa procured by means of a false statement
26  and claim and other document containing such false statement and claim; in violation of Title
27  18, United States Code, Sections 1546(a) and 3237. (See previous paragraphs 8 and 9.)

28                              14

COUNT SEVEN
## FALSE STATEMENT TO THE UNITED STATES
(Violation 18 U.S.C. 1001(a)(2) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about January 14, 2002, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the Executive Branch of the United States Government, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation to authorities of the United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted Department of State (DOS) form DS-156 and form DS-157, thereby knowingly and wilfully failing and refusing to inform United States Government authorities of his involvement with the Islamic Assembly of North America and other entities; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See previous paragraphs 10 through 12.)

## COUNT EIGHT
## VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about January 14, 2002, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student

15

1  visa, signed and submitted Department of State (DOS) form DS-156 and form DS-157,

2  thereby knowingly and wilfully failing and refusing to inform United States Government

3  authorities of his involvement with the Islamic Assembly of North America and other entities;

4  in violation of Title 18, United States Code, Sections 1546(a) and 3238. (See previous

5  paragraphs 10 through 12.)

6

7                                  COUNT NINE
                    FALSE STATEMENT TO THE UNITED STATES
8                      (Violation 18 U.S.C. 1001(a)(2) and 3238)

9        The previous numbered paragraphs one through twenty-eight are hereby re-alleged as

10  though set forth in full herein.

11       On or about April 6, 2002, within and as the same pertains to the District of Idaho,

12  SAMI OMAR AL-HUSSAYEN, Defendant herein, in a matter within the jurisdiction of the

13  Executive Branch of the United States Government, knowingly and willfully made a

14  materially false, fictitious and fraudulent statement and representation to authorities of the

15  United States in relation to SAMI OMAR AL-HUSSAYEN's status as a foreign student in

16  the United States, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a

17  student visa, signed and submitted an Immigration and Naturalization (INS) form I-20,

18  thereby knowingly and willfully representing to United States Government authorities that he

19  sought to enter into the United States for the sole purpose of pursuing a full course of study at

20  the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been,

21  was and would be engaged in activities other than his course of study at the University of

22  Idaho, including, but not limited to, his involvement with the Islamic Assembly of North

23  America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238. (See

24  previous paragraphs 10 through 13.)

25

26

27

28                                        16

## COUNT TEN
### VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3238)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about April 6, 2002, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that SAMI OMAR AL-HUSSAYEN, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, SAMI OMAR AL-HUSSAYEN knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238. (See previous paragraphs 10 through 13.)

## COUNT ELEVEN
### VISA FRAUD
(Violation 18 U.S.C. 1546(a) and 3237)

The previous numbered paragraphs one through twenty-eight are hereby re-alleged as though set forth in full herein.

On or about May 9, 2002, within and as the same pertains to the District of Idaho, SAMI OMAR AL-HUSSAYEN, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an

17

1  application and other document required by the immigration laws and regulations of the

2  United States, (2) knowingly presented such application and other document required by the

3  immigration laws and regulations of the United States which contained a materially false

4  statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and

5  claim, in that SAMI OMAR AL-HUSSAYEN, in entering into the United States, presented

6  to United States Government authorities a student visa procured by means of a false statement

7  and claim and other document containing such false statement and claim; in violation of Title

8  18, United States Code, Sections 1546(a) and 3237.  (See previous paragraphs 10 through 14.)

9

10  Dated this ___ 13th ___ day of February, 2003.

11

12                              A TRUE BILL

13

14                              FOREPERSON

15

16

17

18  THOMAS E. MOSS
    UNITED STATES ATTORNEY

19

20  KIM R. LINDQUIST

21  Assistant United States Attorney

22

23  TERRY L. DERDEN

24  First Assistant United States Attorney
    Chief, Criminal Section

25

26

27

28                              18

EXHIBIT B

1

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | . | Case No. CR03-48-N |
| | . | |
| Plaintiff, | . | |
| | . | Boise, Idaho |
| vs. | . | March 11, 2003 |
| | . | 10:15 a.m. |
| SAMI OMAR AL-HUSSAYEN, | . | |
| | . | (Testimony of Michael Gneckow) |
| Defendant. | . | |
| | . | |

. . . . . . . . . . . . . .

VOLUME I OF II
DETENTION HEARING
BEFORE THE HONORABLE MIKEL H. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        MR. KIM R. LINDQUIST
MR. TERRY DERDEN
MS. STEPHANIE PELL
United States Attorney's Office
877 West Main Street, Suite 201
Boise, Idaho  83702

For the Defendant:      MR. DAVID Z. NEVIN
MR. SCOTT McKAY
Nevin, Herzfeld, Benjamin & McKay
P.O. Box 2772
Boise, Idaho  83701

COURT RECORDER:         TRANSCRIPTION BY:

Verlene Nelson            CANYON TRANSCRIPTION
U.S. District Court      P.O. Box 387
Caldwell, Idaho  83606

Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

2

Exhibit B.txt

I N D E X

| GOVERNMENT WITNESS: | PAGE | LINE |
|---|---|---|

GNECKOW, Michael James

| Direct Examination by Mr. Lindquist | 3 | 11 |
| Cross-Examination by Mr. Nevin | 134 | 14 |

E X H I B I T S

| GOVERNMENT EXHIBITS: | PAGE | LINE |
|---|---|---|

GX 3 - List of Web Sites

| Admitted | 37 | 6 |

GX 4 - Synopsis of Events

| Admitted | 122 | 18 |

GX 5 through 15 - Photographs

| Admitted | 50 | 7 |

GX 14 - Photograph

| Withdrawn | 52 | 7 |

GX 16 through 94 - Photographs
and Graphic Images

| Admitted | 65 | 15 |

DEFENDANT'S EXHIBITS:

DX A, B, C - Articles of
"Seattle PI"

| Admitted | -- | -- |

DX E - Letter of Muslim
Student Association

| Admitted | 185 | 15 |

3

Exhibit B.txt

```
 1                              (Proceedings in progress.)
 2              MR. LINDQUIST:  And with that, Your Honor, we would
 3      have Michael Gneckow testify.
 4              COURT:  Come forward and be sworn.
 5                      (MICHAEL JAMES GNECKOW is sworn.)
 6              CLERK: State your full name and spell your last name.
 7              WITNESS:  Full name is Michael James Gneckow.  The
 8      last name is spelled G-n-e-c-k-o-w.
 9              COURT:  You may proceed.
10              MR. LINDQUIST:  Thank you.
11                              DIRECT EXAMINATION
12      QUESTIONS BY MR. LINDQUIST:
13      Q.  You are a special agent with the FBI; is that correct?
14      A.  That is correct, sir.
15      Q.  And have been for how many years?
16      A.  For almost seven years, sir.
17      Q.  And your present duty station is where?
18      A.  The Coeur d'Alene, Idaho Resident Agency.
19      Q.  Can you give us an idea of just generally and briefly what
20      your present responsibilities are there?
21      A.  As special agent in the Coeur d'Alene RA, I'm also assigned
22      to the Inland Northwest Joint Terrorism Task Force.  My
23      responsibility is to investigate crimes that deal with both
24      domestic and international terrorism as well as other felony
25      crimes under Title 18.
```

                                                                      4

```
 1      Q.  We'll chat here in a moment about the international
 2      terrorism aspect of your responsibilities but first, prior to
```

Exhibit B.txt

3    becoming an FBI agent, were you a police officer?

4    A.   No, sir, but I was in federal law enforcement for

5    approximately ten years.

6    Q.   How so?

7    A.   I was a special agent with the Naval Criminal Investigative

8    Service and was assigned to various offices around the world.

9    Q.   Can you give us an idea of what you did in that capacity?

10   A.   As a special agent with the Naval Criminal Investigative

11   Service, it was my responsibility to investigate felony crimes

12   as they relate to Department of Navy personnel.

13   Q.   Did that also have to do with international terrorism at

14   times?

15   A.   Yes, sir, it did.   A large portion of what the Naval

16   Criminal Investigative Service does is deal with force

17   protection issues overseas, investigation of counter-

18   intelligence and international terrorism matters.

19   Q.   With that background, let's talk a bit about international

20   terrorism.   Of course the charges in this case relate to visa

21   fraud and false statements; is that correct?

22   A.   That is correct.

23   Q.   But your understanding is those charges are made within the

24   context of international terrorism; is that right?

25            MR. NEVIN:   I object to misleading.

                                                                      5

1            COURT:   I'll overrule the objection at this point for

2    foundation purposes.

3            WITNESS:   The question again, please?

                     Page 4

Exhibit B.txt

```
 4   BY MR. LINDQUIST:

 5   Q.   Those charges are made within the context of international

 6   terrorism; is that correct?

 7   A.   That is correct, sir.

 8   Q.   Can you give us an idea just the concept of international

 9   terrorism?  What does it mean from your perspective given what

10   you've told us about your duties?

11   A.   Well, international terrorism and terrorism in general is

12   generally used as a political tool used by organizations or

13   individuals in order to pursue or foster their own political

14   agenda.

15   Q.   Is this -- I'm sorry.

16   A.   I'm sorry.  Using terror as a political weapon.

17   Q.   And does that terror necessarily include violence?

18   A.   Yes, sir.  Well, not necessarily includes violence but most

19   times it does.

20   Q.   Are you familiar with the term "stateless nation" with

21   regard to terrorism?

22   A.   Yes, sir, I am.

23   Q.   What does that mean?

24        MR. NEVIN:  Judge, I'll object to the relevance of

25   this.
```

6

```
 1        COURT:  Response?

 2        MR. LINDQUIST:  The relevance is the -- as I've stated

 3   and as Agent Gneckow has testified is that these charges were

 4   made within the context of international terrorism.  We're

 5   laying the foundation for that and it is particularly pertinent
```

Page 5

Exhibit B.txt

6   for this Court's determination of whether or not the defendant

7   should be released pending trial.

8        COURT:  I'll overrule the objection.

9        WITNESS:   A stateless nation is a term that is

10  frequently used with international terrorism organizations.

11  The reason for that is because, most frequently, terrorist

12  organizations are not bound within the context of a regular

13  country or nation as we know it.  Rather international

14  terrorist organizations is generally made up from individuals

15  from various nations, from various countries and nationalities.

16  Therefore, the term "stateless nation" is in reference to a

17  group or rather organization that makes up the terrorist

18  organization itself.

19  BY MR. LINDQUIST:

20  Q.   Does international terrorism as you've described it have a

21  philosophical basis?

22  A.   Yes, it does.

23  Q.   Generally speaking, what is that philosophical basis as it

24  exists currently?

25  A.   Well, philosophically, I suppose the international

                                                              7

1   terrorism attempts to pursue through its own means pushing its

2   political or philosophical agenda where frequently you have a

3   clash of cultures and philosophies will frequently clash as

4   well and many times terrorism or terrorist acts are in

5   furtherance of a certain philosophy.

6   Q.   And in this particular case, does that have anything to do

Exhibit B.txt

7   with the religion of Islam?

8   A.   Yes, it does.

9   Q.   How so?

10   A.   When we talk about the religion of Islam in the context of

11   international terrorism, it's important to note that we're not

12   talking about anything other than a very strict minority; a

13   minority of extremists that use the religion of Islam as a

14   rationale for their terrorist activities.

15   Q.   And does that radical Islam have any particular perception

16   of the west, particularly the United States?

17   A.   Yes, it does.

18   Q.   What is that?

19   A.   Radical Islam, that espoused by the extremist factions of

20   Islam, view the United States and the west in general as a

21   threat to their own culture.   Any presence of the west,

22   particularly in the form of military troops, military presence

23   is perceived as being against the extremist tenets of Islam.

24   Q.   As a nation, albeit without geographical boundaries,

25   stateless if you will, is there nonetheless a need for members

8

1   or a reality of having members of that issue (inaudible)?

2   A.   Yes, absolutely.

3   Q.   And is there also an aspect -- a financial aspect to it?

4   A.   Yes, most definitely.

5   Q.   How so?

6   A.   As with any organization, any country, any nation, it has

7   to have finances.   It has to have infrastructure in order to

8   operate.

Page 7

Exhibit B.txt

9   Q.   Okay.  Are there organizational needs?

10  A.   Yes.

11  Q.   How so?

12  A.   Well, it's necessary for there to be at least a hierarchy.

13  There needs to be members.  There needs to be infrastructure.

14  There needs to be leadership.  So just like with a regular

15  country itself, there has to have -- there has to be a certain

16  hierarchy, communications, logistics.  Just a regular

17  infrastructure of any sort of organization.

18  Q.   Does recruitment of constituents or members play a role in

19  that phenomenon?

20  A.   Most importantly.  As a stateless nation with no actual

21  borders, with no actual civilian population to recruit from,

22  recruitment -- the recruitment tool or the recruitment methods

23  used are extremely important because this organization has to

24  draw new members from a variety of different nationalities,

25  from a variety of different areas.  So recruitment is most

9

1   definitely an important aspect of that.

2   Q.   Is education and indoctrination an aspect of that

3   recruitment?

4   A.   Yes.

5   Q.   How so?

6   A.   It's important in the recruitment phase for an organization

7   for that organization or that stateless nation to educate

8   prospective recruits.  Generally young -- young men, young

9   persons to educate them as to the ideals of the movement and

Exhibit B.txt

10    then once they're educated, then to further indoctrinate those

11    prospective recruits.

12    Q.   Is organization of those recruits also a factor?

13    A.   Yes, it is.

14    Q.   Motivation of them?

15    A.   Yes, most definitely.

16    Q.   And as far as any particular activities, instruction and

17    direction, is that also part of that phenomenon that you're

18    addressing?

19    A.   Yes.

20    Q.   Generally speaking, do computers play a role in what you've

21    just been talking about?

22    A.   Computers play an amazingly important role.  In today's --

23    in today's day and age with technology the way that it is,

24    communication is just so vastly important.  The world --

25    computers and the internet specifically have allowed the world

                                                                    10

1    to essentially be shrunken down to much smaller than it ever

2    was and the internet allows everyone, including terrorist

3    organizations, to be able to communicate to the widest audience

4    possible.

5    Q.   So generally speaking, it is therefore a mechanism of

6    recruitment and indoctrination; is that correct?

7    A.   Yes, it is.

8    Q.   And motivation and direction as far as activities

9    associated with that indoctrination?

10    A.   Yes, sir.

11    Q.   Talking about that infrastructure associated with

Page 9

Exhibit B.txt

12  international terrorism, does that relate to the infrastructure
13  of the United States in any way?
14  A.  It does.  I believe that the infrastructure of the United
15  States provides a great forum for organizations to come to our
16  country, to take advantage of our rules, our civil liberties
17  and to be able to recruit completely unimpeded.  Many of the
18  countries that members of terrorist organizations belong to are
19  often times oppressive and being able to get out and exercise
20  sessions where lectures can be shared, sometimes very violent
21  lectures would not be tolerated in many other countries.  Our
22  country does allow that to take place.
23  Q.  That international terrorist infrastructure then utilizes
24  the U.S. infrastructure; is that right?
25  A.  Yes, it does.

11

1  Q.  Is there a money aspect of that?
2  A.  Most definitely.
3  Q.  How so?
4  A.  The United States is a very affluent country and most
5  citizens in the United States want to provide donations.  They
6  want to support worthy causes.  It's a terrific forum for
7  organizations to come to the United States, solicit donations
8  that are ostensibly portrayed as being for good causes when in
9  many cases, that's not the case.
10  Q.  Well, let's talk about that.  Do these particular entities
11  have a generic name?
12  A.  Probably the most common form that these entities take is

Exhibit B.txt

13  in the form of charitable organizations.

14  Q.   By -- what do you mean by a charitable organization within

15  the context of what you're testifying to?

16  A.   Well, charitable organizations are nonprofit organizations

17  that purport to solicit funds, solicit donations and then in

18  turn provide some sort of service to the community at large, to

19  the world at large, whether that be in the form of feeding the

20  hungry, sheltering the homeless or providing any sort of

21  support, whether that be religious, cultural and so forth.

22  Q.   From the standpoint of international terrorism, however,

23  are those charitable organizations based upon your experience

24  sometimes used otherwise?

25  A.   Yes.

                                                              12

1  Q.   How?

2  A.   What we have discovered through lengthy investigations is

3  that in many cases, these charitable organizations do provide a

4  service worldwide.  They do clothe and feed and shelter but

5  we've also found that portions of the money that the donors

6  intend for the purposes that I've just stated are actually

7  siphoned off to more diabolical sort of ends.

8  Q.   That relates to international terrorism directly; is that

9  correct?

10  A.   That is correct.

11  Q.   And you will be testifying to us today about several of

12  those organizations within the context of this case; is that

13  right?

14  A.   Yes, sir.

Exhibit B.txt

15   Q.   Universities.   Do universities factor into the utilization

16   by international terrorism of the U.S. infrastructure?

17   A.   That is correct.

18   Q.   Based upon your experience generally speaking, how is that

19   so?

20   A.   Universities are -- there's a couple of ways that

21   universities are actually utilized.   One is that in my

22   discussions with fellow agents from the INS, the Immigration

23   and Naturalization Service, I've learned that perhaps the most

24   easy way to gain access and protracted stays in the United

25   States is through the receipt of student visas -- F-1 student

13

1   visas.

2            Universities are also a wonderful environment, based

3   on the academics that are shared there, for foreign nationals,

4   including those tied to terrorism, to come and learn from some

5   of our best instructors, some of our best professors some

6   highly technological sort of fields and many of those

7   potentially can be used against us.

8   Q.   You've already mentioned computer technology generally with

9   regard to international terrorism.   Does that also factor

10   specifically into international terrorism's utilization of the

11   American infrastructure?

12   A.   Most definitely.

13   Q.   How is that?

14   A.   And this goes back to our discussion a few moments ago

15   about the computers and the use of the internet by

Exhibit B.txt

16   organizations including terrorist organizations.  The computer

17   is not only a vehicle for massive communication but it's also

18   potentially a weapon.  And terrorist organizations recognize

19   that and are -- it's an important facet of their education to

20   be able to learn computer expertise, to maintain web sites, to

21   be able to maintain this infrastructure of communication world

22   wide.

23   Q.   And this particular case, as you will testify to, addresses

24   some of those issues specifically, universities, charitable

25   organizations and computer technology within the context of

14

1   terrorism; is that right?

2   A.   Yes, sir.

3   Q.   Let's talk about a particular aspect of international

4   terrorism.  Are you familiar with the term Al Quaida?

5   A.   Yes, sir, I am.

6   Q.   What does Al Quaida refer to?

7   A.   Al Quaida is a well known international terrorist

8   organization who's -- they're -- the person they look to for

9   leadership is embodied in the form of Usama Bin Laden.  It was

10   something that was created more or less in 1988 as a result

11   of -- in the aftermath let's say of the Russian invasion of

12   Afghanistan.

13   Q.   And so Usama Bin Laden played a particular role in its

14   creation; is that correct?

15   A.   Yes, he did.  He and others.

16   Q.   And others; is that right?

17   A.   That is correct.

Page 13

Exhibit B.txt

18  Q.  In addition to some that you will be testifying about in

19  this particular case, in particular two radical Saudi sheikhs;

20  is that correct?

21  A.  That's correct, sir.

22  Q.  And their names are?

23  A.  Their names are Salman Al-Ouda and Safar Al-Hawali.

24  Q.  Can you give us an idea of in recent history some violent

25  events associated with Al Quaida, conducted by Al Quaida if you

15

1  will?

2  A.  Yes, sir.

3           MR. NEVIN:  I object to the relevance.  We're not

4  going to hear that Sami has had contact with Mr. Usama Bin

5  Laden or that he supports his beliefs or any of it.  It's

6  surely to sensationalize the situation.  It's not relevant to

7  this detention hearing.

8           COURT:  Response?

9           MR. LINDQUIST:  Counsel errs.  There will be testimony

10  that the defendant has direct contact with individuals directly

11  associated with Mr. Bin Laden and does espouse and support Mr.

12  Bin Laden's beliefs and activities.  There will be evidence of

13  that.

14           COURT:  All right.  I'll overrule the objection at

15  this time. (Inaudible) I'm assuming all this information now is

16  general background information in the broadest context.  It

17  will be up to the Government through the presentation of their

18  evidence today to show a connection between the broad

Page 14

Exhibit B.txt

19  principles or things going on and tie into whether or not this

20  defendant either is a danger to the community or constitutes a

21  risk of flight.  There will have to be that tie made, that

22  evidence presented.

23          MR. LINDQUIST:  Very well.

24          COURT:  With that caveat, I'll overrule the objection.

25          MR. LINDQUIST:  Thank you.


                                                              16


1  BY MR. LINDQUIST:

2  Q.  Let's just mention briefly some of the incidents associated

3  with Al Quaida.

4  A.  The most recent incidence -- and please keep in mind there

5  are many incidents.  In August of 1998, Al Quaida was

6  responsible and claimed responsibility for the bombings of the

7  U.S. embassies in Kenya and Tanzania. In October of 2000, the

8  USS Cole was attacked by a small boat laden with explosives.

9  Again, Al Quaida took responsibility for that attack and of

10  course most recently as most people remember, there were the

11  attacks of September 11, 2001 on the World Trade Center and the

12  Pentagon.

13  Q.  What is Jihad in relation to what you're testifying to now?

14  A.  Well, the Jihad that I am going to refer to and it takes

15  many forms is armed Jihad and that is violence against those

16  who are enemies of Islam.

17  Q.  And does that relate to Al Quaida?

18  A.  Yes, it does.

19  Q.  How just briefly?

20  A.  Al Quaida promotes, supports -- supports in the form of

Exhibit B.txt

21   training, logistical support, et cetera, armed Jihad against
22   those who it perceives as being enemies of Islam.
23   Q.   Agent Gneckow, you've talked about the infrastructure of
24   international terrorism, Mr. Bin Laden as a leadership
25   component of that.   With regard to the search warrant affidavit

                                                                    17

1    I mentioned earlier, you heard me mention that, correct?
2    A.   Yes, I did.
3    Q.   Are you familiar with that search warrant affidavit?
4    A.   Yes, I am.
5    Q.   How are you familiar with it?
6    A.   I was principally responsible for preparing the affidavit
7    although I was not the affiant on it.
8    Q.   And for logistical reasons, you were not the affiant
9    presented directly to the Court but you in effect were the --
10   one of the sources or the authors of that, correct?
11           MR. NEVIN:   Objection.   Misleading.
12           COURT:   I'll overrule the objection for foundation.
13           WITNESS:   That is correct.
14   BY MR. LINDQUIST:
15   Q.   And in that search warrant affidavit, specifically at
16   paragraph 9, you reference statements attributable to Usama Bin
17   Laden as it relates to this Jihad -- the instigation of
18   violence, the international terrorism as it relates to the
19   United States and utilization of its infrastructure; is that
20   correct?
21   A.   That is correct.

Exhibit B.txt

22   Q.   And as an aspect of that, there's a component in there that

23   is -- that relates to (inaudible); is that right?

24   A.   Yes.

25   Q.   Explain that very briefly as background for this particular

18

1    statement associated with him.

2    A.   Martyrdom is something that's extremely important.  Suicide

3    operations, for example, are not something that he's done

4    lately.  There are conditions that must be met prior to

5    conducting such an operation and if those conditions are met,

6    then the individual who conducts the suicide operation can

7    achieve martyrdom.  Martyrdom is essentially a better life -- a

8    better life after death.

9    Q.   The quotation attributable to Mr. Bin Laden in paragraph 9

10   of the search warrant affidavit is referred to as his

11   declaration of war; is that correct?

12   A.   That is correct.

13   Q.   And it was found on a web site; is that right?

14          MR. NEVIN:   Object to it as leading.

15          COURT:   I'll overrule the objection for foundation.

16          WITNESS:   Yes.   The affidavit states that it was found

17   on a web site.

18   BY MR. LINDQUIST:

19   Q.   And the quotation attributable to him is recited in full in

20   that paragraph that the Court has; is that right?

21   A.   I'm sorry.   The question again?

22   Q.   That quote that's attributable to him is stated in full in

23   that particular paragraph; is that correct?

Exhibit B.txt

24    A.   Actually, I think this is just a portion.

25    Q.   Or a segment of it; is that right?


                                                              19


 1    A.   A segment, yes.

 2    Q.   But it is a full quote of a segment of that declaration of

 3    war; is that right?

 4    A.   That's correct.

 5    Q.   Just synopsize for us, if you will, what it is that Bin

 6    Laden is proclaiming here in this declaration of war by means

 7    of this web site without taking the time to read it because the

 8    Court has the text.  Just synopsize it for purposes of your

 9    testimony.

10    A.   Well, essentially, the text is -- is urging on operations

11    by the youths because it states that our youths believe in

12    paradise after death.  This is a component of martyrdom.  He

13    says in here -- it says in here that they will receive a

14    reward.  They will go to heaven, forgiveness for all of

15    their -- all their sins for lack of a better term.

16    Q.   So this is that motivation associated with terrorism?

17               MR. NEVIN:  Object to it as leading.

18               COURT:  Yes.  I'll sustain the objection.  So the

19    record it clear, while I understand that the web sites will be

20    an issue in this hearing, this one is not connected with this

21    defendant; is that correct?

22               MR. LINDQUIST:  Not directly, that is correct.

23               COURT:  All right.

24    BY MR. LINDQUIST:

                          Page 18

Exhibit B.txt
25    Q.   Paragraph 10 refers to another web site publication, does

                                                                    20

 1    it not?
 2    A.   Yes, it does.
 3    Q.   And in that particular publication that's quoted there, one
 4    term -- a particular term is used by Bin Laden in relation to
 5    terrorism; is that right?
 6    A.   That is correct.
 7    Q.   What's that term?
 8    A.   The term there is instigate and I think that's a very
 9    important term used on this --
10    Q.   Why is that important in this context?
11    A.   When we talk about terrorism in a general sense, it's not
12    just one or two individuals out there but rather it is -- it is
13    a large infrastructure; the stateless nation we referred to
14    before.  And an important component of that is the instigation
15    to commit acts.  The instigation to just act by itself which is
16    a component along with the recruitment, the indoctrination, the
17    education and as you proceed down this path, you eventually get
18    to the point where you're instigated to take action.
19    Q.   Paragraph 11 refers to a quote from a "Time" magazine
20    interview with Bin Laden; is that correct?
21    A.   That is correct.
22    Q.   Is also refers to instigation, does it not?
23    A.   Yes, it does.
24    Q.   Just read that bolded portion of that that refers to
25    instigation as it's found down in the affidavit.

                              Page 19

Exhibit B.txt

21

 1    A.   Well, the bolded portion reads, "If instigation for Jihad
 2    against the Jews and the Americans is considered to be a crime,
 3    then let history be a witness that I am a criminal.  Our job is
 4    to instigate and by the grace of God, we did that and certain
 5    people responded to this instigation."
 6    Q.   Paragraph 12 references what?
 7    A.   Paragraph 12 is the claim of responsibility by Usama Bin
 8    Laden following the September 11 attacks.
 9    Q.   Okay.  And does it bear some relationship to his
10    declaration of war and its reference to motivating youths to
11    perform these acts?
12    A.   Yes, it does.  That seems to be a constant thing in this is
13    the motivation of the youths, those that are being targeted for
14    recruitment.
15    Q.   There is a particular term in that first paragraph that is
16    significant, is it not, with regards to these activities --
17    these violent activities?
18    A.   And you're referring to the term "operations"?
19    Q.   Yes.   Why is that significant?
20    A.   Consistently through much of the literature that we read,
21    much of the investigative efforts that we take, the term
22    "operations" is a consistent -- is a consistent term when we're
23    dealing with violent Jihad.
24    Q.   Is there a connection between -- you've already referenced
25    that there is a connection between Bin Laden and the two

Exhibit B.txt

22

```
 1    radical sheikhs that you've mentioned, Al-Ouda and Al-Hawali;
 2    is that correct?
 3    A.   That's correct.
 4    Q.   Generally speaking, what is that association or what is
 5    that connection?
 6    A.   Sheikh Al-Hawali and Sheikh Al-Ouda, they were termed in
 7    the early 1990's as two of the awakening sheikhs.  They took a
 8    very radical stance against the Saudi government, a radical
 9    stance against western interests inside Arabia and against the
10    west and the United States in general.  Many of the tenets that
11    they have espoused are the same tenets espoused by Usama Bin
12    Laden and in fact, Usama Bin Laden in many of his publications
13    or interviews makes clear reference to Al-Hawali and Al-Ouda as
14    spiritual leaders of the movement.
15    Q.   As a matter of fact, in Bin Laden's declaration of war,
16    does he not reference both of these two men?
17    A.   Yes, he does.
18    Q.   In what context?
19    A.   At the time of the declaration of war which occurred in
20    August of 1996, both Al-Hawali and Al-Ouda were imprisoned in
21    Saudi Arabia by the Saudi government for the radical preachings
22    against the Saudi government.  Usama Bin Laden frequently took
23    it upon himself to make references to the two sheikhs, Al-Ouda
24    and Al-Hawali demanding their release, making statements about
25    how wrongfully they were imprisoned, things of that nature.
```

23

Exhibit B.txt

1    Q.   Is there public source information that indicates that Bin

2    Laden's turning towards violence more prolifically had

3    something to do with Al-Ouda and Al-Hawali?

4    A.   Yes.   There are some academics out there who believe that

5    as a result of the imprisonment of Al-Ouda and Al-Hawali, Usama

6    Bin Laden took a more violent turn.

7    Q.   Historically, have these two radical sheikhs, Al-Hawali and

8    Al-Ouda been outspoken in their proclamations of Jihad,

9    terrorism and violence against the west, particularly the

10   United States?

11   A.   Yes.   In fact, one of the sheikhs even made Jihad -- his

12   violent Jihad statements prior to the Gulf War, circa 1990.

13   Q.   And that was directed directly towards the United States;

14   is that correct?

15   A.   The United States and the west.

16   Q.   And the west.   Do these radical sheikhs talk about

17   martyrdom and suicide operations in conjunction with the

18   message that they proclaim?

19   A.   Frequently.   Many of their statements are very similar in

20   nature to the ones we referred to from Usama Bin Laden.

21   Q.   Do these two sheikhs also utilize web sites in conjunction

22   with their publications and proclamations?

23   A.   Most definitely.

24   Q.   Generally speaking, how so?

25   A.   Both of the sheikhs and others as well utilize the

24

Exhibit B.txt

1  internet, utilize various web sites to preach their form of

2  radical Islam to the widest audience possible.

3  Q.   Now, you mentioned a moment ago that Bin Laden made some

4  statements regarding the release of these two individuals from

5  imprisonment; is that correct?

6  A.   That is correct.

7  Q.   Would you explain that, their imprisonment and how that

8  relates to that statement?

9  A.   There were -- immediately prior and I think this is the

10 answer to your question.  Immediately prior to the embassy

11 bombings in 1998, there were some -- there were three letters

12 that were --

13 Q.   We'll go to that here in just a moment.

14 A.   Okay.

15 Q.   What I'm -- what I'm referring to is the arrest and release

16 of -- these two sheikhs were ultimately arrested; is that

17 correct?

18 A.   Oh, that is correct, yes.

19 Q.   By what authority, what country?

20 A.   They were arrested in 1994 by the Saudi Arabian government.

21 Q.   There are some particular dates associated with that event?

22 A.   Yes, there are.

23 Q.   Tell us about those dates and the significance of them.

24 A.   On September 11, 1994, Sheikh Al-Ouda and possibly Sheikh

25 Al-Hawali -- but definitely Sheikh Al-Ouda was called before

25

1  the Saudi ministry of the interior and was ordered to no longer

2  preach his -- or to no longer continue preaching against the

Page 23

Exhibit B.txt

3    Saudi ruling government.   Al-Ouda refused -- refused to sign a
4    declaration that was provided to him by the ministry and was
5    subsequently arrested as was Al-Hawali.
6    Q.   Approximately how long were the two imprisoned; do you
7    know?
8    A.   I believe they were released in 1999.
9    Q.   You were going to mention something about the embassy
10   bombings that related to these two men; is that correct?
11   A.   That is correct.
12   Q.   What about that?   Tell us about that.
13   A.   Immediately prior to the embassy bombings in 1998, there
14   were three letters that were faxed to three different media
15   outlets in Europe claiming responsibility for the bombings.   In
16   two of the letters, there were specific conditions that were
17   laid out as to how the violence would stop.   One of the
18   conditions -- and it was -- essentially the same condition in
19   each of these two letters called for the release of Sheikh
20   Al-Hawali, Sheikh Al-Ouda and the (inaudible) sheikh imprisoned
21   in the United States for the 1993 World Trade Center bombings.
22   Q.   Was there a similar demand made in conjunction with another
23   bombing in Saudi Arabia?
24   A.   Yes.
25   Q.   Tell us about that bombing briefly and the circumstances


26

1    associated with it.
2    A.   In 1995, there was a bombing of a National Guard armory --
3    or a National Guard facility in Saudi Arabia.   There was a fax
                              Page 24

Exhibit B.txt

4   to CNN claiming responsibility for that particular attack and

5   in that attack, it claimed that this act was in retaliation for

6   the imprisonment of Al-Hawali and Al-Ouda.

7   Q.   Another event that I would like you to address regarding a

8   house or a facility associated with Al Quaida, a search of that

9   and things found that related to the Sheikh Al-Ouda.

10   A.   Post 9/11 during a search of a former Bin Laden house in

11   Afghanistan, there were tapes of Sheikh Al-Ouda that were found

12   in the house.

13   Q.   And the tapes dealt with what generally speaking?

14   A.   They were generally motivational speeches, talking about

15   Jihad, talking about -- basically motivational sort of

16   speeches.   Lectures.

17   Q.   All right.   And finally in that regard, you mention that

18   these two sheikhs utilized web sites; is that correct?

19   A.   That is correct.

20   Q.   Are you familiar with a particular interview of Sheikh

21   Al-Ouda by a New York Times correspondent where web sites were

22   specifically discussed?

23   A.   Yes, I am aware of that.

24   Q.   And prior to discussing a web site, give us an idea of the

25   tenor of that interview and what it was that Al-Ouda was

27

1   expressing with regard to suicide attacks.

2   A.   Essentially what Al-Ouda was saying during this interview

3   with the New York Times was that suicide operations are

4   acceptable under certain conditions.   The conditions were

5   things to the effect of -- that you're at war, that the attack

Page 25

Exhibit B.txt

6    takes place against the enemy, that innocents are not targeted,

7    things like that.  There were a series of conditions that had

8    to be met before a suicide operation was acceptable.

9    Q.   Was there a discussion of the justification of suicide

10   operations philosophically?

11   A.   Yes.

12   Q.   Generally speaking, what was the philosophical

13   justification?

14   A.   Well, the justification to Al-Ouda was suicide operations

15   are fine because this is war.

16   Q.   In particular, internet web site was referenced by Sheikh

17   Al-Ouda in that interview; is that correct?

18   A.   That is correct.

19   Q.   And that web site is what?

20   A.   That web site is Islam Today.

21   Q.   And does that particular web site bear on your

22   investigation of the defendant in this particular case,

23   generally speaking?

24   A.   Yes, it does.

25   Q.   And how so generally speaking does it bear on the

28

1    defendant?

2    A.   Our investigation has looked into numerous web sites that

3    the defendant has been involved in, one of which is Islam

4    Today.

5    Q.   Let's talk about the defendant from a prospective of your

6    investigation and this information is also contained in the

Exhibit B.txt

7   affidavit as you know.   The defendant began his studies here in

8   the United States, at least as far as your investigation is

9   concerned, where?

10  A.   He actually began working on his master's degree at Ball

11  State University in Muncie, Indiana on or about August, 1994.

12  Q.   And from there, his studies took him where?

13  A.   He received his master's degree at Ball State.   Returned to

14  Saudi Arabia and a couple years later came back to the United

15  States as a J-1 -- on a J-1 visa which he's got a student visa,

16  an F-1 student visa.   A J-1 visa is an exchange visitor as I

17  understand it from my INS counterparts.   And at that time, he

18  was at Southern Methodist University and was providing -- was

19  acting as a visiting professor I believe, something to that

20  effect.

21  Q.   And that's spelled out in paragraph 16 of that affidavit;

22  is that correct?

23  A.   That is correct.

24  Q.   Ultimately, the defendant ended up at the University of

25  Idaho, correct?

                                                              29

1   A.   That is correct.

2   Q.   How did that come about?

3   A.   The defendant made application to the University of Idaho

4   for acceptance into the Ph.D. program for computer science.

5   Q.   And ultimately began studying there; is that right?

6   A.   That's correct.   In the spring semester of '99 if I

7   remember right.

8   Q.   And information that corresponds to that is found in

Exhibit B.txt

 9  paragraph 17; is that right?

10  A.   That is correct.

11  Q.   Let's talk about the University of Idaho computer program.

12  Have you looked into that as part of your investigation at

13  least to a certain extent?

14  A.   Yes, sir, I have.

15  Q.   First of all, what was the focus of the defendant's

16  doctoral dissertation?

17  A.   The focus is on computer security, intrusion defense

18  methodology, things of that nature.

19  Q.   Generally speaking, what did -- what does the University of

20  Idaho program have to offer as far as advanced computer

21  studies?

22  A.   The University of Idaho was designated by the National

23  Security Agency in 1998 or 1999 as a center for excellence with

24  regard to their computer science program.  They have at least

25  one extremely competent person on their faculty who is renowned

                                                                30

 1  throughout government circles as being a forefront of computer

 2  security, instrusion detection techniques and so on.  And as a

 3  result of the University of Idaho's designation as a center for

 4  excellence, they were able to apply for and receive grants from

 5  the federal government to be part of the federal government's

 6  cybercorps program.

 7  Q.   And what's the significance of that as far as projects or

 8  activities involved in at the University of Idaho?

 9  A.   As both a center for excellence and as having cybercorps

                              Page 28

Exhibit B.txt

10   program at the university, it enabled the university to work on

11   sensitive sometimes classified projects on behalf of the

12   federal government.

13   Q.   Did your investigation reveal that there were limitations

14   necessarily associated with that?

15   A.   Yes.   The program at the University of Idaho as I

16   understand it has both the CSDS program which is the center

17   for -- I probably don't have the exact name.   But it works

18   alongside with the cybercorps program in essentially teaching

19   students both sets of programs the same methodology with regard

20   to computer security, instrusion detection, et cetera.   The

21   cybercorps portion of the program is a scholarship program that

22   only U.S. citizens can access.   But essentially, they're taught

23   the same thing with the exception of some very sensitive

24   programs.

25   Q.   So as a foreign student, the defendant would not have been

                                                                    31

1   able to participate in the cybercorps programs; is that

2   correct?

3   A.   That's not quite correct.   He could not participate in the

4   cybercorps program as far as being a scholarship student and he

5   would not necessarily be able to participate on sensitive

6   programs.   However, other programs with lesser sensitivities

7   could potentially have been accessed by the defendant.

8   Q.   And otherwise was the full breadth and depth of the

9   University of Idaho program available to him?

10   A.   More or less with the exception of the sensitive programs.

11   Q.   And as far as access to those American students that did

Exhibit B.txt

12   participate in those programs -- those sensitive programs,

13   there was nothing to prevent his association with them; is that

14   correct?

15   A.   No.   And in fact my understanding is that they all worked

16   alongside one another anyway.

17   Q.   Did your investigation allow you to become somewhat

18   familiar with the University of Idaho computer network?

19   A.   Yes, it did.

20   Q.   How does that relate to the computer program that Mr.

21   Al-Hussayen participated in?

22   A.   I'm not quite sure I understand.

23   Q.   Does the computer network have something to do with his

24   studies there?

25   A.   Yes.

                                                                    32

1    Q.   How?

2    A.   Although my understanding is that much of his project work

3    was not necessarily tied to the network as a computer science

4    Ph.D. candidate, the network was something I'm sure that he

5    would have access on a routine basis.

6    Q.   Tell us about that network just generally.   An advanced

7    network?

8    A.   Very advanced.

9    Q.   What else can you tell us about it just generally to give

10   us some idea?

11   A.   The University of Idaho network is a very fast, very

12   sophisticated, very powerful network.   It is -- for lack of a

Page 30

Exhibit B.txt

13    better term, it's a back bone of much of the activity that
14    occurs in that area.
15    Q.   And as far as its activity with other networks, what did
16    your investigation reveal?
17    A.   It's directly connected to many of the other very large
18    universities in the northwest.
19    Q.   We'll come back and revisit that area in a moment but in
20    the meantime, let me ask you some questions about another
21    aspect of the affidavit and we're referring specifically to
22    paragraph 29 as a reference for those that have a copy and the
23    defendant's outside activities, if you will, with regard to web
24    site work.   Are you with me?
25    A.   Yes, I am.

                                                          33

1    Q.   Can you just give us an idea generally speaking did your
2    investigation show that the defendant -- whether or not the
3    defendant was involved in activities outside of his studies at
4    the University of Idaho that had to do with web sites?
5    A.   Yes.
6    Q.   Generally speaking, what did you find?
7    A.   What we found and we continue to find are extensive ties,
8    extensive links either through as a technical advisor, as the
9    maintainer, as the creator of numerous web sites.
10    Q.   And web sites associated with any particular entities or
11    individuals?
12    A.   Yes.
13    Q.   For example?
14    A.   We have discovered web sites -- multiple web sites that are

Exhibit B.txt

15    tied to a charitable organization located in the Detroit,

16    Michigan area.

17    Q.    What is that organization?  What's the name of it?

18    A.    That organization is the Islamic Assembly of North America.

19    Q.    And its acronym is IANA customarily; is that correct?

20    A.    That is correct.

21    Q.    And generally speaking, what did your investigation reveal

22    as far as his web site activities in relation to that charity?

23    A.    Various web sites that we've looked at have the defendant's

24    stamp on them, whether it's in -- whether it was a web site he

25    created, whether it's a web site that he appears on the

34

1     technical advisory committee for, whether -- whether he is a

2     technical advisor.  Numerous web sites to that fashion.

3     Q.    Have you been able to identify all of the web sites that

4     bear his stamp if you will in your opinion?

5     A.    I seriously doubt we've identified all of them.

6     Q.    But you have identified some; is that correct?

7     A.    Yes.

8     Q.    And we'll get to those more in just a moment.  But first of

9     all, let's talk about the Islamic Assembly of North America.

10    Can you tell us a little bit about that and this roughly

11    corresponds to paragraph 30 of the affidavit?

12    A.    Yes.  My understanding is that the Islamic Assembly of

13    North America or IANA was incorporated in 1993 in Colorado.  It

14    is a nonprofit organization and it -- its purported existence,

15    its purported function is that of the spread of Islam or Da'wa.

Page 32

Exhibit B.txt
16  They use -- they make extensive use of web sites to communicate

17  their messages around the globe.  They solicit donations.  They

18  receive quite a bit of money and another aspect of their

19  function is they generally have an annual conference in which

20  guest speakers are invited, members of other charitable

21  organizations attend and it's generally considered to be a big

22  deal.

23  Q.   Based upon your investigation, can you give us an idea

24  roughly when the investigation shows that the defendant began

25  having these ties with the Islamic Assembly of North America?

                                                                    35

1   A.   We have ties based on web site activity that begins right

2   about 1998.  Circa '98 I believe.  And we have other ties to

3   him in other areas, financial, in other ways as well.

4   Q.   At some point in time, did you discover a formal

5   demonstration of his tie to the IANA?

6   A.   As a matter of fact, I did.  We were able to access Idaho

7   Department of State records and discovered that Mr. Al-Hussayen

8   is the registered agent for the IANA in Idaho.

9   Q.   And what was the date associated with that initial

10  registration that you found?

11  A.   That was May 11, 2001.

12  Q.   And has your investigation shown activities attributable to

13  the defendant that seem to be consistent with that agency?

14  A.   Yes.

15  Q.   You've mentioned the web sites that bear the defendant's

16  stamp, if you will, and associated with the IANA.

17           MR. LINDQUIST:  Your Honor, I would like the witness

Exhibit B.txt

18    to reference Exhibit 3.  Counsel has a copy.  Your Honor, you

19    should have a copy there and I believe the agent also has a

20    copy of that.

21            COURT:  Any objections to referencing this exhibit for

22    illustrative purposes?

23            MR. NEVIN:  Not to referencing it, no, sir.

24            COURT:  All right.  You may proceed with Exhibit 3.

25    BY MR. LINDQUIST:

36

1     Q.   Take a look at that Exhibit 3.  Tell us what that is.

2     A.   Exhibit 3 is a list of various web sites that we have

3     identified to date that are linked in one fashion or another to

4     the defendant.

5     Q.   And it consists of three columns; is that correct?

6     A.   That is correct.

7     Q.   The first column is the internet web site name, correct?

8     A.   Yes.

9     Q.   What's the second column?

10    A.   The second column is the actual date that the web site was

11    created or registered.

12    Q.   Okay.  And the third column?

13    A.   The third column is just a quick reference to who the web

14    site is registered to and what sort of ties they have to Mr.

15    Al-Hussayen.

16    Q.   So it's a shorthand for those ties; is that correct?

17    A.   That is correct.

18    Q.   And a more -- a fuller statement of that is contained in an

Page 34

Exhibit B.txt

19   affidavit paragraph 33 further referenced by the Court; is that

20   correct?  Double check.

21   A.   Yes.

22   Q.   All right.  Let's talk about some of the things you found

23   in conjunction with some of these web sites.

24        MR. LINDQUIST:  First of all, Your Honor, I would

25   offer for purposes of this hearing that Exhibit 3.

37

1        COURT:  All right.  It will be admitted for

2    illustrative purposes of the witness's testimony.  It's

3    referred to also in paragraph 33 (inaudible) as near as I can

4    tell (inaudible).

5        MR. LINDQUIST:  Thank you.

6            (Government Exhibit No. 3 admitted.)

7    BY MR. LINDQUIST:

8    Q.   Agent Gneckow, take a look at web site no. 9 that's listed

9    there.  Do you see that?

10   A.   Yes, I do.

11   Q.   What is that web site?

12   A.   That web site is Al-Asr.ws.

13   Q.   And Al-Asr, what's the significance of that from the

14   standpoint of the defendant's involvement with these web sites?

15   A.   The significance of that particular web site is that the

16   defendant, Mr. Al-Hussayen, is the sole registrant of that web

17   site.

18   Q.   All right.  And Al-Asr, does that refer to a particular

19   entity?

20   A.   Yeah.  There is a Saudi Arabian company named Dar Al-Asr

Exhibit B.txt

21   and the Al-Asr web sites -- it's my understanding that the

22   Al-Asr web sites are the official web sites for that company.

23   Q.   And your investigation showed that the defendant was

24   directly linked to those web sites at Dar Al-Asr -- within the

25   context of those web sites; is that correct?

38

1          MR. NEVIN:   I'm going to object to the question, Your

2    Honor, as being leading and I don't understand what he means

3    either with respect to (inaudible).

4          COURT:   Why don't you rephrase the question.

5          MR. LINDQUIST:   Maybe a clarification but the rules of

6    evidence don't apply.

7          COURT:   That's correct.   I have to be able to

8    understand the question that's being posed and understand the

9    answer so --

10         MR. LINDQUIST:   Okay.   So you did not understand the

11   question, Your Honor?

12         COURT:   No.

13   BY MR. LINDQUIST:

14   Q.   Agent Gneckow, does Dar Al-Asr have something to do with

15   the defendant's involvement with these web sites?

16   A.   Yes.

17   Q.   What is that?

18   A.   When you -- when you access Dar Al-Asr records even over

19   the internet, Mr. Al-Hussayen's address and frequently his

20   name, telephone number, e-mail address are all associated with

21   web sites that belong to Dar Al-Asr.

Page 36

Exhibit B.txt

22  Q.  What address do you see most commonly as far as the

23  defendant is concerned?

24  A.  The address that we generally see is 311 West Sweet Avenue,

25  Apartment 6, Moscow, Idaho, 83843.

39

1   Q.  With regard to that web site, Al-Asr.ws, do you know when

2   that web site was created?

3   A.  Yes.  That was web site was created on September 11, 2000.

4   Q.  By whom specifically?

5   A.  It was created by Mr. Al-Hussayen.

6   Q.  Okay.  And sometime after September 11 of 2000 but before

7   September 11 of 2001, did a particular publication occur or

8   appear on that web site that related to September 11, 2001?

9   A.  That's correct.

10  Q.  Can you -- and that publication at least in part is

11  portrayed in paragraph 20 -- excuse me.  In paragraph 34 of the

12  affidavit; is that correct?

13  A.  That is correct.

14  Q.  Would you read that for us, please?

15  A.  The entire paragraph or --

16  Q.  Just read the quoted portion beginning with the second

17  part.

18  A.  The second part is the rule --

19  Q.  Let me interrupt you just to make sure we're clear.  This

20  is what appeared on the web site created by the defendant; is

21  that correct?

22  A.  That's correct.

23  Q.  And this was -- approximately when did it appear in

Page 37

Exhibit B.txt

24   relation to September 11, 2001?

25   A.   It occurred either May or June of 2001.   So approximately

40

1    four or five months prior to the September 11 attacks.

2    Q.   All right.   Go ahead and read that.

3             MR. NEVIN:   Judge, may I inquire in aid of objection?

4             COURT:   Yes.

5             MR. NEVIN:   When you use the term "create," you don't

6    mean that Mr. Al-Hussayen wrote this language that you're about

7    to read, do you?

8             WITNESS:   Do I answer that?

9             MR. NEVIN:   It was addressed to you.

10            COURT:   Yes.

11            WITNESS:   No, I did not say that he wrote it.

12            MR. NEVIN:   When you use the term "create" referring

13   to the web site itself?

14            WITNESS:   That's correct.

15            MR. NEVIN:   And it's your testimony that he created

16   this web site?

17            WITNESS:   He is listed as the sole registrant for the

18   web site.

19            MR. NEVIN:   Is that the same as creation of the web

20   site?

21            WITNESS:   It can mean the same.

22            MR. NEVIN:   But it doesn't necessarily?

23            MR. LINDQUIST:   Your Honor, I believe this is

24   cross-examination and not aid of --

Page 38

Exhibit B.txt
25          COURT:  I'll allow counsel to (inaudible).


41


1           MR. NEVIN:  And you don't know whether that's the case
2    in this situation.
3           WITNESS:  I don't believe I know that at this point,
4    no.
5           MR. NEVIN:  But in any event, this wasn't written by
6    Mr. Al-Hussayen?
7           WITNESS:  No.  As a matter of fact, this article was
8    written by another radical Saudi sheikh by the name of Homed
9    Ali (phonetic).
10          MR. NEVIN:  What do you mean by another?
11          MR. LINDQUIST:  Your Honor, now we're into
12   cross-examination.  We're beyond what he needs in the scope of
13   direct.
14          COURT:  I'll allow this last question and then --
15          MR. NEVIN:  What do you mean by another?
16          WITNESS:  In addition to Salman Al-Ouda and Safar
17   Al-Hawali.
18          MR. NEVIN:  That's all I have.
19          COURT:  All right.
20   BY MR. LINDQUIST:
21   Q.  Read that to us, will you?
22   A.  "The second part is the rule that the (inaudible) which
23   means holy warrior must kill himself if he knows that this will
24   lead to killing a great number of the enemies.  And that he
25   will not be able to kill them without killing himself first or

Page 39

Exhibit B.txt

42

1   demolishing a center vital to the enemy or its military force

2   and so on.   This is not possible except by involving the human

3   element in the operation.   In this new era, this can be

4   accomplished with the modern means of bombing or bringing down

5   an airplane on an important location that will cause the enemy

6   great losses."

7   Q.   Let's talk about the chronology associated with this

8   publication, the creation of the web site and other events.

9   You've already testified to Bin Laden's declaration of war; is

10  that correct?

11  A.   That's correct.

12  Q.   And that occurred approximately when?

13  A.   I believe that was August 25, 1996.

14  Q.   And you've testified to the web site registration by the

15  defendant of Al-Asr.ws in which this appears; is that right?

16  A.   That is correct.

17  Q.   And the publication itself in May or June of 2001; is that

18  correct?

19  A.   That is correct.

20  Q.   In conjunction with the events of September 11, did your

21  investigation reveal anything about the defendant's activities

22  in the Moscow area in relation to a bank?

23  A.   Yes, it did.

24  Q.   Tell us about that.

25  A.   More specific question?

Page 40

Exhibit B.txt

1  Q.   In specific regard to the date September 11 of 2001, did

2  your investigation identify some activities of the defendant

3  with regard to a banking institution?

4  A.   Yes.

5  Q.   Tell us about that.

6  A.   It's my understanding based on our investigation that the

7  defendant last set foot inside the main branch of the U.S. Bank

8  in Moscow, Idaho on September 4, 2001.

9  Q.   What's the significance of September 4 from the standpoint

10  of September 11 given your experience and this investigation

11  specifically?

12  A.   Activity involving various individuals that are currently

13  under investigation seem to almost halt as of September 4,

14  September 5 time frame.

15  Q.   What happened on September 11 as far as he was concerned

16  and the bank?

17  A.   On September 11, 2002, a year after the terrorist attacks,

18  the defendant was first seen since -- over a year later

19  entering the bank and making a cash deposit.

20  Q.   So you have the November -- the September 11, 2001 events

21  and then a year later, he next appears in the bank following

22  the September 4, 2001 appearance; is that correct?

23  A.   Right.   On the anniversary.

24  Q.   And then you also mention the Bin Laden declaration of

25  acceptance of responsibility for those events.

Exhibit B.txt

```
 1          COURT:  Before we leave that area, is it your
 2    testimony that the defendant was seen at the main bank on
 3    September 4, 2001?
 4          WITNESS:  Yes.
 5          COURT:  You may proceed.
 6    BY MR. LINDQUIST:
 7    Q.   In conjunction with the arrest of the defendant and as part
 8    of this search warrant affidavit, search warrants were
 9    executed; is that correct?
10    A.   That is correct.
11    Q.   And just generally speaking, tell us how those search
12    warrants were obtained.
13    A.   The search warrants were obtained by applying for the
14    search warrants preparing an affidavit and presenting those in
15    front of a U.S. magistrate.  The search warrants were obtained
16    and then were subsequently executed.
17    Q.   And executed on what day?
18    A.   They were executed on February 26, 2003.
19    Q.   Where were the search warrants executed?
20    A.   There were four separate locations.  One was the
21    defendant's home at 311 West Sweet, Apartment 6, Moscow, Idaho.
22    A second search warrant was executed for the defendant's
23    vehicle, a 1992 Pontiac Bonneville.  A third one was served at
24    an apartment on D Street, 504 and one-half D Street which is on
25    the corner of Van Buren and D in Moscow, Idaho and the fourth
```

45

Page 42

Exhibit B.txt

1  and final warrant was served at the engineering isotope lab on
2  the University of Idaho campus where the defendant's work
3  station was located.
4  Q.   When you say work station, did that include a computer?
5  A.   Yes, it did.
6  Q.   Was a search done of the contents of that computer?
7  A.   A cursory examination only.
8  Q.   Okay.  And can you tell us just briefly how that search of
9  the computer was conducted, how it was done?
10 A.   The computer was transported to our Pocatello information
11 technology center where some intelligence analysts in
12 conjunction with our computer analysis response team conducted
13 a cursory examination of various files on that computer.
14 Q.   Okay.  Can you give us an idea generally speaking how much
15 material was identified on that computer?  First of all, the
16 size of the hard drive.
17 A.   The hard drive was an 80 gigabyte hard drive which to put
18 in comparison, that computer at that location at the University
19 of Idaho would normally have been only a 3 or 4 gigabyte hard
20 drive.
21 Q.   What did you find as far as the amount of material
22 contained on that large hard drive?
23 A.   In the cursory examination which probably was only 29,000
24 files resulted in the identification of numerous photographs --
25 photo images.

46

1  Q.   Can you give us an idea, recognizing that it has been a
2  cursory review, of the number of photographic images that were
Page 43

Exhibit B.txt

3    recovered from the hard drive or that are on that hard drive?

4    A.   Thousands.   Thousands of photographs.

5    Q.   Were some retrieved for purposes of this case, for purposes

6    of this hearing?

7    A.   Yes, some were retrieved.

8    Q.   Take a look, if you will, at Exhibits 5 through 15 that you

9    have there in front of you.   Do you see those?

10   A.   Yes, I do.

11   Q.   Are those photographs taken from the hard drive that you've

12   just referenced?

13   A.   Yes.

14   Q.   The defendant's hard drive there in the isotope lab; is

15   that correct?

16   A.   That is correct.

17   Q.   And these are just a few of thousands of other pictures

18   that are on that hard drive; is that right?

19   A.   Yes.

20   Q.   Can you give us an idea generally speaking of what

21   collectively these -- this group of photographs depict?

22   A.   Exhibit 5 through --

23   Q.   5 through 15.   Go ahead and just pull those out.

24   A.   Exhibits 5 through 14 are all photographic or artistic

25   renditions of the attacks on the World Trade Center or

47

1    photographs of the World Trade Center in New York.

2    Q.   And 15?

3    A.   The 15th is an aerial view of the Pentagon building in

Page 44

Exhibit B.txt
```
 4  Washington D.C.
 5          MR. LINDQUIST:  Your Honor, I offer these for purposes
 6  of this hearing.
 7          COURT:  Any objection to Exhibits 5 through 15?
 8          MR. NEVIN:  Can I have a moment, Your Honor?
 9          COURT:  All right.
10          MR. NEVIN:  May I inquire in aid of an objection, Your
11  Honor?
12          COURT:  All right.  It will be solely for foundation,
13  how they were obtained, et cetera.
14          MR. NEVIN:  Yes.
15          COURT:  All right.
16          MR. NEVIN:  Yes.
17                              EXAMINATION
18  QUESTIONS BY MR. NEVIN:
19  Q.  Did you personally seize the computer?
20  A.  No, sir, I did not.
21  Q.  Have you been told where it was seized from?
22  A.  Yes.
23  Q.  And it was seized from an office area?
24  A.  Yes, sir.  It was seized from the engineering isotope lab.
25  Q.  And this is an office area that's utilized by -- only by
```

                                                                48

```
 1  Mr. Al-Hussayen?  Is that your testimony?
 2  A.  No.  It's my understanding that he shares that office with
 3  another person.
 4  Q.  And do you know the history of this computer?  Do you know
 5  who it's been used by, how it arrived at that location, who put
```
                              Page 45

Exhibit B.txt

6    those images on the computer, matters of that sort?

7    A.   No, sir.   Those items are still under investigation.

8    Q.   Isn't there a way that you can look at a computer and tell

9    who's accessed the particular files on the computer and when

10   they were last accessed?

11            MR. LINDQUIST:   Your Honor, this is really

12   cross-examination.

13            WITNESS:   Sir, I'm not a technical expert.

14            COURT:   I'll allow counsel to finish.

15            WITNESS:   Sir, I'm not a technical expert in that

16   manner.

17   BY MR. NEVIN:

18   Q.   Go ahead.   Sorry.

19   A.   The answer is I'm not a technical expert when it comes to

20   computer analysis.

21   Q.   You know that to be the case though.   You can determine

22   when files have been accessed.

23   A.   Sir, I refer those questions to the technical guys.

24   Q.   You can't tell us as you sit here on the witness stand that

25   Mr. Al-Hussayen has ever looked at these images, can you?

49

1    A.   Sir, that computer was seized from his work station area

2    and I do know that he accessed that computer.

3    Q.   That's not my question.

4            MR. LINDQUIST:   Now we're in cross-examination, Your

5    Honor.

6            MR. NEVIN:   I think this is foundational to whether

Exhibit B.txt

 7  these come into evidence.

 8          MR. LINDQUIST:  No, it isn't.  This is

 9  cross-examination.

10          COURT:  I'll allow him to finish up this short line of

11  inquiry and then you can state an objection to the evidentiary

12  introduction if you have one.

13  BY MR. NEVIN:

14  Q.  Then my question was you can't testify as you sit on the

15  witness stand today that Mr. Al-Hussayen ever looked at these

16  images, can you?

17          MR. LINDQUIST:  And I'll object to the relevancy of

18  that.

19          COURT:  Do you have an objection to the (inaudible)?

20          MR. NEVIN:  Yeah, I object that they've not been

21  adequately tied to Mr. Hussayen to be admitted into evidence.

22          COURT:  I'll overrule the objection.  Counsel, I plan

23  on going till noon today if that works with everyone before we

24  take that break.  Is that agreeable?

25          MR. NEVIN:  Yes, sir.  Would we start up again at

50

 1  1:00 -- 1:30?

 2          COURT:  At 1:00.

 3          MR. NEVIN:  At 1:00.

 4          COURT:  Yes.  All right.  You may proceed.  Exhibits 5

 5  through 15 will be admitted.

 6          MR. LINDQUIST:  Thank you.

 7          (Government's Exhibit Nos. 5 through 15 admitted.)

 8                  CONTINUED DIRECT EXAMINATION
                        Page 47

Exhibit B.txt

```
 9   QUESTIONS BY MR. LINDQUIST:

10   Q.   Very quickly and briefly, what does Exhibit 5 depict?

11   A.   Bear with me for one second.

12   Q.   Do you have them there?

13   A.   I'm sure I have it here somewhere.  Here we go.  Exhibit 5

14   is what appears to be a photograph of the World Trade Center

15   after it had collapsed.

16   Q.   Exhibit 6?

17   A.   Exhibit 6 is what appears to be a computer generated image

18   of the World Trade Center depicting where the first and second

19   impacts of the aircraft hit the towers.

20   Q.   Exhibit 7?

21   A.   Exhibit 7 is a photograph of the World Trade Center sky

22   line prior to the attack -- well, at some time prior to the

23   attack.

24   Q.   Exhibit 8?

25   A.   Exhibit 8 appears to be a dual image of the second aircraft
```

51

```
 1   before -- immediately before and right after it crashed into

 2   the towers.

 3   Q.   Exhibit 9?

 4   A.   Exhibit 9 are two photographs.  A larger photograph of the

 5   World Trade Center undamaged and then an inserted photograph of

 6   the trade centers on fire.

 7   Q.   Exhibit 10?

 8   A.   Exhibit 10 again appears to be a computer generated image

 9   of the World Trade Centers showing in stages how the aircraft
```

Page 48

Exhibit B.txt
10  impacted into the towers.

11  Q.  Exhibit 11?

12  A.  Exhibit 11 is a photograph -- what appears to be a

13  photograph of the World Trade Centers after they had collapsed

14  and rescue personnel were on the scene.

15  Q.  12?

16  A.  Exhibit 12 is a photograph of the World Trade Centers taken

17  from below.  It shows that both towers are on fire.

18  Q.  13?

19  A.  13 is another image of the trade centers from a distance

20  with the Empire State Building in front of it that show the

21  towers on fire.

22  Q.  14?

23  A.  14 appears to me to be the same --

24  Q.  As a previous one, doesn't it?

25  A.  As a previous one.

                                                              52

 1  Q.  No. 8?

 2  A.  Yes.  That's the same as Exhibit 8.

 3          MR. LINDQUIST:  Given that, Your Honor, I would move

 4  to withdraw No. 14 because it's already depicted in -- by

 5  Exhibit 8.

 6          COURT:  All right.  It will be withdrawn.

 7              (Government Exhibit No. 14 withdrawn.)

 8  BY MR. LINDQUIST:

 9  Q.  And then 15?

10  A.  And 15 is an aerial photograph of the Pentagon building.

11  Q.  Is your testimony that these are the only photographs

                        Page 49

Exhibit B.txt

12  depicting the World Trade Center in conjunction with the events

13  of 9/11 on that computer?

14  A.   By no means whatsoever.

15  Q.   Why do you say that?

16  A.   The cursory examination of the photographic images on that

17  computer revealed thousands and thousands of photographs.  I

18  can't even begin to guess how many were of the World Trade

19  Center.

20  Q.   Let's continue talking about the defendant's web site

21  activities.  Specifically, did your investigation show any

22  connection between the defendant and the sheikhs that you've

23  mentioned, Al-Ouda and Al-Hawali?

24  A.   Yes.

25  Q.   Tell us what those connections are.


                                                                53

1  A.   Well, the investigation has revealed numerous connections

2  between the defendant and Sheikh Al-Ouda and Sheikh Al-Hawali.

3  Q.   Let's just talk web sites for right now.

4  A.   As far as web sites are concerned, the defendant has been

5  involved in the maintenance, technical advisement for web --

6  multiple web sites for both Sheikh Al-Ouda and Sheikh

7  Al-Hawali.

8  Q.   Take a look at Exhibit No. 3 which is that list of web

9  sites associated with the defendant.  Do you have that?

10  A.   Yes, I do.

11  Q.   Can you point out the number of the web site that is

12  directly attributable to one of those sheikhs or those two

                            Page 50

Exhibit B.txt

13   sheikhs?

14   A.   Islam Today for example is --

15   Q.   Number --

16   A.   Is no. 8.

17   Q.   Okay.

18   A.   Islam Today is Sheikh Al-Ouda's web site.   He publishes a

19   lot of his lectures, articles on that web site and I believe

20   even on the web page itself, there is reference to the fact

21   that that is Sheikh Al-Ouda's web site.

22   Q.   And that's the web site that he referenced in the interview

23   with the New York Times reporter, correct?

24   A.   That's correct.

25   Q.   What other web sites do we see here associated with either

54

1    of those two gentlemen?

2    A.   Well, clearly web sites nos. 10 and 11 are associated with

3    Sheikh Al-Hawali.   Those web sites are Al-Hawali.org and

4    Al-Hawali.com.

5    Q.   Okay.   Now, did your investigation identify some particular

6    publications associated with those web sites or other web sites

7    linked to the defendant and the IANA publications of these two

8    radical sheikhs?

9    A.   Yes.

10   Q.   Let me call your attention to one in particular.   And this

11   is cross referenced if you will with affidavit paragraph 36.

12   Are you with me?

13   A.   All right.

14   Q.   That affidavit paragraph 36 references some publications

Page 51

Exhibit B.txt

15    that appeared on one of these web sites; is that correct?

16    A.   Yes, it does.

17    Q.   Okay.   Which web site is that?

18    A.   That is web site Al-Asr.ws.

19    Q.   And give us an idea what that publication or publications

20    consisted of.

21    A.   That publication -- Al-Asr.ws is an internet magazine or

22    one of the functions is I suppose as an internet magazine and

23    on the date depicted there in the affidavit of May 15, 2001,

24    there were at least three articles that specifically spoke to

25    the issue of suicide operations.

                                                                    55

1     Q.   Who were the authors of those articles?

2     A.   The authors were Sheikh Homed Ali (phonetic).

3     Q.   And where have we heard him before -- of him?

4     A.   He is the sheikh that wrote the article that had the

5     verbiage in it about bringing down an airplane.

6     Q.   Okay.

7     A.   There was also an article entitled "Suicide Operations"

8     which was written by Sheikh Salman Al-Ouda and --

9     Q.   And in essence, the content of that with regard to suicide

10    operations, what?

11    A.   In that particular article, Sheikh Al-Ouda stated that

12    death is better than a humiliating life and it gave

13    justifications and conditions on suicide operations.

14    Q.   Go to paragraph 37.   Does that reflect another publication

15    associated with Sheikh Al-Ouda?

                              Page 52

Exhibit B.txt

16   A.   Yes, it does.

17   Q.   And what -- what web site are we talking about here?

18   A.   That web site is Islam Way.com.

19   Q.   And that is associated with the Islamic Assembly of North

20   America; is that correct?

21   A.   Yes, sir.

22   Q.   And what was the orientation of that publication?

23   A.   I'm not sure I understand.

24   Q.   What did the publication say?  What was its --

25   A.   It again was a publication or an article that justified

56

1    suicide bombings.

2    Q.   Paragraph 38 talks about an event associated with a

3    Canadian web site at the time; is that correct?

4    A.   That's my understanding.

5    Q.   Tell us about that.   What happened here?

6    A.   As is stated in the affidavit, on August 16, 2001, three

7    full weeks prior to the September 11 attacks, there was a

8    posting on the Islam Way.com web site that was titled "An

9    Invitation to Jihad" and in that particular posting, there was

10   an invitation as I said in the title for -- or a recruitment

11   pitch essentially to come and fight with the Mujahideen.   Come

12   and train and then eventually fight with --

13   Q.   Did that result in a complaint by a particular entity?

14   A.   Yes, it did.

15   Q.   Tell us about that.

16   A.   There was a Jewish entity in Canada that became aware of

17   that particular posting, brought that to the attention of the

Page 53

Exhibit B.txt

18   Royal Canadian Mounted Police who initiated an investigation.
19   Q.   Did that also result in some press, some articles in the
20   newspaper?
21   A.   Yes, it did.
22   Q.   Does that paragraph in the affidavit reflect at least a
23   snippet of one of those articles and the perception of what was
24   appearing on that web site?
25   A.   Yes, it does.

57

1    Q.   Would you read that snippet for us if you would on the
2    bottom of page 13?  And that appeared in what newspaper?  Do
3    you recall?
4    A.   I don't recall.
5    Q.   Okay.
6    A.   Sorry.
7    Q.   But a Canadian newspaper; is that correct?
8    A.   That is correct.
9    Q.   All right.   Read that sentence to us, would you?
10   A.   It states, "Terrorist organizations have been making
11   increasing use of the internet to further their violent
12   agendas.  They use computers to communicate, spread propaganda,
13   fund raise and organize operations.  Canada may be becoming a
14   base for such cyber terrorism because of the technological
15   advancement."
16   Q.   Did that newspaper article have anything to do with your
17   investigation of the defendant meaning was it generated as a
18   result of your investigation of the defendant or was it

Page 54

Exhibit B.txt

19  completely independent?

20  A.   No.  It was completely independent.

21  Q.   This is just something that you came across as part of your

22  investigation; is that right?

23  A.   That's correct.

24  Q.   Let's talk about another publication associated with the

25  defendant's web sites.  Take a look at paragraph 39.  Are you

58

1   with me?

2   A.   Yes, I am.

3   Q.   That is another publication on what web site?

4   A.   That is again on Islam Way.com.

5   Q.   And what is the gist of that particular publication?

6   A.   This again appears to be a posting on Islam Way.com where

7   the writer of the posting advised -- excuse me, that he was

8   leaving Afghanistan in an on-duty status and further stated

9   that Jihad is the only means to eradicate all evil on a

10  personal and general level.  And that the only answer is to

11  ignite and trigger an all out war, a worldwide Jihad, and that

12  we will do our best to ignite this war.  May Allah protect us.

13  Q.   Affidavit paragraph 40 references yet another publication

14  associated with these web sites; is that correct?

15  A.   That is correct.

16  Q.   And this -- the web site in this particular case is what?

17  A.   This web site is Islam Today.net.

18  Q.   Now again, remind us.  That web site is tied to what

19  particular individual?

20  A.   It's my understanding that that belongs to Sheikh Al-Ouda.

Page 55

Exhibit B.txt

21  Q.   And this publication though is not by Sheikh Al-Ouda,

22  correct?

23  A.   No, it's not.

24  Q.   Is it by whom?

25  A.   It is by Sheikh Safar Al-Hawali.


                                                              59


1   Q.   And the date of that publication?

2   A.   September 4, 2002.

3   Q.   Title of the article that was published?

4   A.   The title of the article is "Appeal to Help Our Palestinian

5   Brothers."

6   Q.   Can you give us an idea of the content of that publication,

7   its philosophical orientation, what it was saying?

8   A.   It was essentially calling for support of Jihad in the

9   Palestinian situation.   There is verbiage in the publication

10  that states developing the methods and means of Jihad such as

11  targeting settlements, surprise attacks on military bases,

12  manufacturing and improving weapons and similar careful and

13  wise choices in deep penetration and martyrdom operations,

14  et cetera, et cetera.

15  Q.   These then were publications, indications of direct contact

16  between the defendant and these two radical sheikhs by means of

17  those publications on the web sites; is that right?

18          MR. NEVIN:   I'll object to that as a leading question.

19          COURT:   I'll sustain the objection.

20  BY MR. LINDQUIST:

21  Q.   There were other connections -- your investigation revealed

                            Page 56

Exhibit B.txt

22  other connections, did they not, or revealed other things as

23  far as connections between the defendant and these two sheikhs;

24  is that right?

25  A.   That's correct.


60


1   Q.   Did the investigation participate in what is referred to

2   statutorily as the Foreign Intelligence Surveillance Act?

3   A.   Yes, it did.

4   Q.   Just generally speaking, what is that?

5   A.   The Foreign Intelligence Surveillance Act is a mechanism by

6   which the United States Government after going through a long

7   process of applying for -- to have this act operational by

8   which we can have a court-ordered surveillance or court-ordered

9   wire tap with regard to circumstances dealing with national

10  security matters.

11  Q.   All right.  How is that different from what in the federal

12  system we commonly refer to as a Title 3 wire tap or court-

13  ordered authorization?  How is it different?

14  A.   It's different in the sense that we go before an entirely

15  different court.  For example, instead of going before a

16  criminal magistrate to obtain a search warrant, you actually go

17  before the Foreign Intelligence Surveillance Court.

18  Q.   What I'm really getting to is on the Title 3, we're talking

19  about a typical criminal investigation within the federal

20  system; is that correct?

21  A.   That's correct.

22  Q.   As the Foreign Intelligence Surveillance Act deals with

23  national security and investigations that are directly prompted

Exhibit B.txt

24    by national security; is that correct?
25    A.    That's correct.


                                                                    61


 1    Q.    And as a result of those court authorized interceptions, a
 2    criminal investigation can gain access to learn what has been
 3    intercepted and learned as a result of those investigations; is
 4    that right?
 5    A.    That's correct.
 6    Q.    What type of interceptions were involved -- or did you
 7    receive information from?  Are we talking phone calls, computer
 8    e-mails?  Is that what we're talking about?
 9    A.    Primarily.
10    Q.    Okay.  So that's what we're talking about as far as these
11    interceptions are concerned; is that right?
12    A.    That's correct.
13    Q.    Did some of those court authorized interceptions reveal
14    activities by the defendant?
15    A.    Yes, they did.
16    Q.    And in what capacity?  Telephone and e-mail?
17    A.    That's correct.
18    Q.    All right.  Did those interceptions reveal anything as far
19    as the relationship between the defendant and Sheikh Al-Ouda?
20    A.    Yes.
21    Q.    What did they reveal generally speaking?
22    A.    They revealed -- they revealed one thing, that the
23    defendant has an extreme amount of respect for Sheikh Al-Ouda.
24    He has operated in the capacity of assisting with setting up
                              Page 58

Exhibit B.txt
25     web sites that Sheikh Al-Ouda can use as a vehicle to preach

62

 1     his message to -- as I've stated before, to the widest audience
 2     possible.
 3     Q.   Did they reveal the direct contact between the defendant
 4     and that sheikh?
 5     A.   Yes, they do.
 6     Q.   And those associated with the sheikh?
 7     A.   Yes, they do.
 8     Q.   Did those interceptions also reveal anything similar with
 9     regard to Sheikh Al-Hawali?
10     A.   Yes, very similar.
11     Q.   What?
12     A.   Again, the interceptions show a very close link between the
13     defendant and Sheikh Al-Hawali, the setting up of web sites,
14     the providing of vehicles for extended communication,
15     telephonic contact with intermediaries of Sheikh Al-Hawali.
16     Q.   And all within the context of web site work; is that
17     correct?
18     A.   I believe so.
19     Q.   In the course of those interceptions, do you remember any
20     characterization by Sheikh Al-Ouda or those associated with him
21     of the defendant as far as the defendant's role in this web
22     site work?
23     A.   Yes.  I seem to recall there being one intercepted
24     communication in which --
25               MR. NEVIN:  I'll object to that without further

Page 59

Exhibit B.txt

63

 1   foundation as to who made the statement and time, place,
 2   matters of that sort.
 3            COURT:   You may proceed a little bit with foundation.
 4   BY MR. LINDQUIST:
 5   Q.   Tell us approximately when this interception took place and
 6   the defendant was involved; is that correct?
 7   A.   The defendant was involved.   The party on the other end was
 8   Sheikh Al-Ouda and he deferred to the defendant as being the
 9   manager or -- I don't recall the exact verbiage but essentially
10   the manager of the web site and he deferred decisions with
11   regard to the web site to him.
12   Q.   And would follow his, meaning the defendant's direction; is
13   that correct?
14   A.   Yes.
15   Q.   You mentioned that the search warrants were executed in
16   conjunction with the arrest of the defendant.   Did those search
17   warrants show anything or result in any evidence that
18   corroborated the tie between the defendant and Sheikh Al-Ouda
19   and Sheikh Al-Hawali?
20   A.   Yes, they did.
21   Q.   Tell us about that.
22   A.   During one of the executed search warrants, an address,
23   phone book was discovered and in that phone book in Arabic were
24   written the telephone numbers for both Sheikh Al-Ouda and
25   Sheikh Al-Hawali.

Exhibit B.txt

64

1    Q.   Was that finding consistent with your investigation

2    otherwise that you testified to?

3    A.   Yes.

4    Q.   You've already testified to photographs that were found on

5    the defendant's computer, seized at the isotope lab.   There

6    were other photos that were seized from that in your cursory

7    review; is that correct?

8    A.   Yes.

9    Q.   Take a look at Exhibits 16 through 94.   Do you have those

10   up there?

11   A.   I do.

12   Q.   And all of those exhibits depict photographs; is that

13   correct?

14   A.   I am pretty sure they are all photographs.   No, I take that

15   back.   I know that there are some that are graphic images of

16   maps for example but not many.

17   Q.   But they were all taken from the computer that you

18   testified to; is that right?

19   A.   That's correct.

20   Q.   Categorically, what do all of these photographs have in

21   common from the standpoint of what you've been testifying to

22   today?   What's their significance?   What's their pertinence

23   here?   Why are we showing them to the judge?

24   A.   I think their significance is clear.

25   Q.   What is it?

65

Exhibit B.txt

1  A.   Almost without exception, these photographs show Jihad --
2  what we could consider to be Jihadist sort of things.   Many
3  photographs of Usama Bin Laden.   Many photographs of Chechnyan
4  Mujahideen.   Photographs of dead disemboweled bodies.
5  Photographs of what appear to be captured Russian soldiers.
6  Q.   International terrorism related event; is that correct?
7  A.   Exactly.
8          MR. LINDQUIST:   I offer these exhibits into evidence,
9  please, for purposes of this hearing.
10         COURT:   Any objection?
11         MR. NEVIN:   The same objection I expressed with
12  respect to the other photographs.
13         COURT:   All right.   That's been noted and overruled.
14  We'll admit Exhibits 16 through 94.
15            (Government Exhibit Nos. 16 through 94 admitted.)
16         COURT:   You may proceed.
17         MR. LINDQUIST:   Thank you.
18  BY MR. LINDQUIST:
19  Q.   Let's just go through some of these.   There are quite a
20  number but there again, in that regard, this is just a small
21  percentage of what your cursory review found; is that right?
22  A.   Just the tip of the iceberg in my opinion.
23  Q.   Take a look at Exhibit 17.   Who's that?
24  A.   That appears to be a photograph of Sudaman Abu Gathe
25  (phonetic) who is known as -- he is an Al Quaida or was an Al

66

Exhibit B.txt

1    Quaida spokesman.

2    Q.   Okay.   Exhibit 18?

3    A.   That's a photograph of a Taliban soldier with an RPG -- a

4    rocket propelled grenade.

5    Q.   Exhibit 20?

6    A.   That's a photograph of Usama Bin Laden superimposed on some

7    Arabic text that we have not translated yet.

8    Q.   Exhibit 21?

9    A.   Photograph of Usama Bin Laden.

10   Q.   And 23?

11   A.   Usama Bin Laden.

12   Q.   24?

13   A.   Usama Bin Laden.

14   Q.   25?

15   A.   Usama Bin Laden.

16   Q.   26?

17   A.   That appears to be a photograph of Hisballah (phonetic)

18   rebels with rocket propelled grenades on the shoulders and a

19   firearm of some sort.

20   Q.   29?

21   A.   That is a photograph of the American flag being burned.

22   Q.   What's the significance of 30?

23   A.   30 --

24   Q.   Specifically.

25   A.   Specifically?  Well, it is a photograph almost in the form

67

1    of a poster it appears that shows Usama Bin Laden facing off

2    with President George Bush and there is a target superimposed

Page 63

Exhibit B.txt

3    on the president's head with the center of his head directly in

4    the center of the cross hairs of the target.

5    Q.   And it has a reference to a web site; is that correct?

6    A.   Yes, it does.

7    Q.   No. 31.

8    A.   Usama Bin Laden and others.

9    Q.   Who's depicted in 33 to your knowledge?

10   A.   You know, I'm not certain.  That's a photograph of an

11   individual that we have yet to identify.

12   Q.   34, what does that show?

13   A.   That is a photograph of Washington, D.C.

14   Q.   The capital building, correct?

15   A.   Yes, it is.

16   Q.   35, what's the significance of that specifically?

17   A.   35 is a poster and the shape of the blob in the middle of

18   the poster appears to be Chechnya.  Inside the blob are

19   soldiers who appear to be Mujahideen and the poster itself

20   makes reference to a very radical web site, Cocaus.com

21   (phonetic) which is linked to many of the IANA, Islamic

22   Assembly of North America, sites and the defendant received

23   e-mail from Cocaus.

24   Q.   36?

25   A.   Taliban soldiers with RPG's.

                                                                68

1    Q.   39?

2    A.   Although I'm not positive, this appears to be a photograph

3    of the inside of the Moscow music hall where the chemical

Page 64

Exhibit B.txt

4   agents were introduced to essentially put an end to the

5   takeover of that -- that theater by Mujahideen rebels.

6   Q.   You're going to reference that here in a moment in another

7   capacity, correct?

8   A.   Yes, sir.

9   Q.   41?

10  A.   That is a photograph of Sheikh Al-Ouda.

11  Q.   42?

12  A.   That is Eden Catab (phonetic), a Chechnyan rebel leader.

13  Q.   You mentioned some Russian soldiers.   Exhibit 44.

14  A.   This is a photograph of what appears to be a Russian

15  soldier, Petrov Demetri Alexandrovich, almost as if he has --

16  he's got his name superimposed in front of him.   Although we

17  don't know what it is, we suspect he may have been taken

18  prisoner.

19  Q.   Similarly 45; is that correct?

20  A.   Yes.

21  Q.   And I'm skipping over some that depict violent deaths; is

22  that right?

23  A.   That is --

24  Q.   Corpses and so forth?

25  A.   That is correct.

69

1   Q.   Exhibit 49?

2   A.   Exhibit 49 is a map that appears to be pulled from MS NBC.

3   Q.   A map of what?

4   A.   The map is of the State of California and there are four

5   specific locations that are designated on the map, each of

Page 65

Exhibit B.txt

 6   which appears to be a bridge:  The Golden Gate Bridge in San

 7   Francisco, the Bay Bridge in San Francisco, the Coronado Bridge

 8   between San Diego and Coronado and the Vincent-Thomas Bridge

 9   that spans the main channel of L.A. harbor.

10   Q.   50?

11   A.   Is a photograph of the Golden Gate Bridge.

12   Q.   52?

13   A.   52 is a photograph of detainees being flown in U.S.

14   military aircraft to Guantanamo Bay.

15   Q.   54?

16   A.   Our initial analysis of this photograph indicates that this

17   is a suicide note with a superimposed arrow pointing to the

18   detonation switch.

19   Q.   58?

20   A.   Usama Bin Laden.

21   Q.   59?

22   A.   This appears to be soldiers including what appears to be a

23   wounded soldier in the Cashmere region.

24   Q.   What's 60?  Who's depicted in 60?

25   A.   That's Sheikh Al-Ouda.

                                                              70

 1   Q.   61, what's the significance of that building?

 2   A.   That's the FBI headquarters building in Washington, D.C.

 3   Q.   62, who's that?

 4   A.   Sheikh Al-Ouda.

 5   Q.   63, more fighters; is that correct?

 6   A.   Actually Taliban fighters.

Exhibit B.txt

```
 7   Q.   Taliban fighters?  64, what's that?

 8   A.   That is a United Airlines passenger jet.

 9   Q.   On the ground or flying?

10   A.   Flying.

11   Q.   65?

12   A.   Is a U.S. Navy aircraft carrier.

13   Q.   66, who's that?

14   A.   That's Sheikh Al-Ouda.

15   Q.   67, what's the significance of that building?

16   A.   That's a photograph of a building in Israel where a Jewish

17   wedding was being held and it was bombed.

18   Q.   72, who is that?

19   A.   I'm not sure.  Sorry.

20   Q.   Okay.  What do we see there?  We see --

21   A.   We see what appears to be a scholarly looking elderly man

22   with -- in a vehicle with an automatic weapon at his side.

23   Q.   Going back to Exhibit 64, the United Airlines plane flying,

24   is this the only -- is this the only one of this nature that

25   was found in your cursory review of airplanes?
```

                                                              71

```
 1   A.   I don't think so.  I'm not sure.

 2   Q.   Fair enough.  73, what does that depict?

 3   A.   That is the Knesset Building, the Israeli parliament

 4   building.

 5   Q.   75, do you know what that depicts?

 6   A.   That appears to be a nuclear reactor in North Korea.

 7   Q.   The individuals in 76, what's the significance of that

 8   photo; do you know?
```

Exhibit B.txt

 9   A.   Those folks -- those three individuals in that one

10   photograph are the victims of the Gibla Baptist Hospital

11   murders.

12   Q.   And does that relate to No. 77 that follows?

13   A.   It does.

14   Q.   What does that show?

15   A.   That's a photograph of the Gibla Baptist Hospital in the

16   Yemen -- Gibla, Yemen.

17   Q.   Does that have something to do with international

18   terrorism?

19   A.   It does.  On December 30, 2002, a terrorist gunman -- at

20   least one entered the hospital and murdered some of the -- at

21   least one doctor and some medical personnel inside the

22   hospital, wounded several others.

23   Q.   And 78, what does that show?

24   A.   That is a photograph of the British ship HMS South Hampton

25   as it's traveling through the Suez Canal.

72

 1   Q.   79, who is that?

 2   A.   That is Zacharias Musowi (phonetic).

 3   Q.   Who's he?

 4   A.   He is currently at trial for terrorist charges related to

 5   September 11.

 6   Q.   No. 80, who is that?

 7   A.   That is Richard Reed --

 8   Q.   Who is he?

 9   A.   He is the infamous shoe bomber that tried to ignite his

Exhibit B.txt

10    shoes in the transatlantic flight.

11    Q.   No. 83, who is that; do you know?

12    A.   That is Daniel Pearl, the assassinated or murdered

13    journalist.

14    Q.   And he was murdered where?

15    A.   Pakistan I think.

16    Q.   Pakistan? 84, what does that depict?

17    A.   That is a photograph of President George Bush superimposed

18    on other photographs that show U.S. military troops and Usama

19    Bin Laden.   The title of this file is "War, Al Quaida."

20    Q.   No. 90?

21    A.   That's Sheikh Al-Ouda.

22    Q.   No. 93?  I think No. 93 and 94 are two versions of the same

23    picture, are they not?

24    A.   Yes, they are.

25    Q.   What do they depict?

                                                                    73

1    A.   Well, the title of this file is "Air Marshals" and the

2    photograph shows what appears to be a training exercise where a

3    masked attacker is behind another individual and what appears

4    to be slitting his throat.

5    Q.   The review of that computer is ongoing; is that correct?

6    A.   Yes.

7    Q.   And these particular photographs became available to you

8    only as recently as when?

9    A.   Late last night.

10    Q.   We've been talking about the defendant's web site --

11    outside web site activities and how that relates to terrorism;

Exhibit B.txt

12    is that correct?

13    A.   That's correct.

14    Q.   Now I want to ask you some questions about his outside

15    business activities in the same connection.   We're looking at

16    page 14 for cross reference purposes of the affidavit.

17    Specifically as far as my first question, it's affidavit

18    paragraph 41.   Generally speaking, what did your investigation

19    find as far as the outside business activities of the

20    defendant?

21    A.   The financial aspects of the investigation have revealed

22    extensive amounts of money passing in and out of the

23    defendant's accounts.   We've identified at least six different

24    bank accounts in the United States and significant moneys

25    passing through them.



                                                                    74



1    Q.   Prior to the execution of the search warrants that you've

2    mentioned, how many bank accounts have you identified

3    associated with the defendant?

4    A.   I want to say there were six -- are you talking about other

5    than his own accounts?

6    Q.   No, I'm just talking about accounts known to you prior to

7    his arrest and the execution of the search warrants.

8    A.   His accounts, six.

9    Q.   As a result of the execution of the search warrants, have

10    you become aware of potentially any other bank accounts

11    associated with --

12    A.   It appears that we've identified other accounts, yes.

                              Page 70

Exhibit B.txt

13  Q.   And the investigation is ongoing with regard to them; is

14  that correct?

15  A.   That's correct.

16  Q.   Paragraph 42.   These business relationships, these

17  financial relationships that your investigation revealed were

18  connected with what entity primarily?

19  A.   They were primarily connected with the Islamic Assembly of

20  North America.

21  Q.   And were there connections -- financial connections,

22  business connections with other individuals and other entities

23  besides the Islamic Assembly of North America?

24  A.   Yes.

25  Q.   Did that include Sheikh Al-Ouda or that you would

                                                                     75

1   characterize as business?

2   A.   Yes.

3   Q.   Sheikh Al-Hawali?

4   A.   To the extent that they deal with the web sites, yes.

5   Q.   Fair enough.   As far as the IANA, the Islamic Assembly of

6   North America, what -- describe for us, if you would, the

7   business relationship that your investigation found as far as

8   the defendant was concerned.

9   A.   We've cited tens of thousands if not hundreds of thousands

10  of dollars that have passed from the defendant to the Islamic

11  Assembly of North America in the form of checks, wire transfers

12  and other means.

13  Q.   Have colleagues of yours done assessments of the financial

14  information that you have obtained?

Exhibit B.txt

15   A.   Yes.

16   Q.   Does that assessment include the funds going into the

17   defendant's accounts and what funds were going out of the

18   accounts?

19   A.   Yes.

20   Q.   Can you give us an idea generally speaking of the nature of

21   the funds generally speaking going into his personal accounts,

22   going in?

23   A.   The defendant routinely receives large sums of money that

24   come from overseas sources.   Generally from Saudi Arabia.   They

25   pass into his account and subsequently pass out of his

76

1   account --

2   Q.   Before going to where they go out of the account, let's

3   just talk about the funds coming in.   Did you identify any

4   funds coming into his accounts that you could attribute

5   directly to his studies and living?

6   A.   Yes.

7   Q.   Tell us about that.

8   A.   As a foreign student from Saudi Arabia in the United

9   States, Mr. Al-Hussayen is essentially on a scholarship of

10   sorts from the Saudi government.   He receives a monthly stipend

11   that ranges in amounts but it's generally about $2,700 a month

12   more or less.

13   Q.   Were you able in your analysis -- your financial analysis

14   to segregate the study/living related expenses coming into the

15   account and where they went and the nonstudy/living related

Page 72

Exhibit B.txt

16   expenses or the moneys that came into his account and where

17   they went?

18   A.   Yes.

19   Q.   Were they clearly segregated?

20   A.   It appears that there was a definite split.

21   Q.   Did that financial analysis show that the defendant was

22   functioning as a financial conduit of large sums of money?

23   A.   Yes.

24   Q.   Can you give us an idea of some of the sources of that

25   nonstudy/nonliving expense money that the financial records

77

1   show went into his accounts?

2   A.   Well, for example, we identified two wire transfers in 1998

3   that came from a family member of Mr. Al-Hussayen.

4   Q.   Who's that?

5   A.   That would be Saleh Al-Hussayen.

6   Q.   And as far as the investigation is concerned, what do you

7   deem that relationship to be, that individual to the defendant?

8   A.   It appears that Saleh Al-Hussayen is the defendant's uncle.

9   Those two wire transfers totaled approximately $100,000.

10   Q.   And approximately when did those transfers occur?

11   A.   They occurred in 1998 and I can be more specific if I refer

12   to the affidavit.  In September 10 and September 25 of 1998 and

13   were broken into two wire transfers each approximately $50,000.

14   Q.   Did your financial analysis maintain or insure the

15   integrity of those funds being maintained as they passed

16   through the defendant's bank account and out?

17   A.   Yes.

Page 73

Exhibit B.txt

18  Q.  Where did they go?  Where did they go out and into?

19  A.  Almost to the penny, that hundred thousand dollars went to

20  IANA.

21  Q.  Was there a period of time that the defendant held those

22  funds in his bank account before they went out to the IANA?

23  A.  Yes.

24  Q.  Approximately how long was that?

25  A.  It was approximately six to nine months that that money sat

78

1   in the defendant's account.

2   Q.  By the way, has your investigation revealed whether or not

3   these accounts generated interest?

4   A.  Yes.

5   Q.  What has your investigation shown?

6   A.  They do not generate interest.

7   Q.  And have you come to understand why that is?

8   A.  Yes.  Upon request of many of the foreign students, they

9   will not accept interest payments into their accounts.

10  Q.  As a religious matter; is that correct?

11  A.  That is correct.

12  Q.  So the hundred thousand sat there for that period of time

13  not collecting interest; is that right?

14  A.  That's correct.

15  Q.  And then went where?

16  A.  It went piecemeal to IANA over a period of time.

17  Q.  Did the financial analysis of that flow of the hundred

18  thousand dollars from the uncle through the defendant's bank

Exhibit B.txt

19  accounts to the IANA correlate with any other receipt of a

20  large sum of money by the IANA?

21  A.   Yes.

22  Q.   And this is I believe also depicted or referenced in

23  affidavit paragraph 45; is that correct?  No, excuse me.  I'm

24  wrong.  Not 45.  42.

25  A.   No, I don't think it's there.


79


1  Q.   Okay.  You know what I'm referring to?

2  A.   I know what you're referring to.

3  Q.   I'll find the paragraph here in a moment.

4  A.   There was a -- paragraph 48.

5  Q.   48, thank you.

6  A.   In May of 1998, there was a $300,000 wire transfer to IANA

7  from a Swiss bank account.  It was only when that $300,000 was

8  exhausted by IANA that payments of the defendant's $100,000

9  began to be disbursed to IANA.

10  Q.   Showing the correlation of activity of operations; is that

11  correct?

12  A.   Yes.  As the payments were made, in many cases on the same

13  day that say $14,000 wire transfer was sent to IANA, payments

14  were made to officers from that IANA bank account essentially

15  in the form of salary.

16  Q.   Has your investigation revealed how these moneys -- these

17  moneys that are sent from the defendant's bank accounts to the

18  IANA are characterized by the IANA?

19  A.   Yes.  The investigation has revealed that the IANA books

20  refer to them as loans.

Exhibit B.txt

21    Q.    Loans?

22    A.    Right.

23    Q.    Is there anything in the investigation that would suggest

24    to you that these are legitimate loans?

25    A.    No.

80

1     Q.    Your investigation suggests that --

2              MR. NEVIN:   Object.   This is leading.

3              COURT:   All right.   I'll sustain the objection.

4              MR. LINDQUIST:   I didn't even get it out, Your Honor.

5              COURT:   You appear to be heading in a leading

6     direction.

7              MR. LINDQUIST:   Well, I'm going to surprise you

8     because it wasn't headed that way.

9     BY MR. LINDQUIST:

10    Q.    And what did your investigation suggest as far as the

11    nature of the funds that were being funneled through his

12    account?

13    A.    They appear to be payments that were -- that the defendant

14    was receiving from overseas or sometimes in the form of local

15    solicitation that was being sent to the IANA for use by the

16    IANA exclusively.

17    Q.    And concealed in loan designation?

18    A.    That's what it appears at this stage.

19    Q.    An affidavit paragraph 43, the uncle is mentioned a bit

20    more; is that correct?

21    A.    That is correct.

Exhibit B.txt

22    Q.  Did your investigation show additional contact between this

23    uncle -- and when I say additional, additional to the hundred

24    thousand dollars funds that flowed through the defendant's

25    account, additional contact with the United States by that

81

1     uncle?

2     A.  I'm not sure I understand the question.

3     Q.  Did your investigation reveal that the uncle was here at

4     any particular time in the United States?

5     A.  Yes, it did.

6     Q.  What did your investigation reveal as far as when he was

7     here?

8     A.  It appeared that the uncle arrived in the United States on

9     or about August 20 of 2001.  He was met in New York or

10    Washington, D.C., I'm not exactly sure but he was met on the

11    east coast by some members of a Moslim (inaudible) in New York.

12    He was given a tour of the area, given a tour of downtown New

13    York -- of downtown Manhattan including the vicinity of the

14    World Trade Centers.  He subsequently traveled to the Midwest

15    to Chicago, to Detroit, even into Canada and it appears that he

16    met with numerous officials of both the IANA and other

17    charitable organizations.

18    Q.  Was there anything in your investigation that indicated

19    that the defendant joined him at some point in time on this

20    trip?

21    A.  There are indications that they did join and that is based

22    on our review of financial analysis of the defendant's accounts

23    which show money disbursed in Ann Arbor, Michigan area from his

Page 77

Exhibit B.txt

24    account at the same time that the uncle was in Ann Arbor.

25    Q.   Where did the trip take the uncle and by the way, was the

82

1     uncle alone according to the information that you received as

2     far as this trip was concerned?

3     A.   No, the uncle was accompanied by his spouse, Fadine

4     Peterson (phonetic).

5     Q.   And where did the trip take them after the Detroit area?

6     A.   I may have the sequence incorrect but they did travel to

7     Chicago and to Canada, returned to Michigan and then traveled

8     back to Virginia.

9     Q.   And approximately when was it that they arrived back in

10    Virginia?

11    A.   I believe it was on or about September 6, 2001.

12    Q.   And do you know where they initially stayed when they

13    returned to the Virginia area and what part of the Virginia

14    area was that?

15    A.   It was the Herndon, Virginia area more or less.

16    Q.   Do you recall where they went initially there in the

17    Herndon, Virginia area?

18    A.   They stayed at one hotel for a couple of nights.  I can't

19    recall the hotel but then after one or two nights, changed the

20    hotel to the Marriott Residence Inn in Herndon.

21    Q.   And you recall what day that was that they went into the

22    Marriott Residence in Herndon?

23    A.   I'm not positive.

24    Q.   Approximately how long prior to September 11?

Page 78

Exhibit B.txt
25   A.   Just two or three days prior.




83



1   Q.   What's the significance of the Marriott Residence in

2   Herndon as far as this investigation is concerned?

3   A.   That particular hotel is significant because our

4   investigation nationwide has revealed that at least three of

5   the hijackers of Flight 77 stayed at that hotel on September

6   10.

7   Q.   And the three hijackers have been linked to which of the

8   flights of the September 11 events?

9            MR. NEVIN:   Object to it as asked and answered.

10           COURT:   I'll allow him to answer (inaudible) response.

11           WITNESS:   The Flight 77 was the flight that eventually

12   crashed into the Pentagon.

13   BY MR. LINDQUIST:

14   Q.   After September 11, did an FBI investigation involve the

15   uncle and his wife?

16           COURT:   This might be a good time to stop before you

17   go into another area.   We'll go ahead and recess for one hour

18   and reconvene at 1:00.   The court's in recess.

19           CLERK: All rise.

20               (A recess was taken.)

21           CLERK:   All rise.   The Court is back in session.

22           COURT:   Good afternoon.   You may be seated.   You may

23   proceed where you left off.   The witness will return to the

24   stand.   I'll remind you you are still under oath.

25           MR. NEVIN:   Judge, could I interrupt just to -- for a

Page 79

Exhibit B.txt

84

```
 1  moment?  I anticipate the need to present evidence to the Court
 2  by a teleconference.
 3           COURT:  I was advised of that by the clerk.  I will
 4  break a little before 2:00 and (inaudible) set up --
 5           MR. NEVIN:  That will be fine.
 6           COURT:  (Inaudible.)
 7           MR. NEVIN:  Thank you.
 8           COURT:  You may proceed.
 9  BY MR. LINDQUIST:
10  Q.  Agent Gneckow, before the lunch break, you provided
11  testimony about the computer images and if you recall, I
12  skipped over several as far as asking for your specific
13  comments and over the lunch break, you advised me that there
14  were several that you felt would be particularly pertinent as
15  far as their relevance; is that correct?
16  A.  That's correct.
17  Q.  If you'd take Exhibits 86, 87 and 91.  Do you find those?
18  86, 87 and 91.
19  A.  I've got them.
20  Q.  What does the image on 86 portray and its significance?
21  A.  What's interesting about the image on Exhibit 86 is that
22  the file name is "Dirty Bomb."  The photograph depicts or the
23  image depicts two or three individuals that are wearing
24  hazardous material protective gear including gas masks and the
25  like.
```

Exhibit B.txt

85

1    Q.   Turn to 87.   What's the significance of that image?
2    A.   That image is what appears to be a map of Kenya and there
3    is emblazoned with a red star or --
4    Q.   Asterisk-type --
5    A.   Asterisk type mark where the city of Mumbasa, Kenya is
6    located.   That corresponds to the location of the city of
7    Mumbasa.   Again, what's interesting to me about this particular
8    file is that the file name is "Recruits" for one thing and that
9    that is the location of a terrorist attack.
10   Q.   On the U.S. embassy there?
11   A.   Yes, sir.
12   Q.   And 91?
13   A.   91 appears to be an image of Amed Braheen (phonetic) who
14   was arrested by the Spanish (inaudible) due to his connections
15   to the September 11 terrorist attacks.   The Spanish
16   investigation in conjunction with ours indicates that there are
17   strong ties between Braheen and Sheikh Al-Ouda.
18   Q.   Also during the noon hour, I believe you received some
19   information concerning the source of these images as far as the
20   computers; is that correct?
21   A.   That's correct.
22   Q.   And we need to correct your testimony as far as where these
23   images came from; is that right?
24   A.   That is correct.
25   Q.   Where did these images, Exhibits 5 through 94, come from as

86

Page 81

Exhibit B.txt

1  far as the computers related to the search warrants that you've
2  previously referenced?
3  A.  Well, originally it was my understanding that they came
4  solely from the computer at the engineering isotope lab.
5  However, I was told that that is not correct.  In fact, some of
6  the images come from the defendant's personal computer taken
7  from his home.  And may I also clarify something?  The images
8  themselves were taken -- were taken from a mirror image of
9  those hard drives so as not to taint the actual real hard
10 drives.
11 Q.  All right.  A couple of other matters of clarification of
12 your previous testimony.  You talked about Islamic Assembly of
13 North America and its offices in the Detroit area; is that
14 correct?
15 A.  That is correct.
16 Q.  More specifically, where are the offices of the Islamic
17 Assembly of North America?
18 A.  Well, specifically, the offices are located I believe in
19 Ypsilanti, Michigan which is a suburb of Ann Arbor.
20 Q.  You also provided testimony about the web site event in
21 Canada associated with Islam Way.com and the complaint by the
22 Jewish entity regarding the recruitment publication there.  Do
23 you recall that?
24 A.  Yes, I do.
25 Q.  Can you tell us what the investigation revealed as far as

87

Exhibit B.txt

1  what happened to the web site Islam Way.com as it existed in

2  Canada after that complaint and the investigation by the RCMP?

3  A.   It's my understanding based on information received from

4  the RCMP that when that newspaper article was published, within

5  a day or two, the web site itself Islam Way.com relocated from

6  Canada to Ann Arbor, Michigan.

7  Q.   In your testimony, you refer to certain financial

8  transactions between the defendant and the Islamic Assembly of

9  North America, transactions that were characterized as loans.

10  Do you remember that?

11  A.   That's correct.

12  Q.   Over the noon hour, you referenced to me specifically a

13  check that you recall being identified as part of the financial

14  investigation that had to do with the IANA and a loan; is that

15  right?

16  A.   That is correct.

17  Q.   Tell us about that.

18  A.   The financial investigation showed that there was a check

19  from an IANA bank account back to the defendant and there was a

20  notation in the memo line that indicated -- and I'm not exactly

21  sure of the verbiage but it indicated that it may have been a

22  repayment of a loan.   The significance of that was when the

23  endorsement on the back of the check was reviewed, it was

24  indeed signed by the defendant.   However, it was signed back

25  over to an IANA official.

88

1  Q.   When we broke, you were recounting the trip of the

2  defendant's uncle and his wife to the United States around the

Page 83

Exhibit B.txt

3   time of September 11, 2001; is that correct?

4   A.   That is correct.

5   Q.   I want to clarify one aspect of your testimony with regard

6   to the Marriott Residence in Herndon.   What did the

7   investigation reveal as far as where the uncle and his wife

8   were staying on the day prior -- or the evening prior to

9   September 11, that is September 10?

10  A.   Well, on the evening of September 10, the uncle and his

11  wife were staying at the Marriott Residence Inn.   On that same

12  evening, our investigation has revealed that three of the

13  hijackers also stayed in the same hotel.

14  Q.   Do you have any idea of how many hotels there are in the

15  Herndon, Virginia area?

16  A.   I couldn't give you a specific number.   I would venture

17  there are several.

18  Q.   Following September 11, did the FBI make contact with the

19  uncle and his wife?

20  A.   Yes.

21  Q.   Approximately how long after September 11?

22  A.   My understanding is that he and his wife were interviewed

23  on or about September 17.

24  Q.   And where did that interview take place?   Do you know?

25  A.   The interview took place at the hotel.

89

1   Q.   And can you tell us what happened at that interview?

2   A.   My understanding after speaking with the agent who

3   conducted the interview was that during the course of the

Page 84

Exhibit B.txt

4   interview, the uncle exhibited signs of physical distress and

5   actually fainted to the ground during the course of the

6   interview.  He was subsequently brought to a local hospital and

7   examined by a physician there.

8   Q.   And did the investigation reveal whether or not anything

9   wrong was found with the uncle?

10  A.   No.  In fact, the agent who conducted the interview spoke

11  directly with the attending physician who told the agent that

12  he could find nothing wrong with the patient and the opinion of

13  the agent, she felt the attack was fained.

14  Q.   The agent felt the attack was fained?

15  A.   Meaning the seizure.

16  Q.   Okay.  That was the agent though that was of that

17  perception?

18  A.   Yes.

19  Q.   All right.  As a result of that seizure -- that fained

20  seizure according to the perception of the agent, what was the

21  result of the interview of the uncle?

22  A.   It was effectively terminated.

23  Q.   And was his wife interviewed?

24  A.   Yes.  While the uncle was being attended at the hospital,

25  the interview continued with the spouse, Fadine Peterson

90

1   (phonetic).

2   Q.   And generally speaking, the content of that interview did

3   include the trip that you have been referencing?

4   A.   Yes, it did.

5   Q.   To the United States?

Page 85

Exhibit B.txt

```
 6   A.   Yes, it did.
 7   Q.   Subsequent to that interview of the uncle and his wife by
 8   the FBI agents, was there yet another interview by the FBI
 9   later?
10   A.   Yes.
11   Q.   How much later?
12   A.   Within the next day or so.
13   Q.   By the same agents or different agents?
14   A.   Different agents.  He was -- the uncle was recontacted
15   based on the circumstances of the incomplete interview.
16   However, no additional information was obtained from the uncle.
17   Q.   And following that interview, where did the uncle and the
18   wife go?
19   A.   They returned to -- my understanding is they returned to
20   Saudi Arabia on or about September 19 I would say.
21   Q.   Had any procedural mechanism been imposed by the Bureau to
22   try and prevent their leaving?
23   A.   There was telephonic contact between the agent who
24   conducted the first interview based on that agent's opinion
25   that the uncle should not be allowed to leave until additional
```

                                                                   91

```
 1   follow-up could occur specifically with regard to questions
 2   dealing with the events of September 11.  However, her
 3   recommendation for whatever reason did not -- was not complied
 4   with.
 5   Q.   So they left without further contact; is that correct?
 6   A.   That is correct.
```

                              Page 86

Exhibit B.txt

7  Q.  Let's reference affidavit paragraph 44 in relation to the

8  business relationship between the defendant and the Islamic

9  Assembly of North America.  Based upon your investigation, your

10  personal involvement in this investigation, your knowledge of

11  it, how would you characterize its business relationship with

12  the Islamic Assembly of North America, his role if you will?

13  A.  Well, it was a very close role.  Based on the information

14  we have obtained through our financial investigation, through

15  intercepted communications, it's clear that the defendant had

16  if not a central -- if not a leading role, then certainly a

17  central role in the operation of that organization.

18  Q.  In what capacities?

19  A.  The capacities were multi-faceted.  For example, his

20  technical expertise was extremely valuable to IANA in the

21  registration of web sites, the technical advisement to those

22  running web sites.  He was involved in much of the decision

23  making process with regard to money flow, obtaining donations

24  for the charity.

25  Q.  Personnel decisions?

92

1  A.  Yes.

2  Q.  He played a key role in that as well?

3  A.  Yes, he did.

4  Q.  Would it be fair to say that for all intents and purposes,

5  he was a senior officer of that organization?

6  A.  I would say if not on paper, he was a de facto senior

7  executive.

8  Q.  Did that relationship -- that business relationship with

Exhibit B.txt

9    the Islamic Assembly of North America include one with its at

10   least paper leader at the time?

11   A.   Yes.

12   Q.   And who was that leader at the time, the head of the

13   Islamic Assembly of North America?

14   A.   The then president was an individual by the name of

15   Mohammed Al-Hamari.

16   Q.   What did your investigation reveal as far as the nature of

17   the relationship between the defendant and Mr. Al-Hamari?

18   A.   The relationship was extremely close.   Hundreds of

19   telephone calls between the two, e-mail contact, financial

20   dealings, face to face contact.   What you might typically see

21   in a corporation with the executive officers.

22   Q.   Is Mr. Al-Hamari presently the subject of a government

23   investigation?

24   A.   Yes, he's currently under investigation.

25   Q.   As an aspect of the defendant's business relationship with

93

1    the IANA, did that include disbursement of funds to

2    individuals?

3    A.   Yes, it did.

4    Q.   And we're talking about affidavit paragraph 44 for

5    reference, are we not?

6    A.   Yes, sir.

7    Q.   Can you give us an idea of some of the locations where

8    money was sent as influenced or done by the defendant?

9    A.   Not including wire transfers or money sent within the

Page 88

Exhibit B.txt

10    United States, there were numerous wire transfers sent around

11    the world to Cairo, Egypt; Montreal, Canada; Riyadh, Saudi

12    Arabia; Aman, Jordan and Islamabad, Pakistan.

13    Q.   Did your investigation reveal any transfer or transfers

14    associated with an Amal Saltan?

15    A.   Yes, sir, they did.

16    Q.   Who's Amal Saltan?

17    A.   Amal Saltan is currently actively involved in the Al-Manar

18    internet magazine.  He writes for the magazine, has some

19    controlling interest in the magazine although the Al-Manar

20    magazine which is internet site no. 3 on our web site chart on

21    Exhibit 3 is also affiliated with the subject.  He is the

22    administrative contact for that magazine.  But historically,

23    Amal Saltan is of interest to us for this investigation because

24    the defendant has sent him approximately $15,200 over the past

25    two or three years in the form of wire transfers.  Amal Saltan

94

1    is a former member of the Egyptian Islamic Jihad, the EIJ which

2    is designated by the United States Government as a foreign

3    terrorist organization.

4    Q.   What's the significance of the designation as a foreign

5    terrorist organization?  What does that mean?

6    A.   If for example an individual in the United States were to

7    send money to or have significant contact financially or

8    otherwise with an organization that is a foreign terrorist

9    organization or with members of an FTO, that person would be in

10    violation of U.S. law.

11    Q.   And that designation is coming pursuant to a particular law

Exhibit B.txt

12    or procedure?

13    A.   There is a process that is done at the highest levels of

14    government where various organizations and individuals or

15    information pertaining to those individuals or organizations

16    are reviewed and a determination is made through executive

17    order that these individuals and/or organizations would be

18    designated as foreign terrorist organizations.  I'd like to add

19    that currently, Amal Saltan, it appears that he is espousing

20    the fact that he is no longer a member of the EIJ although that

21    is something that is still currently under investigation.

22    Q.   Referring back to Mr. Al-Hamari, the defendant's business

23    relationship -- relationship with him involved a particular

24    bank account that the investigation revealed.

25    A.   Yes, it did.

95

1     Q.   Tell us about that bank account.

2     A.   There is a bank account under the name of the defendant

3     that is in Ann Arbor, Michigan yet the address on the bank

4     account is that of Mohammed Al-Hamari in Ann Arbor, Michigan.

5     In fact, the sole -- the only signatures on that account on the

6     checks are from Mr. Al-Hamari.  However, it is the defendant

7     Mr. Al-Hussayen who is listed as the sole signatory on the

8     account.

9     Q.   Paragraph 49 of the affidavit refers to the travel

10    activities of the defendant as revealed by his financial

11    records primarily; is that correct?

12    A.   That is correct.

Exhibit B.txt

13  Q.  Can you give us an idea of the number of -- before I ask

14  you that question, as revealed by the financial records showing

15  either his own travel or travel of others that he helped fund;

16  is that correct?

17  A.  That is correct.

18  Q.  Can you give us an idea of the number of states involved

19  domestically as far as his travel is concerned?

20  A.  As far as an exact number, I'm not certain.  However, there

21  is extensive travel on the west coast, southern United States,

22  the Midwest, the east coast, extensive travel.  In addition,

23  there is travel funded for other individuals including travel

24  as remote as Brazil.

25  Q.  Did your investigation show that that travel was consistent


96


1  with the defendant as a very active officer of the Islamic

2  Assembly of North America?

3  A.  It seemed to go hand in hand with that particularly in the

4  context of raising donations for the charity.

5  Q.  Affidavit paragraph 50 refers to phone toll information

6  gleaned by the investigation, correct?

7  A.  Yes.

8  Q.  What are phone tolls just briefly?

9  A.  Phone tolls are a record kept of telephone calls that are

10  made that are generally charged to a particular telephone

11  number.  Long distance calls, cellular telephone calls, things

12  of that nature.

13  Q.  Can you give us an idea of the breadth of the telephone

14  activity revealed by these phone tolls investigation?

Exhibit B.txt

15    A.    The extent of phone activity is tremendous.   Just with

16    contact with Mohammed Al-Hamari and the IANA for example,  there

17    are hundreds of telephone calls.   And in addition to that, much

18    of the telephone activity is not trackable by us at this point

19    because for the past few years, the defendant has been using

20    prepaid calling cards in order to make his long distance calls.

21    Q.    How do prepaid calling cards prevent the generation of the

22    information that the investigation would otherwise seek?

23    A.    It's not impossible but it is extremely difficult to track

24    the phone activity on prepaid calling cards.

25    Q.    Affidavit paragraph 45 talks about another purported

97

 1    charitable organization with whom the defendant had contacts;

 2    is that correct?

 3    A.    That is correct.

 4    Q.    What is that organization?

 5    A.    That organization is called Help the Needy.

 6    Q.    Tell us about Help the Needy.   What has that historically

 7    consisted of?

 8    A.    Well, Help the Needy is an Iraqi relief organization that

 9    is located in Syracuse, New York.   The Help the Needy or HTN as

10    it's referred to was a spin off organization out of the IANA.

11    In fact its leader, its president, Rafael Defere (phonetic), is

12    the self proclaimed vice president of IANA.

13    Q.    Are you aware as part of your participation in this case as

14    to whether or not Help the Needy has been investigated by the

15    federal authorities of the United States?

Exhibit B.txt

16  A.   Yes, it has been.

17  Q.   Do you have knowledge of what those -- that investigation

18  consists of?

19  A.   Yes.   The investigation primarily focused on tax violations

20  and violations of the U.S. embargo on Iraq.

21  Q.   Can you tell us the state of that prosecution presently?

22  A.   Yes.   Rafael Defere and several other officials of Help the

23  Needy have been indicted by a federal grand jury in New York.

24  Their offices have been searched.   Rafael Defere is currently

25  in custody after being arrested on February 26 with a couple

98

1  other officers of Help the Needy.

2  Q.   Did that -- did those events have anything to do with the

3  arrest and search warrant events of this case?

4  A.   Yes, they did.

5  Q.   What?

6  A.   Because of the close association between our defendant, Mr.

7  Al-Hussayen, and Rafael Defere and the close associations

8  between the IANA and Help the Needy, when the Syracuse FBI

9  chose to conduct those searches and affect their arrest in

10  Syracuse, our arrests and our -- our arrest rather and our

11  search warrants here were coordinated in such a fashion that

12  they were conducted at the same time.

13  Q.   Has the investigation revealed a tripart type relationship

14  among the defendant, Mr. Defere and Mr. Al-Hamari?

15  A.   Definitely.

16  Q.   What is the nature of that relationship according to the

17  criminal investigation that you've done?

Page 93

Exhibit B.txt

18   A.   We have obtained information through a variety of different

19   means that the defendant, Mr. Al-Hussayen, Rafael Defere, the

20   president of Help the Needy, and Mohammed Al-Hamari, the then

21   president of the IANA, have had extensive conversations, have

22   met face to face on numerous occasions and have generally

23   discussed the future of IANA, have discussed setting up boards

24   of trustees, typical executive officer type of meetings.

25   Q.   You mentioned that Mr. Defere was arrested and detained; is

99

1   that correct?

2   A.   That is correct.

3   Q.   Now, these two other individuals were subject of -- at

4   least one other individual was subject of an arrest warrant in

5   that coordinated case, correct?

6   A.   That is correct.

7   Q.   That person's name is what?

8   A.   It's Iman (phonetic) Jarwan.

9   Q.   And do you know if that individual has been detained?

10   A.   It is my understanding that he is detained.

11   Q.   In addition to the charges that you've mentioned otherwise

12   as to Mr. Defere, are there any other charges relating to Mr.

13   Jarwan in conjunction with this detention hearing?

14   A.   I believe so although I'm unaware of the exact specifics.

15   Q.   Do you know -- can I jog your memory?  Does that involve

16   visa fraud charges?

17   A.   As a matter of fact, it does.   Thank you.

18   Q.   Affidavit -- excuse me.   One more series of questions as

Page 94

Exhibit B.txt

19 far as Help the Needy is concerned.  Did your investigation

20 show any direct financial transactions between defendant and

21 Help the Needy?

22 A.   Yes.

23 Q.   In what form did those transactions occur; how were they

24 reflected?

25 A.   It's my understanding that those were in the form of

100

1 personal checks to Help the Needy.

2 Q.   Do you recall a particular check or checks that had

3 notations that are pertinent to what we're dealing with here?

4 A.   Yes.

5 Q.   Tell us about that.

6 A.   On at least one, maybe more of the checks, there were

7 notations and I believe they were in Arabic on the memo line

8 that stated that the money sent to Help the Needy was for Iraq.

9 Q.   Affidavit paragraph 46 references yet another charity; is

10 that correct?

11 A.   That is correct.

12 Q.   And the name of that charity?

13 A.   The name of that charity is Benevolence International

14 Foundation.

15 Q.   What did the investigation reveal as far as the connection

16 between Benevolence International Foundation and this case?

17 A.   Primarily the financial aspects of the investigation showed

18 that Benevolence International Foundation has sent money to the

19 IANA and in general terms, that money has been sent to

20 assistant sponsoring conferences and the like.

Page 95

Exhibit B.txt

21   Q.   Has Benevolence International been subject of an

22   investigation?

23   A.   Yes, it has.

24   Q.   Do you have knowledge of what the status of that

25   investigation is presently?


101


1   A.   Yes.   It's my understanding that the leader of Benevolence

2   International, a gentleman by the name of Arno (phonetic) has

3   pled guilty to numerous charges and he is currently awaiting

4   sentencing.

5   Q.   Let me ask you this:   To your knowledge, what was his role

6   or relationship with BIF or Benevolence International

7   foundation?

8   A.   When he was in a leadership role of Benevolence

9   International and he was specifically involved in providing

10   material support to the Mujahideen in Chechnya.

11   Q.   So those federal charges related to the operation by him of

12   Benevolence International as a racketeering enterprise in

13   providing material support to Bin Laden and Al Quaida?

14   A.   Yes.

15   Q.   Now, you indicated that he pled guilty.   Do you recall what

16   he pled guilty to?   Let me see if I can refresh your

17   recollection.

18   A.   Thank you.

19   Q.   Did he plead guilty to illegally averting charitable

20   contributions to Mujahideen in Bosnia and Chechnya?

21   A.   Yes, he did.

Exhibit B.txt

22  Q.  But otherwise denied supporting Al Quaida and Bin Laden; is
23  that correct?
24  A.  That is correct.
25  Q.  However, do you know what the position of the U.S.

102

1   attorney's office in Chicago is as far as the proof that they
2   intend to introduce at his sentencing regarding the connection
3   with Al Quaida and Bin Laden?
4   A.  Yes.  Their position is that they will be introducing
5   information at sentencing that will clearly show that link.
6   Q.  You mentioned with regard to -- I'm not sure I recall in
7   regard to what but as far as the executive order that
8   designates -- oh, it was with regard to the Egyptian Islamic
9   Jihad, the executive order whereby an entity or organization
10  can be designated a terrorist organization; is that correct?
11  A.  That is correct.
12  Q.  Do you know if -- is there a similar designation as far as
13  an organization that doesn't designate as a terrorist
14  organization but a terrorist support?
15  A.  Yes.  As a matter of fact, executive order 13224 gives the
16  United States Treasury the authority to designate organizations
17  and individuals as supporting terrorism.
18  Q.  And was Benevolence International so designated by that
19  executive order?
20  A.  It was and as a result, their assets were frozen.
21  Q.  Frozen by what entity?
22  A.  Frozen by the United States Treasury.
23  Q.  There is an acronym of OFAC.

Exhibit B.txt

24    A.   Yes, it is.

25    Q.   What does OFAC stand for?

103

1    A.   That is the Office of Foreign Asset Control.

2    Q.   Is that the entity that's responsible for making that --

3    for doing that freezing of assets?

4    A.   Yes, sir, it is.

5    Q.   There is yet another charity to which the defendant and the

6    IANA have been connected by the investigation; is that right?

7    A.   That's correct.

8    Q.   And what is that charity?

9    A.   That would be the Global Relief Foundation.

10    Q.   And where is the Global Relief Foundation based?

11    A.   Like Benevolence International, it is also based in the

12    Chicago area.

13    Q.   What did your investigation reveal as far as the

14    connections among Global Relief Foundation, the Islamic

15    Assembly of North America and the defendant?

16    A.   Are you asking about financial?

17    Q.   Financial, yes.

18    A.   Well, we -- our financial aspects of the investigation have

19    revealed that there have been checks -- personal checks written

20    by the defendant to Global Relief and on the memo line of those

21    checks, there is I believe again in Arabic a notation that the

22    money is to go to Chechnya.

23    Q.   Is that consistent with your knowledge of such transactions

24    as they might be associated with the investigation of

Page 98

Exhibit B.txt
25   international terrorism in general?

104

1    A.   Yes.

2    Q.   How so?

3    A.   Investigations around the country that come across

4    information such as this, personal checks with notations on the

5    memo line, seem to indicate that the people that are sending

6    the money have a specific purpose for that check.  In this

7    case, it's our belief that those checks were written

8    specifically to go to the Mujahideen in Chechnya.

9    Q.   Did your investigation reveal a connection between Global

10   Relief Foundation and the Islamic Assembly of North America?

11   A.   Yes, there is a connection.

12   Q.   And generally speaking, what was -- what is that or has

13   been that connection?

14   A.   Well, the connection between Global Relief and the Islamic

15   Assembly is like I had mentioned earlier where the IANA

16   sponsors these annual conferences and invites charitable

17   organizations from around the country to participate.  Global

18   Relief is one of those organizations and it's my understanding

19   that Global Relief may also have sent money to the IANA to help

20   pay -- offset the costs of these conferences.

21   Q.   Does the name Al-Multayce mean anything to you?

22   A.   Yes, it does.

23   Q.   What's Al-Multayce?

24   A.   Well, Al-Multayce is a meeting place.

25   Q.   Where?

Exhibit B.txt

105

1    A.    The specific reference to Al-Multayce as far as our

2    investigation is concerned, it corresponds to one of the search

3    locations that we executed our search warrants for on February

4    26.    That is the apartment that I mentioned earlier that's

5    located at 504 and a half D Street in Moscow, Idaho.

6    Al-Multayce is a relatively small apartment, sparsely

7    furnished -- or not furnished at all actually and inside that

8    apartment is a place where many individuals would go and meet

9    on a regular basis, primarily on Saturday evenings, to discuss

10   information in private that was not necessarily to be discussed

11   at the Islamic center in Moscow.

12   Q.    Did that include the defendant, that group?

13   A.    Yes, it did.

14   Q.    Does Al-Multayce have anything to do with Al-Marreti?

15   A.    Yes, it does.

16   Q.    What's Al-Marreti?

17   A.    Al-Marreti is a web site.  It's also a bank account

18   controlled by Mohammed Al-Hamari.

19   Q.    Mohammed Al-Hamari again the historical leader --

20   A.    The then president of IANA.  Colocated at the Al-Multayce

21   apartment on D Street was a computer that was attached to a

22   credit card machine and from that computer, on-line sales for

23   IANA were conducted and payments were received.

24   Q.    And what was the connection with Al-Hamari as far as the

25   control and maintenance of that account?

Exhibit B.txt

1    A.   Although still under investigation, there is a bank account

2    in the Detroit area under the name of Al-Marreti which is the

3    same name as the web site that shows Mohammed Al-Hamari, the

4    then president of IANA, as probably the sole signatory but at

5    least one of the signatories on that account.

6    Q.   Let's shift gears a little bit, Agent Gneckow.   You've

7    indicated that the investigation included a court authorized

8    interception of certain communications by the defendant and

9    including his wife; is that correct?

10   A.   That is correct.

11   Q.   In preparation for this hearing and the investigation

12   otherwise, did you identify certain interceptions that might be

13   of value as far as the court's determination in this particular

14   case?

15   A.   Yes, I did.

16   Q.   Let's talk about a few of those, shall we?   How do they

17   reflect the number of interceptions that have been realized to

18   your knowledge?

19   A.   There are -- there are so many interceptions.   These are

20   just a tiny sample of what we have.

21   Q.   Do you recall any interceptions in which the FBI is

22   mentioned?

23   A.   Yes, I recall at least two.

24   Q.   Okay.   Let me refer you to one I believe September 12 of

25   2002.   Do you know which one I'm talking about?

Exhibit B.txt

1   A.   I do.

2   Q.   And the defendant was one of the -- this was a telephone

3   intercept; is that correct?

4   A.   Yes, it was.

5   Q.   The defendant was one of the participants talking; is that

6   right?

7   A.   That is correct.

8   Q.   And what was discussed between the defendant and the party

9   that he was talking to as far as the FBI?  What was the nature

10  of this discussion?

11  A.   Well, generally it was a business discussion that dealt

12  with establishing as a venue for business something in the

13  State of Texas.  It was the defendant's response that he didn't

14  feel that was a good idea because there's one company in

15  particular that is having difficulty with the FBI in that

16  state.

17  Q.   You're referring to another call of November 25 of 2002.

18  The defendant was a participant in this telephone call that was

19  intercepted; is that right?

20  A.   Yes.

21  Q.   And they were talking about his studies at the University

22  of Idaho; is that correct?

23  A.   That is correct.

24  Q.   Tell us what the --

25           COURT:   The date of that again?

108

Page 102

```
                        Exhibit B.txt
   1           WITNESS:  November 25, 2002.

   2   BY MR. LINDQUIST:

   3   Q.   They discussed extensions; is that correct?

   4   A.   That is correct.

   5   Q.   Tell us about that.

   6   A.   Well, in this particular telephone call, it dealt with the

   7   defendant's attempts to get additional -- an additional

   8   extension or stipend from the Saudi government to allow him to

   9   stay longer to complete his studies.  In the course of the

  10   conversation, the defendant made the statement that he was not

  11   prepared to have the FBI knock on his door.

  12   Q.   I'll refer you to a telephone call intercepted on October

  13   24, 2002.  The defendant's wife was talking with a friend; is

  14   that correct?

  15   A.   That is correct.

  16   Q.   I believe they discussed something that you referenced

  17   earlier with regard to the exhibits, the images from the

  18   computers; is that right?

  19   A.   That's correct.

  20   Q.   What was the nature of this discussion?

  21   A.   This discussion centered around the Mujahideen takeover of

  22   the Moscow music hall in Moscow, Russia.  The content of the

  23   conversation was that it was the participants in the

  24   conversation's opinion that it was good to go from a defensive

  25   posture to an offensive posture with regard to (inaudible)
```

109

```
   1   activity.

   2   Q.   Did the interception reveal any -- any expression by the
                        Page 103
```

Exhibit B.txt

3    defendant's wife as far as her attitude toward America?

4    A.   Yes.   In that telephone call, she said that she hates

5    America.

6    Q.   Let me refer you to an intercepted call of November 19 of

7    2002 involving discussion between the defendant and someone

8    else and discussing the arrest of a person in Palestine.   Do

9    you know what I'm referring to?

10   A.   Yes.

11   Q.   What was the gist of that conversation as far as what was

12   happening in Palestine?

13   A.   Essentially the conversation dealing with this particular

14   arrest was something -- one of the individuals wanted to have

15   posted or published on one of the web sites associated with the

16   defendant, Mr. Al-Hussayen.   However, it was Mr. Al-Hussayen

17   who told the caller -- or the callee that he did not want to

18   have any information published until they got additional

19   details relative to the arrest.

20   Q.   Let me refer you to an intercepted call of October 29, 2002

21   between the defendant and another person where they were

22   talking about conferences.

23            MR. NEVIN:   What was the date again?

24            MR. LINDQUIST:   I'm sorry.   October 29 of 2002.

25   BY MR. LINDQUIST:

110

1    Q.   With regard to conferences.   Do you know which one I'm

2    talking about?

3    A.   Yes.

Page 104

Exhibit B.txt

4   Q.   And earlier in your testimony, you referred to one of the

5   publications, the web site publications, the term "operations";

6   is that correct?

7   A.   That's correct.

8   Q.   Is that term used here?

9   A.   Yes, it was.

10   Q.   Tell us about that.

11   A.   In this particular phone call, the discussion of operations

12   in the sense of suicide operations was discussed and the fact

13   that this is a topic that always causes debate at the

14   conferences.   The significance of this particular call we

15   believe is as a result of the Saudi mufti condemning suicide

16   operations after --

17   Q.   The Saudi --

18   A.   M-U-F-T-I.

19   Q.   What's that?

20   A.   That is a religious political leader of the Saudi

21   Arabian -- of Saudi. Following the attacks of -- the terrorist

22   attacks of September 11, he issued a Fatwa condemning the

23   suicide operations.

24   Q.   Fatwa, what's that?

25   A.   A Fatwa is a religious ruling typically issued by a sheikh

111

1   or someone in very high standing with the Islamic society.

2   Q.   Please refer to a call of November 28 of 2002 involving the

3   defendant that also used this term I believe a second

4   operation; is that correct?

5   A.   That is correct.

Page 105

Exhibit B.txt

6    Q.   Please tell us about that call.

7    A.   In this particular conversation, Sami -- excuse me, Mr.

8    Al-Hussayen and a friend of his discussed suicide operations in

9    Palestine.  They discussed the fact that there were many deaths

10   and Mr. Al-Hussayen thank his friend for that information and

11   said it was very powerful.

12   Q.   I'd like to refer you to a call of December 4, 2002.  That

13   was intercepted but did not necessarily involve the defendant;

14   is that correct?

15   A.   Right.  This was an e-mail communication that was sent to a

16   group address so there were numerous recipients on this

17   particular communication although the defendant was one of the

18   people in the group address.

19   Q.   And what was the nature of the item that was intercepted?

20   A.   The item that was intercepted appears to be a communique

21   from the Al Quaida political office extolling the virtues and

22   successes of a Jihadist and suicide operations targeting the

23   west.

24   Q.   This specifically references, does it not, the bombings in

25   Kenya?


112


1    A.   Yes, it does.  I believe it also references the attack on

2    the USS Cole if I'm not mistaken.

3    Q.   It references those two bombings -- the bombings of the two

4    embassies; is that right?

5    A.   That's correct.

6    Q.   The World Trade Center?

Page 106

Exhibit B.txt

7    A.   Yes.

8    Q.   The Pentagon; is that correct?

9    A.   Yes.

10   Q.   And the Pennsylvania -- or the plane that crashed in

11   Pennsylvania as part of the 9/11 events; is that correct?

12   A.   Yes, there was references to that as well.

13   Q.   And I mean this is -- it's fairly extensive but

14   essentially, what this proclaimed -- what does it teach you or

15   instructing as far as these particular events of the past are

16   related to the future?

17   A.   It's clearly in my opinion a motivational document.   This

18   is the good stuff that we've done and let's continue doing it.

19   Q.   Are you familiar as a result of your experience in this

20   investigation with what is referred to as the Al Quaida

21   political office?

22   A.   I am somewhat familiar with it but not very -- in a

23   detailed fashion.

24   Q.   Are you experienced enough with it to say that this would

25   be part of that infrastructure that you were talking about at

113

1    the beginning of your testimony associated with international

2    terrorism?

3    A.   Certainly.   As part of any organization, something like a

4    periodic newsletter or motivational document would be part and

5    parcel of that.

6    Q.   I'd like to refer you to a telephone call of January 19 of

7    2003 that was intercepted.   That addressed involved Mr.

8    Al-Hussayen and another individual as they talk about two of

Exhibit B.txt

 9   Mr. -- of Sheikh Al-Ouda's lectures; is that right?

10   A.   That is correct.

11   Q.   Tell us what was said between the two gentlemen in this

12   interception.

13   A.   During this particular telephone call, Mr. Al-Hussayen

14   discussed with the other individual the fact that there were

15   two Sheikh Al-Ouda lectures, one of which had not been endorsed

16   or supported by the Saudi government.   During the course of the

17   conversation, Mr. Al-Hussayen stated that he felt that both

18   articles could be published and if they fell under any

19   scrutiny, they meaning the operators of the web site, they

20   would simply say that they are a service provider only and it

21   won't happen again.

22   Q.   Refer to a call of January 21 of 2003, just two days later

23   involving the defendant and another Al-Ouda lecture; is that

24   right?

25   A.   I'm sorry.   I think that is a Al-Hawali lecture.

114

 1   Q.   Is that Al-Hawali?   Okay.   Excuse me.   What lecture are we

 2   referring to?

 3   A.   What date are we talking about?

 4   Q.   January 21 of 2003.

 5   A.   Right.   I'm very sure that is a Al-Hawali lecture.

 6   Q.   Sorry.   Okay.   And what was the title -- first of all, how

 7   does it relate to this telephone call that was intercepted?

 8   A.   The telephone call itself was a discussion in which the

 9   defendant, Mr. Al-Hussayen, was talking about this article that

Exhibit B.txt

10    was going to come out, the article -- the title of the article

11    being the anti Fatwah and the new tarters (phonetic).

12    Q.   What is anti Fatwah?  What does that mean?

13    A.   Anti Fatwah is a violent movement to oust in this

14    particular case the Jews.

15    Q.   And did the investigation ultimately identify that article

16    which was intercepted in this telephone conversation?

17    A.   Yes, we did identify it.

18    Q.   And can you tell us about the content of that article, what

19    it contained?  What did it say?  First of all, where did you

20    find it?  Was it on the web site somewhere?

21    A.   It was on the web site and in fact it was found on Sheikh

22    Al-Ouda's web site, Islam Today.

23    Q.   And that's on our chart, correct?

24    A.   That is on our chart, yes.

25    Q.   All right.  What was the content of this publication?  What

                                                                    115

1    did it say?

2    A.   Well, the content of the publication spoke of the anti

3    Fatwah and how important it was for the true believes to

4    support it in any deed possible, whether by paying money, by

5    writing articles, by actually supporting it through violence.

6    But that the anti Fatwah was something that was forbidden to

7    stop and the anti Fatwah itself encompassed several different

8    fronts many of which -- or all of which are listed in this

9    particular article.  Among them are suicide operations, attacks

10    on settlements, firing mortars, blowing up tanks, developing

11    explosives, killing in hand to hand combat, attacks on bases,

                              Page 109

Exhibit B.txt

12  strong intelligence pursuing important Jewish personalities,

13  bribing the enemies.  There were also references in the article

14  to the United States calling the United States itself the new

15  tarters (phonetic).

16          There's verbiage in here that states the only thing

17  that will make America retract from war -- and I believe this

18  is a reference to the possible war with Iraq.  The only thing

19  that will make America retract from war or any murderous

20  project it has in the region is for Israel to be struck and hit

21  causing it more and pain and suffering in such a fashion that

22  there will be no solution but to stop the American aggression.

23  Q.  Okay.  Let me refer you to an e-mail that was intercepted

24  on April 15 of 2002.  Do you know which one I'm referring to?

25  A.  Yes, I do.


                                                                116


1  Q.  And it referred to Jihad, did it not?

2  A.  Yes, it did.

3  Q.  And weapons?

4  A.  Yes, it did.

5  Q.  In what way?

6  A.  This particular message was forwarded to Mr. Al-Hussayen

7  from another student at the University of Idaho essentially

8  soliciting donations and funding for Hamasse which is a foreign

9  terrorist organization.  The message in short lays out the cost

10  for bullets, assault rifles, explosives, et cetera and calls

11  for support for the Muslim brothers that are fighting in

12  Palestine.

Exhibit B.txt

13   Q.   Another e-mail that was associated with Mr. Al-Hussayen was

14   intercepted on April 16 of 2002; is that correct?

15   A.   That is correct.

16   Q.   This one dealing -- this one being an article in favor of

17   suicide bombings; is that correct?

18   A.   That is correct.

19   Q.   And in sum, what did this article proclaim as far as

20   suicide bombings were concerned?

21   A.   I have to apologize.   I do not have that article with me.

22   Q.   But you can tell us that it was an article extolling the

23   propriety of suicide bombings; is that right?

24   A.   Yes, it was.

25   Q.   An intercepted e-mail of November 12, 2002 regarding the

117

1   reservation of a web site.   Are you familiar with that?

2   A.   Yes, I am.

3   Q.   What was the nature of that e-mail?

4   A.   This e-mail communication dealt with a specific request to

5   have the defendant, Mr. Al-Hussayen, set up a web site for an

6   article by one of the sheikhs.   We believe it is Sheikh

7   Al-Ouda.   The speech was going to deal with the Iraqi situation

8   vis-a-vis the United States and in fact a name for that web

9   site was recommended to Mr. Al-Hussayen.

10   Q.   Were you able to locate that talk for which the web site

11   was reserved, the Iraq talk?

12   A.   Yes.

13   Q.   And can you give us an idea of what the content or the

14   orientation of that talk was for purposes of this hearing?

Exhibit B.txt

15    What did it say?

16    A.   Well, the lecture or the article itself was actually

17    unsigned so it is difficult for us to --

18    Q.   We don't know who the author is.

19    A.   We don't know who the author is.  We believe it was Sheikh

20    Al-Ouda based on the e-mail communication that occurred prior

21    to that.  Before I talk about the article, I think it's

22    important to note that the web site name that was requested of

23    Mr. Al-Hussayen is the web site name that he registered for

24    this particular article although it was linked to a second web

25    site.  The web site in particular that the article exist -- or

118

1    was located on was Sawtna, S-a-w-t-n-a I believe, and it was

2    linked to another web site called Nation Voice all registered

3    by Mr. Al-Hussayen.

4            The speech itself was very similar to much of the

5    verbiage we have seen so far and that is it dealt with

6    showing -- or arguing that the United States was completely

7    wrong in an inference to go against Iraq and that those -- any

8    efforts in that regard would be dealt with.

9    Q.   Is there any reference in the talk to charity associations

10   and organizations?

11   A.   I believe there were.  However, I don't have that

12   information in front of me.

13           MR. LINDQUIST:  Your Honor, we're a little bit before

14   the hour you indicated that you wanted to break.

15           COURT:  It's about five till.  We'll go ahead and

Page 112

Exhibit B.txt

16   recess.  We'll take a presentation of evidence out of order at

17   this time.  We'll take a recess.

18          CLERK:  All rise.

19               (A recess was taken.  The testimony of Ab Dul

20               Rakman Al-Hussayen was taken.   Direct

21               Examination of Michael Gneckow was continued.)

22          COURT:   We'll go ahead and then continue with the

23   Government's evidence.

24          MR. NEVIN:   Your Honor, thank you for accommodating

25   that out of order (inaudible).

119

1          COURT:  You're quite welcome.   You may proceed.

2          MR. LINDQUIST:   Thank you.

3   BY MR. LINDQUIST:

4   Q.   Agent Gneckow, we were talking about some specific

5   interceptions that the investigation revealed.  I'd like to

6   refer you to the one of January 17 of 2003 that involved a

7   martyrdom poem.  Do you know what I'm talking about?

8   A.   Yes, sir, I do.

9   Q.   That was an e-mail interception; is that correct?

10  A.   That is correct.

11  Q.   And tell us about that, how that was intercepted on the

12  defendant's e-mail.

13  A.   This was an e-mail communication that came from Islam Today

14  I believe.  The communication, it was --

15  Q.   Islam Today so that we remember is the web site associated

16  with Sheikh Al-Ouda?

17  A.   Yes, Sheikh Salman Al-Ouda, that's correct.  This was a

Page 113

Exhibit B.txt

18   short poem, the title of which was "A Martyr under 20" and if

19   you like, I can --

20   Q.   Do you have the gist of that poem there?

21   A.   Actually I do.

22   Q.   Go ahead.

23   A.   The poem goes as follows:

24        MR. NEVIN:   Judge, let me object to this without

25   additional testimony about the context.  It can't be told from

120

1   the testimony thusfar whether this was something that Mr.

2   Al-Hussayen received under circumstances, whether (inaudible).

3   I think that foundation (inaudible).

4        MR. LINDQUIST:   That's cross-examination.  The link to

5   the defendant has been established as far as the interception

6   of his e-mail.  It's dealing with martyrdom and the other

7   testimony that the agent has provided.  It's very relevant.

8        COURT:   I'll overrule the objection.

9   BY MR. NEVIN:

10  Q.   Go ahead.

11  A.   The poem as translated states, "I kiss your young heart.  I

12  kiss the toes upon your feet that are going to their death.  I

13  kiss a beautiful head and beautiful eyes.  I kiss your heart

14  where religion and your strong faith live.  I kiss your heart

15  which was certain that life that has fettered me and the poor

16  pretentious others was nothing but a passing trip.  I kiss your

17  picture and your name and your wound, your wound that

18  embarrasses shallow people like me.  God is generous and you

Page 114

Exhibit B.txt

19  are the martyr."

20  Q.  I'd like to you reference another interception I believe.

21  A telephone call the day before the defendant's arrest.  He was

22  arrested on what day?

23  A.  Mr. Al-Hussayen was arrested on February 26, 2003.

24  Q.  So this would be on the 25th; is that correct?

25  A.  That is correct.

121

1   Q.  And this call was between the defendant and whom?

2   A.  Between the defendant and one of his brothers.

3   Q.  Do you know which brother that was?

4   A.  Yes.  It was Khalid (phonetic).

5   Q.  One of the brothers mentioned by Abdul Rakman, the brother

6   that just testified; is that correct?

7   A.  That's correct.  I believe he is the brother residing in

8   Calgary.

9   Q.  And can you tell us what this call was about?

10  A.  There was a number of items discussed during the

11  conversation.  Towards the end of the conversation, the brother

12  asks Mr. Al-Hussayen where he would recommend that he send

13  money.  Mr. Al-Hussayen tells his brother to send money to Help

14  the Needy since according to Mr. Al-Hussayen it was above

15  suspicion unlike some other organizations that are under

16  monitoring.  The brother asked if the money was going to Iraq.

17  Mr. Al-Hussayen said yes and that it was a good choice.

18  Q.  I'll also refer you to telephone call that was intercepted

19  on November 16 of 2002 involving the defendant and another

20  individual.  Do you recall that?

Exhibit B.txt

21  A.  Yes, I do.

22  Q.  And what was the gist of that conversation within the

23  context of your testimony here today?

24  A.  In that conversation, Mr. Al-Hussayen stated that they,

25  meaning the United States, have to live in terror in order to


122


1   rationalize their actions.

2   Q.  If you would, do you have exhibit -- do you have Exhibit 4

3   there in front of you?

4   A.  Yes, I do.

5   Q.  And that exhibit is a synopsis, if you will, of the events

6   associated with the false statement and visa fraud charges of

7   the indictment; is that correct?

8   A.  Yes, sir, that is.

9   Q.  And they correspond to essentially affidavit paragraphs 15

10  and 19 through 28; is that right?

11  A.  That's correct.

12          MR. LINDQUIST:  Your Honor, I offer that for the

13  benefit of the Court in simply assessing that aspect of the

14  affidavit.

15          COURT:  Any objections to the summary?

16          MR. NEVIN:  No, sir.

17          COURT:  All right.

18          (Government's Exhibit No. 4 admitted.)

19  BY MR. LINDQUIST:

20  Q.  Agent Gneckow, you mentioned previously in your testimony

21  that your investigation revealed much of the defendant's

Exhibit B.txt

22   doctoral dissertation pursuit at the University of Idaho; is

23   that correct?

24   A.   That's correct.

25   Q.   Did that investigation reveal that he was struggling in

123

1    that doctoral pursuit?

2    A.   It certainly indicated that, yes.

3    Q.   In what way?

4    A.   It appears that Mr. Al-Hussayen, the defendant, has

5    required at least three extensions of his stay in the United

6    States.   Interviews of University of Idaho personnel seem to

7    indicate that he is about a year and a half behind schedule on

8    his studies and in fact some official or an official at the

9    university expressed frustration in his lack of progress in

10   pursuit of his doctoral (inaudible).

11   Q.   And who was that official?

12   A.   That official would be Dr. Debra Frinke.

13   Q.   We'll go to that here in just a moment but before we go

14   there, may I infer from your testimony that the defendant is

15   now functioning under the fourth extension to your knowledge?

16   A.   The details of the extension are unclear to me.   The

17   extension was not something that was extended to Mr.

18   Al-Hussayen in the form of additional stipend payments from the

19   Saudi government.

20   Q.   What has your investigation revealed as far as the status

21   of the stipend payments?

22   A.   It's my understanding that the stipend payments from the

23   Saudi government have ceased and in fact Mr. Al-Hussayen is

Page 117

Exhibit B.txt

24    supporting his continued stay in the United States out of his

25    own pocket or with assistance from others other than the Saudi

124

1    government.

2    Q.   And do you know whether or not a deadline has been

3    established or did the investigation reveal that as far as that

4    extension -- fundless extension if you will and when the

5    doctoral must be had?

6    A.   It appears on the limited information that I have in my

7    possession that sometime in May appears to be the end of the

8    extension.

9    Q.   Does that correspond to essentially the semester that we're

10    in as far as the University of Idaho is concerned?

11    A.   Essentially, yes.

12    Q.   You mentioned Dr. Frinke  what has been her relationship

13    with the defendant?

14    A.   For a time, Dr. Frinke was the defendant's advisor for his

15    doctoral dissertation.

16    Q.   Is she now?

17    A.   She no longer is now.

18    Q.   Why not?

19    A.   There were a series of events that ultimately led to the

20    defendant switching advisors.  Dr. Frinke stated that although

21    Mr. Al-Hussayen -- although she considered Mr. Al-Hussayen to

22    be very bright, she was puzzled and frustrated by his lack of

23    progress in pursuing the degree.

24    Q.   Did she say anything about him being preoccupied or

Page 118

Exhibit B.txt
25    otherwise distracted?


                                                                        125


 1    A.   In fact, she did.  She said it appeared that he was

 2    preoccupied.  She said something was going on.  She couldn't

 3    put her finger on it but she felt that something needed to be

 4    done, a change of some sort was in order, some action needed to

 5    be taken.  That was preceded by Mr. Al-Hussayen switching

 6    advisors on his own.

 7    Q.   Did she say anything that had to do with her coming close

 8    to taking some action -- negative action toward him because of

 9    his lack of progress?

10    A.   She indicated that because of his lack of progressing,

11    because something she couldn't immediately identify, something

12    that dealt with his preoccupation perhaps with other items, she

13    was being forced quickly into the position of perhaps having to

14    take some action which ultimately could have been her

15    reassigning him to another advisor herself but certainly she

16    was facing a crossroads.

17    Q.   Your understanding is from interviews of her that the

18    defendant took steps to change advisors in light of that?

19    A.   Yes.

20    Q.   Who is the defendant's advisor now to your knowledge?

21    A.   That would be a Mr. Dickinson at the University of Idaho.

22    Q.   Has he also been interviewed as part of this investigation?

23    A.   Yes, he has.

24    Q.   And can you tell us how he characterized Mr. Al-Hussayen as

25    far as how the defendant compares with his other students?

Exhibit B.txt

126

1    A.   Well, I believe that based on the interview, Mr. Dickinson
2    is fond of Mr. Al-Hussayen.  He feels he's bright but in
3    comparing him with past students he's had as advisees, he said
4    Mr. Al-Hussayen would not be in the star or spectacular
5    category of previous students.
6    Q.   In your testimony, you've indicated that the defendant had
7    his office in the isotope lab there at the University of Idaho,
8    correct?
9    A.   That is correct.
10   Q.   Did your investigation indicate that that has always been
11   the case or not?
12   A.   No.  As a matter of fact, he has not always had his lab at
13   the -- or his work station at the isotope lab.  In fact, our
14   investigation revealed that no one knew that he had moved his
15   lab or his work station to that lab.  No one in authority, that
16   is neither Dr. Frinke, Dr. Dickinson nor people responsible for
17   oversight of the lab itself.
18   Q.   And it was there at the isotope lab where he had his work
19   station that the computer with the large hard drive was
20   identified; is that correct?
21   A.   That's correct.
22   Q.   Did you have occasion to talk to Dr. Frinke about the
23   computer security situation there at the University of Idaho,
24   the network?
25   A.   I did.

Exhibit B.txt

1  Q.   Generally speaking, how did she characterize the
2  vulnerability of that network to you?
3  A.   She said that unfortunately because of the academic setting
4  of the university and simple funding issues that the University
5  of Idaho's network was very vulnerable to cyber probing, cyber
6  attack.
7  Q.   Did you discuss with her as part of the interview her
8  position with regard to the program that the advanced students
9  have available to them and how that relates to computer
10  security versus hacking?
11  A.   Yes, we did have an opportunity to discuss that with her.
12  Q.   And essentially, what was her position with regard to that
13  program -- the significance of that program and the concepts of
14  security and hacking?
15  A.   Well, Dr. Frinke as I mentioned earlier in my testimony is
16  considered preeminent within circles of the government with
17  regard to computer security, intrusion defense, things of that
18  nature.  Because of her knowledge in that area, she takes her
19  job very seriously when it comes to instructing new students
20  that are part of these programs.  She told me that she makes it
21  a point upon her initial contact with new students to make sure
22  that they understand to not use the knowledge that they're
23  learning in the program to go out and conduct hacking because
24  certainly someone who knows how to defend a computer system
25  will also know the weaknesses and how to exploit it.

Exhibit B.txt

```
 1        She says she takes great pains in even using the FBI
 2   as an example to say that if you go out -- addressing the
 3   students, if you go out and do any hacking, the FBI will
 4   investigate.
 5   Q.   You might have said this and I didn't catch it.   If I
 6   didn't, I apologize.   Did she characterize these advanced
 7   students as sophisticated hackers on the right side of the law?
 8   Does that ring a bell?
 9   A.   Actually, no.   In our discussions during the interview
10   process, those were -- those were things that we threw back and
11   forth in discussion.   But clearly, it was apparent during the
12   course of the interview that there has to be an ethical line
13   that students with that kind of knowledge have to walk and not
14   cross.   And I believe that she takes a very serious look at
15   that and impresses that upon her students.
16   Q.   I have a newspaper article here with an article attributed
17   to the Associated Press that indicates a quote of Dr. Frinke
18   it says, quote, "The technology that protects the system is the
19   same technology that can bring a system down," closed quote.
20   Assuming she made that statement, is that consistent with what
21   she told you in her interview?
22   A.   I think it's very consistent.   Dr. Frinke even stated that
23   with a cursory look at a student in the CSDS program at the
24   University of Idaho, you might think of that person -- you
25   might believe that person is a hacker because the tools that
```

129

Exhibit B.txt

1  they use in order to learn their profession to do their
2  research are the same tools that a hacker would use.
3  Q.   I also have an article that came off of a web site that is
4  attributed to I believe the Lewiston Tribune also quoting Dr.
5  Frinke.  It says, "The average computer owner, Frinke said, can
6  help guard against everything from identity theft to terrorism
7  by routinely adapting or using more complicated passwords.
8  Those who have constant on-line service should also invest in
9  the latest firewall components to help insure against entry."
10  Is that comment, assuming she made it, consistent with her
11  interview by the FBI?
12  A.   Absolutely.  I think she is very aware of the potential
13  vulnerabilities of computer systems and that is consistent with
14  what we learned from our interview with her.
15  Q.   Did your investigation include chatting with security
16  officials at the University of Idaho with regard to that
17  network?
18  A.   Yes, it did.
19  Q.   Anyone in particular?
20  A.   Yes.  The IT security director, for lack of a better term,
21  Tony Opheim (phonetic) was interviewed.  I myself did not
22  conduct that interview but I am privy to the information
23  obtained.
24  Q.   And did that interview include -- did it address entries
25  into the network that Dr. Frinke perhaps is referring to here

130

1  in this article and the security danger associated with that?
2  A.   Yes.

Page 123

Exhibit B.txt

3    Q.   Generally speaking, what is your understanding of what this
4    fellow said as far as entries into the network and the
5    difficulties that that can cause?
6    A.   I think Mr. Opheim is very comfortable with the level of
7    security he has for the network based on the limited budget
8    that he has.  However, he is also very concerned about the
9    vulnerabilities of the network and in the discussions that our
10   investigators have had with him, one of his biggest concerns is
11   of probing or intrusion from within versus from without.  For
12   example, if someone were to have access to the network and in
13   such a fashion, they essentially bypass some of the stronger
14   security layers, get inside the layers of the onion if you will
15   and are able to probe the system, probe the network which as
16   you recall from my earlier testimony is a very advanced, very
17   fast, very sophisticated network.
18   Q.   And connected with other networks; is that right?
19   A.   Yes, it is.
20   Q.   Did your investigation include analysis by computer experts
21   with regard to the large hard drive computer in the isotope
22   lab?
23   A.   Yes.
24   Q.   Did that analysis render a result or an opinion as to the
25   nature of that computer with that large hard drive from the

131

1    standpoint of being a server?
2    A.   Yes, it did.
3    Q.   What's your understanding of that analysis?

Page 124

Exhibit B.txt

4    A.   My understanding from the analysis or the security scan

5    that was run on that particular computer is that it is or was a

6    file server.   The concern by the information technology

7    security personnel at the University of Idaho is independent

8    file service created on a network essentially create a back

9    door for entry into the network.

10    Q.   An open portal; is that correct?

11    A.   Yes.

12    Q.   With the security officer, did you discuss whether or not

13    this type of phenomenon, a server in fact resulting in an open

14    portal in a left-handed way, how that relates to the security

15    policy of the University of Idaho?

16    A.   Yes.   He said that -- I'm sorry.

17    Q.   Go ahead.   What was said?

18    A.   Periodic scans are always made of the computer systems at

19    the university looking for violations of university policy.   An

20    independent file server is a violation of policy and it would

21    be immediately shut down and the persons responsible for either

22    the creation or use of that file server would then be

23    answerable to the dean of the university and perhaps have their

24    network privileges removed.

25    Q.   Did the technical analysis indicate that the defendant's

132

1    computer as a server had in effect had that effect of opening

2    that portal?

3    A.   Yes.   An independent scan of that particular server was run

4    and there were indications that IP addresses from outside the

5    network had perhaps probed the network.   What he was not able

Page 125

Exhibit B.txt

6   to tell us was the extent, whether it was just a probing issue,

7   whether it was a false positive, whether someone actually

8   entered the network and was inside downloading or probing for

9   security weaknesses within.  The scan could not tell us any of

10  that but what it did tell us was that there were at least two

11  IP addresses, possibly three, that appear to have paned or

12  probed at a minimum the system.

13  Q.  Did one of those IP addresses correspond to a web site that

14  we've discussed here today?

15  A.  Yes, it did.

16  Q.  And what is that web site?

17  A.  That web site is Islam Way.com.

18  Q.  And that is associated with the Islamic Assembly of North

19  America; is that correct?

20  A.  Yes, it is.

21  Q.  Shifting gears slightly, did your post-arrest interviews

22  reveal anything as far as people opining about the defendant's

23  radical orientation changing after September 11?

24  A.  Yes.

25  Q.  What did those interviews reveal?

133

1   A.  There was at least one interview that I'm aware of where a

2   fellow student, an associate, stated that prior to September

3   11 --

4           MR. NEVIN:  I'll object to it without further

5   foundation with respect to who made the statement.

6           COURT:  Response?

Page 126

Exhibit B.txt
```
 7            MR. LINDQUIST:  That's fine.
 8   BY MR. LINDQUIST:
 9   Q.   Who made the statement?
10   A.   During the interview, a fellow student, Sala Al-Korida
11   (phonetic), statements were made that prior to September 11,
12   the group to which Mr. Al-Hussayen belongs was very radical but
13   that they toned down their rhetoric for lack of a better word
14   after September 11.
15   Q.   To your knowledge, Agent Gneckow, does the United States
16   have an extradition treaty with Saudi Arabia?
17   A.   To my knowledge, there is no extradition treaty.
18   Q.   And to your knowledge at the present time, independently of
19   this prosecution and this detention hearing mechanism, does the
20   Immigration and Naturalization Service or what was formally
21   before Homeland Security the Immigration and Naturalization
22   Service have a detainer lodged against the defendant at the
23   present time for those independent administrative proceedings?
24   A.   It is my understanding that there is a detainer.
25   Q.   And is your understanding that those charges are similar to
```

134

```
 1   the charges in this indictment and also reflect the orientation
 2   of this investigation?
 3   A.   Yes, sir.
 4            MR. LINDQUIST:  Your Honor, thank you.  Those are the
 5   questions that I have of Agent Gneckow.
 6            COURT:   (Inaudible.)
 7            MR. NEVIN:  Is this a time we can take a brief recess,
 8   Your Honor?
```

Exhibit B.txt

 9          COURT:  All right.  We'll be in recess for 15 minutes
10    until 3:30.
11          CLERK: All rise.
12               (A recess was taken.)
13          COURT:  You may be seated.  You may proceed.
14                         CROSS-EXAMINATION
15    QUESTIONS BY MR. NEVIN:
16    Q.  Let's start with the last point you testified about first,
17    this business of talking to Deb Frinke. Did I understand you to
18    say that Dr. Frinke was not aware that Sami was occupying a new
19    work station at the isotope lab?
20    A.  That's correct.
21    Q.  And he had moved to that location fairly recently, isn't
22    that true?
23    A.  I'm not positive of the date he moved.
24    Q.  You haven't checked that out in the course of your
25    investigation?


                                                                   135


 1    A.  Those sorts of things are under investigation right now.
 2    Unfortunately, nobody knew when he moved into the isotope lab.
 3    Q.  No one knew?
 4    A.  No one at the university that we've interviewed to this
 5    date.
 6    Q.  Yeah.  But it's not true that no one knew, is it?
 7    A.  Oh, I'm sure you're correct.  There are some people that
 8    know when he moved over there.  But as far as our investigation
 9    is concerned, we have yet to interview someone who knows when

Exhibit B.txt
10   he moved there.

11   Q.   Yeah, your investigation is incomplete in that respect but

12   we're talking about an office that is a physical location at

13   the university, right?  I mean it's visible to the naked eye,

14   correct?

15   A.   That is correct, sir.

16   Q.   Anybody who wanted to go there could see that Sami was

17   occupying that space, right?

18   A.   That's not correct, sir.  That office space is locked much

19   of the time.

20   Q.   The time -- this is the computer, is it not, that all of

21   these pictures that you found was located on, right?

22   A.   No, sir.  Some of the photographs came from that computer.

23   Some came from Mr. Al-Hussayen's home computer.

24   Q.   Right.  And the bulk of them came from the computer at the

25   isotope lab; isn't that true?

136

1   A.   Sir, I'm not sure what the percentage is.

2   Q.   Did you determine when those pictures had been placed on

3   the hard drive of that computer?

4   A.   As you recall from my previous testimony, sir, it was just

5   a cursory review.  Complete analysis of the computer has yet to

6   be conducted.

7   Q.   Well, isn't it true that those pictures -- that many of

8   those pictures were probably placed on that computer before

9   Sami ever started using it?

10   A.   Sir, as I stated, I --

11   Q.   You don't know.

Page 129

Exhibit B.txt

12   A.   That part of the investigation, that analysis has yet to be

13   conducted.

14   Q.   Isn't it true that Sami has only started using the computer

15   in that location for something like the last six months or so?

16   A.   As I mentioned earlier, sir, we're still looking into the

17   exact date that he moved in there.

18   Q.   Well, yes, sir, but you testified -- your testimony

19   indicated that these photographs -- I mean you came here and

20   testified that these photographs are connected to Sami

21   Al-Hussayen and you indicate that -- the implication is that

22   he's downloaded them and preserved them for the purposes of

23   having them on his computer because they -- they're consistent

24   with his beliefs.   I mean that was the tenor of your testimony,

25   wasn't it?


137


1   A.   Sir, I never stated that he downloaded any of those images.

2   Q.   Well, why were you -- why was it raised then?

3   A.   Because in the normal course of an investigation that deals

4   with computer activity, typical analysis of computers includes

5   retrieving documentary evidence, photographic images, things of

6   the like.

7   Q.   So you had time to print them out and attach the file name

8   to them but you didn't have time to determine when they were

9   downloaded?

10   A.   Sir, the computer at the isotope lab as an example is an 80

11   gigabyte computer.   To put things in perspective, that is

12   thousands, perhaps millions of documents.   The search was

Page 130

Exhibit B.txt

13  conducted just on the 26th and this was just a cursory review
14  of what was on the computer.
15  Q.  Sir, if you had time to print these images, you had time to
16  tell us when they were downloaded, didn't you?
17  A.  No, sir.
18  Q.  Okay.
19  A.  No, sir.
20  Q.  Okay.  Now, you know, don't you that when I log onto the
21  New York Times.com, for example, that happens to be my home
22  page that the images that are on New York Times.com are
23  downloaded to my computer and they stay there on my computer
24  until I go and I delete them.  Don't you know that to be true?
25  A.  Sir, I don't have an internet computer at home so I don't

138

1   necessarily know that.
2   Q.  You're conducting this investigation and you don't know
3   that?
4   A.  Sir, I rely on my --
5           MR. LINDQUIST:  This is just argumentative.
6           COURT:  I'll sustain the objection.
7           MR. NEVIN:  Well, Your Honor, the witness --
8           COURT:  Proceed by questions, Counsel.
9   BY MR. NEVIN:
10  Q.  Well, sir, you then aren't aware of how pictures end up on
11  a computer?  Is that your testimony?
12  A.  My testimony, sir, is that I rely on the technical experts
13  to tell me that.
14  Q.  And so the answer would be you don't know how they get

Exhibit B.txt

15    there, you personally?

16    A.   I'm sorry.   Was that a question?

17    Q.   Yes.

18    A.   I personally rely on the technical experts to provide me

19    information relative to the computer analysis aspects of our

20    investigation.

21    Q.   So if I told you that when a person logs onto a news

22    organization's web site and the photographs are downloaded onto

23    a person's computer, if I told you that they stay there until

24    you go and delete them, you wouldn't be able to disagree to

25    that?

139

1    A.   I would have to refer to the experts.

2    Q.   Did you say that was an 80 gigabyte hard drive?

3    A.   That is my understanding.

4    Q.   That will hold a lot of photographs, won't it?

5    A.   That's what I've been told, yes.

6    Q.   And photographs will keep flowing onto it until it fills

7    up, right?

8    A.   I would have to defer to the experts on that, sir.

9    Q.   And it is the filling up of a computer with photographs

10    that would typically cause its performance to slow down and it

11    would alert a person to the fact that it was filling up that

12    something needed to be done about that; isn't that true?

13    A.   Again, sir, I would have to defer to the experts on that.

14    Q.   You testified that this is unusually large, this 80

15    gigabyte hard drive.   That a 3 or 4 gigabyte hard drive would

Page 132

Exhibit B.txt

16   be more a typical kind of (inaudible).

17   A.   That's what I've been told.

18   Q.   Isn't it true that a 3 to 4 gigabyte hard drive won't even

19   run the operating systems that are used at the University of

20   Idaho?

21   A.   Again, sir, I'd have to defer to the experts on that.

22   Q.   Did I understand you to say that Dr. Frinke told you that

23   she, Dr. Frinke, made it clear to all of her students that if

24   they did any hacking, the FBI would in some way be made aware

25   of it and would investigate it?

140

1    A.   Yes.  Dr. Frinke made statements to us that indicated that

2    she was cognizant of the potential security concerns and made

3    every effort to allow her students to understand that security

4    on these systems is paramount as far as her teachings are

5    concerned.

6    Q.   So anybody who was using the computer -- anybody who would

7    have been in her program would be -- would have some awareness,

8    some capacity to be aware of the level of sophistication that

9    the FBI has in gathering up these kinds of communications?

10   A.   I don't know that that's necessarily what she said to me,

11   sir.  I believe that she said that she used the FBI as an

12   example of an entity that would potentially investigate in the

13   event there was hacking.

14   Q.   She didn't tell you that Sami had ever been involved in

15   hacking, did she?

16   A.   She did not.

17   Q.   And she didn't tell you that the system at the University

Exhibit B.txt

18  of Idaho was ever compromised in any way, did she?

19  A.   She did not say that it had ever been compromised but she

20  did express grave concerns about its vulnerable status.

21  Q.   She told you that Mr. Al-Hussayen had changed advisors on

22  his own?

23  A.   That is what she said, yes.

24  Q.   Did she tell you that she had had an illness, I believe

25  breast cancer, that prohibited her from being at the university

141

1  for something on the order of a year?

2  A.   We were aware of that, yes.

3  Q.   You were aware of that before you testified here?  You were

4  aware of that earlier today when you testified?

5  A.   Was I aware of the fact that Dr. Frinke had suffered from

6  an illness?

7  Q.   Yes.

8  A.   Yes.

9  Q.   Isn't that the reason that Sami Al-Hussayen changed

10  advisors because she was really no longer accessible to him?

11  A.   I have not had the opportunity to ask Mr. Al-Hussayen why

12  he changed advisors.

13  Q.   You had the opportunity to ask Dr. Frinke that, didn't you?

14  Didn't she tell you that?

15  A.   Dr. Frinke said that he changed advisors on her own --

16  excuse me, on his own rather than putting her in the position

17  of having to take action herself but that the break-up was

18  amicable.

Page 134

Exhibit B.txt

19    Q.  Do you think it's unusual for a person to get extensions on

20    the completion of their doctoral work?

21    A.  I don't know, sir.  I don't know if it's unusual or not.

22    Q.  Well, your testimony implied that it was unusual.

23    A.  I certainly think that three extensions sounds unusual.

24    Q.  Okay.  Have you made inquiry about that to see whether

25    doctoral students typically get extensions, whether that's

142

1    unusual or not?

2    A.  Not specifically, sir.

3    Q.  You referred to a statement that you had overheard or that

4    someone in your investigation had overheard that Sami

5    Al-Hussayen had been involved in and a statement was made to

6    the effect that in the United States, they have to live in

7    terror in order to rationalize their actions?  Do you remember

8    that?

9    A.  Yes, I do remember that.

10    Q.  What was the date of that?

11    A.  I would have to refer to my notes.

12    Q.  Feel free to do that.

13         WITNESS:  Your Honor, may I?

14         COURT:  Yes.

15    BY MR. NEVIN:

16    Q.  Are you ready to --

17    A.  Yes, sir, I am.

18    Q.  Go ahead.

19    A.  The date as reflected in my notes is November 16, 2002.

20    Q.  And was that an e-mail?

Exhibit B.txt

21    A.   I don't recall specifically whether it was e-mail or

22    telephonic intercept.

23    Q.   Mr. Gneckow, what did it refer to?  Can you give it some

24    context?

25    A.   I unfortunately don't have the document in front of me.



143



1    Q.   Aren't you aware that a lot of people around this country

2    feel that one of the justifications for going to war in Iraq

3    which many people disagree with is a degree in a sense of

4    people being terrified and therefore to urge us on to go to war

5    in Iraq?

6    A.   I'm sorry, sir.  I didn't understand your question.

7    Q.   Well, have you been following the debate about whether we

8    should go to war in Iraq over the last few months?

9    A.   Yes, sir, I have.

10    Q.   Aren't you aware that there are a lot of people who believe

11    that argument for going to war in Iraq is based on trying to

12    make people in the United States feel that they live in terror

13    or that they should be fearful and that therefore it's

14    necessary to go to war in Iraq to eradicate terrorism?

15    A.   That may be the argument that some people are placing, yes.

16    Q.   Is that what Mr. Al-Hussayen was referring to in the

17    conversation?

18    A.   Sir, as I mentioned before --

19    Q.   You don't know.

20    A.   -- I don't have content here in front of me.

21    Q.   Now, you also testified that on the day before he was

Exhibit B.txt
```
22  arrested, Sami spoke to his brother Halid?

23  A.   Khalid.   That's spelled K-h-a-l-i-d.

24  Q.   And you think it's pronounced Khalid?

25  A.   That's how I pronounce it, sir.




                                                         144




 1  Q.   And is it correct that the brother -- that Khalid asked

 2  Sami, "Where should I send money?"  And Sami said to Help the

 3  Needy?

 4  A.   Yes.

 5  Q.   Because that was above suspicion?

 6  A.   That's exactly right, sir.

 7  Q.   And that he understood the money was going to Iraq?

 8  A.   Sami's brother actually asked him if the money was going to

 9  Iraq and Sami said that yes, it was.

10  Q.   Don't you know that there have been embargos in place

11  against Iraq for a number of years?

12  A.   Yes, sir, I am aware that there is an embargo.

13  Q.   And aren't you aware that that's created tremendous

14  hardship among common people in Iraq?

15  A.   Sir, that may be so but the embargo is law.

16  Q.   And the embargo has caused there to be medical hardship,

17  nutritional hardship, matters of that sort?  You're aware of

18  that, aren't you?

19  A.   Sir, I've not done any research into the conditions in

20  Iraq.

21  Q.   Isn't it reasonable for people to want to try to provide

22  some relief to people under those circumstances?  Isn't that in

23  fact kind of a noble purpose?
```

Exhibit B.txt

24    A.   Sir, you recall from my previous testimony, I said the
25    United States is an area in which because of its affluent

145

1     nature and because the American people are so giving that this
2     is an area where donations to charities of worthy causes are
3     something that are common place for us and that's why it's a
4     place that terrorist organizations like to operate out of.
5     Q.   On January 17 of 2003, you stated that there was a
6     martyrdom poem and you read from the poem.
7     A.   I did.
8     Q.   And you indicated that the e-mail was from Islam Today.
9     Who at Islam Today was it from?
10    A.   It's interesting you bring that up because I spoke with Mr.
11    Lindquist and we were going to correct the fact that it came
12    from Islam Way versus Islam Today.
13    Q.   There's a difference, isn't there?
14    A.   Yes, there is a difference.
15    Q.   All right.   And with respect to Islam Way, where did
16    that -- who did that e-mail come from?
17    A.   My recollection of the document is that it came from Islam
18    Way itself; not from a specific individual.
19    Q.   So it was a publication of Islam Way.com?
20    A.   I don't know that to be certain.   The Islam Way.com e-mail
21    address is what sent that to Mr. Al-Hussayen.   I don't know
22    necessarily that it was a publication so much as perhaps it was
23    just an e-mail that included that.
24    Q.   Was it sent to anyone besides Mr. Al-Hussayen?

Exhibit B.txt
25   A.   I'm not certain.


146


1    Q.   Isn't it correct that Islam Way has mailing lists of
2    thousands of people to whom communications are sent?
3    A.   Sir, I don't know that for a fact.
4    Q.   Maybe as many as 90,000?
5    A.   Sir, I don't know that.
6    Q.   Are you -- did you look to see what Sami's GPA was at the
7    University of Idaho?
8    A.   Yes, sir, I looked at it on a number of occasions.
9    Q.   It's a 3.88, isn't it?
10   A.   My recollection that the last one is a 3.88, yes.
11   Q.   Isn't it true that he went all the way through his doctoral
12   program at the University of Idaho and got one B, all the rest
13   A's in his courses?
14   A.   My recollection of his studies indicate that yes, he did
15   get good grades.
16   Q.   And yet your testimony (inaudible) that he was struggling?
17   A.   As you recall, my testimony stated that in the interview
18   with Dr. Frinke, she believed that he was struggling based on
19   his lack of progress in the pursuit of his doctoral
20   dissertation which is not necessarily the same thing as
21   attending class and receiving grades.
22   Q.   Did you mention that on April the 15th, Sami had received a
23   message from another student soliciting money for Hamasse?
24   A.   I'll have to double check the date.  If you'll bear with me
25   for a moment.

Exhibit B.txt

147

1   Q.   Sure.

2   A.   Your question again, please?

3   Q.   April 15 of 2002, a message to Sami requesting soliciting

4   money for Hamasse?

5   A.   On April 15, 2002, Mr. Al-Hussayen did receive an e-mail

6   message from another student at the University of Idaho.  The

7   content of that message was essentially a solicitation of funds

8   for Hamasse.  In that particular e-mail, there was information

9   that suggested the cost of bullets per bullet of automatic

10  weapons, explosives, et cetera.

11  Q.   And you didn't tell us what Mr. Al-Hussayen's response was.

12  A.   I did not tell you what his response is, you're correct.

13  Q.   What was it?

14  A.   Sir, I don't have his response in front of me.

15  Q.   So if I sent you an e-mail describing donations to Hamasse

16  in an unsolicited e-mail, would that make you guilty of

17  something?

18  A.   Sir, I didn't say that someone who receives an e-mail like

19  that is necessarily guilty.  However, individuals who routinely

20  receive e-mail messages that talk about Jihad, that talk about

21  terrorist activity, that is something of concern to me.

22        MR. NEVIN:  Your Honor, I have three exhibits that I

23  would ask to be marked.

24        COURT:  All right.  The bailiff will hand them to be

25  marked.  Marked as Defendant's Exhibits A, B and C.  Copies are

Exhibit B.txt

148

```
 1    provided to (inaudible).
 2              MR. NEVIN:   Yeah.
 3              MR. LINDQUIST:   They have?
 4              MR. NEVIN:   Yeah.
 5              WITNESS:   Thank you.
 6    BY MR. NEVIN:
 7    Q.   I'll ask if you have Defendant's Exhibits A, B and C in
 8    front of you?
 9    A.   Yes, sir.
10    Q.   And do you recognize those, sir?
11    A.   I recognize Exhibit A as a photocopy of what appears to be
12    an article from the Seattle Post (inaudible).   Exhibit B is
13    what appears to be another article also from the Seattle PI and
14    Exhibit C is again what appears to be another article from the
15    Seattle PI.
16    Q.   And the date of those articles?
17    A.   The date of the article for Exhibit A is -- appears to be
18    August 2, 2002.
19              MR. LINDQUIST:   Your Honor, I'm going to object.   May
20    I ask a question in aid of that objection?
21              COURT:   All right.
22              MR. LINDQUIST:   Agent Gneckow, have you seen any of
23    these three exhibits before looking at them right now?
24              WITNESS:   No.
25              MR. LINDQUIST:   Foundation hasn't been laid to allow
```

149

Exhibit B.txt

1    this witness to be addressing these exhibits.

2           COURT:   Response.

3           MR. NEVIN:   Well, Your Honor, I'll state by way of

4    proffer that these are articles which appeared in the Seattle

5    Post Intelligence August the 2nd, 2002, some six months

6    before -- more than six months before Sami was arrested and

7    they refer to Sami and there will be additional testimony about

8    these matters.   And they indicate that members of the Muslim

9    community in the Palouse were made crystal clear aware that the

10   FBI was conducting an investigation of allegations of money

11   being funded to improper -- funneled to improper organizations;

12   that this information became available, as I say, six months

13   before Sami's arrest and I think it's important because as we

14   know, Sami made no attempt to flee the country despite the fact

15   that these articles were published.

16          COURT:   Well, as I stated at the outset, the formal

17   rules of evidence do not apply in a detention hearing.   We're

18   just going to proceed by proffer or otherwise.   To the extent

19   the objection is based more upon the rules of evidence than the

20   matter that should be considered by the Court, I'll overrule

21   the objection to the extent that the witness may have knowledge

22   of what's contained in the articles or whatever the

23   (inaudible).

24   BY MR. NEVIN:

25   Q.   And you've never seen these before?

150

Page 142

Exhibit B.txt

1   A.   No, I don't believe I have.

2   Q.   Are you aware of this -- these articles being written?

3   A.   I seem to recall that there was information that part of

4   our investigation had been leaked to the media.  However, I try

5   to make it a habit not to concern myself with the actual

6   written stories that come out.

7   Q.   You're saying it was not a concern to you that your -- some

8   of the aspects of your investigation may have been leaked to

9   the media?

10  A.   No, that's not what I said.  I said the content of the

11  stories themselves are of little concern to me.  The fact that

12  it was leaked to the media was of concern to me.

13  Q.   And the reason that it would be of concern to you is

14  because it might reveal to the people that you were

15  investigating the fact that you were investigating them and

16  then in response to that, they might try to flee or take other

17  actions?

18  A.   Yeah.  Among the other actions they would take could

19  potentially be the destruction of valuable evidence as well.

20  Q.   Right. And possibly trying to flee the jurisdiction to

21  avoid being around when you arrested them.  That's a

22  possibility as well.

23  A.   It is a remote possibility, yes.

24  Q.   Well, do you have information that Mr. Al-Hussayen has

25  destroyed evidence?

151

1   A.   It would be very difficult to determine if say hard

2   documentary evidence in the form of paper had been destroyed

Page 143

Exhibit B.txt

3    and things were shredded or burned or put away other places.

4    It would be difficult to know that.

5    Q.   Sure.   But as difficult as it would be, you do sometimes

6    find that kind of thing out and you don't have any evidence of

7    that having occurred in this situation?

8    A.   Sir, Moscow, Idaho is about two hours south of our office.

9    The logistics of being able to keep an eye on the physical

10   comings and goings of people down there are quite difficult.

11   If someone were to leave the house and destroy evidence, it's

12   very possible we would never know.

13   Q.   And again, you don't have evidence that there's been any

14   destruction of evidence?

15   A.   The investigation --

16            MR. LINDQUIST:   That's been asked and answered, Your

17   Honor.

18            MR. NEVIN:   No, actually it hasn't been answered, Your

19   Honor.

20            MR. LINDQUIST:   It has been answered by this witness.

21            COURT:   Well, just a moment.   Let the Court rule on

22   the matter.   Can you respond to that question directly yes or

23   no?

24            WITNESS:   The investigation has yet to determine

25   whether evidence has been destroyed.   However, as we stated

152

1    throughout my testimony, the investigation is ongoing.

2    BY MR. NEVIN:

3    Q.   And you have acquired mountains of evidence, would that be

Page 144

Exhibit B.txt

4   fair to say?  Is that true?

5   A.   A lot of evidence, yes.

6   Q.   You testified about a check that Sami wrote to the Global

7   Relief Foundation, did you not?

8   A.   Actually I believe I said it was a check or checks written

9   to Global Relief, yes.

10   Q.   And those would have written on Sami Al-Hussayen's bank

11   account?

12   A.   I believe that is the case, yes.

13   Q.   Which bank account uses his name, right?

14   A.   I'm sorry.   Your question?

15   Q.   The bank account uses his name.

16   A.   Which bank account uses his name?  Is that what you're

17   asking?

18   Q.   No.   The bank account that -- from which the checks to the

19   Global Relief Fund were written were written on a bank account

20   that has Sami Al-Hussayen's name attached to it, right?

21   A.   That is correct, yes.

22   Q.   And the checks have his name as well printed right on them,

23   don't they?

24   A.   Yes, I believe so.

25   Q.   Not any effort to hide the fact that that -- that that

153

1   check was being written to that organization, right?

2   A.   Well, not necessarily unless you take into the account the

3   fact that the memo line is written in Arabic versus in English.

4   Q.   Yes.   And do you have anybody in your organization who

5   speaks Arabic, sir?

Page 145

Exhibit B.txt

6  A.   As a matter of fact, we do have a number of language

7  specialists who speak Arabic but there are none assigned to the

8  Coeur d'Alene office nor to the Boise office and that's where

9  the lion's share of the evidence regarding the financial

10 aspects of the investigation are conducted.

11 Q.   The testimony that you provided about the Al-Multayce, the

12 apartment at 504 and a half D Street, do you remember that?

13 A.   Yes.

14 Q.   You indicated that there were private discussions which

15 were undertaken which were not to be discussed in public.

16 A.   I don't believe that's what I said, sir.

17 Q.   What did you say about that?

18         MR. LINDQUIST:   About what, Your Honor?   There was a

19 large number of questions directed toward that.

20         COURT:   They're referring to the apartment and what

21 occurred there.

22 BY MR. NEVIN:

23 Q.   Was their testimony not that it was a place to hold private

24 discussions?

25 A.   I believe that my testimony did shadow -- or did share

                                                                  154

1  information such as that and that's based primarily on

2  investigative experience.   Generally around the country, these

3  sorts of investigations clearly indicate that there are

4  separate secluded meeting places by which many groups that are

5  currently under investigation can meet privately to discuss

6  private things.   These meetings typically took place on

                          Page 146

Exhibit B.txt

7   Saturday evenings in Moscow on the other side of town from the

8   Islamic center.  Not everyone from the Islamic center was

9   invited to these meetings.  Therefore, it appears that these

10  meetings were for more private discussions.

11  Q.  Sir, that was a social club, wasn't it?

12  A.  Sir, I've never been asked to attend.  I would not know.

13  Q.  Well, aren't there foosball tables -- isn't there a

14  foosball table there?

15  A.  Sir, I've never been inside the Al-Multayce apartment.

16  Q.  Well, but the FBI has been inside there.  Didn't they serve

17  a search warrant there?

18  A.  That is correct.

19  Q.  Well, you've not been told that there was a foosball table

20  and a pingpong table there?

21  A.  Sir, no one told me that there is a foosball table inside

22  the apartment and until someone tells me such, I won't know.

23  Q.  In any event, you don't have -- in all of your

24  interceptions and all the rest, you don't have any indication

25  that any kind of secret conversations took place at that

155

1   location, do you?

2             MR. LINDQUIST:  Your Honor, could we approach a side

3   bar, please?

4             COURT:  All right.

5                  (A side bar discussion was had.)

6   BY MR. NEVIN:

7   Q.  Mr. Gneckow, you also described payments -- some checks

8   that had been written by Sami to -- that had been intended to

Exhibit B.txt

 9    go to Chechnya.  And that those -- those were checks which were
10    directed to the Global Relief Foundation; is that correct?
11    A.   That is correct.
12    Q.   And again, those checks were written on Sami's own bank
13    account, checks that had his name printed on them, correct?
14    A.   I'm not sure without the checks in front of me but I would
15    imagine that is the case.
16    Q.   Do other people write checks to the Global Relief
17    Foundation?
18    A.   Yes.  It's my understanding that the Global Relief
19    Foundation receives many checks.
20    Q.   Thousands of checks from people all over; isn't that true?
21    A.   I don't know what the number is, sir.
22    Q.   Did you indicate that the Global Relief Foundation has been
23    declared to be a terrorist organization?
24    A.   Sir, I believe my testimony stated that pursuant to
25    executive order 13224, it has been designated by the U.S.

                                                                   156

 1    treasury department as a terrorist support organization under
 2    the guidelines of OFAC, the Office of Foreign Asset Control.
 3    Q.   Is the same true of Help the Needy?
 4    A.   No, sir.  I do not believe that Help the Needy has been
 5    designated under OFAC.
 6    Q.   Is it true that Help the Needy has been indicted as an
 7    organization?
 8    A.   I'm not absolutely positive that the organization itself
 9    has been indicted.

                         Page 148

Exhibit B.txt

10   Q.   The organization IANA, Islamic Assembly of North America,

11   has not been designated as a terrorist organization, has it?

12   A.   Not at this time, it hasn't.

13   Q.   And not at any time in the past, has it?

14   A.   No, sir.

15   Q.   Not at any time when Sami Al-Hussayen was dealing with it,

16   right?

17   A.   Well, at this time, we have a bunch of evidence as a result

18   of search warrants at IANA that are in the process of being

19   reviewed.  At the conclusion of that review, we'll see what

20   happens.

21   Q.   Yes.  And my question was that at no time during the time

22   that Sami Al-Hussayen was dealing with IANA was it ever

23   declared to be a terrorist organization?

24   A.   And his dealings with them continue to date; is that

25   correct?

157

1   Q.   Today?  They continue today?

2   A.   To date I said.

3   Q.   Is that your testimony, that he continues to deal with them

4   today?

5   A.   Sir, obviously he can't be dealing with them today.

6   Q.   Right.  So let me ask the question again.  Isn't it true

7   that at no time when Sami Al-Hussayen has ever dealt with IANA

8   has it been declared to be a terrorist organization?

9   A.   Not by OFAC, no, sir.

10   Q.   By someone else?

11   A.   Currently investigations clearly point to the fact that

Page 149

Exhibit B.txt

12   they're considered to be a support for terrorism.

13   Q.   So in other words, you're thinking about declaring them to

14   be a terrorist organization?

15   A.   Sir, that's not my call.

16   Q.   And isn't it true that at all times that Sami has dealt

17   with IANA that it has been a 501(c)(3) corporation?

18   A.   I'm not certain whether the entire time it has been but I

19   believe that is true.

20   Q.   The government has never acted to take away its tax exempt

21   status?

22   A.   Not yet.

23   Q.   It hasn't happened in the past.   Not at any time when Sami

24   was dealing with them was it -- was that status taken away?

25   A.   No, sir, not yet.


                                                               158


1    Q.   Isn't it true that their assets were frozen at a time after

2    September the 11th but then the freeze was lifted shortly

3    afterwards?

4    A.   Yes, sir.   I'm vaguely aware of that incident, yes.

5    Q.   IANA has not been indicted, has it?

6    A.   No, sir.

7    Q.   Has any person who is presently a principal of IANA been

8    indicted?

9    A.   I'm not exactly certain of the answer of that, sir.   I know

10   that we have individuals who may still be in active status with

11   IANA that are currently under arrest or under indictment.   The

12   current status of those individuals I'm not certain of right

Exhibit B.txt

13   now.

14   Q.   You've referred to IANA from time to time as a charity and

15   IANA has a legitimate purpose even in your view; isn't that

16   true?

17   A.   It's a purported charitable organization, yes.

18   Q.   Well, it conducts seminars and conventions and operates

19   summer programs up in Canada.  You're aware of that, aren't

20   you?

21   A.   I'm not aware of summer programs in Canada, no, sir.

22   Q.   You're aware that undertaking those activities costs money,

23   aren't you?

24   A.   Of course.

25   Q.   You're also aware that they maintain an 800 number called

159

1    Fatwah. Do you know what that is?

2    A.   Yes, sir, I'm aware of the hot line.

3    Q.   And that's a number that people can call to get questions

4    answered about Islamic law and Islamic religious issues?

5    A.   I have never spoken to anyone who has called that line,

6    sir.

7    Q.   You've not made an effort to determine whether that's a

8    legitimate operation or enterprise?

9    A.   Sir, based on the number and various activities including

10   the volume of web sites, the Fatwah line is one of the areas

11   that we have not paid very close attention to other than

12   financial flows back and forth between individuals involved in

13   that.

14   Q.   Well, you know that it costs money to run the Fatwah line,

Page 151

Exhibit B.txt

15   don't you?

16   A.   I don't know that, sir.

17   Q.   Then you know as well that IANA runs something called the

18   radio net.

19   A.   Yes, I'm aware that they run a web site called radio net.

20   Q.   And you're aware that there was an effort at one time to

21   start a radio station at IANA, aren't you?

22   A.   I'm not necessarily aware of that, no.

23   Q.   Do you know that it costs money to operate the IANA radio

24   net?

25   A.   I would imagine it probably does cost money, sir.


                                                                 160


 1   Q.   Now, you mentioned a quarterly magazine that IANA

 2   publishes, Al-Manar Al-Jaheed.   You're familiar with that,

 3   aren't you?

 4   A.   Yes, I am.

 5   Q.   And in fact you testified about money being sent to Amal

 6   Saltan, did you not?

 7   A.   I did.

 8   Q.   Isn't it true that Amal Saltan has been responsible for

 9   publication of Al-Manar Al-Jaheed?

10   A.   My understanding is that Amal Saltan is actively involved

11   in that effort, yes.

12   Q.   Yeah.   And you said that Sami had sent Mr. Saltan some

13   $15,200 over a period of time, correct?

14   A.   That does not include money sent directly from IANA to

15   Saltan.

Page 152

Exhibit B.txt

16  Q.  I was just asking you about money that Sami sent.  That was

17  your testimony, wasn't it?

18  A.  It is although Sami being an officer -- de facto officer at

19  least of the IANA, moneys flowing from the IANA to Amal Saltan

20  I believe are pertinent.

21  Q.  How often were moneys received from -- how often did Sami

22  send money to Amal Saltan?

23  A.  I'm not specifically sure of the number of times but the

24  amount is $15,200.

25  Q.  Is it correct that it costs money to publish the magazine

                                                                161

1  Al-Manar Al-Jaheed?

2  A.  Sir, I haven't looked at the books.

3  Q.  You haven't.  You haven't looked at IANA's books?

4  A.  They've been seized as part of a search warrant and I have

5  not reviewed that as yet.

6  Q.  Isn't it true that the magazine Al-Manar Al-Jaheed is

7  received by American universities?

8  A.  Sir, I don't know that.

9  Q.  Isn't it true that IANA publishes books?

10  A.  I do believe that they publish books, yes.

11  Q.  And you can get on Amazon.com right now and find four or

12  five titles that IANA has published, can't you?

13  A.  Sir, do you recall from my testimony I don't have an

14  internet computer.

15  Q.  Are you aware that IANA provides scholarships to students?

16  A.  I'm not aware of that, sir.

17  Q.  Are you aware that IANA has a library program for prison

Exhibit B.txt

18    inmates?

19    A.   Yes, I'm aware of that.

20    Q.   Are you aware that the government reimburses IANA for their

21    expenses associated with that project?

22    A.   Sir, if I may, during my testimony previously, I said that

23    these various charitable organizations around the country do

24    charitable work but portions of the work are not necessarily

25    sent to good causes and in fact in many cases, portions of the


162


1    money are siphoned off for diabolical causes.  So to say to me

2    that IANA is involved in charitable work simply restates what I

3    testified to previously.

4         MR. NEVIN:  Your Honor, I ask that the answer be

5    stricken as nonresponsive.

6         COURT:  It is nonresponsive.  Please just try your

7    best to answer the questions asked by counsel.

8         WITNESS:  Yes, Your Honor.

9    BY MR. NEVIN:

10    Q.   The question was are you aware that they have a public

11    library project?

12    A.   I'm not aware of that, sir.

13    Q.   Well, have you analyzed what IANA has done with the money

14    that you say it received from Sami Al-Hussayen?

15    A.   We have done some analysis in that, yes.

16    Q.   Is it your testimony that it was used for operation of

17    IANA?

18    A.   I believe it is used for operation of IANA, yes.

Page 154

Exhibit B.txt

19  Q.  And for these legitimate purposes, among others, that I

20  have just articulated?

21  A.  What the money has done after it's paid out as salary out

22  to the employees, I'm not aware of that.

23  Q.  Do you know how many people give money to IANA?

24  A.  No, sir, I don't.

25  Q.  Do you know what organizations give money to IANA?

163

1  A.  I know some.

2  Q.  Is it your intent -- is it your belief that all of the

3  organizations and all of the people who provide money to IANA

4  has committed crimes?

5  A.  Sir, my previous testimony, I said that many people send

6  money -- the reason many of these organizations exist in the

7  United States is because people donate money to these

8  organizations believing that the end result is going to be the

9  charitable -- the charitable services that the organization

10  purports.  So certainly people will send money to charitable

11  organization including IANA not knowing where the money's going

12  but assuming it goes to the charitable cause that they're told.

13  Q.  How long has your investigation of IANA been ongoing?

14  A.  That's kind of difficult to say.  The investigation of the

15  defendant Mr. Al-Hussayen was initiated shortly after the event

16  of September 11, 2001.  As part of the investigation of Mr.

17  Al-Hussayen, IANA was identified and subsequently was

18  investigated.

19  Q.  So you don't know when the investigation of IANA began?

20  A.  Sir, if I could reference some of the case files, I could

Page 155

Exhibit B.txt

21   tell you exactly the date but I don't have the case files in

22   front of me.

23   Q.   Are they available to you readily today?

24   A.   No, sir.

25   Q.   Despite all of the investigation that you've done, however,

164

1    you still are not -- you still have not caused IANA to be

2    indicted, correct?

3    A.   Sir, IANA is not under indictment at this time.

4    Q.   So to a person from the outside looking in at IANA, during

5    all of the periods of time that we've been talking about, '98,

6    '99, the year 2000, the year 2001, the year 2002, IANA looks

7    for all intents and purposes like a legitimate organization

8    from the outside, doesn't it?

9    A.   Oh, not necessarily, sir.

10             MR. LINDQUIST:  I'll object to the form of the

11   question from the perspective of whom?  From the perspective of

12   a law enforcement officer investigating international terrorism

13   or what?

14             COURT:  The witness was starting to answer the

15   question in any event.  I'll let the -- are you standing on

16   your objection?

17             MR. LINDQUIST:  Yes.

18             COURT:  I will sustain the objection and the question

19   can be rephrased.

20             MR. NEVIN:  All right.

21   BY MR. NEVIN:

Page 156

Exhibit B.txt

22   Q.   From the point of view of a person -- not from the point of

23   view of a law enforcement person.  Let's start from the point

24   of a view of an ordinary person.  IANA has all the appearances

25   of a legitimate organization, does it not?

165

1    A.   Sir, that's a difficult question for me to answer.  I've

2    been in federal law enforcement for 17 years.  To ask me to

3    tell you what a reasonable nonlaw enforcement person would

4    think is -- that's a difficult question for me to answer.

5    Q.   You offered testimony about Sami's Uncle Saleh.  Do you

6    recall that testimony?

7    A.   Yes, I do.

8    Q.   What is Saleh's background?  Have you determined that?

9    A.   I believe that he is currently a minister in the Saudi

10   government and his post is Mecca at this time.

11   Q.   Right.  The Islamic holy city?

12   A.   Yes.

13   Q.   And you don't advocate or contend that he advocates

14   terrorism, do you?

15   A.   Sir, not having had the opportunity to interview him, I

16   can't really answer that question.

17   Q.   You're not aware of him ever having written or spoken in

18   favor of terrorism, are you?

19   A.   I have no information at my disposal to analyze regarding

20   that.

21   Q.   And so you simply don't have any evidence to suggest that,

22   do you, and nor does the FBI?

23            MR. LINDQUIST:  To suggest what, Your Honor?

Page 157

Exhibit B.txt

24          MR. NEVIN:  That he's involved in terrorism.
25          WITNESS:  Sir, based on the events that resulted in

                                                              166

1    his interview and subsequent interview, I don't necessarily
2    have information that suggests that he isn't something --
3    someone that we need to talk to about terrorism.
4    BY MR. NEVIN:
5    Q.   Was it your testimony that he was seen together with the
6    terrorists who were at that hotel?
7    A.   No, sir, that was not my testimony.
8    Q.   He wasn't seen with them at all, was he?
9    A.   Sir, I have no information based on the investigation that
10   he was observed in the company of the hijackers.
11   Q.   You don't have any evidence that he knows the hijackers, do
12   you?
13   A.   Sir, I have no evidence to suggest that he doesn't know the
14   hijackers.
15   Q.   And Mr. Gneckow, if he were truly aware of what the
16   hijackers were about to do and supported it or had been
17   involved in it in some way, the last place he would be with
18   them is at the hotel with them the day before the hijacking
19   occurs.  Doesn't that make sense to you?
20   A.   Sir, you're asking me to speculate into the mind of a
21   person I've never met.
22   Q.   Well, the last place that anybody with advanced knowledge
23   of September 11 would be would be there at that hotel with the
24   hijackers unless they were one of the hijackers.  I mean

Exhibit B.txt
25    doesn't that make sense to you?


167


 1          MR. LINDQUIST:  Your Honor, that's a nice argument but
 2    we should leave that for closing argument.  I'd be happy to
 3    address it.
 4          COURT:  All right.  I'll sustain the objection.
 5    BY MR. NEVIN:
 6    Q.  Well, isn't it more likely in your view, sir, that it's
 7    just a coincidence?
 8          MR. LINDQUIST:  And again that's just argument.  If
 9    counsel wants to make that argument in closing, I'd be happy to
10    respond.
11          COURT:  All right.  I'll sustain the objection.
12    BY MR. NEVIN:
13    Q.  So how old is Saleh?
14    A.  I'm not exactly sure but I believe his date of birth was in
15    1931.
16    Q.  So he's a man in his 70's.
17    A.  If that date of birth is correct, yes.
18    Q.  And was it your testimony that a number of people were
19    questioning him?
20    A.  I believe my testimony was that he was interviewed once on
21    September 17 by a couple of FBI agents and then perhaps a day
22    later.  I'm not sure of the date.
23    Q.  Was it hostile questioning?
24    A.  My understanding, sir, is that when questions were asked
25    relative to the event of September 11, that precipitated a

Exhibit B.txt

168

1    seizure.

2    Q.   So you have a 70-year-old Saudi man who's within days of

3    September 11 is being interviewed by FBI agents and your

4    testimony is that an attack that he had was fained?

5    A.   Sir, the testimony that I provided was based on the

6    information received from the interviewing agent who was

7    perhaps in the best position to make an assessment after also

8    speaking with the attending physician at the hospital.

9    Q.   Mr. Gneckow, isn't it true that all of the money that you

10   claim that Sami forwarded to IANA was forwarded from his own

11   personal bank accounts?

12   A.   Sir, based on the volumes of the accounts involved in this,

13   I wouldn't be comfortable in saying that all of the money has

14   come from his personal accounts.

15   Q.   Well, the vast majority of it?

16   A.   Again, sir, there's continued investigation that needs to

17   be conducted.   For example, a search warrant conducted at Mr.

18   Al-Hussayen's house discovered the existence of a bank account

19   that belongs to another individual who has since left the

20   United States that Mr. Al-Hussayen apparently is using as well.

21   Q.   Well, sir, you don't know of any money that Sami

22   Al-Hussayen sent to IANA that did not come out of his personal

23   bank accounts, do you?

24   A.   That's not necessarily true.

25   Q.   What money do you know of that Sami sent to IANA that did

Exhibit B.txt

169

1   not come out of his personal bank accounts?
2   A.   Sir, during the solicitation of donations for these
3   charitable organizations, in particular for IANA, and based on
4   the review of Mr. Al-Hussayen's bank account and the bank
5   accounts of other associates in Moscow, Idaho, there are a lot
6   of cash transactions that occur.   And it's difficult for me to
7   say where those cash transactions come from.   They could come
8   from Mr. Al-Hussayen's account.   It could come from others'
9   accounts.
10          MR. NEVIN:   Well, Your Honor, I ask that be stricken
11  as nonresponsive to the question I asked.
12          MR. LINDQUIST:   It was very responsive.
13          COURT:   Well, I will not strike the testimony.   He was
14  responding to whether he has information that the money came
15  all out of the personal checking accounts.   He responded that
16  apparently there was some cash transactions (inaudible) respond
17  to that.
18  BY MR. NEVIN:
19  Q.   Your testimony is that there was cash transactions between
20  IANA and Mr. Al-Hussayen?
21  A.   No, sir.   My testimony is that based on the fact that there
22  are these cash transactions that exist out there, the
23  difficulty in tracking that makes it very hard for us to
24  determine whether moneys came from other places other than Mr.
25  Al-Hussayen's account that he personally delivered to IANA.

Page 161

Exhibit B.txt

```
 1    Those are things that require further investigation.
 2    Q.   Right.   But at this point, you just don't know of any such
 3    transfers, do you?
 4    A.   Yes, sir.   But I also don't know that they don't exist.
 5    Q.   The bank accounts list -- the bank accounts in Moscow and
 6    in Pullman list Sami's correct home address, don't they?
 7    A.   I believe the ones in Moscow and Pullman do list his
 8    address in Moscow.
 9    Q.   And those accounts, according to your testimony, were used
10    to send money to IANA.   Isn't that correct?
11    A.   That is correct.
12    Q.   And the way the banking system works is that checks are
13    photocopied or microfilmed and retained and anybody who wrote a
14    check to IANA on their own bank account would not be able to
15    conceal the fact that they had done so.   Isn't that true?
16    A.   That is assuming of course that the information on the
17    accounts is correct.   For example, my earlier testimony
18    indicated that there is a bank account under Mr. Al-Hussayen's
19    name in Michigan that is solely used by Mohammed Al-Hamari, the
20    president of IANA.
21    Q.   And what was it used for?
22    A.   Sir, I don't know.   But all of the checks written off of
23    that account bear Mr. Al-Hamari's signature.
24    Q.   Well, I understand and with respect to that account, you
25    know that all of those -- all of the money in that account was
```

171

Page 162

Exhibit B.txt

```
 1   used for day to day expenditures of Mr. Al-Hamari, don't you?
 2   A.   Sir, I don't know that for a fact.
 3   Q.   You indicated that Mr. Al-Hussayen was a registered agent
 4   for IANA in the State of Idaho.
 5   A.   That is correct.
 6   Q.   And he registered under his own name, right?
 7   A.   Yes.
 8   Q.   He didn't go in and offer an alias or a phony name or
 9   anything, right?
10   A.   Not to my knowledge.
11   Q.   That's not a particularly effective way to hide your
12   connection with an organization, is it, to list your own name
13   as the registered agent?
14   A.   Yes.   But there are other ways in which he hid his
15   association with IANA.
16   Q.   Well, certainly if a person thought he were making
17   contributions to a terrorist organization, he wouldn't list
18   himself as the registered agent with the organization.   That
19   wouldn't be very smart, would it?
20   A.   Again, sir, I have not had the opportunity to interview Mr.
21   Al-Hussayen and ask him questions such as that.
22        COURT:  All right.  We're going to take a short
23   recess.  I have to address a case that I have set for trial in
24   Pocatello.  I've got to confer with counsel on that.  So we'll
25   recess for about 10 or 15 minutes.
```

172

```
 1        CLERK: All rise.
 2             (A recess was taken. The testimony of John
```
Page 163

Exhibit B.txt

3      Dickinson was taken and the proceedings were

4      recessed at 5:39 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

173

I, court-approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled matter.

Page 164

Exhibit B.txt


Signature of Approved Transcriber          Date


   Tamara A. Weber

Typed or Printed Name

**EXHIBIT C**

THOMAS E. MOSS
UNITED STATES ATTORNEY

KIM R. LINDQUIST
ASSISTANT UNITED STATES ATTORNEY

TERRY L. DERDEN
FIRST ASSISTANT UNITED STATES ATTORNEY
    and CRIMINAL CHIEF

DISTRICT OF IDAHO

DAVID B. DEITCH
TRIAL ATTORNEY, UNITED STATES DEPARTMENT OF JUSTICE

WELLS FARGO BUILDING
877 WEST MAIN STREET, SUITE 201
BOISE, IDAHO  83702
TELEPHONE:  (208) 334-1211
**MAILING ADDRESS:**
  **BOX 32**
  **BOISE, IDAHO  83707**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cr. No. **CR 0 3 - 0 0 4 8 - C - EJL** |
| Plaintiff, | SUPERSEDING INDICTMENT |
| vs. | (Vio. 18 U.S.C. 371 , 956, 2339A, |
| SAMI OMAR AL-HUSSAYEN, |     1546(a), 1001(a)(2), 3237, 3238 |
| Defendant. | |

THE GRAND JURY CHARGES:

At all times pertinent to this Superseding Indictment:

378

**INTRODUCTION**

1.     This Superseding Indictment charges defendant **SAMI OMAR AL-HUSSAYEN** with various criminal offenses arising from his work on behalf of the Islamic Assembly of North America (hereafter the "IANA"), the Al-Haramain Islamic Foundation (hereafter "Al-Haramain") , Dar Al-Asr and other entities through which he provided material support and resources to terrorists.  As described in further detail in this Superseding Indictment, **AL-HUSSAYEN** provided, among other things, computer advice and assistance, communications facilities, and financial instruments and services that assisted in the creation and maintenance of internet websites and other internet media intended to recruit and to raise funds for violent jihad, particularly in Palestine and Chechnya.  **AL-HUSSAYEN's** conduct in furtherance of this conspiracy violated federal law barring material support of terrorists, and the false statements and omissions he made during the process of obtaining student non-immigrant visas to enter the United States also constituted violations of federal law.

2.     As used in this Superseding Indictment, "jihad" is an Arabic word meaning "holy war."  In this context, it refers to the taking of actions against persons or governments that are deemed to be enemies of a fundamentalist version of Islam.  Historically, violent jihad has included armed conflicts and other violence in numerous areas of the world, including Afghanistan, Chechnya, Israel, the Philippines and Indonesia.  The armed conflicts in these geographic areas and elsewhere have involved murder, maiming, kidnaping, and the destruction of property.

3.     In addition to and in conjunction with dates otherwise specifically indicated herein, reference in this Superseding Indictment to "at all times pertinent to this Superseding Indictment" shall mean at least between September 13, 1994 and on or about February 26, 2003.

**DEFENDANT**

4.     Defendant **SAMI OMAR AL-HUSSAYEN** is a citizen of Saudi Arabia.  Between about August 7, 1994 and February, 2003, **AL-HUSSAYEN** studied in the United States as a foreign student.  He studied at Ball State University in Muncie, Indiana, where he obtained a Masters of Science degree in computer science and at Southern Methodist University in Dallas, Texas.  Thereafter, **AL-HUSSAYEN**

studied at the University of Idaho in the Ph.D. program in computer science.

## DEFENDANT'S RELATIONSHIP WITH IANA AND AL-HARAMAIN

### The Islamic Assembly of North America (IANA)

5.     At all times pertinent to this Superseding Indictment, the IANA purported to be a non-profit charity organized pursuant to the laws of the United States.  Between at least January 1, 1999 and the date of this Superseding Indictment, the IANA maintained offices in Ann Arbor, Michigan.  The IANA provided a number of internet websites and other internet-related outlets for disseminating information regarding Islam, as well as for soliciting and receiving donations of monies both from within the United States and without.  As detailed below, IANA-sponsored websites included a variety of materials intended to recruit and to raise funds for violent jihad.  The IANA also hosted regular conferences in the United States, with participation by individuals affiliated with other purported charitable organizations located within the United States as well.

6.     During the period between on or about November 16, 1999, to February 13, 2003, AL-HUSSAYEN functioned as an employee and official of the IANA and, together with the president of the IANA, engaged in significant decision-making and business transactions related to IANA's business, particularly with respect to the creation, maintenance and content of websites and the associated fundraising for IANA.  Since May 11, 2001, AL-HUSSAYEN has been the registered agent for the IANA in Idaho.  AL-HUSSAYEN was involved in the planning of at least one of the IANA conferences described above, and attended and participated in more than one such conference.

7.     During AL-HUSSAYEN's period of study, the government of his native country paid for his tuition and provided to him and his family a stipend for living expenses.  Beginning on or about August 17, 1994, AL-HUSSAYEN, at various times, maintained at least six United States bank accounts in Indiana, Texas, Idaho and Michigan.  From at least January 23, 1997, until the date of this Superseding Indictment, AL-HUSSAYEN received into and disbursed out of his bank accounts more than $300,000.00 in excess of the study-related funds he received during the same period of time.

8.     Beginning on or about November 16, 1999, AL-HUSSAYEN made disbursements of the

3

excess funds referenced in the preceding paragraph to the IANA, to the IANA's officers (including its president), and for other operating expenses of the IANA, such as the salaries of its employees. From about December of 1994 to about July of 2002, **AL-HUSSAYEN** traveled and otherwise funded travel for other individuals, including travel related to the IANA, through **AL-HUSSAYEN**'s bank accounts and to locations in numerous states, as well as foreign countries.

9.     Between on or about November 16, 1999, to February 13, 2003, **AL-HUSSAYEN's** IANA-related business activities included frequent contact with the president of the IANA, including numerous telephone conversations and e-mails, as well as face-to-face meetings. **AL-HUSSAYEN** disbursed money directly to said president of the IANA in the form of wire transfers and personal checks, and **AL-HUSSAYEN** also maintained a checking account in a Michigan bank in **AL-HUSSAYEN's** name alone, but with the president's home address.

**The Al-Haramain Islamic Foundation**

10.     At all times pertinent to this superseding indictment, Al-Haramain was a purported charity centered in Saudi Arabia. It developed a world-wide network of offices and representatives in a number of countries, including Saudi Arabia, the United States (Ashland, Oregon), Chechnya, Bosnia, Somalia and Kenya. Its stated mission included the dissemination of fundamentalist Islamic doctrines, including by means of the Internet. On or about March 11, 2002, pursuant to Executive Order 13224, the United States Government designated the Bosnia and Somalia branches of Al-Haramain as Specially Designated Global Terrorists.

11.     From at least on or about November 10, 2001, until February 13, 2003, **AL-HUSSAYEN** was a representative of Al-Haramain in that he provided assistance in that organization's internet-related business and activities. **AL-HUSSAYEN's** Al-Haramain activities included contact with Al-Haramain officials. In addition, on one or more occasions, **AL-HUSSAYEN** signed contracts on behalf of Al-Haramain, and, in doing so, represented that he was legally authorized to do so.

4

**DEFENDANT'S WEBSITE WORK**

12.  From at least October 2, 1998, until February 13, 2003, **AL-HUSSAYEN** engaged in extensive computer website support activities beyond his course of study at the University of Idaho. These activities included expert computer services, advice, assistance and support to and for organizations and individuals, including the IANA, a Saudi information technology company known as Dar Al-Asr and two Saudi sheikhs. **AL-HUSSAYEN's** activities included website creation, registration, management, administration and maintenance. A number of these websites accommodated and contained materials intended to recruit and to raise funds for violent jihad.

**The IANA Websites**

13.  At all times pertinent to this Superseding Indictment, through the efforts of **AL-HUSSAYEN** and others known and unknown to the grand jury, the IANA maintained and/or controlled a number of websites. These websites included the following:

a.  www.al-multaqa.com, a website that included the online publication of "Al-Multaqa," an Arabic language magazine of which **AL-HUSSAYEN** was a member of the Board of Editors, and which was created April 5, 1999, and registered to "Al-Multaqa" at a Moscow, Idaho address used by **AL-HUSSAYEN** and others.

b.  www.islamway.com, a website created August 18, 1998 and registered to the IANA. **AL-HUSSAYEN** was the director, administrator, and advisor to other webmasters of the website, in creating, maintaining and controlling the site's format and content.

c.  www.alasr.ws, an internet magazine created September 11, 2000, with **AL-HUSSAYEN** as the sole registrant, editor of the magazine and administrator of the website.

d.  www.iananet.org, a website created August 1, 1995, registered to the IANA, and subsequently designed and maintained by Dar Al-Asr.

e.  www.almanar.net, a website created October 2, 1998, and registered to Al-Manar Al-Jadeed Magazine, with **AL-HUSSAYEN** as the administrative contact person.

f.  www.ianaradionet.com, essentially an Internet radio station, which was created

5

May 25, 1999 and registered to the IANA, with **AL-HUSSAYEN** as the head of its supervisory committee and member of its technical committee.

        g.    www.almawred.com, an Islam-related shopping website associated with the IANA, which was created November 1, 1999 and registered to Dar Al-Asr, with **AL-HUSSAYEN** as the administrative contact person.

        h.    www.liveislam.net, a website created July 8, 2002 which, though never active, listed **AL-HUSSAYEN** as the sole registrant and designated administrator.

        i.    www.liveislam.com, a speech broadcast-facilitating Website, which was created June 12, 2000, with **AL-HUSSAYEN** as a key administrator and providing technical support.

14.    These websites were intended to assist in recruiting and in raising funds for violent jihad. To that end, one or more of the websites contained explicit calls for violent jihad against non-Muslims and for financial support for those who went to fight jihad. These websites urged visitors that their religious duty was to participate in violent jihad or to make financial contributions to support violent jihad, and at least one such page provided a link to a website for such donations.

**The Internet E-Mail Group**

15.    Beginning in early 2000, visitors to www.islamway.com and to the Arabic language website described in the preceding paragraph (as well as other websites such as www.al-multaqa.com) who wished to see so-called "news" concerning jihad were directed to sign up for an internet e-mail group maintained and moderated by **AL-HUSSAYEN** and others. An internet e-mail group is an internet facility that permits members to post e-mails, files (such as documents, images, and audio or video files), as well as links to internet websites, to which other members then have access. This particular internet e-mail group, which grew to more than 2400 members, was intended to permit members to post inquiries and information relating to violent jihad, and thereby provided a communications platform for individuals who wished to engage in violent jihad. **AL-HUSSAYEN's** status as a moderator of the internet e-mail group gave him various privileges with respect to the acceptance, retention and deletion of messages posted to the group.

6

16.     The invitation to join the internet e-mail group included a "Cry and Call" to Muslims that exhorted them to "fight the idolater with your money, your selves, your tongues and your prayers." The first posting on the internet e-mail group (on February 2, 2000) was an identical "Cry and Call" posted by **AL-HUSSAYEN**, one of numerous postings that he made to the internet e-mail group.

17.     Posts to the internet e-mail group included a July 14, 2001, posting that purported to be from a mujahid (warrior) departing from Bosnia, and extolled the virtues of violent jihad.  Other members who responded with further posts to the internet e-mail group stated that they too had fought violent jihad.

18.     Another example of posts to the internet e-mail group is a February 25, 2000, post responding to a specific request for information on how one could train for violent jihad.  In the post, a member of the internet e-mail group gave detailed instructions on how to travel and train at a particular terrorist training camp outside of the United States.

19.     Another example is a February 25, 2003, posting to the internet e-mail group that contained an "urgent appeal" to Muslims serving in the American military.  The posting called upon such individuals to provide information about valuable targets for attacks, particularly in the Middle East.  The long list of requested targets included American military bases, the logistical support (including drinking water) for such bases, the residences of civilian workers supporting the bases, storage facilities for weaponry and ammunition, facilities of American oil companies, and the routes followed by oil tankers.  The posting specifically urged an attack upon a specifically identified high-ranking American military official.

20.     The internet e-mail group also served as a platform for **AL-HUSSAYEN's** direct fundraising appeals.  In February, 2000 (shortly after the creation of the internet e-mail group), **AL-HUSSAYEN** sent a message to all members of the internet e-mail group urging them to donate money to support those who were participating in violent jihad in order to provide "them with weapons and physical strength to carry on with the war against those who kill them."  This message was thereafter sent at the beginning of each month as a "monthly reminder" to donate money in support of violent jihad.

7

**The Dar Al-Asr Websites**

21.     At all times pertinent to this Superseding Indictment, Dar Al-Asr was an information technology company in Saudi Arabia.  From at least August of 1999, **AL-HUSSAYEN** was a representative and official of Dar Al-Asr in the United States.  Dar Al-Asr's principal website was www.alasr.net, which was created on August 15, 1999 and registered to Dar Al-Asr in **AL-HUSSAYEN's** name and at his Moscow, Idaho, address.  The website www.hccjrah.com was created February 22, 2000 and was registered to Dar Al-Asr, with **AL-HUSSAYEN** as the administrative contact person.  The website www.alsunnah.com was created August 10, 2000, and registered, with **AL-HUSSAYEN** paying the invoice.  As previously referenced, Dar Al-Asr was affiliated with a number of IANA Websites, including www.alasr.ws, www.almanar.net, www.al-multaqa.com, www.iananet.org and www.ianaradionet.com.

**The Websites of the Sheikhs**

22.     During the period of time pertinent to this Superseding Indictment, **AL-HUSSAYEN** had personal contact with two sheikhs known to the Grand Jury, in that he performed internet-related business and activities on their behalf, including the publication of fatwas – that is, religious decrees – justifying violent jihad .

23.     **AL-HUSSAYEN** registered the websites www.alhawali.org and www.alhawali.com for one of these sheikhs.  Both websites were created November 18, 2000 and in their registration referenced both Dar Al-Asr and **AL-HUSSAYEN**, with **AL-HUSSAYEN** as the administrative contact for www.alhawali.com.  The website www.islamtoday.net, created March 17, 2000 and registered to an official of the Al-Haramain Foundation, was the website for and on behalf of the other of these two sheikhs and was administered at least in part by **AL-HUSSAYEN**.  It was also linked to some of the other websites described above.

**Defendant's Control Over The Websites**

24.     **AL-HUSSAYEN** exercised significant control over the IANA websites and others.  In e-mails to **AL-HUSSAYEN** and others, IANA and Al-Haramain officials expressly recognized

8

1 **AL-HUSSAYEN's** expertise, and deferred to him on decisions as to the content and management of the
2 websites.

3      25.      In his capacity as Dar Al-Asr agent, **AL-HUSSAYEN** had financial and operational
4 responsibility for www.alasr.net and www.alasr.ws, as well as financial responsibility for a number of
5 other website domains owned by and/or affiliated with Dar Al-Asr, including www.alhawali.com,
6 www.alhawali.org, www.adssite.net, www.almandhoor.com, www.al-duaij.net, and www.alyaqaza.com.

7      26.      As a result of **AL-HUSSAYEN's** control over, and extensive involvement with, these
8 websites and other internet media, **AL-HUSSAYEN** not only knew that the communications platform he
9 created would be used to support and justify violent activities, but he also specifically intended that the
10 expert advice and assistance, communication facilities, financial instruments and services, and other
11 material support he provided would be used to recruit and to raise funds for violent jihad.  As such,
12 **AL-HUSSAYEN** knew and intended that the material support and resources that he provided were to be
13 used in preparation for, and to commit, violations of federal law involving murder, maiming, kidnaping,
14 and the destruction of property.  **AL-HUSSAYEN** also sought to conceal and disguise the nature,
15 location, source and ownership of the material support and resources that he provided.

16                                            **THE STUDENT VISAS**

17      27.      In order for a foreign student to study in the United States on an F-1 student
18 visa, the student must declare and promise under oath to United States authorities that the
19 student seeks a presence in the United States solely for the purpose of pursuing the student's
20 course of studies.  The foreign student must truthfully and fully declare his associations with
21 organizations to the appropriate United States Government authorities in order for those
22 authorities to evaluate any such association and related activities in relation to the interests of
23 the United States.

24      28.      On or about September 23, 1998, **AL-HUSSAYEN** applied to the University of
25 Idaho at Moscow, Idaho, by submitting an International Application Form requesting that he
26 be admitted to the Computer Science Ph.D. program for the Spring 1999 Semester.

27

28                                                    9

29.   In or about January, 1999, **AL-HUSSAYEN** was admitted to the Computer Science PhD program at the University of Idaho, with an emphasis on computer security and intrusion techniques.  University of Idaho records indicated that he began his studies during the Spring 1999 Semester.  At the time, the defendant published his permanent address as 311 Sweet Ave., Apt. #6, Moscow, Idaho.

**The year 1999 transactions**

30.   On or about May 17, 1999, United States Immigration and Nationalization (INS) Form I-20 was issued by the University of Idaho, allowing **AL-HUSSAYEN** to study in the Computer Science Ph.D. program beginning no later than August 24, 1999, and ending no later than December 17, 2004.

31.   On or about July 17, 1999, while outside the United States, **AL-HUSSAYEN** signed the Student Certification of the INS Form I-20 at section #11, which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge.  I certify that I seek to enter or remain in the United States temporarily, **and solely for the purpose of pursuing a full course of study at [the University of Idaho].**  I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

**AL-HUSSAYEN** falsely made said certification, despite his extensive internet and business activities described above.  On or about July 20, 1999, the United States Government issued an F-1 student visa to **AL-HUSSAYEN** at Riyadh, Saudi Arabia.  The visa was valid for twenty-four months, or until July 20, 2001.

32.   On or about August 11, 1999, **AL-HUSSAYEN** was admitted by the United States Government into the United States at John F. Kennedy International Airport in New York City, New York, as an F-1 student.  **AL-HUSSAYEN** was admitted into the United States by the United States Government pursuant to the July 20, 1999 visa and in direct reliance upon **AL-HUSSAYEN's** certification on the INS Form I-20 dated July 17, 1999.

**The year 2000 transactions**

10

33.     On or about July 7, 2000, a second INS Form I-20 was issued by the University of Idaho and designated "for Continued attendance at this school" and in order "to add dependant."  On or about this same day and in Moscow, Idaho, **AL-HUSSAYEN** signed the Student Certification of said INS Form I-20 at section #11 and which read in pertinent part:

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge.  I certify that I seek to enter or remain in the United States temporarily, **and solely for the purpose of pursuing a full course of study at [the University of Idaho]**.  I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

**AL-HUSSAYEN** falsely made said certification, despite his extensive internet and business activities described above.  On or about July 9, 2000, **AL-HUSSAYEN** departed from the United States at the John F. Kennedy International Airport in New York City, New York.

34.     On or about August 25, 2000, **AL-HUSSAYEN** was admitted into the United States by the United States Government at Washington, DC, as an F-1 student. **AL-HUSSAYEN** was admitted into the United States by the United States Government pursuant to the student visa dated July 20, 1999 as previously referenced and in reliance upon **AL-HUSSAYEN's** certification on the INS Form I-20 dated July 7, 2000.

**The year 2002 transactions**

35.     On or about January 10, 2002, **AL-HUSSAYEN** departed the United States at the John F. Kennedy International Airport in New York City, New York.  On or about January 13, 2002, **AL-HUSSAYEN** signed and submitted to the United States embassy a DOS Form DS-156 for the purpose of obtaining another F-1 student visa.  Section 36 of the form reads in pertinent part:

> I certify that I have read and understand all the questions set forth in this application and the answers I have furnished on this form are true and correct to the best of my knowledge and belief.  I understand that any false or misleading statement may result in the permanent refusal of a visa or denial of entry into the United States.  I understand that possession of a visa does not automatically entitle the bearer to enter the United States of America upon arrival at a port of entry if he or she is found inadmissable.

At section nineteen of the Form DS-156, **AL-HUSSAYEN** stated that the purpose of his entry

11

into the United States was to "study;" and, at section twenty-six, that he would do so at the University of Idaho.  At section 20, he stated his permanent address in the United States to be 311 Sweet Ave. #6, Moscow, Idaho, 83843.  As part of his application for the F-1 student visa, **AL-HUSSAYEN** relied upon and/or submitted the INS Form I-20 dated July 7, 2000, as previously referenced.

36.   On or about January 14, 2002, the DOS Form DS-156 was formally stamped as received by the United States Government at the United States Embassy in Riyadh, Kingdom of Saudi Arabia.  However, the application was refused because the birth date of **AL-HUSSAYEN** on the visa application and the July 7, 2000 INS Form I-20 did not match the birth date on his passport.

37.   On or about January 14, 2002, and in conjunction with the same F-1 student visa application, **AL-HUSSAYEN** submitted a DOS Form DS-157 Supplemental Non-immigrant Visa Application to the United States Government at the United States Embassy in Riyadh, Kingdom of Saudi Arabia, which DOS Form DS-157 was attached to the original DOS Form DS-156 submitted on January 14, 2002.  Section 13 of the DOS Form DS-157 required the applicant to "[l]ist all Professional, Social, and Charitable Organizations to Which You Belong (Belonged) or Contribute (Contributed) or with Which You Work (Have Worked)." **AL-HUSSAYEN** listed "ACM & IEEE."  ("ACM" stands for the Association for Computive Machinery, and "IEEE" stands for the Institute of Electrical and Electronic Engineers.) **AL-HUSSAYEN** listed no other affiliations, particularly of any charitable organizations. **AL-HUSSAYEN** falsely and intentionally did not list the IANA, Al-Haramain or other entities.

38.   On or about March 19, 2002, the University of Idaho provided an INS Form I-20 for **AL-HUSSAYEN** "for Continued attendance at this school" and to "correct birth-date." On or about April 6, 2002, **AL-HUSSAYEN** signed the Student Certification of the INS Form I-20 at section eleven, which stated in pertinent part:

12

1

2

3

4

> I have read and agreed to comply with the terms and conditions of my admission. . . . I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, **and solely for the purpose of pursuing a full course of study at [the University of Idaho]**. I also authorize the named school to release any information from my records which is needed. [Emphasis added.]

5   AL-HUSSAYEN falsely made the certification, despite his extensive internet and business

6   activities described above. On or about the same day of April 6, 2002, **AL-HUSSAYEN**

7   formally submitted the INS Form I-20 dated April 6, 2002, to the United States Government

8   at the United States Embassy in Riyadh, Kingdom of Saudi Arabia, and the United States

9   Government issued **AL-HUSSAYEN** an F-1 student visa in direct reliance upon **AL-**

10   **HUSSAYEN's** certifications on the DOS Form DS-156 dated January 14, 2002, and attached

11   DOS Form DS-157, together with the INS Form I-20 dated April 6, 2002.

12        39.    On or about May 9, 2002, **AL-HUSSAYEN** was admitted by the United States

13   Government into the United States at the John F. Kennedy International Airport in New York

14   City, New York, as an F-1 student by virtue of the F-1 student visa issued April 6, 2002, and

15   in direct reliance upon **AL-HUSSAYEN'S** certifications on the DOS Form DS-156 dated

16   January 14, 2002, and attached DOS Form DS-157, together with the INS Form I-20 dated

17   April 6, 2002. During the admission at the John F. Kennedy International Airport, **AL-**

18   **HUSSAYEN** was inspected by INS and Customs officials. During the inspections, the INS

19   Form I-20 dated April 6, 2002, was photocopied by the Customs officials, with the Customs

20   officials retaining the copy and the original being returned to **AL-HUSSAYEN.**

21

22

23   **COUNT ONE**
**CONSPIRACY TO PROVIDE MATERIAL SUPPORT**
**OR RESOURCES TO TERRORISTS**
**(Violation 18 U.S.C. 371 and 2339A)**

24

25   The facts set forth in the previously numbered paragraphs 1 through 39 are hereby re-

26   alleged as though set forth in full herein.

27

28   13

1    Beginning at a time uncertain, but no later than September 13, 1994, until on or about

2   February 26, 2003, within and as the same pertains to the District of Idaho, **SAMI OMAR**

3   **AL-HUSSAYEN** did knowingly conspire, combine, confederate, and agree with persons

4   known and unknown to the Grand Jury, to provide material support and resources, and to

5   conceal and disguise the nature, location, source and ownership of material support and

6   resources, intending that they were to be used in preparation for and in carrying out a violation

7   of Title 18, United States Code, Section 956 (conspiracy to kill, kidnap, maim, or injure

8   persons or damage property in a foreign country), in violation of Title 18, United States Code,

9   Section 2339A and Section 371.

10   **The Purpose of the Conspiracy**

11    The purpose of the conspiracy was to create and maintain websites and other internet

12   media, which were intended in part to recruit personnel and raise funds for violent jihad in

13   such places as Chechnya and Israel.

14   **The Manner and Means of the Conspiracy**

15    From on or about September 13, 1994, until on or about October 26, 2001, the

16   material support and resources that were the manner and means of the conspiracy included

17   currency, financial services, communications equipment, and personnel.  From on or about

18   October 26, 2001, until on or about February 26, 2003, the material support and resources that

19   were the manner and means of the conspiracy included currency, monetary instruments,

20   financial services, expert advice and assistance, communications equipment, and personnel.

21    At times relevant to the conspiracy, **AL-HUSSAYEN** provided these material support

22   and resources at the request of certain persons located in the United States and abroad,

23   knowing that the persons to whom he provided the material support and resources were

24   attempting to fund and facilitate overseas violence, and intending to assist in these efforts.

25   **Overt Acts in Furtherance of the Conspiracy**

26    Defendant **AL-HUSSAYEN**, together with co-conspirators known and unknown to

27

28                                          14

the Grand Jury, committed overt acts as part of and in furtherance of the conspiracy, including the following:

a.      On or about January 29, 2000, on the www.al-multaqa.com website, defendant, together with co-conspirators known and unknown to the Grand Jury, invited "those who cannot physically engage in holy war" to join an internet e-mail group "for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers," and urged all readers "to help the Chechen holy warriors with [their] support, [their] money, and [their] selves." As described above, members of this internet e-mail group posted inquiries and information relating to violent jihad. The internet e-mail group thus provided a communications platform for individuals who wished to engage in violent jihad.

b.      On or about May 15, 2001, on the www.alasr.ws website, defendant, together with co-conspirators known and unknown to the Grand Jury, published several fatwas (that is, religious decrees) justifying and encouraging violent jihad, including suicide attacks.

c.      Defendant, together with co-conspirators known and unknown to the Grand Jury, published or broadcasted a wide variety of speeches, lectures and articles justifying and glorifying violent jihad. Thus, for example, the following articles were transmitted to the internet service provider that hosted the www.al-multaqa.com website: "The World's Bravest People" (extolling the Chechen mujahideen (warriors) and asking Allah to destroy the Russian army and make their wives into widows), "Jihad in the Qur'an and the Sunnah", "The True Meaning of Shaheed" (stating that to die as a shaheed (martyr) is the ultimate honor), "The Objectives and Aims of Jihad"; and "The Religious and Moral Doctrine on Jihad." These same articles were also found on defendant's home computer in a subdirectory named "almultaqa"

d.      Defendant, together with co-conspirators known and unknown to the Grand Jury, called upon Muslims to participate personally in violent jihad, or, alternatively, to provide financial assistance to such groups. For example, from in or about October, 2000, to

15

1    in or about September, 2002, the www.islamway.com website included a specific solicitation
2    of donations to the Islamic Resistance Movement, also known as HAMAS, and provided a
3    link for that purpose to a website that it characterized as the official mouthpiece of HAMAS.
4    As a result of HAMAS's participation in violent jihad in Israel, HAMAS has been designated
5    by the United States Department of State since 1997 as a foreign terrorist organization,
6    pursuant to Section 219 of the Immigration and Nationality Act.   On April 15, 2002, Al-
7    Hussayen received an e-mail in which the sender forwarded a solicitation for donations to
8    Hamas.  The original e-mail purported to be from "the battalion of the martyr Ezeldeen Al-
9    Qassam" of "the military wing for the Islamic Resistance Movement," and stressed the need
10   for money in order to arm fighters against the "Zionists occupiers."  **AL-HUSSAYEN** thus
11   knew and intended that the donations he solicited on behalf of HAMAS would be used in
12   preparation for, and in committing, violent jihad.

13        e.      Defendant, together with co-conspirators known and unknown to the Grand
14   Jury, published graphic videos depicting mujahideen and other subjects relating to violent
15   jihad with the intent to inspire viewers to engage in violent jihad or to provide financial
16   assistance to those who did so.  Individuals in the United States who viewed these videos was
17   inspired at least in part by the videos to travel overseas to train for and engage in violent jihad
18   and related terrorist offenses.

19        f.      **AL-HUSSAYEN** sent numerous messages to the internet e-mail group.  For
20   example, on February 20, 2000, **AL-HUSSAYEN** sent a post to the internet e-mail group
21   forwarding materials titled "Virtues of Jihad" that glorified those who die in battle while
22   performing violent jihad.  The post explained that such people have their own place in heaven
23   close to Allah, and that the problem with Islam today is that Muslims have given up on violent
24   jihad and are not practicing it enough.

25        g.      Defendant, together with co-conspirators known and unknown to the Grand
26   Jury, sought to conceal their participation in the broadcast of an inflammatory lecture (by one
27

28                                           16

1  of the sheikhs described above) in which the sheikh urged listeners to participate in violent

2  jihad in Israel.  In particular, on or about January 19, 2003, **AL-HUSSAYEN** discussed with

3  another individual a plan to deny to authorities, if questioned, that they knew the nature of the

4  materials that they were broadcasting, and the way in which they could structure the broadcast

5  to permit them to make that denial.

6

7                                        **COUNT TWO**

8                        **FALSE STATEMENT TO THE UNITED STATES**
                          **(Violation 18 U.S.C. 1001(a)(2) and 3238)**

9        The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set

10  forth in full herein.

11       On or about July 17, 1999, within and as the same pertains to the District of Idaho,

12  **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the

13  Executive Branch of the United States Government, knowingly and willfully made a

14  materially false, fictitious and fraudulent statement and representation to authorities of the

15  United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in

16  the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a

17  student visa, signed and submitted an Immigration and Naturalization (INS) form I-20,

18  thereby knowingly and willfully representing to United States Government authorities that he

19  sought to enter into the United States for the sole purpose of pursuing a full course of study at

20  the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been,

21  was and would be engaged in activities other than his course of study at the University of

22  Idaho, including, but not limited to, his involvement with the Islamic Assembly of North

23  America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

24

25

26

27

28                                           17

**COUNT THREE**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about July 17, 1999, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238.

**COUNT FOUR**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3237)**

The previous numbered paragraphs 1 through 39, are hereby re-alleged as though set forth in full herein.

On or about August 11, 1999, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an

18

1 | application and other document required by the immigration laws and regulations of the
2 | United States, (2) knowingly presented such application and other document required by the
3 | immigration laws and regulations of the United States which contained a materially false
4 | statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and
5 | claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented
6 | to United States Government authorities a student visa procured by means of a false statement
7 | and claim and other document containing such false statement and claim; in violation of Title
8 | 18, United States Code, Sections 1546(a) and 3237.

9

10 | **COUNT FIVE**
   | **FALSE STATEMENT TO THE UNITED STATES**
11 | **(Violation 18 U.S.C. 1001(a)(2) and 3238)**

12 | The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set
13 | forth in full herein.

14 | On or about July 7, 2000, within and as the same pertains to the District of Idaho,
15 | **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the
16 | Executive Branch of the United States Government, knowingly and willfully made a
17 | materially false, fictitious and fraudulent statement and representation to authorities of the
18 | United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in
19 | the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a
20 | student visa, signed and submitted an Immigration and Naturalization (INS) form I-20,
21 | thereby knowingly and willfully representing to United States Government authorities that he
22 | sought to enter into the United States for the sole purpose of pursuing a full course of study at
23 | the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been,
24 | was and would be engaged in activities other than his course of study at the University of
25 | Idaho, including, but not limited to, his involvement with the Islamic Assembly of North
26 | America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

27

28 | 19

**COUNT SIX**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3238)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about July 7, 2000, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States and (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby knowingly and willfully representing to United States Government authorities that he sought to enter into the United States for the sole purpose of pursuing a full course of study at the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was and would be engaged in activities other than his course of study at the University of Idaho, including, but not limited to, his involvement with the Islamic Assembly of North America; in violation of Title 18, United States Code, Sections 1546(a) and 3238.

**COUNT SEVEN**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3237)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about August 25, 2000, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an

20

1   application and other document required by the immigration laws and regulations of the

2   United States, (2) knowingly presented such application and other document required by the

3   immigration laws and regulations of the United States which contained a materially false

4   statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and

5   claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented

6   to United States Government authorities a student visa procured by means of a false statement

7   and claim and other document containing such false statement and claim; in violation of Title

8   18, United States Code, Sections 1546(a) and 3237.

9

10   **COUNT EIGHT**

11   **FALSE STATEMENT TO THE UNITED STATES**<br>**(Violation 18 U.S.C. 1001(a)(2) and 3238)**

12

13       The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set

14   forth in full herein.

15       On or about January 14, 2002, within and as the same pertains to the District of Idaho,

16   **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the

17   Executive Branch of the United States Government, knowingly and willfully made a

18   materially false, fictitious and fraudulent statement and representation to authorities of the

19   United States in relation to **SAMI OMAR AL-HUSSAYEN**'s status as a foreign student in

20   the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a

21   student visa, signed and submitted Department of State (DOS) form DS-156 and form DS-

22   157, thereby knowingly and wilfully failing and refusing to inform United States Government

23   authorities of his involvement with the Islamic Assembly of North America and other entities;

24   in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

25

26

27

28   21

1

2

### COUNT NINE
### VISA FRAUD
### (Violation 18 U.S.C. 1546(a) and 3238)

3   The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set

4   forth in full herein.

5   On or about January 14, 2002, within and as the same pertains to the District of Idaho,

6   **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and

7   subscribed as true to the United States a false statement with respect to a material fact in an

8   application and other document required by the immigration laws and regulations of the

9   United States and (2) knowingly presented such application and other document required by

10  the immigration laws and regulations of the United States which contained a materially false

11  statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student

12  visa, signed and submitted Department of State (DOS) form DS-156 and form DS-157,

13  thereby knowingly and wilfully failing and refusing to inform United States Government

14  authorities of his involvement with the Islamic Assembly of North America and other entities;

15  in violation of Title 18, United States Code, Sections 1546(a) and 3238.

16

17

18

### COUNT TEN
### FALSE STATEMENT TO THE UNITED STATES
### (Violation 18 U.S.C. 1001(a)(2) and 3238)

19  The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set

20  forth in full herein.

21  On or about April 6, 2002, within and as the same pertains to the District of Idaho,

22  **SAMI OMAR AL-HUSSAYEN**, Defendant herein, in a matter within the jurisdiction of the

23  Executive Branch of the United States Government, knowingly and willfully made a

24  materially false, fictitious and fraudulent statement and representation to authorities of the

25  United States in relation to **SAMI OMAR AL-HUSSAYEN's** status as a foreign student in

26  the United States, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a

27

28

22

1  student visa, signed and submitted an Immigration and Naturalization (INS) form I-20,

2  thereby knowingly and willfully representing to United States Government authorities that he

3  sought to enter into the United States for the sole purpose of pursuing a full course of study at

4  the University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been,

5  was and would be engaged in activities other than his course of study at the University of

6  Idaho, including, but not limited to, his involvement with the Islamic Assembly of North

7  America; in violation of Title 18, United States Code, Sections 1001(a)(2) and 3238.

8

9  **COUNT ELEVEN**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3238)**

10

11  The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set

12  forth in full herein.

13  On or about April 6, 2002, within and as the same pertains to the District of Idaho,

14  **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and

15  subscribed as true to the United States a false statement with respect to a material fact in an

16  application and other document required by the immigration laws and regulations of the

17  United States and (2) knowingly presented such application and other document required by

18  the immigration laws and regulations of the United States which contained a materially false

19  statement, in that **SAMI OMAR AL-HUSSAYEN**, in applying for and receiving a student

20  visa, signed and submitted an Immigration and Naturalization (INS) form I-20, thereby

21  knowingly and willfully representing to United States Government authorities that he sought

22  to enter into the United States for the sole purpose of pursuing a full course of study at the

23  University of Idaho, when, in fact, **SAMI OMAR AL-HUSSAYEN** knowingly had been, was

24  and would be engaged in activities other than his course of study at the University of Idaho,

25  including, but not limited to, his involvement with the Islamic Assembly of North America;

26  in violation of Title 18, United States Code, Sections 1546(a) and 3238.

27

28

23

**COUNT TWELVE**
**VISA FRAUD**
**(Violation 18 U.S.C. 1546(a) and 3237)**

The previous numbered paragraphs 1 through 39 are hereby re-alleged as though set forth in full herein.

On or about May 9, 2002, within and as the same pertains to the District of Idaho, **SAMI OMAR AL-HUSSAYEN**, Defendant herein, (1) knowingly made under oath and subscribed as true to the United States a false statement with respect to a material fact in an application and other document required by the immigration laws and regulations of the United States, (2) knowingly presented such application and other document required by the immigration laws and regulations of the United States which contained a materially false statement, and (3) knowingly used a non-immigrant visa obtained by a false statement and claim, in that **SAMI OMAR AL-HUSSAYEN**, in entering into the United States, presented to United States Government authorities a student visa procured by means of a false statement and claim and other document containing such false statement and claim; in violation of Title 18, United States Code, Sections 1546(a) and 3237.

Dated this _8th_ day of January, 2004.

A TRUE BILL

*Kristine J. Crawford*
FOREPERSON

THOMAS E. MOSS
UNITED STATES ATTORNEY

*Kim R. Lindquist*
KIM R. LINDQUIST
Assistant United States Attorney

*[signature]*
TERRY L. DERDEN
First Assistant United States Attorney
Chief, Criminal Section

*[signature]*
DAVID B. DEITCH
Trial Attorney

24