# Exhibit 1

## Plaintiffs' More Definite Statement as to Mohammed Hussein Al Amoudi

Plaintiffs incorporate by reference the entirety of the Third Amended Complaint, (*Burnett* original docket #29, filed November 22, 2002) including all of the allegations and claims contained therein. Plaintiffs additionally allege, upon information and belief, as to Mohammed Hussein Al Amoudi:

*Mohammed Hussein Al Amoudi Has Substantial Connections with the United States.*

1. WorldSpace Satellite Company Ltd. is a corporation organized and doing business in the British Virgin Islands.  It is also operating in Washington, D.C. through an agreement with WorldSpace, Inc., a corporation organized in Maryland and re-incorporated in Delaware in 2004.  WorldSpace Satellite Company Ltd. builds and operates satellites to support the Digital Audio Radio Service system (XM and Sirius Satellite Radio).  During the mid-1990s, Mohammed Hussein Al Amoudi and Khalid Bin Mahfouz (through companies controlled by them and through Credit Suisse as a fiduciary) provided a majority of the capital necessary to develop the WorldSpace system and commence commercial operations. In total, they provided approximately $1.1 billion in cash to WorldSpace.

2. In 2003, Mohammed Hussein Al Amoudi was a shareholder of Hewlett Packard Co.  The company's corporate headquarters are located at 3000 Hanover Street, Palo Alto, CA 94304-1185. Funds were invested through his account at ABN Amro in Geneva.

3. The Al Amoudi and bin Mahfouz clans control three private Saudi Arabian oil companies, Delta Oil, Nimir Petroleum and Corral Petroleum, which work very closely with several United States oil companies conducting international business.  The Saudi families have formed international consortia with U. S. oil companies Texaco, Unocal, Amerada Hess, and Frontera Resources.  Mohammed Hussein Al Amoudi's business interests, meanwhile, are

closely intertwined with those of Khalid bin Mahfouz. The closeness of their interests is underlined by their joint oil venture, Delta-Nimir, as well as by their partnership in the Saudi firm The Marei Bin Mahfouz & Ahmed Al Amoudi Group of Companies & Factories.

4. Mohammed Hussein Al Amoudi continues to profit from his working relationship with America's oil businesses. Mohammed Hussein Al Amoudi and his family, through Delta Oil, teamed up with the United States oil company Amerada Hess to create the Delta Hess Alliance in 1998 for the development and exploration of oil fields in the Caspian region.

5. Mohammed Hussein Al Amoudi is sole owner of Preem Petroleum Holdings AB. Until 2004, Preem Petroleum filed forms with the United States Securities and Exchange Commission (SEC). SEC filings reflect that Preem Petroleum registered with the SEC on July 16, 2001 and had entered into various agreements with United States corporations and banks since at least 1995. The 2003 annual report of Preem Petroleum states, "In the first quarter of 2004, about three shiploads have left Scanraff (Preem Petroleum refinery) with petrol to the United States. Normally there is a ship going just once in a while," indicating regular business with the United States.

6. Mohammed Hussein Al Amoudi's MIDROC group is a consortium which consists of about 30 companies. MIDROC-Ethiopia is the parent company and operates other sister enterprises such as Sheraton Addis, MIDROC Construction Ethiopia, MOHA Soft Drinks S.C., National Mining Corporation, and National Motor Companies. MIDROC is represented in Washington, D.C. by Verner Lipfert through an operation called Rock Creek Corporation. Rock Creek Corporation is a Delaware corporation with a registered office at 1025 Vermont Avenue in D.C.

7. Mohammed Hussein Al Amoudi is part of the "Bin Mahfouz and & Alamoudi Co. for Travel and Tourism." The address is 12062 Valley View, Suite 206, Garden Grove, CA 92645. The company organizes first class Umrah and Hajj Trips, offers tourism and escort services and airline ticketing and cruise services.

8. In the early 1990's, Mohammed Hussein Al Amoudi came to the United States on behalf of Khalid bin Mahfouz to speak with a U.S. Treasury Department minister regarding Khalid bin Mahfouz's involvement in fraudulent practices of the Bank of Credit and Commerce International (BCCI), where Mahfouz was Chief Operating Officer.

***Mohammed Hussein Al Amoudi Has Provided Financial Support to Well-Known al-Qaeda Support Groups.***

9. On at least one occasion, Mohammed Hussein Al Amoudi personally ordered the transfer of funds to defendant Islamic Assembly of North America ("IANA"). On May 14, 1998, $300,000 was wired from Mohammed Hussein Al Amoudi's account at ABN Amro to an account at First America bank N.A. Michigan (National City Bank) belonging to IANA. Mohammed Hussein Al Amoudi ordered the transfer on May 12, 1998, by a fax signed by him to IANA, First of America Bank-Central, Lansing MI 48909 USA, routing #07200915, account #013 003 9506.

10. IANA is an Islamic outreach organization with branches located throughout the United States, formed in 1993 to propagate the virulent Salafi-Wahhabist strain of fundamentalist Islam practiced by Osama bin Laden and his followers. IANA utilizes books, magazines, internet materials, conferences, and audio lectures to convey its message, and IANA and its affiliates have published and disseminated numerous materials advocating violent jihad against the United States. IANA's conferences and lectures have featured jihadist sheikhs and

senior al-Qaeda operatives and recruiters, such as Abdelrahman Al-Dosari (a.k.a. Sheikh Abu Abdul Aziz Barbaros) and Sheikh Muhammad Al-Jibaly.

11. IANA has been directly or indirectly affiliated with a number of suspect organizations and individuals, including the Al Kifah Refugee Center, the U.S. branch of al-Qaeda's predecessor organization, Makhtab al-Khidamat; Azzam Publications, al-Qaeda's premier English-language mouthpiece; the Muslim Brotherhood, an Egypt-based fundamentalist group with well-known terror links; and anti-American jihadist dissident sheikhs such as Salman al-Awdah, Hamed al-Ali, and Safar al-Hawali. These clerics, who have lectured at IANA functions and/or have had their works featured in IANA publications, have advocated suicide bombings and "martyrdom" attacks and have been cited by Osama bin Laden himself as spiritual guides for the al-Qaeda movement. In addition, an officer of IANA's Canada branch harbored Ould Slahi, a senior al-Qaeda operative involved with the 1998 Embassy bombings and the foiled Millennium plot, in Montreal.[1]

12. From 1997 to 2003, Sami al-Hussayen played a leading role in IANA as a member of the organization's Board of Trustees, as well as an IANA official representative and employee in charge of technological development and financial management. Hussayen stood criminal trial in Idaho for material support of terrorism, charged in aiding al-Qaeda by soliciting funds on the internet and funneling donations via IANA. Under Hussayen's stewardship as technological manager and chief webmaster of IANA's several websites, IANA's affiliate webpages repeatedly provided religious justification for suicide attacks, including the September 11th hijackings, as well as advocating such forms of attack; featured al-Qaeda propaganda videos and encouraged individuals to take up arms and travel abroad to participate in jihad efforts against Western targets; and called upon supporters to donate funds to al-Qaeda and other like-

---

[1] Burnett Plaintiffs' More Definite Statement as to Islamic Assembly of North America

4

minded terrorist organizations. Hussayen also had email contact with the al-Qaeda political office; one communiqué extols the virtue of successful suicide operations against the United States and specifically references the September 11th attacks, the 1998 U.S. Embassy bombings in Kenya and Tanzania, and the 2000 attack on the USS Cole, all carried out by al-Qaeda operatives. In addition, during Hussayen's tenure, IANA received financial support from Specially Designated Global Terrorist (SDGT) Organizations Global Relief Foundation (GRF), Benevolence International Foundation (BIF), and Al Haramain Islamic Foundation.

13. Mohammed Hussein Al Amoudi is also connected to a separate federal terrorism inquiry in the United States in Herndon, Virginia. In 2000 Mohammed Hussein Al Amoudi paid more than $50,000 in consulting fees to Sterling Management Group, one of more than 100 entities controlled by a group of Islamic activists suspected by the Justice Department of financing terrorism.

14. As part of the Swiss government's investigation into the SAAR Network/ SAFA Group, the government uncovered financial transactions between Mohammed Hussein Al Amoudi and the SAFA Group. On July 11, 2000, $53,697.48 was wired from an account belonging to Mohammed Hussein Al Amoudi into an account belonging to defendant Sterling Management Group, Inc.

15. Sterling Management Group, Inc. (SMG) ostensibly serves as an entrepreneurial business development, investment, and management consulting service. It provides management, finance, and accounting services to charitable and for-profit organizations; among its service sectors are real estate and the agro-industrial field. SMG also runs the Sterling Charitable Gift Fund, an Islamic 501(c)3 charity. Its officers and executives include several *Burnett* defendants and individuals suspected by the United States government of financially

5

abetting terrorist activity; these individuals also feature prominently throughout the SAAR network of companies, serving as executive officers and board members. Among those affiliated with SMG are defendants including M. Yaqub Mirza, M. Omar Ashraf, Muhammad Ashraf, Taha Jaber al-Alwani, Jamal Barzinji, and Iqbal Unus.

16.     SMG is but one of the organizations which make up the diverse SAAR network of charities, banks, and businesses. The SAAR Foundation was founded by and receives its primary financial support from the Saudi Arabian Al Rajhi family, which has a long history of providing financial support for al-Qaeda terrorism. Incorporated in 1983 as a non-profit in Herndon, Virginia, the SAAR Foundation is a vast conglomerate network of over one hundred affiliated non-profit and for-profit organizations, characterized by heavily overlapping directorates. Most of the SAAR entities do not maintain physical operating presences, but rather stand as "shell" companies or front organizations for the funneling of money to terrorist organizations. The SAAR Foundation has received billions in revenue.

17.     SAAR Foundation executives have served as officers of and have worked with SDGT companies and individuals. In addition, SAAR Foundation associates were implicated in al-Qaeda's 1998 U.S. Embassy bombings in Kenya and Tanzania. In March 2002, the offices of many SAAR organizations, as well as the residences of top SAAR executives, were raided in a joint terrorism task force operation on suspicion of money laundering and tax evasion activities in conjunction with ties to terrorist groups and individuals, among them al-Qaeda and Osama bin Laden, as well as for alleged connections to the September 11 attacks. The raids resulted in the confiscation of a vast quantity of materials linking SAAR officials directly to al-Qaeda's terrorism-financing apparatus. Sterling Management Group is just one of the many cogs in the

SAAR Foundation's complex network of front companies created as a façade to conceal the group's efforts to bankroll al-Qaeda terrorism.

18. Sterling Management Group, Inc. is chaired by defendant Yaqub Mirza. In March, 2002, Yaqub Mirza's house was raided by federal authorities investigating his alleged connections to al-Qaeda and September 11, 2001. Yaqub Mirza is, or has served as, an officer and/or director of twenty-nine SAAR Foundation entities and maintains signatory authority over seventeen different bank accounts associated with fifteen different SAAR Foundation entities, making him the financial mastermind of the SAAR Foundation.

19. Yaqub Mirza was also Secretary/Treasurer of Sanabel al-Kheer, an investment arm of the International Islamic Relief Organization, located in Herdon, Virginia at 555 Grove Street  Its sister corporation, The Sana-Bell, Inc., also operates out of 555 Grove Street and lists Yaqub Mirza as the Secretary.  The Sana-Bell, Inc. was incorporated on July 28, 1989, the year a list called the "golden chain" was created.  Discovered during raids of the Bosnian offices of Benevolence International Foundation, the "golden chain," according to the United States government, is a list of the initial financiers of al-Qaeda.  Three of the names on the "golden chain" list, Ibrahim Afandi, Saleh Kamel, and Suleiman Abdul Aziz al Rajhi, match those on the articles of incorporation of The Sana-Bell, Inc. at 555 Grove Street.

20. Yaqub Mirza is also the first organizer of the U.S. offices of Muslim World League, known for its close association with and support of Osama Bin Laden and other high ranking al-Qaeda officials.  Recent Congressional testimony affirms the relationship between

Sana-Bell, Inc., Yaqub Mirza, Muslim World League, and International Islamic Relief Organization.[2]

21.     Mohammed Hussein Al Amoudi is a partner of Khalid bin Mahfouz in a number of businesses.  In addition to several oil companies including Nimir Petroleum, Delta Oil, and Corral Petroleum, Mohammed Hussein Al Amoudi and Khalid bin Mahfouz are involved in a construction company called Yeminvest.  Yeminvest built and controls the Aden Port Facilities in Aden, Yemen.  In 1999 al-Qaeda blew up the USS Cole while it was refueling at the Aden Port Facilities.  The Federal Bureau of Investigation suspects the involvement of these facilities in the attack and believes that Yeminvest may have been involved as well.

22.     On October 22, 2001, the FBI initiated an investigation into the connections between Mohammed Hussein Al Amoudi and Osama Bin Laden because of Mohammed Hussein Al Amoudi's close connections with the Aden, Yemen harbor, the site of the USS Cole attack.

23.     As aforementioned, in the early 1990's, Mohammed Hussein Al Amoudi met with a U.S. Treasury Department minister in the United States on behalf of Khalid bin Mahfouz, who was under investigation for his participation in several fraudulent practices while Chief Operating Officer of BCCI.  On behalf of Khalid bin Mahfouz, Mohammed Hussein Al Amoudi offered the U.S. official a bribe to drop the case against BCCI.

24.     Khalid bin Mahfouz was indicted on July 1, 1992, on BCCI related charges for participation in a Scheme to Defraud in the First Degree in Violation of New York Penal Law § 190.65.  The indictment alleges a series of misrepresentations, sham loans and fraudulent conduct in failing to disclose the status of Khalid bin Mahfouz's interest in BCCI.

---

[2] *See* Testimony of Matthew Epstein with Evan Kohlmann Before the House committee on Financial Services Subcommittee on Oversight and Investigations; Progress Since 9/11:  The Effectiveness of U.S. Anti-Terrorist Financing Efforts; March 11, 2003.

8

25. Under Khalid bin Mahfouz, the BCCI was also implicated in supporting international terrorism, as reported by the United States Senate.

> In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.

26. As a result of a 1998 audit of defendant National Commercial Bank ("NCB"), Mohammed Hussein Al Amoudi replaced Khalid bin Mahfouz as head of NCB after Saudi authorities placed Khalid bin Mahfouz under house arrest in Taif, Saudi Arabia.

27. The 1998 bank audit discovered that NCB, which at the time was under Khalid bin Mahfouz's stewardship, had made unauthorized transfers of funds to organizations supporting terrorism, including a $3 million transfer to the Muwaffaq ("Blessed Relief") Foundation, an entity endowed by Khalid bin Mahfouz for the purpose of financing al-Qaeda. In addition, the audit uncovered unreported transfers of $74 million over a ten-year period to the International Islamic Relief Organization ("IIRO"), a known supporter of bin Laden, which diverted funds to al-Qaeda. The surreptitious nature of these transfers suggests that the $74 million was not given to IIRO for legitimate charitable purposes, but rather to support IIRO's involvement in international terrorism.

28. NCB was also implicated between 1986 and 1990 in the fraudulent schemes and practices of BCCI. A 1992 United States Senate Report on the BCCI scheme detailed the role of NCB in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism. NCB was used by Osama bin Laden and al-Qaeda as a financial arm, serving as a financial conduit for Osama bin Laden's operations.

29. In 1998, Mohammed Hussein Al Amoudi was registered as shareholder of Tadamon Islamic Bank in Sudan.

30. Tadamon Islamic Bank was substantially used by the al-Qaeda network. According to a testimony of former al-Qaeda financier in Khartoum, Jamal Ahmed Mohamed al-Fadl, during the 2001 trial regarding the 1998 Embassy bombings in Africa, Tadamon Islamic Bank managed accounts of al-Qaeda operatives.[3]

31. Tadamon Islamic Bank is also a shareholder of Al Shamal Islamic Bank, a bank formed in Sudan and extensively used for al Qaeda operations.

---

[3] *See Burnett* Third Amended Complaint ¶ 109