UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to the Al Baraka Group, as that term is herein defined** |

*This document relates to:*     Federal Insurance Co. v. al Qaida
                              03 CV 06978 (RCC)


**AMENDED RICO STATEMENT**
**APPLICABLE TO THE AL BARAKA GROUP**

      Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 for defendants:

- Al Baraka Investment and Development Company ("Al Baraka")

- Saudi Dallah Al Baraka Group LLC ("Dallah")

- Saleh Abdullah Kamel ("Kamel")

(These defendants are sometimes hereinafter collectively referred to as the "Al Baraka Group".) Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.    The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.    The name of the defendants to whom this RICO statement pertains and the alleged misconduct and basis for liability is set forth in Exhibit "A".

3.    Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| defrauding the US Government | 18 U.S.C. § 371 |
| filing false or materially false tax returns | 26 U.S.C. § 7206(1), (2) |
| engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | the Al Baraka Group | Throughout this period, the Al Baraka Group conspired to support terrorism, to evade tax obligations, and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | the Al Baraka Group | the Al Baraka Group undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise they were underwriting, the al Qaida movement, planned to and would commit an act of deadly aggression |

| | | |
|---|---|---|
| | | against the United States in the near future, using the resources supplied by the Al Baraka Group |
| early 1990s to 9/11/2001 | Kamel | In violation of 18 U.S.C. § 1956, on multiple occasions Kamel conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations |
| early 1990s to 9/11/2001 | Kamel | In violation of 18 U.S.C. § 1957, on multiple occasions Kamel conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| early 1990s to 9/11/2001 | Kamel | In violation of 18 U.S.C. § 371, Kamel conspired to and did cause certain entities to defraud the United States Government of taxes legally due |
| early 1990s to 9/11/2001 | Kamel | In violation of 26 U.S.C. § 7206(1), (2), Kamel conspired to and did cause certain entities to file false or materially false tax returns |
| early 1990s to 9/11/2001 | the Al Baraka Group | the Al Baraka Group agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

    (c) not applicable

    (d) No.

    (e) No.

    (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants

3

consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Arab regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. the al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Al Baraka Group fits neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

(c) no.

(d) All of the Al Baraka Group are associated with the Enterprise.

(e) The Al Baraka Group are members of the Enterprise, and are separate and distinct from the Enterprise.

(f) The Al Baraka Group intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

4

7. The pattern of racketeering activity conducted by the Al Baraka Group is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Al Baraka Group funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by the Al Baraka Group, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Al Baraka Group, and laundered funds from Islamic so-called charities, including the charities and corporations among the Al Baraka Group. The financial facilitators, including the Al Baraka Group, also raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *zaka*, the mandatory charitable contributions required of all Muslims. Al Qaida also collected money from employees of corrupted charities.

    The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like the Al Baraka Group. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Al Baraka Group. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Al Baraka Group. Each member of the Al Baraka Group, with knowledge and intent, agreed to the overall objectives of the conspiracy, and each agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Each member of the Al Baraka Group also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

6

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20. not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Al Baraka | Headed by defendant Kamel, Al Baraka is a wholly owned subsidiary of Dallah.  Al Baraka has for many years knowingly maintained accounts for many of the so-called charities that operate within al Qaida's infrastructure.  Al Baraka advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts.  Through this mechanism, Al Baraka facilitates al Qaida's fundraising efforts.  The accounts maintained by Al Baraka on behalf of the so-called charities have been used to transfer funds to al Qaida cells throughout the world.  Despite its knowledge that the accounts it maintains were being used to fund terrorism, Al Baraka has continued to maintain those accounts, and has knowingly provided financial services and other forms of material support to al Qaida.  In addition, Al Baraka has provided substantial support to al Qaida through its subsidiaries and affiliates, including Al Shamal Islamic Bank, Tadamon Islamic Bank and al Aqsa Bank.  Thus, Al Baraka has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.  Along with Kamel, Al Baraka is also a shareholder in Tadamon Islamic Bank, which has long provided financial services and other forms of material support to al Qaida.  Along with Kamel, Al Baraka is an investor in Al Shamal Bank, along with Osama bin Laden, Omar Abdullah Kamel, al Faisal Islamic Bank and | 1962(c) 1962(d) |

| | the Sudanese Government. | |
|---|---|---|
| Dallah | Dallah is at the center of a complex banking system through which, beginning in the early 1980's, Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical brand of Islam at the heart of the al Qaida ideology.  Endowed with enormous funding, Dallah gave extensive support for radial Islamic causes. | 1962(c) 1962(d) |
| | Upon information and belief, Dallah, through its subsidiary Dallah Avco, also directly financed some of the September 11th hijackers.  According to senior officials within the United States government, the Joint Congressional Inquiry into the September 11th attack revealed that a Saudi intelligence official named Omar al Bayoumi provided direct assistance to Kalid al-Midhar and Nawaf Al Hazmi, two of the September 11th hijackers.  When al-Midhar and Al Hazmi arrived in Los Angeles, Al-Bayoumi, a Saudi citizen and prominent member of San Diego's Muslim community, traveled to Los Angeles to meet them.  Immediately before doing so, Al-Bayoumi visited the Saudi consulate in Los Angeles.  At the consulate, Al-Bayoumi met with Fahad Al-Thumairy, a Saudi diplomat who was stripped of his diplomatic visa and later barred from the United States, based on suspected ties to terrorism.  Following their meeting, Al-Bayoumi facilitated the future hijackers' settlement in the San Diego community, and paid two months rent for an apartment on their behalf.  According to various sources, Al-Bayoumi is an intelligence agent of the Kingdom of Saudi Arabia.  There is substantial credible evidence to support this conclusion.  In or around 1994, Al-Bayoumi was hired by Dallah Avco, a division of the Dallah al-Baraka business group, to work on an aviation project commissioned by the Saudi government.  Al-Bayoumi remained in the employment of Dallah Avco for the next seven years.  For five of those seven years, the Saudi government reimbursed Dallah Avco for Al- | |

|  | Bayoumi's salary and Al-Bayoumi was considered a Saudi civil servant. Mysteriously, although the project for which Al-Bayoumi was allegedly hired was based in Saudi Arabia, Al-Bayoumi moved to the United States in August of 1994 and began taking English classes at San Diego State University's College of Extended Studies. Dallah Avco records indicate that, as of 1999, Dallah Avco sought to terminate Al-Bayoumi's annual employment contracts. To that end, a Dallah Avco official wrote to the Saudi aviation authority saying "the company is not willing to renew the period for another year and we wish this to be known." In response, the aviation authority sent an urgent letter advising Dallah Avco that the Saudi government wanted Al-Bayoumi's contract renewed "as quickly as possible." Witnesses have reported that Al-Bayoumi had access to "seemingly endless" funds while in the United States. In fact, despite the modest salary he was paid as a Dallah Avco employee, Al-Bayoumi was able to front $400,000 for the purchase of a mosque. The Joint Inquiry's investigation also revealed that Al-Bayoumi received monthly checks in January 1999 from Princess Haifa, wife of Prince Bandar, through an intermediary named Osama Basnan. Some of the money Al-Bayoumi received from Princess Haifa ended up in the hands of the two September 11th hijackers. |  |
|---|---|---|
| Kamel | Saleh Abdullah Kamel is a wealthy Saudi businessman and one of al Qaida's principal individual financiers. Kamel is Chairman of al Baraka Financial Institution, which is deeply involved in providing financial services and other forms of material support to al Qaida. Kamel also co-founded the U.S. branch of Sana-Bell, Inc., an enterprise established to provide revenues to sustain the U.S. operations of the International Islamic Relief Organization (the "IIRO"). In founding Sana-Bell, Inc., Kamel knew and intended that it would be used as a vehicle for funding terrorist |  |

10

|  | organizations, including al Qaida, through the IIRO and the SAAR Network.  Kamel has been identified as one of al Qaida's principal financiers, and has made substantial contributions to many of the so-called charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks, the culmination of which was the Attack. |  |