**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**AMENDED RICO STATEMENT**<br>**Applicable to Dar Al Maal Al Islami Trust,**<br>**and DMI Administrative Services, S.A.** |

*This document relates to:*      Federal Insurance Co. v. al Qaida
                                  03 CV 06978 (RCC)


**AMENDED RICO STATEMENT APPLICABLE TO DAR AL MAAL AL ISLAMI**
**TRUST AND DMI ADMINISTRATIVE SERVICES, S.A.**

        Based on information currently available, plaintiffs submit this Amended RICO
statement pursuant to the Case Management Order dated June 15, 2004 for defendants Dar Al
Maal Al Islami Trust and DMI Administrative Services, S.A.

        Given the vastly complicated nature of the conspiracy and other wrongdoing that
led to the events of September 11, 2001, much information is presently unavailable to plaintiffs,
absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as
information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).


2.      The names of the defendants to whom this RICO statement pertains is Dar Al Maal Al
        Islami Trust and DMI Administrative Services, S.A.  The alleged misconduct and basis
        for liability is set forth in Exhibit "A".


3.      Not applicable.  All known wrongdoers are named as defendants in this action. Given the
        vastly complicated nature of the conspiracy and other wrongdoing that led to the events
        of September 11, 2001, however, much information is unavailable to plaintiffs, and the
        identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore
        reserve the right to amend this RICO statement as information is learned and verified and
        after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a)  list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| Anti Terrorism Act | 18 U.S.C. § 2332(b) |

(b)  dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. | Throughout this period, Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida Movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. | Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which they were participating, the al Qaida Movement, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Dar Al Maal Al Islami |

| | | Trust and DMI Administrative Services, S.A. |
|---|---|---|
| early 1990s to 9/11/2001 | Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. | Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of the al Qaida Movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a)     The enterprise (the "Enterprise" or "al Qaida Movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)     The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida Movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists,

proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  DMI Trust and DMI Administrative Services, S.A. fit neatly into this framework by facilitating the transfer of funds to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    (c)     No.

    (d)     DMI Trust and DMI Administrative Services, S.A., are associated with the Enterprise.

    (e)     DMI Trust and DMI Administrative Services, S.A. are members of the Enterprise, and are separate  and distinct from the Enterprise.

    (f)     DMI Trust and DMI Administrative Services, S.A. intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.     The pattern of racketeering activity conducted by DMI Trust and DMI Administrative Services, S.A. is separate from the existence of the al Qaida Movement, but was a necessary component to the  Attack.

8.     The Enterprise conducts terrorism all over the world; the racketeering activity conducted by DMI Trust and DMI Administrative Services, S.A. facilitates the funding of that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.     The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.    The Enterprise  relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.    Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.    Not applicable.

12.    Not applicable.

13.    The Al Qaida Movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14.    The history of the conspiracy behind the al Qaida Movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan,

and relied on well-placed financial facilitators, including Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on individuals and institutions who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Al Qaida also collected money from employees of corrupted charities.

The funds thus raised were used to, among other things, operate terrorist training camps in Sudan, Afghanistan and elsewhere, at which some recruits were trained in conventional warfare but the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Sudan, Afghanistan and other regions where al Qaida maintained training camps and operations.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the support provided by participants and conspirators like Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A.  Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.   As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.   Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.   Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| **VI** | Torture Victim Protection Act, |
|--------|--------------------------------|

| | |
|---|---|
| | 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.   pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.   not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A. | Dar Al Maal Al Islami Trust ("DMI Trust") and DMI Administrative Services, S.A. ("DMI S.A.") are part of a network of related and intertwined financial institutions, collectively known as Dar Al Maal Al Islami ("DMI"), also known as the "House of Islamic Money" – created on July 29, 1981 and headquartered at avenue Louis-Casai 84, in Cointrin, Geneva, Switzerland.<br><br>**Organizational Structure and Purpose of Dar Al Maal Al Islami, DMI Administrative Services S.A. and Daar Al-Maal Al-Islami Trust** -- DMI is the predecessor-in-interest to DMI Trust and DMI S.A.  DMI S.A. is located in Geneva, Switzerland.  The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions."[1] These continents include North America, Europe, Africa and Asia.  DMI S.A. provides assistance to the Board of Supervisors of DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology."[2]  Therefore, DMI Trust and DMI S.A. directly participate in the oversight and management of DMI Trust's subsidiary and associate entities.  DMI Trust owns 100% of DMI S.A.  DMI S.A. is both a wholly owned subsidiary and an agent of DMI Trust.  DMI S.A. and DMI Trust are referred to collectively herein as "DMI."  The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "House of Islamic Money").<br><br>DMI's main subsidiaries and affiliates are DMI S.A., Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank, as described herein.  DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden. | 1962(c)<br><br>1962(d) |

DMI Trust is an Islamic Financial Institution founded in 1981.[3] "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."[4] Financial and business institutions established by DMI Trust include banking, investment, Takaful (insurance), Retakafol (reinsurance) and business companies.   Asset management, however, is the Group's core business activity.  "The Trust's policy is determined by its fifteen-member Board of Supervisors.  To ensure strict conformity with Islamic principles, all DMI operations are reviewed and approved by its Religious Board.  The Trust's administrator, DMI Administrative Services S.A., located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries."[5]   DMI S.A. is a wholly owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions, and policies of the DMI Trust.  DMI S.A. acts as one of DMI Trust's operational arms.

Since its establishment, DMI has advocated and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in the modern era.  DMI was founded "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."[6] DMI is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."[7]  "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim.  The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."[8]

Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen.  As Mujahid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).

In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirmed DMI's commitment to

financial jihad: "May Allah bless your Jihad and all your efforts. May He aid you and affirm your faith."[9]

Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

**DMI Liability** – DMI has, over a period of many years, directly and through its subsidiaries and affiliates, knowingly provided material support and resources to al Qaeda and/or affiliated individuals and entities. DMI's misconduct includes laundering money for al Qaeda, knowingly and intentionally providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. In addition, DMI's *Zakat* accounts have been used to support al Qaeda. In addition, DMI companies have facilitated financial transactions for, and advertised, maintained and serviced accounts on behalf of, several of al Qaeda's known charity fronts, including al Haramain Islamic Foundation, International Islamic Relief Organization and the Muslim World League. DMI has also entered into business partnerships with prominent al Qaeda supporters, such as the National Islamic Front, the fundamentalist regime which has ruled Sudan since 1989 and provided safe haven to Osama bin Laden and al Qaeda from 1991 through 1996. Through these actions, DMI has knowingly conspired to support al Qaeda's global jihad, and aided and abetted that terrorist organization.

DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

**Faisal Islamic Bank of the Sudan** -- An associated company of the DMI Trust is the Faisal Islamic Bank of the Sudan.[10] The Faisal Islamic Bank of the Sudan has served on the Board of Supervisors of the DMI Trust.[11] Statements by officials of DMI Trust confirm DMI's direct involvement in Faisal Islamic Bank's operations. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated: "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."[12]

Prince Mohammed founded Faisal Islamic Bank of Sudan in 1977 in partnership with the National Islamic Front (NIF), the radical Islamist party headed by Hassan al Turabi which has dominated Sudanese politics for several decades and controlled the government of Sudan since 1989.  Members of the Muslim Brotherhood and NIF occupy prominent positions on the Board of Directors of the Faisal Islamic Bank.  In addition, the NIF has granted Faisal Islamic Bank privileges which were denied other banks, including full tax exemption on assets, profits, wages and pensions, as well as guarantees against confiscation or nationalization.  Moreover, the bank has supplied loans to the NIF and to its prominent members.  In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the NIF to operate, at least as late as 1992, from the penthouse of the bank's headquarters.[13]  Through this association, "Turabi's party became the best financed in the Sudan."[14]

Al Qaeda has materially benefited from the business relationship among DMI, Faisal Islamic Bank and the NIF.  In 1989, Hassan al Turabi, the ideological and political leader of the NIF, invited Osama bin Laden to move the entire al Qaeda organization to Sudan.  Bin Laden accepted the invitation, and transplanted his nascent terrorist organization to Sudan in 1991.  Bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan.  During the five years that al Qaeda resided in Sudan, the organization maintained a symbiotic relationship with the NIF, and enjoyed the NIF's complete protection.  The protection, support and safehaven provided by the NIF allowed al Qaeda to grow from a small organization with less than 20 dedicated members to a global terrorist empire.  In addition, while in Sudan, al Qaeda established several businesses in partnership with the NIF, to fund al Qaeda's campaign to attack America.

Absent the support and safehaven provided by the NIF during this time, al Qaeda would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

The benefits al Qaeda derived from its relationship with the NIF were made possible, at least in part, by the partnership between the NIF and Faisal Islamic Bank, which partnership helped the NIF retain power in Sudan during the relevant time period.  As a corollary, it is reasonable to infer that DMI and Faisal Islamic Bank hoped to reap financial benefit from the NIF's relationships with

bin Laden.  As Islamic banking institutions, DMI and Faisal Islamic Bank are forbidden to charge interest.  Instead, the banks enter into partnerships with their depositors and borrowers, and share in the financial success of those partnerships.  As Prince Mohammad al Faisal al Saud has explained:  "We make money when our borrowers make money.  If they don't we don't collect anything."  By virtue of this system, DMI and Faisal Islamic Bank were partners with the NIF in the NIF's endeavors, including those involving Osama bin Laden.

Given Faisal Islamic Bank's close relationship with the NIF, and the NIF's direct role in managing the bank's operations, DMI and Faisal Islamic Bank were necessarily aware that Osama bin Laden was using the NIF's protection to build a global terrorist empire in Sudan.  Indeed, bin Laden's relationship with the NIF and Hassan al Turabi was widely publicized.  In fact, Turabi held an elaborate reception for bin Laden at the time of his arrival in Sudan.  News reports during this period confirmed bin Laden's ambition to conduct a global jihad and to attack America, and that thousands of *mujihadeen* were traveling to Sudan to receive terrorist training.  By virtue of these reports, and their close relationship with the NIF, DMI and Faisal Islamic Bank necessarily were aware of al Qaeda's relationship with the NIF during this time.

Al Qaeda was so confident in the absolute protection of the NIF that it openly maintained accounts at Faisal Islaimc Bank.  Former al Qaeda financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum had held bank accounts for al Qaeda operatives during bin Laden's years of operation in Sudan:

> Q.  Where were the accounts [of al Qaeda] held?  In what countries?
> A.  (…) we got account in Bank Faisl Islami [Faisal Islamic Bank].
> Q.  Is that also in Khartoum?
> A.  Yes.[15]

**<u>Connections To The Al Shamal Islamic Bank of Sudan</u>** -- The Faisal Islamic Bank of the Sudan was a founding member of the Al Shamal Islamic Bank in Sudan and one of the bank's principal shareholders.[16]

The other co-founders of the bank included the government of the Northern State of Sudan, which was under the control of the NIF and Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development.  Main shareholders included the following co-defendants: the predecessor of the Benevolence International Foundation, Al Baraka for

Investment and Development, and Sheik Saleh Abdullah Kamel.

The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank which was a founding shareholder of the Al Shamal Islamic Bank.  The Tadamon Islamic Bank was formed in the Sudan on November 28, 1981.

A spokesman and shareholder for Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps....  Jihad has now become an obligation that comes before any other duty."[17]

DMI Trust is a major investor in Al Shamal Bank.  Another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan).

The Al Shamal Islamic Bank was capitalized by Osama bin Laden in the amount of fifty million U.S. dollars ($50,000,000.00). "[Osama bin Laden] in concert with National Islamic Front leaders, built a network of businesses, including an Islamic Bank Al Shamal."[18]  Osama bin Laden continued to use this bank to finance his terrorist training activities in Sudan and to support his world wide terrorist network. In addition, Al Shamal Bank regularly provided financial and account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank.  Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts. Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank.[19]  Osama bin Laden also financed the al Qaeda network in part through the Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
> $1,200 a month.
> For how long did you work for him [Osama bin Laden]?
> Almost two years.
> What Banks did he keep his money at?
> Bank Al Shamar.[20] [In responding "Bank Al Shamar," Al-Fadl was referring to Al Shamal Islamic Bank.]

Jamal Al-Fadl also testified that he transferred one hundred thousand U.S. dollars ($100,000.00) on Osama bin Laden's behalf to an al Qaeda representative in Jordan.[21]  In the same trial, another former al Qaeda operative stated that the Al Shamal Islamic Bank was used for operational purposes.  The witness was wired two hundred fifty thousand U.S. dollars ($250,000.00) *via* the Bank of New York for the purchase of stinger missiles and an airplane which he delivered to Osama bin Laden.[22]

The General Manager of Al Shamal Islamic Bank acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank.  The accounts were opened on March 30, 1992 for the company Al-Hijrah for Construction and Development Ltd.  According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan.  A third account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia.[23]  This company, according to the U.S. State Department, was founded by prominent National Islamic Front members and exercises a monopoly over major agricultural exports from the Sudan.[24]

Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee stated that Al Shamal Islamic Bank operations continue and that there is evidence that Osama bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities.[25]

**<u>Tadamon Islamic Bank</u>** -- The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank, which was a founding shareholder of the Al Shamal Islamic Bank.  Jamal Al-Fadl testified in the criminal trial concerning the 1998 Embassy bombings that the Tadamon Islamic Bank was used by members of al Qaeda to fund the terrorist attacks and to generally support the network.[26]

**<u>Faisal Islamic Bank of Egypt</u>** -- Designated terrorist and Co-Defendant Youssef Nada[27] co-founded Faisal Islamic Bank of Egypt with former DMI Trust chairman Prince Mohammed Al Faisal Al Saud.  Youssef Nada is the director of Al Taqwa Bank (a Specially Designated Global Terrorist entity) and a member of the  Egyptian Muslim Brotherhood and Gama'a al-Islamiya, which is directly allied with al Qaeda through Dr. Ayman al-Zawahiri.  In 1970 Nada moved to Saudi Arabia and established contact with

13

members of the Saudi Royal family, and in 1977 he and Mohammed Al Faisal Al Saud established the Faisal Islamic Bank in Egypt.[28]

Faisal Islamic Bank of Egypt was heavily involved in the Bank of Credit and Commerce International (BCCI) banking fraud scandal of the 1970s and 1980s. Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA)[29] rapidly spread to become a vast fraudulent empire. BCCI head Khalid bin Mahfouz was indicted in the United States on July 1, 1992 on criminal fraud charges and ultimately paid two hundred twenty-five million U.S. dollars ($225,000,000.00) in a settlement with U.S. prosecutors. The 1992 Senate Investigative Report on BCCI detailed the bank's role in supporting terrorism via massive diversions of laundered money.[30] Faisal Islamic Bank of Egypt moved approximately five hundred fifteen million five hundred thousand U.S. dollars ($515,500,000.00) of its deposits into overseas BCCI accounts.[31] A "major creditor of BCCI,"[32] Faisal Islamic Bank of Egypt was the main source of unrecorded deposits used by BCCI to conceal losses.

DMI Trust board members continue to participate in the regulation of Faisal Islamic Bank of Egypt. Through the conduct described above, DMI has knowingly and intentionally conspired to channel material support to al Qaeda, and aided and abetted al Qaeda in its ongoing campaign to attack America.

**Islamic Principles and _Zakat_** – DMI and its affiliated and subsidiary companies have also channeled support to al Qaeda through the distribution of _Zakat_ and _haraam_ funds. DMI and its affiliates operate under Islamic principles of finance, paying no interest on investments, and performing financial transactions in line with _Sharia_ (Islamic law).

To ensure that the investments and activities of DMI and its subsidiaries and affiliates comply with _Sharia_ principles, DMI, like virtually every Islamic bank, maintains a Religious Board to oversee operations and ensure compliance with Islamic law.

The Religious Board plays a crucial role in determining the amount, manner and purposes for which _Zakat_ is distributed. _Zakat_, or almsgiving, is one of the five pillars of Islam. The Quran requires every Muslim, both as individuals and corporations, to give _Zakat_ for specific charitable purposes as identified in the Quran.

In addition, Islamic financial institutions like the DMI companies identify and calculate *Haraam* income - income that is collected but is considered unacceptable according to *Sharia* principles - for their depositors or investors. Islamic financial institutions typically maintain a department to oversee and distribute *Haraam* income for themselves as well as for their individual investors to ensure that both the donation amount and its subsequent distribution comply with *Sharia* law.  In addition, DMI Trust and its affiliates and subsidiaries have their own *Haraam* obligation that must be calculated and subsequently donated to charity.

Rather than provide charity directly to the needy, DMI and its affiliates disburse *Zakat* and *Haraam* funds under their control to charities of their own choosing.  The charities, in theory, are to disburse the money to the needy.  As a result, Islamic financial institutions like DMI are directly involved in the selection of charities to receive donations of their own and their depositors' dollars.

For a period of many years, DMI and its affiliated and subsidiary companies have known that many of the ostensible charities to which they channeled *Zakat* and *Haraam* funds were, in fact, fronts for al Qaeda.  These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

In addition, DMI Trust's subsidiary Faisal Islamic Bank and the Islamic Investment Company of the Gulf actively participated in the collection of funds for certain of al Qaeda's "charitable" front organizations.  For example, co-defendant IIRO solicited donations through full-page advertisements run in leading Islamic journals.  These advertisements, which called for *Zakat* donations to assist the needy in Chechnya, Bosnia, and other such areas, often provided account numbers to facilitate the contribution of funds.  In many of these advertisements, which ran throughout the 1990s to the present in such publications as the English-language Muslim World League Journal (an Islamic periodical distributed widely throughout the United States), account numbers appeared for Faisal Islamic Bank and the Islamic Investment Company of the Gulf.

During the time period that Faisal Islamic Bank provided the foregoing support and services to MWL and IIRO, the involvement of those ostensible charities in the sponsorship of al Qaeda was well known in the Arab and Muslim communities.  Indeed, between 1992 and 2001, numerous media reports and statements by government officials implicated the MWL and IIRO in al Qaeda

activities, plots and attacks in Pakistan, Afghanistan, Egypt, India, Kenya, Tanzania, the Philippines and elsewhere.

DMI and its affiliated and subsidiary companies were necessarily aware of the reports and investigations implicating prominent Islamic charities, including IIRO and MWL, in the sponsorship of al Qaeda.  In fact, in order to comply with its obligations under *Sharia*, DMI's Religious Board was required to carefully investigate and screen the "charities" selected to receive *Zakat* and *Haraam* contributions from the DMI companies, to ensure that those "charities" were using donated funds for purposes authorized by the Quran.  As a result, DMI Trust knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

Despite the actual knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of *Zakat* and *Haraam* contributions on their own behalf and on behalf of their investors, depositors and account holders.  Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

As a result of its obligation to inquire and its access to information about its investors and depositors, DMI knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and account holders, to certain charities, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.

**United States Contacts and Jurisdiction** -- DMI sought and seeks depositors from the general public throughout the world.  It also sought and seeks capital from its shareholders.  DMI makes its money from investing its depositors' money and from investing its own and others' capital.  DMI, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

In its quest to seek world wide participation, DMI advertises in the United States.  A full page advertisement was published in the Wall Street Journal in 1981 announcing the "Foundation of Dar Al Maal Al Islami With a Capital of 1000 Million Dollars."  In its 'Covenant and Call to Ummat Al Islam,' DMI executed a declaration that included the following statement:

> The Founders observe with dismay the pernicious temptation afforded to Muslims by the all pervasive influence of the Riba-dominated financial structure established in Ummat Al-Islam in imitation of institutions alien to it, and the Founders will join in a Holy Struggle for the sake of Allah, exalted be his Name, to eliminate Riba from Ummat Al-Islam since Riba as defined by the Glorious *Sharia* is banned by Allah.[33]

By advertising in a major United States publication with nationwide circulation and soliciting business from American consumers in support of a "holy struggle" in the slightly veiled language of jihad, DMI illustrates that it has purposefully directed its material support for Islamic extremist activities at the United States for more than two decades.

On November 27, 1984, Faisal Islamic Bank (Egypt), Faisal Islamic Bank (Sudan) and Dar Al-Maal Al-Islami (DMI) ran an ad in the *New York Times* stating that they would be unable to attend a Conference on Islamic Banking and Finance at the Westbury Hotel, New York on December 12, 1984 "due to conflict with DMI's Annual General Meeting in Istanbul. It is therefore evident that the Conference will not have the necessary expertise to represent practices in Islamic Banking."[34]

When DMI was established in mid-1981, bank officials told the *Wall Street Journal* that it would be active in:

> Islamic investment, Islamic solidarity, and Islamic banking activities…" in Moslem nations and **in the U.S.** and Europe. It added that "Islamic banks capitalized by an organization of the standing of DMI will have a greater capacity to attract deposits from the public and governments."  DMI said it is fixing its capitalization at $1 billion because it "will compete with well-established and well-capitalized" Western financial institutions."[35]

In addition, DMI has published various advertisements in U.S. magazines and journals distributed by various Saudi-based charities.  In one such advertisement in the Journal of the Muslim World League, there is a picture of the DMI building in Switzerland with a notation which reads "the group benefits from an extensive network with a strong foothold with the major international Islamic centers.  Its subsidiaries -- banks, insurance and investment companies -- are rooted regionally to respond more rapidly and effectively to client needs.  The synergetic relationship between the subsidiaries gives DMI the leading edge."

DMI also has significant business operations in the United States.  DMI's wholly-owned subsidiary, Crescent International Ltd., is a

Bermuda registered company owned by Greenlight SA of Switzerland. Both entities are DMI Trust subsidiaries. A 2003 SEC 'Registration Statement' for shareholders of Acclaim Entertainment Inc., states:

> Mel Craw, Manager of DMI Trust, has voting and dispositive control over securities held by Crescent International, Ltd.[36]

DMI Trust's 2001 Annual Report states that Greenlight (Switzerland) S.A. and Crescent International Ltd are 100 percent DMI Trust-owned "principal subsidiaries."[37]

DMI, Crescent International, Ltd., and Greenlight SA have overlapping business managers and addresses. In Crescent International Ltd.'s SEC filings, Crescent International, Greenlight (Switzerland) SA, and DMI SA Services use the same business address in Geneva Switzerland:

*Crescent International Ltd. January 2, 1999 SEC Filing*
Melvyn Craw
Crescent International Limited
c/o Greenlight (Switzerland) SA
84, Av Louis-Casai, P.O. Box 42
1216 Geneva, Cointrin, Switzerland[38]

*Crescent International Ltd. February 10, 2004 SEC Filing*
c/o Greenlight (Switzerland) SA
84 AVE LOUIS CASAI, 1216
COINTRIN/GENEVA Switzerland[39]
DMI Trust uses the same business address as DMI Administrative Services S.A., Greenlight (Switzerland) SA, and Crescent International, Ltd.:
*www.dmitrust.com has the following under contact information:*
Daar Al-Maal Al-Islami Trust
Contact:
c/o DMI Administrative Services S.A.
84, Avenue Louis-Casai, P.O. Box 161
1216 Cointrin-Geneva Switzerland

The 1999 SEC report lists a U.S. contact for Crescent International/DMI as:

COPY TO:
Sara P. Hanks, Esq.
Rogerts & Wells
200 Park Avenue
New York, NY  10166 Tel:  212-878-8000

In June 2003, Crescent International Ltd. owned 1.2%, or 1.4 million shares of Acclaim Entertainment Inc. prior to Acclaim's stock offering.[40]  An April 1, 2004 stock sale Prospectus for Sun Healthcare Group, Inc., lists Crescent International Ltd. as owner of 35,000 shares of Sun Healthcare Group being offered for sale on the NASDAQ exchange. The report states:

> Mel Craw and Maxi Brezzi, in their capacity as managers of Green Light (Switzerland) SA, the investment adviser to Crescent International Ltd., have voting control and investment discretion over the shares owned by Crescent International Ltd. Messrs. Craw and Brezzi disclaim beneficial ownership of such shares.[41]

Since 2000, International FiberCom, Inc., (IFC) a Phoenix-based telecommunications service provider has borrowed at least $14 million from Crescent International.  Crescent owns more than 2 million FiberCore shares.  On June 22, 2001, IFC announced:

> The completion of the private placement of $10 million in Series D Convertible Preferred Stock to Crescent International Ltd., an investment company managed by GreenLight (Switzerland) SA, and warrants exercisable to purchase 509, 554 shares of common stock at a price of $5.89 for a five year term…Crescent also agreed to purchase up to $10 million of common stock of the company in increments of between $200,000 and $2.5 million at the discretion of the company during the 18-month commitment period.[42]

In June 2002, Dauphin Technology announced that 6.6 million shares of common stock: "may be acquired by Crescent International Ltd."  In September 2001, Dauphin entered into a $10 million securities purchase agreement that "allows Dauphin to sell Crescent Crescent up to $7.5 mission in stock until September 27, 2003."[43]

As of October 2001, DMI Trust had invested at least $200 million in the International Development Bank Infrastructure Fund L.P.[44]  DMI committed "$100 million for equity and an additional $100 million for complementary finance facility purposes."[45]  The fund "seeks to work with governments, international project sponsors and local companies in investing in infrastructure projects in Islamic Development Bank member countries."[46]

The fund was launched and is "managed" by Washington, DC-based Emerging Markets Partnership (EMP).  The private equity firm expects to raise $1 billion for the initiative. It is believed to be the first private investment vehicle for private-sector infrastructure projects in the Islamic world.  EMP set up offices for the fund in Bahrain to "handle fund-raising efforts."[47]

In addition, DMI became a 35% partner in Boston Capital, a Massachusetts based real estate financing firm with "holdings in 48 states and the U.S. Virgin Islands."[48]

The CEO of DMI stated in an interview with the Gulf Daily news that the DMI group has "substantially increased" its investments in the United States after September 11, 2001.[49]

DMI has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts. Moreover, DMI has purposefully availed itself of the jurisdiction of the United States because it has directed its activities at the United States. DMI has financially and materially supported al Qaeda, Wael Jelaidan, Yassin Al Kadi and other al Qaeda members that call for holy war or jihad against the United States. Moreover, DMI's supervising board members and religious board members have publicly called for jihad against the United States.

PHILA1\2276582\1 117430.000

1   Annual Report DMI Trust 2002, p. 3.
2   *Id.*
3   Annual Report DMI Trust 1994, p. 2.
4   *Id.*
5   *Id.* (Emphasis added).
6   Dr. Ali Hassan Abdel Kader, member of the *Sharia* Control Authority of DMI, "Report on the Islamic Economy and Contemporary Transactions," published by DMI, (1981). Preface authored by Dr. Ibrahim Moustapha Kamel, Executive Vice President to the President of the Administrative Council of DMI.
7   *Id.*
8   *Id.* (Emphasis added).
9   Annual Report DMI Trust 1984. Translated from the French.
10  Annual Report DMI Trust 1996, p. 28.
11  Annual Report DMI Trust 1989, p. 5.
12  *Id.* (emphasis added).
13  Judith Miller, "The Islamic Wave," the New York Times Magazine, p.22 (May 31, 1992); *See also,* Jonathan Randal, "Sudan Party Puts New Face on Fundamentalism," Washington Post, A30, Col. 4. (April 7, 1988).
14  *Id.*
15  Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 6, 2001).
16  Statement by Al Shamal Islamic Bank (October 1, 2001).
17  "Sudanese students enroll for controversial military service," AP News (June 6, 1998); AP News (August 4, 1998).
18  Congressional Research Service, "Terrorism: Near Eastern Groups and State Sponsors," p. 16 (February 13, 2002).
19  Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 6, 2001).
20  *Id.*

[21]   *Id.*

[22]   Testimony of Essam Al Riddi, U.S.A. v. Osama bin Laden (February 14, 2001).

[23]   Statement of Mohamed S. Mohammed, Al Shamal Islamic Bank (September 2001).

[24]   U.S. State Department Fact Sheet on Osama bin Laden (August 14, 1996).

[25]   Statement of Senator Carl Levin, Hearing on National Money Laundering Strategy for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (September 26, 2001).

[26]   Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 20, 2001).

[27]   The United States Department of the Treasury designated Youssef Nada as a Global Terrorist on November 6, 2001 for his role in funding al Qaeda *via* his Al Taqwa bank.  (*Source: OFAC bulletin, November 7, 2001.*)

[28]   Paul W. Rasche, "The Politics of Three - Pakistan, Saudi Arabia, Israel," *Studien von Zeitfragen* 35, Jahrgang InternetAusgabe 2001, p. 6 (December, 2001).  Also published under the name F. William Engdahl.

[29]   John Aloysius Farrell, "With Probes, Making His Mark," the Boston Globe (June 20, 2003).

[30]   Senate Foreign Relations Committee Investigative Report on the BCCI Affair (December, 1992).

[31]   William E. Schmidt, "Egypt Takes Control of BCCI Affiliate," Wall Street Journal.

[32]   http://www.icclaw.com/1500/formex/pps/ukp51973.htm.

[33]   Dar Al-Maal Al-Islami, Advertisement, *Wall Street Journal*, June 12, 1981, p. 28. (Emphasis added).

[34]   Dar Al-Maal Al-Islami and Faisal Bank Advertisement, New York Times, November 27, 1984, p. D21.

[35]   "Islamic-Style Bank and Investment Group Is Formed with Capital Set at $1 Billion," *Wall Street Journal*, June 11, 1981, p. 31. (Emphasis added).

[36]   Securities and Exchange Commission, Amendment No. 1 to Form S-3 Registration Statement Under the Securities Act of 1933, Acclaim Entertainment, Inc. August 22, 2003, p. 21.

[37]   Dar Al-Maal Al-Islami Trust, Annual Report 2001, p. 35.

[38]   Crescent International Ltd SEC Filing, Acquisition of Infocure Corp. Stock, Schedule 13D, Amdt. No. 1, January 2, 1999.

[39]   Crescent International Ltd SEC Filing, Acquisition of Franklin Wireless Corp. Stock, February 10, 2004.

[40]   Dar Al-Maal Al-Islami Trust, Annual Report 2001.

[41]   Sun Healthcare Group, Inc., Form 424B3, Prospectus, File No. 333-113710, Securities and Exchange Commission, April 1, 2004.

[42]   "International FiberCom Amends Credit Facility," *The Phoenix Business Journal,* June 22, 2001.

[43]   "Dauphin Technology Registers Stock," Tampa Bay Business Journal, June 26, 2002.

[44]   Otis Bilodeau, "Private Equity True Believers," *The Daily Deal*, October 23, 2001.

[45]   *Asia Private Equity Review*, August 1, 2003.

[46]   Emerging Market Partnership Web site:  http://www.empwdc.com/EMPIDBFund.htm.

[47]   *Daily Deal*, October 23, 2001; "Jeddah-Based IDB Launches a Fund," *Wall Street Journal Europe*, October 8, 1998.

[48]   Boston Capital Web site:  https://www.bostoncapital.com/aboutIndex.html.

[49]   "Islamic Banks Victimized by Western Media," Gulf Daily News, (November 12, 2001).