UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to**<br>**Khalid Bin Mahfouz** |

*This document relates to:*  *Federal Insurance Co. v. al Qaida*
                             03 CV 06978 (RCC)


# RICO STATEMENT
## APPLICABLE TO KHALID BIN MAHFOUZ

Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Khalid Bin Mahfouz.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains is Khalid Bin Mahfouz. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| relating to unlawful procurement of citizenship or naturalization papers | 18 U.S.C. § 1425 |
| relating to the unlawful reproduction of naturalization or citizenship papers | 18 U.S.C. § 1426 |
| relating to the sale of naturalization or citizenship papers | 18 U.S.C. § 1427 |
| obstruction of justice | 18 U.S.C. § 1503 |
| obstruction of a criminal investigation | 18 U.S.C. § 1510 |
| obstruction of state or local law enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| fraud or misuse of visa permits or other documents | 18 U.S.C. § 1546 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Anti-terrorism Act | 18 U.S.C. 2332(b) |
| defrauding the US Government | 18 U.S.C. § 371 |

| filing false or materially false tax returns | 26 U.S.C. § 7206(1), (2) |
|---|---|
| engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Khalid Bin Mahfouz ("Bin Mahfouz") | Bin Mahfouz conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Bin Mahfouz | Bin Mahfouz undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Bin Mahfouz | Bin Mahfouz agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their

3

scheme to conduit money to terrorists, and yet obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.

(a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Khalid Bin Mahfouz fit neatly into this framework by raising funds for, providing funding and money laundering services to, and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) Khalid Bin Mahfouz is associated with the Enterprise.

(e) Khalid Bin Mahfouz is a member of the Enterprise, and is separate and distinct from the Enterprise.

(f) Khalid Bin Mahfouz intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Khalid Bin Mahfouz is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Khalid Bin Mahfouz furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Khalid Bin Mahfouz, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators, including Khalid Bin Mahfouz, who laundered funds through Islamic so-called charities, such as the Blessed Relief Foundation, and corporations and raised money from witting and unwitting donors. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Khalid Bin Mahfouz. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Khalid Bin Mahfouz. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Khalid Bin Mahfouz. Khalid Bin Mahfouz, with knowledge and

intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Khalid Bin Mahfouz also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20. not applicable

6

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Khalid Bin Mahfouz ("Bin Mahfouz") | Khalid Bin Mahfouz has provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad. Bin Mahfouz is among al Qaida's most significant individual financiers. In addition, he has directly participated in the channeling of financial and logistical support to al Qaida through entities under his control, including National Commercial Bank and Muwafaq Foundation.<br><br>Between 1986 and 1990, bin Mahfouz was Chief Operating Officer of the Bank of Credit and Commerce International (BCCI), and one of that bank's principal shareholders. Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA) rapidly spread to become a vast fraudulent empire.<br><br>Under bin Mahfouz, BCCI actively participated in a variety of criminal endeavors, including the sponsorship of terrorism, as reported by the United States Senate. In particular, investigations by the CIA and U.S. Senate directly implicated BCCI in the laundering of drug money, manipulation of financial markets, arms trafficking, and in handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.<br><br>The 1992 US Senate Report on the BCCI Affair also linked the bank to financial funding of the Afghan war: | 1962(c)<br>1962(d) |

> BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI. The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

According to the Senate Report, BCCI's support of terrorism and arms trafficking developed out of several factors.

> First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

On July 1, 1992 bin Mahfouz was indicted in New York for his role in BCCI's criminal activites. The indictment alleged a series of misrepresentations, sham loans, and fraudulent conduct by bin Mahfouz. Bin Mahfouz paid over $200 million in fines to avoid further prosecution.

**National Commercial Bank:** The Saudi National Commercial Bank (NCB) was founded in 1950 by Salim bin Mahfouz, Khalid's father. After Salim's death in 1986, Khalid became President and CEO, and its principal shareholder with control over more than 50% of the banks capital. NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London,

SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City.

NCB was directly involved between 1986 and 1990 in the fraudulent schemes and practices of BCCI.

While under bin Mahfouz's control, NCB served as a primary vehicle for channeling financial support to Osama bin Laden and al Qaida. In this regard, former CIA Chief of Counter-terrorism Vincent Cannistraro testified as follows during a congressional hearing in October 2001:

> How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism.

A bank audit conducted in 1998 revealed that over a 10 year period $74 million was funneled by NCB's Zakat Committee to the International Islamic Relief Organization (IIRO), with the knowledge and intent that certain of those funds would be channeled to al Qaida. NCB also actively facilitated the transfer of funds to al Qaida through accounts held by the Saudi Red Crescent and Blessed Relief Foundation, two of al Qaida's other charity fronts.

In or about 1998, the NCB opened two "shared accounts" with Al-Rajhi Banking & Investment Corp (Special Joint account #22 and #33) for IIRO as a member of the Saudi Joint Relief Committee for Kosovo and

Chechnya (SJRC). The SJRC served as a vehicle for funneling donations to al Qaida fighters in Kosovo and Chechnya. These accounts were not reviewed by the Audit Division nor by the Zakat Committee in 1998, indicating that they were established to launder funds in support of al Qaida activities in Kosovo and Chechnya.

As an officer and principal shareholder of NCB, bin Mahfouz was specifically aware of the bank's contributions to, and other support of, IIRO, al Haramain and SJRC. Bin Mahfouz was also expressly aware that those ostensible charities were in fact fronts for al Qaida. In fact, statements by government officials and media reports published in the Arab world between 1992 and September 11, 2001 directly implicated IIRO, al Haramain and SJRC in al Qaida operations, plots and attacks in Kosovo, Chechnya, Kenya, Tanzania, Albania, the Philippines, Egypt, Afghanistan, Bosnia and elsewhere. By virtue of these accounts, bin Mahfouz necessarily knew and intended that al Qaida would materially benefit from the support NCB provided to al Qaida's charity fronts.

According to a November 22, 1999 British intelligence report, the Saudi Arabian Royal family used NCB to channel funds to Osama Bin. In the fall of 1999, Reuters and USA Today quoted US intelligence sources stating an NCB audit conducted by Saudi government officials uncovered that $3 million was diverted to al Qaida through the bank from five of Saudi Arabia's prominent business leaders' accounts. The transactions were laundered through accounts at NCB in the name of the Blessed Relief Foundation (a/k/a Muwafaq Foundation), an al Qaida charity front founded by bin Mahfouz and E.O. 13224 designee Yassin al Kadi.

NCB also provided facilities for a fundraiser to finance the families of the "heroes of the

10

Palestinian uprising" sponsored by IIRO in 2000.

Bin Mahfouz was dismissed from NCB in 1999, soon after the audit revealed the bank's extensive involvement in sponsoring al Qaida. However, he remains a shareholder of NCB (10%), along with his wife, Naila Abdulaziz Kaaki (10%) and their sons (16% for both Abdulrahman and Sultan). Bin Mahfouz's brother-in-law, Saleh Hussein Kaaki, also sits on the NCB Board of Directors.

**Golden Chain:** Bin Mahfouz is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded

that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm

**Blessed Relief:** In June 1991 the Bin Mahfouz family founded Muwafaq Ltd in the Isle of Man, a tax haven. Its backers were named as a group of Saudi investors from Jeddah. The same year, Muwafaq Foundation (Blessed Relief) was established in Sudan, with Yasin Al Qadi acting as chairperson.

Abdulrahman Bin Khalid Bin Mahfouz, son of Khalid Bin Mahfouz, was named Director of the Muwafaq Foundation, while simultaneously serving as member of the board and Vice Chairman of the Executive Management Committee of NCB. Abdulrahman Bin Khalid Bin Mahfouz acknowledged in an interview with Forbes Magazine that Muwafaq Foundation was the "brainchild" of his father, "who funded it with as much as $30 million".

At the time they established Muwafaq Foundation, Yassin al Qadi and Khalid bin Mahfouz intended for it to serve as a vehicle for funding and otherwise supporting terrorist organizations, including al Qaida.

The assets of Muwafaq Foundation and those of its Chairman, Yasin Al Qadi, were frozen on October 12, 2001 by the US Treasury Department pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism. The governments of the United Kingdom, Turkey, Kazakhstan, Albania, Slovenia and Switzerland have also followed suit. The US

authorities described Yasin Al-Qadi as a "terrorist" and Muwafaq Foundation as an organization that "financially supports terrorism" and "funnels money to the al Qaeda terrorist network".

In a November 29, 2001 letter to Swiss authorities requesting that the Swiss government block al Qadi's assets, a copy of which is attached hereto and incorporated herein by reference, Treasury Department General Counsel David Aufhauser summarized the Muwafaq Foundation's pervasive sponsorship of al Qaida as follows:

> The leader of the terrorist organization Al Gama'at Al Islamiya, Talad Fuad Kassem, has said that the Muwafaq Foundation provided logistical and financial support for a mujahadin battalion in Bosnia. The foundation also operated in. Sudan, Somalia and Pakistan, among other places.
>
> A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations.
>
> Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al-Qa'ida and the Al Faran terrorist group responsible for the kidnapping of Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United States for his role in the first World Trade Center attack. Following the arrest of Ramzi Yusif in 1995, the Pakistani police reportedly raided Muwafaq's offices and held its local director in custody for several months. The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.
>
> The Muwafaq Foundation also employed or served as cover for Islamic extremists connected with the military activities of Makhtab Al-Khidamat (MK), which has been partially financed by the Muwafaq

Foundation. The Muwafaq Foundation supplied identity cards and employment as cover for some Arabs to allow them, to obtain visas to remain in Pakistan. The founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor. Following the dissolution of MK in early June 2001 and its absorption into Al Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq also merged with Al- Qa'ida.

Mr. Kadi has asserted in various press interviews that the Muwafaq Foundation ceased operations at a range of different times in 1995, 1996 or 1997. However, the United Nations reported that Muwafaq was active in Sudan as late as 1997. Moreover, far from ceasing operations, the U.N. report stated that the "Muwafaq Foundation plans to continue to expand its humanitarian activities in the coming year...." U.N. Department of Humanitarian. Affairs, Consolidated Inter-Agency, Appeal for Sudan January-December 1997 (Feb. 18, 1997)(emphasis added).

From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate.[9] Ayadi Chaliq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF. As of February 1999, Mr. Chafiq was running Mr. Kadi's European network and serving as the president of Depositna Banka in Sarajevo, Bosnia, which was owned by Mr. Kadi. Mr. Chafiq may have participated in planning an attack on a U.S. facility in Saudi Arabia. Mr. Chafiq left his residence in London in a hurry after the September 11 attacks, and had reportedly been in the United States in the months preceding the attack

The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qa'ida and other terrorist organizations. Working in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and training terrorist cells. Their

|  | provision of humanitarian aid and educational services is done in concert with the terrorist to win the hearts and minds of the local people to whatever causes the terrorists espouse. When a region becomes more settled, such as Bosnia or Albania today, seemingly legitimate businesses replace charitable foundations as cover for continuing terrorist organizational activity. Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.<br><br>In an interview with the magazine *al-Watan al-Arabi* in 1996, Osama bin Laden stated that Muwafaq in Zagreb is one of the humanitarian organizations that he is actively supporting.<br><br>In his capacity as an officer of NCB, and founder of Muwafaq Foundation, bin Mahfouz knowingly and actively participated in those organizations' continuous efforts to advance al Qaida's terrorist ambitions, and used his positions within those organizations to ensure that they served as effective mechanisms for raising and laundering funds for, and providing other forms of material support to, al Qaida. By virtue of his active role in the wrongdoing of NCB and Muwafawq Foundation, bin Mahfouz is personally responsible for the actions of those entities. In addition, bin Mahfouz has donted vast sums of his personal fortune to al Qaida, in support of that terrorist organization's campaign to attack America. |  |