[69]   Counsel then asked Mrs.El- Mashtouli to think back to a time when she was first able to carry on a conversation with her husband after the marriage contract to the present time.  Then he says at p. 634, Vol. 7 of the transcript:

> Q. I would like you to tell the Court if you have ever heard during that period of time your husband mention the following groups or the following organizations that I am going to read to you:
>
> Q. Pakistan Scholars Society
>
> A. Yes.  He took my husband to the lawyer, and the lawyer helped us fill out all the papers for the case.
>
> Q. This was, you said, a couple of months after you arrived in Canada?
>
> A. Yes.
>
> Q. Prior to that, had you ever heard the name Ali Hussein?
>
> A. No.
>
> Q. After you met Mr. Hussein, can you briefly tell us what, if anything, he did for your and your family?
>
> A. He helped us find the lawyer.  He also translated the papers for our case.  He would also go with my husband to the school if the children had any questions or any problems there.  At the time I was pregnant with my child, Ali, and he used to go with me to the family doctor.
>
> Q. Why did you accompany your husband to the school?
>
> A. Because my husband couldn't use the English language, and the children were just starting school in Canada and they were having some difficulty accommodating to life in Canada.

[70]    At page 634, Vol. 7, counsel questioned Mrs. Mashtouli as follows:

> I would like you to tell the Court if you have ever heard during that period of time
> your husband mention the following groups or the following organizations that I am
> going to read to you.  Pakistan Scholars' Society

A. No.

Q. Partisan Movement in Kashmir.

Q. No.

Q. Jihad Movement in Bangladesh.

A. No.

Q. The World Islamic Front for the Jihad Against the Jews and the Crusaders.

A. No.

Q. Islamic Salvation Front Al-Qaida.

A. No.

Q. Sudan's National Islamic Front.

A. No.

Q. Vanguards of Conquest.

A. No.

Q. The Islamic Revival Foundation.

A. No.

Q. The Muslin Brotherhood.

A. The Muslim Brotherhood is a very old organization in Egypt.  I used to hear that name since the 1970s when I was a little child.

Q. Do you know if your husband has ever had any dealings with The Muslim Brotherhood?

A. No.

Q. Has he ever, to your knowledge, associated with anyone who has had dealings with The Muslim Brotherhood?

A. No.

Q. The Foundation for the Rebirth of Islam's heritage?

A. No.

Q. Human Concern International?

A. No.

Q. The Liberation Army for Holy Sites?

A. No.

Q.  Just so that I am straight on this point, your husband has friends, but you are not allowed to meet those friends in his presence if they are men.  Is that correct?

A.  No, I am not allowed to be in the presence of men whether my husband is there or not.  This is in accordance with the rules and regulations of Islam.

Q. However, today you are.

A.  This situation is a necessity and my husband is present.

Q.  So, if it is a necessity, then Islam makes an exception.  Is that right?

A.  Yes, Islam would make an exception if it is a necessity.

Q.  Again, this is a similar question.  I am going to ask you in the same fashion, except this time I am referring to people's names, not organizations.  I want you to tell me if from the time of the marriage contract to the present time you have heard your husband mention any of these names.  About Al-Zummur.

A.  No.

Q.  Tawfik Al-Sirri.

A.  No.

Q.  Akram Abdel Aziz Sherif.

A.  No.

Q.  Mustafa Kamal.

A.  No.

Q. Abu Hamza El-Masri.

A. This Abu Hamza is mentioned often these days in the newspapers. Almost every day the name is mentioned.

Q. Do you mean at the present time?

A. Yes.

Q. Do you know in what context his name is mentioned?

A. That is since the explosions at the embassies.

Q. Which embassies.

A. The name is mentioned in connection with the tourists in Yemen and that he is connected to that incident.

Q. Can you recall when you first began reading about this man's name in the newspapers?

A. A month or a month and a half ago.

Q. Before a month and a half ago, had you ever heard this name being mentioned by your husband?

A. No.

Q. Had you ever heard the name Abu Hamza El-Masri being mentioned at all prior to one and a half months ago?

A. No.

Q. I am going to continue with the names.  Mohammad Jamel Khalifa.

A. No.

Q. Abu Ammar.

A. No.

Q. Kamal Ojaisa.

A. No.

Q. Ahmad Husayn Ujayzah

A. No.

Q. Murjan Mustafa Salim.

A. No.

Q. Ahmed Ibrahim Asyed Al-Mujar.

A. No.

Q. Adel al-Sayyid al-Kudus?

A. No.

Q. Kassem Daher?

A. No.

Page: 57

Q. Abu Dar?

A. No.

Q. Since you have known him or since you have been able to speak with him, your husband has never mentioned any of these names to you?

A. No.

Q. To your knowledge, has your husband ever been to Kenya?

A. No, he has never been there.

Q. To your knowledge, has your husband ever been in Tanzania?

A. No. It is only the countries that we mentioned.

Q. Prior to the start of these proceedings back in June of this year and since the time that you have known him, have you ever heard your husband mention the name Shei Mar Al-Rahman?

A. No.

Q. Have you ever heard that name?

A. I am familiar with this name ever since I was in Egypt, since I was a little girl.

Q. How about Mohammed Abdul Salam Faraj?

A. No.

Q. You have never heard your husband mention that name?

A. No.

Q. How about Karam Zuhdi?

A. No.

[71]    Counsel then moved into a different area, namely questions with respect to the interviews that took place at her family home. Her testimony does not extend in any major way beyond what has already been indicated by her husband and by her son Ahmed. She was only able to give a very cursory answer to most of the questions because she was kept rather busy being in a second room with six children none of whom, apparently were asleep. She indicated a concern which began as soon as they saw the two people in the parking lot and I don't think the concern or apprehension ever let up. She was constantly concerned about the fact that the interpreter did not seem to be doing any speaking and she was worried because her husband had only 20 or 30 percent ability in the English language. She was concerned enough to pound on the wall and ask him to come out and when he did she said: "You are talking and he is talking and there is no interpreter".

[72]    She went on (p. 650, Vol. 7 of the transcript):

> A. I told him, "I am concerned because your English is weak and you are always using the dictionary. What is the other person doing?". On the first interview and the second interview I asked my son Ahmed to be with his father so that he would help him with the English language.

But that was not allowed. When asked about the third meeting she indicated, as had her

husband and son before her, there was only one person. His name was David and there

was no interpreter at all.

[73]     Another point which she made again was the fact that she was concerned because

her husband's English is poor. She was asked a question at p. 656:

> Q. Did you think of having one of your children, perhaps the eldest one, Ahmed,
> help your husband out during the interview?
>
> A. During the first interview and the second interview they wouldn't allow any of
> the children to be present, so this time I just asked the children to stay away.

[74]     It had been suggested by one of the CSIS officers that the respondent had said that

he would rather the interview take place without an interpreter. When asked by counsel if

her husband had ever expressed to her that if he was ever interviewed again by CSIS he

would rather that interview take place without an interpreter, Mrs. Mashtouli answered:

"After the second interview we were not aware that there would be another interview".

They did not discuss the third interview between themselves other than in general terms.

She was asked the question at p. 657:

> Q. How did your husband feel in general about what had taken place during the
> interview, the last one?
>
> A. He was very upset as a result of the third interview because that person
> threatened him.
>
> Q. Which person?

A. The investigator.

Q. Did your husband tell you how the investigator threatened him?

A. Yes. He said, "If within three or four days, you didn't call me back and you didn't give me the information I ask for, you will be arrested," and actually this is what happened.

[75]     One further resolve emanated from that third interview namely, as the respondent put it in his answer at p. 658, line 11:

> He said that, should the investigator come another time, I am not going to allow him into the house unless he has a paper from court.

[76]     Although Mrs. El-Mashtouli could not speak English very well either she was asked the question (p. 659, line 14):

Q. When the officer would be speaking, would you be able to tell that that is who was speaking as opposed to when your husband was speaking?

A. Yes.

Q. During the third interview, do you recall the tone of the officer's voice when he was speaking to your husband?

A. Sometimes it would be a very high voice and sometimes it would be low.

Q. When you say "high", what do you mean?

A. For example, if he would ask my husband something and my husband wouldn't know the answer, the investigator would be angry and upset.

[77]     Toward the end of her testimony she was asked by counsel:

Q. Have you ever heard of an individual by the name of Ahmad Khoder or Ahmad Khader?

A. The mother-in-law of this person helped me a lot. She takes care of me.

Q. Do you know Ahmad Khader or do you know his mother-in-law or do you know both of them?

A. I know the mother-in-law. I met her here in Canada at the mosque.

Q. Have you ever met Ahmad Khader?

A. No.

Q. How did you come to meet Ahmad Khader's mother-in-law?

A. That was the month of Ramadan; at the mosque.

Q. How long ago was that?

A. It was the year we came here to Canada. . . . Just toward the end of 1996.

Q. Could you describe the nature of your relationship with Mr. Khader's mother-in-law?

A. When sometimes I need to go to a female gynecologist and, if my husband is not available to come with me, I would take her with me.

Q. Is that the extent of your contact with her, to the doctor and to the mosque?

A. She also invited me at one time during the month of Ramadan to have the breakfast meal.

Q. Did you attend?

A. Yes.

Q. Did you go alone?

A. No, I went with my husband because she is married.

Q. Do you know if your husband knows Mr. Ahmad Khader?

A. No.

Q. No you don't know or no he doesn't know this person?

A. When we were in Pakistan, he didn't know this person.

Q. What about in Canada?

A. No, because this person is not living here in Canada.  When we met his mother-in-law she asked me if we had met the family back in Pakistan.

Q. How did you respond?

A. No, I said I didn't meet her daughter there, and the husband of her daughter was in Pakistan at that time.

Q. To your knowledge, your husband doesn't know Ahmad Khader?

A. No.

Q. Before the proceedings before this Court, before June of this year, had you ever heard your husband mention the name Mustafa Kreir?

Page: 63

A. No.

Q. That individual is also known as Al-Fadhl.

A. No.

Q. You have never heard that name either?

A. No.

Q. Before these proceedings, had you ever heard your husband mention anyone by the name of Kassem Daher?

A. No.

Q. That individual is apparently also known as Abu Dar.

A. No.

Q. Have you ever heard of an individual by the name of Hassan Farhat?

A. Yes.

Q. Do you know if your husband knows Hassan Farhat?

A. Yes, he is the first person that my husband met after we came here to Canada.

Q. Do you know how your husband came to meet Hassan Farhat?

A. He was looking for any Muslim person who would help us because we didn't know anyone here in Canada.

Q. Did Mr. Farhat help your family after you arrived?

A. Yes. After we left the shelter, that is when he met him. He helped him look for an apartment.

Q. "He" being Farhat?

A. Yes, I mean my husband and Hassan Farhat. They were looking for an apartment.

Q. For your family?

A. Yes, for my family here in Canada.

Q. Do you know if, after you found a home, whether or not your husband had any further dealings with Mr. Farhat?

A. Yes. He also helped us because, after our arrival, we were asked to go through a medical examination and to do some tests.

Q. How did he help you in that regard?

A. He was living on the same street where he had an apartment. Sometimes, when my husband was going to the mosque, he would pick him up and go with him to the mosque.

Q. Is that the extent of the relationship between your husband and Mr. Farhat as far as you know?

A. Yes. It was the kind of assistance that he provided us with.

[78]    Then, at p. 666, Vol. 7:

Q. Do you know if your husband, since he has been in Canada, has worked.?

A. You mean in Canada?

Q. Yes.

A. He was attending school after we came to Canada.

Q. Did he ever work?

A. A year ago, a bit more, a person by the name of Parek would take him to work with him.

Q. What was your husband doing with Parek?

A. Cleaning.

Q. Anything else?

A. In the month of October or November of 1998 he also worked with one Magdi.

Q. "He" being your husband?

A. Yes, my husband.

Q. Where did he work, starting at that time?

A. At the Jewish Community Centre.

Q. What kind of work was he doing there?

A. Cleaning. ... He was working until Tuesday and on Wednesday he was arrested.

[79]   **Mr. Hisham Bakir**

Prior to this hearing Mr. Bakir signed an affidavit in which he indicated that he is a

Canadian citizen, a friend of Mahmoud Jaballah and his family, and since the incarceration

of Mr. Jaballah he has acted as an aide to Mr. Jaballah's wife and family.  Since a period

when Mr. Jaballah retained counsel in these proceedings he has acted as his counsel's

interpreter at the Metro West Detention Centre.  He has attended on numerous occasions at

the offices of Mr. Jaballah's counsel in these proceedings and has assisted counsel as a

liaison and an assistant in the preparation of Mr. Jaballah's case.  He has also executed

errands under counsel's request above and beyond interpretation.  He brought with him

two letters of support and a petition with many names on it saying, among other things:

"Mr. Mahmoud Jaballah has no connection with any terrorist group, not in the present

time, nor in the past.  Also, that Mr. Jaballah has a good reputation during all his stay in

Canada and has proved to be a reliable person for community and for his family."


[80]   Mr. Bakir was born on April 12, 1966 in Iran but today is a Canadian citizen. He is

a married man with one child.  He is working.  Although he would like to be working as a

geologist right now there is difficulty in finding a job as a geologist and so he works in a

metal company.

[81]    He has known Mr. Jaballah for about two and a half years and first met him in

1996 at the Mosque called Gami Mosque.  They didn't see each other all that often,

probably about once a month and he would classify them as family friends.  They visited at

each other's homes sometimes.


[82]    He had not been here at the time Mr. Jaballah was arrested because he was doing

his pilgrimage in Saudi Arabia as part of his religion and he returned approximately April

6, 1999.


[83]    Since he returned from Saudi Arabia he has helped Mr. Jaballah and his family.  In

his evidence he stated: "Because he has children from one to thirteen years old and the

wife is sick and she can't drive, because we are family friends I have to give them a hand

and help them doing shopping for them or when they want to go and see their father."

[84]    Having established the preliminaries, counsel went right to the heart of the matter

with this question:

> Q.  I would like you to think back from the time you initially met Mahmoud Jaballah
> and think of the times that you spent with him socially and at the mosque.  I would
> like you to tell me if during that time and prior to the time that he was in jail you
> ever heard him mention a group that has been referred to here as Al-Jihad.
>
> A.  No.
>
> Q.  He has never mentioned that group to you at all?
>
> A.  No.

Q. During that same period did you ever hear Mr. Jaballah mention - - I will give you two names, and you tell me if you ever heard him mention them.  Ayman Al-Zawaheri?

A. No.

Q. Ossama Bin Laden?

A. No.

Q. So from the time that you have met him you have never heard him mention these names?

A. No.

[85]    Then later in his testimony, at p. 761, Vol. 9 of the transcript:

Q. When you were reading these [news] articles and throughout the time that you knew Mahmoud Jaballah, did you ever suspect that he might be involved with Al-Jihad?

A. No.

Q. Did you ever have any suspicions as his friend that he might be involved with any group that might advocate violence of any kind?

A. No.

Q. Especially against the Egyptian government?  Did you ever suspect that he might be involved in that?

A. No.  I felt that he comes to this country because they put him in jail and he is not free in his country, and they don't deal with them -- they don't have rights there.

Q. So you were familiar with the problems he had in Egypt?

> A. Yes. That is why he is out of his country.

[86]     Mr. Bakir indicated that he had contact with the lawyers, Mr. Galati and Mr.

Rodrigues.  That was soon after Mr. Jaballah was in jail.  Later we heard that when Mr.

Bakir returned from Saudi Arabia he started to find Mr. Jaballah a lawyer and, as I have

indicated earlier, he attended with Mr. Galati at the Metro West Detention Centre to help

them with translation.  He also had attended at the law office of Mr. Rodrigues and Mr.

Galati.  Mr. Jaballah's case was discussed by him with the two lawyers.

[87]     Mr. Bakir was approached by CSIS on August 4, 1999 at his home but apparently

they talked in the CSIS agent's car.  He remembers the name Baker.  When he was

approached he was asked if he had someone's permission or a paper from any office that

he could come and start asking personal questions about himself.  In response, agent Baker

showed him a paper saying, "This allows us to come and question people any time,

anywhere".

> A. Also, he told me, "If you don't want to speak, we can get information another
> way." He said, "If you cannot answer, we can get –." I said, "No, I can talk, but
> this is not the way to come.  I have a family.  I have a job.  I have appointments." I
> told him, "I can't come and see you in your office without an appointment.  How
> can you come and see people without an appointment?"  He said, "It will take less
> than an hour and we will have another meeting and call you to make an
> appointment."
>
> Q. So in the end you agreed?
>
> A. Yes.  I finished quickly because I had an appointment at that time.

Q. How long did you end up speaking with the officer?

A. Almost one hour.

[88]    Apparently the first questions were a series of personal questions about Mr. Bakir

and then counsel asked him what questions he was asked about Mr. Jaballah.  He wanted

to know when he met him and  how often did he visit him.  Mr. Bakir told him that they

were friends and that he was helping the family.  He told him that after he was in jail he

helped with the family because they needed help.  The children, and the wife was sick and

did not drive.  And then Mr. Bakir told him: "You don't want us to help them?  He said,

'No, you can help them' ".

[89]    It was pretty well all Mr. Bakir could remember except the agent asked him:

A. He asked me about another person.

Q. Such as?

A. Like Hassan Farhat or Kreir.

[90]    He was asked questions about the mosque, specifically the Salaheddin Mosque in

connection with Hassan Farhat.  The CSIS agent said one day Farhat was on the board of

the mosque and he left the board.  "They kicked him out.  Why?  Do you know this?"  Mr.

Bakir said in reply: "I heard about this, but I don't go and ask personal questions".  As a

matter of fact, shortly after that, when he was asking questions, Mr. Bakir replied: "No, that is personal information about that person".

[91]    After this discussion about the CSIS agent asking questions, counsel then asked Mr. Bakir if he had ever worked at the Bathurst Street Jewish Community Centre and he answered that he had.  He said that when Mr. Jaballah was working there he went and visited him and gave him a hand once or twice.  After that people knew him and said that maybe Mr. Jaballah would soon out and that Mr. Bakir could take his position.  Mr. Bakir was also out of work at that time which was in April.  He ended up working there about a month and a half toward the end of May.

[92]    At this point, (p. 771, Vol. 9) counsel asked:

> Q. You said in connection with my last question that the people there said that Mr. Jaballah would be out soon.  Do you recall saying that?
>
> A. Yes.
>
> Q. Could you explain what you meant by that.
>
> A. Everybody was thinking that maybe they would question him and ask him for some information and let him go.
>
> Q. Who told you that he will soon be out?
>
> A. The people who were working there.

That included the workers and the supervisor.  When asked later:

> Q.  When you took over from Mr. Jaballah, did you get the impression that he could go back to work if he wanted to?
>
> A.  That was the reason I was working so that, when he come out, he can work in this place again.
>
> Q.  Who told you that?
>
> A.  Magdi told me.

[93]   Later on another item came up and counsel asked the question:

> Q.  Just a general question.  The people that you associate with - - and let's restrict ourselves to the people you know from the mosque and other Muslims.  Do you know of any people who reside in the province of Ontario that have their car insurance in the province of Quebec?  Have you ever heard of this?
>
> A.  I don't know exactly who, but I heard of some people going and making insurance in Quebec because insurance is cheap there.

Mr. Bakir was asked to introduce his affidavit into Court and was questioned by Mr.

Rodrigues at p. 776, Vol. 9:

> Q.  Did you have anything to do with the compilation of these names and signatures? Did you have anything to do with gathering these signatures?
>
> A.  Yes.  Many people in the community know Mr. Jaballah and they know he is a good person, so they decided to make this paper so the people can sign it to show to the government, so they can help this person.  He is almost three years in Canada, and all these people know him and they sign it.

And the source was apparently people at two or three mosques, after Friday prayer.  Mr.

Bakir also indicated at p. 778:

Page: 73

> Q. I want you to turn to page 1 of the exhibit, Bader Islamic Association of
> Toronto. Could you tell us what you know about this organization.

> A. It is a charitable organization also helping Muslims in Canada to get education
> and books. Also they have a library, so you can go and read there. They are
> helping poor people. Recently there was an earthquake in Turkey, so the people
> collected money for them.

[94]   When asked the question:

> Q. At page 2 there is the Centre of Toronto. Could you tell us what you know
> about this organization?

> A. This is a mosque. It is part of the centre and also people attend prayer there and
> Friday prayer.

[95]   The question of the word Walid was touched upon when Mr. Bakir said that his

wife's parents were in Morocco and he often spoke to her father on the telephone or when

he visited them once a year or once a month. At p. 780, Vol. 9 the question was put to Mr.

Bakir:

> Q. When you speak to your father-in-law on the telephone, how do you refer to
> him. Do you refer to him by his family name, first name or family name?

> A. Mostly we call our father-in-law or big brother Walid or sometimes Amni,
> uncle, or Walid, father. He is older than my father.

> Q. So you refer to him as Walid?

> A. Yes. When you say father-in-law, in our language we call it like this.

[96]   In a question on p. 781, Vol. 10, Mr. Bakir was asked if anyone else in his family

was referred to as Walid. He answered:

> A. In our culture the big brother. Because my big brother is just two years older
> than me, I call him by the name of his oldest daughter. Big brother, especially if the
> father has passed away, we call Walid because he is taking care of the family.

[97]    The people who knew that Mr. Jaballah had been put in jail because after prayers

the Imam would give a speech.

**Dr. Aly Hindy**

[98]    Dr. Aly Hindy is working for Ontario Power Generation, formerly Ontario Hydro

as a senior civil engineer and he has been there for nineteen years in the Project

Management Department. In addition to this Doctor Hidy is also the President and Imam

which is a religious leader in the Salahedin Islamic Centre in Scarborough. At p. 804, Vol.

10 he was asked:

> Q. You refer to it as the Salahedin Islamic Centre. What kind of centre is it?
>
> A. It is a mosque and also has religious education and also we teach the Arabic
> language, solve family problems, perform marriages - - many activities for the
> Muslim community in Scarborough.
>
> Q. Do you perform marriages yourself?
>
> A. Yes.

[99]    Dr. Hindy knows Mahmoud Jaballah and tells us at p. 805:

> A. It was about three years ago. I saw him in the Centre a few times. Of course, it
> is my function also to meet the people personally, to give them comfort. If they
> have any problems they can come to me for guidance.

. . .

Q. From that time onward, how frequently did you have contact with him?

A. About three times in general, and there was one time specifically that he came to me to ask me about this problem with CSIS.

Q. Could you tell us when you were approached by Mr. Jaballah in connection with his problem, as you referred to it, with CSIS?

A. He came and said that SCIS was almost threatening him. He came to ask, "What are my rights?"

Q. When was that; do you recall?

A. I would say about six months before his arrest.

. . .

Q. From what you could tell, from your observation, what was his state of mind? How was he feeling when he approached you to seek your advice?

A. He was very troubled by this. This is not only him; we feel like this is happening in the whole community, these visits from CSIS. They contact people from the community and they even come to their homes. The people don't know their rights. They don't know that they can say "no".

[100]   Dr. Hindy indicated that he had some information from CSIS about Jaballah and he wanted to talk to him because he had been warned by CSIS about him. As he indicates, it was really the other way around. He started to try to know, because this was his duty, to make sure that there are no illegal activities in the mosque. He indicated that he would like to know this person so he approached him and talked to him and he kept an eye on him in

general and on people whose names had also been give to him by CSIS.  He said, at the

end of his study: "I didn't notice anything wrong".  He reiterated that he had no concerns

about Mr. Jaballah, no concerns at all from the community, or from himself, or from the

people who helped him at the centre.

[101]   On another point he was asked specifically by counsel (p. 809, Vol. 10):

> Q. Are you familiar with a group known as Al-Jihad?
>
> A. Yes.
>
> Q. How are you familiar with that group?  How did you come to learn about that group?
>
> A. Mainly from the media.
>
> Q. Throughout the time that you have known Mr. Jaballah, did you have any suspicions that he may somehow be linked with this group?  Did you suspect it?
>
> A. No, I didn't have any suspicions about this.
>
> Q. Did anyone in your congregation, the worshippers, ever approach you and say that they were concerned about Mr. Jaballah being connected with this group?
>
> A. No.
>
> . . .
>
> He has been living here for almost two years.

[102]   All visits from CSIS weren't gut-wrenching; when Dr. Hindy had been on the job two or three months he received a call from a CSIS member asking him to join him for a chat.  It was a friendly meeting, and the agent  gave Dr. Hindy some information about things to be careful about in the community.  Dr. Hindy felt no sense of alarm because he wasn't the subject of any investigation.  The agent said he was trying to help and suggested to Dr. Hindy that security should also be his concern in his country.  He advised him to be careful of things like sending money to certain organizations.  Then Dr. Hindy was given some names by the CSIS officer who said: "Watch out for these people".  One of the names on the list was that of Mr. Jaballah. Interestingly enough it was Michel who approached from CSIS and he warned Dr. Hindy to be careful because there were some elements connected to terrorism attending his centre and he gave a few names.  Of particular interest to Dr. Hindy was Mr. Jaballah and after he had finished a most thorough study of the man and his habits, he says: "There was nothing in what he was saying".

[103]   Despite some of Dr. Hindy's concerns about the approach and the conduct of CSIS he is quick to point out that if any of his parishioners could pose some threat to himself and his congregation he would contact CSIS and tell them.

[104]   Probably the most powerful statement came from Dr. Hindy when being questioned at p. 821, Vol. 10:

> Q.  You hold a significant and, I think everyone would agree, a respected professional position, and you are also a person of respect in your community.  Why have you taken so much time to be present here in these proceedings?

> A. Because we care about Mr. Jaballah.  We know he is innocent, and this could
> happen to anybody else in our community.

[105]   Going back a little, Dr. Hindy said that he had done an investigation and indeed a

very comprehensive study because he had been given the name from CSIS but they found

nothing wrong.

[106]   At this point the affidavit of Dr. Aly Hindy was filed as Exhibit No. 9.  The exhibit

was an affidavit signed Dr. Aly Hindy and attached to it were two copies of signatures of

numerous individuals from the Islamic community in Toronto in support of Mahmoud

Jaballah.  Once again in this case Dr. Hindy was asked at p.831, Vol. 10:

> Q.  Why did you decide to engage in this exercise of collecting these names and
> explaining to these people what they were signing, and so?
>
> A.  Because every one of us is concerned about Mr. Jaballah and we want him to be
> here with us.  We don't want him to go back to suffer the same situation that he was
> suffering before.  Finally, he found a good place to live, a peaceful place.  He was
> very peaceful and was trying to establish his life here with his children and his wife,
> and now he is being threatened with going back to the same situation.  Maybe this
> time it would be even worse.
>
> If you challenge the Egyptian government or even claiming refugee status itself is
> considered something against the government.

[107]   Wrapping up, counsel asked Dr. Hindy at p. 833:

> Q.  Just one last question, Dr. Hindy.  You had two interviews in total with CSIS?
>
> A.  That's right.

Q.  Was CSIS aware on those occasions that you are a citizen of this country?

A.  Yes.

Q.  At any time were you advised by CSIS that, before speaking with them, you had the right to consult a lawyer?  Were you advised of that?

A.  No.

Q.  Were you told that you could refuse?

A.  No.

In cross-examination by counsel for the applicant this suggestion was put to Dr. Hindy

(p.836, Vol 10)

Q.  Would it be fair to say, Dr.Hindy, that, in essence, your other position as Imam of the Salahedin Mosque, although a very responsible position, would be a part-time position?

A.  You could say that, but the main activity is actually on Friday, and I always take Friday off from my work, from Ontario Power Generation, and then on Saturday and Sunday.  Those two days, plus Friday after 12 o'clock, is the main activity.  In the rest of the week the place has very little attendance because people are working. The main activity is from Friday noon until the end of Sunday, and I am always there.

## Mr. Arafat El-Asahi

[108]   Dr. El-Asahi was born on December 25, 1940 in Gaza, Palestine.  He is a married man with seven children and thirteen grandchildren.  He is a Canadian citizen.  At the present time he is a full-time employee of the Muslim World League that has its

headquarters in Saudi Arabia and has over 30 offices all over the world.  He was

questioned at p. 855 Vol. 20 of the transcript:

> Q. That is the Muslim World League?
>
> A. Which is the mother organization of what is called IIRO, the Relief branch of the Muslim World League.
>
> Q. Is IIRO also known as the International Islamic Relief Organization?
>
> A. Yes, it is.

[109]   It was agreed that it would be referred to as the IIRO.  On p. 857, Vol. 10:

> Q. In your professional capacity, do you do any work with the IRRO?
>
> A. Yes.  I am Director of this office in Canada.
>
> Q. Where is the office located?
>
> A. It is in Etobicoke here.
>
> Q. Is that the only IIRO office in Canada?
>
> A. Yes.
>
> Q. How long has that office been operating?
>
> A. For the last eight years or so.
>
> Q. During those eight years, have you been associated with the IIRO in Canada? Have you been here throughout those eight years?

A. I am in charge of this - - actually, it is not a very active office in Canada. It is only representing some activities among the Muslim communities in Canada.

Q. Have you been with that office for the past eight years?

A. All the time, yes.

Q. During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?

A. Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.

Q. I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?

A. I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?

Q. Yes.

A. Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.

Q. For those of us who are not as familiar as you are with the Muslim World League, could you tell us a bit about the work of that organization internationally?

A. The Muslim World League was established in 1963 as an organization trying to help Muslims who live as minorities. Where ever Muslims exist as minorities, this organization tries to help them in one way or another - - in education, in social needs, in every aspect of their lives. Whatever it can give to them, it doesn't hesitate to do that.

Page: 82

Q. Is there any connection between that organization and the United Nations?

A. Absolutely. We have an observer status with the United Nations - - not only the United Nations, but a number of prominent international organizations. One of them is called the Arab League. The Arab League is a league of all Arab States. Also we have a status with the OIC, the Organization of Islamic Countries, which represents 55 countries who are all Muslim. We have this status with all of them.

Q. Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?

A. Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.

Q. When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?

A. What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.

[110]   From this juncture on counsel for the respondent indicated that he would be referring strictly to the IIRO. We now go to p. 862, Vol. 10 of the transcript:

Q. During the eight years that you have been with IIRO/World Muslim League here in Canada, have you ever received any indication from the Canadian authorities that they are concerned in any way about your office?

A. Yes.

Q. When was that?

A. Some agents from CSIS called me, and they came and visited me.

Q. Do you recall who it was?

A. The same person representing CSIS. Everybody knows this. He came to my office and he asked me about us, what we are, what our activities here and elsewhere in the world are. When he knew, as I told you, about ourselves, he was satisfied and he said to me, "If you need any help, here is my card. Call me." Then he called again maybe one year later.

Q. When did he call you the first time?

A. About three years ago. The second time he called asking the question, which was very strange to me, "Do you receive any threats from anybody?" I said, "Yes, it so happens that I had two letters threatening us." "Can I come and see them?" He came. He said, "Are these threats from Muslim terrorists?" I said, "No. Why should Muslims threaten us when we are here to help them?" [emphasis added]

[111]   Dr. El-Asahi took considerable pride, and well he should, when he said at p. 864,

Vol. 10::

We publish booklets actually to educate Muslims and Canadians non-Muslims about what we stand for, what Islam stands for. One our books fell into the hands of the Minister of Defence at the time, David Collonnette (sic). He is still the Honourable Collonnette (sic). He is a minister until now, but of course he has a different portfolio. He read one of our books called 'The Holy Koran's Message to Jews and Christians'. The Holy Koran is our holy book, like the Holy Bible. It is a message not only to Muslims; it is a message to the universe, to everybody, including the members of the other two divine religions. The book was quotations from the Koran addressed to the followers of Judaism and Christianity. He [the Minister] read the book and he expressed his happiness about it, ... and he said, "Other people, when they write about religion, concentrate on differences and, thus, they divide people. In this book by this author there is a concentration on commonalities." He was happy with the book because it concentrates on what joins us together.

[112]   During Dr. El-Ashi's examination-in-chief, we come yet again across the name

Ossama Bin Laden.  At p. 867, Vol. 10:

A. Everybody knows who Ossama Bin Laden is. He was with the Afghan guerillas from the beginning of their uprising against the Soviet Union. The United States used to help the Afghans during that period, before the nineties. He was on the popular level getting help from the people of Saudi Arabia and sending them - -

from what I read in the papers - - sending them to those guerillas. Then afterward, after the Soviet Union left, he continued to do the same thing.

To me, as a representative of the Muslim World League and IIRO, I feel that he has exceeded his limits, to make attacks or to say, "I want to make an international war against everybody." That is not Islam; this is against Islam.

Q. So what we have been reading in the newspapers as to what Ossama Bin Laden is supporting, you don't support?

A. Absolutely not, and I categorically say that there are no relationships between Ossama Bin Laden - - how can there be a relationship when Ossama Bin Laden himself lost his Saudi citizenship? He is no more a Saudi citizen, and the Government of Saudi Arabia, I am stating, is our government. We work for it. Whatever the government does and its attitude toward Ossama Bin Laden and other people, that is our attitude, too.

Q. So when CSIS says that Ossama Bin Laden is connected to your organization's offices in Pakistan, what do you say to CSIS?

A. I am afraid this is inaccurate. This is absolutely not correct.

Q. My recollection of CSIS' position is that, in addition to that, the IIRO offices in Pakistan are involved in fraudulent activities.

A. Again, this is an offence to the IIRO. It is absolutely unfounded.

. . .

Q. I would like you to tell me, Dr. El-Asahi, if you know Mahmoud Jaballah.

A. I heard the name. He called me on the phone and he said he worked for our office in Pakistan. He was a Principal. He sent me a letter, and his wife also called me. I never met any of them, and I saw the letter. The letter has been issued by the Director of our office in Pakistan. They know the person, so it is a genuine letter, that he was the Principal of the school operated and started by the IIRO for orphans in Pakistan. He was there. Because the letter is in Arabic and it is from Pakistan, he wanted me to confirm this information. I wrote a letter to that effect, to whom it

may concern, that indeed, based on this letter, this man worked for this organization during a certain period.

Q. When Mr. Jaballah approached you with that letter, do you recall if that was the name he introduced himself as, Mahmoud Jaballah?

A. Of course, Mahmoud Jaballah. I have a copy of the letter.

Q. Would you check the name on that letter, please.

A. His name is Mahmoud El-Sayy Jaballah.

Q. Is that the Arabic letter?

A. English. That is my letter, and the Arabic is here. It is the same, Mahmoud El Sayy Jaballah.

Q. That letter came to you from Mr. Jaballah?

A. Yes.

Q. And that is the letter that was issued by the organization in Pakistan?

A. The one in Arabic is written by my organization, the office in Pakistan. If you need a copy of it.

Q. Perhaps you could take us through it again. You received the letter from your branch in Pakistan?

A. No. I received the letter on behalf of Mr. Jaballah here, that he had a letter that proves that he worked as a Principal of one of our organizations in Pakistan during a certain period, and the organization says that he was of excellent character and good behaviour. This is text of the letter. I am paraphrasing it for you. So we issued this letter, to whom it may concern.

Q. In English?

A. In English. We say: "This is to certify that the IIRO is an Islamic international organization that has branches in various countries, one of which is in Pakistan, where Mr. Mahmoud used to work."

...

Q. Do you recall, Dr. El-Asahi, when you were initially approached by Mr. Jaballah?

A. It has a date. It was January 6, 1999. That is the date of my letter, January 1999.

[113]   In cross-examination Dr. El-Asahi confirms (at p. 875, Vol. 10) that he is an employee of the Muslim World League. At p. 877, Vol. 10, the following questions and answers were given:

Q. Do I understand correctly from the questions that you responded to from Mr. Rodrigues that the IIRO is really only active in those places where there is need for relief?

A. Yes.

Q. In other words, in Canada, in terms of your dual role with your dual office here, you would be doing more activity in relationship to the Muslim World League than you would with regard to the IIRO?

A. Exactly, although we do have certain activities from the IIRO required to be done in Canada. For instance, in the month of fasting we have some money coming from there to spend to make parties for those who fast. The poor people here in a number of mosques would get together and eat as guests of the IIRO.

Q. When they break their fast?

Page: 87

A. Exactly. This is an example. There are other things.

Q. You said "money from there".

A. From Saudi Arabia.

Q. You also indicated in response to a question from Mr. Rodrigues that you would not know what was going on with the Muslim World League/IIRO office in Washington, D.C. in terms of the Americans possibly investigating them because that is an affair for their office.

A. That is true.

Q. At the same time you indicated in a response to a question from Mr. Rodrigues that you are not aware of what the IIRO office in Pakistan would do in recruiting people to teach there because that is an affair that is intrinsic to that office.

A. Ask me about what I do here and my relationship with the headquarters in Jeddah.

Q. Having said that, you are not really able to tell this Court what goes on at the IIRO office in Pakistan beyond which somebody in Pakistan is prepared to say, are you?

A. I can tell because I know about the general policy and the rules and objectives of the organization which nobody is allowed to go beyond. Everybody has to abide by the rules and the principles of the organization. In that way I can tell.

Q. You have already told us that, in your view, what Ossame Bin Laden has done is beyond the principles of Islam and is contrary to the principles of Islam

A. In his threat to declare war against civilians and to demolish and bomb targets everywhere in the world just because they are American or European, this is not Islamic at all.

Q. Given that you don't know precisely what goes on in the office in Pakistan - - and I recognize that your view is that Ossama Bin Laden is beyond the principles of

Islam - - would it be possible that there might be individuals operating within the office in Pakistan who admire what Ossama Bin Laden has done?

A.  No.  The answer is "no" because the office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia.  If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League.

If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did.  That gives me an indication that everybody is within - - there is also an embassy in every country.  In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals.  They know who does what.

Q.  How can you say that, Dr. El-Asahi, when you don't know exactly what it is that might be going on inside the Pakistan office?  Is it not possible that somebody could keep his opinions to himself about Ossama Bin Laden, but work quietly on his behalf without letting his superiors or the officials in Jeddah know what he is doing?

A.  Does anybody know what goes on in my mind and your mind?  We are not accountable for what goes into our minds; we are accountable for our actions.  Whether he keeps this or that is not a concern of anybody as long as he or she abides by the principles of the organization or the government.

Q.  Are you saying that it is possible that somebody could act or attempt to act in secret but, so long as he keeps to the official policy line of the organization and the home organization doesn't know what he is doing in secret, he might continue along at variance to official policy?

A.  I am not saying that; you are saying that.  I am saying that I don't know what happens in secret with anybody; nobody knows.  This is what I am saying.

[114]   In re-examination counsel for the respondent, at p.883 asked:

Q.  In your opinion, Doctor, would the Saudi government fund any organization that is involved, perceived, or stated to be involved in terrorism?

A.  This exactly as you would say:  Would the U.S. government fund any organization that is involved in terrorism?  The same answer.

Q. What is that answer?

A. The answer is: Impossible.  How can they?

## Mr. Steve Rosenbaum

[115]   Mr. Galati called the next witness, Mr. Steve Rosenbaum.  Mr. Rosenbaum is a

barrister and solicitor and a member of the Bar of Ontario since 1984.  He represented Mr.

Jaballah, his wife and children during the course of the refugee claim and hearing.  At p.

890, Vol. 10 Mr. Galati asked:

> Q. During your representation of Mr. Jaballah, his wife and children, did anyone
> from CSIS ever call you to tell you that they were interviewing your client during
> the same time period and during the course of their claim?

> A. No.

> Q. Did the Minister's representative, the Refugee Claims officer or any of the
> interpreters during the sittings of the refugee claim ever indicate to you or tell you
> that CSIS was investigating my client, Mr. Jaballah?

> A. Never.

[116]   Then in a question at p. 892:

> Q. Is it normal practice, both in your own experience and in dealing with other
> practitioners in your area, that refugee lawyers will encourage and request their
> clients to collect documentation or documentary evidence to support their refugee
> claim?

> A. That is correct.

> Q. I don't know whether you recall, but is it likely that you did so with Mr. Jaballah
> and his family?

A. Yes, I do recall that.

Q. Did you.

A. Yes.

Q. Do you know a Mr. Ali Hussein?

A. Yes, I do.

Q. Who is he?

A. He was the interpreter who assisted us during our preparatory meetings for the refugee hearing, together with Mr. Jaballah.

Q. Was he someone Mr. Jaballah brought to your office or was he a regular interpreter of yours that you had used?

A. He was a person that Mr. Jaballah brought to my office.

## CONCLUSIONS AND REASONS FOR ORDER

[117]   Both counsel emphasized the fact this case would turn on the credibility of the

parties and the witnesses and I agree.

[118]   There is also one major feature of applications brought pursuant to paragraph

40.1(4)(a) of the *Immigration Act* and that is the direction from Parliament which I think

bears repeating here.

(4) Judicial Consideration of Certificate - Where a certificate is referred to the Federal Court pursuant to subsection (3), the Chief Justice of that Court or a judge of that Court designated by the Chief Justice for the purposes of this section shall
(a) examine within seven days, *in camera*, the security or criminal intelligence reports considered by the Minister and the Solicitor General and hear any other evidence or information that may be presented by or on behalf of those Ministers and may, on the request of the Minister or the Solicitor General, hear all or part of such evidence or information in the absence of the person named in the certificate and any counsel representing the person where, in the opinion of the Chief Justice of the designated judge , as the case may be, the evidence or information should not be disclosed on the grounds that the disclosure would be injurious to national security or to the safety of persons;

(4) Examen judiciaire - Lorsque la Cour fédérale est saisie de l'attestation, le juge en chef de celle-ci ou le juge de celle-ci qu'il délègue pour l'application du présent article:

a) examine dans les sept jours, à huis clos, les renseignements secrets en matière de sécurité ou de criminalité dont le ministre et le solliciteur général ont eu connaissance et recueille les autres éléments de preuve ou d'information présentés par ces derniers ou en leur nom; il peut en outre, à la demande du ministre ou du solliciteur général, recueillir tout ou partie de ces éléments en l'absence de l'intéressé et du conseiller la représentant, lorsque, à son avis, leur communication porterait atteinte à la sécurité nationale ou à celle de personnes.

[119]   It's not surprising that counsel have attacked this particular admonition to judges but the authority is now clearly spelled out and we have proceeded with it since at least 1994 and probably earlier. ·

[120]   When counsel are representing a client under these terms and conditions I can appreciate that it is extremely difficult but it is a difficulty that Parliament feels should be overcome given its responsibility for protecting Canadians and other residents of Canada.

[121]   This case lends itself to being divided into three points of time, namely: A. the time in Egypt;  B. the time between arrival in Saudi Arabia and departure for Canada; and C. the time in Canada.

## A. Time in Egypt

[122]   Both the respondent and his wife gave a very careful, albeit chilling, commentary and evidence of the time they spent in Egypt and why they wanted to leave.  Of all of their evidence this was certainly the most credible and really unchallenged.  I accepted that they were persecuted; I accept that they were imprisoned and that no charges were brought against them; and I accept the fact that the respondent instituted an action against the government which, as I have indicated earlier, he abandoned when he left for Saudi Arabia.  Nor did I find any real fault with the fact he had to tell a few lies in order to convince the captain of the ship they were sailing on that everything was in order when he knew it was not in order.  I don't think that exchange really impinged upon his credibility and I suspect that anyone of us caught in that situation would be tempted to tell a few lies if it meant becoming clear of something they feared for good reason.  In any event that was the way I saw it, save and except for the evidence presented to me at the *in camera* meeting and of course I cannot comment on that.

## B. Time spent after left Egypt until arrival in Canada

[123]   Again, the respondent brought to our attention that the pilgrimage to the holy place was for a limited time and he had to leave at the end of that specific period of the pilgrimage.  He was able to stay in Saudi Arabia for a limited period of time and after that he was forced to travel to Pakistan and later Yemen.  His wife was not with him in Yemen but apparently working in Pakistan during this time.  He then tells us, in answer to questions from his counsel, about his going to Yemen and Azerbaijan and  that the Canadian authorities would know that he had gone to Azerbaijan because it was shown on the passport.  He adds that there was no stamp in his passport showing Yemen and the only way the Canadian authorities would get that information would be if he told them, as he indicated he did.

[124]   On the other side of the coin is the fact that he spent a year in Yemen and we heard very few if any details other than the fact of why he went there and that he was unsuccessful in getting a job and that he sustained himself by using money that he had earned in Pakistan and his wife was able to look after her financial requirements because she had also been working and in fact was still working and had saved some money.  By and large, there wasn't too much to criticize about the evidence here but this is an area where he had gone to seek protection and yet seemed to move around quite easily in what was for him a danger zone, if Egypt was apparently demanding that Egyptians be returned to Egypt.

[125]   Here again the *in camera* evidence tells a different story and I can't of course comment on that information.

## C. Time in Canada

[126]   I don't need to belabour this again other than to say that I was impressed by the number and the calibre of people who came forward on his behalf and on behalf of his wife and children.  I have already highlighted some of the actions that were taken by people who wanted to do nothing more than help.

[127]    I was particularly impressed by Dr. Ali Hindy because he had taken on the responsibility of checking Mr. Jaballah out after being told by CSIS that he might be a problem.  He said at the end of his study: "I didn't notice anything wrong".  He also brought home to the Court that he had no concerns about Mr. Jaballah, no concerns at all from the community or from himself or from the people who help him at the centre.  This was pretty strong backing coming from a person in the community who has obligations of his own to see to the members of his mosque and an indication that people were coming from various centres just to be at the mosque because of the way it was run.  The wrapping-up information about Dr. Hindy's relationship with the respondent came when counsel said: "You hold a significant, and I think everyone would agree, a respected professional position and are also a person of respect in your community.  Why have you taken so much time to be present here at these proceedings?" and Dr. Hindy replied:

"Because we care about Mr. Jaballah.  We know he is innocent and this could happen to anybody in our community."

[128]  I don't wish to reiterate what I have already said in these Reasons but I thought it important to include strong attitudes of people who have known the respondent over a comparatively short time and would have a natural propensity, I believe, and a correct one, to support their compatriots in the community.

[129]  The respondent had been given work by a friend with the initials TJ and it amounted to menial labour from time to time when a job vacancy occurred.  The respondent befriended TJ and agreed to drive him to the airport with all of his luggage and his family.  TJ's evidence was to the effect that neither his car nor the car of his brother was large enough for the amount of luggage they were taking and that is why they seized upon this offer from the respondent.

[130]  Of interest here was that the luggage was not taken into the airport but simply unloaded at the sidewalk and TJ would have to move it the rest of the way.  At this point I think it should also be pointed out that the respondent was known to TJ as Mustafa Jaballah.

[131]   When TJ and his family arrived in Egypt they apparently were treated shamefully by the Egyptian authorities and I think it is pretty clear from the evidence that they were not interested in TJ but they were interested in Jaballah.  The problems faced by TJ were unlike anything he had ever had happen to him before and he had made several trips to Egypt but this was the first time that he was manhandled in this particular way.  He was asked a series of questions and shown pictures in which he was asked to identify the people in them.

[132]   I believe that once the officials realized, or more importantly, once TJ realized that the man he knew was called Mahmoud Jaballah, he conceded that he knew him but that he didn't know him by that particular name.

[133]   Once it had been settled in the minds of the Egyptian authorities they then began their questioning about contacts TJ had had with Jaballah.  I believe they kept him for something like ten hours the first time at the airport and for a shorter time on the second occasion when the photographs was finally identified.

[134]   This incident points out that Jaballah would have some reason to be concerned if he returned to Egypt, or so the evidence seems to say to me because the clear-cut evidence is that TJ suffered at the hands of the officials because they thought he was a good friend of, or working with, or on behalf of Jaballah.

[135]   Jaballah's evidence has been that if he returned to Egypt voluntarily or if he was forced back there was clearly interest in him. His friend, TJ, made the point that he had been questioned in a very deliberate fashion and for a long period of time about the whereabouts of the respondent. And so, as the respondent indicates, they were out to get him back; certainly on this particular issue he is on pretty solid ground on that part of his testimony.

[136]   If nothing else this incident squares with Jaballah using the name Mustafa with people he did not trust or did not know and he had reason to be apprehensive about meeting new people in Canada. There is also an indication here that the Egyptian authorities were well informed because they had taken a photo of Jaballah and TJ outside the airport and then showed it to TJ during the second meeting with officials.

[137]   I cite this instance because it goes a long way to establishing the credibility of the respondent.

Page: 98

## DECISION

[138]   I am satisfied, based upon the evidence presented to me *in camera* and in open

court, that the certificate filed by the Minister and the Solicitor General is not reasonable

and the certificate is quashed.

Ottawa, Ontario                                   _____ B. Cullen _____
November 2, 1999
                                                               J.F.C.C.