4 of 10 DOCUMENTS

Copyright 2002 FDCHeMedia, Inc. All Rights Reserved.
Federal Document Clearing House Congressional Testimony

February 12, 2002 Tuesday

**SECTION:** CAPITOL HILL HEARING TESTIMONY

**LENGTH:** 13000 words

**COMMITTEE:** HOUSE FINANCIAL SERVICES

**HEADLINE:** INVESTIGATING PATTERNS OF TERRORISM FINANCING

**TESTIMONY-BY:** STEVEN EMERSON, EXECUTIVE DIRECTOR

**BODY:**

Testimony of Steven Emerson Before the House Committee on Financial Services Subcommittee on Oversight and Investigations

"PATRIOT Act Oversight: Investigating Patterns of Terrorist Fundraising" Fund-Raising Methods and Procedures for International Terrorist Organizations

February 12, 2002

Steven Emerson is an internationally recognized expert on terrorism and national security, a correspondent, and an author who also serves as the Executive Director of The Investigative Project. His current book, American Jihad: The Terrorists Living Among Us, published by The Free Press, details the rise of the militant Islamic infrastructure in the United States and provides the most comprehensive account of the major fundamentalist Islamic cells on American soil to date.

Mr. Emerson started The Investigative Project in late 1995 following the broadcast of his documentary film, "Jihad in America," on public television. The film exposed video of clandestine operations of militant Islamic terrorist groups on American soil. For the film, Mr. Emerson received numerous awards including the George Polk Award for best television documentary, one of the most prestigious awards in journalism. He also received the top prize from the Investigative Reporters and Editors Organization (IRE) for best investigative report in both print and television for the documentary. The award from the IRE was the fourth such award he had received from that group.

Since 1996, Mr. Emerson has testified more than a dozen times before Congress on such topics as the terrorist infrastructure in the US, Palestinian violations of the Oslo accords, the protection of America's national infrastructure, and the threat of Islamic fundamentalism against the United States and the West. He regularly appears in the Wall Street Journal op-ed page as well as numerous other publications, and gives frequent interviews to television networks throughout the United States and abroad.

Mr. Emerson first worked for the U.S. Senate Foreign Relations Committee starting in 1977. He then became a freelance writer in 1982, writing primarily for the New Republic. Mr. Emerson is the author of four books. He published his first book in 1985, The American House of Saud:: The Secret Petrodollar Connection. Mr. Emerson joined U.S. News and World Report magazine in 1986 as the national security correspondent where he published two more books: Secret Warriors and The Fall of Pan Am 103: Inside the Lockerbie Investigation. In 1990, Mr. Emerson joined CNN as a special investigative correspondent. In 1993, Mr. Emerson left CNN to begin work on his PBS "Jihad in America" documentary that aired at the end of 1994.

Introduction

President George Bush stated on September 24. 2001. "Money is the life - blood of terrorist operations. Today, we're asking the world to stop payment." Since then, the US government has engaged in a full-court press designed to freeze, seize, interrupt, slow down and otherwise interdict the flow of funds to terrorists. To a certain extent, however, government agencies were forced to act without having first developed the critical intelligence base on terrorist fundraising that would ordinarily would have preceded prior to government action. But these were not ordinary times-and it became imperative that the flow of funds available to terrorists be shut down immediately. Government agencies and law enforcement rose to the occasion and performed brilliantly. The American public owes a great deal of gratitude to the thousands of government agents who have worked tirelessly on tracking down terrorist assets around the globe.

But with the benefit of hindsight and the opportunity to distill investigative intelligence, we can now step back and examine the primary routes through which terrorists have raised or laundered monies. . The manner in which terrorists have raised money for their horrific operations has ranged from a variety of sources including. but not limited to. the use of charitable organizations, corporate "front" entities, financial institutions; and Internet-based funding. The 1998 bombing of the U.S. Embassies in Kenya and Tanzania provided a prime example of how these means of fund-raising were all utilized.

This testimony will probe into the means of fundraising by such organizations as alQaeda, Hamas. and Hizballah. The significance of this broad sampling of organizations is to show that each of these terrorist organizations utilize the same types of methods to fund their terrorist activities.

I. Charities

A fundamental exploitation that Islamic fundamentalists have been able to avail themselves of so efficiently and thoroughly is through a charity or relief organization. For most of the world, charities represent all that is good about mankind-helping others in need. bringing people together, and correcting the wrongs of the world. But for the terrorist. charities represent a perfect cover for collecting large amounts of money and arms to be used for terrorist operations.

The general public often cringes at the thought that charities designed for benevolent purposes can be used to support terrorism. Often. First Amendment concerns are raised regarding a charity's freedom of speech and freedom of association and the overreaching of federal law enforcement against legitimate charities. Therefore. scrutiny of these charities by federal law enforcement authorities has sometimes been met with media criticism based on such concepts as "ethnic profiling" and discrimination.

Unfortunately. terrorists do in fact utilize charitable organizations within the United States to accomplish their funding purposes. Furthermore, because charities face far less scrutiny from the IRS than other for-profit corporations and individuals. occasionally, these same charities that engage in terrorist pursuits have succeeded in receiving financial assistance from government-sponsored grant programs such as the U.S. Agency for International Development (USAID). For example, the Holy Land Foundation for Relief and Development (HLFRD), whose assets were ordered frozen for funding the Hamas terrorist organization, was approved by USAID to receive supplemental funding. t Disturbingly, when charities like HLFRD are funding terrorism, they are doing so at the expense of the American taxpayer, while undermining the fundamental values that the United States represents.

a. Al-Qaeda's Abuse of Charities

Al-Qaeda has availed itself of the freedoms inherent within the American political spectrum in order to reap financial benefits. The following examples show how this has been accomplished.

1.The International Islamic Relief Organization (IIRO)

Foremost among charities tied to Osama Bin Laden and al-Qaeda, as well as other terrorist organizations such as Hamas, is the International Islamic Relief Organization (IIRO). The IIRO, which has many branches around the world, was established in 1978 and is headquartered in Jeddah, Saudi Arabia. 2 The current Secretary- General of the IIRO is Adnan Khalil Basha. The IIRO is considered to be the "operating arm"3 of the Muslim World League (MWL), and, according to Dr. Ahmed Mohammed Ali, Secretary-General of the MWL, it provides "humanitarian assistance" through the IIRO.

There is documentary evidence of IIRO's solid ties to serving as a conduit for terrorism. Most recently, a man arrested in Canada who worked for the IIRO was found to have numerous ties to al- Qaeda and Osama Bin Laden. Mahmoud Jaballah, working as a principal in an Islamic school in Canada, was arrested in 1999 for allegedly belonging

to Al Jihad, an organization thought to work closely with al-Qaeda and led by one of al-Qaeda's top lieutenants, Ayman AlZawahiri. Jaballah was released almost a year later due to a lack of evidence against him, but was rearrested in August 2001 when the Canadian Security Intelligence Service (CSIS) uncovered new information solidifying Jaballah's connections to al-Qaeda.s

During his deportation hearing, Jaballah stated he worked for the IIRO in Peshawar, Pakistan, in the capacity of "teaching orphans."6 Despite these claims, a diagram introduced by the Canadian government at the trial tells a different story. The diagram illustrates the connections between various individuals and organizations all linked to Al Jihad. An arrow beginning at IIRO and pointing directly to Al Jihad has the words "Secretly funds terrorism" superimposed upon the arrow. [SEE EXHIBIT] It is the Canadian government's contention, then, that IIRO funds terrorism clandestinely. Jaballah was eventually "processed for deportation as a threat to national security."

A CSIS operative, named in the trial only as "Mike" to preserve his anonymity, elucidated how a relief organization could operate as a means to actively support terrorism:

[M]ost members of Al Jihad, as cover for their operations, usually employ themselves with relief organization as teachers or as aid workers. Just to give you a few examples, Mercy International was one of the organizations that was used to support the network of Al Jihad when it was conducting its operation against American embassies in East Africa when they were blown up. An organization by the name of Human Concern International, one of whose employees is a man by the name of Ahmed Said Khadr, used the network of Human Concern International to facilitate the attack on the Egyptian embassy in Islamabad in November 1995.

The IIRO's road to terrorism might even lead to September 11, 2001. Fayez Ahmed Alshehri, one of the hijackers on United Airlines Flight 175 which crashed into the southern tower of the World Trade Center, told his father he was going to go work for the IIRO and never saw his family again.9 Whether IIRO was the gateway for this hijacker's entry into terrorism is unclear, but it necessitates a further investigation.

IIRO branches provide more than a base for recruitment for terrorists. They also provide material support, instructions, and funding. On January 7, 1999, according to Karnal Singh, a deputy inspector-general of police in India, the U.S. consulates in Madras and Calcutta were targeted by a Bangladeshi national, Sayed Abu Nasir, on orders from among others, Sheikh Al Gamdin, President of the IIRO, Asia. After September 11, 2001 Pakistan deported 89 Arab aid workers in order to cut support for Bin Laden and al-Qaeda. Among the organizations that employed these workers was the IIRO.

In the Philippines, the IIRO office in Zamboanga City is the coordinating center for secessionist Islamic militants in the southern region of the country where Muslims are the majority. 12 IIRO's Zamboanga City office, which was established some time in the early 1990s, was under the direct control of Mohammad Jamal Khalifa, the brother-in-law of Osama Bin Laden.

In April 1994, Khalifa was indicted by Jordanian authorities for being involved in the bombing of a cinema in Jordan. Later that year, on December 1, Khalifa entered the United States on a visa he had applied for earlier. Two weeks later, Khalifa was arrested and extradited to Jordan where he was subsequently acquitted of charges against him.

The State Department was gathering information pursuant to Khalifa's application for a visa and entry into the United States. In 1994, a cable from the American Embassy in Manila, Philippines, to the Secretary of State summarized the findings of the local media:

A Saudi Arabian-based relief agency operating in Manila had been coordinating with and helping Muslim Secessionist factions in Mindanao and the ASG [Abu Sayyaf Group]. The head of the Agengr((- #"M- [sic] (Islamic Relief Organization (IIRO)), is identified as a Saudi named Muhamad Jammal ((Khalifah)).

Through Khalifa and the IIRO, Bin Laden ensured an instrumental role in the militant secessionist movement.

Another cable from 1994, from the Secretary- of State to American Embassy in Khartoum further solidified Khalifa's role as a terrorist:

FYI, Osama Bin Laden's brother-in-law, Muhammad Jamal Khalifah [sic], was arrested in California on 12/16. REFTEL refers to Khalifa as a "known financier of terrorist operations", and an officer of an Islamic NGO in the Philippines that is a known Hamas front. He is under indictment in Jordan in connection with a series of cinema bombings earlier this year.

According to reliable reports, western intelligence sources have traced IIRO money transfers to bank accounts in London. England and Amman. Jordan; which is then channeled through front groups to Palestinian Hamas-backed organizations in the West Bank and Gaza Strip. 17 Mohammed al-Zawahiri, brother of Dr. Avman al- Zawahiri who is one of Osama Bin Laden's top lieutenants, worked all over the world for the IIRO.1a Mohammed al-Zawahiri was sentenced to death in absentia in Egypt and is believed to lead the Jihad Organization's military wing.

As part of its international presence, the IIRO has a distinct but suspiciously compartmented presence in the United States. The organization epitomizes how current record keeping can make following the money flow of relief organizations and charities extremely difficult. By understanding how IIRO functions in the United States, we can better understand how to improve upon our current system of maintaining public records for these charities. Armed with more accurate records, a more effective. tight tourniquet can be made to stop the money flow supporting terrorism.

Within the United States, the IIRO works through two other differently-named organizations, the International Relief Organization (IRO) and the Success Foundation." All three organizations are in reality one and the same. According to corporate filings with the Virginia Secretary of State. the IRO is "doing business as" the "International Islamic Relief Organization.

Created shortly before the U.S. Embassy bombings in East Africa in 1998, the Success Foundation was a recipient of $15,000 from the IRO (according to IRO's Tax Form 990 filed with the IRS in 1998) that was earmarked for "educational expenses." Line item 80 in Success Foundation's Tax Form 990 for 2000 filed with the IRS lists the "International Relief Organization" as an organization to which it is related, though this information is lacking in IRO's parallel form.

With three incorporated institutions all co-existing together in the United States, this relief organization has the infrastructure ready to quickly shift funding from one to the other, as they have in the past. Thus, the money trail is extremely complicated and constantly in flux. IIRO does not limit this shifting of money to its trio of American NGOs. In 1996 through 1998, on the IRO's Income Tax Form 990, the relief organization listed among its itemized educational expenses a donation to the Holy Land Foundation for Relief and Development (HLFRD). In 1996 alone, IRO donated $21,980 to HLFRD. On December 4, 2001, the Holy Land Foundation's assets were ordered frozen, and it was branded a Specially Designated Global Terrorist [SDGT] Entity for funding the Hamas terrorist organization.

After the devastating attacks on September 11. 2001, intelligence scrambled to understand how the hijackers financed their operation. From basic issues such as housing, clothing, food, and transportation. to the logistics of the operation, including purchasing plane tickets, obtaining false identifications, and combat training, al-Qaeda necessarily provided funding. When President Bush's first Executive Order blocking terrorist property was issued on September 24, 2001, most of the world was shocked to note that charities were among the organizations whose assets were frozen and designated SDGTs. To fund this attack, al- Qaeda had to collect and disperse money, and they did so through various charities. Charities played a key role in the September 11'h attacks, and they will continue to raise money for terrorist activities unless forceful action is taken with both care and alacrity.

2.Charities Associated with the September 11, 2001 Terrorist Attacks

The next section will discuss two charities that have been primary in the post-September 11, 2001, investigation into the funding of al-Qaeda operations. The Wafa Humanitarian Organization was included as the first charity on President Bush's initial list of organizations and individuals designated as Specially Designated Global Terrorist Entities [SDGT] that was issued on September 24, 2001. This initial list was comprised of individuals and organizations alleged to have been complicit in the terrorist attacks of September 11, 2001. The Rabita Trust for the Rehabilitation of Stranded Pakistanis was designated as a SDGT on October 12, 2001.

The Wafa Humanitarian Organization

Funded from Saudi Arabiathe Wafa Humanitarian Organization was the first charity tied to terrorism to have its assets frozen post-September 11. One of the highest ranking officials captured in December in Afghanistan is Abdul Aziz, a Saudi who is also with the Wafa Humanitarian Organization." As reported in an Afghan Taliban radio report in June 2001, the Taliban's Minister of Public Works. Mowla wi Ahmadollah Moti, "met the head of the Wafa charity organization, esteemed Sheikh Abo Abdul Aziz Naqi" where "both sides discussed matters of mutual interest and repair of highways inside the country."

Wafa also worked closely with Pakistani nuclear scientists. The FBI contends that Wafa coordinated activities with Ummah Tameer-e- Nau,24 a charity and organization closely tied to alQaeda. Ummah Tameer-e-Nau's assets were

frozen on December 20, 2001, by the U.S. Treasury Department and designated a SDGT. Ummah Tameer-e- Nau was founded by Sultan Bashir-ud-Din Mehmood, one of the top Pakistani nuclear scientists. Mehmood worked for more than 30 years to develop Pakistan's nuclear capabilities, and ultimately, succeeded in building a nuclear bomb in 1998.' Along with Mehmood, Abdul Majeed served on Pakistan's Atomic Energy Commission until the two retired in 1999.

Ummah Tameer-e-Nau epitomizes an organization operating as a charity to remain clandestine. The charity was allowed to operated freely in Afghanistan, a privilege bestowed only to a small minority of NGOs. The Taliban went so far as to permit Ummah Tameer-e-Nau to make business deals on the Taliban's behalf Given Ummah Tameer-e-Nau's status as a charity. the world community ignored the group's involvement in Afghanistan and the Taliban. Ironically, while the world gave its tacit approval to Ummah Tameer-e-Nau, secret meetings were being held between Osama Bin Laden and the organization. Shortly after the September 11 attacks. Mehmood and Majeed were taken into custody by the Pakistani government for these meetings with Bin Laden but later freed. Both Mehmood and Majeed's assets were frozen by the U.S. Treasury Department on December 20, 2001, and both men were designated SDGTs.

Rabita Trust for the Rehabilitation of Stranded Pakistanis

The Rabita Trust, while ostensibly working in Pakistan, has its roots in Saudi Arabia. In July 1988. Pakistani President Zia ul- Had and Dr. Abdullah Omar Naseef,, the then-secretary-general of the World League (MWL), established the Rabita Trust for the repatriation and rehabilitation of stranded Pakistanis. 27 The Muslim World League (MWL) is an organization based in Mecca, Saudi Arabia, and is funded by wealthy Saudis. 28 Naseef also served as "one of the vice-presidents of Rabita Trust"29 and is currently the chairman of the foundation. 30 Effectively, the Rabita Trust is a subsidiary of the Muslim World League, and therefore an offshoot of a Saudi organization.

Operating under the guise of a charity. the Rabita Trust instead served to promote terrorism. According to a press release issued by the Department of the Treasury on October 12, 2001:

The Secretary-General of the Rabita Trust Wa'el Hamza Jalaidan, one of the founders of Al-Qaeda along with Osama bin Laden. Wa'el Julaidan is the logistics chief of Bin Laden's organization and fought on Bin Laden's side in Afghanistan.

Rabita Trust was designated a SDGT on October 12, 2001. by President Bush's Executive Order freezing the assets of terrorists and terrorist groups.

3.Qatar Charitable Society

Another charity engaged in the financing of al-Qaeda and other organizational terrorist operations is the Qatar Charitable Society (QCS). According to the Qatar Charity Society's website. its mission statement claims that:

QCS aims to offer relief and help to orphans, victims of war and disasters by supporting them financially. socially and culturally up to the age of 18. QCS aids widows to meet living expenses particularly those who lost all relatives and friends.

According to a WHOIS lookup of the Qatar Charitable Society's website, http://www.gsociety.org, Hashem Hussein is listed as both the Administrative and Billing Contact for the site. He lists the email address "hashimna, MMAA.GOV. QA;" indicating that Hashem Hussein works for the Qatari government. The MMAA is The Ministry of Municipal Affairs and Agriculture, and its website can be reached at http://www.mmaa.gov.ga.

In trial proceedings surrounding the prosecution of individuals associated with the conspiracy to bomb the U.S. Embassies in Kenya and Tanzania in 1998, another charity was mentioned as serving as a supporting organization for al-Qaeda. This organization was the Qatar Charitable Society. Jamal Ahmed Al- Fadl. a former member of al-Qaeda and a state witness at the trial, worked with the Qatar Charitable Society in 1993." When asked about his relationship with the group. Al-Fadl replied:

The guy, he runs a group, he is one of our membership, one of the al Qaeda group membership, and also he is Islamic National Front membership, and he was in Afghanistan. So he helped our people for the travel. documents, and also if some money come from the Gulf area to the organization, he gives the group some money from that money.

This leader is further identified as Dr. Abdullah Mohamed Yusef, a veterinarian whose role was elaborated more by Al-Fad] when he stated, "He helped the jihad Eritrea group, and also he give $20,000 for one of the attack outside of Sudan."

In his second day on the witness stand. A]-Fadl discusses a meeting in 1994 with the Qatar Charitable Organization referred to here as Jam Qatar Heira:

Q. Where was it?

A. In Jam Qatar Heira. It's Qatar organization [Society].

Is that the same organization you described yesterday or a different one?

Yes, same one.

Q. Is that the Qatar Charitable Organization (Society]J?

A. Yes.

Q. What happened at that meeting?

A. Dr. Munim al Khabir, he say some members in Islamic National Front. they believe they did their best to bring Saddiq al Mahdi to make relationship with him to start something, unite all the groups of Sudan to run the government, but Saddiq al Mahdi. he don't like that because we change the government during his time, and he say some people say if we kill him is better for Sudan., because Saddiq al Mahdi got relationship with other countries, and any time we find a chance. he told them, and he make them mad against the Islamic National Front in Sudan.

The Qatar Charitable Society provides another example of how the al-Qaeda terrorist organization has been able to infiltrate charitable organizations in order to provide funding for its terrorist ventures. The truth remains that this pattern of charitable organizations funding terrorism is a common denominator among terrorist groups.

b.Hamas Use of Charities

1.Holy Land Foundation for Relief and Development

On December 4, 2001. President Bush, froze the assets of the Holy Land Foundation for Relief and Development (HLFRD). While stating that HLFRD's money was used to support the Hamas terrorist organization, President Bush further stated. "Those who do business with terror will do no business with the United States or anywhere else the United States can reach.' ,36 HLFRD provides one of the best examples of how federal law enforcement could track the proterrorist activities of an organization while being unable to cease such operations.

HLFRD, from its incorporation in 1989 until the freezing of its assets in 2001, collected donations in the United States under the guise of a humanitarian and charitable organization. These funds would be wired to llamas charitable conduits within the West Bank and Gaza Strip which would then transfer these funds to varying Hamas efforts, including, but not limited to, suicide bombings and other terrorist exploits. As a 2001 FBI report states. "a significant portion of the funds raised by the [HLFRD] are clearly being used by the HAMAS organization.'" Hamas is currently a designated foreign terrorist organization-pursuant to powers bestowed upon the United States Department of State under the Antiterrorism and Effective Death Penalty Act of 1996.

According to the FBI's 2001 report, "In 1993 and 1994, the FBI monitored meetings of identified HAMAS leaders and senior representatives from the [HLFRD]. During these meetings. discussions were held regarding the need for HAMAS fund-raising in the United States. as well as the primary role of the [HLFRD] to serve this function." Meetings under surveillance by federal law enforcement included a 1993 meeting in Philadelphia of high- ranking members of llamas. HLFRD, and another related organization - the Islamic Association for Palestine (IAP). According to the FBI, "It was decided that most or almost all of the funds collected in the future should be directed to enhance the Islamic Resistance Movement [llamas] and to weaken the self- rule government [in Israel]."

This meeting stressed that the capabilities for fund-raising within the United States were amplified by the "democratic environment in the United States.'" As the FBI states in its report regarding this meeting. "The participants decided that for fund-raising purposes. the United States theater was very valuable to them. They stated they could not afford to lose it." In other words, as with other terrorist organizations raising funds within the United States, the ability to exploit the freedoms here was of paramount importance and relevance. Thus. Hamas terrorist operations could flourish through the assistance of monies received from the United States vis-avis HLFRD. Even so, HLFRD was not the only charitable organization utilized by Hamas for funding purposes during the past two decades.

2.Al-Agsa Educational Fund

In 1993, Abdelhalim al-Ashgar incorporated the al-Aqsa Educational Fund (AAEF), at the University of Mississippi, ostensibly to raise money for charities located in Gaza and the West Bank. Al-Agsa Educational Fund published an advertisement in the October 15, 1993 edition of the Islamic Association for Palestine/Hamas Arabic-language publication al-Zavtouna that shows the primary purpose of the fund:

[AAEF is a] non-profit charitable association acting for the education of the Palestinian with the following goals:

-Support association for education

-Support the deportees in Marj al-Zuhour [in 1992, Israel deported more than 400 members of both Hamas and the Palestinian Islamic Jihad to Lebanon where they remained in Marj al-Zuhour until international pressure forced Israel to accept these deportees bank into Israel]

-Provide the opportunity of education for our people's children

-Especially the children of the martyrs, the prisoners and the fosters

-And for students who can't complete. their studies because of financial reasons

AAEF is described as a Hamas-front in the FBI's 2001 report on the Holy Land Foundation (cited above). According to the FBI, in early 1994, the AAEF was in competition with HLFRD for Hamas fund- raising in the US. The conflict arose from Hamas Political Bureau head Mousa Abu Marzook's decision to choose HLFRD over the AAEF as Hamas' primary fund-raising entity in the US.

Abdelhalim al-Ashgar is a Palestinian who currently resides in Alexandria, Virginia, and has lived in the United States since 1989. The FBI Memorandum on HLFRD states that in 1992 the government of Israel notified the FBI that al-Ashgar was "a U.S.- based Hamas activist who was involved in transferring funds from the United States to Hamas in the West Bank and Gaza."39 Al- Ashgar was the organizer of the above-referenced Philadelphia meeting in 1993 in which high-ranking members of HLFRD and Hamas were involved.

After being called before a grand jury investigation exploring the activities of Hamas within the U.S., al-Ashgar refused to cooperate, and, on February 23, 1998, Judge Denise L. Cote found al-Ashgar in contempt, for which he was jailed. Al-Ashgar was subsequently released from prison, after it became clear that he would not change his mind about testifying. The April 2, 1998, edition of the Arabic-language newspaper al-Risala states that, at the time he was called before the grand jury to testify, al- Ashgar was a Research Associate at the United Association for Studies and Research (UASR), which was founded in 1989 by the head of the Hamas Political Bureau; Mousa Abu Marzook. Prior to moving to the United States, al-Ashgar had served as head of Public Relations at the Islamic University in Gaza for a period of about eight years. According to documents submitted in the Abu Marzook extradition proceedings, whose trial precipitated the grand jury investigation. this university was founded by, among others, Abu Marzook and Hamas founder Sheikh Ahmed Yassin (about whom UASR has written extensively).

The use of charitable organizations as fund-raising conduits for al-Qaeda and Hamas show how this tactic has been accepted by multiple terrorist organizations as a means of financing. Similar examples can be shown through charitable conduits set up by other such terrorist organizations as the Palestinian Islamic Jihad. Another means of fund-raising for terrorist organizations is through the use of corporate fronts through which terrorist activities are shielded or where corporate proceeds are used to support the various terrorist ventures.

II. Corporations/For-Profit Entities

Whereas charities and other similar non-profit entities provide excellent cover for terrorists, the usage of for-profit corporations and entities for funneling money to international terrorists has also been uncovered as a part of the support infrastructure. These for-profit bodies can alter their balance sheets and financial statements in order to hide the fact that profits from various commercial enterprises (including real estate deals, Internet ventures, and other seemingly innocuous business transactions) were used to finance terrorism worldwide. With this accounting mechanism in place. a corporate model allows terrorists to transfer money between branches around the world with little public or government scrutiny.

a. AI-Qaeda's Use of Corporate Enterprises

l. Darkazanli Import-Export Company

Darkazanli Import-Export Company (Darkazanli) was the first private business to have its assets frozen by President Bush due to suspected links with the September 11 attacks. The White House executive order published on September 25, 2001. describes this Hamburg-based company as a "front group" for al-Qaeda41 and its CEO, the Syrian-born businessman Mamoun Darkazanli, as one of Bin Laden's financial lieutenants. 42 In fact. Darkazanli offers a strategic paradigm for the manner in which a small, legitimate business with convenient European locations and inconspicuous business transactions., can be misused to launder money, purchase sensitive technical equipment, and facilitate the establishment - both in Europe and elsewhere - of business "front" groups for al- Qaeda.

Darkazanli has strong U.S. connections. The company's name surfaced during a 1997 FBI raid on the home of former Bin Laden personal secretary, U.S. citizen Wadih El-Hage.4' The raid produced a business card for "Anhar Trading Co.," listing El Hage as its director and giving two addresses for the company's location. The U.S. address coincides with El-Hage's home address in Arlington., Texas; whereas, the address in Germany - "Uhlenhorster Weg 34, 2000 Hamburg 76"44 - matches exactly the location and phone and fax numbers for Mamoun Darkazanli and Darkazanli Import-Export Company. In fact, during a 1993 business trip to Cyprus to purchase a ship for Bin Laden, Wadih El-Hage asked that all related business documents be sent to his business address in Germany, that is, the business address of Darkazanli.45 Therefore, al-Qaeda used Darkazanli both to facilitate and to legitimate its terrorism activities by camouflaging its existence and business location behind an active "front" company.

Darkazanli is also involved with a second Bin Laden financial operative. the Sudanese engineer Mamdouh Mahmud Salim.46 In Sudan, Salim once directed Wadi Aqiq, an umbrella company for Bin Laden, and was engaged in al-Qaeda military training. In the period between 1995 and 1998. Salim made frequent trips to Germany with the purpose of obtaining electronic equipment for Bin Laden's network4g. Washington officials also suspect that, during those trips, Salim tried to procure enriched uranium for al-Qaeda.49 On both occasions, Mamoun Darkazanli and Darkazanli Import-Export Company provided cover, business collaboration and facilitated communication for Bin Laden's financial chief and his transactions. For instance, in 1995, Mamoun Darkazanli co-signed with Mamdouh Salim a joint Deutsche Bank business account, over which, when Salim was away from Germany. Mamoun Darkazanli had the power of attorney Mamoun Darkazanli acted as Salem's host, translator, and business partner in Germany .5 In addition, the Darkazanli company's specialty in the import-export of electronic appliances, was a suitable cover for procuring technical equipment for al-Qaeda.

2.Barakaat Telecommunications / interweave

When corporations operating on behalf of al-Qaeda (or other terrorist organizations) desire to infiltrate a certain market or country, they often search for unwitting corporate accomplices within the particular market whose activities are respected and established. This was the situation that existed between Bracket Telecommunications and the U.S.-based Interweave corporation.

After the September 11 attacks, the U.S. government froze the assets of the huge Al Bracket conglomerate on November 7, 2001, and designated Al Bracket and its subsidiaries as Specially Designated Global Terrorist Entities (SDGT). A prominent subsidiary of Al Bracket is Bracket Telecommunications, renowned for its huge telecommunications market share in Somalia. Working throughout Somalia, the network of telecommunications offices was used to foster banking activity."

By controlling communications throughout Somalia, Bracket could ensure that terrorists received a means to communicate with each other, via the Internet or over secure telephones. Furthermore, since Somalia lacks any official currency, Bracket Telecommunications served to disperse funds around the world - usually through banks in the Gulf States. According to a United States Institute of Peace (USIP) report from October 1998, the banking division of Bracket Telecommunications handled about U.S. $500,000 a month in transfers.

Early in 2001, Bracket Telecommunications and Interweave. a California-based company, formed a synergy whereby Interweave was to be "a turnkey supplier of GSM [Global System for Mobile Telecommunications] network equipment and services to expand Bracket's existing GSM Network. ,54 In a press release, Interweave and Bracket Telecommunications celebrated their partnership, with Al Bracket Vice President and CTO of its Dub operations Abdullahi Hussein Kahie stating, "Since entering into a strategic relationship with Interweave two years ago and deploying an initial network for 10 service areas, Interweave has demonstrated that they not only have the robust product necessary for the task, but their product evolution is designed to get a greater number of networks up and running under capital expenditure budget restraints... InterWAVE's project management and support capabilities have served Bracket well and under the new political climate. we expect both ourselves and Interweave to benefit greatly from an exponential growth in business."

The fact that Bracket. a business working for al-Qaeda, could embark upon a business relationship with an American company without any governmental agency, let alone the corporation, knowing is testimony enough to the duplicity of terrorists. In this case, terrorists themselves were effectively working within the United States. earning money. and spending that money directly on the September 11 attacks. In terms of terrorist financing, a more frightening scenario can hardly be imagined. Yet, another equally frightening scenario exists where this corporate example replicates itself under the onus of other terrorist organizations.

b.Hamas Utilization of Corporate Funding

1.InfoCom Corporation

On September 5, 2001, agents from the Joint Terrorism Task Force operating out of Dallas. Texas, instituted a search warrant against InfoCom Corporation, an Internet service provider in Richardson, Texas, for its ties to the Hamas terrorist organization. The Office of Foreign Assets Control (OFAC) notified InfoCom that two of its bank accounts, totaling $70,000, had been frozen due to a lump-sum investment of $250,000 provided to InfoCom in 1993 by Nadia Elashi Marzook, the wife of Hamas leader Mousa Abu Marzook who is named by OFAC as a specially- designated terrorist for his leadership role in the Hamas terrorist organization. '6 As a by-product of the search instituted against InfoCom, the Bureau of Export Administration had suspended InfoCom's export privileges based on suspicions that InfoCom had violated U.S. export control laws by making shipments to Libya and Iran, two states listed as state sponsors of terrorism to which any export shipments are prohibited under U.S. law.

At the time of the search, subpoenas were served on two of InfoCom's clients, the Islamic Association for Palestine (IAP) and the Holy Land Foundation for Relief and Development (HLFRD). As previously discussed. HLFRD's assets were frozen by executive order on December 4, 2001. as a primary fund-raising entity for the Hamas terrorist organization. Furthermore, an INS document issued in August 2001 referred to IAP as "an organization which advocates the spreading of propaganda supporting HAMAS."'8

2.Quranic Literacy Institute

In June 1998. the United States Government instituted a civil forfeiture action against the assets of the Quranic Literacy Institute (QLI), a corporation based in Chicago, Illinois, and Mohammad Salah (who will be discussed later). The basis for this civil forfeiture, all action typically reserved for drug- smuggling and dealing operations, arose as a result of a federal investigation of transfers of money by both QLI and Salah in which the FBI concluded "there is probable cause to believe that some of these transfers and transmissions have been of money intended for use in support of domestic and international terrorist activities... [T]he illegal transfers have supported specific terrorist activities involving the extortion, kidnapping [sic] and murder of the citizens and government of the State of Israel...." "9 The focus here is the use of QLI as a corporate entity to launder funds for the Hamas terrorist organization. The interrelationship between QLI and Salah, who was arrested and served five years in prison in Israel for providing funds and instructions to Hamas military leaders in the West Bank and Gaza Strip. provides another example of how terrorist organizations have succeeded in providing funding from within the United States.

Bank records show that QLI President, Ahmad Zaki Hammad, gave Salah three checks for $6,000 each on three consecutive days in October, 1991. The checks were not drawn from QLI bank accounts, but rather came from Hammad's personal account.

On June 18. 1991, bank records show Salah received $40.00 in the form of five separate cashier's checks. The checks were obtained by Linda Abusharif, the sister of QLI treasurer Abraham Abusharif.

QLI's relationship with Salah helped him obtain a mortgage to purchase his house in Bridgeview, Illinois. QLI vouched to the lending bank that Salah was an employee of the organization, earning $36,000 a year. The FBI investigation found that Salah never was an employee of QLI as he and the organization claimed.

FBI investigators found evidence of a land deal conducted by QLI with the backing of a Saudi named Yassin Kadi whose assets have been frozen by President Bush since September 1 l. 2001, for his role in financing a number of al-Qaeda ventures. The FBI affidavit filed in conjunction with the civil forfeiture action stated that the intent of the deal was to raise money for Salah and others to distribute to Hamas. In short, the deal involved QLI using Kadi's money ($820.000 wired from Switzerland) to purchase a tract of land in Illinois with a company called "Golden Marble," run by Dr. Tamer AI-Rafai, a doctor and businessman. The idea apparently was to generate income by renting out the property, then sell it when a large infusion of cash was needed.

Though this case continues to be litigated in Illinois. it shows how federal law enforcement authorities have observed other means of fund-raising for terrorist causes.

c. Hizballah Money Laundering

Terrorism fund-raising and support has also been propagated under standard money laundering principles. Though this money laundering was not conducted under the auspices of corporate activities, the Lebanese Hizballah has managed to find support within the United States from individuals who are willing to supply to them technologically-advanced equipment that they could not otherwise procure. Multiple cases are currently being prosecuted in the United States: however. a singular snapshot is provided here to show how these activities were financed.

On July 21. 2000, agents from the Federal Bureau of Investigation (FBI) in Charlotte, North Carolina, arrested eleven individuals on charges of smuggling contraband cigarettes to Michigan from North Carolina and money-laundering. In a superseding indictment filed in the United States District Court for the Eastern District of North Carolina on March 28. 2001, four individuals were charged with providing "material support or resources to a foreign terrorist organization" in violation of 18 U.S.C. & 2339B. Specifically the individuals were charged with providing "currency, financial services, training., false documentation and identification, communications equipment, explosives, and other physical assets to Hizballah; in order to facilitate its violent attacks." According to the indictment, the members of the cell planned to acquire such items as night vision devices, global positioning systems, mine and metal detection equipment. stun guns. nitrogen cutters, laser range finders, and camera equipment.

The money-laundering scheme alleged by the Government was simple: the defendants would buy large amounts of cigarettes in the State of North Carolina where the price of cigarettes was extremely low. Then, they would transport these cigarettes to Michigan where the price of cigarettes was significantly higher. The Government alleged that the proceeds of the sale of the cigarettes in Michigan was used to finance the purchase of the above-mentioned items for the Hizballah terrorist organization.

In addition to the funds raised from the cigarette sales, these individuals also engaged in credit card fraud to facilitate their purchases. Five individuals were charged with obtaining a false drivers license which was used to submit fraudulent credit card applications. One individual used various aliases to obtain additional fraudulent credit cards. Said Mohamad Harb, also one of these five individuals, bribed an employee of First Union National Bank to reactivate a closed account of an individual who had left the U.S. to execute a check fraud scheme.

These examples illustrate how individuals have managed to exploit lax regulations pertaining to the issuance of identification in order to engage in credit card fraud and money laundering to finance and equip terrorist organizations abroad.

III. Couriers and Financial Institutions

In addition to the use of charities and for-profit corporate entities and ventures. terrorism fund-raising has also incorporated the use of banking and other financial institutions in addition to individual courier arrangements and the concept of hawala.

a. Al-Qaeda's Hawala transaction system

For terrorists, keeping their money trail as hidden as possible engenders a constant flow of monetary resources. As such, financial transactions, one of the most heavily documented activities in the United States, are a burden for terrorists trying to maintain anonymity. To overcome this obstacle, al-Qaeda members and other terrorists have relied upon the Hawala banking system.

A Hawala transaction involves the paperless movement of money. whereby one individual sends money to a target individual through a Hawala dealer. The Hawala dealer communicates with another Hawala dealer near the target individual and has that dealer give the money to the target individual. In the case of a Hawala. money is not sent or wired. Therefore, records of the transaction are kept to a minimum, and, if records are kept, they are often unclear since there is no standard for record-keeping of these transactions. More importantly, these transactions can occur at any time of the day or night. providing for the rapid transfer of money. All of these attributes make Hawala banking an asset to terrorists wishing to transfer money to each other.

Al Bracket, which as described earlier had its assets frozen and was designated a SDGT by the U.S. government, functioned as a Hawala, based out of Dub, United Arab Emirates. Al Bracket had branches all over the world in 40 countries, including multiple offices in the United States. The Al Bracket conglomerate extended to over 187 offices

around the world, with 60 of those being located in Somalia. 62 A1 Bracket was run by Ahmed Nur Ali 3im'Ale. reputed to have extensive ties to Osama Bin Laden by the U.S. government.

Al Bracket's extensive network facilitated the clandestine transfer of money with ease and rapidity. Such a tangled network creates huge obstacles in following the money flow between terrorists and the speed at which the money travels makes finding where the terrorists' finances are at any given moment a Herculean task.

b. Bank al-Taqwa

According to President Bush, al-Taqwa is "an association of offshore banks and financial management firms that have helped al- Qaeda shift money around the world." Al-Taqwa's connections to al- Qaeda led the Bush administration to freeze al-Taqwa's assets on November 7, 2001. During this announcement. President Bush also stated that al-Taqwa skims money from every transaction for the benefit of terrorist organizations and enables the proceeds of crime in one country to be transferred to pay for terrorist acts in another.

AI-Taqwa was founded by the Muslim Brotherhood in 1988 in the Bahamas and later in 1991 in Algeria, as the beginning of "establishing a world bank for fundamentalists" aimed to compete with Western financial institutions. Al-Taqwa reportedly has other branches in Liechtenstein, Italy, Malta, and Panama with its headquarters in Switzerland. As a world bank for fundamentalists, al-Taqwa was open to money laundering with a number terrorist organizations, most notably al-Qaeda and. in the past, Hamas.

Al-Taqwa enabled al-Qaeda's financial network to obscure its paper trail by transferring money from one al-Taqwa branch to another. French Intelligence officials claim that by 1999, the bank was channeling funds for Osama Bin Laden. A Swiss investigation that started in 2000 revealed that al-Taqwa transferred funds for Bin Laden from Kuwait and the United Arab Emirates to al-Taqwa's affiliates in Malta and then on to Switzerland and the Bahamas. This deceptive method of money laundering allows the source of al-Qaeda funds an additional layer of secrecy. In 2001, the Italian branch of al-Taqwa also came under investigation by authorities as a channeling house for Bin Laden's funds.

One reason for al-Taqwa's success in laundering terrorist money is its organization as an anomalous network of loosely connected financial institutions. The Swiss branch of Al-Taqwa Management changed its name in February 2001 to "Nada Management Organization," on the advice of Swiss banking authorities. Through this name change, the Swiss branch avoided any confusion with its parent group, "Taqwa," which is located in Panama . This allowed al-Taqwa to further obscure the connections between its branches. In some countries, al-Taqwa has exploited organizational structure loopholes to avoid money-laundering crimes. In Switzerland, the Swiss Federal Banking Commission certified that the al-Taqwa headquarters in Geneva is neither a bank nor a financial intermediary and, as such, is not subject to the country's money laundering control regulations.

Not surprisingly, al-Taqwa's support of terrorism goes beyond financial transactions. Ahmed Idris Nasreddin, a founder and director of al-Taqwa, personally financed al-Qaeda by utilizing the tax-exempt advantages of a charity. Nasreddin financially supported the Islamic Cultural Center of Milan, which the U.S. Treasury press release coinciding with President Bush's Executive Order freezing terrorists' assets on September 24. 2001. described as "the main al-Qaeda station house in Europe" that "'used to facilitate the movement of weapons, men and money across the world." P.F. Barchi, Nasreddin's lawyer, stated that Nasreddin made "charity" donations to the Islamic Cultural Center of Milan that paid for rent, electricity, heating and cleaning- bills.'

Dr. Yusuf Abdullah Al-Qaradawi is on al-Taqwa's Shari'ah Board and one of Taqwa's largest shareholders as of December 31, 1999. with over 5,000 shares. Al-Qaradawi resides in Qatar and is one of the most popular clerics in the Muslim Brotherhood movement. Statements by him in the past and present indicate his affinity toward the terrorist activities of such groups as Hamas. Islamic Jihad and others and his justification of these activities as integral components of the Islamic way of life. In an interview that appeared in the September 1999 edition of the Palestine Times with Qaradawi. he suggests that if one cannot actively participate in the armed struggle. then he or she should provide financial support such that the Mujahideen can fight on behalf of all Muslims.

Qaradawi blesses, "the martyrdom operations in which a given Muslim fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy... If we can't carry out acts of Jihad ourselves, we at least should support and prop up the Mujahideen financially and morally so that they will be steadfast until God's victory."

Qaradawi has also called for an "electronic jihad" and. just a few weeks before the attacks on September 11, he published a fatwa on his website, qaradawi.net. in which he praised suicide attacks, calling them "the highest form of jihad."

c. Hamas' Al-Aqsa Bank, Beit al-Mal, and Joint Ventures with Citibank

The Al-Agsa Bank and Beit al-Mal are both examples of terrorist organizations using financial institutions to launder money. and of a funding front integrating a legitimate business into its network. After $30 million disappeared from its accounts with the designated terrorist group al-Taqwa Bank, the "world bank for fundamentalists." Hamas established Al-Agsa Islamic Bank in 1997.4

Mohammed Sarsour; a U.S. citizen and former Vice-President of Bir Zeit University, is both Deputy General of Al-Agsa Islamic Bank and General Manager of Beit al-Mal Holdings. 75, Beit al-Mal Holdings is part owner of Al-Agsa Islamic Bank, with a $4,000,000 capital investment. Both are part owners of Sinokrot Global Group, founded by mutual board member Mazen Sinokrot. Essentially. these three financial groups - Beit al-Mal, Al-Agsa, and Sinokrot Global - share founders. board members, and funds, and cooperatively act as a buffer between Hamas and its donors.

However, due to their money laundering operations, Israel banned both Beit al-Mays and Al-Aqsa's operations.78 The United States, also, has frozen both companies' assets. President Bush referred to banning the banks as "freezing the assets of Hamas."

In order to bypass Israeli restrictions and make its funds accessible to Hamas operatives in Israel and the territories, Al- Agsa embarked on joint projects with Citigroup, intertwining itself with Citibank's Israel division. Soon. al-Aqsa and Citibank shared a single database for Israel. Money deposited into Al-Agsa accounts in Europe or other parts of the Middle East became accessible from Israel through Citibank chapters.

When Citibank was opening an office in Tel Aviv in January 2001, Israeli authorities; formally questioned its ties to Al-Agsa, prompting Citigroup to request advice from the U.S. Treasury Department. 81 Citigroup has not released any information on the Treasury Department's response, but has since severed its ties to Al-Agsa. Israeli counterterrorism authorities estimate that over $1,000,000 has been deposited into al-Agsa accounts for Hamas since its affiliation with Citibank. 12 At least some of this money reached Hamas through Citibank."

d. Hamas' Use of Couriers

Similar to the hawala banking system described above, the Hamas terrorist organization has utilized a system of money couriers to transport funds from the United States to Hamas military leaders in the West Bank and Gaza Strip. The most famous example of this type of activity was the arrest in Israel of Mohammad Salah, a Chicago resident, for carrying funds from Hamas leader Mousa Abu Marzook to Hamas military leaders in January 1993. Released from Israeli prison in 1997, Salah returned to Chicago, and, in June 1998., the U.S. Government instituted a civil forfeiture action against his assets based on his alleged involvement in money laundering for terrorism. In the FBI affidavit supporting the civil forfeiture, FBI Special Agent Robert Wright detailed cash transfers from Salah to Hamas military leaders that were offset by complementary deposits by Hamas leader Marzook into Salah's U.S. bank account.

In addition to Salah, a Milwaukee family has also been implicated in carrying money from the United States to Hamas leaders in Israel and the Occupied Territories. According to the FBI report detailing the activities of the Holy-Land Foundation for Relief and Development (HLFRD), the following was written regarding the Sarsour family:

Jamil Sarsour confession: On October 23, 1998. Sarsour was arrested by the [Government of Israel] for his involvement with the HAMAS terrorist organization, specifically, for providing financial and other assistance to HAMAS fugitive and military activist, Adel Awadallah. At the time of his arrest. Sarsour was carrying $66.30.00. a personal telephone book and two American passports. Sarsour was interviewed and provided information concerning his and his brother, Salah's activities in support of HAMAS over the last several years.

During the course of his interview, Sarsour described his brother Salah Sarsour's involvement with HAMAS and fund-raising activities by the [Holy Land Foundation] ... on behalf of HAMAS. Sarsour stated that ... hls brothers Salah and Imad are involved in raising money in the name of the [Holy Land Foundation] that is actually for HAMAS.

Sarsour's family name was mentioned in statements by Mohammed Salah after his arrest and conviction in Israel. In his interrogation. Salah stated that the Sarsour family provided a means for sending money to Hamas activists in the West Bank and Gaza. According to a translation of his statements, Salah stated, "The Sarsour family is famous in America." Furthermore., Mohammad Sarsour, another member of the family, is the Deputy General of Al-Aqsa Islamic Bank and General Manager of Beit al-Mal Holdings, two organizations mentioned above whose assets have been ordered frozen by President Bush for their support of the Hamas terrorist organization.

IV. Terrorism Fundraising on the Internet

Another developing area where terrorists have found success in their fundraising efforts is through the medium of the Internet. Contrary to the popular belief that terrorist organizations are comprised of unsophisticated ruffians, the use of the Internet as a fundraising tool is indicative of the savvy of these organizations and their technological capabilities.

a. Al-Rashid Trust

On September 24. 2001, President Bush signed an executive order freezing the assets of the Pakistani-based Al-Rashid Trust. On October 31. 2001, Attorney General John Ashcroft requested that the State Department designate Al-Rashid and several other groups named in the executive order as "foreign terrorist organizations." Originally founded as a genuine charity in the 1980s, Al-Rashid Trust was co-opted by radical Islamists to channel funds to the Afghan mujahideen. When the Taliban took control of Afghanistan. Al-Rashid became the unofficial donor- line to aid Mullah Mohammed Omar, the Taliban's leader. In 1999, one of Al-Rashid's websites made an ominous prediction:

"With the imposition of American sanctions upon Afghanistan, an undeclared cold was has begun between [the infidels] and Islam. In the near future conditions will deteriorate further for that Islamic country because America in its frustration will resort to further pressure-tactics and machinations, and if the proud Muslims of Afghanistan continue their firm stand (as it is hoped they will) then in all probability a fierce war will break out. In such conditions honor and prudence demand that the Muslims make timely preparations.

Despite the harshness of its anti-American rhetoric. Al-Rashid has until recently been able to openly advertise its presence on the Internet and solicit funds from website visitors. On the former website of "Voice of the Taliban" ( http://w-ww.dharb-i- mumin.com). guests were greeted with a sleek pop-up appeal to donate to Al-Rashid. The appeal was directed particularly at Taliban supporters in Great Britain and the U.S., listing two wire account numbers in Pakistan - one for dollars and one for pounds-sterling. Visitors were urged to "help your Afghan brothers whole-heartedly." Like many of these radical fundraising messages, this website was being hosted on a commercial Internet provider that is, in fact, based in the United States.

b. Global Jihad Fund (GJF)

Following the U.S. missile attacks against Afghanistan and the Sudan in August 1998, a British Muslim named Mohammed Sohail announced on Internet public newsgroups that "the global alliance of democracy, sodomy and international-law (unholy trinity) has attacked the bases of Sheikh Mujahid Osama bin Laden... we Muslims must support the Sheikh against the crusader-zionist world government (new world whoreder)." Sohail finished his message by quoting the Prophet Mohammed: "Perform jihad against the disbelievers. with your wealth, yourselves and your tongues."

After being confronted by reporters for the British Sunday Telegraph about his statements. Sohail admitted being connected with a London-based organization known as the "Global Jihad Fund." He explained: "I work as a volunteer helping with things such as fundraising and recruitment for organizations involved in Jihad."" He then went further and affirmed. "I work for two people. really. Mr. Massari and Osama Bin Laden.

Visitors to the Global Jihad Fund (GJF) website86 are shown a monograph of several flags" including those of the U.S., U.K., France, and Israel. Superimposed over this image is an Arabic phrase, commanding faithful Muslims to "kill them all until there will be no more struggle and the word of Allah will be the only one." The site continues by explaining. "the main aim... of Global Jihad Fund is to facilitate the Growth of various Jihad Movements around the World by supplying them with sufficient Funds to purchase Weapons and train their Individuals." In August 1998, Mohammed Sohail confirmed in another Internet newsgroup posting that "GJF supports Sheikh Mujahid Osama bin Laden."

On the GJF website. there are a number of articles dealing with the subject of jihad. Among the most shocking is an alleged interview with a Pakistani child who claimed to have been to Afghanistan on several occasions "to wage jihad." In addition to expressing his enjoyment at helping to kill the enemy, the young man explained that his future goal was to give the United States "a good beating."

The Global Jihad Fund maintained a relatively sophisticated fundraising network in London for the purpose of aiding international Islamic "holy warriors" in such places as Bosnia. Afghanistan, Kashmir, Kosovo, and Chechnya. The group encouraged Muslims outside of London to "Start a Jihad Support Network in your city... don't be afraid of [the tyranny of the infidels]." Its website still offers "jihad military training"" in several undisclosed locations. The Sunday Telegraph investigation also revealed that, as a result, "dozens of volunteers are being drilled in the use of guns and explosives," allegedly "to prepare them for the military wing of [alQaeda]."87 When e-mailed in early 2000. the

coordinators of the military training confirmed that, indeed, they were recruiting international volunteers, including from the United States.

In fact, even U.S.-based Islamic radicals have established websites to support the jihadist network of Osama Bin Laden. One Muslim-American claiming to be from Las Cruces. New Mexico established "The Road to Jihad"" website. For almost two years prior to the events of September 11, the introductory page to the website featured a large graphic of the New York city skyline, with the American and Israeli flags burning above it. The site went on to offer audio and video of Osama Bin Laden and other famous Arab-Afghans, bank account numbers for donations to the Taliban and Laskhar-e-Taiba. and pages of practical and ideological advice for budding jihadists. On August 22. 2001. the author of jihadroad.com wrote in an e-mail that he had just returned from Afghanistan where he had sought "training and to perform jihad."' He reported that the Taliban were stockpiling large numbers of "brand new weapons (heavey[sic], med, and light) and be used only in the jihad to open palestine." When asked about Osama Bin Laden, he explained:

"I saw l 00s of youth getting harsh training in remote camps all have one in mind to open land [and] liberate palestine... Shaikh osama is the most humble kind sincere faithful simple hundsom[sic] person u can ever meet... 1 advise a to migrate there and join the state."89

Though "The Road to Jihad" is no longer online, there is no indication that any official action has been taken against its former Webmaster.

c. Hamas' 101 Days Campaign

In the 101 Days charity campaign. the terrorist movement Hamas has managed to combine both the requirements of political propaganda and the endeavors of terrorism financing. Launched and advertised through the official Hamas website ( http://ww",.palestine-info.net), 101 Days unites the resources and efforts of a number of legal and illegal Islamic charities. The purported goal is to assist "our Palestinian brothers and sisters in support of their steadfastness" against "the illegitimate occupation of Palestine." Yet, this charitable fundraising campaign is an excellent case-in-point of how terrorist movements use the internet and modern technologies to raise money and recruit supporters.

The 101 Days logo is featured by the Hamas official website in Arabic. If an Internet viewer clicks on it, the logo transports him or her to the comprehensive 101 Days Campaign site, run by the United Kingdom-based charity Interpal, or the Palestinian Relief and Development Fund. According to both the Israeli government and FBI reports, Interpal belongs to the Hamas organization. Following the September 11 attacks and the U.S.- launched war on terrorism, the 101 Days website was updated to reflect the new political developments. When an Internet viewer decides to donate on-line and goes to the United States section of the 101 Days website, the names of both the Holy Land Foundation for Relief and Development (HLFRD) and the Global Relief Foundation (GRF) appear. Yet. these charities are not listed among the official organizations participating in the fundraising effort. In December 2001; the Bush administration froze the assets of both of these organizations. The Internet site for the 101 Days campaign thus provides an ingenuous way to both unite the efforts of various charity organizations and to dissemble their direct participation.

V.A Case Study: The Embassy Bombing

In a presage of the September 11 attacks, the 1998 U.S. Embassy bombings in Nairobi, Kenya, and Dar Es Salaam. Tanzania, exemplified al-Qaeda's efficient and simultaneous use of corporations, charities, and financial systems to cause mass destruction to both people and property. In a multiyear project, al-Qaeda members created a profitable fishing company, established a working charity and commandeered another, and disseminated funding to the terrorists through a Hawala bank. Most of these organizations were fully operational, and all remained undetected, while providing material support for the terrorists. For the terrorists, the fishing company provided money to live on, the charities supplied weapons and explosives, and the Hawala bank injected funding from al-Qaeda members outside the operation. In an ironic harmony, the organizations aided the terrorists with all the support they needed until havoc ensued on August 7, 1998, when two emb assies were destroyed and 224 people were killed.

a. The use of corporations

1.Al-Qaeda fishing company

Another convicted conspirator in the embassy bombing attack. Mohammed Sadiq Odeh. established a fishing business in Mombassa, Kenya. Though Odeh claims to be merely a commercial entrepreneur, the facts speak otherwise. Kenyan fishing inspector Kibarua Mjitta, a government witness in the recent Embassy- Bombing trial in New York, testified that Odeh's business activities were quite suspicious-- he typically unloaded his catch at night, after inspectors

had already gone home: "The department was missing information. statistics from Mr. Odeh."91 Odeh refused to hire any locals to help him, bringing in any necessary manpower exclusively from the al-Qaeda cell in Nairobi.

In fact. Odeh was using his business enterprise as fronts for al- Qaeda activities and means to provide the cash for terrorist operations. Odeh used the fishing company's boat to flee Nairobi the night before the bombings. FBI Agent Abigail Perkins, testifying based on interviews she had with Khalfan Khamis Mohamed, convicted and sentenced to life in jail for his role in the bombing, described another purpose for which Odeh's fishing 'boat was utilized:

Q. And did Khalfan Khamis Mohamed indicate to you if the boat was used for any purpose other than fishing?

A. He did.

Q. What was that?

A. He said it was also used for jihad.

FBI Agent John Michael Anticev, in an exchange with Odeh's attorney Anthony Ricco, affirmed based on interviews he had with Odeh that Abu Hafs, the military commander of alQaeda recently killed in Afghanistan, gave the boat to Odeh:

Q. First he told you that there was a fishing business.

A. Yes.

Q. And the fishing business came from a boat that he got from Abu Hafs, right?

A. Yes.

Q. And the boat was from Al Oaeda. Right?

A. Yes.

Q. And he said that the boat provided income for other members of Al Qaeda who were in the area. 93

This independent business structure is a particularly troubling development because it heralds the likelihood of terrorist cells operating independently from any foreign financial benefactor, raising the lionshare of their assets from otherwise legitimate. non-descript commercial entities.

2.Anhar Trading and Ties to the United States

Osama Bin Laden's former personal secretary, Wadih El-Hage. was a key figure in the 1998 terrorist attack. Despite being scrutinized by U.S. intelligence, El-Hage used his American passport to guarantee freedom of movement. He traveled across Africa and Europe to search for foreign business partners to team up with al-Qaeda front companies based in Kenya. Sudan, and elsewhere. He engaged in enterprises as diverse as leather, gemstones, and even ostriches, channeling profits from these ventures through a variety of international financial institutions, including several Cypriot branches of large U.S. banks. When FBI agents searched El-Hage's home, they found business cards for one of El-Hage's dummy corporations, '"Anhar Trading." The German address on the card was, in fact, the Hamburg home of key Bin Laden financier Mamoun Darkazanli.

b. The use of charities

1.Mercy International Relief Agency (MIRA)

Wadih El-Hage was active in another typical al-Qaeda front activity: religious charity groups. The thin veneer of legitimacy associated with these charity groups was critical in preventing detection of the planned terrorist operations. A religious charity to play a major role in the tenor attacks in East Africa was Mercy International. Al Qaeda operatives used the offices of Mercy in Nairobi as a critical communications and planning point. Abdullah Mohammed, an alleged Kenya embassy bomber, carried eight boxes of El-Hage's personal effects to Mercy's office. The items, seized later by the FBI, included false documents, letters, faxes, and passports.

Patrick Fitzgerald, Assistant U.S. Attorney General, referring to documents seized at Mercy International's office, affirmed the charity's hidden role as a front for al-Qaeda:

The enterprise charged in the document is with using nongovernment organizations as a front ... It is an office where documents were seized. These documents show that Mercy International, while it does have legitimate charitable purpose, has other purposes that are contrary to that.

Moreover, documents that were seized show clearly the charity's involvement in smuggling weapons into Kenya, as Patrick Fitzgerald indicated:

Receipt dated July 24, 1998, and on the back it said getting weapons from Somalia.

2."Help Africa People":

In Kenya, El-Hage registered "Help Africa People," a humanitarian group supposedly aiding indigent Africans with money raised from the U.S. and Germany. In fact, "Help Africa People" did little more than provide jobs and a cover to shield El-Hage and other conspirators from official scrutiny while they plotted to strike against America. Shockingly, registry papers for Help Africa People contained the name Moataz al-Hallak, a U.S.-based Islamic cleric who has already been linked to the purchase of a jet aircraft for use by Bin Laden. Though questioned by lawn enforcement on several occasions, al-Hallak remains in Maryland free of any prosecution.

c. Moving Money - Dahab Shil

Dahab Shil, a Hawala bank that functions much like Al Bracket, should have forewarned us of the dangers that became all too apparent on September 11. Based in Somalia.

Dahab Shil has at least 87 branches worldwide, including offices in Canada., New Zealand, Australia, with approximately 10 branches in the United States.

Dahab Shil"s infrastructure provided unquestioning support for the al-Qaeda member, Mohamed al-Owhali, who was eventually convicted in the bombing of the U.S. Embassies in Africa. Four days after he drove the truck-bomb to the U.S. Embassy in Nairobi, al-Owhali was transferred $1,000 from an al-Qaeda member in Yemen.

VI. Recommendations/Modification of Current System

As investigators and law enforcement personnel attempt to assess the infiltration of terrorist groups and funding within mainstream America, there is a growing understanding that terrorist funding has been distributed through seemingly "legitimate" conduits. A new approach must be taken in order to prevent future funding of such groups. One area that needs to be examined is the IRS 990 Return of Organization Exempt from Income Tax form. These forms do not provide or require enough information from groups requesting 501(c)(3), tax-exempt status. There are certain groups that have made attempts to falsify their intentions in order to gain such status. thus enabling them to function in a "legitimate" manner and at times move money to terrorist groups and affiliates in a seemingly lawful method. In order to better assess the validity of their charitable pursuits, these forms must require more essential information from the submitting organization in order to better determine activities and affiliations of the group, as well as specific details of monetary distributions. Specific examples of indiscretions of such groups will be cited in order to give a better understanding of the manipulation of tax-exempt status.

Necessary Modifications to 990 Forms

Tighter regulations need to be created in order to gain a better understanding of who the board of directors of these organizations are and what other groups they are affiliated with. A standard needs to be set-much like that in the ?001 US PATRIOT Act-where members of board of directors are mandated to provide legal names with matching address. phone and social security numbers, as well as other boards that they serve upon. These stricter recommendations will help provide authorities with a greater understanding of the board members and their affiliations with other groups. For example. Abdurahman Alamoudi, who has voiced his support of the terrorist groups Hamas and Hizballah, serves on the Board of Directors of Success Foundation, Inc.. an offshoot of the International Islamic Relief Organization (IIRO), a Saudibased charity whose charities have been used to provide money for al-Qaeda and Hamas terrorist activities. Upon further examination of the ?000 success Foundation, Inc. annual IRS 990 form, one would find that the group provided funding to Human Appeal International, an Islamic charity based overseas. In a report submitted by the FBI on November 5, 2001. Human Appeal International was described as being closely connected to Hamas. In addition. Human Appeal received large amounts of funding from the HLFRD.:

"FBI investigation has revealed a close relationship among the HLFRDRD, HAMAS and HAI. FBI investigation has determined that the HLFRDRD provides significant funding to HAI, which benefits the HAMAS agenda."

In that same year. Success Foundation also provided funding to Ismail Elbarassee, a key US-based Hamas leader, for Inmate Services. Elbarrasse held a joint bank account with Hamas Political Leader Musa Abu Marzook, prior to Marzook's deportation to Jordan in 1997, from which money was transferred to Muhammad Salah in Chicago. According to the FBI report released on November 5. "SDT Muhammad Salah stated that he was directed by Marzook to receive funds from Elbarasse to be used for funding HAMAS military operations."

Careful inspection of 990 forms will show that there has not been enough evaluation regarding the groups that are said to receive funds from the charitable organization. There is not enough emphasis on trying to determine how funds have been distributed and to whom. For example: in the 1999 990 form for LIFE for Relief and Development, formerly known as International Relief Association, Inc., the group offers vague descriptions of money allocated from its $9,183,936 earnings. Under Part III, Statement of Program Service Accomplishments, they offer vague explanations for money allocations. $443.538 was given for "Disaster relief; food and shelter provided in Turkey and other Asian countries." $7,174,820, a majority of the group's earnings. was spent under the description "Food, shelter and medical supplies were distributed in Iraq and Kurdistan with the help of other NGOs." These are just two examples from one particular group although there are many other organizations that could be used as illustrations of this problem.

Immediately many questions come to mind when examining these descriptions: what particular organizations and individuals received these grants? What was actually provided under the auspices of "disaster relief, food, and shelter?" What NGOs assisted in the distribution of goods? What other countries received assistance? Is there a way to be sure that the funds actually reached said groups? Are these groups considered legitimate organizations by their native lands? In order to assess these issues, organizations need to prove that they are providing funds for legitimate organizations and that these allocations are actually going to the designated recipients.

**LOAD-DATE:** February 14, 2002

120SG5

********** Print Completed **********

Time of Request: April 20, 2005 11:45 AM EDT

Print Number: 1862:41356494
Number of Lines: 651
Number of Pages:

Send To: WTCELLIOTT, COZEN
COZEN & O'CONNOR
1900 MARKET ST
PHILADELPHIA, PA 19103-3527