

# Al Qaeda Finances and Funding to Affiliated Groups

*Strategic Insights*, Volume IV, Issue 1 (January 2005)

by Victor Comras

*Strategic Insights* is a monthly electronic journal produced by the Center for Contemporary Conflict at the Naval Postgraduate School in Monterey, California. The views expressed here are those of the author(s) and do not necessarily represent the views of NPS, the Department of Defense, or the U.S. Government.

For a PDF version of this article, click here.

This paper provides a case study of al Qaeda finances and funding to affiliated groups. It is based in large part on my observations and experience as one of five international monitors charged by the UN Security Council to oversee the effectiveness of the measures adopted by the Security Council against al Qaeda and the Taliban. Some of the material in this paper is drawn directly from the five reports our monitoring group made to the Security Council during my tenure..

Considerable mystery and intrigue still surrounds the al Qaeda terrorist network and its sources of funding. We know more today than we did three years ago about its financial tools and structure, but we still have not identified much of its sources of supply and funding. And much of what we know may only be conjecture. The CIA has estimated, for example, that it cost Al Qaeda' some $30 million a year to sustain itself during the period preceding 9/11, but the agency is still not sure what al Qaeda needs or expends today. And we still do not know with any precision just how much, and from whom, al Qaeda raises its money, or how it allocates it.[1]

The roots of al Qaeda's financial network, we believe, trace back directly to the extensive recruitment and financing networks established to support anti-Soviet jihad activities in Afghanistan. These networks made extensive use of Muslim charitable organizations and businesses around the world. As al Qaeda developed and transformed itself into an international terrorist movement, it established or infiltrated a series of international Muslim charities that could be use to collect and mask the funds it needed. These funds were used by these charities for both legitimate humanitarian relief and to support al Qaeda activities. This included supporting the establishment and maintenance of new radical Islamic centers propagating al Qaeda's virulent theology and opposition to western culture and values. These centers also provided a means by which al Qaeda could undertake extensive, worldwide indoctrination and recruitment efforts. They also helped to raise, and encouraged donations for al Qaeda's cause.

We know also that Al Qaeda relied heavily on sympathetic financial facilitators within these businesses and charities, and other deep pocket donors, to obtain and channel the funds necessary to meet its logistical and operational requirements. The 9/11 commission report concluded that a core group of these financial facilitators were responsible for most of its funding. These facilitators obtained funds from a variety of donors, primarily in the Gulf countries and particularly in Saudi Arabia. "Some individual donors surely knew," the commission report says, "…the ultimate destination of their donations. …These financial facilitators also appeared to rely

heavily on certain imams at mosques who diverted zakat donations to the facilitators and encouraged support of radical causes."[2]

There is considerable less certainty with regard to other possible sources of al Qaeda funding. The 9/11 commission said that it had received no credible evidence to substantiate allegations that bin Ladin used his own funds, or that al Qaeda was funded by foreign governments, or that it ran its own businesses, or that it dealt in conflict diamonds or that it profited from the international drug trade.[3] However, many other international experts and observers believe that al Qaeda has drawn on such multiple sources.[4] The 9/11 Commission itself, has admitted that the lack of credible evidence regarding such activities might be due to a continuing lack of hard intelligence regarding al Qaeda finances.[5] Many experts continue to believe, as I do, that al Qaeda and its disparate cells will use whatever means are at hand to generate the funds they need.

The defeat of the Taliban regime in Afghanistan and the elimination of al Qaeda's bases and safe haven there have caused al Qaeda to splinter into scores of independent cells increasingly responsible for their own funding and maintenance. There are increasing indications that these groups have turned to small local businesses, petty crime and the drug trade to sustain themselves.[6]

Several Experts, including those associated with the 9/11 Commission, believe that al Qaeda is now having a difficult time raising funds and that it has had to cut back significantly on its expenditures.[7] This presumption is based, in large part on the success the United States and certain other governments have had in identifying and closing down al Qaeda's traditional resource base. However, there is some reason to question these assumptions. The pace of terrorist recruitment and activities has accelerated, not decreased, and the growth of self sustaining local al Qaeda cells is also increasing. There are reports also of large sums of money flowing into the hands of Iraqi insurgents, including Abu Musab al-Zarqawi, from Saudi Arabia and other Muslim states.[8] New training camps are being established in several remote areas in the Middle East, Southeast Asia, Africa and several countries of the former Soviet Union.[9] There are also indications that the pace of funds being providing to radical fundamentalist teaching centers around the world has remained constant, or even increased.[10]

Much of the investigation and research related to al Qaeda has dealt with its funding mechanisms and not with the motivation that has generated the donations and dedication that has supported it. A good part of this dedication comes from radical Islamic conviction and an associated absence of tolerance towards other ethnical or religious customs or beliefs. This stems, in part, from a radical expansion of fundamentalist Islam during the past four decades. It may be generated, in part, also by a growing resentment and alienation toward Western cultural influence in the Muslim world. The Stagnant Israeli-Palestinian situation and the war in Iraq have also served as motivations for recruitment and support of a new generation of al Qaeda related jihadists.

## Al Qaeda's Financial Facilitators

The 9/11 Commission pointed to a core number of financial facilitators involved in raising, moving and storing the money al Qaeda needs for its maintenance, logistic and operational requirements. They raised funds from donors primarily in the Gulf region, but also from countries round the world. They used bogus and legitimate charities, shell companies and legitimate businesses as covers. They also enabled al Qaeda to develop a substantial financial network in Southeast Asia, as well as funding sources in Europe, Africa and Asia..

Several of these financial facilitators have been captured or identified, while many continue to remain anonymous. Some have been designated by the U.S. Treasury and the United Nations Al Qaeda and Taliban Sanctions Committee. Their assets are subject to freezing orders in many countries, yet many remain at large and continue their financial and business operations.

The capture of Sheikh Saiid al-Masri, Abdul Rahim Riyadh and Khalid Sheikh Mohammed, among other top al Qaeda officials, dealt a serious blow to al Qaeda's financial network. They reportedly provided names and information that have led to the identification of other facilitators and funding sources. Credible information and leads have also been obtained from past al Qaeda financial operatives such as Omar al-Faruq [11] and Jamal Ahmed Al-Fadl[12], who broke with al Qaeda in the mid 1990s. But, knowing the names of al Qaeda financial facilitators has not been enough to put them out of business. There is also some indication that al Qaeda has been able to replace them almost on a one to one basis, with persons or organizations still unknown. By some accounts al Qaeda funding is again on the increase.[13]

Saudi Arabia has come in for heavy criticism for allowing certain identified al Qaeda financiers, such as Osama bin Ladin's brother-in-law, Mohammed Jamal Khalifa, and Wael Hamza Julaidan, both of whom were very active in raising funds for al Qaeda, to continue to conduct business affairs in Saudi Arabia.[14] Similarly, Youssef Nada and Idris Nasreddin, who were designated as Al Qaeda financiers by the by the U.S. Treasury Department and the United Nations, continue able to manipulate their assets from their headquarters in Campione d'Italia and Rabat, Morocco.[15] While Saudi Millionaire Yassin Al-Qadi has been indicted in the United States for funding al Qaeda through his Muwafaq charity, he continues to run his business empire from Switzerland and Saudi Arabia.[16]

## Charities

Al Qaeda's reliance on charities to raise, mask, transfer and distribute the funds it needs, has been put under close scrutiny by counter-intelligence and enforcement agencies around the world. They have put together a composite sketch of the activities of more than 50 international and local charities. Many of these charities are, or were associated with some of the major Islamic umbrella organizations headquartered in Saudi Arabia, including, but certainly not limited to, the International Islamic Relief Organization (IIRO), the Benevolence International Foundation, the al Haramian Islamic Foundation, Blessed Relief (Muwafaq) Foundation, and the Rabita Trust. These organizations have branches worldwide and are, or were, engaged in activities related to religious, educational, social and humanitarian programs. But we now know that they were also used, knowingly or unwittingly, to assist in financing Al-Qaeda.

Charity forms a very important part of Muslim law and tradition. There is a recognized religious duty in the Muslim world to provide a set portion of ones earnings or assets for religious or charitable purposes (Zakat), and otherwise to support charitable works through voluntary deeds or contributions (Sadaqah). In countries like Saudi Arabia or the United Arab Emirates that have no established income tax system, the Zakat substitutes as the principal source of funding for religious, social and humanitarian organizations and activities. The funds are collected by the Government, or though local mosques and religious centers. Sadaqah contributions are also made directly to established Islamic charities. As both Zakat and Sadaqah are viewed as personal religious responsibilities there has traditionally been little or no government oversight of these activities. Donations in large measure remain anonymous.

Al Qaeda has taken full advantage of this lack of oversight to open its own front charities and to solicit funds through collection boxes at mosques and Islamic centers. It has also placed operatives in key positions within established charities that are able to do its bidding. Funds raised or allocated by or for al Qaeda are co-mingled, maintained and transferred with funds designated for legitimate relief and developmental activities. Their ultimate use to support al Qaeda activities can only become known when the moneys are transferred or diverted to al Qaeda-related recipients.

In 1962 the Saudi Royal family established the Muslim World League in Mecca and provided it funds to support the propagation of Wahhabi Islam. The Muslim World League undertook a series

of activities to fund institutions outside of Saudi Arabia, especially in Afghanistan, Pakistan, Southeast Asia and the Middle East. The organization also became active in Europe, including countries of the former Soviet Union and North America. Saudi public and private support for these activities has been estimated at over $75 billion during the last four decades.[17] Many experts have drawn a link between this conversion effort and the rise in appeal of al Qaeda throughout the Muslim world. The line from Wahhabism to Jihadism is a very thin one, and easily crossed religiously and intellectually.

The International Islamic Relief Organization is another Wahhabi sponsored charity. Established in 1978, it has branch offices throughout the world, including 36 in Africa, 24 in Asia, 10 in Europe and 10 in Latin America, the Caribbean and North America. The bulk of its financial contributions come from private donations in Saudi Arabia. This includes a long standing endowment fund (Sanabil al-Khair) established to generate a stable income to finance its various activities. The IIRO continues to be closely associated to the Muslim World League with which it participates in many joint activities. Many prominent Middle East figures and financiers have supported this mainstream Islamic charity.[18]

Buy, the IIRO has also been used to channel funds to al Qaeda. According to a CIA report funds raised through the International Islamic Relief Organization were used to support at least six Al Qaeda training camps in Afghanistan prior to 9/11.[19] Evidence produced in Canadian Court proceedings also linked the IIRO directly to groups responsible for the 1998 bombings of the American Embassies in Dar es Salaam and Nairobi.[20] The former head of the IIRO office in the Philippines, Muhammad Jamal Khalifa, was also accused of links to al Qaeda and terrorist activities.[21] IIRO's current Secretary General, Dr. Adnan Khaleel Pasha, has sought to clean house and steer clear of any links to al Qaeda. However, the IIRO, under his direction continues to provide direct support to Hamas activists.[22]

The Benevolence International Foundation is another Saudi umbrella charity organization that has served as an important funding source for al Qaeda. Benevolence was established in the late 1980's as two separate organizations. One, the Islamic Benevolence Committee was established as a charity based in Peshawar, Pakistan and Jeddah, Saudi Arabia. Its titular founder was Sheikh Adil Abdul Batarjee. Its sister organization, Benevolence International Corporation was set up as an import export business in the Philippines by Mohammed Jamal Khalifa, who also headed the Philippines IIRO office. Both organizations were engaged in raising funds to support the mujahideen in Afghanistan. The two organizations appeared to work separately until the early 1990s. In 1992 they became the Benevolence International Foundation and opened new branches throughout Southeast Asia as well as in Europe and America.

The U.S. Treasury Department took action in December 2001 to designate Benevolence International Foundation (BIF) as financiers of terrorism. The United States subsequently called upon the Security Council to add Benevolence to its consolidated list of entities associated with al Qaeda. The Treasury Department charged that BIF and its chief executive officer, Enaam Arnaout were involved in funding al Qaeda activities including "the purchase of rockets, mortars, rifles and offensive and defensive bombs, and …(distributing) them to various mujahideen camp's, including camps operated by al Qaeda"[23] The Treasury document also cited direct links between Arnaout and bin Ladin, and with Mamdouh Mahmud Salim, a bin Laden lieutenant. Testimony at the 2001 trial of United States v. Bin Laden, et al, implicated Salim in efforts to develop chemical weapons for al Qaeda and to obtain nuclear weapons components.[24]

The al Haramain Islamic Foundation, based in Jedda, is one of Saudi Arabia 's most active charities in spreading Islamic fundamentalism. Al Haramain reportedly funded some 3000 Wahhabi missionaries and concentrated heavily in establishing new Wahhabi Mosques in Southeast Asia, the Balkans, and Africa. Since 9/11 Al Haramain has come under close international scrutiny as a conduit for al Qaeda funding. According to its web site Al Haramain operates in some 49 countries. It raises some $30 million per year drawing its funding largely

from Saudi donors. Its founding general manager Shiekh Aqeel al-Aqeel maintained a close relationship with the Saudi Ministry of Islamic Affairs, and the Saudi government was considered one of its principal benefactors.

On 11 March 2002 the United States and Saudi Arabia jointly designated the Bosnia and Herzegovina and Somalia offices of Al-Haramain as al Qaeda funding sources. Al-Haramain Somalia had funneled money to Al-Ittihad al-Islami, a designated terrorist group, by disguising the funds as contributions for an orphanage project and for Islamic school and mosque construction.[25] The Bosnia office was linked to Al-Jemaah al-Islamiyah al-Masriyah and to Osama bin Laden. Further investigation also implicated branches in Albania, Croatia, Ehtiopia, Kenya, Kosovo, Indonesia, Pakistan, and Tanzania. The Russian government has also complained to Saudi Arabia regarding alleged Al Haramain funding for Chechen rebels.[26] The Saudi government has removed Shiekh Al-Aqeel as Al Haramain's General Manager and ordered the closing of 15 branches outside Saudi Arabia.[27] Shiekh Aqeel al-Aqeel was designated by the U.S. Treasury in June 2004 and his name was added to the United Nations Consolidated Al Qaeda associate list.[28] However, it does not appear that Saudi Arabia has taken any other actions against him.

The "Blessed Relief" charity, also known as the Muwafaq Foundation was established in 1991 by Yassim al-Qadi who was subsequently identified as an associate of Osama bin Ladin. The stated purpose of the charity was to "relieve disease, hunger and ignorance." The Charity was active in Bosnia during the Balkan wars and was closed in 1998 following allegations of fund-raising and transferring of funds on behalf of al Qaeda and other terrorist organizations. The foundation's principal benefactor was Khalid Bin Mahfouz. Al-Qadi was subsequently designated by the U.S. Treasury Department on October 12, 2001.[29]

The Rabita Trust was established in Pakistan in 1988 ostensibly to repatriate and rehabilitate stranded Pakistanis from Bangladesh. Its stated aims included the dissemination of Dawah (culture), to expound the teachings of Islam, "and to 'defend' Islamic causes in a manner that safeguards the interests and aspirations of Muslims, solves their problems, refutes false allegations against Islam, and repels inimical trends and dogma which the enemies of Islam seek to exploit in order to destroy the unity of Muslims and to sow seeds of doubt in the Muslim brethren."[30] The members of the Trust included both Pakistanis and Saudis, including Pakistan's Ministers of Finance and Interior as well as Saudi Prince Talal ibn Abdul Aziz, secretary-generals of the Muslim World League and the International Islamic Relief Organization and President of the Council of Saudi Chamber of Commerce. Most of its funding was secured from Saudi businessmen. Funds from the trust were reportedly used for a number of al Qaeda related activities, including recruitment and training in Afghanistan, Pakistan and elsewhere. The Rabita Trust was run by Wael Hamza Julaidan, who the U.S. Treasury Department charged was an associate of Usama bin Ladin and Ayman al-Zawahiri. He was designated by the U.S. and the UN as an al Qaeda associate in late 2002.[31]

These are but a few of the charities that al Qaeda has used to support its indoctrination, recruitment, and training efforts as well as its logistical maintenance and terrorist activities. The current status of many of these charities is unclear. Some of them continue in operation today. The International Islamic Relief Organization has new top leadership in Saudi Arabia. But many of its local chapters retain their past management and structure. Likewise branches of al-Haramian, despite closing orders from Saudi Arabia continue active in many countries including Somalia and Indonesia. Other closed charities have merely opened again under new names.

## Businesses - Supporting Al Qaeda

There is considerable anecdotal information that al Qaeda, and its sympathizers continue to run businesses to support al Qaeda. Shortly after September 11, U.S. investigators looked at several

businesses in Yemen that were implicated in funding to al Qaeda. They named the Al Hamati Sweet Bakeries and two honey businesses, Al Nur Honey Press Shops and Al Shifa Honey Press for Industry and Commerce. The Treasury Department charged that these companies knowingly funneled money to bin Laden as well as helped transport arms for al Qaeda. Both these operations are still in business.

Besides these small business operations, Al Qaeda's financial facilitators also make use of shell companies, shell banks, offshore trusts to hide their assets and to protect the identity of individuals, businesses, or other entities they have used to raise money for al Qaeda. There has been some progress in tightening up regulation and oversight of such business activities, but several countries continue to attract offshore business enterprises behind which al Qaeda can hide. These countries invite business activities by retaining a liberal "no look" policy.[32]

During the early 1990s, Al Qaeda ran a series of international businesses out of its safe haven in Sudan. According to testimony given in U.S. court by Jamal Ahmed al- Fadl, many of these businesses were held in the name of a shell corporation established in Sudan under the name Wadi al-Aqiq. Other companies he spoke about included the Ladin International Company, an import-export concern; Taba Investment, a currency trading firm; Hijra Construction, which built bridges and roads; and the Themar al-Mubaraka Company, which grew sesame, peanuts and white corn for the group on a farm near Ed Damazin, Sudan. The 9/11 Commission report indicates that these al Qaeda businesses in Sudan were closed down by the Sudanese government when Al Qaeda was expelled in 1998. Nevertheless, little information has come to light concerning possible business holdings of these shell companies outside Sudan.

In a report submitted to the United Nations Al Qaeda and Taliban Sanctions Committee the Government of the Philippines indicated that Mohammed Jamal Khalifa, the brother-in law of Osama bin Laden, had established numerous businesses, corporations and charitable institutions there which had served as a network to fund the Abu Sayyaf group as well as other extremist organizations.[33] These reportedly included the Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, Manpower Services and Daw al-Iman al-Shafee Inc.[34] Al-Qaeda operative, Wali Khan Amin Shah, established several shell companies, in Malaysia, as did Hambali, who used a shell "import export" company, Konsojaya Trading Company to hide terrorism funding transactions.[35]

In Europe, Youssef Nada and Idris Nasreddin acted as key financial facilitators to hide and move al Qaeda money. They had established a series of shell companies in Liechtenstein, Switzerland and Italy to hide and protect their transactions and their holdings. Nada and Nasreddin were able to use their various shell entities to continue to manage and manipulate their assets well after they had been designated by the United Nations Security Council and their accounts had been frozen. In order to circumvent the sanctions against him, Nada changed the registered name of two of his shell companies in Liechtenstein and used them to begin a process of liquidation of their holdings. Liechtenstein was unable to identify which assets were being liquidated as it had not required the shell company to maintain any list of its assets.[36]

There is also an interesting nexus between businesses and the charities they have used to mask their terrorism related funding. These charities provided al Qaeda deep pocket donors deniability and protected them from charges of knowingly financing terrorist organizations. The charities also provided an ideal conduit to mask the transfer of these funds to al Qaeda.

It is also not uncommon for both large and small Islamic charities to own and control their own businesses, and to use them as sources of unregulated funds for use as they please. We believe that these businesses have also been used to fund al Qaeda through their owner-charities. But, much of this is still speculation and little information has yet been gathered concerning this business-charities nexus.

A few of charity-business networks have been identified in the course of post 9/11 investigation and enforcement efforts. Operation Green Quest uncovered such links in its investigation of Yassin al Qadi and his involvement with BMI, which stands for the Arabic Beit ul Mal, or House of Finance. Green Quest established that there were links between BMI and an Islamic charity called Mercy International. Mercy was, in turn tied with al Taqwa and was implicated in several al Qaeda operations including the bombing of American Embassies in Kenya and Tanzania.[37]

An investigation into the activities of a number of Saudi and other Middle East businessmen working out of Herndon Virginia also unveiled a network of some 100 intertwined companies and charities charged with funding al Qaeda and other terrorist groups. This included Islamic educational, cultural and charitable organizations as well as for-profit businesses and investment firms. Most of the Islamic educational and charitable organizations were "paper" organizations registered at a common address but having no apparent physical structure. This network became known as the Safa Group.[38] The Safa Group was closely associated in the United States with the SAAR Foundation, a charity with branches in both Canada and the United States funded by Saudi Billionaire Salaeh Abdul Aziz- al Rajhi. Evidence was uncovered showing that the Safa Group, using the various affiliated charities and companies under its control, transferred money in convoluted transactions through a network of inter-related organizations designed to prevent investigators from tracking the ultimate recipients. Collateral evidence supported the view that these recipients included al Qaeda, Hamas and other associated terrorist groups.[39]

## Al Qaeda's Other Fund Sources

There is still good reason to look closely at the international drug trade operating out of areas in Afghanistan and Pakistan's northwest territory that are still not under central government control. How much of this may still reach al-Qaeda is uncertain. The Taliban was known to take a large cut from this $6 billion drug trade. While the 9/11 Commission was dubious that any of these funds still reach al Qaeda, other experts maintain that a portion of these funds remain critical for al Qaeda's maintenance in remote areas of Afghanistan and neighboring regions.[40] Some experts believe that al Qaeda's reliance on drug money has increased as a result of the crackdown on charities. Admittedly, evidence linking al Qaeda directly to the drug trade is scarce. However, Mirwais Yasini, the head of Afghanistan's Counter Narcotics Directorate, maintains that the Taliban and its allies derived more than $150 million from drugs in 2003. He believes that there is still a "central linkage" between many of the drug traffickers, Mullah Omar and Osama bin Laden.[41] Drug funds are also reported key to funding al Qaeda operations in areas of the former Soviet Union, including Chechnya.[42]

Since 9/11 and the United States led coalition victory in Afghanistan al Qaeda has gone through a new transformation. Its network structure has splintered. Al Qaeda's shuria, or high command council, no longer plays a central role in soliciting funds or allocating expenditures. Rather, al Qaeda's largely compartmentalized cells have become responsible for much of their own financial support. These local cells now operate autonomously, raising funds through local businesses, charities and petty crime. This has involved such activities extortion, drug and cigarette smuggling, credit card fraud, coupon fraud and other petty crimes.[43]

The United Nations Monitoring Group received several reports that theft rings which help finance extremist groups, including al Qaeda cells, have been involved in the trafficking of identity documents and the pilfering of items including computers, cellular phones, passports and credit cards. An al Qaeda terrorist cell in Spain reportedly used stolen credit card numbers and provided forged credit cards for the use of al-Qaeda cells in other countries. Similar activity was also reported in Belgium.[44]

The crackdown on al Qaeda financing may have led al Qaeda, even before 9/11 to transfer a portion of its exposed assets into untraceable precious commodities. This process reportedly

began as early as 1998 when freezing actions were first initiated in the United States and European against the Taliban. This reportedly included transfers into such gold, diamonds, tanzanite and other precious commodities. These precious commodities are small and easy to store and transport. They hold their value over time. They can also be released in small quantities in the market without arousing attention.[45]

## Banking for Al Qaeda

From the beginning Al Qaeda has made use of the international banking community to conduct many of its financial activities. Osama bin Ladin and other top leaders of al Qaeda, as well as many of it Al Qaeda's financial facilitators maintained bank accounts in Europe, North America and other international banking centers. Since the 1998 Embassy bombings and again after the 9/11/2001 attacks, banks have increased their vigilance concerning possible terrorist funding activities. Freezing orders have been placed against funds identified as belonging to al Qaeda and the Taliban, as well as those associated with them. Banks have also received orders to stop transactions related to Al Qaeda and to report all suspicious transactions to local authorities.. Nevertheless, there is still reason to believe that well heeled financiers, and established charities and businesses with links to al Qaeda, continue to use international banking facilities. They are adept at masking these transactions through the use of trianglarization and intermediaries.

Al Qaeda's facilitators have also been active in establishing their own banking networks to handle and hide financial transactions. Two such networks uncovered by investigators, al Barakat and al Taqwa, provide good examples of such activities.

Al Barakat was founded in Mogadishu by Ahmed Nur Ali Jim'ale and established its headquarters in Dubai. Its principal activities include running a telecom service in Somalia and several other countries, a bank and a money remittance (or Hawala) system. The U.S. Treasury Department charged that the company skimmed fees from remittances sent by expatriate Somalis and used that money to finance al Qaeda terrorist activities. Al Barakaat's hawala operation reportedly spread through some 40 countries. It was estimated that Al Barakaat handled some $140 million a year in transmitted payments. Service charges ranged from 2% to 5%. This may have generated revenues in the millions for al Qaeda.[46] In addition to providing revenue for al Qaeda, al Barakaat also provided a discrete channel for the transfer and distribution of al Qaeda funds.[47]

Al Taqwa, with offices in Switzerland, Liechtenstein, Italy and the Caribbean is suspected of provided other important transfer and banking facilities for al Qaeda. Al Taqwa was founded by Youssef Nada, an Egyptian-born businessman long close to the Muslim Brotherhood. According to the U.S. Treasury, al Taqwa acted largely as a money laundering facility for al Qaeda and other Islamic terrorist groups. It also provided "indirect investment services for al Qaeda investing funds for bin Laden and making cash deliveries on request to the Al Qaeda organization." According to one report, al Taqwa even provided a clandestine line of credit for a close associate of bin Ladin.[48]

## Hawala

Hawala operations abound throughout the Middle East, Asia, the Pacific region and Latin Amercia. They also have well established branches in Europe and North America. Hawala has long served the critical function of providing for the remittance needs of guest workers, or as informal banking system where established banking fears to tread.

By some estimates, hawala handles more international transactions in the Middle East Asia and the Pacific then the established banking system. Certainly, they service a larger client base.

Most hawala operations are unregulated. Few records are kept and transfers are handled informally and, in most cases, with no real oversight. This offers al Qaeda, and those supplying it with money, an ideal channel for handling its money transfer requirements. Many hawalars are also well connected with banks in Asia and the Middle East. Their transfer accounts raise few questions and are employed for settlement between hawalars, hiding completely the transactions originator and ultimate receiver.

Several countries have begun to crackdown on hawala operations as part of their anti money laundering and terrorism financing programs. But, few have had any real success in securing oversight over such transactions.[49]

## Using Al Qaeda Money

We can still only speculate concerning al Qaeda's budget and expenditures. Before 9/11 these funds were used in large part for logistics, training, maintenance and operations. According to the 9/11 Commission study, al Qaeda funded salaries of jihadists, training camps, airfields, vehicles, arms, and the development of training manuals. Bin Ladin also provided approximately $10 million to $20 million per year to the Taliban. Indoctrination and recruitment remained the responsibility primarily of Islamic fundamentalist teachers sympathetic to al Qaeda's cause. And these groups had their own sources of support and funding. Al Qaeda also contributed to supporting the financial requirements of the Taliban regime—however the extent of this support remains also in the realm of conjecture. Some funds were also used to support local social, cultural and humanitarian programs aimed at winning a base of local support in Afghanistan and elsewhere.[50]

The 9/11 Commission report tells us also that before 9/11 al Qaeda was active in establishing alliances with other Islamic terrorist organization. This included groups in Southeast Asia such as Jemaah Islamiayah and Abu Sayyaf They also developed ties with the Salafist groups of North Africa, and other emerging Islamist groups in several areas of the former Soviet Union. Al Qaeda also provided other Jihadi groups with start-up funding and funding for selective operational activities. Many of these groups developed common resource and funding sources with al Qaeda. But, they often preferred to seek outside funds from al Qaeda to pay for specific terrorist operations. The Commission believes that such financial support to other groups has been curtailed since 9/11. What remains now, their report says, appears to be based more on "personal relationships with operatives than on a management structure."[51]

Nevertheless, there is considerable anecdotal information that al Qaeda continues today to provide financial and logistical assistance to groups in Chechnya, North Africa, and Southeast Asia. According to Indonesian investigators, Al Qaeda was responsible for funding Jemaah Islamiayah's Bali bombing operation as well as the August 2003 bombing of the Marriott Hotel in Jakarta.[52] Al Qaeda is also believed to have helped finance the establishment of terrorist training camps in remote areas of Indonesia, Malaysia, the Philippines and Thailand as late as the spring of 2003.[53] Al Qaeda also continues to retain substantial financial links with the Salafist Group for Call and Combat in North Africa, and is suspected of providing new financial support to emerging groups in both East and West Africa.[54]

## Government responses

The fight against terrorism has benefited significantly from increased intelligence gathering in the wake of 9/11. This has included information gleaned from forensic banking investigations, from suspicious transaction reports, from seized computers and documents and from information obtained from captured al-Qaeda operatives or associates. This information has led to the arrest and closing down of several terrorist financing schemes and those responsible for them.

Steps were taken in a number of countries to designate individuals and entities, including charities, which were believed implicated in al Qaeda and associated terrorism financing. Many of these designations were submitted to the UN Security Council for addition to the UN consolidated list of al Qaeda and Taliban associated individuals and entities. The Security Council also passed a series of resolutions imposing on all countries the obligation to freeze the assets of such individuals and entities and to prevent their nationals from providing them any economic resources. But, these measures have been too narrowly applied. First of all they pertain only to those 390+ individuals and entities on the UN list.[55] And, beyond that, few countries have acted to freeze assets other than bank accounts.[56] To date some $137 million has been reported frozen by banks in 30 countries Most of this money belonged to the Taliban regime in Afghanistan. Some $59 million appeared to be associated directly with al Qaeda and those supporting it.[57]

Many governments also put in place new regulations after 9/11 to tighten banking oversight. These included new "know your customer" requirements and an obligation to report all suspicious transactions. The United Nations, FAFT, the IMF and the World Bank have all become active in encouraging and assisting countries to adopt new financial regulatory measures. Most countries now have in place legislation or regulations authorizing them to freeze the assets of persons or entities designated by the Security Council as associated with al Qaeda or the Taliban, but these measures do not yet apply to other individuals or entities not yet included on the UN lists. In some countries further evidentiary requirements must also be met before such freezing actions can be implemented.

Most countries have failed to take action against other tangible assets, including businesses and other income producing assets, in the hands of identified al Qaeda supporters. Several countries have indicated that they lack the means or authority to reach beyond bank accounts. Many are also loath to close down or take over the administration of business assets associated with designated persons or entities. There is also the additional problem of businesses and assets which are owned and administered jointly with non-designated persons. This may include family members.[58]

Before 9/11, few countries regulated charities other than in relation to their tax status. A number of countries have acted since to impose new charity oversight procedures. Some 50 charities have reportedly been shut down in Gulf countries, and 40 more charities have come under official surveillance. Saudi Arabia has announced that it has audited 245 domestic charities and frozen their external offices, shutdown 12 charities and banned donation boxes at commercial stores and mosques. However, the names of very few of these charities have so far been submitted to the Security Council for designation.[59]

Current International cooperation against terrorism financing is founded largely on a series of International obligations, regional agreements, and bilateral arrangements. UN Security Council Resolutions 1373 (2001) and 1526 (2004) provide important pillars for this cooperation. The former directs that all countries afford one another the "greatest measure of assistance" in tracing down terrorists and investigating terrorist acts. It also calls on all countries to "find ways of intensifying and accelerating the exchange of operational information." The Resolution also established a special Counter Terrorism Committee charged with enhancing international efforts to deal with terrorism. But it has not yet provided an effective platform for cooperative counter-terrorism efforts.[60]

Resolution 1526 (2004) also calls upon all countries to identify al Qaeda members and associated organizations and to provide appropriate information concerning their names and activities to the Security Council's Al Qaeda and Taliban Sanctions Committee so that they might be included in the Committee's list of al Qaeda members and associates. This list now includes only 162 al Qaeda members and 103 associated entities, a very small segment of the al Qaeda network. But, many countries continue to feel reticent about providing the names of their nationals or residents to the Security Council for listing. The vast amount of persons and entities listed to

date were provided by the United States. But what about the vast majority of al Qaeda members not included on this UN list? Many of them, although known in some countries, remain anonymous in others, and relatively free to roam and support al Qaeda activities.[61]

## Recommendations

There are a great number of challenges ahead of us in the war on terrorism, and in halting funding for terrorism financing and particularly for those associated with al Qaeda. However, this writer believes that there are a number of things that need to be done, or done better, as we carry out our responsibilities to protect our citizens and our national interests.

First, we need to focus greater attention on the funding that supports the propagation of radical Islam—the very foundation that al Qaeda and like-minded groups use to indoctrinate and recruit new adherents. We must put much greater pressure on all countries and entities that fund hate or religious intolerance. This should be considered as both a foreign policy and public diplomacy initiative.

International cooperation in support of the war on terrorism financing is still patently inadequate. Most cooperation takes place on a bilateral basis. While the United States has developed some effective channels for working with other countries, cooperation among third countries remains quite limited. We need a much better forum for providing mutual support and for exchanging information related to terrorism financing.

The United Nations Consolidated List of Designated Individuals and Entities remains woefully inadequate and out of date. This list provides the basis for freezing actions in most countries, and for getting them to halt possible terrorism related transactions. Yet most of the known al Qaeda world is still not on this UN list. It must either be rapidly expanded, or replaced by a new formula that requires all countries to take the appropriate action against those who finance al Qaeda terrorism.

We must also find a better way to use intelligence information in freezing assets and pursuing criminal prosecutions. Too many known terrorist financiers continue to remain free to carry out their trades because of the reticence to share intelligence and other evidentiary information. Harsh financial and other penalties must be imposed to deter terrorist funding.

The G-8 has put in place a Counter Terrorism Action Group with a mandate to identify and assist countries that lack the resources necessary to combat terrorism financing effectively. The group was also charged with putting greater pressure on countries that lacked the necessary political will. This group must take on a much higher profile of activity.

Winning the war on terrorism financing is not impossible. But it is very difficult. New ideas must be tested and applied to dealing with this 21st century scourge.

## About the Author

Victor D. Comras is a leading expert on international trade embargoes and economic sanctions, and the global effort to combat terrorism financing and money laundering. A retired career diplomat of the United States, he served under appointment by Secretary General Kofi Annan as one of five international monitors to oversee the implementation of Security Council measures against terrorism (al-Qaeda) and terrorism financing. Mr. Comras also has a strong background in consular and immigration affairs. Mr. Comras' articles regarding international issues have appeared in *The Washington Post*, *The Financial Times*, and other publications.

> For more insights into contemporary international security issues, see our *Strategic Insights* home page.
>
> To have new issues of *Strategic Insights* delivered to your Inbox at the beginning of each month, email ccc@nps.edu with subject line "Subscribe". There is no charge, and your address will be used for no other purpose.

**References**

1. See *The 9/11 Commission Report* and *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing*, page 9.

2. See *The 9/11 Commission Report* and *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing*, page 9.

3. See *The 9/11 Commission Report*, pages 20-21

4. See *The 9/11 Commission Report*, pages 22-24

5. See generally the *First and Second Reports of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaida, The Taliban and Individuals and Entitles Associated With Them, UNDOCs S/2003/669 dated 8 July 2003 and S/2003/1070 dated 3 December 2003.* On Al Qaeda's use of the Drug Trade see *Money Laundering: Current Status of our Efforts to Coordinate and Combat Money Laundering and Terrorist Financing, Hearings Before the Senate Caucus on International Narcotics Control*, March 4, 2004. Also Chouvy, Pierre-Arnaud; "Narco-Terrorism in Afghanistan," *Terrorism Monitor*, Volume II, Issue 6, March 25, 2004. On diamonds and other precious commodities, see Farah, Douglas, *Blood From Stones, The Secret Financial Network of Terror* (New York: Random House, 2004).

6. *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing*, page 5: "The U.S. intelligence community largely failed to comprehend al Qaeda's methods of raising, moving, and storing money, because it devoted relatively few resources to collecting the strategic financial intelligence that policymakers were requesting or that would have informed the larger counterterrorism strategy."

7. See *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing*, page 10.

8. John Lumpkin, "Insurgents Infiltrating Iraq Have Cash," *Associated Press*, October 21, 2004. Also, statements by Senator Bob Graham on *CNN's Late Edition with Wolf Blitzer* on October 17, 2004.

9. See, for example Raymond Bonner, "Philippine Camps Are Training Al Qaeda's Allies, Officials Say," *The New York Times*, May 31, 2003.

10. See David Ottaway, "U.S. Eyes Money Trails of Saudi-Backed Charities," *The Washington Post,* August 19, 2004

11. See "Confessions of an al Qaeda Terrorist, *Time Magazine* (Web Exclusive), September 15, 2002.

12. You may see his testimony in the *United States v. Usama Bin Ladin et al*, involving the Embassy bombings.

13. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070 dated 3 December 2003.*

14. *Ibid.*

15. *Ibid.*

16. Michael Isikoff and Mark Hosenball, "Paying for Terror, Treasury Department Documents Detail the Murky World of Al Qaeda's Financing," *Newsweek* (Web Exclusive), May 12, 2004.

17. David D. Aufhauser, Former U.S. Treasury Department General Counsel, "An Assessment of Current Efforts to Combat Terrorism Financing," 20, *Statement Before the Senate Committee on Governmental Affairs*, June 15, 2004.

18. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070 dated 3 December 2003, Paragraphs 40-43.*

19. This CIA report was released under a Freedom of Information request. Extracts from the text of the report are available online at http://www.centerforsecuritypolicy.org/cia96charities.pdf.

20. See *Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, Docket DES-6-99, 2 November 1999.

21. See *Philippine Country Report, UN Security Council Resolution 1267 and 1455, Al Qaeda Sanctions Committee*, October, 2004 S/AC.37/2003/(1455)/79 22 October 2003.

22. Steven Stalinsky, "Saudi Royal Family's Financial Support to the Palestinians, 1998–2003: More than 15 billion Rials ($4 Billion U.S.) Given to 'Mujahideen Fighters' and 'Families of Martyrs,'" *MEMRI Special Report 17*, July 3, 2003.

23. "Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism," *U.S. Treasury Department Press Release (PO-3632)*, November 19, 2002.

24. *Ibid.*

25. "Security Council Committee Established Pursuant To Resolution 1267 (1999) Adds Two Entities To Its Consolidated List," *United Nations Press Release SC/7331*, March 15, 2002.

26. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070 dated 3 December 2003*, Paragraph 46.

27. Staff Writer, "Al-Haramain Shuts 3 Offices Abroad, 4 More to Close," *Arab News*, Jeddah, May 16, 2003.

28. "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaeda Supporters, Treasury Marks Latest Actions in Joint Designation with Saudi Arabia," *U.S. Treasury Press Release JS-1703*, June 2, 2004.

29. "Treasury Department Releases List of 39 Additional Specially Designated Global Terrorists," *U.S. Treasury Press Release PO-689*, October 12, 2001.

30. See http://216.239.39.104/search?q=cache:EhM3DIw-sXUJ:www.satp.org/tracking/Goto.asp%3FID%3D82+Rabita+Trust+++objectives+&hl=en&ie=UTF-8

31. "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," *U.S. Treasury Press Release PO-3397*, September 6, 2002.

32. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070, December 3, 2003,* para 68.

33. *Philippine Country Report, UN Security Council Resolution 1267 and 1455, Al Qaeda Sanctions Committee, October, 2004 S/AC.37/2003/(1455)/79,* October 22, 2003.

34. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070, December 3, 2003*, para 55. *See also Commonwealth of Australia, Parliamentary Debates, House of Representatives, Official Hansard No.10, 2003 (Wednesday 14 May 2003), Question No. 1645, Foreign Affairs, Southeast Asia.*

35. See *The 9/11 Commission Report*, footnote 14 to chapter 5: "Hambali also was one of the founders of Konsojaya, a Malaysian company run by a close associate of Wali Khan…. Intelligence report, interrogation of Hambali, Nov. 19, 2003."

36. More recently Liechtenstein amended its company registration laws to require companies to provide a profile of their activities and assets. See also *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070 dated 3 December 2003*, paras 70-81.

37. Matthew A. Levitt, *Hearings on "The Role of Charities and NGOs in the Financing of Terrorist Activities,* House Subcommittee on International Trade and Finance, August 1, 2002. "At the New York trial of four men convicted of involvement in the embassy attacks, a former al-Qaeda member named several charities as fronts for the terrorist group, including Mercy. Documents presented at the trial demonstrated that Mercy smuggled weapons from Somalia into Kenya, and Abdullah Mohammad, one of the Nairobi bombers, delivered eight boxes of convicted al-Qaeda operative Wadi el-Hage's belongings—including false documents and passports—to Mercy's Kenya office."

38. See Affidavit of David Kane, "In The Matter of Searches Involving 555 Grove Street, Herndon, Virginia and Related Locations," *U.S. District Court for the Eastern District of Virginia, Alexandria Division*, October (2003)

39. *Ibid.*

40. See Testimony of Steven W. Casteel, Assistant Administrator for Intelligence, Drug Enforcement Administration, May 20, 2003, *United States Senate Committee on the Judiciary, Hearings on Narco-Terrorism: International Drug Trafficking and Terrorism—A Dangerous Mix*. See also Tim McGirk. "Terrorism's Harvest, How Al Qaeda is Tapping Into the Opium Trade to Finance its Operations and Destabilize Afghanistan," *Time, Asia Edition*, August 9, 2004 Volume 164, No 6; Mark Schneider, "Colombia in Kabul," *Washington Times*, December 4, 2003; and Mark McDonald, "Tajikistan at crossroads of the drug trade, Desperately poor, it fights a losing battle," *Detroit Free Press*, May 4, 2004.

41. "Interview with Mr. Mirwais Yasini, head of the Counter Narcotics Directorate (CND) Kabul," *IRIN News Service*, October 19, 2004.

42. See Makarenko, Tamara, "Crime, Terror and the Central Asian Drug Trade," *Harvard Asia Quarterly*, Spring 2002.

43. See Jeffrey Robinson, "How petty crime funds terror," I*nternational Herald Tribune*, August 13, 2004.

44. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070 dated 3 December 2003* and previous.

45. See Farah, *Douglas, Blood From Stones, The Secret Financial Network of Terror*, (New York: Random House, 2004).

46. *The 9/11 Commission* expressed considerable doubt about the role al Barakat has played in supporting al Qaeda. This is convened in the case study treatment given al Barakat in the *Staff Monograph on Terrorist Financing.* The Treasury Department initially claimed that "The principal owner of al Barakat is a close personal friend and associate of Osama bin Laden. And we have compelling evidence that… monies raised by al Barakat are being used to support al Qaeda to fund terrorist training camps and to purchase arms for al Qaeda terrorists… Al Barakat was channeling as much as 15 to $20 million a year to al Qaeda." Treasury agents ended up shutting down eight al Barakat offices in the United States. *Update on Tracking the Financial Assets of Terrorists: One Year Later,* press briefing by Jimmy Gurule, then Under Secretary of Treasury for Enforcement, Foreign Press Center, Washington DC, September 9, 2002.

47. T*he 9/11 Commission Report* and *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing* starting at page 67.

48. "Bank Al Taqwa, for which Nasreddin is a director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tunisia's An-Nahda, and Usama bin Laden and his Al Qaeda organization. Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization. In 1997, it was reported that the $60 million collected annually for Hamas was moved to Bank Al Taqwa accounts. As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Usama bin Laden and as of late September 2001, Usama bin Laden and his Al Qaeda organization received financial assistance from Youssef M. Nada." Excerpt from "The United States and Italy Designate Twenty-Five New Financiers of Terror," *U.S. Treasury Department press release PO-3380*, covering the designation of Youssef Nada and Idris Nasreddin, dated August 29, 2002.

49. See Vaknin, Sam, "Hawala, the Bank That Never Was," *UPI International*, October 17, 2001.

50. See Gunaratna, Rohan, *Inside Al Qaeda, Global Network of Terror* (New York: Columbia University Press, 2002), Pages 60–74.

51. See *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing,* page 29.

52. See Abuza, Zackary, "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah," *National Bureau of Asian Research Analysis,* Volume 14, Number 5, December 2003.

53. *Ibid.*

54. See Schanzer, Jonathan, "Algeria's GSPC and America's 'War on Terror'", *Washington Institute Policy Paper 666*, October 2002, and "Africa Terror Havens," *Council of Foreign Relations*, December 2003.

55. See Comras, Victor and Farah, Douglas, "Tackling Al-Qaeda's Terror Network," *Financial Times*, February 5, 2004

56. *Second Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, S/2003/1070 dated 3 December 2003*, Paras 80–83.

57. *First Report of the Monitoring Group Established Pursuant to United Nations Security Council Resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003) on sanctions against Al Qaeda, The Taliban and Individuals and Entitles Associated With Them, UNDOCs S/2003/669 dated 8 July 2003*, Para 37.

58. See Comras, Victor, "Filling the Information Gaps on Al Qaeda," *Washington Post*, June 1, 2004.

59. There continues to be a general reticence to act against charities, even those suspected of channeling funds to Al-Qaeda, unless strong evidence is presented and judicial findings can be obtained. This higher standard of proof has inhibited the designation of charities and their inclusion in the list. Only some 17 charities or branches of charities have been designated so far by the Committee. They represent only the tip of the iceberg according to most experts in the field. Even when such charities have been listed there has been an even stronger reticence to go behind the charities, to reach to their directors, donors and fund-raisers.

60. See Comras, Victor, "Filling the Information Gaps on Al Qaeda," *Washington Post*, June 1, 2004.

61. Ibid.