28

Senator SPECTER. Ambassador Gold, you are now double time, so could you sum up?

Mr. GOLD. Yes. I will wrap up with one more document.

One of the strongest sources of evidence showing Saudi Arabian support for Hamas, a recognized international terrorist organization, is actually a letter written by Mahmud Abbas, also known as Abu Mazen, the Prime Minister of the Palestinian Authority today. This letter was written in December 2000. It was a fax that was sent to Prince Salman, governor of Riyadh and a full brother of King Fahd. In this letter, Abu Mazen specifically requests that the Saudis stop funding al-Jamiya al-Islamiya, which is a Hamas front in the Gaza Strip.

I would just end by showing you the kind of activities that this organization does, because many people say, oh, well, they are involved in civilian activity. This is a graduation of 1,650 kindergarten students in the Gaza Strip in 2001 in which the children are in uniforms. They are re-enacting terrorist attacks. For example, here is a young girl re-enacting the lynching of Israeli soldiers. Many of them are also wearing suicide belts as well. So this is the kind of education which Saudi Arabia has been funding and the kind of education which Abu Mazen has sought that the Saudis stop.

One last element, because terrorist financing is—and this will be my final slide. This is a check, a corporate check from the Chase Manhattan Bank in New York. The corporate check belongs to Al-Rajhi Banking and Investment Company, which has long been suspected of being a conduit for terrorist financing by many authorities. In this case, we actually found a check from 1999 showing how an American account could be used for funding Hamas. The organization the check is written to is Lajna Sakat Tulkarm, which means the Tulkarm Charity Board, which is an unquestionable Hamas front.

I will stop here, and we can go into further elements of my presentation.

Senator SPECTER. Thank you, Ambassador Gold.

The Committee had invited Adel al-Jubeir, foreign policy spokesman for the Kingdom of Saudi Arabia, to appear and he declined. I want that to be known publicly.

Our next witness is Jonathan Winer, formerly Deputy Assistant Secretary of State for International Law Enforcement, and now an attorney with the firm of Alston and Bird. Thank you very much for joining us, Mr. Winer, and we look forward to your testimony.

### TESTIMONY OF JONATHAN M. WINER,[1] ALSTON AND BIRD

Mr. WINER. Thank you, Mr. Chairman. Before the team goes off to Saudi Arabia to try and work these issues out, it may be useful to recollect what has happened in past missions.

Back in 1998, 5 years ago, right after the bombs went off in Dar es Salaam and Nairobi, the Executive Branch convened an interagency meeting on the International Emergency Economic Powers Act to determine whether there should be designations in connection with those bombings in relationship to terrorist finance. We

---
[1] The prepared statement of Mr. Winer appears in the Appendix on page 110.

29

tried to assess as a government then what the basis was for al-Qaeda to carry out its activities around the world, and we had two false conclusions we were basing our assessment on at the time. The first is it doesn't take a lot of money to be a terrorist, and the second is bin Laden is wealthy and doesn't need money from anybody else. It was an incomplete theory of the case, an inadequate theory of the case, and ultimately a wrong theory of the case.

The actual case was it cost a lot of money to create al-Qaeda. It was a constant fundraising operation. And it took us some months until late 1998 to figure that out. We now had a theory. The question was what to do about it.

What we sought to do then was to map the network with fragmented information, identify the key nodes, and then try to disrupt those nodes. We also had as a government the enormous power of the International Emergency Economic Powers Act to freeze assets of foreign entities—banks, businesses, charities, whatever. And we recognized that this important power was not recognized or understood by many countries, including countries where we saw terrorist finance to be a problem.

We came to the conclusion that we should do an International Emergency Economic Powers Act designation against the Taliban as one way of taking action against al-Qaeda, as a means of putting pressure not only on the Taliban but their supporters, as well as other governments in the region. We wanted to increase the leverage that we had.

We had had sporadic contacts at that point with embassies in the region, including with the Saudis. These were not particularly focused, and they weren't particularly high level. We recognized in late 1998, early 1999 as a government that the only way you can really deal with the Saudi Government is from the top down. There were communications between the Vice President's office and Crown Prince Abdullah which took place in which the United States said we want to send a team over that is very high level to discuss something that is very important in connection with our embassies having been attacked.

In May or June 1999, these meetings took place in Saudi Arabia. They were interagency meetings, very similar to the interagency meetings that are about to take place once again in Saudi Arabia that have been discussed earlier today in these hearings.

We had said we didn't want one-on-one's, this agency meeting with that agency on either side, because when you have one-on-one's agency after agency, you can get the runaround: We would love to help you, but you have to go talk to someone else. We wanted a unified, integrated approach government to government. That is my understanding of what took place. I was not directly part of that mission. I received reports when it came back.

The delegation talked about IEEPA to the Saudi Government. They talked about how the use of IEEPA could hurt U.S.-Saudi financial and economic relationships and even result in substantial freezes of Saudi funds and freezes of funds of high-level individuals in Saudi Arabia with international prominence. These meetings took place 4 years ago, prior to the September 11 attacks.

We advised them that we would be shutting down Ariana Airlines, the Taliban's airline, and that any airports that continued to

30

permit Ariana flights to take place, they could potentially get shut down. At that point, the Moscow airport and the Saudi airport were two of the airports that Ariana was using, given cover in part by the Russians. The Saudi ability—Ariana Airlines' ability to use Saudi Arabia was stopped at that time, and that provided the first use of IEEPA in that area relevant to the terrorist area.

We hoped that this would start a new relationship on the subject of terrorist finance. I left the government in late 1999. I was told that there was a second meeting in early 2000. Another U.S. interagency delegation went to Saudi Arabia. The readout that I hear on an unclassified basis very generally is that there was only marginal benefit from the second meeting, that the desert sands of Saudi Arabia had ground down this initiative like so many before it. Again, 3½ to 4 years ago, prior to September 11.

One problem we ran into was that the Saudis had very little centralized integration and their government agencies didn't talk to one another, didn't trust one another, didn't work together, didn't communicate with one another. And that had an impact on the political will of the Saudi Government.

Now, I was asked also to talk briefly about the designation process. I participated in IEEPA designation processes on various issues when I was in the Clinton Administration, and I can tell you that, yes, sometimes it was the State Department who said no, we don't want to get our foreign partners upset—not my part of the State Department but other parts of the State Department. And, of course, geographics trump functionals most of the time at the State Department. State relationships are more important. Sometimes it was the FBI. Quite often it was the FBI because they didn't want to have criminal cases interfered with. Sometimes it was the Justice Department backing up the FBI.

In my experience, it was never the CIA or the intelligence agency. It may have happened in other cases, but not in any case that I participated in. And very rarely—rarely—it was the White House or the Treasury, but very rarely. Usually State or FBI in my experience.

Now, did we shoot down designations that Treasury had the ability to put together and, in fact, recommended? We absolutely did. It did not happen to be in the terrorist area during my time. It was in other areas. But it certainly happened, in which foreign policy or other considerations trumped decisions or recommendations made by OFAC. I can say that as a general matter.

A couple of final points before I run out of time. It has been my experience that collective leadership is not usually a mechanism to forceful action. In the Clinton Administration, through much of the time a fellow named Dick Clark pushed counterterrorism in a central way, including terrorist finance. I am sure there is someone doing this in the administration today. I just don't happen to know who it is. I am concerned that there isn't somebody in the White House with that job. I think there should be.

Finally, with regard to the Saudis and this latest mission, coming 4 years after the first mission on exactly this topic, denial is not just a river in Egypt, and those who forget the past are condemned to repeat it.

Thank you, Mr. Chairman.

Senator SPECTER. Thank you very much, Mr. Winer.

Our next witness is Steve Emerson, an expert on terrorism and terrorist financing, the author of "American Jihad: The Terrorists Living Among Us." Mr. Emerson is currently NBC's terrorism analyst and a special investigative correspondent for CNN.

Thank you for joining us, Mr. Emerson, and we look forward to your testimony.

### татеSTIMONY OF STEVEN EMERSON,[1] EXECUTIVE DIRECTOR, THE INVESTIGATIVE PROJECT

Mr. EMERSON. Let me clarify that I was formerly a correspondent for CNN. Thank you to the Committee for holding this hearing this morning. I think that shining a light on the whole issue of the very intricate web of connections between the Saudi Government and the funding of terrorism is absolutely pivotal to preventing another September 11.

Just recently, in the last month, Adel al-Jubeir, foreign affairs adviser to the Crown Prince Abdullah, denied that Saudi Arabia was funding terrorism, and when asked about whether Saudi charities had complied with the new regulations, he said he hoped so. He also stated, "If the UN is headquartered in New York, is America responsible for everything the UN does?"

Now, I think it is very important to bear out in the very beginning here that the analogy that Mr. Jubeir has referred to is not correct. The fact of the matter is that major Saudi NGOs, non-governmental organizations, as they have been designated legally, either in Saudi Arabia or in conjunction with the United Nations, have been tied for years directly and indirectly to the support for al-Qaeda, Hamas, Islamic Jihad, and other terrorist groups. Often, it must be stated, the connections are not neatly compartmentalized, largely because of the very complex ways in which terrorist funding has been laundered to terrorist groups. Still at other times, the evidence shows that NGOs carry out activities that are "totally legitimate and legal." Indeed, it is the very external legitimacy of these groups that provides the perfect cover to siphon off, divert, or launder financial support or to provide cover for terrorist cells. There is also a problem sometimes in determining whether an affiliate group makes the entire organization corrupt or whether, in fact, there is just one bad rogue chapter in that organization.

Let me just briefly go over some of these things that I have presented in the written testimony to give an indication of why the problem is not just limited to either select chapters and why it is connected to the Saudi regime itself.

For example, we have collected several textbooks used and distributed in the United States, distributed by the Saudi Embassy in Washington, D.C. They have the full imprimatur of the Kingdom of Saudi Arabia on the textbooks. In the testimony, I refer to the curricular used in grades 4 through 11, but let me just cite a quote from the 7th grade class Book 5. The book says, "'What is learned from the Hadith?' and teaches, 'The curse of Allah be upon the Jews and the Christians.'" Grades 8 through 11 continue to emphasize the notion and piousness of the jihad, and in grade 11 it warns

---

[1] The prepared statement of Mr. Emerson appears in the Appendix on page 131.

against taking the Jews and Christians as friends or protectors of Muslims.

I think this, unfortunately, helps develop a whole generational mind-set that leads to terrorism, noting that terrorism is really the culmination of indoctrination and recruitment. Much of that indoctrination is entirely legal, with terrorism being the violent, illegal expression ultimately and representing the culmination of the indoctrination and recruitment.

The Muslim World League, as has been referred to previously, is a group that was established in 1962 by the Saudi Arabian regime. It has continued to fund major Islamic movements around the world, often defending itself by claiming it is only involved in promoting education or repelling hatred against Islam.

However, it is absolutely clear that U.S. investigators, law enforcement for the FBI and intelligence investigators at the CIA, have collected abundant material showing MWL connections to al-Qaeda and to Hamas during the past 20 years—15 years in Hamas, to be specific, and in the case of al-Qaeda going back to the late 1980's. Similarly, other groups in Saudi Arabia, NGOs such as the International Islamic Relief Organization, established in 1978 as an arm of the MWL. Let me just briefly point out that in 1994, Muhammad Jamal Khalifa, Osama bin Laden's 37-year-old brother-in-law, was arrested in California coming from the Philippines. In his possession were documents connecting Islamic terrorist manuals to the International Islamic Relief Organization, the group that he had headed in the Philippines. In addition, the Canadian Government has stated in testimony in Canadian courts in the last 2 years that the IIRO secretly funded terrorism.

I think it is also important to note that Fayez Ahmed Alshehri, one of the September 11 airline hijackers, told his father before he set out for the hijacking conspiracy that he was going to work for the IIRO.

There is another group that is also involved and controlled by the Saudi Government and also has been cited in terms of its ties to Bosnian terrorists and to al-Jemaa Islamiyah. This group is al-Haramain.

Last, I would like to point out that the group called WAMY, the World Assembly of Muslim Youth, is an organization that, even though Saudi officials claim have no official connection, is largely funded by Saudi officials and by senior Saudi philanthropists. This organization has been tied to the 1993 World Trade Center bombing and has been repeatedly tied to al-Qaeda in numerous activities around the world. Most of that material I submit for the record in the testimony.

Thank you very much.

Senator SPECTER. Thank you, Mr. Emerson.

I had asked FBI Official Pistole to stay, and I have one question for you at this point as a follow-up to Mr. Winer. Is Mr. Pistole present?

Mr. LORMEL. I am Dennis Lormel, sir. Mr. Pistole had to go back to the office. I stayed behind. I am chief of the Terrorist Financing Operations Section.

Senator SPECTER. Well, when we ask witnesses to come, we request that they stay for the full hearing because in the course of

the hearing other issues arise where we would like to have them here.

Mr. LORMEL. Sir, that is why I stayed. If I could answer the question, I would be happy to.

Senator SPECTER. Well, when the Committee asked Mr. Pistole to stay, he ought to stay. In his absence, I will ask you the question.

It has been reported that the FBI will not pursue a criminal investigation where probable cause exists for the investigation if there is an objection from the State Department. Is there any validity to that report?

Mr. LORMEL. No, sir, I don't believe so. Maybe if you could explain a little more, I could better understand the context.

Senator SPECTER. Well, the report is that where there is probable cause to pursue an investigation under the criminal laws of the United States, the State Department can interpose an objection and prevent that investigation from going forward. And that is a very relevant point of inquiry at this particular hearing. It is a point that I have inquired about before.

Would you do two things? Would you identify yourself for the record? Do that now.

Mr. LORMEL. Dennis Lormel, and I am the chief of the Terrorist Financing Operations Section in the Counterterrorism Division of the FBI.

Senator SPECTER. OK. And would you relay that question to higher authorities in the Federal Bureau of Investigation and respond to this Committee?

Mr. LORMEL. Yes, sir, I will.

Senator SPECTER. Thank you.

Mr. LORMEL. And to my knowledge, I am not aware of any such cases. I can specifically speak to terrorist financing, and in our investigations there has been no such interaction with the State Department requesting that we stand down on criminal cases.

Senator SPECTER. Well, take the question up with higher authorities in the FBI, and while you are doing that, tell them that when the Committee asks a witness to appear, we like to have them here for the entire hearing, like the Senators are here for the entire hearing.

Mr. LORMEL. Yes, Senator.

Senator SPECTER. Mr. Winer, you very delicately stated that the State Department doesn't want to get our foreign partners upset. That is a magnificent understatement. Have you ever heard of a report that the FBI would not pursue an investigation, a criminal investigation, where probable cause existed if the State Department raised an objection at the highest levels?

Mr. WINER. I have not heard such reports, sir. In the time that I was at the State Department as the senior person for international law enforcement, I was aware of no such request from the State Department to the Bureau. Certainly I made none or would have encouraged or permitted the making of none.

However—and it is an important caveat—when requests of that nature are made, they are not written down and they are not done within the system, and they are done at a high level. I don't mean this specific request because I don't know of such a request. But

34

if a foreign government wished to be protected from a particular action by the U.S. Government and a Secretary of State so chose to do it, they do have the capacity and, in my experience, take advantage of that capacity to go around the system on any number of highly sensitive matters to arrange to have things done.

I think it is very undesirable because I believe every decision made should be on the record. I believe it is critical for the integrity of the system not to have decisions taken off the record. But it did take place during my time in government, not in connection with the FBI, not in connection with a criminal justice matter.

Senator SPECTER. Well, what was it in connection with and what was it?

Mr. WINER. Inquiries that other people were making other than the FBI. Matters were essentially calmed, quieted, stopped as a result of very high-level interventions, but not criminal justice pertaining to terrorism, not law enforcement per se. Regulatory.

Senator SPECTER. Can you be a little more specific in 12 seconds?

Mr. WINER. I can not, not because I am trying to protect any information from the Committee but because while I recollect it happening more than once, the exact circumstances are not at my fingertips, unfortunately. The memory of it is absolutely precise, but the substance, unfortunately, is not, sir.

I will say last, if I may, that in the regulatory review process, the fact that there is no process for integrating the equities into a solution is a huge problem when it comes to IEEPA. And, generally speaking, the way in which the Bureau deals with the State Department is that simply the Bureau does its thing, the State Department does its thing, and never the twain shall meet. So the problem is, when you get into everyone asserting their equities within the interagency process for an IEEPA designation, if one component objects, often that terminates, shuts down the whole thing, and that is not a good outcome.

Thank you, sir.

Senator SPECTER. Well, there is considerable concern by many in the Congress about Saudi Arabia being shielded for foreign policy reasons.

Mr. WINER. I have that concern, sir.

Senator SPECTER. That has been broadly expressed here today and in virtually every quarter. And one of the inquiries which has to be pursued is to what extent that is done and what are the policy ramifications, and it may be appropriate on public policy lines. But when you have a criminal investigation, an investigation into the U.S. Criminal Code, and there is probable cause to proceed, and it does not proceed because of foreign policy considerations, that is a matter which should attract the attention of the Congress at the highest levels. And that is an issue which is being pursued. It is not an easy issue to get answered.

Chairman Collins.

Chairman COLLINS. Thank you very much, Senator Specter.

Ambassador Gold, your exhibits are extremely persuasive and convincing in casting much doubt on the repeated claims by the Saudi Government that it is not funneling money to terrorist groups such as Hamas. Our previous FBI witness believes that

35

there has finally been a sea change in the commitment of the Saudis since the bombing in May in Riyadh.

I want to ask you two questions. First, what is your general assessment of the commitment by the Saudis in the wake of the May bombing? Do you believe there really is an attitude change and a commitment now? And, second, have you seen any evidence that the May 12 bombings have caused the Saudis to cut back on their financial and other support for Hamas?

Mr. GOLD. Let me answer your question, Madam Chairman. I think one has to draw a fundamental distinction between what is going on domestically in Saudi Arabia and what might be going on globally. Certainly that is the evidence that I have at this point.

I think it is clear, anybody just perusing newspapers since May 12, that Saudi Arabia is taking a large number of counterterrorist actions at home in terms of unveiling different units of al-Qaeda or—and, by the way, in geographically different parts of the kingdom—or trying to find weapons caches. That seems to be what is going on there. Counterterrorism activity at home seems to be considerable in comparison to what existed before.

However, I can report to you with, let's say, full authority and perhaps even encapsulating the national intelligence assessment of Israel that at present, as we speak, approximately 50 to 70 percent of the Hamas budget comes from Saudi Arabia. And I would say that portion, the Saudi portion of Hamas funding, is growing rather than declining.

Now, that is all I can say about the particular case of Saudi Arabia and Hamas. I think it would be interesting to compare what is going on globally in the Philippines, in Russia, in East Africa, and with respect to al-Qaeda as well outside of Saudi Arabia to see whether their action is only aimed at protecting themselves domestically, but it is basically the same old business overseas.

Chairman COLLINS. Thank you.

Mr. Emerson, you raised a very good point in your statement that it is not only a matter of Saudi support, financial support for terrorist organizations but, rather, the curriculum, the schools, what Saudi children and Saudi-supported schools elsewhere are teaching young people and whether or not they are instilling a hatred of Christians and Jews. And to me that is equally disturbing because it helps raise a whole new generation of people who are going to be susceptible to terrorists, to involvement with terrorist groups.

Have you seen any change in Saudi schools since the events of September 11 or more recently since the bombing in Riyadh?

Mr. EMERSON. Since September 11, I can tell you Saudi officials have declared that they have reined in some of the clergy and they fired or, "re-educated more than a thousand clerics."

On the other hand, the fact of the matter is if one looks at the FBIS reports, the Foreign Broadcast Information Service reports, plus the Saudi media and Saudi television, which is openly available on satellite television, one can see routine demagoguery leveled against the United States, against Christians and Jews routinely. Saudi websites features are the demonization of Jews and Christians as well as moderate Muslims. And I think you should be aware of something else, very disturbing. This incitement is not

necessarily illegal. It is considered free speech, and particularly in the United States. The problem is: How does one combat incitement within the context of an open society?

It is my feeling that incitement needs to have the sunshine to expose the whole virus of extremism, and those groups, entities, individuals that are propagating the incitement need to be delegitimized, or invited to the United States, or embraced. And I think that goes to the heart of getting Saudi Arabia to understand and recognize that it must rein in the extremists that in turn breed the terrorists that carried out September 11.

Chairman COLLINS. Thank you. May I do just one quick question for Mr. Winer?

Senator SPECTER. Absolutely.

Chairman COLLINS. Thank you.

Mr. Winer, you have experience in a previous administration, and I am trying to better understand why the U.S. Government has not been tougher with the Saudis. Do you believe that one factor, aside, perhaps, from our bases or oil, but I have heard that the U.S. Government has been hesitant to go after some suspected financers of terrorist groups because they are prominent Saudi business people. Do you think that is accurate?

Mr. WINER. Yes.

Chairman COLLINS. Could you expand further on why you think the Federal Government under both the previous administration and perhaps this administration as well has been somewhat reluctant to fully confront the Saudi Government in the wake of all of this compelling evidence?

Mr. WINER. I think a number of the factors are institutional and bureaucratic before you get to the additional factors pertaining to Saudi Arabia itself.

First, institutionally and bureaucratically, the only businessmen really that the U.S. Government went after prior to September 11 were Colombian businessmen who were also major cocaine traffickers. Prior to that, we used the International Emergency Economic Powers Act against countries or against military leaders, that kind of thing. These were businessmen. We were able to go after them because we found a computer in Colombia from the Cali cartel that listed all the businesses owned by these people who we had chapter and verse as drug traffickers. Easy case to make. Justice led making that case. Treasury, Mr. Newcomb strongly supported doing that because he felt all the facts were there, and it wasn't going to put IEEPA powers at risk, because what the U.S. Government is worried about, if we reach too far and somebody who is well funded goes after us and says you don't have the authority to do that, you don't have the public evidence to do that, we might lose some of that power. So there is an institutional concern. Don't overreach and then lose some of the power you have. Those are institutional and bureaucratic but very important constraints.

In the area of Saudi businessmen, you have got the problem of the fragmentary nature of the information, the fact that money is fungible, and just because a businessman funded a huge charity and that charity engaged in terrorist logistical support and recruitment in the Philippines and in the Middle East and in Chechnya

and Bosnia and wherever, while also doing lots of wonderful other things, how do you know that that businessman when he gave that money intended the bad things as well as the good things? A difficult case to make.

So prior to September 11, you are having tremendous tensions over what is the right thing to do in light of those institutional issues, legal issues, practical issues, even before you get to the sensitivity of the Saudi relationship itself. The facts about terrorist finance, while voluminous, are also often rather murky and difficult to fully decipher. Our intelligence was poorly arrayed prior to September 11 to gather all the information we needed. The interagency process didn't work as well as it should have, although Dick Clark tried valiantly to put it together and did, I think, a remarkable job. We didn't have as many facts as we should have. But we went to the Saudis as a government, shared with them what we had, asked them for more information, warned them of what might take place, and ultimately nothing happened. I think those are all facts that are undisputable. The why's and the wherefore's and the what should's are really up to you all to determine next.

Thank you very much, Madam Chairman.

Chairman COLLINS. Thank you, Senator Specter.

Senator SPECTER. Thank you, Chairman Collins. Senator Pryor.

Senator PRYOR. Thank you.

Mr. Winer, if you can educate this Committee just very briefly, as I understand Saudi Arabia—tell me if this is true or not. But as I understand Saudi Arabia, the economic power and the political power really are merged into one in the sense of there are families and it is pretty much one and the same.

Mr. WINER. I know of no facts to dispute that assessment. I think that is right.

Senator PRYOR. OK. So sometimes when we talk about individuals doing something versus the government doing something, a lot of times it is a matter of an individual maybe in their personal capacity versus in some other official capacity, right? It is all a hodgepodge. It is all mixed up. Is that fair to say?

Mr. WINER. Yes, sir.

Senator PRYOR. One thing that we are sensitive to obviously here in this country is al-Qaeda as a terrorist organization. I know that Ambassador Gold has mentioned a few times, Hamas. In this country, we are not quite as tuned into that. But, Ambassador Gold, what other terrorist organizations in your personal view have ties to Saudi Arabia besides al-Qaeda and Hamas?

Mr. GOLD. Well, many of these organizations are part of all the same network. In fact, al-Qaeda should probably be seen as a consortium of terrorist organizations where they use the assets, sometimes manpower assets, sometimes financial, conduit assets, sometimes expertise in explosives, and share them around the world. Some of those assets are in the Philippines. Some of those assets are in Indonesia. Some of those assets are in Chechnya and Dagestan in Russia. Some of those assets are in Egypt. And Hamas, by the way, is part of that network to a large extent.

I think you can find the fingers of Saudi financial involvement through these charities with most of the countries that I mentioned.

38

Let me just add one other point to my presentation at this time. Many times you are going to see Saudi denials, very firm denials, that they have cleaned up their act, that these charitable contacts around the world no longer are with suspected groups. For example, there was a press release put out on October 18, 2002, by the Saudi Embassy in Washington, and in it the Saudis asserted that, since September 11, all charitable groups have been audited to ensure that there are no links to suspected groups.

Now, I don't know what a suspected group is and they don't clarify it, but you would think that a suspected group would be groups that are on the State Department list of terrorist organizations. Well, the very same month that in Washington the Saudis were putting this out as a press release to the Washington Press Corps, you had another little event going on in Riyadh, Saudi Arabia. You had a WAMY conference. And that photograph of Khaled Mashal, one of the highest leaders in the Hamas organization, was taken by Reuters at a WAMY conference in October 2002, the very same month. So, in Washington, they are saying that they are cutting off their contacts, the contacts of the charities, with suspected groups, yet in Riyadh you have the Saudis inviting one of the leaders of Hamas to a WAMY conference in Saudi Arabia.

By the way, the Hamas actually prepared a record of Khaled Mashal's meetings in Riyadh, and it was found by Israeli forces the following month in the Gaza Strip. And according to that record, Khaled Mashal was not just a peripheral guest of a peripheral organization, WAMY. He actually had a for-eyes meeting with Crown Prince Abdullah, who actually chaired that WAMY conference.

Senator PRYOR. Mr. Winer, if I may ask you, with the increased financial security on terrorist organizations around the world, do you see some new tactics out there that they are trying to do to get around some of our efforts? And what are those tactics, and what do we need to be looking for?

Mr. WINER. Yes, sir. One quick observation. I am not aware of any individual or entity that has been arrested for terrorist finance in Saudi Arabia to date. If there have been any such arrests, none of them have been publicly announced.

As to new techniques, gold markets and precious metals generally, commodities, diamonds, as Senator Akaka raised before, remain essentially unregulated globally. Regulation of charities globally still is extremely poor, and charities remain a tremendous opportunity well outside Saudi Arabia for moving terrorist funds.

The underground alternative remittance systems are still, by and large, extremely poorly regulated. In every country, we are beginning a crackdown. Here we have required them to register in theory. I am not sure whether that is as effective as it should be. Certainly registration of hawalas in the Middle East remains relatively minimalist in practice, and those networks are very substantial. Money continues to move back and forth in terms of currency from Yemen to Saudi Arabia and into and out of UAE. So our ability to track all of that, particularly in connection with remittances, some of which involve legitimate remittances and some of which don't, is poor. And the religious schools around the world generally have no oversight in terms of movements of money.

In the United States, if you go to the IRS filings for religious groups, mosques, synagogues, or churches—it doesn't matter what religion—all you have to do is say, "I am a mosque," "I am a church." That is all you have to report to the IRS. There is no further detail in the public filings beyond that. That is in the United States, which is presumably one of the better regulated countries. So I think that is still a potentially significant problem.

That said, formal financial institutions cannot risk being associated with terrorist finance. If the U.S. Government were to go after any major financial institution anywhere in the world with a terrorist finance designation, it would create such a chilling impact that one would imagine further due diligence, regulatory efforts be put into place by financial institutions all over the world to ensure that didn't happen to them and to protect shareholder interests and equities.

Thank you.

Senator PRYOR. Thank you for that answer, and I want to thank the panel for being here.

Senator SPECTER. Thank you, Senator Pryor.

The Committee intends to pursue the question as to whether economic sanctions are being imposed, and there are very substantial indicators that they are not. When Saudi Arabia is involved, we are soft on economic sanctions. But there is a broader picture which is emerging, and that is the potential for criminal sanctions.

We have held in the Judiciary Committee hearings several years ago on the focus on U.S. citizens being murdered in Israel by terrorist organizations. And we are pursuing the question of bringing those terrorists to the United States for trial.

In 1986, we passed the Terrorist Prosecution Act, which gives extraterritorial jurisdiction to the United States to bring terrorists into our courts and to impose the death penalty. And there are two cases which we are currently focusing on with Israeli Attorney General Rubenstein and U.S. Attorney General John Ashcroft. One involves an individual who is in the United States where requests have been made to get witnesses to testify about his conduct involved in terrorism and murder of American citizens, and that evidence has to be provided by Israel. And contacts have been made at the very highest level with the Israeli Government, and some assurances have been received that there will be cooperation.

There is another individual who confessed on television, with no question about the voluntariness of the confession. And the issue is getting that individual extradited to the United States, which is complicated because, as is well known, Israel does not have the death penalty. But there are exceptions under Israeli law where national security is involved. And when we go through the very impressive chart, Ambassador Gold, that you put up about Saudi national charities and the financing of international terrorism, and they are not non-governmental organization, they are governmental organizations, those individuals who finance Hamas are potentially liable for prosecution in the United States criminal courts because Hamas takes credit for the killings. The murders at Hebrew University were American. U.S. citizens were murdered.

So this is a matter that we need to pursue further on the hard evidentiary line. But I think that economic sanctions are fine. I

40

would like to see them imposed, but there is a lot more that can be done.

Let me yield at this point to Senator Collins, and I will come back to questioning.

Chairman COLLINS. I just want to thank you, Senator, for spearheading this investigation. It is important, and the evidence we have heard in the statements this morning from the experts are compelling in painting a picture of the Saudi Government's many links to these charitable organizations and those organizations linked to terrorist groups. So I applaud your initiating this investigation, and I look forward to continuing to work with you.

Senator SPECTER. Well, thank you. Thank you, Senator Collins. Senator Pryor, do you have any further questions?

Senator PRYOR. No.

Senator SPECTER. Then let me proceed just a bit further.

Ambassador Gold, you have testified about the document which was signed by the current Palestinian Prime Minister requesting that Saudi official stop financing Hamas. Would you go through that again and elaborate on precisely what it says?

Mr. GOLD. Well, we actually have an English translation.

Senator SPECTER. That is from Abu Mazen?

Mr. GOLD. Abu Mazen, yes. Also known as Mahmud Abbas.

Senator SPECTER. Who is the Palestinian Prime Minister.

Mr. GOLD. He is the Palestinian Prime Minister, and he wrote in his own handwriting a fax that was sent to Prince Salman, the governor of Riyadh and full brother of King Fahd, probably the fourth most powerful man in Saudi Arabia. And I can just read this paragraph to you that I have on the screen, which is an exact translation of the relevant material.

Senator SPECTER. Please do.

Mr. GOLD. "I hereby wish to inform you that he"—meaning Yasser Arafat—"has spoken with me on the telephone and asked me to transmit to you his request that you mediate and interfere and express his view concerning the ongoing situation in our homeland. The Saudi committee responsible for transferring the donations to beneficiaries has been sending large amounts to radical committees and associations, among which the Islamic Society"—that is a translation of al-Jamiya al-Islamiyah—"which belongs to Hamas, the al-Islah Association"—an association known to be a Hamas institution in Gaza—"and to the brethren who engage in jihad in all regions. This fact badly influences the internal situation. It also results in strengthening these brethren and has, therefore, a negative impact on all sides. Moreover, the Committee does not send any money or assistance to members of Fatah."

So this is, again, written not by an Israeli but by perhaps the No. 2 man in the Palestinian Authority today——

Senator SPECTER. Perhaps the No. 1 man.

Mr. GOLD. Well, a lot of people are hoping to make him the No. 1, Prime Minister Mahmud Abbas. It is in his own handwriting, and it was written in December 2002.

Senator SPECTER. I will come to you in a minute, Mr. Winer. And it is directed to whom, again?

41

Mr. GOLD. Prince Salman is the governor of Riyadh, and it is directed to him. He is a full Sudairi brother of King Fahd, and I would say about the fourth most powerful man in Saudi Arabia.

Senator SPECTER. Do you have a judgment as to why the letter was written to him?

Mr. GOLD. Well, apparently they had sent messages to others as well, such as Prince Naif. But Salman has always been a kind of critical figure in many of the charitable enterprises, and perhaps that was why he was chosen.

Senator SPECTER. And when the last line says that no contributions were given to Fatah, what do you make of that?

Mr. GOLD. Well, I think here there is a desire, clearly, to make sure that all resources coming from Saudi Arabia go through the Fatah organization, which is the largest national component inside the Palestinian Authority. They want the money in their hands and not going to Hamas.

I think the importance of this document is that it clearly indicates that Saudi Arabia was funding Hamas in the year 2000, and we would say, as I said earlier, that funding is continuing to this day, in fact, becoming more significant as we speak.

Senator SPECTER. Mr. Winer, you had your hand up indicating a wish to say something?

Mr. WINER. It relates to this topic. Last year, FBIS reported that President Musharraf in Pakistan sent a similar communication to senior Saudi officials asking the Saudi Government to stop funding or Saudi Arabia to stop funding radical militants in madrassas in Pakistan who were creating problems of Islamic militancy within Pakistan for President Musharraf.

Senator SPECTER. What do you think we ought to do about that, Mr. Winer? You are a former State Department official.

Mr. WINER. I think that the Congress and the White House still speak with the bully pulpit, that they are communicating, as you are doing today, is important. Beyond that, I think sanctions have to be taken against particular entities, when we have sufficient evidence to determine that an entity, regardless of who——

Senator SPECTER. How about sanctions against the Saudi Arabian Government?

Mr. WINER. I think the first thing to do is sanctions against economic entities that are substantial where we have definitive information that those entities have been used to fund terrorism. That is what our law permits. That is what we have warned Saudi Arabia, among others, we could do. To the extent that we have the ability to do that and the evidentiary packages are sufficient, I think we should do it. That is my opinion.

Senator SPECTER. Ambassador Gold, to what extent, as you produce documents and show charts, is there an evidentiary chain which would go to these officials of the Saudi Government who are chairmen of these organizations, IIRO, WAMY, al-Haramain, to show the connection between those individuals and their direction of funds through these specific organizations to Hamas, which then results in the murders of U.S. citizens?

Mr. GOLD. I cannot supply the evidence to show that the heads, the chairmen of these organizations know where every dollar is going in these particular allocations to Hamas. But, again, the ma-

42

terial showing that the organizations are allocating to Hamas is clear-cut.

I would say there is one other aspect here, I think, that should be taken into account. I cannot speak about how the U.S. Government should respond. I am an Israeli citizen. But we are now——

Senator SPECTER. We are going to reserve those questions for State Department officials. We are not going to ask an Israeli former Ambassador to tell us what to do.

Mr. GOLD. But I will comment on one aspect affecting policy today because the United States is now leading the way to implement what is called the road map, a performance-based road map to a permanent two-state solution. And in phase one of the road map—this is from the Department of State website—you can see that Arab States are expected to cut off public and private funding and all other forms of support for groups supporting and engaging in violence and terror. Therefore, I would say the crown jewels of U.S. Middle East policy, that is, the road map, specifically refers to cases like Saudi Arabia. In short, Saudi Arabia ought to go under the road map.

I would also add that at the Sharm El-Sheikh Summit on June 3, 2003, President Bush made a declaration in which he said he had the assurances of all those present that there would be no more terrorist funding, and here is the actual phrase that he used at the summit: "The leaders here today have declared their firm rejection of terror regardless of its justifications. They have also committed to practical actions to use all means to cut off assistance, including arms and financing, to any terror group."

So what you have is clear-cut U.S. policy to make sure that Saudi Arabia doesn't continue funding Hamas. I would say from the testimony you have heard today, the same networks that are working with Hamas are also working with al-Qaeda. If you make sure that the funding to Hamas stops, you will also, to a large extent, improve the national security of the United States by cutting off the funding routes to al-Qaeda as well.

Senator SPECTER. Ambassador Gold, when you say you can not say that these officials in these organizations, these governmental officials knew where every dollar went, I can understand that. But if they know that there are some dollars going to Hamas and they know Hamas is engaged in terrorism, and that terrorism results in murders of U.S. citizens, that is—you don't have to find where every dollar goes. You just have to be able to prove that they know that some dollars are going to terrorists.

Mr. GOLD. I would suggest they have a kind of corporate responsibility standing at the head, at the apex of these organizations to know about it.

Senator SPECTER. You can not establish criminal liability as the head of a corporation. You have got to prove that they knew what was going on, knowledge, participation, and acquiescence.

Mr. GOLD. The documents that I can supply can show the organizations' links to Hamas. I can also show you how the organization is structured. But you would have to go probably to U.S. agencies to find out whether any other information is available linking these individuals to Hamas funding.

43

Senator SPECTER. And when you have the connection to al-Qaeda, it is a much broader criminal responsibility. There you have the murders of 3,000 American citizens.

Mr. GOLD. That is absolutely true. But, again, I will only make statements here about things that I can document. What I have stated in this Committee hearing I can document.

Senator SPECTER. Well, the statement by the President that you have got on the board is about as good as you can get for him to extract those promises from the leaders of Saudi Arabia and other countries. And now the issue is pursuit to see to it that they live up to what they have said.

One other subject before adjourning. Mr. Emerson, your comment, I think, about the 7th graders who were having hate materials in their educational portfolios, that has been a problem ongoing for quite a long time. We have seen in the Palestinian Authority materials in grade schools, and part of the funding of the Palestinian Authority after Oslo, before we stopped the funding, was conditioned on changing, taking those materials out of the textbooks.

You have had considerable experience in this field. What recommendations would you have as to how to deal with the problem of this hate literature going to the next generation?

Mr. EMERSON. I think it is probably the most frustrating problem to deal with insofar as asking Saudi Arabia to stop the incitement within its own borders is basically asking it to essentially renounce its own Wahhabist ideology. There is a fundamental contradiction here.

On the other hand, as a result of the Riyadh attacks, I think more members of the family realize that the tiger is now coming to bite it and it cannot afford to keep paying off cooptation money overseas or even trying to essentially incite its citizens against Christians or Jews or Israelis or Americans in an effort to dissuade them from being frustrated with the regime itself.

But there is a fundamental contradiction here. My belief is that Saudi Arabia, as you have noted here, should be subject to the sanctions that were empowered by the PATRIOT Act because of the fact that foreign national central monetary institutions are allowed to be subject to sanctions if their funding mechanisms do not stop or are aware of terrorist financing. And I think the body of evidence of terrorist ties going back for the last 15 years on WAMY, IIRO, al-Haramain, and several other Saudi, "NGOs are so demonstrably present that it would be reckless disregard for anyone to say that they were unaware of those ties, let alone not taking responsibility."

At this point, I can tell you based on the information we have collected that there are direct ties between Saudi Government officials, the members of the family—not all, but some—and all of those NGOs in terms of the financial support and the largesse they receive.

One other point I would just like to add, because you have been very good in terms of pressing the government to make sure that it does not succumb to any political pressure. I can tell you based on discussions that I have had with law enforcement officials and prosecutors that while no one has said to me that they received a

red light from the State Department, they have repeatedly expressed their frustration at the resistance within the government decisionmaking process to fully give them the green light to go after and conduct criminal investigations against Saudi entities and individuals. Part of the frustration is because Saudi Arabia has provided diplomatic immunity or actually pulled back some of the key witnesses, material witnesses that were being held here or subject to investigation and not made them available to the U.S. Government.

In other cases, it is the fear of antagonizing the Saudi regime that has basically put a red light to some of the key law enforcement prosecutions that are being considered at this point as we speak.

Senator SPECTER. Well, first you say there is no red light, and then you say there is not a green light. And we are not looking for amber in between. And then you just concluded by saying that there was a red light on criminal investigations. Could you amplify that a bit?

Mr. EMERSON. The red light insofar as a document that says we will not support a criminal investigation because of fear of engendering antagonism of the Saudi regime, I know of no such document that would ever be produced.

Senator SPECTER. Well, you wouldn't necessarily expect to have a document under seal, notarized. You might have a conversation. Who would want to put that in writing? Some congressional committee might get a hold of it.

Mr. EMERSON. Right, but you might not even have the conversation. It might just die, on the wane. In other words, it might not be acted upon.

Senator SPECTER. Well, there would be a reason for why it wasn't acted upon.

Mr. EMERSON. Well, there would be some type of bureaucratic reasons. Look, I can tell you documents we received under FOIA going back to 1996, 1997, and 1998, show that certain radical Islamic charities were being categorized as terrorist conduits back in those years—and yet they weren't frozen or had any sanctions against them until 2001. So something intervened to stop that designation and stop the asset forfeiture.

Now, I can not tell you what stopped it because I haven't received the documents—and I deal only with empirical evidence. But I know something stopped it, and I can only imagine that it was diplomatic pressure.

Senator SPECTER. Well, those are subjects we are going to pursue. One final comment. When you talk about Saudi textbooks responding to Wahhabi philosophy, there is a limit to how far you can go, even under those circumstances, as far as inciting murder. That crosses international lines, and it is an international crime. And we have got to look at the toughest lines, economic sanctions, criminal sanctions, whatever it takes.

Well, thank you very much, gentlemen. I think this has been informative, and stay tuned.

[Whereupon, at 12:41 p.m., the Committee was adjourned.]

# APPENDIX

Senate Committee on Governmental Affairs
John S. Pistole
Deputy Assistant Director
Counterterrorism Division
Federal Bureau of Investigation

July 31, 2003

"Terrorism Financing: Origination, Organization, and Prevention"

Good morning Madam Chair Collins, Senator Lieberman, and other distinguished members of the committee. It is an honor to testify before this committee regarding the FBI's efforts in identifying, tracking and dismantling the financial structure supporting terrorist groups.

Prior to the events of September 11, 2001 (9/11), the FBI had no mechanism to provide a comprehensive, centralized, focused and pro-active approach to terrorist financial matters. While the FBI examined financial records at the time of previous terrorist attacks, as part of the investigation into each of the attacks, the events of 9/11 identified a critical need for a more comprehensive, centralized approach to financial matters. The Terrorist Financing Operations Section (TFOS) of the FBI's Counterterrorism Division was formed, after 9/11, in response to this critical need. The mission of the TFOS has since evolved into a broader strategy to identify, investigate, prosecute, disrupt and dismantle incrementally, all terrorist related financial and fund-raising activities.

Identifying, tracking and dismantling the financial structure supporting terrorist groups is critical to successfully dismantling the organizations and preventing future terrorist attacks. As is the case in most investigations, locating and "following the money" plays a critical role in identifying those involved in the criminal activity, establishing links among them, and developing evidence of their involvement in the activity.

Terrorists, their networks and support structures, require funding in some form to exist and operate. Whether the funding and financial support is minimal or substantial, it usually leaves a financial trail that can be traced, tracked, and exploited for pro-active and reactive purposes. Being able to identify and track financial transactions and links after a terrorist act has occurred or terrorist activity has been identified, represents only a small portion of the mission; the key lies in exploiting financial information in efforts to identify previously unknown terrorist cells, recognize potential terrorist activity/planning, and predict and prevent potential terrorist acts.

In forming the TFOS, the FBI built upon its traditional expertise in conducting complex criminal financial investigations and long established relationships with the financial services

1

46

communities in the United States and abroad. Integrating these skills and resources with the Counterterrorism Division, allows the FBI to bring its full assets to bear in the financial war on terrorism.

The TFOS is both an operational and coordinating entity with pro-active and reactive responsibilities. As a coordinating entity, the TFOS is responsible for ensuring that a unified approach is pursued in investigating terrorist financing networks. The TFOS achieves this directive by: 1) coordinating the financial aspects of FBI Field Office and Legat terrorism investigations; 2) establishing overall initiatives, policy and guidance on terrorist financing matters; 3) participating in the National Security Council's Policy Coordinating Committee (PCC) on Terrorist Financing; 4) coordinating national liaison with the financial services sector; 5) cooperating in and coordinating criminal terrorist financing investigations with the Department of Justice; and 5) providing support and training to Field Offices to include the designated Terrorism Financing Coordinator (TFC).

It is critical that the financial aspects of terrorism investigations be adequately addressed and that a concerted, coordinated effort is made to investigate terrorist finance issues by experienced financial investigators. Rarely will a terrorist financing investigation be confined to the territory of one field office, rather they normally span not only multiple field office jurisdictions, but the globe; i.e., these types of investigations will frequently be linked to investigations and/or issues in other jurisdictions and other countries. It is imperative that these investigative efforts be effectively coordinated, placed into perspective with other counterterrorism efforts, prioritized in accordance with national and global strategies, and addressed in concert rather than in a disjointed, inefficient manner. Prior to the establishment of the TFOS, there did not exist within the FBI a mechanism to ensure appropriate focus on terrorist finance issues and provide the necessary expertise and overall coordination to comprehensively address these matters.

So how far have we come in the war on terrorist financing since 9/11? There currently exists a much better understanding of terrorist financing methods. More sophisticated and effective processes and mechanisms to address and target terrorist financing continue to develop and evolve. Pro-active approaches are increasingly being utilized. The awareness around the world on the part of law enforcement, government agencies, regulators and policy makers, and the private sector of terrorist financing methods, suspicious financial activity and vulnerabilities is much higher since 9/11. International cooperation has reached unparalleled levels. Outreach with, and cooperation from, the private sector has been outstanding and continues to develop, particularly the level of two-way interaction between law enforcement and the private sector. The ability to access and obtain this type of information immediately has significantly enhanced the FBI's ability to identify, investigate, and resolve immediate threat situations involving potential terrorist activity. For example, the ability to conduct real-time monitoring of specifically identified financial activity has been invaluable to not only investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations. Another example of not only more pro-active measures but also of increased cooperation and coordination with the international community.

47

Extensive training and support of international investigations by TFOS has led to Agent visits/exchanges and training programs involving a variety of countries from Europe, Southeast Asia, the Middle East, South America, etc. In support of specific high profile joint terrorist financial investigative matters, a number of countries and agencies, including the United Kingdom, Switzerland, Canada and Europol, have detailed investigators to TFOS on a TDY basis. TFOS has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. These joint investigations have successfully targeted the financing of several overseas al-Qa'ida cells, including those located in Indonesia, Malaysia, Singapore, Spain, and Italy. Furthermore, with the assistance of relationships established with the central banks of several strategic countries, successful disruptions of al-Qa'ida financing have been accomplished in counties such as the UAE, Pakistan, Afghanistan, and Indonesia.

TFOS has developed a specific terrorist financing/money laundering crimes curriculum for international training which includes topics such as: acquiring and handling evidence in document intensive financial investigations, major case management techniques, forensic examination tools, and methods of terrorist financing. At the request of the US Department of State, TFOS has led an interagency team to provide this curriculum to a number of countries (and is scheduled to provide to approximately 38 countries) identified as needing law enforcement training on conducting terrorist financing investigations.

TFOS has cultivated and maintains a contact database of private industry and government sources/persons who can provide financial data, including real-time monitoring of financial transactions. Many of these contacts can be reached or accessed on 24 hour/7 days a week emergency allowing TFOS to respond rapidly to critical incidents.

Through these contacts the TFOS has access to data and information from a variety of entities including: Banking, Credit/Debit Card Sector, Money Services Businesses, Securities/Brokerages Sector, Insurance, Travel, Internet Service Providers, Telecommunications Industry, Law Enforcement, State/Federal Regulatory Agencies, Public and Open Source Data Providers, the Intelligence Community, and International Law Enforcement and Intelligence Contacts. The timeliness and accessibility of the data is contingent on a variety of factors including whether the acquisition of the information requires legal process, the search capabilities of the data provider, and the size and depth of the data request. The ability to access and obtain this type of information in a time sensitive and urgent manner has significantly enhanced the FBI's ability to identify, investigate and resolve immediate threat situations involving potential terrorist activity. For example, the ability to conduct real-time monitoring of specifically identified financial activity has been invaluable to not only investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations.

Being able to identify and track financial transactions and links after a terrorist act has occurred or terrorist activity has been identified represents only a small portion of the mission; the key lies in exploiting financial information in efforts to identify previously unknown terrorist cells, recognize potential terrorist activity/planning, and predict and prevent potential terrorist acts. Prior