to 9/11, there was not enough emphasis placed on addressing the mechanisms and systems associated with terrorist financing and disrupting them before they could be utilized to further terrorist activities. Since September 11, TFOS, together with the Counter-Terrorism Section (CTS), Criminal Division of the Department of Justice (DOJ), have begun a number of pro-active link analysis initiatives to identify potential terrorists and terrorist related financing activities.

The overriding goal of these projects is to pro-actively identify potential terrorists and terrorist related individuals/entities, mechanisms or schemes through the digital exploitation of data. To accomplish this, TFOS seeks to 1) identify potential electronic data sources within domestic and foreign government and private industry providers; 2) create pathways and protocols to acquire and analyze the data; and 3) provide both reactive and proactive operational, predictive and educational support to investigators and prosecutors.

Information sharing is critical to all of our efforts. The intelligence community, including the FBI, produces and obtains tremendous amounts of classified intelligence information. While much of the information can be of significant value in terrorist finance investigations, the value will not be realized nor maximized absent the ability to filter the information, analyze it, and disseminate it in an appropriate manner to those who can make the best use of the information. Toward this end, the TFOS participates in joint endeavors involving the CIA, FBI, Treasury Department, Department of Justice, and the Department of Homeland Security involving potential terrorist related financial transactions, in addition to other joint participation between TFOS and the intelligence agencies. TFOS has personnel detailed to the CIA/CTC/FINO and personnel from there work directly with TFOS on financial intelligence matters.

The National Security Council formalized the Policy Coordinating Committee (PCC) on Terrorist Financing at the end of 2001. Treasury chairs the PCC and representatives from the Central Intelligence Agency, the Department of Defense, the Department of Justice, the Federal Bureau of Investigation, the Department of Homeland Security, the National Security Council and the State Department attend meetings.

The PCC generally meets at least once a month to coordinate the United States government's campaign against terrorist financing. The meeting generally focuses on ensuring that all relevant components of the federal government are acting in a coordinated and effective manner to combat terrorist financing.

**Terrorist Financing Successes**

In addition, the FBI, working in coordination with other entities of the US government, has participated in the following successes:

- An FBI Joint Terrorism Task Force in Charlotte used racketeering statutes to obtain convictions which disrupted and dismantled a Hizballah procurement and fund-raising cell. Twenty-six individuals were arrested for crimes including immigration fraud, visa fraud,

cigarette smuggling, interstate transportation of stolen property, fraud, bank fraud, bribery, money laundering, racketeering, and providing material support to a terrorist organization.

- The FBI coordinated with the Office of Foreign Asset Control (OFAC) to justify the blocking of Holy Land Foundation for Relief and Development (HLF) assets and the closing of its US offices, shutting down HAMAS' largest fund-raising entity in the US. The HLF had been linked to the funding of HAMAS terrorist activities, and in 2000, HLF raised $13 million.

- Offices of the Benevolence International Foundation (BIF), a US based charity, were shut down and its assets and records blocked following an OFAC and FBI investigation which determined that the charity was being used to funnel money to Al Qa'ida. In February 2003, Enaam Arnaout, the head of BIF, pled guilty to racketeering conspiracy, admitting he fraudulently obtained charitable donations in order to provide financial assistance to persons engaged in violent activities overseas.

- As a result of information developed by the FBI, a foreign security service, in conjunction with US Intelligence Community agencies, apprehended one of the most significant money launderers associated with Usama Bin Laden, for funneling $67 million through international accounts to al-Qa'ida and the Taliban.

- A criminal case against Sami Al Arian, the alleged US leader of the Palestinian Islamic Jihad (PIJ), and the World Islamic Studies Enterprise has forced the closure of several front companies suspected of funneling money to support PIJ operations against Israel. In August 2002, the investigation led to the deportation of Mazen Al-Najjar, the brother-in-law of Sami Al Arian and a known PIJ member. In February, following a 50-count indictment for RICO and Material Support of terrorism violations, the FBI arrested Al-Arian and three other U.S.-based members of the Palestinian Islamic Jihad, including Sameeh Hammoudeh, Hatim Naji Fariz, and Ghassan Ballout. The FBI also executed seven search warrants associated with this action.

- TFOS has provided operational support to FBI Field Divisions across the United States to enhance the intelligence/criminal investigations of individuals and groups, associated with or providing material support to, terrorist organizations and activities. This assistance is provided in the form of conducting intelligence/criminal financial investigations, financial analytical support, major case management, financial link analysis, and the deployment of teams of experts to develop investigative plans to analyze large volumes of documents and data. TFOS has provided this operational support in the Al Qa'ida sleeper cell cases in Buffalo and Portland, as well as in the Richard Reid, John Walker Lindh, Jose Padilla, Al Haramain, PIJ, and Mohamed Almoayad cases, among many others. This type of operational support has also been provided to Divisions investigating NGOs, such as the Holy Land Foundation for Relief and Development, Benevolence International Foundation and the Global Relief Foundation.

- TFOS has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. These joint investigations have successfully targeted the financing of several overseas Al Qa'ida cells, including those located in Indonesia, Malaysia, Singapore, Spain, and Italy. Furthermore, with the assistance of relationships established with the central banks of several strategic countries, successful disruptions of Al Qa'ida financing have been accomplished in counties such as the UAE, Pakistan, Afghanistan, and Indonesia.

- The FBI conducted a detailed financial investigation/analysis of the19 hijackers and their support network, following the September 11th attacks. This investigation initially identified the Al Qa'ida funding sources of the 19 hijackers in the UAE and Germany. The financial investigation also provided the first links between Ramzi Binalshibh and the 9/11 operation. A continuing investigation, in coordination with the PENTTBOMB Team, has traced the origin of the funding of 9/11 back to financial accounts in Pakistan, where high-ranking and well-known Al Qa'ida operatives played a major role in moving the money forward, eventually into the hands of the hijackers located in the U.S. As part of the 9/11 financial investigation, thousands of individuals and organizations were investigated in the U.S. and abroad to determine whether they played any part in supporting the hijackers or the operation. Although the vast majority of these individuals and organizations were cleared, this process of elimination resulted in numerous other quality terrorism investigations being initiated, as well as criminal charges against hundreds of individuals for fraud and other criminal activity.

- At the request of a foreign liaison service, TFOS traced financial transactions in a near real-time manner which led to the location of a terrorist cell and prevention of a terrorist act.

- Since 9/11, the United States has frozen $36.3 million in terrorist assets while other countries have frozen an estimated $97 million, for a total of over $133 million.

- U.S. authorities issued blocking orders on the assets of 281 terrorists, terrorist organizations, and terrorist supporters, effectively denying them access to the U.S. financial system.

- Federal law enforcement officials have arrested over 61 individuals, indicted 43 and convicted 12 in connection with terrorist financing investigations.

- U.S. Government agencies, to include the FBI's TFOS, deployed trainers and advisers on missions to countries around the world to assist with the drafting of legislation to combat terrorist financing, strengthen bank supervision in identifying suspicious transactions, and address other financial crimes and corruption.

- Since 9/11, over 120 countries have introduced new terrorist-related legislation and approximately 80 countries established Financial Investigation Units.

**Saudi Arabia and the War on Terrorism**

Following the 9/11 attacks, it became apparent that the role of Non-Governmental Organizations (NGOs) and charitable organizations, as a source of funding for terrorist groups, needed closer scrutiny. This included the role of Saudi Arabia and its citizens in the support of terrorism, both directly and indirectly, through the financial support of these charitable organizations.

The Kingdom of Saudi Arabia has taken proactive measures to deter global terrorism. In 1995, the bombing of Khobar Towers occurred in Saudi Arabia. In 1996, the Kingdom established a joint Counter-Terrorism Committee with the United States to share information on al-Qa'ida. In the wake of September 11, Saudi Arabia has increased its counterterrorism efforts with the following initiatives:

- Saudi Arabia has put new laws and regulations in place for all charitable groups, ensuring that they are audited to prevent the flow of funds to entities other than charity.
- Saudi Arabia has further strengthened its laws and regulations regarding money laundering. These efforts include new rules concerning the verification of customers' identities as well as restrictions on non-residents' ability to open accounts in the country.
- Saudi Arabia and the United States maintain a Counter-Terrorism Committee comprised of intelligence and law enforcement personnel who meet regularly to share information and resources and develop action plans to root out terrorist networks.
- In March 2002, Saudi Arabia and the US jointly blocked the accounts of Bosnia and Somalia branches of Al-Haramain Islamic Foundation, and in the summer of 2002, jointly froze the assets of the Rabita Trust, and those of its director Wa'el Hamza Julaidan, an associate of Bin Laden who provided financial and logistical support to al-Qa'ida.
- Saudi Arabia has contributed to the break up of a number of al-Qa'ida cells, the arrests of key al-Qa'ida leaders and capture of al-Qa'ida members in Saudi Arabia.

Since the May 12, 2003 bombings of the three western compounds in Riyadh, Saudi Arabia, cooperation with the Kingdom of Saudi Arabia has improved. The FBI sent an investigative team to the Kingdom and worked with the law enforcement and intelligence services to conduct the appropriate post incident investigation and evidence collection. Cooperation with the Saudi Arabian government continues on this and other terrorism investigations.

**The USA PATRIOT Act and Other Legislation**

Our efforts to combat terrorism have been greatly aided by the provisions of the PATRIOT Act. The success in preventing another catastrophic attack on the U.S. homeland would have been much more difficult, if not impossible, without the Act. It has already proved extraordinarily beneficial in the war on terrorism, and our opportunities to use it will only

increase. Most importantly, the PATRIOT Act has produced greater collection and sharing of information within the law enforcement and intelligence communities.

Title III of the Act, also known as the International Money Laundering Anti-Terrorist Financing Act of 2001, has armed us with a number of new weapons in our efforts to identify and track the financial structure supporting terrorist groups. Past terrorist financing methods have included the use of informal systems for transferring value in a manner that is difficult to detect and trace. The effectiveness of such methods should be significantly eroded by the Act, which establishes stricter rules for correspondent bank accounts, requires securities brokers and dealers to file Suspicious Activity Reports or SARS, and certain money services to register with FinCEN and file SARS for a wider range of financial transactions.

There are other provisions of the Act that have considerably aided our efforts to address the terrorist threat including: strengthening the existing ban on providing material support to terrorists and terrorist organizations; the authority to seize terrorist assets; and the power to seize money subject to forfeiture in a foreign bank account by authorizing the seizure of a foreign bank's funds held in a U.S. correspondent account.

It is important for the Committee and the American people to know that the FBI is using the PATRIOT Act authorities in a responsible manner. We are making every effort to effectively balance our obligation to protect Americans from terrorism, with our obligation to protect their civil liberties.

**Executive Branch Organizational Changes**

Organizational changes that have taken place within the Executive Branch with respect to the investigation of terrorism financing include the execution of a Memorandum of Agreement (MOA) between the Department of Justice (DOJ) and the Department of Homeland Security (DHS) concerning terrorist financing investigations. The MOA addresses the importance of waging a seamless, coordinated campaign against terrorist sources of financing. It was signed by Attorney General Ashcroft and Homeland Security Secretary Ridge on May 13, 2003. Prior to this agreement, both the DOJ and DHS had separate terrorist financing task forces. Under DOJ, the FBI had the TFOS, which was discussed earlier. The DHS had the Bureau of Immigration and Customs (ICE) led Operation Green Quest (OGQ).

Pursuant to the MOA, OGQ ceased to exist as a program name as of June 30, 2003. Accordingly, the FBI was designated to lead terrorist financing investigations and operations. It was agreed that DHS would focus its activities on protecting the integrity of U.S. financial infrastructures. To that extent, the DHS implemented the ICE led Operation Cornerstone. Operation Cornerstone will identify vulnerabilities in financial systems through which criminals launder their illicit proceeds, bring the criminals to justice and work to eliminate the vulnerabilities.

The majority of the former OGQ case inventory was criminal cases, with no nexus to terrorism. These cases were converted from OGQ to Operation Cornerstone. Those cases that had a nexus to terrorism that were investigated by the former OGQ are currently being assessed for transition to the appropriate FBI Joint Terrorism Task Force (JTTF). Ongoing and future Operation Cornerstone investigations that develop links to terrorism will be referred to the FBI through the TFOS. The ICE and TFOS are coordinating investigative initiatives that will enable the ICE to identify financial systemic vulnerabilities and which will enable the TFOS to identify ties to terrorism and terrorist financing. In addition, there is a liaison from ICE assigned to TFOS, and investigators from ICE will be represented on the JTTFs.

Terrorism represents a global problem. The solution is grounded in what would have been considered prior to 9/11, unprecedented international cooperation and coordination. The threat it poses must always be considered imminent. In addition to considerable financial investigative expertise, addressing terrorism and the finances that support and propagate it requires the ability to both implement proactive and preventive approaches to disrupt and dismantle as well as the ability to conduct highly reactive immediate response financial investigations to address potential imminent threats. As stated herein and in conjunction with more and more of the international community and other aspects of the US Government, the FBI has made considerable progress toward achieving and implementing these abilities.

Again, I offer my gratitude and appreciation to you, Madam Chair Collins, Senator Specter, and the Governmental Affairs Committee, for dedicating your time and effort to this issue and I would be happy to respond to any questions.

STATEMENT OF R. RICHARD NEWCOMB, DIRECTOR
OFFICE OF FOREIGN ASSETS CONTROL
U.S. DEPARTMENT OF THE TREASURY
BEFORE THE
COMMITTEE ON GOVERNMENTAL AFFAIRS
UNITED STATES SENATE
HEARINGS ON TERRORISM FINANCING: ORIGINATION, ORGANIZATION AND PREVENTION
JULY 31, 2003

Madam Chairman, members of the Committee, thank you for the opportunity to testify on OFAC's efforts to combat terrorist support networks that threaten United States citizens and property worldwide. It's a pleasure to be here. Please allow me to begin with a brief general overview of the problem, as I see it.

**Foundations of Terrorist Financing and Support**

The threat of terrorist support networks and financing is real, and it has been our mission to help identify and disrupt those networks. The vast majority of the world's Muslims are peaceful, though a committed, vocal, and well-organized minority is competing to mobilize a new generation in the tools and trade of Jihad.

There is much we know about how such radical Islamic terrorist networks were established and still thrive. Wealthy and influential individuals and families based in the Middle East have provided seed money and support to build a transnational support infrastructure that terrorists have used for their purposes. This network, fueled by deep-pocket donors and often controlled by terrorist organizations, their supporters or those willing to look the other way, includes or implicates banks, businesses, NGOs, charities, social services organizations, schools, mosques, madrassas, and affiliated terrorist training camps and safe houses throughout the world.

The terrorist networks are well-entrenched and self-sustaining, though vulnerable to U.S., allied and international efforts applying all tools at our disposal. Looking forward, please allow me to explain how we have come to this view and present the strategy, being implemented in coordination with other Federal agencies

including the Departments of Defense, State, Justice, Homeland Security, the FBI, the intelligence community and other agencies, to choke off the key nodes in the transnational terrorist support infrastructure.

**OFAC Mission and Experience on Counterterrorism**

The primary mission of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury is to administer and enforce economic sanctions against targeted foreign countries and foreign groups and individuals, such as terrorists and terrorist organizations and narcotic traffickers, which pose a threat to the national security, foreign policy or economy of the U.S. OFAC acts under general Presidential wartime and national emergency powers, as well as specific legislation, to prohibit transactions and freeze (or "block") assets subject to U.S. jurisdiction. Economic sanctions are intended to deprive the target of the use of its assets and deny the target access to the U.S. financial system and the benefits of trade, transactions and services involving U.S. markets, businesses and individuals. These same authorities have also been used to protect assets within the U.S. jurisdiction of countries subject to foreign occupation and to further important U.S. nonproliferation goals.

OFAC currently administers and enforces 26 economic sanctions programs pursuant to Presidential and Congressional mandates. Active enforcement of these programs is a crucial element in preserving and advancing the foreign policy and national security objectives that underlie these initiatives that are usually taken in conjunction with diplomatic, law enforcement and occasionally military action. In 1977, the Congress passed the International Emergency Economic Powers Act ("IEEPA"), which serves as the primary statutory authority for a Presidential declaration of a national emergency in peacetime for the purpose of imposing economic sanctions.

Many "country-based" sanctions programs are part of the U.S. government's response over time to the threat to U.S. national security and foreign policy posed by international terrorism. The Secretary of State has designated seven countries - Cuba, North Korea, Iran, Libya, Iraq, Sudan and Syria - as supporting international terrorism. Most of these countries are subject to comprehensive economic sanctions, including: Cuba (1963); Iran (1979 and again in

1987); Libya (1986); and Sudan (1997). Comprehensive sanctions against Iraq, originally imposed in 1990, were recently lifted although the national emergency remains in place. Comprehensive sanctions against North Korea, originally imposed in 1950, were lifted in 2000, except with respect to North Korean imports and "Weapons of Mass Destruction" blockings. Syria is not subject to comprehensive sanctions; however, certain financial transactions involving all terrorism list countries including Syria are regulated.

The origins of OFAC's involvement in the fight against terrorism stem from the initial conception of terrorism as being solely state-sponsored. OFAC's mandate in the realm of terrorism was to compile available evidence establishing that certain foreign entities or individuals were owned or controlled by, or acting for on behalf of, a foreign government subject to an economic sanctions program. Such entities and individuals become "specially designated nationals," ("SDNs") and are subject to the same sanctions as the foreign government to which they are related.

**Authorities to Target Non State Organizations, Individuals and Entities**

In January 1995, the President used the IEEPA authorities to deal with the threat to U.S. foreign policy and national security posed by terrorists who threaten to disrupt the Middle East Peace Process. This marked the beginning of the use of IEEPA sanctions authorities to target terrorists, terrorist groups and their sources of fundraising. This action, implemented through Executive Order 12947, opened the door to new programs and expanded the use of economic sanctions as a tool of U.S. foreign policy to target groups and individuals, as well as foreign governments. During the late 1990s, IEEPA authorities were used to issue additional Executive orders imposing sanctions on Al-Qaeda, and Usama bin Ladin. These E.O.s also provide authority to designate and sanction entities or individuals that are owned or controlled by, act for or on behalf of, or that provide material or financial support to Al-Qaeda or Usama bin Ladin.

Following this model, in October 1995, during a speech at a UN 50th anniversary celebration, the President announced the concept of adapting E.O. 12947 to target significant foreign narcotics traffickers centered in Colombia, i.e.,

the Colombian drug trafficking cartels. That IEEPA program, under E.O. 12978, began with the President identifying four Cali Cartel drug kingpins, and has expanded into a key tool in the fight against the Colombian cartels. As of today, 14 Colombian drug kingpins, 340 entities, and 470 other individuals associated with the Cali, North Valle, and North Coast cartels' and their business empires have been designated as Specially Designated Narcotics Traffickers ("SDNTs") under E.O. 12978.

Building on the successes of the Colombian cartels Program under E.O. 12978, in December 1999, Congress enacted the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), originally introduced by Senators Coverdell and Feinstein, modeled on IEEPA and OFAC's SDNT program. It provides a statutory framework for the President to impose sanctions against foreign drug kingpins and their organizations on a worldwide scale. Like the terrorism program under E.O. 12947 and the SDNT program under E.O. 12978, the Kingpin Act is directed against the individual or entity and their support infrastructure, not against the countries in which they are imbedded. Since the first list of kingpins was issued under that authority, 38 foreign drug kingpins (these are in addition to the 14 Colombian drug kingpins designated under E.O. 12978), 11 derivative companies, and 15 derivative individuals have been designated.

The Congress, in 1996, passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA makes it a criminal offense to: (1) engage in a financial transaction with the government of a country designated as supporting international terrorism; or (2) provide material support or resources to a designated Foreign Terrorist Organization (FTO).

Currently, 36 FTOs are subject to OFAC-administered sanctions. These FTOs have been designated by the Secretary of State in consultation with the Secretary of the Treasury and the Attorney General. Under the AEDPA and OFAC's implementing regulations, U.S. financial institutions must maintain control over all funds in which an FTO has an interest and report those actions to OFAC. OFAC is the coordination point with State and Justice on FTO designations and also has responsibility for coordinating with the financial community, the FBI, State,

and other Federal agencies in implementing the prohibitions of the AEDPA.

**Authorities in Response to September 11th**

The President harnessed these economic powers and authorities in launching the war against terrorism. In response to the terrorist attacks of September 11, and pursuant to the powers available to the President under IEEPA, President Bush issued Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism" declaring that the acts of grave terrorism and the threats of terrorism committed by foreign terrorists posed an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. E.O. 13224, as amended, authorizes the Secretary of the Treasury, in consultation with the Department of State, Department of Justice and the Department of Homeland Security, to implement the President's authority to systemically and strategically attack terrorists, terrorist organizations and terrorist support networks.

This order prohibits U.S. persons from transacting or dealing with individuals and entities owned or controlled by, acting for or on behalf of, assisting or supporting, or otherwise associated with, persons listed in the Executive Order. Those designated and listed under the Executive Order are known as "Specially Designated Global Terrorists", or SDGTs. Violations of the E.O. with respect to SDGTs are subject to civil penalties; and if the violation is willful, persons may be criminally charged. The Executive Order also blocks "all property and interests in property of [designated persons] that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons[.]"[1]

The PATRIOT Act, passed in October 2001, amends IEEPA to provide critical means and authority to OFAC to counter terrorist financing. The Act has enhanced OFAC's ability to implement sanctions and to coordinate with other agencies by clarifying OFAC's authorities to block assets of suspect entities prior to a formal designation in "aid of an investigation." This critical authority helps prevent the flight of assets and prevents the target from engaging in potential damaging behavior or transactions.

Prior to the passage of the PATRIOT Act, OFAC was wary of relying on classified information under IEEPA programs, because, unlike the Antiterrorism and Effective Death Penalty Act of 1996, IEEPA did not contain a provision explicitly authorizing submission of classified information to a court, in camera and ex parte, upon a legal challenge to a designation. The new PATRTIOT Act authority has greatly enhanced our ability to make and defend designations by making it absolutely clear that OFAC may use classified information in making designations without turning the material over to an entity or individual that challenges its designation.

**Rolling FTO's into SDGT's Makes War on Terrorist Infrastructure Global**

On November 2, 2001, the U.S. took a significant step in the War on Terrorism when the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, utilized the new authorities in E.O. 13224 to designate 22 Foreign Terrorist Organizations (FTOs) as Specially Designated Global Terrorists (SDGTs). This action expanded the War on Terrorism beyond Al-Qaeda and the Taliban and associated individuals and entities to include Hamas, Hizballah, the FARC, the Real IRA and others. As then recognized by the State Department, this action created a truly global war on terrorism and terrorist financing and demonstrated our commitment to continue and expand our efforts against all terrorist groups posing a threat to the United States, our citizens, our interests, and our allies. Currently, there are 36 FTOs which are also designated as SDGTs.

To date, the U.S. has designated 281 individuals and entities as SDGTs pursuant to E.O. 13224. 202 of these entities are associated with either Al-Qaeda or the Taliban which provides the basis to notify these names to the UN for listing pursuant to United Nations Security Resolutions (UNSCRs) 1267, 1333, 1373, 1390 and 1455. The United States has worked diligently with the UN Security Council to adopt international resolutions reflecting the goals of our domestic executive orders and providing the mechanisms for UN member states to freeze terrorist-related assets.

**Using Designation Authorities in Cooperation with International Partners**

The emerging international threat of Al Qaeda in the 1990s necessitated OFAC's participation in the U.S. government's focus on developing information and strategies against terrorist financing and infrastructures. In that context, it was clear that the cooperation of foreign governments, including Saudi Arabia, Kuwait and the UAE, would be critical in impeding the flow of funds to terrorists.

Having developed an understanding of how terrorist support networks operate, we began direct engagements with allies. For example, in June 1999, an OFAC delegation met with Finance Ministry, Intelligence and Law enforcement officials in Saudi Arabia, Kuwait and the UAE. The purpose of the trip was to find answers to certain questions we were unable to resolve to our satisfaction and to put officials on notice that cooperation on these issues was critical. We were clear that U.S. interest in these issues would continue.

In these meetings and others held subsequently in the region, we shared information and asked questions. Through the discussions, we identified areas where we could work together. These areas included strengthening the weak regulatory authorities over financial institutions and discussing the possibility for creating new oversight for charities. These proposals were met with assurances of cooperation, but we understood that getting assistance on these issues would be a serious challenge because it represented a change in policies and structures within governments and societies.

Importantly, in efforts to crack down on support for terrorists and terrorist fundraising, we have always made clear the intent of the U.S. government to deal with these issues cooperatively. A key element of our strategy and engagement was to take open, decisive action with host governments against several high impact targets. The designation and blocking of assets of high-profile supporters of terrorist groups could deter others, forcing key nodes of financial support to choose between public exposure of their support for terrorist activity or their good reputation. We believed this approach could also be effective against banks, business, NGOs and other institutions.

We traveled to Saudi Arabia again in January 2000. The purpose was again to communicate that the U.S. wanted to work with Saudi officials jointly in efforts to crack down on support for terrorists and terrorist fundraising. At the time however, we did not have many of the tools necessary to sufficiently back up threats with action; especially, in cases where the target was assessed as intransigent. This is the strategy that has been in place since September 11th as one of the means of deterring and disrupting terrorist financing. The tools Congress and the President have given us since September 11th have enhanced our ability to deliver this message and carry out this strategy.

**Post 9-11 Efforts**

After the 9-11 attacks, President Bush rallied the international community to unite in the war on terrorism. The international community, including our allies in the Persian Gulf, joined us and have committed to fully cooperating on all fronts against Al-Qaeda and its supporters. On a regular basis, for example, the United States works cooperatively with Saudi authorities on issues relating to the war on terrorism. In some areas, cooperation is routine and systematic; in other areas, especially those touching on aspects of terrorist financing and infrastructure, which touches on all aspects of government, coordination is more complex.

Following up on our previous trips and other U.S. efforts, OFAC visited Saudi Arabia and several other states in the region in December 2001 and January 2002. In Saudi Arabia, we met with an inter-agency delegation to discuss terrorist financing and to explore areas of mutual concern. Specifically, we discussed some possible joint U.S.-Saudi public actions to deny individuals and entities we suspected were supporting terrorism access to international financial markets and to prevent U.S. and Saudi citizens from having dealings with them. We also discussed Saudi efforts to strengthen regulatory oversight of charities and other charitable fundraisers, and steps taken by the Saudi Arabian Monetary Authority (SAMA) to tighten-up banking controls and improve compliance efforts.

In addition, we held meetings with a small group of private Saudi citizens and leaders of the Jeddah Chamber of

Commerce (JCCI). The purpose was to explore the charitable giving practices amongst its membership and encourage actions that would ensure that charitable funds are not ultimately channeled to terrorist activity. Later in January 2002, the JCCI announced that a task force would be set up to develop a comprehensive financial and administrative system for the nation's charities.

On March 11, 2002, Treasury Secretary O'Neill and Saudi authorities announced the joint designation of the Somalia and Bosnia-Herzegovina offices of the Al Haramain Foundation, a Saudi-based NGO with offices throughout the world. In addition to on-going law enforcement and intelligence cooperation, this effort marked an expansion of U.S.-Saudi cooperative efforts to act against the terrorist support networks. Based on evidence that these two branch offices were providing support to Al-Qaeda, these entities were forwarded to the UN Sanctions Committee for inclusion under the UNSCR 1333/1390 list.

In May 2002, an OFAC delegation returned to Saudi Arabia to continue the on-going dialogue on issues related to terrorist finance and infrastructure. During this trip, we were informed that the Saudi Government planned to significantly enhance its oversight of charitable organizations to prevent their exploitation by supporters of terrorism. Several months later, on September 6, 2002, the United States acted again with Saudi Arabia and jointly referred to the UN Sanctions Committee Wa'el Hamza Julaidan, an Al-Qaeda co-founder who was a leader of several terrorist-affiliated NGOs.

In October 2002, Saudi authorities announced that a full review was conducted of its charitable organizations and issued new guidelines, including one which mandates reporting to the Saudi Foreign Ministry of all charitable activities outside of Saudi Arabia. Shortly thereafter, on December 3, 2002, Saudi authorities publicly announced the establishment of a High Commission for oversight of all charities. Saudi authorities also reported that a process was being developed to establish operational procedures to track all donations to and from charities.

In addition to these actions, SAMA enhanced its scrutiny of the financial system. As part of this effort, in February 2003, SAMA reported that it had launched a program to train judges and investigators on legal aspects of terrorist

financing and money laundering, international requirements for financial secrecy, and methods followed by criminals to exchange information.

**Effect of May 12, 2003 Riyadh Attacks**

On May 12, 2003, homicide bombers affiliated with Al-Qaeda struck three residential compounds in Riyadh, Saudi Arabia, killing thirty-four including nine Americans. Saudi authorities responded with new resolve in fighting the war on terrorism and carried out a number of actions to capture, kill or arrest suspected terrorists operating in Saudi Arabia.

Marking a recognition of the seriousness of the challenges on terrorist finance and infrastructure issues, Saudi authorities announced that charitable organizations would no longer be authorized to provide funds outside of Saudi Arabia other than through highly-controlled and government supervised channels. Additionally, Saudi authorities announced that Al Haramain was closing operations in as many as ten countries outside Saudi Arabia. The U.S. continues to monitor the status of these announced efforts and to express our critical interest in cooperating to maximize possibilities for effectiveness.

In June 2003, Saudi authorities announced that SAMA distributed a circular to all banks and financial institutions in Saudi Arabia requiring the full and immediate implementation of nine new policies and procedures applicable to charitable and welfare institutions. The new rules include requirements that all accounts of a single organization be consolidated into one account, that depositors provide banks with sufficiently verifiable identification, and that cash withdrawals be strictly prohibited.

To implement these new rules, SAMA reported that it intends to verify compliance through on-site inspections by SAMA officials, receipt of regular compliance reports, and certification by external auditors. The new rules take into account the Saudi Banking Control Law, SAMA's regulations, the Financial Action Task Force (FATF) 40 Recommendations, the FATF 8 Special Recommendations on Terrorist Financing, and applicable UN Security Council resolutions.

The United States supports all efforts reported by Saudi authorities to improve efforts to prevent the flow of charitable funds to terrorist activity. Joint efforts, including the designation of senior Al-Qaeda leadership based in Saudi Arabia like Wael Hamza Julaidan, demonstrate the willingness of Saudi authorities to cooperate on high impact financing and infrastructure targets. These actions by Saudi authorities present the U.S. with opportunities to cooperate in improving, verifying, and evaluating progress. We must continue to engage Saudi authorities in areas where we believe improvements can be made, and continue to demonstrate that we are steadfast in our determination to eliminate the threat posed by the terrorist networks.

As efforts to improve oversight of charities continue, we believe we should seek to cooperate closely in three key areas: (1)-programmatic: (2) personnel; and (3) financial. Specifically, it is critical that we continue to follow up with Saudi authorities to measure whether 1) the true goals and objectives of charities are what they purport to be; 2) whether leadership and staff are appropriately vetted and not committed to any dual-purposes; and 3) whether the means that are used to raise and move funds are transparent.

Additionally, we must continue our dialogue with wealthy individuals, families and merchants to ensure that they are taking all necessary precautions to prevent charitable donations from supporting terrorist activity. In instances where we have strong reason to believe that some elements are not doing enough, we must pursue more stringent measures, which we believe, may force others to become more vigilant in ensuring that funds are not provided for terrorist activity. Looking forward, Saudi Arabia and other important partners continue to indicate their willingness to cooperate in joint efforts, and we remain committed to ensuring that maximum efforts are made to achieve tangible results.

**Multilateral Actions Against Al-Qaeda and other Terrorist Infrastructure**

Reflecting the broad range of mechanisms by which terrorist groups, particularly Al-Qaeda, receive financial and other material support, OFAC has effectively implemented the President's designation authority against a variety of targets. These range from using targeted economic

sanctions to disrupt the terrorist financing operations of an international "hawala" network as well as a more traditional banking network, to disrupting the activities of several key NGOs in supplying financing and other services to Al-Qaeda. Information available to the US Government indicates that these actions have disrupted Al-Qaeda's support network and OFAC continues its efforts to plan, prepare and implement actions, which will impact on the ability of terrorists and their networks to provide material, financial and logistical support for future terrorist strikes. For examples of some of these actions, please see Appendix 1.

Due to the transnational nature of the terrorist infrastructure, support and cooperation with our allies is a critical part of making U.S. designation actions successful. By developing and establishing authorities and procedures for entities associated with Al-Qaeda and the Taliban to be submitted to the UN, we have begun to institutionalize on a global scale the importance of sanctions as a critical tool against the terrorist support networks. We continue to work with our allies in making designations against Al-Qaeda's infrastructure that may be notified to the UN.

**Towards a Strategic Effort and "Key Nodes" Approach**

Over the next six to twelve months, OFAC is seeking to significantly expand its efforts and the impact of the implementation of the President's authorities under E.O. 13224 by adopting a more systematic approach to evaluating the activities of major terrorist organizations in various regions. This approach will focus on identifying "key nodes" that sustain the abilities of terrorist organizations to remain operational, despite successful actions by the U.S. and its allies to capture, kill and arrest terrorist cell members, leaders and operational planners.

In furtherance of this end, OFAC initiated a collaborative effort with the Department of Defense to develop information and strategies against terrorist financing and infrastructure. Before OFAC's secure facility was operational, DOD agencies to include the Office of Naval Intelligence (ONI), in addition to the Financial Crimes Enforcement Network (FINCEN), generously provided space and support to OFAC personnel that was critical to OFAC efforts

immediately following the 9-11 attacks. Since this time, OFAC staff have continued liaison relationships with several DOD agencies and combatant commands. As a result of this effort, OFAC has gained wider access to information and expertise critical in carrying out the President's authorities under EO 13224.

Specifically, in October 2002, OFAC began a joint project with the U.S. Pacific Command (USPACOM) and other DOD elements that identified terrorist support networks in Southeast Asia and selected key nodes, or priority targets, in these networks. The project's geographic scope included four countries – Indonesia, the Philippines, Malaysia and Singapore – and eight terrorist or Islamic extremist groups. The project focused special attention on Jemaa Islamiyah (JI), the Abu Sayyaf Group (ASG), and the Moro Islamic Liberation Front (MILF), because of their relative importance in the region and threat to U.S. interests.

For JI, which subsequently carried out the Bali bombings and has strong ties to Al-Qaeda, the project identified the key leaders, fundraisers, businessmen, recruiters, companies, charities, mosques, and schools that were part of its support network. Thus far, we have imposed sanctions against two of these key nodes, and are coordinating action against several others.

This process is the model that OFAC is seeking to continue and expand in collaborative efforts with DOD agencies including ONI and the combatant commands. Next week, I will be visiting USEUCOM headquarters and meeting with the Chief of Staff, to lay the groundwork to continue a joint project including USEUCOM and OFAC Officers. We also hope to begin projects with the Central (USCENTCOM) and Southern (USSOUTHCOM) Commands shortly thereafter. Working with DOD Commands and other DOD agencies provides OFAC and its DOD partners a force multiplier that brings together a variety of counterterrorism tools and resources to enhance opportunities for future efforts.

Taking a regional approach along with the various command's areas of responsibility, the effort will seek to identify and isolate key nodes in the transnational terrorist support infrastructure in the respective areas of responsibility. This approach seeks to provide the opportunity to cripple an entire organization at one time through OFAC's implementation of the President's authority

in coordination with possible actions of other U.S. departments and agencies and in cooperation with our allies.

We have already taken steps to implement this approach in some regions. OFAC analysts are currently working with DOD agencies, including analysts from the Office of Naval Intelligence (ONI), to fully identify the terrorism support infrastructure in the Horn of Africa. In this region, shipping and related drug smuggling activities appear to be strengthening the terrorist networks in this area. Working with ONI provides OFAC the opportunity to work with analysts with unique expertise in areas otherwise less accessible to OFAC.

In the Southern Command area of responsibility, Narco-Terrorists in Colombia are one of the major targets. On October 31, 2001, three Colombian guerrilla-terrorist organizations that had previously been determined to be Foreign Terrorist Organizations - the FARC (Revolutionary Armed Forces of Colombia), the AUC (United Self-Defense Forces of Colombia) and the ELN (National Liberation Army) - were added to the list of global terrorists under E.O. 13224. On June 1 of this year, President Bush named two of those organizations - the FARC and the AUC - as foreign drug kingpins under authority of the Foreign Narcotics Kingpin Designation Act, thus, effectively recognizing them as narco-terrorists.

Although the structure, goals, and international ties of these groups are significantly different from those of the Islamic extremist terrorist organizations linked to Al-Qaeda and Hamas, these Colombian narco-terrorist organizations are still dependent upon cash or other media of exchange, such as drugs-for-guns, to sustain their guerrilla and paramilitary forces. Thus, although their key nodes may be more difficult to isolate in a meaningful sense for the effective application of OFAC's economic sanctions, they are not immune. We expect that some aspects of these organizations and their support structures will be found to be susceptible to OFAC actions.

For a description of the graphical representations of a key nodes approach that could be applicable to a terrorist support network in any region, please see Appendix 2.

**Summary**

The funds necessary for a terrorist organization to carry out an attack often are minimal, but the support infrastructure critical for indoctrination, recruitment, training, logistical support, the dissemination of propaganda and other material support requires substantial funding. The President's powers under IEEPA, E.O. 13224, as well as other legislation provide the United States with authorities that are critical to attacking the unusual and extraordinary threats posed by the transnational terrorist support networks. OFAC's effectiveness in implementing these authorities requires strong coordination with other U.S. departments and agencies and support from U.S. allies.

Terrorist organizations including Al-Qaeda, Egyptian Islamic Jihad, Jemaa Islamiyah, Al-Ittihad Al-Islamiyya, Hamas, Hizballah and others rely on their infrastructure for support and to shield their activities from scrutiny. The secretive nature of their activities and their frequent reliance on charitable, humanitarian, educational and religious cover are vulnerabilities OFAC can exploit by making designations under E.O. 13224. Decisive action against high impact targets deters others, forcing key nodes of financial support to choose between public exposure of support for terrorist activity or tarnishing their reputation, to the detriment of their business and commercial interests.

Looking forward, OFAC seeks to continue coordinating with other U.S. agencies as efforts are expanded to impede the activities of terrorist organizations. By duplicating the approach to Southeast Asia in coordination with USPACOM, we plan to identify and isolate key nodes in the transnational terrorist support infrastructure through a regional approach reflecting the areas of responsibility of the military commands. This approach seeks to enhance the coordination of OFAC's actions with those of other U.S. departments and agencies and in cooperation with allies.

**Appendix 1**

**Al-Barakaat network:** Shortly after September 11, 2001, OFAC identified the Al-Barakaat Network as a major financial operation that was providing material, financial, and logistical support to Usama Bin Laden, Al-Qaeda, and other terrorist groups. The work done by OFAC led to President Bush's November 7, 2001 announcement of the freezing of assets of the Al-Barakaat Network. In the announcement, the President was joined by the Secretary of the Treasury, the Secretary of State and the Attorney General. As a result of that action, Barakaat's cash flow--nearly $1.4 billion in less than two years--was severely disrupted. Al Ittihaad Al Islamiya--the Somali militia closely tied to Al Qaeda and a major beneficiary of the funds moving through Barakaat—also suffered a crippling loss of income.

**Nada-Nasreddin network:** OFAC worked closely with its partners in the Caribbean and Europe for nearly a year to unearth the Muslim Brotherhood backed network of financial houses and investment firms used by the European and Caribbean-based Al-Qaeda supporters, Yousef Nada and Ahmed Idris Nasreddin. These companies were then publicly designated by the U.S. and notified and listed at the UN in November 2001 and August 2002, significantly disrupting their activities. Cooperative efforts made by international partners including Italy, Switzerland, Luxembourg, and the Bahamas were critical in making this action successful.

**Benevolence International Foundation (BIF) and Global Relief Foundation (GRF) Blocking in aid of Investigation:** On December 14, 2001, the U.S. Treasury Department blocked in aid of investigation both BIF and GRF in Chicago, Illinois. OFAC, in coordination with the FBI in Chicago, blocked the business records and bank accounts of BIF and GRF, pending further investigation by OFAC. GRF filed for injunctive relief in U.S. District Court on January 28, 2002. BIF filed its complaint in U.S. District Court on January 30, 2002. On October 17, 2002, OFAC designated GRF pursuant to E.O. 13224 and on November 18, 2002, designated BIF. The district court rejected GRF's motion for a preliminary injunction on June 11, 2002. This decision was affirmed by the Seventh Circuit on December 31, 2002. On February 25, BIF's civil suit against the US Government was voluntarily dismissed with prejudice and without costs. On July 3, 2003, GRF filed a petition for writ of

*certiorari* with the Supreme Court. Both BIF and GRF were notified and listed at the UN.

**Designation of Holy Land Foundation (HLF), Beit al-Mal, and al-Aqsa Islamic Bank:** On December 4, 2001, the U.S. Treasury Department designated Holyland Foundation ("HLF"), Beit al-Mal Holdings, and al-Aqsa Islamic Bank pursuant to E.O.s 13224 and 12947. HLF was also added to the EU's list of terrorists in June 2002. On March 8, 2002, HLF filed its complaint in U.S. District Court. On May 31, 2002, OFAC redesignated HLF. On August 8, 2002, the district court denied HLF's motion for a preliminary injunction on all counts and granted summary judgment to the government as to most of HLF's claims, including its due process, First Amendment, and Religious Freedom Restoration Act claims. On June 20, 2003, the D.C. Circuit upheld the district court's ruling in full. On February 6, 2002, OFAC received a petition from Beit al-Mal for removal from the SDGT list. On June 7, 2002, al-Aqsa submitted a petition to OFAC for removal from the SDGT list. Both cases are under review.

**Kuwaiti Charities:** On January 9, 2002, Treasury designated the Pakistani and Afghan branches of the Revival of Islamic Heritage Society (RIHS) and the Afghan Support Committee (ASC) as entities supporting the Al-Qaeda network. The RIHS is a Kuwaiti-based charity with offices in Pakistan, Afghanistan and throughout the world. The Peshawar, Pakistan office defrauded donors to fund terrorists, including inflating the number of orphans it was ostensibly supporting with the names of fictitious or dead children in order to obtain additional funds from the RIHS Kuwait headquarters. The additional money was then diverted to Al-Qaeda terrorists. ASC located in Jalalabad, Afghanistan, solicited donations from local charities in Arab countries by falsely asserting that the funds collected were destined for orphans and widows. In reality, the financial chief of the ASC served as the head of organized fundraising for Usama Bin Laden and turned over the funds collected by the ASC to Al-Qaeda operatives. These entities were notified and listed at the UN.

**G7 Joint Designation:** On April 19, 2002, the United States, along with the other G7 members, jointly designated nine individuals and one organization. Most of these groups were European-based Al-Qaeda organizers and financiers of

terrorism. Because of their Al-Qaeda links, all ten of these names were notified and listed at the UN.

**U.S.-Central Asia Joint Designation:** On September 6, 2002, the United States, Afghanistan, Kyrgyzstan, and China jointly notified and listed at the UN the Eastern Turkistan Islamic Movement, an Al-Qaeda-linked organization active in parts of South and Central Asia.

**Jemaa Islamiyya:** On October 23, 2002, the United States designated the Southeast Asia-based terrorist group, Jemaa Islamiyya, the perpetrator of the deadly attacks on a nightclub in Bali on October 12th. In the subsequent request of the United Nations to also designate this group for its ties to the Al-Qaeda organization, the U.S. joined Australia, Indonesia, Singapore, and 46 other countries, including all the members of ASEAN and the EU, in notifying and listing Jemaa Islamiyya's at the UN. This represents the most widespread show of support to initiate a designation at the UN to date.

**Three Chechen Groups:** On February 28, 2003, the United States designated three Chechnya-based terrorists groups responsible for the Moscow theater siege. In the subsequent request to the UN for notification and listing these groups based on their ties to the Al-Qaeda organization, the U.S. was joined by UN Security Council members France, Russia, China, the UK, Spain, and Germany.

**Cooperation with European Union Member States:** On February 26, 2002 and May 3, 2002, the United States joined the Spanish Government and designated more than 20 ETA related operatives. These names were not notified to the UN. On August 8, 2002 joined the Italian Government in designating several Al-Qaeda related individuals which were notified to and listed at the UN. In addition, on June 6, 2003, the U.S. joined Italy and Germany in designating 17 Al-Qaeda individuals which were notified to the UN.

## Appendix 2

**Anatomy and Disruption of Terrorism Support Networks**

The attached four charts lay out OFAC's theory regarding how we currently employ and could expand the use of sanctions authority to disrupt the financial and support networks of several prominent terrorist groups.

**Charts 1 and 2** are examples of the various steps of the funding process. Donors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations, in turn, use the funds both for legitimate humanitarian efforts, but also either wittingly or unwittingly allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organization with close ties to the extremist group or members of the extremist group with responsibility for liaising with charitable organizations.

**Chart 3** is a model of a terrorist support network with the key nodes highlighted that we believe economic sanctions could effectively impact. These include financial, leadership, and influence nodes. Influence nodes can include individuals and institutions that provide spiritual or other guidance, or serve as recruitment centers.

**Chart 4** shows theoretically how designation and isolation of the key nodes identified in Chart 3 will sever critical ties within the overall network and thereby disrupt its overall functioning.

Model of the Origin and Flow of Funds to Extremist Groups
Donors/Sources of
Intermediaries
Charities
Facilitators
Extremist Groups



CHART #2
MODEL OF THE ORIGIN AND FLOW OF FUNDS TO EXTREMIST GROUPS
DONORS/SOURCES OF FUNDING
INTERMEDIARIES
CHARITIES
FACILITATORS
EXTREMIST GROUPS
Page 1

CHART #3
KEY NODES OF A MODEL TERRORIST NETWORK
Page 1



CHART #4
MODEL TERRORIST NETWORK WITH NODES REMOVED
LARGER entities represent the key nodes of the network.
Entities in a GREEN box are financial targets.
Entities in a RED box are leadership targets.
Entities in a BLUE box are influence targets.
Page 1

**SAUDI SUPPORT FOR INTERNATIONAL TERRORISM: BACKGROUND AND CURRENT DEVELOPMENTS**

**Testimony by Dr. Dore Gold, President of the Jerusalem Center for Public Affairs and former Israeli Ambassador to the United Nations**

**U.S. Senate Committee on Governmental Affairs, Thursday, July 31, 2003**

Nearly two years ago on September 11, 2001, most well-informed observers about the Middle East were shocked to hear that 15 out of the 19 hijackers who carried out the attacks on the World Trade Center and the Pentagon were Saudi citizens. It was equally surprising that the mastermind of the worst terrorist attack on the United States in its history, Osama bin Laden, was born and raised in Saudi Arabia. This curiosity and wonder about the Saudi role in the attack came up once more with the release of the September 11 report by the U.S. Congress and its disclosure of "incontrovertible evidence" linking Saudis to the financing of al-Qaeda operatives in the United States.

For decades, terrorism had been associated with states like Libya, Syria, or Iran. Saudi Arabia had been a pro-Western force during the Cold War and had hosted large coalition armies during the 1991 Gulf War. Saudi Arabia had not been colonized during its history, like other Middle Eastern states that had endured a legacy of European imperialism. This background only sharpened the questions of many after the attacks: What was the precise source of the hatred that drove these men to take their own lives in an act of mass murder?

In a series of articles appearing in the Egyptian weekly, *Ruz al-Yousef* (the *Newsweek* of Egypt), this past May, Wael al-Abrashi, the magazine's deputy editor, attempted to grapple with this issue. He drew a direct link between the rise of much of contemporary terrorism with Saudi Arabia's main Islamic creed, Wahhabism, and with the financial involvement of Saudi Arabia's large charitable organizations:

> "Wahhabism leads, as we have seen, to the birth of extremist, closed, and fanatical streams, that accuse others of heresy, abolish them, and destroy them. The extremist

religious groups have moved from the stage of *Takfir* [condemning other Muslims as unbelievers] to the stage of 'annihilation and destruction,' in accordance with the strategy of Al-Qa'ida – which Saudi authorities must admit is a local Saudi organization that drew other organizations into it, and not the other way around. All the organizations emerged from under the robe of Wahhabism."

"I can state with certainty that after a very careful reading of all the documents and texts of the official investigations linked to all acts of terror that have taken place in Egypt, from the assassination of the late **president Anwar Sadat** in October 1981, up to the Luxor massacre in 1997, Saudi Arabia was the main station through which most of the Egyptian extremists passed, and emerged bearing with them terrorist thought regarding *Takfir* – thought that they drew from the sheikhs of Wahhabism. They also bore with them funds they received from the Saudi charities."

(Middle East Media Research Institute, Special Dispatch Series - No. 526 - Saudi Arabia, June 20, 2003)

Thus, while some Western commentators have sought to explain the roots of al-Qaeda's fury at the U.S. by focusing on the history of American policy in the Middle East or other **external** factors, a rising number of Middle Eastern analysts have concentrated instead on **internal** Saudi factors, including recent militant trends among Saudi Arabia's Wahhabi clerics and the role of large Saudi global charities in terrorist finance. This requires a careful look at how Saudi Arabia contributed to the ideological roots of some of the new wave of international terrorism as well as how the kingdom emerged as a critical factor in providing the resources needed by many terrorist groups.

**Historical Roots**

The particular creed of Islam practiced in Saudi Arabia, which is known in the West as Wahhabism, emerged in the mid-18th century in Central Arabia from the teachings of Muhammad ibn Abdul Wahhab. This Arabian religious reformer sought to rid Islam of foreign innovations that compromised its monotheistic foundations and to restore what he believed were

the religious practices of the 7th century at the time of the Prophet Muhammad and his immediate successors. He established a political covenant in 1744 with Muhammad bin Saud, according to which he received bin Saud's protection and in exchange legitimized the spread of Saudi rule over a widening circle of Arabian tribes. This covenant between the Saudi royal family and Wahhabism is at the root of modern Saudi Arabia.

In retrospect, Wahhabism was significant for two reasons. First, it rejuvenated the idea of the militant *jihad*, or holy war, which had declined as a central Islamic value to be applied universally. Under the influence of Sufism, for example, *jihad* had also evolved into a more spiritual concept. Second, Wahhabism became associated with a brutal history of political expansion that led to the massacre of Muslims who did not adhere to its tenets, the most famous of which occurred against the Shiites Muslims of Kerbala in the early 18th century and against Sunni Muslims in Arabian cities, like Taif, during the early 20th century. These Muslims were labeled as polytheists and did not deserve any protection. The highest spiritual authority of Islam during this period, the Sultan-Caliph of the Ottoman Empire, regarded the Wahhabis as heretics and waged wars against them in defense of Islam.

Yet it would be a mistake to focus on Wahhabism alone as the ideological fountainhead of the new global terrorism. Modern Saudi Arabia in the 1950s and 1960s hosted other militant movements that had an important impact, as well. For reasons of regional geopolitics, King Saud, King Faisal, and their successors provided sanctuary to elements of the radical Muslim Brotherhood from Egypt, Sudan, Jordan, and Syria. Some were provided Saudi stipends. Others were given positions in the Saudi educational system, including the universities, or in the large Saudi charities, like the Muslim World League, that was created in 1962. For example, Egyptian President Abdul Nasser had the Muslim Brotherhood ideologue, Sayyed Qutb, executed in 1966; his brother, Muhammad Qutb, fled to Saudi Arabia and taught at King Abdul Aziz University in Jiddah. He was joined in the 1970s by one of the heads of the Muslim Brotherhood from Jordan, Abdullah Azzam. In 1979, both taught Osama bin Laden, a student at the university.

Saudi Arabia's global charities, like the Muslim World League, permitted the spread of the new militancy that was forged from the cooperation between the Wahhabi clerics and the Muslim Brotherhood refugees. After 1973, these charities benefited from the huge petrodollar resources

dispensed by the Saudi government, which undoubtedly helped them achieve a global reach. Abdullah Azzam headed the office of the Muslim World League in Peshawar, Pakistan, when it served as the rear base for the war against the Soviet occupation of Afghanistan. He was joined by his student, bin Laden, who with Saudi funding also set up the Mujahidin Services Center (Maktab Khadmat al-Mujahidin) for Muslim volunteers who came to fight the Red Army. After Moscow's defeat in Afghanistan, this office became al-Qaeda.

Thus, the Saudi charities became instrumental for the continuing global *jihad*. Bin Laden's brother-in-law, Muhammad Jamal Khalifa, ran the offices of the International Islamic Relief Organization (IIRO), a Muslim World League offshoot, in the Philippines. Local intelligence agencies suspected that it served as a financial conduit to the Abu Sayyaf organization. Muhammad Zawahiri, brother of bin Laden's Egyptian partner, Ayman Zawahiri, would eventually work for IIRO in Albania. Indeed, IIRO would eventually be suspected of involvement in terrorist threats in India, Kenya, and to Russian forces in Chechnya.

**Ideological Roots of the New Terrorism**

These developments seem far beyond the horizon of the Israeli-Palestinian conflict, but not completely, for a careful examination of the religious sources of some of the worst suicide bombings against the State of Israel by the Hamas organization leads also to Saudi Arabia. Looking at Hamas websites, this very month, one finds Saudi clerics prominently featured as providing the religious justification for suicide bombings. Of 16 religious leaders cited by Hamas, the largest national group backing these attacks are Saudis. The formal Saudi position on suicide bombings, in fact, has been mixed. To his credit, the current Saudi Grand Mufti, Sheikh Abdul Aziz bin Abdullah Al al-Sheikh, has condemned these acts. Yet at the same time, Saudi Arabia's Minister for Islamic Affairs, Sheikh Saleh Al al-Sheikh, has condoned them: "The suicide bombings are permitted...the victims are considered to have died a martyr's death."

The Hamas-Saudi connection should not come as a surprise. Hamas emerged in 1987 from the Gaza branch of Muslim Brotherhood which, as noted earlier, had become a key Saudi ally during previous decades. When Hamas spiritual leader Sheikh Ahmed Yasin was let out of an Israeli

prison in 1998, he went to Saudi Arabia for medical treatment and Crown Prince Abdullah made a high-profile visit to his hospital bedside. Bin Laden had made the fate of Sheikh Yasin an issue for his al-Qaeda followers as well. In his 1996 "Declaration of War," he listed Sheikh Yasin's release from prison as one of his demands or grievances.

Saudi support for suicide bombings has wider repercussions. Other militant Islamic movements cite Saudi clerics to justify their activities – from the Chechen groups battling the Russians to Iraqi mujahidin (al-jam'ah al-salifiyah) fighting the U.S. army in western Iraq. In order to evaluate the significance of these religious rulings, it is necessary to focus on the stature of these various clerical figures.

For example, just after the September 11 attacks, it is true that many Saudi government officials condemned them. But there were other voices as well. Shortly thereafter a Saudi book appeared on the Internet justifying the murder of thousands of Americans, entitled *The Foundations of the Legality of the Destruction That Befell America.* The Introduction to the book was written by a prominent Saudi religious leader, Sheikh Hamud bin Uqla al-Shuaibi. He wrote on November 16, 2001, that he hoped Allah would bring further destruction upon the United States. Al-Shuaibi's name appears in a book entitled the *Great Book of Fatwas*, found in a Taliban office in Kabul. Sheikh al-Shuaibi appears on the Hamas website, noted earlier, as a religious source for suicide attacks. He appears on the website of the Islamic militants fighting the U.S. army in western Iraq as well. His ideas had global reach.

The question that must be asked is whether a religious leader of this sort is a peripheral figure on the fringes of society or whether he reflects more mainstream thinking. In fact, al-Shuaibi had very strong credentials. Born in 1925 in the Wahhabi stronghold of Buraida, he was a student of King Faisal's Grand Mufti, Sheikh Muhammad ibn Ibrahim Al al-Sheikh. Al-Shuaibi's roster of students read like a "Who's Who" of Saudi Arabia, including the current Grand Mufti and the former Minister of Islamic Affairs and Muslim World League secretary-general, Abdullah al-Turki. When al-Shuaibi died in 2002, many central Saudi figures attended his funeral. In short, he was mainstream. His militant ideas about justifying the September 11 attacks were echoed by Sheikh Abdullah bin Abdul Rahman Jibrin, who actually was a member of the Directorate of

Religious Research, Islamic Legal Rulings, and Islamic Propagation and Guidance – an official branch of the Saudi government.

**Financial Support for the New Global Terrorism**

As already demonstrated, Saudi Arabia erected a number of large global charities in the 1960s and 1970s whose original purpose may have been to spread Wahhabi Islam, but which became penetrated by prominent individuals from al-Qaeda's global *jihadi* network. The three most prominent of these charities were the International Islamic Relief Organization (an offshoot of the Muslim World League), the World Assembly of Muslim Youth (WAMY), and the Charitable Foundations of al-Haramain. All three are suspected by various global intelligence organizations of terrorist funding.

It would be incorrect to view these charities as purely non-governmental organizations. At the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also a Saudi cabinet member, chairs the Constituent Council of the Muslim World League. The Saudi Minister of Islamic Affairs chairs the secretariat of WAMY and the administrative council of al-Haramain. All three organizations have received large charitable contributions from the Saudi royal family that have been detailed in Saudi periodicals.

The earliest documented links between one of these charities and terrorists was found in Bosnia. It is a handwritten account on IIRO stationery from the late 1980s indicating the use of this charity's offices for the support of militant actions. But the strongest documented cases that demonstrate the ties between Saudi Arabia's global charities and international terrorism are related to Hamas. These ties were alleged already in the mid-1990s when a Hamas funding group received instructions to write letters of thanks to executives of IIRO and WAMY for funds it had received. In 1994, President Clinton made a brief stopover in Saudi Arabia during which he complained about Saudi funding of Hamas. These charges about Saudi Arabia bankrolling Hamas have become even more vociferous in recent years.

The Saudis have been equally vociferous in their denials. Crown Prince Abdullah's foreign

policy advisor, Adel al-Jubeir, asserted on CNN's "Crossfire" on August 16, 2002: "We do not allow funding to go from Saudi Arabia to Hamas." More recently, Foreign Minister Prince Saud al-Faisal told the Saudi daily *Arab News* on June 23, 2003, that since the establishment of the PLO as the sole legitimate representative of the Palestinian people, the Saudi Kingdom only sends funding through the PLO. He denied that the Saudis finance Hamas.

Yet during Israel's Operation Defensive Shield last year, a whole array of documents was uncovered which show these repeated Saudi denials to be completely baseless. One of the strongest pieces of evidence came from a handwritten letter written in Arabic by the current Palestinian Prime Minister, Mahmud Abbas (Abu Mazen), on December 30, 2000, to Prince Salman, governor of Riyadh and a full brother of King Fahd. Abbas complained that Saudi donations in the Gaza Strip are going to an organization called al-Jamiya al-Islamiya (the Islamic Society), which Abbas explained "belongs to Hamas." He wanted the funds for Fatah.

Al-Jamiya al-Islamiya was not just a Hamas front, supporting positive social programs and secretly diverting funds to military activity. Even its showcase activities were reprehensible. For example, at a kindergarten graduation involving some of its 1,600 Palestinian pre-schoolers, children wore uniforms and carried mock rifles. Others re-enacted the lynching of Israelis or other terrorist attacks. Thus, the Saudis were not only funding the current generation of terrorism but also the next generation as well.

There were other documents linking Saudi institutions to terrorist financing. An actual IIRO document was found that detailed how $280,000 was to be allocated to 14 Hamas front groups. Checks made out to well-known Hamas fronts from the corporate account of al-Rajhi Banking and Investment at Chase Manhattan Bank were also uncovered. Al-Rajhi Banking and Investment was one of the largest Saudi banking networks which serviced the Saudi charities. Its head, Sulaiman al-Rajhi, headed the family that established the SAAR (the acronym for his name) foundation in Herndon, Virginia, which was raided last year by U.S. federal agents because of suspected terrorist links.

There were other conduits for terrorist funding that were disclosed. Spreadsheets of the Saudi

Committee for Aid to the al-Quds Intifada were found. These lists, that detailed the movement of moneys to the families of suicide bombers, were significant. Saudi spokesmen tried to distance themselves from this activity by arguing that they helped these families through international aid organizations. Yet it became clear from the spreadsheets that these contributions were given through a specifically Saudi organization that was headed by the Saudi Minister of the Interior Prince Naif. Indeed, at the top right-hand side of the spreadsheet found in the West Bank, the name "Kingdom of Saudi Arabia" stands out. In the words of Secretary of State Colin Powell, this kind of support "incentivized" the suicide terrorist attacks.

The Hamas case demonstrated the mode of operation of Saudi charities in support of terrorism. It was significant for those investigating other cases of global terrorism, including al-Qaeda, since very often these groups shared the same funding mechanisms. As a case study, it is particularly useful, since it is the best-documented case of how the Saudis used their charities to back militant activities.

**Current Situation**

Most of the documents discovered in the West Bank and Gaza Strip were dated from the year 2000. Saudi diplomats argued that after September 11, 2001, they had turned over a new leaf. For example, in October 2002, the Royal Embassy of Saudi Arabia in Washington released a statement detailing the steps they had taken to keep better track of what the charities were doing. The Saudi statement asserted that since September 11, 2001, "charitable groups have been closely monitored and additional audits have been performed to assure that there are no links to suspected groups."

Yet, the very same month the newest Saudi assurances were provided in Washington, one of the top leaders of Hamas, Khaled Mashal, was invited to Riyadh for a WAMY conference. So while in Washington the press corps was told that there were no longer any ties between the Saudi charities and suspected groups, in Riyadh, one of the three main Saudi charities was hosting the leader of one of the suspected groups, Hamas, that had been labeled by the U.S. government as

an international terrorist organization. According to a captured Hamas document that detailed Khaled Mashal's visit to Saudi Arabia, he actually had been invited by Crown Prince Abdullah himself. While Hamas had refused at the time to stop its suicide attacks, nonetheless, Saudi officials reassured Mashal of continuing support.

A new context for the issue of Saudi funding of terrorist groups was created when President Bush issued the "Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict" on April 30, 2003. Besides requiring difficult measures by Israelis and Palestinians alike, the new Bush administration plan specifically called on Arab states in its first phase to "cut off public and private funding and all other forms of support for groups supporting and engaging in violence and terror." In short, Saudi Arabia had to come under the roadmap, as well. Meeting the leaders of Saudi Arabia, Jordan, Egypt, and Bahrain at Sharm el-Sheikh on June 3, 2003, President Bush announced that they had committed themselves to use all means to cut off assistance to any terror group.

It might have been expected that Saudi Arabia would adhere to this firm U.S. policy. On May 12, 2003, Saudi Arabia itself was struck by a triple suicide bombing that led to 35 fatalities, including 9 Americans. Having denied that there was an al-Qaeda presence in the Saudi kingdom, the Saudi government began uncovering al-Qaeda cells and munitions in Riyadh, Mecca, Medina, Jidda, and in the northern al-Jawf area. Having provided the ideological and financial basis for the growth of al-Qaeda and its sister organizations, including Hamas, Saudi Arabia found that the fire they had ignited was coming back to burn them as well.

Unfortunately, while the Saudis appear to be taking their own domestic threat seriously, there is no indication that they have scaled back their support for Hamas. The Israeli national assessment is that Saudi Arabia today funds more than 50 percent of the needs of Hamas and the Saudi percentage in the total foreign aid to Hamas is actually growing. Saudi Arabia continues to aid the families of suicide bombers. It helps dual-use charities and charities that funnel funds directly to military activities against Israel.

At present, Hamas has agreed to a temporary truce with Israel called a *hudna*, but it is vigorously

seeking to rebuild its operational infrastructure, including an effort to increase the quantity and quality of Qassam rockets launched against Israelis towns. Muslim writers have argued in the past that a *hudna* is to be maintained until the balance of power improves for the Muslim side. Funding Hamas today jeopardizes the present cease-fire between Israel and the Palestinians and increases the likelihood that Hamas will return to militant action.

It is instructive to recall that in 1995, Saudi Arabia's National Guard headquarters was struck by pro-bin Laden forces, as well. Domestic threats in the mid-1990s did not cause the Saudis to halt their assistance to *jihadi* groups abroad, like Hamas or the Taliban, in the past. Riyadh appears able to draw a distinction between acts of domestic subversion and international terrorist activities, which are seen as part of the global *jihad.*

**Conclusions**

This testimony was intended to disclose the critical role of Saudi Arabia in providing ideological and financial support for the new terrorism. While most of the evidence presented here comes from the specific case of Hamas, the modus operandi adopted in the Hamas case is probably applicable to other parts of the global terrorist network as well. This is especially true of the critical role of Saudi Arabia's global charities in sustaining many similar militant organizations from Indonesia to central Russia. While Saudi spokesmen have provided repeated assurances that they have cleaned up these activities, their denials with respect to terrorist funding do not stand up against the documented evidence that has accumulated in the last two years.

The Saudi government faces hard dilemmas. It has recently taken disciplinary action against some of its most extreme religious leaders. But traditionally, the Saudis need the backing of their clerics to legitimize their regime; that is the heart of the Saudi-Wahhabi covenant that dates back to the 18th century. Yet the Saudis also need the ultimate protective shield provided by the United States. In order to sustain this, they have spent huge sums of money for public relations firms and influence-brokers. But the time has come to tell the Saudis that they have to make a choice. After September 11, there has to be zero tolerance for terrorist funding and other forms

of terrorist support.

The stakes involved are not just a question of public relations or Arab-Israel point-scoring in Washington. The West needs to come to an understanding with the Islamic world based on mutual respect and tolerance. The radicalization of the Middle East being promoted by the Saudis undermines that goal and threatens to substitute instead a vision of perpetual militancy and conflict. For that reason, what is at stake is nothing less than the security of the United States and its allies, as well as the question of whether the Middle East moves in the direction of hope and peace or relapses into a state of continuing strife.

# Saudi Minister of Interior Prince Nayef bin Abdel-Aziz, November, 2002;

- "We put big question marks and ask who committed the events of September 11 and who benefited from them…**I think they [the Zionists] are behind these events**…I cannot still believe that 19 youths, including 15 Saudis, carried out the September 11 attacks with the support of bin Laden and his Al-Qa`ida organization. It's impossible. I will not believe that these people have the power to do so horrendous an attack."

# Abdallah Bin Matruk Al-Haddal - Ministry of Islamic Affairs, January, 2002;

- "…bin Laden waged an Islamic Jihad; he defended the oppressed people in Afghanistan. He expelled the Soviet Union [from Afghanistan] …**Men like bin Laden will not allow the Islamic world to bow down under the infidel enemies' tyranny, under the tyranny of the U.S**…"

Kingdom of Saudi Arabia
Shura Council
Maneh ibn Hammad Al-Johani
Secretary-General
Shura Council
Dr. Abdullah Naseef
Secretary-General
World Assembly of Muslim Youth
Grand Mufti
Shaiykh Abdul Aziz Bin Baz
SR10,000 in 1996
Prince Al-Waleed bin Talal bin Abdel Aziz
SR1 million in 1995
Governor of Riyadh
Prince Salman Bin Abdel Aziz
One of the "Largest Single Donors" – 1992. SR1m in 1996
SR1 million in 1995
Deputy Governor of Riyadh
Prince Statam Bin Abdul
SR1 million
Muslim World League
Sanabel al-Kheer
International Islamic Relief Organization



PIX.: KHALIL ABDEL AZIZ, TEACHER FROM SAUDI ARABIA



# 11th Grade Saudi Textbook Distributed in the United States;

- **"… the Summons to Islam in its initial stages was confronted by this when factions of the Jews strove to oppose it and deceive it by various treacherous and perfidious methods, violating their agreement with the Messenger of Allah. Allah responded to their deception by slaughtering them, cleansing the land of their evil and filth**. The word of Truth was exalted, victories followed one after another and booty came continuously to the Muslims…"

# Saudi Source of Inspiration for Hamas Suicide Bombing

المركز الفلسطيني للإعلام

July 10, 2003

الصفحة الرئيسية | من نحن؟ | للاتصال بنا | خريطة الموقع

في هذا القسم
- الفتاوى الفقهية
- دراسات وبحوث
- كتب وإصدارات

الفتاوى والتأصيل الشرعي

أضفنا لقائمة

مواضيع خاصة بالعمليات الاستشهادية

- الإرهاب الإسرائيلي وشرعية المقاومة والعمليات الاستشهادية
- سنة الله الماضية في الكون والحياة...
- بيان رابطة علماء فلسطين يناشد الإخوة المزارعين إخراج زكاة الزيتون ، و المحافظة على أرضهم ، و الدفاع عنها
- التحالف مع أمريكا لضرب العراق أو أي قطر عربي أو إسلامي خيانة لله و رسوله و للمؤمنين و حرام شرعا
- بيان من هيئة علماء السودان نصرا للمجاهدين على أرض فلسطين الجمعة 22 محرم 1423هـ الموافق 5 أبريل 2002م
- نداء للمسلمين لنجدة إخوانهم في فلسطين .. لم يبق للأمة من مخرج شرعي [illegible] الشيخ سفر بن عبد الرحمن الحوالي
- [illegible]
- فتوى العلامة الدكتور يوسف القرضاوي حول مشاركة النساء في العمليات الاستشهادية
- ملف خاص : شرعية العمليات الاستشهادية
- فتوى بشأن العمليات الفدائية الاستشهادية صادرة عن مجمع الفقه الإسلامي – السودان
- فتوى صادرة عن رابطة علماء فلسطين في حكم العمليات الاستشهادية
- [illegible]
- [illegible]
- فتوى شيخ الأزهر وعدد من علماء مجمع البحوث الإسلامية في مصر
- هل يُعتبر منتحرا من فجر نفسه بحزام ناسف وسط العدو؟ د. عجيل جاسم النشمي – الكويت
- [illegible]
- فتاوى العلماء :
  - [illegible]
  - [illegible]
  - [illegible]
  - الشيخ محمد بن عبدالله السيف ـــ مفتي المجاهدين في الشيشان ـــ .

  ملف ورد
- الإصابة في طلب الشهادة ، جابر بن عبد القيوم الساعدي الشامي أبو قتيبة



94

"The Foundations of the Legality of the Destruction that Befell America"

( مَا كَانَ اللَّهُ لِيَذَرَ الْمُؤْمِنِينَ عَلَى مَا أَنْتُمْ عَلَيْهِ حَتَّى يَمِيزَ الْخَبِيثَ مِنَ الطَّيِّبِ)

# التأصيل لمشروعية ما حصل لأمريكا من تدمير

تقديم

الشيخ العلامة حمود العقلاء

و

الشيخ الفاضل علي الخضير

كتبه /عبدالعزيز بن صالح الجربوع

Fatwah Authorizing the Use of WMD

# رسالة
# في
# حكم استخدام أسلحة الدمار الشامل
# ضد الكفار

كتبه :
ناصر بن حمد الفهد

**ربيع الأول - 1424**

# Saudi National Charities and the Financing of International Terrorism

| | IIRO | WAMY | al-Haramain |
|---|---|---|---|
| | International Islamic Relief Organization | World Assembly of Muslim Youth | Charitable Foundations of al-Haramain |
| **CHAIRMAN** | Sheikh Abdul Aziz bin Abdullah Al al-Sheikh | Sheikh Saleh bin Abdul Aziz Al al-Sheikh | Sheikh Saleh bin Abdul Aziz Al al-Sheikh |
| **TITLE** | (Grand Mufti, Saudi Cabinet Member) | (Minister of Islamic Affairs, Saudi Cabinet Member) | (Minister of Islamic Affairs, Saudi Cabinet Member) |
| **RELATION TO SAUDI GOVERNMENT** | Chairman of Constituent Council of World Muslim League | Chairman of WAMY Secretariat | Chairman of al-Haramain Administrative Council |
| **OFFICIAL SOURCES OF FUNDING** | DONATIONS FROM SAUDI ROYAL FAMILY | DONATIONS FROM SAUDI ROYAL FAMILY | DONATIONS FROM SAUDI ROYAL FAMILY |

# The "Golden Chain"

MUSLIM WORLD LEAGUE
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

رابطة العالم الإسلامي
هيئة الإغاثة الإسلامية العالمية

No ________
Date ________

[illegible] لقاء الدكتور [illegible] / [illegible]
[illegible]

[illegible] والسؤال [illegible]
[illegible] إجازة [illegible]
[illegible]
[illegible]

توزيع [illegible] البيوت [illegible]
[illegible]

يتم نقل الأجهزة [illegible] المنطقة [illegible]

[illegible]

[illegible] المؤسسات [illegible]
[illegible]

[illegible]
[illegible]

[illegible]
[illegible]

وضع [illegible] الأجهزة في [illegible]

بعد ذلك الخطوات المذكورة [illegible] عادل [illegible]