# SAUDI ARABIA AND THE FIGHT AGAINST TERRORISM FINANCING

## HEARING

BEFORE THE

## SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA

OF THE

## COMMITTEE ON INTERNATIONAL RELATIONS HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTH CONGRESS

SECOND SESSION

————

MARCH 24, 2004

————

### Serial No. 108–109

————

Printed for the use of the Committee on International Relations



Available via the World Wide Web: http://www.house.gov/international_relations

————

U.S. GOVERNMENT PRINTING OFFICE

92–744PDF                 WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON INTERNATIONAL RELATIONS

HENRY J. HYDE, Illinois, *Chairman*

JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
CHRISTOPHER H. SMITH, New Jersey,
  *Vice Chairman*
DAN BURTON, Indiana
ELTON GALLEGLY, California
ILEANA ROS-LEHTINEN, Florida
CASS BALLENGER, North Carolina
DANA ROHRABACHER, California
EDWARD R. ROYCE, California
PETER T. KING, New York
STEVE CHABOT, Ohio
AMO HOUGHTON, New York
JOHN M. McHUGH, New York
ROY BLUNT, Missouri
THOMAS G. TANCREDO, Colorado
RON PAUL, Texas
NICK SMITH, Michigan
JOSEPH R. PITTS, Pennsylvania
JEFF FLAKE, Arizona
JO ANN DAVIS, Virginia
MARK GREEN, Wisconsin
JERRY WELLER, Illinois
MIKE PENCE, Indiana
THADDEUS G. McCOTTER, Michigan
KATHERINE HARRIS, Florida

TOM LANTOS, California
HOWARD L. BERMAN, California
GARY L. ACKERMAN, New York
ENI F.H. FALEOMAVAEGA, American
  Samoa
DONALD M. PAYNE, New Jersey
ROBERT MENENDEZ, New Jersey
SHERROD BROWN, Ohio
BRAD SHERMAN, California
ROBERT WEXLER, Florida
ELIOT L. ENGEL, New York
WILLIAM D. DELAHUNT, Massachusetts
GREGORY W. MEEKS, New York
BARBARA LEE, California
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
EARL BLUMENAUER, Oregon
SHELLEY BERKLEY, Nevada
GRACE F. NAPOLITANO, California
ADAM B. SCHIFF, California
DIANE E. WATSON, California
ADAM SMITH, Washington
BETTY McCOLLUM, Minnesota
CHRIS BELL, Texas

THOMAS E. MOONEY, SR., *Staff Director/General Counsel*
ROBERT R. KING, *Democratic Staff Director*

———

## SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA

ILEANA ROS-LEHTINEN, Florida, *Chairwoman*

STEVE CHABOT, Ohio
JOHN M. McHUGH, New York
NICK SMITH, Michigan
JO ANN DAVIS, Virginia
MIKE PENCE, Indiana
THADDEUS G. McCOTTER, Michigan
ROY BLUNT, Missouri
JOSEPH R. PITTS, Pennsylvania
KATHERINE HARRIS, Florida

GARY L. ACKERMAN, New York
HOWARD L. BERMAN, California
ELIOT L. ENGEL, New York
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
SHELLEY BERKLEY, Nevada
ADAM B. SCHIFF, California
BEN CHANDLER, Kentucky

YLEEM POBLETE, *Subcommittee Staff Director*
GREGG RICKMAN, *Senior Professional Staff Member*
DAVID ADAMS, *Democratic Professional Staff Member*
MATT ZWEIG, *Staff Associate*
AMY SERCK, *Staff Associate*

# C O N T E N T S

———————

Page

## WITNESSES

The Honorable J. Cofer Black, Coordinator, Office of the Coordinator for
  Counterterrorism, U.S. Department of State  ................................................  8
Thomas J. Harrington, Deputy Assistant Director, Counterterrorism Division,
  Federal Bureau of Investigation  ..............................................................  14
Juan C. Zarate, Deputy Assistant Secretary, Executive Office for Terrorist
  Financing & Financial Crimes, U.S. Department of the Treasury  .................  18
Steven Simon, Senior Analyst, Rand Corporation  ...............................................  41
Robert Baer, former CIA Middle East Intelligence Officer  ..................................  50

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

The Honorable Ileana Ros-Lehtinen, a Representative in Congress from the
  State of Florida, and Chairwoman, Subcommittee on the Middle East and
  Central Asia: Prepared statement  ...........................................................  2
The Honorable J. Cofer Black: Prepared statement  ..............................................  11
Thomas J. Harrington: Prepared statement  .........................................................  15
Juan C. Zarate: Prepared statement  ....................................................................  20
The Honorable Steve Chabot, a Representative in Congress from the State
  of Ohio: Articles and press release submitted for the record  .........................  45

## APPENDIX

Responses from the Honorable J. Cofer Black to questions submitted for
  the record by the Honorable Ileana Ros-Lehtinen  .........................................  60
Questions submitted for the record by the Honorable Ileana Ros-Lehtinen
  to Juan C. Zarate [responses not received prior to printing]  .........................  68
The Honorable Nick Smith, a Representative in Congress from the State
  of Michigan: Prepared statement  .............................................................  68
Testimony from the hearing before the Subcommittee on Terrorism, Tech-
  nology and Homeland Security of the Committee on the Judiciary, United
  States Senate, September 3, 2003  ...........................................................  69

# SAUDI ARABIA AND THE FIGHT AGAINST TERRORISM FINANCING

————

**WEDNESDAY, MARCH 24, 2004**

House of Representatives,
Subcommittee on the Middle East
and Central Asia,
Committee on International Relations,
*Washington, DC.*

The Committee met, pursuant to call, at 1:35 p.m. in Room 2360, Rayburn House Office Building, Hon. Ileana Ros-Lehtinen, (Chairwoman of the Subcommittee) presiding.

Ms. Ros-Lehtinen. Thank you. The Subcommittee will come to order.

Since the horrific events of September 11th, we have been confronted with the undeniable fact that 15 of the 19 terrorists who caused this act of mass murder were from Saudi Arabia. Because of this, it is our duty to examine what the Saudis have done, are doing now, and what they will do in the future to prevent this kind of tragedy from ever repeating.

We want to gain an understanding of how Saudi Arabia is working to repair a system that many say was broken or at the very least had grown out of control. Moreover, we want to understand what our own government is doing to help the Saudis close down the network that facilitated the implementation of the September 11th terrorist plot.

I must say, however, that there are grave concerns on this Subcommittee, and I would say in Congress in general, over the extent of Saudi cooperation in this fight and, specifically, the Saudi role in the financing and abetting of terrorist groups in general.

Having said this, I am pleased that the United States and the Saudi government have set up two task forces, one to counter terrorism overall and the other to counter terrorism financing specifically. I am also pleased that the Saudi government is closing down charities and controlling the collection of Zakat, or the charitable donation, that is so important in Islam. Yet I am concerned that there are some red lines beyond which it might be impractical or even impossible for Saudi officials to cross.

Moreover, I fear that the sheer size of the financing effort and the extent of the financial enterprises have created a self-sustaining enterprise for many of these groups. It is quite possible that this aid from the connections in Saudi Arabia have set them upon the path of financial independence, irrespective of any future Saudi help.

(1)

2

Terrorist connections through businesses, social service institutions, schools, mosques, and charities, in some cases opened in the West, allow them to continue their terrorist operations against us on multiple fronts.

The mixing of charitable work with terrorism is a cowardly and cynical misuse of trust dedicated to destruction. This combination only complicates the search for the assets that fund terrorism, blurring the target for U.S. and allied investigations.

I realize that this fight is ongoing and difficult. I also realize the sensitivities involved. Americans, however, are worried that while their government is telling them that Saudi Arabia is a great friend, they see Saudi-originated charities still operating around the world supplying the seed money for attacks against the United States and our allies.

There are also charities like the Al-Haramain foundation, that act as umbrella groups for other charities and have overseas offices. Only recently, the United States closed down one branch of this group in Oregon.

These charities must be shut down and their infrastructure purged to prevent re-emergence in a different form.

Americans also are rightly concerned about the proliferation of anti-American statements coming from Saudi and other Imams encouraging terrorism.

It will be important for us to learn of Saudi actions regarding the reforms being undertaken in the mosques, both in the education of the Imams, as well as the ban on the collection of the Zakat.

It is important too, that Saudi Arabia stop the flow of funds to Hamas. This violent terrorist group has killed almost 300 Israelis in more than 50 homicide bombings over the past several years. If the money is not provided officially, as is claimed, I believe it is necessary to stop it on the private level as well. It is in our common interest to prevent this violent group from getting the funds to commit murder.

I want to believe that the Saudi government is sincere when it says that it is intent on stopping al-Qaeda. I also want to believe that they are sincere in stopping the money flow to them, but I want to see the results of these actions. Simply put, Saudi Arabia must be part of the solution to this vast problem, not a participant.

I hope that the witnesses today will fully speak to the concerns of this Subcommittee. I believe that we have a great number of questions to bring to your attention and I appreciate your willingness to testify today, especially to Ambassador Black, whom I understand canceled a trip to Athens to be with us today.

Thank you, Ambassador.

With that, I would like to yield to our Ranking Member, my good friend from New York who had a wonderful event last night, Mr. Ackerman.

[The prepared statement of Ms. Ros-Lehtinen follows:]

PREPARED STATEMENT OF THE HONORABLE ILEANA ROS-LEHTINEN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA, AND CHAIRWOMAN, SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA

Since the horrific events of September 11th, we have been confronted by the undeniable fact that fifteen of the nineteen terrorists who caused this act of mass murder, were from Saudi Arabia. Because of this, it is our duty to examine what the

3

Saudis have done, are doing now and what they will do in the future to prevent this kind of tragedy from ever repeating.

We want to gain an understanding of how Saudi Arabia is working to repair a system that many say was broken or at the very least had grown out of control. Moreover, we want to understand what our own government is doing to help the Saudis close down the network that facilitated the implementation of the September 11th terrorist plot.

I must say, however, that there are great concerns on this Subcommittee, and I would say in Congress in general, over the extent of Saudi cooperation in this fight and, specifically, the Saudi role in the financing and abetting of terrorist groups in general.

Having said this, I am pleased that the United States and the Saudi Government have set up two task forces, one to counter terrorism and the other to counter terrorism financing. I am also pleased that the Saudi Government is closing down charities and controlling the collection of the Zakat, or charitable donation, that is so important in Islam. Yet, I am concerned that there are some red lines beyond which it might be impractical or even impossible for Saudi officials to cross.

Moreover, I fear that the sheer size of the financing effort and the extent of the financial enterprises have created a self-sustaining enterprise for many of these groups. It is quite possible that this aid from the connections in Saudi Arabia have set them upon the path to financial independence, irrespective of any future Saudi help.

Terrorist connections through businesses, social service institutions, schools, mosques, and charities, in some cases opened in the West, allow them to continue their terrorist operations against us on multiple fronts.

The mixing of charitable work with terrorism is a cowardly and cynical misuse of trust dedicated to destruction. This combination only complicates the search for the assets that fund terrorism, blurring the target for U.S. and allied investigators.

I realize that this fight is ongoing and difficult. I also realize the sensitivity involved. Americans, however, are worried that while their government is telling them that Saudi Arabia is a great friend, they see Saudi-originated charities still operating around the world supplying the seed money for attacks against the U.S. and our allies. There are also charities like the Al-Haramain foundation, that act as umbrella groups for other charities and have overseas offices. Only recently, the United States closed down one branch of this group in Oregon.

These charities must be shut down and their infrastructure purged to prevent reemergence in a different form.

Americans also are rightly concerned about the proliferation of anti-American statements coming from Saudi and other imams encouraging terrorism.

It will be important for us to learn of Saudi actions regarding the reforms being undertaken in the Mosques, both in the education of the Imams, as well as the ban on the collection of the Zakat.

It is important too, that Saudi Arabia stop the flow of funds to Hamas. This violent terrorist group has killed almost three hundred Israelis in more than 50 homicide bombings over the past several years. If the money is not provided officially, as is claimed, I believe it is necessary to stop it on the private level as well. It is in our common interest to prevent this violent group from getting the funds to commit murder.

I want to believe that the Saudi government is sincere when it says it is intent on stopping Al-Qaeda. I also want to believe that they are sincere in stopping the money flow to them. I do, however, want to see the results of their actions. Simply put, Saudi Arabia must be a part of the solution to this vast problem, not a participant.

I hope the witnesses today will fully speak to the concerns of this Subcommittee. I believe that we will have a great number of questions to bring to your attention.

Mr. ACKERMAN. Thank you, Madam Chair, and thank you for participating. Thank you especially for scheduling this hearing this morning and for your statement.

The devastating attacks of September 11th and the fact that 15 of the 19 hijackers were from Saudi Arabia caused a significant reevaluation and examination of a relationship to which most Americans had previously given little thought.

An initial conclusion of that examination, I think, is that the United States needs from Saudi Arabia both stability and change

4

and how we thread that needle presents us with one of the most difficult medium term foreign policy problems.

Up until May of last year, I think it is fair to describe Saudi Arabia's counterterrorism cooperation as limited to terrorist groups and threats outside of Saudi Arabia, but since the attacks in Riyadh in May and November of last year, United States-Saudi cooperation on all aspects of terrorism has taken a qualitative turn for the better. Most commentators argue that the Saudis now get it and see that al-Qaeda is out to eliminate them as well as us.

I am reasonably sure that the Saudi leadership always saw al-Qaeda this way, but the attacks inside the Kingdom and against them have given the government a new sense of urgency.

The steps that the Saudis have taken on terrorism financing are far reaching and welcome. They include a new law making money laundering and terrorist financing criminal offenses; a ban on collecting cash at mosques; a prohibition on transferring charitable funds collected in Saudi Arabia outside of the country without foreign ministry approval; a requirement for charitable organizations in Saudi Arabia to have single disbursement bank accounts; and closure of unlicensed money exchange houses, as well as closer supervision of hawalas.

Bilaterally, the Saudis have joined with us to set up a joint task force to investigate terrorist financing in Saudi Arabia and earlier this year Saudi Arabia joined the United States Government in asking the U.N. Sanctions Committee to designate four branches of al-Haramain as financial supporters of terrorism.

But for all the positive steps that the Saudis have taken, there are still questions of political will. For example, while the formation of both the High Commission for Charities and the Financial Intelligence Unit have been announced, it is not clear that either of these organizations has had an adequate staff or budget.

Similarly, it is not yet clear that Saudi officials are willing to prosecute Saudis for involvement in terrorism financing. For instance, while Saudi officials have removed Sheikh Akil al-Akil, the former director of al-Haramain, for allegedly moving millions of dollars out of the country via couriers, they have yet to announce any criminal proceedings against him.

Additionally, the Saudis seem reluctant to take action against international charities that are headquartered in Saudi Arabia, such as the World Muslim League, the International Islamic Relief Organization, or the World Assembly of Muslim Youth, claiming that they cannot exert legal control of these organizations because they are international in nature.

Saudi officials have likened this situation to the U.N. presence in New York, but surely the Saudi government at a minimum could require all charities operating in Saudi Arabia to abide by Saudi law.

While today we focus on one aspect of our relationship with Saudi Arabia, I think a word needs to be said about the context in which the changes in Saudi Arabia's attitude on terrorism financing are occurring.

These changes are, I believe, part of the larger national dialogue that is occurring in Saudi Arabia. Crown Prince Abdullah deserves credit for sanctioning a very broad conversation among Saudis over

5

the future of Saudi society, including education reform, the role of women in Saudi society, and even the announcement of municipal elections, but while the dialogue is a positive step, it is tempered by several points.

First, I do not think anyone should be fooled into thinking that the end result of these changes will be anything less than the continued control of the country by the House of Saud.

Second, the limits of the discussion were on full display last week with the arrest of several prominent academics who, dissatisfied with the government's sponsored Human Rights Commission, wanted to form an independent human rights organization.

Third, much has been made of the announcement of elections, but little has been seen in terms of follow-up. As with all things Saudi, much has been done and much remains to be done.

I do not think anyone will dispute that even after September 11th Saudi Arabia remains central to United States interests in the Persian Gulf. One need only look at the projected global demand for oil over the next decade to see that a stable, reasonably friendly Saudi Arabia is essential to the world economy, so the foundation of the United States-Saudi relationship will remain largely the same: United States security cooperation in exchange for a steady flow of Saudi oil to global markets.

Yet our requirements in the global war on terror and our desire to press for democratization across the region argue for change. How we balance these conflicting requirements over the next several years forms the medium term dilemma that I previously mentioned.

I hope today that our witnesses will be able to help us find at least part of that balance.

I thank you, Madam Chair, and I do look forward to hearing from our witnesses.

Ms. ROS-LEHTINEN. Thank you very much, Mr. Ackerman.

Mr. Berman?

Mr. BERMAN. Madam Chair, I think I will wait to ask questions after the witnesses testify. Thank you.

Ms. ROS-LEHTINEN. Thank you.

Ms. Berkley?

Ms. BERKLEY. Thank you, Madam Chairman.

I am in the middle of a Transportation mark-up across the hall, so I would like to give an opening statement and if I could possibly be here for the testimony, I am very anxious to hear that as well.

Ms. ROS-LEHTINEN. Absolutely.

Ms. BERKLEY. In his speech to Congress following the September 11th attacks, President Bush said nations would either be with us or with the terrorists. Two and a half years since the war on terrorism was launched, real questions exist as to whether or not Saudi Arabia has been working as an ally. Is it with us or is it with the terrorists?

Shortly after 9/11, NATO forces raided the Saudi High Commission for Aid to Bosnia. This so-called charity was founded by Prince Salam bin Abdul Azia, supported by King Fahd. On this raid, authorities discovered plans for further terrorist attacks, pictures of the U.S.S. Cole and the World Trade Center, and anti-semitic and anti-American material.

6

An employee of the high commission is currently incarcerated at Guantanamo Bay and authorities are attempting to trace millions of dollars in unaccounted funds.

Tragically, this is not an isolated incident. So-called charitable organizations with connections to the Saudi government including the Mercy International Relief Organization, the Islamic Relief Organization and others have been connected with deadly acts of terrorism, both before and after 9/11.

Even more alarming is the Saudi government's support of Palestinian suicide bombers. In 2001, the Israeli Defense Ministry recovered Palestinian authority records detailing Saudi financing of terrorism. These records show that a charity controlled by the Saudi foreign minister transferred $55 million to the Palestinians. Of that, $545,000 was distributed to 102 families of Palestinian martyrs, including eight suicide bombers.

The government has also managed charities—including helping to organize a $100 million telethon to raise money for families of Palestinians killed fighting Israelis.

The Saudi government is currently engaged in a multi-million dollar PR campaign to draw attention to their cooperation and anti-terrorism efforts. They extol the shared values between the United States and the Kingdom, dubbing themselves our partners in peace.

However, Saudi Arabia has not acted to eliminate support for terrorist organizations, including those opposed to the United States or to Israel. This refusal to act and continued reluctance to police their own people all but equates to government support of terrorism.

In testimony before the Senate last year, the general counsel for the Treasury Department described Saudi Arabia as the epicenter of the world's terrorist money trail. At the same time, the Under Secretary of Enforcement stated that a dozen of al-Qaeda's principal financial backers, most of them wealthy Saudis, also fund the terrorist group Hamas.

Ambassador Dore Gold, President of the Jerusalem Center for Public Affairs and former Israeli Ambassador to the United Nations, has reported that Hamas received $12 million to $14 million annually from sources inside Saudi Arabia.

This represents more than 50 percent of its annual budget and these funds come from both official and non-governmental sources. After the attacks of September 11th, this proportion grew even larger as donations from the United States, Europe and other Persian Gulf countries dried up.

Supporters of Saudi Arabia have claimed that these accusations are misleading and inaccurate. However, when *The New York Times* quotes a senior leader of Hamas thanking the Saudi people for continuing to send aid to the people through the civilian and popular channels despite all American pressures exerted on them, the international community must take notice and, more importantly, it must act to increase accountability on the part of our so-called allies.

With friends like the Saudis, this nation hardly needs any more enemies.

Thank you.

7

Thank you, Madam Chairman.

Ms. ROS-LEHTINEN. Thank you very much, Ms. Berkley.

We would like to have Congressman Joe Crowley of New York for his opening statement.

Joe?

Mr. CROWLEY. Thank you, Chairwoman Ros-Lehtinen, and Ranking Member Gary Ackerman for holding this important hearing on Saudi Arabia and the fight against terrorism financing.

I would also like to thank our esteemed guests for testifying before this Committee this afternoon.

After the September 11th terrorist attacks, Saudi Arabia made no attempt to stop the funding of terrorist groups or the madrassas that sill breed hate throughout the world today.

The Saudi royal family can no longer live the fairy tale life they have had since the Kingdom was created some 72 years ago. The United States needs to tell the royal family that it is time to stop the funding of terrorism. Terrorism is not just a problem of the west, but also a problem for the Kingdom as well.

The religious schools the Saudis fund preach extreme forms of Islam and advocate violence against non-muslims in the west. It is time for the Saudis to stop funding directly or indirectly terrorist groups and organizations.

While the royal family finally decided to join the U.S. on a task force to monitor terrorist financing, this task force was not created until 2 years after the attack upon our country on 9/11. Many have speculated the royal family only agreed to this after 34 people were killed last May in Riyadh.

Even after the two terrorist bombings in May and November of last year, the Saudis still do not seem willing to change their ways.

I hope that we can bring Saudi Arabia's lack of cooperation in the war on terrorism to light and bring some change to that country as well.

I thank you and yield back.

Ms. ROS-LEHTINEN. Thank you, Mr. Crowley.

I will introduce both panels, although obviously we will hear from the Administration panel first.

We will have Ambassador J. Cofer Black, the State Department's Coordinator for Counter-Terrorism.

I thank you again for being with us.

Ambassador Black has had a distinguished 28-year career in the Directorate of Operations at the Central Intelligence Agency. Prior to joining the State Dept, Ambassador Black was the Director of the CIA Counter-Terrorism Center. In this capacity, he served as the Special Assistant for Counter-Terrorism to the CIA Director, as well as the National Intelligence Officer for Counter-Terrorism.

Also, we have testifying Mr. Thomas Harrington, the Deputy Assistant Director of Counter-Terrorism Operational Support Branch at the Federal Bureau of Investigation.

In November 2002, Mr. Harrington was selected by the FBI Director for his current position in which he has national program management responsibility for the Foreign Terrorist Tracking Task Force of the Counterterrorism Operation Response Section and the National Threat Center.

8

He has served in the FBI field offices in Philadelphia and Denver, as well as in the headquarters in Washington.

We thank Mr. Harrington for his appearance today.

And, finally, we will hear from Juan Zarate, Deputy Assistant Secretary in the Executive Office for Terrorist Financing and the Financial Crime at the Department of Treasury.

Mr. Zarate is responsible for formulating and coordinating the department's counterterrorism financing and anti-money laundering efforts. In this capacity, he is responsible for policy guidance and oversight of the Financial Crimes Enforcement Network and the Office of Foreign Asset Control and policy guidance for the IRS Criminal Investigation Division.

On our second panel which we will hear from shortly we will be hearing from Mr. Robert Baer, a former Middle East intelligence officer with the Central Intelligence Agency, who has served in places such as Iraq, Tajikistan, Morocco, Lebanon, Sudan and India. When Mr. Baer left the Agency in 1997, he was awarded the Career Intelligence Medal.

And, finally, we will hear from Mr. Steven Simon, Senior Analyst with the RAND Corporation. Before this position, Mr. Simon was the Assistant Director and Carol Deane Senior Fellow for U.S. Security Studies at the International Institute for Strategic Studies in London.

Before this, he served as the Senior Director for trans-national threats on the U.S. National Security Council. Also at the National Security Council, he served as the Director for Global Issues and Multi-Lateral Affairs. He also worked in the Bureau of Political Military Affairs in the Department of State as Acting Principal Deputy Assistant Secretary and as the Director of the Office of Policy Analysis.

We look forward to our second panel's insight as well.

With that, I would like to have Ambassador Black begin his testimony.

Thank you.

## STATEMENT OF THE HONORABLE J. COFER BLACK, COORDINATOR, OFFICE OF THE COORDINATOR FOR COUNTERTERRORISM, U.S. DEPARTMENT OF STATE

Ambassador BLACK. Madame Chairperson and distinguished Members of the Committee, thank you very much for this opportunity to testify on United States counterterrorism efforts, especially as they relate to our efforts to staunch terrorist financing with the assistance of the government of the Kingdom of Saudi Arabia.

I am particularly pleased to be able to testify in front of you with Mr. Harrington from the FBI and Mr. Juan Zarate from the Treasury Department.

We are continuing our global campaign to root out terrorists and those who support them, building on the coalition formed in the aftermath of the September 11th attacks. There can be no sanctuary, no refuge for terrorists, and we are working closely with our friends and allies in a global coalition to marshal all of our collective strength in this effort.

9

While we have made progress in our global efforts, there is much that remains to be done and much that remains unknown. Recent attacks in Spain, Israel, Turkey and elsewhere clearly show us that our work remains unfinished. We must remove these terrorists "root and branch," and we will need help from like-minded nations to make this happen.

We have such a like-minded ally in the Kingdom of Saudi Arabia. It is clear that the Saudi government "gets it" when it comes to terrorism. The Saudis have been confronted with the horror of suicide attacks on their own soil, and have seen how the virtuous intentions of charity can be corrupted for the support of terrorism and terrorists

Our dialogue with the Saudis on counterterrorism issues has grown closer over the past year and took on a renewed urgency following the May 12, 2003, bombings in Riyadh. This latest outrageous murder in the global war on terrorism, which resulted in the death of nine Americans and 20 others, including five children, shocked the Saudis and our cooperation has grown closer every day since.

The Saudis are a key ally in the global war on terror. Their performance has not been flawless. They have a large task before them, but we see clear evidence of the seriousness of purpose and the commitment of the leadership of the Kingdom to this fight.

They must combat the terrorists who have taken root in their own backyard and simultaneously address those issues, whether social, cultural or economic, which have allowed extremism to take root in the Kingdom.

With our colleagues from across the interagency, we have worked closely with Saudi officials in the Kingdom to enhance our cooperation. This effort has included a number of initiatives to staunch terrorist financing and to increase law enforcement and intelligence cooperation. We expect that they will continue to seek U.S. assistance as they act to address this threat.

As a part of this continuing effort to engage with the Saudi government on counterterrorism issues, I have traveled to the Kingdom on five times since January 2003 in the company of interagency colleagues and more recently with Deputy National Security Advisor Fran Townsend, who now leads this dialogue. This has been a labor-intensive effort, but it is bearing fruit.

Counterterrorism finance has been the central focus of this engagement. The Saudis have responded with an impressive array of new institutional, legal and regulatory changes aimed at combating terrorist finance. In fact, some of these steps are among the most restrictive measures to be found anywhere in the world, particularly their new regulations related to charities.

Saudi officials are beginning to make the kind of fundamental and necessary changes to their financial and charity systems which will choke off the flow of funds that keep al-Qaeda and other terrorists in business. They have also taken a number of very public steps in the area of terrorist finance. Let me highlight some recent accomplishments in these areas.

On January 22 of this year, we jointly submitted with the Saudi government the names of four branches of the Riyadh-based al-

10

Haramain Foundation charity to the U.N. 1267 Sanctions Committee for world-wide sanctions, including asset freezing.

The addition of these four entities made for a total of 10 joint United States-Saudi submissions to the U.N. 1267 Sanctions Committee since December 2002, the largest number of joint designations with any country over that span.

We continue to work together to look for additional entities and individuals providing support to al-Qaeda, and hope to have additional successes in this arena.

On February 29, the Saudis announced the formation of the National Saudi Society for Relief and Charitable Works Abroad. We are still awaiting the full details on the form and function of this new body, but this is a welcome development, as it should allow the government to exert more stringent oversight of Saudi charitable activities abroad.

The Saudis have already instituted a variety of new laws and regulations that have the potential to fundamentally alter their banking and charity systems.

Saudi banks have implemented strict "know your customer" rules which require additional due diligence on the part of banks to ensure the transparency of all account holders.

Charitable organizations are now required to use only a single bank account and they are prohibited from making or receiving cash payments. This obviously allows much greater Saudi government oversight over the ability of Saudi charities to operate outside of the Kingdom.

The Saudis have taken fundamental steps to increase accountability and prevent misuse of the fundamental Islamic tenet of zakat, or charity, including the removal of all cash collection boxes from mosques and shopping centers.

The government has reigned-in the activities of hawalas, which are the informal money transfer systems commonly used throughout the Arabian Gulf region, particularly by foreign workers. Independent hawalas are being closed down in the Kingdom and replaced with government-regulated establishments which perform essentially the same function, but with far greater oversight.

In September 2003, a team of assessors from the Financial Action Task Force (FATF) and the Gulf Cooperation Council (GCC) visited the Kingdom. FATF is a multilateral organization of 33 members individually and collectively devoted to combating money laundering. The FATF/GCC team conducted a formal assessment of Saudi Arabia's system of anti-money laundering and counterterrorism finance laws and regulations, and the overarching supervisory and regulatory framework.

Their February 2004 report documents that the Kingdom is in compliance or near-compliance with international standards in almost every indicator of effective instruments to combat money laundering and terrorist financing.

While significant work remains, particularly in the area of implementation, this FATF/GCC report is a testament to the advances the Saudi government has made in shoring up its controls over its banking system and charities.

A new Joint Task Force on Terrorism Finance, which my colleague from the FBI will describe in greater detail, is in its initial

11

stages. This will necessarily move much of our day-to-day and case-by-case efforts in the war on terror away from the interactions of diplomats and put it on an expedited, real-time, law enforcement basis.

The Saudis have established a Financial Intelligence Unit (FIU), which is responsible for analyzing and exchanging information related to suspicious financial transactions with Saudi regulatory and law enforcement entities.

These efforts have begun to make a real difference. Saudi improvements in the oversight and accountability of charitable funds have made it more difficult for terrorists to get their hands on such funding.

We are seeking to upgrade Saudi counterterrorism capacity by providing training in a number of fields, particularly in the area of terrorist financing.

For example, we will continue to provide financial investigative training to the Saudis to enhance their capacity to monitor their banking system and charities for terrorist financing and money-laundering activities.

The Saudis are a strong ally and are taking unprecedented steps to address an al-Qaeda menace that threatens us both. We believe that they are headed in the right direction, are committed to countering the threat of al-Qaeda, and are giving us extremely strong cooperation in the war on terrorism. There remains, of course, much work still to be done, both singly and jointly, but we are optimistic that these efforts are paying off, which is the reason why I canceled my trip to Athens to review the Olympics and the possible threats that could occur.

The work of this Committee is very important. It is very important, I think, for you to understand what we have been working on, our perceptions of the Saudi government. I think there has been a fundamental change. We all know the past. I have lived the past, I have been there. If it was not in my view a fundamental change I would not be here and I would not be addressing you in this vein.

I would also point out that there really is not much of an alternative. Having been a counterterrorism practitioner, without the cooperation of the Saudi government, I wonder at the resources required on the part of the U.S. Government to be able to replicate that capability to identify and root out terrorists in Saudi Arabia, to identify and terminate financial links of terrorism, so I think it is a strategy that is beginning to show real momentum and I hope, Madam Chairperson, that it is something that my colleagues and I can reflect for your consideration.

Thank you very much.

Madame Chairwoman, distinguished Members of the Committee, I thank you for this opportunity to appear before you.

[The prepared statement of Ambassador Black follows:]

PREPARED STATEMENT OF THE HONORABLE J. COFER BLACK, COORDINATOR, OFFICE OF THE COORDINATOR FOR COUNTERTERRORISM, U.S. DEPARTMENT OF STATE

INTRODUCTION

Madame Chairwoman and distinguished members of the Committee: thank you for the opportunity to testify on U.S. counterterrorism efforts, especially as they relate to our efforts to staunch terrorist financing with the assistance of the government of the Kingdom of Saudi Arabia.

12

We are continuing our global campaign to root out terrorists and those who support them, building on the coalition formed in the aftermath of the September 11th attacks. There can be no sanctuary, no refuge for terrorists, and we are working closely with our friends and allies in a global coalition to marshal all of our collective strength in this effort.

While we have made progress in our global efforts, there is much that remains to be done, and much that remains unknown. Recent terrorist attacks in Spain, Israel, Turkey and elsewhere clearly show us that our work remains unfinished. We must remove these terrorists "root and branch," and we will need help from like-minded nations to make this happen.

We have such a like-minded ally in the Kingdom of Saudi Arabia. It is clear that the Saudi government "gets it" when it comes to terrorism. The Saudis have been confronted with the horror of suicide attacks on their own soil, and have seen how the virtuous intentions of charity can be corrupted for the support of terrorism and terrorists.

COOPERATION GROWING CLOSER

Our dialogue with the Saudis on counterterrorism issues has grown closer over the past year, and took on a renewed urgency following the May 12, 2003 bombings in Riyadh. This latest outrageous murder in the global war on terrorism, which resulted in the death of nine Americans and twenty others, including five children, shocked the Saudis, and our cooperation has grown closer every day since.

The Saudis are a key ally in the Global War On Terror. Their performance has not been flawless, and they have a large task before them, but we see clear evidence of the seriousness of purpose and the commitment of the leadership of the Kingdom to this fight. They must combat the terrorists who have taken root in their own backyard and simultaneously address those issues—whether social, cultural or economic—which have allowed extremism to take root in the Kingdom.

With our colleagues from across the interagency, we have worked closely with Saudi officials in the Kingdom to enhance our cooperation. This effort has included a number of initiatives to staunch terrorist financing and bolster law enforcement and intelligence cooperation. We expect that they will continue to seek U.S. assistance as they act to address this threat.

As a part of this continuing effort to engage with the Saudi government on counterterrorism issues, I have traveled to the Kingdom five times since January 2003, in the company of interagency colleagues, and more recently with Deputy National Security Advisor Fran Townsend, who now leads this dialogue. This has been a labor-intensive effort, but it is bearing fruit.

PROGRESS AGAINST TERRORIST FINANCING

Counterterrorism finance has been the central focus of this engagement. The Saudis have responded with an impressive array of new institutional, legal and regulatory changes aimed at combating terrorist finance. In fact, some of these steps are among the most restrictive measures to be found anywhere in the world, particularly their new regulations related to charities.

Saudi officials are beginning to make the kind of fundamental and necessary changes to their financial and charity systems which will choke off the flow of funds that keep al-Qaida and other terrorists in business. They have also taken a number of very public steps in the area of terrorist finance. Let me highlight some recent accomplishments in these areas.

*Accomplishments*

- On January 22 of this year, we jointly submitted with the Saudi government the names of four branches of the Riyadh-based al-Haramain Foundation charity to the UN 1267 Sanctions Committee for world-wide sanctions, including asset freezing.

- The addition of these four entities made for a total of ten joint U.S.-Saudi submissions to the UN 1267 Sanctions Committee since December 2002, the largest number of joint designations with any country over that span.

- We continue to work together to look for additional entities and individuals providing support to al-Qaida, and hope to have additional success in this arena;

- On February 29 the Saudis announced the formation of the National Saudi Society for Relief and Charitable Works Abroad. We are still awaiting full details on the form and function of this new body, but this is a welcome development, as it should allow the government to exert more stringent oversight of Saudi charitable activities abroad;

13

- The Saudis have already instituted a variety of new laws and regulations that have the potential to fundamentally alter their banking and charity systems;
- Saudi banks have implemented strict "know your customer" rules which require additional due diligence on the part of banks to ensure the transparency of all account holders;
- Charitable organizations are now required to use only a single bank account, and they are prohibited from making or receiving payments in cash. This obviously allows much greater Saudi Government oversight over the ability of Saudi charities to operate outside of the Kingdom;
- The Saudis have taken fundamental steps to increase accountability and prevent misuse of the fundamental Islamic tenet of zakat, or charity, including the removal of all cash collection boxes from mosques and shopping centers;
- The government has reigned-in the activities of hawalas, which are the informal money transfer services commonly used throughout the Arabian Gulf region, particularly by foreign workers. Independent hawalas are being closed down in the Kingdom and replaced with government-regulated establishments which perform essentially the same function, but with far greater oversight;
- In September 2003, a team of assessors from the Financial Action Task Force (FATF) and the Gulf Cooperation Council (GCC) visited the Kingdom. FATF is a multilateral organization of thirty-three members individually and collectively devoted to combating money laundering. The FATF/GCC team conducted a formal assessment of Saudi Arabia's system of anti-money laundering and counter-terrorism finance laws and regulations, and the overarching supervisory and regulatory framework.
- Their February 2004 report documents that the Kingdom is in compliance or near-compliance with international standards in almost every indicator of effective instruments to combat money laundering and terrorist financing.
- While significant work remains, particularly in the area of implementation, this FATF/GCC report is a testament to the advances the Saudi government has made in shoring up its controls over its banking system and charities.
- A new Joint Task Force on Terrorism Finance, which my colleagues from the FBI describe in greater detail, is in its initial stages; this will necessarily move much of our day to day and case by case efforts in the War On Terror away from the interactions of diplomats and put it on an expedited, real-time, law enforcement basis;
- The Saudis have established a Financial Intelligence Unit (FIU), which is responsible for analyzing and exchanging information related to suspicious financial transactions with Saudi regulatory and law enforcement entities.

These efforts have begun to make a real difference. Saudi improvements in the oversight and accountability of charitable funds have made it more difficult for terrorists to get their hands on such funding.

We are seeking to upgrade Saudi counterterrorism capacity by providing training in a number of fields, particularly in the area of terrorist financing.

For example, we will continue to provide financial investigative training to the Saudis to enhance their capabilities to monitor their banking system and charities for terrorist financing and money-laundering activities.

CONCLUSION

The Saudis are a strong ally and are taking unprecedented steps to address an al-Qaida menace that threatens us both. We believe that they are headed in the right direction, are committed to countering the threat of al-Qaida, and are giving us extremely strong cooperation in the War On Terrorism. There remains, of course, much work still to be done, both singly and jointly, but we are optimistic that our efforts are paying off.

Madame Chairwoman, distinguished Members of the Committee, I thank you for this opportunity to appear before you.

Ms. ROS-LEHTINEN. Thank you so much, Mr. Ambassador. We appreciate your presence and your testimony.

Mr. Harrington?

14

**STATEMENT OF THOMAS J. HARRINGTON, DEPUTY ASSISTANT DIRECTOR, COUNTERTERRORISM DIVISION, FEDERAL BUREAU OF INVESTIGATION**

Mr. HARRINGTON. Madam Chair and Members of the Committee, thank you very much for this opportunity to testify about terrorism financing issues and, in particular, as they relate to our joint efforts with the government of the Kingdom of Saudi Arabia.

The number one priority for the FBI is to identify terrorists' activities in sufficient time to disrupt these operations. To do this, all intelligence and law enforcement investigative and analytical components must be strategically utilized in a cohesive manner.

Our mission can only be achieved through close coordination and cooperation with our intelligence community and law enforcement partners.

This belief lies at the heart of the FBI's reliance on, and commitment to, the interagency partnerships we have forged through our national Joint Terrorism Task Force and our local level Joint Terrorism Task Forces. With intelligence collection and exploitation as our principal focus, coupled with our criminal investigative authorities as a vital tool, the JTTFs around the country represent the fusion of skills and authorities our nation needs to combat terrorism in the United States.

Information sharing, coordination and interagency cooperation are critical parts of this effort; however, partnerships within the United States will only succeed if they enjoy the support of our many friends and partners throughout the world. The FBI is committed to these international partnerships and recognizes the critical role they play in our ability to develop actionable intelligence.

The Kingdom of Saudi Arabia is an important partner in this international effort and has taken significant steps to deter global terrorism. There is more that can be done to further this relationship; however, the steps that have been taken thus far are very encouraging and promising. For example, cooperative counterterrorism efforts increased notably after the Riyadh bombings on May 12, 2003, when the Kingdom asked the FBI to send an investigative team to Saudi Arabia to assist in intelligence and law enforcement services in conducting evidence collection and the post-incident investigation.

In this effort, Saudi officials allowed FBI agents to directly participate in crime scene analysis and witness interviews, including interviews of Saudi citizens never done before.

The current state of cooperation between our two countries is significant and information sharing continues to increase pertaining to areas like al-Qaeda. Together, we have agreed to focus increased investigative attention on identifying and eliminating sources of terrorist funding within the Kingdom and around the world. In furtherance of this agreement, the Saudis now host the Joint Task Force on Terrorist Financing which is comprised of members of the intelligence and law enforcement services of the United States and Saudi Arabia.

Established in August 2003, the mission is to identify and investigate persons and entities suspected of providing financial support to terrorist groups. Also, they are required as part of their mission to recommend appropriate criminal or regulatory sanctions to be

15

undertaken to stem the flow of funds to terrorists or terrorist organizations. The sole purpose is to raise the priority of financial investigations to a new all-time level.

Working together, we are identifying sources of terrorism funding and have initiated significant operations to address them. I cannot over emphasize the importance of this initiative and the efforts on the part of both of our countries to make it work.

As you will hear from my colleagues at the State Department and Treasury, Saudi Arabia has greatly contributed to combating terrorist financing by joining the United States in blocking the assets of several designated terrorist organizations. My prepared remarks go into greater detail.

Madam Chair, as this Committee knows, the ability to prevent the financing of terrorist acts centers large on the implementation—and I want to emphasize the enforcement—of laws that permit regulatory and investigative intervention. Saudi Arabia has taken several steps which greatly enhance the activities of our joint efforts to prevent terrorism financing. I think Ambassador Black eloquently stated some of these and I will skip over this in my statement to save some time, if possible.

Finally, Saudi Arabia has strengthened its regulations on money laundering by requiring financial institutions to verify customers' identities and placing restrictions on non-residents' ability to open accounts, which we find to be very, very significant.

With regards to training, as you may know, in September 2003, the FBI and the Internal Revenue Service-Criminal Investigative Division began a series of terrorism financing training for the Saudi Arabian government in Riyadh. The second training session was held in Washington, DC in December 2003 and a third is currently scheduled to take place in Riyadh in May of this year.

The topics include Methods of Terrorism Financing, Initiating Investigations, Major Case Management, Evidence Acquisition, Computer Forensics, Money Laundering, and Expenditure Methods of Proof, just some of the topics that are covered in this comprehensive training program.

The training also includes case scenarios, in which students participate in practical exercises to increase their understanding of terrorist-financing investigations. This training will directly benefit our task force efforts in the Kingdom by focusing on methods of identifying sources of terrorist funding.

While the government of the Kingdom of Saudi Arabia has taken significant steps to combat terrorism, there are still hurdles that need to be overcome.

I look forward to our continued partnership with the Kingdom and hope our past progress is an indication of the future steps we will take jointly.

I appreciate the opportunity to be here today and I will be happy to answer any questions at the appropriate time.

[The prepared statement of Mr. Harrington follows:]

PREPARED STATEMENT OF THOMAS J. HARRINGTON, DEPUTY ASSISTANT DIRECTOR, COUNTERTERRORISM DIVISION, FEDERAL BUREAU OF INVESTIGATION

Thank you Mr. Chairman and Members of the Subcommittee for the opportunity to testify about terrorist financing issues, and in particular, as they relate to our joint efforts with the government of the Kingdom of Saudi Arabia

16

The number one priority of the FBI is to identify terrorists' activity in sufficient time to disrupt their operations. To do this, all intelligence and law enforcement investigative and analytical components must be strategically utilized in a cohesive manner. This belief lies at the heart of the FBI's reliance on, and commitment to,the interagency partnerships we have forged through our Joint Terrorism Task Forces (JTTFs). With intelligence collection and exploitation as our principal focus, and criminal investigative authorities as a vital tool, the JTTFs represent the fusion of skills and authorities our nation needs to combat terrorism in the United States. Information sharing and interagency cooperation are critical parts of this effort; however, partnerships within the United States will only succeed if they enjoy the support of our many friends and partners throughout the world. The FBI is committed to these international partnerships and recognizes the critical role they play in our ability to develop actionable intelligence.

Beginning shortly after 9/11/2001, the FBI created its Terrorism Financing Operations Section (TFOS). Its mission is to identify and disrupt world-wide terrorism financing activities. Through joint initiatives and partnerships with other U.S. and foreign intelligence services, we have realized significant results which include the prevention of specific acts of international terrorism. Denying terrorists the financial means to carry out acts of violence is an integral part of the FBI's commitment to countering terrorism and is an area where we have realized significant success.

The FBI's long history of success in combating complex financial schemes in the areas of corporate fraud; financial institution fraud; and illicit funds transfers/money laundering schemes of drug traffickers are being successfully applied to the international terrorism arena.

U.S.–SAUDI COOPERATION

The Kingdom of Saudi Arabia is an important partner in this international effort and has taken significant steps to deter global terrorism. There is more that can be done to further this relationship; however, the steps that have been taken thus far are very encouraging and promising. For example, since 9–11, Saudi Arabia has questioned thousands and arrested more than 600 with suspected ties to terrorism. Cooperative counterterrorism efforts increased notably after the Riyadh bombings on May 12th, 2003 when the Kingdom asked the FBI to send an investigative team to Saudi Arabia to assist its intelligence and law enforcement services in conducting evidence collection and post-incident services in conducting evidence collection and post-incident investigation. In this effort, Saudi officials allowed the FBI to directly participate in crime scene analysis and witness interviews, including those of Saudi citizens.

The current state of cooperation between our two countries is significant, and information sharing continues to increase in matters pertaining to al-Qa'ida. Together, we have agreed to focus increased investigative attention on identifying and eliminating sources of terrorist funding within the Kingdom and around the world. In furtherance of this agreement, the Saudis now host the Joint Task Force on Terrorist Financing (JTFTF), which is comprised of members of the intelligence and law enforcement services of the U.S. and Saudi Arabia. The JTFTF was established in August 2003, with the mission to identify and investigate persons and entities suspected of providing financial support to terrorist groups; and recommending appropriate criminal and/or regulatory sanctions to be undertaken to stem the flow of funds to terrorists or terrorist organizations. Its purpose is to more effectively utilize the intelligence capabilities and investigative authorities of its component members. Working together, we are identifying sources of terrorist funding and have initiated significant operations to address them. I cannot over emphasize the importance of this initiative and the efforts on the part of both of our countries to make it work. The FBI is a significant participant in this project and together with our partnership agencies, including the Internal Revenue Service-Criminal Investigative Division, is committed to its success.

As you will hear from my Department of State and Treasury colleagues, Saudi Arabia has greatly contributed to combating terrorist financing by joining the U.S. in blocking the assets of several designated terrorist organizations. In March 2002, Saudi Arabia and the U.S. jointly blocked the accounts of Wa'el Hamza Julaidan, an associate of Usama bin Laden who provided financial and logistical support to Al-Qa'ida. In addition, accounts of the Bosnia and Somalia branches of the Al-Haramain Islamic Foundation were blocked in March 2002, and in January 2004, the Saudis and the U.S. jointly blocked four more Al-Haramain branches in Kenya, Tanzania, ,Pakistan and Indonesia.

17

SAUDI FINANCING LEGISLATION

Mr. Chairman, as this Subcommittee knows, the ability to prevent terrorist acts largely depends on the implementation of laws that permit investigative intervention. Saudi Arabia has taken several steps that greatly enhance the activities of our joint efforts to prevent terrorism financing.

Non-Governmental Organizations (NGOs) and charitable organizations serve legitimate purposes however, they can be vulnerable to abuse for use as a source of funding for terrorist organizations. The Kingdom of Saudi Arabia has put new laws in place that are designed to ensure donations to charities aren't diverted to entities other than humanitarian organizations. It also issued instructions to all institutions prohibiting the transfer of funds by charitable organizations to recipients outside the Kingdom. New rules have been codified that impact on the Opening of Bank Accounts and place new restrictions on the bank accounts of Saudi charities:

- All accounts must be maintained in *one* single account for each charity; sub-accounts are permitted, but such an account is restricted to *receiving* deposits only;
- No ATM or credit cards can be issued for these accounts. All payments may be made *only* by checks payable to the first beneficiary for deposit in a Saudi bank;
- The Saudi Arabian Monetary Agency's (SAMA's) approval is necessary to open a bank account, the account must be opened in Riyals only, and valid customer identification is required in addition to providing the organization's license;
- No overseas transfers are allowed from these accounts, and only two individuals who are authorized by the board of a charitable organization are allowed to operate the account.

Saudi Arabia has taken other actions that benefit joint terrorism financing efforts. The Ministry of Labor has developed a database containing financial information relating to all of its charities, and updates the database on a quarterly basis with information derived from submitted financial reports. An effort is underway to integrate the charities licensed by the Ministry of Islamic Affairs into this database. In addition, the Ministry of Labor is conducting an audit of all their licensed charities, and this requirement will reportedly be extended to their licensed charities, as well.

The Saudis have begun to establish official government-operated money remitters intended to compete directly with unlicensed money remitters such as Hawalas and other informal financial systems. These licensed remitters are called "Speed Cash"', and are attached to a commercial bank and therefore, subject to all requirements of the parent bank. Saudi private sector representatives report that the service has been a profitable business, and officials believe that it has reduced the extent to which there is reliance on informal systems. Saudi officials report that they have begun to crack down on unlicensed money remitters.

Finally, Saudi Arabia has also strengthened its regulations on money laundering by requiring financial institutions to verify customers' identities and placing restrictions on non-residents' ability to open accounts in the country.

TRAINING

In September 2003, the FBI and the Internal Revenue Service-Criminal Investigative Division provided the first phase of counterterrorist financing and anti-money laundering training to the Saudi Arabian Government in Riyadh. The second phase of this training was held in Washington, DC in December 2003. A third such training program is currently scheduled to take place in May of this year, in Riyadh. This training emphasizes the role of a field investigator in financial crimes investigations as it relates to investigations of terrorism financing. The topics include Methods of Terrorism Financing, Initiating Investigations, Evidence Acquisition, Computer Forensics, Money Laundering, and Expenditure Methods of Proof, among others. The training also includes case scenarios, in which students participate in practical exercises to increase their understanding of terrorist-financing investigations. This training has been completely funded and supported by the State Department and the interagency Terrorist Finance, Training and Technical Assistance Working Group, chaired by the State Department, and it will directly benefit the JTFTF by focusing on methods of identifying sources of terrorist financing.

In addition to U.S. training, in February 2003, the SAMA implemented a technical program to train judges and investigators on terrorism financing and money laundering. The program is focused on training law enforcement on legal matters including financing and money laundering methods, international requirements for

18

financial secrecy, and the methods criminals use to exchange information. SAMA provides substantial training to both the private sector and to other Saudi agencies.

CONCLUSION

While the Government of the Kingdom of Saudi Arabia has taken significant steps to combat terrorism, there are still hurdles they must overcome. In addition, terrorist-minded extremists are likely to change tactics and become more sophisticated in their intelligence collection, communication and financing. The ability to identify and track terrorism-related financial transactions will continue to be vital to our mutual success. Saudi Arabia has contributed to the successful dismantling of Al-Qa'ida cells, the arrests of key Al-Qa'ida leaders, and the capture of Al-Qa'ida members in the Kingdom. I look forward to our continued partnership with the Kingdom and hope our past progress is an indication of the future steps we will jointly take.

I appreciate the opportunity to appear today and thank you Mr. Chairman and members of the Subcommittee, for dedicating your time and effort to this important issue. I will be happy to address your questions.

Ms. ROS-LEHTINEN. Thank you, Mr. Harrington.
Mr. Zarate?

## STATEMENT OF JUAN C. ZARATE, DEPUTY ASSISTANT SECRETARY, EXECUTIVE OFFICE FOR TERRORIST FINANCING & FINANCIAL CRIMES, U.S. DEPARTMENT OF THE TREASURY

Mr. ZARATE. Thank you, Madam Chair. I would like to make some brief remarks and ask that my statement be made part of the record.

Ms. ROS-LEHTINEN. Without objection.

Mr. ZARATE. Thank you. Chairwoman Ros-Lehtinen, Congressman Ackerman and distinguished Members of the Subcommittee, thank you for this opportunity to discuss how the Treasury Department and our government are working with the Kingdom of Saudi Arabia to combat terrorist financing.

I am very pleased to be here today with Ambassador Black and Deputy Assistant Director Harrington, with whom we work on a daily basis to combat terrorist financing at home and abroad.

Madam Chair, we are still deep in the midst of our war against terror. This is a global menace fed by the frenzy of misguided ideology and fueled by funds dedicated to the commission of horrendous acts.

We have witnessed such acts not just on the streets of New York and Washington, but on the railways of Madrid and Moscow, the housing compounds in Riyadh, and the commercial zones of Istanbul, Bali and Casablanca.

A critical part of our strategy is to deprive al-Qaeda and like minded terrorist groups of the money that allows them not only to kill, but to recruit, create alliances and to sustain a global terrorist network.

Our investigations and actions against terrorist financing have revealed the global and sophisticated nature of terrorist financing networks. The abuse of charitable organizations, reliance on deep-pocket donors, and the use of informal methods of moving money, like hawala and courier networks, present challenges for ferreting out tainted capital used to finance a global network of terror. Attacking these networks requires critical support from our allies.

In our open global economy, capital flows freely and funds intended to underwrite attacks on the homeland can be generated in and traverse foreign financial centers.

19

Since September 11th, we have built an international coalition to attack the sources of terrorist financing. The international community has frozen and seized approximately $200 million of terrorist-related funds. Over 170 jurisdictions have issued blocking orders, and we have built a tighter international financial net through which suspect funds may be captured.

Governments around the world have arrested, financially isolated, or otherwise deterred key financial facilitators and conduits. The efforts of the Kingdom of Saudi Arabia fall in line with this international cooperation and continue to improve in substantively important ways.

The al-Qaeda-directed attacks of May and November last year in Riyadh and the uncovering of virulent cells of operatives within Saudi Arabia have awakened the Saudi government to the harsh reality that this threat must be dealt with aggressively.

I have directly witnessed the evolution of the Saudi attitude and approach on my series of visits to the Kingdom. The Saudi government has taken important steps independently and along with us to attack al-Qaeda's finances and to prevent the continued support for those who would attack the United States and Saudi Arabia.

Madam Chair, allow me to share some important highlights, some of which Ambassador Black has already mentioned, but I think these are worth reiterating.

The Saudis have captured or otherwise dealt with known operatives, financial facilitators and financiers for al-Qaeda. For example, Saudi actions against an al-Qaeda leader and key financial facilitator known as Swift Sword as well as Khaled Ali Haj, the suspected al-Qaeda chief in the Gulf, were important steps in disrupting the financial network of al-Qaeda.

Along with Saudi Arabia, as the Ambassador mentioned, we have frozen the assets of organizations and individuals suspected of providing support to al-Qaeda. In this regard, the United States and Saudi Arabia have jointly proposed 10 names to the United Nations 1267 Sanctions Committee since December 2002, requiring thereby the world to freeze any assets belonging to those entities.

Most recently, in late January, the United States and Saudi Arabia jointly designated four branches of the Saudi-based Al-Haramain Islamic Foundation located in Indonesia, Kenya, Tanzania, and Pakistan, because these branches were providing financial, material, and logistical support to the al-Qaeda network and other terrorist organizations.

As my FBI colleague has mentioned, we have created a joint task force with the Saudis with FBI and IRS criminal agents on the ground in Riyadh to investigate terrorist financing. This is where sharing of information such as bank accounts and records happens in a real-time manner. That was unthinkable years ago.

To deal with the abuse of charities in a systemic way, Saudi Arabia has issued comprehensive new restrictions on the financial activities of Saudi charities, to include, as the Members have mentioned, a ban on transfers outside of the Kingdom and cash contributions in local mosques and public collection boxes for charities.

The Kingdom of Saudi Arabia has also taken comprehensive action to reduce the threat of terrorist financing through alternative remittance systems, such as the hawala system through enforce-

20

ment actions and the creation of market alternatives known as speed cash.

The Kingdom has recently amended the legislative and regulatory framework governing its formal financial sector to improve its ability to combat terrorist financing and other financial crimes. Among these steps is the enactment of the Anti-Money Laundering Law of 2003 last autumn, resulting in improved reporting and record keeping requirements, and the establishment of a financial intelligence unit.

Importantly, the Saudis have subjected their newly reformed anti-money laundering regime to the technical scrutiny of international experts from the Financial Action Task Force. The willingness to undergo this assessment represents a new commitment to openness by Saudi authorities, but like all countries, the Kingdom faces several ongoing challenges and we are asking them to do more.

Madam Chair, the most fundamental challenge facing the Kingdom is defusing the religious extremism that facilitates support and recruitment for radical Islamist terrorist organizations like al-Qaeda.

Ms. ROS-LEHTINEN. I am sorry. That is a former colleague of ours, Congressman Mel Levine. We have to stop and say hello.

Mr. ZARATE. Not a problem.

Ms. ROS-LEHTINEN. Go right ahead.

I apologize. Go right ahead.

Mr. ZARATE. Not a problem, Madam Chair.

As I was saying, the Saudi efforts to deal with the issue of radical extremism is important to ensure that militant religious extremism cannot provide a platform for terrorists, either to justify or to launch their terrible actions.

The Saudi government must also fully implement and enforce the comprehensive measures it has enacted to ensure charities, hawalas and their formal financial system are not abused for terrorist purposes.

The Kingdom must also continue to publicize and promote its actions against terrorists as necessary measures to deter al-Qaeda's support and to signal their commitment in this war.

Madam Chair, the ongoing threat of terrorist financing demands a sustained and comprehensive commitment from all governments of the world. The actions, measures, and initiatives adopted by the Kingdom of Saudi Arabia have achieved real results and we anticipate and will demand continued progress in the months ahead.

We look forward to working with Congress on this issue, as well as with the Saudis.

[The prepared statement of Mr. Zarate follows:]

PREPARED STATEMENT OF JUAN C. ZARATE, DEPUTY ASSISTANT SECRETARY, EXECUTIVE OFFICE FOR TERRORIST FINANCING & FINANCIAL CRIMES, U.S. DEPARTMENT OF THE TREASURY

INTRODUCTION

Chairwoman Ros-Lehtinen, Congressman Ackerman and distinguished members of the Subcommittee, thank you for this opportunity to discuss how the Treasury Department and our government are working with the Kingdom of Saudi Arabia to combat terrorist financing.

21

The ongoing threat of terrorist financing demands a sustained and comprehensive commitment from all governments of the world. I thank the Congress for providing the U.S. government with powerful resources, authorities, and support to assist us in our efforts to attack terrorist financing networks. Of particular importance to these efforts, the USA PATRIOT Act expanded the law enforcement and intelligence community's ability to access and share critical financial information regarding terrorist investigations, while Title III of that Act enhances our joint abilities to obtain, analyze and apply financial information to attack the financing of terrorist activities. At Treasury, we are committed to utilizing, aggressively but judiciously, the enhanced powers you have provided us to ensure that relevant financial information is used to both initiate and support actions against terrorist organizations.

But we have found that our success is also dependent on the political will and resources of other governments. As we have discussed on many occasions with you and your colleagues in the Congress, our investigations and actions against terrorist financing have revealed the global and sophisticated nature of terrorist financing networks. The abuse of charitable organizations, reliance on deep-pocket donors, and the use of informal methods of moving money—like hawala networks—present challenges for ferreting out tainted capital used to finance a global network of terror. Attacking these networks requires critical support from our allies as part of a comprehensive and sophisticated strategy. Indeed, our mission to dismantle the financial infrastructure of al Qaida and like-minded terrorist groups can only be achieved with international cooperation and support.

Since September 11th, we have built an international coalition to attack the sources of terrorist financing and have sustained the momentum in taking the fight to the facilitators of terror. The international community has frozen and seized approximately $200 million of terrorist-related funds, over 170 jurisdictions have issued blocking orders, and we have built a tighter international financial net through which suspect funds may be captured. Governments around the world have arrested, financially isolated, or otherwise deterred key financial facilitators. The efforts of the Kingdom of Saudi Arabia fall directly in line with this international cooperation and continue to improve in substantively important ways.

The threat of terrorist financing and the need to attack and prevent the flow of funds to terrorists is now an accepted principle around the world and in Saudi Arabia. The al Qaida-directed attacks of May and November 2003 in Riyadh and the uncovering of virulent cells of al Qaida operatives within Saudi Arabia have awakened the Saudi government to the harsh reality that this threat must be dealt with aggressively. The Kingdom has taken important steps, independently and along with us, to attack al Qaida's finances and to prevent the continued support for those who would attack the United States and Saudi Arabia.

Our progress in working with the Kingdom of Saudi Arabia to attack terrorist financing networks is best understood in the context of the complementary targeted and systemic approaches described in our *2003 National Money Laundering Strategy*. In the short term, we have engaged the Saudis on a number of terrorist financing targets to eliminate key sources and conduits of terrorist support and have established direct mechanisms to work together on the real threat posed to both of our countries. Over the longer term, we have worked with the Saudis to enhance the transparency and accountability of formal and informal financial systems, particularly those that have been abused by terrorists to raise and move money in the past. These efforts are ongoing, and much work remains to be done. Yet the targeting actions and systemic reforms undertaken by the Kingdom of Saudi Arabia clearly demonstrate its commitment to work with us and the international community to combat the global threat of terrorist financing.

INCREASED SAUDI UNDERSTANDING, COOPERATION AND ACTION AGAINST TERRORIST FINANCING

Our dialogue, engagement and cooperation with the Saudis on terrorist financing issues have developed progressively—and often quietly—over the past two years as the Kingdom of Saudi Arabia, like much of the world, has grown to understand and appreciate its vulnerability to global terrorism. I have witnessed this evolution firsthand in my trips to the Kingdom, first in December 2002, then with Secretary Snow in September 2003, and most recently, with Deputy National Security Advisor Frances Fragos Townsend in December 2003.

In particular, the bombing attacks in Riyadh in May and November of last year sparked a series of Saudi actions to confront aggressively the threat posed by al Qaida and its global terrorist network. Targeted actions against specific and identifiable sources and conduits of terrorist support have made an immediate impact on the ability of terrorist cells and organizations to operate. The systemic actions un-

22

dertaken by the Saudis will take more time to produce results, but these changes could have a substantial long-term effect on the ability of terrorists to use financing mechanisms previously abused to advance terrorist causes and operations.

*Targeted Actions*

The Saudis have taken direct and important actions to attack the financial underpinnings of al Qaida's terrorist infrastructure, not just in Saudi Arabia but around the world.

First, the Saudis have taken action on their own to capture or otherwise deal with known operatives, financial facilitators and financiers for al Qaida. For example, Saudi action against an al Qaida leader and key financial facilitator known as Swift Sword was an important step in disrupting the financial network of al Qaida in the Gulf region. Just last week, a raid by Saudi agents eliminated Khaled Ali Haj, the suspected al Qaida chief on the Arabian Peninsula, and one of his associates. Aggressive, proactive steps by the Saudi government against key financiers and facilitators are continuing and serve as an important disruptive element of the war against al Qaida.

The Saudi government has also taken steps to isolate and freeze the assets of individuals and entities designated as terrorist supporters—including the freezing of over five million dollars and seizure of terrorist-related assets. We have worked closely with Saudi Arabia to freeze the assets of organizations and individuals suspected of providing support to al Qaida. In this regard, the U.S. and Saudi Arabia have jointly proposed ten names to the United Nations 1267 Sanctions Committee since December 2002. The Committee included these names on its consolidated list, resulting in a binding obligation on all UN member states to freeze the assets of the underlying individuals and entities. Most recently, on January 22, 2004, the US and Saudi Arabia jointly proposed the names of four branches of the Saudi-based Al-Haramain Islamic Foundation to the UN Sanctions Committee. These branches—located in Indonesia, Kenya, Tanzania and Pakistan—provided financial, material and logistical support to the al Qaida network and other terrorist organizations.

Other joint US-Saudi designations include the following actions:

- On March 11, 2002, the US and Saudi Arabia jointly designated the Somalia and Bosnia branches of the Al-Haramain Islamic Foundation. These branches were engaged in supporting terrorist activities and terrorist organizations, such as al Qaida and AIAI (al-Itihaad al-Islamiya).
- On September 6, 2002, the US and Saudi Arabia jointly designated Wa'el Hamza Julaidan as an associate of Usama bin Laden and a supporter of al-Qa'ida. Saudi Arabia also forwarded this name to the UN 1267 Sanctions Committee.
- On December 22, 2003, the US and Saudi Arabia jointly designated Vazir—a non-governmental organization located in Travnik, Bosnia—after it was determined that Vazir was simply another name for the previously-designated Al Haramain-Bosnia. The two governments also designated Safet Durguti, the representative of Vazir.

Beyond these designations, we have created a close agent-to-agent working relationship with the Saudis to deal with terrorist financing specifically. Last fall, we created the Joint Terrorist Financing Task Force, based in Riyadh. Through this Task Force, investigators from the FBI and from the IRS Criminal Investigation Division (IRS–CID) have gained unprecedented access to Saudi accounts, witnesses, and other information. The Task Force agents both provide and receive investigative lead information on various terrorist financing matters. In addition, U.S. agents seek assistance from Saudi investigators in following terrorist financing, and in using that information to identify or attack terrorist cells and operations. Information received by the U.S. agents is passed through FBI's Terrorist Financing Operations Section in Washington to the interagency Joint Terrorist Task Forces (JTTFs) nationwide.

As part of this initiative, IRS–CID participated in the FBI's two week-long classes of financial investigation training to Saudi Arabian criminal investigators, pursuant to the State Department's sponsorship. These courses included the following topics: charitable entities, money laundering, net worth method of proof, expenditures method, documenting financial crimes, and computer sources of financial information. IRS–CID anticipates participating in a third class that will be presented in the spring of this year, possibly in Riyadh. These combined efforts of capacity-building and working hand-in-hand on the ground in Riyadh have already produced substantial results as we continue to unearth leads and unravel the financial support for al Qaida in Saudi Arabia.

23

*Systemic Actions*

In addition to taking action against targeted terrorist financing networks, the Kingdom of Saudi Arabia has introduced numerous systemic changes in its formal and informal financial sectors to address vulnerabilities exploited by terrorist organizations in the past. These reforms should enhance the transparency and accountability of these sectors, allowing investigators to more readily identify and interdict terrorists and their supporters who continue to rely upon these sectors to raise and move funds and other elements of support.

*Charities*

Abuse of the charitable sector by terrorist supporters in Saudi Arabia remains an ongoing concern. Given the generous contributions from Saudi Arabia and the Islamic requirement of zakhat (or charity), there is a deep need for the Saudi government to ensure that money intended for good purposes is not diverted to al Qaida or other terrorist groups. Saudi Arabia has acknowledged this vulnerability and is taking action to safeguard the integrity of its charitable sector. The protection of the charitable sector and the goodwill of donors are not only important for our national security interests but are also essential to preserving the sanctity and faith in charitable giving. For both reasons, the Saudi government has taken concrete steps to deal with this identified risk.

On May 24th of last year, Saudi Arabia issued comprehensive new restrictions on the financial activities of Saudi charities, including the following:

- Charitable accounts can only be opened in Saudi Riyals;
- Enhanced customer identification requirements apply to charitable accounts;
- Each charity must consolidate its banking activity in one principal account. Although sub-accounts are permitted for branches, they are restricted to receiving deposits—all withdrawals and transfers must be serviced through the main account;
- No cash disbursements are permitted from charitable accounts; payments are only allowed by check payable to the first beneficiary and must be deposited in a Saudi bank;
- No ATM or credit cards may be issued against a charitable account (all outstanding ATM and credit cards for such accounts have been canceled);
- No transfers from charitable accounts are permitted outside of Saudi Arabia.

Moreover, the Kingdom has banned cash contributions in local mosques and removed cash collection boxes for charities from shopping malls.

In some respects, these restrictions go further than those of any country in the world. We commend Saudi Arabia for taking these important steps and urge its officials to ensure that these new rules are rapidly implemented and enforced fully and vigorously. We will continue to work directly with the Saudi government on the concerns we have about the vulnerability of their charity—often sent to crisis regions —being abused by terrorists.

*Alternative remittance systems—Hawala*

The Kingdom of Saudi Arabia has also taken comprehensive action to reduce the threat of terrorist financing through alternative remittance systems, such as *hawala*.[1] There are more than seven million locally-paid expatriate workers living in Saudi Arabia. These workers support their families living in their home countries, thereby creating a strong and economically legitimate demand for remittance services in the Kingdom. The Kingdom has sought to service this demand and protect remittance systems from terrorist abuse through a mandatory licensing requirement and additional legal, economic, and supervisory measures. Only licensed banks and money-exchangers are allowed to provide remittance services. Licenses are issued by the Saudi Arabian Monetary Agency (SAMA), which controls and supervises Saudi financial sectors.

The Saudi government targets unlicensed remittance systems for prosecution. The Kingdom has reported that over the past 15 years, 204 cases have been filed against 437 individuals for engaging in unlicensed remittance activities, and more than US $9.6 million in financial penalties have been assessed against these individuals.

---

[1]Alternative remittance systems represent informal or unregulated means of transferring value between or among multiple locations. Often these systems are comprised of geographic networks and are described by a variety of specific terms depending on the region or community they serve. *Hawala* is the term often used to describe alternative remittance systems or services in the Middle East.

24

Nonetheless, the Kingdom has acknowledged that criminalization alone is insufficient as long as there is a demand for these services, prompting a complementary economic approach to attack unlicensed remittances. The Kingdom has encouraged banks to open special remittance centers to provide secure, inexpensive, and rapid money transfer services. As a result of this policy, a majority of Saudi banks now offer such services—known as "Speed Cash"—which are available after traditional banking hours for the convenience of expatriates employed during normal working hours. These banks, as well as money-exchange providers licensed to provide remittance services, are regulated and supervised by SAMA to ensure adequate implementation of client identification, reporting and recordkeeping requirements. These steps represent a sophisticated, multilayered response to the terrorist financing risks presented by alternative remittance systems.

*Formal financial sector*

The Kingdom has recently amended the legislative and regulatory framework governing its formal financial sector to improve its ability to combat terrorist financing and other financial crimes. These changes attack terrorist financing on a systemic level by promoting greater transparency and accountability. Among the most important legislative and regulatory reforms in this area are the enactment of the Anti-Money Laundering Law of 2003 last autumn, and the issuance of Anti-Money Laundering Implementation Rules just last month. Specific measures include improved reporting and record-keeping requirements, new inter-agency coordination mechanisms, and the establishment of a financial intelligence unit.

The Saudis have subjected their newly reformed anti-money laundering regime to intense international scrutiny. The Financial Action Task Force (FATF)—a 33-member international body dedicated to promoting international compliance with anti-money laundering and counter-terrorist financing (AML/CFT) standards—has recently conducted an in-depth review of Saudi Arabia's overall AML/CFT regime, which included an extensive on-site examination. The willingness to undergo this assessment represents a new commitment to openness by Saudi authorities and an opportunity to benefit from the insight of international AML/CFT experts. FATF is in the process of completing the assessment, and we look forward to FATF's issuance of a summary report in June.

ONGOING CHALLENGES

The measures and initiatives described above demonstrate considerable progress and commitment by the Kingdom of Saudi Arabia in combating terrorist financing. But like all countries, the Kingdom faces several ongoing challenges in the global campaign against terrorist financing. Many of these challenges involve the implementation of the measures and initiatives described above. Other challenges are more fundamental.

The most fundamental challenge facing the Kingdom is defusing the religious extremism that facilitates support and recruitment for radical Islamist terrorist organizations like al Qaida. The Kingdom of Saudi Arabia has begun to take action to deal with this problem. These efforts are important to ensure that militant religious extremism cannot provide a platform for terrorists to justify and launch their terrible actions. The Kingdom is working with clerics, and has also launched a public campaign against terrorism, including publishing a hotline and offering rewards to those who have information on identified or suspected terrorist individuals or operations. These efforts must be sustained to overcome the threat of terrorism engendered by militant religious extremism, which has no scruples in attacking innocent civilians—including Muslims.

Another critical challenge for the Kingdom is fully implementing and enforcing the comprehensive measures it has enacted to ensure charities are not abused for terrorist purposes. In a cultural environment committed to charitable giving, the Kingdom must move forward to clarify and empower an oversight authority that will administer effective control over the sector and ensure compliance with obligations under the new regulatory measures that I have described. This authority must also coordinate its efforts with other elements of the regulatory and criminal justice system.

In addition to these primary challenges, the Kingdom faces a number of secondary challenges in combating terrorist financing. These challenges include ensuring that originator information is recorded on all cross-border wire transfers, protecting its borders from illicit cash couriers, and sharing critical information on terrorist financing investigations with all relevant investigatory authorities, both domestically and internationally. These types of challenges are common to all countries, and we will be working together with the Kingdom to improve global performance on these issues.

25

Finally, the Kingdom must continue to publicize and promote its actions against terrorists as necessary measures to protect the safety of the Saudi and global populace. My sitting here and discussing these measures with you not only sends a message to the Saudi people regarding the commitment of their government, but also to other Islamic countries regarding their need and ability to undertake similar initiatives.

We work in close partnership with the Saudis on these issues on a daily basis to protect the American and Saudi people from the scourge of terrorism.

CONCLUSION

As I stated earlier, the ongoing threat of terrorist financing demands a sustained and comprehensive commitment from all governments of the world. The measures and initiatives adopted by the Kingdom of Saudi Arabia indicate that the Kingdom stands committed with us to defeating this threat. The targeted actions undertaken by the Kingdom have already produced tangible results, and the systemic changes made by the Kingdom could prove even more effective in defeating terrorist financing over the long term.

We look forward to continuing to work with the Kingdom as it begins to implement the systemic changes discussed above. The terrorist financing challenges we all face are considerable, but the progress we have achieved provides a solid basis from which to move forward. We appreciate the efforts of the Kingdom to date—as they put the lives of their agents and people on the line to fight this battle. We anticipate continued progress in the months ahead.

Thank you again for the opportunity to testify before you today on these matters of great importance. We look forward to our continued work with Congress to combat the threat of terrorist financing.

Ms. ROS-LEHTINEN. Thank you so much. Thank you, all of you gentlemen, for your excellent testimony.

I am going to begin with some questions and we will move to the other Members as well.

Thank you.

Mr. Ambassador, with this new task force that you were discussing, the U.S.-Saudi Terrorism Financing Task Force, what are the operational rules regarding the sharing the sharing of intelligence information? Do we grant full and unfettered access to the Saudis? Do Saudi officials see all of the information we possess on the various targets of our investigation?

Regarding other details of the agreement for this task force, if you could explain the precautions to prevent the Saudis learning how to evade our methods, the security level, who will have access to the information, what types of information they will seek, what are the terms of United States access and freedom to operate in Saudi Arabia and is this an open-ended operation or will this task force be time limited?

Ambassador BLACK. Madam Chairperson, if I might, I would like to turn Mr. Zarate, who can give you a comprehensive answer on that.

Mr. ZARATE. Madam Chairwoman, in coordination with the Saudis, as you know, there are two task forces in essence set up. One is a task force to share intelligence information on a real time basis given the ongoing and real threats faced in the Kingdom for attacks as well as to share information related to threats to the United States.

Ms. ROS-LEHTINEN. I was talking about the financing.

Mr. ZARATE. The financing. The financing was set up this past summer and, as Mr. Harrington can probably discuss as well, that is a system set up with intelligence agents as well as financial investigators from the FBI and IRS.

26

The sharing of information entails a sharing of leads, actual leads, requests for bank records and information on accounts. It also involves requests for access to individuals for interviews and interrogation.

In terms of the protocols for vetting what information is shared with the Saudis, that is something that is largely done both here at headquarters from the FBI, but also done on the ground through our representatives on the intelligence side, as well as the investigatory side, to ensure that the relevant information being shared is the type that we want the Saudis to be seeing.

Ms. ROS-LEHTINEN. We run the risk of sharing the information and then what happens is they make an end run and they learn how to evade our tactics, and I am sure there are going to be some follow-up questions on that.

What actions have been taken by the Saudi government against the Saudi financial sponsors of al-Qaeda that are listed in the "Golden Chain"? According to written testimony provided to the Senate Committee on Banking, Housing and Urban Affairs in October of last year, the list included six bankers, 12 businessmen, two former Saudi ministers and their cumulative corporate net worth totals more than $85 billion. What can you tell us about what is new with that investigation?

Mr. ZARATE. Madam Chairwoman, first, in terms of what the Saudis have done, one of the significant designations that we have nominated to the U.N., this is back in September of last year, was the designation of Wa'el Hamza Julaidan, a Saudi citizen, a key financier whose assets have been frozen in Saudi Arabia.

In addition, the Saudis have taken actions to investigate other individuals, including Yasin al-Qadi, who is a Saudi citizen who we designated back in 2001, and they continue to investigate those individuals who we identify to them as being suspect.

I think part of the answer may be better answered in a closed session because of the sensitivity of ongoing investigations.

That being said, the Saudis take very seriously the information that we, the FBI, the intelligence services, share with them with respect to suspect individuals.

I would like to mention, Madam Chair, one of the challenges of the terrorist financing campaign writ large is our ability to compile and ferret the information that is relevant to foreign governments like Saudi Arabia to help prompt them to take relevant actions.

I will tell you that when we have been able to do that, when we have been able to provide the Saudis with relevant information, they have taken action, whether it has been taken publicly or quietly.

Ms. ROS-LEHTINEN. Thank you.

Mr. Harrington, you mentioned in your written testimony that the Saudi Labor Ministry is creating a database of charities. How many charities are listed on that database so far? What other ministries will it be merged with? What authority and what access will the U.S. have as part of our joint task forces or will they be separate functions?

Mr. HARRINGTON. I do not know how many charities, I do not know if my colleagues can point to that list at this point and tell

27

you how many charities are on the list. Clearly, the Saudis have been very, very open with us.

To try to answer a couple of your earlier questions, on the task force itself, it is a relatively small group of FBI agents, FBI employees, analysts, IRS agents and intelligence folks. Their focus is clearly on just financial issues. There are two sets of FBI employees in Saudi right now. We have the Legat that is there that handles the general criminal terrorism leads. There is a Legat and two Assistant Legats, so three agents total, a translator and several office assistants.

By creating this financial task force, we took the burden off the Legat so that this group specializes and focuses solely on the financial leg of terrorism. As a result, the turn around time on our leads has been significantly improved. We get real time information on potential leads here in the United States, as well as covering leads that are generated by our investigations and that require Saudi assistance to pursue them. And, again, in an open hearing, it is difficult to go into more details on that, but I would be happy to do that at some later date.

Ms. ROS-LEHTINEN. Well, we are going to try to schedule that. Thank you.

Just one last question for Mr. Zarate.

What is Treasury doing to get a handle on the European and Middle Eastern fiduciaries and the shell companies and banks that operate outside the scope of conventional banking activities? Have they acted against correspondent accounts, secret accounts, Saudi sovereign accounts? What actions have the Europeans and particularly the Lebanese authorities taken in these directions?

Mr. ZARATE. Madam Chairwoman, we have worked very closely with our European allies and with other countries, including Lebanon, to deal with multiple problems, the problem of the use of front companies by al-Qaeda and other groups, the use of charities as we have mentioned here extensively, the use of the hawala network, the informal system, the money exchange operations as well.

What we have done in the past, Madam Chairwoman, has been to identify those that we have sufficient information about to the U.N. for designation. For example, early in the campaign against terrorist financing, we identified certain bakeries and honey shops in the Gulf that were being used by al-Qaeda to raise and move money. We identified an extensive network, the al-Taqwa network, which had banking operations in the Caribbean as well as in Europe, which formed part of a financial network not only for al-Qaeda, but for Hamas and other terrorist groups.

So we have continued to try to search for information with respect to how to handle these efforts.

I would like to emphasize that part of the efforts are handled in quiet ways with intelligence resources and otherwise. Some of this is handled publicly through the designations and the freezing of assets and part of this, and this is the long-term effort, is handled through systemic changes, where we have frankly driven and quarterbacked the international movement toward greater regulatory oversight over some of these networks which frankly had never been regulated before.

28

And, again, I think that is where you see greater regulation in Europe over charities, you see greater regulation in the Gulf and South Asia over the Hawala network, so all of that is part of the comprehensive campaign.

Ms. ROS-LEHTINEN. Thank you so much.

Mr. Ackerman?

Mr. ACKERMAN. Thank you, Madam Chair.

I want to get back to the charitable organizations, if I might, and, in particular the ones that have been termed international charitable organizations, particularly the ones I cited in my opening comments, as well as others such as the Islamic Relief Organization and the World Assembly of Muslim Youth. Are they subject to Saudi law and what is their current status?

Mr. ZARATE. Congressman, if I could, I would like to answer that question.

We have addressed this issue directly with the Saudi government and they realize the importance of it to us.

There are two key elements to our engagement: First, trying to determine to what extent these organizations, which are global organizations, have been infiltrated by al-Qaeda, have been used either in the past or are currently being used to funnel money. So part of our effort is to work very closely with the Saudis to get as much information as possible about ongoing operations.

The second part of this is to get a handle over what regulatory steps the Saudi government can take over these organizations.

As you have mentioned, Congressman, under Saudi law, these three organizations fall under the umbrella or the rubric of a multilateral organization, so they do not technically fall under the charitable regulations.

Mr. ACKERMAN. How are they treated in our country, before you proceed?

Mr. ZARATE. In our country?

Mr. ACKERMAN. Yes.

Mr. ZARATE. If they are a 501(c)(3) organization, they would be treated as a charitable organization and would be subject to the reporting requirements, including Form 990s and other relevant forms subject to oversight by the IRS.

Mr. ACKERMAN. Are they operating in the United States?

Mr. ZARATE. That is something I think is better handled in a closed session, Congressman, in part because as I mentioned part of our efforts have to do with investigations.

Mr. ACKERMAN. Let me ask you question you can answer in an open session. Have any of them filed to be 501(c)(3)s?

Mr. ZARATE. I would have to go back to check, Congressman, to make sure I have accurate information for you on that.

Mr. ACKERMAN. Okay. Please continue.

Mr. ZARATE. So in essence, you have identified a very important point, this is a point that was identify by the FATF experts team. One of the members on that team is the director of my office. That is something that we are engaging with the Saudis with directly.

In discussions with the Saudis on our last trip with Ambassador Black and Fran Fragos Townsend, we raised this issue again with the Saudis and it is at the top of the agenda in terms of how they

29

are going to handle this from a regulatory standpoint. Again, part of this has to do with a legal definition as to how they are treated.

Mr. ACKERMAN. Have they done anything to regulate them or do they just operate freely there?

Mr. ZARATE. Well, in discussions with SAMA, which is the central financial regulator for the government of Saudi Arabia, they have indicated that they have in fact looked at the operations of these organizations and have started to treat them if not de jure, then de facto as charitable organizations. So that is a good sign because that means that there is continued scrutiny with respect to their actions, continued scrutiny with respect to who is involved and who the directors are.

Mr. ACKERMAN. Are the Saudis cooperating with us as far as the suggestions that we are making? Are we making suggestions to the Saudis as to how to treat them?

Mr. ZARATE. Yes, we are. And I think the international financial experts have as well and we have certainly engaged in this dialogue with them.

Part of this, Congressman, is also understanding and being sensitive with respect to their laws and their legal regime and trying to figure out the best way and the most effective way of dealing with the identified risks.

Mr. ACKERMAN. The non-international charities, the ones that are controlled by members of the ruling family, are they subject to Saudi law?

Mr. ZARATE. Yes. All Saudi charities are subject to and the new charities are subject to the new charities regulations.

Mr. ACKERMAN. Even the personal ones of the ruling family?

Mr. ZARATE. All of the Saudi charities that are registered Saudi charities.

Mr. ACKERMAN. Let me ask it a different way. Are the ones controlled by the ruling family registered Saudi charities?

Mr. ZARATE. We believe so. Congressman, I think it bears mentioning, and this is an important point of fact, that many of the charities established in the Kingdom had as sort of honorary boards many of the members of the royal family, so in many instances——

Mr. ACKERMAN. You are talking in the past tense?

Mr. ZARATE. Yes. Because as the Saudi regime has realized and the royal family has realized, the open sort of unchecked support of charitable operations without realizing how these charities are operating or how they are moving money is not a wise thing.

Mr. ACKERMAN. But there are separate charities—I mean, a lot of us have our names, whether we know it or not, on honorary boards or things, but the ones that are actually controlled by the family, are they subject to Saudi law and are they registered?

Mr. ZARATE. Congressman, I believe so and I believe it is also part of an ongoing effort, something that was announced in late February by the Saudi government to consolidate all of the charities, including those charities that you are mentioning.

As Ambassador Black mentions in his written testimony, we are still waiting for further details with respect to the contours of that plan, but that is an important first step.

30

Mr. ACKERMAN. Could we hear further from you on that when you have that together?

One further thing on this, if I may Madam Chair.

The Saudi authorities are obviously very interested in preventing money from flowing to al-Qaeda which affects them directly, but they seem to have a different attitude when it comes to stopping funding that goes to other organizations, for example, Hamas.

Two years ago, we know that Crown Prince Abdullah withdrew his support for Hamas, but it is also my understanding that special accounts for funnelling assistance to Palestinian organizations continued to exist.

First, do charitable contributions from Saudi Arabia continue to flow to Hamas? Are these special accounts for Palestinians subject to any of the new laws that are governing charities?

Ambassador BLACK. Why don't I try and answer that for you?

We do know that the Saudi government does provide significant funding for the Palestinian Authority. It has stated to us that it does not provide funding to Hamas, so the Saudi government does not provide this funding. So what we are talking about here is private Saudi citizens. It is something that we are looking at with them.

We have made it clear to them that they need to clamp down on these funds making their way to Hamas from the Kingdom. We are exploring who is involved, seeking to identify them. It is an ongoing process.

I would also add that this is not just related to Saudi Arabia, but our efforts in the European Union and in other areas, in fact, as I speak today, the British have identified five individuals of Hamas whose funds are to be frozen. This is something that is important to us, it is not something that is readily apparent, and we need to identify the individuals and work with the Saudis to shut it down.

Mr. ACKERMAN. Are there Hamas representatives that travel to Saudi Arabia to raise money? And also what about affiliates of al-Qaeda? Do they come to Saudi Arabia to raise money?

Ambassador BLACK. Well, I am sure they do. I suspect they do clandestinely, at the very least. As you know, there are al-Qaeda operatives in Saudi Arabia that we are looking to identify and engage to render to law enforcement. It would be reasonable to expect that Hamas does clandestinely. I would have to look and check in terms of the overt posture.

Mr. ACKERMAN. And would you also report back to us, if you would, Ambassador?

Ambassador BLACK. I would be happy to, sir.

Mr. ACKERMAN. What the Saudis authorities have done, if anything, to stop this kind of activity.

Ambassador BLACK. Yes, sir.

Mr. ACKERMAN. Thank you.

Ms. ROS-LEHTINEN. Thank you.

Our Vice Chair of the Subcommittee, Mr. Chabot.

Mr. CHABOT. Thank you, Madam Chair.

Let me ask you first of all, and Mr. Harrington or any of you could respond, there was a recent report that in the days immediately following September 11th that former White House Counterterrorism Director Richard Clarke authorized that nearly 140

31

Saudis be allowed to be flown out of the United States out of fear of retribution.

What kind of investigation was each of these Saudis put through by the FBI and can you comment on what the retribution might have been that they were concerned about?

We would also like to get a list of the 140 people, if at all possible.

Anyone could—Mr. Harrington or whoever would like to respond.

Mr. HARRINGTON. Yes. I would be happy to try to answer that to some degree.

Mr. CHABOT. Thank you.

Mr. HARRINGTON. Obviously, that is part of the 9/11 investigation, which I think some of the details have come out. I do not have that list. We will try to put it together for you and I will try to get that for you at a later date.

The retribution, clearly there was concern after 9/11 about backlash against Middle Eastern groups and the Saudis were quick to try to remove some of their folks from the country. My understanding is, and, again, I was not in the counterterrorism program at that time, was that each of these folks were screened and interviewed by FBI agents prior to their departure and I would have to, for the record, go back and verify that for you, though. But we did look at them and we did try to validate who they were, what their purpose was in the United States.

Mr. CHABOT. Would either of the other gentlemen like to respond in any way?

[No response.]

Mr. CHABOT. All right. Next, in November 2002, the *Wall Street Journal* reported that as part of the government's case against the International Relief Organization of Virginia on charges of financing terrorist causes information surfaced that the Saudi Embassy in Washington had supplied at least $400,000 to the charity.

What can you tell us about this and other kinds of funding for these so-called charities that has been funneled through the Saudi Embassy and who knew about these transfers?

Whoever would like to respond.

Mr. HARRINGTON. Again, in an open hearing like this, I am not comfortable that I would be able to give you the answers you probably would like to hear. We certainly have taken a look at that. Obviously, there is a pending case, there are court filings in northern Virginia on that particular issue.

The Saudi Embassy has been very cooperative with us. There are lines of communication that have been open. They have provided the FBI directly information over the last year. The results of some of that information has been the genesis of new investigations for us. So there is cooperation there, there are discussions, and, again, in a more private session I think we could probably provide you with some further details.

Mr. CHABOT. There are numerous reports of vast Saudi funding of educational and religious institutions here in the United States. There is some worry that the network could be serving as a support base for potential future attacks.

32

How cooperative are the Saudis being in revealing information on their funding of schools and mosques and other religious centers here in the United States?

Mr. HARRINGTON. Again, the Saudis have been very open with us, they have provided information directly to the FBI. Again, the lines of communication are open, they are willing to answer any questions we have and, again, other than that, I really cannot go any further than that right at the moment.

Mr. CHABOT. Finally, I have 1 minute left, so could you comment on how extensively United States banks may be unwittingly used to transfer funds between Saudi donors and al-Qaeda through corporate, private or other types of accounts?

Mr. ZARATE. Congressman, it is always a risk that financial institutions, whether in the U.S. or worldwide, can be used as a conduit for the financing of terrorism or other financial crimes. That is in part why, given the powers granted to us in the Patriot Act, thanks to the Congress, we have increased the measures we have taken with the formal financial system and expanded the regulatory scope and deepened the regulatory scope of the anti-money laundering system here in the U.S., putting us on the cutting edge worldwide.

I would dare say we have some of the finest compliance systems in the world with respect to our banks. There are certainly certain banks that need to improve their efforts and we are engaged with our functional regulators on a daily basis to make sure that the banks are compliant with relevant anti-money laundering systems and laws.

Mr. CHABOT. Thank you.

Thank you, Madam Chair.

Ms. ROS-LEHTINEN. Thank you, Mr. Chabot and Mr. Ackerman. We will try to schedule that classified briefing so we can get those questions answered.

Mr. Berman?

Mr. BERMAN. Thank you, Madam Chair.

So leaving out there hanging the notion that Richard Clarke presumably, unbeknownst to the President, Dr. Rice, other people in the White House, the Department of Transportation, decided to sneak the family members of Osama bin Laden out, Mr. Harrington responds to the question without referencing the assumption and Ambassador Black has nothing to add, are you by your silence or by your failure to direct yourself to the unsubstantiated character smear indicating that this is why Osama bin Laden's family was let out of the United States and a special waiver allowing aircraft to take the family back to Saudi Arabia, are you attempting to confirm by accepting that assumption that that is what happened?

Ambassador BLACK. What I will tell you, sir, is that the Department of State was not involved in this process, so I will tell you that.

Mr. BERMAN. So you have no reason to know whether what Mr. Chabot has said has any truth whatsoever?

Ambassador BLACK. I do not know.

Mr. BERMAN. And you, Mr. Harrington?

33

Mr. HARRINGTON. All I can add is I have no knowledge of Mr. Clarke's role in any of that effort. Again, I was not present at the time in the counterterrorism division and I would have to go back and review our findings on that. I am not prepared to go any further than that.

Mr. BERMAN. Well, one would think that high minded public servants when asked a question prefaced by that kind of a smear would make it clear that in no sense were they accepting the validity of that if they had no reason to know the validity of it.

Back to the subject of the hearing.

A leader in the security forces, one of the many security forces, of the Palestinians told me last May at the time that Abu Mazen was the prime minister and we were trying very much to enable the Palestinian security forces to deal with terrorist, that at that very moment significant support was coming from Saudi Arabia for Hamas' military operations and terrorist operations.

At this particular point, what is the status of that situation? To your knowledge, was that a false statement, an inaccurate statement? If it was accurate, has it stopped?

Ambassador BLACK. I will start and perhaps Mr. Zarate would like to finish.

The government is not facilitating the passage of funds to Hamas. As I indicated earlier in my testimony, we are working with them to identify private individuals who are moving funds and that is the operational course that we are involved in now. I cannot speculate on the accuracy, whether it is or it is not, we assume that monies still continue to go to Hamas from private individuals. We are in the process of trying to identify these people and working with the Saudi government to do something about it.

Let me turn to Mr. Zarate and see if he has anything to add.

Mr. ZARATE. Congressman, I think we are still concerned about funding for Hamas coming out of the Gulf generally and certainly out of Europe, as Ambassador Black mentioned. It is an ongoing concern for us that we have raised directly with our European partners, it is something that we raise with our Saudi partners, it is something we raise with our Gulf partners.

Certainly we think there are still private sources of funding to Hamas from a variety of countries and sources, from private individuals.

Mr. BERMAN. All of you have described what you believe to be a serious effort by at least elements of the Saudi government to work with you and cooperate with you in dealing with terrorist financing and stopping that from emanating from Saudi Arabia. Prince Nayef was the Saudi Interior Minister and apparently the anti-terror czar who was knowingly setting up the funding for many of the Wahhabi madrassa schools throughout the Middle East and accused Zionists of responsibility for September 11th, denied any involvement by any Saudi citizens in that attack, notwithstanding the Crown Prince's statements in regard to that and plays a role in all of this.

To what extend do you feel you have the entire cooperation of the Saudi government, particularly of Prince Nayef, in your efforts?

Ambassador BLACK. I think it is clear to indicate, as I hope I did in my testimony, that we are not at the end of this fight against

34

terrorism in the Kingdom of Saudi Arabia. We are trying to give
an indication that I think we are making good progress, certainly
over the last year, certainly accelerated by the May and November
attacks.

We have very effective contacts within the government that have
the authority that has been passed to them to cooperate with us,
to work with us faithfully.

I would certainly agree with you that it is not everybody and I
am sure there are individuals not only that are not neutral but
that are hostile to not only the United States but effective coopera-
tion with security officials in the government of Saudi Arabia.

I would say the answer to your question would be I think we
have made very good progress. We have a long way to go. There
are individuals that are not cooperating, I am sure, but we do have
ones that are and they have the authority to work with us and pro-
ceed and I am encouraged and I think in the time certainly those
of us here at the table have been working on this I think we have
made good progress.

Mr. HARRINGTON. I would agree with that. We have had tremen-
dous cooperation both at the mid-level and low-level and I believe
the Director of the FBI has had some outstanding meetings at his
level, all with pledges of cooperation. Any time we have had a prob-
lem, we have been able to go to them.

Mr. BERMAN. Does that include the Interior Ministry and the
czar for anti-terrorism?

Mr. HARRINGTON. Yes, sir. At the appropriate levels we have had
discussions with them, we have had commitments from them, and,
again, those have equated into case specific examples that we can
give you of cases moving forward, intelligence being passed in a
timely fashion now. That did not exist, though, several years ago.

Ambassador BLACK. I think to answer to his question, again, this
is an open session. That makes me a little circumspect in answer-
ing. I would be happy to meet with you privately, if you would pre-
fer that, but I would say the essence of your question is are we
working effectively and cooperatively with the people that count in
the Saudi security administration, my answer to that is you bet.

Mr. BERMAN. Okay. I think my time has more than expired,
Madam Chair.

Ms. ROS-LEHTINEN. Thank you very much, Mr. Berman.

Mr. Pitts?

Mr. PITTS. Thank you, Madam Chairman.

Mr. Ambassador, what can you tell us about Saudi Arabia's fund-
ing of madrassas? These schools preach anti-Semitism and ter-
rorism, and they serve as a real breeding ground for terrorism.
While the Saudis maintain they are fighting terrorism, how can
they justify funding these schools that are indoctrinating countless
thousands to hate, commit terrorism and murder?

Ambassador BLACK. We have an ongoing program to press the
Saudis to do more to control private fund raising and charitable or-
ganizations that purport to work abroad.

We have encouraged them to monitor closely and look at mosque
building madrassas that could be used for subversive activities.

You asked exactly the right question. This is a real challenge and
having been previously a counterterrorism practitioner, this system

35

has quite the head start on us. It also is from our perspective exacerbated by there are a goodly number of madrassas that do good religious teachings, that are, I think, from our perspective, okay. There are a number that are not. We try and identify these. We are working with the Saudi government as well as others to identify and cut funding that goes to madrassas that we believe are encouraging hate, anti-Semitism and the like.

We also work with local governments in foreign countries to present a counterweight to these type of facilities. One example would be in Pakistan. The Pakistani government has taken a good lead in trying to set up parallel schools and systems and so this is to the good.

My words are good, but I would say that we are at just at the beginning of this. It is an issue that we will continue to address. This will see me out. We will be at this for years.

We also have to make differentiation between what is religious teachings and activities and those that are associated with the education and provision of potential recruits for terrorist organizations.

I would say to you that it is still early days in this. We are very mindful of it. It is big, it is huge. As the President says, this is going to be a long-term struggle.

And where, on the one hand, we need to move aggressively and quickly against the terrorists, the key to counterterrorism, of course, is countering terrorists and not countering everybody else and encouraging those people to feed young recruits into terrorist organizations.

So the key here is to work with the Saudi government, which we are. As we do these other things, we are increasingly going into this and that is sort of where we are. It is not very eloquent, I apologize, but that is where it is.

Mr. PITTS. Is the Saudi government working with other governments like Pakistan or Indonesia or Malaysia to disrupt existing networks outside of Saudi Arabia? Are they being proactive, not just reactive? And how can we encourage the Saudis to cooperate in this way, to be proactive in rolling up some of these terrorist networks?

Ambassador BLACK. The answer to your question is yes, but the corollary to that is that the government of Saudi Arabia and the Saudi people are in quite a fight right now in their own country. Their security forces are engaged against terrorists, they have lost many lives, young policemen and soldiers, in firefights with al-Qaeda cells, so I would say their primary focus, as ours would be in a similar situation, is the internal terrorist threat and they are in contact with foreign leaders and working this issue.

We encourage them to do more. I think Saudi Arabia the government would tell you that these issues are connected and interrelated and so we are making progress on that. We, of course, need to do much more.

Mr. PITTS. Since they have their hands full, perhaps they could find some appropriate actions by others. They seem to have plenty of money.

Ambassador BLACK. Yes, sir. We are looking at that. As an example, in the Saudi government there is also humanitarian need that they can fulfil. Saudis as a people are compassionate. In other

36

words, those individuals say in Iraq per se that need help, that need support and that we encourage, are allowing the provision of goods in kind, tractors and the like, and not cash. So the government has interposed themselves. They have their hands on the choke point. The good Saudi people that want to contribute for a good cause have a way to do that.

Mr. PITTS. Have they cooperated with U.S. intelligence or U.S. personnel on the Khobar Towers bombing, the Air Force billeting facility that was struck in June 1996? Is their investigative arm willing to share evidence with U.S. counterparts?

Ambassador BLACK. If I can turn that over to my FBI colleague? I am not so sure on that.

Mr. HARRINGTON. Again, in an open hearing, this is somewhat difficult, but certainly we waited over 4 years for direct access to individuals we believe that were involved in Khobar Towers. Certainly the environment is completely different from that time compared to today. I think there is still room for us to have further discussions on that, but they are more actively involved in trying to provide that assistance. We are building relationships now one on one between investigators at both the working level, mid level and, as I stated earlier, the executive levels. We are making progress.

Mr. PITTS. Thank you, Madam Chair. My time is up.

Ms. ROS-LEHTINEN. Thank you so much, Mr. Pitts.

Congressman Crowley was sweet enough to let us skip his turn so that Congresswoman Berkley can ask her question and get back to her other hearing and then we will hear from Congressman Crowley.

Shelley?

Ms. BERKLEY. Thank you very much, Madam Chairman.

Thank you all for being here, I appreciate the information, but with all due respect, I am not overly impressed with our Saudi partners.

The Saudis have been exporting terrorists and funding terrorism throughout the world for the last 20 years under the mistaken belief that they would not be the victims of their own creation and now that they are the victims all of a sudden they have become our partners against terrorism. I think it is too little too late and while you have spoken of some improvements, the reality is you are touching the tip of the iceberg and we do not have a clue what the Saudis are doing or what the Saudi royal family is funding. But there is certainly enough evidence to believe that they continue, if not at the same pace, to fund al-Qaeda, to fund Hamas, and other terrorist organizations throughout the world.

There are a number of questions that I have, but I have to get back to the other hearing, but what I would like to do is leave a list and have you answer in writing.

One issue that I would like to bring up is the Saudi support for the Qassam rockets. There have been reports that Saudi Arabia may be playing a role in Hamas' development of the Qassam rockets. Apparently, Hamas operative Osama Karika was recently caught en route from Gaza to Saudi Arabia carrying documents detailing the Qassam rocket program.

37

Karika told Israeli interrogators that he had received financial backing for the Hamas rocket program in Saudi Arabia and was returning to brief people on progress and secure more funding.

Can you confirm this cooperation?

Mr. Ambassador?

Ambassador BLACK. Yes, Ma'am. Thank you very much for that. We certainly look forward to your questions and we will try and answer them.

It sounds like it is in the preserve of intelligence. I cannot rule out something like this could be possible certainly without the support of the Saudi government. It would need to be checked out and looked into and we would need to have the intelligence and security people look at it. I do not know what the state of play on that is.

There are people moving around the Middle East with money involved in nefarious activities, it is a fact of life, it has been going on for a long time. It is our mission to identify them and stop them.

Ms. BERKLEY. And funded by the Saudi government?

Ambassador BLACK. Ma'am, we have been told at a very senior levels and we do everything to confirm this that there is no official Saudi government support for Hamas.

Ms. BERKLEY. What is the definition of official?

Ambassador BLACK. Well, a government entity would be like the U.S. Government vis-a-vis perhaps—it is a bad analogy, but yourself. You acting in your private capacity would be seen as different than being a representative of the government. As we understand now, representatives of the government would be in contrast to private individuals.

Ms. BERKLEY. Do you consider members of the Saudi royal family members of the government or private individuals? And if you have a prince writing a million dollar check to Hamas so that they can develop these rockets, are they doing it as citizens of Saudi Arabia or as members of the Saudi royal family?

Ambassador BLACK. I do not mean to be cute, but there are a lot of princes of various levels. Some of them are unemployed and sort have no jobs and live off of wealth. One's affiliation to the royal family does not make them a part of the government. It is possible that a junior prince or someone well removed from the government could be involved with something like this, but it would be speculation.

Ms. BERKLEY. How do we rein that in?

Ambassador BLACK. The problem is we have to identify these people.

Ms. BERKLEY. And who does that?

Ambassador BLACK. Well, we do that through, one, cooperation with the Saudi government; two, by security and intelligence activities outside the Kingdom and those people would look at the problem from both ends.

Ms. BERKLEY. I would submit to you if we are relying on the Saudi government to turn over information about their Saudi princes, no matter how low ranking they are, we are going to be waiting an awfully long time.

I am going to prepare a list of questions, if you do not mind answering them, and I thank you very much for your courtesy.

38

I have to say and I know this is not the subject of this hearing, but when I go on a Saudi Web site, when they are encouraging tourists to come to Saudi Arabia and I hear you speak of them glowingly and say that they are really cooperating and they are good friends and allies, when they list people that need not apply for visas and they talk about Jews, I am Jewish, does that mean that I could not get a visa to go to Saudi Arabia? And what type of friendly country is that that we would wish to be associated or allied with?

Ambassador BLACK. Yes, Ma'am. I certainly agree with you. I am speaking from a standpoint of counterterrorism, as a partner with the government of Saudi Arabia in the field of counterterrorism, and I would submit that that is reprehensible. Our government is against it. We work with them to change it, yet in this process you have to work with what you have and we are attempting to save lives in the process.

Ms. BERKLEY. I would submit to you that there are hundreds of dead Israelis that have been omitted from this process that we are working on with the Saudis and if this nation wants to get serious about terrorists and terrorism and eradicating the threat world-wide, the first country we ought to look to are the Saudis and stop pretending that they are allies and friends of ours. They are not.

Ms. ROS-LEHTINEN. Thank you, Congressman Berkley.

Congressman Crowley?

Mr. CROWLEY. Thank you, Madam Chair. Thank you for holding this hearing today.

I just want to make an observation. I do not want to get too far afield from the subject matter at hand and I was not in the room when the statement was made pertaining to Mr. Clarke, but I feel that more needs to be said about the statement alleging the actions by Mr. Clarke while in the White House.

It appears as though to me that character assassination has trickled up to the legislative branch and is not solely owned by the White House at this time. In other words, if you do not like what the person is saying, attack at every opportunity that makes itself available, even if the opportunity comes at a Subcommittee hearing that was conceived, I understand, months in advance and before we knew that Mr. Clarke would be releasing his book this week.

I do not know if there is anyone here from the White House, but I am sure if they are here they must have been cringing when that question was being asked. That is just an observation I would make. I do not think the White House would actually ask Mr. Chabot or any other Member of this Committee to ask such a question before such an impressive panel when we are dealing with the issue of international terrorism and the sponsorship thereof and what role the Saudi government is playing in that.

Having said that, Ambassador Black, I just want to come back to your statement. The line where it says: "We have such a like-minded ally in the Kingdom of Saudi Arabia," I understand that you are probably making reference to a like mindedness in terms of fighting the war against terrorism. That is correct, am I not?

Ambassador BLACK. Yes, sir. I apologize if that is not clear. I do counterterrorism, perhaps I overly focus on that and I would say, sir, just having worked on this for years, there has been a signifi-

39

cant change and they very much see this issue, gratefully and thankfully, very much the way we do, that we have to identify these people and we have to have them arrested or detained or otherwise taken care of so they do not hurt innocent men, women and children.

Mr. CROWLEY. See, I agree with you, I think they probably do get it now that they have had the same acts committed against their government, their own people in essence, but I think it is interesting that like mindedness, in my opinion, ought to extend beyond the war of international terrorism.

When you look within the country itself and way in which it treats half of its own population, I think one could describe that as state sponsored terrorism within its own borders, the way in which it treats women, not being given the right to vote, not being able to drive, not being able to leave the building without a man with that person, the religious police that are on the streets that beat people for wearing inappropriate clothing, etc.

A country that has that set of standards, that set of rules within its own borders and then somehow is going to be working with us to undo international terrorism or go after international terrorism and at the same time with the other hand not necessarily with the government but members of the government who are then funnelling money to madrassas all around the world, including countries like Pakistan, Indonesia, to Bangladesh, for instance, and certainly even here to the United States, it is just an interesting—and I do not mean to come on you, Ambassador, too much, but it is an interesting choice of language to use within your statement and I just want to make a point of that.

What are we doing in terms of bringing the pressure to bear upon the Saudis? And if you have already answered this, I apologize. If you have, I will make reference to your notes, but one of the U.S. counterterrorism policies is to isolate and to apply pressure on states that sponsor terrorism to force them to change their behavior.

I, for one, I would agree and want to be associated with Ms. Berkley in terms of her observation of Saudi Arabia. Whether it is Saudi Arabia or other countries, but specifically, Saudi Arabia, what is the United States doing to force them to change their behavior or their past behavior?

Ambassador BLACK. I certainly agree with you. Their behavior in the past left considerable room for improvement.

Beginning in my experience in this job, beginning in January of last year, diplomatically, the United States Government began working very closely with the leadership of Saudi Arabia. Our desires were made very clear. There was responsiveness on their part. It was adopted and operationalized among the key individuals and their legal and security establishments. We have seen measurable evidence of this cooperation in terms of terrorists killed, joint entities established.

I certainly agree with the Congresswoman just speaking from a standpoint of counterterrorism. Young police officers in Saudi Arabia are locking and loading and having shootouts in the Kingdom and people are dying.

40

A large number of al-Qaeda terrorists have been killed or detained. They have lost a lot of their young men in these struggles. This is counterterrorism. This is what happens in this kind of war.

Mr. CROWLEY. And some would argue that they are actually responsible for the terrorism that was created in their own country by the policies they put forward.

Ambassador BLACK. Well, I am not going to——

Mr. CROWLEY. I know you are not. I understand that.

Ambassador BLACK. Again, I guess the key point I am saying is it is very difficult for me to speak to the sort of history of the relationship. I would say to you I have been a counterterrorism practitioner; before, it was not as good as it is now and before it was not very good at all, but I think we have really made significant progress because of the reality of the threat. They are working with us closely.

In fact, the last time I was in the Kingdom, sometimes I look at the evidence of this cooperation and I think how long ago would it have been where one would think something like this was possible. There are full-page advertisements in the newspapers with pictures of al-Qaeda terrorists asking the population if you know anything about these people turn them in and they are doing it. So you have that going.

They are engaging terrorists, they are working closely with us. So we are not all the way there yet, there are other aspects of their society absolutely that we would encourage them to think about changing, but in counterterrorism alone, that is all I can speak to, I think we are making some real progress there.

Mr. CROWLEY. Thank you, Ambassador.

Mr. SMITH. The reports that Saudi Arabia is funding the PLO and Hamas, is accurate? Is it still happening?

Ambassador BLACK. In part. The Palestinian Authority receives sort of a bimonthly stipend from the government of Saudi Arabia for support costs and infrastructure support and administration. As I commented earlier, sir, the government of Saudi Arabia claims, and we have no evidence to contradict them, that the government is not providing support to Hamas.

Mr. SMITH. And the World Muslim Fund?

Mr. ZARATE. Congressman, you may be referring to the Muslim World League or the World Assembly of Muslim Youth. These are two of the multi-lateral organizations we were referring to earlier that are charities that operate, certainly, within Saudi Arabia and around the world. That is something that we are addressing directly with the Saudis, trying to both ferret out those operatives that are using those organizations worldwide to continue to funnel money to al-Qaeda and like-minded groups, but as well looking for opportunities to change the regulatory oversight of those organizations within Saudi Arabia.

Mr. SMITH. So do I understand your testimony, and I apologize for coming in late, we have several Committees, as you know, that you are optimistic, positive about the increase in cooperation over the last couple of years and you are optimistic about the continuing cooperation in the Saudis' help to fight terrorism?

Ambassador BLACK. I would say that I have been increasingly optimistic in the last year and a half. It has matured greatly. Our

41

cooperation now is productive in terms of measurable achieve-
ments, number of terrorists arrested, detained, the work we are
doing in IDing and cutting financial links to terrorism. So I think
the recent past is very good and I am here to tell you that we have
a reason to be optimistic because of the results achieved and this
has been directly related to the leadership shown by senior officials
in the Kingdom in making a fundamental and strategic choice to
cooperate with us and to allow us to work with them on some as-
pects of counterterrorism inside the Kingdom of Saudi Arabia.

Mr. SMITH. And help me understand the effort of sanctions on in-
dividual firms or individual Saudis.

Mr. ZARATE. Congressman, what we have done with the Saudis,
as Ambassador Black mentioned earlier, is to identify 10 entities
to the United Nations for the application of sanctions by the inter-
national community. Those sanctions include asset freezes that re-
quire the international community to not only freeze the assets
that may exist for those entities, which in this case involve Saudi-
based charities and branches around the world as well as a Saudi
citizen, but as well commits the international community to a trav-
el ban as well as other measures.

Mr. SMITH. Gentleman, on behalf of the Chairman and the Rank-
ing Member, thank you all very much. We will ask the second
panel——

Are there any other short statements that you would like to put
on the record?

Ambassador BLACK. No, sir. Thank you. It was an honor to be
here.

Mr. SMITH. Gentlemen, Thank you very much.

Mr. ZARATE. Thank you, Congressman.

Mr. SMITH. The second panel, as I understand it, has been intro-
duced, Mr. Robert Baer, the former CIA Middle East intelligence
officer, and Mr. Steven Simon, the senior analyst with RAND Cor-
poration.

Gentlemen, again, thank you very much. Your total testimony
will be made part of the Committee's record. We would ask you to
come close to the 5 minutes, starting with you, Mr. Simon.

## STATEMENT OF STEVEN SIMON, SENIOR ANALYST, RAND CORPORATION

Mr. SIMON. Thank you, Mr. Chairman, and Members of the Com-
mittee.

Fundraising is a key issue. Groups who commit terrorist acts
need cash to do that. Having said that, these groups are, to a de-
gree, self-sufficient. They are self-sufficient in part as a matter of
necessity, both in terms of the uncertainty of supply of cash from
elsewhere and, in the interests of operational security, they are to
some extent self-sufficient for doctrinal reasons.

The lure of Muslim warfare justifies or calls for the taking of
booty, fay or hanima are the words, and terrorist groups are doc-
trinally motivated to secure funds on their own by stealing from
the societies in which they live. Of course, we know that terrorist
groups do this with alacrity, especially on the Islamist side. Credit
card fraud and so on are important ways of gaining funds.

42

The other thing to bear in mind is that without a big infrastructure as al-Qaeda required before September 11th and its expulsion from Afghanistan, they have a lesser need for funds, although a surge capability for fund raising is a useful thing to have for establishing new networks, consolidating networks, and setting into motion high impact or large scale operations.

A third thing to bear in mind is that the very metastasis of this group, the way it has spread and dispersed and become in effect a global jihad. This means that funds are being raised in many different locations and there is very good scholarly work going on concerning fund raising that has been dispersed well beyond what was called earlier the epicenter of Saudi Arabia and Southeast Asia is a particularly important area for this kind of activity. The tri-border area in Latin America is as well.

This is not to say that tracking funds is unimportant. It is important not only for the purposes of interdicting the funds that are in motion or stanching the flow at the base in order to starve operators, it is important, too, for the purposes of locating operators themselves. This is a very useful string for intelligence agencies on the right side of the fence to pull on.

It is also true that the emergence or maybe a better way to put it is the unavoidable recognition at this point by the Saudi leadership that there is an intifada going on in their own country against them has moved them to acknowledge the urgency of long-standing United States demands that they get a grip on the significant flow of funds from the Kingdom to a variety of charitable and missionary organizations that have been linked to terrorist acts.

We have talked in this chamber in the past few minutes about Hamas. We know that money is going to Hamas in significant sums from Saudi Arabia, at least viewed against the scale of Hamas requirements, maybe 12 to 14 million a year, and we know this because the Palestinian Authority is very upset about it and they talk to us about it. They are contesting political control of a future Palestinian state with Hamas and Saudi support of their competitor is not a very good thing from their perspective and probably not a good thing from ours either.

A number of initiatives were discussed earlier in this presentation. They are very impressive. The FATF review process, the joint task force, the Saudi Arabian Monetary Agency's regulatory process for monitoring money laundering and terrorist financing, the establishment of a financial intelligence unit, the Saudi Royal Commission on Charities and so forth, all of these are very impressive. Thus far, their appears at least to the outside scholar very little follow-through.

The very ambiguity with which the representatives of the Administration expressed in discussing the degree of follow-through, the confusion that one could see in this testimony, is just evidence that the situation remains in flux, so you have a regulatory framework being established, but it is very difficult actually to launch as a practical matter.

But I am not going to focus on these things for the simple reason that I am not involved in the implementation. What I would like to do is just take 2 or 3 minutes to underline the huge difficulty

43

that the Saudis are going to have in implementing these arrangements and explaining why it will be so difficult for them to do so.

In the first instance, most Saudis, I think, believe that the Muslim world is under lethal attack by a vigorous, robust and maybe an all powerful enemy. Under such circumstances, it is the personal obligation of every able bodied Muslim to come to the defense of the Muslim community, of his fellow Muslims.

Now, of course, as a practical matter, most people cannot do this. You have a family, you have a business, you live in a particular country, unless you are young and relatively unencumbered, you cannot run off to Chechnya or to Palestine or to Kashmir or to any number of other places where Muslims are perceived to be under attack and join the war. So you do the next best thing, you write a check or you give cash.

And this impulse within Saudi society is deeply seated. It is hard wired, if you will. It is a passionate need. Public opinion survey data that has been collected within the Kingdom tends to confirm this fact. The bin Laden worldview, if I can put it that way, is widely shared. And when important Muslim leaders like Sheikh Amed Yasin in Gaza or the former Chechan leader Yadarbaev are assassinated, the long arm, the tentacles of a hostile power are seen as operating within the Muslim world in a pernicious way and this tends to reinforce the perception of beleaguerment, of being besieged.

It is also true, unfortunately, that polling data within the Kingdom shows that bin Laden himself remains a revered figure by many people, perhaps most people, in that country, so support for a jihad against the enemies of Islam that bin Laden embodies is a very important element of societal values.

Now, when you have a situation like this, you can build a dam in the form of interlocking regulatory and law enforcement structures, but tributaries will develop around that dam, flows of money that this dam will not stop.

Now, this is not to say that one should not build the dam. The dam must be built and the Saudis must have their feet held to the fire and so forth. It is absolutely essential.

My point, rather, is that the money will leak out anyway and probably in significant numbers.

Now, let me just conclude by saying that the Saudi leadership is engaged now in a very delicate process of transition. It is extremely fraught, the outcome at this point is unknowable. In the course of this transition, they have to negotiate two long-standing contracts, one with society and one with a clerical establishment whose approval is indispensable to the legitimacy of the Saudi rulers themselves.

The bargaining process in this renegotiation is a very delicate one and there will be horse trading, especially with the clerical establishment. Things will have to be offered up by the Saudi leadership in return for concessions it expects to get from a clerical establishment on whom it relies for its legitimacy.

Thus, you will see continuing, just as an example, you will see continuing oppression of women in Saudi Arabia because that is something that at this point in time the Kingdom will have to surrender to the clerics in return for other forms of support.

44

Reform in the education system is perhaps another example in which concessions will have to be made. The education system emphasizes a curriculum known to specialists as tawhid. It is very xenophobic, it is very hostile toward the Shiites as well as Jews and Christians, and it does not exactly favor an open view of the world, yet that element of the curriculum may have to remain as a concession by the Kingdom to the clerics.

Many of these tradeoffs, it seems to me, will have to be made in the process of winning both clerical and societal support for the kinds of changes we are looking for in broad Saudi support for jihad.

The clerical leadership, which embodies, as we know by now, a Wahhabi doctrine, believes that it is incumbent upon the ruler, upon the political ruler, if you will, to wage jihad where it is necessary on behalf of the Muslim community and there is no question in the minds of many that such a jihad is necessary.

Any walking back from that obligation or, even worse, any impediment that the political leadership may put in the way of the exercise of that obligation will be strongly resisted by the clerical leadership. So this combination of a strong, broad societal commitment to jihad as well as the commitment of a clerical establishment whose support is crucial to the regime are going to be very powerful structural impediments to the kinds of reforms we would like to see in Saudi Arabia.

And, again, to conclude, this is not to say that we should not press for such reforms, we absolutely must. It is essential, but we should not expect miracles.

Thank you.

Ms. Ros-Lehtinen. Thank you so much, Mr. Simon.

Before I recognize Mr. Baer, I would like to point out that in the audience we have our esteemed colleague, the former Chair of the International Relations Committee, Mr. Ben Gilman of New York.

Ben, it is always a delight to see you and I congratulate you for the wonderful work you are doing on United States interests in the United Nations. We thank you for all of your efforts.

Mr. Baer, if you could just bear with us for 1 minute, there was a question that had arisen regarding Mr. Chabot's line of questioning and I think a lot was read into the way he phrased the question and I would like to recognize him now so he could cite the source upon which his question related to Mr. Clarke was based.

Mr. Chabot. Thank you, Madam Chair, and I will be relatively brief here.

I had asked a question, I wish Mr. Berman was here right now, but I had asked a question early on, and I will quote what I said:

"There was a recent report that in the days immediately following 9/11 that former White House Counterterrorism Director Richard Clarke authorized that nearly 140 Saudis be allowed to be flown out of the United States, out of fear of retribution."

So that is what I said.

Ms. Ros-Lehtinen. So you were referring to an article?

Mr. Chabot. Yes.

Ms. Ros-Lehtinen. You did not say——

45

Mr. CHABOT. I said there was a report.

Ms. ROS-LEHTINEN [continuing]. That you had knowledge of it, but you had a report of an article.

I had asked Mr. Chabot to share with us the source of that questioning.

Mr. CHABOT. Well, there was indeed a report and I would ask unanimous consent——

Ms. ROS-LEHTINEN. Without objection.

Mr. CHABOT [continuing]. That the *International Herald Tribune* dated September 4, 2003 be included in the record.

If I could just read two paragraphs here:

> "Top White House officials personally approved the evacuation of dozens of influential special agents, including relatives of Osama bin Laden, from the United States in the days after the September 11, 2001 attacks when most flights were still grounded, according to a former White House advisor. Richard Clarke, who ran the White House crisis team after the attacks but has since left the Bush Administration, said he agreed to the extraordinary plan because the Federal Bureau of Investigation assured him that the departing Saudis were not linked to terrorism. The White House feared that the Saudis could face retribution for the hijackings, Clarke said."

And the article goes on.

There is also a second article in *National Review* which goes into even more detail along the same lines. There is also a reference to a *Vanity Fair Magazine* article again along those same lines. So I would ask that these articles be included in the record.

Ms. ROS-LEHTINEN. Thank you. Without objection.

[The information referred to follows:]

WHITE HOUSE AGREED TO WHISK SAUDIS AWAY AFTER 9/11

Eric Lichtblau, *NYT*
Thursday, September 4, 2003

SENATOR CRITICIZES AIRLIFT

WASHINGTON—Top White House officials personally approved the evacuation of dozens of influential Saudis, including relatives of Osama bin Laden, from the United States in the days after the Sept. 11, 2001, attacks when most flights were still grounded, according to a former White House adviser.

Richard Clarke, who ran the White House crisis team after the attacks but has since left the Bush administration, said he agreed to the extraordinary plan because the Federal Bureau of Investigation assured him that the departing Saudis were not linked to terrorism. The White House feared that the Saudis could face "retribution" for the hijackings, Clarke said.

The fact that relatives of bin Laden and other Saudis had been rushed out of the country became public soon after the Sept. 11 attacks. But questions have lingered about the circumstances of their departure, and Clarke's statements provided the first acknowledgment that the White House had any direct involvement in the plan and that senior administration officials had personally signed off on it.

Clarke made his remarks in an article in Vanity Fair magazine published Thursday, and amplified them Wednesday in an interview and congressional testimony. The White House had no comment on his statements.

The disclosure came just weeks after the classified portion of a congressional report on the Sept. 11 attacks suggested that Saudi Arabia had financial links to the hijackers. Clarke's comments are likely to fuel accusations that the United States has gone soft on the Saudis because of diplomatic concerns.

46

Senator Charles Schumer, a New York Democrat, seized on Clarke's comments to call on the White House to conduct an investigation into the hasty departures of about 140 Saudis in the days after the attacks.

Schumer said in an interview that he suspected some of the Saudis who were allowed to leave, particularly two relatives of bin Laden who he said had links to terrorist groups themselves, could have shed light on the events of Sept. 11.

"This is just another example of our country coddling the Saudis,'" Schumer said. "It's almost as if we didn't want to find out what links existed."

While FBI officials would not discuss details of the case, they said that in the days immediately after the Sept. 11 attacks bureau agents interviewed the adult relatives of bin Laden, members of a rich Saudi family, before the White House cleared them to leave. Bin Laden is said to be estranged from his family.

"We did everything that needed to be done," said John Iannarelli, a bureau spokesman. "There's nothing to indicate that any of these people had any information that could have assisted us, and no one was accorded any additional courtesies that wouldn't have been accorded anyone else."

But Vanity Fair quotes Dale Watson, the former head of counterterrorism at the FBI, as saying that the departing Saudis "were not subject to serious interviews or interrogations." Watson could not be reached for comment.

The article depicts an elaborate but hurried evacuation, with private planes picking up Saudis from 10 U.S. cities. Some aviation and bureau officials said they had been upset by the operation because the government had not yet lifted flight restrictions for the general public, but said they had not had the power to stop it, the article says.

Clarke, who left the White House in February, said in an interview that he was driven by concern for the safety of the Saudis after the hijackings. "We were concerned, just as the Saudis were concerned, that the Saudis and other Middle Easterners would be targeted for retribution," he said. He called the current criticism of the evacuation "a tempest in a teapot," adding that he had told the bureau to hold anyone it had suspicions about, and that the FBI had said it had not held anyone.

Schumer said in a letter to the White House Wednesday that the Saudis appeared to have had "a free pass" despite possible knowledge about the attacks.

"I find it hard to believe that two days after 9/11, the FBI would even know what questions to ask and who to ask it of," Schumer said in an interview. The New York Times

---

THE GREAT ESCAPE: HOW DID ASSORTED BIN LADENS GET OUT OF AMERICA AFTER SEPTEMBER 11?

*National Review*, Sept 29, 2003
by Byron York

Last year, on the first anniversary of September 11, there were serious, unanswered questions about the Bush administration's decision to allow members of the bin Laden family living in the United States to leave the country in the days after the terrorist attacks. Now, on the second anniversary of September 11, there are still serious, unanswered questions. But ever so slowly, new information is emerging.

The basic story has been known for quite a while. Not long after the attacks, the Saudi government, saying it feared retribution against Saudi citizens, worked with the bin Laden family to gather up more than 100 family members and other prominent Saudis for a flight to Jeddah. A chartered jet made pickups in Los Angeles, Orlando, and Washington, D.C., before making a final stop at Boston's Logan Airport, from which it departed for Saudi Arabia.

But the Saudis required permission to leave the country, and it has never been clear who in the U.S. government gave it to them. In interviews with National Review last year (see "The Great Escape," Sept. 30, 2002), a State Department source said Foggy Bottom "played no role" in the matter; an FBI spokesman said the Bureau did not have the authority to make that decision; and the White House declined to answer questions.

Recently, however, Richard Clarke, the former head of anti-terrorism at the National Security Council, gave some answers while testifying before the Senate Judiciary Committee's subcommittee on terrorism. "I do recall the State Department coming to us that week [after September 11]," Clarke testified,

saying that the Saudi Embassy felt that in the wake of the terrorist attacks, Arabs in this country, particularly Saudis, might be victims of retribution attacks, and they wanted therefore to take some Saudi students and the Saudi citizens back

47

to their kingdom for safety, and could they be given permission to fly, even though we had grounded all flights. Now, what I recall is that I asked for flight manifests of everyone on board and all of those names need to be directly and individually vetted by the FBI before they were allowed to leave the country. And I also wanted the FBI to sign off even on the concept of Saudis being allowed to leave the country. And as I recall, all of that was done. It is true that members of the bin Laden family were among those who left. We knew that at the time. I can't say much more in open session, but it was a conscious decision with complete review at the highest levels of the State Department and the FBI and the White House.

What Clarke could not testify to was the thoroughness with which the FBI questioned the departing Saudis. Last year, National Review reported that the FBI conducted brief, day-of-departure interviews with the Saudis—in the words of an FBI spokesman, "at the airport, as they were about to leave." Experts interviewed by National Review called the FBI's actions "highly unusual" given the fact that those departing were actually members of Osama bin Laden's family. "They [the FBI] could not have done a thorough and complete interview," said John L. Martin, the former head of internal security at the Justice Department.

At the Judiciary subcommittee hearing, New York Democratic senator Charles Schumer asked Clarke how closely the Saudis were questioned. "Sir, all I can tell you is that I asked the FBI to do that," Clarke replied. "I asked the director and the assistant director of the FBI to do that. They told me they did it." End of story.

Clarke's statement—and Schumer's questions—came as a result of an article in Vanity Fair that questioned some aspects of the Saudi exodus. Author Craig Unger reported that the Saudis made an additional pickup flight, on an eight-passenger Learjet that flew from Tampa to Lexington, Ky., on the afternoon of September 13, 2001. That flight, Unger said, occurred at a time when the Federal Aviation Administration had banned all private flights (commercial planes had just resumed flying). "Three private planes violated the ban that day, and in each case a pair of jet fighters quickly forced the aircraft down," writes Unger. Yet the Saudi flight, he says, was allowed to travel undisturbed.

Vanity Fair suggests that that was the result of some sort of intervention by the Bush White House. But administration sources tell National Review they have looked into the matter and found no record of such a flight receiving any special permission to fly. The sources also say that charter aviation was allowed to resume on the morning of September 13, several hours before the Tampa-to-Lexington flight is said to have departed, which would mean that the plane, which Vanity Fair says was chartered, did not need any clearance to fly. Overall, it appears that all flights—the ones gathering up Saudis domestically and the one from Boston to Jedda—took place after the government allowed aviation to resume.

Yet the big question—Who decided to allow the bin Ladens to leave the country and why?—remains.

Vanity Fair quotes Nail al-Jubeir, the Saudi director of information, as saying that the Saudi flights were approved "at the highest level of the U.S. government"—just as Clarke said. So far, however, those highest levels are saying very little. The FBI's account remains the same—"We didn't clear them to leave the country, we don't have that power," a spokesman tells National Review . As for the State Department, Secretary Colin Powell, when asked about the subject on Meet the Press , said, "I don't know the details of what happened, but my understanding is that there was no sneaking out of the country; that the flights were well known, and it was coordinated within the government." For its part, the White House remains silent.

All of which has led to growing curiosity. "I think people need to know the facts," says Arizona Republican senator Jon Kyl, who chaired the Judiciary subcommittee hearing the day Richard Clarke testified. "It's a perfectly legitimate subject. Clarke very candidly testified that he had run it past the State Department."

The official silence has also led observers to wonder whether there is some information about the bin Laden flights in the 28 blacked-out pages of the House and Senate intelligence committees' September 11 report. Those pages are apparently devoted to Saudi involvement in the terrorist attacks, but it seems they do not cover the Saudi departures. Sen. Kyl has read the material, and while he will not say what is in it—not even whether it discusses the Saudis—he says he is "unaware of any information in the intelligence reports that I have read that specifically goes into that."

Finally, the administration's silence on the Saudi question is having one more effect: It is allowing some Democrats to turn the issue into a political football.

The day after he questioned Clarke, Sen. Schumer participated in a news conference with the Senate Democratic leadership. "On September 12th and 13th [2001], hundreds of Saudis were able to take flights home back to Saudi Arabia

48

when no one else could fly," Schumer said. "I couldn't fly. Senator Boxer couldn't fly. Senator Durbin couldn't fly. But relatives of the royal family, including two members of the bin Laden family, were allowed to get on airplanes and go back to Saudi Arabia."

According to all available evidence, that is simply not true. Perhaps Schumer was unaware of the facts; at the hearing the day before, he confessed that he had not even read the Vanity Fair article, relying instead on a summary the magazine had released. In any event, he leveled an incendiary charge based on faulty premises.

Schumer has also written a letter to the president calling for an investigation of the Saudi flights. "For whatever reason, it appears as if these particular Saudis were given a free pass by the U.S. government despite their potential knowledge about 9–11," Schumer wrote. "Allowing approximately 140 Saudi citizens with potential links to the 9–11 attacks to leave the United States without FBI interrogation in the days after September 11th is clearly a glaring investigative failure."

Now, it's possible that other Democrats will pick up the story as well. Presidential candidates Howard Dean and Richard Gephardt have both been highly critical of the administration's dealings with the Saudis, and asking why George W. Bush let the family of the mastermind of September 11 leave the country shortly after the terrorist attacks might work very well in a campaign speech. In the end, the Bush White House might end up paying a political price for its refusal to answer a few simple questions.

COPYRIGHT 2003 National Review, Inc.
COPYRIGHT 2003 Gale Group

———————

PRESS RELEASE FROM VANITY FAIR

FORMER COUNTERTERRORISM CZAR TELLS VANITY FAIR HOW BIN LADENS AND OTHER SAUDIS WERE CLEARED TO FLY OUT OF U.S. AFTER SEPTEMBER 11; GOVERNMENT OFFICIALS DENY FLIGHTS EVER TOOK PLACE

NEW YORK, N.Y.—Former White House counterterrorism czar Richard Clarke tells Vanity Fair that the Bush administration decided to allow a group of Saudis to fly out of the U.S. just after September 11—at a time when access to U.S. airspace was still restricted and required special government approval. According to other sources, at least four flights with about 140 Saudis, including roughly two dozen members of the bin Laden family, flew to Saudi Arabia that week—without even being interviewed or interrogated by the F.B.I.

Officially, the White House has declined to comment. But a source inside the White House says that the administration is confident that no secret flights took place and that there is no evidence to suggest that the White House ever authorized such flights. An F.A.A. spokesman, Chris White, told the Tampa Tribune that a flight on September 13 did not even take place. "It's not in our logs. It didn't occur." In addition, the F.B.I. denies that it played any role in the repatriation.

But Vanity Fair writer Craig Unger interviewed Dan Grossi, a private eye and former Tampa Police Department officer who received a call two days after 9/11 asking him to escort Saudi students on a flight from Tampa to Lexington, Kentucky, even though private planes were still grounded nationwide. "I was told it would take White House approval," Grossi tells Unger. But when the plane's pilot showed up, they took off.

At the time, Richard Clarke chaired an ongoing crisis group in the 18-by-18-foot Situation Room in the West Wing of the White House. Vice President Dick Cheney and National-Security Adviser Condoleezza Rice were hunkered down managing the crisis, and Colin Powell, C.I.A. director George Tenet, and Defense Secretary Donald Rumsfeld came and went. "Somebody brought to us for approval the decision to let an airplane filled with Saudis, including members of the bin Laden family, leave the country," Clarke tells Unger. "My role was to say that it can't happen until the F.B.I. approves it. And so the F.B.I. was asked—we had a live connection to the F.B.I.—and we asked the F.B.I. to make sure that they were satisfied that everybody getting on that plane was someone . . . O.K. to leave. And they came back and said yes, it was fine with them. So we said, 'Fine, let it happen. . . . I asked them if they had any objection to the entire event—to Saudis leaving the country at a time when aircraft were banned from flying."

Clarke, who headed the Counterterrorism Security Group of the National Security Council, now runs a consulting firm in Virginia and does not recall who initiated the request for approval. He says it was probably either the F.B.I. or the State Department, both of which have denied playing any such role.

49

"It did not come out of this place," says a State Department source. "The likes of Prince Bandar does not need the State Department to get this done."

"I can say unequivocally that the F.B.I. had no role in facilitating these flights one way or another," Special Agent John Iannarelli, the F.B.I.'s spokesman on counterterrorism activities, tells Unger.

However, Saudi Arabia's director of information, Nail al-Jubeir, said that the flights had been requested by the Saudis and were authorized "at the highest level of the U.S. government."

After the September 11 attacks, Prince Bandar bin Sultan, the Saudi ambassador to the United States, was in Washington orchestrating the exodus of about 140 Saudis scattered throughout the country who were members of, or close to, the House of Saud, which rules Saudi Arabia, and the bin Laden family. By coincidence, even before the attacks, Bandar had been scheduled to meet President Bush in the White House on September 13, 2001, to discuss the Middle East peace process. The meeting took place as planned. Nail al-Jubeir tells Unger that he does not know if Bandar and the president discussed getting the bin Ladens and other Saudis back to Saudi Arabia.

Some Saudis tried to get their planes to leave before the F.B.I. had even identified who was on them, Unger reports. "I recall getting into a big flap with Bandar's office about whether they would leave without us knowing who was on the plane," an F.B.I. agent says. "Bandar wanted the plane to take off, and we were stressing that the plane was not leaving until we knew exactly who was on it." Dale Watson, the F.B.I.'s former head of counterterrorism, tells Unger that while the Saudis were identified, "they were not subject to serious interviews or interrogations." The bureau has declined to release the Saudis' identities.

The wealthy bin Laden family long ago broke with their terrorist brother, Osama, but Unger reports that some members of the family have had links to militant Islam. Abdullah and Omar bin Laden had been under F.B.I. investigation for their involvement with the American branch of the World Assembly of Muslim Youth (WAMY), which has published writings by one of Osama bin Laden's principal intellectual influences. According to documents obtained by the Public Education Center in Washington, the file on Abdullah and Omar was reopened on September 19, 2001, while the Saudi repatriation was under way. A security official who served under George W. Bush tells Unger, "WAMY was involved in terrorist-support activity. There's no doubt about it."

The Saudis' planes took off from or landed in Los Angeles, Washington, D.C., Houston, Cleveland, Orlando, Tampa, Lexington, Kentucky—and Newark and Boston, both of which had been points of origin for the September 11 attacks. "We were in the midst of the worst terrorist act in history," Tom Kinton, director of aviation at Boston's Logan airport, tells Unger, "and here we were seeing an evacuation of the bin Ladens! . . . I wanted to go to the highest authorities in Washington. This was a call for them. But this was not just some mystery flight dropping into Logan. It had been to three major airports already, and we were the last stop. It was known. The federal authorities knew what it was doing. And we were told to let it come."

"I asked [the F.B.I.] to make sure that no one inappropriate was leaving," Clarke tells Unger. Clarke assumed the F.B.I. had vetted the bin Ladens prior to September 11. "I have no idea if they did a good job. I'm not in any position to second-guess the F.B.I."

Prince Bandar has had a 20-year friendship with former president George H. W. Bush. Unger questions whether the long-standing Bush-Saudi relationship could have influenced the administration. The latest in a line of business links between the Bush family and the Saudis involves the Carlyle Group, a private-equity firm for which George H. W. Bush is a senior advisor and former secretary of state James Baker III is a senior counselor. The Carlyle Group has received $80 million in Saudi investment, Unger reports, including $2 million from the bin Ladens which was returned to them after September 11. In 1995, Abdulrahman and Sultan bin Mahfouz invested "in the neighborhood of $30 million" in the Carlyle Group, according to family attorney Cherif Sedky. Abdulrahman bin Mafouz was a director of the Muwafaq Foundation, which has been designated by the U.S. Treasury Department as "an al-Qaeda front." (Carlyle categorically denies that the bin Mahfouzes are now or have ever been investors.)

Clarke believes the decision to let the Saudis go was made because "there's a realization that we have to work with the government we've got in Saudi Arabia. The alternatives could be far worse. The most likely replacement to the House of Saud is likely to be more hostile—in fact, extremely hostile—to the U.S."

The October issue of Vanity Fair hits newsstands in New York on September 3 and nationally on September 9.

50

Ms. ROS-LEHTINEN. And, once again, as Mr. Chabot has pointed out, he is not saying that he has any knowledge himself of this, but just was pointing out that there were some reports. We know that Mr. Clarke has denied that and said that he had not approved the request but that other agencies had.

Mr. CHABOT. Thank you, Madam Chair.

Ms. ROS-LEHTINEN. We thank you so much, Mr. Chabot, for sharing that with us.

Mr. CHABOT. Thank you.

Ms. ROS-LEHTINEN. Mr. Baer?

### STATEMENT OF ROBERT BAER, FORMER CIA MIDDLE EAST INTELLIGENCE OFFICER

Mr. BAER. Madam Chair and this honorable Committee, thank you very much for having me.

I would like to start with the comments of my co-panelist, Mr. Simon, with which I fully agree. We have to keep in mind that many people in Saudi Arabia and the rest of the Middle East consider that they are at war with us, and yet try to remain our allies in a very difficult time.

Many of these societies have medieval banking systems, private banks and accounting procedures which do not match our standards and they in fact have ways to get around funding terrorism, funding jihad, supporting Hamas, supporting the Islamic jihad, and supporting Hezbollah in Lebanon.

What I would like to do is get down to the specifics right away to let you know what I am talking about. I was just out in Dubai where I talked with police officials and they say, yes, we understand, we understand that you have a problem with the charities and that money is getting into bin Laden's movement and to other movements, but the problem is that we very much have a cash economy in Dubai.

They told me every day there is somebody flying out of Dubai, 20, 30 people, with $250,000 apiece. They are going to Pakistan, some are going to Afghanistan, they do not know where the money is going, they are not prepared to clamp down on this transfer of cash right now. It would destroy their economy. They are not even sure they could do it if they wanted to.

More than that, you have to take a look at other banking systems around the Middle East. One is Lebanon. It has traditionally been a major center in the Middle East, and as of today you can still open a passbook account in Lebanon and put as much money as you want in this account. All it consists of is a piece of paper signed by the bank manager, it is typed out. I have seen examples where the full name is not used, so you can use a partial name, you can put several million dollars in it.

There is also in Europe a problem with banking as well which we cannot address in spite of our best efforts from Treasury and that is nominee accounts. In many places in Europe, you can open an account, a lawyer opens the account and gives management of the money to another individual, so theoretically Osama bin Laden could open a bank account in Monte Carlo, put it in the name of a lawyer who is at least not publicly associated with him, and draw

51

money off that account, he could even use credit cards, and his name would never appear on that bank account.

This is something that we need to consider as a tributary to this dam that we have put up and it is quite effective and it is quite effective in Saudi Arabia, but more than that, we have in the Middle East, I think we need to look at this, a process of—let us say they are going through a crisis. Some people call it disintegration. There is a lot of loose money that is not controlled.

One case I ran into this fall was Al-Madina Bank. I was able to talk to the manager of the bank. The bank president was in jail, his brother was in jail. His brother is one of the chief advisors to King Fahd. They gave me accounts adding up to $2.8 billion of money that was transferred from Saudi Arabia to the UBS Bank in Switzerland to the bank in Lebanon. Subsequently, this money has disappeared and the way it disappeared was that someone transferred it around the world to numerous nominee accounts and then destroyed the hard drives for the Swift accounts.

So if we are talking about stemming 200 or 300 million dollars going to bin Laden through the charities and through private donors, what can we do about something like this where you have serious management of accounts in the Middle East?

Another thing we have to consider, we seem to step around this question, is that the 9/11 attacks were largely funded through cash. As I understand, people came from Saudi Arabia, deposited the money in a bank in Dubai and it was transferred to the United States.

We still until today do not know who that money belonged to. Two of the people that transferred the money are under arrest. Was it their money? Was it somebody else's? There are numerous front companies in Germany that supported the Hamburg cell and a lot of that money came from Saudi Arabia. We still do not have arrests on that, we still do not have disclosure where that money came from.

Finally, what I would like to point out is that there were 15 Saudis on those airplanes and, as a former case officer with the Central Intelligence Agency, they were recruited by somebody and we know it was not bin Laden.

I would like to know who in Saudi Arabia recruited those people and if they are in jail, that is fine; if they are not, why not? We are not getting any disclosure on Saudi Arabia. We are being assured that they are cooperating with terrorism and that they are scared and yes, they are indeed scared. And, no, the Saudi government did not sponsor 9/11, but it is still very much an opaque country and there are still a lot of answers we need to get.

Thank you very much, Madam Chair.

Ms. ROS-LEHTINEN. Well put. Thank you so much, Mr. Baer.

I would like to recognize Mr. Royce to start our line of questioning.

Mr. ROYCE. I thank the gentlelady. I have a couple of questions, but I wanted to start with Mr. Baer.

Just recently, one of our colleagues made some observations about Afghanistan and Pakistan after he returned. He said that they are shifting in al-Qaeda from traditional charity-based financ-

52

ing over to financing through heroin trade, basically narco-terrorism.

Now, even if that is true, you still have these other networks of terrorist that are using charity, I just wanted your view on that question.

I chair the Africa Subcommittee and whenever I travel on the continent, I hear from local leaders about what is happening in their sufi communities in North Africa, West Africa, East Africa, with the radical new Wahhabi madrassas.

As one local governor said to me in Nigeria,

> "My old mosque is across from a new mosque which is 10 times the size with 100 times the budget and only one condition came with it and that was a Gulf State mullah who preaches a very different education than the one I got in the old madrassa. The students I see them wearing Osama bin Laden T-shirts and they are teaching jihad."

He says,

> "They are teaching nothing but hate for the west."

It is being funded by Gulf States, how do we cut off those funds? Some observations from you on how we could do that.

Mr. BAER. Well, for a start, on narco-terrorism, I think it is an extremely important point. I was assigned to Lebanon in the 1980s and we noticed that the Islamic jihad in Lebanon that were hijacking airplanes, TWA, blowing up our Embassy, blowing up the Marines, were using the heroin trade and the hashish trade to raise money and, not only that, they were using the financing mechanisms of narcotics and I think we are seeing that in Afghanistan again.

Those channels of raising money are extremely efficient. They are well tried, they are hard to close down, as DEA found out. Today in Washington—I can deposit money in Dubai, hundreds of thousands of dollars, and collect in Washington through facilities. There is no reason why these people cannot.

Keep in mind that I did work for the CIA, I was a case officer, and we spent our lives hiding money so we could pay agents. It is efficient, it is hard to close down, and we were up against some of the best, the KGB.

Mr. ROYCE. But let me ask you this question. The example you just gave us was 2.8 billion transferred out of Saudi Arabia, ends up in Lebanon. Funds of that magnitude—clearly, if we could figure out a way to get cooperation—in your book, you said the Saudi government seemed to be adopting the same see no evil, the same blinders that we had adopted with respect to this.

What if we were to really focus on a high level position in the United States Government that was solely devoted to going after money laundering after getting support in Europe and especially in the Middle East for a new regimen of banking laws which would allow us greater transparency?

Do you think things like this 2.8 billion, which really is a frightening number when you think about what that could finance, that we could go after and crack some of that if we had that type of concerted effort?

53

Mr. BAER. Oh, absolutely. We have to start in some of these banking centers. It is not just Lebanon, Liechtenstein has become a major conduit of illegal funds, money laundering. We have to go to Lebanon and ask what happened to this $2.8 billion.

I have provided the transfers to this Committee, which you can find to look at this. This is public information now. I would like to know where that money went.

Mr. ROYCE. And your request to us on the Committee is to follow up and get an answer to some of these questions that you are asking in your testimony and I think without objection, if I could ask, Madam Chair——

Ms. ROS-LEHTINEN. Of course.

Mr. ROYCE [continuing]. If we could do that and get back to you on that question.

Also, in your book, *See No Evil*, there is one particular paragraph that really stood out for me and I just want to go through this. You say,

> "Whether it was Osama bin Laden, Yassir Arafat, Iranian terrorism, Saddam Hussein, or any of the other evils that so threaten the world, the Clinton Administration seemed determined to sweep them all under the carpet. Ronald Reagan and George Bush before Clinton were not much better. The mantra at 1600 Pennsylvania Avenue seemed to be get through the term, keep the bad news from the newspapers, dump the nay sayers, gather money for the next election, gobs and gobs of it, and let some other Administration down the line deal with it all. Worst of all, my CIA had decided to go along for the ride. Now that such horrendous neglect has come home to roost in such misery provoking ways, I take no pleasure whatsoever in having been right."

There is a lot of finger pointing going on these days, it is an election year. We have the 9/11 commission working as we speak, but I am going to ask, and I understand that you are out of government, has this situation improved?

Mr. BAER. The situation has definitely improved. We are aware today, as we were not before 9/11, that we are the target of war. You can call it Suni fundamentalism, militant Islam, anything you want. These people believe they are at war with us. They want us out of the Middle East, they want to destroy Israel.

The problem is what do we do because we ignored this in the 1980s and the 1990s. And, by the way, I will point the finger at myself, too. My last job was group chief for Central Asia and we had no systematic program to go after bin Laden and I take responsibility there. I did not realize that bin Laden was a threat.

This is completely bipartisan. I do not think that today we as Americans really understand the transition the Middle East is going through and the fact that it is going to come home to roost again. We have a hard time penetrating these groups because they are believers. I mean, after all, if you are going to have suicide bombers, what is the CIA, DIA or the FBI going to offer them? A trip to Disneyland? You cannot get inside these groups. They do not want money, they are indoctrinated to martyrdom and it is something completely alien to us.

54

Our attitude is fine, you know, go buy some MIG jets and start a war, do anything but do not kill civilians. We just cannot compare our cultures. We have a long way to go.

The CIA has got to change its recruiting. We are going to need a lot of foreigners, we are going to need a lot of people that believe there is a moderate way in Islam. We are going to need Muslim agents that are going to need to penetrate this. This is all going to be a long war, as Ambassador Black said.

And starting with the banking and the charities is a good start, but that is just the tip of the iceberg.

Mr. ROYCE. Mr. Baer, I just want to conclude by thanking you for speaking out and getting on the record things that we need to know and I would like to follow up later with you. Thank you.

Mr. BAER. Thank you, Congressman.

Mr. ROYCE. Thank you, Madam Chair.

Ms. ROS-LEHTINEN. Thank you very much, Mr. Royce.

Mr. Ackerman?

Mr. ACKERMAN. Thank you, Madam Chair. I would like to get a few things on the record myself.

I find the statements that Mr. Chabot has popped in and out making to be very troubling, that somebody on the Committee would continue the harangue of joining with a political campaign and using the forum of this Committee to constantly try to discredit a former member of the Administration much in the news today and, by inference and innuendo, accuse him of various things.

It is indeed a sad moment for this Subcommittee, but if this Subcommittee is going to be used as a platform to discredit one political party or another, I find that both sad, it may improve the attendance here at our sessions, but it certainly demeans the process considerably.

To expand on the selective record that Mr. Chabot tried to establish, he put certain things by unanimous consent in the record. Mr. Berman asked several questions of the first panel that was before us at that time and Ambassador Black said that the State Department had no knowledge of Mr. Clarke's activity vis-a-vis putting the Saudis on the plane after September 11th and cited an article in *Vanity Fair* and placed an article in the record from the *Herald Tribune*.

Mr. Clarke said that he signed off on the plan. He did not say that this was his plan. In fact, he said it was higher ups in the White House.

Now, I do not think that the Vice President and the President of the United States can have it both ways, first to say that this guy was out of the loop, not in a real decision making position after appointment him the terrorism czar for the United States, and then claim, well, he was out of the loop, just ignore him because that is not an important position, someone who served four Administrations in a non-partisan fashion.

But indeed in his testimony before the Senate Judiciary Committee, Mr. Clarke said, and I would ask unanimous consent to put his remarks in the record——

Ms. ROS-LEHTINEN. Without objection.

Mr. ACKERMAN [continuing]. From that session.

55

Thank you, Madam Chair.

He said that he could not cite the specifics at the open hearing, but assured the Senate Judiciary Committee that the decision to send those Saudis out of the country on the plane was sent down to him by the highest levels in the State Department, the FBI and the White House and that what he did was what any prudent person in that position would do, he asked for the names of the people that were being put on the plane and to have them vetted, which he believed the FBI did in a cursory fashion.

That is the record as we know it, but to try to use this Committee to further a campaign to shaft this guy, to discredit him and his credibility, is something that is beneath the dignity of this Committee, Madam Chair, and the way that you have always respectfully handled the Committee.

Ms. ROS-LEHTINEN. If the gentleman would yield?

Mr. ACKERMAN. I would be delighted to yield to the Chair.

Ms. ROS-LEHTINEN. I think that if we would read back Mr. Chabot's words, I do not think that there would be any insinuation that he was saying anything disparaging of the character. This was literally what he said, there was a recent report, which is true, it is right here. That does not mean the report is true, but listen to what it said, and he read it just like that. There was a recent report in the days immediately following 9/11 that former White House——

So he did not say that he was an evil man, he did not say that he is personally responsible, and he alluded to the article, as you had pointed out, in *Vanity Fair* and I will read just this quote, and this is Mr. Clarke's quote, I am not saying he did not use any characterization of it:

"My role was to say that it can't happen until the FBI approves it and so the FBI was asked, we had a live connection to the FBI, we asked the FBI to make sure that they were satisfied that everybody getting on that plane was someone okay to leave. And they came back and said yes, it was fine with them, so we said fine, let it happen."

Mr. ACKERMAN. Right. So Mr. Clarke did everything——

Ms. ROS-LEHTINEN. So if you read back Mr. Chabot's words, I do not think he was doing any character assassination or anything of that type. He wanted to ask the witnesses what they knew of that and I think that that is something that this Subcommittee is directly asking about, Saudi involvement in this problem.

Mr. ACKERMAN. I happen to be very fond of Mr. Chabot. I do not agree with a lot of things he says and he certainly says then in a rather laid back kind of way, but I know that he has said a lot of things that he deeply regrets. The fact that he said it in a kind and offering way, brought it up here at this hearing at a time that was intended, I believe, to just lay it out in a matter of a perfunctory way until Mr. Berman called him on it, to try to be discrediting of somebody's reputation, which is very much a part of a campaign on the national level right now.

The Vice President was very soft spoken, too, when he tried to roast the guy on national T.V. and said, well, you know, we do not even know who this guy is, he is only our national terrorism czar,

56

he is not in the loop, but he did not say it with all the undertones that I am saying it with, but that is how the American people read it.

Despite the fact that Mr. Chabot's tone might be a lot warmer than mine at the moment, still there is no doubt in the minds of anybody who was listening carefully to what he said and, more importantly, what he was doing, that this was intended to be damage control for the Administration and roughing up Mr. Clarke a bit further in yet another forum and you can turn any dial and you will see the spinmeisters doing this all over the lot. And that is what I am sad about, that it would be done here, but if he chooses to do that in even the kind and gentlemanly way that he does it, he should expect that this side will be ready for the fight.

Ms. Ros-Lehtinen. Thank you. And just to either continue or end this, I think that if we would read back without any tone what Mr. Chabot's actual words were, it was asking a legitimate question of the State Department, FBI, Department of Treasury officials who might have also had a hand in allowing these flights to take off and there were those press reports and I literally read what Mr. Chabot said and we could read back his comments after that and I do not think that there was any character classification, positive/negative, it was neutral: What about these reports, are they true?

Mr. Ackerman. Did he ask that of anybody? Or did he just lay that out there?

Ms. Ros-Lehtinen. He asked——

Mr. Ackerman. It was Mr. Berman that asked the question.

Ms. Ros-Lehtinen. He said what kind of investigation was each of these Saudis put through by the FBI, he wanted a list of the folks who were allowed to travel and the folks indicated that they had no knowledge of it. I think in the 9/11 investigation, the State Department——

Mr. Ackerman. The State Department guy did not know anything, the FBI did not know anything, and yet this guy is running the country, Mr. Baker, he is deciding to send 140 Saudis out on a special flight when all the airports are closed and no flight could get in and out and you and I were taking the railroad to get to Washington because we could not get airborne, but this guy was running the country and the air control system and everything, despite the fact that the Vice President said he is out of the loop.

It is just a matter of his putting it out there, Madam Chair, that was offensive.

Ms. Ros-Lehtinen. I know, but I think it was a legitimate question.

Mr. Ackerman. He did not say it in an offending way, but, you know——

Ms. Ros-Lehtinen. When the reports were cited, his name was linked and I think it was a legitimate question on Mr. Chabot's part.

Mr. Ackerman. I am sure it was and I am legitimately trying to de-link it.

Ms. Ros-Lehtinen. Okay. Good deal.

Mr. Royce. Madam Chair? Excuse me.

Ms. Ros-Lehtinen. Thank you.

57

Mr. Royce?

Mr. ROYCE. If I could, there was another question I wanted to ask, if I could.

Ms. ROS-LEHTINEN. Yes, please go ahead.

Mr. ROYCE. It had to do with a question of a special envoy for money laundering, actually setting up a position in our government of having a special envoy who would be held responsible. I think there is a lot of responsibility to go around on all of these questions.

The question now is how do you give somebody the power and the authority and a high enough position in an administration that they can actually go after the money laundering and stay on it day in, day out. Get answers and be at the table with the international institutions. For example, when the World Bank meets they can exert their influence from the top and say if the United States is going to go along with these international institutions, we are going to have reforms that allow for more transparency, specifically so that we can look at the laundering of money that ends up financing terror.

I would like to ask the two witnesses if they think that if we could push for such an agenda, such an elevation of responsibility and authority into a special envoy that would be given that authority and power, whether that comes out of Treasury or however, what they feel.

Would that make a discernable difference or not?

Ms. ROS-LEHTINEN. And dovetailing, if I could, Mr. Royce, on your question, the role of banks in Europe also. How would you see this envoy if he would have some sort of capability in overseeing or looking at some of the transfer of funds, that we have had reports of banks in Europe, the Middle East perhaps, having a role in transferring the funds for these groups and expanding on that if you could tell us the role of private fiduciaries in Switzerland and Lebanon that we have heard may have had a role in these transfer of funds.

Mr. BAER. If I could answer first, I think it is a brilliant idea, Congressman. First of all, this government has an enormous amount of resources to trace money: The Central Intelligence Agency, the State Department, the IRS, but more than that the National Security Agency, which has a responsibility for following this, has an incredible database that if a czar for money laundering overlooked this—and also getting to the point where you are looking at really what the Department of Justice is doing in a country like Switzerland and, as far as I can tell, the Swiss are more concerned about keeping American money out because of all the pressure we put on them than they are of keeping Arab money out. It is the way it works, I think the Swiss are being very vindictive about it.

And also you have the question of the fiduciary accounts. All you do is you find a nominee, trusted, you can either carry cash to him or you can make a transfer and the money essentially disappears in another man's name.

You have to regulate these fiduciary accounts. They are all over Europe. Some countries are better than others. I think the Swiss

58

are the worst. These people are untouchable. France, they watch it very closely and they put pressure on the nominee.

We have to get some sort of unity in Europe, as well as the prime banking centers in the Middle East and East Asia, you have the same problems.

What I have found is that the people who deal in money are very clever and they are very concerned about keeping their money away from the tax authorities and everybody else and they seem to be just a step ahead of us and a more concerted effort to go after these people and throw some of our best bankers at it under a czar, I think it would be very effective. It would also be very effective in finding where you have strange transfers of money which would give leads to the FBI and the CIA to follow people, in particular in this country, ATM transfers and things like that.

Thank you.

Ms. ROS-LEHTINEN. Thank you so much, Mr. Royce.

And thank you, Mr. Ackerman.

Thank you to this excellent panel of witnesses for your testimony today and for all the audience members as well who participated.

This Subcommittee is now adjourned.

[The Subcommittee was adjourned at 4:02 p.m.]

# A P P E N D I X

---

MATERIAL SUBMITTED FOR THE HEARING RECORD

60

RESPONSES FROM THE HONORABLE J. COFER BLACK, COORDINATOR, OFFICE OF THE
COORDINATOR FOR COUNTERTERRORISM, U.S. DEPARTMENT OF STATE TO QUES-
TIONS SUBMITTED FOR THE RECORD BY THE HONORABLE ILEANA ROS-LEHTINEN, A
REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA, AND CHAIRWOMAN,
SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA

**Questions for the Record Submitted to
Ambassador J. Cofer Black by
Representative Ros-Lehtinen (#1)
House International Relations Committee,
Subcommittee on the Middle East and Central Asia
March 24, 2004**

**Question:**

"How would the National Saudi Society for Relief and Charitable Works
Abroad that the Saudis announced they were forming, work with the Saudi
Ministry of Finance to monitor and oversee Zakat funds?  Have Saudi
decrees controlling and providing instructions for the auditing and collecting
of Zakat been altered, or have new decrees been issued, as part of the efforts
that the Saudis are undertaking to increase 'accountability?'"

**Answer:**

The National Saudi Society for Relief and Charitable Works Abroad

is an entirely new entity, as its creation was only announced on February 21st

of this year.   We are currently engaged with the Saudi government in

discussions over the form and function of this new entity.

Regarding instructions for the auditing and collection of Zakat, the

decrees put in place last year – i.e., the banning of cash contributions,

limiting charitable institutions to a single bank account, etc. – are still in

place.  We anticipate that the Saudi government will institute additional

oversight measures with the stand-up of its new charities oversight entity.

61

**Questions for the Record Submitted to**
**Ambassador J. Cofer Black by**
**Representative Ros-Lehtinen (#2)**
**House International Relations Committee,**
**Subcommittee on the Middle East and Central Asia**
**March 24, 2004**

**Question:**

"I mentioned in my statement that I am concerned that there might be certain "red lines" that the Saudis have been unable to cross when it comes to reforms in the Kingdom.  In your discussions with Saudi authorities, have you encountered such problems?"

**Answer:**

Our engagement with the Saudis is a work in progress, and while we have had solid cooperation and success to date, there is much more that needs to be done.  We continue to press forward with our views on issues of concern in the Kingdom, including in areas which are politically sensitive. The Saudis have implemented reforms to date (e.g., new charity regulations, zakat collection boxes) which would have seemed unlikely in the past.  We will continue to press forward on sensitive issues, building on the cooperation we have received to date in our successful bilateral engagement on counterterrorism issues.

62

**Questions for the Record Submitted to
Ambassador J. Cofer Black by
Representative Ros-Lehtinen (#3)
House International Relations Committee,
Subcommittee on the Middle East and Central Asia
March 24, 2004**

<u>**Question:**</u>

"We have heard reports for some time about the Saudis, among others, who
have crossed the border with Iraq to join the "fight" against U.S. troops in
Iraq. We also understand that these forces are receiving funding from within
Saudi Arabia, particularly in the Fallujah area. What is the Saudi
government doing to stop this infiltration from Saudi Arabia? What are we
doing to curb Saudi funding and proseletyzing in Iraq?"

<u>**Answer:**</u>

We are concerned about the presence of "foreign fighters" in Iraq, and

efforts to tighten border controls have been a high priority in discussions of

U.S. officials with all of Iraq's neighbors. The Saudis have been responsive

to our concerns, and have increased security measures on their side of the

border to interdict flows of goods and personnel which might support

insurgent and terrorist activities in Iraq. The Saudis maintain regular

contacts with U.S. forces patrolling on the Iraq side of the border to

coordinate activities, and they regularly share information with us as part of

this cooperation.

63

We are also engaged with the Saudi government to identify, in Iraq and elsewhere, instances where Saudi-supported mosques and religious schools overseas are being used to preach or teach hatred, or serve as terrorist recruitment centers by extremist elements.  The Saudis have implemented several initiatives in this regard in the Kingdom, and we are working to ensure that similar procedures are taken by Saudi-supported activities in other countries.

64

**Questions for the Record Submitted to
Ambassador J. Cofer Black by
Representative Ros-Lehtinen (#4)
House International Relations Committee,
Subcommittee on the Middle East and Central Asia
March 24, 2004**

**Question:**

"What is the Administration doing to encourage our friends in Europe to join with us in freezing assets of a variety of terrorist groups, including Hizballah?"

**Answer:**

We regularly raise our concerns about the terrorist activities of

Hizballah and other terrorist groups in our diplomatic contacts with our

European partners.  This includes information exchanges on these groups, as

well as the activities of State Sponsors of Terrorism Iran and Syria in

supporting terror, particularly the Palestinian rejectionist groups.  These

efforts have yielded some successes, such as the EU designation of HAMAS

in 2003, but we continue to press for asset-freezing actions against charities

with links to this terrorist organization and against the group's leaders,  of

the type carried out by the United Kingdom in March against five senior

members of HAMAS.

65

We will continue to make our case to the Europeans to take action collectively and individually to freeze the assets of those supporting terrorist groups that pose a threat to our mutual interests.

66

**Questions for the Record Submitted to**
**Ambassador J. Cofer Black by**
**Representative Ackerman (#1)**
**House International Relations Committee,**
**Subcommittee on the Middle East and Central Asia**
**March 24, 2004**

**Question:**

"Are there HAMAS representatives that travel to Saudi Arabia to raise money?  And also what about affiliates of al-Qaida?  Do they come to Saudi Arabia to raise money?"  What have the Saudi authorities done, if anything, to stop this kind of activity?"

**Answer:**

We are concerned about the activities of fundraisers from numerous terrorist groups in the Arabian Gulf region.

There is no official HAMAS or al-Qaida presence in the Kingdom of Saudi Arabia.  The Saudi Government has also stated repeatedly that it does not provide any financial assistance to HAMAS.  That said, there is clear evidence that private funds for terrorist groups, including HAMAS and al-Qaida affiliates, are raised in the Kingdom.  We have clearly expressed this concern to the Saudi government, as we have to other governments in the region and also in Europe, where HAMAS in particular derives a great deal of its financing.

67

The Saudis have put in place some of the most restrictive controls against anti-money laundering and terrorist financing in the region, and we are engaged with them on a number of initiatives to curb the flow of funds from the Kingdom to terrorists.  This includes the identification of organizations and individuals believed to be providing assistance to terrorist groups.  The Saudis have cooperated with our efforts in the past (e.g., joint designation of Wa'il Hamza Julaidan and branches of the al-Haramain Foundation), and we expect this process to continue.

———————

68

QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE ILEANA ROS-LEHTINEN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA, AND CHAIRWOMAN, SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA, TO JUAN C. ZARATE, DEPUTY ASSISTANT SECRETARY, EXECUTIVE OFFICE FOR TERRORIST FINANCING & FINANCIAL CRIMES, U.S. DEPARTMENT OF THE TREASURY

[NOTE: At the time of the printing of this hearing, Mr. Zarate's responses to these questions had not been received by the Committee on International Relations.]

*Question 1:*

Are the majority of payments from Saudi Arabia to Al-Qaeda and other terrorist groups made through conventional banking methods such as wire transfers, or are you noticing a shift to gold transfers or other in forms of assets such as diamonds and of course drugs?

*Question 2:*

With this new U.S.-Saudi terrorism financing task force, what are the operational rules regarding the sharing of intelligence information? Do we grant full and unfettered access? Do Saudi officials see all the information we possess on the various targets of our investigations?

*Question 3:*

Regarding other details of the agreement for this task force, can you explain

- the precautions to prevent Saudis learning how to evade our methods
- the security level
- who will have access to information and what types of information will they see
- what are the terms of U.S. access and freedom to operate in Saudi Arabia
- is this an open-ended operation or will it be time-limited

*Question 4:*

Are numbered or secret accounts as well as correspondent accounts part of Saudi bank reforms that would tighten "know your customer rules?"

*Question 5:*

Are U.S. banks being unwittingly used to transfer funds between Saudi donors and Al-Qaeda, through corporate, private, or other types of accounts?

*Question 6:*

Al-Haramain of Oregon, whose assets were recently blocked by Treasury pending an OFAC determination, was described by the Treasury as a "branch" of Al-Haramain in Saudi Arabia. What made it a "branch"? Who were the Oregon organization's directors and officers at the time of its closure by the USG? Who appointed them? When? How much control was exerted by Saudi authorities throughout the time of the group's operations? Had any orders been given to transfer its assets elsewhere? How much? By whom? To what end?

*Question 7:*

There had been earlier reports that the Saudi government had ordered all of Al-Haramain's foreign branches closed. Did such an order go out from the Saudis? And when? To whom was it directed? Was it carried out and to what effect? What happened to the assets of the foreign branches?

———————

PREPARED STATEMENT OF THE HONORABLE NICK SMITH, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MICHIGAN

I want to thank Chairwoman Ros-Lehtinen for holding this hearing today on Saudi terrorist financing.

Since September 11th, we have heard much about the significance of Saudi Arabia in Middle Eastern and Islamic terrorism. Osama bin Laden and 15 of the 19 September 11th terrorists were Saudis. More fundamentally, Saudi Arabia has been an important part of the infrastructure of terror. Many Saudi charities have been linked to terrorist organizations. People with Saudi diplomatic credentials have been linked to terrorist organizations, even near us in Washington. And the Kingdom itself has funded religious institutions throughout Central Asia, the Middle East, and Europe that have formed a core of the recruiting network that turns young Muslims into terrorists.

69

Saudi Arabia has, in some ways, recognized its own culpability in terrorism. The Kingdom has cooperated significantly with the United States, our allies, and the United Nations in reforming some of its financing system. New regulations make it significantly harder for funds from Saudi Arabia to find their way into terrorist coffers without the knowledge of the government. For example, charities must now be registered with the government, and they cannot wire money out of the Kingdom. This has restricted the flow of terrorist funds to some extent.

Saudi Arabia has responded as it has, in part, because its own interests are very much at stake. The attacks last year in Riyadh and the subsequent discoveries about the depth of support for al-Qaeda in Saudi society have shocked the royal family into taking genuine steps. No leader in the Middle East missed the lesson of Sadat that terrorists undermine the state itself. Osama bin Laden has explicitly targeted the government of Saudi Arabia and its royal family as al-Qaeda's primary target. In a number of less-publicized attacks, al-Qaeda has targeted the Saudi oil infrastructure, the financial life-blood of the monarchy.

However, it appears that the Saudi government's response to al-Qaeda is somewhat of a special case. There is clear evidence that Saudi Arabia funds the PLO, and there is suggestive evidence that it funds Hamas. The Saudi government also has not been as helpful as they could be in addressing al-Haramayn and the World Muslim Fund. There is clearly work to be done more broadly in fighting terrorism.

It is important to continue to work with Saudi Arabia and others to expose and destroy terrorist financial networks. We must also recognize that the terrorists are changing how they get and use money in response to our actions, and we must update our techniques to address these new methods. We have found al-Qaeda sleeper cells in Europe that fund themselves through legitimate businesses such as car dealerships. This committee has already spoken about the link between narcotics and terrorism. Kidnapping and extortion have been a significant source of funds for Abu Sayyaf in the Philippines.

Shutting down terrorists financial networks is an important step, but it is not enough. We must work with the Saudis, the Pakistanis, and others to shut down logistical and information networks. Terrorist organizations are evolving from top-down structures where commands flow down to much more diffuse bottom-up structures where recruiting, financing, and operational planning is all being done at the cell level. Our pressure in the financial realm may have accelerated this process because it is harder to track. We must focus on the implications of this shift if we are to continue to be effective in our fight against terror.

Again, I would like to thank the Chairwoman for holding this hearing today. Saudi Arabia has served a dangerous role in the international terrorist infrastructure. We should applaud them for the progress that they have made, but we should also make sure that they realize that there is more progress to be made. Finally, we should also be aware of how the terrorist threat is evolving.

———————

TESTIMONY FROM THE HEARING BEFORE THE SUBCOMMITTEE ON TERRORISM, TECHNOLOGY AND HOMELAND SECURITY OF THE COMMITTEE ON THE JUDICIARY, UNITED STATES SENATE, SEPTEMBER 3, 2003

Senator SCHUMER. No, but it is an issue you and I have been working on. Senator Kyl has been very, very out front in chairing hearings on Wahabi-ism and what it means and how we have ignored it. We hope to have more hearings on this issue. We even wrote an op ed together, which I heard while we were away got published in the Washington Post.

There is a report out today about an article that is going to—or is, I think, being made public today or tomorrow in Vanity Fair, which has done pretty serious journalism, where you are quoted, Mr. Clarke, and I just wanted to talk a little bit about it.

The basic thrust of the article is that right after 9/11, when no one was allowed to fly, some special planes were able to spirit Saudis out of the country; that it had top clearance, that some of the members on that plane were members of the bin Laden family.

Now, let me posit that much of the bin Laden family is not allied with the terrorist bin Laden and, in fact, are part of the Saudi rulers or, you know, upper class, ruling class, whatever you want to call it. But two, at least, of those bin Ladens had been under some suspicion for other kinds of terrorist activities or supporting terrorism in the past.

This reporter seemed to do a pretty good job. He interviewed some private investigators who received a call 2 days after 9/11 asking them to escort Saudi students on a flight from Tampa to Lexington, Kentucky. He interviewed some airport offi-

cials who knew that the planes had gotten top, top, top clearance when no one else could fly, and a bunch of other people.

Can you tell us what you know about this? You are quoted in the article, and again I think you are doing a service because one of the things the Chairman and I have felt is that we haven't gone deeply enough and looked into enough the relationship between some in the Saudi leadership and terrorism.

Mr. CLARKE. Senator, as I recall the event—as you know, I was the national crisis coordinator on 9/11 and 9/12, making a lot of decisions, or implementing a lot of decisions. I do recall the State Department coming to us that week, and I don't remember what day, and saying that the Saudi embassy felt that, in the wake of the terrorism attacks, Arabs in this country, particularly Saudis, might be victims of retribution attacks. And they wanted, therefore, to take some Saudi students and other Saudi citizens back to the Kingdom for safety, and could they be given permission to fly even though we had grounded all flights?

What I recall is that I asked for flight manifests of everyone on board, and all of those names to be directly and individually vetted by the FBI before they were allowed to leave the country. I also wanted the FBI to sign off even on the concept of Saudis being allowed to leave the country. As I recall, all of that was done. It is true that members of the bin Laden family were among those who left. We knew that at the time.

I can't say much more in open session, but it was a conscious decision with complete review at the highest levels of the State Department and the FBI and the White House.

Senator SCHUMER. Now, in this article—and I don't want to tear into the Chairman's time here—he has a source, so who knows? But he says that the State Department did not—"It did not come out of this place," says a State Department source. "The likes of Prince Bandar do not need the State Department to get this done." Then he quotes Special Agent John Ianorelli, of the FBI, saying "I can say unequivocally that the FBI had no role in facilitating these flights one way or the other."

Let me ask you, I guess, two questions. Are you confident, given your vast knowledge, that every person who was on—how many flights were there? The article is unclear.

Mr. CLARKE. I believe there was one.

Senator SCHUMER. Just one that stopped in all these places, because he names four or five cities. "The Saudi planes"—he says plural; he uses "planes"—"took off or landed in Los Angeles, Washington, Houston, Cleveland, Orlando, Tampa, Lexington, Kentucky, and Newark and Boston."

How thoroughly were these people on this plane or these planes vetted?

Mr. CLARKE. Senator, all I can tell you is that I asked the FBI to do that. I asked the director and the assistant director to do that. They told me they did it. I think the key thing here is that no one on those aircraft manifests has ever been subsequently wanted by the FBI for an interrogation.

So the notion which this author perhaps is trying to paint that people who were involved in 9/11 or in planning terrorism somehow were allowed to escape, I think, is wrong. No one on those flight manifests has ever been designated by the FBI as having been involved in 9/11.

Senator SCHUMER. But let me ask you this question. This is just a summary, so I haven't read the article. It is what Vanity Fair puts out. My impression, or at least my assumption of why this was important was not necessarily that those connected with terrorism might have escaped, although who knows—but your word means a whole lot to me; I have such huge respect for you, and we knew each other even back in the Clinton days when we were talking about some of these issues—but rather that many of them might have been able to shed some light, particularly in the time thereafter, about what happened, what went on, et cetera.

Do you know if we have made any efforts to question any of these people subsequent to their being in Saudi Arabia, given something you have acknowledged and we have all acknowledged, the lack of complete Saudi cooperation when we wished to question some people there? Have we tried, have we been successful? Do you have any knowledge of that?

Mr. CLARKE. I do not know the answer to that, Senator. I would be guessing and I would rather not do that. But I would stress that, despite what the article may say, this decision was reviewed by the State Department and was reviewed by the FBI and signed off on by the FBI. All of the names on all of the flight manifests were checked before anyone was allowed to leave the country. And my specific question to the FBI was, if there is anybody you want to hold, hold them.

Senator SCHUMER. And was anyone—sorry. I wouldn't mind if you have your question and I could just continue for 4 or 5 minutes myself.

71

Chairman KYL. Yes. Here is what I would like to do and see if it is okay with you, Senator Schumer. Obviously, we are deviating in this line of questioning from what the hearing was all about.

Senator SCHUMER. It just was so officious.

Chairman KYL. I understand, and I am fascinated by the pursuit of the issue as well, but Mr. Clarke wasn't advised beforehand that we were going to get into this.

Senator SCHUMER. Right.

Chairman KYL. Here is what I would like to suggest. Since I have to get down to the White House and my car is leaving in just a second, I would like to just make a concluding comment and, with your permission, bring the hearing to a close, with the understanding that we will continue to converse with Mr. Clarke and, as events call for it—we are going to have a hearing a week from today, September 10, that is going to get back to the question of Saudi involvement and other related issues.

Senator SCHUMER. That is just fine with me.

Chairman KYL. We have plenty of time to pursue this, but I think, under the circumstances, if it is all right with you, that is the way I would like to deal with it.

Senator SCHUMER. Well, I read this 2 hours ago.

Chairman KYL. I have got it here and I think it is worth pursuing, but let's give Mr. Clarke a little more time just to———

Senator SCHUMER. Would you be available tomorrow or the next day to talk about this?

Mr. CLARKE. Yes.

○