**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to**<br>**Youssef Abdul Latif Jameel** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                     03 CV 06978 (RCC)

## RICO STATEMENT
## <u>APPLICABLE TO YOUSSEF ABDUL LATIF JAMEEL</u>

       Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Youssef Jameel, a/k/a Youssef Abdul Latif Jameel, Yousif Abdullatif Jameel, Yousif Jameel and/or Yousif Jamil.

       Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.      The name of the defendant to whom this RICO statement pertains is Youssef Jameel. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable.  All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.      The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.      (a)    <u>list of predicate acts and specific statutes violated</u>:

| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
| --- | --- | --- |
| early 1990s to 9/11/2001 | Youssef Jameel ("Jameel") | Jameel conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Jameel | Jameel undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Jameel | Jameel agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering |

|  |  | activity in connection with the Enterprise. |
|--|--|--|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, even constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.     (a)     The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)     The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Youssef Jameel fit neatly into this framework by raising funds for, providing funding and money laundering services to, and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c)     No.

(d)     Youssef Jameel is associated with the Enterprise.

(e)     Youssef Jameel is a member of the Enterprise, and is separate and distinct from the Enterprise.

(f)     Youssef Jameel intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which  criminal activity culminated in the Attack.

7.     The pattern of racketeering activity conducted by Youssef Jameel is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8.     The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Youssef Jameel furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.     The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.     The Enterprise, and the racketeering activities conducted by Youssef Jameel, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.     Not applicable.

12.     Not applicable.

13.     The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Ladin.

14.     The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators, including Youssef Jameel, who laundered funds through Islamic so-called charities, such as the Blessed Relief Foundation, and corporations and raised money from witting and unwitting donors.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the zakat, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist

4

training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Youssef Jameel.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Youssef Jameel.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Youssef Jameel.  Youssef Jameel, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Youssef Jameel also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.     As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.     Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.     Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.     pendent state claims:

| **I** | Trespass |
|---|---|
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |

| V | Intentional and Negligent Infliction of Emotional Distress |
|---|---|
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20.    Not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Youssef Jameel ("Jameel") | Youssef Jameel has provided critical financial, logistical and technical support to al Qaida in relation to that terrorist organization's global jihad.<br><br>For years, Jameel has been a managing officer of the Abdul Latif Jameel Group ("Jameel Group"), a global financial conglomerate based in Jedda, Saudi Arabia. The Group is owned by Jameel and his family, founded in 1955, and has diverse global concerns including real estate, international trade, shipping, consumer finance and the world's largest Toyota franchise.<br><br>Among the group's American concerns are real estate, managed through Jaymont Inc. and Jaymont Properties, Inc., which develops and manages office buildings in major U.S. cities. Jameel is also a former board member and the largest individual shareholder of Global Natural Resources, Inc., based in Houston, TX.<br><br>Following the September 11 attacks, the United States government asked the Saudi Arabia Monetary Authority, the Kingdom's central banking agency, to monitor the accounts regarding a number of prominent businessmen, including the Jameel Group, to prevent them from funneling further assistance to al Qaida. In his role as managing officer of the Jameel Group, Jameel has directly participated in the channeling of corporate funds and *zakat* contributions to al Qaida, through various charity fronts. | 1962(c)<br>1962(d) |

**Golden Chain:** Youssef Jameel is identified on the Golden Chain as one of al Qaida's principal financiers.  The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement.  See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.  See Final Report of the 9/11 Commission, Note 21 to Chapter 2.  The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis to for designating him as a terrorist sponsors under Executive Order 13224.  See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm

**Support for Persons and Organizations Known To Aid Al Qaida:**

Batterjee:  Jameel provided funds to key al Qaida fundraiser Adel Batterjee, a fellow member of the Golden Chain.

Adel Abdul Jalil Batterjee ("Batterjee") has, since the formation of al Qaida in 1988, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.  On December 21, 2004, the United States Government designated Batterjee as a Specially Designated Global Terrorist, based on his pervasive support and sponsorship of al Qaida and Osama bin Laden.  In the statement issued in conjunction with Batterjee's designation, the Treasury Department succinctly described Batterjee's dedicated and extensive efforts to support al Qaida:

"Adel Abdul Jalil Batterjee served as the Executive Director and a member of the Board of Directors of Benevolence International Foundation (BIF), which was designated as a Specially Designated Global Terrorist (SDGT) by the Treasury in November 2002 for its support to al Qaida and UBL.

"Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator," said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).

"In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan. LBI provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003. LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and

financed by UBL and is the precursor organization of al Qaida. LBI later joined al Qaida upon the dissolution of MK.

"In the early 1990s, LBI began operating under the name Benevolence International Foundation (BIF) in an effort to widen its appeal to the general public and increase its credibility with other governments. BIF and LBI remained one organization with interchangeable assets under Batterjee's control.

"In 1993, Batterjee incorporated BIF in the United States, where it also provided financial and operational support to mujahideen fighters worldwide, including members of al Qaida in Afghanistan, the Sudan, Bosnia-Herzegovina and Chechnya. At one point, UBL confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida.

"According to information available to the U.S. Government, it was around that time that a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee. Instead, the employee reported he was detained and questioned by Saudi authorities regard an ing BIF links to UBL. Once released, he returned to the Sudan where he met with UBL and informed him of his detainment. As a result, BIF operations were curtailed for a period of time.

"Batterjee subsequently resigned as Director of BIF and personally selected UBL confidant Enaam Arnaout to serve as the organization's head. Documents obtained by the U.S. Government demonstrate that Arnaout, while employed with LBI and BIF, worked with members of al Qaida to procure weapons for use in al Qaida training camps. While employed by Batterjee at LBI, Arnaout reported directly to Batterjee, which was outside the usual chain of command.

"Batterjee remained active in BIF despite having officially resigned as Director. Evidence shows that Arnaout made an effort to

conceal Batterjee's continued involvement in BIF. In 2002, when Arnaout learned that U.S. authorities were scrutinizing BIF's activities, he warned Batterjee through an intermediary against transferring funds to any BIF offices.

"Evidence of BIF's ties to al Qaida surfaced in March 2002 searches by Bosnian authorities of the organization's Sarajevo offices. These searches uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization. Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain."

"This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor. "Usama" appears after seven of the listings and "Baterji" appears after an additional six listings."

**Charities:** Among the charities front groups supporting the Enterprise which Jameel directly supported, with knowledge of the Enterprise's aims, were defendants Benevolence International Foundation, Saudi Red Crescent Society, Saudi Joint Relief Committee, Saudi High Commission for Bosnia-Herzegovina, Al Haramain Islamic Foundation, the International Islamic Relief Organization and the World Assembly of Muslim Youth.

<u>BIF:</u>   The allegations listed above highlight BIF's involvement with the Enterprise.

<u>Saudi Red Crescent:</u>   Jameel has provided millions of Saudi Riyals in support to the Red Crescent, plus in-kind donations of vehicles sold at Jameel Group dealerships.

The Saudi Arabian Red Crescent Society (the "Saudi Arabian Red Crescent") is a Saudi Arabia-based ostensible charity, which

conducts operations throughout the world.  The Saudi Arabian Red Crescent has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

The Saudi Arabian Red Crescent has provided important support to al Qaida, including maintaining passport for al Qaida operatives so they can avoid searches.  Indeed, the Saudi Arabian Red Crescent is referred to as an "umbrella" by al Qaida operatives, and Abdullah Azzam, Osama bin Laden's spiritual advisor, wrote that "at the forefront" of the Islamic charities that provided "financial support" to jihad is the Saudi Arabian Red Crescent.

In 2001, in Bosnia, two administrators for the Saudi Arabian Red Crescent, Boumediene Lakhdar and Nechle Mohammed, were arrested for plotting terrorist attacks against the U.S. and British Embassies in Sarajevo.

The Saudi Arabian Red Crescent is also a participant in the Islamic Coordination Council (the "ICC"), an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan.  Other members of the ICC included the IIRO and the Qatar Charitable Society.  Throughout the 1980s the Saudi Arabian Red Crescent provided extensive financial and logistical support to the mujihadeen in Afghanistan.  During this time, the Saudi Arabian Red Crescent was populated and run by Islamic militants who would become the future founders of al Qaida.  Indeed, Wa'el Julaidan served as an officer of the Saudi Arabian Red Crescent for many years, and continued to fill that role following the establishment of al Qaida.  Ayman-Zawahiri, al Qaida's second in command, joined the Saudi Arabian Red Crescent in 1985.  In 1995, he presented himself as a representative of the Saudi Arabian Red Crescent and raised $500,000 in the San

Francisco area.

Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujhadeen elements which joined Osama bin Laden's al Qaida, and the Saudi Arabian Red Crescent redirected its efforts towards the fulfillment of the objectives of the newly established al Qaida movement. The Saudi Arabian Red Crescent's integral role in the growth and development of the nascent al Qaida movement has been confirmed by documents seized in Bosnia and Herzegovina, during the searches of the Benevolent International Foundation's offices. During those searches, investigators recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. On point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaida, and suggests the participation of the Saudi Arabian Red Crescent, among others. During that same search, investigators found a letter on Saudi Arabian Red Crescent stationary to Abu Rida, another founding member of al Qaida, requesting that "weapons be inventoried." At the bottom of the letter is a note from Osama bin Laden to Wa'el Julaidan stating that al Qaida has an extreme need for weapons.

Moreover, Saudi Arabian Red Crescent employees have repeatedly been implicated in al Qaida attacks and plots. In 1996, two Sudanese members of the Saudi Arabian Red Crescent were arrested in connection with the 1995 Egyptian Embassy bombing in Pakistan. In October 2001, Pakistan deported several dozen representatives of the Saudi Arabian Red Crescent, after confirming their affiliation with al Qaida.

In addition, other of al Qaida's charity fronts have used the Saudi Red Crescent as a vehicle for conducting operations in regions were those charities had been banned from operating based on their affiliation with al Qaida. For

example, when Russian authorities refused to permit several Saudi charities to provide aid in Chechnya, the Saudi government channeled the operations of those charities through the Saudi Red Crescent.

<u>SJRC:</u>   The Saudi Arabian Red Crescent, supported by Jameel and the Jameel Group, is one of the organizations comprising the Saudi Joint Relief Committee (the "SJRC"), a body established by the Kingdom to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya.  The other purported charities comprising the SJRC include the International Islamic Relief Organization (the "IIRO"), World Assembly of Muslim Youth, al Haramain Foundation, Islamic Endowments and Makk Establishment, among others.

In Kosovo the SJRC served as a cover for several al Qaida operatives, including Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC.   Between 1998 and 2000, the Kingdom, through the SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with the SJRC bureaus. Throughout this time, the SJRC, of which the Saudi Arabian Red Crescent was a part, was under the supervision and control of Saudi Interior Minister Prince Naif bin Abdul Aziz.

<u>Saudi High Commission:</u>  Jameel has provided material support to the Saudi High Commission.

The SHC is ostensibly a charitable organization, headed by Defendant Prince Salman bin Abdulaziz al Saud.   Since its formation in 1993, the SHC has served as a major conduit for funneling financial and logistical support to al Qaida.   According to Bosnian officials, al Qaida members began entering Bosnia-Herzegovina as relief workers for the SHC, almost immediately after the

organization established operations in the country. During the next ten years, the SHC channeled to al Qaida literally millions of dollars that had been donated to the SHC. To this date, investigators have been unable to account for approximately $41,000,000 donated to the charity.

In October 2001, NATO peacekeeping forces raided the SHC's headquarters in Sarajevo, as part of an ongoing investigation into the organization's ties to terrorism. During the raid, investigators found computer hard drives of photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the USS Cole. Investigators also discovered files on pesticides and crop dusters, information about how to make fake State Department badges, and photographs and maps of Washington, on which prominent government buildings had been specifically marked.

Following the raid, the Financial Police of the Federation of Bosnia-Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism related activities, stating: "Members of the SFOR (stabilization forces) have on premises of the Saudi High Commission for relief to Boznia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization."

During the month of the raid, officials in Bosnia also arrested several members of the al Qaida network, who were plotting an attack on the United States embassy in Sarajevo. At least two of those men, including the group's leader Bensayah Belkacem, were employees of the SHC. Belkacem has been identified as a top al Qaida lieutenant. At the time of Belkacem's arrest, authorities discovered in his apartment fake passports and a mobile

telephone listing for Abu Zubeida, al Qaida's then third-in-command.

The SHC's funneling of financial and logistical resources to al Qaida was well known to senior officials in the organization, including Prince Salman, for many years prior to the September 11th Attack. In fact, an association called the "Mothers of Srebrenica and Podrinje" sent a letter to Prince Salman in September of 2000, in his capacity as head of the SHC, complaining that the organization was not applying donated funds for humanitarian purposes.

Al Haramain Islamic Foundation: Jameel gave 1.5 million SR at a joint fundraiser held in December 1999 for Al Haramain Islamic Foundation, the International Islamic Relief Organization and the World Assembly of Muslim Youth. AHIF, based in Oregon, was the U.S. branch of Al Haramain, a global entity based in Saudi Arabia.

The Riyadh office of Al Haramain ("AHSA") was – until the Saudi government announced that it was dissolving al Haramain amid suspicions that it was a terrorist front that had provided financing and other support to al Qaida and Osama bin Laden – the headquarters of a vast network of offices and representatives around the world. At least eight of those branches, including AHIF, have been designated by the U.S. government as global sponsors of terrorism and, as noted above, the Saudi government has stated that it is dissolving all elements of the global organization as a counter-terrorism measure.

Al Haramain is a Saudi charity front that has exploited its non-profit status for the benefit of Osama bin Laden and his terrorist network al Qaida, in the furtherance of international terrorism. Al Haramain has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure,

and provided material support and resources to al Qaida. Specifically, "Al-Haramain has knowingly and intentionally lent material support to Al Qaida through, *inter alia*, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings."

Prior to September 11, 2001 Al-Haramain, which receives the bulk of its donations from Saudi Arabia and the Middle East, laundered money for Al Qaida. Evidence assembled by the U.S. Treasury Department demonstrates the Al Haramain played a significant role in the 1998 bombings of two U.S. embassies in East Africa. Al Haramain also directly funded the 2002 Bali nightclub bombing.

Al Haramain operated a single website for all its branches. This same website had a direct link to a website specifically promoting al Qaida.

IIRO:  Jameel gave 1.5 million SR at a joint fundraiser held in December 1999 for Al Haramain Islamic Foundation, the International Islamic Relief Organization and the World Assembly of Muslim Youth.

The International Islamic Relief Organization (IIRO) is a subsidiary body of the Muslim World League, with offices throughout the globe. The IIRO has long operated as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated organizations.

According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which al Qaida planned, approved and coordinated the September 11th Attack, and at which some or all of the September 11

hijackers received indoctrination and training.

Outside of Afghanistan, the IIRO has used its branch offices throughout the world to facilitate al Qaida's activities. According to the December 2, 2003 report of the United Nations Security Council Committee Concerning al Qaida and the Taliban, the Philippine branch of the IIRO served as the coordinating center for Islamic extremists in the Far East throughout the 1990's, and channeled funds to the Abu Sayyaf group, a terrorist organization operating under the al Qaida umbrella.

In 1993, officials linked members of the Zagreb office of the IIRO to an Islamic extremist group headed by Muhammad Sa'd Darwish Al Shazy, which was planning to conduct anti-Jewish bombings in Croatia. In addition to representatives of IIRO, Al-Shazy's organization included the heads of the Zagreb offices of the Saudi High Commission and the Kuwaiti Joint Relief Committee, representatives of the Human Relief International and members of the Qatar Charitable Society.

Through its offices in Kenya, the IIRO provided direct financial and logistical support to al Qaida terrorists involved in the 1998 bombings of the United States Embassies in Dar Es Salam, Tanzania and Nairobi, Kenya. As a result of an investigation into the involvement of the IIRO in the bombings, Kenyan officials deregistered the IIRO's Nairobi office.

According to the Indian government, IIRO officials were behind the 1999 al Qaida plot to attack the U.S. consulates in Madras and Calcutta, in response to the American military retaliation for the African embassy bombings. The IIRO was also involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and Brooklyn

Bridge, the plot to assassinate former President Bill Clinton and the late Pope John Paul II, and the plot to blow up 12 American commercial airplanes simultaneously.

The operational cell designated to carry out the planned attacks on the U.S. consulates was led by Sayed Abu Nesir, a Bangladeshi national who was directed to launch the attacks by Shaykh Ahmed al-Gamdin, Director of IIRO operations in Asia.

During subsequent interrogation, Abu Nesir declared that 40 to 50% of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir. Among other duties, Abu Nesir visited the training camps on behalf of IIRO to assess their funding needs. At the direction of al-Gamdin, Nesir himself attended one of the al Qaida camps to receive training, where he met Osama bin Laden..

IIRO's Bosnia office has been directly involved in al Qaida operations as well. One of the heads of that office, Abdel Aziz Zaher, was expelled from his residence in Belgrade in early 1993 after officials linked him to terrorist activity in the region. Zaher was also affiliated with the MWL and Sanabil Relief Agency. Zaher's top lieutenant at IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaida and al Qaida affiliated Islamic militants in the Balkans with weapons and ammunition.

In October 2001, Pakistani officials identified and expelled some two dozen al Qaida members who had been working for the IIRO in Pakistan.

Mahmoud Jaballah, head of IIRO's Canadian office, was arrested and jailed by Canadian officials based on his links to al Qaida and al Jihad..

In 1991, the IIRO established a US branch in Virginia, under the name International Relief Organization, Inc. (IRO). The IRO operated from offices at 360 South Washington Street, Washington, DC, where it shared office space with the MWL. The Washington, DC offices of the IIRO and MWL were part of a complicated web of for-profit and ostensible charitable organizations within the United States, commonly known as the SAAR Network, the majority of which maintained offices at 555 Gross Street, Herndon, VA. The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and Washington based charities and for-profit enterprises within the SAAR Network. Through that investigation, the details of which are further discussed herein, federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaida and Hamas.

The IIRO further sponsored al Qaida through its participation in the Saudi Joint Relief Committee. As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives.

WAMY: Jameel gave 1.5 million SR at a joint fundraiser held in December 1999 for Al Haramain Islamic Foundation, the International Islamic Relief Organization and the World Assembly of Muslim Youth.

Founded in 1973, WAMY, which has its headquarters in Riyadh, officially bills itself as an organization which "aims to assist young Muslims around the world in leading fulfilled

lives through Islam."

WAMY is under the umbrella of the Muslim World League (the "MWL"), from which it receives substantial support and assistance. WAMY is an organization that sponsors a number of other Islamic charities, commonly referred to as bodies or members of the League, including, in addition to WAMY, the International Islamic Relief Organization, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and Rabita Trust, among others.

WAMY also operates under the aegis of the Saudi Joint Relief Committee, along with a number of other Islamic charities.  WAMY further sponsored al Qaida through its participation in the SJRC.

WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Khasmiri terrorists.

According to Indian officials, Nazir Qureshi, an Assistant Secretary General of WAMY, has supplied money and other assets to Khasmiri terrorist groups associated with al Qaida.

Mohammed Ayyub Thukar, President of the World Khasmir Freedom Movement and a principal financier of the al Qaida affiliated Hizbul Mujihadeen, served as a WAMY official during exile in Saudi Arabia.

WAMY has provided military training to prospective jihadists, and members of the organization have fought under Gulbadin Hekmatyar's Hizb e Islami in Afghanistan.

On February 19, 2003, the United States government designated Hekmatyar pursuant to Executive Order 13224, based on his affiliation with al Qaida.

WAMY also has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world. When he was arrested in 1992, Ahmed Ajaj, who was subsequently convicted for his role in the 1993 World Trade Center bombing, had in his possession an al Qaida Manual entitled "*Military Lessons In The Jihad Against The Tyrants*" which detailed how to establish and maintain clandestine operational cells. The manual was distributed to Ajaj by WAMY. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

In 1992, Abdullah bin Laden, Osama bin Laden's nephew, established a WAMY office within the United States, in Falls Church, Virginia. At least through 1998, Abdullah bin Laden served as the president of WAMY's U.S. operations. WAMY's U.S. office was affiliated with the SAAR Network of businesses and charities created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. WAMY's U.S. operations were raided by federal authorities in conjunction with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated FTOs.

WAMY also has provided financial support to the U.S. based Council on American Islamic Relations (CAIR), a purported civil rights organization which received its initial seed money from the Holy Land Foundation for Relief and Development. On December 4, 2001, the Treasury Department listed Holy Land Foundation for Relief and Development as a specially designed terrorist pursuant to

Executive Order 13224.

WAMY has also supported al Qaida affiliated extremists through its participation in the Islamic Coordination Council, an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan. Other members of the ICC included the IIRO, Saudi Red Crescent and Qatar Charitable Society. Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujhadeen elements which joined Osama bin Laden's al Qaida.

WAMY is closely affiliated with defendant Benevolent International Foundation ("BIF"). In fact, WAMY and BIF shared a common address in Peshawar, Pakistan, and frequently shared common officers and directors. As outlined in further detail in the Amended Complaint, BIF long has provided material support and resources to al Qaida.

<u>Other Charities:</u>   Jameel has also been a financial supporter of the Islamic Salvation Front of Algeria, a banned terrorist organization containing an armed wing, and the Raza Academy, a radical group which condemned the United States for rooting the Taliban from Afghanistan, supports suicide bombers in Israel, sends "human shields" to Iraq and supported insurgents in Bosnia and Chechnya.

At all times material hereto, Jameel knew and intended that the funds he directed to the SRC, IIRO, WAMY, SHC and al Haramain Foundation, both personally and through the companies he controlled, would be used to support al Qaida's global jihad. As an initial matter, Jameel's inclusion on the Golden Chain reveals that he was a central figure in the conspiracy to channel funds to al Qaida through ostensible charities from the early years of al Qaida's formation. Moreover, during the time period that Jameel provided the

|  | foregoing support and services to those ostensible charities, numerous media reports and statements by government officials implicated those organizations in al Qaeda activities, plots and attacks in Pakistan, Afghanistan, Egypt, India, Kenya, Tanzania, the Philippines and elsewhere.  In addition, Jameel maintained close business and personal relationships with central figures in the al Qaida organization, including Adel Batterjee, one of al Qaida's primary fundraisers.<br><br>Through all this, Youssef Jameel knowingly and actively participated in continuous efforts to advance al Qaida's terrorist ambitions, and used his financial position as an effective mechanism for raising funds for, and providing other forms of material support to, al Qaida. By virtue of his active role in the Enterprise's wrongdoing, Jameel is personally responsible for the resulting harm. |  |