**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                    Civil Action No.
SEPTEMBER 11, 2001                            03 MDL 1570 (RCC)


--------------------------------------------------------x

**This document relates to:**

> ***Thomas E. Burnett, Sr., et al. vs. Al Baraka***
> ***Investment and Development Corp., et al.***
> **03 CV 9849 (RCC)**


## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS OF WA'EL HAMZA JELAIDAN, KHALID BIN MAHFOUZ AND YOUSEF JAMEEL

### INTRODUCTION

In their motions to dismiss, defendants Wa'el Hamza Jelaidan, Khalid Bin Mahfouz and Yousef Jameel argue that they are not subject to the jurisdiction of this Court. Each defendant's role in founding and financing al Qaeda from its very inception demonstrates, however, that each is answerable in the courts of the United States for the terrorist actions of al Qaeda directed at the United States.

In ruling on certain other motions to dismiss, the Court found plaintiffs' submissions regarding the series of "Golden Chain" documents to be insufficient to demonstrate a basis for jurisdiction in this Court. Specifically, the Court noted: "[W]ith no indication who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 817 (2005). Rather, the Court concluded, the "Golden Chain" document "is only a list of names found in a

charity's office."    349 F. Supp.2d at 818.    Accordingly, with respect to motions to dismiss that the Court has not yet heard or ruled on, which present similar jurisdictional questions, Plaintiffs now submit supplemental materials in support of a *prima facie* showing and to provide the Court with additional information and evidence about the "Golden Chain" – a single document in a larger series of documents utilized by various government agencies in the war on terrorism.

As demonstrated below, these documents, which include the "Golden Chain" list were introduced and relied on in *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003).  Contrary to this Court's conclusions about the "Golden Chain's" relevance or admissibility, it has been referenced and included as a resource to be used in the sentencing hearing of al Qaeda sponsor Enaam Arnaout; cited by the 9/11 Commission's Final Report in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists, a decision not lightly taken by the Executive branch of the government.  Most importantly, however, a former member of al Qaeda, Jamal al Fadl (D236) has reviewed and confirmed that names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI.  Jamal al Fadl specifically identified Saleh Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaeda.  Al Fadl is a former al Qaeda leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaeda terrorist trials.

The "Golden Chain" list is but one exhibit among 248 exhibits cited and attached to a proffer filed by the United States government supporting the admissibility of certain

co-conspirator statements.  The Illinois Court ruled that the proffer cannot be linked to a specific conspiracy and the documents were therefore not admissible under the co-conspirator exception to the hearsay rule.  *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *2.  Merely because a certain document is ruled inadmissible in one proceeding, does not render the document unable to be authenticated (or made relevant) forever.  In fact, the documents were later submitted by the United States government and considered by the Illinois Court at the sentencing of Enaam Arnaout in imposing a sentence upon this al Qaeda supporter who pled guilty.[1]

As explained in detail below, the "Golden Chain" list and related documents demonstrate the role of Wa'el Jelaidan, Yousef Jameel and Khalid Bin Mahfouz (and others) in founding and funding al Qaeda.  These documents provide substantial evidence that these defendants directed their conduct at the United States by funding an organization dedicated to attacking the United States.[2]

## BACKGROUND OF THE SEIZED DOCUMENTS FROM BOSNIA (INCLUDING THE "GOLDEN CHAIN")

On November 14, 2002, the U.S. District Court for the District of Columbia issued a Letters Rogatory request to the Supreme Court of the Federation of Bosnia and Herzegovina, requesting copies of documents that had been seized from the office of Benevolence International Foundation (hereinafter "BIF"), a Specially Designated Global

---

[1]  *See* "Government's Response to Defendant's Position Paper as to Sentencing Factors" *U.S. v. Enaam M. Arnaout.* Case No. 02CR 892 (ND Ill.) (SBC), p. 32. June 12, 2003; Exhibit 4 to the Affidavit of Evan F. Kohlmann (or "Kohlmann Aff."), attached as Attachment A to the Affidavit of David K. Draper ("Draper Aff.").

[2]  The legal standard governing this Court's assertion of jurisdiction is set forth in detail in the original opposition papers to the motions to dismiss and will not be repeated here.  Plaintiffs note only that (a) minimum contacts is satisfied where the defendants' intentional, and allegedly tortious, actions were "expressly aimed" at the relevant forum, *see Calder v. Jones,* 465 U.S. 783, 789 (1984); and (b) in opposition to a motion to dismiss for lack of personal jurisdiction, plaintiffs need not rest on their pleadings, but may provide additional factual information through affidavits.  *See Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) .

Terrorist Group. *Burnett, et al. v. al Baraka Investment and Development Corporation, et al.*, 02-CV-01616, Docket #24 (JR) (DDC) (November 14, 2002). The Bosnian government, however, previously released all copies of these documents to the United States government. The Bosnian Supreme Court, therefore, issued an order requesting that the United States government turn over the records to Plaintiffs for use in this litigation.[3]   In recognition of the request of the Bosnian Supreme Court and the issuance of the Letters Rogatory request, the U.S. Attorneys Office for the Northern District of Illinois sent a partial set of the seized evidence from Bosnia to Plaintiffs' counsel.[4]

The documents seized from the offices of BIF were not, as this Court seemed to imply from its Opinion and Order, a smattering of random materials collected from the office of some ill-described charity in Bosnia. The seized materials, to members of al Qaeda, are the equivalent of the Declaration of Independence to the founding fathers of the United States. The documents "historically annotate[] the formation and development of Al Qaida." *See*, Kohlmann Aff., at ¶19, attached as Attachment A to the Draper Aff.[5]

Al Qaeda was so concerned with the security of these historical formation documents that they secreted them from Afghanistan to Bosnia and placed them in the care of a former Bosnian intelligence officer and member of al Qaeda, Munib Zahiragic. *Id*. ¶ 12. The documents "were deemed too important to accidentally fall in enemy hands . . . ." *Id.* Mr. Zahiragic was the head of the BIF office in Bosnia, and he turned these documents over to Bosnian officials when their offices were raided in March of 2002.

---

[3]   Order, Supreme Court of Bosnia and Herzegovinia, Case Number 09-12/5-04-3-1483 (February 25, 2003), Exhibit 8 to Kohlmann Aff.

[4]   Letter from Assistant U.S. Attorney John Kocoras (March 10, 2003), Exhibit 9 to Kohlmann Aff.

[5]   (Mr. Kohlmann's affidavit was also filed in response to Defendant, Yousef Jameel's (D#201's) Motion to Dismiss on October 18, 2004. *See* Docket # 505).

BIF in Illinois was designated by the United States government as a specially designated global terrorist in the wake of 9/11, and the Bosnian office was designated as well.

The documents include handwritten meeting minutes:

> On August 11, 1988, the notes describe 'a discussion regarding the establishment of a new military group…Qaida (the base).'" The meeting concludes that within six months of Al Qaida (the base), 314 brothers will be trained and ready.[6]

> Shortly thereafter in a subsequent meeting an advisory council was established. Bin Laden stated that "Al Qaida is basically an organized Islamic faction. Its goal will be to lift the word of God to make His religion victorious." The council also established a set of requirements to enter Al Qaida and a pledge or an oath that each member was required to declare. The meeting concluded by stating that the "work of Al Qaida commenced on September 10, 1988...."[7]

The advisory council established a list of action items for the new al Qaeda movement which sought to "keep[] alive the jihadist's spirit among Muslims in general and the Arabs in particular, by opening bases for their jihad along with maintaining contact lines with them."[8] The action items included "[f]orming a committee to receive donations and maintain an account and the spending:

> - the Crescent (*aka* the Saudi Red Crescent),
> - the Rabita (*aka* the Muslim World League),
> - Sheikh Abdallah,
> - the Relief Agency (Hayaat Al-Ighata),
> - Abu Mazin."

---

[6]   Kohlmann Aff. ¶ 20; *citing*, Meeting Minutes Seized from Bosnia (August 11, 1988), Tareekhosama/50/Tareekh Osama 122-123, Exhibit 5.

[7]   Kohlmann Aff. ¶ 20; *citing*, Meeting Minutes Seized from Bosnia, Tareekhosama/50/Tareekh Osama 127-127a (August 20, 1988), Exhibit 6.

[8]   Kohlmann Aff. ¶ 20; *citing*, Action Items Seized from Bosnia, Tareekhosama/29/Tareekh Osama 91-92a.

Draper Aff., Attachment B, BOS000067-74.  Al Qaeda even printed its declaration: "the only solution is the continuation of the armed jihad."  Draper Aff., Attachment B, BOS000070.

Included in the seized documents along with the "Golden Chain" are numerous letters written, signed and dated by Osama bin Laden requesting donations for al Qaeda or the distribution of funds.[9]  Osama bin Laden's signature which appears throughout these documents was identified and authenticated by Jamal al Fadl in 2001.  Draper Aff., Attachment C.  "The cache of documents [also] includes memoranda and meeting notes written on the letterhead of various Islamic charities including the Muslim World League, the International Islamic Relief Organization and Al Birr (the predecessor to Benevolence International Foundation).  One of the documents written on the letterhead of the Muslim World League and the International Islamic Relief Organization, states that:

> one must pursue finding an umbrella which you can stay under, other than the Crescent (most likely, the Saudi Red Crescent) because I expect that Abu Al-Hasan[10] will be replaced, because he is known by them especially after Abu Mazin left the arena, and I prefer the name of the League (most likely, Muslim World League)…."[11]

One of these documents seized in the Bosnian office of BIF is a handwritten memo on BIF letterhead stationery providing a detailed expense report for months in 1990.  Among the transactions described are wage payments made for the months April to June, 1990; 70,000 paid to the Yemeni camp by Defendant Adel Batterjee; a 100,000

---

[9]   Kohlmann Aff. ¶ 21; *citing*, Collection of Osama bin Laden Letters Seized from Bosnia, Tareekhosama/19/Tareekh Osama 79; Tareekhosama/33/Tareekh Osama 99; Tareekhosama/12/ Tareekh Osama 68; Tareekhosama/36/Tareekh Osama 102; Tareekh Osama 80; Tareekhosama/38/ Tareekh Osama 105; Tareekhosama/39/Tareekh Osama 106; Tareekhosama/34/Tareekh Osama 100; Tareekh Almusadat 41.

[10]   "Abu Al-Hasan" or "Abu Al-Hasan al Madani" are alias' of Wael Jelaidan, as explained below.

[11]   Kohlmann Aff. ¶ 22; *citing*, Meeting Minutes Seized from Bosnia, Tareekhosama/49/Tareekh Osama 121.

payment to "the Jihad Department;" and 500 paid to "Usama's . . . (illegible) account."[12] This payment was made from the BIF charity to Osama Bin Laden two years after the formation of al Qaeda and the withdrawal of the Soviets from Afghanistan.

The cache of seized documents does not purport to describe the war in Afghanistan. The war in Afghanistan was a public event and donations provided to the mujahideen were very well known and frequently published. Al Qaeda was concerned about the secrecy of this cache of documents because it described and historically annotated al Qaeda's birth. Releasing the information would expose Osama bin Laden's financial life-line, his "Golden Chain" of support.

<u>Jamal al Fadl</u>

In the same cache of documents, among the materials which contemporaneously describe the historical formation of al Qaeda, is a document which has been described by al Qaeda operative Jamal Ahmed al Fadl in an FBI 302 Interrogation Report as the "Golden Chain."[13]

> Jamal Ahmed Mohamed Al-Fadl was one of the first to swear allegiance to Usama Bin Laden when Al Qaeda was formed in Afghanistan in 1988. A critical member of the Al Qaeda network, Al Fadl trained at various terrorist training camps operated by Osama bin Laden on the Afghanistan and Pakistan border including: Khalid bin al-Walid, Jihad Wal, Al-Farooq, and Abu Bark al-Siddiz.

*See,* Affidavit of Jean Charles Brisard ("Brisard Aff."), at ¶ 2, Exhibit 12, attached as Attachment D.[14]

---

[12]    Kohlmann Aff. ¶ 6, 22; *citing*, Internal BIF Memoranda Seized from Bosnia, BOS000394-400.

[13]    Al Fadl has been allowed to testify in numerous USG prosecutions of al Qaeda and its supporters including the U.S. District Court and the Southern District of New York.

[14]    Mr. Brisard's affidavit also was filed in response to Defendant, Yousef Jameel's (D#201's) Motion to Dismiss on October 18, 2004.  (Docket #505).

> Osama bin Laden selected Al-Fadl to move with him to Sudan in
> 1991.  In Sudan, Al Fadl was given a budget of Two-Hundred Fifty
> Thousand  U.S.  Dollars  ($250,000.00)  to  rent  and  purchase
> properties for the Al Qaeda Shura council.  Jamal Al Fadl also
> managed  the  finances  for  several  front  companies  formed  by
> Usama  Bin  Laden  in  Sudan.   While  in  Sudan,  Jamal  Al  Fadl
> provided  extensive  financial  services  for  Usama  Bin  Laden  and
> high ranking members of Al Qaeda.

Brisard Aff., at ¶ 3.

Through these experiences, Jamal al Fadl became intimately familiar with the historical development and financial operations of al Qaeda.  Jamal al Fadl attended strategy meetings in Bosnia where Osama bin Laden's directive  to "use the regional jihad in Bosnia as a 'base for operations' . . . against al Qaeda's true enemy, the United States" was discussed.  Kohlmann Aff. ¶ 11.

In 1996, Jamal al Fadl, former top al Qaeda lieutenant, after a dispute with Bin Laden over embezzled al Qaeda finances, turned himself in to the U.S. government and volunteered to be an inside informant.  *See,* Kohlmann Aff. ¶ 14.  Jamal al Fadl provided detailed testimony concerning Osama bin Laden's financial network as the U.S. Justice Department's star witness at the federal trial of Osama Bin Laden in the Southern District of New York in February 2001.  *Id.*

In August 2002, the FBI discussed the materials seized in Bosnia with Jamal al Fadl and the FBI prepared a report concerning the interview.  *See,* Draper Aff., Attachment E; FBI 302 Statement (or "FBI 302").  "The Federal Bureau of Investigation has adopted a practice of preparing memoranda of interviews recording potentially 'testimonial' matters in a form designated as FD-302."  *U.S. v. LaRouche Campaign, et al.*, 695 F. Supp 1265, 1268 (D.C. Mass. 1988).  Plaintiffs authenticated the document as an example of an accurate FBI 302 through a sworn witness statement from a former

member of the Joint Terrorism Task Force.   The witness was asked whether he was familiar with how FBI 302's were written and he responded in the affirmative, "I've written hundreds, maybe a thousand or more of them."   *Confidential Witness Interview*, p. 29, line 3-4, Draper Aff., Attachment F.   The witness concluded that the al Fadl FBI 302 Statement is authentic.   *Id.* at p. 29, line 5-7.

While Jamal al Fadl's name does not appear in the 302, there is sufficient evidence within the document to identify him as the interviewee source.   Moreover, the U.S. Attorney's office described the "reports concerning al Fadl's statements to agents investigating this [*Arnaout*] case" and attached the documents as an exhibit to the Bill of Particulars.   *See*, Bill of Particulars, *US v. Arnaout*, Case No. 02 CR 892 (ND Ill.) (SBC) (February 5, 2003), p. 2, Exhibit 2 to Kohlmann Aff.

Jamal al Fadl identified a document within the collection which referenced information about himself that he provided "upon arriving at Camp Masada in the Jaji region of Afghanistan."   *See*, FBI 302, p. 1.   Al Fadl also recognized the name of Abu Al Abbas Al Madani in one of the seized documents, as one of the people who swore bayat (oath of loyalty) to al Qaeda in the same ceremony that al Fadl swore bayat to al Qaeda. *Id.* at 2.   Al Fadl also recognized the name of another member of al Qaeda, Abdallah Al Roomi as the individual whom Osama bin Laden instructed to kill Jamil Ur Rahman.

> Jamil Ur Rahman was an Afghani leader who had close ties to members of the Saudi Arabian government.  Source advised that Jamil Ur Rahman was attempting to influence wealthy Saudi Arabians not to provide money to bin Laden and his Al Qaeda network.  As a result,  Jamil Ur Rahman and Osama bin Laden were at odds with one another.  Source estimated that Abdallah Al Roomi killed Jamil Ur Rahman during 1989 or 1990.

*Id.* at 2.  These statements concerning conduct in 1989 and 1990 clearly demonstrate that certain wealthy Saudi citizens were funding al Qaeda <u>after</u> the conclusion of the war in Afghanistan and after the formation of al Qaeda.  In fact, the Saudi funding source for al Qaeda was so significant that when Rahman attempted to interfere with the transactions, Osama bin Laden had him murdered.  *Id.*

In reviewing a chart of al Qaeda members, which was included in the seized Bosnian documents, al Fadl recognized the name Abu Al Hussan, listed under "jihad support."  *Id.* at 7.  Al Fadl confirmed that Abu Al-Hassan's is an alias for Defendant Wael Jelaidan, of Saudi descent, and head of the Pakistan office of International Islamic Relief Organization.  *Id.*  Wael Jelaidan's name is listed on the "Golden Chain" document as a recipient of funds and is a Defendant in *Burnett*.  *See*, "Golden Chain," Attachment G to Draper Aff.  The U.S. Department of Treasury has designated Jelaidan as an al Qaeda terrorist and in doing so also identified his aliases.  They include "Abu Al-Hasan al Madani."  Draper Aff., Attachment H, p.1.  The U.S. Treasury elaborated on Jelaidan's role in al Qaeda:

> Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV.  When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan."  Julaidan has established contacts with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri.  Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000.  Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar.
>
> In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General.  The Rabita Trust is an NGO designated under President Bush's Executive

Order as an organization that provided logistical and financial support to al-Qa'ida.  *Id.,* at 2.

Among the seized al Qaeda formation documents is a handwritten note from Osama bin Laden to Wael Jelaidan (*aka* Abu Al Hasan, Abu Al Hassan al Madani) on Saudi Red Crescent stationery telling Wael Jelaidan of "extreme need for weapons." Draper Aff., Attachment I.  The seized group of al Qaeda formation documents contain numerous references to Wael Jelaidan as a key figure – both with his real name and his alias.  (*e.g.* "Brother Wael Jleidan" [sic] BOS000093, Attachment J to Draper Aff.; "Wa'el Jalaedan (President of the Saudi Red Crescent)" BOS000028, Attachment K to Draper Aff.; "give our best regards to brother Abu Al-Hasan" BOS000054, Attachment L to Draper Aff.)  A list of key al Qaeda members puts Osama bin Laden at #1, and Abu Al Husan Al Madani at #7.  BOS000089, Exhibit M to Draper Aff.  Osama bin Laden writes:

> "I ask that you communicate my greetings to Abu Al-Hasan Al-Madani and I hope that he will visit us . . ."  Signed Osama Bin Laden, BOS000020, Exhibit N to Draper Aff.

Strikingly, the signature on one of these key formation documents (resolving a dispute over how to organize al Qaeda) BOS000052 is the identical signature as on the affidavit of Wael Jelaidan submitted in this very case.  *Cf.* Draper Aff. Attachments O and P.

The collection of documents also reflect quite clearly Wael Jelaidan's operative role in material support to al Qaeda:

> "We also request that you send all amount of 400,000 Rupees to the owner of the weapon for delivery . . . according to Abu Al-Hasan's wishes . . ."  BOS000055, Draper Aff., Attachment Q.

Wael Jelaidan (Abu Hassan) is also a critical figure in discussions of "a Committee…formed in Saudi Arabia to collect money promised by donors." BOS000036, Draper Aff., Attachment K.

Al Fadl also recognized the name Abu Ibrahim as a member of al Qaeda in the organizational chart who was the head of the Peshawar office of the Kuwait Red Crescent Society, a charity used to raise funds for the Arab mujahideen. *See,* FBI 302, at 8.  Al Fadl said that he later became the manager of the Hijra Construction Company which was owned by Osama bin Laden and which built roads and bridges in the Sudan. *Id.*

Number 18 on the chart was identified as Adel Farhat a Saudi who al Fadl believed ran the Al Birr Al Dawalia charity. *Id.* at 10.  This charity was the predecessor of Benevolence International Foundation.  Defendant Arnaout was sentenced to 11 years in federal prison for his role in supporting al Qaeda via BIF.  Al Fadl stated that Al Birr had an office in the Sudan in the 1990's and an office in Zagreb, Croatia.  "Source noted that Bin Laden specifically used these two Al Birr Al Dawalia offices as a means to move money to al Qaeda." *Id.*

Al Fadl describes conversations he had with Osama bin Laden where they discussed the use of charities to fund al Qaeda.  Specifically they discussed "…the fact that $20,000 used by al Qaeda to fund the plot to kill Egyptian President Hosni Mubarak came from the Qatar Charitable Society." *See*, FBI 302 at 17.  "Bin Laden mentioned that Al Birr Al Dawalia as well as other charities were also utilized by al Qaeda for similar purposes." *Id.*

Al Fadl also reviewed the al Qaeda meeting minutes seized in Bosnia, (which included the "Golden Chain") Tareekhosama/54/Tareekh Osama 127-127a, and

12

confirmed that the date in which al Qaeda was formed was on September 10, 1988. Most importantly for purposes of this motion, Jamal al Fadl was shown document 108 contained in folder 41. "While reviewing the document, source indicated that some of the names appearing on the document appeared to be members of a group who source (al Fadl) referred to as the "Golden Chain." FBI, 302 at 23-24. According to the source the "Golden Chain" consisted of "wealthy individuals from the Gulf region who provided Bin Laden and al Qaeda with money on a regular basis." FBI 302, at 23. Al Fadl identified Defendant Yousef Jameel as purchasing a satellite phone for bin Laden. *Id.* Al Fadl explains that all Muslims are required to pay zakat or charity worth 2.5% of their total yearly earnings. *Id.*

> Source identified the individual listed next to number 4, Yousef Jameel, as purchasing a satellite phone for Bin Laden…. Source stated that the individual listed next to number 6, Saleh Kamel, owns Al Baraka Bank. Source was informed by both Madani Al Tayyib and Abu Rida, [both are members of Al Qaeda] that they used Saleh Kamel's bank.

*Id.*

Al Fadl (or "Source" in the 302 statement) had a specific conversation with Madani Al Tayyib wherein he informed al Fadl that "both Yousef Jameel and Saleh Kamel donated their zakat funds, via the "Golden Chain" to bin Laden's Al Qaeda group." *Id.* Jamal al Fadl also stated that he had conversations wherein he learned that "Bin Laden would never fight or attempt to change the governments of any Gulf state because members of the "Golden Chain" reside in those states." *Id.* This statement by al Fadl is corroborated by another high-ranking member of al Qaeda, Abd Al-Aziz Al-Muqren, a/k/a Abu Hajer, who recently described al Qaeda's internal debate about whether to commit terrorist attacks within the Kingdom of Saudi Arabia in an interview

with *The Voice of Jihad* online magazine.   While some argued in favor of beginning

attacks in the Kingdom:

> Others said we had to preserve the security of this base and of this country [i.e. Saudi Arabia], from which we recruit the armies, from which we take out the young people, and from which we receive [financial] backing.  It must therefore remain safe.
>
> My opinion is an intermediate opinion, between the two groups.  It is true that we must keep the enemy preoccupied with himself and not give him a sense of security, because as soon as he secures his bases and his lines of supply, he will have an opportunity to use them to attack our brothers in different parts of the countries of the Islamic world.  But we must prepare ourselves and be ready for this momentous event the best way we possibly can.  We told them:  'Wait, we are readying ourselves.'  Then we attacked the Americans.
>
> It is also true that we must take advantage of this country [Saudi Arabia] because it is the primary source of funds for most Jihad movements, and it has some degree of security and freedom of movement.  But we must strike a balance between this and America's invasion of the Islamic world and its hobbling of the Jihad movement and even of other Islamic movements....

Attachment R to Draper Aff., at 1-2.

Al Fadl also said that "the name Al Rajhi listed next to number 7 on the list on

this document is the name of a bank in which al Qaeda had funds on deposit."  FBI 302,

at 24.  Al Fadl also identified ". . . the name Batterjee appearing to the right of many of

the names on the document is the same name . . . as one of the main people who operated

Al Birr Al Dawalia."  *Id.*[15]   Jamal al Fadl was prepared to provide testimony at the

sentencing phase in *Arnaout* concerning the seized Bosnian documents and the "Golden

Chain."[16]

---

[15]   Unfortunately, the interview was terminated due to time.  The witness noted that he had additional information about some of the individuals that the source described in the interview.

[16]   "Government's Response to Defendant's Position Paper as to Sentencing Factors" *U.S. v. Enaam M. Arnaout*, at fn 13, p. 31; Kohlmann Aff., Exhibit 4.

<u>Other Sources Citing the "Golden Chain" as Authoritative</u>

The United States' Proffer document filed in *Arnaout* and the al Fadl 302 are not the only place in which the "Golden Chain" has been cited as an authentic, authoritative document. The Final Report of the 9/11 Commission cites to the "Golden Chain":

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'[17]

The Congressional Research Service reported that "Saudi individuals and other financiers associated with the "Golden Chain" enabled bin Laden and al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996."[18] This support proved critical as Osama bin Laden provided funds to the Taliban in return for his safe harbor in the amount of ten to twenty million dollars a year.[19] Moreover, the CIA estimates that "it cost al Qaeda about $30 million per year to sustain its activities before September 11th and that this money was raised almost entirely through donations." 9/11 Report at 170. The 9/11 Commission Report also stated that "al Qaeda found fertile ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight." 9/11 Commission Final Report at 171.

---

[17] The 9/11 Commission Final Report ("9/11 Report"), July 2004, Exhibit S to Draper Aff., at p. 55.

[18] Alfred B. Prados and Christopher M. Blanchard, "Saudi Arabia: Terrorist Financing Issues," CRS Report for Congress, pp. 2, 3 (December 8, 2004); *citing,* 9/11 Commission Report, at 66.

[19] 9/11 Staff Report to the Commission, Monograph on Terrorist Financing, p 28, Exhibit T to Draper Aff.

The United States Department of Treasury cited the "Golden Chain" in its decision to designate Adel Batterjee as a Specially Designated Global Terrorist pursuant to Executive Order 13224:

> [I]n March 2002 searches by Bosnian authorities of [BIF's] Sarajevo offices…uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization. Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain."
>
> This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor.  "Usama" appears after seven of the listings and "Batterji" appears after an additional six listings.

Draper Aff., Exhibit U, U.S. Treasury Dept., at 2.

It is these same documents that were the subject of the Court's issuance of letters rogatory and the Bosnian Supreme Court's directive to the FBI - D.O.J.  While Jamal al Fadl's 302 is an interview that may or may not in and of itself be admissible, it is certainly sufficient information, at this stage of the proceedings, for the Court to conclude that the individuals al Fadl describes in his interview may have contributed funds to al Qaeda and that Plaintiffs should be entitled to proceed with discovery.  It also certainly provides a sufficient basis for a qualified expert to opine upon under the Federal Rules of Evidence.  *See* Affidavits of Kohlmann and Brisard.  In addition, there are two important facts which make it more probable than not that the "Golden Chain" is a listing of contributors to al Qaeda.  First, Jamal al Fadl stated that the names he was familiar with on the "Golden Chain" list were individuals who directly contributed funds to al Qaeda. Second, the "Golden Chain" document was contained within a secreted collection of materials which describe the foundation and birth of al Qaeda.  The list was not a random

document in the office of an unknown charity in Bosnia; it was a prized possession to al Qaeda, so important that Osama bin Laden would be willing to commit murder to maintain its secrecy.

Even if the Court in weighing this evidence does not believe that the list is what Plaintiffs allege it is, this is not the stage in the proceedings where the Court engages in this type of analysis. *Pelman ex rel v. McDonalds Corp.*, 396 F.3d. 508 (2d. Cir. 2005); *Michael v. Clark Equipment Co.*, 380 F.2d 351 (2d. Cir. 1967). Plaintiffs have alleged sufficient facts and have even provided a sampling of some of the evidence that they have collected to support their allegations. At this stage of the proceeding, the Court must adopt Plaintiffs allegations as true. Plaintiffs respectfully but strenuously object to the Court's imposition of a more severe and stringent evidentiary standard at this embryonic pleading state than the law requires. *Pelman ex rel v. McDonalds Corp.,* 396 F.3d 508 (2d. Cir. 2005).

### Plaintiffs are Entitled to Leave to Supplement Their Oppositions to the Motions to Dismiss of Wa'el Jelaidan, Khalid Bin Mahfouz and Yousef Jameel

While alleging that a particular individual or business has engaged in the financing of terrorism must be undertaken by civil litigants with caution, the rules concerning what allegations must be pled are governed by the same rules as any other civil case, Rule 8. Congress did not enact stricter pleading standards for civil terrorist litigation. 18 U.S.C. 2333 *et. seq.* Indeed, as noted in *Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000 (7th Cir. 2002), and more recently in the 'Patriot Act" Congress and three successive Presidents have armed civilian victims with causes of action against terrorist enablers and, indeed, encouraged the use of same.

Cases which seek to hold financiers of terrorism civilly liable face enormous challenges in collecting admissible evidence because terrorist financiers purposefully hide their financial activity and their illegal behavior.  Were courts to impose heightened pleading standards and force litigants to establish admissible evidence before discovery, civil lawsuits against terrorist financiers would not be possible.  Courts would in effect undermine the very remedies that Congress created.

Nevertheless, even if the submission of evidence as opposed to allegations were required at this point in this case, the Court never requested or held an evidentiary hearing in order to weigh the evidence plaintiffs obtained.  As a result, Plaintiffs seek leave to supplement the responses to the motion to dismiss of Wael Jelaidan, Khalid bin Mahfouz, and Yousef Jameel as to the "Golden Chain" collection of al Qaeda formation documents.  Plaintiffs respectfully request that the Court permit the attached factual material contained in this motion be added to the existing record as to Defendants Wael Jelaidan, Khalid Bin Mahfouz, and Yousef Jameel.[20]

THEREFORE, Plaintiffs respectfully move this Honorable Court, in light of the new factual issues presented herein to supplement their pleadings as to the "Golden

---

[20]   In the alternative, Plaintiffs seek an opportunity to file an amended complaint.  Before the case was transferred from Washington DC, Judge Robertson instructed that Plaintiffs add new Defendants' names to the action and not file any additional allegations or amendments.  In the event that a Defendant sought additional specific facts which support the claim against them, the procedure in place was for defendants to request (and Plaintiffs to provide) a more definite statement pursuant to Fed. R. Civ. P. 12(e).  This same procedure has been adopted before this Court.  See, CMO #2, at 6 and 7.  Some Defendants herein, however, intentionally resisted the allegations of a more definite statement so they could argue Plaintiffs failed to allege sufficient factual information concerning the claims brought against them.  Certain Defendants took advantage of the procedural mechanisms adopted and in place by the Court for strategic advantage.  Plaintiffs should be entitled to amend their complaint.  Fed. R. Civ. P. 15(a) provides that leave to amend shall be freely given when justice so requires.  Refusing leave to amend a complaint may be grounds for an abuse of discretion.  See, Foman v. Davis, 371 U.S. 178, 182 (1962); Devaney v. Chester, 813 F.2d 566, 569 (2nd Cir. 1987).  In this case, Plaintiffs (and Defendants) were instructed by Judge Robertson and this Court not to amend their complaint, but to seek and provide more definite statements.  Defendants cannot fail to request a 12(e) and then argue that the factual allegations are insufficient.  To do so is grossly unfair.

Chain" and related documents.  In the alternative, Plaintiffs request an opportunity to file an amended complaint pursuant to Fed. R. Civ. P. 15.

Dated:  June 8, 2005                   Respectfully submitted,
New York, New York

/S/

Ronald L. Motley, Esq. (SC-4123)
Jodi Westbrook Flowers, Esq. (SC-66300)
Donald A. Migliori, Esq. (RI-4936; MA-567562;
    MN-0245951)
Michael E. Elsner, Esq. (NY & VA-ME8337)
Robert T. Haefele, Esq. (NJ-58293; PA-57937)
Elizabeth Smith, Esq.
Justin B. Kaplan, Esq. (TN-022145)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Jayne Conroy, Esq. (NY-JC8611)
Paul J. Hanly, Jr., Esq. (NY-PH5486)
Andrea Bierstein, Esq. (NY-AB4618)
HANLY CONROY BIERSTEIN
    & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

Harry Huge, Esq. (DC-55640)
HARRY HUGE LAW FIRM, LLP
Market Square North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046

Allan Gerson, Esq. (DC-327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557

Attorneys for Plaintiffs