# Attachment A
## (Part 2 of 6)

# Exhibit 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | No. 02 CR 892 |
| | ) | |
| ENAAM M. ARNAOUT | ) | Hon. Suzanne B. Conlon |

## GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING
## THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits this proffer, pursuant to Federal Rule of Evidence 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987), of the government's evidence supporting the admission of coconspirators' statements at trial.

1

# TABLE OF CONTENTS

I.    GOVERNING LAW5

    A.    General Principles5

    B.    The "In Furtherance" Requirement10

        1.    Statements Made to Execute the Conspiracy10

        2.    Statements Regarding the Conspiracy's Activities11

        3.    Statements to Recruit Conspirators12

        4.    Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure the Listener12

        5.    Statements About the Progress and Accomplishments of the Conspiracy13

        6.    Statements to Conceal the Criminal Objectives of the Conspiracy13

    C.    Admission of Statements Without Regard to the Coconspirator Rule14

    D.    The Absence of Confrontation Clause Issues with Coconspirator Statements14

II.    EVIDENCE OF THE CONSPIRACY, ITS PARTICIPANTS, AND STATEMENTS IN FURTHERANCE OF THE CONSPIRACY15

    A.    Overview of Conspiracy15

        1.    Defendant Arnaout, LBI and *Mekhtab al Khidemat*17

        2.    Defendant Arnaout and *al Qaeda* in Afghanistan20

        3.    Defendant Arnaout, *al Qaeda*, the Sudan and BIF21

        4.    Defendant Arnaout and BIF in Illinois22

        5.    *Al Qaeda*, BIF and Bosnia-Herzegovina23

        6.    BIF, Batterjee and Bin Laden24

        7.    BIF, *al Qaeda* and Chechnya25

    B.    Beginning of the Rule 801(d)(2)(E) Conspiracy26

    C.    *Lajnatt Al-Birr Al-Islamiah*27

2

D.   BIF's Archive28

    1.   "Tareekh Osama" File28

    2.   "Tareekh Al Musadat" File37

    3.   "Al Jabal" File39

    4.   Miscellaneous Files43

E.   Defendant Arnaout's Videos With Hekmatyar46

F.   Shift from "LBI" to "BIF"47

G.   BIF's Hidden Mission48

H.   BIF's Efforts in Sudan56

I.   BIF's Efforts in Bosnia-Herzegovina62

J.   BIF's Efforts in Chechnya71

    1.   Background71

    2.   X-Ray Machine and Anti-Mine Boots for Chechen *Mujahideen*75

    3.   Camouflage Uniforms for Chechen *Mujahideen*86

    4.   WWW.QOQAZ.COM89

K.   BIF's Efforts in Azerbaijan91

L.   BIF's Efforts in Tajikistan92

M.   BIF's Matching Gift Program95

N.   Fundraising by Yusuf Ansari Wells95

O.   Defendant Arnaout's False Declarations and Continuing Fraud96

P.   Defendant Arnaout's Message to Batterjee98

Q.   Defendant Arnaout's Coaching of BIF's Sarajevo Director99

R.   Defendant Arnaout's Instructions to BIF Officer to Flee100

III.   CONCLUSION101

## I.     GOVERNING LAW

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Below are summaries of the case law interpreting this rule, the background of the charged conspiracy, the evidence of the conspiracy and its participants, and the evidence showing that the proffered coconspirator statements were made during and in furtherance of the conspiracy.

### A.     General Principles

The admission of a coconspirator statement against a defendant is proper where the government establishes, by a preponderance of evidence, that: (1) a conspiracy existed; (2) the defendant and the person making the cited statement were members of that particular conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gajo*, 290 F.3d 922, 928 (7th Cir. 2002); *United States v. Centracchio*, 265 F.3d 518, 530 (7th Cir. 2001); *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *Santiago*, 582 F.2d at 1130-31.

The Seventh Circuit has "identified several options available to the district court to determine the admissibility of *Santiago* evidence: (1) make a preliminary determination based on the government's proffer of evidence, (2) rule on each statement as elicited at trial based on the evidence presented at that point, (3) conditionally admit the evidence without a proffer subject to eventual supporting evidence to be presented sometime at trial (risking, of course, a possible mistrial), or (4) hold a 'full-blown' pre-trial hearing to consider all the evidence and make a decision." *United States v. Hunt*, 272 F.3d 488, 494 (7th Cir. 2001). However, the court "often discouraged the fourth alternative, a full-blown pre-trial hearing, as inefficient and potentially duplicative." *Id.* (citing *United States v. McClellan*, 165 F.3d 535, 554 (7th Cir.1999)). In this circuit, the preferred way for the government to make its preliminary "coconspirator-statement" factual showings is by the filing of a pretrial written proffer of the government's evidence.[1] *See*

*United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992); *United States v. Hooks*, 848 F.2d 785, 794-95 (7th Cir. 1988).

In determining whether a coconspirator statement is admissible pursuant to Rule 801(d)(2)(E), the court may examine the coconspirator statement itself to decide whether a conspiracy existed and whether the defendant participated in it. "Bootstrapping" in this fashion is expressly permitted – the statement of a coconspirator may be the predicate for its own admissibility. *Bourjaily*, 107 S.Ct. at 2781-82; *Godinez*, 110 F.3d at 454-55; *see also United States v. Zambrana*, 841 F.2d 1320, 1344-45 (7th Cir. 1988) (discussing how overall context of coconspirator statements is what makes the statements very reliable as evidence of a defendant's role in a conspiracy). The evidence used in showing a conspiracy and a given defendant's participation in that conspiracy may be either direct or circumstantial. *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983).

Case law makes clear that a "conspiracy" under Rule 801(d)(2)(E) includes any joint venture, including lawful ones. *See United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989) ("[W]e initially note that Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and that a charge of criminal conspiracy is not required to invoke the evidentiary rule"); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1984) ("Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. . . . The government did not have to prove by a preponderance of the evidence all the elements of the criminal conspiracy before Coe's statement could be admitted

---

[1]     This Court has substantial discretion in the manner in which it decides to evaluate the admissibility of coconspirator statements. Although the pre-trial proffer is the customary procedure, the Court may admit coconspirator statements subject to the government's eventual proof at trial by preponderance of the evidence of the elements required under Fed. R. Evid. 801(d)(2)(E). *See United States v. Doerr*, 886 F.2d 944, 967 (7th Cir. 1989).

against Korenak and Joseph. The proposition that the government did have to establish by a preponderance of independent evidence was that Coe, Korenak and Joseph were engaged in a joint venture – that there was 'a combination between them[.]'") (quoting *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917)) (internal citations omitted); *United States v. Layton*, 855 F.2d 1388, 1400 (9th Cir. 1988), *overruled on other grounds, United States v. George*, 960 F.2d 97, 99 (9th Cir. 1992) ("[T]he district court correctly determined that Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, whether legal or illegal, in which the declarant and the defendant jointly participated."). Indeed, the "conspiracy" for purposes of Rule 801(d)(2)(E) can be any joint venture and need not be one charged in an indictment – in fact, the rule can be invoked in civil cases. *Coe*, 718 F.2d at 835-36.

Importantly, the coconspirator need not be specifically identified in order for his or her statement to be admitted as a coconspirator's statement. In *United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000), a prosecution of leaders of the Gangster Disciples ("GDs") street gang, the Seventh Circuit upheld the admission of a document identifying high-ranking GDs as a coconspirator's statement, even though the author was unknown. The court explained:

> The details contained in "The List" were such that it could only have been written by a member of the GDs or by someone sufficiently involved with the business to be intimately familiar with it – in other words, by a co-conspirator. The defendants are wrong to suggest that it is necessary to know the precise identity of a coconspirator before statements can be admitted under Rule 801(d)(2)(E).

*Id.* Likewise, in *United States v. De Guidino*, 722 F.2d 1351, 1356 (7th Cir. 1984), cited in *Smith*, the court upheld the admission of a similar, anonymously-authored document:

> The contents of the pollo lists also establish the lists as co- conspirator statements admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence. This rule provides that a statement is not hearsay (and thus is admissible) if it is a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. In the present case, the contents of the lists clearly show that their author was familiar with the

workings of the conspiracy. The fact that the lists contain dates and records of payment is evidence that they were written during the course of the conspiracy. The names, dollar figures, and telephone numbers are evidence that the lists were utilized to maintain information necessary to continue the smuggling activities of the conspiracy. Since this evidence was not countered by any evidence that the lists were made at any time other than during the conspiracy or that the lists were not made to further the conspiracy, we hold that the lists were admissible as co-conspirators' statements.

*See also United States v. Postal*, 589 F.2d 862, 886 n. 41 (5th Cir. 1979) (admitting a document under Rule 801(d)(2)(E) and stating "Although it is not clear who authored the logbook . . . we think it inescapable that one of the crew of La Rosa did so.").

Admissions by a defendant are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. *See United States v. Shoffner*, 826 F.2d 619, 626-27 & n.10 (7th Cir. 1987). Of course, a defendant's own admissions are obviously and powerfully relevant to establish the factual predicates for the admission of coconspirator statements against him. *See United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987); *United States v. Alexander*, 741 F.2d 962, 966 (7th Cir. 1984), *overruled on other grounds*, *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir. 1985).

Where Rule 801(d)(2)(E) is implicated, it is clear that once a conspiracy is established, "only slight evidence is required to link a defendant to it." *Shoffner*, 826 F.2d at 617 (quoting and citing prior authorities). It is also clear that "statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern." *Potts*, 840 F.2d at 372 (citing cases). "Conversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." *Shoffner*, 826 F.2d at 628 (citations omitted).

Further, certain principles of general conspiracy law are relevant to Rule 801(d)(2)(E) inquiries that are made as to the existence of a conspiracy and a defendant's membership in it. For instance, a defendant joins a conspiracy if he i) agrees with a conspirator to participate in the project or enterprise that is the object of a scheme involving others, and ii) knowingly acts in

8

furtherance of that object; it is immaterial whether the defendant knows, has met with, or has agreed with every coconspirator. *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986); *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985). Similarly, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985). A defendant may be found guilty even if he joined or terminated his relationship with core conspirators at different times. *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985). Even after a conspirator has concluded his active participation in the activities of the conspiracy, the statements of coconspirators will be admitted against him, unless he affirmatively establishes that he has withdrawn from the scheme. *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

In addition, coconspirators' statements generally may be relayed to the jury in their entirety to place the coconspirators' statements in context and make them intelligible for the jury. *United States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

### B.    The "In Furtherance" Requirement

To establish that a statement was made "in furtherance" of the conspiracy, the government need only show "some reasonable basis" upon which to conclude that the statement furthered the conspiracy. *United States v. Zizzo*, 120 F.3d 1338, 1352 (7th Cir. 1997); *United States v. Stephens*, 46 F.3d 587, 597 (7th Cir. 1995); *Shoffner*, 826 F.2d at 628. Furthermore, the government has a "relatively low burden of proof on this issue." *Shoffner*, 826 F.2d at 628 (collecting cases). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception. *United States v. Singleton*, 125 F.3d 1097, 1107 (7th Cir.

1997); *United States v. Powers*, 75 F.3d 335, 340 (7th Cir. 1996); *United States v. Stephenson*, 53 F.2d 836, 845 (7th Cir. 1995). Thus, updates on a conspiracy's progress, *Potts*, 840 F.2d at 371, and conversations concerning planning or review of coconspirators' exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985), are statements "in furtherance."

As discussed below, the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement.

### 1.    Statements Made to Execute the Conspiracy

Statements made by conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). Such statements "intended to promote the conspiratorial objectives" are readily admitted pursuant to Rule 801(D)(2)(E). *See, e.g., United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997); *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). Statements which prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991). *See also United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987) (sole purpose of conversation from coconspirator's perspective was to promote conspiracy's unlawful objectives; coconspirator's responses to individual's questions were designed to whet individual's interest in acquiring stolen property). Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989).

### 2.    Statements Regarding the Conspiracy's Activities

Similarly, statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy. *United States v. Ashman*, 979

10

F.2d 469, 489 (7th Cir. 1992). Likewise, statements that are part of the information flow between conspirators made in order to help each conspirator perform his role are "in furtherance" of the conspiracy *Gajo*, 290 F.3d at 929; *Godinez*, 110 F.3d at 454; *United States v. Herrero*, 893 F.2d 1512, 1527-28 (7th Cir. 1990); *Garlington*, 879 F.2d at 283-84; *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988). Statements to assure that a coconspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986).

### 3.   Statements to Recruit Conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. *Godinez*, 110 F.3d at 454; *Shoffner*, 826 F.2d at 628. Indeed, "[c]onversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." *United States v. Dorn*, 561 F.2d 1252, 1256-57 (7th Cir. 1977).

### 4.   Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure the Listener

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy, such as couriers, contribute to the conspiracy. *Van Daal Wyk*, 840 F.2d at 498-99. The Seventh Circuit has also found that "[s]tatements made to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." *Stephenson*, 53 F.3d at 845; *United States v. Curtis*, 37 F.3d 301, 307 (7th Cir. 1994).

As the Seventh Circuit held in *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990):

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname . . . is in furtherance of the conspiracy, because

it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. *See id.*; *Van Daal Wyk*, 840 F.2d at 499 ("statements were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role").

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. A coconspirator's statement describing a defendant's past drug deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source. *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990). Likewise, statements made to reassure and calm the listener may further the conspiracy as well. *Garlington*, 879 F.2d at 284 (upholding admission of coconspirator's statement to defendant in a murder conspiracy "We're going to take care of him" reasoning that the statement encouraged the defendant to perform his task in the conspiracy).

### 5. Statements About the Progress and Accomplishments of the Conspiracy

Statements made by conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. *Potts*, 840 F.2d at 371, *Molt*, 772 F.2d at 368-69. Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

### 6. Statements to Conceal the Criminal Objectives of the Conspiracy

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in

furtherance" of the conspiracy where ongoing concealment is one of its purposes. *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *Xheka*, 704 F.2d at 985-86. "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. *See Van Daal Wyk*, 840 F.2d at 499.

### C.     Admission of Statements Without Regard to the Coconspirator Rule

As discussed above, statements that a defendant personally makes are admissible against him as admissions of a party-opponent pursuant to Rule 801(d)(2)(A) without reference to the coconspirator statement rule. *See Shoffner*, 826 F.2d at 626-27 & n.10. Statements that a conspirator does not make personally, but which he impliedly or expressly authorizes an agent to make in the context of an existing agency relationship are admissible pursuant to Rule 801(d)(2)(D). *United States v. Feldman*, 825 F.2d 124, 128 (7th Cir. 1987); *see also United States v. Gibson*, 690 F.2d 697, 701 (9th Cir. 1982).

### D.     The Absence of Confrontation Clause Issues with Coconspirator Statements

No separate Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements which are offered for their truth against the defendant. This is because the requirements for admission under Rule 801(d)(2)(E) are identical to "the requirements of the Confrontation Clause." *Bourjaily*, 483 U.S. at 182. Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met. *Id.*; *United States v. Ceballos*, 302 F.3d 679, 689, n.2 (7th Cir. 2002) (stating that the Confrontation Clause of the Sixth Amendment does not apply to statements admitted under Rule 801(d)(2)(E)); *United States v. Singleton*, 125 F.3d at 1107-08; *see also Idaho v. Wright*, 497 U.S. 805, 814 (1990) (Confrontation Clause is not violated where hearsay statement falls within a firmly rooted hearsay exception). As a result, in considering the admissibility of proffered coconspirator

statements, the trial court does not consider whether or not the coconspirator-declarant is "unavailable" or whether there is independent evidence to establish the "reliability" of the proffered statements. *Inadi*, 475 U.S. at 400; *Bourjaily*, 483 U.S. at 183-84.

## II.   EVIDENCE OF THE CONSPIRACY, ITS PARTICIPANTS, AND STATEMENTS IN FURTHERANCE OF THE CONSPIRACY

Set forth below is the government's proffer demonstrating that the conspiracy described below existed at least as early as 1987 in Afghanistan and grew over the years to include individuals working in many additional countries.

The first section below provides an overview of the conspiracy, including overviews of defendant Arnaout's collaboration with *al Qaeda, Hezb e Islami* and other violent groups in various countries.   The conversations recounted in those overviews and subsequent sections are merely summaries of oral statements in furtherance of the conspiracy.   The documents summarized in the first section are discussed in more detail in the ensuing sections (where they are cited by their exhibit number in the appendix) which explain the evolution of BIF and the expansion of defendant Arnaout's support to violent organizations in various locations, along with the efforts defendant Arnaout employed to raise money fraudulently and to conceal facts from donors and the public.

### A.   Overview of Conspiracy

Outlined in detail in this proffer is a fifteen-year, international conspiracy to use ostensibly charitable organizations to support violence overseas on behalf of purportedly Islamic causes.   As the evidence set forth below and in the appendix demonstrates, defendant Arnaout played an integral role in the conspiracy.   As summarized in those sections, in the latter part of the 1980s, defendant Arnaout actively assisted *mujahideen* while working for a Saudi relief organization, *Lajnatt Al-Birr Al-Islamiah* ("LBI"), and other organizations within Afghanistan and Pakistan, along with Usama Bin Laden and others who ultimately established *al Qaeda* (literally translated as "the base").   Defendant Arnaout continued his work with those individuals and affiliated groups after *al Qaeda* formed and even after LBI evolved into Benevolence International Foundation, Inc. ("BIF") and incorporated in the U.S.[2]   The assistance provided was neither incidental nor sporadic but a core mission of defendant Arnaout and those organizations.

15

Indeed, the evidence shows that defendant Arnaout's participation in the material support of violent *jihad* remained consistent in methods over the years and merely changed to expand the number of armed belligerents he and the BIF Enterprise (described in the Indictment) supported: first fighters in Afghanistan, then fighters in the Sudan, then Bosnia-Herzegovina (or "Bosnia") and then Chechnya, among others. The people and organizations he collaborated with over time – including, but not limited to, BIF (and LBI), its founder Adel Batterjee, Usama Bin Laden and his *al Qaeda* network, and Gulbuddin Hekmatyar and the *Hezb e Islami* ("Islamic Party") group – changed little over time, and indeed the plans made in Afghanistan and Pakistan in the late 1980s discussed below were made precisely for the purpose of establishing support for *jihad* in places outside of Afghanistan. Moreover, the trust and methods of operation that defendant Arnaout and the BIF Enterprise forged in Afghanistan with the *mujahideen* cemented the working relationships with various *mujahideen* as the work of the BIF Enterprise expanded to encompass the Sudan, Bosnia-Herzegovina ("Bosnia"), Chechnya and elsewhere, and continued at least until the day of defendant Arnaout's arrest. The agreement clearly violated American law in 1992

---

[2]     Documents containing quoted and paraphrased statements in this proffer have been filed in a four-volume appendix to this proffer. With the exception of a newspaper article on the "Black Swans" commando group, the government incorporates the appendix in its entirety herein and asserts that the complete documents are statements in furtherance of a conspiracy under Rule 801(d)(2)(E). Indeed, the government has endeavored to be inclusive in this proffer and the appendix in order to advise the Court and counsel of the theory of admissibility and to comply with the Court's direction in its decision denying a bill of particulars. Nevertheless, considering the length of this conspiracy and its international scope, it is impossible to include in this proffer every statement made in furtherance of the conspiracy that the government may seek to introduce at trial, particularly considering that the government does not know what defense or defenses defendant Arnaout might raise. Moreover, despite its length, this proffer does not include all of the evidence the government will seek to introduce at trial; rather, it includes a good faith outline of the statements the government anticipates it may seek to have admitted at trial as coconspirators' statements, along with additional evidence to place those statements into context. This proffer does not even attempt to summarize all statements made by defendant Arnaout to others which will be offered in evidence without resort to the co-conspirator exception to the hearsay rule.

when the BIF Enterprise most explicitly decided to take action within the United States, by incorporating here. Importantly, however, the conspiratorial agreement had been formed and acted upon several years earlier, as BIF acknowledged in documents discussed below. In that context, actions taken in Afghanistan, the Sudan, Bosnia and Chechnya should not be viewed as disparate conduct but should instead be viewed as the conduct of an evolving enterprise in which defendant Arnaout played a leadership role.[3]

### 1.   Defendant Arnaout, LBI and *Mekhtab al Khidemat*

Beginning in approximately 1987, defendant Arnaout used the cover of work with BIF's predecessor charity entity, *Lajnatt Al-Birr Al-Islamiah* (the "Islamic Benevolence Committee"), to provide material support to *mujahideen* in Afghanistan associated with, among others, Usama Bin Laden and the *al Qaeda* organization as well as Gulbuddin Hekmatyar and the *Hezb e Islami* organization. Defendant Arnaout provided support in a variety of ways, including purchasing large quantities of weapons, operating radio communications at a *mujahideen* camp and delivering a variety of supplies to the *mujahideen* ranging from food and blankets to weapons, during the time he purported to be a relief worker.

By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ("MK") (the "Office of Services") to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI, the BIF forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al

---

[3]     Thus, although the Indictment charges that the unlawful conspiracy began in 1992, when BIF first incorporated in the United States, the agreement or joint venture for purposes of Rule 801(d)(2)(E) began in 1987. *See Kelley*, 864 F.2d at 573; *Coe*, 718 F.2d at 835 and the discussion above.

Madani")[4] of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name *"Hay'at al-Igatha al-Islamiya al-'Alamiyaa"*), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ("MWL").[5] In many respects, Wael Julaidan was a leading supporter of the *jihad* through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for "Jihad Support," even dating to the time prior to the forming of *al Qaeda*. MK also published *"al Jihad"* magazine which was a tool to recruit *mujahideen* to fight in Afghanistan. Bin Laden, a *mujahideen* leader, received financial support from a group of wealthy donors from the Gulf area known as the "Golden Chain," linked to Adel Batterjee, the Saudi founder of both LBI and BIF. Other military leaders in Pakistan in the late 1980's included Gulbuddin Hekmatyar, a highly-educated member of a Pashtun tribe. *Hezb e Islami* (the "Islamic party") was one of the *mujahideen* groups fighting against the Russians and for a time was headed by Yunis Khalis. Hekmatyar served under Yunis Khalis and then later headed *Hezb e Islami*. Hekmatyar was aligned with Usama Bin Laden in Afghanistan after *al Qaeda* was formed in 1988, and indeed many of *al Qaeda*'s camps were located in territory controlled by Hekmatyar. As discussed below, *Hezb e Islami* later became

---

[4]      In this proffer and at trial there will be numerous references to "Abu" names that warrant a brief explanation. "Abu" in Arabic means "father of." Thus the name "Abu Hassan" means "father of Hassan." In much of the Middle East, a man who has a son will be referred to as "Abu (son's name)" as a sign of respect. However, this practice was adopted in Afghanistan by the *mujahideen* as a device to make it more difficult for hostile intelligence services to track the *mujahideen*. Thus, the use of real names was generally avoided. Many of the "Abu" names included an additional reference to the country (or city) from which the person hailed. Thus, "Abu Hassan al Madani" is an indication that the person hailed from Medina in Saudi Arabia. Defendant Enaam Arnaout was known as "Abu Mahmoud al Suri" and "Abu Mahmoud al Hamawi" because he hailed from the town of Hama in Syria.

[5]      Defendant Arnaout himself worked with the Muslim World League prior to working for LBI.

involved in activities in Baku, Azerbaijan, in support of the Chechen *mujahideen* in or about 1995, and *Hezb e Islami* was then similarly aligned with *al Qaeda* in Chechnya.

Bin Laden and Azzam went their separate ways in approximately 1988 because Bin Laden wanted to conduct *jihad* outside of Afghanistan and Azzam was not prepared to do so. After the split, Bin Laden remained aligned with Hekmatyar who held views similar to Bin Laden, while Azzam continued with MK until he was killed in 1989. Hekmatyar provided Bin Laden with training camps in geographic areas that Hekmatyar controlled.

During this time frame, defendant Arnaout administered military camps and purchased supplies for the camps, including food and a variety of weapons. Defendant Arnaout worked directly with Usama Bin Laden,[6] Wael Julaidan, Abu Rida al Suri (Mohamed Loay Bayazid), Abu Hajer al Iraqi (Mamdouh Salim), Hekmatyar and other *mujahideen* military leaders during this time. As discussed below, BIF documents later purport that both Abu Rida and Abu Hajer – who both became key figures in the *al Qaeda* network – served as officials of BIF.

During the time while defendant Arnaout was providing this military logistical support, he was ostensibly working for LBI or at times MWL. At LBI, Arnaout's work was segregated from that of the other LBI workers who reported their budgets and activities through a chain of command (which reported in part to the United Nations) while defendant Arnaout worked in areas controlled by Bin Laden's and Hekmatyar's forces and reported outside the other chain of command and instead directly to Batterjee.

### 2. Defendant Arnaout and *al Qaeda* in Afghanistan

As remarkable materials archived by BIF prove, Bin Laden formed *al Qaeda* in 1988 with others, including Salim (Abu Hajer) and Bayazid (Abu Rida). *Al Qaeda* maintained personnel

---

[6]      Defendant Arnaout was very close to Abu Qutaiba al Suri, a Syrian who was extremely close to Bin Laden and served as his bodyguard. Defendant Arnaout often drove Bin Laden or otherwise accompanied him in Afghanistan.

19

files and members pledged a *bayat* (oath of allegiance) and signed a contract.[7]   Defendant Arnaout himself is not known to have made *bayat*, though evidence demonstrates he was very important to the *al Qaeda* network.

For example, in or about 1990, at the direction of *al Qaeda*'s military commanders (Abu Hafs and Abu Ubaidah), defendant Arnaout participated with *al Qaeda* member Yaseen al Iraqi in the purchase of weapons for *al Qaeda* from a Pashtun tribesman named Hajji Ayoub, which weapons included AK47 assault rifles and mortar rounds. Several ten-ton trucks containing these weapons were delivered to *al Qaeda* camps, including the *Jihad Wal* and *Jawr* camps in Afghanistan after being stored in other locations, including a facility controlled by Hekmatyar. This again occurred while defendant Arnaout was ostensibly working for LBI.

### 3. Defendant Arnaout, *al Qaeda*, the Sudan and BIF

Some time after the Soviets withdrew from Afghanistan in 1989, Bin Laden decided to relocate *al Qaeda* to the Sudan, and Abu Hajer laid the groundwork with the Sudanese regime. Abu Hajer – who held very high stature as an *al Qaeda* religious scholar – and Bin Laden persuaded the *al Qaeda* membership in Afghanistan to relocate to the Sudan in 1991. Once in the Sudan, *al Qaeda* worked closely with the National Islamic Front ("NIF") (in effect the ruling party in the Sudan), as well as the Sudanese intelligence service and the *Difaar al Shabi* (meaning the "Popular Defense" and referring to the Sudanese militia known as the Popular Defense Force, hereafter "PDF"). *Al Qaeda* agreed to train the PDF in guerilla warfare tactics for

---

[7]   Members did not always know who else signed a contract or swore a *bayat*. Moreover, many key members of the *al Qaeda* network, including Abu Hajer, may not have become formal members of the group by making *bayat* even though they played a controlling role in the work of *al Qaeda*.

[8]   Prior to 1991, a *jihad* had been declared against John Garang and others (primarily Christians and animists) in the South Sudan in what Sudan termed a civil war. Statements were later issued by a *Hezb e Islami* official (Yunis Khalis) and another *mujahideen* leader from Afghanistan (Haqqani) supporting that *jihad*.

the "civil" war in Southern Sudan against Christians and animists.[8]   In addition, *al Qaeda*, working principally through Abu Rida and Abu Hajer, obtained weapons for the PDF and the Sudanese with *al Qaeda* funds – in one instance, obtaining thousands of Kalashnikov weapons for use by the PDF.   Abu Hajer also advised an *al Qaeda* member then in the Sudan that *al Qaeda* was seeking to develop chemical weapons in an area near Khartoum.[9]   In part, the weapons were to be used by the PDF in the civil war.   Abu Rida and Abu Hajer later also sought in 1993 or 1994 to obtain uranium for *al Qaeda* to attempt to build a nuclear weapon.

In return, the Sudanese intelligence service facilitated the free movement of *al Qaeda* members and weapons in the Sudan.   *Al Qaeda* conducted military training (including explosives training) in the Sudan and was given certain camps by the NIF.   During this time period beginning after the move to the Sudan in 1991, Bin Laden (working with Salim) issued *fatwahs*[10] indicating that the United States was the "head of the snake" and the enemy and should be attacked in Somalia and elsewhere.

In or about 1991, at the time when the leadership of the *al Qaeda* organization relocated to the Sudan, the LBI/BIF organization (each referred to in Arabic as "al Birr," or "Benevolence") followed suit and opened its first office in the Sudan specifically to support *al Qaeda* and the *mujahideen* in the Sudan, particularly the PDF, as discussed in further detail below.   BIF's collaboration with *al Qaeda* in the Sudan mirrored how LBI had worked in Afghanistan.   BIF

---

[8]      Prior to 1991, a *jihad* had been declared against John Garang and others (primarily Christians and animists) in the South Sudan in what Sudan termed a civil war. Statements were later issued by a *Hezb e Islami* official (Yunis Khalis) and another *mujahideen* leader from Afghanistan (Haqqani) supporting that *jihad*.

[9]      The effort was a joint effort involving Sudanese officials and an Iranian affiliated organization, with some support from Iraq.

[10]      A *fatwah* is in essence an Islamic legal ruling.   Islamic law ("*sharia*") gives guidance as to what is "*halal*" (proper) and "*haram*"(forbidden).   When there is a question as to whether Islamic law permits or forbids certain activity, an Islamic scholar is approached for *fatwah*.

located its office in Khartoum near the office of the PDF and persons managing the PDF frequently visited BIF, which provided all manner of logistical support to the PDF. BIF then continued to function in the Sudan to support *al Qaeda* and *mujahideen* efforts as detailed below.

### 4.   Defendant Arnaout and BIF in Illinois

In 1992, BIF incorporated in Illinois, with Adel Batterjee and two others in Saudi Arabia serving as directors. Defendant Arnaout was named a board member and executive director. At least as of fall 1994, Bayazid – the man known as Abu Rida, who was present for the founding of *al Qaeda*, who participated in obtaining various weapons (including weapons for *al Qaeda* and the PDF in the Sudan) and communications equipment and also sought to develop chemical weapons and obtain uranium for a nuclear weapon for *al Qaeda* – became the President of BIF in Illinois, working with defendant Arnaout.[11]

### 5.   *Al Qaeda, BIF and Bosnia-Herzegovina*

In the period of the fall of 1992, *al Qaeda* dispatched a representative then based in the Sudan to Zagreb, Croatia, to gather information for Bin Laden about Bosnia and the prospects of acquiring businesses in Croatia for use by *al Qaeda*. The *al Qaeda* member traveled to Zagreb, Croatia, where he met with various people, including defendant Arnaout, as well as two *al Qaeda* members, Abdel Rahman al Dosari a.k.a. "Hown" (an expert in mortars) and Abu Zubair al Madani (a cousin of Bin Laden).[12] Abdel Rahman al Dosari advised that *al Qaeda* was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses to support *al Qaeda* economically. He further advised that BIF (referred to as "*al*

---

[11]   Indeed, when stopped by law enforcement officials in December 1994 in California, Bayazid possessed an Illinois driver's license with BIF's business address (except for the suite number) listed as his address. He was in the company of Bin Laden's brother and brother-in-law.

[12]   Later, the *al Qaeda* member Abu Zubair al Madani was killed in battle in Bosnia and was featured prominently in a fundraising video produced under the logo of LBI.

*Birr*") was providing money for weapons for *al Qaeda* and that they had in fact obtained weapons from Cologne, Germany, for Bosnia with the assistance of BIF and Abu Rida.[13]  Abdel Rahman al Dosari also stated that *al Qaeda*'s goal in Bosnia was to establish a base for operations in Europe against *al Qaeda*'s true enemy, the United States.

In the same time frame of approximately 1992, Abu Hajer (Salim) had advised the same *al Qaeda* member that *al Qaeda*'s goal was to make Bosnia a base for European operations. This overlapped with the time that Salim (and Bin Laden) were approving *fatwahs* and giving lectures to the *al Qaeda* membership in the Sudan indicating that America was *al Qaeda*'s main enemy and that even the killing of American civilians was Islamically proper under appropriate circumstances.

Beginning at this time, as discussed in more detail below, BIF provided food, clothing, money and communications equipment to various fighters in Bosnia, including the Bosnian army and the "Black Swans," an irregular warfare unit of Bosnian Muslims.  In May 1998, Salim traveled to Bosnia using a document bearing Arnaout's signature indicating that Salim was a director of BIF.

### 6.    BIF, Batterjee and Bin Laden

In or about 1993, Bin Laden advised an *al Qaeda* member that *al Qaeda* was using several charities to fund its operations overseas, including *al Birr*.[14]  The *al Qaeda* member

---

[13]        To be clear, BIF was not the only organization providing weapons to the *mujahideen*.  On that same trip, the *al Qaeda* member had meetings with the Third World Relief Agency ("TWRA"), headed by Fatih Abu Hassanein, an influential member of the Sudanese NIF.

[14]        The other charities Bin Laden specifically discussed included the Muslim World League (discussed above) and the Qatar Charitable Society, headed by Dr. Abdallah Mohamed Yousef.  In 1995, after a failed attempt by *al Qaeda* operatives to assassinate President Hosni Mubarak of Egypt while on travel to Addis Ababa in Ethiopia, Bin Laden complained to the *al Qaeda* member that Qatar Charitable Society funds had been used in that operation and that he was concerned that *al Qaeda*'s abilities to use charities to fund operations might be compromised as a result.

understood from conversations with Bin Laden and others in *al Qaeda* that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for *al Qaeda* operations. The money for *al Qaeda* operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy.

Also in about 1993, a BIF employee in the Sudan traveled to Saudi Arabia to meet with Adel Batterjee but was detained and questioned by Saudi authorities. After he was released, the BIF employee returned to the Sudan where he met with Usama Bin Laden who questioned him about what had happened. Madani al Tayyib, then *al Qaeda*'s chief financial officer, reported to another *al Qaeda* member that the Saudi authorities must have questioned the employee because they had found documents linking "*al Birr*" to Bin Laden. Tayyib later indicated that the problem had been fixed, although BIF's operations in Saudi Arabia were apparently curtailed at that time.

### 7.    BIF, *al Qaeda* and Chechnya

In 1995, Madani al Tayyib (then in the Sudan serving as *al Qaeda*'s chief financial officer) asked an *al Qaeda* member to travel to Chechnya through Baku, Azerbaijan, to join with *al Qaeda* in the fighting in Chechnya. The *al Qaeda* member – whose trip was later cancelled for personal reasons – was told that he would be joining up with Ibn al Khattab, a *mujahideen* leader who had worked in Afghanistan with Bin Laden. At about this time, the website of the Chechen *mujahideen* indicated that Ibn al Khattab led the Arab contingent of fighters in Chechnya. BIF (and the Global Relief Foundation) had been identified on the Internet website as conduits for financial support to those fighters.

Meanwhile, BIF opened an office in Chechnya mirroring *al Qaeda*'s expansion into this area. BIF worked closely with Sheik Fathi, an influential *mujahideen* supporter from Afghanistan who was of Jordanian/Chechen extraction. During this time, BIF provided material support to the Chechen *mujahideen* in the form of anti-mine boots, while raising money on the

false pretense that the funds were for winter shoes for civilians. BIF also provided an X-ray machine, cash, anti-mine boots and military uniforms to the Chechen *mujahideen*.

Indeed in 1998, *al Qaeda* military commander Saif ul Islam served as the BIF officer in Grozny, Chechnya. Saif ul Islam (also known as "Abu Islam" and "Abu Islam al Masry") is an Egyptian lawyer who became an *al Qaeda* member and a top military instructor as well as a member of *al Qaeda*'s military committee who was very active in violent activity.[15] Meanwhile, the BIF office in neighboring Baku, Azerbaijan, was staffed by Gul Mohamed, the *Hezb e Islami* representative in Baku.

During the period prior to October 1999, defendant Arnaout toured Chechnya and Dagestan and reported back to a BIF fundraiser as to the role that Ibn al Khattab, Sheik Fathi, Saif ul Islam (whom he described as "knowledgeable") and others played in Chechnya.

## B.    Beginning of the Rule 801(d)(2)(E) Conspiracy

In effect, LBI and BIF were closely intertwined. The conspirators were less concerned about the formality of the corporate structure and more concerned with creating an image of BIF as international and less associated with Islam to increase its donor base and appeal to other international organizations.

Indeed, so intertwined were LBI and BIF that BIF often claimed to have been established in 1987 despite not being incorporated until 1992. An internal list of questions and answers prepared by an employee of BIF in Illinois for BIF workers states:

**Started?**
*      12 years ago. Have been in Chicago since May 1993.
*      Dec. 1992 had Florida address.

---

[15]      Saif ul Islam participated in training persons in Somalia in the early 1990's for an eventual attack on the American forces there and later underwent explosives training in Lebanon by Hezballah after Abu Hajer helped forge a relationship between *al Qaeda* and Iranian intelligence. Saif ul Islam's passport photograph was recovered in a 1997 search of the Kenyan cell of *al Qaeda*.

**Established?**
\*       In Pakistan, ran from Saudia (sic) 1987

Ex 1 at 1.  The date on the memorandum is incomplete ("December 28, 199").  *Id.*  However, based on the names of the BIF employees listed and the statement that BIF was "established" in 1987 and "started" "12 years ago," the memorandum was likely written in 1999.  (If the omitted digit in the date is not a 9, then the memorandum explains that BIF was established even before 1987.)    Notably,  this memorandum warns employees at the beginning to "NEVER VOLUNTEER ANY INFORMATION" to callers and later instructs *"Do not volunteer any Information."  Id.* (emphasis in original).  On one if its websites, www.benevolence.org, BIF maintained that it was established in 1987, but it eventually changed that to 1992.[16]

### C.     *Lajnatt Al-Birr Al-Islamiah*

*Lajnatt Al-Birr Al-Islamiah*, which evolved into BIF, was indeed established in approximately 1987 in Pakistan and ran from Saudi Arabia, consistent with BIF's December 28, 1999 memorandum above.  LBI's founder was Adel Batterjee (who later founded BIF), a wealthy individual in Jeddah, Saudi Arabia, who started LBI in Peshawar, Pakistan, during the conflict between the Soviet Union and Afghanistan.[17]

Like BIF, LBI provided support to the *mujahideen* as well as humanitarian services to refugees affected by the conflict.  As discussed below, in no later than 1993, Adel Batterjee, LBI's and BIF's founder, selected defendant Arnaout to run BIF.   Defendant Arnaout's

---

[16]       BIF also maintained a website written mostly in Arabic, www.bifint.org, registered to Adel Batterjee.  Ex. 2.  The website included among other items information for making donations to BIF's accounts in the Sudan, Yemen, Switzerland, England, and the Netherlands; and information on where BIF was operating in the Sudan, along with maps of Sudan.  *Id.*

[17]       Peshawar, near the Pakistan-Afghanistan border, served as a key city for refugees fleeing Afghanistan and *mujahideen* traveling to the region to fight in Afghanistan against the Soviets.

experience at LBI played a significant role in his operation of BIF. *See* Ex. 3 (memorandum by BIF Board Member Suleman Ahmer to defendant Arnaout on October 19, 1997 explaining that "in the last meeting I had learnt a lot when you had given to me the example of Lajnat-ul-Birr"). Defendant Arnaout and others then made an effort to conceal Batterjee's involvement in BIF. *See* Ex. 4 (letter from defendant Arnaout to a BIF employee on November 6, 1997, instructing: "For the person in Saudi Arabia give him the three names of the Founders. You will find it in the old bylaws (The names along with Adil B.). Tell him that all we know about them is that they are Saudi Business men and that they left the organization in May 93. Donot (sic) disclose any other information").

### D.    BIF's Archive

In March 2002, searches by Bosnian authorities of BIF's offices in Sarajevo, Bosnia-Herzegovina (operating under the name *Bosanska Idealna Futura*) yielded a substantial amount of evidence shedding light on defendant Arnaout's past and his relationship to *al Qaeda* and *Hezb e Islami*. A treasure trove of electronically scanned documents and photographs, including many with defendant Arnaout, were recovered on a CD-ROM and a hard drive.

### 1.    "Tareekh Osama" File

BIF had in its Sarajevo office a computer file labeled "Tareekh Osama," or "Osama's History." The file contains scanned images of documents which chronicles Usama Bin Laden's activities in Afghanistan which led to the formation of *al Qaeda* and even includes later reports of the danger Bin Laden poses to the U.S.

BIF possessed in the file a handwritten draft list of the people referred to within *al Qaeda* as the "Golden Chain," wealthy donors to *mujahideen* efforts. Ex. 5. At the top of the list is a Koranic verse stating: "And spend for God's cause." *Id.* The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. *Id.* "Usama" appears after seven of the listings, including the listing "Bin Laden Brothers." *Id.* "Baterji", LBI's and BIF's founder, appears after six of the listings. *Id.* Only

27

three other persons are listed in the parentheses. *Id.*

Included in the same file as the "Golden Chain" notes is an article from the *Arab News* on May 4, 1988, titled "Arab Youths Fight Shoulder to Shoulder With Mujahedeen." Ex. 6; *see also* Ex.7. A photograph within the article shows Bin Laden walking with defendant Arnaout, referred to in the caption as "Abu Mahmoud from Syria," *Id.* at 2. Another photograph within the article shows "Ayman Khayyat from Jeddah holding a rifle." *Id.* Khayyat was a high-ranking officer in LBI who later worked for BIF. The article discusses a battle in the *Masada* area of the Jaji region, and noted that defendant Arnaout, referred to as "Abu Mahmoud, a youth from the Syrian city of Hamat," was there. The article quotes defendant Arnaout who said that Russians destroyed the trees the *mujahideen* hoped to use as fortifications. *Id.*

BIF's Tareekh Osama file contains a letter written to "Generous brother Abu Al-Rida" from "Your brother Abu Al-Qaaqaa", an alias of Usama Bin Laden. Ex. 8. "Abu Al-Rida" is Mohamed Loay Bayazid, who, as discussed above, was president of BIF in 1994. The letter states that although it is from Bin Laden, it is signed by defendant Arnaout, using the name Abu Mahmoud. *Id.* Defendant Arnaout wrote, "He [Bin Laden] is far away from me and he authorized me through a communication to sign on his behalf, my apology." *Id.* The letter sends greetings to Bayazid from "Al-Maasada", the camp where defendant Arnaout fought with Bin Laden described in the *Arab News* article above. *Id.* The letter instructs Bayazid to give the bearer of the letter, Omar Luftee, an airline ticket to Saudi Arabia. *Id.*

Another letter from Bin Laden to Abu Rida explains that the time has come for an attack on the Russians. Ex. 9. Bin Laden concludes the letter by asking Abu Rida to "communicate my greeting to Abu Al-Hasan Al-Madani and I hope that he will visit us if he has returned from Hijaz, and I also hope that you bring 500,000 rupees at a minimum." *Id.* As discussed above, Abu Hassan al Madani (Wael Julaidan) is a leader of a relief organization that also provided logistical support to Bin Laden.[18] A letter on MWL/IIRO letterhead recounting a meeting discussed attacks being launched from "League" offices and that passports should not be kept

with the Saudi Red Crescent because Julaidan was returning to Saudi Arabia. Ex. 9a.

BIF's Tareekh Osama file also contains a March 4, 1987 letter from Bin Laden, using his alias Abu Al-Qaaqaa, to "Brother Abu Al-Rida" (Bayazid), requesting that he give 500,000 rupees to the man bearing the letter. Ex. 11. A March 17, 1987 letter to Bayazid requests that he assist two individuals in their travel to Yemen, including providing them with airline tickets and arranging their lodging.   Ex. 12.   The author of the letter, Abu Muath Al-Masri, informed Bayazid that "this is based on what brother Abu Abdallah informed us at the Al-Maasada." *Id.* The letter also requests that Bayazid send 400,000 rupees "to the owner of the weapon for delivery in Parachinar, according to Abu Al-Hasan's wishes, for security reasons." *Id.*

Another letter from Bin Laden to Abu Rida that BIF possessed asks Abu Rida to give Abu Ubaidah 5000 Saudi Riyals, "or their equivalent, from my account." Ex. 13. Abu Ubaidah signed the bottom of the letter stating that he received 5000 Riyals from Abu Rida. *Id.* Abu Ubaidah was then the military commander of *al Qaeda.*

A letter from defendant Arnaout to Abu Hafs (Mohammed Atef, a close associate of Usama Bin Laden who became *al Qaeda's* military commander) is also in BIF's file. Ex. 14. The letter states that its bearer is from *Hezb e Islami* and "loaned us" a howitzer, and it should be returned so it can be taken to Kabul.  *Id.*  The letter also bears Bin Laden's signature at the bottom. *Id.*

---

[18]     A dispute broke out between two relief organizations in late 1988 (after *al Qaeda* had been founded), including the Saudi Red Crescent Society of which Julaidan was president. Ex. 10. (The memoranda from the time indicate that the "Saudi Benevolence Committee (Adel Baterji)" was the main financier of the humanitarian project in dispute and took sides with Julaidan.) The dispute was submitted to secret arbitration before Dr. Fadhl (a leading Islamic Scholar for the *al Jihad* organization headed by Ayman al Zawahiri) and Abu Hajer al Iraqi, both of whom served on the *fatwah* committee of *al Qaeda. Id.* Among other things, Julaidan had accused the opposing party (Ahmed Said Khadr, a/k/a "Abdel Rahman al Kanadi") of having suspicious contacts with non-Islamic agencies. *Id.*

A letter from Bin Laden to defendant Arnaout instructs Arnaout to consult with Abu Hafs (Atef) about locating a particular group of soldiers "as camp guards." Ex. 15. Another letter from an "Abu Abdallah" to defendant Arnaout informs Arnaout that the author had been trying unsuccessfully to contact him on a certain radio ("at the number 650, on the black device, to no avail"). Ex. 16. The author wrote that he hopes that "Abu Al-Qaaqaa," or Bin Laden, has reached defendant Arnaout safely. *Id.* The letter then informs defendant Arnaout that a group of people are going to meet with defendant Arnaout at the *Al Masada* camp. *Id.*

A separate letter, from Bin Laden to Abu Rida, states that Abu Ubaidah and Abu Hafs should each be paid 4500 Riyals monthly and treated like *Mekhtab al Khidemat* – thus establishing that military commanders were salaried by the support organizations. Ex. 17.

The foregoing documents, possessed by BIF electronically, corroborate that defendant Arnaout provided logistical support to fighters during the period in Afghanistan when he worked for LBI, part of the BIF Enterprise.

BIF also had in its Tareekh Osama file a scanned list of goals, which appears to have been authored near the end of the conflict between the Soviet Union and Afghanistan. The list includes "Holding a mass media event to collect in-kind and financial donations" and "Clarifying the Mujahideen's situation to the world and keeping the spirit of Jihad alive." Ex. 18. The list also includes: "Forming a committee to receive donations and maintain an account and the spending"; "Urging the Islamic agencies to bring in all of what they have"; and "Sending some brethren to secure provisions for the Mujahideen." *Id.* The list names some organizations which may be involved in this, including the "Rabita" or MWL (for whom defendant Arnaout also worked), but it does not specifically name BIF (not yet formally incorporated) or LBI (the predecessor).

In addition to discussing fundraising, the list contains numerous entries calling for the establishment of a leadership council and determining the best places to work. *Id.* It calls for:

A printed declaration which will explain the following:

30

a.     The East's and West's agreement to prevent the establishment of an Islamic nation and thorn.

b.     The only solution is the continuation of the armed Jihad.

c.     Taking interest in the training and seizing the opportunity.

d.     Supporting the Mujahideen believers and [illeg.].

e.     Specifying the locations where we want the brethren to be.  Will be signed by Yunis Khallis, Ansar Al -Jihad ["supporter of *jihad*"]

f.     Urging the brethren to be patient, pious, obedient, and to practice abstinence (Abu Hajir).

*Id.* (parentheses in original).  Near the end of the list the following entry appears ominously: "Keeping alive the Jihadist spirit among Muslims in general, and the Arabs in particular, by opening bases for their Jihad along with maintaining contact lines with them.  The Sudan is recommended."  *Id.*  In 1991, *Al Qaeda* moved its base of operations to Sudan.  BIF quickly followed, as discussed above and below.

BIF kept in this same file a letter on the *jihad* in Eritrea (near Ethiopia) written to Usama Bin Laden.  Ex. 19.  After discussing the history of the conflict and the authors' objectives, the letter states:

Therefore, we come to you with the following requests which we believe to be important at the present time:

1.  Facilitating the travel of the youth to the field of Jihad so that they can benefit from the training possibilities, by providing them with tickets and entry visas.

2.  Dedicating two individuals on a temporary basis to follow up on transporting the youth and to facilitate their travel and movement, as there are more than one million immigrants in Sudan, Djibouti, Northern Yemen, and Saudi Arabia.

3.  Opening a Maktab al-Khadamat in Northern Yemen, and Sudan, and opening a guest house in the city of Peshawar, to accommodate the youth upon their arrival.

* * * * *

31

> In conclusion, we ask God the Almighty to grant you success in your service of Islam and the Muslims, to multiply your reward, to increase the scale of your good deeds, and to make you and us victorious in defeating the unjust.

*Id.* Indeed, in addition to opening an office in Sudan, BIF opened an office in Yemen.

BIF also maintained scanned copies of handwritten documents chronicling the origins of *al Qaeda* which were not known to the public. The series contains minutes of an August 11, 1988 meeting between "Abu Al Ridha", or Mohamed Loay Bayazid, and "the Sheikh", or Usama Bin Laden, "regarding the establishment of a new military group" consisting of a "general camp," a "special camp," and "*Qaida*," or base. Ex. 20. The minutes show that Bayazid asked Bin Laden if Bin Laden agreed that the "military gang" of "Sheikh Abdullah" (Sheikh Abdullah Azzam, the co-founder of *Mekhtab al Khidemat* with Bin Laden) has ended and that "disagreement is present." *Id.* Bayazid explained to Bin Laden: "I suggest that the Army's forces are present in Afghanistan (here), and I see that we should think in the origin of the idea we came for from the beginning. All this to start a new fruit from below zero." *Id.* Bayazid noted that a year has passed in the history of *Al Masada. Id.*

> According to the report, Bin Laden responded:
> I, starting all these matters, in the darkest of circumstances, and the period is very short, we took very huge gains from the country's people in Saudi – we were able to give a political power to the Mujahideen – gathering donations in very large amounts – restoring power. The period is basically a correct situation to do the work.

*Id.*

> The report concludes:
> <u>Abu Al Ridha:</u>    a. Establishing a staged plan.
>                     b. Establishing a time-frame for this stage.
>
> Question: does it need specialized people.
> Answer: is there a specialized person amongst us.
>
> – Initial estimate, within 6 months of *Al Qaida*, 314 brothers will be trained and ready.

*Id.*

A week later, according to minutes maintained by BIF, a meeting was held "at the Sheikh's house," leading to the official formation of *al Qaeda*. Ex. 21. The minutes begin:

> The brothers mentioned in the second page attended the Sheikh's house, to discuss the case of the Advisory Council, and the new distribution in Peshawar, mentioned in the attached document. Most of the discussion was about choosing an Advisory Council, which is accepted by all who are present in the arena.

*Id.* The minutes explain that the meeting was held over three days, and it names the persons on the Advisory Council, beginning with "Sheikh Usama" and including "Abu Hasan al Madani" (Wael Julaidan), Abu Ubaidah Al Banshiri (who became *al Qaeda*'s military commander and is now deceased), "Abu Hajir" (Mamdouh Salim), who traveled in Bosnia in 1998 with defendant Arnaout's assistance, as discussed below, and others. *Id.*

The minutes continue: "The meeting resulted in explanation of 40 points of them and the Sheikh summarized it in 2 points: – the complaints. – Mismanagement and bad treatment in Maktab al Khadamat." *Id.* This report confirms that *al Qaeda* was formed following a split between Abdallah Azzam and Bin Laden within *Mekhtab al Khidemat*. The group decided that "the military work" was "to be divided in two parts, according to duration:"

> – Limited duration (known), they will go to Sada camp, then get trained and distributed on Afghan fronts, under supervision of the military council.
>
> – Open duration (long), they enter a testing camp and the best brothers of them are chosen, in preparation to enter *Al Qaida Al Askariya* ["the military base"].
>
> The mentioned *Al Qaida* is basically an organized Islamic faction, its goal will be to lift the word of God, to make His religion victorious.

*Id.*

> The minutes then set forth the "Requirements to enter *Al Qaida*:"
> – Members of the open duration.
> – Listening and obedient.
> – Good manners.
> – Referred from a trusted side.

33

– Obeying statutes and instructions of *Al Qaida*. These are from the rules of the work.

*Id.*

The requirements also include that the prospective member "reads the pledge"of loyalty, or *bayat*. The text of *al Qaeda*'s original *bayat* appears in the minutes:

The pledge of God and His covenant is upon me, to listen and obey the superiors, who are doing this work, in energy, early-rising, difficulty, and easiness, and for His superiority upon us, so that the word of God will be the highest, and His religion victorious.

*Id.*

The report notes that the meeting ended on August 20. *Id.* It continues: "Work of *Al Qaida* commenced on 9/10/1988, with a group of 15 brothers, including nine administrative brothers[.]" *Id.* The report ends: "On 9/20, Commandant Abu Ubaida arrived and informed me of the existence of thirty brothers in *Al-Qaida*, who meet the requirements, and thanks be to God." *Id.*

A separate document discusses the formation of an advisory council and a committee to handle financial matters, involving Bin Laden, Wael Julaidan (who is the charity leader Abu Hasan al Madani discussed above), Abu Hajer, Abu Ubaidah and others. Ex. 22.

Another report discusses a meeting between Abu Hajer, Abu Ubaidah, and twelve others also in August 1988 where *Al Jihad* magazine was discussed along with the role of *Mekhtab al Khidemat*. Ex. 23. The document mentions defendant Arnaout by the name "Abu Mahmoud al Suri." *Id.*

The file also includes a handwritten organizational chart, with Bin Laden ("Abu Abdullah") at the top, followed by a level of officers responsible for various projects including

---

[19]    This document has been provided to the defense pursuant to a protective agreement restricting its disclosure and is not included in this filing because of its sensitive nature.

*jihad* funding, military matters (Abu Ubaidah) and management.[19]  Also included on this chart are Abu Hajer (Mamdouh Mahmud Salim), Abdullah Azzam and others, though defendant Arnaout is not named.[20]  The chart appears to list the principal person responsible for each aspect.

BIF also maintained in the Tareekh Osama file documents concerning Bin Laden's more recent activities, including a transcript of a June 1998 episode of "Nightline" regarding Bin Laden and including an interview with Bin Laden threatening the U.S. (Ex. 24), and a July 1998 *Reader's Digest* Article titled "This Man Wants You Dead" (Ex. 25).  In the same file is a copy from Westlaw of the U.S. Department of State's Public Notice of the Designation of Foreign Terrorist Organizations on October 8, 1997.  Ex. 26.

### 2. "Tareekh Al Musadat" File

BIF also maintained scanned documents in a voluminous "*Tareekh al Musadat*" file which chronicle the history of the *Al Masada* camp.  The file includes personnel files of people instrumental in *al Qaeda*, including Wadih El-Hage, (convicted in May 2001 in U.S. District Court for the Southern District of New York of conspiracy to kill U.S. nationals, among other offenses).  Ex. 27.  El-Hage's file notes that he was "trained on most types of weapons" including explosives and booby traps.  *Id.*  Another letter requests explosives (crossed out) or a handguns course for defendant Arnaout.  Ex. 28.

Included in this file is a letter to Abu Rida on the letterhead of the Saudi Red Crescent agency requesting that weapons be inventoried.  Ex. 29.  At the bottom of the letter is a note from Usama Bin Laden to "Abu Al Hasan" (Wael Juleidan) stating that Bin Laden's group has an

---

[19]    This document has been provided to the defense pursuant to a protective agreement restricting its disclosure and is not included in this filing because of its sensitive nature.

[20]    Because Abdullah Azzam is listed on the chart, the organization described pre-dates *al Qaeda*.

extreme need for weapons. *Id.*

The file also contains a letter to defendant Arnaout, "Abu Mahmoud," urging him not to forget "the base of the canon that sits on the legs of the Goryunov" and the diesel fuel he obtained, and requesting an "extra microphone." Ex. 30.

Also in the file is a letter to "Abu Abdullah," a name used by Bin Laden, from Abu Khalid Al Masri (a former Egyptian military officer who was a leading *mujahideen* military figure in Afghanistan) discussing *Al Masada* and various military concerns, and concluding with a request to "give our regards to all of the brothers, especially Abu Mahmoud." Ex. 31. A separate letter from Abu Muath to Abu Ubaidah (who became *al Qaeda*'s military commander) informs Abu Ubaidah that Abu Abdallah (Bin Laden) and Abu Mahmoud (defendant Arnaout) have arrived at a certain location (referred to in code as "number 1"). Ex. 32.

BIF also possessed in this file a chart of radio frequencies, with numbers assigned to particular individuals. Ex. 33. Included on this chart are Abu Abdullah (Bin Laden), Abu Ubaidah, and Abu Hafs (Mohamed Atef, who succeeded Abu Ubaidah as *al Qaeda*'s military commander). *Id.* Another letter written to Abu Mahmoud requests batteries for a walkie-talkie and a video camera with batteries. Ex. 34.

Also in the file is a letter from an individual to Abu Ubaidah informing Abu Ubaidah that the author is "at a camp at the Afghanistani Pakistani frontier in the Parshinar region affiliated with the Islamic Party [*Hezb e Islami*]. . . ." Ex. 35. The author states: "The camp is led by Abu Mahmoud the Syrian from a provisioning point of view" and includes a telephone number for Abu Mahmoud. *Id.*

36

### 3.    "Al Jabal" File

BIF also maintained files labeled "*Al Jabal*" (meaning "The Mountain") containing scanned handwritten daily reports and  scanned letters.  Defendant Arnaout is referred to throughout the files as "Abu Mahmoud."  In fact, the file contains a letter instructing that it is to be delivered "To the hand of Abu Mahmoud – Enaam."  Ex. 36.

The daily reports cover activities at *Hezb e Islami*'s *Al Jabal* special forces *mujahideen* camp in and around 1991.  A report covering July 12 to 15, 1991, notes that a special forces battalion of *mujahideen* affiliated with *Hezb e Islami* led by "Sideeq the Engineer" arrived and were evaluated by defendant Arnaout ("brother Abu Mahmoud").    Ex. 37.  As an entry for September 16, 1991 reveals, defendant Arnaout was kept updated on the camp's affairs.  Ex. 38. A report from October 29 and 30, 1991, notes that defendant Arnaout inspected the *Al Jabal* camp on October 29 and went to the Al-Fath *mujahideen* camp the following day, before leaving for Peshawar.  Ex. 39.  A later report, dated November 7 and 8, 1991, notes that Hekmatyar ordered seventy *mujahideen* to Peshawar for a special matter based on their athletic ability and conduct, and defendant Arnaout was informed of these activities.  Ex. 40.  A November 9, 1991 report notes that  Engineer Sideeq arrived at *Al Jabal* with shoes and clothing for the *mujahideen*. *Id.*  A similar report for December 2 and 3, 1991, notes that defendant Arnaout and "Abu Mohamed 'Adel'" visited the *Al Jabal* camp after the *mujahideen* performed their morning physical training, and defendant Arnaout addressed the *mujahideen* in a short speech.  Ex. 41.  A December 23 report notes that defendant Arnaout left the camp for Jaji, and it adds that on the 24th and 25th, military studies at *Al Jabal* were suspended while the *mujahideen* moved out of tents and into a new structure.  Ex. 42.  Another daily report (undated) records the arrival of Abdul Ghaffar with military outfits for the *mujahideen* and the visit of Sheikh Hekmatyar, who was greeted with a military parade and gave a speech.  Ex. 43.

Another document describes the graduation of over 100 *mujahideen* from the camp.  Ex. 44.  A proposed agenda for a graduation ceremony, written on a page of a calendar dated May 18,

1991, states that defendant Arnaout and Engineer Sideeq will consider a format for a *bayat* (or oath of allegiance) "to God and the Prophet for the continuation of the *Jihad*." Ex. 45.

An organizational chart in an *Al Jabal* file lists "Abu Mahmoud" at the top and shows two individuals beneath defendant Arnaout: Haj Abdul Ghaffar, an "administrator" in charge of guards, "kitchen," bakery and purchasing; and Sideeq the Engineer over the "Organizational (*Jihad*)" or "*Almujahideen*" program, responsible for daily activities, "securing the *mujahideen*'s needs," the relationship between "the party" and the squad, and "Weapons and uniform." Ex. 46. A similar chart shows an organization with defendant Arnaout at the top, over two groups: one called "My Organization (Jihady) and another one that deals with administration. Ex. 47. The "Jihady" section is over "The Mujahideen Program," which is involved with weapons. *Id.* A letter to defendant Arnaout from "his brother in Jihad and Islam" discussing martial arts training at the camp requests permission from defendant Arnaout to fire a Kalishnikov in the author's free time. Ex. 48.

An *Al Jabal* file also includes a hand-drawn map on *Hezb e Islami* letterhead, specifically from *Hezb e Islami*'s "Afghan Al Mujahidin Affairs – Internal Affairs" office. Ex. 49. At the top of the map is the label "Jabal." *Id.* Next to that is the label "Abu Mahmood." *Id.* The map also depicts a hospital and a warehouse which will house *mujahideen*. *Id.*

Included in the file is a list of tasks to be accomplished and the name of the person who is to perform them. Ex. 50. It indicates that "Engineer Hikmatyar" is to provide some clothing for *mujahideen*, while defendant Arnaout is to ensure that *mujahideen* should not be "sent" unless they are in uniform with the proper boots, jacket, and socks. *Id.* Similarly, the file contained a list of items and their cost, including anti-aircraft weapons (*Zikoyaks*) and other heavy weapons (*Doshkas*), and discussed the construction of a mosque for 4000 *mujahideen*. Ex. 51. Another letter in the file, written to Adel Batterjee, requests ammunition and a car for *Hezb e Islami*. Ex. 52. A letter from defendant Arnaout to Batterjee discusses a visit from guests, adding that defendant Arnaout might take them on a "hot visit" if they are ready, and requests $20,000 in

cash. Ex. 53.

A report written on or around February 15, 1989, describes "The Sheikh's visit to Nangarhar" and discusses his visit to several camps including Jaroor (which the report labels "A center of Al-Qaida"), Pari (labeled "A center which belongs to Al-Qaida"), Jihadawal (labeled "A special center which belongs to Al-Qaida"), and Manikando (labeled "A special center which belongs to Al-Qaida"). Ex. 54. The report notes that the area of Khost "is in the hands of Abu Hafs." *Id.*

The *Al Jabal* letters include "An Appeal to Support the Holy War in Sudan" written by *Hezb e Islami* official Yunnis Khalis in 1991, urging Muslims to fight in Sudan. Ex. 55. In another letter, on *Hezb e Islami* letterhead, Khalis wrote that defendant Arnaout wanted to train up to 200 *mujahideen* "for our party." Ex. 56 (incorrectly dated in 1970).

The file also contains a July 30, 1991 letter to defendant Arnaout from Haji Abdul Saboor on *Hezb e Islami* letterhead stating that he has sent a group of seven *mujahideen* to defendant Arnaout and hopes that defendant Arnaout will take care of them. Ex. 57. Another letter – written on LBI letterhead – requests the purchase of ten vehicles for *Hezb e Islami*.[21] Ex. 58.

A November 27, 1991 letter to defendant Arnaout on *Hezb e Islami* letterhead from Abdul Ghaffar informs defendant Arnaout that Engineer Sideeq had to borrow a car. Ex. 59. The author asked defendant Arnaout to emphasize with Sideeq that the vehicle should be returned quickly. *Id.* A different letter from Abdul Ghaffar (incorrectly dated 1998) informs defendant Arnaout that the "number of the *mujahideen* has reached 155," that Engineer Sideeq has returned without shoes or jackets, and if the number of *mujahideen* increases, they will need more blankets. Ex. 60. Another letter to defendant Arnaout from Abdul Ghaffar acknowledges

---

[21]     BIF had in its Illinois office a 1992 appeal from Hekmatyar, "Amir, Hezb-i-Islami," soliciting donations for the operation of a university in Afghanistan. Ex. 57a.

receipt of 50,000 Rupees and informs defendant Arnaout that "the sheikh" is in Jaji and Abu Talha is in Sadda waiting for the *mujahideen* to arrive. Ex. 61.

Another letter, from "the general representative of Hizb-Al-Islami," asks defendant Arnaout for financial help and states that they could not afford water or food for their "generous guests of *Mujahideen* and field commanders." Ex. 62. A separate letter to defendant Arnaout from "Abdul Rahman" notes that the author has received Kalishnikov rifles and requests gasoline, sugar, nails, and other supplies. Ex. 63.

In a December 23, 1991 letter, "Abu Talha" apologized to defendant Arnaout for discontinuing his work with him and asked that defendant Arnaout give his pistol to "Abu Dajana at Seda Camp." Ex. 64.

A January 18, 1992 letter to defendant Arnaout from "Engineer Abu Abdallah" asks defendant Arnaout to send him a bank draft. Ex. 65. Also included is a letter to defendant Arnaout in 1992 requesting that defendant Arnaout assist in providing clothing and food for a group of 1200 *mujahideen*. Ex. 66. Another letter, on *Mekhtab al Khidemat* letterhead, asks defendant Arnaout to arrange a permit for a Czech Scorpion pistol and to use "extraordinary effort" to secure the permit. Ex. 67.

The file includes a message written to defendant Arnaout that Adel Batterjee called and asked about defendant Arnaout and that defendant Arnaout's brother, "Dr. Hisham" also called. Ex. 68. A letter from "Abu Mohammed" to defendant Arnaout tells Arnaout that Abu Mohammed is in *Beit Al-Ansar* ("House of the Supporters") and asks defendant Arnaout to give him the briefcase containing Abu Mohammed's money. Ex. 69. Abu Mohammed also tells defendant Arnaout that he would like to visit "Sheikh Adil." *Id.*

Also in the file is a scanned Saudi Airlines ticket with handwriting on the back from LBI Officer Ayman Khayyat requesting that defendant Arnaout ("Brother Abu Mahmoud al Suri") and two other LBI employees (Abu Abdullah al Lubnani and Abdul Salaam Zakaria) assist "Brother Osama" (not contended to be Usama Bin Laden) with residency, transferring currency,

training, shooting and visiting Kashmir. Ex. 70.

During much of this time period, defendant Arnaout was ostensibly employed by LBI and MWL. Ex. 71.

### 4.    Miscellaneous Files

BIF also had documents organized electronically into a variety of smaller files. Included in these files is a letter addressed to both defendant Arnaout and Abu Ubaidah requesting dynamite, among other items. Ex. 72. In another letter, this one written by defendant Arnaout, Arnaout requests bags to carry Rocket-Propelled Grenade (R.P.G.) rockets, bombs, Kalishnikov bayonets, and small magazines. Ex. 73.

Other documents include: a letter to defendant Arnaout from Abdel Saboor requesting "provisions for the front" along with relief assistance (Ex. 74); a letter from Abd Al Sami' (or "Abdel Samia," a name used by defendant Arnaout) requesting pipes to make dynamite and RDX fuses (Ex. 75); a letter to defendant Arnaout from Abdel Rahman telling him that guests will not be allowed for three to four day visits, unless they are on the side of "Abu Al-Qaaqaa" (Bin Laden) (Ex. 76); a list of items and quantities needed, including hand grenades, detonators, and magazines (Ex. 77); a letter urging the reader to send with the individuals who were at *Al Masada* and whose brothers went with "Abu Abdullah" (Bin Laden) mortars and other weapons (Ex. 78); a letter to defendant Arnaout requesting supplies and informing him that thirty more *mujahideen* were sent to the *Al Jabal* camp (Ex. 79); a letter from Abdel Saboor on *Hezb e Islami* letterhead to defendant Arnaout and "Abdel Salam" requesting that they move the *mujahideen* quickly and informing defendant Arnaout that some weapons were inadequate (Ex. 80); a letter to defendant Arnaout from Abdel Saboor on *Hezb e Islami* letterhead discussing the defeat of enemy forces at the direction of Hekmatyar (Ex. 81); and a note from defendant Arnaout using the names Abu Mahmoud and "Abdel Sameei" (or "Samia") to "the exalted Sheikh Usama Bin Laden - Abu Abdallah" at the top of a copy of an article about the conflict in Kashmir (Ex. 82). Along with defendant Arnaout's apparent role of getting provisions, he was also in charge of

communications. Ex. 83.

Further documents include: a receipt for cash from Abu Mahmoud al Suri (defendant Arnaout) for the purchase of 250 rockets (Ex. 84); a receipt for the purchase of a pickup truck from Abu Mahmoud al Suri, also containing prices of missiles (Ex. 85) and a letter from the purchaser agreeing to deliver the truck to the "Islami Khalis Party" (Ex. 86.); another receipt for cash from Abu Mahmoud al Suri for the purchase of mortar rockets (Ex. 87); a receipt for cash from Abu Mahmoud al Suri (defendant Arnaout) for the purchase of 108 missiles (Ex. 88); a receipt for a check from Abu Mahmoud al Suri for the purchase of 52 missiles (Ex. 89); a letter from defendant Arnaout to the "Ameer [Commander] of Torkham" inquiring about the availability of projectiles and fuses (Ex. 90); a letter to Abu Mahmoud al Suri stating that the author has received 108 missiles and 68 fuses (Ex. 91); a letter discussing the establishment of "supporting services" "without associating the office with this administration publicly"(Ex. 92); a report from Abdel Saboor on *Hezb e Islami mujahideen* affairs, including a list of *mujahideen* commanders, the weapons they have, and the weapons they need (Ex. 93); a request from *Hezb e Islami* for the formation of a camp in a particular area and outlining the plans for the camp (Ex. 94); a receipt from Abdel Saboor for the receipt of 100,000 Pakistani Rupees from defendant Arnaout in February 1990 "for the Jihad" (Ex. 95); a separate receipt from Abdel Saboor for the receipt of 190,000 Pakistani Rupees from defendant Arnaout (Ex. 96); an April 1990 letter to defendant Arnaout from Abdel Saboor on LBI letterhead (Ex. 97); an LBI accounting document reflecting: the receipt of money from Abu Ridha, that certain amounts received by Abu Rida will be paid by Abu Hajer, that "Sheikh Adel" spent money on the Yemeni's camp, that Abdel Saboor and "Abdel Ghafar" received money from LBI, and that there was a payment from "Abu Al-Baraa" to "the Jihad Department" (Ex. 98). Also included is: a 1990 letter from Abdel Ghafar to defendant Arnaout telling defendant Arnaout that he has left the battalion and he will discuss the matter further after defendant Arnaout meets "with brother Abu Al-Khattab Al-Saudi" (Ex. 99); another letter to defendant Arnaout from Abdel Ghafar about his situation with "Abu

Al-Khattab al-Saudi" (Ex. 100); and four receipts from Abdel Ghafar for cash, two noting that payment is from defendant Arnaout and one stating that the cash is salary (Ex. 101). *See also* Ex. 102 (a letter to defendant Arnaout requesting a payment of 82,901 rupees to Abdel Rahman Al-Masri).

A report by Dr. Abdullah Azzam titled "Journey of Maktab Khadamat Al-Mujahideen" discusses issues related to MK including publishing *Al Jihad* magazine and providing support to the *mujahideen*. Ex. 103. It concludes by noting that the "Islamic foundations contributed in the Jihadist arena through the financial support of the fronts and of the Arab lions in the Maktab Al-Khadamat," noting that at the forefront LBI and the Saudi Red Crescent, among others. *Id.* at 2.

Finally, defendant Arnaout separately maintained at BIF's Illinois office a photograph with a note that it was of the "Red Cross Hospital, which the *Mujahideen* captured in the latest battles." Ex. 104.

### E.   Defendant Arnaout's Videos With Hekmatyar

Some of defendant Arnaout's activities in Afghanistan are also recorded on videotape. In one videotape, for example, defendant Arnaout is seen driving in a convoy of trucks. Upon arrival at its destination (a camp), defendant Arnaout leads a group in prayers. Shortly after the prayers, defendant Arnaout, Hekmatyar and others assemble a satellite telephone provided by defendant Arnaout and his companion. Later in the tape, Hekmatyar and others at the camp discuss various matters including the political situation in Afghanistan, among other things. At one point, Hekmatyar addresses defendant Arnaout and asks if he is from Syria. Defendant Arnaout responds affirmatively. *See* transcript, attached hereto as Exhibit 105.

In another videotape, defendant Arnaout again is seen meeting with Hekmatyar and in this tape, defendant Arnaout and Hekmatyar engage in an extended discussion about Afghanistan, its change in leadership, and the *mujahideen*. See transcript, attached hereto as Exhibit 106.