UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:   *Federal Insurance Co. v. al Qaida*, 03 CV 06978 (RCC)


**PLAINTIFFS' REPLY TO THE JOINT OPPOSITION OF PRINCE
NAIF BIN ABDUL AZIZ AL SAUD AND PRINCE SALMAN BIN
ABDUL AZIZ AL SAUD TO PLAINTIFFS' MOTION FOR LEAVE
TO SUPPLEMENT THE RECORD WITH ADDITIONAL EVIDENCE
IN RESPONSE TO THE MOTIONS TO DISMISS SUBMITTED
BY PRINCE NAIF AND PRINCE SALMAN**

On June 10, 2005, the *Federal* plaintiffs filed a Motion for Leave to Supplement the Record with Additional Evidence in response to the Motions to Dismiss submitted by Prince Naif bin Abdul Aziz al Saud (Prince Naif) and Prince Salman bin Abdul Aziz al Saud (Prince Salman). The Motion seeks leave to file a recently obtained Arabic language newspaper article published in the Egyptian newspaper *Ruz al Yusef* in August of 1998, as well as a translation of a relevant except from that lengthy article.[1] On June 13, 2005, Prince Naif and Prince Salman filed a joint Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Supplement the Record.[2] For the reasons set forth below, consideration of this important piece of evidence would in no way prejudice the defendants, and will substantially assist the Court in deciding the

---

[1] The *Federal* plaintiffs received the article in Arabic on May 18, 2005, and obtained a official translation of the relevant excerpt on June 8, 2005.

[2] The docket reflects the opposition was filed by Prince Naif bin Abdul Aziz al Saud and Prince Sultan bin Abdul Aziz al Saud, and not by Prince Salman. Based on the content of the opposition itself, as well as the fact that plaintiffs did not seek leave to supplement the record relative to Prince Sultan's Motion to Dismiss, plaintiffs assumed that counsel inadvertently mis-designated the filing party when affecting the submission through the ECF system. For purposes of this Reply, plaintiffs treat the opposition as having been properly filed by Prince Naif and Prince Salman.

Motions to Dismiss of Princes Naif and Salman.  Accordingly, the *Federal* plaintiffs respectfully submit that their Motion for Leave to Supplement the Record should be granted.

The *Federal* plaintiffs' claims against Princes Naif and Salman arise from their sponsorship, in both their official and personal capacities, of several Saudi charities that extensively sponsored al Qaida in the years preceding the September 11th Attack.  The First Amended Complaint (FAC) alleges that both princes provided extensive financial and logistical support, in their personal capacities, to the International Islamic Relief Organization (IIRO), Muslim World League (MWL), al Harmain Islamic Foundation, Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC) and Saudi High Commission for Bosnia and Herzegovina (SHC).  FAC ¶¶ 442, 442, 461, 463.  The pleadings further allege that Prince Naif extensively supported those same organizations through official positions he held in the government, including his roles as head of the SJRC, Minister of Interior, and member of the Supreme Council for Islamic Affairs, the governmental agency responsible for supervising the Saudi charities and providing those charities with funds and other forms of support.  FAC ¶¶ 435, 436, 438.  The FAC likewise alleges that Prince Salman used his official positions within the government, including his role as head of the SHC, to foster those ostensible charities' support of Osama bin Laden's organization.  FAC ¶¶ 456, 457.

Because the sponsorship of al Qaida by both Princes is alleged to have flowed through intermediary charity fronts, this Court has held that the plaintiffs must present factual allegations or "evidence" sufficient to give rise to an inference that the Princes knew that the charities they were supporting were channeling resources to al Qaida.  In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 756, 801 (S.D. N.Y. 2005).

Plaintiffs maintain that the detailed allegations of the FAC themselves give rise to a logical inference that both Prince Naif and Prince Salman were aware that the charities they were

2

funding and otherwise sponsoring were channeling material support and resources to al Qaida. In this regard, the FAC specifically alleges that the IIRO, MWL, al Haramain, SHC and SJRC were directly implicated in the financing and logistical sponsorship of al Qaida in various regions of the World, during the years preceding the September 11th Attack. On this point, a review of the allegations pertaining to the IIRO is insightful. Among other things, the FAC alleges that a 1996 CIA report concluded that the IIRO was directly funding six al Qaida training camps in Afghanistan. FAC ¶134. The FAC further alleges that the IIRO office in the Philippines was established by Osama bin Laden's brother-in-law, served as the coordinating center for Islamic extremists throughout the Far East throughout the 1990s, and channeled funds to the al Qaida affiliated Abu Sayyef Group. FAC ¶¶ 135, 136. The FAC also alleges that the IIRO was implicated in 1995 al Qaida plots to assassinate the Pope and simultaneously attack multiple U.S. airliners while in flight. FAC ¶ 136. In addition, the FAC asserts that Kenyan officials moved to de-register the IIRO in 1998, after investigations into the bombings of the U.S. embassies in Kenya and Tanzania revealed that the IIRO's Kenyan office was serving as a conduit for financial and logistical support for al Qaida. FAC ¶ 139. The FAC also details the IIRO's involvement in a 1999 al Qaida plot to attack US consulates in Madras and Calcutta, and sponsorship of terrorist activities in Bosnia as early as 1993. FAC ¶¶ 140, 143. The FAC contains similarly specific allegations regarding the involvement of the other Saudi charities in pre-9/11 al Qaida plots and activities.

In light of the other allegations of the FAC, it is only reasonable to infer that both Prince Salman and Prince Naif were aware of the reports and investigations implicating the relevant Saudi charities in terrorist activities well before September 11, 2001. As the Complaint makes clear, Saudi Arabia rigidly controlled and supervised the relevant charities, both through the local embassies and the Supreme Council for Islamic Affairs. FAC ¶¶ 114, 131, 168, 181, 203.

Statements by officials of the charities confirm the accuracy of these allegations. During Canadian court proceedings in 1999, Arafat el Asahi, the North American head of the IIRO, testified that the IIRO and MWL are both closely supervised by the Saudi government, and that the local embassies monitor the activities of the regional offices of the charities:

> Q. Given that you don't know precisely what goes on in the office in Pakistan - and I recognize that your view is that Osama Bin Laden is beyond the principles of Islam - would it be possible that there might be individuals operating within the office in Pakistan who admire what Osama Bin Laden has done?
>
> A. No. The answer is "no" because the office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at work at all with the IIRO or with the Muslim World League.
>
> **If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office for 11 years as I did. That gives me an indication that everybody is within - there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi nationals. They know who does what.**

Reasons for Order of Justice B. Cullen, <u>Minister of Citizenship and Immigration v. Mahmoud Jaballah</u>, Federal Court of Canada, DES-6-99, at p. 81.[3]

In view of the Kingdom's extensive supervision of the charities, it is clear that senior officials of the Kingdom who were deeply involved in the management and oversight of the charities, such as Prince Naif and Prince Salman, would have been aware of the numerous pre-9/11 reports and investigations implicating those charities in al Qaida's global *jihad*.

In addition, according to an affidavit submitted of record by Prince Turki al Faisal al Saud in these proceedings, the Kingdom participated in a formal intelligence sharing program

---

[3] This testimony is quoted, in part, in the FAC at ¶ 115. A complete copy of the "Reasons for Order" in which that testinmony appears was previously filed of record in connection with the *Federal* plaintiffs' Opposition to the Kingdom of Saudi Arabia's Motion to Dismiss.

with the United States relative to al Qaida from 1997 forward. In view of this formal intelligence sharing program, it is reasonable to infer that details of the 1996 CIA report regarding the involvement of Saudi charities in the sponsorship of terrorist activities would have been communicated to the Saudi government.[4] Significantly, Prince Turki, the head of Saudi Arabia's intelligence service during the period in question, served as a member of the Supreme Council of Islamic Affairs, along with Prince Naif. As that body was responsible for supervising funding of the Saudi charities, it is only logical to assume that Prince Turki would have shared any information in his possession regarding the involvement of those charities in the sponsorship of terrorism with the other members of the Committee. Furthermore, at all relevant times, Prince Naif served as the Saudi Minister of Interior, and was therefore responsible for Saudi Arabia's internal security. As the defendants' have themselves repeatedly asserted that al Qaida has posed a threat to Saudi Arabia's internal security for a period of many years, it would be illogical to suggest that Prince Turki would not have shared information concerning al Qaida's financial and logistical support network with Prince Naif. Moreover, given the fact that the 1996 CIA Report specifically identifies the SHC as one of the charities sponsoring terrorist activities, it is also logical to infer that the details of that report would also have been shared with Prince Salman, the head of that charity.

The FAC also identifies specific meetings at which officials of other governments warned high ranking Saudi officials of the involvement of Saudi funded "charities" in the sponsorship of terrorism. Indeed, according to the FAC, French Interior Minister Pasqua met with Prince Naif himself regarding the problem in 1994. Delegations from the U.S. government raised similar concerns during meetings in 1999 and 2000. It is reasonable to assume that U.S. authorities would have specifically discussed the IIRO, al Haramain, MWL, SHC and SJRC at those

---

[4] A copy of this report was previously filed of record in opposition to the Motions to Dismiss of Princes Salman and Naif on November 1, 2004.

5

meetings, given the conclusions of the 1996 CIA report as well as the other reports and investigations implicating all of those organizations in the sponsorship of al Qaida's activities.[5]

The *Ruz al Yusef* article the *Federal* plaintiffs seek to submit at this time simply represents evidence of another direct warning from a foreign official to Prince Naif of the pervasive sponsorship of terrorism by ostensible Islamic charities. Specifically, the article indicates that the Egyptian Minister of Interior expressed a specific concern regarding the involvement of so-called Islamic charities in the sponsorship of terrorist activities to Prince Naif at a conference of Arab interior ministers.

Articles of this nature represent precisely the kind of "evidence" plaintiffs may rely upon in opposing a motion to dismiss under the Foreign Sovereign Immunities Act (FSIA). The fact that the article may not be admissible at trial is irrelevant. As another Court in this district explained in reviewing a Motion to Dismiss under the FSIA:

> [A]lthough many of plaintiffs' supporting documents – which include newspaper articles, publications by the Iranian Foundation, and a Complaint filed by a former employee of the New York Foundation later withdrawn – do not constitute evidence admissible at trial, they suggest that admissible evidence might well be obtained if discovery were permitted. Thus, they are sufficient to convince the Court that dismissal of plaintiff's claim without discovery on the "alter ego" issue would be premature.

Gabay v. Mostazafan Foundation of Iran, 151 F.R.D. 250 (S.D. N.Y. 1993).

As the newspaper article attached to Plaintiffs' Motion is directly relevant to a material issue, and is competent "evidence" to demonstrate that discovery is likely to reveal that Princes Naif and Salman were in fact aware that the Saudi charities enjoying their support were sponsoring al Qaida, it should be considered by the Court at this time. Moreover, because this

---

[5] In light of the constructive and actual notice provided by the events described above, the FAC specifically alleges that Princes Naif and Salman knew, prior to September 11, 2001, that charities enjoying their support were funneling resources they provided to al Qaida. Notably, neither of these Princes has submitted an affidavit denying that allegation. As such, plaintiffs respectfully submit that the defendants have failed to raise a competent challenge to that that factual allegation.

document simply builds on the significant body of evidence already submitted to the Court on the issue of the Princes' knowledge, and the article quotes a statement made by Prince Naif himself, the defendants can hardly claim any prejudice by accepting this submission at this time.

Finally, due to time constraints, the *Federal* plaintiffs were unable to obtain a complete translation of the article prior to the hearing on the defendants' Motion to Dismiss, and therefore submitted a partial translation of the relevant portion of that article. The *Federal* plaintiffs would be happy to provide a complete translation and certificate of accuracy upon request.

                    Respectfully submitted,

                    **COZEN O'CONNOR**

By: _____
     STEPHEN A. COZEN, ESQUIRE
     ELLIOTT R. FELDMAN, ESQUIRE
     MARK T. MULLEN, ESQUIRE
     SEAN P. CARTER, ESQUIRE
     1900 Market Street
     Philadelphia, PA 19103
     Tele: (215) 665-2000
     Fax: (215) 665-2013

Date: June 20, 2005