**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02 CV 6977
*Burnett v. Al Baraka Investment & Development Corp.*, 03 CV 5738
*Cantor Fitzgerald & Co. v. Akida Bank Private Ltd.,* 04 CV 7065
*Continental Casualty Co. v. Al Qaeda Islamic Army,* 04 CV 5970
*Euro Brokers, Inc. v.  Al Baraka Investment & Development Corp.,* 04 CV 7279
*Federal Insurance Co. v.  Al Baraka Investment & Development Corp.*, 03 CV 6978
*New York Marine & General Insurance Co. v. Al Qaeda,* 04 CV 6105
*O'Neill v. Al Baraka Investment and Development Corp.*, 04 CV 1923
*World Trade Center Properties, LLC v. Al Baraka Investment,* 04 CV 7280

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO
MOTIONS TO DISMISS OF DEFENDANT
FAISAL ISLAMIC BANK - SUDAN**

## TABLE OF CONTENTS

I.      INTRODUCTION .......................................................... 1

II.     PLAINTIFFS' CLAIMS ARE WELL PLED ................................... 6

        A.      Applicable Legal Standard ........................................... 6

        B.      Plaintiffs State a Claim Against FIBS Under the ATA ..................... 9

        C.      Plaintiffs State a Claim Against FIBS Under the ATCA ................... 10

        D.      Plaintiffs State Valid Wrongful Death and Survival Claims ............... 12

        E.      Plaintiffs State Valid Punitive Damages and Conspiracy Claims ........... 12

III.    FIBS IS SUBJECT TO PERSONAL JURISDICTION .......................... 12

        A.      Applicable Legal Standard .......................................... 13

        B.      The Court Has Personal Jurisdiction Because FIBS Knowingly
                and Intentionally Provided Financial Services and Support for
                Al Qaeda Attacks Targeting America ................................. 13

        C.      The Court Has Personal Jurisdiction Because FIBS Knew
                and Intended that the Acts of its Al Qaeda Co-Conspirators
                Would Impact the United States .................................... 17

        D.      At Minimum, Plaintiffs Should be Allowed to Conduct
                Jurisdictional Discovery .......................................... 19

IV.     CONCLUSION .......................................................... 21

## TABLE OF AUTHORITIES

*Andre Emmerich Gallery, Inc. v. Segre*, 1997
U.S.Dist. LEXIS 16899 (S.D.N.Y. Oct. 29, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*All State Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215 (S.D.N.Y. 1992) . . . . . . . 18

*Bigio v. Coca-Cola,* 239 F.3d 440 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Boim v. Quranic Literacy Institute,*
291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Busch v. Buchman, Buchman & O'Brien Law Firm,*
11 F.3d 1255 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chance v. Armstrong,* 143 F.3d 698 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Chrysler Capital Corp. v. Century Power Corp.,*
778 F. Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cutco Industrial, Inc. v. Naughton*, 806 F.2d 361 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . 13

*Daliberti v. Iraq*, 97 F. Supp.2d 38 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Doe v. Islamic Salvation Front,* 257 F. Supp. 2d 115 (D.D.C. 2003) . . . . . . . . . . . . . . . 11

*Estates of Ungar ex rel. Strachman v. Palestinian Authority,*
153 F. Supp. 2d 76 (D.R.I. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Geisler v. Petrocelli,* 616 F.2d 636 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Investment Properties Intl., Ltd. v. IOS, Ltd.,*
459 F.2d 705 (2nd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*International Shoe Co. v. Washington,* 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . 15, 18

*IUE AFL-CIO Pension Fund v. Herrmann,*
9 F.3d 1049 (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ii

*Kadic v. Karadzic*, 70 F.3d 232 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kamen v. America Telegraph & Telegraph Co.*,
791 F.2d 1006 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Marine Midland Bank, N.A. v. Miller*,
664 F.2d 899 (2nd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*PDK Labs v. Friedlander*, 103 F.3d 1105 (2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 8

*Phelps v. Kapnolas*, 308 F.3d 108 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
244 F. Supp. 2d 289 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp. 2d 54 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F. Supp. 325 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Sosa v. Alvarez-Machain*, 124 S.Ct. 2761 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Sparrow v. United States*, 216 F.3d 1111 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 6

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Woodward v. Community Action Agency*, 239 F.3d 517 (2nd Cir. 2001) . . . . . . . . . . . . . 6

*World-Wide Volkswagon Corp. v. Woodson*,
444 U.S. 286 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 19

*Wynder v. McMahon*, 360 F.3d 73 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

## FEDERAL STATUTES

28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. §§ 2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13, 14

18 U.S.C. §§ 2334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Fed. R. Civ. P. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12, 13, 18, 19

## **MISCELLANEOUS**

MOORE'S FEDERAL PRACTICE § 12.31[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## I.   INTRODUCTION

Under the Anti-Terrorism Act[1], whoever knowingly provides financial support or services

to terrorist organizations has himself committed an act of international terrorism, as well as

having aided and abetted the terrorists and is, accordingly, responsible for the terrorists' attacks.

Plaintiffs allege Faisal Islamic Bank - Sudan ("FIBS") knowingly and intentionally provided

financial services and support to Al Qaeda to attack the United States.  Under the law, FIBS's

support for Al Qaeda is an act of international terrorism, thus subject to civil liability in the

United States. *See Boim v. Quranic Literary Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002) ("The

only way to imperil the flow of money and discourage the financing of terrorist acts is to impose

[ATA] liability on those who knowingly and intentionally supply the funds to the persons who

commit the violent acts.") (*citing* S. Rep. 102-342, at 22) (by imposing "liability at any point

along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money" for

terror attacks on the United States).

Plaintiffs[2] allege that FIBS provided specific banking services and support for Al Qaeda

terror attacks against the United States:

> Defendant FAISAL ISLAMIC BANK-Sudan was also implicated as an AL
> QAEDA sponsor during the 2001 United States trial on the 1998 [U.S.]
> embassy bombings in Africa as managing bank accounts for AL QAEDA

---

[1] The Anti-Terrorism Act ("ATA") provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism[.]" 18 U.S.C. §2333.

[2] Because the pleadings are similar and the issues are nearly identical, plaintiffs in *Ashton* (02-6977), *Burnett* (03-9849), *Cantor Fitzgerald* (04-7065), *Continental Casualty* (04-5970), *Euro Brokers* (04-7279), *Federal Insurance* (03-6978), *New York Marine* (04-6105), *O'Neill* (04-1923) and *WTC Properties* (04-7280) have elected to file a consolidated response to defendant's motion.  However, because all of the plaintiffs are not pursuing RICO claims, *Cantor Fitzgerald, Continental Casualty, Euro Brokers, Federal Insurance, New York Marine, O'Neill* and *WTC Properties* are simultaneously submitting a separate consolidated brief to address their RICO claims.

operatives.  Al Fadl, testified:

> Q.     Where were the accounts [of AL QAEDA] held?  In what countries?
> A.     . . . we got account in Bank Faisal Islami [Faisal Islamic Bank].

*Ashton* Fourth Amended Complaint ("4AC")  ¶ 66; *see also Ashton* 4AC ¶ 275; *Federal*

Plaintiffs' Amended RICO Statement applicable to the Faisal Islamic Bank - Sudan ("FIBS

RICO") at Ex. A; *Federal* Plaintiffs' Amended RICO Statement applicable to Dar Al Maal Al

Islami Trust and DMI Administrative Services, S.A. ("DMI RICO") at Ex. A ("Defendant

FAISAL ISLAMIC BANK was implicated during Al Fadl's May 2001 United States trial

testimony regarding the bombings as holding and managing accounts for AL QAEDA

operatives."); *Burnett* Third Amended Complaint ("3AC") ¶¶ 101, 365; *Federal* First Amended

Complaint ("1AC") ¶ 315.

Not only did FIBS itself provide financial services and support for Al Qaeda attacks

against the United States by managing and holding bank accounts for Al Qaeda operatives, but

FIBS became inextricably intertwined with Osama Bin Laden who supplied $50 million in the Al

Shamal Islamic Bank, which FIBS founded, owned and controlled:

> Bin Laden . . . capitalized al-Shamal Islamic Bank in Khartoum.  Bin Laden
> invested $50 million in the bank. . . . Defendant FAISAL ISLAMIC BANK
> SUDAN was one of the five main founders of AL SHAMAL ISLAMIC BANK
> . . . . Al SHAMAL ISLAMIC BANK issued shares to its main founders . . .
> includ[ing] FAISAL ISLAMIC BANK BANK,

*Ashton* 4AC  ¶¶  49, 274, 53; *Burnett* 3AC ¶¶ 70, 73, 74, 100, 364, 388, 473; *Federal* 1AC ¶ 322;

*Federal* FIBS RICO at Ex. A; *Federal* DMI RICO at Ex. A:

> [AL SHAMAL ISLAMIC BANK] has repeatedly been used to fund criminal
> and terrorist activities.  Al Fadl further testified that OSAMA BIN LADEN
> and at least six AL QAEDA operatives held bank accounts in AL SHAMAL
> ISLAMIC BANK under their real names.

> [Al Qaeda financier] Jamal Ahmed al Fadl also testified that AL QAEDA
> operatives received monthly checks of several hundred dollars from AL
> SHAMAL ISLAMIC BANK accounts and that he transferred $100,000.00
> from AL SHAMAL ISLAMIC BANK to an AL QAEDA representative in
> Jordan.
>
> Al SHAMAL ISLAMIC BANK is an instrumental bank in BIN LADEN's
> financial support network.  BIN LADEN used AL SHAMAL BANK for the
> funding of his AL QAEDA network leading up to the 1998 United States
> Embassy bombings in Africa.

*Ashton* 4AC  ¶¶  63, 64, 275; *Burnett* 3AC ¶¶ 79, 80, 81, 365*; Federal* 1AC ¶ 329; *Federal* FBIS

RICO at Ex. A; *Federal* DMI RICO at Ex. A.

> [A]nother associate of Defendant Osama bin Laden, Essam al Ridi, testified that the
> Al Shamal Bank was used for Al Qaeda operational purposes, stating that "$250,000
> was wired from Al Shamal Islamic Bank" in 1993 via Bank of New York to a Bank
> of America account held in Dallas, Texas -- where he used it to "buy a plane
> delivered to bin Laden . . . intended to transport Stinger missiles. . . ." in 1993.
>
> Following September 11, 2001, the Chairman of the Senate Armed Services
> Committee and Chairman of the Permanent Subcommittee on Investigation of the
> Governmental Affairs Committee testified that Defendant Al Shamal Islamic
> Bank operations continue to finance and materially support international terrorism
> and that there are indications that Osama bin Laden remains the leading
> shareholder of that bank.

*Burnett* 3AC ¶¶ 82, 83.

From the above pled facts, it is clear that plaintiffs have alleged that both Al Shamal's

main founder and FBIS profited handsomely through Osama Bin Laden's $50 million

"investment" in Al Shamal Islamic Bank.  And from those well pled facts, this Court should

reasonably infer that, in return, FIBS knowingly and intentionally provided financial services and

support to support Al Qaeda.

This inference is particularly strong given that: (a) FIBS's founder Yousef Nada is a

Specially Designated Global Terrorist as an Al Qaeda financier, who conspired with (b) Al

Shamal Bank's chairman Adel Batterjee, a Specially Designated Global Terrorist, who conspired

with (c) FIBS directors Abdullah Omar Naseef and Amin Aqeel Attas, who founded Rabita

Trust, a Specially Designated Global Terrorist Entity, and (d) FIBS, Osama Bin Laden, Al

Shamal Islamic Bank and Al Qaeda throughout the 1990s had their base of operations in Sudan, a

designated State Sponsor of Terrorism. *See* First Fawcett Aff. at ¶¶ 2-14, attached as Exhibit 1.

Indeed, the symbiotic relationship between FIBS and al Qaeda flourished under the rule

of the "radical extremist Islamic government in SUDAN [that] provided refuge to BIN LADEN."

*Ashton* 4AC ¶ 48.  As confirmed by a 2002 Congressional Research Service Report:

> [B]in Laden relocated to SUDAN with the approval of SUDAN National
> Islamic Front (NIF) leader Hasan Al Turabi. There, in concert with NIF
> leaders, [bin Laden] built a network of businesses, including an Islamic
> Bank (al Shamal) [which] . . . . enabled him to offer safe haven and
> employment in SUDAN to AL QAEDA members, promoting their
> involvement in radical Islamic movements in their countries of origin
> (especially Egypt) as well as anti-U.S. terrorism.

*Ashton* 4AC ¶ 50; *Burnett* 3AC ¶ 71; *Federal* 1AC ¶ 32; *Federal* FIBS RICO at Ex. A; *Federal*

DMI RICO at Ex. A.  FIBS was at the core of that Sudanese "network of businesses" which

*enabled* al Qaeda to launch "anti-U.S. terrorism," including the September 11 attacks.  And that

is precisely how "the financing, aiding and abetting and material support of OSAMA BIN

LADEN, AL QAEDA, and international terrorism in part through FAISAL ISLAMIC BANK"

was wrought.  *Ashton* 4AC ¶ 255; *Federal* FIBS RICO at Ex. A; *Federal* DMI RICO at Ex. A;

*see also* Statement of U.S. Senator Carl Levin, Hearing on National Money Laundering Strategy

for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (September 26, 2001)

(stating that FIBS-owned Al Shamal Islamic Bank continues to offer financial support and

services to Al Qaeda and that Osama Bin Laden "remains the leading shareholder of the bank"

through trustees); Fawcett Aff. ¶ 5 (stating Al Qaeda continued to use Sudan as a safe haven

from which to launch terrorist attacks worldwide throughout 2001) (citing U.S. State

Department, "Patterns of Global Terrorism," May 21, 2002).

Moreover, the above testimony from al Fadl, *Ashton* 4AC ¶ 66, *Burnett* 3AC ¶ 101,

*Federal* FIBS RICO at Ex. A, *Federal* DMI RICO at Ex. A, makes clear that FIBS supported Al

Qaeda when defendant OSAMA BIN LADEN publicly announced his intention to target the

United States. Indeed, during the 1998 period when FIBS was providing support to al Qaeda,

Bin Laden announced:

> The ruling to kill Americans and their allies - civilians and military - is an
> individual duty for every Muslim who can do it in any country in which it
> is possible to do.

*Ashton* 4AC ¶ 120; *Burnett* 3AC at Introduction. In that same period the U.S. enacted the ATA,

which imposes civil and criminal penalties on terrorism supporters, and which subjects FIBS to

personal jurisdiction because it knowingly and intentionally provided Al Qaeda with financial

services and support to launch terror attacks on the United States. As such, FIBS directed its

conduct at the United States and could reasonably anticipate being "haled into court" here.

Plaintiffs properly allege proximate cause because the September 11 terror attacks were

the foreseeable consequence of FIBS's intentional support of Al Qaeda, the very conduct at

which Congress directed the ATA. The attacks were the "natural and probable" consequence of

FIBS's support of anti-U.S. terrorism.

5

## II.   PLAINTIFFS' CLAIMS ARE WELL PLED

### A.   APPLICABLE LEGAL STANDARD

FIBS moves to dismiss the instant actions pursuant to Fed. R. Civ. P. 12(b)(6), for failure

to state a claim.  Such a motion must be denied unless "it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.

Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004);

*Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*).  The Court's role is "not to

assay the weight of the evidence which might be offered in support" of the Complaint, but

"merely to assess the legal feasibility" of the Complaint.  *Geisler v. Petrocelli*, 616 F.2d 636, 639

(2d Cir. 1980) . In evaluating whether plaintiffs ultimately could prevail, the Court must accept

as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them.

*Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184.  Plaintiffs are not required to prove their case at

the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence

should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The

issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but

whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*,

143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the liberal pleading requirements of

Fed. R. Civ. P. 8(a)(2). *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule

8(a)(2) provides that a complaint must include only "a short and plain statement of the claim

showing that the pleader is entitled to relief" and that such a statement simply shall "give the

defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*

6

(quoting *Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002) (allegation "I was turned down for a job because of my race" would be sufficient to survive a Rule 12(b)(6) motion). Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993).

Two recent Second Circuit cases underscore and re-affirm these principles. In *Phelps*, the plaintiff alleged that the employees of the prison where he was incarcerated had violated his Eighth and Fourteenth Amendment rights by inflicting cruel and unusual punishment. *Phelps,* 308 F.3d at 182. Plaintiff further alleged that defendants "knew or recklessly disregarded" that the diet the defendants had placed him on was inadequate and would cause pain and suffering. *Id.* The district court dismissed the complaint, finding that it failed to state a claim, in part because the plaintiff had not sufficiently alleged that defendants acted with the requisite *scienter*, deliberate indifference. The district court found plaintiff's allegations of *scienter* conclusory and held that plaintiff had failed to allege facts from which the Court could infer the defendants' knowledge. *Id.* at 184. The Second Circuit reversed, holding that a district court "may not go beyond FRCP 8(a) to require the plaintiff to supplement his pleadings with additional facts that support his allegations of knowledge either directly or by inference." *Id.* at 186-87. The Court explained:

> It was improper to dismiss Phelps's Amended Complaint for failing to supplement Phelps's basic allegations with additional facts to support them by inference, for it does not appear from the face of the complaint beyond

7

> doubt that Phelps "can prove no set of facts in support of his claim which would
> entitle him to relief."

*Id.* at 187, *quoting Conley*, 355 U.S. at 45-46.  Moreover, the Court explained that dismissal was

improper because, through discovery, the plaintiff might uncover direct evidence to support his

allegations. *Phelps*, 308 F.3d at 187.  Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point,
> courts must take care lest judicial haste in dismissing a complaint in the long run
> makes waste.  Untimely dismissal may prove wasteful of the court's limited
> resources rather than expeditious, for it often leads to a shuttling of the lawsuit
> between the district and appellate courts.

*Id.* at 185 (citations omitted).

More recently, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second

Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading

standards to be applied.  In *Pelman*, the district court had dismissed because, it ruled, plaintiffs

had failed to "draw an adequate causal connection between their consumption of McDonald's

food and their alleged injuries."  *Id.* at 511.  The Second Circuit rejected this approach.  It held

that the information the district court found to be missing in the Complaint was "the sort of

information that is appropriately the subject of discovery, rather than what is required to satisfy

the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." *Id.* at 512.  Quoting the

unanimous Supreme Court ruling in *Swierkiewicz*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery
> rules and summary judgment motions to define disputed facts and issues and to
> dispose of unmeritorious claims.  The provisions for discovery are so flexible and
> the provisions for pretrial procedure and summary judgment so effective, that
> attempted surprise in federal practice is aborted very easily, synthetic issues
> detected, and the gravamen of the dispute brought frankly into the open for the
> inspection of the court.

*Id.*, quoting *Swierkiewicz*, 534 U.S. at 512-13.

### B. PLAINTIFFS STATE A CLAIM AGAINST FBIS UNDER THE ANTI-TERRORISM ACT

Under the ATA, FIBS is liable if it provided ***any material support*** to al Qaeda with

knowledge of its terrorist agenda or if it aided and abetted al Qaeda or Osama bin Laden in their

course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir.

2002) (emphasis added). This Court has already recognized that, under the ATA, "material

support includes money [and] financial services[.]" *In re Terrorist Attacks on September 11,*

*2001*, 349 F. Supp.2d 765, 825 (S.D.N.Y. 2005) ("January 18 Order"). As demonstrated above,

plaintiffs have alleged that FIBS knowingly and intentionally provided money and financial

services to Osama bin Laden and al Qaeda. *See Ashton* 4AC, *supra*; *Burnett* 3AC, *supra.*

Plaintiffs also properly allege that FIBS's support and assistance was a proximate cause

of the September 11 attacks. Plaintiffs allege that "The financial resources and support network

of . . . Defendants – charities, banks, front organizations and financiers – are what allowed the

attacks of September 11, 2001 to occur. Terrorists like Osama bin Laden and his al Qaeda

network . . . cannot plan, train and act on a massive scale without significant financial power,

coordination and backing." *Ashton* 3AC ¶ 30; *Burnett* 3AC at Introduction; *see also Boim v.*

*Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002) ("[T]here would not be a trigger

to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to

bankroll the persons who actually commit the violence.") Moreover, this Court has already held

that "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the

September 11 attacks may be the natural and probably consequence of knowingly and

9

intentionally providing material support to al Qaeda." 349 F. Supp. 2d at 826. Finally, as this

Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew

specifically about the September 11 attacks or that they committed any specific act in furtherance

of that attack." *Id.* at 829. Accordingly, under the standards set forth in this Court's January 18

Order, plaintiffs have properly pled a claim under the ATA. The remainder of plaintiffs' claims

similarly ought not be dismissed.[3]

## C.   PLAINTIFFS STATE A CLAIM AGAINST FIBS UNDER THE ALIEN TORT CLAIMS ACT

FIBS contends that the non-U.S. plaintiffs' claims under the Alien Tort Claims Act

("ATCA"), 28 U.S.C. § 1350, should be dismissed because FIBS is not a state actor and did not

engage in "egregious forms of misconduct." But the ATCA does not require that the defendant

act under color or law and "egregious forms of misconduct" is not the test for when plaintiff may

assert a claim under the ATCA. In *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004), a case

oddly not mentioned by FIBS, the Supreme Court held that the ATCA creates a cause of action

for a certain set of tort claims, including, at a minimum, "violation of safe conducts, infringement

---

[3] Should plaintiffs' claims under the ATA fail for any reason, the common law claims also exist as separate claims arising under state law. *See* 137 Cong. Rec. S4511 04 (April 16, 1991); *see also Boim*, 291 F.3d at 1010 (language and history of ATA "evidence[] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law"). To the extent that these claims have been "federalized" under the Anti-Terrorism Act, they are governed by federal law. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal statute). In determining which states' laws govern, this Court would apply the choice-of-law rules used by New York. *See Ideal Electronic Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997) (federal court hearing state-law claims applies choice of law rules of the place in which it sits).

Furthermore, plaintiffs recognize that this Court has already held that the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, provides a cause of action only against individuals. *See* January 18 Order, 349 F.Supp.2d at 828. Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing on this issue.

of the rights of ambassadors, and piracy." 124 S.Ct. at 2761. The Court further held that the

ATCA provides jurisdiction for causes of action "based on the present-day law of nations" to the

extent that such claims rest "on a norm of international character accepted by the civilized world

and defined with a specificity comparable to the features of the 18th-century paradigms" of the

other three claims. 124 S.Ct. at 2761-62. The status of the defendant, as a state actor or not, did

not enter into the Supreme Court's analysis.

Here, plaintiffs' claims may be asserted under the ATCA under either prong established

by the Supreme Court. Airplane hijacking is the modern-day equivalent of piracy. Thus, even

under the Supreme Court's more limited construction of the original torts covered by the ATCA,

plaintiffs' claims, which arise from the four airplane hijackings on September 11, 2001, are

cognizable under that statute. But even if that were not so, airplane hijacking has been

recognized by numerous courts as the kind of specific violation of international law covered by

the ATCA. *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447-48 (2d Cir. 2001); *Kadic v. Karadzic*,

70 F.3d 232, 240 (2d Cir. 1996); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120

(D.D.C.2003); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 309

(S.D.N.Y.2003); *see generally United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991)

("Aircraft hijacking may well be one of the few crimes so clearly condemned under the law of

nations that states may assert universal jurisdiction to bring offenders to justice, even when the

state has no territorial connection to the hijacking and its citizens are not involved"). Although

these cases pre-date the Supreme Court's ruling in *Sosa*, their holding is entirely consistent with

the test adopted by the Supreme Court – that the international norm in question, in this case, the

11

prohibition on airplane hijacking, be of an "international character accepted by the civilized world and defined with a specificity comparable to" the original torts that fell within the ATCA.

### D.     PLAINTIFFS STATE VALID WRONGFUL DEATH AND SURVIVAL CLAIMS

FIBS's primary argument for dismissal of the claims for wrongful death and survival is entirely derivative of its argument for dismissal of the ATA claims.  As demonstrated above, plaintiffs have sufficiently pled that causal connection between FIBS's support of Osama bin Laden and al Qaeda and the injuries and deaths suffered on September 11.

### E.     PLAINTIFFS STATE VALID PUNITIVE DAMAGES AND CONSPIRACY CLAIMS

FIBS seeks dismissal of plaintiffs' claim for punitive damages on the ground that, under New York law, punitive damages are a remedy, not a cause of action.  FIBS presents no argument that plaintiffs are not entitled to recover punitive damages in this lawsuit.  Since it is clear that punitive damages are available in connection with the claims that plaintiffs assert, and because the question of what law governs plaintiffs' claims remains open, this Court should not dismiss plaintiffs' claim for punitive damages because of this technicality of New York law.  The same is true with respect to plaintiffs' claims for conspiracy.  If plaintiffs have properly pled a conspiracy theory of liability against FIBS, the claim should not be dismissed at this time merely because, under New York, this is an alternate basis of liability rather than a separate claim, as it may turn out that New York law does not govern plaintiffs' claims.

### III.    FIBS IS SUBJECT TO PERSONAL JURISDICTION

FIBS's Rule 12(b)(2) motion boils down to an argument that the exercise of jurisdiction over FIBS under the ATA "would violate due process."  Plaintiffs respectfully disagree.

**A.      APPLICABLE LEGAL STANDARD**

To defeat a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction

made before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings

and affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d

Cir. 1986).  In evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe

all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in

plaintiffs' favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997).  In addition, the

Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE*

*AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993).  Under this standard,

FIBS's Rule 12(b)(2) motion fails.

**B.      THIS COURT HAS PERSONAL JURISDICTION BECAUSE FIBS KNOWINGLY &
INTENTIONALLY PROVIDED FINANCIAL SERVICES & SUPPORT FOR AL QAEDA
ATTACKS TARGETING AMERICA**

FIBS begins its argument that it is not subject to the personal jurisdiction of this Court

with the false premise that plaintiffs fail to state a claim under the ATA. *See* FIBS Mem. Supp.

Dismiss at 8 n.8 ("To the extent that plaintiffs seek jurisdiction under the Anti-Terrorism Act

("ATA") . . . they have failed to state a claim.").  Yet as shown above, plaintiffs ATA claim

against FIBS is well pled under Rule 8.  And because plaintiffs do state a claim against FIBS

under the ATA, this Court may assert personal jurisdiction over FIBS to adjudicate the ATA

claim and all of the other claims asserted in the complaints. *See* 18 U.S.C. § 2334(a) (ATA

providing that claims may be brought "in any district where any plaintiff resides" and that

process "may be served in any district where the defendant resides, is found, or has an agent.").

Knowing that this Court has statutory grounds to exercise personal jurisdiction over FIBS

13

under the ATA, FIBS retreats to its fall-back position that assertion of jurisdiction under the ATA "would violate due process." *See* FIBS Mem. Supp. Dismiss at 8 n.8. We disagree.

In this case, because the ATA provides for nationwide service of process, the due process analysis hinges on "whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994); *see also Burnett I*, 274 F. Supp. 2d at 95-96 (personal jurisdiction proper in ATA case where defendants have minimum contacts with United States as a whole); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001) (same). Conceding that the relevant forum for due process analysis is the United States as a whole, FIBS insists that it "has never taken any steps to purposely establish any connection with this country." FIBS Mem. Supp. Dismiss at 12. Plaintiffs beg to differ.

Plaintiffs allege that FIBS intentionally supported terrorists whose express aim was to cause injury in the United States. *See Ashton* 4AC *supra*; *Burnett* 3AC *supra*. In "ascertaining whether a defendant meets the 'minimum contacts' test, the single most important consideration is whether a defendant's 'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54, 59 (D.D.C. Oct. 27, 2003) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In the instant matter, because FIBS knowingly and intentionally provided financial services and support for al Qaeda attacks targeting America, including the September 11 attacks, *see Ashton* 4AC *supra*, *Burnett* 3AC *supra, Federal* 1AC at ¶¶ 317, 318-19, *Federal* FIBS RICO at Ex. A, *Federal* DMI RICO at Ex. A, FIBS should have reasonably anticipated being haled into Court in America. And because FIBS should have

14

anticipated as much, the exercise of personal jurisdiction over FIBS would "not offend

'traditional notions of fair play and substantial justice.'" *World-Wide Volkswagen Corp.*, 444

U.S. at 292 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

In the terror litigation context, District Judge Thomas Penfield Jackson in *Pugh v.*

*Socialist People's Libyan Arab Jamahiriya* upheld personal jurisdiction over individual Libyan

defendants in their personal capacities who conspired to bomb a French aircraft over Niger *en*

*route* from Congo to Paris, killing 170 passengers, including seven Americans.  *Pugh*, 290 F.

Supp. 2d at 56, 58-60.  *Pugh* reasoned:

> [T]he individual defendants . . . conspired to sabotage and succeeded in
> destroying a civilian commercial aircraft filled to capacity with innocent
> and unsuspecting passengers while in flight.  As the plane they chose to
> destroy was on an international flight and expected to stop in several
> nations before reaching its final destination, the individual defendants
> could and should have reasonably postulated that passengers of many
> nationalities would be on board, from which they could also expect they
> might be haled into the courts of those nations whose citizens would die.
> Given the number of passengers on UTA Flight 772, and the international
> nature of the flight, it was also altogether foreseeable that *some* Americans
> would be aboard the plane, whose lives would be lost, *and that the*
> *individual defendants would have to answer in some fashion in American*
> *courts for the consequences of their actions. . . .*

*Id.* at 59 (emphasis added).  Because Congress passed many U.S. statutes over the past twenty

years imposing sanctions on those who commit acts of international terrorism, the "interest of the

United States in preventing and punishing international terrorism has been a matter of worldwide

common knowledge for years."  *Id.*  Hence, Judge Jackson concluded that due process is not

offended by the exercise of personal jurisdiction in a civil action over foreign defendants who

conspire to commit acts of international terrorism:

> Thus, in light of the pre-existing statutory authority providing for the

15

> criminal prosecution of those who carry out terrorist acts, and the
> defendants' intentional targeting of foreign nationals at the risk of killing
> Americans among them, defendants should have anticipated the possibility
> of being 'haled into court' in
> the United States in some capacity.  And because they should have
> anticipated as much, this Court concludes that it may constitutionally
> exercise personal jurisdiction over the individual defendants in their
> personal capacities without offending any 'traditional notions of fair
> play and substantial justice.'

*Id.* at 59-60.  And since our Constitution allows the exercise of personal jurisdiction over foreign

defendants who "should have anticipated the possibility of being haled into court in the United

States" for conspiring to bomb a French plane flying from Congo to Paris "at the risk of killing

Americans," *id.,* our Constitution likewise allows this Court to exercise personal jurisdiction

over FIBS who knowingly provided financial services and support to al Qaeda attacks targeting

and killing thousands of American civilians on American soil.

Likewise, in *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325

(E.D.N.Y. 1998), *aff'd in part,* 162 F.3d 748 (2d Cir. 1998), District Judge Thomas C. Platt

exercised personal jurisdiction over Libyan defendants based on their "intentional, tortious acts

that were expressly aimed at the United States" through their support of terrorists who killed our

citizens by bombing a United States flag aircraft over Lockerbie, Scotland.  *Id.,* 995 F. Supp. at

330 (citing *Calder*, 465 U.S. at 789).  Reasoning that because the "effects" of the defendants'

extraterritorial conduct upon the United States "are sufficient to provide fair warning such that

the foreign [defendants] may be subject to the jurisdiction of the courts of the United States," *id.*

at 330 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)), the assertion of

personal jurisdiction over non-resident defendants who support and enable terrorist attacks

against the United States is Due Process:

16

> Any foreign [defendant] would know that the United States has substantial interests in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, *including civil actions in United States courts*.

*Rein*, 995 F. Supp. at 330 (emphasis added).

Likewise, in *Daliberti v. Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000), the Court rejected the personal jurisdiction challenge of a terror sponsor who argued that "[b]ecause all of [defendant's] conduct alleged in the complaint occurred outside the borders of the United States, defendant . . . had no 'fair warning that a particular activity [would] subject [it] to the jurisdiction'" of a United States court. *Id.* at 53 (citing *Burger King Corp.,* 471 U.S. at 472). The Court held that because "[a]ll states are on notice that state sponsorship of terrorism is condemned by the international community . . . [i]t is reasonable that Iraq be held to answer in a United States court for acts of terrorism against United States citizens." *Id.* at 54. Accordingly, the assertion of personal jurisdiction over a foreign terror supporter who targeted U.S. citizens satisfies due process. *Id.*

Applying these principles to the case at bar, when FIBS knowingly provided financial services and support for multiple al Qaeda attacks targeting America, including the September 11 attacks, *see Ashton* 4AC *supra*, *Federal* 1AC *supra*, *Federal* FIBS RICO at Ex. A, *Federal* DMI RICO at Ex. A, FIBS knew that those attacks would have a devastating impact on America. Accordingly, FIBS "should [have] reasonably anticipate[d] being haled into court there." *World Wide Volkswagen Corp.*, 444 U.S. at 297.

### C. THIS COURT HAS PERSONAL JURISDICTION BECAUSE FIBS KNEW & INTENDED THAT THE ACTS OF ITS AL QAEDA CO-CONSPIRATORS WOULD IMPACT THE UNITED STATES

FIBS insists that "the alleged conspiratorial acts of the terrorists of September 11 can

hardly form the basis of personal jurisdiction over the bank." FIBS Mem. Supp. Dismiss at 10. Plaintiffs disagree.

"Many courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory." *All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (asserting personal jurisdiction over Australian defendants via conspiracy theory by imputing forum acts of co-conspirators done in furtherance of conspiracy) (citing *Chrysler Capital Corp.*, 778 F. Supp. at 1266-70 (asserting personal jurisdiction over non-resident defendant via conspiracy theory). To assert personal jurisdiction, "[t]he conspiracy theory is merely a way of imputing acts done in the state to the out-of-state conspirator." *All State Life Ins. Co.*, 782 F. Supp. at 221 n.6. And by imputing forum acts of their co-conspirators to non-resident defendants, this Court has repeatedly found that such non-resident defendants have minimum contacts with the forum sufficient to satisfy Due Process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the suit, supplies the necessary minimum contacts [under] *International Shoe*, 326, U.S. 310, 316 (1945)."); *Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899 at * 17 (S.D.N.Y. 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contacts satisfying Due Process).

Consonant with the logic of *Pugh, Rein* and *Daliberti, supra*, the Second Circuit conspiracy-jurisdiction cases of *Dixon* and *Andre Emmerich Gallery* explain that when non-resident defendants enter into a conspiracy knowing that the forum acts of their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants

18

should "reasonably anticipate being haled into court there." *Dixon,* 507 F. Supp. at 352; *Andre Emmerich*, 1997 U.S. Dist. 16899 at * 17 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)); *see also Chrysler Capital Corp.*, 778 F. Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Hence, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their co-conspirators satisfies Due Process.

Not disputing that the forum acts of a co-conspirator may be imputed to a foreign defendant to establish its minimum contacts with the forum, FIBS argues that plaintiffs have not made "a *prima facie* showing of conspiracy." FIBS Mem. Supp. Dismiss at 9. We disagree.

As explained above, plaintiffs' complaints make a *prima facie* showing of conspiracy between FIBS and Al Qaeda to injure America. Hence, by imputing the September 11 forum contacts of its Al Qaeda co-conspirators to FIBS, this Court may assert personal jurisdiction over FIBS in accordance with due process.

### D.    AT MINIMUM, PLAINTIFFS SHOULD BE ALLOWED TO CONDUCT JURISDICTIONAL DISCOVERY

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *See, e.g., Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (district court may permit jurisdictional discovery to help resolve Rule 12(b)(2) motion); MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) ("Generally, the district court should allow discovery if the jurisdictional claim has a reasonable basis and it appears that pertinent facts may be uncovered.").

Especially where, as here, pertinent jurisdictional facts lie within the control and

19

knowledge of the defendant contesting jurisdiction, it would be unfair to deny plaintiffs the opportunity to conduct jurisdictional discovery. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("Under Rule 12(b) . . . in resolving claims that they lack jurisdiction, courts . . . have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party"); *Investment Properties Intl., Ltd. v. IOS, Ltd.*, 459 F.2d 705, 707-08 (2d Cir. 1972) (error to deny plaintiffs "opportunity to utilize discovery to develop basic jurisdictional facts from data solely within the defendants' possession").

In this case, there is every reason to believe that jurisdictional discovery will expose substantial contacts between FIBS and the United States.  Specifically, jurisdictional discovery will show that:

- In 1993, at the time that Sudan was hosting Osama Bin Laden and al Qaeda, the FIBS held correspondent banking relationships with three US banks: The Bank of New York, Barclay's Bank, and Wells Fargo Bank. *See* Second Fawcett Aff. at ¶ 3, attached as Ex. 2.

- Through January 2003, FIBS maintained a correspondent account,[4] # 803-3331-933 at the Bank of New York, which gave FIBS the capability through the Bank of New York to engage in global cash management, investment banking, foreign currency exchange and multi-currency hedging, liquidity via short-term investment, and global trading with letters of credit and internet payment. *See* Second Fawcett Aff. at ¶¶ 4, 7.

Plaintiffs contend limited jurisdictional discovery would reveal the nature and extent of FIBS's continuous business activities in the United States, therefore leaving no question that this

---

[4] A correspondent account is held by bank, broker, dealer, or financial institution that acts on behalf of another financial institution with limited or restricted access to the financial markets where a transaction must occur. The services provided by a correspondent bank include inter alia, operating US Dollar clearing accounts, operating foreign currency or Nostro accounts, issuing letters of credit, operating as a transfer agent, and acting as a custodian for investments and other records  *See* Fawcett Aff. at ¶¶ 5, 6.

Court may exercise personal jurisdiction over FIBS with full Due Process of law.  Furthermore, plaintiffs are entitled to discover facts in support of their conspiracy jurisdiction argument that by imputing the September 11 forum contacts of its Al Qaeda co-conspirators to FIBS, this Court may assert personal jurisdiction over FIBS.

## IV.   CONCLUSION

For the reasons set forth above, defendant FIBS's motion to dismiss should be <u>DENIED</u> in total.

Dated: June 24, 2005
New York, New York

Respectfully submitted,

_/s/_____
James P. Kreindler (JK7084)
Justin T. Green (JG0318)
Andrew J. Maloney, III (AM8684)
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY  10017-5590
Phone (212) 687-8181

_/s/_____
Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
Motley Rice LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Phone (843) 216-9000

21

_/s/_____

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
Hanly Conroy Bierstein & Sheridan LLP
112 Madison Avenue, 7th floor
New York, New York 10016
Phone (212) 784-6400


_/s/_____

Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Phone (215) 665-2000


_/s/_____

Jerry S. Goldman, Esq.
Jerry S. Goldman & Associates
111 Broadway, 13th Floor
New York, New York 10060
Phone (212) 242-2232

22