UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02 CV 6977
*Burnett v. Al Baraka Investment & Development Corp.*, 03 CV 5738
*Cantor Fitzgerald & Co. v. Akida Bank Private Ltd.*, 04 CV 7065
*Continental Casualty Co. v. Al Qaeda Islamic Army*, 04 CV 5970
*Euro Brokers, Inc. v. Al Baraka Investment & Development Corp.*, 04 CV 7279
*Federal Insurance Co. v. Al Baraka Investment & Development Corp.*, 03 CV 6978
*New York Marine & General Insurance Co. v. Al Qaeda*, 04 CV 6105
*O'Neill v. Al Baraka Investment and Development Corp.*, 04 CV 1923
*World Trade Center Properties, LLC v. Al Baraka Investment*, 04 CV 7280

**FIRST AFFIDAVIT OF JOHN FAWCETT IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
FAISAL ISLAMIC BANK SUDAN'S MOTION TO DISMISS**

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF NEW YORK | ) |

JOHN FAWCETT, being duly sworn, deposes and says:

1.     For over two years, I have been working under contract for Kreindler & Kreindler

LLP as an investigator in the case of *Kathleen Ashton v. al Qaeda Islamic Army et al.*

2.     As part of my duties, I have been asked to research contacts between Faisal

Islamic Bank Sudan ("FIBS") and organizations that have been designated by the United States

Government as terrorists and/or sponsors of terrorists. I found four such connections relating to

the following entities and individuals: Sudan, Adel Batterjee, Youssef Nada, and Rabita Trust.

3.     <u>Sudan</u>: Sudan was designated by the Secretary of State as a State Sponsor of

Terror in August 1993. *See Attached Document # 1.*

4.      In November 1997, the President placed sanctions on Sudan because of its support for terrorism. *See Attached Document # 2.*

5.      In 2000 and again in 2001, the U.S. Department of State, in its annual report entitled "Patterns of Global Terrorism," declared that Sudan was still harboring al Qaeda. *See Attached Document # 3.*

6.      Adel Batterjee:  According to Sudanow, a publication of the Sudanese Government, Faisal Islamic Bank was a founder of al Shamal Bank.  *See Attached Document # 4.*

7.      The U.S. Department of State in a 1996 issued a fact sheet stating that Usama Bin Laden invested $50 million in al Shamal Bank.  *See Attached Document # 5.*

8.      Industry records show that Adel Batterjee is the chairman of al Shamal Bank.  An organization which Mr. Batterjee founded, Benevolence International Foundation, a.k.a. al Bir International, is a major shareholder in al Shamal Bank.  *See Attached Document # 6.*

9.      The U.S. Treasury Department named Mr. Batterjee as well as Benevolence International as Specially Designated Global Terrorists ("SDGT") for providing financial and material support to al Qaeda and Usama Bin Laden. *See Attached Document # 7.*

10.      Youssef Nada:  Youssef Nada, was a founder and shareholder of Faisal Islamic Bank Sudan. *See Attached Document # 8.*

11.      The U.S. Treasury Department declared Youssef Nada a SDGT on November 7, 2001. *See Attached Document # 9.*

2

12.    Rabita Trust: According to the Directory of Islamic Financial Institutions in 1988, two of the directors of Faisal Islamic Bank Sudan were Sheikh Amin Ogeil Attas and Dr. Abdalla Omer El Nasif.   *See Attached Document # 10.*

13.    According to the Journal of the Muslim World League, in July 1988, Attas and Nasif founded Rabita Trust in Islamabad, Pakistan.   *See Attached Document # 11.*

14.    Rabita Trust was declared a SDGT by the U.S. Treasury Department on October 12, 2001.   *See Attached Document # 12.*

Dated: New York, New York
       June 24, 2005

Respectfully submitted,

John Fawcett

Sworn to before me this
24th day of June, 2005

Notary Public

LISHA G. LaPLANTE
Notary Public, State of New York
No. 41-4858847
Qualified in Queens County
Commission Expires May 12, 20 _2_ _6_

3

# DOCUMENT #1

Home | Contact Us | Email this Page | FOIA | Privacy Notice | Archive | Español   Search

# U.S. DEPARTMENT *of* STATE

| About the State Dept. | Press and Public Affairs | Travel and Living Abroad | Countries and Regions | International Issues | History, Education and Culture | Business Center | Other Services | Employment |

Counterterrorism Office

**Counterterrorism Office**

**State Sponsors of Terrorism**

## State Sponsors of Terrorism

Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism are designated pursuant to three laws: section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act. Taken together, the four main categories of sanctions resulting from designation under these authorities include restrictions on U.S. foreign assistance; a ban on defense exports and sales; certain controls over exports of dual use items; and miscellaneous financial and other restrictions.

Designation under the above-referenced authorities also implicates other sanctions laws that penalize persons and countries engaging in certain trade with state sponsors. Currently there are six countries designated under these authorities: Cuba, Iran, Libya, North Korea, Sudan and Syria.

| Country | Designation Date |
|---------|------------------|
| Cuba | March 1, 1982 |
| Iran | January 19, 1984 |
| Libya | December 29, 1979 |
| North Korea | January 20, 1988 |
| Sudan | August 12, 1993 |
| Syria | December 29, 1979 |

The rescission of Iraq's designation on October 20, 2004 was discussed by Department Spokesman Richard Boucher at a daily press briefing on October 20, 2004.

For more details about State Sponsors of Terrorism, see "Overview of State Sponsored Terrorism" in previous editions of Patterns of Global Terrorism .

---

This site is managed by the Bureau of Public Affairs, U.S. Department of State.
External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
**Copyright Information** | **Disclaimers**

DOCUMENT #2



# SUDAN

## What You Need To Know About U.S. Sanctions

## An overview of the Sudanese Sanctions Regulations -- Title 31 Part 538 of the U.S. Code of Federal Regulations

■ **INTRODUCTION** - On November 3, 1997, after finding that the policies and actions of the Government of Sudan, including continued support for international terrorism, ongoing efforts to destabilize neighboring governments, and the prevalence of human rights violations, including slavery and the denial of religious freedom, constituted an unusual and extraordinary threat to the national security and foreign policy of the United States, President Clinton issued Executive Order No. 13067, declaring a national emergency to deal with that threat. The order, issued under the authority of International Emergency Economic Powers Act (50 U.S.C. 1701-1706) ("IEEPA"), the National Emergencies Act (50 U.S.C. 1601 et seq.) and section 301 of title 3, United States Code, imposed a trade embargo against Sudan and a total asset freeze against the Government of Sudan. The Sudanese Sanctions Regulations, 31 C.F.R. Part 538 (the "Regulations") implement Executive Order No. 13067.

Criminal penalties for violating the Regulations range up to 10 years in jail, $500,000 in corporate, and $250,000 in individual fines. In addition, civil penalties of up to $11,000 per violation may be imposed administratively.

This fact sheet is a broad overview of the Regulations.

■   **BUYING FROM SUDAN** - Goods or services of Sudanese origin may not be imported into the United States either directly or through third countries without a license. Exceptions include: (1) Sudanese merchandise up to $100 in value in non-commercial quantities may be brought into the United States either for strictly personal use as accompanied baggage or sent as a gift to a person in the United States and (2) information or informational materials may be imported without restriction. All other imports of Sudanese origin must be authorized by the Office of Foreign Assets Control.

Importation into the United States from third countries of goods containing raw materials or components of Sudanese origin is not prohibited if those raw materials or components have been incorporated into manufactured products or otherwise substantially transformed in a third country.

■ **SELLING TO SUDAN** - Except for information or informational materials and donated articles intended to relieve human suffering, such as food, clothing and medicine, and the licensed export of agricultural commodities, medicine and medical devices, no goods, technology, or services may be exported from the United States to Sudan, either directly or through third countries, without a license. Exportation of goods or technology from the United States to third countries is prohibited if the exporter knows, or has reason to know, that the goods or technology are intended for transshipment to Sudan. The exportation of goods or technology intended specifically for incorporation or substantial transformation into a third-country product is also prohibited if

the particular product is to be used in Sudan, is being specifically manufactured to fill a Sudanese order, or if the manufacturer's sales of the particular product are predominantly to Sudan. No U.S. bank, including its foreign branches, may finance, or arrange offshore financing for, third-country trade transactions where Sudan is known to be the ultimate destination of, or the Government of Sudan is the purchaser of, the goods. Arranging transactions which ultimately benefit Sudan (for example, brokering third-country sales to Sudan) constitutes an exportation of brokerage services to Sudan in violation of the Regulations. The Regulations also prohibit non-U.S. persons from unauthorized re-exportation of U.S. origin goods to Sudan.

■   **SPECIALLY DESIGNATED NATIONALS** - Individuals or organizations that are owned or controlled by, or act on behalf of, the Government of Sudan anywhere in the world may be named by the U.S. Treasury Department as "Specially Designated Nationals" ("SDNs") of Sudan. U.S. persons are prohibited from transacting business with these individuals and entities, and all of their property in the United States or in the possession or control of a U.S. person is blocked. Their names are published in the Federal Register, an official publication of the U.S. Government. A listing of such SDNs may be obtained by calling the Office of Foreign Assets Control ("OFAC") at 202/622-2490. The listing, however, is a partial one and any U.S. individual or organization engaging in transactions with foreign nationals must take reasonable care to make certain that such foreign nationals are not owned or controlled by or acting on behalf of Sudan. U.S. individuals or organizations who violate the Regulations by transacting business with Specially Designated Nationals may be subject to civil or criminal prosecution.

■ **SUDANESE GOVERNMENT ASSETS BLOCKED** - Effective November 4, 1997, all property and interests in property of the Government of Sudan, including its agencies, instrumentalities and controlled entities and SDNs, in the United States or in the possession or control of a U.S. person, including their overseas branches, are blocked. All transfers of such property must be authorized by OFAC. Any unlicensed funds transfer involving a direct or indirect interest of the Government of Sudan (including any transfer routed to a Sudanese Government-controlled bank) for which banks subject to U.S. jurisdiction receive instructions must be deposited into a blocked account on the books of the bank receiving the instructions. Such funds may not be returned to a remitter without a specific license from OFAC. No unlicensed debits may be made to blocked accounts to pay obligations of U.S. or other persons, whether the obligations arose before or after the sanctions against Sudan were imposed. Setoffs against blocked accounts are prohibited.

■ **FINANCIAL DEALINGS WITH SUDAN** - Payments for and financing of licensed sales of agricultural commodities, medicine and medical devices may be accomplished by cash in advance, sales on open account (provided the account receivable is not transferred by the

person extending the credit), or by third country financial institutions that are neither U.S. persons nor government of Sudan entities. U.S. banks may advise or confirm letters of credit issued by third country banks covering licensed sales.

Payments for licensed sales of agricultural commodities, medicine and medical devices, which must reference an appropriate OFAC license, may not involve a debit to a blocked account on the books of a U.S. depository institution. Before a U.S. bank initiates a payment, or credits its customer for a licensed transaction, it must determine that the transfer is authorized.

As a rule, all other financial dealings with Sudan are prohibited, including the performance by any U.S. person of any contract, including a financing contract, in support of an industrial, commercial, public utility, or governmental project in Sudan.

U.S. persons are authorized to send and receive personal remittances to and from Sudan, provided that such transfers are not processed through a bank owned or controlled by the Government of Sudan. Financing related to trade contracts involving Sudan which were in place prior to November 4, 1997, and for which underlying transactions were completed by December 4, 1997, may be completed in accordance with their terms, provided that no debits are made to a blocked account.

■   **PROHIBITED FACILITATION -** The Regulations prohibit the facilitation by a U.S. person of the direct or indirect exportation or reexportation of goods, technology or services to or from Sudan. Facilitation of a trade or financial transaction that could be lawfully engaged in directly by a U.S. person or from the United States is not prohibited. Likewise, performance of services of a purely clerical or reporting nature that does not further trade or financial transactions with Sudan or the Government of Sudan will not violate the prohibition on exportation of services to Sudan.

■   **NON-GOVERNMENTAL ORGANIZATIONS -** Registration numbers may be issued by OFAC on a case-by-case basis to non-governmental organizations ("NGOs") involved in humanitarian or religious activities in Sudan. A registration number authorizes certain transactions by or on behalf of the registered NGO that would be otherwise prohibited, such as the exportation of goods or services, or the transfer of funds

directly into Sudan, for the purpose of relieving human suffering. Applications for registration must include the following information (names of individuals and organizations should be provided in English, or transliterated when that is not possible, and in the language of origin, and should include any acronym or other names used to identify the individuals or organizations):

(a) Organization name;

(b) Address and phone number of the organization's headquarters location;

(c) Full name, nationality, citizenship, current country of residence, birth dates and places of birth for key staff at the organization's headquarters, such as the chairman and board members, president, director, etc.;

(d) Identification of field offices or partner offices elsewhere, including addresses, phone numbers, and organizational names used, as well as the identification of the senior officer(s) at these locations, including their name, nationality, citizenship, position, and date of birth;

(e) Identification of subcontracting organizations, if any, to the extent known or contemplated at the time of the proposal;

(f) Existing sources of income, such as official grants, private endowments, commercial activities, etc.;

(g) Financial institutions that hold deposits on behalf of or extend lines of credit to the organization;

(h) Independent accounting firms (if employed in the production of the organization's financial statements);

(i) Most recent official registry documents, annual reports, and annual filings with the local government, as applicable / available;

(j) Names and addresses of organizations that the applicant currently provides or proposes to provide funding, services or material support to, as applicable;

(k) A detailed description of the organization's humanitarian or religious activities and projects in Sudan.

Registrants conducting transactions for their Sudanese operations should reference their registration number on all funds transfer, purchase, shipping, and financing documents. OFAC records must be updated by Registrants with any changes to (a) - (j).

If you have information regarding possible violations of any of these regulations, please call the Treasury Department's Office of Foreign Assets Control at 202/622-2430. Your call will be handled confidentially.

---

**LICENSE APPLICATION GUIDELINES FOR EXPORTS TO IRAN, LIBYA AND SUDAN OF AGRICULTURAL COMMODITIES, MEDICINE, AND MEDICAL DEVICES**

**Ag/Med Program**

The following information is intended to serve as guidance to persons applying for licenses authorizing Ag/Med exports to Iran, Libya, and Sudan pursuant to, respectively, the Iranian Transactions Regulations, 31 C.F.R. Part 560, the Libyan Sanctions Regulations, 31 C.F.R. Part 550, and the Sudanese Sanctions Regulations, 31 C.F.R. Part 538. Applicants are encouraged to consult the regulations for a complete statement of the rules applicable to Ag/Med exports.

Applications not containing all of the required information will be considered incomplete and returned without action and without prejudice. A new application will be accepted upon resubmission of a **complete** application.

To apply for a license to export agricultural commodities, medicine, or medical devices to Iran, Libya, or Sudan under the Ag/Med Program, applicants must submit a license request, in writing, to the Office of Foreign Assets Control (OFAC). The following items must be included in clear and legible form:

- Identification of the country and program for which the applicant is requesting a license on the top of the first page of the application and on the front of the envelope . (Example: **Iran – Ag/Med Program**). If the applicant wishes to submit applications for two or more countries, **a separate application** must be submitted for each country;

- Applicant's full legal name (if the applicant is a business entity, the state or jurisdiction of incorporation and principal place of business);

- Applicant's mailing and street address;

- Name of the individual(s) responsible for the application and related commercial transactions, including the individual's/individuals' telephone number, fax number, and if available, email address so that we may reach a responsible point of contact should there be any questions about the application;

- Applicant's signature;

- Names and addresses of all parties involved in the transactions and their roles, including financial institutions, and any Iranian, Libyan, or Sudanese broker, purchasing agent, end-user, or other participant in the purchase of the agricultural commodities, medicine, or medical devices;

- continued on Page 3 -

# DOCUMENT #3

In 1999, Libya paid compensation for the death of a British policewoman/*/, a move that preceded the reopening of the British Embassy. Libya also paid damages to the families of victims in the bombing of UTA flight 772. Six Libyans were convicted in absentia in that case, and the French judicial system is considering further indictments against other Libyan officials, including Libyan leader Muammar Qadhafi.

/*/In April 1984, a British policewoman was killed and 11 demonstrators were wounded when gunmen in the Libyan People's Bureau in London fired on a peaceful anti-Qadhafi demonstration outside their building.

Libya played a high-profile role in negotiating the release of a group of foreign hostages seized in the Philippines by the Abu Sayyaf Group, reportedly in exchange for a ransom payment. The hostages included citizens of France, Germany, Malaysia, South Africa, Finland, the Philippines, and Lebanon. The payment of ransom to kidnappers only encourages additional hostage taking, and the Abu Sayyaf Group, emboldened by its success, did seize additional hostages--including a US citizen--later in the year. Libya's behavior and that of other parties involved in the alleged ransom arrangement served only to encourage further terrorism and to make that region far more dangerous for residents and travelers.

At year's end, Libya had yet to comply fully with the remaining UN Security Council requirements related to Pan Am 103: accepting responsibility, paying appropriate compensation, disclosing all it knows, and renouncing terrorism. The United States remains dedicated to maintaining pressure on the Libyan Government until it does so. Qadhafi stated publicly that his government had adopted an antiterrorism stance, but it remains unclear whether his claims of distancing Libya from its terrorist past signify a true change in policy.

Libya also remained the primary suspect in several other past terrorist operations, including the Labelle discotheque bombing in Berlin in 1986 that killed two US servicemen and one Turkish civilian and wounded more than 200 persons. The trial in Germany of five suspects in the bombing, which began in November 1997, continued in 2000. Although Libya expelled the Abu Nidal organization and distanced itself from the Palestinian rejectionists in 1999, it continued to have contact with groups that use violence to oppose the Middle East Peace Process, including the Palestine Islamic Jihad and the Popular Front for the Liberation of Palestine-General Command.

### North Korea

In 2000 the Democratic People's Republic of Korea (DPRK) engaged in three rounds of terrorism talks that culminated in a joint DPRK-US statement wherein the DPRK reiterated its opposition to terrorism and agreed to support international actions against such activity. The DPRK, however, continued to provide safehaven to the Japanese Communist League-Red Army Faction members who participated in the hijacking of a Japanese Airlines flight to North Korea in 1970. Some evidence also suggests the DPRK may have sold weapons directly or indirectly to terrorist groups during the year; Philippine officials publicly declared that the Moro Islamic Liberation Front had purchased weapons from North Korea with funds provided by Middle East sources.

### Sudan

The United States and Sudan in mid-2000 entered into a dialogue to discuss US counterterrorism concerns. The talks, which were ongoing at the end of the year, were constructive and obtained some positive results. By the end of the year Sudan had signed all 12 international conventions for combating terrorism and had taken several other positive counterterrorism steps, including closing down the Popular Arab and Islamic Conference, which served as a forum for terrorists.

Sudan, however, continued to be used as a safehaven by members of various groups, including associates of Usama Bin Ladin's al-Qaida organization, Egyptian al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS. Most groups used Sudan primarily as a secure base for assisting compatriots elsewhere.

Khartoum also still had not complied fully with UN Security Council Resolutions 1044, 1054, and 1070, passed in 1996--which demand that Sudan end all support to terrorists. They also require Khartoum to hand over three

Egyptian Gama'a fugitives linked to the assassination attempt in 1995 against Egyptian President Hosni Mubarak in Ethiopia. Sudanese officials continued to deny that they had a role in the attack.

## Syria

Syria continued to provide safehaven and support to several terrorist groups, some of which maintained training camps or other facilities on Syrian territory. Ahmad Jibril's Popular Front for the Liberation of Palestine-General Command (PFLP-GC), the Palestine Islamic Jihad (PIJ), Abu Musa's Fatah-the-Intifada, and George Habash's Popular Front for the Liberation of Palestine (PFLP) maintained their headquarters in Damascus. The Syrian Government allowed HAMAS to open a new main office in Damascus in March, although the arrangement may be temporary while HAMAS continues to seek permission to reestablish its headquarters in Jordan. In addition, Syria granted a variety of terrorist groups--including HAMAS, the PFLP-GC, and the PIJ--basing privileges or refuge in areas of Lebanon's Bekaa Valley under Syrian control. Damascus generally upheld its agreement with Ankara not to support the Kurdish PKK, however.

---

### *Weapons-of-Mass-Destruction (WMD) Terrorism*

*At the dawn of a new millennium, the possibility of a terrorist attack involving weapons of mass destruction (WMD)--chemical, biological, radiological, nuclear (CBRN), or large explosive weapons--remained real. As of the end of 2000, however, the most notorious attack involving chemical weapons against a civilian target remained Aum Shinrikyo's sarin nerve agent attack against the Tokyo subway in March 1995.*

*Most terrorists continued to rely on conventional tactics, such as bombing, shooting, and kidnapping, but some terrorists--such as Usama Bin Ladin and his associates--continued to seek CBRN capabilities.*

- *Popular literature and the public dialog focused on the vulnerability of civilian targets to CBRN attacks. Such attacks could cause lasting disruption and generate significant psychological impact on a population and its infrastructure.*

- *A few groups, notably those driven by distorted religious and cultural ideologies, showed signs they were willing to cause large numbers of casualties. Other potentially dangerous but less predictable groups had emerged, and those groups may not abide by traditional targeting constraints that would prohibit using indiscriminate violence or CBRN weapons.*

- *Some CBRN materials, technology, and especially information continued to be widely available, particularly from commercial sources and the Internet.*

---





# United States Department of State

# May 2002

## North Korea

The Democratic People's Republic of Korea's (DPRK) response to international efforts to combat terrorism has been disappointing. In a statement released after the September 11 attacks, the DPRK reiterated its public policy of opposing terrorism and any support for terrorism. It also signed the UN Convention for the Suppression of the Financing of Terrorism, acceded to the Convention Against the Taking of Hostages, and indicated its willingness to sign five others. Despite the urging of the international community, however, North Korea did not take substantial steps to cooperate in efforts to combat terrorism, including responding to requests for information on how it is implementing the UN Security Council resolutions, and it did not respond to US proposals for discussions on terrorism. It did not report any efforts to search for and block financial assets as required by UN Security Council Resolution 1373. Similarly, the DPRK did not respond positively to the Republic of Korea's call to resume dialogue, where counterterrorism is an agenda item, nor to the United States in its call to undertake dialogue on improved implementation of the agreed framework. In light of President Bush's call to recognize the dangerous nexus between Weapons of Mass Destruction and terrorism, this latter failure, with its implications for nuclear development and proliferation, was especially troublesome.

In addition, Pyongyang's provision of safehaven to four remaining Japanese Communist League-Red Army Faction members who participated in the hijacking of a Japanese Airlines flight to North Korea in 1970 remained problematic in terms of support for terrorists. Moreover, some evidence suggested the DPRK may have sold limited quantities of small arms to terrorist groups during the year.

## Sudan

The counterterrorism dialogue begun in mid-2000 between the US and Sudan continued and intensified during 2001. Sudan condemned the September 11 attacks and pledged its commitment to combating terrorism and fully cooperating with the United States in the campaign against terrorism. The Sudanese Government has stepped up its counterterrorism cooperation with various US agencies, and Sudanese authorities have investigated and apprehended extremists suspected of involvement in terrorist activities. In late September, the United Nations recognized Sudan's positive steps against terrorism by removing UN sanctions.

Sudan, however, remained a designated state sponsor of terrorism. A number of international terrorist groups including al-Qaida, the Egyptian Islamic Jihad, Egyptian al-Gama'a al-Islamiyya, the Palestine Islamic Jihad, and HAMAS continued to use Sudan as a safehaven, primarily for conducting logistics and other support activities. Press speculation about the extent of Sudan's cooperation with the United States probably has led some terrorist elements to depart the country. Unilateral US sanctions remained in force.

## Syria

Syria's president, Bashar al-Asad, as well as senior Syrian officials, publicly condemned the September 11 attacks. The Syrian Government also cooperated with the United States and with other foreign governments in investigating al-Qaida and some other terrorist groups and individuals.

The Government of Syria has not been implicated directly in an act of terrorism since 1986, but it continued in 2001 to provide safehaven and logistics support to a number of terrorist groups. Ahmad Jibril's Popular Front for the Liberation of Palestine—General Command (PFLP-GC), the Palestine Islamic Jihad (PIJ), Abu Musa's Fatah-the-Intifadah, George Habash's Popular Front for the Liberation of Palestine, and HAMAS continued to maintain offices in Damascus. Syria provided Hizballah, HAMAS, PFLP-GC, the PIJ, and other terrorist organizations refuge and basing privileges in Lebanon's Beka'a Valley, under Syrian control. Damascus, however, generally upheld its September 2000 antiterrorism agreement with Ankara, honoring its 1998 pledge not to support the Kurdistan Workers' Party (PKK).

Damascus served as the primary transit point for the transfer of Iranian-supplied weapons to Hizballah. Syria continued to adhere to its longstanding policy of preventing any attacks against Israel or Western targets from Syrian territory or attacks against Western interests in Syria.

DOCUMENT #4

**the economy**



*ISLAMIC BANK OF THE NORTH*

Fields of waving grain

# Son of the North

*Islamic banking is a relatively new approach which has made its appearance in recent years. Whilst Islamic laws exerted control over Muslim financial practices since the days of the Prophet, an Islamic approach to the complex business of world banking has only come with the increasing economic importance of Arab peoples during the course of this century. For Sudan the year 1978 witnessed the first such experience with the establishment of Faisal Islamic Bank. This was followed by the appearance of a number of other Islamic banks with similar aims. All are interested in investing in the infrastructure, aiding development projects and encouraging self-help. All are to attract the savings of expatriates.*

*Last month a new Islamic Bank (Islamic Bank of the North) was established. Sudanow reporter, El Hidai Ahmed, reports on this development.*

AT THE INITIATIVE of the Northern Regional Government, the Investment and Development Company of the North, and Sheikh Salih Abdalla Kamil, a Saudi businessman, the Islamic Bank of the North (IBN) was formed in February of this year. Based in Khartoum, the IBN objectives are: reconsolidating the Islamic banking system; investment in the fields of agriculture, commerce, industry, mining and estate activities; and, of course, normal banking activities. The bulk of its activities are expected to be in the Northern region.

'Furthermore, IBN aims at reactivating the resources of Sudanese expatriates, especially those of northern origin who are estimated to be 70 per cent of country's total expatriates,'

stated Dr. Abdel Wahab Osman, the former Northern Regional Minister of Finance who is now Chairman of IBN.

Dr. Abdel Wahab noted that his previous experience as minister of finance in the region, together with the feasibility study carried out by the bank, under-scored the possibility of large investment in the Northern region.

The negligence of development projects over most of the region, and the failure of governmental schemes, reduced the productive capacity and



'The future is prosperous'

lowered the living standards of the population, although the region is potentially rich, and its population has participated in many self-help projects. According to IBN's records, the participation of the public in self-help projects, such as schools, health centres, police stations, etc. represents 90 per cent of regional investment, while the rest was carried out by the government. 'This ratio indicates the public response to participation in investment and development, which encouraged the formation of IBN,' explained Dr. Abdel Wahab.

Another significant aspect was that the Northern region has the nation's highest yield of bean production, which could secure self-sufficiency to the whole of Sudan, without a government subsidy. The potential of the region in the field of agriculture is not limited to this one aspect; for example, vegetable and fruit plantations could be easily improved by the availability of cold storage and marketing assistance.

Currently the foundation has been laid for the registration of the bank under the Companies Act of 1925. A temporary Board of Directors has been formed and the bank has obtained a considerable number of local and foreign banks, firms, businessmen, and Sudanese expatriates as promoters.

Some fundamental promoters are: Regional Northern Government: North Co-Ltd; El Sheikh Salih Abdalla Kamil; Faisal Islamic Bank; Tudamun Islamic Bank; National Bank for People's Development; Sudanese Islamic Bank; and Islamic Dawa'a Organisation. A promoter's minimum shareholding is 200 shares valued at US$100 each, while the public can subscribe with one share paid for in US dollars. The total of promoters' shares is US$2,053,750. The capital cost of the Bank was US$20,000,000, divided into 200,000 shares valued US$100 each.

A public campaign has now been launched to place the shares, locally and in the Arab world. The bank has not yet selected its staff or the date of business operations. But November, 1985 will be the closing date for subscription shareholders.

Dr. Abdel Wahab concluded, 'We believe that the future is prosperous; and we have investment suggestions in the fields of housing, air cargo, agriculture, etc. These proposals are to be directed mainly to serving Sudanese expatriates who haven't known where to invest their money. Thus, the Bank would be an opportunity for them to return home with no fears. The bank is expecting concessions from the government, like exemptions on excise duties and profit taxation according to the Investment Act of 1980.' ●

# DOCUMENT #5

TEXT: STATE DEPARTMENT ISSUES FACTSHEET ON BIN LADIN
(Sponsor of Islamic extremist activities described)

August 14, 1996

Washington -- The State Department issued the following factsheet on Usama bin
Muhammad bin Awad Bin Ladin on August 14, calling him a financier of Islamic
extremist activities.

(begin text)

Usama Bin Ladin: Islamic Extremist Financier

Usama bin Muhammad bin Awad Bin Ladin is one of the most significant financial
sponsors of Islamic extremist activities in the world today. One of some 20 sons of wealthy
Saudi construction magnate Muhammad Bin Ladin -- founder of the Kingdom's Bin Ladin
Group business empire -- Usama joined the Afghan resistance movement following the 26
December 1979 Soviet invasion of Afghanistan. "I was enraged and went there at once,"
he claimed in a 1993 interview. "I arrived within days, before the end of 1979."

Bin Ladin gained prominence during the Afghan war for his role in financing the
recruitment, transportation, and training of Arab nationals who volunteered to fight
alongside the Afghan mujahedin. By 1985, Bin Ladin had drawn on his family's wealth,
plus donations received from sympathetic merchant families in the Gulf region, to organize
the Islamic Salvation Foundation, or al-Qaida, for this purpose.

-- A network of al-Qaida recruitment centers and guesthouses in Egypt, Saudi Arabia, and
Pakistan has enlisted and sheltered thousands of Arab recruits. This network remains
active.

-- Working in conjunction with extremist groups like the Egyptian al-Gama'at al-
Islamiyyah, also know as the Islamic Group, al-Qaida organized and funded camps in
Afghanistan and Pakistan that provided new recruits paramilitary training in preparation
for the fighting in Afghanistan.

-- Under al-Qaida auspices, Bin Ladin imported bulldozers and other heavy equipment to
cut roads, tunnels, hospitals, and storage depots through Afghanistan's~~ mountainous
terrain to move and shelter fighters and supplies.

After the Soviets withdrew from Afghanistan in 1989, Bin Ladin returned to work in the
family's Jeddah-based construction business. However, he continued to support militant
Islamic groups that had begun targeting moderate Islamic governments in the region. Saudi

officials held Bin Ladin's passport during 1989-1991 in a bid to prevent him from solidifying contacts with extremists whom he had befriended during the Afghan war.

Bin Ladin relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi. In a 1994 interview, Bin Ladin claimed to have surveyed business and agricultural investment opportunities in Sudan as early as 1983. He embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Kh~artoum. Bin Ladin also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the re~gime's behalf:

-- Bin Ladin's company, Al-Hijrah for Construction and Development, Ltd., built the Tahaddi (challenge) road linking Khartoum with Port Sudan, as well as a modern international airport near Port Sudan.

-- Bin Ladin's import-export firm, Wadi al-Aqiq Company, Ltd., in conjunction with his Taba Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members. At the same time, Bin Ladin's Al-Themar al-Mubarak~ah Agriculture Company, Ltd. grew to encompass large tracts of land near Khartoum and in eastern Sudan.

-- Bin Ladin and wealthy NIF members capitalized Al-Shamal Islamic Bank in Khartoum. Bin Ladin invested $50 million in the bank.

Bin Ladin's work force grew to include militant Afghan war veterans seeking to avoid a return to their own countries, where many stood accused of subversive and terrorist activities. In May 1993, for example, Bin Ladin financed the travel of 300 to 480 Afghan war veterans to Sudan after Islamabad launched a crackdown against extremists lingering in Pakistan. In addition to safehaven in Sudan, Bin Ladin has provided financial support to militants actively opposed to moderate Islamic governments and the West:

-- Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden (billeted there to support U.N. relief operations in Somalia) claimed that Bin Ladin financed their group.

-- A joint Egyptian-Saudi investigation revealed in May 1993 that Bin Ladin business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

-- By January 1994, Bin Ladin had begun financing at least three terrorist training camps in northern Sudan (camp residents included Egyptian, Algerian, Tunisian and Palestinian extremists) in cooperation with the NIF. Bin Ladin's Al-Hijrah for Construction and Development works directly with Sudanese military officials to transport and provision

DOCUMENT #6



Tue, Jun 21, 2005, 21:03 GMT

## Al Shamal Islamic Bank   (Exchange - N/A : SHIB.SD)

Last Trade
**N/A**

| | |
|---|---|
| **Country** | Sudan |
| **Ownership Type** | Listed |
| **Sector** \| **Industry** | Financial Services \| Commercial Banks |

**Principal Activities**    Commercial banking and trade finance according to Islamic principles

**Date of Establishment**    January 1990

**Branches**    13 branches throughout Sudan

**Stock Market Listing**

| Exchange | Symbol | RIC/ID | Stock Type | Currency |
|---|---|---|---|---|
| Khartoum SE | | SHIB.SD | Ordinary | SDD |

### Key Officers

**Adel Abdul Jalil Batterjee**
Chairman

**Ismail Mohammed Osman**
General Manager

More Officers >

### Contact Details

Al Sayed Abdel Rahman Street
PO Box 10036
Khartoum 11111
Sudan

**Tel:**
+249 11-779078
+249 11-779474
+249 11-782925

**Fax:**
+249 11-772661
+249 11-773585
+249 11-782586

**Email:**
info@shamalbank.com

**Website:**
www.shamalbank.com/

### Major Shareholders

Adel Abdul Jalil Batterjee [Saudi Arabia]
Al Ataia Brothers Company [Sudan]
Al Baraka Investment and Development [Saudi Arabia]
Al Ber International Organization [Sudan]
Al Sabigoon for Investment, Export and Import [Sudan]
Al Shamal for Investment and Development Company [Sudan]
Babiker Salim Abu-Senoon [Sudan]
Faisal Islamic Bank of Sudan [Sudan]
Government of Northern State [Sudan]
Mohamed Abdelmonem Khedir [Sudan]
National Fund for Social Insurance [Sudan]
Omar Abdulla Kamel [Saudi Arabia]
Omar Osman Mohamed Saleh [Sudan]
Osama Muhammad Munir Halawani
Saleh Abdullah Kamel [Saudi Arabia]
Tadamon Islamic Bank [Sudan]

### Related Entities

**Auditors**

Ahmed Osman Al Rayah

**Law Firms**

Mohammed Yousif Mohammed

| Summary Financials | 31-Dec-00 |
|---|---|
| | SDD'000 |
| Capital | 1,000,000 |

Company information © 2005 ABQ Zawya Ltd.

formatted version

# DOCUMENT #7

HOME | CONTACT TREASURY | SITE INDEX | FOIA | ESPAÑOL | ACCESSIBILITY | PRIVACY & LEGAL

OFFICE OF FOREIGN ASSETS CONTROL

search    SEARCH

**News**
**Direct Links**
**Key Topics**
**Press Room**
**Organization**
**Offices**
  Domestic Finance
  Economic Policy
  General Counsel
  Information and Technology
  Management
  International Affairs
  Management
  Public Affairs
  Tax Policy
  Terrorism and Financial
  Intelligence
  ▸ Office of Foreign Assets
    Control
    Designation Lists & Financial
    Advisories
    Publications and Legislation
    Programs and Initiatives
  Treasurer
**Bureaus**
**Education**

## Office of Foreign Assets Control

### Recent OFAC Actions

Full List | Previous | Next

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

**11/19/2002**

Benevolence International Foundation has now been officially listed as a "Specially Designated Global Terrorist" [SDGT].

The following entry has therefore been deleted:

BENEVOLENCE INTERNATIONAL FOUNDATION, INC., 20-24 Branford Place, Suite 705, Newark, NJ 07102, U.S.A.; 9838 S. Roberts Road, Suite 1-W, Palos Hills, IL 60465, U.S.A.; P.O. Box 548, Worth, IL 60482, U.S.A.; U.S. FEIN: 36-3823186 (all financial assets and all records are blocked) [BPI-PA]

and the following entries have been added (without "a.k.a."s listed as separate entries in this Bulletin):

BENEVOLENCE INTERNATIONAL FOUNDATION (a.k.a. AL BIR AL DAWALIA; a.k.a. BIF; a.k.a. BIF-USA; a.k.a. MEZHDUNARODNYJ BLAGOTVORITEL'NYJ FOND), 8820 Mobile Avenue, 1A, Oak Lawn, IL 60453, U.S.A.; P.O. Box 548, Worth, IL 60482, U.S.A.; formerly at 9838 S. Roberts Road, Suite 1W, Palos Hills, IL 60465, U.S.A.; formerly at 20-24 Branford Place, Suite 705, Newark, NJ 07102, U.S.A.; Bashir Safar Ugli 69, Baku, Azerbaijan; 69 Boshir Safaroglu St., Baku, Azerbaijan; Sarajevo, Bosnia-Herzegovina; Zenica, Bosnia-Herzegovina; "last known address," 3 King Street, South Waterloo, N2J 3Z6 Canada; "last known address," P.O. Box 1508 Station B, Mississauga, Ontario, L4Y 4G2 Canada; "last known address," 2465 Cawthra Rd., #203, Mississauga, Ontario, L5A 3P2 Canada; Ottawa, Canada; Grozny, Chechnya; 91 Paihonggou, Lanzhou, Gansu, China 730000; Hrvatov 30, 41000, Zagreb, Croatia; Makhachkala, Daghestan; Duisi, Georgia; Tbilisi, Georgia; Nazran, Ingushetia; Burgemeester Kessensingel 40, Maastricht, Netherlands; House 111, First Floor, Street 64, F-10/3, Islamabad, Pakistan; P.O. Box 1055, Peshawar, Pakistan; Azovskaya 6, km. 3, off. 401, Moscow, Russia 113149; Ulitsa Oktyabr'skaya, dom. 89, Moscow, Russia 127521; P.O. Box 1937, Khartoum, Sudan; P.O. Box 7600, Jeddah 21472, Saudi Arabia; P.O. Box 10845, Riyadh 11442, Saudi Arabia; Dushanbe, Tajikistan; United Kingdom; Afghanistan; Bangladesh; Bosnia-Herzegovina; Gaza Strip; Yemen; U.S. FEIN: 36-3823186 [SDGT]

BENEVOLENCE INTERNATIONAL FUND (a.k.a. BENEVOLENT INTERNATIONAL FUND; a.k.a. BIF-CANADA), "last known address," 2465 Cawthra Rd., Unit 203, Mississauga, Ontario, L5A 3P2 Canada; "last known address," P.O. Box 1508, Station B, Mississauga, Ontario, L4Y 4G2 Canada; "last known address," P.O. Box 40015, 75 King Street South, Waterloo, Ontario, N2J 4V1 Canada; "last known address," 92 King Street, 201, Waterloo, Ontario, N2J 1P5 Canada [SDGT]

BOSANSKA IDEALNA FUTURA (a.k.a. BECF CHARITABLE EDUCATIONAL CENTER; a.k.a. BENEVOLENCE EDUCATIONAL CENTER; a.k.a. BIF-BOSNIA; a.k.a. BOSNIAN



## FROM THE OFFICE OF PUBLIC AFFAIRS

December 21, 2004
JS-2164

### U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224

The U.S Department of the Treasury today announced the designation of Adel Abdul Jalil Batterjee and Saad Rashed Mohammad al-Faqih for providing financial and material support to al Qaida and Usama bin Laden (UBL).

The U.S. is submitting both names to the United Nations 1267 Committee, which will consider adding them to the consolidated list of terrorists tied to al Qaida, UBL and the Taliban. Batterjee and al-Faqih are not linked to each other.

Today's action was taken pursuant to Executive Order 13224. The United States has now designated 396 individuals and entities as terrorists, their financiers or facilitators since September 2001. In addition, the global community has frozen over $144 million in terrorist-related assets.

Adel Abdul Jalil Batterjee served as the Executive Director and a member of the Board of Directors of Benevolence International Foundation (BIF), which was designated as a Specially Designated Global Terrorist (SDGT) by the Treasury in November 2002 for its support to al Qaida and UBL.

"Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator," said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).

In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan. LBI provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003. LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al

Qaida. LBI later joined al Qaida upon the dissolution of MK.

In the early 1990s, LBI began operating under the name Benevolence International Foundation (BIF) in an effort to widen its appeal to the general public and increase its credibility with other governments. BIF and LBI remained one organization with interchangeable assets under Batterjee's control.

In 1993, Batterjee incorporated BIF in the United States, where it also provided financial and operational support to mujahideen fighters worldwide, including members of al Qaida in Afghanistan, the Sudan, Bosnia-Herzegovina and Chechnya. At one point, UBL confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida.

According to information available to the U.S. Government, it was around that time that a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee. Instead, the employee reported he was detained and questioned by Saudi authorities regarding BIF links to UBL. Once released, he returned to the Sudan where he met with UBL and informed him of his detainment. As a result, BIF operations were curtailed for a period of time.

Batterjee subsequently resigned as Director of BIF and personally selected UBL confidant Enaam Arnaout to serve as the organization's head. Documents obtained by the U.S. Government demonstrate that Arnaout, while employed with LBI and BIF, worked with members of al Qaida to procure weapons for use in al Qaida training camps. While employed by Batterjee at LBI, Arnaout reported directly to Batterjee, which was outside the usual chain of command.

Batterjee remained active in BIF despite having officially resigned as Director. Evidence shows that Arnaout made an effort to conceal Batterjee's continued involvement in BIF. In 2002, when Arnaout learned that U.S. authorities were scrutinizing BIF's activities, he warned Batterjee through an intermediary against transferring funds to any BIF offices.

Evidence of BIF's ties to al Qaida surfaced in March 2002 searches by Bosnian authorities of the organization's Sarajevo offices. These searches uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization. Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain."

This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor. "Usama" appears after seven of the listings and "Baterji" appears after an additional six listings.

Also uncovered from the Bosnian raid were photographs of Arnaout with UBL and an administrative diagram of UBL's close associates, along with cover names and assignments within al Qaida of mujahideen trained in Afghanistan.

In October 2002, Arnaout was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities.  Batterjee was named as an un-indicted co-conspirator in the indictment.  On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for diverting BIF funds to pay for supplies to armed jihadists in Bosnia and Chechnya.

### Identifying Information
### ADEL ABDUL JALIL BATTERJEE
**AKAs:**      Adel Abdul Jalil Batarjee
`Adil Al-Battarjee
Adel Batterjee
`Adil `Abd al Jalil Batarji

**DOB:**          July 1, 1946
**POB:**          Jeddah, Saudi Arabia
**Nationality:**  Saudi Arabian
**Address:**      2 Helmi Kutbi Street, Jeddah, Saudi Arabia

Saad Rashed Mohammad al-Faqih has maintained associations with the al Qaida network since the mid-1990s, including an individual associated with the 1998 East Africa embassy bombings.

Al-Faqih has had contact with both UBL and Khaled al Fawwaz, who acted as UBL's de facto representative in the U.K.  According to information available to the U.S. Government, al-Faqih and al Fawwaz shared an office in the late 1990s, and al-Faqih worked with and provided assistance to al Fawwaz, who served as the intermediary between UBL and al-Faqih.

Following the 1998 East African embassy bombings, al Fawwaz was arrested in the United Kingdom under an extradition request from the United States.  At the U.S. trial of the East African embassy bombers, prosecutors provided evidence that al-Faqih paid for a satellite phone that al Fawwaz passed on to UBL, who allegedly used it to help carry out the attacks.

According to information available to the U.S. Government, al-Faqih was also associated with al Qaida member and fugitive Abu Musab al-Suri, a.k.a. Mustafa Nasar

Al-Faqih is head of the non-governmental organization Movement for Islamic Reform in Arabia (MIRA).  Extremists utilize a website controlled by al-Faqih and MIRA to post al Qaida-related statements and images.  While MIRA has issued disclaimers warning users to not attribute postings on MIRA message boards to al Qaida, information available to the U.S. and UK Governments shows that the messages are intended to provide  ideological and financial support to al-Qaida affiliated networks and potential recruits.  AQ-affiliated author, Lewis Attiyatullah, whose statements have been published on MIRA's website, has been directly

# DOCUMENT #8

Case 1:03-md-01570-GBD-FM   Document 1009   Filed 06/24/05   Page 27 of 40

 



# Eclairage
LE TEMPS • MERCREDI 20 NOVEMBRE 2002 • 11

# La vie secrète de Youssef Nada, ambassadeur de l'ombre des Frères musulmans

Principal inculpé dans l'enquête ouverte par la Suisse après les attentats du 11 septembre, le banquier égyptien s'est confié à la chaîne arabe Al-Jazira. Il admet avoir occupé de hautes fonctions au sein de la confrérie qui est la mère de tous les mouvements islamistes modernes

Sylvain Besson

Une atmosphère presque romanesque entoure la villa de Youssef Nada, à Campione, enclave italienne située en face de Lugano. Après avoir roulé longuement dans une immense gare, le visiteur parvient à un mur percé d'un interphone d'où sort la voix d'une vieille dame chargée de tenir à distance les importuns. N'entre pas qui veut chez Youssef Nada, ce septuagénaire qui fut, à la tête de la banque al-Taqwa (la piété en arabe), basée à Lugano avant sa dissolution à la fin de 2001, l'un des financiers les plus puissants du mouvement islamiste international.

Jusqu'à aujourd'hui, la vie de Youssef Nada, âgé de 71 ans, était demeurée un mystère. En soit dernier, pourtant, le banquier a levé un coin du voile sur son étonnante carrière. Au cours d'un entretien de près de dix heures diffusé par la télévision Al-Jazira, Youssef Nada, qui s'exprime dans un arabe populaire fortement teinté d'accent égyptien, a expliqué n'être «qu'une ligne dans la grande encyclopédie des Frères musulmans». C'est déjà un aveu rare pour un membre de cette organisation – qu'il définit comme «un grand mouvement islamiste modéré» – fondée en Égypte il y a 70 ans, qui est la matrice de tous les groupes islamistes actuels.

Durant presque toute son existence, Nada a été au service des Frères: enrôlé pendant son adolescence dans la lutte contre le colonialisme britannique, il a été jeté en prison par le régime de Nasser, avec des milliers d'autres militants, entre 1954 et 1956. Il est ensuite exilé en Libye, puis en Tunisie, avant d'être accueilli à la fin des années 60 par les dirigeants de la junte des colonels en Grèce: à l'époque, les Frères musulmans, anticommunistes, étaient soutenus par l'Occident.

Sur la chaîne arabe, Youssef Nada a pour la première fois reconnu que son rôle chez les Frères dépassait celui de simple banquier: en fait, l'homme d'affaires a longtemps été le «délégué aux relations internationales» de l'organisation. Cet ambassadeur de l'ombre, bien introduit auprès de dirigeants arabes tels que le président tunisien Bourguiba ou l'ancien roi Fayçal d'Arabie saoudite, semble être intervenu dans presque toutes les crises traversées par le Proche-Orient depuis les années 60. Ainsi, en 1990, il rencontrait Saddam Hussein à Bagdad pour lui proposer un plan de paix incitant le retrait de l'armée irakienne du Koweït et son remplacement par des troupes de pays musulmans comme le Pakistan ou le Maroc. Quelques années plus tard, à Lausanne, il rencontrait le roi Fahd d'Arabie saoudite pour négocier le retour dans leur pays des



*Youssef Nada.*

prisonniers iraniens accusés d'avoir fomenté des troubles à La Mecque.

Grâce à ses contacts politiques et son flair commercial – il a fait fortune dans le ciment au cours des années 60 et se dit encore millionnaire –, Youssef Nada peut aussi revendiquer le titre de père fondateur de la finance islamique (lire ci-contre). En 1977, le banquier est retourné au Caire après plus de vingt ans d'exil. Il y fonde alors la Faisal Islamic Bank, première banque à tenter de concilier la gestion financière moderne avec les préceptes du Coran. Sa création reflétait le virage idéologique de l'Égypte, qui avait rompu ses alliances avec l'Union soviétique et se rapprochait de l'Occident. Autrefois persécutés, les islamistes devenaient des alliés contre la menace communiste.

Le président de la Faisal Islamic Bank était un prince saoudien, Mohammed al-Fayçal al-Saoud, fils du roi Fayçal qui fut le premier ministre des Frères musulmans dans les années 60. Éduqué à l'occidentale, cet aristocrate à la silhouette puissante appartient cependant à l'aile la plus religieuse de la famille royale. L'un de ses an-

ciens employés le décrit comme «un idéaliste, qui rêvait de remettre la finance islamique au service du développement des pays musulmans». Sa présence à la tête de la banque créée par Youssef Nada reflète le nouveau rôle de l'Arabie saoudite à la fin des années 70. «Il y a eu, à cette époque, une alliance entre l'Arabie saoudite et les Frères musulmans contre le communisme, avec l'appui des Américains», explique un ancien banquier arabe.

«Je n'ai jamais enfreint la loi. Ils ne peuvent rien prouver. Je les mets au défi de prouver quoi que ce soit»

La finance islamique ne tarda pas à s'étendre à de nouveaux territoires. Une deuxième banque, appelée également Faisal Islamic Bank, dont Youssef Nada était actionnaire et qui était présidée par Mohammed al-Fayçal, fut fondée au Soudan. En 1978, Genève accueillis Shareed's Investment, toujours présidée par le fils de Fayçal et qui devint plus tard Faisal Finances. À cette structure s'ajouta en 1981 une société de services, Dar-el-Maal al-Islami (la maison de l'argent islamique, DMI), installée dans un tour de vers près de l'aéroport de Genève et contrôlée par un trust des Bahamas (lire ci-dessous). Son président, jusqu'en juin 2000, était Mohammed al-Fayçal.

Dès 1979, Youssef Nada organisa le soutien économique de la République islamique d'Iran, alors très isolée internationalement. Mais l'Arabie saoudite se méfiait du régime de l'ayatollah Khomeyni, qui incarnait une version chiite, révolutionnaire et anti-occidentale du mouvement islamiste. Dans les années 80, un Frère musulman résidant en Suisse, Ibrahim Salah, a tenté d'amener chez DMI près d'un milliard de dollars de capitaux iraniens, mais l'affaire ne s'est pas faite. En 1988, Youssef Nada créa sa propre entreprise, Al-Taqwa, dont l'infrastructure principale fut installée à Lugano: c'est une société de services, liée à une banque nommée aussi Al-Taqwa et installée, aux Bahamas, dans le bureau d'avocat Arthur Hanna, qui domicilie le trust DMI.

Depuis un an, la situation de Youssef Nada est devenue de plus en plus difficile. Sa fortune a été bloquée par les autorités de plusieurs pays après le 11 septembre 2001, et le richissime financier se

plaint aujourd'hui de n'avoir pas de quoi s'acheter un kilo de farine. Le Ministère public de la Confédération l'a ensuite inculpé de «soutien ou participation à une organisation criminelle». Al-Taqwa a été mise en liquidation en décembre 2001, laissant derrière elle des centaines de millions de dollars de pertes.

Le 22 octobre dernier, Youssef Nada a été interrogé à Milan par des agents américains qui enquêtent sur le financement de l'organisation terroriste Al-Qaida. Ils ne sont pas les seuls à s'intéresser à lui. Youssef Nada fait aussi l'objet d'enquêtes en Suisse, en Italie et en Égypte. Depuis le 11 septembre 2001, Youssef Nada a été soumis à un feu roulant de questions: les États-Unis accusent en effet Al-Taqwa d'avoir entretenu des relations avec les Groupes islamiques armés (GIA) algériens et le Hamas palestinien, qui aurait confié 60 millions de dollars à la banque. Le banquier d'origine égyptienne a rejeté ces accusations «invraisemblables» et démenti tout lien avec Al-Qaida, en dépit des accusations portées en ce sens par des islamistes détenus en Égypte. «Sous la torture, ils ont dit ce qu'Al-Qaida, en dépit des islamistes détenus en Égypte. «Sous la torture, ils ont dit ce qu'Al-Jazira, on peut faire dire n'importe quoi à n'importe quel prisonnier. J'en ai fait l'expérience.» Selon Youssef Nada, les Frères musulmans, et non Al-Qaida, sont la «véritable cible des enquêteurs américains».

Malgré ses démentis, les enquêteurs suisses du Ministère public fédéral disposeraient désormais de suffisamment d'éléments contre Youssef Nada pour transmettre le dossier Al-Taqwa à un juge, ce qui serait la dernière étape avant un procès en bonne et due forme. Selon le procureur général adjoint Claude Ni-

cati, il est possible que ce dossier soit transmis à un juge d'instruction en 2003.

Les enquêteurs helvétiques semblent particulièrement intrigués par le voyage de Youssef Nada en Afghanistan, en 1989. Le banquier ne cache pas qu'il a soutenu la lutte contre les Soviétiques dans les années 80, pas plus qu'il ne fait mystère de ses affinités idéologiques avec l'islamiste radical afghan Gulbuddin Hekmatyar, un ancien protégé de la CIA. Il affirme que le but de sa visite sur place était de partager à des négociations entre les différentes factions afghanes. Son bras droit au sein d'Al-Taqwa, Ghaleb Himmat, a également visité l'Afghanistan quelques années plus tard. Lors d'une audition menée le 2 octobre à Berne, le Ministère public fédéral a questionné Himmat sur ses rencontres, lors de ce séjour, avec des proches d'Oussama Ben Laden. Mon client s'est rendu en Afghanistan pour participer à des pourparlers de paix, assure son avocat, John Rossi. Bien sûr, il a croisé des gens là-bas, mais pour l'instant, aucune accusation concrète de soutien à un mouvement terroriste n'a été évoquée.»

Ces interrogations à répétition semblent laisser de marbre Youssef Nada. «Je n'ai jamais enfreint la loi, a-t-il affirmé à Al-Jazira. Ils ne peuvent rien prouver. Je les mets au défi de prouver quoi que ce soit.»

*Des policiers italiens encerclent la villa de Youssef Nada à Campione, près de Lugano, lors d'une perquisition.*   ARCHIVES



## Les principes de la finance islamique

Chaque banque islamique est épaulée par un conseil de religieux. Il existe cinq méthodes permettant d'investir de l'argent sans recourir aux intérêts: prêter à un investisseur avec qui la banque partage profits et pertes; prêter sans intérêts, généralement à ceux qui sont dans le besoin; devenir actionnaire d'une entreprise; acheter un bien et le revendre plus cher; acheter un bien et le louer au client. L'Iran, le Pakistan et le Soudan ont intégralement l'ensemble de leurs systèmes financiers pour les rendre compatible avec la loi islamique.

Selon un analyste européen d'Al-Qaida, l'organisation terroriste a pu recourir aux banques islamiques pour se financer: «Les banques, islamiques ou autres, fonctionnaient comme des entonnoirs où l'argent versé au profit d'organisations charitables était collecté. Ensuite, il circule entre différentes ONG jusqu'à ce qu'un agent d'Al-Qaida infiltré le détourne. «Le fait que nous soyons mentionnés dans cette plainte est une erreur grossière, qui nous révolte», explique Gilbert Coutau, l'un des administrateurs de DMI.   Sy. B.

# Les affaires de DMI au Soudan lui valent des ennuis aux Etats-Unis

La société DMI a entretenu dans les années 80 des relations étroites avec Hassan al-Tourabi, qui est membre des Frères musulmans et devint à la fin des années 80 le chef spirituel de la révolution islamique soudanaise. Hassan al-Tourabi et un autre religieux soudanais, Sadiq al-Mahdi, faisaient alors partie du conseil d'administration de DMI. Mais DMI relativise l'importance de cette relation: «Ils faisaient partie des fondateurs honoraires, avec 39 autres personnalités du monde islamique», explique l'un des directeurs de la fondation.

Fondée en 1981, en plein essor de la finance islamique, la société genevoise DMI a investi au Soudan dans les années 80, avant que Hassan al-Tourabi ne transforme ce pays en avant-garde du mouvement islamiste international – c'est d'ailleurs lui qui invita de 1991 à

1996 Oussama Ben Laden à installer son quartier général à Khartoum. DMI affirme cependant qu'à cette époque, elle avait déjà largement retiré ses investissements du Soudan. «Nous n'avons aucun lien, direct ou indirect, avec le terrorisme, ajoute un représentant de DMI à Genève. Selon nos informations, DMI n'a d'ailleurs pas fait l'objet, en Suisse, d'une enquête spécifique. En revanche, comme le révélait *Le Temps* le 14 novembre, les autorités suisses ont bloqué chez la société sœur Faisal Finances de nombreux comptes appartenant à Yassin Qadi, un cheikh saoudien soupçonné par les États-Unis d'avoir financé des mouvements terroristes. Yassin Qadi affirme de son côté qu'il n'a rien à se reprocher.

L'une des deux plaintes collectives que des proches des victimes du

11 septembre ont déposées est automne cite DMI et la Faisal Islamic Bank du Soudan parmi les soutiens financiers d'Al-Qaida. Cette accusation s'appuie essentiellement sur l'interrogatoire par une cour américaine d'un ancien cadre d'Al-Qaida, Jamal Ahmed al-Fadl, en juin 2001. En voici un extrait: «[...] – Vous rappelez-vous que quelqu'un d'autre ait eu des comptes ouverts à son nom pour Al-Qaida? – Abdouh al-Makhlafi. [...] – Quel rôle jouait-il pour Ben Laden? – Il va avec Ben Laden quand Ben Laden voyage à l'extérieur et à l'intérieur du Soudan. [...] Il est comme un garde du corps pour lui, et aussi quand Ben Laden a besoin de mettre quelque chose en banque, il utilise ce compte pour cela. [...] – Où étaient ces comptes? Dans quels pays? – Au Soudan, à la banque Tadamon Islami. – Où

d'autre? – À la banque Faisl (sic) Islami. – Est-ce aussi à Khartoum? – Oui [...].»

Selon d'anciens employés, DMI fournissait des services de comptabilité aux banques Faisal établies en Égypte, à Bahrein et au Soudan. Le rapport annuel 2001 de DMI mentionne que le groupe possède un investissement dans la Faisal Islamic Bank du Soudan. Mais si la direction de DMI admet que l'établissement soudanais a eu comme président Mohammed al-Fayçal, elle affirme qu'il n'a rien à voir avec la société basée à Genève et qu'il n'y aucun lien capitalistique, même indirect, entre DMI et la banque soudanaise. «Le fait que nous soyons mentionnés dans cette plainte est une erreur grossière, qui nous révolte», explique Gilbert Coutau, l'un des administrateurs de DMI.   Sy. B.

# DOCUMENT #9



| HOME | CONTACT TREASURY | SITE INDEX | FOIA | ESPAÑOL | ACCESSIBILITY | PRIVACY & LEGAL |

OFFICE OF FOREIGN ASSETS CONTROL

search    **SEARCH**

**News**
**Direct Links**
**Key Topics**
**Press Room**
**Organization**
**Offices**
 Domestic Finance
 Economic Policy
 General Counsel
 Information and Technology Management
 International Affairs Management
 Public Affairs
 Tax Policy
 Terrorism and Financial Intelligence
 ▸ Office of Foreign Assets Control
  Designation Lists & Financial Advisories
  Publications and Legislation
  Programs and Initiatives
 Treasurer
**Bureaus**
**Education**

## Office of Foreign Assets Control

### Recent OFAC Actions

Full List | Previous | Next

**11/07/2001**

The Secretary of the Treasury has designated the following entities and individuals as "Specially Designated Global Terrorists" [SDGT]s. Their names have been integrated into all versions of OFAC's SDN list as well as OFAC's brochure on Terrorism.

Entities:

AARAN MONEY WIRE SERVICE INC., 1806 Riverside Ave., 2nd Floor, Minneapolis, Minnesota, U.S.A. [SDGT]

AL BARAKA EXCHANGE LLC, P.O. Box 20066, Dubai, U.A.E.; P.O. Box 3313, Deira, Dubai, U.A.E. [SDGT]

AL TAQWA TRADE, PROPERTY AND INDUSTRY COMPANY LIMITED (f.k.a. AL TAQWA TRADE, PROPERTY AND INDUSTRY; f.k.a. AL TAQWA TRADE, PROPERTY AND INDUSTRY ESTABLISHMENT; f.k.a. HIMMAT ESTABLISHMENT), c/o Asat Trust Reg., Altenbach 8, Vaduz 9490, Liechtenstein [SDGT]

AL-BARAKAAT, Mogadishu, Somalia; Dubai, U.A.E. [SDGT]

AL-BARAKAAT BANK, Mogadishu, Somalia [SDGT]

AL-BARAKAAT BANK OF SOMALIA (a.k.a. BARAKAAT BANK OF SOMALIA; a.k.a. BBS), Bossaso, Somalia; Mogadishu, Somalia [SDGT]

AL-BARAKAAT GROUP OF COMPANIES SOMALIA LIMITED (a.k.a. AL-BARAKAT FINANCIAL COMPANY), Mogadishu, Somalia; P.O. Box 3313, Dubai, U.A.E. [SDGT]

AL-BARAKAAT WIRING SERVICE, 2940 Pillsbury Avenue, Suite 4, Minneapolis, Minnesota 55408, U.S.A. [SDGT]

AL-BARAKAT FINANCE GROUP, Dubai, U.A.E.; Mogadishu, Somalia [SDGT]

AL-BARAKAT FINANCIAL HOLDING COMPANY, Dubai, U.A.E.; Mogadishu, Somalia [SDGT]

AL-BARAKAT GLOBAL TELECOMMUNICATIONS (a.k.a. BARAKAAT GLOBETELCOMPANY), Hargeysa, Somalia; Mogadishu, Somalia; P.O. Box 3313, Dubai, U.A.E. [SDGT]

AL-BARAKAT INTERNATIONAL (a.k.a. BARACO CO.), Box 2923, Dubai, U.A.E. [SDGT]

AL-BARAKAT INVESTMENTS, P.O. Box 3313, Deira, Dubai, U.A.E. [SDGT]

[SDGT]

BARAKO TRADING COMPANY LLC, P.O. Box 3313, Dubai, U.A.E. [SDGT]

GLOBAL SERVICE INTERNATIONAL, 1929 5th St., Suite 204, Minneapolis, Minnesota, U.S.A. [SDGT]

HEYATUL ULYA, Mogadishu, Somalia [SDGT]

NADA MANAGEMENT ORGANIZATION SA (f.k.a. AL TAQWA MANAGEMENT ORGANIZATION SA), Viale Stefano Franscini 22, Lugano CH-6900 TI, Switzerland [SDGT]

PARKA TRADING COMPANY, P.O. Box 3313, Deira, Dubai, U.A.E. [SDGT]

RED SEA BARAKAT COMPANY LIMITED, Mogadishu, Somalia; Dubai, U.A.E. [SDGT]

SOMALI INTERNATIONAL RELIEF ORGANIZATION, 1806 Riverside Ave., 2nd Floor, Minneapolis, Minnesota, U.S.A. [SDGT]

SOMALI INTERNET COMPANY, Mogadishu, Somalia [SDGT]

SOMALI NETWORK AB (a.k.a. SOM NET AB), Hallbybacken 15, Spanga 70, Sweden [SDGT]

YOUSSEF M. NADA & CO. GESELLSCHAFT M.B.H., Kaernter Ring 2/2/5/22, Vienna 1010, Austria [SDGT]

YOUSSEF M. NADA, Via Riasc 4, Campione d'Italia I, CH-6911, Switzerland [SDGT]

Individuals:

ABDULLKADIR, Hussein Mahamud, Florence, Italy (individual) [SDGT]

ADEN, Abdirisak, Skaftingebacken 8, Spanga 163 67, Sweden; DOB 01 Jun 1968 (individual) [SDGT]

ALI, Abbas Abdi, Mogadishu, Somalia (individual) [SDGT]

ALI, Abdi Abdulaziz, Drabantvagen 21, Spanga 177 50, Sweden; DOB 01 Jan 1955 (individual) [SDGT]

ALI, Yusaf Ahmed, Hallbybacken 15, Spanga 70, Sweden; DOB 20 Nov 1974 (individual) [SDGT]

AWEYS, Dahir Ubeidullahi, Via Cipriano Facchinetti 84, Rome, Italy (individual) [SDGT]

AWEYS, Hassan Dahir (a.k.a. ALI, Sheikh Hassan Dahir Aweys; a.k.a. AWES, Shaykh Hassan Dahir); DOB 1935; citizen Somalia (individual) [SDGT]

HIMMAT, Ali Ghaleb, Via Posero 2, Campione d'Italia CH-6911, Switzerland; DOB 16 Jun 1938; POB Damascus, Syria; citizen Switzerland; alt. citizen Tunisia (individual) [SDGT]

HUBER, Albert Friedrich Armand (a.k.a. HUBER, Ahmed), Mettmenstetten, Switzerland; DOB 1927 (individual) [SDGT]

HUSSEIN, Liban, 2019 Bank St., Ottawa, Ontario, Canada; 925 Washington St., Dorchester, Massachusetts, U.S.A. (individual) [SDGT]

DOCUMENT #10

# DIRECTORY OF
# ISLAMIC FINANCIAL
# INSTITUTIONS

Edited by
JOHN R. PRESLEY

CROOM HELM
London • New York • Sydney

© 1988 International Centre for Islamic Studies
Croom Helm Ltd, Provident House, Burrell Row,
Beckenham, Kent, BR3 1AT

Croom Helm Australia, 44-50 Waterloo Road,
North Ryde, 2113, New South Wales

Published in the USA by
Croom Helm
in association with Routledge, Chapman & Hall, Inc.
29 West 35th Street,
New York, NY 10001

British Library Cataloguing in Publication Data

Presley, John R.
   Directory of Islamic financial institutions.
   1. Financial institutions — Islamic
   countries — Directories
   I. Title
   332.1'025'17671        HG187.3
ISBN 0-7099-1347-8

Library of Congress Cataloging-in-Publication Data

A Directory of Islamic financial institutions/edited by John R.
   Presley for ICIS.
      p.   cm.
   Bibliography: p.
   Includes index.
   ISBN 0-7099-1347-8
   1. Banks and banking — Islamic countries — Directories. 2. Banks
and banking — Islamic countries. I. Presley, John R.
II. International Centre for Islamic Studies.
HG3368.A5D57   1988
332.1'025'17671 — dc19
                                                87-30403

Printed and bound in Great Britain by Mackays of Chatham Ltd, Kent

# Contents

Preface
Acknowledgements

*Part One  Islamic Banking: The Background*

Introduction                                                                    1
1.  A Framework of Islamic Banking                                              3
2.  The Islamic Economic System: An Overview                                   14
3.  Islamic Banking Operations                                                 20
4.  The International Association of Islamic Banks (IAIB), The
    Higher Religious Supervisory Board and Dar Al-Maal
    Al-Islami                                                                  37
5.  The Role of the Islamic Development Bank (IDB): The
    First Ten Years                                                           49
6.  The Evolution of Islamic Banking                                         61
7.  The Islamic Financial System and Banking: Some
    Theoretical Considerations                                               67
Selected Bibliography on Islamic Economics and Banking                       78

*Part Two  Directory of Islamic Financial Institutions*

Introduction                                                                 97
Index to Islamic Banks and Financial Institutions                            99
                                                                             101

*Part Three  Islamic Banking: Case Studies and Banking Laws*

Introduction                                                                213
1.  The Islamic Republic of Iran                                            215
    Appendix: Islamic Banking Law in Iran                                   217
2.  Islamic Banking in Pakistan                                             228
    Appendix: Islamic Banking Law in Pakistan                               254
3.  Major Issues of Transition in Islamic Banking                           269
    Appendix A: Islamic Banking Law in Malaysia                             298
    Appendix B: Islamic Banking Law in Turkey                               311
                                                                            329



FEB 07 2004

## INDEX TO ISLAMIC BANKS AND FINANCIAL INSTITUTIONS

### Directors

Taj El Sir Abdel Rahman (General Manager)
Hassan Mohamed Salah (Deputy General Manager)
Bashir Musa (Assistant General Manager)
Ibrahim Hassan Idris (Assistant General Manager)
Mahmoud A Ommal (Khartoum Branch Manager)
Awadalla Elhadi Mabrouk (Wad Medani Manager)
Khalifa Mohamed Abdel Rahman (Port Sudan Manager)
Mohamed Ahmed Omer Elkanm (New Halfa Manager)
Hussain Mohamed Omer El Mufti (Dongola Manager)
Abdulla Bukhari Mohamed (Atbara Manager)

### Objectives

The Bank's objectives are essentially, 'Consolidation, promotion and development of the co-operative sector by offering the necessary financing for the societies in their different fields and throughout the country'.

### Capital structure (LS million)

Authorised capital    15
Paid-up capital    5

Of the paid-up capital, LS 3 million has been paid by the government and LS 2 million by the co-operative societies.

### Future developments

The Bank's strategy is to give particular regard to small depositors and small investors and to spread its services throughout the country.

### Faisal Islamic Bank (Sudan)

**Head office**
PO Box 10143
Khartoum
Sudan

**Telephone/telex/cable**
Tel: 81846, 81857
Telex: 22519 SD, FIBS 22164 SD
Cable: BANKISLAMI-KTM

## INDEX TO ISLAMIC BANKS AND FINANCIAL INSTITUTIONS

**Other branches**

**Capital branch:**

*Main branch:*
Fayha Building
PO Box 10143
Khartoum
Tel: 73717, 73566
Telex: FIBS 22164 SD, FIBS 22519 SD
Cable: BANKISLAMI-KTM

*Central station:*
PO Box 2415
Khartoum
Tel: 75590, 75586
Telex: FIBS 22164 SD
Cable: BANKISLAMI-KTM

*United Nations Square:*
PO Box 2415
Khartoum
Tel: 78957, 73774
Telex: FIBS 22519 SD
Cable: BANKISLAMI-KTM

*Expatriates' branch:*
PO Box 2415
Khartoum
Tel: 75567
Telex: FIBS 22163 SD
Cable: BANKISLAMI-KTM

*University of Khartoum:*
Po Box 2415
Khartoum
Tel: 78691
Telex: FIBS 22519 SD
Cable: BANKISLAMI-KTM

*Central Station, Omdurman:*
PO Box 835
Omdurman
Tel: 51971, 53126
Telex: FIBS 28042 SD
Cable: BANKISLAMI-KTM

FEB 07 2004

INDEX TO ISLAMIC BANKS AND FINANCIAL INSTITUTIONS

*Craftsmen and Artisans, Omdurman:*
PO Box 835
Omdurman
Tel: 50332, 56997
Telex: 28042 SD
Cable: BANKISLAMI-KTM
*Al Souqona Khartoum South:*
Tel: 47751, 47758
Cable: BANKISLAMI-KTM

*Country branches*

*Port Sudan:*
PO Box 877
Port Sudan
Tel: 4651, 4695
Cable: BANKISLAMI-PORT SUDAN
*El Gadaref:*
PO Box 324
Gadaref
Tel: 3503, 3403
Cable: BANKISLAMI-GADAREF
*Kosti:*
Faisal Islamic Bank
Kosti Branch
Kosti
Cable: BANKISLAMI-KOSTI
*El Obied:*
PO Box 239
El Obied
Tel: 2609
Cable: BANKISLAMI-EL OBIED
*Atbara:*
PO Box 42
Atbara
Tel: 3071, 3126
Cable: BANKISLAMI-ATBARA
*Kassala:*
PO Box 314
Kassala
Tel: 2044
Telegram: Bankislami — Kassala

INDEX TO ISLAMIC BANKS AND FINANCIAL INSTITUTIONS

*Juba:*
PO Box 25
Juba
Tel: 2389
Telegram: Bankislami — Juba
*Damazin:*
PO Box 106
Damazin
Tel: 2156
Telegram: Bankislami — Damazin
*El Fasher:*
Faisal Islamic Bank
El Fasher
Tel: 2238
Telegram: Bankislami — El Fasher
*Dongla:*
Tel: 2590, 2590
Telegram: Bankislami — Dongla

*Subsidiary companies*

*Islamic Insurance Company:*
PO Box 2776
Khartoum
Tel: 78287
Telex: TATA 22167 SD
Telegram: TATA — Khartoum
*Islamic Trading and Service Co Ltd:*
PO Box 2415
Khartoum
Tel: 81611, 81950, 81054
Telex: Tislm 22166 SD
Telegram: Tislm — Khartoum
*Real Estate Development Co:*
PO Box 2415
Khartoum
Tel: 80171
Telex: RECO 22945 SD
Telegram: RECO Khartoum

*Date of formation*
Established August 1977; commenced operations May 1978.

*Background*
FIB (Sudan) was established in August 1977 and started operations in May 1978

# DOCUMENT #11

A Travel Notebook in the Noble Al-Quds

extensive internal damage done by a dum-dum bullet: an incision right accross him. An Israeli officer in a rage tore out the stitches. The patient died.

Farmers are forbidden to drill wells to irrigate their fields and to drink. The Israelis cement up the wells, and steal the water resources for the settlements. Building is hindered. When a house is bulldozed, residents are forbidden to rebuild it. One family of 14 just lives in a tent now, pitched beside their ruined house.

The battle of olive trees continues. "The Jews hate the olive tree," one farmer was telling me. "They are always uprooting them. Whole groves of them sometimes 'for security reasons' they say. We love the olive tree. It is called blessed in the Qur'an. We just replant them. They are a symbol of Peace." Palestine is full of olive trees: Holy Land.

It is reported in the Traditions that of all the trees it is only the *Gharqad* tree which will not betray a Jew hiding behind it. The Jews are taking precautions planting this tree everywhere now: in the middle of traffic islands, in parks, around houses and on the roadside. They cannot plant enough of them, like the Swiss build atom shelters.

•  •  •

(One Way Media, 3 Goodge Place, London, WIP 3FL.)

# Rabita Trust for Stranded Pakistanis Formed

— Amin Aqeel Attas

The following is a statement released to the news media from Islamabad/Karachi, immediately after the formal approval of the Rabitat al-Alam al-Islami Trust, which has come into being at the initiative of the Muslim World League, Makkah, now working in close cooperation with the Government of Pakistan, for the repatriation and rehabilitation of the Stranded Pakistanis. President Muhammad Zia-ul-Haq and H.R.H. Prince Talal bin Abdul Aziz have respectively agreed to be the Chairman and Co-Chairman of the Trust, while Dr. Abdullah Omar Nasseef, the MWL Secretary-General, and Sahabzada Muhammad Yaqub Khan, Foreign Minister of Pakistan, are to be its Vice-Chairmen.

I will work as the Director-General-Cum-Secretary-General of the Board and Mr. Hasan Zaheer, Secretary, Cabinet Division, Government of Pakistan, will be its Deputy Director-General. Maulana Zafar Ahmad Ansari, a veteran of the Pakistan movement, has kindly accepted to remain associated with our work, now as a Pakistan Government nominee on the Board. The Minister of Interior, Mr. Naseem Aheer, and the Minister of Commerce, Finance, Planning and Development, Dr. Mahbub-ul-Haq, will be members of the Board on behalf of Government of Pakistan, whereas names from the Rabita to complete the membership of the Board are being finalized. Registration of the Rabita Turst, with head office in Islamabad, is also being attended to.

Islamabad, July 9, 1988.

Alhamdulillah, today we have signed the Rabitat al-Alam al-Islami Trust Deed for the much-awaited programme of repatriation and rehabilitation of our Pakistani brethren languishing in indescribable conditions in Bangladesh.

We have no words to thank Allah for His compassion and benevolence in enabling us to reach this accord with the Government of Pakistan. We are absolutely confident that Allah in His infinite mercy will grant us success in fulfilling our moral, religious and ideological obligation that has been repeatedly announced from Makkah and Islamabad. That responsibility now devolves on the newly constituted Board of Trustees which has come into existence by Allah's grace.

President Muhammad Zia-ul-Haq has indeed taken a momentous decision to extend all possible assistance to the Rabita in its mission to transport and rehabilitate those courageous patriots who have time and again sacrificed all they had for this Islamic Republic. He deserves the appreciation of the entire Muslim nation and more so of the Rabita which gratefully acknowledges the contribution of Rs 250 million made to the Rabita Trust last evening. The Government of Pakistan has also graciously agreed to provide us suitable land for setting up appropriate housing colonies for the affected people.

We are happy and proud to place on record our heartfelt thanks to the Custodian of the Two Holy Harams, King Fahd bin Abdul Aziz, for his untiring efforts in the service of Islam and Muslim peoples throughout the world. He has shown keen interest in the Rabita programme for the repatriation and rehabilitation of the stranded Pakistanis, and but for his support and encouragement it would not have been possible for us to undertake such an onerous task.

We are getting the Trust registered at Islamabad and opening an account with Pak Rs 50 million being given as an initial contribution by the Rabita. We would simultaneously start a vigorous fund-raising campaign in various countries f the repatriation and rehabilitation of the stranded Pakistanis — a programme which would cost at least Pak Rs 5,500 million. It is our earnest hope that within a few months we will be able to collect a substantial amount of money to help pave the way for constructing proper townships, as envisaged in our rehabilitation plan

On this auspicious occasion, we wish to convey a word of praise and acclamation to our stranded brethren who have borne the brunt of hunger and deprivation, of agony and separation for seventeen long years with exemplary fortitude. They have proved beyond doubt that they are Pakistanis first and Pakistanis last and that they love Pakistan more than their lives or anything else.

We appeal to them in the name of Islam to remain patient and steadfast as they have always been, and assure them that Insha Allah the day is not very far away when they will be able to relocate themselves in their cherished homeland, Pakistan.

# DOCUMENT #12

hello

UNITED STATES
# DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

| HOME | CONTACT TREASURY | SITE INDEX | FOIA | ESPAÑOL | ACCESSIBILITY | PRIVACY & LEGAL |

search **SEARCH**

**News**
**Direct Links**
**Key Topics**
**Press Room**
**Organization**
**Offices**
  Domestic Finance
  Economic Policy
  General Counsel
  Information and Technology Management
  International Affairs
  Management
  Public Affairs
  Tax Policy
  Terrorism and Financial Intelligence
  ▸ Office of Foreign Assets Control
    Designation Lists & Financial Advisories
    Publications and Legislation
    Programs and Initiatives
  Treasurer
**Bureaus**
**Education**

## Office of Foreign Assets Control

### Recent OFAC Actions

Full List | Previous | Next

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

**10/12/2001**

OFAC has added the names of 39 terrorists to its list of SDGTs. Their assets must be blocked immediately. All of OFAC's SDN material has been revised accordingly, including delimited and fixed field files. For details, including individual entries for all "a.k.a."s, please click on the SDN changes button or review the SDNEW01.txt file available in the delimited files *.exe download. OFAC's Terrorism brochure has also been updated to incorporate the new entries."

Here is a temporary posting, in addition to the permanent SDN Changes file, of the primary records for the new entries on OFAC's SDN list. This temporary posting does not have each "a.k.a." as a separate entry.

ABDULLAH, Abdullah Ahmed (a.k.a. ABU MARIAM; a.k.a. AL-MASRI, Abu Mohamed; a.k.a. SALEH), Afghanistan (DOB 1963; POB Egypt; citizen Egypt) (individual) [SDGT]

AGHA, Haji Abdul Manan (a.k.a. SAIYID, Abd Al-Man'am), Pakistan (individual) [SDGT]

AL-HAMATI SWEETS BAKERIES, Al-Mukallah, Hadhramawt Governorate, Yemen [SDGT]

AL-HAMATI, Muhammad (a.k.a. AL-AHDAL, Mohammad Hamdi Sadiq; a.k.a. AL-MAKKI, Abu Asim), Yemen (individual) [SDGT]

AL-HAQ, Amin (a.k.a. AH HAQ, Dr. Amin; a.k.a. AMIN, Muhammad; a.k.a. UL-HAQ, Dr. Amin) (DOB 1960; POB Nangahar Province, Afghanistan) (individual) [SDGT]

AL-JADAWI, Saqar (DOB 1965) (individual) [SDGT]

AL-KADR, Ahmad Sa'id (a.k.a. AL-KANADI, Abu Abd Al-Rahman) (DOB 01 Mar 1948; POB Cairo, Egypt) (individual) [SDGT]

AL-LIBY, Anas (a.k.a. AL-LIBI, Anas; a.k.a. AL-RAGHIE, Nazih; a.k.a. AL-RAGHIE, Nazih Abdul Hamed; a.k.a. AL-SABAI, Anas), Afghanistan (DOB 30 Mar 1964, Alt. DOB 14 May 1964; POB Tripoli, Libya; citizen Libya) (individual) [SDGT]

AL-MUGHASSIL, Ahmad Ibrahim (a.k.a. ABU OMRAN; a.k.a. AL-MUGHASSIL, Ahmed Ibrahim) (DOB 26 Jun 1967; POB Qatif-Bab al Shamal, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

AL-NASSER, Abdelkarim Hussein Mohamed (POB Al Ihsa, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

AL-NUR HONEY PRESS SHOPS (a.k.a. AL-NUR HONEY CENTER), Sanaa, Yemen. [SDGT]

AL-QADI, Yasin (a.k.a. KADI, Shaykh Yassin Abdullah; a.k.a. KAHDI, Yasin), Jeddah, Saudi Arabia (individual) [SDGT]

AL-SHARIF, Sa'd (DOB 1969; POB Saudi Arabia) (individual) [SDGT]

AL-SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE, Al-Nasr Street, Doha, Qatar; By the Shrine Next to the Gas Station, Jamal Street, Ta'iz, Yemen; Al-'Arudh Square, Khur Maksar, Aden, Yemen; P.O. Box 8089, Al-Hasabah, Sanaa, Yemen [SDGT]

AL-YACOUB, Ibrahim Salih Mohammed (DOB 16 Oct 1966; POB Tarut, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

ALI, Ahmed Mohammed Hamed (a.k.a. ABDUREHMAN, Ahmed Mohammed; a.k.a. ABU FATIMA; a.k.a. ABU ISLAM; a.k.a. ABU KHADIIJAH; a.k.a. AHMED HAMED; a.k.a. Ahmed The Egyptian; a.k.a. AHMED, Ahmed; a.k.a. AL-MASRI, Ahmad; a.k.a. AL-SURIR, Abu Islam; a.k.a. ALI, Ahmed Mohammed; a.k.a. ALI, Hamed; a.k.a. HEMED, Ahmed; a.k.a. SHIEB, Ahmed; a.k.a. SHUAIB), Afghanistan (DOB 1965; POB Egypt; citizen Egypt) (individual) [SDGT]

ATWA, Ali (a.k.a. BOUSLIM, Ammar Mansour; a.k.a. SALIM, Hassan Rostom), Lebanon (DOB 1960; POB Lebanon; citizen Lebanon) (individual) [SDGT1]

ATWAH, Muhsin Musa Matwalli (a.k.a. ABDEL RAHMAN; a.k.a. ABDUL RAHMAN; a.k.a. AL-MUHAJIR, Abdul Rahman; a.k.a. AL-NAMER, Mohammed K.A.), Afghanistan (DOB 19 Jun 1964; POB Egypt; citizen Egypt) (individual) [SDGT]

BIN MARWAN, Bilal (DOB 1947) (individual) [SDGT]

BIN MUHAMMAD, Ayadi Chafiq (a.k.a. AIADI, Ben Muhammad; a.k.a. AIADY, Ben Muhammad; a.k.a. AYADI CHAFIK, Ben Muhammad; a.k.a. AYADI SHAFIQ, Ben Muhammad), Darvingasse 1/2/58-60, Vienna, Austria; 28 Chaussee de Lille, Mouscron, Belgium; 129 Park Road, NW8, London, England; Helene Meyer Ring 10-1415-80809, Munich, Germany; Tunisia (DOB 21 Jan 1963; POB Safais (Sfax), Tunisia) (individual) [SDGT]

DARKAZANLI, Mamoun, Uhlenhorsterweg 34 11, 22085, Hamburg, Germany (DOB 4 Aug 1958; POB Aleppo, Syria; Passport No: 1310636262 <Germany>) (individual) [SDGT]

EL-HOORIE, Ali Saed Bin Ali (a.k.a. AL-HOURI, Ali Saed Bin Ali; a.k.a. EL-HOURI, Ali Saed Bin Ali) (DOB 10 Jul 1965, alt. DOB 11 Jul 1965; POB El Dibabiya, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

FADHIL, Mustafa Mohamed (a.k.a. AL MASRI, Abd Al Wakil; a.k.a. AL-NUBI, Abu; a.k.a. ALI, Hassan; a.k.a. ANIS, Abu; a.k.a. ELBISHY, Moustafa Ali; a.k.a. FADIL, Mustafa Muhamad; a.k.a. FAZUL, Mustafa; a.k.a. HUSSEIN; a.k.a. JIHAD, Abu; a.k.a. KHALID; a.k.a. MAN, Nu; a.k.a. MOHAMMED, Mustafa; a.k.a. YUSSRR, Abu) (DOB 23 Jun 1976; POB Cairo, Egypt; citizen Egypt, alt. citizen Kenya; Kenyan ID No. 12773667; Serial No. 201735161) (individual) [SDGT]

GHAILANI, Ahmed Khalfan (a.k.a. "AHMED THE TANZANIAN"; a.k.a. "FOOPIE"; a.k.a. "FUPI"; a.k.a. AHMAD, Abu Bakr; a.k.a. AHMED, A.; a.k.a. AHMED, Abubakar; a.k.a. AHMED, Abubakar K.; a.k.a. AHMED, Abubakar Khalfan; a.k.a. AHMED, Abubakary K.; a.k.a. AHMED, Ahmed Khalfan; a.k.a. AL TANZANI, Ahmad; a.k.a. ALI, Ahmed Khalfan; a.k.a. BAKR, Abu; a.k.a. GHAILANI, Abubakary Khalfan Ahmed; a.k.a. GHAILANI, Ahmed; a.k.a. GHILANI, Ahmad Khalafan; a.k.a. HUSSEIN, Mahafudh Abubakar Ahmed Abdallah; a.k.a. KHABAR, Abu; a.k.a. KHALFAN, Ahmed; a.k.a. MOHAMMED, Shariff Omar (DOB 14