**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re Terrorist Attacks on September 11, 2001                    03 MDL 1570 (RCC)
                                                                 ECF Case

-------------------------------------------------------------x

CANTOR FITZGERALD & CO., et al.,

                     Plaintiffs,                                 04 CV 7065 (RCC)
                                                                 ECF Case

            v.

AKIDA BANK PRIVATE LIMITED, et al.,

                     Defendants.
-------------------------------------------------------------x


CANTOR FITZGERALD AND PORT AUTHORITY PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANT
FAISAL ISLAMIC BANK (SUDAN)


Dated: June 27, 2005                      Kenneth L. Adams
       New York, New York                 Jonathan M. Goodman
                                          Christopher T. Leonardo
                                          Stacey A. Saiontz
                                          Dickstein Shapiro Morin & Oshinsky LLP
                                          1177 Avenue of the Americas
                                          New York, New York 10036-2714
                                          Tel.:  212-835-1400
                                          Fax:  212-997-9880

The Cantor Fitzgerald Plaintiffs[1] submit this memorandum of law in opposition to the motion to dismiss of Defendant Faisal Islamic Bank (Sudan) (hereinafter "FIBS").  The Cantor Fitzgerald Plaintiffs separately join all arguments asserted in both Plaintiffs' Consolidated Memorandum Of Law In Opposition To Motions To Dismiss of Defendant Faisal Islamic Bank Sudan, and Property Damage Plaintiffs' Consolidated Memorandum Of Law In Opposition To The Motions To Dismiss Of Defendant Faisal Islamic Bank of Sudan.[2]  The Cantor Fitzgerald Plaintiffs adopt and incorporate herein the aforementioned Consolidated Oppositions and accompanying papers.

The instant Opposition motion primarily directs itself to FIBS' motion to dismiss Counts Nine, Eleven, Twelve, Thirteen of the Cantor Fitzgerald Plaintiffs' First Amended Complaint.  These Counts collectively raise claims specific to the Cantor Fitzgerald Plaintiffs and are distinct from those claims asserted by co-Plaintiffs.

Counts Nine and Eleven seek relief from FIBS for injuries caused by FIBS' concerted action with Al Qaeda and Osama Bin Laden in violation of international law.

---

[1]     The Cantor Fitzgerald Plaintiffs include Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald, L.P., Cantor Index Limited, CO2e.com, LLC, eSpeed Government Securities, Inc., eSpeed, Inc., eSpeed Securities, Inc., TradeSpark, L.P.; and the Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC (collectively, the "Cantor Fitzgerald Plaintiffs").  The Cantor Fitzgerald Plaintiffs allege that they were injured by damage to their physical property and property interests, as well as business interruption losses and lost profits.

[2]     *See* Plaintiffs' Consolidated Memorandum Of Law In Opposition To Motions To Dismiss of Defendant Faisal Islamic Bank Sudan, at p. 1, note 2 (advising that Plaintiffs were filing consolidated motion in opposition, but also, that Cantor Fitzgerald Plaintiffs and co-property damage plaintiffs would be filing consolidated brief to address RICO claims specific to property damage plaintiffs.); *see also* Property Damage Plaintiffs' Consolidated Memorandum Of Law In Opposition To The Motions To Dismiss Of Defendant Faisal Islamic Bank of Sudan, at p.1-2, and note 1 (advising that Cantor Fitzgerald Plaintiffs had joined both Consolidated Oppositions, and also, were filing separately their own Opposition motion relating to issues specific to claims asserted by Cantor Fitzgerald Plaintiffs).

FIBS makes only a passing, non-specific argument regarding the instant international law claims.  *See* FIBS Mem. of Law at pp. 19-20.  Nevertheless, the Cantor Fitzgerald Plaintiffs separately set forth the legal sufficiency of Counts Nine and Eleven.

Count Twelve asserts claims for punitive damages.  As demonstrated below, this Circuit and sister courts have long awarded punitive damages for violations of international law, a fact that vitiates FIBS's two sentence analysis in favor of dismissal of Count Twelve.

Count Thirteen asserts contribution and indemnity claims by Plaintiffs the Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC.  FIBS moves to dismiss these claims as well, FIBS Mem. of Law at pp. 20-21.  These arguments are likewise misplaced.

I.      CANTOR FITZGERALD PLAINTIFFS PROPERLY ASSERT CLAIMS
        UNDER INTERNATIONAL LAW

In Counts Nine and Eleven of the Cantor Fitzgerald Plaintiffs' First Amended Complaint, the Cantor Fitzgerald Plaintiffs allege that all Defendants are jointly and severally liable for Plaintiffs' damages under principles of international law.  *See* First Amended Cantor Action Compl. at ¶¶ 226; 228, 230, 234-36.  Specifically, the Cantor Fitzgerald Plaintiffs assert that aircraft hijacking is a well recognized violation of the law of nations, and that the September 11 attacks were committed through a terrorist airhijacking in violation of international law.  *See* First Amended Cantor Action Compl. at ¶228.[3]  The Cantor Fitzgerald Plaintiffs also contend that FIBS's conduct, insofar as it

---

[3]      *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447-48 (2d Cir. 2001); *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1996); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120 (D.D.C. 2003); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 309 (S.D.N.Y. 2003); *see generally United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991) ("Aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved.").

establishes that Defendant acted directly and in concert with others in financing and materially supporting Al Qaeda, equally demonstrates FIBS's liability for aiding and abetting a violation of international law.  *Id*. at ¶¶228, 230, 234-36,[4]  FIBS's motion to dismiss the Cantor Fitzgerald Plaintiffs' international law claims is without merit.

A.     Subject Matter Jurisdiction Is Proper Under 28 U.S.C. § 1331 and Federal Common Law

The Court clearly possesses subject matter jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims pursuant to 28 U.S.C. § 1331 and federal common law.  The law empowers federal district courts to exercise subject matter jurisdiction over international law claims asserted by both U.S. and foreign victims injured by violations of international law.  For example, in *Filartiga v. Pena- Irala*, 630 F.2d 876, 887, n.22 (2d Cir. 1980), the Second Circuit held that "[f]ederal jurisdiction over cases involving international law is clear," and therefore found that the same reasoning that supports the exercise of jurisdiction over international law claims asserted under the Alien Tort Claims Act ("ATCA") would in all likelihood support jurisdiction under 28 U.S.C. § 1331.  *Id*.  More recently, the court *Bodner vs. Banque Paribas*, 114 F. Supp. 2d 117, 127, n.6 (E.D.N.Y. 2000) followed *Filartiga v. Pena- Irala* in applying 28 U.S.C. § 1331 to exercise jurisdiction over international law claims asserted by American plaintiffs, who were victims of the holocaust and their legal representatives, against foreign banks that looted, converted, and withheld plaintiffs' assets in violation of international law.  *Id*.

---

[4]     *Accord Estates of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 97-98 (D.R.I. 2001) (finding plaintiff-victims of terrorism stated ATA claims, both under material support and accessory after the fact theories, against Palestinian Authority and co-defendants, where plaintiffs alleged *inter alia* that defendants provided designated terrorist entity Hamas with safe haven, a base of operations, permitted and/or encouraged Hamas to operate freely in territories under their control, and otherwise lent material support to families of Hamas members who had been captured or killed carrying out terrorist attacks).

3

The holdings in *Filartiga v. Pena- Irala* and *Bodner vs. Banque Paribas* accurately reflect the current state of the law.  According to the Restatement of Foreign Relations Law:

> Cases arising under treaties to which the United States is a party, as well as cases arising under customary international law, or under international agreements of the United States other than treaties, are "Cases . . . arising under . . . the Laws of the United States, and Treaties made . . . under their Authority, and therefore within the Judicial Power of the United States under Article III, Section 2 of the Constitution.  Civil actions arising under international law or under a treaty or other international agreement of the United States are within the jurisdiction of the United States district courts."

Restatement (Third) of Foreign Relations Law § 111, comment (e) (1987).

The exercise of jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims would also be entirely consistent with Supreme Court and related precedent holding that, as international law is part of federal common law, federal district courts are inherently empowered to adjudicate international claims.  *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("international law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); *In re Agent Orange Prod. Liab. Litig.*, No. MDL 381, 04-CV-400, 2005 WL 729177, at *3 & *38 (E.D.N.Y. March 28, 2005) (ruling "[i]n judging international human rights claims against domestic corporations or others, courts in the United States with jurisdiction act as quasi international tribunals . . . Federal common law, not *Erie*, governs."); *see also Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (federal common law incorporates customary international law); *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international

4

law).[5]  Nor is subject matter jurisdiction over international law claims improper when those claims involve property damage.  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 717 (2d Cir. 2004); *Bodner vs. Banque Paribas,* 114 F. Supp. 2d 117, 127, 127 n.6 (E.D.N.Y. 2000).[6]

This Court, like other courts before it, has ruled that the September 11 attacks were perpetrated in violation of international law.  *In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005); *Burnett I*, 274 F. Supp. 2d at 100.  Further, consistent with established Second Circuit precedent this Court has held that those who act in concert with others in the commission of violations of international law are themselves liable for the resulting damages.  *In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d at 826; *Kadic v. Karadzic,* 70 F.3d 232, 239 (2d Cir. 1995); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,*No. 01 Civ. 9882 (S.D.N.Y. June 13, 2005) at 14 (denying motion for judgment on the pleadings brought by energy company and holding private corporations can be held liable for acting in concert with others who violate international law) (attached as Exhibit 1 to the Declaration of Jonathan Goodman (hereinafter "Goodman Decl."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244

---

[5]      *See also Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192, 1195 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 508 (2004) ("It is not 'insubstantial and frivolous' to assert that federal common law should provide a private cause of action for violations of customary international law.") (citing *Filartiga v. Pena- Irala*, 630 F.2d at 886-87; *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244, 1255 (C.D. Cal. 1999), *rev'd in part on other grounds*, 251 F.3d 1230 (9th Cir. 2001); *Accord Illinois v. Milwaukee*, 406 U.S. 91, 100 (1972) (concluding that 28 U.S.C. § 1331 federal question jurisdiction supports claims founded upon federal common law); *White v. Paulsen*, 997 F. Supp. 1380, 1383-84 (E.D. Wash. 1998); *see generally* Harold Hongju Koh, *Transnational Public Law Litigation*, 100 Yale L. J. 2347, 2385- 86 (1991); Kenneth C. Randall, *Federal Questions and the Human Rights Paradigm*, 73 Minn. L. Rev. 349 (1988).

[6]      There is wealth of additional support for this view.  For example, there is no foreign sovereign immunity against damage claims involving property rights taken in violation of international law. *See* 28 U.S.C. § 1605(a)(3).  Likewise, claims for damages arising out of the forced taking of property through violations of international law are recognized an exception to the Act of State doctrine.  22 U.S.C. § 2370(e)(2).

F. Supp. 2d 289, 321 (S.D.N.Y 2003); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *13 (S.D.N.Y. Feb. 28, 2002); *In re Agent Orange Prod. Liab. Litig.*, No. MDL 381, 04-CV-400, 2005 WL 729177, at *38 (E.D.N.Y. March 28, 2005) ("federal case law dating back more than two hundred years…recognized liability for aiding and abetting violations of international law norms.").  Thus, this Court possesses subject matter over the Cantor Fitzgerald Plaintiffs' international law claims.[7]

> B. The Cantor Fitzgerald Plaintiffs State A Claim That FIBS Acted In Concert With Others In Violation Of International Law

In the present case, the Cantor Fitzgerald Plaintiffs sufficiently allege that FIBS acted in concert with, financed, and/or materially supported Al Qaeda in violation of international law and thus is responsible for the resulting property damage suffered by the Cantor Fitzgerald Plaintiffs.  For example, Cantor Fitzgerald Plaintiffs assert that FIBS acted in concert with, financed, and/or materially supported Al Qaeda by knowingly maintaining bank accounts used by Al Qaeda.  *See* First Amended Complaint at ¶132 ("Al Shamal shareholder defendant Faisal Islamic Bank (Sudan) provided financial and bank account services to several Al Qaeda operatives.").

---

[7]     An alternative basis for jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims exists under 28 U.S.C. § 1367.  In *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003), *appeal dism'd*, 2004 WL 2664532, at *1 (D.C. Cir. Nov. 22, 2004), survivors of American passengers killed in the bombing of UTA Flight 772 and an American corporation that owned the aircraft that was destroyed in the attack sued Libya, its intelligence service, and related individuals for sponsoring the attack.  *Id.* at 56.  The corporate-plaintiff sought relief under 18 U.S.C. § 2333 and asserted related common law claims, whereas the individual plaintiffs relied upon the terrorism exception to sovereign immunity and the Flatow Amendment to establish subject matter jurisdiction and a private right of action.  *Id.* at 56, 60 (citing to 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605(a)(7) (note) (the 1996 Flatow Amendment).  When faced with the defendants' motion to dismiss the corporate plaintiff's common law and ATA claims for lack of subject matter jurisdiction, the court correctly ruled that because it possessed original jurisdiction over the individual plaintiffs' claims, so too could it exercise supplemental jurisdiction over the corporation's claims.  Like the claims at bar, the corporate claims grew "out of the same case or controversy as the individual plaintiffs' claims."  *Id.* at 60, 61.  Thus, insofar as this Court permits any claim to proceed against FIBS, it should also exercise supplemental jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims.  *Id.*; 28 U.S.C. § 1367(a).

Defendant's conduct is evidenced by the following sworn testimony from a captured Al

Qaeda member given in the 2001 trial of *United States v. Osama Bin Laden*:

> Q.  Did you work on the finances for al Qaeda while you were in
> the Sudan?
>
> A.  Yes.
>
> Q.  Did you know where the bank accounts of Usama Bin Laden
> and al Qaeda were?
>
> A.  Yes.
>
> Q.  Do you know whose names they were in?
>
> A.  The bank account under Usama Bin Laden in Bank Shaml,
> Khartoum.
>
> Q.  That was under Usama Bin Laden's true name?
>
> A.  Yes.
>
> Q.  Were there accounts in other names?
>
> A.  Yes.  Afad Makkee got account also.
>
> Q.  Afad Makkee, the account that he had under his name, do you
> know what name that is?
>
> A.  I remember Madani Sidi al Tayyib.
>
> Q.  Do you know of any other persons who had al Qaeda money in
> their accounts?
>
> A.  Abu Rida al Suri.
>
> Q.  Do you know his true name?
>
> A.  Nidal.
>
> Q.  Anyone else that you knew had al Qaeda money in bank
> accounts in their name?
>
> A.  Abu Hajer al Iraqi.
>
> Q.  Do you know his true name?

7

A.  Mamdouh Salim.

Q.  Did you have any accounts in your name?

A.  Shared with Abu Fadhl.

Q.  So you had accounts in your name that were shared with Abu Fadhl?

A.  Yes.

Q.  Do you recall anyone else that had bank accounts in their name for al Qaeda?

A.  Abdouh al Mukhlafi.

Q.  Who was this person named Abdouh al Mukhlafi?

A.  He is from Yemen.

Q.  What role did he play for Bin Laden?

A.  He goes with Bin Laden when Bin Laden travel outside or inside Sudan.

Q.  What role did he play for Bin Laden when Bin Laden traveled?

A.  He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.

Q.  Did he handle money during the travel?

A.  Yes.

Q.  Where were the accounts held?  In what countries?

A.  In Sudan and is in Bank Tadamon Islami.

Q.  Where else?

A.  Also we got account in Bank Faisl Islami.

Q.  Is that also in Khartoum?

A.  Yes.

*United States v. Usama bin Laden,* S(7) 98 Cr. 1023 (S.D.N.Y. Feb. 6, 2001) (Tr: 333:17-to-

335:17) (attached at Goodman Decl. Ex. 2).

The Cantor Fitzgerald Plaintiffs also assert that FIBS acted in concert with others in the lending of financial and material support to Al Qaeda and Bin Laden. First Amended Complaint at ¶135. Multiple sources support this contention. National Islamic Front of Sudan (the "NIF") members "played a prominent role on the board of directors of the Faisal Islamic Bank." *See* Goodman Decl. Ex. 3 (United States Library of Congress Country Studies (Sudan), Finance, found at www.country-studies.com/sudan/finance.html). The U.S. State Department publicly concluded in 1991 that the NIF supported terrorism. *See* Goodman Decl. Ex. 4 (United States State Department, Patterns of Global Terrorism: 1991, Africa Overview: April 1991), found at www.fas.org/irp/threat/terror_91/africa.html.) ("The most disturbing development was the apparent presence in Sudan of many different international terrorist organizations, with the tacit support of the National Islamic Front-dominated government."). Bin Laden was one of those terrorists supported by the NIF. *See* Goodman Decl. Ex. 5 (United States State Department Issues Factsheet on Bin Ladin (Aug. 14, 1996)) ("Bin Ladin relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi."). The U.S. Government's conclusion about the NIF has not changed since 1991.

The U.S. Congressional Research Service, the research arm of Congress, reported that "[Osama bin Laden] in concert with NIF leaders … built a network of businesses, including an Islamic bank (Al Shamal)." Goodman Decl., Ex. 13 (Katzman, K., Congressional Research Service, "Terrorism: Near Eastern Groups and State Sponsors, 2002," p. 16 (Feb. 13, 2002)). In fact, the relationship remained so close that the FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. *See* Goodman Decl., Ex. 14 (Judith Miller,

9

"The Islamic Wave," the New York Times Magazine, p.22 (May 31, 1992)); *see also* Goodman Decl., Ex. 15 (Jonathan Randal, "Sudan Party Puts New Face on Fundamentalism," Washington Post, A30, Col. 4 (April 7, 1988)).  Bin Laden made a two million dollar financial contribution to Turabi via check drawn on FIBS.  Egyptian newspaper Ruz Al Youssif entitled, Ossama Bin Laden: I Bought The Jihad Groups With My Own Money (June 17, 1996).

The support lent to Bin Laden was substantial:  NIF cooperated with Bin Laden to finance the creation of at least three terrorist training camps, and NIF members and Bin Laden joined to capitalize defendant Al Shamal Bank, with Bin Laden personally investing $50 million dollars in the venture.  *See* Goodman Decl. Ex. 5.  FIBS, in turn, was a shareholder of Al Shamal,[8] and Al Shamal (as revealed in sworn testimony in the 2001 *United States v. Bin Laden* trial) opened and maintained bank accounts used by Al Qaeda.  *See* First Amended Complaint at ¶¶ 122-135; *In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d at 825, 837 (denying motion to dismiss by defendant Batterjee given allegations that Batterjee supported Al Qaeda through Al Shamal and other entities).

FIBS argues throughout its motion to dismiss that there is no direct evidence establishing that it knew that the bank accounts it opened, maintained, and serviced were used by Al Qaeda.  FIBS also claims that there are no facts showing that it possessed actual knowledge that it intentionally provided material support to Al Qaeda.  At a minimum, its knowledge and intent can be inferred from its conscious avoidance of the facts.  *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) ("The

---

[8]     *See* Goodman Decl. Ex. 12 (ABQ Zawya Ltd., Company Information Listing for Al Shamal Islamic Bank, found at www.zawya.com/cm/officersprint.cfm?companyid=1000787).  It is not unreasonable to infer from FIBS's investment in Al Shamal that this was a formal banking investment decision which was approved by FIBS' board of directors.  Certainly, FIBS took no action to repudiate the investment.

conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when one 'is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.''') (quoting *United States v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001) and *United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000)).

Specifically, FIBS consciously avoided the facts showing that: (1) as far back as 1991, NIF was supporting terrorism; (2) NIF members maintained prominent roles on the board of directors of FIBS; (3) NIF and Bin Laden worked together to open a bank—Al Shamal—which FIBS itself invested in as a shareholder after Bin Laden capitalized Al Shamal with $50 million dollars; (4) Al Shamal opened bank accounts for Al Qaeda, and at least one account for Bin Laden, in their own names; and (5) Al Qaeda operatives opened accounts at FIBS.  Further, it is reasonable to infer that FIBS's investment in Al Shamal was a formal investment decision approved by FIBS's board of directors.  Certainly, FIBS took no action to repudiate the investment.

Considering these facts, it is therefore fair and reasonable to conclude for purposes of establishing the sufficiency of the Complaint that when Al Qaeda operatives opened bank accounts in their own names at FIBS and Al Shamal, FIBS "had to know" or at least was "aware of the high probability" that the accounts at its own bank and at Al Shamal were being used by and for the benefit of Al Qaeda and Bin Laden.  *Accord In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d at 831; *United States v. Hanlon*, 548 F.2d 1096, 1000 (2d Cir. 1977) (finding fact that defendant, who served as personal typist for head of company engaged in bank fraud through use of falsified loan and purchase documents, was sufficient evidence from which to infer defendant's knowledge of criminal scheme); *see also United States v. Ferrarini*, 219 F.3d

11

145, 154 (2d Cir. 2000).  The Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them.  *See Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004).

It is equally fair to conclude that FIBS knew or consciously avoided knowing that it was highly probable that materially supporting Al Qaeda and Bin Laden would foreseeably result in attacks against United States citizens and United States interests. *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1012 (7th Cir.2002) (holding that, to establish a private cause of action for material support of terrorism under 18 U.S.C. §§ 2333, 2339A, "the plaintiffs must be able to show that [the murder of their son by Hamas] was a reasonably foreseeable result of [defendants'] making a donation" to Hamas).  For instance, Islamic extremists who took credit for the December, 1992 attempted bombings against U.S. servicemen in Yemen "claimed that Bin Ladin financed their group."  *See* Goodman Decl. Ex. 5.  Moreover, at "various times from in or about 1992 until in or about 1993", Bin Laden, "working together with members of the fatwah committee of al Qaeda, disseminated fatwahs to other members and associates of al Qaeda that the United States forces stationed in the Horn of Africa, including Somalia, should be attacked."  *See* Goodman Decl. Ex. 6 (Testimony of J. T. Caruso, Acting Assistant Director, CounterTerrorism Division, FBI, Before the Subcommittee on International Operations and Terrorism, Committee on Foreign Relations, United States Senate (Dec. 18, 2001)).  Although FIBS is sure to argue that it was neither a "member or associate" of Bin Laden or Al Qaeda and thus did not receive any information that Bin Laden intended to strike the United States, at this stage of the proceedings, the fact that NIF members supported terrorism, opened terrorist camps with Bin Laden, did business with Bin Laden, and occupied prominent board positions

12

at FIBS is sufficient to defeat FIBS's claims of ignorance.  In *United States v. District Council of New York City and Vicinity of United*, 778 F. Supp. 738, 753 n.8 (S.D.N.Y. 1991), the court similarly denied a motion to dismiss because the complaint sufficiently alleged that the defendants' lack of knowledge only could have resulted from conscious avoidance of he facts:

> In *Teamsters* Judge Edelstein relied in part on allegations in the complaint that "the lack of knowledge of particular officers could only have resulted from conscious avoidance of the facts." . . . While the Supplemental Complaint at bar contains no specific allegations of conscious avoidance, the difference is not significant for Rule 12(b)(6) analysis.  Conscious avoidance is fact specific and permits, while not requiring, inferences of guilty knowledge and intent.  It arises from proof at trial.  The possibility of such proof in this case must be factored in under *Conley v. Gibson, supra*.[9]

*Id.*

In fact, insofar as NIF-FIBS board members authorized FIBS to invest in Al Shamal and directed FIBS to open, manage, and maintain Al Qaeda bank accounts with the knowledge that such conduct would materially support Al Qaeda and Bin laden, then FIBS is liable for the actions of those directors.  *Dubai Islamic Bank v. Citibank N.A.*, 256 F. Supp. 2d 158, 166-67 (S.D.N.Y. 2003) (imputing knowledge and wrongful conduct of Citibank employees to Citibank where teller, Assistant Vice President and Operations Manager, *inter alia*, altered checks, provided bank reference letters on Citibank letterhead, and transferred funds from closed accounts, all in furtherance of a scheme to defraud a foreign correspondent bank); *New York Islanders Hockey Club LLP v. Comerica Bank*, 71 F. Supp. 2d 108, 118-20 (E.D.N.Y. 1999) (imputing liability to bank where Senior

---

[9]     Although the Cantor Fitzgerald Plaintiffs need not prove FIBS's motive for "deliberately clos[ing]" its eyes "to what otherwise would have been obvious to [it]", *United States v. Squires*, 440 F.2d 859, 864 (2d Cir.1971), it is noteworthy to juxtapose FIBS's conscious avoidance of the facts at its disposal with the fact that FIBS—unlike every other Sudanese bank—"enjoyed privileges denied other commercial banks" operating in Sudan, including but not limited to "full tax exemption on assets, profits, wages, and pensions" in addition to "guarantees against confiscation or nationalization."  *See* Goodman Decl. Ex. 3.

Vice President of bank unwittingly assisted buyer in fraudulent purchase of New York Islanders by repeatedly representing to Islander's owners that they could rely upon bank's verbal and written assurances that buyer was a good credit risk and was valued bank customer, when in fact, Vice President knew that buyer's credit was suspect).[10]

Nor can FIBS escape liability by arguing that there is no nexus in time between its provision of financial and material support to Al Qaeda and Bin Laden and the resulting September 11 attacks.  Following the 7th Circuit's decision in *Boim v. Quranic Literacy Instit.*, one of the charity defendants, the Quranic Literary Institute (hereinafter "QLI"), moved for summary judgment.  *Boim v. Quranic Literary Instit.*, No. 00 C 2905 (Keyes, A., Mag.) (N.D. Ill. Nov. 10, 2004), at 89 (attached as Goodman Decl. Ex. 7).  Plaintiffs claimed that QLI provided material support to Hamas, which plaintiffs' alleged made QLI responsible for Hamas' murder of plaintiffs' child in April 1996.  QLI countered that (1) no QLI funds ever went to Hamas; (2) QLI's employment of co-defendant Mohammed Salah, who plaintiffs' claimed also materially supported Hamas, was legitimately undertaken, albeit on a voluntary basis; and (3) QLI had no knowledge that Salah was involved with or supported Hamas.  *Id*. at 89.  Of special import to the issue at bar, the facts showed that while Salah was a designated terrorist supporter of Hamas, he had stopped working for QLI in 1993—a full three years *prior* to the Hamas attack on plaintiffs' son—and was incarcerated from 1993 until 1997 *at the time* the attack occurred.  *Id*. at 86, 97.  Moreover, while QLI arranged for Salah to be provided with a monetary stipend by a benefactor, Yassin Kadi, who himself was a designated terrorist supporter, that designation did not take place until 2001, *some five*

---

[10]      *United States v. Bank of New England*, 821 F.2d 844 (1st Cir.), *cert. denied*, 484 U.S. 943, 108 S. Ct. 328 (1987) (holding knowledge of employees is the knowledge of the corporation.); *Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976) (same).

*years after the attack occurred*. *Id*. at 97, 101. None of these temporal gaps existing before or after the 1996 attack defeated plaintiffs' claims against QLI:

> QLI admits that Mr. Kadi was, in fact, designated as an SDGT, but they contend that that fact is largely irrelevant, given the SDGT designation had not been made when Mr. Kadi provided support to QLI's principals, indeed, did not take place for another decade after Mr. Kadi provided that support. This is true. But even if Mr. Kadi had not been officially designated an SDGT at that time, a jury could reasonably find that the activities that ultimately led to the designation were, in fact, going on in 1991 and 1992—indeed, that is the very basis of for the Boim's allegations about the way in which QLI's volunteers were paid.

*Id*. at 100.

FIBS cannot reasonably deny that during early 1990s, it opened and maintained bank accounts for Al Qaeda, was managed by board members belonging to a group that supported Bin Laden and Al Qaeda, and, that it invested in a bank, Al Shamal, which "with admitted and substantial ties to Osama bin Laden," *In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 825, that was chaired by designated terrorist supporter defendant Batterjee.

In addition, there is reason to believe that even *after* the February 2001 public trial of *United States v. Usama bin Laden* conclusively showed that Al Qaeda maintained bank accounts at FIBS, and, the September 11 attacks took place, FIBS continued to control, maintain and manage funds and bank accounts belonging to Al Qaeda. According to former U.S. Deputy Assistant Secretary of State, Jonathan M. Winer:

> *Asset Freezes*. In October 2001, U.S. Treasury officials reported that Saudi Arabia had agreed to block financial assets for groups associated with Al Qaeda. Earlier, there had been reports that Saudi Arabia had agreed in September 2001 to freeze a small number of bank accounts from the National Commercial Bank ("NCB") and

Faisal al Islamic Bank, but that subsequent cooperation has been "inconsistent."[11]

Goodman Decl. Ex. 9 (Congressional Testimony of U.S. Deputy Assistant Secretary of State, Jonathan M. Winer, Before the Committee on Governmental Affairs, United States Senate (July 31, 2003), found at www.globalsecurity.org/security/library/congress/ 2003_h/030731-winer.htm).

In sum, these facts are sufficient from which to infer that FIBS' material support of Al Qaeda either continued up to September 11, or if not, and as in the case of QLI, otherwise materially supported Al Qaeda in the commission of the subsequent September 11 attacks.  *Id.* at 44 (holding that to be liable for providing materially support to terrorist, one need only show that the defendant "must have know about [the terrorists'] illegal activities", "must have desired to help those activities succeed, and they must have engaged in some act of helping." (citing *Boim v. Quranic Literary Instit.*, 291 F.3d at 1023); *Accord Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) ("Congress explicitly incorporated a finding into the [Anti-Terrorism And Effective Death Penalty Act] that 'foreign organizations that engage in terrorist

---

[11]     Assuming *arguendo* that FIBS challenges the accuracy of the testimony of former Deputy Secretary of State Winer, the Cantor Fitzgerald Plaintiffs note the following.  First, it is not uncommon for FIBS' formal business name, Faisal Islamic Bank (Sudan), to be abbreviated by those who do business with the bank.  Thus, FIBS has been described by an Al Qaeda operative as "Bank Faisl Islami".  *See* Goodman Decl. Ex. 2.  A fair inference can therefore be drawn from Mr. Winer's reference to "Faisal al Islamic Bank" that FIBS and Faisal al Islamic Bank are, in fact, one and the same.  Second, it is unlikely that when Mr. Winer testified about Saudi Arabia's "inconsistent" cooperation in freezing accounts at Faisal al Islamic Bank, that this referred to a Saudi Arabia based bank.  In this regard, and upon information and belief, there are *no* banks in Saudi Arabia known or doing business as "Faisal al Islamic Bank."  *See* Goodman Decl. Ex. 10 at 3265 (Thompson Bank Directory, World: J-Z (Dec. 2004 – May 2005)). Finally, given the numerous foreign correspondent banking accounts maintained by FIBS in banks inside and outside Saudi Arabia, it is fair to infer from the Mr. Winer's reference to Saudi Arabia's "inconsistent" effort to freeze suspect accounts that this related to accounts within the Kingdom's control, which would include correspondent banking accounts held by FIBS in Saudi Arabia.  *See* Goodman Decl. Ex. 11 at 505 (Thompson Bank Directory Worldwide Correspondents & Resource Guide (Dec. 2004 – May 2005)).  Indeed, FIBS maintains, upon information and belief, multiple correspondent banking accounts in Saudi Arabia.  *Id.*

DOCSNY.154645.1

activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.' . . . It follows that all material support given to such organizations aids their unlawful goals.  Indeed, as the government points out, terrorist organizations do not maintain open books.  Therefore, when someone makes a donation to them, there is no way to tell how the donation is used.  Further, as amicus Anti-Defamation League notes, even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive.  More fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.").[12]

> C.    Punitive Damages Against Properly Recoverable Against FIBS Under International Law

In Count Twelve of the First Amended Cantor Action Compl. at ¶¶237-39, the Cantor Fitzgerald Plaintiffs assert that FIBS is liable for punitive damages.  FIBS has moved to dismiss those claims on the ground that, under New York law, punitive damages are a remedy, not a cause of action.  FIBS Mem. of law at p. 20.  However, FIBS presents no argument that the Cantor Fitzgerald Plaintiffs are not entitled to recover punitive damages in this lawsuit.  Indeed, it is clear that punitive damages are available in connection with the claims that the Cantor Fitzgerald Plaintiffs assert, including but

---

[12]    Analogous support for the Cantor Fitzgerald Plaintiffs' argument is found in the designation of defendant Batterjee.  In designating Batterjee as a terrorist supporter in December, 2004, the United States described Batterjee as a having "ranked as one of the world's foremost terrorist financiers" and cited directly to the Golden Chain list of Al Qaeda donors discovered in a March, 2002 raid on the Sarajevo offices of Batterjee's charity, Benevolence International Foundation.  Goodman Decl. Ex.8 (United States Treasury, Office of Public Affairs, Press Release, U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL (Dec. 21, 2004), found at www.treas.gov/press/releases/js2164.htm).  Despite the fact that the Golden Chain list was—according to the U.S. government—drafted in 1988 and listed Batterjee as a "wealthy financier[] of UBL's mujahideen operations in Afghanistan", actions which significantly predated the September 11 attacks, Batterjee was properly designated for his material support of Al Qaeda.  *See* Goodman Decl. Ex.8.

17

not limited to their international law claims.  *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865

(E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement

the rights secured by the Constitution" to grant punitive damages for violations of

international law); *Paul v. Avril*, 901 F. Supp. 330, 335-36 (S.D. Fla. 1994) ("Both

compensatory and punitive damages are recoverable for violations of international law.

(citing *Filartiga v. Pena-Irala*, *supra*); *see also Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322,

1358-59 (N.D. Ga. 2002) (awarding punitive damages for defendant's violation of

international law); *Xuncax v. Gramajo*, 886 F. Supp. 162, 201-202 (D. Mass. 1995) (same);

*Accord Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260, 269-70 (D. D.C. 2002)

("although the claim of solatium is not recognized under D.C. law, such damages may

be awarded under federal common law for mental anguish resulting from the loss of a

decedent's society and companionship.").

II.      PLAINTIFF THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
         <u>PROPERLY ASSERTS ITS CONTRIBUTION AND INDEMNITY CLAIMS</u>

         Defendant's motion to dismiss the contribution and indemnity claims made

by plaintiffs the Port Authority of New York and New Jersey, and its affiliates, (the

"Port Authority") must fail.  The Port Authority seeks contribution and indemnity from

the Defendant and its co-defendants in the instant case because Defendant and its co-

defendants proximately caused the September 11 attacks and therefore are responsible

for the resulting damage and injuries caused to the Port Authority and allegedly other

victims.  Specifically, certain of the individuals and businesses that allegedly were

harmed in the September 11 attacks seek judgments against the Port Authority in

separate actions under a theory that the Port Authority breached a duty of care owed to

those plaintiffs.  *See generally In re September 11 Litig.*, 21 MC 97 (Hellerstein, J.).  The

Port Authority contests liability in those lawsuits, but to the extent it is held liable, the

18

Port Authority seeks contribution and indemnity for that liability from Defendant and its co-defendants under New York common law.

New York law strongly favors contribution, *Goodkin v. United States*, 773 F.2d 19, 24 (2d Cir. 1985), and broadly authorizes contribution claims where "two or more persons" are subject to liability for damages for the same personal injury, injury to property or wrongful death.  N.Y. C.P.L.R. § 1401; *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 152 (1972).  Under New York law, concurrent, successive and independent, alternative, and even intentional tortfeasors can seek contribution from each other in either "a pending action" through cross-or counter-claims  or "in a separate action," where one tortfeasor would be a plaintiff and the other a defendant.  N.Y. C.P.L.R. § 1403; *see Board of Educ. v. Sargent*, 71 N.Y.2d 21, 27-28 (1987); *Dole v. Dow Chem. Co.*, 30 N.Y.2d at 390-91; *Glasser v. M. Fortunoff of Westbury Corp.*, 71 N.Y.2d 643, 646 (1988) (noting contribution and indemnity claims are not exclusive to co-defendants in the same pending action).  Hence, New York law supports the Port Authority's contribution and indemnity claims.

Nor can Defendant reasonably contest that the Port Authority's contribution and indemnity claims are timely asserted in this action.  Contribution and indemnity claims routinely are litigated prior to judgment being issued in the underlying action. *See Board of Educ. v. Sargent*, *supra* (analyzing contribution claim brought by one tortfeasor against another tortfeasor "for whatever damages [the contribution plaintiff] *might* incur in the [underlying] action") (emphasis added); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003); *see also* Restatement (Third) of the Law of Torts, § 23 ("a person seeking contribution may assert a claim for contribution and obtain a contingent judgment in an action in which the person seeking contribution is sued by

19

the plaintiff, *even though the liability of the person against whom is contribution is sought has not yet been extinguished.*") (emphasis added).

Defendant's motion to dismiss the instant contribution and indemnity claims also must fail because contribution merely requires that "some form of tort liability" exists and that a duty is alleged to be owed by the contribution defendant to either the underlying plaintiff *or* to the party seeking contribution.  *See Board of Educ. v. Sargent, supra,* at 478; *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 558 (1992).  Here, plaintiffs allege that Defendant aided and abetted a violation of the Anti-Terrorism Act, which incorporates principles of tort liability, and as a result caused or contributed to personal injury or wrongful death.  Cantor Action First Amended Complaint, at ¶¶ 132, 135, 169-176; *Boim vs. Quranic Literacy Institute,* 291 F.3d 1000, 1006-1008 (7th Cir. 2002).  Such allegations already have survived motions to dismiss brought by other defendants.[13] Defendant also cannot deny that it owed a duty to avoid aiding and abetting an intentional tort of trespass against the Port Authority.  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 831.  Hence, the Port Authority has properly alleged a prima facie claim for both contribution and indemnity.[14]

---

[13]     *See Burnett I*, 274 F. Supp. 2d at 105 (denying Al Haramain's motion to dismiss claims of aiding and abetting a violation of ATA and related intentional tort claims and rejecting Al Haramain's arguments that plaintiffs who suffered personal injury and wrongful death in the September 11 attacks failed to create an inference that Al Haramain's acts were the proximate cause of plaintiffs' injuries or that it intentionally committed the alleged offenses).

[14]     In addition, the Port Authority's existing damage claims encompass all losses proximately caused by the September 11 attacks.  A natural and probable consequence of Defendant's role in the September 11 attacks, given the scale of the attack, would be lawsuits brought by victims seeking recovery of their losses.  Thus, judgments and expenses issued against and incurred by the Port Authority that result from the *In re September 11 Litig.* are recoverable against Defendant and its co-defendants under either contribution or indemnity principles or simply as general or consequential damages for the Port Authority's other claims for relief.  *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000); *Steitz v. Gifford*, 280 N.Y. 15, 20 (1939).

<u>CONCLUSION</u>

For the reasons set forth above, this Court should deny Defendant's motion to dismiss. It can adjudicate Plaintiffs' international law claims pursuant to 28 U.S.C. § 1331 and to federal common law, which jointly provide substantive rights of action and remedies, including punitive damages, in matters involving violations of international law. Moreover, claims for contribution and indemnity are more than sufficiently pled.

Dated: June 27, 2005                    Respectfully submitted,
      New York, New York


_____/s/_____
Jonathan M. Goodman

Kenneth L. Adams
Christopher T. Leonardo
Stacey A. Saiontz
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Tel.: 212-835-1400
Fax: 212-997-9880

21

TABLE OF CONTENTS

Page

I.   CANTOR FITZGERALD PLAINTIFFS PROPERLY ASSERT CLAIMS
     UNDER INTERNATIONAL LAW ................................................................. 2

     A.   Subject Matter Jurisdiction Is Proper Under 28 U.S.C. § 1331 and
          Federal Common Law ..................................................................... 3

     B.   The Cantor Fitzgerald Plaintiffs State A Claim That FIBS Acted In
          Concert With Others In Violation Of International Law ............................. 6

     C.   Punitive Damages Against Properly Recoverable Against FIBS
          Under International Law ................................................................... 17

II.  PLAINTIFF THE PORT AUTHORITY OF NEW YORK AND NEW
     JERSEY PROPERLY ASSERTS ITS CONTRIBUTION AND INDEMNITY
     CLAIMS ....................................................................................... 18

CONCLUSION ..................................................................................... 21

DOCSNY.154645.1

TABLE OF AUTHORITIES

Page(s)

*Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976)...................................................... 14

*Baker v. Dorfman*, 239 F.3d 415 (2d Cir. 2000) ........................................................ 20

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004) ........................................................ 5

*Board of Educ. v. Sargent*, 71 N.Y.2d 21 (1987) ........................................................ 19

*Bodner vs. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000) ..........................................3-5

*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002) .................................. 12,14,16,20

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2001)..................................................... 3

*Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488 (S.D.N.Y. 2003)..................................................... 19

*Doe v. Islamic Salvation Front*, 257 F. Supp.2d 115 (D.D.C. 2003) .......................................... 2

*Dole v. Dow Chem. Co.*, 30 N.Y.2d 143 (1972) ........................................................ 19

*Dubai Islamic Bank v. Citibank N.A.*, 256 F. Supp. 2d 158 (S.D.N.Y. 2003).......................... 13

*Estates of Ungar v. Palestinian Auth.*, 153 F. Supp.2d 76 (D.R.I. 2001).................................... 3

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ................................................................3,18

*Filartiga v. Pena*, 577 F. Supp. 860 (E.D.N.Y. 1984)................................................................4,18

*Glasser v. M. Fortunoff of Westbury Corp.*, 71 N.Y.2d 643 (1988)........................................... 19

*Goodkin v. United States*, 773 F.2d 19 (2d Cir. 1985) .............................................................. 19

*Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244 (C.D. Cal. 1999)
   *rev'd in part on other grounds*, 251 F.3d 1230 (9th Cir. 2001) ............................................... 5

*Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192
   (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 508 (2004) ........................................................ 5

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) .......................................... 16

*Illinois v. Milwaukee*, 406 U.S. 91 (1972)................................................................................... 5

*In re Agent Orange Prod. Liab. Litig.* Nos. MDL 381,
   04-CV-400, 2005 WL 729177 (March 28, 2005 E.D.N.Y.) ............................................... 4,6

*In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005).......... 6, 10

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)...................................................... 4,6

*Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1358-59 (N.D. Ga. 2002) ................................ 18

*New York Islanders Club LLP v. Comerica Bank*, 71 F. Supp. 2d 108
  (E.D.N.Y. 1999)................................................................................ 15

*Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994) ........................................................ 18

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289
  (S.D.N.Y. 2003)................................................................................ 2,6

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882
  (S.D.N.Y. (DLC) (June 13, 2005)) .................................................................. 5

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54
  (D.D.C. 2003), *appeal dismissed*, 2004 WL 2664532
  (D.C. Cir. Nov. 22, 2004)........................................................................ 6

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992) ................................................ 20

*Steitz v. Gifford*, 280 N.Y. 15 (1939) ................................................................ 20

*Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260 (D. D.C. 2002) ...................................... 18

*The Paquete Habana*, 175 U.S. 677 (1900) ............................................................ 4

*United States v. Bank of New England*, 821 F.2d 844 (1st Cir.)
  *cert. denied*, 484, U.S. 943 108 S. Ct. 328 (1987) ...................................................... 14

*United States v. District Council of New York City and Vicinity of United*,
  778 F. Supp. 738 (S.D.N.Y. 1991) .................................................................. 13

*United States v. Finkelstein*, 229 F.3d 90 (2d Cir. 2000) .............................................. 11

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000) .............................................. 12

*United States v. Hanlon*, 548 F.2d 1096 (2d Cir. 1977) .............................................. 11

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001)................................................ 11

*United States v. Squires*, 440 F.2d 859 (2d Cir.1971) ................................................ 13

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) .............................................. 12

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991).............................................. 2

DOCSNY.154645.1

*White v. Paulsen*, 997 F. Supp. 1380 (E.D. Wash. 1998) ............................................................ 5

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) .................... 6

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) .................................................... 12

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) ............................................ 18

<u>OTHER AUTHORITIES</u>

28 U.S.C. § 1331 ................................................................................................................... 3

28 U.S.C. § 1605(a)(3) ....................................................................................................... 5,6

22 U.S.C. § 2370(e) (2) ..................................................................................................... 6

18 U.S.C. § 2333 ................................................................................................................ 6

N.Y. C.P.L.R. § 1401 .......................................................................................................... 19

N.Y. C.P.L.R. § 1403 .......................................................................................................... 19


Restatement (Third) of Foreign Relations Law § 111 comment (e) 1987 ............................ 4

Restatement (Third) of the Law of Torts, § 23 .................................................................... 19


*Harold Hongju Koh, Transnational Public Law Litigation*, 100 Yale L. J. 2347,
    2385- 86 (1991) ............................................................................................................... 5

*Kenneth C. Randall, Federal Questions and the Human Rights Paradigm*,
    73 Minn. L. Rev. 349 (1988) .......................................................................................... 5

iv