# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:     *Federal Insurance Co. v. al Qaida*, 03 CV 06978 (RCC)
*Cantor Fitzgerald & Co. v. Akida Bank Private Ltd,* 04 CV 7065
*Continental Casualty Co. v. Al Qaeda Islamic Army*, 04 CV 5970
*Euro Brokers, Inc. v. Al Baraka Investment & Development Corp.*, 04 CV 7279
*New York Marine & General Insurance Co. v. Al Qaeda*, 04 CV 6105
*O'Neill v. Al Baraka Investment and Development Corp.*, 04 CV 1923
*World Trade Center Properties, LLC v. Al Baraka Investment*, 04 CV 7280

# PROPERTY DAMAGE PLAINTIFFS' CONSOLIDATED MEMORANDUM
## OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS
## OF DEFENDANT FAISAL ISLAMIC BANK OF SUDAN

June 27, 2005

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 1

III. LEGAL ARGUMENT ................................................................................................ 7

A. The Property Damage Plaintiffs Have Standing to Assert RICO Claims .......... 7

B. The Property Damage Plaintiffs Have Adequately Pleaded Claims Under RICO ............ 9

C. The Conduct Underlying the Property Damage Plaintiffs' RICO Claims
Confers Personal Jurisdiction Over FIBS ......................................................... 12

D. The Property Damage Plaintiffs' Trespass Claims Are Cognizable ................. 13

E. The Property Damage Plaintiffs Have Asserted Valid Negligence Claims
Against FIBS ..................................................................................................... 14

F. The Federal Plaintiffs' Assault and Battery and Intentional Infliction of
Emotional Distress Claims Are Not Barred by the Statute of Limitations ....... 15

G. The Property Damage Plaintiffs' Aiding and Abetting Claims
Should Not Be Dismissed ................................................................................. 17

IV. CONCLUSION ......................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983)............................................................................................11

*Baisch v. Gallina*,
346 F.3d 366 (2d Cir. 2003)................................................................................10

*Bettis v. Islamic Republic of Iran*,
315 F.3d 325 (D.C. Cir. 2003).............................................................................16

*Boim v. Quranic Literacy Institute*,
291 F.3d 1000 (7th Cir. 2002) .............................................................................15

*De Falco v. Bernas*,
244 F.3d 286 (2d Cir. 2001)................................................................................10

*Dubai Islamic Bank v. Citibank, N.A.*,
256 F. Supp. 2d 158 (S.D. N.Y. 2003)..................................................................9

*First Capital Asset Management v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004)................................................................................10

*Friedman v. Hartmann*,
1994 U.S. Dist. LEXIS 9727 (S.D. N.Y. 1994).....................................................10

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983).............................................................................17

*Holmes v. Security Investor Prot. Corp.*,
503 U.S. 258 (1992).............................................................................................11

*Ideal Electronic Co. v. International Fidelity Insurance Co.*,
129 F.3d 143 (D.C. Cir. 1997).............................................................................16

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*,
2004 U.S. Dist. LEXIS 3829 (S.D. N.Y. 2004)......................................................16

*Johnson v. Nyack Hospital*,
86 F.3d 8 (2d Cir. 1996)......................................................................................16

*Jones v. R.R. Donnelly & Sons Co.*,
    541 U.S. 369 (2004)................................................................16

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)......................................................11

*Louisiana Land & Exploration Co. v. Unocal Corp.*,
    863 F. Supp. 306 (E.D. La. 1994)................................................16

*Morin v. Trupin*,
    832 F. Supp. 93 (S.D.N.Y. 1993).................................................10

*National Asbestos Workers Medical Fund v. Philip Morris, Inc.*,
    74 F. Supp. 2d 221 (E.D.N.Y. 1999) ..........................................9, 11

*In re Terrorist Attacks on September 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)............................................13

*United States v. Allen*,
    155 F.3d 35 (2d Cir. 1998)........................................................10

*United States v. Turkette*,
    452 U.S. 576 (1981)................................................................9

*Von Bulow v. Von Bulow*,
    634 F. Supp. 1284 (S.D. N.Y. 1986)...........................................11, 12

*Yeadon v. New York Transit Authority*,
    719 F. Supp. 204 (S.D. N.Y. 1989)...............................................16

## STATUTES

18 U.S.C. § 1956(a)(1)..............................................................................................13

18 U.S.C. § 1956(a)(3).........................................................................................12, 13

18 U.S.C. § 1956(b)(2) .........................................................................................12, 13

18 U.S.C. § 1961 ......................................................................................................13

18 U.S.C. § 1964(c) ...................................................................................................8

18 U.S.C. § 2339(A)-(C)...........................................................................................13

## OTHER

Restatement (Second) of Torts § 302......................................................................15

137 Cong. Rec. S4511 04 (1991)............................................................................15

## I.  INTRODUCTION

On April 27, 2005, Faisal Islamic Bank of Sudan ("FIBS") filed separate Motions to Dismiss ten of the cases comprising In Re: Terrorist Attacks on September 11, 2001, 03 MDL 1570 (RCC).  FIBS's ten Motions to Dismiss raise several arguments and defenses common to all of the consolidated cases.  In the interests of judicial economy, the Plaintiffs filed a single Consolidated Opposition addressing the common defenses and arguments, which is incorporated herein by reference.  However, FIBS's Motions to Dismiss the *Federal Insurance, Cantor Fitzgerald, Continental Casualty, Euro Brokers, New York Marine, O'Neill and World Trade Center Properties* cases (hereinafter the "Property Damages Cases")[1] raise additional and discreet arguments relative to the trespass, RICO, negligence, contribution and aiding and abetting claims asserted in those cases.  In addition, FIBS's Motion to Dismiss the *Federal Insurance* case raises a unique challenge to the *Federal Insurance* plaintiffs' assault, battery and negligent infliction of emotional distress claims.  The Property Damage Plaintiffs submit this Joint Memorandum of Law in response to the additional and distinct defenses raised by FIBS in its Motions to Dismiss their respective complaints.[2]

## II.  FACTUAL BACKGROUND

FIBS was founded in 1977, with the support of the National Islamic Front ("NIF"), the radical Islamist party headed by Hassan al Turabi which has dominated Sudanese politics for several decades and controlled the government of Sudan since 1989.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *Federal* Amended RICO Statement Applicable to FIBS at Exh. A; see also *Library of Congress Country Study – Sudan –*

---

[1] Several of the cases in fact seek recovery for personal injuries and wrongful deaths, as well as for property damages.  Nonetheless, for ease of reference, the term "Property Damage Plaintiffs" is being used herein, because all of the cases do seek recovery for property or economic losses.

[2] FIBS has also moved to dismiss the *Cantor Fitzgerald* Plaintiffs' international law, contribution and indemnification claims.  The *Cantor Fitzgerald* Plaintiffs are filing a separate Memorandum addressing those arguments.

*Islamic Banking*, Library of Congress, Federal Research Division, June 1991, attached to the Affirmation of Sean P. Carter ("Carter Aff.") as Exh. 1.  Members of the Muslim Brotherhood and NIF occupy prominent positions on the Board of Directors of FIBS.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *Federal* Amended RICO Statement Applicable to FIBS at Exh. A; Carter Aff. Exh. 1.  In addition, the NIF has granted FIBS privileges which were denied other banks, including full tax exemption on assets, profits, wages and pensions, as well as guarantees against confiscation or nationalization.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *Federal* Amended RICO Statement Applicable to FIBS at Exh. A; *O'Neill* RICO Statement at Exh. A; Carter Aff. Exh. 1.  Moreover, the bank has supplied loans to the NIF and to its prominent members.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A.  Through this association, the NIF became the best financed political party in the Sudan.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A.  Stated simply, FIBS is the financial and banking arm of the NIF.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *O'Neill* RICO Statement at Exh. A; Carter Aff. Exh. 1.

In 1989, the NIF, under the leadership of al Turabi, invited Osama bin Laden to move the entire al Qaida organization to Sudan.  Bin Laden accepted the invitation, and transplanted his nascent terrorist organization to Sudan in 1991. *World Trade Center Properties* Complaint ("*WTC* Complaint") ¶ 116;  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *see also* Final Report of the National Commission on Terrorist Attacks Upon the United States (9/11 Report) at pp. 59-60.  Bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan.  During the five years that al Qaida resided in Sudan, the organization

maintained a symbiotic relationship with the NIF.  Under the arrangement, bin Laden invested heavily in the Sudan, performed infrastructure improvements for the NIF, and supplied al Qaida fighters to assist the NIF in an ongoing conflict with Christians in southern Sudan.  *WTC* Complaint ¶ 116.  In exchange, al Qaida enjoyed the unqualified protection and support of the NIF regime.  *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *see also CIA Fact Sheet – Usama bin Laden – Islamic Extremist Financier*, released to the media in 1996, Carter Aff. Exh. 2.  The protection, support and safehaven provided by the NIF allowed al Qaida to grow from a small organization with less than 20 dedicated members to a global terrorist empire.  In addition, while in Sudan, al Qaida established several businesses in partnership with the NIF, to fund al Qaida's campaign to attack America.  *WTC* Complaint ¶ 118; *Continental Casualty* First Amended Complaint ("*Continental* 1AC") ¶¶ 48-49; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *O'Neill* Complaint ¶¶ 22, 37, 46; *O'Neill* RICO Statement at Exh. A; *see also CIA Fact Sheet*, Carter Aff. Exh. 2.

Absent the support and safe haven provided by the NIF during this time, al Qaida would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.  *O'Neill* Complaint ¶¶ 22, 37, 46; *O'Neill* RICO Statement 5(b), 6(b), 14.

Not surprisingly given the close ideological, business, political and personal relationships between the NIF and al Qaida, FIBS has long been one of al Qaida's preferred banks.  In fact, Al Qaida was so confident in the absolute protection of the NIF that it openly maintained accounts at FIBS.  In this regard, former al Qaida financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that FIBS in Khartoum held bank accounts for al Qaida operatives during bin Laden's years of operation in Sudan:

Q.      Where were the accounts [of al Qaeda] held?  In what countries?

A.      (…) we got account in Bank Faisl Islami [Faisal Islamic Bank].

Q.      Is that also in Khartoum?

A.      Yes.

*WTC* Complaint ¶ 238; *O'Neill* Complaint ¶ 37; *Continental* 1AC ¶ 66; *Cantor Fitzgerald* First

Amended Complaint ("*Cantor* 1AC") ¶¶ 130, 132;  *Federal* Amended RICO Statement

Applicable to DMI Trust and DMI, S.A. at Exh. A; *Federal* Amended RICO Statement

Applicable to FIBS at Exh. A.

Given FIBS's close relationship with the NIF, and the NIF's direct role in managing the

bank's operations, FIBS was necessarily aware that al Qaida was using the accounts at FIBS to

build a global terrorist empire in Sudan, and to transfer funds to al Qaida operatives throughout

the World.  *O'Neill* RICO Statement 6(b), Exh. A.  Indeed, the NIF invited bin Laden to Sudan

precisely *because* bin Laden was a prominent Islamic extremist.  As the National Commission on

Terrorist Attacks Upon the United States (the 9/11 Commission) explained in its final report:

"By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese

political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan.

Turabi headed the National Islamic Front in a coalition that had recently seized power in

Khartoum."  9/11 Report at p. 59.  During sworn testimony before the 9/11 Commission, Richard

Clarke, the former White House counter-terrorism coordinator, elaborated on the relationship

between the NIF and al Qaida, emphasizing that:  "Under Turabi, Sudan had become a safe

haven for many terrorist groups, but bin Ladin had special status.  He funded many development

programs such as roads and dined often with Turabi and his family.  Turabi and bin Ladin were

ideological brethren."  Testimony of Richard A. Clarke Before the 9/11 Commission, March 24,

2004, Carter Aff. Exh. 3.  By virtue of the relationship between the NIF and al Qaida, and the

NIF's direct role in the management and operation of FIBS, there can be no credible dispute that

4

FIBS knew that the accounts it maintained for bin Laden and al Qaida were being used to support al Qaida's global jihad.

In addition to maintaining accounts for al Qaida, FIBS partnered with al Qaida in the establishment of the al Shamal Bank of the Sudan. *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A. According to the U.S. government, Osama bin Laden personally contributed fifty million U.S. dollars ($50,000,000.00) to capitalize al Shamal. "[Osama bin Laden] in concert with National Islamic Front leaders, built a network of businesses, including an Islamic Bank Al Shamal." *WTC* Complaint ¶ 118; Carter Aff. Exh. 2. FIBS was a founding member of al Shamal Bank and one of the bank's principal shareholders. *WTC* Complaint ¶ 121; *Cantor* 1AC ¶ 122; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A. The other co-founders of the bank included the government of the Northern State of Sudan, which was under the control of the NIF and Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development. *WTC* Complaint ¶ 120; *Cantor* 1AC ¶¶ 122, 131; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A. Main shareholders included the following co-defendants: the predecessor of the Benevolence International Foundation, Al Baraka for Investment and Development, and Sheik Saleh Abdullah Kamel. *WTC* Complaint ¶ 120; *O'Neill* Complaint ¶ 36, 46, 48; *Cantor* 1AC ¶ 131; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A.; *O'Neill* RICO Statement at Exh. A.

Al Qaida, the NIF and FIBS established al Shamal Bank to provide revenue to al Qaida and the NIF, and to afford al Qaida with convenient access to the global banking system. *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; Carter Aff. Exh. 2. Indeed, Al Shamal Bank regularly provided financial and account services to al Qaida operatives -- six of whom held bank accounts at Al Shamal Bank. *WTC* Complaint ¶ 126.

Osama Bin Laden paid al Qaida members from Al Shamal Bank accounts.  *WTC* Complaint ¶ 127.  Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaida members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.  *WTC* Complaint ¶ 129; *O'Neill* Complaint ¶¶ 36, 46, 48; *Continental* 1AC ¶¶ 57, 58, 63, 64; *Cantor* 1AC ¶¶ 128-128; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *O'Neill* RICO Statement at Exh. A; *Cantor* RICO Statement.

In his testimony during the African Embassy bombings trial, Jamal al Fadl confirmed that bin Laden financed the al Qaida network in part through the Al Shamal Bank:

Q.      When you worked for Osama bin Laden in the Sudan, how much were you paid?

A.      $1,200 a month.

Q.      For how long did you work for him [Osama bin Laden]?

A.      Almost two years.

Q.      What Banks did he keep his money at?

A.      Bank Al Shamar.  [In responding "Bank Al Shamar," Al-Fadl was referring to Al Shamal Islamic Bank.]

*WTC* Complaint ¶ 127;  *Cantor* 1AC ¶¶ 128-129; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *Cantor* RICO Statement.

Jamal Al-Fadl also testified that he transferred one hundred thousand U.S. dollars ($100,000.00) on Osama bin Laden's behalf to an al Qaida representative in Jordan.  *WTC* Complaint ¶ 128; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A.  In the same trial, another former al Qaida operative stated that the Al Shamal Islamic Bank was used for operational purposes.  The witness was wired two hundred fifty thousand U.S. dollars ($250,000.00) via the Bank of New York for the purchase of stinger missiles and an

airplane which he delivered to Osama bin Laden. *WTC* Complaint ¶ 129; *Cantor* 1AC ¶¶ 128-129; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A; *Cantor* RICO Statement.

The General Manager of Al Shamal Islamic Bank acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank. The accounts were opened on March 30, 1992 for the company Al-Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. *WTC* Complaint ¶ 124. A third account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, was founded by prominent NIF members and exercises a monopoly over major agricultural exports from the Sudan. *WTC* Complaint ¶ 125; *Continental* 1AC ¶¶ 57, 58; *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A.

Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee stated that Al Shamal Islamic Bank operations continue and that there is evidence that Osama bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities. *Federal* Amended RICO Statement Applicable to DMI Trust and DMI, S.A. at Exh. A.

## III.   LEGAL ARGUMENT

### A.   The Property Damage Plaintiffs Have Standing to Assert RICO Claims

FIBS contends that the Property Damage Plaintiffs lack standing to assert claims under RICO. In making this argument, FIBS fundamentally misconstrues the character of the Property Damage Plaintiffs' injuries, and is wrong in any case.

The RICO statute confers standing on "any person injured in his business or property by reason of [racketeering acts defined in the statute]." *Id.* (citing 18 U.S.C. § 1964(c)). The Property Damage Plaintiffs' respective complaints each plainly allege direct property damage and economic losses as a result of FIBS's violations of RICO and the resulting terrorist attack of September 11, 2001. *Continental* 1AC ¶ 595 (alleging that plaintiffs "provided insurance coverage to numerous insureds whose property was damaged or destroyed in the September 11th attacks"); *NYMAGIC* 1AC ¶ 54 (plaintiffs "provided insurance coverage to the airline companies (the 'insureds') which owned and operated the commercial airliners which were hijacked and used as weapons in the September 11th Attack."); *Federal* 1AC ¶¶ 541-577 (asserting claims for several billions dollars paid to plaintiffs' insureds for property damages and related losses resulting from the September 11th Attack); *Cantor* 1AC ¶¶ 1, 11, 185-192 (asserting RICO claims against banking and financial defendants, including FIBS, for property damage and business interruption losses suffered in September 11 attack); *O'Neill* RICO Statement ¶ 15 (alleging economic injuries and personal property losses as a result of the September 11th Attack); *WTC* RICO Statement ¶ 4 (alleging the total destruction of the World Trade Center and related economic losses and property damage to other of plaintiffs' properties); *Continental* RICO Statement ¶ 4. These property and business losses are direct and not derivative of the horrendous injuries and loss of life that occurred that day, as FIBS suggests without any support. Thus, the Property Damage Plaintiffs' complaints, as amended by their RICO Statements, plainly assert damages compensable under RICO.

Moreover, while the *Federal* action also asserts subrogation claims arising from payments made in compensation for personal injuries and deaths suffered by victims of the September 11th attacks (in addition to the claims for property damages discussed above), the *Federal* Plaintiffs clearly have standing to pursue recovery under RICO for those claims as well.

*See National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F.Supp.2d 221 (E.D.N.Y. 1999).  Likewise, to the extent that the complaints seek recovery of economic losses resulting from personal injuries and deaths suffered by victims of the attack, plaintiffs submit that it would be fundamentally illogical to conclude that such injuries are not compensable under RICO.  On these points, the Property Damage Plaintiffs refer the Court to the discussion on pp. 11-13 of the Property Damage Plaintiffs' Consolidated Memorandum of Law in Opposition to Motion to Dismiss of Al Haramain Islamic Foundation, Inc., and the discussion on pp. 9-12 of the O'Neill Plaintiffs' Memorandum of Law in Opposition to Al Haramain Islamic Foundation, Inc.'s Motion to Dismiss Pertaining to Certain RICO Issues Only, incorporated herein by reference.

### B.    The Property Damage Plaintiffs Have Adequately Pleaded Claims Under RICO

FIBS also contends that the Property Damage Plaintiffs have failed to adequately plead claims under RICO.  FIBS is wrong.

The Property Damage Plaintiffs' complaints and RICO Statements assert RICO claims against FIBS pursuant to sections 1962 (c) and (d).  The identified enterprise - the al Qaida movement, also referred to as Radical Muslim Terrorism - is a known terrorist network with a well documented desire to perpetrate acts of terrorism and racketeering.  *See Federal* Amended RICO Statement Applicable to FIBS ¶ 5; *Continental* RICO Statement ¶ 6.  Thus, plaintiffs have sufficiently pled the existence of an enterprise:  "a group of persons associated together for a common purpose of engaging in a course of conduct" or "an ongoing organization, formal or informal."  *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981).

The complaints and RICO Statements also allege sufficient involvement by FIBS in the enterprise to sustain claims under Sections 1962(c) and (d).  FIBS correctly states that a plaintiff asserting a civil claim under 1962(c) must allege that the defendant participated in the operation or management of the enterprise.  *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158,

164 (S.D. N.Y. 2003). However, such "discretionary authority" has been described as "a relatively low hurdle for plaintiffs to clear" in the Second Circuit. See First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004), citing Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003); De Falco v. Bernas, 244 F.3d 286, 309 (2d Cir. 2001) and United States v. Allen, 155 F.3d 35, 42-43 (2d Cir. 1998). Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D. N.Y. 1994).

"[T]he requirements for RICO's conspiracy charges under 1962(d) are less demanding." Baisch, 346 F.3d at 376. All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 376-77 (*quoting* Salinas v. United States, 522 U.S. 52, 65 (1997)). "Although parties who do not control the organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be liable under § 1962(d)." Morin v. Trupin, 832 F. Supp. 93, 100 (S.D.N.Y. 1993)

The plaintiffs have satisfied the pleading standards applicable to their 1962(c) and 1962(d) claims, as set forth above. The Property Damage Plaintiffs allege that FIBS *knowingly* provided financial services to al Qaida. *Continental* RICO Statement ¶¶ 2, 5. The Property Damage Plaintiffs further allege that FIBS partnered with al Qaida in the establishment of the al Shamal Bank, a business venture designed to provide revenue to the then nascent al Qaida organization and to provide al Qaida with critical access to the global banking system. In view of the allegations regarding FIBS's integral and pervasive sponsorship of al Qaida's operations

throughout the world, the Property Damage Plaintiffs have adequately alleged that FIBS played a direct and active role in the management and operation of al Qaida's financial network, and that FIBS knowingly conspired to further the objectives of the al Qaida movement during the years leading up to the September 11th Attack. As such, the Property Damage Plaintiffs have met their pleading burden in relation to their Section 1962(c) and 1962(d) claims, particularly given the fact that the plaintiffs have not yet been afforded the opportunity to conduct discovery.

The Property Damage Plaintiffs also have adequately alleged proximate cause under RICO. This requirement is satisfied if plaintiffs allege that the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (*citing Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is likely imprudent. *National Asbestos Workers*, 74 F. Supp. 2d at 225. This Court's decision "should be guided by a flexible, case-by-case approach." *Id.* (citing *Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983) and *Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992)). Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static: as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures." *Id.* Further, failure to explain the alleged injury in detail is not fatal. *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986). Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6). *Id.* The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts." *Id.* (citations omitted).

Here, plaintiffs allege that they were injured directly by FIBS's participation in al Qaida's campaign to attack the United States, and in particular by its provision of "material support and resources to al Qaida." *Federal* 1AC ¶¶ 72-74; *Continental* 1AC ¶ 26; *Cantor* 1AC ¶¶ 1, 11, 185-192. FIBS has participated extensively in al Qaida's global operations, and specifically in furthering al Qaida's goal of committing acts of terrorism against the United States, by providing al Qaida with "the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th attack." *Federal* 1AC ¶ 74; *Continental* RICO Statement ¶¶ 2, 5. Accordingly, plaintiffs have properly pled causation under RICO.

### C.     The Conduct Underlying the Property Damage Plaintiffs' RICO Claims Confers Personal Jurisdiction Over FIBS

Because the Property Damage Plaintiffs' RICO claims against FIBS arise from the bank's money laundering activities on behalf of al Qaida in furtherance of al Qaida's conspiracy to attack America, this Court necessarily possesses personal jurisdiction over FIBS. Pursuant to 18 U.S.C. § 1956(a)(3), a financial institution engages in money laundering if it conducts or attempts to conduct a financial transaction involving property used to conduct or facilitate specified unlawful activity, with the intent:

> (A) to promote the carrying on of specified unlawful activity;
>
> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
>
> (C) to avoid a transaction reporting requirement under State or Federal law.

Under subsection (b)(2) of that same statute:

> the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and—

12

> (C) the foreign person is a financial institution that maintains a
> bank account at a financial institution in the United States.

The conduct underlying the Property Damage Plaintiffs' RICO claims subjects FIBS to personal jurisdiction under the anti-money laundering statute.  As alleged in the Complaints and RICO Statements, FIBS knowingly facilitated financial transactions on behalf of al Qaida, in order to further al Qaida's terrorist activities.  Importantly, 18 U.S.C. § 1961 defines "specified unlawful activity" to include conduct in violation of  18 U.S.C. § 2339(A)-(C), which criminalize the provision of material support or resources to terrorists.  Thus, FIBS has engaged in acts of money laundering within the meaning of 18 U.S.C. § 1956(a)(3).[3]  As FIBS maintains correspondent bank accounts with U.S. based financial institutions, the money laundering activities underlying the Property Damage Plaintiffs' RICO claims confer personal jurisdiction over FIBS in this case.

### D.      The Property Damage Plaintiffs' Trespass Claims Are Cognizable

This Court already has held that plaintiffs who suffered property damages as a result of the September 11th Attack may maintain trespass claims against parties who conspired with, or aided and abetted, al Qaida.  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005).  As the Property Damage Plaintiffs have presented detailed factual allegations regarding FIBS's direct and extensive sponsorship of al Qaida, the Property Damage Plaintiffs have stated valid claims under common law trespass.

---

[3] 18 U.S.C. § 1956(a)(1) further provides that a financial institution is guilty of money laundering in the event that it conducts or attempts to conduct such a financial transaction, knowing that the property involved in that financial transaction represents the proceeds of some form of unlawful activity,  with the intent to promote the carrying on of specified unlawful activity.  As alleged in the Complaints and RICO Statements, al Qaida has, from its inception, depended on the diversion of contributions to ostensible charities to support its global operations.  The funds obtained through this process necessarily represent the proceeds of unlawful activity, in that many well meaning contributors are defrauded in the process.  Given the relationship between the NIF and al Qaida during al Qaida's formative years, FIBS was certainly aware that the funds deposited in the al Qaida accounts it maintained were generated through illegal means, and were being channeled to support al Qaida's terrorist ambitions.  As such, FIBS is guilty of money laundering under 1956(a)(1) as well.  The violations of that subsection also give rise to personal jurisdiction over FIBS under 1956(b)(2).

### E.   The Property Damage Plaintiffs Have Asserted Valid Negligence Claims Against FIBS

FIBS argues that it cannot be liable under a theory of negligence because the Property

Damage Plaintiffs do not allege or identify a duty owed by FIBS to the Plaintiffs.  This argument

ignores the duties and obligations imposed on FIBS as a member of the global banking system.

In 1990, the Financial Action Task Force (FATF), an inter-governmental body whose

purpose is the development and promotion of policies, both at national and international levels,

to combat money laundering and terrorist financing, published its "Forty Recommendations" to

combat money laundering and terrorist financing.  The Forty Recommendations "set out the

framework for anti-money laundering efforts and are designed for universal application.  They

provide a complete set of counter-measures against money laundering covering the criminal

justice system and law enforcement, the financial system and its regulation, and international co-

operation."  *See* Financial Action Task Force Website – About FATF, available at

http://www1.oecd.org/fatf/AboutFATF_en.htm, Carter Aff. Exh. 4.  Of particular note, the Forty

Recommendations set forth minimum standards which must be observed by financial institutions

to guard against money laundering and terrorist financing.  Pursuant to the Forty

Recommendations:

> Financial institutions should not keep anonymous accounts or accounts in
> obviously fictitious names: they should be required (by law, by regulations, by
> agreements between supervisory authorities and financial institutions or by self-
> regulatory agreements among financial institutions) to identify, on the basis of an
> official or other reliable identifying document, and record the identity of their
> clients, either occasional or usual, when establishing business relations or
> conducting transactions (in particular opening of accounts or passbooks, entering
> into fiduciary transactions, renting of safe deposit boxes, performing large cash
> transactions).
>
> Financial institutions should take reasonable measures to obtain information about
> the true identity of the persons on whose behalf an account is opened or a
> transaction conducted if there are any doubts as to whether these clients or
> customers are not acting on their own behalf, in particular, in the case of
> domiciliary companies (i.e. institutions, corporations, foundations, trusts, etc. that

do not conduct any commercial or manufacturing business or any other form of commercial operation in the country where their registered office is located).

Financial institutions should pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose.  The background and purpose of such transactions should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies.

When a financial institution develops suspicions about the operations of a customer, and when no obligation of reporting these suspicious exists, makes no report to the competent authorities, it should deny assistance to this customer, sever relations with him and close his accounts.

*The Forty Recommendations of the Financial Action Task Force on Money Laundering*, Financial Action Task Force, 1990, Carter Aff. Exh. 5.

Given a banking institution's universally recognized obligation to engage in good faith efforts to prevent the financing of terrorism, as reflected by the Forty Recommendations of the FATF, FIBS unquestionably owed a duty of care to plaintiffs.[4]  In knowingly providing financial services to al Qaida, FIBS undeniably violated the duties imposed on it as a member of the international banking system.  As the complaints plainly allege that the Property Damage Plaintiffs injuries were the direct and proximate cause of FIBS's breaches of its duties, the Property Damage Plaintiffs have stated valid negligence claims against FIBS.

    **F.**    **The Federal Plaintiffs' Assault and Battery and Intentional Infliction of Emotional Distress Claims Are Not Barred by the Statute of Limitations**

The *Federal* Plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not time-barred for two reasons.  First, these claims are subsumed within plaintiffs' claims under the ATA, which imports into that federal cause of action "the remedies of American tort law."  *See* 137 Cong. Rec. S4511 04 (April 16, 1991); *see also Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) (language and history of ATA "evidence[]

---

[4] Moreover, as a general principle of tort law, every individual has a duty to exercise reasonable care to avoid physical harm to others' person and property.  See Restatement (Second) of Torts § 302.

an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law"). To the extent that these claims have been "federalized" under the Anti-Terrorism Act, they are governed by federal law. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal statute).[5] State statutes of limitation are inapplicable to federal common law claims. *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004). *See also Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306, 309 (E.D. La. 1994), *reconsideration denied*, 1995 WL 672835 (E.D. La. Nov. 9, 1995) (holding that suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even when brought by private parties).

Moreover, all of the *Federal* Plaintiffs' claims arise from FIBS's participation in the conspiracy to conduct terrorist attacks against the United States; a conspiracy designed to hide the identity of the participants from disclosure to the outside world. As a result, the statute of limitations was tolled until the *Federal* Plaintiffs reasonably should have become aware of FIBS's involvement within the conspiracy, itself a question of fact to be determined through discovery. *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D. N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 2004 U.S. Dist. LEXIS 3829 *17-18 (S.D. N.Y. 2004). Given the clandestine nature of the conspiracy in which FIBS participated, equitable principles require that the statute of limitations be tolled. *See Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (holding that "[e]quitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").

---

[5] Should plaintiffs' claims under the ATA fail for any reason, however, the common law claims also exist as separate claims arising under state law. In determining which states' laws govern, this Court would apply the choice-of-law rules used by New York. *See Ideal Electronic Co. v. International Fidelity Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997), *aff'd on appeal after remand*, 203 F.3d 53 (D.C. Cir. 1999) (federal court hearing state-law claims applies choice of law rules of the place in which it sits).

### G.   The Property Damage Plaintiffs' Aiding and Abetting Claims Should Not Be Dismissed

FIBS also argues that the Property Damage Plaintiffs' have failed to adequately plead the elements of their aiding and abetting claims.  Again, FIBS is mistaken.

Civil liability for aiding and abetting will be imposed where:  (1) the party whom the defendant aids or abets performs a wrongful act that causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides substantial assistance to the wrongdoer. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

The Property Damage Plaintiffs have adequately pleaded each of the requisite elements in relation to their aiding and abetting claims against FIBS.  Once again, the Complaints and RICO Statements plainly allege that FIBS knowingly provided material support and resources to al Qaida, the terrorist organization which carried out the September 11th Attack.  The Complaints and RICO statements further detail the close relationship between the NIF and al Qaida, as well as the NIF's prominent role in the management of FIBS.  These specific allegations make clear that the NIF and FIBS were expressly aware of, and integral participants in, al Qaida's campaign to attack America, and are sufficient to state valid claims under aiding and abetting theories.

**IV.     CONCLUSION**

For the reasons stated above, the Property Damage Plaintiffs respectfully request that

FIBS's Motions to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

Dated:  June 27, 2005                    **COZEN O'CONNOR**

By: _____
            STEPHEN A. COZEN, ESQUIRE
            ELLIOTT R. FELDMAN, ESQUIRE
            MARK T. MULLEN, ESQUIRE
            SEAN P. CARTER, ESQUIRE
            1900 Market Street
            Philadelphia, PA 19103
            Tele:  (215) 665-2000
            Fax:   (215) 665-2013

PHILA1\2294927\1 117430.000