UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re Terrorist Attacks on September 11, 2001                    03 MDL 1570 (RCC)
                                                                 ECF Case

-------------------------------------------------------------x

CANTOR FITZGERALD & CO., et al.,

              Plaintiffs,                                  04 CV 7065 (RCC)
                                                                 ECF Case
    v.

AKIDA BANK PRIVATE LIMITED, et al.,

              Defendants.
-------------------------------------------------------------x

CANTOR FITZGERALD AND PORT AUTHORITY PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF
DEFENDANT SULAIMAN AL RAHJI

Dated: June 28, 2005              Kenneth L. Adams
      New York, New York      Jonathan M. Goodman
                                 Christopher T. Leonardo
                                 Stacey A. Saiontz
                                 Dickstein Shapiro Morin & Oshinsky LLP
                                 1177 Avenue of the Americas
                                 New York, New York 10036-2714
                                 Tel.: 212-835-1400
                                 Fax: 212-997-9880

TABLE OF CONTENTS

Page

I.   CANTOR FITZGERALD PLAINTIFFS PROPERLY ASSERT CLAIMS
     UNDER INTERNATIONAL LAW ........................................................................ 2

     A.   Subject Matter Jurisdiction Is Proper Under 28 U.S.C. § 1331 and
          Federal Common Law ....................................................................... 3

     B.   Cantor Fitzgerald Plaintiffs State A Claim That Defendant Acted In
          Concert With Others In Violation Of International Law .............................. 6

          1.   Defendant Is A Member And Principal of SAAR Network
               a.k.a. Safa Group ...................................................................... 6

          2.   The Defendant's Provision Of Material Support to Al Qaeda .......... 9

     C.   Punitive Damages Against Properly Recoverable Against
          Defendant Under International Law ................................................... 15

II.  THE PORT AUTHORITY PLAINTIFFS PROPERLY ASSERT
     CONTRIBUTION AND INDEMNITY CLAIMS ...................................... 16

CONCLUSION ...................................................................................... 19

DSMDB.1946170.2

TABLE OF AUTHORITIES

Page(s)

*In re Agent Orange Prod. Liab. Litig.* Nos. MDL 381,
04-CV-400, 2005 WL 729177 (March 28, 2005 E.D.N.Y.) ................................ 4,5

*American. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130 (2d Cir.1997) ......... 13

*Apex Oil Co. v. United States,* 530 F.2d 1291 (8th Cir. 1976)................................ 14

*Baker v. Dorfman,* 239 F.3d 415 (2d Cir. 2000) ....................................................... 18

*Bano v. Union Carbide Corp.,* 361 F.3d 696 (2d Cir. 2004) ................................... 4-5

*Board of Educ. v. Sargent,* 71 N.Y.2d 21 (1987) ................................................ 17-18

*Bodner v. Banque Paribas,* 114 F. Supp. 2d 117 (E.D.N.Y. 2000)........................ 3,5

*Boim v. Quranic Literacy Inst.,* 291 F.3d 1000 (7th Cir. 2002) ............................. 18

*Boim v. Quranic Literary Instit.,* No. 00 C 2905 (Keyes, A., Mag. J.) (N.D. Ill. Nov.
10, 2004) ................................................................................................................ 3

*Bigio v. Coca-Cola Co.,* 239 F.3d 440 (2d Cir. 2001).............................................. 2

*Calcutti v. SBU, Inc.,* 273 F. Supp. 2d 488 (S.D.N.Y. 2003).................................. 17

*Doe v. Islamic Salvation Front,* 257 F. Supp.2d 115 (D.D.C. 2003) ...................... 2

*Dole v. Dow Chem. Co.,* 30 N.Y.2d 143 (1972) ...................................................... 17

*Dubai Islamic Bank v. Citibank N.A.,* 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ........ 14

*Estates of Ungar v. Palestinian Auth.,* 153 F. Supp.2d 76 (D.R.I. 2001) ................ 2

*Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir. 1980) ........................................... 3,16

*Filartiga v. Pena,* 577 F. Supp. 860 (E.D.N.Y. 1984)........................................... 4,15

*Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980) .......................................... 12

*Glasser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643 (1988)......................... 17

*Goodkin v. United States,* 773 F.2d 19 (2d Cir. 1985) ............................................ 17

*Hawkins v. Comparet-Cassani,* 33 F. Supp. 2d 1244 (C.D. Cal. 1999)
*rev'd in part on other grounds,* 251 F.3d 1230 (9th Cir. 2001) ............................. 4

DSMDB.1946170.2

*Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192 (D.C. Cir. 2004)........................................................................................... 4

*Illinois v. Milwaukee*, 406 U.S. 91 (1972).......................................................... 4

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)................................................. 4,5

*In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) .......................................... 13,14

*Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002) ........................ 16

*Network Enter., Inc. v. APBA Offshore Prod. Inc.*, No. l 01-11765, 2003 WL 124521 (S.D.N.Y. Jan. 15, 2003) ................................................................................ 14

*New York Islanders Club LLP v. Comerica Bank*, 71 F. Supp. 2d 108 (E.D.N.Y. 1999)............................................................................................. 14

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003) ............................................................... 13

*Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994)............................................... 16

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289 (S.D.N.Y. 2003)............................................................................................. 5

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882 (S.D.N.Y. (DLC) (June 13, 2005))................................................................... 5

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003), *appeal dismissed*, 2004 WL 2664532 (D.C. Cir. Nov. 22, 2004)............................................................................ 5

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992) ................................... 18

*Steitz v. Gifford*, 280 N.Y. 15 (1939) ................................................................ 18

*Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260 (D. D.C. 2002) ............... 16

*In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005). 5,10,12,18

*The Paquete Habana*, 175 U.S. 677 (1900) ..................................................... 4

*United States v. Arnaout*, 2003 WL 255226 (N.D. Ill. Feb. 4, 2003) ................. 11

*United States v. Bank of New England*, 821 F.2d 844 (1st Cir.) ......................... 14

*United States v. Finkelstein*, 229 F.3d 90 (2d Cir. 2000) .................................. 15

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000) ................................... 15

iii

*United States v. Hanlon*, 548 F.2d 1096 (2d Cir. 1977) ................................................. 15

*United States v. Jon-T Chem., Inc.*, 768 F.2d 686 (5th Cir. 1985) ............................... 7

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001) ............................................... 15

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) ............................................... 15

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) ............................................... 2

*White v. Paulsen*, 997 F. Supp. 1380 (E.D. Wash. 1998) ........................................... 4

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991) ...................................................................................................................... 7-8

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ..................... 5

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ..................................................... 16

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) ........................................... 16

## OTHER AUTHORITIES

28 U.S.C. § 1331 ............................................................................................................ 3

28 U.S.C. § 1605(a)(3) ................................................................................................. 5,6

22 U.S.C. § 2370(e)(2) ................................................................................................. 6

18 U.S.C. § 2333 ............................................................................................................ 6

N.Y. C.P.L.R. § 1401 ..................................................................................................... 19

N.Y. C.P.L.R. § 1403 ..................................................................................................... 19

Restatement (Third) of Foreign Relations Law § 111 comment (e) 1987 ........................... 4

Restatement (Third) of the Law of Torts, § 23 ............................................................. 19

*Harold Hongju Koh, Transnational Public Law Litigation*, 100 Yale L. J. 2347, 2385- 86 (1991) .......................................................................................................... 5

*Kenneth C. Randall, Federal Questions and the Human Rights Paradigm*, 73 Minn. L. Rev. 349 (1988) ...................................................................................... 5

DSMDB.1946170.2

The Cantor Fitzgerald Plaintiffs[1] submit this Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rajhi. The Cantor Fitzgerald Plaintiffs separately join all arguments asserted in Plaintiffs' Consolidated Memorandum of Law in Opposition to Motion To Dismiss of Sulaiman Al Rajhi. The Cantor Fitzgerald Plaintiffs adopt and incorporate herein the aforementioned Consolidated Opposition and accompanying papers.

The instant Opposition motion primarily directs itself to Defendant's motion to dismiss Counts Nine, Eleven, Twelve, Thirteen of the Cantor Fitzgerald Plaintiffs' First Amended Complaint. These Counts collectively raise claims specific to the Cantor Fitzgerald Plaintiffs and are distinct from those claims asserted by co-Plaintiffs.

Counts Nine and Eleven seek relief from Defendant for injuries caused by Defendant's concerted action with Al Qaeda and Osama Bin Laden in violation of international law. Defendant makes only passing, non-specific arguments regarding the instant international law claims. *See* Defendant's Mem. of Law, at p. 1, 12 note 30. Nevertheless, the Cantor Fitzgerald Plaintiffs separately set forth the legal sufficiency of Counts Nine and Eleven.

Count Twelve asserts claims for punitive damages. As demonstrated below, this Circuit and its sister courts have long awarded punitive damages for violations of international law, a fact that rebuts Defendant's motion for dismissal of Count Twelve. *See* Defendant's Mem. of Law, at 22.

---

[1] The Cantor Fitzgerald Plaintiffs include Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald, L.P., Cantor Index Limited, CO2e.com, LLC, eSpeed Government Securities, Inc., eSpeed, Inc., eSpeed Securities, Inc., TradeSpark, L.P.; and the Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC (collectively, the "Cantor Fitzgerald Plaintiffs"). The Cantor Fitzgerald Plaintiffs allege that they were injured by damage to their physical property and property interests, as well as business interruption losses and lost profits.

Count Thirteen asserts contribution and indemnity claims by Plaintiffs Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC. Defendant moves to dismiss these claims as well, Defendant's Mem. of Law, at 1. These arguments are likewise misplaced.

## I.    CANTOR FITZGERALD PLAINTIFFS PROPERLY ASSERT CLAIMS UNDER INTERNATIONAL LAW

In Counts Nine and Eleven of the Cantor Fitzgerald Plaintiffs' First Amended Complaint, the Cantor Fitzgerald Plaintiffs allege that all Defendants are jointly and severally liable for Plaintiffs' damages under principles of international law. *See* First Amended Cantor Action Compl. at ¶¶11, 107, 111, 226-230. Specifically, the Cantor Fitzgerald Plaintiffs assert that aircraft hijacking is a well recognized violation of the law of nations, and that the September 11 attacks were committed through a terrorist airhijacking in violation of international law. *See* First Amended Cantor Action Compl. at ¶228.[2] The Cantor Fitzgerald Plaintiffs also contend that Defendant's conduct, insofar as it establishes that Defendant acted directly and in concert with others in financing and materially supporting Al Qaeda, equally demonstrates Defendant's liability for aiding and abetting a violation of international law. *Id*. at ¶¶226-230, 234-36.[3] Cantor Fitzgerald Plaintiffs' international law claims are legally sufficient.

---

[2]    *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447-48 (2d Cir. 2001); *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1996); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120 (D.D.C. 2003); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 309 (S.D.N.Y. 2003); *see generally United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991) ("Aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved.").

[3]    *Accord Estates of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 97-98 (D.R.I. 2001) (finding plaintiff-victims of terrorism stated ATA claims, both under material support and accessory after the fact theories, against Palestinian Authority and co-defendants, where plaintiffs alleged *inter alia* that defendants provided designated terrorist entity Hamas with safe haven, a base of operations, permitted and/or encouraged Hamas to operate freely in territories under their control, and otherwise lent material support to families of Hamas members who had been captured or killed carrying out terrorist attacks);

2

A.   Subject Matter Jurisdiction Is Proper Under 28 U.S.C. § 1331 and
     Federal Common Law

The Court clearly possesses subject matter jurisdiction over the Cantor

Fitzgerald Plaintiffs' international law claims pursuant to 28 U.S.C. § 1331 and federal

common law.  The law empowers federal district courts to exercise subject matter

jurisdiction over international law claims asserted by both U.S. and foreign victims

injured by violations of international law.  For example, in *Filartiga v. Pena- Irala*, 630

F.2d 876, 887, n.22 (2d Cir. 1980), the Second Circuit held that "[f]ederal jurisdiction

over cases involving international law is clear."  *Id.*  Therefore, the court found that the

same reasoning that supports the exercise of jurisdiction over international law claims

asserted under the Alien Tort Claims Act ("ATCA") would in all likelihood support

jurisdiction under 28 U.S.C. § 1331.  *Id.*  More recently, the court in *Bodner vs. Banque*

*Paribas*, 114 F. Supp. 2d 117, 127, n.6 (E.D.N.Y. 2000), followed *Filartiga v. Pena- Irala* and

applied 28 U.S.C. § 1331 to exercise jurisdiction over international law claims asserted

by American plaintiffs, who were victims of the holocaust, and their legal

representatives, against foreign banks that looted, converted, and withheld plaintiffs'

assets in violation of international law.  *Id.*

The holdings in *Filartiga v. Pena- Irala* and *Bodner vs. Banque Paribas* accurately

reflect the current state of the law.  According to the Restatement of Foreign Relations

Law:

> Cases arising under treaties to which the United States is a party, as
> well as cases arising under customary international law, or under
> international agreements of the United States other than treaties,
> are "Cases . . . arising under . . . the Laws of the United States, and
> Treaties made . . . under their Authority," and therefore within the
> Judicial Power of the United States under Article III, Section 2 of
> the Constitution.  Civil actions arising under international law or

---

*Boim v. Quranic Literary Instit.*, No. 00 C 2905 (Keyes, A., Mag. J.) (N.D. Ill. Nov. 10, 2004), attached Exhibit
1 to the Declaration of Jonathan Goodman (hereinafter "Goodman Decl.").

3

> under a treaty or other international agreement of the United States
> are within the jurisdiction of the United States district courts."

Restatement (Third) of Foreign Relations Law § 111, comment (e) (1987).

The exercise of jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims would also be entirely consistent with Supreme Court and related precedent holding that, as international law is part of federal common law, federal district courts are inherently empowered to adjudicate those claims. *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("[I]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); *In re Agent Orange Prod. Liab. Litig.*, Nos. MDL 381, 04-CV-400, 2005 WL 729177, at *3, *38 (Mar. 28, 2005 E.D.N.Y.) (ruling "[i]n judging international human rights claims against domestic corporations or others, courts in the United States with jurisdiction act as quasi international tribunals . . . Federal common law, not *Erie*, governs"); *see also Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (federal common law incorporates customary international law); *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law).[4] Nor is subject matter jurisdiction over international law claims improper where, as here, those international law claims involve property damage. *Bano v. Union Carbide*

---

[4]      *See also Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192, 1195 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 508 (2004) ("It is not 'insubstantial and frivolous' to assert that federal common law should provide a private cause of action for violations of customary international law.") (citing *Filartiga v. Pena- Irala*, 630 F.2d at 886-87; *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244, 1255 (C.D. Cal. 1999), *rev'd in part on other grounds*, 251 F.3d 1230 (9th Cir. 2001); *Accord Illinois v. Milwaukee*, 406 U.S. 91, 100 (1972) (concluding that 28 U.S.C. § 1331 federal question jurisdiction supports claims founded upon federal common law; *White v. Paulsen*, 997 F. Supp. 1380, 1383-84 (E.D. Wash. 1998); *see generally* Harold Hongju Koh, *Transnational Public Law Litigation*, 100 Yale L. J. 2347, 2385- 86 (1991); Kenneth C. Randall, *Federal Questions and the Human Rights Paradigm*, 73 Minn. L. Rev. 349 (1988).

4

*Corp.,* 361 F.3d 696, 717 (2d Cir. 2004); *Bodner vs. Banque Paribas,* 114 F. Supp. 2d 117, 127, 127 n.6 (E.D.N.Y. 2000).[5]

This Court, like other courts before it, has ruled that the September 11 attacks were perpetrated in violation of international law.  *In re Terrorist Attacks of September 11, 2001,* 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005); *Burnett I,* 274 F. Supp. 2d at 100.  Further, consistent with established Second Circuit precedent this Court has held that those who act in concert with others in the commission of violations of international law are themselves liable for the resulting damages.  *In re Terrorist Attacks of September 11, 2001,* 349 F. Supp. 2d at 826; *Kadic v. Karadzic,* 70 F.3d 232, 239 (2d Cir. 1995); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 01 Cv 9882 (DLC) (June 13, 2005) at 14 (denying motion for judgment on the pleadings brought by energy company and holding private actors can be held liable for acting in concert with others who violate international law) (attached as Goodman Decl. Ex. 2); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp. 2d 289, 321 (S.D.N.Y 2003); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *13 (S.D.N.Y. Feb. 28, 2002); *In re Agent Orange Prod. Liab. Litig.,* 2005 WL 729177, at *38 ("federal case law dating back more than two hundred years…recognized liability for aiding and abetting violations of international law norms.").  Thus, this Court possesses subject matter over the Cantor Fitzgerald Plaintiffs' international law claims.[6]

---

[5]    There is wealth of additional support for this view.  For example, there is no foreign sovereign immunity against damage claims involving property rights taken in violation of international law. *See* 28 U.S.C. § 1605(a)(3).  Likewise, claims for damages arising out of the forced taking of property through violations of international law are a recognized exception to the Act of State doctrine.  22 U.S.C. § 2370(e)(2).

[6]    An alternative basis for jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims exists under 28 U.S.C. § 1367.  In *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54 (D.D.C. 2003), *appeal dismissed,* 2004 WL 2664532, at *1 (D.C. Cir. Nov. 22, 2004), survivors of American passengers killed in the bombing of UTA Flight 772 and an American corporation that owned the aircraft that was destroyed in the attack sued Libya, its intelligence service, and related individuals for

B.     Cantor Fitzgerald Plaintiffs State A Claim That Defendant Acted In
       Concert With Others In Violation Of International Law

The Cantor Fitzgerald Plaintiffs sufficiently allege that Defendant acted in

concert with, financed, and/or materially supported Al Qaeda in violation of

international law and thus is responsible for the resulting property damage suffered by

the Cantor Fitzgerald Plaintiffs.  *See* First Amended Cantor Action Compl. at ¶¶11, 107,

111, 226-230; Cantor Fitzgerald Plaintiffs' RICO Statement Applicable to Sulaiman Al

Rahji at Response No. 2.  Defendant's liability can be established by evidence that he

was a principal member and financier of the SAAR Network a.k.a. Safa Group, that the

individuals and entities within the SAAR Network/Safa Group functioned as agents

and alter-egos of each other, that the Defendant and the SAAR Network/Safa Group

entities financed and materially supported Al Qaeda, and, that the Defendant had

actual knowledge of or consciously avoided this fact.

       1.     Defendant Is A Member And Principal of SAAR Network a.k.a.
              Safa Group

According to Dr. Dore Gold, the former Israeli Ambassador to the United

Nations, Defendant established the SAAR Foundation.  *See* First Amended Complaint at

¶107; *See* Testimony of Dr. Dore Gold, Frmr. Ambassador to United Nations, Before

U.S. Senate Committee on Governmental Affairs (July 31, 2003) at 6 (attached as

Goodman Decl. Ex.3).  U.S. terrorism financing investigators who raided the SAAR

---

sponsoring the attack.  *Id.* at 56.  The corporate-plaintiff sought relief under 18 U.S.C. § 2333 and asserted
related common law claims, whereas the individual plaintiffs relied upon the terrorism exception to
sovereign immunity and the Flatow Amendment to establish subject matter jurisdiction and a private
right of action.  *Id.* at 56, 60 (citing to 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605(a)(7) (note) (the 1996
Flatow Amendment).  When faced with the defendants' motion to dismiss the corporate plaintiff's
common law and ATA claims for lack of subject matter jurisdiction, the court correctly ruled that because
it possessed original jurisdiction over the individual plaintiffs' claims, so too could it exercise
supplemental jurisdiction over the corporation's claims.  Like the claims at bar, the corporate claims grew
"out of the same case or controversy as the individual plaintiffs' claims."  *Id.* at 60, 61.  Thus, insofar as
this Court permits any claim to proceed against Defendant, it should also exercise supplemental
jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims.  *Id.*; 28 U.S.C. § 1367(a).

Foundation in 2003 have stated that the SAAR Foundation (which currently operates as "Sterling Charitable Gift Fund" at the same address at 555 Grove Street, Herndon, Virginia) is actually part of a larger network of individuals, charities and related entities that functioned as agents and alter egos of each other. *See* Proposed Redacted Affidavit of David Kane In Support of Application for Search Warrant (Oct. 2002), at 2 ¶3 (attached at Goodman Decl. Ex.4) (describing investigation of individuals, charities, and entities, namely, the SAAR Network, a.k.a., "Safa Group,"[7] which was "controlled by" a small group of individuals who engaged in terrorist financing and related money laundering schemes.).

Under New York law, courts can disregard the corporate form when the corporation primarily transacts the business of the dominating interest rather than its own. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) (alter ego liability requires "complete control by the dominating [party] that leads to a wrong against third parties") (emphasis added). The "alter ego question depends upon the totality of the facts, " *United States v. Jon-T Chem., Inc.*, 768 F.2d 686, 692 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986), including evidence of: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the

---

[7] What Plaintiffs allege as the "SAAR Network" is what the government describes as the "Safa Group". The terms SAAR Network and Safa Group are interchangeable. Thus, for clarity, this Opposition primarily uses the term "Safa Group".

7

dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d at 138-39.

Applying these factors to the SAAR Foundation, the evidence shows that the SAAR Foundation is but the agent or alter ego of the Safa Group. For example:

- ♦ The "SAAR Foundation, Safa Trust, Inc., and dozens of other related entities in the Safa Group" that are "controlled by the individuals that are subject of this investigation" shared the same business address. Goodman Decl. Ex.4 at p.5 ¶6(a)

- ♦ The Safa Group includes over 100 "interwoven" organizations, with associated corporate officers and directors, including Defendant's SAAR Foundation, one of the many "interwoven" alter-ego charities operating within the Safa Group. Goodman Decl. Ex.4 at p.42 ¶88 and accompanying chart.

- ♦ The corporate formalities within the Safa Group, including those of the SAAR Foundation, were routinely disregarded by the pooling and diverting of assets, and the interchange and movement of funds as between "Safa Charities." Goodman Decl. Ex.4 at p.44 ¶1-through-p.49 ¶14; p.52 ¶¶10-11 (Safa Group entities routinely transfer large amounts of funds between themselves to conceal source and path of funds).

- ♦ Safa Group entities were in effect sham companies, used as shells to further criminal goals. Indeed, "many organizations in the Safa Group dissolve and are replaced by other organizations under the control of the same individuals . . . [and] are 'paper' organizations" presently or formerly located at "555 Grove Street" in Herndon, Virginia. *See* Goodman Decl. Ex.4 pp.6-7 ¶2.

- ♦ Thus, the Defendant's SAAR Foundation "simply changed its name" to Sterling Charitable Gift Fund as part of its effort to conceal its continued operations from investigators. Goodman Decl. Ex.4 at p.71 ¶70.

8

♦   In addition, like their other alter-ego Safa Group
members, the Safa Trust and SAAR Foundation
possessed overlapping officers, shared the same address,
and were related entities.  Goodman Decl. Ex.4 at p.72
¶72; p.79 ¶93(d).

The SAAR Foundation, along with other "Safa Charities" sharing the same address and

interlocking directors and officers, were involved in a conspiracy to route money

through hidden paths to terrorists.  *See* Goodman Decl. Ex.4 at p.44 ¶1 (noting also that

SAAR Foundation is one of over 100 active and defunct charities and entities "woven

together by common officers and directors" with over forty sharing the same address);

at p.45 ¶3 (describing control over Safa Group allowed conspirators to  conceal and hide

funds sent to terrorists); *See also* First Amended Cantor Action Compl. at ¶¶11, 107, 111;

*Accord Federal* Plaintiffs Complaint at ¶¶222, 228.

The Defendant was a principal member of the Safa Group.  As noted, the

Defendant created the SAAR Foundation.  In addition, there is evidence from which to

infer that Defendant funded the Safa Group throughout the relevant period leading up

the September 11 attacks:

Based on my examination of financial documents, correspondence,
and interviews with confidential witnesses, I believe that the first
members of Safa Group were established in the early 1980s.  I
believe that one source of funds flowing through the Safa Group is
from the wealthy Al-Rahji family in Saudi Arabia.  The SAAR
Foundation, a Safa Charity, was named after Sulaiman Abdul Aziz
Al-Rahji (SAAR), head of a wealthy Saudi family.  Abdullah
Sulaiman Al-Rahji, a relative of Sulaiman Abdul Aziz, is one of the
directors of the Safa Group corporation, Aradi, Inc., located at 555
Grove Street, Herndon, Virginia.

*See* Goodman Decl. Ex.4 at p.51 ¶7.

2.   The Defendant's Provision Of Material Support to Al Qaeda

The evidence against the Safa Group provides at least a reasonable basis from

which to infer that all members of the Safa Group, including the Defendant and the

9

Defendant's SAAR Foundation, acted in concert to conceal funds for distribution to Al Qaeda and those that materially supported Bin Laden.

One, the government's investigation of the Safa Group resulted in evidence that the Safa Group was a web of charities controlled by principals to engage in money laundering and to provide material support to terrorists. *See* Goodman Decl. Ex.4 at p. 2 ¶3 & p.8 ¶4 (concluding that, based upon investigation of principals and corporate and financial records, that "no innocent explanation" exists for use of multiple layers of financial transactions between "Safa Group companies and charities other than to throw law enforcement authorities off the trail."). In concluding that the SAAR Foundation was used by its officers and directors (themselves members of the conspiracy) to fund terrorists, the government also concluded that the criminal scheme involved "others known and unknown." *See* Goodman Decl. Ex.4 at p.2 ¶3. Plaintiffs contend that there are sufficient facts from which to infer that Defendant was part of this conspiracy. *See* First Amended Cantor Action Compl. at ¶¶11, 231-233.

Aside from the fact that Defendant founded the SAAR Foundation, he also (like designated terrorist financier defendant Batterjee) is a Golden Chain donor. *Compare In re Terrorist Attacks of September 11, 2001,* 349 F. Supp. 2d at 817-18 (declining to rely upon "Golden Chain" as evidence from which to infer participation in terrorist financing, and noting concerns that Golden Chain provided no indication of who wrote the list, when it was written, or for what purpose) *with* Ex.8 to Goodman Decl. filed with Cantor Fitzgerald Plaintiffs' Motion In Opposition to Defendant Faisal Islamic Bank (Sudan)'s Motion To Dismiss (providing facts supporting conclusion that Golden Chain document was created in 1988, and that it was a list of "wealthy financiers "of defendant OBL.). The *9/11 Commission Report* stated,

>Bin Ladin understood better than most of the volunteers the extent
>to which the continuation and eventual success of the jihad in
>Afghanistan depended on an increasingly complex, almost
>worldwide organization.  This organization included a financial
>support network that came to be known as the "Golden Chain,"
>put together mainly by financiers in Saudi Arabia and the Persian
>Gulf states. Donations flowed through charities or other
>nongovernmental organizations (NGOs)  Bin Ladin and the
>"Afghan Arabs" drew largely on funds raised by this network,
>whose agents roamed world markets to buy arms and supplies for
>the mujahideen, or "holy warriors."

*911 Commission Report*, Ch. 2. p.55 (attached as Goodman Decl. Ex. 6.  *See id*. at Ch. 2 p.

66 (stating Bin Laden eventually enjoyed a strong financial position in Afghanistan

thanks to Saudi and other financiers associated with the Golden Chain."); *cf.* Fed. R.

Evid. 807.[8]

---

[8]      In concluding that the Golden Chain document was hearsay, this Court relied upon *United States v. Arnaout*, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003).  *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 818.  The "Golden Chain" was one exhibit among 248 exhibits cited and attached to a proffer filed by the United States government supporting the admissibility of certain co-conspirator statements.  The *Arnaout* court ruled that the *proffer* could not be sufficiently linked to a specific conspiracy and the documents were not admissible under the co-conspirator exception to the hearsay rule.  *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *2 (emphasis added).

         However, it is unclear whether the Golden Chain document was considered by the court in *Arnaout* or if it was addressed by the *Arnaout* decision.  *Arnaout*, 2003 WL 255226, at *1 n.1 ("In its reply to objections to its proffer, the government has withdrawn a substantial [unspecified] portion of its exhibits.").  Moreover, the Cantor Fitzgerald Plaintiffs assert that the Golden Chain document is sufficiently trustworthy at the motion to dismiss stage pursuant to Fed. R. Evid 807.  *See* Plaintiffs' Supplemental Memorandum In Opposition To Motions To Dismiss of Wa'el Hamza Jelaidan, Khalid Bin Mahfouz, and Yousef Jameel (noting Golden Chain document was referenced in and used in *Arnaout* sentencing hearing, by 911 Commission, in designating terrorist supporters and financiers by United States government, and corroborated by captured Al Qaeda members).  This places Plaintiffs' reliance on the Golden Chain on a markedly different footing than that observed in *Arnaout*, where the sole issue was whether the evidence before that court satisfied the co-conspirator exception to the hearsay rule under Illinois law.  *See* 2003 WL 255226, at *1 (analyzing evidentiary proffer under co-conspirator exception to the hearsay rule, and ruling government must establish by a preponderance of the evidence that a conspiracy existed; that the defendant and the declarant were both members of the same conspiracy; and that the proffered statements were made during the course of and in furtherance of that conspiracy.).  In any event, it is premature to decide the evidentiary sufficiency of this piece of evidence when considering the legal sufficiency of the Complaint.  "The issue is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support their claims." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (holding courts task in addressing Rule 12(b)(6) motions" is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").  For these reasons, the Court may properly rely upon the Golden Chain document for the purposes of this motion.

DSMDB.1946170.2

Two, in ordering jurisdictional discovery over the SAAR Network, this Court previously accepted as true Plaintiffs' allegations that SAAR Network entities are "related by common management . . . and they *all* 'have long acted as fully integrated components of al Qaeda's logistical and financial support infrastructure.'" *See In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 823 (emphasis added).  Indeed, the "SAAR Network" included the U.S. branch of designated terrorist defendant charity IIRO, as well as IIRO's alter-ego, defendant Muslim World League, both of which provided financial and material support to Al Qaeda.  *See* Goodman Decl. Ex. 4 at Attachment-C pp.6, 9; First Amended Cantor Action Compl. at ¶66 (alleging that MWL is parent of IIRO, that  IIRO executive testified under oath that MWL and IIRO function together as one entity and are functionally interchangeable, have offices located in same building, and share interlocking executives and overlapping mission statements.); *id.* at ¶¶51-73.  The same is true with respect to other Safa Group entities that lent material support to Al Qaeda through designated terrorists and designated terrorist banks:

> U.S. and European investigators say they have uncovered information in the Bahamas and Europe that in recent years some SAAR entities' funds have moved to two men, Youssef Nada and Ahmed Idris Nasreddin, designated by the United States as terrorist financiers.  The funds moved through two offshore banks in the Bahamas that the pair controlled, officials said.
>
> The institutions, Bank al Taqwa and Akida Bank Private Ltd., have been designated conduits for terrorist funds by the U.S. Treasury Department. In recent months they were shut down by Bahamian authorities under U.S. pressure. In an August report, Treasury said that the banks "have been involved in financing radical groups" including Hamas and al Qaeda, both before and after the Sept. 11 attacks.  Bank al Taqwa and Akida Bank were described by the Treasury Department on [August] 29 as "shell companies" that were "not functional banking institutions.

Douglas Farah and John Mintz, *U.S. Trails Va. Muslim Money, Ties,* Wash. Post. (Oct. 7, 2002), *reprinted in* SITE INSTITUTE (attached at Goodman Decl. Ex. 5).

12

These allegations and facts are equally applicable against the Defendant. Defendant and Defendant's SAAR Foundation were alter egos and agents in the same fashion as was the entire Safa Group. The Defendant's SAAR Foundation operated out of the same Grove Street, Herndon, Virginia address as did the other alter-ego charities existing within the Safa Group. *See* Goodman Decl. Ex. 4 at pp.73-74 ¶76, Attachment-E. The SAAR Foundation was controlled by the same group of officers and directors that dominated the other Safa Charities, and SAAR Foundation funds were routinely interchanged with those of other Safa Charities. *See* Goodman Decl. Ex.4 at p.45 ¶3-though-p.55 ¶15; p.57 ¶29; p.71 ¶ 71.

As such, the activities of the Safa Group and the SAAR Foundation can be imputed to the Defendant. Under New York law, the activities and knowledge of an alter-ego or agent-entity can be imputed to its principal if the agent or alter-ego was dominated and controlled by the principal to affect a wrong. *American. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997); *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164-65 (2d Cir. 2003) ("*Color Tile*"). Where, as here, "the persons dominating and controlling" the entity orchestrated the illegal conduct that gave rise to the injury, their knowledge is imputed to the corporation as principal. *Id.* (citing *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997). Thus, the agent's knowledge—here the Safa Group's and SAAR Foundation's—can be imputed to its principal – Defendant Sulaiman Al Rajhi, as a member of the Safa Group and founder of the SAAR Foundation. *See Mediators*, 105 F.3d at 827; *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

The same is true with respect to the imputation of the Safa Group's knowledge of its funding of Al Qaeda through designated terrorists Youssef Nada,

Ahmed Idris Nasreddin, Bank al Taqwa, Akida Bank Private Ltd., and IIRO to the Defendant. Accepting as true Plaintiffs' allegations,[9] the Safa Group's conduct should be imputed to the Defendant as a Safa Group principal. For example, in *Dubai Islamic Bank v. Citibank N.A.*, 256 F. Supp. 2d 158, 166-67 (S.D.N.Y. 2003), the court imputed knowledge and wrongful conduct of agents (Citibank employees) to their principal (Citibank), where a teller, Assistant Vice President and Operations Manager, *inter alia*, altered checks, provided bank reference letters on Citibank letterhead, and transferred funds from closed accounts, all in furtherance of a scheme to defraud a foreign correspondent bank.

Similarly, in *New York Islanders Hockey Club LLP v. Comerica Bank*, 71 F. Supp. 2d 108, 118-20 (E.D.N.Y. 1999), the court imputed liability to a principal bank where its agent, a Senior Vice President, unwittingly assisted a buyer in the fraudulent purchase of the New York Islanders. The Senior Vice President repeatedly represented to Islander's owners that they could rely upon the bank's verbal and written assurances that the buyer was a good credit risk and was a valued bank customer, when in fact, the agent knew that the buyer's credit was suspect. *Id.*[10]

At a minimum, that Defendant's knowledge and intent was the same as that of the Safa Group and the SAAR Foundation can be inferred from Defendant's conscious avoidance of the facts. "The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found

---

[9]     *See Network Enter., Inc. v. APBA Offshore Prod. Inc.*, No.l 01-11765, 2003 WL 124521 *3 (S.D.N.Y. Jan. 15, 2003) (finding that at motion to dismiss stage plaintiff's alter ego allegations must be accepted as true and refusing to dismiss claim).

[10]    *See also United States v. Bank of New England*, 821 F.2d 844 (1st Cir.) (holding knowledge of employees is the knowledge of the corporation.); *Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976) (same).

DSMDB.1946170.2

when one "is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.'" *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quoting *United States v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001) and *United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000)). *See also United States v. Hanlon*, 548 F.2d 1096, 1000 (2d Cir. 1977) (finding fact that defendant, who served as personal typist for head of company, engaged in bank fraud through use of falsified loan and purchase documents, was sufficient evidence from which to infer defendant's knowledge of criminal scheme); *see also United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000). The Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them. *See Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004).

### C.   Punitive Damages Against Properly Recoverable Against Defendant Under International Law

In Count Twelve of the First Amended Cantor Action Compl. at ¶¶237-39, the Cantor Fitzgerald Plaintiffs assert that the Defendant is liable for punitive damages. Defendant has moved to dismiss those claims. Defendant's Mem. of Law at p.1, 22. However, Defendant presents no argument that the Cantor Fitzgerald Plaintiffs are not entitled to recover punitive damages in this lawsuit. Indeed, it is clear that punitive damages are available in connection with the claims that the Cantor Fitzgerald Plaintiffs assert, including but not limited to their international law claims. *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law; *Paul v. Avril*, 901 F. Supp. 330, 335-36 (S.D. Fla. 1994) ("Both compensatory and punitive damages are recoverable for violations of international law. (citing *Filartiga v. Pena-Irala, supra*); *see also Mehinovic v. Vuckovic*, 198

15

F. Supp. 2d 1322, 1358-59 (N.D. Ga. 2002) (awarding punitive damages for defendant's violation of international law); *Xuncax v. Gramajo*, 886 F. Supp. 162, 201-202 (D. Mass. 1995) (same); *Accord Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260, 269-70 (D. D.C. 2002) ("although the claim of solatium is not recognized under D.C. law, such damages may be awarded under federal common law for mental anguish resulting from the loss of a decedent's society and companionship.").

II.     THE PORT AUTHORITY PLAINTIFFS PROPERLY ASSERT
        CONTRIBUTION AND INDEMNITY CLAIMS

        Defendant's motion to dismiss the contribution and indemnity claims made by plaintiffs the Port Authority of New York and New Jersey, and its affiliates, (the "Port Authority") must fail. The Port Authority seeks contribution and indemnity from the Defendant and its co-defendants in the instant case because Defendant and its co-defendants proximately caused the September 11 attacks and therefore are responsible for the resulting damage and injuries caused to the Port Authority and allegedly other victims. Specifically, certain of the individuals and businesses that allegedly were harmed in the September 11 attacks seek judgments against the Port Authority in separate actions under a theory that the Port Authority breached a duty of care owed to those plaintiffs. *See generally In re September 11 Litig.*, 21 MC 97 (Hellerstein, J.). The Port Authority contests liability in those lawsuits, but to the extent it is held liable, the Port Authority seeks contribution and indemnity for that liability from Defendant and its co-defendants under New York common law.

        New York law strongly favors contribution, *Goodkin v. United States*, 773 F.2d 19, 24 (2d Cir. 1985), and broadly authorizes contribution claims where "two or more persons" are subject to liability for damages for the same personal injury, injury to property or wrongful death. N.Y. C.P.L.R. § 1401; *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143,

16

152 (1972).  Under New York law, concurrent, successive and independent, alternative, and even intentional tortfeasors can seek contribution from each other in either "a pending action" through cross-or counter-claims or "in a separate action," where one tortfeasor would be a plaintiff and the other a defendant.  N.Y. C.P.L.R. § 1403; *see Board of Educ. v. Sargent,* 71 N.Y. 21, 27-28 (1987); *Dole v. Dow Chem. Co.,* 30 N.Y.2d at 151-53; *Glasser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 646 (1988) (noting contribution and indemnity claims are not exclusive to co-defendants in the same pending action).  Hence, New York law supports the Port Authority's contribution and indemnity claims.

        Nor can Defendant reasonably contest that the Port Authority's contribution and indemnity claims are timely asserted in this action.  Contribution and indemnity claims routinely are litigated prior to judgment being issued in the underlying action. *See Board of Educ. v. Sargent, supra,* at 27-28 (analyzing contribution claim brought by one tortfeasor against another tortfeasor "for whatever damages [the contribution plaintiff] *might* incur in the [underlying] action") (emphasis added); *Calcutti v. SBU, Inc.,* 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003); *see also* Restatement (Third) of the Law of Torts, § 23 ("a person seeking contribution may assert a claim for contribution and obtain a contingent judgment in an action in which the person seeking contribution is sued by the plaintiff, *even though the liability of the person against whom is contribution is sought has not yet been extinguished.*") (emphasis added).

        Defendant's motion to dismiss the instant contribution and indemnity claims also must fail because contribution merely requires that "some form of tort liability" exists and that a duty is alleged to be owed by the contribution defendant to either the underlying plaintiff *or* to the party seeking contribution.  *See Board of Educ. v. Sargent, supra,* at 27-28; *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 558 (1992).  Here, plaintiffs

17

allege that Defendant aided and abetted a violation of the Anti-Terrorism Act, which incorporates principles of tort liability, and as a result caused or contributed to personal injury or wrongful death.  Cantor Action First Amended Complaint, at ¶¶ 132, 135, 169-176; *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1006-1008 (7th Cir. 2002).  Such allegations already have survived motions to dismiss brought by other defendants.[11] Defendant also cannot deny that it owed a duty to avoid aiding and abetting an intentional tort of trespass against the Port Authority.  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 831.  Hence, the Port Authority has properly alleged a prima facie claim for both contribution and indemnity.[12]

---

[11]    *See Burnett I*, 274 F. Supp. 2d at 105 (denying Al Haramain's motion to dismiss claims of aiding and abetting a violation of ATA and related intentional tort claims and rejecting Al Haramain's arguments that plaintiffs who suffered personal injury and wrongful death in the September 11 attacks failed to create an inference that Al Haramain's acts were the proximate cause of plaintiffs' injuries or that it intentionally committed the alleged offenses).

[12]    In addition, the Port Authority's existing damage claims encompass all losses proximately caused by the September 11 attacks.  A natural and probable consequence of Defendant's role in the September 11 attacks, given the scale of the attack, would be lawsuits brought by victims seeking recovery of their losses.  Thus, judgments and expenses issued against and incurred by the Port Authority that result from the *In re September 11 Litig.* are recoverable against Defendant and its co-defendants under either contribution or indemnity principles or simply as general or consequential damages for the Port Authority's other claims for relief.  *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000); *Steitz v. Gifford*, 280 N.Y. 15, 20 (1939).

DSMDB.1946170.2

## CONCLUSION

For the reasons set forth above and in all accompanying and incorporated papers, this Court should deny Defendant's motion to dismiss.  The Court should adjudicate Plaintiffs' international law claims pursuant to 28 U.S.C. § 1331 and to federal common law, which jointly provide substantive rights of action and remedies, including punitive damages, in matters involving violations of international law. Moreover, Plaintiffs' claims for contribution and indemnity are sufficiently pled.

Dated: June 28, 2005
      New York, New York

Respectfully submitted,


_____/S/_____
Jonathan M. Goodman

Kenneth L. Adams
Christopher T. Leonardo
Stacey A. Saiontz
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Tel.: 212-835-1400
Fax: 212-997-9880

19

DSMDB.1946170.2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re Terrorist Attacks on September 11, 2001          03 MDL 1570 (RCC)
                                                       ECF Case

------------------------------------------------------------x

CANTOR FITZGERALD & CO., et al.,

                         Plaintiffs,                   04 CV 7065 (RCC)
                                                       ECF Case

              v.

AKIDA BANK PRIVATE LIMITED, et al.,

                         Defendants.
------------------------------------------------------------x

CANTOR FITZGERALD AND PORT AUTHORITY PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF
DEFENDANT SULAIMAN AL RAHJI

Dated: June 28, 2005                    Kenneth L. Adams
       New York, New York               Jonathan M. Goodman
                                        Christopher T. Leonardo
                                        Stacey A. Saiontz
                                        Dickstein Shapiro Morin & Oshinsky LLP
                                        1177 Avenue of the Americas
                                        New York, New York 10036-2714
                                        Tel.: 212-835-1400
                                        Fax: 212-997-9880

TABLE OF CONTENTS

Page

I.    CANTOR FITZGERALD PLAINTIFFS PROPERLY ASSERT CLAIMS
      UNDER INTERNATIONAL LAW ................................................................ 2

      A.    Subject Matter Jurisdiction Is Proper Under 28 U.S.C. § 1331 and
            Federal Common Law .................................................................... 3

      B.    Cantor Fitzgerald Plaintiffs State A Claim That Defendant Acted In
            Concert With Others In Violation Of International Law ........................... 6

            1.    Defendant Is A Member And Principal of SAAR Network
                  a.k.a. Safa Group ...................................................................... 6

            2.    The Defendant's Provision Of Material Support to Al Qaeda .......... 9

      C.    Punitive Damages Against Properly Recoverable Against
            Defendant Under International Law ................................................... 15

II.   THE PORT AUTHORITY PLAINTIFFS PROPERLY ASSERT
      CONTRIBUTION AND INDEMNITY CLAIMS ........................................... 16

CONCLUSION ....................................................................................... 19

TABLE OF AUTHORITIES

Page(s)

*In re Agent Orange Prod. Liab. Litig.* Nos. MDL 381,
04-CV-400, 2005 WL 729177 (March 28, 2005 E.D.N.Y.) ................................................. 4,5

*American. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130 (2d Cir.1997) .......................... 13

*Apex Oil Co. v. United States,* 530 F.2d 1291 (8th Cir. 1976) ..................................................... 14

*Baker v. Dorfman,* 239 F.3d 415 (2d Cir. 2000) .......................................................................... 18

*Bano v. Union Carbide Corp.,* 361 F.3d 696 (2d Cir. 2004) ....................................................... 4-5

*Board of Educ. v. Sargent,* 71 N.Y.2d 21 (1987) ..................................................................... 17-18

*Bodner v. Banque Paribas,* 114 F. Supp. 2d 117 (E.D.N.Y. 2000) ............................................. 3,5

*Boim v. Quranic Literacy Inst.,* 291 F.3d 1000 (7th Cir. 2002) .................................................. 18

*Boim v. Quranic Literary Instit.,* No. 00 C 2905 (Keyes, A., Mag. J.) (N.D. Ill. Nov.
10, 2004) ...................................................................................................................................... 3

*Bigio v. Coca-Cola Co.,* 239 F.3d 440 (2d Cir. 2001) .................................................................. 2

*Calcutti v. SBU, Inc.,* 273 F. Supp. 2d 488 (S.D.N.Y. 2003) ..................................................... 17

*Doe v. Islamic Salvation Front,* 257 F. Supp.2d 115 (D.D.C. 2003) .......................................... 2

*Dole v. Dow Chem. Co.,* 30 N.Y.2d 143 (1972) ......................................................................... 17

*Dubai Islamic Bank v. Citibank N.A.,* 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ......................... 14

*Estates of Ungar v. Palestinian Auth.,* 153 F. Supp.2d 76 (D.R.I. 2001) ................................... 2

*Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir. 1980) ............................................................... 3,16

*Filartiga v. Pena,* 577 F. Supp. 860 (E.D.N.Y. 1984) ............................................................. 4,15

*Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980) .............................................................. 12

*Glasser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643 (1988) ........................................... 17

*Goodkin v. United States,* 773 F.2d 19 (2d Cir. 1985) ............................................................... 17

*Hawkins v. Comparet-Cassani,* 33 F. Supp. 2d 1244 (C.D. Cal. 1999)
*rev'd in part on other grounds,* 251 F.3d 1230 (9th Cir. 2001) .................................................. 4

*Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192
(D.C. Cir. 2004)................................................................................................ 4

*Illinois v. Milwaukee*, 406 U.S. 91 (1972)............................................................... 4

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)..................................................... 4,5

*In re Mediators, Inc.*, 105 F. Supp. 2d 822 (2d Cir. 1997) ............................... 13,14

*Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002) ........................ 16

*Network Enter., Inc. v. APBA Offshore Prod. Inc.*, No. 1 01-11765, 2003 WL 124521
(S.D.N.Y. Jan. 15, 2003) ........................................................................... 14

*New York Islanders Club LLP v. Comerica Bank*, 71 F. Supp. 2d 108
(E.D.N.Y. 1999)............................................................................................. 14

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,
LLP*, 322 F.3d 147 (2d Cir. 2003) ............................................................... 13

*Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994)................................................. 16

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289
(S.D.N.Y. 2003)............................................................................................. 5

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882
(S.D.N.Y. (DLC) (June 13, 2005)) ................................................................ 5

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54
(D.D.C. 2003), *appeal dismissed*, 2004 WL 2664532
(D.C. Cir. Nov. 22, 2004).............................................................................. 5

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992).................................. 18

*Steitz v. Gifford*, 280 N.Y. 15 (1939) ................................................................... 18

*Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260 (D. D.C. 2002) ............... 16

*In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005). 5,10,12,18

*The Paquete Habana*, 175 U.S. 677 (1900) ...................................................... 4

*United States v. Arnaout*, 2003 WL 255226 (N.D. Ill. Feb. 4, 2003) ................. 11

*United States v. Bank of New England*, 821 F.2d 844 (1st Cir.) ....................... 14

*United States v. Finkelstein*, 229 F.3d 90 (2d Cir. 2000) .................................. 15

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000) ................................... 15

*United States v. Hanlon*, 548 F.2d 1096 (2d Cir. 1977)..............................................15

*United States v. Jon-T Chem., Inc.*, 768 F.2d 686 (5th Cir. 1985) ............................7

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001).............................................15

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003)............................................15

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) .............................................2

*White v. Paulsen,* 997 F. Supp. 1380 (E.D. Wash. 1998) ...........................................4

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991)..................................................................................................................7-8

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002).....................5

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ....................................................16

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) ...........................................16

## OTHER AUTHORITIES

28 U.S.C. § 1331 ..........................................................................................................3

28 U.S.C. § 1605(a)(3) ...............................................................................................5,6

22 U.S.C. § 2370(e)(2) ................................................................................................6

18 U.S.C. § 2333 ..........................................................................................................6

N.Y. C.P.L.R. § 1401 .................................................................................................19

N.Y. C.P.L.R. § 1403 .................................................................................................19

Restatement (Third) of Foreign Relations Law § 111 comment (e) 1987 .............4

Restatement (Third) of the Law of Torts, § 23 .......................................................19

*Harold Hongju Koh, Transnational Public Law Litigation*, 100 Yale L. J. 2347, 2385- 86 (1991)..............................................................................................................5

*Kenneth C. Randall, Federal Questions and the Human Rights Paradigm*, 73 Minn. L. Rev. 349 (1988) ...............................................................................................5

The Cantor Fitzgerald Plaintiffs[1] submit this Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rajhi. The Cantor Fitzgerald Plaintiffs separately join all arguments asserted in Plaintiffs' Consolidated Memorandum of Law in Opposition to Motion To Dismiss of Sulaiman Al Rajhi. The Cantor Fitzgerald Plaintiffs adopt and incorporate herein the aforementioned Consolidated Opposition and accompanying papers.

The instant Opposition motion primarily directs itself to Defendant's motion to dismiss Counts Nine, Eleven, Twelve, Thirteen of the Cantor Fitzgerald Plaintiffs' First Amended Complaint. These Counts collectively raise claims specific to the Cantor Fitzgerald Plaintiffs and are distinct from those claims asserted by co-Plaintiffs.

Counts Nine and Eleven seek relief from Defendant for injuries caused by Defendant's concerted action with Al Qaeda and Osama Bin Laden in violation of international law. Defendant makes only passing, non-specific arguments regarding the instant international law claims. *See* Defendant's Mem. of Law, at p. 1, 12 note 30. Nevertheless, the Cantor Fitzgerald Plaintiffs separately set forth the legal sufficiency of Counts Nine and Eleven.

Count Twelve asserts claims for punitive damages. As demonstrated below, this Circuit and its sister courts have long awarded punitive damages for violations of international law, a fact that rebuts Defendant's motion for dismissal of Count Twelve. *See* Defendant's Mem. of Law, at 22.

---

[1]     The Cantor Fitzgerald Plaintiffs include Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald, L.P., Cantor Index Limited, CO2e.com, LLC, eSpeed Government Securities, Inc., eSpeed, Inc., eSpeed Securities, Inc., TradeSpark, L.P.; and the Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC (collectively, the "Cantor Fitzgerald Plaintiffs"). The Cantor Fitzgerald Plaintiffs allege that they were injured by damage to their physical property and property interests, as well as business interruption losses and lost profits.

Count Thirteen asserts contribution and indemnity claims by Plaintiffs Port Authority of New York and New Jersey, Port Authority Trans-Hudson Corporation, and WTC Retail LLC.  Defendant moves to dismiss these claims as well, Defendant's Mem. of Law, at 1.  These arguments are likewise misplaced.

I.      CANTOR FITZGERALD PLAINTIFFS PROPERLY ASSERT CLAIMS
        UNDER INTERNATIONAL LAW

In Counts Nine and Eleven of the Cantor Fitzgerald Plaintiffs' First Amended Complaint, the Cantor Fitzgerald Plaintiffs allege that all Defendants are jointly and severally liable for Plaintiffs' damages under principles of international law.  *See* First Amended Cantor Action Compl. at ¶¶11, 107, 111, 226-230.  Specifically, the Cantor Fitzgerald Plaintiffs assert that aircraft hijacking is a well recognized violation of the law of nations, and that the September 11 attacks were committed through a terrorist airhijacking in violation of international law.  *See* First Amended Cantor Action Compl. at ¶228.[2]  The Cantor Fitzgerald Plaintiffs also contend that Defendant's conduct, insofar as it establishes that Defendant acted directly and in concert with others in financing and materially supporting Al Qaeda, equally demonstrates Defendant's liability for aiding and abetting a violation of international law.  *Id.* at ¶¶226-230, 234-36.[3]  Cantor Fitzgerald Plaintiffs' international law claims are legally sufficient.

---

[2]      *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447-48 (2d Cir. 2001); *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1996); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120 (D.D.C. 2003); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 309 (S.D.N.Y. 2003); *see generally United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991) ("Aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved.").

[3]      *Accord Estates of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 97-98 (D.R.I. 2001) (finding plaintiff-victims of terrorism stated ATA claims, both under material support and accessory after the fact theories, against Palestinian Authority and co-defendants, where plaintiffs alleged *inter alia* that defendants provided designated terrorist entity Hamas with safe haven, a base of operations, permitted and/or encouraged Hamas to operate freely in territories under their control, and otherwise lent material support to families of Hamas members who had been captured or killed carrying out terrorist attacks);

A.      Subject Matter Jurisdiction Is Proper Under 28 U.S.C. § 1331 and
        Federal Common Law

The Court clearly possesses subject matter jurisdiction over the Cantor

Fitzgerald Plaintiffs' international law claims pursuant to 28 U.S.C. § 1331 and federal

common law.  The law empowers federal district courts to exercise subject matter

jurisdiction over international law claims asserted by both U.S. and foreign victims

injured by violations of international law.  For example, in *Filartiga v. Pena- Irala*, 630

F.2d 876, 887, n.22 (2d Cir. 1980), the Second Circuit held that "[f]ederal jurisdiction

over cases involving international law is clear."  *Id.*  Therefore, the court found that the

same reasoning that supports the exercise of jurisdiction over international law claims

asserted under the Alien Tort Claims Act ("ATCA") would in all likelihood support

jurisdiction under 28 U.S.C. § 1331.  *Id.*  More recently, the court in *Bodner vs. Banque*

*Paribas*, 114 F. Supp. 2d 117, 127, n.6 (E.D.N.Y. 2000), followed *Filartiga v. Pena- Irala* and

applied 28 U.S.C. § 1331 to exercise jurisdiction over international law claims asserted

by American plaintiffs, who were victims of the holocaust, and their legal

representatives, against foreign banks that looted, converted, and withheld plaintiffs'

assets in violation of international law.  *Id.*

The holdings in *Filartiga v. Pena- Irala* and *Bodner vs. Banque Paribas* accurately

reflect the current state of the law.  According to the Restatement of Foreign Relations

Law:

> Cases arising under treaties to which the United States is a party, as
> well as cases arising under customary international law, or under
> international agreements of the United States other than treaties,
> are "Cases . . . arising under . . . the Laws of the United States, and
> Treaties made . . . under their Authority," and therefore within the
> Judicial Power of the United States under Article III, Section 2 of
> the Constitution.  Civil actions arising under international law or

---

*Boim v. Quranic Literary Instit.*, No. 00 C 2905 (Keyes, A., Mag. J.) (N.D. Ill. Nov. 10, 2004), attached Exhibit
1 to the Declaration of Jonathan Goodman (hereinafter "Goodman Decl.").

> under a treaty or other international agreement of the United States
> are within the jurisdiction of the United States district courts."

Restatement (Third) of Foreign Relations Law § 111, comment (e) (1987).

The exercise of jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims would also be entirely consistent with Supreme Court and related precedent holding that, as international law is part of federal common law, federal district courts are inherently empowered to adjudicate those claims. *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("[I]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); *In re Agent Orange Prod. Liab. Litig.*, Nos. MDL 381, 04-CV-400, 2005 WL 729177, at *3, *38 (Mar. 28, 2005 E.D.N.Y.) (ruling "[i]n judging international human rights claims against domestic corporations or others, courts in the United States with jurisdiction act as quasi international tribunals . . . Federal common law, not *Erie*, governs"); *see also Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (federal common law incorporates customary international law); *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law).[4] Nor is subject matter jurisdiction over international law claims improper where, as here, those international law claims involve property damage. *Bano v. Union Carbide*

---

[4]     *See also Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192, 1195 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 508 (2004) ("It is not 'insubstantial and frivolous' to assert that federal common law should provide a private cause of action for violations of customary international law.") (citing *Filartiga v. Pena- Irala*, 630 F.2d at 886-87; *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244, 1255 (C.D. Cal. 1999), *rev'd in part on other grounds*, 251 F.3d 1230 (9th Cir. 2001); *Accord Illinois v. Milwaukee*, 406 U.S. 91, 100 (1972) (concluding that 28 U.S.C. § 1331 federal question jurisdiction supports claims founded upon federal common law); *White v. Paulsen*, 997 F. Supp. 1380, 1383-84 (E.D. Wash. 1998); *see generally* Harold Hongju Koh, *Transnational Public Law Litigation*, 100 Yale L. J. 2347, 2385- 86 (1991); Kenneth C. Randall, *Federal Questions and the Human Rights Paradigm*, 73 Minn. L. Rev. 349 (1988).

*Corp.,* 361 F.3d 696, 717 (2d Cir. 2004); *Bodner vs. Banque Paribas,* 114 F. Supp. 2d 117, 127, 127 n.6 (E.D.N.Y. 2000).[5]

   This Court, like other courts before it, has ruled that the September 11 attacks were perpetrated in violation of international law. *In re Terrorist Attacks of September 11, 2001,* 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005); *Burnett I,* 274 F. Supp. 2d at 100. Further, consistent with established Second Circuit precedent this Court has held that those who act in concert with others in the commission of violations of international law are themselves liable for the resulting damages. *In re Terrorist Attacks of September 11, 2001,* 349 F. Supp. 2d at 826; *Kadic v. Karadzic,* 70 F.3d 232, 239 (2d Cir. 1995); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 01 Cv 9882 (DLC) (June 13, 2005) at 14 (denying motion for judgment on the pleadings brought by energy company and holding private actors can be held liable for acting in concert with others who violate international law) (attached as Goodman Decl. Ex. 2); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp. 2d 289, 321 (S.D.N.Y 2003); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *13 (S.D.N.Y. Feb. 28, 2002); *In re Agent Orange Prod. Liab. Litig.,* 2005 WL 729177, at *38 ("federal case law dating back more than two hundred years…recognized liability for aiding and abetting violations of international law norms."). Thus, this Court possesses subject matter over the Cantor Fitzgerald Plaintiffs' international law claims.[6]

---

[5]   There is wealth of additional support for this view. For example, there is no foreign sovereign immunity against damage claims involving property rights taken in violation of international law. *See* 28 U.S.C. § 1605(a)(3). Likewise, claims for damages arising out of the forced taking of property through violations of international law are a recognized exception to the Act of State doctrine. 22 U.S.C. § 2370(e)(2).

[6]   An alternative basis for jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims exists under 28 U.S.C. § 1367. In *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54 (D.D.C. 2003), *appeal dismissed,* 2004 WL 2664532, at *1 (D.C. Cir. Nov. 22, 2004), survivors of American passengers killed in the bombing of UTA Flight 772 and an American corporation that owned the aircraft that was destroyed in the attack sued Libya, its intelligence service, and related individuals for

B.     Cantor Fitzgerald Plaintiffs State A Claim That Defendant Acted In Concert With Others In Violation Of International Law

The Cantor Fitzgerald Plaintiffs sufficiently allege that Defendant acted in concert with, financed, and/or materially supported Al Qaeda in violation of international law and thus is responsible for the resulting property damage suffered by the Cantor Fitzgerald Plaintiffs. *See* First Amended Cantor Action Compl. at ¶¶11, 107, 111, 226-230; Cantor Fitzgerald Plaintiffs' RICO Statement Applicable to Sulaiman Al Rahji at Response No. 2. Defendant's liability can be established by evidence that he was a principal member and financier of the SAAR Network a.k.a. Safa Group, that the individuals and entities within the SAAR Network/Safa Group functioned as agents and alter-egos of each other, that the Defendant and the SAAR Network/Safa Group entities financed and materially supported Al Qaeda, and, that the Defendant had actual knowledge of or consciously avoided this fact.

1.     Defendant Is A Member And Principal of SAAR Network a.k.a. Safa Group

According to Dr. Dore Gold, the former Israeli Ambassador to the United Nations, Defendant established the SAAR Foundation. *See* First Amended Complaint at ¶107; *See* Testimony of Dr. Dore Gold, Frmr. Ambassador to United Nations, Before U.S. Senate Committee on Governmental Affairs (July 31, 2003) at 6 (attached as Goodman Decl. Ex.3). U.S. terrorism financing investigators who raided the SAAR

---

sponsoring the attack. *Id.* at 56. The corporate-plaintiff sought relief under 18 U.S.C. § 2333 and asserted related common law claims, whereas the individual plaintiffs relied upon the terrorism exception to sovereign immunity and the Flatow Amendment to establish subject matter jurisdiction and a private right of action. *Id.* at 56, 60 (citing to 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605(a)(7) (note) (the 1996 Flatow Amendment). When faced with the defendants' motion to dismiss the corporate plaintiff's common law and ATA claims for lack of subject matter jurisdiction, the court correctly ruled that because it possessed original jurisdiction over the individual plaintiffs' claims, so too could it exercise supplemental jurisdiction over the corporation's claims. Like the claims at bar, the corporate claims grew "out of the same case or controversy as the individual plaintiffs' claims." *Id.* at 60, 61. Thus, insofar as this Court permits any claim to proceed against Defendant, it should also exercise supplemental jurisdiction over the Cantor Fitzgerald Plaintiffs' international law claims. *Id.*; 28 U.S.C. § 1367(a).

Foundation in 2003 have stated that the SAAR Foundation (which currently operates as "Sterling Charitable Gift Fund" at the same address at 555 Grove Street, Herndon, Virginia) is actually part of a larger network of individuals, charities and related entities that functioned as agents and alter egos of each other. *See* Proposed Redacted Affidavit of David Kane In Support of Application for Search Warrant (Oct. 2002), at 2 ¶3 (attached at Goodman Decl. Ex.4) (describing investigation of individuals, charities, and entities, namely, the SAAR Network, a.k.a., "Safa Group,"[7] which was "controlled by" a small group of individuals who engaged in terrorist financing and related money laundering schemes.).

Under New York law, courts can disregard the corporate form when the corporation primarily transacts the business of the dominating interest rather than its own. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) (alter ego liability requires "complete control by the dominating [party] that leads to a wrong against third parties") (emphasis added). The "alter ego question depends upon the totality of the facts, " *United States v. Jon-T Chem., Inc.*, 768 F.2d 686, 692 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986), including evidence of: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the

---

[7]     What Plaintiffs allege as the "SAAR Network" is what the government describes as the "Safa Group". The terms SAAR Network and Safa Group are interchangeable. Thus, for clarity, this Opposition primarily uses the term "Safa Group".

dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d at 138-39.

Applying these factors to the SAAR Foundation, the evidence shows that the SAAR Foundation is but the agent or alter ego of the Safa Group.  For example:

- The "SAAR Foundation, Safa Trust, Inc., and dozens of other related entities in the Safa Group" that are "controlled by the individuals that are subject of this investigation" shared the  same business address. Goodman Decl. Ex.4 at p.5 ¶6(a)

- The Safa Group includes over 100 "interwoven" organizations, with associated corporate officers and directors, including Defendant's SAAR Foundation, one of the many "interwoven" alter-ego charities operating within the Safa Group.  Goodman Decl. Ex.4 at p.42 ¶88 and accompanying chart.

- The corporate formalities within the Safa Group, including those of the SAAR Foundation, were routinely disregarded by the pooling and diverting of assets, and the interchange and movement of funds as between "Safa Charities."  Goodman Decl. Ex.4 at p.44 ¶1-through-p.49 ¶14; p.52 ¶¶10-11 (Safa Group entities routinely transfer large amounts of funds between themselves to conceal source and path of funds).

- Safa Group entities were in effect sham companies, used as shells to further criminal goals.  Indeed, "many organizations in the Safa Group dissolve and are replaced by other organizations under the control of the same individuals . . . [and] are 'paper' organizations" presently or formerly located at "555 Grove Street" in Herndon, Virginia.  *See* Goodman Decl. Ex.4 pp.6-7 ¶2.

- Thus, the Defendant's SAAR Foundation "simply changed its name" to Sterling Charitable Gift Fund as part of its effort to conceal its continued operations from investigators.  Goodman Decl. Ex.4 at p.71 ¶70.

- In addition, like their other alter-ego Safa Group members, the Safa Trust and SAAR Foundation possessed overlapping officers, shared the same address, and were related entities. Goodman Decl. Ex.4 at p.72 ¶72; p.79 ¶93(d).

The SAAR Foundation, along with other "Safa Charities" sharing the same address and interlocking directors and officers, were involved in a conspiracy to route money through hidden paths to terrorists. *See* Goodman Decl. Ex.4 at p.44 ¶1 (noting also that SAAR Foundation is one of over 100 active and defunct charities and entities "woven together by common officers and directors" with over forty sharing the same address); at p.45 ¶3 (describing control over Safa Group allowed conspirators to  conceal and hide funds sent to terrorists); *See also* First Amended Cantor Action Compl. at ¶¶11, 107, 111; *Accord Federal* Plaintiffs Complaint at ¶¶222, 228.

The Defendant was a principal member of the Safa Group.  As noted, the Defendant created the SAAR Foundation.  In addition, there is evidence from which to infer that Defendant funded the Safa Group throughout the relevant period leading up the September 11 attacks:

> Based on my examination of financial documents, correspondence, and interviews with confidential witnesses, I believe that the first members of Safa Group were established in the early 1980s.  I believe that one source of funds flowing through the Safa Group is from the wealthy Al-Rahji family in Saudi Arabia.  The SAAR Foundation, a Safa Charity, was named after Sulaiman Abdul Aziz Al-Rahji (SAAR), head of a wealthy Saudi family.  Abdullah Sulaiman Al-Rahji, a relative of Sulaiman Abdul Aziz, is one of the directors of the Safa Group corporation, Aradi, Inc., located at 555 Grove Street, Herndon, Virginia.

*See* Goodman Decl. Ex.4 at p.51 ¶7.

### 2.   The Defendant's Provision Of Material Support to Al Qaeda

The evidence against the Safa Group provides at least a reasonable basis from which to infer that all members of the Safa Group, including the Defendant and the

Defendant's SAAR Foundation, acted in concert to conceal funds for distribution to Al Qaeda and those that materially supported Bin Laden.

One, the government's investigation of the Safa Group resulted in evidence that the Safa Group was a web of charities controlled by principals to engage in money laundering and to provide material support to terrorists. *See* Goodman Decl. Ex.4 at p. 2 ¶3 & p.8 ¶4 (concluding that, based upon investigation of principals and corporate and financial records, that "no innocent explanation" exists for use of multiple layers of financial transactions between "Safa Group companies and charities other than to throw law enforcement authorities off the trail."). In concluding that the SAAR Foundation was used by its officers and directors (themselves members of the conspiracy) to fund terrorists, the government also concluded that the criminal scheme involved "others known and unknown." *See* Goodman Decl. Ex.4 at p.2 ¶3. Plaintiffs contend that there are sufficient facts from which to infer that Defendant was part of this conspiracy. *See* First Amended Cantor Action Compl. at ¶¶11, 231-233.

Aside from the fact that Defendant founded the SAAR Foundation, he also (like designated terrorist financier defendant Batterjee) is a Golden Chain donor. *Compare In re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d at 817-18 (declining to rely upon "Golden Chain" as evidence from which to infer participation in terrorist financing, and noting concerns that Golden Chain provided no indication of who wrote the list, when it was written, or for what purpose) *with* Ex.8 to Goodman Decl. filed with Cantor Fitzgerald Plaintiffs' Motion In Opposition to Defendant Faisal Islamic Bank (Sudan)'s Motion To Dismiss (providing facts supporting conclusion that Golden Chain document was created in 1988, and that it was a list of "wealthy financiers "of defendant OBL.). The *9/11 Commission Report* stated,

Bin Ladin understood better than most of the volunteers the extent
to which the continuation and eventual success of the jihad in
Afghanistan depended on an increasingly complex, almost
worldwide organization. This organization included a financial
support network that came to be known as the "Golden Chain,"
put together mainly by financiers in Saudi Arabia and the Persian
Gulf states. Donations flowed through charities or other
nongovernmental organizations (NGOs). Bin Ladin and the
"Afghan Arabs" drew largely on funds raised by this network,
whose agents roamed world markets to buy arms and supplies for
the mujahideen, or "holy warriors."

*911 Commission Report*, Ch. 2. p.55 (attached as Goodman Decl. Ex. 6. *See id.* at Ch. 2 p.

66 (stating Bin Laden eventually enjoyed a strong financial position in Afghanistan

thanks to Saudi and other financiers associated with the Golden Chain."); *cf.* Fed. R.

Evid. 807.[8]

---

[8]      In concluding that the Golden Chain document was hearsay, this Court relied upon *United States v. Arnaout*, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003). *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 818. The "Golden Chain" was one exhibit among 248 exhibits cited and attached to a proffer filed by the United States government supporting the admissibility of certain co-conspirator statements. The *Arnaout* court ruled that the *proffer* could not be sufficiently linked to a specific conspiracy and the documents were not admissible under the co-conspirator exception to the hearsay rule. *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *2 (emphasis added).

However, it is unclear whether the Golden Chain document was considered by the court in *Arnaout* or if it was addressed by the *Arnaout* decision. *Arnaout*, 2003 WL 255226, at *1 n.1 ("In its reply to objections to its proffer, the government has withdrawn a substantial [unspecified] portion of its exhibits."). Moreover, the Cantor Fitzgerald Plaintiffs assert that the Golden Chain document is sufficiently trustworthy at the motion to dismiss stage pursuant to Fed. R. Evid 807. *See* Plaintiffs' Supplemental Memorandum In Opposition To Motions To Dismiss of Wa'el Hamza Jelaidan, Khalid Bin Mahfouz, and Yousef Jameel (noting Golden Chain document was referenced in and used in *Arnaout* sentencing hearing, by 911 Commission, in designating terrorist supporters and financiers by United States government, and corroborated by captured Al Qaeda members). This places Plaintiffs' reliance on the Golden Chain on a markedly different footing than that observed in *Arnaout*, where the sole issue was whether the evidence before that court satisfied the co-conspirator exception to the hearsay rule under Illinois law. *See* 2003 WL 255226, at *1 (analyzing evidentiary proffer under co-conspirator exception to the hearsay rule, and ruling government must establish by a preponderance of the evidence that a conspiracy existed; that the defendant and the declarant were both members of the same conspiracy; and that the proffered statements were made during the course of and in furtherance of that conspiracy.). In any event, it is premature to decide the evidentiary sufficiency of this piece of evidence when considering the legal sufficiency of the Complaint. "The issue is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support their claims." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (holding courts task in addressing Rule 12(b)(6) motions" is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."). For these reasons, the Court may properly rely upon the Golden Chain document for the purposes of this motion.

Two, in ordering jurisdictional discovery over the SAAR Network, this Court previously accepted as true Plaintiffs' allegations that SAAR Network entities are "related by common management . . . and they *all* 'have long acted as fully integrated components of al Qaeda's logistical and financial support infrastructure.'" *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 823 (emphasis added). Indeed, the "SAAR Network" included the U.S. branch of designated terrorist defendant charity IIRO, as well as IIRO's alter-ego, defendant Muslim World League, both of which provided financial and material support to Al Qaeda. *See* Goodman Decl. Ex. 4 at Attachment-C pp.6, 9; First Amended Cantor Action Compl. at ¶66 (alleging that MWL is parent of IIRO, that IIRO executive testified under oath that MWL and IIRO function together as one entity and are functionally interchangeable, have offices located in same building, and share interlocking executives and overlapping mission statements.); *id.* at ¶¶51-73. The same is true with respect to other Safa Group entities that lent material support to Al Qaeda through designated terrorists and designated terrorist banks:

> U.S. and European investigators say they have uncovered information in the Bahamas and Europe that in recent years some SAAR entities' funds have moved to two men, Youssef Nada and Ahmed Idris Nasreddin, designated by the United States as terrorist financiers. The funds moved through two offshore banks in the Bahamas that the pair controlled, officials said.
>
> The institutions, Bank al Taqwa and Akida Bank Private Ltd., have been designated conduits for terrorist funds by the U.S. Treasury Department. In recent months they were shut down by Bahamian authorities under U.S. pressure. In an August report, Treasury said that the banks "have been involved in financing radical groups" including Hamas and al Qaeda, both before and after the Sept. 11 attacks. Bank al Taqwa and Akida Bank were described by the Treasury Department on [August] 29 as "shell companies" that were "not functional banking institutions.

Douglas Farah and John Mintz, *U.S. Trails Va. Muslim Money, Ties*, Wash. Post. (Oct. 7, 2002), *reprinted in* SITE INSTITUTE (attached at Goodman Decl. Ex. 5).

These allegations and facts are equally applicable against the Defendant. Defendant and Defendant's SAAR Foundation were alter egos and agents in the same fashion as was the entire Safa Group. The Defendant's SAAR Foundation operated out of the same Grove Street, Herndon, Virginia address as did the other alter-ego charities existing within the Safa Group. *See* Goodman Decl. Ex. 4 at pp.73-74 ¶76, Attachment-E. The SAAR Foundation was controlled by the same group of officers and directors that dominated the other Safa Charities, and SAAR Foundation funds were routinely interchanged with those of other Safa Charities. *See* Goodman Decl. Ex.4 at p.45 ¶3-though-p.55 ¶15; p.57 ¶29; p.71 ¶ 71.

As such, the activities of the Safa Group and the SAAR Foundation can be imputed to the Defendant. Under New York law, the activities and knowledge of an alter-ego or agent-entity can be imputed to its principal if the agent or alter-ego was dominated and controlled by the principal to affect a wrong. *American. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997); *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164-65 (2d Cir. 2003) ("*Color Tile*"). Where, as here, "the persons dominating and controlling" the entity orchestrated the illegal conduct that gave rise to the injury, their knowledge is imputed to the corporation as principal. *Id.* (citing *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997). Thus, the agent's knowledge—here the Safa Group's and SAAR Foundation's—can be imputed to its principal – Defendant Sulaiman Al Rajhi, as a member of the Safa Group and founder of the SAAR Foundation. *See Mediators*, 105 F.3d at 827; *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

The same is true with respect to the imputation of the Safa Group's knowledge of its funding of Al Qaeda through designated terrorists Youssef Nada,

Ahmed Idris Nasreddin, Bank al Taqwa, Akida Bank Private Ltd., and IIRO to the Defendant.  Accepting as true Plaintiffs' allegations,[9] the Safa Group's conduct should be imputed to the Defendant as a Safa Group principal.  For example, in *Dubai Islamic Bank v. Citibank N.A.*, 256 F. Supp. 2d 158, 166-67 (S.D.N.Y. 2003), the court imputed knowledge and wrongful conduct of agents (Citibank employees) to their principal (Citibank), where a teller, Assistant Vice President and Operations Manager, *inter alia*, altered checks, provided bank reference letters on Citibank letterhead, and transferred funds from closed accounts, all in furtherance of a scheme to defraud a foreign correspondent bank.

Similarly, in *New York Islanders Hockey Club LLP v. Comerica Bank,* 71 F. Supp. 2d 108, 118-20 (E.D.N.Y. 1999), the court imputed liability to a principal bank where its agent, a Senior Vice President, unwittingly assisted a buyer in the fraudulent purchase of the New York Islanders.  The Senior Vice President repeatedly represented to Islander's owners that they could rely upon the bank's verbal and written assurances that the buyer was a good credit risk and was a valued bank customer, when in fact, the agent knew that the buyer's credit was suspect.  *Id.*[10]

At a minimum, that Defendant's knowledge and intent was the same as that of the Safa Group and the SAAR Foundation can be inferred from Defendant's conscious avoidance of the facts.  "The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found

---

[9]      *See Network Enter., Inc. v. APBA Offshore Prod. Inc.*, No.1 01-11765, 2003 WL 124521 *3 (S.D.N.Y. Jan. 15, 2003) (finding that at motion to dismiss stage plaintiff's alter ego allegations must be accepted as true and refusing to dismiss claim).

[10]      *See also United States v. Bank of New England*, 821 F.2d 844 (1st Cir.) (holding knowledge of employees is the knowledge of the corporation.); *Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976) (same).

when one "is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.'" *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quoting *United States v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001) and *United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000)). *See also United States v. Hanlon*, 548 F.2d 1096, 1000 (2d Cir. 1977) (finding fact that defendant, who served as personal typist for head of company, engaged in bank fraud through use of falsified loan and purchase documents, was sufficient evidence from which to infer defendant's knowledge of criminal scheme); *see also United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000). The Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them. *See Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004).

   C. Punitive Damages Against Properly Recoverable Against Defendant Under International Law

    In Count Twelve of the First Amended Cantor Action Compl. at ¶¶237-39, the Cantor Fitzgerald Plaintiffs assert that the Defendant is liable for punitive damages. Defendant has moved to dismiss those claims. Defendant's Mem. of Law at p.1, 22. However, Defendant presents no argument that the Cantor Fitzgerald Plaintiffs are not entitled to recover punitive damages in this lawsuit. Indeed, it is clear that punitive damages are available in connection with the claims that the Cantor Fitzgerald Plaintiffs assert, including but not limited to their international law claims. *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law); *Paul v. Avril*, 901 F. Supp. 330, 335-36 (S.D. Fla. 1994) ("Both compensatory and punitive damages are recoverable for violations of international law. (citing *Filartiga v. Pena-Irala, supra*); *see also Mehinovic v. Vuckovic*, 198

F. Supp. 2d 1322, 1358-59 (N.D. Ga. 2002) (awarding punitive damages for defendant's violation of international law); *Xuncax v. Gramajo*, 886 F. Supp. 162, 201-202 (D. Mass. 1995) (same); *Accord Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260, 269-70 (D. D.C. 2002) ("although the claim of solatium is not recognized under D.C. law, such damages may be awarded under federal common law for mental anguish resulting from the loss of a decedent's society and companionship.").

II.    THE PORT AUTHORITY PLAINTIFFS PROPERLY ASSERT
       CONTRIBUTION AND INDEMNITY CLAIMS

       Defendant's motion to dismiss the contribution and indemnity claims made by plaintiffs the Port Authority of New York and New Jersey, and its affiliates, (the "Port Authority") must fail. The Port Authority seeks contribution and indemnity from the Defendant and its co-defendants in the instant case because Defendant and its co-defendants proximately caused the September 11 attacks and therefore are responsible for the resulting damage and injuries caused to the Port Authority and allegedly other victims. Specifically, certain of the individuals and businesses that allegedly were harmed in the September 11 attacks seek judgments against the Port Authority in separate actions under a theory that the Port Authority breached a duty of care owed to those plaintiffs. *See generally In re September 11 Litig.*, 21 MC 97 (Hellerstein, J.). The Port Authority contests liability in those lawsuits, but to the extent it is held liable, the Port Authority seeks contribution and indemnity for that liability from Defendant and its co-defendants under New York common law.

       New York law strongly favors contribution, *Goodkin v. United States*, 773 F.2d 19, 24 (2d Cir. 1985), and broadly authorizes contribution claims where "two or more persons" are subject to liability for damages for the same personal injury, injury to property or wrongful death. N.Y. C.P.L.R. § 1401; *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143,

152 (1972).  Under New York law, concurrent, successive and independent, alternative, and even intentional tortfeasors can seek contribution from each other in either "a pending action" through cross-or counter-claims  or "in a separate action," where one tortfeasor would be a plaintiff and the other a defendant.  N.Y. C.P.L.R. § 1403; *see Board of Educ. v. Sargent*, 71 N.Y. 21, 27-28 (1987); *Dole v. Dow Chem. Co.*, 30 N.Y.2d at 151-53; *Glasser v. M. Fortunoff of Westbury Corp.*, 71 N.Y.2d 643, 646 (1988) (noting contribution and indemnity claims are not exclusive to co-defendants in the same pending action). Hence, New York law supports the Port Authority's contribution and indemnity claims.

Nor can Defendant reasonably contest that the Port Authority's contribution and indemnity claims are timely asserted in this action.  Contribution and indemnity claims routinely are litigated prior to judgment being issued in the underlying action. *See Board of Educ. v. Sargent, supra,* at 27-28 (analyzing contribution claim brought by one tortfeasor against another tortfeasor "for whatever damages [the contribution plaintiff] *might* incur in the [underlying] action") (emphasis added); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003); *see also* Restatement (Third) of the Law of Torts, § 23 ("a person seeking contribution may assert a claim for contribution and obtain a contingent judgment in an action in which the person seeking contribution is sued by the plaintiff, *even though the liability of the person against whom is contribution is sought has not yet been extinguished.*") (emphasis added).

Defendant's motion to dismiss the instant contribution and indemnity claims also must fail because contribution merely requires that "some form of tort liability" exists and that a duty is alleged to be owed by the contribution defendant to either the underlying plaintiff *or* to the party seeking contribution.  *See Board of Educ. v. Sargent, supra,* at 27-28; *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 558 (1992).  Here, plaintiffs

allege that Defendant aided and abetted a violation of the Anti-Terrorism Act, which incorporates principles of tort liability, and as a result caused or contributed to personal injury or wrongful death.  Cantor Action First Amended Complaint, at ¶¶ 132, 135, 169-176; *Boim v. Quranic Literacy Institute,* 291 F.3d 1000, 1006-1008 (7th Cir. 2002).  Such allegations already have survived motions to dismiss brought by other defendants.[11]  Defendant also cannot deny that it owed a duty to avoid aiding and abetting an intentional tort of trespass against the Port Authority.  *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 831.  Hence, the Port Authority has properly alleged a prima facie claim for both contribution and indemnity.[12]

---

[11]    *See Burnett I,* 274 F. Supp. 2d at 105 (denying Al Haramain's motion to dismiss claims of aiding and abetting a violation of ATA and related intentional tort claims and rejecting Al Haramain's arguments that plaintiffs who suffered personal injury and wrongful death in the September 11 attacks failed to create an inference that Al Haramain's acts were the proximate cause of plaintiffs' injuries or that it intentionally committed the alleged offenses).

[12]    In addition, the Port Authority's existing damage claims encompass all losses proximately caused by the September 11 attacks.  A natural and probable consequence of Defendant's role in the September 11 attacks, given the scale of the attack, would be lawsuits brought by victims seeking recovery of their losses.  Thus, judgments and expenses issued against and incurred by the Port Authority that result from the *In re September 11 Litig.* are recoverable against Defendant and its co-defendants under either contribution or indemnity principles or simply as general or consequential damages for the Port Authority's other claims for relief.  *Baker v. Dorfman,* 239 F.3d 415, 427 (2d Cir. 2000); *Steitz v. Gifford,* 280 N.Y. 15, 20 (1939).

<u>CONCLUSION</u>

For the reasons set forth above and in all accompanying and incorporated papers, this Court should deny Defendant's motion to dismiss.  The Court should adjudicate Plaintiffs' international law claims pursuant to 28 U.S.C. § 1331 and to federal common law, which jointly provide substantive rights of action and remedies, including punitive damages, in matters involving violations of international law.  Moreover, Plaintiffs' claims for contribution and indemnity are sufficiently pled.

Dated: June 28, 2005
       New York, New York

Respectfully submitted,

___/S/_____
Jonathan M. Goodman

Kenneth L. Adams
Christopher T. Leonardo
Stacey A. Saiontz
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Tel.: 212-835-1400
Fax: 212-997-9880