

PROVIDED BY
FindLaw
WWW.FINDLAW.COM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

NOV 1 0 2004

STANLEY BOIM, Individually and as )
Administrator of the Estate of     )
DAVID BOIM, deceased, and JOYCE    )
BOIM,                              )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )    No. 00 C 2905
                                   )
QURANIC LITERACY INSTITUTE, HOLY   )
LAND FOUNDATION FOR RELIEF AND     )
DEVELOPMENT, ISLAMIC ASSOCIATION   )
FOR PALESTINE, AMERICAN MUSLIM     )
SOCIETY, AMERICAN MIDDLE EASTERN   )
LEAGUE FOR PALESTINE, UNITED       )
ASSOCIATION FOR STUDIES AND        )    Magistrate Judge
RESEARCH, MOHAMMED ABDUL HAMID     )    Arlander Keys
KHALIL SALAH, MOUSA MOHAMMED ABU   )
MARZOOK, AMJAD HINAWI, and THE     )
ESTATE OF KHALIL TAWFIQ AL-SHARIF, )
                                   )
                Defendants.        )

## MEMORANDUM OPINION AND ORDER

This case arises out of the murder of David Boim, a seventeen-year-old American citizen who was killed in a Hamas terrorist attack in the West Bank.  David's parents sued two men who were directly involved in the murder, as well as several U.S.-based individuals and organizations they claim helped to support Hamas, for violation of 18 U.S.C. §2333.  The case is before the Court on motions for summary judgment.

638



A.   <u>Factual Background</u>

   1.   <u>Procedural History of *Boim v. OLI, et al.*</u>

On May 13, 1996, David Boim, a citizen of both the United
States and Israel who was living in Israel with his parents, both
United States nationals, was shot in the head while waiting for a
bus in the West Bank.  David's father, Stanley Boim, testified at
his deposition that, shortly after the attack, "it became public
knowledge as reported in the media that Hamas was behind it."
Transcript of Deposition of Stanley Boim, p. 14.  The official
document reporting David's death indicated that David had died
from a "Gunshot Wound; a victim of a terrorist attack as stated
in Israeli death certificate issued by the Ministry of Interior
at Jerusalem on June 3, 1996."  *See* Report of the Death of an
American Citizen Abroad (attached as Exhibit 2 to Plaintiffs'
(HLF) Rule 56.1 Statement).  And a 1997 article from the
Jerusalem Post indicates that one of the men wanted for his
involvement in the attack, "Khalil Ibrahim Tawfik Sharif," who
went on to kill himself in a 1997 suicide bomb attack on a
Jerusalem pedestrian mall, was a Hamas activist.  *See* "3[rd] Ben-
Yehuda Bomber Identified," Jerusalem Post, October 30, 1997
(attached as Exhibit 11 to Plaintiffs' Rule 56.1 Statement in

support of its motion against HLF).[1] Another of the attackers,
Amjad Hinawi, confessed to participating in the attack; he was
charged by the Palestinian Authority with participating in a
terrorist act and as an accomplice in the killing of David Boim.
Despite his confession, Mr. Hinawi pled not guilty, but was tried
and convicted on both counts, and sentenced to ten years of hard
labor.  *See* Notes of United States Foreign Service Officer
Abdelnour Zaibeck, a representative from the Consulate General of
the United States, who attended Mr. Hinawi's court proceedings
(attached as Exhibit 6 to Plaintiffs' (HLF) Rule 56.1 Statement);
Report of Sentence of Amjad Mu`hamad Rashid Al`hinawi (attached
as Exhibit 10 to Plaintiffs' (HLF) Rule 56.1 Statement).

On May 12, 2000, David's parents, Stanley and Joyce Boim,
sued Mr. Hinawi and the estate of Khalil Tawfiq Al-Sharif, who
had by that time blown himself up in the suicide bombing.  They
also sued Mousa Mohammed Abu Marzook, who allegedly served for
many years as the admitted leader of Hamas' political wing in the
United States, and Mohammed Abdul Hamid Khalil Salah, who
allegedly served as the United States-based leader of Hamas'
military branch.  *See* Complaint, ¶¶11-12.  The Boims also named
as defendants the Quranic Literacy Institute ("QLI"), the Holy

---

[1]Because the Boims filed separate motions against each defendant,
with separate Rule 56.1 Statements, the Court has added the
defendants' identifiers to avoid confusion for anyone hoping to find
the particular exhibits in the vast record.

Land Foundation for Relief and Development ("HLF"), the Islamic Association for Palestine ("IAP"), the American Muslim Society (d/b/a the Islamic Association for Palestine in Chicago) ("AMS"), and the American Middle Eastern League for Palestine ("AMELP") – all entities that, according to the complaint, directly or indirectly raise and launder money for Hamas and finance Hamas' terrorist activities. *See* Complaint, ¶¶5, 6,7, 8, 9. Finally, the Boims sued the United Association for Studies and Research ("UASR"), which allegedly serves as Hamas' political command center in the United States. *Id.*, ¶10.

In each case, the Boims sought to hold the defendants civilly liable under the Antiterrorism Act of 1990 (the "Antiterrorism Act"), 18 U.S.C.§ 2300 *et seq.* (West 2004). The Antiterrorism Act provides, in pertinent part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors or heirs, may sue therefor in any appropriate district court of the United States and . . . recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. §2333. The Boims alleged that defendants Hinawi and Al-Sharif were directly involved in David's murder, and that the remaining defendants provided material support to Hamas. *See* Complaint, ¶54. They requested compensatory damages in the amount of $100,000,000 and punitive damages in the amount of $100,000,000, plus fees and costs. The Boims further requested

4

that, in accordance with the Antiterrorism Act, their damages be trebled, and they sought an injunction preventing defendants from raising any additional money for Hamas. *Id.*, ¶¶56, 58.

Defendants QLI, HLF, Salah, IAP, AMS, and AMELP all moved to dismiss the Boims' complaint, arguing that the Boims' claim really sought to impose "aiding and abetting" liability, and that such liability was precluded under §2333. In an opinion issued January 10, 2001, the district judge disagreed, and denied the motions, holding that §2333 permitted a cause of action based on the theory that the "defendants aided and abetted international terrorism." *See Boim v. Quranic Literacy Institute*, 127 F. Supp. 2d 1002, 1018 (N.D. Ill. 2001). The next month, following a request by QLI, the district court certified three questions for appeal:

> (1) does funding, *simpliciter*, of an international terrorist organization constitute an act of terrorism under 18 U.S.C. §2331?;
>
> (2) does 18 U.S.C. §2333 incorporate the definitions of international terrorism found in 18 U.S.C. §§2339A and 2339B?; and
>
> (3) does a civil cause of action lie under 18 U.S.C. §2331 and §2333 for aiding and abetting international terrorism?

*See Boim v. Quranic Literacy Institute, et al.*, No. 00 C 2905 (N.D. Ill. Minute Order entered February 22, 2001).

Before the appeal was heard, the parties consented to proceed before a United States Magistrate Judge, and the case was

reassigned to this Court on April 13, 2001.  The Seventh Circuit
set the appeal for argument on September 25, 2001, and issued its
decision on June 5, 2002.  The court first held that the Boims
may succeed in their claims against the organizational defendants
by proving that they "provided material support to terrorist
organizations."  *Boim v. Quranic Literacy Institute, et al.*, 291
F.3d 1000, 1016 (7th Cir. 2002).  On the question of whether 18
U.S.C. §2333 is broad enough to cover the conduct of persons who,
like the organizational defendants, did not themselves commit the
violent acts complained of, the court held, after noting that the
interpretation of §2333 was a matter of first impression, that
"aiding and abetting liability is both appropriate and called for
by the language, structure and legislative history of section
2333," because "[t]he only way to imperil the flow of money and
discourage the financing of terrorist acts is to impose liability
on those who knowingly and intentionally supply the funds to the
persons who commit the violent acts."  *Id.* at 1021.

The court held that this did not, as the defendants argued,
amount to imposing "guilt by association" in violation of the
First Amendment: "[t]hat Hamas may also engage in legitimate
advocacy or humanitarian efforts is irrelevant for First
Amendment purposes if HLF and QLI knew about Hamas' illegal
operations, and intended to help Hamas accomplish those illegal
goals when they contributed money to the organization."  *Id.* at

6

1024 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932
(1982); *Scales v. United States*, 367 U.S. 203, 229 (1961); *Noto
v. United States*, 367 U.S. 290, 298 (1961); *Healy v. James*, 408
U.S. 169, 186 (1972); *National Organization for Women, Inc. v.
Scheidler*, 267 F.3d 687, 703 (7th Cir. 2001)).   The court also
rejected defendants' argument that liability could not be imposed
under §2333 if, as contended, the defendants provided support to
Hamas with the sole intent of contributing to the organization's
humanitarian and charitable programs, rather than its military or
terrorist factions: "[t]errorist organizations use funds for
illegal activities regardless of the intent of the donor, and
Congress thus was compelled to attach liability to all donations
to foreign terrorist organizations."   *Id.* at 1027.

In short, the Seventh Circuit answered the certified
questions as follows:

> funding, *simpliciter*, of a foreign terrorist
> organization is not sufficient to constitute an act of
> terrorism under 18 U.S.C. §2331.  However, funding that
> meets the definition of aiding and abetting an act of
> terrorism does create liability under sections 2331 and
> 2333.  Conduct that would give rise to criminal
> liability under section 2339B is conduct that
> "involves" violent acts or acts dangerous to human
> life, and therefore may meet the definition of
> international terrorism as that term is used in section
> 2333.  Finally, . . . civil liability for funding a
> foreign terrorist organization does not offend the
> First Amendment so long as the plaintiffs are able to
> prove that the defendants knew about the organization's
> illegal activity, desired to help that activity succeed
> and engaged in some act of helping.

*Id.* at 1028.

7

Following the Seventh Circuit's ruling, the Boims moved for default judgment against Mr. Hinawi and against UASR.  This Court granted both motions; the former for failing to answer the Complaint despite proper service, and the latter for failing to comply with discovery.  The Boims also moved to sever the case against Mr. Hinawi and to dismiss the case as to Mr. Marzook and the estate of Al-Sharif because of an inability to effectuate service on them.  Again, the Court granted both motions. Additionally, the Court granted the Boims' motion for the entry of a default judgment against AMELP.

Thereafter, the Boims filed a First Amended Complaint, naming principally the same defendants, but adding allegations about each.  With respect to HLF, the Boims added that, in December 2001, HLF was named as a "Specially Designated Terrorist" by the President of the United States, that HLF's assets had been seized by the Federal Bureau of Investigation, and that the Court of Appeals for the District of Columbia Circuit had ruled, in *Holy Land Foundation v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003), that HLF funded Hamas' terrorist activities.  *See* First Amended Complaint, ¶6.

With respect to IAP, the Boims added an allegation about the structure and organization of the various entities using the "IAP" name; specifically, that "[t]here has been continuously since the early 1980's an entity or group of persons and entities

8

operating under the name 'Islamic Association for Palestine' (collectively, 'IAP National'). IAP National is an umbrella organization that encompasses the various organizations throughout the country which call themselves 'IAP,' including defendants AMELP, AMS, and IAP Texas." *Id.*, ¶7. The Boims had simply referred to "IAP Texas" as "IAP" in their original Complaint.

The Amended Complaint also references meetings that took place in 1993 and 1994 between named defendants and Hamas members and activists, and it alleges that the defendants worked together and with Mr. Marzook as part of an ongoing conspiracy to promote Hamas and to raise money in the United States for Hamas' terrorist operations. *Id.*, ¶¶32-33, 36. The Amended Complaint did not add any new causes of action, however; the Boims still seek redress for a single cause of action – violation of 18 U.S.C. §2333.

The remaining, non-defaulted defendants – Mr. Salah, QLI, HLF, IAP and AMS – all answered the First Amended Complaint (IAP and AMS filed a joint Answer), and the case proceeded through discovery. It is now before the Court on motions and cross-motions for summary judgment.

    2.   <u>Parallel and Related Proceedings</u>

        a.   <u>Proceedings relating to Terrorist Designations</u>

On January 23, 1995, President Clinton signed Executive

Order 12947, prohibiting transactions with terrorists who
threaten to disrupt the Middle East peace process. *See* Executive
Order No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995). Annexed to
the Order was a relatively short list (with just twelve entries)
of such terrorist organizations (thereafter referred to as
"Specially Designated Terrorists" or "SDTs"). *Id.*, 60 Fed. Reg.
at 5081.[2] Hamas (also known as the Islamic Resistance Movement)
was one of the organizations on the list. *Id.* Executive Order
12947, *inter alia*, prohibited donations to designated
organizations, directed all agencies of the United States
Government to take all appropriate measures within their
authority to carry out the Order's provisions, directed the
Federal Bureau of Investigation to handle the investigation of
possible violations of the Order, and directed the FBI to timely
notify the Department of the Treasury of any action taken on such
investigations.

   To that end, on November 5, 2001, Dale L. Watson, the

-----

   [2]In the wake of the September 11th attacks, President Bush signed
a similar order, Executive Order 13224, and created a new list of
individuals and organizations he dubbed "Specially Designated Global
Terrorists" or "SDGTs." *See* Executive Order No. 13224, 66 Fed. Reg.
49079 (Sept. 23, 2001). Neither Hamas, nor any of the defendants named
in this case was included on the list of SDGTs that was originally
annexed to Executive Order 13224. At one point or another, however,
Hamas, the Holy Land Foundation and Mohammed Salah have been added to
the list of SDGTs, as have other individuals and organizations whose
names appear in this opinion. *See* Alphabetical List of Blocked
Persons, Specially Designated Nationals, SDTs, SDGTs, Foreign
Terrorist Organizations & Specially Designated Narcotics Traffickers,
31 C.F.R. Ch. V, App. A (October 25, 2004).

Assistant Director of the Federal Bureau of Investigation's
Counterterrorism Division, wrote an "action memorandum" to R.
Richard Newcomb, Director of the United States Treasury
Department's Office of Foreign Assets Control ("OFAC"),
concerning HLF.  Mr. Watson's memo described some of the history
of Hamas, one of the frontrunner SDTs; it also described the
history of HLF, HLF's organizational structure, and the results
of various surveillance projects capturing and documenting the
relationship between HLF and Hamas.  Mr. Watson summed up his
memo by recommending that OFAC add HLF (which he referred to as
HLFRD) to the list of SDTs:

> FBI investigations of HAMAS activities in the United
> States have revealed that the HLFRD is the primary
> fund-raising entity for HAMAS and that a significant
> portion of the funds raised by the HLFRD are clearly
> being used by the HAMAS organization.  The information
> provided in this document confirms that the HLFRD is
> acting for or on behalf of HAMAS.  Further, senior
> members of HLFRD support HAMAS ideology and activities.
> These HAMAS activities interfere with the Middle East
> peace process and pose a threat to the national
> security, foreign policy, or economy of the United
> States.  As such, HLFRD should be considered by OFAC
> for SDT designation as a HAMAS entity, subject to the
> prohibitions of the [International Emergency Economic
> Powers Act].

Watson Memorandum, p. 49 (Bates No. 0108) (attached to the
Declaration of Samuel A. Simon, Jr., at Exhibit 13 of Plaintiffs'
(HLF) Rule 56.1 Statement).

On December 4, 2001, Director Newcomb issued a "Blocking
Notice" to HLF, advising that OFAC had blocked all of HLF's real

and personal property, including offices, furnishings, equipment, and vehicles, as well as all funds and accounts in which HLF has any interest.  *See* Exhibit 14 to Plaintiffs' (HLF) Rule 56.1 Statement.  On March 8, 2002, HLF sued John Ashcroft, the United States Department of Justice, Paul O'Neill, the United States Department of the Treasury, Colin Powell and the United States Department of State in the United States District Court in Washington D.C., seeking a declaration that the defendants' designation of HLF as an SDT and the defendants' seizure of HLF's assets were unlawful; HLF alleged violations of the United States Constitution, the Religious Freedom Restoration Act ("RFRA"), the International Emergency Economic Powers Act ("IEEPA"), and the Administrative Procedures Act ("APA").

HLF lost its challenge of the SDT designation and blocking order, both in the district court, *see Holy Land Foundation v. Ashcroft*, 219 F. Supp. 2d 57 (D. D.C. 2002), and on appeal to the United States Court of Appeals for the D.C. Circuit, *see Holy Land Foundation v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (hereinafter "Ashcroft").  Of particular import here, the D.C. Circuit determined that "[t]he ample record evidence (particularly taking into account the classified information presented to the court *in camera*) establishing HLF's role in the funding of Hamas and of its terrorist activities is incontrovertible."  333 F.3d at 165.  The court noted that HLF

12

"had every opportunity to come forward with some showing that that evidence is false or even that its ties to Hamas had been severed," and it failed to do so, even when given additional time to respond to the evidence weighing in favor of the SDT designation. *Id.* at 165-66. Along the same lines, the court noted that "HLF had every opportunity and incentive to produce the evidence sufficient to rebut the ample evidence supporting the necessary conclusion that it was a funder of Hamas but could not do so." *Id.* at 166. And, in addressing HLF's RFRA claim, the court held that "[t]here is no free exercise right to fund terrorists. The record clearly supports a conclusion that HLF did." *Id.* at 167. HLF filed a petition for *certiorari* to the United States Supreme Court; that petition was denied. *See Holy Land Foundation for Relief & Development v. Ashcroft,* — U.S. —, 124 S.Ct. 1506 (Mar. 1, 2004).

   b.   Criminal Proceedings

On July 26, 2004, the United States indicted HLF and seven of its principals (Shukri Abu-Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader, and Abdulraham Odeh) for, among other things, conspiring to provide and providing material support to a foreign terrorist organization — namely, Hamas — in violation of 18 U.S.C. §2339B(a)(1). The case is pending in the United States District Court in Dallas, Texas. On August 19, 2004, the United States

13

indicted Mr. Salah, as well as Mousa Mohammed Abu Marzook and Abdelhaleem Hasan Abdelraziq Ashqar, for, among other things, knowingly providing and attempting to provide material support and resources to a foreign terrorist organization - namely Hamas - in violation of 18 U.S.C. §2339B.  That case is pending in this district.

Almost immediately after the indictments were handed down, HLF and Mr. Salah filed separate motions to stay this action pending resolution of the criminal matters.  On September 9, 2004, after hearing from the parties both in briefs and in extensive oral arguments, the Court denied those motions. Mr. Salah moved for reconsideration, and, after hearing additional oral argument from the parties, the Court denied the motion for reconsideration as well.

B.   <u>Discussion & Analysis</u>

The Boims have filed separate motions for partial summary judgment on the issue of liability against Mr. Salah and HLF, both of whom filed their own cross-motions for summary judgment. Additionally, IAP and AMS filed a joint motion for summary judgment against the Boims, who filed a cross-motion for summary judgment against those entities.  And QLI moved for summary judgment in its favor, without prompting a cross-motion from the Boims.  Thus, in all, there are seven summary judgment motions before the Court; there are also three motions to strike, which

14

the Court will consider in connection with the relevant motions
for summary judgment.

Summary judgment is properly entered when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). The Supreme Court has instructed district courts to act
"with caution" in granting summary judgment; "where there is
reason to believe that the better course would be to proceed to a
full trial," the motion should be denied. *Anderson v. Liberty
Lobby*, 477 U.S. 242, 255 (1986). At this stage of the
proceedings, the Court makes no credibility determinations and
weighs no evidence; instead, the Court accepts the non-movant's
evidence and draws all justifiable inferences in its favor. *Id.*

The Boims have sued the defendants for violation of 18
U.S.C. §2333, which provides, in relevant part, that "[a]ny
national of the United States injured in his or her person . . .
by reason of an act of international terrorism, or his or her
estate, survivors, or heirs, may sue therefor . . . and shall
recover threefold the damages he or she sustains . . . ." 18
U.S.C. §2333(a). The statute "clearly is meant to reach beyond
those persons who themselves commit the violate act that directly
causes the injury"; indeed, the statute is specifically drafted

15

"to extend liability to all points along the causal chain of terrorism." *Boim*, 291 F.3d at 1011, 1020. Conduct that would give rise to criminal liability under §2339B(a), would give rise to civil liability under §2333. *Id.* at 1028. And 2339B provides that "[w]hoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. §2339B(a)(1).

The Boims have alleged that the defendants conspired to provide, and provided, material support to Hamas. "Material support" would include, among other things, money and financial services, lodging, training, safehouses, and false documentation or identification. 18 U.S.C. §§2339A(b), 2339B(g). To prove that the defendants provided material support to Hamas in violation of §2333, the Boims would have to show that they knew about Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping. *Boim*, 291 F.3d at 1023. To prove that the defendants conspired to provide material support to Hamas in violation of §2333, which imports general tort law principles, *see Boim*, 291 F.3d at 1010, 1020, the Boims would have to show that the defendants "acted in concert to commit an unlawful act . . . the principal element of

16

which [was] an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981)(quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)).  The Boims need not show that the defendants knew about the attack that killed David Boim, or that they committed any specific acts in furtherance of that attack; rather, the Boims need only show that the defendants were involved in an agreement to accomplish an unlawful act and that the attack that killed David Boim was a reasonably foreseeable consequence of the conspiracy.  *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 643 (1946).  Nor would the Boims be required to provide direct evidence of an agreement between the parties; "[c]ircumstantial evidence may provide adequate proof of conspiracy."  *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971).

1.   Motions Filed By and Against The Holy Land Foundation

The Boims seek summary judgment against HLF on the issue of liability only.  In their motion, the Boims argue that the undisputed evidence demonstrates all of the necessary elements of their claim against this defendant – namely, that David Boim was a United States citizen, that he was killed in a Hamas attack, and that Holy Land Foundation supported Hamas' terrorist activities.  To support the last point, the Boims rely

17

substantially on the rulings in *Holy Land Foundation for Relief &*
*Development v. Ashcroft, supra.*  The Boims argue that, based upon
those rulings, HLF is collaterally estopped from denying that it
knowingly provided material support to Hamas.  HLF countered that
the evidence is, at best, inconclusive as to all of these points;
in particular, on the last point, HLF argues that collateral
estoppel does not apply under the circumstances presented.

HLF also filed a cross-motion for summary judgment, arguing
that, given the lack of evidence to support the Boims' claim, HLF
is entitled to judgment as a matter of law.  Specifically,
HLF argues that the Boims' claim fails because they have offered
no admissible evidence to establish that HLF has ever knowingly
provided material support to Hamas, or that Hamas is responsible
for David Boim's murder.

By way of background, HLF, originally known as the Occupied
Land Fund, was incorporated as a tax-exempt organization in
California on January 11, 1989.  *See* Articles of Incorporation of
the Occupied Land Fund (attached as Exhibit J to Plaintiffs'
(HLF) Rule 56.1 Statement).  On September 16, 1991, it changed
its corporate name to The Holy Land Foundation for Relief and
Development and moved to Texas.  *See* Certificate of Amendment of
Articles of Incorporation of the Occupied Land Fund (attached as
Exhibit J to Plaintiffs' (HLF) Rule 56.1 Statement).  An HLF
brochure submitted with the Boims' motion for summary judgment

18

indicates that HLF was "established in 1987 and had since grown to become prominent among relief organizations that serve the humanitarian needs and promote the well-being of the Palestinian people in the West Bank, Gaza Strip, and beyond." *See* Exhibit V to Plaintiffs' (HLF) Rule 56.1 Statement.   The D.C. Circuit noted that HLF "describes itself as 'the largest Muslim charity in the United States.'" *Ashcroft*, 333 F.3d at 160.

With respect to HLF's ties to Hamas, the record evidence (deposition testimony as well as documentary evidence from the administrative record in the *Ashcroft* case) shows that, in the years after the United States designated Hamas as an SDT, HLF provided significant funding (hundreds of thousands of dollars) to the following organizations: the Islamic Charity Association (a.k.a. Islamic Charitable Society in Hebron), Ramallah Zakat Committee, Jenin Zakat Committee, Nablus Zakat Committee, Tolkarem Zakat Committee, Orphan Care Association in Bethlehem, Qalqiliyah Zakat Committee, Hebron Zakat Committee (a.k.a. Hebron Tithing and Alms Committee), Dar El Salam Hospital, Islamic Aid Committee (a.k.a. Islamic Relief Agency), Sanabil Association for Relief and Development, and the Human Appeal International-Jordan.   *See* Transcript of Deposition of Shukri Abu-Baker, pp. 170-76; *see also* AR 1209-15 (attached as Exhibit 4 to Plaintiffs' (IAP/AMS) Rule 56.1 Statement).   The evidence further shows that all of these organizations are either known fronts for Hamas,

known supporters of Hamas, or entities whose funding is known to
benefit the Hamas agenda.  *See* Watson Memorandum, pp. 0087-88,
0091-0105; *see also, e.g.,* AR 0856-63, 1252-61, 1271-78.

The record also contains a report of a statement from
Mohamed Anati, the Executive Director of the Holy Land
Foundation, Jerusalem, the sole agency of HLF in the West Bank
and Israel (at least as of 1994).  *See* Accord between HLF and
HLF-Jerusalem (attached as Exhibit 4 to Plaintiffs' (IAP/AMS)
Rule 56.1 Statement, pp. 0759, 0764, 0810).  In the statement,
Mr. Anati admits being a Hamas activist, and admits that some of
HLF's money was channeled to Hamas. *See* AR 1263-1278.  The record
also contains documents that appear to show (there are no
official documents) that, in 1997, the Government of Israel's
Minister of Defense declared HLF to be "disallowed" for
channeling money to Hamas. *See* AR 1335-40.

The Boims also rely upon a videotape from a 1989 IAP
conference that shows, among other things, a veiled speaker who
is identified as a Hamas terrorist and who specifically thanks
the Occupied Land Fund (the entity now known as HLF) for its
support.  *See* Exhibit T to Plaintiffs' (HLF) Rule 56.1 Statement;
Declaration of Reuven Paz, Exhibit A (attached as Exhibit M/A to
Plaintiffs' (HLF) Rule 56.1 Statement).  Mr. Abu-Baker admitted
that he attended that conference.  *See* Responses to Requests for
Admission, ¶4 (attached as Exhibit U to Plaintiffs' (HLF) Rule

20

56.1 Statement).

The record also includes brochures and other literature
designed, in whole or in part, to promote Hamas' agenda.  These
items routinely included a solicitation to send funds for the
cause to HLF (or the Occupied Land Fund, depending on the
publication date).  HLF's representative, however, denies that
HLF took any affirmative steps to have its name and address
included in these documents.  *See* Group Exhibit P to Plaintiffs'
(HLF) Rule 56.1 Statement; Transcript of Deposition of Shukri
Abu-Baker, pp. 105-115.

The record also contains deposition testimony from Mr. Abu-
Baker, who has served as HLF's President and Chief Executive
Officer since 1989.  *See* Answers to Interrogatories, Nos. 2, 5
(attached as Exhibit 21 to Plaintiffs' (HLF) Rule 56.1
Statement); Deposition of Shukri Abu-Baker, p. 10.  Mr. Abu-Baker
initially testified as HLF's Rule 30(b)(6) designee; in that
capacity, he testified that HLF frequently received donations
from people who wanted their money to go to the family or
children of a "shaheed" or "martyr," and that HLF made it a
practice to try to accommodate the requests of those donors.  *See*
Abu-Baker Deposition, p. 168.  According to the Boims, a
"shaheed" or "martyr" is someone who dies while serving Hamas'
agenda, whether in a suicide bombing or some other terrorist
attack, or at the hands of an Israeli soldier.  *See, e.g.,*

Exhibit E to Plaintiffs' (HLF) Rule 56.1 Statement (translation
of The Khaled Mishaal Interview, describing terrorist acts as
"martyrdom operations"); Exhibit E to Plaintiffs' Reply
Memorandum, ¶¶5d, 5e (and attached exhibits E and F)(Reuven Paz'
translations of Palestinian Authority and Hamas website
publications characterizing Mr. Al-Sharif, one of David Boim's
murderers, who subsequently died in a suicide bombing, as a
"martyr"); Mr. Abu-Baker testified that a broader meaning may be
ascribed to these terms, such that they can refer to anyone who
dies as a result of the Israeli occupation and the Palestinian
uprising. Deposition of Shukri Abu-Baker, pp. 162-63, 167-68.
In either case, it is clear that HLF targeted the families of
martyrs to receive its money.

In his capacity as a 30(b)(6) witness, Mr. Abu-Baker also
testified that, in 1992, HLF received a $210,000 contribution
from Mr. Marzook. *See* Deposition of Shukri Abu-Baker, pp. 75-76,
79. Mr. Abu-Baker testified that he knows Mr. Marzook, and that
Mr. Marzook is married to the first cousin of Ghassan Elashi, who
served first as HLF's Treasurer and Secretary, and later as the
Chairman of HLF's Board of Directors, *see* Answers to
Interrogatories, No. 2 (attached as Exhibit 21 to Plaintiffs'
(HLF) Rule 56.1 Statement); HLF's Responses to Requests for
Admission, ¶6 (attached as Exhibit C to Plaintiffs' Reply
Memorandum). Mr. Abu-Baker testified that, other than the

22

$210,000 contribution, Mr. Marzook had no relationship or involvement with HLF.  *See* Transcript of Deposition of Shukri Abu-Baker, p. 75.

According to the Boims – and Mr. Watson – Mr. Marzook served for many years as the head of Hamas' political bureau; he was designated as an SDT on August 25, 1995.  *See* Complaint, ¶¶12, 34; Watson Memorandum, pp. 0073-74 (attached as Exhibit B to Plaintiffs' (HLF) Rule 56.1 Statement).  The Watson Memorandum details Mr. Marzook's $210,000 contribution, and relies upon it to link HLF to Hamas.  Watson Memorandum, pp. 0074. And the administrative record upon which Mr. Watson relied contains copies of checks written by Mr. Marzook and made payable to HLF. *Id.*, pp. 0684-87.

Some time after Mr. Abu-Baker's 30(b)(6) deposition, the Boims indicated that they wanted to depose Mr. Abu-Baker in his individual capacity as a fact witness.  Counsel for HLF indicated that Mr. Abu-Baker would, if deposed, invoke his Fifth Amendment right and refuse to answer substantive questions.  *See* August 10, 2004 Letter from John Boyd to Richard Hoffman (attached as Exhibit H to Plaintiffs' Reply).  And, in fact, the Boims' counsel deposed Mr. Abu-Baker on September 28, 2004, and he did, as expected, refuse to testify pursuant to the Fifth Amendment. *See* Transcript of Oral and Videotaped Deposition of Shukri Abu-Baker, pp. 6-127 (attached as Exhibit A to Plaintiffs' Supplement

23

to the HLF Summary Judgment Record Based on the Testimony of
Shukri Abu-Baker).  Similarly, at his deposition, Mr. Elashi
invoked his Fifth Amendment right, refusing to answer any
substantive question posed on the ground that it might tend to
incriminate him.  *See* Transcript of Deposition of Ghassan Elashi,
pp. 6-91.  Because Mr. Abu-Baker and Mr. Elashi chose to remain
silent at their depositions, the Court is entitled to draw a
negative inference that the answers they would have given, had
they answered the questions posed and answered them truthfully,
would have tended to subject them to criminal liability.  *See,
e.g., In re High Fructose Corn Syrup Antitrust Litigation,* 295
F.3d 651, 663 (7th Cir. 2002); *Baxter v. Palmigiano,* 425 U.S.
308, 318 (1976).  This is just one more bit of admissible
evidence against HLF on the question of whether it knew about
Hamas' illegal activities and desired to help those activities
succeed.

In contrast to this evidence, the record also contains a
July 27, 2004 declaration from HLF's attorney, John Boyd.  *See*
Exhibit A to HLF's Rule 56.1 Statement).  Attached to that
declaration is another declaration from Mr. Boyd, this one signed
on June 15, 2002 and prepared in response to the motion for
summary judgment filed by the government in the *Ashcroft* case.
*See* Exhibit A/1 to HLF's Rule 56.1 Statement.  And attached, in
turn, to Mr. Boyd's 2002 declaration are declarations from Shukri

24

Abu-Baker, then HLF's CEO, Dalell D. Mohmed, an HLF donor and an
Emergency Relief Coordinator for HLF, and Mohammed Abumoharram,
the manager of HLF's Gaza office.  *See* Exhibits A/2, A/3, and A/4
to HLF's Rule 56.1 Statement.  All three declarations testify to
a vast amount of admirable, charitable work done by HLF – all
totally unrelated to Hamas – and all three declarants adamantly
disavow any ties to Hamas, and any condonation of Hamas'
activities.  *See* Exhibit A/2, §§3, 7, 30, 31; Exhibit A/3, §§2,
5-30, 32, 35-51; Exhibit A/4, §§5-7, 12.  Ordinarily, these
declarations might be enough to create a genuine issue of fact as
to the connection between Hamas and HLF.  *See Anderson*, 477 U.S.
at 255.  *But see Logan v. Caterpillar, Inc.*, 246 F.3d 912, 923
(7th Cir. 2001)(self-serving affidavits, if not supported in the
record, will not preclude summary judgment).  Thus, resolution of
the Boims' summary judgment motion turns, in no small part, on
whether the Court is bound, under the doctrine of collateral
estoppel or issue preclusion, by the *Ashcroft* court's ruling that
HLF provided material support to Hamas. *See Holy Land Foundation
for Relief & Development v. Ashcroft, supra.*

Before turning to the collateral estoppel question, the
Court considers HLF's argument that the Boims have failed to
provide evidence that David Boim was actually killed by Hamas.
As HLF correctly points out, if the Boims have failed to meet
this burden, the Boims' case would fail, without the Court even

25

having to reach the question of whether HLF funded Hamas.

HLF's assertions notwithstanding, the record contains ample evidence showing that Hamas did, in fact, take responsibility for the attack that killed David Boim.  The evidence in the record shows that David was murdered in a terrorist attack, not in some random drive-by shooting.  Mr. Hinawi, one of the attackers, was charged with and convicted of committing a terrorist act, as well as for his participation in the murder.  *See* Abdelnour Zaibeck's Notes of Proceedings for Amjad Hinawi (February 10, 12 and 14, 1998)(attached as Exhibit 6 to Plaintiffs' (HLF) Rule 56.1 Statement); Report of Sentence of Amjad Hinawi (February 14, 1998) (attached as Exhibit 10 to Plaintiffs' (HLF) Rule 56.1 Statement).  A September 22, 1997 press bulletin issued by the Government of Israel's Press Office states that Mr. Hinawi is a member of Hamas, and that the Government of Israel sought Mr. Hinawi's extradition because of his involvement with the Hamas attack that killed David.  *See* Press Bulletin of September 22, 1997, p. 2 (attached as Exhibit 9 to Plaintiffs' (HLF) Rule 56.1 Statement).  Al-Sharif, who, with Mr. Hinawi, carried out the attack on David Boim and his friends, is also reported in the record as being a Hamas activist.  *See* "3[rd] Ben-Yehuda Bomber Identified," the Jerusalem Post (October 30, 1997) (attached as Exhibit 11 to Plaintiffs' (HLF) Rule 56.1 Statement).  Mr. Boim testified that, shortly after David's murder, the media reported

26

that Hamas was taking credit for the attack, and it became public
knowledge that Hamas was behind the attack.  Transcript of
Deposition of Stanley Boim, p. 14 (attached as Exhibit 3 to
Plaintiffs' (HLF) Rule 56.1 Statement).

    Added to this evidence is the fact that a default judgment
has been entered against Mr. Hinawi, which means, as a practical
matter, that the Court accepts as true the well-pled allegations
in the Complaint about him - that is, that he is a Hamas
terrorist and one of two Hamas agents who carried out the attack
on David Boim.  *See* Complaint, ¶¶13, 25-28; *Dundee Cement Co. v.
Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th
Cir. 1983)("As a general rule, a 'default judgment establishe[s],
as a matter of law, that defendants [are] liable to plaintiff as
to each cause of action alleged in the complaint.' . . . Upon
default, the well-pleaded allegations of a complaint relating to
liability are taken as true.")(quoting *Breuer Electric Mfg. Co.
v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir.
1982).

    In short, all of the evidence in the record on this issue
points to Hamas as the entity responsible for David's murder.
Even now, HLF has offered no evidence that anyone other than
Hamas was responsible for the attack.  Accordingly, the Court
finds that David Boim was murdered by Hamas activists, in a
Hamas-sponsored attack, and that no reasonable jury could find

27

otherwise.

The Court turns now to the collateral estoppel issue and considers what effect, if any, the D.C. Circuit's rulings in the *Ashcroft* case should have on this case. The Boims argue that HLF is collaterally estopped from relitigating the issue of whether it knowingly funded Hamas and its terrorist activities. The Boims assert that HLF has already raised this issue - and lost - in the *Ashcroft* case.

"Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). "Collateral estoppel, like the related doctrine of *res judicata*, serves to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" *Id.* (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). At various turns, the Supreme Court has broadened the scope of the collateral estoppel doctrine, first by abandoning the mutuality of parties requirement, and then by approving the "offensive" use of collateral estoppel - that is, the use of the doctrine by a plaintiff seeking to foreclose a defendant from

28

relitigating an issue the defendant previously lost against
another plaintiff.  *Id.* at 158-59 (citing *Blonder-Tongue
Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S.
313 (1971); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)).
*See also Wolverine Mutual Insurance v. Vance*, 325 F.3d 939, 943
n.3 (7th Cir. 2003).

Collateral estoppel "may compel a grant of summary judgment
as to the factual issues resolved by [an] earlier judgment."
*Cook County v. Lynch*, 560 F. Supp. 136, 140 (D.C. Ill. 1982).
The doctrine applies when (1) the issue sought to be precluded is
the same as that involved in the prior action; (2) that issue was
actually litigated; (3) the determination of the issue was
essential to the final judgment; and (4) the party against whom
estoppel is invoked was fully represented in the prior action.
*Chicago Truck Drivers, Helpers & Warehouse union (Independent)
Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526 (7th
Cir. 1997).  It "does not apply when the party against whom the
earlier decision is asserted did not have a 'full and fair
opportunity' to litigate the claim or issue . . . ."  *Kremer v.
Chemical Construction Corp.*, 456 U.S. 461, 480-81 (1982)(citing
*Allen v. McCurry*, 449 U.S., at 95; *Montana v. United States*, 440
U.S. 147, 153 (1979); *Blonder-Tongue Laboratories, Inc. v.
University of Illinois Foundation*, 402 U.S. 313, 328-329 (1971)).
And "'[r]edetermination of issues is warranted if there is reason

29

to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation.'" *Id.* at 481 (quoting *Montana*, 440 U.S. at 164 n.11).

Notably, the Court is not being asked to consider the adequacy of the process provided HLF in the designation proceedings, to the extent there were any designation proceedings. The prior action in question is not the SDT designation, but the proceedings in the *Ashcroft* case challenging that designation. Thus, the question before this Court is whether the decision of the D.C. Circuit – not the underlying decision by OFAC – satisfied the elements set forth above. With regard to those elements, the parties agree that HLF was fully represented in the *Ashcroft* case; they disagree as to whether the remaining elements have been satisfied. HLF argues that collateral estoppel cannot apply, because the issues before this Court are different from those decided in the *Ashcroft* case, and because the D.C. courts did not provide HLF with a "full and fair opportunity" to litigate the question of whether it ever provided support to Hamas.

In the *Ashcroft* case, HLF sued the individuals and agencies responsible for HLF's SDT and SDGT designation, and for the seizure of HLF's assets. In its complaint, HLF alleged that the defendants violated HLF's procedural due process rights by depriving HLF of its property without prior notice and a hearing,

30

and without a prompt post-deprivation hearing, all in violation
of the Fifth Amendment to the United States Constitution (Count
One); that the defendants violated HLF's Fifth Amendment right to
substantive due process (Count Two); that the defendants' seizure
of HLF's assets constituted a taking without just compensation,
in violation of the Fifth Amendment's Takings Clause (Count
Three); that the defendants searched HLF's premises and seized
HLF's assets without a warrant and without probable cause, in
violation of the Fourth Amendment to the United States
Constitution (Count Four); that the defendants' designation of
HLF as an SDT and an SDGT and their seizure of HLF's assets
substantially interfered with HLF's rights to freedom of speech
and freedom of association, as guaranteed by the First Amendment
(Count Five); that the defendants' designation of HLF as an SDT
and an SDGT and their seizure of HLF's assets substantially
burdened HLF's exercise of religion, as well as that of HLF's
employees and donors, in violation of both the First Amendment
and the Religious Freedom Restoration Act (Counts Six and Seven,
respectively); and that the designation and seizure of assets
were done in violation of various sections of the Administrative
Procedures Act (Count Eight). *See Holy Land Foundation v.
Ashcroft, et al.*, No. 02cv00442 (GK) (D. D.C. Complaint filed
March 8, 2002) (attached as Exhibit 15 to Plaintiffs' (HLF) Rule
56.1 Statement). HLF sought a declaratory judgment that the

31

defendants' actions violated HLF's rights as outlined in the complaint, and an injunction restraining the defendants from continuing to block HLF's assets, as well as fees and expenses. *Id.*

On May 31, 2002, the *Ashcroft* defendants filed a motion seeking dismissal of Counts One through Seven, and summary judgment on Count Eight, the Administrative Procedures Act claim. *See HLF v. Ashcroft, et al.*, No. 02cv00442 (GK) (D.D.C. Motion filed May 31, 2002)(attached as Exhibit 18 to Plaintiffs' (HLF) Rule 56.1 Statement). The district court conducted a "lengthy motions hearing" on HLF's motion for a preliminary injunction and the defendants' dismissal and summary judgment motions. Based on the presentations at that hearing, as well as the parties' briefs and the entire administrative record before it, the court issued its opinion. *See Holy Land Foundation for Relief & Development v. Ashcroft, et al.*, 219 F. Supp. 2d 57 (D. D.C. 2002).

As a preliminary matter, the district court determined that the scope of its review was limited to the administrative record, primarily because HLF had failed to establish that the record was, in any way, incomplete and had failed to demonstrate any bias or bad faith on the part of OFAC in the designation process. *Id.* at 65-66. In ruling on the defendants' motion for summary judgment on HLF's APA claim, the district court determined that OFAC's decision to designate HLF as an SDT and an SDGT was

neither arbitrary nor capricious; rather, the court held, "[t]he seven volume, 3130 page administrative record in this case provides substantial support for OFAC's determination that HLF acts for or on behalf of Hamas." *Id.* at 69. Specifically, the court noted, "the administrative record contains ample evidence that . . . HLF has had financial connections to Hamas since its creation in 1989; . . . HLF funds Hamas-controlled charitable organizations; . . . HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; [and] FBI informants reliably reported that HLF funds Hamas." *Id.* at 69. The court then detailed the evidence in the administrative record supporting each of these points, concluding that, because OFAC's determination that HLF acts for or on behalf of Hamas was neither arbitrary nor capricious, but was supported by substantial evidence in the administrative record, the defendants had not violated the APA and were, therefore, entitled to summary judgment on that claim. *Id.* at 74-75.

With respect to the defendants' motion to dismiss the RFRA and constitutional claims, the district court held that HLF had failed to state a claim under the RFRA, the First Amendment or the Fifth Amendment. Specifically, the court held that the defendants' actions had not run afoul of procedural or due process concerns or the Takings Clause, *id.* at 76-78, and that HLF failed to state a claim for violation of any right to free

33

association, free speech, or the free exercise of religion.  *Id.*
at 80-83.  The court held, however, that HLF had stated a claim
for violation of its Fourth Amendment rights, most notably by
alleging that the government had entered HLF's offices, searched
HLF's property, and seized HLF's documents and office equipment,
all without a warrant, and without otherwise establishing the
necessary probable cause.  *Id.* at 79-80.

On HLF's preliminary injunction motion, the court held that
HLF had not demonstrated a likelihood of success on any of its
claims, and that the balance of harms and public interest would,
in any case, weigh in favor of denying HLF's motion.  *Id.* at 84-
85.  Thus, in the end, the district court denied HLF's
preliminary injunction motion, and granted the defendants' motion
to dismiss and for summary judgment as to all but the Fourth
Amendment claim.  *Id.* at 85.

HLF appealed, arguing, among other things, that the district
court erred in refusing to order the administrative record
completed and supplemented, and that the defendants' designation
of HLF as an SDT and an SDGT and the attendant seizure of HLF's
assets were arbitrary and capricious.  *See Holy Land Foundation*
*for Relief & Development v. Ashcroft, et al.,* No. 02-5307 (D.C.
Cir. Brief of Appellant filed January 23, 2003)(attached as
Exhibit 17 to Plaintiffs' (HLF) Rule 56.1 Statement).  In
connection with the first argument, HLF claimed that the district

34

court had refused to allow HLF to conduct discovery and refused to supplement and complete the record with exhibits HLF proffered that demonstrated the inaccuracy of the record.  *See* Brief of Appellant, p. 53.  In its opinion, issued after oral argument, the D.C. Circuit first agreed with the district court that the decision to designate HLF as an SDGT was "based on ample evidence in a massive administrative record."  333 F.3d at 162.  In reaching this conclusion the court: rejected HLF's attempt to attack the hearsay evidence in the record, noting that "the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations"; and rejected HLF's attempt to characterize as irrelevant evidence in the record that pre-dated the 1995 designation of Hamas as a terrorist organization, noting that HLF presented no plausible evidence showing that HLF's ties to Hamas had been severed.  *Id.*  The court held that OFAC had reasonably determined that Hamas had an interest in HLF's property, as the record "provided substantial evidence to support that conclusion."  *Id.* at 163.

Further, the court held, in the course of the redesignation proceedings, if not the initial designation proceedings, "HLF was accorded all the administrative process it was due . . . ."  *Id.* at 163.  Specifically, the court noted, in April 2002, the Department of the Treasury notified HLF that it was re-opening