the administrative record and considering whether to re-designate
HLF as an SDGT on the basis of additional evidence linking HLF
and Hamas; HLF was given thirty-one days to respond; HLF
responded, and Treasury considered its response as well as the
other evidence in deciding whether redesignation was appropriate.
*Id.* at 164. This was enough, the court held, to satisfy due
process concerns under the circumstances. *Id.*

The *Ashcroft* court recognized in its appellate opinion, for
the district court "to reach the outcome that it did [on
defendants' motion to dismiss HLF's First Amendment claims], that
there is no constitutional right to fund terrorism, the district
court first had to find that HLF funds terrorism." *Id.* at 165.
The D.C. Circuit acknowledged that this was improper in the
context of a motion to dismiss under Rule 12(b)(6), which does
not permit the court to look beyond the complaint and would not
have permitted the court here to consider the administrative
record, as it unquestionably did. *Id.* at 165. But, the court
held, any error on the part of the district court in this regard
was harmless, because under no circumstances could HLF have come
forward with evidence upon which a reasonable trier of fact could
have found that the SDT and SDGT designation and the blocking
order violated HLF's First or Fifth Amendment rights. *Id.* at
165. On this point, the D. C. Circuit determined that:

> [t]he ample record evidence (particularly taking into
> account the classified information presented to the

court *in camera*) establishing HLF's role in the funding of Hamas and its terrorist activities is incontrovertible.   While not in accordance with proper procedures, HLF has had every opportunity to come forward with some showing that that evidence is false or even that its ties to Hamas had been severed.   HLF's presentations at the administrative stage did not reach this goal, even when HLF was given an additional thirty-one days to respond to its redesignation and to the new evidence in April of 2002.

333 F.3d at 165-66.

Based upon the quoted language, this Court is persuaded that the question of whether HLF provided material support to Hamas was not only actually litigated in the *Ashcroft* case, but it was necessary to the D.C. Circuit's decision to affirm the district court's dismissal of the bulk of HLF's complaint.   In short, the Court finds that the basic prerequisites for the application of issue preclusion are satisfied – the issue on which the Boims seek to preclude HLF is the same as that involved in the prior litigation, the issue was actually litigated, and it was essential to the final judgment.   *See Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc.* 125 F.3d 526, 530 (7th Cir. 1997).

Turning to the question of whether HLF had a "full and fair opportunity" to litigate this issue, the Court begins with the proposition that "judicial affirmance of an administrative determination is entitled to preclusive effect." *Kremer*, 456 U.S. at 480 n.21 (citing *CIBA Corp. v. Weinberger*, 412 U.S. 640, 644 (1973)).   It is of no consequence that the *Ashcroft*

37

litigation involved the judicial review of an administrative determination, as opposed to being a case initiated in the federal courts.  *Grubb v. Public Utilities Comm'n*, 281 U.S. 470, 475-477 (1930).  Additionally, the "full and fair opportunity to litigate requirement is satisfied so long as minimum due process standards are satisfied."  *Charles Koen & Associates v. City of Cairo*, 909 F.2d 992, 1000 (7th Cir. 1990).  HLF argues that this was not the case in the D.C. Circuit proceedings, because: HLF never had a hearing before the agency whose action HLF challenged; HLF was denied the opportunity to put exculpatory evidence in the record; HLF was denied the opportunity to call witnesses to establish its innocence; the court sustained the agency's decision even though it was based entirely on hearsay; the court relied on secret evidence; the court granted summary judgment against HLF *sua sponte*, without first providing notice of its intent to do so; and the court struck from the record all of the evidence HLF tendered.

None of HLF's arguments on this score is new; each was raised – and rejected – in the *Ashcroft* case.  The Court similarly rejects them here.  First, based upon the exhibits submitted, it appears that the administrative record challenged in the *Ashcroft* case actually did contain the documents HLF sought to include.  At a hearing on HLF's attempt to obtain evidence outside the parameters of the administrative record,

38

Judge Kessler, the district judge to whom the *Ashcroft* case was

assigned, specifically asked the government's attorney whether

the administrative record included HLF's materials, and she

represented that it did:

> THE COURT: All right.  Then I want to know whether that
> record includes any of the materials which I believe
> plaintiff says that it submitted to Treasury in that
> period between the designation and the redesignation?

> MS. SHAPIRO: Yes, absolutely.  In fact one of the
> things that was accomplished by doing the redesignation
> was the incorporation of all of the materials that
> plaintiff submitted with its motion for a preliminary
> injunction, and an additional letter that Mr. Cline
> wrote to the Treasury Department making some additional
> points in addition to incorporating those documents.
>       Those are all contained in the administrative
> record.  I think there may be close to an entire volume
> dedicated to their submissions.

*See Holy Land Foundation v. Ashcroft*, No. 02-442, Transcript of

Motions Hearing Before Judge Kessler, p. 25 (D.D.C. July 18,

2002) (attached as Exhibit 6 to HLF's Rule 56.1 Statement).

Moreover, HLF has never (in the *Ashcroft* case or in this

Court) offered any insight as to what was lacking in the record

before the federal courts in the *Ashcroft* case.  In its appellate

brief to the D.C. Circuit, HLF attempted to support its argument

that the government's SDT designation was incorrect and biased

with evidence HLF had unearthed showing that (1) the United

States Agency for International Development ("USAID") issued a

2002 press release boasting that it (USAID) had contributed food,

water and medical supplies to Al Razi Hospital; and (2) another

non-Muslim charity that was in partnership with USAID publicly acknowledged donating to Al Razi Hospital, as well as at least three of the same zakat committees that HLF contributed to - the same committees that evidenced, according to the government, HLF's support of Hamas.  *See Holy Land Foundation v. Ashcroft*, No. 02-5307, Brief of Appellant at 56, filed January 23, 2003 (D.C. Cir.) (attached as Exhibit 17 to Plaintiffs' (HLF) Rule 56.1 Statement).  As the Court sees it, there are two problems with this evidence: first, contributing to one entity - or even a few entities - connected to Hamas is not the same thing as deliberately targeting Hamas-controlled entities to receive the vast majority of one's money, which is what the government showed HLF did.  Second, and more importantly, this evidence does nothing to disprove the evidence showing that HLF provided material support to Hamas.

Finally, "[d]ue process is not a fixed menu of procedural rights. How much process is due depends on the circumstances." *Society of Lloyd's v. Ashenden*, 233 F.3d 473, 479 (7th Cir. 2000).  *See also Moyer v. Peabody*, 212 U.S. 78, 84-85 (1909)("what is due process of law depends on circumstances. It varies with the subject-matter and the necessities of the situation."), *cited in Hamdi v. Rumsfeld*, — U.S. —, 124 S.Ct. 2633, 2681 (June 28, 2004)(Thomas, J., dissenting).  The Court is persuaded that, under the circumstances, HLF had a "full and fair

opportunity" to litigate its claim that it did not provide
material support to Hamas.  In proceedings before the D.C.
Circuit, HLF was represented by counsel, and HLF had the
opportunity to argue and explain its position fully.  It is true
that Judge Kessler denied HLF's motion to expand the scope of her
review, and denied HLF the opportunity to depose witnesses
involved in the designation and re-designation proceedings.  But
it is equally true that that decision was not made until after
the judge had heard a detailed proffer from HLF's counsel
concerning what information and discovery they sought, and why.
This Court is in no position to second guess the judge's rulings
on the issue.  Moreover, the D.C. Circuit did consider the
judge's rulings on the issue, and, in those proceedings, HLF was
again ably represented by counsel, who had a full and fair
hearing before the Court of Appeals.

To the extent the proceedings surrounding HLF's SDT
designation and redesignation failed to measure up (in terms of
discovery and the strict adherence to the rules of evidence) to
the standards one might expect to find in a *de novo* proceeding in
federal court, that is perhaps excusable; after all, the
designation proceedings were not a *de novo* proceeding in a
federal court.  Rather, HLF's complaints arise – and must
therefore be viewed – in the context of executive orders, agency
action and judicial review of that action, all involving a

41

volatile and emotional issue (terrorism).  This Court does not
know - and will likely never know - the exact nature of the
"classified information" that was "presented to the [D.C.
Circuit] *in camera*." *See Holy Land Foundation v. Ashcroft*, 333
F.3d at 165.  But that does not vitiate the potential preclusive
effect of the court's judgment.  Indeed, collateral estoppel or
issue preclusion may appropriately be applied based on default
proceedings, where the later court has no evidence before it, and
based on proceedings that are so abbreviated that they are the
functional equivalent of default proceedings.  *E.g., In re Catt*,
368 F.3d 789, 791-92 (7th Cir. 2004).

The Court is not insensitive to HLF's contention that some
Muslims and affiliated organizations have experienced certain
hardships in the post-September 11th climate in America.  But the
Court's role requires it to focus not on generalities, but on
specifics.  And here, HLF has given the Court no reason to
question the D.C. Circuit's judicial independence or integrity.
There is nothing to suggest that the court acted inappropriately
or as a rubber stamp for the Justice Department.  On the
contrary, based upon the record, the Court can only conclude that
the D.C. Circuit provided HLF with a full and fair opportunity to
present its side of the case; the court simply chose to reject
HLF's side in favor of the defendants'.

In short, HLF had a full and fair opportunity to be heard on

42

the question of whether it provided material support to Hamas,
the question was actually litigated and decided in the *Ashcroft*
case, and this Court is bound by the D.C. Circuit's ruling on the
issue.  Collateral estoppel applies here, and, as a result, the
Boims are entitled to summary judgment against HLF on liability.
With the D.C. Circuit's ruling, as well as the other evidence in
the record linking Hamas to David Boim's murder and linking HLF
to Hamas, no reasonable jury could find for HLF on the liability
issue.  Accordingly, the Court grants the Boims' motion for
summary judgment, and denies HLF's motion for summary judgment.

    2.   Motions Filed By and Against IAP and AMS

    The Islamic Association for Palestine ("IAP") and the
American Muslim Society ("AMS") joined forces, as they did with
their Answer to the Complaint, in their joint motion for summary
judgment.  In their motion, they argued that, although the record
might contain some evidence that some of the other defendants
knew about Hamas' terrorist activities and engaged in acts to
help those activities succeed, the record contains no evidence
that this was true of IAP or AMS.  The Boims filed a cross-motion
for summary judgment on the issue of liability only, arguing that
IAP and AMS provided material support to Hamas by paying for
Hamas leaders and members to come to the United States to attend
and speak at conferences, by helping to distribute pro-Hamas
literature and propaganda, and by using that literature and

propaganda to solicit donations to Hamas' cause.

For IAP and AMS to be liable to the Boims under 18 U.S.C. §2333, they must have known about Hamas' illegal activities, they must have desired to help those activities succeed, and they must have engaged in some act of helping. *See Boim v. Quranic Literacy Institute, et al.*, 291 F.3d at 1023. Summary judgment in the defendants' favor is appropriate only if no reasonable jury could find for the Boims on these points; conversely, summary judgment in the Boims' favor is appropriate only if no reasonable jury could find for the defendants on these points. *See Anderson*, 477 U.S. at 248.

The first element of the Boims' claim requires a showing that IAP and AMS knew about Hamas' illegal activity, and, on this point, the record is clear: IAP and AMS concede that Hamas "has used political and violent means, including terrorism, to pursue its goal of establishing an Islamic Palestinian state in Israel, the West Bank, and Gaza," and they concede that Hamas was responsible for David Boim's murder. *See* IAP/AMS' Rule 56.1 Statement, ¶¶10-11; IAP/AMS' Response to Plaintiffs' Rule 56.1 Statement, ¶5. The remaining two elements – that IAP and AMS desired to help Hamas' illegal activities succeed, and that they engaged in some act of helping to further that goal – require a bit more discussion.

At the outset, the Court notes that IAP and AMS' arguments

44

on summary judgment, both in their own motion, and in response to the Boims' motion, effectively boil down to: "that's a different organization; that's not us."  The Court rejects the notion that the IAP involved in this case is somehow different from the IAP whose name appears throughout the record.  Although the evidence shows that there were a number of organizations using the IAP name, the evidence also shows that those organizations were related – whether officially or unofficially.

According to the parties' statements of fact, the IAP named in the Boims' complaint is a not-for-profit Texas corporation; the Court will refer to this entity as "IAP Texas" in an attempt to avoid confusion.  AMS, another named defendant, is a not-for-profit Illinois corporation that serves as the Chicago Chapter of IAP.  According to IAP and AMS, the purpose of both corporations is "to promote the cause of Palestine in America"; according to the Boims, their purpose is "to promote Hamas and the Muslim Brotherhood."  *See* IAP/AMS' Rule 56.1 Statement, ¶¶4-5; Plaintiffs' Response to IAP/AMS' Rule 56.1 Statement, ¶¶4-5.

In their complaint, the Boims allege that "[t]here has been continuously since the early 1980's an entity or group of persons and entities operating under the name "Islamic Association for Palestine" (collectively, "IAP National")" and that "IAP National is an umbrella organization that encompasses the various organizations throughout the country which call themselves "IAP,"

45

including Defendants AMELP, AMS and IAP Texas." *See* First
Amended Complaint, ¶7. Although the defendants dispute this, the
evidence bears this out.

Rafeeq Jaber testified that he has served as President of
AMS from its inception in 1993 to the present; he also served as
President of an entity referred to as "IAP National" from 1996 to
1998, and then again from 1999 to the present. Transcript of
Deposition of Rafeeq Jaber taken April 9, 2003[3], pp. 10-12
(attached as Exhibit 10 to the Appendix of Exhibits to
Plaintiffs' Answer to IAP and AMS' Rule 56.1 Statement). He
testified that he also served as the President of IAP Texas
beginning in 2002. *Id.*, p. 15. Although he testified that IAP
Texas and AMS are two distinct entities, he also testified that
IAP National is sort of an umbrella organization that floats
between IAP Texas and AMS, without any separate corporate
structure; when IAP National is headquartered in Dallas, IAP
Texas serves as the National organization; when IAP National is
headquartered in Chicago, AMS serves as the National
Organization. *Id.*, pp. 13-15. Thus, there is no question that,
during the years when IAP Texas served as the headquarters for

---

[3] Mr. Jaber's deposition was initially taken on April 9, 2003.
After hours of questioning, the parties agreed to continue the
deposition. Mr. Jaber's second deposition was held on July 28, 2003.
The Court will refer to the transcripts from Mr. Jaber's April 9, 2003
deposition as "Jaber Deposition I", and to the transcripts from the
July 28, 2003 deposition as "Jaber Deposition II."

IAP National, IAP Texas and IAP National were one and the same;
similarly, when AMS served as the headquarters for IAP National,
AMS and IAP National were one and the same.

Similarly, Omar Ahmad, who served as the President of IAP
National before Mr. Jaber, testified that AMELP, another of the
companies alleged by the Boims to be within IAP's umbrella, did
business for a time as IAP, though apparently without any kind of
corporate formality. *See* Deposition of Omar Ahmad, pp. 38, 46,
76-77.

Mr. Jaber testified that, even when IAP National was based
in AMS' Chicago office, IAP Texas continued to be responsible for
certain IAP National projects; IAP Texas published Al-Zaytuna, it
held fundraising events, sold promotional merchandise and it
helped to organize and plan IAP's annual conference. Jaber
Deposition I, pp. 131-32. Mr. Jaber also testified that IAP
Texas created promotional items – videotapes, audiotapes, t-
shirts, cups and such – and then IAP National and AMS sold them
for profit. *Id.*, pp. 95-96. Mr. Jaber testified that IAP
National and AMS "exchange[d] money" with IAP Texas. *Id.* at 261.
He also testified that, at times, AMS and IAP National gave money
to AMELP. Jaber Deposition II, pp. 51-52 (attached as Exhibit 5
to IAP and AMS' Rule 56.1 Statement).

The Boims' characterization of IAP as an umbrella
organization is further supported by Mr. Jaber's testimony that

IAP National, the organization that floated between AMS and IAP
Texas, had "chapters" in various other parts of the country,
including Detroit, Wisconsin, New Jersey and California.  Jaber
Deposition I, pp. 184-85.  According to Mr. Jaber, the chapters,
which were really more like committees, helped to publicize
conferences and other events put on by IAP National, and they
helped to raise money for IAP.  *Id.* at 185-88, 192.  In fact, he
testified that, in the years before AMS was officially
incorporated, he was known as the head of IAP's Chicago chapter;
he testified that he formed AMS, in large part, to make more
official or legitimate the activities that he was already doing
for IAP National.  Jaber Deposition II, pp. 89-90.

Further solidifying the fact that these organizations are
all related, loosely if not officially, is the fact that they
have acted as one in this lawsuit.  As noted, IAP and AMS filed a
joint answer, as well as a joint motion for summary judgment and
a joint response to the Boims' motion.  And, according to Mr.
Ahmad, AMS hired Mr. Fennerty to represent it in this lawsuit,
and AMELP just tagged along.  Ahmad Deposition, p. 44.

In short, the record shows that at all times relevant to
this action, there was a national organization serving as the
Islamic Association for Palestine, and that IAP Texas and AMS
either formally served as that organization, or were so
intertwined and involved with that organization as to make any

48

formal distinction meaningless.  The defendants cannot now hide
behind their ambiguous and amorphous corporate design. The Court
finds that the defendants' "it wasn't us" arguments ring hollow.

Turning to the question of whether IAP and AMS desired to
help Hamas' activities succeed, and, in fact, engaged in some act
of helping those activities succeed, the record contains an
abundance of evidence that both of these propositions is, in
fact, true.  First, the Watson Memorandum includes a report of
surveillance tapes that clearly demonstrate a desire on the part
of all in attendance to help Hamas survive and prosper.  *See* AR
1399-1475 (attached as Exhibit 5 to Plaintiffs' (IAP/AMS) Rule
56.1 Statement).  The reports detail conversations that were
recorded in October of 1993, during a meeting that took place in
Philadelphia, Pennsylvania.

The overarching theme of the discussions taped by the FBI
concerned how the entities affiliated with and working for Hamas
should operate in the United States in light of the Oslo Accord,
more formally known as "the Oslo Declaration of Principles," in
which Yasser Arafat and Yitzhak Rabin recognized, ostensibly on
behalf of Palestinians and Israelis, each other's right to exist
as a people within the borders of Palestine/Israel, and committed
themselves to negotiating a permanent settlement and to improving
relations between the two peoples.  The participants in the
Philadelphia meeting, all believed by the FBI to be members or

49

supporters of Hamas, universally condemned the Accord and vowed to do what they could to ensure its failure.  For example, according to the FBI, Mr. Ashqar asked rhetorically "What shall we do next?" and answered that "[t]he answer is to adhere to a strategy that can make the accord fail"; said "we can achieve that," but "how to achieve our goals is not the subject of this meeting.  The objective is how can we act in the American theater."  Exhibit 5, AR 1419.  *See also* AR 1458 (recap of meeting's objectives listing, as number one, "[t]he need to make the peace accord fail.")

The men discussed the best way to support the Movement, which clearly refers to Hamas, though they tried to be careful about using the name Hamas, and concluded that the institutions operating in the United States "should be at the service of the Movement over there [and that] [t]his should include finance, information, political and everything." *Id.*, 1431.  According to the FBI report, the men discussed trying to increase awareness and fundraising efforts by bringing in guests from the occupied territories to speak at mosques and Islamic centers (AR 1432), having HLF and IAP join forces (AR 1439), placing appeals for humanitarian donations in Al-Zeitouna, the Monitor and other Islamic magazines (AR 1443), among other means.  According to the FBI, a speaker identified as Abdul Rahman LNU (last name unknown) urged that the group should "concentrate our efforts on

50

supporting Jihad . . . . This can be done, he said, through concentrating our financial resources on those directly connected with Jihad, such as [the] injured, the martyrs, their families and the prisoners." Exhibit 5, AR 1445.

At a closing meeting, the men discussed that "their institutions, such as the Fund [HLF] and the Union [IAP] were established in the first place to provide assistance to the Movement [Hamas] inside the Occupied Territories and they should not deviate from this objective." *Id.*, AR 1459. Ultimately, the group concluded that IAP should not change its objectives or methods dramatically. *See id.*, AR 1461.

According to the FBI, Omar Ahmad attended that meeting. At his deposition in this case, Mr. Ahmad testified that he could not recall whether he attended the 1993 meeting in Philadelphia. Deposition of Omar Ahmad, pp. 221- 25. But he testified that it was not uncommon for him to meet with the men identified in the surveillance report - Abdelhaleem Hassan Ashqar, Akram Karubi, Mohammed Al-Hanooti, Ismail Elbarasse, Moin Kamal, Mohammed Shabib, Shukri Abu-Baker, Ghassan Elashi, and Haitham Maghawri. *Id.*, pp. 241-42. Mr. Ahmad testified that he knew some of these men back in 1993 - namely, Messrs. Ashqar, Karubi, Al-Hanooti, Elashi, Abu-Baker and Maghawri; he further testified that he did not know whether Ashqar, Karubi, Al-Hanooti, and Elashi were or were not members or supporters of Hamas, but that he knew for

sure that Abu-Baker and Maghawri were not. *Id.*, pp. 227-235,
237. He testified that both Messrs. Abu-Baker and Maghawri told
him many times that they had nothing to do with Hamas. *Id.*, p.
235.

Mr. Ahmad testified that he served as President of AMELP,
but he could not remember the exact time frame. Ahmad
Deposition, p. 8, 30. He also testified, however, that, during
the time when he was President of AMELP, AMELP was doing business
as IAP and sometimes as the IAP Information Office, and he
testified that AMELP did business as IAP, and sometimes as the
IAP Information Office, during the early 1990s. *See* Ahmad
Deposition, p. 38, 46, 76-77. Thus, it is extremely likely that
Omar Ahmad was serving as President of AMELP and IAP in October
1993, when the Philadelphia meeting took place. This is
consistent with the testimony of Rafeeq Jaber, who testified that
he became President of IAP in 1996, and that Mr. Ahmad preceded
him in that position; he also testified that, when he was working
with IAP in the late 1980s and early 1990s, he dealt with the
President of IAP, who was Jasser Bushnaq first and then Omar
Ahmad. *See* Jaber Deposition I, p. 55-56.

In addition to the documents contained in the Watson
Memorandum, the record contains evidence that IAP and AMS (as
well as the various organizations within the national IAP
umbrella) contributed money, on a number of occasions, to HLF,

and that they routinely and consistently encouraged people to donate money to HLF, and otherwise assisted in HLF's fundraising endeavors.  *See, e.g.,* Jaber Deposition I, pp. 69-76.  Mr. Jaber testified that some of the money IAP and AMS gave to HLF actually represented donations from individuals who had given the money to IAP or AMS to give to HLF; Mr. Jaber testified that people sometimes came to him and asked if he would accept a donation to AMELP or HLF, he accepted the donation, and then turned around and wrote a check to AMELP or HLF.  *Id.,* pp. 73-74, 76.  When asked why people would give IAP or AMS money on behalf of HLF, Mr. Jaber testified that he recommended HLF to people wishing to make donations to the Palestinian cause.  Jaber Deposition I, pp. 76-77.

Mr. Jaber testified that IAP and AMS "encourage[d] people to donate for [HLF] of course," and "we mention that in our IAP web page."  *Id.,* pp. 201-02.  He testified that neither IAP National nor AMS has ever donated its own money to HLF, but that they worked to "promote [HLF] in every way we can."  *Id.,* pp. 203, 206.  Mr. Jaber testified that one way IAP promoted HLF was by including solicitations for donations to HLF in the press releases and "action alerts"[4] IAP National published.  *Id.,* pp.

---

[4]"Action alerts" were communiques published and distributed from time to time, typically in response to some event in the Middle East or the United States, or to mark an anniversary or auspicious occasion.  Jaber Deposition I, pp. 263-64.

206-08. Mr. Jaber testified that IAP National routinely
solicited donations to the Occupied Land Fund and HLF "to support
the needy people in Palestine." Jaber Deposition II, pp. 166-67.
Omar Ahmad similarly testified that IAP advertised for HLF, and
encouraged people to donate to HLF. Ahmad Deposition, pp. 98-
100.

Additionally, Mr. Jaber testified that IAP allowed HLF to
set up a booth at its annual conventions to do its own
fundraising; he also testified that the money IAP raised at its
1996 convention all went to HLF. Jaber Deposition I, pp. 253-55.

Mr. Jaber also testified that, long before he officially
formed AMS in 1996, he was actively involved in the business of
IAP through an organization called the Mosque Foundation. *See*
Jaber Deposition II, pp. 69-70. Mr. Jaber testified that, in
connection with his involvement with the Mosque Foundation, he
became known as the head of IAP's Chicago Chapter in 1991. In
that capacity, in the late 1980s and early 1990s, he worked with
IAP to sponsor annual events celebrating the anniversary of the
*Intifada*. *Id.,* pp. 70-76, 80-81. Mr. Jaber testified that the
money raised during these *Intifada* celebrations all went to HLF
(or the Occupied Land Fund, as it was then known). *Id.,* pp. 77-
78.

Although these fundraising and financing activities relate
to HLF, and not Hamas, taken in the context of the findings made

54

above and elsewhere about HLF's established link to Hamas, this
is strong evidence that IAP was supporting Hamas, consistent with
the FBI's surveillance reports.

Beyond fundraising, the record shows that IAP and AMS
published and distributed an abundance of pro-Hamas documents.
Mr. Ahmad testified that IAP published statements and information
from Hamas.  Ahmad Deposition, pp. 254-55.  Mr. Jaber initially
testified that, at least while he was in charge, neither IAP nor
AMS had ever published Hamas press releases or communiques (he
could not say whether the same was true before he assumed
control).  Jaber Deposition I, p. 165.  On further questioning,
however, he admitted that the December 1988/January 1989 edition
of *Ilafilastine* featured IAP's logo and published a Hamas
statement, along with a solicitation for donations to be made to
the Occupied Land Fund (HLF); Mr. Jaber also admitted that
IAP's logo appeared on the publication of Hamas' charter, as did
several IAP addresses. Jaber Deposition II, pp. 175-76.  Mr.
Jaber also admitted that IAP had more recently published and
distributed a number of pro-Hamas documents, including an August
30, 2001 editorial written by Khalid Amyreh that advocated
martyrdom operations, meeting death with death, and killing jews.
Jaber Deposition II, pp. 189-90.  He testified that IAP paid Mr.
Amyreh for the material he provided, but that IAP did not
necessarily publish the editorial because it shared Mr. Amyreh's

55

views.  *Id.*, pp. 190-92.

Additionally, Mr. Jaber testified that, when Mohammed Salah was arrested in Israel, IAP National and AMS had a number of events to try and garner public support for his release.  Jaber Deposition I, pp. 212-13.  Though, in fairness, he also testified that he believed the Israeli government was holding Mr. Salah without justification.  *Id.*, p. 214.  On the other hand, Mr. Jaber testified that, in 1997, under his leadership, IAP National published documents designed to garner public support for Abu Marzook, who Mr. Jaber knew at the time to be the head of the political bureau of Hamas.  *Id.* at 227-29.  Despite this, Mr. Jaber testified, AMS and IAP National "got involved in the case" by printing and distributing information about Mr. Marzook and his arrest in New York, and by asking people "to write to the president, to the judge . . . ."  Jaber Deposition I, pp. 78-79. Mr. Jaber testified that IAP National and AMS generated and distributed documents aimed at rallying support for HLF after HLF's assets were seized by OFAC.  Jaber Deposition II, pp. 98-99.  Of course, publishing documents in support of members of Hamas or in support of organizations or people known to support Hamas is not against the law.  But all of this does tend to evidence a desire on the part of IAP to help Hamas succeed.

The record also shows that IAP held annual conferences or conventions, invited pro-Hamas speakers to present at those

conferences or conventions, and paid for their travel expenses.
Omar Ahmad testified that, when he was President of AMELP, doing
business as IAP, IAP's practice with respect to the annual
conferences was to bring in speakers from a variety of groups,
including Hamas.  Ahmad Deposition, pp. 122-23.  He further
testified that, when IAP brought a speaker from overseas to speak
at a conference, IAP paid that person's travel expenses.  *Id.*,
pp. 101-02.  Rafeeq Jaber also testified that IAP National paid
the travel expenses of the speakers it brought in for its
conventions.  Jaber Deposition I, p. 269.

The record shows that IAP's 1989 conference featured a
veiled Hamas terrorist.  *See* Plaintiffs' Rule 56.1 Statement,
Exhibit 43 (the videotape of the conference); Ahmad Deposition,
pp. 196-99 (admitting that the speaker appears to represent
Hamas); Jaber Deposition II, pp. 132-35(confirming that the tape
shows IAP's 1989 conference and bears IAP's logo).  The record
shows that IAP's 1996 conference featured Sheikh Ali al-
Bayanouni, who was the leader of the Muslim Brotherhood[5] of
Syria, and "Sister Nadia al-Ashi, the wife of Musa Abu Marzouk,[6]

---

[5]The Muslim Brotherhood, which started as an Islamist revivalist
movement in 1928, is the parent organization from which Hamas sprung.
*See* Plaintiffs' (IAP/AMS) Rule 56.1 Statement, ¶¶1-4.

[6]This is a reference to Mousa Mohammed Abu Marzook, who was
originally named as a defendant in this case; Mr. Marzook was awaiting
extradition proceedings in New York at the time this article came out.
*See In re Extradition of Marzook*, 924 F.Supp. 565, 579 (S.D. N.Y.
1996).

the political leader of Hamas who has been in an American prison for more than a year and a half." *See* Muslim World Monitor, p. 4 (January 1997)(attached as Exhibit A to Plaintiffs' Reply Brief).

At his deposition, Mr. Jaber was shown an excerpt from a book by Steven Emerson entitled "American Jihad, The Terrorists Living Among Us"; the excerpt dealt with Hamas and identified various instances where Hamas leaders or Hamas supporters had appeared and spoken at IAP conferences.  For example, according to Mr. Emerson, IAP's 1989 Kansas City conference featured a Hamas commander, as well as Yusef al-Qaradawi, an Egyptian-born religious scholar based in Qatar; IAP's 1996 Chicago conference featured Mohammad abu Faris, a Jordanian Islamic leader who, according to Mr. Emerson, called for jihad in his speech; IAP's 1997 Chicago conference featured Ahmed al-Kufahi, who, according to Mr. Emerson, urged the audience to take up arms against the Israeli occupation; IAP's 1999 conference featured Salah Sultan, who spoke in support of the martyrdom operations; IAP's 2000 conference featured Jamal Said, who, according to Emerson, advocated providing support for the families of the martyrs and specifically requested that the attendees donate to that cause. Jaber Deposition II, pp. 147-159.  Mr. Jaber admitted that each of the people identified had, in fact, given speeches at the various IAP conferences, but he testified that he could not remember whether they, in fact, made the statements Mr. Emerson

58

attributed to them.  Mr. Jaber made it clear, however, that he is familiar with Mr. Emerson, and that he considers him to be an "Arab-basher" and a "liar."  *Id.*

The record makes clear that, if IAP has never outrightly cheered on Hamas' terrorist activities, it has come awfully close.  Certainly, IAP has never condemned Hamas' tactics.  Indeed, Mr. Jaber testified that IAP takes no position on whether suicide bombings, also called "martyrdom operations," are right or wrong, "because we do not judge.  I don't believe we are in a position to judge the people what they do and what they do not do.  Because the one in the field is different than the one sitting in the chair like me here."  Jaber Deposition II, pp. 194-95.  The record shows that IAP actually praises Hamas' terrorist activities, though it does so somewhat subtly:  Mr. Jaber admitted that IAP National, under his leadership, published articles and editorials characterizing suicide bombers and those who carried out bombing operations against Israeli targets as "martyrs" and as "freedom fighters," though he claimed that IAP took no official position on the validity of those characterizations.  Jaber Deposition II, pp. 194-98.

The record also contains a declaration from Rashid Khalidi, a professor of Middle Eastern History and the Director of the Center for International Studies at the University of Chicago; Professor Khalidi served as an advisor to the Palestinian

delegation to the Palestinian-Israeli peace negotiations of 1991-1993 in Madrid and Washington, D.C.  *See* Declaration of Rashid Khalidi (attached as Exhibit 6 to IAP and AMS' Rule 56.1 Statement).  Professor Khalidi's aim is to make clear that opposition to the Israeli occupation is not the same as support for Hamas; the Court did not for one moment equate the two.  But expressing that opposition via suicide bombings and terrorist attacks such as the one that killed David Boim would seem, to this Court, to be precisely what Hamas is about.  And the Seventh Circuit has instructed that those who provide material support to terrorists, who help to fund - directly or indirectly - Hamas' terrorist activities are liable, under 18 U.S.C. ¶2333 to the same extent as those who actually commit the terrorist acts.

The Court recognizes that the record contains some statements that counter the evidence detailed above.  For example, in a declaration submitted in support of IAP and AMS' motion for summary judgment, Mr. Jaber states that, at least while he was a member or the President of IAP and AMS, neither organization supported terrorists or terrorist activities, engaged in helping terrorist activities succeed, engaged in helping terrorist acts, or intentionally, knowingly or deliberately gave money to support terrorist activities.  *See* Declaration of Rafeeq Jaber, ¶¶5-8 (attached as Exhibit 4 to IAP and AMS' Rule 56.1 Statement).  But the Seventh Circuit has said

that conclusory, self-serving testimony, lacking factual support
in the record, cannot defeat a summary judgment motion. *See,
e.g., Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001);
*Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719,
724 (7th Cir. 1998); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d
705, 709 (7th Cir. 1995); *Darnell v. Target Stores*, 16 F.3d 174,
177 (7th Cir. 1994). More importantly, Mr. Jaber's declaration
does nothing to refute the evidence that IAP provided material
support to Hamas in the years when he was not a member and was
not the President.

Based upon the evidence in the record, the Court is
persuaded that no genuine issues of fact exist, and that no
reasonable jury could, on the record before the Court, find in
favor of IAP and AMS on the question of liability. Accordingly,
the Court denies IAP/AMS' motion for summary judgment, and grants
the Boims' motion for partial summary judgment against these
defendants.

### 3.   Motions Filed By and Against Mohammed Salah

The Boims have alleged that Mohammed Salah, a naturalized
U.S. citizen who lives in Illinois, is "the admitted U.S.-based
leader of the military branch of Hamas," and is named on the list
of Specially Designated Terrorists. First Amended Complaint,
¶12. They allege that Mr. Salah was incarcerated in Israel from
January 1993 to November 1997, after pleading guilty to a variety

61

of offenses, including financing a number of Hamas' operatives;
they further allege that, during that period of incarceration,
Mr. Salah admitted that he channeled money for Hamas' operations
and that he recruited, organized and trained terrorist operatives
in Israel. *Id.* Finally, they allege that Mr. Salah worked with
Abu Marzook to coordinate Hamas' fundraising and money laundering
operations in the United States. *Id.*, ¶34.

To hold Mr. Salah liable under 18 U.S.C. §2333, the Boims
must show that he knew about Hamas' illegal activities, he
desired to help those activities succeed, and he engaged in some
act of helping. *See Boim v. Quranic Literacy Institute, et al.,*
291 F.3d at 1023. The Boims have moved for summary judgment on
liability against Mr. Salah, arguing first that, because of the
Israeli conviction, Mr. Salah is estopped from denying that he
knew about Hamas' terrorist activities, desired to help them
succeed, and committed acts to help them succeed; alternatively,
the Boims argue that, even without the Israeli conviction, the
evidence in the record shows that Mr. Salah provided material
support to Hamas in violation of 18 U.S.C. §2333. Mr. Salah
opposed the Boims' motion, arguing that the Israeli conviction
carries no weight in this court, and that, without that
conviction, the Boims have no evidence that he provided any
support to Hamas or that Hamas was even involved in David Boim's
murder. In fact, Mr. Salah filed a cross-motion for summary

judgment, arguing that, as a matter of law, the Boims cannot
prevail on their claim against him because the record contains no
admissible evidence linking him to Hamas, and no admissible
evidence linking Hamas to David's murder.

Before turning to the merits of the parties' summary
judgment motions, the Court must address a motion to strike filed
by Mr. Salah.  Mr. Salah has moved to strike a number of the
exhibits that Boims have filed in support of their motion for
summary judgment.  Mr. Salah argues that Exhibits 7 through 15,
17 through 21, 23 through 26, and 28 are irrelevant, unreliable,
or otherwise inadmissible, and that the Court should not consider
them in ruling upon the Boims' motion for summary judgment.  For
purposes of this motion only, the Boims have chosen not to defend
the admissibility of Exhibits 10, 17, 18, 23, 24, 26, and part of
Exhibit 12.  Because of this, the Court will not consider these
exhibits in ruling on the Boims' motion for summary judgment
against Mr. Salah.  The Court will address in turn below the
contested exhibits.

At the outset, on summary judgment, the Court may consider
any evidence that would be admissible at trial.  *See Stinnett v.
Iron Works Gym/Executive Health Spa*, 301 F.3d 610, 613 (7th Cir.
2002).  At this stage, the evidence need not be admissible in
form, but it must be admissible in content.  *Id.*  The question of
admissibility, as well as the decision to grant or deny a motion

63

to strike exhibits as inadmissible, are vested in the district court judge's sound discretion.  *See, e.g., Credit General Insurance Company v. Midwest Indemnity Corp.*, 916 F.Supp. 766, 771 (N.D. Ill. 1996).

Mr. Salah first asks the Court to strike Exhibit 7, which the parties have referred to as the "Hinawi conviction," though it is really just the English translation of the notes U.S. Foreign Service Officer Abdelnour Zaibeck made while observing Hinawi's trial.  Mr. Salah argues that the document is inadmissable because (1) it is inauthentic, (2) it violates Federal Rule of Evidence 1002, (3) it constitutes hearsay and double-hearsay, (4) the Boims have not complied with Federal Rule of Evidence 604 regarding interpretation and translation of this document, and (5) it would not otherwise be admissible at trial. The Court has not relied on this exhibit in connection with the motions involving Mr. Salah, and will therefore grant Mr. Salah's motion to strike it.

Mr. Salah next moves to strike Exhibits 8 and 9, which are described, respectively, as a copy of a Palestinian Authority website regarding Al-Sharif, one of the perpetrators of the attack that killed David Boim, and printed material from Hamas websites.  Mr. Salah contends that exhibits 8 and 9 are inadmissible for many of the same reasons raised in connection with Exhibit 7 – hearsay, proper authentication, and compliance

64

with Rule 604; they also argue that the websites are irrelevant, and that admitting them would confuse the jury.  Like Exhibit 7, these exhibits have played no role in the Court's consideration of the motions involving Mr. Salah, and the Court will therefore grant Mr. Salah's motion to strike them.

Mr. Salah next seeks to strike Exhibit 11, which is a transcript, in English, of an interview of Khaled Mishaal, who was actively involved in the creation and growth of Hamas and served as the head of Hamas' political bureau; the interview was conducted by Ghassan Charbel for Al-Hayat and published in seven parts in December 2003.  Mr. Salah contends that Exhibit 11 is inadmissible because it (1) has not been authenticated pursuant to Federal Rule of Evidence 902, (2) constitutes hearsay, and (3) presents expert testimony without having qualified the witness as an expert.  Mr. Salah also claims that the source of Exhibit 11 is unknown.  Mr. Salah's authenticity challenge would clearly fail; the interview was published by Al-Hayat, a well known Arabic language newspaper, *see* Declaration of Reuven Paz, ¶19, and under the Federal Rules of Evidence, "extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to . . . [p]rinted materials purporting to be newspapers or periodicals."  Federal Rule of Evidence 902(6).  Having said this, however, because the Court has not considered this exhibit in connection with the motions filed by and against

65

Mr. Salah, the Court will grant Mr. Salah's motion to strike it.

Next, Mr. Salah asks the Court to strike Exhibit 12, which consists of the declaration from Samuel A. Simon, Jr., the FBI agent charged with responding to the Boims' subpoena for documents relating to the Watson Memorandum, as well as the corresponding documents that were part of the administrative record in the *Ashcroft* case. For purpose of this motion only, the Boims have stated that they do not contest the admissibility of any of the documents, except for Agent Watson's memorandum, and so the Court will limit its discussion to that specific document and will not consider the remaining documents.

Mr. Salah contends that the Watson Memorandum is inadmissible hearsay. To the extent this is true, the Watson Memorandum clearly falls under the public record exception to hearsay, and is therefore admissible. *See, e.g., U.S. v. Sutton,* 337 F.3d 792, 797 (7th Cir. 2003) (citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 158, 170 (1988)(opinions contained in an investigative report of an airplane crash covered by public record exception to hearsay)). Federal Rule of Evidence 803(8) provides a hearsay exception for public reports setting forth "matters observed pursuant to duty imposed by law as to which matters there was a duty report . . . ." In his affidavit accompanying the Watson Memorandum, Agent Simon authenticated the report as having been part of the administrative record in the

66