*Ashcroft* case.  Mr. Salah does not challenge that the report was prepared by FBI representatives in the course of the FBI's regularly conducted activities.  Nor does he challenge the fact that the report summarizes an investigation performed by the FBI in accordance with its legal duty regarding the affiliation of Mr. Salah, among others, with Hamas.

Mr. Salah next seeks to strike Exhibits 14 and 15, which are described, respectively, as an August 21, 1995 handwritten statement of Mr. Salah, and an English translation thereof.  Mr. Salah argues that these exhibits should be stricken because the Boims failed to authenticate the documents in accordance with Rule 604, and because the Boims failed to comply with Rule 604's translation requirements.  The Court disagrees on both counts. Federal Rule of Evidence 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Here, because Mr. Salah produced the documents during discovery, the Boims asked Mr. Salah questions to authenticate both exhibits at his deposition.  *See* Deposition of Mohammad Salah, pp. 73-76.  Mr. Salah invoked his Fifth Amendment rights and refused to answer any questions regarding the documents. Because he refused to answer questions that would either authenticate the documents or deny their authenticity, this Court

refuses to allow him to now claim that the Boims have failed to meet their burden to authenticate.

Moreover, the Seventh Circuit has held that the opponent of the evidence bears the burden of showing that a genuine issue of authenticity exists. *Cf. Tyson v. Jones & Laughlin Steel Co.,* 958 F.2d 756, 761 (7th Cir. 1992). Mr. Salah has failed to make such a showing here. His brief merely claims that the Boims failed to meet their burden because they offered "no evidence that Salah actually made the statement in question." Salah's Motion to Strike, p. 11. As previously stated, the Boims made efforts to authenticate the documents. They specifically asked Mr. Salah if he personally hand-wrote the document in question, when he wrote the document, and why he wrote the document. Mr. Salah's refusal to answer the question or deny that he wrote the documents gives rise to the inference that the documents are authentic.

Perhaps more significant is the fact that Mr. Salah himself produced the translation during discovery. Indeed, the Boims specifically asked Mr. Salah at his deposition if Exhibit 15 was an accurate translation and if it was a document that he produced during discovery. *See* Salah Deposition, pp. 73-77. Again, Mr. Salah's refusal to answer any questions regarding the translation's accuracy gives rise to the inference that it is accurate.

Additionally, Dr. Paz, the Boims' expert, authenticated the translation.  Rule 604 of the Federal Rules of Evidence states "[a]n interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation."  In his declaration, Dr. Paz affirmed that the translation of Mr. Salah's statement was "true and correct."  Paz Declaration, ¶26.  For all of these reasons, the Court denies the motion to strike Exhibits 14 and 15.

Mr. Salah next asks the Court to strike Exhibits 13, 19, 20, 21, 25, and 28 – all purported bank documents – on the grounds that they have not been properly authenticated and constitute inadmissible hearsay, pursuant to Rules 901 and 802, and 801, respectively.  Initially, the Court notes that authentication "does not erect a particularly high hurdle" to admissibility. *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2d Cir.2001) (citing Fed. R. Evid. 901).  Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  The party offering the evidence is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*

176 F.3d 43, 49 (2d Cir. 1999) (internal citation and quotation marks omitted).  The proponent satisfies Rule 901 "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id.*

The checks that the Boims rely upon easily clear the Rule 901 hurdle.  "Commercial paper, signatures thereon, and documents relating thereto to the extent provided by general commercial law" are self-authenticating and do not require extrinsic evidence of authenticity.  *Ament v. Townsend,* No. 98 C 1918, 1998 WL 299806, at *4 (N.D. Ill. May 29, 1998) (citing Fed. R. Evid. 902(9)).  Nor do the checks fall victim to Mr. Salah's hearsay challenge.  *See Kepner-Tregoe, Inc. v. Leadership Software, Inc.,* 12 F.3d 527, 540 (5th Cir. 1994)("'signed instruments such as wills, contracts and promissory notes are writings that have independent legal significance and are nonhearsay.'") (quotations omitted.)

The Boims have also sufficiently established the authenticity of Mr. Salah's checking account statements and wire transfer receipts from LaSalle Talman Bank.  LaSalle Bank Corporation authenticated many of the checking account statements.  *See* Szewczyk Dec. ¶¶ 7-8, 11-12 (attached as Exhibit 2 to Plaintiffs' Response to Mr. Salah's Motion to Strike); Fed. R. Evid. 803(6).  With regard to the remaining checking account statements and wire transfer receipts, the Court notes that all

of these documents were produced by Mr. Salah in response to the Boims' discovery request seeking "all bank statements, all cancelled checks, all statements from instruments" etc.  While Rule 902 does not identify evidence produced in discovery as self-authenticating – at least when the evidence has not been produced pursuant to a subpoena – Mr. Salah refused to either acknowledge or disavow these exhibits at his deposition. Instead, Mr. Salah remained silent, invoking his Fifth Amendment right not to incriminate himself.  The Court is free to draw from Mr. Salah's silence inferences adverse to Mr. Salah's interests, especially in light of the other evidence authenticating the records.  Under the circumstances presented here, the Court concludes that Mr. Salah's production and subsequent silence are sufficient to authenticate the documents in question.

Finally, Mr. Salah's checking account statements and wire transfer receipts do not constitute hearsay.  The Boims have introduced evidence tending to establish that these records were prepared in the regular course of a regularly conducted business activity.  *See* Fed. R. Evid. 803(6); *see also* Szewczyk Dec. ¶¶ 4, 7-8, 11-17).  As the Tenth Circuit explained, "[b]ank records are particularly suitable for admission under Rule 803(6) in light of the fastidious nature of record keeping in financial institutions, which is often required by governmental regulation." *United States v. Johnson,* 971 F.2d 562, 572 (10th

Cir. 1992).   Accordingly, Mr. Salah's motion to strike the bank records included in Exhibits 13, 19, 20, 21, 25 and 28 is denied.

Turning to the merits of the parties' summary judgment motions, the Court quickly denies Mr. Salah's motion.  His assertions to the contrary notwithstanding, the default judgment against Hinawi, together with the Report of Hinawi's Sentence, would be enough to establish, at a minimum, an issue of fact as to whether Hamas was responsible for David Boim's murder.  Moreover, as the Court will explain below, the evidence establishes that Mr. Salah provided material support to Hamas.

Initially, although Mr. Salah has declined to admit that Hamas uses violence and acts of terrorism to further its goals, he does not dispute that Hamas has been designated as an SDT, an SDGT, and an FTO; nor does he dispute that Mousa Abu Marzook, who served at various times as the leader of Hamas' political wing, has been designated as an SDT, or that he himself has been designated as an SDT.  *See* Plaintiffs' (Salah) Rule 56.1 Statement, ¶¶17-19, 22, 27, and Mr. Salah's responses thereto.

It is undisputed that, on January 25, 1993, Mr. Salah was arrested by the Israeli military authorities; he was prosecuted in an Israeli military court in 1995 for "membership and activity in an illegal organization [Hamas]," "holding office in an illegal organization [Hamas]," "performance of services for an illegal organization [Hamas]," "activity against public order,"

and "giving shelter."  *See* Report of Court Proceedings in Court
File #4221/93 (attached as Exhibit 31 to Plaintiffs' (Salah) Rule
56.1 Statement); Plaintiffs' (Salah) Rule 56.1 Statement, ¶69,
and Mr. Salah's response thereto.  Mr. Salah pled guilty to these
charges, he was convicted based upon his plea, and he was
sentenced to eight years imprisonment, with five years to be
served from the date of his arrest, and the remaining three years
to be suspended and served only if Mr. Salah committed additional
offenses within five yeas of his release from prison.  *See* Report
of Court Proceedings in Court File #4221/93 (attached as Exhibit
31 to Plaintiffs' (Salah) Rule 56.1 Statement).

The record shows that, while Mr. Salah was in custody in
Israel, he was interviewed a number of times by the Israeli
Secret Service, and, during the course of those interviews, he
made statements that are, to put it mildly, vastly against his
interest.  The transcripts of those interviews, along with their
English-language translations were submitted by the Boims in
support of their motion for summary judgment against Mr. Salah,
*see* Plaintiffs' (Salah) Rule 56.1 Statement, Exhibit 17; in light
of the parties' arguments (or lack thereof) on Mr. Salah's motion
to strike, the Court has not considered these statements.

But the record also includes another statement from Mr.
Salah while he was in Israeli custody, a statement written in his
own hand and addressed, not to the Secret Service, but to other

73

individuals who were being held in the same detention center as
Mr. Salah; the record also includes the English-language
translation of this statement.  See Plaintiffs' (Salah) Rule 56.1
Statement, Exhibits 14 and 15.  In this statement, Mr. Salah
details his involvement with Hamas, his relationship with Mr.
Marzook, and the specifics of his activities in Israel and the
Occupied Territories during his January 1993 trip and during
prior trips.  *See id.*  In particular, in this statement, Mr.
Salah writes that he made the 1993 trip at the request of Mr.
Marzook, and that the purpose of the trip was to revive and
organize Hamas' military operations in the wake of the December
1992 deportation of 400 Hamas members.  *See* Exhibit 15, pp. 5-6.
In fact, the statement reveals that Mr. Salah attempted to
accomplish and accomplished this goal.  As the Court will explain
in more detail below, the statement shows that Mr. Salah
distributed money to Hamas' operatives for the express purpose of
carrying out terrorist activities.  By way of example, the
statement shows that Mr. Salah met with Salah Arouri, a Hamas
activist, and that he provided Mr. Arouri with money to buy
weapons to be used in terrorist operations.  *See id.*, p. 8-9.
The statement describes various meetings with Hamas' operatives,
all geared, specifically or generally, to Hamas' military
operations.  *See id.*, pp. 6-23.  It also includes an assessment
of how his detention might, and might not, impact Hamas'

operations.  *Id.*, pp. 49-52.

The Boims first argue that, because of the Israeli conviction, Mr. Salah is estopped from denying that he provided material support to Hamas.  And, at first blush, the conviction would seem to establish that Mr. Salah, in fact, provided money to men whom he knew to be Hamas operatives, with the intent that the money would be used to finance and otherwise further Hamas' terrorist activities – conduct that would clearly subject him to liability under §2333.  *See Boim*, 291 F.3d at 1023.  But, Mr. Salah argues, the confession he gave while in custody in Israel, and the resulting conviction, were procured by torture, the product of coercion and duress.  As such, he argues, they are entitled to no weight in this Court.

The question of what impact, if any, the Israeli confession and conviction should have in this Court has turned into a mini trial within a trial: the Boims have offered a declaration from Emanuel Gross, a law professor and licensed Israeli attorney who has served as a military attorney, a military judge and the President of an Israeli military tribunal, who opines that Mr. Salah's conviction "met generally accepted standards of fairness."  *See* Declaration of Emanuel Gross, ¶12. For his part, Mr. Salah submitted a declaration from Avigdor Feldman, the Israeli attorney who represented him throughout the Israeli military proceedings and who both parties agree is "one of the

75

most distinguished and prominent civil rights attorneys in
Israel." *See* Plaintiffs' (Salah) Rule 56.1 Statement, ¶77, and
Mr. Salah's response thereto. According to Mr. Feldman, Israeli
military courts do not comport with accepted principles of
fairness generally, and Mr. Salah's case was no exception; Mr.
Feldman opined that Mr. Salah's conviction is not worthy of full
faith and credit under the laws of the United States. *See*
Declaration of Avigdor Feldman, ¶¶4-32.

Despite his declaration, at his deposition, Mr. Feldman
acknowledged that, even in the Israeli military court
proceedings, defendants get full discovery, except for matters
that are "put under a privilege of secrecy"; they have access to
pre-trial discovery, an opportunity to confront and cross-examine
witnesses who testify against them; they are notified of the
charges against them, they receive notice of hearings and have
the opportunity to present evidence in their favor, they have
access to counsel, and they have the right to appeal. *See*
Deposition of Avigdor Feldman, pp. 13-14, 22-24. Mr. Feldman
also testified, consistent with Mr. Gross, that, even in the
military courts, a conviction may not be based exclusively on a
defendant's confession; rather, there must be some corroborating
evidence to support the conviction. *See id.*, p. 23; Declaration
of Emanuel Gross, ¶17(c); Plaintiffs' (Salah) Rule 56.1
Statement, ¶84, and Mr. Salah's response thereto. Mr. Feldman

76

testified that he recalled Mr. Salah telling him that he had been subjected to certain conduct that might be interpreted as torture. Feldman Deposition, p. 29. He, not surprisingly, testified that he did not witness any misconduct or torture, *id.,* pp. 30, 33, 36; and he testified that, each time he saw Mr. Salah, Mr. Salah appeared to be fine physically, he had no bruises or other physical signs of abuse. *Id.,* pp. 45-46.

To be sure, the record contains evidence that arguably counsels against affording full faith and credit to Mr. Salah's conviction in the Israeli military court. For example, the record includes an unclassified State Department cable, dated March 4, 1993 and written to the Israeli Minister of Foreign Affairs in connection with the United States Embassy's attempts to monitor Mr. Salah's treatment; the cable states that the Embassy "remains troubled by allegations of mistreatment of these three Americans and we have asked for an investigation into these allegations." Exhibit 2 to Mr. Salah's Appendix of Exhibits in Response to Plaintiffs' Motion for Summary Judgment. More specifically, the cable states that Mr. Salah reported being confined in a cell known as "the refrigerator," that he reported being threatened with beatings for failure to sign a Hebrew language statement, he reported being forced to stand naked and threatened with beatings if he failed to sign a statement. *Id.*

On the flip side, the record also includes State Department

cables in which Mr. Salah is reported to be "relaxed and in good physical condition" and that he "reports no mistreatment." *Id.* But, at the end of the day, none of the evidence that gives the Court pause on the full faith and credit question goes to the statement Mr. Salah wrote on August 21, 1995; rather, the issue comes up in the context of statements Mr. Salah allegedly made to the Secret Service. Mr. Salah has never claimed that the August 21, 1995 statement was the product of torture, coercion or duress. Rather, the record shows that that statement was written by Mr. Salah for people he believed were other Palestinian prisoners; people who were, for all intents and purposes, on his side.[7]

Perhaps more importantly, the record contains an abundance of evidence to corroborate much of what Mr. Salah wrote in his statement. For example, in his statement, Mr. Salah details his relationship with Mousa Abu Marzook, the admitted leader of Hamas' political wing, who has himself admitted to raising money for Hamas. *See In re Extradition of Marzook*, 924 F.Supp. 565, 579 (S.D. N.Y. 1996). Mr. Salah describes various meetings he had with Mr. Marzook, and he states that, in connection with his

---

[7]At his deposition, Mr. Feldman suggested that this statement too could have been the product of coercion, because Mr. Salah may have felt pressure from these people to prove that he was not a collaborator. *See* Feldman Deposition, pp. 60-62. But Mr. Salah has never said that this was the case; and, in fact, the coercion he has claimed – being kept in "the refrigerator," being forced to stand naked, and being threatened with beatings, all relate to treatment by the Secret Service, not his fellow prisoners.

1993 trip to the Occupied Territories, Mr. Marzook told him to allocate funds as follows: "Ramallah: 100,000; Nablus: 130,000; Hebron: 100,000; Gaza: Military (Activity): 300,000; The Rest: According to the Military and General Requirements." *See* Translation of August 21, 1995 Statement, p. 13 (attached as Exhibit 15 to Plaintiffs' (Salah) Rule 56.1 Statement). Thus, Mr. Salah's total expected allocation would have been in excess of $630,000 (depending on the "Military and General Requirements" in the non-delineated regions). In fact, the bank records show that, shortly before Mr. Salah left on his trip, he received wire transfers and other deposits from Mr. Marzook or from people associated with Mr. Marzook that totaled almost a million dollars.

Specifically, the record includes wire transfer reports showing that large amounts of money flowed from Ismail Elbarasse, a Hamas activist, to Mr. Salah: two reports show incoming transfers of $300,000 each, and another shows an incoming transfer of $135,000. *See* Plaintiffs' (Salah) Rule 56.1 Statement, Exhibit 13. According to the reports, the money was wired to an account controlled by Mr. Salah, account number 022034532. *Id.* Bank statements from that account, held jointly by Mr. Salah and his wife, in fact reflect a $300,000 deposit on December 29, 1992, a $135,000 deposit on January 20, 1993, and a $300,000 deposit on January 25, 1993. *Id.*

79

The record also includes an incoming wire transfer showing that Nasser Alkhatib transferred money to Mr. Salah in January 1993. Specifically, the record shows that Mr. Alkhatib transferred $50,000 to Mr. Salah on January 21, 1993. *See* Exhibit 28. Mr. Salah's bank statement confirms that his account did, in fact, receive a $50,000 credit on that date. *See* Exhibit 13. The bank records also show that Mr. Alkhatib wired money to Mr. Salah's wife, Azita Salah; on January 21, 1993, he transferred $30,000 to her, and, on January 22, 1993 he transferred $170,000 to her; according to the bank's transfer reports, both transfers were deposited into a joint account that Mrs. Salah shared with her husband, account number 239328806. *See* Exhibit 28. A summary of that account confirms that, on January 22, 1993, the account had two "credit memos," one for $30,000, and one for $170,000. *Id.* The Boims have alleged that Mr. Alkhatib is a Hamas activist who served as Mr. Marzook's personal secretary and made financial transactions on his behalf, before leaving the country in 1993; this is supported by information contained in the Watson Memorandum. *See* Watson Memorandum, p. 15[8] (in which Agent Watson reports that, "[d]uring an FBI interview . . . on March 15, 1994," Nasser Alkhatib advised that "he worked for Marzook and conducted various bank

---

[8]The Watson Memorandum is included as an attachment to the Declaration of FBI Agent Samuel A. Simon, Jr., Exhibit 12 to Plaintiffs' (Salah) Rule 56.1 Statement.

transactions for Marzook").

The bank records further corroborate Mr. Salah's statement as to how he allocated the money he brought with him when he traveled on Mr. Marzook's instructions.  For example, Mr. Salah's bank records show that, on September 3, 1992, while he was in Israel, Mr. Salah wrote ten $5,000 checks that were made out to cash and drawn on his LaSalle Talman account; the checks were cleared through the central branch of an Israeli bank in Tel Aviv five days later.  *See* Plaintiffs' (Salah) Rule 56.1 Statement, Exhibits 19-20.  Mr. Salah's bank records also show that, on January 28, 1993, shortly after Mr. Salah was arrested, the bank posted three $10,000 checks he had written, presumably shortly before that date.  *See* Exhibits 13, 20.

Additionally, in his August 21, 1995 statement, Mr. Salah claims that he helped to train two new Hamas recruits, Sharif Alwan and Rizzak Salah.  *See* Statement, p. 4.  This statement is corroborated by a bank record showing that, on September 29, 1992, Mr. Salah wrote a $3,000 check to Ghada Sherif for, according to the memo line on the check, "tickets syria."  *See* Plaintiffs' Rule (Salah) 56.1 Statement, Exhibit 21.

Even on seemingly inconsequential matters, the statement is corroborated in the record. For example, Mr. Salah's statement notes that, some time in late 1991 or early 1992, certain activities for Palestine, though expected to continue, did not

proceed because, among other reasons, "I was busy building my
house." *See* Translation of August 21, 1995 Statement, p. 5
(attached as Exhibit 15 to Plaintiffs' (Salah) Rule 56.1
Statement). The record shows that, in fact, Mr. Salah was
building a new house at the end of 1991. *See* Declaration of
Ahmad Zaki Hammad, ¶9 (in which Mr. Hammad states that he lent
Mr. Salah money to pay contractors who were building his new
house)(attached as Exhibit B to QLI's Supplemental Appendix in
Support of its Motion for Summary Judgment); Exhibit 41 to
Plaintiffs' (QLI) Rule 56.1 Statement (showing that Mr. Hammad
wrote the check in October 1991). *See also* Deposition of
Mohammed Salah, p. 6-7 (where Mr. Salah testifies that he has
lived in the home for eleven years, since "'92 almost").

In addition to Mr. Salah's statement, the record includes
the Watson Memorandum, which details Mr. Salah's role with Hamas
and his involvement with many men known by the governments of
both the United States and Israel to be Hamas terrorists. *See*
Watson Memorandum (Exhibit 12 to Plaintiffs' (Salah) Rule 56.1
Statement). With respect to the flow of money to Mr. Salah, the
Watson Memorandum states that, in 1992 and January 1993, Messrs.
Marzook and Elbarasse were providing funds to Mr. Salah, who was
arrested in Israel on January 25, 1993 for supporting Hamas
terrorist activities. *See* Watson Memorandum, p. 15.
Specifically, Agent Watson states that "[r]ecords verified that

Marzook deposited a total of $23,410.00 into Salah's U.S. bank
account during the time period of May 20, 1990 to November 29,
1992"; that "Elbarasse deposited a total of $740,000.00 in
Salah's account during the time period of August 8, 1992 to
January 25, 1993; and Nasser Alkhatib deposited a total of
$251,000.00 into Salah's account during the time period of August
21, 1992 to January 22, 1993." *Id.*, pp. 15-16.  With respect to
Mr. Salah's Israeli arrest, Agent Watson notes that, at the time
of his arrest, Mr. Salah had $97,000 in cash in his possession,
after having admitted to already disbursing approximately
$140,000 to individuals identified by the GOI [Government of
Israel] as members of Hamas.  *Id.*, p. 15.

It is important to note that, although Mr. Salah has
challenged the admissibility of some of the evidence against him,
he has not rebutted any of this evidence.  In fact, he has chosen
to remain silent in the face of the evidence demonstrating his
ties to Hamas and his efforts on behalf of Hamas' terrorist
activities, which brings the Court to the next point.

Added to the evidence detailed above is the fact that Mr.
Salah has invoked the rights afforded him by the Fifth Amendment
to the United States Constitution, both in response to deposition
questions and in response to many of the Boims' statements of
undisputed fact; his wife similarly invoked her Fifth Amendment
rights at her deposition.  By way of example, Mr. Salah declined

83

to answer the following questions based upon his rights as
protected by the Fifth Amendment: (1) "are you now or have you
ever been a member of Hamas," *see* Deposition of Mohammed Salah,
p. 78; (2) "[i]n fact it's true, sir, that you are now and have
been a member of Hamas," *id.*; (3) "[i]t's correct, sir, that you
played a role in the activities of Hamas," *id.*; (4) "[i]t's
correct, sir, isn't it, that Abu Marzook instructed you to travel
to Israel in January 1993 to see what could be done to reorganize
Hamas after the [1992] deportations; isn't that correct, sir,"
*id.*, p. 90; (5) "[a]nd it's correct, sir, that when you went to
Israel, the West Bank and Gaza in 1992 and 1993, you knew at the
time Hamas was involved in perpetrating violent acts in that part
of the world; isn't that correct, sir," *id.*, p. 95; (6) "[y]ou
learned, sir, that Hamas took credit for murdering David Boim;
isn't that correct, sir," *id.*, p. 98; (7) "[i]t's correct, sir,
that you, yourself, provided organizational and financial
assistance to persons you knew or suspected were members of
Hamas; isn't that correct, sir," *id.*, p. 100; and (8) "you are
the U.S. based military leader of Hamas; isn't that correct,
sir," *id.*, p. 172.  He also invoked his Fifth Amendment rights in
response to many of the Boims' Rule 56.1 statements of fact.
Specifically, Mr. Salah "relie[d] upon his privilege against
self-incrimination as to the contention that $735,000 was
transferred by someone identified as Ismail Elbarasse to LaSalle

Talman account number 02-203453-2 which was held in the name of
Muhammad Salah and Azita Salah," Mr. Salah's Response to
Plaintiffs' (Salah) Rule 56.1 Statement, ¶24; he "relie[d] upon
his privilege against self-incrimination as to the statement that
the funds were to be used by Salah to fund Hamas military
operations," id., ¶25; he relied upon his privilege against self-
incrimination as to the statements about the ten $5,000 checks he
wrote to cash from Israel in September 1992, see id., ¶42; he
relied upon his privilege against self-incrimination as to the
statements about his dealings with Rihbe Abdel Rahman, the
unlicensed Israeli money changer, see id., ¶59-61; he relied upon
his privilege against self-incrimination as to the statements
about the wire transfers coming into his account from Marzook and
Alkhatib, see id., ¶62; and he relied upon his privilege against
self-incrimination as to the statement that, at the time of his
arrest in Israel, he had $97,400 in his possession, see id., ¶64.

Although silence alone would not support the entry of
summary judgment, it does give rise to a negative inference that
Mr. Salah and his wife would have incriminated themselves, had
they answered the questions posed. See, e.g., In re High Fructose
Corn Syrup Antitrust Litigation, 295 F.3d 651, 663 (7th Cir.
2002); Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). And that
inference, when taken together with the evidence of Mr. Salah's
involvement with Hamas, is enough to establish liability on Mr.

Salah's part under 18 U.S.C. §2333.  Based on the evidence in the record, including the negative inference that is permissibly drawn from Mr. Salah's decision to invoke his Fifth Amendment rights, a reasonable jury could reach but one conclusion: Mr. Salah knew about Hamas' illegal activities, he wanted those activities to succeed, and he engaged in numerous acts to help ensure that they did.

Mr. Salah makes a couple of arguments relating to the conspiracy allegations in the Boims' complaint, which bear consideration.  First, Mr. Salah argues that the Boims' claim must fail because they cannot establish that he was, in any way, connected to Hamas after January 1993, when he was arrested in Israel; indeed, he argues, he was in an Israeli prison when David Boim was killed.  But this is of no moment.  The Seventh Circuit did not say that, to impose liability under §2333, the Boims have to link Mr. Salah or any of the other defendants specifically to the attack that killed David Boim; rather, the court held that, to impose liability for aiding and abetting - that is, providing material support to - a terrorist organization, the Boims need only show that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping.  *Boim*, 291 F.3d at 1028.  The evidence shows that all three are true with respect to Mr. Salah, and no reasonable jury could find otherwise.  Moreover, under

86