principles of civil conspiracy law, which is subsumed in §2333,
Mr. Salah would be liable for acts committed in furtherance of
the conspiracy to fund Hamas, even if those acts were committed
after he ceased being an active participant. *See United States
v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989)("the law will not let
you wash your hands of a dangerous scheme that you have set in
motion and that can continue to operate and cause great harm
without your continued participation"; "for withdrawal to limit a
conspirator's liability 'mere cessation of activity is not enough
...; there must also be affirmative action, either the making of
a clean breast to the authorities, or communication of the
abandonment in a manner calculated to reach co-conspirators. And
the burden of withdrawal lies on the defendant.'") (quoting
*United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964)).  Had
Mr. Salah disavowed his involvement with Hamas, or somehow
repudiated his involvement with Hamas' military operations, he
might be able to escape liability for acts committed in
furtherance of Hamas' agenda after that repudiation.  But the
record contains no evidence that Mr. Salah ever did so.

Second, and relatedly, Mr. Salah argues that the Boims'
claim against him must fail because the record contains no
evidence linking him to the men who shot David Boim.  And, to
support that proposition, Mr. Salah cites *Ungar v. The Islamic
Republic of Iran*, 211 F. Supp. 2d 91 (D. D.C. 2002), which, as

Mr. Salah admits, did not involve §2333. For purposes of this case, the Court is bound by the Seventh Circuit's decision, which holds that liability under §2333 extends broadly to encompass traditional tort and criminal liability concepts. *See Boim*, 291 F.3d at 1020. Thus, even if the Boims could not establish that Mr. Salah provided material support to Hamas – a hypothetical, given the conclusion above that they could, and did – the Boims could still impose liability on Mr. Salah if they could show that David's death was a reasonably foreseeable consequence of the conspiracy that was Hamas, *see Pinkerton*, 328 U.S. at 643, which would seem almost a given on the record before the Court.

4.   <u>Motions Filed By and Against Quranic Literacy Institute</u>

The Boims have alleged that the Quranic Literacy Institute, an Illinois not-for-profit corporation that translates and publishes sacred Islamic texts, is really engaged in the business of raising and laundering money for Hamas. *See* First Amended Complaint, ¶5. Tangentially, the Boims allege that QLI provided an aura of legitimacy to Mr. Salah by purporting to employ him as a computer analyst, effectively permitting him to continue to act on behalf of Hamas without raising suspicion; the Boims allege that QLI helped to conceal Mr. Salah's role as Hamas' military commander and served as the vehicle through which he channeled hundreds of thousands of dollars to Hamas operatives. *See* First Amended Complaint, ¶¶5, 44.

As with the other defendants, to prevail on their claim against QLI, the Boims would have to show that QLI provided material support to Hamas, or that it attempted or conspired to provide material support to Hamas. 18 U.S.C. §2333. QLI has moved for summary judgment, arguing that the Boims cannot possibly prevail because (1) no money attributable to QLI ever went to Hamas; (2) QLI employed Mr. Salah legitimately, though on a volunteer basis; and (3) QLI had no knowledge that Mr. Salah may have been engaged in unlawful activities elsewhere. The Boims did not file a summary judgment motion with respect to QLI; in fact, they argue that summary judgment is inappropriate because genuine issues of fact exist as to whether QLI helped to conceal Mr. Salah's illegal activities, whether QLI gave cash to Mr. Salah to distribute to Hamas agents, and whether QLI raised and laundered money for Hamas through a real estate transaction involving property in Woodridge, Illinois.

Before turning to the merits of QLI's motion for summary judgment, the Court must consider the parties' motions to strike certain exhibits submitted with the parties' motion papers. In support of its motion for summary judgment, QLI submitted declarations from its three founders, Amer Haleem, who serves as QLI's Secretary, Ahmad Zaki Hammad, who serves as QLI's President, and Ibrahim Abusharif, who served as QLI's Treasurer from 1990 to 1998. The Boims have asked the Court to strike

89

these declarations because, in the Boims' view, they are not based on personal knowledge. The Boims also ask the Court to strike Mr. Hammad's declaration because they never had a chance to depose him. On this latter argument, the Court will deny the motion; the Boims never issued a notice for Mr. Hammad's deposition, and, at least based on the documentary evidence submitted, defendants' counsel never told the Boims that Mr. Hammad would not be produced for deposition (rather, counsel reported only that Mr. Hammad was out of the country and had been for quite some time, which was apparently true).

Turning to the question of personal knowledge, as the Boims correctly point out, affidavits submitted in support of summary judgment must be made based on personal knowledge. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003); Fed. R. Civ. P. 56(e); Fed. R. Evid. 602. Although "personal knowledge" may include reasonable inferences, those inferences must be "substantiated by specific facts," and they must be "grounded in observation or other first-hand personal experience." *Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir. 1998)(citing *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988)); *Payne*, 337 F.3d at 772 (citing *Visser v. Packer Engineering Associates*, 924 F.2d 655, 659 (7th Cir. 1991)(*en banc*)). The Court finds that the declarations of Mr. Haleem, Mr. Abusharif and Mr. Hammad generally pass muster under these standards,

90

despite the fact that they do not explicitly state that the representations made therein are based upon personal knowledge.

For example, although the Boims argue that paragraphs 2, 3, 5, and 7 of Mr. Haleem's declaration are not based on personal knowledge, the statements made therein do appear to be based on Mr. Haleem's first-hand knowledge; according to his declaration, Mr. Haleem was one of the founders of QLI and the Quran Project, and he served and serves as QLI's Secretary; as such, he would seem to have been in a position to know why the founders formed the organization (¶¶2-3, 5) and what the focus of the project was (¶7).  The same would be true with respect to Mr. Abusharif: as the Treasurer of QLI, and as an active volunteer with both QLI and the Quran Project, Mr. Abusharif would seem to have first-hand knowledge of why QLI and the Quran Project were started, and what went on at the business.  Similarly, the Court may infer that Mr. Haleem, as a founding member of QLI, as the Secretary of QLI, and as one of the three people who were most active in QLI and the Quran Project, would have had personal knowledge about what he and the other volunteers were doing for QLI, as well as about how QLI's activities were financed; the same is true of Mr. Abusharif.  Mr. Haleem would also appear to have personal knowledge of Mr. Salah's employment status with QLI and the employment verification letter, as well as about the transactions and investments QLI decided to pursue.  Indeed, Mr. Haleem states

in his declaration that he was directly involved in both the employment verification letter and the Woodridge transaction. And it is certainly no great leap to infer that Mr. Abusharif, who served as Treasurer of QLI, has first-hand knowledge of how and why QLI was funded.

There is, however, nothing in any of the declarations that would allow the Court to infer that any of these men would have had personal knowledge about what Mr. Salah did when he was not doing work for QLI or the Quran Project. Accordingly, from Mr. Haleem's declaration, the Court will strike paragraph 21 and those portions of paragraph 22 dealing with activities other than those done for QLI and the Quran Project; from Mr. Abusharif's declaration, the Court will strike paragraphs 18, 22, 23, 24, and those portions of paragraph 19 dealing with Mr. Salah's non-QLI activities; and, from Mr. Hammad's declaration, the Court will strike paragraph 10 and the first sentence of paragraph 9.

The Boims also ask the Court to strike portions of the three declarations based on relevance. Even if the Court were to agree that the statements about the formation and background of QLI are irrelevant to the question of liability, the Court will not strike them on this basis; just as the statements in the Boims' submissions about Hamas' history give context to the allegations in the Boims' claims, the statements about QLI's history give context to QLI's defenses to those claims.

92

Next, the Court turns to QLI's motion to strike, which covers certain paragraphs in FBI Agent Robert Wright's affidavit, as well as the statement made by Mohammed Salah while he was in Israeli custody; QLI also asks the Court to disregard, for purposes of its motion, the fact that Mohammed Salah and his wife invoked their Fifth Amendment rights in response to questions asked of them at their depositions. The Court has addressed Mr. Salah's statement, as well as the consequences of his decision to invoke the Fifth Amendment, in the context of the motions for summary judgment filed by and against Mr. Salah. Neither of these pieces of evidence is direct evidence of QLI's liability, though of course Mr. Salah's involvement with Hamas is a necessary predicate to holding QLI liable for trying to cover up those activities. But instructions about how the evidence against Mr. Salah should weigh against QLI can be addressed at the final pre-trial conference and at trial, as can instructions about adverse inferences to be drawn from Mr. Salah's and Mrs. Salah's invocation of the Fifth Amendment. For purpose of resolving QLI's motion for summary judgment, the Court has not relied upon Mr. Salah's statement or his and his wife's decision to refuse to answer deposition questions.

As for the June 8, 1998 affidavit of FBI Agent Wright, QLI seeks to strike paragraphs 8, 22, 24, 27, 31 and 50, and the Boims have indicated that they do not oppose the motion with

respect to paragraphs 8, 24, 27 and 31, leaving only paragraphs

22 and 50 in dispute.   Paragraph 22 of Agent Wright's affidavit

states:

> bank records show that on each of October 29, 30 and
> 31, 1991, Salah received a $6,000 check, ($18,000 in
> total), executed by Ahmad Zaki Hameed, the President of
> QLI.   The checks were not drawn on QLI bank accounts,
> but rather from Zaki's personal bank account.

Wright Affidavit, ¶22 (attached as Exhibit 26 to Plaintiff's

(QLI) Rule 56.1 Statement).   Paragraph 50 states:

> Salah has related to Israeli authorities that he
> arrived in Jerusalem on January 14, 1993 for the
> purpose of meeting other Hamas operatives to
> coordinate, among other things, a terrorist attack
> against Israeli [sic].   Salah further related that on
> January 19, 1993, subsequent to his initial round of
> meetings with various Hamas operatives, some of whom
> Salah met with pursuant to Abu Marzook's instructions,
> he placed an international call from Israel to his wife
> Azita in Chicago and instructed her to wire $200,000.00
> from their joint LaSalle Bank account to First Chicago
> Bank of Ravenswood account number 678006002654-4 held
> in the name of Rihbe Abdel Rahman.   According to Salah,
> Rahman was an unlicensed money changer.   Bank records
> reviewed by the FBI indicate that Azita Salah carried
> out her husband's instructions on the same day.
> According to Salah the $200,000.00 was then transferred
> from Abdel Rahman account to the Middle East.

*Id.,* ¶50.   QLI argues that these statements should be stricken

because they refer to bank documents that were not attached and

therefore violate both the best evidence and the hearsay rules.

In response, the Boims argue that the testimony about the

$200,000 transfer and about the October 29 $6,000 check is proper

because the bank documents evidencing those transactions are, in

fact, a part of the record; they further argue that the testimony

94

about the remaining two $6,000 checks is appropriate because
records documenting those transactions have all been lost or
destroyed or are otherwise unavailable. For purposes of this
motion, the Court need not decide whether Agent Wright's
testimony is proper; as the Court will explain, even without this
evidence, the Boims have offered enough evidence to get to a
jury.

The Court turns now to the merits of QLI's summary judgment
motion. As indicated above, the record contains declarations
from QLI's founders, Amer Haleem, who serves as QLI's Secretary,
Ahmad Zaki Hammad, who serves as QLI's President, and Ibrahim
Abusharif, who served as QLI's Treasurer from 1990 to 1998.
According to Mr. Haleem and Mr. Abusharif, QLI was formed out of
a desire "to provide their fellow English-speaking Muslims with a
better and deeper understanding of their faith" and "to give
Americans, in general, and readers of English worldwide a first
hand knowledge of Islam from its principal sources." Declaration
of Amer Haleem, ¶2 (attached as Exhibit 2 to QLI's Rule 56.1
Statement); Declaration of Ibrahim Abusharif, ¶2 (attached as
Exhibit 4 to QLI's Rule 56.1 Statement). Mr. Haleem and Mr.
Abusharif have represented that QLI's major undertaking and
central purpose is "the Quran Project," "an entirely new
translation of the Quran, based on a careful and scholarly review
and analysis of every single word of the more than 6200 verses in

95

that book and the spiritual, legal, and historical contexts of their revelation, followed by a painstaking process of communicating this analysis in proper and befitting English that is both relevant to the modern reader and literary in merit, idiom, and impact." Abusharif Declaration, ¶6.  *See also* Haleem Declaration, ¶7; QLI's Rule 56.1 Statement, ¶10.  The Boims allege that, regardless of the truth of these statements, QLI also knowingly provided, conspired to provide and aided and abetted others in providing material support to Hamas.  *See* Plaintiffs' Response to QLI's Rule 56.1 Statement, ¶10.

The Boims have alleged that QLI gave Mr. Salah a job and a monthly stipend, both of which allowed him to pursue his Hamas activities without arousing suspicion.  QLI has attempted to show that this is fantasy; according to QLI, the reality was that QLI sought and received help from Mohammed Salah, on a volunteer basis, with respect to various administrative and computer-related tasks.  To compensate Mr. Salah for that help, and to allow him to pursue this noble work, as well as the considerable volunteer work he was doing in the local Muslim community, QLI helped to arrange monthly stipend payments from a benefactor. Although QLI has attempted to provide an innocuous explanation for each of the Boims' allegations, the record evidence is such that a jury should be permitted to decide whether those explanations are true.

The record shows that Mr. Salah, in fact, worked for QLI beginning in the late 1980s or early 1990s, and continuing through 1993.  *See* QLI's Rule 56.1 Statement, ¶¶19, 28; Hammad Declaration, ¶8; Muhammad Salah's Answers to Plaintiffs' First Set of Interrogatories, No. 2 (attached as Exhibit 22 to Plaintiffs' (QLI) Rule 56.1 Statement).  QLI contends, however, that Mr. Salah worked for QLI on a volunteer basis, not as an employee.  *See* QLI's Rule 56.1 Statement, ¶29, Haleem Declaration, ¶23; Hammad Declaration, ¶8, Abusharif Declaration, ¶20.  Nevertheless, QLI admits that its President, Mr. Hammad, arranged for Mr. Salah (as well as Mr. Haleem and Mr. Abusharif) to receive a monthly payment of $3,000 from Yassin Kadi, who QLI characterizes as a "Saudi Arabian philanthropist."[9]  Brief in Support of Summary Judgment, p. 9.  *See also* Haleem Declaration, ¶¶16, 20, 23; Abusharif Declaration, ¶¶15, 17.  In their declarations, Mr. Haleem and Mr. Abusharif both state that Mr. Hammad, who knew Yassin Kadi when he was at a Chicago architecture firm in the 1970s, asked Mr. Kadi to support Mr. Haleem, Mr. Abusharif and Mohammed Salah, the three individuals who were most active in volunteering their time and skills to the Quran Project and QLI.  Haleem Declaration, ¶¶14, 16; Abusharif Declaration, ¶¶12, 15, 17.  They further state that, with respect

---

[9]At least since October 12, 2001, the United States government has characterized Mr. Kadi quite differently: as of that date, he is a "Specially Designated Terrorist."

to Mr. Salah, the money was meant to compensate him, not only for his work with QLI and the Quran Project, but also for all of his work in the local Muslim community.[10]   Haleem Declaration, ¶23; Abusharif Declaration, ¶20.   According to Mr. Hammad – whose testimony about the whole Kadi arrangement is surprisingly sparse, given that Mr. Haleem and Mr. Abusharif say that he was the driving force behind the arrangement and the point person for Mr. Kadi – Mr. Kadi "provided support for Amer Haleem, Abraham Abusharif, and Muhammad Salah to enable them to pursue their good works in the Muslim community in the Chicago area, including, but not limited to, their otherwise uncompensated activities with the Quran Project and then with the Quranic Literacy Institute." Hammad Declaration, ¶6.   Interestingly, Mr. Hammad admits nothing about his role in setting up the "benefactor" arrangement.   And no one explains why Mr. Hammad received no money, despite everyone's apparent agreement that Mr. Hammad was the head of the project, the head of QLI and the person doing the bulk of the labor with respect to the translation and scholarly research. *See* Haleem Declaration, ¶19; Abusharif Declaration, ¶16.   By the declarants' own admissions, Mr. Haleem and Mr. Abusharif served

_____

[10]According to QLI, Mr. Salah was very active in the small, but growing Muslim community located in and around Bridgeview, Illinois; he donated his time, as well as his business and computer expertise and his expertise with all things Muslim, to serve the local community and to help it to grow and prosper.   To the extent the statements about Mr. Salah's activities are not based upon personal knowledge, they will not be considered.

98

as assistants to Mr. Hammad, and Mr. Salah served what was essentially an office manager role, yet each received $3,000 per month, while Mr. Hammad received nothing.

Adding to the troubling nature of the financial arrangements between Mr. Kadi and QLI, QLI seems to be deliberately vague about how Mr. Kadi's payments were made. Mr. Haleem and Mr. Abusharif both state that the funds never entered an account of QLI. *See* Haleem Declaration, ¶20; Abusharif Declaration, ¶17. But none of the declarants seems to want to specify where the money went. Mr. Haleem states that the money "was transmitted from an account controlled by Mr. Kadi in Europe to an account of one of the three recipients." Haleem Declaration, ¶20. In fact, according to Mr. Abusharif's deposition testimony, the money from Mr. Kadi was deposited into an account controlled by Mr. Salah – who was, by all accounts, less involved than Messrs. Haleem and Abusharif in QLI and who had, by all accounts, the lowest level of responsibility among the men involved in QLI. *See* Deposition of Abraham Abusharif, pp. 43-44 (attached as Exhibit 39 to Plaintiffs' (QLI) Rule 56.1 Statement). According to Mr. Abusharif, Mr. Salah then distributed the money to himself, Mr. Abusharif and Mr. Haleem. *Id.* This would seem to be particularly odd, given that Mr. Abusharif, not Mr. Salah, was the Treasurer of QLI.

Perhaps most damaging to QLI, the record contains evidence

99

demonstrating that, not only has Mr. Salah been designated as an SDGT, but Mr. Kadi, QLI's admitted "benefactor" was, effective October 12, 2001, officially named by the United States government as an SDGT.  *See* Department of the Treasury, Office of Foreign Assets Control, Additional Designations of Terrorism-Related Blocked Persons, 66 Fed. Reg. 54404 (Oct. 26, 2001)(amending OFAC's list of individuals and organizations designated as SDGTs to include, among others, "Shaykh Yassin Abdullah Kadi").  QLI admits that Mr. Kadi was, in fact, designated as an SDGT, but they contend that that fact is largely irrelevant, given that the SDGT designation had not been made when Mr. Kadi provided support to QLI's principals, indeed, did not take place for another decade after Mr. Kadi provided that support.  This is true.  But even if Mr. Kadi had not been officially designated an SDGT at the time, a jury could reasonably find that the activities that ultimately led to that designation were, in fact, going on in 1991 and 1992 – indeed, that is the very basis for the Boims' allegations about the way in which QLI's "volunteers" were paid.  It may very well be that QLI's principals simply have very bad luck in that the people they find to support (financially or otherwise) their endeavors just happen to turn up on the government's list of people who support (financially or otherwise) terrorist organizations.  But, then again, it may be that QLI hooked up with Mr. Kadi and Mr.

Salah by design, because of a common desire to further terrorist
activities, as the Boims allege.  It is not for the Court to
weigh the evidence or to decide whose side the evidence favors;
that task belongs to the jury.  *See Anderson*, 477 U.S. at 249
("at the summary judgment stage the judge's function is not
himself to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial").

Adding to the intrigue is a letter dated September 4, 1991
and written by Amer Haleem on letterhead bearing the Quran
Project name; the letter states that "Mohammad Salah has been
employed with THE QURAN PROJECT since January 1, 1991 as a
Computer Analyst at a salary of $36,000 per year."  *See* Exhibit
37 to Plaintiffs' (QLI) Rule 56.1 Statement.  QLI and Mr. Haleem
have explained that this letter was written when QLI was
considering making Mr. Salah an employee and considering making
that decision retroactive to allow QLI to pay Mr. Salah's social
security taxes.  *See* Haleem Declaration, ¶24.  To prove his
point, Mr. Haleem states that Mr. Salah requested the letter to
support his application for an apartment in Justice, Illinois,
that Mr. Salah in fact rented that apartment, and that he (Mr.
Haleem) actually visited Mr. Salah at that apartment.  *Id.*, ¶¶24-
25.  Mr. Haleem's explanation about the letter may, in fact, be
true.  But the letter could just as easily be viewed by a

101

reasonable jury as evidence that QLI was attempting to help Mr. Salah appear to be legitimate by making it appear that he was a regular employee, earning a regular salary, when, in fact, the set-up was altogether different.  Indeed, the $36,000 figure suggests that, their assertions about the purpose of Mr. Kadi's support notwithstanding, the monthly payments were for Mr. Salah's QLI activities and not for anything else he did in the Muslim community.  And the fact that Mr. Salah actually rented the apartment in Justice could be viewed, by a reasonable jury, not as evidence that the letter served an innocuous purpose, but as evidence that QLI's efforts to make Mr. Salah appear legitimate worked.

In addition to the evidence about QLI's alleged attempt to provide cover for Mr. Salah, the Boims have offered evidence from which a reasonable jury could find that QLI laundered money for Mr. Salah, and possibly for Hamas.  For example, QLI admits that it asked Mr. Kadi for money to invest in a real estate transaction, and that, pursuant to that request, Mr. Kadi gave QLI $820,000.  *See* Haleem Declaration, ¶¶27-28; Hammad Declaration, ¶7; Abusharif Declaration, ¶¶25-26.  According to QLI, this amount was not a grant or a gift, but an interest-free loan.  *See* Haleem Declaration, ¶27; Hammad Declaration, ¶7; Abusharif Declaration, ¶25.

According to QLI, on July 22, 1991, Dr. Tamar Al-Rifai, a

medical doctor with experience as a real estate developer,
purchased a piece of property in Woodridge, Illinois with Mr.
Kadi's $820,000, and the land was immediately transferred into a
land trust for the benefit of QLI.  *See* Haleem Declaration, ¶¶29-
32; Abusharif Declaration, ¶¶26-28; Deposition of Tamer Al-Rifai,
pp. 30, 32-33, 39-40 (attached as Exhibit 20 to QLI's Rule 56.1
Statement).  The record shows that, in June 1994, the Woodridge
property was sold for $970,000, and the money was deposited into
QLI's account.  *See* Haleem Declaration, ¶¶36-37; Abusharif
Declaration, ¶¶31-32.  Closing documents from the sale of the
Woodridge property show that QLI received a check in the amount
of $988,500 on June 30, 1994.  *See* Exhibit 52 to Plaintiffs'
(QLI) Rule 56.1 Statement.  There is no evidence in the record to
suggest that QLI ever repaid Mr. Kadi's "loan"; in fact, Mr.
Haleem testified that it did not.  *See* Deposition of Amer Haleem,
pp. 121-22(attached as Exhibit 38 to Plaintiffs' (QLI) Rule 56.1
Statement).

   Additionally, the record shows that, under the original
terms of the Woodridge deal, Mr. Al-Rifai was required to make
two rental payments to QLI; one in the amount of $150,000 on July
22, 1991 and one in the amount of $14,000 three months later.
*See* Lease & Sale Agreement dated July 22, 1991 and executed by
Mr. Hammad on behalf of QLI and Mr. Al-Rifai on behalf of Golden
Marble Inc. (attached as Exhibit 46 to Plaintiffs' (QLI) Rule

56.1 Statement); Al-Rifai Deposition, pp. 54-55; Affidavit of FBI
Agent Robert Wright, ¶29.   A subsequent Lease and Sale Agreement,
executed after Mr. Al-Rifai's first round of checks bounced,
provided for the rental payments to be made on January 15, 1992
and January 30, 1992; the amounts remained the same.   *See* Lease
and Sale Agreement dated January 23, 1992 and executed by Mr.
Hammad on behalf of QLI and Mr. Al-Rifai on behalf of Golden
Marble Inc. (attached as Exhibit 18 to QLI's Rule 56.1
Statement).   Ultimately, on September 11, 1991, Mr. Al-Rifai and
Golden Marble paid QLI $22,000; on September 12, 1991, they paid
QLI $88,000.   *See* Exhibit 48 to Plaintiffs' (QLI) Rule 56.1
Statement; QLI's Response to Plaintiffs' Rule 56.1 Statement,
¶¶137-138.   QLI did not cash these checks until March 11, 1992.
*See* QLI's Response to Plaintiffs' Rule 56.1 Statement, ¶140.   QLI
claims that the checks were deposited into a QLI account, and it
cites the deposition testimony of Mr. Abusharif to support that
claim.   But, in fact, Mr. Abusharif, who testified that he
deposited the checks immediately, appears to have been referring
to the first set of checks from Mr. Al-Rifai, the set that
bounced, when he said he deposited them into the QLI account; in
fact he admitted that his testimony was based on general practice
and some vague memory, rather than a specific recollection that
he deposited the checks into QLI's account.   *See* Abusharif
Deposition, pp. 104-05.   The record does, however, contain copies

104

of the checks, which appear to show an endorsement from the North
American Muslim Trust, a "co-op fund" held for the Quran Project,
as well as a bank statement from that fund showing a $110,000
deposit made on March 11, 1992. *See* Exhibit 2 to QLI's Response
to Plaintiffs' Rule 56.1 Statement. But, in any event, the
record shows that, within five days of Mr. Hammad endorsing the
second round of Al-Rifai checks (which totaled $110,000),
Mohammad Salah received the first of three wire transfers,
totaling $107,000, from a Swiss bank. *See* QLI's Response to
Plaintiffs' Rule 56.1 Statement, ¶¶143-144. It is possible that
a jury may conclude that the closeness - in both amount and time
- between the two groups of checks is pure coincidence. But it
is also possible, in light of the other evidence in the record,
that a jury might reasonably conclude that the transfers were
connected, evidencing an intent on QLI's part to funnel money to
Mr. Salah, and to do so secretly.

And there is more. According to QLI, it pushed Mr. Al-Rifai
to sell the property in 1994 because Mr. Al-Rifai had missed
rental payments due on the agreement, and because QLI had lost
confidence in Mr. Al-Rifai's ability to make future payments.
*See* Haleem Declaration, ¶¶34-36; Abusharif Declaration, ¶¶29-31.
And, given that Mr. Al-Rifai's first checks bounced, that would
seem to be a reasonable reaction on QLI's part. But the Boims
have offered evidence that QLI pressured Mr. Al-Rifai to sell

when it did because it wanted to provide support, through Mr.
Salah, to the Hamas activists and operatives who had been
deported by the Israeli government to Lebanon.  First, the record
shows that QLI started to pressure Mr. Al-Rifai to sell the
property in December 1992, which was right after the government
of Israel deported 400 people suspected of being members of
Hamas.  *See*, e.g., Affidavit of Robert Wright, ¶39 (noting that
on December 17, 1992, the GOI deported approximately 400
suspected Hamas members).  Additionally, Mr. Al-Rifai told FBI
Agent Wright, in 1998, that, when Mr. Hammad started pressuring
him to liquidate the Woodridge investment, he told him that the
money was needed immediately for "a mission above all else."  *See*
Wright Affidavit, ¶44; *see also* Al-Rifai Deposition, pp. 59, 65-
67 (in which Mr. Al-Rifai testified that the people with whom he
was dealing at QLI began to pressure him to sell the property in
December 1992, and that, in pressuring him to sell, Mr. Hammad
told him that what he was working on was "above all else.").  It
is possible, as QLI suggests, that Mr. Hammad simply meant that
his work of translating the Quran was all important.  But it is
also possible, given the timing, that a jury could reasonably
find that Mr. Hammad wanted to sell the property to liquidate
money for the purpose of providing support to Hamas' deported
members and their families.

Based on the record before it, the Court finds that the

Boims have offered enough evidence to get to a jury on their claim that QLI provided cover for Mohammed Salah's involvement with Hamas and that QLI helped to funnel money to Hamas. Accordingly, QLI's motion for summary judgment is denied.

C.    Conclusion

For the reasons explained above, the Court grants the Boims' motion for partial summary judgment against HLF [#297], grants the Boims' motion for partial summary judgment against IAP and AMS [#304], and grants the Boims motion for partial summary judgment against Mr. Salah [#263]. The Court denies the motions for summary judgment filed by HLF [#308], Mr. Salah [#293], QLI [#271], and IAP and AMS [#266]. Further, the motions to strike filed by Mr. Salah [#295], QLI [#330], and the Boims [#305] are granted in part and denied in part, as explained in this Opinion.

The case will proceed to trial on the matters remaining at issue on December 1, 2004 in Courtroom 1903. The trial will involve both liability and damages as to defendant QLI, and damages alone as to defendants HLF, IAP and AMS, and Mr. Salah.

Dated: November 10, 2004


                    ENTER:

                    _Arlander Keys_____
                    ARLANDER KEYS
                    United States Magistrate Judge

                    107