UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THE PRESBYTERIAN CHURCH OF SUDAN, REV.  :
MATTHEW MATHIAN DEANG, REV. JAMES KOUNG :
NINREW, NUER COMMUNITY DEVELOPMENT      :
SERVICES IN U.S.A., FATUMA NYAWANG      :     01 Civ. 9882 (DLC)
GARBANG, NYOT TOT RIETH, individually   :
and on behalf on the Estate of her      :     OPINION AND ORDER
husband JOSEPH THIET MAKUAC, STEPHEN    :
HOTH, STEPHEN KUINA, CHIEF TUNGUAR      :
KUEIGWONG RAT, LUKA AYUOL YOL, THOMAS   :
MALUAL KAP, PUOK BOL MUT, CHIEF PATAI   :
TUT, CHIEF PETER RING PATAI, CHIEF      :
GATLUAK CHIEK JANG, YIEN NYINAR RIEK,   :
and MORIS BOL MAJOK, and on behalf of   :
all others similarly situated,          :
                                        :
                    Plaintiffs,         :
                                        :
          -v-                           :
                                        :
TALISMAN ENERGY, INC., and REPUBLIC OF  :
THE SUDAN,                              :
                                        :
                    Defendants.         :
----------------------------------------X

Appearances:

For the Plaintiffs:

Carey R. D'Avino
Stephen A. Whinston
Keino R. Robinson
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania  19103

Lawrence Kill
John M. O'Connor
Linda Gerstel
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York  10020

Steven E. Fineman
Rachel Geman
Daniel E. Seltz
Lieff, Cabraser, Heimann &
Bernstein, LLP
780 Third Avenue, 48th Floor
New York, New York  10017

Elizabeth J. Cabraser
Richard M. Heimann
Bill Lann Lee
Lieff, Cabraser, Heimann &
Bernstein, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111

For Defendant Talisman Energy, Inc.:

Joseph P. Cyr
Marc J. Gottridge
Scott W. Reynolds
Lovells
900 Third Avenue
New York, New York  10022


DENISE COTE, District Judge:

     The plaintiffs are current and former residents of southern Sudan who allege that they were victims of genocide, crimes against humanity, and other violations of international law perpetrated by the Canadian energy company Talisman Energy, Inc. ("Talisman") and the Government of Sudan ("Sudan").  Talisman has moved for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P., contending that under standards set forth in new Second Circuit and Supreme Court decisions, there is insufficient evidence that customary international law provides either for corporate liability for serious human rights abuses, or for secondary liability theories of aiding and abetting or conspiracy to commit serious human right abuses.  For the following reasons, the motion is denied.

**BACKGROUND**

More detailed recitations of the allegations and history of this litigation under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, appear in prior Opinions, familiarity with which is assumed.[1]  Talisman has previously filed two motions to dismiss, both of which were denied.  See Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2004 WL 1920978, at *2 (S.D.N.Y. Aug. 27, 2004); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 354 (S.D.N.Y. 2003) ("2003 Opinion").

The 2003 Opinion

In the 2003 Opinion, the Honorable Allen G. Schwartz held, among other things, that corporations may be held liable under international law for violations of jus cogens norms,[2]

---

[1]  For additional background, see Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2005 WL 1060353 (S.D.N.Y. May 6, 2005) (resolving issues surrounding certain plaintiffs' standing to sue); Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 458-65 (S.D.N.Y. 2005) (comprehensive discussion of facts in context of motion for class certification); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2004 WL 1920978 (S.D.N.Y. Aug. 27, 2004) (denying Talisman's second motion to dismiss); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289 (S.D.N.Y. 2003) (denying Talisman's first motion to dismiss); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (AGS), 2003 WL 1342532 (S.D.N.Y. Mar. 18, 2003) (addressing Sudan's failure to appear).

[2]  As the 2003 Opinion explained, jus cogens norms are peremptory norms, and their violation constitutes an offense of "universal concern." Presbyterian Church, 244 F. Supp. 2d at 306.  Jus cogens norms include the prohibition on genocide, torture, slavery, crimes against humanity, and extrajudicial killing.

3

Presbyterian Church, 244 F. Supp. 2d at 319, and that
international law recognizes theories of liability such as
conspiracy and aiding and abetting (collectively, "secondary
liability"), id. at 321-22.  In so holding, the 2003 Opinion
noted that the Second Circuit had frequently confronted ATS cases
involving corporate defendants and had never found itself to lack
jurisdiction because corporations could not be liable under
international law.[3]  Id. at 308-13.  That Opinion also noted that
other circuits, as well as numerous district courts, had
confronted ATS cases involving corporate defendants, and that no
federal court decision could be found holding that corporations
could not be liable under international law.[4]  Id. at 313-15.

_____

[3]  Specifically, the 2003 Opinion referenced Jota v. Texaco,
Inc., 157 F.3d 153 (2d Cir. 1998); Wiwa v. Royal Dutch Petroleum
Co., 226 F.3d 88 (2d Cir. 2000); Bigio v. Coca-Cola Co., 239 F.3d
440 (2d Cir. 2000); and Aguinda v. Texaco, Inc., 303 F.3d 470 (2d
Cir. 2002).

[4]  On this point, the 2003 Opinion referenced the following
circuit court decisions: Doe I v. Unocal Corp., 395 F.3d 932 (9th
Cir. 2002), reh'g en banc granted by 395 F.3d 978 (9th Cir.
2003); Beanal v. Freeport McMoran, Inc., 197 F.3d 161 (5th Cir.
1999); and Carmichael v. United Techs. Corp., 835 F.2d 109 (5th
Cir. 1988).  The Opinion also referenced Deutsch v. Turner Corp.,
317 F.3d 1005 (9th Cir. 2003), a decision that was later amended
at 324 F.3d 692 in ways that do not affect the analysis.
The 2003 Opinion also discussed the following district court
decisions: Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118 (WHP),
2002 WL 31082956 (S.D.N.Y. Sept. 17, 2002); Wiwa v. Royal Dutch
Petroleum Co., No. 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y.
Feb. 28, 2002); Bodner v. Banque Paribas, 114 F. Supp. 2d 117
(E.D.N.Y. 2000); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424
(D.N.J. 1999); and Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078
(S.D. Fla. 1997).  It should be noted that Abdullahi was later
vacated and remanded by the Second Circuit in an unpublished
opinion.  See Abdullahi v. Pfizer, Inc., Nos. 02-9223 (L), 02-
9303 (XAP), 2003 WL 22317923, at *4 (2d Cir. Oct. 8, 2003).  In
Abdullahi, the district court had held that it had jurisdiction,
but dismissed for forum non conveniens reasons.  Abdullahi, 2002

The 2003 Opinion further cited international law supporting corporate liability, including International Military Tribunal decisions from Nuremberg, id. at 315-16, international treaties, id. at 316-17, resolutions of international organizations such as the United Nations Security Council, id. at 318, and decisions of the European Court of Justice, id.

Regarding international law's recognition of theories of liability such as conspiracy and aiding and abetting, the 2003 Opinion cited International Military Tribunal decisions from Nuremberg, id. at 322, international criminal statutes,[5] id. at 322-23, international treaties,[6] id. at 323, and decisions of the

---

WL 31082956, at *6, *12.  The Second Circuit vacated and remanded the forum non conveniens dismissal, directing the district court to consider the ramifications of a Nigerian court's dismissal of a parallel action.  Abdullahi, 2003 WL 22317923, at *3.

    [5]  These statutes include: Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991, S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., art. 7(1), U.N. Doc. S/RES/827 (1993) ("ICTY Statute"); Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, Between 1 January 1994 and 31 December 1994, S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg., art. 6(1), U.N. Doc. S/RES/955 (1994) ("ICTR Statute"); Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, art. 25(3), U.N. Doc. A/CONF.183/9 (1998) ("Rome Statute").

    [6]  The 2003 Opinion cited the following treaties: Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, art. 3, 102 Stat. 3045, 3045, 78 U.N.T.S. 277, 280 ("Genocide Convention"); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 4(1), 1465 U.N.T.S. 112 ("Torture Convention").

International Criminal Tribunal for the former Yugoslavia and the
International Criminal Tribunal for Rwanda, <u>id.</u> at 323-24.  The
2003 Opinion also cited Second Circuit and district court cases[7]
indicating that conspiracy and aiding and abetting are actionable
under the ATS.  <u>Id.</u> at 320-21.


<u>Talisman's Motion</u>

In its motion for judgment on the pleadings, Talisman
contends that the Supreme Court's decision in <u>Sosa v. Alvarez-
Machain</u>, 124 S. Ct. 2739 (2004), and the Second Circuit's
decision in <u>Flores v. Southern Peru Copper Corp.</u>, 406 F.3d 65 (2d
Cir. 2003),[8] have so changed the landscape of law governing ATS
lawsuits that the 2003 Opinion was clearly erroneous for two
reasons.  First, Talisman claims that <u>Alvarez-Machain</u>, which held
that federal courts should not recognize ATS claims for
violations of international law norms "with less definite content
and acceptance among civilized nations than the historical
paradigms familiar" when the ATS was enacted, <u>Alvarez-Machain</u>,
124 S. Ct. at 2765, requires a finding that corporate liability
and secondary liability are not sufficiently definite and
accepted in international law to support an ATS claim.  Second,

---

[7]  The 2003 Opinion cited: <u>Bigio</u>, 239 F.3d 440; <u>Kadic v.
Karadzic</u>, 70 F.3d 232, 244-45 (2d Cir. 1995); <u>Wiwa</u>, 2002 WL
319887, at *1; <u>Kavlin</u>, 978 F. Supp. at 1091.

[8]  The opinion cited by Talisman, <u>Flores v. Southern Peru
Copper Corp.</u>, 343 F.3d 140 (2d Cir. 2003), was later republished
at <u>Flores v. Southern Peru Copper Corp.</u>, 406 F.3d 65 (2d Cir.
2003).

Talisman claims that <u>Flores</u>, which held that determining the content of customary international law[9] requires looking to "concrete evidence of the customs and practices of States," <u>Flores</u>, 406 F.3d at 82, renders the sources consulted in the 2003 Opinion no longer authoritative, and requires a finding that there is insufficient evidence to support the existence of corporate liability and secondary liability under international law.

## DISCUSSION

"[T]he legal standards for review of motions pursuant to Rule 12(b)(6) and Rule 12(c) are indistinguishable." <u>DeMuria v. Hawkes</u>, 328 F.3d 704, 706 n.1 (2d Cir. 2003).  When considering a motion to dismiss, a court must "accept[] as true the factual allegations in the complaint as true and draw[] all inferences in the plaintiff's favor." <u>Scutti Enters., LLC v. Park Place Entm't Corp.</u>, 322 F.3d 211, 214 (2d Cir. 2003) (citation omitted). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." <u>Raila v. United States</u>, 355 F.3d 118, 119 (2d Cir. 2004).  <u>See also</u> <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 514 (2002).

---

[9]    <u>Flores</u> described customary international law as "composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." <u>Flores</u>, 406 F.3d at 80.

1.  Corporate Liability in International Law

Talisman's argument that corporate liability under
international law is not supported by sufficient evidence and is
not sufficiently accepted in international law to support an ATS
claim is misguided.  The 2003 Opinion meticulously demonstrated
that corporations may be held liable under international law for
violations of jus cogens norms, citing Second Circuit and other
federal precedent, as well as a wide array of international law
sources.  No subsequent decision since that Opinion's issuance,
including Alvarez-Machain and Flores, indicates that the
Opinion's conclusions regarding corporate liability in
international law were erroneous.  Indeed, subsequent events only
confirm the validity of its analysis.  After that Opinion, the
Second Circuit twice confronted ATS cases with corporate
defendants, and neither time did it hold that corporations cannot
be liable under customary international law.  In Bano v. Union
Carbide Corp., 361 F.3d 696 (2d Cir. 2004), the Second Circuit
vacated the district court's dismissal of property damage claims
against the corporation in question and remanded the action.  Id.
at 717.  Perhaps more importantly, the very case on which
Talisman relies to press its argument regarding the sources used
in the 2003 Opinion featured a corporate defendant, see Flores,
406 F.3d at 69, and made no mention of the possibility that the
defendant's status as a corporation could support a finding that
jurisdiction was lacking.  Instead, the Flores court read Kadic
in precisely the same way as the 2003 Opinion -- to support the

8

notion that ATS claims "may sometimes be brought against private actors," and that, among other things, acts of "genocide violate customary international law regardless of whether they are undertaken by state or private actors."  Id. at 76.

The Supreme Court also has not endorsed Talisman's view.  In fact, the case to which Talisman turns for its argument regarding the level of international consensus required for a customary international legal norm explicitly contemplates the existence of corporate liability under customary international law.  Alvarez-Machain, 124 S. Ct. at 2766 n.20.  The Alvarez-Machain Court described the need to consider whether the violation of a "given norm" incurs international legal liability "if the defendant is a private actor such as a corporation."  Id. (emphasis supplied).  See also In re Agent Orange Prod. Liab. Litig., --- F. Supp. 2d ----, Nos. MDL 381, 04-CV-400 (JBW), 2005 WL 729177, at *43 (E.D.N.Y. Mar. 28, 2005) (same observation).  The Supreme Court also read Kadic just as the 2003 Opinion and the Flores court did -- to hold that there is a "sufficient consensus . . . that genocide by private actors violates international law."  Alvarez-Machain, 124 S. Ct. at 2766 n.20 (emphasis supplied).

In spite of these obstacles, Talisman contends that because Flores defined customary international law as "those clear and unambiguous rules by which States universally abide, or to which they accede, out of a sense of legal obligation and mutual concern," Flores, 406 F.3d at 84, the fact that no treaty or international tribunal decision imposes liability on corporations

9

for violations of customary international law relating to human rights demonstrates that corporate liability is not part of the customary international law governing violations of <u>jus cogens</u> norms.  This argument rests on a misreading of <u>Flores</u> and a flawed conception of customary international law.  Determining whether a rule is part of customary international law requires looking "primarily to the formal lawmaking and official actions of States."  <u>Id.</u> at 82.  "States need not be universally successful in implementing [a] principle in order for a rule of customary international law to arise."  <u>Id.</u> at 80.  As the International Court of Justice has observed, "[i]n order to deduce the existence of customary rules, . . . it [is] sufficient that the conduct of States should, in general, be consistent with such rules, and that instances of State conduct inconsistent with a given rule should generally have been treated as breaches of that rule."  Military and Paramilitary Activities in and Against Nicaragua (Nicar. v. U.S.) (Merits), 1986 I.C.J. 14, 98, para. 191 (June 27).

The official actions of States, however, are necessarily bound to the circumstances in which they act.  Talisman's criticism, for example, that the ICTY and ICTR Statutes do not provide for corporate criminal liability for genocide and other atrocities carries very little weight as those Statutes were devised in the context of ethnic and tribal warfare where atrocities committed by private individuals, not corporations, loomed large.  Such an argument is akin to claiming that a rule

10

governing the law of the sea has not reached the status of customary international law because a number of landlocked States have not adopted it.[10]  In the context of torture and genocide, courts around the world have acknowledged that it is not necessary for any given State to provide a domestic civil or criminal remedy for torture or genocide in order for the prohibitions on torture and genocide to retain their status as peremptory norms of international law.  See, e.g., Tachiona v. Mugabe, 234 F. Supp. 2d 401, 416 (S.D.N.Y. 2002) (genocide and torture); Jones v. Saudi Arabia, [2004] E.W.C.A. Civ. 1394, [2005] 2 W.L.R. 808, 2004 WL 2387139, paras. 79-80, 92 (Court of Appeal (England), Civil Division, Oct. 28, 2004) (torture); Nulyarimma v. Thompson, 96 F.C.R. 153, 165 A.L.R. 621, [1999] FCA 1192, 1999 WL 1953230, paras. 18-22, 207 (Federal Court of Australia, Sept. 1, 1999) (genocide).

One of the clearest means for determining the content of a

---

[10]  Indeed, for the purposes of this case, the value of the ICTY and ICTR Statutes, as well as the decisions of their Tribunals and ATS cases addressing similar subject matter such as Kadic, is that they confirm that customary international law prohibiting violations of jus cogens norms such as genocide applies to private actors in addition to state actors.  It is this distinction, and not distinctions within the category of private actors, that the Supreme Court emphasized as salient in Alvarez-Machain, 124 S. Ct. at 2766 n.20, and for good reason, as there is no principled basis for contending that acts such as genocide are "of mutual, and not merely several concern to States," Flores, 406 F.3d at 81 (citation omitted), when the acts are performed by some private actors, like individuals, but not by other private actors, like corporations.  The decisions of certain Nuremberg Tribunals, also cited in the 2003 Opinion, wherein the liability of corporations was explicitly recognized and corporate officers were prosecuted, are important for the same reason.

rule of customary international law is to examine situations where a governmental institution asserts a claim purportedly based on the customary rule, and to consider, as part of state practice, whether States with competing interests object.  Cf. Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 941-42 (D.C. Cir. 1988); United States ex rel. Lujan v. Gengler, 510 F.2d 62, 67-68 (2d Cir. 1975); Phillip R. Trimble, The Supreme Court and International Law, 89 Am. J. Int'l L. 53, 55 (1995) (noting that "the only way that customary international law can change [is] by one state's violating the old norm and other states' acquiescing in the violation").  The natural place to find evidence of state practice in the context of corporate liability for violations of jus cogens norms is in cases where a government's judiciary exerts jurisdiction over a foreign corporation for claims based on such alleged violations.  For example, objections by foreign sovereigns in general are not uncommon in ATS litigation where the State's interests are implicated in some way.  See, e.g., Alvarez-Machain, 124 S. Ct. at 2766 n.21; Alperin v. Vatican Bank, --- F.3d ---, Nos. 03-16166, 03-15208, 2005 WL 1355589, at *17 (9th Cir. June 9, 2005); Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1231 n.6 (11th Cir. 2004); Sarei v. Rio Tinto PLC, 221 F. Supp. 2d 1116, 1202-04 (C.D. Cal. 2002).  The executive branch of the United States Government has also objected, particularly on policy grounds, when, among other things, U.S. national corporations have been defendants in ATS cases.  See, e.g., In re Agent Orange Prod.

<u>Liab. Litig.</u>, 2005 WL 729177, at *27-28; <u>In re South African</u>
<u>Apartheid Litig.</u>, 346 F. Supp. 2d 538, 553 (S.D.N.Y. 2004).  In
other circumstances, the executive branch of the United States
government has expressly not objected when U.S. national
corporations have been defendants in ATS cases.  <u>See, e.g.</u>, <u>Doe</u>
<u>I</u>, 395 F.3d at 959.  Indeed, in this action, the Government of
Canada ("Canada") has transmitted a letter via the U.S.
Department of State to this Court expressing political concerns
about the foreign policy implications of exerting
extraterritorial jurisdiction over a Canadian corporation based
on events occurring in Sudan.  Pointedly, Canada has not objected
to the notion that customary international law provides for
corporate liability for violations of <u>jus cogens</u> norms.  Indeed,
Talisman has not cited a single case where any government
objected to the exercise of jurisdiction over one of its national
corporations based on the principle that it is not a violation of
international law for corporations to commit or aid in the
commission of genocide or other similar atrocities.  If this
issue was a genuine source of disagreement in the international
community, it would be expected that the assertion of such a rule
as customary would provoke objections from States whose interests
were implicated by the assertion of the rule in those cases
against their nationals.  <u>Cf.</u> <u>Kane v. Winn</u>, 319 F. Supp. 2d 162,
202 & n.62 (D. Mass. 2004) (referring to persistent objector
doctrine of customary international law).  With such compelling
evidence of state practice, coupled with that already reviewed in

13

great detail by the 2003 Opinion, Talisman's motion as it pertains to corporate liability in international law must be denied.

## 2.  Secondary Liability in International Law

Talisman's argument that secondary liability under international law is not supported by sufficient evidence and is not sufficiently defined in international law to support an ATS claim is also misguided.  Here, too, the 2003 Opinion marshaled a variety of Second Circuit and other federal decisions, as well as a collection of international law sources to demonstrate that customary international law provides for secondary liability.  To the extent that Talisman argues that under <u>Flores</u>, the sources relied upon by the 2003 Opinion are no longer authoritative, this argument is not only contrary to a concession Talisman made earlier in this litigation, but it is based on an incomplete and flawed analysis.  As the 2003 Opinion notes, Talisman conceded in its initial motion to dismiss papers that "international law recognizes theories of complicit liability."  <u>Presbyterian Church</u>, 244 F. Supp. 2d at 321.

In any event, Talisman contends, among other things, that ICTY and ICTR decisions are not appropriate sources for clarifying the content of aider and abettor liability in international law.  Talisman argues that this conclusion "necessarily follows" from the <u>Flores</u> court's determination that the European Court of Human Rights, whose decisions were cited by

14

the plaintiffs in <u>Flores</u>, is empowered "to interpret and apply
the rules set forth in the European Convention for the Protection
of Human Rights and Fundamental Freedoms -- an instrument
applicable only to its regional States parties -- not to create
new rules of customary international law." <u>Flores</u>, 406 F.3d at
96 (citation omitted).  Talisman contends that because the ICTY
and ICTR were established pursuant to statutes that limit their
jurisdiction both geographically and temporally, they also are
not empowered to create new rules of customary international law.

The ICTY and ICTR Statutes differ in important respects from
the European Convention for the Protection of Human Rights and
Fundamental Freedoms.  First, the ICTY and ICTR Statutes were
created by resolutions of the United Nations Security Council,
not a regional convention.  U.N. Security Council resolutions are
binding on all Member States, <u>see</u> U.N. Charter, art. 25, which
include all but a handful of States in the world.  In adopting
the ICTY Statute, the Security Council delivered a mandate to the
ICTY to "prosecut[e] persons responsible for serious violations
of international humanitarian law."  S.C. Res. 808, U.N. SCOR,
48th Sess., 3175th mtg., para. 1, U.N. Doc. S/RES/808 (1993)
("S.C. Res. 808").  The Security Council delivered a similar
mandate to the ICTR to "prosecut[e] persons responsible for
genocide and other serious violations of international
humanitarian law."  S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d
mtg., para. 1, U.N. Doc. S/RES/955 (1994).  In this context, the
Security Council noted that "all parties are bound to comply with

the obligations under international humanitarian law," and that "persons who commit or order the commission of grave breaches of the [Geneva] Conventions are individually responsible in respect of such breaches."  S.C. Res. 808.

The entire purpose of the ICTY and ICTR is therefore to adjudicate violations of customary international law as provided in the Statutes.  This project is wholly different from the European Court of Human Rights, which is charged with interpreting and applying a regional human rights convention. Although the Tribunals do not create new rules of customary international law, they occupy a special role in enunciating the current content of customary international law norms.[11]  ICTY and ICTR opinions typically engage in nuanced and exhaustive surveys of international legal sources, and as such, they are exceedingly useful as persuasive evidence of the content of customary international law norms.  This conclusion is in agreement with the overwhelming majority of federal courts that have had occasion to turn to ICTY and ICTR opinions in ATS cases, both before and after Alvarez-Machain and Flores.  See Presbyterian Church, 226 F.R.D. at 478 n.21 (collecting cases).  To the extent that one district court has held otherwise, this Court respectfully declines to follow it.  See In re South African Apartheid Litig., 346 F. Supp. 2d at 550.

_____

[11]  This analysis applies with similar force to decisions of the Nuremberg Tribunals.  Although the Nuremberg Tribunals were not established by the U.N. Security Council, they were nevertheless charged with prosecuting war crimes and other violations of customary international law.

Talisman also contends that the Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF.183/9 (1998) ("Rome Statute"), was an improper source for the 2003 Opinion to consider due to the refusal of the United States to ratify it, and the fact that only approximately 100 of the 191 U.N. Member States have ratified it so far.  Talisman's argument depends on a misreading of <u>Flores</u>, which held that "[a]ll treaties that have been ratified by at least two States provide <u>some</u> evidence of the custom and practice of nations. However, a treaty will only constitute <u>sufficient proof</u> of a norm of customary international law if an overwhelming majority of States have ratified the treaty, <u>and</u> those States uniformly and consistently act with its principles."  <u>Flores</u>, 406 F.3d at 88-89 (emphasis in original).

It is entirely appropriate to consider, as the 2003 Opinion did, the Rome Statute when determining the content of customary international law norms that are addressed in some fashion in the Statute -- all that Talisman can safely claim on this issue is that the Rome Statute <u>on its own</u> may not constitute sufficient proof of a given norm at this point in time.  Moreover, Talisman's argument regarding the number of Rome Statute ratifications is misleading when viewed outside the context of the sometimes bureaucratic treaty ratification process in individual States.  For example, as of October 9, 2001, the

17

Genocide Convention had been ratified by only 133 of 191 U.N. Member States, but there is no dispute that as customary international law, it is binding on all States.  See United Nations Treaty Collection, Convention on the Prevention and Punishment of the Crime of Genocide, Participants as of 9 October 2001.[12]  Indeed, the ratification process in individual States can be lengthy.  By the end of 1955, approximately the same amount of time that the Rome Statute has currently been open for ratification, the Genocide Convention had attracted only 45 ratifications.  Id.  The United States did not ratify the Genocide Convention until November 25, 1988, approximately forty years after its creation, and long after the Convention bound all States as an expression of customary international law.  Id.

The timing of the United States' ratification of the Genocide Convention also reduces the impact of Talisman's argument regarding the United States' current status as a non-party to the Rome Statute, particularly in light of the reasons for the United States' decision not to ratify the Rome Statute. Although Talisman trumpets those reasons as supporting its cause, the reasons expressed by the United States Government for non-ratification are unhelpful to Talisman.  The objections raised by the United States centered on the procedures contained in the final draft of the Rome Statute, not the substance of the international legal rules contained therein.  The United States

_____

[12]  This document may be retrieved at http://www.unhchr.ch/html/menu3/b/treaty1gen.htm.

feared "unchecked power in the hands of the prosecutor" that
could lead to "politicized prosecutions."  Marc Grossman, Under
Secretary for Political Affairs, U.S. Department of State,
"American Foreign Policy and the International Criminal Court,"
Remarks to the Center for Strategic and International Studies,
May 6, 2002.[13]  The United States expressed no reservations about
the substantive norms expressed in the text of the Statute.

Talisman also argues that the standards for secondary
liability are vague and imprecise in international law, and
cannot meet the <u>Alvarez-Machain</u> requirement that offenses be
"defined with a specificity comparable to the features of the
18th-century paradigms we have recognized," <u>Alvarez-Machain</u>, 124
S. Ct. at 2761-62, or the <u>Flores</u> requirement that rules of
customary international law be "clear, definite, and
unambiguous."  <u>Flores</u>, 406 F.3d at 87.  Talisman persistently
ignores the structure of the ICTY and ICTR, however, in order to
generate apparent conflicts in those Tribunals' jurisprudence
regarding the <u>mens rea</u> standard for liability based on aiding and
abetting.  Both Tribunals were established with Appeals Chambers
endowed with the power to review and reverse Trial Chamber
decisions for errors of law, among other things.  <u>See</u> ICTY
Statute, art. 25; ICTR Statute, art. 24.  Consequently, where
there are inconsistencies between Trial Chamber decisions and
Appeals Chamber decisions, decisions of the Appeals Chamber are

---

[13]  This document may be retrieved at http://www.state.gov/
p/9949.htm.

19

authoritative.  To the extent that Talisman can point to
disagreement on points of law between decisions of different
Chambers in the Tribunals, Talisman only describes variances
between different Trial Chambers, or between an earlier Trial
Chamber decision and a subsequent Appeals Chamber decision.  The
supposed ambiguities to which Talisman refers are therefore
chimerical.

   Talisman also attempts to demonstrate that the <u>actus reus</u>
standard for liability based on aiding and abetting is a source
of disagreement in international law.  Talisman points to a 1998
ICTY Trial Chamber decision that extended aiding and abetting
liability in "certain circumstances" to "moral support or
encouragement of the principals in their commission of the
crime."  <u>Prosecutor v. Furundzija</u>, No. IT-95-17/1-T, 1998 WL
34310018, para. 199 (Trial Chamber, Int'l Crim. Trib. for the
Former Yugoslavia, Dec. 10, 1998).  Discussing this standard, a
Ninth Circuit panel decided to leave "the question whether such
liability should also be imposed for moral support which has the
required substantial effect to another day."  <u>Doe I</u>, 395 F.3d at
951.  Talisman draws liberally from a concurring opinion in <u>Doe I</u>
which noted that the inclusion of moral support is "far too
uncertain and inchoate a rule for us to adopt without further
elaboration as to its scope by international jurists," <u>id.</u> at
969-70, and that "it is a novel standard that has been applied by
just two ad hoc international tribunals."  <u>Id.</u> at 969.

   The question of whether the "novel" moral support standard

should be included in the definition of aider and abettor
liability, however, did not prevent the Ninth Circuit from
imposing liability for aiding and abetting another's violation of
international law under a settled, core notion of aider and
abettor liability in international law "for knowing practical
assistance or encouragement which has a substantial effect on the
perpetration of the crime." Id. at 951.  Therein lies the flaw
in Talisman's argument.  The ubiquity of disagreement among
courts and commentators regarding the fringes of customary
international legal norms is unsurprising.  The existence of such
peripheral disagreement does not, however, impugn the core
principles that form the foundation of customary international
legal norms -- principles about which there is no disagreement.

### CONCLUSION

Talisman's motion for judgment on the pleadings is denied.

SO ORDERED:

Dated:     New York, New York
           June 13, 2005

                                    _____
                                         DENISE COTE
                                    United States District Judge

21