waging holy war on behalf of Allah.  He asked for money for Islamic Jihad, whose martyr "Nidal Zaloom went out with a dagger and stabbed four Jews in Jerusalem."

52. Damra repeatedly stated that the money would go to the Islamic Jihad.  Damra told the audience that anyone who wanted to write a check should make it out to the *ICP*.  During this time, the video depicts the crowd coming to the podium area and laying money at Damra's feet.  As Damra was requesting money for the Islamic Jihad, it was announced that $6,785 had been contributed so far.  Damra announced that there would be a permanent *ICP* fund in Cleveland for anyone who wanted to donate to the Islamic Jihad.

53. An undated document was seized containing a speech given by *Al-Arian* as president of *ICP* in which he describes a struggle between Islam and the West and stated that "we are in a battle of life and death, in a battle of fate and future against the Western Hegemony and tyranny wanting to control the capabilities of the nations in order to enslave steal and control them." Further on he stated "What is needed is the dismantling of the cultural system of the West."

54. Investigators who seized *Al-Arian*'s home computer found in it files for three wills for three individuals who were planning to die as martyrs on Jihad.  In the first, dated 2/19/92, Nizar Mahmoud wrote "the Jihad for Palestine is a Jihad for Allah, it is an obligation for you wherever you are, because there is no one more loved by Allah than the martyr." In the second, Adel Daher wrote about his desire to be a martyr and quoted the Koran regarding Allah's reward for those who fight and are slain in his cause.  In the third, Khaled Muhammad *Hassan* stated:

> If we cannot destroy today this house, the Jew's State, we can ignite the fire in its regions, and if we ignite it every where no one will be able to extinguish it.  We should charge the atmosphere of enmity and create a flammable Jihad climate that needs a match stick only.

31

The location of these wills on *Al-Arian*'s Macintosh home computer illustrates the close connection between *Al-Arian* and *PIJ* suicide bombers.

55. I know from the Tampa investigation that Sheik *Rahman* (the "Blind Sheik") visited *Al-Arian* at his residence in Tampa and spoke at his mosque, as did Sheik *Odeh*.

56. In sum, there is probable cause to believe that, until 1995, *Al-Arian* used *ICP* and *WISE* as the American front for *PIJ*, and that until December 2001, *HLF* acted as the primary American front for *HAMAS*. There is probable cause to believe that money sent to *Al-Arian* was really money going to *PIJ*, and that money sent to *HLF* was really money going to *HAMAS*.

57. Further, there is probable cause to believe that those who knew *Al-Arian, Shallah, al-Najar, Khalil Shikaki*, or *Nafi* from their conferences or writings and sent money to *ICP* or *WISE* - - or directly to *Al-Arian* himself - - knew that they were sending it to support suicide bombings and terrorism conducted by *PIJ*. Similarly, there is probable cause to believe that those contributors to *HLF* who knew the leaders of *HAMAS* or *HLF* - -and at least some of those who did not - - contributed their money to support suicide bombings and terrorism conducted by *HAMAS*.

58. Finally, there is probable cause to believe that many of those who sent money to *Al-Arian, WISE*, and *ICP* for *PIJ*, as well as some of those who sent money to *HLF*, conspired to provide material support to terrorists, and to engage in international transfers of money to promote offenses against a foreign nation involving murder, kidnaping, robbery, extortion, and the destruction of property by means of explosive or fire, in violation of 18 U.S.C. §§ 1956(a)(2) and (h) and 2339A and 2339B.

IX.    The *Safa Group* and Associated Individuals

32

59. In the next sections of this affidavit, I will show the probable cause to believe that the individuals controlling the *Safa Group* sent money to *HLF* and *Al-Arian* to support suicide bombings conducted by *HAMAS* and *PIJ*. First I will establish that the individuals controlling the  share a common ideology with *HAMAS* and *PIJ* and know exactly what *HAMAS* and *PIJ* do with the monies they receive.  Then I will establish that these individuals have continued to send money to *HLF* and *Al-Arian* for *HAMAS* and *PIJ*, through ever more concealed methods.

A.    The Ideology

60. I have found information indicative of a conspiracy between *Safa Group* individuals and Sami *Al-Arian* to support and fund terrorists and terrorist groups including *HAMAS* and *PIJ*. A most striking example is a letter seized during the 1995 search warrants, from a central figure in the *Safa Group*, *Al-Alwani* at *IIIT* (both of which will be further identified below) to *Al-Arian* at *WISE*, and dated November 19, 1991.  In that letter, *Al-Alwani* referred to the payment of monies from *IIIT* to *PIJ*, and wrote that he and his colleagues, and their organizations, considered themselves to be indistinguishable from *Al-Arian*, *Shallah* (now the head of *PIJ*) and other founders and members of *PIJ*.  In specific, *Al-Alwani* stated in his letter to *Al-Arian*:

> Honorable brother, I think we do not need to affirm that we consider you as a Group, you and brother *Mazen* [*al-Najar*] and brother *Khalil* [*Shikaki*, brother of *PIJ* founder *Fathi Shikaki*] and brother *Bashir* [*Nafi* ] and Brother *Ramadan* [*Shallah*, present head of *PIJ*] and *Sheikh Abdel Aziz* [*Odeh*, a founder and spiritual leader of the *PIJ*], a part of us and an extension of us, and us part of you and extension of you also, we never experienced any doubts about that since we knew you and we will continue like that.

61. *Al-Alwani* continued:

> And the matter of the financial support was never the basis of our relationship, for our relation added to the brotherhood of faith and Islam is an ideological and cultural concordance with the same objectives and all of your institutions are considered by us as ours, and they receive all the

33

> attention, and I explained to you the circumstances the institutions of your
> brother go through, and despite which we can truthfully say that we gave
> your institutions or our institutions that you manage more attention than
> institutions we manage by ourselves, because you are in an important
> positions without a doubt, and you deserve from us and our likes all
> cooperation, God willing . . . .

62. *Al-Alwani* stated that he was speaking not only for himself, but also for other

members of the *Safa Group*:

> And I would like to affirm these feelings to you directly on my
> behalf and on the behalf of all my brothers, Dr. *Abdel Hamid*
> *[Abusulayman]*, Dr. *Jamal [Barzinji]*, Dr. *Ahmad [Totonji]*, Dr.
> *Hisham [Al-Talib]* . . . .

63. *Al-Alwani* noted that it didn't matter to the *Safa Group* how *Al-Arian* characterized

the $45,000 *Al-Arian* received from the *Safa Group*, as part of its total contribution of $50,000 (I

have added the bold type):

> And I would like to affirm these feelings to you directly on my behalf and
>
> on the behalf of all my brothers, Dr. Abdel Hamid, Dr. Jamal, Dr.
>
> Ahmad, Dr. Hisham, and at the same time, affirm to you that when we
>
> make a commitment to you, or we try to offer, we do it for you as a Group,
>
> **regardless of the side or the facade you use the donation for**...." What
>
> is left is to remind you that what is mentioned in your letter is that what
>
> you already received is forty thousands, and what we have in the records
>
> for you is forty-five thousands, and I will inquire about the matter with the
>
> brothers accountants so I will send you what will complete the amount of
>
> fifty thousands, God willing . . . .

B.   The Individuals

34

64.   The below-listed individuals are the founding and facilitating members of the *Safa Group*, an interwoven set of organizations that were established in the U.S. with the assistance of other Saudi Arabian and other Middle Eastern nationals.   Based on the evidence in this affidavit, I know that they are ardent supporters of *PIJ* and *HAMAS*.   They have repeatedly voiced their ideological support.   I have seen repeated instances of their financial support, and believe that they have acted to conceal many other instances of their financial support.

65.   *Abdulhamid Abusulayman* incorporated *IIIT* in Virginia with *Taha Jaber Al-Alwani* in 1982.   In the letter from *Al-Alwani* to *Al-Arian* seized in the 1995 searches in Tampa, quoted above, *Al-Alwani* affirmed that *PIJ* and the *Safa Group* shared a common ideology.   *Al-Alwani* expressly mentioned *Abusulayman* as having the same sentiments as the entire *Safa Group.*

66.   *Taha Jaber Al-Alwani* incorporated *IIIT* with *Abusulayman* in 1982, and was the president of *IIIT* from about 1986 through 1997.   *Al-Alwani* wrote the letter to *Al-Arian* expressing solidarity as quoted above.   In another seized document, *Al-Alwani* refers to $50,000 in financing that he and the *Safa Group* provided to *WISE /ICP.*

67.   Various documents and videotapes obtained in the Tampa searches show that *Al-Alwani*, the President of *IIIT*, attended and spoke at *ICP* conferences with *Al-Arian, Shallah, Sheik Odeh* (spiritual leader and co-founder of *PIJ*) and *Sheik Rahman* (the "Blind Sheik" convicted of conspiracy to blow up New York tunnels and the United Nations in New York in October 1995).   Inasmuch as *ICP* conferences were, in essence, *PIJ* conferences, I know that *Al-Alwani* has long been a supporter of *PIJ.*

68.   In October 1999, a confidential asset of the FBI, who has provided reliable information in the past, furnished the Washington Field Office of the FBI a copy of a fatwa

35

(declaration) signed by *Al-Alwani* at some point between December 1988 and November 1989, proclaiming

> the truth by the powers invested in us by Allah, that Jihad is the only way to liberate Palestine; that no person or authority may settle the Jews on the land of Palestine or cede to them any part thereof, or recognize any right therein for them.

69. In early 2000, *Al-Alwani* spoke with FBI Special Agents Ammerman and Wyman. *Al-Alwani* admitted to attending several *ICP* meetings with *Al-Arian*, as well as being acquainted with *Nafi* and *Shallah*. *Al-Alwani* stated that he maintained regular contact with *Al-Arian*, and that *Al-Arian* typically contacts him when *Al-Arian* visits the Washington, D.C. area several times a year.

70. *Hisham Al-Talib* is a director or officer of several *Safa Group* organizations, including *Safa Trust, Inc.* and *IIIT*. *Al-Talib* was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*.

71. *M. Omar Ashraf* is a director or officer of seven *Safa Group* organizations, including *Grove Corporate Plaza, Mar-Jac Investments*, and *Sterling Charitable Gift Fund*.

72.    *Muhammed Ashraf* is a director or officer of over 20 *Safa Group* organizations incorporated with the address of 555 Grove Street, Herndon, Virginia, including *Sterling Investment Group, Sterling Charitable Gift Fund*, and *York Foundation*.

73. *Jamal Barzinji* has been the officer or director of numerous *Safa Group* organizations, including *Mar-Jac Poultry, Reston Investments*, and *Safa Trust*. *Barzinji* was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*. I believe that *Barzinji* is not only closely associated with *PIJ* (as evidenced by ties to *Al-Arian*, including documents seized in Tampa in 1995 reflecting direct correspondence between *Barzinji* and *Al-Arian*), but

36

also with *HAMAS*.  **REDACTED** xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

*Xxxxxxxx*xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxx.

74.  *Mohammed Jaghlit* has been an active supporter of *Al-Arian* and *PIJ*, both

ideologically and financially.  Two documents seized in Tampa in 1995 were letters sent by

*Jaghlit* to *Al-Arian* in 1994, referencing enclosed checks from *SAAR Foundation* for $10,000 and

$5,000.  In both of these letters, *Jaghlit* instructed *Al-Arian* not to disclose the contribution

publicly or to the media.

75.  Moreover, *Jaghlit* also has been an active supporter of *HAMAS*.  As noted above,

the *Safa Group* charity *al-Aqsa Educational Fund* acted as an American front for *HAMAS* until

the 1994 meeting in Oxford, Mississippi, described above, during which *HAMAS* representatives

explained to *al-Aqsa* representatives that *Marzook* had designated *HLF* as *HAMAS's* primary

fund-raising entity.  I have seen the IRS Forms 1023, Application for Recognition of Exemption,

and the 990-EZ, filed by the *Al-Aqsa Educational Fund, Inc.*, for 1990 and 1996, respectively.

Each of the two IRS forms reflects that the president of *Al-Aqsa* is Mohammad El-Gajhleet of

555 Grove Street in Herndon, Virginia.  I believe that "Mohammad El-Gajhleet" is an alternative

spelling for *Mohammad Jaghlit*, and the two names refer to the same individual.

76.  *M. Yaqub Mirza* is a corporate officer or director of numerous *Safa Group*

organizations located at 555 Grove Street in Herndon, including *Safa Trust, Inc.*, *SAAR*

*Foundation, Inc.*, *Reston Investments, Inc.*, *Mar-Jac Investments*, and *African Muslim Agency*.

*Mirza* is the predominant signatory on *Safa Group* checks.

37

77. *Cherif Sedky* was a director of the *SAAR Foundation* and now is a director of at least two *Safa Group* companies.

78. *Ahmad Totonji* is a corporate officer of several *Safa Group* organizations, including *Safa Trust, Inc.*, and was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*. *Totonji* is also referenced in another seized letter from *Al-Arian* to *Al-Alwani*. In this letter, *Al-Arian* solicited more funding and referred to a meeting he had with *Totonji* where *Totonji* promised him another $20,000. As recently as November 1, 2001, *Totonji* signed a check for $10,000 to *Al-Arian* through *Al-Arian*'s organization known as the Tampa Bay Coalition for Justice and Peace, drafted on the account of *Safa Group* charity *IIIT*.

79. *Iqbal Unus* is a director of the *Child Development Foundation*, a *Safa Group* organization, along with *Abusulayman* and *Al-Talib*, an advisor on the *Sterling Charitable Gift Fund* and *Sterling Management Group* organizations, and the administrative and billing contact for web sites for *IIIT* and *FIQH Council of North America*.

C.   The Funding

80. Discovered in the Tampa searches in 1995 were letters indicating that in 1991 and 1992, *IIIT* contributed at least $50,000 to *PIJ* front-group *WISE*. Moreover, another document seized during these warrants was a 1991 letter from *Shallah* – now the leader of *PIJ* – to an administrator of the University of South Florida, with a copy to *Nafi*, stating that *IIIT* was the largest contributor to *WISE*.

81. Additional documents seized in Tampa in 1995 include two that *Jaghlit* sent to *Al-Arian* in 1994, referencing checks enclosed by with the letters from *Safa Group* charity the *SAAR Foundation* for $10,000 and $5,000, respectively. In both of these letters, *Jaghlit* instructed *Al-*

38

*Arian* not to disclose the contribution publicly or to the media. I conclude from *Jaghlit*'s instructions that *Jaghlit* knew very well that the *SAAR* money was going to *PIJ* to support terrorism.

82. On February 2, 1995, *Mirza* signed a check for $15,000 to *WISE* on a *Safa* bank account, the deposit slip for which was found in *Al-Arian*'s home during execution of the 1995 search warrants.

83. As recently as November 1, 2001, *Totonji* wrote a check for $10,000 to *Al-Arian* through *Al-Arian*'s Tampa Bay Coalition for Justice and Peace, drafted on *IIIT*'s account at First Union Bank in Herndon.

84. IRS Form 990 for *Safa Trust, Inc.* for tax year 1996 indicated that *Safa* maintained $162,000 as "a library trust" for *HAMAS*-front *HLF*. In 1997, HLF received three *Safa Trust* checks in the amounts of $75,000, $87,500, and $162,500, all signed by *Mirza*.

X. Evidence of Layering Indicative of Money Laundering,
   Tax Evasion, and Material Support to Terrorists

   A. Overview

85. The investigation has focused on the organizations associated with the *Safa Group* through corporate records, tax filings, financial transactions, interviews with confidential informants, and visual surveillance. I have determined that the individuals associated with the *Safa Group* use or have used over 100 organizations, which are interrelated through corporate officers and holding company - subsidiary relationships, to facilitate the funding of terrorist operations. Many of these organizations are listed in Attachment C. A list of most of the individuals acting as officers of *Safa Group* organizations referencing the organizations with

39

which they are associated is included as Attachment D; both Attachments C and D are
incorporated by reference here.

86. This array of organizations includes for-profit businesses, purported educational institutions, and charities. Many of the organizations have identical or overlapping directorates or management. Many of the organizations of the *Safa Group* are phantom entities with no physical presence, as evidenced by the multiple addresses for the organizations provided on official documents and the lack of signs announcing the various organizations at what is represented to be their business address. The relationships and operations of these organizations are convoluted not only by the repeating pattern of corporate officers and directors but also the large number of entities involved.

87. While I don't now know for sure why the labyrinth of organizations and charities that comprise the *Safa Group* was constructed, there does not appear to be any innocent explanation. In the course of the investigation, I have considered why this labyrinth was constructed. Possible explanations include

    a.    To conceal support for terrorism;

    b.    To conceal support for otherwise non-exempt organizations (for example, to conceal support to foreign charities over which domestic charities do not maintain control, or even to political parties);

    c.    To shelter income derived from what actually are personal investments; and

    d.    To shelter income derived what actually was someone else's personal investments for which individuals in the United States were trustees (for example, to shelter income on the investments of a member of the *Al Rajhi* family);

    e.    To shelter income from personal investments in the course of sheltering income for someone else (some combination of "c" and "d" above); and

    f.    To avoid excise taxes that would otherwise be due and payable on private foundations.

Based on the past history of the individuals involved, I believe that the most likely reason is to conceal support for terrorism.

40

88.  Although the *Safa Group* consists of over 100 interwoven organizations, the investigation has focused on approximately 20 core organizations, and their associated corporate officers and directors.  The table below illustrates the overlapping directorates by listing the *Safa Group* members on which this investigation has focused and their principal officers, directors and trustees:

Z89950004-P/C-000046.041

| | Abusulayman | Al-Alwani | Al-Rajhi | Al-Talib | Ashraf, M. Omar | Ashraf, Muh. | Barzinji | Jaghlit | Mirza | Sedky | Totonji | Unus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| African Muslim Agency | | | | × | | | | | × | | | |
| Amana Limited | | | | | × | | | | × | × | | |
| Aradi Inc. | | | × | × | | | | | × | × | | |
| Grove Corp. | | | | × | | × | × | | × | | | |
| Grove Corporate Plaza | | | | | × | | | | × | | | |
| GSISS | × | × | | | | | | | | | | |
| Heritage Education Trust | | × | | | | | × | × | × | | | |
| HFC Feed Mill | | | | | | × | | | × | | | |
| Humana Charitable Trust | | | | | × | | | | | × | | |
| IIIT | × | × | | × | | | × | | × | | × | × |
| Mar-Jac Investments, Inc | | | | × | × | × | × | | × | | | |
| Mar-Jac Poultry Inc. | | | | × | × | | × | | × | | | |
| Mena Corporation | | | | × | | | × | | × | | | |
| Mena Investments, Inc. | | | | × | | | × | | × | | | |
| Reston Investments Inc | | | | × | | | × | × | × | | | |
| SAAR Foundation | | | | × | | | × | × | × | × | | |

42

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAAR Foundation, Canada | | | | | x | | | | x | | x | |
| SAAR International | | | | x | | | | x | | x | x | |
| Safa Trust, Inc. | x | | | x | | | | x | x | x | x | |
| Sterling Charitable Gift Fund. | | | | | | | x | | | x | | |
| Sterling Investment Group | | | | | x | | x | | | x | | |
| Sterling Management Group | | | | | x | | x | | | x | | |
| York Foundation | | x | | | | | x | | | x | | |
| York International | | | | | | | | | | x | | |

43

Z89950004 P/C 000046 043

B.    Analysis of the *Safa Charities*

1.  IRS tax files and corporation documents disclose that 555 Grove Street, 500 Grove Street, and associated addressed in Herndon are the corporate offices of record for over 100 active and defunct corporations, partnerships and tax exempt charitable organizations that are woven together by common officers and directors.  According to the Virginia Secretary of State, approximately 40 active corporations claim their offices to be located at 555 Grove Street, alone.

IRS Special Agents Mary Balberchak, Paul Shanks and Steven Smith reviewed Forms 990  (Return of Organization Exempt From Income Tax) and additional tax-related information for seven tax-exempt *Safa Group* organizations.  Many of the conspirators are officers in one or more of those charitable organizations.  All seven of the charitable organizations (hereinafter, the "*Safa Charities*") are located in or near Herndon, Virginia, and five are co-located at the same 555 Grove Street address.  The *Safa Charities* are:

| | | |
|---|---|---|
| *African Muslim Agency* | *Heritage Education Trust* | *IIIT* |
| *SAAR Foundation* | *Safa Trust* | *Sterling Charitable Gift Fund* |
| *York Foundation* | | |

2. The IRS Special Agents also reviewed individual tax returns of certain officers of the same tax-exempt organizations as well as corporate returns of for profit businesses that are wholly owned by a *Safa Charity* and/or controlled by the same officers, directors and trustees that control the charities.  In 2000 the IRS conducted a limited examination on one of those charities.  The IRS Special Agents reviewed the audit file and consulted with the two IRS Revenue Agents that conducted the examination on that entity.  Other documents were also reviewed, including corporation documents for the same entities and other related companies, certain real estate settlement documents and bank records.

44

3.      Analysis of the above returns and available supporting documentation disclosed a series

of transactions between related companies that, when examined in their entirety, evidences a

conspiracy between *Mirza, Abusulayman, Al-Alwani, Barzinji, Al-Talib, M. Omar Ashraf,*

*Muhammad Ashraf, Jaghlit, Sedky, Ahmad Totonji,* and others, known and unknown, to route

money through hidden paths to terrorists, and to defraud the United States by impeding,

impairing, obstructing and defeating the lawful government functions of the IRS in the

ascertainment, computation, assessment, and collection of federal income taxes.  What follows is

a summary of allegations, evidence of which will be detailed in this affidavit.

4. The conspirators have moved or authorized the movement of funds through a series of

transactions involving the *Safa Group,* which includes the *Safa Charities,* and also for-profit

corporations owned by or related to them.  The evidence to date demonstrates that multiple

millions of dollars have been moved between the *Safa Charities,* between the for-profit members

of the *Safa Group* and the *Safa Charities,* and between the *Safa Charities* and foreign entities

represented to be charitable in nature.  The financial transactions involve contributions to the

*Safa Charities* from for-profit corporations of the *Safa Group,* loans to for-profit corporations in

the *Safa Group,* contributions, loans, and grants between the *Safa Charities* and the movement of

funds from the *Safa Charities* into offshore trusts and other foreign entities.

5. Although, based on their representations to the IRS, each of the *Safa Charities* is

treated as a public charity under federal tax laws, their gross revenues derive from sources which

make the basis for their meeting the public support test unclear.  Of the contributions to the *Safa*

*Charities* for 1996-2000, the vast majority, over 71.8% percent, comes from other members of

the *Safa Group* or from their principals.  Of that support which does not emanate from the *Safa*

*Group* or its principals another 12.2% is reportedly derived from the unidentified contributors labeled "overseas general public." 13.2%, is comprised of funds from other overseas entities including benefactors in Kuwait, Saudi Arabia, and Malaysia.

6. Similarly, the pattern of grants and allocations made does not demonstrate the *Safa Charities* are operating for an exempt purpose. The grants and allocations made by the *Safa Charities* generally go to other members of the *Safa Charities*, or in some instances, other charities within the *Safa Group*. For the years in question 84.4% went to these entities. Another 14.3% was reportedly given to recipients which, contrary to law, the *Safa Charities* did not identify on the relevant Forms 990.

7. In addition, of the $54 million in grants and allocations reported for 1996-2000, $26 million (or 49%) was transferred to entities in the Isle of Man, $20 million (or 37%) remained within the *Safa Charities*. Of the balance approximately $7.7 (or 14.3%) went to unidentified donees. Accordingly, I believe that the *Safa Charities* are used to shuttle monies between them, blur the trail, and hinder the ability of investigators to ascertain the ultimate disposition of those monies. This investigation *has* followed the complex trail and determined, as stated above, that, of the funds whose recipients can be identified, virtually the only monies disbursed by the *Safa Charities* are monies that were disbursed *either* to other *Safa Charities*, or transferred to the name of off shore entities in tax havens.

8. By exercising common control, the *Safa Charities* ensure the tax benefits of their movement of funds between tax-exempt and for-profit entities, without ever having to surrender control of the funds. Although substantial funds are moved between various entities, the conspirators have maintained control over their disposition even after the funds are transferred

46

through the use of interlocking directorates and common officers, the common physical location

of members of the *Safa Group* at 555 Grove Street, and the centralization of control over

monetary transfers among the *Safa Group* in the persons of *Mirza* and *Safa Group* employee

*Beverly Hassan.*

    9.  For example, *Mirza* has signatory authority over 27 different bank accounts associated

with 15 different organizations of the *Safa Group*, including five of the *Safa Charities*.  *Al-Talib*

has signatory authority over 21 different bank accounts associated with nine members of the *Safa*

*Group*, including two *Safa Charities*.  *Barzinji* has signatory authority over 18 different bank

accounts associated with nine members of the *Safa Group*, including three *Safa Charities*.

    10.  In addition, although *Hassan* is shown as an employee of *Mar-Jac Investments, Inc.*

between 1996 and 2000 and also of *Sterling Management Group* at 555 Grove Street, she

conducts financial transactions for many of the *Safa Group* members.  In the 90-day period

between October and December 2001, *Hassan* authorized 16 transactions on behalf of seven

different organizations:  *Safa Trust, York Foundation, Sterling Charitable Gift Fund, Sterling*

*Management Group, Mar-Jac Investments, Reston Investments, Inc.*, and *African Muslim*

*Agency.*

    11.  A further example is found in a letter obtained by IRS auditors in 2000 in connection

with an audit of *SAAR Foundation.*  The letter, dated December 3, 1997, from *Humana*

*Charitable Trust*, P.O. Box 1297, Herndon, Virginia, was addressed to *Mirza* of the *SAAR*

*Foundation.*  The letter explained that *Humana* was an Isle of Man trust, stated *Humana's*

purpose, and requested *Mirza*, on behalf of *SAAR* to become a "major sponsor" of *Humana*.  The

letter was signed "*Amana Limited* Trustee" and bore what appears to be the signature of *Mirza*.

47

In other words, *Mirza*, on behalf of *Amana Limited*, the trustee for *Humana*, sent a letter to *Mirza*, Director of *SAAR*, soliciting major donations from *SAAR* to *Humana* in the Isle of Man.

12. Further, except for *IIIT*, the *Safa Charities* do not report active fundraising programs. Of the seven entities examined, only *IIIT* and *Safa* Trust report expenditures indicating significant fundraising. *York*, *AMA*, *Heritage* and *Sterling Charitable Gift Fund* report no expenses for fundraising. SAAR reports $806 in fundraising for over five years. Further, although Virginia law requires any charity soliciting for public funds in the state of Virginia to be registered with the Virginia Office of Consumer Affairs, Vernon Paige of the Virginia State Office of Consumer Affairs advised Special Agent Balberchak on January 30, 2002 that none of the *Safa Charities* are registered in Virginia.

13. The vast majority of the funds leaving the circle of the *Safa Charities* is distributed to two Isle of Man entities (purportedly charitable trusts): *Humana Charitable Trust*, which is controlled by *Mirza*, *Sedky* and *M. Omar Ashraf*; and *York International*, for which the *Mirza* is a trustee. Between 1996 and 2000, approximately $26 million was moved from the *Safa Charities* to *Humana* and *York*. The disposition of funds from these entities is unknown.

Z89950004-P/C-000046.048

14.     The movement of funds into entities in the Isle of Man, a known tax haven, makes it difficult to verify whether these funds were used for terrorist financing or some other non-exempt purpose.  The table below summarizes the funds which moved to the Isle of Man:

| Entity | Amount | Recipient | Location |
|---|---|---|---|
| *African Muslim Agency* | $    445,000 | *York International Trust* | Isle of Man |
| *SAAR  Foundation* | $21,128,978 | *Humana Charitable Trust* | Isle of Man |
| *Safa Trust* | $ 4,462,147 | *York International Trust* | Isle of Man |
| *York Foundation* | $    400,000 | *York* International Trust | Isle of Man |

1.      When the IRS attempted through an audit to verify the ultimate disposition of the funds sent to the Isle of Man entities, their efforts were stymied by *Mirza* and *Qureshi*.  The auditors never learned of the $5.3 million moved to *York International* because relationships between *SAAR, African Muslim Agency, Safa Trust* and *York Foundation*, were concealed from them.  As for the funds moved to *Humana*, the auditors learned that, although required by law to monitor whether its grants to overseas charities were being used for charitable purposes, *SAAR* had no such records at its U.S. offices.  Ultimately, *SAAR* produced checks amounting to $168,667, or 0.8%, of the $21.1 million that *SAAR* represented had moved from *SAAR* to *Humana*.

2. The Form 990 tax returns for the *Safa Charities* concealed relationships that existed between certain charities and concealed certain financial transactions between the charities and the for-profit members of the *Safa Group*.  The direct impact of this non-disclosure is the concealment of transactions which may be taxable, partially taxable, or subject to excise taxes or similar penalties imposed for violation of limitations on how exempt organizations conduct their

Z89950004-P/C-000046-049

business. In addition, the disclosure of such relationships could lead to an inquiry as to whether the entity was being operated for an exempt purpose and ultimately revocation of tax exempt status.

3. On the basis of the foregoing, I have probable cause to believe that the *Safa Charities* are being operated to hide the distribution of monies to *PIJ* and *HAMAS*, and, I have probable cause to believe that they are being operated for the primary purpose of conducting a business unrelated to their exempt purposes, *i.e.*, investing and managing the substantial funds accumulated by the *Safa Charities*.

4. The money movements between the *Safa Charities* create the false impression they are publicly supported and operating for an exempt purpose, when, by and large, the funds never leave the control of the *Safa Charities* and their offshore related entities. Thus, the principals of the *Safa Charities* are manipulating the tax exempt status of the *Safa Charities* as part of a conspiracy to impede and impair the Internal Revenue Service in the determination and collection of federal tax, and to do so, are misrepresenting the nature of the operations of the *Safa Charities* to IRS officials and the public.

5. It is important to remember that many of the organizations in the *Safa Group* as listed in Attachment C are for-profit businesses. One, *Mar-Jac Poultry, Inc.*, is a large poultry processor located at 1020 Aviation Boulevard, Gainesville, Georgia, whose principal officers are *Barzinji, Al-Talib, M. Omar Ashraf* and *Mirza*. The bank signature cards for *Mar-Jac Poultry, Inc.* show that *Barzinji, Al-Talib, Mirza* and *M. Omar Ashraf* have signatory authority over the bank accounts. Additionally, UCC-1 filings show that *Humana* was a creditor of *Mar-Jac Poultry* after July 2000.

50

6.      First Union and IRS records reflect that *Mar-Jac Poultry* transferred millions of dollars to *Safa Group* businesses and charities between 1997 and 2000.  IRS filings and corporate bank records show that *Mar-Jac Poultry* is owned by *Mar-Jac Holdings, Inc.*, which is a majority-owned subsidiary of *Safa Trust, Inc. Mar-Jac Poultry* was purchased by the *Safa Group* in 1985.

7.  Based on my examination of financial documents, correspondence, and interviews with confidential witnesses, I believe that the first members of *Safa Group* were established in the early 1980's.  I believe that one source of funds flowing through the *Safa Group* is from the wealthy *Al-Rajhi* family in Saudi Arabia.  The *SAAR Foundation*, a *Safa Charity*, was named after Sulaiman Abdul Aziz *Al-Rajhi* (*SAAR* ), head of a wealthy Saudi family.  Abdullah Sulaiman *Al-Rajhi*, a relative of Sulaiman Abdul Aziz, is one of the directors of the *Safa Group* corporation, *Aradi, Inc.*, located at 555 Grove Street, Herndon, Virginia.

8.  I have found that members of the *Safa Group* moved large amounts of funds into the United States to support their organizational infrastructure.  Some of these occurred in the late 1970's and 1980's.  As documented by a USCS Currency and Monetary Instrument Report, *Safa Group* member *Ibrahim Hassaballa* brought $3,388,000 in cash into the United States from Saudi Arabia in 1980.  These funds allowed the individuals to both start and acquire businesses and organizations in the United States.

9. *SAAR Foundation* first applied for recognition of exempt status in 1983.  At that time it listed its governing body as consisting of nine members, including *Totonji, Barzinji, Al-Talib*, and *Abusulayman*.  Presently, *Barzinji, Totonji*, and *Al-Talib* comprise the three directors of *Safa Trust, Inc*, and, with Mirza, *Safa*'s only officers.  *Abusulayman, Al-Talib, Barzinji*, and *Totonji* are presently the only officers of *IIIT*.

51

10.  The *Safa Group* organizations routinely transfer large amounts of funds between each other. Often, the bank accounts through which the funds move appear to be utilized as "pass through" accounts. A "pass through" account is an account that is utilized as part of a layering process. Money that enters these accounts tend to remain there for short periods of time, after which the money is then transferred on to another account. "Pass through" accounts are commonly utilized by criminal organizations to convolute the trail of any illicit moneys.

11.  An example of an intra-*Safa Group* money transfer and apparent "pass through" activity that I believe is conducted for the purpose of layering financial transactions and confusing any ostensible investigation of the group occurred just last fall. First Union records reflect that the *Sterling Charitable Gift Fund* deposited a check received from *Mar-Jac* Poultry for $250,000 on October 26, 2001. Those records further show that *Sterling* transferred $100,000 to *SAAR Foundation* on November 2, 2001, from the same First Union account that received the check from *Mar-Jac* Poultry. Moreover, *Sterling* wire transferred the remaining $150,000 to *SAAR Foundation* on November 29, 2001.

12.  Inasmuch as the money from *Mar-Jac Poultry* obviously was destined for *SAAR Foundation* (however temporarily), I suspect that it was first routed to *Sterling* only to make it more difficult for investigators to decipher the ultimate disposition of the $250,000 apparently generated by *Mar-Jac Poultry*. But the difficulty created by the positioning of *Sterling* between *Mar-Jac* and *SAAR* on the money trail is only one of many barriers created by the *Safa* Group to any investigator trying to ascertain the ultimate disposition of *Safa Group* money. As explained above, it is impossible to determine from domestic bank records the ultimate location of money received by *SAAR*, for *SAAR* was itself but a way-station for money being routed around the

52

world by the *Safa* Group; before *SAAR* was officially dissolved in 2000 (long before receiving

the $250,000 from *Mar-Jac* by way of *Sterling*), it made virtually all of its disbursements to

"charities" located in the Isle of Man.

13.   As an example of layering involved a charitable contribution and loan, *Safa*

contributed $8.6 million to *Heritage* according to the *Safa* Trust 990.  In that same year *Heritage*

loaned $5.5 million to *Mar-Jac Holdings*, *Safa's* majority owned subsidiary.  In the following

year, Heritage transferred $4.1 million to *Safa*, reporting that this was a return of the 1996

contribution.

14.   There is no reason *Safa* could not have made the loan directly to *Mar-Jac Holdings*,

its subsidiary.  I believe that the route the funds traveled, from *Safa* to *Heritage* to *Mar-Jac*, with

a portion being returned to *Safa*, was designed to disguise the true nature of the transaction and

the ultimate disposition of these funds.

15.   All of these financial activities listed above are indicative of money laundering.  The

layering and pass through activities that occur are designed to disguise the origin and ultimate

destination of the moneys.  I suspect that moneys ultimately are transferred directly to terrorist

organizations from the *Safa Group* entities on the Isle of Man, or that funds are otherwise

expended for purposes which do not further the *Safa Charities'* exempt purpose(s).  Due to bank

secrecy laws in such tax havens, it is very difficult for investigators to have access to bank

account information.  I expect evidence related to these money laundering, terrorist support

activities and tax fraud to be found at the subject addresses of this affidavit.

C.    Particulars

53

16.  Based on the work of the IRS-CI Special Agents, I will now turn to the particulars of the *Safa Charities*:

1.  *African Muslim Agency*

17.    IRS records show the *African Muslim Agency* is a tax-exempt organization located at 555 Grove Street, Herndon, Virginia, with a reported purpose to "help other charitable organizations."  According to its Form 990 filed in May 2001, two of its three officers were *Al-Talib* and *Mirza*.

18. 91.3% of *African Muslim Agency*'s contributions between 1996-2000 were derived from *Safa* Group related entities[2] and/or individuals; at least 4.1% came from unidentified contributors. For the same period, 42.2% of *African Muslim Agency*'s grants and allocations were made to *Safa* Group related entities and 53% were made to unidentified donees.  No contributions, grants or allocations were identified on the 1996 Form 990.  The 1997 return showed $100,000 in contributions and $144,000 in grants and allocations, but no identified contributors or donees.  The 1998 return showed contributions received of $1,110,000 - - 99% of which came from *Mar-Jac* Poultry, *Inc.*, a *Safa Group* company for which *Mirza, Altaib, Barzinji* and *M. Omar Ashraf* are officers - -  and grants/allocations disbursed of $1,065,000  - - of which 90% went to *Safa* Group companies *IIIT*  and *York* International.  The 1999 Form 990 showed $1,125,000 contributions from one contributor – *Mar-Jac* Poultry, *Inc.*

2.    The *Heritage* Education Trust, Inc.

---

[2]"Related entities and/or individuals" as used herein refers to either other *Safa Charities*, officer(s), director(s), or trustee(s) of one of the *Safa Charities*, or for-profit or tax-exempt organizations for which one or more officer(s), director(s), or trustee(s) of the seven charities are also officer(s), director(s), or trustee(s) within the *Safa Group*.  This is not the same definition applied to the various questions on Form 990.

Z89950004-P/C-000046 054

19. IRS records show that The *Heritage Education Trust, Inc.* is a tax-exempt organization located at 750-A Miller Drive, SE, Leesburg, Virginia, with a purpose to "assist educational institutions." According to its Form 990 filed on October 16, 2001, its officers are *Al-Alwani* and *Jaghlit*.

20. 58.9% of *Heritage's* contributions between 1996 and 2000 were derived from *Safa Group* related entities and/or individuals; 41.1% came from overseas. For the same period, 75% of its grants and allocations were made to *Safa Group* related entities; 24.9% were made to unidentified donees. Its 1996 Form 990 reflects that it received $8,600,000 from *Safa Trust* and another $4,400,500 from overseas, but made a grant only to *SISS* - - a *Safa Group* entity - - in the amount of $800,000. In 1997, it received $1,600,000 from overseas and made grants and allocations of over $5,000,000, split between *SISS* and *Safa Trust, Inc.* It received no contributions of significance between 1998 and 2000 except for $23,500 from *Jaghlit*, but during that time granted $1,903,000 to *SISS* and another $2,802,939 to unidentified donees.

3.   International Institute of Islamic Thought ("*IIIT*")

21.     IRS records show that *IIIT* is a tax-exempt organization located at 500 Grove Street in Herndon, Virginia with a purpose of "research and education for religion of Islam." According to its Form 990 filed in November 2001, its officers consisted of *Abusulayman*, *Al-Talib*, *Barzinji*, and *Totonji*.

22. As noted above, correspondence seized pursuant to the search warrants in 1995, reflected direct communications between the *IIIT* officers and *Al-Arian* in which the former expressed solidarity with the latter. Discovered in the searches were letters indicating that in 1991 and 1992 *IIIT* contributed at least $50,000 to *PIJ* front-group *WISE*. Moreover, another

55

document seized during these warrants was a 1991 letter from present *PIJ* leader *Shallah* to an administrator of the University of Southern Florida (with a copy to *Nafi*) stating that *IIIT* was the largest contributor to *WISE*.

23. In January 2000, *Jaghlit* told FBI agents that *Nafi* started working at *IIIT* around April 1994. According to *Jaghlit*, *Nafi* was "on loan" from *WISE* until 1996 at which time *IIIT* decided to sponsor *Nafi* in his immigration and naturalization proceedings. *Jaghlit* told the FBI that *IIIT* paid *WISE* an unspecified amount of money in return for allowing *Nafi* to work at *IIIT*. I believe that *Jaghlit* told the FBI that *IIIT* paid *WISE* for allowing *Nafi* to work at *IIIT* in order to conceal the fact that *IIIT* transferred money to *WISE* precisely because *WISE* was a front receiving money for *PIJ*.

24. In June 1998, **redacted xxxxxxxxxxxxxxxxxxx** at *IIIT*'s physical address and its post office box in Herndon revealed the receipt of mail from the *El-Shifa Pharmaceutical Industries Company*, in Khartoum, Sudan. That company's facility, believed to be producing ingredients used in chemical weapons, was the target of an August 20, 1998 American cruise missile attack that retaliated for the bombing of American embassies in Kenya and Tanzania.

25. **Redacted xxxxxxxxxxx** revealed that between October and November 1998, *IIIT* received one parcel through the U.S. mail from *Al-Arian* in Tampa, and another mailed from Lebanon to B.M. *Nafi* at *IIIT*. This confirms to me that the connections between the *Safa Group* and both *Al-Arian*, and *Nafi* remained close even after *WISE* and *ICP* shut down operations.

26. 97.9% of all contributions to *IIIT* between 1997and 2000 were derived from *Safa Group* related entities and/or individuals; another 1.5% came from overseas entities. Over the same period, 72.7% of *IIIT*'s grants and allocations were reported to be for "Free distribution of

56

books and publications." Unlike the other *Safa Charities*, this appears to be a substantial grant of funds outside the *Safa Charities*, but it is impossible to tell, based on this generic description, what *IIIT* (who earlier funded *PIJ*) ultimately did with these funds.

27. On *IIIT*'s returns, the majority of *IIIT*'s grants and allocations are not identified as to donee. Rather, the returns reflect donations going to generic categories (i.e., free distribution of books and publications). According to *IIIT*'s 1998 Form 990, it received $634,936 in contributions - - 96% of which came from *Safa* Trust and the *African Muslim Agency* - - and disbursed $73,998 in grants and allocations, 82% of which was for "free book distribution." In 1999, it received $721,500 -- the majority of its contributions -- from the *African Muslim Agency* and the *Safa Trust, Inc.*, and made grants of $50,700. In 2000, 100% of its contributions for the year, $1,376,000, came from *Safa Trust* and *York Foundation*.

4.   The *SAAR Foundation, Inc.*

28.   IRS records show that *SAAR Foundation, Inc.* ("*SAAR*") was a tax-exempt organization at 555 Grove Street with a purpose to "assist and promote religious and educational research" that was dissolved on December 20, 2000. According to its last Form 990 return, filed May 18, 2001, *SAAR*'s officers and trustees consisted of *Mirza, Jaghlit,* and *Sedky.*

29. 90.3% of *SAAR*'s contributions between 1996-2000 were derived from related *Safa Group* entities; the remaining 9.7% came from overseas. Over the same period, 94.6% of its grants and allocations were made to *Safa Group* related entities - - including $21,128,978 to *Humana Charitable Trust* in the Isle of Man. When an IRS audit was conducted on *SAAR* in 2000, *Mirza* told auditors that he had set up *Humana Charitable Trust* in the Isle of Man to receive transferred assets from *SAAR*, due to publicity tying *SAAR* to terrorist organizations.

57

30. *SAAR*'s 2000 return shows that it dissolved on December 20, 2000. The return shows that it made a grant/allocation consisting of $2,650,000 of *Mar-Jac Investments, Inc.* stock to *Sterling Charitable Gift Fund* ("*Sterling*"), another *Safa Charity*.

5.      *Safa Trust, Inc.*

31. IRS records show *Safa Trust, Inc.* is a tax-exempt organization located at 555 Grove Street with a purpose to "[p]romote religious, educational & cultural projects." Its Form 990 return filed November 6, 2001 listed *Barzinji, Mirza*, Totonji, and *Al-Talib* as its officers, directors, and trustees.

32.. 53.7% of *Safa Trust*'s contributions between 1996 and 2000 were derived from *Safa Group* related entities and/or individuals; 39.6% came from overseas entities. For the same period, 84% of *Safa Trust*'s grants and allocations were made to *Safa Group* related entities; 15.3% was made to unidentified donees. In 1996, *Safa* received $2,935,695, all from unidentified entities overseas, and made grants or allocations of $4,955,900, over 99% of which went to *Heritage Education Trust*, and *IIIT*. In 1997, it received $6,594,988 contributions, over 99% of which came from overseas or related individuals and entities, and provided grants and allocations of over $3,800,000 -- over 99% of which went to related *Safa Group* entities. In 1998, it received about $95,000 - - mostly from *Mirza* - - and disbursed $764,793, over 99% of which went to *IIIT* and *York* International. In 1999, *Safa* received about $1,759,025 in contributions ($1,128,125 of which came from *Mirza*), and made cash grants and allocations of $2,108,756 to unidentified donees. In 2000, *Safa* received only minor contributions but distributed $2,072,681 in grants and allocations, 97% of which went to *IIIT*, the *York Foundation* (in Herndon), and *York International* in the Isle of Man.

58

6.      *Sterling Charitable Gift Fund*

33.      IRS records show *Sterling Charitable Gift Fund* ("*Sterling*") is a tax-exempt

organization located at 555 Grove Street with a purpose "to support charitable organizations

which conduct, promote and administer charitable, religious and educational programs and

activities described in 501(c)(3)." The 2000 Form 990, filed in May 2001, lists *Mirza, M. Omar

Ashraf*, and Muhammad *Ashraf* as *Sterling*'s officers, directors, and trustees.

34. *Sterling Charitable Gift Fund* began operation in 2000. There were only two

transactions recorded for that year. First, *Mirza, M. Omar Ashraf* and Muhammad *Ashraf*

collectively contributed $300 to *Sterling*. Second, *Sterling* received 1000 shares of *Mar-Jac

Investments, Inc.* stock, valued at $2,650,000, from *SAAR* (as noted above, this was virtually all

of *SAAR's* remaining assets). According to the IRS Form 990, *Sterling* made no grants or

allocations in 2000.

7.      *York Foundation*

35.      IRS records show *York Foundation* is a tax-exempt organization located at 555 Grove

Street with a purpose of "education, research, charity." The Form 990 return filed on May 20,

2001 lists *Abusulayman, Mirza*, and Muhammad *Ashraf* as its officers, directors, and trustees.

36. 96.4% of *York*'s contributions during 1999 and 2000 were derived from *Safa Group*

related entities and/or individuals. During the same period, 72.4% of its grants and allocations

were made to *Safa Group* related entities and 21.8% were made to unidentified donees. *York*'s

Form 990 for 1999 reflects contributions of $1,432,500, 93% of which were received from

related *Safa Group* individuals and entities. *York* illegally failed to identify any of its donees for

the year. In 2000, at least 97% of the $4,967,762 it received came from related *Safa Group*

59

individuals and entities; it made cash grants and contributions of $392,000 to *IIIT* and $400,000 to *York* International in the Isle of Man.

XI.   False Statements on the Forms 990

    A.   General

37. In the course of their review of the Forms 990 for the *Safa Charities*, the agents assigned to this investigation have discussed and reviewed certain entities on these returns with tax law specialists from IRS's Tax-Exempt and Government Entities, Exempt Organization Division. These specialists confirmed, based on evidence presented to them by the investigating agents, that infomation as to relationships to the reporting entity required by Form 990, Part VI, Question 80(a) and Form 990, Schedule A, Part III, Question 2 should have been disclosed by the tax exempt entity. The succeeding paragraphs describe the information sought by those questions and the evidence which demonstrates the answers provided were false.

    B.   False Statements Regarding Relationships to Other Organizations

38. Part VI, Line 80a, Form 990, asks, " Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc. to any other exempt or nonexempt organization?" If answered "yes", the name of the organization is required to be identified. The instructions for Form 990 indicate that a "yes" answer to Line 80a is required if most (more than 50%) of the organization's governing body, officers, directors, trustees, or membership are also officers, directors, trustees, or members of any other organization. The officers, directors, trustees, or members need not constitute 50% or more of the other organization. Thus, if the reporting

60