organization has a total of five officers and three of those officers sit on the board of 12 directors of another entity, then the organizations are related and the relationship must be disclosed.

39. A review of the Forms 990 filed with IRS, tax returns of other related entities, tax related information, and corporate information obtained from the Virginia State Corporation Commission revealed the following:

40. *Mirza*, *M. Omar Ashraf*, and *Muhammad Ashraf* were the sole individuals listed as officers, directors, trustees, and key employees on *Sterling Charitable Gift Fund*'s Form 990 for the year 2000. Line 80a, Part VI, of this return, concerning related organizations, was answered "no". However, a review of the 1999 and 2000 Forms 990 for *York Foundation* revealed that *Mirza* and *Muhammad Ashraf* were also two of the three listed officers, directors, trustees, and key employees of *York Foundation*. *York*'s Form 990 also reflected the answer "no" on line 80a, Part VI. *Mirza* signed as President on both the *York* Form 990 and the *Sterling* Form 990. The responses on both returns are false because they failed to report that the two organizations were related to each other.

41. According to Virginia State corporation records, *Mirza*, *M. Omar Ashraf*, and *Muhammad Ashraf* were either the only officers and directors, or comprised the majority (greater than 50%) of the officers or directors of: *Mar-Jac Investments, Inc.* (located at 555 Grove Street, Suite 110, Herndon, VA), of *Grove Corporate Plaza, Inc.* (no longer in business; formerly located at 555 Grove St., Suite 110, Herndon, VA), and of *Sterling Management Group, Inc.* (located at 555 Grove St., Suite 116) for the year 2000. None of these relationships are disclosed on *Sterling Charitable Gift Fund*'s 2000 Form 990, Part VI, Line 80a and 80b. The failure to disclose these relationships is material for the following reasons. *Sterling Charitable*

61

*Gift Fund*'s primary asset in the year 2000 was 1,000 shares of *Mar-Jac Investments, Inc.* stock. Also, Georgia State corporation records reflect that *Sterling Management Group, Inc.* is the manager of HFC Feed Mill, LLC. *York Foundation*'s 2000 Form 990 shows that during the year 2000, *Mar-Jac Poultry* contributed its 100% interest in *HFC Feed Mill, LLC*, worth $4,402,000, to *York Foundation*.

42.. The *SAAR Foundation*'s 1997-2000 Form 990 lists *Mirza* and *Sedky* as two of its three listed officers, directors, trustees, and key employees. *SAAR*'s 1997 and 1999 Forms 990 reflects the answer "yes" to question 80a, Part VI, but names only relationships with *SAAR* International (1997) and *Mar-Jac* Investments (1999). However, documents found in a settlement file for the sale of the real estate located at 555 and 585 Grove Street and 596 and 598 Grant Street, Herndon, VA, show that *Humana Charitable Trust* is an Isle of Man trust. The documents show that *Humana* was set up on November 12, 1997 by *Amana Limited*, with *Amana* being the original Trustee whose directors are *Mirza* and *Sedky*. The documents further indicate that *Amana Limited* is an Isle of Man corporation whose appointed officers are *Mirza*, *Sedky*, and *M. Omar Ashraf.* The Forms 990 for *SAAR* fail to disclose this relationship. From 1997 through 2000, *SAAR* contributed the majority of its assets ($21.1 million) to *Humana Charitable Trust* but did not disclose the relationship between the donor (*SAAR* ) and the donee (*Humana*) on its Forms 990 as required.

43. *SAAR*'s 1996 Form 990 return lists *Mirza* and *Jaghlit* as two of its three officers, directors, trustees, and key employees. *SAAR*'s 1996 Form 990, Part VI, Question 80(a) reflects the answer "yes", but identifies only *SAAR* International DC, Inc. as a related organization. Yet, in 1996, *Mirza* and *Jaghlit* were also officers of *Safa Trust, Inc.* and of *Heritage Education*

62

*Trust, Inc.* as evidenced by their respective Form 990s for 1996. These relationships are not disclosed in *SAAR's* 1996 Form 990 return.

C.    **False Statements on Schedule A (Supplementary Information),**
      **Form 990 Relating to Statements About Activities**

44. Section 501(c)(3) organizations must attach a completed Schedule A (Form 990-Supplementary Information) to their Form 990. Part III of Schedule A requests information about the organization's activities during the year. Question 2, Part III, Schedule A asks, "During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any of its trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary:

    a.    Sale, exchange, or leasing of property?
    b.    Lending of money or other extension of credit?
    c.    Furnishing of goods, services, or facilities?
    d.    Payment of compensation (or payment or reimbursement of expenses if more than $1,000)?
    e.    Transfer of any part of its income or assets?

45. The Schedule A instructions specify that Part III, lines 2(a) through 2(e) apply to both sides of a listed transaction. Reporting is required, for example, whether the exempt organization is a payer or payee, buyer or seller, lender or borrower.

D.    **False Statements Relating to Question 2b, Part III,**
      **Schedule A – Lending of Money or Extension of Credit**

    1.    *SAAR Foundation*

46.    A review of the Forms 990 show that sometime prior to 1996, the *SAAR Foundation, Inc.* made a $15,000,000 loan to *Mar-Jac Investments, Inc.*, a taxable entity. On its 1997 Form 990, *SAAR* listed *Mar-Jac* Investments as a 100% subsidiary with

63

assets of $11,500,000. This loan was carried as a loan receivable on *SAAR*'s Forms 990 for 1996 through 1998. Although the loan was not made during the years 1996 through 1998, *SAAR* continued to extend credit to *Mar-Jac* Investments during these years as a balance was still due. No interest rate is shown. On each of *SAAR*'s returns for 1996-98, however, the answer to Question 2(b), Part III, Schedule A (hereafter "Q2b") is "no".

47. These are false statements because Virginia State corporate records reflect that *Mirza* was a registered agent, director, president, and treasurer of *Mar-Jac* Investments from 1997-2000. *SAAR*'s 1996-2000 Forms 990 demonstrate that *Mirza* was the President, CEO, and Trustee of *SAAR* during those years. On its 2000 return, *SAAR* reported that its interest in *Mar-Jac Investments* had been contributed to *Sterling Charitable Gift Fund* but *Mirza,* who signed the Forms 990 for *SAAR* and for *Sterling,* concealed that he was on both ends of this transaction.

48. *SAAR*'s 1996 and 1997 Forms 990 also reflect a $109,890 demand loan made by *SAAR* to *Mar-Jac* Poultry. Again, the answer to Q2b is "no". This is a false statement because, according to State of Georgia corporation records, *Mirza* is an officer of *Mar-Jac Poultry, Inc.*

    2.   *Safa Trust*

49. *Safa Trust, Inc.*'s 1999 and 2000 Form 990 returns show that *Safa Trust* made a loan of $900,000 to *Reston Investments, Inc.*, a taxable entity, during 1999, the balance of which had increased to $1,364,972 by the end of the year 2000. In addition, *Safa Trust*'s 1998 Form 990 shows that it had a note payable (liability) to *Reston Investments, Inc.* in the amount of $352,857. *Barzinji, Mirza,* and *Al-Talib* were all officers of both *Safa Trust* and of *Reston Investments, Inc.* in 1998-2000, according to *Safa*'s Forms 990 and Virginia State corporation records. Yet, the

789950004-P/C-000046.064

*Safa Trust* Form 990s for 1998, 1999, and 2000, signed by *Mirza*, falsely show the answer "no" to Q2b.

50. In addition, *Safa Trust*'s Forms 990 reflect that it had also made a $263,000 working capital loan to *Grove Corporate, Inc.* in 1997 and a $500,000 loan to *Mar-Jac* Poultry sometime prior to 1996, the balance of which carried into 1996. *Mirza* was an officer of both of these taxable entities. *Barzinji* and *Al-Talib* were also officers of *Grove Corporate, Inc.* Yet, on *Safa*'s returns for 1996 and 1997, the answer to Q2b is falsely stated as "no".

    E.    False Statements Relating to Question 2a (Sale, exchange, or leasing of property) and 2e (Transfer of any part of income or assets), Part III, Schedule A

        1.    *African Muslim Agency*

51. 1998 and 1999 Forms 990 for the *African Muslim Agency* report that *Mar-Jac Poultry*, a taxable entity, donated $1,100,000 cash to the *African Muslim Agency* in 1998 and $1,125,000 cash to the *African Muslim Agency* in 1999. Georgia State corporation records reflect that *Mirza* and *Al-Talib* were both officers of *Mar-Jac Poultry*. *African Muslim Agency*'s Form 990 shows both individuals were also officers of the *African Muslim Agency*. Yet, *African Muslim Agency*'s Forms 990 for 1998 and 1999 both answer "no" for question 2e. These are false statements since *Mar-Jac Poultry* transferred assets to *African Muslim Agency* while *Mirza* and *Al-Talib* were officers of both entities.

        2.    *SAAR Foundation*

52. *SAAR*'s 1999 Form 990 reflects that it invested $2,703,760 in corporate bonds of *Mar-Jac* Investments, a taxable entity. *Mirza* was the President, CEO, and a trustee of *SAAR* and the President, Treasurer, and a director of *Mar-Jac Investments*. *SAAR*'s 1999 return reflects the

65

answer "no" to Questions 2a and 2e.  These are false statements since *Mar-Jac Investments* sold corporate bonds to *SAAR* and *SAAR* transferred assets (i.e., funds) to *Mar-Jac Investments* to purchase the bonds.

        3.    *Safa Trust*

53.  *Safa Trust*'s Forms 990 reflect that during 1997, *Safa* invested $2,000,000 in the corporate stock of *Grove Corporate, Inc.*  According to Maryland State Personal Property Returns, *Barzinji*, *Mirza*, and *Al-Talib* were all officers of *Grove Corporate, Inc.* and of *Mena* Corporation, both taxable entities.  According to *Safa*'s 1997 return, all three were also officers of *Safa Trust*.  Yet, *Safa Trust*'s 1997 return reflects the answer "no" to Questions 2a and 2e. These are false statements since *Grove Corporate, Inc.* sold corporate stock to *Safa* and *Safa* transferred assets (i.e. funds) to *Grove Corporate* to purchase the stock.

        4.    *York Foundation*

54. *York Foundation*'s 2000 Form 990 shows that *Mar-Jac Poultry*, a taxable entity, donated 100% ownership of HFC Feed Mill, LLC, valued at $4,402,000, to *York Foundation*. *York*'s 1999 Form 990 shows that *Mar-Jac Poultry* donated $175,000 cash to *York* in 1999. Georgia State corporation records reflect that *Mirza* was an officer of *Mar-Jac Poultry* . *York*'s Forms 990 identifies *Mirza* as an officer of *York*.  On *York*'s Forms 990 for 1999 and 2000, however, question 2e was answered "no".  These are false statements since *Mar-Jac Poultry* transferred assets to *York Foundation* while *Mirza* was an officer of both *Mar-Jac Poultry* and *York*.

      F.    False Statements Relating to Contributions Received
           and Grants Made by Tax Exempt Organizations

          1.   *African Muslim Agency and IIIT*

66

55. The *African Muslim Agency*'s 1998 Form 990 reflects that it made a $600,000 cash donation to *IIIT*. On its 1998 Form 990, however, *IIIT* only reported that it received a $370,000 contribution from *African Muslim Agency*. One or both of these returns are false statements. The *African Muslim Agency*'s 1997 Form 990 does not report making any donations to *IIIT* in 1997. However, *IIIT*'s Form 990 for 1997 shows that *African Muslim Agency* contributed $265,000 to *IIIT* in 1997. One of these is a false statement.

56. *IIIT*'s 1997 and 1998 returns appear to have been signed by *Al-Talib*. *African Muslim Agency*'s 1997 and 1998 returns were signed by *Mirza*.

### 2. *Safa Trust*

57. Between January 17, 1997, and July 1997, checks totalling $325,000 were drawn on the *Safa Trust*, *Inc.* bank account at First Union Bank and made payable to *HLF* - - the *HAMAS* front group. This amount is not reflected on *Safa Trust*'s 1997 Form 990 as a contribution. I believe that *Safa* did not mention this contribution on its return to make it less likely that law enforcement authorities would track money from *Safa* to *HLF*.

### 3. *Safa Trust* and *Heritage Education Trust*

58. On its 1996 Form 990, *Safa Trust* reported that it made grants and allocations of $3,602,009 to *Heritage Education Trust*. On *Heritage*'s 1996 Form 990, *Heritage* reported that it received $8,600,000 in contributions from *Safa Trust*. One of these returns is a false statement. *Safa*'s 1996 return was signed by *Mirza*. *Heritage*'s 1996 return was also signed by *Mirza*, who was *Heritage*'s Secretary, Treasurer, and Director in 1996.

### 4. *Safa Trust* and *IIIT*

67

59. On its Form 990 for 1997, *IIIT* reported that it received contributions of $522,007 from *Safa Trust* in 1997, but on its own Form 990, *Safa Trust* reported that it donated $585,649 to *IIIT* the same year.  On its Form 990 for 1998, *IIIT* reported that it received contributions of $240,000 from *Safa Trust*, but *Safa Trust* reported that it only donated $159,178 to *IIIT* the same year.  At least one of these returns is false.  *Mirza* signed *Safa*'s Forms 990 for 1997 and 1998.  *Al-Talib* appears to have signed *IIIT* Forms 990 for 1997 and 1998.

### 5. *Heritage Education Trust* and *SISS*

60. *Heritage Education Trust*'s 1996 Form 990 reflects that *Heritage* gave a grant/allocation of $800,000 in that year to its affiliate, *SISS*.  In its 1996 Form 990, *SISS* reported that it received only $450,000 in total contributions (contributors not shown) the same year, a difference of $350,000.  One of these returns is false.

### 6. *SAAR and Safa*

61.    A check written by *Mirza* from the account of *SAAR Foundation* to *All Dulles Area Muslim Society ("ADAMS")*, in the amount of $250,000, was deposited into a *Safa Trust* account on December 15, 1997.  On *SAFA*'s 1997 Form 990, however, this amount is not reflected as a contribution received from either *ADAMS* or *SAAR*.  Moreover, *Safa*'s 1997 Form 990 does not reflect any other transactional relationship with *ADAMS* or *SAAR* (i.e., a loan receivable or loan payable) that would explain the transaction.  Furthermore, *SAAR*'s Form 990 for 1997 does not reflect a grant/allocation to either *ADAMS* or *SAFA* in 1997, not does *SAAR*'s return show any other transactional relationship with *ADAMS* or *Safa* (i.e. loan receivable or loan payable) that would explain the transaction.  (*M. Omar Ashraf*, of *Sterling Charitable Gift Fund*, is listed as an officer of *ADAMS*).

68

XII.    THE *SAAR* Audit

    A.    Observations of and Information Obtained from Auditors

    62.   In March of 1999 the Internal Revenue Service, Tax Exempt/Government Entities, Exempt Organizations Division began an audit of *SAAR*'s Forms 990 for the year 1997 and 1998. The audit concluded on February 21, 2001. At the conclusion of the audit the IRS issued a notification to *SAAR* that it was continuing to recognize its status as exempt pursuant to Section 501(c)(3). Revenue Agents Eugene Gilmartin and Michael Bieloski, who conducted the audit were interviewed by agents assigned to this investigation.

    63. Gilmartin and Bieloski audited the Forms 990 returns filed by *SAAR* for the years 1997 and 1998. At the outset *SAAR* represented it was not conducting any business during the examined years other than distributing its assets. As a result, the examination was limited in scope to attempting to verify that the grants and allocations made by *SAAR* were for religious, scientific or educational purposes. As part of their examination, the auditors met with *Mirza* and *SAAR*'s return preparer, *Manzoor Qureshi,*, at *SAAR*'s office at 555 Grove Street in Herndon. *Mirza* was not present for the entire audit; however, *Qureshi* called him in on several occasions to answer specific questions.

64.    The investigation has obtained the audit file from Revenue Agent Gilmartin. The file contained correspondence, work papers and some cancelled checks. As a result of his review of the file and interview of the examining agents, investigators learned the following:

    65. The revenue agents were told that *SAAR* was created for people overseas to pay scholarships for Muslims in the United States.

69

Z89950004 P/C 000046 069

66. *Mirza* told the examining agents that he had founded *Humana Charitable Trust* in the Isle of Man ("*Humana*") and was transferring *SAAR*'s assets to it as a result of negative newspaper publicity that associated *SAAR* and *Safa Trust* with terrorist groups. Gilmartin and Bieloski stated that *Mirza* and/or *Qureshi* led them to believe that *Mirza* intended to move these two charities out of the country.

67. In order to verify that *SAAR*'s grants/allocations were being used for an exempt purpose, the examiners requested a list of donee-beneficiaries that had received grants from *SAAR* and/or *Humana* for the years 1997 and 1998. They contacted those donees located in the United States, who denied having any knowledge of *Humana* or *SAAR*. *Mirza* advised the examiners that *Humana*'s funds were distributed to Al *Rajhi* Charities in Saudi Arabia and then to the beneficiaries through *Al-Rajhi*. *Qureshi* sent a letter stating that *Mirza* had traveled to Saudi Arabia and obtained copies of wire transfers and checks aggregating $168,667 that went from *Al-Rajhi* to U.S. beneficiaries. The auditors obtained confirmation from recipients that they received grants from *Al-Rajhi* Charities, but never received documentation that *Humana* funds were ever disbursed to *Al-Rajhi*.

B.     Misstatements/Misrepresentations During the Audit

68. I have spoken with IRS agents who have reviewed the file associated with the audit. In light of their knowledge of the investigation and facts set forth elsewhere in this affidavit, there is probable cause that *Mirza* and *Qureshi* obstructed or attempted to obstruct the successful completion of the audit by providing false and/or misleading information to the auditors. In particular, when the auditors made inquiries into entities related to *SAAR* they were met by false denials of such relationships.

70

69. At the outset of the audit, the agents asked for an "organizational chart of all subordinate or related entities." At the opening meeting on April 6, 2000, *Mirza* and *Qureshi* stated the universe of related entities is substantially smaller than the agents had anticipated. They subsequently received a chart which showed that the only active members were *SAAR Foundation, Inc.*, and it wholly owned subsidiary *Mar-Jac Investments, Inc.* In light of the evidence set forth in this affidavit, this representation is patently false.

70. The auditors were told that *SAAR* was winding down its operations and that all of its assets had been transferred overseas to *Humana Charitable Trust*. In the course of the audit they were provided a resolution of the Board of Directors of *SAAR*, directing that all assets be transferred to *Humana* and that *SAAR* be dissolved. In fact, $2,650,000 of *SAAR* assets were transferred to a domestic tax exempt organization, *Sterling Charitable Gift Fund*, an organization whose identity and existence were concealed from the auditors. According to IRS records, *Sterling Charitable* Fund was established in March 2000, 11 months before the *SAAR* audit was concluded. The transfer of the $2,650,000 occurred on December 20, 2000, the date of *SAAR*'s purported dissolution. By the formation of *Sterling Charitable Gift Fund* and the transfer of *SAAR* assets to it, *SAAR* became *Sterling*. In other words *SAAR* simply changed its name to *Sterling*.

71. In addition, *SAAR* still had an active bank account with First Union Bank until October 2001. The address on the account was 555 Grove Street, Herndon, Virginia. *SAAR*'s 2000 Form 990 shows that it transferred the majority of its assets, consisting primarily of stock in *Mar-Jac Investments*, to *Sterling Charitable Gift Fund*. According to *Sterling*'s Form 990 for 2000, *Sterling*'s address is the same as *SAAR*'s – 555 Grove Street in Herndon. *Mirza* is listed

71

on *Sterling*'s 2000 return as the President of *Sterling*. Furthermore, according to First Union

statements, *Sterling* transferred $250,000 to "*SAAR Foundation*, Int'l Institute of Islamic

Thought (*IIIT*), 555 Grove Street, Herndon, VA 22070" during November 2001. The money

was deposited into an account in the name of *IIIT* at P.O. Box 669, Herndon, VA 20170.

However, the transfer of money in November 2001 indicates that *SAAR* operated as alter ego or

nominee of *IIIT* even though, according to IRS records, it was dissolved as a 501(c)(3) charity in

December 2000.

     72.. During an April 6, 2000 meeting attended by *Mirza* and *Qureshi*, the auditors were

told that there was no overlap of officers or trustees between *SAAR* and *Safa Trust, Inc.* In

addition they were told that *Mirza*'s company, *Sterling Investments*, provided management and

accounting services for *Safa Trust*, creating the impression that the only relationship between

*Sterling* and *Safa* was an arm's length business relationship. Further, they were told that *Safa*

*Trust* had its offices in Herndon, but at a location different from *SAAR*'s. In fact, in an interview

for Regardie's Magazine published in October 1988, *Mirza* admitted that *Safa Trust* was an

entity related to *SAAR*. Moreover, from 1996-2000, *Mirza*, the President/CEO/Trustee of *SAAR*

at 555 Grove Street, was listed on *Safa*'s Forms 990 as a Vice President of *Safa Trust* and its

registered agent for service of process at 555 Grove Street. In addition *Safa*'s bank statements

for October-December 2001 went to the same address as *SAAR*'s.

     73. At the same April 6, 2000 meeting the auditors were told of the existence of *York*

*Foundation*, a new entity represented to be independent from the *SAAR Foundation*. In fact,

*Mirza*, the President and Treasurer of *York Foundation*, is also the President/CEO and Trustee of

*SAAR Foundation*, which was located at the same address as *York Foundation*.

72

C.    Additional Information Concerning *Al-Rajhi* Charity

74. IRS-CI Special Agents have reviewed the copies of 14 checks provided during the audit as substantiation that *SAAR* had made grants/allocations to beneficiaries through *Humana Charitable Trust* and *Al-Rahji* Charity.  They found that the checks were drawn on a Chase Manhattan Bank Account in New York.  The account is in the name of *Al-Rahji* Banking & Investment Corp, Riyadh, Saudi Arabia.  Eleven of the checks indicate on the face that the amount of the check came, not from *Al-Rahji* Charity, but from an individual named Abdul Rahman *Al-Rajhi.*  The other three checks do not identify from whom the amounts came.  The eleven checks, totaling $104,000, show that someone, not *Al-Rajhi* Charity, remitted the stated amount to the account holder, *Al-Rajhi* Banking & Investment Corp., which in turn drew checks on a New York bank account in the stated amounts to the payees.  Nothing on any of the 14 checks identifies the funds as having been issued from *Al-Rajhi* Charity, much less from *Humana.*

75. The remitter, Abdul Raham *Al-Rajhi*, is identified on a website as the Vice Chairman & Executive Manager of *Al-Rahji* Commerical Foreign Exchange.  Correspondence with the *Al-Rahji* Charity purportedly related to the donations does not indicate that Abdul Rahman *Al-Rahji* is with *Al-Rajhi* Charity.  A web search did not locate a web address for *Al-Rajhi* Charity.  The only evidence that Abdul Rahman *Al-Rajhi* is connected with an *Al-Rajhi* Charity Office comes from a statement prepared by *Mirza* in the course of the audit, dated December 29, 2000, which asserts Abdul Rahman *Al-Rajhi* is a manager of *Al-Rajhi* Charity.

76. *Al-Rajhi* Banking & Investment Corp.'s website indicates that Abdullah Sulaiman *Al-Rajhi* is the General Manager of *Al-Rajhi* Banking & Investment Corp.  Virginia corporation

73

information indicates he is also the President of *Aradi, Inc.*, located at the same address as *SAAR*,

555 Grove Street. Other officers listed for *Aradi, Inc.* are *Al-Talib* and *Sedky*. Thus, while the

*Safa Group* cannot be said to have formal control over *Al-Rajhi* Banking & Investment Corp.,

the *Safa Group* had access to a bank and banking officials through Abdullah Sulaiman *Al-Rajhi*

for purposes of producing checks purportedly paid for *SAAR*'s charitable purposes.

XIII.   Additional Layering in Connection with *SAAR Foundation*'s Dissolution

77. *Mirza* stated in the audit that *SAAR* had been founded as a charitable organization in

the United States to earn a better yield on funds collected in Saudi Arabia for charitable

purposes. This was done because the members of the *Al-Rahji* family believed that, by investing

in the United States, they could earn a higher yield on the funds collected prior to the time they

were disbursed for charitable purposes.

78. After what he described alternatively as adverse publicity in papers about

connections to terrorism, or the media becoming too probing in 1995 -1996 (which appears to

refer to the press reporting *SAAR* giving money to *PIJ* through *IIIT* ), *Mirza* stated that *Humana*

was formed in the Isle of Man in November 1997. He then explained that rather than

establishing its own disbursement office (to determine who would receive grants), *Humana*

decided it would use the *Al-Rajhi* Charity office in Saudi Arabia. As a result of this

restructuring, *SAAR* placed its considerable asset pool beyond the immediate reach of United

States law enforcement and added at least two additional layers (*Humana* and  *Al-Rajhi*) to any

grant purportedly made for charitable purposes. With respect to disbursements to United States-

based donees, this path requires all disbursements to be moved from *SAAR*, overseas, through a

74

minimum of two financial institutions, before being returned to the ultimate beneficiary in the United States.

79. There is no innocent reason which accounts for these additional financial transactions connected with these disbursements. *SAAR* performed a role as the money managers for this huge asset pool. Even if *SAAR* was incapable of determining who was entitled to the grants, the names of the recipients could have been relayed to *SAAR* - - and the disbursement by *SAAR* could have been made directly to those recipients - - without first forwarding the funds through the additional financial institutions.

XIV.   Evidence of Personal Inurement

80.     In this section I will detail the supporting evidence uncovered in the financial investigation which has established probable cause to believe that *Safa Group* individuals have obtained personal inurement as a result of their control over the businesses and charities described above. As a result, principals of the *Safa Group* have also committed tax fraud in connection with their individual income tax returns.

81. One of the primary reasons the Form 990 requires disclosure of transactions between related entities and individuals is because of the prospect of personal inurement, i.e., individuals profiting personally from a § 501(c)(3) entity. The evidence reviewed to date demonstrates several examples of personal inurement.

## Paragraphs 192 through 213 REDACTED

E.     Failure to Disclose Foreign Bank Accounts

82. A business account application signature card from 1st American Bank shows that *SAAR* International, with an address of 555 Grove Street in Herndon opened a bank account at

75

ZВ9950004-Р/С-000046-075

1st American Bank on 09/19/89. *Mirza*, *Al-Talib*, and *Barzinji* all had signatory authority. The bank statement reflects the use of the same taxpayer EIN number as the one used by *SAAR Foundation, Inc.* The use of the same taxpayer EIN number demonstrates that *Mirza* represented to the bank that *SAAR Foundation, Inc.* and *SAAR* International were the same entity.

83. A business account application signature card from 1st American Bank shows that *SAAR Foundation Canada, Inc.*, Grove Street in Herndon, opened a bank account at 1st American Bank on 02/22/90. *Mirza*, *Al-Talib*, and *Barzinji* all had signatory authority.

84. A review of *SAAR* bank records for account # 2000071284015 at First Union revealed seven debit memos for transfers cumulatively totaling over $200,000 to either *"SAAR Foundation* Canada" or *"SAAR Foundation"* at Canadian Imperial Bank of Commerce. While I have not yet obtained foreign bank accounts, this evidence gives me reasonable cause to believe that they are signatories on a foreign bank account in the name of *SAAR Foundation Canada* and/or *SAAR Foundation* at the Canadian Imperial Bank of Commerce.

85. The accounts of *SAAR Foundation* and *SAAR Foundation Canada* at First Union in Virginia include *Mirza*, *Barzinji*, *Al-Talib*, and/or *Jaghlit* as the signatories on those accounts. Thus, I have probable cause to believe that *Mirza*, *Barzinji*, *Jaghlit* and *Al-Talib* have signatory authority over accounts at Canadian Imperial Bank and thus have filed materially false tax returns for the year 1996 in that they failed to disclose on Schedule B of their personal tax returns that they had signatory authority over a bank account in a foreign country. A review of the relevant returns demonstrates that each individual answered "No" to the question related to foreign bank accounts.

76

86. Further, a document dated 12/15/97 and entitled, "Consent to Action Taken in Lieu of an Organizational Meeting of *Amana Limited*" that investigators obtained from BB&T Bank, shows that the directors of *Amana* (*Sedky* and *Mirza*) resolved that *Amana*, an Isle of Man corporation (and the Trustee for *Humana*, an Isle of Man trust) designated Commerce Bank of Maryland (later taken over by BB&T) and Bank Leu as depositories for the funds of *Amana Limited* and *Humana*. Moreover, First Union records for *SAAR* contain debit memos for three international fund transfers on October 15, 1998, totaling $2,000,000, to Credit Suisse / Bank Leu for the benefit of *Humana*. Thus, I have probable cause to believe that *Mirza* had signature or other authority over any accounts in the name of *Humana Charitable Trust*, including Bank Leu, a foreign bank account and, accordingly, filed a materially false tax return for 1998 in that he failed to disclose on his return's Schedule B that he had signatory authority over a bank account in a foreign country.

87. Moreover, *Mirza* had control over the overseas bank accounts for the Isle of Man entities *Humana* and *York International Trust*.

88. On October 16, 1998, *Mar-Jac Holdings, Inc.* wrote a check to *York International Trust* in the amount of $54,327.83. The notation on the check evidenced a loan made to *Mar-Jac Holdings, Inc.* by *York International Trust*. The check was endorsed, "Pay to *Sterling Investment Group*," and signed by *Mirza*, trustee for *"York Int."*

89. A review of *Mirza*'s 1998 individual income tax return shows that *Mirza* failed to identify signature or other authority over a foreign bank account. On the basis of the foregoing evidence, I have probable cause to believe this is a materially false statement.

XV.    <u>Conclusions Regarding Offenses Committed</u>

77

90. On the basis of the facts set forth in the foregoing affidavit, I have probable cause to believe that:

a.   At all times relevant to this affidavit, *Al-Arian*, *WISE*, *ICP*, and *HLF* were fund raising fronts for *HAMAS* and *PIJ*.

b.   *Al-Alwani*, *Barzinji*, *Jaghlit*, *Mirza*, and others in the *Safa Gr*oup maintained a financial and ideological relationship with persons and entities (*WISE, ICP, HLF, Al-Arian, Nafi*, and Ramadan *Shallah* ) with known affiliations to the designated terrorist Groups *PIJ* and *HAMAS*.

c.   *Al-Alwani*, *Barzinji*, *Jaghlit*, *Mirza*, and others in the *Safa Gr*oup maintained their financial relationships with *WISE, ICP, HLF, Al-Arian, Nafi,* and *Shallah* through various members of the *Safa Group* particularly including *IIIT*.

d.   Before search warrants were executed in 1995, the financial support provided to terrorist front-groups provided by the organizers of the *Safa Group* was sometimes relatively open and sometimes hidden.

e.   After the search warrants were executed in 1995, the members of the *Safa Group* continued to ideologically support *HAMAS* and *PIJ* but generally did not provide overt financial support to those organizations.

f.   After the search warrants were executed in 1995, the members of the *Safa Group* stopped providing open support to *HAMAS* and *PIJ*. Instead, they concentrated on routing financial support to those same organizations by layering financial transactions through charities and businesses within the *Safa Group* to conceal and disguise the fact that they were continuing to send money from the United States to the Middle East to fund international terrorism, in violation of 18 U.S.C. § 1956(a)(2), 18 U.S.C. § 2339A, and 18 U.S.C. § 2339B.

91.   On the basis of the facts set forth in the foregoing affidavit, even if the *Safa Group* is not sending money to *HAMAS* and *PIJ*, I have probable cause to believe that *Abusulayman, Al-Alwani, Barzinji, Al-Talib, M. Omar Ashraf, Muhammad Ashraf, Jaghlit, Sedky, Ahmad Totonji,* and others, have engaged in a conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Department of the Treasury in the

78

ascertainment, computation, assessment, and collection of federal income taxes, in

violation of 18 U.S.C. §371, by -

a.   Using the *Safa Charities* to take advantage of exemptions from federal income
taxation while abusing the requirements for tax exempt status;

b.   Using a web of corporate entities, both exempt and non-exempt, over which they
exercised actual or effective control to move funds between entities, through a
series of transactions designed to conceal the true nature, source, disposition and
taxability of revenues moved between these entities; and

c.   Misrepresenting the nature of the relationship between the *Safa Charities* and for-
profit members of the *Safa Group* to avoid scrutiny of their financial transactions.

92.  Further, I have probable cause to believe that *Mirza, Abusulayman, Al-Alwani,*

*Barzinji, Al-Talib, M. Omar Ashraf, Muhammad Ashraf, Jaghlit, Sedky, Ahmad Totonji,* and

others engaged in a scheme to file or cause the filing of materially false Forms 990 concealing

the relationships between the *Safa Charities*, certain for-profit companies and the financial

transactions between these related entities, all in violation of 26 U.S.C. § 7206(1) and (2).

93. Further, I have probable cause to believe that *Mirza* and *Qureshi* engaged in a corrupt

endeavor to impede and impair the due administration of the internal revenue laws in violation of

26 U.S.C. § 7212(a) during the *SAAR* audit by:

a.   affirmatively misrepresenting the status of *SAAR Foundation* and the disposition
of its assets;

b.   concealing from the auditors the identity of *Sterling Charitable Gift Fund*, which
was organized in March 2000, utilized the same address as *SAAR* and received
*SAAR*'s major asset;

c.   concealing the fact that *SAAR* maintained an active bank account until at least
October 2001;

d.   affirmatively misrepresenting that there was no overlapping of officers between
*SAAR Foundation* and *Safa Trust, Inc.*, when *Mirza* was an officer of both *SAAR*
and *Safa*;

79

e.     affirmatively misrepresenting the relationship between *Al-Rahji* Charities and *SAAR*, by omitting that Abdul Rahman *Al-Rahji* is an officer of *Aradi, Inc.*, located at the same address as *SAAR*; and

f.     concealing the relationship between *York Foundation* and *SAAR*.

94.  Finally, I have probable cause to believe that *Al-Alwani, M. Omar Ashraf, Muhammad Ashraf, Mirza, Jaghlit, Barzinji, Totonji,* and *Al-Talib* each have willfully filed false individual income tax returns for the years 1997 and 1998 in violation of 26 U.S.C. § 7206(1) by over-reporting deductions, under-reporting income, and/or failing to report signatory authority over foreign bank accounts.

XVI.  <u>Records Created and Maintained by the Targets</u>

95.  There is probable cause to believe that the items listed in Attachment B will be found at the locations to be searched, and represent contraband, instrumentalities, fruits, and evidence of the commission of criminal violations against the United States.  In the following paragraphs, I will set forth my basis to support that the items set forth in Attachment B will be located on the premises for which this application seeks search warrants.

A.  <u>Records Required to be Maintained by *Safa Charities*</u>

96.  Part IV, line 91 of the IRS Form 990 requires tax-exempt entities filing Forms 990 to identify their custodians of records as well as the physical locations where the records are maintained.  While the instructions to Form 990 do not directly address what records are referenced by this line, the IRC and Regulations set forth comprehensive record-keeping requirements which the entity admits exist when it answers line 91.

97.  26 U.S.C. § 6001 generally requires the keeping of records.  It states:

Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe.

80

98. The regulations under Section 6001 require that:

[A]ny person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information. 26 C.F.R. § 1.6001-2(a).

99.   With respect to exempt organizations the regulations state:

[E]very organization exempt from tax under section 501(a) shall keep such permanent books of account or records, including inventories, as are sufficient to show specifically the items of gross income, receipts and disbursements.  Such organizations shall also keep such books and records as are required to substantiate the information required by section 6033. See section 6033 and §§ 1.6033-1 through 1.6033-3.  26 CFR § 1.6001-1(c).

100.  Section 1.6033-2 of the regulations requires that "every organization exempt from taxation under section 501(a) shall file an annual information return specifically setting forth its items of gross income, gross receipts and disbursements, and such other information as may be prescribed in the instructions issued with respect to the return."

101.    The references in 26 C.F.R.  §§1.6001-2(a) & 1.6003-2 to "any information on the return" or "prescribed in the instructions" describe the duty of the entity to maintain specific records, which relates to the admission as to the custodian and location of records.  The statement on the Form 990 can be construed to be an admission that the full panoply of records to support any entry on the return, or required by the instructions, is at the physical location identified on the return.

102.  Based on my examination of the IRS Forms 990 and conversations with the IRS-CI agents involved in this case, I know that records to support entries on the IRS Forms 990 are required by law to be maintained by the *Safa Charities* at the locations identified by those

81

charities in their most recent IRS Form 990s. These records include all records regarding

officers, directors, employees, grants received, expenses, employee salaries, distributions,

investments, contributions received, grants and allocations made, assets, loans, liabilities, and

other financial and organizational relationships.

      B.     Records of Money Laundering, Tax Evasion, and Support for Terrorists

      103. In my experience, and as shown in this affidavit, providing support to terrorists

through layered transactions, and/or tax evasion accomplished through misuse of charitable

status, results in the production and maintenance of records. Records relating to the acquisition

and disposition of the money transferred to overseas money laundering havens, as well as to

terrorists, are produced and likely to be maintained in residential and business locations used by

the conspirators of these crimes. Accordingly, records relating to transfers of money to, from,

and between companies and charities in the *Safa Group* are likely to be maintained in the

business and residential locations used by the individuals controlling the *Safa Group*.

104.     Based upon my experience and training in investigations involving the transfer of funds

offshore to evade taxes or hinder law enforcement's ability to trace their ultimate disposition, I

know that individuals accomplishing such transfers often maintain some form of records. They

tend to maintain records either at their business or residence reflect their interest in the offshore

accounts under their control, as well as how much money they transferred to ultimate

destinations from those offshore accounts. Accordingly, regardless of whether the individuals

connected with the *Safa Group* engaged in material support to terrorists or merely tax evasion,

there is probable cause that they maintain records relevant to the offenses described in this

affidavit in their business premises or in their homes.

Z89950004 P/C 000046 082

105.  In the course of this investigation, I have seen various spellings of the names of many of the individuals controlling the *Safa Group*, as well as various spellings of the names of terrorists and terrorist-front groups.  For example, I have seen *Barzinji* also as "albarzinji;" *Al-Talib* as "Altalib;" *Jaghlit* as "El-Gajhleet;" *Najar* as "Naajar," "Najjar," and "al-Najar;" *Shikaki* as "Shiqaqi;" and Mohammad spelled in various ways such as "Mohamed," "Muhamed," and "Muhammed."  Based on my training and experience, I know that many Arabic names are not consistently translated into English, at least in part because the Arabic language does not have letters equivalent to our vowels.  Accordingly, the records that I seek to seize include those referencing aliases, fictitious, and nominee names of individuals otherwise relevant to this investigation.

C.    Computer Files

106.  Based on my training and experience, I know that businesses ordinarily maintain records relating to their financial activities.   Some or all of these records typically are maintained at the location where the businesses conducts their operations.   Additionally, businesses today routinely utilize computers to generate correspondence, maintain financial records, and electronically communicate with other businesses and persons.   I am further aware that the use of computer networks is increasingly common, even in modest-sized companies.

107.    Data generated on individual computers in a network can be stored on the hard drive of individual computers and/or on the computer network's server.   In addition, individual users of this network can save data outside the computer network on electronic storage media, including diskettes, and other electronic and optical storage mediums.

Z89950004-P/C-000046.083

108.  I know that the *Safa Group* utilizes computers to maintain books and records.  On its Form 990 for 1999 filed with the IRS in May 2000, *SAAR Foundation* listed fully depreciated computers/printers with an original basis of $14,959.  Although *SAAR* may have dissolved in December 2000, it transferred its assets to *Sterling Charitable Gift Fund.* Moreover, First Union records reflect a $3,533.02 check dated September 30, 1997, on the account of *Safa Trust, Inc.*, payable to Micron Electronics, a computer equipment manufacturer.

109.  On its IRS Form 990 for the year 2000, filed in January 2001, *IIIT* showed that it was depreciating almost $50,000 of computer equipment and software.  On its Form 990 for the year 2000, filed in October 2001, *Heritage Education Trust, Inc.*, represented that was depreciating a computer.

110.    On its 1997 Form 1120, U.S. Corporation Income Tax Return, filed in September 1998, *Mar-Jac Investments, Inc.* showed that it was depreciating various assets, including computer hardware and software with a basis of over $75,000.  In January 2000, *Mar-Jac Investments* employee Beverly *Hassan* told FBI agents that *Mar-Jac Investments* and *Reston Investments* provided management, accounting, payroll, and administrative services for the *SAAR* affiliated companies operating in the Northern Virginia area.

111.  I learned from USCS SA Augustus Acquino that the USCS has conducted an investigation to determine the locations of web sites and email addresses used by members of the *Safa Group.*  SA Acquino told me that *IIIT* maintains several web pages both in English and Arabic that appear to be mirror images located on the same Internet service. One web page is located at web address www.iiit.org;; the other is identified only by the IP address of 209.35.161.210.  Both of these web addresses reside on the computer network of the Internet

84

Service Provider ("ISP") Interland of Atlanta, GA.  Investigation by USCS indicates that both

pages provide links to the email address of iiit@iiit.org mailto:iiit@iiit.org to contact the

organization. The Internet domain registration information lists the domain of iiit.org  as

registered to *IIIT* in Herndon, Virginia, with an administrative and billing contact listed as *Iqbal*

*Unus*, at *IIIT,* in Herndon, with the email address of iqbalunus@iiit.org.

   112.  SA Acquino told me that the web site located at web address www.iiit.org has a

direct link from the main home web page to the *Child Development Foundation* ("*CDF*"),

another *Safa Group* organization.  This link is the only external link displayed on the main web

page.  Account subscriber records obtained from Interland identify *Iqbal Unus* and *IIIT* as the

subscriber of the *CDF* and the *IIIT* sites; in fact both accounts appear on the same subscriber

record.  http://www.sterlingmgmt.com Moreover, a commercial data base check for *CDF* listed

*Unus* as the email contact at iqbalunus@hotmail.com.  Hotmail records reflect that this account

is subscribed by *Iqbal Unus*.

   113.  SA Acquino told me that USCS investigation revealed that the *Sterling*

*Management Group* ("*SMG*") maintains a web site located at the web address/Uniform Resource

Locator (URL) of www.sterlingmgmt.com. The web site, hosted on the network of Ardent

Communications, an ISP in McLean, Virginia, provides an address of 555 Grove Street, Suite

116, in Herndon, and an email address of smg@sterlingmgmt.com.  In addition to providing

information about various *SMG* investment projects, the web site offers extensive information

about the donation of funds to the *Sterling Charitable Gift Fund*.  Subscriber information

obtained from Ardent Communications for the account relating to the *SMG* web page indicates

that the account is in the name of *Omar Ashraf* of *Sterling Management Group* of 555 Grove Street in Herndon, with a contact email address of admin@sterlingmgmt.com.

114. SA Acquino told me that an online query of *Mar-Jac Investments, Inc.* revealed that the administrative and billing contact for *Mar-Jac* is *Omar Ashraf*, at 555 Grove Street in Herndon, with an email contact of marjac@erols.com. SA Acquino told me that investigation revealed that this email account is hosted by RCN Communications, in Fairfax, Virginia, and is subscribed to by *M. Omar Ashraf, Mar-Jac Investments*, 555 Grove Street, in Herndon.

115. SA Acquino told me investigation of *Amana Mutual Funds Trust* revealed that it maintains that a web page at web address/URL of www.amanafunds.com, hosted on the computers or network of Advanced Telcom Group, a Santa Rosa, CA Internet service provider. The *Amana* web page offers an email address of AMANA@SATURNA.COM as a contact point.

116. SA Acquino further told me that *FIQH* maintains a web page located at web address/URL www.fiqhcouncil.org. Internet domain registration information identifies *Iqbal Unus* as the billing and administrative contact for this domain, with an email contact address of iqbalunus@aol.com. According to records received from AOL, the email account iqbalunus@aol.com is subscribed to by *Iqbal Unus* at 12607 Rock Ridge Road in Herndon.

117. SA Acquino further told me the *All Dulles Area Muslim Society ("ADAMS")*, maintains an Internet presence in the form of a world wide web page located at web address www.adamscenter.org which provides information about the organization, its activities, the identities of the officers of the organization, and actively solicits charity contributions. The web sited identifies *Totonji* as the chairman of the Board of Trustees, with an email contact listed as

86

totonji@iiit.org.   *Omar Ashraf* is listed as the registered agent, with a contact email address at omar@sterlingmgmt.org.

118.   The host of the ADAMS web site as CI Host of Bedford, Texas. Account records obtained from CI Host identified the administrator of the ADAMS web page as Muhammad Rahman.  Account records indicate that Rahman communicates with CI host via email using the email address of mrahman@meisoft.com. Rahman's name and email address are also listed as the administrative, billing and technical contact on the adams.org domain information.  Account records further indicate that Rahman is the person that administers the web site and also maintains the database relating to the contributions raised by *ADAMS*.

119.   SA Acquino told me that a commercial database check for *Iqbal Unus* located his resume, including *ADAMS* and *Amana* as organizations with which he was associated.  The resume lists two email addresses for *Unus*, iunus@iiftihar.org and iqbalunus@aol.com.

120.   Based the facts previously set forth, I have probable cause to believe that the computers in their business premises and homes, as well as their email accounts and web sites are among the locations in which the targets of this investigation maintain the files and records described in Attachment B.

121.   Each computer file is the equivalent of a hard copy file, but possibly containing many pages of information.   By analogy to hard copy data, it will be necessary for seizing agents to look at least at the first "page" of each file in order to determine whether the contents of the file is seizable under the warrant language.   In order to identify whether the records relate to the illegal activity, agents would have to, either: (a) remain on the premises for an extended period in order to view each file contents to determine whether they are relevant and seizable, and then

87

print hard copies of the identified file records, or alternatively, (b) seize the computer and its

internal hard-drive, and related equipment, to permit examination of the contents of the hard-

drive files at an off-site location to separate out the magnetically stored documents within the

scope of the warrant.   The records in the hard-drive are, at this point, inseparable, in the sense

that no single record can be seized in this present form without first performing operations on the

information with the computer equipment.   Therefore, authority is requested to remove the

computer from the premises, given that this is the less intrusive of the two alternatives cited

above.

122. The removal of the computers and related equipment is also necessary to determine

whether any security devices have been installed which might either prevent copying of the

records, or cause their destruction within the system.   The requirements of additional time and

facilities to achieve this objective constitute additional reasons for removal of the equipment.

123.    The software programs used in connection with the data stored in the hard disk or on

diskettes must also be examined by the investigating agents in order to determine that they are in

fact standard, commercially-available software, so that we may obtain identical programs if

necessary for the examination, copying and possible introduction into evidence at any trial which

may ensue, of the data files which contain records authorized to be seized.   For the same reason,

the system operating manuals and all documentation relating to the hardware or software must be

examined by the investigating agents in connection with the examination of the system.

Removal of the equipment from the premises during the examination is necessary because

computer-based evidence is quickly and easily destroyed.

88

124. For the reasons stated above, it is proposed that, upon approval of the warrant, the computer equipment, its related program documentation and peripheral equipment which is known to be compatible and necessary for the proper functioning of the system, be removed to the safekeeping of the investigating agencies for proper examination, and copies be made of the relevant records.   Chain of custody will be maintained by the seizing agent, a trained computer specialist and the investigating agent charged with the duty of determining whether a particular record is within the scope of the warrant.   Copies of such materials as necessary for the ongoing course of business will be made on request of the entities from whom they were seized.

XVII.   Locations of Records

125.   There is probable cause to believe that evidence of the crimes described in this affidavit will be found in the following locations:

A.   Business Premises

1.      555 Grove Street

126. There is reasonable cause to believe that the books and records, as required under IRC 6001 and the regulations promulgated thereunder and as described below, for the *Safa Group* Companies and Charities are presently located in the office suite behind the door marked as the door for Suites 110, 114, and 116 in the building at 555 Grove Street.  This belief is founded on the following facts.

127.  I visited 555 Grove Street and observed the office suite behind the door marked as the door for Suites 110, 114, and 116 to be one common suite.  I entered the office from the office building's hallway through the one door jointly listing *Mar-Jac Investments, Inc.*, *Reston Management, Inc.*, and *Sterling Management Group, Inc.* at Suites 110, 114 and 116,

89

Z89950004-P/C-000046.089

respectively, and found the interior office space to be a common area with a common

receptionist desk.  I saw various offices inside the common area, but there was no differentiation

between the companies, nor numbers on the various office doors; instead, there were only names

of individuals on placards at the offices within the suite.

128.  According to the most recent IRS Forms 990 filed by the *Safa Charities*, the records

of the *African Muslim Agency, SAAR Foundation, Safa Trust, Sterling Charitable Gift Fund*, and

*York Foundation* are all located at 555 Grove Street, Herndon, Virginia, under the care of *Mirza*.

The address for *African Muslim Agency* as shown on the front of the 1997 IRS Form 990 is 555

Grove Street, Suite 110.  The address for the *Sterling Charitable Gift Fund*, as shown on the

front of the 2000 IRS Form 990 is 555 Grove Street, Suite 116.

129.   First Union National Bank records reflect that statements for bank accounts in the names

of the following *Safa Group* entities are being mailed to 555 Grove Street, Herndon, VA 22070:

| *Safa* Company | Date of Statement Seen |
|---|---|
| *African Muslim Agency* | 1/31/01 |
| *Reston Investments, Inc.* | 12/31/01 |
| *Mar-Jac Investments* | 12/31/01 |
| *SAAR Foundation, Inc.* | 9/28/01 |
| *Sterling Charitable Gift Fund* | 12/31/01 |
| *Safa Trust, Inc.* | 12/31/01 |
| *Sterling Management Group, Inc.* | 12/31/01 |

130. IRS Exempt Organization Specialists Michael Bieloski and Eugene Gilmartin

recently advised IRS-CI special agents that, in June 2000, they personally met with *Mirza* and

the *SAAR* return preparer at 555 Grove Street in the course of conducting an audit of *SAAR*

*Foundation*, and, in a conference room at that location, received from them various records –

including computer records  – and observed a computer in the office.

2.     500 Grove Street

90

131.  According to the IRS Form 990 filed by *IIIT* on November 20, 2001, the records of *IIIT* are maintained at 500 Grove Street, 2nd Fl., in Herndon, Virginia, in the care of Beverly *Hassan*. *IIIT* is on file with the Virginia Secretary of State as an active corporation domiciled at 500 Grove Street, Suite 114, Herndon, Virginia.  In January 2002, an IRS special agent made a pretext telephone call to the publicly listed number for the *IIIT*.  A woman answered the telephone with the words "*IIIT*" and advised the agent that the company had recently moved to the second floor of 500 Grove Street.

### 3.    750-A Miller Drive SE, Leesburg, Virginia

132.  The location 750-A Miller Drive SE, Leesburg, Virginia is the office of *Heritage Education Trust*, *FIQH*, and *GSISS*.  *Heritage* filed a Form 990 on October 16, 2001 which represents that its corporate records are located at 750-A Miller Drive SE, Leesburg, Virginia.  According to Virginia Secretary of State Corporation Commission records, the *Heritage Education Trust*, *Inc.*, *Heritage Holdings*, *Inc.*, *SISS*, and *FIQH* are located at 750-A Miller Drive SE, Leesburg, Virginia.

133.  In January 2002, government agents followed a gray 1999 Chrysler Concord bearing Virginia registration, ZHT 5636, from the residence of *Al-Alwani* at 1105 Safa Street in Herndon, to 750-A Miller Drive in Leesburg.  Virginia Department of Motor Vehicles ("DMV") records reflect the vehicle is registered to *SISS* at 750-A Miller Drive, Leesburg, Virginia.

134. IRS Information Returns for the year 2000 reflect that *Jaghlit* Family Trust No. 1 and *Jaghlit* Family Trust No. 2 both reflect the address of 750-A Miller Drive, SE, Leesburg, VA 20175.  As noted above, the records of *Jaghlit* Family Trust No. 1 are relevant to any determination of personal income tax evasion by *Jaghlit*.

### 4.    The Administration Offices of *Mar-Jac Poultry*

91

at 1020 Aviation Boulevard, Gainesville, GA

135. *Mar-Jac Poultry* is headquartered at 1020 Aviation Boulevard, Gainesville, Georgia. On February 13, 2002, INS SA Beamish spoke with *Mar-Jac Poultry* personnel manager Don Bull under the pretext of learning where immigration records were maintained. Bull told SA Beamish that the company's corporate and financial records were maintained in the administrative offices in a one-story building with a sign on it reading "Administrative Offices."

B.   Residences

136. Based on my experience as a criminal investigator, individuals typically keep personal financial records in their residence. The records include bank records, investment records, records of purchases, records of expenditures, loan documentation, IRS information returns (e.g, W-2s, 1099s, 1098s, etc.) as well as other financial documents. Individuals also typically keep retained copies of their tax returns in their residence along with supporting schedules and documentation.

137. Through my participation on this investigation, I am aware of the addresses where paper and electronic records are kept concerning the money laundering and terrorist support activities of the conspirators and the organizations that they use. These records are stored at business and charity locations, as well as residences. Based upon my training and experience, I know that individuals commonly keep, store, and maintain records of organizations in which they are members or officers at their residence as well as their offices. Individuals involved in "layering" schemes, especially when these schemes include organizations with little or no physical presence, will commonly use their residence as a base of operations, from which they conduct their daily illegal activities.

92

138. I have spoken with INS Senior SA William West, who as explained above executed search warrants in November 1995 at the residence of *Al-Arian*, and the office locations of *ICP* and *WISE*. SA West related to me that upon executing the search warrants, he found that the documents relating to *Al-Arian*'s terrorist affiliations, which had been seized at *Al-Arian*'s residence, were roughly equal in number and importance to the criminal case as the documents seized at the business locations. Furthermore, SA West told me that he seized more documents at the residence relating to foreign terrorist connections. It is SA West's opinion that the residences of terrorists and their supporters are just as likely to contain records of contacts with terrorists, operative documents, and other related material in their homes as in their businesses.

139. In this matter, the history of the *Safa Charities* and the past investigations of it and the entities in Tampa, Florida, increase the probability that important evidence will be stored off the business premises. The *Safa Charities'* activities first came under scrutiny in the aftermath of the search warrants executed at the offices of *WISE/ICP* and the residence of *Al Arian* in 1995. Thereafter, *Mirza* complained that the press was getting too probing in 1995-96. *Mirza* also related that one reason for moving assets of *SAAR* off shore was because of adverse publicity in 1997 and 1998 linking *SAAR* and *Safa* to terrorism. Eventually, in January of 2000, *Al-Alwani, Jaghlit*, and *Hassan*, were interviewed by the FBI in connection with a criminal investigation. This was followed closely by an IRS audit of *SAAR* and scrutiny of the final destination of the funds headed off shore. The principals of the *Safa Group* have every reason to believe that they are the subject of growing government scrutiny. In view of these circumstances, it is my experience that organizational records are even more likely to have been removed from office addresses and maintained at residences.

93

5.      The Residence of *Mirza* at 11922 Safa Court, Herndon, VA

140.  I know that the single-family dwelling at 11922 Safa Court, Herndon, Virginia, is

the residence of *Mirza*. On April 5, 2001, *Mirza* signed his 2000 tax return, which listed his

personal address as 11922 *Safa* Court, Herndon, Virginia. The Forms W-2 from *Mar-Jac*

*Investments, Inc.* and *Mar-Jac Poultry, Inc.* which were attached to his 2000 tax return also list

that as his address. In January 2002, Fairfax County property records reflected that *Mirza* was

the owner of 11922 Safa Court, and Virginia Power identified him as the subscriber for

electricity at this address. In addition, Virginia Power records show that *Mirza* listed his

employer as *Mar-Jac Investments Inc.* Finally, *Mirza* is a registered officer or agent of three

businesses registered with the Virginia Secretary of State located at this same address.

141.  On February 4, 2002, a mail cover was obtained on the residence of *Mirza* at 11922

*Safa* Court to ascertain the senders of mail received at that address. In February 2002 various

documents were found indicating that *Mirza* receives business mail at his house, including

correspondence for *Mar-Jac Poultry, Inc.* (for which *Mirza* is an officer); *Amana* (the Isle of

Man corporation that set up *Humana*); and Amtrax Limited (a company that likely is related to

Amtrax Holding, Inc., an overseas company that, according to *Safa Trust*'s Form 990,

contributed $250,000 to *Safa Trust* in 1997).

6.      The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, VA

142.  I know that the single-family residence at 9034 Swift Creek Road, Fairfax, Virginia

is the residence of Mohammad *Jaghlit*. According to a January 2002 Virginia DMVs records

check, Mohammad Ali *Jaghlit* was issued a Virginia driver's license with a listed address of

9034 Swift Creek Road, Fairfax Station, Virginia. In January 2002, government agents observed

94

a white Volvo with Virginia plates YNU8077 parked in the driveway of the residence near the

garage entrance.  According to Virginia DMV records, the vehicle's registered owners are Noor

and Mohammad Ali *Jaghlit* of 9034 Swift Creek Road, Fairfax, Virginia.

143. On February 4, 2002, government agents recovered trash thrown out from *Jaghlit*'s

residence at 9034 Swift Creek Road.  One document that was found was a fax, dated August 9,

2001, from the *HLF* in Gaza to the *HLF* in Richardson, Texas, containing notes of a meeting

ordering actions on various *HLF* projects.

       7.      The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia

144.    I know that the single family dwelling located at 11919 Safa Court, Herndon, Virginia is

the residence of *Barzinji*. A Fairfax County Police Department criminal history check revealed

that in November 2000, Jamal *Barzinji* was arrested at 11919 Safa Court, Herndon, Virginia, and

charged with Domestic Abuse and Resisting Arrest.  Fairfax County Police performed tax

records checks for that property and found records identifying *Barzinji* as the registered property

owner.  Moreover, while Jamal M. and Suzanne F *Barzinji*'s U. S. Individual Income Tax

Returns for the years 1996-2000 reflect the address 555 Grove Street in Herndon, the W-2 forms

attached to the returns reflect the address of 11919 Safa Court.  Finally, First Union records

reflect that address for the account of Jamal M. *Barzinji*, Suzanne F. *Barzinji*, and Suhaib

Al*Barzinji* on the statement for the period ending January 23, 2002.

       8.      The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia

145. I know the single family dwelling at 1105 Safa Street, Herndon, Virginia to be the

residence of *Al-Alwani*  In January 2002, the Fairfax County Police performed tax records

checks finding that 1105 Safa Street, was owned by Al Alwani.  The Virginia DMV confirmed

that Al Alwani has a valid driver's license and that the address used on his license is 1105 Safa Street. In January 2002, Virginia Power information identified Al Alwani, the president of *IIIT*, as the subscriber for power at that address.

         9.    The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia

      146. I know the single family dwelling at 305 Marjorie Lane, Herndon, Virginia to be the residence of Ahmad *Totonji*. In January 2002, Virginia Power information reflected that Ahmad M. *Totonji,* a Director of *IIIT,* and Maysoon *Al-Talib* were the subscribers for power at that location. Virginia DMV records reflect Ahmad *Totonji* was issued a Virginia driver's license with a listed address of 305 Marjorie Lane, Herndon, Virginia.

      147. In January 2002, law enforcement agents working on the *Safa Group* investigation retrieved from trash discarded from the house at 305 Marjorie Lane a roster of *IIIT* employees with their telephone extensions and e-mail addresses. I know, therefore, that *Totonji* has recently maintained *IIIT* records in his house.

        10.    The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia

      148. I know the single family dwelling at 12607 Rock Ridge Road, Herndon, Virginia to be the residence of *Iqbal Unus*. According to Virginia Secretary of State records, *Unus* is the registered agent of Education, Training and Research Associates of 12607 Rock Ridge Road, Herndon, Virginia. In January 2002, Fairfax County Police performed tax record checks for 12607 Rock Ridge Road and determined *Iqbal* and Aysha *Unus* as the registered property owners. In January 2002, Virginia Power identified *Iqbal* J. and Aysha A. *Unus* as active subscribers for that address, and identified *Iqbal Unus*' employment as the Director of Human Development for *Mar-Jac, Inc.*

96

149. On February 11, 2002, a trash run was conducted by government agents to recover refuse disposed of by the residents of 12607 Rock Ridge Road. Various documents were found indicating that *Unus* maintains records at his house, including June 7, 2001, correspondence for the *Amana Mutual Funds Trust*, of which *Unus* is a trustee.

150. On January 28, 2002, a law enforcement agent conducted an Internet registrant query on the domain name "*FIQH*COUNCIL.NET." The administrative and billing point of contact for this domain name is *Iqbal Unus* at the International Islamic Forum for Science, Technology, and Human Research Development (*IIFSTHRD*), 12607 Rock Ridge Rd., Herndon, Virginia 20170. *FIQH* and *IIFSTHRD* are *Safa Group* organizations.

11. <u>The Residence of *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA</u>

151. I know the single family dwelling at 12541 Browns Ferry Road, Herndon, Virginia, to be the residence of *M. Omar Ashraf*. Virginia Secretary of State records reflect that *Mohammad Omar Ashraf* is president of two corporations at this address. According to Virginia DMV records, *Mohammad Omar Ashraf* was issued a Virginia driver's license with a listed address of 12541 Browns Ferry Road. In January 2002, an IRS special agent observed three vehicles at that address, two of which Virginia DMV records reflected to be registered to *Mohammad Omar Ashraf* and Zahida P. Ashraf at that address; the third was registered to *Mar-Jac Poultry , Inc.*, at 555 Grove Street in Herndon. Finally, Virginia Power identified *Mohammad Ashraf* and Zahida Ashraf as active subscribers for power last month at 12541 Browns Ferry Road, and listed *Mohammad Ashraf*'s employment as the Project Manager for *Mar-Jac Investments Inc.*

97

12.    The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA.

*Muhammad Ashraf* is the registered agent of Enterprise Investment Group, Inc., a company incorporated on September 12, 2001, at 12528 Rock Ridge Road. Further, in January 2002, Virginia Power identified an active subscriber account for this address in the names of *Muhammad* and Munawar *Ashraf*, and reflected *Muhammad Ashraf*'s employment as a legal writer for *Mar-Jac*.

<u>CONCLUSION</u>

152. I have probable cause to believe from the foregoing affidavit that the targets of this investigation identified in this affidavit have engaged in a long standing, ongoing pattern of criminal activity.   Further, I have probable cause to believe that evidence of these violations will be found in the business premises and residences for which warrants are sought.

153. Accordingly, based on the information outlined above, there is probable cause to believe that the items and records as set forth in Attachment B, attached hereto and incorporated herein, constituting evidence of violations of 18 U.S.C. §§ 371, 1956(a)(2)(A) and (h), 2339A, and 2339B, and 26 U.S.C. §§ 7201, 7206, and 7212 are contained within the premises and properties known as:

1.    555 Grove Street, Suites 110 through 116, Herndon, Virginia;

2.    500 Grove Street, 2nd Floor, Herndon, Virginia;

3.    750-A Miller Dr.  SE, Leesburg, Virginia;

4.    The Administration Offices of *Mar-Jac Poultry* at 1020 Aviation Blvd., Gainesville, Georgia;

5.    The residence of *Mirza* at 11922 Safa Court, Herndon, Virginia;

6.    The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, Virginia;

98

Z89950004-P/C-000046.098

7.      The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia;

8.      The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia;

9.      The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia; and

10.     The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia;

11.     The Residence of  *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA;

12.     The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA

all of which properties are more particularly described in Attachment A, which is incorporated

herein.

WHEREFORE, your affiant requests that search warrants be issued pursuant to Rule 41

of the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

**SIGNATURE ON ORIGINAL**
DAVID KANE, Senior Special Agent
United States Customs Service

Subscribed to and sworn before me this ___ day of March 2002.

**SIGNATURE ON ORIGINAL**
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

99

Z89950004-P/C-000046.099