UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |
| *This document relates to:* | |

*Burnett v. Al Baraka Investment & Development Corp.* 03-CV-5738 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.*, 03-CV-9849 (RCC)
*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977 (RCC)
*Barrera v. Al Qaeda Islamic Army*, 03-CV-7036 (RCC)
*Cantor Fitzgerald v. Akida Bank Private Limited*, 04-CV-7065 (RCC)
*Continental Cas. Co. v. Al Qaeda*, 04-CV-5970 (RCC)
*Euro Brokers Inc. v. Al Baraka Inv. & Dev. Corp*, 04-CV-7279 (RCC)
*Federal Ins. v. Al Qaida*, 03-CV-6978 (RCC)
*New York Marine & General Ins. Co. v. Al Qaida*, 04-CV-6105 (RCC)
*Estate of O'Neill v. Al Baraka Investment and Development Corp.*, 04-CV-1923 (RCC)
*Salvo v. Al Qaeda Islamic Army*, 03-CV-5071 (RCC)
*Tremsky v. Osama bin Laden*, 02-CV-7300 (RCC)
*World Trade Ctr. Props. L.L.C. v. Al Baraka Inv. & Dev. Corp.*, 04-CV-7280 (RCC)


# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF SULAIMAN AL RAJHI


June 28, 2005

TABLE OF CONTENTS

*Page*

INTRODUCTION ..................................................................................................1

APPLICABLE LEGAL STANDARD..................................................................8

    I.    FED. R. CIV. P. 12(B)(6) STANDARD ...............................................8

    II.    FED. R. CIV. P. 12(B)(2) STANDARD ...............................................9

ARGUMENT ......................................................................................................10

    I.    Plaintiffs Have Stated Claims Upon Which Relief can be Granted ..................10

    II.    Plaintiffs Adequately Allege Causation Regarding All Claims .........................11

    III.    The Complaint States a Claim Against Sulaiman Al Rajhi Under the Anti-Terrorism Act ........................................................................14

    IV.    The Complaint States a Claim Against Sulaiman Al Rajhi Under the Alien Tort Claims Act ........................................................................15

    V.    The Complaint Adequately Alleges Common Law Claims................................17

    VI.    The Plaintiffs State Claims Against Al Rajhi Under RICO..............................19

    VII.    This Court has Personal Jurisdiction Over Sulaiman Al Rajhi ........................21

    VIII.    The Plaintiffs' Intentional Tort Claims Are Not Time Barred.........................24

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

*Page*

## CASES

*Abdullahi v. Pfizer, Inc.*, No. 01CIV8118, 2002 WL 31082956, at *4 (S.D.N.Y. Sept. 17, 2002), *vac'd on other grounds*, 2003 WL 22317923 (2d Cir. Oct. 8, 2003) ............................16

*Albright v. Oliver*, 510 U.S. 266, *reh. denied*, 510 U.S. 1215 (1994) ..............................................8

*All State Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215 (S.D.N.Y. 1992) ..........................24

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) ...............................................................................20

*Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ................................................25

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2001) .....................................................................16

*\*Boim v. Quranic Literacy Institute, et al.*, 291 F. 3d 1000 ................................................. passim

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961) ..............21

*Calder v. Jones*, 465 U.S. 783 (1984) ...............................................................................................22

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................................8

*Cutco Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ...........................................................9

*De Falco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ...........................................................................20

*Desidero v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198 (2nd Cir. 1999) .................................9

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001) ............................................9

*Doe v. Islamic Salvation Front*, 257 F.Supp.2d 115 (D.D.C.2003) ...........................................16, 17

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ...............................20

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir., 2004) ................................20

*Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727 (S.D.N.Y. 1994) ........................................20

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ...........................................................................9

*Gryl ex rel. Shire Pharmaceuticals Group PLC v. Shire Pharmaceuticals Group PLC*, 298 F.3d 136 (2d Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003) ..................................................9

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .....................................................................12

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2nd Cir. 1990) ........................................12

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ........................................11, 12

*In re Agent Orange Prod. Liab. Litig.*, 2005 WL 729177, at *37-39 .............................................17

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 2004 U.S. Dist. LEXIS 3829 *17-18 (S.D.N.Y. 2004) ...................................................................................................25

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ................................9

*In re South African Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004) ................................17

*In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765 (S.D.N.Y. 2005).......... passim

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................................21

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993).......................................10

*Johnson v. Nyack Hospital*, 86 F.3d 8 (2d Cir. 1996)....................................................................25

*Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004) ............................................................25

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1996)......................................................................16, 17

*LaBounty v. Adler*, 933 F.2d 121 (2d Cir. 1991) ...........................................................................9

*Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306 (E.D. La. 1994),
    *reconsideration denied*, 1995 WL 672835 (E.D. La. Nov. 9, 1995) ........................................25

*Martin v. Herzog*, 126 N.E. 814 (N.Y. 1920) ...............................................................................19

*Morin v. Trupin*, 832 F. Supp. 93 (S.D.N.Y., 1993).....................................................................20

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289
    (S.D.N.Y.2003)................................................................................................................16, 17

*Rasul v. Bush*, 124 S. Ct. 2686 (2004) ..........................................................................................21

*Salinas v. United States*, 522 U.S. 52 (1997) ................................................................................20

*Samuels v. Air Trans. Local 504*, 992 F.2d 12 (2d Cir. 1993)........................................................8

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ....................................................................................8, 9

*\*Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004)................................................................15, 17

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)................................................................................8

*United States v. Allen*, 155 F.3d 35 (2d Cir. 1998)......................................................................20

*United States v. Arnaout*, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003)...............................7

United States v. Enaam Arnaout, No. 02 CR-892 (N.D. Ill. Filed Jan. 6, 2003)............................6

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991)..............................................................16

*Yeadon v. New York Transit Authority*, 719 F. Supp. 204 (S.D.N.Y. 1989) ...............................25

**STATUTES**

CPLR 302(a)(2) ..............................................................................................................................24

**TREATISES AND ARTICLES**

45A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351,
    at 253-59 (2d ed. 1990)................................................................................................................23

*Use of Federal Statutes in State Negligence Per Se Actions*, 13 Whittier L. Rev. 831
    (1993)......................................................................................................................................19

**UNITED STATES CODE**

18 U.S.C. § 2333(a) .................................................................................................... passim

18 U.S.C. § 2339B ..................................................................................................12, 14

18 U.S.C. § 2339C ......................................................................................................12

18 U.S.C. §§ 1961-65; Racketeer Influenced and Corrupt Organizations Act (RICO)......... passim

18 U.S.C. §§ 2331-38; Anti-Terrorism Act (ATA) ............................................... passim

28 U.S.C. § 1350 Alien Tort Claims Act...................................................15, 16, 17

28 U.S.C. § 1653 ...........................................................................................................9

**PUBLIC LAWS**

S. Rep. 102-342.............................................................................................................11

**LEGISLATIVE HISTORY**

137 Cong. Rec. S4511 04 (April 16, 1991) ...............................................................24

Anti-Terrorism Act of 1990, Hearing Before the Sub-Committee on Courts and
  Administrative Practice, Senate Committee on Judiciary 101st Cong., 2d Sess., at
  Cong. Rep. 8143 (1991).........................................................................................23

**INTERNATIONAL LAW AND CONVENTIONS**

Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, art. 2, S. TREATY
  DOC. NO. 106-6, at 4, 37 I.L.M. 249, 253 ...........................................................16

Hague Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970,
  22 U.S.T. 1641 ......................................................................................................16

International Convention for the Suppression of the Financing of Terrorism, G.A. Res.
  54/109, U.N. Gaor, 4th Sess., U.N. Doc. A/Res/54/109 (1999) ................................16

Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil
  Aviation, Sept. 23, 1971, 24 U.S.T. 565...............................................................16

Tokyo Convention on Offences and Certain Other Acts Committed on Board Aircraft,
  Sept. 14, 1963, 704 U.N.T.S. 219 .........................................................................16

U.N. Security Council Resolution 1373 (September 28, 2001)................................2, 16

**RESTATEMENTS**

Restatement (Second) of Torts § 285 (1965) ............................................................19

# INTRODUCTION

On October 9, 2004, United States Attorney General John Ashcroft stated, "There is no moral distinction between those who carry out terrorist attacks and those who knowingly finance those attacks."[1]   In this action, plaintiffs, victims and survivors of the September 11, 2001 terrorist attacks, seek to hold accountable those who financed, materially supported, aided and abetted, conspired with or otherwise sponsored the terrorist network that perpetrated those attacks.   As demonstrated in the extensive and detailed Complaints, RICO Statements, and supplemental pleadings in this action there is an abundance of evidence that a network of banks, corporations, wealthy individuals, and so-called "charities" have aided, abetted, funded, and provided material support to al Qaeda and Osama bin Laden.   Without this crucial support, the al Qaeda terrorists could not have planned and carried out their attacks.   In fact, the Executive Branch views the funding of terrorism as a violation of international law:

> The international community has recognized the need to take action against terrorism and has condemned such acts of terrorism in United Nations Security Council [R]esolutions 1368 of September 12, 2001, 1373 of September 28, 2001, and 1390 of January 16, 2002.  These resolutions, taken together, obligate UN Member states, among other things to take necessary steps to *prevent the financing of terrorism*, to deny safe haven to terrorists, and to restrict the transfer of arms and arms-related material to terrorists.

Periodic Report on the National Emergency With Respect to Persons Who Commit, Threaten to Commit, or Support Terrorism (President George W. Bush) (Apr. 9, 2002) (Transmitted to Congress March 20, 2002) at 5 (emphasis added).

This view of terrorism financing and aiding and abetting terrorism has been echoed by Vice President Richard Cheney who stated, ''Any person . . . that supports, protects or harbors

---

[1] John Roth, Douglas Greenburg, Serena Wille, *National Commission on Terrorist Attacks Upon the United States: Monograph on Terrorist Financing*, at 103.

terrorists is complicit in the murder of the innocent and will have to be held to account."[2] Furthermore, United Nations Security Council Resolution 1373, issued on September 28, 2001 pursuant to Article VII of the U.N. Charter thus making it legally binding upon the 9/11 U.N. Member states pursuant to Article 25 of the U.N. Charter, states that "all States shall . . . prevent and suppress the financing of terrorist acts."  In addition, the worldwide consensus against the financing of terrorism is evident in the fact that, since its introduction in 1999, the International Convention on the Suppression of the Financing of Terrorism has been ratified by 137 member states of the United Nations.  Condemnation of aiding and abetting vis-à-vis financing of terrorism is subject to universal condemnation both in the United States and abroad.

Sulaiman Al Rajhi was a central and knowing participant in the aiding, abetting, and material support of al Qaeda.[3]  An Independent Task Force sponsored by the Council on Foreign

---

[2]  Remarks by Vice President Richard Cheney to the Heritage Foundation, October 10, 2003, and found at http://www.heritage.org/Research/MiddleEast/DickCheneySpeech.cfm.

[3]  Because the pleadings overlap at times and the issues are nearly identical, plaintiffs in *Ashton* (02-6977), *Burnett* (03-9849), *Cantor Fitzgerald* (04-7065), *Continental Casualty* (04-5970), *Euro Brokers* (04-7279), *Federal Insurance* (03-6978), *New York Marine* (04-6105), *O'Neill* (04-1923) and *WTC Properties* (04-7280) have filed a consolidated response to defendant's motion and plaintiffs in each action incorporate the arguments made herein. Cantor Fitzgerald Plaintiffs join in the instant Plaintiffs' Consolidated Opposition Motion, but also, will be filing their own Opposition motion addressing issues specific to their claims.  The relevant pleadings are:  Fourth Amended Consolidated Master Complaint, *Ashton v. Al Qaeda Islamic Army* ["*Ashton*"], (02-CV-6977);  Complaint, *Barrera v. Al Qaeda Islamic Army* ["*Barrera*"], (03-CV-7036); Amended Complaint, *Burnett v. Al Baraka Inv. & Dev. Corp*., (03-CV-5738); Third Amended Complaint, *Burnett v. Al Baraka Inv. & Dev. Corp*., (03-CV-9849) [collectively, "*Burnett TAC*"]; First Amended Complaint, *Cantor Fitzgerald v. Akida Bank Private Limited* ["*Cantor*"], (04-CV-7065) (RCC); First Amended Complaint, *Continental Cas. Co. v. Al Qaeda* ["*Cont'l Cas.*"], (04-CV-5970); Complaint, *Euro Brokers Inc. v. Al Baraka Inv. & Dev. Corp.* ["*Euro Brokers*"], (04-CV-7279); First Amended Complaint*, Federal Ins. v. Al Qaida* ["*Fed. Ins.*"], (03-CV-6978)'; First Amended Complaint, *New York Marine & Gen. Ins. Co. v. Al Qaida* ["*NY Marine*"], (04-CV-6105); Second Amended Complaint, *O'Neill v. Al Baraka Investment Corp.* ["*O'Neill*"], (04-CV-1923) (RCC); Consolidated First Amended Master Complaint, *Salvo v. Al Qaeda Islamic Army* ["*Salvo*"], (03-CV-5071); Amended Complaint, *Tremsky v. Osama bin Laden* ["*Tremsky*"], (02-CV-7300); Complaint, *World Trade Cent. Prop. LLC v. Al Baraka Inv. & Dev. Corp.* ["*WTC*"], (04-CV-7280); RICO Statement Applicable to Sulaiman Abdulaziz Al Rajhi, *Cantor Fitzgerald v. Akida Bank Private Limited* ["*Cantor RICO*"]; RICO Statement Applicable to Defendants Sulaiman Abdulaziz Al Rajhi, Abdullah Sulaiman Al Rajhi and Saleh Abdulaziz Al Rajhi, *Cont'l Cas.* ["*Cont'l Cas.* RICO"]; RICO Statement Applicable to Defendants Sulaiman Abdulaziz Al Rajhi, Abdullah Sulaiman Al Rajhi and Saleh Abdulaziz Al Rajhi, *Euro Brokers* ["*Euro Brokers* RICO"]; Amended RICO Statement Applicable to Defendants Sulaiman Abdulaziz Al Rajhi, Abdullah Sulaiman Al Rajhi and Saleh Abdulaziz Al Rajhi, *Fed. Ins.* ["*Fed. Ins.* RICO"]; RICO Statement Applicable to Sulaiman Abdul Aziz Al Rajhi and Khalid Sulaiman Al Rajhi, *O'Neill* ["*O'Neill* RICO"]; and RICO Statement Applicable to Defendants Sulaiman Abdulaziz Al Rajhi, Abdullah Sulaiman Al Rajhi and Saleh

Relations concluded in its 2002 report on Terrorism Financing that al Qaeda's support network is "notably and deliberately decentralized, compartmentalized, flexible and diverse in its methods and targets."  Burnett TAC, Introduction at p. 203; WTC RICO ¶ 8.  It is characterized by "layers and redundancies"; it "raises money from a variety of sources and moves money in a variety of ways."  Id. at 204; WTC RICO at 8.

In his motion to dismiss, defendant Sulaiman Al Rajhi not only seeks to exploit the decentralized and compartmentalized nature of the network he helped set up, he attempts to redraft, oversimplify and grossly generalize the very specific and extensive body of allegations against him.  In so doing, Sulaiman Al Rajhi attempts to create a complete distortion and re-characterization of the allegations against him.  Viewing the allegations as pled, however, demonstrates that Sulaiman Al Rajhi is a central participant who knowingly provided material support to al Qaeda through a wide variety of means and methods.

Sulaiman Al Rajhi provided essential and material support to al Qaeda through his active involvement and participation in the financial and "charitable" al Qaeda network.  Contrary to Defendants oft-repeated claim that the allegations against defendant are vague, conclusory, legally insufficient and suggest no wrongdoing, at all relevant times "Sulaiman Al Rajhi acted with knowledge and intent that the flow of funds to al Qaeda would continue unabated."  Cantor RICO ¶ 2.  Even while acknowledging that this thread runs throughout the detailed and specified allegations of the various actions, the defendant complains that he is somehow not apprised of the 'what, when, where, why and how' of his long years of wrongdoing.  He also attempts to grossly oversimplify Plaintiffs' claims.  This flies in the face of logic and law, but so there is no question, Plaintiffs will attempt to spell it out for defendant yet again.  The specific allegations of

---

Abdulaziz Al Rajhi, *WTC* ["*WTC* RICO"]; and Plaintiffs' Response to Al Rajhi's Motion for More Definite Statement [Al Rajhi 12(e)].

Sulaiman Al Rajhi's involvement in materially supporting, aiding and abetting al Qaeda include, but are not limited to:

- Sulaiman Abdul Aziz Al Rajhi established, founded, financed, and is the namesake of the SAAR network of "charities" and front groups organized at 555 Grove Street in Herndon, Virginia.  *Federal Ins.* Amended RICO, Exhibit A, *O'Neill* RICO, page 15.  The SAAR network is comprised of over 100 entities at this single address, with overlapping officers and directors set up to launder money to al Qaeda and international terrorism.  *Id.*

- In March 2002, SAAR was raided under a federal search warrant, for the 555 Grove Street address in Herndon, Virginia, by the U.S. Treasury Department's Operation Greenquest looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including Osama bin Laden.)"  It was said by authorities that the probe of Herndon groups is the largest federal investigation of terrorism financing in the world.  An affidavit from Homeland Security agent David Kane said that the SAAR network in Herndon has sent more than $26 million in untraceable money overseas and that the leaders of the organization "have committed and conspired to . . . provide material support to foreign terrorist organizations."  *O'Neill* RICO at 16-17; Exhibit 1, Declaration of Justin Kaplan in Support of Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Sulaiman Al Rajhi, Exhibit 10.

- The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of terror.  This network has been used to funnel money, billions of dollars, to al Qaida.  *Id.*

- In 1989, Sulaiman Al Rajhi was on the Board of Trustees of Sanabel Inc. (company registered in the District of Columbia) with Ibrahim Afandi and Saleh Kamel and the same three persons that incorporated Sanabel al-Kheer, the investment arm of IIRO based at 555 Grove Street, Herndon, Virginia.  Al Rajhi 12(e) ¶ 85.

Having set up these front groups, defendant sat on their boards or executive councils (i.e., Ashton ¶ 85).  These were not arms-length board memberships as defendant contends, however, as these are not typical charities, corporations or entities.  As this Court has already recognized in denying SAAR's motion to dismiss:

> After an ongoing investigation in the Eastern District of Virginia, federal authorities raided the offices of several of these Defendants in Herndon, Virginia in March 2002. [Federal Complaint 227]. The investigation has allegedly revealed that SAAR Network funds have been transferred to designated terrorists and al Qaeda operatives Youssef Nada and Ahmed Idris Nasreddin. *Id.* 228; *see* Exec. Order No. 13224 (designating individuals as terrorists).

*In re Terrorist Attacks on September 11, 2001*, 349 F.Supp. 2d 765, 823 (S.D.N.Y. 2004). While defendant might prefer to align himself with other defendants that have been dismissed by this Court such as Saleh Kamel or Tarik bin Laden, he cannot avoid the facts. As has been alleged repeatedly and the United States government asserts; Sulaiman Al Rajhi's name is an acronym for the "SAAR" entities. *WTC* ¶ 215; Kaplan Decl., Exhibit 10. The Court continued:

> Certain of these groups may be subject to personal jurisdiction in light of Plaintiffs' allegation that they purposefully directing its activities at the United States by transferring money to designated terrorists Youssef Nada and Ahmed Idris Nasreddin, particularly if they intended the money to support terrorism. [Federal Complaint 228]. Additionally, general jurisdiction could be appropriate for the SAAR Network entities having offices in Virginia. [Federal Complaint 227]. Accordingly, the SAAR Network's motion to dismiss is denied without prejudice. The parties are to engage in jurisdictional discovery to determine which of the Network's entities have a presence in Virginia and which entities transferred money to Nada and Nasreddin.

*In re Terrorist Attacks on September 11*, 2001, 349 F.Supp. 2d 765, 823.

At least three different experts on terrorism financing have identified Sulaiman Al Rajhi as an al Qaeda terrorism sponsor working through the SAAR network in their Congressional testimony. See O'Neill RICO, Exhibit A, quoting Professor Michael Waller's testimony. As Jonathan Winer testified: "On a regional basis, such terrorist funding links include . . . In the U.S., funding of numerous charities by Suleiman Abdul Al-Aziz al-Rajhi, a senior member of one of Saudi Arabia's most prominent families. These charities, largely based in Herndon, Virginia," are under current investigation by the FBI and have been linked to specially

designated terrorist finance entity Al-Taqwa.  Kaplan Decl., testimony of Jonathan Winer, July

31, 2003; testimony of Dr. Dore Gold, July 31, 2003, Exhibits 4 and 5.

- In addition to laundering money to al Qaeda through SAAR front groups, Sulaiman Al Rajhi also used international banking and financial operations to provide material support to al Qaeda.  Ashton ¶ 470; WTC RICO 5(b); O'Neill RICO, Exhibit A.

- This financial activity included but was not limited to his control and chairmanship of the Al Rajhi Bank.  Sulaiman Al Rajhi was also on the board of directors of Specially Designated Global Terrorist (or "S.D.G.T.") entity Akida Bank in the Bahamas.  Akida Bank was run by S.D.G.T.  Yousef Nada.  *Ashton* ¶470.

- Sulaiman Al Rajhi funneled money and worked for fellow terrorism financier Yousef Nada laundering money through S.D.G.T. organization Bank al Taqwa.  *Federal Ins.* RICO, Exhibit A; *O'Neill* RICO p.15.

- Sulaiman Al Rajhi enjoyed a long and ongoing financing relationship with S.D.G.T. Yousef Nada and S.D.G.T. Ahmed Idris Nasreddin.  Kaplan Decl. Exhibit 12.

- Sulaiman Al Rajhi also materially supported SDGT's and al Qaeda fronts al Haramain and Benevolence International Foundation.  Federal Ins. RICO, Exhibit A; O'Neill RICO p. 15.

- Defendant sat on the board of the IIRO.  *Id.*  In 1998, Sulaiman Abdul Aziz Al Rajhi was on the executive council of IIRO with Ibrahim Afandi.  Al Rajhi 12(e) ¶ 85; *WTC* ¶ 220.  Ibrahim Afandi is listed on the "Golden Chain."  *See* Exhibit 2, Affidavit of David K. Draper ("Draper Aff.").

- Defendant is implicated as an al Qaeda sponsor by the "Golden Chain" list.  *Id.*[4]

---

[4] The "Golden Chain" document (which is but one of a collection of hundreds seized in Bosnia) lists "Al Rajhi." Upon good faith information and belief, the "Al Rajhi" at issue is Sulaiman Al Rajhi.  The list was among several hundred documents contained in an al Qaeda computer file.  Based on analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement.  See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, No. 02 CR-892 (N.D. Ill. Filed Jan. 6, 2003).  The National Commission on Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report:  "Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization.  This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states.  Donations flowed through charities or other non governmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world

markets to buy arms and supplies for the mujahideen, or "holy warriors."  (Draper Aff., Attachment O, 9/11 Commission Final Report, July 2004, p. 55; and footnote 21).  "Bin Ladin eventually enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the "Golden Chain."  (Draper Aff., 9/11 Commission Final Report, p. 66; and footnote 77).  The U.S. Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designation him as a terrorist sponsor under Executive Order 13224.  *See* Draper Aff.; *December 21, 2004 U.S. Treasury Department Press Release Regarding the Designation of Adel Batterjee*.  The 9/11 Commission Monograph on Terrorism Financing cites to "a group of wealthy donors from the Persian Gulf region known as the "Golden Chain," which provided support to … Usama Bin Ladin."  Draper Aff., Exhibit P.  The 9/11 Monograph continues:

> The Chicago agents, who had been working with Bosnian officials on the case, provided the Bosnians with enough evidence to gain legal authority to conduct a criminal search of BIF's offices there.  An FBI agent accompanied the Bosnians on the search to ensure a proper chain of custody necessary for the admission of anything found into a U.S. criminal proceeding.  This search yielded compelling evidence of links between BIF's leaders, including Arnaout, and Usama Bin Ladin, and other al Qaeda leaders, going back to the 1980s.  The material seized included many documents never before seen by U.S. officials, such as the <u>actual minutes of al Qaeda meetings</u>, the al Qaeda oath, al Qaeda organizational charges, and the "Golden Chain" list of wealthy donors to the Afghan mujahideen, as well as letters between Arnaout and Bin Ladin, dating to the late 1980s.  It was an <u>enormous break</u>.  Draper Aff., National Commission on Terrorist Attacks Upon the United States Monograph on Terrorist Financing Staff Report to the Commission, Attachment P (emphasis added).

The Council on Foreign Relations Studies in an October 2002 report stated:  "For years, individuals and charities based in Saudi Arabia have been the most important source of funds for Al Qaeda.  And for years, Saudi officials have turned a blind eye to this problem."  Draper Aff., CRS Report for Congress, Saudi Arabia:  Terrorist Financing Issues, December 8, 2004, *citing* the Report of the Independent CFR Task Force, Attachment R.  The CRS Report continued as to the "Golden Chain:"

> Specifically, the [9/11] report describes bin Laden's use of "the Golden Chain," an informal financial network of prominent Saudi and gulf individuals originally established to support the anti-Soviet Afghan resistance movement in the 1980s.  U.S. officials state that this network collected funds and funneled it to Arab fighters in Afghanistan, and later to Al Qaeda, using charities and other non-governmental organizations.  According to the Commission's report, Saudi individuals and other financiers associated with the Golden Chain enabled bin Laden and Al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996.  These activities were facilitated in part, the report argues, by the "extreme religious views" that exist within Saudi Arabia and the fact that "until recently" Saudi charities were "subject to very limited oversight."  Draper Aff., CRS Report for Congress, Saudi Arabia:  Terrorist Financing Issues, December 8, 2004, Attachment R.

In concluding that the Golden Chain document was hearsay, this Court relied upon *United States v. Arnaout*, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003).  *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 818.  The "Golden Chain" was one exhibit among 248 exhibits cited and attached to a proffer filed by the United States government supporting the admissibility of certain co-conspirator statements.  The *Arnaout* court ruled that the *proffer* could not be sufficiently linked to a specific conspiracy and the documents were not admissible under the co-conspirator exception to the hearsay rule.  *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *2 (emphasis added).  However, it is unclear whether the Golden Chain document was considered by the court in *Arnaout* or if it was addressed by the *Arnaout* decision.  *Arnaout*, 2003 WL 255226, at *1 n.1 ("In its reply to objections to its proffer, the government has withdrawn a substantial [unspecified] portion of its exhibits.").  Moreover, the Plaintiffs assert that the Golden Chain document is sufficiently trustworthy at the motion to dismiss stage pursuant to Fed. R. Evid 807.  This places Plaintiffs' reliance on the Golden Chain on a markedly different footing than that observed in *Arnaout*, where the sole issue was whether the evidence before that court satisfied the co-conspirator exception to the hearsay rule under Illinois law.  *See* 2003 WL 255226, at *1 (analyzing evidentiary

- Defendant managed the defendant National Commercial Bank budget for the defendant Saudi Joint Relief Committee. *Id.*

- Sulaiman Al Rajhi is also implicated by a criminal financial investigation in the International Court of Criminal Justice. Kaplan Decl., Exhibit 11.

This is not a case of "guilt by association" as defendant contends. Sulaiman Al Rajhi is a central figure in terrorism financing; these are no mere associations or coincidental arms-length relationships. Nor can defendant seriously contend that the allegations against him lack specificity given the 19-page exhibit attempting to summarize them attached to his motion to dismiss.

## APPLICABLE LEGAL STANDARD

### I.   Fed. R. Civ. P. 12(b)(6) Standard

Motions to dismiss pursuant to Rule 12(b)(6) are highly disfavored. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), and a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*; *Samuels v. Air Trans. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993); *In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765, 825 (S.D.N.Y. 2005); *accord Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002). In deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), courts must presume that all well-pleaded allegations are true, resolve all doubts and inferences in the pleader's favor, and view the pleading in the light most favorable to the non-moving party. *Albright v. Oliver*, 510 U.S. 266, 267, *reh. denied*, 510 U.S. 1215 (1994); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Gryl ex*

proffer under co-conspirator exception to the hearsay rule, and ruling government must establish by a preponderance of the evidence that a conspiracy existed; that the defendant and the declarant were both members of the same conspiracy; and that the proffered statements were made during the course of and in furtherance of that conspiracy). Moreover, this same Court considered the proffer in sentencing. In any event, it is premature to decide the evidentiary sufficiency of this piece of evidence when considering the legal sufficiency of the complaint. For these reasons, the Court may properly rely upon the Golden Chain document for the purposes of this motion.

*rel. Shire Pharmaceuticals Group PLC v. Shire Pharmaceuticals Group PLC*, 298 F.3d 136, 140 (2d Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003); *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991); *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d at 825 (citing *Desidero v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2nd Cir. 1999)).   "The issue is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support their claims." *Scheuer v. Rhodes*, 416 U.S. at 236; *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (holding court's task in addressing Rule 12(b)(6) motions "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").   Based on the allegations contained in the *Burnett* TAC, Sulaiman Al Rajhi has failed to meet the burden of showing that the allegations regarding him are insufficient to withstand scrutiny pursuant to Rule 12(b)(6).   Therefore, his motion should be denied.

## II.      Fed. R. Civ. P. 12(b)(2) Standard

On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the minimal burden of showing a factual basis upon which the court may exercise personal jurisdiction over the defendant.  *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).   In this regard, at the pleading stage, the plaintiff need only make a *prima facie* showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion.   *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).   In ruling on the motion, the Court should resolve factual discrepancies appearing in the record in favor of the Plaintiffs.  *Id.* at 84.

In making their *prima facie* case for personal jurisdiction, however, plaintiffs are not limited to their pleadings.   Rather, that case may be established through pleadings and affidavits. *See Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *See* 28 U.S.C. § 1653. Moreover, in evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe

all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in

plaintiffs' favor. *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).[5]

## ARGUMENT

### I.      Plaintiffs Have Stated Claims Upon Which Relief can be Granted

The Plaintiffs have alleged that Sulaiman Al Rajhi provided monetary and other support

to the SAAR network, and that the SAAR network knowingly supported the terrorist activities of

al Qaeda. *Burnett* TAC, ¶ 86, 261, 266; *WTC* ¶¶ 133, 435, 440; *Euro Brokers* ¶ 96; *WTC* and

*Euro Brokers* RICO ¶ 5(f) and (g), Exhibit A; *Continental* ¶¶ 357-60, 467-68; *Continental* RICO,

Exhibit A; *Cantor* FAC ¶¶ 11, 107, 111; *Cantor* Plaintiffs' RICO No. 2; *O'Neill* RICO Exhibit

A; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶357, 373, 466, 471; *Tremsky* AC ¶¶ 53,

150, 155; *Federal* FAC ¶¶ 223, 226, 231, 232 and *Federal* RICO at Exhibit A. As detailed in the

extensive pleadings summarized *supra*, Sulaiman Al Rajhi also utilized international banking

and financing institutions for money laundering to materially support aid and abet al Qaeda. In

addition to his own Al Rajhi Bank, he sat on the board of S.D.G.T. Bank Akida Ltd. in the

Bahamas. He has long been involved with S.D.G.T.'s Yousef Nada and Ahmed Idris Nasreddin

in financing international terrorism. These allegations sufficiently state a cause of action against

Sulaiman Al Rajhi. In addition, the Complaint provides allegations directed against all

Defendants collectively stating that all defendants participated in a conspiracy to support al

Qaeda and its stated goals. *Burnett* TAC Introduction, pp. 199-200, 203-206, 217-218; ¶ 89, ¶¶

631-722; *WTC* ¶¶ 1, 3, 8-11, 36, 37, 226, 1121-1192; *Euro Brokers* ¶¶ 5, 28, 144-192;

*Continental* ¶¶ 26, 27; *See also Cantor* FAC ¶¶ 11, 111, 185-192; *Cantor* RICO No. 2; *O'Neill* ¶

23; *Federal* FAC ¶¶ 72, 73, 623-626; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶5; *NY*

---

[5] The Kaplan Decl. and the Draper Aff. are submitted as *prima facie* evidence of personal
jurisdiction over defendant.

*Marine* 1AC, ¶44, 45, 51-53; *Tremsky* AC Introduction pp. 7-8, 11, 19-20; ¶ 56; *Federal* RICO.

Thus, the pleading standard has been met pursuant to Rule 12.

## II.    Plaintiffs Adequately Allege Causation Regarding All Claims

Congress' rationale in enacting the ATA is related to the issue of proximate causation. "The Senate Report on Section 2333(a) emphasized that, *by imposing liability along the causal chain of terrorism, it would interrupt or at least imperil, the flow of money."*  Senate Report on Section 2333(a), S. Rep. 102-342 at 122 (emphasis added), cited in *Boim v. Quranic Literacy Institute, et al.,* 291 F. 3d 1000, 1011.  Plaintiffs adequately allege causation under the ATA and the other legal theories pled.

In *Boim*, the Seventh Circuit found there would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence.  *Id.* at 1021.  "The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Id.*  Herein, as in *Boim*, the Court of Appeals made clear "(t)he defendants repeatedly confuse what must be alleged with what must be proved.  **The plaintiffs need not set out in detail all of the facts on which they base their claim.**" *Id.*  at 1025 (emphasis supplied).   Ultimately, Plaintiffs must show that Sulaiman Al Rajhi knew of or had to know of al Qaeda's illegal activities, that he desired to help those activities succeed, and he engaged in some act to help the illegal activities. *Id.* at 1023. At this stage of the litigation, Plaintiffs' responsibility is to include the requisite allegations regarding the cause of action rather than "set out in detail all of the facts on which they base their claim."  This burden has been met.

The Ninth Circuit held in *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000), that the knowing provision of "material support" to a designated terrorist entity

violates 18 U.S.C. § 2339B, regardless of whether the donor intended to support the terrorist

activities of the group and regardless of whether the particular dollars provided to the

organization can be traced to the resulting acts of terrorism.  The Ninth Circuit explained:

> [A]ll material support given to such organizations aids their unlawful
> goals….  More fundamentally, money is fungible; giving support intended
> to aid an organization's peaceful activities frees up resources that can be
> used for terrorist acts.

*Id*.  Section 2339B of the ATA recognizes that even the provision of humanitarian or "peaceful"

support to such a group inevitably redounds to the benefit of the group's terrorist purposes.[6]

Congress, by enacting 18 U.S.C. § 2339C, further clarified that direct causation of the terrorist

act in question was unnecessary in the funding of terrorism by stating "it shall not be necessary

that the funds were actually used to carry out a predicate act." 18 U.S.C. § 2339C(a)(3).

The rationale for for 18 U.S.C. § 2339C applies here.  Defendant does not have to

participate in or even know about, the *specific* bad act that ultimately harms the victim.

Defendant need only assist the terrorist group knowing that the assistance would lead to

wrongful and harmful acts.  *See also Halberstam v. Welch*, 705 F.2d 472, 483-485 (D.C. Cir.

1983); *Hecht v. Commerce Clearing House, Inc*., 897 F.2d 21 (2nd Cir. 1990); *Diduck v.*

*Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2nd Cir. 1992)(abrogated on other grounds).

Even small donations made knowingly and intentionally in support of terrorism may meet the

standard for civil liability under Section 2333.  *Boim* 291 F. 3d at 1015.

Substituting the situation of this case into the framework of *Halberstam*, it is not

necessary for Plaintiffs to allege or prove that Sulaiman Al Rajhi knew specifically that al Qaeda

was going to commit the precise atrocities of September 11, 2001.  Rather, when Sulaiman Al

---

[6] As noted above, the Seventh Circuit in *Boim* held that § 2333 incorporates the standards of § 2339B because it
would make no sense to conclude, "that Congress imposed criminal liability . . . on those who financed terrorism,
but did not intend to impose civil liability on those same persons. . ." 291 F.3d at 1014.

Rajhi provided funding or other material support to al Qaeda, it was enough that he knew al Qaeda was involved in terrorist activity purposefully directed at the United States. *Burnett* TAC ¶¶ 86, 89, 261, 266, 631-34; *WTC* ¶¶ 133, 226, 435, 1121-1124; *Euro Brokers* ¶ 96; *WTC* and *Euro Brokers* RICO Statements ¶ 5(b); *Continental* ¶¶ 357-60, 467-68; *Continental* RICO Statement, Exhibit A; *See also Cantor* FAC ¶¶ 11, 107, 111, 185-192; *Cantor* RICO Statement at Response No. 2; *O'Neill* ¶ 23; *O'Neill* RICO Statement ¶ 5(b)(g), 6(b), 14, Exhibit A; *Salvo* 1AC ¶357, 460, 466, 71; *NY Marine* 1AC ¶51-53; *Tremsky* AC ¶¶ 53, 56, 150; *Federal* FAC ¶ 77 and *Federal* RICO.

The Plaintiffs' allegations about the Defendants' material support of al Qaeda, which targets the United States, satisfies the proximate cause analysis.  Plaintiffs also maintain aiding and abetting and conspiracy claims under 18 U.S.C. § 2333 against Sulaiman Al Rajhi.  An aiding and abetting claim will require the Plaintiffs to prove, at a later point in the litigation, that [the donees] knew about [the terrorist organization's] illegal operations and provided aid to [the terrorist organizations] with the intent to facilitate those illegal activities.  *Boim*, 291 F.3d at 1024.  That is precisely what the Plaintiffs allege in regard to Sulaiman Al Rajhi, that he knew of the illegal activities of al Qaeda and other terrorist groups, and that his SAAR network supported terrorism and al Qaeda, and Sulaiman Al Rajhi used the SAAR network, the Al Rajhi Bank, the Akida Bank, and a network of corrupt entities to directly facilitate these illegal activities.[7] Kaplan Decl. Exhibit 5.

---

[7] *Burnett* TAC Introduction at 199-200, 203-206, 217-218; ¶¶ 86, 252, 261, 266; *WTC* ¶¶ 1-3, 8-11, 36, 37, 215, 219, 273, 426, 435, 440; *Euro Brokers* ¶¶ 6, 92, 96; *WTC* and *Euro Brokers* RICO Statements ¶ 5(f) and (g), Exhibit A; *See also Cantor* FAC ¶¶ 11, 107, 111, 185-192; *Cantor* RICO Statement at Response No. 2; *O'Neill* RICO Statement ¶ 5(b)(g), 6(b), 14, Exhibit A; *Federal* FAC ¶¶ 226, 228, 231, 232; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶357, 373, 466, 471; *Tremsky* AC Introduction pp. 7-8, 11, 19-20; ¶¶ 53, 141, 150, 155; *Federal* RICO; Testimony by Dr. Dore Gold.

**III.    The Complaint States a Claim Against Sulaiman Al Rajhi Under the Anti-Terrorism Act**

The ATA, 18 U.S.C. § 2331 *et seq.* creates a private cause of action for injuries resulting from international terrorism.   18 U.S.C. § 2333.   There can be no doubt that the acts of September 11th were acts of "international terrorism" within the meaning of 18 U.S.C. § 2331 *et seq. See Smith,* 247 F. 3d 532, *supra*.   In *Boim*, the court recognized two theories on which a plaintiff can proceed.   *Boim*, 291 F.3d at 1009.   First, the court concluded, a plaintiff may recover under § 2333 if the defendants violated 18 U.S.C. §§ 2339A and 2339B, which criminalize the provision of "material support or resources" to terrorists and foreign terrorist organizations, respectively.   *Id.* at 1012-14   Provision of such support gives rise to civil liability under § 2333 where the support was material -- that is, of the type that implies the element of knowing or intentional support.   *Id.* at 1015

The second theory of liability endorsed in *Boim* permits recovery where the defendants have aided and abetted an act of international terrorism.   *Id.* at 1021.   The court reasoned that "although the words 'aid and abet' do not appear in the statute, Congress purposely drafted the statute to extend liability to all points along the causal chain of terrorism."   *Id.* at 1019-20.   The court stated that the failure to impose aider and abettor liability on those who knowingly and intentionally funded acts of terrorism would thwart "*Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence.*"   *Id.* at 1021 (emphasis supplied).

Here, the Complaint adequately alleges that Sulaiman Al Rajhi, and the other Defendants, provided "material support or resources" and "aided and abetted" al Qaeda terrorists and that they did so "knowingly and intentionally, resulting in the causal chain of violence."   *Burnett* TAC ¶ 267, ¶¶ 645-652; *WTC* ¶¶ 441, 1125-1131; *Euro Brokers* ¶¶ 151-158; *Federal* FAC ¶¶

624-626; *See also Cantor* FAC ¶¶ 11, 107, 111, 185-192; *Cantor* RICO Statement at Response No. 2; *See also Cantor* FAC ¶¶ 11, 107, 111, 185-192; *Cantor* RICO Statement at Response No. 2; *O'Neill* ¶23; *O'Neill* RICO Statement ¶ 5(b)(g), 6(b), 14, Exhibit A; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶472; *NY Marine* 1 AC ¶51-53; *Tremsky* AC ¶¶ 156, 230; *Federal* RICO.  Indeed, the *Burnett* TAC alleges as to all Defendants:

> Defendants knew or reasonably should have known they were providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent people.  Defendants clearly knew or should have known, they were providing material support, aiding and abetting and enabling the terrorists that brutalized America and the world on September 11, 2001.

*Burnett* TAC, p. 217; *Federal* FAC ¶¶ 70-74.

## IV.    The Complaint States a Claim Against Sulaiman Al Rajhi Under the Alien Tort Claims Act

In *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004), the Supreme Court held that the ATCA creates a cause of action for a certain set of tort claims, including, at a minimum, "violation of safe conducts, infringement of the rights of ambassadors, and piracy." 124 S.Ct. at 2761.  The Court further held that the ATCA provides jurisdiction for causes of action "based on the present-day law of nations" to the extent that such claims rest "on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" of the other three claims. 124 S.Ct. at 2761-62.  The crucial question for ATCA purposes, therefore, is *not* whether Sulaiman Al Rajhi is a private or state actor, *defacto* or otherwise, but whether the type of action alleged amounts to a violation of the law of nations, or constitutes one of three specific violations, namely: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." Sosa, 124 S.Ct. at 2761.

Here, plaintiffs' claims may be asserted under the ATCA under either prong established by the Supreme Court.  International terrorism is the modern-day equivalent of piracy.  Thus,

plaintiffs' claims, which arise from the four airplane hijackings on September 11, 2001, are cognizable under that statute.[8]  The murderous attacks of September 11, 2001 were also specific acts of terrorism that are universally condemned under international law.  *See* U.N. Security Council Resolution 1373 (September 28, 2001).[9]   The perpetrators violated numerous pre-existing, widely ratified, international anti-terrorism conventions, including, but not limited to: the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, 22 U.S.T. 1641; the Tokyo Convention on Offences and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, 704 U.N.T.S. 219; and, the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, 24 U.S.T. 565 (making aircraft hijacking and other offenses committed aboard aircraft international criminal offenses). The attacks also were a violation of the more recent International Convention for the Suppression of Terrorist Bombings.  See Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, art. 2, S. TREATY DOC. NO. 106-6, at 4, 37 I.L.M. 249, 253.  Moreover, the financing of these acts is a serious crime under international law.  International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. Gaor, 4th Sess., U.N. Doc. A/Res/54/109 (1999).  Accordingly, such acts of terrorism – and the financing or material support of them – committed by private parties are actionable and can give rise to liability under

---

[8] Furthermore, airplane hijacking has been recognized by numerous courts as the kind of specific violation of international law covered by the ATCA.  *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447-48 (2d Cir. 2001); *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1996); *Doe v. Islamic Salvation Front*, 257 F.Supp.2d 115, 120 (D.D.C.2003); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 309 (S.D.N.Y.2003); *Abdullahi v. Pfizer, Inc.*, No. 01CIV8118, 2002 WL 31082956, at *4 (S.D.N.Y. Sept. 17, 2002), *vac'd on other grounds*, 2003 WL 22317923 (2d Cir. Oct. 8, 2003); *see generally United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991) ("Aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved").  Although these cases pre-date the Supreme Court's ruling in *Sosa*, their holding is entirely consistent with the test adopted by the Supreme Court.

[9] U.N. Security Council Resolution 1373 was issued pursuant to the Article VII powers of the U.N. Security Council.  Therefore, it is legally binding on all member States of the U.N. pursuant to Article 25 of the U.N. Charter. Resolution 1373 determined that all States are obligated to prevent and suppress the financing of terrorists acts; to criminalize the provision of funds to carry out such acts; and to prohibit persons or entities from making any funds available for the benefit of those who commit, facilitate or participate in the commission of terrorist acts.

the ATCA.  *See, e.g., Islamic Salvation Front*, 993 F. Supp. at 5 (describing "terrorist activities" alleged in complaint), 18 U.S.C.  §§ 2333, 2339C.[10]

It is sufficient for the Plaintiffs to allege, as they have, that Sulaiman Al Rajhi with other of the Defendants, conspired with or aided and abetted in a violation of the law of nations.  *Burnett* TAC ¶¶ 653-57; *Tremsky* AC ¶¶ 229-231; *Federal* FAC ¶¶ 618-621.  Indeed, many federal courts following the Supreme Court's ruling in *Sosa* have recognized that ATCA liability can be based on conspiratorial relationships or theories of aiding and abetting.[11]  Thus the Plaintiffs' have alleged that the Defendant has aided in the commission of the modern day equivalent of piracy, and that the Defendant has violated present day international law.  Under *Sosa*, 124 S.Ct. 2739, this is enough to subject the Defendant to the ATCA.

## V.    The Complaint Adequately Alleges Common Law Claims

With respect to plaintiffs' claims for wrongful death, aiding and abetting, survival, negligent and intentional infliction of emotional distress, conspiracy, trespass, and negligence, Sulaiman Al Rajhi's arguments are a variation on a single theme.  Ignoring the allegations of the Complaints, about his knowing support of terrorism, Sulaiman Al Rajhi continues to insist that

---

[10] The alien Plaintiffs unquestionably have alleged facts sufficient to state a cause of action under the ATCA.  The allegations describe in detail how the Sulaiman Al Rajhi has financed and materially supported al Qaeda activities targeted at the United States.  *Burnett* TAC Introduction, pp. 199-200, 203-205, ¶ 86, 252, 261, 266; *WTC* ¶¶ 1-3, 8-11, 215, 219, 273, 400, 426, 435; *Euro Brokers* ¶¶ 6, 92, 96; *WTC* and *Euro Brokers* RICO Statements ¶ 6(b), 14, Exhibit A; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶111, 242, 357, 373, 466, 471; *NY Marine* 1AC ¶41-43; *Tremsky* AC Introduction pp. 7-8, 11, 19-20; ¶¶ 53, 141, 150, 155; *Federal* FAC ¶¶ 70-78, 79-83 and *Federal* RICO.  The plaintiffs also allege that al Qaeda, in particular, has used the Islamic charity system to funnel money – and hatred – through Islamic charities, with the charities', and thus, the donor's, material support.  *Burnett* TAC at pp. 207-208; *WTC* ¶ 16; *Euro Brokers* ¶ 35.  Moreover, the Plaintiffs make allegations specific to Sulaiman Al Rajhi and other Defendants alleging their active monetary sponsorship of al Qaeda sponsors.  *Burnett* TAC ¶¶ 261-267, 86, 252, 266; *WTC* ¶¶ 435-441, 133, 426, 440; *Euro Brokers* ¶¶ 92, 96; *WTC* ¶¶ 1-3, 8-11, 215, 219, 273, 400, 426, 435; *Euro Brokers* ¶¶ 6, 92, 96; *WTC* and *Euro Brokers* RICO Statements ¶ 6(b), 14, Exhibit A; *Salvo* 1AC ¶466-472, 357, 373, 471; *Tremsky* AC ¶¶ 53, 141, 150-156; *Federal* FAC ¶¶ 222-232 and *Federal* RICO.

[11] *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, Case No. 01-CV-9882 (DLC), slip op. at 14 (S.D.N.Y. June 13, 2005) (holding that corporate liability and concerted action liability were available pursuant to the ATS); *In re Agent Orange Prod. Liab. Litig.*, 2005 WL 729177, at *37-39 (citing to *Kadic*, 70 F.3d 232, at 244-45 (ATS contemplates liability for defendants who have acted in concert with a state to commit torture and other gross human rights violations); *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d at 826; *cf. In re South African Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004) (holding aiding and abetting under ATCA non-permissible in a case specifically cited in *Sosa* as infringing upon foreign affairs powers of the Executive Branch).

the Complaints only provide legally insufficient conclusory statements.  Because the Complaints allege substantially more than that, they properly assert these common law claims.

Indeed, this Court has already held that plaintiffs may maintain common law claims against parties who conspired with, or aided and abetted, al Qaeda.  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 830.  As the Plaintiffs have presented detailed factual allegations regarding Sulaiman  Al Rajhi's direct and extensive sponsorship of al Qaida, the have stated valid claims under common law theories.

With respect to plaintiffs' claims for wrongful death, aiding and abetting, survival, negligent and intentional infliction of emotional distress, conspiracy, and negligence, Sulaiman Al Rajhi's arguments are a variation on a single theme.  Ignoring the allegations at issue about his knowing support of international terrorism, Sulaiman Al Rajhi continues to insist that the relevant pleadings only provide legally insufficient conclusory statements.  Because the plaintiffs allege substantially more than that, it properly asserts these common law claims.

Plaintiffs Complaint alleged that Sulaiman Al Rajhi breached the duties encompassed in the norms of conduct found in international law.  Plaintiffs pled that Sulaiman Al Rajhi was aided and abetted and/or was engaged in a conspiracy to provide funding to al Qaeda and that such funding was a proximate cause of Plaintiffs' damages. *Burnett* TAC ¶¶ 86, 89, 261, 266, 658-88; *WTC* ¶¶ 133, 226, 435, 440, 1151-1173; *Euro Brokers* ¶¶ 96, 144-150, 184-189; *WTC* and *Euro Brokers* RICO Statements ¶ 5(b), (f), (g), 8, 14, 16; *See also Cantor* FAC ¶¶ 11, 107, 111, 185-192; *Cantor* RICO Statement at Response No. 2; *O'Neill* ¶ 23; *O'Neill*  RICO ¶ 5(b)(g), 6(b), 14, Exhibit A; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶357, 360, 466, 471, 599-605; *NY Marine* 1AC ¶51-53, 55-64, 68-71, 76-80; *Tremsky* AC ¶¶ 53, 56, 150, 155, 232-256; *Federal* FAC ¶¶ 624-626.   These allegations

constitute adequate basis for notice of plaintiffs' common law claims.   The truth of these allegations must be determined at trial, not in the context of a motion to dismiss.

Plaintiffs have an additional basis for their negligence claims.  The *Burnett* TAC alleges that Sulaiman Al Rajhi violated the ATA and ATCA.  These statutes define the duty Sulaiman Al Rajhi owed to Plaintiffs.  Negligence *per se* is a concept that developed at common law and found its way into the jurisprudence of all of the states.  *Use of Federal Statutes in State Negligence Per Se Actions*, 13 Whittier L. Rev. 831 (1993).  Negligence *per se* establishes that statutes may be used to define the scope of duty owed by an actor to an individual who has been injured as a result of his conduct.  *Id.*[12]  This approach is well established.  On this subject, Judge Cardozo stated:

> We think the unexcused omission of the statutory signals is more than some evidence of negligence.  It is negligence in itself… By the very terms of the hypothesis, to omit, willfully or heedlessly, the safeguards prescribed by law for the benefit of another that he may be preserved in life or limb, is to fall short of the standard of diligence to which those who live in organized society are under a duty to conform.

*Martin v. Herzog*, 126 N.E. 814, 815 (N.Y. 1920).

## VI.   The Plaintiffs State Claims Against Al Rajhi Under RICO

The complaints and RICO Statements allege sufficient involvement by Sulaiman Al Rajhi in the enterprise at issue to sustain claims under Sections 1962(a), (c) and (d) of RICO.

---

[12] The Restatement (Second) of Torts § 285 (1965) states:

> The standard of conduct of a reasonable man may be … (b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide, if its purpose is found to be exclusively or in part:
>
> (a)   to protect a class of persons which includes the ones whose interest is invaded, and
> (b)   to protect the particular interest which is invaded, and
> (c)   to protect that interest against the kind of harm which has resulted, and
> (d)   to protect that interest against the particular hazard from which the harm results.

The Restatement Second goes on to say: "The unexcused violation of a legislative enactment or an administrative regulation which is adopted by the court as defining the standard of conduct of a reasonable man, is negligence in itself." Rest. 2d of Torts § 288 B (1).

Sulaiman Al Rajhi correctly states that a plaintiff asserting a civil claim under 1962(c) must allege that the defendant participated in the operation or management of the enterprise. *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). However, such "discretionary authority" has been described as "a relatively low hurdle for plaintiffs to clear" in the Second Circuit. *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir., 2004), citing *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998). Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D.N.Y. 1994).

"[T]he requirements for RICO's conspiracy charges under 1962(d) are less demanding." <u>Id.</u> at 376. All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." <u>*Id.*</u> at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)). "Although parties who do not control the organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993)

The plaintiffs have satisfied the pleading standards applicable to their 1962(c) and 1962(d) claims, as set forth above and in the RICO statements on file. In view of the allegations regarding Sulaiman Al Rajhi's and pervasive sponsorship of al Qaeda's operations throughout the world, the Plaintiffs have adequately alleged that Sulaiman Al Rajhi played a direct and

active role in the management and operation of al Qaeda's financial network and enterprise, and that Sulaiman Al Rajhi knowingly conspired to further the objectives of the al Qaeda movement leading to the September 11th Attacks.  As such, the Plaintiffs have met their pleading burden in relation to their Section 1962(c) and 1962(d) claims, particularly since the plaintiffs have not yet been afforded the opportunity to conduct discovery.[13]

## VII.   This Court has Personal Jurisdiction Over Sulaiman Al Rajhi

Sulaiman Al Rajhi also contends that this Court lacks personal jurisdiction over him. However, a federal court may exercise personal jurisdiction over a non-resident defendant when: (1) the defendant is amenable to service of process pursuant to a statute or rule of court that authorizes such an exercise; and, (2) such an exercise is consistent with due process of law.  *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Service of process on Sulaiman Al Rajhi was demonstrably adequate.  Similarly, the evidence shows that an exercise of jurisdiction by this Court would be consistent with due process of law because the plaintiffs allege Sulaiman Al Rajhi had adequate minimum contacts with the United States, and that he purposely directed his actions at residents of the United States when he financed al Qaeda, whose stated purpose was targeting Americans. *See* Kaplan Decl.; Draper Aff.; *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 (1961).

Sulaiman Al Rajhi has many business interests which include extensive dealings with

---

[13] Plaintiffs' Complaints and RICO Statements further allege that Al Rajhi engaged in conduct in furtherance of the enterprise which is actionable under section 1962(a). Pursuant to that section: "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt … to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."  In the present case, plaintiffs allege that Al Rajhi solicited funds from donors in the United States and throughout the world under the guise of "charity" via the ostensible charities and banks he controlled and diverted the funds collected to al Qaeda. Thus, the complaints and RICO statements plainly allege that Al Rajhi derived income through a pattern of racketeering activity, including multiple acts of mail and wire fraud, and invested that income in the enterprise. As the Supreme Court has explicitly recognized that al Qaeda's terrorist endeavors, including the September 11th attacks, directly affect interstate commerce, plaintiffs have undeniably stated RICO claims under Section 1962(a). *See Rasul v. Bush*, 124 S. Ct. 2686, 2690 (2004) (stating that the September 11th attacks "severely damaged the U.S. economy").

American corporations, or corporations which do extensive business in the United States. *See O'Neill* ¶ 40; Kaplan Decl. and Exhibits thereto. Specifically, Sulaiman Al Rajhi and his family set up the SAAR Foundation, incorporated in Herndon, Virginia with offices in the United States. *Burnett* TAC ¶ 261; *WTC* ¶ 435; *WTC* and *Euro Brokers* RICO Statements, Exhibit A; *Continental* ¶ 467; *O'Neill* RICO Exhibit A; *Ashton* 4AC ¶¶337-338, 537, 559-562; *Salvo* 1AC ¶466; *Tremsky* AC ¶ 150; *Federal* RICO. Sulaiman Al Rajhi also does business in the U.S. through Mar-Jac Poultry, al-Watania Poultry, Mar-Jac Investments, and Piedmont Poultry, *Burnett* TAC ¶ 87; *WTC* ¶ 134; *Continental* ¶¶ 360, 467; *O'Neill* RICO Exhibit A; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Salvo* 1AC ¶358; *Tremsky* AC ¶54; *Federal* RICO. Plaintiffs' have specifically alleged that Sulaiman Al Rajhi runs a network of charities headquartered in the United States, and he also conducts business in the United States and throughout the world through several corporate holdings. *See* Kaplan Decl.

Sulaiman Al Rajhi has also purposefully directed his actions at the United States. *See* Kaplan Decl. and Exhibits thereto. In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum satisfies the due process requirements for jurisdiction, even if *none* of the defendant's conduct took place in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984). The Court held that jurisdiction was warranted because the defendants' intentional, and allegedly tortuous, actions were "expressly aimed at California." *Id.* Like the defendants in *Calder*, Sulaiman Al Rajhi is accused of intentional tortious acts. Here, plaintiffs and their deceased loved ones were targeted because they were in the United States.

Plaintiffs allege that Sulaiman Al Rajhi knowingly provided material support to terrorism targeted against the United States, by providing funds for that purpose to al Qaeda and

organizations which funneled money to al Qaeda.  *Burnett* TAC Introduction at 207-208, 212-213, 217-218; ¶¶ 86, 252, 261, 266; *WTC* ¶¶ 1, 13, 36, 133, 215, 219, 273, 426, 435, 440; *WTC* and *Euro Brokers* RICO Statements ¶ 5(b), (f), (g), 6(b), 8, 14, 16, Exhibit A; *Continental* ¶¶ 357-60, 467-68; *Continental* RICO Statement, Exhibit A; *See also Cantor* FAC ¶¶ 11, 107, 111, 185-192; *Cantor* RICO Statement at Response No. 2; *O'Neill* ¶ 23; *O'Neill* RICO ¶ 5(b)(g), 6(b), 14, Exhibit A; *Ashton* 4AC ¶¶ 337-338, 537, 559-562; *Federal* FAC ¶¶ 223, 226, 228, 231, 232; *Salvo* 1AC ¶357, 373, 471; *NY Marine* 1AC ¶41-43, 51-53; *Tremsky* AC Introduction pp. 7-8, 11, 19-20, ¶¶ 53, 141, 150, 155; *Federal* RICO.  As alleged in the *Burnett* TAC, al Qaeda specifically targeted civilians in the United States, proclaiming that, "America is a state at war with us" and noting that "killing of women and the old and children of the war states . . . is permissible . . . ."  *Burnett* TAC Introduction at 207; *WTC* ¶13.  Thus, al Qaeda made no secret of the fact that its intended target was citizens and residents of the United States.  Sulaiman Al Rajhi "purposefully directed" activities at the United States.

In addition, while enacting the Anti-Terrorism Act of 1990 (hereinafter "ATA"), which Plaintiffs invoke, the Congress sought to lessen jurisdictional issues, such as those presented in the instant case.  The ATA "removes the jurisdictional hurdles in the courts confronting victims and it empowers victims with all the weapons available in civil litigation."  Anti-Terrorism Act of 1990, Hearing Before the Sub-Committee on Courts and Administrative Practice, Senate Committee on Judiciary 101st Cong., 2d Sess., at Cong. Rep. 8143 (1991).[14]

Sulaiman Al Rajhi also is subject to jurisdiction here because, as alleged in the

---

[14] If the Court determines that Plaintiffs' allegations are not enough to establish personal jurisdiction, then Plaintiffs seek leave to conduct discovery to determine the extent to which Defendant has targeted or purposefully availed himself of the Court's jurisdiction and his personal contacts with the United States.  "[A] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery.  45A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990).

complaints and RICO Statements, he conspired with al Qaeda to attack the United States.  Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum.[15]  *See In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 805 (acts committed in New York by co-conspirators subject out of state defendant to jurisdiction under CPLR 302(a)(2)); *All State Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215, 221 (S.D.N.Y. 1992).[16]

## VIII.   The Plaintiffs' Intentional Tort Claims Are Not Time Barred

The Plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not time-barred for two reasons. First, these claims are subsumed within plaintiffs' claims under the ATA, which imports into that federal cause of action "the remedies of American tort law." *See* 137 Cong. Rec. S4511 04 (April 16, 1991); *see also Boim*, 291 F.3d at 1010 (language and history of ATA "evidence[] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law"). To the extent that these claims have been "federalized" under the Anti-Terrorism Act, they are governed by federal law. *See Bettis v. Islamic Republic of Iran*, 315

---

[15] For a further analysis of this Court's authority to exercise personal jurisdiction over the defendants in this action under this test, the Plaintiffs respectfully refer the Court to the discussion set forth on pp. 23-24 of the Property Damage Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Perouz Sedaghaty."

[16] The Defendant misreads the law when he argues that he is immune from suit pursuant to the ATSSSA.  Def. Mem. of Law at p.12 note 30.  The "exclusive remedies" provision upon which the Defendant relies clearly relates only to suits for damages against the airlines.  This is shown by the fact that Section 408(b), which houses the exclusive remedies provision at issue, directs itself to "LIMITATION ON AIR CARRIER LIABILITY" and follows subsection (a), which also limits itself to suits against the airlines:  (a) IN GENERAL.--Notwithstanding any other provision of law, liability for all claims, whether for compensatory or punitive damages, arising from the terrorist-related aircraft crashes of September 11, 2001, against any *air carrier* shall not be in an amount greater than the limits of the liability coverage maintained by the air carrier.  In any case, the Defendant's reliance on the ATSSSA to escape liability is wholly defeated by the will of Congress as expressed in the Act.  Under subsection (c) EXCLUSION.--"Nothing in this section shall in any way limit any liability of *any person* who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act."  Here, Plaintiffs have uniformly alleged that Defendant was a knowing participant in the September 11 attack by way of his role in the lending of material support to Al Qaeda and in his participation in a conspiracy to accomplish the same.  Thus, in asking the Court to grant him immunity from Plaintiffs' claims, the Defendant is asking the Court to misapply the ATSSSA and ignore the expressed will of Congress that authorizes suits such as the case at bar.  The Court should decline the Defendants' invitation to error.

F.3d 325 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal statute). State statutes of limitation are inapplicable to federal common law claims. *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004). *See also Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306, 309 (E.D. La. 1994), *reconsideration denied*, 1995 WL 672835 (E.D. La. Nov. 9, 1995) (holding that suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even when brought by private parties).

The defendants neglect to acknowledge that the *Burnett* Complaint was filed on August 15, 2002 within the one year statute of limitations for intentional torts under New York law. Moreover, all of the Plaintiffs' intentional tort claims arise from Sulaiman Al Rajhi's participation in the conspiracy to conduct terrorist attacks against the United States; a conspiracy designed to hide the identity of the participants from disclosure to the outside world. As a result, the statute of limitations was tolled until the Plaintiffs reasonably should have become aware of Sulaiman Al Rajhi's involvement within the conspiracy, itself a question of fact to be determined through discovery. *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D.N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation,* 2004 U.S. Dist. LEXIS 3829 *17-18 (S.D.N.Y. 2004). Given the clandestine nature of the conspiracy in which Sulaiman Al Rajhi participated, equitable principles require that the statute of limitations be tolled. *See Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (holding that "[e]quitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").

## CONCLUSION

For the foregoing reasons, this Court should deny Sulaiman Al Rajhi's motion to dismiss.

Respectfully submitted,


/s/
_____
Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Attorneys for *Burnett* Plaintiffs


William N. Riley, Esq. (IN Bar #4941-49)
Amy Ficklin DeBrota, Esq. (IN Bar #17294-49)
PRICE WAICUKAUSKI RILEY & DEBROTA, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone:  (317) 633-8787

Attorneys for *Burnett* Plaintiffs


Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

Attorneys for *Euro Brokers* and *WTC Properties* Plaintiffs


Stephen A. Cozen (SC 1625)
Elliott R. Feldman (EF 8111)
Sean P. Carter (SC 0636)
Mark T. Mullen (MM 2384)
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Telephone:  (215) 665-2000


Attorneys for *Federal* Plaintiffs

James Kreindler, Esq.
KREINDLER & KREINDLER LLP
100 Park Avenue, 18th Floor
New York, NY 10017-5590
Telephone:  (212) 687-8181

Attorneys for *Ashton* Plaintiffs

Robert M. Kaplan (RK1428)
FERBER FROST CHAN & ESSNER, LLP
530 Fifth Avenue, 23rd Floor
New York, New York 10036-5101
Telephone:  (212) 944-2200

Attorneys for *Continental* Plaintiffs

David H. Fromm, Esq. (DH-9334)
Frank J. Rubino, Jr., Esq. (FR-6202)
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, New York 10017
Telephone:  (212) 983-8500

Attorneys for New York Marine and
General Insurance Company Plaintiffs

On behalf of all Counsel in the above-related cases

27