# Attachment P

# National Commission on Terrorist Attacks Upon the United States

## Monograph on Terrorist Financing



## Staff Report to the Commission

John Roth
Douglas Greenburg
Serena Wille

The Chicago investigation of GRF suffered a major blow in late spring or early summer 2001 when the FISA warrants were not extended. The Chicago agents were now in the same position as those in Detroit—deprived of electronic surveillance, their most potent intelligence-gathering tool.

## GRF's status on 9/11

The FBI's investigation over the several years before 9/11 led the investigating agents to believe GRF was an organization dedicated to supporting international jihad and was raising substantial funds in the United States toward that goal. The FBI agents developed what they thought was a good understanding of GRF's activities, despite significant obstacles imposed by a dysfunctional process for obtaining NSLs and FISA warrants. Although the FBI did the bulk of the work investigating GRF, the investigation benefited from contributions by the intelligence community and by foreign law enforcement sources, both of which substantially aided the FBI's understanding of the GRF's overseas activities. Despite the considerable body of knowledge they had, the FBI agents believed they lacked the evidence necessary to bring a criminal prosecution against GRF or its principals. In any event, the perceived restrictions imposed by the wall made such a prosecution extremely difficult, at best, and initiating a criminal investigation could have put the FISA warrants at risk. As a result, the FBI was left with nothing to do but continue to gather intelligence on GRF's activities in the United States. This task was made far more difficult by the inability to renew the FISA warrants in Chicago or obtain FISA coverage in Detroit. The agents did not have any plan to disrupt what they believed to be a major jihadist fund-raising operation, or any endgame for their investigation.

## The origin of BIF

BIF was incorporated in Illinois in March 1992 and received tax-exempt status in March 1993. Its origins can be traced to Saudi Arabia, where in 1987 Sheikh Adel Abdul Jalil Batterjee founded Lajnat Al-Birr Al-Islami (LBI), a Jeddah-based NGO. LBI provided support to the mujahideen fighting the Soviets in Afghanistan, as well as humanitarian aid to refugees of the war in Afghanistan. Batterjee, from a merchant family in Saudi Arabia, was affiliated with a group of wealthy donors from the Persian Gulf region known as the "Golden Chain," which provided support to mujahideen, including mujahideen under the leadership of Usama Bin Ladin. The U.S. government has alleged that BIF was incorporated in the United States to attract more donations and deflect scrutiny from LBI.

At BIF's founding in 1992, its three directors were Batterjee and two other Saudis. In March 1993, Batterjee and the two other Saudis were replaced by three new directors, including Enaam Arnaout, who became BIF's executive director, managing its day-to-day operations and reporting to Batterjee. The U.S. government contends the change was made after Batterjee came under scrutiny in Saudi Arabia for financially supporting jihad

outside of approved channels. Despite his formal removal, Batterjee continued to play a major role in running BIF and was in frequent contact with Arnaout from his home in Saudi Arabia. The government contends that Arnaout was a longtime jihadist supporter, with personal ties to Usama Bin Ladin dating back to the 1980s. He allegedly provided military and logistical support to the mujahideen in the late 1980s and early 1990s, as an employee of LBI and another Saudi NGO, the Muslim World League. In doing so, he allegedly worked closely with Usama Bin Ladin and other mujahideen who later became significant members or supporters of al Qaeda. According to INS data compiled by the FBI, Arnaout, a native Syrian, lived in Hama, Syria, from his birth in 1962 until 1981, when he went to study in Saudi Arabia. In 1989, Arnaout married an American citizen he met in Peshawar, and he became a naturalized U.S. citizen in March 1994.

BIF publicly described itself as an "organization devoted to relieving the suffering of Muslims around the world." According to its IRS filings, it received more than $15 million in donations between 1995 and 2000.

## *The FBI investigation of BIF*

The FBI started its investigation of BIF in 1998 as a result of a conference that a Chicago agent attended in Washington, D.C., where he learned of foreign intelligence reports indicating that Arnaout was involved in providing logistical support for jihadists. The FBI in Chicago opened an FFI in February 1999, focusing on Arnaout as the key player. The GRF case agents also served as the lead case agents on BIF investigation. Much like the early GRF investigation, BIF investigation featured surveillance and digging through garbage. The FBI also sought to develop sources. The trash covers were fruitful, as BIF "threw out everything"—including telephone bills and detailed and elaborate reports on its activities, which Arnaout demanded from his subordinates on a daily basis. The FBI began to run down some of the names and numbers appearing in the trash. In addition, on April 21, 1999, the agents recovered from BIF's trash a newspaper article on bioterrorism, in which someone had highlighted sections relating to the United States' lack of preparedness for a biological attack.

When it opened the FFI, the FBI in Chicago knew of Adel Batterjee but had little understanding of who he was. They later obtained records showing Batterjee was contributing funds to BIF. In the summer of 1999, they sent what the Bureau calls a lead—relaying information and requesting action—to Saudi Arabia, through the Legat, for information on Batterjee. As of 9/11 they still had received no response.

Chicago submitted a FISA request in April 2000, but it was not approved until after 9/11. Notwithstanding evidence that BIF had significant links to Usama Bin Ladin and was sending significant amounts of money overseas, the Chicago agents could not get an inside look at the organization that a FISA could provide. As we will later show, after 9/11 it was simply too late.

National Commission on Terrorist Attacks Upon the United States

After opening the FFI, FBI Chicago obtained NSLs for phone and bank records. The bank records gave a good indication of the scope of BIF's fund-raising activities. According to contemporaneous documents, the FBI believed based on its yet to be completed investigation that BIF was receiving approximately forty to sixty thousand dollars a week, and that between 1997 and 1998, BIF sent more than $2.5 million to its overseas offices in Bosnia, Azerbaijan, Pakistan, and Tajikistan.

FBI Chicago had cultivated a good human source who provided useful information on BIF, though never any smoking guns. The Chicago agents had a much closer relationship with the CIA on BIF than they did on GRF, because they cooperated on certain international matters in the BIF investigation. They regularly met with the CIA concerning BIF, received some useful information, and shared much of their information. For example, the Chicago agents learned from the CIA important information about BIF's founding and the sources of its funding. Still, the CIA and the FBI did not have a perfect relationship, and the CIA held back some information. The Chicago agents believed the CIA wanted to shield certain information from the FBI because of fears of revealing sources and methods in any potential criminal litigation in the United States.

The Chicago agents obtained all the bank account numbers for the BIF's overseas offices, which BIF had typed up and later thrown out in the trash. They provided this information to the intelligence community, which they hoped could trace the money overseas. They never heard anything back about such a trace, however.

The BIF investigation revealed the difficulties in securing foreign cooperation in terrorism investigations. FBI Chicago submitted a lead to a European ally, through the Legat, for information about European intelligence reports concerning a BIF official's purported involvement in the kidnapping of Americans in Kashmir. The U.S. ally never even acknowledged the request, let alone replied. The FBI did not submit MLAT requests for foreign records because, again, it had no criminal case.

The FBI's New York Field Office, which ran the primary FBI investigation of Bin Ladin, was a key source of information for Chicago. But the New York agents were overwhelmed with work, and did not always coordinate well with their Chicago counterparts. Although the New York agents were aware of the BIF/GRF investigations, they sent out their own leads relevant to these investigations, annoying the Chicago agents. The agents in New York did not have time to share information proactively, although those in Chicago were welcome to look through New York's files for relevant information—which they did, gaining helpful information.[86]

GRF's bank filed a money-laundering Suspicious Activity Report with the Treasury Department's Financial Crimes Enforcement Network (FinCEN) regarding BIF's large transfers of money to the Republic of Georgia. It was apparently concerned that BIF was involved with Russian organized crime. The Chicago agents said they did not make any requests of FinCEN before 9/11, explaining that FinCEN would not have been useful to

---

[86] According to the BIF's attorney, the bank actually closed the BIF's accounts just before 9/11, forcing BIF to find another bank in the Chicago area, which it was able to do.

96

them because it could not help them trace the money once it got overseas. They knew that BIF was sending big money overseas, and even knew the account numbers and office directors of the BIF overseas offices that were receiving the money. Their problem was tracing the money once it got there, and the believed FinCEN could provide no help in this regard because, like the FBI agents, it had no access to the relevant foreign records.

### *Inability to bring a criminal case to disrupt BIF*

Overall, BIF investigation was in the same position as the GRF investigation on 9/11: the agents believed BIF had substantial ties to al Qaeda, was supporting jihad, and was sending a great deal of money overseas, but they could not trace the money directly to its ultimate destination overseas. Although they had access to considerable information, the agents believed they still could not come close to proving a criminal case against Arnaout or BIF. The BIF investigation was actually in worse shape because, unlike in the GRF investigation, the agents could not get approval for electronic surveillance. The agents tried to understand what was going on overseas, and a European agency had invited the Chicago agents to a meeting to share information. The agents tried to go but, as had happened with the GRF investigation, the Chicago FBI could not afford to send them. The misunderstanding of the wall also created the same problems in the BIF investigation as it did in that of the GRF. For all of these reasons, the FBI could not take any action against BIF, despite what the agents considered extensive knowledge of BIF's malfeasance.

Like the GRF investigation, the BIF investigation lacked an endgame. Believing themselves unable to initiate a criminal investigation and lacking any other means to disrupt what they thought to be a major jihadist fund-raising operation with substantial links to Bin Ladin and al Qaeda, the Chicago agents saw no options other than continued monitoring of BIF's activities. In this respect, the BIF and GRF investigations typified the FBI's pre-9/11 approach to terrorist financing. The FBI had numerous terrorist-financing investigations under way, but the vast majority of them were pursued as intelligence-gathering exercises by FBI intelligence agents, with little or no thought of disrupting the fund-raising through criminal prosecution or otherwise.

### *Post-9/11 Developments*

### *FBI investigations of BIF and GRF after 9/11*

Everything changed almost immediately after 9/11 with respect to the BIF and GRF investigations. Major obstacles to the investigation dropped away, more resources became available, and the issue of terrorist financing gained new prominence among national policymakers in Washington.

As a result, the course of the BIF and GRF investigations dramatically changed and led to a series of events unimaginable on 9/10: the long-delayed FISA warrants were

97

instantaneously approved; the FBI opened a major criminal investigation of GRF and BIF; FBI agents raided the Illinois headquarters of both organizations in an unprecedented overt FISA search; OFAC—an entity entirely unknown to the FBI case agents before 9/11—froze the assets of GRF and BIF; NATO troops kicked in doors of the charities' overseas offices and carted away all their contents; and Bosnian criminal investigators raided BIF's office in Bosnia, seizing a treasure trove of documents directly concerning BIF's relationship with Bin Ladin that dated to the origins of al Qaeda.

In the immediate wake of 9/11, the Chicago FISA warrant for GRF was reinstated, and that for BIF was finally approved. The previously moribund FISA applications from Detroit for GRF were approved as well, as the agent was informed by an emergency call from FBI headquarters.

But after the events of 9/11, electronic surveillance was not very useful, even though the FBI assigned a significant number of translators to the cases. The agents believed that the GRF subjects feared electronic monitoring in the wake of the attacks; they were extremely cautious about their communications. The GRF FISA warrants proved unproductive. On the other hand, electronic surveillance of BIF yielded some useful information, including the fact that Arnaout was passing messages to Batterjee. In addition to electronic surveillance, the agents continued other investigative techniques, including trash covers and physical surveillance.

Coincidentally, the U.S. Attorney for Chicago, Patrick Fitzgerald, on the job for only a couple of weeks, had extensive experience as a terrorism prosecutor and immediately became involved in the investigation of BIF and GRF.[87] Fitzgerald was very interested in prosecuting the cases criminally and, at his urging, the FBI opened a criminal investigation of BIF and GRF in October 2001. The intelligence cases continued as well, and the electronic surveillance continued. Because the wall between criminal and intelligence matters still existed, they decided to have separate case agents for the criminal and intelligence investigations. The lead intelligence case agents moved to the criminal case, and two new agents were assigned to the intelligence cases. The new intelligence agents were responsible for passing information over the wall to the criminal agents.

Fitzgerald immersed himself in the case and took a major role. He directed the FBI to interview al Qaeda cooperators from the New York cases, who provided considerable information on BIF and some on GRF as well. One cooperator, an admitted former al Qaeda member and Bin Ladin associate, said that BIF engaged in financial transactions for al Qaeda in the early 1990s. He also described how al Qaeda would take cash from charitable NGOs, which would then cover the transactions with false paperwork. After

---

[87] Fitzgerald took office pursuant to an interim appointment on September 1, 2001; he was formally appointed and confirmed by the Senate in October. Fitzgerald had extensive experience prosecuting terrorism cases as an Assistant U.S. Attorney in New York, where he prosecuted the Landmarks and Embassy Bombings cases and served nearly six years as co-chief of the Organized Crime and Terrorism Section.

opening the criminal case, the agents also were able to issue grand jury subpoenas for additional phone and bank records.

## *OFAC involvement and the shutdown of BIF and GRF*

While the Chicago agents and prosecutors were starting to think about bringing criminal cases against BIF and GRF, policymakers in Washington were thinking about disrupting al Qaeda financing using whatever tools they had. BIF and GRF came to the attention of OFAC, which began to consider them for possible designation as a supporter of al Qaeda. To this end, OFAC dispatched two analysts to Chicago in early December 2001 to review the FBI files and begin putting together the evidentiary packages that would support designations.

These plans were dramatically accelerated when CIA analysts, drawing on intelligence gathered in an unrelated FBI investigation, expressed concerns that GRF could be involved in a plot to attack the United States with weapons of mass destruction (WMD). Neither the Chicago agents nor the FBI headquarters analysts, who had extensive knowledge of GRF, were consulted on this analysis, which a Chicago FBI supervisor characterized as baseless. The WMD fears led to a plan to enter and search the overseas offices of GRF and BIF to obtain swabbings and other evidence related to possible WMD deployment. BIF was included because the two charities were thought to be related. Although the WMD allegations were never corroborated, the events of 9/11 led to an understandably cautious approach in dealing with potential threats of mass casualties.

At the same time, OFAC received word from the General Counsel of Treasury, who was coordinating the interagency effort against terrorist financing, that it needed to designate BIF and GRF immediately. OFAC had not yet developed the evidence necessary for a designation under IEEPA. As a result, OFAC relied on a provision of IEEPA clarified by the Patriot Act, which provides that OFAC could freeze the assets belonging to a suspected terrorist supporter "during the pendency of an investigation." Only a single piece of paper, signed by the director of OFAC, was required.[88] OFAC announced this action on December 14, 2001, thereby effectively shutting down both charities in the United States while gaining additional time to develop the evidentiary packages necessary for permanent designations. This extraordinary power enabled the government to stop the charities' operations without any formal determination of wrongdoing.

The raids on a number of overseas offices also occurred on December 14, 2001, conducted, in various locations, by NATO troops and U.S. government personnel. NATO troops raided two GRF offices, and NATO publicly stated that GRF "is allegedly involved in planning attacks against targets in the U.S.A. and Europe."[89] At the same time, Albanian National Police, accompanied by an FBI agent, raided the GRF office in Tirana and the home of a GRF employee, seizing $20,000 and taking swabbings for residue of WMD.

---

[88]According to OFAC, in practice, an interagency group discusses and agrees to any designation.
[89] Shenon, "A Nation Challenged: The Money Trail", *New York Times*, Dec. 18, 2001.

99

The original plan did not call for searches or takedowns of the GRF and BIF offices in Illinois. Rather, the FBI was to use its FISA warrants to monitor the charities' reaction to the overseas searches. This plan went awry when word of the impending action apparently leaked to GRF. FBI personnel learned that some of the targets of the investigations may be destroying documents.[90] As a result, the FBI decided to do an unprecedented "overt" FISA search of both GRF and BIF offices, which was hastily assembled and conducted. Following a chaotic process, the government agents searched both BIF and GRF offices in Illinois on December 14, 2001, carting away substantial evidence. The agents also searched the residence of GRF executive director and Arnaout.

On December 14, 2001, the INS detained GRF fund-raiser Rabih Haddad, one of the subjects of the Detroit investigation, on the basis that he was out of his allowed immigration status, having overstayed a student visa issued in 1998. Following bond hearings that were closed to the press, public, and Haddad's family, an immigration judge denied bail and ordered Haddad detained.[91]

While officials and investigators around the world moved to eliminate the perceived WMD threat and shut down the operations of BIF and GRF, investigators working on the 9/11 attacks sought to understand a curious connection between hijackers Nawaf al Hazmi and Khalid al Mihdhar and a GRF fund-raiser. On 9/11, the FBI learned that two days before, hijackers Hazmi and Mihdhar had dropped off bags at an Islamic prayer center in Maryland. The bags, to which the hijackers had affixed a note stating "[a] gift for the brothers," contained fruit, clothing, flight logs, and various other materials. The FBI launched an investigation to determine if the imam of the prayer center played any roles in the attacks. The investigators quickly determined in addition to his other responsibilities, the imam worked part-time raising money for GRF, at the direction of its executive director in Illinois. The FBI investigated his involvement with 9/11 for one and a half years. It ultimately concluded that he had no role in supporting the 9/11 attacks, although the investigating agents considered him to be a supporter of and fund-raiser for the international jihadist movement.

### *BIF and GRF challenge the government's actions*

The charities aggressively denied any connection to terrorism and condemned the raids and assets freeze. GRF's lawyer immediately called the government's action "a terrible, terrible, terrible tragic mistake," and stated, "If they're investigating terrorism, they're not going to find anything here." Another GRF spokesman said the government seized

---

[90] Press leaks plagued almost every OFAC blocking action that took place in the United States. The process had extremely poor operational security. In a number of instances, agents arrived at locations to execute blocking orders and seize businesses only to find television news camera crews waiting for them.

[91] *See Detroit Free Press v. Ashcroft et al*, 303 F.3d 681 (6th Cir. 2002) (setting out background). The hearing was closed pursuant to a September 21 directive from the chief immigration judge that immigration judges close immigration proceedings in certain "special interest" cases defined by the chief judge.

resources that GRF used to "prevent the slow starvation and gruesome death in parts of the Muslim world that rely on such badly needed aid."[92]

On January 28, 2002, GRF sued the Secretaries of Treasury and State, the Attorney General, and the Directors of OFAC and the FBI in federal court in Chicago. GRF requested that the government "unfreeze" its assets and return the items it seized during the December 14 searches. Two weeks later, GRF filed a motion for a preliminary injunction, contending that the government's blocking of its assets and records violated the law and Constitution.[93] BIF filed a similar suit on January 30, 2002, and a similar motion on March 26, 2002. BIF's complaint proclaimed its activities "entirely lawful," and contended that since its founding in 1992 it "has provided tens of millions of dollars worth of humanitarian aid in a dozen countries around the world, as well in the United States."[94]

Upon filing the complaint, BIF's lawyer said, "The government's actions threaten to destroy our essential constitutional liberties. If we no longer live in a society where we are secure from unreasonable searches and from the taking of liberty and property without any form of due process, then the terrorists will have succeeded in an even greater degree of destruction than the devastation of Sept. 11."[95] Despite the blocking of its assets, BIF and GRF could retain counsel because OFAC granted them "licenses" to do so. A license is written authorization from OFAC to spend money in ways otherwise prohibited by the blocking order, such as the release of blocked funds to pay for legal services.

BIF also sought a license to dispense the bulk of the funds blocked by the government, which totaled $700,000–800,000, to fund its overseas charitable causes, including a tuberculosis hospital for children in Tajikistan and the Charity Women's Hospital in Makhachkala, Daghestan. BIF supported its request with evidence of its charitable work, including affidavits from nurses in the hospital attesting to the importance of BIF's donations. According to BIF's counsel, the organization wanted to give away $500,000 of the blocked funds rather than let legal bills consume the money, and it even offered to have FBI agents accompany the funds overseas to their charitable destination. OFAC did not grant the license due to concerns that even funds sent to seemingly legitimate charities can be at least partially diverted to terrorist activities and OFAC's extremely limited ability to monitor the use of funds overseas. OFAC did license BIF and GRF to sustain some operations—retaining some employees and paying utilities, taxes and U.S. creditors—but most of the employees had to be let go, and the charities could neither raise new funds nor distribute existing funds overseas.[96]

---

[92] Deanna Bellandi, "Two Chicago-area Muslim Charity Groups Raided by Federal Agents; Assets Frozen," Associated Press, Dec. 15, 2001.
[93] *See, Global Relief Foundation, Inc. v. O'Neill et al.*, 207 F. Supp. 2d 779 at 787 (N.D. Ill. 2002), *affirmed* 315 F.3d 748 (7th Cir. 2002) (quoting complaint).
[94] *Benevolence International Foundation Inc. v. Ashcroft*, (N.D. Ill.), Complaint.
[95] Laurie Cohen, "2nd Muslim Charity Sues U.S. Officials on Terrorism," Chicago Tribune, Jan. 31, 2002, p. 1.
[96] Ultimately, the charities' legal bills consumed most of the frozen money, which angered donors who had intended their donations be used for humanitarian relief. See, e.g., Gregory Vistica, "Frozen Assets Going

Supporters of GRF fund-raiser Rabih Haddad, who was detained on immigration violations, rallied to his defense. Pointing out that Haddad had condemned the 9/11 attacks and contending he was a moderate and respected religious leader in the Detroit community, they considered his detention in solitary confinement on what appeared to be a minor visa violation as a prime example of discrimination against Muslims and an overzealous government response to 9/11, in violation of basic civil rights. For example, a sympathetic story in a London paper quoted U.S. Representative John Conyers: "The treatment of Rabih Haddad by the Immigration and Naturalization Service over the past several weeks has highlighted everything that is abusive and unconstitutional about our government's scapegoating of immigrants in the wake of the September 11 terrorist attack."[97]

### *Efforts to develop criminal cases against BIF and GRF*

After the preliminary designations and searches of December 14, 2001, the FBI and U.S. Attorney's Office in Chicago focused their attention on developing a criminal case. To do so, they initially faced major logistical challenges. The Illinois searches yielded an enormous amount of information, including hundreds of tapes and videos that had to be translated and reviewed, and many computer hard drives. According to the legal requirements imposed by FISA, all of this information had to be reviewed for "minimization." Since the evidence was seized under intelligence authorities, the Justice Department could use only that evidence relevant to an intelligence investigation or a crime such as terrorism. The logistical difficulties were compounded by the charities' civil litigation, the blocking order and OFAC's continued need for access to the materials so that it could build a case for permanent designations. The latter issue caused considerable frustration and confusion, as there were no rules about exactly what information in the FBI files OFAC could lawfully see. In addition, the lead case agents, who had been intelligence agents, lacked any significant federal criminal investigative experience, let alone experience in preparing a complex, document-intensive financial investigation for prosecution.

The criminal investigation of BIF received a huge boost in March 2002. The Chicago agents, who had been working with Bosnian officials on the case, provided the Bosnians with enough evidence to gain legal authority to conduct a criminal search of BIF's offices there. An FBI agent accompanied the Bosnians on the search to ensure a proper chain of custody necessary for the admission of anything found into a U.S. criminal proceeding. This search yielded compelling evidence of links between BIF's leaders, including Arnaout, and Usama Bin Ladin and other al Qaeda leaders, going back to the 1980s. The material seized included many documents never before seen by U.S. officials, such as the actual minutes of al Qaeda meetings, the al Qaeda oath, al Qaeda organizational charts,

---

to Legal Bills," *Washington Post*, Nov. 1, 2003, p. A6.  According to OFAC, when BIF exhausted the pool of blocked BIF funds, OFAC also issued licenses authorizing BIF to establish and maintain a legal defense fund in which to accept donations to offset its legal expenses.

[97] Andrew Gumbel, "The Disappeared," The Independent, Feb. 26, 2002.

and the "Golden Chain" list of wealthy donors to the Afghan mujahideen, as well as letters between Arnaout and Bin Ladin, dating to the late 1980s. It was an enormous break.

The Bosnian documents helped kick BIF investigation into high gear. Meanwhile, the GRF investigation temporarily took a back seat. On April 30, 2002, Arnaout and BIF were charged with two counts of perjury; the charge was based on a declaration that Arnaout had filed in the civil case against OFAC, in which he asserted that BIF never supported persons engaged in violence or military operations. Arnaout was taken into custody and denied bail. In September, the court dismissed the charges because established Supreme Court precedent held that the particular criminal statute under which he was charged did not apply to the out-of-court statements in Arnaout's declaration.[98] The government filed a criminal obstruction of justice case against Arnaout that same day, on the basis of the same false declaration. BIF was not charged again.

The government came back with a more substantive indictment of Arnaout in October 2002, directly alleging that BIF supported al Qaeda.[99] The indictment alleged that Arnaout operated BIF as a criminal enterprise that for decades used charitable contributions to support al Qaeda, the Chechen mujahideen, and armed violence in Bosnia. The government modified the allegations against Arnaout in a superseding and then a second superseding indictment, the latter of which was filed on January 22, 2003. It charged Arnaout with one count each of racketeering conspiracy under RICO (the Racketeer Influenced and Corrupt Organization Act), conspiracy to provide material support to terrorists, providing material support to terrorists, conspiracy to launder money, and wire fraud and two counts of mail fraud.

Attorney General John Ashcroft personally came to Chicago to announce the filing of the October indictment in a high-profile press conference. His public statements emphasized BIF's alleged support for al Qaeda and recounted much of the historic evidence linking Arnaout to Bin Ladin, including a recitation of the most significant al Qaeda documents seized at the BIF's office in Bosnia. Condemning BIF and Arnaout, the Attorney General declared, "There is no moral distinction between those who carry out terrorist attacks and those who knowingly finance those attacks."[100] BIF's lawyer believed that the Attorney General's inflammatory comments about al Qaeda and Bin Ladin compromised Arnaout's right to a fair trial before an impartial jury and characterized the press conference as "astounding" and "egregious." The trial judge also took notice, later referring to the extensive publicity the case received "in the wake of the Attorney General's remarkable press conference announcing this indictment."[101]

---

[98] *United States v. Benevolence International*, 02 CR 414, 2002 U.S. Dist. Lexis 17223 (Sept. 13, 2002) (court opinion and order).
[99] *United States v. Arnaout*, Second Superseding Indictment at ¶ 3 (same language in initial indictment).
[100] Attorney General Remarks, Chicago, October 9, 2004 (www.usdog.gov/ag/speeches/2002/100902agremarksbifindictment.html, accessed Apr; 1, 2004).
[101] *United States v. Arnaout,* 02 CR 892 (Jan. 28, 2003) (unpublished court order).