# Exhibit 10

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN THE MATTER OF SEARCHES | ) | |
| INVOLVING 555 GROVE STREET, | ) | Misc.  No. |
| HERNDON, VIRGINIA, AND | ) | |
| RELATED LOCATIONS | ) | ~~UNDER SEAL~~ |

"(PROPOSED REDACTED) AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT (OCTOBER 2003)

_____I, David Kane, a Senior Special Agent with the United States Customs Service

("USCS"), in Baltimore, Maryland, being duly sworn, depose and state:

I.      Professional Experience of Affiant

1.       I have served as a Special Agent ("SA") with the USCS for approximately five years.  I

have received training and gained experience in interviewing and interrogation techniques, arrest

procedures, search and seizure, search warrant application, computer crimes, terrorism, and

various other crimes.  I have been the case agent on complex money laundering investigations

that involved the domestic and international transfers of money, layering processes, falsified

records and front organizations.  I have been the case agent on four cases that were terrorism-

related and the affiant on six federal search warrants involving money laundering violations.

2.  Prior to joining the USCS, I obtained a B.A. degree in Government and Politics and a

Masters degree in International Transactions from George Mason University.  I worked as a

financial services agent with Prudential Preferred Financial Services, where I analyzed financial

structures and executed financial transactions with complex, international financial instruments

on a regular basis.

II.     The Investigation

3.  Since December 2001, I and other agents of the USCS, the Internal Revenue Service-

Criminal Investigation ("IRS-CI"), and the Federal Bureau of Investigation ("FBI"), have been

investigating a group of individuals that are suspected of providing material support to terrorists,

money laundering, and tax evasion through the use of a variety of related for-profit companies

and ostensible charitable entities under their control, most of which are located at 555 Grove

Street, Herndon, Virginia.  For ease of reference, I will refer to the web of companies and

charities controlled by these individuals as the "*Safa Group*."  To a large extent, the present

investigation has built on the findings of an investigation previously conducted with respect to

these individuals between 1998 and 2000 by the USCS, the FBI, and the Immigration and

Naturalization Service ("INS"), for suspicion of the same violations.

4.  I will show in this affidavit that probable cause exists to believe that these individuals

have committed and conspired to commit the following offenses:

a.      Transmit money internationally for the purpose of promoting offenses against
        foreign nations involving murder or the destruction of property by means of
        explosives, fire, kidnaping or extortion, in violation of 18 U.S.C.  § 1956(a)(2)(A)
        and (h);

b.      Provide material support or resources to foreign terrorist organizations, in
        violation of 18 U.S.C.  § 2339B;

c.      Provide material support or conceal or disguise the source or ownership of
        material support intended for use in preparation for or in carrying out a terrorist
        act, in violation of 18 U.S.C.  § 2339A;

d.      Defraud the United States by impeding, impairing, obstructing and defeating the
        lawful government functions of the Internal Revenue Service of the Department
        of the Treasury in the ascertainment, computation, assessment, and collection of
        federal income taxes, in violation of 18 U.S.C.  § 371, by availing themselves of
        the advantages of exemption from federal income taxation while abusing the
        requirements for tax exempt status; using a web of related corporate entities to
        move funds through a series of transactions designed to conceal the true nature,

2

source, disposition and taxability of revenues moved between these entities; and misrepresenting the nature of the relationship between charities and for- profit companies to avoid scrutiny of their financial transactions;

e.  Engage in a scheme to file or cause the filing of materially false Forms 990 (Return of Organization Exempt from Tax), concealing the relationships and financial transactions between the related entities, in violation of 26 U.S.C. § 7206(1) and (2);

f.  Engage in a corrupt endeavor to impede and impair the due administration of the internal revenue laws by, during an audit conducted by the IRS, misrepresenting the status of the *SAAR Foundation* and the disposition of its assets, and concealing the relationships between *SAAR* and related entities, in violation of 26 U.S.C. §7212(a); and

g.  File false individual income tax returns for the years 1997 and 1998, in violation of 26 U.S.C. §7206(1).

5.  Because the factual context of this case is so complicated, and the legal context may be one with which the Court is relatively unfamiliar, this is a long affidavit.  For ease of reference, I have included a glossary of the individuals involved in this affidavit and attached it to this affidavit as Attachment E.  I have tried to italicize the type for each individual and organization included in the glossary so that the Court may check the glossary for a short identification of the entities mentioned it reads the affidavit.

III.  Places to be Searched

6.  This application seeks search warrants for the following locations (as specifically described in Attachment "A" to this affidavit and incorporated herein), within which the facts set forth in this affidavit will show that there is probable cause to believe will be found the "Items To Be Seized During Execution of Search Warrants" (as specifically described in Attachment "B", attached to this affidavit and incorporated herein) relating to transfers of money between the

various entities and other individuals and organizations connected to terrorists, as well as evidence of tax evasion and tax fraud:

        a.      555 Grove Street, Office Suite Behind the Door
                    Labeled 110, 114, and 116, Herndon, Virginia

The office suite behind the door marked as the door for Suites 110, 114, and 116 in the building at 555 Grove Street is the business premises of the *SAAR Foundation*, *Safa Trust*, *Inc.*, and dozens of other related entities in the *Safa Group* that are controlled by the individuals that are the subject of this investigation.

        b.      500 Grove Street, 2nd Floor, Herndon, Virginia

The second floor of 500 Grove Street is the business premises of *International Institute For Islamic Thought* ("*IIIT*"), a *Safa Group* company controlled by the individuals that are the subject of this investigation.

        c.      750-A Miller Dr.  SE, Leesburg, Virginia

750-A Miller Drive SE is the business premises of *Heritage Education Trust*, a *Safa Group* company controlled by the individuals that are the subject of this investigation.

        d.      The Administrative Offices of *Mar-Jac Poultry*
                    at 1020 Aviation Blvd., Gainesville, Georgia

1020 Aviation Blvd., Gainesville, Georgia, is the business premises of *Mar-Jac Poultry*, *Inc.*, a *Safa Group* company controlled by the individuals that are the subject of this investigation.  The Administration Building at *Mar-Jac Poultry* contains the business's financial records.[1]

---

    [1] It is perhaps worthwhile to note here that, pursuant to the USA PATRIOT ACT, enacted in October 2001, Rule 41 of the Federal Rules of Criminal Procedure now authorizes warrants to be issued by a Federal magistrate judge in any district in which activities related to terrorism may have occurred, for property outside the district.

e.      The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia

1105 Safa Street in Herndon is the residence of *Taha Jaber Al-Alwani*, an officer and/or

director of *Safa Group* companies including *International Institute of Islamic Thought* ("*IIIT"*),

*FIQH Council of North America* ("*FIQH*"), *Graduate School of Islamic & Social Sciences*

("*GSISS*") (formerly known as the *School of Islamic and Social Sciences* ("*SISS*"))  and *Heritage*

*Education Trust*.

f.      The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia

11919 Safa Court in Herndon is the residence of *Jamal Barzinji*, an officer and/or

director of *Safa Group* companies, including *Mar-Jac Poultry, Inc.*, *Mena Investments, Inc.,*

*Reston Investments, Inc.*, and *Safa Trust*.

g.      The Residence of *Mirza* at 11922 Safa Court, Herndon, Virginia

11922 Safa Court in Herndon is the residence of *M. Yacub Mirza*, an officer and/or

director of *Safa Group* companies including *African Muslim Agency*, *GSISS, Grove Corporate*

*Plaza, Mar-Jac Investments, Mar-Jac Poultry,  Mena Investments, Reston Investments, SAAR*

*Foundation*, *Safa Trust*, *Sterling Management Group*, and *York Foundation*.

h.      The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, Virginia

9034 Swift Creek Road in Fairfax Station is the residence of *Mohammad Jaghlit*, an

officer and/or director of *Safa Group* companies, including *Heritage Education Trust* and *SAAR*

*Foundation*.

i.      The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia

305 Marjorie Lane in Herndon is the residence of *Ahmad Totonji*, an officer and/or

director of *Safa Group* companies, including *IIIT* and *Safa Trust, Inc.*

j.      The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia

12607 Rock Ridge Road in Herndon is the residence of *Iqbal Unus*, an officer and/or

director of *Safa Group* companies including *Child Development Foundation*, as well as the

administrative and billing contact for web sites for *IIIT* and *FIQH Council of North America.*

k.      The Residence of *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA .

12541 Browns Ferry Road in Herndon is the residence of *Mohammad Omar Ashraf,* an

officer and/or director of *Safa Group* companies, including *Grove Corporate Plaza*, *Mar-Jac*

*Investments*, and *Sterling Charitable Gift Fund.*

l.      The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA.

12528 Rock Ridge Road in Herndon is the residence of *Muhammad Ashraf,* an officer

and/or director of *Safa Group* companies including *Sterling Investment Group*, *Sterling*

*Charitable Gift Fund*, and *York Foundation*.

Executive Summary of This Affidavit

1.      I am investigating a criminal conspiracy to provide material support to terrorist

organizations by a group of Middle Eastern nationals living in Northern Virginia.  These

individuals operate or have operated over 100 different organizations, on which they commonly

serve as corporate officers.  These organizations include charitable organizations, educational

and cultural organizations, for-profit businesses and investment firms.  For the purpose of this

affidavit, this group of individuals and the organizations that they operate will be referred to as

the "*Safa Group*."

2.      Many organizations in the *Safa Group* dissolve and are replaced by other organizations

under the control of the same individuals.  Most of these *Safa Group* organizations, which

present themselves as Islamic educational and charitable organizations, are "paper"
organizations that are registered at common addresses, but have no apparent physical presence
on the premises.  The majority of these organizations is or was located at 555 Grove Street,
Herndon, Virginia.

3..      I have seen evidence of the transfer of large amounts of funds from the *Safa Group*
organizations directly to terrorist-front organizations since the early 1990's.  Some of this
information was developed by the FBI, the USCS, and the INS, in previous investigations
conducted of terrorist financing that focused on *Sami Al-Arian*, who fronted for the *Palestinian
Islamic Jihad-Shikaki  Faction* ("*PIJ*"), an organization that has been formally designated by the
President of the United States as a terrorist organization since 1995.  This previous investigation,
which resulted in search warrants being executed in Tampa, Florida, in 1995, showed that money
was being provided directly to *PIJ* front organizations by individuals controlling the *Safa Group*.

        In 1998, the FBI opened an investigation of the *Safa Group*'s terrorist financing
connections as a result of the seizures made in the *Al-Arian* search warrants in Tampa in 1995.
Investigators then noticed that the pattern of direct funding to the *PIJ* front organizations had
changed since the mid-1990s.  By the late 1990's, the finances of the  *Safa Group*, including
charities required by law to open their books to the public, exhibited a convoluted web of
multiple transactions between related corporations and charities that made it virtually impossible
for federal investigators to ascertain where the money that finally left the web of the *Safa Group*
ultimately went.  Indeed, the current investigation has traced millions of dollars through layers of
related companies and to charities in the Isle of Man – from which point the trail cannot
practically be followed.

4.  The FBI, USCS, and IRS agents involved in this investigation at various times since 1998 suspect that, as a result of the 1995 searches in Tampa, the *Safa Group* engaged in the money laundering tactic of "layering" to hide from law enforcement authorities the trail of its support for terrorists.  There appears to be no innocent explanation for the use of layers and layers of transactions between *Safa Group* companies and charities *other than* to throw law enforcement authorities off the trail; this inference is strengthened by the *Safa Group*'s repeated failure to disclose on tax forms as required the connections between various members of the *Safa Group*.  Accordingly, I and the other agents involved in this investigation believe that some of the moneys that move overseas are destined to the *PIJ* and other terrorist organizations; at the least, the money is being used for other than tax-exempt purposes in violation of the tax laws.

5.  I will show in this affidavit that evidence exists that individuals associated with the *Safa Group* are using the various affiliated charities and companies under their control to transfer money in convoluted transactions through a network of inter-related organizations designed to prevent the United States from tracking the ultimate recipients, in violation of the charter of the charitable organizations and the laws relating to the use of tax exempt status.

6.  Based on the past histories of the individuals involved with respect to their overt financial support for terrorist organizations, their repeated misrepresentations by omissions on tax forms of information concealing the interrelationships between the *Safa Group* companies and charities under their control, and the lack of an innocent reason to conduct transactions in these convoluted manners, there is probable cause that the *Safa Group* companies and charities are being used to transfer money to terrorist front groups or some other illicit application.  At the very least, however, this evidence constitutes probable cause that the individuals and entities

8

involved have repeatedly made false tax filings and are conspiring to abuse the tax exempt status

claimed by many of the related *Safa Group* charities.

7.  I will also show in this affidavit that records relevant to material support to terrorists,

money laundering, and tax evasion likely have been generated or maintained by the *Safa Group*

companies and charities, and by the individuals involved.  Finally, I will show in this affidavit

that these records will be found at the business premises of the *Safa Group* companies and

charities, such as 555 Grove Street, in Herndon, and at the homes of some of the individuals

involved.

IV.     Overview of Terrorism and Terrorist-Financing Techniques

8.  Based upon my training and experience, and that of other agents from the USCS, the

FBI, the IRS, and the INS, involved in this and related investigations, I know the following

regarding terrorist financing techniques:

a.      Many terrorist organizations have a financial support structure in the
        United States and in virtually every other developed country.

b.      Often, terrorists and their supporters who are motivated by religious
        ideology, such as Islamic fundamentalist terrorists and their supporters,
        adhere to their ideological creed and inclination to engage in and/or
        support terrorist activities for life.

c.      Terrorist groups differ from other criminal networks because of the motive
        behind their crimes.  Unlike drug traffickers and organized crime groups
        that primarily seek monetary gain, terrorist groups usually have non-
        financial goals, including publicity, dissemination of ideology, political
        legitimacy, and political influence.  Terrorist fundraising is a means to
        these ends.  While they do not seek financial gain as an end, international
        terrorist groups need money to attract and retain adherents and to support
        their presence and activities.  Some foreign terrorist organizations need
        funds for media campaigns, to buy political influence, and even to
        undertake social projects such as hospitals, orphanages, schools, etc.,
        largely with the aim of maintaining membership and attracting
        sympathetic supporters.  For some terrorist groups, the planning and

9

execution of violent attacks seems to comprise a small part of their total budget.

d. A substantial portion of the terrorist funding comes from contributors, some of whom know the intended purpose of their contribution and some of whom do not.  With relatively small sums of money generated from traditional illegal activities, terrorism financing contrasts with the finances of a drug trafficking network, which earns virtually all of its profits from illegal activities.  When compared with a financial investigation of a drug trafficker who has unexplained wealth and sham business dealings, investigating the financial dealings of a terrorist organization is considerably more difficult.  Their members may live modestly.  Their funds may be derived from outwardly innocent contributors to apparently legitimate humanitarian, social and political efforts.  These funds are also only diverted, in part, to terrorist activity.

e. Terrorist groups tap a range of sources for their financial support.  Illicit revenues derived from the proceeds of traditional criminal activities are commingled with legitimate funds because radical organizations have been able to draw on profits from commercial enterprises and on donations from witting and unwitting sympathizers.  Significant funding originates from the U.S., Europe, and the Middle East.  Some funding is provided by state sponsors.  A summary of the various sources of terrorist financing follows:

1. Otherwise Legitimate Commercial Enterprises: Terrorist groups earn profits from businesses they own and also secure donations from sympathetic entrepreneurs.  Some of the businesses set up to provide profits to terrorists include: construction companies, tanneries, banks, agricultural commodity growers and brokers, trade businesses, bakeries, restaurants, bookstores, and other proprietorships.

2. Social and Religious Organizations: Since the early 1990s, terrorist groups have relied increasingly on donations for financial support, much of it from like-minded, non-governmental organizations (such as charities) in the West and Persian Gulf states.

3. State Sponsors: Several rogue nations provide material assistance or resources to terrorists and some provide financial support to terrorists.  Other, more moderate governments also have been a source of financial support for some terrorist organizations.

f. Tracking terrorist financial transactions is more difficult than following the money trails of mainstream criminal groups because of the relatively

10

small amounts of funds required for terrorist actions, the broad range of "legitimate" sources and uses of funds.  While many organized crime groups are adept at concealing their wealth and cash flows for long periods of time, their involvement in the physical trade of illicit drugs, arms, and other commodities often exposes the revenues and expenditures connected to these illegal dealings.  In contrast, terrorist actions generally are comparatively inexpensive and their financing often is overshadowed by the larger financial resources allocated for the group's political and social activities, making it more difficult to uncover the illicit nexus.  For example, investigations into the terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001 have revealed that the overall financing for the attacks totaled approximately $500,000.

g.  Terrorist groups use a variety of means to move their funds, including

1.  Physical Transportation: Cash physically transported by trusted operatives (couriers) is the most difficult to track because it usually leaves no paper trail.

2.  Traditional Financial Institutions: The international nature of most foreign terrorist groups forces them to rely on banks and other financial institutions.  Cells of extremists need local access to funds, and organizations with substantial assets seek the safety and productive management offered by banks, insurance companies, and foundations, albeit in the names of trusted nominees, cover companies, or religious fronts.

3.  Offshore Banks: As do traditional criminal enterprises, terrorist organizations often utilize offshore banks to move their "licit" and illicit funds.  Terrorists know that it is difficult for U.S. investigators to track these moneys, due to the financial secrecy and lack of regulated oversight associated with offshore banking centers.  Traditional tax haven centers where offshore banking and money laundering tend to thrive include the Isle of Man, the Channel Islands, and Switzerland.

h.  Charitable Organizations: Terrorists often establish or utilize "charitable organizations" to move their illicit proceeds.  Terrorists know that many charities receive contributions in the form of cash, and that it is very difficult for investigators to trace money moving through these organizations.  Most charitable organizations are assumed to be of an altruistic and benevolent nature, so criminals often use them knowing that charities are subjected to less government scrutiny.

11

i.      Layering: Terrorist organizations, like traditional criminal organizations, often "launder" their illicit proceeds by utilizing a complex sequence of financial transactions.  Sophisticated terrorist financiers try to make the money trail left by their transactions as difficult to follow as possible by "layering" their transactions; that is to say, by routing their money through numerous paths and indirect channels before ultimately causing their money to arrive at the desired location.  These "layering" transactions often utilize many different individuals and corporations and involve many different bank accounts, false names, "front companies", and "phantom" organizations.  These layering processes are designed to both disguise the true origin and end-destination of the funds and to render exceedingly difficult and confusing any prospective investigation by law enforcement authorities.

j.      Foreign Bank Accounts: Terrorists will hide the existence of their personal or their company's foreign bank accounts to obfuscate the trail of international financial transactions and evade law enforcement.

k.      Saudi Arabian nationals who are suspected of providing funds to terrorists are subject to scrutiny by the Saudi Arabian authorities.  Due to this scrutiny, these individuals cannot provide money to terrorists via direct transfers from their bank accounts in Saudi Arabia.  Therefore, they find alternate methods and routes to fund terrorists.  This often involves utilizing their own or other overseas organizations to funnel money to terrorists.  These organizations are located in many different parts of the world.  The paths of these moneys are often very complex and involve significant "layering."

l.      Whether by their host governments or by the Israeli government, individuals and organizations throughout the Islamic world often are barred from sending money to individuals and organizations in Israel and/or the West Bank and Gaza.  One way that supporters of terrorism in Israel deliver money to terrorists in Israel and/or the West Bank and Gaza is by first transporting the money to the United States and only later sending it to Israel and/or the West Bank and Gaza from the United States.  Accordingly, while terrorist financing money collected in the United States is simply transported abroad, terrorist financing money collected abroad may enter the United States either to facilitate its later transport to terrorist organizations abroad or simply to fund terrorist activity in the United States.

9.      Based upon my training and experience, and that of other agents from the USCS, the

FBI, the IRS, and the INS, involved in this and related investigations, I know the following

regarding the laws relating to terrorist financing:

     a.     Funds involved in traditional money laundering transactions usually are the proceeds of some prior-in-time, specified unlawful activity, as defined by 18 U.S.C. 1956(c)(7). With the exception of the funds generated by traditional crimes for profit, funds used or intended to be used to finance particular acts of terrorism or to be sent to a designated foreign terrorist organization generally will not be related to a prior-in-time, specified unlawful activity. Rather, such funds will acquire their criminal "taint" from their involvement in a transaction intended to assist in or promote an act of terrorism or to fund a designated foreign terrorist organization. As a result, the money laundering charge that is most applicable to financiers of terrorism is 18 U.S.C. § 1956(a)(2)(A), which prohibits the international transfer of money to promote a "specified unlawful activity."

     b.     Pursuant to 18 U.S.C. § 1956(c)(7)(B)(ii), "specified unlawful activities" include offenses against the United States or a foreign nation involving murder, kidnaping, robbery, extortion, or destruction of property by means of explosive or fire, or other terrorism-related specified unlawful activities enumerated under 18 U.S.C. § 1956(c)(7).

     c.     Title 18 U.S.C. § 2339A makes it a crime for persons within the U.S. to provide or to conceal or disguise the nature, location, source, or ownership of "material support or resources," knowing or intending that they are to be used in preparation for or in carrying out a violation of any of the predicate enumerated crimes, including those relating to terrorist acts abroad against United States nationals, use of weapons of mass destruction, international terrorist acts transcending national boundaries, destruction of aircraft, kidnaping, extortion, and murder.

     d.     Pursuant to 18 U.S.C. § 2339A(b), the term material support or resources is defined to include, "currency or monetary instruments or financial securities, financial services, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."

     e.     On January 25, 1995, President Clinton signed Executive Order 12947, Prohibiting Transactions With Terrorists Who Threaten To Disrupt The Middle East Peace Process, declaring a national emergency to deal with

13

the threat to the national security posed by foreign terrorists disrupting the Middle East peace process. This executive order prohibited any transaction or dealing with persons designated in or pursuant to the order. This order designated the *Palestinian Islamic Jihad-Shiqaqi Faction* ("*PIJ*") and *Islamic Resistance Movement* ("*HAMAS*") as Specially Designated Terrorist organizations ("SDTs") which threaten to disrupt the Middle East peace process.

f.   Since October 8, 1997, pursuant to 18 U.S.C. § 2339B(a)(1), no individual or entity may provide material support or resources to an organization designated by the Secretary of State as a "Foreign Terrorist Organization" ("FTO"), or attempt or conspire to do so. An organization is designated as an FTO for up to two years if the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, finds that it is foreign; engages in terrorist activity; and that the terrorist activity threatens U.S. national security or the security of U.S. nationals.

g.   On October 8, 1997, the Secretary of State designated 30 Groups, including *HAMAS* and *PIJ* as "FTOs." See 62 F.R. 52650. On October 8, 1999, the Secretary re-designated most of the originally designated Groups (including *HAMAS* and *PIJ*) and added a new Group, Al Qaida. See 64 F.R. 55112. On October 5, 2001, *HAMAS*, *PIJ*, and Al Qaida were redesignated as FTOs. See 66 F.R. 51088.

V.   <u>Laws Relating to Charitable Organizations</u>

10.  Based on the training and experience of IRS-CI Special Agents Mary Balberchak, Paul Shanks, and Steven Smith, I understand the following regarding the laws relating to tax-exempt organizations:

a.   The Internal Revenue Code ("IRC") creates an exemption from federal income taxation for certain organizations which comply with the provisions of 26 U.S.C. § 501(c)(3). § 501(c)(3) provides an exemption from federal income taxation for:

b.   Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, . . . purposes, no part of the net earnings of which inures to the benefit of any private

14

shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation . . ., and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

c.    An organization obtains an exemption from federal income taxation under § 501(c)(3) by applying to the Internal Revenue Service ("IRS") for a letter determining that it meets the requirements for exemption.  The application process is generally prospective in nature; thus, the IRS generally relies on the representations made by the organization in the documents it submits as to how the organization intends to operate in the future.  An organization receiving a favorable determination letter may generally continue to rely upon the letter as long as there are no substantial changes in the organization's character, purposes, or method of operations.

d.    There are two general categories of § 501(c)(3) entities--private foundations and public charities.  Private foundations are generally supported by investment income and not contributions.  Organizations that are public charities are set up to receive charitable contributions from the public.

e.    The most significant benefit of public charity status is that, pursuant to IRC §§ 4940-45, private foundations are subject to an annual 2% tax on their net investment income but public charities are not.  In addition, there are several restrictions and requirements on private foundations, including (1) restrictions on self-dealing between private foundations and their substantial contributors and other disqualified persons; (2) requirements that the foundation annually distribute income for charitable purposes; (3) limits on their holdings in private businesses; (4) provisions that investments must not jeopardize the carrying out of exempt purposes; and (5) provisions to assure that expenditures further exempt purposes.  Violations of these provisions give rise to taxes and penalties against the private foundation and, in some cases, its managers, its substantial contributors, and certain related persons.

f.    § 501(c)(3) organizations are presumed to be private foundations unless they fall into one of the exceptions in the IRC.  One such exception is for publicly-supported organizations.  An organization qualifies as publicly-supported if it passes the one-third support test, or, failing that, it may qualify under the facts and circumstances test.

g.    The one-third support test is satisfied if the organization normally receives at least one-third of its support from governmental units, contributions

15

made directly or indirectly by the general public, or from a combination of these sources. An organization normally meets the one-third support test for the current tax year and the following year if for the four years immediately before the current year, it met the one third test on an aggregate basis.

h.    The facts and circumstances test treats an entity as publicly-supported if it normally receives 10 percent of its support from governmental units or contributions made directly or indirectly by the general public or from a combination of these sources; *and* it meets the "attraction of public support" requirement. An organization meets the attraction of public support element if it maintains a continuous and bona fide program for solicitation of funds from the general public, community or membership Group or from other charities.

i.    Under the Internal Revenue Regulations an organization "will be regarded as "operated exclusively" for one or more exempt purposes only if it *engages primarily* in activities which accomplish the exempt purposes specified in section § 501(c)(3). An organization is not primarily engaged in activities which accomplish an exempt purpose if more than an *insubstantial* part of its activities is not in furtherance of an exempt purpose." 26 CFR §1.501(c)(3)-1. An organization which is organized and operated for the primary purpose of carrying on an unrelated trade or business is not exempt under § 501(c)(3).

j.    An organization may meet the requirements of § 501(c)(3) although it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purpose or purposes and if the organization is not organized or operated for the primary purpose of carrying on an unrelated trade or business. In determining the primary purpose, all the circumstances must be considered, including the size and extent of the trade or business and the size and extent of the activities which are in furtherance of one or more exempt purposes. 26 CFR 1.501(c)(3)-1

k.    Like for-profit entities, tax exempt entities are subject to audit. If upon review the IRS determines that an organization is not operating consistently with its tax exempt purpose, the IRS may revoke the tax exemption, or impose excise taxes depending upon the nature, degree and severity of the violation. Once an organization loses tax-exempt status, its total revenues are subject to federal income taxation, based upon its business form.

11.  Based on the training and experience of IRS-CI Special Agents Balberchak, Shanks, and Smith, I understand the following regarding reporting requirements for tax-exempt charities:

a      IRC §§ 6033 and 6043(b) require exempt organizations to file returns, if their annual receipts are in excess of $25,000 and they do not fall into a category otherwise exempt from the filing requirement.  Form 990 (Return of Organization Exempt from Income Tax) is used by tax-exempt organizations to provide the IRS with the information required by Section 6033.  Form 990s depict information about contributions received, grants and allocations made, assets and liabilities, organizational relationships, and other financial and organizational information.  This form requires an organization to document, that, in actual operations, it adhered to the standards and procedures it said that it would use when its application for tax exempt status was approved.

b      The IRS relies upon Form 990 to gather information to administer the applicable provisions of the IRC.  In addition, an organization's completed Form 990 (except for the schedule of contributors) is available for public inspection as required by Section 6104 of the IRC.   Form 990 returns are signed under penalty of perjury.  Willful failure to provide information that is required to be disclosed on a Form 990 is subject to prosecution under 26 U.S.C. 7203.  Willfully filing a fraudulent Form 990 is subject to prosecution under 26 U.S.C. 7206(1).

c.     The IRS has an examination program designed to determine if tax-exempt organizations are complying with the tax laws.  The Form 990 is used in the process of defining and determining the scope of an audit of a tax-exempt organization.  A "Yes" response to a question on the Form 990 may not necessarily lead to an audit of the entity; however, if the entity is selected for audit, the responses on the form discussed hereafter would be reviewed and considered in pre-audit planning to decide what issues or aspects of the organization's operations warrant detailed scrutiny.  If an organization fails to furnish accurate information regarding its relationships to other organizations, then the Revenue Agent may miss an issue for examination which he should otherwise be investigating.

d.     One statutory requirement for the operation of a tax-exempt entity is that no part of its earnings inure to the benefit of its shareholders or any individual.  Various parts of the Form 990 elicit information designed to determine whether the organization has engaged in transactions which raise issues of potential personal inurement or private benefits.  Thus, in Part VI of the Form 990, Question 80(a) requires the reporting entity to list any organization to which it is related and whether the related entity is exempt or non exempt.  The information disclosed in this question is

17

utilized to determine whether the entity is operated for an exempt purpose and whether the earnings of the entity are being used for personal or private gain.

e.      Similarly, Schedule A to the Form 990, Part III, Question 2 requires the disclosure of certain transactions (such as loans, sales or exchanges of property or transfer of assets) between the reporting organization and certain insiders or with a taxable entity with which those insiders are affiliated.  If such transactions occurred, the entity is required to attach a detailed statement explaining the transactions.  This question is directed at issues of self-dealing, in which the transaction may have been motivated by private gain.

f.      Part I, Form 990, line 1(d) requires the exempt organization to report its total contributions and attach a schedule of all contributors who gave, in the aggregate more than $5,000 during the year.

g.      Part II, Form 990, line 22 requires the exempt organization to list its grants and allocations identifying the donee's name, address and the amount given and the purpose of the donation.

h.      A § 501(c)(3) organization can make grants to foreign charities, even if the foreign organizations are not recognized as charities under IRC § 501(c)(3), if the § 501(c)(3) organization maintains control and discretion over the use of its funds and maintains adequate records. Control and discretion means that the domestic §  501(c)(3) organization can make an independent decision as to whether it will provide funds to a foreign organization.  The domestic § 501(c)(3) organization is deemed to have control and discretion if it:

1.      makes a pre-grant inquiry concerning the use of its grant so as to obtain reasonable assurance that the grant will be used for charitable purposes; and

2.      obtains reports on the use of its funds.

i.      If the domestic § 501(c)(3) organization does not have control and discretion over the use of its funds, then contributions to the domestic § 501(c)(3) would not be deductible by the donor.  Further, the organization may be determined to be not operating for an exempt purpose.  If it were determined not to be operating for an exempt purpose, its tax-exempt status could be revoked.

j.      All charitable entities are subject to the requirement that the purpose of the charity not be illegal or contrary to public policy.  Illegal acts which make

18

up a substantial part of an organization's activities disqualify it from exemption.  The relative amount required to be considered substantial will vary according to the character and non-exempt quality of the activity.  Thus, a great many violations of a local pollution regulations would be required, whereas very little planned violence or terrorism would be enough to preclude exemption.  For an organization to lose its tax-exempt status, the illegal activity must be undertaken on behalf of the organization, i.e., they must be actions taken by officials of the organization, their agents or actions ratified by the organization.  In instances where tax-exempt status is revoked, contributions to the organization would not be deductible under Section 170 of the IRC.

k.      It is not unusual for tax cheaters to try to receive their income and hold their assets in bogus 501(c)(3) organizations.  Some may attempt to make otherwise non-deductible contributions to non-exempt recipients appear deductible by initially routing their contributions through an organization claiming tax-exempt status, when the ultimate disposition of the contribution is still a non-exempt entity.  Individuals who set up such organizations or claim such status to fraudulently evade income or excise taxes may be prosecuted for tax evasion, as can those who set up ostensibly exempt organizations for the purpose of making their contributions to non-exempt entities appear deductible by first being routed through ostensibly exempt organizations.

VI.    <u>Sources of Information</u>

12.  All information contained in this affidavit is based upon my review of documents related to this investigation, and information furnished to me by other Special Agents of the USCS, INS, IRS, and FBI.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.

VII.   <u>Overview of Terrorists and Terrorist Organizations</u>

A.      <u>The Terrorists</u>

13.  I will show in this affidavit that various individuals associated with the *Safa Group* are providing material or financial support to international terrorists and terrorist organizations

through terrorist front organizations.  The terrorist groups and terrorists that are receiving this support through individuals associated with the *Safa Group* are briefly described below.

14.      *HAMAS*:  *HAMAS* is an acronym for the arabic term for the *Islamic Resistance Movement*, an international terrorist organization founded in 1987 and dedicated to the elimination of the State of Israel.  A "Specially Designated Terrorist" ("SDT") organization since 1995, and a designated Foreign Terrorist Organization ("FTO") since 1997, *HAMAS* espouses an extremist Islamic fundamentalist ideology, and is dedicated to the establishment of an Islamic Palestinian State that encompasses Israel, the West Bank and Gaza.  *HAMAS*'s primary tenets are opposition to compromise with Israel over creation of a Palestinian State and replacement of the Palestinian Authority as the sole representative of the Palestinian people.  To these ends, *HAMAS* pursues a combined program of violence and terror on the one hand, and educational, charitable, and social functions on the other.  The principal purpose of its armed attacks is to intimidate and coerce the Government of Israel and its civilian population.  Its benevolent programs are used to enhance its image and earn goodwill in the Palestinian community.

15.  The use of suicide bombers has become a *HAMAS* trademark.  Between October 1, 2000 and September 10, 2001, *HAMAS* claimed responsibility for at least 20 bombings (including a suicide bombing at an Israeli disco on June 1, 2001, that resulted in the deaths of 21 youths), two shootings, one kidnapping, and one mortar attack, that cumulatively resulted in at least 77 deaths (including three Americans) injuries to at least 547 others, including four Americans.

16.  On August 13, 2001, <u>USA Today</u> ran an article describing how *HAMAS* -run schools serve its ends:

> In *HAMAS* -run kindergartens, signs on the walls read: "The children of the kindergarten are the shaheeds [holy martyrs] of tomorrow." The classroom signs at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs." At an Islamic school in Gaza City run by *HAMAS*, 11-year-old Palestinian student Ahmed state, "I will make by body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys .  .  . .   I will tear their bodies into little pieces and cause them more pain than they will ever know." "Allah Akbar," his classmates shout in response: "God is great." "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise.

17.    *Palestine Islamic Jihad-Shikaki  Faction* ("*PIJ*"), also known as the *Islamic Jihad of Palestine*: *PIJ*, a SDT since 1995, and a FTO since 1997, was founded in the early 1980s by *Fathi Shikaki*.  Another terrorist organization dedicated to the elimination of the State of Israel, *PIJ* is responsible for many suicide bomb attacks in Israel that have resulted in the death of both U.S. and Israeli nationals.  One of these attacks includes the Gaza Strip bus bombing in April 1995, in which U.S. citizen Alyssa Flatow was killed.  The Shura Council is the decision-making body of the *PIJ* and is composed of the highest level *PIJ* officials.

18.  *Mousa Abu Marzook* has been the political and operational leader of *HAMAS*  from the time of its establishment in 1987.  *Marzook* is a native of Gaza who lived in the United States - -in Northern Virginia in specific - -  until 1993; he was arrested trying to reenter the United States in July 1995, and underwent proceedings for extradition to Israel.  In <u>In the Matter of the Extradition of Abu Marzook v. Christopher</u>, 924 F.Supp. 565 (S.D.N.Y. 1996), the district court found that *Marzook* directed *HAMAS's* terrorist activities.

19.  *Sheik Abdel Aziz Odeh* is the spiritual leader and a co-founder of *PIJ*.

21

20.  *Sheik Omar Abdel Rahman,* also known as the "Blind Sheik," is considered the spiritual leader of the radical Islamic terrorists who bombed the World Trade Center in February, 1993.  *Rahman* was convicted of seditious conspiracy based on a plot to blow up New York City tunnels and the United Nations in October 1995, for which he received a life sentence in prison.

21.  *Ramadan Abdullah Shallah* is the current leader of the *PIJ* and resides in Damascus, Syria.  An SDT, *Shallah* replaced *PIJ* founder *Fathi Shikaki*  as the leader of the *PIJ*, after *Shikaki*'s assassination in Malta in 1995.  Prior to taking this position, *Shallah* had resided in Tampa, Florida and was employed as an adjunct professor at the University of South Florida while working as a U.S.  representative of the *PIJ* with *Sami Al-Arian* and *Basheer Nafi*.  In executing search warrants in Tampa in 1995, federal agents seized a video of a speech made by *Shallah* at an *Islamic Committee for Palestine* ("*ICP*") conference in December 1992 organized by *Al-Arian*, in which *Shallah* said that Jihad is a holy war aimed at killing every enemy of Islam, including (among others) the New World Order symbolized by the United States.  *Shallah* stated that Muslims should not be defensive or apologize against charges of terrorism, because Jihad required them to terrorize, devastate, humiliate, and degrade their enemies.

B.  The Terrorist Financiers and Front Groups (Outside of the *Safa Group* )

22.  Terrorist organizations such as *HAMAS*  and *PIJ* have worked in the United States through front Groups and individuals.  They include *Sami Al-Arian, Basheer Nafi*, *the Islamic Committee for Palestine* ("*ICP* "), *the World Islamic Studies Enterprise* ("*WISE* "), and the *Holy Land Foundation for Relief and Development* ("*HLF*").

23.  *Sami Al-Arian* is a Palestinian national employed until earlier this year as a professor at the University of South Florida in Tampa.  *Al-Arian* incorporated *PIJ* front organizations

known as *ICP* and *WISE* in Florida, in 1988 and 1991, respectively.  Based in large part on

documents seized from his home and offices pursuant to federal search warrants in 1995, I

believe that *Al-Arian* has been a leader of *PIJ*, its representative in the United States, and

responsible for raising funds for Jihad, or "holy war." I will describe much more about *Al-Arian*

later in the affidavit when I recount the historical background of this investigation.

24.     *Basheer Nafi* was an active directing member of *PIJ* front organizations *ICP* and *WISE*

in Tampa, Florida, and later *International Institute For Islamic Thought* ("*IIIT*") of the *Safa*

*Group*, until he was deported by the INS in 1996.  According to the May 31, 1995, edition of <u>Al-</u>

<u>Hayat</u>, an Arabic newspaper printed in London, fierce differences erupted within the *PIJ*

between founder *Fathi Shikaki* and elected members of the Shura Council, leading to

resignations of members of the Shura Council including Taysir Al-Khatib and *Basheer Nafi*.

Yet, the November 6, 1995, edition of the Jordanian newspaper <u>Al-Urdun</u>, regarding the

selection of *Shallah* as the new leader of *PIJ,* noted that several other leading *PIJ* members,

including *Nafi*, had *not* been selected.  Thus, it appears that after *Shallah* replaced *Shikaki* as

head of the *PIJ* after the latter's assassination in October 1995, *Nafi* reentered the organization's

leadership.

25.  *Al-Arian* sponsored *Nafi* into the United States in 1992 and 1995, on the grounds that

*Nafi* was to be the Director of Research for *WISE* in Tampa, Florida.  In July 1996, *Nafi* was

removed from the United States pursuant to a deportation order based on allegations that

included that although he was admitted as a worker for *WISE*, in October 1994 he was employed

at *IIIT*, a *Safa Group* charity in Herndon, Virginia.

26.  *Mazen al-Najar* is a brother-in-law of *Sami Al-Arian* who worked as a professor at the University of South Florida while running the day-to-day operations of *WISE*.  *Al-Najar* was arrested and ordered deported on visa violations and immigration fraud charges after a hearing in July 1996, in which INS SA William West testified that *Al-Najar* was a "mid-level operative" in *ICP* and *WISE*, both of which were characterized by SA West as *PIJ* front groups.  *Al-Najar* was released in December 2000, however, for the government's refusal to provide *Al-Najar* with classified information underlying its case that the government claimed warranted his continued detention; that order was reversed and *Al-Najar* is again in custody.  Al Najjar v.  Ashcroft, 257 F.3d 1262 (11th Cir.  2001).

27.  *Khalil Shikaki,* the brother of *PIJ* leader *Fathi Shikaki*, was involved in the day-to-day operations of  *ICP* and *WISE* in the early to mid-1990s, along with *Al-Arian, al-Najar*, and *Shallah*.

28.      *Holy Land Foundation for Relief and Development* ("*HLF*"):   On December 4, 2001, President Bush designated *HLF* an FTO on findings that it was a *HAMAS* front.   *HLF* was determined to provide financial support for families of *HAMAS*  suicide bombers, as well as the Palestinians who adhere to the *HAMAS*  movement.  By providing annuities to families of suicide bombers, *HLF* encouraged the flow of suicide volunteers to *HAMAS* and buttressed its terrorist infrastructure.

29.      *HLF*, a charity in Richardson Texas, was started in large part with $210,000 from *HAMAS*  leader *Marzook* as a support structure for the terrorist group after it was banned in Israel.  *HLF*'s stated mission was to pursue "charitable-relief for refugees and the indigent needy, fund raising furthering the corporation's exempt purposes, and to sponsor charitable

24

activities benefiting and to make contributions or distributions to other 501(c)(3) organizations[.]"   Between 1998 and 2000, *HLF* raised over $24,000,000.

30.  I have read the FBI Memorandum to the Treasury Department's Office of Foreign Assets Control, dated November 5, 2001, that contributed to the basis of *HLF*'s FTO designation OFAC  The memo disclosed that, in a meeting in a Marriott hotel in Philadelphia that the FBI covertly recorded, five *HAMAS* leaders met with the three top executives of *HLF*, and decided that most or almost all of the funds collected by *HLF* in the future would be directed to *HAMAS*.

31.  In a meeting the next year in Oxford, Mississippi, also recorded by the FBI, *HAMAS* representatives explained to the representatives of the *al-Aqsa Educational Fund* - - another fund-raising organization acting as a *HAMAS* front (and a member of the *Safa Group*) - - that *al-Aqsa* should curtail its fundraising activities because *Marzook* had designated *HLF* as the primary fund-raising entity for *HAMAS*.  *Marzook* may have so designated *HLF* because of family connections; according to FBI SA Robert Miranda, who has been investigating the connection between *HAMAS* and *HLF; Marzook* is married to the cousin of *HLF* head Ghassan Elashi, and two other close relatives of *HAMAS* leaders worked for *HLF*.

32.  *ICP / WISE*: The *Islamic Concern Project*, also known as the *Islamic Committee for Palestine* ("*ICP* "), and the *World Islamic Studies Enterprise* ("*WISE* ") were incorporated by *Al-Arian* in Florida as educational organizations in 1989 and 1991, respectively, but actually served as front organizations to raise funds for *PIJ* operations.  *Al-Arian* was assisted in the day-to-day operations of *ICP* and *WISE* by *Nafi*, *al-Najar*, *Khalil Shikaki*, and *Shallah*.  Then the Director of Research for *WISE*,  *Shallah* is now the current leader of *PIJ*, living in Syria, as he has been

25

since the assassination of *PIJ* founder *Fathi Shikaki* in 1995.  *ICP* and *WISE* have been inactive

since execution of the Tampa search warrants in 1995.

VIII.    The Tampa Investigation

33.  In May 1995, INS SA William West, in conjunction with USCS SA John Canfield

and FBI SA Barry Carmody, began a criminal investigation of *ICP* and *WISE* after published

newspaper articles stated these organizations were fronts used to raise funds in support of *PIJ*

and *HAMAS*.

34.  After *Fathi Shikaki*, the leader of *PIJ*, was assassinated in Malta in 1995, the agents

investigating *ICP* and *WISE* saw news accounts that reported that, before replacing *Shikaki* as

the leader of *PIJ*,  *Shallah* had left his position as a professor at the University of Southern

Florida - the same institution that employed *Al-Arian*.

35.  INS records revealed 1993 and 1994 entry records for *Shallah* as a temporary

specialized worker who would be based at the *WISE* address in Tampa, Florida.  INS records

further revealed that *Al-Arian* had filed three different visa petitions on behalf of *Shallah* and in

so doing had identified himself as the Chairman of the Board of *WISE*.

36.  As a result of discovering the immigration records relating to *Al-Arian* and *Shallah*, a

further search was made of the INS visa petition records reflecting *Al-Arian* as the petitioner.

This search identified two visa petitions filed with INS by *Al-Arian* on behalf of Basheer *Nafi*,

who was of interest to the investigators because, on the basis of news reports, they believed him

to be another leader of *PIJ*.  These petitions reflected *Al-Arian* as the Chairman of *WISE*, with

*Nafi* to be the "director of research."  A check of INS entry records for *Nafi* revealed four entries,

26

on two of which he listed his destination address as 5207 East 12th Avenue, Tampa, Florida, the

residence of *Al-Arian*, as well as the listed address of *ICP* on its articles of incorporation.

37. In light of *Al-Arian*'s ties to *PIJ* terrorists *Shallah* and *Nafi*, federal agents executed

search warrants on November 20, 1995, at the residence of *Al-Arian*, his office at the University

of South Florida, and the co-located offices of *WISE* and *ICP*, all in Tampa.

38. Found in the search on *Al-Arian*'s home computer was a 40-page document entitled

"The Manifesto of the Islamic Jihad in Palestine." The Manifesto said that movement was led by

the Secretary General Fathi *Shikaki*, on a "Shura" (consultative) basis, and was based on the

"rejection of any peaceful solution for the Palestinian cause, and the affirmation of the Jihad

solution and the martyrdom style as the only choice for liberation." The document stated that the

United Nations "is a supercilious tool to pass the plans of the Great Satan America, which makes

the wrong right and the right wrong." Because *Al-Arian*'s computer contained both what appear

to be a draft of the *PIJ* Manifesto and a final version of the *PIJ* Manifesto, I believe that *Al-Arian*

drafted the *PIJ* Manifesto.

39.     Also uncovered was a form letter in *Al-Arian*'s computer inviting recipients to a general

conference for the "Movement." Included in the letter were items of the conference agenda

including: Reviewing the activities of the Secretary General and the Command Committee of the

Movement; endorsing the Manifesto; and electing the General Shura (consultative) Council.  The

letter also stated that the Manifesto draft was enclosed.  While the letter did not name the

"Movement", the letter was located in the same computer folder as the draft of the Manifesto of

the Islamic Jihad Movement in Palestine.  The terminology used in the letter regarding the

Manifesto, the General Conference, the Secretary General, and the Shura Council was the same

27

as that used in the Islamic Jihad Movement's literature.  Thus, I conclude from these documents that *Al-Arian* was organizing the *PIJ* from his home in Tampa.

40. Also found in the search of *Al-Arian*'s residence were statements from several bank accounts, including one that he shared with Mohammed Taysir EI-Khatib, a member of the *PIJ* Shura Council.  The bank statement reflected that, on May 29, 1992, El-Khatib wire transferred $102,000 from Beirut, Lebanon, into the account he shared with *Al-Arian* in Tampa, Florida.  I conclude from this that *Al-Arian* handled money for *PIJ* leaders overseas.

41. The search also uncovered a letter from *Al-Arian* to an Islamic Fundamentalist elected to the Kuwaiti Parliament seeking funds for the families of *PIJ* martyrs, on the stated grounds that the movement "carries out selective operations that all the Arab armies together couldn't do." *Al-Arian* told the Kuwaiti that "[r]elations with the brothers who are part of HAMAS is very good, and progressing well. There are serious attempts at establishing permanent coordination and unity of action."  Enclosing his address and phone number, *Al-Arian* called upon the Kuwaiti "to strongly support the Jihad effort in Palestine in order for such operations to continue." I conclude from this that *Al-Arian* engaged in international fund-raising for *PIJ* from his home in Tampa; it also confirms that it is not inconsistent for a *PIJ* supporter to also support *HAMAS*.

42. Also located at the search of *Al-Arian*'s residence was a document, hand written in Arabic, called the Charter of the Center of the Studies, the Intelligence and the Information. This document, hereinafter called "the Charter," set forth a comprehensive plan to establish a hostile intelligence organization in the United States and elsewhere.  It stated that:

> Our presence in North America gives us a unique opportunity to monitor, explore and follow up . . . .  We are in the center which leads the conspiracy against our Islamic world . . . .  Therefore,

28

> we, here can monitor and watch the American policies and the
> activities of those questionable organizations . . . . Therefore, we
> have the capability to establish a Center for Studies, Intelligence
> and Information.

43. The Charter provided for a "Division of Security and Military Affairs," whose

functions were to

> prepare training programs for the brothers.  These programs
> include physical training, surveillance training . . .  programs for
> military training benefitting from the available opportunities that
> exist in this country . . . . To make technical studies with the
> objective of availing spying and military tools and devices to the
> Group in America and the East and about the spying methods and
> equipment in these countries.

44. The Charter provided for an Organization/Law Studies Section whose job it would be

to study the legal aspect of establishing charitable organizations in America.

45. The Charter provided for the establishment of an Intelligence and Monitoring

Apparatus, part of which would be responsible to "to watch the individuals who oppose the

Movement and the Islamic actions.  To watch them, monitor them and to make files on them.  .  .

." Members of the Group should be able to "infiltrate the sensitive intelligence agencies or the

embassies in order to collect information and build close relationships with the people in charge

in these establishments."  They should also use every opportunity to "collect information from

those relatives and friends who work in sensitive positions in the government, et cetera . . . ."

46. The Charter further provided for the establishment of a "Branch of Information and

Security and Military Studies"

> to perform special studies such as purchasing and retaining arms and
> training on these arms.  The situation of the camps and the training
> locations to be studied.  To study the matters of exporting arms in special
> ways in relation to the source of these arms and the implications of
> exporting it.  Also, to follow up on the scientific development relating to
> spying operations, the intelligence agencies and its tools.

47. Also seized during the search was a videocassette of the First Annual Conference of *ICP* organized by *Al-Arian* and held on December 22-26, 1988, in St. Louis. At that conference, *Al-Arian* told the audience that "Islam means Jihad, resistance, fight, and martyrdom. . . . " *Al-Arian* repeated slogans including "Jihad is our way. Victory to Islam. Death to Israel. Revolution until victory."

48. Another item obtained in the search was a videocassette of the Fourth Annual conference of the *ICP* held on December 27-30, 1991 in Chicago, also organized by *Al-Arian*. At that conference, *PIJ* spiritual leader Sheikh Abdel Aziz *Odeh* told the audience that "Muslims should not fear accusation of terrorism or extremism. There are no other choices for Muslims."

49. Another videotape seized during this search contains activities recorded at the Islamic Center of Cleveland on April 7, 1991. Fawaz Abu-Damra, the Imam at the Islamic Mosque in Cleveland, introduced *Al-Arian* as the guest for the evening. As *Al-Arian* came forward, Damra told the audience that *Al-Arian* "heads the *ICP* - and as small excerpt about the *ICP* - it is the active arm of the Islamic Jihad Movement in Palestine in North America. We call it the *ICP* here for security reasons."

50. That same videotape depicted Damra then asking that all video and audio recording devices be turned off for security reasons and the tape goes blank. The tape was turned off and on several times. It later depicted *Al-Arian* stating that "we must continue with the Resistance . . . let's damn America, let's damn Israel, let's damn their allies until death."

51. The tape further depicted Damra telling the audience as *Al-Arian* ended his speech that anyone who donates money to the Intifadah and the Islamic Jihad is like that warrior who is

waging holy war on behalf of Allah.  He asked for money for Islamic Jihad, whose martyr "Nidal

Zaloom went out with a dagger and stabbed four Jews in Jerusalem."

52. Damra repeatedly stated that the money would go to the Islamic Jihad.  Damra told

the audience that anyone who wanted to write a check should make it out to the *ICP*.  During this

time, the video depicts the crowd coming to the podium area and laying money at Damra's feet.

As Damra was requesting money for the Islamic Jihad, it was announced that $6,785 had been

contributed so far.  Damra announced that there would be a permanent *ICP* fund in Cleveland for

anyone who wanted to donate to the Islamic Jihad.

53. An undated document was seized containing a speech given by *Al-Arian* as president

of *ICP* in which he describes a struggle between Islam and the West and stated that "we are in a

battle of life and death, in a battle of fate and future against the Western Hegemony and tyranny

wanting to control the capabilities of the nations in order to enslave steal and control them."

Further on he stated "What is needed is the dismantling of the cultural system of the West."

54.    Investigators who seized *Al-Arian*'s home computer found in it files for three wills for

three individuals who were planning to die as martyrs on Jihad.  In the first, dated 2/19/92, Nizar

Mahmoud wrote "the Jihad for Palestine is a Jihad for Allah, it is an obligation for you wherever

you are, because there is no one more loved by Allah than the martyr." In the second, Adel

Daher wrote about his desire to be a martyr and quoted the Koran regarding Allah's reward for

those who fight and are slain in his cause.  In the third, Khaled Muhammad *Hassan* stated:

> If we cannot destroy today this house, the Jew's State, we can ignite the
> fire in its regions, and if we ignite it every where no one will be able to
> extinguish it.  We should charge the atmosphere of enmity and create a
> flammable Jihad climate that needs a match stick only.

The location of these wills on *Al-Arian*'s Macintosh home computer illustrates the close connection between *Al-Arian* and *PIJ* suicide bombers.

55. I know from the Tampa investigation that Sheik *Rahman* (the "Blind Sheik") visited *Al-Arian* at his residence in Tampa and spoke at his mosque, as did Sheik *Odeh*.

56. In sum, there is probable cause to believe that, until 1995, *Al-Arian* used *ICP* and *WISE* as the American front for *PIJ*, and that until December 2001, *HLF* acted as the primary American front for *HAMAS*. There is probable cause to believe that money sent to *Al-Arian* was really money going to *PIJ*, and that money sent to *HLF* was really money going to *HAMAS*.

57. Further, there is probable cause to believe that those who knew *Al-Arian, Shallah*, *al-Najar*, *Khalil Shikaki*, or *Nafi* from their conferences or writings and sent money to *ICP* or *WISE* - - or directly to *Al-Arian* himself - - knew that they were sending it to support suicide bombings and terrorism conducted by *PIJ*. Similarly, there is probable cause to believe that those contributors to *HLF* who knew the leaders of *HAMAS* or *HLF* - -and at least some of those who did not - - contributed their money to support suicide bombings and terrorism conducted by *HAMAS*.

58. Finally, there is probable cause to believe that many of those who sent money to *Al-Arian, WISE*, and *ICP* for *PIJ*, as well as some of those who sent money to *HLF*, conspired to provide material support to terrorists, and to engage in international transfers of money to promote offenses against a foreign nation involving murder, kidnaping, robbery, extortion, and the destruction of property by means of explosive or fire, in violation of 18 U.S.C. §§ 1956(a)(2) and (h) and 2339A and 2339B.

IX.    The *Safa Group* and Associated Individuals

59. In the next sections of this affidavit, I will show the probable cause to believe that the individuals controlling the *Safa Group* sent money to *HLF* and *Al-Arian* to support suicide bombings conducted by *HAMAS* and *PIJ*.  First I will establish that the individuals controlling the  share a common ideology with *HAMAS* and *PIJ* and know exactly what *HAMAS* and *PIJ* do with the monies they receive.  Then I will establish that these individuals have continued to send money to *HLF* and *Al-Arian* for *HAMAS* and *PIJ*, through ever more concealed methods.

A.    The Ideology

60. I have found information indicative of a conspiracy between *Safa Group* individuals and Sami *Al-Arian* to support and fund terrorists and terrorist groups including *HAMAS* and *PIJ*.  A most striking example is a letter seized during the 1995 search warrants, from a central figure in the *Safa Group*, *Al-Alwani* at *IIIT* (both of which will be further identified below) to *Al-Arian* at *WISE*, and dated November 19, 1991.  In that letter, *Al-Alwani* referred to the payment of monies from *IIIT* to *PIJ*, and wrote that he and his colleagues, and their organizations, considered themselves to be indistinguishable from *Al-Arian*, *Shallah* (now the head of *PIJ*) and other founders and members of *PIJ*.  In specific, *Al-Alwani* stated in his letter to *Al-Arian*:

> Honorable brother, I think we do not need to affirm that we
> consider you as a Group, you and brother *Mazen* [*al-Najar*] and
> brother *Khalil* [*Shikaki*, brother of *PIJ* founder *Fathi Shikaki*] and
> brother *Bashir* [*Nafi* ] and Brother *Ramadan* [*Shallah*, present head
> of *PIJ*] and *Sheikh Abdel Aziz* [*Odeh*, a founder and spiritual leader
> of the *PIJ*], a part of us and an extension of us, and us part of you
> and extension of you also, we never experienced any doubts about
> that since we knew you and we will continue like that.

61. *Al-Alwani* continued:

> And the matter of the financial support was never the basis of our
> relationship, for our relation added to the brotherhood of faith and Islam is
> an ideological and cultural concordance with the same objectives and all
> of your institutions are considered by us as ours, and they receive all the

attention, and I explained to you the circumstances the institutions of your brother go through, and despite which we can truthfully say that we gave your institutions or our institutions that you manage more attention than institutions we manage by ourselves, because you are in an important positions without a doubt, and you deserve from us and our likes all cooperation, God willing . . . .

62. *Al-Alwani* stated that he was speaking not only for himself, but also for other members of the *Safa Group*:

And I would like to affirm these feelings to you directly on my behalf and on the behalf of all my brothers, Dr. *Abdel Hamid* [*Abusulayman*], Dr. *Jamal* [*Barzinji* ], Dr. *Ahmad* [*Totonji* ], Dr. *Hisham* [*Al-Talib*] . . . .

63. *Al-Alwani* noted that it didn't matter to the *Safa Group* how *Al-Arian* characterized the $45,000 *Al-Arian* received from the *Safa Group*, as part of its total contribution of $50,000 (I have added the bold type):

And I would like to affirm these feelings to you directly on my behalf and on the behalf of all my brothers, Dr. Abdel Hamid, Dr. Jamal, Dr. Ahmad, Dr. Hisham, and at the same time, affirm to you that when we make a commitment to you, or we try to offer, we do it for you as a Group, **regardless of the side or the facade you use the donation for**…." What is left is to remind you that what is mentioned in your letter is that what you already received is forty thousands, and what we have in the records for you is forty-five thousands, and I will inquire about the matter with the brothers accountants so I will send you what will complete the amount of fifty thousands, God willing . . . .

B.    The Individuals

64. The below-listed individuals are the founding and facilitating members of the *Safa Group,* an interwoven set of organizations that were established in the U.S. with the assistance of other Saudi Arabian and other Middle Eastern nationals. Based on the evidence in this affidavit, I know that they are ardent supporters of *PIJ* and *HAMAS.* They have repeatedly voiced their ideological support. I have seen repeated instances of their financial support, and believe that they have acted to conceal many other instances of their financial support.

65. *Abdulhamid Abusulayman* incorporated *IIIT* in Virginia with *Taha Jaber Al-Alwani* in 1982. In the letter from *Al-Alwani* to *Al-Arian* seized in the 1995 searches in Tampa, quoted above, *Al-Alwani* affirmed that *PIJ* and the *Safa Group* shared a common ideology. *Al-Alwani* expressly mentioned *Abusulayman* as having the same sentiments as the entire *Safa Group*.

66. *Taha Jaber Al-Alwani* incorporated *IIIT* with *Abusulayman* in 1982, and was the president of *IIIT* from about 1986 through 1997. *Al-Alwani* wrote the letter to *Al-Arian* expressing solidarity as quoted above. In another seized document, *Al-Alwani* refers to $50,000 in financing that he and the *Safa Group* provided to *WISE* /*ICP*.

67. Various documents and videotapes obtained in the Tampa searches show that *Al-Alwani*, the President of *IIIT*, attended and spoke at *ICP* conferences with *Al-Arian*, *Shallah*, *Sheik Odeh* (spiritual leader and co-founder of *PIJ*) and *Sheik Rahman* (the "Blind Sheik" convicted of conspiracy to blow up New York tunnels and the United Nations in New York in October 1995). Inasmuch as *ICP* conferences were, in essence, *PIJ* conferences, I know that *Al-Alwani* has long been a supporter of *PIJ*.

68. In October 1999, a confidential asset of the FBI, who has provided reliable information in the past, furnished the Washington Field Office of the FBI a copy of a fatwa

(declaration) signed by *Al-Alwani* at some point between December 1988 and November 1989, proclaiming

> the truth by the powers invested in us by Allah, that Jihad is the only way to liberate Palestine; that no person or authority may settle the Jews on the land of Palestine or cede to them any part thereof, or recognize any right therein for them.

69. In early 2000, *Al-Alwani* spoke with FBI Special Agents Ammerman and Wyman. *Al-Alwani* admitted to attending several *ICP* meetings with *Al-Arian*, as well as being acquainted with *Nafi* and *Shallah*. *Al-Alwani* stated that he maintained regular contact with *Al-Arian*, and that *Al-Arian* typically contacts him when *Al-Arian* visits the Washington, D.C. area several times a year.

70. *Hisham Al-Talib* is a director or officer of several *Safa Group* organizations, including *Safa Trust, Inc.* and *IIIT*. *Al-Talib* was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*.

71. *M. Omar Ashraf* is a director or officer of seven *Safa Group* organizations, including *Grove Corporate Plaza*, *Mar-Jac Investments*, and *Sterling Charitable Gift Fund*.

72. *Muhammed Ashraf* is a director or officer of over 20 *Safa Group* organizations incorporated with the address of 555 Grove Street, Herndon, Virginia, including *Sterling Investment Group*, *Sterling Charitable Gift Fund*, and *York Foundation*.

73. *Jamal Barzinji* has been the officer or director of numerous *Safa Group* organizations, including *Mar-Jac Poultry*, *Reston Investments*, and *Safa Trust*. *Barzinji* was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*. I believe that *Barzinji* is not only closely associated with *PIJ* (as evidenced by ties to *Al-Arian*, including documents seized in Tampa in 1995 reflecting direct correspondence between *Barzinji* and *Al-Arian*), but

36

also with *HAMAS*.  **REDACTED** xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
*Xxxxxxxxx*xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx.

74.  *Mohammed Jaghlit* has been an active supporter of *Al-Arian* and *PIJ*, both
ideologically and financially.  Two documents seized in Tampa in 1995 were letters sent by
*Jaghlit* to *Al-Arian* in 1994, referencing enclosed checks from *SAAR Foundation* for $10,000 and
$5,000.  In both of these letters, *Jaghlit* instructed *Al-Arian* not to disclose the contribution
publicly or to the media.

75.  Moreover,  *Jaghlit* also has been an active supporter of *HAMAS*.  As noted above,
the *Safa Group* charity *al-Aqsa Educational Fund* acted as an American front for *HAMAS* until
the 1994 meeting in Oxford, Mississippi, described above, during which *HAMAS* representatives
explained to *al-Aqsa* representatives that *Marzook* had designated *HLF* as *HAMAS's* primary
fund-raising entity.  I have seen the IRS Forms 1023, Application for Recognition of Exemption,
and the 990-EZ, filed by the *Al-Aqsa Educational Fund, Inc.*, for 1990 and 1996, respectively.
Each of the two IRS forms reflects that the president of *Al-Aqsa* is Mohammad El-Gajhleet of
555 Grove Street in Herndon, Virginia.  I believe that "Mohammad El-Gajhleet" is an alternative
spelling for *Mohammad Jaghlit*, and the two names refer to the same individual.

76.  *M. Yaqub Mirza* is a corporate officer or director of numerous *Safa Group*
organizations located at 555 Grove Street in Herndon, including *Safa Trust*, *Inc.*, *SAAR
Foundation*, *Inc.*, *Reston Investments*, *Inc.*, *Mar-Jac Investments*, and *African Muslim Agency*.
*Mirza* is the predominant signatory on *Safa Group* checks.

77.  *Cherif Sedky* was a director of the *SAAR Foundation* and now is a director of at least two *Safa Group* companies.

78.  *Ahmad Totonji* is a corporate officer of several *Safa Group* organizations, including *Safa Trust*, *Inc.*, and was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*.  *Totonji* is also referenced in another seized letter from *Al-Arian* to *Al-Alwani*.  In this letter, *Al-Arian* solicited more funding and referred to a meeting he had with *Totonji* where *Totonji* promised him another $20,000.  As recently as November 1, 2001, *Totonji* signed a check for $10,000 to *Al-Arian* through *Al-Arian*'s organization known as the Tampa Bay Coalition for Justice and Peace, drafted on the account of *Safa Group* charity *IIIT*.

79.  *Iqbal Unus* is a director of the *Child Development Foundation*, a *Safa Group* organization, along with *Abusulayman* and *Al-Talib*, an advisor on the *Sterling Charitable Gift Fund* and *Sterling Management Group* organizations, and the administrative and billing contact for web sites for *IIIT* and *FIQH Council of North America*.

        C.    <u>The Funding</u>

80. Discovered in the Tampa searches in 1995 were letters indicating that in 1991 and 1992, *IIIT* contributed at least $50,000 to *PIJ* front-group *WISE*.  Moreover, another document seized during these warrants was a 1991 letter from *Shallah* – now the leader of *PIJ* – to an administrator of the University of South Florida, with a copy to *Nafi*, stating that *IIIT* was the largest contributor to *WISE*.

81. Additional documents seized in Tampa in 1995 include two that *Jaghlit* sent to *Al-Arian* in 1994, referencing checks enclosed by with the letters from *Safa Gr*oup charity the *SAAR Foundation* for $10,000 and $5,000, respectively.  In both of these letters, *Jaghlit* instructed *Al-*

*Arian* not to disclose the contribution publicly or to the media.  I conclude from *Jaghlit*'s

instructions that *Jaghlit* knew very well that the *SAAR* money was going to *PIJ* to support

terrorism.

82. On February 2, 1995, *Mirza* signed a check for $15,000 to *WISE* on a *Safa* bank

account, the deposit slip for which was found in *Al-Arian*'s home during execution of the 1995

search warrants.

83. As recently as November 1, 2001, *Totonji* wrote a check for $10,000 to *Al-Arian*

through *Al-Arian*'s Tampa Bay Coalition for Justice and Peace, drafted on *IIIT*'s account at First

Union Bank in Herndon.

84. IRS Form 990 for *Safa Trust*, *Inc.* for tax year 1996 indicated that *Safa* maintained

$162,000 as "a library trust" for *HAMAS* -front *HLF*.   In 1997, HLF received three *Safa Trust*

checks in the amounts of $75,000, $87,500, and $162,500, all signed by *Mirza*.

X.     Evidence of Layering Indicative of Money Laundering,
       Tax Evasion, and Material Support to Terrorists

       A.  Overview

85.  The investigation has focused on the organizations associated with the *Safa Group*

through corporate records, tax filings, financial transactions, interviews with confidential

informants, and visual surveillance.  I have determined that the individuals associated with the

*Safa Group* use or have used over 100 organizations, which are interrelated through corporate

officers and holding company - subsidiary relationships, to facilitate the funding of terrorist

operations.  Many of these organizations are listed in Attachment C.  A list of most of the

individuals acting as officers of *Safa Group* organizations referencing the organizations with

which they are associated is included as Attachment D; both Attachments C and D are

incorporated by reference here.

86. This array of organizations includes for-profit businesses, purported educational institutions, and charities. Many of the organizations have  identical or overlapping directorates or management.  Many of the organizations of the *Safa Group* are phantom entities with no physical presence, as evidenced by the multiple addresses for the organizations provided on official documents and the lack of signs announcing the various organizations at what is represented to be their business address.  The relationships and operations of these organizations are convoluted not only by the repeating pattern of corporate officers and directors but also the large number of entities involved.

87.  While I don't now know for sure why the labyrinth of organizations and charities that

comprise the *Safa Group* was constructed, there does not appear to be any innocent explanation.

In the course of the investigation, I have considered why this labyrinth was constructed.

Possible explanations include

     a.     To conceal support for terrorism;

     b.     To conceal support for otherwise non-exempt organizations (for example, to conceal support to foreign charities over which domestic charities do not maintain control, or even to political parties);

     c.     To shelter income derived from what actually are personal investments; and

     d.     To shelter income derived what actually was someone else's personal investments for which individuals in the United States were trustees  (for example, to shelter income on the investments of a member of the *Al Rajhi* family);

     e.     To shelter income from personal investments in the course of sheltering income for someone else (some combination of "c" and "d" above); and

     f.     To avoid excise taxes that would otherwise be due and payable on private foundations.

Based on the past history of the individuals involved, I believe that the most likely reason is to

conceal support for terrorism.

88.  Although the *Safa Group* consists of over 100 interwoven organizations, the investigation has focused on approximately 20 core organizations, and their associated corporate officers and directors.  The table below illustrates the overlapping directorates by listing the *Safa Group* members on which this investigation has focused and their principal officers, directors and trustees:

| | Abusulayman | Al-Alwani | Al-Rajhi | Al-Talib | Ashraf, M. Omar | Ashraf, Muh. | Barzinji | Jaghlit | Mirza | Sedky | Totonji | Unus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| African Muslim Agency | | | | x | | | | | x | | | |
| Amana Limited | | | | | x | | | | x | x | | |
| Aradi Inc. | | | x | x | | x | | | x | x | | |
| Grove Corp. | | | | x | | | x | | x | | | |
| Grove Corporate Plaza | | | | | x | | | | x | | | |
| GSISS | x | x | | | | | | | | | | |
| Heritage Education Trust | | x | | | | | x | x | x | | | |
| HFC Feed Mill | | | | | | x | | | x | | | |
| Humana Charitable Trust | | | | | x | | | | x | x | | |
| IIIT | x | x | | x | | | x | | | | x | x |
| Mar-Jac Investments, Inc | | | | x | x | x | x | | x | | | |
| Mar-Jac Poultry Inc. | | | | x | x | | x | | x | | | |
| Mena Corporation | | | | x | | | x | | x | | | |
| Mena Investments, Inc. | | | | x | | | x | | x | | | |
| Reston Investments Inc | | | | x | | | x | x | x | | | |
| SAAR Foundation | | | | x | | | x | x | x | x | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAAR Foundation, Canada | | | | x | | | x | | x | | | |
| SAAR International | | | | x | | | x | | x | | | |
| Safa Trust, Inc. | | x | | x | | | x | x | x | | x | |
| Sterling Charitable Gift Fund. | | | | | | x | | | x | | | |
| Sterling Investment Group | | | | | x | x | | | x | | | |
| Sterling Management Group | | | | | x | x | | | x | | | |
| York Foundation | x | | | | | x | | | x | | | |
| York International | | | | | | | | | x | | | |

B.      Analysis of the *Safa Charities*

1.  IRS tax files and corporation documents disclose that 555 Grove Street, 500 Grove Street, and associated addressed in Herndon are the corporate offices of record for over 100 active and defunct corporations, partnerships and tax exempt charitable organizations that are woven together by common officers and directors.  According to the Virginia Secretary of State, approximately 40 active corporations claim their offices to be located at 555 Grove Street, alone.

 IRS Special Agents Mary Balberchak, Paul Shanks and Steven Smith reviewed Forms 990  (Return of Organization Exempt From Income Tax) and additional tax-related information for seven tax-exempt *Safa Group* organizations.  Many of the conspirators are officers in one or more of those charitable organizations.  All seven of the charitable organizations (hereinafter, the "*Safa Charities*") are located in or near Herndon, Virginia, and five are co-located at the same 555 Grove Street address.  The *Safa Charities* are:

| | | |
|---|---|---|
| *African Muslim Agency* | *Heritage Education Trust* | *IIIT* |
| *SAAR Foundation* | *Safa Trust* | *Sterling Charitable Gift Fund* |
| *York Foundation* | | |

2. The IRS Special Agents also reviewed individual tax returns of certain officers of the same tax-exempt organizations as well as corporate returns of for profit businesses that are wholly owned by a  *Safa Charity* and/or controlled by the same officers, directors and trustees that control the charities.  In 2000 the IRS conducted a limited examination on one of those charities.  The IRS Special Agents reviewed the audit file and consulted with the two IRS Revenue Agents that conducted the examination on that entity.  Other documents were also reviewed, including corporation documents for the same entities and other related companies, certain real estate settlement documents and bank records.

44

3.      Analysis of the above returns and available supporting documentation disclosed a series of transactions between related companies that, when examined in their entirety, evidences a conspiracy between *Mirza*, *Abusulayman*, *Al-Alwani*, *Barzinji*, *Al-Talib*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Jaghlit*, *Sedky*, *Ahmad Totonji*, and others, known and unknown, to route money through hidden paths to terrorists, and to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of federal income taxes.  What follows is a summary of allegations, evidence of which will be detailed in this affidavit.

4. The conspirators have moved or authorized the movement of funds through a series of transactions involving the *Safa Group*, which includes the *Safa Charities*, and also for-profit corporations owned by or related to them.  The evidence to date demonstrates that multiple millions of dollars have been moved between the *Safa Charities*, between the for-profit members of the *Safa Group* and the *Safa Charities*, and between the *Safa Charities* and foreign entities represented to be charitable in nature.  The financial transactions involve contributions to the *Safa Charities* from for-profit corporations of the *Safa Group*, loans to for-profit corporations in the *Safa Group*, contributions, loans, and grants between the *Safa Charities* and the movement of funds from the *Safa Charities* into offshore trusts and other foreign entities.

5. Although, based on their representations to the IRS, each of the *Safa Charities* is treated as a public charity under federal tax laws, their gross revenues derive from sources which make the basis for their meeting the public support test unclear.  Of the contributions to the *Safa Charities* for 1996-2000, the vast majority, over 71.8% percent, comes from other members of the *Safa Group* or from their principals.  Of that support which does not emanate from the *Safa*

*Group* or its principals another 12.2% is reportedly derived from the unidentified contributors labeled "overseas general public." 13.2%, is comprised of funds from other overseas entities including benefactors in Kuwait, Saudi Arabia, and Malaysia.

6. Similarly, the pattern of grants and allocations made does not demonstrate the *Safa Charities* are operating for an exempt purpose. The grants and allocations made by the *Safa Charities* generally go to other members of the *Safa Charities*, or in some instances, other charities within the *Safa Group*. For the years in question 84.4% went to these entities. Another 14.3% was reportedly given to recipients which, contrary to law, the *Safa Charities* did not identify on the relevant Forms 990.

7. In addition, of the $54 million in grants and allocations reported for 1996-2000, $26 million (or 49%) was transferred to entities in the Isle of Man, $20 million (or 37%) remained within the *Safa Charities*. Of the balance approximately $7.7 (or 14.3%) went to unidentified donees. Accordingly, I believe that the *Safa Charities* are used to shuttle monies between them, blur the trail, and hinder the ability of investigators to ascertain the ultimate disposition of those monies. This investigation *has* followed the complex trail and determined, as stated above, that, of the funds whose recipients can be identified, virtually the only monies disbursed by the *Safa Charities* are monies that were disbursed *either* to other *Safa Charities*, or transferred to the name of off shore entities in tax havens.

8. By exercising common control, the *Safa Charities* ensure the tax benefits of their movement of funds between tax-exempt and for-profit entities, without ever having to surrender control of the funds. Although substantial funds are moved between various entities, the conspirators have maintained control over their disposition even after the funds are transferred

46

through the use of interlocking directorates and common officers, the common physical location

of members of the *Safa Group* at 555 Grove Street, and the centralization of control over

monetary transfers among the *Safa Group* in the persons of *Mirza* and *Safa Group* employee

*Beverly Hassan*.

9.  For example, *Mirza* has signatory authority over 27 different bank accounts associated

with 15 different organizations of the *Safa Group*, including five of the *Safa Charities. Al-Talib*

has signatory authority over 21 different bank accounts associated with nine members of the *Safa*

*Group*, including two *Safa Charities*.  *Barzinji* has signatory authority over 18 different bank

accounts associated with nine members of the *Safa Group*, including three *Safa Charities*.

10.  In addition, although *Hassan* is shown as an employee of *Mar-Jac Investments, Inc.*

between 1996 and 2000 and also of *Sterling Management Group* at 555 Grove Street, she

conducts financial transactions for many of the *Safa Group* members.  In the 90-day period

between October and December 2001, *Hassan* authorized 16 transactions on behalf of seven

different organizations:  *Safa Trust, York Foundation, Sterling Charitable Gift Fund, Sterling*

*Management Group, Mar-Jac Investments*, *Reston Investments*, *Inc.*, and *African Muslim*

*Agency*.

11. A further example is found in a letter obtained by IRS auditors in 2000 in connection

with an audit of *SAAR Foundation*.  The letter, dated December 3,1997, from *Humana*

*Charitable Trust*, P.O.  Box 1297, Herndon, Virginia, was addressed to *Mirza* of the *SAAR*

*Foundation*.  The letter explained that *Humana* was an Isle of Man trust, stated *Humana's*

purpose, and requested *Mirza*, on behalf of *SAAR* to become a "major sponsor" of *Humana*.  The

letter was signed "*Amana Limited* Trustee" and bore what appears to be the signature of *Mirza*.

47

In other words, *Mirza*, on behalf of *Amana Limited*, the trustee for *Humana*, sent a letter to *Mirza*, Director of *SAAR*, soliciting major donations from *SAAR* to *Humana* in the Isle of Man.

12. Further, except for *IIIT*, the *Safa Charities* do not report active fundraising programs. Of the seven entities examined, only *IIIT* and *Safa* Trust report expenditures indicating significant fundraising. *York*, *AMA*, *Heritage* and *Sterling Charitable Gift Fund* report no expenses for fundraising. SAAR reports $806 in fundraising for over five years. Further, although Virginia law requires any charity soliciting for public funds in the state of Virginia to be registered with the Virginia Office of Consumer Affairs, Vernon Paige of the Virginia State Office of Consumer Affairs advised Special Agent Balberchak on January 30, 2002 that none of the *Safa Charities* are registered in Virginia.

13. The vast majority of the funds leaving the circle of the *Safa Charities* is distributed to two Isle of Man entities (purportedly charitable trusts): *Humana Charitable Trust*, which is controlled by *Mirza*, *Sedky* and *M. Omar Ashraf*; and *York International*, for which the *Mirza* is a trustee. Between 1996 and 2000, approximately $26 million was moved from the *Safa Charities* to *Humana* and *York*. The disposition of funds from these entities is unknown.

14.     The movement of funds into entities in the Isle of Man, a known tax haven, makes it difficult to verify whether these funds were used for terrorist financing or some other non-exempt purpose.  The table below summarizes the funds which moved to the Isle of Man:

| Entity | Amount | Recipient | Location |
|---|---|---|---|
| *African Muslim Agency* | $    445,000 | *York International Trust* | Isle of Man |
| *SAAR  Foundation* | $21,128,978 | *Humana Charitable Trust* | Isle of Man |
| *Safa Trust* | $  4,462,147 | *York International Trust* | Isle of Man |
| *York Foundation* | $    400,000 | *York* International Trust | Isle of Man |

1.     When the IRS attempted through an audit to verify the ultimate disposition of the funds sent to the Isle of Man entities, their efforts were stymied by *Mirza* and *Qureshi*.  The auditors never learned of the $5.3 million moved to *York International* because relationships between *SAAR*, *African Muslim Agency, Safa Trust* and *York Foundation*, were concealed from them.  As for the funds moved to *Humana*, the auditors learned that, although required by law to monitor whether its grants to overseas charities were being used for charitable purposes, *SAAR* had no such records at its U.S.  offices.  Ultimately, *SAAR* produced checks amounting to $168,667, or 0.8%, of the $21.1 million that *SAAR* represented had moved from *SAAR* to *Humana*.

2. The Form 990 tax returns for the *Safa Charities* concealed relationships that existed between certain charities and concealed certain financial transactions between the charities and the for-profit members of the *Safa Group*.  The direct impact of this non-disclosure is the concealment of transactions which may be taxable, partially taxable, or subject to excise taxes or similar penalties imposed for violation of limitations on how exempt organizations conduct their

49

business.  In addition, the disclosure of such relationships could lead to an inquiry as to whether the entity was being operated for an exempt purpose and ultimately revocation of tax exempt status.

3. On the basis of the foregoing, I have probable cause to believe that the *Safa Charities* are being operated to hide the distribution of monies to *PIJ* and *HAMAS*, and, I have probable cause to believe that they are being operated for the primary purpose of conducting a business unrelated to their exempt purposes, *i.e.*, investing and managing the substantial funds accumulated by the *Safa Charities*.

4. The money movements between the *Safa Charities* create the false impression they are publicly supported and operating for an exempt purpose, when, by and large, the funds never leave the control of the *Safa Charities* and their offshore related entities.  Thus, the principals of the *Safa Charities* are manipulating the tax exempt status of the *Safa Charities* as part of a conspiracy to impede and impair the Internal Revenue Service in the determination and collection of federal tax, and to do so, are misrepresenting the nature of the operations of the *Safa Charities* to IRS officials and the public.

5. It is important to remember that many of the organizations in the *Safa Group* as listed in Attachment C are for-profit businesses.  One, *Mar-Jac Poultry, Inc.*, is a large poultry processor located at 1020 Aviation Boulevard, Gainesville, Georgia, whose principal officers are *Barzinji, Al-Talib, M. Omar Ashraf* and *Mirza*.  The bank signature cards for *Mar-Jac Poultry, Inc.* show that *Barzinji, Al-Talib, Mirza* and  *M. Omar Ashraf*  have signatory authority over the bank accounts. Additionally, UCC-1 filings show that *Humana* was a creditor of *Mar-Jac Poultry* after July 2000.

6.      First Union and IRS records reflect that *Mar-Jac Poultry* transferred millions of dollars to *Safa Group* businesses and charities between 1997 and 2000.  IRS filings and corporate bank records show that *Mar-Jac Poultry* is owned by *Mar-Jac Holdings, Inc.*, which is a majority-owned subsidiary of *Safa Trust, Inc. Mar-Jac Poultry* was purchased by the *Safa Group* in 1985.

7.  Based on my examination of financial documents, correspondence, and interviews with confidential witnesses, I believe that the first members of *Safa Group* were established in the early 1980's.  I believe that one source of funds flowing through the *Safa Group* is from the wealthy *Al-Rajhi* family in Saudi Arabia.  The *SAAR Foundation*, a *Safa Charity*, was named after Sulaiman Abdul Aziz *Al-Rajhi* (*SAAR* ), head of a wealthy Saudi family.  Abdullah Sulaiman *Al-Rajhi*, a relative of Sulaiman Abdul Aziz, is one of the directors of the *Safa Group* corporation, *Aradi, Inc.*, located at 555 Grove Street, Herndon, Virginia.

8.  I have found that members of the *Safa Group* moved large amounts of funds into the United States to support their organizational infrastructure.  Some of these occurred in the late 1970's and 1980's.   As documented by a USCS Currency and Monetary Instrument Report, *Safa Group* member *Ibrahim Hassaballa* brought $3,388,000 in cash into the United States from Saudi Arabia in 1980.  These funds allowed the individuals to both start and acquire businesses and organizations in the United States.

9.  *SAAR Foundation* first applied for recognition of exempt status in 1983.  At that time it listed its governing body as consisting of nine members, including  *Totonji, Barzinji, Al-Talib,* and *Abusulayman*.  Presently, *Barzinji, Totonji,* and *Al-Talib* comprise the three directors of *Safa Trust, Inc*, and, with Mirza, *Safa*'s only officers.  *Abusulayman, Al-Talib, Barzinji,* and *Totonji* are presently the only officers of *IIIT*.

51

10.   The *Safa Group* organizations routinely transfer large amounts of funds between each other. Often, the bank accounts through which the funds move appear to be utilized as "pass through" accounts. A "pass through" account is an account that is utilized as part of a layering process.  Money that enters these accounts tend to remain there for short periods of time, after which the money is then transferred on to another account.  "Pass through" accounts are commonly utilized by criminal organizations to convolute the trail of any illicit moneys.

11.   An example of an intra-*Safa Group* money transfer and apparent "pass through" activity that I believe is conducted for the purpose of layering financial transactions and confusing any ostensible investigation of the group occurred just last fall.  First Union records reflect that the *Sterling Charitable Gift Fund* deposited a check received from *Mar-Jac* Poultry for $250,000 on October 26, 2001.  Those records further show that *Sterling* transferred $100,000 to *SAAR Foundation* on November 2, 2001, from the same First Union account that received the check from *Mar-Jac* Poultry.  Moreover, *Sterling* wire transferred the remaining $150,000 to *SAAR Foundation* on November 29, 2001.

12. Inasmuch as the money from *Mar-Jac Poultry* obviously was destined for *SAAR Foundation* (however temporarily), I suspect that it was first routed to *Sterling* only to make it more difficult for investigators to decipher the ultimate disposition of the $250,000 apparently generated by *Mar-Jac Poultry*.  But the difficulty created by the positioning of *Sterling* between *Mar-Jac* and *SAAR* on the money trail is only one of many barriers created by the *Safa* Group to any investigator trying to ascertain the ultimate disposition of *Safa Group* money.  As explained above, it is impossible to determine from domestic bank records the ultimate location of money received by *SAAR,* for *SAAR* was itself but a way-station for money being routed around the

52

world by the *Safa* Group; before *SAAR* was officially dissolved in 2000 (long before receiving

the $250,000 from *Mar-Jac* by way of *Sterling*), it made virtually all of its disbursements to

"charities" located in the Isle of Man.

13.   As an example of layering involved a charitable contribution and loan, *Safa*

contributed $8.6 million to *Heritage* according to the *Safa* Trust 990.  In that same year *Heritage*

loaned $5.5 million to *Mar-Jac Holdings*, *Safa's* majority owned subsidiary.  In the following

year, Heritage transferred $4.1 million to *Safa*, reporting that this was a return of the 1996

contribution.

14.   There is no reason *Safa* could not have made the loan directly to *Mar-Jac Holdings*,

its subsidiary.  I believe that the route the funds traveled, from *Safa* to *Heritage* to *Mar-Jac*, with

a portion being returned to *Safa*, was designed to disguise the true nature of the transaction and

the ultimate disposition of these funds.

15.   All of these financial activities listed above are indicative of money laundering.  The

layering and pass through activities that occur are designed to disguise the origin and ultimate

destination of the moneys.  I suspect that moneys ultimately are transferred directly to terrorist

organizations from the *Safa Group* entities on the Isle of Man, or that funds are otherwise

expended for purposes which do not further the *Safa Charities*' exempt purpose(s).  Due to bank

secrecy laws in such tax havens, it is very difficult for investigators to have access to bank

account information.  I expect evidence related to these money laundering, terrorist support

activities and tax fraud to be found at the subject addresses of this affidavit.

C.   Particulars

53

16.  Based on the work of the IRS-CI Special Agents, I will now turn to the particulars of the *Safa Charities*:

> 1.  *African Muslim Agency*

17.   IRS records show the *African Muslim Agency* is a tax-exempt organization located at 555 Grove Street, Herndon, Virginia, with a reported purpose to "help other charitable organizations."  According to its Form 990 filed in May 2001, two of its three officers were *Al-Talib* and *Mirza*.

18. 91.3% of *African Muslim Agency*'s contributions between 1996-2000 were derived from *Safa* Group related entities[2] and/or individuals; at least 4.1% came from unidentified contributors. For the same period, 42.2% of *African Muslim Agency*'s grants and allocations were made to *Safa* Group related entities and 53% were made to unidentified donees.  No contributions, grants or allocations were identified on the 1996 Form 990.  The 1997 return showed $100,000 in contributions and $144,000 in grants and allocations, but no identified contributors or donees.  The 1998 return showed contributions received of $1,110,000  - - 99% of which came from *Mar-Jac* Poultry, *Inc.*, a *Safa* Group company for which *Mirza*, *Altaib, Barzinji* and *M. Omar Ashraf* are officers - -  and grants/allocations disbursed of $1,065,000   - - of which 90% went to *Safa* Group companies *IIIT*  and *York* International.  The 1999 Form 990 showed $1,125,000 contributions from one contributor – *Mar-Jac* Poultry, *Inc.*

> 2.    The *Heritage* Education Trust, Inc.

---

[2]"Related entities and/or individuals" as used herein refers to either other *Safa Charities*, officer(s), director(s), or trustee(s) of one of the *Safa Charities*, or for-profit or tax-exempt organizations for which one or more officer(s), director(s), or trustee(s) of the seven charities are also officer(s), director(s), or trustee(s) within the *Safa Group*.  This is not the same definition applied to the various questions on Form 990.

19. IRS records show that The *Heritage Education Trust*, *Inc.* is a tax-exempt organization located at 750-A Miller Drive, SE, Leesburg, Virginia, with a purpose to "assist educational institutions." According to its Form 990 filed on October 16, 2001, its officers are *Al-Alwani* and *Jaghlit.*

20. 58.9% of *Heritage*'s contributions between 1996 and 2000 were derived from *Safa Group* related entities and/or individuals; 41.1% came from overseas. For the same period, 75% of its grants and allocations were made to *Safa Group* related entities; 24.9% were made to unidentified donees. Its 1996 Form 990 reflects that it received $8,600,000 from *Safa Trust* and another $4,400,500 from overseas, but made a grant only to *SISS* - - a *Safa Group* entity - - in the amount of $800,000. In 1997, it received $1,600,000 from overseas and made grants and allocations of over $5,000,000, split between *SISS* and *Safa Trust*, *Inc.* It received no contributions of significance between 1998 and 2000 except for $23,500 from *Jaghlit*, but during that time granted $1,903,000 to *SISS* and another $2,802,939 to unidentified donees.

3.    International Institute of Islamic Thought ("*IIIT*")

21.    IRS records show that *IIIT* is a tax-exempt organization located at 500 Grove Street in Herndon, Virginia with a purpose of "research and education for religion of Islam." According to its Form 990 filed in November 2001, its officers consisted of *Abusulayman*, *Al-Talib*, *Barzinji*, and *Totonji*.

22. As noted above, correspondence seized pursuant to the search warrants in 1995, reflected direct communications between the *IIIT* officers and *Al-Arian* in which the former expressed solidarity with the latter. Discovered in the searches were letters indicating that in 1991 and 1992 *IIIT* contributed at least $50,000 to *PIJ* front-group *WISE*. Moreover, another

55

document seized during these warrants was a 1991 letter from present *PIJ* leader *Shallah* to an administrator of the University of Southern Florida (with a copy to *Nafi*) stating that *IIIT* was the largest contributor to *WISE*.

23. In January 2000, *Jaghlit* told FBI agents that *Nafi* started working at *IIIT* around April 1994.  According to *Jaghlit*, *Nafi* was "on loan" from *WISE* until 1996 at which time *IIIT* decided to sponsor *Nafi* in his immigration and naturalization proceedings.  *Jaghlit* told the FBI that *IIIT* paid *WISE* an unspecified amount of money in return for allowing *Nafi* to work at *IIIT*. I believe that *Jaghlit* told the FBI that *IIIT* paid *WISE* for allowing *Nafi* to work at *IIIT* in order to conceal the fact that *IIIT* transferred money to *WISE* precisely because *WISE* was a front receiving money for *PIJ*.

24.  In June 1998, **redacted xxxxxxxxxxxxxxxxxxxx** at *IIIT*'s physical address and its post office box in Herndon revealed the receipt of mail from the *El-Shifa Pharmaceutical Industries Company*, in Khartoum, Sudan.  That company's facility, believed to be producing ingredients used in chemical weapons, was the target of an August 20, 1998 American cruise missile attack that retaliated for the bombing of American embassies in Kenya and Tanzania.

25.  **Redacted xxxxxxxxxxxx** revealed that between October and November 1998, *IIIT* received one parcel through the U.S. mail from *Al-Arian* in Tampa, and another mailed from Lebanon to B.M.  *Nafi* at *IIIT*.  This confirms to me that the connections between the *Safa Group* and both *Al-Arian*, and *Nafi* remained close even after *WISE* and *ICP* shut down operations.

26.  97.9% of all contributions to *IIIT*  between 1997and 2000 were derived from *Safa Group* related entities and/or individuals; another 1.5% came from overseas entities.  Over the same period, 72.7% of *IIIT*'s grants and allocations were reported to be for "Free distribution of

books and publications." Unlike the other *Safa Charities*, this appears to be a substantial grant of funds outside the *Safa Charities*, but it is impossible to tell, based on this generic description, what *IIIT* (who earlier funded *PIJ*) ultimately did with these funds.

27. On *IIIT*'s returns, the majority of *IIIT*'s grants and allocations are not identified as to donee.  Rather, the returns reflect donations going to generic categories (i.e., free distribution of books and publications).  According to *IIIT*'s 1998 Form 990, it received $634,936 in contributions - - 96% of which came from *Safa* Trust and the *African Muslim Agency* - - and disbursed $73,998 in grants and allocations, 82% of which was for "free book distribution."  In 1999, it received $721,500 -- the majority of its contributions -- from the *African Muslim Agency* and the *Safa Trust, Inc.*, and made grants of $50,700.   In 2000, 100% of its contributions for the year, $1,376,000, came from *Safa Trust* and *York Foundation*.

### 4. The *SAAR  Foundation, Inc.*

28.     IRS records show that *SAAR Foundation, Inc.*  ("*SAAR* ") was a tax-exempt organization at 555 Grove Street with a purpose to "assist and promote religious and educational research" that was dissolved on December 20, 2000.  According to its last Form 990 return, filed May 18, 2001, *SAAR*'s officers and trustees consisted of *Mirza*, *Jaghlit,* and *Sedky*.

29. 90.3% of *SAAR*'s contributions between 1996-2000 were derived from related *Safa Group* entities; the remaining 9.7% came from overseas.  Over the same period, 94.6% of its grants and allocations were made to *Safa Group* related entities  - - including $21,128,978 to *Humana Charitable Trust* in the Isle of Man.  When an IRS audit was conducted on *SAAR* in 2000, *Mirza* told auditors that he had set up *Humana Charitable Trust* in the Isle of Man to receive transferred assets from *SAAR*, due to publicity tying *SAAR* to terrorist organizations.

30. *SAAR*'s 2000 return shows that it dissolved on December 20, 2000.  The return shows that it made a grant/allocation consisting of $2,650,000 of *Mar-Jac Investments, Inc*. stock to *Sterling Charitable Gift Fund* ("*Sterling* "), another *Safa Charity*.

　　　5.　　*Safa Trust, Inc.*

31. IRS records show *Safa Trust, Inc.* is a tax-exempt organization located at 555 Grove Street with a purpose to "[p]romote religious, educational & cultural projects."  Its Form 990 return filed November 6, 2001 listed *Barzinji, Mirza*, Totonji, and *Al-Talib* as its officers, directors, and trustees.

32.. 53.7% of *Safa Trust*'s contributions between 1996 and 2000 were derived from *Safa Group* related entities and/or individuals; 39.6% came from overseas entities.  For the same period, 84% of *Safa Trust*'s grants and allocations were made to *Safa Group* related entities; 15.3% was made to unidentified donees.  In 1996, *Safa* received $2,935,695, all from unidentified entities overseas, and made grants or allocations of $4,955,900, over 99% of which went to *Heritage Education Trust*, and *IIIT*.  In 1997, it received $6,594,988 contributions, over 99% of which came from overseas or related individuals and entities, and provided grants and allocations of over $3,800,000  -- over 99% of which went to related *Safa Group* entities.  In 1998, it received about $95,000 - - mostly from *Mirza* - - and disbursed $764,793, over 99% of which went to *IIIT* and *York* International.  In 1999, *Safa* received about $1,759,025 in contributions ($1,128,125 of which came from *Mirza*), and made cash grants and allocations of $2,108,756 to unidentified donees.  In 2000, *Safa* received only minor contributions but distributed $2,072,681 in grants and allocations, 97% of which went to *IIIT*, the *York Foundation* (in Herndon), and *York International* in the Isle of Man.

6.     *Sterling Charitable Gift Fund*

33.     IRS records show *Sterling Charitable Gift Fund* ("*Sterling* ") is a tax-exempt

organization located at 555 Grove Street with a purpose "to support charitable organizations

which conduct, promote and administer charitable, religious and educational programs and

activities described in 501(c)(3)."  The 2000 Form 990, filed in May 2001, lists *Mirza*,  *M. Omar*

*Ashraf*, and Muhammad *Ashraf* as *Sterling*'s officers, directors, and trustees.

34. *Sterling Charitable Gift Fund* began operation in 2000.  There were only two

transactions recorded for that year.  First,  *Mirza*, *M. Omar Ashraf* and Muhammad *Ashraf*

collectively contributed $300 to *Sterling*.  Second, *Sterling* received 1000 shares of *Mar-Jac*

*Investments, Inc.* stock, valued at $2,650,000, from *SAAR* (as noted above, this was virtually all

of *SAAR's* remaining assets).  According to the IRS Form 990, *Sterling* made no grants or

allocations in 2000.

7.     *York Foundation*

35.     IRS records show *York Foundation* is a tax-exempt organization located at 555 Grove

Street with a purpose of  "education, research, charity."  The Form 990 return filed on May 20,

2001 lists *Abusulayman*, *Mirza*, and Muhammad *Ashraf* as its officers, directors, and trustees.

36. 96.4% of *York*'s contributions during 1999 and 2000 were derived from *Safa Group*

related entities and/or individuals.  During the same period, 72.4% of its grants and allocations

were made to *Safa Group* related entities and 21.8% were made to unidentified donees.  *York*'s

Form 990 for 1999 reflects contributions of $1,432,500, 93% of which were received from

related *Safa Group* individuals and entities. *York* illegally failed to identify any of its donees for

the year.  In 2000, at least 97% of the $4,967,762 it received came from related *Safa Group*

individuals and entities; it made cash grants and contributions of $392,000 to *IIIT* and $400,000 to *York* International in the Isle of Man.

XI.     <u>False Statements on the Forms 990</u>

    A.     <u>General</u>

37. In the course of their review of the Forms 990 for the *Safa Charities*, the agents assigned to this investigation have discussed and reviewed certain entities on these returns with tax law specialists from IRS's Tax-Exempt and Government Entities, Exempt Organization Division.  These specialists confirmed, based on evidence presented to them by the investigating agents, that infomation as to relationships to the reporting entity required by Form 990, Part VI, Question 80(a) and Form 990, Schedule A, Part III, Question 2 should have been disclosed by the tax exempt entity.  The succeeding paragraphs describe the information sought by those questions and the evidence which demonstrates the answers provided were false.

    B.     <u>False Statements Regarding Relationships to Other Organizations</u>

38.  Part VI, Line 80a, Form 990, asks, " Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc. to any other exempt or nonexempt organization?" If answered "yes", the name of the organization is required to be identified.  The instructions for Form 990 indicate that a "yes" answer to Line 80a is required if most (more than 50%) of the organization's governing body, officers, directors, trustees, or membership are also officers, directors, trustees, or members of any other organization.  The officers, directors, trustees, or members need not constitute 50% or more of the other organization.  Thus, if the reporting

organization has a total of five officers and three of those officers sit on the board of 12 directors of another entity, then the organizations are related and the relationship must be disclosed.

39. A review of the Forms 990 filed with IRS, tax returns of other related entities, tax related information, and corporate information obtained from the Virginia State Corporation Commission revealed the following:

40. *Mirza*, *M. Omar Ashraf*, and *Muhammad Ashraf* were the sole individuals listed as officers, directors, trustees, and key employees on *Sterling Charitable Gift Fund*'s Form 990 for the year 2000. Line 80a, Part VI, of this return, concerning related organizations, was answered "no". However, a review of the 1999 and 2000 Forms 990 for *York Foundation* revealed that *Mirza* and *Muhammad Ashraf* were also two of the three listed officers, directors, trustees, and key employees of *York Foundation*. *York*'s Form 990 also reflected the answer "no" on line 80a, Part VI. *Mirza* signed as President on both the *York* Form 990 and the *Sterling* Form 990. The responses on both returns are false because they failed to report that the two organizations were related to each other.

41. According to Virginia State corporation records, *Mirza*, *M. Omar Ashraf*, and *Muhammad Ashraf* were either the only officers and directors, or comprised the majority (greater than 50%) of the officers or directors of: *Mar-Jac Investments, Inc.* (located at 555 Grove Street, Suite 110, Herndon, VA), of *Grove Corporate Plaza, Inc.* (no longer in business; formerly located at 555 Grove St., Suite 110, Herndon, VA), and of *Sterling Management Group, Inc.* (located at 555 Grove St., Suite 116) for the year 2000. None of these relationships are disclosed on *Sterling Charitable Gift Fund*'s 2000 Form 990, Part VI, Line 80a and 80b. The failure to disclose these relationships is material for the following reasons. *Sterling Charitable*

61

*Gift Fund*'s primary asset in the year 2000 was 1,000 shares of *Mar-Jac Investments, Inc.* stock. Also, Georgia State corporation records reflect that *Sterling Management Group, Inc.* is the manager of HFC Feed Mill, LLC. *York Foundation*'s 2000 Form 990 shows that during the year 2000, *Mar-Jac Poultry* contributed its 100% interest in *HFC Feed Mill, LLC*, worth $4,402,000, to *York Foundation*.

42.. The *SAAR Foundation*'s 1997-2000 Form 990 lists *Mirza* and *Sedky* as two of its three listed officers, directors, trustees, and key employees. *SAAR*'s 1997 and 1999 Forms 990 reflects the answer "yes" to question 80a, Part VI, but names only relationships with *SAAR* International (1997) and *Mar-Jac* Investments (1999). However, documents found in a settlement file for the sale of the real estate located at 555 and 585 Grove Street and 596 and 598 Grant Street, Herndon, VA, show that *Humana Charitable Trust* is an Isle of Man trust. The documents show that *Humana* was set up on November 12, 1997 by *Amana Limited*, with *Amana* being the original Trustee whose directors are *Mirza* and *Sedky*. The documents further indicate that *Amana Limited* is an Isle of Man corporation whose appointed officers are *Mirza*, *Sedky*, and *M. Omar Ashraf*. The Forms 990 for *SAAR* fail to disclose this relationship. From 1997 through 2000, *SAAR* contributed the majority of its assets ($21.1 million) to *Humana Charitable Trust* but did not disclose the relationship between the donor (*SAAR* ) and the donee (*Humana*) on its Forms 990 as required.

43. *SAAR*'s 1996 Form 990 return lists *Mirza* and *Jaghlit* as two of its three officers, directors, trustees, and key employees. *SAAR*'s 1996 Form 990, Part VI, Question 80(a) reflects the answer "yes", but identifies only *SAAR* International DC, Inc. as a related organization. Yet, in 1996, *Mirza* and *Jaghlit* were also officers of *Safa Trust*, *Inc.* and of *Heritage Education*

*Trust, Inc.* as evidenced by their respective Form 990s for 1996.  These relationships are not

disclosed in *SAAR*'s 1996 Form 990 return.

> C.    False Statements on Schedule A (Supplementary Information),
> Form 990 Relating to Statements About Activities

44. Section 501(c)(3) organizations must attach a completed Schedule A (Form 990-

Supplementary Information) to their Form 990.  Part III of Schedule A requests information

about the organization's activities during the year.  Question 2, Part III, Schedule A asks,

"During the year, has the organization, either directly or indirectly, engaged in any of the

following acts with any of its trustees, directors, officers, creators, key employees, or members

of their families, or with any taxable organization with which any such person is affiliated as an

officer, director, trustee, majority owner, or principal beneficiary:

> a.    Sale, exchange, or leasing of property?
> b.    Lending of money or other extension of credit?
> c.    Furnishing of goods, services, or facilities?
> d.    Payment of compensation (or payment or reimbursement of expenses if
>         more than $1,000)?
> e.    Transfer of any part of its income or assets?

45. The Schedule A instructions specify that Part III, lines 2(a) through 2(e) apply to both

sides of a listed transaction.  Reporting is required, for example, whether the exempt

organization is a payer or payee, buyer or seller, lender or borrower.

> D.    False Statements Relating to Question 2b, Part III,
> Schedule A – Lending of Money or Extension of Credit

> 1.    *SAAR Foundation*

46.    A review of the Forms 990 show that sometime prior to 1996, the *SAAR*

*Foundation, Inc.*  made a $15,000,000 loan to *Mar-Jac Investments, Inc.*, a taxable entity.

On its 1997 Form 990, *SAAR* listed *Mar-Jac* Investments as a 100% subsidiary with

assets of $11,500,000.  This loan was carried as a loan receivable on *SAAR*'s Forms 990

for 1996 through 1998.  Although the loan was not made during the years 1996 through

1998, *SAAR* continued to extend credit to *Mar-Jac* Investments during these years as a

balance was still due.  No interest rate is shown.  On each of *SAAR*'s returns for 1996-98,

however, the answer to Question 2(b), Part III, Schedule A (hereafter "Q2b") is "no".

47. These are false statements because Virginia State corporate records reflect that *Mirza*

was a registered agent, director, president, and treasurer of *Mar-Jac* Investments from 1997-

2000.  *SAAR*'s 1996-2000 Forms 990 demonstrate that *Mirza* was the President, CEO, and

Trustee of *SAAR* during those years.  On its 2000 return, *SAAR* reported that its interest in *Mar-

Jac Investments* had been contributed to *Sterling Charitable Gift Fund* but *Mirza,* who signed the

Forms 990 for *SAAR* and for *Sterling*, concealed that he was on both ends of this transaction.

48.  *SAAR*'s 1996 and 1997 Forms 990 also reflect a $109,890 demand loan made by

*SAAR* to *Mar-Jac* Poultry.  Again, the answer to Q2b is "no".  This is a false statement because,

according to State of Georgia corporation records, *Mirza* is an officer of *Mar-Jac Poultry, Inc*.

2. *Safa Trust*

49.  *Safa Trust, Inc.*'s 1999 and 2000 Form 990 returns show that *Safa Trust* made a loan

of $900,000 to *Reston Investments*, *Inc.*, a taxable entity, during 1999, the balance of which had

increased to $1,364,972 by the end of the year 2000.  In addition, *Safa Trust*'s 1998 Form 990

shows that it had a note payable (liability) to *Reston Investments*, *Inc.* in the amount of $352,857.

*Barzinji*, *Mirza*, and *Al-Talib*  were all officers of both *Safa Trust* and of *Reston Investments*, *Inc.*

in 1998-2000, according to *Safa*'s Forms 990 and Virginia State corporation records.  Yet, the

64

*Safa Trust* Form 990s for 1998, 1999, and 2000, signed by *Mirza*, falsely show the answer "no" to Q2b.

50. In addition, *Safa Trust*'s Forms 990 reflect that it had also made a $263,000 working capital loan to *Grove Corporate, Inc.* in 1997 and a $500,000 loan to *Mar-Jac* Poultry sometime prior to 1996, the balance of which carried into 1996. *Mirza* was an officer of both of these taxable entities. *Barzinji* and *Al-Talib* were also officers of *Grove Corporate, Inc.* Yet, on *Safa*'s returns for 1996 and 1997, the answer to Q2b is falsely stated as "no".

E.     False Statements Relating to Question 2a (Sale, exchange, or leasing of property) and 2e (Transfer of any part of income or assets), Part III, Schedule A

1.     *African Muslim Agency*

51. 1998 and 1999 Forms 990 for the *African Muslim Agency* report that *Mar-Jac Poultry*, a taxable entity, donated $1,100,000 cash to the *African Muslim Agency* in 1998 and $1,125,000 cash to the *African Muslim Agency* in 1999. Georgia State corporation records reflect that *Mirza* and *Al-Talib* were both officers of *Mar-Jac Poultry*. *African Muslim Agency*'s Form 990 shows both individuals were also officers of the *African Muslim Agency*. Yet, *African Muslim Agency*'s Forms 990 for 1998 and 1999 both answer "no" for question 2e. These are false statements since *Mar-Jac Poultry* transferred assets to *African Muslim Agency* while *Mirza* and *Al-Talib* were officers of both entities.

2.     *SAAR Foundation*

52. *SAAR*'s 1999 Form 990 reflects that it invested $2,703,760 in corporate bonds of *Mar-Jac* Investments, a taxable entity. *Mirza* was the President, CEO, and a trustee of *SAAR* and the President, Treasurer, and a director of *Mar-Jac Investments*. *SAAR*'s 1999 return reflects the

answer "no" to Questions 2a and 2e.  These are false statements since *Mar-Jac Investments* sold corporate bonds to *SAAR* and *SAAR* transferred assets (i.e., funds) to *Mar-Jac Investments* to purchase the bonds.

3.     *Safa Trust*

53.  *Safa Trust*'s Forms 990 reflect that during 1997, *Safa* invested $2,000,000 in the corporate stock of *Grove Corporate, Inc*.  According to Maryland State Personal Property Returns, *Barzinji*, *Mirza*, and *Al-Talib* were all officers of *Grove Corporate, Inc.* and of *Mena* Corporation, both taxable entities.  According to *Safa*'s 1997 return, all three were also officers of *Safa Trust*.  Yet, *Safa Trust*'s 1997 return reflects the answer "no" to Questions 2a and 2e. These are false statements since *Grove Corporate, Inc*. sold corporate stock to *Safa* and *Safa* transferred assets (i.e.  funds) to *Grove Corporate* to purchase the stock.

4.     *York Foundation*

54. *York Foundation*'s 2000 Form 990 shows that *Mar-Jac Poultry* , a taxable entity, donated 100% ownership of HFC Feed Mill, LLC, valued at $4,402,000, to *York Foundation*. *York*'s 1999 Form 990 shows that *Mar-Jac Poultry* donated $175,000 cash to *York* in 1999. Georgia State corporation records reflect that *Mirza* was an officer of *Mar-Jac Poultry* .  *York*'s Forms 990 identifies *Mirza* as an officer of *York*.  On *York*'s Forms 990 for 1999 and 2000, however, question 2e was answered "no".  These are false statements since *Mar-Jac Poultry* transferred assets to *York Foundation* while *Mirza* was an officer of both *Mar-Jac Poultry* and *York*.

F.     False Statements Relating to Contributions Received
and Grants Made by Tax Exempt Organizations

1. *African Muslim Agency* and *IIIT*

66

55. The *African Muslim Agency*'s 1998 Form 990 reflects that it made a $600,000 cash donation to *IIIT*.  On its 1998 Form 990, however, *IIIT* only reported that it received a $370,000 contribution from *African Muslim Agency*.  One or both of these returns are false statements. The *African Muslim Agency*'s 1997 Form 990 does not report making any donations to *IIIT* in 1997.  However, *IIIT*'s Form 990 for 1997 shows that *African Muslim Agency* contributed $265,000 to *IIIT* in 1997.  One of these is a false statement.

56. *IIIT*'s 1997 and 1998 returns appear to have been signed by *Al-Talib*.  *African Muslim Agency*'s 1997 and 1998 returns were signed by *Mirza*.

2. *Safa Trust*

57. Between January 17, 1997, and July 1997, checks totalling $325,000 were drawn on the *Safa Trust*, *Inc.* bank account at First Union Bank and made payable to *HLF*  - - the *HAMAS* front group.  This amount is not reflected on *Safa Trust*'s 1997 Form 990 as a contribution.  I believe that *Safa* did not mention this contribution on its return to make it less likely that law enforcement authorities would track money from *Safa* to *HLF*.

3. *Safa Trust* and *Heritage Education Trust*

58. On its 1996 Form 990, *Safa Trust* reported that it made grants and allocations of $3,602,009 to *Heritage Education Trust*.  On *Heritage*'s 1996 Form 990, *Heritage* reported that it received $8,600,000 in contributions from *Safa Trust*.  One of these returns is a false statement.  *Safa*'s 1996 return was signed by *Mirza*.  *Heritage*'s 1996 return was also signed by *Mirza*, who was *Heritage*'s Secretary, Treasurer, and Director in 1996.

4. *Safa Trust* and *IIIT*

59. On its Form 990 for 1997, *IIIT* reported that it received contributions of $522,007 from *Safa Trust* in 1997, but on its own Form 990, *Safa Trust* reported that it donated $585,649 to *IIIT* the same year.  On its Form 990 for 1998, *IIIT* reported that it received contributions of $240,000 from *Safa Trust*, but *Safa Trust* reported that it only donated $159,178 to *IIIT* the same year.  At least one of these returns is false.  *Mirza* signed *Safa*'s Forms 990 for 1997 and 1998. *Al-Talib*  appears to have signed *IIIT* Forms 990 for 1997 and 1998.

### 5. <u>*Heritage Education Trust* and *SISS*</u>

60. *Heritage Education Trust*'s 1996 Form 990 reflects that *Heritage* gave a grant/allocation of $800,000 in that year to its affiliate, *SISS*.  In its 1996 Form 990, *SISS* reported that it received only $450,000 in total contributions (contributors not shown) the same year, a difference of $350,000.  One of these returns is false.

### 6. <u>*SAAR and Safa*</u>

61.     A check written by *Mirza* from the account of *SAAR Foundation* to *All Dulles Area Muslim Society ("ADAMS")*, in the amount of $250,000, was deposited into a *Safa Trust* account on December 15, 1997.  On *SAFA*'s 1997 Form 990, however, this amount is not reflected as a contribution received from either *ADAMS* or *SAAR*.  Moreover,  *Safa*'s 1997 Form 990 does not reflect any other transactional relationship with *ADAMS* or *SAAR* (i.e., a loan receivable or loan payable) that would explain the transaction.  Furthermore, *SAAR*'s Form 990 for 1997 does not reflect a grant/allocation to either *ADAMS* or *SAFA* in 1997, not does *SAAR*'s return show any other transactional relationship with *ADAMS* or *Safa* (i.e. loan receivable or loan payable) that would explain the transaction.  (*M. Omar Ashraf*, of *Sterling Charitable Gift Fund*, is listed as an officer of *ADAMS*).

XII.    THE *SAAR* Audit

A.    Observations of and Information Obtained from Auditors

62.  In March of 1999 the Internal Revenue Service, Tax Exempt/Government Entities, Exempt Organizations Division began an audit of *SAAR*'s Forms 990 for the year 1997 and 1998.  The audit concluded on February 21, 2001.  At the conclusion of the audit the IRS issued a notification to *SAAR* that it was continuing to recognize its status as exempt pursuant to Section 501(c)(3).  Revenue Agents Eugene Gilmartin and Michael Bieloski, who conducted the audit were interviewed by agents assigned to this investigation.

63.  Gilmartin and Bieloski audited the Forms 990 returns filed by *SAAR* for the years 1997 and 1998.  At the outset *SAAR* represented it was not conducting any business during the examined years other than distributing its assets.  As a result, the examination was limited in scope to attempting to verify that the grants and allocations made by *SAAR* were for religious, scientific or educational purposes.  As part of their examination, the auditors met with *Mirza* and *SAAR*'s return preparer, *Manzoor Qureshi,,* at *SAAR*'s office at 555 Grove Street in Herndon. *Mirza* was not present for the entire audit; however, *Qureshi* called him in on several occasions to answer specific questions.

64.   The investigation has obtained the audit file from Revenue Agent Gilmartin.  The file contained correspondence, work papers and some cancelled checks.  As a result of his review of the file and interview of the examining agents, investigators learned the following:

65. The revenue agents were told that *SAAR* was created for people overseas to pay scholarships for Muslims in the United States.

69

66. *Mirza* told the examining agents that he had founded *Humana Charitable Trust* in the Isle of Man ("*Humana*") and was transferring *SAAR*'s assets to it as a result of negative newspaper publicity that associated *SAAR* and *Safa Trust* with terrorist groups.  Gilmartin and Bieloski stated that *Mirza* and/or *Qureshi* led them to believe that *Mirza* intended to move these two charities out of the country.

67. In order to verify that *SAAR*'s grants/allocations were being used for an exempt purpose, the examiners requested a list of donee-beneficiaries that had received grants from *SAAR* and/or *Humana* for the years 1997 and 1998.  They contacted those donees located in the United States, who denied having any knowledge of *Humana* or *SAAR*.  *Mirza* advised the examiners that *Humana*'s funds were distributed to Al *Rajhi* Charities in Saudi Arabia and then to the beneficiaries through  *Al-Rajhi*.  *Qureshi* sent a letter stating that *Mirza* had traveled to Saudi Arabia and obtained copies of wire transfers and checks aggregating $168,667 that went from *Al-Rajhi* to U.S. beneficiaries.  The auditors obtained confirmation from recipients that they received grants from *Al-Rajhi* Charities, but never received documentation that *Humana* funds were ever disbursed to  *Al-Rajhi*.

      B.      <u>Misstatements/Misrepresentations During the Audit</u>

68.  I have spoken with IRS agents who have reviewed the file associated with the audit. In light of their knowledge of the investigation and facts set forth elsewhere in this affidavit, there is probable cause that *Mirza* and *Qureshi* obstructed or attempted to obstruct the successful completion of the audit by providing false and/or misleading information to the auditors.  In particular, when the auditors made inquiries into entities related to *SAAR* they were met by false denials of such relationships.

69. At the outset of the audit, the agents asked for an "organizational chart of all subordinate or related entities." At the opening meeting on April 6, 2000, *Mirza* and *Qureshi* stated the universe of related entities is substantially smaller than the agents had anticipated. They subsequently received a chart which showed that the only active members were *SAAR Foundation*, *Inc.*, and it wholly owned subsidiary *Mar-Jac Investments*, *Inc.* In light of the evidence set forth in this affidavit, this representation is patently false.

70. The auditors were told that *SAAR* was winding down its operations and that all of its assets had been transferred overseas to *Humana Charitable Trust*. In the course of the audit they were provided a resolution of the Board of Directors of *SAAR*, directing that all assets be transferred to *Humana* and that *SAAR* be dissolved. In fact, $2,650,000 of *SAAR* assets were transferred to a domestic tax exempt organization, *Sterling Charitable Gift Fund*, an organization whose identity and existence were concealed from the auditors. According to IRS records, *Sterling Charitable* Fund was established in March 2000, 11 months before the *SAAR* audit was concluded. The transfer of the $2,650,000 occurred on December 20, 2000, the date of *SAAR*'s purported dissolution. By the formation of *Sterling Charitable Gift Fund* and the transfer of *SAAR* assets to it, *SAAR* became *Sterling*. In other words *SAAR* simply changed its name to *Sterling*.

71. In addition, *SAAR* still had an active bank account with First Union Bank until October 2001. The address on the account was 555 Grove Street, Herndon, Virginia. *SAAR*'s 2000 Form 990 shows that it transferred the majority of its assets, consisting primarily of stock in *Mar-Jac Investments*, to *Sterling Charitable Gift Fund*. According to *Sterling*'s Form 990 for 2000, *Sterling*'s address is the same as *SAAR*'s – 555 Grove Street in Herndon. *Mirza* is listed

71

on *Sterling*'s 2000 return as the President of *Sterling*.  Furthermore, according to First Union

statements, *Sterling* transferred $250,000 to "*SAAR Foundation*, Int'l Institute of Islamic

Thought (*IIIT*), 555 Grove Street, Herndon, VA 22070" during November 2001.  The money

was deposited into an account in the name of *IIIT* at P.O.  Box 669, Herndon, VA 20170.

However, the transfer of money in November 2001 indicates that *SAAR* operated as alter ego or

nominee of *IIIT* even though, according to IRS records, it was dissolved as a 501(c)(3) charity in

December 2000.

72.. During an April 6, 2000 meeting attended by *Mirza* and *Qureshi*, the auditors were

told that there was no overlap of officers or trustees between *SAAR* and *Safa Trust, Inc.*  In

addition they were told that *Mirza*'s company, *Sterling Investments*, provided management and

accounting services for *Safa Trust*, creating the impression that the only relationship between

*Sterling* and *Safa* was an arm's length business relationship.  Further, they were told that *Safa*

*Trust* had its offices in Herndon, but at a location different from *SAAR*'s.  In fact, in an interview

for Regardie's Magazine published in October 1988, *Mirza* admitted that *Safa Trust* was an

entity related to *SAAR*.  Moreover, from 1996-2000, *Mirza*, the President/CEO/Trustee of *SAAR*

at 555 Grove Street, was listed on *Safa*'s Forms 990 as a Vice President of *Safa Trust* and its

registered agent for service of process at 555 Grove Street.  In addition *Safa*'s bank statements

for October-December 2001 went to the same address as *SAAR*'s.

73. At the same April 6, 2000 meeting the auditors were told of the existence of *York*

*Foundation*, a new entity represented to be independent from the *SAAR Foundation*.  In fact,

*Mirza*, the President and Treasurer of *York Foundation*, is also the President/CEO and Trustee of

*SAAR Foundation*, which was located at the same address as *York Foundation*.

72

C.     Additional Information Concerning  *Al-Rajhi* Charity

74. IRS-CI Special Agents have reviewed the copies of 14 checks provided during the
audit as substantiation that *SAAR* had made grants/allocations to beneficiaries through *Humana*
*Charitable Trust* and *Al-Rahji* Charity.  They found that the checks were drawn on a Chase
Manhattan Bank Account in New York.  The account is in the name of *Al-Rahji* Banking &
Investment Corp, Riyadh, Saudi Arabia.  Eleven of the checks indicate on the face that the
amount of the check came, not from *Al-Rahji* Charity, but from an individual named Abdul
Rahman *Al-Rajhi.*  The other three checks do not identify from whom the amounts came.  The
eleven checks, totaling $104,000, show that someone, not *Al-Rajhi* Charity, remitted the stated
amount to the account holder,  *Al-Rajhi* Banking & Investment Corp., which in turn drew checks
on a New York bank account in the stated amounts to the payees.  Nothing on any of the 14
checks identifies the funds as having been issued from *Al-Rajhi* Charity, much less from
*Humana*.

75. The remitter, Abdul Raham *Al-Rajhi*, is identified on a website as the Vice Chairman
& Executive Manager of *Al-Rahji* Commerical Foreign Exchange.  Correspondence with the *Al-*
*Rahji* Charity purportedly related to the donations does not indicate that Abdul Rahman *Al-Rahji*
is with *Al-Rajhi* Charity.  A web search did not locate a web address for  *Al-Rajhi* Charity.  The
only evidence that Abdul Rahman *Al-Rajhi* is connected with an  *Al-Rajhi* Charity Office comes
from a statement prepared by *Mirza* in the course of the audit, dated December 29, 2000, which
asserts Abdul Rahman *Al-Rajhi* is a manager of *Al-Rajhi* Charity.

76.  *Al-Rajhi* Banking & Investment Corp.'s website indicates that Abdullah Sulaiman
*Al-Rajhi* is the General Manager of  *Al-Rajhi* Banking & Investment Corp.  Virginia corporation

information indicates he is also the President of *Aradi*, *Inc.*, located at the same address as *SAAR*, 555 Grove Street.  Other officers listed for *Aradi*, *Inc.* are *Al-Talib* and *Sedky*.  Thus, while the *Safa Group* cannot be said to have formal control over *Al-Rajhi* Banking & Investment Corp., the *Safa Group* had access to a bank and banking officials through Abdullah Sulaiman *Al-Rajhi* for purposes of producing checks purportedly paid for *SAAR*'s charitable purposes.

XIII.   <u>Additional Layering in Connection with *SAAR Foundation*'s Dissolution</u>

77.   *Mirza* stated in the audit that *SAAR* had been founded as a charitable organization in the United States to earn a better yield on funds collected in Saudi Arabia for charitable purposes.  This was done because the members of the *Al-Rahji* family believed that, by investing in the United States, they could earn a higher yield on the funds collected prior to the time they were disbursed for charitable purposes.

78.   After what he described alternatively as adverse publicity in papers about connections to terrorism, or the media becoming too probing in 1995 -1996 (which appears to refer to the press reporting *SAAR* giving money to *PIJ* through *IIIT* ), *Mirza* stated that *Humana* was formed in the Isle of Man in November 1997.  He then explained that rather than establishing its own disbursement office (to determine who would receive grants), *Humana* decided it would use the *Al-Rajhi* Charity office in Saudi Arabia.  As a result of this restructuring, *SAAR* placed its considerable asset pool beyond the immediate reach of United States law enforcement and added at least two additional layers (*Humana* and  *Al-Rajhi*) to any grant purportedly made for charitable purposes.  With respect to disbursements to United States-based donees, this path requires all disbursements to be moved from *SAAR*, overseas, through a

74

minimum of two financial institutions, before being returned to the ultimate beneficiary in the United States.

79. There is no innocent reason which accounts for these additional financial transactions connected with these disbursements. *SAAR* performed a role as the money managers for this huge asset pool. Even if *SAAR* was incapable of determining who was entitled to the grants, the names of the recipients could have been relayed to *SAAR*  - - and the disbursement by *SAAR* could have been made directly to those recipients - - without first forwarding the funds through the additional financial institutions.

XIV.   Evidence of Personal Inurement

80.     In this section I will detail the supporting evidence uncovered in the financial investigation which has established probable cause to believe that *Safa Group* individuals have obtained personal inurement as a result of their control over the businesses and charities described above. As a result, principals of the *Safa Group* have also committed tax fraud in connection with their individual income tax returns.

81. One of the primary reasons the Form 990 requires disclosure of transactions between related entities and individuals is because of the prospect of personal inurement, i.e., individuals profiting personally from a § 501(c)(3) entity. The evidence reviewed to date demonstrates several examples of personal inurement.

## Paragraphs 192 through 213 REDACTED

E.      Failure to Disclose Foreign Bank Accounts

82. A business account application signature card from 1st American Bank shows that *SAAR* International, with an address of 555 Grove Street in Herndon opened a bank account at

1st American Bank on 09/19/89.  *Mirza*, *Al-Talib*, and *Barzinji* all had signatory authority.  The bank statement reflects the use of the same taxpayer EIN number as the one used by *SAAR Foundation*, *Inc.*  The use of the same taxpayer EIN number demonstrates that *Mirza* represented to the bank that *SAAR Foundation*, *Inc.* and *SAAR* International were the same entity.

83. A business account application signature card from 1st American Bank shows that *SAAR  Foundation Canada, Inc*., Grove Street in Herndon, opened a bank account at 1st American Bank on 02/22/90.  *Mirza*, *Al-Talib*, and *Barzinji* all had signatory authority.

84. A review of *SAAR* bank records for account # 2000071284015 at First Union revealed seven debit memos for transfers cumulatively totaling over $200,000 to either *"SAAR Foundation* Canada" or "*SAAR Foundation*" at Canadian Imperial Bank of Commerce.  While I have not yet obtained foreign bank accounts, this evidence gives me reasonable cause to believe that they are signatories on a foreign bank account in the name of *SAAR Foundation Canada* and/or *SAAR Foundation* at the Canadian Imperial Bank of Commerce.

85. The accounts of *SAAR Foundation* and *SAAR Foundation Canada* at First Union in Virginia include *Mirza*, *Barzinji*, *Al-Talib*, and/or *Jaghlit* as the signatories on those accounts. Thus, I have probable cause to believe that *Mirza*, *Barzinji*, *Jaghlit* and *Al-Talib* have signatory authority over accounts at Canadian Imperial Bank and thus have filed materially false tax returns for the year 1996 in that they failed to disclose on Schedule B of their personal tax returns that they had signatory authority over a bank account in a foreign country.  A review of the relevant returns demonstrates that each individual answered "No" to the question related to foreign bank accounts.

86.   Further, a document dated 12/15/97 and entitled, "Consent to Action Taken in Lieu of an Organizational Meeting of *Amana Limited*" that investigators obtained from BB&T Bank, shows that the directors of *Amana* (*Sedky* and *Mirza*) resolved that *Amana*, an Isle of Man corporation (and the Trustee for *Humana*, an Isle of Man trust) designated Commerce Bank of Maryland (later taken over by BB&T) and Bank Leu as depositories for the funds of *Amana Limited* and *Humana*.   Moreover, First Union records for *SAAR* contain debit memos for three international fund transfers on October 15, 1998, totaling $2,000,000, to Credit Suisse / Bank Leu for the benefit of *Humana*.   Thus, I have probable cause to believe that *Mirza* had signature or other authority over any accounts in the name of *Humana Charitable Trust*, including Bank Leu, a foreign bank account and, accordingly, filed a materially false tax return for 1998 in that he failed to disclose on his return's Schedule B that he had signatory authority over a bank account in a foreign country.

87.   Moreover, *Mirza* had control over the overseas bank accounts for the Isle of Man entities *Humana* and  *York International Trust*.

88. On October 16, 1998, *Mar-Jac Holdings, Inc.* wrote a check to *York International Trust* in the amount of $54,327.83.   The notation on the check evidenced a loan made to *Mar-Jac* Holdings, *Inc.* by *York International Trust*.   The check was endorsed, "Pay to *Sterling Investment Group*," and signed by *Mirza*, trustee for *"York Int*."

89. A review of *Mirza*'s 1998 individual income tax return shows that *Mirza* failed to identify signature or other authority over a foreign bank account.   On the basis of the foregoing evidence, I have probable cause to believe this is a materially false statement.

XV.   Conclusions Regarding Offenses Committed

90. On the basis of the facts set forth in the foregoing affidavit, I have probable cause to believe that:

a.   At all times relevant to this affidavit, *Al-Arian*, *WISE*, *ICP*, and *HLF* were fund raising fronts for *HAMAS* and *PIJ*.

b.   *Al-Alwani*, *Barzinji*, *Jaghlit*, *Mirza*, and others in the *Safa Gro*up maintained a financial and ideological relationship with persons and entities (*WISE*, *ICP*, *HLF*, *Al-Arian*, *Nafi*, and Ramadan *Shallah* ) with known affiliations to the designated terrorist Groups *PIJ* and *HAMAS*.

c.   *Al-Alwani*, *Barzinji*, *Jaghlit*, *Mirza*, and others in the *Safa Gro*up maintained their financial relationships with *WISE*, *ICP*, *HLF*, *Al-Arian*, *Nafi,* and *Shallah* through various members of the *Safa Group* particularly including *IIIT*.

d.   Before search warrants were executed in 1995, the financial support provided to terrorist front-groups provided by the organizers of the *Safa Group* was sometimes relatively open and sometimes hidden.

e.   After the search warrants were executed in 1995, the members of the *Safa Group* continued to ideologically support *HAMAS* and *PIJ* but generally did not provide overt financial support to those organizations.

f.   After the search warrants were executed in 1995, the members of the *Safa Group* stopped providing open support to *HAMAS* and *PIJ*. Instead, they concentrated on routing financial support to those same organizations by layering financial transactions through charities and businesses within the *Safa Group* to conceal and disguise the fact that they were continuing to send money from the United States to the Middle East to fund international terrorism, in violation of 18 U.S.C. § 1956(a)(2), 18 U.S.C. § 2339A, and 18 U.S.C. § 2339B.

91.   On the basis of the facts set forth in the foregoing affidavit, even if the *Safa Group* is not sending money to *HAMAS* and *PIJ*, I have probable cause to believe that *Abusulayman*, *Al-Alwani*, *Barzinji*, *Al-Talib*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Jaghlit*, *Sedky*, *Ahmad Totonji*, and others, have engaged in a conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Department of the Treasury in the

ascertainment, computation, assessment, and collection of federal income taxes, in violation of 18 U.S.C. §371, by -

a.   Using the *Safa Charities* to take advantage of exemptions from federal income taxation while abusing the requirements for tax exempt status;

b.   Using a web of corporate entities, both exempt and non-exempt, over which they exercised actual or effective control to move funds between entities, through a series of transactions designed to conceal the true nature, source, disposition and taxability of revenues moved between these entities; and

c.   Misrepresenting the nature of the relationship between the *Safa Charities* and for-profit members of the *Safa Group* to avoid scrutiny of their financial transactions.

92.  Further, I have probable cause to believe that  *Mirza*, *Abusulayman*, *Al-Alwani*, *Barzinji*, *Al-Talib*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Jaghlit*, *Sedky*, *Ahmad Totonji*, and others engaged in a scheme to file or cause the filing of materially false Forms 990 concealing the relationships between the *Safa Charities*, certain for-profit companies and the financial transactions between these related entities, all in violation of 26 U.S.C. § 7206(1) and (2).

93. Further, I have probable cause to believe that *Mirza* and *Qureshi* engaged in a corrupt endeavor to impede and impair the due administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a) during the *SAAR* audit by:

a.   affirmatively misrepresenting the status of *SAAR Foundation* and the disposition of its assets;

b.   concealing from the auditors the identity of *Sterling Charitable Gift Fund*, which was organized in March 2000, utilized the same address as *SAAR* and received *SAAR*'s major asset;

c.   concealing the fact that *SAAR* maintained an active bank account until at least October 2001;

d.   affirmatively misrepresenting that there was no overlapping of officers between *SAAR Foundation* and *Safa Trust, Inc.*, when *Mirza* was an officer of both *SAAR* and *Safa*;

79

e.  affirmatively misrepresenting the relationship between *Al-Rahji* Charities and *SAAR*, by omitting that Abdul Rahman *Al-Rahji* is an officer of *Aradi, Inc.*, located at the same address as *SAAR*; and

f.  concealing the relationship between *York Foundation* and *SAAR*.

94.  Finally, I have probable cause to believe that *Al-Alwani*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Mirza*, *Jaghlit*, *Barzinji*, *Totonji*, and *Al-Talib* each have willfully filed false individual income tax returns for the years 1997 and 1998 in violation of 26 U.S.C. § 7206(1) by over-reporting deductions, under-reporting income, and/or failing to report signatory authority over foreign bank accounts.

XVI.  Records Created and Maintained by the Targets

95.  There is probable cause to believe that the items listed in Attachment B will be found at the locations to be searched, and represent contraband, instrumentalities, fruits, and evidence of the commission of criminal violations against the United States.  In the following paragraphs, I will set forth my basis to support that the items set forth in Attachment B will be located on the premises for which this application seeks search warrants.

A.  Records Required to be Maintained by *Safa Charities*

96.  Part IV, line 91 of the IRS Form 990 requires tax-exempt entities filing Forms 990 to identify their custodians of records as well as the physical locations where the records are maintained.  While the instructions to Form 990 do not directly address what records are referenced by this line, the IRC and Regulations set forth comprehensive record-keeping requirements which the entity admits exist when it answers line 91.

97.  26 U.S.C. § 6001 generally requires the keeping of records.  It states:

Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe.

80

98. The regulations under Section 6001 require that:

[A]ny person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.  26 C.F.R. § 1.6001-2(a).

99.  With respect to exempt organizations the regulations state:

[E]very organization exempt from tax under section 501(a) shall keep such permanent books of account or records, including inventories, as are sufficient to show specifically the items of gross income, receipts and disbursements.  Such organizations shall also keep such books and records as are required to substantiate the information required by section 6033. See section 6033 and §§ 1.6033-1 through 1.6033-3.  26 CFR § 1.6001-1(c).

100.  Section 1.6033-2 of the regulations requires that "every organization exempt from taxation under section 501(a) shall file an annual information return specifically setting forth its items of gross income, gross receipts and disbursements, and such other information as may be prescribed in the instructions issued with respect to the return."

101.    The references in 26 C.F.R.  §§1.6001-2(a) & 1.6003-2 to "any information on the return" or "prescribed in the instructions" describe the duty of the entity to maintain specific records, which relates to the admission as to the custodian and location of records.  The statement on the Form 990 can be construed to be an admission that the full panoply of records to support any entry on the return, or required by the instructions, is at the physical location identified on the return.

102.  Based on my examination of the IRS Forms 990 and conversations with the IRS-CI agents involved in this case, I know that records to support entries on the IRS Forms 990 are required by law to be maintained by the *Safa Charities* at the locations identified by those

81

charities in their most recent IRS Form 990s.  These records include all records regarding

officers, directors, employees, grants received, expenses, employee salaries, distributions,

investments, contributions received, grants and allocations made, assets, loans, liabilities, and

other financial and organizational relationships.

        B.      Records of Money Laundering, Tax Evasion, and Support for Terrorists

103.  In my experience, and as shown in this affidavit, providing support to terrorists

through layered transactions, and/or tax evasion accomplished through misuse of charitable

status, results in the production and maintenance of records.  Records relating to the acquisition

and disposition of the money transferred to overseas money laundering havens, as well as to

terrorists, are produced and likely to be maintained in residential and business locations used by

the conspirators of these crimes.  Accordingly, records relating to transfers of money to, from,

and between companies and charities in the *Safa Group* are likely to be maintained in the

business and residential locations used by the individuals controlling the *Safa Group*.

104.      Based upon my experience and training in investigations involving the transfer of funds

offshore to evade taxes or hinder law enforcement's ability to trace their ultimate disposition, I

know that individuals accomplishing such transfers often maintain some form of records.  They

tend to maintain records either at their business or residence reflect their interest in the offshore

accounts under their control, as well as how much money they transferred to ultimate

destinations from those offshore accounts.   Accordingly, regardless of whether the individuals

connected with the *Safa Group* engaged in material support to terrorists or merely tax evasion,

there is probable cause that they maintain records relevant to the offenses described in this

affidavit in their business premises or in their homes.

105.  In the course of this investigation, I have seen various spellings of the names of many of the individuals controlling the *Safa Group*, as well as various spellings of the names of terrorists and terrorist-front groups.  For example, I have seen *Barzinji* also as "albarzinji;" *Al-Talib* as "Altalib;" *Jaghlit* as "El-Gajhleet;" *Najar* as "Naajar," "Najjar," and "al-Najar;" *Shikaki* as "Shiqaqi;" and Mohammad spelled in various ways such as "Mohamed," "Muhamed," and "Muhammed."  Based on my training and experience, I know that many Arabic names are not consistently translated into English, at least in part because the Arabic language does not have letters equivalent to our vowels.  Accordingly, the records that I seek to seize include those referencing aliases, fictitious, and nominee names of individuals otherwise relevant to this investigation.

C.    Computer Files

106.  Based on my training and experience, I know that businesses ordinarily maintain records relating to their financial activities.   Some or all of these records typically are maintained at the location where the businesses conducts their operations.   Additionally, businesses today routinely utilize computers to generate correspondence, maintain financial records, and electronically communicate with other businesses and persons.   I am further aware that the use of computer networks is increasingly common, even in modest-sized companies.

107.    Data generated on individual computers in a network can be stored on the hard drive of individual computers and/or on the computer network's server.   In addition, individual users of this network can save data outside the computer network on electronic storage media, including diskettes, and other electronic and optical storage mediums.

108.  I know that the *Safa Gr*oup utilizes computers to maintain books and records.  On its Form 990 for 1999 filed with the IRS in May 2000, *SAAR Foundation* listed fully depreciated computers/printers with an original basis of $14,959.  Although *SAAR* may have dissolved in December 2000, it transferred its assets to *Sterling Charitable Gift Fund.* Moreover, First Union records reflect a $3,533.02 check dated September 30, 1997, on the account of *Safa Trust*, *Inc.*, payable to Micron Electronics, a computer equipment manufacturer.

109.  On its IRS Form 990 for the year 2000, filed in January 2001, *IIIT* showed that it was depreciating almost $50,000 of computer equipment and software.  On its Form 990 for the year 2000, filed in October 2001, *Heritage Education Trust*, *Inc.*, represented that was depreciating a computer.

110.    On its 1997 Form 1120, U.S. Corporation Income Tax Return, filed in September 1998, *Mar-Jac Investments*, *Inc.* showed that it was depreciating various assets, including computer hardware and software with a basis of over $75,000.  In January 2000, *Mar-Jac Investments* employee Beverly *Hassan* told FBI agents that *Mar-Jac Investments* and *Reston Investments* provided management, accounting, payroll, and administrative services for the *SAAR* affiliated companies operating in the Northern Virginia area.

111.  I learned from USCS SA Augustus Acquino that the USCS has conducted an investigation to determine the locations of web sites and email addresses used by members of the *Safa Group*.  SA Acquino told me that *IIIT* maintains several web pages both in English and Arabic that appear to be mirror images located on the same Internet service. One web page is located at web address www.iiit.org;; the other is identified only by the IP address of 209.35.161.210.  Both of these web addresses reside on the computer network of the Internet

Service Provider ("ISP") Interland of Atlanta, GA.  Investigation by USCS indicates that both

pages provide links to the email address of iiit@iiit.org mailto:iiit@iiit.org to contact the

organization. The Internet domain registration information lists the domain of iiit.org  as

registered to *IIIT* in Herndon, Virginia, with an administrative and billing contact listed as *Iqbal*

*Unus*, at *IIIT,* in Herndon, with the email address of iqbalunus@iiit.org.

112.  SA Acquino told me that the web site located at web address www.iiit.org has a

direct link from the main home web page to the *Child Development Foundation* ("*CDF"*),

another *Safa Group* organization.  This link is the only external link displayed on the main web

page.  Account subscriber records obtained from Interland identify *Iqbal Unus* and *IIIT* as the

subscriber of the *CDF* and the *IIIT* sites; in fact both accounts appear on the same subscriber

record.  http://www.sterlingmgmt.com Moreover, a commercial data base check for *CDF* listed

*Unus* as the email contact at iqbalunus@hotmail.com.  Hotmail records reflect that this account

is subscribed by *Iqbal Unus*.

113.  SA Acquino told me that USCS investigation revealed that the *Sterling*

*Management Group* ("*SMG*") maintains a web site located at the web address/Uniform Resource

Locator (URL) of www.sterlingmgmt.com. The web site, hosted on the network of Ardent

Communications, an ISP in McLean, Virginia, provides an address of 555 Grove Street, Suite

116, in Herndon, and an email address of smg@sterlingmgmt.com.  In addition to providing

information about various *SMG* investment projects, the web site offers extensive information

about the donation of funds to the *Sterling Charitable Gift Fund*.  Subscriber information

obtained from Ardent Communications for the account relating to the *SMG* web page indicates

that the account is in the name of *Omar Ashraf* of *Sterling Management Group* of 555 Grove Street in Herndon, with a contact email address of admin@sterlingmgmt.com.

114.   SA Acquino told me that an online query of *Mar-Jac Investments, Inc.* revealed that the administrative and billing contact for *Mar-Jac* is *Omar Ashraf*, at 555 Grove Street in Herndon, with an email contact of marjac@erols.com.  SA Acquino told me that investigation revealed that this email account is hosted by RCN Communications, in Fairfax, Virginia, and is subscribed to by *M. Omar Ashraf, Mar-Jac Investments*, 555 Grove Street, in Herndon.

115.   SA Acquino told me investigation of *Amana Mutual Funds Trust* revealed that it maintains that a web page at web address/URL of www.amanafunds.com, hosted on the computers or network of Advanced Telcom Group, a Santa Rosa, CA Internet service provider. The *Amana* web page offers an email address of AMANA@SATURNA.COM as a contact point.

116.    SA Acquino further told me that *FIQH* maintains a web page located at web address/URL www.fiqhcouncil.org.  Internet domain registration information identifies *Iqbal Unus* as the billing and administrative contact for this domain, with an email contact address of iqbalunus@aol.com.  According to records received from AOL, the email account iqbalunus@aol.com is subscribed to by *Iqbal Unus* at 12607 Rock Ridge Road in Herndon.

117.   SA Acquino further told me the *All Dulles Area Muslim Society ("ADAMS")*, maintains an Internet presence in the form of a world wide web page located at web address www.adamscenter.org which provides information about the organization, its activities, the identities of the officers of the organization, and actively solicits charity contributions.  The web sited identifies *Totonji* as the chairman of the Board of Trustees, with an email contact listed as

totonji@iiit.org.   *Omar Ashraf* is listed as the registered agent, with a contact email address at omar@sterlingmgmt.org.

118.   The host of the ADAMS web site as CI Host of Bedford, Texas. Account records obtained from CI Host identified the administrator of the ADAMS web page as Muhammad Rahman.  Account records indicate that Rahman communicates with CI host via email using the email address of mrahman@meisoft.com. Rahman's name and email address are also listed as the administrative, billing and technical contact on the adams.org domain information.  Account records further indicate that Rahman is the person that administers the web site and also maintains the database relating to the contributions raised by *ADAMS*.

119.   SA Acquino told me that a commercial database check for *Iqbal Unus* located his resume, including *ADAMS* and *Amana* as organizations with which he was associated.  The resume lists two email addresses for *Unus*, iunus@iiftihar.org and iqbalunus@aol.com.

120.    Based the facts previously set forth, I have probable cause to believe that the computers in their business premises and homes, as well as their email accounts and web sites are among the locations in which the targets of this investigation maintain the files and records described in Attachment B.

121.    Each computer file is the equivalent of a hard copy file, but possibly containing many pages of information.   By analogy to hard copy data, it will be necessary for seizing agents to look at least at the first "page" of each file in order to determine whether the contents of the file is seizable under the warrant language.   In order to identify whether the records relate to the illegal activity, agents would have to, either: (a) remain on the premises for an extended period in order to view each file contents to determine whether they are relevant and seizable, and then

print hard copies of the identified file records, or alternatively, (b) seize the computer and its internal hard-drive, and related equipment, to permit examination of the contents of the hard-drive files at an off-site location to separate out the magnetically stored documents within the scope of the warrant.   The records in the hard-drive are, at this point, inseparable, in the sense that no single record can be seized in this present form without first performing operations on the information with the computer equipment.   Therefore, authority is requested to remove the computer from the premises, given that this is the less intrusive of the two alternatives cited above.

122. The removal of the computers and related equipment is also necessary to determine whether any security devices have been installed which might either prevent copying of the records, or cause their destruction within the system.   The requirements of additional time and facilities to achieve this objective constitute additional reasons for removal of the equipment.

123.    The software programs used in connection with the data stored in the hard disk or on diskettes must also be examined by the investigating agents in order to determine that they are in fact standard, commercially-available software, so that we may obtain identical programs if necessary for the examination, copying and possible introduction into evidence at any trial which may ensue, of the data files which contain records authorized to be seized.   For the same reason, the system operating manuals and all documentation relating to the hardware or software must be examined by the investigating agents in connection with the examination of the system. Removal of the equipment from the premises during the examination is necessary because computer-based evidence is quickly and easily destroyed.

124. For the reasons stated above, it is proposed that, upon approval of the warrant, the computer equipment, its related program documentation and peripheral equipment which is known to be compatible and necessary for the proper functioning of the system, be removed to the safekeeping of the investigating agencies for proper examination, and copies be made of the relevant records.   Chain of custody will be maintained by the seizing agent, a trained computer specialist and the investigating agent charged with the duty of determining whether a particular record is within the scope of the warrant.   Copies of such materials as necessary for the ongoing course of business will be made on request of the entities from whom they were seized.

XVII.   Locations of Records

125.   There is probable cause to believe that evidence of the crimes described in this affidavit will be found in the following locations:

A.   Business Premises

1.      555 Grove Street

126. There is reasonable cause to believe that the books and records, as required under IRC 6001 and the regulations promulgated thereunder and as described below, for the *Safa Group* Companies and Charities are presently located in the office suite behind the door marked as the door for Suites 110, 114, and 116 in the building at 555 Grove Street.  This belief is founded on the following facts.

127.   I visited 555 Grove Street and observed the office suite behind the door marked as the door for Suites 110, 114, and 116 to be one common suite.  I entered the office from the office building's hallway through the one door jointly listing *Mar-Jac Investments, Inc.*, *Reston Management, Inc.*,  and *Sterling Management Group, Inc.* at Suites 110, 114 and 116,

89

respectively, and found the interior office space to be a common area with a common

receptionist desk.  I saw various offices inside the common area, but there was no differentiation

between the companies, nor numbers on the various office doors; instead, there were only names

of individuals on placards at the offices within the suite.

128.  According to the most recent IRS Forms 990 filed by the *Safa Charities*, the records

of the *African Muslim Agency*, *SAAR Foundation*, *Safa Trust*, *Sterling Charitable Gift Fund*, and

*York Foundation* are all located at 555 Grove Street, Herndon, Virginia, under the care of *Mirza*.

The address for *African Muslim Agency* as shown on the front of the 1997 IRS Form 990 is 555

Grove Street, Suite 110.  The address for the *Sterling Charitable Gift Fund*, as shown on the

front of the 2000 IRS Form 990 is 555 Grove Street, Suite 116.

129.    First Union National Bank records reflect that statements for bank accounts in the names

of the following *Safa Group* entities are being mailed to 555 Grove Street, Herndon, VA 22070:

| *Safa* Company | Date of Statement Seen |
|---|---|
| *African Muslim Agency* | 1/31/01 |
| *Reston Investments*, *Inc.* | 12/31/01 |
| *Mar-Jac Investments* | 12/31/01 |
| *SAAR Foundation*, *Inc.* | 9/28/01 |
| *Sterling Charitable Gift Fund* | 12/31/01 |
| *Safa Trust*, *Inc.* | 12/31/01 |
| *Sterling Management Group*, *Inc.* | 12/31/01 |

130. IRS Exempt Organization Specialists Michael Bieloski and Eugene Gilmartin

recently advised IRS-CI special agents that, in June 2000, they personally met with *Mirza* and

the *SAAR* return preparer at 555 Grove Street in the course of conducting an audit of *SAAR*

*Foundation*, and, in a conference room at that location, received from them various records –

including computer records  – and observed a computer in the office.

2.    500 Grove Street

90

131.  According to the IRS Form 990 filed by *IIIT* on November 20, 2001, the records of *IIIT* are maintained at 500 Grove Street, 2nd Fl., in Herndon, Virginia, in the care of Beverly *Hassan. IIIT* is on file with the Virginia Secretary of State as an active corporation domiciled at 500 Grove Street, Suite 114, Herndon, Virginia.  In January 2002, an IRS special agent made a pretext telephone call to the publicly listed number for the *IIIT*.  A woman answered the telephone with the words "*IIIT* " and advised the agent that the company had recently moved to the second floor of 500 Grove Street.

3.    750-A Miller Drive SE, Leesburg, Virginia

132.  The location 750-A Miller Drive SE, Leesburg, Virginia is the office of *Heritage Education Trust*, *FIQH*, and *GSISS*.  *Heritage* filed a Form 990 on October 16, 2001 which represents that its corporate records are located at 750-A Miller Drive SE, Leesburg, Virginia. According to Virginia Secretary of State Corporation Commission records, the *Heritage Education Trust*, *Inc.*, *Heritage Holdings*, *Inc.*, *SISS*, and *FIQH* are located at 750-A Miller Drive SE, Leesburg, Virginia.

133.  In January 2002, government agents followed a gray 1999 Chrysler Concord bearing Virginia registration, ZHT 5636, from the residence of *Al-Alwani* at 1105 Safa Street in Herndon, to 750-A Miller Drive in Leesburg.  Virginia Department of Motor Vehicles ("DMV") records reflect the vehicle is registered to *SISS* at 750-A Miller Drive, Leesburg, Virginia.

134. IRS Information Returns for the year 2000 reflect that *Jaghlit* Family Trust No. 1 and *Jaghlit* Family Trust No. 2 both reflect the address of 750-A Miller Drive, SE, Leesburg, VA 20175.  As noted above, the records of *Jaghlit* Family Trust No. 1 are relevant to any determination of personal income tax evasion by *Jaghlit*.

4.    The Administration Offices of *Mar-Jac Poultry*

91

at 1020 Aviation Boulevard, Gainesville, GA

135. *Mar-Jac Poultry* is headquartered at 1020 Aviation Boulevard, Gainesville, Georgia. On February 13, 2002, INS SA Beamish spoke with *Mar-Jac Poultry* personnel manager Don Bull under the pretext of learning where immigration records were maintained. Bull told SA Beamish that the company's corporate and financial records were maintained in the administrative offices in a one-story building with a sign on it reading "Administrative Offices."

B.    Residences

136. Based on my experience as a criminal investigator, individuals typically keep personal financial records in their residence. The records include bank records, investment records, records of purchases, records of expenditures, loan documentation, IRS information returns (e.g, W-2s, 1099s, 1098s, etc.) as well as other financial documents. Individuals also typically keep retained copies of their tax returns in their residence along with supporting schedules and documentation.

137. Through my participation on this investigation, I am aware of the addresses where paper and electronic records are kept concerning the money laundering and terrorist support activities of the conspirators and the organizations that they use. These records are stored at business and charity locations, as well as residences. Based upon my training and experience, I know that individuals commonly keep, store, and maintain records of organizations in which they are members or officers at their residence as well as their offices. Individuals involved in "layering" schemes, especially when these schemes include organizations with little or no physical presence, will commonly use their residence as a base of operations, from which they conduct their daily illegal activities.

92

138. I have spoken with INS Senior SA William West, who as explained above executed search warrants in November 1995 at the residence of *Al-Arian*, and the office locations of *ICP* and *WISE*. SA West related to me that upon executing the search warrants, he found that the documents relating to *Al-Arian*'s terrorist affiliations, which had been seized at *Al-Arian*'s residence, were roughly equal in number and importance to the criminal case as the documents seized at the business locations. Furthermore, SA West told me that he seized more documents at the residence relating to foreign terrorist connections. It is SA West's opinion that the residences of terrorists and their supporters are just as likely to contain records of contacts with terrorists, operative documents, and other related material in their homes as in their businesses.

139. In this matter, the history of the *Safa Charities* and the past investigations of it and the entities in Tampa, Florida, increase the probability that important evidence will be stored off the business premises. The *Safa Charities*' activities first came under scrutiny in the aftermath of the search warrants executed at the offices of *WISE/ICP* and the residence of *Al Arian* in 1995. Thereafter, *Mirza* complained that the press was getting too probing in 1995-96. *Mirza* also related that one reason for moving assets of *SAAR* off shore was because of adverse publicity in 1997 and 1998 linking *SAAR* and *Safa* to terrorism. Eventually, in January of 2000, *Al-Alwani, Jaghlit*, and *Hassan*, were interviewed by the FBI in connection with a criminal investigation. This was followed closely by an IRS audit of *SAAR* and scrutiny of the final destination of the funds headed off shore. The principals of the *Safa Group* have every reason to believe that they are the subject of growing government scrutiny. In view of these circumstances, it is my experience that organizational records are even more likely to have been removed from office addresses and maintained at residences.

5.    The Residence of *Mirza* at 11922 Safa Court, Herndon, VA

140.  I know that the single-family dwelling at 11922 Safa Court, Herndon, Virginia, is

the residence of *Mirza*.  On April 5, 2001, *Mirza* signed his 2000 tax return, which listed his

personal address as 11922 *Safa* Court, Herndon, Virginia.  The Forms W-2 from *Mar-Jac*

*Investments, Inc.* and *Mar-Jac Poultry*, *Inc.* which were attached to his 2000 tax return also list

that as his address.  In January 2002, Fairfax County property records reflected that *Mirza* was

the owner of 11922 Safa Court, and Virginia Power identified him as the subscriber for

electricity at this address.  In addition, Virginia Power records show that *Mirza* listed his

employer as *Mar-Jac Investments Inc.*  Finally, *Mirza* is a registered officer or agent of three

businesses registered with the Virginia Secretary of State located at this same address.

141.  On February 4, 2002, a mail cover was obtained on the residence of *Mirza* at 11922

*Safa* Court to ascertain the senders of mail received at that address.  In February 2002 various

documents were found indicating that *Mirza* receives business mail at his house, including

correspondence for *Mar-Jac Poultry*, *Inc.* (for which *Mirza* is an officer); *Amana* (the Isle of

Man corporation that set up *Humana)*; and Amtrax Limited (a company that likely is related to

Amtrax Holding, Inc., an overseas company that, according to *Safa Trust*'s Form 990,

contributed $250,000 to *Safa Trust* in 1997).

6.    The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, VA

142. I know that the single-family residence at 9034 Swift Creek Road, Fairfax, Virginia

is the residence of Mohammad *Jaghlit*.  According to a January 2002 Virginia DMVs records

check, Mohammad Ali *Jaghlit* was issued a Virginia driver's license with a listed address of

9034 Swift Creek Road, Fairfax Station, Virginia.  In January 2002, government agents observed

94

a white Volvo with Virginia plates YNU8077 parked in the driveway of the residence near the

garage entrance.  According to Virginia DMV records, the vehicle's registered owners are Noor

and Mohammad Ali *Jaghlit* of 9034 Swift Creek Road, Fairfax, Virginia.

143. On February 4, 2002, government agents recovered trash thrown out from *Jaghlit*'s

residence at 9034 Swift Creek Road.  One document that was found was a fax, dated August 9,

2001, from the *HLF* in Gaza to the *HLF* in Richardson, Texas, containing notes of a meeting

ordering actions on various *HLF* projects.

7.     The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia

144.     I know that the single family dwelling located at 11919 Safa Court, Herndon, Virginia is

the residence of *Barzinji*.  A Fairfax County Police Department criminal history check revealed

that in November 2000, Jamal *Barzinji* was arrested at 11919 Safa Court, Herndon, Virginia, and

charged with Domestic Abuse and Resisting Arrest.  Fairfax County Police performed tax

records checks for that property and found records identifying *Barzinji* as the registered property

owner.  Moreover, while Jamal M. and Suzanne F *Barzinji*'s U. S. Individual Income Tax

Returns for the years 1996-2000 reflect the address 555 Grove Street in Herndon, the W-2 forms

attached to the returns reflect the address of 11919 Safa Court.  Finally, First Union records

reflect that address for the account of Jamal M. *Barzinji*, Suzanne F. *Barzinji*, and Suhaib

Al*Barzinji* on the statement for the period ending January 23, 2002.

8.     The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia

145. I know the single family dwelling at 1105 Safa Street, Herndon, Virginia to be the

residence of *Al-Alwani*   In January 2002, the Fairfax County Police performed tax records

checks finding that 1105 Safa Street, was owned by Al Alwani.  The Virginia DMV confirmed

that Al Alwani has a valid driver's license and that the address used on his license is 1105 Safa Street. In January 2002, Virginia Power information identified Al Alwani, the president of *IIIT*, as the subscriber for power at that address.

        9.      The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia

146. I know the single family dwelling at 305 Marjorie Lane, Herndon, Virginia to be the residence of Ahmad *Totonji*. In January 2002, Virginia Power information reflected that Ahmad M. *Totonji,* a Director of *IIIT,* and Maysoon *Al-Talib* were the subscribers for power at that location. Virginia DMV records reflect Ahmad *Totonji* was issued a Virginia driver's license with a listed address of 305 Marjorie Lane, Herndon, Virginia.

147. In January 2002, law enforcement agents working on the *Safa Group* investigation retrieved from trash discarded from the house at 305 Marjorie Lane a roster of *IIIT* employees with their telephone extensions and e-mail addresses. I know, therefore, that *Totonji* has recently maintained *IIIT* records in his house.

        10.     The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia

148. I know the single family dwelling at 12607 Rock Ridge Road, Herndon, Virginia to be the residence of *Iqbal Unus*. According to Virginia Secretary of State records, *Unus* is the registered agent of Education, Training and Research Associates of 12607 Rock Ridge Road, Herndon, Virginia. In January 2002, Fairfax County Police performed tax record checks for 12607 Rock Ridge Road and determined *Iqbal* and Aysha *Unus* as the registered property owners. In January 2002, Virginia Power identified *Iqbal* J. and Aysha A. *Unus* as active subscribers for that address, and identified *Iqbal Unus*' employment as the Director of Human Development for *Mar-Jac*, *Inc.*

149. On February 11, 2002, a trash run was conducted by government agents to recover refuse disposed of by the residents of 12607 Rock Ridge Road. Various documents were found indicating that *Unus* maintains records at his house, including June 7, 2001, correspondence for the *Amana Mutual Funds Trust*, of which *Unus* is a trustee.

150. On January 28, 2002, a law enforcement agent conducted an Internet registrant query on the domain name "*FIQH*COUNCIL.NET." The administrative and billing point of contact for this domain name is *Iqbal Unus* at the International Islamic Forum for Science, Technology, and Human Research Development (*IIFSTHRD*), 12607 Rock Ridge Rd., Herndon, Virginia 20170. *FIQH* and *IIFSTHRD* are *Safa Group* organizations.

    11.    <u>The Residence of *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA</u>

151. I know the single family dwelling at 12541 Browns Ferry Road, Herndon, Virginia, to be the residence of *M. Omar Ashraf*. Virginia Secretary of State records reflect that *Mohammad Omar Ashraf* is president of two corporations at this address. According to Virginia DMV records, *Mohammad Omar Ashraf* was issued a Virginia driver's license with a listed address of 12541 Browns Ferry Road. In January 2002, an IRS special agent observed three vehicles at that address, two of which Virginia DMV records reflected to be registered to *Mohammad Omar Ashraf* and Zahida P. Ashraf at that address; the third was registered to *Mar-Jac Poultry , Inc.*, at 555 Grove Street in Herndon. Finally, Virginia Power identified *Mohammad Ashraf* and Zahida Ashraf as active subscribers for power last month at 12541 Browns Ferry Road, and listed *Mohammad Ashraf*'s employment as the Project Manager for *Mar-Jac Investments Inc.*

97

12.    The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA.

*Muhammad Ashraf* is the registered agent of Enterprise Investment Group, Inc., a company incorporated on September 12, 2001, at 12528 Rock Ridge Road.  Further, in January 2002, Virginia Power identified an active subscriber account for this address in the names of *Muhammad* and Munawar *Ashraf,* and reflected *Muhammad Ashraf*'s employment as a legal writer for *Mar-Jac*.

CONCLUSION

152. I have probable cause to believe from the foregoing affidavit that the targets of this investigation identified in this affidavit have engaged in a long standing, ongoing pattern of criminal activity.   Further, I have probable cause to believe that evidence of these violations will be found in the business premises and residences for which warrants are sought.

153. Accordingly, based on the information outlined above, there is probable cause to believe that the items and records as set forth in Attachment B, attached hereto and incorporated herein, constituting evidence of violations of 18 U.S.C. §§ 371, 1956(a)(2)(A) and (h), 2339A, and 2339B, and 26 U.S.C. §§ 7201, 7206, and 7212 are contained within the premises and properties known as:

1.    555 Grove Street, Suites 110 through 116, Herndon, Virginia;

2.    500 Grove Street, 2nd Floor, Herndon, Virginia;

3.    750-A Miller Dr.  SE, Leesburg, Virginia;

4.    The Administration Offices of *Mar-Jac Poultry* at 1020 Aviation Blvd., Gainesville, Georgia;

5.    The residence of *Mirza* at 11922 Safa Court, Herndon, Virginia;

6.    The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, Virginia;

7.      The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia;

8.      The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia;

9.      The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia; and

10.     The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia;

11.     The Residence of  *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA;

12.     The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA

all of which properties are more particularly described in Attachment A, which is incorporated

herein.

WHEREFORE, your affiant requests that search warrants be issued pursuant to Rule 41

of the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

**SIGNATURE ON ORIGINAL**
DAVID KANE, Senior Special Agent
United States Customs Service

Subscribed to and sworn before me this ___ day of March 2002.

**SIGNATURE ON ORIGINAL**
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

Attachment A

1.      555 Grove Street, Office Suite Behind the Door
          Labeled 110, 114, and 116, Herndon, Virginia

555 Grove Street is a three-story brick, contemporary-style building with dark gray-tinted windows that extend continuously and horizontally along the length of the structure and each of the two floors that can be viewed from the street.   Just above each of the windows on each floor there is beige trim that also extends continuously and horizontally along the entire length of the building.   The building is marked by the numbers "555" in white directly above the front lobby door.  The door leading to the office suite behind the door marked as the door for Suites 110, 114, and 116 in that building has on it a brass sign listing Mar-Jac Investments, Inc. 110, Reston Management, Inc. 114 and Sterling Management Group, Inc. 116.

2.      500 Grove Street, 2nd Floor, Herndon, Virginia

500 Grove Street is a three story, beige and dark brown brick colored, contemporary style building on the north side of Grove Street approximately 1/10th of a mile east of the intersection of Grove and Van Buren Streets.   It has tinted windows that extend continuously and horizontally along the length of the structure and along each of the three floors viewable from the street.   The building is marked by the numbers "500" on the front of the building. The building directory lists IIIT (International Institute of Islamic Though) as being located on the second floor.

3.      750-A Miller Dr. SE, Leesburg, Virginia

The building known as  750-A Miller Drive, SE, Leesburg, Virginia is a two-story red brick building with gray bricks across the top and two horizontal lines of gray bricks as an accent, on the west side of Miller Drive approximately ¼ mile from the intersection of Miller Drive and Sycolin Road SE. The building, which houses multiple commercial offices, is located directly across Miller Drive from the Leesburg Airport. The main entrance to the building has glass double doors with the numerals and letter "750-A" in white above the doors on a large plate of glass.  Below "750-A" are white letters, which read, "School of Islamic and Social Sciences."  In the front of 750-A, on the lawn, there is a black sign with the numerals and letter, "750-A" a green square portion with white letters stating, "School of Islamic and Social Sciences."

4.      The Administrative Offices of Mar-Jac Poultry at 1020 Aviation Blvd.,
          Gainesville, Georgia

Mar Jac-Poultry, with an address of 1020 Aviation Blvd., Gainesville, Georgia, is located on the northwest corner of Aviation Boulevard SW and Dorsey Street SW in Gainesville,

1

Georgia, just west of the Gainesville Airport and Aviation Boulevard, SW,  south of the Georgia Department of Public Safety Drivers License Bureau, and east of railroad tracks.  The plant, surrounded by a chain link fence, is comprised of numerous white and yellow buildings made of prefabricated materials.  A brown tan stucco sign depicting a chicken with the letters "M/J" encased within a house-like emblem on its chest, and the words "Mar-Jac" written under the chicken, is located on the south end on the property facing Dorsey St., SW, just west of a gate into the property located on the SE corner of the property west of the intersection of Aviation Boulevard SW and Dorsey St. SW.  The Administrative Offices of Mar-Jac Poultry are located in (1) a one-story building with a sign on it reading "Administrative Offices," located near the gate at the Northeast corner of the property.  On the left side of the gate is a green and blue sign, with white letters, which reads, "All Visitors Must Report To Main Office".  The sign on the north side of the gate is a red sign with white letters that reads, "Administrative Offices Only  No Tractors-Trailers Allowed".  The sign on the south side of the gate is of faded tan color with white letters that reads, "Administrative Offices Only No Tractors/Trailers Allowed."

5.      The Residence of Mirza at 11922 Safa Court, Herndon, Virginia

The residence of Mirza is a beige-colored 1½-story house located at 11922 Safa Court, Herndon, Virginia 20170.  The house is in the Shaker West Subdivision, on the north side of Safa Court approximately 1/10[th] of a mile from the intersection of Safa Court and Safa Street.  The house is located next door to 11926.   A red and white fire hydrant is next to the mailbox, which has the number 11922 and the name "Mirza" on it.   The numbers 11922 are affixed to the house next to the garage.

6.      The Residence of Jaghlit at 9034 Swift Creek Road, Fairfax Station, Virginia

The residence of Jaghlit is located at 9034 Swift Creek Road, Fairfax, Virginia 22039.   A mailbox located at the very end of Swift Creek Road off of  a cul-de-sac, and is identified by the number 9034.   The site is a heavily wooded area and no house is visible from the cul-de-sac.  The mailbox is positioned at the beginning of a long sand and gravel winding driveway.   Two red "Posted - No Trespassing" signs are affixed to trees bordering the driveway.   The driveway becomes blacktop as it nears a house.   The house is a large two-story, symmetrical, modern design dwelling with large arch roofline over the center entrance.   The house has gray siding, with black window shutters.   Silver-colored stone surrounds the center area.   The front door is red and surrounded by white wood trim.   Brass numbers 9034 are vertically affixed to the white wood trim on the left side of the front door.   A large inter-county power line is to the left of the dwelling.   A two-car attached garage is on the right side of the dwelling with a white/cream colored garage door.

7.      The Residence of Barzinji at 11919 Safa Court, Herndon, Virginia

The residence of Barzinji is located at 11919 Safa Court, Herndon, Virginia 20170.   This residence is in the Shaker West Subdivision, on a pipe-stem private driveway off of Safa Court approximately 1/10[th] of a mile from the intersection of Safa Court and Safa Street.   The house is

a blue two-story wooden custom house with a brown front door with a large oval glass in the center.   Before this house, there is a green sign on the right side of a private driveway which reads "11919, 11921, 11923" identifying the three houses on that private driveway.   Houses 11921 and 11923 are identified by numbers affixed to the houses; house 11919 is the only house without a number and is located just past this sign, on the right side.

8.      <u>The Residence of Al-Alwani at 1105 Safa Street, Herndon, Virginia</u>

The residence of Alwani, is located at 1105 Safa Street, Herndon, Virginia 20170.   This residence is a contemporary two-story single family house situated on a semi-secluded lot, approximately ½ acre in size.   It is the first house on the right side of Safa Street as one enters Safa Street northbound from Sugarland Road.   The exterior of the house is constructed with tan siding and the front doors are gray.   The address, 1105, is reflected both on the house (to the right of the two car garage) and on the mailbox.

9.      <u>The Residence of Totonji at 305 Marjorie Lane, Herndon, Virginia</u>

The residence of Totonji is located at 305 Marjorie Lane, Herndon, Virginia 20170, approximately 1/10th of a mile to the east of the intersection of Marjorie Lane and Leona Lane. This structure is a two-story colonial with beige stucco front and a two-car garage.   Numbers #305 are affixed above the garage door.   The roof is made of three copper eaves.   The front door is a single door, brown in color with a brown gated storm door.   A brown mailbox is situated at the bottom of the driveway.

10.      <u>The Residence of Unus at 12607 Rock Ridge Road, Herndon, Virginia</u>

The residence of Iqbal Unus is located at 12607 Rock Ridge Road, Herndon, Virginia 20170.   The residence of is a two-story detached single family home with a two-car garage, immediately to the north of the intersection of Rock Ridge Road and Hawks Nest Court.   The home has light-yellow vinyl siding and a light-brown shingled roof.   The numbers 12607 are centered across the front porch of the residence.

11.      The Residence of Mohammad Omar Ashraf
           <u>at 12541 Browns Ferry Road, Herndon, Virginia</u>

The residence of  Mohammad Omar Ashraf is located at 12541 Browns Ferry Road, Herndon, Virginia 20170.   The residence is the last house on the left, prior to entering the cul-de-sac where the road ends.   The residence is a two-story colonial-style house with white siding, black shutters, a covered porch, and a blacktop driveway from the street leading to a two-car attached garage.  The number "12541" is on the curb of the residence, on the black mailbox located near the curb and on the house, to the right of the front door.

12.     The Residence of Muhammad Ashraf
            at 12528 Rock Ridge Road, Herndon, Virginia

The residence of Muhammad Ashraf is located at 12528 Rock Ridge Road, Herndon, Virginia 20170, between 12530 and 12526 on the north side of Rock Ridge Road between Cellar Creek Way and Dardanelle Road.   The residence is a two-story single family residence with an attached two-car garage, the seventh home from either Cellar Creek Way or Dandanelle Road on Rock Ridge Road.   The front of the residence is constructed of red brick on the lower half and yellow siding on the upper half.   The front windows have gray shutters.   The front entrance has a small stoop with a white post on the left.   The number "12528" is stenciled on the white post of the stoop.   A light post is located left of the driveway along the walkway toward the entrance of the residence.   A mailbox is located curbside left of the driveway of the residence.

4

Attachment B

**Items to be Seized**

a.    Any and all records including financial information, including tax returns and IRS filings, and any work papers related thereto; bank, credit or securities account statements, applications, deposit tickets, receipts, canceled checks, cashier checks, money orders, wire transfer records, debit/credit memos; financial ledgers, journals, investment records, real estate records, other records of assets; records of or related to contributions, grants or disbursements made or received, and/or allocations; loan records, financial statements, audit work papers, audit reports (or correspondence, transmittals or document related to any of the foregoing), regarding any or all of the following entities:

| | | |
|---|---|---|
| African Muslim Agency | International Institute of | SAAR International |
| Aradi, Inc. | Islamic Thought | Safa Trust |
| FIQH Council | Mar-Jac Holdings, Inc. | Sterling Charitable Gift |
| Grove Corporate, Inc. | Mar-Jac Investments, Inc. | Fund |
| Graduate School of Islamic | Mar-Jac Poultry, Inc. | Sterling Management |
| Social Sciences (formerly | Mena Corporation | Group, Inc. |
| SISS) | Reston Investments, Inc. | York Foundation |
| Heritage Education Trust | SAAR Foundation | York International |
| Humana Charitable Trust | | |

and/or any other entity sharing officers, directors, trustees, or employees with the listed entities ("the Safa Group"), and/or any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

b.    Any and all information regarding financial transfers of any kind undertaken by any officer, director, trustee, or employee of any member of the Safa Group, and any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State. .

c.    Any and all information referencing in any way PIJ, Hamas, Al-Qaida, WISE, ICP, Sami Al-Arian, Basheer Nafi, Mazen al-Najar, Ramallah Shallah, Khalil Shikaki, Sheik Odeh, Sheik Rahman, Usama Bin Laden, and any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

d.    Any and all corporate records for any member of the Safa Group, including articles of incorporation, corporate/organizational minute books, stock certificates, membership rosters, lease agreements and applications.

e.    Any and all telephone bills and statements for any member of the Safa Group.

1

f.      Any and all travel records - including itineraries and tickets/ticket copies for any officer, director, employee, or trustee of any member of the Safa Group.

g.      Any and all correspondence referencing in any way PIJ, Hamas, Al-Qaida, WISE, ICP, Sami Al-Arian, Basheer Nafi, Mazen al-Najar, Ramallah Shallah, Khalil Shikaki, Sheik Odeh, Sheik Rahman, Usama Bin Laden, and any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

h.      Any individual income tax returns or other tax returns, and drafts or work papers or documentation related thereto,  for or related to any officer, director, trustee or employee of the *Safa Group*.

i.      Any and all financial documents related to the individual tax returns or other tax returns of Al-Alwani, M. Omar Ashraf, Muhammad Ashraf, Jaghlit, Barzinji, Totonji, and Mirza, and the returns of the Mirza Revocable Family Trust, Mirza Family Partnership, Jaghlit Family Trust No. 1, Jaghlit Family Trust No. 2.

j.      Immigration documents related to WISE, ICP, Sami Al-Arian, Ramadan Shallah, Basheer Nafi, Mazen al-Najar, Khalil Shikaki, PIJ, HAMAS, Al-Qaida, any director, officer, trustee, or employee of any member of the Safa Group, and any individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

k.      Pamphlets, leaflets, booklets, video and audio tapes related to IIIT, WISE, ICP, Sami Al-Arian, Ramadan Abdullah Shallah, Mazen al-Najar, Khalil Shikaki, Basheer Nafi, PIJ, HAMAS, Al-Qaida, any officer, director, or employee of any member of the Safa Group, or any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State, and any member of the Safa Group.

l.      Personnel records identifying employees of WISE, ICP, or any member of the Safa Group, the dates of their employment, their areas of responsibility, and reasons for termination.

m.      Diaries, organizers, day planners, appointment books, telephone message pads, address books and the like, for any any director, officer, trustee, or employee of any member of the Safa Group.

n.      All identification documents reflecting the use of an alias, fictitious, or nominee name, including passports, social security cards, immigration papers (to include but not limited to green cards, work permits, visa) drivers license (domestic or foreign), and state identification cards (domestic or foreign).

2

o.      Contents of safes, lock boxes, file cabinets and other locked containers within the business and/or residence and information or keys regarding safe deposit boxes.

p.      All computer and network equipment and peripherals, the software to operate them, and related instruction manuals to include the items listed below:

q.      Any and all information and/or data stored in the form of magnetic, digital, or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment.  This media includes but is not limited to floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, and any other media, which is capable of storing magnetic coding.

r.      Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include but are not limited to computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

s.      Any and all instructions or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer, or related components.  The items to be seized could include but would not be limited to operating systems, application software, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, DSL lines, cable lines, radio or other means of transmission.

t.      Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device.