# Exhibit 2

*Amended by Order of The Hon. Mr Justice Eady dated 21 July 2003*

**IN THE HIGH COURT OF JUSTICE      CASE NO. HQ 02X00924**
**QUEEN'S BENCH DIVISION**

**BETWEEN:**

### AL RAJHI BANKING AND INVESTMENT CORPORATION

<u>*Claimant*</u>

***and***

### THE WALL STREET JOURNAL EUROPE SPRL

<u>*Defendant*</u>

_____

### RE-AMENDED DEFENCE

_____

1.  It is admitted that the Claimant is a banking corporation, incorporated in Saudi Arabia as set out in para. 1 of the Particulars of Claim.  No admissions are made about the Claimant's alleged substance or its alleged international operations and relationships.

2.  The Defendant will contend that the Claimant has no trading presence and/or no trading reputation in the jurisdiction and therefore has no standing to bring these proceedings and/or has not suffered any harm/injury caused by the publication.  For the avoidance of doubt, the Defendant's case is that Article 10 of the European Convention on Human Rights ("ECHR") does not permit the Claimant to rely on any presumption of damage to establish standing and/or harm/injury; alternatively that, as a foreign trading corporation with no trading presence and/or no trading reputation in the jurisdiction, the Claimant has not established any basis for any presumption of damage in this case.

3.  Para. 2 of the Particulars of Claim is admitted, save that no admissions are made as to the nature or extent of the influence of the WSJE within the jurisdiction.

4.  Para. 3 of the Particulars of Claim is not admitted.  The circulation and readership of the WSJE in mainland Europe is irrelevant.  The Defendant will contend that there has been no harmful publication within the jurisdiction.

5. It is admitted that the Defendant published the article "Saudi officials monitor certain Bank Accounts" (hereafter "the article") part of which is referred to in para.4 of the Particulars of Claim in the WSJE edition of 6 February 2002. The defence relies on the article in its entirety.

6. It is denied that the article conveys the meanings alleged in para. 5 of the Particulars of Claim, or any meaning defamatory of the Claimant.

7. Paras. 6 and 7 of the Particulars of Claim are denied.

8. Further or alternatively, if and in so far as the said words in their natural and ordinary meaning bore or were understood to bear the meaning that because of the nature of the Claimant's past association with persons or institutions reasonably suspected of links to terrorism there were reasonable grounds to suspect that the Claimant had been knowingly or negligently involved in the funding of terrorist-related activity and/or may in the future allow use of its accounts for such funding, they are true in substance and in fact.

### *PARTICULARS OF JUSTIFICATION*

*There is no definitive English translation of Arabic names because they do not transliterate easily or consistently into English. The transliterations pleaded in this Defence should be read accordingly.*

### *The Claimant*

8.1. The Claimant is a Saudi Joint Stock Company. It was formed and licensed as a commercial bank pursuant to Royal Decree on 30 June 1987 and has its headquarters in Riyadh. The Claimant operates under Islamic principles, paying no interest on deposits, and with a "Shariah Board" to review investments and lending schemes in light of Shariah law.

8.2. The Saudi Arabian Monetary Agency ("SAMA") is the central bank of Saudi Arabia. Saudi Arabia's Banking Control Law of 1966 vests SAMA with wide supervisory powers for the purpose of regulating commercial banks in Saudi Arabia. These include powers to issue regulations, rules and guidelines in light of international and domestic supervisory developments, including in relation to money laundering and terrorist financing.

8.3.  At all material times Saudi Arabia has had international obligations in relation to curtailing or preventing money laundering and terrorist financing which have included and/or derived from the following to which the Defendant will refer:

8.3.1.  Saudi Arabia's membership of the International Monetary Fund ("IMF").

8.3.2.  Saudi Arabia's membership of the World Bank ("WB").

8.3.3.  Saudi Arabia's position as a shareholder of the Bank for International Settlements ("BIS").  In 1997, BIS issued the Basel Core Principles for Effective Banking Supervision which provide a global standard for prudential regulation and supervision.  They are supported by the IMF and WB and subscribed to by Saudi Arabia.  In October 2001 BIS issued the Basel Committee's Best Practice Directive: "Customer Due Diligence for Banks".

8.3.4.  In 1990, Saudi Arabia ratified the 1988 UN Convention against Illicit Traffic in Narcotics and Psychotropic Substances and in 1998 introduced rules for its implementation.

8.3.5.  Saudi Arabia's collaboration with the Financial Action Task Force ("FATF"), an intergovernmental body whose purpose is to combat money laundering. Saudi Arabia is a member of FATF through its membership of the Gulf Cooperation Council ("GCC").  In 1990, FATF drew up 40 recommendations ("FATF 40") in relation to money laundering which imposed obligations including to improve the identification of banking clients and the detection of suspicious transactions.  In May 1999, Saudi Arabia approved the implementation of FATF 40.  In October 2001, Saudi Arabia participated in and supported FATF's decision to make 8 special recommendations for immediate implementation.

8.3.6.  Wolfsberg 2000 Anti Money Laundering Principles.

8.3.7.  Saudi Arabia is a founder member of the G-20 Group of countries.  In November 2001, Saudi Arabia took part in the G-20 Meeting in Ottawa and supported its agreement to implement UN measures to combat terrorist financing including by establishing Financial Intelligence Units ("FIUs").

8.4.    The Claimant is required to adhere to the obligations identified at 8.3 above. Further it is regulated and supervised by SAMA and is obliged to comply with SAMA directives, guidelines and advisories including in relation to money laundering, terrorist financing and "know your customer" requirements.   The Defendant will rely on the following:

8.4.1.    The Accounting Standards for Commercial Banks issued by SAMA in 1990;

8.4.2.    Conferences on Anti-Money Laundering hosted by SAMA in 1994 (in conjunction with FATF); 1996 (for the benefit of local and GCC related authorities) and in January 2002 in conjunction with law enforcement agencies; banking institutions and Interpol;

8.4.3.    Guidelines for Prevention and Control of Money Laundering Activities were issued by SAMA to all Saudi Banks in 1995.  These guidelines responded to the FATF 40 recommendations by implementing "know your customer" rules and to ensure that suspicious transactions are maintained and reported to law enforcement officials and to SAMA.

8.4.4.    International Accounting Standards ("IAS").

8.4.5.    Since 1999, the Claimant has been required to cooperate with SAMA in respect of investigations into terrorist financing and implementing the recommendations of the Financial Action Task Force.  The Claimant has admitted that it has cooperated with (and therefore received) requests from US and Saudi governments for information to help identify and capture those responsible for the September 11 terrorist attacks (statement made in US proceedings).

8.4.6.    According to the Claimant, in or about 2001 it implemented a reporting system with Anti Money Laundering applications.

8.4.7.    In November 2001, the Governor of SAMA attended the IMF meeting in Ottawa and joined in an anti-terrorist funding communiqué.

8.5.    As pleaded at paragraph 9.1 below, and as substantially admitted in paragraph 3 of the Reply, terrorism, specifically terrorism perpetrated in the name of Islam, has at all material times been a worldwide problem of pressing international

concern.    Particularly since the atrocities perpetrated in New York and Washington DC on 11 September 2001 ("the events of 9/11") the need to prevent such terrorists from receiving financial support or assistance through the banking and financial systems has been the subject of international action, public interest and worldwide media coverage.

8.6.    Consistent with the obligations, directions, guidelines, advisories and concern referred to above, the Claimant had a duty to monitor publicly available information about customers and to take immediate action in the event of a suspicion that any account was being used to get funds to terrorists to or through 'front' charities.  The Claimant has officers in its compliance department to whom are delegated 'compliance' functions.  Such officers may make decisions on such matters to Board level.

8.7.    The Claimant is majority controlled by the **Al Rajhi** family who derive from it much of their immense wealth.  At all material times family members constituted the majority of the Board of Directors and Executive Committee.  The Chairman, managing director and largest stakeholder was **Sulaiman Abdul Aziz al-Rajhi**.  His brother, **Saleh Abdul Aziz al-Rajhi**, had the second largest shareholding and was a director.  Saleh is referred to in the article complained of but has not brought a claim.  Other members of the Claimant's Executive Committee included **Abdullah Sulaiman Al Rajhi**, who sat on its Executive Committee from about 1993 and has been the Claimant's General Manager from about 1996.  The Defendant relies on the activities of members of the Al Rajhi family as pleaded below in support of its case at paragraph 8 above and in support of its case that their activities inevitably reflect and have reflected upon the reputation and standing of the Claimant.

8.8.    Wahhabism is the established form of Islam in Saudi Arabia.  Wahhabism is a fundamentalist movement founded in the eighteenth century.  It enjoins literal adherence to the Qu'ran and has an aggressive programme for spreading its puritanical form of Islam into other Muslim communities and countries.  **Sulaiman Abdul Aziz al-Rajhi** and the other members of his family are strict followers of this austere and proselytising form of Islam.

*Terrorist entities*

8.9.    ***Usama bin Laden*** is the leader of the terrorist organisation known as ***Al-Qaeda***, (meaning "the Base").  As early as 1979, bin Laden began raising money for the mujahideen forces fighting the Soviet Union in Afghanistan.  From the mid-1980s he established camps in Afghanistan to train volunteers to fight the Soviet army and, subsequently, other targets, in particular, US military personnel and civilians world-wide.

8.9.1.    In 1991 Bin Laden went to the Sudan and set up military-style training camps which many young Saudis attended.  After the 1991 Gulf War, members of Al-Qaeda were told by bin Laden that it was their duty and the duty of every Muslim to drive Americans from Saudi Arabia and kill them.

8.9.2.    In February 1993, a bomb attack on the World Trade Centre in New York took place.  At the resulting trial, Al Qaeda's global jihad purpose was widely reported.

8.9.3.    In 1993, Al-Qaeda endeavoured to kill US forces engaged in Operation Restore Hope in Somalia.

8.9.4.    On 7 April 1994, the Saudi government publicly announced that bin Laden was being deprived of Saudi citizenship for behaviour that "was harming its relations with fraternal countries" and his assets within the Kingdom were frozen.  It was widely reported that this publicity was a signal to Saudi tycoons to stop supporting militant groups under the guise of donating or assisting donations to "charity"; see Youssef Ibrahim, New York Times, April 8, 1994, p.1 and 3 – widely disseminated in Saudi Arabia.

8.9.5.    Bin Laden has issued a series of fatwas that have declared jihad (meaning "holy war") on the US.  Successive fatwas escalated, in tone and scale, the holy war to be waged against the US.  The last major fatwa, issued in February 1998, demanded that Muslims all over the world kill Americans and their allies, military or civilian, wherever they may be. Their allies have been explicitly identified to include UK citizens.

8.9.6.    In August 1998, on the 7th anniversary of the despatch of American troops to Saudi Arabia in response to the Iraqi invasion of Kuwait, members of Al-

Qaeda bombed the US embassies in Kenya and Tanzania killing 258 people and injuring more than 5,000.

8.9.7.  On 21 August 1998, the President of the United States signed an Executive Order blocking the assets of Usama bin Laden and his terrorist cells, including Al Qaeda, as terrorists threatening the Middle East Peace Process.

8.9.8.  In 1999, the United Nations imposed economic sanctions on the Taliban regime in Afghanistan for harbouring bin Laden, and many nations, including the US and the UK, have frozen assets owned by bin Laden and his senior associates.

8.9.9.  In October 2000, Al Qaeda was responsible for a bomb attack on the USS Cole in Yemen.

8.9.10.  On 11 September 2001, Al Qaeda organised multiple plane hijackings and co-ordinated attacks on the World Trade Centre and the Pentagon in the USA causing the deaths of nearly 3,000 civilians from all over the world ("9/11").

8.9.11.  On 23 September 2001, in direct response to the terrorist acts on 9/11, the President signed Executive Order 13224, which ordered the blocking of property of, and prohibition of transactions with, persons who commit, threaten to commit, or provide financial or other support to terrorism.  The list of these "specially designated global terrorists" or terrorist organisations (SDGTs) included Usama bin Laden and Al Qaeda.

8.10.  Palestinian Islamic Jihad ("*PIJ*") was founded in the late 1970s in Egypt.  It is committed to the creation of an Islamic Palestinian State and the destruction of Israel.

8.10.1.  *PIJ* militants have carried out suicide bombing attacks against targets in the West Bank, Gaza Strip and Israel.

8.10.2.  On 7 October 1997 the US Secretary of State designated *PIJ* as a "foreign terrorist organisation" under the Anti-Terrorism Act 1996 (s.219).  As a result of this designation it became illegal for any person within the US or subject to its jurisdiction to provide material support or resources to *PIJ*.

FSI-1860959-1

8.10.3.    Its main faction is proscribed in the UK.

8.10.4.    Organisations which have served as fronts for **PIJ** include World Islamic Studies Enterprise ("**WISE**") funded from 1991 onwards by the **International Institution of Islamic Thought** ("**IIIT**"), which is in turn funded by the **SAAR Foundation** and **SAFA Trust Inc**.   All three are located at 555 Grove Street, Herndon, Virginia as pleaded below.

8.11.    The facts and matters pleaded under 8.9 to 8.10 above were either known to the Claimant or, being matters substantially in the public domain, should have been known to it.

**Banking facilities**

8.12.    As is well known to banking institutions such as the Claimant, terrorist funding comes in large measure through "charities" set up with the real object of disguising transfers to terrorist groups or providing compensation to families of terrorists killed in terrorist action.

8.13.    The Claimant, in breach of its duty, continued to provide banking facilities for (including special accounts for the public to donate to) the following "charitable" organisations notwithstanding that they had been publicly and credibly accused of providing terrorist support, and the Claimant allowed itself to be advertised widely in the Saudi and foreign (Arabic) media as providing such accounts.   The Claimant provided facilities and various banking services to the following entities:

8.13.1.    The Muslim World League ("**MWL**").

8.13.2.    The International Islamic Relief Organisation ("**IIRO**").

8.13.3.    **Al Haramain** Islamic Foundation ("**Al Haramain**").

8.13.4.    World Assembly of Muslim Youth ("**WAMY**") and

8.13.5.    The Saudi Joint Relief Committee ("**SJRC**").

8.14.   The Defendant sets out below its case as to each of these five entities and as to the information that was publicly available concerning each of them, including in the media, of a kind that ought to have been seen, monitored, investigated and checked by the Claimant through its compliance department and/or by virtue of its own monitoring of media stories about itself.

8.15.   ***MWL***.

   8.15.1.   As to ***MWL***:

      8.15.1.1.   ***Wa'el Julaidan***, a close associate of Bin Laden and notorious since 1991 as being one of the 3 founders of Al Qaeda, served as head of ***MWL*** in Pakistan and as Secretary General of the ***Rabita Trust***. ***Julaidan***'s role and support for global jihad was described in the book "The Arab Volunteers in Afghanistan", commissioned by ***Adel Batterjee***, a co-founder of Al Qaeda (second edition published 1991). ***Julaidan***'s support for Bin Laden was also reported in an Egyptian national newspaper, widely circulated in the Middle East, Rose Al-Yusif, issue no. 3388.  His role in "opening up the Arab world to prod for jihad" along with Bin Laden and Azzam, was admitted by Bin Laden in his 1999 Al-Jazeera interview - "We were all in one boat"  (full translation supplied by BBC Worldwide Monitoring, in September 22, 2001).

      8.15.1.2.   ***MWL*** is parent to the ***Rabita Trust***. The ***Rabita Trust*** was designated by the US Government as a Specially Designated Global Terrorist ("SDGT") on 12 October 2001 and its assets were frozen. The ***Rabita Trust*** was described in a press release by US Treasury on 14 October 2001, as follows "***Rabita Trust*** is headed by ***Wa'el Julaidan***, one of the founders of Al Qaeda with bin Laden.  He is the logistics' chief of bin Laden's organisation and fought for bin Laden's side in Afghanistan".  SAMA instructed Saudi banks to search for and freeze the accounts of individuals and entities designated by the US Government on 12 October 2001.

      8.15.1.3.   ***MWL*** is also parent to ***IIRO***, referred to below.

8.15.1.4.  **Abdullah al Obaid** also served as Secretary General of **MWL**.  He was employed as Deputy General Manager of al Watania Poultry, a substantial Saudi company, owned by the Al Rajhi family.

8.15.1.5.  **Wadih El-Hage**, was arrested in 1998 for his role in the US Embassy bombings in Kenya and Tanzania and convicted for those offences in 2001.  Coverage of his trial reported his evidence that he worked as Bin Laden's personal assistant and that he worked for **MWL** in Pakistan.

8.15.1.6.  In May 2000, **MWL** was credibly accused by TASS - the Russian Government news agency - of assisting Chechen Fighters.  **Abdullah al Obaid** was named in that accusation.

8.15.2.  Pending disclosure, the Defendant will rely on the following bank accounts bearing the numbers (excluding any modulus or checking variations) and names set out below which the Claimant provided to **MWL** and which were featured in advertisements and/or in the press:

8.15.2.1.  22 – zakat (shared with **IIRO** and **SJRC**).

8.15.2.2.  23 – Sadaqah (shared with **IIRO** and **SJRC**).

8.15.2.3.  27 – Kosovar Muslims (shared with **IIRO**).

8.15.2.4.  33 – General donations (shared with **IIRO** and **SJRC**).

8.15.2.5.  45 – orphans Kosovo (shared with **IIRO** and **SJRC**)

8.15.2.6.  48 – zakat (shared with **IIRO** and **SJRC**).

8.15.2.7.  49 – General donations (shared with **IIRO** and **SJRC**).

8.15.2.8.  3322 – Joint Kosovo Relief Committee (shared with **IIRO** and **SJRC**).

8.15.2.9.  4600 – Sanabel al Kheir (shared with **IIRO**).

8.15.2.10. 32060801008700 – orphans

8.15.2.11. 32060801008701 – Education

8.15.2.12. 32060801008702 – Muslim minorities

8.15.2.13. 32060801008703 – Qu'ran

8.15.2.14. 32060801008704 – Da'wa

8.16.  **IIRO**:

8.16.1.  **IIRO** is another offshoot of the **MWL** with connections to **MWL, Rabita Trust** and **SJRC**.

8.16.1.1.  Offices of **MWL** and **IIRO** are often at the same location (e.g. 555 Grove Street – see below) and run by the same individuals.

8.16.1.2.  Like **MWL**, **IIRO** was extensively used by the mujahideen during the Soviet-Afghan war.

8.16.1.3.  At all material times, **Sanabel al-Kheer Inc**. was the investment arm of the **IIRO**.  **Sanabel al Kheer Inc** was established in Virginia in 2000 with **Abdallah al Obaid** as its President.   Its registered agent was **Yaqub Mirza** (President, **SAAR**) and its registered office was 555 Grove Street, Herndon, Virginia.

8.16.1.4.  **IIRO** was banned from Kenya in September 1998 as a result of national security concerns following the 1998 terrorist attacks on the US embassies in Kenya and Tanzania.  **Wadih el Hage** was found with documentary evidence connecting him to **IIRO**.

8.16.1.5.  **IIRO**'s head in Pakistan was **Mohammed Jamel Khalifah**.

8.16.1.6.  **Abdullah al Obaid** was President of the **IIRO** Executive Council in 1998 and in or about October 1998 publicly announced the members of the new Executive Council who included **Sulaiman Abdul Aziz Al Rajhi**, the Chairman, Managing Director and largest shareholder of the Claimant.  Accordingly, over and above the publicly available information identified in this paragraph, the Claimant, through its Chairman and Managing Director, had inside information about **IIRO**.

8.16.1.7.  Given these intimate connections between the **IIRO**'s investment arm and its Executive Council and the Claimant's Chairman, Managing Director and largest shareholder and the Al Rajhi family's employee, **Al Obaid**, and the family's **SAAR** associate, **Mirza**, the Claimant must have known or have been in a position to know (had it chosen to investigate) the suspicions which attach to **IIRO**.

8.16.1.8.  The Defendant will also rely on:

8.16.1.8.1.     Reports in the Arab press of an ***IIRO*** conference in December 2000 at which Prince Abdul Majeed called for those who wished to help the "al Aqsa intifada" (i.e. for terrorist attacks on Israel) to do so through ***IIRO***.

8.16.1.8.2.     Statements in "The Arab Volunteers in Afghanistan" (published in 1991 by ***WAMY***) that indicate that ***IIRO*** was used by Al Qaeda to obtain money for the purchase of weapons.

8.16.1.8.3.     Allegations in 2001 by *Janes Intelligence Review* that 70% of ***IIRO*** funds in the Philippines (its branch office having been run by bin Laden's brother in law) went "towards the purchase of weapons and equipment for Abu Sayyaf", a terrorist organisation.

8.16.1.8.4.     Reports in the *Washington Post* in September 2001 that ***IIRO***'s Secretary General admitted that the organisation had donated US$60 million to the Taliban.

8.16.1.8.5.     Steps publicly taken by the Kenyan government after the 1998 bombings to put ***IIRO*** under investigation, and to suspend its operations on suspicion of complicity in the bombing.

8.16.1.8.6.     Evidence presented in Court by the Canadian Government, in December 2001, to justify deportation of ex ***IIRO*** employee, Mahmoud Jaballah, to the effect that ***IIRO*** "secretly funds terrorism"

8.16.1.8.7.     An Intelligence Online report in September 2001 that ***IIRO*** was a supporter of Al Qaeda.

8.16.1.8.8.     Reports of the deportation of ***IIRO*** members in Pakistan, September-November 2001, because they were allegedly funding/conspiring with Al Qaeda.

8.16.2.    Pending disclosure, the Defendant will rely on the following bank accounts bearing the numbers (excluding any modulus or checking variations) and

names set out below which the Claimant provided to *IIRO* and which were featured in advertisements and/or in the press:

8.16.2.1.   22 – zakat (shared with *MWL* and *SJRC*).

8.16.2.2.   23 – Sadaqah (shared with *MWL* and *SJRC*).

8.16.2.3.   27 – Kosovar Muslims (shared with *MWL*).

8.16.2.4.   33 – General donations (shared with *MWL* and *SJRC*).

8.16.2.5.   45 – orphans Kosovo (shared with *MWL* and *SJRC*)

8.16.2.6.   48 – zakat (shared with *MWL* and *SJRC*).

8.16.2.7.   49 – General donations (shared with *MWL* and *SJRC*).

8.16.2.8.   3322 – Joint Kosovo Relief Committee (shared with *MWL* and *SJRC*).

8.16.2.9.   4600 – Sanabel al Kheir (shared with *MWL*).

8.16.2.10. 5999 – Afghan Refugees

8.16.2.11. 15015 – Palestine.

8.16.2.12. 77700.

8.16.2.13. 77702 – Somalia Account.

8.16.2.14. 77722 – Multi Kosovo relief

8.16.2.15. 77755 – Somalia account.

8.17.   **Al Haramain:**

8.17.1.   This organisation has its headquarters in Riyadh, Saudi Arabia.

8.17.1.1.   **Al Haramain** was banned from Kenya in September 1998 as a result of national security concerns following the 1998 terrorist attacks on the US embassies in Kenya and Tanzania.

8.17.1.2.   It diverted "charitable funds" to terrorism in or about 2001, through its Somalia and Bosnia-Herzegovina branches.  This was the reason for their designation on 11 March 2002.  It was the first joint designation by the US and Saudi Arabian authorities.

8.17.1.3.   In May 2000, the Russian Federal Security Service publicly alleged that **Al Haramain** had, since 1997, provided funding to Chechen terrorists, and actually purchased arms and ammunition.  It released intercepts from **Al Haramain** communications with its representative in Chechnya which supported this accusation.

FSI-1860959-1

8.17.1.4. The allegations of the Russian Federal Security Service, including intercept details, were published throughout the world in May 2000. The Defendant provides examples from Agence France Presse; the Associated Press; What The Papers Say; RBC Network; TASS (which identified Abdullah bin Saleh al-Obaid as *MWL* head); and BBC Monitoring.  They were repeated in subsequent publications, for example, Interfax Russian News 7 July 2000, RBC Database 26 June 2000, BBC Worldwide Monitoring 25 June 2000, What The Papers Say 2 April 2001.

8.17.2. Pending disclosure, the Defendant will rely on the following bank accounts bearing the numbers (excluding any modulus or checking variations) and names set out below which the Claimant provided to *Al Haramain* and which were featured in advertisements and/or in the press:

8.17.2.1. 10.

8.17.2.2. 997 - Bosnia.

8.17.2.3. 9292 – Continuous Charity.

8.17.2.4. 10555 – *Al Haramain* Foundation General Account.

8.17.2.5. 10600 – Europe Committee.

8.17.2.6. 98998 – zakat.

8.18. **WAMY**:

8.18.1. The head of this organisation is ***Abdullah bin Laden***, a relative of Usama bin Laden.

8.18.1.1. Its Secretary General was ***Adel Batterjee,*** an Al Qaeda founder and operative.  Batterjee commissioned the book "The Arab Volunteers in Afghanistan" which contained Al Qaeda propaganda.  **WAMY** was the accredited publisher for this book.

8.18.1.2. It was formed in Saudi Arabia by ***Ahmed Totonji*** in the 1970s.

8.18.1.3. It is a part of ***SJRC***.

8.18.1.4.   Four of **WAMY**'s officers, **Ibrahim, Jaber, Barzinji** and **Sulayman**, founded the **SAAR** network company, the International Institute of Islamic Thought ("**IIIT**") referred to below.

8.18.2.   Pending disclosure, the Defendant will rely on the following bank accounts bearing the numbers (excluding any modulus or checking variations) and names set out below which the Claimant provided to **WAMY** and which were featured in advertisements and/or in the press:

8.18.2.1.   66.

8.18.2.2.   001090 – Public.

8.18.2.3.   2841 – Sponsor/support students.

8.18.2.4.   2842 – Education camps.

8.18.2.5.   2843 – Muslim Youth Committee.

8.18.2.6.   2844 – Trusts.

8.18.2.7.   2845 – Projects.

8.18.2.8.   2846 – Tax.

8.18.2.9.   5750 – **WAMY** Kosovo/reconstruction Kosovo.

8.18.2.10. 7600 – Sponsoring orphans.

8.19.   **SJRC**:

8.19.1.   **SJRC** was formed in or about 1999.

8.19.1.1.   **SJRC** is a composite which includes **MWL**, **WAMY**, **IIRO** and **Al Haramain**.

8.19.1.2.   The Claimant knew or ought to have known about the formation and composition of **SJRC** by reason of the following:

8.19.1.2.1.   As pleaded above, the Claimant's own Chairman and Managing Director was a member of the Executive Council of **IIRO** at the material time.

8.19.1.2.2.   Further, the components of **SJRC** were widely reported in the mainstream Arab press: see, for example, Arab News 18 April 1999, Saudi Gazette 19 April 1999, which set out the component organisations.   **WAMY** involvement with **SJRC** was

reported in Arab News, 7 Feb 2000.  **_IIRO_** involvement was reported in Arab News 24 January 2000.

8.19.1.2.3.   The Claimant's "know your customer" duties would include identifying its customer's organisational structure.

8.19.1.3.   **_SJRC_** is headed by **_Wa'el Julaidan_**.  It is the Defendant's case that the Claimant knew or ought to have known that **_Julaidan_** was a founder of Al Qaeda.

8.19.1.3.1.   The Defendant repeats the particulars set out above concerning **_Julaidan_** as to the information that was publicly available about **_Julaidan_**.

8.19.1.3.2.   Further, as a member of the Executive Council of **_IIRO_**, a component member of **_SJRC_**, it is inconceivable that Sulaiman Abdul Aziz Al Rajhi did not know of **_Julaidan_**'s role.

8.19.1.3.3.   For media references to **_Julaidan_** as Bin Laden's accomplice <u>and</u> former director of **_SJRC_**, see BBC Online 3 April 2000 and "The Scotsman" 5 April 2000.

8.19.1.3.4.   **_Julaidan_** is a well-known public figure in Saudi Arabia, and in a bank with c. 6,000 employees, many would have known of him.

8.19.1.4.   The organisation's Kosovo headquarters were raided by the UN's K-FOR police in March 2000, and this raid also received world-wide publicity including from the BBC.  The BBC publicised an intelligence document which it said was prepared by US agencies and supplied by the US government to the UN, and reported that "It claims Adel bin Kazem and **_Wa'el_** Hamza Jalaidan, the Committee's (ie **_SJRC_**'s) former Director, are 'associates of Usama bin Laden' and that Mr Jalaidan helped Bin Laden 'move money and men to and from the Balkans'"... (BBC News 3 April 2000).

8.19.1.5.   These matters put the Claimant on notice of the terrorist potential of services it was providing to **_SJRC_** and its components, namely **_WAMY_**, **_IIRO_**, **_MWL_** and **_Al Haramain_**.

8.19.2.    Pending disclosure, the Defendant will rely on the following bank accounts bearing the numbers (excluding any modulus or checking variations) and names set out below which the Claimant provided to *SJRC* and which were featured in advertisements and/or in the press:

8.19.2.1.   22 – zakat (shared with *MWL* and *IIRO*).

8.19.2.2.   23 – Sadaqah (shared with *MWL* and *IIRO*).

8.19.2.3.   33 – General donations (shared with *MWL* and *IIRO*).

8.19.2.4.   45 – orphans Kosovo (shared with *MWL* and *IIRO*)

8.19.2.5.   48 – zakat (shared with *MWL* and *IIRO*).

8.19.2.6.   49 – General donations (shared with *MWL* and *IIRO*).

8.19.2.7.   3322 – Joint Kosovo Relief Committee (shared with *MWL* and *IIRO*).

8.19.2.8.   5888 – Kosovo Relief Committee.

8.20.    The Defendant's case is that the Claimant in the past provided extensive banking services to *MWL, IIRO, Al Haramain, SJRC* and *WAMY*, notwithstanding its capacity for knowledge of the likelihood that some money deposited in these accounts would be funnelled to support terrorist activity.  Save possibly for *Al Haramain*'s Bosnian and Saudi branch it has taken no action, so far as the Defendant is aware, to suspend or to close or even to investigate these accounts, and this failure to act in the circumstances set out above was contrary to the 'due diligence' duties imposed on the bank by SAMA, FATF and other international banking rules and recommendations also pleaded above.

**SAAR**

8.21.    The Al Rajhi family is the biggest donor to the *SAAR Foundation ("SAAR")*. *SAAR* was incorporated in Herndon, Virginia as a non-profit organisation on 29 July 1983 and voluntarily dissolved on 28 December 2000.  It was incorporated and located at 555 Grove Street, Herndon, Virginia.

8.22.    *SAAR* is an acronym for Sulaiman Abdul-Aziz Al Rajhi, the Chairman, Managing Director and majority shareholder of the Claimant.  *SAAR* is ultimately controlled by *Sulaiman and Saleh Al Rajhi*.  In support of this contention, and the contention at 8.22 above that the Al Rajhi family is the biggest donor to SAAR, the Defendant will rely on the following:

8.22.1.  A statement made by Yaqub Mirza of SAAR and reported in an authoritative publication, Business Dateline, for October 1988 that the Al Rajhi family was the biggest donor to SAAR.

8.22.2.  The SAAR Annual Report for 1991 listed "Sulayman A Al-Salih" as a Director.  His stated address was "PO Box 28, Riyadh, Saudi Arabia", which is the address of the Claimant.  He remained a director of SAAR in 1992.

8.22.3.  **Cherif Sedky** was appointed to the Board of SAAR in 1996 by the Al Rajhi family.  The Defendant will rely on a statement made by Cherif Sedky and reported in The New York Times for 25 March 2002 that "the Al Rajhi family had asked him to go on the [SAAR] because the family wanted to close it down".  Only a family in control of the SAAR Foundation could give such directions.

8.23.  Virginia Secretary of State corporate records show that a complex network of more than 100 intricately-linked and mutually-supporting organisations were based with the **SAAR Foundation** at 555 Grove Street.  This network is hereafter referred to as "the **SAAR Foundation Network**".

8.24.  Terrorist funding is difficult to trace.  It is disguised to protect both donors and recipients from detection by law enforcement.  One favourite method is to utilise a complex web of international companies to disguise the origin and destination of financial transfers and circumvent restrictions.  The complex **SAAR Foundation Network** of organisations at 555 Grove Street is consistent with this method.  It is the Defendant's case, for the reasons set out below, that

8.24.1.  There are reasonable grounds to suspect that that the **SAAR Foundation Network**, including **SAAR**, at 555 Grove Street is a vehicle to provide and facilitate funding for terrorist activities; and in any event,

8.24.2.  The organisations and individuals involved in the **SAAR Foundation Network** at 555 Grove Street provide further evidence of the many close connections between the Claimant, the Al Rajhis and terrorist-related activity.

8.25.  **SAAR** was operated by the following individuals who have held the following positions in **SAAR**:

8.25.1.   **Yacub Mirza** (President, Registered Agent, CEO and Trustee);

8.25.2.   **Mohammad Jaghlit**  (Treasurer and Director);

8.25.3.   **Cherif Sedky** (Secretary, Trustee and Director);

8.25.4.   **Hisham Al-Talib** (Registered Agent);

8.25.5.   **Jamal Barzinji** (Chairman; Secretary; founder trustee and incorporator);

8.25.6.   **Ahmed Totonji** (President and CFO).   **Totonji** was previously employed by the Claimant as an executive in charge of its Majlis-al-Shura branch when he was asked by **Saleh al Rajhi** to work with **SAAR** and with the **SAFA Trust**.   This oral agreement was made in Saudi Arabia on a date which the Defendant is unable to specify, when **Totonji** was an employee of the Claimant.   Documents supplied: "Terrorist Hunter" (Harper Collins), p.297-300.   It is the Defendant's case that **Totonji** executed the decisions of Sueliman and Saleh Al Rajih at **SAAR**.

8.26.   The Defendant's case as to the **SAAR Foundation Network** is as follows:

8.26.1.   Most of the **SAAR Foundation Network** organisations did not maintain a physical presence there, or elsewhere, and disclosed little information publicly.   The majority of the other organisations listed at 555 Grove Street had no advertisement, placard or, indeed, actual activity at 555 Grove Street.   Although many of the organisations were registered as charities, there were no indications that charities were located at the premises as required by Virginia State law.   They conducted no social gatherings, formal events or mailings seeking contributions. The majority of the charities/corporations were not identified in the directories of the building or listed in the Yellow Pages.   The **SAAR Foundation** and affiliated organisations occupy 3 small offices on the 3rd floor of a building in an office park situated in a residential area on the outskirts of Washington DC.

8.26.2.   The **SAAR Foundation Network** organisations at 555 Grove Street had intertwining and constantly changing directorships, with the same individuals serving as executives on the board of a number of companies. The **SAAR Foundation** was at the centre of this network, its operators performing multiple roles within the network  Thus:

8.26.2.1.   **Yacub Mirza** (President, Registered Agent, CEO and Trustee of **SAAR Foundation**) was also:

8.26.2.1.1.   President, CEO and Chairman of **Sterling Management Group** at 555 Grove Street;

8.26.2.1.2.   Vice President of **SAFA Trust Inc** at 555 Grove Street;

8.26.2.1.3.   Secretary/Treasurer of **MWL** which was listed at 555 Grove Street;

8.26.2.1.4.   Secretary/Treasurer of **Sanabel al-Kheer** at 555 Grove Street;

8.26.2.1.5.   Director of **Sana-Bell Inc** at 555 Grove Street;

8.26.2.1.6.   President, Secretary and Registered Agent and Treasurer of **Mar Jac Investment Inc** at 555 Grove Street;

8.26.2.1.7.   Secretary of **Mar-Jac Farms Inc** at 555 Grove Street;

8.26.2.1.8.   CFO and Secretary of **Mar-Jac Poultry** of 555 Grove Street;

8.26.2.1.9.    Secretary of **Mar-Jac Processing** at 555 Grove Street;

8.26.2.1.10.  Vice-President and Secretary of **Reston Investments Inc** at 555 Grove Street;

8.26.2.1.11.  Operator with others of **The African Muslim Agency**, the **Courtland Farm Conservancy Lots Homeowners Association Inc**; **Grove Corporate Plaza, International Islamic Charitable Organisation ("IICO")**, and **Makkah Mukarramah Charity Trust** all at 555 Grove Street.

8.26.2.2.   **Mohammad Jaghlit**  (Treasurer and Director of **SAAR Foundation**) was also:

8.26.2.2.1.   An officer of **IIIT.**

8.26.2.2.2.   Director and President of **Reston Investments Inc** at 555 Grove Street.

8.26.2.3.     **Cherif Sedky** (Secretary, Trustee and Director of **SAAR Foundation**) was also:

8.26.2.3.1.   The lawyer, close business associate and spokesman for **Khaled Bin Mahfouz.  Mahfouz**, a Saudi Arabian citizen, was placed under house arrest in 1998 by Saudi Arabian authorities for collecting substantial donations from other Saudi businessmen for the purposes of providing financing to Usama bin Laden and Al Qaeda.   The funds went to the **Blessed Relief**, a charitable front established to fund Usama bin Laden and Al Qaeda.  **Bin Mahfouz** was close to Usama bin Laden.

8.26.2.3.2.   Sedky was director of Yeminvest, a construction company owned by **Bin Mahfouz**, and operated at least three other businesses jointly as co-director with **Bin Mahfouz**.

8.26.2.3.3.   Secretary of Aradi Inc.  President of Aradi Inc was **Abdullah Sulaiman Al Rajhi,** General Manager of the Claimant.

8.26.2.3.4.   An officer of Courtland Farm Homeowners Association Inc at 555 Grove Street.

8.26.2.4.   **Jamal Barzinji** was President of **SAFA** Trust.

8.26.2.5.   In addition, listed as a secured party of **Mar-Jac Processing** of 555 Grove Street, was Solemagic SA care of **Cherif Sedky** and **Al Rajhi Company for Islam**.  Another secured party was the **SAFA Trust Inc**. of 555 Grove Street.

8.27.   Amongst the other organisations listed at 555 Grove Street were **IIRO**, **Sanabel-al-Kheer** and **IIIT.**

8.28.   The stated purpose of the **SAAR Foundation** was to fund anti-hunger, educational and technology projects in developing Islamic countries.  It had substantial funds and made substantial payments/donations but appears to have undertaken very little, if any, fund-raising activities contrary to its lawyer's representation to the Internal Revenue Service that "its source of funds will be general public rather than a very small group of donors and contributors…the general public will be regularly approached".

8.29.   Organisations, such as **SAAR**, which claim exemption from income tax are required, under penalty of perjury, accurately to complete and file Internal Revenue Service Form 990.  For the year 1998, **SAAR** completed and/or filed two Form 990s in respect of the same period:

8.29.1.   The first, purportedly signed by Mr **Mirza**, bearing a date of 14 May 2001 and purportedly prepared by Mr Qureshi, recorded donations of over US$1.78 billion.  This figure records the highest yearly total for a charitable organisation in US history.  However, **SAAR**'s profile was extremely low and there is no record of fund-raising events or publicity appeals for donations like most charities.

8.29.2.   The second Form 990, also purportedly signed by Mr **Mirza** but bearing the date of 27 February 2002 and also purportedly prepared by Mr Qureshi, records total donations for the period of nil.  Further, the second Form 990 makes no reference to the first Form 990 and provides no explanation for the whereabouts of over US$1.7 billion there recorded.

8.29.3.   The fact that **SAAR** completed and/or filed two conflicting and irreconcilable Form 990s itself affords, in context, reasonable grounds to suspect **SAAR** of involvement in the channelling of funds for terrorist purposes.

**SAAR**

8.30.   **SAAR** has to the knowledge of its operators contributed substantial funds in support of terrorist activity.  Pending disclosure herein, the Defendant will rely on the following:

8.30.1.   In 1993, **SAAR** made a donation of US$285,720 to **IIIT**.  According to **SAAR**'s filed Form 990 for 1993, signed by **Yaqub Mirza**, this was by far the largest donation made by **SAAR** in 1993.  The accompanying supplementary statement to **SAAR**'s Form 990 for 1993 stated that: "The objectives of the recipient organisations are not contradictory to the objectives of **SAAR Foundation**."

8.30.2.   Among the directors of **SAAR** in 1993 were **Jamal Barzinji**, **Ahmad Totonji, Yaqub Mirza** and **Mohammed Jaghlit**.

8.30.3.   **IIIT** made substantial donations to **WISE**.  Pending disclosure herein, the Defendant relies on a donation made by **IIIT** in 1994 of US$10,000 to **WISE**.  The accompanying supplementary statement to **IIIT**'s Form 990 for 1994 stated that: "The objectives of the recipient organisations are not contradictory to the objectives of **IIIT**."  **Barzinji** and **Jaghlit** were officers of **IIIT** and Barzinji was a founder of **IIIT**.

8.30.4.   **Barzinji** and **Jaghlit** (also directors of **SAAR**, under the control of the Al Rajhi family) and the other operators of SAAR and the other directors of **IIIT** knew or should have known that **WISE** was a supporter of and provider of funds to **PIJ**:

8.30.4.1.  **WISE** was founded in Florida in 1991 and headed by **Sami Al Arian**, with **Tarik Hamdi** and **Ramadan Shallah**.

8.30.4.2.  From the outset **WISE** supported publicly the **PIJ** objective of revolutionary Jihad against Israel and held public meetings in the US (of which commercial videos were made) to raise money for this objective.   One such meeting (in Washington in July 1991) was attended by Jamal **Barzinji**, **SAAR** Chairman and **SAFA Trust** President.

8.30.4.3.  Early, ongoing and continued active support for **PIJ** is evidenced by the emergence in October 1995 of **Ramadan Shallah** as leader of **PIJ** having been a member of the **WISE e**xecutive from 1991-95 and a professor at the University of South Florida. The conduct of **WISE** received massive US and some international publicity in August - November 1995 after Ramadan Shallah suddenly emerged as the new leader of Palestinian Islamic Jihad.  Press reporting of the 'academic freedom' dispute over whether the University should continue to co-operate with **WISE** reported that it had funnelled money to the **PIJ**.

8.30.4.4.  It was well known among activist Muslims in the US that **WISE** fundraising events, from 1991 onwards, expressly raised funds to finance violence against Israel because of its occupation of the West Bank and Gaza Strip.

8.30.4.5.  Further, there was correspondence between **SAAR** executives and **Al Arian** in 1994, evidencing **SAAR**'s support and commitment to **WISE**.

8.30.4.6.  These associations between the operators of **WISE** on the one hand and of **SAAR/SAFA** on the other show that the latter well knew the former's objective of providing funds to the **PIJ**.

8.31.   If necessary, the Defendant will rely on section 5, Defamation Act 1952.

9.  Further or alternatively, if, which is denied, the said article conveys defamatory meaning, the Defendant relies on the defence of qualified privilege.

## _PARTICULARS_

9.1.    The article concerns matters of legitimate public interest and importance, namely the existence, extent and purpose of arrangements between the US and other countries, in particular Saudi Arabia, for monitoring private information such as financial and banking information in the aftermath of 11 September 2001, and pursuant to state obligations under Security Council Resolution 1373 (28 September 2001).   Such international arrangements for combating Islamic terrorism were, at the time of the article's publication, amongst the most important and most newsworthy issues in the world.

9.2.    The Defendant also relies on legitimate public interest and importance of:

9.2.1.  the adoption by the US of a policy and practice relating to the requirements of regulation, probity and prudence in the international financial and banking community;

9.2.2.  the communication of that policy and practice to other governments, including the Saudi Arabian government; and

9.2.3.  the adoption by the Saudi Arabian government of its own policy and practices on the requirement for regulation, probity and prudence in the international banking community, especially in respect of surveillance of the activities of persons and businesses which might, wittingly or unwittingly, be connected with or provide support for Islamic terrorism.  Public interest in learning about such action by the Saudi authorities derived, _inter alia_, from the facts that:

9.2.3.1.   fifteen of the nineteen Al-Qaeda terrorists who perpetrated the crime against humanity on 11 September 2001 were from Saudi Arabia and, it is a matter of substantial controversy in the US and the rest of the world whether this "jihad" was inspired by the Wahhabi religion established in that country by its ruling family, the House of Saud;

9.2.3.2.   Al-Qaeda is headed by a Saudi businessman and much of its financial support has come from Saudi business sources via banks and charities in Saudi Arabia and elsewhere.  The organization's key policy is to destroy non-believers and it glories in  the killing of innocent civilians,

notably   Americans (and anyone  who gets in the way) as a means, *inter alia*, of forcing the withdrawal of US troops from Saudi Arabia;

9.2.3.3.   there has been a notorious failure by Saudi Arabia's rulers and law enforcers to investigate Al-Qaeda members and its finances, both prior to and after 11 September 2001, and a notorious refusal to share intelligence on Al-Qaeda with Western agencies.   Controversial allegations have been made that members of the Saudi elite have largely financed Al-Qaeda in order to prevent killings inside Saudi Arabia. On December 11, 2001, the Saudi Embassy in Washington issued a lengthy press release in an effort to refute such allegations stating that SAMA was co-operating with international agencies in monitoring suspected terrorist financing.

9.3.   The readership of the WSJE comprises Americans and other persons who are seriously interested in US politics, diplomacy and business.  It may be inferred that this readership would have special interest in the subject matter of the article, for various professional reasons and for personal reasons (since many would fall within the class targeted by Al-Qaeda).  The editors of the WSJE had a duty to communicate the news in the article to the readership, and to communicate it as soon as its accuracy had been reasonably established.

9.4.   The primary author of the article, James Dorsey, is a distinguished investigative journalist who has covered important financial stories arising  from the Middle East for the WSJE since 1993, and for the previous two decades for United Press International (as Bureau Chief and senior Middle East correspondent) and for The Financial Times, and New York Times.  He is a graduate in economics and the author of a book and an encyclopaedia section on the Middle East.  He has had connections with Saudi Arabia for the past 25 years and is fluent in Arabic.  The article was the kind of news story that he had accurately reported throughout his professional career.

9.5.   Mr Dorsey had spent 5 months continuously in Saudi Arabia (living in Riyadh) before publication of the article, investigating stories about Saudi connections with 11 September and Al-Qaeda.  His cultivated sources included Princes of the House of Saud, their officials, bankers (both local and foreign), and diplomats.

FSI-1860959-1

9.6.    Mr   Dorsey was informed by his sources in the banking community in early December 2001 of the existence of an "off the record" list of bank accounts being monitored at US request by the Saudi Arabian Monetary Authority in consequence of 11 September 2001.   This list included an account of the Claimant.   This was confirmed by a highly placed Saudi banking source at the beginning of February 2002.   The Claimant's name was subsequently confirmed as being on the list by a US diplomat who consulted an official file in the author's presence before providing this confirmation.   The author, notwithstanding the authoritative status of this diplomatic source, made a further check prior to publication with a senior Saudi official, who independently confirmed that the Claimant was on the list.

9.7.    The author and his editors had no reason to believe that any of these sources were other than reliable, and the fact that they corroborated each other made the statement that the Claimant was referred to on the list extremely reliable. They had no reason to suspect that any of these sources was malicious or self-serving, and none was paid money in return for information.

9.8.    Further investigation of the draft article was undertaken in the US, and no reason emerged to suspect its untruth.

9.9.    The article fairly and accurately reported and presented the news of the bank account monitoring by SAMA and fairly and accurately reported the US government reasons for requesting that monitoring.   It made clear that its purpose was to send a warning message to banks and financial institutions, and that many of the Saudi accounts on the list belonged to legitimate entities.   It quoted US officials as giving this explanation for the Claimant's presence on the list, i.e. as being included because of an association "in the past" with some institution suspected of terrorist links.   The tone of the article was moderate, non-accusatory and unsensational, and entirely appropriate to a straight-forward and significant news story.

9.10.   The reporter was scrupulous in obtaining, prior to publication, a comment from a spokesperson for the Claimant, and in publishing that comment, notwithstanding that WSJE did not believe the comment to be true.

9.11.   Prior to publication of the article, the existence of such a list had been widely and wildly discussed in business circles in Saudi Arabia: speculation that it covered

FSI-1860959-1

many thousands of accounts was rife.  In this context, and given its importance as news, its publication on 6 February was justified.

9.12.  The facts reported in the article were true and/or were honestly believed to be true by the WSJE reporter and editors.

9.13.  WSJE reasonably and responsibly offers to publish letters from complainants. (The Claimant in due course refused to take advantage of this opportunity to mitigate his alleged damage.)

10.  The Defendant will rely on the fact that the Claimant has only issued proceedings in this jurisdiction in respect of publication in this jurisdiction.

*GEOFFREY ROBERTSON QC*

*KEIR STARMER QC*

*GEOFFREY ROBERTSON QC*

*RUPERT ELLIOTT*

*GEOFFREY ROBERTSON QC*

*RUPERT ELLIOTT*

**The Defendant believes that the facts stated in this Re-Amended Defence are true. I am duly authorised by the Defendant to sign this statement.**

**Signed ................................................**

**MARK STEPHENS          (Solicitor for the Defendant and partner in the firm Finers Stephens Innocent).**

**Dated  ...............................................**