# Attachment A
## (Part 6 of 6)

**Part 2 of Exhibit 14**

54

4acWterC

1    Yousef was convicted, as I said earlier, of acts he committed
2    in the Philippines but he was also convicted, your Honor, of
3    planning Plan Bojinka, which was a plan to hijack 12 jetliners,
4    simultaneously crash them filled with people into the Pacific
5    ocean, U.S. jetliners.
6            His coconspirator, who confessed, his name was Murad,
7    your Honor, also confessed that one of the plans being
8    considered was to hijack a United States jetliner and crash it,
9    Mr. Murad was a trained pilot, into the CIA in Langley.  These
10   defendants were convicted in 1996, and judgment was entered in
11   1998.
12           Your Honor, your predecessor in this case, before his
13   unfortunate early demise, Judge Schwartz, handled the terrorist
14   case and issued an order the week of his untimely death.  It's
15   the case called Talisman Energy.  In Talisman Energy, Judge
16   Schwartz discussed acts of terrorism and barbarity and torture.
17   He called these acts the depths of depravity and spoke
18   eloquently of the toll on human life taken by terrorism acts.
19           In the case, your Honor, of Kilburn v. Libya, decided
20   three months ago by the D.C. Circuit, unanimously, the Court
21   held that simple proximate cause is the operative standard
22   under the FSIA.  We discussed this last month before your
23   Honor.  The court held unanimously, your Honor, that you cannot
24   impose a requirement that financial assistance to a terror
25   organization be directly traceable to a particular terror act;

4acWterC
1    that that would render the statute under which we're operating,
2    the Antiterrorism Act, a similar provision, that would render
3    ineffectual the material support provisions under which we are
4    bringing our case.  The court held, your Honor, "money, after
5    all, is fungible, and terror organizations can hardly be
6    counted on to keep careful bookkeeping records."
7            Your Honor, there's a case in D.C. that Mr. Carter's
8    going to talk about named Pugh.  It's highly important because
9    it held, among other things, that it had been common knowledge
10   amongst foreign nationals, amongst foreigners, these
11   defendants, they didn't say these defendants, I mean
12   foreigners, who are not residents of the United States, that
13   the United States Government was serious about preventing and
14   punishing terrorism worldwide, and it was common knowledge,
15   since 1984, that the United States was targeting the funding
16   and conduct of terrorism.
17           Your Honor, the Seventh Circuit and the Ninth Circuit,
18   in cases dealing with terrorism of a different sort, found that
19   there's no constitutional right to provide weapons and
20   explosives and money to terrorists.
21           Your Honor, I would like to focus very briefly, if I
22   might, on the statute that provides the basis, majority basis
23   for our claims.  It's called the Antiterrorism Act.  It was
24   enacted in 1992.  And as the Boim Seventh Circuit case found,
25   the legislation provides the imposition of liability at any

56
4acWterC
1   point, at any point, on the causal chain to terrorism.  To
2   interrupt or at least imperil the flow of money.  Aiding and
3   abetting liability reaches persons who did not engage in the
4   proscribed activities at all but who give a degree of aid to
5   those who do.
6           Your Honor, in October of 2002, the prestigious
7   Council on Foreign Relations made this finding about the
8   funding of Al Qaeda.  It was report-specific to that, and this
9   is in the record:  For years, individuals and charities based
10  in Saudi Arabia have been the most important source of funds
11  for Al Qaeda.  For years, Saudi officials have turned a blind
12  eye to this problem.  The general counsel, your Honor, of the
13  treasury department, different testimony from what I withdraw,
14  Mr. David Aufhauser, called Saudi Arabia the epicenter of
15  terrorism financing.
16          Now, if I might, your Honor, I'd like to spend a
17  minute on what counsel has called the Golden Chain document.
18  That's a misnomer.  There is a cachet of documents, your Honor,
19  of which they've only fastened upon one, which is a list of
20  donors.  The Soviet Union announced its intention to withdraw
21  from Afghanistan in late 1998.  Dr. Azzam created Al Qaeda
22  along with Osama Bin Laden in the summer and early spring of
23  1998, to continue Jihad in places other than Afghanistan.  The
24  people whose names are listed on there were donors of, to the
25  jihad efforts in Afghanistan --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4acWterC

```
 1          THE COURT:  Is there anything in the record that
 2   identifies who the author of that document is?
 3          MR. MOTLEY:  Not to my knowledge, your Honor.
 4          THE COURT:  Is there anything in the record that
 5   identifies any donations from any of the names listed on that
 6   document?
 7          MR. MOTLEY:  Yes, sir, your Honor.  We have placed
 8   evidence, some of the people whose names are on that document
 9   are defendants whose motion is ripe before you.
10          THE COURT:  I didn't ask you that, Mr. Motley.  I'd
11   appreciate it if you'd respond to my questions.
12          MR. MOTLEY:  I'm sorry, your Honor.  I thought I was
13   doing so.
14          THE COURT:  Is there anything in that document that
15   indicates that anybody on that document, anyone listed in the
16   document made a specific donation?
17          MR. MOTLEY:  On that document, no.
18          THE COURT:  That document, Mr. Motley.  Is your
19   hearing impaired today?
20          MR. MOTLEY:  It's getting better, Judge.  Thank you.
21          THE COURT:  Okay.  I'll raise my voice if you have a
22   problem.
23          MR. MOTLEY:  No, sir.  I understand.
24          THE COURT:  Is there anything on that document?
25          MR. MOTLEY:  Not on that one document.
```

58

4acWterC

```
 1              THE COURT:  Thank you.  Okay.  Continue.
 2              MR. MOTLEY:  As I was saying, your Honor, there are
 3    more than just that one document.
 4              THE COURT:  Do we even know when the document was
 5    written?  Is there a date on it?
 6              MR. MOTLEY:  I personally do not know when it was
 7    written.
 8              THE COURT:  Is there a date on it?
 9              MR. MOTLEY:  No, sir.
10              THE COURT:  Okay.  Go ahead.
11              MR. MOTLEY:  The documents, your Honor, were recovered
12    by the FBI and the Bosnian police in a raid on a charity.
13              THE COURT:  That's exciting, but it doesn't prove
14    anything, does it, Mr. Motley?
15              MR. MOTLEY:  Your Honor, we believe it does.  The
16    documents that were tendered --
17              THE COURT:  We don't know who the author is, when it
18    was written.  It's very nice that the Bosnian police and the
19    FBI, and I have the highest respect for them, found it.  What
20    is it?  What does it prove, if none of these things are known?
21              MR. MOTLEY:  Your Honor, I respectfully suggest that
22    at this stage of the case, that we should be permitted the
23    opportunity to bring back to your Honor the answers to those
24    questions.
25              THE COURT:  That's another question.  My question is
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

59

```
4acWterC
```

```
 1   at this moment in time:  What does it prove?
 2              MR. MOTLEY:  Your Honor --
 3              THE COURT:  It's merely a piece of paper with names on
 4   it.  Isn't it?
 5              MR. MOTLEY:  That one piece of paper with names on it
 6   is exactly what you say it is, but that's not the only document
 7   that was seized.  It's not the only document that was submitted
 8   to Judge Robertson, pursuant to an order of the Bosnian Supreme
 9   Court.  There are hundreds of documents that were seized, your
10   Honor, and they're all set forth in the Department of Justice's
11   proffer of evidence in the, in Chicago, in the case of Amen
12   Arnaout.
13              THE COURT:  That's all very interesting.  But I didn't
14   see anything in your papers or any of the other plaintiffs that
15   says that this document was written by a particular individual,
16   that it is a list of donations to Al Qaeda and how much, and
17   when it was written.  And whether you say, well, it's not on
18   that document, is there a document that was seized at the same
19   time that says, answers those questions?  I don't think so.
20              MR. MOTLEY:  I don't think --
21              THE COURT:  Or you would have put it in, I'm quite
22   sure.
23              MR. MOTLEY:  I would have put it in, Judge.
24              THE COURT:  I've read your papers very carefully,
25   Mr. Motley.
```

60

4acWterC

```
 1              MR. MOTLEY:  I think, your Honor, that those documents
 2      are not dated.  The U.S. Government did the best they could to
 3      estimate when it was, and the estimate is in 1988.  But it's
 4      not on the document.  I confess, it's not on the document.
 5              And that's one of the reasons why we want to do
 6      discovery.  These are things that we can sort out if we're
 7      allowed to do discovery, and I respectfully suggest, your
 8      Honor, as Judge Robertson pointed out in Burnett I, I think we
 9      plant enough here that we should be entitled to do discovery of
10      these defendants and come back to your Honor in a reasonable
11      period of time with sounder and better and clearer answers to
12      these important questions that you raise.
13              THE COURT:  That's another matter.  But I just want to
14      be very clear on that document.  You put great weight on it,
15      and, when you come right down to it, you don't know when it is.
16      Do we?
17              MR. MOTLEY:  I'd like to find out, Judge.
18              THE COURT:  I understand that.
19              MR. MOTLEY:  And I can't answer your questions.
20              THE COURT:  Okay.
21              MR. MOTLEY:  Because the answers don't appear to those
22      questions --
23              THE COURT:  I just want to be sure of that.
24              MR. MOTLEY:  You're absolutely, positively correct.
25              Your Honor, among those documents, not the list, but
```

61

4acWterC

```
 1    there's another document that sets forth what we call and what
 2    the government called in the Arnaout proffer the charity
 3    strategy of Al Qaeda, that they would use charities as the
 4    basis for raising money to finance Al Qaeda.  That's one of the
 5    documents that we submitted to your Honor, through the Arnaout
 6    proffer.  It's among the long list of documents that were
 7    seized in Bosnia.
 8            Your Honor, I'd also point out the affidavit of
 9    Charles Pasqua, which we discussed with your Honor last time,
10    Mr. Pasqua was the foreign minister, excuse me, interior
11    minister of France.  He submitted a declaration which we filed
12    with your Honor about his specific visit to Saudi Arabia in
13    1994 at which he advised, he says, among others, Prince Sultan
14    that money was being raised in Saudi Arabia and diverted to
15    these charities and being used to fund Al Qaeda.  And he
16    specifically listed in his affidavit one of the defendants in
17    this case, although not a defendant whose motion is before you
18    today.  That would be the Muslim World League.
19            Your Honor, we also submitted an affidavit in this
20    record of Mr. William Wechsler.  Mr. Wechsler was a senior
21    official in the Clinton Administration, who was chairman of the
22    interagency working group tasked with disrupting Al Qaeda's
23    financial network, and he and Mr. Rick Newcombe, for the
24    Department of Treasury, visited Saudi Arabia in 1999 and
25    specifically sat down with senior members of the government and
```

62
4acWterC

```
 1   their banking authorities and again told them that wealthy
 2   Saudi businessmen were financing charities which were then
 3   diverting the funds to Al Qaeda.
 4          In 1999, your Honor, Madeleine Albright, the secretary
 5   of state of the United States, announced her intentions to
 6   bring the matter up yet again with Prince Sultan when he
 7   visited the United States.  In 1999, your Honor, the United
 8   Nations International Convention for the Suppression and
 9   Financing of Terrorism pointed out the important problem of the
10   financing of terrorism and how charities were being used in
11   such a fashion as to support, to support the efforts of Al
12   Qaeda, Hamas, and others.
13          Your Honor, the bottom line here is we believe we've
14   pled and placed in this record sufficient and ample evidence in
15   a general fashion, in a general fashion, of the targeting of
16   the United States by Al Qaeda.  We believe that we have
17   established, your Honor, a record that it was well known in
18   Saudi Arabia and other Arabian Peninsula countries that Al
19   Qaeda was using charities to funnel money to their operations.
20          We believe that through the fatwas, the convictions
21   and other information that we placed in the record, that there
22   was an abundance of evidence that the United States was
23   concerned about Al Qaeda targeting the United States.  This was
24   highly publicized in the United States and in the Arab world.
25          I'd like now, your Honor, to turn to some specific --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

63

4acWterC
1    first of all, I want to point out Judge Robertson's holding in
2    the first Burnett decision at headnote 5 says, "If a party
3    demonstrates that it can support its jurisdictional allegations
4    through discovery, then jurisdictional discovery is justified."
5            Your Honor, I believe that the record here cries out
6    for amplification and that the plaintiffs deserve an
7    opportunity to place before your Honor additional information
8    so that these important questions of jurisdiction and
9    substantive liability can be addressed.
10           Your Honor, we have placed in the record evidence
11   before you of various of the charities who are defendants in
12   this case, of being recognized both in Saudi Arabia and in
13   other foreign countries as harboring and funding Al Qaeda.
14   1996, 1998, 1995, all of those examples we have placed before
15   your Honor in the record.  We have placed before your Honor a
16   large number of media reports in the Arab media discussing the
17   funding of Al Qaeda through donations to charities.  There are
18   articles that we pointed out in our submissions to your Honor
19   of interviews that Mr. Bin Laden himself gave to television, to
20   television reporters and to United States reporters, including
21   The New York Times.
22           Now, your Honor, if I -- I think the Bin Laden
23   indictment and the fact that he was placed on the FBI's most
24   wanted list in the late 1990s certainly gives an amplitude of
25   notice to the world that that gentleman was targeting the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

64

4acWterC

1   United States, that these various charities were being used in
2   the indictment.  It specifically refers -- Mr. Bin Laden's
3   indictment here in New York specifically refers to the use of
4   these NGOs.
5           Now, your Honor, if you would like, I would like to
6   spend a few minutes responding to some of the factual
7   assertions that the defendants made not with respect to whether
8   they're doing business, because we were under the impression
9   that we were addressing conspiracy jurisdiction and directed
10  activity at the United States jurisdiction, the law about which
11  Mr. Carter will discuss with you in a moment.  But if I might
12  defend the complaint itself, and I'm going to refer here simply
13  to Burnett's third amended complaint.
14          Your Honor, there are 139 paragraphs within the third
15  amended complaint that refer to how Al Qaeda purposefully
16  availed itself of and targeted the United States.  Your Honor,
17  Mr., one of the defendants whose case is before you today is
18  Mr. Adel Batterjee.  Mr. Batterjee filed a pleading in this
19  case, a sworn affidavit, which I think we have addressed, but
20  it bears repeating.  For example, he denied ever having
21  participated in the writing of a book by Osama Bin Laden.  We
22  filed an affidavit of one of our investigators and the
23  correspondent for Mr. Batterjee about his participation in that
24  book.  That book was distributed in the United States, and
25  indeed, a copy of it was gotten by our investigator at the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

65

4acWterC

1    request from Mr. Batterjee.
2            Your Honor, with respect to Mohamad Al-Faisal,
3    Mr. Kreindler had requested, and of course, I have to ask your
4    Honor's permission, to address Prince Mohamad Al Faisal when
5    I'm done, if your Honor would permit him to do that for a few
6    minutes.
7            THE COURT:  We're going to stick to the game plan.
8            MR. MOTLEY:  I notice he's chomping at the bit, your
9    Honor.
10           MR. KREINDLER:  Your Honor, if I could have three
11   minutes, that's all it will take.
12           THE COURT:  There will be no stage setting.
13           MR. KREINDLER:  Not stage setting, three minutes on
14   very specific points, your Honor.
15           THE COURT:  Fine.  As it is, we're going to break for
16   lunch at 12:30, and, at the rate we're going now, Mr. Motley is
17   going to use that up.  But I am going to hold you to a half
18   hour.  Keep going.
19           MR. MOTLEY:  Yes, sir.  And I certainly am going to
20   leave ample time for Mr. Carter to discuss the law.
21           Your Honor, with respect to some of the matters that
22   were suggested by counsel, counsel cited some British court
23   decisions.  Those are libel cases, your Honor, where the best I
24   can tell, there's no defense, if you, if the person proves that
25   something was published in the U.K., the truth is not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

66

4acWterC

```
 1   necessarily a defense.
 2          Your Honor, with respect to the National Commercial
 3   Bank, we think that the National Commercial Bank is in the same
 4   position that Al Rajhi was in Burnett I.  We were permitted
 5   limited jurisdictional discovery against Al Rajhi, and we
 6   think, with great respect, your Honor, we should be entitled to
 7   take discovery with respect to National Commercial Bank.
 8          We, I think, have addressed the other defendants in
 9   our papers, your Honor, with sufficient specificity, and I
10   would just like to say generally, your Honor, that the
11   defendants like to fasten on what we've only said three or four
12   things about this particular defendant.  Your Honor, this
13   ignores the general allegations that we've made, which we pled
14   pursuant to the procedures that were worked out by Judge
15   Robertson when he was still officiating over the case, and
16   these are general allegations that are applicable to all of the
17   defendants, and they conveniently want to ignore those.
18          With that, your Honor, I will be glad to answer any
19   other questions and express my gratitude for your Honor's
20   patience in allowing us to make this lengthy presentation
21   today.  And if Mr. Carter is ready, I can turn it over to him.
22          THE COURT:  Very well.  Go ahead, Mr. Carter.  The
23   floor is yours.
24          MR. CARTER:  Thank you.
25          THE COURT:  For your purposes, sir, we'll break at
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

67

4acWterC
```
 1   12:30.  Whatever you'd like to address between now and then.
 2             MR. CARTER:  Thank you, your Honor.
 3             As Mr. Motley mentioned, I'm going to be discussing
 4   the legal standards and principles which should guide the
 5   Court's analysis of the plaintiffs' claims against these
 6   defendants for jurisdictional purposes.
 7             To begin with, your Honor, I think it's important to
 8   note that the touchstone of due process is fair warning and
 9   that no analysis of due process should lose sight of that
10   fundamental objective.  The Fifth and Fourteenth Amendments of
11   the Constitution serve to protect an individual's liberty
12   interest by requiring that individuals have fair warning that
13   an activity they engage in may subject them to the jurisdiction
14   of a foreign sovereign.  And as a corollary to this fair
15   warning principle, the Supreme Court has specifically noted
16   that the analysis of minimum contacts should be informed by
17   relevant policy considerations, which includes the forum's
18   interest in adjudicating the dispute and the plaintiffs'
19   interest in having an efficient and convenient forum for
20   obtaining redress for their injuries.
21             In fact, the Supreme Court has held that such policy
22   considerations may serve to establish the reasonableness of
23   jurisdiction upon a lesser showing of minimum contacts than
24   otherwise would be required.  And in keeping with that
25   principle, your Honor, the Supreme Court has explained that
```

4acWterC

 1  there is no mechanical formula for evaluating minimum contacts
 2  or analyzing due process and has instead emphasized the need
 3  for the courts to employ a highly realistic approach.
 4         In employing that highly realistic approach, the
 5  courts have consistently held that the most important
 6  consideration is whether the defendants' conduct is such that
 7  he should reasonably anticipate being held in the court in the
 8  forum.  And under these standards, your Honor, the exercise of
 9  jurisdiction over these defendants is entirely reasonable and
10  consistent with due process considerations.
11         First and foremost, your Honor, this is a case about
12  the sponsorship of terrorism.  It is not a case involving a
13  commercial dispute over debts owed under a franchise agreement,
14  as was before the Supreme Court in Burger King.  And because
15  this is a terrorism case, there are unique policy
16  considerations implicated.  And as a result, the plaintiffs
17  would submit that the decisions which are most critical and
18  most instructive in evaluating the minimum contacts and
19  personal jurisdiction in this case are Pugh v. Libya, which
20  Mr. Motley mentioned and Rein v. Libya, a decision of the
21  Southern District of New York.
22         Now, during his presentation, your Honor, Mr. Cooper
23  suggested that those cases were inapposite because they dealt
24  with claims against foreign sovereigns; therefore, it didn't
25  speak to the issues presented to the Court today, and that's
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

69

4acWterC

1    fundamentally inaccurate.
2           First of all, Pugh involved, among other things,
3    claims against individuals who were sued in their personal
4    capacity, and the court engaged in an extensive and thorough
5    analysis of due process question in relation to those specific
6    claims.  And likewise, although the claims in Rein were against
7    a foreign state, that did not alleviate the need for the court
8    to go through a thorough and complete analysis of due process
9    considerations because, as the Court is aware, in the Second
10   Circuit, foreign states are entitled to due process as persons
11   within the meaning of the Constitution.
12          So I think to begin with, Pugh and Rein do speak
13   directly to the issues before the Court today.  And in Pugh,
14   the court began its analysis by recognizing that the United
15   States has a compelling interest in sanctioning those who
16   commit terrorist acts and protecting the citizens of the United
17   States from terrorist attacks.  That interest has been
18   consistently and repeatedly announced to the world through acts
19   of Congress, the decisions of these courts and the executive
20   branch for nearly 20 years.
21          The Antiterrorism Act, which, as Mr. Motley explained,
22   forms the predicate for many of the claims in this case, is
23   itself an expression of that paramount interest in the United
24   States of providing redress against terrorists.  And not
25   insignificantly, your Honor, it provides a private cause of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

4acWterC

1    action, a civil cause of action against individuals who provide
2    material support and sponsorship to a terrorist organization,
3    which is precisely the predicate for the claims against the
4    defendants here today.
5            In view of the United States' compelling interest in
6    sanctioning terrorists and protecting U.S. citizens from
7    terrorism, the court in Pugh held that individuals who sponsor
8    terrorists should reasonably expect to be haled into court in
9    the U.S. where it was altogether foreseeable that some
10   Americans would be among the foreign nationals targeted by
11   their actions and, consequently, that the exercise of
12   jurisdiction comported with fair play and substantial justice.
13           The Southern District of New York employed similar
14   reasoning in Rein, holding that any foreign state would know
15   that the United States has a substantial interest in protecting
16   its flag carriers and nationals from terrorist activities and
17   should reasonably expect that if those interests were harmed,
18   they would be subject to a variety of potential responses
19   including civil actions in U.S. courts.
20           And in keeping with the reasoned decisions of Pugh and
21   Rein, the defendants in this case are properly viewed to have
22   established minimum contacts with this forum sufficient to
23   satisfy due process, both because their conduct was directed at
24   the United States within the meaning of Calder v. Jones, and
25   because the actions of their coconspirators in the United

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC
1    States are attributable to them for purposes of evaluating
2    jurisdiction under the conspiracy theory.
3            As Mr. Motley explained in some detail, Al Qaeda had
4    consistently and repeatedly declared its intention to attack
5    U.S. citizens wherever they may be found in the world.  And in
6    sponsoring a terrorist organization that was and remains so
7    singularly devoted to attacking the innocent citizens of the
8    United States, the defendants necessarily directed their
9    conduct at the U.S.
10           Now, Mr. Cooper raised some arguments based on a
11   statement in Calder v. Jones that the defendants in that case
12   were principal participants in the intentional wrong.  And I
13   would respectfully suggest that that statement within Calder v.
14   Jones doesn't support the proposition for which the defendants
15   proffer it to this Court here.  It merely indicated that the
16   defendants in that case actively participated in the
17   intentional tort which is the subject of that claim.  The
18   defendants here would suggest to the Court that it essentially
19   imports into the due process analysis a but for standard of
20   causation.  And that's not what it does.
21           As Mr. Motley explained, the but for standard of
22   causation has been explicitly rejected in terrorism cases in
23   recognition of the fact that terrorist acts are only made
24   possible by the contributions of many individuals to the
25   terrorist organizations.  And so I don't think that the comment

72

4acWterC

```
1    that the defendants in Calder were principal participants
2    supports the proposition for which it's been cited.
3            Regardless, your Honor, these defendants are principal
4    participants in the wrong which is the basis of plaintiffs'
5    claims here.  Individuals who provide material support and
6    sponsorship to a terrorist organization are primary and
7    integral participants in the conduct of terrorist attacks.
8    Congress has recognized this fact within the Antiterrorism Act
9    by criminalizing the act of providing material support and
10   resources to a terrorist organization and by providing a civil
11   cause of action against those who do so.
12           The courts have endorsed this view as well and again,
13   both William and Kilburn, to which Mr. Motley made reference,
14   are instructive on this point.  In both of those cases, the
15   courts properly held that there's no reasoned basis for
16   distinguishing between individuals who provide general support
17   for the terrorist organization and individuals who provide
18   specific support for an attack which causes the plaintiffs'
19   injuries.  The reality is that money donated to a terrorist
20   organization is fungible and can be used for any purposes.
21           Terrorism officials have similarly testified that
22   money is the lifeblood of terrorism, and, most recently, the
23   9/11 Commission concluded that Al Qaeda needed $30 million on
24   an annual basis before 9/11 to sustain its global organization
25   and that the planning, coordination and conduct of the
```

4acWterC
1    September 11 attack would not have been possible absent the
2    infrastructure sustained by those funds.
3            There's another important point, I think, your Honor,
4    that defendants lose sight of.  Al Qaeda is a very
5    sophisticated organization.  It recognizes that when it carries
6    out an attack, there will be an investigation and that that
7    investigation will invariably lead to the source of funding
8    which was used to carry out the attack.  And being a smart
9    organization, it consequently avoids using its principal
10   sources of funding to carry out attacks.  It instead uses funds
11   from its principal sources to sustain its organization and uses
12   less important sources of funding to actually fund the
13   operations.
14           The bombing attack in Spain is an example of that
15   where simple criminal enterprises were used to fund an attack
16   rather than the charity system or contributions from
17   significant donors.
18           Another point in regards to the defendants' reliance
19   on the primary participant comment in Calder, your Honor, which
20   bears mention is that Calder, while involving an intentional
21   tort, didn't involve claims based on the sponsorship of
22   terrorism.  And while defamation is a significant wrong, it's
23   nothing close to the sponsorship of a terrorist act.  And so
24   there were fundamentally different considerations and policy
25   considerations at issue in that case.

74

4acWterC

```
 1          I'd like to move on briefly, your Honor, to the
 2  conspiracy theory of jurisdiction
 3          THE COURT:  Is this a convenient time?  How long is it
 4  going to take?
 5          MR. CARTER:  I think it is a convenient time.
 6          THE COURT:  Go ahead, if you have five minutes.
 7          MR. CARTER:  I meant it was a convenient time for a
 8  break because it's probably not five minutes.
 9          THE COURT:  All right.  We'll take our luncheon recess
10  until 2:00, and we will have, save you three minutes,
11  Mr. Kreindler, and then we'll finish up plaintiffs' argument
12  and 30-minute rebuttal after that.
13          The Court will stand in recess.
14          (Luncheon recess)
15
16
17
18
19
20
21
22
23
24
25
```

75

4acWterC

```
 1                         AFTERNOON SESSION
 2                            2:00 p.m.
 3            (In open court)
 4            THE COURT:  Good afternoon.  Please be seated.
 5            Mr. Carter, you may continue.
 6            MR. CARTER:  Thank you, your Honor.  When we broke for
 7    lunch, I was about to begin speaking about the conspiracy
 8    theory of personal jurisdiction.
 9            As your Honor is aware from the briefs, the conspiracy
10    theory of jurisdiction is based on the premise that the acts of
11    coconspirators within the forum state are like those of an
12    agent attributable to an out-of-state defendant for
13    jurisdictional purposes.  In this case, the defendants
14    themselves acknowledge the existence of the conspiracy which
15    led to the September 11 attack.  However, they failed to
16    understand and appreciate the significance of that fact in
17    regards to the claims asserted against it.
18            The Second Circuit has, in fact, held that where the
19    existence of a conspiracy has been proven to exist, the quantum
20    of evidence required to link a defendant to it need not be
21    overwhelming and may be established purely through
22    circumstantial evidence.  And, your Honor, those are cases in
23    which the Second Circuit was upholding criminal conspiracy
24    convictions based purely on circumstantial evidence.
25            In addition, the Second Circuit has expressly
```

76

4acWterC

```
 1   recognized that conspiracies are rarely proved through direct
 2   evidence, and an individual defendant's participation is rarely
 3   proved through direct evidence.  And as a result, plaintiffs
 4   may rely on circumstantial evidence based on or viewed in the
 5   totality of the circumstances.
 6           Contrary to the defendant's assertion, the various
 7   complaints do, your Honor, contain very specific allegations as
 8   to how these particular defendants directed their conduct at
 9   the United States and conspired with and aided and abetted Al
10   Qaeda.  And in this circuit, before discovery, a plaintiff may
11   defeat a jurisdictional testing motion based purely on the
12   allegations of the complaint, well pled allegations of the
13   complaint.
14           And in view of that fact, your Honor, I'd like to turn
15   briefly to the allegations of the complaint vis-a-vis these
16   particular defendants because they present a far different
17   picture from that that was suggested by the defendants during
18   their presentation.  I take for an example, your Honor,
19   Abdulrahman Bin Mahfouz.  As his counsel acknowledged and as
20   alleged in the complaints, Mr. Bin Mahfouz served as cofounder
21   of the Muwafaq Foundation, with Yassin Al Kadi, and Mr. Bin
22   Mahfouz's father, Kahlid Mahfouz.
23           Now, during his presentation, counsel for Mr. Bin
24   Mahfouz, suggested essentially that the Muwafaq was an innocent
25   organization that had not been designated, and this was a
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC

1   fundamentally misleading statement, your Honor.  Mr. Al Kadi,
2   the founder of Muwafaq, was himself designated on October 12,
3   2002, and the press statement issued by the treasury department
4   stated that Al Kadi founded Muwafaq.  And then it went on to
5   explain that Muwafaq is an Al Qaeda front that receives funding
6   from wealthy Saudi businessmen.  Saudi businessmen have been
7   transferring millions of dollars to Bin Laden through Muwafaq.
8           Now, there is an entire section of the Federal,
9   Ashton, and Burnett complaints dedicated to setting forth
10  allegations regarding the conduct of the Muwafaq Foundation,
11  and as much as counsel for Mr. Bin Mahfouz would like to
12  divorce those allegations from those specific allegations
13  against his client, they can't be.  All of that must be read as
14  a whole, and that's a point that's true as to all of these
15  defendants.
16          One of the things that they all seek to do is to
17  isolate from the remainder of the complaint the sections of the
18  complaint in which they're referenced.  But they have to be
19  tied back to the other allegations of the complaint.  And when
20  read collectively as to Mr. Bin Mahfouz, these allegations
21  clearly describe his intentional targeting of the United States
22  and aiding and abetting and participation in Al Qaeda's
23  conspiracy.
24          Now I mentioned a minute ago, your Honor, that Muwafaq
25  was cofounded by Kahlid Bin Mahfouz.  Kahlid was, not

4acWterC
```
 1   coincidentally, also the president and CEO of National
 2   Commercial Bank, also a defendant challenging jurisdiction here
 3   today.  I say "not coincidentally" because National Commercial
 4   Bank, channelled $3 million to Muwafaq.
 5            THE COURT:  When was he chairman?
 6            MR. CARTER:  He was chairman of the bank between 1996
 7   and 1999, your Honor, and he served as an officer of the bank
 8   prior to that point, and those are facts set forth in the
 9   various complaints as well.
10            National Commercial Bank also contributed $74 million
11   to IIRO, a point which is also set forth in the various
12   complaints.  And a former CIA counterterrorism expert has
13   described NCB as a channel to Bin Laden.  Those are all
14   allegations set forth in the complaint which from the basis of
15   the plaintiffs' claims against NCB.
16            In his presentation to the Court, Mr. Liebman avoided
17   any reference to those allegations, instead adopting the
18   arguments presented by other counsel, as to the purposeful
19   direction and conspiracy aspects of plaintiffs' jurisdictional
20   theory, but those allegations --
21            THE COURT:  Where did this CIA agent make this claim?
22            MR. CARTER:  Your Honor, I believe it was in an
23   interview.  It's not in court testimony.
24            THE COURT:  Do you have any facts to back it up?
25            MR. CARTER:  Your Honor, we do not have evidence which
```

79

4acWterC

 1    would necessarily be admissible of record in a trial at this
 2    point.
 3         What I think, though, is that there are facts which
 4    are sufficient to sustain the allegations.  There is, according
 5    to various reports, an extensive investigation that led to a
 6    disclosure that NCB was funneling money to terrorists which
 7    prompted the Saudi government to take control of the bank in
 8    1999.  And so what we would suggest is that based on the very
 9    specific allegations --
10         THE COURT:  Did the Saudi government state that's why
11    they were doing it?
12         MR. CARTER:  No, they didn't say that's why they were
13    doing it, your Honor.
14         THE COURT:  You're saying it.
15         MR. CARTER:  It is the allegation which is part of the
16    basis of our complaint and relative to which we would seek an
17    opportunity to conduct discovery, your Honor.
18         Prince Sultan also avoids --
19         THE COURT:  Do you maintain that anybody can just make
20    up any sort of claims and conclusions and, therefore, you're
21    entitled to discovery?  That isn't quite what the law is, is
22    it?
23         MR. CARTER:  No, your Honor.  I think what the law is
24    is that the allegations of conspiracy have to be viewed in
25    light of the totality of the circumstances.

80

4acWterC

```
 1              THE COURT:  I know.  You're giving me all this smoke
 2   in broad strokes, in the totality and all that.  Do you have
 3   any facts?
 4              MR. CARTER:  We do have the fact, your Honor, that
 5   Mr. Bin Mahfouz was the founder of the Muwafaq Foundation which
 6   has been described by the treasury department --
 7              THE COURT:  When?
 8              MR. CARTER:  He founded the Muwafaq Foundation -- I
 9   don't know the specific year, your Honor, that it was founded.
10   It was in existence until relatively recently.
11              THE COURT:  I didn't ask you that.  When did he found
12   it?  You're saying that's the big deal.  He founded it when?
13              MR. CARTER:  1992, your Honor.
14              THE COURT:  A long time ago.
15              MR. CARTER:  Your Honor, it's a long time ago, but
16   it's also the period during which Al Qaeda was building its
17   financial infrastructure so that it could support its capacity
18   to conduct global terrorism attacks.  So I don't think what
19   happened in that time frame is necessarily irrelevant here.
20              Mr. Bin Mahfouz is then also chairman of the National
21   Commercial Bank.  There is a relationship among all of these
22   parties which is relatively significant.  He's founding Muwafaq
23   with Yassin Abdullah Al Kadi who is an official designated by
24   the U.S. Government as an Al Qaeda sponsor.
25              THE COURT:  When did they designate him?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81

4acWterC

1          MR. CARTER:  They designated him in October of 2002,
2   your Honor.
3          Prince Sultan, during his discussion, also avoided,
4   your Honor, any real discussion of the allegations that were
5   made against him, but I think it's important to look at those
6   as well.  Prince Sultan, as has been described in some detail,
7   received specific notification in 1994 from Mr. Pasqua of the
8   French government and again in 1999 and 2000 from officials of
9   the U.S. Government, and all of that has been substantiated
10  through affidavits submitted by the plaintiffs.  And he was
11  notified specifically that Saudi-based charities were involved
12  in funneling money to terrorist organizations.  And Mr. Pasqua
13  singled out the Muslim World League.  At the same time, Prince
14  Sultan was serving as the head of the Supreme Council for
15  Islamic Affairs, an organization which had the responsibility
16  for reviewing funding requests of the charities and making
17  disbursements to the charities.
18          On that same board was, since 1995, a member of the
19  Saudi intelligence service, your Honor.  Prince Turki served in
20  that capacity until he moved away from the intelligence
21  service.  So I think that it's fair to say that Prince Sultan,
22  in his capacity as a government official, having received
23  notification from foreign officials and serving on a board with
24  oversight responsibility of the charities along with Saudi
25  intelligence officials, had fair notice of what was going on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

4acWterC

1    with regard to the charities and their involvement in passing
2    money on to terrorists.  And subsequent developments have only
3    affirmed this, your Honor, that the Saudi government itself in
4    June of this year announced that it was shutting down many of
5    its international charities because they were involved in
6    sponsoring terrorism.  They described it themselves as a
7    counterterrorism measure.
8            Now, despite all of these vehicles through which he
9    would have received notice of the problem, Prince Sultan
10   continued to give funding both in his official and personal
11   capacity to the very organizations which had been identified to
12   him as being problematic.  And when viewed in the totality of
13   the circumstances, that is, I would submit, your Honor --
14           THE COURT:  What proof do you have of his giving
15   money?
16           MR. CARTER:  Your Honor, there were submitted in the
17   proceedings before Judge Robertson an actual videotape from a
18   member of the Saudi government acknowledging that Prince Sultan
19   had made contributions in his personal capacity.  There are
20   publications to this effect on Saudi information guide, in
21   which it describes Prince Sultan's annual contributions to, for
22   instance, the IIRO, in the amount of 1 million Saudi rials,
23   annually, which is approximately $300,000.
24           So we do have specific evidence that he made these
25   contributions.  We don't have, your Honor, the plaintiffs will

4acWterC
1    admit, an admission from Prince Sultan that he intended those
2    contributions to be channelled to Al Qaeda, but viewed in the
3    totality of the circumstances, the allegations and evidence are
4    sufficient to state a prima facie case of conspiracy at this
5    stage of the proceeding.
6              Another of the defendants up today is Adel Batterjee,
7    your Honor.  I would say about Mr. Batterjee that he opened
8    offices for Benevolent International Organization, another
9    charity, in Bosnia and Chicago.  Benevolent International
10   Organization was designated by the U.S. Government as an Al
11   Qaeda sponsor.  There are additional --
12             THE COURT:  When?
13             MR. CARTER:  Within the last two years, your Honor.
14   2002, I believe, would be the date.
15             He is also alleged to have either wrote or
16   commissioned a biography on Osama Bin Laden and the jihad
17   struggle.
18             So there are, your Honor, specific allegations as to
19   all of these defendants, regarding the nature of the conduct
20   through which they are alleged to have sponsored this terrorist
21   organization, and those specific allegations are sufficient to
22   sustain the jurisdiction testing motion at this stage of the
23   proceedings.
24             I'd like to briefly, your Honor, address a couple
25   other points, the first of which is the argument that the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

4acWterC

1    defendants can't be haled into court based on the activities of
2    the corporations of which they're officers or directors.  And,
3    your Honor, that misses the point fundamentally of the nature
4    of the allegations made against the defendants.  We're not
5    attempting to bring them into court based on the actions of the
6    corporations.  We're seeking to assert claims against them
7    based on their own actions, which, in some cases, were carried
8    out through the corporation as an agent.  And the Second
9    Circuit has been clear that the so-called fiduciary shield
10   doctrine doesn't insulate a corporate officer from liability or
11   the jurisdiction of the courts where he exercises a degree of
12   control and effectively uses the corporation as an agent to
13   carry out those actions.  And a fair reading of the complaints
14   is not that these people happen to be corporate officers, but
15   rather that they used their positions and authority within
16   these corporations to channel funding and sponsorship to Al
17   Qaeda.
18        Mr. Cohen, during his presentation, also made an
19   argument, your Honor, that the actions of the coconspirators
20   would only be attributable to the individual defendants in the
21   event that we could demonstrate that they acted for effectively
22   the benefit of those defendants.  And what I would say is that
23   individuals who sponsor terrorism necessarily seek to see the
24   terrorist organization succeed in its illicit plan to carry out
25   terrorist attacks.  So successful terrorist attacks are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC

```
 1    essentially the profit that sponsors of terrorism derive from
 2    their sponsorship of the organization.
 3            So I think that that requirement is satisfied here,
 4    based on the knowing and intentional sponsorship of the
 5    organization itself.  It's not a financial profit as would be
 6    typical in many cases, but it is certainly something that the
 7    defendants who sponsor a terrorist organization derive benefit
 8    and, as tragic as it is, pleasure from.
 9            I think lastly, your Honor, I would just like to speak
10    briefly about Judge Robertson's decision in Burnett below as to
11    the issue of personal jurisdiction because it was raised by a
12    few of the defendants.  There are several concerns and problems
13    with the defendants' reliance on the decision here.  First of
14    all, I would submit that Judge Robertson's decision is
15    inconsistent with Pugh and Rein and that those are the more
16    well reasoned decisions.
17            I would also say that Judge Robertson's decision was
18    clearly predicated on his reading and interpretations of the
19    allegations of the complaint and the record before him at that
20    time.  And the record --
21            THE COURT:  Doesn't every judge do that?
22            MR. CARTER:  Every judge does do that, your Honor,
23    you're correct.
24            THE COURT:  I hope he would do those things.  Without
25    reading --
```

4acWterC

```
 1              MR. CARTER:  No.  I would just say a lot of defendants
 2     here would like to extrapolate it to them, and it doesn't
 3     really work to extrapolate it to them since it's based on the
 4     allegations against him.  And even as to Prince Sultan, the
 5     allegations before this Court and the record before this Court
 6     at this time are considerably different.  So I think that all
 7     of those factors weigh against applying Judge Robertson's logic
 8     to these defendants in the present context.
 9              I'd like to cede the last few minutes, your Honor, to
10     Mr. Kreindler so that he can speak briefly about Prince
11     Mohamad.
12              MR. KREINDLER:  Judge, I have four things to say about
13     Prince Mohamad, and listening to your questions to counsel this
14     morning and this afternoon, I think it goes to your inquiry.
15     And your inquiry is:  Why did we sue these defendants among the
16     full panoply of contenders?
17              No. 1, your Honor, we sued Prince Mohamad because he
18     intentionally helped Osama Bin Laden by providing banks,
19     accounts, and financial services.  When Osama Bin Laden moved
20     his organization to the Sudan, he needed banks' financial
21     services.  Prince Mohamad owned and controlled three banks in
22     the Sudan, Faisal Islamic Bank, Al-Shamal Bank and Tadamon
23     Bank.
24              One of those banks, in 1991, Osama Bin Laden deposited
25     or invested $50 million.  That's according to the 1996 State
```

4acWterC

1    Department fact sheet.  That bank was used to move money to
2    banks all around the world, including a bank in Texas that was
3    used for Osama Bin Laden to purchase an airplane for $250,000.
4    Osama Bin Laden needed international banking, and Prince
5    Mohamad provided it to him.
6            No. 2, Mr. Cohen referred to the president, CEO of
7    Suntrust and said, you know, by this reasoning he could be sued
8    anywhere around the world.  What makes that analogy false is
9    the element of intent.  We have alleged that Prince Mohamad
10   provided banking services intentionally to help Osama Bin
11   Laden, not that his bank was used willy-nilly.
12           Point No. 3, Mr. Cohen makes the point that we never
13   allege that Prince Mohamad made money or intended to make money
14   by providing his banks to Osama Bin Laden for Osama Bin Laden's
15   use, and, your Honor, that is exactly our point.  He didn't do
16   it as a banker to make money.  He did it because he wanted to
17   help Osama Bin Laden, out of sympathy with Osama Bin Laden's
18   goals.
19           Point 4, your Honor, Mr. --
20           THE COURT:  What do you base that on?
21           MR. KREINDLER:  What I base that on --
22           THE COURT:  It's out of whole cloth.  He wanted to
23   help him.  What do you base that on?
24           MR. KREINDLER:  One of the things that's seen in
25   Prince Mohamad's papers and other papers is a lot of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

88

4acWterC

1  information on Islamic banking.  They can't charge interest,
2  you're a joint partner.  From the information we have, we do
3  not see a profit to Prince Mohamad.
4          THE COURT:  You're making a conclusion, he wanted to
5  do something.  You just reach out and make these claims with no
6  basis whatsoever, as far as I can see in your papers.
7          MR. KREINDLER:  Your Honor, that is the inference we
8  think it is proper to draw at this stage.
9          THE COURT:  You don't argue it that way, do you?
10         MR. KREINDLER:  Your Honor, I'm not arguing with you
11 at all.  We cannot --
12         THE COURT:  Go right ahead.  It's okay.  You're
13 permitted, you know.
14         MR. KREINDLER:  Well, I'll try and only do it when it
15 may do us some good.
16         THE COURT:  You get a point for candor.
17         MR. KREINDLER:  Let me make one more point.
18         In his testimony from the embassy bombing case, I
19 don't know I don't think Mr. Cohen's characterization is fair.
20 Day 2 of the embassy bombing trials here, Assistant U.S.
21 Attorney Fitzgerald asks the question to Al Qaeda's money man,
22 whose name is Al Fadl:
23 "Q.  While you were in the Sudan, did you handle money for
24 Osama Bin Laden?  Did you work on the finances for Al Qaeda
25 while you were in the Sudan?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

89

4acWterC

```
 1    "A.   Through the interpreter, "Yes.
 2    "Q.   Did you know where the bank accounts," that's accounts
 3    plural, not singular, "of Osama Bin Laden and Al Qaeda were?
 4    "A.   Yes.
 5    "Q.   Do you know whose name they," not it, were in?
 6    "A.   Through the interpreter, "The bank account under Osama Bin
 7    Laden in Bank Shamal Khartoum," the capital of the Sudan."
 8             And then a page later:
 9    "Q.   Where were accounts held?
10    "A.   In Sudan and is in Bank Tadamon Islami.
11    "Q.   Where else?
12    "A.   Also we got account in Bank Faisal Islami."
13        Your Honor, what we know at this point is by owning and
14    controlling these banks in the Sudan, at the time that Osama
15    Bin Laden moved there and needed banking services, Prince
16    Mohamad --
17             THE COURT:  Are you suggesting having a bank account
18    with your bank makes you responsible?
19             MR. KREINDLER:  No.  No, your Honor.  I am suggesting
20    that in a banking world and a world very different than ours
21    with an obligation to know your customers well, as existed
22    there, that we believe, based upon using his company to --
23             THE COURT:  Is there a Saudi Arabian regulation that
24    creates a cause of action to the banker to know that customer?
25    Reading the regulations, it doesn't seem to say that.
```

90

4acWterC

1          MR. KREINDLER:  I'm going back to something that I
2    don't think is in dispute, your Honor, and if it is in dispute,
3    I'm sure one of the many defense lawyers here will correct me,
4    or try to correct me.  But it is my understanding, and again, I
5    do not think it's in dispute, that one of the tenets of Islamic
6    banking, since the banks are not permitted to charge interest,
7    is to form a working relationship with its big customers.
8          And $50 million in the Sudan in 1991, I mean, we're
9    looking at the context, $50 million in the Sudan in 1991 is
10   probably about half the money that's in the whole country.
11   It's a terribly significant event in a small world where a
12   relatively few number of people wield enormous political and
13   economical control.
14         And what we're saying, your Honor, here in this
15   context and in others is doing the best job we could, before
16   any discovery, before any of the criminal trials arising from
17   9/11, we've uncovered information that we believe is
18   significant.  And when this information is considered,
19   particularly when you start connecting the dots, we think that
20   given the chance to prove to your Honor's satisfaction, we will
21   prove to your Honor a clear picture of complicity and
22   culpability on the part of the defendants we've sued.
23         At this point, your Honor is right.  We have just
24   begun.  We have done the best we could to uncover
25   information --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4acWterC

 1          THE COURT:  Don't say I'm right.  I didn't say any of
 2  the things you're now saying.
 3          MR. KREINDLER:  No.  I'm saying you're right, we're at
 4  the early stage.  We have not proven our case.  We all agree
 5  that we -- this case is not ready for a jury yet.  But we have
 6  what we think is significant information, and we're entitled on
 7  a motion to dismiss on the pleadings to have the facts accepted
 8  as true and inferences drawn in our favor.  That's what we're
 9  saying, your Honor.
10          Was that three minutes?
11          THE COURT:  A lot more than I gave you for the
12  questions.  You're lucky you have a blind man watching the
13  clock.
14          All right.  Who is going to do rebuttal?
15          MR. COHEN:  Your Honor, this is Louis Cohen for Prince
16  Mohamad.
17          Let me begin by saying about him --
18          THE COURT:  Are you going to do the entire rebuttal?
19          MR. COHEN:  No, I'm not.  I think others will have
20  things to say about --
21          THE COURT:  All right.  Do it within your time
22  structure.
23          MR. COHEN:  By my count, we have about 25 minutes left
24  from our original hour and a half.
25          THE COURT:  All right.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4acWterC

 1          MR. COHEN:  Let me start by saying that Prince Mohamad
 2   said, in February of 2002, long before this litigation began,
 3   that, in a public statement, in both English and Arabic, that
 4   he expressed his personal condolences to the victims of 9/11
 5   and joined with the rest of the world in utterly condemning
 6   such acts unreservedly.  I know that is not evidence of
 7   anything, but I want on the record the position that Prince
 8   Mohamad took before this litigation even began.
 9          Mr. Kreindler has now done something that he also did
10   in his brief, and we called him on it; namely, to misstate very
11   substantially the allegations that he has made in his
12   complaint.  And I would ask that the Court carefully read our
13   short reply brief in the Ashton case, particularly the first
14   three pages, in which we respond to Mr. Kreindler's assertions
15   in his brief as to what it is that he has said.  We make a
16   couple of points in particular.
17          His brief asserts, as he just did, and I'm quoting
18   from page 1 of his brief, that Prince Mohamad knowingly and
19   intentionally provided currency and financial services needed
20   by Al Qaeda.  He cites, looks to me like about 22 paragraphs of
21   the complaint.  If the Court will review those paragraphs, you
22   will see that not one of them supports that allegation at all
23   and that nothing else helps.
24          For example, a couple of the paragraphs are paragraphs
25   where it just says all the defendants conspired with Al Qaeda.

93
4acWterC
1  A couple of the paragraphs deal with Kahlid Sheik Mohammed, the
2  deputy to Osama Bin Laden, the planner of the 9/11 attacks,
3  who, needless to say, has no relation to Prince Mohamad Al
4  Faisal.  A couple of the paragraphs deal with a general history
5  that Mr. Motley gave us this morning, the attack on the COLE,
6  the attack on the World Trade Center.  None of those paragraphs
7  asserts that Prince Mohamad transferred any money or anything
8  of value to Al Qaeda.
9        Now, with respect to banks, first of all,
10  Mr. Kreindler talks about three banks, Faisal Islamic Bank that
11  I mentioned this morning, Al Shamal, and Tadamon Bank.  The
12  facts with respect to their own complaint are that there is
13  nothing in their complaint that alleges that Prince Mohamad was
14  ever a director, an officer, an employee, or a stockholder of
15  Al-Shamal Bank, and he wasn't.  There is nothing in their
16  complaint that says he ever engaged in any transaction of any
17  kind with that bank, and he didn't.  And there is nothing in
18  the complaint that says he ever approved anything that that
19  bank, and that's the bank in which they've alleged that Osama
20  Bin Laden invested $50 million, there is nothing in the
21  complaint that says that he ever approved any transaction
22  involving that bank.
23        And I recall Mr. Carter's assertion that we're looking
24  to what the individual defendants here did, not to what their
25  corporations did.  There's nothing that ties Prince Mohamad to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

94

4acWterC

1    the banking activities of that bank.  The only connection is
2    that there is an allegation that in 1984, 17 years before the
3    events at issue, Faisal Islamic Bank in Sudan acquired, along
4    with several other organizations, unrelated organizations, the
5    list is at least five, some shares in Shamal Bank, but no
6    allegation that it ever controlled Shamal Bank, and as I say,
7    no allegation that Prince Mohamad personally ever had anything
8    to do with that bank.
9         I won't repeat the whole speech, but the same thing is
10   true with respect to Tadamon Bank.  There is no relationship
11   there.
12        Coming back to Faisal Islamic Bank and the testimony
13   of this man Al Fadl, if the Court will read the pages leading
14   up to and including this testimony, it is true that Mr. Al
15   Fadl, who, by the way, himself left Sudan and turned himself in
16   to the United States in 1996, so everything we're talking --
17   this is according to the 9/11 Commission report, so everything
18   we're talking about is before 1996, which is also when Osama
19   Bin Laden left Sudan without any money, that testimony does
20   describe bank accounts that the, that Mr. Al Fadl said Al Qaeda
21   had had in Sudanese banks.  And the examiner leads himself
22   through testimony about several banks that have nothing to do
23   with Prince Mohamad at all, and then ultimately asks a
24   question, "Anywhere else?" and it is that that produces the one
25   line on which, that they have quoted, saying we got account in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

4acWterC

1  Faisal bank Islamic, account singular, as the transcriber, as
2  the transcriber had it.
3          What I said this morning is right.  The only thing
4  that they allege in their complaint or have with respect to
5  Prince Mohamad is that he is the chairman, the foreign-based
6  chairman, in the sense that he's Saudi and it's in Sudan, of
7  the board of directors of a bank that has this one line of
8  testimony saying, mysteriously, "We got account."  We don't
9  know anything else about that account except the inference that
10 it was an account before 1996.
11         Let me say just, finally, one more word about
12 conspiracy as a basis for jurisdiction.
13         Conspiracy can be a basis for jurisdiction over a
14 foreign defendant where the conspiracy carried out evil
15 actions, terribly evil actions in this case, in the United
16 States, if the plaintiff can establish that the defendant was a
17 member of the conspiracy.  It isn't enough to allege that there
18 was a conspiracy.  The defendant has to be tied to it.  And the
19 argument is that the allegations against Prince Mohamad and
20 various other defendants don't make out a case, wouldn't make
21 out a case, even if all the alleged facts were true, that they
22 were members of a conspiracy.  And without that, they are not
23 entitled to discovery because, as the Second Circuit said in
24 the Jazini case, you have to have a prima facie case first.
25         The Second Circuit was considering the question

4acWterC

1   whether the Jazinis had asserted a basis for jurisdiction over
2   a Japanese corporation, Nissan Japan, the maker of Nissan
3   automobiles, and said, no, and said no, the plaintiffs aren't
4   entitled to any further discovery because they're, and I'm now
5   quoting from page 185 of the opinion in 148 F.3d, because the
6   allegations lack the factual specificity necessary to confer
7   jurisdiction, the conclusory statements without any supporting
8   facts that Nissan USA is wholly controlled by Nissan Japan, and
9   dependent on Nissan Japan for its business plan and financing
10   are but a restatement of factors to be considered under the
11   standards set forth in other cases for showing that a U.S.
12   corporation is an agent of a foreign corporation.
13        Those statements of legal conclusions are not enough
14   even to entitle the plaintiffs to discovery.  The allegations
15   that have been made against Prince Mohamad and other defendants
16   in this case, I carefully reviewed the complaint and I agree
17   that you should view the complaint as a whole, do not have the
18   specificity necessary to confer jurisdiction or entitle the
19   plaintiffs to discovery.
20        Thank you, your Honor.
21        THE COURT:  Okay, Mr. Cohen.  I think you reached into
22   your teammates' time.  I got your point.
23        MR. COHEN:  Thank you.
24        THE COURT:  Thank you.
25        MR. COOPER:  Casey Cooper, your Honor, on behalf of

97

4acWterC
1    Prince Sultan.
2            Mr. Motley did a masterful job this morning of
3    establishing a prima facie case of jurisdiction against Al
4    Qaeda.  He's absolutely right, Al Qaeda did target the United
5    States.  The fact of the matter is that Al Qaeda targeted and
6    continues to target to this day the Kingdom of Saudi Arabia and
7    specifically my client.  Osama Bin Laden named him in his 1996
8    fatwa that Mr. Motley mentioned calling him a traitor to the
9    nation.
10           In contrast, I heard nothing new today to establish
11   personal jurisdiction over Prince Sultan.  Two pieces of
12   evidence were specifically mentioned.  Mr. Motley claims that
13   an affidavit by the former French minister of interior,
14   Mr. Pasqua, describing a 1994 meeting with Prince Sultan, shows
15   that Prince Sultan was on notice that certain charities were
16   supporting Al Qaeda.  Your Honor, I have read that affidavit
17   now six or seven times.  Nowhere does it mention Al Qaeda, and
18   in fact the only charity that it mentions is the Muslim World
19   League.  The problem is the only charities that Prince Sultan
20   is on the record as supporting or as authorizing government
21   grants to on this record are the IIRO and the World Assembly of
22   Muslim Youth, not the Muslim World League.
23           Second, Mr. Motley mentioned an affidavit by William
24   Wechsler, regarding a 1999 meeting between U.S. officials and
25   unnamed Saudi officials.  Importantly, the affidavit never once

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC

1    mentions Prince Sultan.  I would echo what Mr. Cohen said about
2    really carefully parsing this evidence that the plaintiffs have
3    put forth.  It's been mischaracterized repeatedly, and it's
4    really a trap.
5            Another allegation mentioned by Mr. Carter, he said
6    that Prince Sultan heads an organization called Supreme Council
7    of Islamic Affairs.  That is correct.  Mr. Carter says that
8    that organization makes funding disbursements.  That is simply
9    not true.  There's nothing in the record to support it.  As a
10   matter of fact, the only donations in the record having any
11   connection with the Supreme Council of Islamic Affairs are to
12   the World Muslim Youth.  It's clear on the face of those, the
13   checks that we submitted, they're government checks.  It's
14   official conduct.
15           But more fundamentally, your Honor, even if all of the
16   plaintiffs' evidence says what Mr. Motley and Mr. Carter says
17   that it says, it's not enough under Burger King and Calder to
18   establish a prima facie case on jurisdiction.  No primary
19   participation.  No personal involvement in the wrongdoing that
20   gave rise to the plaintiffs' injuries.  As a result, under
21   Jazini, which the plaintiffs agree it appears applies because
22   they've not made out a prima facie case, there is no
23   entitlement to jurisdiction.
24           Mr. Carter seemed to assert that primary participation
25   as used by the Supreme Court in Calder doesn't really mean what

99

4acWterC

1  it says or applies only to certain classes of intentional torts
2  like libel but not others like, you know, terrorism.  The fact
3  of the matter is there's no support for that position of the
4  case law, and it's based fundamentally on this notion that
5  policy considerations can be the basis for an assertion of
6  personal jurisdiction on some lesser showing of minimum
7  contacts in certain cases.
8         The Supreme Court in Burger King addressed that exact
9  issue, quoting that while the courts properly may take into
10  account policy considerations, it is no substitute for
11  constitutionally required minimum contacts analysis.  I quote
12  471 U.S. 462 at 476.  Once it has been decided that a defendant
13  purposefully established minimum contacts within the forum,
14  these contacts may then be considered in light of other factors
15  to determine whether an assertion of personal jurisdiction
16  would comport with fair play and substantial justice.  Minimum
17  contacts is the threshold analysis.  It must come first.
18         Mr. Carter mentioned the Pugh case.  I stand
19  corrected, your Honor, it did involve certain individual
20  defendants over whom the court asserted personal jurisdiction.
21  It doesn't say so in the opinion, but I assume that these were
22  the actual terrorists who planted the bomb.  And that case is a
23  district court case, it is on appeal.  It is clear to us, and
24  we discuss it in our briefs, that to the extent Judge Jackson
25  in that case relied on a foreseeability analysis, it's directly

4acWterC

1    contrary to the Supreme Court's holding in Burger King.  The
2    case that is much more on point here is the one that I
3    mentioned in my opening presentation, the Ungar case out of the
4    District of Rhode Island, which the plaintiffs failed to
5    mention in their briefs, and, notably, they failed to mention
6    it in their presentation today.
7              Finally, your Honor, Mr. Motley referred to the recent
8    Kilburn decision in the D.C. Circuit, and he seems to suggest
9    that the proximate cause standard that was discussed there
10   under the noncommercial tort exception to the FSIA should
11   somehow be implied in the context of personal jurisdiction.  In
12   fact, your Honor, the very opposite is true.  Congress intended
13   for the foreign sovereign immunity exceptions to encompass a
14   minimum contacts analysis under the due process clause.  So
15   what that means in this case is that if Prince Sultan's alleged
16   private conduct does not give rise to personal jurisdiction for
17   all the reasons we've been talking about today, that same exact
18   conduct, the giving of a charitable contributions to a
19   nondesignated perfectly legal charity, cannot give rise to
20   personal jurisdiction over Prince Sultan if it's undertaken in
21   his official as opposed to personal capacity.  He's still
22   entitled to due process protections.
23             Thank you, your Honor.
24             THE COURT:  Thank you, sir.
25             Anyone else?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4acWterC

1          MR. LUTZ:  Yes, your Honor.  Good afternoon, your
2     Honor.  Christopher Lutz for the estate of Mohammad Aljomaih.
3          When I addressed the Court this morning, I observed
4     that when the plaintiffs have been called to account for the
5     specificity of their jurisdictional allegations, they have
6     tended to ignore specifics as to specific defendants and to
7     launch off into a set piece speech, and we heard that from
8     Mr. Motley this morning.
9          Now, as to Mr. Aljomaih, my interest was piqued when
10    Mr. Carter said that the complaints for each defendant
11    specifically allege how they aided and abetted or were involved
12    in the conspiracy.  You remember, Mr. Aljomaih is the
13    88-year-old now dead businessman as to whom there are no
14    allegations in the complaints.  When I listened to what
15    Mr. Carter had to say and he stopped, there was nothing about
16    Mr. Aljomaih.
17         The plaintiffs have been, through months of briefing
18    and minutes and hours of argument, asked to explain how the few
19    specific allegations they make get close to sufficiency for
20    personal jurisdiction, and they simply haven't done it.  In
21    fact, they had so little to say about some of the defendants
22    that they spent time referring to a man named Batterjee whom
23    none of the defense counsel that have spoken this morning
24    represent.  They have had nothing to say about Mr. Aljomaih.
25    What matters for personal jurisdiction purposes is their
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4acWterC

1   specific allegations on that point and whether they establish a
2   prima facie case of personal jurisdiction, not these
3   generalized allegations that Mr. Motley went through this
4   morning, and for Mr. Aljomaih, they said nothing.
5           Now, a final point, your Honor, on the Golden Chain,
6   the issue as to which you and Mr. Motley had a lively exchange
7   this morning.  Mr. Motley said at the end of the back and forth
8   with you that they didn't really know what it was, but they
9   wished they did.  Preliminarily, that's a remarkable basis in
10  the case of Mr. Aljomaih, a document that they don't quite know
11  what it is to accuse him of being an accessory to mass murder,
12  but that's where we stand right now.
13          I do want -- you ask about, you didn't ask so much,
14  your Honor, as a question of discovery to the Golden Chain came
15  up, and I want to address that as to Mr. Aljomaih.  To begin
16  with, for Mr. Aljomaih, the Jazini standards for jurisdictional
17  discovery are not met, but there's two other problems.  One is
18  a practical one, the man is dead.  Mr. Motley says that this
19  Golden Chain document was perhaps authored in 1988.  So that
20  discovery would somehow have to be trying to probe into the
21  supposed intent 16 years ago of a man who is no longer alive.
22  It seems to me not practical, besides being not legally
23  justified.
24          And the final point, of course, is that, as I said
25  this morning, Mr. Aljomaih's full name is not on the Golden

4acWterC

1   Chain, only his last name and only a city where he never lived.
2   A city 600 miles from where he lived for 60 years.  The
3   plaintiffs had the opportunity this morning, your Honor, and
4   through this afternoon, and they said nothing about Mr.
5   Aljomaih.  What they have said in their briefs is insufficient
6   and there is no personal jurisdiction over him.
7              Thank you.
8              THE COURT:  Thank you, sir.
9              Anyone else?
10             MS. BERNABEI:  Yes, your Honor.
11             THE COURT:  Oh, by all means.
12             MS. BERNABEI:  I'd just like to echo some of the
13  things that Mr. Lutz said.
14             Again, Mr. Motley claims that the defendants did not
15  address the general allegations made against awful them.  In
16  fact, that's not what this Court is looking at.  In specific
17  jurisdiction analysis, both Calder and PDK Labs in this circuit
18  made clear that you have to look at the specific contacts, the
19  specific actions, the specific defendants.
20             I'd like to just for a moment, even though we don't
21  believe this is the standard, look at the standard the
22  plaintiffs have put forth for holding a defendant in a personal
23  jurisdiction.  It's a foreseeability standard that they claim
24  is supported under Burger King and is somewhat mentioned in the
25  Helicopteros Nacionales case, two Supreme Court cases.  There

104

4acWterC

1   is absolutely no way that the plaintiffs can show that our
2   defendant, Mr. Al-Husaini, that it was foreseeable that if he
3   did make a contribution of a nature that the defendants say he
4   made or may have made, the plaintiffs say he made or had made
5   in 1988, that it was foreseeable that that would cause harm in
6   the United States in 2001.  There is simply no way they can
7   make that claim.
8         I'd also like to, again, echo the point about Jazini.
9   There is, Mr. Motley suggested that discovery would be
10   appropriate to help establish personal jurisdiction over these
11   defendants.  When there is no factual basis to assert personal
12   jurisdiction, there's not a prima facie case, you have a
13   document that is, you know, basically inscrutable, there is no
14   basis for a prima facie case on jurisdiction, there is no basis
15   to allow jurisdiction, excuse me, allow discovery on personal
16   jurisdiction.  Certainly in the case in chief against other
17   defendants, maybe they can probe this document and find out
18   more about it, but it certainly does not present a basis for
19   discovery in personal jurisdiction against Mr. Al-Husaini.
20         THE COURT:  Thank you, ma'am.
21         MR. LIEBMAN:  Your Honor, Ron Liebman for National
22   Commercial Bank.
23         Mr. Motley asks for discovery against NCB, but he
24   cites nothing in support of his request except a portion of
25   Judge Robertson's opinion dealing with Al Rajhi Bank.  That

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4acWterC

```
 1   citation is off the point.  As Mr. Cohen says, first of all,
 2   the plaintiffs are not entitled to discovery to make the prima
 3   facie case, but at page 97, at 274 F.Supp. 2d, the portion of
 4   the Judge Robertson decision that Mr. Motley cites to dealt not
 5   with specific jurisdiction but with general jurisdiction or the
 6   concept of doing business.
 7          What Judge Robertson dealt with were allegations that
 8   Al Rajhi had certain contacts with the United States.  I have
 9   dealt with the issue or the question of NCB and contacts with
10   the United States.  There were none.  And so, the plaintiffs
11   have not made a case for jurisdictional discovery.
12          With respect to Mr. Carter's comments, your Honor,
13   concerning charitable contributions, there is no allegation in
14   the complaints that NCB made contributions to charities that
15   have been named as terrorist organizations.  As the Seventh
16   Circuit cited or held in Boim, funding charities simpliciter is
17   not enough for a personal jurisdiction.  There are no
18   allegations in the complaint of facts to support knowledge and
19   intent on the part of NCB.
20          Now, with respect to Mr. Carter's comments about
21   Kahlid Bin Mahfouz and his role at NCB, Judge Robertson also
22   dealt with this point, again with respect to Al Rajhi Bank.
23   Judge Robertson held that without an allegation of scope of
24   employment, it is not permissible to hold against the bank
25   actions, if any, of the bank's CEO.  With respect to scope of
```

4acWterC

1    employment, the plaintiff -- and Kahlid Bin Mahfouz, the
2    plaintiffs themselves allege that Mr. Bin Mahfouz had many
3    different roles.  They allege he was the founder of the Blessed
4    Relief Foundation, or Muwafaq.  They've alleged that he was an
5    investor in businesses, including the Saudi Economic and
6    Development Company, the Nimir Petroleum, and that he was
7    executive not just at National Commercial Bank but at another
8    bank as well, BCCI.  So he had lots of different roles, and
9    there's no allegation that anything they claim Mr. Bin Mahfouz
10   did he did within the scope of his employment at the time as
11   the CEO of National Commercial Bank.
12           And, finally, your Honor, with respect to the claims
13   against Mr. Kahlid Bin Mahfouz, an English court, this year in
14   July of 2004, entered a judgment that declared as false the
15   allegation that as chairman of NCB, Mr. Bin Mahfouz diverted
16   funds or otherwise supported Osama Bin Laden or Al Qaeda.  Now,
17   the Court, of course, is not bound by that finding, those
18   findings of fact and that judgment, but under principles of
19   international comity, it is entitled to considerable deference.
20           Thank you, your Honor.
21           THE COURT:  Thank you, sir.
22           MR. KAHN:  Your Honor, Peter Kahn, on behalf of
23   Abdulrahman Bin Mahfouz, the son of Kahlid Bin Mahfouz you've
24   been hearing about from Mr. Liebman.  Three very brief points.
25           Mr. Carter alleged that I wasn't playing it straight
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4acWterC

1    with the Court this morning when I stated that Muwafaq has not
2    been listed by the United States Government as a specially
3    designated terrorist organization.  He cites apparently an
4    alleged Department of Treasury press statement to the contrary.
5    We've never seen such a document, but what we have seen is the
6    official record of the United States Government, which we cite
7    to this Court on the Web site, and that is given at pages 3 and
8    4 of our reply brief.  That is the official record of the
9    United States Government, Muwafaq is not a specially designated
10   terrorist organization.
11          Second, I believe Mr. Carter claimed that we
12   misunderstood the basis for plaintiffs' claim of personal
13   jurisdiction against Abdulrahman Bin Mahfouz.  If I understood
14   his argument, he said they were not relying on the acts of the
15   corporations with which he's been involved but rather on his
16   individual acts, and yet he turned around and said we are
17   relying on the fact that he was an agent of these corporations.
18          Your Honor, which one is it?  If it's in his
19   individual capacity, they have made no allegations of any
20   personal contacts with the United States.  And if it's based on
21   the acts of the corporation, they made no allegations that he
22   participated in, ratified, or even knew of the alleged
23   wrongdoing.  They have simply not established personal
24   jurisdiction against him.
25          Finally, your Honor, you may recall that at the end of

```
        4acWterC
 1    Mr. Motley's remarks this morning, he said that certain
 2    defendants who had argued earlier in the day should not be
 3    heard to complain that there were few, if any, specific
 4    allegations in the complaint made against them.  And I believe
 5    I was one who made such a charge.  He said that the general
 6    allegations in the complaint against all the defendants should
 7    suffice.
 8              Well, your Honor, that argument is not well founded.
 9    It's contrary to well established law, including at least three
10    cases here in the Southern District of New York.  We cite them
11    at pages 1 to 3 of our reply brief at footnote 1 therein, and
12    we respectfully ask the Court to take a look at those cases.
13    Even the simplified pleading requirements of Rule 8 require
14    that plaintiffs plead that Mr. Bin Mahfouz himself and not
15    merely, quote/unquote, all defendants engaged in specific
16    conduct giving rise to plaintiffs' claims.
17              Thank you, your Honor.
18              THE COURT:  Thank you, sir.
19              MR. GAUCH:  Your Honor, James Gauch on behalf of the
20    SBG defendants.  I fear I'm on borrowed time.  I'll be very
21    brief.
22              Simply two points.  First to amplify what Mr. Cooper
23    said in response to the plaintiffs' reliance on the Pugh case
24    for the proposition that FSIA standards of due process should
25    be imported in the ATA.  There's also another decision out of
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

109

4acWterC

1    the District of Columbia, more recent, decided earlier this
2    year, Biton, v. Palestine Interim Self-government, 310
3    F.Supp.2d 172, which, at page 178, adopts exactly this
4    position:  "The court notes that the differences between the
5    ATA and FSIA are too great for the common focus on
6    antiterrorism to allow cross-pollination on this issue."  And
7    therefore the Court declined to extend Flatow and Rein, the
8    principles of those cases to ATA claims, filed against nonstate
9    defendants.
10           Second point, in several hours of argument, there are
11   occasional flashes of insight.  One of these, I think, came at
12   the beginning of Mr. Motley's presentation when he complained
13   that the defendants were claiming that no one should be in this
14   court, "not even people whose name is Bin Laden."
15           That to me is not an extraordinary proposition.  I
16   think the other defendants here today would agree with me today
17   that this case isn't about names and about vague associations;
18   it's about specific factual conduct.  It takes much more than a
19   name or an association unspecified in time and place to force
20   foreign organizations or foreign individuals to defend
21   themselves in a U.S. court.  The plaintiffs have failed to
22   supply that, and therefore, we urge that you grant a motion to
23   dismiss.
24           Thank you.
25           THE COURT:  Thank you, sir.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

110

4acWterC

```
 1            MR. MOTLEY:  Your Honor, Ron Motley.  May I have one
 2   minute?  We didn't take our 90, Judge.
 3            THE COURT:  You can have a minute.
 4            MR. MOTLEY:  Thank you, your Honor.
 5            Your Honor, Rule 8 does not require a 10,000-page
 6   complaint.  Thank you.
 7            THE COURT:  All right.
 8            What time are we on Thursday?  Thank you, all, very
 9   much.  I'll reserve decision and I'll see you all, I believe
10   it's 10:00 on Thursday morning.
11                            o0o
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```