# Exhibit 4

Jonathan M. Winer

Page 1 of 19

Case 1:03-md-01570-GBD-SN   Document 1048-13   Filed 07/12/05   Page 2 of 20

IWS - The Information Warfare Site

Search Site: [___] Go

Home | Terrorism | Categories | Infocon | Reviews | Forum | News | Mailing Lists | Links | Support IWS
About IWS | Site Map

**TESTIMONY**

**Origins, Organization and Prevention of Terrorist Finance**
**Testimony**
**Jonathan M. Winer**
**Alston & Bird LLP**
**Former U.S. Deputy Assistant Secretary of State**
**International Law Enforcement**
**U.S. Senate Committee on Governmental Affairs**
**July 31, 2003**

Mr. Chairman and Distinguished Members of the Committee:

I am honored to testify here today to share my views on terrorist finance, developed during my service as Deputy Assistant U.S. Secretary of State from 1994 through 1999, and most recently, in connection with my service on as a member of the Independent Task Force of the Council on Foreign Relations on Terrorist Finance chaired by Maurice R. Greenberg and directed by William F. Wechsler and Lee S. Wolosky. My testimony has been heavily informed by and is consistent with the report issued by that Task Force in the fall of 2002, whose recommendations I endorse. The views as expressed are my own, but the recommendations I make here parallel in large part those of the Task Force as regrettably few of the recommendations made almost a year ago have yet to become reality.

On the U.S. side, it is essential that the Administration declassify much of the information it may have regarding Saudi terrorist finance, starting with the matters pertaining to the September 11 attacks. With almost two years having passed since the attacks, it can do so without imperiling investigations: the terrorist financiers covered their tracks long ago. I spent years reviewing highly sensitive intelligence information pertaining to illicit finance. I do not find credible the assertions that have been made that declassifying information provided to Congress by the Administration more than a year ago would jeopardize U.S. national security. Sunlight is the best disinfectant. The people have a right to know about the trail of money that made it possible for the September 11 terrorists to murder our people. The material should be declassified.

As a second recommendation, let me emphasis how important it is that the government of Saudi Arabia make public what it knows regarding terrorist finance activities of some key Saudi Arabian businessmen as well as make public what it has done to seize the assets of and punish its terrorist financiers. It is deeply ironic that Saudi Arabia has demanded that the U.S. declassify and release portions of the September 11 report that reportedly discuss Saudi terrorist funding. The Saudi government itself continues to maintain secrecy about what it

now knows about past financial support for terrorism on the part of Saudi businessmen. It similarly continues to maintain secrecy about its own actions, if any, against the assets of such businessmen.

The relationship between the U.S and Saudi Arabia has been sorely torn by September 11. If Saudi Arabia is to repair that relationship, as well as restore its image internationally, it needs to go beyond the public actions it is now taking against terrorists in Saudi Arabia, to take public actions against those who funded Al Qaeda, permitting the allocation of millions of dollars donated in the name of charity to Islamic terrorists who used them in the cause of mass murder.

## Summary

Until the terrorist attacks of September 11, 2001, terrorist finance had remained a back-burner issue internationally, despite efforts by the U.S. to require countries to make it a serious crime and to prosecute it as a serious crime. Combating terrorist finance was especially minimalist in the Middle East, where no jurisdiction had taken substantial steps to discourage it, and few even had minimal anti-money laundering or financial transparency laws in place.

Since the attacks, international organizations, responding largely to US-led efforts, issued a series of measures mandating that jurisdictions curtail the passage of terrorist finance, including UN Security Council Resolution 1373, the FATF Eight Special Recommendations on Terrorist Finance, and significant initiatives by the G-8 and the European Union. Each of these resolutions made clear in broad terms that nations must take more action to inhibit the passage of terrorist finance through domestic financial institutions. These international efforts were supported by individual acts of legislation passed by numerous jurisdictions, including global financial centers such as the United Kingdom and United States, and states in the Middle East and southwest Asia previously known for minimal oversight of their financial sectors. The resolutions were passed in an effort to impede the passage of funds to terrorist groups in the Americas, Asia, Middle East and Western Europe.

During the first two years after the September 11 attacks, these initiatives have achieved modest successes. Several dozen nations have seized terrorist assets, together comprising more than $112 million, according to the UN terrorist monitoring group. Many more countries, including a number in the Middle East, have declared that despite diligent search, there have been no terrorist funds to be found. The U.S has shut down one substantial international hawala network, Al Barakaat. However, there is little evidence to date that new laws requiring alternative remittance houses to register, enacted in the U.S., Hong Kong and elsewhere, have yet had the desired effect of forcing such institutions to either submit to regulation and transparency or to shut down. While a substantial number of countries have enacted new laws and imposed new regulations to avoid name and shame lists, institutions licensed in poorly regulated jurisdictions still have substantially unimpeded access to the financial institutions and markets of New York, London, and Tokyo. Gold and diamond markets, hedge funds, and free-trade zones continue to abound, with few controls and open access to international wire transfer capabilities. In practice, while terrorist groups face new risks in laundering their money, they continue to have a variety of mechanisms by which to finance their activities, involving a range of both banking and non-banking financial institutions. Further progress in protecting against international terrorist finance is unlikely without international action to require customer identification and verification, know-your-customer, and the

ability to trace funds across jurisdictions. Whether non-Islamic states with sophisticated financial services sectors will require the financial institutions they regulate to require such standards of their foreign counterparts, especially in the Middle East and Asia remains to be seen.

Much about the origin and history of recent terrorist finance remains veiled not only by the terrorists but also by ongoing investigative efforts and government secrecy. But one core fact should by now no longer be in dispute: Saudi Arabia has been the most significant source of terrorist funds for Al Qaeda. Accordingly, the response of Saudi Arabia to the terrorist finance problem remains at the center of an effective global response to terrorism. Although Saudi Arabia has now undertaken a series of actions to combat terrorist finance, it has yet to take a number of critically important public actions that will be essential for the further disruption of Al Qaeda's global operations. Steps that have been taken include Saudi disruption of operational cells and arrests or killings of more than 25 suspected members of al Qaeda; announcements that audits of Saudi based charities have been completed; condemnations of extremism and arrests of radical clerics. However, other major terrorist financiers continue to live in Saudi Arabia not visibly affected by enforcement activity.

For further progress against terrorist finance, both the U.S. and Saudi Arabia need to take further actions. Here at home, we need to centralize coordination and oversight of terrorist finance. The President should appoint a special assistant for terrorist finance, as was proposed last fall by the Council on Foreign Relations Task Force on Terrorist Financing. The U.S. should press the EU, the G-8, and all countries in the Middle East to criminalize all fundraising for Hamas, everywhere. The U.S. Treasury should use the Patriot Act Section 311 special designations to apply sanctions to designated foreign financial institutions that we know to have allowed themselves to be used for funneling terrorist funds, tailoring the sanctions to achieve the maximum impact on terrorist financing. We should be sharing greater information with the U.S. private sector regarding what we know and suspect about terrorist money laundering and finance. We should be intensifying our training efforts with other countries on specific strategies to counter terrorist finance. And when it comes to terrorist financiers, regardless of their location or their nationality, we should be prepared to name names and freeze assets, regardless of such political considerations as whether the terrorist financiers live in a large, oil producing Gulf State. As for Saudi Arabia, it needs to arrest terrorist financiers, freeze their assets, and announce these actions in public. Without substantial and visible public actions by Saudi Arabia against terrorist financiers, continued stress in the U.S.-Saudi relationship is not merely probable.

**Funding Methods For Terrorism.**

The methods employed by terrorist groups to garner illicit profits are varied, and each group routinely employs one or more mechanisms to raise funds, to place and layer funds, and to invest funds for terrorism. These include a mixture of ideological, religious, criminal, and business sources, which often mingle and merge, so that it becomes difficult to determine the provenance of any particular terrorist funds in any given case.

Terrorist funds for Al Qaeda have come not only from misapplied Islamic charitable contributions but also from investments in otherwise legitimate businesses, such as Al Barakaat's financial services and Telecommunications Empire. Traditional sources of funds for criminal organizations are also tapped,

especially extortion. There also been a number of reports that businessmen paid Al-Qaeda operatives extortion money to prevent attacks on their business interests throughout the Middle East. The alleged payments were made to assuage Bin Laden, who reportedly threatened to initiate attacks against targets in politically moderate Middle Eastern states, such as Jordan and Saudi Arabia. Similarly, the tiny Abu Sayyaf Group (ASG), which controls sections of the southern Philippines and has close ties with a number of Middle Eastern terrorist groups, routinely demands monthly "revolutionary taxes" from local residents, businessmen, and white-collar workers. It also raises funds through kidnappings for ransom.

Terrorist groups are also linked to narcotics trafficking. The LTTE, a highly organized terrorist group centered in the northern and eastern coastal areas of Sri Lanka, reportedly has close ties to drug trafficking networks in Burma, and members of Hizballah are linked to drug trafficking in Lebanon. The Al-Qaeda network received millions of dollars per annum through the production and distribution of opium, which was smuggled through neighboring Central Asian states, or transported to distribution networks in East Africa. Many terrorist groups have also been linked to other criminal activities, including smuggling and counterfeiting operations. For instance, the Real IRA is active in smuggling assorted goods into Great Britain. In recent years the Real IRA established close links to British criminal groups to sell converted diesel fuel on the black market. Moreover the Real IRA established tobacco-smuggling operational links to east European mafia, and oversees counterfeit operations that produce pirated copies of compact discs and videocassettes. When these illicit profits are coupled with the millions of dollars raised by Irish communities in the United States, the Real IRA can easily afford to recruit new members, construct bomb-making facilities, procure light weaponry, and maintain close contact with other terrorist groups, especially in the Americas.

Funds raised through criminal activities are supplemented with private donations. Prior to Al Qaeda taking advantage of charitable contributions, this approach was undertaken by both Hamas and Hizbollah, which during the 1980 and 1990s received significant financial support from Palestinian émigrés in Western Europe and the US, and even greater support from wealthy Muslims within the Middle East in their course of their making of zakat, or charitable contributions. Since the onset of the Second Intifada in mid-2000, Muslim clerics and religious leaders from Lebanon, Sudan, Algeria, and Jordan publicly and routinely solicit Muslims to support suicide attacks against Israel by making donations to Hamas activists. The backing of religious leaders in the Middle East provides Hamas with spiritual support, and assures a sympathetic presence in mosques, which routinely collect funds for the movement. Efforts to combat terrorist finance schemes were bolstered by pledges from Kuwait, Bahrain and the United Arab Emirates to improve the monitoring of charitable donations. This may prove a difficult task. Intelligence agencies anticipate that the increased presence of U.S. troops in the Middle East may foster anti-US sentiment in the region, and increase donations to charities linked to Middle Eastern terrorist groups.

The growing sophistication and participation of Islamic investors in western finance has also provided an increased source of opportunity for terrorist finance. International investigations continue among securities regulators to determine whether international commodities and futures markets, customarily a secure means of conducting financial transactions with relative anonymity, were used by buyers who knew about the 11 September attacks in advance. In the days after the attacks on the U.S., financial regulators uncovered an unusual pattern of

purchases in shares of a number of companies that fell 40% after the attacks, and other suspicious investments. Though no certain links have been made to members of terrorist organizations, at least one purchaser of the suspect investments reportedly left more than $2 million in profits uncollected after September 11, rather than claim the funds and thereby risk identification.

The extent to which nation-states continue to sponsor terrorist groups remains an open question. The Al-Qaeda network received significant passive and active support from more than one government in the region, and its support from wealthy Saudi Arabians is by now difficult to dispute based on documentation found on the hard drives of computers used by Al Qaeda operatives. U.S. officials continue to signal, with little public evidence to date, that Iraq may have provided support for some Al-Qaeda operations, including the attack on the USS Cole in October 2000. There are also reports that Iran has significantly increased funding to a number of Middle Eastern terrorist groups. In an attempt to radicalize the Palestinian peace process and establish an Islamic Palestinian state similar to its own, Iran has allegedly increased its financial support for Hamas through wire transfers in Jordan. According to public reports, the Iranian embassy in Damascus has been frequently used as a meeting place for members of Hamas and Iranian intelligence agents, suggesting ongoing cooperation among Syria, Iran and Hamas.

**Role of The Muslim Brotherhood.**

The Muslim Brotherhood ("Brotherhood") has played a central role in providing both the ideological and technical capacities for supporting terrorist finance on a global basis. Officially Jamiat al-Ikhwan al-Muslimun, literally translated as the Society of Muslim Brothers, the Muslim Brotherhood was founded as a religious and political organization in Egypt in 1928 by an pan-Islamicist, Hasan al-Banna. Early opposed to secular tendencies in Islamic nations, the organization has sought to foster a return to the original precepts of the Qur'an. It grew rapidly, establishing an educational, economic, military, and political infrastructure. Threatened by its power, Egypt's government banned the organization in 1948 and 1954. It has since existed largely as a clandestine but militant group, marked by its rejection of Western influences.

Elements of the Brotherhood reached Saudi Arabia and the other Gulf states following the Egyptian disaspora. Egyptian Salawfi Muslims involved in the Brotherhood came into closer contact with Saudi Wahabism, and the Brotherhood began to access to Saudi and other Gulf state funds through the zakat process. As a result, Islamic militants had access to revenue streams with no controls that they used to support Islamic associations, Islamic proselytizing, and in some cases, militant and terrorist activity. This Gulf State support, in which Kuwait has played a substantial secondary to Saudi Arabia's primary role, has likely been the most significant source of Al-Qaeda's funding.

As described by Kuwaiti liberal politician Abdallah Bishara, "Charitable associations of Kuwait, Saudi Arabia and other Gulf countries have invested huge sums in Afghanistan and its neighboring countries to create a structure of schools, Koranic seminaries, Islamic cooperatives, humanitarian associations, and social services networks that feed Islamic terrorism. This Islamic system is the rear echelon that supports Bin Laden. And this is why it becomes truly specious to try to check with a magnifying lens whether this money has indeed ended up in Bin Laden's pockets. What really counts is knowing that the military training camps in Afghanistan, Pakistan, Kashmir, and Chechnya that are under

Bin Laden's authority are nurtured by that Islamic system which in its turn was created with money from the Gulf. You will not find a single cent in the possession of these organizations that did not come from the Gulf region. . . . If it were wanted to dry up the funding sources of terrorist organizations at the world level it would not be difficult, because they are all concentrated here in the Gulf region."

One example of the relationship of the Brotherhood to the development of Al Qaeda funding networks, as well as to the involvement of wealthy individuals from Gulf States, is he allegation that Al Taqwa, one of the Brotherhood's major financial mechanisms during the 1990's, received funds from Kuwait and the United Arab Emirates that were then transferred to its accounts in Malta and Lugano and then to the Bahamas. Another is the number of Islamic institutions based in Yemen with alleged ties to the Muslim Brotherhood alleged to act as incubators for terrorist training. These included the al-Baihani school in Aden, owned by a charity, now forcibly closed by Yemen's government, the private al-Iman university, run by Sheikh Abd al-Majid al-Zindani, a leader of the Islah party's radical wing, also temporarily closed, and the Dar Al-Hadith institute, located in a tribal region where Yemeni forces had been searching for suspected Al-Qaeda members, was closed. Last year, the government pushed through a bill unifying the education curriculum and abolishing the so-called scientific institutes - strict Islamic schools with connections to Sudan's erstwhile spiritual leader, Hassan al-Turabi, and, allegedly, Osama bin Laden

The Brotherhood's role in the development of other militant Islamic organizations is also illustrated by its relationship to the establishment of the Indonesian terrorist group Jemaah Islamiya, the JI, created with the aim of setting up an Islamic state in Indonesia. JI's founder has acknowledged being inspired by the Brotherhood in the goal of jihad as a means to the creation of an Islamic state in South East Asia covering Malaysia, Indonesia, Singapore and the southern Philippines. JI then received funding from wealthy Saudis affiliated with Al Qaeda. In turn, the Brotherhood's central financial mechanism, Al Taqwa, established operations in Malaysia that linked to JI. According to the U.S. Treasury, the al Taqwa group, which was designated as terrorist financiers by Treasury on November 7, 2001, has long acted as financial advisers to Al Qaeda, with offices in Switzerland, Liechtenstein, Italy and the Caribbean, providing direct assistance to Osama bin Laden as well as investment advice and cash transfer mechanisms for Al Qaeda and other radical Islamic groups.

Separately, the Brotherhood has been characterized by the U.S. Treasury as the parent from which Hamas ultimately emerged. It also has been linked to a wide range of Islamic terrorist groups, including at various times over the past two decades, the Tamil Tigers, the Afghan mujahidin, the Kashmiri mujahidin, and wars of Islamic revival from Algeria to Egypt, Sudan to Saudi Arabia, Bosnia to Chechnya, Afghanistan to Kashmir, and Central Asia to Mindanao in the Philippines.

In summary, the Brotherhood spread both the ideology of militant pan-Islamicism and became the spine upon which funding operations for militant pan-Islamicism was built, taking funds largely generated from wealthy Gulf State elites and distributing them for terrorist education, recruitment, and operations widely dispersed throughout the world, especially in areas where Muslims hoped to displace non-Muslim or secular governments.

**International Efforts to Counter Terrorist Finance.**

The United Nations Convention for the Suppression of Financing of Terrorism was proposed eighteen months before 11 September 2001, but had received little serious attention. Forty-one states had signed the Convention, but only six had ratified the convention before September 2001. After 11 September 2001, in an effort to assure U.N. support for combating terrorist finance schemes, the UN Security Council unanimously adopted Resolution 1373 (UNSCR 1373), a binding document that requires all 189 U.N. member states to criminalize the use or collection of funds intended, or known to be intended, for terrorism; freeze immediately funds, assets or economic resources of persons who commit, attempt to commit, or facilitate terrorist acts and entities owned or controlled by them; prohibit nationals or persons within their territories from aiding or providing any aid to the persons and entities involved in terrorism; refrain from providing any form of support to entities or persons involved in terrorism; and deny safe haven to those who finance, plan, support, or commit terrorist acts, or provide safe havens.

Member states were required to submit progress reports, providing information as to how they have implemented Resolution 1373 by the end of 2001. The incomplete, and in some cases misleading responses provided a window of the distance yet required to combat terrorist finance by governments in some of the most vulnerable countries. For instance, UAE described as anti-terrorist legislation laws forbidding efforts to engage in armed overthrow of the governments of the UAE. Responses by Yemen and Oman were too vague to permit analysis of whether they had undertaken any substantial anti-terrorist efforts. During 2002, however, a number of countries, including most of those in the Middle East other than Saudi Arabia, enacted comprehensive anti-money laundering and terrorist finance laws, which on paper at least fully implemented Resolution 1373.

At the community level, the European Union (EU) undertook several efforts against terrorist financing and money laundering in the wake of September 11. On 4 December 2001 the European Community adopted an amendment to Directive 91/308, its main anti-money laundering instrument, to expand reporting obligations to include attorneys, and require the oversight of funds channeled through exchange bureaus .The EU also froze the assets of terrorist groups, charities and individuals linked to terrorist finance schemes, established a counter-terrorist unit within Europol intended to work closely with US counterparts, and pledged to ratify a convention on mutual assistance in criminal matters during the course of 2002. The EU undertook plans to introduce a union-wide arrest warrant to replace the current extradition system between the countries. Within the EU, however, legal measures are generally not applicable until they have been undertaken by individual EU member states, many of which have been slow to take action curtailing illicit finance schemes. In other cases, some EU states have taken independent views of which groups activities are terrorist, and which are not subject to sanction. For instance, the EU has not frozen the assets of organizations affiliated with HAMAS, only funds destined for Izz al-Din al-Qassam, the military arm of Hamas. Investigators, however, routinely link the funding of Hamas militant activities to Hamas front organizations that claim to support only social activities in the Middle East.

The FATF responded to the September 11 attacks by explicitly adding terrorist finance to its existing remit to combat money laundering after a two-day meeting in Washington in late October 2001. It issued a series of Eight Special Recommendations dealing specifically with terrorist financing, which if systematically implemented and enforced, would have a substantial impact. The

recommendations highlighted the level of work still be undertaken, asking countries to ratify the 1999 UN Convention for the Suppression of the Financing of Terrorism and UNSCR Resolution 1373; to criminalize the financing of terrorism, terrorist acts and terrorist organizations; freeze and confiscate terrorist assets; report suspicious transactions linked to terrorism; provide the greatest possible measure of assistance to enforcement agencies in other jurisdictions that investigate terrorist financing; impose anti-laundering requirements, such as licensing, on alternative remittance systems; strengthen customer identification measures in all wire transfers; and to ensure that non-profit organizations and charities are not misused to finance terrorism.

FATF member states pledged to implement the Eight Special Recommendations by June 2002, and develop a process of self-assessment to aide other states in implementing the new recommendations. This deadline, however, was not met, because of a lack of cooperation in the international financial community, especially from the Gulf States, none of whom have yet to implement the entire array of Eight Special Recommendations. In theory, the FATF could "blacklist" non-cooperative countries and call on its member states to implement sanctions, such as detailed inspections of accounts that contain funds from non-compliant jurisdictions or a reduction in bilateral and international aid programs. But to date, the FATF has not undertaken action to name and shame for failures to abide by terrorist finance recommendations.

After September 11, the International Monetary Fund (IMF) and the World Bank each pledged to assist in the campaign to cut terrorist funding. In November 2001, the IMF's International Monetary Financial Committee (IMFC) called on all countries to establish financial intelligence units and to increase information sharing across jurisdictions. The IMFC also agreed to counter terrorist financing by accelerating its program of offshore financial center assessments, and to work more closely with the FATF. The World Bank held a ministerial-level meeting in November 2001, and pledged to aid in capacity-building in states that are ill-equipped to regulate money laundering or terrorist financing and are unlikely to meet the new international standards. However, neither of these organizations has chosen to make financial transparency, including effective action against money laundering and terrorist finance, a conditionality on further lending activities.

At a closed meeting held in Monaco on 7 June 2002 members of the Egmont group, an informal organization composed of experts in financial intelligence from 78 countries, met to discuss on-going efforts to combat terrorist finance schemes. The frank discussions revealed a growing frustration toward a number of Gulf States for failing to track funds linked to al-Qaeda. Western regulators expressed marked concern over the failure by jurisdictions in the Middle East to provide assistance to enforcement agencies in other jurisdictions, confiscate terrorist assets, and impose licensing requirements on alternative remittance systems, especially hawaladars located throughout the region.

**Efforts by Middle Eastern States to Curtail Terrorist Finance.**

The well-publicized transfer of funds from financial institutions in the United Arab Emirates (UAE) to al-Qaeda cell members in the United States has caused the UAE to reverse years of inactivity, and pass legislation to combat financial crimes. In early October 2001 the UAE put into force the Law Regarding the Criminalization of Laundering of Property Derived from Unlawful Activity, and drafted legislation to criminalize hawalas. Individuals convicted of an irregular money transfer to finance kidnapping, piracy and terrorism in the UAE could

receive a seven-year prison sentence and a $272,000 fine. Financial institutions are now obliged to report suspicious transactions and the Central Bank is authorized to freeze suspected assets up to seven days. A financial information unit is to be formed within the Central Bank, as well as a National Anti-Money Laundering Committee, chaired by the Governor of the Central Bank. Significant problems still plague financial institutions located in the UAE. There have been no convictions related to financial crimes in the emirates, and Western regulators remain skeptical over the ability of UAE to oversee transactions through hawala brokers. Notably, many bank tellers in the UAE are South Asian immigrant workers, for whom questioning or challenging of the local documentation of an UAE citizen could prove problematic.

UAE concrete action to assist in efforts to combat terrorist finance schemes over the fall and early winter of 2001 presaged other Middle Eastern states initiating nascent steps to combat terrorist finance schemes. In early 2002, Saudi officials invited the FATF into the Kingdom and instructed the appropriate authorities to assist in the preparation of regulations to curtail financial crimes. The Saudi Arabian Monetary Authority reportedly began monitoring 150 suspicious accounts at the request of US law enforcement officials. Western officials have expressed concerns, however, at pronouncements from Saudi officials who have stated that accounts held by Saudi nationals are only being monitored in financial institutions located outside of the Kingdom. Despite conflicting statements by U.S. officials, no one has yet identified any bank accounts related to terrorist finance schemes that have been frozen by Saudi officials. Other states in the Gulf have followed Saudi Arabia, mixing reform and denial. In late March 2002, for example, Oman issued an anti-money laundering law as part of a pledge to combat the financing of global terrorism. However, at the same time, authorities in Oman continue to contend that domestic financial institutions are not vulnerable to money-laundering, despite the reality that Oman abuts the Pakistan/Afghanistan/Iran/Europe drug smuggling route, and offers a sophisticated financial infrastructure to assist in the transfer of illicit assets out of the region.

**Central Role of Saudi Arabia**

In my judgment, based on the public information I have reviewed since the September 11 attacks, Saudi Arabian funders have constituted the preponderant sources of funds for the development of Al Qaeda, and a major source of funds for many other terrorist organizations, including Hamas. Notably, however, the public evidence regarding Saudi support of terrorists is both murky and voluminous. It is murky because only sparse evidence in the form of documents and witnesses has been made public regarding particular terrorist financiers by the U.S. or other governments since the September 11 attacks. It is voluminous in that most of the major elements of Al Qaeda have reported Saudi funding ties, and Saudi funds permeate the world of Islamic charities, supporting entities in the Middle East, South Asia, Southeast Asia, Europe and North America tied to terrorism. On a regional basis, such terrorist funding links include:

· In Pakistan, support for religious schools by Saudi charities that have become training grounds for Al Qaeda at a sufficiently dangerous level that President Musharref has requested such support to cease.
· In Afghanistan, Albania, Bosnia, and Chechnya, direct support for Islamic resistance by Saudi charities such as Khalid bin Mahfouz's and Yasin al Qadi's Muwafaq or Blessed Relief and Benevolence International, as well as providing direct support to Hamas for terrorist activities.

· In Europe, financial support for Mosques linked to Al Qaeda and/or the Muslim Brotherhood, in such countries as Germany, Italy and the United Kingdom. This has included funneling by Al Qaeda of funds from Saudi Arabia to front companies in Madrid, Spain between 1995 and 2001. The companies were allegedly controlled by Muhammad Galeb Kalaje Zouaydi, European chief financier for Al Qaeda, and a Syrian (not Saudi) national. Allegedly, hundreds of thousands of dollars flowed from Saudi Arabia into the accounts of these companies and to Al Qaeda and other radical Islamicist groups.

· In the U.S., funding of numerous charities by Suleiman Abdul Al-Aziz al-Rajhi, a senior member of one of Saudi Arabia's most prominent families. These charities, largely based in Herndon, Virginia, are according to press reports under current investigation by the FBI and have been in turn linked to Muslim Brotherhood specially designated terrorist finance company Al-Taqwa.

· In the Philippines, funding by Khamil al-Shalifa, a brother-in-law of Osama bin Laden, of Abu Sayyaf and possibly of Jamaah Ismaliya in Indonesia.

**What's the Evidence for Terrorist Finance Involving Saudi Arabians?**

There are many data points regarding Saudi Arabia and Saudi Arabian persons as sources of funds for Al Qaeda and other terrorist groups, but little narrative material laying out and integrating the data into a cohesive account. Moreover, because of the scanty information that has been made public, it remains very difficult to determine the extent to which persons that have been publicly identified as linked to terrorist finance intentionally engaged in the activity, or provided funds that were then abused by others, or taken beyond authorized military purposes, such as funding Hamas or rebels in Chechnya, or always intended for Al Qaeda's general use.

**Current public information about these strands includes:**

The Golden Chain. A handwritten list found by the FBI in a raid of the Saudi charity Benevolence International in Sarajevo in March 2002 purports to specify 20 wealthy donors to Al Qaida, including "the bin Laden brothers" and "Baterji," an apparent reference to Adel Abdul Jail Baterjee.

The Spanish/Saudi Connection. Mohamed Galeb Kalaje Zouaydi, a Syrian-born businessman charged with financing the September 11 terrorist attacks, allegedly channeled 670,000 Euros to Al Qaeda cells in the U.S., Germany, Saudi Arabia, Belgium, China, Turkey, Jordan, Syria and the Palestinian territory. According to Spanish police, Zouaydi lived in Saudi Arabia from 1996-2000, where he collected funds for purportedly charitable purposes that he then used to fund Al Qaeda. These operations were in turn linked to the purchase of weapons from Kosovo Albanian guerrillas for bin Laden's operations in Afghanistan and financial support for a Yemenese who attempted to murder the Prime Minister of Yemen. In the fall of 2002, U.S. and Spanish investigators were quoted as expressing frustration with their inability to obtain information from the government of Saudi Arabia regarding the "hundreds of thousands of dollars" that flowed from Saudi Arabia into the accounts of the Spanish companies used as conduits for money to Al Qaeda and other radical Islamic groups.

Allegations Regarding Major Saudi Bankers and Businessmen. Press accounts have repeatedly identified a small number of potentially significant sources of terrorist funds from Saudi Arabia, although the limits to publicly available information continues to make an informed assessment possible of the involvement of any of these individuals in the alleged activity. Reported names

include such persons as Yasin Al-Qadi (Muwafaq); Sheikh Saleh Kamel, chair of the Dallah Al Baraka Group; Khalid bin Mahfouz and possibly some of his relatives; the Al-Rajhi Family, including Saleh Abdul Aziz Al Rajhi; Wael Hamza Jelaidan (Rabita Trust); the Abdullatif Jamil Group of companies; and Adel Abdul Jalil Batterjee.

Allegations Regarding Major Charities. Saudi funds have supported Islamic charitable activities throughout the world, for Islamic centers, mosques, schools, health care facilities, food distribution, and housing. Some half a dozen of the most visible charities, including two of Saudi Arabia's largest, the International Islamic Relief Organization ("IIRO") and the World Muslim League, have repeatedly been linked to supporting terrorist organizations in areas well beyond the Persian Gulf. These include:

The IIRO. Established in 1978, the IIRO has branches throughout the world. Its official activities, as specified on its website, include building mosques, financing and administering schools and sponsoring orphans. Its alleged finance of terrorism include: (a) employment of Mahmoud Jaballah at its offices in Canada, who was arrested in 1999 (and again in 2001) for belonging to Al Jihad; (b) financial support through its office in Zamoanga City in the Philippines for secessionist Islamic militants in the southern region of the country, through Mohammad Jamal Khalifa, Osama bin Laden's brother-in-law; (c) alleged direction of planned attacks on U.S. consulates in Madras and Calcutta through the offices of IIRO Asia; (d) alleged support for the terrorists involved in the 1998 embassy bombings in Dar Es Salaam, Tanzania and Nairobi, Kenya, leading to it being closed by the Kenyan government.

Muwafaq or Blessed Relief. Muwafaq has allegedly forwarded millions of dollars to Al Qaeda for terrorist training and resistance in Afghanistan, Bosnia, and Chechnya, as well as to Hamas.

Benevolence International, an Islamic charity founded in 1987 and alleged in a federal indictment in Chicago to have supported Al Qaeda for more than a decade. The charity spent a reported $3.4 million on relief operations in 2000-2001 alone. The initial president and secretary of the organization was Adel Batterjee, a Saudi identified by federal investigators as the person referred to in the "Golden Chain" memorandum found at the raid by Benevolence International's headquarters in Sarajevo specifying Al Qaeda's principal financial benefactors. Benevolence International also has had interlocking directors and senior officers from the World Muslim League.

Al-Haramain Islamic Foundation. This charity is based in Riyadh, with offices in more than 50 countries. Of these offices, U.S. intelligence has found sufficient evidence of terrorist finance activity, shared with the Saudi government to secure the near-term closing of their operations. As with the IIRO, its official activities include building mosques, financing and administering schools and sponsoring orphans. It has been listed by the U.S. as a specially designated global terrorist organization as a result of its alleged assistance to the Egyptian terrorist group known as Gamma Al Islamia, as well as contacts with the Taliban, Osama bin Laden and Al Qaeda. In May 2003, Saudi Arabia asked the Al-Haramain Islamic Foundation to suspend its activities outside of Saudi Arabia until a security clearance mechanism to screen all personnel is implemented. The charity has closed offices in Croatia, Albania and Ethiopia, and the Saudis state that closures are underway in Kenya, Tanzania, Indonesia and Pakistan, although there are other reports that some Al-Haramain offices have closed and then reopened,

including the one in Indonesia.

Rabita Trust. Based in Pakistan, with the mission of repatriating and rehabilitating Pakistanis stranded in Bangladesh and India after the partitions, the Rabita Trust was founded by the secretary general of the Muslim World League and funded by wealthy Saudis. It was listed as a specially designated global terrorist organization by the U.S. on October 12, 2001.

World Muslim League. One of the largest charities created by the Saudi royal family, World Muslim League personnel have reportedly worked for or with Al Qaeda in Bosnia and Kenya.

Wafa Humanitarian Organization. This Saudi-funded charity was based in Afghanistan and listed as a specially designated global terrorist organization by the U.S. on December 20, 2001. It allegedly was involved in efforts to develop a nuclear program for Al Qaeda.

**What Measures Has Saudi Arabia Taken to Combat Terrorist Finance?**

The May 2003 terrorist attacks in Saudi Arabia have been described by Saudi Prince Bandar as "our September 11," prompting recognition by the government that further anti-terrorist steps are still required, including greater attention to combating terrorist finance. Since then, domestic anti-terrorist efforts by the Saudis have substantially intensified, as have efforts by terrorists to carry out attacks within the Kingdom. As of mid-June 2003, Saudi Arabia reported to the U.S. government that it had arrested some terrorist financiers and is prepared to arrest more over the summer of 2003. The Kingdom is also moving forward with an anti-money laundering and terrorist finance law that it intends to have in place by the time of its first assessment by the Financial Action Task Force ("FATF"), currently scheduled to begin in September 2003. However, public information on the actual activities undertaken by Saudi Arabia to combat terrorist finance remains obscured in several of the most important areas. These include:

Arrests. There have been no publicly reported law enforcement arrests involving terrorist finance. There have been several cases in which Saudi Arabia reported seized assets at the request of the U.S. In its report to the UN, Saudi Arabia stated that it had no successful prosecutions pertaining to terrorist finance acts on the part of any Saudi person, inside or outside of Saudi Arabia. According to the U.S. Department of State, Saudi Arabia has had a small number of prosecutions for money laundering that originated from the filing of suspicious transaction reports. One Saudi official has informally stated that an unspecified number of terrorist financiers have been arrested as of June 16, 2003, although no public announcement of the arrests had been made by that date. The same official also stated that the assets of Yasin al-Qadi, a wealthy Jeddah businessman listed on the specially designated global terrorist list, had also been frozen, but this has not been stated publicly or verified to date.

Asset Freezes. In October 2001, U.S. Treasury officials reported that Saudi Arabia had agreed to block financial assets for groups associated with Al Qaeda. Earlier, there had been reports that Saudi Arabia had agreed in September 2001 to freeze a small number of bank accounts from the National Commercial Bank ("NCB") and Faisal al Islamic Bank, but that subsequent cooperation has been "inconsistent." On January 28, 2002, Saudi Arabia announced that it had "acted" against 150 suspected terrorist accounts, but did not specify what action had been taken. In February 2002, Saudi Arabia announced that it had frozen four bank

accounts linked to suspected terrorists. According to the Associated Press, the announcement was the first time Saudi Arabia had acknowledged it had frozen any terrorist-related accounts, and came the same day Interior Minister Prince Nayef told the AP that no accounts had been frozen. On February 16, 2002, an unnamed senior source at SAMA stated that four accounts had indeed been frozen, and that each belonged to foreigners in Saudi Arabia rather than to Saudi citizens. According to the Saudi government, as of December 2002, it had frozen 33 accounts belonging to three individuals totaling $5,574,196. In a recent press release, Saudi Arabia has stated that it was also one of the first countries in the world to take action against terrorist finance when it froze the assets of Osama bin Laden in 1994.

Action Against Charities. In March 2002, the U.S. and Saudi Arabia announced a joint crackdown on a Saudi charity whose operations in Bosnia and Somalia have been linked to Osama bin Laden, agreeing to freeze the assets of two branches of Al-Haramain Islamic Foundation. According to press accounts, Al-Haramain had been used by the Saudi government as a conduit for relief aid sent to Afghanistan as recently as January 2002 and the group had close ties to senior Saudi officials. U.S. Treasury officials were reported as alleging that Al-Haramain employees in Somalia and Bosnia had been connected to terrorists for years, funneling money to a terrorist group by pretending the funds were going to build orphanages, Islamic schools and mosques. In the summer of 2002, Saudi Arabia also reportedly undertook joint action with the U.S. to freeze the assets of Wa-el Hamza Julaidan, a Saudi fugitive alleged to have funneled money to Al Qaeda, and a director of the Rabita Trust. On June 12, 2003, Adel Al-Jubeir, the foreign affairs advisor to the Crown Prince, announced that Saudi Arabia had "closed the door on terrorist financing and money laundering," through promulgating new regulations to prevent charities from giving money outside Saudi Arabia except under strict controls and oversight. According to a June 12, 2003 Saudi press release, the new regulations require:

· Identification and consolidation of all bank accounts of a charitable or welfare society into a single account for each such organization.

· Requiring identification of each depositor.

· A prohibition on cash withdrawals from any Saudi charity.

· On-site inspections of Saudi banks to determine that the rules regarding charities are being implemented.

· Prohibiting Saudi foundations from maintaining offices outside of Saudi Arabia.

In addition, in June 2003, Saudi Arabia was reportedly preparing to close an additional eight branches of Al-Haramain Islamic Foundation at the request of the U.S., after the U.S. provided it with detailed intelligence regarding the involvement of those branches in terrorist finance.

Identification of Terrorist Fronts. Since September 11, Saudi Arabia has reportedly worked with the U.S. to identify a network of more than 50 shell companies that Osama bin Laden used to move money through more than 25 countries around the world. The companies were identified as located in the Middle East, Europe, Asia and the Caribbean. According to Anthony Cordesman, Saudi Arabia has "quietly" provided information on suspect Saudi accounts in Switzerland, Liechtenstein, Luxembourg, Denmark and Sweden.

Other Activity. On June 12, 2003, the Saudi government announced that it had accelerated a national study of its school curriculum, undertaken by its Ministry of Education, in response to the May 12, 2003 terrorist attacks within Saudi Arabia. It stated that it had adopted two pilot programs in Jeddah and Riyadh, that if successful would then be adopted nationally. It further stated that it had organized a new joint U.S.-Saudi counterterrorism team, including persons from both its intelligence and law enforcement agencies, to work side-by-side to share information on terrorism in "real time" and to conduct joint operations.

**Is Saudi Arabia Still Vulnerable to Terrorist Finance?**

Although Saudi Arabia has taken a number of actions to create a legislative framework to combat terrorist finance, it remains a potential source of funds for terrorism due to a number of vulnerabilities that remain difficult for its government to address. These include:

Charities. Islamic charities funded by Saudi Arabians are estimated to receive about $3 billion to $4 billion annually, of which some 10% to 20% is sent abroad. Until recently, there was little to no regulation of these charities by the Saudi government. Regulations newly imposed in June 2003 to constrain new funding to overseas charitable activities may reduce this vulnerability, depending on the effectiveness of the oversight function and the intentions of key bureaucrats within the country's religious ministry. However, the Saudi government is poorly situated to oversee effectively the disbursement of funds that have already left the Kingdom prior to the new regulations.

Use of Currency. Saudis frequently use cash for monetary transactions rather than electronic payments through credit cards or ATM machines. Reportedly the U.S. Treasury in May 2002 expressed concern to Saudi authorities regarding "the growing use of cash" in the country, making tracing of terrorist funds more difficult.

Alternative Remittance Systems. Hawala transactions outside banks and licensed moneychangers are illegal in Saudi Arabia. Saudi Arabia has reported to the UN that such services outside licensed banks are criminalized. The State Department has reported that SAMA has investigated a number of such cases in recent years. SAMA officials have acknowledged that the financial system is porous and includes illicit currency dealers and traditional hawaladars that are difficult to police.

Support for Islamic Militancy. Saudi Arabia has provided a political and religious environment in which Islamic militancy has flourished. Saudi support for the Palestinians in the Arab-Israeli conflict, urbanization, the Saudi educational system, unemployment, and some themes within Wahhabi religious teachings, including attacks on Christians and Jews by some Islamic teachers, have contributed to the politicization and radicalization of some Saudi Muslims. The country's educational curriculum has long included anti-Christian and Jewish hate literature, as has material issued by the Saudi Ministry of Islamic Practices. In recent weeks, Saudi Arabia has arrested a small number of extremist Islamic clerics and announced that it has sent thousands of others to school for courses to discourage militancy and extremism. However, the strands of religious extremism in Saudi Arabia have been strong and militant pan-Islamic theology remains a significant element fueling terrorism.

Ambivalence Towards Terrorism Associated With Islamic Militancy. Saudi

Arabia has long taken the position that terrorist finance has not been a problem and has not existed in Saudi Arabia. For example, the Saudi July 2002 report to the UN stated "no financial operations with terrorist aims have thus far come to light in the country." It also appears to reserve to itself a determination of what constitutes terrorist finance, albeit in ambiguous terms. In its Resolution 1343 report, Saudi Arabia advised the UN that "in the absence of a precise and unequivocal definition of terrorism endorsed by the international community," it can only freeze or seize funds on the basis of a request from the Minister of the Interior to the Minister of Finance, and confiscate funds only on the basis of a judgment issued by a Saudi court. Given Saudi Arabia's signature on most international treaties concerning terrorism, the statement could be viewed as a veiled articulation of a position that terrorism has yet to be precisely defined internationally, and therefore Saudi Arabia is free to decide who and who are not terrorist financiers.

Bureaucratic Schizophrenia. Public expressions of Saudi attitudes towards asset freezes have been inconsistent. In October 2001, the governor of SAMA, Hamad Sayari, stated that the country had frozen every account Saudi Arabia could find on the U.S. Treasury terrorist list, but it later appeared that Saudi Arabia took the position that there were no such accounts. In February 2002, Saudi Arabia announced freezing four terrorist-related accounts in February 2002. Three months later, Sayari's deputy at SAMA was reported as categorically denying freezing any bank accounts, either of individuals or corporate entities, relating to either money laundering or terrorism. According to a BBC account, the official, Muhammad Al-Jasir, stated that "not even a single bank account has been frozen in Saudi Arabia," noting at the same time that "this Jewish state has not been complying with the 40 recommendations made by the FATF," in an apparent suggestion that inadequate regulation of money laundering in Israel was a greater terrorist finance problem than any that might be posed by Saudi Arabia.

Externally Held Funds. There is little the government of Saudi Arabia can do regarding the billions of dollars in Saudi-owned capital held outside of the country, mostly in trusts and international business companies where the ownership of the assets is hidden behind nominees and agents. This vulnerability is one that can only be dealt with through a global effort by international organizations and other governments to strengthen implementation of know-your-customer principles and to continue focused intelligence acquisition targeting possible terrorist financiers.

Legal Regime Regarding Money Laundering. As of June 2003, Saudi Arabia has yet to create a comprehensive legal regime to combat money laundering, leaving only drug money laundering as a predicate offense.

Reporting. Although the Central Bank has issued guidelines requiring know your customer and suspicious activity reporting, the government's failure to publish statistics makes it difficult to know how comprehensively this regime has been adopted in practice.

Asset Freezes. The handful of accounts reported frozen by Saudi Arabia to date can be interpreted as the result of several likely factors: limited Saudi intelligence on terrorist finance, a failure of political will, a willful refusal to share information with the U.S., and/or a reluctance to provide the Saudi public with information about enforcement actions taken within the Kingdom.

Conflicts of Interest. The fox-guarding-the-chicken-coop problem in Saudi

Arabia is potentially substantial. For example, a task force established by the Jeddah Chamber of Commerce and Industry ("JCCI"), to develop a comprehensive financial and administrative system for charity in Saudi Arabia, was funded and overseen by the Muslim World League ("MWL"). On the one hand, this is unremarkable, as the MWL is Saudi Arabia's largest state-funded charity. On the other hand, MWL has itself been repeatedly linked to terrorist finance, through the activities of some of its member organizations, including the Rabita Trust, placed by the Treasury on its list of specially designated terrorist organizations. Notably, the approach of MWL's leadership to terrorism at an ideological level has itself been ambivalent. For example, a group of scholars affiliated with the MWL issued a statement January 11, 2002 describing terrorism to be only "any unjustified attack by individuals, groups or states against a human being." According to the MWL, terrorism could include an attack on a person's "religion, life, property and honor," but excluded jihad, as "struggling against occupiers and colonial settlers who drive people from their land and against those who help them" is legitimate in Islam.

Corruption. Saudi Arabia has been slow to create a system of civil law that would provide a secure, stable foundation to permit people and businesses to secure property rights and resolve commercial disputes. Despite some progress against corruption, cronyism and local agents remain norms in government contracting, and foreign investment has remained minimal, making the country both dependent upon, and resentful of, the ruling family. Checks and balances are few, making it difficult to police elements of the population, either within the ruling class or elsewhere, who may provide financial support for extremism.

**What Further Steps Could Saudi Arabia Take To Reduce the Threat?**

Enact a FATF-Compliant Money Laundering Law. In the current environment, Saudi Arabia's agreement with the FATF to schedule an assessment in the fall of 2003 likely is evidence of the Kingdom's expectation that it will have a FATF-compliant money laundering law in place by that time. Its draft money laundering law, which has yet to be made public, currently remains under review by a Saudi religious council, one of the final stages prior to adoption.

Intensify Crackdowns on Persons Linked to Terrorism. Soon after the September 11 attacks, Saudi Interior Minister Prince Nayef bin Abdul Aziz reportedly warned that persons engaged in terrorist activities were "ill and cannot be accepted in Saudi society, even if they were part of us. Some organs of the body may become ill, but the sick organ is amputated." Since then, arrests of persons in Saudi Arabia linked to terrorism have taken place in waves, often following the provision of intelligence to the government of Saudi Arabia by the U.S. These arrests appear to have substantially accelerated since the May 2003 attacks. To date, such enforcement activity has largely focused on terrorist cells themselves. They must now focus on terrorist financiers.

Stringently Oversee Charities. The Saudi government appears determined to gain control over the uses of funds overseas raised by charities within the Kingdom as a matter of protecting its own national security. It also appears willing to work with the U.S. on shutting down particular foreign offices of Saudi charities when there is evidence to enable the Saudi government to make an adequate case for such closures with its own clerics. However, follow-through has been inconsistent. In case of Al Harmadain, for example, foreign offices have closed and reopened. To date, it remains uncertain whether oversight of charities within Saudi Arabia's borders yet extends to the actual activities in the field of Saudi-

supported charities operating in the field. Oversight of the financial activities of firms operating in other countries can be difficult for governments in any context. For Saudi Arabia to do so regarding Islamic charities will require a sustained effort. Moreover, such an effort is extremely unlikely to succeed in the absence of the application of public sanctions to charities found to have engaged in prohibited activities.

Make Actions Against Terrorist Finance Public. Adel A. Al-Jubeir, the foreign affairs advisor to the Crown Prince responsible for communicating Saudi efforts regarding terrorist finance to the U.S. public, argues that the Kingdom has sought privacy in the past regarding problems such as terrorist finance, but now is moving towards greater transparency and disclosure to its own public given that public's desire to see the terrorists who have undertaken bombings within the Kingdom punished. Such public naming-and-shaming is essential. It remains, unfortunately, invisible in the area of terrorist finance, raising the question of whether enforcement activity is actually taking place. Saudi Arabia needs to let the world know when it has taken an action against a specific designated terrorist, rather than to speak in generalities only.

Continue to Assist the U.S. The U.S. government is best in the position to monitor Saudi international cooperation against terrorist finance by assessing the Saudi response to particular requests for information on the financial activities of suspected terrorist financiers, and its willingness to freeze assets of such persons or entities. One indicator of such cooperation would be agreement to provide access to suspected terrorist financiers and their agents and related documents to U.S. government investigators. Another would be to return to the U.S. any Saudis who have fled to Saudi Arabia to avoid U.S. legal proceedings or questioning.

Arrest and Seize Assets of Prominent Al-Qaeda Financiers. Saudi Arabia needs to take public action against the Saudis involved in the Golden Chain where there is evidence to show financial support for Al Qaeda after the time of Osama bin Laden's expulsion from Saudi Arabia in 1992. These actions need to include arrests and asset seizures.

Extradite Terrorist Financiers. Beyond arrests and asset seizures are trials and sanctions. To date, Saudi Arabia has refused (at least in public) either to try or to extradite persons involved in terrorist finance. Public trials of persons engaged in such activity, together with seizures of their assets, might act as a deterrent to other would-be terrorist financiers.

Close Financial Institutions Involved in Terrorist Finance. To date, Saudi Arabia has imposed sanctions on no financial institution it has licensed for involvement in handling the funds of terrorism. Suspension or revocation of license for negligence in handling terrorist funds would act as a significant deterrent and constitute an important indicator of Saudi political will against terrorist finance.

Prohibit All Forms of Terrorist Finance. The continued support by Saudi Arabia for Hamas creates a terrorism problem that goes well beyond the impact on the Arab-Israeli conflict, given the ties between Hamas and other terrorist groups. An important indicator would be statements and actions by the Saudi government demonstrating a commitment to combat all forms of terrorism and terrorist finance.

Demonstrate Full Implementation of Anti-Money Laundering and Terrorist Finance Laws. To date, the Saudi government has issued little information to

demonstrate that its anti-money laundering and terrorist finance laws have actually been implemented and enforced. Publication of information on suspicious activity reporting, investigations, arrests, indictments, prosecutions and convictions, as well as regulatory sanctions, would be indicators that such laws are being enforced in practice.

Close Gaps in Existing Anti-Money Laundering Laws and Demonstrating Enforcement of Such Laws. Saudi Arabia has been studying proposed amendments to its existing anti-money laundering laws for more than year, but has yet to enact them.

Provide Public Data On Suspicious Transaction Reports. Existing SAMA guidelines require know your customer procedures and the provision by financial institutions of suspicious transaction reports to SAMA, but there is no evidence these guidelines are being enforced. Public information on suspicious transaction reporting could be one useful indicator that SAMA's anti-money laundering guidelines have been adopted in practice.

Provide Greater Transparency and Accountability Over Charities. The government of Saudi Arabia has announced its comprehensive regulation and supervision of its charities. Given such supervision, publication of detailed data regarding the sources and uses of such funds should be feasible, and could help demonstrate that controls and oversight are actually in place.

For further progress, Saudi Arabia must fully implement the oversight mechanisms it has put into place in theory and apply them to all levels of the population, including prominent Saudis. The government needs to communicate to the Saudi people that no support of Islamic militancy will be tolerated, whether directed inside the Kingdom or beyond, and whether connected to Al Qaeda, Hamas, or other organizations. Such a communication requires the arrest of the most prominent funders of Al Qaeda, based on existing documentation, together with the freezing and ultimately the confiscating of their assets.

Saudi Arabia's continued support for institutions run or managed by Hamas remains an especially significant and continuing terrorist finance problem. Saudi Arabia's official position is that the funds go solely to the "political wing" of Hamas, not terrorists, and are targeted to such institutions as the UN's High Commissioner for Refugees and the Red Crescent. As of yet, there is no public evidence that effective auditing mechanisms are in place to prevent such diversions in fact, despite Saudi Arabia's public assertions that audits of all of its charities have been completed within the Kingdom, as such diversions could readily take place within the Palestinian territories regardless of paper documentation made available in Saudi Arabia to authorities there.

**Conclusion**

The actions taken to date by the U.S. against terrorist finance have helped to result in real progress to impair the ability of terrorists to raise, transfer, and use money to carry out terrorist activities. Before September 11, few countries had laws to combat terrorist finance. Today, most do. Before September 11, few countries froze the assets of terrorists. Today, some have. Prior to September 11, the United Nations contribution against terrorist financing was marginal. Since, it has become significant and likely to be enduring. With that said, progress is not accelerating and in some areas, it may be flagging. The recommendations made last year by the Task Force on Terrorist Finance of the Council on Foreign

Relations remain sensible and feasible. They merely require greater political will. Among the most important actions we could now take would be to:

· Designate a special assistant to the president for combating terrorist financing with the special mandate to lead U.S. efforts on terrorist financing issues. This work should not be done, as it is today, on a part time basis, or without the direct authority and centralized responsibility of the President and the NSC.
· Intensify multinational operational and policy coordination on border controls and identification of terrorist networks.
· Intensify efforts to develop comprehensive global regulation of alternative remittance systems such as hawaladars.
· Expand U.S. bilateral technical assistance programs in problem countries to assist in the creation of effective regulatory, enforcement and control regimes for financial institutions and charitable organizations.
· Undertake strengthened oversight of U.S. charities that send funds overseas.
· Use "special measures" under the Bank Secrecy Act as provided by the Patriot Act to cut off correspondent relations between foreign financial institutions with weak anti-money laundering practices and U.S. banks.
· Publicize what we know about foreign terrorist financiers - regardless of whether they happen to be prominent persons in Saudi Arabia or other allies - and take appropriate regulatory and enforcement action against them.