# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (RCC) |
| | ECF Case |

This document relates to:

*Thomas Burnett, Sr., et al. v. Al Baraka Invest. & Develop. Corp., et al., No. 03 Civ. 5738*
*Thomas Burnett, Sr., et al. v. Al Baraka Invest. & Develop. Corp., et al., No. 03 Civ. 9849*
*Federal Insurance Co., et al. v. Al Qaida, et al., No. 03 Civ. 6978*
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka., et al., No. 04 Civ. 1923*
*Continental Casualty Co. et al, v. Al Qaeda, et al., No. 04 Civ. 5970*
*New York Marine & General Insurance Co. v. Al Qaida, et al., No. 04 Civ. 6105*
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd, et al., No. 04 Civ. 7065*
*Euro Brokers Inc., et at., v. Al Baraka, et al., No. 04 Civ. 7279*
*WTC Properties LLC, et al. v. Al Baraka, et at., No. 04 Civ. 7280*

# PLAINTIFFS' CONSOLIDATED MEMORANDUM
# OF LAW IN OPPOSITION TO THE MOTION TO DISMISS
# OF DEFENDANT DUBAI ISLAMIC BANK

July 26, 2005

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND .............................................................................. 1

III. LEGAL ARGUMENT ......................................................................................... 5

    A.  Service via Publication Was Proper ...................................................... 5

    B.  Plaintiffs Have Properly Established Personal Jurisdiction Over DIB ........................ 8

    C.  Plaintiffs Have Met The Pleading Standards Of This Circuit ................................... 10

        1.  General Pleading Requirements .................................................... 10

        2.  Pleading Knowledge of Terrorist Activity ................................... 13

    D.  Each Individual Cause of Action Has Been Properly Pled ............................... 15

        1.  Anti-Terrorism Act. .................................................................... 15

        2.  Alien Tort Claims Act. ............................................................... 16

        3.  Aiding and Abetting and Civil Conspiracy ................................. 16

        4.  Civil RICO .................................................................................. 18

        5.  Trespass ....................................................................................... 19

        6.  Negligence and Negligent Infliction of Emotional Distress .................. 19

        7.  Plaintiffs' Assault, Battery, and Intentional Infliction of Emotional Distress Claims Are Not Barred by the Statute of Limitations ................ 20

        8.  Wrongful Death ........................................................................... 22

        9.  Survival ........................................................................................ 23

        10. Contribution and Indemnity ........................................................ 23

        11. International Law .......................................................................... 24

        12. Torture Victims Protection Act .................................................... 24

        13. Punitive Damages ........................................................................ 25

IV.  CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

Abebe-Jira v. Negewo, 72 F.3d 844 (11th Cir. 1996)......................................................24

Alexander & Alexander, Inc. v. Fritzen, 503 N.E.2d 102 (N.Y. 1986)............................17

American Land Co. v. Zeiss, 219 U.S. 47 (1911)..............................................................7

Baisch v. Gallina, 346 F.3d 366 (2d Cir. 2003)..............................................................18

Barrueto v. Larios, 205 F. Supp. 2d 1325 (S.D. Fla. 2002)............................................24

Bettis v. Islamic Republic of Iran, 315 F.3d 325 (D.C. Cir. 2003)..................................21

Blinn v. Nelson, 222 U.S. 1 (1911)....................................................................................7

Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002) ....................15, 16, 21

Burger King v. Rudzewicz, 471 U.S. 462 (1985)............................................................10

Calder v. Jones, 465 U.S. 783 (1984) .............................................................................10

Chance v. Armstrong, 143 F.3d 698 (2d Cir. 1998) .......................................................11

Conley v. Gibson, 355 U.S. 41 (1957)..............................................................10, 11, 12

Daliberti v. Iraq, 97 F. Supp. 2d 38 (D.D.C. 2000) .......................................................10

De Falco v. Bernas, 244 F.3d 286 (2d Cir. 2001)...........................................................18

Dobkin v. Chapman, 21 N.Y.2d 490, 289 N.Y.S.2d 161 (1968)........................................7

Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158 (S.D. N.Y. 2003)...............18

Ehrenfeld v. Bin Mahfouz, 2005 U.S. Dist. LEXIS 4741
     (S.D.N.Y. March 23, 2005)........................................................................................8

Farmer v. Brennan, 511 U.S. 825 (1994) .......................................................................14

Filartiga v. Pena, 577 F. Supp. 860 (E.D.N.Y. 1984)......................................................25

First Capital Asset Management v. Satinwood, Inc.,
     385 F.3d 159 (2d Cir. 2004).....................................................................................18

Friedman v. Hartmann, 1994 U.S. Dist. LEXIS 9727 (S.D.N.Y. July 15, 1994)..............18

Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)............................................................11

Goodrich v. Ferris, 214 U.S. 71 (1909) ...........................................................................7

Grannis v. Ordean, 234 U.S. 385 (1914) ......................................................................6, 7

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ...............................................17, 22

Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) ...............................................24

Ideal Electric Sec. Co. v. International Fidelity Insurance Co.,
    129 F.3d 143 (D.C. Cir. 1997)..................................................................................21

In re Issuer Plaintiff Initial Public Offering Antitrust Litigation, 2004 U.S. Dist.
    LEXIS 3892 (S.D. N.Y. Mar. 12, 2004)....................................................................21

Johnson v. Nyack Hospital, 86 F.3d 8 (2d Cir. 1996) .....................................................22

Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004) ............................................21

LaMarca v. United States, 31 F. Supp. 2d 110 (E.D.N.Y. 1998) ....................................22

Leatherman v. Tarrant County, 507 U.S. 163 (1993) ......................................................11

Louisiana Land & Exploration Co. v. Unocal Corp.,
    863 F. Supp. 306 (E.D. La. 1994)..............................................................................21

Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322 (N.D. Ga. 2002) ...............................24, 25

Milliken v. Meyer, 311 U.S. 457 (1940).............................................................................7

Morin v. Trupin, 832 F. Supp. 93 (S.D.N.Y. 1993).........................................................19

Mullane v. Central Hanover Bank & Trustee Co., 339 U.S. 306 (1950)........................6, 7

New York Law Durante Brothers & Sons, Inc. v. Flushing National Bank,
    755 F.2d 239 (2d Cir. 1985).......................................................................................17

Paul v. Avril, 901 F. Supp. 330 (S.D. Fla. 1994)............................................................25

Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005) ............................................13

Phelps v. Kapnolas, 308 F.3d 180 (2d Cir. 2002)..........................................10, 11, 12, 14

Pittman v. Grayson, 149 F. 3d 111 (2d. Cir. 1998)..........................................................17

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
    2003 WL. 1339181 (S.D.N.Y. Mar. 19, 2003).........................................................24

Priest v. Trustees of Town of Las Vegas, 232 U.S. 604 (1914) .........................................7

Pugh v. Socialist People's Libyan Arab Jamahiriya,
    290 F. Supp. 2d 54 (D.D.C. 2003) ...................................................................10

Rein v. Socialist People's Libyan Arab Jamahiriya,
    995 F. Supp. 325 (E.D.N.Y. 1998) .................................................................10

Roller v. Holly, 176 U.S. 398 (1900).....................................................................7

S.E.C. v. Tome, 833 F.2d 1086 (2d Cir. 1987)...................................................6

Sparrow v.United Airlines, Inc., 216 F.3d 1111, 1115...................................11

Swierkiewicz v. Sorema, 534 U.S. 506 (2002)...........................................11, 13

In re Terrorist Attack on September 11, 2001,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)...................................15, 16, 19, 24

United States v. Allen, 155 F.3d 35 (2d Cir. 1998) ...................................18

Valdan Sportswear v. Montgomery Ward & Co.,
    591 F. Supp. 1188 (S.D.N.Y. 1984).............................................................22

Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004)...................14, 15

Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001).........................11

Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004) ...................................10, 11

Xuncax v. Gramajo, 886 F. Supp. 162 (D. Mass. 1995)...................................25

Yeadon v. New York Transit Authority, 719 F. Supp. 204 (S.D. N.Y. 1989) .................21

**STATUTES**

18 U.S.C. § 1956(a)(1)...................................................................................9

18 U.S.C. § 1956(a)(3)................................................................................8, 9

18 U.S.C. § 1956(b)(2) .................................................................................9

18 U.S.C. §1961.............................................................................................9

18 U.S.C. §2333............................................................................................15

Fed. R. Civ. P. 8(a) .................................................................................1, 11, 14

Fed. R. Civ. P. 8(a)(2)....................................................................................11, 12

Fed. R. Civ. P. 9(b) ........................................................................................11, 14

Fed. R. Civ. P. 12(b)(6)..................................................................................10, 11

N.Y. Est. Powers & Trusts Law § 5-4.1 (2003).................................................22

N.Y. Est. Powers & Trusts Law § 11-3.2 (2004)...............................................23

Restatement (Second) of Torts § 302.................................................................20

Restatement (Second) of Torts § 876(b).............................................................22

N.Y. C.P.L.R. § 302(a)(2)....................................................................................8

### **OTHER**

Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990) ..............................15

## I.      INTRODUCTION

On May 25, 2005, Dubai Islamic Bank ("DIB") filed its Motion to Dismiss ten of the

cases comprising *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (RCC).[1]  DIB's

Motion to Dismiss raises several arguments and defenses common to all of the consolidated

cases.  In sum, DIB argues that service was improper; that even if service were proper, personal

jurisdiction is lacking; and even were it not, no plaintiff has stated a claim upon which relief

could be granted, based on alleged flaws in the factual averments and legal causes of action.

DIB cannot escape its liability through any of these efforts.  Service upon DIB via

publication was proper because it was effective; it has clearly submitted to the jurisdiction of the

United States through its activities directed towards it; and plaintiffs' claims all meet the notice

pleading requirements of Fed. R. Civ. P. 8(a) and the specific requirements of each cause of

action, as this brief now demonstrates.

## II.     FACTUAL BACKGROUND

DIB has long been associated with laundering al Qaida money.  See, e.g., *O'Neill* Second

Amended Complaint ("*O'Neill* SAC") ¶ 155.  DIB was founded in 1975, making it the longest-

running bank operating under Shar'ia law.  DIB's involvement with terrorist financing began in

the early 1990s, when it was a major shareholder in the Bank of Credit and Commerce

International ("BCCI"), which was named in a 1992 U.S. Senate Report as a money laundering

operation used to sponsor terrorism.  *Burnett* Third Amended Complaint ("*Burnett* TAC") ¶ 112;

*Cantor Fitzgerald* First Amended Complaint ("*Cantor* FAC") ¶ 136; *Euro Brokers* Complaint ¶

121; *WTC Properties* Complaint ¶ 249; *Continental Casualty* RICO Statement ("*Continental*

RICO") at Exh. A.

---

[1]  While listed on the caption for this motion, the Ashton plaintiffs have not named Dubai Islamic Bank as a
defendant.

In 1999, officials from the State Department, Treasury Department and National Security Council visited Dubai to demand that the government take steps to end its lax supervision of DIB, which had allowed itself to be used by Osama bin Ladin to launder money.  *Cantor* FAC ¶ 138; *Federal Insurance* RICO Statement ("*Federal* RICO") at Exh. A.  According to a July 8, 1999 State Department press conference, DIB's involvement with terrorist money laundering was the key concern.[2]  *Federal* RICO at Exh. A; *Continental* RICO at Exh. A.  Specifically, the federal government possessed evidence demonstrating that Osama bin Ladin and al Qaida were using DIB to finance terrorist attacks against American interests.  The same day as the State Department briefing, the *New York Times* reported that the Central Intelligence Agency had obtained evidence showing that bin Ladin had been allowed to funnel money through DIB. According to the Times, "United States intelligence officials said they had evidence that Mr. bin

---

[2]  Contrary to DIB's representations (see Motion to Dismiss at 10), the State Department's remarks explicitly concerned the Bank's involvement in terrorist money laundering and had nothing to do with the "Sissoko fraud." From the State Department Briefing Transcript:

> FOLEY: Well, in terms of the UAE, we regard the United Arab Emirates, like the other GCC states, as a valued ally with whom we have a close and strong relationship in a broad number of areas. We're also working with the UAE to continue strengthening our counter-terrorism cooperation in many areas, including terrorist money laundering. The government of the United Arab Emirates has told us thatthe Dubai Emirates Government has taken steps to clean up the bank - the Dubai Islamic Bank - and to restore its reputation.

> Q: So if they're taking steps to clean up, that implies that something had been amiss in the past at some time.

> FOLEY: It does imply that, yes. Q: And what was wrong? Was it

> FOLEY: I can't get into the details of it. I think what I said is significant enough, however.

> Q: Well, without getting into the details, since we're talking about a bank, are we also talking about money laundering?

> FOLEY: Well, as I said, the government has told us that the Dubai Emirate has taken steps to clean up that bank, and we are also cooperating with the UAE on a number of areas involving cooperation against terrorism, and that includes the area of money laundering.

State Department Briefing of July 8, 1999 (James Foley).

Laden had a relationship with the bank, <u>which they believed had been arranged with the approval of the officials who control the bank</u>." *Federal* RICO at Exh. A, citing James Risen with Benjamin Weiser, "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations," *The New York Times* A-6 (July 8, 1999) (emphasis added); *Continental* RICO at Exh. A. *See* Carter Aff. Exh. 1.

Beyond these reports of explicit approval of bin Laden's use of DIB for money laundering, which plaintiffs expect to further substantiate through the discovery process, a subsequent NATO Parliamentary Assembly analysis confirmed that al Qaida had used DIB to fund the bombings of the American embassies in Tanzania and Kenya. *Burnett* TAC ¶115; *Cantor* FAC ¶ 139; *Euro Brokers* Complaint ¶ 124; *Continental* RICO at Exh. A. In its November 5, 2004 final general report titled, "The Economic Consequences Of September 11, 2001 And The Economic Dimension Of Anti-Terrorism," the Assembly expanded upon its draft recommendations as referenced in the various complaints:

> It is now apparent that institutions located in the United Arab Emirates, the region's most developed and lightly regulated financial center, played a key role in moving resources to those who planned and carried out the September 11th attacks. There has subsequently been much discussion about a traditional trust based means of transferring value; the al Hawala transaction system, which allows clients to move funds internationally without leaving any traces of the operation. The Al Barakaat Hawala operating out of Somalia and the UAE apparently helped to move funds to the terrorists who carried out the New York and Washington attacks. Al Qaida had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania.

*O'Neill* RICO Statement ("*O'Neill* RICO") at Exh. A.[3] *See* Carter Aff. Exh. 2.

---

[3] *See*, similarly, "Emirates Looked Other Way While Al Qaida Funds Flowed", *Los Angeles Times* A-1 (120-02) ("[M]illions in Al Qaida funds cascaded through the freewheeling financial institutions of the neighboring emirate of Dubai.... The U.A.E. was one of only three countries that maintained diplomatic presence with the now toppled Taliban regime. Despite quiet but persistent prodding by U.S. and other Western diplomats, the emirates' ruling elite was hesitant to reckon with the growing terrorist presence. Regulations that would target terrorists would also interfere with a laissez-faire economy that has bolstered the wealth of their entwined desert kingdoms."). *See* Carter Aff. Exh. 3.

DIB was directly involved in financing the September 11 attacks.  Mustafa Ahmed al-Hisawi (Sheikh Saeed al Masri), bin Ladin's chief financial officer while in the Sudan, lived in the Emirates from June 2001 until September 11, 2001, when he fled for Karachi, Pakistan.  *Burnett* TAC ¶ 116; *WTC Properties* Complaint ¶ 253; *Federal* RICO at Exh. A; *O'Neill* RICO at Exh. A; *WTC Properties* RICO Statement ("*WTC Properties* RICO") at Exh. A; *Continental* RICO at Exh. A.  American authorities have identified at least $500,000 that flowed from his accounts to all nineteen hijackers, including hundreds of thousands of dollars in money transfers from DIB (and its affiliate and correspondent, Standard Chartered Bank) to two of the hijackers (Mohammed Arta and Marwan al-Shehhi) since at least June 2000, to pay for their flight training and expenses.  *Burnett* TAC ¶¶ 117-120; *Federal* FAC ¶ 345; *O'Neill* SAC ¶ 56; *WTC Properties* Complaint ¶¶ 254-257; *Federal* RICO at Exh. A; *O'Neill* RICO at Exh. A; *WTC Properties* RICO at Exh. A; *Continental* RICO at Exh. A.  Finally, just two days before the September 11 attacks, hijackers Atta, al-Shehhi and Walid al-Sheri transferred $15,000 in "surplus funds" back to al-Hisawi.  *Burnett* TAC ¶ 121; *O'Neill* RICO at Exh. A.  These transactions were carried out in violation of international standards adopted to prevent money laundering, including the 40 Recommendations on Money Laundering adopted in 1990 by the international Financial Action Task Force, of which the UAE is a member.

The hijackers also employed DIB to donate to Muslim charities.  For example, an agreement for automatic withdrawal dated July 25, 1999, indicates that hijacker Marwan al Shehhi donated money to Darbar Charity.  The money was transferred from Hong Kong Shanghai Bank account no. 61052114001 into DIB account no. 1520449474101.  *WTC Properties* Amended RICO at Exh. A.[4]

---

[4] DIB is also connected to the Saudi charity International Islamic Relief Organization ("IIRO") and its support of terrorist groups.  According to the Russion FSB (Memo titled "Reference Information on Funding of Abroad-Stationed Chechen Separatists"), the IIRO support Chechen fighters through a "Special Chechen Refugees Assistance Fund" at DIB (Acct. No. 01520483656101).

Shortly after the 9/11 Attack, the Central Bank of the UAE froze the accounts of various persons and organizations suspected of ties with the al Qaida Movement, including DIB, mirroring the September 25, 2001 regulatory alert issued by Luxembourg authorities announcing the Bank's ties to Osama bin Ladin.[5]  *Federal* RICO at Exh. A; *O'Neill* RICO at Exh. A; *Continental* RICO at Exh. A.

DIB has been a key shareholder in other banks well-known for their involvement in laundering money on behalf of the Enterprise, including Tadamon Islamic Bank and Baraka Islamic Bank, an affiliate of Al Baraka Bank.  *Burnett* TAC ¶¶ 108, 111; *O'Neill* 2AC ¶ 54; *Continental* Casualty FAC ¶ 56; Federal RICO at Exh. A; *Continental* RICO at Exh. A.  DIB is also a correspondent bank of Al Shamal Islamic Bank according to the Al Shamal list of correspondent banks, and similarly holds an account for Al Shamal Islamic bank (Acct. No. 015200407702).[6]

Despite these warnings, DIB continued to knowingly provide financial services and other forms of material support to al Qaida, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks like the al Qaida Movement through anti-terrorist and money laundering safeguards and "know your customer" regulations.

## III.   LEGAL ARGUMENT

### A.   Service via Publication Was Proper

DIB argues that despite the fact that they received actual notice of the Complaints, Plaintiffs' court-approved efforts to serve by publication were unconstitutional.  In challenging

---

[5]  DIB appears on two suspect watch lists issued by Luxembourg in connection with the 9-11 attacks: (1) Anti-Money Laundering Service of the Luxembourg State Prosecutor, circular 03/01 SAB; and (2) State Control Committee of the Banking Sector, circular 01/35.

[6]  According to banking records, DIB has an account with Chase Manhattan Bank-New York and has banking guarantees issued by that bank.  In addition, Chase Manhattan Bank-New York is a correspondent bank in the U.S. for DIB.

this Court's September 15, 2004 Publication Order, DIB somehow attempts to argue with a straight face that it has not received constitutionally sufficient notice of a lawsuit for which it has retained counsel, appeared and filed a motion to dismiss.  Nevertheless, DIB argues that the notice provided via publication in the United Arab Emirates was constitutionally insufficient because one of the three publications employed allegedly was not widely circulated in Dubai, and because DIB believes it could have been served directly through other means.

This argument ignores the purpose and requirements of constitutional due process.  As the Second Circuit stated in *S.E.C. v. Tome*, 833 F.2d 1086, 1092 (2d Cir. 1987):

> To submit a party to the jurisdiction of a court, due process has long been held to require the giving of notice in such a manner that there can be little doubt that the party has actual notice of the claims in order to appear and defend.

Justice Jackson further stated:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  The question before this Court therefore is whether publication in the *USA Today, International Herald Tribune*, and the *Al-Quds Al-Arabi* newspapers was "reasonably calculated" to notify DIB of the suit against it so as to satisfy due process.  DIB's appearance and active presence in this case sufficiently demonstrates that service by publication was adequate and thus consistent with due process requirements.

The Second Circuit stated in Tome:  "The 'reasonably calculated' analysis need not be relied on exclusively in this case because we are not dealing with the question of the adequacy of constructive notice."  *Tome*, 833 F.2d at 1093.  At a minimum, in this instance there is constructive notice because DIB has appeared to defend this action.  As the Supreme Court stated in *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), "the fundamental requisite of due process

of law is the opportunity to be heard." The record in this matter establishes that service by publication was adequate, that DIB received notice of the suit, understood that it should retain counsel, and understood its rights because DIB instructed said counsel to file a motion to dismiss. This manifests the adequacy of the notice by publication. Justice Jackson succinctly summed up this matter when he wrote:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Milliken v. Meyer*, 311 U.S. 457 (1940); *Grannis v. Ordean*, 234 U.S. 385; *Priest v. Trustees of Town of Las Vegas*, 232 U.S. 604 (1914); *Roller v. Holly*, 176 U.S. 398 (1900). The notice must be of such nature as reasonable to convey the required information, *Grannis v. Ordean*, *supra*, and it must afford a reasonable time for those interested to make their appearance, *Roller v. Holly*, *supra*, and *cf Goodrich v. Ferris*, 214 U.S. 71 (1909). But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied. 'The criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.' *American Land Co. v. Zeiss*, 219 U.S. 47, 67 (1911); *and see Blinn v. Nelson*, 222 U.S. 1, 7 (1911).

*Mullane*, 399 U.S. at 314-15.

By its September 15, 2004 Order, this Court agreed that publication in these periodicals was appropriate.[7] Actual publication did not begin until December 22, 2004. During that three month period, multiple defendants (both foreign and domestic) who were identified on the publication list came forward to accept service and negotiate briefing schedules. Counsel for

---

[7] Indeed, this Court recognized that publication of the notice in the *Al-Quds Al-Arabi* was reasonably calculated to apprise defendants of the lawsuit. The *Al-Quds Al-Arabi* is published in London and is circulated in Europe, the Middle East, North Africa, and North America. The newspaper has specifically been chosen in the past by terrorists for the granting of interviews, has published several fatwas by Osama bin Laden, and has similarly received statements from al Qaida. Moreover, this Court is in agreement with other courts that the *Al-Quds Al-Arabi* is an appropriate place to publish the notice of this type of suit. *See Mwami, et al. v. Osama Bin Laden, et al.*, Case No. 99-0126 (D.D.C. Aug. 2, 1999); *Havlish v. Osama Bin Laden, et al.*, Case No. 02-0305 (D.D.C.) (J.R.); *Burnett v. Al Baraka Investment & Development Corp., el al.*, Case No. 02-1616 (D.D.C.) (J.R.). New York law clearly permits this type of service where other forms of service are impracticable and the method of service is reasonably calculated to give the defendant notice. CPLR 308(5); *Dobkin v. Chapman*, 21 N.Y.2d 490, 289 N.Y.S.2d 161 (1968); Fed. R. Civ. P. 4(e)(1).

DIB could have similarly contacted the Plaintiffs to discuss an agreement to accept service on behalf of their client but failed to do so.  See *Ehrenfeld v. Bin Mahfouz*, 2005 U.S. Dist. LEXIS 4741 (S.D.N.Y. March 23, 2005) (holding that service on a foreign defendant's U.S. attorney would successfully provide the defendant with notice of the lawsuit).

Notice by publication is designed to impart information about a lawsuit.  However, there is nothing that requires the target to gain the information directly from reading the notice himself, as opposed to someone else advising him of the notice.  Without question, the notice in this case accomplished the goal of informing DIB of the instant action.

In addition to the various modes of print publication, only one of which DIB has addressed, the Complaints have been available on numerous websites in many languages, including Arabic, for almost two years, and coverage of this case in the Arabic media has been widespread.  Nothing in the Constitution, nor any case cited by DIB, requires that the target of the notice gain the information directly from reading the Notice itself, as opposed to learning of it through other sources.  The record in this matter clearly establishes that the Plaintiffs' service of process on Dubai Islamic Bank via publication was effective and consistent with due process requirements.

**B.      Plaintiffs Have Properly Established Personal Jurisdiction Over DIB**

Because the Plaintiffs' RICO claims against DIB arise from the bank's money laundering activities on behalf of al Qaida in furtherance of al Qaida's conspiracy to attack America, this Court necessarily possesses personal jurisdiction over DIB.[8]  Pursuant to 18 U.S.C. § 1956(a)(3), a financial institution engages in money laundering if it conducts or attempts to conduct a

---

[8]  This Court also has personal jurisdiction over the Plaintiffs' claims pursuant to New York's Long Arm Statute. N.Y. C.P.L.R. § 302(a)(2).  At this point in the litigation, the parties have extensively briefed the applicability of the New York Long Arm Statute.  Rather than burdening the Court with a restatement of those same arguments herein, Plaintiffs incorporate by reference the discussion of the applicability of the New York Long Arm Statute set forth in the Federal Plaintiffs' Opposition to the Motion to Dismiss of National Commercial Bank at pp. 10-11, and the Federal Plaintiffs' Opposition to the Motion to Dismiss of Islamic Investment Company of the Gulf at pp. 7-8.

financial transaction involving property used to conduct or facilitate specified unlawful activity, with the intent:

> (A)      to promote the carrying on of specified unlawful activity;
>
> (B)      to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
>
> (C)      to avoid a transaction reporting requirement under State or Federal law.
>
> Under subsection (b)(2) of that same statute:
>
> the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and --
>
> (C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

The conduct underlying Plaintiffs' RICO claims subjects DIB to personal jurisdiction under the anti-money laundering statute.  As alleged in the Complaints and RICO Statements, DIB knowingly facilitated financial transactions on behalf of Osama bin Ladin and others in order to further al Qaida's terrorist activities.  Importantly, 18 U.S.C. § 1961 defines "specified unlawful activity" to include conduct in violation of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of material support or resources to terrorists.  Thus, DIB has engaged in acts of money laundering within the meaning of 18 U.S.C. § 1956(a)(3).[9]  As DIB

---

[9]  18 U.S.C. § 1956(a)(1) further provides that a financial institution is guilty of money laundering in the event that it conducts or attempts to conduct such a financial transaction, knowing that the property involved in that financial transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity.  As alleged in the Complaints and RICO Statements, al Qaida has, from its inception, depended on the diversion of contributions to ostensible charities to support its global operations. The funds obtained through this process necessarily represent the proceeds of unlawful activity, in that many well meaning contributors are defrauded in the process.  Given the relationship between the DIB and al Qaida during al Qaida's formative years, DIB was certainly aware that the funds deposited in the al Qaida accounts it maintained were generated through illegal means, and were being channeled to support al Qaida's terrorist ambitions.  As such, DIB is guilty of money laundering under § 1956(a)(1) as well.  The violations of that subsection also give rise to personal jurisdiction over DIB under § 1956(b)(2).

maintains correspondent bank accounts with Chase Manhattan Bank, a U.S. based financial institution, the money laundering activities underlying the Property Damage Plaintiffs' RICO claims confer personal jurisdiction over DIB in this case.

Moreover, personal jurisdiction over DIB is appropriate because the Bank purposefully directed its activities towards the United States through its active, knowing assistance to al Qaida. In *Burger King v. Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472. Physical presence is not a requirement. *Id*. at 475. In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if none of the defendant's conduct took place in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984).[10]

C.    **Plaintiffs Have Met The Pleading Standards Of This Circuit**

1.    General Pleading Requirements

DIB moves to dismiss the Complaints pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief could be granted. Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam). The Court's role is "not to assay the weight of the evidence which might be offered in

---

[10] This issue has been briefed before this Court at length before. *See, e.g., Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of Yousef Abdul Latif Jameel* at 6-9 (filed Oct. 18, 2004). See especially the discussion of *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003); *Daliberti v. Iraq*, 97 F. Supp. 2d 38, 54 (D.D.C. 2000); and *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dismissed in part*, 162 F.3d 748 (2d Cit. 1998), all of which make clear that terrorists targeting Americans should reasonably foresee being haled into court in the United States and that due process is not violated in placing them under the jurisdiction of our courts.

support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

In evaluating whether Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaints and RICO Statements and draw all reasonable inferences in Plaintiffs' favor. *Wynder*, 360 F.3d at 78; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage. Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint only need include "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id*. at 512 (quoting *Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000), appeal dismissed after remand, 2001 WL 936257 (D.C. Cir. July 12, 2001) (allegation "I was turned down for a job because of my race" would be sufficient to survive a Rule 12(b)(6) motion.). Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69(1993).

-11-

Two recent Second Circuit cases underscore and re-affirm these principles.  In *Phelps*, the plaintiff alleged that the employees of the prison where he was incarcerated had violated his Eighth and Fourteenth Amendment rights by inflicting cruel and unusual punishment.  308 F.3d at 182.  Plaintiff further alleged that defendants "knew or recklessly disregarded" that the diet the defendants had placed him on was inadequate and would cause pain and suffering.  *Id*.  The district court dismissed the complaint, finding that it failed to state a claim, in part because the court said plaintiff had not sufficiently alleged that defendants acted with the requisite *scienter*, deliberate indifference.  The district court found plaintiff's allegations of *scienter* conclusory and held that plaintiff had failed to allege facts from which the Court could infer the defendants' knowledge.  *Id*. at 184.  The Second Circuit reversed, holding that a district court "may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference."  *Id*. at 186-87.  The Court explained:

> It was improper to dismiss Phelps's Amended Complaint for failing to supplement Phelps's basic allegations with additional facts to support them by inference, for it does not appear from the face of the complaint beyond doubt that Phelps "can prove no set of facts in support of his claim which would entitle him to relief."

*Phelps*, 308 F.3d at 187 (quoting *Conley*, 355 U.S. at 45-46).

Moreover, the Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations.  *Phelps*, 308 F.3d at 187.

Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point, courts must take care lest judicial haste in dismissing a complaint in the long run makes waste. Untimely dismissal may prove wasteful of the court's limited resources rather than expeditious, for it often leads to a shuttling of the lawsuit between the district and appellate courts.

*Id*. at 185 (citations omitted).

More recently, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second

Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading

standards to be applied.  In *Pelman*, the district court had dismissed because, it had ruled,

plaintiffs had failed to "draw an adequate causal connection between their consumption of

McDonald's food and their alleged injuries." *Id*. at 511.  The Second Circuit rejected this

approach.  It held that the information the district court found to be missing in the Complaint was

"the sort of information that is appropriately the subject of discovery, rather than what is required

to satisfy the limited pleading requirements of Rule 8(a)." *Id*. at 512.  Quoting the unanimous

Supreme Court ruling in *Swierkiewiez*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery
> rules and summary judgment motions to define disputed facts and issues and to
> dispose of unmeritorious claims. The provisions for discovery are so flexible and
> the provisions for pretrial procedure and summary judgment so effective, that
> attempted surprise in federal practice is aborted very easily, synthetic issues
> detected, and the gravamen of the dispute brought frankly into the open for the
> inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13).

Nowhere does DIB claim not to have fair notice of the allegations being lodged against it.

It clearly knows what has been alleged, and has even attempted to suggest factual evidence at

this early stage rebutting Plaintiffs' claims.  Because the complaints provide fair notice, these are

properly matters to be resolved after discovery is complete, and this is no grounds for dismissal

here.

### 2.   Pleading Knowledge of Terrorist Activity

DIB claims that Plaintiffs have insufficiently demonstrated that the Bank knew that its

customers and facilities were involved in terrorist financing, referring to its actions as "nothing

more than routine banking business." *See* Motion to Dismiss at 5-9.  At this early stage of the

litigation, however, plaintiffs' consistent averments that DIB acted "knowingly" are sufficient

under the Federal Rules of Civil Procedure to allow these claims to proceed.  *Federal* FAC ¶¶
346-347; *Euro Brokers* Complaint ¶ 123; *Cantor* FAC ¶¶ 137-138.

The Federal Rules of Civil Procedure establish a "notice pleading" standard.  Fed. R. Civ.
P. 8(a).  More particular pleading is only required when alleging fraud or mistake; "malice,
intent, knowledge and other condition of mind of a person may be averred generally."  Fed. R.
Civ. P. 9(b).

The Second Circuit has supported this decree unfailingly and has refused to dismiss
complaints for averring knowledge generally.  In *Phelps*, the Second Circuit reversed a district
court ruling which had dismissed a complaint for failure to plead specific facts in support of
allegations of the defendant's knowledge, holding instead that such a heightened pleading
standard was "unwarranted" under Fed. R. Civ. P. 8(a).  308 F.3d at 186.  "A plaintiffs allegation
of knowledge is itself a particularized factual allegation, which he will have the opportunity to
demonstrate at the appropriate time 'in the usual ways'."  *Id.* at 187 n. 6 (citing *Farmer v.
Brennan*, 511 U.S. 825, 842 (1994)).  Moreover, the *Phelps* court instructed: "However unlikely
it may appear to a court from a plaintiffs complaint that he will ultimately be able to prove an
alleged fact such as mental state, the court may not go beyond FRCP 8(a)(2) to require the
plaintiff to supplement his pleadings with additional facts that support his allegation of
knowledge either directly or by inference," suggesting that the weight of the evidence should
instead be assessed at the time of summary judgment proceedings.  *Id.* at 186-87.

The D.C. Circuit recently dealt with similar post-Swierkiewicz issues in reversing the
dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge.
*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004).  Applying the "short and plain
statement of the claim" standard from Rule 8(a), the Court held:  "It is of no moment that
[plaintiffs] allegation of actual or constructive knowledge on the part of the District was

-14-

conclusory.  Many well-pleaded complaints are conclusory.  And while we do not have to accept conclusions of law as true, conclusions of fact are another matter."  *Id.* at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

Every complaint properly alleges that DIB knew that it was involved in financing terrorism.  Plaintiffs have met their burden under notice pleading law.

**D.     Each Individual Cause of Action Has Been Properly Pled**

1.     Anti-Terrorism Act.

Under the Anti-Terrorism Act,[11] DIB is liable if it provided any material support to al Qaida with knowledge of its terrorist agenda or if it aided and abetted al Qaida or Osama bin Laden in their course of terrorist conduct.  *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002) ("[I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence.") (emphasis added).[12]

This Court has already recognized that, under the ATA, "material support includes money [and] financial services[.]"  *In re Terrorist Attack on September 11, 2001*, 349 F. Supp. 2d 765, 825 (S.D.N.Y. 2005) ("January 18 Order").  As demonstrated above, plaintiffs have alleged that DIB knowingly and intentionally provided money and financial services to Osama bin Laden and al Qaida.

Plaintiffs also properly allege that DIB's support and assistance was a proximate cause of the September 11 attacks.  Plaintiffs allege, for example, that "The financial resources and support network of ... Defendants - charities, banks, front organizations and financiers - are what

---

[11]  The Anti-Terrorism Act ("ATA") provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism[.]" 18 U.S.C. § 2333.
[12]  Reviewing the legislative history, the Seventh Circuit concluded: "All of this history indicates an intent by Congress to allow a plaintiff to recover from anyone along the causal chain of terrorism."

allowed the attacks of September 11, 2001 to occur.  Terrorists like Osama bin Laden and his al

Qaida network cannot plan, train and act on a massive scale without significant financial power,

coordination and backing."  *Ashton* 3AC ¶ 30; *Burnett* 3AC at Introduction; *see also Boim*, 291

F.3d at 1021 ("[T]here would not be a trigger to pull or a bomb to blow up without the resources

to acquire such tools of terrorism and to bankroll the persons who actually commit the

violence.")  Moreover, this Court has already held that "[i]n light of al Qaida's public

acknowledgments of its war against the United States, the September 11 attacks may be the

natural and probably consequence of knowingly and intentionally providing material support to

al Qaida."  349 F. Supp. 2d at 826.

Finally, as this Court has previously recognized, "Plaintiffs do not have to allege that

Defendants knew specifically about the September 11 attacks or that they committed any specific

act in furtherance of that attack."  *Id.* at 829.  Accordingly, under the standards set forth in this

Court's January 18 Order, plaintiffs have properly pled a claim under the ATA.

### 2.    Alien Tort Claims Act

DIB contends that Plaintiffs' claims under the Alien Tort Claims Act ("ATCA"), 28

U.S.C. § 1350, should be dismissed because plaintiffs have failed to allege a tort committed by

DIB.  This Court has already rejected this precise argument in its Order of January 18, 2005 and

it should do so here as well.  349 F. Supp. 2d at 826.

### 3.    Aiding and Abetting and Civil Conspiracy

DIB also argues that the Property Damage Plaintiffs have failed to adequately plead the

elements of their aiding and abetting claims because the allegations of knowledge are

conclusory.  Again, they are wrong.

First, as stated above, conclusory allegations regarding knowledge are perfectly acceptable at this point in the proceedings. Moreover, the Complaints and RICO Statements often go further.

Civil liability for aiding and abetting will be imposed where: (1) the party whom the defendant aids or abets performs a wrongful act that causes injury; (2) the defendant is generally aware of his role in an overall illegal scheme or tortious plan at the time he provides the assistance; and (3) the defendant knowingly provides substantial assistance to the wrongdoer. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

DIB is correct that there is no separate cause of action for civil conspiracy under *New York Law Durante Bros. & Sons, Inc. v. Flushing Nat. Bank*, 755 F.2d 239, 251 (2d Cir. 1985). However, allegations of a conspiracy connect the actions of separate defendants with an otherwise actionable tort. *Alexander & Alexander, Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986). Both conspiracy and aiding and abetting create concerted-action liability in New York. *Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998). Conspiracy requires an agreement to commit a tortious act while aiding and abetting requires that the defendant has given substantial assistance or encouragement to the primary wrongdoer. *Id*. at 122-23.

Plaintiffs have adequately pleaded each of the requisite elements in relation to their aiding and abetting claims and conspiracy claims against DIB. Once again, the Complaints and RICO Statements plainly allege that DIB knowingly agreed to and provided material support and resources to al Qaida, the terrorist organization which carried out the September 11th Attack. These specific allegations make clear that the DIB was expressly aware of, and an integral participant in, al Qaida's campaign to attack America, and are sufficient to state valid claims under aiding and abetting and conspiracy theories.

4.    Civil RICO

DIB seeks to dismiss Plaintiffs' civil RICO claims on the grounds that "active management or operation" of the Enterprise has not been alleged, nor was DIB alleged to be a "central figure" in the al Qaida Movement.  These assertions misstate the law.

DIB is correct that a plaintiff asserting a civil claim under 1962(c) must allege that the defendant participated in the operation or management of the enterprise.  *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D. N.Y. 2003).  However, such "discretionary authority" generally has been described as "a relatively low hurdle for plaintiffs to clear" in the Second Circuit, contrary to the lone district court decision excavated by DIB.  See *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, at *4 (S.D.N.Y. July 15, 1994).  Through discovery, this allegation will be further substantiated.

Moreover, "[T]he requirements for RICO's conspiracy charges under 1962(d) are less demanding." *Baisch*, 346 F.3d at 376.  All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id*. at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)).  "Although parties who do not control the organization cannot be liable under § 1962(c), they may still

conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

The plaintiffs have satisfied the pleading standards applicable to their 1962(c) and 1962(d) claims, as set forth above.  Plaintiffs allege that DIB knowingly provided financial services to al Qaida.  *Federal* RICO at Exh. A.  DIB financed the Enterprise's bombings of American embassies in Kenya and Tanzania.  *Federal* RICO at Exh. A, *WTC Properties* RICO at Exh. A.

In view of the allegations regarding DIB's integral and pervasive sponsorship of al Qaida's operations throughout the world, Plaintiffs have adequately alleged that it played a direct and active role in the management and operation of al Qaida's financial network, and that DIB knowingly conspired to further the objectives of the al Qaida Movement during the years leading up to the September 11th Attack.  Plaintiffs have met their pleading burden in relation to their Section 1962(c) and 1962(d) claims, particularly given the fact that the plaintiffs have not yet been afforded the opportunity to conduct discovery.

### 5.   Trespass

This Court has already held that plaintiffs who suffered property damages as a result of the September 11th Attack may maintain trespass claims against parties who conspired with or aided and abetted al Qaida.  349 F. Supp. 2d at 830.  As Plaintiffs have presented detailed factual allegations regarding DIB's direct and extensive sponsorship of al Qaida, the claims under common law trespass are valid.

### 6.   Negligence and Negligent Infliction of Emotional Distress

DIB argues that it cannot be liable under a theory of negligence because the Plaintiffs do not allege or identify a duty owed by DIB to Plaintiffs.  This argument ignores the duties and obligations imposed on DIB as a member of the global banking system.

In 1990, the Financial Action Task Force (FATF), an inter-governmental body whose purpose is the development and promotion of policies, both at national and international levels, to combat money laundering and terrorist financing, published its "Forty Recommendations" to combat money laundering and terrorist financing.  The Forty Recommendations "set out the framework for anti-money laundering efforts and are designed for universal application.  They provide a complete set of counter-measures against money laundering covering the criminal justice system and law enforcement, the financial system and its regulation, and international cooperation."  *See* Financial Action Task Force Website - About FATF, available at htti)://wwwl.oeed.org/£atf/AboutFATF en.htm; Carter Aff. Exh. 4.  Of particular note, the Forty Recommendations set forth minimum standards which must be observed by financial institutions to guard against money laundering and terrorist financing.  *Id*.

Given a banking institution's universally recognized obligation to engage in good faith efforts to prevent the financing of terrorism, as reflected by the Forty Recommendations of the FATF, DIB unquestionably owed a duty of care to plaintiffs.[13]  In knowingly providing financial services to al Qaida, DIB undeniably violated the duties imposed on it as a member of the international banking system.  As the complaints plainly allege that Plaintiffs' injuries were the direct and proximate cause of the Bank's breaches of its duties, Plaintiffs have stated valid negligence claims.  Because this duty is clear, Plaintiffs' claims for negligent infliction of emotional distress remain valid as well.

       7.    <u>Plaintiffs' Assault, Battery, and Intentional Infliction of Emotional Distress Claims Are Not Barred by the Statute of Limitations</u>

Contrary to DIB's assertion, Plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not time-barred.  First, these claims are subsumed within

---

[13]  Moreover, as a general principle of tort law, every individual has a duty to exercise reasonable care to avoid physical harm to others' person and property. See Restatement (Second) of Torts § 302.

plaintiffs' claims under the ATA, which imports into that federal cause of action "the remedies of American tort law."  *See* 137 Cong. Rec. 54511 04 (April 16, 1991); *see also Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7`ᵗʰ` Cir. 2002) (language and history of ATA "evidence[] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law").  To the extent that these claims have been "federalized" under the Anti-Terrorism Act, they are governed by federal law.  *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal statute).[14] Moreover, state statutes of limitation are inapplicable to federal common law claims.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).  *See also Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306, 309 (E.D. La. 1994), *reconsideration denied*, 1995 WL 672835 (E.D. La. Nov. 9, 1995) (holding that suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even when brought by private parties).

Moreover, all of Plaintiffs' claims arise from DIB's participation in the conspiracy to conduct terrorist attacks against the United States, a conspiracy designed to hide the identity of the participants from disclosure to the outside world.  As a result, the statute of limitations was tolled until Plaintiffs reasonably should have become aware of DIB's involvement within the conspiracy, itself a question of fact to be determined through discovery.  *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D. N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 2004 U.S. Dist. Lexis 3892 at *17-18 (S.D. N.Y. Mar. 12, 2004). Given the clandestine nature of the conspiracy in which DIB participated, equitable principles

---

[14]  Should plaintiffs' claims under the ATA fail for any reason, however, the common law claims also exist as separate claims arising under state law. In determining which states' laws govern, this Court would apply the choice-of-law rules used by New York.  *See Ideal Elec. Sec. Co. v. International Fidelity Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997), *aff'd on appeal after remand*, 203 F.3d 53 (D.C. Cit. 1999) (federal court hearing state-law claims applies choice of law rules of the place in which it sits).

require that the statute of limitations be tolled.  *See Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (holding that "[e]quitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").[15]

### 8.   Wrongful Death

Under New York law, a personal representative of a decedent may maintain a wrongful death action provided that the defendant "would have been liable to the decedent by reason of such wrongful conduct if death had not ensued."  *LaMarca v. United States*, 31 F. Supp. 2d 110, 124 (E.D.N.Y. 1998) (mem.) (citing N.Y. Est. Powers & Trusts Law § 5-4.1).  As is alleged in the Complaints and RICO Statements, DIB is liable to such decedents because it provided material support and resources to the terrorists who deliberately caused their death.  *Federal* FAC ¶¶ 344-350; *Federal* RICO at 5(b) & Exh. A.; *O'Neill* SAC ¶¶ 201-214.  It is well established that the knowing provision of material support for homicide gives rise to liability for the resulting death.[16]

Furthermore, New York generally recognizes that those who aid and abet tortious conduct are jointly and severally liable with other participants, regardless of the degree of their participation or culpability in the overall scheme. *Valdan Sportswear v. Montgomery Ward & Co.*, 591 F. Supp. 1188, 1191 (S.D.N.Y. 1984).  The Plaintiffs have therefore sufficiently alleged a cause of action for wrongful death.

---

[15]  Arguably, they are also extended by way of action of the New York Survival cause of action, which the New York legislature specifically extended from 2 years to 2.5 years for 9/11 cases.  See N.Y. Est. Powers & Trusts Law § 5-4.1 (2003).

[16]  S*ee Halberstam*, 705 F.2d at 483-84 (reviewing case law from a number of jurisdictions, citing the Restatement (Second) of Torts § 876(b) cmt. d, and concluding that five factors should be taken into consideration when determining whether the defendant offered enough assistance for liability: the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; his relation to the tortious actor; and the defendant's state of mind).

9.    Survival

In general, New York recognizes survival actions "for injury to person or property ... despite the death of person in whose favor or against whom cause of action existed."  N.Y. Est. Powers & Trusts Law § 11-3.2 (2004).  As is noted above in the discussion of the wrongful death cause of action, it is well established that the knowing provision of material support for tortious acts gives rise to liability for the resulting harm, and DIB's arguments regarding there being "no wrong alleged" are without merit.

DIB also argues that the Federal and other Plaintiffs may not maintain claims for wrongful death and survival because they are not the personal representatives of the decedents.[17] This argument arises from DIB's fundamental misunderstanding of the rights of workers' compensation insurers under the applicable workers' compensation statutes.  On this point, Plaintiffs refer the Court to the arguments set forth on p. 18 of the *Property Damage Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Perouz Sedaghaty* (filed April 8, 2005), incorporated herein by reference.

10.    Contribution and Indemnity

DIB argues for the dismissal of claims for contribution and indemnity by plaintiff Port Authority of New York and New Jersey ("Port Authority") on the grounds that Port Authority has not yet been forced to pay judgment.  This is mistaken.  The Port Authority's legal and factual arguments in support of its contribution and indemnity claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein.[18]

---

[17]  As to the personal injury plaintiffs, the actions are certainly brought by the requisite parties properly in accordance with New York law. See, e.g., *O'Neill*, SAC ¶¶ 25-30, 210, 215.

[18]  *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112); Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rahji, 04 CV 0765 (June 28, 2005) (Docket Entry No. 116).

11.   <u>International Law</u>

DIB claims that plaintiffs have no independent cause of action for violations of international law.  They are incorrect.  In Counts Nine and Eleven of the *Cantor Fitzgerald* FAC and Count Nine of the *WTC Properties* Complaint, Plaintiffs allege that all Defendants are jointly and severally liable for Plaintiffs' damages under principles of international law.  See *Cantor* FAC ¶¶ 226-236; *WTC Properties* Complaint ¶¶ 1174-1179.   Specifically, Plaintiffs assert that aircraft hijacking is a well recognized violation of the law of nations, and that the September 11 attacks were committed through a terrorist hijacking in violation of international law.  DIB's conduct, insofar as it establishes that Defendant acted directly and in concert with others in financing and materially supporting Al Qaida, equally demonstrates its liability for aiding and abetting a violation of international law, which is actionable in American courts.[19] The legal and factual arguments in support of Plaintiffs' international law claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein.[20]

12.   <u>Torture Victims Protection Act</u>

Plaintiffs recognize that this Court has already held that the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, provides a cause of action only against individuals.  *See* 349 F.

---

[19]  *See, e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996) (affirming district court's jury instruction allowing foreign leader to be held liable upon finding that he "directed, ordered, conspired with, or aided the military in torture, summary execution, and disappearance"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 CIV 9882 (AGS), 2003 WL 1339181, at *46-47 (S.D.N.Y. Mar. 19, 2003) (collecting cases) ("U.S. courts have consistently permitted ATCA suits to proceed based on theories of conspiracy and aiding and abetting."); *Barrueto v. Larios*, 205 F. Supp. 2d 1325, 1331-32 (S.D. Fla. 2002) (holding ATCA liability can be based on allegations that defendants conspired or aided and abetted violations of the law of nations); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 2002 WL 851751, at *24-25 (N.D. Ga. Apr. 29, 2002) (holding defendant liable for aiding and abetting in acts that violate customary international law); and *Abebe-Jira v. Negewo*, 72 F.3d 844, 845-48 (11th Cir. 1996) (affirming verdict for torture and cruel, inhuman or degrading treatment where defendant supervised or participated with others in "some of the acts of torture" against plaintiffs).
[20]  *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112); Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rahji, 04 CV 0765 (June 28, 2005) (Docket Entry No. 116).

Supp. 2d at 828.  Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing on this issue.

                13.    <u>Punitive Damages</u>

DIB has moved to dismiss punitive damages claims on the ground that, under New York law, punitive damages are a remedy, not a cause of action.  However, DIB presents no argument that Plaintiffs are not entitled to recover punitive damages in this lawsuit.  Indeed, it is clear that punitive damages are available in connection with the claims that the Plaintiffs assert, including but not limited to their international law claims.  *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law); *Paul v. Avril*, 901 F. Supp. 330, 335-36 (S.D. Fla. 1994) ("Both compensatory and punitive damages are recoverable for violations of international law") (citing *Filartiga v. Pena, supra*); *see also Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1359-60 (N.D. Ga. 2002) (awarding punitive damages for defendant's violation of international law); *Xuncax v. Gramajo*, 886 F. Supp. 162, 201-202 (D. Mass. 1995) (same).

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that Dubai Islamic Bank's Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

COZEN O'CONNOR


Dated: July 26, 2005                          BY: _____

                                   Stephen A. Cozen, Esquire
                                   Elliott R. Feldman, Esquire
                                   Sean P. Carter, Esquire
                                   Adam C. Bonin, Esquire
                                   1900 Market Street
                                   Philadelphia, PA 19103
                                   Tele: (215) 665-2000
                                   Fax: (215) 665-2013

                                   Attorneys for *Federal Insurance* Plaintiffs


                                   Ronald L. Motley, Esq. (RM-2730)
                                   Jodi Westbrook Flowers, Esq.
                                   Donald A. Migliori, Esq.
                                   Michael Elsner, Esq. (ME-8337)
                                   MOTLEY RICE LLC
                                   28 Bridgeside Boulevard
                                   P.O. Box 1792
                                   Mount Pleasant, South Carolina 29465
                                   Telephone: (843) 216-9000


                                   Paul J. Hanly, Jr., Esq. (PH-5486)
                                   Jayne Conroy, Esq. (JC-8611)
                                   Andrea Bierstein, Esq. (AB-4618)
                                   HANLY CONROY BIERSTEIN &
                                      SHERIDAN, LLP
                                   415 Madison Avenue
                                   New York, NY 100 17-11 1 1
                                   Telephone: (212) 401-7600

                                   Attorneys for *Burnett*, *EuroBrokers* and
                                   *WTC Properties* Plaintiffs

Kenneth L. Adams
Richard W. Fields
Stacey A. Saiontz
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
1177 Avenue of the Americas
New York, N.Y. 10036-2714
Telephone: (212) 835-1400
Facsimile: (212) 997-9880

Attorneys for *Cantor Fitzgerald* Plaintiffs

Robert M. Kaplan (RK1428)
FERBER FROST CHAN & ESSNER, LLP
530 Fifth Avenue, 23rd Floor
New York, New York 10036-5101
(212) 944-2200

Attorneys for *Continental* Plaintiffs

Jerry S. Goldman (JG8445)
LAW OFFICES OF JERRY S. GOLDMAN
   AND ASSOCIATES, P.C.
111 Broadway, 13th Floor
New York, New York 10006
Tel.: (212) 385-1005
Fax: (212) 346-4665

Attorney for *O'Neill* Plaintiffs

Attorney for the O'Neill Plaintiffs
David H. Fromm, Esq. (DH-9334)
Frank J. Rubino, Jr., Esq. (FR-6202)
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, New York 10017
(212) 983-8500

Attorneys for Plaintiff *New York Marine And
General Insurance Company*

PHILA1\2314392\1 117430.000