

# Financial Action Task Force
# on Money Laundering
## Groupe d'action financière
## sur le blanchiment de capitaux

# THE FORTY

# RECOMMENDATIONS

20 June 2003

All rights reserved.
Applications for permission to reproduce all or part of this publication should be made to:
FATF Secretariat, OECD, 2 rue André Pascal 75775 Paris Cedex 16, France

# **INTRODUCTION**

Money laundering methods and techniques change in response to developing counter-measures. In recent years, the Financial Action Task Force (FATF) [1] has noted increasingly sophisticated combinations of techniques, such as the increased use of legal persons to disguise the true ownership and control of illegal proceeds, and an increased use of professionals to provide advice and assistance in laundering criminal funds. These factors, combined with the experience gained through the FATF's Non-Cooperative Countries and Territories process, and a number of national and international initiatives, led the FATF to review and revise the Forty Recommendations into a new comprehensive framework for combating money laundering and terrorist financing. The FATF now calls upon all countries to take the necessary steps to bring their national systems for combating money laundering and terrorist financing into compliance with the new FATF Recommendations, and to effectively implement these measures.

The review process for revising the Forty Recommendations was an extensive one, open to FATF members, non-members, observers, financial and other affected sectors and interested parties. This consultation process provided a wide range of input, all of which was considered in the review process.

The revised Forty Recommendations now apply not only to money laundering but also to terrorist financing, and when combined with the Eight Special Recommendations on Terrorist Financing provide an enhanced, comprehensive and consistent framework of measures for combating money laundering and terrorist financing. The FATF recognises that countries have diverse legal and financial systems and so all cannot take identical measures to achieve the common objective, especially over matters of detail. The Recommendations therefore set minimum standards for action for countries to implement the detail according to their particular circumstances and constitutional frameworks. The Recommendations cover all the measures that national systems should have in place within their criminal justice and regulatory systems; the preventive measures to be taken by financial institutions and certain other businesses and professions; and international co-operation.

The original FATF Forty Recommendations were drawn up in 1990 as an initiative to combat the misuse of financial systems by persons laundering drug money. In 1996 the Recommendations were revised for the first time to reflect evolving money laundering typologies. The 1996 Forty Recommendations have been endorsed by more than 130 countries and are the international anti-money laundering standard.

In October 2001 the FATF expanded its mandate to deal with the issue of the financing of terrorism, and took the important step of creating the Eight Special Recommendations on Terrorist Financing. These Recommendations contain a set of measures aimed at combating the funding of terrorist acts and terrorist organisations, and are complementary to the Forty Recommendations[2].

A key element in the fight against money laundering and the financing of terrorism is the need for countries systems to be monitored and evaluated, with respect to these international standards. The mutual evaluations conducted by the FATF and FATF-style regional bodies, as well as the assessments conducted by the IMF and World Bank, are a vital mechanism for ensuring that the FATF Recommendations are effectively implemented by all countries.

---

[1]  The FATF is an inter-governmental body which sets standards, and develops and promotes policies to combat money laundering and terrorist financing. It currently has 33 members: 31 countries and governments and two international organisations; and more than 20 observers: five FATF-style regional bodies and more than 15 other international organisations or bodies.  A list of all members and observers can be found on the FATF website at http://www.fatf-gafi.org/Members_en.htm

[2]  The FATF Forty and Eight Special Recommendations have been recognised by the International Monetary Fund and the World Bank as the international standards for combating money laundering and the financing of terrorism.

# THE FORTY RECOMMENDATIONS

## A.    LEGAL SYSTEMS

### *Scope of the criminal offence of money laundering*

**1.**    Countries should criminalise money laundering on the basis of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, 1988 (the Vienna Convention) and the United Nations Convention against Transnational Organized Crime, 2000 (the Palermo Convention).

Countries should apply the crime of money laundering to all serious offences, with a view to including the widest range of predicate offences. Predicate offences may be described by reference to all offences, or to a threshold linked either to a category of serious offences or to the penalty of imprisonment applicable to the predicate offence (threshold approach), or to a list of predicate offences, or a combination of these approaches.

Where countries apply a threshold approach, predicate offences should at a minimum comprise all offences that fall within the category of serious offences under their national law or should include offences which are punishable by a maximum penalty of more than one year's imprisonment or for those countries that have a minimum threshold for offences in their legal system, predicate offences should comprise all offences, which are punished by a minimum penalty of more than six months imprisonment.

Whichever approach is adopted, each country should at a minimum include a range of offences within each of the designated categories of offences[3].

Predicate offences for money laundering should extend to conduct that occurred in another country, which constitutes an offence in that country, and which would have constituted a predicate offence had it occurred domestically. Countries may provide that the only prerequisite is that the conduct would have constituted a predicate offence had it occurred domestically.

Countries may provide that the offence of money laundering does not apply to persons who committed the predicate offence, where this is required by fundamental principles of their domestic law.

**2.**    Countries should ensure that:

a)    The intent and knowledge required to prove the offence of money laundering is consistent with the standards set forth in the Vienna and Palermo Conventions, including the concept that such mental state may be inferred from objective factual circumstances.

b)    Criminal liability, and, where that is not possible, civil or administrative liability, should apply to legal persons.  This should not preclude parallel criminal, civil or administrative proceedings with respect to legal persons in countries in which such forms of liability

---

[3]   See the definition of "designated categories of offences" in the Glossary.

are available.  Legal persons should be subject to effective, proportionate and dissuasive sanctions.  Such measures should be without prejudice to the criminal liability of individuals.

*Provisional measures and confiscation*

**3.**     Countries should adopt measures similar to those set forth in the Vienna and Palermo Conventions, including legislative measures, to enable their competent authorities to confiscate property laundered, proceeds from money laundering or predicate offences, instrumentalities used in or intended for use in the commission of these offences, or property of corresponding value, without prejudicing the rights of bona fide third parties.

Such measures should include the authority to: (a) identify, trace and evaluate property which is subject to confiscation; (b) carry out provisional measures, such as freezing and seizing, to prevent any dealing, transfer or disposal of such property; (c) take steps that will prevent or void actions that prejudice the State's ability to recover property that is subject to confiscation; and (d) take any appropriate investigative measures.

Countries may consider adopting measures that allow such proceeds or instrumentalities to be confiscated without requiring a criminal conviction, or which require an offender to demonstrate the lawful origin of the property alleged to be liable to confiscation, to the extent that such a requirement is consistent with the principles of their domestic law.

**B.     MEASURES TO BE TAKEN BY FINANCIAL INSTITUTIONS AND NON-FINANCIAL BUSINESSES AND PROFESSIONS TO PREVENT MONEY LAUNDERING AND TERRORIST FINANCING**

**4.**     Countries should ensure that financial institution secrecy laws do not inhibit implementation of the FATF Recommendations.

*Customer due diligence and record-keeping*

**5.\***     Financial institutions should not keep anonymous accounts or accounts in obviously fictitious names.

Financial institutions should undertake customer due diligence measures, including identifying and verifying the identity of their customers, when:

- establishing business relations;
- carrying out occasional transactions: (i) above the applicable designated threshold; or (ii) that are wire transfers in the circumstances covered by the Interpretative Note to Special Recommendation VII;
- there is a suspicion of money laundering or terrorist financing; or
- the financial institution has doubts about the veracity or adequacy of previously obtained customer identification data.

2

The customer due diligence (CDD) measures to be taken are as follows:

a) Identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information[4].

b) Identifying the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner such that the financial institution is satisfied that it knows who the beneficial owner is. For legal persons and arrangements this should include financial institutions taking reasonable measures to understand the ownership and control structure of the customer.

c) Obtaining information on the purpose and intended nature of the business relationship.

d) Conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds.

Financial institutions should apply each of the CDD measures under (a) to (d) above, but may determine the extent of such measures on a risk sensitive basis depending on the type of customer, business relationship or transaction. The measures that are taken should be consistent with any guidelines issued by competent authorities. For higher risk categories, financial institutions should perform enhanced due diligence. In certain circumstances, where there are low risks, countries may decide that financial institutions can apply reduced or simplified measures.

Financial institutions should verify the identity of the customer and beneficial owner before or during the course of establishing a business relationship or conducting transactions for occasional customers. Countries may permit financial institutions to complete the verification as soon as reasonably practicable following the establishment of the relationship, where the money laundering risks are effectively managed and where this is essential not to interrupt the normal conduct of business.

Where the financial institution is unable to comply with paragraphs (a) to (c) above, it should not open the account, commence business relations or perform the transaction; or should terminate the business relationship; and should consider making a suspicious transactions report in relation to the customer.

These requirements should apply to all new customers, though financial institutions should also apply this Recommendation to existing customers on the basis of materiality and risk, and should conduct due diligence on such existing relationships at appropriate times.

**6.\*** Financial institutions should, in relation to politically exposed persons, in addition to performing normal due diligence measures:

    a) Have appropriate risk management systems to determine whether the customer is a politically exposed person.

    b) Obtain senior management approval for establishing business relationships with such customers.

---

[4] Reliable, independent source documents, data or information will hereafter be referred to as "identification data".

\* Recommendations marked with an asterisk should be read in conjunction with their Interpretative Note.

3

      c)     Take reasonable measures to establish the source of wealth and source of funds.

      d)     Conduct enhanced ongoing monitoring of the business relationship.

**7.**    Financial institutions should, in relation to cross-border correspondent banking and other similar relationships, in addition to performing normal due diligence measures:

      a)     Gather sufficient information about a respondent institution to understand fully the nature of the respondent's business and to determine from publicly available information the reputation of the institution and the quality of supervision, including whether it has been subject to a money laundering or terrorist financing investigation or regulatory action.

      b)     Assess the respondent institution's anti-money laundering and terrorist financing controls.

      c)     Obtain approval from senior management before establishing new correspondent relationships.

      d)     Document the respective responsibilities of each institution.

      e)     With respect to "payable-through accounts", be satisfied that the respondent bank has verified the identity of and performed on-going due diligence on the customers having direct access to accounts of the correspondent and that it is able to provide relevant customer identification data upon request to the correspondent bank.

**8.**    Financial institutions should pay special attention to any money laundering threats that may arise from new or developing technologies that might favour anonymity, and take measures, if needed, to prevent their use in money laundering schemes. In particular, financial institutions should have policies and procedures in place to address any specific risks associated with non-face to face business relationships or transactions.

**9.***    Countries may permit financial institutions to rely on intermediaries or other third parties to perform elements (a) – (c) of the CDD process or to introduce business, provided that the criteria set out below are met. Where such reliance is permitted, the ultimate responsibility for customer identification and verification remains with the financial institution relying on the third party.

The criteria that should be met are as follows:

      a)     A financial institution relying upon a third party should immediately obtain the necessary information concerning elements (a) – (c) of the CDD process. Financial institutions should take adequate steps to satisfy themselves that copies of identification data and other relevant documentation relating to the CDD requirements will be made available from the third party upon request without delay.

      b)     The financial institution should satisfy itself that the third party is regulated and supervised for, and has measures in place to comply with CDD requirements in line with Recommendations 5 and 10.

It is left to each country to determine in which countries the third party that meets the conditions can be based, having regard to information available on countries that do not or do not adequately apply the FATF Recommendations.

**10.***   Financial institutions should maintain, for at least five years, all necessary records on transactions, both domestic or international, to enable them to comply swiftly with information requests from the competent authorities. Such records must be sufficient to permit

reconstruction of individual transactions (including the amounts and types of currency involved if any) so as to provide, if necessary, evidence for prosecution of criminal activity.

Financial institutions should keep records on the identification data obtained through the customer due diligence process (e.g. copies or records of official identification documents like passports, identity cards, driving licenses or similar documents), account files and business correspondence for at least five years after the business relationship is ended.

The identification data and transaction records should be available to domestic competent authorities upon appropriate authority.

**11.\*** Financial institutions should pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose.  The background and purpose of such transactions should, as far as possible, be examined, the findings established in writing, and be available to help competent authorities and auditors.

**12.\*** The customer due diligence and record-keeping requirements set out in Recommendations 5, 6, and 8 to 11 apply to designated non-financial businesses and professions in the following situations:

    a)    Casinos – when customers engage in financial transactions equal to or above the applicable designated threshold.

    b)    Real estate agents - when they are involved in transactions for their client concerning the buying and selling of real estate.

    c)    Dealers in precious metals and dealers in precious stones - when they engage in any cash transaction with a customer equal to or above the applicable designated threshold.

    d)    Lawyers, notaries, other independent legal professionals and accountants when they prepare for or carry out transactions for their client concerning the following activities:

- buying and selling of real estate;
- managing of client money, securities or other assets;
- management of bank, savings or securities accounts;
- organisation of contributions for the creation, operation or management of companies;
- creation, operation or management of legal persons or arrangements, and buying and selling of business entities.

    e)    Trust and company service providers when they prepare for or carry out transactions for a client concerning the activities listed in the definition in the Glossary.

### *Reporting of suspicious transactions and compliance*

**13.\*** If a financial institution suspects or has reasonable grounds to suspect that funds are the proceeds of a criminal activity, or are related to terrorist financing, it should be required, directly by law or regulation, to report promptly its suspicions to the financial intelligence unit (FIU).

**14.\*** Financial institutions, their directors, officers and employees should be:

a)   Protected by legal provisions from criminal and civil liability for breach of any restriction on disclosure of information imposed by contract or by any legislative, regulatory or administrative provision, if they report their suspicions in good faith to the FIU, even if they did not know precisely what the underlying criminal activity was, and regardless of whether illegal activity actually occurred.

b)   Prohibited by law from disclosing the fact that a suspicious transaction report (STR) or related information is being reported to the FIU.

**15.\*** Financial institutions should develop programmes against money laundering and terrorist financing.  These programmes should include:

a)   The development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees.

b)   An ongoing employee training programme.

c)   An audit function to test the system.

**16.\*** The requirements set out in Recommendations 13 to 15, and 21 apply to all designated non-financial businesses and professions, subject to the following qualifications:

a)   Lawyers, notaries, other independent legal professionals and accountants should be required to report suspicious transactions when, on behalf of or for a client, they engage in a financial transaction in relation to the activities described in Recommendation 12(d). Countries are strongly encouraged to extend the reporting requirement to the rest of the professional activities of accountants, including auditing.

b)   Dealers in precious metals and dealers in precious stones should be required to report suspicious transactions when they engage in any cash transaction with a customer equal to or above the applicable designated threshold.

c)   Trust and company service providers should be required to report suspicious transactions for a client when, on behalf of or for a client, they engage in a transaction in relation to the activities referred to Recommendation 12(e).

Lawyers, notaries, other independent legal professionals, and accountants acting as independent legal professionals, are not required to report their suspicions if the relevant information was obtained in circumstances where they are subject to professional secrecy or legal professional privilege.

### *Other measures to deter money laundering and terrorist financing*

**17.**   Countries should ensure that effective, proportionate and dissuasive sanctions, whether criminal, civil or administrative, are available to deal with natural or legal persons covered by these Recommendations that fail to comply with anti-money laundering or terrorist financing requirements.

**18.**   Countries should not approve the establishment or accept the continued operation of shell banks. Financial institutions should refuse to enter into, or continue, a correspondent banking relationship with shell banks. Financial institutions should also guard against establishing relations with respondent foreign financial institutions that permit their accounts to be used by shell banks.

**19.\*** Countries should consider:

    a) Implementing feasible measures to detect or monitor the physical cross-border transportation of currency and bearer negotiable instruments, subject to strict safeguards to ensure proper use of information and without impeding in any way the freedom of capital movements.

    b) The feasibility and utility of a system where banks and other financial institutions and intermediaries would report all domestic and international currency transactions above a fixed amount, to a national central agency with a computerised data base, available to competent authorities for use in money laundering or terrorist financing cases, subject to strict safeguards to ensure proper use of the information.

**20.** Countries should consider applying the FATF Recommendations to businesses and professions, other than designated non-financial businesses and professions, that pose a money laundering or terrorist financing risk.

Countries should further encourage the development of modern and secure techniques of money management that are less vulnerable to money laundering.

*Measures to be taken with respect to countries that do not or insufficiently comply with the FATF Recommendations*

**21.** Financial institutions should give special attention to business relationships and transactions with persons, including companies and financial institutions, from countries which do not or insufficiently apply the FATF Recommendations.  Whenever these transactions have no apparent economic or visible lawful purpose, their background and purpose should, as far as possible, be examined, the findings established in writing, and be available to help competent authorities. Where such a country continues not to apply or insufficiently applies the FATF Recommendations, countries should be able to apply appropriate countermeasures.

**22.** Financial institutions should ensure that the principles applicable to financial institutions, which are mentioned above are also applied to branches and majority owned subsidiaries located abroad, especially in countries which do not or insufficiently apply the FATF Recommendations, to the extent that local applicable laws and regulations permit.  When local applicable laws and regulations prohibit this implementation, competent authorities in the country of the parent institution should be informed by the financial institutions that they cannot apply the FATF Recommendations.

*Regulation and supervision*

**23.\*** Countries should ensure that financial institutions are subject to adequate regulation and supervision and are effectively implementing the FATF Recommendations. Competent authorities should take the necessary legal or regulatory measures to prevent criminals or their associates from holding or being the beneficial owner of a significant or controlling interest or holding a management function in a financial institution.

For financial institutions subject to the Core Principles, the regulatory and supervisory measures that apply for prudential purposes and which are also relevant to money laundering, should apply in a similar manner for anti-money laundering and terrorist financing purposes.

Other financial institutions should be licensed or registered and appropriately regulated, and subject to supervision or oversight for anti-money laundering purposes, having regard to the

risk of money laundering or terrorist financing in that sector. At a minimum, businesses providing a service of money or value transfer, or of money or currency changing should be licensed or registered, and subject to effective systems for monitoring and ensuring compliance with national requirements to combat money laundering and terrorist financing.

24.  Designated non-financial businesses and professions should be subject to regulatory and supervisory measures as set out below.

   a)  Casinos should be subject to a comprehensive regulatory and supervisory regime that ensures that they have effectively implemented the necessary anti-money laundering and terrorist-financing measures. At a minimum:

   •  casinos should be licensed;
   •  competent authorities should take the necessary legal or regulatory measures to prevent criminals or their associates from holding or being the beneficial owner of a significant or controlling interest, holding a management function in, or being an operator of a casino
   •  competent authorities should ensure that casinos are effectively supervised for compliance with requirements to combat money laundering and terrorist financing.

   b)  Countries should ensure that the other categories of designated non-financial businesses and professions are subject to effective systems for monitoring and ensuring their compliance with requirements to combat money laundering and terrorist financing. This should be performed on a risk-sensitive basis. This may be performed by a government authority or by an appropriate self-regulatory organisation, provided that such an organisation can ensure that its members comply with their obligations to combat money laundering and terrorist financing.

25.*  The competent authorities should establish guidelines, and provide feedback which will assist financial institutions and designated non-financial businesses and professions in applying national measures to combat money laundering and terrorist financing, and in particular, in detecting and reporting suspicious transactions.

## C.  INSTITUTIONAL AND OTHER MEASURES NECESSARY IN SYSTEMS FOR COMBATING MONEY LAUNDERING AND TERRORIST FINANCING

### *Competent authorities, their powers and resources*

26.*  Countries should establish a FIU that serves as a national centre for the receiving (and, as permitted, requesting), analysis and dissemination of STR and other information regarding potential money laundering or terrorist financing. The FIU should have access, directly or indirectly, on a timely basis to the financial, administrative and law enforcement information that it requires to properly undertake its functions, including the analysis of STR.

27.*  Countries should ensure that designated law enforcement authorities have responsibility for money laundering and terrorist financing investigations. Countries are encouraged to support and develop, as far as possible, special investigative techniques suitable for the investigation of money laundering, such as controlled delivery, undercover operations and other relevant techniques. Countries are also encouraged to use other effective mechanisms such as the use of permanent or temporary groups specialised in asset investigation, and co-operative investigations with appropriate competent authorities in other countries.

28.   When conducting investigations of money laundering and underlying predicate offences, competent authorities should be able to obtain documents and information for use in those investigations, and in prosecutions and related actions. This should include powers to use compulsory measures for the production of records held by financial institutions and other persons, for the search of persons and premises, and for the seizure and obtaining of evidence.

29.   Supervisors should have adequate powers to monitor and ensure compliance by financial institutions with requirements to combat money laundering and terrorist financing, including the authority to conduct inspections.  They should be authorised to compel production of any information from financial institutions that is relevant to monitoring such compliance, and to impose adequate administrative sanctions for failure to comply with such requirements.

30.   Countries should provide their competent authorities involved in combating money laundering and terrorist financing with adequate financial, human and technical resources.  Countries should have in place processes to ensure that the staff of those authorities are of high integrity.

31.   Countries should ensure that policy makers, the FIU, law enforcement and supervisors have effective mechanisms in place which enable them to co-operate, and where appropriate co-ordinate domestically with each other concerning the development and implementation of policies and activities to combat money laundering and terrorist financing.

32.   Countries should ensure that their competent authorities can review the effectiveness of their systems to combat money laundering and terrorist financing systems by maintaining comprehensive statistics on matters relevant to the effectiveness and efficiency of such systems. This should include statistics on the STR received and disseminated; on money laundering and terrorist financing investigations, prosecutions and convictions; on property frozen, seized and confiscated; and on mutual legal assistance or other international requests for co-operation.

*Transparency of legal persons and arrangements*

33.   Countries should take measures to prevent the unlawful use of legal persons by money launderers. Countries should ensure that there is adequate, accurate and timely information on the beneficial ownership and control of legal persons that can be obtained or accessed in a timely fashion by competent authorities.  In particular, countries that have legal persons that are able to issue bearer shares should take appropriate measures to ensure that they are not misused for money laundering and be able to demonstrate the adequacy of those measures. Countries could consider measures to facilitate access to beneficial ownership and control information to financial institutions undertaking the requirements set out in Recommendation 5.

34.   Countries should take measures to prevent the unlawful use of legal arrangements by money launderers. In particular, countries should ensure that there is adequate, accurate and timely information on express trusts, including information on the settlor, trustee and beneficiaries, that can be obtained or accessed in a timely fashion by competent authorities. Countries could consider measures to facilitate access to beneficial ownership and control information to financial institutions undertaking the requirements set out in Recommendation 5.

## D.   INTERNATIONAL CO-OPERATION

**35.**   Countries should take immediate steps to become party to and implement fully the Vienna Convention, the Palermo Convention, and the 1999 United Nations International Convention for the Suppression of the Financing of Terrorism. Countries are also encouraged to ratify and implement other relevant international conventions, such as the 1990 Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and the 2002 Inter-American Convention against Terrorism.

*Mutual legal assistance and extradition*

**36.**   Countries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to money laundering and terrorist financing investigations, prosecutions, and related proceedings. In particular, countries should:

a)   Not prohibit or place unreasonable or unduly restrictive conditions on the provision of mutual legal assistance.

b)   Ensure that they have clear and efficient processes for the execution of mutual legal assistance requests.

c)   Not refuse to execute a request for mutual legal assistance on the sole ground that the offence is also considered to involve fiscal matters.

d)   Not refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality.

Countries should ensure that the powers of their competent authorities required under Recommendation 28 are also available for use in response to requests for mutual legal assistance, and if consistent with their domestic framework, in response to direct requests from foreign judicial or law enforcement authorities to domestic counterparts.

To avoid conflicts of jurisdiction, consideration should be given to devising and applying mechanisms for determining the best venue for prosecution of defendants in the interests of justice in cases that are subject to prosecution in more than one country.

**37.**   Countries should, to the greatest extent possible, render mutual legal assistance notwithstanding the absence of dual criminality.

Where dual criminality is required for mutual legal assistance or extradition, that requirement should be deemed to be satisfied regardless of whether both countries place the offence within the same category of offence or denominate the offence by the same terminology, provided that both countries criminalise the conduct underlying the offence.

**38.\***   There should be authority to take expeditious action in response to requests by foreign countries to identify, freeze, seize and confiscate property laundered, proceeds from money laundering or predicate offences, instrumentalities used in or intended for use in the commission of these offences, or property of corresponding value. There should also be arrangements for co-ordinating seizure and confiscation proceedings, which may include the sharing of confiscated assets.

**39.**   Countries should recognise money laundering as an extraditable offence. Each country should either extradite its own nationals, or where a country does not do so solely on the grounds of nationality, that country should, at the request of the country seeking extradition, submit the case without undue delay to its competent authorities for the purpose of prosecution of the offences set forth in the request.  Those authorities should take their decision and conduct their

proceedings in the same manner as in the case of any other offence of a serious nature under the domestic law of that country. The countries concerned should cooperate with each other, in particular on procedural and evidentiary aspects, to ensure the efficiency of such prosecutions.

Subject to their legal frameworks, countries may consider simplifying extradition by allowing direct transmission of extradition requests between appropriate ministries, extraditing persons based only on warrants of arrests or judgements, and/or introducing a simplified extradition of consenting persons who waive formal extradition proceedings.

### *Other forms of co-operation*

**40.\*** Countries should ensure that their competent authorities provide the widest possible range of international co-operation to their foreign counterparts. There should be clear and effective gateways to facilitate the prompt and constructive exchange directly between counterparts, either spontaneously or upon request, of information relating to both money laundering and the underlying predicate offences. Exchanges should be permitted without unduly restrictive conditions. In particular:

a)   Competent authorities should not refuse a request for assistance on the sole ground that the request is also considered to involve fiscal matters.

b)   Countries should not invoke laws that require financial institutions to maintain secrecy or confidentiality as a ground for refusing to provide co-operation.

c)   Competent authorities should be able to conduct inquiries; and where possible, investigations; on behalf of foreign counterparts.

Where the ability to obtain information sought by a foreign competent authority is not within the mandate of its counterpart, countries are also encouraged to permit a prompt and constructive exchange of information with non-counterparts. Co-operation with foreign authorities other than counterparts could occur directly or indirectly. When uncertain about the appropriate avenue to follow, competent authorities should first contact their foreign counterparts for assistance.

Countries should establish controls and safeguards to ensure that information exchanged by competent authorities is used only in an authorised manner, consistent with their obligations concerning privacy and data protection.

# GLOSSARY

In these Recommendations the following abbreviations and references are used:

"**Beneficial owner**" refers to the natural person(s) who ultimately owns or controls a customer and/or the person on whose behalf a transaction is being conducted. It also incorporates those persons who exercise ultimate effective control over a legal person or arrangement.

"**Core Principles**" refers to the Core Principles for Effective Banking Supervision issued by the Basel Committee on Banking Supervision, the Objectives and Principles for Securities Regulation issued by the International Organization of Securities Commissions, and the Insurance Supervisory Principles issued by the International Association of Insurance Supervisors.

"**Designated categories of offences**" means:

- participation in an organised criminal group and racketeering;
- terrorism, including terrorist financing;
- trafficking in human beings and migrant smuggling;
- sexual exploitation, including sexual exploitation of children;
- illicit trafficking in narcotic drugs and psychotropic substances;
- illicit arms trafficking;
- illicit trafficking in stolen and other goods;
- corruption and bribery;
- fraud;
- counterfeiting currency;
- counterfeiting and piracy of products;
- environmental crime;
- murder, grievous bodily injury;
- kidnapping, illegal restraint and hostage-taking;
- robbery or theft;
- smuggling;
- extortion;
- forgery;
- piracy; and
- insider trading and market manipulation.

When deciding on the range of offences to be covered as predicate offences under each of the categories listed above, each country may decide, in accordance with its domestic law, how it will define those offences and the nature of any particular elements of those offences that make them serious offences.

"**Designated non-financial businesses and professions**" means:

a)    Casinos (which also includes internet casinos).
b)    Real estate agents.
c)    Dealers in precious metals.
d)    Dealers in precious stones.
e)    Lawyers, notaries, other independent legal professionals and accountants – this refers to sole practitioners, partners or employed professionals within professional firms. It is not meant to refer to 'internal' professionals that are employees of other types of businesses, nor to professionals working for government agencies, who may already be subject to measures that would combat money laundering.

f)   Trust and Company Service Providers refers to all persons or businesses that are not covered elsewhere under these Recommendations, and which as a business, provide any of the following services to third parties:

- acting as a formation agent of legal persons;
- acting as (or arranging for another person to act as) a director or secretary of a company, a partner of a partnership, or a similar position in relation to other legal persons;
- providing a registered office; business address or accommodation, correspondence or administrative address for a company, a partnership or any other legal person or arrangement;
- acting as (or arranging for another person to act as) a trustee of an express trust;
- acting as (or arranging for another person to act as) a nominee shareholder for another person.

"**Designated threshold**" refers to the amount set out in the Interpretative Notes.

"**Financial institutions**" means any person or entity who conducts as a business one or more of the following activities or operations for or on behalf of a customer:

1.   Acceptance of deposits and other repayable funds from the public.[5]

2.   Lending.[6]

3.   Financial leasing.[7]

4.   The transfer of money or value.[8]

5.   Issuing and managing means of payment (e.g. credit and debit cards, cheques, traveller's cheques, money orders and bankers' drafts, electronic money).

6.   Financial guarantees and commitments.

7.   Trading in:

   (a) money market instruments (cheques, bills, CDs, derivatives etc.);

   (b) foreign exchange;

   (c) exchange, interest rate and index instruments;

   (d) transferable securities;

   (e) commodity futures trading.

8.   Participation in securities issues and the provision of financial services related to such issues.

9.   Individual and collective portfolio management.

10.  Safekeeping and administration of cash or liquid securities on behalf of other persons.

11.  Otherwise investing, administering or managing funds or money on behalf of other persons.

12.  Underwriting and placement of life insurance and other investment related insurance[9].

13.  Money and currency changing.

---

[5]  This also captures private banking.

[6]  This includes inter alia: consumer credit; mortgage credit; factoring, with or without recourse; and finance of commercial transactions (including forfaiting).

[7]   This does not extend to financial leasing arrangements in relation to consumer products.

[8]  This applies to financial activity in both the formal or informal sector e.g. alternative remittance activity. See the Interpretative Note to Special Recommendation VI. It does not apply to any natural or legal person that provides financial institutions solely with message or other support systems for transmitting funds. See the Interpretative Note to Special Recommendation VII.

[9]  This applies both to insurance undertakings and to insurance intermediaries (agents and brokers).

When a financial activity is carried out by a person or entity on an occasional or very limited basis (having regard to quantitative and absolute criteria) such that there is little risk of money laundering activity occurring, a country may decide that the application of anti-money laundering measures is not necessary, either fully or partially.

In strictly limited and justified circumstances, and based on a proven low risk of money laundering, a country may decide not to apply some or all of the Forty Recommendations to some of the financial activities stated above.

"**FIU**" means financial intelligence unit.

"**Legal arrangements**" refers to express trusts or other similar legal arrangements.

"**Legal persons**" refers to bodies corporate, foundations, anstalt, partnerships, or associations, or any similar bodies that can establish a permanent customer relationship with a financial institution or otherwise own property.

"**Payable-through accounts**" refers to correspondent accounts that are used directly by third parties to transact business on their own behalf.

"**Politically Exposed Persons**" (PEPs) are individuals who are or have been entrusted with prominent public functions in a foreign country, for example Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, important political party officials. Business relationships with family members or close associates of PEPs involve reputational risks similar to those with PEPs themselves. The definition is not intended to cover middle ranking or more junior individuals in the foregoing categories.

"**Shell bank**" means a bank incorporated in a jurisdiction in which it has no physical presence and which is unaffiliated with a regulated financial group.

"**STR**" refers to suspicious transaction reports.

"**Supervisors**" refers to the designated competent authorities responsible for ensuring compliance by financial institutions with requirements to combat money laundering and terrorist financing.

"**the FATF Recommendations**" refers to these Recommendations and to the FATF Special Recommendations on Terrorist Financing.

**ANNEX**

**INTERPRETATIVE NOTES TO
THE FORTY RECOMMENDATIONS**

# INTERPRETATIVE NOTES

**General**

1.   Reference in this document to "countries" should be taken to apply equally to "territories" or "jurisdictions".

2.   Recommendations 5-16 and 21-22 state that financial institutions or designated non-financial businesses and professions should take certain actions. These references require countries to take measures that will oblige financial institutions or designated non-financial businesses and professions to comply with each Recommendation. The basic obligations under Recommendations 5, 10 and 13 should be set out in law or regulation, while more detailed elements in those Recommendations, as well as obligations under other Recommendations, could be required either by law or regulation or by other enforceable means issued by a competent authority.

3.   Where reference is made to a financial institution being satisfied as to a matter, that institution must be able to justify its assessment to competent authorities.

4.   To comply with Recommendations 12 and 16, countries do not need to issue laws or regulations that relate exclusively to lawyers, notaries, accountants and the other designated non-financial businesses and professions so long as these businesses or professions are included in laws or regulations covering the underlying activities.

5.   The Interpretative Notes that apply to financial institutions are also relevant to designated non-financial businesses and professions, where applicable.

**Recommendations 5, 12 and 16**

The designated thresholds for transactions (under Recommendations 5 and 12) are as follows:

*   Financial institutions (for occasional customers under Recommendation 5) - USD/EUR 15,000.
*   Casinos, including internet casinos (under Recommendation 12) - USD/EUR 3000
*   For dealers in precious metals and dealers in precious stones when engaged in any cash transaction (under Recommendations 12 and 16) - USD/EUR 15,000.

Financial transactions above a designated threshold include situations where the transaction is carried out in a single operation or in several operations that appear to be linked.

**Recommendation 5**

*Customer due diligence and tipping off*

1.   If, during the establishment or course of the customer relationship, or when conducting occasional transactions, a financial institution suspects that transactions relate to money laundering or terrorist financing, then the institution should:

    a)   Normally seek to identify and verify the identity of the customer and the beneficial owner, whether permanent or occasional, and irrespective of any exemption or any designated threshold that might otherwise apply.

b)    Make a STR to the FIU in accordance with Recommendation 13.

2.    Recommendation 14 prohibits financial institutions, their directors, officers and employees from disclosing the fact that an STR or related information is being reported to the FIU.  A risk exists that customers could be unintentionally tipped off when the financial institution is seeking to perform its customer due diligence (CDD) obligations in these circumstances. The customer's awareness of a possible STR or investigation could compromise future efforts to investigate the suspected money laundering or terrorist financing operation.

3.    Therefore, if financial institutions form a suspicion that transactions relate to money laundering or terrorist financing, they should take into account the risk of tipping off when performing the customer due diligence process. If the institution reasonably believes that performing the CDD process will tip-off the customer or potential customer, it may choose not to pursue that process, and should file an STR. Institutions should ensure that their employees are aware of and sensitive to these issues when conducting CDD.

*CDD for legal persons and arrangements*

4.    When performing elements (a) and (b) of the CDD process in relation to legal persons or arrangements, financial institutions should:

a)    Verify that any person purporting to act on behalf of the customer is so authorised, and identify that person.

b)    Identify the customer and verify its identity - the types of measures that would be normally needed to satisfactorily perform this function would require obtaining proof of incorporation or similar evidence of the legal status of the legal person or arrangement, as well as information concerning the customer's name, the names of trustees, legal form, address, directors, and provisions regulating the power to bind the legal person or arrangement.

c)    Identify the beneficial owners, including forming an understanding of the ownership and control structure, and take reasonable measures to verify the identity of such persons. The types of measures that would be normally needed to satisfactorily perform this function would require identifying the natural persons with a controlling interest and identifying the natural persons who comprise the mind and management of the legal person or arrangement. Where the customer or the owner of the controlling interest is a public company that is subject to regulatory disclosure requirements, it is not necessary to seek to identify and verify the identity of any shareholder of that company.

The relevant information or data may be obtained from a public register, from the customer or from other reliable sources.

*Reliance on identification and verification already performed*

5.    The CDD measures set out in Recommendation 5 do not imply that financial institutions have to repeatedly identify and verify the identity of each customer every time that a customer conducts a transaction. An institution is entitled to rely on the identification and verification steps that it has already undertaken unless it has doubts about the veracity of that information. Examples of situations that might lead an institution to have such doubts could be where there is a suspicion of money laundering in relation to that customer, or where there is a material change in the way that the customer's account is operated which is not consistent with the customer's business profile.

*Timing of verification*

6.   Examples of the types of circumstances where it would be permissible for verification to be completed after the establishment of the business relationship, because it would be essential not to interrupt the normal conduct of business include:

- Non face-to-face business.
- Securities transactions. In the securities industry, companies and intermediaries may be required to perform transactions very rapidly, according to the market conditions at the time the customer is contacting them, and the performance of the transaction may be required before verification of identity is completed.
- Life insurance business. In relation to life insurance business, countries may permit the identification and verification of the beneficiary under the policy to take place after having established the business relationship with the policyholder. However, in all such cases, identification and verification should occur at or before the time of payout or the time where the beneficiary intends to exercise vested rights under the policy.

7.   Financial institutions will also need to adopt risk management procedures with respect to the conditions under which a customer may utilise the business relationship prior to verification. These procedures should include a set of measures such as a limitation of the number, types and/or amount of transactions that can be performed and the monitoring of large or complex transactions being carried out outside of expected norms for that type of relationship. Financial institutions should refer to the Basel CDD paper[10] (section 2.2.6.) for specific guidance on examples of risk management measures for non-face to face business.

*Requirement to identify existing customers*

8.   The principles set out in the Basel CDD paper concerning the identification of existing customers should serve as guidance when applying customer due diligence processes to institutions engaged in banking activity, and could apply to other financial institutions where relevant.

*Simplified or reduced CDD measures*

9.   The general rule is that customers must be subject to the full range of CDD measures, including the requirement to identify the beneficial owner. Nevertheless there are circumstances where the risk of money laundering or terrorist financing is lower, where information on the identity of the customer and the beneficial owner of a customer is publicly available, or where adequate checks and controls exist elsewhere in national systems. In such circumstances it could be reasonable for a country to allow its financial institutions to apply simplified or reduced CDD measures when identifying and verifying the identity of the customer and the beneficial owner.

10.   Examples of customers where simplified or reduced CDD measures could apply are:

- Financial institutions – where they are subject to requirements to combat money laundering and terrorist financing consistent with the FATF Recommendations and are supervised for compliance with those controls.

---

[10]   "Basel CDD paper" refers to the guidance paper on Customer Due Diligence for Banks issued by the Basel Committee on Banking Supervision in October 2001.

- Public companies that are subject to regulatory disclosure requirements.
- Government administrations or enterprises.

11.   Simplified or reduced CDD measures could also apply to the beneficial owners of pooled accounts held by designated non financial businesses or professions provided that those businesses or professions are subject to requirements to combat money laundering and terrorist financing consistent with the FATF Recommendations and are subject to effective systems for monitoring and ensuring their compliance with those requirements. Banks should also refer to the Basel CDD paper (section 2.2.4.), which provides specific guidance concerning situations where an account holding institution may rely on a customer that is a professional financial intermediary to perform the customer due diligence on his or its own customers (i.e. the beneficial owners of the bank account). Where relevant, the CDD Paper could also provide guidance in relation to similar accounts held by other types of financial institutions.

12.   Simplified CDD or reduced measures could also be acceptable for various types of products or transactions such as (examples only):

- Life insurance policies where the annual premium is no more than USD/EUR 1000 or a single premium of no more than USD/EUR 2500.
- Insurance policies for pension schemes if there is no surrender clause and the policy cannot be used as collateral.
- A pension, superannuation or similar scheme that provides retirement benefits to employees, where contributions are made by way of deduction from wages and the scheme rules do not permit the assignment of a member's interest under the scheme.

13.   Countries could also decide whether financial institutions could apply these simplified measures only to customers in its own jurisdiction or allow them to do for customers from any other jurisdiction that the original country is satisfied is in compliance with and has effectively implemented the FATF Recommendations.

Simplified CDD measures are not acceptable whenever there is suspicion of money laundering or terrorist financing or specific higher risk scenarios apply.

**Recommendation 6**

Countries are encouraged to extend the requirements of Recommendation 6 to individuals who hold prominent public functions in their own country.

**Recommendation 9**

This Recommendation does not apply to outsourcing or agency relationships.

This Recommendation also does not apply to relationships, accounts or transactions between financial institutions for their clients. Those relationships are addressed by Recommendations 5 and 7.

**Recommendations 10 and 11**

In relation to insurance business, the word "transactions" should be understood to refer to the insurance product itself, the premium payment and the benefits.

**Recommendation 13**

4

1.    The reference to criminal activity in Recommendation 13 refers to:

   a)    all criminal acts that would constitute a predicate offence for money laundering in the jurisdiction; or
   b)    at a minimum to those offences that would constitute a predicate offence as required by Recommendation 1.

Countries are strongly encouraged to adopt alternative (a). All suspicious transactions, including attempted transactions, should be reported regardless of the amount of the transaction.

2.    In implementing Recommendation 13, suspicious transactions should be reported by financial institutions regardless of whether they are also thought to involve tax matters. Countries should take into account that, in order to deter financial institutions from reporting a suspicious transaction, money launderers may seek to state *inter alia* that their transactions relate to tax matters.

**Recommendation 14** (tipping off)

Where lawyers, notaries, other independent legal professionals and accountants acting as independent legal professionals seek to dissuade a client from engaging in illegal activity, this does not amount to tipping off.

**Recommendation 15**

The type and extent of measures to be taken for each of the requirements set out in the Recommendation should be appropriate having regard to the risk of money laundering and terrorist financing and the size of the business.

For financial institutions, compliance management arrangements should include the appointment of a compliance officer at the management level.

**Recommendation 16**

1.    It is for each jurisdiction to determine the matters that would fall under legal professional privilege or professional secrecy. This would normally cover information lawyers, notaries or other independent legal professionals receive from or obtain through one of their clients: (a) in the course of ascertaining the legal position of their client, or (b) in performing their task of defending or representing that client in, or concerning judicial, administrative, arbitration or mediation proceedings. Where accountants are subject to the same obligations of secrecy or privilege, then they are also not required to report suspicious transactions.

2.    Countries may allow lawyers, notaries, other independent legal professionals and accountants to send their STR to their appropriate self-regulatory organisations, provided that there are appropriate forms of co-operation between these organisations and the FIU.

**Recommendation 19**

1. To facilitate detection and monitoring of cash transactions, without impeding in any way the freedom of capital movements, countries could consider the feasibility of subjecting all cross-border transfers, above a given threshold, to verification, administrative monitoring, declaration or record keeping requirements.

2. If a country discovers an unusual international shipment of currency, monetary instruments, precious metals, or gems, etc., it should consider notifying, as appropriate, the Customs Service or other competent authorities of the countries from which the shipment originated and/or to which it is destined, and should co-operate with a view toward establishing the source, destination, and purpose of such shipment and toward the taking of appropriate action.

**Recommendation 23**

Recommendation 23 should not be read as to require the introduction of a system of regular review of licensing of controlling interests in financial institutions merely for anti-money laundering purposes, but as to stress the desirability of suitability review for controlling shareholders in financial institutions (banks and non-banks in particular) from a FATF point of view.  Hence, where shareholder suitability (or "fit and proper") tests exist, the attention of supervisors should be drawn to their relevance for anti-money laundering purposes.

**Recommendation 25**

When considering the feedback that should be provided, countries should have regard to the FATF Best Practice Guidelines on Providing Feedback to Reporting Financial Institutions and Other Persons.

**Recommendation 26**

Where a country has created an FIU, it should consider applying for membership in the Egmont Group. Countries should have regard to the Egmont Group Statement of Purpose, and its Principles for Information Exchange Between Financial Intelligence Units for Money Laundering Cases. These documents set out important guidance concerning the role and functions of FIUs, and the mechanisms for exchanging information between FIU.

**Recommendation 27**

Countries should consider taking measures, including legislative ones, at the national level, to allow their competent authorities investigating money laundering cases to postpone or waive the arrest of suspected persons and/or the seizure of the money for the purpose of identifying persons involved in such activities or for evidence gathering.  Without such measures the use of procedures such as controlled deliveries and undercover operations are precluded.

**Recommendation 38**

Countries should consider:

a) Establishing an asset forfeiture fund in its respective country into which all or a portion of confiscated property will be deposited for law enforcement, health, education, or other appropriate purposes.

b)   Taking such measures as may be necessary to enable it to share among or between other countries confiscated property, in particular, when confiscation is directly or indirectly a result of co-ordinated law enforcement actions.

**Recommendation 40**

1.   For the purposes of this Recommendation:

- "Counterparts" refers to authorities that exercise similar responsibilities and functions.

- "Competent authority" refers to all administrative and law enforcement authorities concerned with combating money laundering and terrorist financing, including the FIU and supervisors.

2.   Depending on the type of competent authority involved and the nature and purpose of the co-operation, different channels can be appropriate for the exchange of information. Examples of mechanisms or channels that are used to exchange information include: bilateral or multilateral agreements or arrangements, memoranda of understanding, exchanges on the basis of reciprocity, or through appropriate international or regional organisations. However, this Recommendation is not intended to cover co-operation in relation to mutual legal assistance or extradition.

3.   The reference to indirect exchange of information with foreign authorities other than counterparts covers the situation where the requested information passes from the foreign authority through one or more domestic or foreign authorities before being received by the requesting authority. The competent authority that requests the information should always make it clear for what purpose and on whose behalf the request is made.

4.   FIUs should be able to make inquiries on behalf of foreign counterparts where this could be relevant to an analysis of financial transactions. At a minimum, inquiries should include:

- Searching its own databases, which would include information related to suspicious transaction reports.
- Searching other databases to which it may have direct or indirect access, including law enforcement databases, public databases, administrative databases and commercially available databases.

Where permitted to do so, FIUs should also contact other competent authorities and financial institutions in order to obtain relevant information.